## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ASHINC Corporation, *et al.*,<br><br>          Debtors. | Chapter 11<br><br>Case No. 12-11564 (CSS)<br>(Jointly Administered) |
| BDCM OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., SPECTRUM INVESTMENT PARTNERS, L.P., BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., AS CO-ADMINISTRATIVE AGENT, AND SPECTRUM COMMERCIAL FINANCE LLC, AS CO-ADMINISTRATIVE AGENT,<br><br>          Plaintiffs,<br><br>     v.<br><br>YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P., RONALD BURKLE, JOS OPDEWEEGH, DEREX WALKER, JEFF PELLETIER, IRA TOCHNER, and JOSEPH TOMCZAK,<br><br>          Defendants. | Adv. Proc. No. 14-50971 (CSS)<br><br><br>**DEFENDANTS' ANSWER AND COUNTERCLAIMS**<br><br>**Jury Trial Demanded** |



REDACTED

Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund

I, L.P. (together, "Yucaipa"), and individuals Jos Opdeweegh, Derex Walker, Jeff Pelletier, Ira

Tochner, and Joseph Tomczak (such individuals, the "Individual Defendants," and collectively

with Yucaipa, "Defendants"),[1] by and through their undersigned counsel, answer the Complaint

for (I) Equitable Subordination, (II) Breach of Contract, (III) Breach of the Implied Duty of

Good Faith and Fair Dealing, and (IV) Tortious Interference with Contract, dated November 19,

2014 (the "Complaint"), and filed by BDCM Opportunity Fund II, LP and Black Diamond CLO

2005-1, Ltd. (together, "Black Diamond"), Spectrum Investment Partners, L.P. ("Spectrum"),

Black Diamond Commercial Finance, L.L.C. as Co-Administrative Agent, and Spectrum

Commercial Finance LLC, as Co-Administrative Agent[2] (collectively with Black Diamond and

Spectrum, "Plaintiffs"), and Yucaipa hereby asserts its counterclaim for equitable subordination

against Black Diamond and Spectrum, as follows[3]:

## ANSWER TO COMPLAINT

A.     **Preliminary Statement**

The Complaint chiefly asserts an equitable subordination claim identical to one that

Black Diamond and Spectrum previously asserted more than two years ago, along with several

state law claims all based upon the same operative facts.  Plaintiffs assert only one cause of

---

[1] Defendants Yucaipa American Alliance Fund II, L.P., Yucaipa American Alliance (Parallel) Fund II, L.P., and Ronald Burkle have moved to dismiss the claims against them in their concurrently filed Motion to Dismiss. They therefore do not join in this Answer and Counterclaim.  Instead, if it becomes necessary for any of them to respond further to the Complaint, their response will be made in accordance with Federal Rule of Bankruptcy Procedure 7012(a).

[2] Defendants do not concede that Black Diamond Commercial Finance, LLC or Spectrum Commercial Finance LLC constitutes an appropriate and duly appointed "agent," and reserve all rights to their purported status as plaintiffs in this adversary proceeding.

[3] Pursuant to Delaware Bankruptcy Local Rule 7012-1, the Defendants do not consent to the entry of final orders or judgments by the Court on any claims if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

action against the Individual Defendants—the Fourth Claim for Relief asserting Tortious

Interference with Contract.  Many of the Individual Defendants were not on the Allied Systems

Holdings, Inc. ("Allied") Board of Directors for the entire time covered by the allegations in the

Complaint.  Rather than file a separate answer for each Individual Defendant with potentially

different responses depending on that Individual Defendant's tenure on the Allied Board,

Defendants submit this Answer on behalf of all Defendants.  In so doing, each Individual

Defendant asserts only the admissions that are applicable to the extent that he was on the Allied

Board during the time to which the particular allegation relates.  However, each Individual

Defendant incorporates every denial set forth herein, regardless of when he was a member of the

Allied Board.

      With respect to every allegation and cause of action set forth in the Complaint,

Defendants assert their right to a jury trial.  With respect to every allegation and each cause of

action set forth in the Complaint other than Plaintiffs' claim for equitable subordination,

Defendants (a) assert their right to a jury trial; (b) contest, on independent grounds, venue before

the United States Bankruptcy Court; (c) contest, on independent grounds, the jurisdiction of the

United States Bankruptcy Court; (d) do not consent to the Bankruptcy Court conducting the jury

trial; and (e) do not consent to entry of final orders or judgment by the Bankruptcy Court.

**B.**      **Defendants' Responses to Specific Paragraphs in the Complaint**

      1.      Defendants deny each and every allegation in Paragraph 1 of the Complaint.

      2.      Defendants deny the allegations in Paragraph 2 of the Complaint.

      3.      In response to the allegations in Paragraph 3 of the Complaint, Defendants admit

that: (a) Yucaipa converted its claims in unsecured bonds representing Allied's indebtedness at

the time Allied filed a bankruptcy proceeding in the United States Bankruptcy Court for the

Northern District of Georgia (the "Prior Bankruptcy Case") in 2005 along with certain secured

post-petition equipment financing into approximately 67% of the equity in Allied, as reorganized upon Allied's exit from the Prior Bankruptcy Case in May 2007; and (b) as the new majority shareholder and per the terms of the court-approved plan of reorganization, Yucaipa had the right to, and did, appoint a majority of members to the Allied Board consistent with the obligations set forth in the First Lien Credit Agreement (as defined below) to which Plaintiffs were lenders. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 3 of the Complaint.

4.      In response to the allegations in Paragraph 4 of the Complaint, the terms of the Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit Agreement and Guaranty Agreement, dated May 15, 2007 (the "First Lien Credit Agreement") and the Second Lien Secured Super-Priority Debtor in Possession and Exit Credit Agreement and Guaranty Agreement, dated May 15, 2007 (the "Second Lien Credit Agreement") speak for themselves. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 4 of the Complaint.

5.      In response to the allegations in Paragraph 5 of the Complaint, Defendants admit, upon information and belief, that Allied's financial situation worsened as the U.S. economy headed into the Great Recession and as two of its largest customers (General Motors and Chrysler) went into bankruptcy and sought financial assistance from the United States government, which included the period in or around August 2008, and thereafter, Allied was in material default under the First Lien Credit Agreement, although no lenders ever exercised remedies against Allied as a result thereof until May 2012, despite having the express right to do so. Defendants also admit, upon information and belief, that lenders, including Black Diamond and Spectrum, specifically directed the Administrative Agent (the principal agent administering

the First Lien Credit Agreement, including processing interest payments and other administrative duties) not to do so. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 5 of the Complaint.

6.      Defendants deny the allegations in Paragraph 6 of the Complaint.

7.      In response to the allegations in Paragraph 7 of the Complaint, the First Lien Credit Agreement and the Third Amendment to that agreement (the "Third Amendment") speak for themselves. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 7 of the Complaint.

8.      In response to the allegations in Paragraph 8 of the Complaint, Defendants admit that they did not purchase any debt under the First Lien Credit Agreement (the "First Lien Claims") pursuant to the Third Amendment. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 8 of the Complaint.

9.      In response to the allegations in Paragraph 9 of the Complaint, Defendants admit that in February 2009 Yucaipa pursued a tender offer to acquire a certain amount of First Lien Claims and that the tender offer materials speak for themselves. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 9 of the Complaint.

10.     In response to the allegations in Paragraph 10 of the Complaint, Defendants admit that: (a) Yucaipa's pursuit of a tender offer to acquire a certain amount of First Lien Claims in February 2009 was unsuccessful because, among other reasons, ComVest Investment Partners III, L.P. ("ComVest") had acquired the majority of the First Lien Claims, and ComVest had entered into an exclusivity agreement with the selling lenders prohibiting them from responding to the tender offer; (b) in 2009, Yucaipa negotiated with ComVest, which Defendants are informed and believe held the majority of First Lien Claims and constituted the Requisite Lender

under the First Lien Credit Agreement at that time, in order to acquire ComVest's First Lien Claims; (c) ComVest agreed to sell its First Lien Claims to Yucaipa; and (d) immediately prior to Yucaipa's acquisition of ComVest's First Lien Claims, ComVest as Requisite Lender entered into an amendment to the First Lien Credit Agreement that repealed the Third Amendment's restrictions on the ability of lenders to sell their First Lien Claims to Yucaipa and Yucaipa's ability to hold and vote First Lien Claims (the "Fourth Amendment"). Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 10 of the Complaint.

11.    In response to the allegations in Paragraph 11 of the Complaint, Defendants admit, upon information and belief, that the Fourth Amendment was executed by ComVest and Allied on or about August 21, 2009, immediately prior to Yucaipa's purchase of ComVest's First Lien Claims. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 11 of the Complaint.

12.    Defendants deny the allegations in Paragraph 12 of the Complaint, except that Defendants admit that litigation occurred to which CIT Group/Business Credit, Inc. ("CIT") was party; however, all allegations beyond the fact that this litigation took place are denied.

13.    Defendants deny the allegations in Paragraph 13 of the Complaint.

14.    Defendants deny the allegations in Paragraph 14 of the Complaint.

15.    Defendants deny the allegations in Paragraph 15 of the Complaint.

16.    Defendants deny the allegations in Paragraph 16 of the Complaint.

17.    In response to the allegations in Paragraph 17 of the Complaint, Defendants admit, upon information and belief, that Jack Cooper Transportation, Inc. ("JCT") purchased a portion of Allied's assets for approximately $135 million. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 17 of the Complaint.

18.    Defendants deny the allegations in Paragraph 18 of the Complaint.

19.    Defendants deny the allegations in Paragraph 19 of the Complaint.

20.    The allegations in Paragraph 20 of the Complaint merely summarize the claims asserted and, therefore, no response is necessary.  To the extent a response is required, Defendants deny the allegations in Paragraph 20 of the Complaint.

21.    The allegations in Paragraph 21 of the Complaint set forth legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 21 of the Complaint.

22.    The allegations in Paragraph 22 of the Complaint set forth legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 22 of the Complaint, and specifically deny the assertion of jurisdiction under 28 U.S.C. § 1334(b).

23.    The allegations in Paragraph 23 of the Complaint set forth legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 23 of the Complaint.

24.    The allegations in Paragraph 24 of the Complaint set forth legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 24 of the Complaint.

25.    The allegations in Paragraph 25 of the Complaint set forth legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 25 of the Complaint.

26.    Defendants admit, upon information and belief, the allegations in Paragraph 26 of the Complaint.

27.     Defendants admit, upon information and belief, the allegations in Paragraph 27 of the Complaint.

28.     Defendants admit, upon information and belief, the allegations in Paragraph 28 of the Complaint.

29.     In response to the allegations in Paragraph 29 of the Complaint, Defendants have challenged Black Diamond and Spectrum's status as Requisite Lender, and therefore deny that Black Diamond Commercial Finance, L.L.C. is Co-Administrative Agent under the First Lien Credit Agreement.  Except as expressly answered above, Defendants admit, upon information and belief, the remaining allegations in Paragraph 29 of the Complaint.

30.     In response to the allegations in Paragraph 30 of the Complaint, Defendants have challenged Black Diamond and Spectrum's status as Requisite Lender, and therefore deny that Spectrum Commercial Finance, LLC is Co-Administrative Agent under the First Lien Credit Agreement.  Except as expressly answered above, Defendants admit, upon information and belief, the allegations in Paragraph 30 of the Complaint.

31.     Defendants admit the allegations in Paragraph 31 of the Complaint.

32.     In response to the allegations in Paragraph 32 of the Complaint, Defendants admit, upon information and belief, that Mr. Burkle was the managing member of the general partner of Yucaipa during the relevant time period.  Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 32 of the Complaint.

33.     In response to the allegations in Paragraph 33 of the Complaint, Defendants admit, upon information and belief, that Mr. Opdeweegh was a director of Allied from approximately May 29, 2007 to October 9, 2009, and affiliated with Yucaipa while serving in

that capacity. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 33 of the Complaint.

34.     In response to the allegations in Paragraph 34 of the Complaint, Defendants admit, upon information and belief, that Mr. Walker was a director of Allied from approximately May 29, 2007 to December 27, 2013, and affiliated with Yucaipa while serving in that capacity. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 34 of the Complaint.

35.     In response to the allegations in Paragraph 35 of the Complaint, Defendants admit, upon information and belief, that Mr. Pelletier was a director of Allied from approximately October 29, 2009 to December 27, 2013, and affiliated with Yucaipa while serving in that capacity. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 35 of the Complaint.

36.     In response to the allegations in Paragraph 36 of the Complaint, Defendants admit, upon information and belief, that Mr. Tochner was a director of Allied from approximately May 29, 2007 to January 31, 2008, and again from approximately April 3, 2009 to December 27, 2013, and was affiliated with Yucaipa while serving in that capacity. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 36 of the Complaint.

37.     In response to the allegations in Paragraph 37 of the Complaint, Defendants admit, upon information and belief, that Mr. Tomczak was a director and the interim Chief Financial Officer of Allied from approximately June 27, 2008 to April 3, 2009, and affiliated with Yucaipa while serving in those capacities. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 37 of the Complaint.

38.    Defendants admit, upon information and belief, the allegations in Paragraph 38 of the Complaint.

39.    In response to the allegations in Paragraph 39 of the Complaint, Defendants respectfully refer to the docket in the Prior Bankruptcy Case, which speaks for itself.  Defendants admit that, in or about May 2006, Yucaipa purchased claims amounting to approximately $99 million of the $150 million in unsecured bonds representing Allied's total indebtedness at the time Allied filed the Prior Bankruptcy Case in 2005.  Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 39 of the Complaint.

40.    In response to the allegations in Paragraph 40 of the Complaint, Defendants admit that:

(a) Yucaipa converted its claims in bonds representing Allied's indebtedness at the time Allied filed the Prior Bankruptcy Case in 2005 (along with certain secured post-petition equipment financing) into approximately 67% of the equity in Allied, as reorganized upon Allied's exit from the Prior Bankruptcy Case in May 2007; and (b) that as the new majority shareholder and per the terms of the court-approved plan of reorganization, Yucaipa had the right to, and did, appoint a majority of members to Allied's Board of Directors consistent with the obligations in the First Lien Credit Agreement under which Plaintiffs were lenders.  Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 40 of the Complaint.

41.    In response to the allegations in Paragraph 41 of the Complaint, the First Lien Credit Agreement and the Second Lien Credit Agreement speak for themselves.  Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 41 of the Complaint.

42.    In response to the allegations in Paragraph 42 of the Complaint, the First Lien Credit Agreement speaks for itself. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 42 of the Complaint.

43.    In response to the allegations in Paragraph 43 of the Complaint, the First Lien Credit Agreement speaks for itself. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 43 of the Complaint.

44.    In response to the allegations in Paragraph 44 of the Complaint, the Second Lien Credit Agreement speaks for itself. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 44 of the Complaint.

45.    In response to the allegations in Paragraph 45 of the Complaint, the Second Lien Credit Agreement speaks for itself. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 45 of the Complaint.

46.    In response to the allegations in Paragraph 46 of the Complaint, Defendants admit, upon information and belief, that Allied was in material default under the First Lien Credit Agreement as of approximately August 2008, although no lenders ever exercised remedies against Allied as a result thereof, despite having the express right to do so, until May 2012. Defendants also admit, upon information and belief, that lenders, including Black Diamond and Spectrum, specifically directed the Administrative Agent not to do so. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 46 of the Complaint.

47.    In response to the allegations in Paragraph 47 of the Complaint, the First Lien Credit Agreement and the Second Lien Credit Agreement speak for themselves. Except as

expressly answered above, Defendants deny the remaining allegations in Paragraph 47 of the Complaint.

48.     In response to the allegations in Paragraph 48 of the Complaint, the First Lien Credit Agreement speaks for itself.  Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 48 of the Complaint.

49.     In response to the allegations in Paragraph 49 of the Complaint, the First Lien Credit Agreement speaks for itself.  Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 49 of the Complaint.

50.     In response to the allegations in Paragraph 50 of the Complaint, the First Lien Credit Agreement speaks for itself.  Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 50 of the Complaint.

51.     In response to the allegations in Paragraph 51 of the Complaint, the Third Amendment and the Fourth Amendment speak for themselves.  Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 51 of the Complaint.

52.     Defendants deny the allegations in Paragraph 52 of the Complaint.

53.     Defendants deny the allegations in Paragraph 53 of the Complaint.

54.     In response to the allegations in Paragraph 54 of the Complaint, the Third Amendment speaks for itself.  Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 54 of the Complaint.

55.     In response to the allegations in Paragraph 55 of the Complaint, the Third Amendment speaks for itself.  Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 55 of the Complaint.

56.     In response to the allegations in Paragraph 56 of the Complaint, Defendants admit that they never intended to acquire First Lien Claims subject to the restrictions contained in the Third Amendment.  Further, Yucaipa's filings in the present bankruptcy proceedings speak for themselves.  Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 56 of the Complaint.

57.     Defendants deny the allegations in Paragraph 57 of the Complaint.

58.     In response to the allegations in the second, third, and fourth sentences of Paragraph 58 of the Complaint, the documents from which Plaintiffs purportedly quote speak for themselves, and should be read in their entirety and in context.  Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 58 of the Complaint.

59.     In response to the allegations in the first and third sentences of Paragraph 59 of the Complaint, the documents from which Plaintiffs purportedly quote speak for themselves, and should be read in their entirety and in context.  Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 59 of the Complaint.

60.     In response to the allegations in Paragraph 60 of the Complaint, the February 2, 2009 email referenced therein speaks for itself, and should be read in context and in its entirety. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 60 of the Complaint.

61.     In response to the allegations in Paragraph 61 of the Complaint, the February 3, 2009 email referenced therein speaks for itself, and should be read in context and in its entirety. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 61 of the Complaint.

62.    In response to the allegations in Paragraph 62 of the Complaint, Defendants admit

that in February 2009 Yucaipa pursued a tender offer to acquire a certain amount of First Lien

Claims and that the tender offer materials speak for themselves.  Except as expressly answered

above, Defendants deny the remaining allegations in Paragraph 62 of the Complaint.

63.    In response to the allegations in Paragraph 63 of the Complaint, Defendants admit

that Yucaipa's pursuit of a tender offer to acquire a certain amount of First Lien Claims in

February 2009 was unsuccessful because ComVest acquired the majority of the First Lien

Claims and had entered into an exclusivity agreement with the selling lenders prohibiting them

from responding to the tender offer.  Except as expressly answered above, Defendants deny the

remaining allegations in Paragraph 63 of the Complaint.

64.    Defendants deny the allegations in Paragraph 64 of the Complaint.

65.    Defendants deny the allegations in Paragraph 65 of the Complaint.

66.    In response to the allegations in Paragraph 66 of the Complaint, the minutes of the

August 3, 2009 Allied Board meeting speak for themselves, and should be read in context and in

their entirety.  Except as expressly answered above, Defendants deny the remaining allegations

in Paragraph 66 of the Complaint.

67.    In response to the allegations in Paragraph 67 of the Complaint, the minutes of the

August 3, 2009 Allied Board meeting speak for themselves, and should be read in context and in

their entirety.  Except as expressly answered above, Defendants deny the remaining allegations

in Paragraph 67 of the Complaint.

68.    In response to the allegations in the first, second, and third sentences in Paragraph

68 of the Complaint, the minutes of the August 3, 2009 Allied Board meeting speak for

themselves, and should be read in context and in their entirety. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 68 of the Complaint.

69.    In response to the allegations in the last half of the single sentence constituting Paragraph 69 of the Complaint (beginning at "Defendant Walker . . ."), the minutes of the August 3, 2009 Allied Board meeting speak for themselves, and should be read in context and in their entirety. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 69 of the Complaint.

70.    In response to the allegations in Paragraph 70 of the Complaint, Defendants admit that in 2009, Yucaipa, Individual Defendants Walker and Tochner, and non-party Stephanie Bond engaged in discussions with ComVest, with the assistance of Jonathan Ornstein. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 70 of the Complaint.

71.    In response to the allegations in Paragraph 71 of the Complaint, Defendants admit that:

(a) in 2009 Yucaipa engaged in negotiations with ComVest; (b) Mr. Ornstein assisted in these negotiations; and (c) on or about August 3, 2009 a proposal was made to acquire the First Lien Claims held by ComVest. Further, the email referenced in Paragraph 71 of the Complaint speaks for itself, and should be read in context and in its entirety. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 71 of the Complaint.

72.    In response to the allegations in Paragraph 72 of the Complaint, Defendants admit that on or about August 3, 2009, an agreement in principle was reached to acquire the First Lien

Claims held by ComVest, the terms of which speak for themselves. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 72 of the Complaint.

73.    In response to the allegations in Paragraph 73 of the Complaint, Defendants admit that on or about August 3, 2009, an agreement in principle was reached to acquire the First Lien Claims held by ComVest, the terms of which speak for themselves. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 73 of the Complaint.

74.    In response to the allegations in Paragraph 74 of the Complaint, Defendants admit that:

(a) immediately prior to Yucaipa's acquisition of ComVest's First Lien Claims, ComVest entered into the Fourth Amendment; and (b) upon information and belief, the Fourth Amendment was executed by ComVest and Allied on or about August 21, 2009 immediately prior to Yucaipa's purchase of ComVest's First Lien Claims. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 74 of the Complaint.

75.    In response to the allegations in Paragraph 75 of the Complaint, the Fourth Amendment speaks for itself. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 75 of the Complaint.

76.    In response to the allegations in Paragraph 76 of the Complaint, the Loan Purchase Agreement and the Assignment and Assumption Agreement speak for themselves, and should be read in context and in their entirety. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 76 of the Complaint.

77.    In response to the allegations in Paragraph 77 of the Complaint, Defendants believe that Yucaipa was properly considered the Requisite Lender under the First Lien Credit

Agreement. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 77 of the Complaint.

78.     Defendants deny the allegations in Paragraph 78 of the Complaint.

79.     In response to the allegations in Paragraph 79 of the Complaint, Defendants admit, upon information and belief, that starting in August 2008 and thereafter, Allied was in material default under the First Lien Credit Agreement, although no lenders ever exercised remedies against Allied as a result thereof despite having the express right to do so (including the obvious right to bring an action or at least threaten to bring an action in state court to compel the exercise of remedies by the Requisite Lender), until May 2012. Defendants also admit, upon information and belief, that lenders, including Black Diamond and Spectrum, specifically directed the Administrative Agent not to do so. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 79 of the Complaint.

80.     Defendants deny the allegations in Paragraph 80 of the Complaint.

81.     In response to the allegations in Paragraph 81 of the Complaint, Defendants admit that Yucaipa's status as Requisite Lender was in dispute in other proceedings. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 81 of the Complaint.

82.     In response to the allegations in Paragraph 82 of the Complaint, Defendants admit that Yucaipa's status as Requisite Lender was in dispute, and that, upon information and belief, CIT, as Administrative Agent under the First Lien Credit Agreement, initially worked with Yucaipa in its capacity as Requisite Lender (including entering its First Lien Claims in the loan register in compliance with its duties as agent) but ceased doing so after receiving a threatening and secret letter from Black Diamond and Spectrum, which, according to CIT, sowed confusion.

Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 82 of the Complaint.

83.     In response to the allegations in Paragraph 83 of the Complaint, Defendants admit that, on November 21, 2009, Yucaipa and Allied filed suit in Georgia seeking a declaration that the Fourth Amendment was valid and enforceable and that Yucaipa is the Requisite Lender (the "Georgia Action"). The pleadings filed in the Georgia Action speak for themselves. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 83 of the Complaint.

84.     In response to the allegations in the last half of the first sentence (beginning at "CIT entered into . . .") and the second sentence of Paragraph 84 of the Complaint, the settlement agreement reached in the Georgia Action speaks for itself, and should be read in its entirety and in context. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 84 of the Complaint.

85.     In response to the allegations in Paragraph 85 of the Complaint, the proceedings in *BDCM Opportunity Fund II, LP v. Yucaipa American Alliance Fund I, LP*, Index No. 650150/2012 (the "New York Action") speak for themselves. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 85 of the Complaint.

86.     In response to the allegations in Paragraph 86 of the Complaint, the May 30, 2012 proceedings in the New York Action speak for themselves. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 86 of the Complaint.

87.     In response to the allegations in Paragraph 87 of the Complaint, the November 19, 2012 proceedings in the New York Action speak for themselves. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 87 of the Complaint.

88.     In response to the allegations in Paragraph 88 of the Complaint, the March 8,

2013 decision in the New York Action speaks for itself.  Except as expressly answered above,

Defendants deny the remaining allegations in Paragraph 88 of the Complaint.

89.     In response to the allegations in Paragraph 89 of the Complaint, the December 17,

2013 appellate decision in *BDCM Opportunity Fund II, LP v. Yucaipa American Alliance Fund*

*I, LP*, 978 N.Y.S.2d 10 (N.Y. App. Div. 2013), speaks for itself and reversed the trial court's

decision in the New York Action with respect to Black Diamond based on its conduct, which

raised a triable issue of fact as to whether Black Diamond waived its right to challenge the

validity of the Fourth Amendment and Yucaipa's status as Requisite Lender.  Except as

expressly answered above, Defendants deny the remaining allegations in Paragraph 89 of the

Complaint.

90.     In response to the allegations in Paragraph 90 of the Complaint, the New York

Court of Appeals' denial of a motion for leave to appeal related to the December 17, 2013

appellate decision in *BDCM Opportunity Fund II, LP v. Yucaipa American Alliance Fund I, L.P.*,

978 N.Y.S.2d 10 (N.Y. App. Div. 2013), speaks for itself.  Except as expressly answered above,

Defendants deny the remaining allegations in Paragraph 90 of the Complaint.

91.     In response to the allegations in Paragraph 91 of the Complaint, Defendants deny,

upon information and belief, that JCT had "long sought" to acquire Allied's assets.  Defendants

admit that JCT sought to acquire Allied's assets as early as mid-2011.  Except as expressly

answered above, Defendants admit the remaining allegations in Paragraph 91 of the Complaint.

92.     In response to the allegations in Paragraph 92 of the Complaint, the relevant

September 2013 transcript of the bankruptcy auction proceedings related to Main Bankruptcy

Case No. 12-11564 (the "Credit Bid Proceedings") speaks for itself. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 92 of the Complaint.

93.    In response to the first sentence in Paragraph 93 of the Complaint, the Credit Bid Proceedings speak for themselves. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 93 of the Complaint.

94.    Defendants deny the allegations in Paragraph 94 of the Complaint.

95.    Defendants deny the allegations in Paragraph 95 of the Complaint.

96.    In response to the third, fourth, and fifth sentences in Paragraph 96 of the Complaint, JCT's term sheet of December 19, 2011 speaks for itself. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 96 of the Complaint.

97.    In response to the allegations in Paragraph 97 of the Complaint, Defendants admit that Yucaipa insisted that either:

(a) JCT obtain, in independent negotiations with the other lenders under the First Lien Credit Agreement, including Black Diamond and Spectrum, those lenders' unanimous consent to any transaction involving the sale of Yucaipa's First Lien Claims to JCT, Allied's voluntary bankruptcy, and JCT's acquisition of Allied's assets through subsequent credit bid proceedings; or

(b) in the alternative, JCT purchase, after independent negotiations with the other lenders under the First Lien Credit Agreement, including Black Diamond and Spectrum, those lenders' First Lien Claims at par (i.e., the claims' face value) plus accrued and unpaid interest.

Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 97 of the Complaint.

98.     In response to the first sentence in Paragraph 98 of the Complaint, Black Diamond and Spectrum's demand letters of February and March 2012 speak for themselves. Except as expressly answered above, Defendants deny every allegation in Paragraph 98 of the Complaint.

99.     The allegations in the first, second, fourth, and fifth sentences of Paragraph 99 of the Complaint set forth legal conclusions to which no response is required. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 99 of the Complaint.

100.     Defendants deny the allegations in Paragraph 100 of the Complaint, except that Allied incurred some amount of post-petition financing and that non-Yucaipa lenders incurred some amount of legal fees, which have since been reimbursed without justification and in violation of the orders of the Bankruptcy Court by the Co-Administrative Agents controlled by Black Diamond and Spectrum, all in amounts to be determined at trial.

101.     The allegations in Paragraph 101 of the Complaint set forth legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 101 of the Complaint.

102.     Defendants deny the allegations in Paragraph 102 of the Complaint.

103.     In response to the allegations in Paragraph 103 of the Complaint, the filings in these bankruptcy proceedings speak for themselves. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 103 of the Complaint.

104.     In response to the allegations in Paragraph 104 of the Complaint, the July 9, 2013 summary judgment motion filed in these bankruptcy proceedings speaks for itself. Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 104 of the Complaint.

105.    In response to the allegations in Paragraph 105 of the Complaint, the Court's August 8, 2013 decision in these bankruptcy proceedings speaks for itself.  Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 105 of the Complaint.

106.    In response to the allegations in Paragraph 106 of the Complaint, the Credit Bid Proceedings speak for themselves.  Except as expressly answered above, Defendants deny the remaining allegations in Paragraph 106 of the Complaint.

### First Claim for Relief

### Equitable Subordination Pursuant to 11 U.S.C. § 510(c) against Yucaipa for Harm to All First Lien and Second Lien Lenders

107.    In response to Paragraph 107 of the Complaint, Yucaipa repeats and incorporates by reference Defendants' responses to Paragraphs 1 through 106 of the Complaint.

108.    Yucaipa denies the allegations in Paragraph 108 of the Complaint.

109.    Yucaipa denies the allegations in Paragraph 109 of the Complaint.

110.    Yucaipa denies the allegations in Paragraph 110 of the Complaint.

111.    Yucaipa denies the allegations in Paragraph 111 of the Complaint.

112.    Yucaipa denies the allegations in Paragraph 112 of the Complaint.

### Second Claim for Relief

### Breach of Contract Against Yucaipa

113.    In response to Paragraph 113 of the Complaint, Yucaipa repeats and incorporates by reference Defendants' responses to Paragraphs 1 through 112 of the Complaint.

114.    The allegations in Paragraph 114 of the Complaint set forth legal conclusions to which no response is required.  To the extent a response is necessary, Yucaipa denies the allegations in Paragraph 114 of the Complaint.

115.    In response to the allegations in Paragraph 115 of the Complaint, the proceedings in the New York Action speak for themselves.  Except as expressly answered above, Yucaipa denies the remaining allegations in Paragraph 115 of the Complaint.

116.    The allegations in Paragraph 116 of the Complaint set forth legal conclusions to which no response is required.  To the extent a response is required, Yucaipa denies the allegations in Paragraph 116 of the Complaint.

117.    Yucaipa denies the allegations in Paragraph 117 of the Complaint.

118.    Yucaipa denies the allegations in Paragraph 118 of the Complaint.

119.    Yucaipa denies the allegations in Paragraph 119 of the Complaint.

120.    Yucaipa denies the allegations in Paragraph 120 of the Complaint.

121.    Yucaipa denies the allegations in Paragraph 121 of the Complaint.

122.    Yucaipa denies the allegations in Paragraph 122 of the Complaint.

123.    Yucaipa denies the allegations in Paragraph 123 of the Complaint.

124.    Yucaipa denies the allegations in Paragraph 124 of the Complaint.

125.    Yucaipa denies the allegations in Paragraph 125 of the Complaint.

126.    Yucaipa denies the allegations in Paragraph 126 of the Complaint.

### Third Claim for Relief

### Breach of Duty of Good Faith and Fair Dealing Against Yucaipa

127.    In response to Paragraph 127 of the Complaint, Yucaipa repeats and incorporates by reference Defendants' responses to Paragraphs 1 through 126 of the Complaint.

128.    The allegations in Paragraph 128 of the Complaint set forth legal conclusions to which no response is required.  To the extent a response is required, Yucaipa denies the allegations in Paragraph 128 of the Complaint.

129.    Yucaipa denies the allegations in Paragraph 129 of the Complaint.

130.    Yucaipa denies the allegations in Paragraph 130 of the Complaint.

131.    Yucaipa denies the allegations in Paragraph 131 of the Complaint.

### Fourth Claim for Relief

### Tortious Interference with Contract Against the Yucaipa Directors and Burkle

132.    The Individual Defendants repeat and incorporate by reference Defendants' responses to Paragraphs 1 through 131 of the Complaint.

133.    The allegations in Paragraph 133 of the Complaint set forth legal conclusions to which no response is required.  To the extent a response is required, the Individual Defendants deny the allegations in Paragraph 133 of the Complaint.

134.    In response to the allegations in Paragraph 134 of the Complaint, the Individual Defendants admit that they and, upon information and belief, Mr. Burkle were aware of the First Lien Credit Agreement.  Except as expressly answered above, the Individual Defendants deny the remaining allegations in Paragraph 134 of the Complaint.

135.    The Individual Defendants deny the allegations in Paragraph 135 of the Complaint.

136.    The Individual Defendants deny the allegations in Paragraph 136 of the Complaint.

137.    The Individual Defendants deny the allegations in Paragraph 137 of the Complaint.

138.    The Individual Defendants deny the allegations in Paragraph 138 of the Complaint.

139.    The Individual Defendants deny the allegations in Paragraph 139 of the Complaint.

140.    The Individual Defendants deny the allegations in Paragraph 140 of the Complaint.

141.    The Individual Defendants deny the allegations in Paragraph 141 of the Complaint.

## AFFIRMATIVE DEFENSES

Yucaipa and the Individual Defendants, by and through their undersigned counsel, hereby assert the following affirmative defenses to the claims for relief alleged against them by Plaintiffs in the Complaint, as follows:

### First Affirmative Defense as to All Claims for Relief

### (Failure to State a Claim)

142.    Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 141 of the Complaint.

143.    The Complaint fails to state facts sufficient to constitute a claim for relief against Defendants, and each of them.

144.    The Complaint fails to state facts sufficient to establish subject matter jurisdiction over the alleged state law claims.

### Second Affirmative Defense as to All Claims for Relief

### (Justification)

145.    Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 141 of the Complaint.

146.    Plaintiffs' Claims for Relief are barred because Defendants' conduct was justified, proper, authorized, and/or a lawful exercise of their contractual rights and duties.

### Third Affirmative Defense as to All Claims for Relief

### (Estoppel)

147.    Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 141 of the Complaint.

148.    Plaintiffs are estopped from pursuing their Claims for Relief by the actions and conduct of Allied, Black Diamond, Spectrum, and other lenders.

### Fourth Affirmative Defense as to All Claims for Relief

### (Waiver)

149.    Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 141 of the Complaint.

150.    Plaintiffs are barred by the doctrine of waiver from pursuing their Claims for Relief by the actions and conduct of Allied, Black Diamond, Spectrum, and other lenders.

### Fifth Affirmative Defense as to All Claims for Relief

### (Ratification)

151.    Defendants repeat and incorporate their responses to Paragraphs 1 through 141 of the Complaint.

152.    Plaintiffs are barred in whole or in part by the doctrine of ratification because Plaintiffs were aware of the actions, decisions, and strategies of which they complain and expressly concurred in and affirmed those actions, decisions, and strategies.

153.    Plaintiffs' claims are barred, in whole or in part, because Plaintiffs acknowledged, ratified, consented to and acquiesced in the alleged acts or omissions, if any, of Defendants.

154.    Defendants allege, without admitting any liability whatsoever, that Plaintiffs' claims are barred to the extent that they ratified the transactions at issue.

## Sixth Affirmative Defense as to All Claims for Relief

### (Unclean Hands and *In Pari Delicto*)

155.    Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 141 of the Complaint.

156.    Plaintiffs are barred by the doctrines of unclean hands and *in pari delicto* from pursuing their Claims for Relief by the actions and conduct of Allied, Black Diamond, Spectrum, and other lenders.

## Seventh Affirmative Defense as to All Claims for Relief

### (Unjust Enrichment)

157.    Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 141 of the Complaint.

158.    Plaintiffs are barred by the doctrine of unjust enrichment from pursuing their Claims for Relief by the actions and conduct of Allied, Black Diamond, Spectrum, and other lenders.

## Eighth Affirmative Defense as to All Claims for Relief

### (Consent)

159.    Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 141 of the Complaint.

160.    Plaintiffs are bound by the actions and conduct of Allied, Black Diamond, Spectrum, and other lenders that expressly and/or impliedly constituted consent to each and every act complained of in the Complaint and, accordingly, they are barred by the doctrine of consent from pursuing their Claims for Relief.

**Ninth Affirmative Defense as to the Second, Third, and Fourth Claims for Relief**

**(Statute of Limitations)**

161.    Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 141 of the Complaint.

162.    To the extent that Delaware law supplies the applicable statute of limitations for contract-based claims, including claims based on implied terms of or duties related to contracts, many of the allegations in Plaintiffs' Second and Third Claims for Relief are barred.

163.    To the extent that Delaware law supplies the applicable statute of limitations for tortious-interference-with-contract claims, many of the allegations in Plaintiffs' Fourth Claim for Relief are barred.

**Tenth Affirmative Defense as to the Second and Third Claims for Relief**

**(Contractual Prohibition)**

164.    Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 141 of the Complaint.

165.    Plaintiffs' Second and Third Claims are barred to the extent they seek specific performance of the Third Amendment, which by its provisions bars Plaintiffs from seeking specific performance of its terms.

**Eleventh Affirmative Defense as to the First Claim for Relief**

**(Laches)**

166.    Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 141 of the Complaint.

167.    Plaintiffs are bound by the actions and conduct of Allied, Black Diamond, Spectrum, and other lenders that were aware since at least August 2009 that Yucaipa was relying

on the validity of the Fourth Amendment to the First Lien Credit Agreement and the transactions contemplated thereby, yet failed to take action in a timely manner to assert the claims Plaintiffs now seek to assert. Accordingly, Plaintiffs' First Claim for Relief is barred by the doctrine of laches.

### Twelfth Affirmative Defense as to the Second, Third, and Fourth Claims for Relief
### (Failure to Mitigate)

168.    Defendants repeat and incorporate by reference their responses to Paragraphs 1 through 141 of the Complaint.

169.    Plaintiffs are bound by the actions and conduct of Allied, Black Diamond, Spectrum, and other lenders. Thus, if Plaintiffs suffered any damages or losses, which Defendants deny, then Plaintiffs failed to take reasonable and necessary steps in order to mitigate, lessen, reduce, and minimize those damages and losses.

### Thirteenth Affirmative Defense as to the Fourth Claim for Relief
### (Good Faith)

170.    The Individual Defendants repeat and incorporate by reference Defendants' responses to Paragraphs 1 through 141 of the Complaint.

171.    At all times alleged in the Complaint, the Individual Defendants acted in their capacities as Allied Board Members on an informed basis, in good faith, and in the honest belief that their actions were in the best interest of Allied.

### Fourteenth Affirmative Defense as to the Fourth Claim for Relief
### (Exculpation—Delaware Law)

172.    The Individual Defendants repeat and incorporate by reference Defendants' responses to Paragraphs 1 through 141 of the Complaint.

173.    At all times alleged in the Complaint and in the course of performing their duties as directors of Allied, the Individual Defendants relied in good faith on the records of Allied and on such information, opinions, reports, or statements presented by Allied's officers or employees, committees of the Board, and other persons as to matters the Individual Defendants reasonably believed were within such other persons' professional or expert competence and who were selected with reasonable care by or on behalf of Allied.  Accordingly, the Individual Defendants are protected by the provisions of Delaware Code Annotated, title 8, section 141(e).

### Fifteenth Affirmative Defense as to the Fourth Claim for Relief

### (Business Judgment Rule)

174.    The Individual Defendants repeat and incorporate by reference Defendants' responses to Paragraphs 1 through 141 of the Complaint.

175.    At all times alleged in the Complaint and in the course of performing their duties as directors of Allied, the Individual Defendants relied in good faith on the records of Allied and on such information, opinions, reports or statements presented by Allied's officers or employees, committees of the Board, and other persons as to matters the Individual Defendants reasonably believed were within such other persons' professional or expert competence and who were selected with reasonable care by or on behalf of Allied.  Accordingly, the Individual Defendants are protected by the business judgment rule.

### Reservation of Right to Assert Additional Defenses

176.    Defendants expressly reserve their rights to amend, modify, or supplement their Answer to the Complaint and to allege additional affirmative defenses and claims for relief as may be warranted based on further investigation and discovery in this matter.

## PRAYER

WHEREFORE, Defendants pray for judgment as follows:

1.      That Plaintiffs take nothing by reason of their Complaint;

2.      That judgment is rendered in favor of Defendants;

3.      That Defendants are awarded their costs of suit; and

4.      For such other and further relief as this Court may deem just and proper.

\*                        \*                        \*

## YUCAIPA'S COUNTERCLAIM FOR EQUITABLE SUBORDINATION

Yucaipa hereby brings this counterclaim seeking a declaration under 11 U.S.C. § 510(c) that, for purposes of distribution, the claims held by Black Diamond and Spectrum (together, "Counter-Defendants"), including any claims held pursuant to the First Lien Credit Agreement, are subordinate to the claims of Yucaipa and other holders of claims under the First Lien Credit Agreement that did not participate in or support Counter-Defendants' wrongful acts as set forth below.

### PRELIMINARY STATEMENT

1.     Counter-Defendants are sophisticated hedge funds with expertise in bankruptcy and trading distressed debt.  From at least 2009 and continuing today, they have leveraged that expertise in a carefully orchestrated series of lies, payoffs and legal maneuvers designed to improperly enrich themselves at the expense of Yucaipa.  Counter-Defendants' scheme includes various frauds committed on the United States Bankruptcy Court for the District of Delaware.  It also includes the intentional violation of the Federal Bankruptcy Rules and false allegations levied against Yucaipa employees and designees.

2.     Counter-Defendants' scheme involves the wrongful filing of the involuntary bankruptcy petition against Debtor Allied Systems Holdings, Inc. ("Allied"), one of the largest transporters of new passenger vehicles in North America.  Once they succeeded in placing Allied into bankruptcy, Counter-Defendants attempted—and continue to attempt—to fraudulently subordinate Yucaipa's recoveries on the $170 million in claims against Allied at issue in the bankruptcy proceedings.

3.     Counter-Defendants Black Diamond and Spectrum, along with non-parties Richard A. Ehrlich, Stephen H. Deckoff, and Leslie A. Meier, as principals of Black Diamond, and Jeffrey A. Schaffer, as a principal of Spectrum, and their agents, have implemented the

scheme. The motivation for their misconduct and scheming is simple greed—to make more money off their debt holdings in Allied by knowingly making false accusations of misconduct on the part of Yucaipa in order to seek an equitable subordination of Yucaipa's debt holdings in Allied—which would wipe out Yucaipa's $170 million in First Lien Claims.[4]

4.      Yucaipa first became involved with Allied when it sponsored Allied's exit from the Prior Bankruptcy Case in 2007, pursuant to a plan of reorganization. Pursuant to the plan of reorganization, which the bankruptcy court approved, Yucaipa became majority owner of Allied and was authorized to and did appoint a majority of Allied's Board of Directors, including several Yucaipa employees.

5.      In 2008, however, the Great Recession caused a severe contraction in Allied's revenue and margins and later forced two of Allied's largest customers (General Motors and Chrysler) into bankruptcy. Allied went into material default under its credit agreements in August 2008 and stopped making required interest payments on its outstanding debt beginning in August 2009. Through those hard times, Yucaipa increased its support for Allied by acquiring 56% of Allied's debt under the First Lien Credit Agreement and 80% of its debt under the Second Lien Credit Agreement.

6.   .    In connection with Allied's exit from the Prior Bankruptcy Case, Counter-Defendants Black Diamond and Spectrum had also taken minority debt positions in Allied under the First Lien Credit Agreement. (*See* First Lien Credit Agreement, Ex. 1.) Currently, Counter-Defendants' claims (for which they paid mere cents on the dollar) collectively represent 22% of

---

[4]   This Counterclaim refers to capitalized terms that are defined in the attached Appendix of Technical and Defined Terms.

the total First Lien Claims, although at the time of Allied's exit from the Prior Bankruptcy Case, Counter-Defendants held only 4% of the total First Lien Claims.

7.    Yucaipa's negotiations over its purchases of Allied's debt set the stage for Counter-Defendants to scheme their way to turn their relatively small investment in the First Lien Claims into big profits by attempting to fraudulently demolish Yucaipa's right to collect on its debt. They plotted to turn a modest investment into a tremendous windfall that would pay up to 20 times their original investment by deceiving the Bankruptcy Court and Yucaipa. The four principal steps involved in Counter-Defendants' fraudulent and inequitable scheme were as follows:

8.    **Step 1**: Encourage Yucaipa to acquire as much Allied debt as possible by providing false assurances of cooperation and support.

(a)    Counter-Defendants needed Yucaipa to own a majority of the First Lien Debt in order to accomplish their scheme. Thus, Counter-Defendants encouraged Yucaipa to purchase Allied debt from a separate entity, ComVest Investment Partners III, L.P. ("ComVest"), which held the majority of Allied debt.

(b)    As ComVest was not an Allied insider and thus owed no fiduciary duties to the other lenders, it would have been virtually impossible to equitably subordinate the debt while it was in the hands of ComVest. But if Yucaipa acquired the majority of the First Lien Debt from ComVest, Counter-Defendants Black Diamond and Spectrum would be able to jointly push Allied into an involuntary bankruptcy and attempt to equitably subordinate Yucaipa's First Lien Claims by falsely accusing the Yucaipa designees on the Allied Board of Directors of misconduct.

(c)     Further, as part of its acquisition of the First Lien Claims from ComVest, Yucaipa relied upon modifications to the First Lien Credit Agreement—contained in the Fourth Amendment to the First Lien Credit Agreement—to permit existing lenders to sell First Lien Claims to Yucaipa and to authorize Yucaipa to vote the debt it acquired just like any other lender under the First Lien Credit Agreement. (*See* Fourth Am., Ex. 2.) The Fourth Amendment modified restrictions on the amount of debt that Yucaipa could hold and also modified the restriction prohibiting Yucaipa from becoming the "Requisite Lender" under the First Lien Credit Agreement. The "Requisite Lender" is defined under the First Lien Credit Agreement as a lender or group of lenders collectively holding more than 50% of all outstanding First Lien Claims. As Requisite Lender, Yucaipa would be empowered to control the exercise of certain material remedies by all First Lien Lenders.

9.     *Step 2*:  Prevent Yucaipa from serving as Requisite Lender under the First Lien Credit Agreement.  Once Black Diamond and Spectrum succeeded in getting the majority of the Allied First Lien Debt into Yucaipa's hands, they next surreptitiously instructed the Administrative Agent under the First Lien Credit Agreement, who had initially cooperated with Yucaipa as Requisite Lender, to refuse to recognize directions from Yucaipa in its capacity as Requisite Lender and to challenge the validity of Yucaipa's status as Requisite Lender.  At that time, the Administrative Agent was CIT Group/Business Credit, Inc. ("CIT").

10.     *Step 3*:  File an involuntary bankruptcy petition to force Allied before the jurisdiction of the Bankruptcy Court and submit false statements to the Bankruptcy Court to support that involuntary bankruptcy petition.

(a)     Counter-Defendants then filed an involuntary bankruptcy petition to scuttle a potential deal between Yucaipa and Jack Cooper Transport Company Inc.

("JCT"), a Kansas City, Missouri-based competitor to Allied, which Counter-Defendants knew was looking to purchase Allied's assets through a *voluntary* bankruptcy. If the sale had proceeded as then contemplated, it would have maximized value for all lenders—including Counter-Defendants and Yucaipa.

(b)      But the Yucaipa-JCT deal would have left Yucaipa without a debt claim that Counter-Defendants could seek to equitably subordinate. This is because JCT specifically required the transfer of certain First Lien Claims to JCT (including all the First Lien Claims held by Yucaipa) before the commencement of any bankruptcy. Therefore, Counter-Defendants decided to blow up the Yucaipa-JCT deal by filing an involuntary bankruptcy, in order to ensure that the majority of First Lien Debt remained in Yucaipa's hands as of the initiation of the bankruptcy case.

(c)      Counter-Defendants Black Diamond and Spectrum also needed to qualify as "petitioners" for purposes of commencing an involuntary bankruptcy case. Under Bankruptcy Code Section 303, an involuntary bankruptcy petition may be filed only by three or more holders of claims. While Black Diamond and Spectrum individually could not have satisfied this requirement, together they could (Black Diamond, by virtue of its ownership structure, qualified as two holders of eligible claims).

(d)      As set forth in greater detail below, Black Diamond paid a $4 million bribe to Spectrum, in the form of an illegal claims trade, to induce Spectrum to join the scheme. But Counter-Defendants failed to disclose to the Bankruptcy Court their agreement to trade claims and pay the bribe associated with it. In so doing, they violated the unambiguous disclosure requirements of the Federal Rules of Bankruptcy Procedure—in particular Bankruptcy Rules 1003 and 2019.

(e)     As a result of the involuntary bankruptcy, substantially all of Allied's assets were sold to JCT for $135 million in December 2013—nearly 18 months after the involuntary filing. This was approximately $170 million less in consideration than offered by JCT to all lenders nearly 18 months earlier, on the eve of the involuntary bankruptcy. But Counter-Defendants Black Diamond and Spectrum still profited. At a $135 million purchase price, even before any equitable subordination of Yucaipa's claims, Black Diamond received up to eight times its original investment and, upon information and belief, Spectrum also recovered more than payment in full of its original investment. This all set the stage for the final step in Counter-Defendants' plan.

11.     *Step 4*:  Attempt to wipe out Yucaipa's First Lien Claims with an objectively baseless complaint for equitable subordination.

(a)     Counter-Defendants' final step was to file a complaint for equitable subordination of Yucaipa's First Lien Claims based on false assertions about Yucaipa's role in the management of Allied, in an attempt to wipe out Yucaipa's position in the First Lien Claims and illegally enrich Counter-Defendants. This final step is ongoing to this day, and represents the culmination of Counter-Defendants' scheme. Indeed, the record is clear that Counter-Defendants were scheming to equitably subordinate Yucaipa's debt *even before Yucaipa had acquired any First Lien Claims.*

(b)     If Counter-Defendants' equitable subordination scheme is ultimately successful in spite of their fraudulent conduct, Yucaipa's claims will likely be wiped out, and Counter-Defendants will reap up to a 20-fold return on their initial investment since they would increase their share of the First Lien Debt pie from 22% to 50%.

36

(c)    In addition, Counter-Defendants also implemented a scheme to further disadvantage Yucaipa in connection with the sale of certain real estate and trucking assets that were excluded from the JCT purchase of substantially all of Allied's assets for $135 million, which, as described below, was designed to result in an additional multi-million dollar windfall for Counter-Defendants. Counter-Defendants also skirted a Bankruptcy Court order freezing the payment of approximately $11.6 million for attorneys' fees to themselves, while refusing (without any justification) any comparable payment to Yucaipa for identical fees payable pursuant to the terms of the First Lien Credit Agreement.

12.    Counter-Defendants' misconduct resulted in ongoing injuries to Yucaipa and will have conferred an unfair advantage on Counter-Defendants to the extent their scheme succeeds, and they manage to equitably subordinate Yucaipa's First Lien Claims. Moreover, equitable subordination of Counter-Defendants' claims would not be inconsistent with the Bankruptcy Code.

13.    As set forth in greater detail below, Yucaipa is in a singularly unique position to seek relief for the harm that Counter-Defendants seek to inflict upon it, and for the harm they have already inflicted on Yucaipa. Counter-Defendants' scheme was directed at Yucaipa as the majority holder of Allied's equity, as well as Allied's debt, and was crafted to take advantage of Yucaipa's employees' positions on Allied's Board, as well as Yucaipa's majority holding of Allied's debt. No other holder of a First Lien Claim is similarly situated. It is therefore entirely unrealistic to assume that any lender other than Yucaipa (or anyone else) would bring the equitable subordination claim set forth herein.

## PARTIES AND RELEVANT ENTITIES

14.    Counter-Plaintiffs Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. are limited partnerships organized under the laws of the State of Delaware, with their headquarters located in Los Angeles, California. Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. are lenders under the First Lien Credit Agreement. Yucaipa has a long and established record of fostering economic value through the growth and responsible development of companies. Yucaipa works with management to reposition businesses and implement operational improvements that create value and increase efficiency.

15.    On information and belief, Counter-Defendant BDCM Opportunity Fund II, LP is a Delaware limited partnership that may be served through its registered agent, Corporation Trust Company, at Corporate Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. On information and belief, BDCM Opportunity Fund II, LP is a lender under the First Lien Credit Agreement.

16.    On information and belief, Counter-Defendant Black Diamond CLO 2005-1 Ltd. is a Cayman Islands company that may be served through its registered agent, MaplesFS Limited, at P.O. Box 1093, Queensgate House, 113 South Church Street, Cayman Islands. On information and belief, Black Diamond CLO 2005-1 Ltd. is a lender under the First Lien Credit Agreement.

17.    On information and belief, Counter-Defendant Spectrum Investment Partners, L.P. is a Delaware limited partnership that may be served through its registered agent, Corporation Trust Company, at Corporate Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. On information and belief, Spectrum Investment Partners, L.P. is a lender under the First Lien Credit Agreement.

18.     Non-party Richard A. Ehrlich is a managing director of Black Diamond, and on information and belief resides in New York County, New York.

19.     Non-party Stephen H. Deckoff is a co-founder of Black Diamond, and on information and belief resides in Westchester County, New York.

20.     Non-party Leslie A. Meier is a managing principal of Black Diamond, and on information and belief resides in Lake County, Illinois.

21.     Non-party Jeffrey A. Schaffer is the managing partner of Spectrum, and on information and belief resides in Union County, New Jersey.

22.     Non-party Allied Systems Holdings, Inc. is an Atlanta, Georgia-headquartered corporation founded in 1934.  Until its sale to JCT, Allied provided distribution and transportation services to the automotive industry, including delivery of new vehicles from manufacturing plants to dealerships principally in the United States.

23.     Non-party Jack Cooper Transportation, Inc. is a Kansas City, Missouri-headquartered corporation that provides automotive transportation and logistics services to the automotive industry in the United States and Canada.

24.     Non-party ComVest Investment Partners III, L.P. is a private investment fund that provides equity capital to middle-market companies in the United States.  It is controlled by non-party ComVest Partners.

25.     Non-party CIT Group/Business Credit, Inc. was the Administrative Agent and Collateral Agent for all of Allied's lenders under the Amended and Restated First Lien Super-Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement, and is also one of Allied's First Lien Lenders.

## JURISDICTION AND VENUE

26.     This adversary proceeding was initiated pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure.

27.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. § 105.

28.     This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157, which implicates matters within this Court's exclusive jurisdiction under 28 U.S.C. § 1334.

29.     Venue of this adversary proceeding is proper in this Court pursuant to 28 U.S.C. § 1409, as this adversary proceeding arises in or relates to the Chapter 11 case of the Debtors, pending in the United States Bankruptcy Court for the District of Delaware under the jointly administered Case Number 12-11564, and implicates matters arising under Title 11 of the United States Code.

## FACTUAL ALLEGATIONS

### A.    Yucaipa Sponsors Allied Out of Bankruptcy and Counter-Defendants Become Lenders to Allied

30.     In July of 2005, Allied commenced the Prior Bankruptcy Case in the United States Bankruptcy Court for the Northern District of Georgia.  At the time of the Prior Bankruptcy Case, Allied was indebted to, among others, holders of $150 million of Prior Bonds.

31.     Yucaipa has a reputation for solving thorny business issues through consensus, particularly those involving disputes between management and labor.  During the Prior Bankruptcy Case, the International Brotherhood of Teamsters, which represented more than 4,000 of Allied's employees, and Allied were at loggerheads over potential wage and benefit concessions by the unionized workforce, and a strike (and potential liquidation of Allied) was on

the horizon.  At the urging of the Teamsters, Yucaipa evaluated Allied as an investment opportunity and determined that Yucaipa could play a constructive role that would enable a consensual exit from the Prior Bankruptcy Case and the preservation of approximately 5,000 jobs.  In order to do so, Yucaipa purchased approximately $99 million of the Prior Bonds, and then worked with Allied's management and the Teamsters to forge a consensual plan of reorganization.  As part of that reorganization plan, Yucaipa converted its entire stake in the Prior Bonds (along with certain post-petition secured financing) into a 67% stake in the reorganized Allied.  The reorganization plan won creditor support and bankruptcy court approval in May 2007.

32.    As the new majority shareholder and per the terms of the court-approved plan of reorganization, Yucaipa had the right to appoint a majority of members to Allied's Board of Directors and accordingly designated three of its employees to fill those roles.  In addition, as part of the plan of reorganization in the Prior Bankruptcy Case, Yucaipa and Allied entered into a management agreement in May 2007.  The plan of reorganization also resulted in the appointment of two non-Yucaipa designee Board members.  These two members, Brian Cullen (who was selected by the creditors committee, per the plan of reorganization) and Mark Gendgreske (who was Allied's newly-appointed Chief Executive Officer), continued to serve as non-Yucaipa designees to the Allied Board of Directors through December 2013.  Yucaipa and its designees to the Allied Board of Directors consistently acted to provide Allied with a chance to succeed and maximize value.  Allied funded the plan of reorganization and its exit from the

Prior Bankruptcy Case by obtaining $315 million in loans under two separate credit facilities: the "First Lien Credit Agreement"[5] and the "Second Lien Credit Agreement."[6]

33.     The First Lien Credit Agreement provided a $265 million credit facility in the form of term loans, revolving loans and letters of credit. (First Lien Credit Agreement §§ 2.1–2.4, Ex. 1.) It restricted the assignment of that debt to "Eligible Assignees," which were defined to include lenders under the First Lien Credit Agreement, affiliates of those lenders, and commercial banks, insurance companies, and investment or mutual funds. (First Lien Credit Agreement § 1.1, Ex. 1.) The First Lien Credit Agreement expressly excluded Yucaipa or its affiliates from the definition of "Eligible Assignees," but required that at least a majority of the Allied Board of Directors be appointed by Yucaipa. (*Id.*) The Second Lien Credit Agreement provided for loans in the original principal amount of $50 million. Under various ancillary security documents, Allied and its subsidiaries pledged substantially all of their assets as security for their obligations under the First Lien Credit Agreement and the Second Lien Credit Agreement.

34.     Black Diamond and Spectrum both became lenders under the First Lien Credit Agreement in connection with Allied's emergence from the Prior Bankruptcy Case in May 2007. As other lenders exited or became assignees under the First Lien Credit Agreement over time, Black Diamond and Spectrum bought and sold their debt at declining prices several times after

---

[5]   The "First Lien Credit Agreement" refers to the Amended and Restated First Lien Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated May 15, 2007, by and among Allied Holdings, Inc. and Allied Systems, Inc. as borrowers, various lenders, Goldman Sachs Credit Partners L.P. as lead arranger and syndication agent, and the CIT Group/Business Credit, Inc. as administrative agent and collateral agent.

[6]   The "Second Lien Credit Agreement" refers to the Second Lien Secured Super Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement, dated May 15, 2007.

first acquiring it.  Eventually, Black Diamond and Spectrum increased their combined ownership stake under the First Lien Credit Agreement from 4% to 22%.[7]

35.     At the outset of the Great Recession, lenders holding First Lien Claims sought to exit their positions and looked to Yucaipa as a potential buyer given its already substantial investment in Allied.  In 2008, a majority of the First Lien Lenders approved a third amendment to the First Lien Credit Agreement with the hope of facilitating Yucaipa's purchase of First Lien Claims.  The Third Amendment authorized the First Lien Lenders to sell up to $50,000,000 in term loans under the First Lien Credit Agreement to Yucaipa and its affiliates, subject to certain limitations on Yucaipa's ability to hold and vote certain amounts of debt.  (*See* Third Am., Ex. 3.)

36.     Meanwhile, Allied's financial situation worsened as the U.S. economy headed into the Great Recession.  Starting in August 2008 and thereafter, Allied was in material default under the First Lien Credit Agreement.

37.     Notwithstanding Allied's financial difficulties, Yucaipa continued to support Allied, and successfully restructured Allied's debt under the Second Lien Credit Agreement by acquiring $40 million of that debt out of a total of $50 million, simultaneously converting $20 million into equity.

**B.     Counter-Defendants Hatch Their Scheme**

38.     The combination of Allied's worsening financial condition and Yucaipa's continued efforts to support Allied presented Counter-Defendants with an opportunity to reap a windfall on their initial investment, at the expense of Yucaipa.

---

[7]  At the time of the involuntary bankruptcy filing in May 2012, Black Diamond held approximately $40 million (or approximately 13%) of the First Lien Claims, which it purchased, at a deep discount, for between five and fifteen cents on the dollar, and Spectrum held approximately $26 million (or approximately 8.5%) of the First Lien Claims.

39.    In February 2009, ComVest acquired 56% of the First Lien Claims and became

the Requisite Lender, which gave it substantial powers under the First Lien Credit Agreement to

amend or modify certain provisions of the First Lien Credit Agreement and to direct remedies.

40.    Shortly after ComVest became Requisite Lender, Yucaipa, consistent with its goal

of supporting Allied in an effort to right the ship, entered into direct negotiations with ComVest

to acquire ComVest's majority of First Lien Claims.  Counter-Defendants knew that if Yucaipa

acquired the ComVest debt, Yucaipa would have obtained a 56% share of all the First Lien

Claims.  Were that to happen, Counter-Defendants could jointly push Allied into an involuntary

bankruptcy, at which point Black Diamond and Spectrum could attempt to equitably subordinate

Yucaipa's First Lien Claims by falsely accusing the Yucaipa designees on the Allied Board of

Directors of breaching their fiduciary duties to Allied and operating Allied to Yucaipa's

advantage.  And were their scheme successful, Counter-Defendants would be able to wrongfully

wipe out Yucaipa's 56% ownership stake in the First Lien Claims, and thereby achieve a

windfall: they would go from holding 22% of the First Lien Claims to 50% and make up to 20

times their original investment.[8]

41.    Counter-Defendants' inequitable strategy to enrich themselves at the expense of

Yucaipa included the following steps:  (1) encourage Yucaipa to acquire as much Allied debt as

possible from ComVest; (2) prevent Yucaipa from serving as "Requisite Lender" under the First

Lien Credit Agreement; (3) file an involuntary bankruptcy petition to force Allied before the

jurisdiction of the Bankruptcy Court, and submit false statements to the Bankruptcy Court to

---

[8]    Black Diamond and Spectrum turned down the opportunity to "cash out" at approximately 30 cents on the
dollar when Yucaipa tendered that opportunity to them in February 2009.  At 30 cents on the dollar, Black
Diamond would have made a substantial profit based on its otherwise low investment price (in some cases, as
minimal as five to fifteen cents on the dollar).  However, as would be made clear, Black Diamond and Spectrum
had an even richer payout in mind, one that required the implementation of their unlawful involuntary
bankruptcy/equitable subordination scheme.

support the petition; and finally, (4) attempt to wipe out Yucaipa's First Lien Claims with a bogus complaint for equitable subordination.

### STEP 1: Encourage Yucaipa's Acquisition of the First Lien Claims from ComVest

42.     It would have been virtually impossible for Counter-Defendants to equitably subordinate the First Lien Debt while it was in the hands of ComVest. Among other reasons, ComVest was not an insider of Allied. In practical effect, "insider" status is critical to the success of a claim for equitable subordination due to the heightened scrutiny frequently applied to insider conduct in connection with such claims. Thus, Counter-Defendants encouraged Yucaipa's acquisition of the First Lien Debt from ComVest.

43.     Counter-Defendants began "check[ing] out the 'equitable subordination' angle" against Yucaipa even before Yucaipa acquired any First Lien Claims from ComVest. (Email from M. Riggs, Innovative Equity Partners, to J. Schaffer, Spectrum, Aug. 13, 2009, Ex. 4.) As experienced distressed-debt traders, Black Diamond and Spectrum knew that equitable subordination required that the debt be held by an insider like Yucaipa, rather than a non-insider like ComVest. In order to be successful, this plan required close coordination between Black Diamond and Spectrum and deception of Allied, JCT, Yucaipa, and the Bankruptcy Court.

44.     Although Black Diamond and Spectrum would later claim to have been surprised by Yucaipa's acquisition of the First Lien Claims held by ComVest, the reality is that Yucaipa kept Counter-Defendants fully informed of its efforts throughout the negotiations with ComVest.

45.     Indeed, Counter-Defendants fully supported Yucaipa's efforts. During the spring and summer of 2009, Mr. Ehrlich was continuously advised by Derex Walker of Yucaipa of the status of negotiations regarding the acquisition of ComVest's debt. During these telephone

discussions, Ehrlich was specifically advised of Yucaipa's intention to acquire ComVest's

majority position in Allied's First Lien Debt and become the Requisite Lender.  Black Diamond

understood and encouraged Yucaipa's approach.

46.     On August 18, 2009, Mr. Deckoff, founder and managing principal of the parent

company of Black Diamond, travelled to Los Angeles from New York for the sole purpose of

meeting with Ron Burkle and Derex Walker of Yucaipa to pledge his support for the transfer of

the First Lien Claims from ComVest to Yucaipa, as well as coordinating the going-forward

strategy with respect to Allied.  (*See* Calendar Invitation, Aug. 18, 2009, Ex. 5.)  Mr. Burkle

proposed that Yucaipa continue with its plan to buy ComVest's Requisite Lender position and

then work to sell Allied in a way that maximized the recovery on the First Lien Claims.  In

response, Mr. Deckoff agreed to work together with Yucaipa and to support Yucaipa's plan to

acquire the Requisite Lender position from ComVest.  This plan included a Fourth Amendment

to the First Lien Credit Agreement, which, as Yucaipa fully disclosed to Counter-Defendants,

would be necessary in order for Yucaipa to acquire ComVest's First Lien Debt (i.e., by repealing

the Third Amendment's restrictions on lenders' ability to transfer First Lien Claims to Yucaipa,

and Yucaipa's ability to hold and vote First Lien Debt).  This Fourth Amendment would also

permit Yucaipa to serve as Requisite Lender—as ComVest had—once Yucaipa acquired the

ComVest debt.

47.     Never during the many calls between Mr. Walker of Yucaipa and Mr. Ehrlich, or

during the Yucaipa meeting with Mr. Deckoff, did Black Diamond once state any opposition to

any aspect of Yucaipa's plan to become Requisite Lender, including the Fourth Amendment.

48.     In August 2009, as part of Yucaipa's negotiations to acquire ComVest's First

Lien Debt, ComVest, as Requisite Lender, and a Special Committee of the Allied Board of

Directors—consisting of the Allied Board members who were independent of Yucaipa—reviewed and voted to approve the Fourth Amendment. The Fourth Amendment removed all of the restrictions imposed on Yucaipa's acquisition of the First Lien Debt and made Yucaipa eligible to be Requisite Lender.

49.    On August 21, 2009, Yucaipa relied upon Counter-Defendants' support in purchasing all of ComVest's First Lien Debt, paying ComVest $43 million and acquiring 56% of the First Lien Claims.

50.    Although Black Diamond and Spectrum were encouraging Yucaipa to acquire the First Lien Claims from ComVest and to become Requisite Lender, this encouragement was a sham to get the First Lien Claims out of the hands of a non-insider (ComVest) and into the hands of an insider (Yucaipa) so that Counter-Defendants would have a better shot at equitably subordinating 56% of the First Lien Claims and increasing their share of the pie from 22% to 50%. In truth, behind Yucaipa's back, Black Diamond and Spectrum were scheming to file an involuntary bankruptcy and lawsuits leveling false accusations against Yucaipa and its employees who served on Allied's Board of Directors, all in order to improperly equitably subordinate Yucaipa's claims and make up to 20 times their original investment.

51.    Indeed, only a month after Yucaipa purchased the majority of the First Lien Debt from ComVest, Mr. Schaffer emailed Mr. Ehrlich stating "looks like [Yucaipa] pushed the equity button here . . . you ready to roll." (Email from J. Schaffer, Spectrum, to R. Ehrlich, Black Diamond, Sept. 17, 2009, Ex. 6.) More shocking, even before Yucaipa acquired any First Lien Claims from ComVest, Counter-Defendants were scheming to level false accusations of misconduct against Yucaipa as part of their strategy to "check out the equitable subordination angle."

### STEP 2:  Prevent Yucaipa from Serving as Requisite Lender

52.     In order for Black Diamond and Spectrum's scheme to work, Yucaipa had to hold

the majority of First Lien Debt, but could not have the Requisite Lender status that went along

with that debt.  That is because, as Requisite Lender, Yucaipa would have the power to direct

waivers or forbearances of remedies to assist Allied's reorganization efforts or, alternatively,

control the exercise of remedies (including credit bidding in a bankruptcy sale) for the benefit of

all lenders under the First Lien Credit Agreement.  Thus, Black Diamond and Spectrum

undertook vigorous efforts to prevent Yucaipa from obtaining Requisite Lender status.

53.     Immediately following the closing of the transaction between ComVest and

Yucaipa, CIT (acting as the Administrative Agent) entered all the First Lien Claims held by

Yucaipa on the loan register in compliance with its duties under Section 10.6(b) of the First Lien

Credit Agreement, and engaged in a dialogue with Yucaipa in its capacity as Requisite Lender.

(First Lien Credit Agreement § 10.6(b), Ex. 1.)  However, by letter dated September 18, 2009

(the "September 2009 Letter")—less than one month after Yucaipa closed on the ComVest

transaction—Counter-Defendants secretly directed CIT to refuse to recognize Yucaipa as

Requisite Lender, which resulted in years of expensive litigation in the Georgia Action among

Allied, Yucaipa, and the administrative agent.  (*See* Sept. 2009 Letter, Ex. 7.)[9]

54.     Although Counter-Defendants secretly directed CIT to refuse to recognize

Yucaipa as Requisite Lender, they deliberately decided not to ask CIT in its capacity as

Administrative Agent to refrain from settling the trade between Yucaipa and ComVest because

---

[9]   Ultimately, CIT as Administrative Agent settled the Georgia Action and agreed to recognize Yucaipa as
Requisite Lender along with the validity of the Fourth Amendment.  Once the Georgia Action settled, Counter-
Defendants commenced their own separate litigation, the New York Action, in New York State court in January
2012, seeking a declaration that the Fourth Amendment was void and that Yucaipa could not serve as Requisite
Lender.

they wanted the First Lien Claims in the hands of Yucaipa—an insider—to pursue the "equitable subordination angle."

55.    In 2011, JCT approached Allied and Yucaipa, along with certain other lenders under the First Lien Credit Agreement, about the purchase of Allied's assets.  Such a transaction would have resulted in the pre-bankruptcy transfer of Yucaipa's First Lien Debt to JCT, which JCT would have then converted into the assets of Allied through an expedited bankruptcy sale. Such a transfer would have destroyed Counter-Defendants' scheme before it got out of the starting gate.  In that scenario, as of the commencement of the voluntary bankruptcy case, Yucaipa would not have been a debt holder under the First Lien Credit Agreement—thus, Counter-Defendants would not have had a facially viable equitable subordination claim.

56.    Black Diamond and Spectrum, therefore, began to negotiate with JCT regarding the acquisition of Allied's assets in order to delay the Yucaipa-JCT deal and to buy more time for Counter-Defendants to proceed with an involuntary bankruptcy pursuant to their scheme.

57.    From at least March 2011 through May 2012, Black Diamond and Spectrum negotiated directly with JCT regarding (i) JCT's efforts to acquire Allied's assets and (ii) Black Diamond and Spectrum's willingness to sell their debt claims and finance such an acquisition. At the same time, they plotted to force Allied into involuntary bankruptcy.  After weeks of negotiating directly with Black Diamond, JCT determined that any acquisition could be consummated only through a 363 Sale in an Allied bankruptcy case.  A 363 Sale, which is typically held as an auction, provided a path for JCT to acquire Allied's assets by credit bidding the First Lien Debt as currency.  If JCT could acquire a majority of the First Lien Debt to qualify as Requisite Lender before an Allied bankruptcy, JCT would have the power under the First Lien Credit Agreement to direct a credit bid for Allied's assets using the First Lien Claims as

currency.  Thus, on May 10, 2011, JCT sent a proposal incorporating a bankruptcy filing and

363 Sale to both Black Diamond and Yucaipa.  (Email from M. Riggs, JCT, to D. Walker,

Yucaipa, R. Ehrlich, Black Diamond, May 9, 2011, Ex. 8.)

58.    Black Diamond and Spectrum's negotiation with JCT was a sham; Counter-

Defendants were simply distracting JCT, Yucaipa, and Allied while Counter-Defendants

prepared to carry out their ultimate objective.

59.    On December 6, 2011, JCT reported to Yucaipa that it had reached agreement

with Black Diamond on certain terms, including an agreement that Black Diamond would

provide a bridge loan to JCT for the purpose of financing JCT's purchase of the First Lien Debt

held by Yucaipa.  (Email from M. Riggs, JCT, to I. Tochner, Yucaipa, Dec. 6, 2011, Ex. 9.)  JCT

further reported to Yucaipa that JCT had scheduled a meeting with Counter-Defendants on

December 20, 2011, to "try and craft a package deal where [JCT] can purchase [Yucaipa's] debt,

but simultaneously also acquire the debt of CIT, Black Diamond, and Spectrum."  (Email from

M. Riggs, JCT, to I. Tochner, Yucaipa, Dec. 7, 2011, Ex. 9.)  This was consistent with JCT's

intentions to acquire all First Lien Debt before initiating a bankruptcy case.

60.    While stonewalling JCT, Counter-Defendants continued their own side

discussions regarding the "Allied Strategy."  (Email from S. Deckoff, Black Diamond, to R.

Ehrlich, Black Diamond, Jan. 8, 2012, Ex. 10.)

61.    Counter-Defendants had no intention of participating in a sale to JCT that

involved the pre-bankruptcy transfer of Yucaipa's First Lien Debt to JCT because such a transfer

would put the First Lien Claims in the hands of a non-insider (like JCT) and thus preclude their

chances for a successful equitable subordination claim.  For their inequitable and wrongful plan

to work, only Yucaipa would and could be the appropriate victim.

**STEP 3:  File an Involuntary Bankruptcy Against Allied, Supported by False**

**Statements to the Bankruptcy Court**

62.    Once Counter-Defendants had succeeded in scuttling the deal between JCT and Yucaipa that had been memorialized in a March 8, 2012 term sheet (the "March 2012 Term Sheet"), they were free to pursue their involuntary bankruptcy plan.

63.    In fact, while Black Diamond and Spectrum pretended to be interested in selling their First Lien Claims to JCT, central to their "Allied strategy" was a secret agreement between them to ensure that they maximized and shared their First Lien Claim holdings.  Under this secret agreement, Black Diamond and Spectrum agreed that each of them would offer the other a right of first refusal before transferring debt to a third party, as well as a right to participate pro rata in any debt acquired from third parties.  The purpose of this secret agreement was to ensure that Black Diamond and Spectrum could increase their debt holdings, and also that Spectrum in particular could acquire more "skin in the game" (at the lower acquisition prices for First Lien Claims that might be available to Black Diamond as a more established distressed-debt trader) in order to reward Spectrum for its participation in the involuntary petition and scheme to subordinate Yucaipa's debt.

64.    In January of 2012, Counter-Defendants entered into a formal agreement that contractually bound Black Diamond and Spectrum to extend first refusal and participation rights to each other.  The Cooperation Agreement stated that Counter-Defendants entered into it "in contemplation of . . . certain strategies to enforce the rights of the Parties as Lenders under the First Lien Credit Agreement."  (Cooperation Agreement 1, Ex. 11.)  That the Cooperation Agreement contemplates "certain strategies to enforce [their rights]," appears to reference the anticipated involuntary filing, particularly since the Counter-Defendants exchanged memoranda

and discussed an involuntary filing on numerous occasions, including on the eve of signing the Cooperation Agreement. (*Id.*)  In the context of the communications referencing an involuntary bankruptcy, and the payment of the Involuntary Petition Payoff, the Cooperation Agreement clearly functioned to spur the improper claims trading necessary to "get it done."

65.    The Cooperation Agreement was not disclosed to Yucaipa or to the Bankruptcy Court at the time of the filing of the involuntary bankruptcy, even though it was entered into four months before the filing of the involuntary bankruptcy—and specifically in contemplation of filing an involuntary bankruptcy.  And it was drafted by the same counsel who prepared the involuntary petition for Counter-Defendants.  Nor was the Cooperation Agreement produced in discovery during the involuntary bankruptcy case, even though requests for production of documents served on Black Diamond and Spectrum encompassed this document.  In fact, Counter-Defendants hid the Cooperation Agreement for sixteen months from the Bankruptcy Court and Yucaipa.  Yucaipa discovered the Cooperation Agreement only when Black Diamond and Spectrum—responding to allegations that they were involved in improper claims trading— produced it to purportedly justify their conduct.

66.    The Cooperation Agreement further provided, "[e]ach Party shall timely pay its pro rata share of all costs and expenses incurred in (a) developing and implementing the Strategies, and (b) any action or proceeding arising therefrom or relating thereto, in accordance with that certain Engagement letter between and among the Parties and [their counsel]." (Cooperation Agreement ¶ 7, Ex. 11.)  This provision implies that the Cooperation Agreement was entered into in contemplation of an involuntary bankruptcy filing.

67.    The Cooperation Agreement further provided, "[e]ach Party agrees to disclose to all other Parties to the Agreement all communications (including the substance thereof) between the Party and . . . [Yucaipa]." (Cooperation Agreement ¶ 4, Ex. 11.)

68.    At the same time, in accordance with the Cooperation Agreement, Counter-Defendants pursued their plan to force Allied into involuntary bankruptcy. Black Diamond was more eager to pursue this plan than Spectrum because it held more debt than Spectrum, debt which Black Diamond had purchased at a relatively low average purchase price. Specifically, Black Diamond had purchased its First Lien Debt holdings for five to fifteen cents on the dollar and held nearly twice as much as Spectrum. Black Diamond thus stood to make a larger profit if the scheme was successful. Indeed, other than the Involuntary Petition Payoff, Spectrum had not acquired any First Lien Claims since August 2008.

69.    Black Diamond thus began discussing with Spectrum the Involuntary Petition Payoff, by which Black Diamond would buy Spectrum's support for filing the involuntary bankruptcy (which, under the Bankruptcy Code, requires the support of at least three petitioning creditors). Black Diamond agreed to transfer—as an obvious bribe—an additional $4 million (in face amount) in First Lien Claims to Spectrum on favorable pricing terms in exchange for Spectrum's willingness to fully support the involuntary petition strategy, thereby giving both Spectrum and Black Diamond an additional upside in their plan to subordinate Yucaipa's debt holdings. Black Diamond and Spectrum have admitted in court filings that "in accordance with the Cooperation Agreement, Black Diamond sold Spectrum approximately 40% of the Acquired Debt (i.e., Spectrum's ratable share), which amounted to $4,239,486.90 of First Lien Debt, at the same price that Black Diamond paid for the Acquired Debt." (Black Diamond & Spectrum's

Objection to Yucaipa's Mot. for Leave to File Counterclaim 11, Adv. Proc. No. 13-50530, Aug. 15, 2014, D.I. 316.)

70.    This bribe was the essential and last precondition to Spectrum's agreement to join in the involuntary bankruptcy.  On March 21, 2012, Mr. Schaffer of Spectrum emailed Mr. Ehrlich, "[p]lease get this [claim transfer] closed this week.  We cannot file an involuntary without it done."  (*See* Email from J. Schaffer, Spectrum, to R. Ehrlich, Black Diamond, Mar. 21, 2012 (the "Schaffer Email"), Ex. 12.)

71.    All the while that Counter-Defendants Spectrum and Black Diamond negotiated about their bribe amount, they were still *at the same time* pretending to negotiate with JCT. ▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮  Ex. 13.)  This demonstrates that the negotiation with JCT was just a sham, conducted to lull Allied, JCT and Yucaipa into falsely believing that no involuntary bankruptcy was on the horizon.

72.    Moreover, contrary to Counter-Defendants' false allegations supporting their equitable subordination claim in the bankruptcy case, Yucaipa's negotiations with JCT demonstrate Yucaipa's good faith attempt to reach a deal that would have maximized value for *all* Allied stakeholders.  For instance:

(a)    As of December 2011 and January 2012, the term sheets being discussed between Yucaipa and JCT would have required a credit bid of all claims under the First Lien Credit Agreement.  Further, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████████

████████████████████████████████ Ex. 14.)

(b)     As of February 28, 2012, the proposed term sheet discussed a purchase of all claims held by CIT, Black Diamond, and Spectrum.  (Term Sheet, Feb. 28, 2012, Ex. 15.)

(c)     The March 2012 Term Sheet, dated March 8, 2012, would have benefitted all First Lien Lenders (including Yucaipa and Counter-Defendants) on equal terms—the deal required consent of the other lenders, and JCT was obligated to purchase all outstanding debt claims held by non-consenting lenders "for a purchase price of up to par plus accrued interest."

73.     As noted above (¶ 72), by March 8, 2012, Yucaipa and JCT had finalized the March 2012 Term Sheet pursuant to which JCT would buy the First Lien Claims held by Yucaipa before the commencement of any bankruptcy for approximately $155 million.  At that point, with such an attractive deal on the table for all First Lien Lenders, Black Diamond and Spectrum had no legitimate reason to place Allied into an involuntary bankruptcy, which they knew would scuttle the deal with JCT as outlined in the March 2012 Term Sheet.  Yet Black Diamond and Spectrum went ahead with their plan, intent on achieving an exorbitant profit on their investments by setting up Yucaipa as the proverbial fall guy.

74.     Thus, on May 17, 2012, Black Diamond and Spectrum filed their petition for involuntary bankruptcy against Allied, which included false statements and material omissions to the Bankruptcy Court that were necessary to accomplish Counter-Defendants' scheme.  The involuntary bankruptcy filing violated at least two of the Bankruptcy Rules' material disclosure obligations—Rule 1003 and Rule 2019—in that Counter-Defendants failed to disclose Black

Diamond's Involuntary Petition Payoff to Defendant Spectrum for the purpose of bribing Defendant Spectrum to cooperate in filing the involuntary petition.

75.     First, the involuntary petitions Black Diamond and Spectrum filed against Allied contain a field entitled "Transfer of Claim" which reads as follows: "Check this box if there has been a transfer of claim against the debtor by or to any petitioner. Attach all documents that evidence the transfer and any statements that are required under Bankruptcy Rule 1003(a)." (Involuntary Pet., May 17, 2012, Ex. 16.)  Bankruptcy Rule 1003(a) prohibits the assignment, acquisition, or purchase of claims for the purpose of commencing an involuntary bankruptcy case. Rule 1003(b) requires the filing of an affidavit confirming that each petitioner has complied with Rule 1003(a).

76.     On the filed petitions, this box is checked and the petitions were signed by Mr. Deckoff, a managing principal of Black Diamond, and Jeffrey Schaffer, managing partner of Spectrum. (*Id.*)  Black Diamond and Spectrum's attorney also signed the petitions. (*Id.*)  But Black Diamond and Spectrum did not attach to the petitions any documents evidencing the transfer or statements required under Bankruptcy Rule 1003(a).

77.     Instead, Counter-Defendants coordinated through their joint counsel the submission of affidavits under Bankruptcy Rule 1003 in which (i) Mr. Ehrlich swore that Black Diamond had not "acquired" any claims in Allied for the purpose of commencing the involuntary bankruptcy case (the "Black Diamond Affidavit") and (ii) Mr. Schaffer falsely swore that no claims were "assigned to Spectrum for the purposes of commencing the bankruptcy cases" (the "Spectrum Affidavit"). (*See* Black Diamond Affidavit, Case No. 12-11564-CSS, Bankr. D. Del., May 17, 2012, D.I. 7, Ex. 17; Spectrum Affidavit, Case No. 12-11564-CSS, Bankr. D. Del., May 17, 2012, D.I. 8, Ex. 18.)  The Schaffer Email ("we cannot file an involuntary without it done")

makes clear that the Spectrum Affidavit was a lie and that the Black Diamond Affidavit intentionally contained a material omission by failing to disclose the assignment of approximately $4 million in First Lien Claims to Spectrum. In other words, Spectrum expressly required the Involuntary Petition Payoff as a prerequisite to joining in the filing of the involuntary bankruptcy—so the Bankruptcy Rules required Counter-Defendants to disclose that payoff.

78.    Counter-Defendants also expressly violated the disclosure requirements of Bankruptcy Rule 2019, which requires that "an entity that represents multiple creditors . . . acting in concert to advance their common interests" is required to file a statement disclosing, among other things, "the nature and amount of each disclosable economic interest held in relation to the debtor" and "the date of acquisition by quarter and year of each disclosable economic interest . . . ." Rule 2019 further defines "disclosable economic interest" as "any claim, interest, pledge, lien, option, participation, derivative instrument, or any other right or derivative right granting the holder an economic interest that is affected by the value, acquisition, or disposition of a claim or interest."

79.    In direct violation of Rule 2019, Counter-Defendants intentionally failed to disclose their intended secret claims trade or, more importantly, the existence of their secret Cooperation Agreement that governed their relationship relative to Allied and Yucaipa. This Cooperation Agreement contractually bound Black Diamond and Spectrum to offer to each other the opportunity to acquire a ratable share of any acquired First Lien Debt, which in fact meant Black Diamond would share its proprietary debt purchasing opportunities with Spectrum. In light of the fact that Black Diamond and Spectrum discussed an involuntary bankruptcy filing on numerous occasions, including on the eve of signing the Cooperation Agreement, it is clear that

the language used in the Cooperation Agreement was referring to an anticipated involuntary filing.

80.     Counter-Defendants knew or should have known that the false statements and omissions contained in their affidavits and in other papers filed in these cases violated applicable bankruptcy law and constituted fraud on Allied, Yucaipa, and the Bankruptcy Court. Counter-Defendants intended to mislead Yucaipa and the Bankruptcy Court as to the nature and purpose of the claims transferred by Black Diamond to Spectrum.

81.     In an effort to portray Yucaipa as a bad actor to set the stage for their equitable subordination claim, Counter-Defendants also moved for the appointment of a bankruptcy trustee over Allied's estate. (Mot. to App. Trustee, Main Case No. 12-11564, May 17, 2012, D.I. 13, Ex. 19.) They sought this extreme measure purportedly because Yucaipa manipulated Allied and prevented Allied's Board of Directors from fulfilling its fiduciary obligations. In reality, Yucaipa did nothing of the sort. That is why no other lender had previously sought such extreme relief (or any other relief, for that matter) even though Allied had been in continuous default under the First Lien Credit Agreement since August 2008 and had not paid any interest to the First Lien Lenders since August 2009. Counter-Defendants were attempting to spin a false narrative about Yucaipa's alleged misconduct in order to further their equitable subordination scheme—by misleading the Bankruptcy Court about Yucaipa and by using court filings to buttress their false accusations justifying an equitable subordination.

### STEP 4:  Attempt to Equitably Subordinate Yucaipa's Claims

82.     After commencing the involuntary bankruptcy, Counter-Defendants could then move forward to complete their plan by filing a series of baseless adversary proceedings seeking to equitably subordinate Yucaipa's First Lien Claims to those of Counter-Defendants.

83.     On January 25, 2013, Black Diamond and Spectrum filed an equitable subordination claim against Yucaipa in the Bankruptcy Court. Their complaint is replete with lies and misstatements about Yucaipa, and it contains false allegations of breaches of fiduciary duty and self-dealing, all in an attempt to effectively eliminate Yucaipa's First Lien Claims and enrich Black Diamond and Spectrum. *See Allied Systems, et al.*, Case No. 12-11564, filed on March 14, 2013. Many of these same false allegations also form the basis of the complaint for equitable subordination and other claimed relief in *ASHINC Corp., et al.*, Case No. 13-50499, filed January 25, 2013; *ASHINC Corp., et al.*, Case No. 13-50530, filed February 1, 2013; and *ASHINC Corp., et al.*, Case No. 14-50971, filed on November 19, 2014.

84.     Black Diamond and Spectrum were aware that their allegations against Yucaipa and related parties were objectively baseless and nothing more than fiction. In fact, Counter-Defendants were "checking out the equitable angle" even before Yucaipa acquired any First Lien Claims. (Email from M. Riggs, Innovative Equity Partners, to J. Schaffer, Spectrum, Aug. 13, 2009, Ex. 4.)

85.     While implementing their scheme to enrich themselves at Yucaipa's expense, Counter-Defendants simultaneously confirmed that Yucaipa was acting in good faith to maximize value for the stakeholders. For example, in 2011, Mr. Deckoff of Black Diamond emailed Mr. Burkle, the managing partner of Yucaipa, stating, "[o]n Allied, the strategy you outlined seemed right and you have our support. If there is anything we can do to help let me know." (Email from S. Deckoff, Black Diamond, to R. Burkle, Yucaipa, Feb. 2, 2011, Ex. 20.)

████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 21.)

86.     On June 28, 2011, Mr. Ehrlich emailed Mr. Schaffer to ask if he was "interested in doing a call with Adam Harris [of Schulte Roth & Zabel] to discuss available options," which included, on information and belief, equitable subordination of Yucaipa's First Lien Claims. (Email from R. Ehrlich, Black Diamond, to J. Schaffer, Spectrum, June 28, 2011, Ex. 22.)  Two days later, on June 30, the call with Schulte Roth & Zabel took place.  (Email from R. Ehrlich, Black Diamond, to J. Schaffer, Spectrum, June 30, 2011, Ex. 23.)

87.     Others at Black Diamond were aware of the scheme.  On July 10, 2011, Mr. Deckoff, Black Diamond's founder and managing partner, sent a Sunday night email to Mr. Ehrlich asking if he had "an Allied Strategy figured out yet."  (Email from S. Deckoff, Black Diamond, to R. Ehrlich, Black Diamond, July 10, 2011, Ex. 24.)

88.     In communications between September and October of 2011, Messrs. Ehrlich, Deckoff, and Meier all communicated about the status of the Allied involuntary bankruptcy. (*See* Email from R. Ehrlich, Black Diamond, to L. Meier, S. Deckoff, Black Diamond, Sept. 8, 2011, Ex. 25; Email from J. Schaffer, Spectrum, to R. Ehrlich, Black Diamond, Sept. 13, 2011, Ex. 26.)  On October 13, Mr. Deckoff emailed Mr. Ehrlich, asking, "[w]hat is happening with involuntary on allied?"  (Email from S. Deckoff, Black Diamond, to R. Ehrlich, L. Meier, Black Diamond, Oct. 13, 2011, Ex. 27.)

89.     Over the course of successive months, Black Diamond and Spectrum concealed their agreements and scheming from the Bankruptcy Court and Yucaipa.  As part of the bankruptcy case, Counter-Defendants filed the Black Diamond Affidavit and the Spectrum Affidavit, which misrepresented and concealed the nature of the illegal claims trading between them.  Further, the Cooperation Agreement, which memorialized the cooperation between Black

Diamond and Spectrum, was never produced during the bankruptcy proceedings, although it was responsive to discovery requests propounded by Yucaipa.

90.    Counter-Defendants' motive for forcing the involuntary bankruptcy was simple greed:  to equitably subordinate Yucaipa's First Lien Claims, enabling them to recover more on account of their First Lien Claims by increasing their stake in the claims pool from 22% to 50% by knocking out Yucaipa's 56% ownership interest of the First Lien Debt.  The involuntary bankruptcy petition filed by Black Diamond and Spectrum disrupted Yucaipa's sale of its First Lien Claims to JCT for $155 million.  Black Diamond and Spectrum colluded to block the sale to JCT and used bankruptcy as an attempt to equitably subordinate Yucaipa's 56% ownership in the First Lien Debt.  Because Counter-Defendants had sourced Allied's First Lien Debt for pennies on the dollar, this was a highly rational strategy for them from an economic perspective (although legally wrongful).  If everything went according to plan, Counter-Defendants would parlay an investment of less than $8 million into multiples of that amount—a massive windfall even for highly aggressive hedge funds like Black Diamond and Spectrum.  Counter-Defendants believed they had no downside and an enormous upside—until the truth emerged.

**C.    Black Diamond and Spectrum Collude to Block Payment of Yucaipa's Fees and Expenses, But Pay Their Own Fees and Expenses**

91.    Black Diamond and Spectrum were not content with the execution of their fraudulent equitable subordination scheme—they also further sought to strip Yucaipa of any rights in connection with its holdings of the First Lien Claims.  The First Lien Credit Agreement provides for reimbursement of legal expenses incurred by any lender in certain enumerated circumstances, including expenses incurred in the course of Allied's bankruptcy proceedings. (First Lien Credit Agreement § 10.2h, Ex. 1.)  Through this provision, Yucaipa was entitled to reimbursement for fees and expenses related to, among other things, (a) litigation with CIT to

enforce rights under the First Lien Credit Agreement, (b) litigation with Black Diamond and Spectrum, and (c) Yucaipa's fees incurred in connection with enforcing its rights in Allied's bankruptcy proceedings.

92.    Relying on the First Lien Credit Agreement, on December 19, 2013, Counter-Defendants submitted reimbursement claims to the Administrative Agent (which is now their controlled affiliate) for legal expenses in the aggregate amount of $11.6 million.  Counter-Defendants provided no explanation or details regarding this amount.  Concurrently, Yucaipa also submitted its expense reimbursement claim in the amount of $16.7 million to the Administrative Agent, along with a detailed description of work performed.

93.    Black Diamond and Spectrum colluded to block Yucaipa's claims for expense reimbursement without justification, while arranging for the Administrative Agent (which, again, is their controlled affiliate) to pay their own fees and expenses in full.  Further, Yucaipa petitioned the Bankruptcy Court to freeze any payment of fees and expenses to Counter-Defendants.  Although the Bankruptcy Court ordered the freezing of any such payments, Counter-Defendants worked with the Administrative Agent to end-run that order and obtained payment of their fees and expenses.

**D.    Counter-Defendants Use a Credit Bid to Dilute Interests of Other Lenders in Assets Excluded from the JCT Sale**

94.    Pursuant to the JCT sale in the Allied bankruptcy, JCT acquired substantially all of Allied's assets, but excluded from purchase certain of Allied's real estate assets and trucks.  Counter-Defendants, purporting to act as the Requisite Lender, made a credit bid for those excluded assets.  Yucaipa objected to Counter-Defendants purporting to act as the Requisite Lender and consistently maintained that Counter-Defendants did not qualify as the Requisite Lender, but Yucaipa did not object to the Credit Bid itself.  Black Diamond and Spectrum

designated their controlled affiliates, Black Diamond Commercial Finance L.L.C. and Spectrum

Commercial Finance, LLC, as agents to implement the Credit Bid (the "Black Diamond

Agents"). On August 20, 2013, the Black Diamond Agents formed an entity called SBDRE LLC

("SBDRE") to hold the real estate and trucking assets they anticipated acquiring through the

Credit Bid.

95.     On September 17, 2013, the Bankruptcy Court approved the Credit Bid, but in

doing so the Court explicitly refused to review or approve any provision of SBDRE's

governance. The Bankruptcy Court ruled that it had to determine that Black Diamond and

Spectrum together had the requisite authority to make the Credit Bid in order to allow the Credit

Bid to go forward. If the Bankruptcy Court had not made such a determination, none of the First

Lien Lenders would have been able to submit the Credit Bid on behalf of the group. However,

the Bankruptcy Court went on to hold that nothing in its order affected Yucaipa's state law rights

with respect to SBDRE. (*See* Tr. 99, Case No. 12-11564, Bankr. D. Del., Sept. 17, 2013, D.I.

1844, Ex. 28.) The Bankruptcy Court explicitly reserved all questions with respect to the voting

rights, equity, and corporate governance of SBDRE for an appropriate non-bankruptcy court to

resolve.

96.     The Bankruptcy Court's approval of the Credit Bid in no way blessed the LLC

agreement of SBDRE or Counter-Defendants' planned (but undisclosed) governance of SBDRE.

97.     On November 8, 2013, counsel for Counter-Defendants circulated a memorandum

to the other First Lien Lenders. In the Memorandum, Counter-Defendants first disclosed to the

First Lien Lenders the fact that they intended to assert ongoing and unlawful control over

SBDRE, the entity formed to hold the assets acquired by all of the lenders, pro rata, through the

Credit Bid. (Mem., Nov. 8, 2013, Ex. 29.)

98.     Specifically, Counter-Defendants disclosed that they would withhold from the other First Lien Lenders (including Yucaipa) their pro rata ownership interests in SBDRE. Instead of distributing each First Lien Lender's pro rata share of the assets or each such lender's pro rata share of the membership interests in SBDRE, Counter-Defendants determined that Black Diamond and Spectrum would control SBDRE for an indeterminate period of time while Black Diamond and Spectrum, directly and through the Black Diamond Agents, exercised control over those assets, wholly unfettered by fiduciary duties.  Black Diamond and Spectrum also set up an illegal equity rights offering, the New Issuance, that excluded Yucaipa from participation and dramatically reduced Yucaipa's pro rata allocation of the SBDRE membership interest from 56% to approximately 3% in favor of Black Diamond and Spectrum.

99.     In addition to the New Issuance, Black Diamond has informed the First Lien Lenders that it intends to cause SBDRE to reimburse Counter-Defendants for all of its litigation expenses in securing its control of SBDRE.  Counter-Defendants are not entitled to this reimbursement, which further wrongfully dilutes Yucaipa's recoveries, as well as the recoveries to all First Lien Lenders.

100.     Finally, SBDRE's LLC agreement purports to waive any fiduciary duties that would be owed by Counter-Defendants or the Black Diamond Agents to the fullest extent permitted by Delaware law.  Black Diamond's structure of SBDRE and the New Issuance effectively forces the First Lien Lenders to abandon their interests in the Allied assets acquired through the Credit Bid or to invest substantial additional funds into an enterprise that Counter-Defendants would be entitled to manage in their sole discretion without any fiduciary duties.

101.    Thus, Counter-Defendants have used their current, disputed, temporary control of SBDRE to irreparably dilute the other First Lien Lenders and entrench themselves, while simultaneously limiting their liability for doing so, all in furtherance of their scheme.

**E.    Case No. 15 CV 916-DLC Filed in the Southern District of New York**

102.    On February 6, 2015, Yucaipa filed Case No. 15 CV 916-DLC in the United States District Court for the Southern District of New York.  That Complaint alleges, among other claims, violations of RICO, 18 U.S.C. § 1962 *et seq.*, as well as fraud claims against (1) Richard A. Ehrlich, (2) Stephen H. Deckoff; (3) Leslie A. Meier; (4) Jeffrey A. Schaffer; (5) BDCM Opportunity Fund II, L.P., a Delaware limited partnership; (6) Black Diamond CLO 2005-1 Ltd., a Cayman Islands limited liability company; and (7) Spectrum Investment Partners, L.P., a Delaware limited partnership.  That Complaint alleges facts similar to those contained in this action, but, among other differences, it seeks a damage remedy, rather than equitable subordination of Counter-Defendants' claims.

**F.    Yucaipa Suffered, and Continues to Suffer, Harm as a Result of Counter-Defendants' Inequitable Misconduct**

103.    Counter-Defendants' motive for forcing the involuntary bankruptcy was simple greed: to equitably subordinate Yucaipa's First Lien Claims, enabling them to recover more on account of their own First Lien Claims by increasing their stake in the claims pool from 22% to 49% by knocking out Yucaipa's 56% ownership interest.  The involuntary petition disrupted Yucaipa's sale of its First Lien Claims to JCT for $155 million.  Counter-Defendants colluded to block the sale to JCT and to use bankruptcy as an attempt to equitably subordinate Yucaipa's 56% ownership in the First Lien Debt.  Because Counter-Defendants had sourced Allied's First Lien Debt for pennies on the dollar, this was a highly rational strategy for them.  If everything went according to plan, Counter-Defendants would parlay an investment of less than $15 million

into multiples of that amount—a massive windfall even for highly aggressive hedge funds like Counter-Defendants. Until they got caught and their fraudulent scheme was exposed, Counter-Defendants believed they had little downside and an enormous upside.

104.    Counter-Defendants' decision to orchestrate an involuntary petition and scuttle the sale to JCT had nothing to do with achieving a better price for the sale of Allied's assets. Rather, Counter-Defendants' motivation was a desire to obtain Allied's assets for themselves at Yucaipa's expense.

**G.    Equitable Subordination of Counter-Defendants' Claims Is Not Inconsistent with the Bankruptcy Code**

105.    Granting the relief sought in this Counterclaim against Counter-Defendants would not be inconsistent with the Bankruptcy Code. To the contrary, equitable subordination of Counter-Defendants' claims would be appropriate based on the facts of this case and the governing case law.

**H.    Yucaipa Is the Only Party That Could or Would Seek Equitable Subordination of Counter-Defendants' Claims Based on the Conduct Alleged Herein**

106.    Counter-Defendants' scheme sought to inflict harm uniquely upon Yucaipa. They targeted Yucaipa as the majority holder of Allied's equity as well as its debt. Counter-Defendants crafted their false narrative to take advantage of Yucaipa's employees' positions on Allied's Board, as well as Yucaipa's majority holding of Allied's debt.

107.    No other holder of a First Lien Claim is similarly situated to Yucaipa. Other First Lien Claim holders (a) hold minor stakes in the First Lien Debt; (b) have no equity stake in Allied; (c) are not insiders and have no employees who serve on the Allied Board of Directors; (d) have no involvement in the management or control of Allied; (e) would suffer harm too inconsequential to pursue in connection with an equitable subordination claim; (f) have not been sued for equitable subordination and (g) have always acted in concert with Counter-Defendants.

Moreover, and most critically, Counter-Defendants' scheme was directed at Yucaipa and is focused on eliminating Yucaipa's rights in favor of their own; therefore, this claim is one that only Yucaipa would or could assert. It is entirely unrealistic to assume that any lender other than Yucaipa (or anyone else) would bring the equitable subordination claim set forth in this Counterclaim.

## COUNT I

### (Equitable Subordination Under Sections 510(c) and 105(a) of the Bankruptcy Code Against All Counter-Defendants)

108.    Yucaipa repeats and realleges the allegations of paragraphs 1 through 107 as though fully set forth herein.

109.    Yucaipa alleges this Counterclaim against all Counter-Defendants, affiliates of Counter-Defendants, and others that have asserted claims against any of the Debtors that may, directly or indirectly, benefit any Counter-Defendant.

110.    Counter-Defendants engaged in inequitable conduct, including conduct described in this Counterclaim that has resulted in harm to Yucaipa or the conferring of an unfair advantage on Counter-Defendants. Counter-Defendants have engaged in grossly inequitable conduct including the following:

(a)    Transferring claims for the explicit purposes of commencing these involuntary cases against Allied, in violation of Bankruptcy Rule 1003.

(b)    Knowingly and intentionally failing to disclose the fact that Counter-Defendants illegally transferred claims in violation of Bankruptcy Rule 1003 and that Spectrum had intentionally misled the Court with respect to Spectrum's acquisition of claims from Counter-Defendants in violation of Bankruptcy Rule 1003.

(c)    Filing the involuntary petitions for an improper purpose and in bad faith.

(d)      Perpetrating a scheme to disrupt the consummation of a sale of the

Debtors' assets to JCT, in order to drive down the price of Allied's assets, to the

detriment of Yucaipa and for the benefit of Counter-Defendants.

(e)      Encouraging Yucaipa to purchase ComVest's First Lien Debt, with the

intent to then file involuntary cases against Allied and to use the bankruptcy process to

attack and subordinate Yucaipa's claims based on lies and deception.

(f)      Misstating the facts in their affidavits filed in support of the involuntary

petitions, in violation of Bankruptcy Rule 1003, with the purpose of misleading this

Court.

111.    All of Counter-Defendants' claims against the Debtors' bankruptcy estates should

be equitably subordinated in their entirety to the recovery in full of Yucaipa.

## PRAYER FOR RELIEF

WHEREFORE, Yucaipa prays for judgment in this matter as follows:

A.    Equitably subordinating Counter-Defendants' claims in these cases to the claims of

Yucaipa;

B.    Any and all legal and/or equitable remedies available under applicable bankruptcy and

non-bankruptcy law, including the disgorgement of any fees, costs, and other expenses

(including attorneys' fees) obtained by Counter-Defendants from the Debtors or their

estates; and

\*                    \*                    \*

C.    Such other relief as this Court may find warranted, including, without limitation, an

award to Yucaipa of its fees, costs, and other expenses (including attorneys' fees) related

to this action.

Dated: February 19, 2015
      Wilmington, Delaware

                                   YOUNG CONAWAY STARGATT & TAYLOR,
                                   LLP

                                   */s/ Michael R. Nestor*
                                   John T. Dorsey, Esquire (No. 2988)
                                   Michael R. Nestor (No. 3526)
                                   Sharon M. Zieg, Esquire (No. 4196)
                                   Michael S. Neiburg (No. 5275)
                                   Rodney Square
                                   1000 North King Street
                                   Wilmington, DE  19801
                                   Telephone: (302) 571-6600
                                   mnestor@ycst.com

                                   - and-

                                   GIBSON, DUNN & CRUTCHER LLP
                                   Robert A. Klyman
                                   Maurice M. Suh
                                   Kahn Scolnick
                                   Peter Bach-y-Rita
                                   Theodore O'Reilly
                                   333 South Grand Avenue
                                   Los Angeles, CA  91001
                                   Telephone: (213) 229-7000
                                   RKlyman@gibsondunn.com

                                   *Attorneys for Defendants Yucaipa American Alliance*
                                   *Fund I, L.P., Yucaipa American Alliance (Parallel)*
                                   *Fund I, L.P., Yucaipa American Alliance Fund II,*
                                   *L.P., Yucaipa American Alliance (Parallel) Fund II,*
                                   *L.P., Ronald Burkle, Jos Opdeweegh, Derex Walker,*
                                   *Jeff Pelletier, Ira Tochner, and Joseph Tomczak*

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Bankruptcy Procedure 9015 and Federal Rule of Civil

Procedure 38(b), Yucaipa and the Individual Defendants respectfully: (a) demand a trial by jury,

in United States District Court, of any and all issues triable by a jury; and (b) give notice of their

refusal to consent to have a jury trial conducted by a bankruptcy judge under 11 U.S.C. § 157(e).

Dated: February 19, 2015
      Wilmington, Delaware

                      YOUNG CONAWAY STARGATT & TAYLOR, LLP

                      */s/ Michael R. Nestor*
                      John T. Dorsey, Esquire (No. 2988)
                      Michael R. Nestor (No. 3526)
                      Sharon M. Zieg, Esquire (No. 4196)
                      Michael S. Neiburg (No. 5275)
                      Rodney Square
                      1000 North King Street
                      Wilmington, DE  19801
                      Telephone: (302) 571-6600
                      mnestor@ycst.com

                      - and-

                      GIBSON, DUNN & CRUTCHER LLP
                      Robert A. Klyman
                      Maurice M. Suh
                      Kahn Scolnick
                      Peter Bach-y-Rita
                      Theodore O'Reilly
                      333 South Grand Avenue
                      Los Angeles, CA  91001
                      Telephone: (213) 229-7000
                      RKlyman@gibsondunn.com

                      *Attorneys for Defendants Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund II, L.P., Yucaipa American Alliance (Parallel) Fund II, L.P., Ronald Burkle, Jos Opdeweegh, Derex Walker, Jeff Pelletier, Ira Tochner, and Joseph Tomczak*

## APPENDIX OF TECHNICAL AND DEFINED TERMS

| Term | Definition | First Reference (¶) |
|---|---|---|
| 363 Sale | The sale of a bankruptcy estate's assets under Section 363 of the Bankruptcy Code (11 U.S.C. § 363). Under Section 363(f), a bankruptcy trustee or debtor-in-possession may sell the bankruptcy estate's assets "free and clear of any interest in such property." Secured creditors are generally permitted to credit bid up to the full amount of their claims on a dollar-for-dollar basis with cash bids. | 57 |
| Administrative Agent | The agent appointed under the First Lien Credit Agreement to serve as the principal agent administering the agreement, including processing interest payments and other administrative duties. | 9 |
| Black Diamond Affidavit | Affidavit of Mr. Ehrlich in support of Black Diamond's involuntary petition filed against Allied, wherein Ehrlich states that no claims were transferred to Black Diamond for the purpose of commencing the Allied bankruptcy case. | 77 |
| Black Diamond Agents | Black Diamond Commercial Finance L.L.C. and Spectrum Commercial Finance, LLC, as agents designated by Black Diamond to form SBDRE and credit bid for certain Allied real property assets. | 94 |
| Cooperation Agreement | Secret agreement entered into between Black Diamond and Spectrum, later produced in the Adversary Proceeding Case No. 13-50530, according to which the parties agreed to trade claims and share information as part of their strategy to file an involuntary case against Allied. | 64 |
| Credit Bid | The right of a secured creditor to offset and count up to the full amount of its secured claim towards the purchase price of assets sold by the estate in a 363 Sale, as provided in Bankruptcy Code Section 363(k) (11 U.S.C. § 363(k)). | 94 |
| Eligible Assignee | An assignee eligible to have debt assigned and transferred to it under the First Lien Credit Agreement. | 33 |
| First Lien Claims | Claims of creditors holding debt under the First Lien Credit Agreement. | 3 |
| First Lien Credit | Agreement providing for first lien "exit financing" from Allied's Prior Bankruptcy Case, consisting of a | 5 |

| **Term** | **Definition** | **First Reference (¶)** |
|---|---|---|
| Agreement | $265 million facility in the form of term loans, revolving loans and lenders' deposits to support letters of credit. | |
| First Lien Debt | Debt under the First Lien Credit Agreement. | 8 |
| First Lien Lenders | Lenders under the First Lien Credit Agreement. | 8 |
| Fourth Amendment | Fourth amendment to the First Lien Credit Agreement, which removed restrictions on the transfer of First Lien Debt and allowed Yucaipa to become Requisite Lender. | 8 |
| Georgia Action | Expensive, years-long litigation in Georgia state court among Allied, Yucaipa, and the administrative agent under the First Lien Credit Agreement, CIT, which result from Counter-Defendants Black Diamond and Spectrum's secretly direction to CIT to refuse to recognize Yucaipa as Requisite Lender after adoption of the Fourth Amendment to the First Lien Credit Agreement. | 53 |
| Involuntary Petition Payoff | Black Diamond's bribe to Spectrum to induce Spectrum to join the scheme to file an Involuntary Bankruptcy petition against, consisting of approximately $4 million (in face amount) of Black Diamond's First Lien Claims at Black Diamond's low discounted purchase price. | 64 |
| Memorandum | A memorandum dated November 8, 2013, circulated by counsel for Black Diamond to other First Lien Lenders, disclosing to the lenders the fact that Black Diamond intended to assert control over SBDRE. | 97 |
| New Issuance | Black Diamond and Spectrum's illegal equity rights offering in the Involuntary Bankruptcy proceeding against Allied in the Bankruptcy Court, Case No. 12-11564, filed on March 14, 2013, that excluded Yucaipa from participation and dramatically reduced Yucaipa's pro rata allocation of the SBDRE membership interest from 56% to approximately 3% in favor of Black Diamond and Spectrum. | 98 |
| Prior Bankruptcy Case | Voluntary bankruptcy case filed by predecessors of Allied in 2005. | 4 |
| Prior Bonds | $150 million of unsecured bonds representing Allied's indebtedness at the time Allied filed the Prior Bankruptcy Case. | 30 |

2

| Term | Definition | First Reference (¶) |
|------|-----------|---------------------|
| Requisite Lender | Defined in the First Lien Credit Agreement to mean one or more Lenders having or holding Term Loan Exposure, LC Exposure and/or Revolving Exposure and representing more than 50% of the sum of (i) the aggregate Term Loan Exposure of all Lenders, (ii) the aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving Exposure of all Lenders.  The Requisite Lender has certain power to modify and/or amend loan covenants and direct the Administrative Agent (CIT) to exercise remedies under the First Lien Credit Agreement. | 8 |
| SBDRE | Entity formed by agents of Black Diamond to credit bid for certain real property assets of Allied. | 94 |
| Second Lien Credit Agreement | Agreement providing for Second Lien "exit financing" from Allied's Prior Bankruptcy Case, consisting of $50 million in loans. | 5 |
| Special Committee | A subcommittee of the Allied board of directors, consisting of members independent from Yucaipa. | 48 |
| Spectrum Affidavit | Affidavit of Mr. Schaffer in support of Spectrum's involuntary petition against Allied, wherein Schaffer states that no claims were transferred to Spectrum for the purpose of commencing the bankruptcy case. | 77 |
| Third Amendment | Third amendment to the First Lien Credit Agreement, which removed restrictions on the transfer of Allied's First Lien Debt to Yucaipa. | 35 |

3