# EXHIBIT 2

Execution Copy

## AMENDMENT NO. 4 TO CREDIT AGREEMENT

This **AMENDMENT NO. 4 TO CREDIT AGREEMENT** dated as of August 21, 2009 (this "**Amendment**"), to the Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement, dated as of May 15, 2007 (as amended by that certain Limited Waiver and Amendment No. 1 to Credit Agreement and Pledge and Security Agreement, dated as of May 29, 2007, as further amended by that certain Amendment No. 2 to Credit Agreement, dated as of June 12, 2007 and that certain Amendment No. 3 to Credit Agreement, dated as of April 17, 2008, the "**Credit Agreement**"), by and among **ALLIED SYSTEMS HOLDINGS, INC.** (formerly known as Allied Holdings, Inc.), a Delaware corporation ("**Holdings**"), **ALLIED SYSTEMS, LTD. (L.P.)**, a Georgia limited partnership ("**Systems**" and, together with Holdings, the "**Borrowers**"), and **CERTAIN SUBSIDIARIES OF THE BORROWERS**, the Lenders party thereto from time to time, **GOLDMAN SACHS CREDIT PARTNERS L.P.**, as Lead Arranger and as Syndication Agent and **THE CIT GROUP/BUSINESS CREDIT, INC.** as Administrative Agent (together with its permitted successors in such capacity, "**Administrative Agent**") and as Collateral Agent.

### RECITALS:

**WHEREAS**, the Credit Agreement currently allows Sponsor and its Affiliates (other than the Borrowers and their Subsidiaries) to become Lenders by purchasing and assuming the rights and obligations of one or more Lenders under the Credit Agreement, but only if Sponsor and/or its Affiliates contribute such rights and obligations to the Borrowers in the form of capital contributions;

**WHEREAS**, Requisite Lenders have agreed (a) to amend the Credit Agreement to permit Sponsor and its Affiliates to be Lenders under the Credit Agreement without any requirement to contribute Loans or Commitments to the Borrowers and (b) to consent to make certain other modifications thereto, in each case, in the manner, and subject to the terms and conditions, provided for herein.

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS

1.1     All capitalized terms used herein (including in the introductory paragraph and Recitals set forth above) and not otherwise defined shall have the meanings assigned to such terms in the Credit Agreement.

## SECTION 2. AMENDMENTS TO CREDIT AGREEMENT

2.1     <u>**Amendments to Section 1: Definitions**</u>.

(a)     Section 1.1 of the Credit Agreement is hereby amended by inserting the following definition therein:

LA\1967719.16

" "**Fourth Amendment**" means that certain Amendment No. 4 to the Credit Agreement, dated as of August 21, 2009, by and among the Borrowers, certain Subsidiaries of the Borrowers and the Lenders parties thereto."

(b)    Section 1.1 of the Credit Agreement is hereby further amended by deleting the definitions of "Eligible Assignee" and "Term Loan Exposure" in their entirety and inserting in lieu thereof the following:

" "**Eligible Assignee**" means (i) any Lender, any Affiliate of any Lender and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), and (ii) any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans; provided, neither Borrowers nor any of their Subsidiaries shall be an Eligible Assignee."

" "**Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender plus during the Term Loan Commitment Period, the unfunded Term Loan Commitment of such Lender; provided, at any time prior to the making of the initial Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Term Loan Commitment."

2.2    **Amendments to Section 5: Affirmative Covenants.**

(a)    Section 5.1 of the Credit Agreement is hereby amended by deleting the following at the end of clause (a) thereof:

"and together with such financial statements, a written report certified by an Authorized Officer of Holdings identifying (i) the aggregate amount of Term Loans and Second Lien Term Loans acquired by any Restricted Sponsor Affiliate during such month (and with respect to the first month of any Fiscal Quarter, the amount of Term Loans and Second Lien Term Loans acquired in the last month of the preceding Fiscal Quarter), together with the date of, and purchase price for, each such acquisition and (ii) the aggregate principal amount of Term Loans and Second Lien Term Loans held by any Restricted Sponsor Affiliates as of the last day of such month;"

2.3    **Amendments to Section 8: Events of Default; Carve-Out Event.**

(a)    Section 8.1 of the Credit Agreement is hereby amended by deleting clause (aa) thereof in its entirety.

2.4    **Amendments to Section 10: Miscellaneous.**

(a)    Section 10.5 of the Credit Agreement is hereby amended by deleting clause (e) thereof in its entirety.

(b)    Section 10.6 of the Credit Agreement is hereby amended by deleting clause (b) thereof in its entirety and inserting the following in lieu thereof:

2

"(b)    Register. The Borrowers, Administrative Agent and Lenders shall deem and treat the Persons listed as Lenders in the Register as the holders and owners of the corresponding Commitments, LC Deposits and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment, LC Deposit or Loan shall be effective, in each case, unless and until recorded in the Register following receipt of an Assignment Agreement effecting the assignment or transfer thereof, in each case, as provided in Section 10.6(d); provided, however, any Assignment Agreement that is not recorded in the Register within the time period required by the following sentence shall be deemed effective and recorded in the Register and the assignee thereof shall be deemed a Lender for all purposes under this Agreement in each case at the end of such time period. Each assignment shall be recorded in the Register on the Business Day the Assignment Agreement is received by Administrative Agent, if received by 12:00 noon New York City time, and on the following Business Day if received after such time, prompt notice thereof shall be provided to the Borrowers and a copy of such Assignment Agreement shall be maintained, as applicable. The date of such recordation of a transfer shall be referred to herein as the "**Assignment Effective Date**." Any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments, LC Deposits or Loans."

(c)    Section 10.6(c) of the Credit Agreement is hereby amended by deleting the following at the end of the first sentence of clause (ii) thereof:

"; provided further, that (x) no Lender may sell, assign or transfer or otherwise convey any of its rights and obligations under this Agreement (including the Commitments, the LC Deposits or the Loans) to a Restricted Sponsor Affiliate and no Restricted Sponsor Affiliate shall acquire any such rights or obligations, in each case if (A) immediately prior to and after giving effect to such assignment or transfer the aggregate amount of the Term Loan Exposure held or beneficially owned by all Restricted Sponsor Affiliates would exceed 25% of the aggregate amount of the Term Loan Exposure held or beneficially owned by all Lenders (including Restricted Sponsor Affiliates) or (B) after giving effect to such assignment or transfer, the aggregate amount of Term Loans acquired by all Restricted Sponsor Affiliates since the Closing Date would exceed $50 million (notwithstanding whether all or any portion of such acquired Term Loans have been contributed to the Borrowers or otherwise disposed of by the Restricted Sponsor Affiliates) and (y) assignments by or to a Restricted Sponsor Affiliate shall be further subject to Section 10.6(j)."

(d)    Section 10.6(h) of the Credit Agreement is hereby amended by deleting clause (i) thereof in its entirety and inserting the following in lieu thereof:

"(i) Each Lender shall have the right at any time to sell one or more participations to any Person (other than Holdings or any of its Subsidiaries) in all or any part of its Commitments, Loans or in any other Obligation."

(e)    Section 10.6 of the Credit Agreement is hereby amended by deleting clause (j) thereof in its entirety and inserting the following in lieu thereof (Section 2.17 of the

3

Credit Agreement is hereby correspondingly amended to delete the reference to Section 10.6(j)(iii) therein):

> "(j) <u>Restricted Sponsor Affiliates</u>. The Restricted Sponsor Affiliates, from time to time, intend to become Lenders and, from time to time, to sell, assign or transfer all or a portion of their Commitments, LC Deposits, Loans or other Obligations and the rights and obligations as Lenders related thereto under this Agreement to Eligible Assignees. Each Agent and Lender hereby acknowledges that a Restricted Sponsor Affiliate (i) may be a Lender (<u>provided</u> such Restricted Sponsor Affiliate otherwise satisfies the criteria of the definition of the term of "Eligible Assignee") and (ii) may sell, assign or transfer all or a portion of its Commitments, LC Deposits, Loans, other Obligations and the rights and obligations as a Lender related thereto under this Agreement to Eligible Assignees."

(f) Section 10.6 of the Credit Agreement is hereby amended by deleting clause (k) thereof in its entirety (Section 2.17 of the Credit Agreement is hereby correspondingly amended to delete the reference to Section 10.6(k)(i) therein).

2.5 **<u>Amendments to Exhibits</u>.**

(a) Exhibit E to the Credit Agreement (Assignment and Assumption Agreement) is hereby amended by deleting the heading of Section 1 in its entirety and inserting in lieu thereof the following:

> "1. <u>Representations and Warranties; Covenants</u>."

(b) Exhibit E to the Credit Agreement (Assignment and Assumption Agreement) is hereby further amended by deleting Section 1.1 of the Standard Terms and Conditions for Assignment and Assumption Agreement in its entirety and inserting in lieu thereof the following:

> "1.1 <u>Assignor</u>. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "**Credit Documents**"), or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document."

(c) Exhibit E to the Credit Agreement (Assignment and Assumption Agreement) is hereby further amended by deleting Section 1.2 of the Standard Terms and

4

LA\1967719.16

Conditions for Assignment and Assumption Agreement in its entirety and inserting in lieu thereof the following:

"1.2     Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, and (v) if it is a Non-US Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender."

### SECTION 3.  CONDITIONS PRECEDENT TO EFFECTIVENESS

The effectiveness of the amendments set forth in this Amendment are subject to the satisfaction, or waiver, of the following conditions on or before the date hereof (the "Amendment Effective Date"):

(a)     The Borrowers, the other Credit Parties and Requisite Lenders shall have indicated their consent by the execution and delivery of the signature pages hereof to ComVest via email, telex, telefacsimile, United States mail (certified, return receipt) or courier service at the address and email set forth below:

ComVest Investment Partners III, L.P.
c/o The ComVest Group
CityPlace Tower
525 Okeechobee Blvd., Suite 1050
West Palm Beach, Fl 33401
Attention: Mark Hughes, Jose Gordo
Email: markh@comw.com, joseg@comvest.com
Fax: (561) 727-2100
Phone: (561) 727-2000

(b)     The Requisite Lenders shall have received a certificate from an officer of Holdings stating that as of the Amendment Effective Date and after giving effect to this Amendment (i) the representations and warranties (other than the representations and warranties contained in Sections 4.9, 4.15 and 4.22 of the Credit Agreement) contained in Section 4 herein

5

LA\1967719.16

and in the other Credit Documents are true, correct and complete in all material respects on and as of the Amendment Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties are true, correct and complete in all material respects on and as of such earlier date and (ii) other than those certain specified Events of Default listed on Schedule A hereto (the "**Specified Events of Default**"), no event has occurred and is continuing or will result from the consummation of the transactions contemplated by this Amendment that would constitute an Event of Default or a Default.

(c)　　The Requisite Lenders shall have received an executed copy of the favorable written opinion of Troutman Sanders LLP, counsel for the credit parties, in form and substance reasonably satisfactory to the Requisite Lenders, addressing among other things the due authorization, execution and delivery of this Amendment, the enforceability of the Loan Documents, as amended by this Amendment, and the continuing validity of the security interests in the Collateral created pursuant to the Loan Documents and the perfection thereof.

(d)　　The Requisite Lenders shall have received (i) certified copies of the resolutions of the Board of Directors of each Borrower and each other Credit Party approving this Amendment and the matters contemplated hereby, (ii) a certificate of a duly authorized officer of each Borrower and each other Credit Party certifying the names and true signatures of the officers of the Borrower and such other Credit Party authorized to sign this Amendment, (iii) certified copies of the organizational documents of each Borrower and each other Credit Party, (iv) a certificate of good standing or existence of each Borrower and each other Credit Party issued as of a recent date by the secretary of state or similar officer of the jurisdiction of organization of each such entity and (v) evidence satisfactory to them of the concurrent closing of the transactions contemplated by the Loan Purchase Agreement dated as of the date hereof relating to certain Loans and other Credit Extensions; and

(e)　　The Requisite Lenders, shall have been reimbursed by the Borrowers for all costs and expenses, including attorneys' fees (including the fees, charges and disbursements of Willkie Farr & Gallagher LLP, outside counsel for the Lenders signatory hereto) incurred by the undersigned in connection with the Credit Documents and this Amendment and all other transactions (contemplated, completed or otherwise) related to any thereof, whether or not consummated.

## SECTION 4.  REPRESENTATIONS AND WARRANTIES

4.1　　Corporate Power and Authority.  Each Credit Party has all requisite corporate, limited liability company or partnership (as applicable) power and authority to enter into this Amendment and to carry out the transactions contemplated by, and perform its obligations under, the Credit Agreement, as amended by this Amendment (the "**Amended Credit Agreement**").

4.2　　Authorization of Amendments.  The execution and delivery of this Amendment have been duly authorized by all necessary corporate, limited liability company or partnership (as applicable) action on the part of each Credit Party.

6

4.3    No Conflict. The execution and delivery by each Credit Party of this Amendment and the performance by each Credit Party of the Amended Credit Agreement do not and will not (a) violate (i) any provision of any law or any governmental rule or regulation applicable to any Credit Party, (ii) the certificate or articles of incorporation or bylaws (or other organizational documents) of any Credit Party or (iii) any order, judgment or decree of any court or other agency of government binding on any Credit Party; (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any Contractual Obligation of any Credit Party, (c) result in or require the creation or imposition of any Lien upon any of the properties or assets of a Credit Party other than those in favor of the Collateral Agent, on behalf of itself and the Secured Parties, pursuant to the Credit Documents or those in favor of the Second Lien Collateral Agent on a second priority basis pursuant to the Second Lien Credit Documents, or (d) require any approval of stockholders or any approval or consent of any Person under any Contractual Obligation of any Credit Party other than (i) approvals and consents that have been made or obtained and (ii) approvals and consents the failure of which to obtain could not reasonably be expected to have a Material Adverse Effect.

4.4    Governmental Consents. No action, consent or approval of, registration, notice or filing with or any other action by any Governmental Authority is required in connection with the execution and delivery by each Credit Party of this Amendment or the performance by the Credit Parties of the Amended Credit Agreement except to the extent that the failure to undertake or obtain such action, consent, approval, registration or notice could not reasonably be expected to have a Material Adverse Effect.

4.5    Binding Obligation. This Amendment has been duly executed and delivered by each Credit Party and this Amendment and the Amended Credit Agreement constitute the legal, valid and binding obligation of each Credit Party enforceable against each Credit Party in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting creditors' rights generally and except as enforceability may be limited by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

4.6    Incorporation of Representations and Warranties From Credit Documents. The representations and warranties (other than the representations and warranties contained in Sections 4.9, 4.15 and 4.22 of the Credit Agreement) contained in the Credit Documents are and will be true, correct and complete in all material respects on and as of the Amendment Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case they were true, correct and complete in all material respects on and as of such earlier date.

4.7    Absence of Default. After giving effect to the amendment set forth herein, other than the Specified Events of Default, no event has occurred and is continuing or will result from the consummation of the transactions contemplated by this Amendment that would constitute an Event of Default or a Default.

7

## SECTION 5.  ACKNOWLEDGEMENT AND CONSENT; RELEASE

Each Guarantor hereby consents to the terms of this Amendment and further hereby confirms and agrees that, notwithstanding the effectiveness of this Amendment, the obligations of such Guarantor under each of the Credit Documents to which such Guarantor is a party shall not be impaired and each of the Credit Documents to which such Guarantor is a party are, and shall continue to be, in full force and effect and are hereby confirmed and ratified in all respects.

Each Guarantor hereby acknowledges and agrees that (i) notwithstanding the conditions to effectiveness set forth in this Amendment, such Guarantor is not required by the terms of the Credit Agreement or any other Credit Document to consent to the amendment to the Credit Agreement effected pursuant to this Amendment and (ii) nothing in the Credit Agreement, this Amendment or any other Credit Document shall be deemed to require the consent of such Guarantor to any future amendments to the Credit Agreement.

The Credit Parties hereby acknowledge and agree that, for the avoidance of doubt and notwithstanding any other provision of this Amendment to the contrary, the obligations of the Credit Parties under Section 10.3 of the Credit Agreement as to any Indemnitee shall continue with respect to such Indemnitee notwithstanding any transfer by any Lender of its Loans or Commitments under the Credit Agreement.

The Requisite Lenders hereby acknowledge and agree that, upon ComVest Investment Partners III, L.P.'s ("ComVest") receipt of $1,850,000 pursuant to Section 1.5(a)(ii) of that certain Loan Purchase Agreement, dated as of August 21, 2009 (the "**Loan Purchase Agreement**"), among Yucaipa American Alliance Fund I, LP, Yucaipa American Alliance (Parallel) Fund I, LP and ComVest, (i) all conditions under Section 3(e) hereof shall be fully satisfied and (ii) the Borrowers shall have no further reimbursement obligations to the Requisite Lenders.

As a material inducement to the willingness of ComVest to enter into this Amendment, and to consummate the transactions contemplated hereby, and subject to the terms of the last sentence of this paragraph, ComVest, on the one hand, and each of the Credit Parties, on the other hand, in each case, for itself and its respective successors, assigns and Affiliates (individually, a "**Releasor**" and collectively, the "**Releasors**"), (a) in the case of ComVest, the Credit Parties, and (b) in the case of the Credit Parties, ComVest, and, in each case, the Affiliates, stockholders, partners, controlling persons, Subsidiaries, agents, sub-agents, advisors, employees, directors, officers, successors and assigns of the Credit Parties or ComVest, as applicable, and their respective Affiliates (individually, a "**Releasee**" and collectively, "**Releasees**") hereby forever releases from any and all claims, demands, proceedings, causes of action, orders, obligations, Contractual Obligations, debts and liabilities whatsoever (collectively, "**Claims**"), whether known or unknown, suspected or unsuspected, both at law and in equity, which each Releasor now has, has ever had or may hereafter have against the respective Releasees, in each case, arising on or prior to the Amendment Effective Date, or on account of or arising out of any matter, cause or event occurring on or prior to the Amendment Effective Date (including, without limitation, arising out of or in connection with the Loan Purchase Agreement, the execution, delivery and performance of Loan Purchase Agreement by any Releasee and the consummation of the transactions contemplated thereby), whether or not relating to Claims pending on, or asserted after, the Amendment Effective Date, and which relate to the Borrowers or any Subsidiary thereof

8

and/or relate to or arise out of the Credit Documents, the Second Lien Credit Documents, the Loan Purchase Agreement or the respective transactions contemplated thereby, including any Claims on account of or arising out of any meeting between or among the parties hereto or any representatives thereof that occurred on or prior to the Amendment Effective Date; provided, however, that nothing contained in this Section 5 shall operate (i) to release ComVest in its capacity as a Lender under the Credit Documents from any contractual obligation it may have thereunder that is required to be performed after (but not before) the Amendment Effectiveness Date; provided, further, that notwithstanding the provisions of this clause (i) to the contrary, effective upon the registration or deemed registration of the assignment by ComVest of its Loans and Commitments to the Yucaipa Funds (as defined below) pursuant to the Loan Purchase Agreement in accordance with Section 10.6(b) of the Credit Agreement, as amended by this Amendment, ComVest will be released from all contractual obligations pursuant to Section 10.6(f) of the Credit Agreement (and, for the avoidance of doubt, all other Claims) under the Credit documents, or (ii) to release any Claims against any Credit Party or any Subsidiary thereof or any related Releasee thereof under the Credit Documents or the Second Lien Credit Documents. In furtherance of the foregoing, each Releasor hereby irrevocably covenants and agrees to refrain from, directly or indirectly, asserting any claim or demand, or commencing, instituting or causing to be commenced, any proceeding of any kind against any Releasee, based upon any matter purported to be released hereby. Notwithstanding the provisions of clause (ii) of the proviso to the immediately preceding sentence to the contrary, the parties hereto acknowledge and agree that in accordance with the provisions of the Credit Documents, ComVest may assign all Claims referred to in clause (ii) above under the Credit Documents, and that upon any such assignment, such Claims under the Credit Documents shall be transferred to the applicable transferee. Notwithstanding anything in this paragraph to the contrary, neither Yucaipa American Alliance Fund I, LP nor Yucaipa American Alliance (Parallel) Fund I, LP (collectively, the "**Yucaipa Funds**"), nor any of the Affiliates, stockholders, partners, controlling persons, Subsidiaries, agents, sub-agents, advisors, employees, directors, officers, successors and assigns of such Yucaipa Funds (other than the Credit Parties and their Subsidiaries and their stockholders, partners, controlling persons, Subsidiaries, agents, sub-agents, advisors, employees, directors, officers, successors and assigns) shall constitute Releasees or Releasors hereunder.

## SECTION 6. MISCELLANEOUS

6.1     Binding Effect.  This Amendment shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders.

6.2     Severability.  In case any provision in or obligation hereunder shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

6.3     Effect on Credit Agreement.  Except as expressly set forth herein, Lender agrees to no amendment with respect to the Credit Agreement or any other Credit Document, and the Credit Agreement and the other Credit Documents remain in full force in accordance with their respective terms; provided, however, in case of any inconsistencies between this Amendment and the Credit Agreement, this Amendment shall prevail. The agreement by the Requisite Lenders agreeing to

9

the amendment contained herein does not and shall not create (nor shall any Credit Party rely upon the existence of or claim or assert that there exists) any obligation of Administrative Agent or any Lender to consider or to agree to any further amendment to any Credit Document. In the event that Administrative Agent or Lenders subsequently agree to consider any further amendment to any Credit Document, neither the amendment contained herein nor any other conduct of Administrative Agent or Lenders shall be of any force or effect on Administrative Agent's or Lenders' consideration or decision with respect to any such amendment, and the Administrative Agent and Lenders shall have no further obligation whatsoever to consider or to agree to any such amendment. Administrative Agent, on behalf of the Lenders, expressly reserves the right to require strict compliance with the terms of the Credit Agreement and the other Credit Documents in all respects. The amendment agreed to herein shall not constitute a course of dealing at variance with the Credit Agreement so as to require further notice by Administrative Agent or Lenders to require strict compliance with the terms of the Credit Agreement and the other Credit Documents in the future. The parties hereto acknowledge and agree that this Amendment shall be deemed to be a Credit Document. On and after the Amendment Effective Date, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of like import referring to the Credit Agreement, and each reference in the other Credit Documents to the "Credit Agreement", "thereunder", "thereof", "therein" or words of like import referring to the Credit Agreement shall mean and be a reference to the Amended Credit Agreement.

6.4     Headings.  Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

6.5     APPLICABLE LAW.  **THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF (OTHER THAN SECTION 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).**

6.6     Counterparts.  This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument. As set forth herein, this Amendment shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by ComVest of written or telephonic notification of such execution and authorization of delivery thereof.

*[The remainder of this page is intentionally left blank.]*

10

     **IN WITNESS WHEREOF,** the parties hereto have caused this Amendment to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**BORROWERS:**

**ALLIED SYSTEMS HOLDINGS, INC.**

By: _____

Scott D. Macaulay
Senior Vice President, Chief Financial
Officer and Treasurer

**ALLIED SYSTEMS, LTD. (L.P.)**

By:    Allied Automotive Group, Inc.,
    its Managing General Partner

By: _____

Scott D. Macaulay
Vice President/Treasurer

ACKNOWLEDGED AND AGREED:

ALLIED AUTOMOTIVE GROUP, INC.
ALLIED FREIGHT BROKER LLC
ALLIED SYSTEMS (CANADA) COMPANY
AXIS CANADA COMPANY
AXIS GROUP, INC.
COMMERCIAL CARRIERS, INC.
CORDIN TRANSPORT LLC
C T SERVICES, INC.
F.J. BOUTELL DRIVEAWAY LLC
GACS INCORPORATED
QAT, INC.
RMX LLC
TERMINAL SERVICES LLC
TRANSPORT SUPPORT LLC

By: _____
     Scott D. Macaulay
     Vice President/Treasurer


AXIS ARETA, LLC
LOGISTIC SYSTEMS, LLC
LOGISTIC TECHNOLOGY, LLC

By:    AX       International       Limited,
    its Sole Member and Manager


By: _____
     Scott D. Macaulay
     Vice President/Treasurer

FOURTH AMENDMENT TO THE CREDIT AGREEMENT

To approve the Fourth Amendment:

ComVest Investment Partners III, L.P.

By: _____
Name:    Cecilio M. Rodriguez
Title:       CFO

13

## Schedule A

### Specified Events of Default

1.    The Borrowers delivered to the Administrative Agent certain financial statements and other materials described in and required by Sections 5.1(b) and (d) of the Credit Agreement (collectively "**Financial Reports**") for and in respect of (i) the Fiscal Month and the Fiscal Quarter ended as of June 30, 2008, (ii) the Fiscal Month and the Fiscal Quarter ended as of September 30, 2008 and (iii) the Fiscal Month and the Fiscal Quarter ended as of March 31, 2009 (collectively the "**Financial Statements**").    The Financial Statements, including without limitation the Compliance Certificates for and with respect to the other Financial Statements, disclose, or would disclose, that the Borrowers breached Sections 6.7(a) and 6.7(b) of the Credit Agreement by failing to comply, for the Fiscal Quarters of June 30, 2008, September 30, 2008 and March 31, 2009, with the financial covenants set forth in such sections, which failures to comply constitute Events of Default under Section 8.1(c) of the Credit Agreement.

2.    The Borrowers have failed to timely comply with their obligation to deliver certain monthly reports and other materials described in and required by Section 5.1(a) of the Credit Agreement for the Fiscal Month ended as of April 30, 2009, which failures to comply constitute Events of Default under Section 8.1(c) of the Credit Agreement.

3.    The Borrowers have failed to timely comply with their obligation to deliver a certified written report identifying the amount of Term Loans and Second Lien Term Loans purchased by the Restricted Sponsor Affiliates in the months of June and July the total aggregate amount of Term Loans and Second Lien Term Loans held by the Restricted Sponsor Affiliates as of the end of such months as required by Section 5.1(a) of the Credit Agreement, which failure to comply as of August 30, 2008 has resulted in an Event of Default under Section 8.1(c) of the Credit Agreement.

4.    The Borrowers have failed to timely comply with their obligation to deliver certain annual financial statements, a Compliance Certificate and other materials described in and required by Sections 5.1(c) and (d) of the Credit Agreement for the Fiscal Year ended December 31, 2008, which failure to comply as of April 15, 2009 has resulted in an Event of Default under Section 8.1(c) of the Credit Agreement.    Such annual financial statements would disclose that the Borrowers breached Sections 6.7(a) and 6.7(b) of the Credit Agreement by failing to comply, for the Fiscal Quarters ending December 31, 2008 and March 31, 2009, with the financial covenants set forth in such sections, which failures to comply constitute Events of Default under Section 8.1(c) of the Credit Agreement.

5.    The Borrowers have failed to timely comply with their obligation to deliver a consolidated plan and financial forecast for the Fiscal Year ended December 31, 2009, including (i) a forecasted consolidated balance sheet and forecasted consolidated statements of income and cash flows of Holdings and its Subsidiaries for such Fiscal Year and an explanation of the assumptions on which such forecasts are based, and (ii) forecasted consolidated statements of income and cash flows of Holdings and its Subsidiaries for each month in such Fiscal Year as required by Section 5.1(i) of

14

the Credit Agreement, which failure to comply as of February 28, 2009 has resulted in an Event of Default under Section 8.1(e) of the Credit Agreement.

6.       The Borrowers have been maintaining excess cash balances in bank accounts that are not subject to any account control agreement which constitute an Event of Default under the Section 8.1(e) of Credit Agreement.

7.       The Borrowers have failed to timely comply with their obligation to pay promptly the attorneys' fees of Ropes & Gray LLP incurred by the Agents and Lenders in enforcing any Obligations of or in collecting any payments due from any Credit Party under the Credit Agreement or under the other Credit Documents by reason of such Default or Event of Default or in connection with any refinancing or restructuring of the credit arrangements provided under the Credit Agreement in the nature of a "work-out" or pursuant to any insolvency or bankruptcy cases or proceedings as required by Section 10.2(h) of the Credit Agreement, which failure to comply has resulted in an Event of Default under Section 8.1(a) of the Credit Agreement.

8.       The Borrowers have failed to timely comply with their obligation to reimburse the LC Disbursement as required by Section 2.4(d) of the Credit Agreement, which failure to comply has resulted in an Event of Default under Section 8.1(a) of the Credit Agreement.

9.       The Borrowers have failed to maintain Interest Rate Agreements at the level required by Section 5.12 of the Credit Agreement, which failure has resulted in an Event of Default under Section 8.1(e) of the Credit Agreement.

10.      The Borrowers and the Guarantors have failed to make the payment of interest due to the Lenders on August 3, 2009, which failure has resulted in an Event of Default under Section 8.1(a)(iii) of the Credit Agreement.

11. The Borrowers have failed to comply, for the Fiscal Quarter ending June 30, 2009, with the financial covenants set forth in Sections 6.7(a) and 6.7(b) of the Credit Agreement, which failures to comply constitute Events of Default under Section 8.1(c) of the Credit Agreement.

12.      The Borrowers have failed to timely give notice to the Administrative Agent of the foregoing Defaults or Events of Default as required by Section 5.1(f) of the Credit Agreement, which failure has resulted in an Event of Default under Section 8.1(a) of the Credit Agreement.

LA\1967719.16

# EXHIBIT 3

EXECUTION VERSION

## AMENDMENT NO. 3 TO CREDIT AGREEMENT AND CONSENT

This **AMENDMENT NO. 3 TO CREDIT AGREEMENT AND CONSENT** dated as of April 17, 2008 (this "**Amendment**"), to the Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement, dated as of May 15, 2007 (as amended by that certain Limited Waiver and Amendment No. 1 to Credit Agreement and Pledge and Security Agreement, dated as of May 29, 2007, and as further amended by that certain Amendment No. 2 to Credit Agreement, dated as of June 12, 2007, the "**Credit Agreement**"), by and among **ALLIED HOLDINGS, INC.** (formerly known as Allied Systems Holdings, Inc.), a Delaware Corporation ("**Holdings**"), **ALLIED SYSTEMS, LTD. (L.P.)**, a Georgia limited partnership ("**Systems**" and, together with Holdings, the "**Borrowers**") and **CERTAIN SUBSIDIARIES OF HOLDINGS**, the Lenders party hereto from time to time, **GOLDMAN SACHS CREDIT PARTNERS L.P.**, as Lead Arranger and as Syndication Agent and **THE CIT GROUP/BUSINESS CREDIT, INC.** as Administrative Agent (together with its permitted successors in such capacity, "**Administrative Agent**") and as Collateral Agent.

### RECITALS:

**WHEREAS,** the Credit Agreement currently prohibits Borrowers and their respective Affiliates from becoming Lenders under the Credit Agreement;

**WHEREAS,** Borrowers have requested that Requisite Lenders agree to amend the Credit Agreement to permit Sponsor and its Affiliates (other than Borrowers and their Subsidiaries) to become Lenders under the Credit Agreement by purchasing and assuming the rights and obligations of one or more Lenders under the Credit Agreement and to contribute such rights and obligations to Borrowers in the form of capital contributions;

**WHEREAS,** Borrowers have also requested that Requisite Lenders agree to consent to an amendment of the Second Lien Credit Agreement that permits Sponsor and its Affiliates (other than Borrowers and their Subsidiaries) to contribute or convert previously acquired Second Lien Term Loans into Equity Interests of Holdings;

**WHEREAS,** Administrative Agent and Requisite Lenders have agreed to amend the Credit Agreement to permit Sponsor and its Affiliates (other than Borrowers and their Subsidiaries) to become Lenders under the Credit Agreement and to contribute such rights and obligations to Borrowers, in the manner, and subject to the terms and conditions, provided for herein; and

**WHEREAS,** Administrative Agent and Requisite Lenders have agreed to consent to an amendment of the Second Lien Credit Agreement that permits Sponsor and its Affiliates (other than Borrowers and their Subsidiaries) to contribute or convert previously acquired Second Lien Term Loans into Equity Interests (other than Disqualified Equity Interests) of Holdings, in the manner, and subject to the terms and conditions, provided for herein.

**NOW, THEREFORE,** in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

# SECTION 1.  DEFINITIONS

1.1    All capitalized terms used herein (including in the introductory paragraph and Recitals set forth above) and not otherwise defined shall have the meanings assigned to such terms in the Credit Agreement.

# SECTION 2.  AMENDMENTS TO CREDIT AGREEMENT

2.1    <u>Amendments to Section 1: Definitions</u>.

(a)    Section 1.1 of the Credit Agreement is hereby amended by adding thereto the following definition of "Insolvency or Liquidation Proceeding" and "Restricted Sponsor Affiliates" in the proper alphabetical order:

" '**Insolvency or Liquidation Proceeding**' as defined in the Intercreditor Agreement."

" '**Restricted Sponsor Affiliates**' means Sponsor and its Affiliates (other than Borrowers or any of their Subsidiaries)."

(b)    Section 1.1 of the Credit Agreement is hereby further amended by deleting the definition of "Assignment Agreement" in its entirety and inserting in lieu thereof the following:

" '**Assignment Agreement**' means an Assignment and Assumption Agreement substantially in the form of Exhibit E, with such amendments or modifications as may be approved by Administrative Agent (<u>provided</u>, that the approval of the Requisite Lenders shall be required to amend or modify any provision of Exhibit E that relates to Restricted Sponsor Affiliates)."

(c)    Section 1.1 of the Credit Agreement is hereby further amended by deleting the definition of "Eligible Assignee" in its entirety and inserting in lieu thereof the following:

" '**Eligible Assignee**' means (i) any Lender, any Affiliate of any Lender and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), and (ii) any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and which extends credit or buys loans; <u>provided</u>, (x) neither Borrowers nor any of their Subsidiaries shall be an Eligible Assignee and (y) no Restricted Sponsor Affiliate may be an Eligible Assignee with respect to a sale, assignment or transfer of Commitments, Revolving Loans or LC Deposits."

(d)    Section 1.1 of the Credit Agreement is hereby further amended by deleting the second parenthetical in clause (v) of the definition of "Restricted Junior Payment" in its entirety and inserting in lieu thereof the following:

"(other than the conversion of any of such Indebtedness to common or other Equity Interests of Holdings other than Disqualified Equity Interests)"

(e)    Section 1.1 of the Credit Agreement is hereby further amended by deleting the definition of "Term Loan Exposure" in its entirety and inserting in lieu thereof the following:

""**Term Loan Exposure**" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender plus during the Term Loan Commitment Period, the unfunded Term Loan Commitment of such Lender; provided, at any time prior to the making of the initial Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Term Loan Commitment; provided further that with respect to any provisions of this Agreement relating to the voting rights of Lenders (including the right of Lenders to consent or take any other action with respect to any amendment, modification, termination or waiver of any provision of this Agreement or the other Credit Documents, or consent to any departure by any Credit Party therefrom), the aggregate outstanding principal amount of the Term Loans of all Restricted Sponsor Affiliates shall be disregarded for purposes of this definition of "Term Loan Exposure"."

2.2    **Amendments to Section 2: Loans and Letters of Credit**.

(a)    Section 2.7 of the Credit Agreement is hereby amended by deleting the parenthetical in the second sentence of clause (b) in its entirety and inserting in lieu thereof the following:

"(with respect to any entry relating to such Lender's Commitments, Loans or LC Deposits and any entry relating to any Restricted Sponsor Affiliate's Term Loans)"

(b)    Section 2.17 of the Credit Agreement is hereby amended by deleting the reference to "Section 2.14(e) or Section 2.22" in the first sentence thereof and inserting in lieu thereof "Section 2.14(e), Section 2.22, Section 10.6(j)(iii) or Section 10.6(k)(i)".

2.3    **Amendments to Section 5: Affirmative Covenants**.

(a)    Section 5.1 of the Credit Agreement is hereby amended by inserting the following at the end of clause (a) thereof:

"and together with such financial statements, a written report certified by an Authorized Officer of Holdings identifying (i) the aggregate principal amount of Term Loans and Second Lien Term Loans acquired by any Restricted Sponsor Affiliate during such month (and with respect to the first month of any Fiscal Quarter, the amount of Term Loans and Second Lien Term Loans acquired in the last month of the preceding Fiscal Quarter), together with the date of, and purchase price for, each such acquisition, and (ii) the aggregate principal amount of Term Loans and Second Lien Term Loans held by any Restricted Sponsor Affiliates as of the last day of such month;"

2.4    **Amendments to Section 6: Negative Covenants**.

(a)    Section 6.4 of the Credit Agreement is hereby amended by inserting the following at the end of clause (c) thereof:

"or (to the extent also permitted by the Second Lien Credit Agreement) other Equity Interests (other than Disqualified Equity Interests)"

(b)    Section 6.22 of the Credit Agreement is hereby amended by inserting the following at the end of clause (a) thereof:

", except as a result of one or more capital contributions or conversions of Second Lien Term Loans previously acquired by such Restricted Sponsor Affiliates in return for Equity Interests of Holdings (other than Disqualified Equity Interests) so long as such capital contributions and conversions are made on terms substantially similar to those set forth in Section 10.6(k) of this Agreement "

2.5    **Amendments to Section 8: Events of Default; Carve-Out Event**.

(a)    Section 8.1 of the Credit Agreement is hereby amended by deleting the period at the end of clause (z) thereof and inserting "; or" in lieu thereof and inserting the following new clause (aa) at the end of Section 8.1:

"(aa)  Failure of a Restricted Sponsor Affiliate to perform or comply with any term or condition contained in Section 10.6(j)(ii) or (iii)"

2.6    **Amendments to Section 9: Agents**.

(a)    Section 9.3 of the Credit Agreement is hereby amended by inserting a new clause (d) at the end thereof as follows:

"(d)  Restricted Sponsor Affiliates.  Notwithstanding anything to the contrary contained in this Agreement, Administrative Agent may in its discretion and, upon the direction of the Requisite Lenders, shall use reasonable efforts to (i) exclude Restricted Sponsor Affiliates from receiving from Administrative Agent any document, instrument or other written communication that the Restricted Sponsor Affiliates would otherwise have been entitled to receive under the terms of this Agreement or under any other Credit Document in their capacity as Lenders or is generally distributed by Administrative Agent to all Lenders and (ii) preclude the Restricted Sponsor Affiliates from participating in conference calls with, and attending meetings of, the Lenders (including with respect to the exercise of rights and remedies under any Credit Document).  None of Lenders, Agents or any of their respective officers, partners, directors, employees or agents shall be liable to any Restricted Sponsor Affiliate (in its capacity as a Lender or otherwise) for any such action taken under this Section 9.3(d)."

2.7    **Amendments to Section 10: Miscellaneous**.

(a)    Section 10.5 of the Credit Agreement is hereby amended by inserting a new clause (e) at the end thereof as follows:

4

"(e)    Restricted Sponsor Affiliate Voting Rights. Notwithstanding anything to the contrary in this Agreement:

(i) Restricted Sponsor Affiliates that become Lenders hereunder shall have no right under this Agreement or the other Credit Documents, and hereby waive any such right, to consent or take any other action with respect to any amendment, modification, termination or waiver of this Agreement or the other Credit Documents, or consent to any departure by any Credit Party therefrom; it being understood and agreed that Restricted Sponsor Affiliates shall have no voting rights for all purposes under this Agreement (whether before, during or after an Insolvency or Liquidation Proceeding) and the other Credit Documents with respect to their Term Loans.

(b)    (ii) (w) Restricted Sponsor Affiliates that become Lenders hereunder shall not in their capacity as Lenders hereunder, and hereby irrevocably and voluntarily waive in their capacity as Lenders hereunder any right to, make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Insolvency or Liquidation Proceeding without the prior written consent of all Lenders other than Restricted Sponsor Affiliates (the "**Non-Affiliate Lenders**"), (x) the voting rights of all Restricted Sponsor Affiliates under the Credit Documents during an Insolvency or Liquidation Proceeding shall automatically and irrevocably be assigned to the Non-Affiliate Lenders and the voting rights of the Non-Affiliate Lenders holding Term Loan Exposure shall be automatically ratably increased by the Term Loan Exposure held or beneficially owned by all Restricted Sponsor Affiliates, (y) Administrative Agent may vote in any such Insolvency or Liquidation Proceeding any and all claims of such Restricted Sponsor Affiliates as Lenders hereunder, and each such Restricted Sponsor Affiliate hereby irrevocably and voluntarily assigns such rights to Administrative Agent and appoints Administrative Agent as its agent, and grants to Administrative Agent an irrevocable power of attorney coupled with an interest, and its proxy, for the purpose of exercising any and all rights and taking any and all actions available to such Restricted Sponsor Affiliates as a Lender hereunder in connection with any case by or against Borrowers or any other Credit Party in any Insolvency or Liquidation Proceeding, including the right to file and/or prosecute any claims, to vote to accept or reject a plan and/or to make any election under Section 1111(b) of the United States Bankruptcy Code and (z) such Restricted Sponsor Affiliates, solely in their capacity as Lenders hereunder, shall not challenge the validity or amount of any claim submitted in such Insolvency or Liquidation Proceeding by the Non-Affiliate Lenders or the Agents in good faith in such Insolvency or Liquidation Proceeding or take any other action in their capacity as Lenders hereunder in such Insolvency or Liquidation Proceeding, which is adverse to the Agents' and the Non-Affiliate Lenders' enforcement of their respective claims or receipt of adequate protection (as that term is defined in the United States Bankruptcy Code).

(c)    Section 10.6(c) of the Credit Agreement is hereby amended by inserting the following at the end of the first sentence of clause (ii) thereof:

"; provided further, that (x) no Lender may sell, assign, transfer or otherwise convey any of its rights and obligations under this Agreement (including the Commitments, the LC Deposits or the Loans) to a Restricted Sponsor Affiliate and no Restricted Sponsor Affiliate shall acquire any such rights or obligations, in each case if (A) immediately prior to and after giving effect to such assignment or transfer the aggregate amount of the Term Loan Exposure held or beneficially owned by all Restricted Sponsor Affiliates would exceed 25% of the aggregate principal amount of the Term Loan Exposure held or beneficially owned by all Lenders (including Restricted Sponsor Affiliates) or (B) after giving effect to such assignment or transfer, the aggregate amount of Term Loans acquired by all Restricted Sponsor Affiliates since the Closing Date would exceed $50 million (notwithstanding whether all or any portion of such acquired Term Loans have been contributed to Borrowers or otherwise disposed of by the Restricted Sponsor Affiliates) and (y) assignments by or to a Restricted Sponsor Affiliate shall be further subject to Section 10.6(j)."

(d)    Section 10.6(h) of the Credit Agreement is hereby amended by deleting clause (i) thereof in its entirety and inserting the following in lieu thereof:

"(i) Each Lender shall have the right at any time to sell one or more participations to any Person (other than Holdings, any of its Subsidiaries or any of its Affiliates (including, without limitation, Restricted Sponsor Affiliates)) in all or any part of its Commitments, Loans or in any other Obligation."

(e)    Section 10.6 of the Credit Agreement is hereby amended by inserting a new clause (j) as follows:

"(j)    Restricted Sponsor Affiliates.    The Restricted Sponsor Affiliates, from time to time, intend to become Lenders and, from time to time, to sell, assign or transfer all or a portion of their Term Loans and the rights and obligations as Lenders related thereto under this Agreement to Eligible Assignees.  Each Agent and Lender hereby acknowledges that a Restricted Sponsor Affiliate (i) may be a Lender (provided such Restricted Sponsor Affiliate otherwise satisfies the criteria of the definition of the term of "Eligible Assignee") and (ii) may sell, assign or transfer all or a portion of its Term Loans and the rights and obligations as a Lender related thereto under this Agreement to Eligible Assignees.  Each Lender that is a Restricted Sponsor Affiliate, upon succeeding to an interest in the Term Loans:

(i)  represents and warrants as of each applicable Assignment Effective Date that (x) it is not in possession of any information with respect to Borrowers, their Affiliates or the Obligations that (A) has not been disclosed by or on behalf of Borrowers to Lenders generally or otherwise been posted to that portion of the Platform designated for "private-side" Lenders and (B) could have a Material Adverse Effect or otherwise be material to a decision by a Person to sell the Term Loans or a participation interest therein, (y) immediately prior to and after giving effect to such

assignment or transfer of Term Loans to such Restricted Sponsor Affiliate, the aggregate amount of the Term Loan Exposure held or beneficially owned by all Restricted Sponsor Affiliates does not and will not exceed 25% of the aggregate amount of the Term Loan Exposure held or beneficially owned by all Lenders (including Restricted Sponsor Affiliates) and (z) after giving effect to such assignment or transfer of Term Loans to such Restricted Sponsor Affiliate, the aggregate principal amount of Term Loans acquired by all Restricted Sponsor Affiliates since the Closing Date would not exceed $50 million (notwithstanding whether all or any portion of such acquired Term Loans have been contributed to Borrowers or otherwise disposed of by the Restricted Sponsor Affiliates on or prior to the applicable Assignment Effective Date);

(ii)  agrees that (w) notwithstanding anything in this Agreement to the contrary other than as provided in Section 10.6(k), it shall not sell, assign, contribute, transfer or otherwise convey all or a portion of its Term Loans or rights and obligations as a Lender to Borrowers or their Subsidiaries, (x) notwithstanding anything in this Agreement to the contrary (including, without limitation, Section 5.7), it shall not attend or otherwise participate in any conference calls or meetings (A) between Agents and/or Lenders, on the one hand, and Borrowers or any Affiliate of Borrowers, on the other hand, and (B) between and among Agents and Lenders (other than Restricted Sponsor Affiliates) unless consented to by Administrative Agent or Requisite Lenders, (y) it shall not disclose any information it receives in its capacity as a Lender to Borrowers or to any Affiliate of Borrowers, and (z) Lenders, Agents and their respective officers, partners, directors, employees or agents shall not be liable to such Restricted Sponsor Affiliate (in its capacity as a Lender or otherwise) for any action taken or omitted by any Lender or Agent under or in connection with any of the Credit Documents;

(iii)  agrees further that no later than ten days after the date of such assignment or transfer of such Term Loans (or, if a Default or Event of Default occurs during such ten day period, then three Business Days after such Restricted Sponsor Affiliate has knowledge of the occurrence of such Default or Event of Default but in no event later than the last day of such ten day period), such Restricted Sponsor Affiliate shall make a capital contribution to Borrowers of no less than 50% of the aggregate principal amount of such Term Loans in accordance with Section 10.6(k); and

(iv)  knowingly and irrevocably waives any and all rights to exercise any voting rights it would otherwise have as a Lender for all purposes under this Agreement and the other Credit Documents.

To the fullest extent permitted by applicable law, no Restricted Sponsor Affiliate shall assert, and each Restricted Sponsor Affiliate immediately and automatically upon becoming a Lender, hereby irrevocably (i) waives, any claim or cause of action against any Lender, any Agent and their respective Affiliates, directors, employees, attorneys, agents or sub-agents (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement or otherwise) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the

7

proceeds thereof or any act or omission or event occurring in connection therewith except to the extent caused by such Lender's or Agent's gross negligence or willful misconduct on or after the date such Restricted Sponsor Affiliate becomes a Lender hereunder as determined by a court of competent jurisdiction by final and non-appealable judgment; (ii) waives, releases and agrees not to sue upon any such claim or any such cause of action, whether or not accrued and whether or not known or suspected to exist in its favor and (iii) waives any claim or cause of action against any Agent or any Lender and their respective Affiliates, directors, employees, attorneys, agents or sub-agents on any theory of liability for special, indirect, consequential or punitive damages, arising out of, in connection with, as a result of, or in any way related to this Agreement, or any other Credit Document or any agreement or instrument contemplated hereby or thereby, any Loan or the use of proceeds thereof or any act or omission or event occurring in connection therewith.

**Each Restricted Sponsor Affiliate recognizes and acknowledges that a breach by it of any covenants or agreements contained in this Section 10.6(j) will cause the other Lenders and Agents to sustain damages for which it would not have an adequate remedy at law for money damages, and therefore each Restricted Sponsor Affiliate agrees that in the event of any such breach, each of the other Lenders and Agents shall be entitled to specific performance of such covenants and agreements and injunctive and other equitable relief in addition to any other remedy to which it may be entitled, at law or in equity."**

(f)    Section 10.6 of the Credit Agreement is hereby amended by inserting a new clause (k) as follows:

"(k)    Contribution of Term Loans to Borrowers; Cancellation of Debt.

(i)    The Restricted Sponsor Affiliates, from time to time, intend to make capital contributions of their Term Loans to Borrowers.

(ii)    Notwithstanding anything to the contrary herein, a Restricted Sponsor Affiliate may at any time make a capital contribution of its Term Loans to Borrowers in exchange for Equity Interests of Holdings (other than Disqualified Equity Interests) upon no less than five Business Days' prior written notice to Administrative Agent and Lenders. Such Restricted Sponsor Affiliate and Borrowers shall promptly provide all information and data reasonably requested by Administrative Agent in connection with such capital contribution.

(iii)    Immediately upon a Borrower's acquisition of Term Loans from a Restricted Sponsor Affiliate, (x) such Term Loans and all rights and obligations as a Lender related thereto shall for all purposes (including under this Agreement, the other Credit Documents and otherwise) be deemed to be irrevocably prepaid, terminated, extinguished, cancelled and of no further force and effect and such Borrower shall neither obtain nor have any rights as a Lender hereunder or under the other Credit Documents by virtue of such capital contribution and (y) such Borrower shall deliver to Administrative Agent a written acknowledgement and agreement executed by an Authorized Officer and

in form and substance reasonably acceptable to Administrative Agent acknowledging the irrevocable prepayment, termination, extinguishment and cancellation of such Term Loans and confirming that such Borrower has no rights as a Lender under the Credit Documents or otherwise.

(iv)   As soon as practicable after a Borrower's acquisition of Term Loans from a Restricted Sponsor Affiliate in accordance with this Section 10.6(k), such Borrower shall take all actions necessary to cause such Term Loans to be extinguished or otherwise cancelled in its books and records in accordance with GAAP.

(v)   To the extent permitted by applicable law, no Credit Party shall assert, and each Credit Party hereby irrevocably waives, any claim or cause of action against any Lender, any Agent and their respective Affiliates, directors, employees, attorneys, agents or sub-agents (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement or otherwise) arising out of, in connection with, as a result of, or in any way related to, any capital contribution of Term Loans made by a Restricted Sponsor Affiliate to such Borrower or any act or omission or event occurring in connection therewith, and each Credit Party hereby irrevocably waives, releases and agrees not to sue upon any such claim or any such cause of action, whether or not accrued and whether or not known or suspected to exist in its favor.."

2.8   **Amendments to Exhibits.**

(a)   Exhibit E to the Credit Agreement (Assignment and Assumption Agreement) is hereby amended by deleting the heading of Section 1 in its entirety and inserting in lieu thereof the following:

"1.   Representations and Warranties; Covenants."

(b)   Exhibit E to the Credit Agreement (Assignment and Assumption Agreement) is hereby further amended by deleting Section 1.1 of the Standard Terms and Conditions for Assignment and Assumption Agreement in its entirety and inserting in lieu thereof the following:

"1.1   Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim[,][ and] (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby [and it is not in possession of any information with respect to Borrowers, their Affiliates or the Obligations that (A) has not been disclosed by or on behalf of Borrowers to the Lenders generally or otherwise been posted to that portion of the Platform designated for "private-side" Lenders and (B) could have a Material Adverse Effect or otherwise be material to a decision by a Person to purchase the Loans or a participation interest therein][1]; (b) assumes no responsibility with

---

[1]   To be added only if Assignor is a Restricted Sponsor Affiliate.

respect to (i) any statements, warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "**Credit Documents**"), or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document[; and (c) agrees that if the Assignee sells and assigns all or a portion of the Assigned Interest to any Person, the Assignee may, in its sole discretion, disclose to any such Person that the Assignee acquired the Assigned Interest from the Assignor.][2]"

   (c) Exhibit E to the Credit Agreement (Assignment and Assumption Agreement) is hereby further amended by deleting Section 1.2 of the Standard Terms and Conditions for Assignment and Assumption Agreement in its entirety and inserting in lieu thereof the following:

    "1.2 Assignee. (1) The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision[,][ and] (v) if it is a Non-US Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee [, (vi) it is not in possession of any information with respect to Borrowers, their Affiliates or the Obligations that (A) has not been disclosed by or on behalf of Borrowers to the Lenders generally or otherwise been posted to that portion of the Platform designated for "private-side" Lenders and (B) could have a Material Adverse Effect or otherwise be material to a decision by a Person to sell the Loans or a participation interest therein, (vii) immediately prior to and after giving effect to the assignment of Term Loans contemplated by this Assignment, the aggregate amount of the Term Loan Exposure held or beneficially owned by all Restricted Sponsor Affiliates does not and will not exceed 25% of the aggregate amount of Term Loan Exposure held or beneficially owned by all Lenders (including Restricted Sponsor Affiliates) and (viii) after giving effect to such assignment or transfer of Term Loans to the Restricted Sponsor Affiliate, the aggregate principal amount of Term Loans acquired by all Restricted Sponsor Affiliates since the Closing Date would not exceed $50 million (notwithstanding whether all or any portion of such acquired Term Loans

---

[2] To be added only if Assignor is a Restricted Sponsor Affiliate.

have been contributed to Borrowers or otherwise disposed of by the Restricted Sponsor Affiliates on or prior to the Effective Date)][3]; [and] (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, [and] (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender[.][, (iii) (w) notwithstanding anything in the Credit Agreement to the contrary other than Section 10.6(k) of the Credit Agreement, it shall not sell, assign, contribute, transfer or otherwise convey all or a portion of its rights and obligations as a Lender to Borrowers or their Subsidiaries, (x) notwithstanding anything in the Credit Agreement to the contrary (including, without limitation, Section 5.7 of the Credit Agreement), it shall not attend or otherwise participate in any conference calls or meetings between (A) Agents and/or Lenders, on the one hand, and Borrowers or any Affiliate of Borrowers, on the other hand, or (B) and among Agents and/or Lenders, in each case, unless consented to by Administrative Agent or Requisite Lenders, (y) it shall not disclose any information it receives in its capacity as a Lender to Borrowers or to any Affiliate of Borrowers, and (z) Lenders, Agents and their respective officers, partners, directors, employees or agents shall not be liable to such Restricted Sponsor Affiliate (in its capacity as a Lender or otherwise) for any action taken or omitted by any Lender or Agent under or in connection with any of the Credit Documents; and (c) acknowledges and agrees that prior to the Effective Date, the Assignor may have disclosed to any Person that sold and assigned all or any portion of the Assigned Interest to the Assignor that the Assignor intended to sell all or a portion of the Assigned Interest to the Assignee.][4]

[(II) The Assignee further represents and warrants that after giving effect to such assignment or transfer of Term Loans to the Restricted Sponsor Affiliate, the aggregate principal amount of Term Loans acquired by all Restricted Sponsor Affiliates since the Closing Date is $[_____]].[5]"

---

[3]    To be added only if Assignee is a Restricted Sponsor Affiliate.

[4]    To be added only if Assignee is a Restricted Sponsor Affiliate.

[5]    To be added only if Assignee is a Restricted Sponsor Affiliate.

## SECTION 3. CONSENT

Subject to the satisfaction of the conditions precedent set forth in Section 4 hereof, Administrative Agent and Requisite Lenders hereby (i) consent to an amendment to the Second Lien Credit Agreement that permits Restricted Sponsor Affiliates to make one or more capital contributions or conversions of Second Lien Term Loans previously acquired by such Restricted Sponsor Affiliates in return for Equity Interests of Holdings (other than Disqualified Equity Interests) so long as such capital contributions and conversions are made pursuant to terms substantially similar in form and substance to those set forth in Section 10.6(k) of the Credit Agreement (as amended by this Amendment) and (ii) instruct Collateral Agent to consent to such an amendment to the Second Lien Credit Agreement in accordance with Section 5.3(b) of the Intercreditor Agreement. Borrowers agree to provide Administrative Agent with a copy of any such amendment to the Second Lien Credit Agreement no later than five Business Days prior to the execution and delivery of such amendment to the Second Lien Credit Agreement by Borrowers; it being understood and agreed that the failure to provide such notice to Administrative Agent shall result in an immediate Event of Default.

## SECTION 4. CONDITIONS PRECEDENT TO EFFECTIVENESS

The effectiveness of the amendments and the consent set forth in this Amendment are subject to the satisfaction, or waiver, of the following conditions on or before the date hereof (the "**Amendment Effective Date**"):

(a)    Borrowers, the other Credit Parties, Requisite Lenders and Administrative Agent shall have indicated their consent by the execution and delivery of the signature pages hereof to the Administrative Agent;

(b)    Administrative Agent shall have received a certificate from an officer of Holdings stating that as of the Amendment Effective Date (i) the representations and warranties contained in Section 4 herein and in the other Credit Documents are true, correct and complete in all material respects on and as of the Amendment Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case such representations and warranties are true, correct and complete in all material respects on and as of such earlier date and (ii) no event has occurred and is continuing or will result from the consummation of the transactions contemplated by this Amendment that would constitute an Event of Default or a Default; and

(c)    Borrowers shall have paid Agents and Arranger for all reasonable out-of-pocket expenses incurred by them on or prior to the date hereof in connection with the negotiation and preparation of this Amendment, including the reasonable fees, charges and disbursements of counsel for the Agents and Arranger.

## SECTION 5. REPRESENTATIONS AND WARRANTIES

5.1    Corporate Power and Authority. Each Credit Party has all requisite corporate, limited liability company or partnership (as applicable) power and authority to enter into this Amendment and to carry out the transactions contemplated by, and perform its obligations under, the Credit Agreement, as amended by this Amendment (the "**Amended Credit Agreement**").

5.2     Authorization of Amendments. The execution and delivery of this Amendment have been duly authorized by all necessary corporate, limited liability company or partnership (as applicable) action on the part of each Credit Party.

5.3     No Conflict. The execution and delivery by each Credit Party of this Amendment and the performance by each Credit Party of the Amended Credit Agreement do not and will not (i) violate any provision of any law or any governmental rule or regulation applicable to any Credit Party, the certificate or articles of incorporation or bylaws (or other organizational documents) of any Credit Party or any order, judgment or decree of any court or other agency of government binding on any Credit Party, (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material indenture, mortgage, deed to secure debt, deed of trust, lease, agreement or other instrument to which any Credit Party is a party or by which any Credit Party or any of its property is bound (any of the foregoing, a **"Contractual Obligation"**), (iii) result in or require the creation or imposition of any Lien upon any of the properties or assets of a Credit Party other than those in favor of the Collateral Agent, on behalf of itself and the Secured Parties, pursuant to the Credit Documents or those in favor of the Second Lien Collateral Agent on a second priority basis pursuant to the Second Lien Credit Documents, or (iv) require any approval of stockholders or any approval or consent of any Person under any Contractual Obligation of any Credit Party other than those that have been made or obtained.

5.4     Governmental Consents. No action, consent or approval of, registration or filing with or any other action by any Governmental Authority is required in connection with the execution and delivery by each Credit Party of this Amendment or the performance by the Credit Parties of the Amended Credit Agreement.

5.5     Binding Obligation. This Amendment has been duly executed and delivered by each Credit Party and this Amendment and the Amended Credit Agreement constitute the legal, valid and binding obligation of each Credit Party enforceable against each Credit Party in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, moratorium, reorganization or other similar laws affecting creditors' rights generally and except as enforceability may be limited by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

5.6     Incorporation of Representations and Warranties From Credit Documents. The representations and warranties contained in the Credit Documents are and will be true, correct and complete in all material respects on and as of the Amendment Effective Date to the same extent as though made on and as of that date, except to the extent such representations and warranties specifically relate to an earlier date, in which case they were true, correct and complete in all material respects on and as of such earlier date.

5.7     Absence of Default. As of the date of this Amendment and after giving effect to the amendment set forth herein, no event has occurred and is continuing or will result from the consummation of the transactions contemplated by this Amendment that would constitute an Event of Default or a Default.

## SECTION 6.  ACKNOWLEDGEMENT AND CONSENT

Each Guarantor hereby consents to the terms of this Amendment and further hereby confirms and agrees that, notwithstanding the effectiveness of this Amendment, the obligations of such Guarantor under each of the Credit Documents to which such Guarantor is a party shall not be impaired and each of the Credit Documents to which such Guarantor is a party are, and shall continue to be, in full force and effect and are hereby confirmed and ratified in all respects.

Each Guarantor hereby acknowledges and agrees that (i) notwithstanding the conditions to effectiveness set forth in this Amendment, such Guarantor is not required by the terms of the Credit Agreement or any other Credit Document to consent to the amendment to the Credit Agreement effected pursuant to this Amendment and (ii) nothing in the Credit Agreement, this Amendment or any other Credit Document shall be deemed to require the consent of such Guarantor to any future amendments to the Credit Agreement.

## SECTION 7.  MISCELLANEOUS

7.1     Binding Effect.  This Amendment shall be binding upon the parties hereto and their respective successors and assigns and shall inure to the benefit of the parties hereto and the successors and assigns of Lenders.

7.2     Severability.  In case any provision in or obligation hereunder shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

7.3     Effect on Credit Agreement.  Except as expressly set forth herein, Administrative Agent and Lenders agrees to no amendment with respect to the Credit Agreement or any other Credit Document, and the Credit Agreement and the other Credit Documents remain in full force in accordance with their respective terms.  Administrative Agent's and Requisite Lender's agreeing to the amendment contained herein does not and shall not create (nor shall any Credit Party rely upon the existence of or creed or assert that there exists) any obligation of Administrative Agent or any Lender to consider or to agree to any further amendment to any Credit Document.  In the event that Administrative Agent or Lenders subsequently agree to consider any further amendment to any Credit Document, neither the amendment contained herein nor any other conduct of Administrative Agent or Lenders shall be of any force or effect on Administrative Agent's or Lenders' consideration or decision with respect to any such amendment, and the Administrative Agent and Lenders shall have no further obligation whatsoever to consider or to agree to any such amendment.  Administrative Agent, on behalf of the Lenders, expressly reserves the right to require strict compliance with the terms of the Credit Agreement and the other Credit Documents in all respects.  The amendment agreed to herein shall not constitute a course of dealing at variance with the Credit Agreement so as to require further notice by Administrative Agent or Lenders to require strict compliance with the terms of the Credit Agreement and the other Credit Documents in the future.  The parties hereto acknowledge and agree that this Amendment shall be deemed to be a Credit Document.  On and after the Amendment Effective Date, each reference in the Credit Agreement to "this Agreement", "hereunder", "hereof", "herein" or words of like import referring to the Credit

Agreement, and each reference in the other Credit Documents to the "Credit Agreement", "thereunder", "thereof", "therein" or words of like import referring to the Credit Agreement shall mean and be a reference to the Amended Credit Agreement.

7.4     Fees and Expenses.  The Credit Parties acknowledge that all costs, fees and expenses as described in Section 10.2 and Section 10.3 of the Credit Agreement incurred by Administrative Agent, Collateral Agent and Arranger and their respective counsel with respect to this Amendment and the documents and transactions contemplated hereby shall be for the account of Borrowers.

7.5     Headings.  Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

7.6     APPLICABLE LAW.  THIS AMENDMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF (OTHER THAN SECTION 5-1401 AND 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

7.7     Counterparts.  This Amendment may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  As set forth herein, this Amendment shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by Administrative Agent of written or telephonic notification of such execution and authorization of delivery thereof.

*[The remainder of this page is intentionally left blank.]*

15

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

BORROWERS:                          ALLIED HOLDINGS, INC.

                                    By: _____
                                        Thomas H. King
                                        Executive Vice President
                                        and Chief Financial Officer


                                    ALLIED SYSTEMS, LTD. (L.P.)

                                    By:   Allied Automotive Group, Inc.,
                                          its Managing General Partner


                                    By: _____
                                        Thomas H. King
                                        Executive Vice President
                                        and Assistant Treasurer


                                    ACKNOWLEDGED AND AGREED:

                                    ACE OPERATIONS, LLC
                                    AXIS NETHERLANDS, LLC

                                    By:   AXIS Group, Inc.,
                                          its Sole Member and Manager


                                    By: _____
                                        Thomas H. King
                                        Executive Vice President
                                        and Assistant Treasurer


*Amendment No. 3 Signature Page*

AH INDUSTRIES INC.
ALLIED AUTOMOTIVE GROUP, INC.
ALLIED FREIGHT BROKER LLC
ALLIED SYSTEMS (CANADA) COMPANY
AXIS CANADA COMPANY
AXIS GROUP, INC.
COMMERCIAL CARRIERS, INC.
CORDIN TRANSPORT LLC
C-T SERVICES, INC.
F.J. BOUTELL DRIVEAWAY LLC
GACS INCORPORATED
QAT, INC.
RMX LLC
TERMINAL SERVICES LLC
TRANSPORT SUPPORT LLC

By:    _____
       Thomas H. King
       Executive Vice President and
       Assistant Treasurer


AXIS ARETA, LLC
LOGISTIC SYSTEMS, LLC
LOGISTIC TECHNOLOGY, LLC

By:    AX International Limited,
       its Sole Member and Manager


By:    _____
       Thomas H. King
       Executive Vice President
       and Assistant Treasurer

*Amendment No. 3 Signature Page*

724966.16-New York Server 2A

ADMINISTRATIVE AGENT:                    THE CIT GROUP/BUSINESS CREDIT, INC.,

By: _____

Name: Barbara J. Coffin

Title: AVP

# EXHIBIT 4

| | |
|---|---|
| **From:** | Jeffrey Schaffer </O=FIRST ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=JSCHAFFER> |
| **Sent:** | Thursday, August 13, 2009 10:12 PM |
| **To:** | tmriggs@iequitypartners.com |
| **Subject:** | Re: Any new word-thoughts? Quiet here? |

Why?

----- Original Message -----
From: T. Mike Riggs <tmriggs@iequitypartners.com>
To: Jeffrey Schaffer
Sent: Thu Aug 13 21:53:55 2009
Subject: RE: Any new word-thoughts? Quiet here?

I thought you were going to check out the "equitable subordination" angle.


T. Mike



From: Jeffrey Schaffer [mailto:JSchaffer@spectrumgp.com]
Sent: Thursday, August 13, 2009 6:00 PM
To: tmriggs@iequitypartners.com
Subject: Any new word-thoughts? Quiet here?

1

CONFIDENTIAL

# EXHIBIT 5

| | |
|---|---|
| **Subject:** | Steve Deckoff, Black Diamond & Derex |
| **Location:** | Office |
| **Start:** | Tue 8/18/2009 3:00 PM |
| **End:** | Tue 8/18/2009 3:30 PM |
| **Recurrence:** | (none) |
| **Organizer:** | Ron Burkle |

Confidential

YUCAIPA722403

# EXHIBIT 6

| | |
|---|---|
| **From:** | Rich Ehrlich <rehrlich@bdcm.com> |
| **Sent:** | Thursday, September 17, 2009 8:20 PM |
| **To:** | Jeffrey Schaffer |
| **Subject:** | Re: Allied Letter of Direction |

Can't hurt to ask

On Sep 17, 2009, at 8:17 PM, "Jeffrey Schaffer" <JSchaffer@spectrumgp.com> wrote:

> i have no idea why you think CIT or Yucaipa are going to tell you their step by step plans, nor do i think they even know for sure, since developments occur. they have no reason to trust you or to share with you. without a doubt though, they will each do the best they can to benefit themselves and CIT is snr and yucaipa is jr to us, so we must act for ourselves now

**Confidentiality Notice:** The information contained in this e-mail (and any attachments) is confidential and may be privileged. It is intended for the named recipient(s) only. If you are not the named recipient, you are hereby notified that any use, dissemination, distribution, retention or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by return e-mail and permanently delete the e-mail and any attachments. Thank you for your cooperation.

---

**From:** Rich Ehrlich [mailto:rehrlich@bdcm.com]
**Sent:** Thu 9/17/2009 8:10 PM
**To:** Jeffrey Schaffer
**Subject:** RE: Allied Letter of Direction

I am waiting to hear back on Comvest. Let's see what Ropes has to say tomorrow. I'd also like to know CIT's plan.


Richard Ehrlich

Black Diamond Capital Management, L.L.C.

1 Sound Shore Drive, Suite 200

Greenwich, CT 06830

(203) 552-0888 (phone)

(203) 552-1014 (fax)

rehrlich@bdcm.com

1

CONFIDENTIAL

**Confidentiality Notice:** The information contained in this e-mail (and any attachments) is confidential and may be privileged. It is intended for the named recipient(s) only. If you are not the named recipient, you are hereby notified that any use, dissemination, distribution, retention or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by return e-mail and permanently delete the e-mail and any attachments. Thank you for your cooperation.

**From:** Jeffrey Schaffer [mailto:JSchaffer@spectrumgp.com]
**Sent:** Thursday, September 17, 2009 8:07 PM
**To:** Rich Ehrlich
**Subject:** RE: Allied Letter of Direction

looks like they pushed the equity button here...you ready to roll? also, did you speak internally re: comvest?

**From:** Rich Ehrlich [mailto:rehrlich@bdcm.com]
**Sent:** Thu 9/17/2009 7:55 PM
**To:** Moeller-Sally, Stephen C.; Jeffrey Schaffer; Jeffrey Buller
**Cc:** Wofford, Keith H.; Minot, Winthrop G.
**Subject:** RE: Allied Letter of Direction

I am generally available as well.

**Confidentiality Notice:** The information contained in this e-mail (and any attachments) is confidential and may be privileged. It is intended for the named recipient(s) only. If you are not the named recipient, you are hereby notified that any use, dissemination, distribution, retention or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by return e-mail and permanently delete the e-mail and any attachments. Thank you for your cooperation.

**From:** Moeller-Sally, Stephen C. [mailto:SSally@ropesgray.com]
**Sent:** Thursday, September 17, 2009 7:26 PM
**To:** Rich Ehrlich; Jeffrey Schaffer; Jeffrey Buller
**Cc:** Wofford, Keith H.; Minot, Winthrop G.
**Subject:** FW: Allied Letter of Direction

2

CONFIDENTIAL

SPEC 0003960

Rich, Jeff, Jeff,

Please see attached letter of direction from Yucaipa to CIT regarding certain deposit accounts.  Please let us know if you are available tomorrow for a call to discuss.  We are generally available.

Thanks,

Steve

**Stephen Moeller-Sally**
**ROPES & GRAY LLP**
T 617-951-7012 | M 978-870-7112 | F 617-235-0665
One International Place
Boston, MA 02110-2624
SSally@ropesgray.com
www.ropesgray.com

Circular 230 Disclosure (R&G): To ensure compliance with Treasury Department regulations, we inform you that any U.S. tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of avoiding U.S. tax-related penalties or promoting, marketing or recommending to another party any tax-related matters addressed herein.

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.

---

**From:** Kimball, Eric [mailto:ekimball@pattonboggs.com]
**Sent:** Thursday, September 17, 2009 7:12 PM
**To:** Wofford, Keith H.; Moeller-Sally, Stephen C.
**Cc:** Forshey, Michael
**Subject:** Fw: Allied Letter of Direction

Please see the attached direction letter.

----- Original Message -----
From: May.Chan@lw.com <May.Chan@lw.com>

3

CONFIDENTIAL

SPEC 0003961

To: Kimball, Eric
Cc: Derex.Walker@yucaipaco.com <Derex.Walker@yucaipaco.com>; Stephanie.Bond@yucaipaco.com
<Stephanie.Bond@yucaipaco.com>; Scott.Macaulay@AlliedAutomotive.com
<Scott.Macaulay@AlliedAutomotive.com>; Hazen.Dempster@troutmansanders.com
<Hazen.Dempster@troutmansanders.com>; GLEN.COLLYER@lw.com <GLEN.COLLYER@lw.com>
Sent: Thu Sep 17 17:49:41 2009
Subject: Allied Letter of Direction


Dear Eric,

Per our call, attached please find a direction letter from the Requisite Lenders to the Agent.  Please forward this to
your client.

Best,

May K. Chan

LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, CA 90071-1560
Direct Dial: +1.213.891.7348
Fax: +1.213.891.8763
Email: may.chan@lw.com
http://www.lw.com <http://www.lw.com>


<<Letter of Direction.pdf>>

****************************************************************************
To comply with IRS regulations, we advise you that any discussion of Federal tax issues in this
e-mail was not intended or written to be used, and cannot be used by you, (i) to avoid any penalties
imposed under the Internal Revenue Code or (ii) to promote, market or recommend to another party any
transaction or matter addressed herein.

For more information please go to  http://www.lw.com/docs/irs.pdf
****************************************************************************

This email may contain material that is confidential, privileged and/or attorney work product for
the sole use of the intended recipient.  Any review, reliance or distribution by others or forwarding
without express permission is strictly prohibited.  If you are not the intended recipient, please
contact the sender and delete all copies.

Latham & Watkins LLP

DISCLAIMER:
This e-mail message contains confidential, privileged information intended solely for the
addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have
received it in error, please call us (collect) at (202) 457-6000 and ask to speak with the message
sender. Also, we would appreciate your forwarding the message back to us and deleting it from
your system. Thank you.

This e-mail and all other electronic (including voice) communications from the sender's firm are
for informational purposes only. No such communication is intended by the sender to constitute
either an electronic record or an electronic signature, or to constitute any agreement by the
sender to conduct a transaction by electronic means. Any such intention or agreement is hereby
expressly disclaimed unless otherwise specifically indicated. To learn more about our firm,
please visit our website at http://www.pattonboggs.com.

4

CONFIDENTIAL

# EXHIBIT 7

FILED: NEW YORK COUNTY CLERK 09/26/2012                    INDEX NO. 650150/2012
NYSCEF DOC. NO. 66                              RECEIVED NYSCEF: 09/26/2012
                                                      Motion Sequence No. 3



**ROPES & GRAY LLP**
1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8704
WWW.ROPESGRAY.COM

September 18, 2009

Keith H. Wofford
212-841-8816
646-728-1664 fax
keith.wofford@ropesgray.com

Mr. Eric W. Kimball
Patton Boggs LLP
2001 Ross Avenue
Suite 3000
Dallas, Texas 75201

Dear Eric:

    Thank you for sending us a copy of the letter you received from Latham & Watkins LLP, in which Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP (collectively, the "Sponsors") purport to direct The CIT Group/Business Credit, Inc., in its capacity as Administrative Agent and Collateral Agent (the "Agent") under the Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007 among Allied Systems Holdings, Inc. (f/k/a Allied Holdings, Inc.) and Allied Systems, Ltd. (L.P.), certain subsidiaries thereof, various lenders party thereto, Goldman Sachs Credit Partners L.P. and The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent (the "Credit Agreement"), to terminate the control agreements with respect to certain deposit accounts and to enter into new, and unspecified, control agreements. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

    As you know, our firm represents Black Diamond Capital Management LLC and Spectrum Group Management LLC, managers of funds that are Lenders under the Credit Agreement. It is our view and the view of our clients that the Agent should refuse to acknowledge the purported direction delivered by the Sponsors.

    It would be imprudent for the Agent to act upon the purported direction from the Sponsors. In the first instance, even if it is assumed that the Sponsors constitute "Requisite Lenders" under the Credit Agreement, it is not clear that the Sponsors have the authority to issue the purported direction under the Credit Agreement. The purported direction cites no authority that permits a direction to the Agent to terminate Credit Documents and replace such documents with a form of the Sponsors' choosing. We do not believe that there is any such provision in the Credit Agreement, and would request that the Agent inform us of such provision if it disagrees. Second, the purported direction did not appear to attach the form of replacement control agreements. Without form documents attached, neither the Agent nor any Lender has any way of knowing whether the proposed terms of the new control agreements would contravene provisions of the Credit Documents, impose new

EXHIBIT 6 - 1

duties on the Agent or other Lenders, or potentially violate the special consent provisions of the Credit Agreement.

Further, we have doubts about the validity of the assignment of the Loans to the Sponsors and their entitlement to act as Requisite Lenders under the Credit Agreement. As you know, the Fourth Amendment to the Credit Agreement posted on Intralinks purports to remove prohibitions on ownership of the Loans by the Sponsors.

Compliance with the purported direction could give rise to Events of Default under the Credit Agreement, including an unauthorized release of Collateral. Given the long, and accumulating, slate of continuing defaults under the Credit Documents, such potential or requested action by a purported "Lender" is particularly disturbing. Any effort of the Sponsors to exercise control under the Credit Agreement other than for the purpose of curing the outstanding defaults highlights the Sponsors' severe conflict of interest and the possible breach of their fiduciary duties to creditors. It is inappropriate for the Agent to assist such conduct (whether or not such assistance rises to the level of aiding and abetting) prior to receiving complete assurance that the direction comes from an appropriate source and does not otherwise breach the Credit Documents.

Our clients reserve all their rights under the Credit Documents, the Security Documents, the Intercreditor Agreement, and otherwise. Nothing in this letter shall be deemed, or construed as (i) a modification, amendment, waiver or release of any term or provision of any Credit Document; (ii) a waiver or release of any breach or violation under any Credit Document or as an agreement or proposal to forbear in the exercise of remedies or pursuit of causes of action against the Agent, the Sponsors or otherwise; (iii) an election of remedies by our clients, or (iv) establishing a course of dealing among the parties.

Sincerely,

*Keith H. Wofford*
/mb

Keith H. Wofford

EXHIBIT 6 - 2

# EXHIBIT 8

| | |
|---|---|
| **From:** | Michael Riggs [mriggs@jackcooper.com] |
| **Sent:** | Monday, May 09, 2011 6:37 AM |
| **To:** | Rich Ehrlich - BD; Derex Walker |
| **Cc:** | Theo Ciupitu; Elizabeth Noe - Paul Hastings; jessaustin@paulhastings.com; Mike Testman; Bob Griffin |
| **Subject:** | offer to purchase Allied Holdings - attorney client privileged & confidential |
| **Attachments:** | image001.gif; Allied 363 Letter of Intent from TM Riggs 5-9-11.doc |

Rich and Derex:

Attached is our revised proposal. Given the lender issues, a 363 filing is the only direction we can consider.

Respectfully,

T. Mike Riggs
Chairman
Jack Cooper Holdings Corp.

*Always striving to be the best...*
Cell  262-496-5440
Email   mriggs@jackcooper.com
Website  www.jackcooper.com
Fax  770-200-2672

# Jack Cooper Transport Company, Inc.
2345 Grand Boulevard, Suite 400
Kansas City, Missouri  64108

May 9, 2011

CONFIDENTIAL

Mr. Derex Walker
Chairman
Allied Systems Holdings, Inc.
2302 Parklake Drive
Building 15, Suite 600
Atlanta, Georgia 30345

Mr. Stephen H. Deckoff
Founder
Black Diamond Capital Management, LLC
1 Sound Shore Drive, Suite 200
Greenwich, CT 06830

Mr. Derex Walker
The Yucaipa Companies, LLC
9130 West Sunset Boulevard
Los Angeles, California 90069

Mr. Richard Ehrlich
Black Diamond Capital Management, LLC
1 Sound Shore Drive, Suite 200
Greenwich, CT 06830

Re:    Letter of Intent

Gentlemen:

We at Jack Cooper Transport Company, Inc., a Delaware corporation ("**Jack Cooper**"), subject to the provisions of this Letter of Intent ("**LOI**"), are interested in acquiring substantially all of the assets of Allied Systems Holdings, Inc., a Delaware corporation ("**Allied Systems**"), and its direct and indirect subsidiaries (together with Allied Systems, "**Allied**" or "**Seller**").  The purpose of this LOI is to set forth certain nonbinding present intentions and binding agreements between Jack Cooper, on behalf of itself and one or more entities to be formed (collectively, "**Buyer**"), and Seller with respect to Buyer's possible purchase (the "**Transaction**") of substantially all of the assets of Allied through a sale under Section 363 of Title 11 of the United States Code (the "**Bankruptcy Code**").

Jack Cooper is providing this LOI to Seller and to Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP (collectively, "**Yucaipa**") and Black Diamond Capital Management LLC ("**Black Diamond**"), as the holders of a majority of Seller's equity securities, junior secured debt, and senior secured debt (collectively, Allied, Yucaipa, and Black Diamond, the "**Seller Parties**"), on the basis that once fully executed by all parties, the Seller Parties will allow Jack Cooper and its financing sources to proceed with confirmatory due diligence in a prompt and expeditious manner to obtain, among other things, the necessary financing to complete

Letter of Intent
May 9, 2011
Page 2

the Transaction. Any final and binding agreement would require execution by Buyer and the Seller Parties of a mutually acceptable definitive asset purchase agreement (the "**Definitive Agreement**") and the approval of bankruptcy bid procedures (the "**Bidding Procedures**"), the entry of an order by the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division (the "**Bankruptcy Court**") approving the Transaction, and other related and ancillary agreements and documents (together with the Definitive Agreement, the "**Definitive Documents**").

The following Sections of this LOI numbered 1 through 7 (collectively, the "**Nonbinding Provisions**") reflect the nonbinding present intentions of the parties hereto. The Nonbinding Provisions do not create or constitute any legally binding or enforceable obligation between the parties hereto, and no party hereto shall have any liability to the other parties with respect to the consummation of the Transaction or any of the Nonbinding Provisions. Any obligations of the parties to consummate a Transaction shall be subject in all respects to the satisfactory completion of due diligence, as determined by Buyer and its financing sources in their sole and absolute discretion, and the negotiation, execution, delivery, and performance of the Definitive Documents.

1.  **Structure of Transaction.**  The exact structure of, and the assets to be acquired with respect to, the Transaction would be subject to further due diligence and negotiations. However, Buyer would expect to purchase substantially all of the assets of Seller, including, without limitation, all real, personal, tangible, intangible, and other property of all types and description, free and clear of all liens, claims, and other encumbrances, pursuant to a sale under Section 363 of the Bankruptcy Code (the "**Bankruptcy Process**").  In addition, Buyer would expect to have Seller assign certain identified and designated customer contracts, supply agreements, leases, license agreements, and other executory contracts, which executory contracts would be identified and designated by Buyer in its sole and absolute discretion.  Except as specifically agreed upon and designated by Buyer in the Definitive Documents as part of the Total Consideration, Buyer would not assume or otherwise be responsible for any indebtedness, trade payables, or other liabilities or obligations of Seller or its bankruptcy estate whatsoever, contingent or otherwise.

2.  **Total Consideration.**  The total consideration (the "**Total Consideration**") would be comprised of:

    (a) an amount that would equal One Hundred Seventy-Five Million U.S. Dollars ($175,000,000.00), payable in cash at closing; and

    (b) an additional amount that would be mutually agreed upon between Buyer and The CIT Group/Business Credit, Inc. in order to satisfy all claims under Seller's senior secured revolving facility; and

Letter of Intent
May 9, 2011
Page 3

    (c) the assumption of certain designated liabilities deemed critical to the operations of Allied as determined by Buyer in its sole and absolute discretion.

3.  **Signing and Closing.**  We would propose to enter into the Definitive Documents as soon as practicable following the completion of due diligence. We would expect it would take no longer than forty-five (45) days from the date of execution of this LOI to obtain a financing commitment to finance the Transaction, and the Bankruptcy Process would commence shortly thereafter and be expected to take no longer than ninety (90) days.

4.  **Conditions Precedent to Signing.**  The execution of the Definitive Documents would be subject to the following conditions precedent: (a) satisfactory completion of due diligence, including, without limitation, business, legal, financial, accounting, ERISA and multiemployer pension fund, labor and employment, tax, environmental, customer and vendor, intellectual property, and HR due diligence; (b) the preparation and negotiation of the Definitive Documents; (c) the taking of all corporate actions by the Seller Parties and their respective Board of Directors and stockholders or other similar governance bodies necessary to approve the Definitive Documents and the consummation of the Transaction; (d) the taking of all corporate actions by Buyer and its Board of Directors and stockholders necessary to approve the Definitive Documents and the consummation of the Transaction; (e) obtaining consent from Buyer's senior secured lenders approving the Definitive Documents and the consummation of the Transaction; and (f) the continued operation of Seller in the ordinary course of business.

5.  **Conditions Precedent to Closing.**  Consummation of the Transaction would be subject to the following conditions precedent: (a) execution of the Definitive Documents; (b) receipt of all necessary third-party consents; (c) receipt of all necessary governmental and regulatory approvals; (d) performance in all material respects by Buyer and the Seller Parties of all covenants in the Definitive Documents; (e) the absence of any material adverse change in Seller's business, financial condition, assets, or operations; (f) Buyer having secured adequate financing to consummate the Transaction on terms substantially consistent with those set forth in financing commitment letters delivered by Buyer to the Seller Parties concurrently with the execution of the Definitive Documents; (g) the entry of a final non-appealable order of the Bankruptcy Court approving the Transaction pursuant to Bankruptcy Code Section 363 in a form acceptable to Buyer, in its sole and absolute discretion, and to be attached to the Definitive Agreement; and (h) such other customary conditions precedent that would be mutually agreed to by Buyer and the Seller Parties and set forth in the Definitive Documents.

Letter of Intent
May 9, 2011
Page 4

6. **Employee Hiring.**  Certain of Seller's members of management and employees may be offered employment in the same or substantially similar roles, as would be determined by Buyer prior to the closing in its sole and absolute discretion. Any "golden parachute" arrangements, pension benefits, or other significant employee contracts or obligations that may exist between management and Seller would be cancelled or settled (without payment from Buyer) prior to closing and would not be future liabilities of Buyer.

7. **Consents.**  Buyer and the Seller Parties would cooperate with each other and proceed, as promptly as is reasonably practicable following the execution of the Definitive Documents, to prepare and file any governmental notifications required by any laws or regulations, to seek to obtain all other necessary consents and approvals from third parties (including consent of all the lenders and certain customers of Seller), and to endeavor to comply with all other legal or contractual requirements for, or preconditions to, the consummation of the Transaction.

   Upon execution by the parties hereto of this LOI, the following Sections numbered 8 through 18 (collectively, the "**Binding Provisions**") shall constitute the legally binding and enforceable agreements of the parties hereto in recognition of the significant costs to be borne by each in pursuing the Transaction and further in consideration of their mutual undertakings as to the matters described herein.

8. **Exclusivity.**  Each Seller Party acknowledges that Jack Cooper has spent and will continue to spend considerable time and has incurred and will continue to incur substantial costs and expenses in connection with its due diligence investigation, drafting and negotiating this LOI and the Definitive Documents, and considering consummating the Transaction. Accordingly, each Seller Party agrees that, from the date hereof through the earlier of (a) June 30, 2011 and (b) the entry of an acceptable order by the Bankruptcy Court approving the Bidding Procedures (the "**Exclusivity Period**"), each Seller Party shall not, and each shall cause its Representatives (as hereinafter defined) not to, directly or indirectly, (i) enter into or continue any discussions or negotiations with respect to, agree to, approve, recommend, or enter into any agreement or any understanding with respect to, or solicit, initiate, encourage, or facilitate the submission of any inquiries, proposals, or offers for, the acquisition (including, without limitation, by sale of assets, stock, or debt instruments, merger, consolidation, or other business combination, a lease or licensing transaction, or otherwise) by any person (other than as expressly contemplated by this LOI), directly or indirectly, of any shares of capital stock or other equity interests in Seller or all or any material portion of the assets or indebtedness or other liabilities of Seller (an "**Alternative Transaction**"), or (ii) furnish, or cause to be furnished, any information concerning Seller or its assets or liabilities to, or allow access to the books, records, properties, or management of Seller by, any person with a view to, or in furtherance of, an Alternative Transaction. Each Seller Party hereby agrees, and

Letter of Intent
May 9, 2011
Page 5

shall cause its Representatives, to suspend immediately any existing discussions or negotiations with any person with respect to an Alternative Transaction. If any Seller Party, or any of its Representatives, shall receive an indication of interest, term sheet, letter of intent, proposal, request for information, or any similar submission in each case, in respect of an Alternative Transaction, such person shall, within twenty-four hours of the receipt thereof, deliver written notice thereof to Jack Cooper, which written notice shall include the material terms thereof and the identity of the person or persons making or submitting such indication of interest, term sheet, letter of intent, proposal, request for information, or similar submission. The Seller Parties shall be jointly and severally liable for any and all breaches by any Seller Party and/or its Representatives of the terms set forth in this Section or any other Binding Provisions. For purposes of this LOI, "**Representatives**" means, as to any party hereto, such party's affiliates and subsidiaries and their respective stockholders, LLC members, directors, LLC managers, officers, employees, representatives, existing and potential financing sources, relatives, related parties, and agents (including accountants, attorneys, and investment bankers). For Purposes of this LOI, "**person**" means any individual, corporation, partnership, joint venture, limited liability company, trust, governmental body, or other organization.

In the event that the Seller Parties consummate an Alternative Transaction, Jack Cooper shall be entitled to, and the Seller Parties shall be jointly and severally liable for, a break-up fee of three percent (3%) of the Total Consideration and an expense reimbursement for the actual costs and fees incurred by Jack Cooper and its Representatives through the date of the consummation of the Alternative Transaction (collectively, the "**Break-up Fee**").

9. **Filing a Motion to Approve Transaction.** Within ten (10) business days from the date on which Buyer and the Seller Parties execute the Definitive Documents, Seller shall file its bankruptcy cases in the Bankruptcy Court. Seller shall file, on the same date as the date of the bankruptcy filings, a motion and form of order, both in form and substance acceptable to Buyer in its discretion, seeking approval of the Transaction, the Break-up Fee, and certain other bid protections, including, but not limited to, a minimum overbid and minimum bidding increments, acceptable to Buyer in its discretion (collectively, with the Break-up Fee, the "**Bid Protections**"), pursuant to Bankruptcy Code Section 363. The Seller Parties shall use their best efforts promptly to obtain approval by the Bankruptcy Court of the Bid Protections and the Transaction.

10. **Access to Information and Conduct of Business**. During the Exclusivity Period, the Seller Parties shall afford (and shall cause its Representatives to afford) to Buyer and its Representatives full access at reasonable times to Seller's financial, legal, tax, and other data and information and its employees, suppliers, and customers to conduct its due diligence investigation of Seller and its business and affairs. Such

information shall be made available on a confidential basis and shall be governed by the terms and conditions of that certain Mutual Nondisclosure Agreement between Jack Cooper and Allied Holdings of even date herewith, which shall remain in full force and effect. Furthermore, during the Exclusivity Period, Seller shall: (a) conduct its business only in the ordinary course and consistent with past practice and shall not enter into any transactions other than in the ordinary course of business (including, without limitation, any sale or disposition of assets or liabilities outside the ordinary course of business or any distributions or payments to stockholders); (b) preserve intact its business organization, management, commercial relationships, and goodwill; and (c) promptly notify Jack Cooper of any material change in the normal course of its business

11. **Confidential Joint Settlement and Mutual Release**.  The parties hereto shall and hereby agree to enter into that certain Confidential Joint Settlement and Mutual Release attached hereto as **Exhibit A** and incorporated herein by this reference.

12. **Transaction Costs.**  Each party hereto shall bear its own transaction costs, including, without limitation, legal, accounting, and investment banking costs, except as otherwise provided herein for Jack Cooper in the event of the Seller Parties' consummation of an Alternative Transaction.  Each party hereto shall indemnify the other parties hereto from any claim by any broker or finder based upon arrangements made by or on behalf of the indemnifying party or any of its Representatives in connection with this LOI or the Transaction.

13. **No Public Announcements.**  Except as required by applicable laws, regulations, and legal proceedings or existing credit facilities, the parties hereto and their respective Representatives shall not make any announcement or other disclosure to any third party of the execution of this LOI or the Transaction, both before and after the consummation of the Transaction or the termination of this LOI, without the prior written consent of the parties hereto.

14. **Governing Law.**  This LOI shall be governed by and construed in accordance with the laws of the State of Georgia, without giving effect to the choice of law rules thereof.

15. **Nonbinding Provisions.**  Each party hereto acknowledges and agrees that the Nonbinding Provisions do not create or constitute any legally binding obligations among the parties.  The parties hereto do not intend to be bound by the Nonbinding Provisions, and no party hereto shall have any liability to the other parties hereto with respect to the Nonbinding Provisions.  No party hereto may reasonably rely on any promises inconsistent with this Section.

Letter of Intent
May 9, 2011
Page 7

16. <u>**Counterparts.**</u>  This LOI may be executed in two or more counterparts (including by means of facsimile or electronically transmitted portable document format (PDF) signature pages), each of which shall be deemed to be an original, but all of which together shall constitute and be one and the same instrument.  Counterpart signatures need not be on the same page and shall be deemed effective upon receipt.

17. <u>**Miscellaneous.**</u>  Any waiver, amendment, modification, or supplement of or to any term or condition of the Binding Provisions shall be effective only if in writing and signed by each party hereto.  The rights and obligations under this LOI are not assignable by any party thereto without the prior written consent of the other parties hereto, except that Jack Cooper may assign some or all of its rights or obligations hereunder to one or more of its affiliates, whether now in existence or to be formed.

18. <u>**Expiration of this LOI.**</u>  Unless signed by the parties hereto no later than 5:00 p.m. EST on May 13, 2011, this LOI shall expire.

If you have any questions regarding this LOI, please do not hesitate to call me at (262) 496-5440.  We look forward to working with you.

Sincerely,

**Jack Cooper Transport Company, Inc.**

By:

_____

Name: T. Michael Riggs
Title: Chairman

Accepted and Agreed to by:

**Allied Systems Holdings, Inc.**

By: _____        _____
    Name: Derex Walker            DATE
    Title: Chairman

Letter of Intent
May 9, 2011
Page 8

Accepted and Agreed to by:

**The Yucaipa Companies, LLC**

By: _____          _____
      Name: Derex Walker          DATE
      Title:

**Yucaipa American Alliance**
**Fund I, LP**
By its General Partner, _____

By: _____          _____
      Name: _____          DATE
      Title: _____

**Yucaipa American Alliance (Parallel)**
**Fund I, LP**
By its General Partner, _____

By: _____          _____
      Name: _____          DATE
      Title: _____

Accepted and Agreed to by:

**Black Diamond Capital Management LLC**

By: _____          _____
      Name: _____          DATE
      Title: _____

Letter of Intent
May 9, 2011
Page 9


cc:  Robert Griffin, CEO
     Michael S. Testman, CFO
     Theo A. Ciupitu, EVP and GC
     Jesse H. Austin, III, Esq. (Paul, Hastings, Janofsky & Walker LLP)
     Elizabeth Noe, Esq. (Paul, Hastings, Janofsky & Walker LLP)

# EXHIBIT 9

| | |
|---|---|
| **From:** | derex@att.blackberry.net |
| **Sent:** | Wednesday, December 07, 2011 2:16 PM |
| **To:** | Stephanie Bond |
| **Subject:** | Fw: quick update |
| **Attachments:** | image001.gif |

Sent via BlackBerry by AT&T

**From:** Ira Tochner <ira.tochner@yucaipaco.com>
**Date:** Wed, 7 Dec 2011 22:13:53 +0000
**To:** Ron Burkle<burkle@yucaipaco.com>; Derex Walker<derex.walker@yucaipaco.com>
**ReplyTo:** <ira.tochner@yucaipaco.com>
**Subject:** Fw: quick update

**From:** Michael Riggs <mriggs@jackcooper.com>
**Date:** Wed, 7 Dec 2011 16:11:14 -0600
**To:** ira.tochner@yucaipaco.com<ira.tochner@yucaipaco.com>
**Subject:** quick update

Ira

I have set up a meeting in New York at Black Diamond's office on December 20th. Spectrum will also be attending the meeting. My objective is to try and craft a package deal where I can purchase your debt, but simultaneously also acquire the debt of CIT, Black Diamond, and Spectrum. I will not be able to give you a proposal until after that meeting. I just wanted to keep you updated. Thanks.

T. Mike Riggs
Chairman
Jack Cooper Holdings Corp.



*Always striving to be the best...*
Cell  262-496-5440
Email  mriggs@jackcooper.com
Website  www.jackcooper.com

**From:** Ira Tochner [mailto:ira.tochner@yucaipaco.com]
**Sent:** Tuesday, December 06, 2011 11:33 PM
**To:** Michael Riggs
**Subject:** Re: Black Diamond - confidential

Thx Mike. I assume its ok, but please let me check internally, and I'll get back to you in the morning.

**From:** Michael Riggs <mriggs@jackcooper.com>
**Date:** Tue, 6 Dec 2011 22:27:45 -0600
**To:** ira.tochner@yucaipaco.com<ira.tochner@yucaipaco.com>
**Subject:** Black Diamond - confidential

Ira

Confidential

YUCAIPA686599

I just finished a very long legal call about our prospective deal. The complexities are a bit mind-boggling for my below-average (and aging) brain. After I hung up, it occurred to me that you might not want me to speak with Black Diamond given your concern about confidentiality. But I am not sure. Call or email me with your direction. I have not yet re-touched base with them, and I won't until you say it is OK.

There are several reasons I would like to use them:
1. I can only generate around $50 million of cash down payment for the "bridge loan" to buy you out prior to the bankruptcy. That will suffice for Black Diamond. Unfortunately I could not reach your "$80-$90 million cash down payment" figure you mentioned which Yucaipa would require to do the financing. So I believe Black Diamond might be our mutual best bet to get you an all-cash deal.
2. Any long term bond tack-on "permanent" financing to replace the bridge loan could only occur AFTER the successful bankruptcy process is completed. I do not know how long that will take. Black Diamond has agreed to make a bridge loan to us for as long as 18-24 months.
3. There is no pre-payment penalty if we pay them off early (which is our goal, as soon as possible after the bankruptcy).
4. They are only charging us a single digit interest rate.
5. They are only expecting interest-only payments until the debt matures. That will help us fund the bankruptcy costs easier.
6. With a $50 million down payment to Black Diamond I believe they will do the temporary bridge loan financing for your piece, but I also think I can get them to offer us some extra funding to take out CIT entirely for an additional $20 million. With your piece, Black Diamond's piece, and CIT's piece we should be in a very strong position in bankruptcy.
7. Finally, we have already negotiated with Black Diamond for several months on all the tough terms; so they are already to the point where essentially the only default on the bridge loan is non-payment. That makes them especially attractive to us as a temporary lender. It also makes it much easier for us to get consent from our lenders...which will be required before we can do any deal under our indenture language.

But let me know. If you would prefer I not mention anything to them, then I will not speak with them. Instead I will rekindle our alternative financing sources over the next few days in a highly confidential way. I just worry about the level of diligence anyone else will require to actually fund a temporary loan. But in truth I do not even really know if they are still interested.

Let me know your preference. Thanks.

T. Mike Riggs
Chairman
Cell  262-496-5440
Email  mriggs@jackcooper.com
Website  www.jackcooper.com

-----Original Message-----
From: Ira Tochner [mailto:ira.tochner@yucaipaco.com]
Sent: Monday, December 05, 2011 4:53 PM
To: Michael Riggs
Subject:

Just finalized my plans. Ill be at Ritz Carton Buckhead. In the hotel restaurant at 10 am tomorrow?

This email may contain material that is confidential and for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

This email may contain material that is confidential and for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

Confidential

This email may contain material that is confidential and for the sole use of the intended recipient. Any review, reliance or distribution by others or forwarding without express permission is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies.

Confidential

YUCAIPA686601

# EXHIBIT 10

| | |
|---|---|
| **From:** | Richard Ehrlich <richard.ehrlich@gmail.com> |
| **Sent:** | Sunday, January 08, 2012 5:40 PM |
| **To:** | Steve Deckoff |
| **Subject:** | Re: Windsor Star- Former Allied workers to be hired by Chrysler |

The state court action is just about ready to be filed. Almost there on confi to get Jack Cooper info.

On Jan 8, 2012, at 5:13 PM, Steve Deckoff <sdeckoff@bdcm.com> wrote:

> Where are we on our Allied strategy?

**Confidentiality Notice:** The information contained in this e-mail (and any attachments) is confidential and may be privileged. It is intended for the named recipient(s) only. If you are not the named recipient, you are hereby notified that any use, dissemination, distribution, retention or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by return e-mail and permanently delete the e-mail and any attachments. Thank you for your cooperation.

-----Original Message-----

From: Richard Ehrlich <richard.ehrlich@gmail.com>
To: Steve Deckoff; Les Meier; Jeffrey A. Schaffer <JSchaffer@spectrumgp.com>; Jeff Buller <JBuller@spectrumgp.com>
Sent: Sun Jan 08 17:03:21 2012
Subject: Windsor Star- Former Allied workers to be hired by Chrysler

Check out this post:
http://blogs.windsorstar.com/2012/01/08/former-allied-workers-to-be-hired-by-chrysler/

1

Confidential

BDCM0006164

# EXHIBIT 11

EXECUTION VERSION
PRIVILEGED AND CONFIDENTIAL

January 12, 2012

Ladies and Gentlemen:

This letter agreement ("Agreement") is entered into and made by and among Black Diamond CLO 2005-1 LTD., BDCM Opportunity Fund II, L.P. (collectively, "Black Diamond") and Spectrum Investment Partners, L.P. (together with its affiliates, "Spectrum", and collectively with Black Diamond, the "Parties"), each of whom is a Lender under the First Lien Credit Agreement and/or the Second Lien Credit Agreement.[1] In the aggregate, the Parties own or control (or have the right to acquire), with power to vote, approximately $56.7 million in principal amount of the Obligations (prior to reduction of the LC Commitments) outstanding under the First Lien Credit Agreement ("Lender Claims").

In contemplation of, among other things, the pursuit of certain strategies to enforce the rights of the Parties as Lenders under the First Lien Credit Agreement ("Strategies"), the Parties have agreed to enter into this Agreement.

1.    Cooperation.  For so long as this Agreement is in effect, the Parties shall, in good faith, work together to identify and implement courses of action for the purpose of maximizing the recoveries of the Parties in respect of the Lender Claims.  The Parties

---

[1] "First Lien Credit Agreement" means the Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007 and amended and restated as of May 15, 2007, and as further amended, modified or supplemented through April 17, 2008 (including, without limitation, as set forth in Amendment No. 3 to Credit Agreement and Consent dated as of April 17, 2008), by and among Allied Holdings, Inc. and Allied Systems, Ltd. (L.P.), as Borrowers, certain Subsidiaries of Borrowers, as Subsidiary Guarantors, various Lenders, Goldman Sachs Credit Partners L.P., as Lead Arranger and Syndication Agent, and The CIT Group/Business Credit, Inc. ("CIT"), as Administrative Agent and Collateral Agent.

"Second Lien Credit Agreement" means the Second Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of May 15, 2007 (as amended, modified or supplemented from time to time), by and among Allied Holdings, Inc. and Allied Systems, Ltd. (L.P.), as Borrowers, certain Subsidiaries of Borrowers, as Subsidiary Guarantors, various Lenders, and Goldman Sachs Credit Partners L.P., as Lead Arranger and Syndication Agent, Administrative Agent and Collateral Agent .

The First Lien Credit Agreement and the Second Lien Credit Agreement are collectively referred to herein as the "Credit Agreements."

Capitalized terms used but not specifically defined herein shall have the meanings ascribed to them in the First Lien Credit Agreement.

DOC ID-17646546.8

· EXECUTION VERSION
PRIVILEGED AND CONFIDENTIAL

acknowledge and agree that such courses of action may include the exercise of rights attendant to the Lender Claims and/or claims held by any Party under the Second Lien Credit Agreement.

2.  ˌ Transfer of Lender Claims. (a) For so long as this Agreement is in effect, except as specifically set forth below in this Paragraph 2, each Party shall not (i) grant any proxies to any person in connection with its Lender Claims except as limited by this Agreement and otherwise consistent with the terms hereof, or, (ii) sell, transfer, assign, further pledge, further encumber or otherwise dispose of its Lender Claims, except with the prior written consent of all Parties to this Agreement to a party that agrees in writing (A) to assume such Party's Lender Claim, and (B) to be subject to the terms and conditions of this Agreement. Any such transfer, sale, assignment, further pledge, further encumbrance or other disposition by a Party of all or a portion of its Lender Claims that is not in compliance with the terms of this Agreement shall be void ab initio. Subject to Paragraph 3 hereof, this Agreement shall in no way be construed to preclude any Party from acquiring additional Lender Claims, provided that any such Lender Claim so acquired shall thereafter be subject to this Agreement.

(b) Notwithstanding the foregoing, a Party (a "Selling Party") may sell, transfer or otherwise dispose of its Lender Claims as follows:

(i) to any affiliate, or to one or more funds, managed accounts or entities that are under common management or control with the Selling Party (in which case such Lender Claims shall remain subject to the terms of this Agreement); or

(ii) to any third party so long as:

(A) prior to such sale, transfer or disposition, such Selling Party shall have offered to sell its Lender Claims to the other Parties hereto pursuant to a written notice setting forth the terms and conditions on which the Selling Party is prepared to sell its Lender Claims (including price) (an "Offer"). The non-selling Parties shall have five (5) business days (the "Offer Period") to accept the Offer in writing and to execute a binding commitment to purchase such Lender Claims. If the Offer is not timely accepted in writing and a binding commitment timely executed, subject to compliance with clause B of this Paragraph 2(b)(ii), the Selling Party shall be entitled to sell, transfer or otherwise dispose of its Lender Claims to any third party free and clear of any obligations set forth in this Agreement on terms and conditions no less favorable to the Selling Party than those set forth in the Offer. If the Selling Party does not enter into a binding commitment for the sale, transfer or disposition of its Lender Claims within thirty (30) days after the expiration of the Offer Period, prior to any sale, transfer or disposition thereafter the Selling Party must extend a new Offer to the other Parties hereto in accordance with this Paragraph 2(b)(ii); and

(B) if the Offer of any Selling Party is not timely accepted by one or more non-selling Parties and the Selling Party determines to sell, transfer or otherwise dispose of its Lender Claims to a third party, in connection with such sale, transfer or other disposition the proposed third party purchaser must agree in writing to include in such sale, transfer or other disposition of the Selling Party's Lender Claims all of the Lender

EXECUTION VERSION
PRIVILEGED AND CONFIDENTIAL

Claims of all other Parties hereto on identical terms and conditions. In furtherance thereof, such third party purchaser shall make an offer in writing to each non-selling Party, and such non-selling Parties shall have five (5) business days to accept the offer in writing and to execute a binding commitment to sell its Lender Claims.

3.    <u>Purchase of Lender Claims</u>. If any Party (or any affiliate of any Party) acquires (directly or indirectly), or is offered the opportunity to acquire (directly or indirectly), any additional Lender Claims (an "Additional Claim Purchase"), such Party shall (or, as applicable, shall cause its affiliate to) offer in writing to each of the other Parties hereto the opportunity to acquire such other Party's ratable share of the Lender Claims subject to the Additional Claim Purchase, on the same terms and conditions. The offer to the other Parties hereto may be made prior to or after consummation of the Additional Claim Purchase, but in no event later than five (5) business days following consummation of the Additional Claim Purchase.

4.    <u>Communication with Yucaipa or Borrowers</u>. Each Party agrees to disclose to all other Parties to the Agreement all communications (including the substance thereof) between the Party and either (a) Yucaipa American Alliance Fund I, LP, Yucaipa American Alliance (Parallel) Fund I, LP or any affiliate thereof (collectively, the "Yucaipa Entities"), (b) the Borrowers or any affiliate thereof, or (c) any person named as agent under any of the Loan Documents, in each case relating to the Borrowers, the Guarantors, the First Lien Credit Agreement or the Lender Claims. Such disclosure shall be made promptly and within a reasonable period of time after such communication in accordance with the Notice provisions below.

5.    <u>Confidentiality</u>. Each Party agrees that, without obtaining the prior approval of each other Party (such approval not to be unreasonably withheld or delayed), or except as may be required by applicable law or regulation or by relevant legal, administrative, or regulatory authorities or otherwise in connection with any judicial, regulatory or administrative proceeding or investigation, no Party will (i) issue a press release or other public statement relating to this Agreement, the Strategies, or any matters related thereto, or (ii) otherwise disclose to any third party (other than each Party's principals, employees, members, partners, funding sources, attorneys, auditors, professional advisors, limited partners or Affiliates who need to know) any non-public information regarding the Strategies, or disclose any of the terms of this Agreement, without, in each case, the prior written consent of each other Party.

6.    <u>Representations and Warranties</u>. Each Party represents, warrants and covenants to the other Parties that:

(a)    such Party has all requisite power and authority to execute and deliver this Agreement and to perform its obligations under this Agreement and that such Party has duly authorized such execution, delivery and performance;

(b)    this Agreement, when executed and delivered by such Party, will constitute a valid and binding agreement of such Party, enforceable against such Party in accordance with its terms,

EXECUTION VERSION
PRIVILEGED AND CONFIDENTIAL

      (c)     neither the execution or delivery by such Party of this Agreement nor pursuit of the Strategies will violate or be in conflict with (i) any provisions of law or regulation applicable to such Party, (ii) any order of any court or government agency having jurisdiction over such Party, or (iii) any agreement or instrument to which such Party or any of its Affiliates is a party or to which such Party or any of its Affiliates may be bound;

      (d)     such Party owns or controls, with power to vote, the principal amount of First Lien Obligations and Second Lien Obligations set forth on the signature pages hereto; and

      (e)     it shall not take, directly or indirectly, any action that could reasonably be expected to adversely impact the recoveries (either in dollar amount of form) on account of the Lender Claims, or induce or support any other person to do so.

      7.     <u>Expenses</u>. Each Party shall timely pay its pro rata share of all costs and expenses incurred in (a) developing and implementing the Strategies, and (b) any action or proceeding arising therefrom or relating thereto, in accordance with that certain Engagement letter between and among the Parties and Schulte Roth & Zabel LLP ("SRZ"), dated as of November 9, 2009, regardless of whether this Agreement shall have terminated in accordance with Paragraph 16 hereof. Notwithstanding the above, any waiver, forgiveness or discount of legal fees granted to one of the Parties by SRZ shall be equally applicable to the other Party, *mutatis mutandis*, and shall be attested to by such Party and SRZ.

      8.     <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial; Remedies</u>. This Agreement is governed by the laws of the State of New York, without reference to principles of choice or conflict of laws other than Section 5-1401 of the New York General Obligations Law. Each of the Parties agrees that any legal action or proceeding with respect to this Agreement may be brought in the federal and state courts located in the State of New York, and, by execution and delivery of this Agreement, each Party hereby irrevocably submits itself in respect of its property, generally and unconditionally, to the exclusive jurisdiction of the aforesaid courts in any legal action or proceeding arising out of or relating to this Agreement. Each of the Parties hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement brought in the courts referred to in the preceding sentence. Each of the Parties hereby irrevocably waives the right to a trial by jury in connection with any matter arising out of or relating to this Agreement. The Parties acknowledge that money damages may not be a sufficient remedy for any breach of this Agreement by any Party. Accordingly, in the event of any such breach or threatened breach, each non-breaching Party, in addition to any other remedies at law or in equity that it may have, shall be entitled, without the requirement of posting a bond or other security, to seek equitable relief, including injunctive relief or specific performance or both.

      9.     <u>Notices</u>.

      (a)     All demands, notices, requests, consents, and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered

EXECUTION VERSION
PRIVILEGED AND CONFIDENTIAL

by courier service, messenger, telecopy or electronic mail at, or if duly deposited in the U.S. mail, by certified or registered U.S. mail, postage prepaid, return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

    (i)    in the case of Black Diamond, to:

        1 Sound Shore Drive, Suite 200
        Greenwich, Connecticut 06830

        Attention:  Richard Ehrlich
        Telephone:  (203) 552-0888
        Facsimile:  (203) 552-1014
        Email:  rehrlich@bdcm.com

        with a copy (which shall not constitute notice) to:

        Schulte Roth & Zabel LLP
        919 Third Avenue
        New York, New York  10022

        Attention:  Adam Harris, Esq.
        Telephone:  (212) 756-2253
        Facsimile:  (212) 593-5955
        Email:  adam.harris@srz.com

    (ii)    in the case of Spectrum, to:

        1250 Broadway
        New York, New York  10001

        Attention:  Jeffrey A. Schaffer
        Telephone:  (212) 687-9555
        Facsimile:  (212) 983-2322
        Email:  jschaffer@spectrumgp.com

        Attention:  Stephen C. Jacobs
        Telephone:  (212) 687-9555
        Facsimile:  (212) 983-2322
        Email:  sjacobs@spectrumgp.com

        with a copy (which shall not constitute notice) to:

EXECUTION VERSION
PRIVILEGED AND CONFIDENTIAL

Schulte Roth & Zabel LLP
919 Third Avenue
New York, New York  10022

Attention:  Adam Harris, Esq.
Telephone:  (212) 756-2253
Facsimile:  (212) 593-5955
Email:  adam.harris@srz.com

   (b) All demands, requests, consents, notices and communications shall be deemed to have been given either (i) at the time of actual delivery thereof, or (ii) if given by certified or registered mail, five (5) business days after certification or registration thereof, or (iii) if given by facsimile, upon receipt of confirmation of transmission to the recipient.  For purposes of this Agreement, the term "business day" means any calendar day other than Saturday, Sunday or any other day on which banking institutions in New York, New York are not required to be open.

   10. <u>Amendments; Waivers</u>.  (a) No waiver and no amendment of any provision of this Agreement shall be effective unless such waiver or amendment is in writing and signed by the Party against whom it is sought to be enforced, and then such waiver or amendment shall be effective only in the specific instance and for the specific purpose for which given, (b) no failure on the part of any Party hereto to exercise and no delay in exercising, any right hereunder or under any related document shall operate as a waiver thereof by such Party, and (c) any single or partial exercise of any right hereunder or under any other related document shall not preclude any other or further exercise thereof or the exercise of any other right.

   11. <u>Further Assurances</u>.  The Parties undertake to use their commercially reasonable efforts to execute, deliver, and perform in good faith any agreements as may be necessary or desirable to accomplish the actions contemplated by this Agreement.

   12. <u>Entire Agreement</u>.  This Agreement sets forth the entire agreement and understanding among the Parties relating to the subject matter hereof and supersedes all other prior agreements, discussions and documents with respect thereto.  No Party shall be bound by any terms, conditions, definitions, warranties, understandings or representations with respect to the subject matter hereof other than as expressly provided for in this Agreement and except as may hereafter by agreed to in a writing signed by such Party.

   13. <u>Merger</u>.  Each Party confirms that it has not executed this Agreement in reliance on any promise or representation or warranty (not contained herein) by the other Parties concerning the subject matter hereof.

   14. <u>Captions and Headings</u>.  The captions and headings in this Agreement are for convenience only and (a) are not intended to be full or accurate descriptions of the contents thereof, (b) are not to be deemed to be part of this Agreement, and (c) in no way define, limit, extend or describe the scope or intent of any provisions hereof.

EXECUTION VERSION
PRIVILEGED AND CONFIDENTIAL

15.    Counterparts.  This Agreement may be executed in counterparts, each counterpart when so executed and delivered constituting an original, but all such counterparts together shall constitute one and the same instrument.

16.    Consideration.  Each Party hereto acknowledges the receipt and sufficiency of good and valuable consideration in exchange for its agreement to undertake its duties and obligations under this Agreement.

17.    Termination.  This Agreement shall terminate as to all Parties and be of no further force and effect (except as otherwise set forth herein) on the earliest to occur of the following: (a) the mutual agreement of all of the Parties, (b) the date on which any Party sells, transfers or otherwise disposes of its Lender Claims in accordance with Paragraph 2(b)(ii) of this Agreement, (c) the sale of all or substantially all of the assets of the Borrowers and/or Guarantors, (d) if the Borrowers and/or Guarantors become debtors under Chapter 11 of the Bankruptcy Code, the earliest to occur of (i) the substantial consummation of a plan of reorganization confirmed in accordance with the requirements of Chapter 11 of the Bankruptcy Code, (ii) the entry of a final non-appealable order confirming a plan of reorganization, and (iii) the entry of an order converting the cases to cases under chapter 7 of the Bankruptcy Code.

18.    Survival.  The provisions of Paragraphs 5, 7 and 8 of this Agreement shall survive the termination hereof.

Please acknowledge your agreement to the foregoing by executing this Agreement in the space set forth below, whereupon this Agreement will become a binding contract among the parties hereto.

[SIGNATURES ON FOLLOWING PAGE]

EXECUTION VERSION
PRIVILEGED AND CONFIDENTIAL

**BLACK DIAMOND CLO 2005-1 LTD.**
BLACK DIAMOND CLO 2005-1 ADVISER,
L.L.C., as its Collateral Manager

By: _____
Name: Stephen H. Deckoff
Title:   Managing Principal

First Lien Obligations:
**$  4,544,511.51**
Second Lien Obligations:  $_____

**BDCM OPPORTUNITY FUND II, L.P.**
BDCM OPPORTUNITY FUND II ADVISER,
L.L.C., as its Investment Manager

By: _____
Name: Stephen H. Deckoff
Title:   Managing Principal

First Lien Obligations:
$      26,862,637.20
Second Lien Obligations:  $_____

**SPECTRUM INVESTMENT PARTNERS, L.P.**

By: _____
Name:
Title:

First Lien Obligations:  $_____
Second Lien Obligations:  $_____

EXECUTION VERSION
PRIVILEGED AND CONFIDENTIAL

**BLACK DIAMOND CLO 2005-1 LTD.**
BLACK DIAMOND CLO 2005-1 ADVISER,
L.L.C., as its Collateral Manager

By: _____
Name:
Title:

First Lien Obligations: $_____
Second Lien Obligations: $_____

**BDCM OPPORTUNITY FUND II, L.P.**
BDCM OPPORTUNITY FUND II ADVISER,
L.L.C., as its Investment Manager

By: _____
Name:
Title:

First Lien Obligations: $_____
Second Lien Obligations: $_____

**SPECTRUM INVESTMENT PARTNERS, L.P.**
By: SPECTRUM GROUP MANAGEMENT LLC, As Investment Manager
By: _____
Name: JEFFREY A. SCHAFFER
Title: MANAGING MEMBER

First Lien Obligations: $ 20,531,461.66
Second Lien Obligations: $ 5,000,000