# EXHIBIT 18

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

----------------------------------------x

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| ALLIED SYSTEMS HOLDINGS, INC., | : | |
| | : | Case No. 11-[_____] ([____]) |
| Alleged Debtor. | : | |
| | : | |
| | : | |
| | : | |

----------------------------------------x

| | | |
|---|---|---|
| In re: | : | |
| | : | Chapter 11 |
| ALLIED SYSTEMS, LTD. (L.P.), | : | |
| | : | Case No. 11-[_____] ([____]) |
| Alleged Debtor. | : | |
| | : | |

----------------------------------------x

**AFFIDAVIT OF JEFFREY A. SCHAFFER**
**PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 1003**

STATE OF NEW YORK       )
                        ) ss:
COUNTY OF NEW YORK  )

Jeffrey A. Schaffer being duly sworn, deposes and states:

1.        I make this affidavit on behalf of Spectrum Investment Partners LP ("Spectrum"), a petitioning creditor in the above-captioned involuntary chapter 11 cases (the "Bankruptcy Cases") filed by Spectrum and other petitioning creditors against (i) Allied Systems Holdings, Inc., and (ii) Allied Systems, Ltd. (L.P.) (together, the "Debtors"). I am fully familiar with the facts set forth herein either through my own personal knowledge or through a review of documents related to Spectrum's claims against the Debtors. If called to testify in connection with the Bankruptcy Cases, the following would constitute my testimony.

2.      I am the Managing Member of Spectrum Group Management LLC, which is the investment manager of Spectrum, and am authorized to make this affidavit and to execute a petition commencing the Bankruptcy Cases on its behalf.  Spectrum has its principal place of business at 1250 Broadway, 19th Floor, New York, New York 10001.  Spectrum is a creditor of the Debtors based upon its status as a lender under that certain Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007 by and among Allied Holdings, Inc. and Allied Systems, Ltd. (L.P.), as borrowers, certain subsidiaries of borrowers, as subsidiary guarantors, various lenders, Goldman Sachs Credit Partners L.P., as lead arranger and syndication agent, and The CIT Group/Business Credit, Inc., as administrative and collateral agent (as amended, restated, modified, or supplemented from time to time, the "First Lien Credit Agreement").

### The First Lien Credit Agreement

3.      Pursuant to the First Lien Credit Agreement, various lenders committed to extend term loans, revolving loans, and synthetic letters of credit to the Debtors in the amount of $265 million.  Due to the accrual of interest and fees, the current outstanding aggregate amount of the Obligations (as defined in the First Lien Credit Agreement) is approximately $296.4 million.  A copy of the First Lien Credit Agreement will be annexed to a declaration in support of a statement contemporaneously filed by the petitioning creditors.

4.      Pursuant to the First Lien Credit Agreement, the lenders' commitments under term loans, revolving loans, and synthetic letters of credit were evidenced by promissory notes.  The claims of Spectrum and other petitioning creditors derive from these notes.

5.      The Obligations are secured by first priority liens in substantially all of the Debtors' assets, including, but not limited to accounts, chattel paper, general intangibles, goods,

instruments, insurance, intellectual property, investment related property, letter of credit rights, money, receivables, and commercial tort claims. The Obligations are guaranteed by affiliates of the Debtors.

### The Assignments

6.      By virtue of the execution of several assignment and assumption agreements, Spectrum received an unconditional transfer and assignment of certain amounts of loans owed by the Debtors under the First Lien Credit Agreement (the "Assigned Claims") (the "Assigned Claims"). Redacted copies of the assignment documentation are attached as **Exhibit A**.

7.      The Assigned Claims were not assigned to Spectrum for the purposes of commencing the Bankruptcy Cases.

8.      As of the date hereof, the Debtors are indebted to Spectrum in the amount of at least $21.5 million, together with all accrued and unpaid interest (including default interest), fees and expenses calculated in accordance with the Credit Agreement.


Dated: May __, 2012
        New York, New York                              _____
                                                        JEFFREY A. SCHAFFER


Sworn to and subscribed before me
This ___ day of May, 2012

_____
        Notary Public


SOLMARIA VELEZ
Notary Public - State of New York
NO. 01VE6076495
Qualified in Bronx County
My Commission Expires _____

# EXHIBIT A

# LSTA ████████ TRADE CONFIRMATION

**To:**   *Spectrum Investment Partners, L.P.*
   *Attention:*
   *Phone No.:*
   *Fax No.:*
   *Email:*

**From:**

**Date:**

   We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for ████████ Trade Confirmations (the "Standard Terms and Conditions") published by The Loan Syndications and Trading Association, Inc.® (the "LSTA") as of December 1, 2006, which Standard Terms and Conditions are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the parties and specifically set forth in the "Trade Specific Other Terms of Trade" section below.  The parties hereto agree to submit any dispute as to the reasonableness of a buy-in or sell-out price to binding arbitration in accordance with the LSTA "Rules Governing Arbitration Between Loan Traders With Regard to Failed Trades" in existence on the Trade Date, and to comply with any award or decision issued in connection with such an arbitration proceeding.  Capitalized terms used and not defined in this Confirmation have the respective meanings ascribed thereto in the Standard Terms and Conditions.

| | |
|---|---|
| **Trade Date:** | ████████ |
| **Seller:** | ████████   ☑ Principal   ☐ Agent |
| **Buyer:** | Spectrum Investment Partners, L.P.   ☑ Principal   ☐ Agent |
| **Credit Agreement:** | AMENDED AND RESTATED FIRST LIEN SECURED SUPER-PRIORITY DEBTOR IN POSSESSION AND EXIT CREDIT AND GUARANTY AGREEMENT, dated as of March 30, 2007, as amended and restated as of May 15, 2007 among ALLIED HOLDINGS, INC., ALLIED SYSTEMS, LTD. (L.P.), the Lenders party thereto from time to time, and THE CIT GROUP/BUSINESS CREDIT, INC., as Administrative Agent |
| **Borrower:** | Allied Holdings, Inc., Allied Systems, LTD (L.P.) |
| **Form of Purchase:** | Assignment |



LSTA EFFECTIVE DECEMBER 2006  Copyright © LSTA 2006.  All rights reserved.

**Purchase Amount/**
**Type of Debt:**

| Purchase Amount | Type of Debt | Facility | CUSIP Number |
|---|---|---|---|
| ▮▮▮▮▮ | Revolver | Synthetic LC Commitment | |
| ▮▮▮▮▮ | Term | Term Loan | |

**Purchase Rate:**   ▮▮▮▮▮   Synthetic LC Commitment

▮▮▮▮▮   Term Loan

**Up Front Fees:**   Synthetic LC Commitment   None
**(if any):**

Term Loan   None

**Credit Documentation**   No
**to be provided:**

**Trade Specific**
**Other Terms of Trade:**   Recordation Fee is waived.

Please provide the signature of a duly authorized officer or other signatory where indicated below and return this letter to the attention of Aarti Patel at ClearPar at the following fax number (646)453-2870 or email address: aarti.patel@fnis.com

If you have any questions, please contact Aarti Patel at (845)639-4816.





**Spectrum Investment Partners, L.P.**
**By: Spectrum Group Management LLC, as General Partner**







By:

Name: ▮▮▮▮▮

Title: ▮▮▮▮▮

By:

Name: ▮▮▮▮▮

Title: ▮▮▮▮▮



Page 2 of 2

LSTA EFFECTIVE DECEMBER 2006  Copyright © LSTA 2006. All rights reserved.

ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment") is dated as of the Effective Date set forth below and is entered into by and between ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ (the "Assignor") and Spectrum Investment Partners, L.P. (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Amended and Restated First Lien Senior Secured Super-Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement identified below (as it may be amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of the Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (including, to the extent included in any such facilities, letters of credit, LC Deposits and swingline loans) (the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

1.  Assignor:                    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

2.  Assignee:                    Spectrum Investment Partners, L.P.

3.  Borrower(s):                 Allied Holdings, Inc., Allied Systems, LTD (L.P.)

4.  Administrative Agent:        The CIT Group / Business Credit, Inc., as the administrative agent under the Credit Agreement

5.  Credit Agreement:            The $265,000,000.00 Credit Agreement dated as of May 15, 2007 among Allied Holdings, Inc. ("Holdings"), Allied Systems, Ltd. (L.P.) ("Systems"), certain Subsidiaries of Holdings and Systems, as Guarantors, the Lenders parties thereto, Goldman Sachs Credit Partners L.P., as Administrative Agent, The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent and the other agents parties thereto

6.   Assigned Interest:

| Facility Assigned | Aggregate Amount of Commitment/Loans/LC Deposits for all Lenders | Amount of Commitment/Loans/LC Deposits Assigned | Percentage Assigned of Commitment/Loans/LC Deposits |
|---|---|---|---|
| Synthetic LC Commitment | USD 50,000,000.00 | | |
| Term Loan | USD 177,300,000.00 | | |

Effective Date: ▮▮▮▮▮▮▮▮

7.   Notice and Wire Instructions:

Notices:                                   Notices:

                       Spectrum Investment Partners, L.P.



Phone:
Fax:
Contact:
Email:

Wire Instructions:                         Wire Instructions:

                        Currency:       USD
                                            Bank:           Citibank, N.A. New York
                                            ABA#:
                                            Account #:
                                            Account Name:  Morgan Stanley & Co., NY
                                            FFC:            ▮▮▮▮▮▮Spectrum Investment
                                            Partners, L.P.
                                            Attn:
                                            Reference:      Allied Holdings 1st Lien (5/07)

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR



By:

Name:

Title:

ASSIGNEE

**SPECTRUM INVESTMENT PARTNERS, L.P., as Assignee**

By: Spectrum Group Management LLC, as General Partner



By:

Name:

Title:



3

Consented to and Accepted:

THE CIT GROUP / BUSINESS CREDIT, INC., as Administrative Agent

By: _____

Name: Barbara J. Coffin
Title: Assistant Vice President

Consented to:

ALLIED HOLDINGS, INC.

By: ___N A_____

Name: _____

Title: _____

ALLIED SYSTEMS, LTD (L.P.)

By: ___N A_____

Name: _____

Title: _____

ANNEX I

### STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
### AND ASSUMPTION AGREEMENT

1.  Representations and Warranties.

1.1 Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements (as defined herein), warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "Credit Documents"), or any collateral thereunder, (iii) the financial condition of the Company, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2 Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, and (v) if it is a Non US Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2.  Payments.  All payments with respect to the Assigned Interests shall be made on the Effective Date as follows:

2.1 With respect to Assigned Interests for Term Loans, unless notice to the contrary is delivered to the Lender from the Administrative Agent, payment to the Assignor by the Assignee in respect of the Assigned Interest shall include such compensation to the Assignor as may be agreed upon by the Assignor and the Assignee with respect to all unpaid interest which has accrued on the Assigned Interest to but excluding the Effective Date.  On and after the applicable Effective Date, the Assignee shall be entitled to receive all interest paid or payable with respect to the Assigned Interest, whether such interest accrued before or after the Effective Date.

2.2 With respect to Assigned Interests for Revolving Loans and LC Commitments and LC Deposits, from and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.  General Provisions.  This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment.  This Assignment shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflict



of laws principles thereof.



## PURCHASE AND SALE AGREEMENT 

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the Standard Terms. The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

### TRANSACTION SUMMARY

| | |
|---|---|
| Trade Date: | |
| Agreement Date: | |
| Seller: | |
| Buyer: | Spectrum Investment Partners LP |
| Credit Agreement: | Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007 as amended and restated as of May 15, 2007 among Allied Holdings, Inc. ("Holdings"), Allied Systems, Ltd. (L.P.) ("Systems"), certain Subsidiaries of Holdings and Systems, as Subsidiary Guarantors, the Lenders party thereto, Goldman Sachs Credit Partners L.P., as Syndication Agent, The CIT Group / Business Credit, Inc., as Administrative Agent and Collateral Agent |
| Borrower: | Allied Holdings, Inc. and Allied Systems, Ltd. (L.P.) |
| Purchase Amount(s): | (i) <br> (ii) |
| Tranche(s): | (i) <br> (ii) |
| CUSIP Number(s), if available: | N/A |
| Pre-Settlement Date Accruals Treatment: | ☒ Settled Without Accrued Interest <br> ☐ Trades Flat |
| Type of Assignment: | ☐ Original Assignment <br> ☒ Secondary Assignment |
| Immediate Prior Seller (if any): | |
| Borrower in Bankruptcy: | Yes ☐          No ☒ |
| Delivery of Credit Documents: | Yes ☐          No ☒ |

| TRANSACTION SUMMARY | | |
|---|---|---|
| Netting Arrangements: | Yes ☐ | No ☒ |
| Flip Representations: | Yes ☐[1] | No ☒ |
| Step-Up Provisions: | Yes ☐[1] | No ☒ |
| | Shift Date[2]: | Not Applicable |
| Transfer Notice: | Yes ☐[3] | No ☒ |

**A.    DEFINITIONS**

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement. Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement. Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement. If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means The CIT Group / Business Credit, Inc., as Administrative Agent.

"Assignment" means the Assignment and Assumption Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment.

"Bankruptcy Case" select one:
☒ none.
☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

"Bankruptcy Court" select one:
☒ none.
☐ means [the United States Bankruptcy Court for the _____District of _____ (and, if appropriate, the United States District Court for that District)].

"Bar Date" select one:
☒ not applicable.

---

[1] The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H. Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[2] Specify a Shift Date only if "Yes" is specified opposite "Step-Up Provisions" and if the second box is selected in the definition of Covered Prior Seller. The Shift Date is the date that the Parties agree is the closest possible

approximation for when the market convention for transferring the Loans and Commitments (if any) shifted from a par/near par documentation basis to a distressed documentation basis. In consulting as to the appropriate date, the Parties may refer to published results of an anonymous LSTA poll of disinterested dealers as to such dealers' views regarding the Shift Date or, if results have not been published with respect to the Credit Agreement, either Party may request in writing that the LSTA endeavor to conduct such a poll. To initiate a poll, send a request that includes the name of Borrower and either the CUSIP number (if available) or the name and date of the Credit Agreement to the LSTA at lstashiftdatepolls@lsta.org. The results of such LSTA polls are available to facilitate discussions between the Parties and have no binding effect.

[3] "Yes" can be elected only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.

2

☐ none has been set.
☐ means [specify applicable date, if any].

"Buyer Purchase Price" select one:
☒ not applicable.
☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"Commitments" select one:
☐ none.
☒ means Synthetic LC Commitment in the principal amount of ▆▆▆▆▆▆▆▆ which is funded as an LC Deposit.

"Covered Prior Seller" select one:
☒ not applicable.
☐ means each Prior Seller that transferred the Loans and Commitments (if any)[4] on or after the Shift Date [but prior to the date on which _____[5] transferred such Loans and Commitments (if any)].[6]

"Filing Date" select one:
☒ none.
☐ means [identify date on which Borrower filed Bankruptcy Case].

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

"Netting Letter" select one:
☒ not applicable.
☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:
☒ not applicable.
☐ means [specify original buyer in the netting arrangement].

"Penultimate Buyer" select one:
☒ not applicable.
☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
☐ means [_____].

"Required Consents" means the consent of the Agent.

"Seller Purchase Price" select one:
☒ not applicable.

---

[4]  If applicable to only a portion of the Loans and Commitments (if any), specify the portion that applies, e.g., "each Prior Seller that transferred the [Name of applicable Covered Prior Seller] Loans (as defined in Section 1 of the Annex)."

[5]  Specify the first Entity that transferred the Loans and Commitments (if any) on a distressed documentation basis on or after the Shift Date.

[6]  The bracketed language applies where the relevant Predecessor Transfer Documents include a distressed trade that settled after the par/near par trade which settled on or after the Shift Date.

3

NY440402.3/153-03372

☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" means the $0.00 transfer or other similar fee payable to the Agent in connection with the Assignment.

"Unfunded Commitments" means that part of the Commitments that has not been funded in the form of loans, advances, letter of credit disbursements or otherwise under the Credit Agreement, which is in the principal amount of $0.00.

B.    **SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)**

The following specified terms shall apply to the sections referenced in this Section B:

| | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
| | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (Purchase Price); Netting Arrangements.
    If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

    "(k) [intentionally omitted]."[7]

---

[7] Seller should add, and Buyer should cause Original Buyer or Penultimate Buyer, as applicable, to add, a comparable representation to the Netting Letter in lieu of this representation.

4

Section 4.1(r) (Predecessor Transfer Agreements).
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.
☒ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.
☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.

Section 4.1(u) (Other Documents).
☒ None.
☐ The following: _____.

Section 4.1(v) (Proof of Claim).  N/A
☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
    ☐ the Agent on behalf of the Lenders.
    ☐ Seller or a Prior Seller.
☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.
☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.

C.    **SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)**

**C.1**    Section 5.1(n) (Buyer Status).  [Specify Buyer's status for purposes of determining Required Consents, minimum assignment amount requirements or Transfer Fee requirements.]

☐ Buyer is not a Lender.
☒ Buyer is a Lender.
☐ Buyer is an Affiliate (as defined in the Credit Agreement) of a Lender.
☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

**C.2**    If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

D.    **SECTION 6 (INDEMNIFICATION)**

Section 6.1 (Seller's Indemnities); Step-Up Indemnities.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

E.    **SECTION 7 (COSTS AND EXPENSES)**

☐ The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.
☐ The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.

☐ The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☐ The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☒ There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

F.    **SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)**

F.1    Section 8.2 (Distributions); Step-Up Distributions Covenant.

   (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

   (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

F.2    Section 8.4 (Wire Instructions).

Buyer's Wire Instructions:

Bank Name:    JPMorgan Chase Bank, N.A.
Bank Address:  1166 Avenue of the Americas – 21st Floor
               New York, NY 10036
Bank Contact:  Erma McPherson
               Telephone (212) 899-1393
               Facsimile (212) 899-2914
ABA #:
Account Name:  Spectrum Investment Partners LP
Account No.:
Reference:    Term Loan and Synthetic LC/Allied Holdings



G.    **SECTION 9 (NOTICES)**

Buyer's Address for Notices and Delivery:

Primary Contact:
Spectrum Investment Partners LP
c/o Spectrum Group Management LLC



Attn:
Telephone:
Facsimile:
E-Mail Address:

6

<u>Secondary Contact:</u>
Spectrum Investment Partners LP
c/o Spectrum Group Management LLC

Attn:
Telephone:
Facsimile:
E-Mail Address:



H.      <u>SECTION 26 (FURTHER PROVISIONS)</u>

None.

NY440402.3/153-03372

IN WITNESS WHEREOF, Seller and Buyer have executed this Purchase and Sale Agreement by their duly authorized officers or representatives as of the Agreement Date.

SELLER



By:_____

Name:

Title:

**BUYER**

**SPECTRUM INVESTMENT PARTNERS LP**

By: Spectrum Group Management LLC, as General Partner

By:_____

Name:

Title:

8

IN WITNESS WHEREOF, Seller and Buyer have executed this Purchase and Sale Agreement by their duly authorized officers or representatives as of the Agreement Date.

SELLER



By: _____

Name:

Title:

BUYER

SPECTRUM INVESTMENT PARTNERS LP

By: Spectrum Group Management LLC, as General Partner



By: _____

Name:

Title:

8

## ANNEX TO PURCHASE AND SALE AGREEMENT

1.  If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements[1] and principal amount, as of the settlement date with respect thereto, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.



2.  List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.

    N/A

3.  Description of Proof of Claim (if any).

    N/A

4.  Description of Adequate Protection Order (if any).

    N/A

5.  List any exceptions to Section 4.1(w) (Notice of Impairment).

    None.

6.  The amount of any PIK Interest that accreted to the principal amount of the Loans after the Trade Date but on or prior to the Settlement Date is $0.00.

---

[1]  List (i) any Predecessor Transfer Agreement to which Seller is a party, (ii) any Predecessor Transfer Agreement of Prior Sellers relating to ▮▮▮▮▮▮ loans delivered to Seller by Immediate Prior Seller and (iii) any Predecessor Transfer Agreement of Prior Sellers relating to par loans listed in any Predecessor Transfer Agreement described in the preceding clause (ii).

NY440402.3/153-03372

TRADE ID: 

LSTA  TRADE CONFIRMATION

To:     Buyer Name:     *SPECTRUM INVESTMENT PARTNERS LP*
        Contact Person:
        Phone No:
        Fax No:          

From:   Seller Name:
        Contact Person:
        Phone No:        
        Fax No:
        Email:

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for  Trade Confirmations (the "Standard Terms and Conditions") published by The Loan Syndications and Trading Association®, Inc. (the "LSTA") as of December 1, 2006,[1] which Standard Terms and Conditions are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the parties and specifically set forth in the "Trade Specific Other Terms of Trade" section below. Capitalized terms used and not defined in this Confirmation shall have the respective meanings ascribed thereto in the Standard Terms and Conditions.

**Trade Date:**

**Seller:**

**Buyer:**            SPECTRUM INVESTMENT            ☑ Principal
                      PARTNERS LP [3]

**Credit Agreement:**  This SECURED SUPER-PRIORITY DEBTOR IN POSSESSION AND
                       EXIT CREDIT AND GUARANTY AGREEMENT, dated as of March 30,
                       2007, is entered into by and among ALLIED HOLDINGS, INC., a
                       Georgia corporation and a debtor and debtor in possession under
                       Chapter 11 of the Bankruptcy Code (as defined below)("Holdings"),
                       ALLIED SYSTEMS, LTD. (L.P.), a Georgia limited partnership and a
                       debtor and debtor in possession under Chapter 11 of the Bankruptcy
                       Code ("Systems" and, together with Holdings, the "Borrowers"),
                       CERTAIN SUBSIDIARIES OF BORROWERS, as Subsidiary
                       Guarantors, the Lenders party hereto from time to time, GOLDMAN
                       SACHS CREDIT PARTNERS L.P. ("GSCP"), as Syndication Agent (in
                       such capacity, "Syndication Agent"), and THE CIT GROUP/BUSINESS
                       CREDIT, INC. ("CIT"), as Administrative Agent (together with its

---

[1] The Standard Terms and Conditions are available on the LSTA website at http://www.lsta.org.

[2] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[3] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[4] If multiple borrowers, specify the entity that is named as the first borrower under the Credit Agreement.

[5] Specify amount of Debt to be transferred or, in the case of Debt subject to further funding obligations (as in revolving credit or letter of credit facilities), specify amount of total exposure to be transferred, both funded and unfunded.

[6] Specify whether the type of Debt is term, revolving, letter of credit (if stand-alone), claim amount or other.

[7] Specify Credit Agreement designation of the facility (e.g., tranche). Specify multicurrency component, if any.

permitted successors in such capacity, "Administrative Agent") and as Collateral Agent (together with its permitted successor in such capacity, "Collateral Agent").

| | |
|---|---|
| **Borrower:** | Allied Holdings, Inc and Allied Systems, Ltd. (L.P.) [1] |
| **Form Of Purchase:** | ☑ Assignment |

**Purchase Amount/**
**Type Of Debt:**

| <u>Purchase Amount</u>[2] | <u>Type of Debt</u>[5] | <u>Facility</u>[7] | <u>CUSIP Number</u> |
|---|---|---|---|
|  | Term Loan | TERM LOAN | |
|  | Letter of Credit | SYNTHETIC LC | |

| | |
|---|---|
| **Purchase Rate:** |  |
| **Accrued Interest:** | ☑ Settled Without Accrued Interest |
| **Credit Documentation to be provided:** | ☑ No |

**LSTA Standard**
**Other Terms of Trade:**

☑ FOR THIS TRADE ONLY, seller shall pay no more than a total of one-half of one assignment fee for transactions (specified in this or any other Confirmation) allocated by an investment manager or advisor to multiple funds or accounts.

**Trade Specific**
**Other Terms of Trade**[9]**:**
**Subject to:**   Negotiation, execution and delivery of reasonably acceptable contracts and instruments of transfer, in accordance herewith.

Please provide the signature of a duly authorized signatory where indicated below and return this letter to the attention of 

If you have any questions, please contact 

*SELLER*                         *BUYER*

                *SPECTRUM INVESTMENT PARTNERS LP*

---

[9] Set forth any other terms of this Transaction; include in this Section a specific reference to each term, if any, in this Confirmation (including the Standard Terms and Conditions) that has been modified in any manner whatsoever from the form of LSTA ▓▓▓▓ Trade Confirmation and/or the LSTA Standard Terms and Conditions for ▓▓▓▓ Trade Confirmations; if more space is needed, attach additional pages.



PURCHASE AND SALE AGREEMENT 

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the Standard Terms. The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
|---|---|
| Trade Date: | |
| Agreement Date: | |
| Seller: | |
| Buyer: | **Spectrum Investment Partners LP** |
| Credit Agreement: | **Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007 as amended and restated as of May 15, 2007 among Allied Holdings, Inc. ("Holdings"), Allied Systems, Ltd. (L.P.) ("Systems"), certain Subsidiaries of Holdings and Systems, as Subsidiary Guarantors, the Lenders party thereto, Goldman Sachs Credit Partners L.P., as Syndication Agent, The CIT Group / Business Credit, Inc., as Administrative Agent and Collateral Agent** |
| Borrower: | **Allied Holdings, Inc. and Allied Systems, Ltd. (L.P.)** |
| Purchase Amount(s): | (i)       outstanding principal amount<br>(ii)      principal amount |
| Tranche(s): | (i)<br>(ii) |
| CUSIP Number(s), if available: | N/A |
| Pre-Settlement Date Accruals Treatment: | ☒ Settled Without Accrued Interest<br>☐ Trades Flat |
| Type of Assignment: | ☐ Original Assignment<br>☒ Secondary Assignment |
| Immediate Prior Seller (if any): | |
| Borrower in Bankruptcy: | Yes ☐      No ☒ |
| Delivery of Credit Documents: | Yes ☐      No ☒ |

LSTA EFFECTIVE DECEMBER 2006          Copyright © LSTA 2006. All rights reserved.

NY446468.1/153-03410

| TRANSACTION SUMMARY | | |
|---|---|---|
| Netting Arrangements: | Yes ☐ | No ☒ |
| Flip Representations: | Yes ☐[1] | No ☒ |
| Step-Up Provisions: | Yes ☐[1] | No ☒ |
| | Shift Date[2]: | Not Applicable |
| Transfer Notice: | Yes ☐[3] | No ☒ |

A.    DEFINITIONS

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement.  Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement.  Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement.  If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means The CIT Group / Business Credit, Inc., as Administrative Agent.

"Assignment" means the Assignment and Assumption Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment.

"Bankruptcy Case" select one:
    ☒ none.
    ☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

"Bankruptcy Court" select one:
    ☒ none.
    ☐ means [the United States Bankruptcy Court for the _____District of _____ (and, if appropriate, the United States District Court for that District)].

"Bar Date" select one:
    ☒ not applicable.

---

[1]  The Parties cannot specify "Yes" to both 'Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H.  Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[2]  Specify a Shift Date only if "Yes" is specified opposite "Step-Up Provisions" and if the second box is selected in the definition of Covered Prior Seller.  The Shift Date is the date that the Parties agree is the closest possible

approximation for when the market convention for transferring the Loans and Commitments (if any) shifted from a par/near par documentation basis to a distressed documentation basis.  In consulting as to the appropriate date, the Parties may refer to published results of an anonymous LSTA poll of disinterested dealers as to such dealers' views regarding the Shift Date or, if results have not been published with respect to the Credit Agreement, either Party may request in writing that the LSTA endeavor to conduct such a poll.  To initiate a poll, send a request that includes the name of Borrower and either the CUSIP number (if available) or the name and date of the Credit Agreement to the LSTA at lstashiftdatepolls@lsta.org.  The results of such LSTA polls are available to facilitate discussions between the Parties and have no binding effect.

[3]  "Yes" can be elected only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.

2

☐ none has been set.
☐ means [specify applicable date, if any].

"Buyer Purchase Price" select one:
☒ not applicable.
☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).
☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"Commitments" select one:
☐ none.
☒ means LC Commitment in the principal amount of ▮▮▮▮▮▮▮▮, all of which is funded as an LC Deposit.

"Covered Prior Seller" select one:
☒ not applicable.
☐ means each Prior Seller that transferred the Loans and Commitments (if any)[4] on or after the Shift Date [but prior to the date on which _____[5] transferred such Loans and Commitments (if any)].[6]

"Filing Date" select one:
☒ none.
☐ means [identify date on which Borrower filed Bankruptcy Case].

"Loans" means, collectively, Term Loans in the outstanding principal amount of ▮▮▮▮▮▮▮▮and LC Deposits in the principal amount ▮▮▮▮▮▮▮▮

"Netting Letter" select one:
☒ not applicable.
☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:
☒ not applicable.
☐ means [specify original buyer in the netting arrangement].

"Penultimate Buyer" select one:
☒ not applicable.
☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
☐ means [_____].

"Required Consents" means the consent of the Agent.

"Seller Purchase Price" select one:
☒ not applicable.

---

[4]  If applicable to only a portion of the Loans and Commitments (if any), specify the portion that applies, e.g., "each Prior Seller that transferred the [Name of applicable Covered Prior Seller] Loans (as defined in Section 1 of the Annex)."

[5]  Specify the first Entity that transferred the Loans and Commitments (if any) on a distressed documentation basis on or after the Shift Date.

[6]  The bracketed language applies where the relevant Predecessor Transfer Documents include a distressed trade that settled after the par/near par trade which settled on or after the Shift Date.

3

NY446468.1/153-03410

☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" means the $0.00 transfer or other similar fee payable to the Agent in connection with the Assignment.

"Unfunded Commitments" means that part of the Commitments that has not been funded in the form of loans, advances, letter of credit disbursements or otherwise under the Credit Agreement, which is in the principal amount of $0.00.

B.   **SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)**

The following specified terms shall apply to the sections referenced in this Section B:

| | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
| | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(ii) | Section 4.1(i)(ii) |
| Section 4.1(t) (Setoff) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (Purchase Price); Netting Arrangements.

    If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

       "(k) [intentionally omitted]."[7]

---

[7] Seller should add, and Buyer should cause Original Buyer or Penultimate Buyer, as applicable, to add, a comparable representation to the Netting Letter in lieu of this representation.

NY446468.1/153-03410

Section 4.1(r) (Predecessor Transfer Agreements).
    ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.
    ☒ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.
    ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.

Section 4.1(u) (Other Documents).
    ☒ None.
    ☐ The following: _____.

Section 4.1(v) (Proof of Claim).  N/A
    ☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
        ☐ the Agent on behalf of the Lenders.
        ☐ Seller or a Prior Seller.
    ☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.
    ☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.

**C.**    **SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)**

**C.1**    Section 5.1(n) (Buyer Status).  [Specify Buyer's status for purposes of determining Required Consents, minimum assignment amount requirements or Transfer Fee requirements.]

    ☐ Buyer is not a Lender.
    ☒ Buyer is a Lender.
    ☐ Buyer is an Affiliate (as defined in the Credit Agreement) of a Lender.
    ☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

**C.2**    If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

**D.**    **SECTION 6 (INDEMNIFICATION)**

Section 6.1 (Seller's Indemnities); Step-Up Indemnities.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

**E.**    **SECTION 7 (COSTS AND EXPENSES)**

☐ The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.
☐ The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.

NY446468.1/153-03410

☐  The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☐  The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☒  There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

F.    **SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)**

F.1    Section 8.2 (Distributions); Step-Up Distributions Covenant.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

F.2    Section 8.4 (Wire Instructions).

Buyer's Wire Instructions:

Bank Name:    JPMorgan Chase Bank, N.A.
Bank Address:  1166 Avenue of the Americas – 21st Floor
            New York, NY 10036
Bank Contact:  Erma McPherson
            Telephone (212) 899-1393
            Facsimile (212) 899-2914
ABA #:        
Account Name: Spectrum Investment Partners LP
Account No.:
Reference:    Term Loan and LC/Allied Holdings

Seller's Wire Instructions:

Bank:
ABA No.:
Acct. No.:
Acct. Name:
Attention:
Reference:

G.    **SECTION 9 (NOTICES)**

Buyer's Address for Notices and Delivery:

Primary Contact:
Spectrum Investment Partners LP
c/o Spectrum Group Management LLC

Attn:
Telephone:
Facsimile:
E-Mail Address:

6

Secondary Contact:
Spectrum Investment Partners LP
c/o Spectrum Group Management LLC

Attn:
Telephone:
Facsimile:
E-Mail Address:



**H.      SECTION 26 (FURTHER PROVISIONS)**

None.

7

IN WITNESS WHEREOF, Seller and Buyer have executed this Purchase and Sale Agreement by their duly authorized officers or representatives as of the Agreement Date.

SELLER



By:_____

    Name:
    Title:

BUYER

SPECTRUM INVESTMENT PARTNERS LP

By: Spectrum Group Management LLC, as General Partner

By:_____
    Name:
    Title:

8

IN WITNESS WHEREOF, Seller and Buyer have executed this Purchase and Sale Agreement by their duly authorized officers or representatives as of the Agreement Date.

SELLER

By:_____
    Name:
    Title:


BUYER

SPECTRUM INVESTMENT PARTNERS LP

By: Spectrum Group Management LLC, as General Partner



By:_____
    Name:
    Title:

8

## ANNEX TO PURCHASE AND SALE AGREEMENT

1. If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements[1] and principal amount, as of the settlement date with respect thereto, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.

   Purchase and Sale Agreement, and the related Assignment and Assumption Agreement, each dated as of ▓▓▓▓▓▓▓▓▓ between ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

   Assignment and Assumption Agreement▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2. List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.

   N/A

3. Description of Proof of Claim (if any).

   N/A

4. Description of Adequate Protection Order (if any).

   N/A

5. List any exceptions to Section 4.1(w) (Notice of Impairment).

   None.

6. The amount of any PIK Interest that accreted to the principal amount of the Loans after the Trade Date but on or prior to the Settlement Date is $0.00.

---

[1] List (i) any Predecessor Transfer Agreement to which Seller is a party, (ii) any Predecessor Transfer Agreement of Prior Sellers relating to distressed loans delivered to Seller by Immediate Prior Seller and (iii) any Predecessor Transfer Agreement of Prior Sellers relating to par loans listed in any Predecessor Transfer Agreement described in the preceding clause (ii).

Annex-1



LSTA  TRADE CONFIRMATION

**To:**   Buyer Name:    *SPECTRUM INVESTMENT PARTNERS LP*
          Contact Person:
          Phone No:
          Fax No:

**From:**  Seller Name:
          Contact Person:
          Phone No:
          Fax No:
          Email:



We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for ⬛⬛⬛ Trade Confirmations (the "Standard Terms and Conditions") published by The Loan Syndications and Trading Association®, Inc. (the "LSTA") as of December 1, 2006,[1] which Standard Terms and Conditions are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the parties and specifically set forth in the "Trade Specific Other Terms of Trade" section below. Capitalized terms used and not defined in this Confirmation shall have the respective meanings ascribed thereto in the Standard Terms and Conditions.

**Trade Date:**

**Seller:**                                          ☒ Principal

**Buyer:**    SPECTRUM INVESTMENT           ☒ Principal
              PARTNERS LP [3]

**Credit Agreement:**    This SECURED SUPER-PRIORITY DEBTOR IN POSSESSION AND
                         EXIT CREDIT AND GUARANTY AGREEMENT, dated as of March 30,
                         2007, is entered into by and among ALLIED HOLDINGS, INC., a
                         Georgia corporation and a debtor and debtor in possession under
                         Chapter 11 of the Bankruptcy Code (as defined below)("Holdings"),
                         ALLIED SYSTEMS, LTD. (L.P.), a Georgia limited partnership and a
                         debtor and debtor in possession under Chapter 11 of the Bankruptcy
                         Code ("Systems" and, together with Holdings, the "Borrowers"),
                         CERTAIN SUBSIDIARIES OF BORROWERS, as Subsidiary
                         Guarantors, the Lenders party hereto from time to time, GOLDMAN
                         SACHS CREDIT PARTNERS L.P. ("GSCP"), as Syndication Agent (in
                         such capacity, "Syndication Agent"), and THE CIT GROUP/BUSINESS
                         CREDIT, INC. ("CIT"), as Administrative Agent (together with its

---

[1] The Standard Terms and Conditions are available on the LSTA website at http://www.lsta.org.

[2] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[3] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[4] If multiple borrowers, specify the entity that is named as the first borrower under the Credit Agreement.

[5] Specify amount of Debt to be transferred or, in the case of Debt subject to further funding obligations (as in revolving credit or letter of credit facilities), specify amount of total exposure to be transferred, both funded and unfunded.

[6] Specify whether the type of Debt is term, revolving, letter of credit (if stand-alone), claim amount or other.

[7] Specify Credit Agreement designation of the facility (e.g., tranche). Specify multicurrency component, if any.

permitted successors in such capacity, "Administrative Agent") and as Collateral Agent (together with its permitted successor in such capacity, "Collateral Agent").

**Borrower:** Allied Holdings, Inc and Allied Systems, Ltd. (L.P.) [4]

**Form Of Purchase:** ☑ Assignment

**Purchase Amount/**
**Type Of Debt:**

| Purchase Amount[5] | Type of Debt[6] | Facility[7] | CUSIP Number |
|---|---|---|---|
|  | Term Loan | TERM LOAN | |
| | Letter of Credit | SYNTHETIC LC | |

**Purchase Rate:**

**Accrued Interest:** ☑ Settled Without Accrued Interest

**Credit Documentation** ☑ No
**to be provided:**

**LSTA Standard**
**Other Terms of Trade:**

☑ Assignment fee is waived

**Trade Specific**
**Other Terms of Trade[8]:**
**Subject to:** Negotiation, execution and delivery of reasonably acceptable contracts and instruments of transfer, in accordance herewith.

Please provide the signature of a duly authorized signatory where indicated below and return this letter to the attention 

If you have any questions, please contact Thierry C Le Jouan at (212) 357 4280

**SELLER**

**BUYER**



**SPECTRUM INVESTMENT PARTNERS LP**



---

[8] Set forth any other terms of this Transaction; include in this Section a specific reference to each term, if any, in this Confirmation (including the Standard Terms and Conditions) that has been modified in any manner whatsoever from the form of LSTA _____ Trade Confirmation and/or the LSTA Standard Terms and Conditions for _____ Trade Confirmations; if more space is needed, attach additional pages.

ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment") is dated as of the Effective Date set forth below and is entered into by and between ████████████████████, (the "Assignor") and Spectrum SPC II for the account of B Spectrum Investment Partners, L.P. Segregated Portfolio (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Amended and Restated First Lien Senior Secured Super-Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement identified below (as it may be amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of the Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (including, to the extent included in any such facilities, letters of credit, LC Deposits and swingline loans) (the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

| | | |
|---|---|---|
| 1. | Assignor: | ████████████████████ |
| 2. | Assignee: | Spectrum SPC II for the account of B Spectrum Investment Partners, L.P. Segregated Portfolio |
| 3. | Borrower(s): | Allied Holdings, Inc., Allied Systems, LTD (L.P.) |
| 4. | Administrative Agent: | The CIT Group / Business Credit, Inc., as the administrative agent under the Credit Agreement |
| 5. | Credit Agreement: | The $265,000,000.00 Credit Agreement dated as of May 15, 2007 among Allied Holdings, Inc. ("Holdings"), Allied Systems, Ltd. (L.P.) ("Systems"), certain Subsidiaries of Holdings and Systems, as Guarantors, the Lenders parties thereto, Goldman Sachs Credit Partners L.P., as Administrative Agent, The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent and the other agents parties thereto |



1

6. Assigned Interest:

| Facility Assigned | Aggregate Amount of Commitment/Loans/LC Deposits for all Lenders | Amount of Commitment/Loans/LC Deposits Assigned | Percentage Assigned of Commitment/Loans/LC Deposits |
|---|---|---|---|
| Synthetic LC Commitment | USD 50,000,000.00 |  | |
| Term Loan | USD 180,000,000.00 | | |

Effective Date: 

7. Notice and Wire Instructions:

Notices:



Wire Instructions:

Currency:
Bank:
ABA#:
Account #:
Account Name:
FFC:
Attn:
Reference:



Notices:

Spectrum SPC II for the account of B Spectrum
Investment Partners, L.P. Segregated Portfolio



Phone:
Fax:
Contact:
Email:

Wire Instructions:

Currency:        USD
Bank:            JPMorgan Chase Bank
ABA#:
Account #:
Account Name:   Morgan Stanley & Co B Spectrum
Investment Partners, L.P. Segregated Portfolio
FFC:
Attn:
Reference:       Allied Holdings 1st Lien (5/07)



2

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR



By:

Name:

Title:

ASSIGNEE

SPECTRUM SPC II FOR THE ACCOUNT OF B
SPECTRUM INVESTMENT PARTNERS, L.P.
SEGREGATED PORTFOLIO, as Assignee



By:

Name:

Title:

Consented to and Accepted:

THE CIT GROUP / BUSINESS CREDIT, INC., as Administrative
Agent

By: _____

Name:   J. Danforth

Title:   VP

Consented to:

ALLIED HOLDINGS, INC.

By: _____

Name:

Title:

ALLIED SYSTEMS, LTD (L.P.)

By: _____

Name:

Title:

ANNEX I

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ASSUMPTION AGREEMENT

1.  Representations and Warranties.

1.1 Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements (as defined herein), warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "Credit Documents"), or any collateral thereunder, (iii) the financial condition of the Company, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2     Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, and (v) if it is a Non US Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2.   Payments.  All payments with respect to the Assigned Interests shall be made on the Effective Date as follows:

2.1 With respect to Assigned Interests for Term Loans, unless notice to the contrary is delivered to the Lender from the Administrative Agent, payment to the Assignor by the Assignee in respect of the Assigned Interest shall include such compensation to the Assignor as may be agreed upon by the Assignor and the Assignee with respect to all unpaid interest which has accrued on the Assigned Interest to but excluding the Effective Date. On and after the applicable Effective Date, the Assignee shall be entitled to receive all interest paid or payable with respect to the Assigned Interest, whether such interest accrued before or after the Effective Date.

2.2     With respect to Assigned Interests for Revolving Loans and LC Commitments and LC Deposits, from and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.   General Provisions.  This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment may be executed in any number of counterparts, which together shall



constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment.  This Assignment shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflict of laws principles thereof.



PURCHASE AND SALE AGREEMENT ▓▓▓▓▓▓▓▓▓▓▓

---

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the Standard Terms. The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
|---|---|
| Trade Date: | ▓▓▓▓▓▓▓▓ |
| Agreement Date: | ▓▓▓▓▓▓▓▓ |
| Seller: | ▓▓▓▓▓▓▓▓ |
| Buyer: | **Spectrum Investment Partners LP** |
| Credit Agreement: | **Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007 as amended and restated as of May 15, 2007 among Allied Holdings, Inc. ("Holdings"), Allied Systems, Ltd. (L.P.) ("Systems"), certain Subsidiaries of Holdings and Systems, as Subsidiary Guarantors, the Lenders party thereto, Goldman Sachs Credit Partners L.P., as Syndication Agent, The CIT Group / Business Credit, Inc., as Administrative Agent and Collateral Agent** |
| Borrower: | **Allied Holdings, Inc. and Allied Systems, Ltd. (L.P.)** |
| Purchase Amount(s): | (i) ▓▓▓▓▓▓ **outstanding principal amount** <br> (ii) ▓▓▓▓▓ **principal amount** |
| Tranche(s): | (i) <br> (ii) ▓▓▓▓▓▓ |
| CUSIP Number(s), if available: | N/A ▓ |
| Pre-Settlement Date Accruals Treatment: | ☒ **Settled Without Accrued Interest** <br> ☐ **Trades Flat** |
| Type of Assignment: | ☐ **Original Assignment** <br> ☒ **Secondary Assignment** |
| Immediate Prior Seller (if any): | ▓▓▓▓▓▓▓▓▓▓ |

LSTA EFFECTIVE DECEMBER 2006        Copyright © LSTA 2006. All rights reserved.

NY440633.1/153-03372

NY440633.1/153-03372

| TRANSACTION SUMMARY | | |
|---|---|---|
| Borrower in Bankruptcy: | Yes ☐ | No ☒ |
| Delivery of Credit Documents: | Yes ☐ | No ☒ |
| Netting Arrangements: | Yes ☐ | No ☒ |
| Flip Representations: | Yes ☐[1] | No ☒ |
| Step-Up Provisions: | Yes ☐[1] | No ☒ |
| | Shift Date[2]: | Not Applicable |
| Transfer Notice: | Yes ☐[3] | No ☒ |

A.   DEFINITIONS

Capitalized terms used in this Agreement shall have the respective meanings ascribed thereto in Section 1 of the Standard Terms, as supplemented by Section A of the Transaction Specific Terms and as otherwise may be provided in other provisions of this Agreement.  Terms defined in the Credit Agreement and not otherwise defined in this Agreement shall have the same meanings in this Agreement as in the Credit Agreement.  Except as otherwise expressly set forth herein, each reference herein to "the Agreement," "this Agreement," "herein," "hereunder" or "hereof" shall be deemed a reference to this Agreement.  If there is any inconsistency between the Transaction Specific Terms and the Standard Terms, the Transaction Specific Terms shall govern and control.

In this Agreement:

"Agent" means The CIT Group / Business Credit, Inc., as Administrative Agent.

"Assignment" means the Assignment and Assumption Agreement that is in the form specified in the Credit Agreement for an assignment of the Loans and Commitments (if any) and any Required Consents to such assignment.

"Bankruptcy Case" select one:
☒ none.
☐ means [the case under the Bankruptcy Code pending before the Bankruptcy Court in which Borrower is a debtor, In re _____, No. _____].

"Bankruptcy Court" select one:

_____

[1]  The Parties cannot specify "Yes" to both "Flip Representations" and "Step-Up Provisions" unless they set forth appropriate modifications in Section H.  Neither "Flip Representations" nor "Step-Up Provisions" applies to original assignments.

[2]  Specify a Shift Date only if "Yes" is specified opposite "Step-Up Provisions" and if the second box is selected in the definition of Covered Prior Seller.  The Shift Date is the date that the Parties agree is the closest possible

approximation for when the market convention for transferring the Loans and Commitments (if any) shifted from a par/near par documentation basis to a distressed documentation basis.  In consulting as to the appropriate date, the Parties may refer to published results of an anonymous LSTA poll of disinterested dealers as to such dealers' views regarding the Shift Date or, if results have not been published with respect to the Credit Agreement, either Party may request in writing that the LSTA endeavor to conduct such a poll.  To initiate a poll, send a request that includes the name of Borrower and either the CUSIP number (if available) or the name and date of the Credit Agreement to the LSTA at lstashiftdatepolls@lsta.org.  The results of such LSTA polls are available to facilitate discussions between the Parties and have no binding effect.

[3]  "Yes" can be elected only if "Yes" is specified opposite "Borrower in Bankruptcy" in the Transaction Summary.

2

NY440633.1/153-03372

NY440633.1/153-03372

☒ none.

☐ means [the United States Bankruptcy Court for the _____ District of _____ (and, if appropriate, the United States District Court for that District)].

"Bar Date" select one:

☒ not applicable.

☐ none has been set.

☐ means [specify applicable date, if any].

"Buyer Purchase Price" select one:

☒ not applicable.

☐ means the purchase price payable by Buyer to Original Buyer pursuant to the Netting Letter (this applies if there are three (3) parties involved in the netting arrangement).

☐ means the purchase price payable by Buyer to Penultimate Buyer pursuant to the Netting Letter (this applies if there are four (4) or more parties involved in the netting arrangement).

"Commitments" select one:

☐ none.

☒ means Synthetic LC Commitment in the principal amount of $918,434.29, all of which is funded as an LC Deposit.

"Covered Prior Seller" select one:

☒ not applicable.

☐ means each Prior Seller that transferred the Loans and Commitments (if any)[4] on or after the Shift Date [but prior to the date on which _____ [5] transferred such Loans and Commitments (if any)].[6]

"Filing Date" select one:

☒ none.

☐ means [identify date on which Borrower filed Bankruptcy Case].

"Loans" means, collectively, Term Loans in the outstanding principal amount of ▓▓▓▓▓▓ and Synthetic LC Deposits in the principal amount of ▓▓▓▓▓▓

"Netting Letter" select one:

☒ not applicable.

☐ means that certain Multilateral Netting Agreement in the form currently published by the LSTA dated on or as of the Agreement Date among Seller, Buyer [and] [,] Original Buyer [, Penultimate Buyer] and [describe any other parties to the Netting Letter]].

"Original Buyer" select one:

☒ not applicable.

☐ means [specify original buyer in the netting arrangement].

---

[4]  If applicable to only a portion of the Loans and Commitments (if any), specify the portion that applies, e.g., "each Prior Seller that transferred the [Name of applicable Covered Prior Seller] Loans (as defined in Section 1 of the Annex)."

[5]  Specify the first Entity that transferred the Loans and Commitments (if any) on a distressed documentation basis on or after the Shift Date.

[6]  The bracketed language applies where the relevant Predecessor Transfer Documents include a distressed trade that settled after the par/near par trade which settled on or after the Shift Date.

3

NY440633.1/153-03372

"Penultimate Buyer" select one:
  ☒ not applicable.
  ☐ none ("none" is applicable if there are only three (3) parties involved in the netting arrangement).
  ☐ means [_____].

"Required Consents" means the consent of the Agent.

"Seller Purchase Price" select one:
  ☒ not applicable.
  ☐ means the purchase price payable by Original Buyer to Seller pursuant to the Netting Letter.

"Transfer Fee" means the $0.00 transfer or other similar fee payable to the Agent in connection with the Assignment.

"Unfunded Commitments" means that part of the Commitments that has not been funded in the form of loans, advances, letter of credit disbursements or otherwise under the Credit Agreement, which is in the principal amount of $0.00.

4

NY440633.1/153-03372

NY440633.1/153-03372

B.    SECTION 4 (SELLER'S REPRESENTATIONS AND WARRANTIES)

The following specified terms shall apply to the sections referenced in this Section B:

| | Flat Representation | Flip Representation | Step-Up Representation |
|---|---|---|---|
| | If "No" is specified opposite both "Flip Representations" and "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Flip Representations" in the Transaction Summary, the following subsections of Section 4 shall apply: | If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, the following subsections of Section 4 shall apply: |
| Section 4.1(d) (Title) | Section 4.1(d)(i) | Section 4.1(d)(ii) | Section 4.1(d)(i) |
| Section 4.1(e) (Proceedings) | Section 4.1(e)(i) | Section 4.1(e)(i) | Section 4.1(e)(ii) |
| Section 4.1(f) (Principal Amount) | Section 4.1(f)(i) | Section 4.1(f)(ii) | Section 4.1(f)(i) |
| Section 4.1(g) (Future Funding) | Section 4.1(g)(i) | Section 4.1(g)(ii) | Section 4.1(g)(iii) |
| Section 4.1(h) (Acts and Omissions) | Section 4.1(h)(i) | Section 4.1(h)(i) | Section 4.1(h)(ii) |
| Section 4.1(i) (Performance of Obligations) | Section 4.1(i)(i) | Section 4.1(i)(i) | Section 4.1(i)(ii) |
| Section 4.1(l) (Setoff) | Section 4.1(l)(i) | Section 4.1(l)(i) | Section 4.1(l)(ii) |
| Section 4.1(t) (Consents and Waivers) | Section 4.1(t)(i) | Section 4.1(t)(i) | Section 4.1(t)(ii) |
| Section 4.1(u) (Other Documents) | Section 4.1(u)(i) | Section 4.1(u)(i) | Section 4.1(u)(ii) |
| Section 4.1(v) (Proof of Claim) | Section 4.1(v)(i) | Section 4.1(v)(ii) | Section 4.1(v)(i) |

Section 4.1(k) (Purchase Price); Netting Arrangements.
        If "Yes" is specified opposite Netting Arrangements in the Transaction Summary, Section 4.1(k) shall be amended in its entirety as follows:

        "(k) [intentionally omitted]."[7]

---

[7] Seller should add, and Buyer should cause Original Buyer or Penultimate Buyer, as applicable, to add, a comparable representation to the Netting Letter in lieu of this representation.

5

NY440633.1/153-03372

NY440633.1/153-03372

Section 4.1(r) (Predecessor Transfer Agreements).
    ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to par/near par loans.
    ☒ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to distressed loans.
    ☐ Seller acquired the Transferred Rights from Immediate Prior Seller pursuant to Predecessor Transfer Agreements relating to both par/near par loans and distressed loans.

Section 4.1(u) (Other Documents).
    ☒ None.
    ☐ The following: _____.

Section 4.1(v) (Proof of Claim).   N/A
    ☐ The Proof of Claim was duly and timely filed, on or prior to the Bar Date, by
        ☐ the Agent on behalf of the Lenders.
        ☐ Seller or a Prior Seller.
    ☐ The Bar Date specified in the Transaction Specific Terms has been set in the Bankruptcy Case and no Proof of Claim has been filed.
    ☐ No Bar Date has been set in the Bankruptcy Case and no Proof of Claim has been filed.

**C.**    **SECTION 5 (BUYER'S REPRESENTATIONS AND WARRANTIES)**

**C.1**    Section 5.1(n) (Buyer Status).   [Specify Buyer's status for purposes of determining Required Consents, minimum assignment amount requirements or Transfer Fee requirements.]

    ☐ Buyer is not a Lender.
    ☒ Buyer is a Lender.
    ☐ Buyer is an Affiliate (as defined in the Credit Agreement) of a Lender.
    ☐ Buyer is an Approved Fund [substitute Credit Agreement defined term if different] of a Lender.

**C.2**    If "Yes" is specified opposite "Delivery of Credit Documents" in the Transaction Summary, Buyer represents and warrants that it (i) was not a Lender on the Trade Date and (ii) requested copies of the Credit Documents from Seller on or prior to the Trade Date.

**D.**    **SECTION 6 (INDEMNIFICATION)**

Section 6.1 (Seller's Indemnities); Step-Up Indemnities.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(b) shall apply (and the alternate indemnities contained in Section 6.1(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's indemnities contained in Section 6.1(a) shall apply (and the alternate indemnities contained in Section 6.1(b) shall not apply).

**E.**    **SECTION 7 (COSTS AND EXPENSES)**

☐ The Transfer Fee shall be paid by Seller to the Agent and the Purchase Price shall be increased by an amount equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.

6

☐ The Transfer Fee shall be paid by Buyer to the Agent and Buyer shall receive a credit to the Purchase Price equal to
    ☐ one-half thereof.
    ☐ other relevant fraction or percentage, _____, thereof.
☐ The Transfer Fee shall be paid and allocated in the manner specified in the Netting Letter.
☐ The Transfer Fee has been waived by the Agent and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.
☒ There is no Transfer Fee and, accordingly, no adjustment to the Purchase Price shall be made in respect thereof.

## F.    SECTION 8 (DISTRIBUTIONS; INTEREST AND FEES; PAYMENTS)

F.1    Section 8.2 (Distributions); Step-Up Distributions Covenant.

    (i)    If "Yes" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(b) shall apply (and the alternate covenants contained in Section 8.2(a) shall not apply).

    (ii)    If "No" is specified opposite "Step-Up Provisions" in the Transaction Summary, Seller's covenants contained in Section 8.2(a) shall apply (and the alternate covenants contained in Section 8.2(b) shall not apply).

F.2    Section 8.4 (Wire Instructions).

Buyer's Wire Instructions:

Bank Name:     JPMorgan Chase Bank, N.A.
Bank Address:  1166 Avenue of the Americas – 21st Floor
               New York, NY 10036
Bank Contact:  Erma McPherson
               Telephone (212) 899-1393
               Facsimile (212) 899-2914
ABA #:
Account Name: Spectrum Investment Partners LP
Account No.:
Reference:     Term Loan and Synthetic LC/Allied Holdings

Seller's Wire Instructions:

Bank:
ABA No.:
Acct. No.:
Acct. Name:
Attention:
Reference:

## G.    SECTION 9 (NOTICES)

Buyer's Address for Notices and Delivery:

Primary Contact:
Spectrum Investment Partners LP
c/o Spectrum Group Management LLC

7



Attn:
Telephone:
Facsimile:
E-Mail Address:

<u>Secondary Contact:</u>
Spectrum Investment Partners LP
c/o Spectrum Group Management LLC



Attn:
Telephone
Facsimile:
E-Mail Address:



H.    <u>SECTION 26 (FURTHER PROVISIONS)</u>

None.

8

NY440633.1/153-03372

NY440633.1/153-03372

IN WITNESS WHEREOF, Seller and Buyer have executed this Purchase and Sale Agreement by their duly authorized officers or representatives as of the Agreement Date.

SELLER



By: 

Title:

**BUYER**

**SPECTRUM INVESTMENT PARTNERS LP**

By: Spectrum Group Management LLC, as General Partner

By:_____

Name:

Title:

3

IN WITNESS WHEREOF, Seller and Buyer have executed this Purchase and Sale Agreement by their duly authorized officers or representatives as of the Agreement Date.

SELLER



By:_____

    Name:

    Title:

BUYER

**SPECTRUM INVESTMENT PARTNERS LP**

By: Spectrum Group Management LLC, as General Partner

By:_____

    Name:

    Title:

8

## ANNEX TO PURCHASE AND SALE AGREEMENT

1.  If "Secondary Assignment" is specified opposite "Type of Assignment" in the Transaction Summary, list of Predecessor Transfer Agreements[1] and principal amount, as of the settlement date with respect thereto, of the portion of the Loans and Commitments (if any) thereunder assigned hereby for purposes of Section 4.1(r) and Section 5.1(k)(i) hereof, and designation as to whether such Predecessor Transfer Agreements relate to par/near par loans or distressed loans.

    Purchase and Sale Agreement, and the related Assignment and Assumption Agreement, each ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

    Assignment and Assumption Agreement ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

2.  List of Credit Agreement and any other Credit Documents delivered pursuant to Section 4.1(s) hereof.

    N/A

3.  Description of Proof of Claim (if any).

    N/A

4.  Description of Adequate Protection Order (if any).

    N/A

5.  List any exceptions to Section 4.1(w) (Notice of Impairment).

    None.

6.  The amount of any PIK Interest that accreted to the principal amount of the Loans after the Trade Date but on or prior to the Settlement Date is $0.00.

---

[1] List (i) any Predecessor Transfer Agreement to which Seller is a party, (ii) any Predecessor Transfer Agreement of Prior Sellers relating to distressed loans delivered to Seller by Immediate Prior Seller and (iii) any Predecessor Transfer Agreement of Prior Sellers relating to par loans listed in any Predecessor Transfer Agreement described in the preceding clause (ii).

Annex-1

NY440633.1/153-03372





LSTA  TRADE CONFIRMATION

**To:**     Buyer Name:     *SPECTRUM INVESTMENT PARTNERS LP*
            Contact Person:
            Phone No:
            Fax No:

**From:**   Seller Name:
            Contact Person:
            Phone No:
            Fax No:
            Email:

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for
_____ Trade Confirmations (the "Standard Terms and Conditions") published by The Loan
Syndications and Trading Association®, Inc. (the "LSTA") as of December 1, 2006,[1] which Standard
Terms and Conditions are incorporated herein by reference without any modification whatsoever except
as otherwise agreed herein by the parties and specifically set forth in the "Trade Specific Other Terms of
Trade" section below.  Capitalized terms used and not defined in this Confirmation shall have the
respective meanings ascribed thereto in the Standard Terms and Conditions.

**Trade Date:**

**Seller:**                                                   P.     ☑ Principal

**Buyer:**          SPECTRUM INVESTMENT                              ☑ Principal
                    PARTNERS LP[3]

**Credit Agreement:**   This SECURED SUPER-PRIORITY DEBTOR IN POSSESSION AND
                        EXIT CREDIT AND GUARANTY AGREEMENT, dated as of March 30,
                        2007, is entered into by and among ALLIED HOLDINGS, INC., a
                        Georgia corporation and a debtor and debtor in possession under
                        Chapter 11 of the Bankruptcy Code (as defined below)("Holdings"),
                        ALLIED SYSTEMS, LTD. (L.P.), a Georgia limited partnership and a
                        debtor and debtor in possession under Chapter 11 of the Bankruptcy
                        Code ("Systems" and, together with Holdings, the "Borrowers"),
                        CERTAIN SUBSIDIARIES OF BORROWERS, as Subsidiary

---

[1] The Standard Terms and Conditions are available on the LSTA website at http://www.lsta.org.

[2] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify
ERISA counterparties.

[3] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify
ERISA counterparties.

[4] If multiple borrowers, specify the entity that is named as the first borrower under the Credit Agreement.

[5] Specify amount of Debt to be transferred or, in the case of Debt subject to further funding obligations (as in revolving
credit or letter of credit facilities), specify amount of total exposure to be transferred, both funded and unfunded.

[6] Specify whether the type of Debt is term, revolving, letter of credit (if stand-alone), claim amount or other.

[7] Specify Credit Agreement designation of the facility (e.g., tranche).  Specify multicurrency component, if any.

1 of 3

Guarantors, the Lenders party hereto from time to time, GOLDMAN SACHS CREDIT PARTNERS L.P. ("GSCP"), as Syndication Agent (in such capacity, "Syndication Agent"), and THE CIT GROUP/BUSINESS CREDIT, INC. ("CIT"), as Administrative Agent (together with its permitted successors in such capacity, "Administrative Agent") and as Collateral Agent (together with its permitted successor in such capacity, "Collateral Agent").

**Borrower:**         Allied Holdings, Inc and Allied Systems, Ltd. (L.P.)[4]

**Form Of Purchase:**    ☑ Assignment

**Purchase Amount/**
**Type Of Debt:**

| Purchase Amount[5] | Type of Debt[6] | Facility[7] | CUSIP Number |
|---|---|---|---|
|  | Term Loan | TERM LOAN | |
| ▆▆▆▆▆ | Letter of Credit | SYNTHETIC LC | |

**Purchase Rate:**    ▆▆▆▆▆

**Accrued Interest:**    ☑ Settled Without Accrued Interest

**Credit Documentation**
**to be provided:**    ☑ No

**LSTA Standard**
**Other Terms of Trade:**

    ☑ FOR THIS TRADE ONLY, seller shall pay no more than a total of one-half of one assignment fee for transactions (specified in this or any other Confirmation) allocated by an investment manager or advisor to multiple funds or accounts.

**Trade Specific**
**Other Terms of Trade[9]:**
**Subject to:**    Negotiation, execution and delivery of reasonably acceptable contracts and instruments of transfer, in accordance herewith.

Please provide the signature of a duly authorized signatory where indicated below and return this letter to the attention of ▆▆▆▆▆ the following fax number ▆▆▆▆▆ or e-mail address:

If you have any questions, please contact ▆▆▆▆▆

*SELLER*            *BUYER*

▆▆▆▆▆      *SPECTRUM INVESTMENT PARTNERS LP*

▆▆▆▆▆

---

[4] Set forth any other terms of this Transaction; include in this Section a specific reference to each term, if any, in this Confirmation (including the Standard Terms and Conditions) that has been modified in any manner whatsoever from the form of LSTA Distressed Trade Confirmation and/or the LSTA Standard Terms and Conditions for Distressed Trade Confirmations; if more space is needed, attach additional pages.

ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (the "Assignment") the dated as of the Effective Date set forth below and is entered into by and between ███████████████████████ (the "Assignor") and Spectrum Investment Partners LP (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Amended and Restated First Lien Senior Secured Super-Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement identified below (as it may be amended, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below, the interest in and to all of the Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the respective facilities identified below (including, to the extent included in any such facilities, letters of credit, LC Deposits and swingline loans) (the "Assigned Interest"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

1. Assignor:

2. Assignee:                           Spectrum Investment Partners LP

3. Borrower(s):                        Allied Holdings, Inc., Allied Systems, LTD (L.P.)

4. Administrative Agent:               The CIT Group / Business Credit, Inc., as the administrative agent under the Credit Agreement

5. Credit Agreement:                   The $265,000,000.00 Credit Agreement dated as of May 15, 2007 among Allied Holdings, Inc. ("Holdings"), Allied Systems, Ltd. (L.P.) ("Systems"), certain Subsidiaries of Holdings and Systems, as Guarantors, the Lenders parties thereto, Goldman Sachs Credit Partners L.P., as Administrative Agent, The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent and the other agents parties thereto

6.      Assigned Interest:

| Facility      Assigned | Aggregate Amount of Commitment/Loans/LC Deposits for all Lenders | Amount of Commitment/Loans/LC Deposits Assigned | Percentage Assigned of Commitment/Loans/LC Deposits |
|---|---|---|---|
| Synthetic LC Commitment | USD 50,000,000.00 | ▮▮▮▮▮▮▮▮▮▮ | |
| Term Loan | USD 178,200,000.00 | ▮▮▮▮▮▮▮▮▮▮ | |

Effective Date: ▮▮▮▮▮▮

2

7. Notice and Wire Instructions:



CREDIT CONTACT:



Spectrum Investment Partners LP

Primary Contact:
Spectrum Investment Partners LP
c/o Spectrum Group Management LLC

Attn:
Telephone:
Facsimile:
E-Mail Address:

Secondary Contact:
Spectrum Investment Partners LP
c/o Spectrum Group Management LLC

Attn:
Telephone:
Facsimile:
E-Mail Address:

NY440406.1/153-03372

Wire Instructions: ▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓

Bank: ▓▓▓▓▓
ABA No.: ▓▓▓▓▓
Acct. No.: ▓▓▓▓▓
Acct. Name: ▓▓▓▓▓
L.P.
Attention: ▓▓▓▓▓
Reference: ▓▓▓▓▓



Wire Instructions: Spectrum Investment Partners LP

Bank Name:     JPMorgan Chase Bank, N.A.
Bank Address:  1166 Avenue of the Americas – 21st
Floor
               New York, NY 10036
Bank Contact:  Erma McPherson
               Telephone (212) 899-1393
               Facsimile (212) 899-2914
ABA #:         ▓▓▓▓▓
Account Name:  Spectrum Investment Partners LP
Account No.:   ▓▓▓▓▓
Reference:     Term Loan and Synthetic LC/Allied
               Holdings

4

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR



By:_____
    Name:
    Title:

ASSIGNEE

SPECTRUM INVESTMENT PARTNERS LP, as
Assignee

By: Spectrum Group Management LLC, as General
Partner


By:_____
    Name:
    Title:

NY440406.1/153-03372

5

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR

By:_____
    Name:
    Title:

ASSIGNEE

**SPECTRUM INVESTMENT PARTNERS LP, as Assignee**

By: Spectrum Group Management LLC, as General Partner

By:_____
    Name:
    Title:

5

NY440406.1/153-03372

Consented to and Accepted:

THE CIT GROUP / BUSINESS CREDIT, INC., as Administrative Agent

By:    _Barbara J Coffin_____

Name:    Barbara J Coffin

Title:    Assistant Vice President

Consented to:

**ALLIED HOLDINGS, INC.**

By:    _____

Name:

Title:

**ALLIED SYSTEMS, LTD (L.P.)**

By:    _____

Name:

Title:

6

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT
AND ASSUMPTION AGREEMENT

1.    Representations and Warranties.

1.1    Assignor.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements (as defined herein), warranties or representations made in or in connection with any Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "Credit Documents"), or any collateral thereunder, (iii) the financial condition of the Company, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2    Assignee.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets all requirements of an Eligible Assignee under the Credit Agreement, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, and (v) if it is a Non US Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2.    Payments.  All payments with respect to the Assigned Interests shall be made on the Effective Date as follows:

2.1    With respect to Assigned Interests for Term Loans, unless notice to the contrary is delivered to the Lender from the Administrative Agent, payment to the Assignor by the Assignee in respect of the Assigned Interest shall include such compensation to the Assignor as may be agreed upon by the Assignor and the Assignee with respect to all unpaid interest which has accrued on the Assigned Interest to but excluding the Effective Date.  On and after the applicable Effective Date, the Assignee shall be entitled to receive all interest paid or payable with respect to the Assigned Interest, whether such interest accrued before or after the Effective Date.

2.2    With respect to Assigned Interests for Revolving Loans and LC Commitments and LC Deposits, from and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

7

3.      General Provisions.  This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment.  This Assignment shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflict of laws principles thereof.

3



LSTA  TRADE CONFIRMATION

To:     Buyer Name:      *SPECTRUM INVESTMENT PARTNERS LP*
        Contact Person:
        Phone No:
        Fax No:

From:   Seller Name:
        Contact Person:
        Phone No:
        Fax No:
        Email:

We are pleased to confirm the following transaction, subject to the Standard Terms and Conditions for Trade Confirmations (the "Standard Terms and Conditions") published by The Loan Syndications and Trading Association®, Inc. (the "LSTA") as of December 1, 2006,[1] which Standard Terms and Conditions are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the parties and specifically set forth in the "Trade Specific Other Terms of Trade" section below. Capitalized terms used and not defined in this Confirmation shall have the respective meanings ascribed thereto in the Standard Terms and Conditions.

Trade Date:

Seller:                                              ☑ Principal

Buyer:              SPECTRUM INVESTMENT            ☑ Principal
                    PARTNERS LP [3]

Credit Agreement:   This SECURED SUPER-PRIORITY DEBTOR IN POSSESSION AND
                    EXIT CREDIT AND GUARANTY AGREEMENT, dated as of March 30,
                    2007, is entered into by and among ALLIED HOLDINGS, INC., a
                    Georgia corporation and a debtor and debtor in possession under
                    Chapter 11 of the Bankruptcy Code (as defined below)("Holdings"),
                    ALLIED SYSTEMS, LTD. (L.P.), a Georgia limited partnership and a
                    debtor and debtor in possession under Chapter 11 of the Bankruptcy
                    Code ("Systems" and, together with Holdings, the "Borrowers"),
                    CERTAIN SUBSIDIARIES OF BORROWERS, as Subsidiary
                    Guarantors, the Lenders party hereto from time to time, GOLDMAN
                    SACHS CREDIT PARTNERS L.P. ("GSCP"), as Syndication Agent (in
                    such capacity, "Syndication Agent"), and THE CIT GROUP/BUSINESS
                    CREDIT, INC. ("CIT"), as Administrative Agent (together with its

---

[1] The Standard Terms and Conditions are available on the LSTA website at http://www.lsta.org.

[2] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[3] Designate specific funds, if any, and allocations within T+1 (this may be done on separate trade confirmations); identify ERISA counterparties.

[4] If multiple borrowers, specify the entity that is named as the first borrower under the Credit Agreement.

[5] Specify amount of Debt to be transferred or, in the case of Debt subject to further funding obligations (as in revolving credit or letter of credit facilities), specify amount of total exposure to be transferred, both funded and unfunded.

[6] Specify whether the type of Debt is term, revolving, letter of credit (if stand-alone), claim amount or other.

[7] Specify Credit Agreement designation of the facility (e.g., tranche). Specify multicurrency component, if any.

permited successors in such capacity, "Administrative Agent") and as
Collateral Agent (together with its permitted successor in such
capacity, "Collateral Agent").

| | |
|---|---|
| Borrower: | Allied Holdings, Inc and Allied Systems, Ltd. (L.P.) [6] |
| Form Of Purchase: | ☑ Assignment |

Purchase Amount/
Type Of Debt:

| Purchase Amount[3] | Type of Debt[5] | Facility[7] | CUSIP Number |
|---|---|---|---|
| ███████ | Term Loan | TERM LOAN | |
| ███████ | Letter of Credit | SYNTHETIC LC | |

| | |
|---|---|
| Purchase Rate: | ████████ |
| Accrued Interest: | ☑ Settled Without Accrued Interest |
| Credit Documentation to be provided: | ☑ No |

LSTA Standard
Other Terms of Trade:

☑ FOR THIS TRADE ONLY, seller shall pay no more than a total of
one-half of one assignment fee for transactions (specified in this or any
other Confirmation) allocated by an investment manager or advisor to
multiple funds or accounts.

Trade Specific
Other Terms of Trade[9]:
Subject to:

Negotiation, execution and delivery of reasonably acceptable contracts
and instruments of transfer, in accordance herewith.

Please provide the signature of a duly authorized signatory where indicated below and return this letter
to the attention of ████████████████████████████████████████

If you have any questions, please contact ████████████████████████

*SELLER*                                    *BUYER*
███████████████████                        *SPECTRUM INVESTMENT PARTNERS LP*

████████████████████████████
████████████████████████████
████████████████████████████

---

[8] Set forth any other terms of this Transaction; include in this Section a specific reference to each term, if any, in this Confirmation
(including the Standard Terms and Conditions) that has been modified in any manner whatsoever from the form of LSTA
████████ Trade Confirmation and/or the LSTA Standard Terms and Conditions for ████████ Trade Confirmations; if more space
is needed, attach additional pages.



PURCHASE AND SALE AGREEMENT 

### TRANSACTION SPECIFIC TERMS

THIS PURCHASE AND SALE AGREEMENT is dated as of the Agreement Date and entered into by and between Seller and Buyer to govern the purchase and sale of the Loans, the Commitments (if any) and the other Transferred Rights, in accordance with the terms, conditions and agreements set forth in the Standard Terms. The Standard Terms are incorporated herein by reference without any modification whatsoever except as otherwise agreed herein by the Parties and as specifically supplemented and modified by the terms and elections set forth in the Transaction Summary and Sections A through H below. The Standard Terms and the Transaction Specific Terms together constitute a single integrated Purchase and Sale Agreement governing the Transaction. With respect to the Transaction, the Parties agree to be bound by the Standard Terms and the Transaction Specific Terms set forth herein.

| TRANSACTION SUMMARY | |
|---|---|
| Trade Date: | |
| Agreement Date: | |
| Seller: | |
| Buyer: | Spectrum Investment Partners LP |
| Credit Agreement: | Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement dated as of March 30, 2007 as amended and restated as of May 15, 2007 among Allied Holdings, Inc. ("Holdings"), Allied Systems, Ltd. (L.P.) ("Systems"), certain Subsidiaries of Holdings and Systems, as Subsidiary Guarantors, the Lenders party thereto, Goldman Sachs Credit Partners L.P., as Syndication Agent, The CIT Group / Business Credit, Inc., as Administrative Agent and Collateral Agent |
| Borrower: | Allied Holdings, Inc. and Allied Systems, Ltd. (L.P.) |
| Purchase Amount(s): | (i) ▮▮▮▮▮standing principal amount (ii) ▮▮▮▮ principal amount |
| Tranche(s): | (i) (ii) |
| CUSIP Number(s), if available: | N/A |
| Pre-Settlement Date Accruals Treatment: | ☒ Settled Without Accrued Interest ☐ Trades Flat |
| Type of Assignment: | ☐ Original Assignment ☒ Secondary Assignment |
| Immediate Prior Seller (if any): | |

LSTA EFFECTIVE DECEMBER 2006    Copyright © LSTA 2006. All rights reserved.

NY437534.3/153-07942

NY437534.3/153-07942

# EXHIBIT 19

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------x

In re:                                  :

ALLIED SYSTEMS HOLDINGS, INC.,          :        Chapter 11

                    Alleged Debtor.     :        Case No. 12-[_____] ([____])

                                        :

---------------------------------------------------x

In re:                                  :

ALLIED SYSTEMS, LTD. (L.P.),            :        Chapter 11

                    Alleged Debtor.     :        Case No. 12-[_____] ([____])

---------------------------------------------------x

### EXPEDITED MOTION OF PETITIONING CREDITORS FOR THE APPOINTMENT OF A TRUSTEE PURSUANT TO 11 U.S.C. §§ 105(a), 1104(a)(1) AND 1104(a)(2)

The Petitioning Creditors, BDCM Opportunity Fund II, LP, ("BDCM"), Black Diamond CLO 2005-1 Ltd. ("Black Diamond"), and Spectrum Investment Partners, L.P. ("Spectrum" collectively with BDCM and Black Diamond, "Petitioning Creditors") in their capacity as lenders (in such capacity, the "Lenders") under the Credit Agreements (as defined below), by and through their undersigned counsel, hereby submit this motion ("Motion") for an order under 11 U.S.C. §§ 105(a), 1104(a)(1) and 1104(a)(2) appointing a Chapter 11 trustee in these cases. Contemporaneously herewith, the Petitioning Creditors have filed a motion to limit and shorten notice, and seeking an expedited hearing on the Motion. In support of the Motion, the Petitioning Creditors respectfully state as follows.

## PRELIMINARY STATEMENT

These cases were commenced by the Petitioning Creditors, who are Lenders under Credit Agreements (defined below)[1] pursuant to which the Alleged Debtors[2] obtained approximately $315 million in financing when they emerged from Chapter 11 in 2007 under the control of Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP (collectively, "Yucaipa"). The compelling need for a Chapter 11 trustee in these cases arises from (among other reasons) the ongoing, pervasive manipulation and control of the Alleged Debtors by Yucaipa, and the significant conflicts of interest that leave the Alleged Debtors incapable of fulfilling their fiduciary obligations.

Under the Bankruptcy Code, appointment of a trustee is mandatory if "cause" exists. 11 U.S.C. §1104(a)(1). Courts may also appoint a trustee if it is in the interests of creditors, equity security holders and other interests of the estate. 11 U.S.C. §1104(a)(2).

As shown below, appointment of a Chapter 11 trustee under section 1104(a) is essential because, among other things:

- Yucaipa's position as majority shareholder and purported controlling First Lien Lender, and its control of the Allied board of directors (the "Allied Board") and senior management, create conflicts of interest that prevent the Alleged Debtors from discharging their fiduciary duties;



- As a result of the Alleged Debtors' conflicts of interest and loyalty to Yucaipa, as well as their gross mismanagement of the business, the Petitioning Creditors have no

---

[1] Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Credit Agreements.

[2] The "Alleged Debtors" are Allied Systems Holdings, Inc. ("Allied") and Allied Systems, Ltd. (L.P.) ("Allied Systems").

REDACTED

confidence in the Alleged Debtors' ability to reorganize their business or discharge their fiduciary duties; and

- The Alleged Debtors, under control of Yucaipa, have been unwilling to engage the Petitioning Creditors in restructuring negotiations, which has resulted in litigation between the Petitioning Creditors and Yucaipa and created an acrimonious relationship between Petitioning Creditors (on the one hand), and Yucapia and the Alleged Debtors (on the other hand), warranting appointment of a Chapter 11 trustee.

The Alleged Debtors, as debtors-in-possession, the Allied Board and management owe fiduciary duties of care and loyalty to Alleged Debtors' creditors. The duty of loyalty includes a prohibition against self-dealing which prohibits the Alleged Debtors and members of the Allied Board and management from acting solely in their and Yucaipa's self-interest to the exclusion of other interests, such as the Petitioning Creditors', which they have a duty to protect. LaSalle Nat'l Bank v. Perelman, 82 F. Supp. 2d 279, 292 (D. Del. 2000)(citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991)).

The Alleged Debtors are undeniably under the control of Yucaipa, whose many roles relative to the Alleged Debtors will inevitably lead to the untenable situation of Yucaipa negotiating the terms of any restructuring with itself. Since 2007, as a result of the prior reorganization, Yucaipa (i) has been the majority shareholder of Allied, holding in excess of 70% of its common equity, (ii) designated four out of the five members of the Allied Board, including chairman Derex Walker, and (iii) controlled the actions of Allied's senior management through its appointment of current chief executive officer, Mark Gendregske. In addition, as discussed more fully below, in 2009 Yucaipa purported to acquire a majority of the Obligations under the First Lien Credit Agreement, and to thereby obtain the status of "Requisite Lender" with the ability to bind the Lenders, (including Petitioning Creditors) to various courses of action. Without an independent fiduciary, Yucaipa will control this restructuring from all sides, and it will use that control to benefit its own interest without regard to the interests of other creditors,

3                                                                                      **REDACTED**

including the Petitioning Creditors. Thus, to maintain the integrity of the bankruptcy process and insure that the interests of all creditors are served, a Chapter 11 trustee must be appointed in these cases.

Further, the Alleged Debtors' prepetition conduct, at the direction of and solely for the benefit of Yucaipa, is indicative of the Alleged Debtors' loyalty to Yucaipa and their utter lack of regard for the interests of their creditors, including the Petitioning Creditors. As set forth in more detail below, the financial condition of the Alleged Debtors and their business operations deteriorated, resulting in the occurrence and continuance of certain Events of Default under the Credit Agreements. Further, other Events of Default were the result of affirmative decisions made by the Allied Board and management (at the direction of Yucaipa) to not comply with critical provisions of the Credit Agreements. These Events of Default include, but are not limited to, the following: (i) deliberate and willful failure to pay at least $67 million of principal and interest to all Lenders, including the Petitioning Creditors; ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████[3]

The Alleged Debtors have admitted that these and other Events of Default have occurred and are continuing under each of the Credit Agreements. (Ehrlich Aff., ¶ 10). In any other circumstance, given the substantial and continuing payment defaults and other Events of Default that have occurred and continued for several years, the First Lien Lenders would long ago have

---

[3] *See* Affidavit of Richard Ehrlich in Support of Motion of Petitioning Creditors for the Appointment of a Chapter 11 Trustee dated May 11, 2012 ("Ehrlich Aff.").

REDACTED

instructed the Administrative Agent to accelerate the debt and commence the exercise of remedies.  In the present case, however, the Alleged Debtors, under Yucaipa's control, engaged in a course of conduct with Yucaipa -- in direct violation of the terms of the First Lien Credit Agreement -- designed to thwart the legitimate exercise of the rights of the First Lien Lenders for the sole and exclusive benefit of Yucaipa.

Yucaipa's ability to control the potential restructuring of the Alleged Debtors' First Lien Obligations to the detriment of all Lenders, including the Petitioning Creditors, derives from, and is wholly dependent upon, the claimed validity of the fourth amendment to the Credit Agreement (the "Purported Fourth Amendment") and its claimed status as the controlling lender ("Requisite Lender") under the First Lien Credit Agreement, both of which the Petitioning Creditors have challenged in a state court action commenced prior to the filing of these involuntary petitions. Yucaipa caused the Alleged Debtors to enter into the Purported Fourth Amendment, and to join in its suit against The CIT Group/Business Credit, Inc. ("CIT")[4] when CIT properly refused to acknowledge the validity of the Purported Fourth Amendment.    The Alleged Debtors' involvement with the Purported Fourth Amendment and in related litigation -- which benefited only Yucaipa -- clearly demonstrates that the Alleged Debtors, the Allied Board and senior management are under the control of Yucaipa.  Yucaipa's control of the Alleged Debtors, and the Alleged Debtors' prepetition conduct, have raised substantial doubt whether the Allied Board and the Alleged Debtors' current management can fulfill their fiduciary duties to all creditors.

Appointment of a Chapter 11 Trustee is also appropriate given the Alleged Debtors' gross mismanagement of their business █████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

---

[4] CIT was the Administrative Agent under the First Lien Credit Agreement.  However, the action commenced by Yucaipa and the Alleged Debtors did not name CIT in that capacity.

**REDACTED**



A lack of confidence in the Alleged Debtors' ability to manage their business and discharge their fiduciary duties is grounds for appointment of a Chapter 11 Trustee. As discussed below, the Petitioning Creditors cannot trust the Alleged Debtors' management or the Allied Board, and have no confidence in management's ability to reverse the severely declining business of the Alleged Debtors, when they have shown no ability to do so during the past four years.

This Motion and these cases are not about a group of disgruntled minority lenders in a credit facility. Instead, these disputes are about the role and conduct of Yucaipa, a sophisticated equity investor, who has used its control over the Alleged Debtors to further entrench itself and elevate its own interests above the interests of other Lenders at the expense of the Alleged Debtors and its creditors. To allow Yucaipa to maintain control over the Alleged Debtors during these Chapter 11 proceedings would severely impact the integrity of the bankruptcy process and materially and adversely affect the prospects of a successful reorganization. Indeed, the Alleged Debtors, under Yucaipa's control, have rebuffed the Petitioning Creditors' attempts to engage in meaningful restructuring negotiations. Unless a disinterested fiduciary is appointed, Yucaipa will continue to strategically direct any restructuring process for its benefit and to the detriment of other creditors.

REDACTED

Appointment of a Chapter 11 trustee is necessary and appropriate. Not only does "cause" exist for the appointment of a trustee, but the appointment of a trustee would be in the best interests of all parties. Accordingly, to move these cases forward, preserve the value of these estates, and maintain the integrity of the bankruptcy process, the Petitioning Creditors request the appointment of a Chapter 11 trustee in each of the Alleged Debtors' cases.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## STATEMENT OF FACTS

Allied is a provider of distribution and transportation services to the automotive industry. (Ehrlich Aff., ¶ 3). Allied and several related entities filed for Chapter 11 bankruptcy protection in July 2005. (Ehrlich Aff., ¶ 4).

**Yucaipa's Control of Allied's Business**

In May 2007, Allied emerged from bankruptcy pursuant to a plan of reorganization that resulted in Yucaipa becoming the majority and controlling shareholder of Allied. (Ehrlich Aff., ¶ 4). As a result of its controlling ownership interest, Yucaipa also controls the Allied Board. Pursuant to Allied's plan of reorganization, Yucaipa designated four out of the five members of the Allied Board, including Derex Walker who is currently chairman of the Allied Board. (Harris Decl., Ex. A, at 48-49)[5]. Upon information and belief, Yucaipa's ability to appoint the members of the Allied Board has enabled Yucaipa to control Allied, including the right to appoint and direct the actions of senior management. Yucaipa also selected Allied's current chief

---

[5] *See* Declaration of Adam C. Harris in Support of Motion of Petitioning Creditors for the Appointment of a Chapter 11 Trustee dated May 11, 2012 ("Harris Decl.").

REDACTED

executive officer, Mark Gendregske. Id.

**The Credit Agreements**

In connection with their emergence from bankruptcy in May 2007, the Alleged Debtors obtained an aggregate of $315 million of financing comprised of (a) a $265 million senior secured first priority credit facility ("First Lien Loan"), and (b) a $50 million second lien credit facility ("Second Lien Loan"). The First Lien Loan is governed by the First Lien Credit Agreement. (Ehrlich Aff., ¶ 5). The Second Lien Loan is governed by the Second Lien Credit Agreement. (Schaffer Aff.[6], Ex. A, collectively, with the First Lien Credit Agreement, "Credit Agreements").

The Petitioning Creditors are Lenders under both the First Lien Credit Agreement and the Second Lien Credit Agreement, and own or control, with power to vote (a) approximately $47.9 million (20%) in aggregate principal amount of First Lien Obligations, and (b) approximately $5 million (17%) in aggregate principal amount of Second Lien Obligations. (Ehrlich Aff., ¶ 7); (Schaffer Aff., ¶ 7). Because of its controlling equity ownership position, for purposes of each of the Credit Agreements, Yucaipa is defined as the "Sponsor." (Ehrlich Aff., ¶ 12); (Schaffer Aff., ¶ 7). The First Lien Credit Agreement, prior to any amendments, contained an absolute prohibition against Yucaipa, as the majority and controlling shareholder of Allied, from becoming a First Lien Lender. (Ehrlich Aff., ¶ 8). The purpose of this prohibition was to assure that, Yucaipa, as the majority shareholder, could not also, as a First Lien Lender, interfere with the rights of, and decisions being made by, the First Lien Lenders vis-à-vis Allied, including (without limitation) declaring or waiving defaults, and deciding when (or if) to exercise remedies. This prohibition was designed to prevent Yucaipa, as the controlling owner of the

---

[6] See Affidavit of Jeffrey A. Schaffer in Support of Motion of Petitioning Creditors for the Appointment of a Chapter 11 Trustee dated May 11, 2012 ("Schaffer Aff.").

**REDACTED**

Borrower and guarantors, from buying enough debt to be able to prevent the Lenders from collecting on that debt or otherwise exercising their rights.

## The Alleged Debtors' Events of Default

Just over a year after emerging from Chapter 11, Events of Default began to occur under each of the Credit Agreements. (Ehrlich Aff., ¶ 9). These Events of Defaults include, but are not limited to, the following:

- Failure to pay at least $67 million of principal and interest to all Lenders, including the Petitioning Creditors.



In fact, since August 2008, the Alleged Debtors' Events of Default have continued under the Credit Agreements. The Alleged Debtors have acknowledged the defaults and recognized that the defaults entitled the First Lien Lenders to accelerate the debt. (Ehrlich Aff., ¶ 10).

## Yucaipa Obtains the Right to Become a
## Lender under the Credit Agreements With Significant Restrictions

In addition to its status as majority shareholder of Allied and its control over the Allied Board and day-to-day operations, Yucaipa sought to become a Lender under the First Lien Credit Agreement. Section 10.6 of each of the Credit Agreements permitted Lenders to sell, assign or transfer all or a portion of their rights and obligations under the applicable Credit Agreement, but only to a party that satisfied the definition of "Eligible Assignee." Under each of the Credit Agreements as originally drafted, the definition of Eligible Assignee expressly excluded the "Sponsor" and "Affiliates" of Allied. (Ehrlich Aff., ¶ 12).

9

REDACTED

As majority shareholder, Yucaipa is both the "Sponsor" and an "Affiliate" of Allied. Thus, unless the parties to the Credit Agreements consented to an amendment to the definition of "Eligible Assignee," no Lender could sell, assign or transfer any of its rights or obligations to Yucaipa and, consequently, Yucaipa could not become a Lender under either Credit Agreement. (Ehrlich Aff., ¶ 13); (Schaffer Aff., ¶ 7).  Yucaipa and Allied requested and obtained Lender consent to that certain Amendment No. 3 to Credit Agreement and Consent, dated as of April 17, 2008 (the "Third Amendment"), which amended the First Lien Credit Agreement to allow Yucaipa to become a First Lien Lender and a Second Lien Lender, but only under strictly limited circumstances and conditions.[7] (Ehrlich Aff., ¶ 14).

The Third Amendment placed significant restrictions and conditions on any sale or assignment of Term Loans to Yucaipa; in addition sales or assignments of the LC Deposits and Revolving Loan were not permitted at all.  Specifically, Yucaipa's potential status as a First Lien Lender was subject to the following restrictions and conditions, among others (i) after giving effect to any such sale or assignment, Yucaipa could not hold or beneficially own more than 25% of the aggregate outstanding principal amount of the Term Loans, or acquire more than $50 million in the aggregate of the principal amount of the Term Loans; (ii) Yucaipa was required to make capital contributions to Allied of at least 50% of the aggregate principal amount of Term Loans it acquired; and (iii) Yucaipa would not have any voting rights with respect to any Term Loans it might acquire (which other First Lien Lenders holding Term Loans would have), including rights to consent to any amendment, modification, termination or waiver of any provision of the First Lien Credit Agreement. (Ehrlich Aff., ¶ 15).  These restrictions and conditions served to ensure that Yucaipa, already a majority and controlling shareholder of

---

[7] Pursuant to Amendment No. 3 dated as of April 17, 2008 to the Second Lien Credit Agreement, Yucaipa was also permitted to purchase Second Lien Obligations. (Schaffer Aff., Ex. D, at 3-5).

**REDACTED**

Allied, did not obtain unfettered control over Allied and injure or destroy the Lenders' rights and interests by, among other things, becoming the Requisite Lender under the First Lien Credit Agreement. (Ehrlich Aff., ¶ 16).

Under the First Lien Credit Agreement, the Requisite Lender has the authority to make certain key decisions affecting the rights of all Lenders under the First Lien Credit Agreement, including the Petitioning Creditors, which includes the right to direct the exercise of (or forbearance from exercise of) remedies such as demanding payment by Allied of any and all amounts due, or commencing foreclosure on the collateral pledged to secure the Obligations. (Ehrlich Aff., ¶ 17)

Pursuant to the Third Amendment, the prohibitions imposed on Yucaipa's ability to acquire and vote Term Loans and other Obligations effectively precluded Yucaipa from ever becoming the Requisite Lender. (Ehrlich Aff., ¶ 18). Consequently, because Yucaipa had no ability to become the Requisite Lender under the First Lien Credit Agreement, it could not, as majority and controlling owner of Allied, harm the interests of the Petitioning Creditors and other Lenders, or otherwise interfere with the Lenders' rights. In the Third Amendment, Yucaipa acknowledged that as "Restricted Sponsor Affiliate" its breach of the Third Amendment "will cause the other Lenders and Agents to sustain damages for which they would not have an adequate remedy at law for money damages" and further agreed that "specific performance of such covenants and agreements" contained in the Third Amendment would be the appropriate remedy. Id.

### The Forbearance Agreements

Given the occurrence and continuance of Events of Default, on or about September 24, 2008, Allied entered into forbearance agreement[s] pursuant to which the Lenders

11                                      **REDACTED**

agreed to refrain from taking action to enforce their rights under the Credit Agreements so that the parties could engage in discussions regarding a restructuring of Allied's debt. Those discussions ultimately proved unsuccessful. (Ehrlich Aff., ¶ 19); (Schaffer Aff., ¶ 7).

**The Failed Tender Offer**

In February 2009, Yucaipa launched a tender offer to purchase the Obligations from the First Lien Lenders at a substantial discount to par. The tender offer was conditioned upon acceptance and consent by First Lien Lenders constituting Requisite Lenders to an amendment to the First Lien Credit Agreement that would have eliminated all of the restrictions and conditions imposed upon Yucaipa's ownership of Obligations as set forth in the Third Amendment. (Ehrlich Aff., ¶ 20). Yucaipa's tender offer failed, as Yucaipa did not receive a sufficient number of acceptances to amend the First Lien Credit Agreement in the manner needed. (Ehrlich Aff., ¶ 21).

**Yucaipa, with the Assistance of the Alleged Debtors, Violates the First Lien Credit Agreement; The Purported Fourth Amendment**

After the First Lien Lenders refused to accept Yucaipa's tender offer, it appears that Yucaipa entered into direct discussions with ComVest Investment Partners III ("ComVest") to purchase ComVest's Term Loans and LC Facility Obligations, which at the time comprised a majority of the Term Loans, Revolving Loans and aggregate LC Exposure then outstanding. Given the size of its holdings, ComVest was the Requisite Lender. (Ehrlich Aff., ¶ 23). In connection therewith, Yucaipa caused Allied to enter into a purported amendment to the First Lien Credit Agreement with ComVest, dated as of August 21, 2009 (the "Purported Fourth Amendment"). (Ehrlich Aff., ¶ 24).

The Purported Fourth Amendment, executed by ComVest and the Alleged Debtors, without the consent of the other Lenders or the Administrative Agent, deleted every restriction

12

**REDACTED**

and condition in the Third Amendment prohibiting Yucaipa from acquiring and voting Obligations and preventing it from interfering with Lenders' rights. (Ehrlich Aff., ¶ 25). The Purported Fourth Amendment further allowed Yucaipa to enter into an Assignment and Assumption Agreement with ComVest, dated August 21, 2009 (the "ComVest Assignment"), pursuant to which ComVest assigned its interest in $114.7 million of Term Loans (constituting more than 65% of the aggregate Term Loan Exposure), and $30.4 million of LC Exposure (constituting more than 60% of the aggregate LC Exposure) to Yucaipa, in direct violation of the express limitations imposed by the Third Amendment. (Ehrlich Aff., ¶ 26).

By virtue of the Purported Fourth Amendment, Yucaipa not only claims to have no restrictions on its ability to acquire Obligations under the First Lien Credit Agreement and to vote those Obligations, Yucaipa also asserts that it constitutes the "Requisite Lender." (Ehrlich Aff., ¶ 26). Under the First Lien Credit Agreement, the Requisite Lender has broad authority to make certain decisions affecting the rights of all First Lien Lenders, including the Petitioning Creditors. Those rights include the ability to direct the Administrative Agent to (a) act (or not act) upon the occurrence and during the continuance of an Event of Default, (b) accelerate (or not accelerate) the Obligations when Allied fails to pay interest or principal when due, and (c) exercise (or not exercise) remedies to obtain payment of the Obligations. (Ehrlich Aff., ¶ 17).

Acting under its alleged status as the Requisite Lender, Yucaipa has prevented the Administrative Agent from taking any actions on behalf of the First Lien Lenders to accelerate the Obligations or exercise remedies despite the fact that Allied has admitted to the occurrence and continuance of Defaults and Events of Default for more than three years, including the failure to pay more than $67 million in interest and principal owed to all Lenders on the First Lien Loan and Second Lien Loan. (Ehrlich Aff., ¶ 28).

**REDACTED**

**Prepetition Litigation**

The Administrative Agent initially refused to acknowledge the validity of the Purported Fourth Amendment or Yucaipa's alleged status as Requisite Lender. (Harris Decl., Ex. D, at 2). In response, Yucaipa and Allied commenced an action against CIT, in its individual capacity and not as the Administrative Agent, in the Superior Court of Fulton County, Georgia, *inter alia*, (a) alleging breach of the First Lien Credit Agreement, (b) seeking a declaration that the Purported Fourth Amendment was effective and binding on the parties to the First Lien Credit Agreement, and (c) seeking a declaration that Yucaipa was the Requisite Lender under the First Lien Credit Agreement (the "Georgia Action"). (Harris Decl., Ex. D). Thereafter, on December 21, 2009, CIT filed a verified answer and counterclaims against Yucaipa and Allied seeking a declaration that the Purported Fourth Amendment was ineffective and not binding, that Yucaipa was not the Requisite Lender, and other relief ("CIT Counterclaim"). (Harris Decl., Ex. E).

Notwithstanding the positions set forth in the CIT Counterclaim, on December 5, 2011, without notice to or consultation with the Petitioning Creditors, the parties to the Georgia Action entered into a settlement agreement (the "Settlement Agreement") pursuant to which CIT, in its individual capacity as a Lender, agreed not to "object to, challenge or contest, either directly or indirectly, the validity of the Fourth Amendment," and acknowledged "that Yucaipa is the Requisite Lender for all purposes including the exercise of remedies." (Harris Decl., Ex. F, at 11-12)[8].

As a result of the foregoing, Yucaipa not only has control over the Alleged Debtors (the

---

[8] The Petitioning Creditors dispute the validity, enforceability and effectiveness of the Purported Fourth Amendment, as well as any transaction or event taken in reliance thereon. In order to protect their interests the Petitioning Creditors commenced an action against Yucaipa on January 17, 2012 in the Supreme Court of the State of New York, County of New York, seeking a declaration that the Purported Fourth Amendment is invalid, ineffective and not binding, and that Yucaipa is not the Requisite Lender under the First Lien Credit Agreement. *BDCM Opportunity Fund II, LP et al. v. Yucaipa American Alliance Fund I L.P. et al*, Index No. 650150/2012 (the "New York Action").(Harris Decl., Ex. G).

14                                                                    **REDACTED**

Borrower) through its majority and controlling ownership interest in the Alleged Debtors and control of the Allied Board, but it also purports to have control over all decisions affecting all Lenders (as the purported Requisite Lender), including the ability to prevent the First Lien Lenders from exercising their rights and remedies against the Alleged Debtors (including, without limitation, upon the Maturity Date of the Obligations). (Ehrlich Aff., ¶ 27).

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ In March 2011, the Alleged Debtors admitted that their business model was not viable with its labor costs and customer rate structure. (Harris Decl., Ex. B & C). A failed attempt to reduce their labor costs induced a strike notice from their Teamster represented employees. Id. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

REDACTED



the Alleged Debtors have been unable to pay, and thus have failed to pay, since August 2009 (a) interest and principal payments to all First Lien Lenders in the aggregate amount of at least $57.4 million and (b) interest payments to all Second Lien Lenders in the aggregate amount of at least $9.6 million. (Ehrlich Aff., ¶ 34).

**The Petitioning Creditors' Efforts to Engage**
**The Alleged Debtors in Restructuring Negotiations**

In the face of the ongoing Defaults and Events of Default, including the failure to make interest and principal payments for more than two and one-half years, the Petitioning Creditors attempted to engage the Alleged Debtors in restructuring negotiations. These attempts have been met with a perfunctory response which failed to address the substantive issues raised by the Petitioning Creditors or the Petitioning Creditors' request to engage in restructuring discussions. (Ehrlich Aff., ¶ 37).

16                                    **REDACTED**

## APPLICABLE AUTHORITY

### Appointment of a Trustee is Warranted Under
### Sections 1104(a) and 105(a) of the Bankruptcy Code

Section 1104(a) of the Bankruptcy Code provides that at any time after the

commencement of a Chapter 11 case but prior to confirmation of a plan, a bankruptcy court shall

order the appointment of a trustee:

> (1) for cause, *including*, fraud, dishonesty, incompetence, or gross
> mismanagement of the affairs of the debtor by current management, either
> before or after the commencement of the case or similar cause, but not
> including the number of holders of securities of the debtor or the amount
> of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security
> holders and other interests of the estate, without regard to the number of
> holders of the securities of the debtor or the amount of assets or liabilities
> of the debtor.

11 U.S.C. § 1104(a) (emphasis supplied). The party requesting appointment of a trustee has the

burden of showing by "clear and convincing evidence" that the appointment of a trustee is

warranted. In re Marvel Entm't Group, Inc., 140 F.3d 463, 471 (3d Cir. 1998); In re Sharon

Steel Corp., 871 F.2d 1217, 1226 (3d Cir. 1989).

Section 1104(a) provides for appointment of a Chapter 11 trustee even during the gap

period of an involuntary case. See Prof'l Accountants Referral Servs., Inc., 142 B.R. 424, 429

(Bankr. D.Colo. 1992) (approving the appointment of a Chapter 11 trustee during the gap period

where court found there was a reasonable likelihood that debtor would be found to be a proper

involuntary debtor under the Bankruptcy Code); Collier on Bankruptcy 303-90 (Alan N. Resnick

& Henry J. Sommer ed., LexisNexis) (16th ed. 2011) (". . . a trustee can be appointed in the

[involuntary] chapter 11 case prior to the entry of the order for relief pursuant to section 1104(a).

… By its terms, section 1104 is triggered by the commencement of the case, not the entry of the

order for relief. There is case law supporting appointment of a chapter 11 trustee in these

17                                        **REDACTED**

circumstances (listing cases).").

Appointment of a trustee during the gap period is an appropriate exercise of the court's equitable powers under section 105(a) of the Bankruptcy Code. See Prof'l Accountants, 142 B.R. at 430 ("This Court further believes that, if necessary, the exercise of its equitable powers under 11 U.S.C. § 105 allows for the appointment of a trustee during the gap period").

As discussed below, appointment of a trustee is appropriate here under both Sections 1104(a)(1) and 1104(a)(2) of the Bankruptcy Code.

## A.    Appointment of a Trustee is Required under Section 1104(a)(1) of the Bankruptcy Code.

Section 1104(a)(1) of the Bankruptcy Code requires the appointment of a trustee upon a court's findings of fraud, dishonesty, incompetence, or gross mismanagement by a debtor's current management. 11 U.S.C. § 1104(a)(1). Under section 1104(a)(1), appointment of a trustee is mandatory if cause is shown. 11 U.S.C. § 1104(a); Sharon Steel Corp., 871 F.2d at 1226. The court may consider both prepetition and postpetition misconduct of the current management when making the determination of whether "cause" exists for the appointment of a trustee. 11 U.S.C. § 1104(a)(1).

The language of section 1104(a)(1) does not, by its very terms, set out an exclusive list of what constitutes "cause" mandating the appointment of a trustee. Marvel, 140 F.3d at 472. Thus, the appointment of a trustee for "cause" also may be based upon a finding that the debtor's management suffers from conflicts of interest or is unable to discharge its fiduciary duties. See Id. at 473; In re Bellevue Place Assocs., 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994); In re Ionosphere Clubs, Inc., 113 B.R. 164, 169 (Bankr. S.D.N.Y. 1990).

A Chapter 11 debtor owes fiduciary duties to its estate, including obligations "to protect and to conserve property in its possession for the benefit of creditors" and "to 'refrain from acting

18                                    **REDACTED**

in a manner which could damage the estate, or hinder a successful reorganization..." Ionosphere, 113 B.R. at 169 (quoting Sharon Steel, 86 B.R. at 457); see also Marvel, 140 F.3d at 471, 474. "Indeed, the willingness of courts to leave debtors in possession is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee." Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 355, 105 S. Ct. 1986, 1994 (1986) (citations omitted). Therefore, "the appointment of a trustee is a power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interest of creditors are served." In re Intercat, Inc., 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000).

**B.      Appointment of a Trustee is in the Best Interests of Parties
Under Section 1104(a)(2) of the Bankruptcy Code.**

Even in the absence of "cause", the court may still appoint a trustee pursuant to section 1104(a)(2) if "such appointment is in the interests of creditors, any equity security holders and other interests of the estate." 11 U.S.C. § 1104(a)(2).

Section 1104(a)(2) creates a flexible standard that provides the court with discretion to appoint a trustee when to do so would best serve the parties' and the estate's interests. Sharon Steel, 871 F.2d at 1226 ("Subsection (a)(2) allows appointment of a trustee even when no 'cause' exists."). In determining the best interests of creditors and the estate, courts "resort to [their] broad equity powers. . . . [E]quitable remedies are a special blend of what is necessary, what is fair and what is workable." In re Hotel Assocs., Inc., 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980).

In determining whether to appoint a trustee under section 1104(a)(2), "courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests." Hotel Assocs., 3 B.R. at 345. Among the factors considered by courts are: (i) trustworthiness of the debtor; (ii) the debtor in possession's past and present

**REDACTED**

performance and prospects for the debtor's rehabilitation; (iii) the confidence - or lack thereof - of the business community and of creditors in present management; and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment. <u>Ionosphere</u>, 113 B.R. at 168 (citations omitted).

There are many factual scenarios that have been held to support the appointment of a trustee under section 1104(a), including the following which are relevant here:

- Conflicts of interest preventing the debtor from discharging its fiduciary duties to creditors;[9]

- Gross mismanagement of the debtor;[10]

- A lack of confidence in the debtor's abilities to manage its business and discharge its fiduciary duties;[11] and

- Acrimony between the debtor and its creditors.[12]

---

[9] <u>See, e.g.</u>, <u>Marvel</u>, 140 F.3d at 471; <u>Cajun Elec. Power Coop. v. Cent. La. Elec. Co. (In re Cajun Elec. Power Coop.)</u>, 69 F.3d 746, 751 (5th Cir. 1995), <u>majority op. withdrawn and dissenting op. adopted</u>, 74 F.3d 599, 600 (5th Cir. 1996); <u>Bellevue</u>, 171 B.R. at 624; <u>In re Concord Coal Corp.</u>, 11 B.R. 552, 554-55 (Bankr. S.D.W. Va. 1981).

[10] <u>See, e.g.</u>, <u>Kwitchurbeliakin, LLC, v. Laporte Savings Bank</u>, No. 3:10–CV–170, 2011 WL 93714, at *6 (N.D. Ind. Jan. 10, 2011)(affirming bankruptcy court's appointment of a trustee due to, among other things, debtor's mismanagement resulting in customer and related revenue loss, and debtor's failure to provide lender with statements and financial reports and repair leaky roof and pay real estate taxes); <u>Intercat</u>, 247 B.R. at 922 (appointing trustee for mismanagement for, among other things, willful infringement of the patent rights of W.R. Grace resulting in judgment against debtors, self dealing transactions, waste of corporate assets); <u>Ionosphere</u>, 113 B.R. at 170 (finding gross mismanagement based on "debtors' inability to formulate a business plan and make operating projections which have a longevity of more than several months, along with the continuing enormous operating losses").

[11] <u>See, e.g.</u>, <u>Sharon Steel</u>, 871 F.2d at 1227-28; <u>In re Cardinal Indus.</u>, 109 B.R. 755, 765-66 (Bankr. E.D. Ohio 1990)(sufficient cause exists to appoint a trustee due to the creditors' "serious and general loss of confidence in the Debtors' management," despite no finding of any of the enumerated 1104(a)(1) factors); <u>In re The Bible Speaks</u>, 74 B.R. 511, 512-13 (Bankr. D. Mass. 1987)("the need for a neutral party to mediate disputes between the debtor and its creditors is grounds for a trustee's appointment").

[12] <u>See, e.g.</u>, <u>Marvel</u>, 140 F.3d at 471; <u>Cajun Elec.</u>, 69 F.3d at 751; <u>Bellevue</u>, 171 B.R. at 625.

**REDACTED**

## ARGUMENT

**A.    Yucaipa's Control of the Allied Board and Senior Management Creates Conflicts of Interest that Prevent the Alleged Debtors from Discharging Their Fiduciary Duties to Creditors.**

Yucaipa's control over the Allied Board and senior management, compounded by its role as majority shareholder (i.e. Sponsor) and its self-proclaimed status as controlling Lender (i.e. Requisite Lender), creates conflicts of interest that make it utterly impossible for the Alleged Debtors to exercise their fiduciary duties. Indeed, the inability to fulfill fiduciary duties of a debtor-in-possession is cause to appoint a Chapter 11 trustee. Bellevue, 171 B.R. at 624.

The nature of the fiduciary duties owed by a debtor-in-possession to its creditors is analogous to the fiduciary duties owed by directors to shareholders under state law and includes the duties of care and loyalty. LaSalle Nat'l Bank, 82 F. Supp. at 292. The duty of loyalty includes the prohibition against self-dealing. Id. This means that if the debtor-in-possession is controlled by another party, then the debtor-in-possession, as a fiduciary to all the debtor's creditors, cannot act solely in the interests of that party, to the exclusion of other interests which the debtor-in-possession has the fiduciary obligation to protect. See Bellevue, 171 B.R. at 624 (finding that because a secured creditor controlled the debtor-in-possession, the debtor-in-possession could only act in that secured creditors' interest without considering the debtor-in-possession's fiduciary duties).

The Alleged Debtors are undeniably under the control of Yucaipa, whose many "hats" make their involvement in these cases pervasive at every level. In any restructuring, the Alleged Debtors would be required to negotiate with their creditors and their equity holders -- but in these cases the Allied Board and management are controlled by Yucaipa, the controlling shareholder is Yucaipa and the Requisite Lender having the authority to bind all other Lenders is also

**REDACTED**

(allegedly) Yucaipa. Thus, the Alleged Debtors, under Yucaipa's control, are not free to exercise their fiduciary duties as debtors-in-possession to any other party in interest. Moreover, virtually any transaction that the Allied Board proposes will constitute an "interested party" transaction because Yucaipa occupies every seat at the negotiating table -- as debtor (through its control of the Allied Board and senior management), Requisite Lender (allegedly), and controlling equity holder.

Further, the Alleged Debtors' prepetition conduct is clear evidence of their inability to act independently of Yucaipa. Yucaipa has a history of improperly using its position of control over the Alleged Debtors to further entrench itself and protect its own interests, and the Alleged Debtors have a history of simply going along. The Alleged Debtors' conduct demonstrates their utter lack of regard for the interests of the Petitioning Creditors and other creditors. Since 2008, Events of Default under the Credit Agreements have occurred and continue as a result of the Alleged Debtors' deteriorating financial condition and business operations. Certain other Events of Default were the result of affirmative decisions made by the Allied Board and management (at the direction of Yucaipa) to not comply with critical provisions of the Credit Agreements. These continuing Events of Defaults include the failure to pay in excess of $67 million of principal and interest to all Lenders and failing to deliver financial statements and other information.

Yucaipa caused the Alleged Debtors to enter into the Purported Fourth Amendment, and to join Yucaipa in its suit against CIT in the Georgia Action, when in its capacity as Administrative Agent CIT properly refused to acknowledge the amendment. The Alleged Debtors' involvement in that action -- which benefited only Yucaipa -- clearly demonstrates that the Alleged Debtors, the Allied Board and senior management are mere puppets of Yucaipa and

REDACTED

incapable of making independent decisions or taking actions that may be contrary to Yucaipa's interests (even if it is in the best interest of the Alleged Debtors and their creditors as a whole).

In re Bellevue Place Assocs. is instructive. The debtor in Bellevue was controlled by a single secured creditor pursuant to the terms of a "Master Agreement." 171 B.R. at 624. The Master Agreement vested complete control of the debtor's reorganization process in Meridien, the controlling secured creditor. Id. Meridien representatives, who became the new directors and officers of entities that controlled the debtor, were granted "sole discretion and authority to manage the affairs and operations of [the debtor] BPA." Id. at 620. Accordingly, the court found that, because "the debtor in this case is under the complete control and direction of one secured creditor", the debtor was not free to exercise its fiduciary duties to its other creditors. Id. The court held that the inability of the debtor to exercise its fiduciary duty constituted "cause" under section 1104(a)(1) mandating appointment of a trustee. Id. The court also held that appointment of a trustee was in the best interest of all parties, and thus appropriate under section 1104(a)(2), as of result of the debtor's lack of control. Id. at 624-25. Here, Yucaipa's control of the Allied Board and management, its position as Sponsor, and its alleged position as Requisite Lender and its prepetition conduct undeniably lead to the conclusion that the Alleged Debtors are incapable of exercising their fiduciary duties to all creditors, thereby warranting appointment of a Chapter 11 trustee.

Further, irreconcilable conflicting loyalties and conflicts of interest alone are sufficient to support the appointment of a Chapter 11 trustee. For example, in In re Cajun Elec. Power Coop., Inc., certain creditors moved for appointment of a trustee where the debtor's board members were also board members or managers of the debtor's customers. 69 F.3d at 747, majority op. withdrawn and dissenting op. adopted, 74 F.3d at 600. Specifically, the District Court in Cajun

**REDACTED**

found that a pervasive conflict of interest existed warranting appointment of a Chapter 11 trustee where Cajun's board members owed duties of loyalty to both Cajun's creditors and Cajun's member-customers. Id. at 750 n.13. The dual loyalties of Cajun's board members resulted in numerous conflicts including the failure (i) to collect monies owed by members-customers, and (ii) to allow members access to information and to participate in possible sales of Cajun's assets. Id.; Id. at 751. The Fifth Circuit agreed with the District Court. Id. at 751. The court held that when the board members began "working at cross-purposes . . . the appointment of a trustee may be the only effective way to pursue reorganization." Id. citing In re Colorado-Ute Electric Ass'n, Inc., 120 B.R. 164, 176 (D. Colo. 1990)(holding appointment of a trustee proper where court could not envision a way for current management to resolve conflicts among the debtor, its creditors and its members).

Here, as in In re Cajun Elec. Power Coop., Inc., the Alleged Debtors have conflicting loyalties to both Yucaipa and to their other creditors. Under the influence and at the direction of Yucaipa, the Alleged Debtors have (i) withheld financial information from Lenders, including the Petitioning Creditors, (ii) failed to pay at least $67 million owed to the Lenders under the Credit Agreements, and (iii) refused to engage the Petitioning Creditors in restructuring negotiations. As in Cajun Elec. the Alleged Debtors' Board and senior management suffer from irreconcilable conflicting loyalties and conflicts of interest necessitating appointment of an independent disinterested trustee.

A trustee is also appropriate where, as is the case here, the multiple influences of Yucaipa on the Alleged Debtors and the Alleged Debtors' prepetition misconduct, have raised "substantial doubt whether the Debtor's current management...[could] be considered loyal to its goal of rehabilitation." Concord Coal, 11 B.R. at 554 (Chapter 11 trustee warranted where

24

**REDACTED**

debtor's president had a conflict of interest where he held ownership interests in multiple "competing business interests" which spawned charges of dishonest dealings). It is simply untenable for the Alleged Debtors to be in a situation where they are controlled by management and a board which is in turn beholden to the interests of Yucaipa to the exclusion of other creditors.

Without an independent fiduciary, Yucaipa will remain in total control of the reorganization process, including but not limited to the identification and evaluation of the strategic alternatives to maximize value and creditor resources, and will be situated to drive the reorganization process in a manner that benefits its own interests without regard to the interests of the other creditors. Therefore, appointment of a Chapter 11 trustee in these cases is both necessary and appropriate.

**B.    Gross Mismanagement Warrants Appointment of a Trustee.**

Appointment of a Chapter 11 trustee is appropriate due to the gross mismanagement of the Alleged Debtors. See 11 U.S.C. § 1104(a)(1). In Sharon Steel, the Third Circuit affirmed the appointment of a trustee where mismanagement resulted in the company suffering substantial losses and a failure to cut major expenses. Sharon Steel, 871 F.2d at 1228 (affirming district court's appointment of trustee even after the creditors' committee was granted standing to pursue avoidance actions against insiders because that "may have solved that isolated management problem, but it has not cleared up the question about current management's fitness to continue running Sharon Steel and its commitment to see it through to a successful reorganization"). See also Ionosphere, 113 B.R. at 170 (finding gross mismanagement based on the "debtors' inability to formulate a business plan and make operating projections which have a longevity of more than several months, along with the continuing enormous operating losses").

**REDACTED**

Management's utter failure to stem these losses for such an extensive period of time, in and of itself requires the appointment of a Chapter 11 trustee. See Ionosphere, 113 B.R. at 168.

Moreover, the few actions the Alleged Debtors did take made the situation dramatically worse rather than better.

**C.    The Petitioning Creditors Have No Confidence in Existing Management.**

Similarly, a lack of creditor confidence in a debtor's ability to manage its business and discharge its fiduciary duties is grounds for appointment of a Chapter 11 trustee. See, e.g., Sharon Steel, 871 F.2d at 1227-28. As extensively discussed above, the Petitioning Creditors cannot trust the Alleged Debtors' management to either restructure their business, or to exercise their fiduciary duties, for the benefit of all creditors. The Allied Board and management's past actions indicate that they will protect Yucaipa's interest at the expense of other stakeholders. As a result, if the current management, controlled by Yucaipa, remains at the helm of the Alleged Debtors, these cases will surely be unnecessarily litigious, expensive and unproductive. Creditors cannot be expected to have confidence in management's ability to reverse the Alleged Debtors' business decline when they have shown no ability to do so for the last four years. Id. at 1226-28 (held trustee appropriate where management failed to keep records, operated at a loss

26                                    . **REDACTED**

and failed to cut major expenses). Therefore, appointment of a qualified, competent and independent trustee is necessary here for a successful reorganization.

**D.    Acrimony and Distrust Between the Alleged Debtors and the Petitioning Creditors Warrant Appointment of a Chapter 11 Trustee.**

In the face of the ongoing Defaults and Events of Default -- including the failure to make in excess of $67 million of interest and principal payments for more than two and one-half years, and the commencement of the New York Action -- the Petitioning Creditors attempted to engage the Alleged Debtors in restructuring negotiations. These attempts have been met with a perfunctory response which failed to address the substantive issues raised by the Petitioning Creditors or the Petitioning Creditors' request to engage in restructuring discussions.

The Court of Appeals for the Third Circuit has held that acrimony between the debtor and certain creditors constitutes cause for appointment of a trustee. In In re Marvel Entm't Group, Inc., acrimony developed between the debtors, controlled by Carl Icahn, and certain of debtors' secured lenders. 140 F.3d at 467-69. Among other things, Icahn and the lenders were entangled in multiple litigations and had failed to demonstrate any ability to resolve matters consensually. Id. at 473. The lenders moved for appointment of a trustee claiming that the parties had reached an impasse. Id. at 468 (emphasis supplied). The Third Circuit agreed with the lenders holding that the level of acrimony constituted "cause" under section 1104(a)(1) and that a trustee was in the best interest of all parties and the estate under section 1104(a)(2). Id. at 473-74 ("Having found that this unhealthy conflict of interest was manifest in the 'deep-seeded conflict and animosity' between the Icahn-controlled debtor and the Lenders and in the lack of confidence all creditors had in the Icahn interests' ability to act as fiduciaries, the district court did not depart from the proper exercise of discretion when it determined sufficient cause existed under § 1104(a)(1) to appoint a neutral trustee to facilitate reorganization." ... "The level of acrimony

**REDACTED**

found to exist in this case certainly makes the appointment of a trustee in the best interests of the parties and the estate [under § 1104(a)(2)].").

As set forth above, the Alleged Debtors' management is controlled by and the Allied Board's loyalties run to Yucaipa. Yucaipa controls the Alleged Debtors and will undoubtedly control the identification and implementation of any strategic alternative the Alleged Debtors may determine to pursue in these cases. So long as Yucaipa remains in control of the Alleged Debtors, the Petitioning Creditors have no confidence that a reorganization alternative will be identified and implemented that considers the interests of any party-in-interest other than Yucaipa. The Petitioning Creditors are powerless to change management and are (at the moment) powerless to instruct the Administrative Agent to accelerate the Obligations and commence the exercise of remedies. A neutral trustee is clearly necessary here to facilitate a successful reorganization. As was the case in Marvel, Yucaipa and the Alleged Debtors under their control (on the one hand) and the Petitioning Creditors and other Lenders (on the other hand) are at odds with one another and there is no hope of consensual resolution. These Chapter 11 cases will have no hope of success -- but will rather be mired in extensive, time consuming and expensive litigation -- unless there is a neutral trustee at the helm. This acrimony between the Alleged Debtors and the Petitioning Creditors, in and of itself, is sufficient reason to appoint a Chapter 11 trustee.

REDACTED

## CONCLUSION

WHEREFORE, the Petitioning Creditors respectfully request entry of an order granting

the relief requested herein and such other and further relief as is just.

Dated: May 17, 2012                         LANDIS RATH & COBB LLP
      Wilmington, Delaware
                                    By: _____
                                  Adam G. Landis (No. 3407)
                                  Kerri K. Mumford (No. 4186)
                                  919 Market Street, Suite 1800
                                  Wilmington, Delaware 19899
                                  Telephone: (302) 467-4400
                                  Facsimile: (302) 467-4500

                                  —and—

                                  Adam C. Harris
                                  Robert J. Ward
                                  SCHULTE ROTH & ZABEL LLP
                                  919 Third Avenue
                                  New York, New York 10022
                                  Telephone: (212) 756-2000
                                  Facsimile: (212) 593-5955

                                  *Attorneys for BDCM Opportunity Fund II, LP,*
                                  *Black Diamond CLO 2005-1 Ltd, and*
                                  *Spectrum Investment Partners, L.P.*