# EXHIBIT 20

| | |
|---|---|
| **From:** | Steve Deckoff |
| **Sent:** | Wednesday, February 02, 2011 2:17 AM |
| **To:** | 'burkle@att.blackberry.net' |

Ron - Good seeing you the other night. On Allied, the strategy you outlined seemed right and you have our support. If there is anything we can do to help let me know. On the bank or casino deals you mentioned, I'd be very interested in looking at both or either. We know both industries very well and it would nice to do more things together. I'm headed to Telluride this weekend. Maybe sometime in the future we can get on the ski together. Steve

1

Confidential

# EXHIBIT 21

## Filed Under Seal

# EXHIBIT 22

| | |
|---|---|
| **From:** | Steve Deckoff |
| **Sent:** | Tuesday, June 28, 2011 11:20 AM |
| **To:** | Rich Ehrlich |
| **Subject:** | Re: Allied |

Ok. Go ahead.

-----Original Message-----
From: Rich Ehrlich
To: Les Meier; Steve Deckoff
Sent: Tue Jun 28 11:06:29 2011
Subject: FW:Allied

I'd like to do call with Adam Harris at Schulte to discuss potential courses of action on Allied Systems.


Would you like to have an internal discussion first.



Richard Ehrlich

Black Diamond Capital Management, L.L.C.

1 Sound Shore Drive, Suite 200

Greenwich, CT 06830

(203) 552-0888 (phone)

(203) 552-1014 (fax)

rehrlich@bdcm.com


Confidentiality Notice: The information contained in this e-mail (and any attachments) is confidential and may be privileged. It is intended for the named recipient(s) only. If you are not the named recipient, you are hereby notified that any use, dissemination, distribution, retention or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by return e-mail and permanently delete the e-mail and any attachments. Thank you for your cooperation.

---

From: Jeffrey Schaffer [mailto:JSchaffer@spectrumgp.com]
Sent: Tuesday, June 28, 2011 10:57 AM
To: Rich Ehrlich

1

Confidential

BDCM0006118

Subject: RE: Allied


yes


Jeffrey A. Schaffer

Spectrum Group Management LLC

1250 Broadway, Suite 810

New York, NY 10001

Phone: 212-687-9555

Fax: 212-983-2322

Email: jschaffer@spectrumgp.com


From: Rich Ehrlich [mailto:rehrlich@bdcm.com]
Sent: Tuesday, June 28, 2011 10:50 AM
To: Jeffrey Schaffer
Subject: Allied


Are you interested in doing a call with Adam Harris to discuss available options?


Richard Ehrlich

Black Diamond Capital Management, L.L.C.

1 Sound Shore Drive, Suite 200

Greenwich, CT 06830

(203) 552-0888 (phone)

(203) 552-1014 (fax)

rehrlich@bdcm.com


2

Confidential

BDCM0006119

# EXHIBIT 23

**From:**     Rich Ehrlich
**Sent:**     Thursday, June 30, 2011 10:20 AM
**To:**       'Jeffrey Buller'
**Subject:**  Allied

Are you guys dialing in to call with Schulte?

Richard Ehrlich
Black Diamond Capital Management, L.L.C.
1 Sound Shore Drive, Suite 200
Greenwich, CT 06830
(203) 552-0888 (phone)
(203) 552-1014 (fax)
rehrlich@bdcm.com

Confidential

BDCM0000953

# EXHIBIT 24

**From:** Steve Deckoff
**Sent:** Sunday, July 10, 2011 10:06 PM
**To:** Rich Ehrlich
**Subject:** Re:

Ok

-----Original Message-----
From: Rich Ehrlich
To: Steve Deckoff
Sent: Sun Jul 10 22:05:22 2011
Subject: Re:

Yes... Would like to discuss with you and Les tomorrow. Les is in tomorrow, but out rest of the week.

On Jul 10, 2011, at 8:24 PM, "Steve Deckoff" <sdeckoff@bdcm.com> wrote:

Do you haave an Allied strategy figured out yet?

Confidentiality Notice: The information contained in this e-mail (and any attachments) is confidential and may be privileged. It is intended for the named recipient(s) only. If you are not the named recipient, you are hereby notified that any use, dissemination, distribution, retention or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by return e-mail and permanently delete the e-mail and any attachments. Thank you for your cooperation.

Confidentiality Notice: The information contained in this e-mail (and any attachments) is confidential and may be privileged. It is intended for the named recipient(s) only. If you are not the named recipient, you are hereby notified that any use, dissemination, distribution, retention or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by return e-mail and permanently delete the e-mail and any attachments. Thank you for your cooperation.

1

Confidential

BDCM0006143

# EXHIBIT 25

| | |
|---|---|
| **From:** | Jeffrey Schaffer <JSchaffer@spectrumgp.com> |
| **Sent:** | Tuesday, September 13, 2011 9:56 AM |
| **To:** | Rich Ehrlich |
| **Subject:** | RE: Allied |

No, I thought you were setting up a call with the other holders

Jeffrey A. Schaffer
SPECTRUM GROUP MANAGEMENT
1250 Broadway, Suite 810
New York, NY 10001
Phone: 212-687-9555
Fax: 212-983-2322
Email: jschaffer@spectrumgp.com

-----Original Message-----
From: Rich Ehrlich [mailto:rehrlich@bdcm.com]
Sent: Tuesday, September 13, 2011 8:36 AM
To: Jeffrey Schaffer
Subject: Allied

Where did you go? You working on an alternative solution?

Confidentiality Notice: The information contained in this e-mail (and any attachments) is confidential and may be privileged. It is intended for the named recipient(s) only. If you are not the named recipient, you are hereby notified that any use, dissemination, distribution, retention or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by return e-mail and permanently delete the e-mail and any attachments. Thank you for your cooperation.

The information contained in this email and any attachments may be legally privileged and confidential. If you are not an intended recipient, you are hereby notified that any dissemination, distribution or copying of this email and any attachments is strictly prohibited. If you received this email in error, please notify the sender and permanently delete the email and any attachments immediately. You should not retain, copy or use this email or any attachment for any purpose, nor disclose all or any part of the contents to any other person. Spectrum Group Management LLC and its related entities reserve the right to monitor all email communications through their networks.

1

BDCM0000399

# EXHIBIT 26

| | |
|---|---|
| **From:** | Rich Ehrlich |
| **Sent:** | Thursday, September 08, 2011 4:51 PM |
| **To:** | Les Meier; Steve Deckoff |
| **Subject:** | Allied Update |

Allied has been moving along slowly because I have been waiting for Spectrum, but they have been dragging their feet. I don't have good color as to why. I reached out to several other lenders and they are generally interested in organizing. I suggest that we do a group call next week to discuss our options. I plan to keep Spectrum involved, but I think we should move ahead with or without Spectrum. No news from the company.

Richard Ehrlich
Black Diamond Capital Management, L.L.C.
1 Sound Shore Drive, Suite 200
Greenwich, CT 06830
(203) 552-0888 (phone)
(203) 552-1014 (fax)
rehrlich@bdcm.com

**Confidentiality Notice:** The information contained in this e-mail (and any attachments) is confidential and may be privileged. It is intended for the named recipient(s) only. If you are not the named recipient, you are hereby notified that any use, dissemination, distribution, retention or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by return e-mail and permanently delete the e-mail and any attachments. Thank you for your cooperation.

1

BDCM0006235

# EXHIBIT 27

| | |
|---|---|
| **From:** | Steve Deckoff |
| **Sent:** | Thursday, October 13, 2011 10:23 PM |
| **To:** | Rich Ehrlich |
| **Cc:** | Les Meier |

What is happening with involuntary on allied?

1

Confidential

BDCM0006146

# EXHIBIT 28

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3    Case No. 12-11564-css

4    - - - - - - - - - - - - - - - - - - - - - - - - - -x

5    In the Matter of:

6

7    ALLIED SYSTEMS HOLDINGS, INC., et al.,

8

9           Debtors.

10   - - - - - - - - - - - - - - - - - - - - - - - - - -x

11

12                        United States Bankruptcy Court

13                        824 North Market Street

14                        Wilmington, DE   19801

15                        September 17, 2013

16                        11:00 AM

17

18

19

20

21   B E F O R E:

22   HON. CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  LESLIE MURIN

Page 2

1    HEARING re Doc 1733 - Motion for Authorization to File Under

2    Seal the Objection of the Official Committee of Unsecured

3    Creditors to the Entry of an Order (I) Approving Asset Purchase

4    Agreement and Authorizing the Sale of Certain Assets of Debtors

5    Outside the Ordinary Course of Business; (II) Authorizing the

6    Sale of Assets Free and Clear of all Liens, Claims,

7    Encumbrances, and Interests; (III) Authorizing the Assumption,

8    Sale, and Assignment of Certain Executory Contracts and

9    Unexpired Leases; and (IV) Granting Related Relief

10

11   HEARING re Doc #1175 - Motion of the Debtors for Entry of

12   Orders: (A)(1) Approving Bid Procedures Relating to Sale of

13   Debtors' Assets; (II) Approving Bid Protections; (III)

14   Scheduling a Hearing to Consider the Sale; (IV) Approving the

15   Form and Manner of Notice of Sale by Auction; (V) Establishing

16   Procedures for Noticing and Determining Cure Amounts; and (VI)

17   Granting Related Relief; and (B)(I) Approving Asset Purchase

18   Agreement and Authorizing the Sale of Certain Assets of Debtors

19   Outside the Ordinary Course of Business; (II) Authorizing the

20   Sale of Assets Free and Clear of all Liens, Claims,

21   Encumbrances, and Interests; (III) Authorizing the Assumption,

22   Sale, and Assignment of Certain Executory Contracts and

23   Unexpired Leases and (IV) Granting Related Relief

24

25

Page 3

1    HEARING re Doc #1821 - Motion for Order, Pursuant to Section

2    107(b) of the Bankruptcy Code and Bankruptcy Rule 9018,

3    Authorizing Yucaipa to File Under Seal Portions of Yucaipa

4    American Alliance Fund I, L.P., Yucaipa American Alliance

5    (Parallel) Fund I1, L.P., Yucaipa American Alliance Parallel

6    Fund II, L.P.'s (1) Objection to Sale of Debtors' Real Property

7    Assets to New Allied Acquisition Co., LLC, and (II) Limited

8    Objection to the Sale of Substantially all of the Debtors'

9    Assets to Jack Cooper

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Mary Zajaczkowski

Page 4

1   A P P E A R A N C E S :

2

3   RICHARDS, LAYTON, & FINGER, P.A.

4          Attorneys for Debtors

5          One Rodney Square

6          920 North King Street

7          Wilmington, DE   19801

8   BY:   MARK D. COLLINS, ESQ.

9          ROBERT J. STEARN, JR., ESQ.

10         CHRISTOPHER SAMIS, ESQ.

11

12

13  TROUTMAN SANDERS

14         Attorneys for Debtors

15         600 Peachtree Street, NE Suite 5200

16         Atlanta, Georgia   30308-2216

17  BY:   JEFFREY W. KELLEY, ESQ.

18

19

20  LATHAM & WATKINS

21         Attorneys for Yucaipa

22         355 South Grand Avenue

23         Los Angeles, CA   90071-1560

24  BY:   ROBERT A. KLYMAN, ESQ.

25

Page 5

```
 1    SCHULTE  ROTH  &  ZABEL  LLP

 2            Attorneys  for  BD/SPECTRUM

 3            919  Third  Avenue

 4            New  York,  NY   10022

 5    BY:   DAVID  HILLMAN,  ESQ.

 6            ADAM  C.  HARRIS,  ESQ.

 7            VICTORIA  LEPORE,  ESQ.

 8

 9

10    SIDLEY  AUSTIN  LP

11            Attorneys  for  the  Committee

12            787  Seventh  Avenue

13            New  York,  New  York  10019

14    BY:   MICHAEL  A.  BURKE,  ESQ.

15

16

17    KING  &  SPALDING

18            Attorneys  for  Jack  Cooper

19            1180  Peachtree  Street,  NE

20            Atlanta,  GA   30309

21    BY:   JESSE  H.  AUSTIN,  ESQ.

22            PAUL  FERDINANDS,  ESQ.

23

24

25
```

Page 6

```
 1   MORRIS JAMES LLP

 2         Attorneys for General Motors

 3         500 Delaware Avenue, Suite 1500

 4         Wilmington, DE  19801

 5   BY:   JEFFREY WAXMAN, ESQ.

 6

 7

 8   STEVENS & LEE

 9         Attorneys for Central PA Teamsters Pension Plan

10         1818 Market Street

11         29th Floor

12         Philadelphia, PA 19103

13   BY:   JOHN C. KILGANNON, ESQ.

14

15

16   COHEN, WEISS AND SIMON, LLP

17         Attorneys for TNATINC

18         330 West 42nd Street, 25th Floor

19         New York, NY 10036

20   BY:   THOMAS N. CIANTRA, ESQ.

21

22

23

24

25
```

Page 7

```
 1   DLA PIPER (USA)

 2         Attorneys for CAW - CANADA

 3         919 North Market Street

 4         Wilmington, DE  19801

 5   BY:   SELINDA A. MELNICK, ESQ.

 6

 7

 8   GEBHARDT AND SMITH

 9         Attorneys for LSREF2 Clover Property 6, LLC

10         One South Street, Suite 1200

11         Baltimore, MD  21202

12   BY:   LISA B. TANCREDI, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 8

1              P R O C E E D I N G S

2         THE CLERK:  All rise.

3         THE COURT:  Please be seated.  Good morning.

4         MR. COLLINS:  Good morning, Your Honor.  For the

5    record, Mark Collins of Richards Layton & Finger on behalf of

6    the Debtors.

7              Your Honor, turning to today's agenda, we have three

8    items on the agenda.  Items 1 and 3 relate to two motions to

9    seal objections; the first filed by the Creditors Committee to

10   seal their objection; and the third item was the motion from

11   Yucaipa to seal their supplemental objection.  I don't believe

12   there are any objections to those motions to seal.  But I ask

13   if Your Honor should, if Your Honor had any questions regarding

14   those.

15        THE COURT:  I do not.  Does anyone wish to be heard?

16   All right.  I'll approve them.  Send up the orders.

17        MR. COLLINS:  We will do so, Your Honor.

18        THE COURT:  All right.  At an appropriate time, it

19   doesn't matter.

20        MR. COLLINS:  Okay.  Your Honor, turning to agenda

21   item number 2, this is the Debtors' motion to sell

22   substantially all of their assets, and we are very happy to be

23   before you today on this critically important motion to the

24   Debtors and their operations.

25             As the Court is aware, on September 6th, Jack Cooper

Page 9

1   submitted a revised bid for substantially all of the Debtors'

2   assets in the face amount of $135 million.  As the result of

3   receiving this bid and a number of outstanding objections that

4   were filed to the conduct of the auction that was held back in

5   mid-August, the Creditors Committee, then joined by the

6   Debtors, asked Your Honor to reopen the auction.  Following a

7   telephonic hearing with Your Honor on September 9th, Your Honor

8   did grant the Committee's and the Debtors' motion to reopen the

9   auction.

10          On September 11 and 12, the Debtors conducted the

11  reconvened auction in Wilmington at Richards, Layton and

12  Finger.  At the commencement of the auction, the Debtors

13  declared that Jack Cooper's $135 million bid was the highest

14  and best bid received to date, and invited overbidding from the

15  other qualified bid, the requisite lenders.  Following two days

16  of bidding and intensive off the record meetings among the

17  Debtors, the bidders and the consultation parties, the Debtors,

18  following consultation with the consultation parties,

19  determined that two separate bids when combined together

20  constituted the highest and best bids for the Debtors' assets.

21  One of the winning bids was submitted by Jack Cooper.  Jack

22  Cooper's bid provided for the purchase of most of the Debtors'

23  assets for $135 million consisting of $125 million in cash and

24  $10 million in notes to be issued by Jack Cooper.  Importantly,

25  that asset purchase agreement was revised at the auction to

Page 10

1    exclude a number of what we call excluded assets, and they are

2    made up primarily of excess real property, about a half dozen

3    or so properties, one non-residential real property lease and

4    fifty trailers commonly referred to as lowboys.

5            THE COURT:  As what?

6            MR. COLLINS:  Lowboys.  And we'll refer to these

7    assets throughout, at least my presentation, excluded assets.

8    The other bid that was submitted was submitted by the agents

9    under the Debtors' first lien credit agreement at the direction

10    of the requisite lenders through a newly formed acquisition

11    vehicle that we will refer to as Acquisition Co.  Acquisition

12    Co's bid provides for the acquisition of the excluded assets

13    for an initial credit bid of $5 million, and additional credit

14    bid consideration to be provided after the assets are sold by

15    Acquisition Co.  And if any such assets are not sold within six

16    months of closing, an appraisal of these remaining assets will

17    be conducted.  Either the next sale proceeds obtained from the

18    sale of such excluded asset within a six month period of

19    closing will be applied to reduce the first lien debt on a

20    dollar for dollar basis.  Or if the asset is not sold in six

21    months, there will be an appraisal conducted of that asset, and

22    that appraised value less any carrying costs and related

23    expenses that receive revenue on any such excluded asset will

24    also reduce dollar for dollar the first lien debt.  Thus, this

25    mechanism, in the Debtors' view, affords the Debtors' estate

Page 11

1   the ability to reduce the first lien debt by the fair market

2   value of these excluded assets, and that will be determined in

3   the coming months through this sale process.  And if the assets

4   again are not sold, they will be done through an appraisal

5   process.

6           Importantly, Your Honor, if there are any disputes

7   regarding the net sale price obtained by Acquisition Co or the

8   net appraised value, including whether they reflect the fair

9   market value of these excluded assets, the Debtors may raise

10  those issues before this Court.  And this Court's determination

11  regarding the appropriate credit bid amount for each disputed

12  asset value will control.

13          Your Honor, so in a nutshell, those are the two asset

14  sales that we are seeking approval of today.  We will certainly

15  elaborate on the terms of these two asset sales as we proceed

16  with today's hearing.  For the balance of today's hearing we

17  would propose to proceed in the following manner subject, of

18  course, to Your Honor's views.

19          First, we will run through the objections set forth

20  on the agenda, and we'll discuss the status, the resolution of

21  these objections.  We are happy to report that the vast

22  majority of these objections have been resolved.  In fact, Your

23  Honor, I think after some comments on the record by Mr. Klyman

24  on behalf of Yucaipa, all objections that relate to the Jack

25  Cooper sale transaction we believe have been resolved subject

Page 12

1    to what we'll put on the record, either on the record or

2    insertions to the form of the Jack Cooper sale order.

3         Following confirmation of the resolved objections and

4    the identification of what remains outstanding, we would

5    propose to move for evidentiary case and then we intend to

6    proffer the testimony of two witnesses, Mr. Antinelli from

7    Rothschild and Mr. Blount on behalf of the company.

8         Following this evidentiary case, Your Honor, we'll

9    open it up to argument on any remaining outstanding disputed

10   objections.

11        But again, we're very pleased to be before Your Honor

12   today.  This is, through a lot of work, a lot of effort by the

13   Court and the parties, we believe we are here on an almost

14   entirely consensual basis but for certain objections being

15   raised by Yucaipa, we think can and should be resolved today.

16   Thank you, Your Honor.

17        THE COURT:  Okay, thank you.

18        MR. COLLINS:  I'll turn it over to Mr. Samis who will

19   walk through the objections.

20        THE COURT:  Okay.

21        MR. SAMIS:  Good morning, Your Honor, Chris Samis

22   from Richards Layton and Finger here today on behalf of the

23   Debtors.

24        THE COURT:  Good morning.

25        MR. SAMIS:  Your Honor, I'm going to endeavor to do

Page 13

1    this as expeditiously as possible.  As Your Honor probably

2    noted, there are several objections and matters have been

3    influxed since the conclusion of the reopened auction on

4    Friday.  As Mr. Collins, stated, we believe that all of these

5    are resolved; however, I'll pause briefly after each one to the

6    extent that any party would like to make comments or Your Honor

7    has any questions or concerns.

8             THE COURT:  Okay.  If you do have questions or

9    concerns or you want to put something on the record, please

10   don't hesitate to jump up when your client is mentioned.

11            MR. SAMIS:  Thank you, Your Honor.  Your Honor, I'm

12   just going to take these in order, I think that's the best way

13   to --

14            THE COURT:  From the agenda?

15            MR. SAMIS:  Agenda order, Your Honor.

16            THE COURT:  That's fine.

17            MR. SAMIS:  And we're going to trip over a couple

18   here and there where objections were superseded by subsequent

19   objections.  I'll just note that and then move on and we can

20   discuss them in the context of the superseding objection.

21            THE COURT:  Okay.

22            MR. SAMIS:  Your Honor, that starts us with item A.

23   That is the limited objection and reservation of rights of

24   General Motors.  It's probably best to discuss this one here.

25   They filed actually several objections, they all go to the same

Page 14

1    thing, and that's the preservation of GM's alleged setoff and

2    recoupment rights with respect to accounts receivable.

3            We have conferred with counsel to GM, and we've

4    agreed to add language to the JCT sale order that addresses

5    this concept.  And that language is going to read as follows:

6    The Debtors sale of claims against and alleged rights to

7    receive payment from any one or more of General Motors

8    Holdings, LLC, General Motors LLC, General Motors of Canada

9    Limited including without limitation alleged claims for

10   transportation service charges in the amounts of $2,755,404.35

11   and $1,324,682.84 listed on the Debtors' schedule B21 is

12   expressly subject to any and all of GM's defenses and rights,

13   including but not limited to GM's rights of recoupment and

14   setoff under Michigan law and GM's claims and defenses asserted

15   in the United States District Court for the Eastern District of

16   Michigan, the Michigan court case number 11-11162.  Purchaser

17   shall not assign, sell or otherwise transfer any right or

18   interest in the alleged claims or in the alleged accounts

19   receivable without the prior written consent of GM and any such

20   assignment, sale or transfer without GM's prior written consent

21   is void.  In the event that the purchaser seeks to pursue or

22   enforce the alleged claims, the purchaser and the Debtors agree

23   and consent to exclusive jurisdiction and venue in the Michigan

24   court, and any further litigation relating to the alleged

25   claims' alleged accounts receivable or GM's related defenses

Page 15

1   shall be exclusively in the Michigan case except that if the

2   Michigan court cannot exercise jurisdiction and venue,

3   purchaser and Debtors agree and consent to exclusive venue and

4   jurisdiction in a court of competent jurisdiction located in

5   Oakland County, Michigan.  Further, in the event that the

6   purchaser seeks to pursue or enforce the alleged claims,

7   purchaser and the Debtors consent to any request --

8           THE COURT:  Slow down a little, actually.  I'm

9   actually --

10          MR. SAMIS:  I'm sorry.

11          THE COURT:  I'm actually listening.

12          MR. SAMIS:  Purchaser and Debtors consent to any

13  request by GM to the Bankruptcy Court for relief from the

14  automatic stay to litigate in the Michigan court or another

15  Michigan court any and all claims relating to the alleged

16  claims, alleged accounts receivable and GM's related defenses

17  and damages claims including without limitation GM's claims for

18  damages relating to the alleged breach by Allied Systems of its

19  obligations under the service contract for logistic services

20  between GM and Allied.  Nothing contained in this order or any

21  prior order of the Bankruptcy Court shall affect or otherwise

22  impair to the extent valid any setoff or recoupment rights or

23  defenses of GM or the priority of any setoff recoupment claims

24  or any rights attended thereto including without limitation

25  GM's rights under the service contract, and two, GM's defenses

Page 16

1    to the existence an alleged amount of the alleged claims and

2    the alleged accounts receivable including without limitation on

3    account of GM processing $100 million debit on May 20th, 2011

4    to recoup and/or set off a portion of GM's damages caused by

5    Allied's alleged breach of service contract, and b) on account

6    of the stipulation as to amounts of certain damage claims in

7    the Michigan case.  And that's the provision in its entirety,

8    Your Honor.

9            THE COURT:  Mr. Waxman.

10           MR. WAXMAN:  Your Honor, Jeff Waxman of Morris James

11   on behalf of General Motors.  I do confirm that that resolves

12   the objections of General Motors.  I thank the Debtors and Jack

13   Cooper for their time and I thank the Court.

14           THE COURT:  Thank you.

15           MR. SAMIS:  Your Honor, I promise, that's the longest

16   one.

17           THE COURT:  Okay.

18           MR. SAMIS:  Your Honor, objection B is the objection

19   and reservation of rights of the Teamsters.  Your Honor, that

20   was superseded I think by a subsequent objection, and that's

21   located at N, so I'll proceed and address that once we reach

22   that event.

23           THE COURT:  Okay.

24           MR. SAMIS:  Your Honor, item C, again is General

25   Motors, so we can move on from that.  Item D is the Central

Page 17

1  Pennsylvania Teamsters Pension Fund.  This objection centered

2  on the Debtors confirming that contributions to the pension

3  plan would continue until the associated CBAs were dealt with.

4  The Debtors have no problem confirming that that's going to be

5  the case and the contributions will continue.  Our

6  understanding is as of today and as of the filing of the

7  objection, we're current on those contributions.  I don't know

8  if the fund has anything else to say about that.

9          THE COURT:  Does anyone wish to be heard?  Yes sir.

10          MR. KILGANNON:  Good morning, Your Honor, John

11  Kilgannon, Stevens & Lee for the Central Pennsylvania Teamsters

12  Pension Fund.  What Mr. Samis related to the Court is accurate.

13  The objection was primarily just to confirm that the collective

14  bargaining agreements would be assumed and contributions to the

15  pension fund would be made by the purchaser on a going forward

16  basis.  And I understand that that's indeed the case, and

17  that's represented on the record, so that's satisfactory to the

18  fund.

19          THE COURT:  Thank you.  Navistar?

20          MR. SAMIS:  Your Honor, Navistar at E.  They objected

21  to the manner in which their contracts were described in the

22  initial cure notice.  We revised the description of those

23  contracts in the subsequent cure notices that were filed, and I

24  think we're all on the same page now as to what Navistar

25  contracts are in existence and what Navistar contracts aren't.

Page 18

1    So I think that with respect to that Navistar objection, we're

2    fully resolved.

3            THE COURT:  Any comments?  All right.

4            MR. SAMIS:  Your Honor, item F is the limited

5    objection of the City of New York.  This is actually an

6    objection that goes to the Black Diamond sale agreement.  The

7    City of New York lease is one of the excluded assets that Mr.

8    Collins referenced.  That is going to be dealt with by a

9    procedure that's laid out at paragraph 11 of the Black Diamond

10   order.  I won't go through it word for word.  Basically it sets

11   up a procedure for discussions to occur between Black Diamond,

12   Spectrum and the City of New York related to various cure and

13   adequate assurance issues that are associated with the

14   assumption and the assignment of the lease.  And that language

15   has not yet been shared with the City of New York, but nothing

16   substantive is happening with respect to the City of New York's

17   lease today.  The City of New York is aware that the matter is

18   essentially adjourned for the purposes of today's hearing; I

19   spoke with them on Friday.  But we are going to share the

20   language that Black Diamond has proposed at paragraph 11 with

21   the City of New York before submitting the order, and make sure

22   that it's okay with them.  I don't think that there's anyone

23   here appearing on their behalf today, but we are going to

24   engage in that process to make sure they're okay with the

25   language.

Page 19

1        THE COURT:  Does anyone wish to be heard?  Okay.

2        MR. SAMIS:  Your Honor, that brings us to Iron

3   Mountain Information Management at G.  With respect to Iron

4   Mountain, they raised some adequate assurance issues and also a

5   cure issue.  I can confirm on the record that the appropriate

6   cure amount is $30,679.50 which differs from what the Debtor

7   had listed in its cure notice.  There was a cure amount of zero

8   listed.  But the parties engaged in discussions and determined

9   that was the case.  In addition, with the exchange of the

10  adequate assurance packages, Iron Mountain is now comfortable

11  that JCT's adequate assurance information is sufficient.  So I

12  think that resolves Iron Mountain, Your Honor.

13        THE COURT:  Okay.  Anyone else want to be heard?  All

14  right.  Thank you.

15        MR. SAMIS:  Your Honor, that brings us to the Ellis

16  County objection at H.  Their objection concerned the desire

17  for language to be added on the payment of various personal

18  property taxes, and real property taxes.  And we did endeavor

19  to reach an agreement with them, and we were successful.  That

20  language is going to be inserted in the JCT sale order and it's

21  going to read as follows:  With respect to property in Ellis

22  County, Texas, any valid undisputed 2013 ad valoren taxes on

23  the real and personal property will be paid at closing if such

24  date is on or before January 31st, 2014.  If closing has not

25  occurred by that date, the Debtor shall pay any valid

Page 20

1    undisputed 2013 taxes as billed on or before January 31, 2014.

2    The 2013 taxes shall be paid if valid and undisputed based upon

3    the tax office records and pursuant to 11 U.S.C. 503(b)(1)(d).

4    No administrative expense claim or request for payment need to

5    be filed for these taxes to be paid.  Any disputed ad valoren

6    taxes on real and personal property will be addressed by a

7    court of competent jurisdiction and paid as may be required by

8    the disposition of such dispute.

9              THE COURT:  All right.  Does anyone wish to be heard?

10   Very good.  Thank you.

11             MR. SAMIS:  Your Honor, that takes us to objection I.

12   That again is General Motors, so we can move on from that.

13             That brings us to J, which is another Navistar

14   objection, this one went to a little bit of a different issue.

15   This was just adequate assurance.  At this point they reviewed

16   the package from JCT and my understanding is they've been

17   satisfied by what's been provided.

18             THE COURT:  Does anyone else wish to be heard?  Very

19   good.

20             MR. SAMIS:  Your Honor, that brings us to item K.

21   This is the Debtors' headquarters landlord.  I'd like to pick

22   this up at the end at item FF because it was superseded by a

23   subsequent objection.

24             THE COURT:  Okay.

25             MR. SAMIS:  Your Honor, that brings us to item L.  I

Page 21

1    think it's probably, probably for the best here to do the same

2    thing.  This ends up getting superseded by a subsequent

3    objection later on by the Canadian Autoworkers that's listed at

4    EE, so we can reach that when we move at the end of these

5    items.

6         THE COURT:  All right.

7         MR. SAMIS:  Your Honor, that brings us to items M

8    through S.  I would classify all of these as either matters

9    that were superseded by subsequent objections or objections

10   that I would call process/outcome objections.  Most of them

11   were driven at the original auction and deficiencies, or

12   alleged deficiencies related to the process during that

13   auction.  With the reopening of the auction and the different

14   outcome, I think all of the objections from M through S are

15   either resolved or have been superseded by objections that

16   occur later.  But I pause for a second, rather than going

17   through each one of them individually, this might be more

18   efficient.

19        THE COURT:  All right.  Mr. Burke.

20        MR. BURKE:  Good morning, Your Honor, Michael Burke

21   for the Official Committee of Unsecured Creditors.  Very

22   briefly, as Mr. Collins stated, we're still negotiating some

23   form of language to the sale orders.  I think Mr. Samis is

24   right, for all intents and purposes we are going to withdraw

25   our objection.  However, with your Court's indulgence, I'd just

Page 22

1    like to reserve a little time to make a statement during

2    argument.

3              THE COURT:  Of course.

4              MR. BURKE:  Thank you, sir.

5              THE COURT:  The Teamsters?

6              MR. CIANTRA:  Yes, Your Honor, Thomas Ciantra, Cohen,

7    Weiss and Simon for the Teamsters.  Based on developments, we

8    will be withdrawing our objection.  We would also note in

9    addition to the comments that Mr. Samis made that there were

10   certain revisions that were made to the proposed form of order

11   with respect to the Cooper sale that address certain issues

12   that we had raised with the Debtors and with Cooper that we

13   understand are reflected in the amended order that will be

14   presented to the Court in conjunction with that sale, and we

15   would appreciate that.  Thank you.

16             THE COURT:  Thank you.  Mr. Klyman.

17             MR. KLYMAN:  Thank you, Your Honor.  For the record,

18   Robert Klyman of Latham Watkins, LLP on behalf of Yucaipa.

19   Your Honor, we are working through language issues with the

20   Debtors and with Black Diamond about the form of the order.

21   But the major issues that have been resolved are,  we had

22   objected to the allocation of disputed sale proceeds going to

23   the first lien agents of the Debtors.  We and the first lien

24   agents have agreed that any proceeds allocable to the Yucaipa

25   claim as identified on the register as the petition date plus

Page 23

1    any unpaid and, accrued and unpaid interest will be deposited

2    into a third party escrow.  I think we've agreed on Wilmington

3    Trust.  And we'll work on language about how that gets

4    distributed under what terms and conditions.  And that's the

5    base amount of the claim regardless of any claim, dispute,

6    challenge that may, that has been or may be asserted.

7             And then we also are preserving our rights with

8    respect to the wind down budget.  The current order provides

9    that that budget is subject to the sole and absolute discretion

10   of the first lien lenders.  We're not waiving our rights with

11   respect to that.  And there are some other things.  Based on a

12   markup that was sent over to Mr. Harris and Mr. Collins this

13   morning, we expect to work through those promptly.

14            THE COURT:  Thank you.  Mr. Austin.  I think you've

15   earned your seat before the bar at this point.

16            MR. AUSTIN:  Well I think we've paid for a seat in

17   front of the bar, Your Honor.  Good morning.  For the record

18   Jess Austin for Jack Cooper Holdings Corp.

19            With respect to the objections which we had filed on

20   behalf of Jack Cooper, we will be withdrawing them.  I've

21   confirmed with my client that it does not file objections to

22   selling these assets to itself, we're quite happy to be

23   acquiring these assets.  And having also with the rework of the

24   auction, we have no objections to the sale of those assets

25   which are not being acquired by Jack Cooper to be sold in the

Page 24

1    manner that the Debtor is proposing to an entity designated by

2    the requisite lenders.  And I'll have some small comments at

3    the conclusion, but I wanted the Court to be clear, we are

4    withdrawing our objection.

5              THE COURT:  Very good, I appreciate that.  Thank you.

6              MR. KLYMAN:  Your Honor, again for the record, Robert

7    Klyman of Latham Watkins.  This may have been clear from Mr.

8    Samis's presentation, but we do have some objections with

9    respect to the sale to the first lien agent under their credit

10   bid.  Our comments with respect to the order only went to that

11   related to the Jack Cooper bid.

12             THE COURT:  Thank you.  That wasn't clear.  Okay.

13             MR. SAMIS:  Your Honor, I apologize.  That was one of

14   the ones that I was referring to as having been superseded by a

15   subsequent objection.  There's an objection that goes to that

16   point that Yucaipa lodged later on that's listed deeper in the

17   agenda.

18             THE COURT:  Okay.

19             MR. SAMIS:  Your Honor, so with that, if no one else

20   has comments, that takes us to item T.  Item T was an informal

21   response by Mr. Whatley, he is a service provider to the

22   Debtors.  We went back, he had complained that he thought the

23   cure amount was incorrect.  We went back and researched the

24   issue and the amounts that formed the basis of his cure claim

25   were actually objected to and expunged in Allied's prior

Page 25

1   bankruptcy case.  So our position is that at this point he is

2   owed no amounts in connection with those allegations.  I don't

3   know if Mr. Whatley is present or on the phone, but I pause for

4   a moment.

5            THE COURT:  Does anyone wish to be heard?  Okay.

6            MR. SAMIS:  Your Honor, that takes us to the informal

7   response of Scooterbill Auto Transportation, LLC, that's at

8   item U.  This one is similar.  Scooterbill disagreed with the

9   amount that was set forth in the cure notice which was zero.

10  And we took, we took it upon ourselves to research that amount

11  after we received their complaint.  And it turns out that their

12  claim was satisfied by a stock issuance actually in the prior

13  bankruptcy.  So it's a little bit similar to Mr. Whatley's

14  issue.  So that would be the provision the Debtors are taking

15  today, Your Honor.

16           THE COURT:  Does anyone wish to be heard?  All right.

17           MR. SAMIS:  Your Honor, that brings us to item V

18  which was the informal response of Motivated Security Services.

19  That was a cure amount dispute.  I can confirm on the record

20  today that the appropriate cure amount is $28,306.21.  And the

21  bidders went back, examined their records and determined that

22  the initial period, notice was incorrect.

23           THE COURT:  Okay.  Thank you.

24           MR. SAMIS:  Your Honor, that brings us to Item W.

25  That's the informal response of the New York Susquehanna and

Page 26

1    Western Railway Corporation.  For the purposes of today's

2    hearing there was a cure dispute, I can confirm on the record

3    that their appropriate cure amount is $26,709.25.

4            THE COURT:  All right.

5            MR. SAMIS:  Your Honor, that takes us to item X.

6    Item X was the informal response of Comdata Network.  They, I

7    disagreed with the way their contracts were described in the

8    Debtors' initial cure notice.  We've since corrected that in

9    subsequent cure notices.  And my understanding is that all the

10   parties are now in agreement with the way that the Comdata

11   agreements are described.

12           THE COURT:  Anyone wish to be heard?  Okay.

13           MR. SAMIS:  Your Honor, item Y, that's the informal

14   response of National Union Fire Insurance Company.  This is one

15   of the Debtors' insurers.  For the purposes of today's hearing,

16   we've determined to adjourn that matter.  It went to basically

17   whether or not the insurance agreements at issue were going to

18   be assumed and assigned, that that issue is going to be

19   addressed I think between today's hearing and the closing by

20   JCT.  But National Union is aware and that issue will be taken

21   up.

22           THE COURT:  Okay.  Anyone wish to be heard?  All

23   right.  That's fine.

24           MR. SAMIS:  Your Honor, Item Z, that was the informal

25   response of International Business Machines.  They were

Page 27

1    concerned with the description of their contracts and with the

2    associated cure amount.  I think that we've cured the issue

3    with successive cure notices as to the description of the

4    contracts.  And as far as the cure amount goes, there are

5    several work orders that make up some of the contracts and it's

6    unclear at this time what cure amounts are associated with

7    which contracts.  We do know that the aggregate cure amount is

8    $212,802 even.  To the extent that JCT determines that it's

9    going to be taking the IBM contracts in toto or some subset of

10   the IBM contracts, we'll work out parceling that amount amongst

11   them between now and the closing.

12              THE COURT:  Okay.  Thank you.

13              MR. SAMIS:  Your Honor, that takes us to item AA,

14   that's the informal response of Goodyear Tire and Rubber.  All

15   Goodyear was looking for was confirmation that amounts that

16   were due and owing under the contracts would continue to be

17   paid in the ordinary course until the contract was rejected or

18   assumed, and the Debtors can confirm that's the case, that's

19   our intent.

20              THE COURT:  Very good.

21              MR. SAMIS:  Your Honor, Item BB was an informal

22   response from the Office of the Attorney General for the State

23   of Michigan.  They were looking for the addition of language

24   addressing employer liability taxes and contributions to the

25   workers compensation fund in Michigan.  We have agreed on

Page 28

1   language and that language is going to go into the JCT order

2   and will read as follows:  notwithstanding anything to the

3   contrary in the APA or in this order approving the sale of

4   assets of the Debtors' Michigan businesses, this order will not

5   enjoin, suspend or restrain the assessment, levy or collection

6   of unemployment taxes under Michigan state law and does not

7   constitute a declaratory judgment with respect to any

8   employer's liability for taxes under Michigan state law.  This

9   order is without prejudice to any rights of the purchaser, the

10  Debtors or any of their successors in interest as it may have

11  to challenge the assessment, levy or collection of unemployment

12  taxes or any unemployment experience rating assessed by the

13  Michigan Unemployment Insurance Agency.

14          THE COURT:  Very good.

15          MR. SAMIS:  Your Honor, that takes us then to item

16  CC.  That is the limited objection and reservation of rights of

17  the Trustees of the Canadian Auto Carriers and Logistics

18  Pension Plan.  Your Honor, unless I'm misunderstanding it, this

19  appears to just be a reservation of rights seeking the

20  confirmation that the Debtors and the purchaser will comply

21  with applicable Canadian law based upon the facts and

22  circumstances at the time.  I think the Debtors and the

23  purchaser are comfortable in saying that they'll comply with

24  that Canadian law to the extent necessary.  But if the trustees

25  have anything else to say, I'd be happy to cede the podium to

Page 29

1     them.

2              THE COURT:  And I hear none.  Okay.

3              MR. SAMIS:  Okay.  Your Honor, that takes us to item

4     DD, which was the Yucaipa objection that Mr. Klyman mentioned

5     that remains unresolved.  So if I could just skip over that for

6     a minute since that's going to be the main event, and come down

7     to the conditional objection and reservation of rights of CAW

8     at EE.  For this presentation, I would turn the podium over to

9     Ms. Melnick who is going to recite the terms of the settlement.

10             THE COURT:  Okay, very good.

11             MS. MELNICK:  Good afternoon, Your Honor, Selinda

12    Melnick, DLA Piper for the CAW Canada.  Your Honor, in

13    accordance with Article 6.1 of the APA, the purchaser, Jack

14    Cooper Transfer, or its designated employment offering

15    purchaser entity has agreed to assume any and all obligations

16    and responsibilities of Allied Canada as a result of the

17    application of section 44 of the Canadian Labor Code which

18    addresses successor employer status and obligations in relation

19    to the collective agreement between the CAW Canada and Allied

20    Canada.

21             There have been significant exchanges between the

22    parties including emails between Jack Cooper Transport and the

23    CAW Canada, and its counsel Mr. Wadsworth who is here with me

24    today attempting to address the issues, open issues and

25    concerns that were expressed in the conditional, that were

Page 30

1   remaining with respect to the new sale and were set forth in

2   the conditional objection and reservation of rights which we

3   filed.  And I am happy to report to the Court that those

4   exchanges have clarified, which was one of the major issues was

5   the clarification, to a large extent a good portion of the

6   concerns and issues that were included in the conditional

7   objection.  And the parties are continuing to negotiate as

8   others have indicated the final version of the proposed order

9   to be presented to Your Honor.  And therefore the CAW Canada

10  continues to reserve its rights with respect to the

11  memorialization of some of the resolutions of the issues that

12  were presented including with respect to how a stub payment

13  obligation may be treated whether it's by the Debtors or by the

14  purchaser, and the continuing severance obligations that Your

15  Honor is aware about because of the settlement agreement that

16  was entered into with the CAW Canada and the Debtors.

17          So with that, Your Honor, CAW Canada continues to

18  reserve its rights both with respect to the finalizing of the

19  proposed order to be presented to Your Honor and with respect

20  to the motion for recognition of Your Honor's order up in

21  Canada before the Canadian court.

22          THE COURT:  Okay.  Very good, thank you.

23          MS. MELNICK:  Thank you.

24          MR. SAMIS:  Your Honor, this brings us I think to our

25  last objection.  This is the limited objection of the

1  headquarters' landlord, that is FF.  Item GG is the response

2  from --

3           THE COURT:  FF or GG?

4           MR. SAMIS:  FF, Your Honor.  GG is actually a

5  response of the prepetition first lien agents.

6           THE COURT:  I see.

7           MR. SAMIS:  This is the last actual objection of the

8  sale.

9           THE COURT:  Okay.

10          MR. SAMIS:  Your Honor, the headquarters' landlord

11 was seeking to confirm the treatment of its lease and wanted

12 some language added to the order reserving rights in connection

13 with the security deposit that relates to the lease and some

14 letter of credit proceeds that relate to the lease.

15          In order to address their concerns, I can confirm on

16 the record today that the Debtors intend to occupy the space

17 until the lease expires by its terms, and I can confirm that

18 there's no plan to sublease the headquarters at this time.  The

19 Debtors intend to abide by the terms of the lease until it

20 expires.

21          Your Honor, the other thing is we'd like to insert

22 some language in the order that the landlord has reviewed and

23 approved.  And that language will read as follows:  Nothing

24 contained herein or in the APA shall affect any rights LSREF2

25 may have in connection with the security deposit or the letter

Page 32

1  of credit proceeds currently in the possession of LSREF2 in

2  connection with the agreement of lease dated October 19th, 2007

3  for the Debtors' headquarters building in Atlanta, Georgia.

4          THE COURT:  Okay?  Counsel?

5          MS. TANCREDI:  Good morning, Your Honor.

6          THE COURT:  Good morning.

7          MS. TANCREDI:  Lisa Tancredi on behalf of LSREF2

8  Clover Properties 6, LLC.  There are two issues.  One was the

9  issue of how the security deposit and how the letter of credit

10 proceeds might be impacted by the sale.  And that's been

11 resolved by the language that Mr. Samis just recited on the

12 record.  The other issue, because everything has happened so

13 quickly that the business people have not had an opportunity to

14 speak to the business people at Jack Cooper and would like the

15 opportunity to do so.  And so what I would suggest is that the

16 objection be continued.  It may ultimately be withdrawn once

17 the parties have had a chance to talk so that the business

18 people can talk and my client can get comfortable with what's

19 going on.

20         THE COURT:  Well how do they go to closing with a

21 continued objection?  I mean that's --

22         MS. TANCREDI:  It's just the continued objection on

23 the issue of adequate assurance which is the Debtors' issue,

24 not the, not the purchaser because they're not --

25         THE COURT:  Because they're not assuming, I'm sorry,

Page 33

1    the property is not being assumed and assigned.

2           MS. TANCREDI:  Not through this order.

3           THE COURT:  Well there is no adequate assurance

4    requirement, the Debtor isn't doing anything, it's just staying

5    where it was.

6           MS. TANCREDI:  Well there's still an adequate

7    protection requirement in connection with the sale under 363

8    for any party.

9           THE COURT:  Not if they're not selling it.

10          MS. TANCREDI:  Well, Your Honor, here's the issue.

11   The lease expires under its own terms in the middle of next

12   year.  There -- even based on Mr. Samis's language, I think

13   that there's still opportunity for the parties to change their

14   minds.  Maybe they won't be done with the space, maybe they'll

15   need a little extra time.  Who knows what the future may bring?

16   I would really like for the opportunity of the business people

17   to speak about my client's concerns without impacting the sale.

18          MR. SAMIS:  Your Honor, having just consulted with

19   the representative from the Debtor, I can confirm there's going

20   to be no extra time necessary.

21          THE COURT:  There's what?

22          MR. SAMIS:  There's going to be no extra time

23   necessary.  I think the Debtor will abide by its obligations

24   through the expiration of the lease term, but I don't think

25   that given the --

Page 34

1           THE COURT:  You don't think or they won't?

2           MR. SAMIS:  They will not, Your Honor.  And given

3    that the lease isn't being assigned I don't think there's an

4    adequate assurance issue.

5           THE COURT:  Mr. Austin?

6           MR. AUSTIN:  Jess Austin for Jack Cooper.  I just

7    want to be very clear.  Under the terms of our asset purchase

8    agreement that is an excluded asset, we are not assuming that

9    lease.

10          THE COURT:  Okay.  All right.  Well I don't think

11   that there's anything left, so.

12          MS. TANCREDI:  The problem --  under the --

13          THE COURT:  Let's put it this way.  I think I know, I

14   think your concern, well I think your concern was twofold.  One

15   was you wanted to leave it open for a potential business

16   resolution of various issues.

17          MS. TANCREDI:  Yes.

18          THE COURT:  Which might exist.  I think that exists

19   no matter what.  Okay.  Even if you're the current landlord and

20   there was no sale, you certainly are in a position to negotiate

21   with the Debtor.  I think perhaps the more finer point, I don't

22   know if it's an adequate assurance issue but you used the word

23   adequate protection, I think there's a point there which is

24   this Debtor no longer is going to be operating a business but

25   it's going to have rental obligations to your client.  And your

Page 35

1  concern is that you won't get your rent.  Am I putting words in

2  your mouth?  I don't want to do that.

3          MS. TANCREDI:  I don't think that that is a great

4  concern of my client because it is holding a fairly substantial

5  amount of letter of credit proceeds, which should cover the

6  obligations through the end of the lease term.

7          THE COURT:  Okay.  Well I think your lease is

8  unaffected by the sale.  So I'll overrule the objection.

9          MS. TANCREDI:  Thank you.

10          MR. SAMIS:  Thank you, Your Honor.  I think that

11  takes us through all of the objections that are resolved, and

12  leaves us with Yucaipa's item at DD and the response at GG.

13          THE COURT:  So we're back to the original group,

14  which is fine.  It is what it is.  Is there a procedure at this

15  point?  Do we go to evidence then?  Okay.  Let's do that.  Mr.

16  Stearn, good morning, or good afternoon.

17          MR. STEARN:  Good afternoon, Your Honor.  May it

18  please the Court, Bob Stearn from Richards Layton and Finger on

19  behalf of the Debtors.  And we are prepared to, as you

20  mentioned, to proceed to the evidentiary portion of our

21  presentation.  And with the Court's permission, I'll commence

22  with the proffer of Mr. Antinelli's testimony.

23          THE COURT:  Any objection to the proffer?

24          MR. KLYMAN:  No, Your Honor.

25          THE COURT:  Okay.

Page 36

1        MR. STEARN:  Your Honor, Mr. Antinelli -- if called

2   to testify, Stephen J. Antinelli would testify as follows.  Mr.

3   Antinelli is a managing director of Rothschild, Inc. which is

4   an investment banking firm with two principal lines of

5   business, M&A and Restructuring.  Rothschild was retained as

6   financial advisor and investment banker to the Debtors.  Mr.

7   Antinelli holds a Bachelor of Science degree in mathematics and

8   economics from the University of Notre Dame, and an MBA, excuse

9   me, MBA in finance and accounting from Boston College.  He

10  began his career in the U.S. Air Force, transitioned to the

11  financial services industry, and ultimately focused on

12  restructuring advisory and investment banking work.

13        Mr. Antinelli's commercial career started at Ernst

14  and Young where he was actively involved in both middle market

15  M&A and restructuring advisory services.  Mr. Antinelli left

16  Ernst and Young to assist in the founding of Conway, Del Genio,

17  Gries and Co. where he continued to perform services in M&A and

18  restructuring for approximately 12 years.  Mr. Antinelli left

19  Conway Del Genio in 2009 to join Rothschild as a managing

20  director in its debt advisory and restructuring group.

21        Mr. Antinelli has more than 18 years of experience

22  advising both healthy and distressed companies.  He has led or

23  been actively involved in a number section 363 sale

24  transactions including Converse, Milacron, Veritrans Specialty

25  Vehicles Group, Life Care Holdings and Molven Mills (phonetic).

Page 37

1    Mr. Antinelli was qualified as an expert in section 363 sales

2    at the June 19, 2013 hearing in this case.

3            After being engaged by the Debtors in the spring of

4    2012, Rothschild began a vigorous sale process.  Among other

5    things, Rothschild worked with the Debtors to develop a

6    confidential information memorandum, data room and acceptable

7    confidentiality agreement.  Rothschild contacted approximately

8    100 potential purchasers consisting of both financial and

9    strategic buyers.  Ultimately the sale process bogged down

10   during 2012 due to disputes among the Debtors' first lien

11   lenders.  Although Rothschild never stopped speaking with

12   potential purchasers, the sale process recommenced in earnest

13   during June of 2013 at approximately the time that the Court

14   entered the bid procedures order.  Rothschild thereafter

15   contacted more than 50 potential purchasers including any party

16   that previously showed an interest as well as new potential

17   purchasers such as private equity firms and liquidators.

18   Approximately 40 parties executed confidentiality agreements

19   and more than 25 entered the data room.  No potential purchaser

20   was barred from conducting due diligence.  Throughout the sale

21   process Rothschild made clear that it would entertain bids

22   either for substantially all of the Debtors assets or for

23   individual assets.  Ultimately Your Honor the Debtors received

24   six bids by the August 8, 2013 bid deadline.  Two bids were

25   deemed by the Debtors to be qualified bids -- a $95 million

Page 38

1    cash bid from Jack Cooper Holdings, and a cash bid of up to $50

2    million from New Allied Acquisition Company which was owned by

3    the petitioning creditors in their individual capacities and

4    not as requisite lender.

5              The Debtors also received four bids for specific

6    assets which were deemed to be non-qualified bids.  One of the

7    nonqualified bidders offered to purchase three parcels of land

8    for an amount less than the Debtors believed those parcels to

9    be worth based on prior appraisals and previous offers.  Of the

10   two qualified bids, the Debtors determined that the Jack Cooper

11   bid was the highest and best bid.  The Debtors so notified the

12   parties in advance of the auction.  The nonqualified bidders

13   were invited to attend the auction as well.

14             Your Honor, on August 14 and 15, the Debtors

15   conducted an auction for the sale of their assets.  At the

16   commencement of the auction, the Debtors confirmed that the $95

17   million cash bid submitted by Jack Cooper was the opening bid.

18   The Debtors then invited further bidding.  After conducting an

19   auction for two full days, both of which went late into the

20   evening, the Debtors declared New Allied to be the winning

21   bidder.  Acting as designee of the requisite lenders, New

22   Allied submitted a bid of $105 million which included a

23   substantial cash component to satisfy among other things, the

24   Debtors DIP facility and wind down budget.  The Debtors

25   declared New Allied's bid highest and best only after Jack

Page 39

1    Cooper stated on the record that it would submit no further

2    bids at the auction.

3            Although the auction had concluded, Your Honor, the

4    Debtors remained committed to maximizing the value of their

5    assets and continued to communicate with the petitioning

6    creditors, Jack Cooper, the creditors committee, and Yucaipa in

7    an effort to maximize value.  Jack Cooper submitted a revised

8    bid on Friday, September 6th, 2013.  The headline purchase

9    price of Jack Cooper's revised bid was $135 million,

10   approximately 30 percent higher than the final New Allied bid

11   submitted at the auction.  As the Court is aware, ultimately

12   the auction was reopened to allow the Debtors to consider Jack

13   Cooper's revised bid.  Once again, the nonqualified bidders

14   were invited to attend the auction.

15           On September 11 and 12, the Debtors conducted the

16   reconvened auction.  At the commencement of the reconvened

17   auction, the Debtors declared Jack Cooper's $135 million bid

18   highest and best and invited further bidding.  After two days

19   of bidding, including substantial discussion and negotiation

20   off the record, the Debtors determined that two separate bids

21   submitted by Jack Cooper and an entity that will be formed by

22   the co-administrative agents under the Debtors' first lien

23   credit agreement, which entity I will refer to as Acquisition

24   Co, constituted the highest and best bids for the Debtors'

25   assets.  Together these complimentary bids provide for a sale

1      of substantially all the Debtors assets and the Acquisition Co

2      transaction provides incremental material value to the Debtors'

3      estates.  Additionally, although the two transactions are not

4      conditioned upon each other, the Debtors' support of the

5      complimentary sale to Acquisition Co was necessary to obtain

6      the requisite lenders' consent to the release of their liens in

7      connection with the Jack Cooper transaction.

8              Your Honor, Jack Cooper's bid provides for the

9      purchase of most of the Debtors' assets for $135 million

10     consisting of $125 million in cash and $10 million in notes to

11     be issued by Jack Cooper.  Excluded assets includes certain

12     real estate as well as 50 trailers colloquially, I've never

13     been able to pronounce that word, otherwise referred to as

14     lowboys.  Acquisition Co bid provides for the acquisition of

15     the excluded assets for a credit bid of $5 million and

16     additional consideration to be provided after the assets are

17     disposed of or appraised by Acquisition Co.  Upon the

18     subsequent disposal of the excluded assets, the Debtors'

19     estates will receive additional debt relief in the amount of

20     net proceeds realized above the initial $5 million up front

21     credit bid.  For each asset sold the Debtors will receive

22     advance notice of the terms of the asset sale, information

23     concerning the means by which the sale was conducted and

24     disclosure of whether the sale was made to an affiliate or

25     insider of Acquisition Co.  For any excluded assets which have

Page 41

1   not been sold within six months of the closing date,

2   Acquisition Co will provide an appraisal of the fair market

3   value of the asset and the Debtors will receive additional

4   claim reduction based on the appraisal, less carrying cost and

5   related expenses that exceed revenues generated by the asset.

6   If there are any disputes regarding the sales or appraisals

7   including whether they reflect fair market value, the Debtors

8   may raise those disputes in the Bankruptcy Court.

9          Your Honor, because the first lien lenders have liens

10  on the excluded assets, in Mr. Antinelli's view, it is

11  appropriate to permit Acquisition Co to market and sell those

12  assets.  He is not aware of any reason why this process would

13  not result in maximization of the value of the excluded assets

14  and thus maximization of the amount of the claim reduction.

15         Additionally, Your Honor, the Debtors' ability to

16  come back to the Bankruptcy Court should a dispute arise over

17  the proposed claim reduction should help to ensure that the

18  Debtors are able to maximize the value of the claim reduction

19  which from the Debtors' perspective is akin to receiving cash

20  for these assets.

21         In Mr. Antinelli's opinion, Your Honor, the Debtors

22  conducted an open and fair sales process for their assets.

23  Rothschild contacted numerous potential purchasers and

24  interested parties were given every opportunity to conduct due

25  diligence.  Rothschild actively solicited indications of

Page 42

1    interest in bids.  Based on his participation in the sale

2    process, Mr. Antinelli believes that both successful bidders

3    have acted in good faith and he is not aware of any improper

4    collusion by either bidder or the Debtors.  In Mr. Antinelli's

5    opinion, the sale to Jack Cooper and Acquisition Co is the

6    highest and best transaction available to the Debtors' assets.

7    Your Honor, that concludes Mr. Antinelli's proffer.

8              THE COURT:  Very good.  Thank you.  Cross?

9              MR. KLYMAN:  Briefly, Your Honor.

10             THE COURT:  All right, Mr. Antinelli, please take the

11   stand.  And just remain standing while we have the affirmation.

12             STEPHEN ANTINELLI, WITNESS, SWORN

13             THE CLERK:  Please state and spell your name for the

14   record.

15             THE WITNESS:  Stephen J. Antinelli; S-t-e-p-h-e-n,

16   middle initial J as in John, J-o-h-n; Antinelli, A-n-t-i-n-e-l-

17   l-i.

18             THE CLERK:  Thank you.

19             THE COURT:  Just real quick; thank you, sir, you can

20   step down.  I just make it clear on the issue with the landlord

21   that I am holding the Debtor to its statement that it is not

22   seeking to assign or extend the term of that lease without the

23   express consent of the landlord, so that's clear.

24             UNIDENTIFIED:  That's fine, Your Honor.

25             THE COURT:  Okay.

Page 43

1          MR. HARRIS:  And, Your Honor, if I may, just before

2    Mr. Klyman gets started; Adam Harris from Schulte Roth & Zabel

3    on behalf for the requisite lenders.  Your Honor, we had --

4          THE COURT:  You need to be on the mike, Mr. Harris,

5    I'm sorry.

6          MR. HARRIS:  I'm sorry.  We had filed a motion to

7    strike, rely on the terms of the third amendment to the credit

8    agreement.  I'm happy to allow Mr. Klyman to elicit testimony

9    from Mr. Antinelli, but it's not, it's without prejudice to the

10   argument we are probably going to present at some point --

11         THE COURT:  I understand your argument.

12         MR. HARRIS:  Thank you.

13         THE COURT:  You're welcome.  Mr. Klyman, you may

14   proceed.

15         MR. KLYMAN:  Thank you, Your Honor.  For the record,

16   Robert Klyman of Latham Watkins LLP on behalf of Yucaipa.

17   BY MR. KLYMAN:

18   Q.  Good afternoon, Mr. Antinelli.

19   A.  Afternoon.

20   Q.  You're familiar with the bid made by Black Diamond and

21   Spectrum as agents that's been referred to as the new

22   acquisition purchase?

23   A.  Yes.

24   Q.  And you're familiar that that's for six parcels of real

25   property that are in the Dacula, Merrysville, Midland, Texas,

Page 44

1    Dearborn, London, and Windsor?

2    A.   Yes.

3    Q.   And also for the 50 so-called lowboy trailers, correct?

4    A.   Yes.

5    Q.   And new acquisition, the vehicle that's purchasing these

6    assets, first submitted their bid for the assets during the

7    continued auction on September 11 or 12, correct?

8    A.   Yes.

9    Q.   And that bid was made verbally and not in writing, correct?

10   A.   Yes.

11   Q.   And during the auction there were no written documents

12   submitted in connection with that bid, correct?

13   A.   Correct.

14   Q.   You're familiar with the bid procedures that were approved

15   by this Court in connection with this sale of substantially all

16   the assets of the Debtors, correct?

17   A.   Yes.

18   Q.   And those bid procedures contemplated a going concern sale

19   of the Debtors' assets, correct?

20   A.   Either going concern or the ability to match bids.

21   Q.   Prior to September 11th the Debtors did not specifically

22   market any of these six properties for sale, did they?

23   A.   Well we marketed the entire business or all the assets of

24   the Debtor and we specifically had, I think, roughly 15 or 16

25   bidders that were non-going concern bidders, but we didn't

Page 45

1  separately market them as parcels.

2  Q.  So just to be clear, you didn't go to any potential bidder

3  and say what will you pay for a parcel at 1500 Winder Highway

4  in Dacula, Georgia, correct?

5  A.  That is correct.

6  Q.  And your answer would be the same for the other six parcels

7  that are being sold pursuant to the sale for the Newco

8  Acquisition vehicle, correct?

9  A.  That is correct.

10  Q.  You heard Mr. Stearn in your proffer that the Debtors had

11  received a bid for three estate parcels, two of which were

12  included in the list of assets that are being sold to Newco

13  Acquisition, correct?

14  A.  Correct.

15  Q.  And what was the purchase price for those three assets?

16  A.  The purchase price is an initial bid for $5 million dollars

17  as part of a credit bid.

18  Q.  I'm sorry, I think we, it was [indiscernible] of that

19  question on my part.  This third party bidder who bid for three

20  assets, what was the offer that they made in terms of a

21  purchase price?

22  A.  I believe it was $4.5 million dollars.

23  Q.  The requisite lender and the first lien agents agreed to

24  release their lien with respect to the Jack Cooper bid

25  regardless of whether or not the Newco Acquisition bid was

Page 46

1    approved by the Court, correct?

2    A.   I think it's important to draw a distinction in the

3    settlement discussions and hours at the auction, particularly

4    in the second day.  And I believe it's on the record that the

5    way we got to that settlement was while legally not a lawyer,

6    but technically the bids are not linked.  So you're technically

7    correct.  But the way we got to the table with a global

8    solution was that we were going to pursue these together to get

9    them approved as a transaction.  One was important.  They were

10   negotiated together.  They're legally not connected via

11   documentation.

12   Q.   So if the Court approves the Jack Cooper transaction, but

13   does not approve the Newco Acquisition transaction, the Jack

14   Cooper transaction can still close, correct?

15   A.   That is correct.  That's my understanding.

16   Q.   Are you an expert in selling individual parcels of real

17   property?

18   A.   I am not.

19   Q.   When was the first time you saw the written documentation

20   for the Newco Acquisition bid?

21   A.   I don't know exactly the day, but sometime over the last

22   couple of days, over the weekend.

23   Q.   Did you first get it yesterday?

24   A.   I don't believe it was yesterday.  We had discussions

25   around documentation for the last several days.

Page 47

1          MR. KLYMAN:  Nothing further, Your Honor.

2          THE COURT:  Any other cross?  Mr. Harris?

3          MR. HARRIS:  Just a couple quick questions, Your

4    Honor; thank you.

5    BY MR. HARRIS:

6    Q.  Mr. Antinelli, on behalf of the estates you worked with

7    Black Diamond and Spectrum in their capacities both as

8    requisite lenders and individually to negotiate several asset

9    purchase agreements, isn't that correct?

10   A.  That's correct.

11   Q.  We, in fact, we did one back in May that was presented to

12   the Court?

13   A.  Yes.

14   Q.  And we did another one subsequent to the first round of the

15   auction in July or August?

16   A.  In August yes.

17   Q.  Right.  And do you have an understanding of how the current

18   asset purchase agreement that was filed with the Court relative

19   to the acquisition code bid relates to the prior asset purchase

20   agreements you seen?

21   A.  Yeah the current documentation was baseline from that bid

22   and then amended to reflect the purchase of the specific assets

23   we're discussing.

24   Q.  And, in fact, it's simply the old agreement substantially

25   paired back which is why it's got about 400 references

Page 48

1    intentionally omitted in it?

2    A.  Correct.

3    Q.  So we could actually compare apples to apples, isn't that

4    right?

5    A.  Yes.

6    Q.  Okay.  And under the bid procedures was it the case that

7    the requisite lenders could submit bids at or any time prior to

8    the auction?

9    A.  [indiscernible].

10   Q.  And with respect to the testimony you gave regarding the

11   negotiation of the overall transaction, that was designed in

12   large part to reach the type of consensual resolution that we

13   have here today for the most part other than the objection by

14   Yucaipa, isn't that right?

15   A.  Yes that is correct.

16   Q.  And to avoid the number of objections that were filed by,

17   amongst others, [indiscernible], some of the pension plans,

18   etc.?

19   A.  That's correct.

20   Q.  And in your view the economic outcome of the two

21   transaction, at least in the minds of the requisite lenders,

22   were we're tied together even though, if not, "legally tied,"

23   as you suggested, is that right?

24   A.  Correct.

25        MR. HARRIS:  I have nothing further, Your Honor.

Page 49

1    THE COURT:  Mr. Klyman, that was really in the nature

2    of expanded direct, so I'll allow Mr. Klyman.

3    MR. KLYMAN:  Thank you, Your Honor; for the record

4    Robert Klyman of Latham Watkins on behalf of Yucaipa.

5    BY MR. KLYMAN:

6    Q.  The Debtor has appraisals for the six properties that are

7    identified as being sold to Newco Acquisition, correct?

8    A.  Dated appraisals, yes.

9    Q.  And those appraisals in the aggregate exceed $5 million

10   dollars, don't they?

11   A.  That's correct.

12   Q.  By a significant number, correct?

13   A.  I don't recall the exact number, but yeah I believe there

14   to be a material difference.

15   Q.  Do you have a signed version of the Newco Acquisition

16   vehicle dated?

17   A.  I don't know if it is signed.

18   Q.  You haven't seen the signed one?

19   A.  I didn't look at the signature page.

20   Q.  All right and do you have one that has all of the schedules

21   attached because the one that we received has, at least,

22   Schedule B missing.

23   A.  I did not go through all the schedules, you know, the

24   properties.

25   MR. KLYMAN:  That's it, Your Honor.

Page 50

1          THE COURT:  Thank you.  Mr. Stearn, redirect?

2          MR. STEARN:  Just a few questions, Your Honor.

3   BY MR. STEARN:

4   Q.  Just to address a few questions that my friend Mr. Klyman

5   asked you, Mr. Antinelli.  Among other things, Mr. Klyman asked

6   you whether you had received any written documentation of the

7   bid made by what I refer to as acquisition co during your

8   proffer and you answered, but regardless of whether you

9   received written documentation of that bid during the auction,

10  did you understand the bid?

11  A.  Yes.

12  Q.  And was that bid, in fact, presented by -- well why did you

13  understand the bid?

14  A.  I thought it was well articulated at the auction.

15  Q.  By whom?

16  A.  And heavily negotiated by the parties.

17  Q.  And you asked the question about the bid procedures

18  including whether, I suppose, written documentation was

19  required to be presented at the auction.  Did you have an

20  understanding at the auction as to whether or not any of the

21  bid procedures could be waived by the Debtors?

22  A.  Yes.  I think it's in our discretion if we think it

23  furthers the goals of the auction.

24  Q.  Was the requirement of written documentation being

25  presented at the auction one of the waivable requirements?

1    A.  I believe it was.

2    Q.  You were also asked some questions about whether or not the

3    assets that are being sold to, again the company that I refer

4    to acquisition co during your proffer, were separately

5    marketed.  I want to focus on a slightly different question.

6    We talked in your proffer about the process that's been agreed

7    to for the marketing of those assets.  Mr. Antinelli, in your

8    opinion have the Debtors agreed to a process that is likely to

9    result in a maximization of the value of the excluded assets?

10   A.  Yes.

11   Q.  And why do you believe that?

12   A.  During the auction, we do have all the appraisals of these

13   properties.  It was clearly --

14          THE COURT:  I'm sorry, how old are they?

15          THE WITNESS:  2006.

16          THE COURT:  Okay.

17   BY MR. STEARN:

18   A.  And there was some debate at the auction about utilizing

19   those numbers or other means to get to a number that we could

20   agree on and have a firm price.  The Debtors actually thought

21   it was more prudent to take an approach to set up a process

22   that would provide the Debtor and other parties with what was

23   described in my testimony as a process in which we would

24   understand how the sale was conducted.  We would understand if

25   there were affiliate transactions and we would have the ability

Page 52

1   to raise concerns over receiving or not fair market value, and

2   we could bring those concerns to the Court.  And we thought

3   this would ensure getting fair market value for those

4   properties.

5          MR. STEARN:  One moment please, Your Honor.

6          THE COURT:  Yes, okay.

7          MR. STEARN:  Nothing further, Your Honor.

8          THE COURT:  I do have a question.  I'm trying to find

9   it in the documents.

10         MR. STEARN:  Can we assist Your Honor in any way?

11         THE COURT:  Well I'm looking for, I'd like to know

12   where the properties are; their location.

13         MR. HARRIS:  Your Honor, [indiscernible] scheduled

14   the asset purchase agreement right following the signature

15   pages, lists all the properties.

16         THE COURT:  Okay give me a sec.

17         MR. STEARN:  What he said, Your Honor.

18         THE COURT:  That's romanette 24?

19         MR. STEARN:  Your Honor, if I may just hand you a

20   copy of the schedule.

21         THE COURT:  Yes.  Thank you, I appreciate that.  I

22   assume these are commercial properties?  Well are they

23   industrial properties or are they --

24         THE WITNESS:  It's actually a mix.  We think the one

25   of most interest would be the Windsor property which has been

Page 53

1   rezoned and is in a fairly successful redeveloped area.

2           MR. STEARN:  Your Honor, can I hand a copy of the

3   schedule to the witness?

4           THE COURT:  Yes.

5           MR. STEARN:  Yes.

6           THE WITNESS:  The other property I'd say significant

7   value is the Dearborn property which is currently operating

8   property, industrial.

9           THE COURT:  Is it operating industrial property?

10          THE WITNESS:   Yes.

11          THE COURT:  And the Windsor property is a former

12  commercial?

13          THE WITNESS:  And then recently my understanding it

14  was rezoned and that's one of the properties I referenced that

15  we had both dated appraisals.  We've also had at different

16  points in time offers for that property.

17          THE COURT:  Where approximately associated to

18  [indiscernible] Dacula, [indiscernible] and the [indiscernible]

19  properties?

20          THE WITNESS:  I don't know that, Your Honor.

21          UNIDENTIFIED:  I think my friend Mr. Kelley might be

22  able to --

23          MR. KELLEY:  Your Honor, as a resident of the Atlanta

24  area, Jeff Kelley.  Dacula is in the greater metropolitan

25  Atlanta area, probably 30 miles from downtown.

Page 54

1          THE COURT:  Thank you.  I have no further questions;

2    follow-up?

3          MR. STEARN:  I have no follow up, Your Honor.

4          THE COURT:  Thank you; you may step down, sir.

5          THE WITNESS:  Thank you.

6          THE COURT:  Yes, Mr. Kelley.

7          MR. KELLEY:  Yes, Your Honor, for the record Jeff

8    Kelley for the Debtors.  At this time, I would like to present

9    a much shorter proffer of John Blount who is here in the Court.

10         THE COURT:  Any objections?

11         MR. KLYMAN:  No, Your Honor.

12         THE COURT:  All right we can proceed.

13         MR. KELLEY:  Your Honor, if called to testify John

14   Blount who is present in the Courtroom today would testify as

15   to follows.  He is and for several years has been the chief

16   administrative officer and general counsel of the Debtors,

17   among other titles.  He also is and for several years has

18   served as the secretary to the Debtors' board of directors and,

19   thus, secretary to the special committee of the board of

20   directors.

21         For purposes of the Debtors' sale process leading to

22   today's sale hearing, the Allied board has delegated decision

23   making and approval to a special committee of two non-Yucaipa

24   directors.  The two members of the special committee are Brian

25   Cullen and Mark Gendregske.  Brian Cullen, who is based in Los

1    Angeles is the head of global restructuring of Duff & Phelps.

2    Mr. Gendregske, as the Court is aware, is the CEO of the

3    Debtors.  Mr. Gendregske attended all four days of the auction

4    and Mr. Cullen was consulted frequently by phone.

5         Mr. Blount would further testify that filing the

6    submission at the auction of the two bids before the Court

7    today, a meeting of the special committee was convened and that

8    the special committee unanimously approved the two bids before

9    the Court today as the successful bids at the auction.  Mr.

10   Blount would further testify that he believes it is a valid

11   exercise of the Debtors' business judgment as reflected by the

12   special committee decision to submit these two successful bids

13   to the Court for approval.

14        He would testify that this has been a long and

15   difficult process for the Debtors with much risk and that the

16   Debtors believe that the approval of the successful bids will

17   allow the businesses of the Debtors to emerge as going concerns

18   with a large percentage, I should say, of the jobs preserved.

19   Your Honor, that concludes Mr. Blount's proffer.

20        THE COURT:  Any cross?  Yes.  Please state.

21        MR. KLYMAN:  Yes, Your Honor, just a couple

22   questions.

23        THE COURT:  Very good; that's fine.  Please take the

24   stand, sir.

25        JOHN BLOUNT, DEBTORS' WITNESS, SWORN

Page 56

1          THE CLERK:  Please state and spell your name for the

2     record?

3          THE WITNESS:  John Freeman Blount; J-o-h-n, F-r-e-e-

4     m-a-n, B-l-o-u-n-t.

5          THE CLERK:  Thank you.

6     BY MR. KLYMAN:

7     Q.  Good afternoon, Mr. Blount.

8     A.  Good afternoon.

9     Q.  When the special committee met and approved the two offers

10    that are before the Court today, the special committee

11    understood that the Court could approve the Jack Cooper

12    transaction without also approving the new Allied Acquisition

13    Company acquisition, correct?

14    A.  I believe that's correct, yes.  The special committee

15    understood that they were sort of a global solution, but not

16    technically legally linked.

17    Q.  And when was the last time the special committee met where

18    they approved the two transactions?

19    A.  I'd have to look at a calendar; the last day of the

20    auction.

21    Q.  And at the time that the special committee approved both

22    transactions the special committee did not have written

23    documentation that was executed and fully described the new

24    Allied Acquisition purchase of the real property and lowboy's

25    correct?

Page 57

1   A.   That's correct.

2   Q.   So when the special committee met and approved the bid,

3   they were approving what was recited in terms of purchase price

4   and mechanic for a true up if there wasn't a sale or if the

5   sale wasn't an adequate price, correct?

6   A.   The participants in the auction described the proposed sale

7   to the special committee members, one of whom, of course, was

8   present in the auction himself and that's what they approved

9   without executed written documents.   There were draft documents

10  that they had seen previously that I think the previous

11  testimony reflected that were similar to the documents that we

12  have today, but the finalized documents were not done at that

13  time.

14  Q.   Thank you.

15       MR. KLYMAN:   No further questions.

16       THE COURT:   Mr. Harris?

17       MR. HARRIS:   Thank you, Your Honor.

18  BY MR. HARRIS:

19  Q.   Mr. Blount, have you had an opportunity to review the draft

20  form of asset purchase agreement with respect to the

21  acquisition co purchase of the excluded assets or assets real

22  estate; however you want to refer to them?

23  A.   Yes.

24  Q.   And is there anything that's in that document that is in

25  any way inconsistent with your understanding of what the bid

Page 58

1    was at the time it was made at the auction?

2    A.   No.

3            MR. HARRIS:   Thank you, Your Honor.

4            THE COURT:   Mr. Klyman?

5            MR. KLYMAN:   Thank you, Your Honor.

6    BY MR. KLYMAN:

7    Q.   Did the special committee make any decision that it was

8    important how the equity of New Allied Acquisition was

9    distributed?

10   A.   As I sit here today I don't recall a discussion of that

11   topic.

12   Q.   Thank you.

13           THE COURT:   Mr. Kelley?

14           MR. KELLEY:   I have nothing further of the witness,

15   Your Honor.

16           THE COURT:   Okay, thank you.   You may step down, sir.

17   Any further evidence from the Debtor?

18           MR. KELLEY:   No, Your Honor.

19           THE COURT:   Okay anyone else or any evidence that's

20   going to be submitted?   Okay I hear none.   And I

21   [indiscernible] and how should we proceed.

22           MR. KELLEY:   Your Honor, I think we're left with one

23   [indiscernible] objection that needs to be argued, the

24   objection by Yucaipa.   I believe that Mr. Harris might have

25   something to say about that before we get started with the

1   actual objection, with respect to his motion to strike.

2           THE COURT:  Aside from that my understanding is

3   [indiscernible] itself for a minute, but that the Jack Cooper

4   sale is still not fully baked and that there are exchanges of

5   language still going on, is that correct?

6           MR. KELLEY:  There's a little bit of further

7   documentation.  I think we're very close.

8           THE COURT:  There's just an agreement in principle.

9   It's a chance, just the issue working it out?

10          MR. KELLEY:  Yes.

11          THE COURT:  Okay so when we take a break, you're

12  going to deal with that in the interim.

13          MR. KELLEY:  Yes.

14          THE COURT:  And then I want to come back and present

15  that to the Court today, I assume?

16          MR. KELLEY:  Yes, Your Honor.

17          THE COURT:  Okay.

18          MR. KLYMAN:  Your Honor?

19          THE COURT:  Yes.

20          MR. KLYMAN:  In terms of scheduling, the argument that

21  Yucaipa has I don't think will take more than, you know, five

22  or ten minutes, max.

23          THE COURT:  All right, let's go into it then.  Mr.

24  Harris, did you wish -- should we just hear from --

25          MR. HARRIS:  Your Honor, pursuant to the order Your

Page 60

1    Honor entered denying various motions to shorten -- well about

2    10 days ago I guess it was -- Your Honor indicated that the

3    issues that were presented in some of those motions including

4    our motions to strike the Yucaipa objection would be heard at

5    the hearing.  If Your Honor is inclined to do so I believe now

6    would be the appropriate time to address that prior to Mr.

7    Klyman's comments or if Your Honor would like to do it in a

8    different way, we're happy to accommodate however Your Honor

9    would like to proceed.

10            THE COURT:  I want to hear from Mr. Klyman first.

11            MR. HARRIS:  Thank you, Your Honor.

12            MR. KLYMAN:  Thank you, Your Honor; for the record

13    Robert Klyman of Latham Watkins on behalf of Yucaipa.  Your

14    Honor, the Debtor bears the burden to show that with respect to

15    the properties and assets that are being sold to New Allied

16    Acquisition that they adequately marketed them for sale and

17    that they carried their burden of obtaining the highest and

18    best price.

19            The Debtors, as fiduciaries, have an obligation to

20    maximize the value to the estate.  The undisputed evidence is

21    that the Debtor did not individually market these assets for

22    sale; that they received an offer that they deemed an

23    unqualified bid from a third party for three parcels; two of

24    which are included in the sale that's before Your Honor.

25            Mr. Antinelli who testified that he's not an expert

Page 61

1    in real estate, in individual sales of real estate, so he

2    cannot testify as to how and whether and what is the best way

3    to market those assets.  And he was the one who was the primary

4    negotiator with New Allied Acquisition about the mechanics and

5    true [indiscernible] for the fact.  Your Honor, further there's

6    no urgency to jam this sale through today.  The outside date

7    under the documents as a closing condition is December 31,

8    2013, which is set forth in Section 3.4(b).

9            Although there's a long lead time to close and

10   marketing the assets presumably could take place well before

11   November, and we could have a sale hearing at that point where

12   presumably the highest and best prices will come forward, Black

13   Diamond/Spectrum and New Allied Acquisition dumped their sale

14   documents on Yucaipa last night when I was in the air.  They

15   filed their sale order 45 minutes before the hearing was

16   scheduled to start today, and we have not yet fully reviewed

17   it.  I certainly have not had an opportunity to talk to my

18   client about it.

19            But there are some high points that we wanted to

20   identify for Your Honor.  The first is they seek an order with

21   respect to these asset sales that determine how the proceeds

22   and equity of New Allied Acquisition are going to be

23   distributed to first lien lenders.  And they fixed those rights

24   under an order which for this Court says shall, shall, shall be

25   done the following way including allocating to Yucaipa equity

Page 62

1    of New Allied Acquisition that shall never be voting.  That's

2    regardless of any outcome of litigation about Yucaipa's right

3    under the first lien creditor agreement including an appeal

4    before the New York State Appellate Court which is scheduled to

5    be heard next month.

6              The first lien credit agreement provides for ratable

7    sharing of any proceeds of collateral.  And they seek a Court

8    order approving allocations to Yucaipa that are disparate from

9    other lenders, regardless of the outcome of any litigation or

10   claims with respect to Yucaipa's claim.  They want to provide

11   Yucaipa with non-voting stock.  There's no submission of any

12   documentation reflecting the ownership organization, voting

13   rights, mechanics for distributions of proceeds if there is a

14   sale, nothing.  It's just a blank.

15             We don't have it, you don't have, the Debtor doesn't

16   have it.  And the Court should not be forced to approve this

17   sort of sale on a truncated timeline when there's a long lead

18   time.  The process that Mr. Antinelli's proffer described for a

19   true-up of the sale invites future litigation.  Basically,

20   they're saying Black Diamond and Spectrum are going to engineer

21   a credit bid for $5 million dollars.  They know based on

22   existing appraisals, their own views of the property, and an

23   offer that came in that was deemed a disqualified bidder that

24   the value is going to be higher.  Yet, they as fiduciaries are

25   giving the right to market the assets for sale to a non-

1    fiduciary duty holder.

2          And their remedy is if they in their non-expert

3    opinion believe that the sale price was not adequate based on

4    no standards that have been presented to Your Honor, they can

5    come in and object or Yucaipa can come in and object.  The way

6    to minimize those future disputes is to have the Debtor as a

7    fiduciary, do a 30 to 45 day marketing process and see what

8    comes in.  Cash to lenders is better than a credit bid and a

9    promise to market the assets for sale later.  The Debtor, I

10   understand, is agnostic.  Credit bid, cash, whatever.  But

11   inviting future disputes is not the way to resolve this.

12         So, Your Honor, we believe that the sale should be

13   run by state fiduciaries after adequately marketing.  They

14   haven't identified any urgency to get it done today.  And we

15   believe that there's ample time to have adequate marketing

16   which should moot out the whole process objection; in addition,

17   as set forth in prior offers for the purchase of assets by

18   Black Diamond and Spectrum.

19         Black Diamond and Spectrum have a creative way of

20   structuring transactions to give themselves fees and benefits

21   that are not available to other lenders.  We should not have to

22   have a Court order which blesses them having the ability to do

23   that particularly with the state assets and what distributions

24   that should be made for the benefit of creditors either through

25   an escrow or through the Debtors and not left solely in the

Page 64

1    hands of Black Diamond and Spectrum after the fact.  Thank you,

2    Your Honor.

3          THE COURT:  You're welcome.  [indiscernible] of what

4    Mr. Klyman just addressed --

5          MR. HARRIS:  Certainly, Your Honor --

6          THE COURT:  And I think it's two pieces not to put

7    Mr. words and it's sort of the substance of actually selling, I

8    guess, the procedure about how its selling, how much the

9    property has been marketed, how it's going to be sold.  And

10   then the next piece might be the use, if you will, of proceeds

11   or some of those types of issues that are, perhaps, raised in

12   the form of order.

13         MR. HARRIS:  Let me --

14         THE COURT:  You do it the way you want to do it.

15         MR. HARRIS:  Well let me address both of those, Your

16   Honor.  I actually thought Mr. Klyman was going to get up here

17   and argue about the stuff that's in his objection about the

18   authority of the agent to bid through sub-agents and things

19   like that; none of which he actually said.  So I don't know if

20   he's just dropping those issues and moving onto the sale as an

21   appropriate substantively or whether he's still keeping those

22   alive.  But let me address Your Honor's concerns because I

23   think that the concern that Mr. Klyman raised is really can be

24   addressed in a fairly straightforward manner.

25         And I want to start, Your Honor, with one basic

Page 65

1    principle which is if -- my clients have been called a lot of

2    things in this case.  The one characterization, I think, that

3    clearly everybody would agree with --

4            THE COURT:  I think Yucaipa would say the same.

5            MR. HARRIS:  That's true, Your Honor.  But if nothing

6    else, the clients here are economically motivated.  And a

7    suggestion that by having the properties transferred to the

8    secured lenders, I should say, plural, all of them, pro rata,

9    an entity that is formed for the benefit of taking over those

10   pieces of collateral and monetizing them, we think is a way to

11   maximize value as determined by the first lien agents and

12   requisite lenders in the first lien credit agreement for the

13   benefit of everybody; business decision that they will make in

14   which they're empowered to make under the terms of the credit

15   agreements to which we're all parties.  While at the same time,

16   Your Honor, relieving the estate of the obligation of having

17   people responsible for this, paying costs and expenses of the

18   properties which they have to finance under either a DIP

19   financing or some other cash collateral use and running a

20   process as to which they have no interest in the outcome save

21   one, which is getting the maximum amount of debt relief at the

22   end of the day in terms of debt reduction on the first lien

23   debt.

24           There's no value here for anybody else.  Nobody has

25   raised an argument that somehow these properties are going to

1   sell for an amount when taken in conjunction with JCT is going

2   to result in potential dollars coming back to other creditors

3   of the estate.  So the only people impacted by any of this,

4   Your Honor, are the first lien lenders.  The mechanic we've set

5   up and have agreed to with the company is not a recipe for

6   litigation.  We're economically motivated to maximize the

7   values that are recovered on these properties.  And as we do

8   that during the six month for a six month period, we are going

9   to let the company and the Debtors know in advance the sales

10  that we reach agreement to consummate.  We're going to tell

11  them who the parties are, what the terms are, the means by

12  which bids were solicited for the properties. And if they've

13  got a problem with any of that in terms of what value it

14  generates, they have the ability to come back to Your Honor for

15  recourse relative to the amount of debt that is being forgiven

16  as a result of that transaction.

17         And we were prepared to do that kind of in

18  perpetuity, Your Honor, but at the Debtors' request they said

19  look after six months we're not sure we won't have anybody

20  around to review this stuff anymore.  So we said fine, at the

21  end of six months if it turns out that we haven't sold all the

22  properties in that period of time, which we may or may not.  I

23  can't stand here today and tell you how long it's going to take

24  to modify these properties.  But if we haven't, we'll do an

25  appraisal by an independent recognized either broker or

Page 67

1   appraiser in the geographic area in which the property is

2   located.  We will provide it to you.  We will show you what our

3   carry cost in the property have been and what income we've

4   generated from it.  And we'll give you debt relief based on

5   that at that point in time and then we'll be done.

6           It is, I guess, hypothetically possible that the

7   Debtors, even in their current state, could find a buyer who

8   would pay more for the property then we'll find.  But I

9   suspect, Your Honor, if you took up Mr. Klyman on his offer

10  they'd go out, they'd hire a bunch of brokers in local areas,

11  and the broker would come back with whoever they came back

12  with.  If they're doing it in a shortened time period without

13  the benefit of a long term marketing person, I don't think that

14  that actually maximizes value for the benefit of the lenders or

15  maximizes, frankly, the debt relief the company will get as a

16  result of a more orderly and efficient process run by the

17  people who actually most economically motivated to get the

18  highest price.

19          So in terms of the process, Your Honor, I think that

20  the way we've structured this transaction benefits the estate

21  in multiple ways.  They don't have to worry about these

22  properties anymore.  And, no, we don't intend to wait around

23  for December 31st to close this deal.  We just set that as the

24  outside date, but we intend to close it actually substantially

25  earlier than that.  It gets one more issue off the Debtors'

Page 68

1   plate.  It cuts off their obligation to fund costs and expenses

2   and, at the same time, puts in the hands of those most

3   economically motivated to maximize recoveries for themselves

4   the ability to figure out what the best way to do that is.

5          And, Your Honor, frankly, what we structured here is

6   not much different than if we had simply gone into the Debtors

7   and said let's do a stipulation for relief from stay relative

8   to these properties because we have an undisputed lien, the

9   value is substantially in excess of the value of the

10  properties.  And, obviously, they're not necessary for an

11  effective reorganization at this point.  And under those

12  circumstances, Your Honor, we'd be in, essentially, the same

13  place without going through the, you know, necessarily the

14  concept of a 363.  Here, we did it in the context of an auction

15  which already existed through a set of procedures the Court had

16  already approved and pursuant to a set of documents that the

17  company effectively had already seen and, ultimately, is

18  comfortable with.

19         And just to, I know it's a side issue, Your Honor,

20  but just to address the issue on the schedules.  The schedules

21  haven't been done yet because they're a subset of the broader

22  schedules we did for the operating company transaction.  They

23  just need to be [indiscernible] out to the -- the disclosure

24  schedules relative to these particular assets because of the

25  timing of the auction and the intervening, obviously, very

Page 69

1    important Jewish holiday.  We just haven't had time to pull

2    that together.  We did get the asset purchase agreement

3    together, obviously, and the parties are all comfortable with

4    that.

5             But once we did, we set up this purchase or entity,

6    Your Honor.  We did set it up in a way where the initial equity

7    that's going to be distributed is going to be pro rata to every

8    lender in the first lien credit agreement.  The non-voting for

9    Yucaipa's piece, Your Honor, we think tracks the requirements

10   of the third amendment.  They don't get to vote under the third

11   amendment.  This is effectively a continuing exercise of lender

12   rights relative to their collateral simply through an

13   alternative vehicle and, therefore, we did not think it would

14   be appropriate for them to have voting rights.

15            Similar to the escrow provisions that Mr. Klyman has

16   agreed to relative to the JCT, his equity in the entity will

17   also be reserved, but it will benefit to the extent of any

18   sales, transfers, distributions, just like everybody else's

19   equity, so he's not going to be disadvantaged in any way, shape

20   or form as a result of that.  And, Your Honor, once we set that

21   vehicle up, it will be governed by its own terms.  And what we

22   have said and you can see in the direction and designation

23   agreement we filed a form of, to the extent it needs new

24   capital to pay taxes, pay utilities, pay security, pay other

25   things, everybody will have an opportunity to participate in

Page 70

1   that capital raise pro rata as well.

2          So, you know, I don't see what the disadvantage is

3   here.  Obviously, it's going to need money.  My clients have

4   offered to backstop that money raised on market terms.  We'll

5   figure it out, Your Honor, but the bottom line is this is a

6   secured creditor through their requisite lender and agents

7   effectively asking to turn over the collateral to the party

8   most economically motivated to maximize value for it.  And

9   we're doing it through an entity similar to the way the other

10  agent would do.

11          THE COURT:  Okay.

12          MR. HARRIS:  Thank you.

13          THE COURT:  Thank you.  Mr. Kelley, I don't know if

14  you had any comment?

15          MR. KELLEY:  Your Honor, I know you got a 1:00

16  hearing; just real briefly.  With respect to the process issue,

17  we agree with Mr. Harris's statement.  The Debtors agree to

18  this process as a way of, frankly, to get the very contentious

19  auction process concluded.  We think it's a fair process that

20  will lead to fair value for the estate.  And for the reasons

21  that Mr. Harris stated, we support, you know, we support that

22  aspect of the Black Diamond transaction.  The other issues are

23  intercreditor issues and we'll leave that to argument between

24  Black Diamond and Yucaipa.

25          THE COURT:  Mr. Burke?  Take your time; go ahead.

Page 71

1          MR. BURKE:  Thank you, Your Honor.  Your Honor, I

2     just don't want this day to be lost between continued Yucaipa

3     and Black Diamond bickering.  This is a very important day and

4     it's actually a great day because we have the sale of the

5     company on a going concern, the preservation of over a 1,000

6     jobs, and at a price that was substantially different than what

7     was achieved at the August auction.

8          Again, through Your Honor's good graces and reopening

9     the auction, the sale price went from $105 to $135 for the Jack

10    Cooper assets, and then at least $5 on the supplemental

11    transaction.  Value has greatly been enhanced.  And if I can

12    bring everyone back a short while ago, there was a few months

13    ago there was serious concerns whether this company would

14    liquidate.  And those concerns were raised by Your Honor,

15    possibly appointing a Chapter 11 Trustee and what have you.

16    But through the Debtors' professionals, I would think in some

17    point guided or assisted by the committee the Debtor was able

18    to achieve a sale here for substantial value.  They did

19    maximize value to the estate.  And, importantly, there's a sale

20    of the company as a going concern.

21          So it is a result that I don't think any of us

22    honestly could have sat here two, three months ago and thought

23    we could have achieved.  In sum, Your Honor, the committee

24    supports both the Jack Cooper sale and similarly the

25    supplemental sale to Black Diamond.  I just want to say that

Page 72

1    while they're not, and Mr. Klyman is correct, they're not

2    contingent upon one another, and Your Honor is free to just

3    approve the Jack Cooper sale.  This was part of a global

4    solution.  And the committee was made comfortable by the what I

5    call the safety mechanism at the end.  Yes, the $5 million

6    dollar credit bid isn't necessarily reflective of what the

7    market value of those assets are.  But after those assets are

8    marketed and sold or there is an appraisal, there will be

9    future debt forgiveness.  So the market for an appraisal will

10   determine what the ultimate bid is.  So the bid is not $5

11   million.  It's $5 million plus.  And then, again, when we add

12   that to the results it's in excess of 140 and a much better

13   result than the August auction of 105.

14            Lastly, Your Honor, and I think this is also an

15   important item to point out; there is now an end in sight to

16   this Chapter 11 case.  While there will still be litigation

17   between Yucaipa and Black Diamond, we can see the exit to this

18   Chapter 11 case rather shortly.  We're going to have a sale of

19   substantially all of the assets to Jack Cooper which will

20   close, hopefully, relatively shortly and then the case will be

21   over.  That's important to the committee.  The sale is a going

22   concern.  The continued employment, creditors getting cure

23   costs, suppliers having a contract party.  This is a great

24   result from the committee's perspective, and we urge you to

25   approve the Jack Cooper transaction.  And, again, we also

Page 73

1    support the supplemental transaction to Jack Cooper.  The

2    auction was fair and open, and the Debtors' professionals did a

3    remarkable job in a very difficult situation.  Thank you.

4         THE COURT:  Thank you.  Mr. Austin, some words and

5    then I'll turn it over to Mr. Klyman.

6         MR. AUSTIN:  Thank you, Your Honor, Jess Austin again

7    on behalf of Jack Cooper.  Certainly, my client is not trying

8    to get involved in the fight that appears to be long going and

9    may continue as between Black Diamond and Spectrum on the one

10   end and Yucaipa on the other.  But we do want to buy the

11   designated assets from this Debtor.

12        Everyone seems to be in agreement that that's a good

13   idea and we would note that on the close of the auction or the

14   end of the auction that led to this overall transaction, Your

15   Honor, we explicitly read into the record those assets that

16   were not being acquired by Jack Cooper and would be acquired

17   under what you might call the supplemental bid.  And the

18   schedules of the asset purchase agreement clearly reflected

19   that when they were presented to the Debtor in connection with

20   our final asset purchase agreement on September the 12th.

21        The bottom-line from my client's standpoint, Your

22   Honor, is that we do need approval for the sale.  We certainly

23   are looking for verbal approval of sale to Jack Cooper today to

24   be followed by entry of and presentment of the final written

25   order.  I stand here to say whatever this Court may do with

Page 74

1    respect to the supplemental sale to the Black Diamond/Spectrum

2    designated entity, we ask that it not delay or, otherwise,

3    impact this Court's approval of the sale to Jack Cooper.  We do

4    need and to make sure that Black Diamond and Spectrum

5    individually and as requisite lenders are consenting to the

6    sale to Jack Cooper and will direct the agents for the DIP loan

7    and the first lien credit facility to release their liens and

8    claims [indiscernible] and in interest to those assets being

9    acquired.

10            There was a comment made, I believe, in their

11   response to the Yucaipa objections that their consent to the

12   transaction might have some conditions to it, and I just want

13   to be clarified that we're not given to an issue there.  But

14   bottom-line with Jack Cooper having been deemed the successful

15   bidder for the assets it wanted and the price acceptable to all

16   and with the objection resolved, we would ask the Court and

17   want to make sure that whatever this noise is that the sale of

18   the designated assets to Jack Cooper is not lost.  And that our

19   transaction, at least, go forward for the $135 million dollars

20   which we're proposing.

21            We do have a clock ticking on the Jack Cooper.  It

22   does have a December 31 end date and unlike others, my client

23   will have to go through Hart-Scott-Rodino approval so we need

24   to get that underway as soon as possible.  We really cannot

25   start that until we get the sale order entered.

Page 75

1          THE COURT:  Okay.

2          MR. AUSTIN:  Thank you.

3          THE COURT:  Mr. Klyman, you get the last word here.

4          MR. KLYMAN:  Thank you, Your Honor.  Your Honor, the

5    bid that's being put before you is not as Mr. Harris described

6    like a relief from stay in foreclosure.  They are trying to

7    have this Court pre-ordain the ownership structure and the

8    voting structure with respect to their acquisition vehicle.  We

9    appreciate Mr. Harris's statement that the stock and proceeds

10   of any sale will be put into the same escrow that we described

11   in connection with the Jack Cooper bid, but the provisions of

12   the order that say Yucaipa shall here and forever after not

13   have voting rights are not appropriate here.  And they can deal

14   [indiscernible] any future litigation or appeal that are

15   pending.

16          In addition, I appreciate that Mr. Harris said that

17   ever lender will be treated on a pro rata basis in connection

18   with any increased financing.  I just note that in prior offers

19   for financing in connection with their Black Diamond and

20   Spectrum were taking a 10% backstop fee.  That's also not

21   something that Your Honor should pre-ordain.

22          And, Your Honor, again, we stand on the fact that the

23   Debtors are in the best position to market this.  They have the

24   same incentive to market this for sale as they did the Jack

25   Cooper bid as opposed to just turning it over to Black Diamond

Page 76

1    and letting them run the auction process.  Thank you.

2         THE COURT:  Thank you.  Okay I will --

3         MR. STARK:  Your Honor, I have just a very brief

4    statement about the special committee if I could make it.

5         THE COURT:  Yes.

6         MR. STARK:  I'll be very, very brief.  Your Honor,

7    after the conclusion of the first two day of the auction before

8    we started again with the second two days, there was some

9    pleadings that were filed that had some unflattering

10   characteristics that were ascribed to management and Debtor

11   professionals in connection with the way the first two days

12   were handled.  And the special committee, although Mr.

13   Gendregske was not part of the crafting of the statements for

14   today, has asked me just to put on the record and, otherwise,

15   inform the Court that the special committee closely observed

16   all four days of the auction; vehemently disagrees with the

17   characterizations that were made.

18         We did, in fact, by written delegation of authority

19   hand off to management and to Debtor professionals the actual

20   running of the auction so the special committee did not at

21   every interim and interval step make decisions.  They reserved

22   only the right to determine the ultimate conclusion.  They did

23   observe very carefully what transpired on all four days believe

24   rather than a sham transaction or some of the other colorful

25   characterizations.  The people that were involved Mr.

Page 77

1    Gendregske the CEO, Mr. Blount the GC, Mr. McCulley the CFO, as

2    well as professionals Mr. Antinelli, Mr. Cullen and Mr. Kelley

3    and their respective teams worked extremely hard, were very

4    patient and careful and deliberative in their process,

5    skillful, and tried very hard with a lot of backbone to push

6    back on pressure from all directions.  So the special committee

7    would like Your Honor to know that.  And, frankly, let the

8    record reflect that from their perspective.  Thank you.

9            THE COURT:  I understand your client has his

10   position.  People start getting too sensitive in this case

11   that's their sale 12 months ago.  All right, let's deal with

12   the substance.

13            First of all, with the Jack Cooper sale obviously the

14   evidence is overwhelming that the Jack Cooper sale is the

15   highest and best bid.  The marketing process was more than

16   adequate.  Two rounds of bidding, four full days of auction

17   brought forth what clearly is a superior transaction.  And I'm

18   more than happy to approve the sale of the Jack Cooper

19   transaction subject, of course, to working out the remaining

20   points in the sale order which do not sound to be overly

21   significant.

22            So I don't think I have to say anything more than

23   that in that as soon as they get an order that people have

24   agreed with is marked to show changes from the last version,

25   I'll be happy to look at it and probably, overwhelmingly

Page 78

1    probably sign it as quickly as possible.  The [indiscernible]

2    asset sale I review it as sort of two pieces.  One, I view it

3    as to the marketing and substance of how the transaction has

4    been proposed which includes, of course, the post-sale,

5    marketing, and the true-up or additional consideration that

6    have been provided to the Debtor in the form or debt relief

7    [indiscernible] sales would have more than $5 million dollars

8    and approved higher than $5 million dollars.

9            I think that the second piece, how the acquisition of

10   the escrow is going to be structured, and how that impacts

11   Yucaipa.  And the first point I believe and have seen that the

12   marketing process for these real property I think this has been

13   more than adequate.  It has been included in a company that has

14   been marketed for over two years.  It has been urgently

15   marketed throughout the summer.  Whether or not held out on an

16   [indiscernible], they were part of the transaction offer that,

17   excuse me, the assets offered.  And they also proffered that in

18   a way that piecemeal bids could be considered.

19           I don't there -- this is a question of urgency.  I

20   think that there's a question following through the marketing

21   process that's been in place for quite some time.  And I don't

22   think that any further marketing it will require or be likely

23   to provide any additional consideration at least in the short

24   term that would make any sense and or administrative expense

25   process this case.  So I'll overrule the objection on the

Page 79

1    marketing process.  In addition, however, I'll overrule the

2    objection to the deal that provides for the six months to sale,

3    the true-up.  If there is no sale, the appraiser, true-up, I

4    find that perfectly appropriate, and I don't have a problem

5    with it in the context of this sale or case.

6         I haven't had an opportunity to really crawl through

7    the APA or the order with regard to how the acquisition

8    vehicle, the stock, etc. might affect Yucaipa.  So at this

9    point, I'm not in a position to deal with that piece.  And what

10   I'm going to want is some time to actually look at the order

11   that was filed right before the hearing, allow Mr. Klyman to

12   look through the order.  And I think when we reconvene, if we

13   reconvene, later today perhaps we can deal with it at that

14   time.  If we reconvene later, that's not today, which God

15   forbid we do, but I guess it depends on where people end up,

16   we'll deal with it at that time.  But that little piece I'm

17   just, well not little, but that piece I'm not in a position to

18   make a ruling on as I stand here today.

19        In connection with the motion to strike, I think at

20   this point it's moot for everything that I have approved.  The

21   point it's an open issue.  It's an open issue solely with

22   regard to the language and the provisions that we just

23   discussed.  And to close with where Mr. Burke started, I think

24   it is a significant event in this Debtors' history.  And it is

25   highly -- it's been a very difficult case and I'm not going to

Page 80

1    cast dispersions on anyone.  It's been a difficult case.  And

2    my concern and I'm sure it's a concern for the Debtor and

3    everyone else is that we were going to lose value to the

4    Debtors' estate as a result of the disputes between the various

5    creditor bodies and that the business was going to die on the

6    vine without some path forward, and I've heard that from the

7    Debtors for months and months and months and, of course, it's

8    true.

9            So I'm very pleased that we've been able to separate

10   out, if you will, the business piece of the Chapter 11 from the

11   litigation or the Creditor/Debtor issues that are associated

12   with the case.  And allowed the substance of the Debtors'

13   business to go forward, albeit under new management and

14   ownership, but with as Mr. Burke pointed out the preservation

15   of over a 1000 jobs, and a business that has a potential for a

16   bright future.

17           This might be a strong a case as I can think of for

18   why sometimes 263 asset sales make a lot of sense so it really

19   made sense in this case.  So I'm glad that we've had this

20   result.  I am prepared to sign the Jack Cooper order as soon as

21   I get it.  I'll overrule the objection in connection with the

22   excluded asset sale as I stated leaving open the open issue as

23   described.  And, hopefully, I'll have an opportunity -- well

24   let's do this, let's reconvene at 3:30 here and, Mr. Klyman --

25   here we go.

1        MR. KLYMAN:  Your Honor, that would be fine.  I have

2    a flight to catch, but I can push it back, if needed.  It seems

3    to me that we could work on the order.  If we don't reach a

4    resolution, we can either submit competing orders and you can

5    rule or we can have a telephonic hearing if we're not able to

6    come in right at 3:30.

7        THE COURT:  On this open issue?

8        MR. KLYMAN:  Yes, Your Honor.

9        THE COURT:  Why don't you guys talk about that

10   between now and 3:30.

11       MR. KLYMAN:  Okay, thank you, Your Honor.

12       THE COURT:  Okay.  Hopefully, I'll be able to have an

13   order to sign Jack Cooper.  If not, we'll have a path forward

14   for that and we can touch base at 3:30 about how we go forward.

15   I'd be okay with competing submissions if that's what the

16   parties want to do, but I want everyone to have an opportunity

17   to, you know, chew on that and see where we are.  Okay.  All

18   right, we're adjourned until 3:30 and I have other people

19   coming so if you could please clean up the area.

20       (Recess 1:24 PM to 1:44 PM)

21       THE CLERK:  All rise.

22       THE COURT:  Please be seated.

23       MR. HARRIS:  Good afternoon, Your Honor, Adam Harris

24   from Schulte Roth & Zabel on behalf of the Acquisition Co.,

25   Black Diamond and Spectrum.  Your Honor, during the break in

Page 82

1    addition to working on the order for JCT deal which I believe

2    is still in process and hopefully will be here shortly.

3         We sought to engage with Yucaipa to try and resolve

4    the remaining issues that Your Honor left outstanding this

5    morning, relating to the issue on what I thought was, voting

6    rights relative to their involvement in the equity of the

7    Acquisition Company that they would be receiving on account of

8    their putative ownership of first lien obligations.

9         We started to try and have a conversation about that,

10   Your Honor, but we met with basically a request to delete the

11   entirety of Section I of the proposed form of order that was

12   filed.  I don't know if Your Honor has a copy, but maybe I can

13   hand one up to you to follow along with my comments.

14        THE COURT:  I think I have it right here.  Hang on.

15   Yeah, I have it right here.

16        MR. HARRIS:  So if Your Honor would indulge me in

17   terms of paragraph I which I believe begins on page 7.  You can

18   see that that provision deals with a whole lot more then voting

19   rights.

20        In affect it parallels the provision which the

21   parties including Yucaipa have agreed would be inserted in the

22   JCT order that basically says that the equity, in that case

23   cash, this case equity that you would otherwise be entitled to

24   is going to be set aside and reserved pending a determination

25   of  your ultimate entitlement.  And if you're entitled to it

Page 83

1    you get it and if you're not entitled to it, it gets cancelled.

2            Then it goes onto talk about the fact that at the

3    very end that in the event that they, whatever stock they

4    ultimately do get since they're a restricted sponsor affiliate

5    and restricted in voting by virtue of the Third Amendment would

6    be non-voting.

7            We heard Mr. Klyman's comment this morning during his

8    argument about how that seemed unfair and failed to take

9    account of a possibility that subsequent Court orders and

10   ongoing litigation could reverse or modify the status quo to a

11   point where, a Court in New York for instance, could conclude

12   that maybe the Fourth Amendment was not invalid, and therefore,

13   resurrecting the prospect of them having voting rights at the

14   end of whatever litigation occurred.

15           So we prepared a modification to the order that would

16   address that issue, which if I may, Your Honor, I'd like to

17   hand up.

18           THE COURT:  Yes.

19           MR. KLYMAN:  Excuse me, Your Honor, just for the

20   record that has not been agreed to by Yucaipa.

21           THE COURT:  I understand.  Thank you.

22           MR. HARRIS:  So, Your Honor, what we did is we

23   modified the order in a manner that would, we thought take

24   account of the issue that had been raised this morning by

25   basically providing that the non-voting interest would receive

Page 84

1    when we close this deal, would basically have voting rights in

2    the event and to the extent that a Court of competent

3    jurisdiction, effectively, subsequently entered a final order

4    saying that they either were not restricted or were not subject

5    to the original restriction, and the Third Amendment or

6    whatever.  So whatever that Court ultimately determines in

7    terms of what their voting rights would have been or should

8    have been would effectively then dictate what their voting

9    rights would be in our new entity.

10           We also had a couple other changes, Your Honor, that

11   don't go to that particular issue.  We tried to discuss it with

12   Mr. Klyman.  We advised him that we did not believe that

13   anything in this order while his equity was in reserve if you

14   will would affect any obligation that he board of managers,

15   board of directors, managing members, responsibilities to their

16   membership interest including the ones to which they had a

17   contingent right.

18           So we are not looking to modify those obligations

19   pursuant to this order.  Whatever State Law requires in terms

20   of the responsibilities of a manager or board of directors

21   would be applicable, but to their interest, even if they are in

22   reserve as well as everybody else's.  And we were hopeful that

23   that would reserve the issue, but apparently it has not.

24           So with that, Your Honor, we think that the order is

25   appropriate, does appropriately deal with the issues relative

Page 85

1    to Yucaipa's disputed status both as a Lender, and as to

2    amount, and as to potential subordination.  Similar to what we

3    see in a disputed claims reserve.  And for those reasons

4    believe that with this change which is acceptable to my clients

5    that we've adequately addressed.  And we'd ask Your Honor to

6    enter that order.

7          We're happy to argue some of the other merits, Your

8    Honor, that were raised in the objection, but I think that's

9    what's really on the table at this moment.

10         THE COURT:  Okay, thank you.  Mr. Klyman.

11         MR. KLYMAN:  Thank you, Your Honor, for the record

12   Robert Klyman of Latham & Watkins on behalf of Yucaipa.  Your

13   Honor, through this order Black Diamond and Spectrum are

14   seeking a ruling from this Court that deals with purely State

15   Law issues and governance of the Purchaser Act for the closing

16   of the transaction.

17         It's one thing for an asset purchase agreement to say

18   the purchaser, you know, is hereby authorized to consummate the

19   transaction.  It's quite another for the Bankruptcy Court to

20   set out the parameters of how non-Debtors are going to operate

21   after the fact based on equity that's being issued by a non-

22   Debtor to other non-Debtors.

23         We've got other issues in terms of ratable sharing

24   and how we're being treated, but for purposes of this issue,

25   Your Honor, the LLC and operating agreement, and other LLC

Page 86

1    documents that govern rights of the parties are not before you.

2    They haven't been filed.  We haven't even seen them.  They

3    could, you know, their position right now is that we're non-

4    voting until we get an order that's final and not appealable

5    from another Court that says that we as a first lien Lender can

6    vote.

7            Well there are several problems with that.  The first

8    of it is as I mentioned paragraph I should just be stricken in

9    its entirety.  However the purchaser is going to be governed

10   after will be governed by applicable State Law, not by an order

11   of the Bankruptcy Court.

12           Second, their rights with respect to findings under

13   the first lien Creditor agreement with respect to Yucaipa's

14   rights are not final orders.  So they're on appeal.  So for

15   them to try and have a standard hire here in terms of what our

16   rights are then what their living with seems unfair and beyond

17   the scope of what should be approved in a 363 sale.

18           Third, their position is that we should only have

19   voting rights to the extent a Court of competent jurisdiction

20   finds that we had voting rights under the first lien Creditor

21   agreement.  Well in fact the first lien Creditor agreement says

22   that, arguably says that, we are restricted in our capacity as

23   a Lender.  Well, three or four months from now when we have

24   equity we're not going to be in our capacity as the Lender.  We

25   are going to be in our capacity as an equity holder.  And the

Page 87

1   interpretation of the first lien Creditor agreement on that

2   point and what our rights are after our debt is converted into

3   equity is not an issue that should be determined in the context

4   of a 363 sale.

5          Mr. Harris's offer that during the pendency of this

6   period where we don't have voting rights the managers and the

7   LLC will be governed by applicable State Law, you know, we

8   agree with that.  And there should be no restrictions on that

9   set forth in this order.  But it's only with respect to the

10  duties and obligations that the members have.

11         If after the fact we have the ability under State Law

12  to vote out the members or replace them because they are

13  selling assets to an affiliate or once the six month period

14  ends where the Debtor has the ability to review transactions

15  they're doing a below market transaction to an affiliate or

16  they're borrowing money from them in order to allow them to

17  foreclose on assets to our detriment, or they're having a

18  rights offering which gives them a 10 percent fee like under

19  their last proposal to this Court.

20         We want to be able to have rights as equity holders

21  to vote out management as necessary and as appropriate.  And in

22  fact right now, as I mentioned, we don't even have the LLC

23  agreement.  So it's sort of hard to prejudge what rights we are

24  going to need as equity holders.  On the backend we don't even

25  have the governing documents right now.

Page 88

1          There are other issues associated with the order,

2    Your Honor.  One is on page 6, paragraph 4, about the

3    designation of credit rights to purchaser.  There is language

4    in three places about how this Court is finding that the

5    Requisite Lenders dually appointed the agents to do certain

6    things.  That is not evidence that's before Your Honor.

7          We would also in Paragraph J, and K, and elsewhere

8    where the purchaser is providing written notice to counsel for

9    the Debtors and the Committee, we would want Yucaipa inserted

10   there as well.  On paragraph 7 at page 21, that's the

11   injunction provision.  We would want an expressed finding that

12   nothing in that provision would impact Yucaipa's rights against

13   the purchaser with respect to governance or any other matter.

14         Then we would also strike the last sentence at

15   paragraph 17, where it provides that the Court shall retain

16   non-exclusive jurisdiction with respect to the reserved equity

17   interest which would be in paragraph I, which if paragraph I is

18   struck would not be applicable to begin with.

19         So in sum, Your Honor, this is an attempt by Black

20   Diamond and Spectrum to prejudice Yucaipa's post sale rights as

21   an equity holder under applicable State Law.  We think if

22   that's going to be an issue it should just be determined if and

23   when applicable by a State Court and not be prejudged by an

24   order of this Court.

25         THE COURT:  Okay.

Page 89

1          MR. KLYMAN:  Thank you.

2          MR. HARRIS:  Your Honor, a couple different things.

3   First of all, the last few things that Mr. Klyman just alluded

4   to, is the first I've heard of it.  So I didn't get those

5   comments before I walked in here this afternoon; although, I

6   will note that his reference to there being no evidence about

7   the purchaser being dually designated is just simply incorrect.

8          We did file the direction of designation notice, Your

9   Honor, which a copy of which is really an inter Lender document

10  where the requisite Lenders did direct and appoint the

11  administrative agents to basically go forward with the credit

12  bid and dually authorize the purchaser to act in there instead.

13         So I think the findings here are fully consistent

14  with that piece of information that has been filed with the

15  Court.  And we can have that submitted as an exhibit, Your

16  Honor.  I think the Debtors have seen it and we have executed

17  copies here to the extent anybody wants to see the executed

18  copies.

19         As to the core question Mr. Klyman raised, getting

20  him notices, I don't really mind giving him notices.  But going

21  to the core question, Mr. Klyman's client has a claim against

22  the Debtors' estates.  This Court has jurisdiction over the

23  treatment of that claim and is entitlement to receive

24  distributions out of the estate.

25         And as a result of that similar to what we've done

Page 90

1    with the funds that are coming through on the JCT sale, Your

2    Honor, it is perfectly appropriate to have that distribution if

3    you will reserved such that it preserves for the benefit of the

4    other Creditors of the estate, in this case they were the first

5    lien Lenders, the opportunity to fully resolve the issues

6    relative to their claim, and determine whether they are

7    entitled to receive any distributions or exercise any rights

8    before they go off and start doing it.

9           Here Mr. Klyman affectively wants to take the

10    position that notwithstanding his claim is disputed or

11    potentially subject to subordination or potentially subject to

12    disallowance that he should have the full voting rights as if

13    it were fully allowed.  And there is no plan I've ever seen

14    which would actually provide him with those rights were this to

15    be for instance a distribution under a plan of reorganization.

16           His equity would all be reserved and held back by the

17    Debtors and the disputed claims reserved.  And it would either

18    not be considered outstanding for voting purposes or it would

19    be deemed to have voted in proportion to the outstanding actual

20    equity that had been issued to other Creditors holding allowed

21    claims.  So the mechanics that we've set up here, Your Honor,

22    are entirely consistent with what this Court sees day in and

23    day out with respect to treatment of disputed Creditors.

24           And I just have to say, Your Honor, and I'm not going

25    to go down the same path as some earlier people who came to

1   this podium, but the fact of the matter is since we have

2   managed to the affect wrest control of this credit facility

3   from Yucaipa and get clarity on it, we have done a fairly good

4   job of moving this case forward and trying to bring it to the

5   resolution that's here today, and manage to bring back to the

6   Creditors here values that were not available had we not been

7   in that position, Your Honor.

8           I think that, you know, but for the credit bid that

9   we put in which engendered a lot of animosity towards my

10  client, frankly, both publicly and privately, people were ready

11  to sell these assets for $100 million dollars four weeks ago.

12  And today we stand here having sold them for substantially more

13  than that; just looking at the considerations coming from JCT,

14  and not even taking into account the additional value that's

15  embedded in the excluded assets which is going to be available

16  for the benefit of the first lien Lenders.

17          So as I said earlier, we have a serious economic

18  motivation here.  We've done an extraordinary job so far.  We

19  understand our obligations under State Law to the equity

20  holders of the entity that we will likely be managing.  And we

21  intend to abide by those, but we think that the treatment

22  Yucaipa's claim is not only appropriate, but it's appropriate

23  for this Court to in fact sanction it under the terms of this

24  order as it would with respect to treatment of any disputed

25  claim in the context of a plan.

Page 92

1          Thank you, Your Honor.  If you have any questions,

2     I'd be happy to answer them.  Thanks.

3          MR. KLYMAN:  Your Honor, just briefly in response.

4     In our objection, Your Honor, we had indicated that the

5     distribution of proceeds with respect to these excluded assets

6     or the equity with respect thereto should be done through a

7     plan, through a liquidating plan to give us precisely the

8     protections and issues that Mr. Harris has raised when he says

9     if this was only done through a plan X, Y and Z would happen.

10          They chose to not follow our objection and go forward

11     with a sale.  And the Court's jurisdiction with respect to the

12     purchaser should end when the purchaser consummates the

13     transaction.  How equity gets allocated, who gets to vote,

14     whether or not we need a Court order which says our first lien

15     debt is valid and we're entitled to vote or whether or not we

16     can get a Court subsequently to say now that you hold equity

17     and you're not a Lender you can vote.  That is for another day

18     and hopefully not before this Court.

19          Secondly, Your Honor, although the purchase price did

20     go up considerably over the last month the proposal that was

21     made by Black Diamond and Spectrum had material issues

22     involving the unfair treatment of Yucaipa in a post sale

23     structure.  And we objected every step of the way.  And we

24     would have continued to object under the radical sharing

25     provisions and other aspects of the credit agreement had the

Page 93

1    Black Diamond, Spectrum bid been the prevailing bid.

2         So while it's true that the price went up, I'm not

3    sure that everyone would agree that the structure that Black

4    Diamond and Spectrum put together was unobjectionable.  Thank

5    you.

6         THE COURT:  Okay.

7         MR. HARRIS:  Your Honor, I don't want to waste your

8    time, but I just want to point out there are a couple other

9    very small changes in here that I wanted to bring to your

10   attention.

11        THE COURT:  Let's do that.

12        MR. HARRIS:  Okay, the first, Your Honor, is simply

13   on the first page in footnote 2.  You can see that we just put

14   in here that we attached a copy of the asset purchase agreement

15   in substantially final form.  So that is just a reference.

16        The second, Your Honor, is on page 5, again this is

17   just, I'm looking at the blackline by the way.  These are just

18   references to the docket entry numbers for the dockets that

19   were filed yesterday and the form of order from this morning.

20        THE COURT:  Yup.

21        MR. HARRIS:  The one on page 9, we already brought to

22   Your Honor's attention.  This is the provided however language

23   relative to the voting issue.  Then the last, Your Honor, is on

24   page 18, which simply address the way the hearing has been

25   conducted and the ruling Your Honor may choose to make relative

Page 94

1  to the conduct of the hearing and Yucaipa's objections.

2         THE COURT:  Okay, Mr. Klyman, can I get your comments

3  other than the big comment of --

4         MR. KLYMAN:  Sure, before we do, Your Honor, one

5  point on Mr. Harris's last change.  We didn't waive any of our

6  objections.  You had our papers.  We chose to streamline our

7  argument a certain way, but we certainly didn't waive any of

8  our arguments.

9         THE COURT:  I don't think you waived anything.  I

10 hear you on that.

11        MR. KLYMAN:  The first comment, Your Honor, this is

12 not on their blackline.  This is on the order that was filed.

13 It's on page 6, paragraph F4.  There are three references in

14 that paragraph.

15        THE COURT:  Dually.

16        MR. KLYMAN:  Dually, we would strike that.  Paragraph

17 I we talked about paragraph J and K.  There are references to

18 prompt written notice being provided to counsel for the Debtors

19 and the Committee.  We would want Yucaipa out of there as well.

20 I believe Mr. Harris had no objection to that.

21        THE COURT:  That was in.

22        MR. KLYMAN:  J and K.

23        THE COURT:  I see it in J, oh, I see it.  Yes, okay.

24        MR. KLYMAN:  On page 18, paragraph 3, on approval.  I

25 guess I would ask Mr. Harris because I'm not entirely clear on

Page 95

1     this.  To the extent the agreement and all of the terms and

2     conditions thereto include any restrictions on Yucaipa's

3     ability to vote its equity, we would want a provision in there

4     that says that nothing contained in those agreements would have

5     any impact or limit Yucaipa's exercise of its rights as an

6     equity holder under the purchasers LLC agreement.

7              THE COURT:  I'm sorry.

8              MR. KLYMAN:  This is in paragraph 3 on page 18.

9              THE COURT:  Right, are you looking for language or?

10             MR. HARRIS:  Your Honor, there's nothing in the asset

11    purchase agreement which is what, the other transaction

12    documents per se that deal with the equity issue.  Those are

13    independent of the purchase agreement.

14             MR. KLYMAN:  So long as there is a representation

15    that none of those are impacted by the sale agreement, I'll

16    just move on from this paragraph.

17             MR. HARRIS:  Yeah, they're not in the sale agreement.

18             THE COURT:  Very good.

19             MR. KLYMAN:  Okay.  On page 20, which is paragraph

20    5B, that should just provide that the purchaser is hereby

21    authorized to consummate the transaction.  The rest of it seems

22    to be superfluous since you're approving their sale agreement.

23             THE COURT:  Let me make a note.

24             MR. HARRIS:  Your Honor, this simply implements the

25    designated purchaser concept that we can move things around.

Page 96

1   Obviously, we'd have to come back to Court to deal with

2   counterparties in the event we did that. But we're not, it's

3   not intended if Mr. Klyman is concerned about that we're going

4   to put it outside the corporate structure beyond the ratable

5   sharing of equity of each of the first lien lenders.

6           THE COURT:  At some point I have to have things in

7   here that are necessary to actually formulate the mechanism of

8   a credit bid being the buy, right.  I understand your point on

9   limiting how much I do in connection with how that entity is

10  going to be structured, but some of that has to sort of leech

11  into this order to make it clear that the credit bid actually

12  did occur.

13          MR. KLYMAN:  I understand, Your Honor, we just want

14  to limit, we don't want to go beyond that.

15          THE COURT:  I understand.

16          MR. KLYMAN:  On paragraph 7, on page 21, the last

17  sentence has a notwithstanding the forgoing about the

18  Committees and petitioning Creditors rights to prosecute the

19  Yucaipa litigation, we would something in here where it says

20  nothing contained herein impacts Yucaipa's rights vis-à-vis a

21  purchaser, with respect to any state law issue including the

22  voting of its equity and other corporate governance.

23          THE COURT:  Okay.

24          MR. KLYMAN:  And then on page 29, the last sentence

25  at paragraph 17, we would just strike the last sentence since

1    paragraph I, under our formulation, is being struck.

2              THE COURT:  Which paragraph was that?

3              MR. KLYMAN:  Paragraph 17, it's the carryover on page

4    29.  It's the last sentence.

5              THE COURT:  Yes, I see it.

6              MR. KLYMAN:  And that would be it.

7              THE COURT:  Okay.

8              MR. KLYMAN:  Thank you.

9              THE COURT:  Okay.  What I'm going to do with this is

10   when we take a recess, which we are about to do, as we await

11   the Jack Cooper order I'm going to make a decision on these

12   comments.  And I'll come out and announce them.  Any last

13   words?  Okay, we're in recess.

14       (Recess 4:52 PM to 5:27 PM)

15             THE CLERK:  All rise.

16             THE COURT:  Please be seated.  Every time it

17   dwindles, fewer and fewer people have the stamina.

18             MR. COLLINS:  Your Honor, I don't know if you want to

19   deal with the Jack Cooper order or first finalize the --

20             THE COURT:  Why don't I rule on the [indiscernible]

21   order and then we can turn to Jack Cooper.  I think

22   [indiscernible] argument, the Court has to be involved in an

23   order that sets up the structure by which the transaction

24   occurs, and it's a credit bidding, it's a credit bid under a

25   complicated set of agreements.  And as a result, for integrity

Page 98

1    of the process, there need to be provisions such as how agents

2    are duly appointed underneath the documents.  It's not to

3    overreach into disputes between nondebtors, but to support the

4    integrity of the process.  Having said all that, I find and I

5    think that paragraph I goes too far.  It really is having this

6    Court insert itself into how the entity which is giving the

7    assets under the credit agreement, under the [indiscernible]

8    how that entity then deals with distributing the control,

9    distributing the assets, distributing the equity in that

10   entity.  And that is a, I think an internal issue between two

11   nondebtors.  I stand on that ruling that the requisite lender

12   is Black Diamond and Spectrum, whether other courts will agree

13   on that, whether the appellate court here will agree on some of

14   the rulings, I don't know.  But I do think I goes too far.  So

15   I can run through my comments quickly.  That's the large,

16   obviously the important one.

17         So working off the blackline, page 6, paragraph 4,

18   with all the duly appointed language, that's fine.  I'll allow

19   that.  Striking paragraph I in its entirety.  Let's add in

20   paragraph J and K add Yucaipa as a noticed party.  Page 18,

21   paragraph 2, I think we can just strike that last sentence

22   altogether where it specifies Yucaipa.  And it just says any

23   objections that have not been [indiscernible] settled,

24   continued or otherwise resolved, they're overruled.  I think

25   that covers everyone including Yucaipa.  So strike the last

Page 99

1   sentence.

2           Page 20, paragraph 5(b) there was an issue at the

3   beginning with regard to [indiscernible] I wasn't sure if that

4   got dealt with by the parties speaking to each other or not.

5   Okay.  We can tighten that language up.  I want it to be clear

6   that you have the authority to go through the process, but I'm

7   worried in this I think we may be backdooring paragraph I a

8   little bit.  Okay?

9           The next page 21, the end of paragraph 7, I didn't

10  quite understand what it is you wanted to reserve or make clear

11  was reserved, Mr. Klyman.

12          MR. KLYMAN:  We wanted to provide, Your Honor, that

13  nothing in paragraph 7 affects our state law rights against the

14  purchaser.

15          THE COURT:  Well --

16          MR. KLYMAN:  With respect to any of our distributions

17  or equity.

18          THE COURT:  Right.  It does prejudice in connection

19  with the actual sale.  I mean you couldn't get a collateral

20  attack on it in state court, but --

21          MR. KLYMAN:  Right.  But with respect to the voting

22  rights, equity, any corporate governance.

23          THE COURT:  That should be reserved.  And again

24  tailored appropriately narrowly.

25          Page 29, last line in paragraph 17 is stricken,

Page 100

1    that's the reference to paragraph I.  So subject to those

2    changes and modifications, I'll approve the order.

3           MR. SAMIS:  Your Honor, we'll work with those changes

4    and submit it under certification.

5           THE COURT:  Okay.

6           MR. SAMIS:  Your Honor, for the record, Chris Samis

7    from Richards Layton and Finger on behalf of the debtors.  Your

8    Honor, sometimes I feel like I'm the guy who is in the

9    unenviable position of always jumping up and saying hey,

10   there's one more thing.  But there is just one more --

11          THE COURT:  They didn't give you a chair over there.

12   Come on.

13          MR. SAMIS:  Well, but there is one more thing with

14   respect to this order.  It is paragraph 11.  Your Honor might

15   recall from my recitation of the resolutions of the various

16   responses and objections that I made mentioned of the

17   assumption procedure that was baked into the order with respect

18   to the City of New York and the lease for the Brooklyn Marine

19   Terminal.  And I had indicated during that recitation that we

20   were reaching out, we being the purchasers and the debtors, to

21   the City of New York to see if they had any issue with the

22   procedure that was baked into their paragraph 11.  They

23   responded that the key folks at the City of New York are not

24   going to be around to review the language in the near term.

25   They said that we cannot represent that the language is going

Page 101

1  in on consent.  However, it is the debtors and purchasers

2  position that since this is really just a procedural mechanism

3  that is setting up a 45 day kind of window to have discussions,

4  that we're not really seeking any substantive relief today, and

5  if the paragraph should go in unaltered, I can say that I've

6  spoken with Mr. Hillman and with Mr. Harris and I think they'd

7  be willing to work with the City of New York to the extent that

8  they're not confined to the structure of the language in the

9  paragraph in rote fashion.  But in any event, I think that --

10            THE COURT:  Well, I'm comfortable with the language

11  as it is.  And if they have an issue, they know where the

12  courthouse is and they can come and ask me to do something

13  about it.  But I think it's fine the way it is, and I'm sure

14  Mr. Harris will do his best to cooperate.

15            MR. SAMIS:  Very good, Your Honor.  That was the only

16  --

17            THE COURT:  They had a primary this week, they've got

18  stuff to do.  Or was that last week?  Excuse me.  I'm still

19  busy.  All right.

20            MR. SAMIS:  Thank you, Your Honor.

21            THE COURT:  You're welcome.  Jack Cooper?

22            MR. AUSTIN:  One moment, Your Honor.

23            THE COURT:  Of course.

24            MR. AUSTIN:  Your Honor, may I approach?

25            THE COURT:  Yes.  Thank you.

Page 102

1          MR. AUSTIN:  For the record, I'm Jess Austin on

2    behalf of Jack Cooper Holdings Corp.  Your Honor, what I have

3    given to you is a cumulative blackline which shows the changes,

4    except for a few others I'm going to note in a few minutes, to

5    the form of sale order which was filed with the Jack Cooper

6    asset purchase agreement after it had been deemed to be the

7    successful bidder at the conclusion of the auction on the 12th

8    of September.  What I wanted to do if it's okay with the Court

9    was to quickly go through and basically do a page turn to note

10   to the Court the changes and why those changes came about if I

11   may.

12          THE COURT:  Yes, of course.

13          MR. AUSTIN:  The changes on the first page were

14   really to reflect timing of the hearing and to set up basically

15   ordering of subparagraphs that were coming, or subsections that

16   were coming up on pages 2 and 3 and carrying over to page 4.

17   And then the changes on pages 2 and 3 and 4 are effectively

18   trying to conform definitions and entities as well as to

19   address the nature of certain objections of joinders which were

20   filed in connection with the original sale.  And on page 4 as

21   noted to reference not only the conclusion of the auction that

22   Jack Cooper's bid was deemed highest and best for its purchased

23   assets but the reference to the other, the Black

24   Diamond/Spectrum entity relative to the excluded assets.  Page,

25   changes on page 5 were more of a cleanup type changes in

Page 103

1   subparagraph C as well as subparagraph G.  The same on page 6,

2   same on page 7 to, obviously in paragraph M to reflect the

3   reopened auctions on the designated dates and some further

4   cleanup.

5           The changes going through pages 8 and 9 again I would

6   put in the category of clean up changes as we would proceed.

7   Page 10 was to put in a new subparagraph S dealing with the

8   determination that this Jack Cooper agreement was not a sub

9   rosa chapter 11 plan or to restructure certain rights, fairly

10  standard provision.  Paragraph U was again more of a cleanup,

11  same as going to the changes.

12          On pages 12 and over into 13, paragraph 13 I will

13  address as it relates to subparagraph Z.  There were some

14  various objections that related to potential assumptions or

15  rejections of executory contracts that had been subsequently

16  adjourned not only as it related to the Jack Cooper

17  transaction, but the prior Black Diamond/Spectrum transaction.

18  They have been adjourned subject to that if there's, if we

19  cannot demonstrate obviously the necessary adequate assurance

20  requirements under section 365 to the objector's satisfaction,

21  then we will be back before the Court as may be necessary to

22  address.

23          THE COURT:  Okay.

24          MR. AUSTIN:  Comments on page 14 and 15 again are

25  primarily cleanup.  Turning to pages 16 which carries over to

Page 104

1   17, and this is the probably the biggest substantive, one of

2   the bigger substantive changes.  This deals in paragraph 5, and

3   it says a number of things.

4         THE COURT:  Yes.

5         MR. AUSTIN:  While it restates in, it shows up mainly

6   a lot of changes because it does, this is where after you

7   describe basically the consideration that Jack Cooper is

8   paying, a number of things happen here.  First is Jack Cooper

9   is placed into a deposit, a cash deposit right now of nine and

10  a half million dollars.  If we close and if we at that time

11  substitute the notes that we may issue, and if we don't

12  otherwise come up with the cash for that, then we will place

13  into the escrow account at that time nine and a half million

14  dollars of notes, so that the cash in the escrow can be

15  released as well as $500,000 place amount of the notes can be

16  released effectively in accordance with this agreement.  Those

17  notes then will be held by the escrow holder in the same manner

18  and terms of conditions as a cash deposit.  This paragraph

19  provides that up until the date of closing, the purchaser in

20  this case, Jack Cooper, is entitled to receive all interest

21  accrued on the deposit.  After the closing, interest may accrue

22  on the deposit in whatever form, whether it's, if it's a cash

23  deposit, it's cash, if it happens to be the notes, then the

24  interest that accrues on the notes.  Those earnings and

25  interest will be then allocated at that point pro rata between

Page 105

1   whoever gets the amount of the money out of the good faith

2   escrow deposit.  So for example, you have nine and a half

3   million dollars notes in the account or nine and a half million

4   dollars cash, if based on the purchase price adjustment, $2

5   million of value comes to Jack Cooper and seven and a half

6   million goes to the debtor, Jack Cooper will receive interest

7   on two and a half, two million, and the debtor will receive the

8   interest on seven and a half million.

9           In addition, as the Court may recall, Jack Cooper

10  obtained a right to purchase the notes, but we have agreed that

11  at such time if we actually issue those additional notes, and

12  once those notes are actually then distributed by the debtors,

13  whether its released in escrow or the initial $500,000, then

14  the right of repurchase does not then follow through to those

15  notes.  So that once the debtor issues the notes into basically

16  the marketplace if they either just sell them to third party or

17  if they distribute it in accordance with their distribution

18  rights, our right of purchase then expires.  Just that.

19          And then this paragraph also provides that the

20  debtors will provide to counsel for the prepetition first lien

21  agents notices of the information relating to any net working

22  capital adjustment and will consult with the prepetition first

23  lien agents and agree not to release any funds from escrow to

24  pay any working capital shortfall if there is any without their

25  prior written consent or further order of the Court.  Now,

Page 106

1    there's some, in this paragraph you'll see for example in the

2    last sentence of this paragraph 5, I think the version which

3    you have shows that the debtor shall, one, confer in good

4    faith, confer in good faith is going to be changed and the word

5    consult added.  And there will be struck thereafter any notices

6    or correspondence relating to.  So there will be some

7    additional interlineated handwritten changes there.

8              THE COURT:  So how will they read now?  The debtor

9    shall --

10             MR. AUSTIN:  That sentence will read, the debtor

11   shall (i) consult with the prepetition first lien agents

12   regarding the good faith deposit.

13             THE COURT:  Okay.

14             MR. AUSTIN:  And further up in the paragraph, Your

15   Honor, on page 17 in the third line from the top at the right

16   hand side it says the purchaser notes the release from escrow,

17   there will be handwritten interlineation which will add in

18   after the word escrow, or otherwise released to the prepetition

19   first lien agents.

20             THE COURT:  Got it.

21             MR. AUSTIN:  And then we'll have a couple other small

22   interlineations to deal with in the sentence that talks, the

23   debtor shall promptly provide to counsel the prepetition first

24   lien agents -- it would also be added, and Yucaipa, and it'll

25   say any written notices and the words, or correspondence,

Page 107

1    deleted.

2              THE COURT:  All right.

3              MR. AUSTIN:  Moving on, Your Honor, there's obviously

4    changes because pagination has changed from adding in the

5    amount that we did on paragraph 5 was changed.  19 and

6    paragraph 10, there's cleanup changes.

7              Then we move to paragraph 12.  Paragraph 12 is the

8    major additions that for a practical matter were negotiated

9    between Black Diamond/Spectrum counsel and counsel for Yucaipa

10   and this relates to paragraph 12, 13 and 14 and 15.  And these

11   relate to distribution of proceeds, once we close the

12   transaction, i.e., the cash that comes in, how it's going to be

13   distributed and what have you.

14             THE COURT:  Is all that language agreed to at this

15   point?

16             MR. KLYMAN:  Your Honor, Robert Klyman for Yucaipa.

17   It's all agreed to except some additional interlineations which

18   we've agreed to with Mr. Collins, which he can put on the

19   record.

20             MR. AUSTIN:  I can, if there's some interlineation I

21   can put in the record, Your Honor.

22             THE COURT:  All right, thank you Mr. Austin, thank

23   you.

24             MR. KLYMAN:  Thank you.

25             THE COURT:  I'm not going to pour over it then.

Page 108

1          MR. AUSTIN:  All right.  And I can say that it's a

2    word here or there, you'll see it in the original handwritten

3    in and I can represent to the Court as has been represented to

4    me, that Black Diamond/Spectrum's counsel and Yucaipa's counsel

5    have both agreed to it.

6          On page 25 at paragraph 17, this was really

7    revisions, modifications dealing with the process of ultimately

8    releasing liens.  If we don't actually have obviously a

9    creditor providing a release of liens that would otherwise be

10   released that allows the purchaser and the debtors being

11   authorized to execute the documents necessary to file them of

12   record.

13         Going over on paragraph, on page 27, paragraph 17,

14   because what was otherwise in 17, old 17 was incorporated into

15   the current 17, is why you see that paragraph being struck.

16   The next changes to this order are on page 31, paragraph 33, it

17   was a cleanup relative to upon payment of the purchase price.

18         THE COURT:  Right.  And paragraphs 34 and 35 you'll,

19   the Court will see interlineation of the clause, contractual or

20   statutory obligations the purchaser had or has independent of

21   the sale.  This language was added in at request of both the

22   representatives of the Teamsters as well as Canadian

23   Autoworkers to deal with the fact that Jack Cooper does have

24   separately contractual obligations and potentially under

25   certain Canadian law will have statutory obligations based on

Page 109

1    the nature of our successor in interest status.

2              Page 33, paragraph 37, again was cleanup.  Moving to

3    page 35, we have paragraphs 40, 41 and 42, and 43.  Paragraph

4    41 deals with the objections raised earlier today by the

5    landlord for the corporate headquarters.  Paragraph 41 is

6    language addressing the issues as was described earlier today

7    of the issues with Ellis County, Texas.  Paragraph 42 deals

8    with the relative to certain Michigan state law.  And paragraph

9    43 deals with the objection which had previously been filed by

10   General Motors.  Ad each of these paragraphs have been, do set

11   out the resolution of those particular issues as previously

12   announced.

13             Paragraph, excuse me, page 39, paragraph 52 is a

14   further cleanup.  And then the last changes on pages 40 and 41

15   deal with certain modifications that are cleanup relative to

16   the payment of the health and welfare benefits, generally

17   referred to as the stub amount that may be due postpetition but

18   just immediately at the closing they may not have been paid.

19   Paragraph 54 is being clear that and this comes in by, we've

20   added a clause E to that, the definition of current

21   liabilities, so to the extent those liabilities remain unpaid

22   and we pay them, we being Jack Cooper, because it becomes as

23   we've defined it an assumed health welfare plan benefits, then

24   that payment effectively flows through the working capital

25   adjustment --

Page 110

1          THE COURT:  Got it.

2          MR. AUSTIN:  -- for purposes of determining the final

3   net working capital.  Paragraph 55 adds in a clarification as

4   to where the assumed HPW, HWP benefits drop in.

5          And last, the paragraph 56 is frankly straight out of

6   our asset purchase agreement which was requested to be included

7   in the order by the Canadian Autoworkers to resolve all of

8   their objections and that's why we added that language.

9          Those are the changes to the order as filed, Your

10  Honor. I have the original, if I may approach.

11         THE COURT:  Yes.

12         MR. KLYMAN:  Your Honor, if I may, while he's doing

13  that, there are a couple of interlineations that we need to put

14  on the record that Mr. Collins has or that I can read.

15         MR. COLLINS:  Your Honor, for the record, Mark

16  Collins.  Yeah, those interlineations are in fact in the order

17  that was just handed to Your Honor, and they are identical to

18  these that I can hand over to you and that we went over.  I'm

19  happy to walk Your Honor through the handwritten

20  interlineations.

21         THE COURT:  Let me look at them.

22         MR. COLLINS:  Yeah, they're pretty nonmaterial, I

23  think.

24         MR. KLYMAN:  Your Honor, there's not a dispute.  It's

25  just that there were some that Mr. Collins and I had worked out

Page 111

1   with Mr. Harris and that were not read into the record by Mr.

2   Austin.

3          THE COURT:  All right.  Let me look here.  Are they

4   handwritten in here, Mr. Collins?

5          MR. COLLINS:  They are.

6          THE COURT:  All right, so I'm looking at page 16?

7          MR. COLLINS:  Yes, Your Honor.  Paragraph 5 I think

8   is the first time you start seeing the handwritten

9   interlineation.

10          THE COURT:  Shall terminate when the purchaser notes

11   a released from escrow or otherwise released to the prepetition

12   first lien agent following, and then we've added Yucaipa and

13   consultation, I think we talked about the consultation.  Okay.

14   And page 20, okay.

15          MR. KLYMAN:  I don't know if it was referenced, Your

16   Honor, in paragraph 12A, there's a reference to the wind down

17   budget in a form and amount agreed to by the debtors following

18   consultation with the committee, and then interlineated as, and

19   Yucaipa.

20          THE COURT:  Okay.  I see the change on 21, 22.  And

21   looks like the escrow issue is in 23?

22          MR. KLYMAN:  That's in paragraph 14, Your Honor.

23          THE COURT:  All right.

24          MR. COLLINS:  I believe that was the last one, Your

25   Honor.

Page 112

1        THE COURT:  Okay.  Let's see, page 36, paragraph 47,

2    just begins, except as otherwise provided herein nothing in

3    this order shall alter, etc., etc.  This order stands alone,

4    there are no exhibits or attachments that are to be made?

5        MR. AUSTIN:  No, Your Honor, that order stands alone.

6        THE COURT:  Does anyone wish to be heard?

7        MR. AUSTIN:  Your Honor, we obviously submit this

8    order for the approval of the Jack Cooper asset purchase

9    agreement.  I really need to ask for the record from both Mr.

10   Harris on behalf of Black Diamond and Spectrum in its

11   individual capacity and as requisite lenders that they consent

12   to this transaction and certainly as requisite lenders will

13   direct the agent to consent to this transaction.  And given

14   disputes, we would like Mr. Klyman also to note for the record

15   that his client, Yucaipa, consents to this transaction.  You

16   know, obviously it appears that while there is some level of

17   peace that may have been broken out, it may just be a law

18   enforcement additional fighting and we don't want to be

19   impacted by that down the road.  Thank you.

20       THE COURT:  All right.  You want them to say

21   something Mr. Austin?

22       MR. AUSTIN:  I'd like them to state on the record

23   that they consent to this transaction and they'll approve the

24   release of the liens as provided in that order, Your Honor.

25       THE COURT:  Mr. Harris?

Page 113

1        MR. AUSTIN:  I'd like to make sure that 363(f)(2) is

2   fully complied with.

3        MR. HARRIS:  Your Honor, we said it on the transcript

4   at the auction, and we'll repeat it here.  The requisite

5   lenders and first lien agents are prepared to consent to the

6   transaction to release the liens upon the closing of the

7   transactions and work with Mr. Austin on getting whatever

8   documentation he needs in order to get his free and clear order

9   satisfied.

10        MR. AUSTIN:  Very good.  Mr. Klyman, I suspect you

11   would say, to the extent I was not previously, you know, my

12   objection is overruled.

13      [Laughter]

14        MR. KLYMAN:  Yucaipa has no opposition to the agents

15   releasing their liens.  At the moment, Your Honor, at this time

16   we have no liens to release, but we have no opposition.

17        THE COURT:  Very good.  Thank you.

18        MR. KLYMAN:  Thank you.

19        THE COURT:  All right.  I signed the order.  And

20   we're going to get it filed for you.

21        MR. COLLINS:  Thank you, Your Honor.

22        THE COURT:  Is there anything else for today?  And

23   I'll await, the other transaction will just go under, come over

24   under certification of counsel at whatever time period makes

25   sense.

Page 114

1          MR. HARRIS:  Your Honor, if I could just make one

2    comment.  We are going to endeavor to get that to you tomorrow,

3    Your Honor.  There are recognition hearings already set in

4    Canada for I believe the 19th, so obviously we'll need both

5    orders entered in order to go forward with those hearings on a

6    timely basis.  So I'll work with Mr. Klyman to get language

7    pulled together and hopefully get that to Your Honor tomorrow.

8    If we still have continuing disputes which I hope we won't

9    have, I would just ask Your Honor's indulgence to potentially

10   hold a call or deal with competing orders to try and resolve

11   this promptly.

12          THE COURT:  Mr. Klyman is travelling home tonight.

13   Correct?

14          MR. HARRIS:  He has lots of time to help draft up the

15   one sentence he needs for his reservation of rights.

16          MR. KLYMAN:  Actually, Your Honor, I have the great

17   fortune of having missed all my flights, I'll be here until

18   tomorrow.  So I may not be able to get to an order promptly

19   tomorrow morning, because I'll be traveling all day.  But I'll

20   get to it as soon as I can.

21          THE COURT:  All right.

22          MR. KLYMAN:  Thank you.

23          THE COURT:  Just keep me informed of the status.  I

24   am in all day tomorrow, I have several hearings, but I'm in,

25   Thursday is more dicey, but I don't think we're going to

Page 115

1    Thursday.  And if there are any issues that arise, get me on

2    the phone.  Okay?  We're adjourned.

3          MR. COLLINS:  Thank you, Your Honor.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 116

1                          I N D E X

2      WITNESS                DIRECT    CROSS      REDIRECT   RECROSS

3      Mr. Stephen Antinelli   36       42, 47     50

4      Mr. John Blount         54       56, 57

5                            RULINGS

6      DESCRIPTION                                          PAGE

7      HEARING re Doc 1733 – Motion for Authorization

8      to File Under Seal the Objection of the Official

9      Committee of Unsecured Creditors to the Entry of

10     an Order (I) Approving Asset Purchase Agreement

11     and Authorizing the Sale of Certain Assets of

12     Debtors Outside the Ordinary Course of Business;

13     (II) Authorizing the Sale of Assets Free and

14     Clear of all Liens, Claims, Encumbrances, and

15     Interests; (III) Authorizing the Assumption, Sale,

16     and Assignment of Certain Executory Contracts

17     and Unexpired Leases; and (IV) Granting Related

18     Relief                                                8

19

20     HEARING re Doc #1175 – Motion of the Debtors

21     for Entry of Orders: (A)(1) Approving Bid

22     Procedures Relating to Sale of Debtors'

23     Assets; (II) Approving Bid Protections;

24     (III) Scheduling a Hearing to Consider the

25     Sale; (IV) Approving the Form and Manner of

Page 117

1   Notice of Sale by Auction; (V) Establishing

2   Procedures for Noticing and Determining Cure

3   Amounts; and (VI) Granting Related Relief;

4   and (B)(I) Approving Asset Purchase Agreement

5   and Authorizing the Sale of Certain Assets of

6   Debtors Outside the Ordinary Course of Business;

7   (II) Authorizing the Sale of Assets Free and

8   Clear of all Liens, Claims, Encumbrances, and

9   Interests; (III) Authorizing the Assumption,

10  Sale, and Assignment of Certain Executory

11  Contracts and Unexpired Leases and (IV) Granting

12  Related Relief                                    100

13

14  HEARING re Doc #1821 - Motion for Order,

15  Pursuant to Section 107(b) of the Bankruptcy

16  Code and Bankruptcy Rule 9018, Authorizing

17  Yucaipa to File Under Seal Portions of Yucaipa

18  American Alliance Fund I, L.P., Yucaipa American

19  Alliance (Parallel) Fund I1, L.P., Yucaipa

20  American Alliance Parallel Fund II, L.P.'s (1)

21  Objection to Sale of Debtors' Real Property

22  Assets to New Allied Acquisition Co., LLC, and

23  (II) Limited Objection to the Sale of

24  Substantially all of the Debtors' Assets

25  to Jack Cooper                                    8

Page 118

1                                CERTIFICATION

2              I, Mary Zajaczkowski, certify that the foregoing is a

3      correct transcript from the official electronic sound recording

4      of the proceedings in the above-entitled matter.

5      Mary Zajaczkowski
       *Digitally signed by Mary Zajaczkowski*
       *DN: cn=Mary Zajaczkowski, o, ou,*
       *email=digital1@veritext.com,*
       *c=US*
       *Date: 2013.09.20 14:28:21 -04'00'*

6      AAERT Certified Electronic Transcriber CET**D-531

7      Mary Zajaczkowski

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22     Veritext

23     200 Old Country Road

24     Suite 580

25     Mineola, NY  11501

# EXHIBIT 29

# Schulte Roth & Zabel LLP

## MEMORANDUM

**To:**      The Lenders Party to the First Lien Credit      **Date:**    November 8, 2013
             Agreement

**From:**    The Co-Administrative Agents and the Collateral Agent

**Subject:** Allied Systems Holdings, Inc., et al.

Reference is made to that certain Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement, dated as of May 15, 2007, among Allied Holdings, Inc. and Allied Systems, LTD (L.P.), as Borrowers, certain Subsidiaries of Allied Holdings, Inc. and Allied Systems, LTD (L.P.), as Guarantors, the Lenders from time to time party thereto, and The CIT Group/Business Credit, Inc., as Administrative Agent and Collateral Agent (as amended, modified or supplemented from time to time, the "First Lien Credit Agreement"). All capitalized terms used herein and not otherwise defined shall have the meanings set forth in the First Lien Credit Agreement.

The purpose of this memorandum is to provide you with certain information regarding the Borrowers, the Guarantors and the Obligations under the First Lien Credit Agreement, as well as to inform you (in your capacity as a Lender) of certain actions taken and to be taken by the First Lien Agents (as defined below) affecting the Obligations and the Collateral. **This memorandum and the Exhibits hereto contain information that is important to you as a Lender, and you should read carefully the entirety of this memorandum to understand how your recovery on account of the Obligations owed to you as a Lender may be affected.**

DOC ID - 20686808.4

To the First Lien Credit Agreement
November 8, 2013
Page 2

On May 17, 2012, involuntary petitions pursuant to Chapter 11 of the Bankruptcy Code were filed against the Borrowers in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Borrowers consented to the entry of orders for relief on June 10, 2012, and on the same date each of the Guarantors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court (collectively, the "Chapter 11 Cases").[1] The Chapter 11 Cases are pending before the Honorable Christopher Sontchi, and are being jointly administered under case number 12-11564 (CSS). Certain of the Debtors also filed proceedings in the Ontario Superior Court of Justice on June 12, 2012 under Part IV of the *Companies' Creditors Arrangement Act*. Since June, 2012, the Debtors have continued to operate their businesses and manage their properties as debtors in possession.

Prior to the commencement of the Chapter 11 Cases, Lenders BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 LTD and Spectrum Investment Partners, L.P. (collectively, "Black Diamond/Spectrum") filed an action in the Supreme Court of the State of New York (the "New York Court") against Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP (collectively, "Yucaipa") entitled *BDCM Opportunity Fund II, LP., Black Diamond CLO 2005-1 LTD and Spectrum Investment Partners, L.P. v. Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP, Index No. 650150/2012* (the "State Court Action"). In the State Court Action, plaintiffs sought declaratory judgment that Amendment No. 4 to Credit Agreement, dated as of August 21, 2009, was invalid, and that Yucaipa was not the Requisite Lender under the First Lien Credit Agreement. On November 19, 2012, the New York Court held oral argument on Black

---

[1] The Borrowers and each Guarantor that filed a petition for relief are collectively referred to herein as the "Debtors."

DOC ID - 20686808.4

To the First Lien Credit Agreement
November 8, 2013
Page 3

Diamond/Spectrum's motion for summary judgment.  At the conclusion of oral argument the New York Court announced its determination to grant Black Diamond/Spectrum's motion for summary judgment, and on March 8, 2013 the New York Court issued its written order granting the motion.

In reliance upon the New York Court's November 19, 2012 oral ruling, on December 3, 2012 Lenders BDCM Opportunity Fund II, LP., Black Diamond CLO 2005-1 LTD, Spectrum Investment Partners, L.P. and American Money Management Corporation, acting in the capacity as Requisite Lenders,[2] appointed Black Diamond Commercial Finance, L.L.C. and Spectrum Commercial Finance, LLC, as Co-Administrative Agents, and Black Diamond Commercial Finance, L.L.C. as Collateral Agent (collectively, the "First Lien Agents").[3]

On June 20, 2013, the Bankruptcy Court entered that certain Order (A) Approving Bid Procedures, (B) Approving Cure Procedures, (C) Establishing Date for Auction and Approving Related Procedures, (D) Scheduling Sale Hearing and Related Deadlines, (E) Approving Form and Manner of Notices, and (F) Granting Related Relief (the "Bid Procedures Order"), pursuant to which the Debtors were authorized to proceed with the solicitation of offers for the sale of all or substantially all of their assets, and (if necessary) to conduct an auction. Prior to the Bid Deadline (as defined in the Bid Procedures Order), the Debtors received more than one bid for all or substantially all of the Debtors assets.  As a result, the Debtors conducted an auction to determine the highest or best bid for the assets.  The Debtors initially held the auction for substantially all of their assets on August 14 and 15, 2013, and thereafter continued the auction on September 11 and 12, 2013.  At the conclusion of the auction, the Debtors

---

[2] Calculated in the manner set forth in the First Lien Credit Agreement, as amended through that certain Amendment No. 3 to Credit Agreement and Consent, dated as of April 17, 2008.
[3] The CIT Group/Business Credit, Inc. submitted its resignation as both Administrative Agent and Collateral Agent on April 19, 2012, and such resignation became effective on May 19, 2012.

To the First Lien Credit Agreement
November 8, 2013
Page 4

determined to accept two bids which, together (assuming the closing of both transactions) will result in the sale of all or substantially all of the Debtors assets.  The two transactions are generally the following:

> 1.  The sale of certain assets to Jack Cooper Holdings Corp. pursuant to the terms of that certain Asset Purchase Agreement, dated as of September 10, 2013 (as amended, the "JCT APA").[4]  The Debtors have been advised by Jack Cooper Holdings Corp. that closing under the JCT APA should occur prior to December 31, 2013; and

> 2.  The sale of certain parcels of real estate and equipment, and the assignment of certain leased real property (the "Acquired Assets"), to SBDRE LLC (an entity created by the First Lien Agents for the benefit of the Lenders) pursuant to the terms of that certain Asset Purchase Agreement, dated as of October 9, 2013 (the "SBDRE LLC APA").[5]

Both transactions have been approved by orders of the Bankruptcy Court and recognition orders have been entered by the Ontario Superior Court of Justice.

The SBDRE LLC APA is a "credit bid" by the First Lien Agents (acting at the direction of the Requisite Lenders), on behalf of the Lenders, pursuant to the authority vested in the First Lien Agents under the Credit Documents.  A copy of the limited liability company agreement governing SBDRE LLC is attached as Exhibit A, and a copy of the organizational chart of SBDRE LLC and its subsidiaries is attached as Exhibit B.  It is contemplated that all of

---

[4] A copy of the order approving the JCT APA can be found on the docket of the Chapter 11 cases at Docket Numbers 1831 and 1837.  The docket is available free of charge on the website of the Debtors' noticing agent, Rust Omni (omnimgt.com).
[5] A copy of the order approving the SBDRE LLC APA can be found on the docket of the Chapter 11 cases at Docket Number 1868.

DOC ID - 20686808.4

To the First Lien Credit Agreement
November 8, 2013
Page 5

the Class A Membership Interests of SBDRE LLC will initially be held by the First Lien Agents,

for the benefit of the Lenders.

The First Lien Agents are in the process of determining the means to maximize

the value to be realized by the Lenders from the Acquired Assets.  The options available include,

without limitation, conducting an orderly sale process, owning and operating the properties (as

lessor), or some combination of the foregoing.  In order for SBDRE LLC to pay the anticipated

costs and expenses of owning and, if appropriate, operating, the Acquired Assets, the First Lien

Agents have determined to cause SBDRE LLC to offer to the Lenders the opportunity to

purchase Class B Membership Interests having the terms set forth on Exhibit C.  A summary of

the cash requirements of SBDRE LLC supporting the need to raise capital is attached as Exhibit

D.  In sum, the terms of the Class B Membership Interests are as follows:

1.  The aggregate issuance price will be $10 million;

2.  Affiliates of Black Diamond/Spectrum will "backstop" the issuance of

the Class B Membership Interests, and in return will receive Class C Membership

Interests in SBDRE LLC representing 3% of the aggregate Membership Interests;

3.  Each Lender of record as of November 8, 2013 will be entitled to

purchase all (but not less than all) of its Pro Rata Share of the Class B Membership

Interests.[6]  The right of each Lender to subscribe for Class B Membership Interests shall

not be assignable.  Once issued, the Class B Membership Interests shall not be

transferable except with the consent of the Managing Members.

4.  With respect to any distributions made by SBDRE LLC, the Class A

Membership Interests shall be entitled to 30.34% of each such distribution, the Class B

---

[6] The Pro Rata Share for each of your firm's Lenders is set forth on Exhibit E.

DOC ID - 20686808.4

To the First Lien Credit Agreement
November 8, 2013
Page 6

Membership Interests shall be entitled to 66.66% of such distribution, and the Class C

Membership Interests shall be entitled to 3% of such distribution;

      5. Prior to the occurrence of a "change of control" the Class B

Membership Interests and Class C Membership Interests shall have only those voting

rights required to be afforded to holders of membership interests as dictated by the

Delaware Limited Liability Company Act.  After the occurrence of a "change of control,"

the Class A Membership Interests, the Class A Membership Interests and the Class C

Membership Interests shall vote as a single Class, with the Class A Membership Interests

controlling 30.34% of the vote, Class B Membership Interests controlling 66.66% of the

vote, and the Class C Membership Interests controlling 3% of the vote.[7]  For purposes of

the limited liability agreement, "change of control" shall mean the sale, transfer or other

disposition by the First Lien Agents of the Class A Membership Interests.

      **Any Lender that wishes to subscribe for its Pro Rata Share of the Class B**

**Membership Interests should (x) complete and execute the Subscription Agreement and**

**Joinder attached hereto as Exhibits F and G, respectively, and return them to the First**

**Lien Agents c/o Schulte Roth & Zabel LLP, 919 Third Avenue, New York New York 1002**

**(Attention: Adam Harris) so as to be received by no later than 5:00 p.m. (New York time)**

**on November 15, 2013  (the "Subscription Deadline").  Any Lender who fails to timely**

**submit a properly executed Subscription Agreement by the Subscription Deadline will be**

**forever barred from acquiring Class B Membership Interests.**

---

[7] It is anticipated that Black Diamond/Spectrum (and their affiliates) will own or control a majority of the Class A Membership Interests, Class B Membership Interests and Class C Membership Interests, taken as a whole.

DOC ID - 20686808.4

To the First Lien Credit Agreement
November 8, 2013
Page 7

Within one (1) business day following the Subscription Deadline, SBDRE

LLC will (x) return to each Lender that submitted a Subscription Agreement and Joinder a

countersigned copy of such Subscription Agreement and Joinder, and (y) notify each such

Lender of the date, time and place for the Closing (as defined in the Subscription

Agreement) and the wire transfer information for payment of the Purchase Price (as

defined in the Subscription Agreement).

If you have any questions regarding the foregoing please contact Adam Harris at

Schulte Roth & Zabel LLP, 212-756-2253 (or adam.harris@srz.com).

DOC ID - 20686808.4