## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ASHINC Corporation, *et al.,*[1]<br><br>      Debtors. | Chapter 11<br><br>Case No. 12-11564 (CSS)<br><br>(Jointly Administered) |
| BDCM OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., SPECTRUM INVESTMENT PARTNERS, L.P., BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., AS CO-ADMINISTRATIVE AGENT, AND SPECTRUM COMMERCIAL FINANCE LLC, AS CO-ADMINISTRATIVE AGENT,<br><br>      Plaintiffs,<br><br>v.<br><br>YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P., RONALD BURKLE, JOS OPDEWEEGH, DEREX WALKER, JEFF PELLETIER, IRA TOCHNER, and JOSEPH TOMCZAK,<br><br>      Defendants. | Adv. Proc. No. 14-50971 (CSS)<br><br><br>**BLACK DIAMOND'S AND SPECTRUM'S MOTION TO DISMISS YUCAIPA'S COUNTERCLAIM FOR EQUITABLE SUBORDINATION** |

---

[1] The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: ASHINC Corporation (f/k/a Allied Systems Holdings, Inc.) (58-0360550); AAINC Corporation (f/k/a Allied Automotive Group, Inc. (58-2201081); AFBLLC LLC (f/k/a Allied Freight Broker LLC) (59-2876864); ASCCO (Canada) Company (f/k/a Allied Systems (Canada) Company (90-0169283); ASLTD L.P. (f/k/a Allied Systems, Ltd. (L.P.)) (58-1710028); AXALLC LLC (f/k/a Axis Areta. LLC )(45-5215545); AXCCO Canada Company (f/k/a Axis Canada Company) (875688228); AXGINC Corporation (f/k/a Axis Group, Inc.) (58-2204628); Commercial Carriers, Inc. (38-0436930); CTSINC Corporation (f/k/a CT Services. Inc.) (38-2918187); CTLLC LLC (f/k/a Cordin Transport LLC) (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems. LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863): RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582. The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF FACTS.......................................................................................5

    A.    The Credit Agreement................................................................5

    B.    The Third Amendment................................................................6

    C.    The Purported Fourth Amendment: Yucaipa's Failed Attempt to Usurp Requisite Lender Status ................................................................7

    D.    Spectrum Buys Additional First Lien Debt Pursuant to the Cooperation Agreement................................................................8

    E.    JCT's Negotiations to Buy Allied's Assets................................9

    F.    Proceedings Before This Court................................................10

ARGUMENT................................................................................................12

I.    THE THIRD AMENDMENT BARS YUCAIPA FROM BRINGING THE COUNTERCLAIM................................................................12

    A.    The Covenant Not to Sue Bars This Action................................13

    B.    The Third Amendment Bars Yucaipa From Filing an Action in These Bankruptcy Cases Without the Written Consent of All Lenders................15

II.    YUCAIPA'S COUNTERCLAIM IS SUBJECT TO COLLATERAL ESTOPPEL AND IS IMPLAUSIBLE ................................................16

    A.    Yucaipa Is Collaterally Estopped From Alleging that Black Diamond and Spectrum "Encouraged" Yucaipa to Buy First Lien Debt................16

    B.    Yucaipa's Allegations That Black Diamond and Spectrum "Schemed" to Equitably Subordinate Yucaipa's Claims Are Not Plausible................18

    C.    Yucaipa's Allegation that the Equitable Subordination Claim Against It Is "Objectively Baseless" Is Not Plausible................23

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)..................................................................................................2, 18

*BDCM Opportunity Fund II, LP v. Yucaipa American Alliance Fund I, LP,*
  No. 650150/2012, 2013 WL 1290394 (N.Y. Sup. Ct. Mar. 8, 2013),
  *aff'd,* 112 A.D.3d 509 (N.Y. App. Div. 2013)................................................................8, 10

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007)............................................................................................2, 18, 19

*In re Direct Response Media, Inc.,*
  466 B.R. 626 (Bankr. D. Del. 2012) .............................................................................22

*In re Elrod Holdings Corp.,*
  392 B.R. 110 (Bankr. D. Del. 2008) .............................................................................24

*Fowler v. UPMC Shadyside,*
  578 F.3d 203 (3d Cir. 2009) ........................................................................................19

*Kost v. Kozakiewicz,*
  1 F.3d 176 (3d Cir. 1993)............................................................................................12

*Nat'l R.R. Passenger Corp. v. Penn. Pub. Util. Comm'n,*
  288 F.3d 519 (3d Cir. 2002)...................................................................................16, 17

*Ret. Sys. v. Chubb Corp.,*
  394 F.3d 126 (3d Cir. 2004).........................................................................................12

*Schmidt v. Skolas,*
  770 F.3d 241 (3d Cir. 2014)..........................................................................................5

*Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC,*
  C.A. No. 9151-VCP, 2014 WL 5509787 (Del. Ch. Oct. 31, 2014)...................................14, 15

## Statutes

11 U.S.C. § 1102(a)(1)...................................................................................................23

11 U.S.C. § 1103(c)(2).....................................................................................................23

Pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7012, BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd. (collectively, "Black Diamond") and Spectrum Investment Partners LP ("Spectrum"), by and through their undersigned counsel, respectfully submit this Memorandum of Law in support of their motion to dismiss the Counterclaim for Equitable Subordination (the "Counterclaim") brought by Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. (collectively, "Yucaipa") in its entirety. This is the sole counterclaim asserted by Yucaipa in this action.

## PRELIMINARY STATEMENT

Yucaipa's Counterclaim is the most recent in a long line of attempts by Yucaipa to shift the responsibility for its own misconduct onto Black Diamond and Spectrum, and, as set forth below, its Counterclaim is closely similar to its cross-claims against Black Diamond and Spectrum previously dismissed by this Court in a prior action and is virtually identical to the counterclaim Yucaipa moved to assert in the Committee Adversary Proceeding[2] against Black Diamond and Spectrum, which motion remains pending.

In its Counterclaim, Yucaipa alleges a four-part "scheme" by Black Diamond and Spectrum to equitably subordinate Yucaipa's debt holdings to secure for themselves a disproportionate return on their investment. Specifically, Yucaipa alleges that Black Diamond and Spectrum: (i) encouraged Yucaipa to acquire as much Allied debt as possible by providing false assurances of cooperation and support; (ii) prevented Yucaipa from serving as the Requisite

---

[2] "Committee Adversary Proceeding" or "Committee Adv. Proc." refers to *The Official Committee of Unsecured Creditors of Allied Systems Holdings, Inc. v. Yucaipa American Alliance Fund I, L.P., et al.*, Adv. Proc. No. 13-50530 (CSS) (Bankr. D. Del.).

Lender under the Credit Agreement[3]; (iii) filed involuntary bankruptcy petitions supported by

false statements; and (iv) attempted to wipe out Yucaipa's First Lien Debt[4] with an objectively

baseless complaint for equitable subordination.

Yucaipa's Counterclaim, however, is a work of pure fiction.  The four-part

"scheme" alleged by Yucaipa is implausible under the doctrines set forth in the Supreme Court's

*Iqbal* and *Twombly* decisions.[5]  For instance, according to Yucaipa, Black Diamond and

Spectrum blew up a deal between Allied and Jack Cooper Transport Company Inc. ("JCT"),

which would have resulted in a recovery of 100% of the First Lien Debt plus accrued interest to

Black Diamond and Spectrum and all the other Lenders under the Credit Agreement, to instead

pursue a highly unpredictable litigation strategy that could have resulted in a recovery greater

than the par-plus-accrued recovery offered by JCT but which would have required each and

every one of the following events to occur in Black Diamond's and Spectrum's favor:  (1)

prevailing in a lawsuit to invalidate the Purported Fourth Amendment[6]; (2) prevailing in a

lawsuit seeking a determination that Black Diamond and Spectrum are the Requisite Lenders; (3)

acquiring the Debtors' assets through a credit bid of their First Lien Debt in a court-supervised

auction; (4) prevailing in an equitable subordination lawsuit against Yucaipa[7]; and (5) having the

---

[3] The "Credit Agreement" refers to the Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, as amended and restated as of May 15, 2007, between Allied Holdings Inc. and Allied Systems Ltd. (L.P.) as Borrowers, the Lenders from time to time party thereto, and the CIT Group Business Credit, Inc. as Administrative Agent and Collateral Agent, among others.  The Credit Agreement is attached as Exhibit 1 to Yucaipa's Counterclaim.

[4] "First Lien Debt" refers to the $265 million of first lien debt that the Debtors (collectively, "Allied") incurred pursuant to the Credit Agreement.

[5] *Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

[6] The "Purported Fourth Amendment" refers to Amendment No. 4 to Credit Agreement, dated August 21, 2009. The Purported Fourth Amendment is attached as Exhibit 2 to Yucaipa's Counterclaim.

[7] Of course, damages would be capped at the amount necessary to remedy the harm, which means that the damages recoverable on the equitable subordination claims against Yucaipa *at most* would be par plus accrued interest – the *same* amount that Black Diamond and Spectrum would have received if they had not allegedly blown up the JCT deal, further showing the implausibility of the instant Counterclaim.

value of Debtors' assets acquired by Black Diamond and Spectrum appreciate to the point where the combination of asset values and recovery in the equitable subordination claim exceeded a par-plus-accrued-interest recovery. If any one of these *five* uncertain outcomes had not gone Black Diamond and Spectrum's way, their alleged "scheme" would have failed. Yucaipa's assertion that Black Diamond and Spectrum had a premeditated plan to abandon a par-plus-accrued recovery from JCT in favor of pursuing such a highly speculative and unpredictable strategy simply is not plausible.

Moreover, Yucaipa's allegation that Black Diamond and Spectrum "encouraged" Yucaipa to acquire as much First Lien Debt as possible is simply a recycled version of a closely similar assertion that Yucaipa made in early 2013 in its amended counterclaim and cross-claim (the "Cross-Claims"). This Court has already found that allegation to be implausible and dismissed the Cross-Claims. By collateral estoppel, Yucaipa is precluded from making that same implausible allegation again here.

Further, Yucaipa fabricates a so-called "Involuntary Petition Payoff" that Black Diamond allegedly paid to "bribe" Spectrum into joining the involuntary petitions by completely mischaracterizing a small excerpt from an email chain. According to Yucaipa, the email chain shows that Black Diamond "bribed" Spectrum by selling First Lien Debt to Spectrum at a discounted price that Spectrum allegedly could not have received in the marketplace on its own. In reality, Black Diamond did not "bribe" and did not need to bribe Spectrum because, as Yucaipa itself admits, Spectrum already owned sufficient First Lien Debt to join Black Diamond in filing the involuntary petitions. Moreover, this transaction that Yucaipa falsely characterizes as a "bribe" was not a payment *by Black Diamond* to Spectrum, as Yucaipa falsely alleges, but rather a cash payment *by Spectrum* to Black Diamond to *purchase* additional First Lien Debt

from Black Diamond. As Yucaipa itself admits, Spectrum purchased the additional First Lien

Debt in accordance with the terms of an informal agreement between Black Diamond and

Spectrum which was later reduced to writing (the "Cooperation Agreement"). The Cooperation

Agreement provides that if either of Black Diamond or Spectrum acquired *additional* First Lien

Debt beyond what they already held, the acquiring party would offer the other party its ratable

share of the additional debt at the same purchase price. Thus, Spectrum's purchase of additional

First Lien Debt was not a "bribe"; Spectrum was contractually entitled to buy that First Lien

Debt, and Yucaipa's allegation that Spectrum could not have purchased the First Lien Debt at the

same price on its own is patently false. Accordingly, there was no "Involuntary Petition Payoff"

by Black Diamond to Spectrum to induce Spectrum to file the involuntary petitions.

Finally, contrary to Yucaipa's contention, Black Diamond's and Spectrum's

equitable subordination claim against Yucaipa is not "objectively baseless," as Yucaipa asserts.

As this Court is aware, the Official Committee of Unsecured Creditors of Allied Systems

Holdings, Inc. (the "Committee") *independently* filed its own equitable subordination claim

against Yucaipa after conducting "a comprehensive investigation of potential claims belonging

to the Debtors' estates, including the review of thousands of pages of documents obtained from

the relevant parties." (Allied Bankr., D.I. No. 858 ¶ 6.)[8]  As a result of its investigation, the

Committee concluded that Yucaipa's claims "are subject to equitable subordination." (*Id.* ¶ 6.)

Accordingly, Yucaipa's allegation that the equitable subordination claims are somehow

"fraudulent" cannot withstand scrutiny.

---

[8] "Allied Bankr." refers to *In re ASHINC Corporation, et al.*, Case No. 12-11564 (CSS) (Bankr. D. Del.).

Further, while the allegations in Yucaipa's Counterclaim are not plausible, before even reaching the merits of Yucaipa's allegations, the Counterclaim should be dismissed because two provisions of the Third Amendment bar Yucaipa from asserting its Counterclaim.

*First*, Section 2.7(e) of the Third Amendment[9] (the "Covenant Not to Sue") bars Yucaipa's Counterclaim because the Counterclaim is plainly related to the Credit Agreement.

*Second*, Section 2.7(b) of the Third Amendment prohibits Yucaipa from taking "any action" in an "Insolvency or Liquidation Proceedings" (including these bankruptcy cases) related to the Credit Agreement without the prior written consent of all the other Lenders. Because Yucaipa unquestionably has not obtained such written consent, its Counterclaim must be dismissed.

## STATEMENT OF FACTS[10]

### A.    The Credit Agreement

In May 2007, Allied emerged from bankruptcy under a plan of reorganization that was financed by $265 million of First Lien Debt pursuant to the Credit Agreement, which was comprised of: (i) $180 million in term loans ("Term Loans"); (ii) a $35 million revolving credit facility ("Revolving Loans"); and (iii) a $50 million letter of credit facility ("LC Deposit Loans"). (Counterclaim ¶ 33.) However, since August 2008, Allied was in continuous default under the Credit Agreement. (*Id.* ¶ 36.)

---

[9] The "Third Amendment" refers to Amendment No. 3 to Credit Agreement and Consent, dated April 17, 2008. The Third Amendment is attached as Exhibit 3 to Yucaipa's Counterclaim.

[10] Although, for purposes of a motion to dismiss, the Court must accept the factual allegations in the Counterclaim as true, because Yucaipa's Counterclaim is replete with mischaracterizations and material omissions, Black Diamond and Spectrum provide the following Statement of Facts which supplements the allegations in the Counterclaim with facts from various public filings of which this Court can take judicial notice. *See Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (on a motion to dismiss, courts may consider "the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record").

B.      **The Third Amendment**

Under the Third Amendment, Yucaipa has extremely limited rights to become a

"Lender" under the Credit Agreement.[11]  (Third Amendment § 2.1(a).)  For instance, under the

Third Amendment, Yucaipa is prohibited from, among other things, acquiring more than the

lesser of (i) 25% of the outstanding Term Loans or (ii) $50 million of Term Loans (*id.* § 2.7(c))

and was precluded from voting any of the debt it acquired (*id.* § 2.7(a), (b), and (e)).

Additionally, the Covenant Not to Sue contained in the Third Amendment

severely limits Yucaipa's right to sue any Lender.  The Covenant Not to Sue provides:

> To the fullest extent permitted by applicable law, no Restricted
> Sponsor Affiliate [Yucaipa] shall assert, and each Restricted
> Sponsor Affiliate immediately and automatically upon becoming a
> Lender, hereby irrevocably (i) *waives, any claim or cause of action*
> *against any Lender, any Agent and their respective Affiliates* . . .
> (whether or not the claim therefor is based on contract, tort or duty
> imposed by any applicable legal requirement or otherwise) *arising*
> *out of, in connection with, as a result of, or in any way related to,*
> *this Agreement or any Credit Document or* any agreement or
> instrument contemplated hereby or thereby or referred to herein or
> therein, the transactions contemplated hereby or thereby, *any Loan*
> *or the use of the proceeds thereof or any act or omission or event*
> *occurring in connection therewith* except to the extent caused by
> such Agent's gross negligence or willful misconduct . . . as
> determined by a court of competent jurisdiction by final and non-
> appealable judgment, (ii) *waives, releases and agrees not to sue*
> *upon any such claim or any such cause of action*, whether or not
> accrued and whether or not known or suspected to exist in its favor
> and (iii) waives any claim or cause of action against any Agent or
> any Lender . . .on any theory of liability for special, indirect,
> consequential or punitive damages . . . .

(*Id.* § 2.7(e) (emphasis added).)

Similarly, the Third Amendment prohibits Yucaipa from taking any action in

these bankruptcy cases related to the Credit Agreement without the prior written consent of all

---

[11] As the Court will recall, under the Credit Agreement, prior to the Third Amendment, Yucaipa was precluded from becoming a Lender to Allied at all.

the Lenders.  In particular, Section 2.7(b) provides that, upon becoming a Lender, Yucaipa

"irrevocably and voluntarily waive[d] . . . any right to, make any election, give any consent,

commence any action or file any motion, claim, obligation, notice or application or take any

other action in any Insolvency or Liquidation Proceeding without the prior written consent of all

Lenders other than [Yucaipa]."  (*Id.* § 2.7(b).)[12]

### C.    The Purported Fourth Amendment:  Yucaipa's Failed Attempt to Usurp Requisite Lender Status

During the period between March 2009 and August 2009, Yucaipa entered into

direct negotiations with ComVest, who owned a majority of the First Lien Debt and was the

"Requisite Lender." (Counterclaim ¶¶ 39-40.)  Under the Credit Agreement, the Requisite

Lender is the Lender who holds the majority of First Lien Debt and is vested with the authority

to exercise, or refrain from exercising, numerous remedies under the Credit Agreement. (*Id.*

¶ 39; Credit Agreement § 1.1.)

As discussed above, the Third Amendment severely restricted the amount of First

Lien Debt Yucaipa could acquire.  Yucaipa alleges, however, that Black Diamond and Spectrum

purportedly "encouraged" Yucaipa to buy as much First Lien Debt as possible to effectuate

Yucaipa's scheme to become the Requisite Lender. (*Id.* ¶ 42.)  On August 21, 2009, Yucaipa

caused Allied (which Yucaipa owned and controlled) to enter into the Purported Fourth

Amendment to the Credit Agreement that, if effective, would have stripped the Third

Amendment's restrictions on the amount of First Lien Debt that Yucaipa could acquire and the

restrictions placed on what Yucaipa could do with that debt. (Counterclaim ¶ 48.)

With the Third Amendment's restrictions on Yucaipa's acquisition of First Lien

Debt purportedly eliminated, on August 21, 2009, Yucaipa and ComVest entered into an

---

[12] Yucaipa never sought or received any such consent.

Assignment and Assumption Agreement pursuant to which Yucaipa acquired the First Lien Debt

owned by ComVest. (*Id.* ¶ 49.) Yucaipa then declared itself the Requisite Lender. (*Id.* ¶ 53.)

However, as the New York Supreme Court (the "New York Court") found, and as

affirmed by the New York Appellate Division, the enactment of the Purported Fourth

Amendment was invalid and void *ab initio* because that amendment required *unanimous* Lender

consent, and no Lender (other than ComVest) consented to (or was even asked to consent to) the

terms of the Purported Fourth Amendment. *BDCM Opportunity Fund II, LP v. Yucaipa*

*American Alliance Fund I, LP*, No. 650150/2012, 2013 WL 1290394, at *5 (N.Y. Sup. Ct. Mar.

8, 2013), *aff'd*, 112 A.D.3d 509, 509 (N.Y. App. Div. 2013) (the "New York Action").

> **D.    Spectrum Buys Additional First Lien Debt Pursuant to the Cooperation
> Agreement**

After Yucaipa improperly purchased a majority of the First Lien Debt pursuant to

the invalidly enacted Purported Fourth Amendment, Black Diamond and Spectrum, in and

around mid-2011, entered into a Cooperation Agreement pursuant to which Black Diamond and

Spectrum agreed to work together for the purpose of maximizing their recoveries as Lenders.

(Counterclaim ¶ 63; *id.* Ex. 11.)  At the time they entered into the Cooperation Agreement, two

Black Diamond entities[13] held approximately $30 million in principal amount of First Lien Debt

and Spectrum held approximately $20 million in principal amount of First Lien Debt. (*See id.*

Ex. 11.)  As part of the Cooperation Agreement, Black Diamond and Spectrum agreed that if

either of them acquired additional First Lien Debt, the acquiring party would offer the other party

their ratable share at the same price. (*Id.* § 3.)  The Cooperation Agreement was later

memorialized in a written agreement on January 12, 2012. (*Id.*)

---

[13] These two Black Diamond entities were Plaintiffs BDCM Opportunity Fund II, LP and Black Diamond CLO
2005-1 Ltd.

Yucaipa alleges that right before filing the involuntary petitions, Black Diamond transferred $4 million (in face amount) of First Lien Debt to Spectrum – the so-called "Involuntary Petition Payoff" – to obtain "Spectrum's willingness to fully support the involuntary petition strategy." (Counterclaim ¶ 69.) Yucaipa admits, however, that this transfer was made "in accordance with the Cooperation Agreement" and that the amount of First Lien Debt that Spectrum purchased was its ratable share (approximately 40%) of the amount of First Lien Debt that Black Diamond had purchased and at the same price (as the Cooperation Agreement provided). (*Id.*)

Yucaipa alleges that the Involuntary Petition Payoff was "an obvious bribe" because Spectrum allegedly received "favorable pricing terms in exchange for Spectrum's willingness to fully support the involuntary petition strategy, thereby giving both Spectrum and Black Diamond an additional upside in their plan to subordinate Yucaipa's debt holdings." (*Id.*) In support of Yucaipa's allegation that this transaction was a "bribe," Yucaipa relies on a small excerpt from an email chain which it takes out of context, in which Spectrum emailed Black Diamond, stating: "Please get this closed this week. We cannot file an involuntary without it done." (*See id.* ¶ 70; *id.* Ex. 12.) When the whole email chain is read, it is clear that Spectrum was simply expressing its frustration that the trade had not closed after several months. (*See id.* Ex. 12.) Throughout those months of discussions in the email chain, there is nothing about a payoff or any indication that there was a payoff. (*See id.*)

E.    **JCT's Negotiations to Buy Allied's Assets**

Yucaipa alleges that from December 2011 to May 2012, it was in negotiations with JCT for a deal in which JCT would acquire Allied's assets, but that Black Diamond and Spectrum allegedly scuttled that deal by filing the involuntary petitions. (Counterclaim ¶¶ 55-62.) According to Yucaipa, under the final term sheet, JCT would have purchased all

outstanding First Lien Debt "for a purchase price of up to par plus accrued interest." (*Id.* ¶ 72.) Yucaipa alleges that Black Diamond and Spectrum – despite being promised payment in full for their First Lien Debt – ceased negotiations with JCT on May 17, 2012 because they believed they could make more money by engaging in a highly speculative and unpredictable course of action that required numerous litigations and actions, the outcomes of which were all beyond the control of Black Diamond and Spectrum.

### F.    Proceedings Before This Court

On May 17, 2012, Black Diamond and Spectrum filed involuntary petitions against Allied. (*Id.* ¶ 74.) On October 17, 2012, before the New York Court held that the Purported Fourth Amendment was void *ab initio*, Allied filed an adversary proceeding against all the Lenders seeking declarations regarding the identity of the Requisite Lender as well as the validity of the Purported Fourth Amendment (the "Allied Adversary Proceeding").[14]

As a result of the invalidation of the Purported Fourth Amendment in the New York Action and in a transparent effort to avoid to terms of the Third Amendment, on January 5, 2013, Yucaipa filed the Cross-Claims in the Allied Adversary Proceeding seeking, *inter alia*, a declaration that the Third Amendment was invalid. (Allied Adv. Proc., D.I. No. 65.) At a hearing on February 27, 2013, this Court dismissed Yucaipa's Cross-Claims, finding that the Covenant Not to Sue barred Yucaipa's Cross-Claims. (Allied Adv. Proc., D.I. No. 162 at 105:4-6.) In addition, as set forth in further detail below, this Court also found that the Cross-Claims were implausible. (*Id.* at 104:14-106:3.)

On February 1, 2013, the Committee commenced the Committee Adversary Proceeding, asserting claims against Yucaipa for, *inter alia*, equitable subordination.

---

[14] "Allied Adversary Proceeding " or "Allied Adv. Proc." refers to *Allied Systems Holdings, Inc. v. American Money Management, et al.*, Adv. Proc. No. 12-50947 (CSS) (Bankr. D. Del.).

(Committee Adv. Proc., D.I. No. 1.)  That same day, the Committee filed a motion for standing to prosecute claims on behalf of the Debtors' estates.  (Allied Bankr., D.I. No. 858.)  In that standing motion, the Committee noted that it had undertaken "a comprehensive investigation of potential claims belonging to the Debtors' estates, including the review of thousands of pages of documents obtained from the relevant parties."  (*Id.* ¶ 6.)  In the course of its independent investigation, the Committee uncovered Yucaipa's "efforts to take control over all facets of the Debtors' capital structure in an effort to protect its equity investment and frustrate the legitimate rights of creditors of Allied" and found that "Yucaipa trampled upon the legitimate rights and expectations of the Debtors' secured and unsecured creditors and caused the Debtors to make exorbitant and unnecessary payments to third parties acting at Yucaipa's direction and for Yucaipa's benefit, not for the benefit of the Company or its stakeholders."  (*Id.* ¶ 3.)  Upon completing its independent investigation, the Committee concluded that Yucaipa's claims "are subject to equitable subordination."  (*Id.* ¶ 6.)

On February 27, 2013, the Court granted the Committee standing to pursue various claims against Yucaipa and the Debtors' officers and directors and allowed Black Diamond and Spectrum to "intervene/participate in the litigation."  (Allied Adv. Proc., D.I. No. 162 at 40:15-22.)  As a result, on March 14, 2013, the Committee (as Plaintiff) and Black Diamond and Spectrum (as Intervenors) filed an amended complaint against Yucaipa and numerous officers and directors of Allied.  The amended complaint in the Committee Adversary Proceeding asserts various claims, including an equitable subordination claim on behalf of the estates, brought by the Committee, and an equitable subordination claim on behalf of the Lenders (other than Yucaipa) brought by Black Diamond and Spectrum as Intervenors.

On July 9, 2013, Black Diamond and Spectrum filed a motion for summary judgment in the Allied Adversary Proceeding and the Committee Adversary Proceeding for a determination that they are the Requisite Lenders.  At a hearing on July 30, 2013, this Court granted that motion, ruling that Black Diamond and Spectrum are the Requisite Lenders. (Committee Adv. Proc., D.I. No. 297 at 120:11-13.)  In reaching its conclusion, the Court found that "[u]pon acquiring the debt, Yucaipa subjected itself to the [Credit Agreement] and all of the amendments, including the third amendment."  *(Id.* at 127:13-15.)

In late 2013, the Bankruptcy Court supervised an auction of Allied's assets in which (i) Jack Cooper Holdings Corp. purchased substantially all of Allied assets for approximately $135 million; and (ii) Black Diamond and Spectrum, in their capacity as Requisite Lenders, directed Black Diamond Commercial Finance, L.L.C. and Spectrum Commercial Finance, LLC (the Co-Administrative and Co-Collateral Agents) to acquire the remainder of Allied's assets on behalf of all Lenders (including Yucaipa).  (Allied Bankr., D.I. No. 1868.)

## ARGUMENT

In a motion to dismiss under Rule 12(b)(6), while the Court must accept as true all well pleaded allegations in the Counterclaim, it is "not required to accept legal conclusions either alleged or inferred from the pleaded facts." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). Moreover, the Court "need not credit [the Counterclaim's] 'bald assertions' or 'legal conclusions.'" *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004).

## I.    THE THIRD AMENDMENT BARS YUCAIPA FROM BRINGING THE COUNTERCLAIM

Before even reaching the merits of Yucaipa's allegations, the Counterclaim should be dismissed because the Third Amendment bars Yucaipa's Counterclaim.

A.    **The Covenant Not to Sue Bars This Action**

The Covenant Not to Sue under the Third Amendment broadly prohibits Yucaipa from suing the other Lenders, including Black Diamond and Spectrum, with respect to *any* claim related to the Credit Agreement. Specifically, the Covenant Not to Sue provides that Yucaipa "irrevocably . . . waives, any claim or cause of action against any Lender . . . arising out of, in connection with, as a result of, or in any way related to, [the Credit Agreement]." (Third Amendment § 2.7(e).) In fact, this Court has already ruled that the Covenant Not to Sue barred Yucaipa's very similar sounding Cross-Claims against Black Diamond and Spectrum. In dismissing the Cross-Claims, this Court found that "under [the Covenant Not to Sue's] plain meaning, you can't sue. I don't think there's any questions as to the plain meaning of the covenant and I think it's very clear." (Allied Adv. Proc., D.I. No. 162 at 105:3-6.)

The Covenant Not to Sue has an exception for claims of "gross negligence or willful misconduct . . . as determined by a court of competent jurisdiction by final and non-appealable judgment" (the "Prior Determination Requirement"). (Third Amendment § 2.7(e).) As this Court has already found, the Prior Determination Requirement is not satisfied by merely *alleging* gross negligence or willful misconduct. Rather, under the Prior Determination Requirement, Yucaipa can only sue other Lenders *after* there has been a prior judicial determination by a "court of competent jurisdiction by final and non-appealable judgment" that the Lender committed gross negligence or willful misconduct. (Allied Adv. Proc., D.I. No. 162 at 105:6-13.)

In response to a motion to dismiss made by Black Diamond and Spectrum in an action filed by Yucaipa in the Delaware Chancery Court after this Court's decision dismissing Yucaipa's Cross-Claims, the Chancery Court ruled that this Court's decision applying the Covenant Not to Sue was binding on the Chancery Court on the basis of collateral estoppel, but

also held that it is "reasonably conceivable" that where Yucaipa "alleges a unique harm –

meaning no other Lender could sue and the Prior Determination Requirement could not be

satisfied – construing the Carve Out so broadly that it would fail to provide an escape hatch for

Yucaipa in those circumstances arguably would produce a prohibited result" that would be

"contrary to public policy." *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, C.A. No. 9151-

VCP, 2014 WL 5509787, at *14 (Del. Ch. Oct. 31, 2014).

Here, Yucaipa's Counterclaim falls squarely within the ambit of the Covenant Not

to Sue. The Counterclaim unquestionably relates to the Credit Agreement because (i) Yucaipa

filed the Counterclaim in its capacity as a putative Lender under the Credit Agreement; (ii) the

Counterclaim seeks to increase the distribution payable to Yucaipa on account of its claims under

the Credit Agreement; and (iii) the Counterclaim seeks to equitably subordinate Black

Diamond's and Spectrum's claims under the Credit Agreement. Moreover, Yucaipa cannot

satisfy the Prior Determination Requirement because there has been no judicial determination

that Black Diamond or Spectrum committed gross negligence or willful misconduct.

Nor would the application of the Covenant Not to Sue to Yucaipa's Counterclaim

be contrary to public policy, applying the Chancery Court's gloss on the Covenant, because the

purported harm Yucaipa seeks to remedy in its Counterclaim is not unique to Yucaipa. While

Yucaipa attempts to argue that it suffered a unique harm, and that other Lenders are unlikely to

bring an equitable subordination claim against Black Diamond and Spectrum, because such other

Lenders (1) "hold minor stakes in the First Lien Debt," (2) "have no equity stake in Allied," (3)

are not employees or directors of Allied, (4) "have no involvement in the management or control

of Allied," and (5) "have not been sued for equitable subordination" (*see* Counterclaim ¶ 107),

Yucaipa's Counterclaim is completely silent as to how these four points have *any bearing* on a

Lender's ability to seek equitable subordination on the basis that Black Diamond and Spectrum were harming all Lenders by filing the involuntary petitions to allegedly "scuttle" the JCT deal. Given that JCT was offering to pay par plus accrued interest to *all* Lenders, Yucaipa fails to allege that it was uniquely harmed.

Moreover, Yucaipa's assertion that the other Lenders "would suffer harm too inconsequential to pursue in connection with an equitable subordination claim" is wholly irrelevant. (*Id.*) Even under the Chancery Court's formulation of the Covenant Not to Sue, Yucaipa is not uniquely harmed, and thereby is barred from suing, where another Lender "*could sue.*" *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, 2014 WL 5509787, at *15 (emphasis added). The fact is that any other Lender could have brought a claim for equitable subordination against Black Diamond and Spectrum. Accordingly, Yucaipa was not uniquely harmed, and the Covenant Not to Sue bars Yucaipa's Counterclaim.

### B.   The Third Amendment Bars Yucaipa From Filing an Action in These Bankruptcy Cases Without the Written Consent of All Lenders

In addition to the Covenant Not to Sue, Yucaipa's Counterclaim is barred by the Third Amendment's prohibition on Yucaipa's ability to participate in "Insolvency or Liquidation Proceedings," which is defined as "any voluntary or involuntary case or proceeding under Bankruptcy Law." (Third Amendment §§ 2.1(a), 2.7(b); Intercreditor Agreement § 1.1.) Specifically, Section 2.7(b) of the Third Amendment provides that Yucaipa "*irrevocably and voluntarily waive[s] in their capacity as Lenders hereunder* any right to, make any election, give any consent, *commence any action or file any motion, claim, obligation, notice or application* or take any other action in any Insolvency or Liquidation Proceeding without the prior written consent of all Lenders other than [Yucaipa]." (Third Amendment § 2.7(b) (emphasis added).)

Here, the Allied bankruptcy cases unquestionably are "Insolvency or Liquidation Proceedings" and the equitable subordination Counterclaim Yucaipa seeks to assert is clearly a "proceeding under Bankruptcy Law." Thus, under the Third Amendment, Yucaipa is prohibited from bringing its Counterclaim without the written consent of all Lenders. Because Yucaipa has neither sought nor received such consent, its Counterclaim must be dismissed.

## II.    YUCAIPA'S COUNTERCLAIM IS SUBJECT TO COLLATERAL ESTOPPEL AND IS IMPLAUSIBLE

In addition to the Third Amendment's restrictions on Yucaipa's ability to bring its Counterclaim, the Counterclaim should be dismissed because (i) Yucaipa is collaterally estopped from re-litigating its allegations that Black Diamond and Spectrum "encouraged" Yucaipa to buy First Lien Debt and proclaim itself Requisite Lender, which this Court has already found to be implausible, and (ii) the remainder of Yucaipa's allegations regarding the purported scheme are likewise implausible.

### A.    Yucaipa Is Collaterally Estopped From Alleging that Black Diamond and Spectrum "Encouraged" Yucaipa to Buy First Lien Debt

This is not the first time that Yucaipa has attempted to shift responsibility for its own inequitable conduct onto Black Diamond and Spectrum. In particular, this Court previously found Yucaipa's allegations that Black Diamond and Spectrum "encouraged" Yucaipa to buy First Lien Debt to be implausible, and on that basis dismissed Yucaipa's Cross-Claims. Accordingly, Yucaipa is now collaterally estopped from recycling those same implausible allegations in support of its new Counterclaim.

Collateral estoppel prevents a party from re-litigating an issue that has been litigated in a previous action. *Nat'l R.R. Passenger Corp. v. Penn. Pub. Util. Comm'n*, 288 F.3d 519, 525 (3d Cir. 2002). Collateral estoppel applies when: (i) "an issue of fact or law is actually litigated and determined by a valid and final judgment"; (ii) "the determination is essential to the

judgment"; and (iii) "the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *Id.* (quoting Restatement (2d) of Judgments § 27 (1980).)

Here, Yucaipa alleges that Black Diamond and Spectrum encouraged Yucaipa to purchase as much debt as possible by "providing false assurances of cooperation and support," and allegedly never "once state[d] any opposition to any aspect of Yucaipa's plan to become Requisite Lender, including the Fourth Amendment," but then "secretly directed CIT to refuse to recognize Yucaipa as Requisite Lender." (Counterclaim ¶¶ 8, 47, 53.)

Yucaipa made these same allegations in its Cross-Claims. Specifically, the Cross-Claims alleged that Black Diamond and Spectrum "supported Yucaipa's acquisition of the Requisite Lender position" and "encouraged Yucaipa's proposed plan, a fact on which Yucaipa relied in executing the plan." (Allied Adv. Proc., D.I. No. 65 ¶¶ 5, 71.) The Cross-Claims further alleged that Black Diamond and Spectrum "chose to double-cross Yucaipa" by "surreptitiously sen[ding] a letter to [CIT] questioning the validity of Yucaipa's Requisite Lender status." (*Id.* ¶ 7.)

These allegations were integral to Yucaipa's Cross-Claims, in which it argued that enforcement of the Third Amendment would unjustly enrich Black Diamond and Spectrum because Black Diamond and Spectrum had "encouraged" Yucaipa to buy a majority of the First Lien Debt and proclaim itself Requisite Lender. (*Id.* ¶ 118.) Yucaipa had a full and fair opportunity to litigate the plausibility of those allegations in opposing Black Diamond's and Spectrum's motion to dismiss the Cross-Claims.

In dismissing Yucaipa's Cross-Claims, this Court ruled that Yucaipa's allegations that Black Diamond and Spectrum "encouraged" Yucaipa to buy First Lien Debt and then

secretly urged CIT to refuse to recognize Yucaipa's purported Requisite Lender status were implausible:

- "[T]he allegations in [the Cross-Claims] do not meet [the plausibility] standard. There is some innuendo, there's some vague allegations. The bottom line is I just don't think the story as pled holds together sufficiently to meet the standard." (Allied Adv. Proc, D.I. No. 162 at 104:14-22.)

- "I don't think there's any allegation really that rises to the plausibility that there was any kind of mischief going on that was detrimental or directed at Yucaipa at the time of the third amendment being entered into the purchase, excuse me, and then the fourth amendment being negotiated, and then the debt being b[]ought and then the fourth amendment being passed." (*Id.* at 105:19-106:3.)

Those findings of implausibility (i) were actually litigated and determined; (ii) were necessary to support the final judgment on the merits dismissing Yucaipa's Cross-Claims; and (iii) are conclusive in this action. Accordingly, Yucaipa is now collaterally estopped from alleging that Black Diamond and Spectrum (i) "encouraged" Yucaipa to purchase a majority of Allied's First Lien Debt, execute the Purported Fourth Amendment, and purport to act as the Requisite Lender, and (ii) "surreptitiously" instructed CIT to challenge Yucaipa's purported Requisite Lender status. Without those allegations, the house of cards Yucaipa attempts to build with its Counterclaim lacks a foundation and collapses under its own weight.

**B.  Yucaipa's Allegations That Black Diamond and Spectrum "Schemed" to Equitably Subordinate Yucaipa's Claims Are Not Plausible**

Even assuming, *arguendo*, that Yucaipa's allegations are not barred by collateral estoppel, the Counterclaim's allegations are nevertheless implausible. In order to survive a motion to dismiss, the Counterclaim must contain "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Counterclaim must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. If the counterclaimants "have not nudged

their claims across the line from conceivable to plausible, their [counterclaim] must be dismissed." *Twombly*, 550 U.S. at 570. "This 'plausibility' determination will be a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 677).

Here, Yucaipa's Counterclaim hangs on the theory that Black Diamond and Spectrum engaged in a premeditated scheme to use the bankruptcy process to subordinate Yucaipa's First Lien Debt. (Counterclaim ¶ 11.) Yucaipa's theory is implausible for several reasons.

First, Yucaipa alleges that Black Diamond and Spectrum hatched a scheme to equitably subordinate Yucaipa's First Lien Debt *before Yucaipa had even acquired any First Lien Debt.* (Counterclaim ¶¶ 10, 42-43.) In support of that allegation, Yucaipa takes an email completely out of context. (*Id.* ¶ 43.) In the email, T. Mike Riggs (from JCT) asks Spectrum, "I *thought* you were going to check out the 'equitable subordination' angle." (Counterclaim Ex. 4 (emphasis added).) Rather than confirming that Spectrum was looking into equitable subordination, Spectrum responds, "Why?" (*Id.*) Looking at the email *as a whole*, Spectrum was clearly asking: "Why" did you think Spectrum was checking out the equitable subordination angle? This email does not support Yucaipa's implausible allegation that Black Diamond and Spectrum were checking out the "equitable subordination angle" *before* Yucaipa had even wrongfully acquired any First Lien Debt.

Second, Yucaipa alleges that Black Diamond and Spectrum had hatched a scheme to equitably subordinate Yucaipa in 2009, but then inexplicably waited almost three years from the time Yucaipa acquired First Lien Debt to file involuntary petitions. (*Id.* ¶¶ 42-43, 74.) If, as

Yucaipa alleges, Black Diamond's and Spectrum's ultimate objective since 2009 was to equitably subordinate Yucaipa's First Lien Debt, it is not plausible that they would then wait three years to carry out their objective.

Third, Yucaipa alleges that Black Diamond and Spectrum "negotiated directly with JCT" from at least March 2011 through May 2012 for a deal in which JCT would purchase all the First Lien Debt, including the debt held by Black Diamond, Spectrum and Yucaipa. (*Id.* ¶ 57.) Once again, if Black Diamond's and Spectrum's ultimate objective since 2009 was to equitably subordinate Yucaipa's First Lien Debt, it is not plausible that Black Diamond and Spectrum would negotiate with JCT for more than a year for a deal in which they would sell away their First Lien Debt, and with it, their right to equitably subordinate Yucaipa.

Fourth, Yucaipa's allegation that Black Diamond and Spectrum have been conspiring since 2009 to equitably subordinate Yucaipa renders implausible Yucaipa's allegation that in 2012, Black Diamond had to pay a "bribe to Spectrum, in the form of an illegal claims trade, to induce Spectrum to join the scheme." (*Id.* ¶ 10.) Further, as Yucaipa admits, Spectrum already held sufficient claims to qualify as a petitioning creditor (*id.*), and Black Diamond *sold* First Lien Debt to Spectrum at the same price that Black Diamond had paid for it pursuant to the Cooperation Agreement (*id.* ¶ 69). Accordingly, Spectrum did not need any additional debt to become a petitioning creditor, and the alleged "payoff" was not a "bribe" at all (In fact, Spectrum had to *pay* for the additional First Lien Debt it acquired from Black Diamond).

In alleging that Black Diamond "bribed" Spectrum into filing the involuntary petitions, Yucaipa focuses on a short excerpt from a long chain of emails between Spectrum to Black Diamond, stating: "Please get this closed this week. We cannot file an involuntary without it done." (Counterclaim ¶ 70; *id* Ex. 12.) Relying on this single line, taken out of

context, Yucaipa attempts to impute some sinister motive to Spectrum's acquisition of First Lien Debt. Read in its entirety, however, the email chain shows Spectrum was expressing its frustration that the trade had not closed after several months and that it should be closed before the involuntary petitions were filed to avoid any delays or other administrative issues that could arise if the trade was not closed until after the bankruptcy filing. (Counterclaim Ex. 12.) Throughout those months of discussions in the email chain, there is nothing about a payoff or any indication that there was a payoff. Simply put, Spectrum's purchase of its ratable share of the debt pursuant to the Cooperation Agreement was *not* – as Yucaipa falsely alleges – a "payoff" by Black Diamond to induce Spectrum to join in filing the involuntary petitions but rather the parties simply performing under the pre-existing Cooperation Agreement. Accordingly, Yucaipa's allegations of an "Involuntary Petition Payoff" are not plausible.

Finally, Yucaipa alleges that shortly before filing the involuntary petitions, Black Diamond and Spectrum torpedoed a deal with JCT in which JCT would have purchased the debt held by all First Lien Lenders (including Black Diamond and Spectrum) "for a purchase price of up to *par plus accrued interest*" (Counterclaim. ¶ 72 (emphasis added); *id.* Ex. 15)[15] "in order to seek an 'equitable subordination' of Yucaipa's debt holdings in Allied" (*id.* ¶ 3). Thus, Yucaipa's implausible Counterclaim is built entirely on the premise that Black Diamond and Spectrum gave up a guaranteed recovery from a *transaction* with JCT of par plus accrued interest to instead pursue a highly speculative scheme that *might* (but was highly unlikely to) produce a greater recovery through *litigation* in the Bankruptcy Court.

The ultimate success of this implausible "scheme" was dependent on *all* of the following highly events occurring, the outcomes of which were beyond the control of Black

---

[15] Exhibit 15 to the Counterclaim, which appears to be a term sheet for the purchase of Allied debt by JCT, does not contain a Bates number. It is unclear whether Yucaipa ever produced this document in discovery.

Diamond and Spectrum: (i) Black Diamond and Spectrum would have to convince a court that the Fourth Amendment was invalid and that the Third Amendment was the governing agreement (and prevail in any appeal of that ruling); (ii) Black Diamond and Spectrum would have to prevail in litigation in asserting that they, and not Yucaipa, were the Requisite Lenders (and prevail in any appeal of that ruling); (iii) Black Diamond and Spectrum would have to acquire Allied's assets at a court-supervised auction through a credit bid of the First Lien Debt; (iv) Black Diamond and Spectrum would have to prevail in an equitable subordination claim against Yucaipa with recoverable damages capped at par plus accrued interest (*i.e.*, the same amount that JCT was willing to pay, less the costs and uncertainty of litigation); and (v) the *only* way that Black Diamond's and Spectrum's recovery could exceed par plus accrued interest is if the value of Allied's assets that Black Diamond and Spectrum acquired through the credit bid appreciated to the point where the combination of asset values and recoveries on the equitable subordination claim exceeded a par-plus-accrued-interest recovery.

The outcome of *any* litigation is highly unpredictable. The notion that any rational businessperson would forego a guaranteed recovery of par plus accrued interest in a transaction with JCT to instead pursue such an uncertain litigation strategy – and the expenditure of the time and money this strategy necessarily involves – is simply not plausible.

In sum, because Yucaipa's allegations are not plausible, the Counterclaim should be dismissed. *See In re Direct Response Media, Inc.* 466 B.R. 626, 661 (Bankr. D. Del. 2012) (dismissing equitable subordination claim on the basis that the allegations supporting it were not plausible).

C.    **Yucaipa's Allegation that the Equitable Subordination Claim Against It Is "Objectively Baseless" Is Not Plausible**

Yucaipa alleges that Black Diamond and Spectrum's equitable subordination claim against Yucaipa is "objectively baseless." (Counterclaim ¶ 11.) Yucaipa, however, completely ignores the fact that the Committee *independently* brought a substantially similar equitable subordination claim against Yucaipa. The Committee was appointed by the United States Trustee and has the statutory authority to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan." 11 U.S.C. §§ 1102(a)(1), 1103(c)(2). In accordance with that authority, the Committee undertook "a comprehensive investigation of potential claims belonging to the Debtors' estates, including the review of thousands of pages of documents obtained from the relevant parties." (Allied Bankr. Proc., D.I. No. 858 ¶ 6.)

In the course of its independent investigation, the Committee uncovered Yucaipa's "efforts to take control over all facets of the Debtors' capital structure in an effort to protect its equity investment and frustrate the legitimate rights of creditors of Allied" and found that "Yucaipa trampled upon the legitimate rights and expectations of the Debtors' secured and unsecured creditors and caused the Debtors to make exorbitant and unnecessary payments to third parties acting at Yucaipa's direction and for Yucaipa's benefit, not for the benefit of the Company or its stakeholders." (*Id.* ¶ 3.) Upon completing its independent investigation, the Committee concluded that Yucaipa's claims "are subject to equitable subordination." (*Id.* ¶ 6.) As such, Yucaipa cannot plausibly allege that Black Diamond and Spectrum's assertion of its equitable subordination claim, which is substantially similar to the Committee's equitable subordination claim, is "objectively baseless."

## CONCLUSION

For the foregoing reasons, Black Diamond and Spectrum respectfully request that the Counterclaim be dismissed in its entirety and with prejudice.[16]

Dated: March 18, 2015
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

_/s/ Kerri Mumford_

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile:  (302) 467-4450

- and -

**SCHULTE ROTH & ZABEL LLP**
Adam C. Harris
Robert J. Ward
David M. Hillman
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile:  (212) 593-5955

---

[16] If this Court determines that the Counterclaim should be dismissed, Yucaipa should not be granted leave to amend.  Yucaipa has had the benefit of more than three years of litigation in five different courts, during the course of which Black Diamond and Spectrum have produced tens of thousands of pages of documents.  After all those years of litigation and discovery, the reason that Yucaipa is unable to gather enough factual support to survive a motion to dismiss is simple – such factual support does not exist.  As such, any amendment to the Counterclaim would be futile.  _See, e.g._, _In re Elrod Holdings Corp._, 392 B.R. 110, 113-16 (Bankr. D. Del. 2008) (denying leave to amend equitable subordination complaint where any such amendment would be futile).