**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ASHINC Corporation, *et al.*, | Case No. 12-11564 (CSS) |
| Debtors. | (Jointly Administered) |
| BDCM OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., SPECTRUM INVESTMENT PARTNERS, L.P., BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., AS CO-ADMINISTRATIVE AGENT, AND SPECTRUM COMMERCIAL FINANCE LLC, AS CO-ADMINISTRATIVE AGENT, | Adv. Proc. No. 14-50971 (CSS) |
| Plaintiffs, | |
| v. | |
| YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P., RONALD BURKLE, JOS OPDEWEEGH, DEREX WALKER, JEFF PELLETIER, IRA TOCHNER, and JOSEPH TOMCZAK, | |
| Defendants. | |

**OPPOSITION TO BLACK DIAMOND AND SPECTRUM'S MOTION TO DISMISS**
**YUCAIPA'S COUNTERCLAIM FOR EQUITABLE SUBORDINATION**

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ...................................................................... 1

II.  ARGUMENT ................................................................................................ 4

    A.  The Court's Dismissal of Yucaipa's 2012 Cross-Claim Has No Collateral Estoppel Effect Here ........................................................................ 4

        1.  There Is No Identity of Issues Between the Cases, and the Issues in the 2015 Counterclaim Were Not Litigated in 2013 ...................................... 4

        2.  The Prior Dismissal with Prejudice Was Not Based Upon Factual Implausibility, Which is the Ground Asserted Here ...................................... 10

    B.  The Covenant Not to Sue Does Not Bar Yucaipa's 2015 Counterclaim .............. 15

        1.  The Chancery Court's Interpretation of the Prior Determination Requirement ...................................................................... 15

        2.  The Chancery Court's Interpretation of the Prior Determination Requirement Governs Here ........................................................... 18

        3.  Yucaipa's 2015 Counterclaim Falls Squarely Within the Public-Policy Exception to the Prior Determination Requirement ........................... 23

    C.  The Appearance Prohibition Does Not Bar Yucaipa's 2015 Counterclaim ......... 25

        1.  The Appearance Prohibition Applies Only in "Insolvency or Liquidation Proceedings," Not Adversary Proceedings ................................ 25

        2.  Equitable Estoppel and Public Policy Preclude BD/S from Asserting the Appearance Prohibition Here Against Yucaipa ..................................... 28

            a.  Equitable Estoppel ............................................................................. 28

            b.  Public Policy Prevents BD/S's Newly Minted Interpretation of the Appearance Prohibition .................................................. 30

    D.  Yucaipa's Allegations Easily Clear the *Iqbal-Twombly* Plausibility Hurdle ........ 31

        1.  The Plausibility Standard in the Third Circuit .............................................. 31

        2.  The 2015 Counterclaim Easily Meets the Plausibility Standard .................. 32

            a.  BD/S considered equitable subordination even before Yucaipa acquired any First Lien Debt .............................................. 33

            b.  BD/S thwarted a deal with JCT in the hope that equitably subordinating Yucaipa's debt would provide a more lucrative payout .................................................................................. 35

            c.  BD/S were lying in wait for the optimal time to file their equitable subordination claim ............................................... 37

**TABLE OF CONTENTS**
(continued)

**Page**

d.  BD/S spent a year negotiating with JCT to buy time for their equitable subordination claim and to ensure the deal did not close ................................................................................................ 38

e.  Even though they had been conspiring since 2009, Black Diamond needed to bribe Spectrum in the form of an illegal claims-trade to join the equitable subordination scheme ...................... 38

III.  CONCLUSION .............................................................................................. 40

# TABLE OF AUTHORITIES

<u>Page(s)</u>

**Cases**

*833 N. Corp. v. Tashlik & Assoc.*,
   683 N.Y.S.2d 111 (App. Div. 1998)..................................................................... 22, 30

*Aiello v. City of Wilmington*,
   470 F. Supp. 414 (D. Del. 1979)................................................................................. 18

*Allen v. McCurry*,
   449 U.S. 90 (1980)..................................................................................................... 18

*Am. Capmark Fin. Grp. Inc. v. Lin (In re Capmark Fin. Grp. Inc.)*,
   479 B.R. 330 (Bankr. D. Del. 2012)........................................................................... 14

*Am. Eagle Outfitters v. Lyle & Scott Ltd.*,
   584 F.3d 575 (3d Cir. 2009) ...................................................................................... 27

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................... 32, 34, 40

*Baldwin v. Uni. of Pittsburgh Med. Ctr.*,
   636 F.3d 69 (3d Cir. 2011) ........................................................................................ 27

*Banc of America Securities LLC v. Solow Building Company II, L.L.C.*,
   847 N.Y.S.2d 49 (App. Div. 2007)...................................................................... 21, 22

*Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oesta S.A.*,
   951 N.Y.S.2d 19 (App. Div. 2012).............................................................................. 26

*Beal Sav. Bank v. Sommer*,
   865 N.E.2d 1210 (N.Y. 2007)..................................................................................... 22

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 555 (2007).......................................................................................... 32

*Bradburn Parent Teacher Store, Inc. v. 3M*,
   No. Civ.A 02-7676, 2005 WL 736629 (E.D. Pa. Mar. 30, 2005)............................................ 7

*Braddock v. Zimmerman*,
   906 A.2d 776 (Del. 2006) ......................................................................................... 19

*Brogsdale v. Barry*,
   926 F.2d 1184 (D.C. Cir. 1991)................................................................................. 10

*Brown v. Felsen*,
   442 U.S. 127, 99 S. Ct. 2205, 60 L. Ed. 2d 767 (1979)............................................... 11

*Burlington N. R.R. Co. v. Hyundai Merchant Marine Co.*,
   63 F.3d 1227 (3d Cir. 1995) ................................................................................ 18, 19

*Charles v. Charles*,
   745 N.Y.S.2d 572 (App. Div. 2002)........................................................................... 29

# TABLE OF AUTHORITIES
*(cont.)*

**Page(s)**

*Chester County Intermediate Unit v. Penn.. Blue Shield,*
  896 F.2d 808 (3d Cir. 1990) ...................................................................... 32

*Colton v. N.Y. Hosp.,*
  414 N.Y.S.2d 866 (Sup. Ct. 1979) ............................................................. 22

*Connell v. Liberty Mut. Ins. Co.,*
  841 F. Supp. 578 (D. Del. 1994) ................................................................ 18

*Courtney v. La Salle Univ.,*
  124 F.3d 499 (3d Cir. 1997) ...................................................................... 18

*Covington v. Int'l Ass'n of Approved Basketball Officials,*
  710 F.3d 114 (3d Cir. 2013) ...................................................................... 32

*Del. River Port Auth. v. Fraternal Order of Police,*
  290 F.3d 567 (3d Cir. 2002) ...................................................................... 18

*Desiderio v. Geico Gen. Ins. Co.,*
  967 N.Y.S.2d 392 (App. Div. 2013) ........................................................... 28

*Dist. Council 47 ex rel. Cronin v. Bradley,*
  795 F.2d 310 (3d Cir. 1986) ...................................................................... 14

*Faust v. Deutsche Bank Nat'l Trust Co. (In re Faust),*
  353 B.R. 94 (Bankr. E.D. Pa. 2006) ............................................................ 4

*Ford v. Public Emps. Fed.,*
  573 N.Y.S.2d 174 (App. Div. 1991) ....................................................... 21, 31

*Fowler v. UPMC Shadyside,*
  578 F.3d 203 (3d Cir. 2009) .............................................................. 32, 33, 37

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., LP,*
  850 N.E.2d 653 (N.Y. 2006) ...................................................................... 29

*Gelman v. State Farm Mut. Auto. Ins. Co.,*
  583 F3d 187 (3d Cir. 2009) ....................................................................... 33

*Gilldorn Sav. Ass'n v. Commerce Sav. Ass'n,*
  804 F.2d 390 (7th Cir. 1986) ..................................................................... 18

*Golden v. Cook,*
  293 F. Supp. 2d 546 (W.D. Pa. 2003) ........................................................ 32

*Goldstein v. Carnell Assocs., Inc.,*
  906 N.Y.S.2d 905 (App. Div. 2010) ........................................................... 30

*Gotlin v. Lederman,*
  No. 05-CV-1899 (ILG), 2006 WL 1154817 (E.D.N.Y. Apr. 28, 2006) .................. 30

*Great N. Assocs., Inc. v. Cont'l Cas. Co.,*
  596 N.Y.S.2d 938 (App. Div. 1993) ........................................................... 21

# TABLE OF AUTHORITIES
### (*cont.*)

**Page(s)**

*Greenfield v. Philles Records, Inc.*,
  98 N.Y.2d 562 (N.Y. 2002) ............................................................... 25, 26

*Hawksbill Sea Turtle v. FEMA*,
  126 F.3d 461 (3d Cir. 1997) ............................................................... 9, 11

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
  602 F.3d 237 (3d Cir. 2010) ............................................................... 14

*In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*,
  685 F.3d 353, 357 (3d Cir. 2012) ....................................................... 23, 24

*In re Brown*,
  951 F.2d 564 (3d Cir. 1991) ............................................................... 18

*In re Combustion Eng'g, Inc.*,
  391 F.3d 190 (3d Cir. 2004) ............................................................... 27

*In re Exide Techs, Inc.*,
  299 B.R. 732 (D. Del. 2003) ............................................................... 34

*In re Lipper Holdings v. Trident Holdings*,
  766 N.Y.S.2d 561 (App. Div. 2003) ................................................... 22, 30

*In re Motions for Access of Garlock Sealing Techs. LLC*,
  488 B.R. 281 (Bankr. D. Del. 2013) ................................................... 10

*In re Phil. Newspapers, LLC*,
  599 F.3d 298 (3d Cir. 2010) ............................................................... 36

*Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*,
  458 F.3d 244 (3d Cir. 2006) ............................................................... 4

*Kalisch-Jarcho, Inc. v. City of New York*,
  448 N.E.2d 413, 416 (NY 1983) ................................... 16, 20, 21, 30, 31

*Karibjanian v. Chromalloy Pharm., Inc.*,
  No. CIV. A. 90-4641, 1991 WL 34715 (E.D. Pa. Mar. 13, 1991)............ 9

*Kauffman v. Moss*,
  420 F.2d 1270 (3d Cir. 1970) ............................................................. 11

*KDH Elec. Sys., Inc. v. Curtis Tech. Ltd.*,
  826 F. Supp. 2d 782 (E.D. Pa. 2011) ................................................. 27, 28

*Kelley v. TYK Refractories Co.*,
  860 F.2d 1188 (3d Cir. 1988) ............................................................. 10

*Messick v. Star Enter.*,
  655 A.2d 1209 (Del. 1995) ................................................................. 18

*MPEG LA, LLC v. Audiovox Elecs. Corp.*,
  933 N.Y.S.2d 815 (Sup. Ct. 2011)...................................................... 29

## TABLE OF AUTHORITIES
### *(cont.)*

<u>Page(s)</u>

*Nassau Trust Co. v. Montrose Concrete Prods. Corp.*,
   436 N.E.2d 1265 (N.Y. 1982) ................................................................. 29

*National Railroad Passenger Corp. v. Pennsylvania Public Utilities Commission*,
   288 F.3d 519 (3d Cir. 2002) ................................................................. 10

*Oshiver v. Levin, Fishbein, Sedran & Berman*,
   38 F.3d 1380, 1384 n.2 (3d Cir. 1994) ................................................. 32

*Oswald v. Gibbson*,
   2011 WL 2135619 (E.D. Pa. May 31, 2011) ....................................... 33

*Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*,
   998 F.2d 1192 (3d Cir. 1993) ............................................................... 32

*Phillips v. Cnty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008) ................................................................. 32

*RBC Capital Mkts, LLC v. Educ. Loan Trust IV*,
   87 A.3d 632 (Del. 2014) ....................................................................... 19

*Robison v. First Fin. Capital Mgmt. Corp. (In re Sweetwater)*,
   55 B.R. 724 (D. Utah 1985), *rev'd on other grounds by In re Sweetwater*, 884 F.2d
   1323 (10th Cir. 1989) ........................................................................... 27

*San Remo Hotel, L.P. v. City & County of San Francisco*,
   545 U.S. 323 (2005) ....................................................................... 18, 19

*Schwartz v. Martin*,
   919 N.Y.S.2d 217 (App. Div. 2011) ..................................................... 30

*Scooper Dooper, Inc. v. Kraftco Corp.*,
   494 F.2d 840 (3d Cir. 1974) ................................................................... 9

*SLW Capital, LLC v. Mansaray-Ruffin (In re Mansaray-Ruffin)*,
   530 F.3d 230 (3d Cir. 2008) ................................................................. 26

*Sommer v. Fed. Signal Corp.*,
   593 N.E.2d 1365 (N.Y. 1992) ............................................................... 20

*Spruill v. Gillis*,
   372 F.3d 218 (3d Cir. 2004) ........................................................... 19, 32

*Stanley v. The Int'l Amateur Athletic Fed'n*,
   244 F.3d 580 (7th Cir. 2001) ............................................................... 33

*Sun Healthcare Group, Inc. v. Mead Johnson Nutritional (In re Sun Healthcare Group, Inc.)*,
   2004 WL 941190 (Bankr. D. Del. Apr. 30, 2004) .......................... 26, 27

*Suppan v. Dadonna*,
   203 F.3d 228 (3d Cir. 2000) ............................................................ 4, 10

## TABLE OF AUTHORITIES
### (*cont.*)

**Page(s)**

*Tate v. Showboat Marina P'ship*,
  250 F. Supp. 2d 958 (N.D. Ill. 2003) ................................................................. 18

*W. Penn Allegheny Health Sys., Inc. v. UPMC*,
  627 F.3d 85 (3d Cir. 2010) .................................................................................. 32

*Witkowski v. Welch*,
  173 F.3d 192 (3d Cir. 1999) ................................................................................ 11

*Yucaipa Am. Alliance Fund I, L.P. v. SBDRE LLC*,
  C.A. No. 9151-VCP (Del. Ch. Dec. 11, 2013) .................................................... 15

*Yucaipa Am. Alliance Fund I, L.P. v. SBDRE LLC*,
  C.A. No. 9151-VCP, 2014 WL 5509787 (Del. Ch. Oct. 31, 2014).................... 2, 16, 17, 18, 19

**Statutes**

28 U.S.C. § 1738................................................................................................... 20

**Rules**

Fed. R. Bankr. P. 7001(1)–(10)............................................................................ 30

Fed. R. Bankr. P. 9002(1) .................................................................................... 30

**Treatises**

5A Wright and Miller, Federal Practice and Procedure: Civil 2d, § 1357.................................... 34

# I.    PRELIMINARY STATEMENT

Yucaipa's 2015 Counterclaim[1] alleges a sophisticated fraud scheme by Black Diamond and Spectrum (collectively, "BD/S"), specifically targeted at Yucaipa, leading up to, and through, the Allied bankruptcy.  To perpetrate this scheme, BD/S engaged in orchestrated and coordinated misconduct beginning in 2009 and continuing to the present.  Central to the 2015 Counterclaim is a series of false statements and omissions BD/S made to this Court, intended to conceal the improper claims trading between them in violation of bankruptcy law, all of which Yucaipa discovered after the time of filing the 2012 Cross-Claim (including agreements that BD/S deliberately withheld from Yucaipa and this Court).[2]

BD/S now move to dismiss Yucaipa's 2015 Counterclaim on four grounds:  (i) collateral estoppel based on this Court's prior dismissal of Yucaipa's 2012 Cross-Claim; (ii) Section 2.7(e) of the Third Amendment to the First Lien Credit Agreement (the "Covenant Not to Sue"); (iii) Section 2.7(a) of the Third Amendment (the "Appearance Prohibition" which BD/S argue bars Yucaipa from defending itself or seeking any redress in this action); and (iv) the assertion that Yucaipa's allegations fail to satisfy the *Iqbal-Twombly* "plausibility" standard.  BD/S's contentions are desperate and meritless.

***First***, collateral estoppel does not apply here because the 2015 Counterclaim and the 2012 Cross Claim are entirely different cases.  The 2015 Counterclaim bases its equitable subordination claim on new and extensive factual allegations based upon discovery and three years of litigation; covers a different time frame (from 2009 to the present); and alleges that BD/S's fraudulent conduct was specifically targeted at Yucaipa.  The 2012 Cross-Claim, by contrast,

---

[1]  (D.I. 19, Countercl., Adv. Proc. No. 14-50971.)

[2]  (D.I. 65, Am. Cross-Cl., Adv. Proc. No. 12-50947.)

was a declaratory relief claim seeking to void the restrictions that the Third Amendment placed on Yucaipa's ability to hold and vote First Lien Claims, and was premised on Yucaipa's detrimental reliance. The 2015 Counterclaim does not depend upon a "detrimental reliance" theory, and highlights *the deceptions BD/S made to this Court* in pursuing their scheme to place Allied into involuntary bankruptcy and to pursue the equitable subordination of Yucaipa's debt. Moreover, even if the 2015 Counterclaim did not differ qualitatively and quantitatively from the 2012 Cross Claim, collateral estoppel would still not apply. The Court's dismissal of the 2012 Cross Claim with prejudice was not premised on *factual* implausibility, but instead on legal arguments proffered by BD/S that are not part of their Motion to Dismiss.

**Second**, the 2015 Counterclaim falls within the express Carve Out[3] for "gross negligence or willful misconduct." BD/S seek to invoke the so-called Prior Determination Requirement,[4] arguing that Yucaipa cannot rely on the Carve Out because there has been no prior judicial determination of BD/S's misconduct—but the Delaware Chancery Court rejected this argument in a prior suit between these parties, and under less compelling facts. *Yucaipa American Alliance Fund I, L.P. v. SBDRE LLC*, C.A. No. 9151-VCP, 2014 WL 5509787 (Del. Ch. Oct. 31, 2014). As the Chancery Court held, BD/S may not rely on the Prior Determination Requirement if doing so would have the effect of immunizing BD/S's wrongful conduct. That is, if no other lender could or realistically would bring the equitable subordination claim that Yucaipa asserts, then public policy prevents BD/S from relying on the Prior Determination Requirement to gut the

---

[3]   The Covenant Not to Sue does not bar claims against BD/S arising out of the First Lien Credit Agreement if such claims are "caused by [BD/S's] gross negligence or willful misconduct on or after the date [Yucaipa] becomes a Lender hereunder as determined by a court of competent jurisdiction by final and non-appealable judgment . . . ." (D.I. 19, Third Am. § 2.7(e), Countercl. Ex 3.) This provision is referred to as the "Carve Out."

[4]   The "Prior Determination Requirement" is the latter part of the Carve Out: ". . . as determined by a court of competent jurisdiction . . . ."

Carve Out.  The 2015 Counterclaim sets forth numerous allegations—which are to be accepted as true for purposes of this motion—as to why it is unrealistic to assume any other lender could or would bring the same claim alleged here.  Even if the Court does not find that collateral estoppel bars BD/S's argument, the Chancery Court's construction of the Prior Determination Requirement was correct and should govern here.

*Third*, BD/S misunderstand the Appearance Prohibition, which explicitly applies only in "voluntary or involuntary case[s] or proceeding[s] under Bankruptcy Law" or other similar laws—but not in adversary proceedings such as this action.  (D.I. 19, Ex. 3, Third Am. § 2.7(a); D.I. 1757-2, Intercreditor Agreement § 1.1, No. 12-11564.)  BD/S's absurd interpretation of the Appearance Prohibition would mean that Yucaipa would be unable to defend itself at all in any action in the Bankruptcy Court, no matter how meritless, and that any baseless action would end in a default judgment because Yucaipa would never be allowed to file anything in defense.

Further, BD/S are estopped from asserting the Appearance Prohibition against Yucaipa because they have waited until very recently to assert it even though Yucaipa filed more than 200 pleadings in the Allied bankruptcy case and adversary proceedings.  In addition, even if their interpretation of the Appearance Prohibition were tenable—and it is not—applying it here would exculpate BD/S's intentional and willful misconduct, which is against settled public policy.

*Finally*, Yucaipa's 2015 Counterclaim sets forth compelling allegations that explain how BD/S schemed to reap a huge profit from their Allied investments by pursuing an equitable subordination strategy against Yucaipa.  Yucaipa's Counterclaim is supported by exhibits, including emails between Black Diamond's and Spectrum's principals discussing their plan.  It easily clears the Rule 12(b)(6) "plausibility" hurdle.

Therefore, the Court should deny BD/S's motion to dismiss.

## II.    ARGUMENT

### A.    The Court's Dismissal of Yucaipa's 2012 Cross-Claim Has No Collateral Estoppel Effect Here

BD/S contend that the Court's comments during the February 2013 hearing—regarding the implausibility of the alleged facts in the 2012 Cross-Claim—should be given collateral estoppel effect here, and justify dismissal of Yucaipa's 2015 Counterclaim "*with prejudice*."  (D.I. 41, Mot. to Dismiss Countercl. 16–22, 24.)  This contention ignores both the applicable law and the Court's actual ruling in February 2013.

BD/S, as the parties asserting estoppel, have the burden to demonstrate it applies.  *Suppan v. Dadonna*, 203 F.3d 228, 233 (3d Cir. 2000).  BD/S must establish the following elements, among others:  "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; [and] (3) the previous determination was necessary to the decision . . . ."  *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006) (internal quotation marks omitted); *see also Faust v. Deutsche Bank Nat'l Trust Co.* (*In re Faust*), 353 B.R. 94, 101–04 (Bankr. E.D. Pa. 2006).  BD/S have failed to meet their burden to establish any of these three critical elements of collateral estoppel.

### 1.    There Is No Identity of Issues Between the Cases, and the Issues in the 2015 Counterclaim Were Not Litigated in 2013

First, BD/S must "establish[] an identity of issues between the cases . . . by showing that the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules."  *Suppan*, 203 F.3d at 233 (internal quotation marks omitted).  There is no such identity here.  The Court did nothing more in the February 2013 hearing than dismiss a different complaint, with far different allegations, than what is currently pending.

Yucaipa filed the 2012 Cross-Claim against BD/S on December 5, 2012, seeking declaratory and injunctive relief.  By the time of filing the 2012 Cross-Claim, a New York court had al-

ready voided the Fourth Amendment, so Yucaipa asked this Court to determine whether the

Third Amendment—which restricted Yucaipa's ability to hold and vote First Lien Claims—

governed Yucaipa's First Lien Claims. (See D.I. 65, Am. Cross-Cl. ¶¶ 1–6, 25, Adv. Proc. No.

12-50947.) Yucaipa asserted its 2012 Cross-Claim in the "Allied Adversary Proceeding" (D.I.

65, Adv. Proc. No. 12-50947), which the debtors' estate initiated against all lenders in October

2012 to determine the validity of the Third and Fourth Amendments and to ascertain the identity

of the "Requisite Lender." (See id. ¶ 24; see also D.I. 1 Compl. ¶ 6, Adv. Proc. No. 12-50947.)[5]

The 2012 Cross-Claim did not seek equitable subordination.

In the 2012 Cross-Claim, Yucaipa asserted its own justifiable and detrimental reliance on

BD/S's encouragement when purchasing First Lien Debt from ComVest in 2009, which required

the passage of the Fourth Amendment to First Lien Credit Agreement. (See D.I. 65, Am. Cross-

Cl. ¶¶ 2–6, Adv. Proc. No. 12-50947.) The 2012 Cross-Claim relied upon two central allega-

tions: (1) between 2009 and 2012, after encouragement from and with full disclosure to BD/S

regarding the necessity, and content, of the Fourth Amendment, BD/S subsequently double-

crossed Yucaipa by seeking to invalidate the Fourth Amendment in successive state court actions

(id. ¶¶ 7–8); and (2) Yucaipa "never would have acquired first lien debt holdings" but for its rea-

sonable and detrimental reliance on the validity of the Fourth Amendment. (Id. ¶ 25(a).)

In dismissing the 2012 Cross-Claim, this Court found Yucaipa's allegations implausible

only to the extent "mischief [was allegedly] going on that was detrimental or directed at Yucaipa

at the time of the third amendment being entered into . . . and then the fourth amendment being

negotiated, and then the debt being [bought] and then the fourth amendment being passed." (D.I

---

[5] The "Requisite Lender" is the lender or lenders who held a majority of the First Lien Claims and, under the
terms of the First Lien Credit Agreement, held the power to take certain actions on behalf of all lenders.
(D.I. 19, First Lien Credit Agreement § 1.1, Countercl. ¶ 39, Ex. 1).

162, Tr. Mot. to Dismiss Hrg. 110:11–16, Adv. Case No. 12-50947.)  Thus, the Court found it implausible that (a) Yucaipa would have detrimentally relied on BD/S's encouragement with respect to the 2009 ComVest transaction and the Fourth Amendment and (b) BD/S procured the Covenant Not to Sue by fraud.

The 2015 Counterclaim is not the dismissed 2012 Cross-Claim.  On the contrary, the 2015 Counterclaim sets forth BD/S's multi-year, unlawful plan to:  (a) seek the consolidation of a large amount of First Lien Claims into Yucaipa's hands, an insider whose claims would be more vulnerable to equitable subordination; (b) cooperate to prevent Yucaipa from acting as Requisite Lender or from selling its First Lien Claims to JCT; (c) file the 2012 involuntary bankruptcy petition against Allied supported by false affidavits that concealed illegal claims trading, and the payment of a bribe to Spectrum in the form of a claims transfer; and (d) pursue a baseless equitable-subordination strategy in Bankruptcy Court, which had been conceived even before Yucaipa acquired any First Lien Claims from ComVest.  (D.I. 19, Countercl. ¶¶ 8–11.)

BD/S have failed to establish and "identity of issues" for collateral estoppel purposes because the 2015 Counterclaim alleges significant new facts resulting from a continuing course of conduct, and because it does not depend upon a detrimental reliance theory in connection with the passage of the Fourth Amendment.  The 2015 Counterclaim does not even allege detrimental reliance as to either point, and makes no mention at all of procuring the Covenant Not to Sue by fraud.  Yucaipa's new allegations concern far different issues, both temporally and substantively, and are fully supported by the underlying evidence that Yucaipa has received to date.[6]

---

[6]  The allegations that BD/S sought to concentrate First Lien Claims in Yucaipa's hands are not meant to show that Yucaipa justifiably or detrimentally relied on any encouragement.  The concept of reliance is mentioned only once.  (D.I. 19, Countercl. ¶ 47.)  The allegations instead show that Black Diamond and Spectrum (a) wanted all the majority of First Lien Claims in the hands of an insider, Yucaipa, and (b) were embarking on an unlawful scheme to intentionally disenfranchise Yucaipa.  (*Id.* ¶ 50.)

As for the temporal scope, although BD/S's plan originated in 2009, it continued through 2012 and to the present—well beyond the time period covered in Yucaipa's 2012 Cross-Claim. "[I]t is axiomatic that collateral estoppel cannot apply to [the fact-finder's] factual determinations . . . for a time period that was not at issue in [the prior case]." *Bradburn Parent Teacher Store, Inc. v. 3M*, No. Civ.A 02-7676, 2005 WL 736629, *6 n.7 (E.D. Pa. Mar. 30, 2005). In 2012, for instance, BD/S thwarted the JCT negotiations, violated the claims-transfer rule and bankruptcy disclosure requirements, and filed the involuntary bankruptcy petition. (D.I. 19, Countercl. ¶¶ 55–61, 75–78, 91–101, 103–04, Ex. 10.) In the ensuing bankruptcy, BD/S have used unlawful means to reduce and dilute Yucaipa's ownership interest (and expand their own) in the corporate entity, SBDRE LLC, which BD/S have placed in control of Allied's few remaining assets. (*Id.* ¶ 98.) They also directed the current Administrative Agent (which is their controlled affiliate) to pay their attorney's fees and expenses totaling approximately $12 million out of the monies available to the first lien lenders generally, without any explanation or justification and without allowing similar disbursements to be made to Yucaipa. (*Id.* ¶¶ 91–93.)

Furthermore, the 2015 Counterclaim does not just cover a longer period of time; it alleges an entirely new set of facts, including extensive allegations showing that BD/S communicated about and pursued a fraudulent scheme to harm Yucaipa—which BD/S dubbed the "'equitable subordination angle.'"(D.I. 19, Countercl. ¶ 51, Exs. 4, 6.) In early 2012, BD/S pledged to act together "'in contemplation of . . . certain strategies to enforce the rights of the Parties as Lenders . . . .'" (*Id.* ¶ 64, Ex. 11.) A few months later, Spectrum demanded that Black Diamond sell it $4 million worth of First Lien Claims, stressing that "'[w]e cannot file an involuntary without it done.'" (*Id.* ¶ 69, 70, 75, Ex. 12.) BD/S completed this unlawful trade of First Lien Claims in order to secure Spectrum's participation in the involuntary petition. (*Id.* ¶ 69, 70, 75.) After

completing that sale, BD/S filed their involuntary petition in May 2012, yet misrepresented and concealed their illegal claims trading from the Bankruptcy Court. (*Id.* ¶ 74.) In the ensuing three years of litigation, BD/S later revealed that they are bound by a joint Cooperation Agreement to pursue "certain strategies" to enforce their rights and to engage in claims trading with each other. (*Id.* ¶ 64.)[7] Further, Yucaipa discovered that BD/S had intentionally sabotaged the sale of Allied's assets to JCT in early 2012. (*Id.* ¶¶ 55–61.)

Moreover, unlike the 2012 Cross-Claim, the 2015 Counterclaim describes unlawful conduct in violation of federal bankruptcy rules and criminal statutes. Specifically, Yucaipa alleges that BD/S, as part of their scheme to defraud Yucaipa, made false representations and material omissions to the Bankruptcy Court in violation of 18 U.S.C. § 152(2), (3), and (6) and Fed. R. Bank. P. 1003 and 2019. The 2014 Counterclaim details BD/S's false assertions *to this Court* that they had not transferred any "'claim[s] against the debtor [Allied]'" for the purpose of commencing the bankruptcy. (D.I. 19, Countercl. ¶¶ 75–78, 91–101, 103–104.) In connection with BD/S's filing of the involuntary petition, Black Diamond submitted a sworn affidavit stating that it had not "acquired" any claims in Allied for the purpose of commencing the involuntary case, omitting the fact that it had transferred claims; and Spectrum "falsely swore that no claims were 'assigned to Spectrum for the purposes of commencing the bankruptcy cases.'" (*Id.* ¶ 77, Exs. 17, 18.) The Court's prior finding of implausibility has no bearing on these allegations.

In addition, at the time of bringing the 2012 Cross-Claim, Yucaipa did not know that Spectrum had told Black Diamond that "'[w]e cannot file an involuntary without [a $4 million claims trade],'" or that they both failed to disclose the completed trade to the Bankruptcy Court

---

[7] Although the Cooperation Agreement was responsive to discovery requests, BD/S did not produce it until Yucaipa alleged that BD/S had falsified their involuntary petition by failing to disclose a $4 million First Lien Claims trade. (D.I. 19, Countercl. ¶ 65.)

when filing the involuntary petition.  (*Id*. at ¶ 69, 70, 75, Ex. 12.)  Nor did Yucaipa know of the

Cooperation Agreement,[8] or that BD/S intentionally sabotaged the JCT negotiations.  (*See id*.

¶¶ 55–61, Ex. 10.)  Yucaipa discovered these facts between March and April 2013, when it re-

ceived documents and discovery responses from BD/S that revealed communications between

them that demonstrate extensive, orchestrated and coordinated conduct—all directed at Yucai-

pa—occurring between 2009 and 2012.  (*See, e.g.*, D.I. 61, 87, Adv. Proc. No. 13-50530.)  Thus,

Yucaipa learned of these facts only after the 2012 Cross-Claim was dismissed, making collateral

estoppel unavailable.  *See, e.g.*, *Hawksbill Sea Turtle*, 126 F.3d 461, 466–67 (3d Cir. 1997) (col-

lateral estoppel of court's prior findings was unavailable in subsequent action based on changed

circumstances occurring since the prior findings);[9] *Scooper Dooper, Inc. v. Kraftco Corp.*, 494

F.2d 840, 846 (3d Cir. 1974) ("It is well settled that changed factual circumstances can operate to

preclude the application of collateral estoppel.").  And in any event, the Court's prior implausi-

bility finding did not encompass these issues at all.

Beyond these new facts revealed through discovery, the 2015 Counterclaim also alleges

"significant new facts grow[ing] out of a continuing course of conduct . . . ."  *Hawksbill Sea Tur-

tle*, 126 F.3d at 477.  BD/S seek not only to equitably subordinate Yucaipa's claims, but to ac-

---

[8]   Black Diamond and Spectrum may assert that their Cooperation Agreement could have been discovered through
      the exercise of due diligence.  *Karibjanian v. Chromalloy Pharm., Inc.*, No. CIV. A. 90-4641, 1991 WL 34715,
      at *3 (E.D. Pa. Mar. 13, 1991) (changed circumstances exception inapplicable where information could have
      been discovery through due diligence).  However, Yucaipa exercised due diligence here.  As alleged in the 2015
      Counterclaim, Yucaipa served discovery requests in the UCC Action (*Official Comm. of Unsecured Creditors v.
      Yucaipa Am. Alliance Fund I, L.P.*, Adv. Proc. No. 13-50530 (Bankr. D. Del. Feb. 1, 2013)) seeking documents
      like the Cooperation Agreement.  (D.I. 19, Countercl. ¶ 65.)  Black Diamond and Spectrum produced it only
      when they were accused of improper claims trading, more than a year later.  (*Id*.)

[9]   In *Hawksbill*, the district court previously found that FEMA had satisfied procedural obligations under federal
      environmental law for the construction of a temporary housing facility.  But those findings were deemed not
      preclusive in a subsequent action challenging construction of the facility.  *Id*. at 476–77.  The court in the prior
      proceeding had predicated its findings on the housing facility's temporary nature; by the time of the second ac-
      tion, however, the facility was no longer "temporary" and FEMA's obligations under the law had changed ac-
      cordingly.  *Id*.

tively thwart Yucaipa's legitimate participation in the bankruptcy proceedings themselves by diluting Yucaipa's interest in SBDRE LLC and denying Yucaipa's legitimate requests for attorney's fees and expenses. (D.I. 19, Countercl. ¶¶ 91–93, 98.) Again, the prior implausibility finding had nothing to do with these issues. *See Kelley v. TYK Refractories Co.*, 860 F.2d 1188, 1198 & n.18 (3d Cir. 1988) (finding no identity of issues where "the issues involved in the two actions are distinct."); *Brogsdale v. Barry*, 926 F.2d 1184, 1188 (D.C. Cir. 1991); *In re Motions for Access of Garlock Sealing Techs. LLC*, 488 B.R. 281, 295–96 (Bankr. D. Del. 2013) (no collateral estoppel where present issue was not determined in earlier action).

In short, BD/S have failed to "establish[] an identity of issues between the cases . . . by showing . . . that the facts of both cases are *indistinguishable . . . .*" *Suppan*, 203 F.3d at 233 (internal quotation marks omitted, emphasis added). Instead, BD/S's "collateral estoppel" argument is no more than encouragement to adopt the nonsensical rule that all amended complaints should be dismissed simply because the predecessor complaint was dismissed. Unsurprisingly, BD/S cite no support for their radical interpretation of collateral estoppel. The sole authority on which BD/S rely, *National Railroad Passenger Corp. v. Penn. Public Utilities Commission*, 288 F.3d 519 (3d Cir. 2002), does not assist BD/S at all. *National Railroad* involved identical issues about an unchanged characteristic of the defendant, that is, that it was not a federal entity or arm of Pennsylvania. *Id.* at 524–32. Unlike that static case, the 2015 Counterclaim sets forth detailed, new additional allegations that resulted from document discovery and three years of litigation.

### 2. The Prior Dismissal with Prejudice Was Not Based Upon Factual Implausibility, Which is the Ground Asserted Here

When stating its reasons for dismissing the 2012 Cross-Claim with prejudice, the Court relied only on the "legal bases" that BD/S had raised, which the Court found were "noncurable"

by additional amendment. The Court's dismissal with prejudice did not rest upon the implausibility of the factual theory of the case—rather, the Court's refusal to permit amendment rested on legal bases that BD/S do not raise here. But collateral estoppel "treats as final only those questions *actually and necessarily decided* in a prior suit." *Brown v. Felsen*, 442 U.S. 127, 139 n.10 (1979) (emphasis added); *Hawksbill Sea Turtle*, 126 F.3d at 477 ("Collateral estoppel applies only when the same issues decided in the past action arise again in the present context."). Because of the risk of erroneously denying parties a chance to be heard on their claims, "[r]easonable doubt as to what was decided by a prior judgment should be resolved against using it as an estoppel." *Kauffman v. Moss*, 420 F.2d 1270, 1274 (3d Cir. 1970); *see also Witkowski v. Welch*, 173 F.3d 192, 206 (3d Cir. 1999) ("[W]e caution against [estoppel's] invocation in most . . . cases without extreme care.").[10] Accordingly, the Court should reject BD/S's collateral estoppel argument for this independent reason.

In late January 2013, BD/S moved to dismiss the 2012 Cross-Claim. (D.I. 73, 74, Adv. Proc. No. 12-50947.) They argued that the Covenant Not to Sue barred Yucaipa's Cross-Claim; that the Delaware statute of limitations also barred the 2012 Cross-Claim; and that Yucaipa was bound by the Third Amendment even though it was not an original signatory. (D.I. 74 at 12–19.) Additionally, in their reply brief, BD/S argued that it was factually implausible that BD/S had induced Yucaipa to purchase ComVest's debt and to detrimentally rely on the Fourth Amendment. (D.I. 117 at 1–4, 9–10, Adv. Proc. No. 12-50947.)

At the hearing, BD/S argued the factual implausibility of Yucaipa's allegation that BD/S had "encouraged" it to purchase the ComVest debt. (D.I. 162, Tr. Mot. to Dismiss Hrg. 52:17–

---

[10]   This is particularly applicable here, where the Court's dismissal order in 2013 consisted of a summary ruling that referenced the transcript of the hearing itself, which contained substantial argument and counter-argument. (D.I. 139, Order re: Mot. to Dismiss, Adv. Proc. No. 12-50947.)

19, Adv. Proc. No. 12-50947.)  BD/S asserted that Yucaipa decided to purchase its Requisite

Lender position before BD/S had made any representations, so Yucaipa could not show reliance.

This argument was the centerpiece of their factual implausibility contention (*id.* at 52–55, 105–

06), which BD/S acknowledged was "a very small part of the complaint."  (*Id.*)

This Court ultimately found that "under [the Covenant Not to Sue's] plain meaning, you

can't sue.  I don't think there's any question as to the plain meaning of the covenant and I think

it's very clear."  (*Id.* at 109:15–17.)  The Court also held that "as of August 2009 . . . the cause of

action would be sufficiently ripe to give rise to the beginning of running of the statute of limita-

tions[,] certainly by November of 2009 when litigation had ensued on these very issues," and

that the Delaware statute of limitations barred the 2012 Cross-Claim.  (*Id.* at 112:5–14.)

Regarding plausibility, the Court found "[t]he allegations in the [2012 Cross-Claim] do

not meet [the plausibility] standard. . . .  The bottom line is I just don't think the story as pled

holds together sufficiently to meet the standard."  (*Id.* at 109:8–9.)[11]  The Court specifically stat-

ed that the story revolved around whether "the factual allegations in the complaint . . . [raised] a

plausible issue *about whether the covenant not to sue should be applied*."  (*Id.* at 109:2–5,

110:3–4 (emphasis added).)  The Court continued,

> I don't find anything in the record that would support a plausible
> claim . . . *that in the entry of the third amendment there was any*
> *fraud or wrongdoing whatsoever in connection with the actual*
> *covenant not to sue.  As a matter of fact, I don't think there's any*
> *allegation really that rises to the plausibility that there was any*
> *kind of mischief going on that was detrimental or directed at Yu-*
> *caipa at the time of the third amendment being entered into the*
> *purchase*, excuse me, and then the fourth amendment being nego-
> tiated, and then the debt being brought and then the fourth amend-
> ment being passed….  So basically, I don't know it has led to level

---

[11]  In the order granting BD/S's motion to dismiss, the Court indicated that it was doing so "for the reasons set
forth on the record at the hearing," effectively incorporating the transcript of the hearing into its order.
(D.I. 139, Order re: Mot. to Dismiss 3, Feb. 27, 2013, Allied Adv. Proc.)

of fraud necessarily in connection with the covenant not to sue, but ***it would need to certainly be something with some heft behind it to support some detrimental reliance argument. And it just isn't there***.

(*Id.* at 110:9–20 (emphasis added).)

At the conclusion of the hearing, BD/S asked the Court to dismiss with prejudice because the legal defects the Court identified were not curable. Counsel articulated those legal bases as "the waiver clause, the covenant not to sue, the fact that the subsequent holders [of First Lien Claims] are bound by their predecessors' consents[,] and the statute of limitations, a number of these of which I don't think are curable at all, it seems to me that you should deny the motion for leave to amend." (*Id.* at 114:15–20.)

The Court "concur[red] with counsel that these are in effect legal bases," and dismissed Yucaipa's 2012 Cross-Claim with prejudice. (*Id.* at 115:5–6, 11–12.) Although "[the legal bases] turn obviously to some extent on the facts," the Court found that "I simply don't view them as in effect curable based on my understanding of what's in the cross claims today as well as my broader understanding of the case . . . ." (*Id.* at 115:6–10.)

Thus, contrary to BD/S's summary assertion that the Court's factual implausibility findings were necessary to its decision to dismiss *with prejudice*, the Court relied on "legal bases" to deny Yucaipa leave to amend and to instead dismiss with prejudice, which is the precise remedy BD/S seek here. These legal bases—the Covenant Not to Sue, statute of limitations, waiver clause and the binding nature of the predecessors' consents—are not asserted as part of this Motion to Dismiss and are wholly distinct from the factual implausibility that BD/S now assert as the basis for their collateral estoppel argument. (D.I. 41, Mot. to Dismiss Countercl. at 18.) As a result, the Court's factual implausibility finding has no preclusive effect on the 2015 Counter-claim because the Court did not, and of course could not have, found that Yucaipa could never

13

have pleaded *any* plausible claim upon amendment, especially one based upon facts *unknown to Yucaipa at that time.*

"[I]n determining whether the issue was essential to the judgment, we must look to whether the issue was critical to the judgment or merely dicta." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 248 (3d Cir. 2010) (internal quotation marks omitted).  For example, in *Howard Hess Dental*, the court had held in an earlier decision that a defendant possessed monopoly power and used it against competitors.  *Id.*  Although the court's finding *implied* that the defendant had harmed its competitors, the finding could not be used to establish such harm in a subsequent action.  *Id.*  As the Third Circuit explained, "[s]imply because such a conclusion may be gleaned from the [earlier decision] does not mean that it was essential to our holding."  *Id.*

Here, as explained, the Court's factual implausibility findings were not necessary to the Court's dismissal with prejudice, which was based only on the "legal bases" identified by BD/S, which the Court opined could not be cured by amendment.  (D.I. 162, Tr. Mot. to Dismiss Hrg. 115:6–7, Adv. Case No. 12-50947.)  Factual implausibility was not among the grounds for dismissal with prejudice.  Nor did the Court did not state (or imply) that Yucaipa would be unable to plead a plausible factual theory if it had been given the chance to do so.  Indeed, leave to amend is usually granted so that plaintiffs may attempt to cure deficient factual allegations.  *See Dist. Council 47 ex rel. Cronin v. Bradley*, 795 F.2d 310, 316 (3d Cir. 1986); *Am. Capmark Fin. Grp. Inc. v. Lin* (*In re Capmark Fin. Grp. Inc.*), 479 B.R. 330, 335 (Bankr. D. Del. 2012).

Because the Court's ruling was grounded in "legal bases" that BD/S do not allege here, not in findings of factual implausibility, this Court's prior factual implausibility finding has no collateral estoppel effect here.

**B.** **The Covenant Not to Sue Does Not Bar Yucaipa's 2015 Counterclaim**

BD/S contend that the Covenant Not to Sue[12] bars Yucaipa's 2015 Counterclaim. They are wrong. The Covenant does not preclude Yucaipa's claims against BD/S arising out of the First Lien Credit Agreement as long as such claims are "caused by [BD/S's] gross negligence or willful misconduct on or after the date [Yucaipa] becomes a Lender." (D.I. 19, Third Am. § 2.7(e), Countercl. Ex 3.) BD/S's reading of this provision is nonsensical, requiring a court to decide such claims before they can even be brought. As the Delaware Chancery Court has already held, BD/S's reading of this provision is impermissible as a matter of public policy.

**1.** **The Chancery Court's Interpretation of the Prior Determination Requirement**

In the Chancery Court action, Yucaipa sued BD/S, seeking declaratory relief and damages for BD/S's breaches of the First Lien Credit Agreement and fiduciary duty in structuring and managing SBDRE LLC, an entity holding Allied's few remaining assets. *See Yucaipa Am. Alliance Fund I, L.P. v. SBDRE LLC*, C.A. No. 9151-VCP (Del. Ch. Dec. 11, 2013). BD/S moved to dismiss Yucaipa's claim, invoking the Covenant Not to Sue.

The Chancery Court focused on the Covenant Not to Sue's "gross negligence or willful misconduct" Carve Out. In particular, the court considered whether the Prior Determination Requirement—under which the gross negligence or willful misconduct must be "determined by a

---

[12] Yucaipa did not purchase First Lien Debt pursuant to the Third Amendment to the First Lien Credit Agreement. (D.I. 1, Compl. ¶ 8; D.I. 19, Answer ¶ 8.) Rather, Yucaipa purchased First Lien Debt under the Fourth Amendment. However, the Court found the Fourth Amendment to be void—a decision that Yucaipa has appealed. (See Not. of Appeal, Sept. 19, 2013, 13-cv-01580-SLR (D. Del.), D.I. 1.) Nonetheless, in light of the New York state court's prior decision voiding the Fourth Amendment, the Court also held that Yucaipa's First Lien Debt is constructively subject to "all of the [remaining] amendments [to the First Lien Credit Agreement], including the third amendment." (D.I. 297, Tr. Mot. Summ. Judgment Hrg. 127:13–15, Aug. 30, 2013, Adv. Proc. No. 13-50530.) It is in this context that BD/S invoke the terms of the Third Amendment against Yucaipa. And in responding to BD/S's motion, Yucaipa assumes for the sake of argument that it is subject to the terms of the Third Amendment (although Yucaipa does not concede that this is the case, or that the Third Amendment is valid).

court of competent jurisdiction by a final and non-appealable judgment"—demands, in all instances, a prior judgment in a separate action. *Yucaipa Am. Alliance Fund I, L.P. v. SBDRE LLC*, C.A. No. 9151-VCP, 2014 WL 5509787, at *10–11 (Del. Ch. Oct. 31, 2014).

As an initial matter, the Chancery Court deferred to this Court's previous interpretation of the Covenant Not to Sue and Carve Out (this Court considered these provisions when it granted BD/S's motion to dismiss Yucaipa's 2012 Cross-Claim).  In this Court's view:

> I agree that the carve out as written deals with the narrow situation of a finding at some time post signing of the covenant by a court that there's been willful misconduct or gross negligence.  And . . . I don't think that is done in the auspices of a lawsuit directly related between the parties, it has to come from somewhere else.  It's a little vague, but I think it's fair to say it has to be a narrow exception.

*Id.* at *11.

In construing that "narrow exception," the Chancery Court found that enforcement of the Covenant Not to Sue could violate public policy if the Prior Determination Requirement were interpreted to prevent Yucaipa from seeking redress for harms unique to it—that is, harms for which no other lender but Yucaipa would seek redress.  *Id.* at *14–15.  The court invoked New York case law on contractual interpretation,[13] holding that "'an exculpatory agreement, no matter how flat and unqualified its terms, will not exonerate a party from liability under all circumstances.  Under announced public policy, it will not apply to exemption of willful or grossly negligent acts.'"  *Id.* at *14 n.66 (quoting *Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 416 (N.Y. 1983)).

The Chancery Court held that the Prior Determination Requirement would violate public policy if it has the effect of exonerating BD/S's gross negligence and willful misconduct.  As the

---

[13]   Under the First Lien Credit Agreement's "Applicable Law" provision, the agreement, its amendments, and disputes arising from those, are governed by New York law.  (D.I. 19, First Lien Credit Agreement § 10.14., Countercl., Ex. 1)

court explained, "[a]t the motion to dismiss stage," it is at least "reasonably conceivable that Yu-caipa could show that the outer boundaries of the Covenant are ambiguous . . . and that public policy would prevent the wholesale adoption of the broad interpretation [BD/S] advance[s]." *Id.* at *14. The court elaborated that in applying the Prior Determination Requirement to Yucaipa, this Court logically must have assumed that "another Lender actually *could bring* the claim Yu-caipa seeks to assert against Defendants. As such, in any instance where Yucaipa suffers a dis-tinct harm not shared by any other person or entity that reasonably could bring suit, it would be impossible to satisfy the Prior Determination Requirement." *Id.* In other words, applying the Prior Determination Requirement in such cases would render it unenforceable, because "agree-ments prospectively limiting a party's liability resulting from that party's intentional misconduct are void as against public policy." *Id.* at *14. The Chancery Court relied on this interpretation of the Prior Determination Requirement in denying BD/S's motion to dismiss a number of Yu-caipa's claims (although the court dismissed other claims with prejudice). *Id.* at *15–17.

BD/S's attempt to limit the Chancery Court's holding to narrow situations in which satis-fying the Prior Determination Requirement would be literally impossible. (D.I. 41, Mot. to Dis-miss Countercl. at 14.) But that is not what the Chancery Court held. To the contrary, the court expressly declined to dismiss Yucaipa's declaratory relief claim because "it is *unrealistic to as-sume* anyone other than Yucaipa" would seek such relief. *Yucaipa Am. Alliance Fund I, L.P.*, C.A. No. 9151-VCP, 2014 WL 5509787, at *15 (emphasis added). Likewise, the court declined to dismiss several other claims to the extent Yucaipa alleged that it had been harmed relatively more than other lenders when BD/S diluted Yucaipa's stake in SBDRE. *Id.* at *16. This shows that the court did not impose a literal impossibility requirement—rather, especially at the plead-ing stage, the Chancery Court required only that it be "unrealistic" for other lenders to sue, or

that it was unlikely that they would sue because Yucaipa had a greater incentive.  *Id.* at *15.

### 2. The Chancery Court's Interpretation of the Prior Determination Require-ment Governs Here

The Chancery Court's holding with respect to well-settled principles regarding public policy applies here.  This is true as a matter of collateral estoppel, and also because the Chancery Court's ruling is persuasive, on-point precedent that this Court should follow

Under the doctrine of issue preclusion,[14] federal courts give state-court judgments preclusive effect to the same extent such judgments would have in state court under the relevant state's preclusion or collateral estoppel doctrine.[15]  In Delaware, "if a court has decided an issue of fact necessary to its judgment, that decision precludes relitigation of the issue in a suit on a different cause of action involving a party to the first case."  *Messick v. Star Enter.*, 655 A.2d 1209, 1211 (Del. 1995) (citing *Allen v. McCurry*, 449 U.S. 90 (1980)).  Rulings on motions to dismiss are deemed final judgments under Delaware law for estoppel purposes.[16]  *See RBC Capital Mkts,*

---

[14]  *Del. River Port Auth. v. Fraternal Order of Police*, 290 F.3d 567, 572 (3d Cir. 2002) ("An issue necessary to support [a court's] judgment is conclusive in subsequent suits based on a cause of action involving a party or one in privity.")

[15]  *See* 28 U.S.C. § 1738; *San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323 (2005); *Del. River Port Auth.*, 290 F.3d at 573; *Connell v. Liberty Mut. Ins. Co.*, 841 F. Supp. 578, 583–84 (D. Del. 1994) (Delaware court's interpretation of contract term given preclusive effect in district court); *cf. Courtney v. La Salle Univ.*, 124 F.3d 499, 507–08 (3d Cir. 1997) (Becker, Scirica, JJ., concurring) (state court's contractual interpretation given preclusive effect, even if federal courts would have interpreted contract differently).

[16]  It appears that the Delaware Supreme Court has not determined whether an order must be final in the sense of "appealable" for collateral estoppel purposes, or whether courts may give preclusive effect to interlocutory orders such as the Chancery Court's dismissal order here.  Most authorities do not construe the finality requirement so strictly.  *See Burlington N. R.R. Co. v. Hyundai Merchant Marine Co.*, 63 F.3d 1227, 1231–33 (3d Cir. 1995) ("[T]he concept of finality for purposes of collateral estoppel does not require the entry of a final judgment in the sense of being appealable." (internal quotation marks and citations omitted)); *In re Brown*, 951 F.2d 564, 569 (3d Cir. 1991) (same); *see also* Restatement (2d) of Judgment § 13 (1982) ("'[F]inal judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.").  It is likely that the Delaware Supreme Court would not construe the requirement so narrowly either, because, among other reasons, a "hypertechnical approach of the finality requirement . . . would not serve the policy behind the rule."  *Tate v. Showboat Marina P'ship*, 250 F. Supp. 2d 958, 960 (N.D. Ill. 2003) (citing *Gilldorn Sav. Ass'n v. Commerce Sav. Ass'n*, 804 F.2d 390, 394 (7th Cir. 1986)); *see also Aiello v. City of Wilmington*, 470 F. Supp. 414, 419–20 (D. Del. 1979) (even in res judicata context, some nonappealable orders may be preclusive).

*LLC v. Educ. Loan Trust IV*, 87 A.3d 632, 643–44 & n.42 (Del. 2014) (dismissal with prejudice is final judgment on merits for res judicata purposes); *Braddock v. Zimmerman*, 906 A.2d 776, 780 (Del. 2006) (dismissal without prejudice may be final judgment).

Here, the Chancery Court's decision governs the interpretation of the Prior Determination Requirement because it was a final decision on a dispositive issue and the same parties were involved.[17]  Indeed, the Chancery Court squarely confronted the scope of the Prior Determination Requirement in deciding whether Yucaipa's claims fell within the Carve Out:  "I will not dismiss . . . any Count in which Yucaipa sufficiently has alleged that it sustained a unique wrong not suffered by other Lenders, i.e., situations in which the Prior Determination Requirement cannot be satisfied."  *Yucaipa Am. Alliance Fund I, L.P.*, C.A. No. 9151-VCP, 2014 WL 5509787, at *15. The Court then denied in part and granted in part (with prejudice) BD/S's motion to dismiss, and stayed all remaining claims pending the outcome of the Allied bankruptcy proceedings.  *Id.* at *17.

Thus, the Chancery Court's interpretation of the Prior Determination Requirement is final for collateral estoppel purposes.  *See Burlington N. R.R. Co.*, 63 F.3d at 1233 n.8 (an order sufficiently final "for purposes of collateral estoppel does not require the entry of a judgment final in the sense of being appealable.  Instead, the doctrine . . . applies whenever an action is sufficiently firm to be accorded conclusive effect. . . . [T]he wisest course [is] to regard the prior decision of the issue as final for the purpose of issue preclusion without awaiting the end judgment." (internal quotation marks omitted)).  It is therefore "preclusive" here.  *San Remo Hotel*, 545 U.S. at 335.

---

[17]   The Court may consider judicial records when deciding a motion to dismiss.  *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004).

In any event, even assuming for the sake of argument that this Court elects not to give preclusive effect to the Chancery Court's construction of the Prior Determination Requirement (which would be in error and violate the full faith and credit statute), this Court should nonetheless follow the Chancery Court's persuasive interpretation.[18]

As the Chancery Court correctly explained, New York public policy law, which applies here,[19] does not abide contractual provisions that exculpate "willful or grossly negligent acts." *Kalisch-Jarcho, Inc.*, 448 N.E.2d at 416; *Schwartz v. Martin*, 919 N.Y.S.2d 217, 219 (App. Div. 2011) ("[A]n enforceable release will not insulate a party from grossly negligent conduct."); *Goldstein v. Carnell Assocs., Inc.*, 906 N.Y.S.2d 905, 905 (App. Div. 2010) ("[T]he public policy of this State dictates that a party may not insulate itself from damages caused by grossly negligent conduct." (internal quotations marks omitted)).

As the New York Court of Appeals explained:

> More pointedly, an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing. This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith. Or, when, as in gross negligence, it betokens a reckless indifference to the rights of others, it may be implicit[].

*Kalisch-Jarcho, Inc.*, 448 N.E.2d at 416–417. Thus, no matter how clear the waiver language and the parties' intent, New York public policy provides that contractual waiver provisions cannot exculpate the released party's willful or grossly negligent acts. *Id.* at 416–17; *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1371 (N.Y. 1992) ("[W]hile [defendant's] exculpatory and

---

[18] This Court did not address the public policy exception under New York law when it dismissed Yucaipa's 2012 Cross-Claim.

[19] Again, the Third Amendment's provisions, including the Covenant Not to Sue, are governed by New York law under the First Lien Credit Agreement's "Applicable Law" provision. (D.I. 19, First Lien Credit Agreement § 10.14, Countercl. Ex. 1.)

limitation of liability clauses are enforceable against claims of ordinary negligence, those clauses cannot restrict [defendant's] liability for conduct evincing a reckless disregard for its customers' rights."); *Great N. Assocs., Inc. v. Cont'l Cas. Co.*, 596 N.Y.S.2d 938, 940 (App. Div. 1993).

In *Banc of America Securities LLC v. Solow Building Company II, L.L.C.*, 847 N.Y.S.2d 49 (App. Div. 2007), for instance, the plaintiff had assented to a limitation-of-remedies provision, which limited it to seeking only the remedy of specific performance. *Id.* at 53. The defendant argued that this limitation-of-remedies provision barred the plaintiff from seeking monetary damages. But the court found otherwise because the defendant's interpretation would effectively allow it to intentionally inflict economic harm on plaintiff. *Id.* at 55–57. As a result, the court concluded that under New York's public policy forbidding exculpation of willful misconduct, the provision could not be interpreted in the manner urged by the defendant, and the plaintiff could seek damages. *Id.* at 57.

Here, if the Prior Determination Requirement were interpreted strictly to require a prior judgment obtained by another lender or some party other than Yucaipa—even where (as here) Yucaipa is uniquely harmed and it is unrealistic to assume anyone else would seek the same relief because the conduct was specifically directed at Yucaipa—then the Prior Determination Requirement would exculpate BD/S from willful or grossly negligent acts whenever their conduct was specifically directed against Yucaipa. Such an interpretation would violate black letter New York public policy law. *See Kalisch-Jarcho*, 448 N.E.2d at 416; *Ford v. Public Emps. Fed.*, 573 N.Y.S.2d 174, 176 (App. Div. 1991) (agreement "cannot be interpreted to contravene the public policy of the state." (internal quotation omitted)). Just like in *Banc of America*, where the court interpreted the limitation-of-remedies provision to allow money damages, the Court should interpret the Prior Determination Requirement (especially at the pleading stage) to allow Yucaipa

to seek relief that other lenders would not realistically pursue.  *See Banc of Am. Secs. LLC*, 847 N.Y.S.2d at 57.

Moreover, BD/S's interpretation would effectively nullify the Carve Out because the Prior Determination Requirement could be rarely, if ever, satisfied.  There is no indication in the contract or elsewhere that the parties to the Third Amendment intended to insulate themselves from grossly negligent or willful misconduct directed at Yucaipa.  *See Colton v. N.Y. Hosp.*, 414 N.Y.S.2d 866, 872 (Sup. Ct. 1979) ("[I]t is the parties' intention, in and of itself, which should define [a covenant not to sue's] scope[].").  On the contrary, the opposite is true – the Carve Out expressly excludes such misconduct.  Therefore, as the Chancery Court recognized, the Court should not interpret the Prior Determination Requirement in such a way as to read the Carve Out as a nullity.  *See Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007) ("A reading of the contract should not render any portion meaningless[]." (citation omitted)).

Lastly, BD/S's interpretation of the Prior Determination Requirement also leads to absurd results.[20]  For instance, if a lender openly defrauded Yucaipa with respect to the First Lien Credit Agreement, then Yucaipa would have no remedy unless *another* lender or a non-party to the contract somehow had already obtained a judgment stating that BD/S had defrauded Yucaipa.  Such an interpretation would fail to "give effect to [the] general purpose" of the Carve Out for grossly negligent or willful misconduct, and the Court should reject it.  *Beal Sav. Bank*, 865 N.E.2d at 1214.

---

[20]  *See In re Lipper Holdings v. Trident Holdings*, 766 N.Y.S.2d 561, 561 (App. Div. 2003) ("[A] contract should not be interpreted to produce a result that is absurd"); *833 N. Corp. v. Tashlik & Assoc.*, 683 N.Y.S.2d 111, 112 (App. Div. 1998) ("The defendant's interpretation of [the contract term] would lead to an absurd result which would not accord with the reasonable expectations of the parties[]." (citation omitted)).

### 3.    Yucaipa's 2015 Counterclaim Falls Squarely Within the Public-Policy Exception to the Prior Determination Requirement

The public-policy exception to the Prior Determination Requirement applies here, especially at the pleading stage where the Bankruptcy Court affords Yucaipa the benefit of all doubts in ruling in BD/S's motion.  *See In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 685 F.3d 353, 357 (3d Cir. 2012) ("[A]ll well-pleaded allegations of the complaint must be taken as true and interpreted in the light most favorable to the plaintiffs, and all inferences must be drawn in favor of them." (quotation marks omitted)).

In the 2015 Counterclaim, Yucaipa expressly alleges that it is "entirely unrealistic to assume that any lender other than Yucaipa (or anyone else) would bring the equitable subordination claim" against Black Diamond and Spectrum.  (D.I. 19, Countercl. ¶ 13.)  Yucaipa explains that:

> [It] is in a singularly unique position to seek relief for the harm that Counter-Defendants seek to inflict upon it, and for the harm they have already inflicted on Yucaipa. Counter-Defendants' scheme was directed at Yucaipa as the majority holder of Allied's equity, as well as Allied's debt, and was crafted to take advantage of Yucaipa's employees' positions on Allied's Board, as well as Yucaipa's majority holding of Allied's debt. No other holder of a First Lien Claim is similarly situated.

(*Id.*)  And as Yucaipa also alleges, BD/S encouraged the consolidation of a large amount of First Lien Claims into Yucaipa's hands; prevented Yucaipa from acting as Requisite Lender or from selling its First Lien Claims to JCT; and filed an involuntary bankruptcy petition supported by false affidavits in order to pursue equitable subordination of Yucaipa's claims, not the claims of any other lender.  (*Id.* ¶¶ 8–11.)  Accordingly, it is highly unlikely that any lender who is not Yucaipa would seek the same relief that Yucaipa seeks here.

The uniqueness of Yucaipa's injury here stands in stark contrast to the injury that Yucaipa alleged, and the relief sought, in its 2012 Cross-Claim.  There, Yucaipa had alleged that

"[t]his is a case about [BD/S's] duplicity and unjust enrichment . . . all to *the detriment of the Estate [Allied]*."  (D.I. 65, Cross-Cl. ¶ 2, Adv. Proc. No. 12-50947 (emphasis added).)  But here, Yucaipa alleges that BD/S "attempted—and continues to attempt—to fraudulently subordinate *Yucaipa's* recoveries on the $170 million in claims against Allied at issue in the bankruptcy proceedings."  (D.I. 19, Countercl. ¶ 2 (emphasis added).)  Yucaipa further alleges that BD/S attempted to "wipe out *Yucaipa's* $170 million in First Lien Claims."  (*Id*. ¶ 3 (emphasis added); *see also id*. ¶ 12 (BD/S's "misconduct resulted in ongoing injuries *to Yucaipa*." (emphasis added).)

Moreover, Yucaipa's 2015 Counterclaim also describes how Yucaipa is in a materially different position from other lenders who may otherwise seek to remedy BD/S's misconduct. Specifically, other lenders:  "(a) hold minor stakes in the First Lien Debt; (b) have no equity stake in Allied; (c) are not insiders and have no employees who served on the Allied Board of Directors; (d) have no involvement in the management or control of Allied; (e) would suffer harm too inconsequential to pursue in connection with an equitable subordination claim; (f) have not been sued for equitable subordination; and (g) have always acted in concert with Counter-Defendants."  (D.I. 19, Countercl. ¶ 107.)  BD/S argue that those allegations have no bearing on whether another lender would seek to equitably subordinate BD/S's claims.  (D.I. 41, Mot. to Dismiss Countercl. at 14–15.)  However, the allegations show that no other lenders stood to gain in the same way, and to the same degree that BD/S did; nor were any other lenders also associated with Allied in such a way as to make viable an equitable subordination claim.  *See In re Avandia*, 685 F.3d at 357 ("well-pleaded allegations must be taken as true and interpreted in the light most favorable to the plaintiffs").  Thus, none of the other lenders could or would realistically seek the same relief.  Therefore, resolving all doubts in Yucaipa's favor, the public-policy

exception to the Carve Out applies here.

**C.      The Appearance Prohibition Does Not Bar Yucaipa's 2015 Counterclaim**

BD/S next argue that Section 2.7(a) of the Third Amendment bars the 2015 Counterclaim

because Yucaipa did not secure the prior written consent of all "Lenders" within the meaning of

the Third Amendment, which would have presumably included BD/S.   The Appearance Prohibi-

tion states that Yucaipa has a right to:

> make any election, give any consent, commence any action or file
> any motion, claim, obligation, notice or application or take any
> other action in any Insolvency or Liquidation Proceeding without
> the prior written consent of all Lenders. . . .

(D.I. 19, Third Am. § 2.7(a), Countercl. Ex. 3 (emphasis added).)

In essence, BD/S contend that the Appearance Prohibition requires Yucaipa to receive

BD/S's prior consent to sue or defend itself.   This argument is meritless.

**1.      The Appearance Prohibition Applies Only in "Insolvency or Liquidation
        Proceedings," Not Adversary Proceedings**

Under the unambiguous terms of the Third Amendment, the Appearance Prohibition only

applies to "Insolvency or Liquidation Proceedings," not to adversary proceedings.    If the parties

to the Third Amendment intended such a sweeping interpretation of the provision, it would have

been explicitly included within the ambit of the Appearance Prohibition.

Under New York law, which governs the interpretation of the Third Amendment,[21] "a

written agreement that is complete, clear and unambiguous on its face must be enforced accord-

ing to the plain meaning of its terms." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569

(N.Y. 2002) (internal citations omitted); *accord Banco Espirito Santo, S.A. v. Concessionaria Do*

---

[21]   (D.I. 19, First Lien Credit Agreement § 10.14, Countercl. Ex. 1)

*Rodoanel Oesta S.A.*, 951 N.Y.S.2d 19, 24 (App. Div. 2012).[22]

The Third Amendment specifically defines the term "Insolvency or Liquidation Proceeding" by reference to the Intercreditor Agreement.  (D.I. 19, Third Am. § 2, Countercl. Ex. 3.)  In turn, the Intercreditor Agreement defines "Insolvency or Liquidation Proceeding" as:

> (a)    any voluntary or involuntary case or proceeding under Bankruptcy Law with respect to [Allied];
>
> (b)    any other voluntary or involuntary insolvency, reorganization, or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to [Allied] or with respect to a material portion of their respective assets[.]

(D.I. 1757-2, Intercreditor Agreement § 1.1, No. 12-11564.)

The plain language of the Appearance Prohibition contradicts BD/S's interpretation of it.  For example, the words "any voluntary or involuntary" modify everything that comes after them—in particular, "case or proceeding."   But this case is neither "voluntary" nor "involuntary"—such terms simply have no meaning in connection with an adversary proceeding.

Additionally, other language in the definition of "Insolvency or Liquidation Proceeding" necessarily excludes adversary proceedings.  Under Section 1.1(a) of the Intercreditor Agreement, the term "under Bankruptcy Law" refers to Title 11 of the United States Code or "any similar federal, state or foreign law for the relief of debtors."  (D.I. 1757-2, Intercreditor Agreement § 1.1, No. 12-11564.)  The current action is not a case "under" title 11 because "[a]dversary proceedings in bankruptcy cases are procedurally analogous to civil actions filed in district courts."[23]

---

[22]  "A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion . . . ."  *Greenfield*, 98 N.Y.2d at 569 (internal quotation marks and citations omitted).

[23]  *Sun Healthcare Grp., Inc. v. Mead Johnson Nutritional* (*In re Sun Healthcare Group, Inc.*), 2004 WL 941190, at *1 (Bankr. D. Del. Apr. 30, 2004); *see SLW Capital, LLC v. Mansaray-Ruffin* (*In re Mansaray-Ruffin*), 530 F.3d 230, 234–35 (3d Cir. 2008) (discussing similarities with civil actions); *see also* Fed. R. Bankr. P. 7001(1)–

*(Cont'd on next page)*

Adversary proceedings are not themselves bankruptcy cases. *See Robison v. First Fin. Capital Mgmt. Corp. (In re Sweetwater)*, 55 B.R. 724, 728–29 (D. Utah 1985) ("These adversary proceedings clearly are not 'cases' under Title 11 . . . ."). Indeed, a case "under" title 11 refers "merely to the bankruptcy petition itself." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225–26 n.38 (3d Cir. 2004) (quotation and citation omitted).

Subsection (b) also brings into the definition of "Insolvency or Liquidation Proceeding" the following:  "any receivership, liquidation, reorganization or other similar case or proceeding."  But just as this adversary proceeding is not a case under Title 11, neither is it a receivership, liquidation, or reorganization, or even remotely like those things.  Rather, it is analogous to a civil action filed in district court. *In re Sun Healthcare Grp., Inc.*, 2004 WL 941190, at *1.[24]

Properly interpreted, then, the Appearance Prohibition is meant to prevent Yucaipa from taking actions in voluntary or involuntary cases or proceedings—such as filing an involuntary bankruptcy petition or proposing a restructuring plan in a voluntary proceeding—without first gaining other lenders' unanimous written consent.  That interpretation is consistent with the general intent behind the Third Amendment, namely, to prevent Yucaipa from controlling Allied's debt. *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 75 (3d Cir. 2011) ("The paramount goal of contract interpretation is to determine the intent of the parties." (quoting *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009))).  But the Appearance Prohibition

---

*(Cont'd from previous page)*

(10) (listing different forms of adversary proceedings); Fed. R. Bankr. P. 9002(1) (in applying Federal Rules of Civil Procedure in bankruptcy court, adversary proceedings are considered synonymous with civil actions).

[24]   At the very least, if BD/S argue that the definition is meant to include adversary proceedings, that would have to be based on an ambiguity in the contract and their preferred interpretation of that ambiguity.  Such definitional questions could not be decided against Yucaipa on a motion to dismiss. *See KDH Elec. Sys., Inc. v. Curtis Tech. Ltd.*, 826 F. Supp. 2d 782, 797 (E.D. Pa. 2011) ("[A]mbiguity in the agreement is sufficient to overcome the motion to dismiss.")  However, no ambiguity exists, among other reasons, because this case is clearly not "voluntary" or "involuntary" as is required to fall within the meaning of subsection (a).

is not intended to provide each individual lender a veto over Yucaipa's efforts to defend itself against a civil lawsuit, or to prevent Yucaipa from pursuing its own lawsuit against non-debtors in adversary proceedings.[25]

Furthermore, Yucaipa has filed a motion to withdraw the reference of this civil proceeding so that it may proceed in its proper forum: District Court.  (*See* D.I. 7.)  The case is a state-law dispute between non-debtors.  Three of the claims are non-core, state-law claims which are only before this Court because of Counter-Defendants' forum shopping.  Had it originated in its proper forum, it would be even more obvious that the Bankruptcy Appearance Prohibition is in-applicable.

### 2.    Equitable Estoppel and Public Policy Preclude BD/S from Asserting the Appearance Prohibition Here Against Yucaipa

In any event, BD/S cannot assert the Appearance Prohibition against Yucaipa now because of equitable estoppel and public policy.  The main Allied bankruptcy case and Allied Adversary Proceeding both began in 2012, and the UCC Action in early 2013.  Yucaipa has appeared in the bankruptcy case and related proceedings—filing motions and advancing claims—approximately 200 times before BD/S ever asserted that the Appearance Prohibition forbids Yucaipa from doing so.  BD/S are estopped from making this nonsensical and desperate attempt to prevent Yucaipa from filing motions and defending itself.

### a.    Equitable Estoppel

BD/S are equitably estopped from enforcing the Prohibition to strategically avoid Yucai-

---

[25]   BD/S may argue that subsection (b) of the definition of "Insolvency or Liquidation Proceeding" is ambiguous and intended to cover adversary proceedings.  It is not, as shown above.  However, assuming for the sake of argument that the term is ambiguous, for that very reason, dismissal would not be justified.  *See KDH Elec. Sys.*, 826 F. Supp. 2d at 797  (At the pleading stage, "ambiguity in the agreement is sufficient to overcome the motion to dismiss."); *Desiderio v. Geico Gen. Ins. Co.*, 967 N.Y.S.2d 392, 394 (App. Div. 2013) (to the extent a release of liability is ambiguous, under New York law it cannot form the basis of a motion to dismiss).

pa's 2015 Counterclaim now because they failed to assert it at any point in response to the literally hundreds of actions that Yucaipa has taken in these proceedings. If BD/S's interpretation of the Appearance Prohibition were correct, then Yucaipa detrimentally relied on BD/S's failure to assert this argument before August 2014.

Equitable estoppel prevents the enforcement of contractual rights that would result in an injustice to a party against whom the enforcement is sought. A party relying on estoppel must show that such party, in justifiable reliance on the other party's words or conduct, has been misled into action or inaction upon the belief that the other party would not seek enforcement of a contract right. *See*, *e.g.*, *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt. Lp*, 850 N.E.2d 653, 659 (N.Y. 2006). The party asserting estoppel must have actually been misled by another's conduct, or must have significantly and justifiably relied on such conduct to the party's disadvantage. *Id*. A party may also invoke estoppel where the other party's failure to assert a right promptly has rendered it inequitable to permit the exercise of that right after a lapse of time. *See*, *e.g.*, *Charles v. Charles*, 745 N.Y.S.2d 572, 574 (App. Div. 2002).

Equitable estoppel prevents BD/S from asserting their new interpretation of the Appearance Prohibition. Yucaipa was justified in relying on BD/S's decision not to assert the Appearance Prohibition in its motion to dismiss the 2012 Cross-Claim. *See Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 436 N.E.2d 1265, 1271–72 (N.Y. 1982) (triable question of fact as to detrimental reliance existed where defendant's representations led plaintiff to continue negotiations that ultimately failed, rather than seek other remedies). After years of litigation, enforcing the Appearance Prohibition against Yucaipa now would be inequitable because BD/S repeatedly failed to assert it before invoking it in response to Yucaipa's counterclaims. *See MPEG LA, LLC v. Audiovox Elecs. Corp.*, 933 N.Y.S.2d 815, 824–25 (Sup. Ct. 2011) (equitable estoppel defense

established where plaintiff had led defendant to believe it was in compliance with licensing

terms).  It was not until August 2014 that BD/S first attempted to enforce the Appearance Prohi-

bition, despite approximately 200 appearances by Yucaipa in the Allied proceedings.  Had BD/S

asserted it earlier, Yucaipa could have sought other remedies, such as immediate declaratory re-

lief as to the correct interpretation of the Appearance Prohibition or a claim for reformation of

the underlying contract documents to correct what plainly would have been a mistake in drafting,

contrary to the parties' intent.  And Yucaipa would not have taken the time and expense to assert

its counterclaims and engage in other litigation activities.

Lastly, equitable estoppel is a question of fact under New York law.  *See Gotlin v. Le-*

*derman*, No. 05-CV-1899 (ILG), 2006 WL 1154817, at *11 (E.D.N.Y. Apr. 28, 2006) ("When

there is a dispute as to whether estoppel is proper it is largely considered a question of fact," and

not resolved at the pleading stage); *see also Nassau Trust Co.*, 436 N.E.2d at 1271–72 (detri-

mental reliance is question of fact).  At the very least, because estoppel is factual in nature, the

Court should not grant a motion to dismiss at the pleading stage.

### b.    Public Policy Prevents BD/S's Newly Minted Interpretation of the Appearance Prohibition

BD/S's interpretation of the Appearance Prohibition would also produce absurd results[26]

and violate New York's public policy against contractual provisions that exculpate "willful or

grossly negligent acts."  *Kalisch-Jarcho*, 448 N.E.2d at 416; *Schwartz*, 919 N.Y.S.2d at 219;

*Goldstein*, 906 N.Y.S.2d at 905.  The Court cannot interpret the Appearance Prohibition in such

a way as to leave BD/S free to commit willful misconduct against Yucaipa in any bankruptcy-

---

[26]    *See In re Lipper Holdings*, 766 N.Y.S.2d at 561 ("[A] contract should not be interpreted to produce a result that is absurd"); *833 N. Corp.*, 683 N.Y.S.2d at 112 ("The defendant's interpretation of [the contract term] would lead to an absurd result which would not accord with the reasonable expectations of the parties[]." (citation omitted)).

related proceeding, by avoiding culpability through a veto of any effort by Yucaipa to assert claims, affirmative defenses, or counterclaims against BD/S.

Indeed, BD/S's interpretation conceivably prevents Yucaipa from defending itself at all, against any claim.  The Appearance Prohibition requires lender consent before Yucaipa makes "any election, give[s] any consent, commence[s] any action or file[s] any motion, claim, obligation, notice or application or take[s] any other action."  Quite literally, that list of prohibited actions bars Yucaipa from doing anything.  For instance, if BD/S's interpretation was correct, it could initiate any claim for any amount, and Yucaipa would not be permitted even to answer the complaint.  BD/S's interpretation would give other lenders a blank check to obtain a sizeable default judgment against Yucaipa by vetoing any effort by Yucaipa to defend itself.  This is a nonsensical interpretation of the Third Amendment, and is contrary to public policy.  *See Kalisch-Jarcho*, 448 N.E.2d at 416 (New York public policy forbids provisions that exculpate a party from its own "willful or grossly negligent acts." ); *Ford*, 573 N.Y.S.2d at 176 (agreement "cannot be interpreted to contravene the public policy of the state.").

**D.    Yucaipa's Allegations Easily Clear the *Iqbal-Twombly* Plausibility Hurdle**

Finally, BD/S argue in vain that Yucaipa's claims are not sufficiently plausible under the federal pleading standards.  (D.I. 41, Mot to Dismiss Countercl. at 16–23.)  But the theory that Yucaipa has described in substantial detail throughout the 2015 Counterclaim is not merely plausible—it is more likely than not to have occurred, and Yucaipa has amply corroborated its allegations with specific references to supporting evidence, including emails between BD/S.  Yucaipa's 2015 Counterclaim therefore readily meets and exceeds the *Iqbal-Twombly* "plausibility" threshold.

**1.    The Plausibility Standard in the Third Circuit**

Claims are sufficiently plausible if, accepting all factual allegations as true and constru-

ing the claims in the light most favorable to the plaintiff, "any reasonable reading of the complaint" may entitle the plaintiff to relief. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008); *see W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010). While the "'[f]actual allegations must be enough to raise a right to relief above the speculative level,'" *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007), a claimant "does not have to set out in detail the facts upon which he bases his claim." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 119 (3d Cir. 2013). To that end, the complaint does not have to establish all elements of the plaintiff's prima facie case; it needs only to "raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009).

The plausibility inquiry is "not akin to a probability requirement," but rather a more circumscribed examination whether the plaintiff has pled more than the "sheer possibility" of a defendant's liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). As such, a well-pleaded complaint may not be dismissed even if it "strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 55.[27]

## 2.    The 2015 Counterclaim Easily Meets the Plausibility Standard

The 2015 Counterclaim goes far beyond a "formulaic recitation of the elements" of an equitable subordination theory. *Twombly*, 550 U.S. at 555. Yucaipa supports its pleading with specific exhibits and references to related judicial matters, and has thus provided more than

---

[27] When adjudicating a motion to dismiss based on implausibility, a court may look beyond the complaint to matters of public record, court orders, and indisputably authentic documents, including filings, exhibits and transcripts from related judicial proceedings. *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994) (citing 5A Wright and Miller, Federal Practice and Procedure: Civil 2d, § 1357); *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) ("Given that . . . the issue turns on the indisputably authentic documents . . . , we hold we may also consider these without converting [this motion to dismiss] to a motion for summary judgment."); *Chester County Intermediate Unit v. Penn. Blue Shield*, 896 F.2d 808, 812 (3d Cir. 1990); *Spruill*, 372 F.3d at 223; *Golden v. Cook*, 293 F. Supp. 2d 546, 551 (W.D. Pa. 2003).

"threadbare recitals" of its causes of action.  *Id.* at 570.  Further, Yucaipa has developed a clear "expectation that discovery will reveal [additional] evidence" necessary to prove the elements of its equitable subordination claim.  *Fowler*, 578 F.3d at 213.

BD/S seek to examine the plausibility of certain of Yucaipa's allegations in a vacuum, namely, that:  (1) BD/S first considered equitable subordination before Yucaipa acquired any First Lien Debt; (2) BD/S thwarted the JCT deal to preserve their equitable subordination claim; (3) BD/S's equitable subordination scheme began in 2009; (4) BD/S participated in the JCT negotiations for a year and a half; and (5) Black Diamond needed to bribe Spectrum to participate in filing the involuntary bankruptcy.  BD/S's "divide and conquer" approach to plausibility is itself improper.  *See Oswald v. Gibbson*, 2011 WL 2135619, *2 (E.D. Pa. May 31, 2011) (noting that "*Twombly* emphasized context" and holding that the complaint "takes on an air of probability and rises above a mere conclusory allegation" when read in its entirety); *Stanley v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001) ("In evaluating the dismissal of [the] complaint, we examine the complaint as a whole . . . .").

But even if the Court were to isolate the five sets of allegations on which BD/S rest the implausibility arguments, the defense still fails.  Yucaipa explains below how each allegation "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d Cir. 2009).

### a.    BD/S considered equitable subordination even before Yucaipa acquired any First Lien Debt

BD/S take issue with an August 13, 2009 email between M. Riggs at Innovative Equity Partners and J. Schaffer at Spectrum (D.I. 19, Countercl. Ex. 4), in which Mr. Riggs asks Mr. Schaffer:  "I thought you were going to check out the 'equitable subordination' angle."  (D.I. 19,

Countercl. Ex. 4.)  Mr. Schaffer responds, "Why?"  (*Id.*)  According to BD/S, rather than con-firming that Spectrum was looking into equitable subordination at the time, the email conveys Mr. Schaffer's surprise that Mr. Riggs would think Spectrum was looking into equitable subor-dination.  (D.I. 41, Mot. to Dismiss Countercl. at 19.)  This, according to BD/S, undermines Yu-caipa's allegation that BD/S were considering an equitable subordination strategy even before Yucaipa acquired any First Lien Debt.  (*Id.*)  But BD/S's interpretation of this email is implausi-ble—not the other way around.

Equitable subordination is an extreme remedy reserved for "inequitable conduct" which either results "in injury to the creditors or confer[s] an unfair advantage on the defendant."  *In re Exide Techs., Inc.*, 299 B.R. 732, 744 (D. Del. 2003).  Creditors do not "check out" equitable subordination in the usual course of business.  Mr. Riggs's unprovoked comment that he be-lieved Spectrum was "checking out the 'equitable subordination' angle" confirms that the parties had discussed the topic before.  Moreover, the context indicates that the idea was planted by Mr. Schaffer given Mr. Riggs's lack of familiarity with the remedies available to creditors in bankruptcy against other creditors.  Further, Mr. Riggs, unlike Mr. Schaffer's company, was not a creditor of Allied and thus had no reason to be considering remedies against Yucaipa in its ca-pacity as a creditor.  Mr. Schaffer's answer conveys no surprise or confusion, but merely prompts Mr. Riggs for more information as to why he was asking about it.

The seemingly out-of-the-blue question regarding whether Spectrum was "checking out the 'equitable subordination' angle" on August 13, 2009 (D.I. 19, Countercl. Ex. 4) leads to a "reasonable inference" that Spectrum was considering equitable subordination before Yucaipa acquired its First Lien Debt on August 21, 2009.  *Iqbal*, 566 U.S. at 678.  .

### b.    BD/S thwarted a deal with JCT in the hope that equitably subordinating Yucaipa's debt would provide a more lucrative payout

BD/S argue that the 2015 Counterclaim is implausible because it is "built entirely on the premise that [BD/S] gave up a guaranteed recovery from a *transaction* with JCT of up to par plus accrued interest instead to pursue a highly speculative scheme . . . ." (D.I. 41, Mot. to Dismiss Countercl. at 21 (emphasis added).)  Thus, BD/S argue it was implausible that they would have given up a chance to recover 100% of their investment, in favor of a more speculative ability to recover "the same amount." (*Id*. at 22.)

BD/S's argument overlooks the very nature of their business and the nature of the proposed JCT deal.  While it is true that BD/S stood to recover "par plus interest" in the JCT deal (*id*. at 22), that would not have been an all-cash deal; rather, the proposed consideration would have been substantially in the form of JCT notes.  By contrast, if their subordination scheme succeeds in its entirety, JCT stand to recover far more than "par plus interest"—and in cash.

BD/S are both sophisticated distressed debt traders that repeatedly assume high risk debt because of the potential for large investment returns beyond the face value of the debt.  BD/S acquired First Lien Claims in Allied for substantial discounts to par plus accrued interest, yet hoped to recover far more than the face value of the debt.  (D.I. 19, Countercl. at 43 n.7.)  For example, by forcing Allied into bankruptcy and into an auction sale of their assets, BD/S may very well have planned to use the face value of their First Lien Claims as the equivalent of cash when bidding for Allied's assets.  (*Id*., ¶ 94.)  So long as the assets were worth more than the face value of the First Lien Claims, BD/S would recover more than par plus accrued (had their bid been successful).  Thus, given that both BD/S acquired their shares in Allied as distressed debt (D.I. 19, Countercl. at 42-43), it is exceedingly plausible that both would have elected a "highly speculative scheme" over a recovery pursuant to the more traditional JCT transaction.

Additionally, in order for BD/S to be able to accomplish their equitable subordination scheme, BD/S needed Yucaipa to hold First Lien Debt when Allied entered bankruptcy. Under the JCT deal, Yucaipa's First Lien Debt would have transferred to JCT before a proposed bankruptcy filing. (D.I. 19, Countercl. at 49). This transfer would have nullified BD/S's ability to equitably subordinate Yucaipa, as Yucaipa would no longer own any First Lien Claims at the time of Allied's bankruptcy. (*Id.*) And because JCT would not have been an "insider," JCT would have made a difficult equitable subordination target. (*Id.* ¶ 42.)

Settling for the JCT deal would have deprived BD/S of their long-planned and lucrative recovery both on the equitable subordination claim and, eventually, on the appreciation of any assets acquired through the credit bid. If BD/S succeeds, they will knock out Yucaipa's 56% ownership interest of the First Lien Debt, and in the process increase their stake in the claims pool from 22% to 49%. (D.I. 19, Countercl. at 44.) Further, BD/S also sought unsuccessfully to acquire all of Allied's assets in the bankruptcy (which would have given them control of the entire company and all of its equity, a far better prospect than the notes they would have received in the proposed JCT transaction), but they were outbid by JCT. And BD/S have already made a credit bid for Allied's remaining assets in their current capacity as purported Requisite Lender. *See In re Phil. Newspapers, LLC*, 599 F.3d 298, 320 (3d Cir. 2010) ("A credit bid allows a secured lender to bid the debt owed it in lieu of other currency at a sale of its collateral."). In fact, BD/S concede that "the *only* way [their] recovery could exceed par plus accrued interest is if the value of Allied's assets [they] acquired though the credit bid appreciated to the point where the combination of asset values and recoveries on the equitable subordination claim exceeded a par-plus-accrued-interest recovery." (D.I. 41, Mot. to Dismiss Countercl. at 22.) BD/S have now set themselves up for just such a recovery.

36

Thus, taken as true, Yucaipa's 2015 Counterclaim alleges facts that strongly suggest BD/S's business model, the structure of the JCT transaction, and both BD/S's current position in the Allied bankruptcy gave them reason to sabotage the JCT deal in favor of the larger potential payout offered by the equitable subordination scheme.

### c.    BD/S were lying in wait for the optimal time to file their equitable subordination claim

Next, BD/S argue it is implausible that their scheme to equitably subordinate Yucaipa would have begun back in 2009. BD/S point out that their involuntary petition was not filed until three years later, in 2012. (D.I. 41, Mot. to Dismiss Countercl. at 2–3, 19.)

Plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Fowler*, 578 F.3d at 210. BD/S did not sit idly on their claims for three years. The three-year lag is attributable to BD/S's need to strip Yucaipa of its Requisite Lender status before filing an involuntary petition. (D.I. 19, Countercl. at 48.) BD/S knew their claims would be strongest if brought against someone other than a Requisite Lender, so they fought to strip Yucaipa of that status almost as soon as Yucaipa acquired the First Lien Debt. (D.I. 19, Countercl. at 48.) Requisite lenders may force other lenders to refrain from exercising their rights in the event of a default, so the smoothest iteration of BD/S's plan involved Yucaipa entering the bankruptcy with a majority of First Lien Debt but without the power to act as Requisite Lender. (*Id*.)

Had the JCT deal not threatened to divest BD/S of their ability to equitably subordinate Yucaipa, the lapse in time between hatching the scheme and executing could easily have been longer than three years. Given the time, resources, and energy that BD/S invested to divest Yucaipa of its Requisite Lender status and the fact that BD/S executed their scheme only when faced with the possibility of missing out entirely (because of the JCT deal), it is more than plau-

sible that BD/S's scheme took three years to put into motion.

### d.    BD/S spent a year negotiating with JCT to buy time for their equitable subordination claim and to ensure the deal did not close

BD/S also argue that if their ultimate objective was to equitably subordinate Yucaipa's First Lien Debt, it is not plausible that they would have spent year and a half negotiating a deal to sell away their own First Lien Debt, and with it, the right to equitably subordinate Yucaipa's. (D.I. 41, Mot. to Dismiss Countercl. at 2–3, 20.)  But BD/S's negotiations with JCT were a sham, serving to distract Yucaipa, JCT, and Allied—and to buy BD/S additional time to carry out their equitable subordination scheme.  (D.I. 19, Countercl. at 50.)  BD/S knew that if the JCT deal closed, it would extinguish BD/S's ability to equitably subordinate Yucaipa.  BD/S's participation in the JCT negotiations provided them with ample warning of when they would need to file an involuntary petition to prevent the deal from closing.  (*Id.*)  In other words, BD/S's involvement in the JCT negotiations served a dual purpose—a distraction technique and a means of sabotaging the deal in the event it looked like it might close.  (*Id.*)

### e.    Even though they had been conspiring since 2009, Black Diamond needed to bribe Spectrum in the form of an illegal claims-trade to join the equitable subordination scheme

BD/S argue it is implausible that Black Diamond would have needed to bribe Spectrum to equitably subordinate Yucaipa if the two companies had been colluding since 2009.  (D.I. 41, Mot. to Dismiss Countercl. at 3–4, 21.)  BD/S also contend that Yucaipa's claim is implausible because in the involuntary petition payoff, Spectrum was simply purchasing its ratable share of debt pursuant to the Cooperation Agreement between the parties.  (*Id.*)

But at the time of the transaction, Black Diamond held more Allied debt than Spectrum and had purchased that debt at a relatively low price.  (D.I.19, Countercl. at 53.)  This made equitable subordination a more attractive option to Black Diamond than Spectrum, who had not ac-

quired any First Lien Debt since 2008 and may have, given its holdings, been looking less favorably at the risk attendant to the equitable subordination scheme. (*Id.*) To ensure Spectrum's support for the involuntary petition, Black Diamond had to increase Spectrum's potential windfall from an equitable subordination claim by allowing Spectrum to purchase more First Lien Debt at a favorable price. (*Id*. at 54.)

An email chain attached to the 2015 Counterclaim details the back-and-forth of the deal in which Spectrum acquired a portion of Black Diamond's First Lien Debt. This email evidences that Spectrum had explicitly conditioned its support of the involuntary petition on purchasing additional debt from Black Diamond. (D.I. 19, Countercl. Ex. 12.)

The chain begins on October 17, 2011 with Brad Schaefer of Black Diamond emailing Jeffery Schaffer of Spectrum asking, "Who will be the Closers from Spectrum on this Allied trade?" and stating he will get a "Trade Confirm drafted and sent over." (*Id.*) The conversation continued over the next week, with the parties discussing formalities in the agreement, when suddenly Black Diamond stopped responding. (*Id.*)

A representative from Spectrum followed up on a monthly basis, seeking an update on the agreement language and on January 10, 2012, around the time the parties entered into the Cooperation Agreement, seeking to have the agreements amended to reflect new trade amounts. (*Id.*) Black Diamond finally responded on February 1, 2012, without addressing Spectrum's question regarding trade amounts. (*Id.*)

Spectrum then sent a series of emails in a more rapid succession "following up on the status of the updated docs" which needed to reflect the new trade amount. (*Id.*) By March 21, 2012, the Spectrum representative elevated the issue to Jeffery Schaffer, managing partner at Spectrum, who emailed Rich Ehrlich, managing director at Black Diamond. (*Id.*) Schaffer stat-

ed to Ehrlich, "Please get this closed this week.  We cannot file an involuntary without this done."  (*Id.*)

This email chain is strong circumstantial evidence that just two months before BD/S filed the involuntary petition, Spectrum made its demand clear:  Black Diamond could not stall any longer.  A transfer of First Lien Debt was a condition precedent to securing Spectrum's support for filing the involuntary petition necessary to bring about the equitable subordination claim.

The respective financial position of the parties, the actual transfer of First Lien Debt, the emails evidencing Black Diamond's stall tactics, and Spectrum's final demands (made by the head of Spectrum to the head of Black Diamond) that the debt transfer take place, all allow at least a "reasonable inference" that Black Diamond had to bribe Spectrum with additional First Lien debt before Spectrum would assist in filing the involuntary bankruptcy.  *Iqbal*, 566 U.S. at 678.

### III.    CONCLUSION

The Court should deny BD/S's Motion to Dismiss.


Dated:  April 7, 2015

<div style="margin-left:40%">

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Michael R. Nestor*
John T. Dorsey, Esq. (No. 2988)
Michael R. Nestor (No. 3526)
Sharon M. Zieg, Esq. (No. 4196)
Michael S. Neiburg (No. 5275)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
mnestor@ycst.com

</div>

- and-

GIBSON, DUNN & CRUTCHER LLP
Robert A. Klyman
Maurice M. Suh
Kahn Scolnick
333 South Grand Avenue
Los Angeles, CA  90071
Telephone: (213) 229-7000
RKlyman@gibsondunn.com

Attorneys for Defendants,
Yucaipa American Alliance Fund I, L.P., Yucaipa
American Alliance (Parallel) Fund I, L.P., Yucaipa
American Alliance Fund II, L.P., Yucaipa American
Alliance (Parallel) Fund II, L.P., Ronald Burkle, Jos
Opdeweegh, Derex Walker, Jeff Pelletier, Ira Toch-
ner, and Joseph Tomczak