## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ASHINC Corporation, *et al.*,[1]<br><br>       Debtors. | Chapter 11<br><br>Case No. 12-11564 (CSS)<br><br>(Jointly Administered) |
| BDCM OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., SPECTRUM INVESTMENT PARTNERS, L.P., BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., AS CO-ADMINISTRATIVE AGENT, AND SPECTRUM COMMERCIAL FINANCE LLC, AS CO-ADMINISTRATIVE AGENT,<br><br>       Plaintiffs,<br><br>v.<br><br>YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P., RONALD BURKLE, JOS OPDEWEEGH, DEREX WALKER, JEFF PELLETIER, IRA TOCHNER, and JOSEPH TOMCZAK,<br><br>      Defendants. | Adv. Proc. No. 14-50971 (CSS)<br><br><br>**BLACK DIAMOND AND SPECTRUM'S REPLY BRIEF IN FURTHER SUPPORT THEIR MOTION TO DISMISS YUCAIPA'S COUNTERCLAIM FOR EQUITABLE SUBORDINATION** |

---

[1] The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: ASHINC Corporation (f/k/a Allied Systems Holdings, Inc.) (58-0360550); AAINC Corporation (f/k/a Allied Automotive Group, Inc. (58-2201081); AFBLLC LLC (f/k/a Allied Freight Broker LLC) (59-2876864); ASCCO (Canada) Company (f/k/a Allied Systems (Canada) Company (90-0169283); ASLTD L.P. (f/k/a Allied Systems, Ltd. (L.P.)) (58-1710028); AXALLC LLC (f/k/a Axis Areta. LLC )(45-5215545); AXCCO Canada Company (f/k/a Axis Canada Company) (875688228); AXGINC Corporation (f/k/a Axis Group, Inc.) (58-2204628); Commercial Carriers, Inc. (38-0436930); CTSINC Corporation (f/k/a CT Services. Inc.) (38-2918187); CTLLC LLC (f/k/a Cordin Transport LLC) (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems. LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863): RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582. The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................... 1

ARGUMENT ................................................................................................................... 8

I.    THE THIRD AMENDMENT BARS YUCAIPA FROM BRINGING THE
      COUNTERCLAIM ................................................................................................ 8

      A.    The Covenant Not to Sue Bars Yucaipa's Counterclaim ......................... 8

            1.    Yucaipa misconstrues the Chancery Court's decision ................. 9

            2.    The Covenant Not to Sue does not exculpate Black Diamond and
                  Spectrum for willful misconduct or gross negligence ............... 12

            3.    Because other Lenders could bring the claims Yucaipa asserts in its
                  Counterclaim, the Covenant Not to Sue bars the Counterclaim ............... 14

      B.    Section 2.7(b) Bars Yucaipa's Counterclaim ....................................... 16

            1.    Section 2.7(b) applies to adversary proceedings ....................... 17

            2.    Equitable estoppel does not bar Black Diamond and Spectrum from
                  raising Section 2.7(b) ................................................................. 18

            3.    Public policy does not bar Black Diamond and Spectrum from raising
                  Section 2.7(b) ............................................................................. 21

II.   YUCAIPA IS COLLATERALLY ESTOPPED FROM ALLEGING THAT BLACK
      DIAMOND AND SPECTRUM "ENCOURAGED" YUCAIPA TO BUY FIRST
      LIEN DEBT AND FRUSTRATED ITS BECOMING REQUISITE LENDER ............. 21

      A.    Yucaipa Is Collaterally Estopped From Asserting Issues Concerning Whether
            Their "Encouragement" and Requisite Lender Allegations Are Plausible........... 21

      B.    The Court's Finding of Implausibility Was Necessary to Application of the
            Covenant Not to Sue ............................................................................. 22

III.  THE COUNTERCLAIM'S REMAINING ALLEGATIONS ARE IMPLAUSIBLE ...... 23

      A.    The Crux of Yucaipa's Claimed Scheme Is That Yucaipa Engaged in Bad
            Acts Sufficient to Be Equitably Subordinated ....................................... 25

B.      Yucaipa's Allegation that Black Diamond and Spectrum Gave up a Guaranteed Recovery to Pursue an Unpredictable Litigation Strategy Is Not Plausible.................................................................................................................26

C.      Yucaipa's Allegation that Black Diamond and Spectrum Waited Three Years to File the Involuntary Petitions Is Not Plausible.................................................29

D.      Yucaipa's Allegation that Spectrum's Purchase of Additional First Lien Debt Pursuant to the Cooperation Agreement Was a "Payoff" Is Not Plausible...........31

E.      Yucaipa's Speculative Interpretation of the Riggs Email Is Not Plausible...........32

CONCLUSION .................................................................................................................33

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.,*
    430 N.Y.S.2d 179 (App. Div. 1980)..................................................................18

*BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP,*
    No 650150/2012, 2013 WL 1290394 (N.Y. Sup. Mar. 8, 2013)...........................29

*BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP,*
    978 N.Y.S.2d 10 (App. Div. 2013).........................................................................1

*BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP,*
    8 N.E.3d 849 (N.Y 2014) ......................................................................................2

*Braddock v. Zimmerman,*
    906 A.2d 776 (Del. 2006) .......................................................................................9

*Braintree Labs., Inc. v. Schwarz Pharm., Inc.,*
    568 F. Supp. 2d 487 (D. Del. 2008) .....................................................................15

*Burlington N. R.R. Co. v. Hyundai Merch. Marine Co.,*
    63 F.3d 1227 (3d Cir. 1995) ...................................................................................9

*City of Mount Clemens v. E.P.A.,*
    917 F.2d 908 (6th Cir. 1990) ..................................................................................9

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,*
    365 U.S. 127 (1961) ..............................................................................................15

*Fashion Bug No.2100 of Batavia, Inc. v. 425 W. Main Assocs. (Batavia) LP,*
    809 N.Y.S.2d 481 (table), 2005 WL 3193702 (Sup. Ct. 2005)............................20

*Lipper Holdings, LLC v. Trident Holdings, LLC (In re Lipper Holdings, LLC),*
    766 N.Y.S.2d 561 (App. Div. 2003)......................................................................21

*Mcdonald v. Smith,*
    472 U.S. 479 (1985) ..............................................................................................15

*RBC Capital Mkts., LLC v. Educ. Loan Trust IV,*
    87 A.3d 632 (Del. 2014) .........................................................................................9

*San Remo Hotel, L.P. v. City & Cnty. of San Francisco,*
    545 U.S. 323 (2005) ................................................................................................9

*United Mine Workers of Am. v. Pennington,*
    381 U.S. 657 (1965) ..............................................................................................15

*In re USDigital, Inc.*,
    461 B.R. 276 (Bankr. D. Del. 2011) ................................................................5, 8

*Wills v. RadioShack Corp.*,
    981 F. Supp. 2d 245 (S.D.N.Y. 2013) ...................................................................9

*Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*,
    No. CIV. A. 9151-VCP, 2014 WL 5509787 (Del. Ch. Oct. 31, 2014) ...........................*passim*

## Statutes

11 U.S.C. § 105(a) ...........................................................................................5, 17

11 U.S.C. § 510(c) ...........................................................................................5, 17

## Federal Rules

Fed. R. Bankr. P. 5005(a) advisory comm. nn. ...........................................................17

Fed. R. Bankr. P. 7003 advisory comm. nn. ...............................................................17

## Restatements

Restatement (Second) of Judgments § 13 (1982) ............................................................8

Restatement (Second) of Judgments § 13 cmt. g (1982) ....................................................9

# PRELIMINARY STATEMENT[2]

Ever since the New York Supreme Court (the "New York Court") ruled in favor of Black Diamond and Spectrum as to the invalidity of the Purported Fourth Amendment,[3] Yucaipa has been faced with the prospect that its First Lien Debt would be governed by – and effectively neutered by – the terms of the Third Amendment. In fact, this Court previously ruled in February 2013 that this is the case. Since then, Yucaipa has pursued an aggressive strategy of filing claim after claim against Black Diamond and Spectrum in various courts in the hope that one would stick and provide a strategic bulwark against the claims asserted in this Court by the Committee (on behalf of the Debtors' estates), Black Diamond and Spectrum.

With the equitable subordination Counterclaim at issue in this motion, Yucaipa is trying yet again to pursue claims against Black Diamond and Spectrum, after having failed in its previous attempts. For example, Yucaipa's previous, very similar, Cross-Claims against Black Diamond and Spectrum were dismissed by this Court. Also, Yucaipa's claims against Black Diamond and Spectrum in the Chancery Court were either dismissed or stayed.

This strategy of filing some claim to achieve leverage became even more apparent recently when Yucaipa filed a RICO claim in the United States District Court for the Southern District of New York based on the same factual allegations it now asserts in the Counterclaim,[4]

---

[2] Unless defined herein, capitalized terms shall have the same meaning as set forth in the Opening Memorandum.

[3] Black Diamond and Spectrum successfully obtained a judicial declaration from the New York Court that the Purported Fourth Amendment to the Credit Agreement, which Yucaipa had attempted to force on the Lenders to declare itself the Requisite Lender, was invalid and void *ab initio*. Yucaipa appealed that decision to the New York Appellate Division which affirmed the decision that the Purported Fourth Amendment was invalid and void *ab initio*. *BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, 978 N.Y.S.2d 10 (N.Y. App. Div. 2013). Yucaipa then sought leave to appeal from the New York Court of Appeals, which application was denied. *BDCM Opportunity Fund II, L.P. v. Yucaipa Am. Alliance Fund I, LP*, 8 N.E.3d 849 (N.Y. 2014).

[4] The RICO complaint was filed on February 10, 2015; the Counterclaim was filed on February 20, 2015.

except that instead of asking for equitable subordination, Yucaipa seeks damages under the RICO statute.[5]

Against the background of the previous claims filed in this Court, the Chancery Court and the Southern District of New York, Yucaipa has now decided to also file the Counterclaim at issue in this motion.  However, like the claims previously asserted by Yucaipa and for many of the same reasons, the Counterclaim should be dismissed, in particular because (i) it is prohibited by the applicable Covenant Not to Sue, (ii) its critical opening allegations (that Black Diamond and Spectrum "encouraged" Yucaipa to buy First Lien Debt, then "double-crossed" Yucaipa) are nearly identical to the allegations in the Cross-Claims already found to be implausible by this Court and thus should be barred here on collateral estoppel grounds, and (iii) the remaining allegations should be dismissed on implausibility grounds.

In its opposition to Black Diamond and Spectrum's motion to dismiss (D.I. No. 41) (the "Opening Memorandum"), rather than addressing the issues head on, Yucaipa repeatedly side-steps, reframes, or outright misstates the facts and issues to avoid the inescapable conclusion that Yucaipa's Counterclaim should be dismissed.

For instance, in seeking to avoid the application of the Third Amendment, which bars Yucaipa's Counterclaim (specifically, through the Covenant Not to Sue (Section 2.7(e)) and what Yucaipa calls the "Appearance Prohibition" (Section 2.7(b)), Yucaipa repeatedly argues that enforcement of the Third Amendment to bar Yucaipa, in its capacity as a First Lien Debt

---

[5] In addition, in July 2014, Yucaipa filed a motion for leave to assert a counterclaim in the Committee Action to assert the identical equitable subordination counterclaim at issue in this motion.  Yucaipa was required to file that motion because of the untimeliness of the proposed counterclaim in that proceeding.  When it became apparent that Yucaipa was going to file the exact same equitable subordination counterclaim in the instant action, counsel for Black Diamond and Spectrum asked that Yucaipa withdraw the motion in the Committee Action because it was duplicative and because no motion was needed to assert that counterclaim in this proceeding.  In response, Yucaipa said it wanted to pursue the same counterclaim in both proceedings.

holder, from suing Lenders would "violate public policy" and would be "absurd." (Opp'n at 15, 16, 21-22, 28.)[6]  Yucaipa ignores the fact that this Court already found the Third Amendment and the Covenant Not to Sue to be enforceable against Yucaipa and dismissed the Cross-Claims on the basis of the Covenant Not to Sue.  Further, the Chancery Court also found the Covenant Not to Sue to be enforceable against Yucaipa and dismissed most of the claims asserted by Yucaipa in that action on that very basis (subject only to a very limited exception).[7]

Yucaipa attempts to circumvent the Covenant Not to Sue by blatantly misstating the Chancery Court's holding.  According to Yucaipa, the Chancery Court held that the Covenant Not to Sue does not bar Yucaipa from asserting a claim where it would be "unrealistic" or "unlikely" that other Lenders "would" sue.  That is a plain mischaracterization of the Chancery Court's decision.  Rather, the Chancery Court held[8] that public policy *might* preclude application of the Covenant Not to Sue in very limited circumstances where Yucaipa "alleges a *unique harm* – meaning no other Lender *could* sue and the Prior Determination Requirement *cannot* be satisfied." *Id.* at *15 (emphasis added).  Under this standard, Yucaipa's Counterclaim is barred by the Covenant Not to Sue because, as set forth below, Yucaipa has not alleged a "unique harm" and thus other Lenders "could" sue Black Diamond and Spectrum for allegedly "scuttling" the JCT deal, irrespective of whether it would be "unrealistic" or "unlikely" that other Lenders would do so.

---

[6] Citations to "Opp'n" refer to the Opposition to Black Diamond and Spectrum's Motion to Dismiss Yucaipa's Counterclaim for Equitable Subordination, D.I. No. 56.

[7] *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, No. Civ. A. 9151-VCP, 2014 WL 5509787 (Del. Ch. Oct. 31, 2014).

[8] The Chancery Court's decision, made on a motion to dismiss, was not dispositive of the whole case and thus the Chancery Court's ruling as to the existence of a public policy exception to the Covenant Not to Sue is not binding under collateral estoppel since it did not result in a final judgment.

Similarly, Yucaipa attempts to avoid the Covenant Not to Sue by arguing that Black Diamond and Spectrum's interpretation of the covenant is "nonsensical" and "absurd" (Opp'n at 15-20) because it would allegedly exculpate Black Diamond and Spectrum for acts of gross negligence or willful misconduct. In fact, although not apparent from Yucaipa's misleading description of the Chancery Court's decision, that Court, applying the Covenant Not to Sue, dismissed most of the claims asserted by Yucaipa, including those alleging gross negligence or willful misconduct.

Yucaipa forgets that, as originally drafted, the Credit Agreement expressly barred Yucaipa – as Allied's majority equity holder – from owning *any* First Lien Debt to prevent Yucaipa from being able to control both Allied's equity *and* debt. In light of that concern, the Third Amendment, which (for the first time) allowed Yucaipa to acquire First Lien Debt, severely restricts not only the amount of debt Yucaipa can acquire (a provision which Yucaipa flagrantly breached) but also Yucaipa's *rights* as a First Lien Debt holder. For that reason, under the Third Amendment, Yucaipa does not have rights as a "Lender" but rather extremely limited rights as a "Restricted Sponsor Affiliate." As a Restricted Sponsor Affiliate, pursuant to the Covenant Not to Sue, Yucaipa cannot sue any Lenders, unless there has been a prior judicial determination (the "Prior Determination Requirement") that the Lender acted with gross negligence or willful misconduct, and pursuant to Section 2.7(b) of the Third Amendment ("Section 2.7(b)"), Yucaipa cannot commence any action or file any claim in an "Insolvency or Liquidation Proceeding" with respect to Allied without the prior written consent of *all* the Lenders.

Yucaipa attempts to mislead this Court into believing that just because Yucaipa cannot satisfy the Prior Determination Requirement on *this occasion*, it is "literally impossible"

to ever satisfy it.  To the contrary, as both this Court and the Chancery Court have found, the Prior Determination Requirement *can* be satisfied when another Lender who has been harmed obtains a prior judicial determination of gross negligence or willful misconduct.

Yucaipa next tries to circumvent Section 2.7(b) – which bars Yucaipa from commencing an action or filing any claim in an "Insolvency or Liquidation Proceeding" – by arguing that an "adversary proceeding" is not an action or claim in an "Insolvency or Liquidation Proceeding."  This argument verges on the absurd given that the *Allied bankruptcy cases* – in which Yucaipa filed its Counterclaim – are "Insolvency or Liquidation Proceeding[s]" and Yucaipa's Counterclaim is an "action" or "claim" filed in the Allied bankruptcy cases.

Yucaipa also tries to avoid Section 2.7(b) by arguing that (i) the definition of "Insolvency or Liquidation Proceeding" is a "voluntary or involuntary case or proceeding under Bankruptcy Law"; (ii) in turn, the term "Bankruptcy Law" refers to Title 11 of the United States Code; and (iii) Yucaipa's Counterclaim (for equitable subordination under 11 U.S.C. §§ 510(c) and 105(a)) is somehow a "state-law dispute" that is not "under" Title 11.  This argument is also nonsensical given that, again, the *Allied bankruptcy cases* – in which Yucaipa filed its Counterclaim – are filed under Title 11, as is Yucaipa's equitable subordination claim, which is brought pursuant to Sections 510(c) and 105(a) *"under" Title 11*.  In fact, as this Court has held, an equitable subordination claim, which is what Yucaipa is seeking to assert, can only be brought in a bankruptcy proceeding.  *In re USDigital, Inc.*, 461 B.R. 276, 285 (Bankr. D. Del. 2011) (Sontchi, J.) ("[E]quitable subordination, as set forth in section 510(c), can only be raised in bankruptcy court . . . [I]t is a unique creature of bankruptcy law").

Yucaipa again tries to escape Section 2.7(b) by arguing that Black Diamond and Spectrum are equitably estopped from raising it because they allegedly raised it for the first time

in August 2014.  Even if this mattered, Yucaipa conveniently ignores the fact that (i) Black Diamond and Spectrum actually raised Section 2.7(b) to bar Yucaipa's actions in July 2013, as well as in the Delaware Chancery Court in December 2013; and (ii) the Credit Agreement has a "no waiver" provision, which provides that any delay in raising any right under the Credit Agreement "shall not impair any such right . . . or be construed to be a waiver thereof."  (Credit Agreement § 10.9.)

Next, as set forth below, even if Yucaipa somehow manages to avoid the aforesaid two contractual bars in the Third Amendment to asserting its Counterclaim, Yucaipa's Counterclaim should be dismissed because the allegations supporting the claim are not plausible.

To begin, Yucaipa is collaterally estopped from re-litigating the issue of whether its allegations are plausible that Black Diamond and Spectrum "encouraged" Yucaipa to buy First Lien Debt only to later "double-cross" Yucaipa in connection with Yucaipa's attempt to become the Requisite Lender.  As Yucaipa admits, this Court already ruled that those allegations are not plausible in dismissing Yucaipa's Cross-Claims.  (Opp'n at 5.)  Yucaipa, however, attempts to side-step this issue by arguing that its Counterclaim raises numerous "new" allegations that were not asserted in its Cross-Claims.  Black Diamond and Spectrum are not asserting that Yucaipa is collaterally estopped from raising its new allegations; rather, Yucaipa is collaterally estopped from raising the issues upon which its prior Cross-Claims were based, which are the critical allegations contained in the first part of the Counterclaim where it re-hashes the "encouragement" allegations and the allegations that Black Diamond and Spectrum improperly opposed Yucaipa becoming the Requisite Lender.  These allegations are a material part of the Counterclaim and without them the Counterclaim cannot stand.

As to the new allegations, which comprise the latter part of the Counterclaim and which are not subject to collateral estoppel, they should be dismissed because they too are not plausible. In its Opposition, Yucaipa continues to ignore numerous facts which it finds to be inconvenient or inconsistent with its theory, creating massive holes in their implausible Counterclaim. As set forth in the Opening Memorandum, it is not plausible that Black Diamond and Spectrum would "scuttle" the JCT deal, which would have given them a *100% recovery* on their First Lien Debt, to instead pursue a highly unpredictable litigation strategy that depended upon every one of the following events occurring (none of which Black Diamond and Spectrum could control): (i) prevailing in litigation to invalidate the Purported Fourth Amendment and the appeal therefrom; (ii) obtaining a judicial declaration that Black Diamond and Spectrum are the Requisite Lenders; (iii) acquiring Allied's assets through a credit bid of the First Lien Debt[9]; (iv) prevailing in their equitable subordination claims against Yucaipa; and (v) hoping that the Allied assets they acquired would increase in value to the point where the asset value plus any recovery realized from the equitable subordination litigation exceeded a par plus accrued interest recovery *years* after JCT had offered them a 100% recovery. Yucaipa's allegation that Black Diamond and Spectrum abandoned a *guaranteed* par plus accrued interest recovery in 2012 in favor of pursuing such a highly speculative and unpredictable strategy to achieve the same result is simply not plausible.

Rather than explaining how the alleged multi-step scheme set forth in the Counterclaim is plausible, Yucaipa attempts to highlight and rationalize individual components of the alleged scheme. However, Yucaipa's theory of a highly speculative, multi-year, multi-

---

[9] This Court is well aware that any "credit bid" would have to have been made on behalf of all of the First Lien Debt holders, including Yucaipa (subject to the outcome of the equitable subordination litigation).

faceted scheme for no obvious incremental benefit simply does not make sense.  As a result, Yucaipa's Counterclaim is implausible and should be dismissed.

## ARGUMENT

### I.    THE THIRD AMENDMENT BARS YUCAIPA FROM BRINGING THE COUNTERCLAIM

#### A.    The Covenant Not to Sue Bars Yucaipa's Counterclaim

Under the Covenant Not to Sue, Yucaipa cannot sue any Lenders unless the Prior Determination Requirement is satisfied – that is, unless there has been a judicial finding of "gross negligence or willful misconduct . . . as determined by a court of competent jurisdiction by final and non-appealable judgment."  (Third Amendment § 2.7(e).)  Yucaipa calls this reading of the Covenant Not to Sue "nonsensical" (Opp'n at 15), even though this Court already found that "the carve out as written deals with the narrow situation of a finding . . . that there's been willful misconduct or gross negligence . . . I don't think that is done in the auspices of a lawsuit directly related between the parties, it has to come from somewhere else" (Allied Adv. Proc., D.I. No. 162, at 109:19-25).

The Chancery Court, while accepting that this Court's interpretation of the Covenant Not to Sue is applicable pursuant to collateral estoppel, found that in very limited circumstances – namely, where Yucaipa "alleges a unique harm – meaning no other Lender *could* sue" – applying the Covenant Not to Sue "*arguably* would" be "contrary to public policy." *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, No. Civ. A. 9151-VCP, 2014 WL 5509787, at *15 (Del. Ch. Oct. 31, 2014) (emphasis added).[10]

---

[10] Yucaipa contends that this Court is bound by the Chancery Court's interpretation of the Covenant Not to Sue under the doctrine of collateral estoppel.  (Opp'n at 18-19.)  Yucaipa is mistaken because collateral estoppel requires a final judgment; that is, it requires a prior adjudication in another action that is "determined to be sufficiently firm to be accorded preclusive effect."  (Opp'n at 18 n.16 (citing Restatement (Second) of Judgments § 13 (1982)).)  The Chancery Court's decision plainly was not a final judgment; instead, the Chancery Court declined to dismiss a

*(Continued on next page . . .)*

1.  *Yucaipa misconstrues the Chancery Court's decision*

Even if this Court were to adopt the Chancery Court's interpretation of the

Covenant Not to Sue as "final" and thus entitled to collateral estoppel effect, Yucaipa's

Counterclaim should nevertheless be dismissed.  Yucaipa, in an effort to expand the limited

"public policy" exception articulated by the Chancery Court to reach its Counterclaim, misstates

the Chancery Court's decision.  Specifically, Yucaipa contends that "the Chancery Court required

only that it be 'unrealistic' that other lenders would sue, or that it was unlikely that they *would*

sue because Yucaipa had a greater incentive."  (Opp'n at 17-18 (emphasis added).)  But this was

not the Chancery Court's holding.  Rather, the Chancery Court held that public policy *might*

---

*(Continued)*

number of Yucaipa's claims at the motion to dismiss stage. *See Yucaipa Am. Alliance Fund I*, 2014 WL 5509787, at
*14 ("At the motion to dismiss stage, I find it reasonably conceivable that Yucaipa could show that the outer
boundaries of the Covenant are ambiguous . . . and that public policy would prevent the wholesale adoption of the
broad interpretation [Black Diamond and Spectrum] advance."). This finding simply cannot qualify as a final
judgment because it does not evidence the Chancery Court's "intention that the order be the court's 'final act'" in the
case. *Braddock v. Zimmerman*, 906 A.2d 776, 780 (Del. 2006); *see also* Restatement (Second) of Judgments § 13
cmt. g (1982) (noting that "preclusion should be refused if the decision was avowedly tentative").

The cases upon which Yucaipa relies do not compel a different result. Two of Yucaipa's cases are wholly inapposite.
(*See* Opp'n at 19.) For instance, Yucaipa cites *San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S.
323 (2005), which does not even address the question of whether the prior decision is a "final judgment." Yucaipa's
reliance on *Burlington Northern Railroad Co. v. Hyundai Merchant Marine Co.*, 63 F.3d 1227 (3d Cir. 1995) is also
misplaced. (Opp'n at 19.) In *Burlington*, the court reasoned that the prior determination of an issue "as a matter of
law" at the summary judgment stage could have preclusive effect. *See id.* at 1233 n.8. By contrast, here, the
Chancery Court found that "[a]t the motion to dismiss stage" it was "reasonably conceivable" that application of the
Covenant Not to Sue could, in "limited circumstances," produce a result that was contrary to public policy. *Yucaipa
Am. Alliance Fund I, LP v. SBDRE LLC*, No. Civ. A. 9151-VCP, 2014 WL 5509787, at *14-15 (Del. Ch. Oct. 31,
2014). Thus, unlike the court in *Burlington*, the Chancery Court left the issue of the Covenant's applicability open
for determination at a later stage in the case.

Finally, Yucaipa's other cases are distinguishable because they are based on a final judgment where a motion to
dismiss was *granted in its entirety* and the action was *dismissed.* (*See* Opp'n at 18-19 (citing *RBC Capital Mkts.,
LLC v. Educ. Loan Trust IV*, 87 A.3d 632, 643-44 & n.42 (Del. 2014) (*dismissal with prejudice* is a final judgment);
*Braddock v. Zimmerman*, 906 A.2d 776, 780 (Del. 2006) (*dismissal without prejudice* may be a final judgment).)
This was not the case here where some of the claims were dismissed and others were stayed. Those cases *do not*
stand for the proposition that a decision (such as the Chancery Court's decision) that *denies* in part a motion to
dismiss is a final judgment. Indeed, treating the denial of a motion to dismiss as a final judgment would be
nonsensical given that the action proceeds following such denial. *See City of Mount Clemens v. E.P.A.*, 917 F.2d
908, 915 (6th Cir. 1990) ("[A] denial of a motion to dismiss is not the type of judgment that is given *res judicata*
effect."); *Wills v. RadioShack Corp.*, 981 F. Supp. 2d 245, 265 (S.D.N.Y. 2013) (defendant was not collaterally
estopped by a prior federal court decision denying a motion to dismiss because, *inter alia*, the decision was not a
final judgment on the merits for the purposes of collateral estoppel).

preclude application of the Covenant Not to Sue where Yucaipa "alleges a *unique* harm –

meaning no other Lender *could* sue and the Prior Determination Requirement *cannot* be

satisfied." *Yucaipa Am. Alliance Fund I*, 2014 WL 5509787, at *15 (emphasis added).

Therefore, the Chancery Court found that the public policy exception would apply only when the

harm was unique to Yucaipa and no other Lender *could* bring suit – not where it would be

"unrealistic" or "unlikely" that other Lenders *would* sue. *See id.* ("I will not dismiss, however,

any Count in which Yucaipa sufficiently has alleged that it sustained a unique wrong *not suffered*

*by other Lenders, i.e.*, situations in which the Prior Determination Requirement *could not* be

satisfied.") (emphasis added).[11] Thus, contrary to Yucaipa's contention, the Chancery Court did,

in fact, expressly limit its holding to "narrow situations in which satisfying the Prior

Determination Requirement would be literally impossible." (*See* Opp'n at 17.)

Indeed, the Chancery Court's application of the Covenant Not to Sue is wholly

consistent with the notion that the "public policy exception" is limited to very narrow situations

where *only* Yucaipa has been harmed. Specifically, the Chancery Court declined to dismiss

Yucaipa's claim for a declaratory judgment that it validly owns 55.2% of the First Lien Debt

because Black Diamond and Spectrum's alleged misconduct in that regard "affect[ed] *only*

Yucaipa." *Yucaipa Am. Alliance Fund I*, 2014 WL 5509787, at *15. Thus, this claim satisfied

the Chancery Court's requirement that the harm Yucaipa suffered was "a unique wrong not

---

[11] Yucaipa also incorrectly asserts that the "Chancery Court held that the Prior Determination Requirement would violate public policy if it has the effect of exonerating BD/S's gross negligence and willful misconduct." (Opp'n at 16.) To the contrary, even under the Chancery Court's "public policy" interpretation of the Covenant Not to Sue, if (for the sake of argument) Black Diamond and Spectrum committed an act of gross negligence or willful misconduct that harmed Yucaipa *and* other Lenders, but no other Lenders decided to sue, then the Covenant Not to Sue would bar Yucaipa from suing. For that reason, the Chancery Court dismissed several of Yucaipa's claims on the basis of the Covenant Not to Sue, even though Yucaipa alleged that Black Diamond and Spectrum committed gross negligence and willful misconduct with respect to those claims. *See Yucaipa Am. Alliance Fund I*, 2014 WL 5509787, at *15-16.

suffered by other Lenders." *Id.* The Chancery Court did not base this conclusion on a finding

that it would be "unrealistic" or "unlikely" that other Lenders would sue, as Yucaipa contends.

The correct application of Chancery Court's "public policy" interpretation is best

illustrated by its decision relating to the "New Issuance," concerning the manner in which

SBDRE offered Lenders the opportunity to participate in a new capital raise. The Chancery

Court dismissed Yucaipa's general challenge to the New Issuance because "all Lenders suffered

the same alleged wrong of dilution or other impairment of rights held under the Credit

Agreement, and any of the other Lenders *could have brought suit, but did not.*" *Id.* at *16

(emphasis added). The Chancery Court, however, declined to dismiss the portion of Yucaipa's

claim relating to Yucaipa's alleged "*distinct* wrong of only being able to participate in the New

Issuance at 9.9%, rather than its alleged full ownership of 55.2%." *Id.* (emphasis added). This

finding did not depend on whether it was "realistic" or "unlikely" for another Lender to bring

suit. Rather, it was based on an alleged understatement of Yucaipa's membership interest in

SBDRE (and the predicate for its *pro rata* participation in the capital raise) that affected *only*

Yucaipa.

Indeed, Yucaipa's reading of the Chancery Court's decision would produce

nonsensical results. If, as Yucaipa argues, the application of the Covenant Not to Sue turns on

the other Lenders' motivation to bring suit for purported willful misconduct or gross negligence,

the parties would be forced to conduct discovery into the subjective motivation of the other

Lenders to determine whether it was "realistic" or "unlikely" that they would bring suit before a

Court could ever apply the Covenant Not to Sue. And a determination as to whether the other

Lenders were "sufficiently motivated" to bring suit would likely require an evidentiary hearing.

Such an interpretation would completely eviscerate the Covenant Not to Sue by making it

impossible for any claim brought by Yucaipa to be dismissed on that basis before the case was

well into discovery and well beyond the motion to dismiss stage.

> 2.    *The Covenant Not to Sue does not exculpate Black Diamond and Spectrum for willful misconduct or gross negligence*

Yucaipa's alternative arguments also depend on its flawed interpretation of the

Covenant Not to Sue and the Chancery Court's decision, and therefore fare no better. Yucaipa

first contends that Black Diamond and Spectrum's interpretation of the Prior Determination

Requirement – which is identical to this Court's interpretation – would violate public policy by

"exculpat[ing] BD/S from willful or grossly negligent acts whenever their conduct was

specifically directed against Yucaipa." (Opp'n at 21.) This is incorrect. If Black Diamond and

Spectrum allegedly committed willful or grossly negligent acts that harmed *only Yucaipa*, then

the Chancery Court's decision would permit Yucaipa to bring suit based on what the Chancery

Court found to be the public policy exception. However, if (as here) the asserted willful or

grossly negligent acts allegedly harmed Yucaipa *and other Lenders*, then the Prior Determination

Requirement would mandate that another Lender be the first to sue.[12] The Chancery Court

---

[12] Yucaipa's reliance on New York public policy law is misplaced. (Opp'n at 20-21.) The cases Yucaipa cites stand for the proposition that an exculpation clause cannot "exonerate a party from liability *under all circumstances*," and "contractual waiver provisions cannot exculpate the released party's willful or grossly negligent acts." (*Id.* at 16, 20.) But the Covenant Not to Sue, by its own terms, does not exonerate Lenders "under all circumstances," nor does it exculpate Lenders for willful or grossly negligent acts. Rather, the Covenant Not to Sue specifically *allows* Yucaipa to sue other Lenders (including Black Diamond and Spectrum) when there has been a determination in a court of competent jurisdiction finding that the Lender had committed gross negligence or willful misconduct. Accordingly, the Covenant Not to Sue does not violate New York public policy law.

Yucaipa also lays blame on this Court for "not address[ing] the public policy exception under New York law when it dismissed Yucaipa's 2012 Cross-Claim." (Opp'n at 20 n.18.) However, given Yucaipa's failure to raise the New York public policy exception when first confronted with the Covenant Not to Sue, Yucaipa should be precluded from doing so now. And in any event, even if the Chancery Court's "public policy" interpretation of the Covenant Not to Sue had been applied to Yucaipa's Cross-Claims, which this Court previously dismissed on the basis of the Covenant Not to Sue, Yucaipa's Cross-Claims would still be barred because the Cross-Claims asserted claims that affected other Lenders, not just Yucaipa uniquely. Specifically, Yucaipa brought its Cross-Claims "to determine Yucaipa's rights *and the other first lien Lenders'* rights under the Frist Lien Credit Agreement," and for this Court to determine "how and to which creditors property of the Debtors' estates can be distributed" and "which Lenders can credit bid the first lien debt and in what amount." (Allied Adv. Pro., D.I. 65 at 3-4 (emphasis added).) Because, as Yucaipa

*(Continued on next page . . .)*

decision is consistent with that result because it dismissed the claims that were not unique to Yucaipa even though no Lender had stepped forward and brought such claims.

Yucaipa's next argument is similarly unavailing. Yucaipa contends that Black Diamond and Spectrum's interpretation would effectively nullify the gross negligence/willful misconduct carve-out "because the Prior Determination Requirement could be rarely, if ever, satisfied." (Opp'n at 22.) Yucaipa is incorrect again. As explained above, under the Chancery Court's interpretation, the Prior Determination Requirement could be satisfied through a suit brought by any aggrieved Lender other than Yucaipa. Just because the Prior Determination Requirement is not satisfied on *this occasion* does not mean that it can *never* be satisfied.

In any event, the Prior Determination Requirement was included in the Third Amendment *precisely* because the Third Amendment was intended to limit Yucaipa's rights as a Lender. For that reason, the Third Amendment specifically defines Yucaipa and its affiliates as the "Restricted Sponsor Affiliates," rather than simply including them as "Lenders." (Third Amendment § 2.1; Credit Agreement § 1.1.) If Yucaipa chose to buy Allied debt, then as a Restricted Sponsor Affiliate, Yucaipa's rights were limited. For instance, Yucaipa is (i) prohibited from acquiring any Revolving Loans or LC Commitments (Third Amendment § 2.1(c)), (ii) prohibited from accumulating more than the lesser of 25% or $50 million in outstanding principal amount of Term Loans (*id.* §§ 2.7(c), 2.7(e)), and (iii) prohibited from exercising any and all voting rights it would otherwise have as a Lender (*id.* §§ 2.1(e), 2.7(a), 2.7(b), 2.7(e)). Another restriction placed on Yucaipa's rights as a Restricted Sponsor Affiliate if it chose to buy Allied debt is the Covenant Not to Sue, which makes it harder for *Yucaipa* to sue

---

*(Continued)*

itself admitted, the resolution of its Cross-Claims would have affected other Lenders, not just Yucaipa, application of the Covenant Not to Sue to bar Yucaipa's Cross-Claims did not violate public policy.

than it is for the other Lenders.[13]  Yucaipa has no basis for objecting to the limitations on its

rights which were clearly set forth in the Third Amendment, especially since those limitations

have already been applied against Yucaipa by this Court and the Chancery Court.

> 3.    *Because other Lenders could bring the claims Yucaipa asserts in its Counterclaim, the Covenant Not to Sue bars the Counterclaim*

In its Opposition, Yucaipa contends that it has suffered a unique harm sufficient to

prevent application of the Covenant Not to Sue because Black Diamond and Spectrum (i)

"encouraged the consolidation of a large amount of First Lien Claims into Yucaipa's hands"; (ii)

"prevented Yucaipa from acting as Requisite Lender"; (iii) prevented Yucaipa "from selling its

First Lien Claims to JCT"; (iv) "filed an involuntary bankruptcy petition supported by false

affidavits in order to pursue equitable subordination of Yucaipa's claims"; and (v) attempts to

"fraudulently subordinate *Yucaipa's* recoveries on the $170 million in claims against Allied at

issue in the bankruptcy proceedings."  (Opp'n at 23-24.)  None of these allegations, however,

support the argument that Yucaipa was uniquely harmed.

As an initial matter, Yucaipa already raised the first two allegations – that Black

Diamond and Spectrum encouraged the consolidation of First Lien Claims in Yucaipa's hands

and prevented Yucaipa from acting as Requisite Lender – in its Cross-Claims.  As discussed in

greater detail below, this Court dismissed the Cross-Claims based on the Covenant Not to Sue,

which determination has collateral estoppel effect here as to these allegations.  (Allied Adv.

Proc., D.I. No. 162 at 109:14-17.)  Accordingly, Yucaipa cannot now contend that these same

allegations are sufficient to prevent application of the Covenant Not to Sue here.

---

[13] Thus, the exculpation clause in the Credit Agreement (which sets forth the right to sue of all Lenders other than Yucaipa, the Restricted Sponsor Affiliate) does *not* have a Prior Determination Requirement, while the Covenant Not to Sue (which applies only to the "Restricted Sponsor Affiliates," *i.e.*, Yucaipa) does have a Prior Determination Requirement.  (*Compare* Credit Agreement § 9.3(b), *with* Third Amendment § 2.7(e).)

Yucaipa's third allegation – that Black Diamond and Spectrum prevented a sale to JCT by filing the involuntary petitions – fares no better. In this regard, Yucaipa's Counterclaim alleges that: (i) Black Diamond and Spectrum filed the involuntary petitions to "scuttle" the JCT deal (Counterclaim ¶ 73); (ii) the JCT deal would have "maximized value for *all* Allied stakeholders" with a payment of "up to par plus accrued interest" (*id.* ¶ 72); and (iii) as a result of the filing of the involuntary petitions, JCT acquired Allied for "approximately $170 million less in consideration than offered by JCT to *all* lenders" (*id.* ¶ 10(e)) (emphasis supplied). From the face of these allegations the alleged harms were not unique to Yucaipa. Because *all* the First Lien Lenders stood to benefit from the proposed JCT deal, the filing of the involuntary petitions – which allegedly "scuttled" the JCT deal – harmed *all* the Lenders. (*See* Opening Mem. at 14-15.)

Finally, to the extent that Yucaipa alleges that it was uniquely harmed by the filing of an equitable subordination complaint against it, conduct in litigation cannot form the basis for a claim. That is, Black Diamond and Spectrum's right to file litigation against Yucaipa is protected under the *Noerr-Pennington* doctrine, which protects a litigant's right to "petition the Government for redress of grievances," a fundamental principle that cannot be abridged under the First Amendment of the U.S. Constitution. *See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137 (1961); *Mcdonald v. Smith*, 472 U.S. 479, 482 (1985). The *Noerr-Pennington* doctrine immunizes every step of litigation from liability "regardless of intent or purpose," so long as the litigation is not a "sham." *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965). To invoke the "sham" exception to *Noerr-Pennington*, Yucaipa "must prove, by clear and convincing evidence, that [Black Diamond and Spectrum's]

activities were not really efforts to vindicate [their] rights in court." *Braintree Labs., Inc. v. Schwarz Pharm., Inc.*, 568 F. Supp. 2d 487, 495 (D. Del. 2008).

Yucaipa has not adequately alleged, and cannot show, that the equitable subordination claims filed by Black Diamond and Spectrum are a "sham." In fact, the Committee has, based upon its investigation of potential claims belonging to Allied, *independently* brought a substantially similar equitable subordination claim against Yucaipa that arises from the same nucleus of operative facts as Black Diamond and Spectrum's equitable subordination claims. Yucaipa has not contended, nor could it, that the Committee's equitable subordination claim is a "sham." Accordingly, the First Amendment bars Yucaipa from asserting claims against Black Diamond and Spectrum based on filing these claims.

In sum, Yucaipa has failed to adequately allege that it was uniquely harmed such that application of the Covenant Not to Sue to the Counterclaim would violate public policy.

**B.     Section 2.7(b) Bars Yucaipa's Counterclaim**

Under Section 2.7(b) of the Third Amendment, Yucaipa waived "any right to, make any election, give any consent, *commence any action* or file any motion, *claim*, obligation, notice or application or take any other action in any *Insolvency or Liquidation Proceeding* without the prior written consent of all Lenders . . . ." (Third Amendment § 2.7(b) (emphasis added).) As set forth in the Opening Memorandum, Section 2.7(b) bars Yucaipa from asserting its Counterclaim. Yucaipa, however, contends that (i) Section 2.7(b) does not apply to adversary proceedings, (ii) Black Diamond and Spectrum are equitably estopped from raising Section 2.7(b), and (iii) application of Section 2.7(b) would violate public policy. Yucaipa's arguments are without merit.

1.      *Section 2.7(b) applies to adversary proceedings*

Yucaipa argues that the term "Insolvency or Liquidation Proceeding" applies only

to the "bankruptcy petition itself" and not to this adversary proceeding because, according to

Yucaipa, "this adversary proceeding is not a case under Title 11." (*See* Opp'n at 26-27.)

Yucaipa's argument is perplexing given that the Allied bankruptcy cases – in which this

adversary proceeding was filed – *clearly* are "Insolvency or Liquidation Proceeding[s]" under

Title 11.  Indeed, Yucaipa's own caption to its Opposition indicates that these bankruptcy cases

were filed under "Chapter 11" *of Title 11*.  (D.I. No. 56.)  Moreover, adversary proceedings can

only exist under a voluntary or involuntary bankruptcy case, as they must be filed in the court

where the case under the Bankruptcy Code is pending.  *See* Fed. R. Bankr. P. 5005(a) advisory

comm. nn.; Fed. R. Bankr. P. 7003 advisory comm. nn.  Furthermore, Yucaipa's Counterclaim –

which it filed in *Bankruptcy Court* – is an attempt to "commence any action" or "file any . . .

claim" in an "Insolvency or Liquidation Proceeding" (*i.e.*, the Allied bankruptcy cases).  Under

the clear and unambiguous terms of the Third Amendment, because Yucaipa has not received the

written consent of all Lenders, Yucaipa's attempt to commence an action or file a claim in the

Allied bankruptcy cases is barred by Section 2.7(b).

Yucaipa also makes the absurd argument that Section 2.7(b) does not bar its

Counterclaim because this adversary proceeding is "a state-law dispute between non-debtors."

(Opp'n at 28.)  To the contrary, Yucaipa's Counterclaim – which seeks equitable subordination of

Black Diamond and Spectrum's debt – plainly is made under Title 11 of the Bankruptcy Code

because, as Count I of Yucaipa's Counterclaim shows, Yucaipa's equitable subordination claim is

brought under "Sections 510(c) and 105(a) *of the Bankruptcy Code*" – both of which are under

Title 11.  (Counterclaim at 67 (emphasis added).)  Similarly, Black Diamond and Spectrum's

equitable subordination claim against Yucaipa in this adversary proceeding is likewise brought

"under" Section 510(c) of *Title 11*. As this Court has recognized, "equitable subordination, as set forth in section 510(c), can only be raised in bankruptcy court . . . *it is a unique creature of bankruptcy law.*" *In re USDigital, Inc.*, 461 B.R. 276, 285 (Bankr. D. Del. 2011) (Sontchi, J.) (emphasis added). Indeed, given that the remedy under an equitable subordination claim is the subordination of a creditor's claim *in a bankruptcy proceeding*, Yucaipa's equitable subordination Counterclaim plainly is an attempt to commence an action or file a claim in an "Insolvency or Liquidation Proceeding," which is barred by Section 2.7(b). Accordingly, Yucaipa's argument that its equitable subordination claim is a "state-law dispute" that is not "under" Title 11 is without merit.[14]

> 2.   *Equitable estoppel does not bar Black Diamond and Spectrum from raising Section 2.7(b)*

Yucaipa argues that Black Diamond and Spectrum are equitably estopped from raising Section 2.7(b). Under New York law, the party claiming equitable estoppel must adequately allege "(1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts." *Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.*, 430 N.Y.S.2d 179, 187 (1980). In addition, "[t]he party asserting estoppel must show with respect to himself: (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in his position." *Id.*

Here, Yucaipa argues that Black Diamond and Spectrum should be equitably estopped from raising Section 2.7(b) because they allegedly did not raise it until August 2014.

---

[14] Yucaipa's argument that it has moved to withdraw the reference (Opp'n at 28) is irrelevant because equitable subordination is a bankruptcy-specific remedy. Under the definition of "Insolvency or Liquidation Proceeding," it does not matter which court hears the claim, only that it is a "proceeding under Bankruptcy Law." (Intercreditor Agreement § 1.1.)

(Opp'n at 29.) Yucaipa's claim that "BD/S repeatedly failed to assert [Section 2.7(b)] before invoking it in response to Yucaipa's counterclaims" is simply wrong. (*See* Opp'n at 29.)  In fact, Yucaipa has been on notice of Section 2.7(b) since the enactment of the Third Amendment (which Yucaipa itself helped to draft) and has been on notice of Black Diamond and Spectrum's assertion as to the applicability of Section 2.7(b) since at least ***July 2013***, when Black Diamond and Spectrum moved for summary judgment for a determination of Requisite Lenders and argued as follows:

> Yucaipa's strained argument [that it is the Requisite Lender] would impermissibly render superfluous . . . numerous other restrictions on Yucaipa's rights as a "Restricted Sponsor Affiliate" under Sections 2.7(a), (b) and (e) of the Third Amendment . . . . Section 2.7(b) provides that Yucaipa "***irrevocably and voluntarily waives[s]*** . . . any right to, make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action ***in any Insolvency or Liquidation Proceeding*** without the prior consent of all Lenders other than [Yucaipa]."

(Committee Adv. Proc., D.I. No. 262 at 11 (Reply Memorandum of Law in Further Support of Petitioning Creditors' Motion for Summary Judgment Regarding the Determination of Requisite Lenders) (emphasis added).)

Thereafter, Black Diamond and Spectrum again raised Section 2.7(b) against Yucaipa (i) in the Chancery Court opposing Yucaipa's motion for entry of a status quo order in December 2013, and (ii) in this Court in opposition to Yucaipa's motion for leave to assert a counterclaim in the Committee Action in August 2014.  (*See* Brief in Opp'n to Yucaipa's Motion for Entry of a Status Quo Order at 17-18, C.A. No. 9151-VCP (Del. Ch. Dec. 18, 2013); Committee Adv. Proc., D.I. 316 at 25.)  Accordingly, Yucaipa's claim that it would be inequitable to apply Section 2.7(b) on the grounds of Black Diamond and Spectrum's purported failure to raise it previously should be rejected.

Moreover, even if Black Diamond and Spectrum *had* failed to raise Section 2.7(b) until August 2014, Yucaipa would still not be permitted to rely on that failure because the Credit Agreement contains a "no waiver" provision.  Specifically, Section 10.9 of the Credit Agreement provides, in relevant part, that "[a]ny forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy." (Credit Agreement § 10.9.)  Thus, under the "no waiver" provision, Black Diamond and Spectrum's purported failure to raise Section 2.7(b) earlier in the case would have *no effect* on their ability to raise it now.

Further, to the extent that Yucaipa allegedly relied on the purported failure to raise Section 2.7(b), such reliance was unreasonable given that Yucaipa has been on notice of the terms of the Third Amendment since its inception (in fact, Yucaipa participated in the drafting of the Third Amendment).  *See Fashion Bug No.2100 of Batavia, Inc. v. 425 W. Main Associates (Batavia) LP*, 809 N.Y.S.2d 481 (table), 2005 WL 3193702 (N.Y. Sup. Ct. 2005) (unreasonable for landlord to rely on tenant's actions in contradiction to lease provision because it was a party to the lease and its amendments that tenant sought to enforce).  Given Yucaipa's intimate knowledge of – and well-documented efforts to avoid – the unambiguous terms of the Third Amendment, Yucaipa cannot now feign surprise that Black Diamond and Spectrum are seeking to enforce the terms of the Third Amendment against Yucaipa.

Accordingly, Yucaipa has failed to show that Black Diamond and Spectrum are equitably estopped from asserting Section 2.7(b).

3.    *Public policy does not bar Black Diamond and Spectrum from raising Section 2.7(b)*

Yucaipa argues that Section 2.7(b) violates public policy because it prevents Yucaipa from, among other things, asserting affirmative defenses, answering complaints, and "conceivably prevents Yucaipa from defending itself at all, against any claim."  (Opp'n at 31.)  Yucaipa's hypothetical parade of horribles is without merit.  Section 2.7(b) prevents Yucaipa from commencing an action but it does not prevent Yucaipa from defending itself against a claim brought by a Lender; nor have Black Diamond or Spectrum ever taken such a position.  Contracts are not to be interpreted to produce a result that is absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.  *See Lipper Holdings, LLC v. Trident Holdings, LLC (In re Lipper Holdings, LLC)*, 766 N.Y.S.2d 561, 562 (N.Y. App. Div. 2003).

By contrast, the application of Section 2.7(b) to bar a claim *filed by Yucaipa* against other Lenders does not produce a commercially unreasonable result nor is it contrary to the reasonable expectations of the parties.

## II.    YUCAIPA IS COLLATERALLY ESTOPPED FROM ALLEGING THAT BLACK DIAMOND AND SPECTRUM "ENCOURAGED" YUCAIPA TO BUY FIRST LIEN DEBT AND FRUSTRATED ITS BECOMING REQUISITE LENDER

### A.    Yucaipa Is Collaterally Estopped From Asserting Issues Concerning Whether Their "Encouragement" and Requisite Lender Allegations Are Plausible

Yucaipa first contends that collateral estoppel does not apply here because the "2015 Counterclaim is not the dismissed 2012 Cross-Claim."  (Opp'n at 6.)  This argument is a red-herring because the application of collateral estoppel precludes a party from raising the same *issues*, not the same *claim*.  Black Diamond and Spectrum do not assert, as Yucaipa misleadingly argues, that the *entire* Counterclaim is barred by collateral estoppel.  Rather, they argue that Yucaipa is collaterally estopped from asserting several issues – whether Yucaipa has plausibly alleged that "Black Diamond and Spectrum (i) 'encouraged' Yucaipa to purchase a majority of

Allied's First Lien Debt, execute the Purported Fourth Amendment, and purport to act as the

Requisite Lender, and (ii) 'surreptitiously' instructed CIT to challenge Yucaipa's purported

Requisite Lender status."[15]  (Opening Mem. at 18; Counterclaim ¶¶ 8, 47, 53.)

Nowhere in the Opening Memorandum do Black Diamond and Spectrum contend

that collateral estoppel bars Yucaipa from asserting the remainder of its allegations in the

Counterclaim.  Rather, Black Diamond and Spectrum argue that the rest of Yucaipa's

Counterclaim is either (i) barred by the Covenant Not to Sue and Section 2.7(b) of the Third

Amendment or (ii) implausible.  Thus, Yucaipa's Opposition spends nearly seven pages knocking

down a straw man.  (*See* Opp'n at 4-10.)

It is beyond dispute that this Court has already found that Yucaipa's

"encouragement" and Requisite Lender allegations are implausible.  Indeed, Yucaipa *admits* that

this Court found it implausible that "mischief [was allegedly] going on that was detrimental or

directed at Yucaipa at the time of the third amendment being entered into . . . then the fourth

amendment being negotiated, and then the debt being [bought] and then the fourth amendment

being passed."  (Opp'n at 5; *see also* Allied Adv. Proc., D.I. No. 162 at 111:3-6 ("The fact that it

was all part of a grand strategy that somehow Yucaipa was sucked in to allow [ComVest] to make

the agreement and then make the sale, I just, I just don't find that plausible.").)  Accordingly,

Yucaipa is precluded from arguing that those initial allegations in its Counterclaim are plausible.

**B.     The Court's Finding of Implausibility Was Necessary to Application of the
         Covenant Not to Sue**

Yucaipa also argues that collateral estoppel does not bar its "encouragement" and

Requisite Lender allegations because "the Court's *factual* implausibility findings were not

---

[15] These two allegations correspond to "Step One" and "Step Two" of Black Diamond and Spectrum's purported
scheme.  (Counterclaim ¶¶ 8-9.)

necessary to the Court's dismissal without prejudice, which was based only on the '*legal* bases' identified by BD/S." (Opp'n at 14 (emphasis added).) Once again, Yucaipa is incorrect.

Yucaipa's Cross-Claims alleged that it would be inequitable to enforce the Third Amendment against Yucaipa because Black Diamond and Spectrum had purportedly "supported Yucaipa's acquisition of the Requisite Lender position" and "encouraged Yucaipa's proposed plan" before choosing to "double-cross Yucaipa." (Allied Adv. Proc., D.I. No. 65 ¶¶ 4, 5, 7, 71, 92, 118.) As Yucaipa admits, this Court dismissed the Cross-Claims on the basis of the Covenant Not to Sue. (Opp'n at 12.) The Covenant Not to Sue is contained *in the Third Amendment*, the enforcement of which Yucaipa was challenging in the Cross-Claims on the basis of Black Diamond and Spectrum's alleged actions. (Counterclaim Ex. 3, Third Amendment § 2.7(e).) Thus, in order for the Court to dismiss the Cross-Claims on the basis of the Covenant Not to Sue, the Court needed to first determine the applicability of the Third Amendment against Yucaipa. To do that, the Court was required to assess the "factual plausibility" of Yucaipa's "encouragement" and Requisite Lender allegations to determine whether the enforcement of the Third Amendment against Yucaipa would be inequitable – *before* it could determine the "legal basis" as to whether the Covenant Not to Sue barred Yucaipa's Cross-Claims. As such, Yucaipa's contention that the Court's "factual implausibility" finding was not necessary to the Court's dismissal of the Cross-Claims on "legal bases" is simply incorrect.

## III.    THE COUNTERCLAIM'S REMAINING ALLEGATIONS ARE IMPLAUSIBLE

Faced with the fact that its allegations fail to hang together sufficiently to meet the *Iqbal-Twombly* plausibility standard, Yucaipa misstates the factual record, relies on "facts" not pled in its Counterclaim, and even resorts to simply ignoring facts it finds inconvenient that Black Diamond and Spectrum raised in the Opening Memorandum. Contrary to Yucaipa's contention, Black Diamond and Spectrum do not take a "divide and conquer" approach to

plausibility.  (Opp'n at 33.)  Rather, they illustrate that Yucaipa's *entire* story – viewed as a whole – is so full of inconsistencies and holes that it cannot withstand scrutiny.[16]

In particular, looking at the totality of the Counterclaim's allegations, it is not plausible that Black Diamond and Spectrum would give up a *100% recovery* from JCT for their First Lien Debt to instead pursue a highly unpredictable multi-faceted strategy that was fraught with risk and dependent on outcomes outside of their control.  The implausible "scheme" alleged by Yucaipa depends upon every one of the following unpredictable events occurring in a manner favorable to Black Diamond and Spectrum:  (i) invalidating the Purported Fourth Amendment through litigation; (ii) obtaining a judicial declaration that Black Diamond and Spectrum are the Requisite Lenders; (iii) acquiring Allied's assets through a credit bid on behalf of all Lenders (including Yucaipa, subject to the equitable subordination claims); (iv) prevailing in their equitable subordination claims against Yucaipa and obtaining a substantial recovery; and (v) hoping that the Allied assets they acquired would increase in value to the point where the asset value plus any recovery realized from the equitable subordination litigation exceeded a par plus accrued interest recovery *years* after JCT had offered them a 100% recovery.  Yucaipa's allegations that Black Diamond and Spectrum abandoned a *guaranteed* par plus accrued interest recovery in favor of pursuing such a highly speculative and unpredictable multi-year, multi-faceted scheme for no obvious incremental benefit simply is not plausible.

---

[16] Yucaipa's argument that "discovery will reveal [additional] evidence necessary to prove the elements of its equitable subordination claim" is disingenuous.  (Opp'n at 33 (internal quotation marks omitted).)  As this Court is well aware, the parties conducted substantial document discovery in the Spring of 2013 in preparation for an expedited trial on the Committee's complaint.  Moreover, Yucaipa's Counterclaim itself is based upon discovery produced in 2013.  (*See, e.g.*, Counterclaim ¶¶ 51, 57, 59-60, 70, 84-88.)

In response, Yucaipa either ignores inconvenient facts or attempts to cherry pick and rationalize individual portions of its implausible scheme. As set forth below, Yucaipa's attempted rationalizations fail.

A.     **The Crux of Yucaipa's Claimed Scheme Is That Yucaipa Engaged in Bad Acts Sufficient to Be Equitably Subordinated**

Yucaipa's entire Counterclaim is built around the theory that Black Diamond and Spectrum orchestrated a multi-year, multi-step scheme to use the bankruptcy process to equitably subordinate Yucaipa's First Lien Debt. (Counterclaim ¶ 11.) Of course, the only way that Black Diamond and Spectrum's purported scheme could succeed is if this Court finds that Yucaipa *did something wrong*; that is, the crux of this purported scheme requires this Court to conclude that Yucaipa engaged in inequitable misconduct sufficient to subordinate their claims in these bankruptcy cases. If there were a finding by this Court sufficient to support a determination that Yucaipa's debt should be equitably subordinated, this finding would not be the result of some fraudulent scheme by Black Diamond and Spectrum but would result from bad acts on the part of Yucaipa. This once again illustrates the implausibility of Yucaipa's claim because it ridiculously assumes that Black Diamond and Spectrum control the Courts and all the parties necessary for the alleged fraudulent scheme to be successful, and it also assumes that Yucaipa is innocent of bad acts when a judicial finding of such bad acts on the part of Yucaipa would be necessary for the alleged scheme to succeed.

Given the implausibility of Yucaipa's allegations concerning this equitable subordination "scheme," it is not surprising that Yucaipa, in its 40-page Opposition, does not even address the fact that the Committee (on behalf of the Allied bankruptcy estates) *independently* brought a substantially similar equitable subordination claim against Yucaipa (Opening Mem. at 23). As set forth in the Opening Memorandum, the Committee undertook "a

comprehensive investigation of potential claims belonging to the Debtors' estates," which uncovered Yucaipa's "efforts to take control over all facets of the Debtors' capital structure in an effort to protect its equity investment and frustrate the legitimate rights of creditors of Allied" and found that "Yucaipa trampled upon the legitimate rights and expectations of the Debtors' secured and unsecured creditors and caused the Debtors to make exorbitant and unnecessary payments to third parties acting at Yucaipa's direction and for Yucaipa's benefit, not for the benefit of the Company or its stakeholders." (Allied Bankr. Proc., D.I. No. 858 ¶¶ 3, 6.)

Based on that independent investigation, the Committee concluded that Yucaipa's claims "are subject to equitable subordination." (*Id.* ¶ 6.) As such, Yucaipa cannot plausibly allege that Black Diamond and Spectrum's equitable subordination claim, which is substantially similar to the Committee's claim, is "fraudulent." Yucaipa clearly realizes that this inconvenient fact is fatal to its Counterclaim because Yucaipa fails to even mention it in the Counterclaim or in its Opposition. Given the independent conclusions reached by the Committee supporting their determination to pursue an equitable subordination claim against Yucaipa, the assertion that the claims brought by Black Diamond and Spectrum emanated from a fraudulent strategy devised more than five years ago (and before much of the conduct on which the claims are based even occurred) simply is not plausible.

**B.     Yucaipa's Allegation that Black Diamond and Spectrum Gave up a Guaranteed Recovery to Pursue an Unpredictable Litigation Strategy Is Not Plausible**

Yucaipa contends that it was rational for Black Diamond and Spectrum to give up a guaranteed recovery from JCT of par plus accrued interest on its First Lien Debt to pursue a risky and unpredictable litigation strategy because (i) the JCT transaction would have paid Black Diamond and Spectrum partially in "JCT notes" rather than cash; (ii) Black Diamond and Spectrum *may have* been able to acquire Allied's assets through a credit bid, and those assets

*may have* been worth more than par plus accrued interest; and (iii) the JCT deal would have

prevented Black Diamond and Spectrum from filing an equitable subordination claim against

Yucaipa. (Opp'n at 35-36.) Each of these arguments is fatally flawed.

As an initial matter, Yucaipa's Counterclaim is devoid of any allegation that the

JCT transaction would have paid Black Diamond and Spectrum in JCT notes, rather than cash.

Yucaipa is not permitted to amend its Counterclaim through its Opposition. More importantly,

however, this argument that the JCT deal would only have yielded notes is a red herring. Even

under the alleged "scheme" asserted by Yucaipa, Black Diamond and Spectrum would *not*

receive "cash" – rather, they would receive Allied's *assets* through a credit bid (which would also

be on behalf of *all* Lenders including Yucaipa, subject to the equitable subordination claims).

Even assuming Black Diamond and Spectrum had successfully credit bid for all of Allied's assets

(which they were not able to do) *and* successfully subordinated Yucaipa's First Lien Debt, the

value of the assets Black Diamond and Spectrum acquired could depreciate to a point where they

received *less* than par plus accrued interest. It defies common sense to give up a *guaranteed* par

plus accrued interest recovery – even if part of that recovery is in JCT notes – in exchange for

assets of speculative value.

In any event, even if (as Yucaipa contends) Black Diamond and Spectrum stand to

recover more than par plus accrued "in cash" through their equitable subordination claim, the

difference between (a) an immediate recovery of par plus accrued interest paid, in part, in JCT

notes versus (b) a potential future recovery of par plus accrued interest in cash *if* their equitable

subordination claim was successful is *nil* given that Yucaipa does not allege that JCT would have

been unable to repay its notes in full. The risk and expense involved in pursuing a highly

unpredictable multi-step litigation scheme in the *hopes* of getting an "all cash" recovery at some

later point does not justify passing up a *guaranteed* full recovery, even if part of that guaranteed recovery was in JCT notes.

Yucaipa's next contention, that Black Diamond and Spectrum could have recovered more than par plus accrued interest *if* they were able to acquire Allied's assets through a credit bid and *if* those assets appreciated significantly, illustrates the implausibility of Yucaipa's allegations. (Opp'n at 35.) Neither of these outcomes were within the control of Black Diamond and Spectrum, and, in fact, Black Diamond and Spectrum were unable to acquire Allied's assets through a credit bid (which, in any case, was to be on behalf of the Lenders) because their credit bid was not declared the highest and best bid at the auction. Rather, it was JCT which acquired *substantially all* of Allied's assets in December 2013, while Black Diamond and Spectrum, as Requisite Lenders, acquired – on behalf of all Lenders (including Yucaipa) – a very small number of Allied's real estate and trucking assets that were excluded from the JCT sale. (Counterclaim ¶¶ 10, 94-95.) The speculative and implausible nature of the alleged scheme by Black Diamond and Spectrum is shown by the fact that the alleged scheme ultimately *did not work*.

Finally, the notion that Black Diamond and Spectrum engaged in a sham negotiation with JCT for a year and a half makes no sense because, as set forth in more detail below, if Black Diamond and Spectrum had really wanted to equitably subordinate Yucaipa, they would have filed the involuntary petitions much earlier than May 2012, three years after Yucaipa improperly acquired First Lien Debt in breach of the Third Amendment. There was nothing to be gained from delay. If they really had a scheme to equitably subordinate Yucaipa, Black Diamond and Spectrum would not have wasted their time negotiating with JCT for a year and a half over a deal that (as Yucaipa describes it) Black Diamond and Spectrum would not have accepted

because it "would have nullified BD/S's ability to equitably subordinate Yucaipa, as Yucaipa would no longer own any First Lien Claims at the time of Allied's bankruptcy." (Opp'n at 36.)

In sum, Yucaipa's allegation that Black Diamond and Spectrum's purported "long-planned" scheme culminated in blowing up a *guaranteed full recovery* is simply implausible.

C.    **Yucaipa's Allegation that Black Diamond and Spectrum Waited Three Years to File the Involuntary Petitions Is Not Plausible**

Yucaipa argues that Black Diamond and Spectrum waited three years to file the involuntary petitions because they first needed to "strip Yucaipa of its Requisite Lender status." (Opp'n at 37.) According to Yucaipa, Black Diamond and Spectrum did so because they "knew their claims would be strongest if brought against someone other than a Requisite Lender." (*Id.* at 37.) Yucaipa's argument is not only without basis, it is, in fact, backwards.

That is, Black Diamond and Spectrum filed the involuntary petitions on May 17, 2012 (Counterclaim ¶ 74) before Yucaipa's Requisite Lender status was determined. In fact, Yucaipa was not stripped of its purported Requisite Lender status until more than fifteen months after that filing and it was certainly not clear that Yucaipa losing Requisite Lender status would be the result when the involuntary petitions were filed. Rather, several events that were well beyond the control of Black Diamond and Spectrum had to take place. First, the New York Court ruled that the Purported Fourth Amendment was void *ab initio* in March 2013 (eleven months *after* the involuntary petitions were filed). *BDCM Opp'n Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, No. 650150/2012, 2013 WL 1290394 (N.Y. Sup. Mar. 8, 2013). Then this Court determined in August 2013, fifteen months *after* the involuntary petitions were filed, that Black Diamond and Spectrum were the Requisite Lenders.

Thus, when Black Diamond and Spectrum filed the involuntary petitions, they had no way of knowing whether or not Yucaipa would eventually be stripped of its purported

Requisite Lender status. As such, Yucaipa's argument that Black Diamond and Spectrum waited three years to file the petitions because they first needed to "strip Yucaipa of its Requisite Lender status" is nonsensical because stripping Yucaipa of its Requisite Lender status took place after the filing of the involuntary petitions. If Black Diamond and Spectrum had begun scheming in 2009 to equitably subordinate Yucaipa's First Lien Debt, it is not plausible that they would then inexplicably wait three years to carry out their objective. Moreover, Black Diamond and Spectrum's equitable subordination claim is based on events which occurred *after* 2009. It is not plausible that, as Yucaipa alleges, Black Diamond and Spectrum would have the foresight to know back in 2009 that they would have a viable equitable subordination claim against Yucaipa.

Moreover, it would have made little sense for Black Diamond and Spectrum to spend a year in "sham" negotiations with JCT to "distract Yucaipa, JCT, and Allied" and "buy BD/S additional time to carry out their equitable subordination scheme." (Opp'n at 38.) Yucaipa provides no explanation – plausible or otherwise – as to why Black Diamond and Spectrum needed to "buy time." Nor does Yucaipa explain why Black Diamond and Spectrum needed to "distract Yucaipa, JCT, and Allied" – or what they were being distracted from. If, as Yucaipa alleges, Black Diamond and Spectrum had been planning to equitably subordinate Yucaipa since 2009, there would have been no reason for them to engage in protracted negotiations with JCT that would have removed their ability to equitably subordinate Yucaipa's First Lien Debt vis-à-vis Black Diamond and Spectrum's debt because all parties would have sold their debt to JCT.

Indeed, during those three years between Yucaipa's purchase of First Lien Debt and the filing of the involuntary petitions, Yucaipa could have sold its First Lien Debt to *anyone*, not just JCT, thereby thwarting Black Diamond and Spectrum's alleged "scheme" in a single

stroke. Yucaipa's allegation that Black Diamond and Spectrum were inexplicably "lying in wait" for three years simply makes no sense.

**D.    Yucaipa's Allegation that Spectrum's Purchase of Additional First Lien Debt Pursuant to the Cooperation Agreement Was a "Payoff" Is Not Plausible**

Yucaipa contends that an email chain running from October 2011 through March 2012 supports its contention that Spectrum's purchase of additional First Lien Debt pursuant to the Cooperation Agreement was a "payoff" because it "evidences that Spectrum had explicitly conditioned its support of the involuntary petition on purchasing additional debt from Black Diamond."[17] (Opp'n at 38-39.) To the contrary, Yucaipa's own summary of the email shows that Spectrum's purchase of additional debt was not a "payoff" from Black Diamond to Spectrum (in fact, it was Spectrum that had to pay Black Diamond, not the other way around, as Yucaipa alleges).

In particular, as Yucaipa admits, pursuant to the Cooperation Agreement, Spectrum had already purchased the First Lien Debt from Black Diamond (the so-called "Involuntary Petition Payoff") by October 17, 2011, when the email chain began – *seven* months before the involuntary petitions were filed; the parties merely needed to finalize the "formalities in the agreement." (Opp'n at 39.) Yucaipa further admits that "suddenly Black Diamond stopped responding" and that "Spectrum followed up on a monthly basis" until "Black Diamond finally responded on February 1, 2012" (still several months before the involuntary petitions were filed). Despite this months-long delay, Black Diamond still responded "without addressing Spectrum's question regarding trade amounts," which prompted Spectrum to send "a series of

---

[17] Yucaipa's story is, in itself, contradictory. First, according to Yucaipa, it was *Spectrum*, not Black Diamond, that was checking out the "equitable subordination angle" in 2009. (Opp'n at 33-34; Counterclaim Ex. 4.) However, then, according to Yucaipa, in late 2011/early 2012, Spectrum needed to be bribed to join the involuntary filing because Spectrum "may have, given its holdings, been looking less favorably [than Black Diamond] at the risk attendant to the equitable subordination scheme." (Opp'n at 39.)

emails in more rapid succession" until the parties "elevated the issue to Jeffrey Schaffer, managing partner at Spectrum, who emailed Rich Ehrlich, managing director at Black Diamond," when Mr. Schaffer stated, "Please get this closed this week. We cannot file an involuntary without this done." (Opp'n at 39-40.)

This many months-long email exchange that began *seven* months before the involuntary petitions were filed hardly evidences a "payoff" from Black Diamond to "bribe" Spectrum into joining the involuntary petitions. Rather, Yucaipa's own summary of this email supports the view that Spectrum was expressing its frustration that the trade had not closed after several months and that it should be closed before the involuntary petitions were filed to avoid any delays or other administrative issues that could arise if the trade was not closed until after the bankruptcy filing. Accordingly, Yucaipa's allegation that Spectrum's purchase of additional First Lien Debt was a "payoff" is not plausible.

## E.    Yucaipa's Speculative Interpretation of the Riggs Email Is Not Plausible

In its Counterclaim, Yucaipa misleadingly alleges that that Black Diamond and Spectrum were checking out the "equitable subordination angle" *before* Yucaipa had even acquired any First Lien Debt. (Counterclaim ¶¶ 10, 42-43.) Yucaipa attempts to support this allegation by misconstruing an August 2009 email between Michael Riggs of JCT and Jeffrey Schaffer of Spectrum (the "Riggs Email"), in which Riggs asks, "I thought you were going to check out the 'equitable subordination' angle," and Mr. Schaffer responds, "Why." (Counterclaim Ex. 4.) Notably, the Riggs Email *never mentions Yucaipa* or against whom the "equitable subordination angle" would be sought.

In its Opposition, Yucaipa contends that the "equitable subordination angle" must have been an idea "planted by Mr. Schaffer given Mr. Riggs's lack of familiarity with the remedies available to creditors in bankruptcy against other creditors" – an allegation *not* in the

{935.001-W0036064.}

32

Counterclaim – and that Mr. Riggs "was not a creditor of Allied and thus had no reason to be considering remedies against Yucaipa in its capacity as a creditor." (Opp'n at 34.) But at the time the Riggs Email was sent, Yucaipa *was not a creditor* of Allied either. Thus, like Mr. Riggs, Mr. Schaffer also "had no reason to be considering remedies against Yucaipa *in its capacity as a creditor*." It is simply not plausible that Mr. Schaffer would be "checking out the equitable subordination angle" against Yucaipa *before* Yucaipa even acquired any First Lien Debt, and *three years* before Black Diamond and Spectrum filed the involuntary petitions.

## CONCLUSION

For the foregoing reasons, Black Diamond and Spectrum respectfully request that the Counterclaim be dismissed in its entirety and with prejudice.


Dated: May 1, 2015  
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)  
Kerri K. Mumford (No. 4186)  
919 Market Street, Suite 1800  
Wilmington, Delaware 19801  
Telephone: (302) 467-4400  
Facsimile:  (302) 467-4450

- and -

**SCHULTE ROTH & ZABEL LLP**  
Adam C. Harris  
Robert J. Ward  
David M. Hillman  
919 Third Avenue  
New York, New York 10022  
Telephone: (212) 756-2000  
Facsimile:  (212) 593-5955