IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ASHINC Corporation, et al. | : | Case No. 12-11564 (CSS) |
| | : | |
| Debtor. | : | (Jointly Administered) |
| | : | |
| BDCM OPPORTUNITY FUND II, LP | : | |
| BLACK DIAMOND CLO 2005-1 LTD., | : | |
| SPECTRUM INVESTMENT | : | |
| PARTNERS, L.P., BLACK DIAMOND | : | |
| COMMERCIAL FINANCE, L.L.C., | : | |
| AS CO ADMINISTRATIVE AGENT, | : | |
| AND SPECTRUM COMMERCIAL | : | |
| FINANCE LLC, AS CO - | : | |
| ADMINISTRATIVE AGENT | : | |
| | : | |
| Plaintiffs, | : | Adv. Proc. No.: 14-50971 (CSS) |
| | : | |
| v. | : | |
| | : | |
| YUCAIPA AMERICAN ALLIANCE | : | |
| FUND I, L.P., YUCAIPA AMERICAN | : | |
| ALLIANCE (PARALLEL) FUND I, L.P., | : | |
| YUCAIPA AMERICAN ALLIANCE | : | |
| FUND, II, L.P., YUCAIPA AMERICAN | : | |
| ALLIANCE (PARALLEL) FUND II, | : | |
| L.P., RONALD BURKLE, | : | |
| JOS OPDEWEEGH, JAMES FRANK, | : | |
| DEREX WALKER, JEFF PELLETIER, | : | |
| IRA TOCHNER, AND | : | |
| JOSEPH TOMCZAK. | : | |
| | : | |
| Defendants. | : | |

**OPINION**

LANDIS RATH & COBB LLP
Adam G. Landis
Kerri K. Mumford
919 Market Street, Suite 1800
Wilmington, DE 19801

-and-

SCHULTE ROTH & ZABEL LLP
Adam C. Harris
Robert J. Ward
919 Third Avenue
New York, NY 10022

Counsel to the Plaintiffs


SULLIVAN HAZELTINE
ALLINSON LLP
William A. Hazeltine
901 North Market Street, Suite 1300
Wilmington, DE 19801

-and-

SIDLEY AUSTIN LLP
Michael G. Burke
Brian J. Lohan
Dennis Kao
787 Seventh Avenue
New York, NY 10019

Counsel for the Official Committee
of Unsecured Creditors


Date: August 21, 2015

Sontchi, J. _____

YOUNG CONAWAY STARGATT
& TAYLOR LLP
John T. Dorsey
Michael R. Nestor
Sharon M. Zieg
1000 North King Street
Wilmington, DE 19801

-and-

GIBSON, DUNN & CRUTCHER LLP
Robert A. Klyman
Maurice M. Suh
Kahn Scolnick
333 South Grand Avenue
Los Angeles, CA 90071

Counsel for Defendants

## INTRODUCTION[1]

Before the Court is a Motion to Dismiss Yucaipa's Counterclaim for Equitable Subordination (the "Motion to Dismiss"). This adversary action was commenced by Black Diamond and Spectrum against Yucaipa for, among other things, equitable subordination of Yucaipa's First Lien Claims. In turn, Yucaipa answered the complaint and asserted its own equitable subordination claim (the "Counterclaim") against both Black Diamond and Spectrum alleging that Black Diamond and Spectrum participated in a sophisticated fraud scheme, specifically targeted at Yucaipa, leading up to the Debtors' bankruptcies. The Counterclaim includes allegations of improper claims trading, an ongoing conspiracy to lure Yucaipa into purchasing First Lien Debt, continuing with stripping Yucaipa's expected rights under the First Lien Debt documents, and then seeking to equitably subordinate Yucaipa's claims. Subsequently, Black Diamond and Spectrum moved to dismiss the Counterclaim.

The Court will grant the Motion to Dismiss for a number of reasons. First, Yucaipa's Counterclaim is barred by the Covenant Not to Sue and the Appearance Prohibition contained in the Third Amendment to the Credit Agreement. Second, several factual predicates asserted by Yucaipa in support of its Counterclaim are barred by collateral estoppel. Third, Yucaipa's story does not hold together under examination and its Counterclaim does not meet the standard of plausibility under Bankruptcy Rule 7012(b)(6). Thus, the Counterclaim will be dismissed with prejudice.

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them *infra*.

## JURISDICTION

This Court has jurisdiction over this matter, pursuant to 28 U.S.C. § 1334. This is a core proceeding, pursuant to 28 U.S.C. § 157(b).  Venue is proper in this District, pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL HISTORY

### A. Procedural History

On May 17, 2012, involuntary petitions were filed in this Court by BDCM Opportunity Fund II, LP, Black Diamond CLO 2005- Ltd. (together, "Black Diamond"), and Spectrum Investment Partners LP ("Spectrum," and with Black Diamond, the "Petitioning Creditors") against Allied Systems Holdings, Inc. ("Allied") and its subsidiary Allied Systems, Ltd. (L.P.) ("Systems") under Chapter 11 of the Bankruptcy Code.   On June 10, 2012, the remaining debtors (together with Allied and Systems, the "Debtors") filed voluntary petitions in this Court and, in connection therewith, Allied and Systems consented to the involuntary petitions filed against them.  The Debtors' cases are being jointly administered.

In November 2014, Black Diamond and Spectrum (and certain of their affiliates) filed a complaint against Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund, II, L.P., and Yucaipa American Alliance (Parallel) Fund II, L.P. (collectively, "Yucaipa") as well as individual defendants who were officers or directors of the Debtors and affiliated with Yucaipa, for (i) equitable subordination, (ii) breach of contract, (iii) breach of implied duty of good

4

faith and fair dealing, and (iv) tortious interference with contract.[2] Yucaipa answered the complaint and asserted an equitable subordination counterclaim against both Black Diamond and Spectrum (the "Counterclaim").[3]

The parties agreed that several of the counts in the complaint were non-core (claims of breach of contract, breach of implied duty of good faith and fair dealing and tortious interference with contract). The Court entered an *Agreed Order* that these three counts constituted non-core claims.[4] In conjunction therewith, Yucaipa and the director defendants filed a motion to withdraw the reference[5] related to the non-core claims, which is under advisement with the District Court for the District of Delaware.[6]

As to the remaining/core count for equitable subordination, Yucaipa filed the Counterclaim also seeking equitable subordination and Black Diamond and Spectrum have moved to dismiss.[7] The motion to dismiss has been fully briefed and is ripe for the Court's consideration.

---

[2] Adv. Pro. No. 14-50971, D.I. 1.

[3] Adv. Pro. No. 14-50971, D.I. 19.

[4] Adv. Pro. 14-50971, D.I. 70.

[5] Adv. Pro. 14-50971, D.I. 7.

[6] *See* Adv. Pro. 14-50971, D.I. 46, 71 and 73.

[7] Adv. Pro. No. 14-50971, D.I. 41.

**B. Facts/Background Applicable to this Matter**

    *i.    Allied's First Lien Debt and Prior Bankruptcy*

The Debtors were a leading provider of distribution and transportation services to the automotive industry, specializing in the delivery of new vehicles from manufacturing plants to dealerships.

Certain affiliates of the Debtors entered bankruptcy on July 31, 2005, in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division.  When the Debtors emerged from bankruptcy in May 2007, Yucaipa converted its debt into approximately 67% of the issued and outstanding common stock of the reorganized Debtors (which it later increased to approximately 70%).  Yucaipa also had the right to appoint three of the five members of the Board, appoint the Chief Executive Officer (the fourth member of the Board), and had approval rights over the fifth and final member of the Board, who was to be appointed by the creditors' committee in the 2005 bankruptcy cases.

The Debtors' exit facility from that bankruptcy case included the First Lien Credit Agreement dated May 15, 2007 (the "First Lien Credit Agreement" for the "First Lien Debt" and held by "First Lien Lenders") and the Second Lien Secured Super Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement dated May 15, 2007 (the "Second Lien Credit Agreement").

The First Lien Credit Agreement provided a $265 million secured facility, consisting of term loans in the aggregate principal amount $180 million, revolving loans

in the amount of $35 million, and letters of credit in the amount of $50 million in favor of Allied Holdings and certain of its affiliates.

The First Lien Credit Agreement was amended four times. Although Yucaipa was not an original lender in the First Lien Credit Agreement, through the third amendment (the "Third Amendment"), Yucaipa became a restricted lender under the First Lien Credit Agreement. The Third Amendment also contained a "Covenant Not to Sue" which limited Yucaipa's right to sue any Lender, as well as an "Appearance Prohibition."[8] At the time of the Third Amendment, Yucaipa did not own any First Lien Debt, nor did Yucaipa purchase any First Lien Debt at this time.

---

[8] Section 2.7(e) of the Third Amendment provides:

> To the fullest extent permitted by applicable law, no Restricted Sponsor Affiliate [Yucaipa] shall assert, and each Restricted Sponsor Affiliate immediately and automatically upon becoming a Lender, hereby irrevocably (i) *waives, any claim or cause of action against any Lender, any Agent and their respective Affiliates* . . . (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement or otherwise) *arising out of, in connection with, as a result of, or un any way related to, this Agreement or any Credit Document* or any agreement of instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, *any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith* except to the extent caused by such Agent's gross negligence or wilful misconduct , , , as determined by a court of competent jurisdiction by final and non-appealable judgment, (ii) *waives, releases and agrees not to sue upon such claim or any such cause of action,* whether or not accrued and whether or not known or suspected to exist in its favor and (iii) waives any claim or cause of action against any Agent or and Lender . . . on any theory or liability for special, indirect, consequential or punitive damages . . .

Third Amendment, § 2.7(e) (emphasis added) ("Covenant Not to Sue"). The Third Amendment also stated that Yucaipa "irrevocably and voluntarily waive[s] in their capacity as Lenders hereunder any right to, make any election, give any consent, commence any action or file any motion, claim, obligation, notice of application or take any other action in any Insolvency or Liquidation Proceeding without the prior written consent of all Lenders other than [Yucaipa]." Third Amendment, § 2.7(b).

By mid-2008, Allied had committed a series of defaults under the First and Second Lien Credit Agreements, and it failed to make the required principal payments due to the lenders. In February 2009, ComVest Investment Partners III, L.P. ("ComVest") acquired a majority of Allied's First Lien Debt. In August 2009, Allied entered into the fourth amendment to the First Lien Credit Agreement ("Fourth Amendment") with ComVest. The Fourth Amendment removed many of the restrictions related to the First Lien Debt placed on Yucaipa that were implemented in the Third Amendment. On October 29, 2009, Yucaipa acquired unrestricted First Lien Debt from ComVest.

### ii.    *Black Diamond/Yucaipa Action*

In January, 2012, three of Allied Holdings' other first lien lenders, the Petitioning Creditors, filed suit against Yucaipa in the Supreme Court for the State of New York[9] (the "Black Diamond/Yucaipa Action"). The plaintiffs in the Black Diamond/Yucaipa Action sought, *inter alia*, a judicial declaration that the Fourth Amendment was null and void and that, consequently, Yucaipa was not the "Requisite Lender" (as defined therein) under the First Lien Credit Facility. More specifically, Black Diamond and Spectrum sought a declaration that (i) the Fourth Amendment was null and void because such amendment to the First Lien Credit Agreement required unanimous lender consent, which was not obtained, and (ii) a declaration that Yucaipa was not the Requisite Lender.

Thereafter, Black Diamond and Spectrum moved for summary judgment, which the New York court granted, holding that the First Lien Credit Agreement

---

[9] Index No. 650150/2012.

unambiguously required unanimous consent. The New York court held that the Fourth Amendment was "flatly prohibited under the [First Lien] Credit Agreement absent the consent of all the Lenders," as a result the Fourth Amendment was "invalid and of no force and effect."[10] Yucaipa appealed this decision to the New York Appellate Division. The Appellate Division affirmed the New York Supreme Court's decision granting summary judgment in favor of Spectrum that the Fourth Amendment was void *ab initio* and that Yucaipa was not the Requisite Lender.[11] However, the Appellate Division "modified the law" of the lower court's grant of summary judgment in favor of Black Diamond, finding that there was a triable issue of fact as to whether Black Diamond had waived its right to challenge Yucaipa's status as Requisite Lender.[12] The Appellate Division held that there was no such issue of fact as to Spectrum and that Spectrum had not waived its ability to challenge Yucaipa's status as Requisite Lender.[13] As approval of the Fourth Amendment required unanimous consent of *all* Lenders, including Spectrum, and because Spectrum had not waived its right to challenge the validity of the Fourth Amendment, the Appellate Division affirmed the lower court's finding that the Fourth Amendment was void *ab initio*.[14]

---

[10] *BDCM Opportunity Fund II, LP v. Yucaipa American Alliance Fund I, LP*, No. 650150/2012, 2013 WL 1290394, *5 (N.Y. Sup. Ct. Mar 8, 2013).

[11] *BDCM Opportunity Fund II, L.P. v. Yucaipa American Alliance Fund I, LP*, 112 A.D.3d 509 (N.Y. App. Div. 2013).

[12] *Id.* at 511.

[13] *Id.*

[14] *Id.* at 509-10.

Thereafter, Yucaipa filed a motion for leave to appeal to the New York Court of Appeals, which was denied.[15] Due to the Appellate Division's remand on the issue of waiver, the New York Court of Appeals held that insofar as Yucaipa sought leave to appeal as against Black Diamond, there was not a final judgment upon which an appeal could be made.[16] However, the New York Court of Appeals otherwise denied Yucaipa's motion for leave to appeal.[17]

### iii.    *Sale of the Debtors' Assets*

#### a. Pre-Petition Negotiations with Jack Cooper Transport

Yucaipa alleges that the involuntary petitions were filed by Black Diamond and Spectrum in order to disrupt the consummation of the sale of the Debtors' assets to Jack Cooper Transit ("JCT"). Prior to the Debtors' bankruptcy, Black Diamond and Spectrum negotiated directly with JCT to have JCT acquire Allied's assets through voluntary bankruptcy proceedings. Yuciapa alleges that the final term sheet for the sale to JCT provided that all lenders (including Black Diamond and Spectrum) would be entitled to receive payment in full as part of the transaction. Yuciapa claims that Black Diamond and Spectrum sought to force Yucaipa to buy their claims for 90 cents on the dollar to avoid any risk that the sale to JCT would not close. Thereafter, Yucipa alleges that the same day that Black Diamond and Spectrum officially terminated negotiations with JCT, Black Diamond and Spectrum filed these involuntary bankruptcy proceeding. Yucaipa

---

[15] *BDCM Opportunity Fund II, L.P. v. Yucaipa Am. Alliance Fund I, L.P.*, 22 N.Y.3d 1171, 1172, 985 N.Y.S.2d 472 (N.Y. 2014).

[16] *Id.* at 1171-72.

[17] *Id.*

does not believe there is a valid business purpose for termination of negotiations with JCT or the involuntary bankruptcy filing.

### b.  Post-Petition Sale of Assets to JCT

After the bankruptcy, the Debtors sold substantially all of their assets to JCT, pursuant to section 363 of the Bankruptcy Code, in exchange for approximately $135 million (far less than the "par plus interest" discussed prior to the bankruptcy).[18]

### c.  Credit Bid Sale to SBDRE LLC

In August 2013, Black Diamond and Spectrum, acting as Requisite Lender, formed SBDRE LLC[19] ("SBDRE") to credit bid for certain real estate assets and trucks that were not sold to JCT.  On September 17, 2013, this Court approved the credit bid and the sale of the remaining assets to SBDRE.  After SBDRE acquired these assets, Black Diamond and Spectrum circulated a memorandum (the "Memo") to the First Lien Lenders disclosing that certain Black Diamond agents, who were named in the LCC Agreement as the managing members of SBDRE, would hold the First Lien Lenders' pro rata Class A Membership Interests in SBDRE for the benefit of the First Lien Lenders.  The Memo described the contemplated issues of new membership interests in SBDRE (the "New Issuance").  Following the New Issuance, SBDRE would have Class B and Class C Membership Interests.  SBDRE issued $10 million in new Class B Membership Interests that were to receive 66.6% of the voting rights in and rights to distributions from SBDRE.

---

[18]  Del. Bankr. Case No. 12-11564, D.I. 1837.

[19]  SBDRE LLC was formed pursuant to the Amended and Restated Limited Liability Company Agreement of SBDRE LLC (the "LLC Agreement").

The First Lien Lenders were allowed to buy up to their *pro rata* share of Class B Membership Interests. In exchange for backstopping the New Issuance, Black Diamond and Spectrum granted itself all of the new Class C Membership Interests, which represented 3% of the aggregate Membership Interests in SBDRE. Neither Yucaipa nor any of the other First Lien Lenders participated in the New Issuance. Black Diamond and Spectrum now control all of the Class B and Class C Membership Interests in addition to their *pro rata* shares of the Class A Membership Interests.

      *iv.*    *Related Litigation in these Cases*

          **a.**  **Allied Adversary Proceeding**

As mentioned *supra*, Black Diamond and Spectrum filed involuntary petitions against Allied on May 17, 2012. Subsequently, Allied filed an adversary proceeding against all of the First Lien Lenders seeking declarations regarding the identity of the Requisite Lender as well as the validity of the Fourth Amendment[20] (the "Allied Adversary Proceeding"). Allied then filed a motion to extend the stay to the Black Diamond/Yucaipa Action pending in New York state court. This Court took the motion to extend the stay under advisement pending the New York court's ruling on the then pending motion to invalidate the Fourth Amendment and determination that Yucaipa was not the Requisite Lender. The New York court ruled and invalidated the Fourth Amendment and determined that Yucaipa was not the Requisite Lender.

---

[20] Adv. Pro. 12-50947.

After the New York court's ruling, Yucaipa filed an amended counterclaim and cross-claims ("Cross-Claims") in the Allied Adversary Proceeding seeking, *inter alia*, a declaration that the Third Amendment was invalid. However, this Court dismissed Yucaipa's Cross-Claims finding that the "Covenant Not to Sue" in the Third Amendment applied to Yucaipa; the Court also found that Yucaipa's Cross-Claims were not plausible under Bankruptcy Rule 7012(b)(6).[21]

### b.  The Committee Action

The Court also granted the Official Committee of Unsecured Creditords standing to pursue various claims against Yucaipa and the Debtors' officers and directors and allowed Black Diamond and Spectrum to "intervene/participate in the litigation." Shortly thereafter, the Creditors Committee (as Plaintiff) and Black Diamond and Spectrum (as Intervenors) filed an amended complaint against Yucaipa and numerous officers and directors of Allied (the "Committee Action").[22]  The Complaint in the Committee Action asserts various claims, including an equitable subordination claim on behalf of the estates, brought by the Creditors Committee, and an equitable subordination claim on behalf of the First Lien Lenders (other than Yucaipa) brought by Black Diamond and Spectrum.  The Court entered a scheduling order and discovery ensued.  Thereafter, the Honorable Robert Drain commenced a mediation aimed at finding a global resolution between the Debtors, Black Diamond, Spectrum, the Creditors Committee and Yucaipa.

---

[21] Adv. Pro. 12-50947, Transcript of Hr'g Feb. 27, 2013; 108:12-110:21 (D.I.162).

[22] Adv. Pro. No. 13-50530.

Despite Judge Drain's best efforts over a number of mediation sessions, the mediation was not successful.

Subsequently, in an effort to facilitate the section 363 sale process discussed *supra*, the Court entered a stipulated amended scheduling order pushing out the trial date and related discovery deadlines. This scheduling order also provided that the Court would address the issue of enforceability of the Third Amendment and the identity of the Requisite Lender in conjunction with the proposed sale of Allied's assets.

Thereafter, Black Diamond and Spectrum filed a motion for summary judgment for a determinate that they were the Requisite Lenders under the Credit Agreement, which this Court granted.

### c. Delaware Chancery Court Action

Yucaipa filed an action against SBDRE in the Delaware Chancery Court ("Chancery Court"), which the Chancery Court, upon motion, dismissed. In ruling on the motion to dismiss, the Chancery Court gave collateral estoppel effect to this Court's ruling dismissing the Cross-Claims holding that Yucaipa could not sue Black Diamond and Spectrum "in the absence of a final, non-appealable determination that Black Diamond [and Spectrum] acted with gross negligence or willful misconduct."[23] However, the Chancery Court continued that in any instance where Yucaipa suffers a *distinct harm* not shared by any other person or entity that reasonably could bring suit, it

---

[23] *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, No. CIV.A. 9151-VCP, 2014 WL 5509787, at *14 (Del. Ch. Oct. 31, 2014) (footnote omitted).

14

would be impossible to satisfy the Prior Determination Requirement."[24]  The Chancery

Court held:

> This Court will not revisit the Bankruptcy Court's
> interpretation of the Covenant and the relationship between
> the Carve Out[25] and the Prior Determination Requirement.
> Yucaipa received a full and fair opportunity to litigate that
> issue to the extent it was presented in the Bankruptcy Action
> and cannot re-litigate it here. Yucaipa advances a reasonably
> conceivable argument, however, that in situations where it
> alleges a unique harm—meaning no other Lender could sue
> and the Prior Determination Requirement could not be
> satisfied—construing the Carve Out so broadly that it would
> fail to provide an escape hatch for Yucaipa in those
> circumstances arguably would produce a prohibited result.
> The Bankruptcy Court was not called upon to interpret the
> Covenant in a situation such as Yucaipa alleges here. On the
> whole, I find it reasonably conceivable that Yucaipa could
> show that, even after giving collateral estoppel effect to the
> Bankruptcy Court's holding, Defendants' interpretation of
> the Covenant, in the limited circumstances posited above,
> could produce a result contrary to public policy.[26]

The Chancery Court found that all fourteen counts in Yucaipa's complaint fell within the

Covenant Not to Sue, however, the Chancery Court did not dismiss one of the counts on

this basis because it was "unrealistic to assume anyone other than Yucaipa would seek a

declaratory judgment as to the percentage of the Allied Debt held by Yucaipa," as well as

---

[24] *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, No. CIV.A. 9151-VCP, 2014 WL 5509787, at *14 (Del. Ch. Oct. 31, 2014) (emphasis added).

[25] "Carve Out" was defined by the Chancery Court as the language in the Covenant Not to Sue that states: "except to the extent caused by such Lender's or Agent's gross negligence or willful misconduct . . . ." *See Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, No. CIV.A. 9151-VCP, 2014 WL 5509787, at *10 (Del. Ch. Oct. 31, 2014).

[26] *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, No. CIV.A. 9151-VCP, 2014 WL 5509787, at *15 (Del. Ch. Oct. 31, 2014) (footnote and citations omitted).

two related counts.[27]  However, the counts not dismissed based on the Covenant Not to Sue, were then stayed by the Chancery Court because the bankruptcy action involved substantially similar parties and issues and the Bankruptcy Court could render prompt and complete justice on these counts.[28]

### d.  The Black Diamond/Spectrum vs. Yucaipa Action

As discussed procedurally *supra*, on November 19, 2014, Black Diamond and Spectrum, on behalf of all First Lien Lenders, commenced this adversary action against Yucaipa and Yucaipa directors, among others, seeking (i) equitable subordination, (ii) breach of contract, (iii) breach of the implied duty of good faith and fair dealing, and (iv) tortious interferences with contract (the "Black Diamond/Spectrum Action").[29]  In the Black Diamond/Spectrum Action, the plaintiffs assert that Yucaipa has intentionally schemed to harm the First Lien Lenders.  The plaintiffs continue that Yucaipa held a controlling stake in the Debtors' equity, controlled the Debtors' board of directors, wrongfully acquired majority of the debt under the First Lien Credit Agreement facility, improperly declared itself the "Requisite Lender" under the First Lien Credit Agreement, and used the powers flowing from these positions for Yucaipa's own benefit to the detriment of the First Lien Lenders.[30]

---

[27] *Id.* at *15.

[28] *Id.* at *16-18.

[29] Del. Bankr. Adv. No. 14-50971.

[30] *See* Black Diamond/Spectrum Action, D.I. 1, ¶ 1 (the "Complaint").

Following the commencement of the Black Diamond/Spectrum Action, Yucaipa moved the District Court for the District of Delaware ("District Court") for withdrawal of the reference on all counts in the Complaint except the claim for equitable subordination.[31] Thereafter and pursuant to the parties' agreement, the Court entered an order holding that the following claims were non-core claims: breach of contract, breach of the implied duty of good faith and fair dealing, and tortious interferences with contract. The Court also held that the claim for equitable subordination constituted a core claim.[32] Thereafter, the Bankruptcy Court transmitted the motion for withdrawal of the reference to the District Court for consideration, such motion remains pending.[33] Yucaipa answered the Complaint and asserted the Counterclaim for equitable subordination of Black Diamond's and Spectrum's claims, including those claims held pursuant to the First Lien Credit Agreement. Through the Counterclaim, Yucaipa seeks subordination of Black Diamond's and Spectrum's claims relative to Yucaipa and other holders of claims under the First Lien Credit Agreement. Black Diamond and Spectrum subsequently filed a motion to dismiss this equitable subordination Counterclaim, which is the subject of this opinionn.

> v.    *Cooperation Agreement*

In mid-2011, Black Diamond and Spectrum entered into an agreement (the "Cooperation Agreement") under which Black Diamond and Spectrum agreed that if

---

[31] Black Diamond/Spectrum Action, D.I. 7, 8, 28.

[32] Black Diamond/Spectrum Action, D.I. 69 and 70.

[33] *Id.* at D.I. 71.

either of them purchased any additional Allied debt, the acquiring party would offer a pro rata share of that debt to the other at the same price.[34]  The Cooperation Agreement was memorialized in writing in January 2012.  According to the Cooperation Agreement, the Cooperation Agreement was entered into in contemplation of "the pursuit of certain strategies to enforce the rights of the Parties as Lenders under the First Lien Credit Agreement[,]" among other things.[35]  The Cooperation Agreement continues that Black Diamond and Spectrum "shall, in good faith, work together to identify and implement courses of action for the purpose of maximizing the recoveries" to the lenders under the First Lien Credit Agreement.[36]

At the time Black Diamond and Spectrum entered into the Cooperation Agreement, Black Diamond held approximately $30 million in principal amount of First Lien Debt and Spectrum held approximately $20 million in principal amount of First Lien Debt.  On or around September 28, 2011, Black Diamond purchased approximately $10 million of additional First Lien Debt from an unrelated third party.  At the time of this purchase, Spectrum's ratable share of First Lien Debt held by Black Diamond and Spectrum together was approximately 40%.  On October 14, 2011, Spectrum purchased approximately $4.2 million of First Lien Debt from Black Diamond, this trade closed on April 4, 2012 pursuant to the Assignment and Assumption Agreement.[37]

---

[34] Ward Declaration at Exh. 2.

[35]  Ward Declaration, Exhibit 3 (Cooperation Agreement) at p. 1 (hereinafter referred to only as the "Cooperation Agreement").

[36] Cooperation Agreement at ¶ 1.

[37] *See* Ward Declaration at ¶¶ 5 - 6 and Exhibits 4-5.

## C. Yucaipa's New Claims

Yucaipa asserts that in its review of the written discovery propounded by Black Diamond and Spectrum, Yucaipa has uncovered a scheme whereby Black Diamond "paid-off" Spectrum to join Black Diamond in filing the involuntary petitions. Yucaipa asserts that Black Diamond and Spectrum engaged in illegal claims-trading and continued concealment of that misconduct by Black Diamond and Spectrum in connection with the petitions filed in these cases.

Yucaipa alleges that Black Diamond and Spectrum participated in a fraudulent and inequitable scheme as follows:

> 1.  Black Diamond and Spectrum encouraged Yucaipa to acquire as much Allied debt as possible by providing false assurances of cooperation and support. Yucaipa continues that Black Diamond and Spectrum could only equitably subordinate the debt if it was owned by Yucaipa, rather than ComVest, so Black Diamond and Spectrum encouraged Yucaipa to buy the debt; further knowing that Yucaipa was relying on the Fourth Amendment when it purchased the debt.

> 2.  Once Black Diamond and Spectrum encouraged Yucaipa to purchase a majority of the First Lien Debt, they instructed the Administrative Agent under the First Lien Credit Agreement, who had initially cooperated with Yucaipa as Requisite Lender, to refuse to recognize directions from Yucaipa in its capacity as Requisite Lender and to challenge the validity of Yucaipa's status as Requisite Lender.

> 3.  Black Diamond and Spectrum file involuntary bankruptcy petitions and submitted false statements to the Bankruptcy Court to support the involuntary bankruptcy. Black Diamond and Spectrum filed the involuntary petition to scuttle the sale to JCT which was supposed to proceed as a section 363 sale in a voluntary bankruptcy. The Yucaipa-JCT sale would have required transfer of certain of First Lien Claims to JCT, including all of the First Lien Claims held by Yucaipa, before the commencement of any bankruptcy. This

would mean that Black Diamond and Spectrum would have lost their equitable subordination claim against Yucaipa, thus Black Diamond and Spectrum filed the involuntary petition so that the First Lien Claims remained with Yucaipa. Yucaipa continues that Black Diamond paid a $4 million "bribe" to Spectrum, in the form of an illegal claims trade, to induce Spectrum to become a petitioning creditor. Yucaipa continues that Black Diamond and Spectrum did not disclose the claims trade that induced Spectrum to become a petitioning creditor. As a result of the involuntary bankruptcy, substantially all of Allied's assets were sold to JCT for $135 million in December 2013, which was approximately $170 million less in consideration than offered by JCT to all lenders nearly 18 months earlier. Yucaipa alleged that Black Diamond received up to eight times its original investment and Spectrum also recovered more than payment in full of its original investment, even before equitable subordination of Yucaipa's claim.

4. In an attempt to wipe out Yucaipa's First Lien Claims, Black Diamond and Spectrum filed a baseless complaint for equitable subordination. Yucapia continues that Black Diamond and Spectrum were scheming to equitably subordinate Yucaipa's debt even before Yucaipa had acquired any First Lien Claims. Yucaipa alleges that Black Diamond and Spectrum would receive a 20-fold return on their initial investment if Yucaipa's First Lien Claims were equitably subordinated. Yucaipa alleges that Black Diamond and Spectrum excluded assets from the sale to JCT which resulted in an additional multi-million dollar windfall for Black Diamond and Spectrum.

Yucaipa alleges that it is in a singularly unique position to seek relief for the harm that Black Diamond and Spectrum inflicted upon Yucaipa. Yucaipa alleges that Black Diamond and Spectrum's scheme was directed at Yucaipa as a majority holder of Allied's equity, as well as Allied's debt, and was crafted to take advantage of Yucaipa's employees' position on Allied's Board, as well as Yucaipa's majority holdings of Allied's debt.

More specifically, Yucaipa alleges the Black Diamond and Spectrum participated in a "strategy" to ensure that they maximized and shared their First Lien Claim holdings. Yucaipa argues that the Cooperation Agreement was not disclosed and was, in fact, hidden from the Bankruptcy Court and Yucaipa. Yucaipa asserts that the Cooperation Agreement was specifically entered into in contemplation of the involuntary petitions. Yucaipa also argues that Black Diamond gave an "Involuntary Petition Payoff" to Spectrum to secure Spectrum's participation as a petitioning creditor. Yucaipa alleged that Black Diamond agreed to transfer ("as an obvious bride") an additional $4 million in face amount in First Lien Claims to Spectrum on favorable pricing terms in exchange for Spectrum's willingness to filly support the involuntary petition strategy. Yucaipa alleges that evidence of this "bribe" is seen in Jeffrey Shaffer's (managing member of Spectrum) email to Richard Erlick (managing director of Black Diamond), in which Spectrum, which already held at least $20 million in claims against the Debtors expressly conditioned its cooperation in filing these involuntary bankruptcy petitions on a $1.8 million payoff from Black Diamond. Wherein, Mr. Schaffer states, referring to the transfer: "Please get this closed this week. We cannot file an involuntary without it done."[38]

Yucaipa continues that during the time of the "Involuntary Petition Payoff," Black Diamond and Spectrum were pretending to negotiate with JCT. Yucaipa points to an email between Theo Ciupitu (JCT) and Jeffrey Schaffer (Spectrum) requesting the "exact

---

[38] Defendants' Answer and Counterclaims, Exhibit 12.

dollar amount" of First Lien Claims held by Spectrum, which Spectrum would not provide.[39]

Yucaipa argues that in March 2012, Yucaipa and JCT had finalized a term sheet pursuant to which JCT would buy the First Lien Claims held by Yucaipa before the commencement of any bankruptcy for approximately $155 million. Yucaipa claims that Black Diamond and Spectrum had no legitimate reason to place Allied in an involuntary bankruptcy which they knew would scuttle the deal with JCT.

Yucaipa claims that Black Diamond and Spectrum violated at least two of the Bankruptcy Rules' material disclosure obligations – Rule 1003 and Rule 2019 – in that Black Diamond and Spectrum failed to disclose "Black Diamond's Involuntary Petition Payoff to . . . Spectrum for the purpose of bribing . . . Spectrum to cooperate in filing the involuntary petition."[40] Yucaipa alleges that Black Diamond and Spectrum are being motivated by greed because if Yucaipa's First Lien Claims are equitably subordinated then Black Diamond's and Spectrum's stake in the claims pool increases from 22% to 50%.

Yucaipa further argues that Black Diamond and Spectrum are attempting to strip Yucaipa's rights in connection with its holdings of the First Lien Claims, including the reimbursement of legal expenses incurred in connection with the bankruptcy and the attendant litigation.

---

[39] Defendants' Answer and Counterclaims, Exhibit 13.

[40] Defendants' Answer and Counterclaims at ¶ 74.

In connection with the credit bid for certain real estate assets and trucks that were not sold to JCT, Yucaipa alleges that its interests were diluted through the actions of Black Diamond and Spectrum, including the equity rights offering in the purchasing entity SBDRE that excluded Yucaipa from participation and reduced Yucaipa's pro rata allocation of the SBDRE membership.  Yucaipa also alleges that the SBDRE's LLC agreement purports to waive any fiduciary duties that would be owed by Black Diamond and Spectrum, or their agents, to the fullest extent permitted by Delaware law.

Lastly, Yucaipa claims that the harm caused by Black Diamond and Spectrum is unique to Yucaipa.  Yucaipa alleges that the other First Lien Claim holders (a) hold minor stakes in the First Lien debt; (b) have no equity stake in Allied; (c) are not insiders and have no employees who serve on the Allied Board of Directors; (d) have no involvement in the management or control of Allied; (e) would suffer harm too inconsequential to pursue an equitable subordination claim; (f) have not been sued for equitable subordination; and (g) have always acted in concert with Black Diamond and Spectrum. Yucaipa claims that Black Diamond and Spectrum's "scheme" was directed at Yucaipa and is focused on eliminating Yucaipa's rights in favor of their own.

## ANALYSIS

### A.    Legal Standard

A motion under Rule 12(b)(6)[41] serves to test the sufficiency of the factual allegations in the plaintiff's complaint.[42] "Standards of pleading have been in the forefront of jurisprudence in recent years."[43] With the Supreme Court's recent decisions in *Bell Atlantic Corp. v. Twombly*[44] and *Ashcroft v. Iqbal*,[45] "pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss."[46]

In *Iqbal*, the Supreme Court makes clear that the *Twombly* "facial plausibility" pleading requirement applies to all civil suits in the federal courts.[47] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to survive a motion to dismiss.[48] Rather, "all civil complaints must now set

---

[41] Federal Rules of Civil Procedure 8(a) and 12(b)(6) are made applicable to this adversary proceeding pursuant to Federal Rules of Bankruptcy Procedure 7008 and 7012, respectively.

[42] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) ("The pleader is required to set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist." (citations omitted)).

[43] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 209 (3d Cir. 2009).

[44] 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

[45] 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

[46] *Fowler*, 578 F.3d at 210.

[47] *See Fowler*, 578 F.3d at 210.

[48] *Iqbal*, 556 U.S. at 678 (citations omitted). *See also Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) (citations omitted); *Bartow v. Cambridge Springs SCI*, 285 Fed.Appx. 862, 863 (3d Cir. 2008) ("While facts must be accepted as alleged, 'this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions.'"); *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 333 (3d Cir. 2001) ("Liberal construction has its limits, for the pleading must at least set forth sufficient

out sufficient factual matter to show that the claim is facially plausible."[49]   A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[50] Determining, whether a complaint is "facially plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.[51] "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but not shown-that the pleader is entitled to relief."[52]

After *Iqbal*, the Third Circuit has instructed this Court to "conduct a two-part analysis.  First the factual and legal elements of a claim should be separated.  The [court] must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."[53]   The court "must then determine whether the facts alleged in the

---

information for the court to determine whether some recognized legal theory exists on which relief could be accorded the pleader.  Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.  While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions." (citations omitted)).

[49]  *Fowler*, 578 F.3d at 210 (internal quotations omitted).  *See also Iqbal*, 556 U.S. at 664 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."); *Buckley v. Merrill Lynch & Co. (In re DVI, Inc.)*, 2008 WL 4239120, 2008 Bankr.LEXIS 2338 (Bankr. D. Del. Sept. 16, 2008) ("Rule 8(a) requires a showing rather than a blanket assertion of an entitlement to relief.  We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only fair notice, but also the grounds on which the claim rests." (citations omitted)).

[50]  *Iqbal*, 556 U.S. at 678.

[51]  *Id.* at 679.  "It is the conclusory nature of [plaintiff's] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."  *Id.* at 681.

[52]  *Id.* at 679 (citations and internal quotations omitted).

[53]  *Fowler*, 578 F.3d at 210-11.  *See also Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (holding that a court *must* take the complaint's allegations as true, no matter how incredulous the court may be); *Iqbal*, 129 S.Ct. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

complaint are sufficient to show that the plaintiff has a plausible claim for relief."[54]  The Third Circuit has further instructed that "[s]ome claims will demand relatively more factual detail to satisfy this standard, while others require less."[55]

**B.    Yucaipa is Barred by the Third Amendment from Asserting the Counterclaim**

   *i.    Parties' Arguments*

Black Diamond and Spectrum assert that the Covenant Not to Sue prevents Yucaipa from asserting *any* claim against other Lenders with respect to any claim related to the Credit Agreement.   The Covenant Not to Sue has an exception for claims of "gross negligence or wilful misconduct . . . as determined by a court of competent jurisdiction by final and non-appealable judgment (the "Prior Determination Requirement"),[56] Black Diamond and Spectrum assert that this Court has held that the Prior Determination Requirement allows Yucaipa to sue only *after* there has been a prior judicial

---

suffice . . . . When there are well-plead factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."); *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007); *Carino v. Stefan*, 376 F. 3d 156, 159 (3d Cir. 2004).  The Court may also consider documents attached as exhibits to the Complaint and any documents incorporated into the Complaint by reference. *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 183 (Bankr. D. Del. 2000) (citing *PBGC v. White*, 998 F.2d 1192, 1196 (3d Cir. 1993)). "[I]f the allegations of [the] complaint are contradicted by documents made part thereof, the document controls and the Court need not accept as true allegations of the complaint." *Sierra Invs., LLC v. SHC, Inc. (In re SHC, Inc.)*, 329 B.R. 438, 442 (Bankr. D. Del. 2005). *See also Sunquest Info Sys., Inc. v. Dean Witter Reynolds, Inc.*, 40 F.Supp.2d 644, 649 (W.D. Pa. 1999) ("In the event of a factual discrepancy between the pleadings and the attached exhibit, the exhibit controls." (citations omitted)).

[54] *Fowler*, 578 F.3d at 211 (internal quotations omitted) ("[A] complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts." (citations omitted)).  "The plaintiff must put some 'meat on the bones' by presenting sufficient factual allegations to explain the basis for its claim." *Buckley v. Merrill Lynch & Co., Inc. (In re DVI, Inc.)*, 2008 WL 4239120, at *4, 2008 Bankr.LEXIS 2338, at *13 (Bankr. D. Del. Sept. 16, 2008).

[55] *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010). *See also Arista Records LLC v. Doe*, 604 F.3d 110, 120-21 (2d Cir. 2010) (stating that *Twombly* and *Iqbal* require factual amplification where needed to render a claim plausible, not pleadings of specific evidence or extra facts beyond what is needed to make a claim plausible).

[56] Third Amendment § 2.7(e).

determination of willful misconduct or gross negligence. Black Diamond and Spectrum further assert that Yucaipa is not alleging a "unique harm" because (i) the Counterclaim related to the First Lien Credit Agreement, (ii) Yucaipa filled the Counterclaim in its capacity as a putative Lender under the First Lien Credit Agreement, (iii) the Counterclaim seeks to increase the distribution payable to Yucaipa on account of its First Lien claims, and (iv) the Counterclaim seeks to equitable subordinate Black Diamond's and Spectrum's claims under the First Lien Credit Agreement. Black Diamond and Spectrum further assert that although Yucaipa states several reasons why it is in a unique position, Yucaipa has not articulated how these points have any bearing on other First Lien Lenders' ability to seek equitable subordination on the basis that Black Diamond and Spectrum were harming all First Lien Lenders by filing an involuntary petition and scuttling the JCT deal.

Black Diamond and Spectrum further assert that Yucaipa is barred from filing the Counterclaim by operation of the section 2.7(b) of the Third Amendment (the "Appearance Prohibition") which prevents Yucaipa from filing claims without the consent of *all* the First Lien Lenders.

Yucaipa responds that the Covenant Not to Sue does not bar Yucaipa's Counterclaim because such claims were caused by Black Diamond's and Spectrum's gross negligence and/or wilful misconduct on or after the date Yucaipa became a Lender under the First Lien Credit Agreement. Yucaipa continues that its claims are unique to Yucaipa and other First Lien Lenders could not bring such claims, thus the Counterclaim

falls into the Chancery Court's public policy exception to the Covenant Not to Sue. Yucaipa argues that the Chancery Court only required that it be "unrealistic" for the other lenders to sue or that it was unlikely that they would sue because Yucaipa had a greater incentive. Furthermore, Yucaipa argues that even if the Chancery Court's holding did apply the Prior Determination Clause, Black Diamond and Spectrum could not be exculpated from willful misconduct or grossly negligent acts. Yucaipa asserts that such a result would violate public policy.

Yucaipa further asserts that the Appearance Prohibition, which bars Yucaipa from asserting claims, among other things, in "Insolvency or Liquidation Proceedings" without consent of all First Lien Lenders, is not valid as to the Counterclaim. More specifically, Yucaipa claims that (i) this adversary action is not an "Insolvency or Liquidation Proceeding" but rather akin to a state law action in district court; (ii) Black Diamond and Spectrum are equitably estopped from asserting the Appearance Prohibition because they have not raised such argument until the Motion to Dismiss; and (iii) the Appearance Prohibition violates public policy because it prevents Yucaipa from asserting claims of willful misconduct and gross negligence against Black Diamond and Spectrum.

Black Diamond and Spectrum reply that Yucaipa misstates the holding of the Chancery Court – Black Diamond and Spectrum assert that the Chancery Court's public policy carve out was narrowly tailored and only applies where *only* Yucaipa has been harmed. Black Diamond and Spectrum reply that even though Yucaipa alleges willful

misconduct and gross negligence, the Covenant Not to Sue applies because here the asserted willful or grossly negligent acts allegedly harmed Yucaipa and *other* First Lien Lenders. Thus, the Prior Determination Requirement would mandate that *another* First Lien Lender file such action against Black Diamond and Spectrum. Black Diamond and Spectrum also reply that the Third Amendment was specifically intended to limit Yucaipa's rights, which is why Yucaipa was a "Restricted Sponsor Affiliate" and not a "Lender."

As a portion of Yucaipa's claim is related the JCT sale, where Yucaipa argues that the pre-petition sale would have maximized value for all of Allied's stakeholders with a payment of "up to par plus accrued interest," and as a result of the involuntary petitions, the sale to JCT was $170 million less in consideration than offered by JCT to *all* lenders. Black Diamond and Spectrum point out that the claims related to the JCT sale would have benefited *all* First Lien Lenders, thus, any of the First Lien Lenders could bring this cause of action and it is not unique as to Yucaipa. Black Diamond and Spectrum continue that Yucaipa cannot claim it is "unique" on the basis that there are equitable subordination claims against it. Black Diamond and Spectrum assert that they are protected by the *Noerr-Pennington* doctrine which immunizes litigation from liability, as long as such litigation is not a sham.

Black Diamond and Spectrum continue that they are not equitably estopped from raising the Appearance Prohibition of the Third Amendment because Black Diamond and Spectrum have repeatedly raised such clause, plus Yucaipa, who assisted in drafting the

29

Third Amendment, was aware of this clause.  Lastly, Black Diamond and Spectrum assert

that the Appearance Prohibition does not violate public policy because it only limits

Yucaipa's ability to commence litigation, but it does not limit Yucaipa's ability to defend

itself from claims brought by other First Lien Lenders.

**ii.    *Covenant Not to Sue***

The Covenant Not to Sue, embodied in Section 2.7(e) of the Third Amendment,

provides:

> To the fullest extent permitted by applicable law, no
> Restricted Sponsor Affiliate [Yucaipa] shall assert, and each
> Restricted Sponsor Affiliate immediately and automatically
> upon becoming a Lender, hereby irrevocably (i) *waives, any
> claim or cause of action against any Lender, any Agent and their
> respective Affiliates* . . . (whether or not the claim therefor is
> based on contract, tort or duty imposed by any applicable
> legal requirement or otherwise) *arising out of, in connection
> with, as a result of, or un any way related to, this Agreement or any
> Credit Document* or any agreement of instrument
> contemplated hereby or thereby or referred to herein or
> therein, the transactions contemplated hereby or thereby, *any
> Loan or the use of the proceeds thereof or any act or omission or
> event occurring in connection therewith* except to the extent
> caused by such Agent's gross negligence or wilful misconduct
> . . . as determined by a court of competent jurisdiction by final
> and non-appealable judgment, (ii) *waives, releases and agrees
> not to sue upon such claim or any such cause of action*, whether or
> not accrued and whether or not known or suspected to exist
> in its favor and (iii) waives any claim or cause of action
> against any Agent or and Lender . . . on any theory or liability
> for special, indirect, consequential or punitive damages . . . .[57]

In interpreting the Covenant Not to Sue, it is incumbent to discuss both this Court's prior

ruling and the ruling from the Chancery Court, both interpreting this covenant.

---

[57] Third Amendment, § 2.7(e) (emphasis added) (referred to herein as the "Covenant Not to Sue").

On February 27, 2013, this Court heard oral argument regarding Black Diamond and Spectrum's motion to dismiss Cross-Claims filed by Yucaipa.  More specifically, Black Diamond and Spectrum moved to dismiss on the grounds that the Third Amendment precluded Yucaipa from bringing Cross-Claims based on the Covenant Not to Sue and because such claims were barred by the applicable statute of limitations.  This Court granted the motion to dismiss on both grounds.  As to the Covenant Not to Sue, this Court stated:

> The argument on the [Covenent Not to Sue] are several.  One is simply under its plain meaning, you can't sue.  I don't think there's any question as to the plain meaning of the covenant and I think it's very clear.  I don't find its sort of carve out as written deals with the narrow situation of a finding at some time post signing of the covenant by a court that there's been willful misconduct or gross negligence.  And . . . I don't think that is done in the auspices of a lawsuit directly related between the parties, it has to come from somewhere else.  It's a little vague, but I think it's fair to say it has to be a narrow exception.  And I endorse the view that when looking at the covenant not to sue being applicable we have to look at whether that covenant was entered into as a result of some sort of fraud or misconduct by the party that is being forbidden to sue.[58]

Thus, this Court ruled that there was an absence of any plausible allegations of fraud or wrongdoing in connection with the enactment of the Third Amendment or the Covenant Not to Sue that might provide a basis upon which to invalidate the Covenant Not to Sue. As a result, this Court dismissed Yucaipa's Cross-Claims as barred by the Covenant Not to Sue.

---

[58] Transcript from hearing on Feb. 27, 2013 at 109:14-110:5 (Adv. Pro. No. 12-50947, D.I. 162).

As set forth in more detail, *supra*, Yucaipa then sued Black Diamond and Spectrum in the Chancery Court. The Chancery Court gave collateral estoppel effect to this Court's holding, expanding and stating:

> Alleging willful misconduct is not enough: Yucaipa must show the existence of a final, non-appealable judgment finding gross negligence or willful misconduct by Black Diamond [and Spectrum] *before* Yucaipa can bring suit. This holding implies that some other party, such as another Lender, must bring suit and obtain a final, non-appealable judgment before Yucaipa could file its own lawsuit.[59]

The Chancery Court then stated:

> At the motion to dismiss state, I find it reasonably conceivable that Yucaipa could show that the outer boundaries of the Covenant [Not to Sue] are ambiguous, even after giving collateral estoppel effect to the Bankruptcy Court's ruling, and that public policy would prevent the wholesale adoption of the board interpretation . . . [Black Diamond and Spectrum] advance.
>
> . . .
>
> [I]n any instance where Yucaipa suffers a *distinct harm not share by any other person or entity that reasonably could bring suit*, it would be impossible to satisfy the Prior Determination Requirement. Covenants not to sue are valid and enforceable under New York law. But agreements prospectively limiting a party's liability resulting from that party's intentional misconduct are void as against public policy.
>
> . . .
>
> [I]n situations where [Yucaipa] alleges a *unique harm – meaning no other Lender could sue and the Prior Determination Requirement could not be satisfied* – construing the Carve Out so broadly that it would fail to provide an escape hatch for Yucaipa in those circumstances arguably would produce a prohibited result.[60]

---

[59] *Yucaipa Am. Alliance Fund I., LP*, C.A. No. 9151-VCP, 2014 WL 5509787 at *12 (emphasis supplied).

[60] *Id.* at *14-15 (emphasis added).

In applying its holding, and after giving collateral estoppel effect to this Court's ruling, as well as the Covenant Not to Sue, the Chancery Court did not dismiss several of the counts[61] based on the following:

> I decline to dismiss Count I. Even assuming some other party might have standing to bring this claim, *it is unrealistic to assume anyone other than Yucaipa* would seek a declaratory judgment as to the percentage of Allied Debt held by Yucaipa. Counts II and III depend on the resolution of Count I and those Counts raise similar standing concerns.[62] Accordingly, they will not be dismissed for related reasons. Additionally, Yucaipa advances a reasonably conceivable argument that it could establish that there claims are outside the scope of the Covenant because *they stem from willful misconduct taken by Defendants that affects only Yucaipa.*[63]

The Chancery Court made several statements that might bring certain claims outside of the prohibition in the Covenant Not to Sue. i.e., claims:

    (i)    where Yucaipa suffers a distinct harm not shared by any other person or entity that reasonably could bring suit;

    (ii)    where Yucaipa suffers a unique harm – meaning no other Lender could sue and the Prior Determination Requirement could not be satisfied;

---

[61] The Counts not dismissed, among others, by the Chancery Court were:

> Count I sought declaratory judgment that Yucaipa validly owns 55.2% of the Allied Debt and that Black Diamond cannot disregard that fact.

> Count II sought declaratory judgment that, under Section 18-110 of the Delaware LLC Act, Yucaipa has elected itself managing member of SBDRE.

> Count III sought declaratory judgment that, under section 187-111 of the Delaware LLC Act, Yucaipa elected itself managing member of SBDRE.

*Id.* at 6. However, these counts, as well as all counts that were not dismissed, were stayed by the Chancery Court. *Id.* at *16-18.

[62] *Id.* at *15.

[63] *Id.*

(iii)   where it is unrealistic to assume anyone other than
        Yucaipa will bring suit, even assuming some other
        party might have standing to bring this claim; and

(iv)    that stem from willful misconduct taken by Black
        Diamond and Spectrum that affects only Yucaipa.

Black Diamond and Spectrum advance the argument that the only exception to the

Covenant Not to Sue is when *no other lender can sue* and/or that the claims alleged stems

from their (alleged) willful misconduct that *only affects Yucaipa;* Yucaipa advances a much

broader argument that the only exception to the Covenant Not to Sue is if it is *unreasonable*

*that no other lender would sue.* The Court will review the issue on the "unrealistic that

another lender would sue" argument as that would be the "largest" exception to the

Covenant Not to Sue.

So the question is whether it is unrealistic that another First Lien Lender would

assert a claim for equitable subordination. Yucaipa argues that no other lender (other

than Black Diamond, Spectrum, and Yucaipa) holds a large enough piece of the First Lien

Debt to realistically seek equitable subordination of Black Diamond's and Spectrum's

respective holdings.

That is not the case. As of the Petition Date, Black Diamond and Spectrum

collectively owned approximately 20% of First Lien Debt and Yucaipa held

approximately 55%; as such, 25% of First Lien Debt is held by various other lenders. The

JCT sale resulted in a pay-down of approximately 50% of the First Lien Debt and another

portion of the First Lien Debt was credit bid. It is "realistic" that other lenders (who are

still holding over $30 million in debt after the JCT sale) would and are able to seek

equitable subordination of Black Diamond's and Spectrum's respective First Lien Debt *if* those Lenders believed Black Diamond and Spectrum committed wrongdoings, because those lenders would then have an opportunity to recover more of their investment if approximately 20% of the First Lien Debt was subordinated.

Under the rubric of wilful misconduct and gross negligence, Yucaipa alleges it is unrealistic another creditor would sue because the allegations are specific to Yucaipa, i.e., Black Diamond and Spectrum (i) encouraged the consolidation of a large amount of First Lien Claims by Yucaipa; (ii) prevented Yucaipa from acting as Requisite Lender, (iii) prevented Yucaipa from selling its First Lien Claims to JCT; (iv) filed an involuntary bankruptcy petition supported by false affidavits in order to pursue equitable subordination of Yucaipa's claims; and (v) attempted to fraudulently subordinate Yucaipa's recoveries on the $170 million in claims against Allied at issue in the bankruptcy proceedings. Except as noted below, however, none of these allegations are unique to Yucaipa – but are shared by all First Lien Lenders (other than Black Diamond and Spectrum).

Furthermore, *if* there was an Involuntary Petition Payoff (discussed in detail *infra*), such "wilful misconduct" would be actionable by *all* First Lien Lenders and not "only Yucaipa." Thus the alleged Involuntary Petition Payoff does not create a distinct harm against Yucaipa.

Yucaipa also alleges "unique" status because it has a pending equitable subordination claim against it. Although this is true, such litigation cannot form the basis

of Yucaipa's equitable subordinate claim against Black Diamond and Spectrum. The

*Noerr–Pennington* doctrine[64] immunizes litigation from liability "regardless of intent or

purpose," so long as the litigation is not a "sham."[65] "To invoke the 'sham' exception, a

defendant must prove, by clear and convincing evidence, that a plaintiff's activities were

not really efforts to vindicate its rights in court."[66]  Although Yucaipa disagrees with

Black Diamond's and Spectrum's claims against Yucaipa, the claims against Yucaipa are

clearly intended to vindicate Black Diamond's and Spectrum's claims against Yucaipa,

on behalf of the First Lien Lenders.  Thus, the question becomes whether these non-sham

---

[64] The *Noerr–Pennington* doctrine

> derives from the First Amendment's guarantee of "the right of the people
> . . . to petition the Government for a redress of grievances." U.S. Const.
> Amend. I.  Under the *Noerr–Pennington* doctrine, those who petition any
> department of the government for redress are generally immune from
> statutory liability for their petitioning conduct.  This right includes
> litigation: "the right to petition extends to all departments of the
> Government.  The right of access to the courts is indeed but one aspect of
> the right of petition."  The Supreme Court has thus emphasized that the
> First Amendment right to petition extends to all departments of
> government, including the courts, and has not limited the doctrine to
> particular types of courts or court cases.  Although the *Noerr–Pennington*
> doctrine originally applied to antitrust cases, courts have expanded its
> application to other contexts.

*Giles v. Phelan, Hallinan & Schmieg, L.L.P.*, No. CIV.A. 11-6239 JBS/K, 2013 WL 2444036, at *5 (D.N.J. June 4,
2013) (case citations omitted).  *See also We, Inc. v. City of Philadelphia*, 174 F.3d 322, 330 (3d Cir. 1999) ("[W]e
conclude that the *Noerr–Pennington* doctrine does not confer a right not to stand trial, but rather provides
only a defense against liability for certain conduct . . . .").

[65] The Supreme Court has adopted a two-part definition of sham litigation: First, "the lawsuit must be
objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits";
second, the litigant's subjective motivation must "conceal[ ] an attempt to interfere directly with the
business relationships of a competitor ... through the use [of] the governmental process—as opposed to the
outcome of that process—as an anticompetitive weapon."  *Prof'l Real Estate Investors, Inc. v. Columbia
Pictures*, 508 U.S. 49, 60–61 (citations omitted).  *See also Giles v. Phelan, Hallinan & Schmieg, L.L.P.*, No. CIV.A.
11-6239 JBS/K, 2013 WL 2444036, at *6 (D.N.J. June 4, 2013).  To fall within this exception, a lawsuit "must
be a sham *both* objectively and subjectively." *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 526, 122 S. Ct. 2390,
2396, 153 L. Ed. 2d 499 (2002) (emphasis provided, citations omitted).

[66] *Braintree Labs., Inc. v. Schwarz Pharma, Inc.*, 568 F. Supp. 2d 487, 495 (D. Del. 2008) (citations omitted).

claims against Yucaipa causes Yucaipa a "distinct harm" as to invoke the exception to the Covenant Not to Sue enunciated by the Chancery Court. It would be inequitable for Yucaipa to obtain "unique" status from Black Diamond and Spectrum's claims against Yucaipa. Moreover, such a ruling would chill litigation – for example, if Black Diamond and Spectrum thought that filing claims against Yucaipa would cause a "distinct harm" allowing Yucaipa to fall into the exception to the Covenant Not to Sue, would Black Diamond and Spectrum actually bring their claims and open themselves up to counterclaims? Yucaipa was not uniquely harmed by the filing of this adversary such that application of the Covenant Not to Sue would not apply.

Thus, the Chancery Court exceptions to the Covenant Not to Sue are not applicable to this Counterclaim seeking to equitably subordinate Black Diamond's and Spectrum's First Lien Debt. As such, the claim of equitable subordination is barred by the Covenant Not to Sue.

### iii.    *Appearance Prohibition*

Along with the Covenant Not to Sue, the Third Amendment also restricts Yucaipa's ability to participate in "Insolvency or Liquidation Proceedings," which is defined as "any voluntary or involuntary case or proceeding under Bankruptcy Law."[67] The Third Amendment states that Yucaipa "irrevocably and voluntarily waive[s] in their capacity as Lenders hereunder any right to, make any election, give any consent, commence any action or file any motion, claim, obligation, notice of application or take

---

[67] Third Amendment §§ 2.1(a), 2.7(b).

any other action in any *Insolvency or Liquidation Proceeding without the prior written consent of all Lenders* other than [Yucaipa]."[68]

Yucaipa advances three arguments in opposition to the application of Appearance Prohibition: (i) the Appearance Prohibition does not apply to adversary proceedings, (ii) Black Diamond and Spectrum are equitably estopped from raising the Appearance Prohibition, and (iii) application of the Appearance Prohibition would violate public policy.

### a. Appearance Prohibition in "Insolvency or Liquidation Proceedings"

Yucaipa argues that the term "Insolvency or Liquidation Proceeding" does not apply to adversary proceedings. "Insolvency or Liquidation Proceeding" is defined as:

> (a) any voluntary or involuntary case or proceeding under Bankruptcy Law with respect to . . . [Allied];
>
> (b) any other voluntary or involuntary insolvency, reorganization, or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to . . . [Allied] or with respect to a material portion of their respective assets[.][69]

Yucaipa advances the argument that adversary proceedings are analogous to civil actions in district courts and, therefore, do not fall into the category of bankruptcy proceedings described in the "Insolvency or Liquidation Proceeding" definition. Yucaipa states that the Appearance Prohibition is to prevent Yucaipa from commencing a bankruptcy proceeding or controlling Allied's debt. Black Diamond and Spectrum disagree.

---

[68] Third Amendment § 2.7(e) (emphasis added) (the "Appearance Prohibition").

[69] Intercreditor Agreement, § 1.1, May 15, 2007 (found in Case No. 12-11564, D.I. 1757, Exh B) and Third Amendment §2.1(a) ("'**Insolvency or Liquidation Proceeding**' as defined in the Intercreditor Agreement").

All parties agree that the Debtors' bankruptcy cases are unquestionably "Insolvency or Liquidation Proceedings." That being said, the adversary action was filed in this Insolvency or Liquidation Proceeding. Furthermore, Yucaipa is seeking equitable subordination, which is a bankruptcy claim under section 510(c) and 105(a) of the Bankruptcy Code. This Court has stated that "equitable subordination, as set forth in section 510(c), can *only be raised in bankruptcy court*. Like a preference claim — and unlike a fraudulent conveyance claim — it is a unique creature of bankruptcy law."[70]

As equitable subordination is a creature of bankruptcy law, this adversary action is not just "a state-law dispute between non-debtors." Thus, Yucaipa, in its capacity as a Lender on the Credit Agreement, is prohibited from bringing its Counterclaim without written consent of all Lenders, including Black Diamond and Spectrum. Much like the New York Supreme Court stated when voiding the Fourth Amendment: "This was, of course, flatly prohibited under the [First Lien] Credit Agreement absent the consent of all of the Lenders, and thus the Purported Fourth Amendment is invalid and of no force or

---

[70] *Burtch v. Huston (In re USDigital, Inc.)*, 461 B.R. 276, 285 (Bankr. D. Del. 2011) (footnote omitted; emphasis added). This Court also noted that:

> Indeed, the only law in this Circuit concerning "subordination" arises in bankruptcy cases. *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 323 F.3d 228, 233 (3d Cir.2003); *Burden v. United States*, 917 F.2d 115, 117 (3d Cir.1990); *Citicorp Venture Capital v. Committee of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 n. 7 (3d Cir.1998); *see also Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

*Id.* at n. 45. *See also City of Sioux City, Iowa v. Civic Partners Sioux City, LLC (In re Civic Partners Sioux City)*, LLC, No. ADV 11-9045, 2012 WL 761361, at *11 (Bankr. N.D. Iowa Mar. 8, 2012) ("[T]he Court would have jurisdiction under the portion of *Stern v. Marshall* noting that a counter-claim which arises under the Bankruptcy Code would be a core proceeding.).

effect."[71]  Similarly, here Yucaipa is acting in its capacity to First Lien Lender, the Third Amendment required that Yucaipa seek consent of all of the First Lien Lenders in order to commence its Counterclaim.  As Yucaipa does not have such consent Yucaipa is barred from bringing the Counterclaim.

### b. Equitable Estoppel

Yucaipa next argues that Black Diamond and Spectrum are equitably estopped from asserting the Appearance Prohibition as Yucaipa has appeared in the bankruptcy cases, both through filing motions and advancing claims, approximately 200 times before Black Diamond and Spectrum ever asserted the Appearance Prohibition.  Yucaipa argues that they relied to their detriment on Black Diamond's and Spectrum's failure to assert this argument until August 2014.

As Yucaipa is claiming estoppel, Yucaipa bears the burden of proof.[72]  The elements of estoppel are: "(1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts.  The party asserting estoppel must show with respect to himself: (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in his position."[73]

---

[71]  *BDCM Opportunity Fund II, LP v. Yucaipa American Alliance Fund I, LP*, No. 650150/2012, 2013 WL 1290394, *5 (N.Y. Sup. Ct. Mar 8, 2013).

[72]  *United States v. Asmar*, 827 F.2d 907, 912 (3d Cir. 1987) (citations omitted) ("The burden of proof is on the party claiming estoppel.").

[73]  *Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.*, 76 A.D.2d 68, 81-82, 430 N.Y.S.2d 179, 187 (1980) (citations omitted).  *See also In re Integrated Health Servs., Inc.*, 304 B.R. 101, 110 (Bankr. D. Del. 2004) *subsequently aff'd*, 233 F. App'x 115 (3d Cir. 2007) (citations omitted).

> The essence of the doctrine is to prevent a party from disavowing its previous conduct where the conduct amounts to a concealment or misrepresentation of material fact, unknown to the party claiming estoppel, and where the conduct was motivated by the intention or expectation that it would be acted upon by the adverse party who does in fact rely thereon in good faith in prejudicially changing its position. Application of the doctrine should only be made in very compelling circumstances, where the interests of justice, morality and common fairness clearly dictate that course.[74]

Yucaipa's equitable estoppel argument fails for the following reasons: (i) the Appearance Prohibition is in the Third Amendment, which Yucaipa helped draft;[75] (ii) in July 2013, Black Diamond and Spectrum moved for summary judgment for a determination of Requisite Lenders and argued the Appearance Prohibition;[76] (iii) Black

---

[74] *Great Am. Ins. Cos. v. Subranni (In re Tri-State Armored Servs., Inc.)*, No. 01 1132, 2006 WL 4452993, at *10 (Bankr. D.N.J. Mar. 21, 2006) *aff'd*, 366 B.R. 326 (D.N.J. 2007) (internal modifications, quotation marks and citations omitted).

[75] *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 426 (2d Cir. 1992) ("When the meaning of a contract is litigated, a reviewing court ordinarily looks only at the words used by the drafters, who presumably understood what they intended."); *Brooklyn 13th St. Holding Corp. v. Nextel of New York, Inc.*, No. 11-CV-1048 CBA RLM, 2011 WL 6945862, at *3 (E.D.N.Y. Dec. 30, 2011) *aff'd*, 495 F. App'x 112 (2d Cir. 2012) ("In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use, and thus the court ordinarily looks only at the wording used by the drafters who presumably understood what they intended." (citations and internal quotation marks omitted)). *See also CP III Rincon Towers, Inc. v. Cohen*, 13 F. Supp. 3d 307, 319 (S.D.N.Y. 2014) ("Although contract terms may be interpreted against the drafter, New York applies this rule 'only as a matter of last resort after all aids to construction have been employed without a satisfactory result. Additionally, as is the case in the instant action, where the contract involves bargained-for contracts, negotiated by sophisticated parties, the rationale for this doctrine is inapposite." (citations, internal modifications and quotation marks omitted)).

[76] More specifically, Black Diamond and Spectrum argued:

> Section 2.7(b) provides that Yucaipa "irrevocably and voluntarily waive[s] ... any right to, make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Insolvency or Liquidation Proceeding without the prior written consent of all Lenders other than [Yucaipa]." Again, Yucaipa makes no attempt to explain how it could possibly act as Requisite Lender in these cases or otherwise if it cannot take any action in "any Insolvency or Liquidation Proceeding."

41

Diamond and Spectrum raised Appearance Prohibition in the Chancery Court in December 2013;[77] and (iv) Black Diamond and Spectrum raised the Appearance Prohibition in its opposition to Yucaipa's motion for leave to assert a counterclaim in the Committee Action in August 2014 (although, this motion for leave was ultimately withdrawn, it was fully briefed by the parties).[78]

Moreover, Section 10.9 of the First Lien Credit Agreement provides, in relevant part:

> Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.[79]

Therefore, even if Black Diamond and Spectrum failed to raise the Appearance Prohibition, which they did not, such failure would have no effect on their ability to raise it now.

---

Committee Action, Adv. Case No. 13-50530, D.I. 267 at 11 (Reply Memorandum of Law in Further Support of Petitioning Creditors' Motion for Summary Judgment Regarding the Determination of Requisite Lenders Under First Lien Credit Agreement) (emphasis removed).

[77] Chancery Court Action, C.A. No. 9151-VCP (Del. Ch. Dec. 18, 2013) (Brief in Opposition to Yucaipa's Motion for Entry of a Status Quo Order) at 17-18.

[78] More specifically, Black Diamond and Spectrum argued:

> In particular, Section 2.7(b) provides that, upon becoming a Lender, Yucaipa "irrevocably and voluntarily waive[d] . . . any right to, make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Insolvency or Liquidation Proceeding without the prior written consent of all Lenders other than [Yucaipa]."

Committee Action, Adv. Case No. 13-50530, D.I. 316 at 9 (Black Diamond's and Spectrum's Objection to Yucaipa's Motion For Leave To File a Counterclaim For Equitable Subordination Under 11 U.S.C. § 510(C) Or, in the Alternative, To Amend the Answer To Assert Additional Affirmative Defenses).

[79] First Lien Credit Agreement, §10.9

Thus, Yucaipa has failed to show that Black Diamond and Spectrum are equitably estopped from asserting the Appearance Prohibition.

### c.  Public Policy

Lastly, in regards to the Appearance Prohibition, Yucaipa argues that enforcement of such provision would violate New York's public policy against contractual provisions that exculpate "willful or grossly negligent acts."  Yucaipa continues that Black Diamond's and Spectrum's interpretation conceivably prevents Yucaipa from defending itself at all, against any claim.  Yucaipa believes that the Appearance Prohibition could prevent Yucaipa from answering a complaint, which is a nonsensical interpretation and contrary to public policy.

Black Diamond and Spectrum respond that the Appearance Prohibition prevents Yucaipa from commencing an action but it does not prevent Yucaipa from defending itself against a claim brought by a Lender.

"A contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties"[80] Furthermore, under New York law:

> an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing.  This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith.  Or, when, as in gross negligence, it

---

[80] *Lipper Holdings, LLC v. Trident Holdings, LLC (In re Lipper Holdings, LLC)*, 1 A.D.3d 170, 171, 766 N.Y.S.2d 561, 562 (2003) (citations omitted).

> betokens a reckless indifference to the rights of others, it may
> be implicit [81]

As with the Covenant Not to Sue, other than Yucaipa, other First Lien Lenders have the ability to seek redress against Black Diamond and Spectrum for willful misconduct and/or gross negligence. To the extent that any alleged willful misconduct and/or gross negligence was unique to Yucaipa, public policy would prevent application of the Appearance Prohibition which in that circumstance would be an absurd result. However, as Yucaipa's claims could also be made by other First Lien Lenders, Black Diamond and Spectrum do not have general immunity for their (alleged) intentionally wrongdoings. Furthermore, the Appearance Prohibition states as follows:

> Any right to, make any election, give any consent, commence
> any action or file any motion, claim, obligation, notice of
> application, or take any other action . . . [82]

The plain meaning of the Appearance Prohibition prevents affirmative action by Yucaipa from commencing a claim, motion, lawsuit, etc., under certain circumstances. Furthermore, nothing therein restricts Yucaipa's rights from defending itself from claim arising from the First Lien Credit Agreement.[83]

---

[81] *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385, 448 N.E.2d 413, 416-17 (1983) (footnotes and citations omitted).

[82] Third Amendment, § 2.7(b).

[83] Analogously, when a defendant fails to file a proof of claim and is thus barred from asserting a claim against a debtor, the defendant is not barred from asserting a right of setoff defensively. *See, e.g., Columbia Hosp. for Women Med. Ctr v. NCRIC, Inc. (In re Columbia Hosp. for Women Med. Ctr., Inc.)*, 461 B.R. 648, 672 (Bankr. D.D.C. 2011). Extrapolating this analogous theory, although through the Third Amendment Yucaipa is barred from asserting claims, Yucaipa is allowed to defend itself in any claims brought against it.

###### iv.    Conclusion

Under the plain meaning of the Covenant Not to Sue the Counterclaim is barred and none of the exceptions to application of the bar are present. Furthermore, the Appearance Prohibition is applicable to the Counterclaim. As Yucaipa has not procured the consent of *all* of the First Lien Lenders to bring the Counterclaim it too is barred. Thus, the Counterclaim must be dismissed. Although, these findings are sufficient to resolve the motion to dismiss, the Court will address the parties' additional arguments regarding collateral estoppel and whether the Counterclaim is plausible under Bankruptcy Rule 7012(b)(6).

### C. Certain Factual Assertions Underlying Yucaipa's Counterclaim Are Subject to Collateral Estoppel

In its Counterclaim, Yucaipa alleges that Black Diamond and Spectrum encouraged Yucaipa to purchase as much debt as possible by "providing false assurances of cooperation and support," and allegedly never "once state[d] any opposition to any respect of Yucaipa's plan to become Requisite Lender, including the Fourth Amendment," but then "secretly directed CIT to refuse to recognize Yucaipa as Requisite Lender."[84] Black Diamond and Spectrum argue that these assertions made by Yucaipa are barred by the application of collateral estoppel.

###### i.    Parties' Arguments

Black Diamond and Spectrum assert that Yucaipa's Counterclaim should be dismissed because Yucaipa is collaterally estopped from re-litigating its allegations that

---

[84] Counterclaim ¶¶ 8, 47, and 53.

Black Diamond and Spectrum "encouraged" Yucaipa to buy First Lien Debt and proclaim

itself Requisite Lender. Black Diamond and Spectrum assert that this Court has already

found this claim implausible. Black Diamond and Spectrum reference the Cross-Claims

that Yucaipa asserted in the Allied Adversary Proceeding, which were dismissed by this

Court based on the Covenant Not to Sue, as well as a finding that the Cross-Claims were

not plausible. For example, in Yucaipa's Cross-Claims, Yucaipa claimed:

> [Black Diamond] agreed to work together with Yucaipa and
> support Yucaipa's plan to acquire the Requisite Lender
> position.[85]

> . . . Petitioning Creditors chose to double-cross Yucaipa and
> thereby enhance their leverage in credit. . . . Petition Creditors
> . . .[did not] disclose to Yucaipa any concerns regarding the
> validity of the Fourth Amendment or Yucaipa's requisite
> Lender status.[86]

> Certain Lenders, including Black Diamond, knew in mid-
> August 2009 that Yucaipa was planning to acquire ComVest's
> Requisite Lender position, and did not express any objection
> whatsoever to Yucaipa. . . . During . . . communications, Black
> Diamond never objected in any way to Yucaipa's proposed
> acquisition, never expressed that it would not consent to
> Yucaipa becoming Requisite Lender, and never stated a
> believe that unanimous Lender consent was required for
> Yucaipa to acquire ComVest's position. To the contrast, Black
> Diamond encouraged Yucaipa's proposed plan, a fact on
> which Yucaipa relied in executing the plan.[87]

Black Diamond and Spectrum argue that the above allegations, among others, were

integral to Yucaipa's Cross-Claims, in which Yucaipa argued that enforcement of the

---

[85] Allied Adv. Pro. 12-50947, D.I. 64 (Yucaipa's Amended Counterclaim and Cross-Claim for Declaratory Judgment and Injunctive and Other Relief and Amended Answer to Debtors' Verified Complaint, ¶ 5.

[86] *Id.* at ¶ 7.

[87] *Id.* at ¶ 71.

Third Amendment would unjustly enrich Black Diamond and Spectrum because Black Diamond and Spectrum "encouraged" Yucaipa to buy a majority of the First Lien Debt and proclaim itself Requisite Lender.[88] Thus, Black Diamond and Spectrum assert that these allegations have been litigated and ruled upon and, thus, are barred by collateral estoppel from being raised herein.

Yucaipa responds that there is no identity of issues between the Allied Adversary Proceeding and the case *sub judice*. Yucaipa states: "[t]he Court did nothing more in the February 2013 hearing than dismiss a different complaint, with far different allegations, than what is currently pending."[89] Yucaipa argues that the Cross-Claims against Black Diamond and Spectrum sought declaratory and injunctive relief, the New York court has already voided the Fourth Amendment, and as a result, Yucaipa asked this Court to determine whether the Third Amended governed Yucaipa's First Lien Claims. Yucaipa did not seek equitable subordination in the Cross-Claims. Yucaipa argues that the Cross-Claims relied on two central allegations: (1) between 2009 and 2012, after encouragement from and with full disclosure to Black Diamond and Spectrum regarding the necessity, and content, of the Fourth Amendment, Black Diamond and Spectrum crossed Yucaipa by seeking to invalidate the Fourth Amendment in successive state court actions; and (2) Yucaipa "never would have acquired first lien debt holdings" but for its reasonable and detrimental reliance on the validity of the Fourth Amendment.

---

[88] *Id.* at ¶ 118.

[89] Opposition to Black Diamond and Spectrum's Motion to Dismiss Yucaipa's Counterclaim for Equitable Subordination, D.I. 56, p. 4.

In comparison, Yucaipa asserts that the Counterclaim sets forth Black Diamond and Spectrum's "multi-year, unlawful plan" to: (a) seek the consolidation of a large amount of First Lien Claims into Yucaipa's hands, an insider whose claims would be more vulnerable to equitable subordination; (b) cooperate to prevent Yucaipa from acting as Requisite Lender or from selling its First Lien Claims to JCT; (c) file the 2012 involuntary bankruptcy petition against Allied supported by false affidavits that concealed illegal claims trading in and the payment of a bribe to Spectrum in the form of a claims transfer; and (d) pursue a baseless equitable-subordination strategy in Bankruptcy Court, which had been conceived even before Yucaipa acquired any First Lien Claims from ComVest. Yucaipa argues that the Counterclaim covers a much longer period of time than the Cross-Claims; Black Diamond and Spectrum have used "unlawful means" to reduce and dilute Yucaipa's ownership interest; and have paid the attorneys' fees and expenses of all First Lien Lenders *other than* Yucaipa without explanation or justification. Yucaipa further argues that, unlike the Cross-Claims, here Yucaipa is alleging fraud and unlawful conduct, including false misrepresentation and material omissions in violation of 18 U.S.C. § 152(2), (3) and (6) and Bankruptcy Rules 1003 and 2019. Yucaipa further claims that it only learned of the "bribe" and the Cooperation Agreement *after* the Cross-Claims were dismissed.

Black Diamond and Spectrum reply that collateral estoppel precludes a party from raising the same *issues*, not the same *claim*. Black Diamond and Spectrum are not seeking to bar the entire Counterclaim via collateral estoppel, but believe collateral estoppel bars

Yucaipa from asserting several issues – whether Yucaipa has plausibly alleged that "Black Diamond and Spectrum (i) 'encouraged' Yucaipa to purchase a majority of Allied's First Lien Debt, executed the Purported Fourth Amendment, and purport to act as the Requisite Lender, and (ii) 'surreptitiously' instructed CIT to challenge Yucaipa's purported Requisite Lender status."   (These two allegations correspond with Black Diamond and Spectrum's "purported scheme" listed above).

    *ii.    Analysis*

    The Third Circuit has identified four standard requirements for the application of collateral estoppel:

> (1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action.[90]

Black Diamond and Spectrum have the burden of demonstrating the propriety of the collateral estoppel application.[91]   The Third Circuit has cautioned that collateral estoppel is necessarily "fact intensive."[92]   Furthermore, "doubts about its application should usually be resolved against its use."[93]

    Yucaipa does not dispute whether it was fully represented in the Allied Adversary Proceeding; thus, the discussion herein is focused on whether the Cross-Claims and the

---

[90] *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006) (citations and internal quotations marks omitted).

[91] *Suppan v. Dadonna*, 203 F.3d 228, 233 (3d Cir. 2000) (citations omitted).

[92] *Witkowski v. Welch*, 173 F.3d 192, 206 (3d Cir. 1999).

[93] *Id.* (citation omitted).

Counterclaims raise identical issues and whether there was a previous determination that was necessary to this Court's dismissal of the Cross-Claims.

### a. Identity of Issues

Yucaipa argues that there is no identity of interests between the Cross-Claims and the Counterclaim. "Identity of the issue is established by showing that the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules."[94]  Yucaipa claims that the Cross-Claims were based on Yucaipa's detrimental reliance on the validity of the Fourth Amendment – which the Court found implausible.  Yucaipa seeks to limit the Court's implausibility findings to (a) Yucaipa would have detrimentally relied on Black Diamond's and Spectrum's encouragement with respect to the 2009 ComVest transaction and the Fourth Amendment and (b) Black Diamond and Spectrum procured the Covenant Not to Sue by fraud.

During the Court's ruling on the Cross-Claims, the Court found:

> As a matter of fact, I don't think there's any allegation really that rises to the plausibility that there was any kind of mischief going on that was detrimental **or directed** at Yucaipa at the time of the third amendment being entered into . . . and then the fourth amendment being entered into [or] negotiated."[95]

> The fact that it was all part of a grand strategy that somehow Yucaipa was sucked in to allow [ComVest] to make the agreement and then make the sale, I just, I just don't find that plausible.[96]

---

[94] *Suppan v. Dadonna*, 203 F.3d 228, 233 (3d Cir. 2000) (citations omitted).

[95] Allied Adv. Pro., D.I. 162, 110:9-16 (emphasis added).

[96] Allied Ad. Proc., D.I. No. 162 at 111:3-6.

These Cross-Claims findings are identical to the issue of whether Black Diamond and Spectrum "encouraged" Yucaipa to purchase a majority of Allied's First Lien Debt, to execute the Fourth Amendment, and purport to act as the Requisite Lender, and whether Black Diamond and Spectrum instructed CIT to challenge Yucaipa's purported Requisite Lender status. Thus, there is an identity of issues between the Cross-Claims and the Counterclaim.

### b.  Temporal Requirement

Yucaipa continues that the Counterclaim alleges significant new facts resulting from a continuing course of conduct, which Yucaipa was not aware of when asserting the Cross-Claims. Although it "is axiomatic that collateral estoppel cannot apply to . . . a time period that was not at issue in that trial;"[97] issues are not factually different merely because the damages period extends for a longer period of time.[98]

### c.  Cross-Claims Were Dismissed on a "Legal Basis" and Not Upon Implausibility of the Factual Theory.

Yucaipa asserts that this Court relied only of the "legal bases" that Black Diamond and Spectrum has raised, which the Court found were "noncurable" by additional amendment to the Cross-Claims. Yucaipa asserts that this Court's dismissal of the Cross-Claims did not rest on the implausibility of the factual theory of the case but rather legal

---

[97]  *Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining & Mfg. Co.)*, No. CIV.A. 02-7676, 2005 WL 736629, at *6 n. 7 (E.D. Pa. Mar. 30, 2005) *amended on reconsideration in part sub nom. Bradburn Parent Teacher Store, Inc. v. 3M*, No. CIV.A. 02-7676, 2005 WL 1388929 (E.D. Pa. June 9, 2005).

[98]  *Id.* (citations omitted).

bases, including the application of the Covenant Not to Sue and of the statute of limitations.

Black Diamond and Spectrum respond that in order for the Court to rule on the application of the Covenant Not to Sue contained in the Third Amendment, findings of factual implausibility were necessary to the Court's dismiss without prejudice. Black Diamond and Spectrum continue that this Court dismissed the Cross-Claims on the bases of the Covenant Not to Sue, which is contained in the Third Amendment, the enforcement of which Yucaipa was challenging in the Cross-Claims. Black Diamond and Spectrum argue that for this Court to dismiss the Cross-Claims based on the Covenant Not to Sue, the Court needed to first determine the applicability of the Third Amendment against Yucaipa. Thus, the Court was required to assess the "factual plausibility" of Yucaipa's "encouragement" and Requisite Lender allegations to determine whether the enforcement of the Third Amendment against Yucaipa would be inequitable *before* the Court could determine the "legal basis" as to whether the Covenant Not to Sue barred the Cross-Claims.

Yucaipa's argument is not persuasive. At the hearing on the Cross-Claims, the Court made the following *rulings*:

- While discussing the Covenant Not to Sue, the Court held "that really rests on the *factual allegations* in the complaint that would be necessary to raise an issue, a plausible issue about whether the covenant not to sue should be applied.[99]

- "I don't find anything in the record that would support plausible claim that the, that in the entry of the third amendment there was

---

[99] Allied Adv. Pro., D.I. 162, 109:1-5.

any fraud or wrongdoing whatsoever in connection with the actual covenant not to sue."[100]

- "As a matter of fact, I don't think there's any allegation really that rises to the plausibility that there was any kind of mischief going on that was detrimental or directed at Yucaipa at the time of the third amendment being entered into . . . and then the fourth amendment being entered into negotiated."[101]

- "So basically, I don't know it has led to level of fraud necessarily in connection with the covenant not to sue, but it would need to certainly be something with some heft behind it to support some detrimental reliance argument. And it just isn't there. It just isn't there."[102]

- "As to the applicability, the first credit agreement does contain the provision that when you buy or assign the debt you are stuck with what your assignor had previously agreed to or waived, etc., and I find that when Yucaipa bought this debt they were subject to the agreements that had previously being entered. And as such, they are applicable when we're looking at the third amendment."[103]

- · The fact that it was all part of a grand strategy that somehow Yucaipa was sucked in to allow [ComVest] to make the agreement and then make the sale, I just, I just don't find that plausible.[104]

These are all factual rulings based on the facts plead in Yucaipa's Cross-Claims. The

Court found the *facts* in Yucaipa's Cross-Claims did not meet the plausibility standards.

Using those factual rulings, the Court determined that the Covenant Not to Sue and the

statute of limitations would bar Yucaipa's Cross-Claims.

---

[100] Allied Adv. Pro., D.I. 162, 110:6-9.

[101] Allied Adv. Pro., D.I. 162, 110:9-16.

[102] Allied Adv. Pro., D.I. 162, 110:16-21.

[103] Allied Adv. Pro., D.I. 162, 110:22-111:3.

[104] Allied Adv. Pro., D.I. 162, 111:3-6.

After the Court's ruling, Yucaipa moved for leave to amend their Cross-Claims.[105]
The Court denied Yucaipa's motion for leave to amend and stated:

> I concur with counsel that these are in effect legal bases, they
> turn obviously to some extent on the facts, but I simply don't
> view them as in effect curable based on my understanding of
> what's in the cross claims today as well as my broader
> understanding of the case in and of itself.[106]

However, the Court's statement about the "legal bases" on a motion to amend can negate
the factual findings or convert the Court's ruling to a pure "legal decision." In other
words, these factual rulings were necessary to the Court's dismissal of the Cross-Claims.

### iii.    Conclusion

Based upon the discussion above, the Court find that the following factual issues
are barred on collateral estoppel grounds:

(i)    whether Black Diamond and Spectrum "encouraged"
Yucaipa to purchase a majority of Allied's First Lien
Debt, to execute the Fourth Amendment, and purport
to act as the Requisite Lender, and

(ii)   whether Black Diamond and Spectrum instructed CIT
to challenge Yucaipa's purported Requisite Lender
status.

## D. Yucaipa's Equitable Subordination Counterclaim is Not Plausible Under Bankruptcy Rule 7012(b)(6)?

### i.    Parties' Arguments

Yucaipa alleges that Black Diamond and Spectrum participated in a pattern of
illegal claims-trading and concealment. Yucaipa asserts that the Cooperation Agreement
was "hidden" for 16 months and is only now revealed to the Court and the parties.

---

[105] Allied Adv. Pro., D.I. 162, 113:21114:13.

[106] Allied Adv. Pro., D.I. 162, 114:25-115:1 and 115:5-10.

Yucaipa further argues that the existence of the Cooperation Agreement further expands the scope of Black Diamond and Spectrum's conspiracy as it is written evidence of claims trading in order to file involuntary petitions. Yucaipa further alleges that the Black Diamond and Spectrum's equitable subordination claim against Yucaipa is "objectively baseless" and not plausible.

Black Diamond and Spectrum asserts that Yucaipa's Counterclaim allegations are implausible. Black Diamond and Spectrum assert that the Counterclaim does not contain sufficient facts, if accepted as true, for the Court to draw a reasonable inference that Black Diamond and Spectrum are liable for the alleged misconduct. Black Diamond and Spectrum also assert that their equitable subordination claim against Yucaipa is not "objectively baseless" and argue that the Committee, during their investigation, independently brought a substantially similar equitable subordination claim and Yucaipa.

Yucaipa asserts that the Counterclaim goes far beyond a recitation of the elements of equitable subordination and is supported by specific facts and references. Yucaipa argues that there are emails contemplating an equitable subordination claim even prior to Yucaipa obtaining First Lien Claims; that Black Diamond and Spectrum are both distressed debt traders and repeatedly assume high risk debt for the potential of large investment returns making it plausible that Black Diamond and Spectrum assumed the litigations risks; by subordinating Yucaipa's 56% ownership interest of First Lien Debt, Black Diamond and Spectrum increase their stake in the claims pool from 22% to 49% -

which would be the only way for Black Diamond and Spectrum to obtain a par-plus-accrued-interest recovery; Black Diamond and Spectrum needed sufficient time to "strip" Yucaipa of its Requisite Lender status which accounted for the three year delay between Black Diamond and Spectrum initially discussing equitable subordinate and the filing of the involuntary; Black Diamond and Spectrum's negotiations with JCT were a "sham" to allow more time for Black Diamond and Spectrum to hatch their plan to equitably subordinate Yucaipa's claims; lastly, Black Diamond had to "bribe" Spectrum to participate because Black Diamond had more First Lien Debt, thus Black Diamond increased Spectrum's potential "windfall" from an equitable subordination claim.

Black Diamond and Spectrum respond that it is not plausible for Black Diamond and Spectrum to give up a 100% recovery from JCT for their First Lien Debt to instead pursue a highly unpredictable multi-faceted strategy that was fraught with risk and dependent on outcomes outside of their control.  Black Diamond and Spectrum argue that Yucaipa depends on every one of the following unpredictable events occurring in a manner favorable to Black Diamond and Spectrum: (i) invalidating the Fourth Amendment through litigation; (ii) obtaining judicial declaration that Black Diamond and Spectrum are the Requisite Lenders; (iii) acquiring Allied's assets through a credit bid on behalf of all Lenders (including Yucaipa, subject to the equitable subordination claims); (iv) prevailing in their equitable subordination claims against Yucaipa and obtaining a substantial recovery; and (v) hoping that the Allied assets they acquired would increase in value to the point where the asset value plus any recovery realized

from the equitable subordination litigation exceeded a par plus accrued interest recovery years after JCT had offered them a 100% recovery. Black Diamond and Spectrum assert that this "scheme" is not plausible.

In response to Yucaipa's claim that Black Diamond and Spectrum's equitable subordination claim against Yucaipa is fraudulent: Black Diamond and Spectrum further respond that the Committee brought a similar claim against Yucaipa. In the Committee's investigation it found that "Yucaipa trampled upon the legitimate rights and expectations of the Debtors' secured and unsecured creditors and cause the Debtors to make exorbitant and unnecessary payments to third parties acting at Yucaipa's direction and for Yucaipa's benefit, not for the benefit of the Company or its stakeholders."[107] Furthermore, Black Diamond and Spectrum had no way of knowing at the time of the involuntary filing that Yucaipa would be stripped of its purported Requisite Lender status. As such, Black Diamond and Spectrum assert that Yucaipa's argument that Black Diamond and Spectrum waited three years to file the petitions because they first needed to strip Yucaipa of its Requisite Lender status is not plausible.

Black Diamond and Spectrum further assert the email exchange Yucaipa alleges is proof of a "payoff" began seven months before the involuntary petitions. Lastly, Black Diamond and Spectrum assert that the email between Michael Riggs of JCT and Jeffrey Schaffer of Spectrum, in which Riggs asks 'I thought you were going to check out the 'equitable subordination' angle," and Schaffer responds, "Why?" – has not been linked

---

[107] Allied Adv. Pro., D.I. 858, ¶¶ 3, 6.

whatsoever to Yucaipa.  In fact, Black Diamond and Spectrum point to language in Yucaipa's opposition to the Motion to Dismiss wherein Yucaipa states Riggs "was not a creditor of Allied and thus had no reason to be considering remedies against Yucaipa in its capacity as a creditor."[108]

### ii.    Transfers Prior to Filing an Involuntary Petition

Rule 1003(a) of the Federal Rules of Bankruptcy Procedure requires the party filing an involuntary petition – whether it is the "transferor or transferee" – to attach a copy of all documents evidencing transfers of claims and "a signed statement that the claim was not transferred for the purpose of commencing the case . . . "[109]  "Any transfer of a claim for the purpose of commencing an involuntary case will fall within the prohibition of the rule."[110]

In *Aigner v. McMillan*, the petitioning creditors entered into an agreement regarding the transfer of claims which stated that the petitioner "agrees to file an involuntary bankruptcy action against [the involuntary debtor] . . . and agrees to cooperate in the prosecution of the same . . . ."[111]  The *Aigner* Court found that the petitioner was disqualified from bringing the involuntary petition.[112]

---

[108] Opp'n at 34.

[109] Fed. R. Bankr. P. 1003(a).

[110] *Aigner v. McMillan*, No. 11-47029-DML-7, 2013 WL 2445042, at *5 (Bankr. N.D. Tex. June 4, 2013) (citations, internal quotation marks and modifications omitted).

[111] *Aigner v. McMillan*, No. 11-47029-DML-7, 2013 WL 2445042, at *2 (Bankr. N.D. Tex. June 4, 2013).

[112] *Aigner v. McMillan*, No. 11-47029-DML-7, 2013 WL 2445042, at *6 (Bankr. N.D. Tex. June 4, 2013)

*In re Focus Media, Inc.*[113] is similar to the allegations in the case *sub judice*; therein,

the debtor argued that various claims were traded in order for the creditors to file the

involuntary petitions against the debtor.  Without these contested petitioning creditors,

there were not enough petitioning creditors to file the involuntary petitions.[114]  The *Focus*

*Media* court was faced with affiliated companies that transferred claims to the parent

company prior to the filing of an involuntary petition.  The Ninth Circuit stated:

> Rule 1003 endeavors to curtail "trafficking" in claims.
> Without Rule 1003, such trafficking could enable entities
> without proper claims to acquire them and thus become
> petitioning creditors, or facilitate claim-splitting by
> companies seeking to satisfy the three-entity requirement.[115]

In *Focus Media*, the court determined that the affiliates turned to the parent company to

"facilitate the collection of debts owed to them by" the debtor.[116]  The bankruptcy court

in *Focus Media* considered testimony from the parent company stating that the affiliates

did not come to the parent company asking that the parent file a petition for involuntary

bankruptcy, but sought assistance in collecting their claims against the debtor.[117]  As

quoted by the Ninth Circuit, the bankruptcy court in *Focus Media* held:

> "Nobody testified to there being an oral or written request for
> transfer.  Ms. Menton's feeling that those entities wanted
> ABC, Inc. [the parent company] to collect the debt from Focus

---

[113] *Focus Media, Inc. v. National Broadcasting Company, Inc.* (In re Focus Media, Inc.), 378 F.3d 916 (9th Cir. 2004).

[114] *Id.* at 927.

[115] *Id.* at 927-28 (citations omitted).  *See In re Averil, Inc.*, 33 B.R. 562, 563 (Bankr.S.D.Fla.1983) (expressing concern that"[i]f the co-owners of a single obligation qualify as separate claimants ... [the] legislative purpose [of requiring a joint effort to launch an involuntary proceeding] would be frustrated").

[116] *Focus Media, Inc.*, 378 F.3d at 927.

[117] *Id.* at 927.

> falls far short of there being a legally valid transfer or an assignment from the subsidiaries to ABC, Inc.  Moreover there was no testimony about any particular subsidiary."[118]

On the opposite side of the spectrum in *In re Guerra*,[119] the bankruptcy court found that the petitioning creditors purchased his claim in order to file the involuntary action.  Therein, the petitioning creditor had loaned the selling creditor money over years and owed the petitioning creditor on those loan.  The selling creditor received an unrelated arbitration award against the debtor.[120]  The petitioning creditor purchased the arbitration award as a way to collect his debt against the debtor.[121]  The day after the petitioning creditor purchased the arbitration award, the petitioning creditor, along with another creditor, filed the involuntary petition.[122]  The bankruptcy court held:

> The court therefore draws the following, inexorable conclusions: Cancino [the petitioning creditor] retained Hyppa [an attorney] to file this involuntary before the assignment (what attorney would file an involuntary on less than a day's notice), the arbitration award allowed Cancino to act as a petitioning creditor, and Hyppa then filed the involuntary petition. This horse trading is exactly what Rule 1003 was meant to prohibit.  As such, Cancino is ineligible to act as a petitioning creditor.[123]

A reading of the entire email chain between individuals at Spectrum and others at Black Diamond establishes that: (i) the discussions regarding the trade began in October

---

[118] *Id.* at 928 (9th Cir. 2004) (no citation to the bankruptcy court's ruling provided).

[119] *In re Guerra*, No. 13-51100 CN, 2014 WL 552963 (Bankr. N.D. Cal. Feb. 11, 2014).

[120] *Id.* at *4.

[121] *Id.*

[122] *Id.*

[123] *Id. See also In re Oberle*, No. 06-41515, 2006 WL 3949174, at *1 (Bankr. N.D. Cal. Dec. 21, 2006) (finding that a petitioning creditor was not a qualified petitioner because she transferred a portion of her claim to another for the purpose of creating another petitioning creditors).

2011, (ii) the trade and allocation are consistent with the Cooperation Agreement, (iii) the trade occurred in October 2011, and (iv) the closing documents were delayed over the drafting of "big boy" language.  Although the email states: "Please get this closed this week.  We cannot file an involuntary without it done;"[124] that the email is expressing frustration at a trade that happened months before[125] but had not yet been closed due to documentation issues.

Furthermore, as admitted by Yucaipa, Spectrum held sufficient amounts of First Lien Debt without the purported Involuntary Petition Payoff to participate in the involuntary petitions.

Yucaipa alleges that this email chain is "strong circumstantial evidence that just two months before [Black Diamond and Spectrum] filed the involuntary petition, Spectrum made its demand clear" that Black Diamond needed to transfer the additional First Lien Debt to Spectrum in order to secure Spectrum's participation in the involuntary petition.[126]   However, Yucaipa's argument belies the Cooperation Agreement, Black Diamond's purchase of additional debt, trading that additional debt pursuant to the terms of the Cooperation Agreement, the price paid by Spectrum for the additional First Lien Debt, and the timing of the trade (although, the trade closed much later).  The facts clearly indicate it is more plausible that the trade needed to be completed prior to filing

---

[124] Answer and Counterclaim at Exh 12.

[125] Answer and Counterclaims, Exhibit 12, p. 7

[126] Opposition at p. 39-40.

the involuntary petitions – not for any nefarious reason, but to prevent unnecessary complications with a trade that was made and not yet closed.

Yucaipa argues that the complaint is not a "threadbare" recitation of the elements, and thus, taken as true, should survive the Motion to Dismiss. However, this Court is also charged with using its judicial experience and common sense.[127] "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but not shown-that the pleader is entitled to relief."[128] Here, Yucaipa has not provided more than the mere possibility of misconduct, based on the facts surrounding the prepetition transfer of First Lien Debt from Black Diamond to Spectrum.   As Black Diamond and Spectrum did not transfer the "Involuntary Petition Payoff" in order to commence the involuntary proceedings, such transfer did not need to be disclosed pursuant to Bankruptcy Rule 1003.

### iii.    *Plausibility of Equitable Subordination Claim*

In the Third Circuit, courts generally require the plaintiff to show three elements to establish equitable subordination:

> (1) the claimant must have engaged in some type of inequitable conduct; (2) the claimant's misconduct must have resulted in injury to other creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the Bankruptcy Code. Three principles must be considered in determining whether these three conditions are satisfied.  First, the inequitable conduct directed against the bankruptcy or its creditors may

---

[127] *Id.* at 679. "It is the conclusory nature of [plaintiff's] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth." *Id.* at 681.

[128] *Id.* at 679 (citations and internal quotations omitted).

be sufficient to warrant subordination of a claim regardless of whether it was related to the assertion of that claim. Second, a claim or claims should be subordinated only to the extent necessary to offset the harm which the creditors suffered on account of the inequitable conduct. Third, a party seeking equitable subordination has the initial burden of proof.[129]

### a. Alleged Inequitable Conduct

As noted above, Yucaipa's allegation regarding the purported Involuntary Petition Payoff is not plausible. However, Yucaipa also alleges that Black Diamond and Spectrum orchestrated Yucaipa's purchase of First Lien Debt in order to later equitably subordinate Yucaipa's claim. Yucaipa points to an email on August 13, 2009, between Mike Riggs at Innovative Equity Partners and J. Schaffer at Spectrum. The email conversation was:

> Jeffrey Schaffer: "Any new words-thoughts? Quiet here?"
>
> Mike Riggs: "I thought you were going to check out the 'equitable subordination' angle."
>
> Jeffrey Schaffer: "Why?"[130]

The email does not mention Yucaipa or against whom the "equitable subordination angle" would be sought. At the time of this email exchange, the (purported) Fourth Amendment had not been entered into.[131] Furthermore, Yucaipa did not acquire First Lien Debt until October 29, 2009. Thus, this email correspondence occurred *prior* to Yucaipa owning any First Lien Debt. As such, it is not plausible that this email indicates

---

[129] *Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 49-50 (Bankr. D. Del. 2011) (citations omitted).

[130] Answer and Counterclaims at Exh. 4.

[131] The Fourth Amendment is dated August 21, 2009. Answer and Counterclaims at Exh. 2.

that Black Diamond and Spectrum schemed to equitably subordinate Yucaipa's First Lien Debt.

Yucaipa further asserts that Black Diamond and Spectrum were "lying in wait" for the optimal time to file their equitable subordination claim, including negotiating for a year with JCT only to scuttle the deal. As stated by Black Diamond and Spectrum in their briefing – Yucaipa's argument depends on every one of the following unpredictable events occurring in a manner favorable to Black Diamond and Spectrum: (i) invalidating the Fourth Amendment through litigation; (ii) obtaining judicial declaration that Black Diamond and Spectrum are the Requisite Lenders; (iii) acquiring Allied's assets through a credit bid on behalf of all Lenders (including Yucaipa, subject to the equitable subordination claims); (iv) prevailing in their equitable subordination claims against Yucaipa and obtaining a substantial recovery; and (v) hoping that the Allied assets they acquired would increase in value to the point where the asset value plus any recovery realized from the equitable subordination litigation exceeded a par plus accrued interest recovery years after JCT had offered them a 100% recovery. Yucaipa's reliance on this sequence of events is not plausible.

### iv.    Conclusion re: Plausibility

As set forth above, Yucaipa's allegations are not plausible. Based on the Court's judicial experience and common sense, Yucaipa's allegations cannot create a plausible story. It simply is not plausible that economic actors, such as Black Diamond and

Spectrum, would take that much litigation risk just to aggravate Yucaipa's attempt to own unrestricted First Lien Debt.

## CONCLUSION

At first blush Yucaipa brings a bowl of allegations to the Court for adjudication, but alas, the bowl is really a sieve, and all of Yucaipa's allegations leak out leaving nothing but an empty vessel. In other words, even if Yucaipa's Counterclaim were not barred by the Covenant Not to Sue and the Appearance Prohibition (which they are), they alleged facts do not tell a plausible story. The Counterclaim is an exercise of creative writing which, at closer examination, simply does not hold together. As such, the Court will dismiss Yucaipa's Counterclaim in its entirety, with prejudice, for the reasons set forth above. An order will be entered.