## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

Yucaipa American Alliance Fund I, L.P., and   :
Yucaipa American Alliance (Parallel) Fund I,   :
                                               :
            Appellants-Defendants,             :
                                               :
v.                                             :   Chapter 11
                                               :
BDCM Opportunity Fund II, L.P., Black          :   Case No. 12-11564 (CSS)
Diamond CLO 2005-1 Ltd., Spectrum              :
Investment Partners, L.P., Black Diamond       :   (Jointly Administered)
Commercial Finance, L.L.C., as Co-             :
Administrative Agent, and Spectrum             :   Adv. Proc. No. 14-50971
Commercial Finance, LLC, as Co-                :
Administrative Agent,                          :
                                               :   C.A. No. _____
            Appellees-Plaintiffs.              :
                                               :   ECF Case
                                               :
                                               :
                                               :
                                               :
                                               :
                                               :
-----------------------------------------------x

### APPELLANTS-DEFENDANTS YUCAIPA AMERICAN ALLIANCE FUND I, L.P. AND YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P.'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR LEAVE TO APPEAL

YOUNG CONAWAY
STARGATT & TAYLOR, LLP
Michael R. Nestor (No. 3526)
Edmon L. Morton (No. 3856)
Michael S. Neiburg (No. 5275)
Rodney Square
1000 North King Street
Wilmington, DE  19801
Telephone: (302) 571-6600
mnestor@ycst.com

- and-

GIBSON, DUNN & CRUTCHER LLP
Maurice M. Suh (*Pro Hac Vice*)

Robert A. Klyman (*Pro Hac Vice*)
Kahn Scolnick (*Pro Hac Vice*)
333 South Grand Avenue
Los Angeles, CA  90071
Telephone: (213) 229-7000
msuh@gibsondunn.com

*Attorneys for Appellants-Defendants Yucaipa
American Alliance Fund I, L.P., and Yucaipa
American Alliance (Parallel) Fund I, L.P.*

# TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ........................................................................ 1

II.   BACKGROUND ............................................................................................. 4

      A.    Background of Allied's Bankruptcy and the Underlying Adversary Action............. 4

      B.    The Allied Involuntary Bankruptcy and Underlying Adversary Action .................. 7

      C.    Yucaipa's Counterclaim in the BD/S Action............................................................ 8

      D.    The Bankruptcy Court's Dismissal of Yucaipa's Counterclaim............................... 8

      E.    Yucaipa's RICO Action Pending in This Court ...................................................... 10

III.  LEGAL STANDARD...................................................................................... 11

IV.   ARGUMENT................................................................................................... 12

      A.    This Appeal Presents Controlling Questions of Law, Resolution of Which
            Will Materially Advance the Termination of the Litigations ................................. 12

      B.    There are Substantial Grounds for Differences of Opinion ..................................... 16

            1.    Substantial Grounds for Differences of Opinion Exist as to the
                  Bankruptcy Court's Plausibility Ruling........................................................ 16

            2.    Substantial Grounds for Differences of Opinion Exist as to the
                  Bankruptcy Court's Interpretation of the Covenant Not to Sue .................... 20

            3.    Substantial Grounds for Differences of Opinion Exist as to the
                  Bankruptcy Construction of the Appearance Prohibition.............................. 23

            4.    Substantial Grounds for Differences of Opinion Exist as to the
                  Bankruptcy Court's Application of Collateral Estoppel................................ 24

V.    CONCLUSION............................................................................................... 25

01:17650480.1

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Ashcroft v. Iqbal*,
566 U.S. 662 (2009) ................................................................................................ 17, 18

*Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*,
321 B.R. 147 (D.N.J. 2005) ........................................................................................... 13

*BDCM Opportunity Fund II, LP v. Yucaipa American Alliance Fund I, LP*,
978 N.Y.S.2d 10 (N.Y. App. Div. 2013) ........................................................................ 6, 23

*Beckley Coal Mining Co. v. United Mine Workers of Am.*,
98 B.R. 690 (D. Del. 1988) ............................................................................................ 16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .................................................................................................. 17, 19

*Calabrese v. CSC Holdings, Inc.*,
No. 2:02-CV-5171 JS ARL, 2004 WL 3186787 (E.D.N.Y. July 19, 2004) ......................... 22

*California Motor Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1972) ....................................................................................................... 22

*CALPERS v. WorldCom, Inc.*,
368 F.3d 86 (2d Cir. 2004) ............................................................................................ 12

*Covington v. Int'l Ass'n of Approved Basketball Officials*,
710 F.3d 114 (3d Cir. 2013) .......................................................................................... 17

*First Am. Bank of N.Y. v. Sw. Gloves & Safety Equip., Inc.*,
64 B.R. 963 (D. Del. 1986) ............................................................................................ 11

*First Jersey Nat'l Bank v. Brown (In re Brown)*,
951 F.2d 564 (3d Cir. 1991) .......................................................................................... 24

*Fowler v. UPMC Shadyside*,
578 F.3d 203 (3d Cir. 2009) .......................................................................................... 17

*Fox Sports Net W. 2, LLC v. L.A. Dodgers LLC (In re L.A. Dodgers LLC)*,
465 B.R. 18 (D. Del. 2011) ............................................................................................ 11

*FTC v. Wyndham Worldwide Corp.*,
10 F. Supp. 3d 602 (D.N.J. 2014) .................................................................................. 16

*Howard Delivery Service, Inc. v. Zurich Am. Ins. Co.*,
547 U.S. 651 (2006) ....................................................................................................... 12

# TABLE OF AUTHORITIES
(continued)

Page(s)

*In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*,
685 F.3d 353 (3d Cir. 2012) ................................................................................ 17, 21

*In re Chocolate Confectionary Antitrust Litig.*,
607 F. Supp. 2d 701 (D.N.J. 2009) ........................................................................ 16

*In re Marvel Entm't Grp.*,
209 B.R. 832 (D. Del. 1997) .................................................................................. 16

*In re W.R. Grace & Co.*,
No. 08-246, 2008 WL 3522453 (D. Del. Aug. 12, 2008) ........................................ 11

*Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*,
458 F.3d 244 (3d Cir. 2006) .................................................................................. 24

*Kalisch-Jarcho, Inc. v. City of New York*,
448 N.E.2d 413 (N.Y. 1983) .............................................................................. 20, 23

*Katz v. Carte Blanche Corp.*,
496 F.2d 747 (3d Cir. 1974) ........................................................................ 3, 11, 12, 13

*Lindsay v. Normet*,
405 U.S. 56 (1972) ................................................................................................ 14

*Luben Indus., Inc v. United States*,
707 F.2d 1037 (9th Cir. 1983) .............................................................................. 24

*Malmstein v. Universal Music Grp., Inc.*,
2012 WL 2159281 (S.D.N.Y. June 14, 2012) ........................................................ 24

*Mata v. Eclipse Aerospace, Inc.* (*In re AE Liquidation, Inc.*),
451 B.R. 343 (D. Del. 2011) .................................................................................. 11

*Morrison v. Amway Corp.* (*In re Morrison*),
No. 08–03260, 2009 WL 1856064 (Bankr. S.D. Tex. June 26, 2009) ...................... 22

*Nat'l Cable Television Coop. v. Broadstripe, LLC* (*In re Broadstripe, LLC*),
No. 09-10006, 2009 WL 774401 (D. Del. Mar. 26, 2009) ...................................... 11

*Patrick v. Dell Fin. Servs.*,
366 B.R. 378 (M.D. Pa. 2007) .............................................................................. 15

*Pineda v. Ford Motor Co.*,
520 F.3d 237 (3d Cir. 2008) .................................................................................. 24

01:17650480.1

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Reese v. BP Exploration (Alaska) Inc.*,
   643 F.3d 681 (9th Cir. 2011) ............................................................. 16

*Ropes & Gray LLP v. Jalbert* (*In re Engage*),
   330 B.R. 5 (D. Mass. 2005) ............................................................... 16

*Stanziale, Jr. v. Sun Nat'l Bank* (*In re Dwek*),
   No. CIV. 3:09-CV-5046, 2010 WL 234938 (D.N.J. Jan. 15, 2010) ........................................ 13

*Suppan v. Dadonna*,
   203 F.3d 228 (3d Cir. 2000) ............................................................. 25

*United States v. Philip Morris USA, Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009) ......................................................... 22

*We, Inc. v. City of Phila.*,
   174 F.3d 322 (3d Cir. 1999) ............................................................. 22

*Witkowski v. Welch*,
   173 F.3d 192 (3d Cir. 1999) ............................................................. 24

*Yucaipa Am. Alliance Fund I, L.P. v. SBDRE LLC*, C.A.
   No. 9151-VCP, 2014 WL 5509787 (Del. Ch. Oct. 31, 2014) ............................................ 6, 20

**Statutes**

28 U.S.C. § 1292(b) ......................................................................... 11

28 U.S.C. § 156(a)(1) ....................................................................... 24

28 U.S.C. § 158(a)(1) ....................................................................... 12

28 U.S.C. § 158(a)(3) ....................................................................... 1, 11

**Other Authorities**

Wright & Miller, *Civil Prac. & Proc*. § 3930 (3d ed.) ............................................. 12, 13

Wright & Miller, *Civil Prac. & Proc*. § 3931 (3d ed.) ............................................. 16

01:17650480.1

Appellants-Defendants Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. ("Yucaipa") respectfully seek leave under 28 U.S.C. § 158(a)(3) to appeal the bankruptcy court's dismissal with prejudice of Yucaipa's cross-claim for equitable subordination against BDCM Opportunity Fund II, L.P., Black Diamond CLO 2005-1 Ltd., and Black Diamond Commercial Finance, L.L.C. (collectively, "Black Diamond"), and Spectrum Investment Partners, L.P. and Spectrum Commercial Finance, LLC ("Spectrum," and together with Black Diamond, "BD/S"), which was filed in connection with the claim for equitable subordination brought by BD/S against Yucaipa, No. 14-ap-50971-CSS (the "BD/S Action").

## I.    PRELIMINARY STATEMENT

The bankruptcy court's dismissal of Yucaipa's counterclaim against BD/S meets all of the factors justifying the grant of interlocutory review.  The reason is straightforward and arises from the unique procedural posture of this case.  The BD/S Action is factually and legally intertwined with, and overlaps, three matters currently pending before this Court.  On May 8, 2015, Yucaipa filed a RICO and fraud action against BD/S in this Court (D. Ct. No. 15-cv-00373-SLR) (the "RICO Action").  Yucaipa's (now-dismissed) counterclaim allegations are substantially similar to its allegations in the RICO Action.  On April 9, 2015, this Court granted a motion to withdraw the reference in Case No. 13-cv-1010-SLR (the "Gendregske Action"), which arises from the same allegations in the BD/S Action.  On February 10, 2015, Yucaipa moved to withdraw the reference for the BD/S Action (*see* D. Ct. No. 15-cv-00256-SLR), which, if granted before the bankruptcy court's dismissal, would have brought the dismissed counterclaim before this Court for consideration in the first instance.

In the BD/S Action, the RICO Action, and the Gendregske Action, Yucaipa and BD/S advance two fundamentally different accounts of the *same series of events* leading up to the filing of an involuntary petition for bankruptcy against Allied Systems Holdings, Inc. ("Allied") that is at the center of all these cases (*In re ASHINC Corp.*, No. 12-11564 (Bankr. D. Del. May 17, 2013)).  In its counterclaim and elsewhere, Yucaipa explains (with references to specific evidence including, among other things, an email trail involving BD/S) that BD/S sought to

recover a windfall on its investments in Allied by targeting Yucaipa—levying false allegations of inequitable conduct and exploiting Yucaipa's unique status as Allied's largest creditor and an Allied "insider" with equity and seats on the board.  Through a series of calculated steps, BD/S stripped Yucaipa of its rights as the majority lender, wrongfully put Allied into an involuntary bankruptcy by failing to disclose claims-trading in violation of the Bankruptcy Code, and is now seeking to usurp Yucaipa's claims in the bankruptcy with manufactured allegations of wrongdoing.  BD/S, on the other hand, blame Yucaipa for Allied's financial difficulties and argues that Yucaipa abused its influence over Allied's board.  Yucaipa and BD/S each seek equitable subordination of the other's debt, among other remedies.  While different pieces of conduct impact the relevant and applicable legal theories, there is no question that central and fundamental issues of this case now are before this Court, and that further, if Yucaipa's motion to withdraw the reference is granted, *all the relevant cases* will be before the District Court.

The bankruptcy court's dismissal of Yucaipa's counterclaim, unless appealed at this juncture, creates the unavoidable risk of inconsistent judgments and separate appeals moving forward on separate tracks.  Further, as set forth in greater detail below, BD/S already contend that this order will now bind this Court in its determinations in connection with matters that are already pending before it, some of which the bankruptcy court never had jurisdiction over (the RICO Action) and some of which the bankruptcy court no longer has jurisdiction over (the Gendregske Action) or may no longer have jurisdiction over (the BD/S Action, if this Court grants Yucaipa's motion to withdraw).  Further, the grounds of dismissal present controlling questions of law, resolution of which would materially advance the ultimate termination of the litigations, and substantial grounds for difference of opinion exist on the issues to be appealed.

The bankruptcy court found that (a) Yucaipa's core theory of BD/S's misconduct is "not plausible," (b) a contractual "covenant not to sue" precludes Yucaipa from bringing any claims against BD/S or other lenders, (c) a contractual "appearance prohibition" prevents Yucaipa from taking "any . . . action" in a bankruptcy case, including filing a counterclaim, and (d) certain of Yucaipa's allegations are barred by collateral estoppel.  These are "controlling questions of law"

01:17650480.1

for purposes of an interlocutory appeal because, "if erroneous, [they] would be reversible on final appeal." *Katz v. Carte Blanche Corp*., 496 F.2d 747, 755 (3d Cir. 1974).

Further, resolution of these issues will materially advance the termination of the litigation and failure to grant an interlocutory appeal will create separate appellate tracks that threaten to draw out the litigation and appellate process. BD/S now attempt to apply the bankruptcy court's rulings in the very matters pending before this Court. Indeed, in seeking to dismiss Yucaipa's RICO complaint, BD/S reiterate the *exact same arguments* that the bankruptcy court has now endorsed in dismissing Yucaipa's counterclaim. And since the bankruptcy court's decision, BD/S have taken the position that the ruling is "collateral estoppel" in the RICO case. (*See* Dec. of Kahn Scolnick in Supp. of Mot. for Leave to Appeal ("Scolnick Dec."), Ex 1.)

It would be counterintuitive and a waste of administrative resources for this Court to rely on the bankruptcy court's decision as a "collateral estoppel" basis for dismissing Yucaipa's RICO case, and then, in a year or more, hear Yucaipa's appeal from the bankruptcy court's dismissal order following a final judgment in the underlying adversary proceeding. If, at that point, this Court disagrees with the bankruptcy court's reasoning and vacates its dismissal of Yucaipa's counterclaim, that would require not only a retrial of the adversary case but also reconsideration of the RICO dismissal. Likewise, to the extent this Court withdraws the reference of the BD/S Action, this Court will eventually need to address the validity of Yucaipa's counterclaim anyway (possibly on a motion for reconsideration).[1]

Accordingly, allowing an immediate appeal from the bankruptcy court's dismissal order will materially advance the ultimate termination of the various litigations by allowing this Court to coordinate resolution of all legal and factual questions in an organized and fair manner. Only by considering these key issues now will this Court be able to ensure consistency across the

---

[1] This Court also has before it Yucaipa's appeal from another of the bankruptcy court's prior rulings— that appeal will determine whether Yucaipa is even subject to a contractual "covenant not to sue" or "appearance prohibition" in the first instance. (D. Ct. Nos. 13-cv-01580-SLR, 13-cv-01583-SLR.)

various cases in which these same issues arise. The interests of efficiency, economy, and logic all militate strongly in favor of an interlocutory appeal.

There are also substantial grounds for differences of opinion as to the dismissal of Yucaipa's counterclaim. *First*, the bankruptcy court concluded that BD/S's scheme as detailed in the 111-paragraph counterclaim was "implausible." In so doing, the court misapplied the *Iqbal-Twombly* standard—declining to accept Yucaipa's well-pleaded allegations as true and resolving various inferences *against* Yucaipa. *Second*, the bankruptcy court's application of the contractual "covenant not to sue" violates settled public policy. The court effectively immunized BD/S's willful misconduct and erroneously rejected Yucaipa's allegations as to the various reasons why it would be unrealistic to expect other lenders to bring this claim. *Third*, the bankruptcy court's novel construction of the "appearance prohibition" is likewise contrary to public policy and the plain text of the contract. *Fourth*, the bankruptcy court's application of collateral estoppel is ripe for appellate review for a number of reasons, not the least of which is that the prior ruling on which the court relied is not sufficiently "final" for purposes of estoppel.

In short, the dismissal of Yucaipa's counterclaim presents controlling questions of law, resolution of which will materially advance the termination of the various litigations pending in this Court and the bankruptcy court. And there are substantial grounds for differences of opinion on the underlying ruling. The Court should hear Yucaipa's interlocutory appeal.

## II.    BACKGROUND

### A.    Background of Allied's Bankruptcy and the Underlying Adversary Action

Allied is a transportation-services provider for the automotive industry that specializes in delivering new vehicles from manufacturing plants to dealerships. Yucaipa is an investment management firm with a track record for creating jobs and improving the operations of the companies in which it invests.

***Allied's Prior Bankruptcy.*** In 2007, Yucaipa sponsored Allied's exit from a prior bankruptcy by investing approximately $95 million and acquiring 67% of Allied's reorganized

equity.  (A.P. No. 14-50971, D.I. 19, ¶ 31.)  In conjunction with the Yucaipa-sponsored

bankruptcy exit plan, Allied entered a First Lien Credit Agreement ("FLCA") with various

lenders to finance its operations.  (*Id.* ¶¶ 32–33.)  The FLCA defined the "Requisite Lender" as

lender(s) holding more than 50% of Allied's outstanding first lien debt.  (*Id.* ¶ 39.)  Yucaipa and

BD/S were not initially parties to the FLCA, but they later acquired Allied debt.  (*Id.* ¶¶ 34, 49.)

 ***The Third Amendment.***  In April 2008, Allied and its lenders amended the FLCA to

permit Yucaipa to become a lender subject to onerous restrictions, and simultaneously to bar any

lender from transferring Requisite Lender status to Yucaipa.  Yucaipa did not purchase (and

never would have purchased) any Allied debt under this "Third Amendment."  (*Id.* ¶ 35, Ex. 3.)

 ***BD/S Devise a Scheme to Maximize Their Recoveries at Yucaipa's Expense.***  In March

2009, Yucaipa entered into negotiations to purchase approximately 56% of Allied's first lien

debt.  (*Id.* ¶¶ 39–45.)  BD/S knew that Yucaipa would acquire that debt only pursuant to an

amendment that removed the Third Amendment's restrictions and allowed Yucaipa to become

Requisite Lender (the "Fourth Amendment").  (*Id.*)

 Behind the scenes, however, and unbeknownst to Yucaipa, BD/S were plotting to reap a

huge windfall off of their first lien debt holdings in Allied at Yucaipa's expense, as described in

their contemporaneous email communications described in Yucaipa's counterclaim.  BD/S

would first encourage Yucaipa (an Allied insider) to acquire a majority of the Allied first lien

debt, and would then immediately turn around to prevent Yucaipa from serving as Requisite

Lender (notwithstanding Yucaipa's majority ownership of the first lien debt).  Eventually, BD/S

would wrongfully force Allied into involuntary bankruptcy (in furtherance of their scheme to

recover a windfall at Yucaipa's expense) by failing to disclose their claims trading in violation of

the Bankruptcy Code, and finally they would rely on Yucaipa's "insider" status to seek to

subordinate Yucaipa's first lien debt based on a litany of false allegations.  (*Id.* ¶¶ 40–45.)

 The Fourth Amendment passed on August 21, 2009, at which point Yucaipa purchased

the majority of Allied's first lien debt and became Requisite Lender.  (*Id.* ¶¶ 48–49.)

*The New York Action.*  In January 2012, BD/S sued Yucaipa in New York state court, seeking a declaration that the Fourth Amendment was void.  (*Id.* at p. 48 n.9.)  This maneuver was essential to their equitable subordination plan.  They needed to invalidate the Fourth Amendment, strip Yucaipa of its Requisite Lender status, and straitjacket Yucaipa with the Third Amendment's onerous terms under which Yucaipa never purchased any debt.  (*Id.* ¶ 41.)  The New York court gave BD/S part of what it needed—the court held that the Fourth Amendment was *void ab initio*, and, as a result, that Yucaipa was not the Requisite Lender (the court did not hold that the Third Amendment bound Yucaipa, or that BD/S was the Requisite Lender).  (*See* N.Y. Sup. Ct.,  Index No. 650150/2012, Doc. No. 84, Mar. 8, 2013.)

On appeal, a New York appellate court reversed with respect to Black Diamond, holding that Yucaipa had raised a triable issue of fact as to whether Black Diamond, through its conduct, had waived its right to challenge the Fourth Amendment's validity and Yucaipa's assertion of its status as Requisite Lender.  *See BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, 978 N.Y.S.2d 10 (N.Y. App. Div. 2013).  As of this writing, neither party has moved the proceedings forward in the trial court following the appellate ruling.

*The Chancery Court Action.*  In December 2013, Yucaipa sued BD/S in Delaware Chancery Court, seeking declaratory relief and damages with respect to BD/S's structuring and management of an entity called SBDRE LLC, which held Allied's few remaining assets.  *See Yucaipa Am. Alliance Fund I, L.P. v. SBDRE LLC*, C.A. No. 9151 (Del. Ch. Dec. 11, 2013).

BD/S moved to dismiss, invoking the Third Amendment's "covenant not to sue," which purported to restrict Yucaipa's right to assert claims against other lenders.  As explained below, the Chancery Court relied on New York public policy (New York law governs the FLCA) and refused to apply the covenant to a number of Yucaipa's claims, to the extent it would be "*unrealistic to assume* anyone other than Yucaipa" would seek similar relief.  *Yucaipa Am. Alliance Fund I, L.P. v. SBDRE LLC*, C.A. No. 9151-VCP, 2014 WL 5509787, at *15 (Del. Ch. Oct. 31, 2014) (emphasis added).

**B.    The Allied Involuntary Bankruptcy and Underlying Adversary Action**

BD/S filed involuntary bankruptcy petitions against Allied on May 17, 2012 (No. 12-11564).  Since then, BD/S and Yucaipa have litigated a series of related adversary actions in the bankruptcy court, including (a) No. 12-50947 ("Allied Action"), in which Allied sought a declaration of the identity of the Requisite Lender; and (b) the action out of which Yucaipa's appeal arises, No. 14-50971 ("BD/S Action").  These bankruptcy cases, and the facts underlying how they came to be filed, are central to the BD/S Action and Yucaipa's counterclaim.

The BD/S Action seeks equitable subordination of Yucaipa's first lien claims.  BD/S also pleaded causes of action against Yucaipa and former Allied directors for breach of fiduciary duty, breach of contract, and tortious interference.  In general, BD/S claim that Yucaipa abused its control of Allied's board, seized control of Allied's debt, and sought to preserve its equity investment in Allied by precluding other lenders from exercising their remedies and preventing Allied from entering into strategic transactions with competitors.  (A.P. No. 14-50971, D.I. 1.)[2]

Yucaipa has pursued affirmative relief in response to the Allied Action and BD/S Action.  Initially, Yucaipa asserted a cross-claim in the Allied Action seeking a declaration that the Third Amendment did not bind Yucaipa due to Yucaipa's detrimental reliance on the Fourth Amendment in acquiring debt.  (A.P. No. 12-50947, D.I. 65.)  The bankruptcy court dismissed Yucaipa's cross-claim in February 2013, based on (a) the New York trial court's ruling voiding the Fourth Amendment; (b) the covenant not to sue; and (c) the purported factual implausibility of certain allegations.  (*Id.*, D.I. 162, Tr. Mot. to Dismiss Hrg. 110:11–16.)

Six months later, the bankruptcy court granted BD/S's motion for summary judgment in the Allied Action and found that BD/S—not Yucaipa—were the Requisite Lender.  (*See id.*, D.I. 280; A.P. No. 13-50530, D.I. 289.)  Yucaipa's appeal from that decision is fully briefed and pending before this Court.  (*See* D. Ct. Nos. 13-cv-01580-SLR, 13-cv-01583-SLR, D.I. 1.)  That

---

[2]  The Committee of Unsecured Creditors also brought a similar action against Yucaipa and certain Allied directors, No. 13-50530 (the "Committee Action").

appeal raises, among other issues, the validity of the Third Amendment itself (which contains the "covenant not to sue" and the "appearance prohibition"). (*Id.*, D.I. 17.)

On February 10, 2015, Yucaipa moved in this Court to withdraw the reference of the BD/S Action. (D. Ct. No. 15-cv-00256-SLR, D.I. 1.) The bankruptcy court subsequently ruled that three of BD/S's four claims are "non-core" (the fourth claim is for equitable subordination). (A.P. No. 14-50971, D.I. 70.) Yucaipa's motion to withdraw is now fully briefed.

**C.     Yucaipa's Counterclaim in the BD/S Action**

On February 19, 2015, Yucaipa filed a 38-page equitable subordination counterclaim against BD/S. (A.P. No. 14-50971, D.I. 19.) Yucaipa's counterclaim details how BD/S have schemed their way to turn a relatively small investment in Allied into substantial profits by (i) once Yucaipa acquired the majority of first lien debt, preventing Yucaipa from acting as Requisite Lender[3] or taking other actions to benefit Allied and its stakeholders, because those actions would have prevented the windfall recovery that BD/S seek; (ii) filing the involuntary bankruptcy petition against Allied in May 2012, supported by false affidavits concealing illegal claims trading and Black Diamond's bribe to Spectrum in the form of a claims transfer; and (iii) pursuing a baseless equitable subordination strategy in bankruptcy court, which BD/S conceived of even before Yucaipa acquired any first lien debt. (*Id.* ¶¶ 8–11.)

**D.     The Bankruptcy Court's Dismissal of Yucaipa's Counterclaim**

BD/S moved to dismiss Yucaipa's counterclaim under FRBP 7012. (A.P. No. 14-50971, D.I. 41.) The bankruptcy court granted BD/S's motion without a hearing and dismissed Yucaipa's counterclaim with prejudice on August 21, 2015. (A.P. No. 14-50971, D.I. 82.) In a separate Opinion, the court effectively adopted all of BD/S's arguments (*see id.*, D.I. 82-1, ("Op.")), dismissing Yucaipa's counterclaim on four main grounds:

---

[3] Among other things, BD/S directed the Administrative Agent under the FLCA—CIT Group/Business Credit, Inc. ("CIT")—to refuse to recognize Yucaipa's Requisite Lender status. (A.P. No. 14-50971, D.I. 19, ¶ 53.) When CIT did so, Allied and Yucaipa sued CIT in Georgia state court, eventually obtaining, through settlement, CIT's recognition of the validity of the Fourth Amendment and Yucaipa's Requisite Lender status. (*Id.* & n.9.)

**The Bankruptcy Court found Yucaipa's allegations implausible.**  The bankruptcy court ruled that Yucaipa had not plausibly alleged BD/S's scheme under the *Iqbal-Twombly* standard. For instance, with respect BD/S's undisclosed pre-petition claims trading to initiate the involuntary bankruptcy—which Yucaipa supported with, among other things, an email in which Spectrum's managing partner indicates to Black Diamond's managing director that "[w]e cannot file an involuntary without it done," in reference to "clos[ing]" an "Allied trade" of debt from Black Diamond to Spectrum (A.P. No. 14-50971, D.I. 19, Ex. 12)—the court concluded "the facts clearly indicate it is *more plausible* that the [timing of the trade was] not for any nefarious reason, but to prevent unnecessary complications with a trade that was made and not yet closed" at the time of bankruptcy.  (Op., pp. 61–62 (emphasis added).)  According to the court, Yucaipa alleged no more than the "mere possibility" of misconduct, even though claims are routinely traded *post*-bankruptcy, including BD/S's own post-bankruptcy trades here.  (*Id.* at p. 62.)

**The bankruptcy court relied on the covenant not to sue.**  The bankruptcy court also held that the covenant bars Yucaipa's claims against any other lender (including BD/S).  (*Id.* at pp. 30–34.)[4]  The court reasoned that the covenant's express carve-out for "willful misconduct" is expressly subject to a "Prior Determination Requirement"—under which BD/S's willful misconduct must have been "determined [beforehand] by a court of competent jurisdiction by a final and non-appealable judgment."  (*Id.*)  The court held that Yucaipa could not satisfy the public-policy exception to this Requirement because it was not "unrealistic to assume" another lender would seek the same relief.  (*Id.*)  The court rejected as implausible Yucaipa's allegation that other lenders would not realistically sue BD/S because those other lenders are not Allied insiders and have not been sued for equitable subordination, hold minor stakes, would suffer inconsequential harm, and stand to benefit from BD/S's scheme.  (*Id.* at pp. 34–37.)

---

[4]  In relevant part, the Covenant does not bar claims arising out of the FLCA if such claims are "caused by [BD/S's] gross negligence or willful misconduct on or after the date [Yucaipa] becomes a Lender hereunder as determined by a court of competent jurisdiction by final and non-appealable judgment . . . ." (A.P. No. 14-50971, D.I. 19, Ex. 3 Third Am. § 2.7(e).)

*The bankruptcy court relied on the Third Amendment's appearance prohibition.*  The bankruptcy court also applied an expansive reading of the Third Amendment's "appearance prohibition" to prevent Yucaipa from asserting any counterclaims whatsoever.  The prohibition provides, in relevant part, that Yucaipa may not "make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Insolvency or Liquidation Proceeding without the prior written consent of all Lenders. . . ."  (A.P. No. 14-50971, D.I. 19, Ex. 3, Third Am. § 2.7(a).)  The court rejected Yucaipa's argument that this provision violated public policy to the extent it would immunize BD/S's willful misconduct and, if the court's logic is followed to conclusion, would prevent Yucaipa from even *defending* itself in an adversary case.  (Op., pp. 43–44.)

*The bankruptcy court found Yucaipa's counterclaim barred by collateral estoppel.*  Finally, the court held that Yucaipa was collaterally estopped from alleging that (i) BD/S "encouraged" it to purchase a majority of Allied's first lien debt, execute the Fourth Amendment, and act as Requisite Lender; or (ii) BD/S instructed CIT to challenge Yucaipa's status as Requisite Lender.  (*Id.* at pp. 50–54.)  As relevant here, the court found an "identity of issues" between its 2013 dismissal of Yucaipa's cross-claim for declaratory relief in the Allied Action, and Yucaipa's counterclaim describing the initial steps in BD/S's scheme.  (*Id.* at pp. 50–51.)

### E.    Yucaipa's RICO Action Pending in This Court

Meanwhile, Yucaipa filed the RICO Action against BD/S in this Court on May 8, 2015, alleging violations of civil RICO, fraud, and tortious interference.  (D. Ct. No. 15-cv-00373-SLR, D.I. 1.)  Yucaipa's factual allegations in the RICO Action are substantially similar to those in its counterclaim in the BD/S Action.  (*See id.* ¶¶ 8–36, 64–150.)[5]  But there are also differences.  In particular, Yucaipa includes additional allegations to explain BD/S's scheme within the broader context of civil RICO.  Yucaipa asserts that Black Diamond committed the

---

[5]  Given this overlap, the parties have agreed to coordinate discovery between the BD/S Action, the Committee Action, and the RICO Action.  (*See* D. Ct. No. 15-cv-00373-SLR, D.I. 23.)

predicate acts of bankruptcy fraud and obstruction of justice by trading claims to secure

Spectrum's support for the involuntary bankruptcy petitions, and then failing to disclose the trade

in their bankruptcy filings.  (*Id.*)  Additionally, Yucaipa alleges Delaware-law claims for fraud

and tortious interference.  (*Id.* ¶¶ 209–17.)

BD/S moved to dismiss the RICO Action.  They assert the exact same arguments set forth

in their motion to dismiss Yucaipa's counterclaim in the BD/S Action (and additional arguments

targeting Yucaipa's RICO and state law claims, and seeking a stay in order to conserve judicial

resources and avoid inconsistent rulings).  (*Compare id.*, D.I. 16, *with* A.P. No. 14-50971, D.I.

41.)  BD/S's motion to dismiss is fully briefed and pending before this Court.

## III.    LEGAL STANDARD

When considering whether to grant leave to appeal under 28 U.S.C. § 158(a)(3), courts

"typically borrow[] the standard found in 28 U.S.C. § 1292(b), which governs whether an appeal

of an interlocutory order of a district court to a court of appeals is warranted."  *In re W.R. Grace*

*& Co.*, No. 08-246, 2008 WL 3522453, at *2 (D. Del. Aug. 12, 2008) (citations omitted); *see*

*also Fox Sports Net W. 2, LLC v. L.A. Dodgers LLC* (*In re L.A. Dodgers LLC*), 465 B.R. 18, 29

(D. Del. 2011).  Under this standard, "leave is appropriate where the proposed appeal concerns

(1) a controlling question of law (2) as to which there is substantial ground for difference of

opinion and (3) . . . an immediate appeal . . . may materially advance the ultimate termination of

the litigation . . ."  *Nat'l Cable Television Coop. v. Broadstripe, LLC (In re Broadstripe, LLC)*,

No. 09-10006, 2009 WL 774401, at *2 (D. Del. Mar. 26, 2009) (quotations and citations

omitted); *see also* 28 U.S.C. § 1292(b).[6]

---

[6] Courts have broad discretion and may examine "exceptional circumstances" in deciding whether to hear
an interlocutory appeal.  *Mata v. Eclipse Aerospace, Inc.* (*In re AE Liquidation, Inc.*), 451 B.R. 343, 346
(D. Del. 2011).  Courts may grant leave for "the avoidance of harm to a party *pendente lite* from a
possibly erroneous interlocutory order and the avoidance of possibly wasted trial time and litigation
expense."  *Katz*, 496 F.2d at 756; *see also First Am. Bank of N.Y. v. Sw. Gloves & Safety Equip., Inc.*, 64
B.R. 963, 967 (D. Del. 1986).

# IV.    ARGUMENT

## A.    This Appeal Presents Controlling Questions of Law, Resolution of Which Will Materially Advance the Termination of the Litigations

Yucaipa's appeal presents four controlling questions of law, resolution of which will materially advance the termination of the BD/S Action and the related RICO Action pending in this Court. *First*, did Yucaipa plead sufficient facts to plausibly state a claim for equitable subordination of BD/S's debt, premised on BD/S's multi-step, wrongful plan to harm Yucaipa? *Second*, is it sufficiently plausible that it would be "unrealistic" for other lenders to pursue these claims against BD/S, such that Yucaipa may proceed under the public-policy exception to the covenant not to sue? *Third*, did the bankruptcy court correctly interpret the Third Amendment's appearance prohibition to close the courthouse doors to Yucaipa, even for a claim of willful misconduct against non-debtors in an adversary case? *Fourth*, did the bankruptcy court properly give broad collateral estoppel effect to its 2013 dismissal of Yucaipa's cross-claims?

These questions of law are plainly "controlling" because the bankruptcy court's incorrect disposition of any of them would be reversible error on appeal. *See, e.g.*, *Katz*, 496 F.2d at 755 ("A controlling question of law must encompass at the very least every order which, if erroneous, would be reversible error on final appeal."); Wright & Miller, *Civil Prac. & Proc.* § 3930 (3d ed.) ("There is no doubt that a question is 'controlling' if its incorrect disposition would require reversal of a final judgment."). Indeed, the dismissal with prejudice of the sole claim in a complaint would ordinarily be appealable of right. *See* 28 U.S.C. § 158(a)(1); *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 657 n.3 (2006) ("Congress has long provided that orders in bankruptcy cases may be immediately appealed if they finally dispose of discrete disputes within the larger case."). Here, however, Yucaipa brought an equitable subordination *counterclaim*, so Yucaipa technically needs to wait for a final determination of BD/S's claims before any appeal of right.[7]

---

[7]  The questions raised in this appeal are also controlling because the bankruptcy court's resolution of them left nothing further to decide with respect to Yucaipa's counterclaim. *Cf. CALPERS v. WorldCom*,

*(Cont'd on next page)*

Furthermore, this Court should hear these issues on an interlocutory basis because their immediate resolution may materially advance the termination of the litigation, conserving the time and resources of the bankruptcy court, this Court, the Third Circuit, and the parties. "[C]ourts have tended to make the 'controlling question' requirement the same as the requirement that [the] determination [of the appeal] 'may materially advance the ultimate termination of the litigation.'" *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147, 157 (D.N.J. 2005); *see also Katz,* 496 F.2d at 755 (conserving time and expense is "a highly relevant factor"). Thus, resolution of the appeal need not entirely "terminate the need for trial" or necessarily determine a party's claim on the merits. *Stanziale, Jr. v. Sun Nat'l Bank* (*In re Dwek*), No. CIV. 3:09-CV-5046, 2010 WL 234938, at *2 (D.N.J. Jan. 15, 2010); *accord* Wright & Miller, *Civil Prac. & Proc*. § 3930 (3d ed.) (the "better view that a question is controlling, even though its disposition might not lead to reversal on appeal, if interlocutory reversal might save time for the district court, and time and expense for the litigants").

An interlocutory appeal would save considerable time and expense given the substantial overlap between Yucaipa's dismissed counterclaim and its underlying defense of the BD/S Action. In particular, the bankruptcy court rejected as implausible Yucaipa's overarching theory that BD/S schemed to recover a windfall on its Allied investments by setting up Yucaipa to purchase a majority of first lien debt, and then seeking to subordinate that debt with trumped-up allegations of misconduct. (*E.g*., Op., p. 64.) But that is the very same theory on which Yucaipa is defending itself against BD/S's claims in the BD/S Action. (A.P. No. 14-50971, D.I. 19.)

Thus, regardless of whether the bankruptcy court or this Court (if withdrawal is ultimately granted) hears BD/S's affirmative claims, BD/S will undoubtedly argue that Yucaipa is bound by the bankruptcy court's plausibility findings and cannot assert defenses such as

---

*(Cont'd from previous page)*

*Inc.*, 368 F.3d 86, 95–96 (2d Cir. 2004) (no "controlling question" where, even without an immediate appeal, "at least one alternative basis" exists for resolving the issue below).

BD/S's unclean hands, waiver, or *in pari delicto*. And if Yucaipa cannot appeal the plausibility ruling until a final judgment, then a subsequent reversal by either this Court or the Third Circuit on that issue will inevitably require a complete retrial of BD/S's claims. It is, therefore, highly inefficient and unfair to force Yucaipa to defend itself in the BD/S Action before the plausibility of its core defense has been resolved—it would prevent Yucaipa from giving the fact-finder the complete picture of BD/S's own inequitable conduct. *Cf. Lindsay v. Normet*, 405 U.S. 56, 66 (1972) ("Due process requires that there be an opportunity to present every available defense.").

In addition, as noted above, Yucaipa's now-dismissed counterclaim substantially overlaps with its RICO case pending before this Court. Although the legal theories differ, the factual allegations are materially similar—including BD/S's misconduct in (a) seeking the consolidation of a large amount of Allied debt into Yucaipa's hands, (b) cooperating to prevent Yucaipa from acting as Requisite Lender or from taking actions that would benefit Allied but would have prevented the windfall recovery that BD/S seek, (c) filing the 2012 Allied involuntary bankruptcy petition, supported by false affidavits concealing illegal claims trading, and (d) pursuing their malicious equitable subordination strategy.

Notably, in moving to dismiss Yucaipa's RICO complaint, BD/S recycled the very same arguments presented in their motion to dismiss Yucaipa's counterclaim—which the bankruptcy court has now adopted. For example, BD/S argue that Yucaipa's RICO complaint should be dismissed as "implausible" (D. Ct. No. 15-cv-00373, D.I. 17, pp. 28–31); barred by the covenant not to sue (*id*. at pp. 18–20); and precluded by the 2013 dismissal of Yucaipa's cross-claim (*id*. at pp. 26–28). Indeed, BD/S have now taken the position that they do not need to respond to discovery focused on Yucaipa's RICO allegations because dismissal of Yucaipa's counterclaim has "collateral estoppel" effect in the RICO Action. (Scolnick Dec., Ex 1.)

Therefore, it would not be logical, practical, or efficient to adjudicate the overlapping RICO and BD/S Action without ensuring consistency in terms of the legal and factual viability of each party's core theory. Absent an immediate appeal from the order dismissing Yucaipa's counterclaim, one of the following undesirable scenarios may occur:

1.  The bankruptcy court could rule in BD/S's favor in the BD/S Action either at summary judgment or trial, and as a result, Yucaipa's debt would be equitably subordinated.  Meanwhile, this Court could rule in Yucaipa's favor in the RICO case, concluding that BD/S's equitable subordination scheme was unlawful in any number of respects.  In that scenario, there would plainly need to be a retrial of the BD/S Action—a trier of fact would have found that Yucaipa's theory of BD/S's scheme was not only plausible, but more likely than not to have occurred, and yet Yucaipa was not even permitted to raise that theory (affirmatively or defensively) in the BD/S Action.

2.  Or, this Court could agree with BD/S that the order dismissing Yucaipa's counterclaim requires dismissal of the RICO complaint as a matter of "collateral estoppel."  Eventually, though, this Court would evaluate the merits of the bankruptcy court's dismissal order in an appeal from final judgment in the BD/S Action.  At that point, if the Court disagrees with the bankruptcy court's reasoning, it would not only need to vacate the judgment in the BD/S Action, but also reconsider the dismissal of the RICO Action (which by that time would be before the Third Circuit).

3.  In fact, even if this Court ultimately resolves the RICO case in BD/S's favor on the merits, it could still deny their pending motion to dismiss.  Such a ruling would be irreconcilable with the dismissal with prejudice of Yucaipa's counterclaim as implausible, barred by the covenant not to sue, and precluded by collateral estoppel.

4.  Alternatively, in the RICO case, even without collateral estoppel, this Court might agree with BD/S on the merits and dismiss Yucaipa's complaint for largely the same reasons that the bankruptcy court dismissed Yucaipa's counterclaim.  But that would be appealed of right to the Third Circuit, which could reverse and allow Yucaipa's claims to proceed.  Depending on the timing, that would necessitate either a retrial of the BD/S Action, or, at least, reconsideration of the order dismissing Yucaipa's counterclaim (and any intervening discovery rulings predicated on that order).

Allowing Yucaipa to pursue an interlocutory appeal from the dismissal order would avoid this potential morass and the prospect of inconsistent rulings and/or retrials.  This Court would be able to ensure consistency between the BD/S Action and the RICO Action (for purposes of discovery and merits), and could advance notions of judicial economy through efficient administration of these cases.  Accordingly, granting Yucaipa's motion for leave will materially advance the ultimate termination of the litigations.  *See Patrick v. Dell Fin. Servs.*, 366 B.R. 378, 387 (M.D. Pa. 2007) (granting leave to appeal where "trial would be simplified by the elimination of complex issues," and "discovery could be conducted more expeditiously and at

less expense to the parties"); *Ropes & Gray LLP v. Jalbert* (*In re Engage*), 330 B.R. 5, 8

(D. Mass. 2005) (hearing interlocutory appeal where "the legal issues are fully framed and their

prompt resolution through interlocutory appeal is likely to contribute to a more expeditious

resolution"); *see also* Wright & Miller, *Civil Prac. & Proc.* § 3931 (3d ed.) ("Appeal is also

suitable . . . so long as present appeal may forestall unnecessary proceedings . . . or unnecessary

duplication of proceedings after reversal for issues that should not have been dismissed.").

**B.      There are Substantial Grounds for Differences of Opinion**

Yucaipa also satisfies the final criterion for interlocutory review because there are

substantial grounds for differences of opinion with respect to the bankruptcy court's plausibility

ruling, its interpretation of the covenant not to sue and appearance prohibition, and its application

of collateral estoppel.

Substantial grounds for difference of opinion exist when an order is contrary to

established law.  *In re Marvel Entm't Grp.*, 209 B.R. 832, 837–38 (D. Del. 1997).  There can

also be substantial grounds for difference of opinion even where there are no directly conflicting

cases, so long as the appeal "involves an issue over which reasonable judges might differ."

*Reese v. BP Exploration (Alaska) Inc.*, 643 F.3d 681, 688 (9th Cir. 2011); *see also FTC v.*

*Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 634 (D.N.J. 2014) ("genuine doubt as to the

correct legal standard"); *In re Chocolate Confectionary Antitrust Litig.*, 607 F. Supp. 2d 701, 705

(D.N.J. 2009) ("A substantial ground for difference of opinion exists when controlling authority

fails to resolve a pivotal matter.").

**1.      Substantial Grounds for Differences of Opinion Exist as to the Bankruptcy**
**Court's Plausibility Ruling**

There are substantial grounds for differences of opinion as to the bankruptcy court's

application of the *Iqbal-Twombly* "plausibility" standard to reject Yucaipa's core theory and

dismiss its counterclaim with prejudice.  (Op., pp. 54–65.)

Although Yucaipa's counterclaim went above and beyond by providing actual examples

of evidence supporting Yucaipa's legal theory (for example, internal correspondence from

01:17650480.1

16

BD/S), under the relevant case law, Yucaipa "does not have to set out in detail the facts upon which [it] bases [its] claim." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013).  Rather, Yucaipa simply needs to include enough facts to "raise a *reasonable expectation* that discovery will reveal evidence" supporting its counterclaim.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *accord Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009).  Importantly, "all well-pleaded allegations . . . must be taken as true and interpreted in the light most favorable to [Yucaipa], and all inferences must be drawn in favor of them." *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 685 F.3d 353, 357 (3d Cir. 2012) (quotation marks omitted).  A well-pleaded complaint may not be dismissed even if it "strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 555.

But that is not the standard that the bankruptcy court applied here.  At various points throughout its order, the court refused to accept Yucaipa's well-pleaded facts and supporting evidence as true, expressly declined to draw inferences in Yucaipa's favor, resolved some inferences *against* Yucaipa, and made subjective judgments about the likelihood of Yucaipa proving its allegations.

For instance, the court rejected the allegation that BD/S engaged in improper pre-petition claims trading.  But beyond mere allegations, Yucaipa relies on an email showing that just two months before BD/S filed the involuntary petitions, Spectrum conditioned its participation on a claims trade.  (A.P. No. 14-50971, D.I. 19, Ex. 11.)  Yucaipa also details the context of this communication, including the parties' respective financial position, their cooperation agreement, the actual transfer of debt, the emails evidencing Black Diamond's stall tactics, Spectrum's final demands (made by the head of Spectrum to the head of Black Diamond) that the transfer take place, and BD/S's failure to disclose the trade when filing the involuntary petitions.  (*Id.*, Exs. 12, 17, 18.)  This context strongly supports at least a "reasonable inference" that Black Diamond bribed Spectrum with additional debt in order to consummate the involuntary filing, and then failed to disclose it in violation of bankruptcy law.  *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009).

Yet the bankruptcy court rejected that plausible conclusion, resolved various inferences *against* Yucaipa, and attempted to explain away BD/S's highly suspicious emails with a contrary interpretation that the court found "more plausible." (Op., p. 61.) But the Supreme Court has instructed that plausibility is "not akin to a probability requirement." *Iqbal*, 556 U.S. at 678. Instead, it is simply a question of whether Yucaipa pled more than the "sheer possibility" of BD/S's wrongful conduct. *Id*. And Yucaipa easily satisfied that threshold.

Likewise, Yucaipa relies on an email in which Spectrum's managing partner privately discussed "checking out the equitable subordination angle" with a former CEO of a Spectrum affiliate who had kept Spectrum apprised, over a period of months, of Yucaipa's plan to acquire a majority of first lien debt from his partner. (A.P. No. 14-50971, D.I. 19, Ex. 4.) Yet because this "email does not mention Yucaipa" by name, the court found it was "not plausible" that the email evidenced BD/S's scheme to subordinate Yucaipa's debt starting as early as one week before Yucaipa actually became a lender. (Op., p. 64.) But equitable subordination is an extreme remedy; creditors do not simply "check out" equitable subordination in the usual course of business. This gratuitous comment about "checking out" equitable subordination confirms that the parties had discussed it before. Further, the email is dated in August 2009, during which BD/S knew Yucaipa would be purchasing the majority of Allied's first lien debt (in fact there is a trail of emails over a period of months between the same parties concerning Yucaipa's plans to acquire a majority of first lien debt). All of this at least supports a "reasonable inference" that Yucaipa—the only "insider" looking to acquire Allied debt—was the most likely (if not sole) candidate for equitable subordination,. *Iqbal*, 566 U.S. at 678.

In fact, critically, BD/S *actually filed* the claim for equitable subordination against Yucaipa, and filed no such claim against any other creditor. There were no other facts that would have supported "checking out" equitable subordination against any other creditor because none of those creditors had the key factors that would have supported BD/S's equitable subordination theory—Yucaipa held 56% of the first lien debt, had appointed a majority of directors to Allied's board, and held 67% of Allied's equity. Yucaipa specifically alleged these

factors in the counterclaim.  (A.P. No. 14-50971, D.I. 19 ¶¶ 8–42, 106–07.)  In rejecting these allegations, the bankruptcy court not only improperly resolved inferences against Yucaipa (namely, whose debt the parties were "checking out" for subordination), but did so in an implausible way—as there was *no other creditor* against whom BD/S could have sought to equitably subordinate on the theory that they eventually alleged.

To take just one more example, the bankruptcy court adopted BD/S's argument that it would be "implausible" for BD/S to have engaged in such a risky scheme in order to subordinate Yucaipa's debt.  (Op., pp. 63–65.)  Yet the court either overlooked Yucaipa's allegations explaining how BD/S actually faced little downside given the nature of their investments for pennies on the dollar (A.P. No. 14-50971, D.I. 19, ¶¶ 8–11, 40–45), or the court misapplied the plausibility standard by interpreting Yucaipa's allegations in a light most favorable to BD/S. Even more problematic for an initial pleadings challenge, the court ignored reality and the benefit of hindsight, which reveals how BD/S's "risky" scheme has turned out to be a success (at least so far) each step of the way:  (1) BD/S managed to convince Yucaipa to buy the majority of first lien debt based on false assurances of support and cooperation (including in a face-to-face meeting on August 18, 2009 in Los Angeles, for which Black Diamond's managing partner travelled from New York for the sole purpose of attending), (2) BD/S succeeded in invalidating the Fourth Amendment in the New York litigation, and (3) BD/S joined together to file an involuntary petition and persuaded the bankruptcy court that they are the Requisite Lenders. (*Id.*)  The final step, equitable subordination of Yucaipa's debt, is already well underway in the bankruptcy court.  (*Id.*)  And, if successful, the scheme will allow BD/S to "parlay an investment of less than $8 million into multiples of that amount—a massive windfall even for highly aggressive hedge funds like [BD/S]."  (*Id.* ¶ 90.)

In sum, even if Yucaipa's allegations struck the bankruptcy court as "improbable," the court erred by dismissing them as "implausible."  *Twombly*, 550 U.S. at 556.

2.     **Substantial Grounds for Differences of Opinion Exist as to the Bankruptcy Court's Interpretation of the Covenant Not to Sue**

There are also substantial grounds for difference of opinion as to the bankruptcy court's interpretation of the covenant not to sue. (Op., pp. 30–34.) As a preliminary matter, the court's plausibility findings were contrary to Yucaipa's specific, detailed allegations explaining why its counterclaim fell within the Chancery Court's public-policy exception to the covenant.

The Delaware Chancery Court explicitly held that the covenant's Prior Determination Requirement would violate New York public policy if it has the *effect* of exonerating BD/S's willful misconduct. *Yucaipa Am. Alliance Fund I*, C.A. No. 9151-VCP, 2014 WL 5509787, at *14 n.66 (citing *Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 416 (N.Y. 1983)). The Chancery Court elaborated that the Prior Determination Requirement logically assumed "another Lender *actually could bring* the claim Yucaipa seeks to assert against Defendants. As such, in any instance where Yucaipa suffers a distinct harm not shared by any other person or entity that *reasonably could* bring suit, it would be impossible to satisfy the Prior Determination Requirement." *Id.* at *14–15 (emphasis added). Applying the Requirement in such cases would render it unenforceable, because "agreements prospectively limiting a party's liability resulting from that party's intentional misconduct are void as against public policy." *Id.* at *14. The Chancery Court then found that Yucaipa did not need to show that fulfilling the Requirement would be *literally impossible*. Instead, it need only be "*unrealistic to assume* anyone other than Yucaipa" would seek such relief. *Id.* at *15 (emphasis added).

Here, the Chancery Court's reasoning governs the analysis, not least because the bankruptcy court specifically held that it would "review the issue on the 'unrealistic that another lender would sue' [standard] as that would be the 'largest exception to the Covenant Not to Sue." (Op., p. 34.) Yet the court proceeded to resolve the relevant allegations and inferences—about why it would be unrealistic to assume another lender would sue—*against* Yucaipa.

Yucaipa alleged facts that brought its counterclaim well within the public policy exception. (A.P. No. 14-50971, D.I. 19, ¶¶ 8–42, 106–07.) No other lender, Yucaipa alleged, is

similarly situated to it, and Yucaipa was the only potential target of BD/S's scheme.  (*Id.* ¶¶ 8–42.)  Yucaipa alleged that the other lenders "(a) hold minor stakes in the First Lien Debt; (b) have no equity stake in Allied; (c) are not insiders and have no employees who serve on the Allied Board of Directors; (d) have no involvement in the management or control of Allied; (e) would suffer harm too inconsequential to pursue in connection with an equitable subordination claim; (f) have not been sued for equitable subordination; and (g) have always acted in concert with Counter-Defendants."  (*Id.* ¶ 107.)  Accepting these allegations as true, it is at least plausible that it would be "unrealistic" to expect other minority debt holder to pursue costly, protracted, uncertain litigation against BD/S, particularly when BD/S did not affirmatively target those minority debt holders in litigation.  *See In re Avandia*, 685 F.3d at 357 ("[A]ll well-pleaded allegations of the complaint must be taken as true and interpreted in the light most favorable to the plaintiffs, and all inferences must be drawn in favor of them." (quotation marks omitted)).

In reaching the opposite conclusion as to the plausibility of Yucaipa's allegations, the bankruptcy court appeared to misapprehend its role in determining whether Yucaipa stated a cognizable claim.  As before, it misapplied the *Iqbal-Twombly* standard and concluded that Yucaipa's account was not the most likely one.  The court found that other, non-BD/S lenders collectively hold 25% of the outstanding debt and thus had an incentive to bring equitable subordination claims against BD/S.  (Op., pp. 34–37.)  Further, the court found that "none of [Yucaipa's] allegations are unique to Yucaipa—[they] are shared by all First Lien Lenders."  (*Id.* at p. 35.)  Yet the Court never confronted the numerous plausible (indeed probable) explanations why these other lenders might not sue BD/S.  For instance, one reasonable inference is that the other lenders themselves stood to benefit from the success of BD/S's scheme, which would result in subordination of the largest share of Allied's first lien debt—i.e., Yucaipa's.  Another reasonable inference is that the other lenders individually hold such small stakes in the Allied debt that drawn-out, uncertain litigation against BD/S would not be economically rational (after all, no other lender has sued BD/S).  And yet another reasonable inference is that these other lenders are not Allied "insiders" like Yucaipa, so BD/S cannot (falsely) accuse them of abusing

their insider status in an equitable subordination claim, which removes these other lenders'
incentive to challenge BD/S's allegations against Yucaipa.  These inferences flow directly from
Yucaipa's allegations, but the bankruptcy court declined to reach them.

In addition, Yucaipa is the only lender against whom BD/S actually sought equitable
subordination, and it is unrealistic (and counter to their own economic self-interest) for the other
lenders to complain about that.  The court discounted this fact because, it concluded, the *Noerr-Pennington* doctrine immunizes BD/S at the pleading stage from any suit premised on their
equitable subordination claim.  (Op., pp. 35–37.)  But that was contrary to black-letter law.

For one thing, *Noerr-Pennington* does not cover violations of criminal statutes and fraud,[8]
both of which Yucaipa has alleged here.  (A.P. No. 14-50971, D.I. 19 ¶¶ 108–11.)  For another,
Yucaipa has alleged that BD/S's equitable subordination claim is a "sham," not covered by
*Noerr-Pennington*.  (*Id.* ¶¶ 82–90, 103–04.)  *See, e.g.*, *Morrison v. Amway Corp.* (*In re
Morrison*), No. 08–03260, 2009 WL 1856064, at *5 (Bankr. S.D. Tex. June 26, 2009) (*Noerr-Pennington* does not "appl[y] at all where the defendant's petition to the government was but an
attempt to further a fraudulent scheme constructed prior to the [bankruptcy] petition and the
fraudulent scheme rather than the petition forms the basis of [p]laintiff['s] claims.").  The
bankruptcy court simply concluded that Yucaipa would be unable to prove the sham exception
"by clear and convincing evidence."  (Op., p. 36.)  That was the wrong standard to apply at the
pleading stage.[9]

---

[8]  *See We, Inc. v. City of Phila.*, 174 F.3d 322, 327 (3d Cir. 1999); *see also California Motor Transp. Co.
v. Trucking Unlimited*, 404 U.S. 508, 514 (1972) ("First Amendment rights are not immunized from
regulation when they are used as an integral part of conduct which violates a valid statute."); *United
States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1123 (D.C. Cir. 2009) (*Noerr-Pennington* does not
apply to fraud); *Calabrese v. CSC Holdings, Inc.*, No. 2:02-CV-5171 JS ARL, 2004 WL 3186787, at *2
(E.D.N.Y. July 19, 2004) (*Noerr-Pennington* inapplicable to RICO scheme involving fraudulent threats of
legal action in violation of the Hobbs Act and mail- and wire-fraud statutes).

[9]  The bankruptcy court also misapplied the public-policy exception when it found it "would be
inequitable for Yucaipa to obtain 'unique' status from Black Diamond and Spectrum's claims against
Yucaipa."  (Op., p. 37.)  The court speculated that such a ruling might "chill" BD/S's incentive to bring
claims against Yucaipa—because they would not want to risk falling into an exception to the covenant.
(*Id.*)  This is not an argument that BD/S even made.  Nonetheless, to the extent there is any logical appeal

*(Cont'd on next page)*

Lastly, there is also a substantial ground for differences of opinion as to whether Black Diamond (as opposed to Spectrum) can even invoke the Third Amendment's covenant not to sue—in light of the New York appellate court's ruling that Yucaipa had raised a triable issue of fact as to whether Black Diamond waived its right to challenge the validity of the Fourth Amendment. *See BDCM Opportunity Fund II, LP*, 978 N.Y.S.2d at 10.

### 3. Substantial Grounds for Differences of Opinion Exist as to the Bankruptcy Construction of the Appearance Prohibition

Similarly, there is a substantial ground for difference of opinion as to the bankruptcy court's application of the "appearance prohibition" to bar Yucaipa from asserting any counterclaims whatsoever against BD/S.  Among other flaws in the ruling, the bankruptcy court found that the appearance prohibition barred Yucaipa from bringing any counterclaims, including in the case of BD/S's "willful misconduct" (Op., p. 44), even though such a provision would be unenforceable under New York law.  *See Kalisch-Jarcho*, 448 N.E. 2d at 416 ("an exculpatory clause is unenforceable when . . . the misconduct for which it would grant immunity smacks of intentional wrongdoing").  The bankruptcy court found no issue with public policy because, it concluded, "Yucaipa's claims could also be made by other [lenders]."  (Op., p. 44.) But the ability or motivation of other lenders to sue BD/S simply has no bearing on the proper application of the appearance prohibition—the court imposed its own additional limitation on public policy that finds no support whatsoever in New York's case law.

The court also attempted to limit the public-policy exception with a counter-textual reading of the appearance prohibition itself.  On its face, this provision precludes Yucaipa from "fil[ing] any motion [or] tak[ing] *any other action*" in a bankruptcy case.  (A.P. No. 14-50971, D.I. 19, Ex. 3, Third Am. § 2.7.)  But the court analogized this language to other bankruptcy contexts and construed it merely to preclude Yucaipa from taking an "affirmative action," such

---

*(Cont'd from previous page)*

to the court's reasoning, it was inappropriate in the context of ruling on a motion to dismiss *Yucaipa's* counterclaim, where the court was supposed to resolve inferences in Yucaipa's favor.

as filing a counterclaim, and not "defending itself" against a complaint.  (Op., p. 44 & n.83.)  But this makes little sense—even in a purely defensive mode, the appearance prohibition would still preclude Yucaipa from "fil[ing] any motion," such as a motion to dismiss or for summary judgment, so Yucaipa would not actually be able to defend itself.  And in any event, to the extent this contractual provision is ambiguous such that the court needed to look beyond the four corners of the Third Amendment, the court should have resolved any ambiguities in Yucaipa's favor at the pleading stage.  *See, e.g.*, *Malmstein v. Universal Music Grp., Inc.*, 2012 WL 2159281, at *6 (S.D.N.Y. June 14, 2012) ("At the motion to dismiss stage, a court may resolve issues of contract interpretation when the contract is properly before the Court, but must resolve all ambiguities in the contract in plaintiffs' favor." (quotation marks omitted)).

### 4.    Substantial Grounds for Differences of Opinion Exist as to the Bankruptcy Court's Application of Collateral Estoppel

Finally, there are substantial grounds for differences of opinion as to the bankruptcy court's application of collateral estoppel to bar "certain factual assertions underlying Yucaipa's counterclaim."  (Op., p. 45.)  In fact, the Third Circuit has cautioned that with respect to collateral estoppel, "doubts about its application should usually be resolved against its use." *Witkowski v. Welch*, 173 F.3d 192, 206 (3d Cir. 1999).  Most important, the bankruptcy court's 2013 order dismissing Yucaipa's cross-claims has not yet resulted in a final judgment, so collateral estoppel is unavailable as a matter of law.  *See Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006) (collateral estoppel requires that "the issue was determined by a valid and final judgment").[10]

---

[10]  There is a substantial ground for difference of opinion as to whether the prior dismissal of Yucaipa's cross-claim ever culminated in a "sufficiently final" judgment for collateral estoppel purposes.  *First Jersey Nat'l Bank v. Brown* (*In re Brown*), 951 F.2d 564, 569 (3d Cir. 1991).  Yucaipa could not have appealed the interlocutory dismissal order as of right.  *See Luben Indus., Inc v. United States*, 707 F.2d 1037, 1040 (9th Cir. 1983) (declining to give preclusive effect to interlocutory order that could not have been appealed as of right).  The bankruptcy court has since granted summary judgment to BD/S on their declaratory relief claim, which Yucaipa has appealed as of right under 28 U.S.C. § 156(a)(1).  (*See* D. Ct. Nos. 13-cv-01580-SLR, 13-cv-01583-SLR, D.I. 1.)  But the bankruptcy court still has not issued any final judgment in the Allied Action, or otherwise ruled on BD/S's remaining cause of action—so Yucaipa is unable to appeal the dismissal of its cross-claim under the "merger rule."  *See, e.g.*, *Pineda v. Ford Motor*
*(Cont'd on next page)*

Furthermore, even if there had been a final judgment in the Allied Action, the bankruptcy court erroneously found an "identity of issues" between what was decided in dismissing Yucaipa's 2013 cross-claim for declaratory relief, and the issues raised in Yucaipa's present counterclaim.  (Op., p. 51.)  But there is no identity of issues where, as here, two cases have "different legal issues that arise in a different factual context."  *Suppan v. Dadonna*, 203 F.3d 228, 234 (3d Cir. 2000).  The bankruptcy court's 2013 ruling found it implausible that Yucaipa would have detrimentally relied on BD/S during the passage of the Third or Fourth Amendments, or in acquiring the majority of Allied's first lien debt.  (A.P. No. 12-50947, D.I. 162, Tr. Mot. to Dismiss Hrg. 110:11–16.)  But Yucaipa's present counterclaim is far broader and includes misconduct that post-dates the passage of the Third and Fourth Amendments— including BD/S wrongfully initiating the involuntary bankruptcy and prosecuting the equitable subordination claim against Yucaipa.  (*See* A.P. No. 14-50971, D.I. 19.)[11]

Thus, there are substantial grounds for differences of opinion as to whether collateral estoppel barred any aspect of Yucaipa's counterclaim.

## V.    CONCLUSION

For these reasons, the Court should grant Yucaipa leave to appeal.

Dated: September 4, 2015

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Edmon L. Morton*

Michael R. Nestor (No. 3526)
Edmon L. Morton (No. 3856)
Michael S. Neiburg (No. 5275)

---

*(Cont'd from previous page)*

*Co.,* 520 F.3d 237, 243 (3d Cir. 2008) ("Under the 'merger rule,' prior interlocutory orders . . .  merge with the final judgment in a case, and the interlocutory orders (to the extent that they affect the final judgment) may be reviewed on appeal from the final order." (quotation marks omitted)).

[11]  Contrary to the bankruptcy court's ruling, Yucaipa's allegations do not "merely . . . [extend] the damages period . . . for a longer period of time."  (Op., p. 51.)  Rather, the counterclaim allegations describe a continuing course of conduct that was not limited to the Yucaipa's acquisition of debt in 2009.

01:17650480.1

Rodney Square
1000 North King Street
Wilmington, DE  19801
Telephone: (302) 571-6600
mnestor@ycst.com

- and-

GIBSON, DUNN & CRUTCHER LLP
Maurice M. Suh (*Pro Hac Vice*)
Robert A. Klyman (*Pro Hac Vice*)
Kahn Scolnick (*Pro Hac Vice*)
333 South Grand Avenue
Los Angeles, CA  90071
Telephone: (213) 229-7000
MSuh@gibsondunn.com

*Attorneys for Appellants-Defendants*
*Yucaipa American Alliance Fund I, L.P., and Yucaipa*
*American Alliance (Parallel) Fund I, L.P.*

01:17650480.1

26