# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ASHINC Corporation, *et al.*, | Case No. 12-11564 (CSS) |
| Debtors. | (Jointly Administered) |
| BDCM OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., SPECTRUM INVESTMENT PARTNERS, L.P., BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., AS CO-ADMINISTRATIVE AGENT, AND SPECTRUM COMMERCIAL FINANCE LLC, AS CO-ADMINISTRATIVE AGENT, | Adv. Proc. No. 14-50971 (CSS) |
| Plaintiffs, | |
| v. | |
| YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P., RONALD BURKLE, JOS OPDEWEEGH, DEREX WALKER, JEFF PELLETIER, IRA TOCHNER, and JOSEPH TOMCZAK, | |
| Defendants. | |

## BLACK DIAMOND AND SPECTRUM'S MEMORANDUM OF LAW IN OPPOSITION TO THE YUCAIPA DEFENDANTS' MOTION TO COMPEL AND IN SUPPORT OF THEIR CROSS-MOTION TO STRIKE CERTAIN AFFIRMATIVE DEFENSES

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT .................................................................................................. 1

BACKGROUND ........................................................................................................................ 4

ARGUMENT ........................................................................................................................... 11

I.      THE YUCAIPA DEFENDANTS' MOTION TO COMPEL SHOULD BE DENIED..... 11

      A.      The Yucaipa Defendants are Improperly Seeking Discovery in Support of
              Irrelevant Factual Allegations to Revive Their Dismissed Claims........................ 11

      B.      Black Diamond and Spectrum Have Not Waived Any Discovery Objections...... 21

      C.      Black Diamond and Spectrum Have Properly Withheld Documents Protected
              by the Attorney-Client Privilege ........................................................................ 23

II.     THE YUCAIPA DEFENDANTS' AFFIRMATIVE DEFENSES PREMISED
      UPON IMPLAUSIBLE ALLEGATIONS SHOULD BE STRICKEN ........................... 31

CONCLUSION........................................................................................................................ 35

# TABLE OF AUTHORITIES

**Cases**                                                                                                **Page(s)**

*625 Milwaukee, LLC v. Switch & Data Facilities Co.*,
    No. 06 Civ. 0727, 2008 WL 582564 (E.D. Wis. Feb. 29, 2008) ............................................26

*Bayer CropScience AG v. Dow AgroSciences LLC*,
    No. 10 Civ. 1045 (RMB) (JS), 2011 WL 6934557 (D. Del. Dec. 30, 2011) ..........................33

*BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*,
    112 A.D.3d 509 (N.Y. App. Div. 2013) ..................................................................................4

*In re Benun*,
    339 B.R. 115 (Bankr. D.N.J. 2006) ........................................................................................27

*Bever v. CitiMortgage, Inc.*,
    No. 11 Civ. 01584 (AWI) (SKO), 2014 WL 2042015 (E.D. Cal. May 16, 2014) .................15

*BJ Energy LLC v. PJM Interconnection, LLC*,
    Nos. 08 Civ. 3649, 09 Civ. 2864 (NLS), 2010 WL 1491900 (E.D. Pa. Apr. 13, 2010)..........31

*Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*,
    No. 13 Civ. 13804, 2015 WL 3441155 (E.D. Mich. May 28, 2015) ......................................33

*In re Bridgeport Educ., Inc. Sec. Litig.*,
    No. 12 Civ. 1737 (JM) (JLB), 2014 WL 3867495 (S.D. Cal. Aug. 6, 2014) .........................15

*Burlington Ins. Co. v. Okie Dokie, Inc.*,
    368 F. Supp. 2d 83 (D.D.C. 2005) ........................................................................................23

*In re Cardinal Fastener & Specialty Co.*,
    No. 11 Civ. 15719, 2013 WL 425858 ( N.D. Ohio Feb. 4, 2013) .........................................24

*CGC Holding Co., LLC v. Hutchens*,
    No. 11 Civ. 01012 (RBJ) (KLM), 2016 WL 233551 (D. Colo. Jan. 20, 2016).......................26

*Ciba-Geigy Corp. v. Bolar Pharm. Co., Inc.*,
    747 F.2d 844 (3d Cir. 1984).....................................................................................................18

*CIF Licensing, LLC v. Agere Sys. LLC*,
    No. 07 Civ. 0170 (LPS), 2012 WL 6085368 (D. Del. Dec. 3, 2012) ....................................27

*Coach, Inc. v. Kmart Corp.*,
    756 F. Supp. 2d 421 (S.D.N.Y. 2010)....................................................................................34

*In re Copper Mkt. Antitrust Litig.*,
200 F.R.D. 213 (S.D.N.Y. 2001) .......................................................................30

*Fleet Nat'l Bank v. Harstone*,
No. 96-10166-NG, 1997 WL 557564 (D. Mass. May 29, 1997).......................................17, 33

*Haines v. Cherian*,
No. 15 Civ. 00513 (JFS), 2016 WL 831946 (M.D. Pa. Feb. 29, 2016)...................................12

*Hammond v. Lowe's Home Ctrs., Inc.*,
216 F.R.D. 666 (D. Kan. 2003)..........................................................................21

*HSH Nordbank AG New York Branch v. Swerdlow*,
259 F.R.D. 64 (S.D.N.Y. 2009) .......................................................................28, 29

*Human Genome Sciences, Inc. v. Genetech, Inc.*,
No. 11 Civ. 6519 (MRP) (JEM), 2011 WL 7461786 (C.D. Cal. Dec. 9, 2011) .....................32

*The Jordan (Bermuda) Inv. Co. v. Hunder Green Invs. Ltd.*,
No. 00 Civ. 9214 (RWS), 2006 WL 2773022 (S.D.N.Y. Sept. 27, 2006)..............................24

*Kellogg Brown & Root Servs., Inc. v. United States*,
117 Fed. Cl. 1 (Fed. Cl. 2014) .......................................................................15

*La. Sulphur Carriers, Inc. v. Gulf Res. & Chem. Corp.*,
53 F.R.D. 458 (D. Del. 1971) .......................................................................34

*In re Leslie Controls, Inc.*,
437 B.R. 493 (Bankr. D. Del. 2010) ..................................................................27

*Magnetar Techs. Corp. v. Six Flags Theme Park, Inc.*,
886 F.Supp.2d 466 (D. Del. 2012)..................................................................24, 25

*Mezu v. Morgan State Univ.*,
269 F.R.D. 565 (D. Md. 2010).......................................................................15

*Modern Creative Services, Inc. v. Dell Inc.*,
No. 05 Civ. 3891 (JLL), 2008 WL 305747 (D.N.J. Jan. 28, 2008) ......................................32

*Mylan Pharm. Inc. v. Celgene Corp.*,
No. 14 Civ. 2094 (ES) (MAH), 2016 WL 2943813 (D.N.J. May 20, 2016)..........................13

*In re No-Burn Inc. v. Speller*,
No. 05 Civ. 02096, 2006 WL 4458703 (Bankr. M.D.N.C. Jan. 21, 2006). (*See* Motion .).....15

*S & R Corp. v. Jiffy Lube Int'l, Inc.*,
968 F.2d 371 (3d Cir. 1992)..........................................................................18

*Share Corp. v. Momar Inc.*,
No. 10-CV-109, 2011 WL 2600740 (E.D. Wis. June 29, 2011) ............................................16

*Sheridan v. E.I. DuPont de Nemours Co.*,
Civ. A. No. 93-46-SLR, 1994 WL 468711 (D. Del. Mar. 28, 1994)......................................31

*Stanley v. Chester Cty. Prison Farm*,
No. 85-5502, 1986 WL 305 (E.D. Pa. Sept. 16, 1986), *vacated in part, Stanley v. Chester
Cty. Prison Farm*, 1986 WL 13553 (Dec. 1, 1986) ................................................................23

*Sun Capital Partners, Inc. v. Twin City Fire Ins. Co.*,
No. 12- Civ. 81397, 2015 WL 1860826 (S.D. Fla. Apr. 22, 2015) ........................................26

*Thomas v. Coopersmith*,
No. 11 Civ. 7578, 2016 WL 245317 (E.D. Pa. Jan. 20, 2016) ...............................................13

*Tyco Fire Prods. LP v. Victaulic Co.*,
777 F.Supp.2d 893 (E.D. Pa. 2011) ......................................................................................33

*United States v. Walerko Tool and Eng'g Corp*,
784 F.Supp. 1385 (N.D. Ind.) ...............................................................................................31

*Warner/Chappel Music, Inc. v. Pilz Compact Disc, Inc.*,
No. Civ. A. 99-0293, 1999 WL 999332 (E.D. Pa. Oct. 26, 1999).........................................31

*Westdale Recap Props., Ltd. v. NP/I & G Wakefield Commons, L.L.C.*,
No. 5:11-CV-659-D, 2013 WL 5424844 (E.D.N.C. Sept. 26, 2013) .....................................21

*Wilson v. Kautex*,
No. 1:07-CV-60, 2008 WL 162645 (N.D. Ind. Jan. 14, 2008) ...............................................23

*XpertUniverse, Inc. v. Cisco Sys., Inc.*,
868 F.Supp.2d 376 (D. Del. 2012)..........................................................................................33

*Yurman Design, Inc. v. Chaindom Enters., Inc.*,
No. 99 Civ. 9307 (JFK), 2000 WL 897141 (S.D.N.Y. July 5, 2000) .....................................33

*Zurich Am. Ins. Co. v. Queens Mach. Co.*,
No. 13 Civ. 6774 (DEK), 2014 WL 3891767 (E.D. La. Aug. 7, 2014)..................................15

**Other Authorities**

FED. R. CIV. P. 26(b)(1) ................................................................................................11, 12

FED. R. CIV. P. 26(b)(2)(C)(iii) .........................................................................................12

FED. R. CIV. P. 26(b)(5)(A)(ii) ..........................................................................................29

FED. R. CIV. P.  12(f)..........................................................................................................31, 32

Plaintiffs BDCM Opportunity Fund II, L.P., Black Diamond CLO 2005-1 Ltd.

(collectively "Black Diamond"), and Spectrum Investment Partners, L.P. ("Spectrum" and with

Black Diamond, "BD/S"), by and through their undersigned counsel, hereby submit this

Memorandum of Law in opposition to the motion to compel the production of documents and

responses to discovery requests (the "Motion") brought by Yucaipa American Alliance Fund I,

L.P., Yucaipa American Alliance (Parallel) Fund I, L.P. (collectively "Yucaipa"), Jos

Opdeweegh, Derex Walker, Jeff Pelletier, Ira Tochner, and Joseph Tomczak (collectively the

"Director Defendants" and together with Yucaipa, the "Yucaipa Defendants").   BD/S also

submit this Memorandum of Law in support of their cross-motion to strike certain affirmative

defenses asserted in the Yucaipa Defendants' Answers.

## PRELIMINARY STATEMENT

The Yucaipa Defendants *yet again* come before this Court to pitch the same

implausible factual allegations against BD/S that have twice been rejected by this Court.  This

time, the Yucaipa Defendants ask this Court to compel discovery in support of factual

allegations, despite two previous rulings of this Court that rejected and dismissed those same

factual allegations as implausible.

Yucaipa has sought for years to shift the responsibility for its own misconduct

onto BD/S.  Attempting to do so, Yucaipa asserted cross-claims and a counterclaim against BD/S

based upon factual allegations that BD/S engaged in a lengthy, complex, multi-step scheme to

equitably subordinate Yucaipa's first lien debt.  Yucaipa's alleged scheme is rife with farfetched

allegations as to behavior by BD/S, all of which had to succeed for the scheme to succeed,

including, among other allegations, that BD/S "encouraged" Yucaipa to buy first lien debt while

secretly planning to file an equitable subordination claim against Yucaipa a number of years

later, that BD/S was "lying in wait" by pretending to negotiate with a third party for a sale of

Allied's assets while secretly planning to "scuttle" a deal that offered to pay BD/S par plus

accrued interest, that BD/S relied on obtaining a series of litigation victories (over which they

had no control since the Court would have to rule) to gain a financial windfall, and that BD/S

engaged in bribery and fraud on the Court.  This Court has rejected those factual allegations as

being implausible (as well as rejecting them upon other, independent grounds), first by

dismissing Yucaipa's cross-claims against BD/S in February 2013 and later by dismissing

Yucaipa's counterclaim against BD/S in August 2015.

Nevertheless, in the span of approximately three weeks in late May and early June

2015, the Yucaipa Defendants served 366 separate discovery requests on BD/S, most of which

seek discovery going toward these very same factual allegations this Court has already rejected

as implausible.  BD/S has responded to all 366 discovery requests and objected to such discovery

on the grounds of relevance, undue burden, and others.  BD/S has also referred the Yucaipa

Defendants to the Court's prior rulings dismissing Yucaipa's cross-claims and counterclaim and

has asserted that the Yucaipa Defendants are collaterally estopped from re-litigating issues that

have already been decided.

Simply put, the Yucaipa Defendants' motion to compel should be denied because

it seeks discovery in support of implausible factual allegations that the Court has already

rejected.  While the Yucaipa Defendants seek to mischaracterize BD/S's objections as

purportedly improper "collateral estoppel" objections, they nonetheless acknowledge that the

factual allegations underlying their discovery requests are the *same* factual allegations that the

Court previously determined to be implausible.  Those implausible allegations are therefore not

*relevant*, and discovery in support of them falls outside the scope of Federal Rule of Civil

Procedure ("FRCP") 26(b) (as incorporated by Federal Rule of Bankruptcy Procedure 7026) and runs contrary to well-established law that a litigant may not seek discovery in support of dismissed claims.

The Yucaipa Defendants also seek to compel the production of documents BD/S has withheld on the basis of a common interest privilege. This effort should likewise fail, because the documents BD/S has withheld are protected by the *attorney-client* privilege, regardless of whether a *common interest* privilege applies. Indeed, as set forth in more detail below, the Yucaipa Defendants' effort to compel the production of privileged documents is based on the false premise that a common interest privilege is the only ground that BD/S has asserted. That is not the case—BD/S has asserted the attorney-client privilege over all of the challenged documents because communications among co-clients with the same counsel (*e.g.* Black Diamond and Spectrum) are subject to the *attorney-client* privilege in the absence of the common interest privilege. Whether a common interest privilege also applies to such communications is thus purely an academic question that the Court need not reach. In any event, the Yucaipa Defendants' Motion misapplies the facts and the law with the respect to the common interest privilege. For those reasons, the portion of the Motion seeking to compel production of privileged documents withheld by BD/S should be denied.

Finally, the Court should strike the Yucaipa Defendants' affirmative defenses that are premised upon the same implausible factual allegations that the Court has already rejected. The Yucaipa Defendants' Motion makes clear that their affirmative defenses of unclean hands, waiver, consent, estoppel, and laches are all entirely dependent upon the same allegations that the Court previously determined were implausible. In addition, it is now also clear that many of the Yucaipa Defendants' affirmative defenses are premised upon allegations of fraud, which the

Yucaipa Defendants have failed to plead with particularity pursuant to FRCP 9(b).  At bottom, the Yucaipa Defendants' affirmative defenses of unclean hands, waiver, consent, estoppel, and laches are legally insufficient and will cause prejudice to BD/S (and have already caused prejudice to BD/S) by increasing the costs of discovery and trial, among other things, if they remain in the action.

## BACKGROUND

This dispute centers around a Credit Agreement[1] that arose out of a May 2007 bankruptcy plan of reorganization of Allied.[2]  Since August 2008, Allied was in continuous default under the Credit Agreement, leading to the commencement of various actions before this Court and other courts.

## Overview of Proceedings

In January 2012, BD/S sued Yucaipa in New York State Supreme Court and obtained a judicial declaration that the Purported Fourth Amendment was void *ab initio* and that Yucaipa is not the Requisite Lender (the "New York Action").  *BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*, 112 A.D.3d 509, 509-10 (N.Y. App. Div. 2013).

On May 17, 2012, BD/S filed involuntary bankruptcy petitions against Allied (the "Allied Bankruptcy").[3]  On October 17, 2012, Allied filed an adversary proceeding seeking declarations as to the identity of the Requisite Lender and the validity of the Purported Fourth

---

[1] The "Credit Agreement" refers to the Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, as amended and restated as of May 15, 2007, between Allied Holdings Inc. and Allied Systems Ltd. (L.P.) as Borrowers, the Lenders from time to time party thereto, and the CIT Group Business Credit, Inc. as Administrative Agent and Collateral Agent, among others.

[2] "Allied" collectively refers to ASHINC Corporation (f/k/a Allied Systems Holdings, Inc.) and its related entities in bankruptcy.

[3] The "Allied Bankruptcy" refers to *In re ASHINC Corp., et al.*, Case No. 12-11564 (CSS) (Bankr. D. Del.).

Amendment to the Credit Agreement (the "Allied Action").[4]  On March 14, 2013, the Official

Committee of Unsecured Creditors (the "Committee") (as Plaintiff) and BD/S (as Intervenors)

filed an amended complaint against Yucaipa and numerous directors of Allied (the "Committee

Action").[5]  In the Committee Action, the Committee asserted, among other claims, a derivative

equitable subordination claim against Yucaipa, while BD/S asserted a direct equitable

subordination claim against Yucaipa.

On July 9, 2013, BD/S filed motions for summary judgment in the Allied Action

and the Committee Action for a determination that they are the Requisite Lenders.  At a hearing

on July 30, 2013, the Court granted those motions, holding that BD/S are the Requisite Lenders.[6]

On March 31, 2016, the Delaware District Court affirmed that decision.[7]  Yucaipa's appeal from

the Delaware District Court's decision is pending, but has not yet been briefed.

On December 11, 2013, Yucaipa filed an action in the Delaware Chancery Court

against BD/S, SBDRE LLC ("SBDRE") and related entities, seeking, among other things, to

challenge BD/S's formation of SBDRE and to obtain reimbursement of certain fees and expenses

(the "Chancery Court Action").[8]  On October 31, 2014, the Delaware Chancery Court dismissed

most of Yucaipa's claims pursuant to the Covenant Not to Sue under the Third Amendment and

stayed the remainder of the action pending the resolution of the Allied Bankruptcy in this Court.

BD/S filed this adversary proceeding on November 19, 2014, seeking, among

other things, to equitably subordinate Yucaipa's First Lien Debt (the "BD/S Action").  Several

---

[4] The "Allied Action" refers to *Allied Systems Holdings, Inc. v. American Money Management, et al.*, Adv. Pro. No. 12-50947 (CSS) (Bankr. D. Del.).

[5] The "Committee Action" refers to *The Official Committee of Unsecured Creditors of Allied Systems Holdings, Inc. v. Yucaipa American Alliance Fund I, L.P., et al.*, Adv. Pro. No. 13-50530 (CSS) (Bankr. D. Del.).

[6] *See* Committee Action, D.I. 280.

[7] *Yucaipa Am. Alliance Fund II, LP, et al. v. BDCM Opportunity Fund II, LP, et al.*, Nos. 13-cv-1580, 13-cv1583 (SLR), D.I. 40 (D. Del. March 31, 2016).

[8] The "Chancery Court Action" refers to *Yucaipa American Alliance Fund I, LP v. SBDRE LLC*, C.A. No. 9151-VCP (Del. Ch.).

months later, on May 8, 2015, Yucaipa filed a RICO complaint against BD/S in the District

Court for the District of Delaware (the "RICO Action").[9]  BD/S has moved to dismiss the RICO

Action, and the motion to dismiss has been fully briefed and pending before the Delaware

District Court since July 2015.

**Yucaipa's Implausible Cross-Claims**

On January 5, 2013, Yucaipa sought to invalidate the Third Amendment to the

Credit Agreement by filing cross-claims for a declaratory judgment and other relief in the Allied

Action (the "Cross-Claims").  (Allied Action, D.I. No. 65.)  The Cross-Claims alleged that BD/S

"supported Yucaipa's acquisition of the Requisite Lender position" and "encouraged Yucaipa's

proposed plan, a fact on which Yucaipa relied in executing the plan."  (*Id.* ¶¶ 5, 71.)  The Cross-

Claims further alleged that BD/S "chose to double-cross Yucaipa" by "surreptitiously sen[ding] a

letter to [CIT] questioning the validity of Yucaipa's Requisite Lender status."  (*Id.* ¶ 7.)

On February 27, 2013, this Court dismissed Yucaipa's Cross-Claims on several

grounds, including that the factual allegations underlying the Cross-Claims were implausible (the

"Cross-Claims Dismissal").  (Allied Adv. Pro., D.I. No. 162 at 104:14-106:3.)  The Court

specifically ruled that Yucaipa's allegations that BD/S "encouraged" Yucaipa to buy First Lien

Debt and then secretly urged CIT to refuse to recognize Yucaipa's purported Requisite Lender

status were implausible:

- "[T]he allegations in [the Cross-Claims] do not meet [the plausibility]
  standard.  There is some innuendo, there's some vague allegations.
  The bottom line is I just don't think the story as pled holds together
  sufficiently to meet the standard."  (*Id.* at 104:14-22.)

- "I don't think there's any allegation really that rises to the plausibility
  that there was any kind of mischief going on that was detrimental or
  directed at Yucaipa at the time of the third amendment being entered

---

[9] The "RICO Action" refers to *Yucaipa American Alliance Fund I, L.P., et al. v. Ehrlich, et al.*, Case No. 15-cv-00373 (SLR) (D. Del.).

into the purchase, excuse me, and then the fourth amendment being negotiated, and then the debt being b[]ought and then the fourth amendment being passed." (*Id.* at 105:19-106:3.)

**Yucaipa's Implausible Counterclaim**

On February 19, 2015, Yucaipa filed a Counterclaim for Equitable Subordination against BD/S in the BD/S Action. (Committee Adv. Pro., D.I. No. 19 at 31-69 (the "Counterclaim").) The Counterclaim alleged that BD/S engaged in a premeditated, multi-step, multi-year scheme to use the bankruptcy process to subordinate Yucaipa's First Lien Debt, consisting of a "carefully orchestrated a series of lies, payoffs and legal maneuvers designed to improperly enrich themselves at the expense of Yucaipa." (Counterclaim ¶¶ 1, 11.) The Counterclaim alleged a multi-step "scheme" consisting of the following factual allegations. (*Id.* ¶¶ 7-11.)

The first two steps of the alleged scheme were premised upon factual allegations identical to those the Court had previously rejected in the Cross-Claims Dismissal. In "Step 1," BD/S allegedly "encouraged Yucaipa to acquire as much debt as possible by providing false assurances of cooperation and support." (*Id.* ¶¶ 8, 42-51.) Next, in "Step 2," BD/S allegedly preventing Yucaipa from serving as Requisite Lender under the First Lien Credit Agreement by "surreptitiously instruct[ing] the Administrative Agent under the First Lien Credit Agreement," CIT Group/Business Credit, Inc. ("CIT"), "to refuse to recognize directions from Yucaipa in its capacity as Requisite Lender and to challenge the validity of Yucaipa's status as Requisite Lender." (*Id.* ¶¶ 9, 52-61.)

"Step 3" of BD/S's purported "scheme" was to "[f]ile an involuntary bankruptcy petition . . . and submit false statements to the Bankruptcy Court to support that involuntary bankruptcy petition." (*Id.* ¶¶ 10, 62-81.) This included allegations regarding a "Cooperation

7

Agreement" between Black Diamond and Spectrum, under which Black Diamond allegedly paid

a "$4 million bribe to Spectrum, in the form of an illegal claims trade, to induce Spectrum to join

the scheme" – what Yucaipa has described as the so-called "Involuntary Petition Payoff." (*Id.* ¶¶

10(d), 64-70.)

"Step 4" of the alleged scheme was to "[a]ttempt to wipe out Yucaipa's First Lien

Claims with an objectively baseless complaint for equitable subordination," which Yucaipa

alleged is "based on false assertions about Yucaipa's role in the management of Allied, in an

attempt to wipe out Yucaipa's position in the First Lien Claims and illegally enrich [BD/S]." (*Id.*

¶¶ 11, 11(a), 82-90.)  Yucaipa has alleged that this "final step" (BD/S's equitable subordination

claim) is "ongoing to this day, and represents the culmination of [BD/S's] scheme." (*Id.* ¶¶ 11,

11(a).)

In addition, the Counterclaim also alleged that BD/S engaged in "sham"

negotiations with Jack Cooper Transport Company Inc. ("JCT") "[f]rom at least March 2011

through May 2012" regarding a potential sale of Allied's assets, while "[a]t the same time,

[BD/S] plotted to force Allied into involuntary bankruptcy." (*Id.* ¶¶ 56-62, 71.)  According to

the Counterclaim, BD/S "were simply distracting JCT, Yucaipa and Allied while [BD/S]

prepared to carry out their ultimate objective" and had "no intention of participating in a sale to

JCT . . . ." (*Id.* ¶¶ 58, 61.)

On August 21, 2015, the Court issued an Opinion dismissing the Counterclaim

with prejudice (the "Counterclaim Dismissal").  (BD/S Action, D.I. 82.)  The Court dismissed

the Counterclaim on several independent grounds, including that "the[] alleged facts do not tell a

plausible story." (*Id.* at 65.)  Specifically, the Court found implausible the allegation that the so-

called "Involuntary Petition Payoff" was a bribe or that it needed to be disclosed before the

petition was filed.  The Court concluded that BD/S "did not transfer the 'Involuntary Petition Payoff' in order to commence the involuntary proceedings" and that "such transfer did not need to be disclosed pursuant to Bankruptcy Rule 1003."  (*Id.* at 62.)  The Court also rejected Yucaipa's reliance upon an email from 2009, finding that "it is not plausible that this email indicates that Black Diamond and Spectrum schemed to equitably subordinate Yucaipa's First Lien Debt."  (*Id.* at 63-64.)  Further, the Court expressly rejected as implausible the allegation that BD/S were "'lying in wait' for the optimal time to file their equitable subordination claim, including negotiating for a year with JCT only to scuttle the deal."  (*Id.* at 64.)

As a whole, the Court correctly noted that Yucaipa's alleged scheme was dependent upon "every one of the following unpredictable events occurring in a manner favorable to Black Diamond and Spectrum," including a series of favorable litigation outcomes:

- "invalidating the Fourth Amendment through litigation" (*id.*);

- "obtaining judicial declaration that Black Diamond and Spectrum are the Requisite Lenders" (*id.*);

- "acquiring Allied's assets through a credit bid on behalf of all Lenders" (*id.*);

- "prevailing in their equitable subordination claims against Yucaipa and obtaining a substantial recovery" (*id.*); and

- "hoping that the Allied assets they acquired would increase in value to the point where the asset value plus any recovery realized from the equitable subordination litigation exceeded a par plus accrued interest recovery years after JCT had offered them a 100% recovery" (*id.*).

The Court determined that "Yucaipa's reliance on this sequence of events is not plausible," and that "[i]t is not plausible that economic actors, such as Black Diamond and Spectrum, would take that much litigation risk just to aggravate Yucaipa's attempt to own unrestricted First Lien Debt."  (*Id.* at 64-65.)

The Court concluded that "[a]t first blush Yucaipa brings a bowl of allegations to the Court for adjudication, but alas, the bowl is really a sieve, and all of Yucaipa's allegations leak out leaving nothing but an empty vessel" and that the "Counterclaim is an exercise in creative writing which, at closer examination, simply does not hold together." (*Id.* at 65.) Accordingly, the Court dismissed the Counterclaim with prejudice.

**The Parties' Agreement to Coordinate Discovery**

Discovery in the proceedings referenced above began in 2013 and the parties have exchanged substantial discovery over the past several years. Indeed, as the Yucaipa Defendants acknowledge, "[o]ver the past year, the Yucaipa Defendants and BD/S have engaged in an extensive, good-faith meet-and-confer process in [an] effort to streamline the outstanding discovery disputes as much as possible[.]" (Motion at 1.) Approximately one month after BD/S's motion to dismiss the RICO Action had been fully briefed, on August 27, 2015, the parties filed a Joint Rule 26(f) Report (the "Joint Report") in the RICO Action pursuant to which the parties "preliminarily agreed" to coordinate certain aspects of discovery, "in order to proceed as efficiently as possible and to avoid duplicative discovery efforts," as follows:

> (1) all discovery served in one action shall be deemed served in [all the other actions]; (2) responses to discovery served in one action shall be deemed served in [all the other actions]; and (3) depositions of witnesses shall be deemed to apply to [all the actions]. No other agreements with respect to the meaning of "coordination" have yet been agreed upon by the parties.

(RICO Action, D.I. 23 at 4.)

**The Yucaipa Defendants' Discovery Requests**

The Yucaipa Defendants served BD/S with 366 separate discovery requests in a span of three weeks, between May 20, 2015 and June 10, 2015, comprised of 114 document requests, 208 interrogatories, and 44 requests for admission. BD/S responded to all of the

Requests on July 31, 2015, with the exception of the Yucaipa Defendants' 208 interrogatories,

which  BD/S responded to on August 31, 2015.  As the Yucaipa Defendants' point out, BD/S and

the Yucaipa Defendants have been engaging in an extensive good-faith meet-and-confer process

over the past year to resolve the discovery disputes that are now the subject of this Motion.  At

the heart of this discovery dispute is whether the Yucaipa Defendants are entitled to discovery on

the allegations that this Court has already rejected as being implausible.  All of the discovery

requests and responses and certain correspondence concerning the Requests are attached as

exhibits to the Declaration of Kahn Scolnick (the "Scolnick Declaration"), which collectively

total more than 1,200 pages.

Further, the Yucaipa Defendants also served an additional 344 discovery requests

on April 26, 2016, which BD/S will respond to by August 29, 2016.

## ARGUMENT

## I.    THE YUCAIPA DEFENDANTS' MOTION TO COMPEL SHOULD BE DENIED

### A.    The Yucaipa Defendants are Improperly Seeking Discovery in Support of Irrelevant Factual Allegations to Revive Their Dismissed Claims

The Yucaipa Defendants seek to compel burdensome and expensive discovery in

support of factual allegations that the Court has already rejected as implausible.  (*See* Motion at

8-18.)  Although the Yucaipa Defendants attempt to miscast them, BD/S's objections to the

Requests are well-grounded in FRCP 26(b) (made applicable here by FRBP 7026), which

controls the scope and limit of discovery: "[p]arties may obtain discovery regarding any

nonprivileged matter that is *relevant* to any party's claim or defense and *proportional* to the

needs of the case[.]"  FED. R. CIV. P. 26(b)(1) (emphasis added).  The Court "must limit"

discovery that is "outside the scope permitted by Rule 26(b)(1)," and must take into account,

among other things, "whether the burden or expense of the proposed discovery outweighs its

likely benefit." *Id.*; FED. R. CIV. P. 26(b)(2)(C)(iii).  Because the Requests seek discovery

regarding factual allegations that have already been expressly rejected by the Court as

implausible and therefore are no longer *relevant*, the motion to compel additional discovery in

response to the Requests should be denied.[10]

### 1.    The Yucaipa Defendants Seek Discovery to Support Allegations that This Court Has Already Rejected as Implausible

The Yucaipa Defendants attempt to characterize BD/S's valid relevance

objections to the Requests as "collateral estoppel" objections.[11]  This mischaracterization is

unavailing, and whether "collateral estoppel" is a valid discovery objection is irrelevant.  While

BD/S's relevance objections at issue in this Motion *reference* "collateral estoppel," BD/S's

objections are in fact to relevance, burden, vagueness, and other bases that are well-grounded in

FRCP 26(b)(1)'s limitation that discovery be "*relevant*" and "*proportional to the needs of the*

*case.*"  FED. R. CIV. P. 26(b)(1) (emphasis added).[12]  At bottom, because the Court has already

rejected the factual allegations underlying the Requests as implausible, they are *not relevant* to

this action and such burdensome discovery in furtherance of irrelevant and implausible

allegations fall outside the scope of FRCP 26(b)(1).  *See, e.g., Haines v. Cherian*, No. 15 Civ.

00513 (JFS), 2016 WL 831946, at *6-7 (M.D. Pa. Feb. 29, 2016) (sustaining discovery

---

[10] The Yucaipa Defendants also argue that BD/S's objections that the Requests are vague, overbroad, unduly burdensome, and other objections generally "lack merit."  (Motion at 15.)  At bottom, however, as set forth below, none of the Requests are *relevant*, and even if any of them were marginally relevant (which they are not), their probative value is far outweighed by the burden they would impose and the length of time the discovery would take to conduct.

[11] *See, e.g.*, Motion at 8, where the Yucaipa Defendants include a sub-header titled "Collateral Estoppel Is Not a Valid Discovery Objection."

[12] To be sure, BD/S's objections to the Requests refer to "collateral estoppel" in the context of the Counterclaim Dismissal and the Cross-Claims Dismissal, but the basis of the challenged objections is principally that the information sought is not *relevant* because of the impact of the Court's prior rulings in removing implausible allegations from the dispute.  (*See, e.g.*, Scolnick Decl. Ex. 14.2 at 16-17, Black Diamond's response to Defendant Walker's Interrogatory No. 15 (objecting that the request is "neither relevant to the subject matter of this proceeding nor reasonably calculated to lead to the discovery of admissible evidence to the extent that the Bankruptcy Court has already held that Yucaipa's contention that Black Diamond and Spectrum had encouraged Yucaipa to buy First Lien Debt from ComVest is not plausible," and also that the request is "vague and ambiguous" and "seeks information in support of allegations that Yucaipa is collaterally estopped from asserting" ).)

objections on grounds of relevance and burden); *Thomas v. Coopersmith*, No. 11 Civ. 7578, 2016 WL 245317, at *8-10 (E.D. Pa. Jan. 20, 2016) (denying motion to compel discovery on relevance and burden grounds); *see also Mylan Pharm. Inc. v. Celgene Corp.*, No. 14 Civ. 2094 (ES) (MAH), 2016 WL 2943813, at *8-9 (D.N.J. May 20, 2016) (affirming denial of motion to compel discovery on basis that burden outweighed marginal relevance of material sought).

Critically, the Yucaipa Defendants acknowledge that the Requests seek discovery in support of factual allegations that have already been rejected by this Court as implausible. Specifically, the Motion claims that the Yucaipa Defendants "have *explained* that BD/S orchestrated a carefully timed *series of lies*, *payoffs*, and *legal maneuvers* designed to wrongfully enrich themselves at Yucaipa's expense—setting up Yucaipa as the proverbial fall guy to blame for Allied's misfortunes connected to the Great Recession." (Motion at 10 (emphasis added).) This Court has already twice rejected the Yucaipa Defendants' factual allegations of a multi-year, multi-step conspiracy to manipulate and defraud Yucaipa and the courts as implausible when it dismissed Yucaipa's counterclaim and cross-claims. In fact, that same allegation – verbatim – is made in the Yucaipa Defendants' Counterclaim. (Counterclaim ¶ 1.)

In the Counterclaim Dismissal, the Court dismissed, *with prejudice*, Yucaipa's counterclaim for equitable subordination against BD/S and explained that "[b]ased on the Court's judicial experience and common sense, Yucaipa's allegations cannot create a plausible story." (Counterclaim Dismissal at 64-65.) The Court expressly rejected Yucaipa's sweeping factual allegations that BD/S engaged in a multi-year scheme to equitably subordinate Yucaipa's First Lien Debt, including, among other allegations: (i) that Black Diamond bribed Spectrum to commence the involuntary bankruptcy proceeding, *i.e.*, the "Involuntary Petition Payoff"; (ii) that BD/S were "'lying in wait' for the optimal time to file their equitable subordination claim";

13

and (iii) that BD/S were pretending to negotiate with JCT for over a year intending all along to "scuttle" the deal.  (*Id.* at 64.)

The Court correctly recognized that the Yucaipa Defendants' factual allegations were implausible, in part because they depended upon a series of "unpredictable events occurring in a manner favorable to" BD/S, including numerous and significant victories in litigation (including a favorable judgment on BD/S's pending equitable subordination claim), successfully acquiring Allied's assets through a credit bid on behalf of all Lenders (which was not successful), and appreciation of Allied's assets "to the point where the asset value plus any recovery realized from the equitable subordination litigation exceeded a par plus accrued interest recovery years after JCT had offered them a 100% recovery."  (*Id.*)  As the Court recognized, "Yucaipa's reliance on this sequence of events is not plausible," and that it is "simply not plausible that economic actors, such as Black Diamond and Spectrum, would take that much litigation risk just to aggravate Yucaipa's attempt to own unrestricted First Lien Debt."  (*Id.* at 64-65.)

Likewise, more than two years before the Counterclaim Dismissal, the Court rejected some of the same allegations as implausible when it dismissed the Yucaipa Defendants' cross-claims against BD/S and other First Lien Lenders for a declaratory judgment, unjust enrichment, estoppel and injunctive relief.  (Cross-Claims Dismissal at 110-11.)  At oral argument, the Court aptly stated that "[a]s a matter of fact, I don't think there's any allegation really that rises to the plausibility that there was any kind of mischief going on that was detrimental or directed at Yucaipa at the time of the third amendment being entered into . . . and then the fourth amendment being entered into [or] negotiated."  (Cross-Claims Dismissal at 110: 9-16.)  The Court further found that Yucaipa's allegations that BD/S somehow encouraged

Yucaipa to acquire First Lien Debt from ComVest so that, years later, BD/S could seek to

equitably subordinate Yucaipa's claim was implausible: "[t]he fact that it was all part of a grand

strategy that somehow Yucaipa was sucked in to allow [ComVest] to make the agreement and

then make the sale, I just, I just don't find that plausible." (*Id.* at 111: 3-6.)

   While BD/S's objections to the Requests refer to "collateral estoppel" and the

Court's prior decisions dismissing the Yucaipa Defendants' counterclaim and cross-claims as

implausible, BD/S's objections to the Requests are grounded in *relevance* and the *undue burden*

the Requests would impose.  Indeed, under well-established law, a party may not seek discovery

in support of dismissed claims.  *See*, *e.g.*, *Kellogg Brown & Root Servs., Inc. v. United States*,

117 Fed. Cl. 1, 9 (Fed. Cl. 2014) ("A party may not seek discovery on dismissed claims.");

*Zurich Am. Ins. Co. v. Queens Mach. Co.*, No. 13 Civ. 6774 (DEK), 2014 WL 3891767, at *3

(E.D. La. Aug. 7, 2014) (denying motion to compel because it "is no more than an end-run

around the earlier . . . dismissals of its counterclaims in an attempt to revive them"); *In re*

*Bridgeport Educ., Inc. Sec. Litig.*, No. 12 Civ. 1737 (JM) (JLB), 2014 WL 3867495, at *1 (S.D.

Cal. Aug. 6, 2014) (denying motion to compel "discovery relating only to dismissed claims");

*Bever v. CitiMortgage, Inc.*, No. 11 Civ. 01584 (AWI) (SKO), 2014 WL 2042015, at *3 (E.D.

Cal. May 16, 2014) ("Plaintiff is not permitted to use the discovery process as a fishing

expedition to try and resuscitate dismissed claims.").

   In support of their claim that BD/S has improperly objected to the Requests on

"collateral estoppel" grounds, the Yucaipa Defendants cite only *Mezu v. Morgan State Univ.*,

269 F.R.D. 565, 575 (D. Md. 2010) and *In re No-Burn Inc. v. Speller*, No. 05 Civ. 02096, 2006

WL 4458703, at *2 (Bankr. M.D.N.C. Jan. 21, 2006).  (*See* Motion at 8-9.)  However, neither of

those cases involved relevance objections or an attempt to obtain discovery in support of

dismissed claims, as is the case here.

> ### 2.    The Yucaipa Defendants' Attempt to Repackage Their Implausible Allegations as Affirmative Defenses or a RICO Claim Is Unavailing

The Yucaipa Defendants' attempt to end-run the Court's prior decisions by

asserting that their implausible factual allegations are "relevant to . . . Yucaipa's affirmative

defenses in the Adversary Proceedings and Yucaipa's claims in the RICO Action" is unavailing.

(Motion at 9.)  With respect to the affirmative defenses, the Yucaipa Defendants argue that:

> [T]he Yucaipa Defendants have explained that BD/S orchestrated a carefully timed series of lies, payoffs, and legal maneuvers designed to wrongfully enrich themselves at Yucaipa's expense— setting up Yucaipa as the proverbial fall guy to blame for Allied's misfortunes connected to the Great Recession.  *To that end, the Yucaipa Defendants have asserted the affirmative defenses of unclean hands, waiver, estoppel, consent, and laches, among others.*

(Motion at 10 (emphasis added).)  This is a notable admission and the first time in this multi-year

litigation that the Yucaipa Defendants have revealed that their affirmative defenses are simply

the *same* factual allegations the Court deemed to be implausible and dismissed with prejudice.

Accordingly, as set forth in Section II, *infra.*, the Court should strike the Yucaipa Defendants'

affirmative defenses that are based on implausible allegations, because they are insufficient as a

matter of law and will cause substantial prejudice to BD/S if the Yucaipa Defendants are

permitted to engage in a lengthy discovery to support them.

In any event, the Yucaipa Defendants' attempt to revive implausible allegations

by tying them to their affirmative defenses and claims in the RICO action gets them nowhere.

Discovery in support of dismissed claims is not permitted, and courts have recognized that

discovery is not warranted even for pending claims or defenses, where those claims or defenses

rely upon the same factual allegations as a dismissed claim.  *See*, *e.g.*, *Share Corp. v. Momar*

*Inc.*, No. 10-CV-109, 2011 WL 2600740, at *2 (E.D. Wis. June 29, 2011) (rejecting discovery as "not relevant" despite argument that discovery is related to dismissed claim *and* pending claim because "the conduct forming the basis for the [pending] claim . . . is essentially the same as that alleged in the [dismissed] claim" and "the court has determined that no plausible [claim] was alleged"); *Fleet Nat'l Bank v. Harstone*, No. 96-10166-NG, 1997 WL 557564, at *13 (D. Mass. May 29, 1997) (recommending striking affirmative defenses that were "based on the same allegations of misconduct that were rejected in" defendant's counterclaims).

Indeed, the specific material sought by the Yucaipa Defendants in support of their affirmative defenses only highlights that those defenses are premised upon implausible allegations that do not warrant burdensome discovery.  For example, in support of their unclean hands defense, the Yucaipa Defendants argue that they need discovery of additional "information and documents related to BD/S's 'Cooperation Agreement'" and "details regarding the undisclosed transfer of $4,239,486.90 from Black Diamond to Spectrum in advance of the involuntary filing," beyond the materials that have already been produced and considered by this Court.  (Motion at 11.)  The Yucaipa Defendants argue that this discovery "directly relate[s] to the theory that BD/S were scheming to equitably subordinate first lien debt at the expense of other lenders even before Yucaipa had acquired its first lien claims."  (Motion at 11-12.)  The Court has already considered and rejected this alleged "scheme," specifically including the Cooperation Agreement and "Involuntary Petition Payoff" allegations, finding that neither the sale of First Lien Debt from Black Diamond to Spectrum nor its nondisclosure was improper. (Counterclaim Dismissal at 62 ("As Black Diamond and Spectrum did not transfer the 'Involuntary Petition Payoff' in order to commence the involuntary proceedings, such transfer did not need to be disclosed pursuant to Bankruptcy Rule 1003.").)  To allow the Yucaipa

Defendants to go around fishing for facts in discovery in support of those implausible – and completely unfounded – allegations would be a waste of time and resources and outside the scope of FRCP 26.[13]

The Yucaipa Defendants also seek broad discovery regarding "BD/S's acquisition and sale of first lien debt, the amount they paid or received for that debt, and BD/S's valuation of their own or other lender's debt."  (Motion at 11.)  None of those topics are remotely relevant to an unclean hands defense, and the Yucaipa Defendants do not even attempt to demonstrate otherwise.  The Yucaipa Defendants assert only that "it will be necessary to know who owned what amount of debt, when, and what it was worth at various points in time."  But who owned what amount of debt and how that debt was valued has nothing to do with whether BD/S engaged in bad faith or other misconduct amounting to unclean hands.

The only argument the Yucaipa Defendants offer in support of such discovery is that BD/S "will need to prove harm/damages by comparing the value of their holdings over time against the other opportunities they contend should have been taken on behalf of the debtor[.]" (*Id.*)  However, no measure of damages for BD/S's claims is based upon what amounts were paid for First Lien Debt.  Whether Yucaipa's claims are subordinated has nothing to do with what BD/S or others paid for First Lien Debt or how that debt was valued at various points in time.  In addition to subordination remedies, the only relevant measure of monetary damages is already known to the parties and requires no further discovery from BD/S: the difference between the amount that was paid by JCT in the post-petition sale of Allied's assets and the amount that

---

[13] The two cases cited by the Yucaipa Defendants in support of their unclean hands defense are inapposite.  (Motion at 10 (citing *Ciba-Geigy Corp. v. Bolar Pharm. Co., Inc.*, 747 F.2d 844 (3d Cir. 1984) and *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371 (3d Cir. 1992)).  Neither case involved the question of whether a litigant may seek discovery in support of implausible factual allegations or previously dismissed claims.  The Yucaipa Defendants' reliance upon the *S & R Corp.* case is particularly curious, because there, an unclean hands defense was not even raised and the court found that it would have been unsuccessful in any event.

would have been paid by JCT's offer of par plus accrued interest, had Yucaipa not acted inequitably toward the First Lien Lenders and other creditors.  The discovery sought by the Yucaipa Defendants is therefore irrelevant to any claim or defense and falls outside the scope of FRCP 26.

The Yucaipa Defendants also seek discovery relating to SBDRE and the reimbursement of Lenders' legal expenses in this bankruptcy.  (Motion at 12.)  This Court explicitly deferred SBDRE-related issues to the Delaware Chancery Court, which stayed Yucaipa's claims therein.  The Yucaipa Defendants' attempts to end-run the Delaware Chancery Court's stay of discovery is clearly improper.  Notwithstanding the stay, any conduct by BD/S in connection with SBDRE or the reimbursement of legal fees occurred *after* the filing of the bankruptcy petitions and was done with this Court's *approval*.  It is therefore hard to imagine how even broad discovery into those matters could possibly produce any relevant information that would support Yucaipa's unclean hands defense.

Likewise, none of the topics the Yucaipa Defendants refer to in support of their "Waiver/Acquiescence/Laches" defenses warrant additional discovery beyond what has already been produced.  The Yucaipa Defendants argue that they need to show that "BD/S inexcusably delayed in bringing suit and that the Yucaipa Defendants relied to their detriment on false statements by BD/S."  (Motion at 13.)  As an initial matter, the Court has already rejected these allegations as implausible.  (*E.g.*, Counterclaim Dismissal at 64 (rejecting as implausible the allegation that BD/S were "'lying in wait' for the optimal time to file their equitable subordination claim, including negotiating for a year with JCT only to scuttle the deal").)  Notwithstanding that rejection, none of the Requests go toward any issue concerning BD/S's

alleged delay in bringing suit.  Documents and information concerning the timing of the suit and nonprivileged communications leading up to it have already been produced.

The Yucaipa Defendants also seek additional discovery regarding a meeting between Mr. Deckoff of Black Diamond and Mr. Burkle of Yucaipa in August 2009.  (Scolnick Decl. Ex. 3.2 at 12.)  These Requests seek information in support of factual allegations the Court has already rejected as implausible—namely, that BD/S "encouraged" Yucaipa to acquire First Lien Debt has part of a scheme to later subordinate Yucaipa's claims.[14]

Finally, with respect to Yucaipa's claim that the discovery they seek is relevant to its RICO Action, Yucaipa's attempt to use the parties' agreement to coordinate discovery in the Adversary Proceedings and the RICO Action in order to compel discovery in support of implausible factual allegations is blatantly improper.  BD/S agreed to coordinate discovery in the Adversary Proceedings and in the RICO Action to *reduce* the discovery burdens on both the parties and the courts, not to broaden the scope of discovery or permit the Yucaipa Defendants to make an end-run around prior rulings of this Court, such as the Counterclaim Dismissal and Cross-Claims Dismissal.  Yucaipa freely admits that the allegations in the RICO Action are the *same* allegations that this Court has already rejected as implausible: "Yucaipa's complaint [in the RICO action] details BD/S's scheme to reap a windfall from their relatively small investment in Allied by encouraging Yucaipa . . . to purchase Allied's first lien debt, and then preventing Allied from acting as Requisite Lender, filing the involuntary bankruptcy petition supported by false affidavits, and seeking the equitable subordination of Yucaipa's claims."  (Motion at 4-5.)

---

[14] The Yucaipa Defendants also argue that they need this discovery to disprove BD/S's allegation in their tortious interference claim that Yucaipa "surreptitiously" acquired First Lien Debt.  (Motion at 13.)  However, the tortious interference claim is premised upon allegations that, among other things, the Yucaipa Defendants authorized Yucaipa to purchase First Lien Debt in breach of the validly enacted Third Amendment after forcing through the Fourth Amendment without the consent of other Lenders.  Whether Yucaipa acquired the debt "surreptitiously" or openly is irrelevant to that claim.  In any event, regardless of whether Yucaipa told Black Diamond of its plan to improperly acquire First Lien Debt, there is no allegation that Spectrum acquiesced or waived any rights with respect to Yucaipa's breach of the Third Amendment.

Moreover, Yucaipa's RICO Action is subject to a motion to dismiss, which has been fully briefed and has been pending before the Delaware District Court since July 2015.  BD/S have moved to dismiss the RICO Action on numerous grounds, including that Yucaipa's allegations in the RICO Action are not plausible.  In the event that Judge Robinson agrees with this Court that the factual allegations in the RICO complaint are not plausible (and/or grants the motion to dismiss on other grounds), any discovery into those factual allegations would be wasteful, unduly burdensome, and expensive.

### B.    Black Diamond and Spectrum Have Not Waived Any Discovery Objections

Next, the Yucaipa Defendants take the position that BD/S have waived all of their objections to the Yucaipa Defendants' interrogatories by serving untimely responses to them. The Yucaipa Defendants' attempt to wipe out BD/S's objections to the interrogatories must fail, because (1) BD/S have been engaging in discovery in good faith, and (2) the Yucaipa Defendants have not suffered any prejudice.  *See*, *e.g.*, *Hammond v. Lowe's Home Ctrs., Inc.*, 216 F.R.D. 666, 669-70 (D. Kan. 2003) (excusing failure to timely object to interrogatories where defendant "has cooperated with Plaintiffs with respect to discovery in good faith," "has worked extensively with Plaintiffs' counsel to cooperatively exchange discovery information in this case without strict adherence to time limitations, and it has not objected when Plaintiffs required additional time to respond to discovery"); *Westdale Recap Props., Ltd. v. NP/I & G Wakefield Commons, L.L.C.*, No. 5:11-CV-659-D, 2013 WL 5424844, at *5 (E.D.N.C. Sept. 26, 2013) (declining to waive objections for tardiness where movants "have not demonstrated any prejudice from the delay in service of the response or requested documents, particularly in light of the overall pace of discovery in this case" and where "waiver based on tardiness would be unduly harsh and is not warranted").

21

As explained above, and as evidenced by the more than 1,200 pages attached to Mr. Scolnick's declaration, the Yucaipa Defendants served BD/S with 366 separate discovery requests in a span of three weeks, between May 20, 2015 and June 10, 2015 (the Yucaipa Defendants thereafter served an additional 344 requests on April 26, 2016). BD/S have cooperated in discovery in good faith and have responded to all of the Requests. With the exception of the Yucaipa Defendants' interrogatories, BD/S timely responded to all of the Requests on July 31, 2015. In addition, the Yucaipa Defendants do not dispute that BD/S has met and conferred in good faith with the Yucaipa Defendants' counsel.

The Yucaipa Defendants cannot possibly argue that the one-month delay has caused them prejudice (nor do they even attempt to do so in their Motion). In fact, the Yucaipa Defendants expressly acknowledge on the first page of the Motion that "[o]ver the past year, the Yucaipa Defendants and BD/S have engaged in an extensive, good-faith meet-and-confer process in [an] effort to streamline the outstanding discovery disputes as much as possible…." (Motion at 1.) Likewise, throughout the course of this dispute, BD/S and the Yucaipa Defendants have repeatedly agreed and cooperated with one another for extensions of time. In fact, on August 27, 2015, only a few days before BD/S served responses to the interrogatories, the parties agreed to extend fact discovery until March 16, 2016. Since that time, the parties have twice agreed to further extend fact discovery. Most recently, in early July 2016, the parties agreed to extend the fact discovery period by 5 months until March 2017. (*See* Agreed and Amended Scheduling Order, dated July 5, 2016, Adv. Pro. No. 14-50971 (CSS), ECF No. 116-1 ¶ 3.) In light of those extensions of the discovery deadline, the Yucaipa Defendants waited nearly a year after BD/S served its responses to the interrogatories to bring this Motion.

For all of those reasons, the Court should not find that BD/S has waived their objections to the Yucaipa Defendants' interrogatories.  *See*, *e.g.*, *Burlington Ins. Co. v. Okie Dokie, Inc.*, 368 F. Supp. 2d 83, 91 (D.D.C. 2005) (holding that objections were not waived where responses were not substantially late, the opposing party was not prejudiced by the delay, and there was no misconduct); *Wilson v. Kautex*, No. 1:07-CV-60, 2008 WL 162645, at *4 (N.D. Ind. Jan. 14, 2008) ("[B]ecause the Defendants' delay in filing their objections was insubstantial under the facts of this case, their objections have not been waived."); *Stanley v. Chester Cty. Prison Farm*, No. 85-5502, 1986 WL 305, at *2 (E.D. Pa. Sept. 16, 1986) (although "failure to object to a discovery request in a timely fashion may constitute a waiver of the objection," "it is within the Court's discretion not to compel discovery which is improper"), *vacated in part*, *Stanley v. Chester Cty. Prison Farm*, 1986 WL 13553, at *1 (Dec. 1, 1986) (court later vacated portion of order that granted discovery related to plaintiff's document request).

### C.    Black Diamond and Spectrum Have Properly Withheld Documents Protected by the Attorney-Client Privilege

Finally, the Yucaipa Defendants argue that "BD/S are currently withholding more than 4,000 responsive documents from disclosure based on an improper and vastly overbroad assertion of the common interest doctrine."  (Motion at 21-22.)  That bold claim is both factually and legally incorrect.

First, all of the documents BD/S are withholding are subject to the *attorney-client privilege* (separate and apart from the common interest privilege).  This is made clear by BD/S's privilege logs, which list as the bases for withholding the documents both the attorney-client privilege and the common interest privilege (using the acronyms "AC/CI"), and in some instances the attorney work product doctrine (using the acronym "WP").  (*See* Scolnick Decl. Exs. 21 & 22.)  As set forth below, there is no basis to compel the production of any of the

documents on BD/S's privilege logs based on a purportedly improper assertion of the common interest privilege. All of the documents BD/S are withholding are protected by the attorney-client privilege, and the question of whether the "common interest" privilege applies is purely academic and need not be addressed by the Court.

In *In re Teleglobe Communications Corp.*, which is heavily cited by the Yucaipa Defendants (*see* Motion at 21-27), the Third Circuit recognized that communications among jointly represented clients and their common counsel are protected by the attorney-client privilege. 493 F.3d 345, 362-363 (3d Cir. 2007) ("[w]hen co-clients and their common attorneys communicate with one another, those communications are 'in confidence' for privilege purposes," and "the privilege protects those communications from compelled disclosure to persons outside the joint representation"). Indeed, "[t]he rules governing attorney-client privilege have evolved to cover the representation of two or more people by a single lawyer, a joint representation." *Magnetar Techs. Corp. v. Six Flags Theme Park, Inc.*, 886 F.Supp.2d 466, 479 (D. Del. 2012); *see also In re Cardinal Fastener & Specialty Co.*, No. 11 Civ. 15719, 2013 WL 425858, at *8 ( N.D. Ohio Feb. 4, 2013) ("The attorney client privilege protects joint client communications from discovery by third parties.") (internal quotation marks omitted). Section 75 of the Restatement (Third) of the Law Governing Lawyers provides that "[i]f two or more persons are jointly represented by the same lawyer in a matter, the communication of either co-client that otherwise qualifies as privileged under §§ 68-72 and relates to matters of common interest is privileged as against third persons . . . ." *See also The Jordan (Bermuda) Inv. Co. v. Hunder Green Invs. Ltd.*, No. 00 Civ. 9214 (RWS), 2006 WL 2773022 (S.D.N.Y. Sept. 27, 2006) ("joint clients" who share the same attorney in the same matter are "entitled to the attorney-client privilege").

24

As Yucaipa has known for years, Black Diamond and Spectrum are jointly represented by Schulte Roth & Zabel LLP ("SRZ").  Without question, communications between SRZ and BD/S are protected by the attorney-client privilege.  *Teleglobe*, 493 F.3d at 362-63; *Magnetar Techs. Corp.*, 886 F.Supp.2d at 479.  Indeed, the Yucaipa Defendants' Motion does not claim otherwise.  Yet the *vast* majority of the approximately 4,000 withheld documents that the Yucaipa Defendants challenge in Exhibits 21 and 22 of the Scolnick Declaration are communications between SRZ, Black Diamond and/or Spectrum (the "SRZ Emails").  Specifically, approximately 250 of 284 pages (88%) of Exhibit 21 (annotated version of Black Diamond's privilege log) are entirely comprised of SRZ Emails.  The same is true for approximately 110 of 194 pages (57%) of Exhibit 22 (annotated version of Spectrum's privilege log).  There is no basis for the Court to compel production of those privileged documents, certainly not the flimsy basis asserted by the Yucaipa Defendants that the communications do not involve "*separate* counsel representing *different* clients."  (Motion at 21.)

The communications involving attorneys from Ropes & Gray LLP ("Ropes & Gray") are likewise subject to the attorney-client privilege regardless of whether a common interest privilege applies.  (*See* Motion at 21-22.)  As the Yucaipa Defendants are well aware, BD/S and other First Lien Lenders (other than Yucaipa) formed a steering committee in 2008, before Yucaipa purchased any First Lien Debt and before the involuntary bankruptcy petitions were filed, for the purpose of maximizing their recovery of First Lien Debt and exploring legal claims against Allied and/or Yucaipa (the "Steering Committee").  The Steering Committee retained Ropes & Gray as its counsel, which jointly represented each of the Steering Committee's members and had an attorney-client relationship with each of them.

25

Even if the communications between Ropes & Gray and its co-clients who comprised the Steering Committee do not technically qualify as "common interest" privileged because the co-clients were not represented by separate counsel, the communications are nonetheless protected by the attorney-client privilege because the co-clients were represented by the same counsel (Ropes & Gray) in legal matters concerning the recovery of First Lien Debt and exploring potential claims against Allied and/or Yucaipa.  Although BD/S, perhaps mistakenly, referred to the privilege between the co-clients as both the "attorney-client" and the "common interest" privilege, "'[c]ommon interest' has been used to describe the 'joint client' or 'co-client' privilege." *625 Milwaukee, LLC v. Switch & Data Facilities Co.*, No. 06 Civ. 0727, 2008 WL 582564, at *2 (E.D. Wis. Feb. 29, 2008); *see also CGC Holding Co., LLC v. Hutchens*, No. 11 Civ. 01012 (RBJ) (KLM), 2016 WL 233551, at *3 (D. Colo. Jan. 20, 2016) ("The courts frequently combine the separate situations addressed by the joint client privilege and the common interest rule privilege . . . .").

Second, the Yucaipa Defendants assert that "many" of the withheld communications should be produced because they "involve no attorneys whatsoever."  (Motion at 22.)  This argument fails because it too relies on a false premise that the common interest privilege is the only asserted protection for the subject communications.  (*Id.*)  As explained above, all of the communications that BD/S has withheld are protected by the attorney-client privilege, regardless of whether a common interest privilege applies.  *Teleglobe*, 493 F.3d at 362-63.

Notably, "under the 'joint client' doctrine, clients of the same attorney may share privileged communications with a co-client without waiving attorney-client privilege." *Sun Capital Partners, Inc. v. Twin City Fire Ins. Co.*, No. 12- Civ. 81397, 2015 WL 1860826, at *5

(S.D. Fla. Apr. 22, 2015).  In fact, "each joint client's communications with the attorney may be

shared among the others without destroying either their confidentiality *or the privilege protection*

premised upon it," and "*[c]ommunications between joint clients themselves are also protected*

when their purpose is to facilitate more effective representation, that is, when they are intended

for ultimate transmission to counsel for the purpose of obtaining legal advice."  *In re Benun*, 339

B.R. 115, 128 (Bankr. D.N.J. 2006) (internal quotation marks and citations omitted) (emphasis

added).  All of the non-attorney communications cited in the Motion are between jointly

represented clients with the same counsel, either (i) members of the Steering Committee jointly

represented by Ropes & Gray, or (ii) Black Diamond and Spectrum jointly represented by SRZ.

(*See* Motion at 22, n.21.)  Under the co-client or joint-client doctrine, all of the non-attorney

communications are protected from disclosure by the attorney-client privilege and should not be

produced.

>    Third, the Yucaipa Defendants claim that the First Lien Lenders only shared a

common commercial interest, not a common legal interest.  (Motion at 24-26.)  This argument

also fails.  The First Lien Lenders shared a common legal interest concerning their contractual

rights and legal remedies, including potential legal remedies against Allied and/or Yucaipa.  It is

well established that a common legal interest can be found "even if there are separate or

overlapping commercial interests."  *In re Leslie Controls, Inc.*, 437 B.R. 493, 500 (Bankr. D.

Del. 2010); *CIF Licensing, LLC v. Agere Sys. LLC*, No. 07 Civ. 0170 (LPS), 2012 WL 6085368,

at *8 (D. Del. Dec. 3, 2012) (a common interest must be "legal, not *solely* commercial") (citation

omitted).

>    Thus, even where commercial interests exist, parties can also share a common

*legal* interests.  *Id.*  Here, the First Lien Lenders that formed the steering committee shared a

common legal interest because they required an analysis of the First Lien Credit Agreement as well as issues of contract and bankruptcy law to determine what *legal* claims were available to the non-Yucaipa First Lien Lenders.

The Yucaipa Defendants do not dispute that shared interest, but instead merely draw attention to the fact that a small percentage of the withheld communications – those amongst steering committee members from 2008 and 2009 – took place before Allied entered bankruptcy and before Yucaipa purchased First Lien Debt (as noted above, the vast majority of the withheld documents are actually SRZ Emails, many of which were sent *after* the petitions were filed).  (Motion at 25-26.)  This is a distinction without a difference because it has no impact on the legal nature of the common interest among the First Lien Lenders.  The withheld communications are legal in nature because they concern the steering committee's analysis and litigation strategy in connection with its legal rights and remedies for Allied's numerous defaults of the First Lien Credit Agreement under Yucaipa's direction and control.

The decision in *HSH Nordbank AG New York Branch v. Swerdlow*, 259 F.R.D. 64, 72-73 (S.D.N.Y. 2009) is directly on point.  In *HSH Nordbank*, the plaintiff (an administrative agent on behalf of five separate lenders) brought a breach of contract action against guarantors of a loan.  *Id.* at 69.  The plaintiff asserted that co-lenders of the loan, like the members of the steering committee, shared a common legal interest.  *Id.*  The defendants argued that the plaintiff's interest with other lenders was a commercial interest, not a legal one.  *Id.* at 73.  The court rejected that argument, explaining that "[w]hile the lenders' business interests may coincide or overlap with their legal interests, the obligations they seek to enforce are grounded in contract and, by definition, involve the pursuit of legal rights and remedies."  *Id.*  The court further explained that "[t]his is underscored by the fact that the very subject of the

28

communications was what legal strategy would best serve the interests of [plaintiff] and the non-party lenders." The court concluded that the "co-lenders of [the] Loan" shared "a common interest in enforcing defendants' obligations under the Guaranties" even though the co-lenders' legal interests overlapped with their commercial interests. *Id.* at 72. The same result is warranted here because the challenged communications concern the First Lien Lenders' contractual rights and legal strategies, including potential legal remedies against Allied and/or Yucaipa. The members of the steering committee plainly had a common legal interest, notwithstanding the overlap of common commercial interests.[15]

Fourth, the Yucaipa Defendants criticize the level of detail in BD/S's privilege logs and assert that the descriptions of documents in the privilege logs "fail to establish that the communications are privileged in the first place." (Motion at 26.) This argument is meritless. Under FRCP 26(b)(5), a party withholding privileged documents must simply "describe the nature" of each withheld document "in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." FED. R. CIV. P. 26(b)(5)(A)(ii). In keeping with common practice in federal courts around the country, BD/S provided, for each withheld document, the name of the author, the names of all recipients, a description of the document (*e.g.*, email), the date and time (if available) of the document, the subject line (if applicable), a description of the nature of the communication contained in the document, and the basis for withholding the document. (*See* Scolnick Decl. Exs. 21-22.)

The Yucaipa Defendants cherry-pick a handful of descriptions in BD/S's privilege logs and argue that they are too "general," even though those descriptions identify the senders and recipients, dates, document type, bases for withholding, and clearly state that the withheld

---

[15] While claiming that the steering committee did not have a common legal interest, the Yucaipa Defendants do not even attempt to argue that Black Diamond and Spectrum do not have a common legal interest, even though they seek the production of thousands of SRZ Emails between SRZ, Black Diamond and/or Spectrum.

communications reflect legal advice regarding specific topics, such as "Allied financials," "CIT's resignation as Administrative and Collateral Agent," and the "JCT bid," among many others.  (Motion at 27.)  The Yucaipa Defendants' assertion that they do not understand "why BD/S would have sought legal advice regarding those topics" is as ridiculous as it is irrelevant.  (*Id.*)  Yucaipa is not entitled to understand *why* BD/S might seek legal advice regarding *any* topic.  The descriptions provided in BD/S's privilege logs are more than sufficient under the law and the Yucaipa Defendants are not entitled to anything more.  *See*, *e.g.*, *In re Copper Mkt. Antitrust Litig.*, 200 F.R.D. 213, 223 (S.D.N.Y. 2001).

Indeed, the Yucaipa Defendants' own privilege log provides descriptions that are just as general – or even more general – than as BD/S's privilege logs and provide descriptions of many of the same topics for which the Yucaipa Defendants feign confusion over how they could involve legal advice.  For instance, Yucaipa's privilege log contains entries described as communications "reflecting legal advice" or "necessary to obtain legal advice" regarding:

- "Allied litigation analysis"  (Ward Decl. Ex. 1, at Entry No. 08922);

- "CIT planning and strategy"  (*id.* at Entry No. 15533);

- "update on ComVest deal" (*id.* at Entry No. 24783);

- "CIT litigation" (*id.* at Entry No. 24871);

-  "[P]otential JCT transaction"  (*id.* at Entry No. 19096); and

- "[E]stimates of legal fees"  (*id.* at Entry No. 24496).

For all of the foregoing reasons, the Court should disregard the Yucaipa Defendants' meritless attempt to compel the production of privileged documents.

## II.    THE YUCAIPA DEFENDANTS' AFFIRMATIVE DEFENSES PREMISED UPON IMPLAUSIBLE ALLEGATIONS SHOULD BE STRICKEN

FRCP 12(f) states that a court may strike any "insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f).  Affirmative defenses that are legally insufficient are properly stricken pursuant to FRCP 12(f).  *See*, *e.g.*, *Warner/Chappel Music, Inc. v. Pilz Compact Disc, Inc.*, No. Civ. A. 99-0293, 1999 WL 999332, at *3-5 (E.D. Pa. Oct. 26, 1999) (striking affirmative defenses of lack of standing, estoppel and laches, and noting that "[t]he Court can strike an affirmative defense when it is legally insufficient to prevent recovery under any state of facts reasonably able to be inferred from the well pleaded allegations of the answer"); *BJ Energy LLC v. PJM Interconnection, LLC*, Nos. 08 Civ. 3649, 09 Civ. 2864 (NLS), 2010 WL 1491900, at *1-3 (E.D. Pa. Apr. 13, 2010) (same).[16]

Here, in their attempt to open the door to expensive and burdensome discovery, the Yucaipa Defendants make a significant admission: that their "affirmative defenses of unclean hands, waiver, estoppel, consent, and laches, among others," are the *same* factual allegations that this Court already has found to be implausible.[17]  (*See* Motion at 10; Counterclaim Dismissal at 54-65.)  Specifically, the Yucaipa Defendants make clear that those affirmative defenses are the implausible allegations that "BD/S orchestrated a carefully timed series of lies, payoffs, and legal maneuvers designed to wrongfully enrich themselves at Yucaipa's expense."  (*Id.* at 10.)  Now that it is clear that the Yucaipa Defendants' affirmative defenses for estoppel, waiver, unclean

---

[16] Although Rule 12(f)(2) provides the Court can strike affirmative defenses upon a motion within 21 days of receiving the pleading, Rule 12(f)(1) provides that the Court may do so at any time "on its own." *See*, *e.g.*, *Sheridan v. E.I. DuPont de Nemours Co.*, Civ. A. No. 93-46-SLR, 1994 WL 468711, at *10-12 (D. Del. Mar. 28, 1994) ("[B]ecause Rule 12(f) permits a district court on its own initiative to entertain a motion to strike, the Court has the discretion to hear untimely motions."); *United States v. Walerko Tool and Eng'g Corp*, 784 F.Supp. 1385, 1387 (N.D. Ind.) ("Rule 12(f) allows the court on its own motion to strike matters in a pleading . . . [T]he court may decide the merits of the motion to strike even if the motion is untimely.")

[17] In making this point, the Yucaipa Defendants cite to their affirmative defenses of "Estoppel," "Waiver," "Unclean Hands and *In Pari Delicto*," "Consent," and "Laches."  (Motion at 10 (citing Adv. Pro. No. 13-50530, ECF No. 95 ¶¶ 299-304, 307-08, 315-16; Adv. Pro. No. 13-50530, ECF No. 96 ¶¶ 157-62, 165-66, 168; Adv. Pro. No. 14-50971, ECF No. 19 ¶¶ 147-50, 155-56, 159-60, 166-67).)

hands, consent, and laches turn solely upon factual allegations that the Court has already

determined to be implausible, those affirmative defenses have no chance of success and are

irrelevant to the issues remaining in this dispute because the Court (and finder of fact with

respect to the equitable subordination claims) has already rejected the factual allegations

underlying those defenses as legally insufficient.  (Counterclaim Dismissal at 54-65; Cross-

Claims Dismissal at 110-11.).  They should therefore be stricken pursuant to FRCP 12(f),

because they will cause prejudice to BD/S if they remain in the action.

The decision in *Modern Creative Services, Inc. v. Dell Inc.*, No. 05 Civ. 3891

(JLL), 2008 WL 305747, at *2-4 (D.N.J. Jan. 28, 2008), is instructive.  There, the plaintiff

moved to strike affirmative defenses on the basis that "affirmative defenses previously rejected

on a motion to dismiss constitute legally insufficient defenses" and that the defendant "should

not be allowed an end run around the Court's legal determinations."  *Id.* at *2 (internal quotation

marks and citations omitted).  The defendant responded by arguing that the court's prior denial

of defendant's motion to dismiss "in no way forecloses [defendant] from asserting affirmative

defenses on those grounds, seeking discovery on the allegation at issue and revisiting its

arguments at the summary judgment stage."  *Id.* (internal quotation marks and citations omitted).

The court struck the affirmative defenses that were based upon legal theories it

had previously rejected on the motion to dismiss, holding that the defendant could not reassert

rejected legal theories "in the guise of an affirmative defense" and that the court would not give

the defendant "the ability to renew arguments which have been squarely addressed and decided

by this Court as a matter of law."  *Id.* at * 4.  *See also*, *e.g.*, *Human Genome Sciences, Inc. v.*

*Genetech, Inc.*, No. 11 Civ. 6519 (MRP) (JEM), 2011 WL 7461786, at *8 (C.D. Cal. Dec. 9,

2011) (striking unclean hands affirmative defense because it "relies on the same facts" as

defendant's dismissed counterclaim); *Bowlers' Alley, Inc. v. Cincinnati Ins. Co.*, No. 13 Civ. 13804, 2015 WL 3441155, at *5 (E.D. Mich. May 28, 2015) (where court previously dismissed counterclaim based on fraud as "implausible and insufficient as a matter of law, court stated that "corresponding affirmative defense of fraud . . . must fail for the same reasons"); *Fleet Nat'l Bank v. Harstone*, No. 96-10166-NG, 1997 WL 557564, at *13 (D. Mass. May 29, 1997) (recommending striking affirmative defenses that were "based on the same allegations of misconduct that were rejected in" defendant's counterclaims).

In addition, the Yucaipa Defendants admit throughout the Motion that their affirmative defenses of unclean hands, waiver, estoppel, consent and laches sound in fraud, including "lies, payoffs, and legal maneuvers" (Motion at 13), which must be pled with particularity pursuant to FRCP 9(b).  *See, e.g.*, *Bayer CropScience AG v. Dow AgroSciences LLC*, No. 10 Civ. 1045 (RMB) (JS), 2011 WL 6934557, at *1, *3 (D. Del. Dec. 30, 2011) (noting that affirmative defenses sounding in fraud must be pled with particularity pursuant to FRCP 9(b); striking affirmative defense of estoppel for failure to plead with particularity); *Yurman Design, Inc. v. Chaindom Enters., Inc.*, No. 99 Civ. 9307 (JFK), 2000 WL 897141, at *3 (S.D.N.Y. July 5, 2000) (striking affirmative defenses where defendants failed to "plead their affirmative defenses alleging fraud with the particularity required by Fed. R. Civ. P. 9(b)"); *Tyco Fire Prods. LP v. Victaulic Co.*, 777 F.Supp.2d 893, 901 n.7 (E.D. Pa. 2011) (noting that affirmative defenses sounding in fraud "are subject to Rule 9(b)'s particularized requirements"); *XpertUniverse, Inc. v. Cisco Sys., Inc.*, 868 F.Supp.2d 376, 381 (D. Del. 2012) (dismissing "inequitable conduct" counterclaims and affirmative defenses that were not sufficiently pled under FRCP 9(b)).

Here, the Yucaipa Defendants admit in their Motion that their affirmative defenses sound in fraud.  For instance, the Yucaipa Defendants argue that they need to conduct discovery of the details of the purported fraudulent claims trade (the so-called "Involuntary Petition Payoff") in support of their unclean hands defense.  (Motion at 10-12).  Likewise, the Yucaipa Defendants contend that they need to show that BD/S made "false statements" and that the Yucaipa Defendants "relied to their detriment on false statements by BD/S" in support of their laches, consent and waiver defenses.  (*Id.* at 12-13.)  However, the Yucaipa Defendants' Answer fails to satisfy the particularity requirement for pleading affirmative defenses under FRCP 9(b).  As such, their affirmative defenses of unclean hands, waiver, estoppel, consent and laches should be stricken.

Finally, the Court should strike the affirmative defenses because their inclusion in the case has caused, and will continue to cause, prejudice to BD/S.  For purposes of striking an affirmative defense, increased cost and complexity of discovery are sufficient to show prejudice. *See*, *e.g.*, *La. Sulphur Carriers, Inc. v. Gulf Res. & Chem. Corp.*, 53 F.R.D. 458, 460 (D. Del. 1971) (striking affirmative defenses that would cause prejudice by "substantially complicat[ing] the discovery proceedings and the issues at trial"); *Coach, Inc. v. Kmart Corp.*, 756 F. Supp. 2d 421, 426  (S.D.N.Y. 2010); ("increased discovery costs in having to explore the factual basis" of an affirmative defense constitutes prejudice that warrants striking an affirmative defense).

BD/S has already suffered significant prejudice, namely by having to respond to hundreds of discovery requests seeking information in support of insufficiently pled factual allegations that the Court has already rejected as implausible and by having to respond to this lengthy Motion. BD/S will be severely prejudiced in the future if the affirmative defenses in question remain in the Yucaipa Defendants' pleadings, particularly because those defenses sound in fraud.  Costs of discovery

and trial will be dramatically increased if BD/S is forced to repeatedly seek to defend against the

baseless and implausible allegations that this Court has already rejected.

   For all of the foregoing reasons, the Court should strike the Yucaipa Defendants'

affirmative defenses of unclean hands, waiver, consent, estoppel and laches.

## <u>CONCLUSION</u>

   In conclusion, for all of the foregoing reasons, BD/S respectfully request that the Court

deny the Yucaipa Defendants' Motion and grant BD/'S cross-motion to strike certain of the Yucaipa

Defendants' affirmative defenses.

Dated: August 12, 2016
   Wilmington, Delaware     **LANDIS RATH & COBB LLP**


            _/s/ Kerri K. Mumford_____
           Adam G. Landis (No. 3407)
           Kerri K. Mumford (No. 4186)
           919 Market Street, Suite 1800
           Wilmington, Delaware 19801
           Telephone: (302) 467-4400
           Facsimile: (302) 467-4450

           -and-

           **SCHULTE ROTH & ZABEL LLP**
           Adam C. Harris
           David Hillman
           Robert J. Ward
           919 Third Avenue
           New York, New York 10022
           Telephone: (212) 756-2000
           Facsimile: (212) 593-5955

           *Counsel to BDCM Opportunity Fund II, LP, Black*
           *Diamond CLO 2005-1 Ltd., Spectrum Investment*
           *Partners, L.P., Black Diamond Commercial*
           *Finance, L.L.C., and Spectrum Commercial*
           *Finance LLC.*