## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ASHINC Corporation, *et al.*,<br><br>    Debtors. | Chapter 11<br><br>Case No. 12-11564 (CSS)<br>(Jointly Administered) |
| BDCM OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., SPECTRUM INVESTMENT PARTNERS, L.P., BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., AS CO-ADMINISTRATIVE AGENT, AND SPECTRUM COMMERCIAL FINANCE LLC, AS CO-ADMINISTRATIVE AGENT,<br><br>    Plaintiffs,<br><br>v.<br><br>YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P., RONALD BURKLE, JOS OPDEWEEGH, DEREX WALKER, JEFF PELLETIER, IRA TOCHNER, and JOSEPH TOMCZAK,<br><br>    Defendants. | Adv. Proc. No. 14-50971 (CSS) |

## <u>REPLY BRIEF IN SUPPORT OF THE YUCAIPA DEFENDANTS' MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS AND RESPONSES TO DISCOVERY REQUESTS</u>

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ...................................................................................... 1

II. ARGUMENT ................................................................................................................... 2

    A.  BD/S Should Not Be Permitted to Disavow Their Collateral Estoppel
        Objections .............................................................................................................. 2

    B.  The Requests at Issue Are Relevant to the Parties' Claims and/or Defenses ......... 4

        1.  Many of the Requests at Issue Are Directly Relevant to BD/S's
            Own Claims and Allegations ....................................................................... 4

        2.  The Requests at Issue Are Relevant to the Yucaipa Defendants'
            Affirmative Defenses, and Therefore Discoverable ................................... 8

        3.  The Requests at Issue Are Relevant to the RICO Action ......................... 14

    C.  BD/S's Failure to Timely Respond to the Yucaipa Defendants'
        Interrogatories Constitutes Waiver of All Objections .......................................... 14

    D.  BD/S Fail to Present a Coherent Basis for Their Assertion of Privilege
        Over Thousands of Documents ............................................................................. 16

III. CONCLUSION ............................................................................................................. 18

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Am. Sur. Co. v. Baldwin,*
287 U.S. 156 (1932)................................................................................................9

*Ambac Assurance Corp. v. Adelanto Public Util. Auth.,*
No. 09-5087, 2012 WL 1589597 (S.D.N.Y. May 7, 2012) ....................................11

*Burtch v. Huston (In re USDigital, Inc.),*
443 B.R. 22 (Bankr. D. Del. 2011) ........................................................................6

*Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims,*
160 F.3d 982 (3d Cir. 1998)...................................................................................6

*In re Energy Future Holdings Corp.,*
513 B.R. 651 (Bankr. D. Del. 2014) ...................................................................4, 7

*Fleet Nat'l Bank v. Harstone,*
No. 96-10166-NG, 1997 WL 557564 (D. Mass. May 29, 1997)...........................11

*Internet Media Corp. v. Hearst Newspapers, LLC,*
Civ. No. 10–690–SLR, 2012 WL 3867165 (D. Del. Sept. 6, 2012)......................10

*In re Le-Nature's, Inc.,*
380 B.R. 747 (W.D. Pa. 2008) ..............................................................................15

*Lindsey v. Normet,*
405 U.S. 56 (1972)..................................................................................................9

*In re ML–Lee Acquisition Fund II, L.P.,*
151 F.R.D. 37 (D. Del. 1993) ................................................................................4

*In re No-Burn Inc. v. Speller,*
No. 05–02096, 2006 WL 4458703 (Bankr. M.D. N.C. Jan. 21, 2006)...................3

*Oppenheimer Fund Inc. v. Sanders,*
437 U.S. 340 (1978)...........................................................................................4, 10

*Paramount Aviation Corp. v. Agusta,*
178 F.3d 132 (3d Cir. 1999)...................................................................................9

*Romero v. Allstate Ins. Co.,*
271 F.R.D. 96 (E.D. Pa. 2010)...............................................................................4

*Share Corp. v. Momar Inc.,*
No. 10-cv-109, 2011 WL 2600740 (E.D. Wis. June 29, 2011) .............................10

# TABLE OF AUTHORITIES *(continued)*

Page(s)

*Sun Capital Partners, Inc. v. Twin City Fire Ins. Co.*,
  No. 12-Civ. 81397, 2015 WL 1860826 (S.D. Fla. Apr. 22, 2015) ..........................................17

*SWIMC, Inc. v. Hy-Tech Thermal Solutions, LLC*,
  No. 08-084 (SLR), 2009 WL 1795177 (D. Del. June 24, 2009) ............................................15

*In re Teleglobe Commc'ns Corp.*,
  493 F.3d 345 (3d Cir. 2007)............................................................................................17, 18

*Tyco Fire Prods. v. Victaulic Co.*,
  777 F. Supp. 2d 893 (E.D. Pa. 2011) ..............................................................................1, 10

## Other Authorities

Oxford Dictionaries,
  http://www.oxforddictionaries.com/definition/english/surreptitious (last
  visited Aug. 22, 2016)....................................................................................................................8

## Rules

Fed. R. Civ. P. 12(f) ...............................................................................................................2, 10

Fed. R. Civ. P. 33(b)(4)...........................................................................................................14, 15

## I.   PRELIMINARY STATEMENT

In response to Yucaipa's Motion to Compel, BD/S spend the bulk of their brief rehashing this Court's order dismissing Yucaipa's Counterclaim, and discussing this Court's findings about what was and was not plausible for purposes of asserting a cause of action against BD/S for equitable subordination.  (*See* Opposition at 2.)[1]  BD/S apparently seek to recast their improper "collateral estoppel" objection as one challenging the relevance of the Yucaipa Defendants' affirmative defenses.  No matter.  The Requests at Issue relate not merely to the Yucaipa Defendants' affirmative defenses, but more importantly to *BD/S's own* claims and allegations— the latter of which go virtually ignored in BD/S's opposition.  (*See* Motion at 2, 7, 9.)[2]

Moreover, BD/S's "relevance" argument is also premised on an unduly narrow formulation of the Yucaipa Defendants' affirmative defenses—which do not overlap completely with Yucaipa's dismissed equitable subordination Counterclaim.  (Opposition at 3.)  On the contrary, the affirmative defenses are necessarily broader; the Yucaipa Defendants are entitled to explore these defenses through discovery.[3]  And regardless, courts evaluate counterclaims and affirmative defenses through a "markedly different lens," as counterclaims must be plausible under Rule 12(b)(6), while affirmative defenses need only "provide fair notice of the issue," *Tyco Fire Prods. v. Victaulic Co.*, 777 F. Supp. 2d 893, 901 (E.D. Pa. 2011), and defenses may be pursued unless they are "insufficient[,] redundant, immaterial, impertinent, or scandalous."

---

[1]  Capitalized terms used herein and not otherwise defined shall have the same meaning ascribed to them in the Yucaipa Defendants' Motion to Compel.

[2]  BD/S also included in their brief an untimely cross-motion to strike Yucaipa's affirmative defenses.  This reply brief is submitted in support of Yucaipa's Motion to Compel only. Yucaipa will timely oppose BD/S's motion to strike affirmative defenses separately, per the timing set forth in the local rules.

[3]  This Motion to Compel is brought on behalf of various Defendants, including the Director Defendants.  By contrast, the dismissed Counterclaim for equitable subordination was Yucaipa's alone.

Fed. R. Civ. P. 12(f).  Thus, as a matter of procedure and basic due process, Yucaipa is entitled to seek discovery in support of its affirmative defenses.

Critically, BD/S also do not dispute that the Requests at Issue are relevant to Yucaipa's claims and BD/S's defenses in the RICO Action.  Instead, BD/S cling to the pendency of their motion to dismiss that action as a basis to refuse discovery.  (*See* Opposition at 21.)  But the District Judge has not ruled on that motion, so discovery is live and Yucaipa is entitled to pursue relevant information.

BD/S must also respond to all of the Yucaipa Defendants' Interrogatories because they waived all objections by failing to timely serve them.  BD/S do not even attempt to argue "good cause" to excuse the waiver, and BD/S's musings about "lack of prejudice" misstate the facts and the law.

Finally, BD/S attempt to disavow their assertion of Common Interest protection in their privilege log—after repeatedly invoking this protection as the basis for withholding documents in numerous meet and confer discussions and correspondence.  The Court should not permit them to change theories mid-stream, only after Yucaipa has brought a motion to compel.

Therefore, the Court should grant the Yucaipa Defendants' Motion to Compel.

## II.    ARGUMENT

### A.    BD/S Should Not Be Permitted to Disavow Their Collateral Estoppel Objections

BD/S suggest that the Yucaipa Defendants somehow have mischaracterized their relevance objections as ones for "collateral estoppel" after mistakenly seizing on a mere stray "reference" to the term collateral estoppel.  (Opposition at 12.)  In fact, BD/S *expressly* objected to *58* discovery requests on the basis of collateral estoppel, either in their responses themselves or in meet and confer correspondence.

For example, in response to 28 Interrogatories, BD/S objected "on the grounds that [the Interrogatories] seek information in support of allegations that Yucaipa *is collaterally estopped*

2

*from asserting.*"  (Scolnick Decl., Ex. 29 at 5–14; Ex. 30 at 5–13 (emphasis added).)[4]

BD/S separately offered a *relevance* objection to these same Interrogatories *only* on the grounds that they were "neither relevant to, nor reasonably calculated to lead to the discovery of admissible evidence for, *any of the claims against [the requesting Director Defendant]*." (*Id.* (emphases added).)  In other words, BD/S did not assert that these requests were irrelevant with respect to *Yucaipa itself*.

To support their new position that they "really" meant to assert a relevance objection, not collateral estoppel, BD/S refer only to their response to a separate Interrogatory that is not at issue here.  (*See* Opposition at 12, n.12, citing response to Walker Interrogatory 15.)  Thus, despite BD/S's attempt to reframe all of their objections as based on relevance, their objections were plainly grounded in collateral estoppel.[5]

As Yucaipa has explained, BD/S cannot rely on the collateral estoppel effect of the Counterclaim Dismissal to evade discovery.  *See In re No-Burn Inc. v. Speller*, No. 05–02096, 2006 WL 4458703, at *2 (Bankr. M.D. N.C. Jan. 21, 2006) ("[I]ssues regarding res judicata and collateral estoppel are premature in the discovery phase of a lawsuit"); *see also* Motion at 8. BD/S have no response to these authorities.

Simply put, the Requests at Issue seek information to help Yucaipa flesh out both sides of a long, complicated series of events and transactions, the facts of which remain heavily disputed. By relying on collateral estoppel to block the sharing of information, BD/S seek to ensure that

---

[4]  BD/S asserted this specific objection to the following Interrogatories: BD Tochner 18-21; BD Pelletier 12-15, 19-20; BD Walker 12-13, 20-22; S Tochner 18-21; S Pelletier 12-15, 19-20; S Walker 17-19.

[5]  While BD/S did object to the Disputed Requests for Production on the basis of relevance, the position they took in meet and confer correspondence for refusing to search for responsive documents was that although the Requests were relevant to the allegations in the RICO Action, "[t]he allegations in Yucaipa's RICO Complaint are the same as the allegations raised in its Counterclaims, and thus subject to collateral estoppel."  (Scolnick Decl., Ex. 17 at 1–2.)

the fact finder hears only their narrative, with no basis for testing that narrative or getting the complete picture underlying the various alleged actions or inactions, and the parties' respective motivations and incentives, with respect to each other and Allied.

**B.    The Requests at Issue Are Relevant to the Parties' Claims and/or Defenses**

In any event, the Requests at Issue *are* relevant to BD/S's own claims and allegations, as well as to Yucaipa's affirmative defenses—which go far beyond the allegations in the dismissed Counterclaim.

"It is well settled that Rule 26 establishes a fairly liberal discovery policy." *Romero v. Allstate Ins. Co.*, 271 F.R.D. 96, 100–101 (E.D. Pa. 2010) (internal citations and quotations omitted). Indeed, "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant ... whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party[.]" *Oppenheimer Fund Inc. v. Sanders*, 437 U.S. 340, 350–51 (1978). "[D]iscovery is ordinarily allowed under the concept of relevancy 'unless it is clear that the information sought can have no possible bearing upon the subject matter of the action.'" *In re Energy Future Holdings Corp.*, 513 B.R. 651, 656 (Bankr. D. Del. 2014) (quoting *In re ML-Lee Acquisition Fund II, L.P.*, 151 F.R.D. 37, 39 (D. Del. 1993)).

Given this broad and liberal standard for relevancy, this Court should not permit BD/S to evade their discovery obligations by relying solely on the Counterclaim Dismissal to argue that the Requests at Issue are not "relevant."[6]

**1.    Many of the Requests at Issue Are Directly Relevant to BD/S's Own Claims and Allegations**

Many of the Requests at Issue relate directly to BD/S's own claims and allegations

---

[6]    Notably, BD/S did not address Yucaipa's arguments regarding the other objections they made to the Requests at Issue based on vagueness, overbreadth and undue burden, among others. (*See* Motion at 15–18.) Rather, BD/S claims that "[a]t bottom, however… none of the Requests are *relevant*[.]" (Opposition at 12, n. 10 (emphasis in original).) Thus, BD/S has waived their additional objections which they did not attempt to defend.

asserted in the BD/S Action and Committee Action.  BD/S try to cabin all these requests as relating only to the "implausible" factual allegations in Yucaipa's Counterclaim.  But BD/S ignore the *direct* relevance of these Requests to BD/S's *own* allegations.

For example, in their Complaint, BD/S allege that "[t]he Debtors needed either an equity investment … or a restructuring to reduce the Debtors' leverage and ease their cash requirements.  Indeed, *the First Lien Lenders pleaded with Yucaipa* to provide such an infusion of equity … or to negotiate a restructuring…."  (Adv. Proc. No. 14-50971, D.I. 1, ¶ 5 (emphasis added).)  To investigate what BD/S mean by these allegations, Yucaipa's Request for Production No. 45 seeks, in part, "All Documents … Concerning any potential or actual transaction structure proposed by [BD/S] for Allied[.]"  (Scolnick Decl., Ex. 29 at 3; Ex. 30 at 3.)  Yucaipa is entitled to test BD/S's allegation by seeking evidence of any transactions that BD/S supposedly proposed to Yucaipa as they were allegedly "pleading" with Yucaipa to negotiate a restructuring.

Similarly, BD/S's Complaint alleges that Yucaipa crafted an "intentional scheme to harm the lenders," and that this alleged scheme "was designed to protect [Yucaipa's] equity stake from being wiped out…."  (Adv. Proc. No. 14-50971, D.I. 1, ¶¶ 1–2, 6.)  Accordingly, Yucaipa's Interrogatory No. 8 asks BD/S to "Describe in detail Your understanding of the value of Yucaipa's equity in Allied as of August 21, 2009."  (Scolnick Decl., Ex. 29 at 5; Ex. 30 at 4–5.)  To the extent BD/S argue that Yucaipa's "scheme" was designed to "protect its equity" investment in Allied, Yucaipa must be given leeway to assess BD/S's position as to the value of Yucaipa's equity (and thus the magnitude of Yucaipa's supposed incentive to harm other lenders) on the date Yucaipa supposedly executed its plan to protect its equity.[7]

Likewise, Yucaipa's Interrogatory No. 9 asks BD/S to state the value they assigned to

---

[7]  Notably, BD/S did not object to this Interrogatory on the basis of relevance because it is clearly relevant to a key allegation BD/S make in support of their equitable subordination claims.  Since BD/S's Opposition focused exclusively on the *relevance* of the Yucaipa Defendants' Discovery Requests, BD/S must respond to this Interrogatory.

their own first lien debt on August 21, 2009.  BD/S allege that Yucaipa's actions on this date "harmed" them as Lenders, so Yucaipa must be able to test both the allegation that its actions on this date caused BD/S harm, and the extent of that harm.  A key component in calculating any alleged harm is (presumably) the value of BD/S's own first lien debt (if, for instance, BD/S believed their debt was worthless in August 2009, then how can they claim that anything Yucaipa did or did not do after that date caused them harm?).

Similarly, several of the requests relate directly to the elements that BD/S must establish to prove their equitable subordination claim.  Specifically, BD/S must prove that Yucaipa engaged in inequitable conduct and that its conduct resulted in injury to BD/S or conferred an unfair advantage on Yucaipa.  *See Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 986-87 (3d Cir. 1998).  Moreover, "a claim or claims should be subordinated only to the extent necessary to offset the harm which the creditors suffered on account of the inequitable conduct."  *Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 50 (Bankr. D. Del. 2011) (citations omitted).

Request for Production Nos. 1 and 2, Yucaipa Interrogatory Nos. 1–3, and Pelletier Interrogatory No. 17 seek information and details concerning BD/S's acquisition and sale of first lien debt, including purchase and sale prices, dates of acquisition and sale, and parties involved in purchases or sales.  (Scolnick Decl., Ex. 29 at 1, 4, 10; Ex. 30 at 1, 4, 10.)  Again, in support of their claim, BD/S allege that Yucaipa devised an "intentional scheme to harm the Lenders" (Adv. Proc. No. 14-50971, D.I. 1, ¶ 1), and that Yucaipa implemented that harmful scheme "through a series of pre-meditated steps," beginning with pushing the Lenders to remove the prohibitions on "Yucaipa's ability" to buy debt before the passage of the Third Amendment in April 2008.  (*Id.*, ¶ 7.)  Thus, on the face of BD/S's Complaint, Yucaipa's purported inequitable conduct, and the resulting harm to the Lenders, began before April 2008, and extended through the filing of the involuntary bankruptcy petitions.  Since any supposed "harm" to BD/S is inextricably tied to their first lien debt ownership, BD/S must provide details about their debt ownership so that Yucaipa can investigate and refute the "harm" BD/S claim to have suffered.

For example, did BD/S buy any additional first lien debt during this time that Yucaipa's actions were supposedly harming the Lenders?  If so, why?  Did BD/S do so with full knowledge of what Yucaipa was supposedly doing wrong, or not doing?  Did the purchase price reflect a discount to reflect the supposed harm that Yucaipa was inflicting on Lenders?  Did BD/S try to sell their first lien debt to alleviate any harm, and if so when and for how much?  What else did they do with respect to their first lien debt during this period of alleged misconduct and injury?

Moreover, in order to prove their alleged "harm," BD/S must demonstrate that the various "steps" in Yucaipa's "intentional scheme" designed to harm them affected the value of their holdings over time.  They must also show harm from Yucaipa's supposed refusal to negotiate a restructuring of Allied or infuse equity into Allied.  Neither Yucaipa nor the fact finder can evaluate this alleged harm without details regarding BD/S's actual debt holdings over time as a reference point.  Indeed, in Adversary Proceedings focused exclusively on parties' first lien debt ownership and alleged schemes to impair the value of that debt, the sought-after information reflects basic, foundational facts about the Plaintiffs' debt holdings.  At the very least, it cannot be said that details concerning BD/S's first lien debt ownership "can have no possible bearing upon the subject matter of the action," *In re Energy Future Holdings Corp.*, 513 B.R. at 656.

BD/S respond that "[w]hether Yucaipa's claims are subordinated has nothing to do with what BD/S or others paid for First Lien Debt or how that debt was valued over time." (Opposition at 18.)  Yet, to succeed on their equitable subordination claim, BD/S must prove that they were harmed or injured by Yucaipa's supposedly inequitable conduct—which they allege began before April 2008—and must demonstrate the extent of the harm suffered.  As such, the value of BD/S's debt over time and other details pertaining to their debt ownership are directly relevant to their equitable subordination claim, and at the very least BD/S must establish these facts to show their own standing and injury.

BD/S also argue that none of these topics "are remotely relevant to an unclean hands defense[.]" (*Id.*)  But again, regardless of the connection between these topics and Yucaipa's unclean hands defense, they are relevant to BD/S's *own* allegations and claims.

Walker Interrogatory to Black Diamond Nos. 12 and 13—which seek information related to a meeting that Mr. Deckoff of Black Diamond had with Ronald Burkle of Yucaipa three days before the passage of the Fourth Amendment—also are directly relevant to BD/S's allegations. Again, BD/S allege that the Yucaipa Defendants "crafted a scheme whereby Yucaipa would wrongfully seize control over the First Lien Facility" through a series of "pre-meditated steps," and that after the tender offer failed, the Yucaipa Defendants "undertook a more surreptitious route" to gain control of the First Lien Debt by orchestrating the Fourth Amendment.  (Adv. Proc. No. 14-50971, D.I. 1, ¶¶ 6–7, 10.)  "Surreptitious" means "kept secret, especially because it would not be approved of."[8]  Thus, whether Black Diamond *knew* of Yucaipa's intentions to acquire first lien debt goes directly to the veracity of BD/S's allegation that Yucaipa acquired its First Lien Debt in secret because BD/S would not have approved.[9]  BD/S's Opposition does not even attempt to address the relevance of these Requests to their own allegations.

### 2.    The Requests at Issue Are Relevant to the Yucaipa Defendants' Affirmative Defenses, and Therefore Discoverable

Despite BD/S's efforts to tie the Yucaipa Defendants affirmative defenses solely to the allegations in Yucaipa's Counterclaim, these defenses are, in fact, broader.

BD/S argue that Yucaipa somehow "revealed that their affirmative defenses are simply

---

[8]  (Oxford Dictionaries, http://www.oxforddictionaries.com/definition/english/surreptitious (last visited Aug. 22, 2016).)

[9]  As explained in Yucaipa's Motion, these Requests also are relevant to Yucaipa's defenses of waiver, consent, estoppel and laches.  (Motion at 13.)  In its untimely and procedurally deficient cross-motion to strike, BD/S also argue that these defenses are subject to Rule 9(b)'s particularity requirements.  (Opposition at 33–34.)  This red herring will be addressed in Yucaipa's timely opposition to the motion to strike, and has no bearing on the instant motion.

the *same* factual allegations the Court deemed to be implausible and dismissed with prejudice." (Opposition at 16 (emphasis added).)  To the contrary, the Yucaipa Defendants explicitly argued: "Yucaipa has a right to take discovery in order to develop and pursue its unclean hands defense, *which is based on BD/S's bad faith and inequitable conduct with respect to their investments in Allied and their treatment of Yucaipa.*"  (Motion at 12 (emphasis added)); *see also* Motion at 10 ("To prevail on [an unclean hands] defense, the Yucaipa Defendants will need to establish … that BD/S acted improperly in connection with their own (or other parties') investments in Allied, and/or that BD/S proceeded unfairly against the Yucaipa Defendants before and during the Allied bankruptcy and these Adversary Proceedings.").)  As a result, Yucaipa's unclean hands defense goes well beyond the factual allegations and legal theories set forth in the Counterclaim.

For example, Request for Production Nos. 39–46 and Walker Interrogatory Nos. 20–22 to Black Diamond and Nos. 17–19 to Spectrum seek information related to the payment of Lenders' legal expenses, SBDRE, LLC, the credit bid for Allied's assets, and the issuance of new stock.  Discovery on these topics will reveal that BD/S proceeded unfairly against the Yucaipa Defendants before and during the Allied bankruptcy and these Adversary Proceedings in a way that "injure[d]" Yucaipa and "affect[ed] the balance of equities" by seeking to dilute Yucaipa's pro rata interest in Allied and freezing the payment of Yucaipa's legal fees while directing Allied to pay its own fees.  *Paramount Aviation Corp. v. Agusta*, 178 F.3d 132, 147 n.12 (3d Cir. 1999) (elements of unclean hands defense).

Furthermore, even if some of the Requests at Issue seek information in support of Yucaipa's affirmative defenses that overlaps to some extent with the allegations the Court has rejected as implausible under Rule 12(b)(6), this does not bar discovery of that information.  As a preliminary matter, unlike Yucaipa's right to pursue an affirmative claim for equitable subordination, BD/S do not and cannot dispute that "[d]ue process requires that there be an opportunity to present every available defense." *Lindsey v. Normet*, 405 U.S. 56, 66 (1972) (quotation marks omitted) (quoting *Am. Sur. Co. v. Baldwin*, 287 U.S. 156, 168 (1932)).  Thus,

Yucaipa must be given latitude to explore these defenses.

Second, unlike a counterclaim, "[a]n affirmative defense need not be plausible to survive; it must merely provide fair notice of the issue involved." *Tyco*, 777 F. Supp. 2d at 900; *see also Internet Media Corp. v. Hearst Newspapers, LLC*, Civ. No. 10–690–SLR, 2012 WL 3867165, at *3 (D. Del. Sept. 6, 2012) ("In light of the differences between Rules 8(a) and 8(c) in text and purpose, [ ] *Twombly* and *Iqbal* do not apply to affirmative defenses[.]"). Thus, courts "evaluate [a] challenged affirmative defense and counterclaim through a markedly different lens . . . . The counterclaim must be plausible under *Twombly* whereas the affirmative defense will be deemed sufficient unless it fails to provide fair notice of the issue." *Tyco*, 777 F. Supp. 2d at 901; *cf.* Fed. R. Civ. P. 12(f) (court may strike affirmative defenses only if they are "insufficient[,] redundant, immaterial, impertinent, or scandalous").

Therefore, despite the dismissal of Yucaipa's Counterclaim based on implausibility, the Yucaipa Defendants are entitled to explore information that remains relevant to their affirmative defenses through discovery, even to the extent there may be some overlap between the factual bases underlying the Counterclaim and the facts underlying the defenses. *See Oppenheimer*, 437 U.S. at 350–51 ("Parties may obtain discovery regarding any matter . . . which is relevant . . . whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party[.]").

BD/S argue that a "litigant may not seek discovery in support of dismissed claims." (Opposition at 3.) However, the Requests at Issue do not seek discovery in support of any *claim*; they seek it in support of their affirmative defenses. BD/S's cited cases do not support their position that "courts have recognized that discovery is not warranted even for pending claims *or defenses*, where those claims *or defenses* rely upon the same factual allegations as a dismissed claim." (Opposition at 16 (emphases added).)

In *Share Corp. v. Momar Inc.*, No. 10-cv-109, 2011 WL 2600740 (E.D. Wis. June 29, 2011), the court held that plaintiffs could not seek discovery in support of pending *claims* that depended upon the same factual allegations as dismissed claims. *See id.* at *2. That case did not

10

involve—and the court did not address—whether the parties could seek discovery in support of affirmative defenses. The decision in *Fleet Nat'l Bank v. Harstone*, No. 96-10166-NG, 1997 WL 557564, at *13 (D. Mass. May 29, 1997), is even further from the mark, as discovery was not even at issue there. Rather, the case concerned whether a party's affirmative defenses should be stricken.

As such, BD/S have not pointed to any cases "recogniz[ing] that discovery is not warranted . . . for pending . . . *defenses* . . . where those . . . *defenses* rely upon the same factual allegations as a dismissed claim." (Opposition at 16 (emphases added).) In fact, the opposite is true. *See Ambac Assurance Corp. v. Adelanto Public Util. Auth.*, No. 09-5087, 2012 WL 1589597, at *3 (S.D.N.Y. May 7, 2012) (holding that "[a] mere pleading deficiency with respect to a certain counterclaim … will not prevent [defendant] from asserting an analogous affirmative defense and obtaining discovery.").

BD/S do not (and could not) argue that the Requests at Issue are irrelevant to Yucaipa's defenses. Indeed, the Counterclaim Dismissal highlights precisely *why* Yucaipa needs discovery to explore the known facts that support some of Yucaipa's theories underlying their unclean hands defense.[10] For example, in its Counterclaim, Yucaipa pointed to an email demonstrating that Spectrum was "check[ing] out the equitable subordination angle" just days before the passage of the Fourth Amendment, (Adv. Proc. No. 14-50971, D.I. 19, ¶¶ 43, 51, 54), a transaction that BD/S's own communications show that they had known about for months (Scolnick Reply Decl., Ex. 31). The Court did not believe this email plausibly supported Yucaipa's Counterclaim because it "does not mention Yucaipa or against whom the 'equitable subordination angle' would be sought[,]" and because the correspondence occurred a mere eight days before the execution of the Fourth Amendment on August 21, 2009. (Adv. Proc. No. 14-

---

[10] To reiterate, Yucaipa's unclean hands defense encompasses a broad range of issues, not only those discussed here.

50971, D.I. 82 at 63–64.)

Accordingly, Request for Production No. 36 seeks documents concerning "the equitable subordination of First Lien Debt held by any Lender other than Yucaipa." (Scolnick Decl., Ex. 29 at 1; Ex. 30 at 1.) Any documents responsive to this request would demonstrate either that BD/S were actually contemplating equitable subordination of *other Lenders* or confirm that BD/S were considering equitable subordination of Yucaipa. Such documents would also shed light on what ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ (Scolnick Reply Decl., Ex. 32, at SPEC 0003943.) Similarly, such documents may reveal what plans or strategies Mr. Ehrlich had in mind when he emailed Mr. Schaffer on September 17, 2009, stating that it "looks like they [Yucaipa] pushed the equity button here…you ready to roll?" (Adv. Proc. No. 14-50971, D.I. 19, ¶ 51.)

In addition, BD/S's *own* admissions demonstrate the relevance of the Requests at Issue. They admit in their Opposition and elsewhere that "BD/S and other First Lien Lenders (other than Yucaipa) formed a steering committee *in 2008*, before Yucaipa purchased any First Lien Debt and before the involuntary bankruptcy petitions were filed, for the purpose of maximizing their recovery of First Lien Debt and exploring legal claims against Allied and/or Yucaipa…." (Opposition at 25 (emphasis added); *see also* Scolnick Decl., Ex. 24 at 2 ██████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████.) Indeed, documents identified on their privilege log confirm that BD/S were obtaining legal advice in October 2009—two months after Yucaipa acquired first lien debt, and more than two years *before* BD/S pulled the trigger on an involuntary filing—████████████████████████████████████ ████████████████████████ (Scolnick Decl., Ex. 21 at 31; Ex. 22 at 80.)

Many of the Requests at Issue seek information relevant to BD/S's admitted strategies directed at Yucaipa. For example, Pelletier Interrogatory No. 19 to BD/S asks them to

"[i]dentify the date You first considered seeking equitable subordination [a legal claim] of Yucaipa in relation to Your Allied First Lien Claims." (Scolnick Decl., Ex. 29 at 10; Ex. 30 at 10.)  Likewise, Pelletier Interrogatory No. 20 asks BD/S to identify when they discussed equitable subordination of Yucaipa with any other party.  (Scolnick Decl., Ex. 29 at 10-11; Ex. 30 at 10.)  BD/S's admitted long-term legal strategy against Yucaipa directly support Yucaipa's unclean hands theory that BD/S were plotting against them as far back as 2008.  As such, the Yucaipa Defendants are entitled to explore this information through discovery.  Certainly, the Yucaipa Defendants are entitled to know why BD/S were obtaining legal advice on their ████████████████████████████████████████████████████████████ (Scolnick Decl., Ex. 21 at 31), while almost contemporaneously stating that it was their belief that Yucaipa ███████████████████████████████████████ (Scolnick Reply Decl., Ex. 33 at SPEC 0010928).

BD/S also admit that they were seeking to maximize their recovery of First Lien Debt as of 2008.  Yucaipa is entitled to explore *how* BD/S sought to maximize their recovery (including whether it involved the potential for illegal or inequitable conduct against Yucaipa), and at whose expense BD/S were seeking to do so.  Request for Production No. 37 seeks documents evidencing attempts by BD/S to estimate the value of their own or any other Lender's investment in Allied.  (Scolnick Decl., Ex. 29 at 1-2; Ex. 30 at 1-2.)  BD/S's estimation of the value of their own or any other Lender's investment is directly relevant to BD/S's attempt to maximize their own recovery.

Finally, information related to transfers of debt between BD/S, and information related to the "Cooperation Agreement" between BD/S, also relate to their attempt to maximize their own recovery.[11]  Although the Court did not find Yucaipa's allegations regarding the Cooperation

---

[11]  Request for Production No. 38; Tochner Interrogatory Nos. 18–21; Pelletier Interrogatory Nos. 12–15 (*see* Scolnick Decl., Exs. 29, 30.)

Agreement and the transfers of debt between BD/S sufficiently plausible to support an equitable subordination claim, the fact remains that the Cooperation Agreement exists, and that BD/S did transfer debt between themselves just before filing the involuntary bankruptcy petitions. The Yucaipa Defendants are still entitled to explore the reasons *why* BD/S entered into the Cooperation Agreement and made this debt transfer, as both are relevant to the claims at issue in the Adversary Proceedings regarding first lien debt. If BD/S did not act for a nefarious purpose, they should have no issue with providing this information.

### 3. The Requests at Issue Are Relevant to the RICO Action

Finally, BD/S do not dispute that the Requests at Issue are relevant to the RICO Action, or that the parties agreed to coordinate discovery with respect to the Adversary Proceedings and the RICO Action. Rather, they argue that because they have moved to dismiss the RICO Action, and the motion remains pending, it is "unduly burdensome" and too "expensive" to comply with their present discovery obligations. (Opposition at 21.) BD/S are wrong.

Unless and until the District Judge dismisses the RICO Action (with prejudice), BD/S must comply with their discovery obligations and must produce documents and information that are relevant to that action. Similarly, unless the District Judge agrees with BD/S that the RICO Action is subject to collateral estoppel (which BD/S have not even asked that court to find) or that Yucaipa's allegations are not plausible, BD/S cannot refuse to produce relevant discovery on the assumption that the court *might* eventually agree with them.

### C. BD/S's Failure to Timely Respond to the Yucaipa Defendants' Interrogatories Constitutes Waiver of All Objections

BD/S must answer the Yucaipa Defendants' Interrogatories because they failed to timely object, waiving all objections. BD/S claim that they have not waived their objections because: (1) they have engaged in discovery in good faith; and (2) the Yucaipa Defendants have not suffered prejudice. But neither of these grounds provides the "good cause" necessary to excuse BD/S's failure to timely respond. *See* Fed. R. Civ. P. 33(b)(4).

14

First, BD/S did not exercise good faith efforts in this instance.  Upon BD/S's request, the Yucaipa Defendants agreed to extend the initial Interrogatory response deadline by more than two weeks, to July 31, 2015.  (Scolnick Decl., Ex. 9.)  Despite this extension, BD/S did not serve their objections on July 31, 2015, nor did they even bother to ask for a further extension or inform the Yucaipa Defendants that their responses would not be forthcoming.  Instead, they simply failed to meet the deadline with no explanation.

Two weeks after the July 31 deadline, after hearing no word from BD/S regarding the Interrogatories, counsel for the Yucaipa Defendants sent BD/S a letter inquiring about their responses and objections.  (*Id.*, Ex. 13.)  The Yucaipa Defendants received no answer to their letter until more than two weeks later, when BD/S finally served their responses to the Interrogatories, along with a letter that provided no explanation for the tardy responses, but argued that they had not waived objections.  (*Id.*, Ex. 16 at 2.)  BD/S's complete silence regarding their late-served Interrogatory responses does not constitute good faith engagement in the discovery process.

Second, as Yucaipa has explained, waiver does not depend on whether the requesting party suffers prejudice.  *See* Fed. R. Civ. P. 33(b)(4) ("Any ground not stated in a timely objection is waived unless the court, for good cause, excuses the failure.").  In light of Rule 33's *explicit* waiver provision for untimely objections without any requirement of prejudice to the requesting party, courts regularly deem objections waived for failure to provide a timely response without considering prejudice.  *See SWIMC, Inc. v. Hy-Tech Thermal Solutions, LLC*, No. 08-084 (SLR), 2009 WL 1795177, at *3 (D. Del. June 24, 2009); *In re Le-Nature's, Inc.*, 380 B.R. 747, 750–51 (W.D. Pa. 2008).  Thus, BD/S's assertion that the Yucaipa Defendants did not suffer prejudice due to their late-served objections is unavailing.[12]

---

[12]  Furthermore, BD/S's continued delay tactics with respect to discovery have caused prejudice to the Yucaipa Defendants.  For example, on July 15, 2016, BD/S stated that requested discovery that had been outstanding for more than a year, since June 2015, would be

(Cont'd on next page)

**D.     BD/S Fail to Present a Coherent Basis for Their Assertion of Privilege Over Thousands of Documents**

BD/S argue that "there is no basis to compel the production of any of the documents on BD/S's privilege logs based on a purportedly improper assertion of the common interest privilege." (Opposition at 23-24.)  Thousands of the entries on BD/S's logs were labeled "CI"—for "Common interest asserted between Black Diamond, Spectrum, and other First Lien Lenders (where applicable) for communications in furtherance of their common legal interest in maximizing their recoveries of First Lien Debt, which included exploring potential claims against Allied and/or Yucaipa." (*See* Scolnick Reply Decl., Exs. 34-35.)  Yet BD/S now appear to be disavowing any claimed common interest and are instead re-casting those "CI" entries as being "communications among co-clients with the same counsel."  (Opposition at 3.)

This argument ignores the fact that BD/S have withheld these documents on the explicit basis of the "[c]ommon interest asserted" between BD/S and other First Lien Lenders.  It also ignores that in meet and confer discussions and correspondence, BD/S were adamant that the common interest privilege—not any joint representation—served as the basis for their non-production.  (*See* Scolnick Decl., Ex. 24 at 2 ("Black Diamond and Spectrum *stand on their assertions of a common interest privilege* as set forth in their respective Privilege Logs." (emphasis added)).)

BD/S's new spin that they "perhaps mistakenly[] referred to the privilege between the co-clients as both the 'attorney-client' and the 'common interest' privilege" (Opposition at 26) ignores that the very reason Yucaipa sought to meet and confer with BD/S was to resolve any

---

(Cont'd from previous page)

"forthcoming in the near future."  (Scolnick Decl., Ex. 26 at 1.)  A month later, Yucaipa still has not received the promised documents, and fact discovery is set to close in 7 months. Most recently, BD/S have proven uncooperative in Yucaipa's attempts to schedule third-party depositions to keep fact discovery moving forward in order to meet the fact discovery deadline.  At some point, BD/S must be taken to task for missing deadlines and continued attempts to delay these litigations.

"mistaken" claims of privilege without involving the Court in such a dispute.  Now that BD/S are faced with the reality of defending an unfounded privilege assertion before this Court, they attempt to dodge their prior positions and pivot to a new basis for privilege.  The Court should not tolerate such maneuvering, given that BD/S, as the "parties asserting the privilege (who, incidentally, bear the burden of proving it applies) are expected to explain themselves with more precision than [BD/S] ha[ve] throughout this litigation."  *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 366 n.22 (3d Cir. 2007).

BD/S's newly minted basis for maintaining privilege appears to be that they, along with some undefined group of other First Lien Lenders, are "jointly represented clients and their common counsel are protected by the attorney-client privilege."  (Opposition at 24.)  Apparently trying to explain why they asserted the "AC/CI" in thousands of entries, BD/S are latching onto the fact that in "co-client situations," the joint representation applies only within the "limited congruence of the clients' interests."  *Teleglobe Commc'ns*, 493 F.3d at 362–63.  BD/S assert that the congruence of interest among BD/S and the other First Lien Lenders was for the purpose of "maximizing their recovery of First Lien Debt and exploring legal claims against Allied and/or Yucaipa (the 'Steering Committee')."  (Opposition at 25.)  Of course, the admission that, as far back as 2008, BD/S were plotting against Yucaipa and investigating legal claims, undercuts BD/S's core argument that Yucaipa's counter-narrative is somehow implausible.  BD/S cannot have it both ways—either they were working to orchestrate a scheme against Yucaipa or there was no common interest.

BD/S also attempt to minimize Yucaipa's argument that the hundreds of communications involving no attorney whatsoever are not privileged.  They claim that "clients of the same attorney may share privileged communications with a co-client without waiving attorney-client privilege."  (Opposition at 26 (citing *Sun Capital Partners, Inc. v. Twin City Fire Ins. Co.*, No. 12-Civ. 81397, 2015 WL 1860826, at *5 (S.D. Fla. Apr. 22, 2015)).)  But this misunderstands Yucaipa's argument and the underlying law.

17

Communications between and among joint clients of the same counsel are not in and of themselves protected from disclosure; rather, it is "[w]hen co-clients *and their common attorneys communicate* with one another [that] those communications are 'in confidence' for privilege purposes." *Teleglobe Communications*, 493 F.3d at 363 (emphasis added).  BD/S's identical, boilerplate description that each logged communication "reflect[s] legal advice" (Scolnick Decl., Exs. 21, 22), even when no attorney is present, fails to meet their burden of establishing the attorney-client privilege exists.

Nowhere do BD/S address the evidentiary proof that communications currently logged by them are not in fact privileged.  Documents produced by other parties and non-parties that were logged by BD/S make crystal clear that no legal advice was being sought, communicated, or discussed.  (*Compare* Scolnick Decl., Ex. 27 *with* Ex. 22, Nos. 83 and 84.)  While BD/S are trying to withhold communications about their inequitable strategies regarding Yucaipa, at a minimum the Court should review such communications *in camera* to determine whether there is any protection available.

### III.    CONCLUSION

For these reasons, the Court should grant the Yucaipa Defendants' Motion to Compel.

Dated: August 22, 2016

YOUNG CONAWAY
STARGATT & TAYLOR, LLP

/s/ Michael S. Neiburg
Michael R. Nestor (No. 3526)
Edmon L. Morton (No. 3856)
Michael S. Neiburg (No. 5275)
Rodney Square
1000 North King Street
Wilmington, DE  19801
Telephone: (302) 571-6600
mnestor@ycst.com

- and-

GIBSON, DUNN & CRUTCHER LLP
Maurice M. Suh (*Pro Hac Vice*)

Robert A. Klyman (*Pro Hac Vice*)
Kahn Scolnick (*Pro Hac Vice*)
333 South Grand Avenue
Los Angeles, CA  90071
Telephone: (213) 229-7000
MSuh@gibsondunn.com

*Attorneys for Appellants-Defendants*
*Yucaipa American Alliance Fund I, L.P., and*
*Yucaipa American Alliance (Parallel) Fund I, L.P.*