```
1    UNITED STATES BANKRUPTCY COURT
2    DISTRICT OF DELAWARE
3
4
5    In re:                            : Chapter 11
                                       :
6    ASHINC CORPORATION, et al.,       :
                                       : Case No. 12-11564 (CSS)
7            Reorganized Debtors.      :
                                       : (Jointly Administered)
8    _____:
                                       :
9    BDCM OPPORTUNITY FUND II, LP, BLACK:
     DIAMOND CLO 2005-1 LTD., SPECTRUM  :
10   INVESTMENT PARTNERS, L.P., BLACK   :
     DIAMOND COMMERCIAL FINANCE,        :
11   L.L.C., AS CO-ADMINISTRATIVE AGENT,:
     AND SPECTRUM COMMERCIAL FINANCE    : Adversary Proceeding
12   LLC, AS CO-ADMINISTRATIVE AGENT,   : No. 14-50971 (CSS)
                                       :
13            Plaintiffs,              :
                                       :
14       v.                            :
                                       :
15   YUCIPA AMERICAN ALLIANCE FUND I,   :
     L.P., YUCAIPA AMERICAN ALLIANCE    :
16   (PARALLEL) FUND I, L.P., YUCAIPA   :
     AMERICAN ALLIANCE FUND II, L.P.,   :
17   YUCAIPA AMERICAN (PARALLEL) FUND   :
     II, L.P., RONALD BURKLE, JOS       :
18   OPDEWEEGH, DEREX WALKER, JEFF      :
     PELLETIER, IRA TOCHNER, AND JOSEPH :
19   TOMCZAK,                          :
                                       :
20            Defendants.              :
     _____:
21
22
23
24
25
```

Page 2

1                          United States Bankruptcy Court

2                          824 North Market Street

3                          Wilmington, Delaware

4                          January 9, 2017

5                          11:07 a.m. – 12:55 p.m.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21   B E F O R E :

22   HON CHRISTOPHER S. SONTCHI

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO OPERATOR:  LESLIE MURIN

1    HEARING re The Yucaipa Defendants' Motion to Compel the

2    Production of Documents and Responses to Discovery Requests

3    [Adv. Docket No. 119; filed July 22, 2016]

4

5    HEARING re Black Diamond and Spectrum's Memorandum of Law in

6    Opposition to the Yucaipa Defendants' Motion to Compel and

7    in Support of their Cross-Motion to Strike Certain

8    Affirmative Defenses [Adv. Docket No. 136; filed August 12,

9    2016]

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
1    A P P E A R A N C E S :

2

3    YOUNG CONAWAY STARGATT & TAYLOR, LLP

4         Attorneys for Yuciapa

5

6    BY:  JOHN DORSEY

7

8    GIBSON DUNN & CRUTCHER

9         Attorneys for Yuciapa

10

11   BY:  KAHN SCOLNICK

12        ROBERT KLYMAN (TELEPHONICALLY)

13

14   LANDIS RATH & COBB

15        Attorneys for Black Diamond / Spectrum

16

17   BY:  KERRI MUMFORD

18

19   SCHULTE ROTH & ZABEL LLP

20        Attorney for Black Diamond / Spectrum

21

22   BY:  ROBERT WARD

23

24

25
```

1   MORRIS, NICHOLS, ARSHT & TUNNELL LLP

2       Attorney for Mark Gendregske

3

4   BY:  DEREK C. ABBOTT

5

6   ARNOLD & PORTER | KAYE SCHOLER

7       Attorney for Mark Gendregske

8

9   BY:  RON GHATAN

10

11  ALSO PRESENT TELEPHONICALLY:

12

13  DEREX WALKER

14  ADAM HARRIS

15  MAURICE SUH

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2              CLERK:  All rise.

 3              THE COURT:  Please be seated.

 4              MR. DORSEY:  Good afternoon, Your Honor.

 5              THE COURT:  Good afternoon.

 6              MR. DORSEY:  With your permission, Your Honor, the

 7      way we'd like to proceed today is because of the change in

 8      time.  My co-counsel Mr. Scolnick is here from LA.  He tried

 9      as best he can to catch a 6:00 flight out of Philadelphia.

10              THE COURT:  Sorry about that.

11              MR. DORSEY:  So the way we would like to proceed

12      with the argument is have Mr. Scolnick, he's going to take

13      the bulk of this and argue the motion to compel, except for

14      the privilege issues, and respond to the motion to strike

15      filed by the other side.  And then I will address the

16      privilege issues after (indiscernible); hopefully, we get

17      Mr. Scolnick out of here.

18              THE COURT:  Okay, sorry about that.  I had

19      something come up.  And I certainly didn't want to mess

20      anyone's travel plans up, so I apologize.

21              MR. DORSEY:  No problem.  Thank you.

22              THE COURT:  I'll stop talking and we can start.

23              MR. WARD:  Your Honor, this is Robert Ward from

24      Schulte Roth.  Mr. Scolnick and I were discussing in advance

25      of Your Honor's taking the bench as to whether or not it
```

1   made more sense for me, on behalf of Black Diamond and

2   Spectrum, to go on our motion to strike the affirmative

3   defense or for Mr. Scolnick to go on the motion to compel,

4   since they are tightly wound together.  In some ways, I

5   think it makes more sense for me to go first, but I defer to

6   the Court.

7           THE COURT:  Well, he filed the first motion, so

8   we'll let him go first.  He started this fight.

9           MR. SCOLNICK:  Thank you, Your Honor.  I'm going

10  to start with a little bit of context.  First of all, Kahn

11  Scolnick, Gibson Dunn, for Yucaipa and the individual

12  defendants.  But to put things in context, we've been

13  working together on discovery for more than a couple of

14  years now.  To date, Yucaipa has produced 10 times more

15  documents than Black Diamond and Spectrum combined.  So the

16  background of this motion is that we are seeking parity in

17  the discovery.

18          The current motion is a product of extensive meet-

19  and-confer efforts over several months where the parties

20  worked diligently and were effective in working out a number

21  of the issues.  Everyone knows courts do not like discovery

22  motions, and we tried to narrow it as much as possible, and

23  we're really down to a core few discreet issues.

24          In response, Black Diamond and Spectrum don't

25  dispute that our requests are relevant to our defenses, but

1    they're simply seeking to strike the defenses themselves.

2    There are five defenses that are at issue -- the unclean

3    hands, waiver, estoppel, consent, and laches.  Those are the

4    five defenses that Black Diamond and Spectrum have cross

5    moved to strike.

6           I'll explain that the motion to strike is contrary

7    to clear Third Circuit law, contrary to the decisions of

8    this Court, including Judge Robinson, and would be

9    reversible error.

10           In reality, the motion to strike is an

11   unapologetic effort to cut off our right to discovery, to

12   cut off our due process right to defend ourselves, and to

13   have a preordained result more than a year before the trial.

14           Now first of all, there's no dispute that the

15   motion to strike was 18 months too late.  So the only way

16   under the rules to strike our defenses now is if the court

17   does it on its own motion.  But Black Diamond and Spectrum

18   cite no cases from anywhere within the Third Circuit where a

19   court has stricken defenses on its own motion.  And for good

20   reason, because Rule 12(f) motions are highly disfavored.

21   They're a drastic remedy and they're often abused.

22           And this is precisely such a case where the Rule

23   12 motion came only after a discovery motion.  It's a pure

24   un apologetic discovery tactic, and it's improper

25   particularly here in light of the disparity in documents

1    produced to date.

2         So what is Rule 12?  It is a narrow tool reserved

3    for instances where a defense is legally insufficient, most

4    often where a defense is not even a defense to a cause of

5    action; for instance, a laches defense against the

6    government.  Courts have ruled that is not a valid defense.

7    Or a defense of lack of intent where the cause of action is

8    not intent based.  Those are the sorts of defenses that can

9    be stricken as legally insufficient.

10         But the Third Circuit has held in Cipollone v.

11   Liggett Group, 789 F.2d 181, that courts may not strike

12   defenses unless the insufficiency is clearly apparent on the

13   pleading.  The Court went on to explain the reason for this

14   reticence to strike defenses is because courts should not

15   evaluate the merits of a defense where the factual

16   background remains undeveloped.  The Court reversed the

17   striking of defenses and remanded for further development of

18   the claim and the parties' legal theories.

19         Now here, importantly, there's no argument that

20   our defenses are legally insufficient.  For instance, if

21   we're able to show that Black Diamond and Spectrum committed

22   all sorts of misconduct and acted in bad faith with respect

23   to Yucaipa and with respect to their debt holdings, that is

24   a legally valid defense to a cause of action for equitable

25   subordination.

1            But, rather, what Black Diamond and Spectrum are

2     asking this Court to do is to leverage the prior rulings on

3     our crossclaims and our counterclaims as to legal

4     plausibility under the Twombly Iqbal standard.  And they're

5     trying to say because certain of the allegations, because

6     certain of the allegations were deemed implausible with

7     respect to an affirmative claim, that those facts are now

8     out of the case entirely.  Yucaipa can't rely on those

9     facts, Yucaipa can't seek to develop those facts, the

10    defenses -- the facts are gone with respect to the entire

11    case, but there simply is no authority that supports that

12    sort of relief.

13            The key case they're relying on is called Modern

14    Creative Services out of the District of New Jersey.  There,

15    the Courts struck three affirmative defenses as legally

16    insufficient.  But it's important to look at what those

17    defenses were and why they were legally insufficient.

18    They're very different from what we have here.

19            There, the Court struck the ninth defense, which

20    was that Plaintiff's unfair competition claim was redundant

21    of other tort claims, that was the defense.  The Court

22    struck it because it held, under New Jersey law, unfair

23    competition claims can be redundant of other tort claims.

24    Similarly, the tenth and eleventh defenses were stricken.

25    Those defenses were that there was no independent duty of

1    confidentiality owed.  The Court has ruled, under New Jersey

2    law, that that's not a valid defense because New Jersey law

3    doesn't require independent duty of confidentiality.

4            So there's no parallel to this case because

5    nobody's arguing that these defenses are not valid; rather,

6    the only argument is that they are implausible, the factual

7    underpinnings of the defenses are implausible.  But Twombly

8    Iqbal, plausibility does not apply to an affirmative

9    defense.

10           They cite no case from anywhere where a court has

11   ever struck an affirmative defense as implausible.  And this

12   is for good reason, because Rule 12(b)(6) and Rule 8(a) are

13   very different pleading requirements.  And our papers have

14   cited numerous cases, including from this Court and Judge

15   Robinson, that make this exactly point.  So even if there's

16   a 100 percent overlap between the claims that were

17   dismissed, the legal underpinning -- the factual

18   underpinnings of the claims that were dismissed as

19   implausible and the factual underpinnings of our defenses,

20   that is not a valid ground to strike them.

21           In any event, Black Diamond and Spectrum also

22   overstate, we believe, the prior plausibility, the breadth

23   of the prior plausibility ruling.  We explain on Page 10 of

24   our papers why there are only certain allegations, not all

25   of our factual allegations, but only certain of those

1    allegations that the Court found implausible.  And, most

2    important, the Court made no findings as to the plausibility

3    of our laches or consent or waiver theories; namely, that

4    Black Diamond and Spectrum knew we were trying to acquire

5    debt, knew we were trying to become requisite lender.  They

6    supported it, they went along with it, they took no action

7    to object or to stop it.  Those are valid defenses under the

8    laches or consent or waiver theories, and the Court has made

9    no findings about the plausibility of those facts.

10            One thing I wanted to point out -- we put this in

11   our papers too, Your Honor -- is in New York, the New York

12   litigation.  Remember, the Appellate Court there reversed

13   summary judgment for Black Diamond because there was a

14   trialable issue of fact on Black Diamond -- on our defense

15   of waiver because Black Diamond -- there were facts and

16   evidence that Black Diamond was actively involved in the

17   Fourth Amendment, actively involved in Yucaipa's acquisition

18   of debt.

19            So it would be incongruous and unfair to cut off

20   Yucaipa's ability even to pursue that defense here, to plead

21   it and to pursue discovery, when the New York Court has

22   already held it's appropriate for trial.

23            Black Diamond and Spectrum seem to recognize the

24   deficiency in their argument, so they pivot to Rule 9(b).

25   They argue that our defense is sounding in fraud, so we need

1    to plead those in particularity.  It's telling that this is

2    the first time it's come up when it's seeing purported facts

3    were before the Court for dismissal several times, no one's

4    ever mentioned 9(b).

5              But in any event, there's no real argument that

6    9(b) would apply to a laches or waiver or consent theory.

7    It really is about our unclean hands theory.  So I think at

8    bottom, Judge, if you would like us to plead that theory

9    with more specificity, we'd be happy to do so, but it still

10   would not be subject to a plausibility requirement.

11             Moreover, we have the issue of prejudice.  Many

12   courts have said -- we cite them, including the Newborn

13   Bros. case out of the District of New Jersey -- that even if

14   you have an insufficient defense, you shouldn't strike it as

15   to prejudice to the other side.  And the only thing we've

16   heard here is prejudice in the form of having to respond to

17   discovery, which is ironic because we're here because Black

18   Diamond and Spectrum have not responded to discovery.

19             But in reality, the discovery burdens would not be

20   drastically different, even if the Court were to strike our

21   defenses, because the challenge to discovery requests at

22   issue, and I'm going to go through a couple of them at a

23   high level.  But the challenge to discovery does not relate

24   solely to our defenses, but also more to our general defense

25   of the case and Black Diamond and Spectrum's own

1    allegations.

2              I'm going to give you a couple of examples, with

3    your indulgence, Your Honor.  Several of the requests at

4    issue, probably most of them actually at issue in our motion

5    to compel deal with Black Diamond and Spectrum's own debt --

6    when they bought, when they sold, who they bought from, how

7    much, et cetera, what they held at any particular time.

8    That's Request for Production 1, 2, 37, 56; Interrogatory

9    for Yucaipa 1-3 and 9, Pelletier Interrog 17.  These are all

10   foundational facts.  Black Diamond and Spectrum need to show

11   that they held debt at various points in time in order to

12   assert standing to have claims.

13             Also, perhaps more importantly, it goes to

14   damages.  We're just beginning to scratch the surface as to

15   what the parties' damages theories are here.  But if, as

16   they've alleged, they are harmed because Yucaipa thwarted

17   transactions in 2009 and 2010 and there were strategic

18   opportunities and M&A transactions that Yucaipa thwarted in

19   which the lenders would have been better off, we need to

20   know what they've held, what they stood to gain at that

21   point and compare that to what they ultimately ended up with

22   in the bankruptcy.  And, again, that's just scratching the

23   surface.  But at a minimum, you need to know that before you

24   can defend against the damages claim.

25             Another example: what was the value of Yucaipa's

1    equity at various points in time, black Diamond and

2    Spectrum's calculation of our equity, particularly when we

3    bought the debt.  Their entire theory of the case is that we

4    were motivated to protect our equity; that the entire

5    scheme, at least 12 times in their Complaint, they allege,

6    the entire scheme was designed to protect equity and

7    everything we did was to protect the equity from being wiped

8    out.  But we've explained to them, at the time of our

9    acquisition of debt, the equity was effectively worthless,

10   which is why the debt was trading for so cheap.

11          Are they going to come to trial with evidence

12   that, in fact, our equity was worth something, was worth

13   millions of dollars and actually served as a motivation for

14   all this misconduct?  We're entitled to know that.  We need

15   to explore their theory.  These are not our defense -- these

16   are not our affirmative defense theories; these are simply

17   our general defense of the case.

18          Another category -- I'll just do one or two more,

19   Your Honor.  But, one category is potential transactions

20   that were proposed by Black Diamond and Spectrum, M&A

21   transactions, alternatives to what was going on.  This is

22   Request for Production 45 and Tochner Interrogatory 18.

23   This goes directly to their allegations of misconduct.

24   Throughout the Complaint, they allege that Yucaipa thwarted

25   possible restructuring, possible M&A transactions, all sorts

1    of things that would have benefited the lenders, but wiped

2    out Yucaipa's equity.  We're entitled to know, what are they

3    talking about, what transactions, what alternatives?  They

4    refused to respond to this, but that's completely

5    inappropriate and it's not just based on our affirmative

6    defenses.

7            Finally, information about Black Diamond and

8    Spectrum's principals' meeting with Yucaipa's principals in

9    and around August, 2009, when Yucaipa was looking to buy the

10   debt.  This negates the allegation.  If we're right, if

11   we're able to show that, in fact, there were active

12   meetings, active discussions, full open discussions about

13   what was going on, this negates the allegation that is the

14   centerpiece of Black Diamond and Spectrum's Complaint, that

15   we surreptitiously and improperly bought this debt and we

16   did it behind everyone's back and in secret transaction with

17   ComVest.

18           We're entitled to pursue this.  We're entitled to

19   negate that theory.  And independent of the actual

20   allegations, it goes to our unclean hands, waiver and

21   estopped defenses.  But, again, no one's disputing that the

22   issue -- the requests are relevant to our defenses.  Simply,

23   I'm trying to show that they're also relevant to Black

24   Diamond and Spectrum's claims.

25           So there are numerous other examples, but in the

1   interest of time, Your Honor, and your patience, I'll move

2   on, unless you want me to keep going.

3        THE COURT:  No, that's fine.

4        MR. SCOLNICK:  Okay.  So that's the bottom line is

5   no prejudice here.  Even if the Court were to strike the

6   defenses, the discovery obligations are still similar and

7   certainly not monumentally different.

8        So in sum, Black Diamond and Spectrum waited 18

9   months too long to bring this motion.  They bring it for an

10  improper purpose, i.e., discovery, and they're trying to cut

11  off Yucaipa's right to defend itself.  It would be

12  reversible error, as I explained, under Third Circuit

13  precedent to strike defenses that are not legally

14  insufficient, where there are no clearly apparent defects.

15  And the only asserted basis for striking them now is

16  plausibility, which does not apply to affirmatively

17  defenses.

18        And in any event, no prejudice from having these

19  defenses in the case because Black Diamond and Spectrum

20  still need to respond because of their affirmative claims.

21  So if the Court were to strike the defenses now and shut

22  down our discovery and it would later be reversed, if that

23  happened, it would be an enormous waste of effort and time

24  and expense for the Court and the parties.

25        This is not simply a discreet set of defenses that

1    could be tried separately later.  This, in many ways, is the

2    mirror image of their claims, so the fact finder is going to

3    be entitled to the whole picture to decide these equitable

4    claims for subordination and otherwise.  They argue we

5    scuttled the JCT transaction; we argue it was their

6    scuttling.  They argue we acted improperly and

7    surreptitiously in buying the debt; we argue that they, in

8    fact, knew about it and were encouraging it.

9            These are really facts that the case is based upon

10   and the fact finder is going to need to decide between one

11   of two theories.  And we should not be precluded at the

12   outset of the case effectively at a prelim to pursue this in

13   discovery.

14           So the Court should deny the motion to strike,

15   grant the motion to compel, and allow us to go forward.

16   Thank you.

17           THE COURT:  Okay, thank you.

18           MR. WARD:  Good afternoon, Your Honor.  Robert

19   Ward on behalf of Black Diamond and Spectrum.  And Mr.

20   Scolnick started out with our motion to strike, so I'll do

21   the same.

22           Your Honor, Yucaipa's motion to compel shows for

23   the first time that Yucaipa is seeking to bring the same

24   claims as affirmative defenses that they brought as

25   crossclaims, which were dismissed by this Court, which they

```
1    brought as a counterclaim, which was dismissed by this

2    Court, and which they brought as a RICO action, which was

3    dismissed in September of 2016 by the District Court.

4            And how do we know that?  Well, the answer is,

5    Your Honor, if you look at their motion to compel -- and

6    it's their main brief, it's their moving brief, it's nothing

7    that we pulled out of them, so to speak, by our opposition -

8    - they volunteered at Page 10 of their moving brief, the

9    Yucaipa Defendants had explained that Black Diamond and

10   Spectrum orchestrated a carefully timed series of lies,

11   payoffs, and legal maneuvers designed to wrongfully enrich

12   themselves at Yucaipa's expense.

13           To that end, the Yucaipa Defendants had asserted

14   the affirmative defenses of unclean hands, waiver, estoppel,

15   consent, and laches, among other.  Their tying the two

16   together.  They're tying the alleged lies, payoffs, and

17   legal maneuvers by Black Diamond and Spectrum, which is the

18   core of the crossclaims, counterclaims, and RICO claims,

19   which have been dismissed by Your Honor and by the District

20   Court, to their affirmative defenses -- and for the first

21   time.

22           Now we also know, because they make it even

23   clearer in their opposition at Page 8 to our motion.  They

24   said, Yucaipa -- this is a quote, "Yucaipa has painstakingly

25   laid out the specific, quote, 'who, what, when, where, and
```

1    why of Black Diamond and Spectrum's inequitable conduct in

2    its dismissed counterclaim and pending RICO Complaint."  So

3    they're tying together the affirmative defenses with all the

4    details of, as they say, the dismissed counterclaim and the

5    pending RICO Complaint, which is no longer pending.

6            And, Your Honor, as Mr. Scolnick pointed out, it's

7    Rule 12(f), and it says that a Court may strike any

8    insufficient defense over redundant material, impertinent,

9    or scandalous matter any affirmative defense that's legally

10   insufficient.  And legally insufficient, Your Honor, is the

11   standard, and I would like to refer the Court to a couple of

12   cases.  And these are the cases where the Courts have found

13   that affirmative defenses -- well, first off, Mr. Scolnick

14   is saying that under Rule 8(c), the affirmative defenses had

15   been adequately pled.  But that's not the point.  The point

16   is that numerous courts have struck affirmative defenses

17   that are based on the same facts and same issues as

18   dismissed claims.

19           The Modern Creative case, which Mr. Scolnick

20   recited, which is from the District Court in New Jersey

21   said, in granting a motion to strike affirmative defenses,

22   that it was doing so because the Defendant could not assert

23   rejected theories, quote, "In the guise of an affirmative

24   defense," end quote.  And noted that the Court would not

25   provide the Defendant with, quote, "The ability to renew

Page 21

1    arguments which have been squarely addressed and decided by

2    this Court as a matter of law," end quote.  And then there's

3    the Human Genome case, Your Honor, where the Court struck

4    unclean hands affirmative defenses because it, quote,

5    "Relies on the same facts as Defendant's dismissed

6    counterclaims."  And then there's the Fleet National Bank

7    case where the Court struck affirmative defenses, quote,

8    "Based on the same allegations of misconduct that were

9    rejected in Defendant's counterclaims."

10           Now, Your Honor, the reason we're citing to this

11   is that with respect to the crossclaim that was brought by

12   Yucaipa initially in the action brought by the debtor, the

13   Court -- this Court rejected the allegations that Black

14   Diamond encouraged -- that's the language the Yucaipa used -

15   - encouraged Yucaipa to acquire first-lien debt so that

16   Black Diamond and Spectrum could, years later, equitably

17   subordinate Yucaipa's claims.

18           The Court dismissed that claim, and, in fact, that

19   case is final.  That case is over; in fact, we argued it in

20   the Third Circuit about a month ago.  So that is collateral

21   estoppel.

22           But, in addition, with respect to the

23   counterclaims, which were brought in the -- counterclaim,

24   which was brought in the action of Black Diamond started,

25   this Court held in a number of different rulings, a number

1   of different holdings in the same decision.  Once again,

2   back to Black Diamond -- back again to Yucaipa's initial

3   allegation, the Court held that the allegation that Black

4   Diamond and Spectrum encouraged Yucaipa to acquire first-

5   lien debt by providing false assurances of cooperation and

6   support in 2009 was without basis and dismissed that.  In

7   addition, that a 2009 email that indicated that Black

8   Diamond and Spectrum's schemes to equitably subordinate

9   Yucaipa's first-lien debt; again, didn't state a claim.

10              And I'll add the other allegations made by

11   Yucaipa, which the Court dismissed.  That Black Diamond

12   entered into an illegal claims trade that served as a bribe

13   to induce Spectrum to file an involuntary petition, which

14   Yucaipa calls the involuntary petition payoff; and that

15   Black Diamond was lying in wait or otherwise waiting for the

16   optimal time to file the involuntary petitions; and that

17   also, as this Court dismissed, that Black Diamond engaged in

18   sham transactions with JCT only to scuttle -- again,

19   Yucaipa's words -- to scuttle a deal that would have

20   resulted in a recovery of par plus accrued interest; and

21   then finally, that Black Diamond and Spectrum filed an

22   objectively baseless Complaint for equitable subordination

23   as part of a scheme to wipe out Yucaipa's claims.

24              The fact is, Your Honor, that the affirmative

25   defenses are founded entirely upon not defenses, but claims

1    that Yucaipa is making at this point in the case, against

2    Black Diamond and Spectrum; claims -- aggressive,

3    affirmative claims, not defenses, that the Your Honor has

4    dismissed both in the counterclaim in this case, as well as

5    in the crossclaim, and as well as in the Yucaipa claim.

6             So we didn't unite -- we didn't connect the

7    affirmative defenses that are raised here with these

8    aggressive claims that have been dismissed.  It was Yucaipa

9    that did so in its moving papers.  Yucaipa is arguing that

10   it would be manifestly unfair and violatively of Yucaipa's

11   due process rights to prevent them from pursuing these

12   defenses.  However, the motion to strike would only dismiss

13   those affirmative defenses that rely upon the counterclaim

14   or crossclaim that have already been dismissed.

15            They won't impact at all the affirmative defenses

16   that are not based on those allegations.  For example,

17   Yucaipa can certainly prove that it did not engage in the

18   conduct alleged by Black Diamond and Spectrum, or that such

19   conduct was not wrongful.  That, you know, Yucaipa did not

20   acquire first-lien debt in violation of the Third Amendment,

21   or that it did not improperly declare itself requisite

22   lender, or it did not interfere with potential transactions

23   with JCT that would have yielded a recovery of par plus

24   accrued.

25            They can certainly pursue those defenses.  They

Page 24

1    just can't pursue the defenses that have already been

2    dismissed on a number of occasions by this Court and by the

3    District Court.  And Yucaipa's also committed to pursue

4    other affirmative defenses that it has not linked with the

5    counterclaim and the crossclaim.  It's linked unclean hands,

6    estoppel, waiver, laches, and consent to its prior claims,

7    its prior counterclaim and crossclaims.  But there are

8    additional affirmative defenses it brings, such as

9    justification, the business judgment rule, good faith,

10   exculpation, and failure to mitigate.

11          So it's entirely able to defend itself; it just

12   can't defense itself by constantly going back and

13   reiterating the same claims, which have been dismissed in

14   the crossclaim and the counterclaim and in the RICO claims.

15   In fact, as I pointed out to Your Honor, the facts upon

16   which the affirmative defenses are based -- the affirmative

17   defenses that Mr. Scolnick is speaking about -- are meant to

18   present bad acts by Black Diamond and Spectrum, not the

19   absence of bad acts by Yucaipa.

20          So there is a bright line here, which is that the

21   alleged counterclaim and crossclaims, which were dismissed,

22   were based on allegations by Yucaipa that my clients had

23   engaged in bad acts; in fact, those have been dismissed.

24   Yucaipa can certainly defend itself by showing that it

25   itself had not engaged in bad acts, which is really the

1    nature of an affirmative defense, as opposed to their

2    recycling the crossclaim and counterclaim.

3              Now, we do point out -- and, again, we pointed out

4    for the first time because this is the first time that

5    Yucaipa has linked the affirmative defenses with the

6    crossclaims and the counterclaims that were dismissed, that

7    Rule 9 should apply.  And the reason is that affirmative

8    defenses sounding in fraud are subject to Rule 9(b) pleading

9    requirements, which Yucaipa does not controvert in its

10   opposition.  They admit that.

11             The fact is the reason we say that this sounds in

12   fraud is that Yucaipa in its opposition has said -- and

13   remember their allegations, series of lies, payoffs, and

14   legal maneuvers by Black Diamond and Spectrum, which sound

15   in fraud.  But they say they need discovery in support of

16   the affirmative defenses to prove, among other things, that

17   Black Diamond made false statements and that Yucaipa, that

18   the Yucaipa Defendants, quite, "Relied, to their detriment,

19   on the false statements by Black Diamond and Spectrum."

20             Now, implied in these affirmative defenses is that

21   my client, Black Diamond and Spectrum, intended to do these

22   bad things, and that these bad things -- these lies and

23   legal maneuvers alleged by Yucaipa -- were done with intent

24   by Black Diamond and Spectrum and that they caused damaged

25   to Yucaipa.  Those are all the elements of fraud, and they

1    haven't pled anything with specificity.  In fact, looking at

2    the affirmative defenses, they're bare affirmative defenses,

3    which is why we didn't know until the admission in the

4    motion to compel by Yucaipa that they were tied to the

5    crossclaims and counterclaims, which have been dismissed.

6    They're simply naked claims, such as the claims should be

7    dismissed on grounds of unclean hands, estopped, waiver,

8    with no detail whatsoever.

9            And the one thing that's very interesting is that

10   Yucaipa, when faced with this 9(b) argument, goes so far as

11   to plead that at the opposition on Page 9, that it did plead

12   the affirmative defenses with sufficient particularity based

13   on the factual allegations asserted in the dismissed

14   counterclaim.  So they're faced with a dilemma.  We've

15   pointed out that 9(b) should apply here and there's no

16   detail whatsoever in their affirmative defenses.

17           And when we push them into that corner, what they

18   says is, oh well, we did plead that in our counterclaims,

19   which -- in our counterclaim, which, once again, unites the

20   counterclaim together with the affirmative defenses, and

21   shows that what they're trying to do is seek an end run

22   around Your Honor's dismissal of the counterclaim and the

23   crossclaims and dismissal of the RICO claim by the District

24   Court by simply recycling those same claims.

25           Now, as we pointed out, the cases say that you

Page 27

1    can't try to give new life to a dismissed claim by trying to

2    bring it back through an affirmative defense.  And clearly,

3    that's what they're trying to do.  All the discovery they're

4    trying to get that we've opposed here is the discovery that

5    they would need in support of their crossclaim and in

6    support of their counterclaim.

7            With respect to the prejudice to my clients, this

8    Court, the District Court in Delaware found in Louisiana

9    Sulfur, that a party is prejudiced where affirmative

10   defenses will substantially complicate the discovery

11   proceedings and the issues at trial.  And in a Southern

12   District case called Coach v. Kmart, the Court held that

13   increased discovery costs and having to explore the factual

14   bases of an affirmative defense constitutes prejudice that

15   warrants striking an affirmative defense.

16           The additional discovery that we'd have to engage

17   in here, Your Honor, which is pretty much all the discovery

18   that Yucaipa would have sought if the crossclaim and the

19   counterclaim were still in these cases, and the RICO case

20   too, is going to be incredibly complicated, it's going to be

21   timely.  Mr. Scolnick points out that they've produced 10

22   times more documents than we have.

23           Well, I mean, there's a reason for that: the fact

24   is, Yucaipa was running Allied for years; the fact is

25   Yucaipa bought all the debt, or most of the debt -- a

1    majority of the debt, and set itself up as the requisite

2    lender.  So obviously, they're going to have a whole lot

3    more documents than my client, who was simply an investor.

4            And in any case, where Mr. Scolnick says that all

5    he's doing is seeking parity here, I think that's an odd

6    argument.  Because oftentimes in a case, you'll find that

7    one party, especially the more active party -- Yucaipa

8    running Allied and acting as the requisite lender -- is

9    going to have many more documents than simply an investor.

10           In any case, Mr. Scolnick points out or argues

11   that we made our motion on an untimely basis.  And, in fact,

12   we don't believe that's the case, Your Honor.  The fact is

13   that a motion to strike is supposed to be made before

14   responding to the pleading or within 21 days of being served

15   with the pleading.  However, Federal Rule of Civil Procedure

16   12(f)(1) provides that this Court may strike affirmative

17   defenses at any time, quote, "On its own."  And the cases

18   have held that on its own means that the Court can do that

19   at any time.  And the Courts have also held that that means

20   that a Court may entertain a motion that would otherwise be

21   untimely.  In fact, Judge Robinson in the District Court

22   said that, quite, "Because Rule 12(f) permits a District

23   Court on its own initiative to entertain a motion to strike,

24   the Court has the discretion to hear untimely motions."

25           And the reason we're making the motion now, Your

1    Honor, is because for the first time in their motion to

2    compel, Yucaipa linked the affirmative defenses, which, as I

3    pointed out, in summary and conclusory simply say things

4    like unclean hands, estoppel, et cetera.  They first lined

5    it, and they linked it with a bullet, if you will, to the

6    counterclaim and crossclaims.  It said, we've already set it

7    forth in the counterclaim, but the counterclaim has been

8    dismissed.

9            The fact is we're not late, Your Honor.  This was

10   the first time we could have made this motion.  If we had

11   made the motion at an earlier point in time, likely, we

12   would have met a motion to strike because the affirmative

13   defenses aren't linked on their face in the Answer to the

14   counterclaim.

15           But, you know, in addition to that, Your Honor, if

16   we have learned through discovery, which is through

17   depositions which is likely, that the affirmative defenses

18   were tied to the counterclaim, at that point at the close of

19   discovery, we would have moved for summary judgment to

20   dismiss those affirmative defenses to make the trial more

21   streamlined.

22           So what would have happened is, instead of making

23   the motion now and, hopefully, cutting off expensive and

24   time-consuming discovery, we would have had to go through

25   all that discovery, which would have lengthened the

1    discovery process and made it much more expensive, and then

2    we would have made a motion at that point in time.  So we

3    don't think that the motion is untimely, Your Honor.

4              But to come back, and let me address some of the

5    specific issues that Mr. Scolnick raises as to discovery.

6    First off, the case law is clear that a party may not seek

7    discovery in support of dismissed claims, as we believe

8    Yucaipa is attempting to do here.  In fact, in Beaver v.

9    CitiMortgage, the Court held, Plaintiff is not permitted to

10   use the discovery process as a fishing expedition to try and

11   resuscitate dismissed claims, which we believe is exactly

12   what Yucaipa's trying to do here.

13             And in the Zurich American Insurance case v.

14   Queens Machinery Company, the Court held in denying a motion

15   to compel -- the Court held when it denied a motion to

16   compel, that it is no more than an end run around the

17   earlier dismissals of the counterclaims in an attempt to

18   revive them.

19             And what Mr. Scolnick has pointed out is he's

20   taken a few examples.  For example, one of the document

21   demands that repeats itself among various of the document

22   demands and interrogatories are questions and demands

23   relating to the transfer from Black Diamond to Spectrum of

24   certain amounts of debt for $4 million.

25             Your Honor was faced with that allegation in the

1    counterclaim, and that's the involuntary petition payoff.

2    And the Court found that the purchase by Spectrum of the

3    debt from Black Diamond was not -- did not cause Spectrum to

4    agree to the filing of the involuntary, so we believe that

5    issue is out of this case.  The fact that Spectrum bought

6    some debt from Black Diamond has nothing to do with our

7    claims, and it should have nothing to do with any defenses

8    by Yucaipa.

9              And it just points out, again, that what Yucaipa

10   is doing here with its affirmative defenses is really trying

11   to save affirmative claims.  There's no basis in connection

12   with our claims, with our claims for equitable

13   subordination, that would allow Yucaipa to get into the

14   price paid by Spectrum for the debt or why Black Diamond was

15   interested in selling the debt.  All it has to do with is

16   part of this alleged multitier, multistep, very complex

17   argument that they've made, which Your Honor dismissed in

18   the counterclaim, that requires over, like, a seven-step

19   analysis.

20             That we sucked them in, to use Yucaipa's words,

21   into buying the first-lien debt, and then we sat around

22   lying in wait to try to equitably subordinate them; and

23   that, in fact, we lengthened negotiations with JCT, which we

24   were doing on a sham basis, to wait for the optimum time to

25   bring a claim, and then that we filed an objectively

1    baseless, as they say, equitable subordination claim.  It's

2    like a seven-step highly choreographed plan that we

3    allegedly brought, which was dismissed by this Court, as

4    implausible.

5              The fact is, the amount that was -- that Spectrum

6    paid to have assigned to it the debt from Black Diamond has

7    nothing to do with our claim; it only has to do with they're

8    trying to resuscitate their claims.

9              In addition, just to take one other example, and

10   then I'll sit down, Your Honor.  I think Mr. Scolnick got

11   into this, that the amount that Black Diamond believed

12   Yucaipa's equity was worth; again, that will come in through

13   expert testimony.  It seems irrelevant whether or not my

14   clients thought Yucaipa's debt was worth $100 million or $50

15   million or $75 million, and it's irrelevant for a number of

16   reasons.

17             Well, first off, the expert testimony which we'll

18   put in, you know, at the close of discovery, at the end of

19   discovery and then at trial, is going to be a much more

20   better estimate of the value of Yucaipa's debt.  However,

21   whether Yucaipa's debt was worth anything or not, if it was

22   underwater, the fact is they bought the debt to try to

23   resuscitate the value of their equity to try to bring it

24   above the mark.  If it was worth $10 million or if it was

25   $100 million, it's really not an issue.

1            It's certainly not an issue for our claim, which

2    is all that's left in this case.  It might be an issue for

3    their counterclaim if their counterclaim was still alive.

4    They argue that it was not a matter that we were really

5    concerned about, which was the value of Yucaipa's debt; that

6    all we were trying to do was set up Yucaipa to get them to

7    buy some debt -- sorry.  It's irrelevant to us, they say

8    it's irrelevant to us what the value was of Yucaipa's

9    equity.  All we were trying to do to them is to suck them,

10   as they say, to buying debt, and then basically wait around

11   to equitably subordinate them.

12            So the value of Yucaipa's equity is irrelevant to

13   our claims.  And certainly, our opinion as to the value of

14   Yucaipa's equity would be irrelevant to this case.  Thank

15   you, Your Honor.

16            THE COURT:  You're welcome.

17            MR. SCOLNICK:  (indiscernible) here, Your Honor.

18   The value of Yucaipa's equity is irrelevant to our case.

19   Well, that is contrary to at least a dozen allegations in

20   the Black Diamond and Spectrum Complaint and probably a

21   dozen more in the committee case.  That, in fact, is the

22   entire motive theory behind all the misconduct that they're

23   alleging.  So in an attempt to get away from discovery, if

24   they're going to concede that, fine.  But then if the Court

25   grants this request, we don't want to ever hear again that

1    we were motivated to protect our equity because that is not

2    -- that's not a valid theory if he's going to give away the

3    relevance of that allegation.

4         Mr. Ward talked a lot about timing, the timing of

5    the motion.  I mean, we concede that the Court could rule on

6    its motions; we're just saying the Court ought not to do so.

7    And there's not dispute that there's no case from within the

8    Third Circuit where the Court has stricken defenses on its

9    own motion.

10        All the cases that Mr. Ward cited, and I talked

11   within my opening about Modern Creative Services, but all

12   the other ones -- Human Genome Sciences, Fleet National

13   Bank, Bowler's Alley v. Cincinnati.  All those cases had a

14   situation where the prior ground for dismissing a claim was

15   directly applicable to the affirmative defense, i.e.,

16   there's no independent duty of confidentiality owed or some

17   other reason why the invalidity of the claim itself also

18   rendered the defense invalid.  Here, the only invalidity of

19   our legal claim was implausibility.  Implausibility is not

20   applicable to our defenses, and I haven't heard anything to

21   the contrary.

22        With respect to the vast majority of our discovery

23   requests.  I haven't heard any response to the argument that

24   the requests are, in fact, relevant to Black Diamond and

25   Spectrum's own claims and are a defense of those claims.

1    You can pick out the claims transfer, that's maybe one or

2    two of the requests at issue, the $4.5 million claims trade.

3    But some many of these other requests are relevant more

4    broadly to the case itself.

5             As to Mr. Ward's theory about what our defense

6    ought to be.  I think my client's listening, and I'm sure

7    he's bristling with Mr. Ward's theory about what defense we

8    can pursue and what defense we ought to pursue and how we

9    should position the case.  But the reality is it's our

10   defense, it's our case to try.  We're allowed to pursue

11   whatever theories we deem sufficient, as long as those are

12   legally viable.

13            And here, an equitable subordination claim has a

14   defense of unclean hands.  That is a viable defense, an

15   equitable defense to an equitable claim.  Equitable

16   subordination requires a Plaintiff to prove that he's coming

17   to the Court with clean hands.  The conduct of the Plaintiff

18   is clearly relevant with an equitable claim like

19   subordination.

20            What else?  Finally, I think the only other thing

21   I wanted to cover was that with respect to some of these all

22   -- some of these facts that were deemed implausible.  We are

23   not seeking to revisit those.  We tried to pursue an

24   interlocutory appeal; it didn't work.  We're stuck with that

25   now.  We're living with that for the case.  We do not have a

1    claim, an affirmative claim, for subordination against Black

2    Diamond and Spectrum.

3            But that does not mean the facts that underlie

4    some of the allegations in that defense are completely

5    irrelevant; particularly, for example, Black Diamond and

6    Spectrum planning, as early as August in 2009 and before, to

7    subordinate our debt.  I know that Your Honor has already

8    found that implausible.  But as recently as last Friday,

9    they admitted in a discovery response that they, in fact,

10   were seeking to subordinate our debt, were investigating

11   equitable subordination of Yucaipa as early as August, 2009.

12   And that's in our response we got last Friday.

13           So that's a fact that's come out in the case.

14   We're allowed to develop that fact, to ask about it in

15   discovery, to pursue it in depositions, and eventually when

16   we get to trial to put on that fact as part of our defense.

17   Thank you.

18           MR. WARD:  Your Honor, one very brief point, if I

19   could.  And I may have misspoken or maybe I was misheard --

20   more likely I misspoke because I do that.  It is a central

21   point of our case that Yucaipa purchased the debt to protect

22   the value of its equity.  Now, I thought I'd said that's

23   regardless of whether Yucaipa's equity was worth $10

24   million, $100 million, or even if it was underwater.  It

25   still, we believe, was buying the debt in order to preclude

1    the Debtors from being able to exercise any remedies,

2    including an involuntary bankruptcy because as requisite

3    lender, it -- I'm sorry -- including that bankruptcy

4    because, as the requisite lender, it could have prevented

5    that remedy.

6              So I don't think that I made any major statement

7    here because in our pleadings, we make it very clear, and

8    we've made it very clear from the beginning, that we believe

9    Yucaipa purchased the debt to protect its equity.  But that

10   doesn't turn on what the amount or the value of that equity

11   was.  Thank you, Your Honor.

12             THE COURT:  You're welcome.  All right, good.  Mr.

13   Dorsey?

14             MR. DORSEY:  Thank you, Your Honor.  I apologize

15   ahead of time, I'm battling a little bit of a sinus

16   infection.

17             THE COURT:  Oh, I'm sorry to hear that.

18             MR. DORSEY:  So I'll try to keep my voice up, but

19   I'm probably going to have to speak a lot more slowly than

20   some of the folks have so far.

21             The privilege log, Your Honor, raises a number of

22   issues.  As you know, the burden of showing that the

23   attorney-client privilege applies is on the party seeking to

24   impose that privilege.  In this case, we have a privilege

25   log that includes entries with a dozen or more entities that

1    they claim were subject to the same privilege of counsel

2    with Ropes & Gray.

3              We haven't seen anything to show that there

4    actually was an attorney-client relationship between all of

5    those entities and Ropes & Gray.  We have no engagement

6    agreements; we have no common interest agreement that's been

7    provided.  They haven't done anything to try to prove that

8    they actually have a common interest or an attorney-client

9    relationship with all of these lenders.  They could have

10   done that when responding to the motion.  They could have

11   attached affidavits; they, for whatever reason, chose not to

12   do so.

13             It's also -- the application of attorney-client

14   privileges is undermined by the log itself.  In order to

15   have an attorney-client privilege, you have to have

16   communications between a client and an attorney.  They

17   claim, after some machinations in the papers, that they

18   really didn't mean all those common interest allegations or

19   common interest claims that they made in their privilege

20   log, that's it really attorney-client privilege with all of

21   these lenders.

22             But if you look at the entries in the privilege

23   log, it undermines that allegation.  And just a few

24   examples, Your Honor, in Black Diamond's privilege log at

25   Page 12 and 26, there are a number of entries that include

1    other counsel, including an attorney from Patton Boggs -- or

2    Patton Boggs, I'm sorry, not Blue anymore, same on Page 26.

3    Not only is there a reference to Patton Boggs, but it looks

4    like they're being contrary to Patton Boggs.  The entry is

5    confidential communications reflecting a device regarding

6    correspondence from Patton Boggs and attaching the same.

7            So on the one hand, they're claiming attorney-

8    client privilege for communications with their supposed

9    clients about issues that they then turned around and have a

10   letter that they're claiming privilege on that Patton Boggs

11   sent to them.  We don't know what the topic is, it's not

12   included in the log.

13           The same with Spectrum's privilege log.  If you

14   look at theirs, there's also a number of entries on Page 24,

15   26, 28, all of which include Patton Boggs as one who

16   received as copy of this communications.  On Page 67 of

17   Spectrum's log, there are entries in which Goodwin Procter

18   received copies of this communication.  We don't know who

19   Goodwin Procter represented; we don't know why there were

20   receiving this communication.  But by definition, if those

21   two firms were involved in these communications, they can't

22   be attorney-client privilege, so that's a waiver.

23           Another issue is with the logs, if you look at

24   them closely and you start to analyze them, you can see that

25   there's differences between the clients.  For example, CIT

1    appears in a number of entries as a part of the group who

2    was claimed by this attorney-client privilege.  But then on

3    Page 32 and 34 of Spectrum's privilege log, there are

4    entries from Ropes & Gray to someone at Spectrum, copying

5    two other people at Ropes & Gray.  And it says it's an email

6    chain, confidential communications reflecting legal advice

7    regarding the replacement of CIT as agent.

8                So there clearly was differences between the

9    parties over the issues involved in this case.  You can't

10   have attorney-client privilege on the one hand with CIT and

11   communications; on the other hand, turn it around and say

12   we're going to have communications not involving CIT because

13   we have a dispute with you over your actions in the case.

14   It just doesn't work.

15               The same issues arise with respect to the supposed

16   common interest.  By now, I'm assuming that what they'll

17   argue is -- well, the ones where the other counsel is

18   involved, those are common interests.  But, again, there's

19   no indication that all these parties had a common interest;

20   the CIT entries indicate that there was differences.

21               And it was a sloppy handling of the privilege log,

22   Your Honor.  The way they just, in almost every single

23   entry, they claimed attorney-client privilege and common

24   interests.  It shows that they weren't really going through

25   these documents carefully to determine what the basis for

Page 41

1    each of the claims were.

2            And with regard to common interests -- and this is

3    not in the papers, Your Honor, I apologize.  But, as you

4    know, Rule 501 of the Federal Rules of Evidence says that a

5    state law applies the rule -- a decision in the case, then

6    the Court should apply the state law privilege to those

7    communications.

8            The documents in this case, the credit agreement,

9    is governed by New York law; therefore, New York governs the

10   determination of the issues.  Under New York law, and I have

11   a case I can hand up to Your Honor if you would like, New

12   York does not recognize a common interest in communications

13   between parties when they're negotiating business

14   transactions, even if they have a common interest in the

15   outcome of that transaction.  That's the Ambac v.

16   Countrywide case, and if you'd like, Your Honor, I can hand

17   up copies of it.

18            THE COURT:  Thank you, Mr. Dorsey.

19            MR. DORSEY:  So in this case, just because they

20   have a credit agreement and there was some dispute over the

21   credit agreement doesn't mean that there was going to be

22   litigation or the threat of litigation with regard to every

23   single issue that they talk about in these privilege logs,

24   which includes things like the selling of first-lien debt.

25   So some of the first-lien lenders were interested in selling

Page 42

1   their debt; others perhaps were not interested in selling

2   their debt.  Those were business transactions, not

3   litigation transactions -- not litigation issues.  There are

4   emails involving restructuring the debt, entering into the

5   amendments to the credit agreement.  Those are business

6   transactions, not litigation issues.  And, therefore, the

7   common interest privilege under New York law would not

8   apply.

9           Finally, Your Honor, there's the question of --

10  there's a number of entries where the clients were talking

11  amongst themselves, and they're claiming privilege as to

12  those.  They cite to a couple of cases, one of them a

13  Florida District Court case, which actually stands for the

14  unremarkable proposition that you have co-clients and the

15  attorney send a communication to one of them and that co-

16  client then sends it to the other co-client, you don't lose

17  the privilege.

18          The bankruptcy case that they quote too for the

19  proposition that the clients can talk between themselves, as

20  long as they are communicating about the case.  The quoted

21  language is not actually the Court speaking -- it's a

22  commentator -- and the Court did not actually adopt that

23  language from that decision.

24          The privilege logs, again, undermine the idea that

25  the clients were talking amongst themselves about issues

1    that they were then going to communicate with their counsel.

2    For example, if you look at the Black Diamond log at Page

3    29, entry 177 is from an individual at Spectrum to an

4    individual at Black Diamond -- no indication that they are

5    attorneys.  They're the only ones on the email.  And the

6    subject matter is Goodwin Group.  And it says, confidential

7    communication reflecting legal advice, first-lien lenders

8    potentially selling first-lien debt to Yucaipa.  Those --

9    there's no indication on this log that that relates to

10   anything related to litigation.  It's talking about the

11   first-lien lender selling their debt.  How did that have to

12   do anything with Allied and Yucaipa?  And that

13   communication, no indication this communication was from or

14   to an attorney, any attorney.

15        Those are just a few of examples, Your Honor.  I

16   had one other issue I wanted to raise if I can find it.  We

17   looked at Page 67 of the Spectrum log, these are

18   communications -- I already mentioned these -- about

19   replacing CIT as the agent.  And there are entries, 710, is

20   between someone at Ropes & Gray to Spectrum, copied to other

21   Ropes & Gray attorneys and talks about replacement of CIT as

22   the agent.  There are then communications between 711,

23   there's a communication from someone at Spectrum to a number

24   of individuals, including attorneys at Goodwin Procter.

25   Absent from that email is anyone at Ropes & Gray.  Clearly,

1    Ropes & Gray was not involved in that communication, has

2    nothing to do with the litigation, has to do with something

3    else entirely, but it's been logged on this log.

4            So the bottom line, Your Honor, is the logs were

5    not done properly.  They were done hastily, claiming

6    complete privilege on every single entry, both attorney-

7    client and common interest.  And that lack of attention to

8    detail is sufficient, in and of itself, to have the Court

9    waive privileged to all the documents on the log.  And that

10   would be ultimately what we would ask the Court to do.

11   Alternatively, we'd like to submit some of these documents

12   to the Court to look at to see are they really actually

13   attorney-client privilege.

14           And if you look at Mr. Scolnick's affidavit

15   attached to his motion, there are documents that we received

16   from third parties that are logged on this log that clearly

17   are not attorney-client privilege or common interest

18   privilege.  So there's just a complete sloppiness here, Your

19   Honor, that shouldn't be tolerated.

20           THE COURT:  Okay.

21           MR. DORSEY:  Thank you.

22           THE COURT:  Thank you, Mr. Dorsey.

23           MR. WARD:  Your Honor, when Yucaipa made their

24   motion, they focused most of their attention -- and by that,

25   I mean, most of the documents that they were seeking to

1    obtain which were on our privilege log are documents that

2    were exchanged between my firm and Black Diamond and

3    Spectrum.  Apparently, they've walked away from that

4    position now, and I think wisely, because the attorney-

5    client privilege just straight up without reference to any

6    common interest privilege would clearly apply to those

7    documents.  That's the client privilege, but it's simply a

8    subset of the attorney-client privilege.

9         However, the same applies to Ropes & Gray, and

10   that's the reason I mentioned it.  Prior to my firms

11   involvement, there was a steering committee of first-lien

12   lenders, which excluded Yucaipa, excluding Yucaipa was

13   created, and they retained Ropes & Gray as their counsel.

14   So once again, just like my firm representing Black Diamond

15   and Spectrum, those documents are privileged.

16        It's not even a common interest privilege issue.

17   There's no common interest privilege issue that needs to be

18   raised with respect to Ropes & Gray communicating with the

19   members of that steering committee, which were just about

20   all the first-lien lenders, except for Yucaipa.  So there's

21   no need to get into commercial interest versus legal

22   interest, and Ambac, the New York State case, is not

23   applicable.

24        And, in fact, I'll get into the common interest in

25   a second, but the documents that are covered, we believe, by

1       the common interest do not involve transactions that would

2       be going on among the first-lien lenders.  It involves the

3       first-lien lenders seeking legal advice and being provided

4       legal advice by Ropes & Gray in connection with their

5       contract rights and their legal remedies arising out of

6       those contract rights, vis-a-vis Yucaipa.

7               So with respect to Ropes & Gray, which seems to be

8       the major focus of Yucaipa's attack here, there's no need to

9       go to the common interest privilege.  It's simply straight

10      up attorney-client privilege where Ropes & Gray, in effect -

11      - well, not in effect, but actually was representing all the

12      members of the steering committee, which are all the first-

13      lien lenders, I think, except for -- and most of the first-

14      lien lenders, except for Yucaipa.

15              With respect to the argument about Patton Boggs,

16      I'm told by my colleagues that the reference that Mr. Dorsey

17      made was to a document which is not exchanged for Patton

18      Boggs.  All that the document is detailing, and, in fact, I

19      think the very line and our disclosure in the privilege log

20      shows that it's simply Ropes & Gray discussing some

21      communication with Patton Boggs, however, or comment on some

22      communication with Patton Boggs, but Patton Boggs is not on

23      the communication.

24              Even so, Patton Boggs represented CIT, which,

25      although not a member of the steering committee, it had its

1    own counsel, Patton Boggs.  We believe that they did share a

2    common interest with the other first-lien lenders.  And it

3    wasn't a commercial interest; it was a legal interest, as I

4    pointed out to Your Honor vis-a-vis Yucaipa.  The other

5    first-lien lenders had contractual rights and legal

6    remedies, and they were simply seeking advice from Ropes &

7    Gray, and in the case of CIT, from Patton Boggs, in

8    connection with those legal rights.  And that surely was --

9    certainly was a common legal interest.

10           With respect to the argument that there were some

11   exchanges between individuals in which attorneys were not

12   included.  We do cite some individual cases, and it's a

13   fairly unremarkable proposition, that individuals at a

14   company where you've got an attorney representing a single

15   company, individuals writing to each other in order to fine

16   tune or facilitate more effective representation, which is

17   intended ultimately to be communicated to the attorneys,

18   those are privileged communications.

19           I mean, of course, as we know, if an attorney is

20   rendering advice and that advice is then shared by one

21   individual with another individual who's not an attorney,

22   that's privileged.  But also if two individuals are speaking

23   and trying to fine tune an issue for the attorney, that's

24   also privileged.  And that's all that's happening in

25   connection with the communications that are going on between

1    individuals, which ultimately would get communicated to the

2    attorneys.  And I would point out that Yucaipa has thousands

3    of documents on its privilege log where there's no attorney

4    that's included.  So, clearly, Yucaipa subscribes to the

5    same understanding of privilege logs that we do.

6              With respect to the privilege log that we

7    provided, we believe, Your Honor, it was entirely consummate

8    with the way privilege logs should be prepared.  It

9    contained the names of the author -- the name of the author

10   of the document, the names of all the recipients, a

11   description of the document, the date and time, if

12   available, of the document, the subject line, if applicable,

13   a description of the nature of the communication contained

14   in the document, and the basis for withholding such

15   document.  There's nothing wrong with our privilege log.

16             With respect to certain communications between

17   Black Diamond and Spectrum, I think that Mr. Dorsey referred

18   to.  Again, they were represented by us, the single firm.

19   It's not a common interest issue; even if there were, we

20   still thing think that there will be a legal interest.  But

21   they had one counsel, which was us.  And so when Black

22   Diamond and Spectrum are speaking to each other about advice

23   that they want from my firm, that clearly is going to be

24   privileged, and those are some of the documents that Mr.

25   Dorsey is referring to.

1          Goodwin Procter represented some of the other

2    first-lien lenders at some point.  And, again, those were

3    the first-lien lenders had a common legal interest against

4    Yucaipa.  And as Your Honor knows from the argument in this

5    case, there was Yucaipa, which we've made many allegations

6    that Yucaipa violated the Third Amendment and, you know,

7    created the Fourth Amendment, violated the credit agreement.

8    It's not surprising that the first-lien lenders would have

9    gotten together and formed a steering committee or would

10   have gotten together in a common interest against Yucaipa,

11   and that's all we're talking about here.

12          But, again, most of the documents that Mr. Dorsey

13   is talking about that they've challenged are documents

14   between my firm and Black Diamond and Spectrum.  Clearly, I

15   think those are now off the table on the basis of what Mr.

16   Dorsey is saying.  And most of the remainder of the

17   documents are Ropes & Grapy documents, and they represented

18   the steering committee of first-lien lenders and, again,

19   just one counsel.

20          So I think this is much ado about nothing.  Thank

21   you, Your Honor.

22          THE COURT:  You're welcome.

23          MR. DORSEY:  It's interesting, Your Honor.  I

24   didn't hear Mr. Ward say that all of the members of the

25   first-lien lending group were clients of Ropes & Gray; in

1    fact, he said that -- I think he said that virtually all.

2    But that means there may be some on this privilege log who

3    were not clients of Ropes & Gray, and he still hasn't

4    actually said which ones were and which ones weren't.  So

5    how do we know?  And it's his burden, and he didn't

6    establish that burden.

7              The communications with individuals -- just let me

8    talk aside here -- communications between individuals, Mr.

9    Ward spoke about the situation where you have a single

10   client with a company and you have individuals within the

11   company that are communicating with each other.  Clearly,

12   that's privileged.  These were two different clients, would

13   be the equivalent of two co-clients sitting down before

14   their deposition and saying, okay, here's our story, now

15   let's go tell the lawyer.  That's not privileged under any -

16   - and that's why, in this context, these communications

17   between individuals raises a question about whether or not

18   these were done properly, especially given the sloppiness

19   with the assertions of privilege that they've made here that

20   just don't match up.

21             The communications they say were between -- did

22   not include Patton Boggs.  Yet, on Spectrum's privilege log,

23   Item 243 is a communication between someone at CIT, a number

24   of people I assume are on -- were first-lien lenders, copied

25   to James Chadwick, Esquire, Patton Boggs.  So, and there's a

1    number of those entries, dozens of them in the privilege

2    log, Your Honor.  So it's not just that they were the

3    subject of an email; they actually received them, which

4    destroys privilege.

5              Therefore, we would renew our request that the --

6    all the documents be considered waived because of the lack

7    of their coming forth with evidence to show that the

8    attorney-client privilege applies to any of those documents.

9              THE COURT:  Thank you, Mr. Dorsey.

10             MR. WARD:  Your Honor, one quick comment, please.

11             THE COURT:  Yes.

12             MR. WARD:  I'm told by my colleagues, Your Honor,

13   that with respect to the privilege log, every first-lien

14   lender that's on that privilege log was a member of the

15   steering committee, except for CIT.  And if I didn't make

16   that clear, I apologize.  CIT was represented by Patton

17   Boggs, and we think there's a common interest with respect

18   to CIT.  However, it is every first-lien lender that's

19   listed on the log since Mr. Dorsey called me out on that

20   point.

21             And with respect to my saying that the Patton

22   Boggs reference that he referred to in his opening points

23   did not include a communication with Patton Boggs.  That's

24   true of the items from the privilege log that he raised.

25   There are other items, and I thought I'd mentioned that --

1    maybe I mentioned it too briefly -- between Patton Boggs and

2    Ropes & Gray and various other clients.  That, we think, is

3    part of the common interest.  So, again, with respect to

4    Ropes & Gray and the steering committee, there's no need for

5    common interest.

6            With respect to CIT and Patton Boggs on the one

7    hand and Ropes & Gray and the rest of the first-lien lenders

8    accepting Yucaipa, we think there's a common legal interest.

9    As I said, there were contractual rights and remedies that

10   were at issue there, not transaction.  Thank you.

11           THE COURT:  All right.  Anything further?

12           MR. DORSEY:  Nothing further, Your Honor.

13           THE COURT:  Okay, thank you.  This has been very

14   helpful.  Any further common on any matter?  All right, I'm

15   going to continue to take the matter under advisement, and

16   I'll be issuing an order in relatively short order -- an

17   order in short order.  Not a lengthy decision because this

18   is, although important, you know, it's -- I don't want to

19   take another six months to write a lengthy decision.  You

20   need to know and you need to move forward, so you'll get a

21   decision from me shortly.

22           I apologize, I hope you make you plane.

23           MR. SCOLNICK:  I think I will, Your Honor.

24           THE COURT:  Okay, very good.  Well, good luck with

25   the traffic.  We're adjourned.

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5    Sonya

6    Ledanski Hyde

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde,
o=Veritext, ou,
email=digital@veritext.com, c=US
7    Date: 2017.01.10 16:31:51 -05'00'

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  January 10, 2017