**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ASHINC Corporation, *et al.*,<br><br>　　　　　　　　　　Debtors. | Case No. 12-11564 (CSS)<br>(Jointly Administered) |
| CATHERINE E. YOUNGMAN, LITIGATION TRUSTEE FOR ASHINC CORPORATION, ET. AL., AS SUCCESSOR TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ASHINC CORPORATION, AND ITS AFFILIATED DEBTORS,<br><br>　　　　　　　　　　Plaintiff,<br><br>BLACK DIAMOND OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., and SPECTRUM INVESTMENT PARTNERS, L.P.,<br><br>　　　　　　　　　　Intervenors,<br><br>　　　　　　　　　　v.<br><br>YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P., MARK GENDREGSKE, JOS OPDEWEEGH, JAMES FRANK, DEREX WALKER, JEFF PELLETIER, IRA TOCHNER, and JOSEPH TOMCZAK,<br><br>　　　　　　　　　　Defendants. | Adv. Proc. No. 13-50530 |
| CATHERINE E. YOUNGMAN, LITIGATION TRUSTEE FOR ASHINC CORPORATION, ET AL., AS SUCCESSOR TO BLACK DIAMOND OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., SPECTRUM INVESTMENT PARTNERS, L.P., BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., as co-administrative agent, and SPECTRUM COMMERCIAL FINANCE LLC, as co-administrative agent,<br><br>　　　　　　　　　　Plaintiff, | Adv. Pro. No. 14-50971 (CSS) |

v.

YUCAIPA AMERICAN ALLIANCE FUND I, L.P.,
YUCAIPA AMERICAN ALLIANCE (PARALLEL)
FUND I, L.P., YUCAIPA AMERICAN ALLIANCE
FUND II, L.P., YUCAIPA AMERICAN ALLIANCE
(PARALLEL) FUND II, L.P., RONALD BURKLE,
JOS OPDEWEEGH, DEREX WALKER, JEFF
PELLETIER, IRA TOCHNER, and JOSEPH
TOMCZAK,

                    Defendants.

## LITIGATION TRUSTEE'S MEMORANDUM IN SUPPORT
## OF MOTION FOR PARTIAL SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................. iii

NATURE AND STAGE OF PROCEEDINGS ............................................. 1

SUMMARY OF ARGUMENT ............................................................... 2

    1.    Breach of Contract (Estate Claim 5 and Direct Lender Claim 2) — Failure to Make Capital Contribution ................................................................. 2

    2.    Equitable Subordination of Yucaipa's Claims (Estate Claims 1-2; Direct Lender Claim 1) ...................................................................... 3

    3.    Fraudulent Transfer and Disallowance — Against Yucaipa (Estate Claims 10, 11, and 13) ......................................................................... 3

    4.    Tortious Interference — Against the Yucaipa Directors and Burkle (Direct Lender Claim 4) ......................................................................... 4

STANDARD ........................................................................................ 4

STATEMENT OF UNDISPUTED FACT ................................................ 5

    I.    Yucaipa's Investments and Controlling Stake in Allied ..................... 5

        A.    Yucaipa's Selection of Allied's CEO and Appointment of New Board .............. 6

        B.    Allied's 2005 Bankruptcy Exit Financing ................................. 7

        C.    Yucaipa's Investment in Allied Quickly Faltered ....................... 7

    II.    Yucaipa's Efforts to Control Allied's Entire Capital Structure ............. 8

        A.    Negotiations and Adoption of the Third Amendment .................. 8

        B.    Yucaipa's Failed Tender Offer and ComVest's Acquisition of First Lien Debt .................................................................. 9

        C.    Yucaipa's Direct Negotiations with ComVest, Excluding Allied ...... 12

        D.    The Purported Fourth Amendment ........................................ 14

    III.    Yucaipa Breaches the Third Amendment, Making No Capital Contributions and Seizing Control as Requisite Lender ......................... 14

i

IV.    Litigation Over the Fourth Amendment ....................................................................15

V.     Yucaipa Wrongfully Uses its Purported "Requisite Lenders"
       Status to Benefit Itself to Detriment of Allied and Its Stakeholders............................16

VI.    Fourth Amendment Voided and BD/S Recognized As Requisite Lenders ................19

VII.   JCT Buys Substantially All of Allied's Assets .........................................................20

VIII.  Trustee Assumes Prosecution of These Adversary Proceedings ...............................20

ARGUMENT .........................................................................................................................21

I.     Yucaipa Breached the Third Amendment..................................................................21

II.    Yucaipa's Debt Holdings Should Be Equitably Subordinated ...................................23

       A.    Yucaipa's Inequitable Conduct Compels Subordination...................................24

       B.    Yucaipa's Inequitable Conduct Injured Allied's Creditors ..............................28

       C.    Equitable Subordination Is Consistent with the Goals of the
             Bankruptcy Code ..........................................................................................30

III.   The Allied Estates Are Entitled to Fraudulent Transfers Made for Yucaipa's Benefit
       When Allied Was Insolvent and Disallowance of Yucaipa Claims ..........................31

       A.    Transfers Should be Avoided and Recovered under §§548 and 550.................32

       B.    Transfers Should be Recovered under §§544(b), 550, and State Law...............33

       C.    Yucaipa's Claims Should be Disallowed Until the Transfers are Returned.......37

       D.    Prejudgment Interest Should Be Granted on All Fraudulent Transfers.............37

IV.    Yucaipa Directors and Burkle Tortiously Interfered With First Lien Lender Rights..37

CONCLUSION.......................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*,
  2013 WL 1290394 (Sup. Ct. N.Y. Cnty. Mar. 8, 2013),
  *aff'd*, 112 A.D.3d 509 (1st Dep't 2013),
  *leave to appeal denied*, 22 N.Y.3d 1171 (2014) .......................................................19 n.43

*Boyce v. Soundview Tech. Grp., Inc.*,
  464 F.3d 376 (2d Cir. 2006)...................................................................................22

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).................................................................................................4

*City of Binghamton v. Serafini*,
  8 A.D.3d 835 (3d Dep't 2004) ..................................................................23 n.50

*Cliffs Nat. Res. Inc. v. Seneca Coal Res., LLC*,
  2017 WL 5148426 (D. Del. Oct. 31, 2017) ............................................. 33-34

*In re 848 Brickell Ltd.*,
  243 B.R. 142 (S.D. Fla. 1998) ...............................................................................28

*In re Aerogroup Int'l, Inc.*,
  601 B.R. 571 (Bankr. D. Del. 2019),
  *motion to certify appeal denied*, 2020 WL 757892 (D. Del. Feb. 14, 2020).............22 n.49

*In re Allied Sys. Holdings Inc*,
  556 B.R. 581 (D. Del. 2016),
  *aff'd sub nom. In re ASHINC Corp.*, 683 F. App'x 131 (3d Cir. 2017) ...........................20

*In re Am. Bus. Fin. Servs., Inc.*,
  362 B.R. 149 (Bankr. D. Del. 2007) .......................................................................24

*In re Burbank Generators, Inc.*,
  48 B.R. 204 (Bankr. C.D. Cal. 1985)

*In re Computer Universe, Inc.*,
  58 B.R. 28 (Bankr. M.D. Fla. 1986) ......................................................................33

*In re Epic Capital Corp.*,
  290 B.R. 514 (Bankr. D. Del. 2003),
  *aff'd*, 307 B.R. 767 (D. Del. 2004) ................................................................. 4-5

*In re FAH Liquidating Corp.*,
    572 B.R. 117 (Bankr. D. Del. 2017) ...................................................................34

*In re FBI Wind Down, Inc.*,
    581 B.R. 116 (Bankr. D. Del. 2018) ...................................................................33

*In re Fedders N. Am., Inc.*,
    405 B.R. 527 (Bankr. D. Del. 2009) ...................................................................34

*In re Hechinger Inv. Co. of Del.*,
    327 B.R. 537 (D. Del. 2005),
    *aff'd*, 278 F. App'x 125 (3d Cir. 2008) ...............................................................5

*In re Green Field Energy Servs., Inc.*,
    585 B.R. 89 (Bankr. D. Del. 2018) .....................................................................38

*In re LightSquared Inc.*,
    511 B.R. 253 (Bankr. S.D.N.Y. 2014) ................................................................25

*In re Lucas Dallas, Inc.*,
    185 B.R. 801 (B.A.P. 9th Cir. 1995) ..................................................................31

*In re Mervyn's Holdings, LLC*,
    426 B.R. 488 (Bankr. D. Del. 2010) ...................................................................34

*In re Mid-Am. Waste Sys., Inc.*,
    284 B.R. 53 (Bankr. D. Del. 2002) ...............................................................23, 30

*In re Mortg. Lenders Network USA, Inc.*,
    406 B.R. 213 (Bankr. D. Del. 2009) ..............................................................22 n.49

*In re Opus E., LLC*,
    528 B.R. 30 (Bankr. D. Del. 2015),
    *aff'd*, 2016 WL 1298965 (D. Del. Mar. 31, 2016),
    *aff'd*, 698 F. App'x 711 (3d Cir. 2017) ..............................................................37

*In re Steel Wheels Transport, LLC*,
    2011 WL 5900958 (Bankr. D.N.J. Oct. 28, 2011) ..............................................30

*In re SubMicron Sys. Corp.*,
    432 F.3d 448 (3d Cir. 2006) ................................................................................23

*In re Winstar Commc'ns, Inc.*,
    348 B.R. 234 (Bankr. D. Del. 2005),
    *aff'd*, 2007 WL 1232185 (D. Del. Apr. 26, 2007),
    *aff'd in part, modified in part*, 554 F.3d 382 (3d Cir. 2009) ...............................24, 28, 30

*In re Winstar Commc'ns, Inc.*,
　　554 F.3d 382 (3d Cir. 2009)......................................................................23

*In re W.R. Grace & Co.*,
　　281 B.R. 852 (Bankr. D. Del. 2002) .........................................................34

*Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc.*,
　　92 F.3d 139 (3d Cir. 1996).........................................................................32

*Proud Designs, Inc. v. Whidden*,
　　90 A.D.3d 732 (2d Dep't 2011) .................................................................21

*Roan/Meyers Assocs., L.P. v. CT Holdings, Inc.*,
　　26 A.D.3d 295 (1st Dep't 2006) ...........................................................23 n.50

*Rossi v. Twinbogo Co.*,
　　193 A.D.2d 481 (1st Dep't 1993) ...........................................................38, 40

*Second Source Funding, LLC v. Yellowstone Capital, LLC*,
　　144 A.D.3d 445 (1st Dep't 2016) ...............................................................21

## Rules & Statutes

Ariz. Rev. Stat. Ann. § 44-1002(B)...........................................................35 n.84

Ariz. Rev. Stat. Ann. § 44-1004 ...............................................................35 n.83

Ariz. Rev. Stat. Ann. § 44-1009 ...............................................................35 n.84

Cal. Civ. Code § 3439.02(b) .....................................................................35 n.84

Cal. Civ. Code § 3439.04 ..........................................................................35 n.83

Cal. Civ. Code § 3439.09 ..........................................................................35 n.83

Del. Code Ann. tit. 6, § 1302(b)................................................................35 n.84

Del. Code Ann. tit. 6, § 1304 ....................................................................35 n.83

Del. Code Ann. tit. 6, § 1309 ....................................................................35 n.83

Fed. R. Bankr. P. 7056 ....................................................................................4

Fed. R. Civ. P. 56(c) ...................................................................................4, 5

FLA. STAT. ANN. § 726.103(2) ................................................................35 n.84

FLA. STAT. ANN. § 726.105 ....................................................................35 n.83

FLA. STAT. ANN. § 726.110 ....................................................................35 n.83

GA. CODE ANN. § 18-2-72(b) ................................................................35 n.84

GA. CODE ANN. § 18-2-74 ......................................................................35 n.83

GA. CODE ANN. § 18-2-79 ......................................................................35 n.83

N.Y. C.P.L.R. § 5001 ..............................................................................23 n.50

N.Y. C.P.L.R. § 5004 ..............................................................................23 n.50

N.Y. DEBT. & CRED. LAW § 273 ...........................................................35 n.83

N.Y. DEBT. & CRED. LAW § 278 ...........................................................35 n.83

11 U.S.C. § 101(31)(B)(iii) ...........................................................................24

11 U.S.C. § 363 ............................................................................................20

11 U.S.C. § 502(d) .................................................................................31, 37

11 U.S.C. § 510(c) .......................................................................................23

11 U.S.C. § 544 .....................................................................................*passim*

11 U.S.C. § 548 .....................................................................................*passim*

11 U.S.C. § 550 .....................................................................................*passim*

28 U.S.C. § 1961 ..........................................................................................37

Plaintiff Catherine E. Youngman, as Litigation Trustee ("**Trustee**") for ASHINC Corp. (formerly known as Allied Systems Holdings, Inc.) and related Debtors ("**Allied**" or the "**Company**"), respectfully submits this memorandum of law in support of her motion for partial summary judgment against Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP ("**Yucaipa**"), Yucaipa's founder and principal Ron Burkle ("**Burkle**"), and the former Allied directors and officers appointed by Yucaipa — Jos Opdeweegh, Derex Walker, Jeff Pelletier, and Ira Tochner (collectively, the "**Yucaipa Directors**") — on Claims 1-2, 5, 10-11, and 13 brought on behalf of the Allied Estates ("**Estate Claims**")[1] and on Claims 1, 2, and 4 brought on behalf of the lenders under Allied's first lien credit facility (the "**Direct Lender Claims**").[2]

## NATURE AND STAGE OF PROCEEDINGS

Yucaipa, Burkle, and the Yucaipa Directors caused Allied and its stakeholders hundreds of millions of dollars in losses by wrongfully exerting total control over Allied's equity and debt, and arrogating for Yucaipa benefits to which it was not entitled. Among other things, Yucaipa

---

[1]    The Estate Claims are asserted in *Catherine E. Youngman, Litig. Tr. for ASHINC Corp. v. Yucaipa Am. All. Fund I, L.P.*, Adv. Proc. No. 13-50530 (Bankr. D. Del.) ("**13-50530**"). They are: (1) Equitable Subordination, (2) Equitable Subordination for Harm to All First Lien and Second Lien Lenders, (3) Recharacterization, (4) Specific Performance of Contribution Provision, (5) Breach of Contract for Breach of Contribution Provision, (6) Specific Performance of Divestiture of Debt Provision, (7) Breach of Fiduciary Duty against Yucaipa, (8) Breach of Fiduciary Duty against Allied Directors, (9) Aiding and Abetting Breaches of Fiduciary Duties, (10) Avoidance and Recovery of Fraudulent Transfers (11 U.S.C. §§548(a), 550), (11) Avoidance and Recovery of Fraudulent Transfers (11 U.S.C. §§544(b), 550), (12) Preferential Transfers, and (13) Disallowance of Claims. (Ex. 1). Exhibits (abbreviated "**Ex.**") are attached to the accompanying Declaration of Gila S. Singer. Emphasis is added to, and internal quotations, brackets, ellipses, and citations omitted from, quoted material, unless otherwise indicated.

[2]    The Direct Lender Claims are asserted in *Catherine E. Youngman, Litig. Tr. for ASHINC Corp. v. Yucaipa Am. All. Fund I, L.P.*, Adv. Proc. No. 14-50971 (Bankr. D. Del) ("**14-50971**"). They are: (1) Equitable Subordination, (2) Breach of Contract, (3) Breach of the Implied Duty of Good Faith and Fair Dealing, and (4) Tortious Interference with Contract. (Ex. 2).

— at Burkle's direction — leveraged its controlling shareholder status and its dominion over the Allied board to seize control of Allied's first lien debt, in violation of clear prohibitions in the governing Third Amendment to Allied's First Lien Credit Facility (the "**Third Amendment**"), which barred Yucaipa from acquiring a controlling interest in that debt or serving as "**Requisite Lenders**." Yucaipa also flouted its express contractual duty, if it did acquire first lien term loans, to make a capital contribution to Allied within ten days of the acquisition in an amount equal to 50% of the loans acquired.

Yucaipa's unlawful effort to end-run the Third Amendment's prohibitions has been consistently rejected by the courts. The purported Fourth Amendment it engineered to circumvent the Third Amendment's restrictions was judicially voided, but not before Yucaipa used it to masquerade as Requisite Lenders and enrich itself at the expense of the Allied Estates. Yucaipa caused over $220 million in damages to Allied and its constituents — all at Burkle's direction and with the assistance of a complacent, conflicted Board.

By this motion, the Trustee seeks summary judgment on:

- Estate Claims 1-2 (equitable subordination (against Yucaipa)), 5 (breach of contract (against Yucaipa)), 10-11 (avoidance and recovery of fraudulent transfers (against Yucaipa)), and 13 (disallowance of claims (against Yucaipa)); and

- Direct Lender Claims 1 (equitable subordination (against Yucaipa)), 2 (breach of contract (against Yucaipa)), and 4 (tortious interference with contract (against the Yucaipa Directors and Burkle)).

## SUMMARY OF ARGUMENT

1.    **Breach of Contract (Estate Claim 5 and Direct Lender Claim 2) — Failure to Make Capital Contribution.** On August 21, 2009, Yucaipa purchased a majority of Allied's first lien debt in breach of the governing Third Amendment and then compounded that breach by failing to make a required capital contribution in the amount of 50% of the first lien term loans it

acquired within ten days.  The Third Amendment has been judicially determined to be valid and binding, and it is undisputed that Yucaipa never made the mandatory capital contribution.

      2.     **Equitable Subordination of Yucaipa' Claims (Estate Claims 1-2; Direct Lender Claim 1).**  Yucaipa's inequitable conduct warrants subordination of its claims as an Allied creditor because it caused both (1) injury to Allied's non-Yucaipa creditors, and (2) conferred an unfair advantage on Yucaipa.  Yucaipa's inequitable conduct includes its breaches of the First Lien Credit Agreement; its improper exercise of control over Allied and its capital structure; and its interference with negotiations in 2011-12 with Jack Cooper Transport ("**Jack Cooper**" or "**JCT**"), whose attempts to buy Allied's assets were thwarted by Yucaipa.  Yucaipa insisted on using its leverage over the Company to attempt to sell its debt to JCT at a premium.  Yucaipa prevented Allied from negotiating a transaction that would ensure ratable treatment for all lenders and terms far more favorable than the terms of the post-bankruptcy purchase of Allied's assets by JCT in December 2013.

      3.     **Fraudulent Transfer and Disallowance — Against Yucaipa (Estate Claims 10, 11, and 13).**  Yucaipa, as controlling shareholder and holder of three of five Allied Board seats, caused an insolvent Allied to make numerous payments for Yucaipa's benefit, in exchange for which Allied did not receive reasonably equivalent — indeed, any — value.  These payments were made to (a) Yucaipa's attorneys for legal services performed for Yucaipa and not Allied; (b) Yucaipa and ComVest Investment III, L.P. ("**ComVest**"), the former majority first lien debtholder of Allied, for legal fees and other expenses in connection with a private sale of ComVest's majority share of the first lien debt to Yucaipa; and (c) Jonathan Ornstein, a mutual friend of, and intermediary between, principals of Yucaipa and ComVest, who assisted in brokering that deal.  All of these payments were for Yucaipa's sole benefit.  Yucaipa's claims

should be disallowed in the amount of the fraudulent transfers until such amounts are returned.

4.        **Tortious Interference — Against the Yucaipa Directors and Burkle (Direct Lender Claim 4).**  With full knowledge that the Third Amendment barred Yucaipa from acquiring enough debt to become majority first lien debtholder, the Yucaipa Directors and Burkle caused Yucaipa to violate that contractual prohibition by purchasing ComVest's majority first lien holdings — and Yucaipa then disregarded its duty to make the mandatory capital contribution required by the Third Amendment.  The Yucaipa Directors and Burkle also interfered with the contractual rights of other first lien lenders by causing Allied to commit ongoing breaches of the First Lien Credit Agreement, including failures to make interest and principal payments (even as Yucaipa was appropriating Allied cash for itself) or provide lenders required financial reporting.  The Yucaipa Directors and Burkle also caused Yucaipa to interfere in the 2011-12 negotiations with Jack Cooper, causing those negotiations to disintegrate when Yucaipa did not receive the premium it improperly demanded.  This prevented the closing of a pre-bankruptcy transaction on terms far more favorable to Allied and its creditors than the 363 sale that closed in December 2013.

## STANDARD

"Summary judgment … is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole which are designed to secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Under FED. R. CIV. P. 56(c) — made applicable to adversary proceedings under FED. R. BANKR. P. 7056 — "summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *In re*

*Epic Capital Corp.*, 290 B.R. 514, 520 (Bankr. D. Del. 2003), *aff'd*, 307 B.R. 767 (D. Del. 2004); FED. R. CIV. P. 56(c).

Summary judgment will not be denied based on "[t]he mere existence of some evidence in support of the nonmoving party...; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue." *In re Hechinger Inv. Co. of Del.*, 327 B.R. 537, 543 (D. Del. 2005), *aff'd*, 278 F. App'x 125 (3d Cir. 2008) (unpublished). The moving party is entitled to judgment as a matter of law "[i]f the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof." *Id.*

## STATEMENT OF UNDISPUTED FACT

**I.    Yucaipa's Investments and Controlling Stake in Allied**

Allied was a unionized car hauling company engaged in the transport of new vehicles in North America (Ex. 54). On July 31, 2005, Allied filed a petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Northern District of Georgia (the "**2005 Bankruptcy**").[3] Yucaipa — a private equity firm founded by Ron Burkle (Ex. 4 at 1) — began analyzing investment opportunities in the Company in an effort spearheaded by Derex Walker, a Transaction Partner hired by Yucaipa in January 2006 to provide experience with restructuring and distressed debt investing.[4] ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████  ██

---

[3]    *In re Allied Holdings, Inc.*, No. 05-12515 (CRM) (Bankr. N.D. Ga.).

[4]    *See* Ex. 3; *see also* Ex. 98 (Walker Dep.) 42:24-43:14; Ex. 101 (Burkle Dep.) 15:11-23.

[5]    *See* Ex. 54; Ex. 101 (Burkle Dep.) 15:11-23.

██████████████████████████████████████████████

Allied emerged from the 2005 Bankruptcy in May 2007 under a Plan of Reorganization
(the "**Plan**") sponsored by Yucaipa and the International Brotherhood of Teamsters.  (Ex. 11).

████████████████████████████████████████████████████████

████████████  Yucaipa obtained the ability to control Allied's Board of Directors (the
"**Board**"), with the right to appoint three of Allied's five Board members and Allied's Chief
Executive Officer (the fourth Board member), and a veto over Allied's fifth Board member, who
was to be selected by the Creditors' Committee from the 2005 Bankruptcy.[7]

### A.    Yucaipa's Selection of Allied's CEO and Appointment of New Board

Following confirmation of the Plan in 2007, Yucaipa removed all of Allied's Board
members.  It replaced them with three of its employees, including Board Chairman Derex
Walker.[8]  On March 5, 2007, before Allied exited its 2005 Bankruptcy, Yucaipa retained the
executive search firm Heidrick & Struggles to find a new CEO and fourth Board member for the
Company.  (Ex. 15). ████████████████████████████████████████

███████████████████████████████████████████

████████████████████████  Walker and others at Yucaipa interviewed candidates
before offering the position to T. Michael Riggs, then the CEO of JHT Holdings, Inc., a

---

[6]    Ex. 54; Ex. 98 (Walker Dep.) 153:19-154:1.

[7]    Ex. 5 at §7.2; Ex. 54 ("YAAF appointed four of the five directors on the board, consisting
of three YAAF representatives and the CEO"); Ex. 98 (Walker Dep.) 153:19-154:21.

[8]    Ex. 12.  Yucaipa's initial Board designees were Derex Walker, Ira Tochner, and Jos
Opdeweegh.  Walker served as Chairman until December 2013 (Ex. 98 (Walker Dep.) 45:22-46:3).
Ira Tochner served from May 2007 to January 2008 and again from April 2009 to December 2013
(Ex. 89 (Yucaipa's 3/30/16 Responses to Black Diamond's First Interrogatories) at 14-15); James
Frank served from January 31 to May 19, 2008 (Exs. 16, 23); Joseph Tomczak served from June
2008 to April 2009 (Ex. 89 at 14-15); Jos Opdeweegh served from May 2007 to October 2009
(*id.*); and Jeff Pelletier served from October 2009 to December 2013 (*id.*).

company specializing in the delivery of large commercial trucks in North America (Ex. 98

(Walker Dep.) at 156:4-22).  Riggs declined the offer, and the job went to Defendant Mark

Gendregske (*id.*).  Gendregske served as Allied's CEO and a Director from June 2007 through

December 2013 under an employment agreement negotiated by Yucaipa (Exs. 6, 8).

The fifth and final member of the Allied Board was nominated by the Creditors'

Committee, subject to a veto by Yucaipa if the nominee was not "reasonably satisfactory" to it.

(Ex. 11 at 3).  ████████████████████████████████████████████

████████████████████████████████

**B.**    **Allied's 2005 Bankruptcy Exit Financing**

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████ █████████████████████████████

████████████████████████████████████████

██████████████████████████████████ CIT also served as the

Administrative Agent and Collateral Agent for the First Lien Facility.  (Ex. 9 at APPENDIX

A−1-3).

**C.**    **Yucaipa's Investment in Allied Quickly Faltered**

Shortly after it exited the 2005 Bankruptcy in May 2007, Allied's financial condition

began to deteriorate.  (Ex. 81 at ¶7).  ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[9]     *See* Ex. 9 (First Lien Credit Agreement); Ex. 10 (Second Lien Credit Agreement and,
together with the First Lien Credit Agreement, the "**Credit Agreements**"); Ex. 14.

███████████████████████████████████████████████

███████████████████████████████████████████████

## II.    Yucaipa's Efforts to Control Allied's Entire Capital Structure

### A.    Negotiations and Adoption of the Third Amendment

On March 31, 2008, Allied's Board met on an "emergency basis" to discuss Yucaipa's proposal to amend the Credit Agreements to permit Yucaipa to purchase Allied's bank debt with the option of converting the debt into equity.  (Ex. 19 at 1).  ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████    The Board appointed Brian Cullen and Allied's CEO, Mark Gendregske, to serve on the Special Committee with a mandate to, among other things, consider and negotiate Yucaipa's proposed transaction.  (*Id.*).

On April 17, 2008, Allied — with the consent of CIT and a majority of the other Lenders — agreed to the Third Amendment to the First Lien Credit Agreement.  (Ex. 20).  Under the Third Amendment, Yucaipa and its affiliates remained restricted from acquiring Allied First Lien debt except within specified limits and only if it satisfied stringent contractual conditions:

- **Limits.**  Yucaipa was barred from acquiring (i) any Letter of Credit Commitments, and (ii) more than $50 million, or 25%, of the aggregate Term Loans.  (*Id.* at §§2.1(c), 2.7(c)).

---

[10]    *See* Ex. 18 (2/18/08 "Allied_Debt_Purchase_Proposal_Internal_080219 Final.pdf").

- **Mandatory Capital Contributions.**   Yucaipa was required to make capital contributions to Allied in an amount equal to 50% of any Term Loans it acquired, within 10 days of the acquisition.  (*Id.* at §2.7(e)).

- **No Right to Act as Requisite Lenders.**   Yucaipa — as a "Restricted Sponsor Affiliate[]" — was barred from serving as Requisite Lender, voting with other Lenders, or controlling the First Lien Credit Facility.  (*Id.* at §2.1(c), (e)).[11]

On the morning of April 17, 2008, Walker emailed Burkle informing him of the adoption of the Third Amendment.  (Ex. 21).  ███████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ A Third

Amendment to the Second Lien Credit Agreement was later adopted as of April 30, 2008.

(Ex. 22).  Unlike the Third Amendment to the First Lien Credit Agreement, the second lien

amendment placed no restrictions on Yucaipa purchasing Second Lien Debt and gave Yucaipa

the unilateral option of converting some or all of its Second Lien holdings into equity.  (*Id.*).

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

**B.   Yucaipa's Failed Tender Offer and ComVest's Acquisition of First Lien Debt**

Yucaipa's contribution and subsequent cancellation of ████████████ Allied's Second

Lien Debt did not create sufficient liquidity for Allied.  By June 2008, the Company defaulted on

covenant provisions of the First Lien Credit Agreement.[13]  CIT sent the Company a Notice of

---

[11]   Additionally, Yucaipa "irrevocably and voluntarily waive[d]" any right it would have had as a Lender to take any action in an Allied bankruptcy "without the prior written consent of all [other] Lenders" (Ex. 20 §2.7(b)), and "waive[d] any claim or cause of action against any Lender" arising out of, or related to, the Credit Agreement, "except to the extent caused by such Lender's … gross negligence or willful misconduct" (*id.* at §2.7(e)).

[12]   Ex. 98 (Walker Dep.) 159:11-160:4; Ex. 21.

[13]   Ex. 95 (Tomczak Dep.) 75:23-76:6; Ex. 24.

Default and Reservation of Rights dated September 3, 2008.  (Ex. 25).

From September to December 2008, Yucaipa, Allied, and a Steering Committee of First Lien Lenders discussed restructuring alternatives.  Walker summarized these discussions at a December 10, 2008, Board meeting, reporting that ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████  Walker also reported that █████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████

The proposal Walker outlined at the December 10, 2008, Board meeting was never consummated.  On January 24, 2009, the Allied Board was asked to consider a new proposal by Yucaipa pursuant to which:

█ ███████████████████████████████████████████████
████████████

█ █████████████████████████████████████████

█ █████████████████████████████████████████████████
███████████████

This proposal evolved into a Yucaipa tender offer, which was circulated by Allied's then interim CFO Joe Tomczak to the First Lien Lenders on February 4, 2009 (the "**Tender**

**Offer**").[14]  Yucaipa offered to acquire a majority of the outstanding First Lien term loans ███

███

███

███

On February 12, 2009, Patton Boggs, as counsel for the Agent, CIT, wrote a letter to Troutman (copying Tomczak) about the Tender Offer and proposed Fourth Amendment:



(Ex. 32 (underscoring in original; italics added)).  Yucaipa never responded to CIT's letter.

The Tender Offer was unsuccessful.[16]  On February 21, 2009, ComVest, which was not previously one of Allied's Lenders, successfully acquired more than 50% of Allied's First Lien Debt, becoming Requisite Lenders under the First Lien Credit Agreement.  (Ex. 33).  Shortly thereafter, Jonathan Ornstein — a friend of both Burkle and ComVest principal Robert Priddy — reached out to ComVest to broker an introduction with Yucaipa.[17]  On February 23, 2009, Derex Walker and Ira Tochner flew to Florida for an initial introductory meeting with ComVest

---

[14]     Ex. 30.  The Tender Offer was set to expire on February 11, 2009, but was later extended to February 25, 2009.  (*See* Ex. 31).

[15]     Goldman Sachs — which had been advising Yucaipa and Allied in attempts to secure an amendment to the First Lien Credit Agreement since August 2008 — was unwilling to serve as Administrative Agent for the Tender Offer.  Roopesh Shah (of Goldman Sachs) told Derex Walker in a February 2, 2009, email ███

███

[16]     Ex. 98 (Walker Dep.) 528:9-11.

[17]     *See* Ex. 34; Ex. 56 (2/24/11 Walker Dep.) 99:16-100:12; Ex. 92 (ComVest 30(b)(6) Dep.) 64:14-65:6.

executives at their offices in West Palm Beach.[18]

### C.    Yucaipa's Direct Negotiations with ComVest, Excluding Allied

On March 5, 2009, Ron Burkle, Ira Tochner, and Derex Walker of Yucaipa met with

Robert Priddy and Mark Hughes of ComVest at Burkle's home in Beverly Hills.[19]   The

following day, Allied held a telephonic Board meeting at which Walker recounted █████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

███████████████████████████ Walker also reported that ████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

The following week, Yucaipa's litigation counsel, Mark Kasowitz of Kasowitz Benson

Torres LLP ("**Kasowitz**"), wrote to ComVest contending ████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████   At his deposition, Burkle conceded that there never had been any

agreement stemming from this ComVest meeting.[22]

---

18      *Id.* at 37:24-38:5; 194:23-195:5.

19      *Id.* at 70:24-71:3.

20      Ex. 37.

21      *Id.  See also* Ex. 92 (ComVest 30(b)(6) Dep.) 213:3-5; 229:13-17.

22      Ex. 101 (Burkle Dep.) 128:9-10 ("I was never at any meeting where any agreement [with ComVest] took place.").

In early April 2009, Yucaipa and ComVest agreed to a reservation of rights with respect to their dispute over the purported March 5 agreement, and they continued negotiating the terms a transaction over the next four months.[23]  Those negotiations involved only ComVest on the one hand and Yucaipa (Burkle, Walker, and Tochner) on the other hand.  (Ex. 92 (ComVest 30(b)(6) Dep.) 246:24-248:9).  Neither Allied CEO Gendregske nor the Allied Director appointed by the Creditors Committee, Cullen, was involved in these negotiations with ComVest.[24]

When it purchased Allied debt, ComVest was working with Mike Riggs, Yucaipa's initial selection for Allied CEO.  Riggs owned an Allied competitor, Active Carhaul ("**Active**"), which in May 2009 merged with and became Jack Cooper Transport.[25]  ComVest's initial investment strategy was to consolidate the industry by taking ownership of Allied and inserting Riggs as the new CEO with a new management team and Board of Directors.[26]  Riggs, however, was not included in discussions with Yucaipa.  ComVest's 30(b)(6) witness, Mark Hughes, testified that during the six months of Yucaipa and ComVest's negotiations:

- Yucaipa was clear that it had no interest in working with Riggs.  (Ex. 92 (ComVest 30(b)(6) Dep.) 77:6-12).

- Every deal proposed by Yucaipa included ComVest agreeing to a Fourth Amendment to the First Lien Credit Facility to (a) remove the restrictions on Yucaipa's ability to hold First Lien Debt, and (b) put Yucaipa in control of the First Lien Facility.  (*Id.* 263:7-20, 280:15-281:1).

---

[23]    Ex. 38; *see also* Ex. 92 (ComVest 30(b)(6) Dep.) 246:24-248:9, 253:11-16.

[24]    Ex. 97 (Gendregske Dep.) 274:2-22 (only met with ComVest once and it was to discuss operations); Ex. 99 (Cullen Dep.) 185:6-17 (no recollection of ever meeting or speaking with ComVest); Ex. 92 (ComVest 30(b)(6) Dep.) 331:18-341:20 (ComVest only met with Allied management once to discuss operations and once at a meeting with one of Allied's customers in an effort to retain its business, which ComVest, Yucaipa, and Allied management attended; Yucaipa was present every time ComVest met with Gendregske); Ex. 39 (agenda for operations meeting with management).

[25]    Ex. 93 (Riggs Dep.) 20:3-21:4; Ex. 94 (JCT 30(b)(6) Dep.) 22:19-25:13.

[26]    Ex. 92 (ComVest 30(b)(6) Dep.) 28:5-29:22.

- Yucaipa and Burkle were blocking ComVest from interacting with Allied's management, even though ComVest had a contractual right to do so. (*Id.* 194:23-203:11).

On August 3, 2009, Derex Walker ███████ at an Allied Board meeting that ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ Despite the fact that the

Company had sufficient funds to make this interest payment, the Board obediently voted to

default. (*Id.* at 2). Allied never made another interest payment to the First Lien lenders. (Ex. 98

(Walker Dep.) 571:20-25).

**D.    The Purported Fourth Amendment**

On August 21, 2009, Yucaipa and ComVest entered a Loan Purchase Agreement

("**LPA**"), ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████    ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ The

Fourth Amendment did not purport to cure any of Allied's Events of Default or reset any

financial covenants, as contemplated in earlier iterations of the amendment. (Ex. 44).

**III.    Yucaipa Breaches the Third Amendment, Making No Capital Contributions and Seizing Control as Requisite Lender**

It is undisputed that Yucaipa did not make any capital contribution to the Company

---

27      Ex. 43 §§1.2, 1.3. ████████████████████████████████

████████████████████████████████████████████████

following its acquisition of ComVest's First Lien debt. ████████████████████

████████████████████████████████████████████

████ Yucaipa contemporaneously announced to its investors that:



████████████████████████ When CIT did not heed this direction, Yucaipa sent
another letter demanding that CIT comply on or before October 14, 2009.[29]  When CIT did not
do so, Yucaipa and Allied sued CIT in Georgia seeking, among other things, a declaratory
judgment holding that the Fourth Amendment was valid and that Yucaipa was Requisite Lenders
under the First Lien Credit Agreement (the "**Georgia Action**").[30]

## IV.    Litigation Over the Fourth Amendment

On December 21, 2009, CIT filed a counterclaim in the Georgia Action seeking, among
other things, declaratory judgment that (1) the purported Fourth Amendment was ineffective,
(2) the Third Amendment remains in full force and effect, and (3) Yucaipa cannot be "Requisite
Lenders" under the First Lien Credit Agreement.  (Ex. 52 at ¶¶36-42).  The Georgia Litigation

---

[28]    Ex. 49; *see also* Ex. 50 at ¶37.

[29]    *Id.* at ¶38.

[30]    *Id.*

continued for two years, ███████████████████████████████████

████████████████████████████████████████████   In

December 2011, CIT settled the Georgia Litigation on its own behalf, but expressly not on behalf

of any of Allied's other lenders.[32]

The next month, First Lien Lenders BDCM Opportunity Fund II, LP, Black Diamond

CLO 2005-1 Ltd. (collectively, "**Black Diamond**"), and Spectrum Investment Partners, L.P.

("**Spectrum**," and together with Black Diamond, "**BD/S**"), filed a lawsuit in New York State

Court seeking a declaration that the Fourth Amendment was invalid and that Yucaipa was not the

Requisite Lenders (the "**NY Action**").  (Ex. 61 (NY Action Complaint)).

## V.    Yucaipa Wrongfully Uses its Purported "Requisite Lenders" Status to Benefit Itself to Detriment of Allied and Its Stakeholders

Even before Yucaipa wrongfully seized the title Requisite Lenders, it exerted undue

control over Allied for its own benefit.  Beginning in 2007, Yucaipa caused Allied to make

payments of Yucaipa's legal fees — to Kasowitz for services provided in New York and Latham

& Watkins LLP ("**Latham**") for services provided in California.[33]  Neither Kasowitz nor Latham

represented Allied.  All of the paid invoices were addressed to Yucaipa.[34]

████████████████████████████████████████████████
████████████████████████████████████████████████

---

[31]    Ex. 88 (Yucaipa Defendants' 5/29/15 First Supplemental Responses and Objections to the Official Committee of Unsecured Creditors' First Set of Requests for Admission).

[32]    Ex. 60 at §1(b).

[33]    Ex. 88.

[34]    ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████  *See also, e.g.*, Ex. 97 (Gendregske Dep.)
148:14-16 (Latham was Yucaipa's counsel), 278: 21-23 (same); Ex. 98 (Walker Dep.) 350:20-22
(Latham represented Yucaipa), 619:4-13 (Yucaipa was represented by Kasowitz).

████████████████████████████████████████████████████████████████

████████████████████████████    Allied's payment to Ornstein was made pursuant to his bogus "Consulting Agreement" with Allied, which was arranged by Derex Walker (Ex. 53) and pursuant to which no consulting services were provided.  Ornstein testified that he did not recall providing any consulting services to Allied in 2010 (the year the consulting services were supposedly provided), and his testimony was confirmed by Walker, Tochner, and Gendregske.[36]

████████████████████████████████████████████████████████████████

████████████████████████████████████

In spring 2011, Allied's CEO and CFO ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████    During this period, Yucaipa internally discussed ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

Despite Allied's struggles, Riggs (CEO of Active, later JCT) remained highly motivated to acquire Allied.  Riggs testified that he first became interested in doing so in late 2008 and, over succeeding years, made several proposals to combine Allied with Active and JCT.[37]

In late 2011, Riggs was in discussions with Yucaipa and other First Lien Lenders

---

[35]     Ex. 91 (Ornstein Dep.) 43:21-23.

[36]     Ex. 91 (Ornstein Dep.) 130:15-22; Ex. 98 (Walker Dep.) 712:16-24; Ex. 100 (Tochner Dep.) 315:9-12; Ex. 97 (Gendregske Dep.) 324:6-9.

[37]     Ex. 93 (Riggs Dep.) 271:5-13 (Riggs on a 5-year "quest" to acquire Allied), 79:8-11 ("for me it was always about acquiring Allied, however we did that"), 83:13-84:1 (Riggs "wanted to get these things together and try to get the synergies"), 97:17-98:5 (combining with Allied was "the dream … I really wanted it to work whatever it took"), 189:21-190:16.

(including BD/S) about acquiring substantially all of Allied's debt in order to gain control over the Company, combine it with JCT, and run the new entity.  Riggs testified that the acquisition of Allied's debt was a means to his end goal of owning the Company, and that he pursued this method because Yucaipa preferred a debt transaction to a typical M&A deal.[38]

JCT's 30(b)(6) witness testified that, from JCT's perspective, "it made sense to us to placate [Yucaipa] and give them a premium" because JCT "equated [the] requisite lender position similar to a control[] premium." (Ex. 94 (JCT 30(b)(6) Dep.) 69:14-21).  Yucaipa's demand for a premium left less JCT money available for all other First Lien debtholders, so JCT lowered its offer other debtholders like BD/S to 70¢ on the dollar.  (Ex. 67).

On February 15, 2012, lawyers for BD/S wrote to the Allied Board stating that the Company was insolvent and offering to "engage the Board of Directors immediately in a discussion regarding an appropriate restructuring and/or recapitalization ...  to preserve and protect the Company's assets, and to maximize the value available for all interested parties." (Ex. 62 at 3-4).

---

[38]    Ex. 93 (Riggs Dep.) 234:8-235:21; *see also id.* at 235:22-236:15 ("I was not in the debt investing business, I was in the business of running companies, so this whole thing was to try to get a package together.").

[39]

[40]

████████████████████████████████████████████████████

██████████████████████████████████████  On May 16, 2012, counsel for BD/S

tried to reach an agreement directly with Yucaipa for "Equal and Ratable Sharing," sending a

draft letter agreement.  (Ex. 69 at BDCM0004358, ¶4).  Yucaipa did not substantively respond,

and BD/S filed a petition for involuntary bankruptcy of Allied on May 17, 2012.

When deposed in this case, Burkle testified that *pari passu* treatment amongst the lenders

— *i.e.*, precisely what BD/S had been seeking for months leading up to the involuntary petition

— would have been "fair."[41]  Burkle further testified that he instructed Yucaipa personnel to

agree to *pari passu* treatment in the course of negotiations with JCT.[42]  There is no written record

of this instruction, and it is incontrovertible that no such instruction was ever followed.  Yucaipa

continued to demand a premium for its first lien debt, based on the false assertion that it was

Requisite Lenders, until Allied's bankruptcy.

## VI.    Fourth Amendment Voided and BD/S Recognized As Requisite Lenders

In March 2013, summary judgment was granted in BD/S's favor in the NY Action.  The

Court held that: (1) Yucaipa caused Allied to enter into the Fourth Amendment, which was

"flatly prohibited under the Credit Agreement;" (2) the Fourth Amendment "is not, and never

was, effective;" and (3) "Yucaipa [was] not the Requisite Lender."[43]

Following this ruling, on August 8, 2013, Chief Judge Sontchi granted summary

judgment to BD/S, holding that they, not Yucaipa, were Requisite Lenders (*see* 13-50530, D.I.

---

[41]     Ex. 101 (Burkle Dep.) 174:2-175:20.

[42]     *Id.*

[43]     *BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*, 2013 WL 1290394, at *5-6 (Sup. Ct. N.Y. Cnty. Mar. 8, 2013), *aff'd*, 112 A.D.3d 509 (1st Dep't 2013), *leave to appeal denied*, 22 N.Y.3d 1171 (2014).

297 at 130), that the Third Amendment governed (*id.* at 127), and that Yucaipa was collaterally estopped from asserting the Fourth Amendment's validity (*id.* at 123-24).  The District Court and Third Circuit both affirmed.  *In re Allied Sys. Holdings Inc*, 556 B.R. 581, 608-09 (D. Del. 2016), *aff'd sub nom. In re ASHINC Corp.*, 683 F. App'x 131, 141-42 (3d Cir. 2017).

## VII.  JCT Buys Substantially All of Allied's Assets

An auction for the Debtors' assets under 11 U.S.C. §363 was held in September 2013.[44] JCT submitted a bid to buy substantially all of Allied's assets for $135 million, which the Court approved.  (*See* 12-11564, D.I. 1837 (Sale Order)).[45]  The sale (the "**JCT 363 Sale**") closed on December 27, 2013.  (*See* 12-11564, D.I. 2127 (Report of Sale of Debtors' Assets)).

## VIII.  Trustee Assumes Prosecution of These Adversary Proceedings

Under the Debtors' Modified First Amended Joint Chapter 11 Plan of Reorganization dated December 3, 2015 (12-11564, D.I. 3360-1) (the "**Amended Plan**") and a Litigation Trust Agreement dated December 20, 2016, the Estate Claims and Direct Lender Claims are now jointly prosecuted by the Trustee.  (Amended Plan §5.13).  These claims seek recovery on behalf of the Company and, if successful, all stakeholder constituents will recover under a Litigation Proceeds Waterfall approved by Chief Judge Sontchi.  (*See id.* §§5.11(b), 5.14).[46]

The Estate Claims and Direct Lender Claims have been coordinated for purposes of discovery and are subject to a joint schedule through dispositive motions.  Fact discovery closed on July 26, 2019, and expert discovery closed on January 10, 2020.  Further procedural history is set forth in the parties' joint submission at 13-50530. D.I. 599 ("**Joint Procedural History**").

---

[44]    Exs. 82, 83.

[45]    BD/S as confirmed Requisite Lenders placed a successful credit bid for certain additional assets. (*See* 12-11564, D.I. 1868 (Order Authorizing and Approving Sale of Assets)).

[46]    Yucaipa is an exception to this recovery waterfall.  (12-11564, D.I. 3383 at ¶¶MM, 1).

## ARGUMENT

### I.    Yucaipa Breached the Third Amendment

The Trustee is entitled to summary judgment on her breach of contract claims — Estate Claim 5 and Direct Lender Claim 2.  The whole point of the voided Fourth Amendment was to delete the restrictions and obligations the Third Amendment imposed on Yucaipa.  Following implementation of the Fourth Amendment, Yucaipa proceeded to disregard the limits and obligations imposed by the Third Amendment, including Yucaipa's duty to make a capital contribution to Allied on or before August 31, 2009, in the amount of 50% of the first lien term loans Yucaipa had bought.  There is no genuine dispute that Yucaipa failed to do so.

Under governing New York law (Ex. 9 §10.14; Ex. 20 §7.6), a plaintiff bringing a breach of contract claim "must allege the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages."  *Second Source Funding, LLC v. Yellowstone Capital, LLC*, 144 A.D.3d 445, 445-46 (1st Dep't 2016).  Each element is satisfied here.  *See, e.g.*, *Proud Designs, Inc. v. Whidden*, 90 A.D.3d 732, 733-34 (2d Dep't 2011) (granting summary judgment in defendants' favor on counterclaim for breach of contract where "defendants demonstrated their prima facie entitlement to judgment as a matter of law by presenting evidence that the plaintiff materially breached the contract").

The Third Amendment is valid and binding on Yucaipa.  Allied and BD/S, along with the other First Lien Lenders, are signatories to the Third Amendment, and Yucaipa became bound by it upon its purchase of First Lien Debt in August 2009.  (*See also* 13-50530, D.I. 297 at 127:13-15 (Chief Judge Sontchi holding that "[u]pon acquiring the debt, Yucaipa subjected itself to the first lien credit agreement and all of the amendments, including the third amendment.")).  Under the Third Amendment, Yucaipa was obligated to make a capital contribution equal to 50% of any Term Loans it purchased within 10 days of the purchase (*see* Ex. 20 at §§2.1(c); 2.7(c), (e)).

██████████████████████████████████████████

████████████████████████████████████    Yucaipa does not dispute that it never

made the required capital contribution, either as a cash infusion, or as a contribution of debt to be

forgiven and exchanged for Allied equity.  As a result, both Allied and its creditors suffered

damages.  ████████████████████████████████

██████████████████████████████████████████

██████   ████████████████████████████████

██████████████████████████████████████████

Either way, damages were suffered, and summary judgment should be granted in the Trustee's

favor for Yucaipa's material breach of the Third Amendment.  "All a plaintiff must establish is

(1) that the defendant caused the breach and (2) that damages resulted from that breach."  *Boyce*

*v. Soundview Tech. Grp., Inc*., 464 F.3d 376, 392 (2d Cir. 2006) (applying New York law).

The Trustee is also entitled to statutory prejudgment interest on its contractual damages.

Because the right to recovery arises under New York law, New York law "also governs the

availability of prejudgment interest."[49]  Prejudgment interest accrues at the 9% statutory rate



---

47    █████████████████████████████████████████
      █████████████████████████████

48    █████████████████████████████████████████
      █████████████████████████████████████████
      █████████████████████████████████████████
      █████████████████████████████████████████
      █████████████████████████████████████████

49        *In re Aerogroup Int'l, Inc.*, 601 B.R. 571, 598 n.191 (Bankr. D. Del. 2019) (citing *In re Mortg. Lenders Network USA, Inc.*, 406 B.R. 213, 247-48 (Bankr. D. Del. 2009)), *motion to certify appeal denied*, 2020 WL 757892 (D. Del. Feb. 14, 2020).

under New York law, running from the date of the breach.[50]  The calculation of prejudgment

interest to which the Trustee was entitled, as of September 27, 2019, is set forth in Ex. 103

(Risius Report) at ¶¶89-90, 121-22, 132-33.

## II.    <u>Yucaipa's Debt Holdings Should Be Equitably Subordinated</u>

The Trustee is entitled to summary judgment on Estate Claim 1-2 and Direct Lender

Claim 1 for equitable subordination of Yucaipa's debt as a matter of law.  A claim may be

equitably subordinated on a showing that (1) the claimant engaged in inequitable conduct,

(2) resulting in injury to the creditors or conferring an unfair advantage on claimant, and

(3) subordination is not inconsistent with the Bankruptcy Code.  *See In re SubMicron Sys. Corp.*,

432 F.3d 448, 461-62 (3d Cir. 2006); 11 U.S.C. §510(c).  There can be no genuine dispute that

Yucaipa's misconduct satisfies all three elements.

When a claimant is an "insider," as Yucaipa was here, its claim is subject to rigorous

scrutiny, and the standard for equitable subordination is much lower.  *In re Winstar Commc'ns,*

*Inc.*, 554 F.3d 382, 412 (3d Cir. 2009) ("A claim arising from the dealings between a debtor and

an insider is to be rigorously scrutinized by the courts."); *In re Mid-Am. Waste Sys., Inc.*, 284

B.R. 53, 69-70 (Bankr. D. Del. 2002) ("The most important factor … is whether the claimant

was an insider or outsider in relation to the debtor.…  [W]here the claimant is an insider, the

standard for finding inequitable conduct is much lower.").

"Once the proponent of subordination comes forward with material evidence of unfair

conduct, the burden shifts to the insider or fiduciary claimant to demonstrate the fairness of his

---

[50]    *See, e.g.*, *Roan/Meyers Assocs., L.P. v. CT Holdings, Inc.*, 26 A.D.3d 295, 296 (1st Dep't
2006) (prejudgment interest properly awarded on plaintiff's successful summary judgment motion
on breach of contract claim); *City of Binghamton v. Serafini*, 8 A.D.3d 835, 838 (3d Dep't 2004)
(plaintiff properly recovered prejudgment interest at statutory rate of 9% running from the date of
default); N.Y. C.P.L.R. §§5001, 5004.

conduct," and the insider must prove both "the good faith of such a transaction" and "the inherent fairness from the point of view of the corporation and those with interests therein." *Id.* at 69; *see also In re Winstar Commc'ns, Inc.*, 348 B.R. 234, 284 (Bankr. D. Del. 2005) ("When the creditor is an insider, the proof required to prove equitable subordination is not demanding. In such cases, a bankruptcy trustee need only show material evidence of unfair conduct."), *aff'd*, 2007 WL 1232185 (D. Del. Apr. 26, 2007), *aff'd in part, modified in part,* 554 F.3d 382 (3d Cir. 2009).

Yucaipa is plainly an insider. The Bankruptcy Code provides that "[t]he term 'insider' includes" a "person in control of" a corporate debtor. 11 U.S.C. §101(31)(B)(iii). Yucaipa cannot credibly dispute its insider status following Allied's emergence from the 2005 Bankruptcy. Yucaipa at all relevant times controlled three of five Board seats, and the final two members served at Yucaipa's pleasure.[51] Beginning in August 2009, Yucaipa also purported to control both the First and Second Lien Facilities, ███████████████████ ████████████████████████████████████

### A.    Yucaipa's Inequitable Conduct Compels Subordination

Yucaipa's inequitable conduct manifested itself in multiple ways previously discussed.

In breach of the Credit Agreement, Yucaipa acquired ComVest's First Lien Debt Holdings and used that debt to masquerade as Requisite Lenders, breaching the Third Amendment to the First Lien Credit Agreement as a matter of law. (Section I, *supra.*) That breach, alone, suffices to establish inequitable conduct for purposes of equitable subordination. *See, e.g.*, *In re Am. Bus. Fin. Servs., Inc.*, 362 B.R. 149, 164-65 (Bankr. D. Del. 2007) (Trustee

---

[51]    In addition to having effectively selected them, Yucaipa could remove them at will. (Ex. 13 at Yucaipa-LW00013732 (Board members removed by majority stockholder)).

stated equitable subordination claim where defendant "engaged in inequitable conduct, such as

… breach of contract"); *see also In re LightSquared Inc.*, 511 B.R. 253, 348 (Bankr. S.D.N.Y.

2014) ("substantial breach of contract and advantage-taking by the creditor" suffices to establish

inequitable conduct for equitable subordination purposes).

Yucaipa also breached the Third Amendment by (i) failing to make the required 50%

capital contribution upon acquiring first lien term loans (Section I, *supra*), and (ii) as discussed

below (pp. 27-28), by filing multiple lawsuits in flagrant violation of a binding contractual

waiver and covenant not to sue.

Further, following ComVest's purchase of Allied debt in February 2009, Yucaipa seized

control over negotiations with ComVest, to the exclusion of Allied CEO Gendregske and Cullen

(the two Allied Board members not employed by Yucaipa) and Allied's management.[52]

Yucaipa pushed through the invalid Fourth Amendment in connection with the Yucaipa-

ComVest Transaction so that Yucaipa could purchase ComVest's debt and take over as Requisite

Lenders — while, notably, failing to cure *any* Events of Default or reset any of the Financial

Covenants under the First Lien Credit Agreement.  (Ex. 42).

From that point forward, Yucaipa falsely claimed full control over Allied — both equity

and debt — as controlling shareholder and purported Requisite Lenders.  Yucaipa abused that

control, causing Allied to commit repeated Events of Default under the First Lien Credit

Agreement, injuring the Company and its stakeholders, including creditors, failing to make

---

[52]     *See* Ex. 98 (Walker Dep.) 528:19-24 (Yucaipa negotiating directly with ComVest), 531:7-
532:6 (meeting in March 2009 with Burkle, Walker, Tochner, and principals of ComVest); Ex.
100 (Tochner Dep.) 200:2-24 (Tochner, Walker, and Burkle were involved in the
Yucaipa/ComVest negotiations between March and August 2009; Tochner did not recall anyone
from Allied participating); Ex. 92 (ComVest 30(b)(6) Dep.) 246:24-248:9, 253:11-16; *see also,
e.g.*, Ex. 96 (Opdeweegh Dep.) 151:14-16 (ComVest never met with Allied Board); Ex. 97
(Gendregske Dep.) 281:6-20 (Walker and Tochner having conversations with ComVest).

principal and interest payments and failing even to deliver required financial reporting.[53]  With Yucaipa at the helm, Allied reached the point in spring 2011 that management reported to the Board ███████████████████████████████████████████████████████

Notwithstanding these mounting troubles, JCT remained an interested potential white knight, but Yucaipa usurped that opportunity for itself, seeking a premium for its debt and a subpar return for all other debtholders.

In late 2011 to 2012, it would have been in the best interest of Allied and its stakeholders for the Company to negotiate directly a strategic combination with JCT.[54]  But Yucaipa — with the compliant acquiescence of all the Yucaipa Directors — commandeered the JCT negotiations, causing them ultimately to disintegrate in the wake of its avaricious demands.[55]  Yucaipa and the Yucaipa-controlled Board ignored BD/S's repeated requests that all lenders be treated fairly — ratably — in the JCT negotiations.[56]  Burkle, Yucaipa's founder and managing principal, could not defend this as "fair" at his deposition, admitting that BD/S was "entitled" to *pari passu* treatment, which would have been "fair" and "what I would do."[57]

Yucaipa also caused Allied to make numerous fraudulent transfers for Yucaipa's benefit. (*See* Section III, *infra*.)  These transfers further depleted the funds of an already cash-strapped

---

[53]    *See, e.g.*, Exs. 41, 48, 62.

[54]    *See* Ex. 104 (Macey Report) ¶¶118-119; Ex. 106 (Macey Rebuttal) ¶¶22-26.

[55]    ████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

[56]    Exs. 62, 66, 70, 68, 69, 71.

[57]    Ex. 101 (Burkle Dep.) 173:8-175:20.

Allied, leaving it with insufficient funds to make required payments to the First Lien Lenders.[58]

In addition, Yucaipa acted inequitably in filing multiple lawsuits in flagrant violation of a binding contractual waiver and covenant not to sue.[59] *First*, after summary judgment motions were fully briefed in the NY Action, Yucaipa and its controlled Allied Board caused Allied to file an adversary proceeding asking Chief Judge Sontchi to rule on these same issues, for the transparent purpose of circumventing an adverse ruling in the NY Action.[60] Yucaipa then caused Allied to seek to extend the automatic bankruptcy stay to the NY Action, in which the Debtors were not parties.[61] After the New York Court ruled in BD/S's favor, and BD/S affiliates became co-Administrative Agents of the credit facility, Yucaipa disregarded the New York Court's ruling and moved in this Court for a declaration that the Third Amendment was unenforceable against Yucaipa, and that Yucaipa validly held its First Lien debt.[62] Yucaipa further breached the covenant not to sue by asserting counterclaims against BD/S in the 14-50971 adversary proceeding; bringing suit in Delaware Chancery Court against BD/S and the BD/S-affiliated co-Agents; and suing BD/S and their individual employees for alleged RICO violations in the

---

[58]    Ex. 98 (Walker Dep.) 571:20-25 (Allied stopped making interest payments on August 4, 2009).

[59]    Yucaipa "irrevocably and voluntarily waive[d]" any right it would have had as a Lender to take any action in an Allied bankruptcy "without the prior written consent of all [other] Lenders" (Ex. 20 §2.7(b)).  Yucaipa also covenanted not to sue, "waiv[ing] any claim or cause of action against any Lender, any Agent and their respective Affiliates, directors, employees, attorneys, agents or sub-agents … arising out of, in connection with, as a result of, or in any way related to, [the Credit] Agreement or any Credit Document … except to the extent caused by such Lender's or Agent's gross negligence or willful misconduct" (*id.* §2.7(e)).  Yucaipa's breaches of the covenant not to sue and the prohibition on taking action in Allied's bankruptcy without the consent of all lenders are also documented in the Joint Procedural History.

[60]    *See* Ex. 74 (*ASHINC Corp. v. AMMC VIII, Ltd. et al.*, Adv. Proc. No. 12-50947-CSS (Bankr. D. Del.) ("**Allied Adversary Proceeding**"), D.I. 1); Ex. 73.

[61]    Ex. 75 (Allied Adversary Proceeding, D.I. 4).

[62]    *See* Ex. 76 at 36; Ex. 77; Exs. 78, 79 (Allied Adversary Proceeding, D.I. 55, 65).

Southern District of New York, which Yucaipa voluntarily withdrew and refiled in the District of Delaware.[63] All these efforts were unsuccessful, and courts consistently determined that Yucaipa's claims were brought in violation of the covenant not to sue.[64] Yucaipa's "protracted and abusive litigation tactics harmed the estate by causing it to incur" unnecessary fees. *In re 848 Brickell Ltd.*, 243 B.R. 142, 149 (S.D. Fla. 1998).

Yucaipa also acted inequitably in refusing to support post-petition proposals by JCT in 2012 to serve as a stalking horse bidder, in part, because Yucaipa wanted to submit its own credit bid, even as its Requisite Lenders status was under judicial review.[65] ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

All of these acts by Yucaipa to "reap[] a substantial benefit" for itself "at the expense of the Debtors' other creditors" warrant subordination. *Winstar*, 348 B.R. at 285.

## B.   Yucaipa's Inequitable Conduct Injured Allied's Creditors

Yucaipa's breach of the Third Amendment damaged Allied and its stakeholders

---

[63]     *See* 14-50971, D.I. 19; Ex. 84 (Am. Verified Compl. *Yucaipa Am. All. Fund I, LP et al. v. SBDRE LLC et al.*, C.A. No. 9151-VCP (Del. Ch. Feb. 14, 2014)); Ex. 86 (Compl., *Yucaipa Am. All. Fund I, L.P. et al. v. Richard A. Ehrlich et al.*, No. 15-cv-916 (S.D.N.Y. Feb. 6, 2015), ECF No. 1 ("**SDNY Compl.**")); Ex. 87 (Compl., *Yucaipa Am. All. Fund I, L.P. et al. v. Richard A. Ehrlich et al.*, No. 15-cv-373 (D. Del. May 8, 2015), ECF No. 1 ("**D. Del. Compl.**")).

[64]     *See* Ex. 80 (Allied Adversary Proceeding, D.I. 162) at 108-12 (Yucaipa's cross-claims in the Allied Adversary Proceeding barred by covenant); 14-50971, D.I. 82-1 at 26-37 (counterclaims barred by covenant); Ex. 85 (Delaware Chancery Court action largely barred by covenant); Ex. 90 (dismissal of RICO action in the District of Delaware).

[65]     ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

[66]     Ex. 72.

(Section I, above).  It also conferred an unfair advantage on Yucaipa, which used its breaches to leapfrog to the top of Allied's capital structure and proclaim ██████████████████████ ██████████████████████████  Yucaipa understood that the Yucaipa-ComVest Transaction — which conditioned closing on Allied's entry into the Fourth Amendment <u>without</u> unanimous lender consent — was risky.  In February 2009, Goldman Sachs, Allied's financial advisor assisting in restructuring negotiations, ████████████████████████████ ██████████████████████████████████████████████ ████████████  CIT notified Allied and Yucaipa that it viewed an earlier iteration of the Fourth Amendment as impermissible.[69] █████████████████████████████████ ████████████████████████████████████

Allied's violations of the First Lien Credit Agreement at the behest of Yucaipa and the Yucaipa-controlled Board — including Allied's repeated failures to make interest and principal payments or to provide required financial information — harmed the First Lien Lenders, as did the fraudulent transfers.  Yucaipa's usurpation of control over negotiations with JCT, with the acquiescence of the Yucaipa-controlled Board, and Yucaipa's abuse of its supposed Requisite Lenders status to demand a premium price for its debt, alone, causing those negotiations to crater, severely harmed the Lenders.  These acts prevented consummation of a pre-bankruptcy transaction with JCT on terms that would have been far more favorable to Allied and its stakeholders than the JCT 363 Sale that subsequently occurred in late 2013.  Both in this case and in other litigations, Yucaipa vigorously maintained that, but for the filing of the 2012

---

[67]     Ex. 47.

[68]     *See* n.15.

[69]     Ex. 32.

[70]     *See* Ex. 46.

bankruptcy, a pre-bankruptcy sale of Allied to JCT would have been consummated at $170 million more than the ultimate post-bankruptcy sale price ███████████████████████

Finally, Yucaipa's abusive litigation tactics and breaches of the covenant not to sue damaged the Allied Estates and BD/S by causing them to incur fees to fight those baseless claims.

Yucaipa's inequitable conduct warrants subordination as a matter of law. *See, e.g.*, *Winstar*, 348 B.R. at 285 (granting equitable subordination where claimant "reaped a substantial benefit but at the expense of the Debtors' other creditors"); *In re Steel Wheels Transport, LLC*, 2011 WL 5900958, at *7-8 (Bankr. D.N.J. Oct. 28, 2011) (granting Trustee's summary judgment motion on equitable subordination claim in light of claimants' "persistent course of inequitable conduct," including "blatantly divert[ing] estate assets to settle personal obligations, improve the position of favored creditors, and frustrate the recovery of legitimate claimants.").

### C. Equitable Subordination Is Consistent with the Goals of the Bankruptcy Code

Equitable subordination is "consistent with the basic goal of equality of distribution in bankruptcy." *Mid-Am.*, 284 B.R. at 73. "A claimant whose inequitable conduct has harmed other creditors has skewed the prospects for equal distribution, and subordination corrects this." *Id.* Yucaipa's inequitable conduct was aimed at, and succeeded in, achieving grossly unequal distributions. Yucaipa received distributions based on the debt it claims to hold, which

---

[71]    14-50971, D.I. 19, Paragraph 10(e), page 36; ████████████████████████████████

████████████████████████████████████████████████████ This allegation also formed the predicate to two separate actions Yucaipa brought against BD/S and various individual employees asserting civil RICO and other claims. (*See* Ex. 86 (SDNY Compl.) at ¶¶25, 172, 204; Ex. 87 (D. Del. Compl.) at ¶¶185, 217).

have been sitting in escrow for years,[72] as well as fraudulent transfers to Yucaipa and for its benefit that enriched it at the expense of Allied and the other creditors (*see* Section III, below). Subordination of Yucaipa's claim is appropriate and consistent with the Code to ensure equality.

## III.    The Allied Estates Are Entitled to Fraudulent Transfers Made for Yucaipa's Benefit When Allied Was Insolvent and Disallowance of Yucaipa Claims

The Trustee is entitled to summary judgment on Estate Claims 10-11 (avoidance and recovery of fraudulent transfers, against Yucaipa, under 11 U.S.C. §§544(b), 548(a), 550, and corresponding state law) and 13 (disallowance of claims, against Yucaipa, under 11 U.S.C. §502(d)).  Section 548(a) allows avoidance of "actual" or "constructive" fraudulent transfers made within two years of the filing of the bankruptcy petition.  11 U.S.C. §548.  Section 544(b) allows avoidance of any transfer avoidable under applicable state law.  11 U.S.C. §544.  To the extent a transfer is avoided under Section 544 or 548, Section 550(a) provides that the Trustee "may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property," from "the entity for whose benefit such transfer was made" — in this case, Yucaipa.  11 U.S.C. §550(a)(1).  Summary judgment is appropriate when the undisputed facts reveal that the insolvent "debtor did not receive property" in exchange for the transfers, "nor did the transfers satisfy a present or antecedent debt of the debtor."  *In re Lucas Dallas, Inc.*, 185 B.R. 801, 807–08 (B.A.P. 9th Cir. 1995).

The undisputed facts demonstrate that Yucaipa caused Allied to make payments for Yucaipa's sole benefit, without fair consideration, when Allied was insolvent.  These include payments by Allied to Kasowitz and Latham for legal fees incurred by Yucaipa, and payments by Allied to Yucaipa and ComVest to cover their legal fees and expenses in connection with the

---

[72]    *See* Exs. 107, 108, 109 (reflecting escrowed distributions to Yucaipa).

Yucaipa-ComVest Transaction — including the payment to Jonathan Ornstein for his work in brokering the deal.  These payments should be avoided and recovered for the benefit of the Allied Estates, and Yucaipa's claims disallowed until such transfers are recovered.

### A.  Transfers Should be Avoided and Recovered under §§548 and 550

Under Section 548(a), a transfer made by the Debtors within two years of the petition's filing (on or after May 17, 2010, here) may be avoided if made (i) with intent to hinder, delay, defraud any creditor (actual fraudulent transfer); or (ii) in exchange for "less than a reasonably equivalent value" while the Debtors were insolvent or if the Debtors became insolvent as a result (constructive fraudulent transfer).  *See also, e.g.*, *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc.*, 92 F.3d 139, 149 (3d Cir. 1996).

Beginning in 2007, Allied paid Yucaipa's legal counsel Kasowitz in New York and Latham in California for legal fees incurred by Yucaipa.[73]  Transfers made on or after May 17, 2010, meet the criteria for constructive fraudulent transfers because they were made when Allied was insolvent, for Yucaipa's sole benefit, with no "reasonably equivalent value" realized by Allied, and are recoverable from Yucaipa.

*First*, Yucaipa does not dispute that Allied was insolvent on or after May 17, 2010.[74]

*Second*, Allied's payments to Kasowitz and Latham were not in exchange for "reasonably equivalent value."  Kasowitz and Latham represented only Yucaipa, not Allied.[75]  Their invoices

---

[73]    *See* Ex. 88.

[74]    *See* Ex. 102 (Yucaipa expert Fischel's Report) at 8-10 (insolvent by 2008-2009); Ex. 105 (Fischel Rebuttal) at ¶12 & n.23.

[75]    *See, e.g.*, Ex. 97 (Gendregske Dep.) 148:14-16 (Latham was Yucaipa's counsel), 278:21-23 (same); Ex. 98 (Walker Dep.) 350:20-22 (same), 619:4-13 (Yucaipa represented by Kasowitz).

were addressed to, and for services rendered solely to, Yucaipa.[76]  A debtor does not receive

reasonably equivalent value for paying a debt incurred by a third party for services rendered to

that party.  *See, e.g.*, *In re Computer Universe, Inc.*, 58 B.R. 28, 30-31 (Bankr. M.D. Fla. 1986)

(no reasonably equivalent value in exchange for payment of accounting fees of parent

corporation: "As a general rule, an insolvent debtor receives less than a reasonably equivalent

value where it transfers its property in exchange for consideration which passes to a third

party."); *In re Burbank Generators, Inc.*, 48 B.R. 204, 206 (Bankr. C.D. Cal. 1985) (no

reasonably equivalent value when debtor paid fees for legal services rendered to an employee

engaged in unlawful conduct: "If a transfer solely benefits a third party, it is clear that the debtor

has not received reasonably equivalent value in exchange.").  *Cf. In re FBI Wind Down, Inc.*, 581

B.R. 116, 149 (Bankr. D. Del. 2018) (payment of a third party's debt yields benefit to debtor that

is "minimal and not of reasonably equivalent value").

 *Third*, Allied's transfers to Kasowitz and Latham on or after May 17, 2010 — █████

████████████████████████████████████████████ — are recoverable

from Yucaipa under Section 550 because Yucaipa is "the entity for whose benefit such

transfer[s] w[ere] made."  11 U.S.C. §550(a)(1).

 **B.** **Transfers Should be Recovered under §§544(b), 550, and State Law**

 "Delaware courts apply the 'most significant relationship' test" to determine applicable

state law under Section 544(b).  *Cliffs Nat. Res. Inc. v. Seneca Coal Res., LLC*, 2017 WL

---

[76] 

[77] *See* Ex. 88.

5148426, at *2 n.2 (D. Del. Oct. 31, 2017).  Factors include: "(a) the place where the injury

occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile,

residence, nationality, place of incorporation and place of business of the parties, and (d) the

place where the relationship, if any, between the parties is centered."  *In re FAH Liquidating

Corp.*, 572 B.R. 117, 129 (Bankr. D. Del. 2017).  *See also, e.g.*, *In re Mervyn's Holdings, LLC*,

426 B.R. 488, 496 n.6 (Bankr. D. Del. 2010) (state of transferor's incorporation, state of debtor's

incorporation and headquarters, and state of incorporation and headquarters of transferee); *In re

Fedders N. Am., Inc.*, 405 B.R. 527, 547 (Bankr. D. Del. 2009) (debtor's state of incorporation

and location of transferee); *In re W.R. Grace & Co.*, 281 B.R. 852, 855 (Bankr. D. Del. 2002)

(state of transferee's physical location).

     Applying these factors, the states with the most significant relationships to the transfers

— whose laws may apply under Section 544(b) — are: (1) Georgia (location of debtor/transferor

Allied); (2) California (location of transferees Latham and Yucaipa);[78] (3) Delaware (place of

incorporation of debtor/transferor Allied and transferee Yucaipa);[79] (4) Florida (location of

transferee ComVest);[80] (5) Arizona (location of transferee Ornstein)[81] and (6) New York

(location of transferee Kasowitz).[82]  Each of these states has adopted the Uniform Voidable

Transactions Act ("**UVTA**"), which shares the same elements as Section 548(a), but applies to

transfers made four years, and not just two years, before the petition (thus, on or after May 17,

---

[78]    *See* Ex. 26; 14-50971, D.I. 19 at 38 ¶14.

[79]    *See id.*

[80]    *See, e.g.*, Ex. 45 at Yucaipa052925.

[81]    Ex. 91 (Ornstein Dep.) 8:19-24 (Phoenix address); Ex. 53.

[82]    *See* Ex. 51; *see also* 13-50530, D.I. 76 at ¶215 n.8.

2008, rather than May 17, 2010).[83]

Accordingly, Allied's transfers to Yucaipa's lawyers made on or after May 17, 2008, are avoidable under Section 544(b) and the UVTA for the same reasons they are avoidable under Section 548, and they are recoverable under Section 550 because they were made for Yucaipa's benefit.  These transfers total $4,107,385.47 ($2,458,549.76 to Kasowitz and $1,648,835.71 to Latham).  (*See* Ex. 88).[84]

In addition to the voidable transfers to Yucaipa's lawyers, Allied's payments to Yucaipa and ComVest in connection with the Yucaipa-ComVest Transaction are avoidable under Section 544(b) and the UVTA, and are recoverable from Yucaipa under Section 550(a)(1), because they were made (i) when Allied was insolvent; (ii) for the sole benefit of Yucaipa, with no "reasonably equivalent value" realized by Allied; and (iii) with the intent of benefitting Yucaipa at the expense of other creditors. ■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

---

[83]    *See* GA. CODE ANN. §§18-2-74, 18-2-79; CAL. CIV. CODE §§3439.04, 3439.09; DEL. CODE ANN. tit. 6, §§1304, 1309; FLA. STAT. ANN. §§726.105, 726.110; ARIZ. REV. STAT. ANN. §§44-1004, 44-1009.  Effective April 4, 2020, New York has also adopted the UVTA, *see* N.Y. Debt. & Cred. Law §§273, 278.  The New York statute previously in effect provided a six-year lookback period, but that additional time is irrelevant because no challenged transfers were made in, to or from New York during the additional two years: the only relevant transfers made between May 17, 2006, and May 17, 2008, were payments from Allied (in Georgia) to Latham (in California).

[84]    Yucaipa does not dispute that Allied was insolvent on or after May 17, 2008.  (*See* Ex. 102 (Fischel Report) at ¶¶18-22; Ex. 105 (Fischel Rebuttal) at ¶12 & n.23).  Nor could it.  Under the UVTA, a debtor who is generally not paying debts as they come due is presumed to be insolvent. *See* GA. CODE ANN. §18-2-72(b); CAL. CIV. CODE §3439.02(b); DEL. CODE ANN. tit. 6, §1302(b); FLA. STAT. ANN. §726.103(2); ARIZ. REV. STAT. ANN. §44-1002(B).  It is also undisputed that, as of August 2009, Allied was in default on its interest payment obligations under the First Lien Credit Agreement and was, therefore, insolvent by that time.  (*See, e.g.*, Ex. 41 (8/7/09 default letter)). ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

██████████

Like Allied's payments to Kasowitz and Latham, these payments covered legal fees and expenses incurred by third parties, not Allied, for services rendered to those third parties, not Allied.  These payments were made pursuant to the LPA (*see* Ex. 43 at §§1.5(a)(ii), (b)(ii)), an agreement governing a private debt purchase and sale between Yucaipa and ComVest to which Allied was not a party (*id.* at 1, S-1) and from which it did not benefit.

Similarly, Allied's payment ████████████████████ to Jonathan Ornstein was made for Yucaipa's benefit, not Allied's.  Allied paid Ornstein pursuant to a supposed consulting agreement, but Ornstein — like Gendregske, Walker, and Tochner — could not recall any consulting services Ornstein actually provided to Allied during the term of the Consulting Agreement.[86]  The only service Ornstein recalled receiving payment for was his assistance in negotiating the Yucaipa-ComVest Transaction — negotiations in which Allied did not participate and which culminated in a private debt transaction to which Allied was not a party and from which it did not benefit.[87]

Allied did not receive reasonably equivalent value for any of these payments, all of which were made solely to benefit Yucaipa.  Even more, these transfers benefitted Yucaipa at the expense of Allied's other creditors.  Yucaipa caused Allied to use its increasingly limited funds to make these payments while at the same time — together with the Yucaipa-controlled Board — causing the Company to skip interest and principal payments to the First Lien Lenders.[88]

---

[85] ████████████████████████████████████████████████████

[86] Ex. 91 (Ornstein Dep.) 130:15-22; Ex. 98 (Walker Dep.) 712:16-24; Ex. 100 (Tochner Dep.) 315:9-12; Ex. 97 (Gendregske Dep.) 324:6-9, 325:11-15.

[87] Ex. 91 (Ornstein Dep.) 129:1-10.

[88] Exs. 40 (Board agreed to default interest due 8/4/09); 41 (8/7/09 letter regarding interest default); 48 (9/15/09 letter regarding principal default).

### C.    Yucaipa's Claims Should be Disallowed Until the Transfers are Returned

Section 502(d) provides that the Court "shall disallow any claim of any entity from which

property is recoverable" under Section 550, among others, "unless such entity or transferee has

paid the amount, or turned over any such property, for which such entity or transferee is liable."

11 U.S.C. §502(d).  As discussed in Section III(A)-(B), transfers by Allied to (i) Yucaipa's

lawyers, (ii) Yucaipa and ComVest in connection with the Yucaipa-ComVest Transaction, and

(iii) to Ornstein, are recoverable from Yucaipa under Section 550(a)(1).  It is undisputed that

these amounts have not been returned by Yucaipa.  Therefore, summary judgment should be

granted in the Trustee's favor on Estate Claim 13, and Yucaipa's claims disallowed in these

amounts.  *See, e.g.*, *In re Opus E., LLC*, 528 B.R. 30, 105 (Bankr. D. Del. 2015) (because certain

creditors were "liable for preferential and/or fraudulent transfers, the Court agrees that any claim

they hold must be disallowed unless and until they have returned the transfers"), *aff'd*, 2016 WL

1298965 (D. Del. Mar. 31, 2016), *aff'd*, 698 F. App'x 711 (3d Cir. 2017) (unpublished).

### D.    Prejudgment Interest Should Be Granted on All Fraudulent Transfers

Prejudgment interest should be granted on all fraudulent transfers.  *See, e.g.*, *id.* at 108-09

(awarding prejudgment interest at federal judgment interest rate, per 28 U.S.C. §1961, on

fraudulent transfer accruing from the date on which it occurred).[89]

## IV.    Yucaipa Directors and Burkle Tortiously Interfered With First Lien Lender Rights

The Trustee is entitled to summary judgment on Direct Lender Claim 4 for tortious

interference with contract against the Yucaipa Directors and Burkle because they intentionally

interfered with the First Lien Lenders' rights under the First Lien Credit Agreement.

The elements of tortious interference under New York law are: "(1) a valid contract;

---

[89]      *See* Ex. 103 (Risius Report) at ¶¶107-08.

(2) defendant['s] knowledge of the contract; (3) defendant's intentional interference with the contract and a resulting breach; and (4) damages." *In re Green Field Energy Servs., Inc.*, 585 B.R. 89, 113 (Bankr. D. Del. 2018). New York law governs because the contract "expressly states New York law governs, and the cause[] of action arise[s] out of the rights, duties, and obligations created by the Agreement." *Id.* at 110-11.

Because each element of tortious interference is established on the record, summary judgment is appropriate. *See, e.g.*, *Rossi v. Twinbogo Co.*, 193 A.D.2d 481, 484 (1st Dep't 1993). The Third Amendment was at all relevant times operative and binding on Yucaipa,[90] and the Yucaipa Directors and Burkle were aware of it.[91] The Yucaipa Directors and Burkle intentionally caused Yucaipa to breach the Third Amendment and damage Allied and its stakeholders.

To begin with, Burkle, together with Walker and Tochner, took over negotiations with ComVest to allow Yucaipa to obtain control over ComVest's majority First Lien Debt position, which the Third Amendment prohibited.[92] Burkle and the Yucaipa Directors thwarted

---

[90]    13-50530, D.I. 297 at 127:13-15.

[91]    ███████████████████████████████████████████

[92]    *See* Ex. 98 (Walker Dep.) 528:19-24 (Yucaipa negotiating directly with ComVest), 531:7-532:6 (March 2009 meeting with Burkle, Walker, Tochner, and ComVest); Ex. 100 (Tochner Dep.) 200:2-24 (Tochner, Walker, and Burkle involved in the Yucaipa/ComVest negotiations from March-August 2009; Tochner did not recall Allied participating); Ex. 92 (ComVest 30(b)(6) Dep.) 246:24-248:9, 253:11-16; *see also* Ex. 96 (Opdeweegh Dep.) 151:14-16 (ComVest never met with Allied Board); Ex. 97 (Gendregske Dep.) 281:6-20 (Walker and Tochner conversations with ComVest).

ComVest's efforts to deal directly with Allied's management.[93]  Allied's Board (then including

Walker, Tochner, and Opdeweegh)[94] approved the invalid Fourth Amendment, which purported

to allow Yucaipa to purchase ComVest's debt and take over as Requisite Lenders, in violation of

the Third Amendment.  (Ex. 42).  Burkle and the Yucaipa Directors then caused continued

breaches of the First Lien Credit Agreement by Allied at the expense of the First Lien Lenders,

including non-payment of principal and interest and non-delivery of required financial reporting.

(*See, e.g.*, Exs. 41, 48, 62).

Burkle and the Yucaipa Directors further interfered with the contractual rights of the First

Lien Lenders by causing Yucaipa to assert its purported Requisite Lenders status in negotiations

with JCT and demand a premium price for its debt.[95]  JCT capitulated based on its understanding

that Yucaipa was in fact the Requisite Lenders, and, as a result, reduced its offer to BD/S for

their debt to a discount to par.[96]  The Allied Board, which included Walker, Tochner, and

Pelletier at the time,[97] as well as Burkle, Walker, and Tochner in their capacities as Yucaipa

representatives, ignored BD/S's request for ratable treatment for all First Lien Lenders and for

Allied's Board to step in and negotiate a deal on terms that would have been far more favorable

to Allied and its stakeholders than the post-bankruptcy JCT 363 Sale that took place in 2013.

---

[93]     Ex. 92 (ComVest 30(b)(6) Dep.) 194:23-203:11 (ComVest's attempts to gain access to Allied's management were thwarted by Yucaipa and, specifically, Ron Burkle).

[94]     *See* Ex. 89 at 14-15.

[95]     ███████████████████████████████████████████████████

[96]     Ex. 93 (Riggs Dep.) 266:18-24 (JCT's final term sheet to Yucaipa in March 2012 offered "a higher percentage of the face value" than JCT was offering BD/S); Ex. 94 (JCT 30(b)(6) Dep.) 69:14-21 (in JCT's view, "it made sense to us to placate [Yucaipa] and give them a premium" because JCT "equated [the] requisite lender position similar to a control[] premium."), 173:15-175:21 ("Q: Would Jack Cooper have agreed to pay a premium if Yucaipa, in fact, was not a requisite lender? … A: I — I don't believe so.").

[97]     *See* Ex. 89 at 14-15.

The inaction of the Yucaipa Directors and Burkle left BD/S with no feasible alternative but to file the involuntary petition to protect their rights.  Because each element of tortious interference is met, summary judgment should be granted in the Trustee's favor.  *See, e.g.*, *Rossi*, 193 A.D.2d at 484.

## <u>CONCLUSION</u>

For the foregoing reasons, summary judgment should be granted in the Trustee's favor on Estate Claims 1-2, 5, 10-11, and 13, and Direct Lender Claims 1, 2, and 4.

Dated: May 1, 2020

**FOX ROTHSCHILD LLP**

By:        */s/ Seth A. Niederman*
Seth A. Niederman (DE Bar No. 4588)
Citizens Bank Center
919 N. Market Street, Suite 300
Wilmington, DE 19801
Tel.: (302) 654-7444
Fax: (302) 656-8920
sniederman@foxrothschild.com

-and-

**JOSEPH HAGE AARONSON LLC**
Gregory P. Joseph
Douglas J. Pepe
Gila S. Singer
485 Lexington Avenue, 30th Floor
New York, NY 10017
Telephone: (212) 407-1200
gjoseph@jha.com

-and-

**ZAIGER LLC**
Jeffrey H. Zaiger
432 Park Avenue, Suite 19A
New York, NY 10022
Telephone: (917) 572-7701
jzaiger@zaigerllc.com

*Counsel for the Litigation Trustee and Plan Administrator*

825921

40