# Exhibit 72

DRAFT

**EXHIBIT
641**
5-23-2019
WALKER - II
Lori Scinta, RPR, CSR #4811

## MINUTES OF SPECIAL MEETING OF THE
## BOARD OF DIRECTORS OF
## ALLIED SYSTEMS HOLDINGS, INC.
### August 28, 2012

A special telephonic meeting of the Board of Directors of Allied Systems Holdings, Inc. ("Allied" or the "Company") was held on August 28, 2012, pursuant to notice given to all members. Present were Brian Cullen, Derex Walker, Mark Gendregske, and Jeff Pelletier. Also in attendance by invitation of the Board were Jeff Kelley and Michael Johnson of Troutman Sanders; Todd Snyder, Steve Antinelli, Marcello Messer, and Matt Braun of Rothschild; and Scott Macaulay and John Blount of the Company. Mr. Blount acted as Secretary of the meeting.

Mr. Blount called the meeting to order and took the Board through the meeting's agenda: an update on the Company's liquidity, the marketing process, and discussions with Jack Cooper Transport, Inc. ("JCT"). Mr. Blount then turned the meeting over to Mr. Messer.

Mr. Messer began taking the Board members through the previously-circulated materials (attached). He advised that the Company had liquidity of just under $20 million, with $12 million in DIP availability. This number was $6 million better than budget and resulted from lower than expected disbursements (offset somewhat by slightly lower than expected receipts). Mr. Messer also advised that the Company had tripped technical defaults due to the slightly lower than expected receipts, and that the DIP lender had already formally waived those defaults.

Mr. Macaulay told the Board that over time disbursements would catch up to the budgeted amounts, eliminating the liquidity surplus. Mr. Cullen asked how much runway the DIP provided the Company and Mr. Macaulay responded by saying that the DIP provided a good runway, but that the Company was missing some of the initiatives in the budget because it was holding off on implementing those initiatives in anticipation of a coming sale to a third party.

Mr. Messer then updated the Board on the marketing process, stating that Rothschild had contacted 91 parties, consisting of 43 strategic buyers and 48 financial buyers. Out of the 91, 19 had requested NDAs (3 strategic buyers, 16 financial), and 16 had executed NDAs. He reminded the Board that Rothschild was requesting evidence of financial wherewithal from strategic buyers before providing them any confidential information. Those who executed an NDA were asked to return a non-binding indication of interest by September 5, 2012.

Mr. Messer said that there had been several calls between JCT's new banker (Barclays) on the one hand and the Company and Rothschild on the other hand. JCT had taken terminal-level data for the Company from January to June and annualized it to create estimated 2012 terminal level EBITDA. These estimates did not comport with updated actual performance numbers. Analysis

1

DRAFT

revealed that the disparity was caused primarily by (1) a sharp decline in Axis volumes (Axis was going through its version of the 2008 automotive slowdown since much of its business was generated by lease returns, which trail new vehicle sales by three to four years); (2) JCT's failure to account for seasonal fluctuations when annualizing previously-provided data; (3) significant disruptions and added cost due to Ford's difficulties with the launch of the new Escape; and (4) loss of Honda and Mazda traffic.  Once the numbers were reconciled, Barclays, on behalf of JCT, put together a new proposal for the acquisition of the Company (attached).

For a discussion of the new JCT proposal, Mr. Messer turned the meeting over to Mr. Antinelli, who said that the proposal suggested a significant reduction in purchase price.  He said the structure was a 363 sale with a total face price of $200 million, made up of $40 million in cash (assuming CIT were to accept $20 million as had been previously suggested to the Company), $80 million in second lien debt, and $80 million in non-voting equity.  The equity number suggested JCT had placed a value on the combined company of over ten times pro forma EBITDA, a very substantial valuation to say the least.  The proposal also offered to cover up to $4 million in past due amounts owed to Central States Pension Plan and $1 million per year for five years payable to Yucaipa for consulting services.

Mr. Antinelli went on to explain that the proposal still did not have committed financing, but rather an anchor and arrange strategy where Barclays had committed to putting up a significant amount of financing, would search out a few other anchors, and then go out to sell the deal to a wider array of investors.

The most glaring issue with the proposal, according to Mr. Antinelli, was the fact that it was contingent on the renegotiation of the Company's contract with Ford, resulting in at least $20 million in additional annual revenue, with the negotiations to be handled by JCT.  Mr. Antinelli opined that this provision represented an obvious opportunity for JCT to continue renegotiating the proposal, and concluded that the Company obviously could not stand by while its largest competitor renegotiated the Company's contract with its largest customer.

The timeline set forth in the proposal was identified as "highly aspirational" by Mr. Antinelli, and he also noted that the proposal contained a "substantial" $27 million make-whole payment to JCT's current bondholders.  This provision suggested that the bondholders would not accept the previously-proposed tack-on financing.

Mr. Walker then asked why, if JCT's existing bondholders were not willing to refinance, Barclays was optimistic it could get financing.  Mr. Antinelli explained that the two were slightly different issues.  His opinion was that JCT's existing bondholders did not want to take a minority position and also felt the company was overpaying for Allied.  He noted that the current proposal was easier to finance than the previous proposal and stated that although Barclays had been optimistic, financing was certainly not a "slam dunk."

2

DRAFT

Next, Mr. Antinelli discussed responding to the proposal. He stated that he had discussed the benefits of pursuing a credit bid on a parallel path with Yucaipa, Black Diamond, and Spectrum. All three recognized the benefits. He said that the current proposal was a re-trade with a lot of open items subject to further re-trade. He advised that the Company should push JCT to do more homework and come up with a more solid proposal.

Mr. Antinelli than raised a few additional issues with the proposal: (1) it provided only $40 million in cash. Even if CIT took only $20 million, that would not leave enough cash to do everything that needed to be done; (2) the proposal appeared to suggest that pension withdrawal liability would be triggered and then left behind in the estate; (3) JCT appeared to believe that HSR would not be an issue and early termination would be granted; and (4) the proposed Ford increase would be approximately 11-12% even *after* the future increases already baked into the contract, and would offer JCT another big opportunity to re-trade the deal while simultaneously putting our biggest customer at risk.

Mr. Gendregske stated that pursuing the JCT deal as structured would be a terrible strategy. He said that JCT would have more leverage to get what it wanted from Ford after the deal was done, and that going to Ford in advance would likely kill the Company.

Mr. Antinelli expressed his complete agreement. He then stated that Barclays was not likely to come up with a better financing structure than anchor and arrange. He noted the current proposal, when compared to the prior proposal, represented $15 million less cash, $75 million less paper, elimination of the $20 million non-compete payment, and elimination of the $6.5 million payment for obligations to management. He acknowledged that the new proposal did contain more equity, but at an inflated value. Mr. Antinelli also advised the Board that JCT had not given any indication of their plans for management, and said that, although it was not contained in the proposal, dismissal of the Allied/JCT/Riggs lawsuit was a condition to the deal.

Rothschild's recommendation, as provided by Mr. Antinelli, was to solicit feedback on the proposal from Allied's senior lenders. He recommended that Allied provide Yucaipa, Black Diamond and Spectrum with the proposal and with a description of Rothschild's reaction to the proposal. He said the goal should be to get JCT to a firm deal without the open items and conditions.

Mr. Walker said the current proposal represented a major re-trade and that he was at a loss as to why the Company would continue the dialogue. Mr. Antinelli agreed that the economics were way off from where they had been, but noted that the marketing process strongly suggested that the Company was not going to get a better offer from anyone else. He said the Company needed to pursue a credit bid in order to push JCT into an appropriate deal. Mr. Snyder added that even if the Company were ultimately to decide that a credit bid was superior to a sale to JCT, the Company would still benefit from the process of

3

DRAFT

pushing the JCT negotiations through to the end.

Mr. Antinelli advised the Board that all of the key parties seemed to already know that JCT had submitted a new proposal. He recommended sharing the proposal with the unsecured creditors committee ("UCC"), petitioning creditors, CIT, and everyone's various advisors. Mr. Walker expressed a concern over sharing the proposal with the UCC, noting that given the membership of the UCC, sharing with them would essentially make the proposal public. Mr. Kelley advised that the UCC was aware of the existence of the proposal and was already waiting for it. He and Mr. Antinelli recommended sharing the proposal with the UCC, but Mr. Walker noted that the provisions in the proposal regarding Ford could be particularly problematic, as Ford would undoubtedly be disturbed by those provisions (and without cause, since those provisions had already been deemed wholly unacceptable by the Company). Mr. Gendregske agreed that sharing the Ford information would be bad for the Company. After an extended discussion on how to deal with the issue, the Board decided, on advice of counsel and its financial advisor, to share a summary or redacted version of the proposal.

Mr. Gendregske then turned the Board's attention to some of the attendant costs of the ongoing bankruptcy. He noted that the Company had been hauling Hyundai vehicles on spot buys in the US, that Hyundai was very happy with the service, but that no permanent awards would be forthcoming from Hyundai during Allied's bankruptcy. He also informed the Board that the Company had an opportunity to lease its empty facility in Windsor, Ontario, but only on a long term basis. Because of uncertainty surrounding the sale process, the Company was uncomfortable entering a long-term lease that might subsequently result in a major administrative claim. He also noted that several other savings initiatives (including a renegotiated lease for the home office and a renegotiated IT contract with IBM) were being held in abeyance for the same reason. Finally, he advised that Hertz expressed an interest in giving Axis the title storage business that would result from Hertz's acquisition of Dollar, but again not while the Company was in bankruptcy.

Mr. Kelley asked if it was too early to start pursuing the credit bid process immediately. Mr. Gendregske said it was not too early from management's perspective, that the credit bid should be pursued immediately, and that more time in limbo was not good for the Company. Mr. Cullen agreed, and asked Mr. Walker to advise the Board on where Yucaipa stood with respect to a possible credit bid. Mr. Walker said that Yucaipa was still discussing the issue internally and would likely have an answer shortly. He said that Yucaipa would likely pursue a credit bid and that it made sense to keep working the JCT proposal as well.

On behalf of Rothschild, Mr. Antinelli summarized the agreed path forward: the Board would wait to hear shortly from Yucaipa on a credit bid. In the meantime, the Company would share the JCT proposal with the petitioning creditors and would share a redacted or summarized version with the UCC.

4

DRAFT


There being no further business to be discussed at the meeting, the meeting was adjourned.


Respectfully submitted,


John F. Blount, Secretary

CONFIDENTIAL

ROTHSCHILD

TROUTMAN
SANDERS

# Discussion materials

28 August 2012

480086
28 August 2012

# Disclaimer

This presentation was prepared by Rothschild Inc. ("Rothschild") and Troutman Sanders LLP ("Troutman Sanders") (collectively, the "Advisors") for the benefit and internal use of Allied Systems Holdings, Inc. ("Allied" or the "Company"). In providing this presentation, the Advisors have relied upon information that is publicly available or has been provided to the Advisors under the terms of a confidentiality agreement. The presentation reflects the Advisors' view and prevailing financial and market conditions as of the date hereof, all of which are accordingly subject to change. The Advisors have not assumed any responsibility for independent verification of any of the information contained herein including, but not limited to, any forecasts or projections set forth herein. In addition, the Advisors assume no obligation to update or to correct any inaccuracies which may become apparent in this presentation and the analyses contained herein are not and do not purport to be appraisals of the assets, stock or business of the Company. This presentation is incomplete without reference to, and should be viewed solely in conjunction with, the oral briefing provided by the Advisors. Nothing contained herein shall be deemed to be a recommendation from the Advisors to any party, including, without limitation, the Company to enter into any transaction or to take any course of action. Neither this presentation nor any of its contents may be summarized, excerpted from, disclosed publicly, or made available to any third parties or used for any other purpose without the prior written consent of the Advisors.

480086
28 August 2012



TROUTMAN
SANDERS ■ R ROTHSCHILD

1

# 1 Agenda

**Rothschild and Troutman Sanders are pleased to provide an update to the Company's Board of Directors. Our presentation today will cover:**

■ Liquidity update

■ M&A process update

■ Status of discussions with Jack Cooper Transport Co. ("JCT")

480066
28 August 2012

TROUTMAN SANDERS    ROTHSCHILD

2

# 2 Liquidity update

**The following summarizes the Company's current liquidity and principal sources of variance between actual and projected cash flow**

**Current liquidity**

- As of August 19, Allied had total liquidity of $19.5 million, comprised of:
  - $7.5 million of unrestricted cash; and
  - $12.0 million of availability under the DIP
- The Company's current liquidity exceeds its budget by $5.9 million

**Principal sources of variance (cumulative since July 15)**



- Receipts have been $0.4 million lower than projected, primarily due to:
  - Lower than anticipated volumes at Axis, partially offset by higher volumes at AAG
  - Timing delays caused by the accounting system changes at Kia and Hyundai (currently, $1.0 million is 30+ days past due from these two customers)
- Disbursements have been $2.7 million lower than projected, primarily due to:
  - Timing of professional fee disbursements ($0.7 million)
  - Vendor deposits and pre-payments have been lower than forecasted
  - Lower than anticipated volumes at Axis
  - The above have been partially offset by the fact that servicing Ford's Escape facility has been costlier than anticipated due to challenges associated with the product launch



TROUTMAN SANDERS ROTHSCHILD

# 3 Liquidity update

## Actual versus forecast through week ending August 19th



Currently, liquidity is $19.5 million, which is $5.9 million above plan

Currently, $8 million is drawn on the DIP facility and $12 million remains available

Liquidity ($000)

Waivers granted due to covenant violations resulting from the delay of $1.8 million and $1.4 million payments in the weeks ending 7/22/12 and 8/5/12, respectively

$5.9 million

$25,000
$20,000
$15,000
$10,000
$5,000
$0

6/10/12  6/17/12  6/24/12  7/1/12  7/8/12  7/15/12  7/22/12  7/29/12  8/5/12  8/12/12  8/19/12

— Forecast  — Actual

Note
1 Includes unrestricted cash on hand and revolver availability

TROUTMAN SANDERS    ROTHSCHILD

480086
28 August 2012

4

# 4 Liquidity update

## Cumulative variance (week ending 7/15/12 – 8/19/12)

| Cumulative variance 7/15/12 – 8/19/12 ($000) | Forecast | Actual | Variance | % of Forecast | Test Level |
|---|---|---|---|---|---|
| Unit Volume | 177,518 | 179,764 | 2,246 | 101.3% | 90.0% |
| Receipts | $30,375 | $29,981 | (395) | 98.7% | 90.0% |
| **Operating Disbursements** | | | | | |
| Payroll & Payroll Taxes | $12,446 | $12,884 | (438) | | |
| Central States Health Welfare and Pension | 3,237 | 3,059 | 178 | | |
| Fuel | 3,680 | 4,728 | (1,047) | | |
| Insurance | 139 | 549 | (409) | | |
| Other Disbursements | 14,647 | 11,598 | 3,049 | | |
| Total Operating Disbursements | $34,149 | $32,816 | $1,334 | | |
| Total Operating Cash Flow | ($3,774) | ($2,835) | $939 | | |
| Capital Expenditures | 593 | — | 593 | | |
| Total Operating Cash Flow less Capex | ($4,367) | ($2,835) | $1,532 | | |
| **Financing Disbursements** | | | | | |
| Interest | $93 | $15 | $78 | | |
| Principal | 0 | — | | | |
| Total Financing Disbursements | $93 | $15 | $78 | | |
| Disbursements Excluding Reorg Costs | $34,836 | $32,830 | $2,005 | 94.2% | 110.0% |
| Reorganization Costs | 1,262 | 609 | 653 | | |
| Total Cash Outlays | $36,097 | $33,439 | $2,658 | | |
| Net Increase/ (Decrease) in Cash | ($5,722) | ($3,458) | $2,263 | | |
| Unrestricted Cash | $4,742 | $7,458 | $2,716 | | |
| DIP Availability | 8,859 | 12,000 | 3,141 | | |
| Ending Liquidity | $13,601 | $19,458 | $5,857 | | |

TROUTMAN SANDERS    ROTHSCHILD

# 5 Marketing process overview

**The following summarizes the status of the marketing process for Allied:**

- To date, Rothschild has contacted 91 parties, consisting of 43 strategic buyers and 48 financial buyers
- Out of 91 potential buyers contacted, 19 have requested NDAs
  - Of this group, 3 are strategic buyers and 16 are financial buyers
  - 16 of the 19 NDAs distributed to date have been executed
- For strategic buyers[1], Rothschild is requesting evidence of financial wherewithal prior to agreeing to disseminate confidential information
- Rothschild has requested that interested parties who have signed NDAs submit non-binding indications of interest by September 5, 2012

**Marketing process summary**

| | Contacted | Not interested | CA sent | CA executed | CIM distributed | CA executed not interested |
|---|---|---|---|---|---|---|
| **Total:** | | | | | | |
| Strategic[2] | 43 | 22 | 3 | 2 | 2 | — |
| Financial | 48 | 29 | 16 | 14 | 14 | 3 |
| **Total M&A** | **91** | **51** | **19** | **16** | **16** | **3** |

Note
1 Financial wherewithal was not requested from one sponsor-backed strategic
2 Figures include JCT

TROUTMAN SANDERS  ROTHSCHILD

# 6 Marketing process overview

## Update on JCT discussions

■ In connection with Barclays' due-diligence and development of a revised transaction proposal, Barclays and JCT have had multiple discussions with Allied and its advisors

■ Barclays and JCT have focused on Allied's latest financial results, particularly in light of an analysis performed by JCT when it conducted due-diligence on the Company in the months preceding the bankruptcy filing

  – JCT had previously prepared its own forecast for Allied's 2012 performance by annualizing Allied's actual Aug – Nov 2011 results at the terminal level and applying certain price increase assumptions in order to arrive at 2012 "terminal-level EBITDA" (i.e., excluding corporate overhead)

  – JCT then compared this forecast to the Company's annualized, actual Jan – Jun 2012 results at the terminal level, which imply a substantially lower 2012 "terminal-level EBITDA" projection than JCT's previous forecast for Allied

■ Barclays and JCT sought to understand the sources of this variance. In diligencing their analysis, it has become clear that the major sources of variance include:

  – Underperformance at Axis due to timing of anticipated volumes from the leasing return market

  – JCT's failure to appropriately account for seasonality

  – Challenges associated with Ford's Escape launch

  – The loss of Honda and Mazda traffic at certain terminals



490086
28 August 2012

# 7 Marketing process overview

**Update on JCT discussions (cont'd)**

- Based on their review of Allied's actual LTM results and its updated business plan, Barclays and JCT have revised their transaction proposal for Allied; highlights are as follows (see the following slides for comments and a side-by-side comparison to JCT's previous proposal):

  - Transaction to be consummated through a $363 sale with a purchase price of $200 million plus Assumed Liabilities; consideration comprised of:

    - $40 million of cash (seeks to maintain prior treatment of CIT)

    - $80 million of new 2nd Lien Term Loans

    - 14% of Non-voting Common Stock in pro forma JCT (JCT ascribes a value of $80 million to this equity stake, implying a 10.1x enterprise valuation based on 2012E pro forma combined EBITDA of $96.1 million)

    - Assumption of up to $4 million in past-due payments owed by Allied to Central States pension fund

  - 5 year agreement with Yucaipa for $1 million per year for consulting services and Board representation

  - Subject to best-efforts financing and due-diligence contingencies

    - The financing would be fully committed and the financing condition would be removed upon signing the APA

    - Due-diligence condition to be removed prior to signing APA

  - Transaction contingent on renegotiation of Ford contract to provide for $20 million in incremental annual earnings at current volumes

  - Transaction to be approved by the Bankruptcy Court by November 15th

    - Agreement in principle by September 14th and completion of APA and motion to approve bid procedures by September 30th

    - Barclays to complete marketing process by September 30th

    - Bid procedures hearing to be held the week of October 1st

*The purchase of Allied is part of a broader refinancing for JCT to complete a $310MM new money financing, made up of the following:*

- *$230MM 1st Lien Term Loan (L+875)*
- *$160MM 2nd Lien Term Loan (L+1375, $80MM of which is new money)*

480086
28 August 2012



TROUTMAN SANDERS | ROTHSCHILD

480086
28 August 2012

# 8 Marketing process overview

## Lender discussions

**Rothschild believes, in addition to a substantial reduction in purchase price, there are a number of issues and conditions with the JCT term sheet that reinforce our view regarding the development of a credit bid from the lenders on a parallel path**

Rothschild has addressed this through separate discussions with Yucaipa, Black Diamond and Spectrum

- Each lender realizes the potential benefits associated with this strategy as well as the underlying complexity given the intercreditor issues

- Rothschild will continue to seek to bring the parties together to preserve / maximize value



# 9 Term sheet summary

480086
28 August 2012

| | Jack Cooper draft – 6/26/2012 | Jack Cooper draft – 8/23/2012 | Comments |
|---|---|---|---|
| **Buyer(s)** | ▪ Jack Cooper and/or one or more affiliates to be determined | ▪ SAME | |
| **§363 Sale** | ▪ Buyer and Allied would enter into an APA with the Buyer as the stalking horse bidder to purchase substantially all of Allied's assets<br><br>▪ Buyer and Allied to mutually agree upon assignment of customer contracts, supply agreements, leases, license agreements and other executory agreements | ▪ SAME<br><br>▪ Not addressed | ▪ Term sheet continues to suggest elements of a Plan such as CIT treatment |
| **Closing Date** | ▪ The date the §363 Sale is consummated | ▪ SAME | |
| **Timing** | ▪ N.A. | ▪ Finalize term sheet by September 14th<br>▪ Complete APA and bidding procedures and file motion approving same by September 30th<br>▪ Auction and hearing to approve the sale by November 15th | ▪ Unrealistic milestones; negotiations on term sheet, APA and bid procedures likely to require more than 30 days if to be filed with the support off Allied's major creditor constituents |
| **Assumed liabilities** | ▪ Those liabilities specifically agreed upon by the Buyer in the APA and no others | ▪ Assumption of Allied's liability for past-due amounts owed to the Central States pension fund in an amount not to exceed $4MM as of the Closing Date | ▪ Will any other liabilities be assumed?<br>▪ How will the MEPPA withdrawal liability be treated? |
| **HSR Filing** | ▪ Within three business days of executing the APA, Allied and the Buyer make a Hart-Scott-Rodino ("HSR") filing | ▪ Not addressed | |
| **Bid Protections** | ▪ §363 sale motion and proposed order (as acceptable to Buyer) to be filed by Allied within two business days of the execution of the APA<br><br>▪ Motion will include a Backup §363 Sale (as discussed below), break-up fee and bid protections, including but not limited to, minimum overbid and minimum bidding increments, acceptable to Buyer in sole discretion | ▪ Customary §363 sale provisions, including bidding and auction procedures and deal protection provisions approved by the Bankruptcy Court | |



TROUTMAN SANDERS ▪ ROTHSCHILD

480066
28 August 2012

# 10 Term sheet summary

| | Jack Cooper draft – 6/26/2012 | Jack Cooper draft – 8/23/2012 | Comments |
|---|---|---|---|
| Conditions Precedent to Closing | ■ Usual and customary closing conditions including:<br>– JCT obtains lender and investor consent and necessary funds, including, without limitation, increasing its revolver to $90MM<br>– Expiration or termination of any applicable waiting period under HSR<br>– Bankruptcy Court order approving the §363 Sale<br>– Settlement and dismissal with prejudice of all claims and counterclaims in lawsuit between Buyer and Allied | ■ Usual and customary closing conditions<br>■ Renegotiation of Allied's contracts with Ford under terms that will result in incremental earnings of not less than $20MM per annum, assuming current levels of hauled units<br>– Allied to provide permission for JCT to engage in discussions directly with Ford concerning modifications of Allied's contracts<br>– Negotiations to be completed before September 30, 2012 | ■ Unacceptable; JCT will need to negotiate with Ford after Closing<br>■ Need to clarify whether $20MM is prior to agreed upon rate increases  (If so, approximately a 15% rate increase)<br>■ Timeline suggests Allied would allow these discussions prior to committed financing |
| Financing commitment | ■ $155.3MM of tack-on JCT senior secured notes[1] | ■ Best-efforts financing expected to be fully committed by the APA signing:<br>– $50MM ABL revolver; comparable to existing ABL terms (undrawn at close)<br>– $230MM 1st Lien Term Loan: L+875 (1.25% floor)<br>– $160MM 2nd Lien Term Loan: L+1375 (1.25% floor) | ■ Not clear at this point that Barclays' pre-syndication efforts will be successful<br>■ If pre-syndication efforts fail, financing will not be fully committed |
| Yucaipa Consulting Agreement | ■ Upon Closing, Buyer would enter into 5-year consulting agreement with Yucaipa or its affiliates for labor and other consulting services<br>– $1MM payable annually commencing on Closing Date, plus reimbursement of out-of-pocket fees and expenses<br>– Other customary terms and conditions including accelerated payment upon a change of control | ■ JCT will enter into a 5-year agreement with Yucaipa for $1MM per year for consulting services and Board representation | |

**Note**
1 Assumes all Other First Lien Lenders choose Cash Consideration under the 6/26/2012 proposal

 TROUTMAN SANDERS | R | ROTHSCHILD

11

# 11 Term sheet summary

| | Jack Cooper draft – 6/26/2012 | Jack Cooper draft – 8/23/2012 | Comments |
|---|---|---|---|
| §363 Sale Consideration | ■ CIT to receive cash equal to 57% of its claim<br>■ Other First Lien Lenders (all lenders excluding Black Diamond, Spectrum, Yucaipa and CIT (together the "Major Lenders")) have the choice to receive either (i) cash equal to 57% of their claims (the "Cash Consideration") or (ii) Rollover Consideration<br>■ Major Lenders would receive Rollover Consideration which includes the following:<br>  – Jack Cooper's 12 ¾% Senior Secured Notes Due 2015 equal to 85% of the principal amount of the Rollover Holders' claims under the First Lien Credit Agreement (requires amendment of JCT Indenture)<br>  – Penny warrants to purchase 8.0% of the fully-diluted, non-voting common stock JCT<br>  – The holders of a majority of the Warrants would have the right to appoint one person (to be mutually agreed upon) to the JCT Board of Directors and all holders will join existing shareholder agreement<br>■ Cash in exchange for entering into mandatory Rollover Holder Restriction Agreement (discussed in greater detail below)<br>■ Cash repayment of DIP not to exceed $20MM | ■ Cash in an amount of $40MM to repay:<br>  – Amount of principal and interest outstanding under DIP facility as of the Closing Date<br>  – $20MM in cash in full satisfaction of CIT's $35MM claim (57% recovery)<br>  – Any amount in excess of the above may be distributed under a POR by Allied to its creditors or for management severance claims as determined by Allied<br>■ $80MM of new 2nd Lien Term Loan to be issued at Closing (excluding OID and ticking fees). See appendix A term sheet for additional detail<br>■ Non-voting Class C common shares equal to 14% of fully diluted JCT shares valued at $80MM by JCT. See appendix A for term sheet for additional detail<br>  – Implies an enterprise value of $967.1MM or 10.1x 2012E PF combined EBITDA of $96.1MM | ■ Not able to allocate sale proceeds in a $363 sale<br>■ Significantly less consideration<br>  – Cash consideration decreased by up to $15MM[1]<br>  – Debt consideration decreased by $75.3MM[1]<br>  – Removed non-compete consideration ($20MM over 4 years) and management severance consideration ($6.5MM)<br>  – Equity consideration increased by 6%, but at what appears to be a very high valuation<br>■ 10.1x enterprise valuation exceeds industry norms; therefore, equity consideration is likely worth significantly less than $80MM<br>  – Class C common shares can be re-purchased for $80MM from Closing until 12/31/13 and for $100MM from 1/1/14 until 12/31/14<br>■ Estate will need to set aside sufficient cash for transaction costs, administrative claims and wind-down expenses<br>■ Class C Holders able to appoint one Board member |

Note
1 Assumes all Other First Lien Lenders choose Cash Consideration under the 6/26/2012 proposal

460085
28 August 2012

12

TROUTMAN SANDERS    ROTHSCHILD



480086
28 August 2012

# 12 Term sheet summary

| | Jack Cooper draft – 6/26/2012 | Jack Cooper draft – 8/23/2012 | Comments |
|---|---|---|---|
| **Rollover Holder Restriction Agreement** | ▪ Lenders who agree to receive Rollover Consideration are required to agree to a 5-year non-compete, non-solicitation of customers, vendors, and senior employees; and mutual confidentiality and mutual non-disparagement restrictions in North America<br><br>▪ In return JCT will pay Lenders (on a pro rata basis) an annual amount of $5MM over four years, with the first payment due on the first anniversary of the Closing Date | ▪ Not applicable | ▪ Non-compete payments in the original proposal had provided for significant value to lenders ($20MM on a non-discounted basis) |
| **Mgmt. retention payment** | ▪ Buyer to assume and pay at Closing payment obligations up to $6.5MM under existing employment agreements and severance and bonus plans between Allied and its employees provided such employees agree to perform certain transition services and agree to customary restrictive covenants | ▪ No payments to management addressed in the proposal | ▪ Seek clarity as it relates to intentions with management |
| **Jack Cooper Lawsuit** | ▪ JCT, Allied, and Yucaipa would motion the court in the Allied-JCT Lawsuit to extend the discovery deadline until July 31, 2012 and would agree to further motion such court to further extend the discovery deadline as necessary to prevent having depositions held while the parties are attempting to consummate the Proposed Transaction | ▪ Not addressed | |

TROUTMAN SANDERS ▪ ROTHSCHILD

13

480086
29 August 2012

# 13 Term sheet summary

| | Jack Cooper draft – 6/26/2012 | Jack Cooper draft – 8/23/2012 | Comments |
|---|---|---|---|
| **HSR Clearance** | ▪ JCT makes reasonable best efforts following execution of APA to obtain HSR clearance and Allied would use reasonable best efforts to make filings and respond to requests<br><br>▪ Buyer would not be required to take any action (i.e. divestiture, consent decree, operational limitations, etc.) that would be reasonably likely to have a material adverse impact on the value of Allied, its assets and its operations or the value of JCT's operations post-acquisition | ▪ Not addressed | |
| **Failure to close §363 Sale prior to target date** | ▪ If the Buyer fails to close §363 Sale (for any reason other than due to Allied's material breach) within 120 days of entry of Order approving bidding procedures, Major Lenders may elect to assume Buyer's rights and obligations under APA and credit bid their claims under the Credit Agreement (the "Backup §363 Sale") | ▪ Not applicable | |
| **Stock Sale Obligation** | ▪ If Lenders pursue Backup §363 Sale, they would be obligated for a period equal to the shorter of (a) 120 days after such acquisition, (b) date when Buyer ceases to pursue HSR Clearance, or (c) date of any final, non-appealable order prohibiting the §363 Sale, to sell their equity interest to Buyer for the consideration they would have otherwise received under the Plan (defined below)<br><br>▪ APA would contain mutually acceptable terms and conditions including, without limitation, indemnification by the seller of stock in favor of the Buyer | ▪ Not applicable | |



TROUTMAN SANDERS | ROTHSCHILD

480386
28 August 2012

# 14 Term sheet summary

| | Jack Cooper draft – 6/26/2012 | Jack Cooper draft – 8/23/2012 | Comments |
|---|---|---|---|
| Lender Plan Support Agreements | ■ Simultaneous with the signing of the APA, Buyer would sign definitive agreements with Yucaipa, Black Diamond, Spectrum and CIT (the "Lender Plan Support Agreements") confirming their agreement to support a plan of reorganization (the "Plan") in which:<br>— Yucaipa, Black Diamond and Spectrum would receive the Rollover Consideration;<br>— CIT would receive the Cash Consideration;<br>— All First Lien Lenders given option to elect Rollover Consideration or Cash Consideration;<br>— Settlement and dismissal with prejudice of all claims and counterclaims in lawsuit between Black Diamond / Spectrum and Yucaipa;<br>— Black Diamond and Spectrum shall withdraw their motion to appoint a trustee as of the date of such Lender Plan Support Agreements;<br>— CIT, Black Diamond and Spectrum would retroactively affirm Amendment No. 4 to Credit Agreement, dated August 21, 2009;<br>— An agreement of each Lender to credit bid its Credit Agreement claims in the event that Yucaipa elects to pursue the Backup §363 Sale<br>— Mutual releases of all claims; and<br>■ Transfee / assignee of any claims held by Major Lenders must agree in writing to be bound by terms of Lender Support Agreements | ■ Not applicable | |
| Transaction costs | ■ Each party responsible for its own costs | ■ Not addressed | |

TROUTMAN SANDERS   R ROTHSCHILD

15

# 15 Combined capitalization & credit statistics

## Pro forma capitalization summary ($MM)

| | JCT standalone | As of December 31, 2012E | | |
| --- | --- | --- | --- | --- |
| | | Adjustment | PF Combined | PF Leverage |
| Cash | — | $1.6 | $1.6 | |
| Debt: | | | | |
| Revolving credit facility (ABL) | $13.9 | ($13.9) | — | — |
| Existing 12.75% Senior Secured Notes | 157.5 | (157.5) | — | — |
| $50MM ABL revolver | — | — | — | — |
| First lien term loan | — | 230.0 | 230.0 | 2.4x |
| Second lien term loan | — | 160.0 | 160.0 | 4.1x |
| Unsecured note payable | 2.1 | — | 2.1 | 4.1x |
| Unsecured pension note | 3.6 | — | 3.6 | 4.1x |
| Total debt | $177.1 | | $395.7 | 4.1x |
| Preferred stock - Series A | $1.5 | ($1.5) | — | 4.1x |
| Preferred stock - Series A | 37.0 | (37.0) | — | 4.1x |
| Total debt + preferred stock | $215.6 | | $395.7 | 4.1x |
| Common equity[1] | $491.4 | $80.0 | $571.4 | 10.1x |

## Credit statistics

| LTM financials and credit statistics ($MM) | JCT standalone | Transaction Adjustment | Pro forma 12/31/2012E |
| --- | --- | --- | --- |
| Adj. FY 2012E EBITDA[2] | $57.8 | $38.3 | $96.1 |
| Run-rate maintenance capex | 14.0 | (4.0) | 10.0 |
| Run-rate cash interest expense | 22.8 | 25.0 | 47.8 |
| Run-rate preferred cash dividend | 4.7 | (4.7) | — |
| (Total debt + preferred stock) / EBITDA | 3.7x | | 4.1x |
| (Total debt + preferred stock) / (EBITDA - capex) | 4.9x | | 4.6x |
| EBITDA / cash interest | 2.5x | | 2.0x |
| EBITDA / (cash interest + preferred cash dividend) | 2.1x | | 2.0x |
| (EBITDA - capex) / cash interest | 1.9x | | 1.8x |
| (EBITDA - capex) / (cash interest + pfd. cash dividend) | 1.6x | | 1.8x |

480086
28 August 2012

Notes
1 Class C non-voting common stock of $80MM issued pursuant to transaction
2 Based on Barclays pro forma 2012E "financeable EBITDA." Assumes JCT FY 2012E EBITDA of $57.8MM + Allied FY 2012E EBITDA of ~$1.0MM plus synergies of $25.0MM related to corporate overhead, $10.7MM from closure of certain Allied terminals and $3.6MM related to backhaul

16

TROUTMAN SANDERS    ROTHSCHILD

# 16 Next steps

- Solicit feedback on revised JCT proposal from major first lien lenders

- Communicate issues with revised proposals to JCT

- In parallel with JCT negotiations, develop credit bid / stand-alone POR with first lien lenders

TROUTMAN SANDERS | R | ROTHSCHILD

480086
28 August 2012

17

# Appendix A. Debt and equity term sheets

480086
28 August 2012

Appendix A. Debt and equity term sheets

# A.1 First Lien Term Loan

| Illustrative Terms | |
|---|---|
| Issuer | Jack Cooper Holdings Corp. ("JCT") |
| Facilities | $230.0 million 1st Lien Term Loan B (the "TLB") |
| Assumed Ratings | Unrated |
| Tenor | 4 years |
| Use of Proceeds | To fund the acquisition, refinance existing 12.75% Senior Secured Notes due 2015 and Series A and Series B Preferred Stock, pay related fees and expenses and general corporate purposes |
| Applicable Margin | L + 875 |
| OID | 98 |
| LIBOR Floor | 1.25% |
| Security | ■ Perfected first priority security interest in substantially all assets of the Borrower and its subsidiaries (including a pledge of all stock in domestic subsidiaries and 65% of stock in foreign subsidiaries) except for the ABL Collateral <br><br> ■ Perfected second priority security interest in ABL Collateral |
| Guarantees | All of the existing and future domestic restricted subsidiaries |
| Ranking | *Pari passu* with all existing and future indebtedness and senior to all existing and future subordinated indebtedness |
| Optional Prepayments | 101 soft call for the first 12 months |
| TLB Amortization | 1% per annum; bullet at maturity |
| Mandatory Prepayments | Customary for facilities of this type including prepayments from excess cash flow, asset sale and debt issuance proceeds |
| Financial Covenants | Maximum leverage, minimum interest coverage, minimum liquidity, maximum capital expenditures and others TBD |
| Negative Covenants | Customary for facilities of this type including limitations on indebtedness, liens, asset sales, investments, restricted payments, transactions with affiliates, etc. |
| Flex | TBD |
| Ticking Fee | 50 bps per annum on aggregate commitment amount for days 0 – 60 upon signing the Commitment Papers; 100 bps thereafter |
| Conditions to Closing | Customary for facilities of this type, including, without limitation, revised contracts with Ford for terminals currently operated by Allied that will result in incremental earnings of not less than $20,000,000 per annum, assuming current levels of hauled units |

480686<br>29 August 2012



TROUTMAN SANDERS  ■R ROTHSCHILD

480066
28 August 2012

# A.2 Second Lien Term Loan

| Illustrative Terms | |
| --- | --- |
| Issuer | Jack Cooper Holdings Corp. ("JCT") |
| Facilities | $160.0 million 2nd Lien Term Loan (the "2TL") ($80 million to be distributed to Allied Creditors) |
| Assumed Ratings | Unrated |
| Tenor | 5 years |
| Use of Proceeds | To fund the acquisition, refinance existing 12.75% Senior Secured Notes due 2016 and Series A and Series B Preferred Stock, pay related fees and expenses and general corporate purposes |
| Applicable Margin | L + 1375 |
| OID | 98 |
| LIBOR Floor | 1.25% |
| Security | ■ Perfected second priority security interest in substantially all assets of the Borrower and its subsidiaries (including a pledge of all stock in domestic subsidiaries and 65% of stock in foreign subsidiaries) except for the ABL Collateral<br>■ Perfected third priority security interest in ABL Collateral |
| Guarantees | All of the existing and future domestic restricted subsidiaries |
| Ranking | *Pari passu* with all existing and future senior indebtedness and senior to all existing and future subordinated indebtedness |
| Optional Prepayments | ■ NC-1, 103, 102, 101, par<br>■ In year one, JCT can repay the 2TL with proceeds from an equity raise up to 25% of the amount of 2TL outstanding at a call price of 103 |
| Amortization | Bullet at maturity |
| Mandatory Prepayments | Customary for facilities of this type including prepayments from excess cash flow, asset sale and debt issuance proceeds |
| Financial Covenants | None |
| Negative Covenants | Customary for facilities of this type including limitations on indebtedness, liens, asset sales, investments, restricted payments, transactions with affiliates, etc. |
| Flex | TBD |
| Ticking Fee | 50 bps per annum on aggregate commitment amount for days 0 – 60 upon signing the Commitment Papers; 100 bps thereafter |
| Conditions to Closing | Customary for facilities of this type, including, without limitation, revised contracts with Ford for terminals currently operated by |



TROUTMAN
SANDERS  **R** ROTHSCHILD

20

480096
28 August 2012

Appendix A. Debt and equity term sheets

# A.3 Class C Non-Voting Common Stock

| Illustrative Terms | |
|---|---|
| Issuer | Jack Cooper Holdings Corp. ("JCT") |
| Size / Security | Class C Non Voting Common Stock (the "Class C Stock") issued to Allied equal to 14.0% of the outstanding common shares; number of shares based on 1,295,204 fully diluted shares outstanding, comprised of 800,810 Class A shares; 335,864 Class B shares; 116,408 warrant shares (Class B); and 42,122 option shares (Class B) |
| Ranking | In the event of liquidation, the holders of shares of common stock (including holders of the Class C Stock, "Class C Holders")) are entitled to receive all assets of JCT available for distribution to Class A and Class B shareholders, subject to the rights and preferences of any then outstanding shares of preferred stock |
| Dividends | Subject to the rights and privileges of any then outstanding shares of preferred stock and any restrictions under JCT's indebtedness, dividends may be declared and paid on the Class C Stock from lawfully available funds as and when determined by the Board of Directors. Class C shares will be entitled to receive dividends to the same extent as Class A and Class B shall receive dividends |
| Optional Redemption | The Class C Stock shall be redeemable by JCT at JCT's option in accordance with the schedule set forth below:<br><br>■ From the time of Closing to December 31, 2013...........$80 million<br><br>■ On or after January 1, 2014 to December 31, 2014.........$100 million |
| JCT Sale | In the event of a sale of JCT or substantially all of JCT's assets ("JCT Sale") or a merger or similar consolidation resulting in a change of control, the Class C Holders will share with Class A and Class B shareholders, pro-rata, in JCT Sale consideration available to common shareholders in accordance with the Holders' economic ownership of JCT |
| Transfer Rights | Customary restrictions on the transfer of the Class C Stock in accordance with the existing stockholders' agreement |
| Voting Rights | Class C Holders shall have no voting power on or any right to participate in any proceedings in which JCT or its stockholders take action except that JCT may not modify the rights of the Class C shares without the consent of the holders of a majority of such Class C shares; provided, that Class C Holders shall have the right to vote following the occurrence of a public registered offering by JCT of any common stock on the same basis as purchasers of JCT's common stock pursuant to such public registered offering; provided further, that T. Michael Riggs and his family members and trusts shall have super-majority voting rights with respect to any common stock held by them to ensure their holding in the aggregate a majority of all voting rights of the common stock of JCT following the occurrence of such public registered offering |
| Stock Splits, Dividends or Combinations | If JCT shall in any manner subdivide (by stock split, dividend or otherwise) or combine the outstanding shares of Class A, Class B or Class C shares, the shares of each class shall be subdivided or combined to the same extent |
| Board Member | Class C Holders shall have the right to appoint one (1) Member to the Board of Directors |



TROUTMAN SANDERS ROTHSCHILD

Appendix B. Proposed JCT timeline

Appendix B. Proposed JCT timeline

# B.1 Proposed JCT timeline

August 2012 / September 2012 / October 2012 / November 2012

| Proposed Timeline Week(s) of: | Bankruptcy / §363 Sale Process | Financing Process |
|---|---|---|
| August 20 – August 27 | ▪ Transaction overview / financing terms provided to JCT and Allied (by August 24th) Allied to begin reverse due diligence on JCT | ▪ Begin drafting Confidential Information Memorandum (CIM) and Lenders' Presentation (LP)<br>▪ Continue due diligence on JCT and Allied |
| September 3 | ▪ Negotiate key transaction terms | ▪ Finalize CIM, LP and due diligence |
| September 10 | ▪ Reach agreement with Allied on key transaction terms and begin drafting Asset Purchase Agreement (APA) and Bid Procedures (by Sept. 14th) | ▪ Distribute preliminary information to select group of key investors<br>▪ Begin drafting commitment papers and term sheets |
| September 17 | ▪ Finalize Allied due diligence on JCT / Transaction<br>▪ Finalize APA and bid procedures | ▪ 1-on-1 meetings with key investors<br>▪ Finalize commitment papers and term sheets<br>▪ Begin drafting Credit Agreement (CA) |
| September 24 | ▪ JCT and Allied sign APA (by September 30th)<br>▪ Filing of §363 sale motion and APA | ▪ Receive commitments from key investors<br>▪ Barclays and investors enter into commitment letters for debt<br>▪ Continue drafting CA |
| October 1 | ▪ Hearing on Bid Procedures | ▪ Bank meeting<br>▪ Syndication in process, respond to lenders Q&A<br>▪ Continue drafting CA |
| October 8 | ▪ Bankruptcy Court approves §363 Bid Procedures (by October 9th if not approved day of Hearing) | ▪ Lenders' commitments due<br>▪ Finalize CA and distribute for lender review |
| October 15 – November 12 | ▪ Due diligence period for other potential bidders<br>▪ §363 sale auction / Bankruptcy Court approval (by November 15th) | |
| November 19 | ▪ Closing of sale including distribution of cash, equity and 2nd Lien Term Loan to Allied | ▪ Bring down due diligence call<br>▪ Sign Credit Agreement / close and fund |

480086
28 August 2012

TROUTMAN SANDERS    ROTHSCHILD 

23

**CONFIDENTIAL**
**FOR DISCUSSION PURPOSES ONLY**

August 23, 2012

Mr. Stephen Antinelli
Rothschild Inc.
1251 Avenue of the Americas
51st Floor
New York, NY 10020

Re:    Jack Cooper Transaction Proposal

Dear Steve:

We are pleased to present for your consideration the following non-binding proposal (the "Proposal") regarding the transaction described in this letter (the "Transaction"):

1.    Summary of Transaction.

(a)    Jack Cooper Holdings Corp. and certain of its affiliates (collectively, "Jack Cooper") would execute and deliver an asset purchase agreement (the "APA") pursuant to which Jack Cooper would, subject to the conditions set forth therein, acquire substantially all of the assets of Allied Systems Holdings (the "Company") (the "Purchased Assets"), free and clear of all liens, claims, security interests and other encumbrances, pursuant to Section 363 of the Bankruptcy Code ("Section 363").

(b)    The aggregate purchase price for the Purchased Assets (the "Purchase Price") would be an amount equal to (i) $40,000,000 of cash, plus (ii) $80,000,000 in principal amount of Second Lien Term Loans, plus (iii) 14% of Non-voting Common Stock in the pro forma Jack Cooper with a value we believe is equal to $80,000,000, plus (iv) the Assumed Liability Amount (each of the foregoing is described in a summary of the Transaction including the term sheets set forth in Exhibit A).

(c)    In addition, Jack Cooper will, upon closing of the Transaction, be willing to enter into a five year consulting agreement with Yucaipa for services and Board of Directors representation.

2.    Definitive Agreement.  In conjunction with the completion of Jack Cooper's due diligence review of the Company described herein, the parties hereto shall negotiate the terms of the APA.  The APA will contain terms consistent with the terms of Exhibit A and will contain

8-23-12

CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY

other mutually satisfactory covenants, representations and warranties, closing conditions and other terms customary for transactions of this nature. Without limiting the foregoing, the APA will contain customary Section 363 sale provisions, including bidding and auction procedures and deal protection provisions, with it being understood that all such bidding, auction and deal protection provisions shall be approved by the Bankruptcy Court. Jack Cooper is prepared to devote the resources necessary to execute and deliver the APA on an expedited basis and would propose completion of the APA and bidding procedures by September 30, 2012.

3.    Due Diligence. Jack Cooper and its representatives will expeditiously complete its financial and legal due diligence review of the Company (including a business, financial and legal review). The Company shall grant to Jack Cooper and its representatives, including Barclays and its counsel, access to the personnel, properties, books, records, customers, suppliers and other business relations of the Company for purposes of completing its due diligence review.

4.    Financing. Barclays has proposed financing for the Transaction, which will be comprised of a $230,000,000 First Lien Term Loan and a $160,000,000 Second Lien Term Loan (collectively, the "Term Loans"). Barclays is in the process of completing financial and legal due diligence on both Jack Cooper and the Company. Barclays has retained Skadden Arps as counsel and is commencing the preparation of marketing materials and the drafting of commitment letters and documentation to finance the Transaction. Once the Company and Jack Cooper have reached an agreement in principle on the material terms of the Transaction, Barclays will commence marketing of the Term Loans to investors. Barclays estimates it will need two weeks to market the Term Loans in order to be in a position to provide a financing commitment. Assuming the Term Loans are successfully marketed on terms that Jack Cooper can agree to and a commitment for such financing is entered into between Jack Cooper and Barclays, Jack Cooper can enter into the APA without any financing conditions.

5.    Contracts with Ford Motor Company. A key condition to the Financing and the closing under the APA will include a renegotiation of the terms of the Company's contracts with Ford Motor Company ("Ford") under terms which will result in incremental earnings of not less than $20,000,000 per annum, assuming current levels of hauled units. To effectuate this on an expedited basis (i.e. 3-4 weeks) we would propose that the Company provide permission to Jack Cooper to engage in discussions with Ford concerning modification of the Company's contracts in connection with the Transaction so that negotiations can be completed before September 30, 2012.

6.    Timing. Based upon our review of the Company's operating performance, the Company's EBITDA has deteriorated significantly over the June 2012 time period as compared to its performance for the August to November 2011 time period. Accordingly, we believe it is important for both parties to move forward expeditiously in order to avoid further deterioration. We believe that if the parties and creditor constituencies of the Company can reach an agreement in principle by September 14, 2012 and an APA can be completed by September 30, 2012, Barclays can complete its marketing process by the same date, and the Company can be in a position to file a motion approving the bidding procedures by the beginning of October, with a proposed hearing date for Bankruptcy Court approval of the APA by no later than November 15, 2012 and a closing immediately thereafter.

8-23-12

CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY

7.    Binding Effect.  This Proposal is not intended to be, and shall not constitute, a binding or enforceable agreement between the parties hereto or commitment of any kind; no legal or equitable rights, responsibilities or duties are created by this Proposal; and nothing herein shall obligate Jack Cooper or the Company to enter into any agreement for any transaction or other purpose.

We look forward to working with you and the Company on the Transaction and would propose that you share this confidential Proposal with the Company's Board and its first lien lenders that are subject to non-disclosure agreements.

Sincerely,

T. Mike Riggs

Chairman, Jack Cooper Holdings Corp.

cc: Mark Shapiro
    Barclays

**EXHIBIT A**

Transaction Proposal

See attached.

8-23-12

Confidential

For Discussion Purposes Only

# BARCLAYS

# Project Journey
# Transaction Proposal

August 23, 2012

Confidential

# Preliminary Transaction Overview

## Transaction Summary

- Jack Cooper ("JC") purchases substantially all the assets of Allied for $200.0mm of total consideration, comprised of a combination of $40.0mm in cash and $80.0mm principal amount of 2nd Lien Term Loan and $80.0mm in non-voting common equity equal to 14% of the common equity
- JC raises $310.0mm in new money with the proceeds used to refinance existing Jack Cooper senior secured notes, redeem Jack Cooper Series A and B preferred stock, provide cash consideration to Allied creditors and pay transaction fees and expenses
- Pro-forma capital structure consists of the following:
  - $50.0mm ABL Revolver: comparable to existing ABL terms
  - $230.0mm 1st Lien Term Loan: L + 875 (1.25% floor)
  - $160.0mm 2nd Lien Term Loan: L + 1375 (1.25% floor), of which $80.0mm is issued to Allied creditors
  - $80.0mm Non-Voting Common Equity: issued as consideration for Allied creditors

## 363 Sale Proposal

### 363 Sale Consideration

- Cash in an amount of $40.0mm to repay (in such order of priority):
  i. The amount outstanding under the DIP Facility as of the Closing Date for principal and interest in full satisfaction thereof
  ii. Up to $20.0mm of the outstanding CIT loan in full satisfaction thereof, based on 57% of the outstanding balance of $35mm
  iii. Any amount in excess of (i) and (ii) may be distributed under a Plan of Reorganization by Allied to its creditors or for claims of management severance as Allied shall determine
- New 2nd Lien Term Loan on terms identical to the New 2nd Lien Term Loan to be issued by JC in the principal amount at closing of $80.0mm (excluding OID and ticking fee)
- Non-voting Class C common shares equal to 14% of the fully diluted shares of Jack Cooper with a value of $80.0mm

### Assumed Liabilities

- Assumption of Allied's liability for past-due amounts to the Central States Pension Fund in an amount not to exceed $4.0mm as of the Closing Date

### Yucaipa Consulting Agreement

- JC will enter into a 5-year consulting agreement with Yucaipa and pay $1mm per year for consulting services and Board representation

## Sources & Uses

($ in millions)

| Sources | |
|---|---|
| First Lien Term Loan | $230.0 |
| Second Lien Term Loan (New Money) | 80.0 |
| Second Lien Term Loan (Take Back) | 80.0 |
| Non-Voting Common Equity | 80.0 |
| **Total** | **$470.0** |

| Uses | |
|---|---|
| Repay JC Revolving Credit Facility (ABL) | $13.9 |
| Repay JC Existing 12.75% Sen. Sec. Notes due 2015 | 157.5 |
| Redeem JC Series A & B Preferred[1] | 44.3 |
| Debt / Equity Consideration to Allied Creditors | 160.0 |
| Cash Consideration to Allied Creditors | 40.0 |
| Cost of JC Make Whole / Defeasance Fee[2] | 27.8 |
| OID, Fees and Expenses | 25.0 |
| Balance Sheet Cash | 1.6 |
| **Total** | **$470.0** |

1. Assumes a premium of 15%
2. Make whole on existing Jack Cooper Senior Secured Notes at 117.64, which is currently estimated as the maximum amount payable. Company intends to seek to pay a lower premium.

 BARCLAYS

1

For Discussion Purposes Only

# Illustrative Refinancing Proposal (cont'd)

**Confidential**

## Capitalization and Pro Forma Leverage

| ($ in millions) | As of 12/31/2012E | Trans Adj | PF 12/31/2012E | PF Lev |
|---|---|---|---|---|
| **Cash** | 0.0 | 1.6 | 1.6 | |
| **Debt** | | | | |
| Revolving Credit Facility (ABL) | 13.9 | (13.9) | 0.0 | 0.0x |
| 12.75% Sen. Sec. Notes due 2015 | 157.5 | (157.5) | 0.0 | 0.0x |
| $50mm ABL Revolver | 0.0 | 0.0 | 0.0 | 0.0x |
| First Lien Term Loan | 0.0 | 230.0 | 230.0 | 2.4x |
| Second Lien Term Loan | 0.0 | 160.0 | 160.0 | 4.1x |
| Unsecured Note Payable | 2.1 | 0.0 | 2.1 | 4.1x |
| Unsecured Pension Note | 3.6 | 0.0 | 3.6 | 4.1x |
| **Total Debt** | 177.0 | 218.6 | 395.7 | 4.1x |
| Preferred Stock - Series A | 1.5 | (1.5) | 0.0 | 4.1x |
| Preferred Stock - Series B | 37.0 | (37.0) | 0.0 | 4.1x |
| **Total Debt + Preferred** | 215.5 | 180.1 | 395.7 | 4.1x |
| **Non-Voting Common Equity** | 0.0 | 80.0 | 80.0 | |

## Credit Statistics

| ($ in millions) | As of 12/31/2012E | Trans Adj | PF 12/31/2012E |
|---|---|---|---|
| **LTM Financials and Credit Statistics** | | | |
| Adj FY 2012E EBITDA [1] | 57.8 | 38.3 | 96.1 |
| Run-Rate Maintenance Capex | 14.0 | (4.0) | 10.0 |
| Run-Rate Cash Interest Expense | 22.8 | 25.0 | 47.9 |
| Run-Rate Preferred Cash Dividend | 4.7 | (4.7) | 0.0 |
| Total Debt + Pref. / EBITDA | 3.7x | | 4.1x |
| Total Debt + Pref. / (EBITDA - Capex) | 4.9x | | 4.6x |
| EBITDA / Cash Int. | 2.5x | | 2.0x |
| EBITDA / Cash Int. + Pref. Cash Div. | 2.1x | | 2.0x |
| (EBITDA - Capex) / Cash Int. | 1.9x | | 1.8x |
| (EBITDA - Capex) / Cash Int. + Pref. Cash Div. | 1.6x | | 1.8x |

1. Based on Barclays preliminary analysis of pro forma FY 2012E "financeable EBITDA." Assumes JC financeable FY 2012E EBITDA of $57.8mm plus Allied FY 2012E EBITDA of $1.0mm plus the following synergies: $25.0mm related to corporate overhead, $10.7mm related to closure of certain Allied terminals and $3.6mm related to backhaul.

 BARCLAYS

For Discussion Purposes Only

**Confidential**

# 1st Lien Term Loan

| Illustrative Terms | |
|---|---|
| *Issuer* | Jack Cooper Holdings Corp. (the "Company") |
| *Facilities* | $230.0 million 1st Lien Term Loan B (the "TLB") |
| *Assumed Ratings* | Unrated |
| *Tenor* | 4 years |
| *Use of Proceeds* | To fund the acquisition, refinance existing 12.75% Senior Secured Notes due 2015 and Series A and Series B Preferred Stock, pay related fees and expenses and general corporate purposes |
| *Applicable Margin* | L + 875 |
| *OID* | 98 |
| *LIBOR Floor* | 1.25% |
| *Security* | ▪ Perfected first priority security interest in substantially all assets of the Borrower and its subsidiaries (including a pledge of all stock in domestic subsidiaries and 65% of stock in foreign subsidiaries) except for the ABL Collateral<br>▪ Perfected second priority security interest in ABL Collateral |
| *Guarantees* | All of the existing and future domestic restricted subsidiaries |
| *Ranking* | *Pari passu* with all existing and future indebtedness and senior to all existing and future subordinated indebtedness |
| *Optional Prepayments* | 101 soft call for the first 12 months |
| *TLB Amortization* | 1% per annum; bullet at maturity |
| *Mandatory Prepayments* | Customary for facilities of this type including prepayments from excess cash flow, asset sale and debt issuance proceeds |
| *Financial Covenants* | Maximum leverage, minimum interest coverage, minimum liquidity, maximum capital expenditures and others TBD |
| *Negative Covenants* | Customary for facilities of this type including limitations on indebtedness, liens, asset sales, investments, restricted payments, transactions with affiliates, etc. |
| *Flex* | TBD |
| *Ticking Fee* | 50 bps per annum on aggregate commitment amount for days 0 – 60 upon signing the Commitment Papers; 100 bps thereafter |
| *Conditions to Closing* | Customary for facilities of this type, including, without limitation, revised contracts with Ford for terminals currently operated by Allied that will result in incremental earnings of not less than $20,000,000 per annum, assuming current levels of hauled units |

 **BARCLAYS**

3

**For Discussion Purposes Only**

**Confidential**

# 2nd Lien Term Loan

| | Illustrative Terms |
|---|---|
| *Issuer* | Jack Cooper Holdings Corp. (the "Company") |
| *Facilities* | $160.0 million 2nd Lien Term Loan (the "2TL") ($80 million to be distributed to Allied Creditors) |
| *Assumed Ratings* | Unrated |
| *Tenor* | 5 years |
| *Use of Proceeds* | To fund the acquisition, refinance existing 12.75% Senior Secured Notes due 2015 and Series A and Series B Preferred Stock, pay related fees and expenses and general corporate purposes |
| *Applicable Margin* | L + 1375 |
| *OID* | 98 |
| *LIBOR Floor* | 1.25% |
| *Security* | ▪ Perfected second priority security interest in substantially all assets of the Borrower and its subsidiaries (including a pledge of all stock in domestic subsidiaries and 65% of stock in foreign subsidiaries) except for the ABL Collateral<br>▪ Perfected third priority security interest in ABL Collateral |
| *Guarantees* | All of the existing and future domestic restricted subsidiaries |
| *Ranking* | *Pari passu* with all existing and future senior indebtedness and senior to all existing and future subordinated indebtedness |
| *Optional Prepayments* | ▪ NC-1, 103, 102, 101, par<br>▪ In year one, the Company can repay the 2TL with proceeds from an equity raise up to 25% of the amount of 2TL outstanding at a call price of 103 |
| *Amortization* | Bullet at maturity |
| *Mandatory Prepayments* | Customary for facilities of this type including prepayments from excess cash flow, asset sale and debt issuance proceeds |
| *Financial Covenants* | None |
| *Negative Covenants* | Customary for facilities of this type including limitations on indebtedness, liens, asset sales, investments, restricted payments, transactions with affiliates, etc. |
| *Flex* | TBD |
| *Ticking Fee* | 50 bps per annum on aggregate commitment amount for days 0 – 60 upon signing the Commitment Papers; 100 bps thereafter |
| *Conditions to Closing* | Customary for facilities of this type, including, without limitation, revised contracts with Ford for terminals currently operated by Allied that will result in incremental earnings of not less than $20,000,000 per annum, assuming current levels of hauled units |

 **BARCLAYS**

4

**For Discussion Purposes Only**

**Confidential**

# Class C Non-Voting Common Stock

| | Illustrative Terms |
|---|---|
| *Issuer* | Jack Cooper Holdings Corp. (the "Company") |
| *Size / Security* | Class C Non-Voting Common Stock ("the "Class C Stock"), issued to Allied Systems Holdings ("Allied"), equal to 14.0% of the outstanding common shares; number of shares based on 1,295,204 fully diluted shares outstanding, comprised of 800,810 Class A shares; 335,864 Class B shares; 116,408 warrant shares (Class B); and 42,122 option shares (Class B) |
| *Ranking* | In the event of liquidation, the holders of the shares of common stock (including holders of the Class C Stock, "Class C Holders")) are entitled to receive all assets of the Company available for distribution to Class A and Class B shareholders, subject to the rights and preferences of any then outstanding shares of preferred stock |
| *Dividends* | Subject to the rights and privileges of any then outstanding shares of preferred stock and any restrictions under the Company's indebtedness, dividends may be declared and paid on the Class C Stock from lawfully available funds as and when determined by the Board of Directors. Class C shares will be entitled to receive dividends to the same extent as Class A and Class B shall receive dividends |
| *Optional Redemption* | The Class C Stock shall be redeemable by the Company at the Company's option in accordance with the schedule set forth below:<br><br>• From the time of Closing to December 31, 2013.........$80 million<br>• On or after January 1, 2014 to December 31, 2014........$100 million |
| *Company Sale* | In the event of a sale of the Company or substantially all of the Company's assets ("Company Sale") or a merger or similar consolidation resulting in a change of control, the Class C Holders will share with Class A and Class B shareholders, pro-rata, in the Company Sale consideration available to common shareholders in accordance with the Holders' economic ownership of the Company |
| *Transfer Rights* | Customary restrictions on the transfer of the Class C Stock in accordance with the existing stockholders' agreement |
| *Voting Rights* | Class C Holders shall have no voting power on or any right to participate in any proceedings in which the Company or its stockholders take action except that the Company may not modify the rights of the Class C shares without the consent of the holders of a majority of such Class C shares; provided, that Class C Holders shall have the right to vote following the occurrence of a public registered offering by the Company of any common stock on the same basis as purchasers of the Company's common stock pursuant to such public registered offering; provided further, that T. Michael Riggs and his family members and trusts shall have super-majority voting rights with respect to any common stock held by them to ensure their holding in the aggregate a majority of all voting rights of the common stock of the Company following the occurrence of such public registered offering |
| *Stock Splits, Dividends or Combinations* | If the Company shall in any manner subdivide (by stock split, dividend or otherwise) or combine the outstanding shares of Class A, Class B or Class C shares, the shares of each class shall be subdivided or combined to the same extent |
| *Board Member* | Class C Holders shall have the right to appoint one (1) Member to the Board of Directors |

 **BARCLAYS**

5

**For Discussion Purposes Only**

# Proposed Timeline

**Confidential**

August 2012 — September 2012 — October 2012 — November 2012

Bank Holiday

| Week(s) of: | Bankruptcy / 363 Sale Process | Financing Process |
|---|---|---|
| August 20 – August 27 | ■ Transaction overview / financing terms provided to JC and Allied (by August 24th)<br>■ Allied to begin reverse due diligence on JC | ■ Begin drafting Confidential Information Memorandum (CIM) and Lenders' Presentation (LP)<br>■ Continue due diligence on JC and Allied |
| September 3 | ■ Negotiate key transaction terms | ■ Finalize CIM, LP and due diligence |
| September 10 | ■ Reach agreement with Allied on key transaction terms and begin drafting Asset Purchase Agreement (APA) and Bid Procedures (by September 14th) | ■ Distribute preliminary information to select group of key investors<br>■ Begin drafting commitment papers and term sheets |
| September 17 | ■ Finalize Allied due diligence on JC / Transaction<br>■ Finalize APA and bid procedures | ■ 1-on-1 meetings with key investors<br>■ Finalize commitment papers and term sheets<br>■ Begin drafting Credit Agreement (CA) |
| September 24 | ■ JC and Allied sign APA (by September 30th)<br>■ Filing of 363 sale motion and APA | ■ Receive commitments from key investors<br>■ Barclays and investors enter into commitment letters for debt<br>■ Continue drafting CA |
| October 1 | ■ Hearing on Bid Procedures | ■ Bank meeting<br>■ Syndication in process, respond to lenders Q&A<br>■ Continue drafting CA |
| October 8 | ■ Bankruptcy Court approves 363 Bid Procedures (by October 9th if not approved day of Hearing) | ■ Lenders' commitments due<br>■ Finalize CA and distribute for lender review |
| October 15 – November 12 | ■ Due diligence period for other potential bidders<br>■ 363 sale auction / Bankruptcy Court approval (by November 15th) | |
| November 19 | ■ Closing of sale including distribution of cash, equity and 2nd Lien Term Loan to Allied | ■ Bring down due diligence call<br>■ Sign Credit Agreement / close and fund |



**BARCLAYS**

6

**For Discussion Purposes Only**

**Confidential**

# Disclaimer

This document has been prepared by Barclays Capital Inc. ("Barclays") for information purposes only. This document is an indicative summary of the terms and conditions of financial instrument or transaction described herein and may be amended, superseded or replaced by subsequent summaries. The final terms and conditions of the transaction will be set out in full in the applicable offering document(s) or binding transaction document(s).

This document shall not constitute any commitment to provide services in connection with the transaction described herein or an underwriting commitment, an offer of financing, an offer to sell, or the solicitation of an offer to buy any financial instruments described herein, which in each case shall be subject to Barclays' internal approvals. No transaction or services related thereto is contemplated without Barclays' subsequent formal agreement. Barclays is not acting as a fiduciary. Accordingly you must independently determine, with your own advisors, the appropriateness for you of the transaction or financing before investing or transacting. Barclays accepts no liability whatsoever for any consequential losses arising from the use of this document or reliance on the information contained herein.

Barclays does not guarantee the accuracy or completeness of information which is contained in this document and which is stated to have been obtained from or is based upon trade and statistical services or other third party sources. Any data on past performance, modelling or back-testing contained herein is no indication as to future performance. No representation is made as to the reasonableness of the assumptions made within or the accuracy or completeness of any modeling or back-testing or any other information contained herein. All opinions and estimates are given as of the date hereof and are subject to change and Barclays assumes no obligation to update this document to reflect any such changes. The value of any investment may fluctuate as a result of market changes. The information herein is not intended to predict actual results and no assurances are given with respect thereto. Nothing herein shall be deemed to constitute investment, legal, tax, financial, accounting or other advice.

Barclays, its affiliates and the individuals associated therewith may (in various capacities) have positions or deal in transactions, securities or other financial instruments (or related derivatives) identical or similar to those described herein.

IRS Circular 230 Disclosure: Barclays and its affiliates do not provide tax advice. Please note that (i) any discussion of U.S. tax matters contained in this communication (including any attachments) cannot be used by you for the purpose of avoiding tax penalties; (ii) this communication was written to support the promotion or marketing of the matters addressed herein; and (iii) you should seek advice based on your particular circumstances from an independent tax advisor. Notwithstanding anything herein to the contrary, each recipient hereof (and their employees, representatives, and other agents) may disclose to any and all persons, without limitation of any kind from the commencement of discussions, the U.S. federal and state income tax treatment and tax structure of the proposed transaction described herein and all materials of any kind (including opinions or other tax analyses) that are provided relating to such tax treatment and tax structure. For this purpose, "tax structure" is limited to facts relevant to the U.S. federal and state income tax treatment of the proposed transaction described herein and does not include information relating to the identity of the parties, their affiliates, agents or advisors.

BARCLAYS CAPITAL INC., THE UNITED STATES INVESTMENT BANKING AFFILIATE OF BARCLAYS BANK PLC, ACCEPTS RESPONSIBILITY FOR THE DISTRIBUTION OF THIS DOCUMENT IN THE UNITED STATES. ANY TRANSACTIONS BY U.S. PERSONS IN ANY FINANCIAL INSTRUMENT DISCUSSED HEREIN MUST ONLY BE CARRIED OUT THROUGH BARCLAYS CAPITAL INC., 745 SEVENTH AVENUE, NEW YORK, NY 10019.

NO ACTION HAS BEEN MADE OR WILL BE TAKEN THAT WOULD PERMIT AN OFFERING OF THE FINANCIAL INSTRUMENT DESCRIBED HEREIN IN ANY JURISDICTION IN WHICH ACTION FOR THAT PURPOSE IS REQUIRED. NO OFFERS, SALES, RESALES OR DELIVERY OF THE FINANCIAL INSTRUMENT DESCRIBED HEREIN OR DISTRIBUTION OF ANY OFFERING MATERIAL RELATING TO SUCH FINANCIAL INSTRUMENT MAY BE MADE IN OR FROM ANY JURISDICTION EXCEPT IN CIRCUMSTANCES WHICH WILL RESULT IN COMPLIANCE WITH ANY APPLICABLE LAWS AND REGULATIONS AND WHICH WILL NOT IMPOSE ANY OBLIGATION ON BARCLAYS OR ANY OF ITS AFFILIATES.

THIS DOCUMENT DOES NOT DISCLOSE ALL THE RISKS AND OTHER SIGNIFICANT ISSUES RELATED TO THE TRANSACTION OR TO AN INVESTMENT IN THE FINANCIAL INSTRUMENT DESCRIBED HEREIN. PRIOR TO TRANSACTING, YOU SHOULD ENSURE THAT YOU FULLY UNDERSTAND THE TERMS OF THE TRANSACTION AND SUCH FINANCIAL INSTRUMENT AND ANY APPLICABLE RISKS.

Barclays Bank PLC is registered in England No. 1026167. Registered Office: 1 Churchill Place, London E14 5HP. Copyright Barclays Bank PLC, 2012 (all rights reserved). This document is confidential, and no part of it may be reproduced, distributed or transmitted without the prior written permission of Barclays.

 **BARCLAYS**

**For Discussion Purposes Only**

**CONFIDENTIAL**
**FOR DISCUSSION PURPOSES ONLY**

August 23, 2012

Mr. Stephen Antinelli
Rothschild Inc.
1251 Avenue of the Americas
51ˢᵗ Floor
New York, NY 10020

Re:    Jack Cooper Transaction Proposal

Dear Steve:

We are pleased to present for your consideration the following non-binding proposal (the "Proposal") regarding the transaction described in this letter (the "Transaction"):

1.    Summary of Transaction.

(a)    Jack Cooper Holdings Corp. and certain of its affiliates (collectively, "Jack Cooper") would execute and deliver an asset purchase agreement (the "APA") pursuant to which Jack Cooper would, subject to the conditions set forth therein, acquire substantially all of the assets of Allied Systems Holdings (the "Company") (the "Purchased Assets"), free and clear of all liens, claims, security interests and other encumbrances, pursuant to Section 363 of the Bankruptcy Code ("Section 363").

(b)    The aggregate purchase price for the Purchased Assets (the "Purchase Price") would be an amount equal to (i) $40,000,000 of cash, plus (ii) $80,000,000 in principal amount of Second Lien Term Loans, plus (iii) 14% of Non-voting Common Stock in the pro forma Jack Cooper with a value we believe is equal to $80,000,000, plus (iv) the Assumed Liability Amount (each of the foregoing is described in a summary of the Transaction including the term sheets set forth in Exhibit A).

(c)    In addition, Jack Cooper will, upon closing of the Transaction, be willing to enter into a five year consulting agreement with Yucaipa for services and Board of Directors representation.

2.    Definitive Agreement.  In conjunction with the completion of Jack Cooper's due diligence review of the Company described herein, the parties hereto shall negotiate the terms of the APA.  The APA will contain terms consistent with the terms of Exhibit A and will contain

CONFIDENTIAL
FOR DISCUSSION PURPOSES ONLY

other mutually satisfactory covenants, representations and warranties, closing conditions and other terms customary for transactions of this nature. Without limiting the foregoing, the APA will contain customary Section 363 sale provisions, including bidding and auction procedures and deal protection provisions, with it being understood that all such bidding, auction and deal protection provisions shall be approved by the Bankruptcy Court. Jack Cooper is prepared to devote the resources necessary to execute and deliver the APA on an expedited basis and would propose completion of the APA and bidding procedures by September 30, 2012.

3.    Due Diligence. Jack Cooper and its representatives will expeditiously complete its financial and legal due diligence review of the Company (including a business, financial and legal review). The Company shall grant to Jack Cooper and its representatives, including Barclays and its counsel, access to the personnel, properties, books, records, customers, suppliers and other business relations of the Company for purposes of completing its due diligence review.

4.    Financing. Barclays has proposed financing for the Transaction, which will be comprised of a $230,000,000 First Lien Term Loan and a $160,000,000 Second Lien Term Loan (collectively, the "Term Loans"). Barclays is in the process of completing financial and legal due diligence on both Jack Cooper and the Company. Barclays has retained Skadden Arps as counsel and is commencing the preparation of marketing materials and the drafting of commitment letters and documentation to finance the Transaction. Once the Company and Jack Cooper have reached an agreement in principle on the material terms of the Transaction, Barclays will commence marketing of the Term Loans to investors. Barclays estimates it will need two weeks to market the Term Loans in order to be in a position to provide a financing commitment. Assuming the Term Loans are successfully marketed on terms that Jack Cooper can agree to and a commitment for such financing is entered into between Jack Cooper and Barclays, Jack Cooper can enter into the APA without any financing conditions.

5.    Contracts with Ford Motor Company. A key condition to the Financing and the closing under the APA will include a renegotiation of the terms of the Company's contracts with Ford Motor Company ("Ford") under terms which will result in incremental earnings of not less than $20,000,000 per annum, assuming current levels of hauled units. To effectuate this on an expedited basis (i.e. 3-4 weeks) we would propose that the Company provide permission to Jack Cooper to engage in discussions with Ford concerning modification of the Company's contracts in connection with the Transaction so that negotiations can be completed before September 30, 2012.

6.    Timing. Based upon our review of the Company's operating performance, the Company's EBITDA has deteriorated significantly over the January to June 2012 time period as compared to its performance for the August to November 2011 time period. Accordingly, we believe it is important for both parties to move forward expeditiously in order to avoid further deterioration. We believe that if the parties and the creditor constituencies of the Company can reach an agreement in principle by September 14, 2012 and an APA can be completed by September 30, 2012, Barclays can complete its marketing process by the same date, and the Company can be in a position to file a motion approving the bidding procedures by the beginning of October, with a proposed hearing date for Bankruptcy Court approval of the APA by no later than November 15, 2012 and a closing immediately thereafter.

8-23-12

**CONFIDENTIAL**
**FOR DISCUSSION PURPOSES ONLY**

7.    <u>Binding Effect</u>.  This Proposal is not intended to be, and shall not constitute, a binding or enforceable agreement between the parties hereto or commitment of any kind; no legal or equitable rights, responsibilities or duties are created by this Proposal; and nothing herein shall obligate Jack Cooper or the Company to enter into any agreement for any transaction or other purpose.

We look forward to working with you and the Company on the Transaction and would propose that you share this confidential Proposal with the Company's Board and its first lien lenders that are subject to non-disclosure agreements.

Sincerely,

T. Mike Riggs

Chairman, Jack Cooper Holdings Corp.


cc: Mark Shapiro
    Barclays

**EXHIBIT A**

Transaction Proposal

See attached.

8-23-12