# Exhibit 78

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ALLIED SYSTEMS HOLDINGS, INC., *et al.*,[1] | Case No. 12-11564 (CSS) |
| Debtors. | (Jointly Administered) |

---

ALLIED SYSTEMS HOLDINGS, INC.

Plaintiff,

v.

AMERICAN MONEY MANAGEMENT CORP.,
AVENUE CAPITAL GROUP, BDCM
OPPORTUNITY FUND II, LP, BENNETT
MANAGEMENT, BLACK DIAMOND CLO 2005-1
LTD., DEL MAR DISTRESSED OPPORTUNITIES
MASTER FUND, MJX ASSET MANAGEMENT,
LLC, PAR-FOUR INVESTMENT MANAGEMENT,
SPECTRUM INVESTMENT PARTNERS LP, TEAK
HILL - CREDIT CAPITAL INVESTMENTS, LLC,
THE CIT GROUP/BUSINESS CREDIT, INC., THE
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS, YUCAIPA AMERICAN ALLIANCE
FUND II, L.P., YUCAIPA AMERICAN ALLIANCE
(PARALLEL) FUND II, L.P.

Defendants.

YUCAIPA AMERICAN ALLIANCE FUND I, L.P.,
YUCAIPA AMERICAN ALLIANCE (PARALLEL)
FUND I, L.P., YUCAIPA AMERICAN ALLIANCE
FUND II, L.P., AND YUCAIPA AMERICAN

Adv. Proc. No. 12-50947 (CSS)

Re:  Adv. Proc. D.I. 4, 12
     Main Case D.I. 574

---

[1]     The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (87568828); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582). The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

01:12978610.1

1

ALLIANCE (PARALLEL) FUND II, L.P.

       **Counterclaim and Cross-Claim Plaintiffs,**

       **v.**

ALLIED SYSTEMS HOLDINGS, INC.

       **Counterclaim Defendant,**

       **and**

AMERICAN MONEY MANAGEMENT CORP., AVENUE CAPITAL GROUP, BDCM OPPORTUNITY FUND II, LP, BENNETT MANAGEMENT, BLACK DIAMOND CLO 2005-1 LTD., DEL MAR DISTRESSED OPPORTUNITIES MASTER FUND, MJX ASSET MANAGEMENT, LLC, PAR-FOUR INVESTMENT MANAGEMENT, SPECTRUM INVESTMENT PARTNERS LP, TEAK HILL - CREDIT CAPITAL INVESTMENTS, LLC, THE CIT GROUP/BUSINESS CREDIT, INC., THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,

       **Cross-Claim Defendants.**

## YUCAIPA'S (I) COUNTERCLAIM AND CROSS-CLAIM FOR DECLARATORY JUDGMENT AND INJUNCTIVE AND OTHER RELIEF AND (II) ANSWER TO DEBTORS' VERIFIED COMPLAINT

By and through their undersigned counsel, Yucaipa American Alliance Fund II, L.P. and Yucaipa American Alliance (Parallel) Fund II, L.P. (together, "Yucaipa Fund II"), along with Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. (together, "Yucaipa Fund I" and collectively with Yucaipa Fund II, "Yucaipa"), hereby assert their counterclaim and cross-claim for declaratory judgment and injunctive and other relief, and Yucaipa Fund II hereby answers Debtors' verified complaint for declaratory judgment and injunctive relief (the "Complaint") as follows:

## YUCAIPA'S COUNTERCLAIM AND CROSS-CLAIM FOR DECLARATORY JUDGMENT AND INJUNCTIVE AND OTHER RELIEF

Yucaipa hereby files this Counterclaim for Declaratory Judgment and Injunctive and Other Relief against plaintiff Allied Systems Holdings, Inc. ("Allied Holdings" or "Debtor") and files this Cross-Claim for Declaratory Judgment against defendants American Money Management Corp., Avenue Capital Group, BDCM Opportunity Fund II, LP, Bennett Management, Black Diamond CLO 2005-1 Ltd., Del Mar Distressed Opportunities Master Fund, MJX Asset Management, LLC, Par-Four Investment Management, Spectrum Investment Partners LP, Teak Hill-Credit Capital Investments, The CIT Group/Business Credit, Inc., and the Official Committee of Unsecured Creditors (collectively, "Defendants") to determine Yucaipa's rights and the other first lien Lenders'[2] rights under the First Lien Credit Agreement (defined below) and to determine the validity and legal effect of certain provisions of the Third Amendment thereto.

## PRELIMINARY STATEMENT

1.     The resolution of the instant litigation before this Court is critical to the successful and timely resolution of the Debtors' bankruptcy cases, the administration of estate assets and the ultimate distributions to holders of claims. At issue are (a) the rights of Yucaipa – as holder of the majority of the Debtors' first lien indebtedness – to hold and vote Yucaipa's debt position which was purchased and held for over three years in reasonable reliance upon the Fourth Amendment (defined below) to the Debtors' First Lien Credit Agreement which a New York State Court orally declared without taking any discovery would be deemed invalid in certain respects and (b) rights asserted by the so-called Petitioning Creditors (defined below) that they are now "Requisite Lenders" and have the right to appoint themselves as agent under that First

---

[2] All capitalized terms that are not defined herein shall have the meanings attributed to them in the First Lien Credit Agreement.

Lien Credit Agreement. The resolution of these issues will inform, among other things, how and to which creditors property of the Debtors' estates can be distributed, which Lenders can credit bid the first lien debt and in what amount, what debt can be contributed in a bid by Yucaipa to acquire assets of the Debtors' estate, and whether a plan of reorganization can be consensually confirmed. Moreover, only this Court can timely bind all parties in interest, including the Debtors, the Official Committee of Unsecured Creditors in the above captioned bankruptcy cases (the "Creditors' Committee") and all of the first lien Lenders, to a resolution of the foregoing issues.

### A. Factual Background

2. Certain affiliates of Debtors previously entered bankruptcy on July 31, 2005 in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division (Case No. 05-12515-CRM) (the "Prior Allied Bankruptcy Case"). As part of the Prior Allied Bankruptcy Case, Yucaipa held approximately $99 million of unsecured note claims issued by those debtors. At the time Yucaipa appeared in the Prior Allied Bankruptcy Case, that case was at an impasse and those Allied debtors faced liquidation. Yucaipa's involvement in the Prior Allied Bankruptcy Case was encouraged by the International Brotherhood of Teamsters (the "IBT"), which represents most of the debtors' employees and which was concerned about the viability of the business. Yucaipa made additional loans during the Prior Allied Bankruptcy Case to enable the debtors in that case to purchase much needed equipment and obtained an unprecedented 17.5% wage concession (totaling up to $105 million) from the IBT to fund future capital expenditures. Yucaipa's involvement also led to dramatic reductions in the interest rate and fees paid by the debtors in the Prior Allied Bankruptcy Case under their debtor-in-possession financing facility. In addition, Yucaipa co-sponsored a plan of reorganization that enabled

Allied Holdings to survive and preserve thousands of jobs. Through that plan of reorganization, Allied Holdings emerged from the Prior Allied Bankruptcy Case with a de-levered capital structure and enhanced prospects for competing successfully in the car haul industry. Upon the effective date of the plan, Yucaipa converted all of its debt claims into approximately 67% of Allied Holdings, as reorganized. Yucaipa also designated three members of the reorganized Allied Holdings' board of directors; the other two members of the board were independent and not designated by Yucaipa (including one independent individual designated by the official creditors' committee in the Prior Allied Bankruptcy Case). The non-Yucaipa designated members of the Allied Holdings board of directors make up a special committee (the "Special Committee"), which was formed to independently consider and negotiate on behalf of the Debtors certain matters involving Yucaipa.

3.     In order to finance its exit from the Prior Allied Bankruptcy Case, Allied Holdings, as borrower, and certain of its affiliates and subsidiaries, as guarantors, entered into the First Lien Credit Agreement on May 15, 2007 with Goldman Sachs Credit Partners L.P. as lead arranger and syndication agent (as amended, the "First Lien Credit Agreement" or "CA"). The First Lien Credit Agreement was an exit facility from the Prior Allied Bankruptcy Case and provided a facility for term loans, revolving loans and lenders deposits to support letters of credit issued to beneficiaries for the benefit of Allied Holdings and certain of its affiliates. Simultaneously, Allied Holdings also entered into that certain Second Lien Secured Super Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement, dated May 15, 2007 (the "Second Lien Credit Agreement").

**B.     The Amendments to the First Lien Credit Agreement**

01:12978610.1                                    5

4.      Yucaipa was not a Lender under the original First Lien Credit Agreement, which contained certain provisions that restricted Lenders from selling debt they held under the First Lien Credit Agreement to Yucaipa. (*See, e.g.*, CA § 10.6(c), p. 44 (excluding Yucaipa, as Sponsor, from becoming an "Eligible Assignee" to whom Lenders were contractually permitted to sell or assign their first lien debt); CA § 1.1, pp. 17 (referring to Yucaipa as "Sponsor").)

5.      The First Lien Credit Agreement was amended over time.  The first and second amendments are not relevant to the matters before the Court.  In April 2008, The CIT Group/Business Credit, Inc. ("CIT"), as Administrative Agent to all Lenders under the First Lien Credit Agreement, coordinated passage of Amendment No. 3 to Credit Agreement and Consent (the "Third Amendment" or "3A").  (*See* 3A.)  The Third Amendment – approved by Allied Holdings' Special Committee and executed by Allied Holdings, and approved by a majority of the first lien Lenders – authorized the first lien Lenders to sell up to $50,000,000 in principal amount of term loans under the First Lien Credit Agreement to Yucaipa and its affiliates, provided that (a) fifty percent of such acquired term loans would be converted into capital of Allied Holdings and (b) Yucaipa's voting rights under the First Lien Credit Agreement would be restricted pursuant to the Third Amendment.  (*See* 3A §§ 2.7(e)(iii), (iv).)

6.      Yucaipa was not a signatory to the Third Amendment and did not become bound by the First Lien Credit Agreement as amended through the Third Amendment, as that First Lien Credit Agreement would not permit the purchase of loans under the First Lien Credit Agreement that Allied Holdings, the then majority first lien Lenders, and Yucaipa eventually executed pursuant to the Fourth Amendment.  Although the Lenders were permitted to sell Yucaipa first lien term loans under the Third Amendment, Yucaipa never purchased any such term loans under that amendment.

7.      Instead, at or around the time the Third Amendment was executed, an amendment to the Second Lien Credit Agreement that was similar to the amendment to the First Lien Credit Agreement was executed, except it did not have limits on the amount of second lien debt that Yucaipa could purchase or limits on Yucaipa's voting rights. At that time, Yucaipa acquired two-thirds of the debt under the Second Lien Credit Agreement.

8.      Approximately 15 months later, on August 21, 2009, Allied Holdings and ComVest Investment Partners III, L.P. ("ComVest"), as the majority or "Requisite Lender" under the First Lien Credit Agreement, executed Amendment No. 4 to Credit Agreement (the "Fourth Amendment" or "4A"). (*See* 4A.) The Special Committee – consisting of the Allied Holdings board members who were independent of Yucaipa – reviewed and voted to approve the Fourth Amendment. Allied Holdings was represented by independent outside counsel in connection with the Third Amendment and Fourth Amendment, and Yucaipa (along with the first lien Lenders) was provided with written legal opinions from Allied Holdings' counsel in connection therewith.

9.      Various sections of the Fourth Amendment amended or deleted certain of the various restrictions and conditions that sections of the Third Amendment placed on first lien debt that Yucaipa might acquire. The Fourth Amendment permitted Yucaipa to acquire and accept assignment of Allied Holdings' first lien debt (including terms loans and amounts deposited to support letters of credit issued for the benefit of Allied Holdings) and to become Requisite Lender under the First Lien Credit Agreement. (*See, e.g.*, 4A §§ 2.1(b), 2.4(e).)

**C.      Yucaipa Reasonably And Detrimentally Relied On The Validity Of The Fourth Amendment In Acquiring Claims Under The First Lien Credit Agreement**

10.      In reasonable reliance on the validity of the Fourth Amendment, on August 21, 2009 – again, approximately 15 months after the Third Amendment became effective – Yucaipa

acquired the first lien debt then held by ComVest, which constituted more than fifty percent of all of Allied Holdings' first lien debt, making Yucaipa "Requisite Lender." The actual holdings Yucaipa acquired consisted of $114,712,088.66 of Term Loans and $30,400,458.40 of LC Commitments (*i.e.* deposits to support letter of credit), totaling $145,112,547.06 of the $265,000,000 maximum first lien loans authorized by the First Lien Credit Agreement. As noted, the Special Committee approved the Fourth Amendment, and Allied Holdings was represented by independent outside counsel in connection with the Fourth Amendment.

11. Yucaipa would not have purchased any portion of Allied Holdings' first lien debt, much less ComVest's complete holdings, if it understood that any portion of the Fourth Amendment was invalid. In this regard, Yucaipa received and reasonably relied upon the legal opinion of Allied Holdings' counsel that the Fourth Amendment was enforceable against Allied Holdings. In addition, the other Lenders under the First Lien Credit Agreement were aware of Yucaipa's intent to purchase claims following the Fourth Amendment yet never raised a timely objection to that purchase. Yucaipa reasonably (and, in light of the New York State Court's oral ruling, detrimentally) relied on these and other facts and actions, and on the validity of the Fourth Amendment, in acquiring ComVest's majority stake in Allied Holdings' first lien debt.

12. On or about December 9, 2011, Yucaipa directed CIT as Administrative Agent pursuant to the Settlement Agreement (as defined below) to terminate the LC Commitments. This termination resulted in $16,928,474.40 of deposits that had been made to support the letters of credit being released to the Lenders under the First Lien Credit Agreement. Each of the Lenders that then had an LC Commitment outstanding received its pro rata portion of the funds that were released. None of the Petitioning Creditors or other Lenders complained about this termination, Yucaipa's authority in regard thereto, or Yucaipa's acquisition of first lien debt

from ComVest under the Fourth Amendment, and each accepted its pro rata share of the released funds.

13.     As described in further detail below, however, the Petitioning Creditors caused CIT, the Administrative Agent for all Lenders under the First Lien Credit Agreement, to litigate the validity of the Fourth Amendment and Yucaipa's Requisite Lender status in Georgia State Court for approximately two years.  However, CIT, Allied and Yucaipa settled that action on December 5, 2011 and CIT dismissed with prejudice all claims it brought in its individual and representative capacities on December 7, 2011.  Then, in January 2012 – nearly two and a half years after execution of the Fourth Amendment and a month after their Agent dismissed all claims it litigated on their behalves in Georgia – the Petitioning Creditors filed suit against Yucaipa in New York State Court (the "New York Action").  The Petitioning Creditors' sole claim in the New York Action seeks, *inter alia*, a judicial declaration that the Fourth Amendment is null and void and that, consequently, Yucaipa is not the Requisite Lender under the First Lien Credit Agreement.

14.     On November 19, 2012, more than three years after execution of the Fourth Amendment, the Court in the New York Action held a hearing on the Petitioning Creditors' motion for summary judgment.  The Court in the New York Action indicated at oral argument that it would approve the Petitioning Creditors' motion for summary judgment.  That Court has not yet issued a written order (which is required for an order to be effective under applicable state law), and Yucaipa intends to take an appeal of any written order.  Moreover, as illustrated by the issues raised below, the impact of the New York State Court's anticipated ruling on the parties' rights and the Debtors' chapter 11 cases is far from clear, but must be resolved

efficiently in order for the Debtors to preserve value for creditors and exit from chapter 11
protection as a going concern.

15.     Though the New York Court has not yet issued an order nor entered a judgment
thereon, the Petitioning Creditors have notified the Debtors that the Petitioning Creditors now
deem themselves "Requisite Lender" under the First Lien Credit Agreement.  The Petitioning
Creditors also executed that certain Appointment Agreement dated as of December 3, 2012 (the
"Purported Appointment Agreement"), by and among the Petitioning Creditors and American
Money Management Corporation, purporting to appoint affiliates of the Petitioning Creditors,
Black Diamond Commercial Finance, L.L.C. and Spectrum Commercial Finance LLC, as
successor administrative and collateral agents pursuant to the First Lien Credit Agreement.  As
noted, Yucaipa intends to appeal the New York State Court's decision once judgment is entered,
and disputes the foregoing creditors' right to act as "Requisite Lender" or to appoint successor
agents under the First Lien Credit Agreement.

**D.     This Court Should Resolve Issues Associated With The Third Amendment Because
        It Is The Only Court Capable Of Resolving The Core Issues Present Herein,
        Binding All Parties And Expediting The Debtors' Exit From These Cases**

16.     As a result of the foregoing, and assuming the broadest possible written order
affirming the Petitioning Creditors' motion for summary judgment in the New York Action, *the
instant case faces the following issues critical to the determination of how the bankruptcy cases
will be resolved, claims administered and proceeds of any asset sales will be distributed – each
of which requires resolution by this Court*:

        a.     Yucaipa reasonably and detrimentally relied on the effectiveness of the
Fourth Amendment.  Yucaipa never would have acquired first lien debt holdings, and indeed
prior to the Fourth Amendment was not permitted to and chose not to purchase the first lien debt

holdings that Yucaipa ultimately purchased. Moreover, Yucaipa was not – and still is not – a signatory to the Third Amendment and never intended to purchase any debt claims that would make it bound by the Third Amendment's provisions; in fact, although Yucaipa was permitted to do so, Yucaipa decided not to purchase any first lien holdings that would be subject to the limitations of the Third Amendment. Certain parties to this adversary proceeding and the bankruptcy case, however, have raised the issue of whether Yucaipa is bound by the Third Amendment. The resolution of this issue is critical to the outcome of and distributions in these bankruptcy cases, including, without limitation, a determination of how and whether first lien claims can be contributed as consideration in any asset sale under Section 363 of the Bankruptcy Code;

        b.  if Yucaipa is somehow bound by the Third Amendment, Yucaipa asserts that the other first lien Lenders would reap a windfall and be unjustly enriched if Yucaipa were forced to convert any of its debt to capital or be prevented from voting its debt. Yucaipa never executed the Third Amendment, did not act pursuant to or under the Third Amendment, and would be inequitably harmed if it were now retroactively bound by its terms. Moreover, the Debtors and other Lenders, including the Petitioning Creditors are now estopped from enforcing the Third Amendment against Yucaipa because, among other reasons, they were aware of, and made no effort to oppose, the passage of the Fourth Amendment or Yucaipa's acquisition of first lien debt pursuant thereto. Accordingly, it would be inequitable to enforce retroactively the Third Amendment's provisions on the indisputably valid first lien debt that Yucaipa acquired in reasonable reliance on the Fourth Amendment;

        c.  depending on the rationale of the written summary judgment order in the New York Action, there may be grounds to invalidate and/or sever certain additional provisions

in the First Lien Credit Agreement and the applicable amendments restricting Yucaipa's rights; and

        d.  Yucaipa contends that even if the Third Amendment is somehow applicable, (i) the other Lenders under the Third Amendment will have only a breach of contract claim for potential damages against ComVest for purported breach of the Third Amendment in connection with ComVest's sale of its debt position under the First Lien Credit Agreement to Yucaipa and (ii) such breach of contract claim, if any, should be the exclusive remedy for such Lenders.

        17.  As evidenced by the Purported Appointment Agreement, the Petitioning Creditors have demanded that the Debtors recognize the Petitioning Creditors as "Requisite Lender" after giving effect to the Third Amendment and have sought to install their affiliates as successor "Administrative Agent" and "Collateral Agent." Such recognition and installation of their agents could give the Petitioning Creditors the right to effectuate a credit bid and exercise other remedies to the detriment of Yucaipa. Yucaipa disputes the Petitioning Creditors' status as Requisite Lender and right to appoint successor administrative or collateral agents under the terms of the First Lien Credit Agreement.

        18.  Additionally, the Petitioning Creditors along with other Lenders claim of "Requisite Lender" status also unjustly enriches such Lenders; they are now estopped from asserting and acting upon such status. The Petitioning Creditors acquired a minority position in the first lien debt and should not be allowed to dramatically increase their voting rights and distributions years after the fact by depriving Yucaipa of the benefit of its bargain pursuant to the Fourth Amendment on which it reasonably relied; Yucaipa's only acquisition of the first lien debt was of a majority of such indebtedness, in reasonable reliance upon the Fourth Amendment

that enabled Yucaipa to act as Requisite Lender. Again, Yucaipa would not have purchased any

of the first lien debt had it known that it could be subject to the decisions of other Lenders, and

the other Lenders are now estopped from taking any actions that would purport to credit bid or

otherwise impact Yucaipa's first lien debt holdings.

19.     The resolution of these disputes is central to the parties' respective rights to credit

bid or otherwise participate in a sale process. Further, without an expedited resolution of these

issues by this Court, the Debtors will be hamstrung by piecemeal litigation over the various

parties' rights, including the amount of Yucaipa's claims, which Lender can cause a credit bid

under the First Lien Credit Agreement and contribute claims as consideration in a section 363

sale, and how the Debtors' assets should be distributed to creditors. Accordingly, Yucaipa

respectfully requests that this Court determine these issues so as to facilitate the Debtors'

expeditious exit from these chapter 11 cases.

## JURISDICTION AND VENUE

20.     This adversary proceeding was initiated pursuant to Rule 7001 of the Federal

Rules of Bankruptcy Procedure.

21.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 157 and 1334 and 11 U.S.C. § 105.

22.     This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. §

157, which implicates matters within this Court's exclusive jurisdiction under 28 U.S.C. § 1334.

23.     Venue of this adversary proceeding is proper in this Court pursuant to 28 U.S.C. §

1409 as this adversary proceeding arises in or relates to the chapter 11 case of the Debtors,

pending in the United States Bankruptcy Court for the District of Delaware under the jointly

administered case number 12-11564, and implicates matters arising under title 11 of the United States Code.

## PARTIES

24.    Counterclaim-plaintiffs and cross-claim-plaintiffs Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP (together, "Yucaipa Fund I") are limited partnerships organized under the laws of the State of Delaware, with their headquarters located at 9130 West Sunset Boulevard, Los Angeles, CA 90069. Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP are Lenders under the First Lien Credit Agreement. Allied Holdings did not name Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP as defendants in its adversary proceeding complaint.

25.    Yucaipa American Alliance Fund II, LP and Yucaipa American Alliance (Parallel) Fund II, LP (together, "Yucaipa Fund II") are limited partnerships organized under the laws of the State of Delaware, with their headquarters located at 9130 West Sunset Boulevard, Los Angeles, CA 90069. Yucaipa American Alliance Fund II, LP and Yucaipa American Alliance (Parallel) Fund II, LP are not Lenders under the First Lien Credit Agreement; Yucaipa believes such entities were named in error in Debtor's Complaint.

26.    Allied Holdings is a Debtor in this bankruptcy case and is a party to all of the contracts at issue in this adversary proceeding.

27.    On information and belief, American Money Management Corp. is an Ohio corporation who may be served through its registered agent, CT Corporation System, at 1300 East Ninth Street, Cleveland, Ohio 44114. On information and belief, American Money Management Corp. is a Lender under the First Lien Credit Agreement.

28.     On information and belief, Avenue Capital Group is a Delaware corporation who may be served through its registered agent, National Corporation Research, Ltd., at 615 S. Dupont Hwy., Dover, Delaware 19901. On information and belief, Avenue Capital Group is a Lender under the First Lien Credit Agreement.

29.     On information and belief, BDCM Opportunity Fund II, LP is a Delaware limited partnership who may be served through its registered agent, Corporate Trust Center, at 1209 Orange Street, Wilmington, Delaware 19801. On information and belief, BDCM Opportunity, Fund II, LP is a Lender under the First Lien Credit Agreement.

30.     On information and belief, Bennett Management is a Connecticut corporation who may be served through its registered agent, CT Corporation System, at One Corporation Center, Hartford, Connecticut 06103. On information and belief, Bennett Management is a Lender under the First Lien Credit Agreement.

31.     On information and belief, Black Diamond CLO 2005-1 Ltd. is a Cayman Island company who may be served through its registered agent, MaplesFS Limited, at P.O. Box 1093, Queensgate House, 113 South Church Street, Cayman Islands. On information and belief, Black Diamond CLO 2005-1 Ltd. is a Lender under the First Lien Credit Agreement. (Black Diamond CLO 2005-1 Ltd. and BDCM Opportunity Fund II, LP are collectively referred to herein as "Black Diamond".)

32.     On information and belief, Del Mar Distressed Opportunities Master Fund is a Cayman Island company who may be served through the registered agent for Del Mar Asset Management, LP, National Corporation Research, Ltd., at 615 S Dupont Hwy., Dover, Delaware 19901. On information and belief, Del Mar Distressed Opportunities Master Fund is a Lender under the First Lien Credit Agreement.

33.     On information and belief, MJX Asset Management, LLC is a Delaware limited liability company who may be served through its registered agent, Corporation Service Company, at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. On information and belief, MJX Asset Management, LLC is a Lender under the First Lien Credit Agreement.

34.     On information and belief, Par-Four Investment Management is a New Jersey corporation who may be served through its registered agent at 50 Tice Blvd., Woodcliff Lake, New Jersey 07677. On information and belief, Par-Four Investment Management is a Lender under the First Lien Credit Agreement.

35.     On information and belief, Spectrum Investment Partners LP is a Delaware partnership who may be served through its registered agent, Corporation Trust Company, at Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801. On information and belief, Spectrum Investment Partners LP is a Lender under the First Lien Credit Agreement. (Spectrum Investment Partners LP and Black Diamond shall collectively be referred to herein as "Petitioning Creditors".)

36.     On information and belief, Teak Hill-Credit Capital Investments, LLC is a Delaware corporation who may be served through its registered agent, Corporation Service Company, at 2711 Centerville Rd., Ste. 400, Wilmington, Delaware 19808. On information and belief, Teak Hill-Credit Capital Investments, LLC is a Lender under the First Lien Credit Agreement.

37.     On information and belief, The CIT Group/Business Credit, Inc. ("CIT") is a Delaware corporation who may be served through its registered agent, Corporation Trust Company, at Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801. On information and belief, CIT is a Lender under the First Lien Credit Agreement. Although CIT

has entered into a settlement agreement with Allied Holdings and Yucaipa that resolves most, it not all of the issues about which Yucaipa seeks a declaration here, Yucaipa joins CIT as a cross-claim defendant in an abundance of caution to ensure that all first lien Lenders are bound by the results in this action.

38.     The Creditors' Committee can be served by its counsel of record in these cases, Michael G. Burke, Esq., Sidley Austin, LLP, 787 Seventh Ave., New York, New York 10019. The Creditors' Committee is not a party to the First Lien Credit Agreement, but, on information and belief, it has reserved the right to assert claims against Yucaipa that may be impacted by the declaratory relief Yucaipa seeks herein.

**STATEMENT OF ADDITIONAL FACTS RELEVANT TO YUCAIPA'S COUNTERCLAIMS AND CROSS-CLAIMS**

**A.     First Lien Credit Agreement**

39.     Allied Holdings, as borrower, and certain of its affiliates and subsidiaries, as guarantors, entered into the First Lien Credit Agreement on May 15, 2007.

40.      The First Lien Credit Agreement provides that a Lender or group of Lenders thereunder collectively holding more than 50% of the sum of the aggregate of all of the outstanding first lien loans constitutes the "Requisite Lender" or "Requisite Lenders" with certain powers, among other powers, to direct the Administrative and Collateral Agents under the First Lien Credit Agreement to take certain actions on behalf of all the Lenders.

41.     Section 10.5(a) of the First Lien Credit Agreement states:

> Subject to the additional requirements of Sections 10.5(b) and 10.5(c), no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of the Requisite Lenders . . . .

42.     Sections 10.5(b) and 10.5(c) of the First Lien Credit Agreement prohibit certain amendments, modifications, terminations or waivers without other parties' consent.  Those sections state in full:

(b)     <u>Affected Lenders' Consent</u>.  Without the written consent of each Lender (other than a Defaulting Lender) that would be affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i)     extend the scheduled final maturity of any Loan or Note;

(ii)     waive, reduce or postpone any scheduled repayment (but not prepayment);

(iii)     extend the stated expiration date of any Letter of Credit beyond the LC Commitment Termination Date;

(iv)     extend the date on which any LC Deposit is required to be made by, or returned to, any LC Lender.

(v)     reduce the rate of interest on any Loan (other than any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.10) or any fee or any premium payable hereunder;

(vi)     extend the time for payment of any such interest or fees;

(vii)     reduce the principal amount of any Loan or any reimbursement obligation in respect of any Letter of Credit;

(viii)     amend, modify, terminate or waive any provision of Section 2.13(b)(iii), this Section 10.5(b), Section 10.5(c) or any other provision of this Agreement that expressly provides that the consent of all Lenders is required;

(ix)     amend the definition of **"Requisite Lenders"** or **"Pro Rata Share"**; <u>provided</u>, with the consent of Requisite Lenders, additional extensions of credit pursuant hereto may be included in the determination of **"Requisite Lenders"** or **"Pro Rata Share"** on substantially the same basis as the Term Loan Commitments, the Term Loans, the LC Commitments, the LC Deposits, the Revolving Commitments and the Revolving Loans are included on the Closing Date;

(x)     release all or substantially all of the Collateral or all or substantially all of the Guarantors from the Guaranty except as expressly provided in the Credit Documents; or

(xi)     consent to the assignment or transfer by any Credit Party of any of its rights and obligations under any Credit Document.

(c)     <u>Other Consents</u>.  No amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall:

(i)     increase any Commitment of any Lender over the amount thereof then in effect without the consent of such Lender; provided, no amendment, modification or waiver of any condition precedent, covenant, Default or Event of Default shall constitute an increase in any Commitment of any Lender;

(ii)    amend, modify, terminate or waive any provision hereof relating to the Swing Line Sublimit or the Swing Line Loans without the consent of Swing Line Lender;

(iii)   alter the required application of any repayments or prepayments as between Classes pursuant to Section 2.15 without the consent of Lenders holding more than 50% of the aggregate Term Loan Exposure of all Lenders, LC Exposure of all Lenders or Revolving Exposure of all Lenders, as applicable, of each Class which is being allocated a lesser repayment or prepayment as a result thereof; provided, Requisite Lenders may waive, in whole or in part, any prepayment so long as the application, as between Classes, of any portion of such prepayment which is still required to be made is not altered;

(iv)    amend, modify, terminate or waive any provision of Section 2.4 or this Section 10.5(c)(iv) without the written consent of Administrative Agent (including any Person acting as Administrative Agent under Section 2.4 pursuant to the last sentence of Section 9.7);

(v)     amend, modify, terminate or waive any provision of Section 2.16(h) without the written consent of one or more Lenders having or holding Revolving Exposure and representing more than 50% of the sum of the aggregate Revolving Exposure of all Lenders;

(vi)    amend, modify or waive this Agreement or the Pledge and Security Agreement so as to alter the ratable treatment of Obligations arising under the Credit Documents and Obligations arising under Hedge Agreements or the definition of "**Lender Counterparty**," "**Hedge Agreement**," "**Obligations**," or "**Secured Obligations**" in each case in a manner adverse to any Lender Counterparty with Obligations then outstanding without the written consent of any such Lender Counterparty;

(vii)   amend, modify, terminate or waive any provision of Section 9 as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case without the consent of such Agent;

(viii)  amend, modify, terminate or waive any provision of Section 2.24, 4.25, 6.15, or 6.21, without the written consent of each Lender;

(ix)    amend, modify, terminate or waive any provision of Section 3.4 that provides for the satisfaction of Administrative Agent with any conditions set forth therein, without the written consent of Administrative Agent; or

(x)     amend, modify, terminate or waive any provision of the Intercreditor Agreement without the consent of Lenders holding more than 50% of the aggregate Revolving Exposure of all Lenders if any such amendment, modification, termination or waiver would have, as among all Classes, a

disproportionately adverse effect on the rights under this Agreement or any other Credit Document of Lenders holding Revolving Exposure.

43.     The First Lien Credit Agreement contains a severability provision:

In case any provision in or obligation hereunder or under any other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(CA § 10.11.) The First Lien Credit Agreement also contains a clause which states that the parties' various respective obligations thereunder are independent covenants and not conditions, stating: "All covenants hereunder shall be given independent effect . . . ." (*See* CA § 10.7.)

44.     Yucaipa was not a Lender under the original First Lien Credit Agreement.

**B.     The Third Amendment**

45.     In early 2008, a number of Lenders were concerned about the state of the automotive industry and were looking for strategies to exit their positions in the Allied Holdings debt. Some of these Lenders expressed interest in potentially selling their debt positions to Yucaipa but recognized that doing so would potentially constitute a default under the First Lien Credit Agreement without an amendment to its terms. To facilitate such potential sales, the Lenders held discussions with Allied Holdings about potentially amending the First Lien Credit Agreement to allow Yucaipa to be an "Eligible Assignee" under that document's terms.

46.     In April 2008, CIT, as Administrative Agent, coordinated passage of the Third Amendment. The Third Amendment was enacted with Requisite Lender consent, not unanimous consent. (*See* 3A § 4(a).) Yucaipa was not a signatory to the Third Amendment.

47.     Sections 2.1(c) and 2.7(e) of the Third Amendment permitted Lenders to sell or assign to Yucaipa Allied Holdings' first lien debt by amending the term "Eligible Assignee" in the First Lien Credit Agreement. (3A § 2.1(c); *see also* 3A § 2.7(e) (each "Lender hereby

acknowledges that [Yucaipa] may be a Lender (provided [Yucaipa] otherwise satisfies the criteria of the definition of the term of 'Eligible Assignee')").) It is undisputed that unanimous consent was not required to amend the term "Eligible Assignee" in the Third Amendment. (*See* 3A § 4(a).)

48.     The Third Amendment contained several amendments to the First Lien Credit Agreement's terms, including several restrictions and conditions on any first lien debt that Yucaipa might acquire. First, Section 2.7(e) purported to require Yucaipa to make a capital contribution of at least 50% of any Term Loans it acquired. (3A § 2.7(e).)[3] Second, Section 2.7 and Section 2.7(e) at (j)(i) purported to cap the amount of first lien debt that Lenders could assign to Yucaipa to the lesser of (A) "25% of the aggregate principal amount of the Term Loan

---

[3]     3A § 2.7(e) states in relevant part:

Each Lender that is a Restricted Sponsor Affiliate [Yucaipa], upon succeeding to an interest in the Term Loans: ... (iii) agrees further that no later than ten days after the date of such assignment or transfer of such Term Loans ..., such Restricted Sponsor Affiliate shall make a capital contribution to Borrowers of no less than 50% of the aggregate principal amount of such Term Loans in accordance with Section 10.6(k).

Section 10.6(k) (as defined at 3A § 2.7(f)), in turn, states:

(k) <u>Contribution of Term Loans to Borrowers; Cancellation of Debt</u>.
     (i)     The Restricted Sponsor Affiliates, from time to time, intend to make capital contributions of their Term Loans to Borrowers.
     (ii)     Notwithstanding anything to the contrary herein, a Restricted Sponsor Affiliate may at any time make a capital contribution of its Term Loans to Borrowers in exchange for Equity Interests of Holdings (other than Disqualified Equity Interests) upon no less than five Business Days' prior written notice to Administrative Agent and Lenders. Such Restricted Sponsor Affiliate and Borrowers shall promptly provide all information and data reasonably requested by Administrative Agent in connection with such capital contribution.
     (iii)     Immediately upon a Borrower's acquisition of Term Loans from a Restricted Sponsor Affiliate, (x) *such Term Loans* and all rights and obligations as a Lender related thereto *shall for all purposes (including under this Agreement, the other Credit Documents and otherwise) be deemed to be irrevocably prepaid, terminated, extinguished, cancelled and of no further force and effect* and such Borrower shall neither obtain nor have any rights as a Lender hereunder or under the other Credit Documents by virtue of such capital contribution and (y) such Borrower shall deliver to Administrative Agent a written acknowledgement and agreement executed by an Authorized Officer and in form and substance reasonably acceptable to Administrative Agent acknowledging the irrevocable prepayment, termination, extinguishment and cancellation of such Term Loans and confirming that such Borrower has no rights as a Lender under the Credit Documents or otherwise. . . .

(3A § 2.7(f) (italicized emphasis added).)

Exposure held or beneficially owned by all Lenders (including [Yucaipa]) or (B) after giving

effect to such assignment or transfer, the aggregate amount of Term Loans acquired by

[Yucaipa] since the Closing Date would exceed $50 million (notwithstanding whether all or any

portion of such acquired Term Loans have been contributed to Borrowers or otherwise disposed

of by [Yucaipa])." (3A § 2.7(c); *see also* 3A § 2.7(e) at (j)(i).) Third, sections of the Third

Amendment purported to limit the voting rights associated with any Term Loans Yucaipa might

acquire. For example, Section 2.1(e) changed the term "Term Loan Exposure" ("TLE") by

adding language that would disregard any Term Loans Yucaipa might acquire from any

provisions "relating to the voting rights of Lenders" under the First Lien Credit Agreement. (3A

§ 2.1(e).) Specifically, that section modified the TLE language contained in the original First

Lien Credit Agreement by adding the emphasized clause below:

> "Term Loan Exposure" means, with respect to any Lender, as of any date of
> determination, the outstanding principal amount of the Term Loans of such
> Lender plus during the Term Loan Commitment Period, the unfunded Term Loan
> Commitment of such Lender; provided, at any time prior to the making of the
> initial Term Loans, the Term Loan Exposure of any Lender shall be equal to such
> Lender's Term Loan Commitment; *provided further that with respect to any*
> *provisions of this Agreement relating to the voting rights of Lenders (including*
> *the right of Lenders to consent or take any other action with respect to any*
> *amendment, modification, termination or waiver of any provision of this*
> *Agreement or the other Credit Documents, or consent to any departure by any*
> *Credit Party therefrom), the aggregate outstanding principal amount of the Term*
> *Loans of all Restricted Sponsor Affiliates[4] shall be disregarded for purposes of*
> *this definition of "Term Loan Exposure".*

(*Id.* (emphasis added); *see also* 3A § 2.7(a) (any voting rights Yucaipa might acquire would

purportedly be assigned to the other Lenders, whose own voting rights would "be automatically

ratably increased" by such assignment).)

      49. The Third Amendment also contains a severability clause, which states:

---

[4] Yucaipa was defined to be a Restricted Sponsor Affiliate in the Third Amendment.

> In case any provision in or obligation hereunder shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(3A § 7.2.)

50. Yucaipa did not make any first lien purchases while the Third Amendment was in effect prior to the enactment of the Fourth Amendment, which is discussed below. Yucaipa never would have acquired any first lien debt while the Third Amendment's restrictions and conditions limiting Yucaipa's potential ownership rights existed.

**C. Lenders Seek To Sell To Yucaipa, Remove Third Amendment Restrictions**

51. In December 2008, with the automotive industry in serious decline, Lenders holding a majority of Allied Holdings' first lien debt sought to exit their positions but faced an extremely limited market of buyers for such debt. Such Lenders sought to sell their positions to Yucaipa pursuant to the Third Amendment, but Yucaipa made clear to those Lenders that it would buy the Lenders' positions only if certain Third Amendment terms related to Yucaipa's potential acquisitions were amended and Yucaipa could serve as the Requisite Lender on its own.

52. On February 4, 2009, Yucaipa submitted a written tender offer (the "Tender Offer") by email to all Lenders, including Petitioning Creditors, (the "February 4 Email"). The Tender Offer package included Allied Holdings' proposed fourth amendment to the Credit Agreement (the "Proposed Fourth Amendment") that would have amended the Third Amendment's terms to eliminate any limits on the amount of Term Loans and LC Deposits Yucaipa could purchase, permitted Yucaipa to acquire a majority of Allied Holdings' first-lien debt, and permitted Yucaipa to become the Requisite Lender, among other changes. The February 4 Email shows that the Tender Offer documents, including the Proposed Fourth

23

Amendment, were sent to Richard Ehrlich of Black Diamond and Jeffrey Schaffer and Jeff
Buller of Spectrum, among other representatives for all Lenders. Although some of the Proposed
Fourth Amendment's terms varied from the Fourth Amendment that ComVest enacted on
August 21, 2009, the two documents were materially similar, and their definitions of "Term
Loan Exposure" were identical.

53.     On February 11, 2009, Yucaipa offered to extend the deadline for responses to the
Tender Offer in an email that was sent to all Lenders, including Richard Ehrlich of Black
Diamond and Jeffrey Schaffer and Jeff Buller of Spectrum, among others.

54.     No Lender took any steps to demonstrate opposition to any aspect of Yucaipa's
Tender Offer or the Proposed Fourth Amendment. Petitioning Creditors never informed Yucaipa
that the changes in the Proposed Fourth Amendment would violate the letter or the spirit of the
First Lien Credit Agreement, and never stated that such changes could be made only with their
consent. Yucaipa specifically and detrimentally relied on the Lenders' lack of any objection to
the Proposed Fourth Amendment when it later acquired a majority of Allied Holdings' first lien
debt in reliance on the validity of the Fourth Amendment that ComVest and Allied Holdings
enacted on August 21, 2009.

55.     At approximately the same time in February 2009, ComVest acquired the
majority of Allied Holdings' first lien debt, including a majority of both the First Lien Term
Loans and LC Commitments from Allied Holdings' then-existing Lenders. Shortly thereafter,
Yucaipa entered into direct negotiations with ComVest to acquire its Requisite Lender position.
These negotiations played out over several months and involved different proposals, but every
one of them contemplated ComVest enacting certain amendments to the Third Amendment's

terms, Yucaipa acquiring ComVest's majority position in Allied Holdings' first-lien debt, and Yucaipa becoming the Requisite Lender.

56.     During the time Yucaipa and ComVest were negotiating over Yucaipa's purchase of Allied Holdings' first lien debt held by ComVest, Richard Ehrlich of Black Diamond called Yucaipa several times to inquire about the status of the negotiations. Yucaipa told Mr. Ehrlich, and he was fully aware throughout the summer of 2009, that Yucaipa intended to acquire ComVest's majority position in Allied Holdings' first lien debt and become the Requisite Lender. Black Diamond not only understood Yucaipa's intentions and did not object, but went further, proposing to join with Yucaipa in transactions to gain total control of Allied Holdings' assets, to the detriment of all other Lenders. During calls with Mr. Ehrlich and during an August 18, 2009 in-person meeting between Mr. Deckoff of Black Diamond and two Yucaipa representatives, Black Diamond proposed a transaction whereby Black Diamond and Yucaipa would put Allied Holdings into bankruptcy and seek to purchase its assets at a low-ball price. Under Black Diamond's plan, Black Diamond and Yucaipa would jointly make a new loan to Allied Holdings to fund its bankruptcy, which would be structured as bankruptcy debtor-in-possession financing. Black Diamond assumed that Allied Holdings would be unable to repay that loan, and therefore Black Diamond could foreclose on Allied Holdings' assets without providing any recovery to the rest of Allied Holdings' Lenders. Black Diamond advised Yucaipa that it was willing to write off its investment in the first lien debt in the bankruptcy because it held so little debt and had only paid $0.15 on the dollar for that debt. It further advised that its plan would provide a larger profit to Yucaipa than buying ComVest's position in Allied Holdings' first lien debt would provide. Yucaipa rejected Black Diamond's proposal. During Mr. Ehrlich's calls with Yucaipa and during Mr. Deckoff's meeting with Yucaipa, Black

Diamond never expressed any opposition to any aspect of Yucaipa's plan to become Requisite Lender.

## D.   The Fourth Amendment

57.    On August 21, 2009, Allied Holdings and ComVest, as the Requisite Lender under the First Lien Credit Agreement, executed the Fourth Amendment. Allied Holdings' Special Committee – consisting of the Allied Holdings board members who were independent of Yucaipa –reviewed and voted to approve the Fourth Amendment after being advised by outside counsel. Yucaipa (along with the first lien Lenders) also was provided with a written legal opinion from Allied Holdings' counsel in connection with the Fourth Amendment's enactment.

58.    Various sections of the Fourth Amendment amended or deleted certain of the various restrictions and conditions that sections of the Third Amendment placed on first lien debt that Yucaipa might acquire, as described above. The Fourth Amendment permitted Yucaipa to acquire and accept assignment of Allied Holdings' first lien debt and become Requisite Lender under the First Lien Credit Agreement. (*See, e.g.,* 4A §§ 2.1(b), 2.4(e).)

59.    Among its changes, Section 2.1(b) of the Fourth Amendment modified the language of "Term Loan Exposure" by deleting the language added by the Third Amendment. That section thereby restored the "Term Loan Exposure" language to its condition as it existed in the First Lien Credit Agreement prior to the Third Amendment's enactment:

> "Term Loan Exposure" means, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender plus during the Term Loan Commitment Period, the unfunded Term Loan Commitment of such Lender; provided, at any time prior to the making of the initial Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Term Loan Commitment.

(4A § 2.1(b) (emphasis in original); *compare id. and* CA § 1.1 ("Term Loan Exposure" language) *with* 3A § 2.1(e).)

60.     The Fourth Amendment also contains a severability clause with wording identical to the severability clause contained in the Third Amendment. (4A § 6.2; *see* 3A § 7.2.)

61.     In reliance on the validity of the Fourth Amendment, Yucaipa acquired all of ComVest's majority holdings of Allied Holdings' first lien debt on August 21, 2009. These holdings consisted of $114,712,088.66 of Term Loans and $30,400,458.40 of LC Commitments, totaling $145,112,547.06 of the $265,000,000 maximum first lien loans authorized by the First Lien Credit Agreement.

62.     Certain Lenders, including Black Diamond, knew in mid-August 2009 that Yucaipa was planning to acquire ComVest's Requisite Lender position, and did not express any objection whatsoever to Yucaipa. As noted above, Black Diamond and Yucaipa held an in-person meeting in Los Angeles on August 18, 2009 to discuss, among other things, Yucaipa's plan to acquire ComVest's Requisite Lender position. Yucaipa's acquisition of ComVest's position was discussed further during an August 19, 2009 conference call involving Black Diamond, Yucaipa and Yucaipa's counsel. During these communications, Black Diamond never objected in any way to Yucaipa's proposed acquisition, never expressed that it would not consent to Yucaipa becoming Requisite Lender, and never stated a belief that unanimous Lender consent was required for Yucaipa to acquire ComVest's position. To the contrary, Black Diamond acquiesced in Yucaipa's proposed plan.

63.     The following day, August 20, 2009, Mr. Ehrlich of Black Diamond followed up with Mr. Derex Walker of Yucaipa via email, asking, "What did you decide?" regarding "Allied." Understanding him to be asking if Yucaipa had decided to pursue Black Diamond's proposed transaction or to acquire ComVest's majority position in Allied Holdings' debt. Mr. Walker responded: "Haven't yet." On August 22, 2009, Mr. Walker advised Black Diamond,

through Mr. Ehrlich, by email that Yucaipa "did in fact take an assignment of the ComVest debt." Black Diamond did not object or express in any way that Yucaipa's acquisition was improper; instead, Mr. Ehrlich responded, "OK. Let me know a good time [to talk]." Even after the Fourth Amendment was passed and Yucaipa acquired ComVest's majority position – permitting Yucaipa to become Requisite Lender – Black Diamond did not object to Yucaipa.

64.    Mr. Walker of Yucaipa also contacted Jeff Schaffer of Spectrum on August 22, 2009, to inform him that Yucaipa had taken an assignment of ComVest's first lien loans. Mr. Schaffer responded to Mr. Walker's email on September 8, 2009, stating "I am back in the office this week. Please call me at your convenience so we can discuss next steps. Thanks, Jeff." Yucaipa also offered to meet in person with Mr. Schaffer later in September 2009, but he was not available. Even though Yucaipa attempted to open a line of communication with Mr. Schaffer, he never objected in any way to Yucaipa's acquisition, never expressed that the Fourth Amendment was invalid or that unanimous Lender consent was required for Yucaipa to acquire ComVest's position, and never questioned Yucaipa's Requisite Lender status to Yucaipa before his and Black Diamond's counsel sent a letter to the Lenders' Agent, CIT, on September 18, 2009, as discussed below.

65.    Yucaipa also contacted the Administrative Agent for all first lien Lenders, CIT, on or about August 22, 2009, to inform them that Yucaipa had taken an assignment of ComVest's first lien loans. Yucaipa had a series of phone calls with CIT representatives over the weeks that followed concerning Yucaipa's requests as Requisite Lender for CIT as Administrative Agent to resolve certain outstanding administrative issues. During those multiple calls, CIT never objected in any way to Yucaipa's acquisition, never expressed that the Fourth Amendment was invalid or that CIT's or all Lenders' consent was required for Yucaipa to

acquire ComVest's position, and never questioned Yucaipa's Requisite Lender status. In fact, CIT entered all of Yucaipa's loans on the Register in compliance with its duties as Administrative Agent under First Lien Credit Agreement Section 10.6(b) shortly after the Fourth Amendment was executed. As a result, all Lenders are bound by the Credit Agreement to "deem and treat the Persons listed as Lenders in the Register [including Yucaipa] as the holders and owners of the corresponding Commitments, LC Deposits and Loans listed therein for all purposes hereof [of the Credit Agreement]." (First Lien Credit Agreement Section 10.6(b).)

66. Yucaipa would not have purchased any portion of Allied Holdings' first lien debt, much less ComVest's stake, if it understood that any portion of the Fourth Amendment were invalid or that any Lender contended that Yucaipa could not acquire a majority of Allied Holdings' first lien debt , or that the Fourth Amendment was invalid, without unanimous Lender consent. Yucaipa specifically and detrimentally relied on the Lenders' lack of any objection to its plan to acquire a majority of Allied Holdings' first lien debt in going forward with that transaction.

**E.      The Georgia Litigation**

67. Approximately a month after Yucaipa acquired ComVest's majority position – with Petitioning Creditors' full knowledge and without any objection from Petitioning Creditors – Petitioning Creditors changed course and expressly instructed CIT, as Administrative Agent for all Lenders, to challenge the validity of the Fourth Amendment by letter dated September 18, 2009. In that letter, Petitioning Creditors instructed CIT "that the Agent should refuse to acknowledge the purported direction delivered by [Yucaipa as Requisite Lender]" based on their "doubts about the validity of the assignment of the Loans to [Yucaipa] and their entitlement to act as Requisite Lenders under the [First Lien] Credit Agreement."

68.     CIT, as Administrative Agent for all Lenders, pressed Petitioning Creditors'
dispute with Yucaipa.  In response to that pressure, on November 21, 2009, Yucaipa and Allied
filed suit in Georgia seeking a declaration that the Fourth Amendment was valid and enforceable
and that Yucaipa is the Requisite Lender (the "Georgia Complaint").  In the Georgia Complaint,
Yucaipa and Allied expressly asserted certain claims against CIT in its capacity as
Administrative Agent.

69.     CIT brought a counterclaim in both its representative capacity as Administrative
Agent and in its individual capacity as a Lender (the "CIT Counterclaim").  (The litigation
related to the Georgia Complaint and the CIT Counterclaim is referred to herein as the "Georgia
Action").  The CIT Counterclaim included a declaratory judgment claim, which CIT asserted in
its representative capacity as Administrative Agent for all Lenders, that the Fourth Amendment
was ineffective and that Yucaipa was not the Requisite Lender.

70.     Petitioning Creditors participated in the Georgia Action: they produced
documents in response to subpoenas, made themselves available for deposition, and
communicated with both CIT, their Agent, and Yucaipa about the proceedings.

71.     On December 5, 2011, after more than two years of litigation, CIT, Yucaipa and
Allied executed a settlement agreement in the Georgia Action (the "Settlement Agreement").
Among other things, the Settlement Agreement expressly stated that the parties "will dismiss
their respective claims in the Action with prejudice upon the execution of this Agreement." CIT
entered the Settlement Agreement in both its representative capacity as Administrative Agent
and in its individual capacity as a Lender.  Among other things, CIT bound itself in the
Settlement Agreement to various obligations as Administrative Agent and Collateral Agent
under the First Lien Credit Agreement's first lien facility.

72. On December 7, 2011, the parties to the Georgia Action filed mutual dismissals with prejudice of all of their claims (the "Dismissals with Prejudice"). In the Dismissals with Prejudice, "Defendant and Counterclaim-Plaintiff The CIT Group/Business Credit Inc." expressly stated that it was dismissing "all claims it asserted in its Verified Answer and Counterclaims," including the claim CIT asserted in its role as Administrative Agent for all Lenders to invalidate the Fourth Amendment and declare that Yucaipa was not the Requisite Lender.

73. Prior to the settlement of the Georgia Action, Petitioning Creditors were fully aware that settlement negotiations were ongoing between Yucaipa, Allied and CIT from approximately May 2011 until December 2011. All Lenders became aware of the settlement on December 5, 2011 when CIT posted it to IntraLinks, but no Lender objected to the settlement between December 5, 2011 and the entry of the Dismissals with Prejudice on December 7, 2011.

74. Yucaipa intended for CIT to execute the Settlement Agreement and the Dismissals with Prejudice in both its representative capacity and in its individual capacity as a Lender, and Yucaipa understood that CIT did, in fact, act in both capacities in executing both documents.

75. Yucaipa understood that CIT served as Petitioning Creditors' agent in the Georgia Action, and that CIT was litigating on its own behalf and on behalf of all Lenders, including Petitioning Creditors, throughout the Georgia Action. In connection with the action described below between Petitioning Creditors and Yucaipa, Petitioning Creditors repeatedly and expressly admitted that CIT acted as their agent during the Georgia Action, including in a statement made under oath in an affidavit filed by one of Petitioning Creditor's principals, Richard Ehrlich.

**F.     The New York Litigation**

76.     On January 18, 2012, the Petitioning Creditors filed the New York Action against Yucaipa in the Supreme Court of the State of New York, Index No. 650150/2012.  Petitioning Creditors' sole claim in the New York Action seeks, *inter alia*, a judicial declaration that the Fourth Amendment is null and void and that, consequently, Yucaipa is not the Requisite Lender under the First Lien Credit Agreement.

77.     On August 27, 2012, before any discovery had been taken in the New York Action, Petitioning Creditors filed a motion for summary judgment on their declaratory judgment claim, arguing that the Fourth Amendment's change to the term "Term Loan Exposure" had the effect of changing the definition of Requisite Lender without all "affected" Lenders' consent in violation of First Lien Credit Agreement § 10.5(b)(ix).

78.     The New York Court heard oral argument on Petitioning Creditors' motion for summary judgment on November 19, 2012.  Although the New York Court has not yet issued its written order, at oral argument the Court expressed the intention to grant Petitioning Creditors' motion for summary judgment.

79.     Yucaipa disagrees with the New York Court's anticipated order and intends to take an appeal from it.  Yucaipa continues to contend that the Fourth Amendment's change to the definition of "Term Loan Exposure" did not effect a change to the definition of "Requisite Lender" and did not do so in a way that "affected" Petitioning Creditors.  Yucaipa also contends, even assuming, *arguendo*, that the Fourth Amendment provision's change to TLE was not passed with the required level of consent, that the New York Court should, consistent with the Fourth Amendment's severability clause, sever the purportedly offending "Term Loan Exposure" language from the remaining provisions of the Fourth Amendment, and should not invalidate the Fourth Amendment in its entirety.  Accordingly, the remainder of the Fourth

Amendment's provisions should remain fully effective.

**G.    Validity of Third Amendment's Restrictions and Conditions on Yucaipa's Acquisitions of First Lien Debt**

**1.    Enforcement of the Third Amendment's Restrictions Against Yucaipa Would Effectuate an Unjust Enrichment at Yucaipa's Expense**

80.     It would be manifestly inequitable, and result in an impermissible windfall unjustly enriching the other Lenders, if Yucaipa were to be held to the terms of the Third Amendment to which it never intended to be bound. As illustrated by the fact that Yucaipa decided not to purchase debt under the Third Amendment, Yucaipa would not have purchased any portion of Allied Holdings' first lien debt, much less a majority of this debt, if it understood that it would be bound by the Third Amendment, or if it understood that any portion of the Fourth Amendment was invalid.

81.     If the contribution provisions of the Third Amendment were enforced against Yucaipa – which were expressly removed by the Fourth Amendment on which Yucaipa reasonably relied – a significant amount of the otherwise indisputably valid first lien loans purchased by Yucaipa would be converted to capital, resulting in a windfall enhanced recovery to the other Lenders that they would have had absolutely no right to receive if the indebtedness purchased by Yucaipa was in the hands of any other entity.

82.     Moreover, despite the Petitioning Creditors' knowledge of the Fourth Amendment and Yucaipa's purchase of loans pursuant thereto before and at the time the Fourth Amendment was executed, the Petitioning Creditors sat on their hands and did not contest Yucaipa's acquisition of this debt or the Fourth Amendment. Yucaipa respectfully submits that to enforce retroactively the Third Amendment against Yucaipa would deprive Yucaipa of its legitimate expectations in purchasing the first lien debt it acquired pursuant to the Fourth Amendment and

would result in an unjust enrichment of the other Lenders at Yucaipa's expense, a result that should not be permitted under equity and in good conscience. Thus, Petitioning Creditors, other Lenders, and all other interested parties should now be estopped from enforcing the Third Amendment's contribution and voting restrictions against Yucaipa so as to preclude the unjust enrichment of the other first lien Lenders at Yucaipa's expense.

### 2. Under the New York State Court's Interpretation of the Fourth Amendment, the Third Amendment's Restrictions and Conditions Should be Severed and Invalidated

83.     Assuming, *arguendo*, that the New York Court disregards the severability clause of the Fourth Amendment and completely invalidates the Fourth Amendment for the reasons urged by Petitioning Creditors, it would be patently unfair to treat Yucaipa's acquisition of Allied Holdings' first lien debt as if the Third Amendment applied to it.

84.     First, as described above, Yucaipa never would have acquired first lien debt if it knew the Fourth Amendment were invalid and the Third Amendment would apply. Yucaipa understood that the Fourth Amendment was valid based on its approval by ComVest, as Requisite Lender, and Allied Holdings, through the Special Committee.

85.     Second, Yucaipa specifically and detrimentally relied on the fact that Black Diamond, among other Lenders, never objected to either the Fourth Amendment or Yucaipa's acquisition before it occurred on August 21, 2009 – despite Black Diamond's full, prior knowledge of Yucaipa's plan to acquire ComVest's majority position and that a Fourth Amendment would permit that act. Third, Yucaipa understood that CIT settled and dismissed its claims in the Georgia Action in both its individual capacity and in its representative capacity as Administrative Agent on behalf of all Lenders. In settling that action, Yucaipa specifically and detrimentally relied on that fact that no Lender ever objected to CIT's prosecution and settlement

of the Georgia Action on behalf of the first lien Lenders.

86. Moreover, the application of the Third Amendment's contribution provisions – which Yucaipa understood to be null and void at the time it acquired its first lien debt – also would unfairly result in a financial windfall to Petitioning Creditors and all other Lenders. These provisions would unfairly require Yucaipa, without its consent, to contribute some portion of its first lien debt to Allied Holdings, increasing the pro rata recovery of all other first lien Lenders.

87. Assuming, *arguendo*, that the New York Court disregards the severability clause of the Fourth Amendment and completely invalidates the Fourth Amendment for the reasons urged by Petitioning Creditors, then, based on the reasoning that led that Court to invalidate certain provisions of the Fourth Amendment, several provisions of the Third Amendment would also be invalid under the terms of First Lien Credit Agreement Sections 10.5(b) and (c) and therefore would need to be severed pursuant to its and the First Lien Credit Agreement's severability clauses. For instance:

   a. Contribution Provisions. Assuming, *arguendo*, the Fourth Amendment is invalid because it passed without the required level of lender consent, then the Third Amendment's contribution provisions (*see* 3A § 2.7(e) at (j)(iii)) violated several subsections of Sections 10.5(b) and (c) as they too were not passed with affected Lender consent because:

   - The Third Amendment's contribution provisions violated Section 10.5(b)(vii) because their enforcement would "reduce the principal amount of any Loan", affecting all Lenders by a reduction in the principal amount of the first lien Term Loans.

   - The Third Amendment's contribution provisions also violated Section 10.5(b)(ix) because a contribution of 50% of Yucaipa's Term Loans would have decreased the amount of Term Loans then outstanding, thereby increasing *all* Lenders' pro rata rights and affecting a change to the definition of "Pro Rata Share."

35

- Assuming, *arguendo*, that the Fourth Amendment's provision regarding Term Loan Exposure violated Section 10.5(b)(ix) because it affected a change to the Term Loan Exposure calculation, then the Third Amendment's contribution provisions also violated Section 10.5(b)(ix) by affecting a change to the Term Loan Exposure calculation by decreasing the amount of outstanding Term Loans.

b.  <u>Term Loan Exposure</u>.  Assuming, *arguendo*, that the Fourth Amendment's provisions that changed the definition of Term Loan Exposure violated First Lien Credit Agreement Section 10.5(b)(ix), then the Third Amendment's provisions that changed the definition of Term Loan Exposure also violated that section.  The Third Amendment's Section 2.1(e) added in the very language to the definition of Term Loan Exposure that the Fourth Amendment's Section 2.1(b) deleted.  If deleting this language in the Fourth Amendment required Petitioning Creditors' consent, then so too did the Third Amendment's addition of such language.  The effect of such severance would be to return the "Term Loan Exposure" definition to its state in the First Lien Credit Agreement – which is identical to its definition under the Fourth Amendment.

c.  <u>Voting Rights</u>.  Similarly, the Third Amendment's section that purportedly eliminated Yucaipa's voting rights also violated First Lien Credit Agreement Section 10.5(b)(ix), among others, by increasing each Lender's voting rights on a pro rata basis, thereby affecting a change to the definition of "Pro Rata Share" without each Lender's consent.

d.  <u>Indebtedness Permitted to be Acquired</u>.  Assuming, *arguendo*, that a change to the identity of the Requisite Lender changes the definition of Requisite Lender in violation of Section 10.5(b)(ix), then the Third Amendment's purported cap on the amount of Term Loans Yucaipa could acquire also violated Section

10.5(b)(ix), among other sections.

**H.     Petitioning Creditors Seek To Act As Requisite Lender, Administrative Agent and Collateral Agent Even Before A Ruling In The New York Action**

88.     As of the date of this Counterclaim and Cross-Claim for Declaratory Judgment, the New York Court had not yet written a decision ruling on Petitioning Creditors' motion for summary judgment.

89.     Notwithstanding the New York Court's comments from the bench, until the New York Court reduces its decision to a writing entered on the docket in the New York State Court, the Fourth Amendment remains valid and Yucaipa remains the Requisite Lender.

90.     Nevertheless, on November 26, 2012, Petitioning Creditors wrote to counsel for the Debtor stating that, "in accordance with the valid and enforceable terms of the Credit Agreement as determined by Justice Ramos [the New York Court], Petitioning Creditors together with American Money Management Corporation . . . now constitute Requisite Lenders." In that letter, Petitioning Creditors also stated their "intention" to appoint themselves as "co-Administrative Agents."

91.     On December 3, 2012, Petitioning Creditors and American Money Management Corporation sent to the Debtor an "Appointing Agreement," purporting to appoint Petitioning Creditors or their affiliates as co-Administrative Agents and as Collateral Agent.

92.     On information and belief, the Petitioning Creditors will soon seek to act in furtherance of their own self-interests and to Yucaipa's detriment in their self-appointed roles as Requisite Lenders and Agents, including, without limitation, by changing entries on the Register in an effort to unilaterally contribute Yucaipa's debt to equity, seeking to enforce remedies against Debtors and commencing a credit bid or Section 363 sale process.

## COUNT I
## DECLARATORY JUDGMENT

93.    Yucaipa repeats and realleges the allegations of paragraphs 1 through 92 hereof.

94.    The Third Amendment and its various provisions were enacted with Requisite Lender consent, not unanimous Lender consent.  (*See* 3A § 4(a).)  Yucaipa was not a signatory to the Third Amendment.

95.    The Third Amendment contains several restrictions and conditions on any first lien debt that Yucaipa might acquire.  Those restrictions and conditions violate various provisions of the First Lien Credit Agreement, as described above, and should be severed from the Third Amendment pursuant to its severability clause.  (3A § 7.2; *see also* CA § 10.11 (severability clause).)

96.    Nonetheless, Petitioning Creditors have alleged that the Third Amendment is fully valid and enforceable.  Yucaipa expects Petitioning Creditors to claim that the Third Amendment's restrictions and conditions should be enforceable against Yucaipa.

97.    Additionally, an attorney for the Unsecured Creditors' Committee suggested to this Court during its November 26, 2012 status conference that the Unsecured Creditors' Committee may well seek to enforce the Third Amendment's contribution provisions against Yucaipa.

98.    Thus, there exist justiciable disputes regarding the allegations contained in this Counterclaim and Cross-Claim and Allied's Complaint regarding the various Lenders' and other creditors' respective rights and obligations under the First Lien Credit Agreement's and the Third Amendment's various provisions.

99.    Accordingly, assuming, *arguendo*, that the Fourth Amendment's provisions are invalid, then Yucaipa seeks a declaration that:

a) The Third Amendment's contribution provisions violated several subsections of First Lien Credit Agreement Sections 10.5(b) and (c), as described above in Paragraph 87(a), and those provisions are invalid and unenforceable and are severed from the Third Amendment;

b) The Third Amendment's change to the definition of Term Loan Exposure violated First Lien Credit Agreement § 10.5(b)(ix), as described above in Paragraph 87(b), and those provisions are invalid and unenforceable and severed from the Third Amendment;

c) The Third Amendment's contradictory terms that purported to eliminate Yucaipa's voting rights violated First Lien Credit Agreement § 10.5(b)(ix) and are otherwise invalid and unenforceable), as described above in Paragraph 87(c), and those provisions are invalid and unenforceable and severed from the Third Amendment;

d) The Third Amendment's purported cap on the amount of Term Loans Yucaipa could acquire is invalid because it violated First Lien Credit Agreement § 10.5(b)(ix), as described above in Paragraph 87(d), and those provisions are invalid and unenforceable and severed from the Third Amendment; and

e) The severability clauses of the First Lien Credit Agreement and the Third Amendment function to sever the provisions described above from the Third Amendment rather than leading to the invalidation of the entire Third Amendment.

100. As a result of the foregoing, Yucaipa seeks a further declaration that it validly holds the term loans and LC commitments that it acquired from ComVest (which currently

amount to $114,712,088.66 of term loan exposure and $20,107,488.56 of LC exposure that is

now treated as term loan exposure following the LC facility's closure), plus accrued interest,

does not have any obligation to contribute any portion of these loans as equity or otherwise, and

has all voting and other rights associated with these loans under the First Lien Credit Agreement,

including the right to sell or assign all such loans.

**COUNT II**
**UNJUST ENRICHMENT**

101.    Yucaipa repeats and realleges the allegations of paragraphs 1 through 100 hereof.

102.    In April 2008, CIT, as Administrative Agent, coordinated passage of the Third

Amendment. The Third Amendment – which was approved by Allied Holdings' Special

Committee and executed by Allied Holdings – authorized Lenders to sell up to $50,000,000 in

principal amount of term loans under the First Lien Credit Agreement to Yucaipa and its

affiliates, provided that (a) fifty percent of such acquired term loans would be converted into

capital of Allied Holdings and (b) Yucaipa would not have any voting rights with respect to the

term loans acquired under the First Lien Credit Agreement as amended by the Third

Amendment.

103.    Yucaipa was not a signatory to the Third Amendment. Although Lenders were

permitted to sell Yucaipa first lien term loans, Yucaipa did not purchase any of the First Lien

Credit Agreement term loans under the Third Amendment.

104.    Yucaipa only purchased Allied Holdings' first lien debt following passage of the

Fourth Amendment, which eliminated, among other things, the provisions of the Third

Amendment that purported to (a) limit the amount of debt that could be sold to Yucaipa, (b)

restrict Yucaipa's voting rights with respect to its first lien debt holdings, and (c) require Yucaipa

01:12978610.1

to contribute 50% of the first lien debt it was permitted to acquire under the Third Amendment to equity in the Debtor.

105.    On August 21, 2009, Allied Holdings and ComVest, as the Requisite Lender under the First Lien Credit Agreement, executed the Fourth Amendment. Allied Holdings' Special Committee – consisting of the Allied board members that were independent of Yucaipa – reviewed and voted to approve the Fourth Amendment. Allied was represented by its own independent counsel in connection with the Third Amendment and Fourth Amendment, and Yucaipa (along with the other Lenders) was provided with customary legal opinions from Allied Holdings' counsel in connection therewith.

106.    Various sections of the Fourth Amendment amended or deleted certain of the restrictions and conditions that sections of the Third Amendment placed on first lien debt that Yucaipa might acquire, as described above. The Fourth Amendment permitted Yucaipa to acquire and accept assignment of Allied Holdings' first lien debt (including terms loans and amounts deposited to support letters of credit issued for the benefit of Allied Holdings) and become Requisite Lender under the First Lien Credit Agreement.

107.    In reasonable reliance on the validity of the Fourth Amendment, on August 21, 2009 Yucaipa acquired all Allied Holdings' first lien debt then held by ComVest, and such first lien debt was more than fifty percent of all of Allied Holdings' first lien debt. The actual holdings consisted of $114,712,088.66 of Term Loans and $30,400,458.40 of LC Commitments (*i.e.* deposits to support letter of credit), totaling $145,112,547.06 of the $265,000,000 maximum first lien loans authorized by the First Lien Credit Agreement.

108.    Yucaipa would not have purchased any portion of Allied Holdings' first lien debt, much less ComVest's complete stake, if it understood that any portion of the Fourth Amendment

was invalid. In this regard, Yucaipa received and reasonably relied upon the legal opinion of Allied Holdings' independent counsel that the Fourth Amendment was valid and enforceable.

109.     If the Third Amendment is strictly enforced against Yucaipa according to all of its terms, resulting in Yucaipa being compelled to convert part of its debt holdings to capital, and/or preventing Yucaipa from voting its currently-held debt, then the other first lien Lenders would reap a windfall, and thus be unjustly enriched. Yucaipa never executed the Third Amendment, did not act pursuant to or under the Third Amendment, and would be inequitably harmed if it were now retroactively bound by its terms.

110.     In addition, compelling Yucaipa to treat its first lien debt as if it had been purchased under the terms of the Third Amendment could result in Yucaipa's debt holdings being decreased by tens of millions of dollars. This decrease in Yucaipa's first lien debt holdings would result in a concomitant decrease in the Debtors' debt and an increase in the Debtors' equity of tens of millions of dollars. Thus, the contribution of Yucaipa's first lien debt to the Debtors' equity would inequitably harm Yucaipa and unjustly enrich the Debtor at Yucaipa's expense.

111.     Compelling Yucaipa to treat its first lien debt as if it had been purchased under the terms of the Third Amendment also would result in a proportional decrease in the percentage of Debtors' first lien debt held by Yucaipa and a concomitant increase in the percentage of first lien debt held by the other Lenders. Thus, the contribution of Yucaipa's first lien debt to the Debtors' equity would inequitably harm Yucaipa and unjustly enrich the other Lenders at Yucaipa's expense.

112.    Accordingly, compelling compliance with all the provisions of the Third Amendment would result in the unjust and inequitable enrichment of the Debtor and the other Lenders at Yucaipa's expense.

113.    For the foregoing reasons, Yucaipa is entitled to a declaration that the restrictions on the amount of debt that Lenders could sell to Yucaipa, and the equity contribution provisions and voting restrictions of the Third Amendment are not enforceable as against Yucaipa.

### COUNT III
### ESTOPPEL

114.    Yucaipa repeats and realleges the allegations of paragraphs 1 through 113 hereof.

115.    On August 21, 2009, Allied Holdings and ComVest, as the Requisite Lender under the First Lien Credit Agreement, executed the Fourth Amendment. The Special Committee – consisting of the Allied Holdings board members who were independent of Yucaipa – reviewed and voted to approve the Fourth Amendment. Allied Holdings was represented by independent outside counsel in connection with the Third Amendment and Fourth Amendment, and Yucaipa (along with the first lien Lenders) was provided with written legal opinions from Allied Holdings' counsel in connection therewith.

116.    The other Lenders were aware that Yucaipa sought passage of the Fourth Amendment so that it could become a Lender and the Requisite Lender, and did not object to Yucaipa's efforts. The other Lenders did not object to the Fourth Amendment when it was passed, and did not object to Yucaipa becoming Requisite Lenders.

117.    During the time Yucaipa and ComVest were negotiating over Yucaipa's purchase of Allied Holdings' first lien debt held by ComVest, Richard Ehrlich of Black Diamond called Derex Walker of Yucaipa several times to inquire about the status of the negotiations. Yucaipa told Mr. Ehrlich, and he was fully aware throughout the summer of 2009, that Yucaipa intended to acquire

ComVest's majority position in Allied Holdings' first lien debt and become the Requisite Lender. Black Diamond not only understood Yucaipa's intentions and did not object, but went further, proposing to join with Yucaipa in transactions to gain total control of Allied Holdings' assets, to the detriment of all of Allied Holdings' other Lenders. During Mr. Walker's calls with Mr. Ehrlich and during a meeting with Mr. Deckoff of Black Diamond, Black Diamond never took any steps to demonstrate opposition to any aspect of Yucaipa's plan to become Requisite Lender.

118.    Various sections of the Fourth Amendment amended or deleted certain of the restrictions and conditions that sections of the Third Amendment placed on first lien debt that Yucaipa might acquire, as described above. The Fourth Amendment permitted Yucaipa to acquire and accept assignment of Allied Holdings' first lien debt (including terms loans and amounts deposited to support letters of credit issued for the benefit of Allied Holdings) and become Requisite Lender under the First Lien Credit Agreement.

119.    In reasonable reliance on the validity of the Fourth Amendment, on August 21, 2009, Yucaipa acquired all Allied Holdings' first lien debt then held by ComVest, and such first lien debt was more than fifty percent of all of Allied Holdings' first lien debt. The actual holdings consisted of $114,712,088.66 of Term Loans and $30,400,458.40 of LC Commitments (*i.e.* deposits to support letter of credit), totaling $145,112,547.06 of the $265,000,000 maximum first lien loans authorized by the First Lien Credit Agreement.

120.    Yucaipa would not have purchased any portion of Allied Holdings' first lien debt, much less ComVest's complete stake, if it understood that any portion of the Fourth Amendment was invalid, or if it understood that its purchase was not permitted under the First Lien Credit Agreement without the Fourth Amendment. In this regard, Yucaipa received and reasonably

relied upon the legal opinion of Allied Holdings' counsel that the Fourth Amendment was enforceable.

121.    In January 2012, nearly two and a half years after execution of the Fourth Amendment, Petitioning Creditors filed suit against Yucaipa in the New York State Court.

122.    For the foregoing reasons, including because Debtors and the other Lenders did not object to the Fourth Amendment, they are estopped from arguing that the Third Amendment is controlling.

## COUNT IV
## INJUNCTIVE RELIEF

123.    Yucaipa repeats and realleges the allegations of paragraphs 1 through 122 hereof.

124.    The Petitioning Creditors, together with American Money Management Corporation ("AMC"), have asserted they are Requisite Lenders under the First Lien Credit Agreement.

125.    In addition, the Petitioning Creditors and AMC improperly have purported to appoint Petitioning Creditors or their affiliates as co-Administrative Agents and as Collateral Agent.

126.    Petitioning Creditors and AMC are not Requisite Lenders under the First Lien Credit Agreement or otherwise and have no right or authority under the First Lien Credit Agreement or otherwise to act as such or to take any actions in furtherance of that status, including appointing Administrative and Collateral Agents and directing such Agents to take any action with respect to the First Lien Credit Agreement, including without limitation, modifying the Register to change the ownership interests of Yucaipa.

01:12978610.1

127. Yucaipa is entitled to a temporary, preliminary and permanent injunction barring Petitioning Creditors and AMC from acting as Requisite Lenders and from taking any action based upon that claimed status.

128. Yucaipa will be irreparably harmed were the Petitioning Creditors and AMC permitted to act as Requisite Lenders and take action based upon that claimed status.

129. Yucaipa lacks an adequate remedy at law.

130. If the Petitioning Creditors and AMC are not enjoined from acting as Requisite Lenders and Agents under the First Lien Credit Agreement and from taking action based upon that claimed status, Yucaipa will suffer harm that outweighs any harm to the Petitioning Creditors and AMC if the requested injunctive relief is granted.

131. Accordingly, Yucaipa is entitled to the injunctive relief set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Yucaipa requests that this Court enter the declaratory judgment and injunctive and other relief described above, and grant such other and further relief as the Court deems just and proper.

## YUCAIPA'S ANSWER TO DEBTORS' VERIFIED COMPLAINT
## FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Yucaipa hereby answers the Complaint as follows:

1. Yucaipa admits the allegations contained in the first and fourth sentences of paragraph 1. Yucaipa denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second and third sentences of paragraph 1.

2. Yucaipa admits the allegations contained in the first sentence of paragraph 2 and admits, upon information and belief, the allegations contained in sentence 2 of paragraph 2.

3.      Yucaipa admits the allegations contained in the first and second sentences of paragraph 3.  Yucaipa admits the allegations contained in the third sentence of paragraph 3 and states by way of further response that CIT settled the Georgia Action by entering into the Settlement Agreement and signing and filing the Dismissals With Prejudice of all of its claims, including those claims it asserted in its representative capacity as Administrative Agent.

4.      Yucaipa admits the allegations contained in paragraph 4.

5.      Yucaipa admits the allegations contained in paragraph 5, but states by way of further response that CIT's dismissals with prejudice of the Georgia Action precludes any subsequent claims by Petitioning Creditors that Yucaipa is not Requisite Lender under the doctrine of *res judicata*.

6.      Yucaipa admits that Plaintiff seeks the relief stated in paragraph 6.

7.      Yucaipa admits the allegations contained in paragraph 7.

8.      Yucaipa admits the allegations contained in paragraph 8.

9.      Yucaipa admits the allegations contained in paragraph 9.

10.      Yucaipa admits the allegations contained in paragraph 10.

11.      The allegations of paragraph 11 assert legal conclusions for which no response is required, but to the extent that a response is required, Yucaipa admits those allegations.

12.      The allegations of paragraph 12 assert legal conclusions for which no response is required, but to the extent that a response is required, Yucaipa admits those allegations.

13.      The allegations of paragraph 13 assert legal conclusions for which no response is required, but to the extent that a response is required, Yucaipa admits those allegations.

14.      The allegations of paragraph 14 assert legal conclusions for which no response is required, but to the extent that a response is required, Yucaipa admits those allegations.

15. Yucaipa admits the allegations contained in paragraph 15.

16. Yucaipa admits, upon information and belief, the allegations contained in paragraph 16.

17. Yucaipa admits, upon information and belief, the allegations contained in paragraph 17.

18. Yucaipa admits, upon information and belief, the allegations contained in paragraph 18.

19. Yucaipa admits, upon information and belief, the allegations contained in paragraph 19.

20. Yucaipa admits, upon information and belief, the allegations contained in paragraph 20.

21. Yucaipa admits, upon information and belief, the allegations contained in paragraph 21.

22. Yucaipa admits, upon information and belief, the allegations contained in paragraph 22.

23. Yucaipa admits, upon information and belief, the allegations contained in paragraph 23.

24. Yucaipa admits, upon information and belief, the allegations contained in paragraph 24.

25. Yucaipa admits, upon information and belief, the allegations contained in paragraph 25.

26. Yucaipa admits, upon information and belief, the allegations contained in the first and second sentences of paragraph 1. Additionally, Yucaipa admits the remaining

allegations contained in paragraph 26, and states by way of further response that CIT settled the Georgia Action by entering into the Settlement Agreement in its representative capacity as Administrative Agent and then dismissing with prejudice all of its claims including those brought in its representative capacity.

27.     Yucaipa admits, upon information and belief, the allegations contained in paragraph 27.

28.     Yucaipa denies the allegations contained in paragraph 28.  By way of further response, Yucaipa admits that Yucaipa American Alliance Fund I, L.P. is a Delaware corporation who may be served through its registered agent, Corporation Trust Company, at Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801 and that Yucaipa American Alliance Fund I, L.P. is a Lender under the First Lien Credit Agreement.

29.     Yucaipa denies the allegations contained in paragraph 29.  By way of further response, Yucaipa admits that Yucaipa American Alliance (Parallel) Fund I, L.P. is a Delaware corporation who may be served through its registered agent, Corporation Trust Company, at Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801 and that Yucaipa American Alliance (Parallel) Fund I, L.P. is a Lender under the First Lien Credit Agreement.

30.     Yucaipa admits the allegations contained in paragraph 30, and respectfully refers the Court to the First Lien Credit Agreement, and the amendments thereto, which speak for themselves.

31.     Yucaipa denies that the First Lien Credit Agreement excluded Yucaipa from possessing first lien debt, as it instead contained preclusions against Lenders selling their debt, otherwise admits the allegations contained in paragraph 31, and respectfully refers the Court to the First Lien Credit Agreement, and the amendments thereto, which speak for themselves.

32. Yucaipa admits the allegations contained in paragraph 32, respectfully refers the Court to the First Lien Credit Agreement and the Third Amendment, which speak for themselves, and states by way of further response that the Third Amendment added a proviso to the term "Term Loan Exposure" to exclude the principal amount of Term Loans held by all "Restricted Sponsor Affiliates" from the "Term Loan Exposure" definition for purposes of voting rights only. Yucaipa was not yet a Lender at the time of the Third Amendment and thus was not a party to it. Yucaipa did not acquire any first lien debt under the Third Amendment prior to the passage of the Fourth Amendment.

33. Yucaipa admits the allegations contained in paragraph 33, and respectfully refers the Court to the Third and Fourth Amendments, which speak for themselves.

34. Yucaipa admits the allegations contained in paragraph 34, and respectfully refers the Court to the First Lien Credit Agreement and the Third and Fourth Amendments, which speak for themselves.

35. Yucaipa admits the allegations contained in paragraph 35, and respectfully refers the Court to the First Lien Credit Agreement and the Third and Fourth Amendments, which speak for themselves.

36. Yucaipa admits the allegations contained in paragraph 36, and by way of further response denies that it is not an "Eligible Assignee" under the First Lien Credit Agreement, as amended, and states that CIT's dismissal with prejudice of its claims in the Georgia Action in its representative capacity as Administrative Agent precludes any claim that Yucaipa is not Requisite Lender.

37. Yucaipa admits the allegations contained in paragraph 37, respectfully refers the Court to the Georgia Complaint, which speaks for itself, and by way of further response denies

that it is not an "Eligible Assignee" under the First Lien Credit Agreement, as amended, and states that CIT's dismissal with prejudice of its claims in the Georgia Action in its representative capacity as Administrative Agent precludes any claim that Yucaipa is not Requisite Lender.

38. Yucaipa admits the allegations contained in paragraph 38, respectfully refers the Court to the CIT Counterclaim, which speaks for itself, and states by way of further response that the CIT Counterclaim Complaint was filed by CIT in its capacity as Administrative Agent. Yucaipa states further that CIT settled the Georgia Action by entering into the Settlement Agreement in its administrative capacity and then dismissing with prejudice all of its claims, including but not limited to those brought in its representative capacity.

39. Yucaipa admits the allegations contained in paragraph 39, and respectfully refers the Court to the Complaint in the New York Action and the CIT Counterclaim, which speak for themselves.

40. Yucaipa admits the allegations contained in paragraph 40.

41. Yucaipa admits the allegations contained in paragraph 41.

42. Yucaipa admits the allegations contained in paragraph 42 and states by way of further response that CIT's dismissal with prejudice of its claims in the Georgia Action in its representative capacity as Administrative Agent precludes any claim that Yucaipa is not Requisite Lender.

43. Yucaipa admits the allegations contained in paragraph 43.

44. Yucaipa admits the allegations contained in paragraph 44 and states by way of further response that CIT's dismissal with prejudice of its claims in the Georgia Action in its representative capacity as Administrative Agent precludes any claim that Yucaipa is not Requisite Lender.

## AS AND FOR A FIRST CAUSE OF ACTION

45.     Yucaipa repeats and incorporates by reference herein its responses to paragraphs 1 through 44.

46.     The allegations of paragraph 46 assert legal conclusions for which no response is required, but to the extent that a response is required, Yucaipa admits those allegations.

47.     Yucaipa admits the allegations contained in paragraph 47.

48.     Yucaipa admits the Complaint seeks the declarations referenced in paragraph 48 and admits Plaintiff is entitled to them.

49.     Yucaipa admits the Complaint seeks the declarations referenced in paragraph 49, admits Plaintiff is entitled to them, and states by way of further response that CIT's dismissal with prejudice of its claims in the Georgia Action in its representative capacity as Administrative Agent precludes any claim that Yucaipa is not Requisite Lender.

## AS AND FOR A SECOND CAUSE OF ACTION

50.     Yucaipa repeats and incorporates by reference herein its responses to paragraphs 1 through 49.

51.     The allegations of paragraph 51 assert legal conclusions for which no response is required, but to the extent that a response is required, Yucaipa admits those allegations.

52.     The allegations of paragraph 52 assert legal conclusions for which no response is required, but to the extent that a response is required, Yucaipa admits those allegations. Additionally, Yucaipa admits the allegations contained in the second sentence of paragraph 52.

53.     Yucaipa admits the allegations contained in paragraph 53.

54.     Yucaipa admits the allegations contained in paragraph 54.

55.     Yucaipa admits the allegations contained in paragraph 55.

56.     Yucaipa admits the allegations contained in paragraph 56.

## ANSWER TO THE PRAYER FOR RELIEF

Yucaipa admits that Plaintiff is entitled to the relief requested in (i) and (iii) of its prayer

for relief and, by way of further response to (ii) and (iv) of its prayer for relief, states that the

relief provided should reflect the relief requested in Yucaipa's Counterclaim and Cross-Claim for

Declaratory Judgment and Injunctive and Other Relief.   By way of further response, Yucaipa

asserts affirmative defenses consistent with its Counterclaim and Cross-Claim for Declaratory

Judgment and Injunctive and Other Relief, and expressly reserves the right to amend and

supplement its affirmative defenses. Yucaipa also reserves the right to assert additional

affirmative defenses if other parties subsequently assert additional claims in this adversary

proceeding.

*[Remainder of page intentionally left blank]*

Dated: December 5, 2012
     Wilmington, Delaware

YOUNG, CONAWAY, STARGATT &
    TAYLOR, LLP

/s/ *Michael R. Nestor*
John T. Dorsey, Esquire (No. 2988)
Michael R. Nestor (No. 3526)
Rodney Square
1000 North King Street
Wilmington, DE  19801
Telephone: (302) 571-6600
mnestor@ycst.com

- and -

KASOWITZ, BENSON, TORRES &
    FRIEDMAN LLP

David E. Ross
David E. Spalten
Adam K. Grant
1633 Broadway
New York, New York 10019 Phone:
(212) 506-1700
DRoss@kasowitz.com

*Attorneys for Yucaipa*