# Exhibit 80

```
1    UNITED STATES BANKRUPTCY COURT
2    DISTRICT OF DELAWARE
3    Case No. 12-11564 (CSS)
     ----------------------------------------------------------X
4
     In the Matter of:
5
6
     ALLIED SYSTEMS HOLDINGS, INC., et al.,
7
             Debtors.
8
     ----------------------------------------------------------X
9
     ALLIED SYSTEMS HOLDINGS, INC.
10
             Plaintiff,
11
12
         v.
13
14
     AMERICAN MONEY MANAGEMENT CORP., AVENUE CAPITAL
15
     GROUP, BDCM OPPORTUNITY FUND II, LP, BENNETT MANAGEMENT,
16
     BLACK DIAMOND CLO 2005-1 LTD., DEL MAR DISTRESSED
17
     OPPORTUNITIES MASTER FUND, MJX ASSET MANAGEMENT, LLC,
18
     PAR-FOUR INVESTMENT MANAGEMENT, SPECTRUM INVESTMENT
19
     PARTNERS LP, TEAK HILL - CREDIT CAPITAL INVESTMENTS,
20
     LLC, THE CIT GROUP/BUSINESS CREDIT, INC., THE OFFICIAL
21
     COMMITTEE OF UNSECURED CREDITORS, YUCAIPA AMERICAN
22
     ALLIANCE FUND II, L.P. and YUCAIPA AMERICAN ALLIANCE
23
     (PARALLEL) FUND II, L.P.
24
             Defendants.
25
```

Page 2

YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA

1

AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA

2

AMERICAN ALLIANCE FUND II, L.P., and YUCAIPA AMERICAN

3

ALLIANCE (PARALLEL) FUND II, L.P.

4

     Counterclaim and Cross-Claim Plaintiffs,

5

6

     v.

7

8

ALLIED SYSTEMS HOLDINGS, INC.

9     Counterclaim Defendant,

10  and

11  AMERICAN MONEY MANAGEMENT CORP., AVENUE CAPITAL

12  GROUP, BDCM OPPORTUNITY FUND II, LP, BENNETT MANAGEMENT,

13  BLACK DIAMOND CLO 2005-1 LTD., DEL MAR DISTRESSED

14  OPPORTUNITIES MASTER FUND, MJX ASSET MANAGEMENT, LLC, PAR-

15  FOUR INVESTMENT MANAGEMENT, SPECTRUM INVESTMENT PARTNERS

16  LP, TEAK HILL - CREDIT CAPITAL INVESTMENTS, LLC, THE CIT

17  GROUP/BUSINESS CREDIT, INC., THE OFFICIAL COMMITTEE OF

18  UNSECURED CREDITORS.

19     Cross-Claim Defendants.

20  ---------------------------------------------------------X

21  BDCM OPPORTUNITY FUND II, LP, BLACK DIAMOND

    CLO 2005-1 LTD, and SPECTRUM PARTNERS, L.P.

22

     Plaintiff(s),

23

24

     v.

25

Page 3

YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA

AMERICAN ALLIANCE (PARALLEL) FUND I, L.P.,

YUCAIPA AMERICAN ALLIANCE FUND II, L.P.,

YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II,

L.P., RONALD BURKLE, DEREX WALKER, IRA TOCHNER,

JEFF PELLETIER, JOS OPDEWEEGH, OSEPH TOMCZAK,

And MARK GENDREGSKE

    Defendants.

-----------------------------------------------------------X

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF

ALLIED SYSTEMS HOLDINGS, INC. and its affiliated debtors,

    Plaintiff,

v.

YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA

AMERICAN ALLIANCE (PARALLEL) FUND I, L.P.,

YUCAIPA AMERICAN ALLIANCE FUND II, L.P.,

YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II,

L.P., MARK J. GENDREGSKE, JOS OPDEWEEGH, JAMES

FRANK, DEREX WALKER, JEFF PELLETIER, IRA TOCHNER,

And JOSEPH TOMCZAK.

    Defendants.

-----------------------------------------------------------X

Page 4

U.S. Bankruptcy Court

1

824 Market Street

2

Wilmington, DE  19801

3

February 27, 2013

4
5

09:30 AM

6

B E F O R E:

7

HONORABLE CHRISTOPHER S. SONTCHI

8

U.S. BANKRUPTCY JUDGE

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1   HEARING re:   Notice of Agenda of Matters Scheduled for

2   Hearing on February 27, 2013.

3

4
                    Cross-Claim Defendants BDCM Opportunity Fund
    HEARING re:

5
    II, LP's Black Diamond CLO 2005-1 Ltd's and Spectrum

6
    Investment Partners LP's Motion to Dismiss the Amended Cross

7
    Claim in its Entirety [Adv. Docket No. 73; filed January 25,

8
    2013].

9

10

11                  Motion of the Official Committee of Unsecured
    HEARING re:

12  Creditors for an Order Authorizing the Committee to Pursue

13  Certain Claims and Causes of Action of the Debtors'

14  Estates [Docket No. 858; filed February 1, 2013].

15

16
                    Motion and Memorandum of Law of Petitioning
    HEARING re:

17
    Creditors for Entry of an Order (I) Pursuant to 11 U.S.C.

18
    §105(a) Granting Standing to Petitioning Creditors to

19
    Prosecute  Certain Claims of the Debtors Estates for,

20
    Inter Alia, Equitable Subordination, Breach of Fiduciary,

21
    Aiding and Abetting Breach of Fiduciary Duty and Breach of

22
    Contract, or Alternatively (II) Granting Petitioning

23
    Creditors Leave to Intervene as Plaintiffs in Adversary

24
    Proceedings No. 13-50530 Pursuant to Federal

25

Page 6

Rule of Civil Procedure 24 [Docket No. 876; filed February 8,

1

2013].

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Transcribed by: Mary Zajaczkowski

24

25

```
 1   A P P E A R A N C E S:
 2   TROUTMAN SANDERS LLP
 3          Attorney for the Debtors
 4          600 Peachtree Street
 5          Suite 5200
 6          Atlanta, Georgia 30308
 7
 8   BY:   JEFFREY W. KELLEY, ESQUIRE
 9
10   SCHULTE ROTH & ZABEL LLP
11          Attorneys for Petitioning Creditors
12          919 Third Avenue
13          New York, New York 10022
14
15   BY:   ADAM HARRIS, ESQUIRE
16          ROBERT WARD, ESQUIRE
17
     SULLIVAN HAZELTINE ALLINSON
18
            Attorney for the Committee
19
            901 North Market Street
20
            Suite 1300
21
            Wilmington, DE  19801
22
23
     BY:   WILLIAM HAZELTINE, ESQUIRE
24
25
```

Page 8

```
 1   SIDLEY AUSTIN
 2        Attorneys for the Committee
 3        787 7th Avenue
 4        New York, New York 10019
 5   BY:  MICHAEL BURKE, ESQUIRE
 6        NICHOLAS LAGEMANN, ESQUIRE
 7
 8   RICHARDS LAYTON & FINGER
 9        Attorney for the Debtors
10        One Rodney Square
11        Wilmington, Delaware 19801
12   BY:  ROBERT STEARN, ESQUIRE
13
14   BROWN RUDNICK LLP
15        Attorney for Special Committee of the Board
16        Seven Times Square
17        New York, New York 10036
18   BY:  ROBERT STARK, ESQUIRE
19
20   ARNOLD & PORTER LLP
21        Attorney for Mark Gendregske
22        555 Twelfth Street, NW
23        Washington, DC 20004
24   BY:  JUSTIN ANTONIPILLAI, ESQUIRE
25
```

1   LATHAM & WATKINS LLP

2         Attorney for Yucaipa

3         355 South Grand Avenue

4         Los Angeles, California 90071

5   BY:   ROBERT KLYMAN, ESQUIRE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    [missing audio from 9:49-9:50]

2         MR. KELLY:  -- the Official Committee of Unsecured

3    Creditors and by Black Diamond and Spectrum.  And the other

4    is argument on motions to dismiss in an adversary proceeding.

5    There had been discussions concerning the standing motions,

6    and there is a partial deal involving most of the

7    participants, and I'll let them speak for themselves.  And

8    I'll yield to whoever wishes to address the Court on the

9    suggestion as to handle the standing motions.

10        THE COURT:  Okay.  Mr. Harris.

11        MR. HARRIS:  Good morning, Your Honor.  I believe

12   procedurally that a certificate of no objection was actually

13   entered, was submitted yesterday with respect to the

14   Committee's motion for standing.  There had been no

15   opposition filed by any party to that, so if I understand the

16   docket correctly, Mr. Hazeltine actually filed the

17   certificate of no objection with respect to that.

18        THE COURT:  When?  When?  Did you send it over?

19        MR. HAZELTINE:  Your Honor, William Hazeltine on

20   behalf of the Committee.  We filed a certificate of no

21   objection on the motion to seal.

22        MR. HARRIS:  Motion to seal, I'm sorry, then my

23   mistake.  So there's no --

24        THE COURT:  All right.

25        MR. HARRIS:  Sorry.

1          THE COURT:  Okay.

2          MR. HARRIS:  There's no opposition filed --

3          THE COURT:  Because I just lost an evening when I

4    could have signed something.  Okay.  All right.  We're okay

5    now.

6          MR. HARRIS:  There's no --

7          THE COURT:  Yes, I signed that order.

8          MR. HARRIS:  Okay.  There's no opposition filed to

9    the Committee's motion for standing.  There had been

10   responses filed by the Debtors, by the Committee and by Mr.

11   Gendregske to the petitioning creditors' request for

12   standing, or on the alternative a grant of an order for

13   intervention of the Committee's adversary proceeding as an

14   additional plaintiff.

15          There had been discussions between parties, Your

16   Honor, which I believe has resulted in an agreement in

17   principal with the exception of one issue as between the

18   Debtors, the Committee and the petitioning creditors that

19   would resolve the responses and issues raised by the Debtors

20   and the Committee in opposition.  Mr. Gendregske has not

21   signed on to that agreement in principal, Your Honor.  I

22   would be happy to lay out for the Court the terms that had

23   been agreed to by the three parties and identify the one open

24   issue, and I can then turn the podium over to Mr.

25   Gendregske's counsel to address any continuing objections

1    he may have, if that is okay with Your Honor.

2         THE COURT:  All right.  So this, this proposed

3    resolution which I guess I'll hear about in a minute, is,

4    resolves both your client's motion for standing and the

5    Committee's motion for standing?

6         MR. HARRIS:  I believe so, Your Honor.

7         THE COURT:  Okay.

8         MR. HARRIS:  If I may.

9         THE COURT:  Yes, please do.  Hang on just -- go

10   ahead.

11        MR. HARRIS:  As a preliminary, I believe all parties

12   are in agreement on the following terms -- that the Committee

13   would be granted standing to prosecute the causes of action

14   set forth in the complaint that the Committee filed in the

15   adversary proceeding.  The petitioning creditors, assuming

16   Your Honor approves this, would withdraw our request for

17   standing as set forth in our motion.

18        THE COURT:  Okay.

19        MR. HARRIS:  The petitioning creditors would be

20   authorized to intervene in the Committee's adversary

21   proceeding as an intervening plaintiff but not acting as an

22   estate representative or be deemed to be acting on behalf of

23   the estate.  The petitioning creditors and the Committee will

24   work to incorporate into an amended complaint if appropriate

25   so that a single complaint will exist and will incorporate

1  all the claims and defendants that are to be prosecuted.

2  Right now as Your Honor knows there's two adversaries, two

3  complaints, they are substantially overlapping, there are

4  some minor nuance differences in terms of defendants and

5  cases of action.  We're going to talk to the Committee about

6  whether their complaint should be amended in some respect to

7  incorporate some of those things, but we may or may not do an

8  amended complaint.

9          THE COURT: All right.  And when you say you, that's a

10  global you.

11          MR. HARRIS:  Yeah, right.

12          THE COURT:  Right.  And we'll just -- just for

13  parameters, I suppose will withdraw your complaint.

14          MR. HARRIS:  Yes, it's in the list.

15          THE COURT:  Okay, sorry.

16          MR. HARRIS:  That's okay.

17          THE COURT:  When you said that you would intervene

18  not as an estate representative, would, I assume you would

19  not be adding any individual causes of action.

20          MR. HARRIS:  There are two aspects to the causes of

21  action which arguably had individual components for the

22  benefit of petitioning creditors, but I think they're

23  actually subsumed within the causes of action the Committee

24  has already stated.  One is the claim for enforcement of the

25  obligations under the third amendment to the credit

1    agreement.  Obviously, the Debtors are a party to that and we

2    are a party to that.  Each one of us could bring that but

3    that cause of action is already stated so we're not going to

4    be adding any additional causes of action there.

5            THE COURT:  All right.

6            MR. HARRIS:  With respect to the equitable

7    subordination causes of action, in connection with the trial

8    on that issue, to the extent Your Honor finds any kind of

9    improper conduct or inequitable conduct that would give rise

10   to subordination, there will also have to be a determination

11   as to which creditor parties were adversely affected.  It

12   could be some it could be all.  So I don't think it adds any

13   additional causes of action there either, although obviously

14   there are individual nuances for different creditor groups

15   that come up in the context of that.

16           THE COURT:  Okay.

17           MR. HARRIS:  My very next point, Your Honor, is that

18   the petitioning creditors will withdraw our adversary

19   proceeding obviously in favor of the Committee's action.

20           The next point is the intervening plaintiffs will be

21   entitled to fully participate in all aspects of discovery and

22   trial.  But to avoid duplication and burden, the petitioning

23   creditors will not require the parties on whom we've served

24   discovery to independently respond to them.  And effectively

25   they're going to be withdrawn.  We're going to rely on the

Case 1:20-cv-05004-CSS Doc 462-5 Filed 05/02/20 Page 16 of 121
Case 1:20-cv-05004-CSS Doc 462 Filed 03/15/20 Page 15 of 121

Page 15

1   Committee's discovery requests right now with the right to

2   supplement.  And I believe, Your Honor, that to the extent

3   there's any differences in the discovery requests, that'll

4   get flushed out in the context of what are inevitably going

5   to be meet and confer conferences between the various parties

6   so that, you know, the parties on whom we've served discovery

7   and who they served discovery on won't have to duplicate the

8   responses in effect.

9          THE COURT:  And your, I mean is that going to matter,

10  your complaint is being dismissed anyway, so there would be

11  no discovery in connection with your action.

12         MR. HARRIS:   Right.  It'll kind of go away by

13  operation of law.

14         THE COURT:  All right.  What about has there been any

15  discussion about how depositions would occur, or is that an

16  issue for another day?

17         MR. HARRIS:  I think that's an issue for coordination

18  which is kind of my next point, Your Honor, which is that

19  we're going to use, we and the Committee have agreed to use

20  reasonable best efforts to coordinate all of our efforts on

21  discovery, depositions, strategy, prosecution, who is going

22  to take the lead on what issues, things like that to avoid,

23  you know, duplication and incremental costs as best as we

24  possibly can.

25         THE COURT:  Okay.

1        MR. HARRIS:  The UCC has asked and we have agreed

2    that they have the right to seek guidance from the Court to

3    modify the scope of the intervention in the event they

4    believe that we are not acting in the best interest of the

5    estates generally and prosecution of the causes of action.

6        THE COURT:  But your client will remain your client.

7        MR. HARRIS:  My client is going to remain my client,

8    yes.

9        THE COURT:  Right.  And their client will be, well

10   they'll be acting on behalf of the Debtors' estate as a

11   whole.

12       MR. HARRIS:  Correct.  But I think the idea here is

13   if for any reason they think we're being obstructionists in

14   any way or --

15       THE COURT:  Right.

16       MR. HARRIS:  -- overstepping our bounds, if you will,

17   that they have the right to come to Your Honor and ask to put

18   us back in our cage.

19       THE COURT:  Okay.

20       MR. HARRIS:  The next point, Your Honor, is that the

21   petitioning creditors and the Committee have agreed that

22   neither party is going to have either a veto or a consent

23   right over any proposed settlement.  If any party reaches a

24   settlement with one or more defendants they can propose it

25   and seek approval from Your Honor subject, of course, to the

1    whole 9019 process and everybody's rights and connection with

2    that process.

3            THE COURT:  All right.  So if they reach a settlement

4    in connection with the Debtors' estate, you'll have the right

5    to object to it.

6            MR. HARRIS:  Correct, and conversely --

7            THE COURT:  And if you reach a settlement on your

8    individual claims, they'll have a right to settle it or

9    objection to it.

10           MR. HARRIS:  Right.  Or if there's, if there are

11   individual claims or if there is a potential for a more

12   global settlement that parties agree to then we have the

13   right to propose it, obviously, they have the right to oppose

14   it and take whatever positions they think are appropriate.

15           THE COURT:  All right.

16           MR. HARRIS:  The nest point, Your Honor, is simply a

17   reservation of rights.  As we noted in our papers, the

18   petitioning creditors simply want to reserve the right to

19   seek an award of substantial contribution under 503(b) in the

20   event such an award would be, in our view, justified.

21   Obviously, that's subject to the rights of any and all

22   parties in the case to take whatever positions they think are

23   appropriate.  And those are the terms on which all the

24   parties have agreed other than Mr. Gendregske's counsel as I

25   indicated before.

1        The only open issue, Your Honor, is the following

2   one, which is that the Committee and the petitioning

3   creditors believe that the sole and exclusive authority to

4   propose a settlement with the defendants in the case or any

5   of them should be vested in the plaintiffs in the adversary

6   proceeding, and no longer reside with the Debtors.  The --

7        THE COURT:  I'm sorry, start that over again.

8   ME   MR. HARRIS:  The open issue we have which the

9   Committee and we agree on, but which the Debtors are

10  concerned about, and I'll let them speak for themselves on

11  this, is that the plaintiffs both the Committee and the

12  Petitioning Creditors as the intervening plaintiffs either

13  individually or together would have the sole and exclusive

14  authority to propose a settlement and prosecute a settlement

15  with the defendants in the adversary as opposed to having the

16  company continue to have the authority to discuss potential

17  settlements with the defendants.  We believe that if the

18  Committee and the Petitioning Creditors are going to be

19  prosecuting these actions and the defendants, and there's a

20  possibility of settlement, the defendants should be talking

21  to us not having the opportunity to discuss potential

22  settlements with various parties who, you know, may or may

23  not believe in the causes of action who may or not be

24  involved in the causes of action in terms of their

25  assessment, etc.

1      I understand, obviously, any settlement would be

2   subject to everybody's rights to take positions under 9019

3   when ultimately proposed.  But really, Your Honor, as a

4   matter of efficiency and focus, it would make the most sense

5   to have the defendants talking to the plaintiffs in the

6   action rather than any other parties who have agreed that

7   they would and chosen not to take up the cause here and

8   prosecute them.

9          THE COURT:  You touched on a matter that was

10  certainly on my mind coming in and I'm not sure exactly how

11  or if it's been resolved by what you've gone through, which

12  is who's in charge of running the show.  The Committee is

13  going to be in charge of running the adversary proceeding,

14  correct?

15          MR. HARRIS:  The Committee is going to be in charge

16  of running the adversary proceeding working with us, but they

17  have --

18          THE COURT:  They have the decision making authority

19  and you'll tag along; or, if you feel, at some point like you

20  need to stand up more for yourself you'll come back and

21  they'll either agree or you'll come back and ask for me

22  right?

23          MR. HARRIS:  At this point, Your Honor, we don't

24  actually think that there is a big difference of view

25  certainly as it relates to the prosecution of these causes of

1   action or our collective belief in their viability.  There

2   may differences in opinion on strategy.  There may be

3   differences of opinion on settlement and their parties have

4   the ability to go their own ways, obviously.  But as it

5   relates to the causes of action which are purely estate

6   causes of action, clearly the Committee is the one vested

7   with prosecution of those.  We're in the case.  We get to

8   understand all the discovery.  We, hopefully, will be

9   coordinating with them pretty closely in terms of how the

10  prosecution of the claim gets put together.

11          On those causes of action where we have independent

12  rights, we reserve the right, obviously, to stand up and say

13  hey we think this needs to be prosecuted or dealt with in a

14  slightly different way, particularly, as it relates to the

15  contractual claims and equitable subordination as it relates

16  to the harm we believe was suffered upon my clients directly.

17  But as a bottom-line matter it's the Committee's adversary

18  proceeding.  We're intervening plaintiff, and they are vested

19  with the causes of action and to act on behalf of the

20  estates.

21          THE COURT:  Okay.  So, I guess there are different

22  ways you could look at it which is there is the idea of

23  settling simply the adversary proceeding.  There is the idea,

24  perhaps, of settling the Debtors' case perhaps separately

25  from the adversary proceeding, although I struggle to see how

1    that would be possible.  Or there could be a global

2    settlement that would deal with the adversary proceeding and

3    the Debtors' case.  And what I'm hearing you say is that

4    notwithstanding that the Debtors could be or would be

5    affected by any settlement like that, you do not want them to

6    have the power to actually enter into it.

7            MR. HARRIS:  Well let me be clear, Your Honor.  If

8    the Debtors were to propose a case resolution that didn't

9    require a resolution of the causes of action in the adversary

10   proceeding then what I'm saying here wouldn't matter.  If

11   they were to propose a sale that basically preserved the

12   litigation for later and escrowed a bunch of proceeds, that's

13   fine, and that would not be impacted by what we're saying

14   here.  But I think what we're saying today is that to the

15   extent the case resolution will if the Debtors propose would

16   include or require some resolution or releases that would

17   affect the causes of action, that would require -- that would

18   not be something they could do without having at least the

19   Committee or us supportive of it.

20           THE COURT:  Okay.  Okay I understand.

21           MR. HARRIS:  I'll turn the podium over to the Debtors

22   to speak to that issue.  And then I believe Mr. Gendregske's

23   counsel wants to be heard with respect to the intervention --

24           THE COURT:  Well let me -- I think my plaintiff might

25   want to be heard.

1       MR. KELLEY:  As a preliminary matter, I neglected --

2   this is Jeff Kelley for the Debtors.  I neglected to

3   introduce to the case on the record Mr. Robert Stark who is,

4   I believe, Your Honor knows who Your Honor has approved as

5   counsel to our Special Committee in this case.  And the

6   Special Committee in this particular instance consisting of

7   one person because we have two members: one of whom is

8   defendant and one who is not.  So the one person member of

9   our Special Committee has been, through Mr. Stark's

10   involvement, involved in all aspects of our positions on this

11   standing and intervention motion.  I did want to make the

12   Court aware that Mr. Stark was here today.

13       THE COURT:  I did see him on the list, but thank you.

14   Welcome.

15       MR. BURKE:  Good morning, Your Honor, Michael Burke

16   for the Committee and, again, thank you for allowing us to be

17   heard.  Mr. Harris did outline the proposed settlement and

18   quite literally it's done on loose leaf paper 20 minutes

19   before this hearing and which would be subject to a

20   stipulation and order that we would enter.  But I think Your

21   Honor asked the correct questions.

22       The Committee would retain control of their adversary

23   proceeding.  The Petitioning Creditors would be intervening

24   in our adversary proceeding.  Their adversary proceeding

25   would be dismissed.  And as we went through, we are trying to

Page 23

1  coordinate so there's not duplication of services and

2  unneeded costs to the estate, so we will coordinate with

3  matters with respect to discovery.  And, moreover, and,

4  importantly, in addition to control that if the Committee

5  comes up with a settlement we, obviously, retain and have

6  because we believe standing is unequivocally ours, the right

7  to propose that settlement subject to a 9019 and the

8  Petitioning Creditors could object.

9        Your Honor also hit upon what I think is a very

10  important point of, you know, if there's a settlement of this

11  case that what's the likelihood of a settlement of the

12  Bankruptcy case without addressing this adversary proceeding.

13  I think that's very moot, but, of course, if there is a sale

14  we can always reserve the rights, put the money in escrow or

15  what have you.  But we actually think there probably can be

16  no resolution to the Bankruptcy case without a resolution of

17  the adversary proceeding.

18        So on authority to settle, I guess, I guess isn't the

19  correct word.  We're not trying to prevent the Debtor from

20  proposing a, you know, a plan or a sale process.  But one in

21  which it affects our rights in connection with the adversary

22  proceeding.  We don't think that's likely, but we would not

23  want the Debtors to essentially get around the ability or

24  have them settle the adversary proceeding or grant releases

25  or what have you.

1        So we will try to flush out this protocol again which

2    was just come up with this morning in a form of stipulation

3    and order, but Mr. Harris did appropriately relay the main

4    key points subject to the, you know, the devil being in the

5    details in this stipulation and order.  If Your Honor has any

6    questions.

7        THE COURT:  So what you're asking -- maybe I should

8    ask Mr. Stark.  But what you're asking, the open issue you're

9    asking is whether or not the Debtor, even though it's not a

10   party to the adversary proceeding, would, nonetheless, be

11   able to participate in settlement negotiations presumably

12   with Yucaipa that would include the adversary proceeding

13   without your participation?

14       MR. BURKE:  Right trying to settle the adversary

15   proceeding whether through a plan or without -- well we think

16   we should have the sole exclusive authority to resolve the

17   adversary proceeding.  I'm not trying to infringe upon their

18   plan or 363 sale rights; however, if they affect my complaint

19   they shouldn't be permitted to do that.

20       THE COURT:  Right, okay I got you.

21       MR. BURKE:  Thank you.

22       THE COURT:  You're welcome.  Mr. Stearn, good

23   morning.

24       MR. STEARN:  Good morning, Your Honor, may it please

25   the Court Bob Stearn from Richards Layton & Finger on behalf

1   of the Debtors.  Largely in agreement with what we heard

2   today with the exception of that last point and I'll explain

3   why in a moment.  From the Debtors' perspective what we were

4   trying to guard against was really the burden and expense to

5   the estate of having to participate in really two separate

6   adversary proceedings which were in many ways overlapping.

7   And one of the reasons we're substantially in agreement with

8   the stipulation as has been presented is because it protects

9   us from that.  For instance, we're now looking at one

10  complaint instead of two.  We're now looking at one discovery

11  request instead of two; although recognizing that there may

12  be some supplementation.

13      I'm encouraged by the suggestion that the Petitioning

14  Creditors and the Committee will coordinate on discovery.

15  For instance, if we're defending the depositions of, you

16  know, one of our officers our view is going to be look you

17  get seven hours.  If you get relief from the Court for more,

18  you can convince us as to why you're entitled to more fine.

19  But this is one case, you know, one complaint and we're going

20  to proceed through discovery efficiently and you guys

21  coordinate and you figure out how you're going to divide the

22  seven hours up amongst yourselves.  But when seven hours is

23  up, absent our agreement or Court order, we're leaving.

24      So we were encouraged to hear about the coordination.

25  And, of course, the last thing that I was happy to hear about

1  was, for instance, essentially that everyone is reserving

2  their 503(b) rights. Obviously, you know, the Petitioning

3  Creditors are going to reserve whatever right they think they

4  have to seek substantial contribution. We're going to

5  reserve our rights with respect to trying to, you know,

6  protect against that. We don't want the estate to keep

7  paying for really two plaintiffs.

8       But the issue on which we've not yet reached

9  agreement and I think I don't know that we will, but there's

10  been very little discussion about it so far was this notion

11  of sole settlement authority. It was first raised to us this

12  morning; 20, 25 minutes whatever it was before the hearing

13  was the first that we heard about it. It's not the subject

14  of any of the motions that are presented to Your Honor today.

15  Neither standing motions sought this relief. It was first

16  floated to us literally at 10 after 9:00 or something like

17  that this morning.

18       We're certainly not in a position right now to give

19  up what we view to be potentially important rights especially

20  in connection with a plan. And we've essentially also been

21  asking the Special Committee to address issues relating to

22  standing. And, obviously, there's been no consultation with

23  the Special Committee on an important issue like this. So as

24  I stand here today with respect to this question about

25  whether the Debtors would or could be forced to give up what

1   we view as potentially important rights, at least,

2   hypothetically; don't know how this case is going to play

3   out.

4       But as we've said many times before, our goal is to

5   get out as quickly as we can, given the damage that's being

6   done to the business while we're in Bankruptcy.  We're

7   certainly not prepared as we stand here today to give up

8   rights that potentially could be valuable with respect to

9   moving forward with a plan process and getting us out of the

10  case.  I think that's something that's going to have to be a

11  subject of further discussion as between the parties.  And if

12  the parties are unable to agree, I suspect we'll be back

13  before Your Honor on that issue.  Thank you, Your Honor.

14      THE COURT:  Thank you, Mr. Stearn.

15      MR. STEARN:  I don't know if Mr. Stark wants to be

16  heard on that issue or not.

17      THE COURT:  Good morning.

18      MR. STARK:  Good morning, Your Honor, thank you for

19  allowing me to appear in the case.  Robert Stark from Brown

20  Rudnick on behalf of the Special Committee.  I'll be very

21  brief, because the points have already been made.  But I do

22  think for three reasons and, again, we're writing pretty

23  quickly on a piece of paper as we're learning about the

24  settlement terms.

25      I cannot state to the Court that the Special

Case 1-43-09734-CSS-5 Doc 4062-5 Filed 05/02/20 Page 29 of 121
Case 1-23-00947-CSS Doc 962 Filed 03/15/43 Page 28 of 121

Page 28

1    Committee is supportive of this particular attribute of the

2    settlement and we do want a settlement.  We want all

3    settlements.  This case seems to be in certain respects

4    contracting as opposed to easing.  And I'm not sure that this

5    company, its business is, otherwise, enabled and strong

6    enough to stand forever in a Bankruptcy case like Tribune or

7    Lyondell or some of these other cases where litigation amok

8    where we kept the case going for years and years and years.

9    This is not that strong of a company.

10         From our perspective the idea that settlement

11   authority would be vested exclusively with the plaintiffs

12   here and not and removed from the company certainly hasn't

13   been briefed and so, therefore, I haven't had any opportunity

14   to talk to the Special Committee about it.  I think that's

15   really important because this doesn't seem, at least, in my

16   experience to be customary.

17         And some of you were involved in Tribune and Lyondell

18   and cases like that, it doesn't seem to be a customary

19   proposition that a plaintiff, a committee, even an official

20   committee that is leading plaintiff would have the ability to

21   sort of touch upon, if not, eviscerate certain rights of

22   exclusivity, certain rights under 1107, for a debtor in

23   possession to lead his way out.  And on top of that, I'm not

24   entirely sure it's very wise.

25         In this case, again, we have a lot of inter-creditor

1   litigation, here and elsewhere.  We have a lot of issues that

2   are being raised as far as value allocation is concerned.

3   Obviously, there's been governance issues and causes of

4   action have been asserted.  And the Debtor is not objecting

5   to the prosecution of that.  But the beginning of a

6   litigation is far different than the ending of the

7   litigation.  And the foreseeability of how and when we're

8   going to end that litigation at this moment, you have to

9   evaluate the strength of the business and determine whether

10  or not the business is strong enough to withstand the

11  possibility that this could evolve and devolve into further

12  litigation for extended periods of time.  I'm not entirely

13  sure this business is like that.

14       And so the opportunities that the Bankruptcy Code

15  presents a debtor to propose to the Court as all parties in

16  interest a solution.  They don't have to like it.  They can

17  argue against it.  They can vote it down.  But having, at

18  least, the opportunity to lead through and try to come up

19  with ideas that solve problems that's, I think, what debtors

20  are supposed to do and that's what's being proposed we cannot

21  do preordained before even gotten to the idea of sitting down

22  and talking about it.  Thank you, Your Honor.

23       THE COURT:  Thank you, Mr. Starck.  Mr. Gendregske.

24       MR. ANTONIPILLAI:  Good morning, Your Honor, Justin

25  Antonipillai from Arnold & Porter on behalf of Mr.

1    Gendregske.  I understand this is a little bit, it has the

2    sort of sense of a train that's already left the station.  If

3    the Court would permit me, I'd like to talk for a minute,

4    just focus on the intervention point because the standing

5    point we made was just simply in a derivative claim, there

6    shouldn't be two separate parties, and I believe that's no

7    longer at issue.

8         There's some very pragmatic concerns we have about

9    the arrangement that is on paper.  And I think largely Your

10   Honor has started unpacking them.  But I'm going to start, if

11   the Court would permit me, with a brief discussion of the

12   law, and I'll try and be brief.  I know Your Honor certainly

13   knows many of these cases.

14        For us, we are facing straightforward breach of

15   fiduciary duty and aiding and abetting of breach of fiduciary

16   duty claims.  There's standard straight, you know,

17   straightforward State law claims, non-core.  They could have

18   been brought in State Court and, you know, then we'd be

19   having an argument about whether they're related too.  Right,

20   you can imagine that kind of a discussion going on.

21        The question really is, you know, I know this is not

22   overly relevant, but if we were outside of Bankruptcy and we

23   were just in the District Court, this would be very clear

24   that the Petitioning Creditors should not be allowed to

25   intervene in this case.  So that's the sort of paradigm I'm

1    starting from.  One could disagree and one could say maybe

2    permissive intervention, but it's certainly not mandatory

3    intervention outside the Bankruptcy circumstance.

4         Then we go to the Bankruptcy contacts and how does it

5    change its analysis.  And I'm going to start by citing three

6    cases.  I don't normally do this, but citing three cases that

7    are arguably adverse to my position.  I just want to explain

8    and cite them for the Court up front.  We start with Marin

9    Oil.  Marin Oil was the Third Circuit case.  Obviously, it

10   held that a creditor's committee has the mandatory right to

11   intervene in almost any proceeding including adversary

12   proceedings.  And they're not limited in that case to amicus

13   status.  They have to have more.

14        It was, obviously, limited on space to creditors

15   committee.  There's a fair amount of discussion in that case

16   about the special roles of creditors' committees.  But I have

17   to tell Your Honor and Your Honor certainly read the case,

18   there's a fair amount of dicta in that case that arguably

19   relates beyond creditors' committees in interpreting the

20   relationship between 1109(b) and 24.  Okay so that's the

21   first one, but it's limited to creditors' committee.

22        In State Street Bank, Judge Walsh in this Court

23   applied essentially Marin to require intervention by a Debtor

24   in a case essentially applying Marin Oil.  And then third

25   Phar-Mor extended Marin, although it even cited internal

1  criticism and there's a dissent in that case, extended Marin

2  Oil to adversary proceedings that are non-core and arguably

3  unrelated to jurisdiction.  But, again, it's creditors

4  committee case, so that's the sort of lay of the land.

5       You have Marin Oil, State Street Bank and Phar-Mor.

6  They're all in the creditor's committee context or with the

7  debtors' committee context, but they're arguably adverse and

8  they all have sort of general language that interprets the

9  relationship between 1109(b) and 24(a) in a way that's

10  broader.  It's dicta, but it's adverse to us.

11       Marin has been harshly criticized in many ways and

12  it's limited on its facts to the creditors' committees'

13  cases.  Obviously, the Fifth Circuit and the Tenth Circuit,

14  the Fifth Circuit in Fuel Oil.  The Tenth Circuit has also

15  joined in saying that 1109(b) does not create a mandatory

16  right to intervene in any adversary proceeding related to a

17  bankruptcy.  That is the better reading of the relationship

18  between 1109(b) and 24(a).

                      And in this context, it also

19  plays off the plain language of 7024 and the advisory

20  committee notes.

21       So our simple point is under the plain language of

22  7024 and Rule 24 and the advisory committee notes, a creditor

23  as opposed to a creditor committee does not have the right to

24  mandatorily intervene in a case like this.  And we've looked

25  since Marin Oil, it's been, you know, 20, 24 years since that

1   case came out.  We couldn't find a single case holding that a

2   creditor, an individual creditor as opposed to a creditors

3   committee gets to intervene as a mandatory matter in an

4   adversary proceeding like this under the rationale of Marin

5   Oil.  I think that's for good reasons.

6          One, it would, you know, there are a lot of adverse

7   consequences that one can imagine from that; some of which

8   are playing out in the, you know, proposed order that we have

9   before you.  So, notwithstanding, the language of the cases

10  we've cited, Rule 24(a) does not require the Petitioning

11  Creditors to mandatorily intervene in this case.  And then it

12  becomes a matter of permissive intervention.

13         And I think of what you've heard today which is that

14  essentially the Petitioning Creditors are saying that the

15  creditors committee can proceed with the case.  That

16  essentially that's a concession that their interest are

17  adequately protected in terms of the estates interest here.

18  Again, you have a derivative claim, and we believe that the

19  estate -- essentially what they're saying is that the

20  creditors committee can bring this case as it does in many

21  other cases and that should be the end of the matter in terms

22  of the permissive intervention analysis, because, again, if

23  you have a party that's adequately representing the interest

24  of the estate, there is no permissive intervention.

25  Obviously, the Judge, Your Honor can reach a different

1    conclusion in its discretion.

2         So that brings us to pragmatic concerns we have in

3    that context.  And we're looking at this from a permission

4    intervention perspective.  We have real concerns about what

5    this means.  I mean the last issue about the various ways in

6    which the settlements can go forward strikes us as very

7    complicated and you can imagine that being fought over at

8    every step in the proceedings.  In many ways, this agreement

9    looks a lot like standing without calling it standing.  They

10   are called the plaintiff in the case.  They're allowed to do

11   every version of discovery.  And even provisions about

12   withdrawing discovery, basically reserve the right to serve

13   it again.  You know, withdraw the complaint means that they

14   have to coordinate, but there's a lot of reservation of

15   rights.

16        It doesn't look like this is a material difference

17   from, you know, affording a separate party standing on a

18   derivative claim.  And, again, you know, in a derivative

19   case, you know, there's hundreds of cases talking about why.

20   And once you've granted one party standing to bring a

21   derivative claim, you don't want every shareholder, for

22   example, also intervening in the same case.  You know, we

23   cited some of that language because it complicates the case.

24   You're going to have issues all the way through about what

25   does it mean in discovery, what does it mean in terms of

1  settlement, who has authority, and it's not really necessary

2  in this case.

3       Our point is there seem to be two issues that are

4  really underlying this effort by the Petitioning Creditors to

5  intervene.  I don't think they need to intervene in order to

6  solve those issues.  One, they're already a plaintiff in a

7  case that's essentially been consolidated with my client's

8  case.  And we've all agreed that discovery can take place in

9  a coordinative way.  So a simple order that requires

10  coordination of discovery between this case and the case in

11  which the Petitioning Creditors are already bringing their

12  direct claims effectively solves the issue with respect to

13  discovery.  You know, we're going to have to take the

14  discovery once, coordinate the discovery, you know, not

15  repeat it, but that solves most of the issues with respect to

16  discovery.

17       The reason I'm resisting intervention as a plaintiff

18  is that, you know, could very well carry with it other rights

19  that I don't think are necessary and are certainly not

20  justified under either 24(a) or 24(b).  So a coordinated

21  discovery order we don't object to and that would certainly

22  solve the issues with respect to most of the issues.  They're

23  already withdrawing their complaint.  And certainly there's

24  nothing wrong, you know, the Committee and the Petitioning

25  Creditors, they're always allowed to just coordinate in terms

1    of what plan should be brought.  There's no bar on that.  But

2    the notion that they be permitted to intervene as a plaintiff

3    that carries with it, you know, certain, you know, certain

4    other rights potentially and we don't know what that means.

5    But for discovery purposes, I think it's solved by the order

6    of just coordinating discovery.

7        Second, for settlement purposes, this provision is

8    troublesome to us.  We can imagine a lot of issues coming a

9    long down the way as to who's in charge of the case, who gets

10   to weigh in on what.  And Rule 9019 already gives the

11   Petitioning Creditors the right to weigh in once they sort of

12   seen the settlement discussions weigh in and disagree with it

13   or work out, you know, in terms of a settlement authority.

14       And so we think both a coordinated discovery order

15   and an order, you know, the normal 9019 process basically

16   covers most of the watershed, the waterfront.  And I don't

17   know honestly standing here what the consequences, all of the

18   consequences of permitting the Petitioning Creditors to

19   intervene under these circumstances.  We sort of explained

20   why it's not legally permitted or required, certainly.  But,

21   you know, once you have a party in the case as a plaintiff,

22   you know, I'm sure that will be thrown back at us regularly

23   as to what their rights are, what their permitted to

24   participate in, what their rights are for settlement.

25       And in a case that's trying to move towards trial in

1   August, I think that unduly complicates this case.  And,

2   obviously, Your Honor, we've made this clear and Your Honor

3   will be ruling on all of this stuff, but, you know, we

4   haven't worked through our issues with respect to a right to

5   a jury trial.  We could have a severance of this case of our

6   claims against my client.  You could have, you know,

7   withdrawal of the reference or, at least, the discussion

8   about that.  You know, you can imagine what the arguments

9   would be there.  But it's not appropriate at this point on

10   this law to have us burdened in some ways with the

11   Petitioning Creditors as a named intervener when I think most

12   of the relief they seek can be achieved through a coordinated

13   discovery order and through the normal 9019 process.  Thank

14   you, Your Honor.

15        THE COURT:  Thank you.  Mr. Klyman.

16        MR. KLYMAN:  Thank you, Your Honor, for the record

17   Robert Klyman of Latham & Watkins on behalf of Yucaipa.

18   Yucaipa has not taken a position on who has standing.  We've

19   been agnostic on that.  The only point that I'd like to make

20   is that to the extent Your Honor does allow this resolution

21   to move forward, Yucaipa may amend its answer depending on

22   how the complaints shake out.  And we will work -- if you

23   grant this, notwithstanding, Mr. Gendregske's counsel's

24   points that we will work with the Committee to work out an

25   appropriate timeline that doesn't slow down the track that

1  we've already set out to get to a trial in August.

2      THE COURT:  Thank you.

3      MR. HARRIS:  Your Honor, would you like to hear a

4  response?

5      THE COURT:  Sure.

6      MR. HARRIS:  Your Honor, just a couple issues to

7  address the concerns raised by Mr. Gendregske's counsel.  I'm

8  not entirely clear, frankly, what coordinated discovery order

9  Mr. Gendregske's counsel thinks can be entered here.  On the

10  one hand, he complains in his response that there shouldn't

11  be two adversary proceedings that are prosecuted

12  simultaneously.  There should be one, etc.  That's exactly

13  the resolution we've come to here.

14      If I understand his position correctly the two

15  adversary proceedings would stay outstanding.  They could be

16  a coordinated discovery order between the two.  To my mind

17  that creates enormous inefficiencies.  The first thing that

18  is going to happen is somebody is going to file motions to

19  dismiss our adversary proceedings or certain portions of it

20  in any event for lack of standing.  So we actually think what

21  we've done here is create a much more efficient means to move

22  these cases forward such that --

23      THE COURT:  Well I think his argument is that your

24  case should be dismissed.  The Committee's case should go

25  forward.  And basically you'd have the right to see whatever

1    happens; attend the deposition, get a copy of the document.

2    But not actually actively participate, and I think that's

3    what he's saying.

4           MR. HARRIS:  I mean maybe that's one interpretation,

5    Your Honor.  I'm not sure that's what I heard.  But that also

6    kind of skirts the few, you know, important issues here that

7    would remain outstanding such as the fact that we do have the

8    right to bring a contract enforcement action against Yucaipa

9    under the terms of the third amendment.  That is a claim that

10   my clients possess independent of the Debtors.

11          THE COURT:  But he wouldn't care about that.  His

12   client wouldn't care about that because he wouldn't be a

13   defendant.

14          MR. HARRIS:  True.  And we also have, we believe, an

15   independent basis for equitable subordination for harm

16   suffered on my clients in particular.  And that claim would

17   subsume virtually all of the discovery and information

18   relating to actions and conduct of the board of directors

19   during the relevant periods here, which while not necessarily

20   in connection with prosecution of a claim for a breach of

21   fiduciary duty or aiding and abetting breach of fiduciary

22   duty.  Clearly, the conduct of the board here and the actions

23   of the board here are relevant to the overall claims for

24   equitable subordination.

25          It's not just Yucaipa acting with one hat on.  It's

1   the whole panoply of conduct that they undertook in the

2   context of both trying to become the requisite lender, as

3   well as the conduct in the context of the board.  So I

4   actually think that the way that we set this out is actually

5   a much more efficient process and not as confusing as Mr.

6   Gendregske's counsel would have it.

7          Circling back, Your Honor, I mean in our papers and

8   in Mr. Gendregske's papers there are standards that we both

9   actually agree on for the Court to review in terms of

10  intervention come down to basically two: do we have a

11  sufficient interest in the case in order to justify

12  intervention and is there adequate representation.

13         With respect to the first factor, Your Honor, we've

14  laid it out in our papers, but there seems to be several

15  basis to conclude that we do have a sufficient interest here

16  to justify intervention.  It's not just a mere economic

17  interest in terms of recovery in the case --

18         THE COURT:  You really don't need to get into the

19  intervention issue.

20         MR. HARRIS:  All right, Your Honor.  So with the

21  pragmatic standpoint, we think that the agreement that's been

22  reached between the company, the Committee here creates an

23  enormously efficient way to move forward with what our --

24  it's not one adversary proceeding.  It's actually several

25  adversary proceedings and potentially cross claims, all of

1   which are being prosecuted simultaneously, all of which we're

2   going to be in the middle of simply by virtue of the way the

3   parties have agreed to proceed with these subject to Mr.

4   Gendregske's issues with potential severance of certain

5   claims, etc.

6          So with that, Your Honor, we think the Court should

7   approve the agreement that's been reached here.  And to the

8   extent Your Honor does so, we will work to prepare an agreed

9   form of order to submit to Your Honor. Thank you.

10          THE COURT:  Mr. Burke.

11          MR. BURKE:  Thank you again, Your Honor, and I'll be

12   brief.  As Your Honor is probably sick of hearing me say, you

13   know, from the outset the Committee's view has always been

14   that they're sitting in the middle of these two titans: Black

15   Diamond and Yucaipa and there can't be a resolution to this

16   case unless these two parties settle or are forced to settle.

17          We proposed as Your Honor knows several months ago to

18   try to streamline the process by teeing up a 363 sale with

19   the Yucaipa bid.  That did not proceed, but it was a way to

20   streamline the case because, quite literally, the Debtor

21   can't stay in bankruptcy for the rest of its life.

22          THE COURT:  Well it just might stay in bankruptcy for

23   the rest of its life.

24          MR. BURKE:  So, you know, to that point again this is

25   another attempt at the Committee trying to streamline this.

1   Quite honestly, I have no desire to go to trial in August.

2   May is when we're supposed to mediate.  It would be my hope

3   that there can be a resolution through mediation, and we will

4   work our hardest to try to get that.  But I don't want to be

5   left in another situation where under this stipulation if we

6   have, it is our adversary proceeding.  We control the

7   adversary proceeding.  They have rights to intervene.  I'm

8   not conceding for a moment that they have any direct causes

9   of action.  But let's hypothetically if they do, then we may

10  have separate issues that we have to deal with.  By having

11  them intervene in our adversary proceeding, it will tee up

12  everything for mediation or, at least, a trial if we ever get

13  there.  And I do think that this is more streamlined and a

14  quicker approach then battling over estate causes of actions

15  and private causes of action that Black Diamond may have.

16  Again, our sole intent here is to streamline this, come up

17  with a resolution, hopefully consensually to get the Debtors

18  out of Bankruptcy.  Thank you.

19          THE COURT:  You're welcome.  Any last comments?  Okay

20  well a couple of things.  In preparing for today's hearing on

21  the standing issues, it was one of my primary thoughts,

22  concerns issues I thought was just the pragmatic ability to

23  figure out how to run a case like this where the Committee

24  sought standing and in its papers the Petitioning Creditors

25  didn't object provided they would be allowed to intervene.

1    And the issue becomes who controls the litigation if you have

2    two different plaintiffs with two different ideas going two

3    different directions and one lawsuit, you've got all sorts of

4    problems.

5            So in the context of the proposed agreement, I think,

6    flushes out, at least, most of those issues, although I could

7    see some, perhaps, arising in the future.  And what I really

8    probably will be doing is just kicking the can down the road.

9    Hopefully, we never have to deal with it, but if we do we'll

10   do with it in the context of agreements about discovery,

11   agreements about settlement, etc. etc.

12           So I'm certainly willing to grant the Committee's

13   standing to pursue the Committee's cause of action.  I don't

14   think Mr. Gendregske would object to that.  It is picking one

15   or the other.  However on the picking one or the other issue,

16   I will allow Black Diamond to, excuse me the Petitioning

17   Creditors to intervene/participate in the litigation provided

18   that the issue about coordinating discovery and having one

19   set of document requests and one deposition.  I'm not going

20   to give you -- I can tell you as I'm sitting here right now

21   I'm not giving the Committee a deposition and then turning

22   around and letting the Petitioning Creditors take it a week

23   later.  If you both want to participate and you both want to

24   ask questions at one deposition, I'll deal with that at a

25   future date if necessary.  But, you know, it's going to be

1   one set of document requests, one set of interrogatories, one

2   set of request for admissions, one set of depositions unless

3   you can come back and tell me there's a problem.

4        That solves a big issue I had about coming in and

5   saying okay I'm going to grant the Committee's motion.  I'm

6   going to allow the Petitioning Creditors to intervene.  We

7   don't have one captain.  We got two.  And, you know, gosh

8   knows what's going to happen.  And I think I understand how a

9   settlement might work in the event one is reached.

10  Certainly, it sounds to me like all parties' rights are being

11  reserved in connection with the substance of any 9019 motion

12  that's put in front of the Court.

13        It's a little unclear -- well and it's also, I think

14  -- well it's confusing when you get to the point of okay

15  let's say Petitioning Creditors and Yucaipa reach some sort

16  of settlement.  The Committee is not a party to it, doesn't

17  necessarily agree with it.  Debtor is not a party to it,

18  doesn't necessarily agree with it.  And you come in and you

19  try to get a 9019 motion approved that settles their causes

20  of action or settles the Debtors' plan, etc. etc., I don't

21  know how that's going to work.  And I can't contemplate it.

22  All the different ways it might work.  I mean I think the

23  reality is that unless all four parties, Committee, Yucaipa,

24  Petitioning Creditors, the Debtor are all on board with the

25  settlement, it's likely not to be a settlement, but I don't

1    know.

2          So notwithstanding that I'm unsure about how that

3    might play out, at least for purposes of moving the standing

4    motion forward and getting the litigation going and there's

5    not going to be a settlement until the litigation gets going

6    and we know what's happening, I'm okay with the structure

7    that's been set forward.  Now I just want to make sure I

8    understand before I make a decision if I have to on exclusive

9    right to propose a settlement of the adversary proceeding.

10         I guess my question is because I heard Mr. Stark say

11   he hadn't even had a chance to talk to his client about it.

12   I heard Mr. Stearn say I haven't even had a chance to talk to

13   my client about this piece, do you want me to make a decision

14   on that issue or do you want to wait and?

15         MR. HARRIS:  Your Honor, I think the comments by both

16   Mr. Stearn and Mr. Stark are fair because the issue was not

17   as they said raised in the motion papers and it did come up

18   in a discussion this morning as we were trying to work

19   through the details of this.  I think it would be appropriate

20   to give them an opportunity to speak to their clients about

21   positions and to talk to us as to why we think the structure

22   we proposed makes sense.  And, hopefully, we can come to a

23   resolution in the form of an agreed order to submit to Your

24   Honor.  And if we can't, we may need to come back to you on

25   just that particular issue, but I don't think you need to

1    rule on it this morning.

2         MR. STARK:  Robert Stark again.  Your Honor, I'm

3    certainly fine with that and I'm certainly happy to pick up

4    the phone and call my client as soon as we leave the

5    Courthouse.  The only problem that I have if and it is

6    foreseeable especially if the Special Committee decides that

7    it is not supportive of this particular attribute of the

8    settlement, do we then have an opportunity to brief the issue

9    for Your Honor and then come back and argue it again.  And I

10   don't want to necessarily hold up the other attributes of the

11   settlement because as Your Honor just said getting it started

12   we can't have an ending until we've gotten it started.

13        THE COURT:  I don't think I would need, I think have,

14   in effect, heard -- well I don't want to say that.  The idea

15   of briefing the issue really sort of takes me back a bit

16   because this thing needs to get moving and we have a schedule

17   in place.  So I'm not sure I'd allow additional briefing, but

18   I certainly would allow I expect more discussion on the

19   record before I rule if you want me to.  I'm a little sort of

20   at a loss how to proceed.  I have an idea in my head, but

21   those are bad places for ideas sometimes.

22        And let me, well let me say that other than that open

23   issue, I am generally on board with what the parties have

24   agreed to do and would approve it subject to seeing the

25   details, etc. etc.  I don't know if that piece would blow up

Page 47

1   all the other pieces.  I don't know if that piece is

2   sufficiently narrow that I can deal with it on its own and it

3   will not affect the overall settlement.  I'm not asking

4   anybody to make that decision as I sit here today.

5            MR. STEARN:  May I please the Court.

6            THE COURT:  I can't force the parties to settle no

7   matter how much I would like to do that.

8            MR. STEARN:  May I please --

9            THE COURT:  Except that there's 9019 or something

10  like that.

11           MR. STEARN:  May I please the Court, once again, Bob

12  Stearn from Richard Layton & Finger on behalf of the Debtors.

13  Just an observation or two, Your Honor, my view is this last

14  point is not driving the bus.  That the parties, otherwise,

15  have an agreement irrespective of it and then we just have a

16  dispute as to this separate point which can be cleaved off.

17  And, respectfully, I would say that if it something that Your

18  Honor is going to entertain if after I speak with my client,

19  Mr. Stark speaks with his client, if we have sort of a

20  unified voice that we're just not willing to give up this

21  right without kicking and screaming, we likely would, at

22  least, request the ability to submit something in writing to

23  the Court since the issue, again, has not even been

24  presented.  It's not even been requested in any form of

25  motion or pleading.  It's just come up today in conversation

1    so.  Thank you, Your Honor.

2         THE COURT:  All right.  So I'll reserve decision on

3    that aspect of the agreement in principle that's been

4    reached, at least, between the Committee, Mr. Harris's client

5    and Yucaipa's indifferent.  So other than the open issue, I

6    will approve the proposed procedure.  I'll overrule the

7    objection subject, of course, to actually seeing the

8    stipulation and seeing what it says.  And if it's consistent

9    with what I've been told in Court, I won't have a problem

10   with it.  I will hold aside an issue on who gets to take the

11   lead in settlement at this time without prejudice to the

12   concept that that might blow what I've already agreed to up;

13   in which case, I'll deal with that if necessary.  If it's a

14   discreet issue, I'll deal with that in its context.

15        But I think it would be wise for everyone to actually

16   be able to have a more less frantic discussion and be able to

17   talk to their clients, etc., etc. on this issue.  So I think,

18   hopefully, everyone understands that.  Are there any

19   questions in connection with going forward in that way?

20        MR. HARRIS:  No, Your Honor, we'll work to put

21   together an agreed order between the parties consistent with

22   what Your Honor's rulings are.

23        MR. STEARN:  Bob Stearn for the Debtors, no

24   questions, Your Honor; thank you very much.

25        THE COURT:  You're welcome.  Okay that for present

1   purposes hopefully and forever deals with the two standing

2   motions.  That leaves us with the motion to dismiss the cross

3   claims, I believe, correct?  Okay we have to switch

4   personnel, bring in new Court Reporter.  And now seems like a

5   good time since it's a natural break so we'll take a short

6   recess while we get a new Court Reporter.

7          (Recess 10:44:28 to 10:48:47)

8              THE CLERK:  All rise.

9              THE COURT:  Please be seated.  From the Petitioning

10  Creditors.

11             MR. WARD:  Good morning, Your Honor.  Your Honor, my

12  name is Robert Ward from Schulte Roth & Zabel on behalf of

13  Petitioning Creditors and their motion to dismiss.

14             Your Honor, in their cross claims Yucaipa is seeking

15  a declaratory judgment that certain provisions of the third

16  amendment are null and void.  These happen to be the

17  provisions that prevent Yucaipa from acquiring a majority of

18  the debt from controlling the debt, that is, and from

19  becoming the requisite lender.  They also happen to be the

20  same provisions that were nullified by the fourth amendment

21  which allowed them to become the requisite lender and to

22  acquire the debt.

23             With the nullification, if you will, of the fourth

24  amendment, this presents a problem for Yucaipa.  So what

25  they're asking this Court to do is, in effect, through a

 1   ruling on this cross claim ultimately to reinstate those

 2   provisions that allow them to control the debt and to become

 3   the requisite lender, provisions that were in the fourth

 4   amendment which have now been knocked out and nullified by

 5   the ruling by Justice Ramos.  So it's a clear end run around

 6   the decision in New York.  They could have brought this

 7   action in New York.  They didn't, clearly, because of the

 8   negative result they've gotten in New York, so they're asking

 9   Your Honor to provide them with the relief here which is to

10   knock out the various provisions in the third amendment that

11   prevent them from controlling the debt and from becoming the

12   requisite lender.

13        These provisions very briefly, Your Honor, are a

14   provision in the third amendment that prohibited Yucaipa from

15   voting any of the debt it acquired, that prohibited Yucaipa

16   from counting the debt toward for the purposes of becoming

17   the requisite lender for the percentage to get to the 50%.

18   They couldn't count their debt.  In addition, one of the

19   provisions they seek to have nullified here by Your Honor is

20   the prohibition of Yucaipa acquiring more than 25% of the

21   term loans or $50 million dollars of the term loans.

22        So basically, Your Honor, as we say it's an end run

23   around the decision in New York.  We think it's improper.

24   And among the reasons we do and these are all legal reasons

25   as opposed to factual.  That's why we're doing this on a

1    motion to dismiss is that New York law, Your Honor, which

2    governs the substance of the credit agreement provides that

3    you look at the four corners of an agreement.  And if the

4    language is unambiguous, you give those unambiguous

5    provisions their effect.

6          And there are two contractual provisions.  We think

7    they're unambiguous, very clear, and then there's the statute

8    of limitations.  The two unambiguous provisions are 2.7(e) of

9    the third amendment which amended the first lien credit

10   agreement and created 10.6(j) which is a covenant not to sue

11   specifically addressed to Yucaipa.  In addition, there's

12   10.6(b) which says that any subsequent holders take

13   subsequent to the consent and authorizations of the

14   predecessors.  And, clearly, the predecessors here consented

15   to the third amendment.  Yucaipa doesn't contest that.

16         The third is the statute of limitations which we

17   believe is the three year statute of limitations.  The third

18   amendment which Yucaipa is claiming violates the provisions

19   of the first lien credit agreement, but the third amendment

20   was created, signed, executed on April 21st of 2008.  The

21   suit to invalidate these provisions of the third amendment

22   was not brought until four and a half years later in December

23   of last year.  It's a three year statute of limitations as

24   I'll get into in a moment, Your Honor.

25         But before I do, I do want to get into some of the

1   facts that were raised by Yucaipa in its cross claim.  First

2   off, this is primarily a detrimental and reasonable reliance

3   case.  I say primarily.  It's actually entirely a detrimental

4   and reasonable reliance case by Yucaipa.  Their principle

5   theme is that Black Diamond, Spectrum, and the other lenders

6   did not say anything in connection with the purported fourth

7   amendment or with Yucaipa's acquisition of the debt and since

8   they didn't say anything, they relied on it.  As I'll get

9   into in a moment, Your Honor, there's a big problem with that

10  claim.  10.9 of the first lien agreement has a no waiver

11  clause, and I'll get into that in more detail, but it says as

12  no waiver clauses say that a delay or failure to act does not

13  result in the loss of that right.

14       Now in addition to the primary focus of the cross

15  claim which is you didn't tell me I couldn't do this which

16  clearly would fall by the no waiver claim, there is a

17  smattering of and Black Diamond encouraged us to do it.  I

18  say a smattering because it's a very small part of the

19  complaint as opposed to the constant and consistent

20  allegations that Black Diamond, Spectrum, the lenders, CIT

21  you didn't tell me I couldn't do this.  You didn't stop me.

22       With respect though to the alleged incursion by Black

23  Diamond, first off, it's got some significant issues.  What

24  Yucaipa is saying is that in a meeting in Los Angeles and in

25  a couple of phone calls in August of 2009, we encouraged them

1    to do something, to buy the debt, to enter into this

2    purported fourth amendment.  The problem is unless, you know,

3    we had a crystal ball in August of 2009 they had a crystal

4    ball in February of 2009.  In February of 2009, they already

5    had done so.  They already sought to acquire the debt.  They

6    had sent tender offer materials to all of the lenders in

7    February of 2009 which contained what they called the

8    proposed fourth amendment which they admit in their cross

9    claims is materially the same as the actual fourth amendment

10   that was entered into and has now been nullified.

11           So in February of 2009, they had already committed to

12   do this, already sent out the tender offer materials so

13   they've got their causation backwards to say that in August

14   of 2009 we encouraged them to do something that they had

15   already sought to do in February of 2009.  So although on a

16   motion to dismiss a Court generally has to accept what's well

17   pled.  Something is not well pled, Your Honor, when it's

18   patently absurd and we've cited those cases.  You can't go

19   back in time.  February of '09 they made the decision.

20   August of '09 they had discussions with us.  One can't cause

21   the other.  Something after the fact can't cause something

22   before the effect.

23           In addition to that, Your Honor, Yucaipa is saying

24   that because the lenders failed to object to the draft fourth

25   amendment which they submitted with the tender offer of

1   materials in February of 2009, you know, they moved ahead

2   with the project, you know, to acquire the debt.  And they

3   also say that since there was no objection to that draft

4   fourth amendment that was submitted with the tender offer

5   materials in February of 2009 that they thought they were

6   okay.  They detrimentally relied upon it.  That's hard to

7   believe, Your Honor, because the lenders rejected the tender

8   offer.  So Yucaipa in its papers is saying well no one said

9   there was a problem with our acquisition of the debt.  Well

10  they did.  They voted with their feet.  They didn't go ahead

11  with the tender offer.  The lenders refused to accept it.  So

12  how that's not a rejection is difficult to understand; again,

13  an incredible allegation.

14          The third thing and we raised this in our reply

15  papers is Yucaipa is asserting that in August of 2009 they

16  were encouraged by a meeting with Mr. de Koff [phonetic] of

17  Black Diamond and several, you know, quick phone calls.

18  However, a year prior in a hotly contested matter called

19  Performance Transportation Services in the western district

20  of New York, Black Diamond and Yucaipa were warring with each

21  other.  We provided the documents that show there clearly was

22  no love lost.  They were fighting with each tooth and nail.

23          So it strains creditability and it patently absurd to

24  say that less than a year later Mr. Burkel from Yucaipa would

25  have relied upon his sworn enemy Mr. de Koff who they were

1  warring with each other in the Performance Transportation

2  Services case. So it's just not credible as we say, Your

3  Honor. There's no need to give any credit to what are

4  patently absurd allegations. In addition, they're a small

5  part of the complaint. The main complaint is no one told me

6  I couldn't do this and, therefore, I reasonably relied. But

7  in addition to all that, Your Honor, it's irrelevant because

8  we have legal defenses which get around these facts even if

9  Your Honor was to give them any creditability or any credence

10  and those are the three that I mentioned that I'll get into

11  in a second.

12       But before I do, Your Honor, the no waiver clause

13  which is 10.9 of the first lien agreement says it both ways.

14  It says no failure or delay by the lenders in the exercise of

15  power, right or privilege shall be construed to be a waiver

16  or acquiescence therein. And then it says in the same

17  paragraph the other way around: any failure to exercise or

18  delay in exercising any right, power, or remedy shall not be

19  construed to be a waiver thereof or preclude the exercise of

20  such rights.

21       So even if it were the case that the lenders sat on

22  their hands this no waiver clause you know ends it for

23  Yucaipa, precludes their claim. And, Your Honor, I said that

24  the primary theme of the complaint is that the lenders sat on

25  their hands. I'll give you some examples. At paragraph 18:

1    the allegation in the cross claim is that Black Diamond did

2    not express any intention to challenge Yucaipa's buying the

3    debt.  Paragraph 19: the lenders never raised a timely

4    objection to the purported fourth amendment.  Paragraph 25:

5    the lenders were made aware and made no efforts to oppose the

6    purported fourth amendment or Yucaipa's acquisition to the

7    debt.  It goes on and on.  Then at paragraph 71: Black

8    Diamond never objected to Yucaipa's proposed acquisition.

9    Paragraph 73: Spectrum never objected to the acquisition.

10   And then at some other paragraphs CIT and the lenders.

11        These claims of the fact that we sat on our hands

12   and, therefore, they reasonably relied on us not doing

13   anything first off, they're not true.  As I mentioned, Your

14   Honor, on the tender offer our clients voted with our feet

15   and refused to go ahead with it.  But, more importantly, they

16   fall by virtue of Section 10.9.

17        We're getting into the actual legal claims, Your

18   Honor.  Section 2.7(e) is a covenant not to sue.  And it says

19   that Yucaipa, it's specifically tailored to Yucaipa which in

20   the third amendment is called the restricted sponsor

21   affiliate.  It says Yucaipa cannot assert, and Yucaipa

22   irrevocably waives any claims, causes of actions against any

23   lenders arising out of contract of tort, in any way related

24   to the third amendment or any of the credit documents, and it

25   releases all claims whether accrued or not, known or not, or

Page 57

1   suspected.  And it even waives special and direct

2   consequential and punitive damages.  It's a broad covenant

3   not to sue.

4        And by virtue of Section 10.5(b) which I'll get into

5   in a second and that's the provision that says a subsequent

6   holder takes pursuant to the consents and authorizations of

7   the predecessor.  It clearly binds Yucaipa.  In fact, Section

8   2.7(e) specifically says the restricted sponsor affiliate

9   can't bring these claims and that is Yucaipa.  With respect

10  to claims like this, Your Honor, they're enforceable in New

11  York.  A covenant not to sue is expressly permitted under New

12  York law.  And as a result, it should be given effect.

13        Yucaipa alleges, Your Honor, that the covenant not to

14  sue is procured by misconduct.  Actually what they say is

15  that Section 2.7(e) is invalidated because of the misconduct

16  of the Petitioning Creditors.  However, in order to nullify a

17  covenant not to sue, there has to be an allegation that the

18  covenant itself was procured by misconduct or fraud.  There's

19  no allegation in the pleadings that that's the case.  The

20  allegation in the pleading is that their purchase of the debt

21  was pursuant to fraud and was produced by fraud.  There's no

22  allegation that the covenant itself was procured by

23  misconduct.  And as a result under the law of New York the

24  covenant not to sue is given effect.

25        And, you know, this is not surprising, Your Honor,

1  because if it was simple enough simply to say that the

2  covenant was pursued or my actions were procured by fraud,

3  then every covenant not to sue would be rendered null and

4  void.  You could never have one, because the simple

5  allegation in a fraud claim or a misconduct claim or an

6  estoppel claim that your actions procured, that your actions

7  were, my actions were procured by your action would render a

8  covenant not to sue unenforceable.  It can't be the case.

9  That's why it's restricted.  There has to be an allegation

10  that the covenant itself was procured by misconduct or fraud.

11  No such allegation in the pleading, Your Honor.  As a result

12  it's in effect.

13       Yucaipa does argue that there's an exception to

14  2.7(e) an exception to the covenant not to sue.  That the

15  claims are not waived "to the extent their caused by such

16  lenders gross negligence or willful misconduct."  However,

17  what Yucaipa fails to do is continue with that exclusion,

18  with that exception.  It says gross negligence or willful

19  misconduct on or after the date that Yucaipa became a lender.

20  Yucaipa didn't become a lender until the fourth amendment.

21  The allegations here are not challenging the fourth

22  amendment.

23       They're challenging the third amendment.  The third

24  amendment was entered into well before Yucaipa acquired the

25  debt.  Yucaipa acquired the debt in August of 2009.  The

1   third amendment was entered into in April of 2008.  So this

2   temporal limitation on this exclusion means that it doesn't

3   apply.

4           In addition to that, Your Honor, another part of the

5   exclusion is that it has to be a finding of gross negligence

6   or willful misconduct on or after the date Yucaipa became the

7   lender "as determined by a Court of competent jurisdiction by

8   a final and non-appealable judgment.  There's been no Court

9   of competent jurisdiction making a finding that there was

10  gross negligence or misconduct on the part of my clients.

11          And as a result, that's the second reason that this

12  exclusion --

13          THE COURT:  I'm sorry where is the exclusion

14  specifically?

15          MR. WARD:  It's in the covenant not to sue 2.7(e) of

16  the third amendment, Your Honor.

17          THE COURT:  Okay.

18          MR. WARD:  And with respect to the fact that there

19  has to be a finding by a Court of competent jurisdiction,

20  Yucaipa seeks to get around that by saying hey, you know

21  we're pleading misconduct and we're pleading willful

22  misconduct and gross negligence here, but that's too easy.

23  You can't just get around a covenant not to sue like this by

24  claiming that especially when there's language in the

25  exclusion that says there has to be a finding by a Court of

1   competent jurisdiction to that effect.  Because if it was

2   easy enough simply to plead a fraud or an estoppel cause of

3   action, a misconduct cause of action as their pleading here

4   and say well, therefore, the covenant not to sue doesn't

5   apply everybody could do it.  You can imagine, Your Honor,

6   someone comes in and pleads willful misconduct or gross

7   negligence and then is not able to prove it and as a result,

8   they render null and void a covenant like this, which makes

9   no sense because, of course, there's a cardinal rule of

10  contract instruction that you have to give effect to every

11  provision in an agreement.

12       So if Yucaipa can simply come and in and say oh it's

13  okay I'm pleading that and at some point I think I can prove

14  willful misconduct and that gets around your covenant not to

15  sue, it means the covenant not to sue has no effect because

16  what if they don't prove it, then how do you put the covenant

17  into effect, you know, in expo facto, so to speak.  So that

18  exclusion doesn't apply.

19       Yucaipa also makes a number of other arguments to do

20  an end run around the covenant not to sue.  First, they say

21  that -- sorry, Your Honor, just got ahead of myself.  First,

22  they say, Your Honor that the fourth amendment itself

23  nullified this covenant not to sue.  Well except the fourth

24  amendment now has also been nullified in the decision in New

25  York.  But, again, Yucaipa can't have it both ways.  They

1    allege in the cross claim, and the whole basis for the cross

2    claim I saw, I looked at it last night, there's five specific

3    places where Yucaipa says that their cross claim assumes the

4    fact that Justice Ramos in New York is invalidating the whole

5    fourth amendment.  That's how they get a justiciable

6    controversy here.  Now if the fourth amendment has been

7    nullified in its entirety and, therefore, they can present

8    this issue in front of the Court.

9         With respect to this covenant not to sue, they're not

10   saying well wait a minute, I know that I'm trying to get a

11   justiciable controversy before the Court for a declaratory

12   judgment by saying the whole fourth amendment is invalidated,

13   but that's except for the part that invalidates the covenant

14   not to sue.  Well they can't have it both ways.  If the

15   fourth amendment is not nullified in its entirety which is

16   the basis for their claim, then they're not here.  If, on the

17   other hand, I'm sorry, then the covenant not to sue can't be

18   invalidated.  If, on the other hand, the, you know the Fourth

19   -- sorry I'll have to do it again.

20        If the fourth amendment is invalidated in its

21   entirety, then the covenant not to sue is in effect.  It's in

22   the third amendment.  If, on the other hand, there are pieces

23   of the fourth amendment that are still alive, well their

24   whole cross claim is based on an assumption that Justice

25   Ramos has invalidated the whole fourth amendment, so they

1    can't have it both ways.  They're either or they're not here.

2         If they're here based on the invalidity of the whole

3    fourth amendment, the covenant not to sue applies because

4    it's in the third amendment.  If, on the other hand, they're

5    now saying well, you know, the fourth amendment is still

6    alive well then they're whole cross claim falls because -- at

7    paragraph 25, paragraph 93, paragraphs 96 and paragraph 108

8    they're whole claim is based on the entire invalidity of the

9    fourth amendment.

10         The other thing they're saying which is a little bit

11   in conflict with their allegation that the whole fourth

12   amendment has been rendered null and void in their complaint

13   as I've just cited to Your Honor is that the fourth amendment

14   might be severable.  However, the relief that we sought in

15   our motion for summary judgment which was granted by the

16   Judge from the bench was that that purported fourth amendment

17   to the credit agreement is not and never was effective, and

18   that's what he said to me you've won, move on, and that he'll

19   render a decision in writing.

20         But contrary to what Yucaipa is saying, a ruling from

21   the bench is still an effective ruling.  The relief that we

22   sought in our summary judgment motion was clear.  It was

23   focused.  It was that the fourth amendment was null and void

24   and the Judge granted that ruling.  So with respect to

25   severability, we don't think that there is an issue, but we

Page 63

1    do take instance with Yucaipa saying that we didn't raise the

2    issue in front of Justice Ramos.  In fact, the issue of

3    severability was raised in front of Justice Ramos.  They

4    raised it in their briefs and they didn't raise it in the

5    oral argument, but, you know, that was their choice in the

6    oral argument.  And then they submitted several letters

7    subsequent to the oral argument to Justice Ramos about

8    severability, so the issue has been raised.  It's not been

9    hidden.

10        But, more importantly than that since Yucaipa does

11   argue the severability issue in their motion before Your

12   Honor and their objection to our motion, Your Honor, the law

13   on severability when it comes to New York is that if the sole

14   purpose and effect of an agreement is an integrated whole and

15   one part is interdependent on the other then it's not

16   severable.  It's an integrated document.  And, Your Honor,

17   the sole purpose and effect of the purported fourth amendment

18   was to remove each of the restrictions that prevented Yucaipa

19   from exerting influence on the lenders and becoming the

20   requisite lender.

21        So the purported fourth amendment, Your Honor, was

22   clearly intended to be a wholly integrated document that had

23   one goal which was handing the requisite lender status to

24   Yucaipa.  And there was no argument otherwise before Justice

25   Ramos.  This is not a typical situation of severability, Your

1    Honor, where you have a mistake and some language that would,

2    otherwise, doom some benign agreement.  Here, the entire

3    purpose of the fourth amendment, every substantive provision,

4    is part of a forbidden objective to give Yucaipa dictatorial

5    power over the first lien debt.  And the reason I can say

6    that so clearly, Your Honor, is if you look through the

7    fourth amendment what it simply does is pick and choose

8    provisions of the third amendment which it needs to overturn

9    in order for Yucaipa to vote its debt, to become the

10   requisite lender, to buy enough that it can become the

11   requisite lender.  It's all part and parcel of the same

12   whole.  It's not severable.

13          And with respect to the next argument, Your Honor,

14   which is based on 10.6(b), that's the language that says a

15   subsequent holder is bound by the consent and authorizations

16   of the predecessor lenders.  The fact is the predecessor

17   lenders here consented to the third amendment.  Yucaipa

18   doesn't contest it otherwise.  There's nowhere in their

19   pleadings where you will see that Yucaipa contests that the

20   predecessors from whom they bought consented to the third

21   amendment.

22          And the fact that a subsequent holder takes subject

23   to the predecessor lender's consents and authorizations is

24   not surprising.  It's the law.  Even if there weren't a

25   provision like this, the case law provides that an assignee

1  assumes the assignors obligations.  When they bought this

2  debt, they knew what was contained in the third amendment.

3  The third amendment had these prohibitions on things it could

4  do.  It couldn't vote its debt.  It couldn't acquire enough

5  debt to become the requisite lender.  And it couldn't count

6  the debt that it bought for the calculation to become the

7  requisite lender.  It knew that.  How do we know that,

8  because it was actively involved in the negotiation and the

9  drafting of the third amendment.

10         The Committee in its complaint at paragraph 66 says

11  that.  So there's no hiding.  The fact is they knew what was

12  in the third amendment and when they bought the debt they

13  knew what was in the third amendment.  And they knew that

14  Section 10.6(b) which is in actually the underlying first

15  lien agreement, not even the Third or the fourth amendment,

16  says that the subsequent holders take pursuant to the

17  consents and authorizations of the successors.  So there

18  can't be any doubt that they took subject to the provisions

19  of the third amendment.

20         Now one argument they make is a specific general

21  argument, you know, the rule of contract instruction that the

22  specific governs over the general.  And they say that there's

23  another provision of the first lien agreement 10.5 or 10.5(b)

24  which says when an amendment can and cannot be made.  That's

25  not specific to this case or what's before you, Your Honor.

1   What's specific to us before you is 10.6(b) the provision

2   that I'm talking about which says specifically that a

3   successor take subject to the consents and authorizations of

4   the predecessor.  It can't be any more specific than that.

5           Next, Your Honor, with respect to the statute of

6   limitations.  The argument that Yucaipa makes it's throughout

7   its cross claim, but in particular paragraph 108 is that the

8   restrictions in the third amendment are inconsistent with the

9   terms of the first lien credit agreement which was being

10  amended by the third amendment.  And, therefore, if the

11  restrictions in third amendment are inconsistent with the

12  terms of the first lien credit agreement, they were

13  inconsistent at the time the third amendment was passed.  So,

14  in effect, the third amendment was void ab initio.

15          And, in fact, the claim here is a declaratory

16  judgment claim that we believe accrued as of the time of the

17  third amendment.  If the allegation by Yucaipa, Your Honor,

18  is that the third amendment was inconsistent with provisions

19  of the first lien agreement and, therefore, is null and void

20  then it clearly was null and void the moment it was passed.

21  That was in April of 2008 and the action was not brought

22  within three years which we believe is the statute of

23  limitations.  And that's the Delaware statute of limitations,

24  Your Honor, which is a three year contract statute of

25  limitations.  And as we argued in our papers a Bankruptcy

1  Court as a general matter applies the choice of law rules of

2  the State in which it sits; Delaware clearly here.

3          In addition where there's a choice of law provision

4  as there is in this case, Your Honor, and it is New York, but

5  when there's a choice of law provision the case law that's

6  Gluck vs. Unisys in the Third Circuit and also American

7  Energy which is a case in Delaware, a choice of law provision

8  does not apply with the statute of limitations unless there

9  is an explicit reference in the agreement that it does.  And

10  there is no explicit reference here.  It's Section 11.14,

11  Your Honor, of the first lien credit agreement and that makes

12  no specific reference to the statute of limitation.  So as a

13  result, Your Honor, the choice of law is where Your Honor is

14  sitting which is in Delaware.

15          Now if that weren't enough, the Delaware Borrowing

16  Statute provides that if a cause of action arises outside of

17  the State an action cannot be brought in Delaware after the

18  expiration of whichever is shorter: the time limited by the

19  law of Delaware or time limited by the place where the cause

20  of action arose.  That's 10 Del. C. §121.  The shorter

21  statute here, Your Honor is three years.  The statute in New

22  York is six years, but we don't even see that the cause of

23  action here arises in New York.  It may have arisen in

24  Atlanta.  It may have arisen somewhere else, but we don't

25  think it arose in New York.  But in any case, under the

1  Borrowing Statute this action cannot continue because the

2  statute of limitations applies and it's three years.

3       With respect to the argument that, you know the New

4  York statute should apply, the only thing that happened in

5  New York, Your Honor, is that Justice Ramos ruled to

6  invalidate the purported fourth amendment, but that's no

7  basis for finding that the New York statute applies.

8  Otherwise, there's no assertion, there's no allegation in the

9  cross claim that anything happened in New York, so New York

10  certainly can't apply.

11       With respect to the argument relating to the statute

12  of limitations, Yucaipa argues that the Borrowing Statute

13  should not apply because Borrowing Statutes typically apply

14  when one party is doing forum shopping.  The case law isn't

15  that strong.  It doesn't really call it forum shopping,

16  however, Yucaipa chose the forum here, Your Honor.  This is

17  the cross claim challenges the third amendment just like we

18  had challenged the fourth amendment in New York.  Yucaipa

19  could have brought this action in New York before Justice

20  Ramos where he was dealing with similar issues; the fourth

21  amendment as opposed to the third amendment.

22       They chose to come to this Court because they didn't

23  like the result that they were getting in New York.  In

24  addition, Your Honor, a cross claim is not like a

25  counterclaim.  It's not compulsory.  It's permissive.  It can

Page 69

1    be brought anytime.  Yucaipa clearly made a choice.  They

2    decided to come into this Court.  And since they decided to

3    come into this Court, they have to be bound by the statute of

4    limitations of this Court pursuant to the Borrowing Statute.

5    Just a few other points on the statute of limitations, Your

6    Honor; I'm about to wrap up.

7          One of the arguments that they make is, Yucaipa makes

8    is the statute began to run when Justice Ramos ruled.  Well

9    that makes no sense.  The assertion here is that the third

10   amendment was void at the time it was passed, because the

11   assertion at paragraph 108 of the complaint is that the third

12   amendment violated the provisions in the first lien credit

13   agreement which the third amendment was amending.  If that's

14   true, it violated them the moment it was passed.  It doesn't

15   all of a sudden start violating the first lien credit

16   agreement when a Judge decides that the subsequent agreement

17   the fourth amendment should be invalidated.

18         THE COURT:  Don't I not have a controversy until the

19   fourth amendment is invalidated?

20         MR. WARD:  Your Honor, did you not or I couldn't hear

21   you.

22         THE COURT:  I'm sorry I was leaning back.  Wasn't it

23   the case there was no controversy until Justice Ramos made

24   his ruling?

25         MR. WARD:  Well, Your Honor, I think the issue of

Page 70

1    whether there's a case of controversy which is a

2    justiciability issue isn't relevant for the purpose of the

3    statute of limitations and I was just about to get there,

4    because there are several cases.  One is Marvel and I think

5    the other is Madison Fund vs. Midland that says in connection

6    with a breach of contract cause of action, it runs from the

7    date of the breach.  So it doesn't run from the date of

8    anything else.  It's fairly clear contract law that a breach

9    of contract claims runs from the date of the breach.  And it

10   applies to an assignee.  It applies to the third party

11   beneficiary.

12        So if taking Yucaipa at its word as you have to do

13   for purposes of a motion to dismiss, that the third amendment

14   violated the first lien credit agreement.  That was the

15   breach.  Now this is a declaratory judgment action, but the

16   way statutes of limitations work with declaratory judgment

17   actions is you take the corresponding damages claim and we've

18   cited, you know, case law for that.  And the corresponding

19   claim here is breach of contract.  And with every breach of

20   contract claim, there's no tolling.  It's not like a fraud

21   claim.  It's not tolled.  A breach of contract starts for the

22   statute of limitations purposes when the breach took place.

23        And the only breach here based on the theory that

24   Yucaipa is espousing is that the third amendment violated

25   provisions and was inconsistent with provisions in the first

1   lien credit agreement.  That had to happen on April 21st of

2   2008 when the third amendment passed.  It's a breach of

3   contract, the statute of limitations.  Those are the rules.

4   They could have brought these claims early on.  And they

5   never tried to bring them early on, because, Your Honor, it

6   didn't hurt them early on.  They had the fourth amendment in

7   effect and so everything was on cruise control.  However,

8   just because they didn't feel that they had a problem by

9   virtue of the fourth amendment knocking out the provisions in

10  the third amendment which they're now asking this Court to

11  knock out doesn't mean there wasn't a breach.  I'm sorry,

12  Your Honor.

13          THE COURT:  No, no, I'm just having trouble getting

14  my head around it.  I mean they didn't have any issue with

15  the third amendment until the fourth amendment was put in

16  place.

17          MR. WARD:  I understand, Your Honor, and I think with

18  all due respect, I think we're confusing two concepts.  I

19  think whether or not you have an issue that's not what causes

20  a statute of limitations to begin to run, at least in

21  connection with a breach of contract claim.  Now we all know

22  that there are tolling --

23          THE COURT:  I was going to say unless there's some

24  tolling.

25          MR. WARD:  Unless there's some tolling, but there's

1    tolling when it comes to a fraud claim.  I mean we all know

2    that.  I don't really know what it is in Delaware.  I know

3    what it is in New York.  It's two years after discovery or

4    six years after the event, so there are tolling provisions

5    like that.  But there is not a tolling provision when it

6    comes to a breach of contract that I'm aware of in any Court

7    or in any state, and there certainly isn't one in Delaware.

8    And maybe it's a hard and fast rule and maybe it's

9    unfortunate that for Yucaipa it's a hard and fast rule, but

10   justiciability is one thing.  Whether I have an issue is

11   another thing.

12        The statute of limitations for a breach of contract

13   claims runs at the time of the breach.  And with all due

14   respect, Your Honor, if Yucaipa thought there was a problem

15   with the third amendment, that is, that some of the terms of

16   the third amendment were inconsistent with the first lien

17   credit agreement, they knew it.  They helped draft it.  The

18   complaint of the Committee points out from documents it has

19   that we didn't have that they were actively involved, and

20   that's paragraph 66 of the creditors committee's complaint.

21        So they really have no standing.  There should be no

22   equitable tolling here and I'll get to that in a second,

23   because they knew about the issue all along.  They didn't

24   have a problem with it.  But that doesn't allow them to get

25   around the statute of limitations.  If their assertion is to

1    be believed in the cross claim, they say clearly the third

2    amendment was inconsistent with provisions of the first lien

3    agreement.  There's nothing about the passing of the fourth

4    amendment that made the third amendment more consistent with

5    the first lien credit agreement.

6         Now we think the fourth amendment was inconsistent

7    and Justice Ramos ruled that way.  But the third amendment if

8    it was inconsistent, they knew it was inconsistent.  They had

9    helped draft it.  They can't bold-facedly come in and say the

10   third amendment was inconsistent with the terms of the first

11   lien credit agreement.  Nothing that Justice Ramos did,

12   nothing that's in the fourth amendment made the third

13   amendment more or less inconsistent with the first lien

14   credit agreement.  It either was or it wasn't.  It's very

15   binary.

16        I'm trying to read a note from my partner, Your

17   Honor.  And as I was getting into a moment ago, Your Honor,

18   Yucaipa is an assignee.  They're a subsequent holder.  And

19   the case law which we cite in our papers is that an assignee

20   takes subject to the rights of the assignor including

21   specifically for statute of limitation purposes.  So just

22   like 10.6(b) said if you're a subsequent holder, you take

23   subject to the rights of the predecessor holder.  The case

24   law is very clear that the statute of limitations applies.

25        Now Yucaipa does try to get around this issue, Your

1   Honor, and gets into another one of these logical conundrums

2   that I had a problem with a moment here, but here's how it

3   goes.  What Yucaipa is saying is well we had no right to

4   contest that, because Convest had the interest at the time.

5   Now the answer to that is well yeah, but you took from

6   Convest or you bought from Convest or Convest's predecessors

7   and the statute of limitations for a breach of contract arose

8   at the time Convest or its predecessors entered into the

9   third amendment if we had believed your claim that the third

10  amendment is inconsistent with the first lien.  So it starts

11  running from the date Convest or its predecessors had it.

12  You as the assignee take subject to that statute of

13  limitations.  That the way a statute of limitations law works

14  and the way assignments work.

15       What they say is well except we had no right to

16  contest that.  Well except you're taking subject to the

17  rights of your predecessor.  But then they say well and

18  Convest had no right to contest that because some of the

19  provisions that we're challenging here specifically relate to

20  us that we can't vote any stock that we buy.  You know, that

21  we can't buy so much stock and that we can't count it toward

22  the requisite lender provision.  Here's their problem.

23  Convest or its predecessors have no standing to challenge the

24  third amendment.  I would say, Your Honor, that the assignee

25  Yucaipa because the only way they get standing is through

1    buying this debt.  Yucaipa, the assignee, has to take subject

2    to the fact that Convest and its predecessors have no

3    standing.

4         So, again, their arguments tend to be very circular.

5    They take with one hand and try to give back with the other.

6    So what they're saying is Convest couldn't contest this and,

7    therefore, the statute of limitations didn't begin to run;

8    well until we got it.  Yeah, but you took it from Convest.

9    And if Convest had no standing to contest the third

10   amendment, then you don't have standing either.  They need to

11   have some sort of standing to contest this because the only

12   way they get their rights is by buying this debt.  And they

13   bought the debt subject to the rights that the predecessors

14   had.  It does get a little bit convoluted, but since they

15   take their rights as an assignee they're stuck with the way

16   the statute of limitations runs.

17        And just a couple of other quick points, Your Honor,

18   in addition to everything else, third party beneficiary law,

19   to be a third party beneficiary you have to have a valid

20   contract.  You have to have the contract being attended for

21   the beneficiary's benefit and the benefit is direct rather

22   than incidental.  And for this, I would just cite, Your

23   Honor, to the whereas clause in the third amendment.  I mean

24   there's no doubt what the third amendment is for.  It's for

25   Yucaipa.  It says Yucaipa you couldn't buy debt before.  Now

1   you can buy debt, but you can only buy debt subject to the

2   following restrictions.  You can't vote it; the things that I

3   went through before.

4           The whereas clause of the third amendment says, the

5   borrowers have requested, the borrower is Allied which is

6   controlled by Yucaipa.  They had all the equity or most of

7   the equity and controlled the board and the management.  The

8   whereas clause says, the borrowers requested --

9           MR. KLYMAN:  Excuse me, Your Honor, if I may this is

10  maybe the 18th time that Mr. Ward is citing the facts outside

11  of the complaint.  He's not allowed to do that as part of a

12  motion to dismiss.  He's going on about the PTS litigation

13  which was -- he cites to the creditor committee's complaint,

14  not our complaint.  He cites to control over management which

15  his nowhere in our complaint.

16          MR. WARD:  Right, Your Honor, I'll take back control

17  over management because I don't --

18          MR. KLYMAN:  Your Honor, there are other issues, Your

19  Honor, that go partly to the heart of his argument where

20  we've tried to give him some leeway.  We were going to

21  address it in our argument, but he's way outside the scope of

22  our complaint, Your Honor.

23          MR. WARD:  I don't think so, Your Honor.  I mean

24  maybe on that point and I'll withdraw on that point on Allied

25  being controlled by Yucaipa, although I do think, Your Honor,

1    this is not the first time you've heard about that, Your

2    Honor.

3            THE COURT:  Well, but look there's a standard to be

4    applied.

5            MR. WARD:  There is --

6            THE COURT:  And a lot of things I know that don't

7    necessarily get taken into account here.

8            MR. WARD:  And I agree, Your Honor --

9            THE COURT:  Including in whatever's in the

10   Committee's complaint.

11           MR. WARD:  I understand, Your Honor, but let me go to

12   the whereas clause of the third amendment which is before

13   Your Honor.  The whereas clause says the borrowers requested

14   the requisite lenders agree to amend the credit agreement to

15   permit the sponsor.  That's Yucaipa, Your Honor, to become a

16   lender under the credit agreement.  Since the whereas clause

17   specifically says that the purpose of the third amendment is

18   to allow Yucaipa to become a lender, clearly they're a third

19   party beneficiary.  And if they're a third party beneficiary,

20   Your Honor, the law is clear that the statute of limitations

21   on a third party beneficiary runs from the date of the

22   contract.  The date of the contract April of 2008 Yucaipa is

23   a clear party beneficiary from the whereas clause that is in

24   the third amendment.  I'm not going to astringent evidence,

25   so clearly by virtue of the third party beneficiary argument

```
 1   Yucaipa has to deal with the three year statute of

 2   limitations.

 3          And with respect to Mr. Klyman's assertion about PTS

 4   as we cited in a footnote in our reply brief, Your Honor,

 5   matters which are of public record which and thereby which

 6   this Court can take judicial notice can be made a part of a

 7   motion to dismiss --

 8          THE COURT:  Well it's one thing to take notice of the

 9   fact there's a lawsuit.  It's another thing to take notice of

10   the fact how parties were behaving in the lawsuit where, you

11   know, whether they were each other's throats or how

12   contentious the litigation is, that's not something I can

13   take judicial notice of.

14          MR. WARD:  I understand, Your Honor.  We did attach

15   several of the pleadings from the PTS case which were filed.

16   They're a matter of public record from which we believe that

17   Your Honor can easily construe and understand that the

18   parties were at each other's throats.  But I take your point,

19   Your Honor.

20          With respect to my final point, Your Honor, maybe

21   second to last point, equitable tolling.  For equitable

22   tolling the main thesis is that a party was actively mislead

23   by the other party concerning their cause of action.  You

24   can't have that here, Your Honor, because Yucaipa was

25   actively involved in connection with the third amendment.
```

1          MR. KLYMAN:  Again, Your Honor --

2          MR. WARD:  I promise when Mr. Klyman is up I'm not

3     going to interfere with --

4          THE COURT:  Yeah, Mr. Klyman, I understand.  I'll

5     hear from you when it's your turn.  Proceed.

6          MR. WARD:  Thank you, Your Honor.  I just lost my

7     place, Your Honor, I apologize.  In any case, Your Honor, we

8     believe that Yucaipa had notice of its causes of action long

9     ago.  Even if it's not April 21st of 2008 which is the date

10    of the third amendment, they didn't bring this action, this

11    cause claim until December 5th, I believe it was, of 2012, so

12    applying a three year statute of limitations from Delaware

13    that gets them to December of 2009.  That is well after they

14    bought the debt, well after they alleged in their pleadings

15    that the Petitioning Creditors had already turned on them.  I

16    think it's after the Georgia litigation had been started.

17    It's after the Georgia litigation had been initiated by

18    Yucaipa -- sorry, Your Honor.

19          Your Honor, three years prior to the date they filed

20    their cross claim which should be December 5th of 2009 was

21    after they had already bought the debt in August of 2009.

22    And according to the allegations in their own pleadings, they

23    had learned that the Petitioning Creditors had done things

24    that were adverse to them.  And they had to start, they being

25    Yucaipa, had to start an action against CIT to try to enforce

1    the fourth amendment.  So, clearly, they had notice that

2    there were issues with the fourth amendment and the third

3    amendment when they started the Georgia action.  And so even

4    if it's not April 21st of 2008, they still had plenty of

5    notice during the times they allege in their complaint August

6    of 2009, for example, which predates the, you know, the three

7    years for the running of the statute of limitations.

8            But the final point, Your Honor, and that is there is

9    an allegation in their opposition that statute of limitations

10   don't apply to an affirmative defense.  And even if Your

11   Honor dismisses their complaint, their declaratory judgment

12   complaint, estoppel and unjust enrichment complaint, they can

13   still bring the same assertions as an affirmative defense.

14   It is true that typically a statute of limitations doesn't

15   apply to an affirmative defense to another claim.  However,

16   our equitable subordination claim relates to the fourth

17   amendment and the purchase of debt from Comcast.  That took

18   place in August of 2009.

19           Their cross claim relates to the third amendment.

20   It's different issues.  The third amendment was a year and a

21   half before and separate assertions and allegations in their

22   cross claims about the third amendment.  The only relief they

23   seek in their declaratory judgment action, Your Honor, is a

24   declaration that certain provisions of the third amendment

25   are not enforceable and that they're null and void.  In our

1    equitable subordination claim, Your Honor, we don't deal with

2    that issue.  We deal with the fourth amendment and the

3    purchase of the debt from Convest.  Thank you very much, Your

4    Honor.

5            THE COURT:  You're welcome.

6            MR. LAGEMANN:  Good morning, Nick Lagemann from

7    Sidley Austin on behalf of the Committee.  I just would like

8    to speak very briefly in terms of our support for the motion

9    to dismiss the cross claim.  Consistent with what Your Honor

10   was discussing before about what the Court may or may not be

11   able to rely upon in reviewing the motion to dismiss and the

12   cross claim itself, I will confine myself simply to what is

13   in the cross claim itself.  As I'm sure the Court is aware

14   under the Supreme Court's decisions in Twombly and Iqbal the

15   Court is required to take a look at the allegations to

16   determine whether they state a plausible set of facts that

17   could support a claim.

18           Here, we respectfully submit that the cross claim

19   utterly fails that standard for the following reasons.  And

20   Mr. Ward touched upon this, but I do just want to go through

21   a couple of the specific allegations within the cross claim.

22   In particular, Yucaipa alleges that they somehow relied upon

23   an agreement reached with the Petitioning Creditors in August

24   2009 that the Petitioning Creditors would somehow support or

25   not object or do something in connection with what Yucaipa

Page 82

1   terms its "plan" to take control of the first lien debt

2   structure.  And that's specifically at paragraph 3 of the

3   cross claim.

4        The problem with this allegation is that Yucaipa's

5   own cross claim admits that its intent, its plan, its design

6   was formed months before the Petitioning Creditors are even

7   alleged to have done any affirmative agreement, acquiescence

8   or anything of the sort with relation to what Yucaipa terms

9   its plan.  In particular as of December 2008, Yucaipa admits

10  it would not purchase any first lien debt unless "certain

11  third amendment terms related to Yucaipa's potential

12  acquisition were amended and Yucaipa could serve as the

13  requisite lender on its own."  That's paragraph 60 of the

14  cross claim.

15       Then they admit at paragraph 4 as of February 2009

16  Yucaipa "intended to spend tens of millions of dollars to

17  acquire a majority of the first lien debt pursuant to an

18  amendment that reversed the restrictions on ownership in the

19  third amendment."  That's, again, at paragraph 4 of the cross

20  claim.

21       They admit at paragraph 61 they launched a tender

22  offer which included a version of the fourth amendment that

23  if valid would have enacted the intended reversals that

24  Yucaipa was seeking.  Now, we all know the tender offer

25  fails, but Yucaipa doesn't claim that the failure of the

Page 83

1   tender offer changed its plan, altered its intent, or did

2   anything of the sort, nor does it say the Petitioning

3   Creditors were somehow in some agreement that caused that.

4        No, instead what Yucaipa says is right after the

5   failure of the tender offer "Yucaipa entered into direct

6   negotiations with Convest to acquire its requisite lender

7   position." That's at paragraph 64 of the cross claim. And

8   Yucaipa also admits in the same paragraph that it had its

9   negotiations with Convest, but the negotiations "played out

10  over several months and involved different proposals, but

11  every one of them contemplated Convest enacting certain

12  amendments to the third amendments terms. Yucaipa's

13  acquiring Convest majority position and Allied Holdings first

14  lien debt and becoming the requisite lender."

15       Now what's important about those allegations is they

16  establish that whatever Yucaipa's intent that it's planned,

17  to use its word, was formed and was pursued months before the

18  Petitioning Creditors came into the picture. Now one very

19  other brief point on plausibility or implausibility, Your

20  Honor, what you're being asked to believe in the cross claim

21  is that a multibillion dollar private equity firm armed with

22  armies of lawyers and advisors was somehow mislead because

23  they had a commercial discussion with another party. We

24  submit and we certainly did not see anything in the

25  opposition that there was no support in the law and certainly

1   none in the facts of their play that could insulate Yucaipa

2   from liability to the Debtors' estates for the actions that

3   it has done based upon the allegations we see in the cross

4   claim.  Unless Your Honor has any questions, thank you.

5       MR. KLYMAN:  Thank you, Your Honor.  For the record

6   Robert Klyman of Latham & Watkins on behalf of Yucaipa.  Your

7   Honor, we've already touched on the legal standard on our

8   motion to dismiss.  The Court must accept Yucaipa's

9   allegations as true and draw all reasonable conclusions in

10  its favor.  The facts offered up by the Petitioning Creditors

11  or the Committee that are not contained in the amended

12  complaints are irrelevant for purposes of a motion to

13  dismiss.

14      So as I mentioned while Mr. Ward was making his

15  presentation, the inferences that he's drawing from

16  litigation in PPS not applicable here.  The rejection by

17  Black Diamond of a tender offer not present here.  The

18  allegations state that the tender offer was unsuccessful

19  because Convest came in and bought up a majority of the debt.

20  The allegations that, you know, we should cite to the

21  Committee complaints and rely on that also as you indicated

22  have no place here.

23      Mr. Ward in his argument he narrowly construed the

24  Yucaipa complaint as simply a declaratory relief action

25  seeking to invalidate limited portions of the third

1    amendment.  That's not a fair reading of the complaint.  In

2    count two, for example, Yucaipa seeks to invalidate the

3    applicability of the entire third amendment because of the

4    unjust and inappropriate actions of Black Diamond and

5    Spectrum.  Same thing in count three and count four.  He's

6    looking at one paragraph of count one which is at paragraph

7    108, but ignoring the rest of the prayer for relief.

8         Now Black Diamond and Spectrum's first argument says

9    that, you know, we should be, that the complaints should be

10   dismissed because of the plain terms of the third amendment.

11   But right now as we sit here today in this Court, there's no

12   legal basis on which to conclude that the third amendment

13   applies to Yucaipa.  I mean we're at (c).  Although Judge

14   Ramos orally ruled in November 2012 that he was going to

15   grant Black Diamond and Spectrum's motion for summary

16   judgment invalidating the fourth amendment, he hasn't written

17   any order and no order has been entered on the docket.

18        We can only speculate as to why this delay has

19   occurred, but based on filings in this Court that were

20   submitted by Black Diamond and Spectrum you know that Yucaipa

21   has argued to Judge Ramos that he can severe certain portions

22   of the fourth amendment while retaining the rest of the

23   fourth amendment.  It is possible that based on severability,

24   Judge Ramos will strike the various amendments that modified

25   Section 2.7(e) and 10.6(b) that are identified by Petitioning

1  Creditors and other provisions in the third amendment upon

2  which Black Diamond relies.  As a matter of New York law

3  until there's a written Court order the fourth amendment

4  remains in full force and effect.  For that reason alone, the

5  motion which depends upon the operation of the third

6  amendment should be denied.

7        Now Black Diamond says well if the fourth amendment

8  doesn't apply or the fourth amendment is still in force

9  because we're still waiting for Judge Ramos then we don't

10 have a right controversy for the cross complaint.  And, Your

11 Honor, that's just not true.  First of all, as you've said as

12 the parties just said in this case we need to move the issues

13 along related to who holds what debt, whether or not Yucaipa

14 can be subordinated, what the shape of a purchase agreement

15 would look like quickly, because this is not the type of case

16 that is getting better with age.

17        And there is a right of controversy.  As described in

18 the cross claim at paragraph 15 on December 3rd, 2012 Black

19 Diamond sent a notice to the Debtors demanding that Black

20 Diamond and Spectrum and one other lender be recognized as

21 the requisite lender.  Yucaipa has a firm position that

22 Yucaipa should be recognized as requisite lender and that's

23 one of the issues that is being tested in the cross

24 complaint.  Because if Yucaipa loses the ability to act as

25 requisite lender and loses its debt claim, Yucaipa's overall

1    position and argument is that that would result in an unjust

2    enrichment and a windfall for other lenders and an

3    inappropriate prejudice to Yucaipa in large measure because

4    of the actions by Black Diamond and Spectrum that are laid

5    out in great detail in the complaint.

6          In addition, Black Diamond and the Committee have

7    filed their own complaints, their own litigation where they

8    seek to enforce the third amendment and the Debtor teed this

9    off by filing its own declaratory relief action to which a

10   number of our claims counterclaims against the Debtor were

11   compulsory.  And we ended up having to file cross claims

12   against other parties because they all arose from the same

13   operative facts and implicated core issues that would be

14   tested before this Court such as equitable subordination and

15   credit bidding and the like.

16         Second, the counterclaim seeks a declaration that

17   certain of the third amendment provisions don't apply.  And

18   Black Diamond and Spectrum's attempt to apply those

19   provisions at the motion to dismiss stage seeks to determine

20   the ultimate issue in this case without a trial.  We seek the

21   declaration that not only certain provisions don't apply, but

22   that they're stopped from applying the entire, all of the

23   provisions of the third amendment.

24         You know it's described in the complaints and the

25   cross complaint in 2008 the then existing lenders sought to

1    amend the first lien credit agreement to allow them to sell

2    that to Yucaipa.  This took the form of a third amendment.

3    That's at paragraphs 11 and 54 among others.  CIT, as agent,

4    coordinated the passages of the third amendment and which was

5    approved by the Special Committee of the Debtors' board and

6    approved by the majority of the lenders.  That's at cross

7    complaint at paragraph 12.

8         It's undisputed based on the cross complaint that

9    Yucaipa was not a signatory of the third amendment and never

10   bought any debt under the third amendment.  And, in fact,

11   given the restricted terms of the third amendment, Yucaipa

12   made it clear and would never have purchased debt under the

13   third amendment.  That's, among other places, cross complaint

14   of paragraph 13; therefore, no one expected that Yucaipa was

15   going to be bound by the third amendment in April 2008.

16        And, in fact, as pled in the cross complaint the

17   genesis of the third amendment was that certain lenders who

18   were seeing the decline of the automobile industry and by

19   extension the car haul industry wanted to sell their debt.

20   This document, this third amendment was not for the benefit

21   of Yucaipa unless Yucaipa decided to buy debt.  This document

22   was for the benefit of lenders to enable them to sell debt to

23   Yucaipa without any promise or representation that Yucaipa

24   was going to buy debt on the back end.  It's absurd based on

25   the allegations in the complaint to say that Yucaipa was

Page 89

1   somehow a third party beneficiary of the third amendment when

2   they disclaimed that they were not going to buy any debt what

3   so ever in the third amendment.

4          Approximately eight months later in December 2008,

5   the auto industry continued to decline and lenders holding a

6   majority of the first lien debt approached Yucaipa about

7   buying the debt.  As set forth in paragraph 60 of the cross

8   complaint, Yucaipa made it clear to those lenders that it

9   would only acquire debt if the restrictions in the third

10  amendment were eliminated and Yucaipa could serve as

11  requisite lender.

12         In February 2009 as described in the cross complaint,

13  Yucaipa launched a tender offer for debt under the fourth

14  amendment, not under the existing third amendment.  And when

15  I say under the fourth amendment it was a precursor to the

16  fourth amendment.  The material terms as set forth in the

17  cross complaint were essentially the same.  The tender offer

18  included an amendment to eliminate provisions of the third

19  amendment concerning, among other things, the amount of debt

20  Yucaipa could acquire and to eliminate restrictions on

21  Yucaipa serving as requisite lender.  That's identified in

22  counterclaim at paragraph 61.

23         Unlike Mr. Ward's allegations that outside the four

24  corners of our complaints there was no rejection by Black

25  Diamond or Spectrum of the fourth amendment.  But instead as

Page 90

1    alleged in the complaint, Convest came in and for whatever

2    reason better price or whatever, they acquired the majority

3    of the first lien debt, thereby obviating the tender offer.

4    Thereafter, Yucaipa entered into negotiations with Convest

5    and ultimately acquired Convest's majority position pursuant

6    to the fourth amendment as described, in among other places,

7    paragraphs 15 and 16 of the cross complaint.  That was in

8    August of 2009.

9          But it's abundantly clear from the allegations in the

10   complaint that Yucaipa never acquired and never intended to

11   acquire any claims under the third amendment.  And also as

12   I'll describe in a few minutes and as laid out in great

13   detail in the cross complaint, Black Diamond and Spectrum

14   were actively encouraging this debt purchased under the

15   fourth amendment with respect to Convest when in discussions

16   with Yucaipa.  In addition to Yucaipa's clear intent never to

17   be bound by the third amendment, the cross complaint lays out

18   facts which are as I mentioned presumed to be true that

19   Yucaipa relied on Black Diamond and Spectrum's support in

20   acquiring the requisite lender position.  And it also pleads

21   that it would be inequitable and work an unjust enrichment if

22   Black Diamond and Spectrum could now apply the third

23   amendment to Yucaipa.

24         For example, as set forth in paragraph 72 and 73,

25   Black Diamond and Spectrum were consulted in the loop about

1   Yucaipa's purchase of the debt under the fourth amendment and

2   encouraged that purchase.  It wasn't just no noise coming

3   from them and, therefore, Yucaipa made the assumption that

4   there would be no objection.  There was active encouragement,

5   and after the execution of the fourth amendment, that support

6   continued.

7        And CIT, for example, recorded all of Yucaipa's loans

8   on the registry which, as a result, means that pursuant to

9   the terms of the credit agreement Black Diamond and Spectrum

10  were obligated to treat Yucaipa's holdings of approximately

11  $145 million dollars of debt and requisite lender status.

12  The head of Black Diamond and the head of Yucaipa as

13  described in the cross complaint mentioned about strategies

14  after Yucaipa became requisite lender.

15       For example, after the execution of the fourth

16  amendment as set forth in paragraph 72, they discussed a

17  joint strategy to use their debt to implement a sale of

18  Allied which relied on Yucaipa's status as requisite lender.

19  They further met in February 2010 nearly six months after

20  Yucaipa acquired the requisite lender position under the

21  fourth amendment to discuss Yucaipa's plans as requisite

22  lender to increase Allied's value and Black Diamond expressed

23  support for those plans.  That's at paragraph 8.

24       They met in New York on January 31, 2011 nearly 18

25  months after Yucaipa acquired the requisite lender position

1   to, again, discuss Yucaipa's plans as requisite lender.

2   That's at paragraph 8.  Then in March through May 2011, Black

3   Diamond made numerous proposals to effectuate a transaction

4   with respect to Allied, each of which relied upon Yucaipa's

5   status as requisite lender.  That's also at cross claim,

6   among other places at paragraph 8.

7        And then in December 2011, more than 25 months after

8   Yucaipa acquired a requisite lender position under the fourth

9   amendment.  Yucaipa directed CIPS agents to terminate certain

10   letters of credit which resulted in the distribution of

11   approximately $17 million dollars in deposit to existing

12   lenders including Black Diamond on a pro rata basis.  This

13   only could have occurred had the lenders and CIT recognized

14   Yucaipa's requisite lender under the fourth amendment.

15   That's laid out across claim at paragraph 21.

16        It is in the foregoing, Black Diamond's arguments

17   that this covenant to sue should not apply, can't survive.

18   First of all the whole premise of the cross complaint is that

19   it would be unjust to bind Yucaipa to the third amendment,

20   which it never signed up to, would have never bought debt to

21   and only move forward under the fourth amendment because of

22   the improper encouragement.  It was turned out to be

23   duplicitous by Black Diamond and Spectrum.

24        First as laid out in our papers a party cannot rely

25   on a covenant not to sue, where the covenant was procured by

1    misconduct.  Based on the facts set forth in the cross

2    complaint, the petitioning creditors acted duplicitously in

3    inducing Yucaipa to acquire the first lien debt, supporting

4    Yucaipa as requisite lender, accepting the fruits of the

5    actions of Yucaipa as requisite lender through the release of

6    funds, working with Yucaipa to develop proposals that relied

7    on Yucaipa's requisite lender status and then two years after

8    the fact seeking to apply the terms of the third amendment to

9    Yucaipa.  This bait and switch was intentional

10   misrepresentation.  All as plead in the cross claim and

11   demonstrates that the application of the covenant is the

12   result of their misconduct.

13        Second, covenants not to sue cannot be relied upon to

14   insulate a party from its own willful or intentional

15   misconduct such as the wrongful conduct alleged by Black

16   Diamond and Spectrum throughout the cross complaint.  In

17   essence such covenants are shields, not swords.  And here

18   Black Diamond and Spectrum seek to use the covenant as a

19   sword to grant themselves an unjust financial windfall after

20   falsely assuring Yucaipa that they supported Yucaipa as

21   requisite lender under the fourth amendment.

22        Most interestingly to us was that Black Diamond

23   intentionally, Black Diamond and Spectrum, intentionally

24   omitted from its papers when it was citing to Section 2.7(e)

25   in the covenant not to sue.  The language in 2.7(e) that

Case 1-15-01074-CSS  Doc 106-25  Filed 05/02/20  Page 95 of 121
Case 1-15-01074-CSS  Doc 106-25  Filed 03/15/13  Page 94 of 121

Page 94

1   knocked out the applicability of the covenant not to sue, if

2   any operative act was caused by any lenders gross negligence

3   or willful misconduct after the date that Yucaipa became the

4   lender as determined by a Court.  Well that is essentially

5   what our whole complaint is about that they acted

6   duplicitously before and after execution of the fourth

7   amendment, and as a result we should be able to argue that it

8   would be unjust and inequitable for Black Diamond and

9   Spectrum to be able to apply the third amendment against

10  Yucaipa.

11      We're not yet at point where a Court of competent

12  jurisdiction has made that determination, but we have all

13  agreed pursuant to the schedule that's played out that in

14  August this Court is going to make that determination.  Black

15  Diamond and Spectrum also attempt to bar the cross claim by

16  Section 10.6(b), which according to Black Diamond and

17  Spectrum provide that the consent to the third amendment by

18  Yucaipa's predecessor's in interest bind Yucaipa.

19      Like the other provisions of the third amendment

20  Yucaipa never agreed nor intended to be bound by the third

21  amendment.  Further, as laid out in the papers Yucaipa

22  alleges that that provision was not validly affected because

23  it required the consent to each affected lender.

24      Now Black Diamond and Spectrum next delve into the

25  statute of limitations issue.  Under the legal standard there

1   is no accrual of the statute of limitations unless there is a

2   justiciable controversy which involved some present prejudice

3   to the Plaintiff, which didn't occur until Judge Ramos made

4   his oral ruling.

5           Now, Mr. Ward says no such thing as equitable

6   tolling, but that's just not right.  If a party to a contract

7   alleges a breach and the other party agrees to cure in six

8   months and doesn't, you can't go back to that period of time

9   and say oh, statute of limitations tolled because you had an

10  agreement that they would cure.  The same thing applies here.

11          According to Black Diamond while the fourth amendment

12  was in full force, while Black Diamond was working with

13  Yucaipa to implement transactions that required Yucaipa's

14  requisite lender status, and as late as December 2011 where

15  Black Diamond was accepting the fruits of Yucaipa's requisite

16  lender status under the fourth amendment.  Black Diamond

17  argues that Yucaipa should have brought suit seeking to

18  declaratory relief that the third amendment didn't apply.

19  Well the fourth amendment was in full force and effect.  We

20  would have been facing other arguments about rightness, and

21  lack of a judiciable controversy if we somehow manufactured

22  an argument at that time that we shouldn't be bound by the

23  third amendment.

24          We were not as I mentioned the third party

25  beneficiary to the third amendment.  In fact Yucaipa

Page 96

1    expressly disclaimed any interest in being a participant

2    under the third amendment and never bought that under that

3    amendment.  When Yucaipa acquired claims under the fourth

4    amendment CIT as the agent of Black Diamond and Spectrum

5    among others entered Yucaipa on the registry, thereby,

6    recognizing Yucaipa as a valid debt holder.  And there has

7    been no allegation that Yucaipa is not properly on the

8    registry today.

9         Following the CIT litigation which involved the

10   fourth amendment that was dismissed with prejudice by CIT, so

11   as late as 2010 there was no controversy that was still

12   brewing that would somehow suggest that Yucaipa should worry

13   itself at all with the third amendment.

14        Further, as we lay down our objection, even if you

15   get into a discussion about which statute of limitation

16   applies, and we think it's irrelevant because the cause of

17   action didn't accrue until Judge Ramos ruled on the bench the

18   six year New York Statute of Limitation applies.  Yucaipa was

19   not forum shopping and ended up in this venue only because

20   the petition and Creditors filed an involuntary petition.

21   They fought a transfer of this case to another venue.  Then

22   the Debtors filed a declaratory relief action, and Yucaipa

23   had compulsory counter claims to that action.  And as a

24   result also filed cross claims against Black Diamond, and

25   Spectrum and others.

1        Even if this dis-causative action could of somehow

2   been split with some in New York and some here, the overlap

3   of facts and law that would have occurred mandated one forum

4   that combined all Creditors and the Committee.  We spent a

5   lot of time arguing in front of Your Honor months ago about

6   how it was necessary that this Court take jurisdiction of all

7   of the issues because the Debtor needed a binding resolution

8   of all the issues so it could try and exit this case.

9        As I mentioned the issues associated with Yucaipa's

10  claims that Black Diamond and Spectrum acted inequitably are

11  directly implicated by and serve as affirmative defenses to

12  Black Diamond and Spectrum's complaints, and the Committees

13  complaints and their efforts to subordinate Yucaipa's claims

14  as well as other Court proceedings involving credit bidding

15  if we ever get to a sale.  So this was the logical venue, but

16  the underlying policies with respect to the borrowing statute

17  that would shorten the statute of limitations that are not

18  implicated because Yucaipa did not choose this forum.  In any

19  event, as I mentioned under either the New York or Delaware

20  Statutes the claims are barred.

21       Now Black Diamond and Spectrum also contend for the

22  first time in the reply that Section 10.9, the so called no

23  waiver provision, blocks Yucaipa's cross complaint.  This

24  argument was only raised in the reply and should not be

25  considered by the Court.  They had plenty of time to brief

1    their issues and they raised a new argument in the reply.

2    But if Your Honor is going to consider it, you know, this

3    argument is not applicable.

4         Yucaipa is contending first of all as with all the

5    other provisions of the third amendment that the third

6    amendment doesn't apply and if it did it would result in

7    unjust enrichment windfall to Black Diamond, and Spectrum and

8    the other lenders.  Because Yucaipa never intended to be

9    bound by the third amendment and never would have bought that

10   under the third amendment.

11        The cases cited by Black Diamond and Spectrum as

12   dealing with arguments that the exercise of expressed

13   remedies are not waived by the passage of time or estoppel

14   are just not applicable.  We are not arguing for example,

15   that the acceptance of late payments result in the waiver of

16   compliance with payment terms or that, you know, defendants

17   were prevented from arguing that a one year delay in bringing

18   an action constituted a waiver.

19        Here we are arguing that the entire third amendment

20   should not apply to us on unjust enrichment and inequitable

21   grounds.  And that was purely driven by the decision that was

22   made by Judge Ramos which still, as I mentioned, is not yet

23   reduced to a written order, but we need to get this case

24   moving.  And so as a result we are willing to proceed to get

25   to an August trial date even while Judge Ramos has not issued

1    his written order.

2            THE COURT:  Thank you.  Reply?

3            MR. WARD:  Your Honor, very briefly.  Thank you.

4            THE COURT:  Yes.

5            MR. WARD:  Your Honor, just a couple of points.

6    First, with respect to the equitable tolling argument,

7    throughout the cross-claims Yucaipa alleges that it would

8    never have brought that under the third amendment.  Now,

9    clearly it had made that determination before the passage of

10   the fourth amendment, it sought the fourth amendment to get

11   rid of the restrictions in the third amendment, which were

12   the reasons it wouldn't buy debt.  But considering it

13   wouldn't buy debt under the third amendment and had made that

14   decision well before the fourth amendment adds purchase of

15   the debt, it was aware of the issues with the third amendment

16   at that time, which would be any time between April 21st of

17   2008 when the third amendment was entered into and August of

18   2009 when they purchased the debt.  That's still more than

19   the three years prior to the statute of limitations.

20   Equitable tolling certainly can't toll the claim past the

21   date when they've made the decision that they wouldn't buy

22   under the third amendment or past the date when they actually

23   bought under the fourth amendment.  So I think that that

24   argument is out the window.

25           In addition, what Yucaipa would have us believe is

1     that in connection with the third amendment, the lenders went

2     out on their own without Yucaipa's help and passed an

3     amendment to remit Yucaipa to buy debt but in post terms that

4     were unacceptable to Yucaipa.  I mean what would have been

5     the point?  Again, I think that's relevant to when did

6     Yucaipa get notice of its claim.  Clearly, it had notice of

7     its claim well before the fourth amendment.

8           And with respect to the point that Mr. Klyman just

9     raised about the no waiver clause, first off, one of

10    Yucaipa's arguments is that we don't know what parts of the

11    fourth amendment are in effect, but some parts of the fourth

12    amendment may knock out some of the defenses we have.  The

13    primary example is the covenant not to sue which I've dealt

14    with, I raised in the argument.  But there's nothing in the

15    fourth amendment that addresses the no waiver clause, that's

16    10.9 of the first lien agreement, that's been in effect since

17    the beginning.  So there's nothing in the fourth amendment

18    regardless of what justice Ramos does that's going to knock

19    out the no waiver clause.  Now Mr. Klyman says yeah, but

20    unfair, you didn't raise the no waiver clause until the

21    reply.  The no waiver clause is very much a part of the

22    argument in front of Justice Ramos.  The New York litigation

23    is cited many times in the cross claim, it's clearly before

24    Your Honor, and we've attached the briefs which, the briefs

25    on the motion for summary judgment where we cite to the no

1    waiver clause.  Because not surprisingly, in the New York

2    action, Yucaipa brought up how unfair it would be if the

3    fourth amendment was reversed because they relied upon what

4    Black Diamond did, allegedly did, didn't do, and they relied

5    upon the fact that the lenders didn't oppose the fourth

6    Amendment.  We cited the no waiver clause in front of Justice

7    Ramos in our papers which are an exhibit to our reply.  So

8    clearly this is not a new argument that Yucaipa couldn't

9    anticipate, they are a party, they're with the other party in

10   the New York action.

11        In addition, the assertions relating to the third

12   amendment are before the Court, were before the Court in the

13   Georgia action.  And I looked at my notes which Mr. Klyman

14   was speaking, the Georgia action was commenced by Yucaipa on

15   November 13th of 2009 seeking to enforce the fourth

16   amendment.  And in the course of those arguments dealing with

17   the history of the third amendment leading up to the fourth

18   amendment, November 13th, 2009 is still more than three years

19   prior to Yucaipa's bringing this action.  So whether it's

20   equitable estoppels or whatever argument you want to make,

21   they were aware of these claims when they brought the Georgia

22   action in November of 2009.  They were certainly aware of

23   these claims at least in-between the period of the third

24   amendment and the fourth amendment, but it doesn't have to be

25   April 21st, 2008, the date of the third amendment.  It can be

1    any time between the third amendment and the fourth amendment

2    and their purchase of the debt which was August of 2009.

3    That's still more than three years before.

4            What's happening here is very opportunistically,

5    Yucaipa likes the fourth amendment, they didn't want to do

6    anything vis-à-vis the third amendment, and as I think Mr.

7    Lagemann may have said in his papers, they were caught with

8    their hands in the cookie jar and they're now going back and

9    saying, oh but we have these issues relating to the third

10   amendment.  The fact is statutes of limitations for breaches

11   of contract aren't tolled by any actions except this

12   equitable tolling argument.  And, Your Honor, it doesn't,

13   shouldn't apply here because Yucaipa was aware of these

14   claims well before the three years, and as I say, well before

15   it purchased the debt in August of 2009.

16           So just a couple of other things.  Mr. Klyman points

17   out that I was focusing substantially on the declaratory

18   judgment claim because most of their complaint, or cross

19   claim focuses on that.  But whether it's the declaratory

20   judgment claim which specifically calls for the reversal or

21   voiding of four paragraphs there, or the unjust enrichment

22   claim or the estoppel claim, it all deals simply with the

23   third amendment.  The third amendment again was passed a long

24   time ago.

25           Mr. Klyman also says that as a matter of New York

1    law, Justice Ramos's ruling from the bench that the fourth

2    amendment is null and void has no affect.  There's not a

3    single case cited by Yucaipa for that proposition, and in

4    fact it's not true, at least in New York.  I'm not going to

5    get into something that's extraneous to the pleadings, but

6    there's no case cited by Yucaipa that that is true.  Your

7    Honor, I'm pretty much done here.

8           Oh, one of the other issues, and this is the covenant

9    not to sue, is the claimant I think is blending things

10   together.  The law is clear, the cases that he cites, and in

11   fact he even mentioned that a covenant not to sue will not be

12   given affect if that covenant was procured by fraud.  And

13   then half a second later, Mr. Klyman said, as his papers say,

14   as the cross claim says, that their investment was procured

15   by fraud.  Their investment is not the covenant not to sue.

16   Covenant not to sue is separate.  The case law is clear, in

17   order to knock out a covenant not to sue, you have to have a

18   specific allegation that that covenant itself was procured by

19   fraud and misconduct, there is no allegation anywhere in the

20   pleadings to that affect.  So the covenant not to sue

21   applies.

22           THE COURT:  Okay.

23           MR. WARD:  And finally, Your Honor, with respect to

24   the covenant not to sue, Mr. Klyman says, well you know it

25   does say, well it says two things, it's got a temporal

1   limitation which is it's only the actions after they become a

2   lender, and the actions after they become a lender are really

3   not in play in the cross claim as everything before, so the

4   temporal limitation on the exclusion to the covenant not to

5   sue doesn't apply.  But the other aspect of the exclusion is

6   there has to be a finding of willful misconduct or gross

7   negligence by a court.  And he says, oh yeah, it's okay,

8   we're alleging that and we're going to prove that here.  As I

9   said, Your Honor, it's circular.  If that's the way that you

10  can get around a covenant not to sue, then everybody would

11  come in on a covenant like this and say, I can prove willful

12  misconduct.  They'll take the case to discovery, the case

13  will settle, and the covenant will have no effect.  Basically

14  this provision says there has to have been a finding of gross

15  negligence or willful misconduct, and there hasn't been here.

16  And the reason is that this covenant is more in the nature of

17  a contribution or indemnity claim, and, you know, Your Honor

18  can construe it, but basically this hadn't been an argument

19  raised by Yucaipa before.  But basically what this is is a

20  claim, is a covenant not to sue where Yucaipa gives up the

21  rights, Yucaipa has no right to sue.  But clearly if by

22  virtue of some third party's claim where some court has found

23  that a lender has acted grossly, negligently or with willful

24  misconduct, somehow Yucaipa has to pay for our gross

25  negligence or willful misconduct, then they have the right to

1    sue, but it requires a prior determination by a court. It's

2    not just an end around a covenant not to sue where you can

3    always simply plead it and say, oh yeah, I'm going to prove

4    that later on, and if I don't, well too bad, the case will be

5    over, and the covenant wouldn't have any affect.

6        With respect to the covenant, and I know I had a

7    point, but now it slipped my mind. Well I think that's it,

8    it couldn't have been much of a point. Maybe I'll think of

9    it while Nick is up.

10        THE COURT: All right. Thank you.

11        MR. LAGEMANN: Your Honor, Nick Lagemann from Sidley

12    Austin for the Committee. Two very quick points. You did

13    not hear Mr. Klyman, sat and went through the allegations in

14    the cross claim, but you did not hear any refutation of the

15    fact that his own allegations established that Yucaipa formed

16    its intent to pursue its plan well before any action was

17    undertaken by the petitioning creditors. So in terms of the

18    allegations later on that after August '09 they somehow

19    relied upon whether it be an agreement, affirmative

20    encouragement, acquiesce, whatever, it doesn't fit and it's

21    implausible under the facts as alleged in the complaint.

22        The second point is simply this. Yucaipa's argument

23    here and is that essential party A, being the petitioning

24    creditors, either agreed or acquiesced to party B, Yucaipa's

25    preexisting plan to purchase the debt of party C, being the

1    debtors, and that that somehow insulates party B from

2    liability to party C if party B's actions were wrongful.

3    They haven't identified a single case or any authority that

4    supports an allegation or a claim of such a nature, and we

5    frankly think nonexists.  It's implausible, there are

6    allegations are contradicted by their own allegations in the

7    cross claim and we respectfully submit the motion should be

8    granted.  Thank you, Your Honor.

9          THE COURT:  Thank you.

10          MR. KLYMAN:  Very briefly, Your Honor.

11          THE COURT:  Counsel have anything further?

12          MR. WARD:  Actually it was a plausibility point, the

13    fact that, you know, contrary to what Mr. Klyman said, the

14    Court doesn't need to accept everything that's pled in the

15    complaint, the Bell Atlantic Twombley case says it has to be

16    plausible, and we've said in other cases that say it can't be

17    patently absurd.

18          THE COURT:  Okay.  Thank you.  Mr. Klyman, briefly.

19          MR. KLYMAN:  Very briefly, Your Honor.  Going back to

20    the point that Mr. Lagemann just made. Yucaipa developed a

21    plan to buy pursuant to the fourth amendment, and then they

22    made that plan before they pulled the trigger with Convest

23    expressly dependent upon the encouragement and support of

24    Black Diamond and Spectrum.  That's in the pleadings.  That's

25    how it happened and as laid out in the pleadings.  And Mr.

1  Lagemann cannot get up now and say that's not well pled

2  because it's all over the pleadings.

3       Secondly, Mr. Ward would have this Court apply a

4  statute of limitations to when we started litigating with

5  CIT.  Well that litigation was settled, while that litigation

6  was going on before there was a resolution, it would have

7  been nonsensical for us to then go into another court or that

8  court and seek to invalidate the third amendment.

9       And last, with respect to the covenant not to sue,

10  Mr. Ward reads into that language which does not exist.  It

11  doesn't say that a covenant not to sue is limited to our

12  action against a lender who has been found in a separate

13  action to have committed willful misconduct or fraud.  It

14  could have been written that way, but that's not how it was

15  written.  A covenant, and this must have been important to

16  them because in their pleadings they put ellipses where the

17  carve out for intentional misconduct and fraud existed in

18  section 2.78.  That provision by its plain terms allows us to

19  get a determination by court of competent jurisdiction that

20  they acted improperly and then argue that the covenant not to

21  sue applies.  And our position is is that we would have never

22  been in this mess and we would not have the third amendment

23  even arguably applied to us had they not acted inequitably as

24  laid out in our cross complaint.  Thank you.

25       THE COURT:  All right.  Thank you.  I'm going to take

1    a break and I'm going to gather my thoughts and then we will,

2    I'll come back out and make a ruling.  That will probably be

3    about, I don't know, 20 minutes or so.  Let's do this.  We'll

4    reconvene at 12:45.

5    (Recess 12:16 to 12:56)

6         THE CLERK:  All rise.

7         THE COURT:  Please be seated.  I'm going to do my

8    best to articulate my reasoning in connection with my ruling.

9    Given the fast track that this case needs to stay on and

10   really frankly the fact that on the particular close matter,

11   I don't think it requires me to take the matter under

12   advisement and issue a more complete opinion, we'll just go

13   with my ruling, which in short is to grant the motion to

14   dismiss.

15        And in support of that I really for all material

16   aspects adopt the petitioning creditors' arguments virtually

17   in toto.  Let me highlight some of them.

18        Starting off with the standard of review on the

19   motion to dismiss.  Obviously all well pled allegations need

20   to be taken as true, but under the Twombly Iqbal standards as

21   interpreted by the Third Circuit, something more than mere

22   really window dressing or bald allegations need to be made,

23   they have to rise to the level of plausibility.  I think in

24   this case -- let me back up a second.  The motion to dismiss

25   is on two bases, one the covenant not to sue brought us the

1    action and the other is the statute of limitations.  Talking

2    about the first item, that really rests on the factual

3    allegations in the complaint that would be necessary to raise

4    an issue, a plausible issue about whether the covenant not to

5    sue should be applied.  And the allegations in this

6    complaint, and by complaint I mean cross-claim do not meet

7    that standard.  There is some innuendo, there's some vague

8    allegations.  The bottom line is I just don't think the story

9    as pled holds together sufficiently to meet the standard.

10   Implicit in talking about that is the concept that the actual

11   covenant not to sue applies, and I understand that was also

12   an argument made by Yucaipa that it did not.  But hopefully

13   as I go through that here I'll address these things.

14        The argument on the covenant not to sue are several.

15   One is simply under its plain meaning, you can't sue.  I

16   don't think there's any question as to the plain meaning of

17   the covenant and I think it's very clear.  I don't find its

18   sort of carve out to be particularly troubling either.  The -

19   - I agree that the carve out as written deals with the narrow

20   situation of a finding at some time post signing of the

21   covenant by a court that there's been willful misconduct or

22   gross negligence.  And I don't think that can, I don't think

23   that is done in the auspices of a lawsuit directly related

24   between the parties, it has to come from somewhere else.

25   It's a little vague, but I think it's fair to say it has to

1    be a narrow exception.  And I endorse the view that when

2    looking at the covenant not to sue being applicable we have

3    to look at whether that covenant was entered into as a result

4    of some sort of fraud or misconduct by the party that is

5    being forbidden to sue.

6         And I don't find anything in the record that would

7    support plausible claim that the, that in the entry of the

8    third amendment there was any fraud or wrongdoing whatsoever

9    in connection with the actual covenant not to sue.  As a

10   matter of fact, I don't think there's any allegation really

11   that rises to the plausibility that there was any kind of

12   mischief going on that was detrimental or directed at Yucaipa

13   at the time of the third amendment being entered into the

14   purchase, excuse me, and then the fourth amendment being

15   negotiated, and then the debt being brought and then the

16   fourth amendment being passed.  Excuse me.  So basically, I

17   don't know it has led to level of fraud necessarily in

18   connection with the covenant not to sue, but it would need to

19   certainly be something with some heft behind it to support

20   some detrimental reliance argument.  And it just isn't there.

21   It just isn't there.

22        As to the applicability, the first credit agreement

23   does contain the provision that when you buy or assign the

24   debt you are stuck with what your assignor had previously

25   agreed to or waived, etc., and I find that when Yucaipa

1   bought this debt they were subject to the agreements that had

2   previously been entered.  And as such, they are applicable

3   when we're looking at the third amendment.  The fact that it

4   was all part of a grand strategy that somehow Yucaipa was

5   sucked in to allow Convest to make the agreement and then

6   make the sale, I just, I just don't find that plausible.  I

7   think it is true that it was part of the strategy by Yucaipa

8   to eventually purchase the debt under terms roughly

9   equivalent to what ultimately at the time they were

10  contemplating, it ultimately ended up being with the fourth

11  amendment.  And again, the, that's a very normal and

12  understandable provision that when you buy something, when

13  you buy debt, you buy the debt, it is what it is and you are

14  where you are, and you can't undo, you don't have the time

15  machine ability to undo a previous agreement.  Excuse me, I'm

16  sorry.

17          I also find that the waiver argument or the waiver

18  provision bars the case for the reasons that were discussed

19  in the briefs; for instance, statute of limitations.  Again,

20  this is an independent, these are really two rulings.  It's

21  granting the motion to dismiss on the covenant not to sue,

22  granting the motion to dismiss in connection with the statute

23  of limitations.  I look at the statute of limitations.  I

24  think it is not true that the cause of action would arise as

25  of the signing in April of 2008.  Again, while the documents

1    are what they are at that time, I do think you need to look

2    at it in the context of what the underlying facts might be

3    and when a cause of action might arise.  Having said that,

4    Yucaipa was clearly on notice throughout times after April of

5    2008 as to what was going on, they had their strategy, they

6    were mulled in negotiations that ultimately led to the fourth

7    amendment, and they bought debt into the situation -- this is

8    after April of 2008, they bought the debt in August 2009 I

9    believe.

10          I think it is a fair reading and correct that as of

11   August 2009 that the cause of action would be sufficiently

12   ripe to give rise to the beginning of running of the statute

13   of limitations certainly by November of 2009 when litigation

14   had ensued on these very issues, albeit with CIT, there was

15   notice that would give rise to running of the statute of

16   limitations three years, that takes us to November 2012 which

17   is before this lawsuit was brought.  The Delaware statute of

18   limitations is applicable here based on the fact that this

19   case was brought in Delaware, breach of contract claim

20   brought in a federal court setting in Delaware, so the

21   Delaware statute applies.  In the alternative, the borrowing

22   statute applies which would use the shorter three year

23   statute of limitations.  Other than a bald choice of law

24   provision there's nothing in this contract or deal that is so

25   involved in New York to provide that the New York statute of

1   limitations would have to apply.  First of all the contract

2   doesn't say that.  It was mentioned that the case survived

3   the transfer of venue motion but not to New York, to Georgia,

4   I believe.  So maybe not a motion, but certainly, I can't

5   think back that far, but certainly there was movement about

6   changing venue.  So the [indiscernible] year statute applies

7   and that statute run at the latest in November of 2012, so

8   the cause of action, the cross claim is barred by the running

9   of the statute of limitations.

10         Other than to say that I generally endorse the

11   petitioning creditors' legal arguments set forth in their

12   brief, I think this is a sufficient reasoning to support the

13   Court's decision to deny the motion to dismiss.  The Court

14   will enter an order.  Mr. Klyman?

15         MR. WARD:  Your Honor, you said deny.

16         THE COURT:  I'm sorry, to grant the motion to

17   dismiss.  And I apologize.

18         MR. KLYMAN:  Your Honor, we obviously respectfully

19   disagree.

20         THE COURT:  Of course.

21         MR. KLYMAN:  We're not going to reargue all the

22   points that we made before.  We do want the opportunity to

23   have leave to amend to see if we can cure whatever you

24   identified as the defects in the pleadings.  We think that

25   there are sufficient facts to justify the inapplicability of

1  these provisions in the third amendment to Yucaipa.  There

2  may be other facts that we can bring out about why there

3  should be additional tolling of the statute of limitations

4  and why we should not be barred, and we want an opportunity

5  to expeditiously amend our complaint to see if we can meet

6  that test.  We won't slow down the process, we're still

7  embarking on discovery, there's still going to be affirmative

8  defenses that are going to be pled, it's not going to

9  prejudice the August trial date, but we think we would be

10  significantly prejudiced if we didn't have an opportunity to

11  amend particularly given, you know, the various standards

12  that apply to a motion to dismiss and that leave to amend is

13  grandly liberally.

14         MR. WARD:  Your Honor, may I?  Your Honor, given the

15  various bases that Your Honor has made your decision on, the

16  waiver clause, the covenant not to sue, the fact that the

17  subsequent holders are bound by their predecessors' consents

18  and the statute of limitations, a number of these of which I

19  don't think are curable at all, it seems to me that you

20  should deny the motion for leave to amend.  And I do think

21  it's going to get in the way of our ability to move this case

22  along.  We start, we've already started document discovery to

23  the extent that we've served document demands on each other,

24  etc.

25         THE COURT:  Okay.  I'm going to deny the motion to

1    amend.  I'm going to dismiss the case with prejudice.  I --

2    sorry.

3             MR. WARD:  We have an order [indiscernible]

4             THE COURT:  Okay.  Just quickly.  I'm not going to

5    allow an amendment of the complaint.  I concur with counsel

6    that these are in effect legal bases, they turn obviously to

7    some extent on the facts, but I simply don't view them as in

8    effect curable based on my understanding of what's in the

9    cross claims today as well as my broader understanding of the

10   case in and of itself.  So, no,  I will not allow leave to

11   amend and the case will be, the cross-claim will be dismissed

12   with prejudice.

13            MR. WARD:  Your Honor, we have an order prepared.  I

14   don't know if it's appropriate [indiscernible].

15            THE COURT:  I'll enter an order.

16            MR. WARD:  Thank you, Your Honor.

17            THE COURT:  Anything else for today?  All right.

18   Thank you.  We're adjourned.

19        (Whereupon these proceedings were concluded at 1:11 PM)

20

21

22

23

24

25

1                    I N D E X

2

3                    RULINGS

4                                      Page    Line

5

    HEARING re:  Notice of Agenda of Matters

6

    Scheduled for Hearing on February 6, 2013     6      12

7

8

9

              Cross-Claim Defendants BDCM

    HEARING re:

10

11  Opportunity Fund II, LP's Black Diamond

12

    CLO 2005-1 Ltd's and Spectrum Investment

13

14  Partners LP's Motion to Dismiss the Amended

15

    Cross Claim in its Entirety [Adv. Docket

16

17  No. 73; filed January 25, 2013]              108       7

18

19

              Motion of the Official

    HEARING re:

20

21  Committee of Unsecured Creditors for an

22

    Order Authorizing the Committee to Pursue

23

24  Certain Claims and Causes of Action

25

Page 117

1   of the Debtors' Estates

2
    [Docket No. 858; filed February 1, 2013].    108    7

3

4

5
                    Motion and Memorandum of Law
    HEARING re:
6
    of Petitioning Creditors for Entry of an Order
7

8   (I) Pursuant to 11 U.S.C. §105(a) Granting

9
    Standing to Petitioning Creditors to
10

11  Prosecute Certain Claims of the Debtors

12
    Estates for, Inter Alia, Equitable Subordination,
13

14  Breach of Fiduciary, Aiding and Abetting

15
    Breach of Fiduciary Duty and Breach of
16

17  Contract, or Alternatively (II) Granting

18
    Petitioning Creditors Leave to Intervene
19

20  as Plaintiffs in Adversary Proceedings

21
    No. 13-50530 Pursuant to Federal Rule
22

23  of Civil Procedure 24

24
    [Docket No. 876; filed February 8, 2013]    108    7

25

1                              CERTIFICATE

2      I certify that the foregoing is a correct transcript from the

3      electronic sound recording of the proceedings in the above-

4      entitled matter.

5

6      AAERT Certified Electronic Transcriber CET**D-531

7      Mary Zajaczkowski

8

9      AAERT Certified Electronic Transcriber CET**00650

10     Theresa Pullan

11

12

13

14

15

16

17

18

19

20

21     Veritext

22     200 Old Country Road

23     Suite 580

24     Mineola, NY  11501

25     Date:  February 10, 2013

# UNITED STATES BANKRUPTCY COURT
## District of Delaware

**In Re:**
ALLIED SYSTEMS HOLDINGS, INC., et al.,
    Debtor

Chapter:  11

Bankruptcy No. 12–11564–CSS

_____

Allied Systems Holdings, Inc.

    Plaintiff

Adversary No. 12–50947–CSS

    vs.

Bennett Management , et al.

    Defendant

### *NOTICE OF FILING OF TRANSCRIPT AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION*

A transcript of the proceeding held on 2/27/13 was filed on 3/15/13 . The following deadlines apply:

The parties have  7 days to file with the court a *Notice of Intent to Request Redaction* of this transcript. The deadline for filing a *request for redaction* is 4/5/13 .

If a request for redaction is filed, the redacted transcript is due 4/15/13 .

If no such notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is 6/13/13 unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber (see docket for Transcriber's information) or you may view the document at the clerk's office public terminal.

_____

Clerk of Court

Date: 3/15/13

(ntc)

# Notice Recipients

| | | |
|---|---|---|
| District/Off: 0311–1 | User: Leslie | Date Created: 3/15/2013 |
| Case: 12–50947–CSS | Form ID: ntcAP | Total: 1 |

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| | | | | |
|---|---|---|---|---|
| ust | United States Trustee | 844 King Street, Room 2207 | Lockbox #35 | Wilmington, DE 19899–0035 |

TOTAL: 1