# Exhibit 81

EXHIBIT
588
5-22-2019
WALKER - I
Lori Scinta, RPR, CSR #4811

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

In re:

ALLIED SYSTEMS HOLDINGS, INC., *et al.*,[†]

　　　　Debtors.

Chapter 11
No. 12-11564 (CSS)
(Jointly Administered)

---

ALLIED SYSTEMS HOLDINGS, INC.,

　　　　Plaintiff,

　　　　v.

AMMC VIII, LIMITED, AVENUE CAPITAL
GROUP, BDCM OPPORTUNITY FUND II, LP,
BENNETT MANAGEMENT, BLACK DIAMOND
CLO 2005-1 LTD., DEL MAR DISTRESSED
OPPORTUNITIES MASTER FUND, MJX ASSET
MANAGEMENT, LLC, PAR-FOUR
INVESTMENT MANAGEMENT, SPECTRUM
INVESTMENT PARTNERS LP, TEAK HILL
CREDIT CAPITAL INVESTMENTS, LLC, THE
CIT GROUP BUSINESS CREDIT, INC., THE
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS, YUCAIPA AMERICAN ALLIANCE
FUND II, L.P., and YUCAIPA AMERICAN
ALLIANCE (PARALLEL) FUND II, L.P.,

　　　　Defendants.

Adversary Proceeding
No. 12-50947 (CSS)

---

[†] The Debtors in these cases, along with their federal tax identification numbers (business numbers where applicable), are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (87568828); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582).

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF ALLIED SYSTEMS HOLDINGS,
INC., and its affiliated debtors,

       Plaintiff,

BLACK DIAMOND OPPORTUNITY FUND II, LP,
BLACK DIAMOND CLO 2005-1 LTD., and
SPECTRUM INVESTMENT PARTNERS, L.P.,

       Intervenors,

          v.

YUCAIPA AMERICAN ALLIANCE FUND I, L.P.,
YUCAIPA AMERICAN ALLIANCE (PARALLEL)
FUND I, L.P., YUCAIPA AMERICAN ALLIANCE
FUND II, L.P., YUCAIPA AMERICAN ALLIANCE
(PARALLEL) FUND II, L.P., MARK
GENDREGSKE, JOS OPDEWEEGH, JAMES
FRANK, DEREX WALKER, JEFF PELLETIER,
IRA TOCHNER, and JOSEPH TOMCZAK,

       Defendants.

Adversary Proceeding
No. 13-50530 (CSS)

---

**DECLARATION OF DEREX WALKER IN SUPPORT OF YUCAIPA'S
OPPOSITION TO THE PETITIONING CREDITORS' MOTION FOR
SUMMARY JUDGMENT REGARDING THE DETERMINATION OF
REQUISITE LENDERS UNDER THE FIRST LIEN CREDIT AGREEMENT**

YOUNG CONAWAY STARGATT
& TAYLOR, LLP
  Michael R. Nestor (No. 3526)
  Edmon L. Morton (No. 3856)
  Donald J. Bowman, Jr. (No. 4383)
  Michael S. Neiburg (No. 5275)
  Laurel D. Roglen (No. 5759)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:  +1.302.571.6600

LATHAM & WATKINS LLP
  Russell F. Sauer, Jr.
  Robert A. Klyman
  Wayne S. Flick
  Kimberly A. Posin
355 South Grand Avenue
Los Angeles, CA 90071
Telephone:  +1.213.485.1234

*Attorneys for Yucaipa*

Dated:  July 23, 2013

## DECLARATION OF DEREX WALKER

I, Derex Walker, under penalty of perjury declare as follows:

1.      I am a transaction partner with YEC, Inc., a company affiliated with Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP (the two funds being collectively referred to herein as "Yucaipa"). After its emergence from bankruptcy in May 2007 (see below), I was asked by Yucaipa to serve on the board of directors of Allied Systems Holdings, Inc. ("Allied") and have served on the Allied board continuously since that time.

2.      I submit this declaration in support of Yucaipa's Opposition to the Petitioning Creditors' Motion for Summary Judgment Regarding the Determination of Requisite Lender Under the First Lien Credit Agreement. The facts contained in this declaration are within my personal knowledge and are known or believed by me to be true and correct.

### Yucaipa Rescues Allied Out Of Chapter 11 Bankruptcy

3.      Predecessors of the Debtors (the "Prior Debtors") filed for bankruptcy protection in 2005. Yucaipa held approximately $99 million of unsecured note claims issued by the Prior Debtors. Yucaipa also made additional loans during the prior bankruptcy to enable the Prior Debtors to purchase much-needed equipment, and obtained an unprecedented 17.5% in wage concessions from the Teamsters ("IBT") to help fund future capital expenditures. In addition, Yucaipa co-sponsored a plan of reorganization with the Prior Debtors and the IBT (the "Plan") that enabled the Prior Debtors to reorganize, to survive and to preserve thousands of jobs. The Prior Debtors, reorganized, are the "Current Debtors" in the present bankruptcy cases.

4.      The Current Debtors, with Allied as their parent, emerged from the prior bankruptcy in May 2007 with a de-levered capital structure and enhanced prospects for

1

competing successfully in the car haul industry.  Pursuant to the Plan, Yucaipa converted all of its debt claims into roughly 67% of the equity of Allied.  Also pursuant to the Plan, the Allied board of directors consisted of five members, including a new CEO (to be selected by Yucaipa and reasonably acceptable to the Creditors Committee in the then-pending bankruptcy), a member chosen by the Prior Debtors' Creditors Committee (to be reasonably acceptable to Yucaipa), and three others selected by Yucaipa.

5.    In March 2008, based on the recommendation of Allied's regular outside counsel and now counsel to the Current Debtors, Troutman Sanders, Allied's newly appointed CEO, Mark Gendregske, and the Creditors Committee appointee, Brian Cullen (a well-known restructuring expert from Duff & Phelps) established a special committee (the "Special Committee"), which was formed independently to consider and to negotiate on behalf of Allied certain matters involving Yucaipa.  Troutman Sanders specifically opined to the board that, because Gendregske "did not have a long-standing relationship with Yucaipa (had held no previous job in Yucaipa)," had no ownership interest in Yucaipa and "was hired into his current position as President and Chief Executive Officer of the Company through an independent head-hunting firm, and had no other agreements with Yucaipa" he "was sufficiently independent and should be a member of the special committee."  This advice is reflected in the March 31, 2008 Allied Board Minutes, a true and correct copy of which is attached hereto as Exhibit 1.

6.    To finance Allied's exit from the prior bankruptcy, the Current Debtors entered into a two-tiered exit financing, including a "First Lien Credit Agreement" that provided a $265 million facility in the form of term loans ($180 million), revolving loans ($35 million) and lenders deposits to support letters of credit ($50 million), and a $50 million "Second Lien Credit Agreement."  The CIT Group/Business Credit, Inc. ("CIT")

2

was appointed Administrative Agent for the lenders under the First Lien Credit Agreement.

### The Economy Plunges Into Recession, Leading To The Third Amendments To The Credit Agreements

7.      Beginning in mid-2007, the global and U.S. economies plunged into a recession, which, among other things, devastated the U.S. automotive market. Thus, shortly after Allied exited bankruptcy, its financial condition began to deteriorate. As a consequence, in early 2008 the Allied first and second lien debt was trading at a significant discount to par, and a number of lenders expressed interest in potentially selling their debt positions to Yucaipa. Yucaipa considered the opportunity to acquire first and second lien debt at a discount not just as a beneficial investment opportunity, but also as a means to benefit Allied and all of its stakeholders if, after acquiring the debt, Yucaipa contributed some of it to the capital of Allied, thereby de-levering the balance sheet and positively affecting Allied's cash flow along with increasing customer confidence. It was always Yucaipa's intent to contribute some of the acquired debt to Allied equity.

8.      The possibility of Yucaipa acquiring Allied debt and contributing some of it to Allied's capital was presented to the Allied board and the Special Committee because it would require amendments to the First and Second Lien Credit Agreements. From the Special Committee's and the board's perspective, Allied needed to improve its balance sheet, keep its customers calm and avoid a going concern opinion from its auditors, which, in turn, would have caused a default under both credit agreements and would likely have led to a "free fall" into bankruptcy. Recognizing that Yucaipa's acquisition of Allied debt would benefit the company and all of its constituencies, the Special Committee supported the proposal.

3

9.     To facilitate potential sales, Allied, the first and second lien lenders, through their respective administrative agents and counsel, and Yucaipa began negotiating potential amendments to both the First and Second Lien Credit Agreements to allow Yucaipa to become an "Eligible Assignee." As discussions concerning a Third Amendment to the First Lien Credit Agreement progressed, however, the lenders imposed increasingly restrictive terms on the first lien debt that Yucaipa proposed to acquire. Although Yucaipa was willing to live with certain restrictions on the amount of first lien debt it could acquire and the voting rights associated with that debt, the restrictions the first lien lenders sought to impose eventually became so onerous that Yucaipa lost its appetite to acquire first lien debt. Nevertheless, Allied, the Special Committee and Yucaipa pursued the Third Amendment to the First Lien Credit Agreement to conclusion in order to facilitate Yucaipa's acquisition of second lien debt and the contribution of that debt to Allied.

10.     Simultaneously with pursuit of a Third Amendment to the First Lien Credit Agreement, Allied and Yucaipa were also pursuing an amendment to the Second Lien Credit Agreement that would allow Yucaipa to buy second lien debt and to contribute some of it to the capital of the company. Although not as attractive to Yucaipa because of its junior position, Yucaipa's acquisition and contribution of second lien debt was *more* attractive to Allied because of the higher interest rate it carried and because of its positive impact on company cash flow. The proposed amendment to the Second Lien Credit Agreement contained none of the restrictions on Yucaipa-acquired second lien debt that the first lien lenders sought to impose. Among other things, there were no limits on the amount of second lien debt Yucaipa could acquire, no restrictions on the voting rights of such debt and no requirement that any portion of it be contributed to company capital.

4

11.    Although not required, it was always Yucaipa's plan to contribute a portion of any Allied second lien debt to company capital – but such a contribution was barred by the First Lien Credit Agreement absent an amendment.  So, Allied and Yucaipa pursued the Third Amendment to the First Lien Credit Agreement so that Yucaipa could acquire and contribute second lien debt.

12.    The Third Amendments to both the First and Second Lien Credit Agreements passed with *majority*, or Requisite Lender, consent.  Yucaipa elected not to purchase first lien debt because of the restrictions and conditions limiting Yucaipa's potential ownership rights.  But Yucaipa did invest an additional $26 million in Allied, purchasing $40 million of the $50 million in outstanding second lien debt.  After doing so, Yucaipa voluntarily contributed $20 million of this debt to the capital of Allied in return for preferred stock – a transaction approved by the Special Committee and supported by a fairness opinion from an outside advisory firm.  This voluntary contribution helped de-lever the Allied balance sheet, reduce its principal and interest payments on the debt and avoid the issuance of a going concern opinion from its auditors.

### The Economy Continues To Deteriorate And Allied Is Faced With Unreasonable Lender Demands

13.    By mid-2008, the U.S. economy as a whole, and the auto industry in particular, continued its precipitous decline.  In August 2008, Allied notified its lenders that it was in covenant default under the First Lien Credit Agreement and wished to discuss an out-of-court restructuring through an amendment to the First Lien Credit Agreement.  The Allied board was concerned that a new Chapter 11 filing so soon after it emerged from its first bankruptcy would result in a loss of business from which the company would never recover – just as had happened to competitor Performance

5

Transportation Services ("PTS"). The Allied board and Yucaipa were confident that, notwithstanding the economy, given Allied's industry leadership position, the fact that other car haulers (including PTS) were going out of business and a belief that the auto industry would eventually recover, Allied could succeed if given the time to do so. Indeed, Allied purchased a large fleet of tractor-trailers from PTS, which was liquidating through a forced bankruptcy, to put itself in a position to capture new business when the auto industry eventually improved.

14.    While suggesting that they were willing to consider a restructuring of the first lien debt, the lenders insisted, as a purported initial step, that Allied enter into a "Forbearance Agreement" pursuant to which the first lien lenders would temporarily refrain from exercising remedies in return for various concessions, a 2% increase in the interest rate payable on the debt, a $250,000 fee and the payment of hundreds of thousands of dollars to the lenders' lawyers and financial advisors.  As a condition to the Forbearance Agreement, the lenders also required that Yucaipa execute a "Sponsor Side Letter."  This letter required that during the forbearance period Yucaipa forego payments on the second lien debt and not acquire any of Allied's first lien debt – even under the onerous Third Amendment, which because of the capital contribution provision, would have further improved Allied's balance sheet.  Although Yucaipa had no obligation to execute the Sponsor Side Letter, it did so, and then extended its term, solely for Allied's benefit and with no consideration for itself.

15.    While both Allied and Yucaipa were prepared to amend the First Lien Credit Agreement to the significant benefit of the lenders, the lenders' demands of both Allied and Yucaipa were simply unreasonable, particularly given the cash crunch that Allied was facing.  While Allied was prepared to agree to an increase in the interest rate (paid in a combination of cash and PIK) and to pay a fair and reasonable amendment fee

6

of 1% of first lien debt held by lenders who consented to the amendment, the lenders insisted on: (a) a 6% increase in the interest rate paid in cash on the $35 million revolver and $50 million in LC commitments; (b) a 6% increase in the interest rate paid in cash on the $180 million in term loans plus an additional 5% in PIK interest; and (c) an *amendment fee of 2% of the total loan commitments or $5.7 million*. From Yucaipa, the lenders demanded a $30 million capital infusion and the contribution of its remaining $20 million in second lien debt to Allied capital.[1]

16.    The lender requirements of Allied for a restructuring made no sense for a company struggling to preserve cash flow in the face of an economy and an industry in a downward spiral.[2] Thus, no agreement was reached, no amendment to the First Lien Credit Agreement was executed and the forbearance period expired.

## Allied's Lenders Request That Yucaipa Acquire Their Debt

17.    With no restructured credit agreement in place and the auto industry continuing to decline, in December 2008, first lien lenders holding *substantially more than 50%* of the Allied debt sought to exit their positions in Allied's first lien debt by selling their positions to Yucaipa. I was the point of contact for Yucaipa in connection with these negotiations. Many of these lenders were the same ones who approved the Third Amendment and its restrictions on sales of first lien debt to Yucaipa. Now that they were "sellers," however, not even they believed the Third Amendment barred Yucaipa's acquisition of their combined Requisite Lender position or that unanimous lender consent was required to vitiate the Third Amendment. And, among the lenders

---

[1] Yucaipa proposed acquiring up to $45 million of first lien debt at 45% of par and to accept PIK interest on such debt provided it was not encumbered by the terms of the Third Amendment, and to accept PIK interest on the $20 million of second lien debt Yucaipa already held.

[2] As the Court is well-aware, both General Motors and Chrysler were on the precipice of bankruptcy at the end of 2008 and, in fact, filed for bankruptcy protection in 2009.

prepared to sell to Yucaipa was Spectrum – one of the Petitioning Creditors. Nevertheless, I made clear to the lender representatives that Yucaipa would only buy their majority position if the Third Amendment terms related to Yucaipa's potential acquisitions were amended and Yucaipa could serve as Requisite Lender.

18.    I reached an agreement with the representatives of the majority of the first lien lenders to acquire their debt for $28 per $100 of debt and, as far as Yucaipa understood, the deal was done on December 24, 2008, subject only to the execution of final documents.

19.    The documentation of this transaction would have included a fourth amendment to the First Lien Credit Agreement eliminating the restrictions on sales of debt to Yucaipa and eliminating or relaxing many of the financial covenants, again for the purpose of giving Allied breathing room to survive the economic downturn and a chance to prosper when the economy and automotive industry began to recover.  None of the selling lenders ever suggested to me that this amendment required unanimous lender consent.

20.    Shortly after Christmas 2008, one of the selling lenders' representatives contacted me and indicated that several members of the selling group were concerned about the reaction of non-selling lenders to their agreement to eliminate and/or relax Allied's financial covenants immediately before they sold their debt holdings.  Thus, they asked whether Yucaipa would provide an indemnity.  Initially, Yucaipa balked at this eleventh-hour request.  A few weeks later, however, in mid-January 2009, I offered, on behalf of Yucaipa, to eliminate the covenant amendments from the proposed fourth amendment if, in return, the selling lenders would sell their first lien debt at 26%, rather than 28%, of par.

## Yucaipa Makes A Tender Offer

21.     Unbeknownst to Yucaipa at the time, an Allied competitor, owned by T. Michael Riggs ("Riggs"), made a bid to acquire a majority of Allied's first lien debt for $30 per $100.  Unaware of the lenders' discussions with Riggs and perplexed by the silence from lenders that were once anxious to sell, Yucaipa decided to try to acquire a majority of the Allied first lien debt through a written tender offer to all first lien lenders (the "Tender Offer") which was launched in early February 2009.  The Tender Offer included and was conditioned upon the passage of a proposed Fourth Amendment to the First Lien Credit Agreement (the "Proposed Fourth Amendment") by a majority of the first lien lenders, which was how the Third Amendment was enacted.

22.     The Special Committee recommended, and the Allied board approved, the Proposed Fourth Amendment because (a) given the difficulties Allied was experiencing with the lender group and their unreasonable restructuring demands, they believed that if Yucaipa could acquire a majority of the first lien debt, the interests of its lenders would be better aligned with those of Allied and its other constituencies; and (b) the Proposed Fourth Amendment would have reset the financial covenants in the First Lien Credit Agreement to a more reasonable level, consistent with expected 2009 EBITDA, and waived prior events of default.

23.     The Tender Offer documents, including the Proposed Fourth Amendment, were sent to all first lien lenders, including the Petitioning Creditors.  No lender informed Yucaipa of its view that the changes contained in the Proposed Fourth Amendment concerning Yucaipa's acquisition of first lien debt or its ability to act as Requisite Lender required unanimous lender consent.  Indeed, the only lender that addressed the Proposed Fourth Amendment was CIT which, through its counsel, merely stated that, because the Proposed Fourth Amendment purported to modify the role of the Administrative Agent,

9

"the consent of the Agent is required, as well as the consent of the Requisite Lenders

. . . ." A true and correct copy of the letter from CIT's counsel dated February 12, 2009

is attached hereto as Exhibit 2.

24.     Contrary to the Petitioning Creditors' repeated assertion, the Tender

Offer was *not* rejected by the lenders.  Rather, by early February 2009, Riggs had begun

to firm up the financing for his acquisition bid and a majority of lenders had signed an

exclusivity agreement with Riggs' financial partner, ComVest Investment Partners

("ComVest"), to negotiate for the sale of their Allied debt only with ComVest for a

specified period.  Counsel for these lenders sent a letter to Yucaipa and Allied directing

that their clients not be contacted in connection with the Tender Offer because of the

exclusivity agreement.  A true and correct copy of the letter from Goodwin Procter dated

February 4, 2009 is attached hereto as Exhibit 3.

25.     Shortly after the Tender Offer was launched, I had a telephone

conversation with Richard Ehrlich of Black Diamond.  He advised me that Black

Diamond was not included in the lender group seeking to sell to the unnamed third party

(ComVest's identity as the potential buyer was not known at the time to Yucaipa).

During this and several follow-up calls, Mr. Ehrlich, on behalf of Black Diamond, asked

if it could partner with Yucaipa in connection with Allied, subject to Yucaipa acquiring a

majority of Allied's first lien debt in the Tender Offer or, in the alternative, sell its debt

holdings to Yucaipa at a "premium" over what other lenders would receive in the Tender

Offer.  During our several calls on this subject, Mr. Ehrlich never mentioned or expressed

any concern about the restrictions in the Third Amendment or the terms of the Proposed

Fourth Amendment.

10

## Yucaipa Acquires Requisite Lender Status With The Petitioning Creditors' Knowledge and Encouragement

26.    By late February 2009, Yucaipa and Allied were advised that ComVest had completed the purchase of approximately 55% of the Allied first lien debt and, accordingly, became Requisite Lender under the First Lien Credit Agreement.

27.    In early March 2009, Yucaipa commenced negotiations with ComVest to buy its Requisite Lender position in the Allied first lien debt. Again, I was one of the principal negotiators on Yucaipa's behalf in connection with the ComVest negotiations. These negotiations played out over nearly six months, in fits and starts, and involved different proposals and structures. The principal focus of the Yucaipa proposals was a restructuring of the Allied first lien debt to be controlled by ComVest and Yucaipa (and such additional first lien debt as they might acquire) including, among other things, allowing Yucaipa to serve as Requisite Lender, a maturity date extension on the ComVest-Yucaipa controlled debt, interest rate relief, financial covenant relief and a waiver of existing defaults. Yucaipa also was prepared to extend the maturity date with PIK interest on its second lien debt.

28.    On several separate occasions, Yucaipa believed it had finalized a deal with ComVest with execution copies of the relevant transaction documents ready for signature. Each time, at the last minute, ComVest failed to close any of the agreed-upon transactions. Eventually, in August 2009, Yucaipa simply agreed to acquire the Allied first lien debt owned by ComVest.

29.    The Petitioning Creditors were well aware of the ongoing negotiations between Yucaipa and ComVest, and of Yucaipa's intention to spend tens of millions of dollars to acquire ComVest's Requisite Lender position pursuant to an amendment that reversed the restrictions on Yucaipa-acquired first lien debt imposed by the Third Amendment. I had several conversations with Mr. Ehrlich of Black Diamond during the

11

summer of 2009 in which I specifically discussed Yucaipa's intention to acquire ComVest's majority position in Allied first lien debt and become Requisite Lender. Indeed, in the weeks immediately prior to Yucaipa's purchase from ComVest, I participated in several such calls with Mr. Ehrlich as well as in a face-to-face meeting in Los Angeles on August 18, 2009 with Steven Deckoff,  Black Diamond's principal, in which Yucaipa's plan to acquire ComVest's Requisite Lender position in the Allied first lien debt was specifically discussed.

30.     More specifically, at the meeting on August 18, Mr. Deckoff proposed a plan for Yucaipa to use its soon-to-be acquired control over Allied to file for bankruptcy with a DIP loan made by Yucaipa and Black Diamond after which they would do a "low value" plan of reorganization that would give Allied to them as DIP lenders – to the detriment of all of Allied's other stakeholders, including the other first lien lenders.  We advised Mr. Deckoff that Yucaipa was unwilling to participate in this strategy which we found distasteful.  We further advised Mr. Deckoff that Yucaipa was very close to completing the acquisition from ComVest and the price we were proposing to pay for the debt to be acquired, and Mr. Deckoff specifically expressed support for Yucaipa's plan to acquire the ComVest position.  Then, two days before the ComVest closing, I, along with others, spoke again on the phone with Mr. Ehrlich of Black Diamond and reiterated Yucaipa's plan to acquire the ComVest position, and he, in turn, reiterated Black Diamond's support.

31.     At no time during the face-to-face meeting with Mr. Deckoff or my calls with Mr. Ehrlich, did anyone from Black Diamond object to Yucaipa's proposed acquisition or inform Yucaipa that they believed a Yucaipa purchase of ComVest's Requisite Lender position would be invalid or require unanimous lender consent.

12

32.    On August 21, 2009, Allied and ComVest, as the Requisite Lender under the First Lien Credit Agreement, executed the Fourth Amendment. The Fourth Amendment amended or deleted the restrictions and conditions imposed by the Third Amendment on first lien debt that Yucaipa might acquire, and permitted Yucaipa to acquire and to accept assignment of Allied's first lien debt and become Requisite Lender under the First Lien Credit Agreement.[3] Allied's Special Committee reviewed and voted to approve the Fourth Amendment after being advised by outside counsel. Allied's counsel, Troutman Sanders, provided a written legal opinion to CIT, as the lenders' agent, stating that the Fourth Amendment was legally binding. Attached hereto as Exhibit 4 is a true and correct copy of the Troutman Sanders opinion letter dated August 20, 2009.

33.    In reliance on the validity of the Fourth Amendment, Yucaipa acquired all of ComVest's majority holdings of Allied's first lien debt on August 21, 2009. These holdings consisted of $114,712,088.66 of Term Loans and $30,400,458.40 of LC Commitments, totaling $145,112,547.06 (54.75%) of the $265,000,000 first lien debt authorized by the First Lien Credit Agreement. Yucaipa paid ComVest approximately $43 million and provided ComVest some additional contingent upside in Yucaipa's investment in Allied.

34.    Following the execution of the Fourth Amendment, I notified all of the first lien lenders, including the Petitioning Creditors, of Yucaipa's acquisition of Allied first lien debt, the passage of the Fourth Amendment and its status as Requisite Lender. Yucaipa also sought to engage with the Petitioning Creditors, who held the next most

---

[3] The Fourth Amendment did not include the provisions of earlier versions that were designed effectively to restructure the Allied first lien debt. Once the Yucaipa-ComVest negotiations turned to a purchase transaction rather than some form of joint participation, Yucaipa believed it made more sense first to acquire the debt and then prepare a subsequent "Fifth Amendment" to address Allied's needs after obtaining Requisite Lender status.

significant amounts of first lien debt, to discuss a going-forward plan for Allied. True and correct copies of several examples of my email communications with the Petitioning Creditors on this subject and produced by the Petitioning Creditors are attached hereto as Exhibit 5 (SPEC0012581), Exhibit 6 (BDCM30277) and Exhibit 7 (SPEC0003973-75).

35.    Yucaipa also contacted CIT, the Administrative Agent, to inform CIT that Yucaipa had taken an assignment of ComVest's first lien loans. CIT entered all of Yucaipa's loans on the Register in compliance with its duties as Administrative Agent under the First Lien Credit Agreement.

### The Georgia Litigation

36.    Unbeknownst to Yucaipa, only one month after Yucaipa's acquisition of the Requisite Lender position and only one day after Mr. Deckoff of Black Diamond spoke by telephone with Yucaipa's founder Ronald Burkle about a strategy for maximizing the value of Allied, Petitioning Creditors caused their lawyers to surreptitiously send a letter to CIT questioning the validity Yucaipa's Requisite Lender status and directing CIT to refuse to acknowledge Yucaipa as such. Petitioning Creditors did not send this letter to Yucaipa or otherwise disclose to Yucaipa any concerns regarding the validity of the Fourth Amendment or Yucaipa's Requisite Lender status.

37.    As discussed below and contrary to what the Petitioning Creditors were doing behind the scenes, their communications with Yucaipa were very different. Indeed, for the next several years, Petitioning Creditors continued to propose and discuss with Yucaipa transactions that necessarily relied upon Yucaipa acting as Requisite Lender including, for example, the purchase of all of the first lien debt by Jack Cooper at a discount to par, which purchase was to be financed by the Petitioning Creditors. The Petitioning Creditors pursued discussions with Jack Cooper about financing the debt

claims held by Yucaipa and recognizing Yucaipa's status as Requisite Lender up until they filed the New York Action.[4]

38.     In the meantime, CIT, as Administrative Agent, pressed Petitioning Creditors' dispute with Yucaipa. Although it had entered in the debt register Yucaipa's acquisition of the majority of Allied first lien debt, CIT refused to follow several other requests made by Yucaipa and its lawyers.

39.     In response to CIT's inaction, on November 21, 2009, Yucaipa and Allied filed suit in Georgia against CIT in its capacity as Administrative Agent, seeking a declaration that the Fourth Amendment was valid and enforceable and that Yucaipa was the Requisite Lender (the "Georgia Action"). CIT, in turn, brought counterclaims both in its individual capacity as a lender, and a declaratory judgment claim in its representative capacity as Administrative Agent, that the Fourth Amendment was ineffective and that Yucaipa is not the Requisite Lender.

40.     Throughout the pendency of Georgia Action, I always understood that CIT was litigating on its own behalf as well as on behalf of all first lien lenders, including the Petitioning Creditors, as the lenders' agent under the First Lien Credit Agreement.

41.     I had a number of conversations with Mr. Ehrlich of Black Diamond during the pendency of the Georgia Action about the status of the case and its progress. Indeed, during settlement negotiations which were ongoing between Yucaipa, Allied and CIT, Mr. Ehrlich of Black Diamond called me repeatedly for updates. I understood Mr. Ehrlich's calls were to gauge Yucaipa's settlement posture, and understood that Mr. Ehrlich also was talking with CIT throughout the settlement process. During these calls, Mr. Ehrlich never complained about CIT's handling of the Georgia Action, never

---

[4] During the negotiations with Jack Cooper, the Petitioning Creditors sought to induce Jack Cooper not to purchase first lien debt from other lenders without obtaining the consent of the Petitioning Creditors.

expressed that a settlement of the Georgia Action would not resolve the claims CIT

brought in its representative capacity, never said that his or other lenders' consent would

be required to finalize the settlement, and never once suggested that Yucaipa could not be

the Requisite Lender.

     42.     On December 5, 2011, after more than two years of litigation, CIT,

Yucaipa and Allied executed a settlement agreement in the Georgia Action (the

"Settlement Agreement"), which provided that the parties "will dismiss their respective

claims in the Action with prejudice." CIT entered into the Settlement Agreement in both

its representative capacity as Administrative Agent and in its individual capacity as a

lender. Among other things, CIT bound itself in the Settlement Agreement to various

obligations as Administrative Agent and Collateral Agent under the First Lien Credit

Agreement.

     43.     On December 7, 2011, the parties to the Georgia Action filed mutual

dismissals with prejudice of all of their claims (the "Dismissals"). In the Dismissals, CIT

confirmed that it was dismissing *all claims* it asserted in its Verified Answer and

Counterclaims," including the claim CIT asserted in its role as Administrative Agent

seeking to invalidate the Fourth Amendment and to declare that Yucaipa was not the

Requisite Lender. Yucaipa intended and understood that CIT's dismissal would resolve

with finality the declaratory judgment claim it brought in its representative capacity.

     44.     Yucaipa intended for CIT to execute the Settlement Agreement and the

Dismissals with Prejudice in both its representative capacity and in its individual capacity

as a Lender, and Yucaipa understood that CIT did, in fact, act in both capacities in

executing both documents.

     45.     Shortly after the Georgia Action was dismissed, Yucaipa directed CIT as

Administrative Agent to terminate certain LC commitments under the First Lien Credit

Agreement. This resulted in $16,928,474.40 of deposits that had been made to support the LCs being released to the first lien lenders. Each lender that had an LC Commitment outstanding (including the Petitioning Creditors) received its *pro rata* portion of the funds released. Neither the Petitioning Creditors nor any other lender complained about this termination or questioned Yucaipa's authority to direct it as Requisite Lender, and each accepted its *pro rata* share of the released funds. This makes clear that all of the first lien lenders – including the Petitioning Creditors – had accepted and ratified Yucaipa's Requisite Lender status.

### Throughout This Period, The Board And Yucaipa Sought To Preserve Allied For The Benefit Of All Stakeholders

46.    As discussed above, Allied's emergence from bankruptcy in 2007 coincided with a U.S. and global economic recession which had a dramatic impact on the automobile industry and, in turn, dramatically reduced the demand for automotive transport services. But, Allied, its Board and Yucaipa believed that, with a modicum of lender patience, Allied could survive the downturn and emerge well-positioned to once again become a financially profitable company and a dominant force in the automotive transport industry. Thus, the principle goal of the Allied Board and Yucaipa was, at all times, to provide Allied with a sufficient financial runway to allow it to succeed – for the benefit of all of its stakeholders.

47.    Between the fall of 2007 and the Petitioning Creditors' precipitous filing of the involuntary bankruptcy petition, Allied, with Yucaipa's support, pursued multiple business combination strategies with key competitors including PTS, Jack Cooper Transport (multiple times), IEP Carhaul, Cassens, United Road and Waggoneers, in an effort to strengthen Allied's future prospects.

48.     In addition, both Allied and Yucaipa consistently considered both in-court and out-of-court restructuring alternatives.  Throughout the Fall of 2008, Allied and Yucaipa sought to restructure the first lien debt, but, as noted above, the demands of the first lien lenders were completely unreasonable and acquiescence would only have assured Allied's demise.  In the spring of 2009, Yucaipa, with Allied's support, pursued a transaction with ComVest that would have resulted in a substantial restructuring of Allied's first lien debt.  Yucaipa and Allied also considered a pre-packaged bankruptcy in which no value would be retained by the existing shareholders, including Yucaipa, but concluded that such an option would have resulted in customer defections and precipitated a "free-fall" from which Allied would never recover – to the benefit of no one.

49.     Further, both Allied and Yucaipa continued their efforts to make Allied successful – even in the face of unexpected difficulties.  For example, the 17.5% wage concessions that Yucaipa negotiated with the Teamsters in 2007 were scheduled to expire in May 2010.  Because of Allied's financial condition, both Allied and Yucaipa sought to negotiate a "transition period" for the wage increases rather than an immediate "snap back" to 2007 wage levels.  Instead, the Teamsters offered only two choices, an immediate "snap back" in wages or a strike.  Recognizing that it could not survive a strike, even a short one (such as the one which led to the liquidation of PTS only 2 years earlier), Allied accepted the "snap back" in wages which negatively impacted its cost structure.  Although Allied's liquidity remained tight, the company managed this liquidity crunch by, among other things, deferring capital expenditures.

50.     In 2011, Allied sought to improve the terms of its customer contracts, many of which had been negotiated with the auto manufacturers in 2009 when the auto industry was in dire straits.  By the beginning of 2011, as Allied and Yucaipa had

predicted, the auto industry was beginning to recover. Manufacturing output was increasing and, accordingly, so was the demand for car hauling services. Allied management, including its CEO and board member, Mr. Gendregske, advised the board that it was the right time to approach its customers, seek price increases and refuse to haul cars for those who balked. While other manufacturers rejected Allied's overture, Ford accepted the price increase and signed a new agreement that had unprecedented terms, including market share protection that precluded Ford from shifting production from plant to plant in order to escape its obligation to use Allied as its carrier, a common industry practice which has proven to be an Achilles' Heel for unionized car haulers. The end result of this strategy was that although Allied's volume decreased, its margins increased and better positioned the company for future growth. And, this business strategy was previewed with Black Diamond before it was implemented, and, in fact, Black Diamond's senior principal, Mr. Deckoff, endorsed and supported the strategy.

51.    The Allied Board and Yucaipa also continued to consider the possibility of a bankruptcy restructuring both in 2010 and 2011, with the specific participation of Black Diamond and other lenders. Again, however, it was believed that such a filing would likely lead to customer defections, the prompt demise of Allied and the loss of thousands of jobs. Because the Allied Board and Yucaipa never believed that a bankruptcy filing would provide the best recovery for its stakeholders, we continued to pursue a variety of M&A options with the support and encouragement of the Petitioning Creditors through the time of the involuntary bankruptcy filing.

52.    Indeed, and although they had instigated the Georgia Action (totally unbeknownst to Yucaipa), throughout 2010 and 2011 the Petitioning Creditors continued to socialize with Yucaipa and negotiate potential business strategies. In fact, in 2011, the Petitioning Creditors were presenting proposals to Yucaipa and separately to competitor,

Jack Cooper Transportation, concerning their financing of Jack Cooper's purchase of all the Allied first lien debt at a discount to par. These proposals acknowledged the validity of Yucaipa's holdings of Allied first lien debt and its status as Requisite Lender by the Petitioning Creditors.

53.    Finally, Yucaipa's acquisition of first lien debt from ComVest, notwithstanding the subsequent dispute which arose over Yucaipa's status as Requisite Lender, in and of itself provided Allied with what it needed most – time. Although Yucaipa had planned on restructuring the first lien debt once it acquired Requisite Lender status, the dispute with CIT over its status prevented it from doing so. Nevertheless, during the pendency of the Georgia Action, and even though Allied had been in default under the First Lien Credit Agreement since the summer of 2008,[5] neither the Petitioning Creditors nor any other lender for that matter ever asked Yucaipa to exercise remedies against Allied for its defaults or sought to exercise remedies on their own. In the meantime, Allied's financial condition improved, jobs were retained and vendors and suppliers earned tens of millions of dollars in revenue.

### The New York Action

54.    Much to the surprise of Yucaipa and Allied, approximately five weeks after the Georgia Action was dismissed, on January 18, 2012, the Petitioning Creditors sued Yucaipa in New York state court (the "New York Action"). The Petitioning Creditors' sole claim in the New York Action sought a judicial declaration that the Fourth

---

[5]  Since the fall of 2008 Allied had been in covenant default under the First Lien Credit Agreement. In August 2009, several weeks before Yucaipa acquired ComVest's Requisite Lender position, the Allied Board voted not to make a $4.8 million quarterly interest payment to the first lien lenders because, based on the recommendation of CFO Scott Macaulay, doing so would not have left Allied with an insufficient cash operating cushion, thus creating a payment default. The non-payment of accrued interest, and thus Allied's payment default, continued until the filing of the involuntary bankruptcy petition.

Amendment is null and void, and that, consequently, Yucaipa is not the Requisite Lender under the First Lien Credit Agreement.

<u>**Current First Lien Debt Holdings**</u>

55.    Yucaipa currently holds $134,835,689 in Allied first lien debt consisting of $114,712,087 of Term Loans and $20,123,602 of LC Commitments.

56.    On April 19, 2012, CIT notified Allied that it was resigning as Administrative Agent under the First Lien Credit Agreement effective in thirty (30) days or as of May 19, 2012.  A true and correct copy of the April 19, 2012 CIT resignation letter is attached hereto as <u>Exhibit 8</u>.  No successor Administrative Agent has been appointed.  Indeed, on May 16, 2012, counsel for the Petitioning Creditors expressly objected to the ability of Yucaipa to appoint a successor Administrative Agent because of the dispute over Yucaipa's status as Requisite Lender under the First Lien Credit Agreement.  A true and correct copy of the May 16, 2012 letter from Schulte Roth & Zabel is attached hereto as <u>Exhibit 9</u>.

57.    Based upon the information provided by CIT to Yucaipa shortly before CIT resigned as agent, there is a total of $244,047,530 in outstanding Allied first lien debt.  A true and correct copy of the information provided by CIT to Yucaipa concerning the first lien debt holdings in April 2102 is attached hereto as <u>Exhibit 10</u>.  CIT holds the $35,000,000 revolver.  The two Black Diamond funds hold a combined $31,407,149 in Allied first lien debt, and the two Spectrum funds hold a total of $20,531,462 in Allied first lien debt.  Thus, Petitioning Creditors hold a combined $51,938,610 of Allied first lien debt or 47.56% of the non-Yucaipa owned Allied first lien debt – less than a majority.

58.    The difference between  the amount of first lien debt Petitioning Creditors claim to hold ($56,486,964) and what the CIT register shows that they hold

21

($51,938,610) is $4,548,354. I understand that the Petitioning Creditors claim to have commenced the process of acquiring this $4,548,354 in Allied first lien debt held from AMMC VIII, Limited ("AMMC") in June 2012. (*See* BDCM0030816-19 attached to the Ehrlich Affidavit and SPEC0014868-71 and SPEC0014874-77 attached to the Schaffer Affidavit.) But, these purported purchases occurred after CIT resigned as agent. And, pursuant to Section 10.6(b) of the First Lien Credit Agreement, no "assignment or transfer" of Allied first lien debt "shall be effective . . . unless and until recorded in the Register" which can only be effected by the Administrative Agent.

59.    In an apparent effort to overcome this roadblock, it appears that the *Petitioning Creditors have unilaterally determined that they are the Requisite Lenders* and, therefore, appear to have secretly appointed a Black Diamond affiliate, Black Diamond Commercial Finance, LLC, as the supposed "Administrative Agent" who in turn has "approved" the purported AMMC assignments. (*Id.*) Of course, who, if anyone, is Requisite Lender has not yet been determined.

60.    Since, in the wake of CIT's resignation in May 2012, there is no properly appointed Administrative Agent, the purported transfers by AMMC are not yet effective and, accordingly, cannot be counted among the Petitioning Creditors' first lien debt holdings.

I declare under penalty of perjury under the laws of the United States of America and the State of Delaware that the foregoing is true and correct to the best of my knowledge and belief. Executed this 23rd day of July 2013 at Los Angeles, California.

Derek Walker

22