# Exhibit 84

**EFiled:  Feb 14 2014 10:40AM EST**
**Transaction ID 55000644**
**Case No. 9151-VCP**

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP,<br><br>   *Plaintiffs*,<br><br> v.<br><br>SBDRE LLC, Black Diamond Commercial Finance L.L.C., Spectrum Commercial Finance, LLC, BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 LTD, and Spectrum Investment Partners, L.P.,<br><br>   *Defendants*. | C.A. No.  9151-VCP |

## AMENDED VERIFIED COMPLAINT

Plaintiffs Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP, (together "Yucaipa"), by and through its undersigned counsel, for its Amended Verified Complaint against defendants BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 LTD, and Spectrum Investment Partners, L.P. (together "Black Diamond"), Black Diamond Commercial Finance L.L.C., Spectrum Commercial Finance, LLC (together, the "Black Diamond Agents") and SBDRE LLC ("SBDRE"), allege as follows:

## NATURE OF THE ACTION

1. Through this action, Yucaipa asks this Court to determine the lawful management of SBDRE, to issue a declaratory judgment as to the scope of Yucaipa's beneficial ownership of assets held by SBDRE, and to award Yucaipa damages for Black Diamond's breaches of contract and breaches of fiduciary duty in structuring and managing SBDRE in contravention of the Credit Agreement (as defined below).

01:15018844.4

2.      SBDRE was formed for the sole purpose of holding, managing, or liquidating certain real estate assets (the "Assets") to be acquired from the bankruptcy estate  of Allied Systems Holdings, Inc. ("Allied") on or about December 13, 2013, by the First Lien Agents on behalf of all first lien lenders pursuant to a credit bid (the "Credit Bid").  The creditors behind this credit bid (the "Lenders") each hold debt of Allied that is subject to a single credit agreement (the "Credit Agreement").  Yucaipa is one of the Lenders, holding 55.2% of the obligations outstanding under the Credit Agreement.

3.      None of the Lenders have sought to overturn the Credit Bid.  However, there is a pending dispute with respect to Yucaipa's rights under the Credit Agreement.  The Credit Agreement does not govern how the Assets held by SBDRE are to be managed once acquired through the Credit Bid.  The bankruptcy court overseeing Allied's bankruptcy has expressly determined that it does not have jurisdiction to determine how the Assets are to be divided among the Lenders or how SBDRE is to be managed for the benefit of the Lenders.

4.      A group of Lenders (referred to collectively as "Black Diamond") purports to have the authority to control SBDRE.  Using that purported authority, it has purported to appoint the Black Diamond Agents as managing members of SBDRE.  Black Diamond's sole basis for this asserted authority is its claim that it is the Requisite Lender (i.e., majority lender) under the Credit Agreement even though it is undisputed that it holds only 21% of the outstanding obligations under the Credit Agreement.  Not only is Yucaipa, which holds $135 million of the $244 million in principal obligations under the Credit Agreement (the "Allied Debt"), rather than Black Diamond, which holds $52 million of the Allied Debt, the rightful Requisite Lender under the Credit Agreement, but the Credit Agreement itself does not empower the Requisite Lender

under any circumstances to unilaterally manage collateral acquired by the Lenders in the manner that Black Diamond seeks to do through its control of SBDRE.

5.      Whether Yucaipa or Black Diamond is the Requisite Lender is the subject of litigation pending in two other jurisdictions; however, the implications of that determination on the governance and control of SBDRE is not before either of the other courts and that question does not fall within the scope of either of the other pending actions.

6.      Black Diamond has purported to use its unlawful control over SBDRE to include provisions in SBDRE's Limited Liability Company Agreement ("LLC Agreement") that would, if controlling upon the Lenders, modify the Lenders' rights vis a vis the Requisite Lender, which Black Diamond purports to act as.

7.      Furthermore, although Black Diamond's claim to be Requisite Lender, as presented to the Bankruptcy Court relies upon Yucaipa holding 55.2% of the Allied Debt, outside of Court supervision, Black Diamond has disregarded the majority of Yucaipa's Allied Debt.  For example, in allocating governance rights and economic rights with respect to SBDRE, Black Diamond and the Black Diamond Agents have unilaterally disregarded a majority of Yucaipa's Allied Debt.

8.      Thus, Yucaipa seeks a declaratory judgment from this Court that it validly holds 55.2% of the Allied Debt.  Yucaipa also seeks a declaratory judgment from this Court that because it holds a majority of the Allied Debt it is entitled to act as the managing member of SBDRE and/or to elect a managing member for SBDRE.

9.      Yucaipa further seeks a determination from this Court that Black Diamond has breached the Credit Agreement or, in the alternative, has breached the covenant of good faith and fair dealing, by seeking to alter the respective rights of the Lenders through the purported LLC

Agreement of SBDRE and that Black Diamond's efforts to so alter the Lenders' rights were ineffectual.

10.     Not only is Black Diamond improperly asserting control over SBDRE, but it is seeking to use that control to cause SBDRE to engage in a series of irrevocable self-dealing transactions for the benefit of Black Diamond.  Among other things, SBDRE has announced that it has caused SBDRE to make a rights offering that would modify the Lenders' proportionate ownership of SBDRE, and for which Black Diamond would receive outsized fees and substantial backstop rights, rather than each Lender receiving its pro-rata share of such ownership.  Black Diamond admits that this rights offering (which has no business justification and is being launched in the absence of a business plan or any due diligence by the Black Diamond Agents as to the options available to maximize the value of the acquired real estate) will vest Black Diamond, which currently holds less than 25% of the Allied Debt, with majority control of SBDRE.  Black Diamond has also announced that it will use its control over SBDRE to cause SBDRE to reimburse Black Diamond's legal expenses without any review by any third party of the expenses to determine whether they are reimbursable.

11.     Separately, Black Diamond has used its control over other collateral of the Lenders to reimburse its own and the Black Diamond Agents' fees and expenses in violation of the Credit Agreement and its fiduciary duties.

12.     Besides declaratory relief, Yucaipa seeks damages for Black Diamond and the Black Diamond Agents' improper, self-dealing actions, which breach the Credit Agreement, or in the alternative, the covenant of good faith and fair dealing, and Black Diamond's fiduciary duties to Yucaipa and the Lenders.

## THE RELEVANT ENTITIES

13.    Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP (together "Yucaipa"), the plaintiffs in this case, currently hold $135 million of the $244 million in Allied Debt governed by the Credit Agreement.  Based on these holdings, Yucaipa is the rightful Requisite Lender under the Credit Agreement.

14.    BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 LTD, and Spectrum Investment Partners, L.P. (collectively "Black Diamond") hold $52 million of the $244 million in debt governed by the Credit Agreement.  Black Diamond contends that they are collectively the Requisite Lender.

15.    SBDRE LLC ("SBDRE") was formed by Black Diamond on August 20, 2013, to receive the Assets acquired by the Lenders through the Credit Bid.

16.    Black Diamond Commercial Finance, L.L.C. and Spectrum Commercial Finance LLC (together the "Black Diamond Agents") were purportedly appointed by Black Diamond as Co-Administrative Agents (as defined in the Credit Agreement) for the Lenders and Black Diamond Commercial Finance, L.L.C. was purportedly appointed by Black Diamond as Collateral Agent (as defined in the Credit Agreement) for the Lenders on December 3, 2012. Black Diamond purported to appoint the Black Diamond Agents as Co-Managing Members of SBDRE.

## JURISDICTION

17.    This Court has jurisdiction over this action pursuant to Section 18-110 of the LLC Act because, through this action, Yucaipa seeks, among other claims, a determination as to the governance of SBDRE, a Delaware LLC and 10 *Del. C.* § 341 based upon its equitable jurisdiction.

01:15018844.4

## BACKGROUND

### I.    The Credit Agreement.

18.    In May of 2007, Allied Systems Holdings, Inc. ("Allied") emerged from bankruptcy. Under Allied's plan of reorganization, Yucaipa became the controlling stockholder of Allied, and Allied obtained a $265 million senior secured first priority credit facility ("First Lien Facility") from a group of lenders (the "Lenders"). Yucaipa was not a Lender when Allied emerged from bankruptcy.

19.    The First Lien Facility is governed by the First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement (the "Credit Agreement"), which has been amended and restated several times.

20.    The Credit Agreement provides that one or more Lenders holding more than 50% of the total Allied Debt may act as the "Requisite Lender." The Requisite Lender has the authority to either exercise the Lenders' rights in the event of a default by Allied, the borrower, or to cause all the Lenders to forbear from exercising their rights under the Credit Agreement. The Credit Agreement does not imbue the Requisite Lender with authority to adjust the respective rights of the Lenders.

21.    Under the initial Credit Agreement, Yucaipa was not an Eligible Assignee (as defined in the Credit Agreement) of debt.

22.    In 2008, Allied was having difficulty complying with the financial covenants under the Credit Agreement because of the Great Recession and the resulting downturn in the North American automotive industry for which Allied transports new vehicles. Certain of the Lenders sought to sell their Allied Debt, but could not find a buyer who was an Eligible Assignee. Allied and these Lenders sought and obtained the consent of a majority of the Lenders to amend the Credit Agreement – the Third Amendment – to permit Yucaipa to become an

Eligible Assignee and the Lenders to sell to Yucaipa up to 25% of the term loan debt governed by the Credit Agreement.  Yucaipa was not involved in the negotiation of the final terms of the Third Amendment to the Credit Agreement.

23.    In February of 2009, ComVest Investment Partners III, L.P.  ("ComVest") acquired approximately 55% of the Allied Debt.  In August of 2009, ComVest, which was then the Requisite Lender under the Credit Agreement, sought to exit its position.  A majority of the Lenders approved a fourth amendment of the Credit Agreement (the "Fourth Amendment"), which lifted the assignment and transfer restrictions from Yucaipa, among other things.  After the Fourth Amendment was approved, Yucaipa purchased ComVest's Allied Debt.  Because of its purchase of ComVest's Allied Debt, Yucaipa became the Requisite Lender as of August 21, 2009.

24.    In December of 2011, acting as Requisite Lender, Yucaipa asked Allied to release $17 million in excess deposits relating to a letter of credit facility under the Credit Agreement. Allied did so for the benefit of all Lenders, including Black Diamond, which never objected to Yucaipa acting as Requisite Lender when it served Black Diamond's interest.  Black Diamond received more than $3 million in connection with the release of the letter of credit facility.

25.    Additionally, after Yucaipa became the Requisite Lender, Black Diamond made a number of proposals to Yucaipa in Yucaipa's capacity as Requisite Lender, which proposals related to the acquisition of all the Allied Debt at a discount to par by a competitor to Allied, which acquisition would be financed by Black Diamond.

26.    Yucaipa did not effect Black Diamond's proposals relating to the acquisition of all of the Allied Debt by a competitor to Allied.

01:15018844.4                                                7

**II.**   **Allied's Second Bankruptcy.**

27.    On January 18, 2012, Black Diamond brought an action for a declaratory judgment in the New York Supreme Court that Yucaipa was not the Requisite Lender under the Credit Agreement on the grounds that the Fourth Amendment was void.

28.    On May 17, 2012, Black Diamond brought an involuntary petition for bankruptcy against Allied in the United States Bankruptcy Court for the District of Delaware.   Allied's bankruptcy proceeding remains pending before the Honorable Christopher Sontchi.   Allied continues to manage its affairs as a debtor in possession.

29.    On December 3, 2012, Black Diamond, purporting to act as the Requisite Lender, claimed to appoint its affiliates, the Black Diamond Agents, as Co-Administrative Agents (as defined in the Credit Agreement) for the Lenders and Black Diamond Commercial Finance, L.L.C. as Collateral Agent (as defined in the Credit Agreement) for the Lenders under the Credit Agreement.

30.    Upon information and belief, the Black Diamond Agents are wholly owned subsidiaries of Black Diamond.   Upon information and belief, the Black Diamond Agents do not have offices or officers separate from those of Black Diamond.   Upon information and belief, as demonstrated by their joint activity, the Black Diamond Agents function purely as a façade for Black Diamond.

31.    On March 8, 2013, the New York Supreme Court, without permitting any discovery, granted a declaratory judgment that the Fourth Amendment was void (the "New York Ruling").   In the New York Ruling, the New York court did not determine that Black Diamond was the Requisite Lender and did not rule as to the efficacy of the Third Amendment.

32.    Yucaipa promptly appealed the New York Ruling in New York state court.

33.     After appointing the Black Diamond Agents, Black Diamond sought a ruling from the Bankruptcy Court that it had the authority to act as the Requisite Lender.

34.     Under the Credit Agreement, to qualify as a Requisite Lender, a Lender or group of Lenders must hold more than 50% of the Allied Debt governed by the Credit Agreement. Black Diamond holds only $52 million of the $244 million in Allied Debt governed by the Credit Agreement. Black Diamond has claimed to hold $56 million in Allied Debt. Because even the $56 million in Allied Debt that Black Diamond claims to hold is far less than the 50% of the Allied Debt required to qualify as the Requisite Lender, to convince the Bankruptcy Court that it was the Requisite Lender, Black Diamond admitted that Yucaipa held $135 million in Allied Debt, but argued that Yucaipa's Allied Debt must be excluded from the Requisite Lender calculation.

35.     On August 7, 2013, the Bankruptcy Court entered an order providing that Black Diamond would be deemed the Requisite Lender under the Credit Agreement. In doing so, the Bankruptcy Court relied heavily on the New York Ruling and also accepted Black Diamond's proposed calculation under which Yucaipa held $135 million in Allied Debt. Yucaipa has appealed the Bankruptcy Court's ruling that Black Diamond qualifies as a Requisite Lender. That appeal remains pending.

36.     Then, Black Diamond, purporting to act as the Requisite Lender made a credit bid (the "Credit Bid") for the Assets, real estate assets and other property of Allied which will not be acquired by another buyer. Yucaipa objected to Black Diamond purporting to act as the Requisite Lender and has consistently maintained that Black Diamond is not the Requisite Lender, but did not object to the Credit Bid itself.

37.     On September 17, 2013, the Bankruptcy Court approved the Credit Bid.  In doing so, the Bankruptcy Court ruled that it had to determine that Black Diamond had the requisite authority to make the Credit Bid in order to allow the Credit Bid to go forward.   If the Bankruptcy Court had not made such a determination, none of the Lenders would have been able to submit the Credit Bid on behalf of the group.  However, the Bankruptcy Court went on to hold that nothing in its order affected Yucaipa's state law rights with respect to SBDRE.  *See In the matter of Allied Systems Holdings, Inc., et al.*, Tr. p. 99, Sept. 17, 2013 (hereinafter "Bankruptcy Court Sept. Tr."), Exhibit A hereto.  The Bankruptcy Court explicitly reserved all questions with respect to the voting rights, equity, and corporate governance of SBDRE for an appropriate state court to resolve.

## III.    The Formation of SBDRE.

38.     The Black Diamond Agents formed SBDRE on August 20, 2013 to hold the assets that the Lenders anticipated acquiring through the Credit Bid.

39.     The Bankruptcy Court explicitly refused to review or approve any provision of SBDRE's governance when approving the Credit Bid.  The Bankruptcy Court held that Black Diamond's request that it do so would amount to "having this Court insert itself into how the entity which is giving the assets under the credit agreement, under the [indiscernible] how that entity then deals with distributing the control, distributing the assets, distributing the equity in that entity.  And that is a, I think, an internal issue between two nondebtors."  Bankruptcy Court Sept. Tr. at 98. Thus, the Bankruptcy Court's approval of the Credit Bid in no way blessed the LLC Agreement of SBDRE or Black Diamond's planned (but undisclosed) governance of SBDRE.  In fact, the Bankruptcy Court approved the Credit Bid with the implicit understanding that all lenders under the Credit Agreement would be treated equally and fairly with respect to the acquired real estate assets.

01:15018844.4

10

40. On November 8, 2013, counsel for Black Diamond circulated a memorandum (the "Memorandum"), attached hereto as Exhibit B, to the Lenders. In the Memorandum, Black Diamond first disclosed to the Lenders the fact that it intended to assert ongoing and unlawful control over SBDRE, the entity formed to hold the Assets acquired by all of the Lenders, pro rata, through the Credit Bid.

41. Specifically, Black Diamond disclosed that it would withhold from the Lenders their pro rata ownership interests in SBDRE. Instead of distributing each Lender's pro rata share of the Assets or each Lender's pro rata share of the membership interests in SBDRE, Black Diamond has asserted that the Black Diamond Agents will hold the Class A Membership Interests in SBDRE for an indeterminate period of time while Black Diamond, directly and through the Black Diamond Agents, exercises control over those assets, wholly unfettered by fiduciary duties.

42. The Memorandum also attached the LLC Agreement that Black Diamond announced would govern SBDRE's control and management. The LLC Agreement purported to modify the Lenders' rights with respect to management of the Assets in a number of ways.

43. For example, the LLC Agreement named the Black Diamond Agents as SBDRE's managing member, whereas, under the Credit Agreement, Lenders holding a majority of the Allied Debt were entitled to select a Requisite Lender, which in turn could select a Collateral Agent and Administrative Agent.

44. Additionally, under the Credit Agreement, the Requisite Lender's, the Administrative Agent's, and the Collateral Agent's powers were strictly limited; under SBDRE's LLC Agreement, Black Diamond and the Black Diamond Agents (whose affiliates have a strategic interest in the Assets through their ownership of JHT Holdings, Inc., an auto

transportation company) have broad discretion in managing the assets acquired through the Credit Bid. The LLC Agreement accords Black Diamond and the Black Diamond Agents greater authority to manage the Assets than the Requisite Lender, the Administrative Agent, or the Collateral Agent are permitted under the Credit Agreement.

45.    It is particularly problematic for the Black Diamond Agents to have broad discretion with respect to the management of SBDRE because Spectrum Investment Partners, L.P. ("Spectrum"), one of the entities making up the group referred to herein as Black Diamond, is part of a consortium that acquired JHT Holdings ("JHT") in 2006. Spectrum remains a significant stockholder in JHT.

46.    JHT is one of the leading asset-light logistics providers for truck manufacturers. Historically, JHT has delivered 95% of the Class 8 heavy duty trucks and more than 50% of Class 5-7 trucks delivered in America. JHT has been a competitor of Allied. JHT likely has a strategic interest in the Assets.

47.    Spectrum therefore has a conflict of interest with respect to the management and sale of the Assets. Spectrum's conflict of interest prevents Black Diamond and the Black Diamond Agents from exercising independent and disinterested business judgment with respect to the Assets or the management of SBDRE.

48.    Moreover, the LLC Agreement purports to limit the liability and fiduciary duties of Black Diamond and the Black Diamond Agents beyond the limitations on liability and fiduciary duties afforded the Requisite Lender, the Administrative Agent, and the Collateral Agent under the Credit Agreement. The LLC Agreement also provides for indemnification of liability arising from the management of SBDRE, which indemnification may interfere with the

effectiveness of claims brought under the Credit Agreement with respect to the management of SBDRE.

49.     The LLC Agreement also potentially limited the venues in which Black Diamond and the Black Diamond Agents could be sued as compared to the Credit Agreement.

50.     Furthermore, The LLC Agreement included a number of additional changes in Black Diamond and the Black Diamond Agents duties, powers, and rights and the Lenders' rights and powers as compared to the Credit Agreement.

51.     The Requisite Lender has no authority under the Credit Agreement to modify the Lenders' rights or the Requisite Agent's authority in this manner.

52.     In purchasing Allied Debt governed by the Credit Agreement, the Lenders did not anticipate that a Requisite Lender would be permitted to modify the Lenders rights by placing collateral acquired for the benefit of the Lenders into a vehicle with governance rights different from those imposed by the Credit Agreement.

53.     This attempt to modify the powers and duties of Black Diamond and the Black Diamond Agents breached the Credit Agreement, breached fiduciary duties owed to the Lenders, and breached the covenant of good faith and fair dealing.

54.     Even under Black Diamond's purported governance scheme, as a Lender, Yucaipa is a beneficial holder of the SBDRE Membership Interests.

## IV.    The Self-Dealing New Issuance

55.     Furthermore, the Memorandum asserted that Black Diamond would use its unlawful control over SBDRE to promptly engage in a blatantly self-dealing issuance of new membership interests (the "New Issuance"), which is structured to secure Black Diamond's control over SBDRE and to divert to Black Diamond a majority of the value of the Assets acquired through the Credit Bid.

56.     At a hearing in this action on Yucaipa's Motion for Entry of Status Quo Order on December 20, 2013, Black Diamond admitted that it had effected the New Issuance as set forth in the Memorandum.[1]

57.     The New Issuance was a self-dealing transaction that breached Black Diamond and the Black Diamond Agent's fiduciary duties to Yucaipa and the Lenders in a number of respects, breached the Credit Agreement, and breached the duty of good faith and fair dealing to the extent that it did not breach the plain terms of the Credit Agreement.

### A.     The New Issuance Is a Breach of Contract Because it Imposed a Capital Call on the Lenders that Was not Permitted by the Credit Agreement.

58.     The New Issuance exceeded the Requisite Lender's authority to manage collateral on behalf of the Lenders under the Credit Agreement.

59.     Under the Credit Agreement, each Lender shared pro rata in the value of the Assets.   The Requisite Lender's, the Administrative Agent's, and the Collateral Agent's authority to manage any collateral, including the Assets, is limited to the powers set forth in the Credit Agreement.   The Credit Agreement does not permit the Requisite Lender to make a capital call or to require additional contribution by the Lenders in order for the Lenders to maintain their pro rata holding of Allied Debt and interest in the collateral securing that debt.

60.     Under the LLC Agreement, the Black Diamond Agents purportedly hold 100% of the Class A Membership Interests in SBDRE for the benefit of the Lenders.   Prior the New Issuance, the Class A Membership Interests were entitled to 100% of the economic interest in the Assets acquired through the Credit Bid.

---

[1] Based on Black Diamond's statement that the New Issuance had occurred, Yucaipa refers to the New Issuance in the past tense in this Complaint.  Yucaipa lacks personal knowledge as to the state of the New Issuance.

61.    In the New Issuance, SBDRE issued $10 million in new Class B Membership Interests.  Each Lender was permitted to subscribe to only what Black Diamond deemed to be that Lender's pro rata share of the Class B Membership Interests.  These Class B Membership Interests receive 66.6% of the voting rights in and rights to distributions from SBDRE following the New Issuance.

62.    In addition, through the New Issuance, Black Diamond received all of a new class of membership interests in SBDRE, the Class C Membership Interests, representing 3.0% of the aggregate Membership Interests in SBDRE, in exchange for backstopping the New Issuance.

63.    Black Diamond admits that any Lender who did not participate in the New Issuance had its interest in the Assets diluted.  According to Black Diamond, Lenders who did not participate in the New Issuance lost 2/3 of their proportionate interest in the Assets as a result of the New Issuance.  For every Lender who did not participate in the New Issuance, Black Diamond's interest in the Assets increased by 2/3 of that Lender's interest because Black Diamond has secured for itself alone the right to backstop the New Issuance.

64.    The New Issuance was not subject to any public sale.  No Lender other than Black Diamond participated in the New Issuance.  Thus Black Diamond has or will own 100% of the Class B and C Membership Interests and more than 70% of the Membership Interest (directly or indirectly) in SBDRE.

65.    The Credit Agreement does not permit the Requisite Lender to require Lenders to make additional contributions in order to maintain their pro rata interest in any collateral acquired by the Lenders.  The Lenders did not reasonably anticipate that the Requisite Lender could require additional contributions from the Lenders when entering into the Credit Agreement.  And, the New Issuance is not entirely fair to the Lenders.

**B.     The New Issuance Is a Breach of Contract, a Breach of Fiduciary Duty, and a Breach of the Covenant of Good Faith and Fair Dealing Because it Reallocates Governance and Economic Interests from the Lenders to the Participants In the New Issuance.**

66.     The New Issuance is also wrongful because it disproportionately allocates governance and economic interests in SBDRE to participants in the New Issuance at the expense of the Lenders.

67.     Under the Credit Agreement, Lenders select the Requisite Lender based upon their pro rata Allied Debt holdings and Lenders are entitled to their pro rata share of the economic interest in any collateral in the event of a foreclosure.  The New Issuance reallocated two thirds of those rights to the participants in the New Issuance.

68.     The Lenders hold their interests in the Assets acquired through the Credit Bid indirectly in the form of Class A Membership Interests, which are currently held by the Black Diamond Agents.

69.     Prior to the New Issuance, the Class A Membership Interests were the only membership interests in SBDRE.  Following the New Issuance, each class of SBDRE Membership Interests votes together, with the Class A Membership Interests controlling only 30.3% of any vote, the Class B Membership Interests 66.7% of any vote, and the Class C Membership Interests 3% of any vote.  Thus, the New Issuance reallocated a majority of the voting rights to the Class B Membership Interests created through the New Issuance and allocated to participants in the New Issuance.

70.     Moreover, following the New Issuance, the Class A Membership Interests receive only 30.3% of any distribution from SBDRE, the Class B Membership Interests receive 66.7% of any distribution from SBDRE, and the Class C Membership Interests receive 3% of any distribution from SBDRE.  Thus, in exchange for the $10 million promised through the New

Issuance, the participants in the New Issuance obtained a majority of the economic return from the Assets.

71.     The New Issuance purportedly commits to raise $10 million.  In order for the allocation of 2/3 of the governance and economic rights in SBDRE to the New Issuance to be fair to the Lenders (assuming that any new issuance were permitted under the Credit Agreement), the Assets could be worth no more than $5 million.  However, upon information and belief, the Assets are worth substantially more than $5 million.  Thus the New Issuance is not only impermissible but it also improperly diverts the value of the Assets from the Lenders to the participants in the New Issuance.

C.     **The New Issuance Is a Breach of Contract, a Breach of Fiduciary Duty, and a Breach of the Covenant of Good Faith and Fair Dealing Because It Was Structured to Prevent Lender Participation.**

72.     The Requisite Lender is a fiduciary for the Lenders and has the right to direct the actions of the Collateral Agent and the Administrative Agent.  Thus, the Requisite Lender has a fiduciary duty to exercise its authority as Requisite Lender and to direct the actions of the Collateral Agent and the Administrative Agent for the benefit of all Lenders.

73.     Black Diamond structured the New Issuance in a manner than precluded or discouraged Lenders from participating in the New Issuance for the benefit of Black Diamond and affiliates of Black Diamond.  In fact, no other Lender other than Black Diamond participated in the new Issuance.

74.     Among other disincentives to participation, the Memorandum imposed an arbitrary and unnecessary short deadline for participation.  The Memorandum, which was circulated no earlier than November 8, 2013, claimed that any Lender who did not subscribe to the New Issuance was irrevocably diluted as of November 15, 2013, one week after the

Memorandum was dated.  However, SBDRE was not expected to acquire the Assets until substantially after November 15, 2013 and, as of the date of this amended complaint, SBDRE has not yet acquired the Assets.  Thus, SBDRE did not need the funds to be raised through the New Issuance as of the deadline that Black Diamond set for participation.

75.     Additionally, the Memorandum required each Lender to participate in the New Issuance to the full extent of its pro rata share, if at all.  Upon information and belief, there was no business basis for this requirement.

76.     Moreover, under the Credit Agreement, each Lender's Allied Debt was freely transferrable, whereas the Class B Membership Interests issued through the New Issuance may only be transferred with the permission of the Black Diamond Agents.  This imposed a disincentive for any Lender other than Black Diamond to purchase Class B Membership Interests.

77.     Finally, the New Issuance required each Lender participating to consent to the LLC Agreement for SBDRE.  As detailed herein, the LLC Agreement for SBDRE improperly modified the Lenders' rights vis a vis Black Diamond, the Black Diamond Agents, and the Assets.  These modifications are not in the best interests of the Lenders.

78.     Not only does the Credit Agreement not permit a Requisite Lender to conduct a new issuance, but the New Issuance that Black Diamond and the Black Diamond Agents purported to conduct breached Black Diamond and the Black Diamond Agent's contractual and fiduciary duties to the Lenders, including Yucaipa, due to its self-dealing, improper, and coercive structure.

D.      **The New Issuance Is a Breach of Contract, a Breach of Fiduciary Duty, and a Breach of the Covenant of Good Faith and Fair Dealing Because Black Diamond Improperly Prevented Lenders from Participating Pro Rata.**

79.     In addition to structuring the New Issuance to dissuade Lenders from participating, Black Diamond also wrongfully allocated subscription rights in the New Issuance to ensure that Black Diamond and its affiliates would be able to acquire the majority of the New Issuance, regardless of the Lenders' willingness to participate.

80.     Under the terms of the New Issuance, as stated in the Memorandum, only Lenders were permitted to participate in the New Issuance: entities that were not Lenders were not permitted to participate.  Nonetheless, upon information and belief, Black Diamond permitted affiliates of Black Diamond that were not Lenders to participate in the New Issuance.

81.     In the New Issuance, Yucaipa was not permitted to acquire Class B Membership Interests in proportion to its total Allied Debt, including the Allied Debt that it acquired from ComVest, which amounts to 55.2% of the total Allied Debt.  The schedule that Black Diamond provided to Yucaipa, showing the extent to which Black Diamond would permit Yucaipa to participate in the New Issuance, plainly shows that Yucaipa was permitted to acquire only a sliver of the Class B Membership Interests (9.9%), not the 55.2% to which it would be entitled in a true pro rata issuance.

82.     Black Diamond has admitted that in determining each Lender other than Yucaipa's pro rata share of the New Issuance, Black Diamond proceeded as though Yucaipa held 55.2% of the Allied Debt.  As a result, by its own admission, Black Diamond did not assign approximately 46% of the New Issuance to any Lender.  Black Diamond permitted its affiliates to subscribe to that portion of the New Issuance through the backstop rights that it granted to itself.

01:15018844.4

83.     Thus, in addition to the 3% interest that Black Diamond awarded itself for backstopping the New Issuance, Black Diamond's allocation of the right to participate in the New Issuance ensured that it acquired sufficient Class B Membership Interests through the backstop to secure control of SBDRE regardless of the future rulings with respect to Yucaipa's ownership of Allied Debt.

84.     The Memorandum admits that "[i]t is anticipated that [Black Diamond] will own or control a majority of the Class A Membership Interests, Class B Membership Interests and Class C Membership Interests, taken as a whole."  But, before the New Issuance, Black Diamond owned less than 25% of the total Allied Debt used to Credit Bid for the Assets that SBDRE exists to receive and distribute to the Lenders.

85.     After the initial complaint in this action was filed, Black Diamond admitted that its affiliates were the only entities to participate in the New Issuance.

86.     Thus, in disproportionately allocating the value and control rights with respect to SBDRE to the participants in the New Issuance, and structuring the New Issuance to discourage or preclude other Lenders or third parties from participating, Black Diamond was effectively seizing a disproportionate share of the control and economic rights with respect to the Allied Assets acquired through the Credit Bid for itself, in breach of the Credit Agreement and in breach of its fiduciary duties.

**E.      The New Issuance Is a Breach of Contract, a Breach of Fiduciary Duty, and a Breach of the Covenant of Good Faith and Fair Dealing Because It Is Not Proportionate to Any Business Need of SBDRE.**

87.     The amount raised through the New Issuance is not proportionate to a business need of SBDRE.  The New Issuance is disproportionate to what Black Diamond unilaterally

assigns as the value of the Allied Assets that the New Issuance will supposedly be used to maintain.

88.    Following the New Issuance, the Class A Membership Interests, which correspond to the Lenders' pro rata share of the $244 million Allied Debt, are entitled to 30.3% of any SBDRE distribution.  The Class B Membership Interests, which correspond to the $10 million raised through the New Issuance, are entitled to 66.7% of any SBDRE distribution.  The Class C Membership Interests will be entitled to 3.0% of any SBDRE distribution.

89.    Thus, Black Diamond allocates more than twice the economic value of SBDRE to the Class B Membership Interests as it allocates to the Class A Membership Interests.

90.    If the $10 million promised through the New Issuance was worth approximately twice as much as the Allied Assets, the New Issuance would make no economic sense.  In effect, through the New Issuance, Black Diamond would have forced all Lenders to contribute a total of $10 million in cash to enable the distribution of assets valued at approximately $5 million.

91.    If the Allied Assets are worth more than $5 million, then Black Diamond's allocation of 30.3% of the value of SBDRE to the Class A Membership Interests and 66.6% of the value of SBDRE to the Class B Membership interests is unfair.  In effect, through the New Issuance, Black Diamond promised $3.03 million (only 30.3% of the $10 million subscription price for the New Issuance accrues to the benefit of the Class A Membership Interests) in exchange for a 69.6% (66.6% through the Call B Membership Interests, 3% through the Class C Membership Interests) interest in the Allied Assets.  If the Allied Assets are worth $5 million, the 69.6% share that Black Diamond acquired through the New Issuance would be worth $3.48 million.  Thus, if the Allied Assets were worth $5 million, Black Diamond would have paid $3.03 million for $3.48 million in assets.  If the Allied Assets were worth $20 million, as has

been estimated, the 69.6% share acquired by Black Diamond through the New Issuance would be worth $13.92 million.

92.     In either case, $10 million is not required for the management of the Assets in the near term.  The Assets are not operating assets.  They consisting largely of undeveloped or unoccupied properly and other rights.  The Assets require approximately $1 million or less per year for upkeep and maintenance.  In short, SBDRE does not need $10 million to maintain the Assets and will not in the foreseeable future.

93.     Upon information and belief, Black Diamond has done no due diligence concerning the need for funding for SBDRE.  The Memorandum states that Black Diamond has not determined whether it will cause SBDRE to operate the assets or to sell them.  Given this lack of business plan, it is unclear how Black Diamond could determine that SBDRE needs $10 million for any business purpose, other than to disenfranchise the other Lenders.

94.     Even if cash were required, the New Issuance is unnecessary because there is a potential buyer for one or more of the properties included in the Assets.  SBDRE's cash needs could be satisfied by such a sale, but Black Diamond has not pursued it.

**F.      The New Issuance Is a Breach of Contract, a Breach of Fiduciary Duty, and a Breach of the Covenant of Good Faith and Fair Dealing Because It Effectively Requires Lenders to Enter Into a New Business Venture with Black Diamond in Order to Maintain their Interest in the Assets Acquired through the Credit Bid.**

95.     Under the Credit Agreement, Lenders cannot be required to make any additional loans, the money lent by the Lenders has to be repaid according to a specific schedule, and the Requisite Lender's ability to act on behalf of the Lenders is strictly limited.

96.     Black Diamond's creation of SBDRE, the LLC Agreement for SBDRE, and the New Issuance upends the Lenders' rights and expectations in each of these respects.

97.    First, the New Issuance raises an additional $10 million in capital, which the Lenders could not be required to contribute under the Credit Agreement.

98.    Second, under the Credit Agreement, the Lenders all agreed to lend funds to Allied.  Allied was subject to various limitations and covenants designed to ensure that the Lenders' received the benefit of their bargain with respect to their loans to Allied.  Under SBDRE's LLC Agreement, Black Diamond and the Black Diamond Agents have broad discretion in managing the Assets.  Unlike Allied, Black Diamond and the Black Diamond Agents are not required to repay the Lenders on any particular schedule.

99.    Third, SBDRE's LLC Agreement purports to waive any fiduciary duties that would be owed by Black Diamond or the Black Diamond Agents to the fullest extent permitted by Delaware law, to permit the Black Diamond Agents to manage the Assets as they see fit, and to require SBDRE to indemnify the Black Diamond Agents for claims arising from their management of the Assets.

100.    Black Diamond's structure of SBDRE effectively creates an entirely new business enterprise to manage the collateral owned by the Lenders.  Black Diamond and the Black Diamond Agents (who as noted earlier have a strategic interest in the Assets) have far more discretion with respect to this new enterprise than they had with respect to the collateral under the Credit Agreement.  The New Issuance effectively forced the Lenders to abandon their interests in the Allied Assets acquired through the Credit Bid or to invest substantial additional funds into this new enterprise.

101.    In short, the New Issuance appears intended to entrench Black Diamond's wrongful control of the Assets rather than further any identified or legitimate business need of SBDRE.

102.    In addition to the New Issuance, Black Diamond has informed the Lenders that it intends to cause SBDRE to reimburse Black Diamond for all of its litigation expenses in securing its control of SBDRE.  Black Diamond is not entitled to this reimbursement.

103.    Thus, Black Diamond seeks to use its current, disputed, temporary, control of SBDRE to irreparably dilute the other Lenders and entrench itself, while simultaneously limiting its liability for doing so.

## V.    Expense Reimbursement

104.    Black Diamond and the Black Diamond Agents have also breached the Credit Agreement or the covenant of good faith and fair dealing and Black Diamond's fiduciary duties by undertaking to reimburse themselves for their fees and expenses out of the proceeds of the Lenders' collateral, rather than leaving that task to Allied, and by applying different standards to their own requests for reimbursement of fees and expenses pursuant to the Credit Agreement than they have applied to Yucaipa's request for reimbursement of fees and expenses pursuant to the Credit Agreement.

105.    On September 17, 2013, the Bankruptcy Court approved the sale of a majority of Allied's property to Jack Cooper Holdings Corp. (the "Jack Cooper Sale").  The Jack Cooper Sale closed on December 20, 2013 and was funded on December 27, 2013.  The Assets are those assets of Allied that were not sold in the Jack Cooper Sale.

106.    On December 3, 2013, Black Diamond informed the Lenders that the Black Diamond Agents would reimburse Black Diamond, the Black Diamond Agents, and other Lenders' reasonable fees and expenses related to the Allied Bankruptcy out of the proceeds of the Jack Cooper Sale, pursuant to Section 10.2 of the Credit Agreement and Section 7.2 of the Security Agreement.  *See* Letter Regarding Possible Reimbursement (Dec. 3, 2013), Exhibit C hereto.

107.    Section 10.2 of the Credit Agreement provides in pertinent part that:

> Borrower agrees to pay promptly . . . (f) all the actual costs and reasonable expenses (including the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by Collateral Agent and its counsel) in connection with the custody or preservation of any of the Collateral; (g) all other actual and reasonable costs and expenses incurred by each Agent in connection with the syndication of the Loans and Commitments and the negotiation, preparation and execution of the Credit Documents and any consents amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (h) after the occurrence of a Default or an Event of Default, all reasonable costs and expenses, including reasonable attorneys' fees (including reasonable allocated costs of internal counsel) and reasonable costs of settlement, incurred by any Agent and Lenders in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit documents by reason of such Default or Event of Default (including in connection with the sale, lease or license of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a 'work out' or pursuant to any insolvency or bankruptcy cases or proceedings.

*See* Credit Agreement, Exhibit D hereto.

108.    Section 7.2 of the Amended and Restated Pledge and Security Agreement (the "Security Agreement"), Exhibit E hereto, governing the Allied Debt, includes a distribution waterfall that lists the reimbursement of expenses ahead of distributions to Lenders on account of the principal of the Allied Debt.

109.    Yucaipa pointed out to Black Diamond that, among other issues, the Credit Agreement and Security Agreement provided for the payment of expenses by the Borrower, rather than the Requisite Lender and its agents.  Because (a) a borrower would be motivated to ensure that the Requisite Lender and its agents' fee and expense reimbursement requests were

reasonable and fully supported before paying them out and (b) the Requisite Lender could not be expected to or entrusted with the task of reviewing its own reimbursement request in a similar manner, Yucaipa proposed that Black Diamond, the Black Diamond Agents, and any Lender submitting a reimbursement request provide information concerning their reimbursement requests to the other Lenders and provide each Lender with an opportunity to object to the Court if the amount submitted for reimbursement seemed unreasonable.

110.    Counsel for Black Diamond and the Black Diamond Agents expressly rejected Yucaipa's demand that any request for expense reimbursement should be subject to a right of the other Lenders to review information pertaining to the request in order to confirm its reasonableness and that any Lender should have the right to object to any unreasonable or unverifiable expense submitted for reimbursement.

111.    On December 19, 2014, a teleconference was held before the Bankruptcy Court in an effort to resolve the dispute with respect to reimbursement requests.  The Bankruptcy Court ruled that:

> the collateral agent will retain out of the money it receives or to pay all the asserted expenses, and they will do that in a segregated account, not necessarily (indiscernible - 11:50:54) escrow agreement but a segregated account.
>
> .  .  .
>
> So collateral agent or the appropriate person will (indiscernible - 11:52:53) all the requests expenses in a segregated account, the net proceeds will be distributed pursuant to the sale order, including funding the escrow, to Yucaipa of approximately 52 percent I believe, and third, any payment by the collateral agent as to those expenses until otherwise ordered by the Court you will provide seven-days written notice to the effective parties and at that point the notice recipients will have an opportunity to do what they wish to do, which may include a request for this Court to become involved in the decision. At that point this Court will decide in

> effect whether to -- to get -- to weigh in on it or to send you
> elsewhere. And this is all unless otherwise ordered by the Court at
> a further time.

*See In the matter of Allied Systems Holdings, Inc., et al.*, Tr., p. 29, 30-31, Dec. 19, 2013, (the

"December 19 Ruling"), Exhibit F hereto.

112.    Within hours of the December 19 Ruling, Black Diamond and the Black Diamond

Agents announced that they still intended to reimburse all of the fees and expenses that they had

asserted.    *See* Black Diamond Notice of Reimbursement and Reserve (Dec. 19, 2013) (the

"Reimbursement Notice"), Exhibit G hereto.    Despite demand by Yucaipa, Black Diamond and

the Black Diamond Agents refused to provide Yucaipa with any information concerning the

basis or the reasonableness of the fee and expense reimbursements that the Black Diamond

Agents intended to make (and ultimately made) to themselves and Black Diamond.

113.    The Black Diamond Agents also announced on December 19, 2013, that they

intended to establish a $7,500,000 "reserve account" for "potential future costs and expenses that

may be incurred by [the Black Diamond] Agents in furtherance of their duties and

responsibilities under the Credit Documents."    Reimbursement Notice, p. 2.    The Black Diamond

Agents also refused to provide Yucaipa with any detail regarding the factual basis for the

establishment of this reserve account.    The Credit Agreement does not permit the Requisite

Lender, the Collateral Agent, or the Administrative Agent to establish such a reserve account.

114.    The Black Diamond Agents also announced that they received expense

reimbursement requests from several other non-Yucaipa Lenders, which the Black Diamond

Agents intended to pay in full.    Reimbursement Notice, p. 2.

115.    Conversely, Black Diamond and the Black Diamond Agents announced that,

unlike the payments to themselves and every other Lender, the funds to reimburse Yucaipa's fees

and expenses in connection with Allied's bankruptcy would be held in escrow.  Reimbursement Notice, p. 2.  Assuming (arguendo) that the Black Diamond Agents were empowered to reimburse Lenders for fees and expenses, as the Black Diamond Agents have purported to do, there would still be no basis to immediately reimburse the other Lenders, while escrowing the reimbursement requested by Yucaipa.

116.    On December 26, 2013, within the seven day objection period created by the December 19 Ruling, Yucaipa filed the Preliminary Objection of Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. to Administrative Agent's Notice of Disbursement of Costs and Expense Reimbursement (the "Preliminary Objection"), Exhibit H hereto.  In the Preliminary Objection, Yucaipa objected to the Black Diamond Agents' stated reimbursement plan and noted that because Allied, the borrower, was the entity obligated to reimburse expenses, any expense reimbursement should be subject to Bankruptcy Court oversight and should provide the Lenders, as the parties in interest, with information concerning the reimbursement requests and an opportunity to object.

117.    On December 26, 2013, counsel for Black Diamond and the Black Diamond Agents advised counsel for Yucaipa that the Black Diamond Agents intended to pay the announced reimbursement of certain Lender expenses, including those of Black Diamond and the Black Diamond Agents, in spite of the December 19 Ruling and the fact that Yucaipa had timely filed an objection.

118.    In response to Black Diamond's refusal to abide by the Bankruptcy Court's December 19 Ruling, on December 27, 2013 counsel for Yucaipa sought clarification from the Bankruptcy Court that Black Diamond's stated course of action would violate the December 19 Ruling.  *See* First Email exchange among M. Nestor, A. Harris, and Bankruptcy Court, at Email

from M. Nestor at 11:17 am (Dec. 27, 2013), Exhibit I hereto.  Black Diamond and the Black Diamond Agents responded with a 12 page letter brief.  *See* First Email exchange among M. Nestor, A. Harris, and Bankruptcy Court, at Email from A. Harris at 12:49 pm attaching Letter Brief (Dec. 27, 2013, 12:49 pm), Exhibit I hereto.

119.    The Bankruptcy Court promptly rejected Black Diamond's arguments.  *See* Second Email exchange among M. Nestor, A. Harris, and Bankruptcy Court, at email from the Court at 2:12 pm (Dec. 27, 2013) ("I believe Yucaipa's position is consistent with what I ruled on the record.  They have raised an objection.  At this point, I believe I have to decide what to do about it."), Exhibit J hereto.  The Bankruptcy Court directed that fees should not be paid pending a court ruling.  *Id.*

120.    Despite the December 19 Ruling and their awareness (as demonstrated by the 12 page Letter Brief submitted within two hours of Yucaipa raising the issue with the Bankruptcy Court) that their right to distribute reimbursement payments would be subject to further review by the Bankruptcy Court, Black Diamond and the Black Diamond Agents went ahead and wired the funds for the reimbursement payments.  *See* Second Email exchange among M. Nestor, A. Harris, and Bankruptcy Court, at email from A. Harris at 4:42 pm (Dec. 27, 2013) ("After receiving Judge Sontchi's e-mail we confirmed with our clients that the wires for the expense reimbursement had already been processed."), Exhibit J hereto.  Yucaipa does not know whether the payments were made before or after the Bankruptcy Court's 2:12 email to counsel.  Yucaipa immediately requested the specific wire information regarding each payment so made but to date has not received such information.

121.    The Black Diamond Agents' payment to themselves and Black Diamond of what they assert are their reimbursable reasonable fees and expenses is not permitted under the Credit

Agreement. It would not be permitted under the plain language of the Credit Agreement if Black Diamond were the Requisite Lender (which it is not) and the Black Diamond Agents were duly appointed as Collateral Agent and Administrative Agent (which they are not). That the Requisite Lender and its Agents would be able to use collateral belonging to the Lenders to pay whatever they deem to be their reimbursable fees and expenses was not contemplated by the Lenders entering into the Credit Agreement.

122.    Black Diamond and the Black Diamond Agents are taking advantage of their control over the proceeds of the collateral to seize authority with respect to expense reimbursement that they do not have under the Credit Agreement. This attempted expansion of authority is a breach of fiduciary duty in as much as it unfairly benefits Black Diamond at the Lenders' expense.

123.    Black Diamond and the Black Diamond Agents have taken the position in submissions to the Bankruptcy Court and in correspondence with Yucaipa that the Black Diamond Agents' reimbursement payments are not subject to review by the Bankruptcy Court on the grounds that any dispute arising from the expense reimbursement is a dispute between and among non-debtors. The Bankruptcy Court has stated that it will consider whether to adjudicate this issue or whether to defer to a state court. *See* December 19 Ruling, p. 31, Exhibit F hereto.

124.    In the event that the Bankruptcy Court does not resolve this issue, Yucaipa and the other Lenders have been harmed both by Black Diamond and the Black Diamond Agents' seizure of authority not permitted to them under the Credit Agreement and by the Black Diamond Agents improper reimbursement of expenses.

## VI.    The Ruling of the New York Superior Court

125.    Yucaipa brought the Verified Complaint Pursuant to Sections 18-110 and 18-111 of the LLC Act, the initial complaint in this action on December 11, 2013.  At that time, Yucaipa's appeal from the New York Ruling remained pending.

126.    On December 17, 2013, the appellate Division, First Department of the New York Supreme Court issued an opinion in which it determined that there were triable issues of fact with respect to whether Black Diamond had waived its right to challenge or was otherwise estopped from contesting Yucaipa's status as Requisite Lender.

127.    The Bankruptcy Court's determination that Black Diamond was the Requisite Lender was thus premised on a New York Ruling that has since been modified in a manner material to the Bankruptcy Court's determination.

## VII.    Black Diamond's Control Over SBDRE Is Unlawful

128.    Through its purchase of ComVest's Allied Debt, Yucaipa became the holder of more than 50% of the Allied Debt and became the Requisite Lender.  As the holder of more than 50% of the Allied Debt, Yucaipa is entitled to elect any managing member of SBDRE.  As the proper Requisite Lender, Yucaipa is entitled to manage the distribution of the interests in SBDRE.

129.    Black Diamond has wrongfully asserted that it is the Requisite Lender and on that basis has claimed that it has the authority to control SBDRE on an ongoing basis despite holding less than 25% of the Allied Debt.  Black Diamond is not entitled to manage SBDRE.

130.    The Credit Agreement does not empower the Requisite Lender, the Collateral Agent, or the Administrative Agent to manage foreclosed assets belonging to the Lenders on an ongoing basis or in a manner that directly dilutes the interests of the other Lenders.  It does not empower the Requisite Lender, the Collateral Agent, or the Administrative Agent to make

01:15018844.4

capital calls upon the Lenders. The Credit Agreement explicitly limits the powers of the Requisite Lender, the Collateral Agent, and the Administrative Agent to the powers set forth in the Credit Agreement and related agreements. Thus, even if Black Diamond were the Requisite Lender, the Credit Agreement would not allocate governance of SBDRE to Black Diamond or the Black Diamond Agents, as explained above.

131.    Additionally, Black Diamond seeks to convert its improper contested control of SBDRE to permanent control of SBDRE though the self-dealing New Issuance. As detailed above, the New Issuance violates the Credit Agreement and is not entirely fair to the Lenders. The New Issuance would exceed Black Diamond and the Black Diamond Agents' authority with respect to the Assets, even if Black Diamond were the Requisite Lender.

132.    Furthermore, Black Diamond, while purporting to act as the Requisite Lender, has disregarded the Allied Debt that Yucaipa purchased from ComVest when allocating the Lenders' rights with respect to the Assets. The Requisite Lender does not have the authority to determine or disregard any Lender's Allied Debt holdings. In attempting to disregard Yucaipa's Allied Debt, Black Diamond has exceeded the authority to which it claims to be entitled as the Requisite Lender.

133.    Finally, Black Diamond has exceeded its authority and violated the Credit Agreement by reimbursing what it asserts to be its own reasonable expenses, while refusing to reimburse Yucaipa's reasonable and reimbursable fees and expenses, as required under the Credit Agreement.

## COUNT I
### (Declaratory Judgment)

134.    The allegations of paragraphs 1-133 are incorporated by reference as if fully alleged herein.

135.    Yucaipa validly owns and holds 55.2% of the Allied Debt as a result of Yucaipa's purchase of Allied Debt from ComVest.

136.    For more than a year after Yucaipa's acquisition of Allied Debt from ComVest, Black Diamond acquiesced to Yucaipa acting as Requisite Lender and Black Diamond obtained benefits thereby.  Black Diamond also affirmatively dealt with Yucaipa as if Yucaipa were the Requisite Lender.

137.    Black Diamond waited for years after Yucaipa's acquisition of Allied Debt to challenge Yucaipa's right to purchase or hold that Allied Debt.

138.    Then, starting in late 2013, Black Diamond and the Black Diamond Agents began to disregard a portion of Yucaipa's Allied Debt holdings while purporting to act as Requisite Lender, Administrative Agent, and Collateral Agent.

139.    By disregarding a portion of Yucaipa's Allied Debt Black Diamond and the Black Diamond Agents have purported to allocate to themselves greater economic interest in and greater control over the Assets acquired by the Lenders through the Credit Bid.

140.    Yucaipa is entitled to a declaratory judgment that Yucaipa validly owns and holds 55.2% of the Allied Debt and that neither Black Diamond nor is affiliates is permitted to disregard any portion of Yucaipa's Allied Debt holdings.

## COUNT II
### (Declaration Pursuant to Section 18-110 of the LLC Act)

141.    The allegations of paragraphs 1-140 are incorporated by reference as if fully alleged herein.

142.    By reason of the forgoing facts and circumstances, Yucaipa is entitled to a declaration that Black Diamond lacked authority to appoint the Black Diamond Agents as the managing member of SBDRE.

143.    By reason of the forgoing facts and circumstances, Yucaipa is entitled to a declaration that Black Diamond lacked authority to allocate the voting membership interests in SBDRE to the Black Diamond Agents.

144.    By reason of the forgoing facts and circumstances, Yucaipa is entitled to a declaration that Yucaipa, as the holder of a majority of the Allied Debt, has elected itself the managing member of SBDRE.

## COUNT III
### (Declaration Pursuant to Section 18-111 of the LLC Act)

145.    The allegations of paragraphs 1-144 are incorporated by reference as if fully alleged herein.

146.    By reason of the forgoing facts and circumstances, Yucaipa is entitled to a declaration that Black Diamond lacked authority to appoint the Black Diamond Agents as the managing member of SBDRE.

147.    By reason of the forgoing facts and circumstances, Yucaipa is entitled to a declaration that Black Diamond lacked authority to allocate the voting membership interests in SBDRE to the Black Diamond Agents.

148.    By reason of the forgoing facts and circumstances, Yucaipa is entitled to a declaration that Yucaipa, as the holder of a majority of the Allied Debt, has elected itself the managing member of SBDRE.

## COUNT IV
### (Breach of Contract – Imposition of LLC Agreement)

149.    The allegations of paragraphs 1-148 are incorporated by reference as if fully alleged herein.

150.    The Credit Agreement is a valid contract that governs the rights and responsibilities of any Requisite Lender with respect to the other Lenders.

151.    Under the Credit Agreement, a Requisite Lender is not permitted to modify the rights of the Lenders vis a vis any collateral acquired by the Lenders.

152.    Under the Credit Agreement, a Requisite Lender is not permitted to modify the rights of the Lenders vis a vis the Requisite Lender.

153.    Through the terms of the LLC Agreement of SBDRE, Black Diamond and the Black Diamond Agents have purported to modify the rights of the Lenders vis a vis the Assets acquired by the Lenders through the Credit Bid.

154.    Through the terms of the LLC Agreement of SBDRE, Black Diamond and the Black Diamond Agents have purported to modify the rights of the Lenders vis a vis Black Diamond and the Black Diamond Agents.

155.    Black Diamond and the Black Diamond Agents purported approval of the LLC Agreement is a breach of the Credit Agreement.

156.    Yucaipa and the Lenders have been and will be harmed by Black Diamond and the Black Diamond Agents imposition of the LLC Agreement, if that imposition is effective.

**COUNT V**
**(Breach of Fiduciary Duties – Imposition of LLC Agreement)**

157.    The allegations of paragraphs 1-156 are incorporated by reference as if fully alleged herein.

158.    The Requisite Lender owes the Lenders fiduciary duties.  The Requisite Lender is empowered to control the Administrative Agent and the Collateral Agent.  When acting as the Requisite Lender, Black Diamond owes the Lenders fiduciary duties.  Black Diamond has

purported to act as Requisite Lender in appointing the Black Diamond Agents.  Black Diamond has the authority to control the Black Diamond Agents.

159.    Black Diamond or the Black Diamond Agents have purported to approve the LLC Agreement to govern the Lenders' indirect interests in the Assets held by SBDRE.

160.    As detailed above, the terms of the LLC Agreement expand the rights of the Black Diamond Agents beyond what is permitted under the Credit Agreement and limit the liability of Black Diamond and the Black Diamond Agents as compared to the Credit Agreement.

161.    The LLC Agreement includes additional terms that are more favorable to Black Diamond and the Black Diamond Agents than the terms of the Credit Agreement.

162.    Black Diamond breached its fiduciary duties to the Lenders by attempting to modify its rights and the rights of the Lenders in a manner favorable to Black Diamond and the Black Diamond Agents.

163.    Yucaipa and the other Lenders have been and will continue to be injured if the terms of the LLC Agreement are permitted to govern Black Diamond and the Black Diamond Agents' management of the Allied Assets.

**COUNT VI**
**(Breach of the Duty of Good Faith and Fair Dealing – Imposition of LLC Agreement)**

164.    The allegations of paragraphs 1-163 are incorporated by reference as if fully alleged herein.

165.    A covenant of good faith and fair dealing is implied in all contracts under Delaware law.  Such covenant operates to prevent a party from acting arbitrarily or unreasonably, and thereby frustrating the benefits of the bargain that the other party reasonably expected.  The implied covenant also applies when a contract confers discretion on a party.  In

01:15018844.4

such a case, the implied covenant requires that the party exercising that discretion does so reasonably and in good faith.

166.    The covenant of good faith and fair dealing is implied in the Credit Agreement and applies when any party to the Credit Agreement exercises its discretion under the Credit Agreement.

167.    As set forth herein, the Credit Agreement allocated various rights and duties among the Lenders, the Requisite Lender, the Administrative Agent, and the Collateral Agent.

168.    The parties to the Credit Agreement did not anticipate that those rights could be modified other than through amendment to the Credit Agreement.

169.    By placing the Assets acquired through the Credit Bid in SBDRE and approving the LLC Agreement, which includes terms different from the Credit Agreement, for SBDRE, Black Diamond and the Black Diamond Agents have purported to modify the Lenders' rights with respect to the Allied Assets acquired as collateral for the loans that the Lenders made to Allied pursuant to the Credit Agreement.

170.    To the extent that Black Diamond's effort to modify the rights and powers of the Lenders through the formation of SBDRE, imposition of the LLC Agreement, and contribution of the Allied Assets to SBDRE is not explicitly precluded by the Credit Agreement, it is a violation of the covenant of good faith and fair dealing, for which Yucaipa has no adequate remedy at law.

171.    Yucaipa and the other Lenders have been and will continue to be injured if the terms of the LLC Agreement are permitted to govern Black Diamond and the Black Diamond Agents' management of the Allied Assets.

## COUNT VII
### (Breach of Contract – The New Issuance)

172.    The allegations of paragraphs 1-171 are incorporated by reference as if fully alleged herein.

173.    The Credit Agreement is a valid contract that governs the rights and responsibilities of any Requisite Lender with respect to the other Lenders.

174.    Through the New Issuance, Black Diamond and the Black Diamond Agents have exceeded the Authority of the Requisite Lender, the Administrative Agent, and the Collateral Agent under the Credit Agreement by diluting the rights of the Lenders with respect to the Assets acquired through the Credit Bid.

175.    Black Diamond and the Black Diamond Agents breached the Credit Agreement by conducting the New Issuance.

176.    Yucaipa and the Lenders have been and will be harmed by the New Issuance, if the New Issuance is effective, in an amount to be proven at trial.

## COUNT VIII
### (Breach of Fiduciary Duty – The New Issuance)

177.    The allegations of paragraphs 1-176 are incorporated by reference as if fully alleged herein.

178.    The Requisite Lender owes the Lenders fiduciary duties.  The Requisite Lender is empowered to control the Administrative Agent and the Collateral Agent.  When acting as the Requisite Lender, Black Diamond owes the Lenders fiduciary duties.  Black Diamond has purported to act as Requisite Lender in appointing the Black Diamond Agents.  Black Diamond has the authority to control the Black Diamond Agents.

179.    As a fiduciary for the Lenders, any self-dealing transaction approved or effected by Black Diamond must be entirely fair to the Lenders.

180.    The New Issuance is a self-dealing transaction because, among other things, (a) Black Diamond received rights not afforded other Lenders, such as the right to backstop, in connection with the New Issuance; (b) Black Diamond received the Class C Membership Interests though the New Issuance; (c) the New Issuance was structured to prevent or limit participation by any Lender other than Black Diamond; and (d) Black Diamond was the only Lender to participate in the New Issuance.

181.    The New Issuance is not entirely fair to the Lenders because, among other things, (a) Black Diamond did not employ any safeguards to ensure that the New Issuance was entirely fair to the Lenders; (b) the New Issuance was not proportional to any business need of SBDRE; (c) the New Issuance disproportionately allocated the value of SBDRE to Black Diamond; and (d) the New Issuance improperly subverted the Lenders' governance rights with respect to the Assets in favor of Black Diamond and the Black Diamond Agents.

182.    Black Diamond breached its fiduciary duties by effecting the New Issuance or by permitting the Black Diamond Agents to effect the New Issuance.

183.    Yucaipa and the other Lenders have been and will continue to be injured by the New Issuance.

## COUNT IX
### (Breach of the Duty of Good Faith and Fair Dealing – The New Issuance)

184.    The allegations of paragraphs 1-183 are incorporated by reference as if fully alleged herein.

185.    A covenant of good faith and fair dealing is implied in all contracts under Delaware law.    Such covenant operates to prevent a party from acting arbitrarily or

unreasonably, and thereby frustrating the benefits of the bargain that the other party reasonably expected. The implied covenant also applies when a contract confers discretion on a party. In such a case, the implied covenant requires that the party exercising that discretion does so reasonably and in good faith.

186.    The covenant of good faith and fair dealing is implied in the Credit Agreement and applies when any party to the Credit Agreement exercises its discretion under the Credit Agreement.

187.    As set forth more fully above, through the Credit Agreement, the Lenders entered into a transaction whereby they lent funds to Allied. The Lenders did not anticipate entering into any other business venture as a result of entering into the Credit Agreement.

188.    The New Issuance effectively required that, in order to maintain their pro rata ownership interest in the Assets acquired through the Credit Bid, the Lenders were required to contribute additional funds to SBDRE and consent to Black Diamond and the Black Diamond Agents having additional discretion to manage the Assets acquired through the Credit Bid on an ongoing basis.

189.    By contributing the Assets acquired through the Credit Bid to SBDRE, indicating that they may manage SBDRE on an ongoing basis and so providing in SBDRE's LLC Agreement, and through the New Issuance, Black Diamond and the Black Diamond Agents have purported to convert the Lenders' secured loans to Allied into a minority interest in a new business venture managing the Assets.

190.    To the extent that this change in the Lender's intended transaction is not explicitly precluded by the Credit Agreement, it is a violation of the covenant of good faith and fair dealing.

01:15018844.4

40

191.    The Lenders have been and will be harmed by Black Diamond and the Black Diamond Agents' management of the Assets in contravention of the Lenders' expectations when they entered into the Credit Agreement in an amount to be proven at trial.

## COUNT X
### (Breach of Contract – Fee Reimbursement)

192.    The allegations of paragraphs 1-191 are incorporated by reference as if fully alleged herein.

193.    The Credit Agreement is a valid contract that governs the rights and responsibilities of any Requisite Lender with respect to the other Lenders.

194.    Under the Credit Agreement, the borrower, rather than the Requisite Lender is empowered to and required to reimburse certain expenses of the Requisite Lender, the Requisite Lenders' Agents, and the Lenders.

195.    The Credit Agreement does not provide for the creation of reserves or hold backs to pay future anticipated reimbursable expenses.

196.    Black Diamond and the Black Diamond Agents have breached the Credit Agreement by reimbursing their own and other Lenders' fees and expenses.

197.    Black Diamond and the Black Diamond Agents have breached the Credit Agreement by creating a $7,500,000 reserve against future reimbursement requests that Black Diamond or the Black Diamond Agents may submit.

198.    Alternatively, in the event that Black Diamond or the Black Diamond Agents are permitted under the Credit Agreement to assume the role of Allied in reimbursing fees and expenses, they have breached the Credit Agreement by refusing to reimburse Yucaipa's reasonable fees and expenses related to Allied's bankruptcy and by treating Yucaipa's reimbursement requests differently than the requests made by other Lenders.

199.    Yucaipa and the Lenders were damaged by Black Diamond and the Black Diamond Agents' self-dealing reimbursement of fees and expenses in breach of the Credit Agreement in an amount to be proven at trial.

## COUNT XI
### (Breach of Fiduciary Duties – Fee Reimbursement)

200.    The allegations of paragraphs 1-199 are incorporated by reference as if fully alleged herein.

201.    The Requisite Lender owes the Lenders fiduciary duties.  The Requisite Lender is empowered to control the Administrative Agent and the Collateral Agent.  When acting as the Requisite Lender, Black Diamond owes the Lenders fiduciary duties.  Black Diamond has purported to act as Requisite Lender in appointing the Black Diamond Agents.  Black Diamond has the authority to control the Black Diamond Agents.

202.    Under the Credit Agreement, to obtain reimbursement of expenses, the Requisite Lender, the Administrative Agent, and the Collateral Agent must demonstrate to Allied, the borrower, that any fee or expense for which they seek reimbursement is reasonable and falls within a category of reimbursable expense.  This requirement prevents the Requisite Lender, the Administrative Agent, and the Collateral Agent from obtaining reimbursement improperly.  It benefits the Lenders by ensuring that any expense that is reimbursed was reviewed for reasonableness by a third party, who was interested in avoiding unnecessary payments.  Thus, this contractual requirement is a burden upon the Requisite Lender and its Agents and has value to the Lenders.

203.    In breach of the Credit Agreement, Black Diamond and the Black Diamond Agents have used their control over the proceeds of the Lenders' collateral to assert that they may oversee reimbursement requests.  In doing so, Black Diamond and the Black Diamond

Agents have eliminated any third-party oversight over their own reimbursement requests. Black Diamond and the Black Diamond Agents have refused to provide Yucaipa, or the other Lenders, with the information necessary to take on the role of verifying that any fee or expense for which Black Diamond and the Black Diamond Agents seek reimbursement is reasonable and falls within a category of reimbursable expense.

204.    By overseeing the reimbursement of their own fees and expenses, while providing no information to the Lenders, Black Diamond and the Black Diamond Agents have modified the arrangement among Allied, the Lenders, Black Diamond, and the Black Diamond Agents in a manner detrimental to the Lenders and beneficial to Black Diamond and the Black Diamond Agents.

205.    The elimination of third party oversight over Black Diamond and the Black Diamond Agent's requests for reimbursement is not entirely fair to the Lenders.

206.    Black Diamond has breached its fiduciary duties to the Lenders by eliminating or permitting the Black Diamond Agents to eliminate any third-party oversight of Black Diamond and the Black Diamond Agents' expense reimbursement.

207.    Yucaipa and the other Lenders were damaged by Black Diamond and the Black Diamond Agents' elimination of any third party oversight with respect to the reimbursement of their own fees and expenses in an amount to be proven at trial.

## COUNT XII
### (Breach of the Duty of Good Faith and Fair Dealing – Fee Reimbursement)

208.    The allegations of paragraphs 1-207 are incorporated by reference as if fully alleged herein.

209.    A covenant of good faith and fair dealing is implied in all contracts under Delaware law.    Such covenant operates to prevent a party from acting arbitrarily or

unreasonably, and thereby frustrating the benefits of the bargain that the other party reasonably expected.  The implied covenant also applies when a contract confers discretion on a party.  In such a case, the implied covenant requires that the party exercising that discretion does so reasonably and in good faith.

210.    The covenant of good faith and fair dealing is implied in the Credit Agreement and applies when any party to the Credit Agreement exercises its discretion under the Credit Agreement.

211.    Under the Credit Agreement, to obtain reimbursement of expenses, the Requisite Lender, the Administrative Agent, and the Collateral Agent must demonstrate to Allied, the borrower, that any fee or expense for which they seek reimbursement is reasonable and falls within a category of reimbursable expense.  In including this provision in the Credit Agreement, the Lenders expected that the Requisite Lender, the Administrative Agent, and the Collateral Agent would not be in a position to approve the reimbursement of their own expenses.

212.    To the extent that Black Diamond and the Black Diamond Agents' efforts to take control of expense reimbursement and refusal to provide any information to any third part concerning the fees and expenses for which they seek reimbursement is not a breach of the Credit Agreement, it is a violation of the covenant of good faith and fair dealing, because it frustrates the Lenders' reasonable expectation that any reimbursement request would be subject to review by a third party.

213.    Yucaipa and the other Lenders were damaged by Defendants' modification of the process for expense reimbursement in an amount to be proven at trial.

## COUNT XIII
### (Aiding and Abetting Breach of Fiduciary Duty)

214. The allegations of paragraphs 1-213 are incorporated by reference as if fully alleged herein.

215. The Black Diamond Agents had knowledge that Black Diamond owed fiduciary duties to the Lenders, including Yucaipa.

216. The Black Diamond Agents had knowledge that Black Diamond breached its fiduciary duties to the Lenders, by among other things, imposing an LLC Agreement on SBDRE, which purports to expand the Black Diamond Agents' authority, using the New Issuance to gain control of SBDRE in a self-dealing manner, and modifying the process by which Black Diamond and the Black Diamond Agents obtain reimbursement of any reimbursable expenses to eliminate any third party oversight.

217. The Black Diamond Agents' assistance was a substantial and, in many cases, crucial, factor enabling Black Diamond's breaches of fiduciary duty. Without the Black Diamond Agent's active cooperation, SBDRE would not have been created, the proceeds of the Credit Bid would not have been transferred to SBDRE, the New Issuance would not have been approved by the Managing Member of SBDRE, and Black Diamond would not have been able to obtain reimbursement of any expenses out of proceeds of the Jack Cooper Sale.

218. As discussed above, these breaches of fiduciary duty caused damages to Yucaipa in an amount to be proven at trial.

## COUNT XIV
### (Violations of Article 9 of the UCC)

219. The allegations of paragraphs 1-218 are incorporated by reference as if fully alleged herein.

01:15018844.4

45

220.    Because the Lenders acquired the Assets through the Credit Bid, the Assets are the proceeds of collateral subject to a security interest. In forming SBDRE, the Black Diamond Agents exchanged the Assets for ownership of SBDRE.  Thus, ownership of SBDRE is also the proceeds of collateral subject to a security interest.

221.    Defendants' actions with respect to SBDRE and the Assets are governed by Article 9 of the Uniform Commercial Code (the "UCC").

222.    Article 9 of the UCC imposes duties of care, good faith, and commercial reasonableness upon a party having possession or control of collateral or the proceeds of collateral.  Defendants' control and disposition of the Assets and SBDRE are subject to these duties of care, good faith, and commercial reasonableness.

223.    Article 9 of the UCC imposes notice requirements upon any disposition of collateral or its proceeds by a secured lender.  Defendants' disposition of the Assets and interests in SBDRE are subject to these notice requirements.

224.    Defendants' sale of almost 70% of the equity in SBDRE through the New Issuance, co-mingling the proceeds of the New Issuance with the Assets, and managing the Assets for their own benefit violated the duties of care, good faith, and commercial reasonableness imposed by the UCC.

225.    Defendants' notice of the formation of SBDRE and of the New Issuance through the Memorandum did not comply with the notice requirements imposed by Article 9 of the UCC.

226.    Defendants have violated multiple provisions of Article 9 of the UCC.

227.    Yucaipa was injured by Black Diamond's failure to comply with the UCC in an amount to be proven at trial.

01:15018844.4

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that the Court enter an order:

A.      declaring that Yucaipa owns 55.2% of the Allied Debt and that neither Black Diamond nor any Black Diamond Agent is permitted to disregard any portion of Yucaipa's Allied Debt holdings;

B.      declaring that, as a holder of the majority of the Allied Debt, Yucaipa is lawfully entitled to elect the managing member of SBDRE;

C.      finding Black Diamond and the Black Diamond Agents in breach of the Credit Agreement;

D.      or, in the alternative, finding Black Diamond and the Black Diamond Agents to have breached the covenant of good faith and fair dealing;

E.      finding Black Diamond to have breached its fiduciary duties to the Lenders;

F.      finding that the Black Diamond Agents aided and abetted Black Diamond's breaches of fiduciary duty;

G.      finding that Yucaipa was injured by Black Diamond's failure to comply with the UCC;

H.      voiding the New Issuance;

I.      awarding Yucaipa damages based upon Black Diamond's and the Black Diamond Agents' breaches of contract or of the covenant of good faith and fair dealing and breaches of fiduciary duty;

J.      awarding Yucaipa damages based upon Black Diamond's and the Black Diamond Agents' failure to comply with the UCC;

J.      awarding prejudgment interest and post-judgment interest;

01:15018844.4

47

K.      awarding plaintiffs their reasonable costs and expenses incurred in connection with this action, including reasonable attorneys' fees; and

L.      granting such other relief as the Court may deem just and proper.

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Martin S. Lessner*

_____
Martin S. Lessner (No. 3109)
Michael R. Nestor (No. 3526)
Emily V. Burton (No. 5142)
Rodney Square
1000 North King Street
Wilmington, DE  19801
(302) 571-6600

Dated: February 12, 2014                    *Attorneys for plaintiffs*

## **CERTIFICATE OF SERVICE**

I, Emily V. Burton, hereby certify that on February 12, 2014, I caused to be served a true and correct copy of the foregoing document upon the following counsel of record in the manner indicated below:

**By File & ServeXpress**

Rebecca L. Butcher
Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, DE 19801

*/s/ Emily V. Burton*
Emily V. Burton (No. 5142)