# Exhibit 85

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

---------------------------------------------------

Yucaipa American Alliance Fund I, LP   :
and Yucaipa American Alliance   :
(Parallel) Fund I, LP,   :
  :
            Plaintiffs,   :
  :
    v.   :
  :
SBDRE LLC, Black Diamond   :
Commercial Finance L.L.C., Spectrum   :
Commercial Finance L.L.C., BDCM   :
Opportunity Fund II, LP, Black   :
Diamond CLO 2005-1 Ltd., and   :
Spectrum Investment Partners, L.P.,   :
  :
          Defendants.   :
  :

C.A. No. 9151 – VCP

---------------------------------------------------

## MEMORANDUM OPINION

Submitted: June 16, 2014
Decided: October 31, 2014

Martin S. Lessner, Esq., Michael R. Nestor, Esq., Emily V. Burton, Esq., Matthew C. Bloom, Esq., YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; *Attorneys for Plaintiffs.*

Adam G. Landis, Esq., Rebecca L. Butcher, Esq., K. Tyler O'Connell, Esq., LANDIS RATH & COBB LLP, Wilmington, Delaware; Adam C. Harris, Esq., Robert J. Ward, Esq., David M. Hillman, Esq., SCHULTE ROTH & ZABEL LLP, New York, New York; *Attorneys for Defendants.*

**PARSONS, Vice Chancellor.**

This case involves a dispute among the major lenders to a now-bankrupt company known as Allied Systems Holdings, Inc.  Resolving the parties' competing positions requires navigating a maze of relevant documents: a senior credit agreement, the third amendment to that credit agreement, the related security agreement, and the limited liability company agreement of SBDRE LLC, a Delaware limited liability company ("LLC") formed by the defendant Black Diamond to acquire and realize upon the lenders' collateral.

The Court of Chancery is at least the sixth court to become involved in this controversy.  An opening skirmish between the plaintiffs and a non-party to this case seeking a declaratory judgment about the validity of a purported fourth amendment to the credit agreement dragged on for two years in Georgia before those parties settled.  Then, litigation in New York between the parties currently before me resulted in an opinion invalidating the same disputed fourth amendment.  The Appellate Division of New York's Supreme Court affirmed that holding and the New York Court of Appeals denied further review.  Meanwhile, parallel litigation moved forward in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  That litigation continues.  An appeal from a significant decision of the Bankruptcy Court currently is pending before the United States District Court for the District of Delaware (the "District Court").  Amidst all of this litigation, the parties also attempted unsuccessfully to mediate their dispute.

In this case, the plaintiffs initially sought a status quo order.  I denied the motion for a status quo order on December 20, 2013.  This action is currently before me on

1

Defendants' motion to dismiss or stay the complaint. For the reasons that follow, I conclude that a covenant not to sue in the third amendment to the credit agreement bars the plaintiffs from bringing several of the fourteen counts asserted in the complaint and portions of other counts. As for the claims that have survived the motion to dismiss in whole or in part, I find that resolution of those claims should be stayed pending completion of the litigation in the Bankruptcy Court.

## I.    BACKGROUND[1]

### A.    The Parties

Allied Systems Holdings, Inc. ("Allied") operated a car-hauling and car-delivery business. Allied is currently in bankruptcy proceedings. The dispute in this case revolves around Allied's debt.

Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP (together, "Plaintiffs" or "Yucaipa") are investment funds. Plaintiffs held a majority equity interest in Allied when it entered bankruptcy. Before the bankruptcy, Yucaipa also had purchased a majority of the relevant Allied debt.

Defendants BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 LTD, and Spectrum Investment Partners, L.P. (together, "Black Diamond") are also investment funds. Black Diamond owns a significant amount of the relevant Allied debt.

---

[1]    Unless otherwise noted, the facts recited herein are drawn from the well-pled allegations of the Amended Verified Complaint ("Complaint"), together with its attached exhibits, and are presumed true for the purposes of Defendants' motion to dismiss. The factual record is largely undisputed.

Defendant Black Diamond Commercial Finance L.L.C. and Spectrum Commercial Finance, LLC (together, the "Black Diamond Agents") are entities created by Black Diamond to serve important roles under the credit agreement governing the Allied debt.

Defendant SBDRE LLC ("SBDRE") is a Delaware LLC created by Black Diamond to realize upon assets acquired from the Allied estate following a successful credit bid.

Black Diamond, the Black Diamond Agents, and SBDRE collectively comprise the "Defendants" in this case.

### B.      Facts

Allied emerged from its first bankruptcy in May 2007.   Under the plan of reorganization, Yucaipa became the controlling stockholder.  Yucaipa held no Allied debt at that time.  Allied had a $265 million senior secured priority credit facility (the "Allied Debt") from a collection of lenders (the "Lenders").  The Allied Debt is governed by the Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement (the "Credit Agreement") and the related Amended and Restated Pledge and Security Agreement (First Lien) (the "Security Agreement").

As defined in the Credit Agreement, one or more Lenders holding more than 50% of the total Allied Debt can act as the "Requisite Lender."  The Requisite Lender has the authority, in the event of a default by Allied, either to exercise the Lenders' rights or to cause the Lenders to forbear from exercising their rights under the Credit Agreement. Basically, this case is about Yucaipa's thwarted attempt to become the Requisite Lender. Under the Credit Agreement, however, Yucaipa was not an "Eligible Assignee"—one to

whom the Lenders could assign their debt—and, therefore, Yucaipa could not become a Lender, much less the Requisite Lender.

After two amendments of no importance here, a majority of the Lenders agreed to Amendment No. 3 to Credit Agreement and Consent (the "Third Amendment") on April 17, 2008. The Third Amendment allowed Yucaipa to acquire some Allied Debt from the other Lenders. But, the Third Amendment imposed onerous restrictions on Yucaipa, such as limiting it to acquiring no more than 25% of the term loan debt—one of three kinds of debt recognized under the Credit Agreement—requiring Yucaipa to make capital contributions to Allied in proportion to the debt it acquired, stripping any Yucaipa-held debt of voting rights, and subjecting Yucaipa to a broadly-worded covenant not to sue. Indeed, under the Third Amendment, Yucaipa assumed the unique status of a "Restricted Sponsor Affiliate" and was not permitted to become a Lender. Given the 25% cap on the amount of Allied Debt Yucaipa could acquire, it also could not become Requisite Lender under the Third Amendment.

In February 2009, ComVest Investment Partners III, L.P. ("ComVest") acquired roughly 55% of the Allied Debt. Later that year, a majority of the Lenders approved a fourth amendment to the Credit Agreement (the "Fourth Amendment"). The Fourth Amendment lifted all restrictions on Yucaipa's acquisition of Allied Debt. Following approval of the Fourth Amendment, Yucaipa purchased ComVest's lending position, thereby acquiring 55.2% of the Allied Debt. The Complaint alleges that on August 21, 2009, Yucaipa became the Requisite Lender. As such, Yucaipa purportedly gained the ability to cause the Lenders to forbear from exercising their rights in the event of a

default by Allied.  Given Allied's struggles following its exit from its first bankruptcy, Yucaipa apparently saw this as a valuable power.  Nonetheless, in May 2012, Black Diamond filed an involuntary petition for bankruptcy against Allied in the Bankruptcy Court, and Allied entered bankruptcy a second time only five years after its first bankruptcy.  The second bankruptcy proceeding is still pending.

Unfortunately for Yucaipa, the New York courts declared the Fourth Amendment void.  That ruling had an important impact on the current bankruptcy litigation.  The Bankruptcy Court declared Black Diamond the Requisite Lender.  Thereafter, the vast majority of Allied's assets were sold to Jack Cooper Holdings Corp. (the "Jack Cooper Sale").  That sale closed on December 20, 2013, and was funded on December 27, 2013. While the Jack Cooper Sale was in the works, Black Diamond, acting as Requisite Lender, made a credit bid (the "Credit Bid") for the remaining assets of Allied (the "Assets").  On September 17, 2013, the Bankruptcy Court approved the Credit Bid.

In that context, the Black Diamond Agents formed SBDRE on August 20, 2013, to receive and hold the Assets that the Lenders anticipated acquiring from the Credit Bid. One part of the dispute currently before this Court involves the relationship between the Amended and Restated Limited Liability Company Agreement of SBDRE LLC (the "LLC Agreement") and the Credit Agreement.  After the formation of SBDRE, on November 8, 2013, Black Diamond circulated a memorandum (the "Memo") to the Lenders.  The Memo disclosed that the Black Diamond Agents, who were named in the LLC Agreement as the managing members of SBDRE, would hold the Lenders' pro rata Class A Membership Interests in SBDRE for the benefit of the Lenders.

More importantly, the Memo described the contemplated issuance of new membership interests in SBDRE (the "New Issuance"). Following the New Issuance, SBDRE would have Class B and Class C Membership Interests. SBDRE issued $10 million in new Class B Membership Interests that were to receive 66.6% of the voting rights in and rights to distributions from SBDRE. The Lenders were allowed to buy up to their pro rata share of Class B Membership Interests if they subscribed to the New Issuance by November 15, 2013, one week after the Memo was circulated. Thus, for example: a Lender holding 10% of the Allied Debt would have a 10% Class A Membership Interest and had the opportunity during the New Issuance to purchase up to 10% of the Class B Member Interests for $1 million. In exchange for backstopping the New Issuance, Black Diamond granted itself all of the new Class C Membership Interests, which represented 3% of the aggregate Membership Interests in SBDRE.

Because neither Yucaipa nor any of the other Lenders participated in the New Issuance, Black Diamond now controls all of the Class B and Class C Membership Interests in addition to its pro rata share of the Class A Membership Interests. In total, Black Diamond holds approximately 70% of the aggregate Membership Interests in SBDRE. As a result of the New Issuance, the Class A Membership Interests control 30.3% of the vote and receive 30.3% of any distribution from SBDRE. The Complaint alleges that the Assets are worth more than $5 million, and that the New Issuance, therefore, unfairly diluted the Lenders' rights. Further, Yucaipa complains that it only was allowed to acquire 9.9% of the Class B Membership Interests, meaning that the New

Issuance was not a true pro rata issuance in that Yucaipa had purchased 55.2% of the Allied Debt from ComVest.

Finally, there is a dispute about fees and expenses relating to the current Allied bankruptcy. On December 3, 2013, Black Diamond informed the Lenders that the Black Diamond Agents would reimburse Black Diamond, the Black Diamond Agents, and the other Lenders their reasonable fees and expenses related to Allied's bankruptcy from the proceeds of the Jack Cooper Sale, pursuant to Section 10.2 of the Credit Agreement. On December 19, after a Bankruptcy Court hearing on the matter, Black Diamond and the Black Diamond Agents caused those reimbursements to be made. The Complaint alleges, however, that Black Diamond refused to reimburse Yucaipa and instead has caused Yucaipa's fees and expenses to be held in escrow.

## C.    Procedural History

The procedural history of this and the other related litigation constitutes an important part of the background of the pending motion. This Section, therefore, recites that history in some detail.

### 1.    The New York Litigation

Black Diamond filed suit against Yucaipa in New York state court in 2012 seeking a declaratory judgment that the Fourth Amendment was invalid (the "New York Litigation"). The New York Supreme Court issued an opinion on March 8, 2013, in which it concluded that: (1) the previous Georgia litigation settlement did not bind Black Diamond; (2) the Fourth Amendment was invalid *ab initio* because, pursuant to Section 10.5 of the Credit Agreement, enacting the Fourth Amendment required the unanimous

consent of all Lenders, which was not given; and (3) based on the invalidity of the Fourth Amendment, Yucaipa was not the Requisite Lender.[2]

The First Department of the New York Supreme Court's Appellate Division affirmed the Supreme Court's opinion in all relevant respects. The Appellate Division's opinion, however, modified the trial court's opinion in that it held there was a triable issue of fact as to whether Black Diamond waived the ability to challenge Yucaipa's status as Requisite Lender.[3] The New York Court of Appeals denied further review on April 3, 2014.[4]

Despite the remaining issue of whether Black Diamond waived the ability to challenge Yucaipa's Requisite Lender status, the New York Litigation is concluded for all purposes relevant to this action. Even if Black Diamond did waive its right to challenge Yucaipa's claim to Requisite Lender status, Defendants represented to this Court that Defendant Spectrum, which also participated in the New York Litigation, objects to Yucaipa serving as Requisite Lender.[5] The Appellate Division held that

---

[2]    *BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, 2013 WL 1290394 (N.Y. Sup. Ct. Mar. 8, 2013).

[3]    *BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, 978 N.Y.S.2d 10, 13 (N.Y. App. Div. 2013).

[4]    *BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, 8 N.E.3d 849 (N.Y. 2014).

[5]    Oral Arg. On Defs.' Mot. to Dismiss or Stay and Mot. to Stay Disc. (June 16, 2014) ("Yucaipa MTD Arg.") Tr. 132-33.

Spectrum did not waive its rights to challenge Yucaipa's status.[6] Thus, because the New York courts determined that the Fourth Amendment required unanimous consent, any waiver by Black Diamond is irrelevant.

## 2.    The Bankruptcy Action

Black Diamond brought an involuntary petition for bankruptcy against Allied in the Bankruptcy Court on May 17, 2012 (the "Bankruptcy Action"). The Bankruptcy Action and related adversary proceedings remain pending before the Bankruptcy Court.[7] The Bankruptcy Court issued two rulings relevant to this case and several notable issues remain under advisement. Defendants place significant weight on a collateral estoppel argument and, in the alternative, seek a stay of this case. The Bankruptcy Court's rulings are vital to both arguments.

First, and most importantly for present purposes, the Bankruptcy Court issued an oral ruling on February 27, 2013, granting a motion to dismiss Yucaipa's cross-claims in the Bankruptcy Action.[8] The Bankruptcy Court, as one of its alternative holdings, ruled that the Third Amendment's covenant not to sue barred Yucaipa's claims.[9] I discuss this

---

[6]    *BDCM Opportunity Fund*, 978 N.Y.S.2d at 13.

[7]    *The Official Comm. of Unsecured Creditors of Allied Sys. Hldgs., Inc.* (*In re Allied Sys. Hldgs., Inc.*), Ch. 11 Case No. 12-11564 (CSS), Adv. No. 13-50530-CSS (Bankr. D. Del.) [hereinafter *Allied Bankr.*].

[8]     *Allied Bankr.* Mot. to Dismiss (Feb. 27, 2013) ("MTD") Arg. Tr. 103-10.

[9]    *Id.* at 107 ("[T]hese are really two rulings. It's granting the motion to dismiss on the covenant not to sue, granting the motion to dismiss in connection with the statute of limitations.").

holding in greater detail below in connection with Defendants' argument that Yucaipa is collaterally estopped from re-litigating the meaning of the covenant not to sue.[10]  Second, the Bankruptcy Court granted summary judgment in favor of Black Diamond, an intervenor in that case, finding them to be the Requisite Lenders under the Credit Agreement.[11]

Unlike the New York Litigation, the Bankruptcy Court's rulings remain the subject of further proceedings.  Yucaipa appealed at least the summary judgment ruling to the District Court.[12]  The appeal apparently was stayed for a period while the parties attempted mediation.[13]  Additionally, Defendants in this case, along with other Allied creditors, are pursuing equitable subordination claims against Yucaipa in the Bankruptcy Action.[14]  Yucaipa has suggested to this Court that most of the parties in the Bankruptcy

---

[10]    *See infra* Section II.B.2.

[11]    *Allied Bankr.* Summ. J. Op. (Aug. 7, 2013), at 3; *Allied Bankr.* Summ. J. Arg. Tr. (July 30, 2013) 126-27.

[12]    *Allied Bankr.* Notice of Appeal (Aug. 21, 2013) (appealing the *Allied Bankr.* Summ. J. Op.).  *But see* Yucaipa MTD Arg. Tr. 43-45 (counsel for defendants: asserting that Yucaipa appealed both the Requisite Lender ruling and the dismissal of its cross-claims).  In any event, my decision does not depend on whether Yucaipa also appealed the motion to dismiss.

[13]    *See In re Allied Sys. Hldgs., Inc.*, No. 1:13-cv-01580 (D. Del.) (minimal docket activity).  Counsel for Defendants have indicated that the bankruptcy-related mediation recently was declared at an impasse.  Yucaipa MTD Arg. Tr. 44-45.

[14]    *See* Transmittal Aff. of K. Tyler O'Connell in Supp. of Defs.' Mot. to Dismiss or Stay the Am. Compl. Ex. 4.

Action have reached a settlement and only need approval by the Bankruptcy Court.[15] Defendants dispute that representation, however, and contend that the settlement agreement is stale.[16]   In any case, Defendants stated that they would not settle their equitable subordination claims against Yucaipa even if the other creditors did settle.[17] Nothing in the record to date indicates that the Bankruptcy Court has approved a settlement of any of the relevant claims.

### 3.        The current Court of Chancery litigation

Plaintiffs filed their initial Verified Complaint on December 11, 2013, together with a Motion to Expedite and a Motion for Entry of a Status Quo Order (the "Status Quo Motion").   After full briefing, the Court heard argument on the Status Quo Motion and rendered an oral ruling on December 20, 2013, denying the motion.[18]   Plaintiffs then amended their complaint and, on February 14, 2014, filed the current operative Complaint.

Defendants moved to dismiss or stay this action shortly thereafter.   The parties completed their briefing on that motion on May 5, 2014.[19]   In the midst of that briefing,

---

[15]    Yucaipa MTD Arg. Tr. 101.   *See also* Transmittal Aff. of Matthew C. Bloom Ex. 2.

[16]    Yucaipa MTD Arg. Tr. 56.

[17]    *Id.* at 128-29.

[18]    Status Quo Arg. Tr. 77-94.

[19]    Briefing on the motion to dismiss consisted of Defendants' Opening Brief ("Defs.' Opening Br."), Plaintiffs' Opposition Brief ("Pls.' Opp'n Br."), and Defendants' Reply Brief ("Defs.' Reply Br.").

Defendants moved to stay discovery pending resolution of their motion to dismiss. The Court heard oral argument on both of Defendants' motions on June 16 (the "Argument"). At the conclusion of the Argument, the Court took the motion to dismiss or stay under advisement, but granted the motion to stay discovery.[20] This Memorandum Opinion resolves the motion to dismiss or stay.

### 4.    An overview of litigated and unlitigated issues

As indicated in the preceding portions of this Memorandum Opinion, the parties to this case have engaged in and continue to engage in extensive litigation elsewhere. Thus far, the results of that related litigation are as follows: (1) the New York Litigation has been concluded and the New York courts found that the Fourth Amendment to the Credit Agreement was invalid *ab initio*; and (2) the Bankruptcy Action is continuing and to date (a) the Bankruptcy Court has dismissed Yucaipa's cross-claims, finding that the Third Amendment bound Yucaipa and that the Third Amendment's covenant not to sue barred Yucaipa's claims;[21] (b) the Bankruptcy Court has found that Defendants are the Requisite Lenders;[22] (c) Yucaipa has appealed at least determination (b) and that appeal remains

---

[20]    Yucaipa MTD Arg. Tr. 133-36.

[21]    *Allied Bankr.* MTD Arg. Tr. 105-06.

[22]    *Allied Bankr.* Summ. J. Op. 3.

pending;[23] and (d) Defendants are pursuing equitable subordination claims against Plaintiffs in the Bankruptcy Action.[24]

As demonstrated in the following portions of this Memorandum Opinion, a number of Plaintiffs' arguments in this Court either are contingent upon a not-yet-issued final determination by the Bankruptcy Court or are duplicative of claims pending before the Bankruptcy Court, or were decided against Yucaipa in a previous proceeding. In sum, Yucaipa lost in the New York Litigation and exhausted its appeals, and Yucaipa also lost at least twice in the Bankruptcy Court, though its appeal from that court remains pending. It is against that backdrop that this Court must analyze Yucaipa's claims here.

### D.    Parties' Contentions

Yucaipa asserts fourteen separate counts in its 227-paragraph Complaint. The counts mostly can be grouped into four overarching categories: (1) claims related to Yucaipa's debt ownership (Counts I-III); (2) claims based on the alleged inconsistency of the SBDRE LLC Agreement with the Credit Agreement (Counts IV-VI); (3) claims regarding the New Issuance (Counts VII-IX); and (4) claims pertaining to the disputed fee reimbursements (Counts X-XII). Count XIII for aiding and abetting the foregoing and Count XIV for UCC violations cut across the four substantive categories. The specific nature of Yucaipa's claims is identified briefly below:

---

[23]    *See supra* notes 12-13.

[24]    *See supra* note 14.

- Count I seeks a declaratory judgment that Yucaipa validly owns 55.2% of the Allied Debt and that Black Diamond cannot disregard that fact.

- Count II seeks a declaratory judgment that, under Section 18-110 of the Delaware LLC Act ("DLLCA"), Yucaipa has elected itself managing member of SBDRE.

- Count III seeks a declaratory judgment that, under Section 18-111 of the DLLCA, Yucaipa has elected itself managing member of SBDRE.

- Count IV accuses Defendants of breach of contract based on SBDRE's LLC Agreement impermissibly modifying the Lenders' rights under the Credit Agreement.

- Count V asserts that Defendant Black Diamond, as Requisite Lender, owes the Lenders fiduciary duties and breached those duties by granting itself extra powers in SBDRE's LLC Agreement.

- Count VI alleges that, by forming SBDRE and imposing its LLC Agreement on the Lenders, Defendants breached the implied covenant of good faith and fair dealing in the Credit Agreement.

- Count VII avers that the New Issuance constituted a breach of the Credit Agreement.

- Count VIII accuses Black Diamond of breaching fiduciary duties it owed to the other Lenders, which stem from its status as Requisite Lender, by adopting and implementing the New Issuance.

- Count IX asserts that Defendants breached the implied covenant of good faith and fair dealing in the Credit Agreement by adopting and implementing the New Issuance.

- Count X claims that Defendants breached the Credit Agreement by reimbursing their own and other Lenders' fees and expenses or, alternatively, by treating Yucaipa's fee requests differently.

- Count XI avers that Black Diamond breached the fiduciary duties it owes as Requisite Lender by eliminating third-party oversight of its and its Agents expense reimbursements.

- Count XII alleges that the fee reimbursements made by Defendants in the absence of third-party oversight violated the implied covenant of good faith and fair dealing in the Credit Agreement.

- Count XIII accuses the Black Diamond Agents of aiding and abetting Black Diamond's breaches of fiduciary duties.

- Count XIV asserts that the New Issuance and Black Diamond's self-serving management of SBDRE violated various requirements of Article 9 of the UCC governing the handling of collateral.

Defendants counter that *all* of Yucaipa's claims are barred by a covenant not to sue in the Third Amendment to the Credit Agreement.  In the alternative, Defendants argue that any claims this Court does not dismiss should be stayed pending resolution of the ongoing litigation in the Bankruptcy Court.  Relatedly, Defendants contend that Yucaipa is collaterally estopped from making a number of its arguments because of rulings adverse to it in the New York Litigation and in the Bankruptcy Action.  Besides these primary challenges to the sufficiency of Plaintiffs' claims, Defendants also advance a number of more targeted arguments related to some of Plaintiffs' specific theories, such as arguments disputing the applicability of UCC Article 9 to the Assets.

15

## II.    ANALYSIS

To have any of its claims heard in this Court, Yucaipa must survive Defendants' challenge to the legal sufficiency of its claims and also surmount their arguments for staying this case pending resolution of the Bankruptcy Action.    After reciting the standards of review, this Section analyzes the parties' arguments.    Ultimately, I conclude that the covenant not to sue bars a large portion of this action.    As for the remaining Counts in the Complaint, I find that a stay is appropriate.

### A.    Standards of Review

### 1.    Motion to Dismiss

Pursuant to Court of Chancery Rule 12(b)(6), this Court may grant a motion to dismiss for failure to state a claim if a complaint does not assert sufficient facts that, if proven, would entitle the plaintiff to relief.    As recently reaffirmed by the Supreme Court, "the governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[25]    That is, when considering such a motion, a court must:

---

[25]    *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011) (footnote omitted).

16

> accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.[26]

This reasonable "conceivability" standard asks whether there is a "possibility" of recovery.[27] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[28] Failure to plead an element of a claim precludes entitlement to relief and, therefore, is grounds to dismiss that claim.[29]

Generally, the Court will consider only the pleadings on a motion to dismiss under Rule 12(b)(6). "A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents."[30] In this case, a number of documents are in play for purposes of Defendants' motion to dismiss. Most of

---

[26]  *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[27]  *Id.* at 537 & n.13.

[28]  *Price v. E.I. duPont de Nemours & Co.*, *Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[29]  *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000) (Steele, V.C., by designation).

[30]  *Allen v. Encore Energy P'rs*, 72 A.3d 93, 96 n.2 (Del. 2013).

these items were submitted by the Plaintiffs as attachments[31] or were discussed by Plaintiffs.[32]

The Credit Agreement, the Security Agreement, the Third Amendment, and the SBDRE LLC Agreement indisputably are integral documents to the Complaint. Additionally, the New York Litigation and the Bankruptcy Action are inextricably intertwined with this case, and I consider the rulings in these actions to be integral to the Complaint as well.[33]   To provide but one example, Black Diamond's Requisite Lender

---

[31]   The initial complaint included: (a) the Bankruptcy Court's oral ruling approving the Credit Bid; (b) the New Issuance Memo circulated by Black Diamond; and (c) the SBDRE LLC Agreement.   Upon amending and filing the current Complaint, Plaintiffs also attached: (a) the Credit Agreement; (b) the Security Agreement; (c) a December 19 oral ruling of the Bankruptcy Court relating to the disputed fee reimbursements; and (d) Black Diamond and Yucaipa's filings in the Bankruptcy Court related to the disputed fees.

[32]   The Complaint discusses the history of both the Third Amendment and the Fourth Amendment.   Compl. ¶¶ 22-23.   The Complaint describes the related New York Litigation and the Bankruptcy Action, including the Bankruptcy Court's summary judgment order.   *Id.* ¶¶ 27-37.   The Complaint also briefly discusses the relationship of the New York Litigation to the Bankruptcy Court's rulings.   *Id.* ¶¶ 125-27.   In their briefing, Plaintiffs described the history of the New York Litigation.   Pls.' Opp'n Br. 4-5.   In the course of describing the Bankruptcy Action, Plaintiffs mention Defendants' intervention and assertion of the equitable subordination claim and also note the proposed settlement.   *Id.* at 6-7.   Plaintiffs further describe their pending appeal of the Bankruptcy Court's rulings that the Third Amendment is the operative amendment to the Credit Agreement and that Black Diamond is the Requisite Lender.   *Id.* at 7-8.

[33]   *See Orman v. Cullman*, 794 A.2d 5, 15-16 (Del. Ch. 2002) (describing standard of review on a motion to dismiss and describing consideration of documents outside the four corners of the complaint).   I also take judicial notice of the related opinions in the New York Litigation and the Bankruptcy Action.   *See* Del. R. Evid. 201(a), 202.   *See also In re Gen. Motors S'holder Litig.*, 897 A.2d 162, 168-69 (Del. 2006) (describing appropriate situations when trial courts can consider

status comes from its invalidating the Fourth Amendment in New York and then winning summary judgment in the Bankruptcy Action.  Several counts in the Complaint allege that Black Diamond breached fiduciary duties it owed as Requisite Lender.  As discussed below, the related litigation is important because of its collateral estoppel effect and because it demonstrates why staying this matter is appropriate.

## 2.    Motion to Stay

Ordering a stay "is an inherent power of the trial court, which is concomitant to the control vested in a trial court, to manage its affairs and to achieve the orderly disposition of its business."[34]  As such, "[t]he granting of a motion to stay is not a matter of right, but rather rests within the sound discretion of the court."[35]  In assessing which of multiple actions challenging the same conduct should proceed, Delaware courts often apply the *McWane* doctrine, also known as the first-filed rule.

---

matters outside the complaint on a motion to dismiss); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 86 A.2d 312, 320 & n.28 (Del. 2004) (noting the propriety of judicial notice of publicly filed documents and collecting cases).

[34]    *State v. Harris*, 616 A.2d 288, 291 (Del. 1992) (citing *Gebhart v. Ernest DiSabatino & Sons, Inc.,* 264 A.2d 157, 159 (Del. 1970)); *accord Taylor v. LSI Logic Corp.*, 689 A.2d 1196, 1201 (Del. 1997) (noting that the Court of Chancery has "the inherent power . . . to control its own docket, manage its affairs, achieve the orderly disposition of its business and promote the efficient administration of justice.").

[35]    *In re The Bear Stearns Cos. S'holder Litig.,* 2008 WL 959992, at *5 (Del. Ch. Apr. 9, 2008) (citing *Adirondack GP, Inc. v. Am. Power Corp.,* 1996 WL 684376, at *6 (Del. Ch. Nov. 13, 1996) ("The court should inform its analysis with considerations of comity and the necessities of an orderly and efficient administration of justice.")).

"It has long been held in Delaware that, 'as a general rule, litigation should be confined to the forum in which it is first commenced, and a defendant should not be permitted to defeat the plaintiff's choice of forum in a pending suit by commencing litigation involving the same cause of action in another jurisdiction of its own choosing.'"[36]  Thus, "[u]nder the [*McWane*] first-filed rule, this Court freely exercises its broad discretion to grant a stay 'when there is a prior action pending elsewhere, in a court capable of doing prompt and complete justice, involving the same parties and the same issues.'"[37]

Under *McWane*, however, the parties and issues need not be identical.  "Instead, the courts examine whether the ultimate legal issues to be litigated will be determined in the first-filed action, and thus, repeatedly have held that *McWane* requires only a showing of '[s]ubstantial or functional identity.'"[38]  Similar issues are those that arise out of a

---

[36]   *Transamerica Corp. v. Reliance Ins. Co. of Ill.*, 1995 WL 1312656, at *3 (Del. Super. Aug. 30, 1995) (quoting *McWane Cast Iron Pipe Corp. v. McDowell-Wellman Eng'g Co.,* 263 A.2d 281, 283 (Del. 1970)).

[37]   *Bear Stearns,* 2008 WL 959992, at *5 (quoting *McWane*, 263 A.2d at 283).

[38]   *McQuaide v. McQuaide*, 2005 WL 1288523, at *4 (Del. Ch. May 24, 2005) (quoting *AT & T Corp. v. Prime Sec. Distrib., Inc.,* 1996 WL 633300, at *2 (Del. Ch. Oct. 24, 1996)); *see also Chadwick v. Metro Corp.,* 856 A.2d 1066 (Table), 2004 WL 1874652, at *2 (Del. 2004) ("Under *McWane* and its progeny, a judge, in the exercise of his or her discretion, may stay or dismiss a later-filed suit where a first-filed suit is pending in a court capable of administering prompt and complete justice, and involves substantially similar parties and issues."); *Transamerica Corp.*, 1995 WL 1312656, at *3.

"common nucleus of operative facts."[39]  Likewise, parties are considered substantially the same for purposes of *McWane* "where related entities are involved but not named in both actions, referring to the exclusion as 'more a matter of form than substance.'"[40]

## B.    Does the Covenant Not to Sue Bar this Action?

## 1.    The Covenant

Section 2.7(e) of the Third Amendment creates a new Section 10.6(j) in the Credit Agreement.[41]  Part of the new Section 10.6(j) is the covenant not to sue (the "Covenant").  As demonstrated by its language below, the Covenant is exceptionally broad:

> To the fullest extent permitted by applicable law, no Restricted Sponsor Affiliate [which includes Plaintiffs] shall assert, and each Restricted Sponsor Affiliate immediately and automatically upon becoming a Lender, hereby irrevocably (i) waives, any claim or cause of action against any Lender, any Agent and their respective Affiliates, directors, employees, attorneys, agents or sub-agents (whether or not the claim is based on contract, tort or duty imposed by any applicable legal requirement or otherwise) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith *except to the extent caused by such Lender's or Agent's gross negligence or willful misconduct* on or after the date such Restricted Sponsor Affiliate becomes a Lender hereunder <u>as determined</u>

---

[39]    *Schnell v. Porta Sys. Corp.,* 1994 WL 148276, at *4 (Del. Ch. Apr. 12, 1994).

[40]    *McQuaide*, 2005 WL 1288523, at *4 (quoting *FWM Corp. v. VKK Corp.,* 1992 WL 87327, at *1 (Del. Ch. Apr. 27, 1992)).

[41]    The Credit Agreement, which includes the Covenant, is governed by New York law.  Credit Agreement § 10.14.

> by a court of competent jurisdiction by a final and non-appealable judgment, (ii) waives, releases and agrees not to sue upon any such claim or any such cause of action, whether or not accrued and whether or not known or suspected to exist in its favor and (iii) waives any claim or cause of action against any Agent or any Lender and their respective Affiliates, directors, employees, attorneys, agents or sub-agents on any theory of liability for special, indirect, consequential or punitive damages, arising out of, in connection with, as a result of, or in any way related to this Agreement, or any other Credit Document or any agreement or instrument contemplated hereby or thereby, any Loan or the use of proceeds thereof or any act or omission or event occurring in connection therewith. (Emphases added).

Yucaipa focuses the Court's attention on the portion emphasized with italics (the "Carve Out"). Defendants point instead to the language emphasized with underlining (the "Prior Determination Requirement").

Determining the meaning of the Covenant requires referencing a series of cross-defined terms. A "Restricted Sponsor Affiliate," as defined in Section 2.1 of the Third Amendment, means "Sponsor and its Affiliates (other than Borrowers or any of their Subsidiaries)." The term Sponsor means "collectively, Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP"[42]—*i.e.*, Plaintiffs herein. The parties to the Third Amendment presumably used the new term Restricted Sponsor Affiliate, rather than just Sponsor, because the Third Amendment modified the definitions of "Eligible Assignee" and "Term Loan Exposure," among other provisions, to account for possible debt acquisition by the Restricted Sponsor Affiliate, *i.e.*, Yucaipa.

---

[42]    Credit Agreement § 1.1.

The Covenant, therefore, applies to Yucaipa.  Indeed, the Covenant by its terms applies only to Yucaipa and "Affiliates" of Yucaipa, as defined in the Credit Agreement. Nothing in the record indicates that any party other than Yucaipa ever satisfied the definition of Restricted Sponsor Affiliate.

Finally, I note that the Credit Agreement contained a more limited exculpatory clause applicable to all "Lenders."  That term, as used throughout this Memorandum Opinion, applies to those parties that signed the Credit Agreement as Lenders or who became a party to the Credit Agreement by means of an assignment from a Lender. Section 9.3(b) of the Credit Agreement states: "No Agent nor any of its officers, partners, directors, employees or agents shall be liable to Lenders for any action taken or omitted by any Agent under or in connection with any of the Credit Documents except to the extent caused by such Agent's gross negligence or willful misconduct."  This exculpatory provision plainly is narrower than the Covenant.  Overall, the intention of the drafters of the Third Amendment seems clear: if Yucaipa acquired any of the Allied Debt, it would be "Restricted" in the sense that Yucaipa would have to surrender a number of rights otherwise held by a Lender.

## 2.    The Bankruptcy Court's holding

Based on the rulings of the Bankruptcy Court, Defendants argue that Plaintiffs are collaterally estopped from re-litigating the Covenant.  This Court, therefore, needs to examine closely what the Bankruptcy Court held.  Yucaipa, in the 59-page amended answer, counterclaim, and cross-claim that it filed in the Bankruptcy Action, alleged four

main claims against Defendants, who are Yucaipa's co-creditors in the Bankruptcy Action:

- Count I sought a declaratory judgment that several portions of the Third Amendment are invalid and that Yucaipa validly holds the Allied Debt it purchased from ComVest;

- Count II sounded in unjust enrichment; Yucaipa averred that strict enforcement of the Third Amendment against Yucaipa would unjustly enrich the Debtor (Allied) and the other Lenders;

- Count III asserted that the other Lenders are estopped from arguing that the Third Amendment controls because they did not object to the Fourth Amendment; and

- Count IV requested injunctive relief preventing the Petitioning Creditors (Black Diamond) from acting as Requisite Lender and appointing their Agents—a defined term under the Credit Agreement—to act in ways harmful to Yucaipa.[43]

In late February 2013, the Bankruptcy Court dismissed Yucaipa's cross-claims on the basis of the Covenant and, in the alternative, a statute of limitations defense.[44]

The Bankruptcy Court observed that "for all material aspects [it] adopt[ed] the petitioning creditors' arguments virtually in toto."[45]   Referring specifically to the Covenant, the Bankruptcy Court found the Covenant "very clear" and did not find the

---

[43]   Transmittal Aff. of Rebecca L. Butcher in Further Supp. of Defs.' Mot. to Dismiss or Stay the Am. Compl. Ex. 2, at 42-50.

[44]   *Allied Bankr.* MTD Arg. Tr. 103-10.

[45]   *Id.* at 104.

"carve out to be particularly troubling."[46]    As to the Carve Out and the Prior

Determination Requirement, the Bankruptcy Court held:

> I agree that the carve out as written deals with the narrow
> situation of a finding at some time post signing of the
> covenant by a court that there's been willful misconduct or
> gross negligence.  And . . . I don't think that is done in the
> auspices of a lawsuit directly related between the parties, it
> has to come from somewhere else.  It's a little vague, but I
> think it's fair to say it has to be a narrow exception.[47]

In addition, the Bankruptcy Court noted the absence of any allegations of fraud or

wrongdoing in connection with the enactment of the Third Amendment or the Covenant

that might provide a basis upon which to invalidate the Covenant.

### 3.    Collateral estoppel

Collateral estoppel, also known as issue preclusion, prevents a party who litigated

an issue in one forum from later re-litigating that issue in another forum.  Although more

narrow than res judicata, which also is known as claim preclusion, issue preclusion

materially can alter the course of litigation.  Under Delaware law, "the 'preclusive effect

of a foreign judgment is measured by [the] standards of the rendering forum.'"[48]  Here,

because the Bankruptcy Court rendered the relevant opinion, I look to the law of the

United States Court of Appeals for the Third Circuit.  In the Third Circuit, "[i]ssue

preclusion applies when '(1) the issue sought to be precluded [is] the same as that

---

[46]    *Id.* at 105.

[47]    *Id.*

[48]    *Acierno v. New Castle Cty.*, 679 A.2d 455, 459 (Del. 1996) (quoting *Columbia
Cas. Co. v. Playtex F.P., Inc.*, 584 A.2d 1214, 1217 (Del. 1991)).

involved in the prior action; (2) that issue [was] actually litigated; (3) it [was] determined by a final and valid judgment; and (4) the determination [was] essential to the prior judgment.'"[49]

In its February 2013 decision, the Bankruptcy Court dismissed Plaintiffs' cross-claims with prejudice on the basis of the Covenant and denied leave to amend.[50]  This was a final and valid judgment.[51]  The parties actually litigated the applicability of the Covenant.  Both sides briefed the issue and dealt with it at length during oral argument.  The ruling as to the Covenant also was essential to the judgment of the Bankruptcy Court.[52]  The only element of collateral estoppel potentially open to debate is whether the issue presented here is the same as in the Bankruptcy Action.

---

[49]    *In re Graham*, 973 F.2d 1089, 1097 (3d Cir. 1992) (quoting *In re Braen*, 900 F.2d 621, 628-29 n.5 (3d Cir. 1990)).  *See also Leyse v. Bank of Am., Nat'l Ass'n*, 538 Fed. App'x 156, 158-59 (3d Cir. 2013) (identical statement of the standard).

[50]    *Allied Bankr.* MTD Arg. Tr. 110.

[51]    *See Free Speech Coal., Inc. v. Att'y Gen. of U.S.*, 677 F.3d 519, 541 (3d Cir. 2012) ("We have stated that '[f]inality for purposes of issue preclusion is a more pliant concept than it would be in other contexts,' and that finality 'may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.'") (quoting *In re Brown*, 951 F.2d 564, 569 (3d Cir. 1991)) (internal quotations omitted); RESTATEMENT (SECOND) OF JUDGMENTS § 13 (1982) ("[F]or purposes of issue preclusion . . . 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.").

[52]    Although the parties did not brief this point, the Third Circuit recently took a side in the circuit split over the preclusive effect of alternative judgments, such as the one rendered by the Bankruptcy Court.  The dispute centers on whether an alternative holding is "necessary" to the judgment.  Some courts give preclusive

Defendants advance the Covenant as the first of several arguments in their Opening Brief.  According to Defendants, "because all of the claims in the Amended Complaint are barred by the Covenant Not to Sue, the Amended Complaint should be dismissed in its entirety."[53]  Yucaipa responds in three ways, one of which is clearly precluded by the Bankruptcy Court's ruling, another of which is either precluded or incorrect, and the third of which does not appear to be precluded by the prior ruling. Yucaipa first points to the Carve Out and reasons that because it is alleging willful misconduct, that is sufficient to avoid the effect of the Covenant.  As discussed in the preceding subsection, the Bankruptcy Court specifically addressed this argument and found that the Prior Determination Requirement trumped the Carve Out.  Alleging willful misconduct is not enough: Yucaipa must show the existence of a final, non-appealable judgment finding gross negligence or willful misconduct by Black Diamond *before* Yucaipa can bring suit.  This holding implies that some other party, such as another Lender, must bring suit and obtain a final, non-appealable judgment before Yucaipa could file its own lawsuit.

---

effect to neither holding; some courts give preclusive effect to both holdings; and a small minority of courts applies a middle ground and examines the carefulness of the alternative determination before deciding whether to give it preclusive effect.  The Third Circuit came down firmly on the side of giving preclusive effect to both holdings.  *See generally Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249-55 (3d Cir. 2006) (describing the circuit split, the rationales of each position, and the basis for the Third Circuit's conclusion).

[53]    Defs.' Opening Br. 30.

Second, Yucaipa argues that the claims involving SBDRE and its LLC Agreement fall outside the scope of the Covenant.  The Bankruptcy Court dismissed Yucaipa's cross-claims based on the "plain meaning" of the Covenant, suggesting it read the Covenant broadly.[54]  The Covenant, for example, bars all claims:

> arising out of, in connection with, as a result of, or in any way related to this Agreement, or any other Credit Document or any agreement or instrument contemplated hereby or thereby, any Loan or the use of proceeds thereof or any act or omission or event occurring in connection therewith.[55]

Yucaipa has alleged claims relating to: (1) its debt ownership; (2) the SBDRE LLC Agreement; (3) the New Issuance; and (4) the disputed fees.  The language of the Covenant, as interpreted by the Bankruptcy Court, covers all of Yucaipa's claims.

Determining the amount of Allied Debt that Yucaipa holds requires interpretation of the Credit Agreement and its related amendments.  Yucaipa purchased a majority of the Allied Debt pursuant to the Fourth Amendment.  The Fourth Amendment, however, was found to be void in the New York Litigation and Yucaipa is collaterally estopped from relitigating that issue.[56]  The Bankruptcy Court later held that the Third Amendment is the operative amendment.  Under the Third Amendment, Yucaipa: (1) is quantitatively limited in the amount of Allied debt it can acquire; (2) is required to make capital

---

[54]    *Allied Bankr.* MTD Arg. Tr. 105.

[55]    Third Amendment § 2.7(e).

[56]    *BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, 978 N.Y.S.2d 10, 13 (N.Y. App. Div. 2013); s*ee also supra* Section I.C.1.

contributions to Allied in proportion to its debt acquisitions; and (3) is not entitled to voting rights for the debt it buys. Any determination of Yucaipa's debt ownership would require analyzing these and other provisions of the Credit Agreement. As such, a lawsuit to determine Yucaipa's debt holdings is, at least, "related to" the Credit Agreement and, therefore, comes within the scope of the Covenant.

For similar reasons, Yucaipa's claims relating to SBDRE also are covered by the language of the Covenant. SBDRE relates to the Credit Agreement in several ways. First, SBDRE is a sub-agent of the Black Diamond Agents, which serve defined roles under the Credit Agreement.[57] Second, SBDRE was created to receive and realize upon the Assets that formerly secured the Credit Agreement and were directly the subject of the Security Agreement.[58] Third, Yucaipa only has rights in SBDRE because of Yucaipa's status as a Restricted Sponsor Affiliate. That status derives from the Credit Agreement and its amendments.

The claims relating to the New Issuance alternatively allege breach of the Credit Agreement, breach of the implied covenant of good faith and fair dealing in the Credit

---

[57]    *See* Credit Agreement § 9.7.

[58]    On a related note, Count XIV, alleging violations of Article 9 of the UCC, relates to SBDRE, because SBDRE holds the Assets. More fundamentally, Yucaipa alleges that the Assets are collateral or proceeds of collateral. If the Assets were collateral, then they comprised collateral securing the Credit Agreement and also were subject to the Security Agreement. If the assets were proceeds, then they still relate to the Credit Agreement, because the Credit Bid that resulted in the proceeds was a transaction contemplated by Section 9.8(b) of the Credit Agreement, which describes the Lenders' ability to realize upon the collateral. As such, Count XIV also is covered by the Covenant.

Agreement, and breach of Black Diamond's fiduciary duties as Requisite Lender. Any claim directly alleging a breach of the Credit Agreement undoubtedly falls within the Covenant's scope and any claims against the Requisite Lender also relate to the Credit Agreement. The Requisite Lender is a creation of the Credit Agreement and does not exist outside of it. Any analysis of the Requisite Lender's duties vis-à-vis the Lenders requires an interpretation of the Credit Agreement and falls within the plain language of the Covenant.

Finally, the disputed fees directly relate to the Credit Agreement and are covered by the Covenant. In its Complaint, Yucaipa states that the fees violated Section 10.2 of the Credit Agreement and Section 7.2 of the Security Agreement.[59]

In sum, *all* of the Counts in Yucaipa's Complaint are covered by the Covenant.[60] Under the Bankruptcy Court's interpretation of the Covenant, which has collateral estoppel effect here, Yucaipa cannot sue Black Diamond in the absence of a final, non-appealable determination that Black Diamond acted with gross negligence or willful misconduct.[61] There is no such ruling. Accordingly, Defendants' argument that

---

[59]    *See* Compl. ¶¶ 107-08.

[60]    That is, each claim advanced by Yucaipa qualifies as "arising out of, in connection with, as a result of, or in any way related to, this [Credit] Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith." Credit Agreement § 10(j).

[61]    Yucaipa does not allege gross negligence, but there is no dispute that all of Yucaipa's claims assert willful misconduct.

Yucaipa's claims are barred by the Covenant and that the entire Complaint should be dismissed initially appears persuasive.

Plaintiffs, however, advance a third argument.[62]    According to Yucaipa, interpreting the Covenant in this manner would be "commercially unreasonable" or would produce an absurd result.    Plaintiffs most clearly stated their position at oral argument: "public policy does not permit an intentional prospective waiver of a tort like this."[63]    They contend that adopting Defendants' interpretation of the Covenant would allow Black Diamond to "declare all of Yucaipa's Allied Debt void at any time, without any Court order, and Yucaipa would have no recourse whatsoever."[64]    At the motion to dismiss stage, I find it reasonably conceivable that Yucaipa could show that the outer boundaries of the Covenant are ambiguous, even after giving collateral estoppel effect to the Bankruptcy Court's ruling, and that public policy would prevent the wholesale adoption of the broad interpretation Defendants advance.

For instance, a logical premise of the Bankruptcy Court's holding is that another Lender actually *could bring* the claim Yucaipa seeks to assert against Defendants.    As such, in any instance where Yucaipa suffers a distinct harm not shared by any other person or entity that reasonably could bring suit, it would be impossible to satisfy the

---

[62]    Plaintiffs devoted only one paragraph to this argument in their Answering Brief. Pls.' Opp'n Br. 20-21.  They pressed it somewhat more at the Argument.  *See* Yucaipa MTD Arg. Tr. 31-32, 36, 39-40.

[63]    Yucaipa MTD Arg. Tr. 39.

[64]    Pls.' Opp'n Br. 20-21.

Prior Determination Requirement.  Covenants not to sue are valid and enforceable under New York law.[65]  But, agreements prospectively limiting a party's liability resulting from that party's intentional misconduct are void as against public policy.[66]

This Court will not revisit the Bankruptcy Court's interpretation of the Covenant and the relationship between the Carve Out and the Prior Determination Requirement. Yucaipa received a full and fair opportunity to litigate that issue to the extent it was presented in the Bankruptcy Action and cannot re-litigate it here.  Yucaipa advances a reasonably conceivable argument, however, that in situations where it alleges a unique

---

[65] *See, e.g.*, *Joao v. Cenuco, Inc.*, 376 F. Supp. 2d 380, 382 (S.D.N.Y. 2005) ("Covenants not to sue are expressly permitted under New York law. . . . If two parties sign a covenant not to sue each other, then a dispute arising out of the conduct covered by that agreement cannot provide the basis for a justiciable controversy, and the case must be dismissed."); *Kamfar v. New World Rest. Gp., Inc.*, 347 F. Supp. 2d 38, 50 (S.D.N.Y. 2004) ("Covenants not to sue, requiring that the obligor forbear from bringing any current or future claims against the obligee, are valid in New York."); *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1370 (N.Y. 1992) ("Absent a statute or public policy to the contrary, a contractual provision absolving a party from its own negligence will be enforced."); *Klapper v. Graziano*, 970 N.Y.S.2d 355, 360 (Sup. Ct. 2013) ("[P]arties are free to enter into contractual agreements which limit liability and such agreements will be binding upon the parties provided the language is sufficiently clear and unambiguous.").

[66] *See, e.g.*, *Kalisch-Jarcho, Inc. v. City of New York*, 448 N.E.2d 413, 416 (N.Y. 1983) ("But an exculpatory agreement, no matter how flat and unqualified its terms, will not exonerate a party from liability under all circumstances.  Under announced public policy, it will not apply to exemption of willful or grossly negligent acts."); *Schwartz v. Martin*, 919 N.Y.S.2d 217, 219 (App. Div. 2011) ("[A]n enforceable release will not insulate a party from grossly negligent conduct."); *Goldstein v. Carnell Assocs., Inc.*, 906 N.Y.S.2d 905, 905 (App. Div. 2010) (stating that "the public policy of this State dictates that 'a party may not insulate itself from damages caused by grossly negligent conduct,'" and collecting cases) (quoting *Sommer*, 593 N.E.2d at 1370).

harm—meaning no other Lender could sue and the Prior Determination Requirement could not be satisfied—construing the Carve Out so broadly that it would fail to provide an escape hatch for Yucaipa in those circumstances arguably would produce a prohibited result.  The Bankruptcy Court was not called upon to interpret the Covenant in a situation such as Yucaipa alleges here.   On the whole, I find it reasonably conceivable that Yucaipa could show that, even after giving collateral estoppel effect to the Bankruptcy Court's holding, Defendants' interpretation of the Covenant, in the limited circumstances posited above, could produce a result contrary to public policy.[67]

### 4.    Which Counts are dismissed?

As discussed, the Covenant's reach extends quite far.  All fourteen Counts in the Complaint come within its ambit.  There is no indication in the record of any final, non-appealable judicial determination that any of the Defendants engaged in willful misconduct.  As such, the Prior Determination Requirement is not satisfied.  Based on the preceding analysis, any Count alleging a harm for which another Lender could have brought suit is barred by the Covenant, as interpreted in the Bankruptcy Action.  I will not dismiss, however, any Count in which Yucaipa sufficiently has alleged that it

---

[67]    *See Colton v. N.Y. Hosp.*, 414 N.Y.S.2d 866, 872 (Sup. Ct. 1979) ("The proper approach is to hold, as we hold here, that a covenant not to sue and a release are both contracts governed by the same principle of contract law, the intention of the parties."); *see also XO Commc'ns, LLC v. Level 3 Commc'ns, Inc.*, 948 A.2d 1111, 1123 (Del. Ch. 2007) ("'A contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties.'") (quoting *Superb Gen. Contracting Co. v. City of New York*, 833 N.Y.S.2d 64, 66-67 (App. Div. 2007)).

sustained a unique wrong not suffered by other Lenders, *i.e.*, situations in which the Prior Determination Requirement cannot be satisfied.

I decline to dismiss Count I.[68]  Even assuming some other party might have standing to bring this claim, it is unrealistic to assume anyone other than Yucaipa would seek a declaratory judgment as to the percentage of the Allied Debt held by Yucaipa. Counts II and III depend on resolution of Count I and those Counts raise similar standing concerns.  Accordingly, they will not be dismissed for related reasons.  Additionally, Yucaipa advances a reasonably conceivable argument that it could establish that these claims are outside the scope of the Covenant because they stem from willful misconduct taken by Defendants that affects only Yucaipa.  For example, while all Lenders are subject to Black Diamond's management of SBDRE, Yucaipa alone has claims that it should be the managing member of SBDRE because it purchased a majority of the Allied Debt.

Counts IV-VI are dismissed.  These Counts allege that SBDRE's LLC Agreement runs afoul of the Lenders' rights as established in the Credit Agreement.[69]  But, these alleged wrongs are not unique to Yucaipa.  Any other Lender could bring these claims if

---

[68]    Section I.D *supra* listed and briefly described the fourteen Counts in Yucaipa's Complaint.

[69]    These Counts appear to be asserted in the alternative, because the "imposition" of the LLC Agreement could not be a breach of contract, a breach of fiduciary duty, and a breach of the implied covenant of good faith and fair dealing.  More likely, Defendants could be liable under only one of these theories, depending on the facts proved.

they feel wronged by SBDRE's LLC Agreement.  To date, it appears that no one else has brought such a claim.  Accordingly, the Prior Determination Requirement applies here and these Counts are dismissed.

Counts VII-IX are dismissed in part.  These Counts assert that the New Issuance violated the Lenders' rights.[70]  As with Counts IV-VI, all Lenders suffered the same alleged wrong of dilution or other impairment of rights held under the Credit Agreement, and any of the other Lenders could have brought suit, but did not.  In one sense, however, Yucaipa suffered the distinct wrong of only being able to participate in the New Issuance at 9.9%, rather than its alleged full ownership of 55.2%.  Thus, Yucaipa arguably had its stake diluted more than the other Lenders.  Accordingly, Counts VII-IX of the Complaint, are dismissed such that Yucaipa cannot allege a general challenge to the New Issuance, but without prejudice to Yucaipa's ability to pursue those Counts to the extent they challenge the specific wrong allegedly suffered by Yucaipa as a result of the  reduction of its participation in the New Issuance to 9.9%.[71]

---

[70]    Similar to Counts IV-VI, these Counts allege breach of contract, breach of fiduciary duty, and breach of the implied covenant of good faith and fair dealing, respectively.

[71]    Specifically, for example, Count VII would include a claim that the New Issuance violated the Credit Agreement to the extent that Yucaipa was not allowed to participate pro rata at its alleged 55.2% level of ownership.  The precise level of Yucaipa's ownership, and the related amount of extra dilution Yucaipa suffered, is entangled with resolution of Count I.  Count VIII similarly would be restricted to the unique harm Yucaipa suffered and effectively would read: Black Diamond breached its fiduciary duties as Requisite Lender by not allowing Yucaipa to participate in the New Issuance at its 55.2% level of ownership.  The same limitations apply to Count IX.

For the reasons discussed in the next Section, I decline to reach the issue of whether the Covenant precludes Counts X-XIII. Finally, Count XIV is dismissed. Any other Lender could have brought this claim, but did not. As such, the Covenant bars Yucaipa from pursuing Count XIV at this time.

In sum, Counts IV-VI and Count XIV are dismissed with prejudice. Counts VII-IX are dismissed with prejudice in part and may be pursued solely in accordance with the limitations stated in this Section. Finally, I deny the motion to dismiss as to Counts I-III, Counts VII-IX (as narrowed), and Counts X-XIII.

## C.   Is a Stay Appropriate?

Of the Counts not dismissed on the basis of the Covenant, I conclude that all of those Counts are intimately intertwined with the litigation in the first-filed Bankruptcy Action. The Bankruptcy Action involves substantially similar parties and issues and the Bankruptcy Court, despite being a court of limited jurisdiction, is capable of rendering prompt and complete justice. Resolution of the claims pending before the Bankruptcy Court could moot every non-dismissed aspect of this case and terminate this litigation. To the extent any Counts of Yucaipa's Complaint require further proceedings after the conclusion of the Bankruptcy Action—such as the New Issuance Counts—I consider it likely that the issues then-presented will be narrowed significantly and will be substantially more well-defined than they currently are. For these reasons, I conclude that all remaining aspects of this proceeding should be stayed.

Count I seeks a declaratory judgment that Yucaipa validly owns 55.2% of the Allied Debt. Relatedly, Counts II and III seek a declaratory judgment that Yucaipa has

elected itself managing member of SBDRE. Defendants advance a colorable argument that Yucaipa is collaterally estopped from pursuing the key issues underlying these claims because those issues were decided adversely to Yucaipa in the context of the Bankruptcy Court's summary judgment decision on the Requisite Lender issue.[72] Yucaipa disagrees. Regardless, it is uncontested that Yucaipa's appeal of the Bankruptcy Court's summary judgment opinion remains pending. All of the issues presented by Counts I-III could be resolved in the context of the Bankruptcy Action.[73] A decision here, however, could result in inconsistent judgments. Furthermore, to the extent Yucaipa succeeds in having the Bankruptcy Court's summary judgment ruling reversed on appeal, Counts II and III, which appear contingent on the resolution of Count I, likely would become moot.

Counts VII, VIII, and IX relate to the New Issuance and state claims most properly presented to this Court. Distilled to their essence, the New Issuance Counts allege that Black Diamond, through the Black Diamond Agents, diluted the other Lenders' Membership Interests in SBDRE, a Delaware LLC, in a self-dealing transaction designed to seize control of a majority of SBDRE's Membership Interests and distribution rights.

---

[72]    *See Allied Bankr.* Summ. J. Op. 3; *Allied Bankr.* Summ. J. Arg. Tr. 126-27.

[73]    A creditor is a claimant upon the bankrupt estate. 11 U.S.C. §§ 101(5) & (10) (West 2014). Yucaipa, as a creditor, is a claimant on the bankrupt Allied estate. In determining distributions from the estate's assets, the Bankruptcy Court likely will decide how much debt Yucaipa holds and the priority of that debt. *See id.* §§ 502(b), 726; *see also id.* § 506(a)(1). If Yucaipa is equitably subordinated, however, the Bankruptcy Court may not reach this specific issue.

Aside from Count VIII, Defendants do not even seek dismissal of these Counts of the Complaint on any ground other than the Covenant.

As I concluded in the preceding Section of this Memorandum Opinion, these Counts are barred in large part by the Covenant. Only substantially narrower versions of the New Issuance Counts remain.[74] Indeed, depending on the outcome of Count I, which is being stayed, Counts VII-IX could be moot.[75] I also note that these are only damages claims and there is no indication in the record that it would be difficult or impossible to collect on a judgment against Black Diamond. Based on all of these factors, I conclude that these narrowed Counts VII-IX should be stayed.

Counts X-XII, relating to the disputed fees, provide textbook examples of instances where a stay under *McWane* is appropriate. Yucaipa, according to its own Complaint, brought the fee reimbursement issue to the Bankruptcy Court's attention.[76] This issue relates entirely to the Bankruptcy Action and the Bankruptcy Court appears to have taken it under advisement. Resolving the disputed fee issue here would be wastefully duplicative and create a risk of inconsistent judgments. Therefore, I am convinced that Counts X-XII, regarding the disputed fee reimbursements, should be stayed pending resolution of the first-filed Bankruptcy Action.

---

[74]   *See supra* note 71.

[75]   If Count I is resolved such that Yucaipa's holdings of the Allied Debt do not exceed 9.9%, Yucaipa would have suffered no distinct wrong in the New Issuance.

[76]   Compl. ¶¶ 111, 116, 118-20.

Finally, I stay Count XIII as well. That Count alleges that the Black Diamond Agents aided and abetted Black Diamond's breaches of fiduciary duties. Having determined to stay Counts VIII and XI, which involve the underlying alleged breaches of fiduciary duty by Black Diamond, there is no point in proceeding with the dependent Count XIII at this time.

## III.    CONCLUSION

The parties to this case previously litigated the Covenant issue in the Bankruptcy Court. The Bankruptcy Court's ruling precludes Yucaipa from re-litigating that determination here. As a result, the principles of issue preclusion support dismissal of Counts IV, V, VI, and XIV, and I hereby dismiss those Counts with prejudice. The Bankruptcy Court, however, does not appear to have faced the issue of whether the Covenant bars claims for willful misconduct uniquely harmful to Yucaipa. I conclude that Yucaipa conceivably could show that interpreting the Covenant to bar Yucaipa from suing in such situations would be contrary to public policy in New York, whose law is controlling here. Therefore, I deny Defendants' motion to dismiss Counts I-III and X-XIII, and grant in part and deny in part Defendants' motion to dismiss Counts VII-IX, as specified in Section II.B.4 *supra*.

As to Defendants' motion to stay, I find that the remaining portions of the Complaint require determination of issues properly before the Bankruptcy Court and currently pending resolution in that forum. Determination of those issues could terminate all remaining litigation here. In any event, the Bankruptcy Court's rulings, particularly as to Yucaipa's debt holdings, are likely to eliminate, or at least narrow, the issues before

this Court.  For these reasons, I grant Defendants' motion to stay these proceedings as to Counts I-III, VII-IX (as narrowed), and X-XIII, until completion of the Bankruptcy Action or further order of this Court.

   **IT IS SO ORDERED**.