Exhibit 90

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| YUCAIPA AMERICAN ALLIANCE FUND I, L.P., and YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civ. No. 15-373 (SLR) |
| RICHARD A. EHRLICH, STEPHEN H. DECKOFF, LESLIE A. MEIER, JEFFREY A. SCHAFFER, BDCM OPPORTUNITY FUND II, L.P., BLACK DIAMOND CLO 2005-1 LTD., and SPECTRUM INVESTMENT PARTNERS, L.P., | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

---

John T. Dorsey, Esquire, Michael R. Nestor, Esquire, Sharon M. Zieg, Esquire, and Michael S. Neiburg, Esquire, of Young Conaway Stargatt & Taylor LLP, Wilmington, Delaware; Robert A. Klyman, Esquire, Maurice M. Suh, Esquire, and Kahn Scolnick, Esquire, of Gibson, Dunn & Crutcher, LLP, Los Angeles, California.  Counsel for Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P.

Adam G. Landis, Esquire and Kerri K. Mumford, Esquire, of Landis Rath & Cobb, L.L.P., Wilmington, Delaware; Robert J. Ward, Esquire, of Schulte Roth & Zabel L.L.P., New York, New York.  Counsel for Richard A. Ehrlich, Stephen H. Deckoff, Leslie A. Meier, Jeffrey A. Schaffer, BDCM Opportunity Fund II, L.P., Black Diamond CLO 2005-1 Ltd., and Spectrum Investment Partners, L.P.

---

**MEMORANDUM OPINION**

Dated:  September 乄 , 2016
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

This action arises from the bankruptcy cases of Allied Systems Holdings, Inc., *et al.* ("Allied").[1]  Plaintiffs Yucaipa American Alliance Fund I, L.P., and Yucaipa American Alliance (Parallel) Fund I, L.P. (together, "plaintiffs") filed a complaint against BDCM Opportunity Fund II, L.P. and Black Diamond CLO 2005-1 Ltd. (together, "Black Diamond"), Spectrum Investment Partners, L.P. ("Spectrum" and together with Black Diamond, "BD/S"), and certain members of Allied's board of directors (Richard A. Ehrlich, Stephen H. Deckoff, Leslie A. Meier, and Jeffrey A. Schaffer) (collectively, "defendants") asserting violation of the Racketeer Influenced and Corrupt Organizations ("RICO") Act,[2] as well as state law claims for fraud and tortious interference with business relations.  (D.I. 1 ("complaint"))[3] Defendants move to dismiss on the bases that: the complaint fails to state a claim under §§ 1962(c) and (d) of the RICO Act; the complaint fails to state claims for tortious interference or fraud; the complaint is barred by the *Noerr-Pennington* doctrine;[4] and plaintiffs' claims are barred by a covenant not to sue.  (D.I. 17)  Alternatively, defendants move to stay the

---

[1] Allied Systems Holdings, Inc. is now known as ASHINC Corporation.

[2] 18 U.S.C. § 1961, *et seq.*

[3] The court will cite Defendants' Opening Brief in Support of the Motion to Dismiss as (MTD at __); Yucaipa's Opposition Brief as (MTD Opp. at __); and Defendants' Reply Brief as (MTD Reply at __).  Other "D.I." references will be to the docket for Civ. No. 13-373 (SLR).

[4] The *Noerr-Pennington* doctrine protects a litigant's right to "petition the Government for redress of grievances," a fundamental principle that cannot be abridged under the First Amendment of the U.S. Constitution.  *See E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137 (1961).  Under the *Noerr-Pennington* doctrine, every step of litigation is immune from liability.  *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965).  Courts in the Third Circuit have applied the *Noerr-Pennington* doctrine to dismiss RICO actions.  *See e.g., Giles v. Phelan, Hallinan & Schmieg, LLP*, 2013 WL 2444036, at *11 (D.N.J. June 4, 2013) (dismissing RICO claims); *Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*, 2000 WL 1508873, *1 (2d Cir. Oct. 11, 2000) ("*Noerr-Pennington* immunity is applicable to RICO actions and to state-law claims such as fraud and tortious interference").

action pending resolution of related actions pending in the bankruptcy cases. (*Id.*)  Because the complaint fails to state a claim under RICO, and the court declines to exercise supplemental jurisdiction over the state law claims, the motion to dismiss will be granted.

## II. BACKGROUND

### A. The Bankruptcy Cases

Allied was a provider of distribution and transportation services to the automotive industry.  Allied emerged from its first bankruptcy in May 2007, and plaintiffs became Allied's majority shareholder under the plan of reorganization, with control over its board of directors.  To finance its emergence from bankruptcy, Allied borrowed $265 million of first lien debt (the "First Lien Debt" or "First Lien Claims") from numerous lenders ("Lenders") pursuant to a Credit Agreement.[5]  As defined in the Credit Agreement, one or more Lenders holding more than 50% of the total First Lien Debt can act as the "Requisite Lenders," and the Requisite Lenders are vested with authority to exercise – or refrain from exercising – certain rights and remedies on behalf of all Lenders, such as declaring events of default, demanding immediate payment by Allied of any and all amounts due, or commencing foreclosure. (*Id.,* §§ 1.1, 8.1, 9.8)

Under the Credit Agreement, the only parties eligible to act as Requisite Lenders were "Lenders," which consisted only of the original Lender signatories to the Credit Agreement, and "Eligible Assignees" that subsequently become Lenders pursuant to an Assignment Agreement. (*Id.,* § 1.1)  Plaintiffs were not original Lender signatories to the Credit Agreement, and the definition of Eligible Assignee provided that "no . . . Sponsor shall be an Eligible Assignee." (*Id.,*)  "Sponsor" is a defined term applicable only to

---

[5] "Credit Agreement" refers to the Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, as amended and restated as of May 15, 2007, between Allied Holdings Inc. and Allied Systems Ltd. (L.P.) as Borrowers, and the Lenders from time to time party thereto (as amended). (D.I. 1, ex. 1)

plaintiffs. This prohibition recognized the manifest conflict of interest between plaintiffs (as Allied's controlling shareholders) and the Lenders (as creditors of Allied).

In 2008, certain events of default occurred under the terms of the Credit Agreement, and Allied stopped making interest payments on the First Lien Debt. Plaintiffs orchestrated the passage of a Third Amendment to the Credit Agreement, which gave plaintiffs limited rights to become a Lender, capping the amount of debt they could purchase, stripping that debt of any voting power, and requiring certain contributions to equity. (D.I. 1, ex. 14, Third Amendment § 2.1(a)) Thus, plaintiffs could never become Requisite Lenders under the Third Amendment. The Third Amendment also contained a covenant not to sue, which limited plaintiffs' rights to sue any Lender. The covenant not to sue provided:

> To the fullest extent permitted by applicable law, no Restricted Sponsor Affiliate [plaintiffs] shall assert, and each Restricted Sponsor Affiliate immediately and automatically upon becoming a Lender, hereby irrevocably (i) **waives, any claim or cause of action against any Lender, any Agent and their respective Affiliates** . . . (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement or otherwise) **arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or** any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, **any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith** except to the extent caused by such Lender's or Agent's gross negligence or willful misconduct . . . as determined by a court of competent jurisdiction by final and non-appealable judgment, (ii) **waives, releases and agrees not to sue upon any such claim or any such cause of action**, whether or not accrued and whether or not known or suspected to exist in its favor and (iii) waives any claim or cause of action against any Agent or any Lender . . . on any theory of liability for special, indirect, consequential or punitive damages . . . .

(*Id.*, § 2.7(e) (emphasis added))

In February 2009, ComVest Investment Partners III, L.P. ("ComVest") became the Requisite Lender. Thereafter, plaintiffs directly negotiated with ComVest to acquire the First Lien Debt. On August 21, 2009, plaintiffs caused Allied to enter into a purported Fourth Amendment to the Credit Agreement which, if effective, would have eliminated the Third Amendment's restrictions on plaintiffs' acquisition of First Lien Debt and would have allowed

3

plaintiffs to become Requisite Lenders.  Indeed, that same day, plaintiffs purported to

purchase ComVest's debt and declared themselves Requisite Lenders.  However, the

Fourth Amendment was not approved by unanimous consent of the Lenders as required by

the Credit Agreement.  CIT Group Business Credit, Inc. ("CIT") – a Lender and the

Administrative Agent under the Credit Agreement – challenged plaintiffs' status as Requisite

Lenders, which led to a lengthy litigation in Georgia state court among plaintiffs, Allied, and

CIT ("Georgia Action").  CIT settled that litigation with plaintiffs and Allied, but the settlement

did not resolve the issues between plaintiffs and the other Lenders.  In January 2012, BD/S

commenced an action in New York state court ("New York Action") against plaintiffs, and

successfully obtained a judicial declaration that plaintiffs were not the Requisite Lenders

because the Fourth Amendment was not validly enacted and was void *ab initio*.[6]

On May 17, 2012, while the New York Action was pending, Black Diamond filed

involuntary petitions for bankruptcy against Allied in the bankruptcy court, and Allied entered

bankruptcy for the second time, five years after its first bankruptcy.  (*See* Bankr. D.I. 1)[7]

Allied shortly thereafter consented to the entry of orders for relief under the Bankruptcy

Code.  On October 18, 2012, Allied commenced an adversary proceeding seeking a

determination as to, among other things, the identity of the Requisite Lenders under the

---

[6] *See BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP,* No. 650150/2012, 2013 N.Y. Misc. LEXIS 1993, *13 (N.Y. Sup. Ct. Mar. 8, 2013).  The First Department of the New York Supreme Court's Appellate Division ("New York Appellate Division") affirmed the finding that the Fourth Amendment is void *ab initio* and that plaintiffs are not the Requisite Lenders.  *BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP,* 112 A.D.3d 509, 509 (N.Y. App. Div. 2013).  The New York Appellate Division's opinion, however, modified the lower court's opinion in that it held there was a triable issue of fact as to whether Black Diamond waived the ability to challenge plaintiffs' status as Requisite Lenders.[6] *See id.* at 511.  The New York Court of Appeals denied further review on April 3, 2014, thereby exhausting plaintiffs' appeals. *BDCM Opp. Fund II, LP v. Yucaipa Am. Alliance Fund I, LP,* 8 N.E.3d 849, 849 (N.Y. 2014).

[7] The docket of Allied's chapter 11 cases, captioned *In re ASHINC Corporation, et al.*, Case No. 12-11564 (CSS) (Bankr. D. Del.), is cited herein as (Bankr. D.I. __).

4

Credit Agreement (Adv. No. 12-50947 (CSS)) (the "Allied Action").  On March 14, 2013, the

Official Committee of Unsecured Creditors appointed on behalf of Allied's bankruptcy

estates (the "Committee"), together with BD/S (as intervenors), filed an amended complaint

in the bankruptcy court seeking, among other things, to equitably subordinate plaintiffs'

purported First Lien Debt and to compel plaintiffs to comply with the Third Amendment's

requirement that plaintiffs contribute their debt to capital (Adv. No. 13-50530 (CSS)) (the

"Committee Action").  On November 19, 2014, BD/S filed an equitable subordination

complaint against plaintiffs (Adv. No. 14-50971 (CSS)) (the "BD/S Action").  The Committee

Action and the BD/S Action remain pending in the bankruptcy court, and discovery is

currently scheduled to be completed by July 17, 2017.  (*See* Committee Action at D.I. 392

(parties' July 12, 2016 status report))

The bankruptcy court issued an oral ruling on February 27, 2013, granting a motion

to dismiss plaintiffs' cross-claims in the Allied Action, including their claim for declaratory

relief that certain provisions of the Third Amendment should be deemed void.  (*See*

Committee Action D.I. 255 at 103-08)  On June 19, 2013, the bankruptcy court entered an

agreed scheduling order in the Allied Action and Committee Action in which the parties

(including plaintiffs) acknowledged that the bankruptcy court may address the issue of

"[w]ho, if anyone, is 'Requisite Lender' under the Debtors' [Credit Agreement].'" (*See*

Committee Action D.I. 268 ¶¶ 2(a), (b))  Thereafter, BD/S filed a motion for summary

judgment in both the Allied Action and Committee Action seeking a declaration that BD/S

are the Requisite Lenders under the Credit Agreement.  (*See* Committee Action D.I. 254)

After full briefing, the bankruptcy court, on July 30, 2013, ruled from the bench that BD/S

are the Requisite Lenders.[8]  Plaintiffs appealed that decision and, on March 31, 2016, the

court affirmed the bankruptcy court's decision.[9]

Following the bankruptcy court's ruling that BD/S are the Requisite Lenders, in the

summer of 2013, the bankruptcy court supervised an auction of Allied's assets in which

BD/S, in their capacity as Requisite Lenders, submitted a credit bid to purchase Allied's

assets on behalf of the Lenders.  Ultimately, Jack Cooper Holdings Corporation made the

highest and best bid and purchased substantially all of Allied's assets.  That sale closed on

December 20, 2013 and was funded on December 27, 2013.  BD/S, in their capacity as

Requisite Lenders, used their credit bid, which was approved by the bankruptcy court on

September 17, 2013, to purchase the remainder of Allied's assets (the "SBDRE Assets") on

behalf of all Lenders (including plaintiffs).  (See Bankr. D.I. 1837, 1868 (sale orders))

On December 11, 2013, plaintiffs filed an action in the Delaware Court of Chancery

against BD/S and others to challenge the allocation of the SBDRE Assets.  On October 31,

2014, the Delaware Court of Chancery dismissed most of plaintiffs' claims by applying the

bankruptcy court's decision through collateral estoppel that the Third Amendment is valid.[10]

The claims that were not dismissed by the Court of Chancery were stayed pending

resolution of Allied's chapter 11 cases.[11]  On December 9, 2015, a plan of reorganization

co-sponsored by BD/S in their capacity as the Requisite Lenders was approved by the

bankruptcy court.  (See Bankr. D.I. 3383)  The plan of reorganization, which was supported

by both Allied and the Committee, includes the prosecution of claims against plaintiffs and

---

[8] See Committee Action D.I. 280, Allied Action D.I. 275 (bankruptcy court order granting summary judgment); 7/30/13 Hr'g. Tr. at 120-30 (bankruptcy court bench ruling).
[9] See Civ. No. 13-1580 (SLR), D.I. 39, 40; Civ. No. 13-1583 (SLR), D.I. 39, 40.
[10] Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC, No. 9151-VCP, 2014 WL 5509787, at *14 (Del. Ch. Oct. 31, 2014).
[11] See id. at *16-*17.

certain of its principals for equitable subordination, breach of contract, breach of fiduciary duty, and other claims.

On May 8, 2015, plaintiffs filed the instant action asserting violation of § 1962(c) of the RICO Act (count I); conspiracy to violate § 1962(c) pursuant to § 1962(d) (count II); fraud under state law (count III); and tortious interference with business relations under state law (count IV). On June 4, 2015, defendants moved to dismiss or stay the action. (D.I. 16) The motion to dismiss is fully briefed and properly before the court.

### B. The Alleged RICO Scheme

Plaintiffs assert a racketeering scheme by defendants, the goal of which was to force Allied into involuntary bankruptcy and equitably subordinate plaintiffs' claims in order to "recover a substantial multiple on their original investment." To implement this scheme, which was allegedly motivated by "simple greed" (D.I. 1, ¶ 123), Black Diamond and Spectrum encouraged plaintiffs' acquisition of ComVest's debt so that plaintiffs would obtain a 56% share of all of the First Lien Claims. "Were that to happen, [d]efendants could jointly push Allied into an involuntary bankruptcy, at which point, Black Diamond and Spectrum could attempt to equitably subordinate [plaintiffs'] First Lien Claims by falsely accusing [plaintiffs'] designees on the Allied board of directors of breaching their fiduciary duties to Allied and operating Allied to [plaintiffs'] advantage." (D.I. 1, ¶ 79) After "encourag[ing] [plaintiffs] to acquire as much Allied debt as possible by providing false assurances of cooperation and support" (id., ¶ 8), Black Diamond and Spectrum subsequently conspired and acted to prevent plaintiffs from serving as Requisite Lenders under the Credit Agreement; "scuttle" a deal with Jack Cooper Transport Company Inc., a competitor and prospective purchaser of Allied's assets (the "JCT Deal"); file involuntary bankruptcy petitions against Allied supported by false statements and material omissions; attempt to wipe out plaintiffs' First Lien Claims with a "bogus" complaint for equitable subordination;

7

and abuse their Requisite Lender status with the goal of further harming plaintiffs. (*Id.*, ¶ 82)

With respect to specific factual allegations, plaintiffs allege that Black Diamond and Spectrum first encouraged plaintiffs (insiders of Allied) to buy as much First Lien Debt as possible. (*Id.*, ¶¶ 8-10, 83-89)  In support of this allegation, plaintiffs rely on an email dated February 2, 2011 from Black Diamond to plaintiffs stating that, "[o]n Allied, the strategy you outlined seemed right and you have our support." (*See id.*, ex. 21)  Despite this encouragement, defendants were planning to assert an equitable subordination claim against plaintiffs as early as 2009, as evidenced by an email from a third party to Spectrum, dated August 13, 2009, in which the third-party states: "I thought you were going to check out the 'equitable subordination' angle." (*Id.*, ex. 15)  Plaintiffs also point to an email from Spectrum to Black Diamond, dated September 17, 2009 – one month after plaintiffs' purchase of ComVest's debt – in which Spectrum states "looks like [plaintiffs] pushed the equity button here . . . you ready to roll." (*See id.*, ex. 17)  Plaintiffs assert that this is evidence of a scheme to file the involuntary petitions, level false accusations, and file an equitable subordination action against plaintiffs as insiders. (*Id.*, ¶ 90)

Notwithstanding the ruling in the New York Action that plaintiffs were not the Requisite Lenders under the Credit Agreement, and the bankruptcy court's conclusion that BD/S are the Requisite Lenders, plaintiffs further assert that, as part of the scheme, defendants wrongfully prevented plaintiffs from serving as Requisite Lenders. (*Id.*, ¶¶ 13-17, 92-94)  Specifically, Black Diamond and Spectrum "secretly (and successfully) urged CIT . . . to refuse to recognize [plaintiffs] as Requisite Lender[s]" and pursue expensive litigation against plaintiffs in the Georgia Action. (*Id.*, ¶ 93)

Plaintiffs further allege that, as part of their scheme, defendants interfered with the JCT Deal by pretending to negotiate with JCT for over a year and then filing involuntary

8

petitions in order to "kill the deal." (*Id.*, ¶¶ 18-20, 95-100, 109, 215)  Specifically, the sale "would have resulted in the pre-bankruptcy transfer of [plaintiffs'] First Lien Debt to JCT." (*Id.*, ¶ 95)  Pursuant to the proposed transaction, "JCT would have purchased substantially all of the assets and assumed the liabilities of Allied, including debt owned by [plaintiffs]." (*Id.*, ¶ 214)  However, because such a sale was inconsistent with defendants' scheme, after JCT initially approached all Lenders, Black Diamond negotiated directly with JCT from March 2011 through May 2012. (*Id.*, ¶ 96)  Plaintiffs claim that the result of these direct negotiations was JCT's determination that any acquisition could be consummated only through a sale of Allied in a voluntary bankruptcy case under 11 U.S.C. § 363.[12] (*Id.*, ¶¶ 97, 215)  In support of this allegation, plaintiffs rely on an email, dated May 10, 2011, from JCT to Black Diamond and plaintiffs, containing a proposal incorporating a voluntary bankruptcy filing and § 363 sale. (*Id.*, ¶ 99)  Plaintiffs claim that, in December 2011, JCT reported that it had reached an agreement with Black Diamond on certain terms, including a bridge loan from Black Diamond to JCT to the purpose of financing JCT's purchase of the First Lien Debt held by plaintiffs. (*Id.*, ¶ 98; ex. 19)  By March of 2012, "[t]he parties had agreed upon substantially all of the terms of that transaction, ... and expected to complete the necessary contracts and paperwork to effectuate the transaction." (*Id.*, ¶ 214; ex. 4)  "The consummation of the sale was thus reasonably likely and probable." (*Id.*, ¶ 214)  Although the term sheets provided that defendants would have received par plus accrued interest for their First Lien Debt, plaintiffs assert that an equitable subordination claim, if successful, offered defendants the possibility of a greater recovery, so defendants "scuttled" the deal

---

[12] Section 363 of the Bankruptcy Code provides that the trustee, after notice and a hearing, may sell property of the estate "other than in the ordinary course of business."  11 U.S.C. § 363(b).  This section empowers the trustee to sell assets "free and clear of any interest in such property of an entity other than the estate" including claims that could otherwise be assertable against the buyer of the assets under the common law doctrine of successor liability.  *See In re Grumman Olson Indus., Inc.,* 467 B.R. 694, 703 (S.D.N.Y. 2012).

with JCT by filing the involuntary bankruptcy. (*Id.*, ¶ 100)  According to plaintiffs, the negotiations with JCT were "simply a sham, conducted to lull Allied, JCT, and [plaintiffs] into falsely believing that no involuntary bankruptcy was on the horizon." (*Id.*, ¶ 109)  In support of this assertion, plaintiffs rely on an email, dated January 8, 2012, between Black Diamond principals referring to the "Allied Strategy." (*Id.*, ¶ 100, ex. 20)

Plaintiffs allege that "central to [the] Allied Strategy" was a Cooperation Agreement executed in January 2012, pursuant to which Black Diamond and Spectrum agreed to offer a right of first refusal and participation rights to one another before transferring any Allied debt to a third party. (*Id.*, ¶¶ 101-102)  The Cooperation Agreement states that it was entered into "in contemplation of . . . certain strategies to enforce the rights of the Parties as Lenders under the [Credit Agreement]" and provided that the parties would share costs and expenses. (*Id.*, ex. 13)  Plaintiffs assert that the Cooperation Agreement was entered into in contemplation of an improper involuntary bankruptcy proceeding and functioned to spur improper claims trading. (*Id.*, ¶¶ 102, 104)

In this regard, to induce Spectrum to join Black Diamond as a petitioning creditor[13] in the involuntary bankruptcy, Black Diamond gave Spectrum a "bribe."  The alleged bribe was Black Diamond's agreement to transfer $4 million of its own First Lien Claims to Spectrum "on favorable pricing terms." (*Id.*, ¶ 107)  Black Diamond and Spectrum appear to have conceded that the transfer to Spectrum was made for the same price that Black Diamond originally paid for the debt (*id.,* ¶ 107), but assert that the transfer was not made for the purposes of filing involuntary petitions.  In support of their allegations that the transfer was a bribe, plaintiffs rely on an email dated March 21, 2012 between Spectrum and Black

---

[13] Section 303 of the Bankruptcy Code provides that an involuntary case is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 by three or more creditors. *See* 11 U.S.C. § 303(b).

Diamond, in which Spectrum stated: "Please get this [claim transfer] closed this week.  We cannot file an involuntary without it done." (*Id.*, ¶ 108; ex. 6)  Plaintiffs acknowledge in the complaint that "Spectrum already held sufficient claims to qualify as a petitioner of the involuntary bankruptcy under Bankruptcy Rule 1003," but asserts that the transfer of an additional \$4 million in First Lien Claims was "clearly an inducement in violation of 18 U.S.C. § 152(6)." (*Id.*, ¶ 170)

Plaintiffs allege that the involuntary petitions filed by Black Diamond and Spectrum two months later were supported by false statements and material omissions regarding the transfer. (*Id.*, ¶¶ 110-113)  Specifically, although defendants checked the box on the involuntary petitions indicating whether "there has been a transfer of claim against the debtor by or to any petitioner," defendants failed to attach evidence of such transfers as required by Bankruptcy Rule 1003(a).[14] (*Id.*, ¶ 111)  The affidavit filed on behalf of Black Diamond ("Black Diamond Affidavit"), which stated that no claims had been transferred to Black Diamond, contained a material omission in failing to disclose that Black Diamond had transferred claims to Spectrum and a false statement that the transfers were not made "for the purpose of commencing the Bankruptcy Cases." (*Id.*, ¶ 113)  Similarly, plaintiffs assert that the affidavit on behalf of Spectrum ("Spectrum Affidavit") contained a false statement that the claims it received from Black Diamond "were not assigned to Spectrum for the purpose of the commencing the Bankruptcy Cases." (*Id.*, ¶ 112)

---

[14] Federal Rule of Bankruptcy Procedure 1003(a) provides: "A transferor or transferee of a claim shall annex to the original and each copy of the petition a copy of all documents evidencing the transfer, whether transferred unconditionally, for security, or otherwise, and a signed statement that the claim was not transferred for the purpose of commencing the case and setting forth the consideration for and terms of the transfer.  An entity that has transferred or acquired a claim for the purpose of commencing a case for liquidation under chapter 7 or for reorganization under chapter 11 shall not be a qualified petitioner."

Plaintiffs assert that defendants have abused their status of Requisite Lenders to further harm plaintiffs. (*Id.*, ¶¶ 1, 82) The Credit Agreement provides for reimbursement of legal expenses incurred by any Lender under certain circumstances, including expenses in a bankruptcy proceeding. (*Id.*, ¶ 129) Plaintiffs claim that they are entitled to be reimbursed for fees and expenses relating to the litigation with CIT, the litigation with Black Diamond and Spectrum, and fees incurred in the Allied bankruptcy proceedings. (*Id.*, ¶ 129) According to plaintiffs, defendants have colluded to block payment of plaintiffs' fees and expenses while reimbursing their own. (*Id.*, ¶¶ 129-31) Finally, defendants obstructed justice by failing to disclose the Cooperation Agreement, which was responsive to discovery requests propounded by plaintiffs in the bankruptcy proceedings. (*Id.*, ¶ 122)

### C. Alleged Predicate Acts Under RICO

The RICO Act imposes criminal and civil liability upon those who engage in certain "prohibited activities." Each prohibited activity is defined in 18 U.S.C. § 1962 to include, as one necessary element, proof either of "a pattern of racketeering activity" or of "collection of an unlawful debt." "Racketeering activity" is defined in RICO to mean "any act or threat involving" specified state-law crimes, any "act" indictable under various specified federal statutes, and certain federal offenses. 18 U.S.C. § 1961(1). Under the statute, a "pattern" requires at least two acts of racketeering activity within a 10-year period. 18 U.S.C. § 1961(5).

The "predicate acts" alleged in the complaint are: (1) false oath in relation to a bankruptcy proceeding in violation of 18 U.S.C. § 152(2), regarding the Black Diamond and Spectrum Affidavits, including the redaction of certain information in the trading records attached to the Spectrum Affidavit (D.I. 1, ¶¶ 174-79); (2) false declarations in relation to a bankruptcy proceeding in violation of 28 U.S.C. § 152(3) regarding the Black Diamond and Spectrum Affidavits (*id.*, ¶¶ 181-82); (3) instances of claims trading in relation to a

12

bankruptcy proceeding in violation of 18 U.S.C. § 152(6) regarding the transfer of First Lien Claims between Black Diamond and Spectrum (*id.*, ¶¶ 166-72); (4) wire fraud in violation of 18 U.S.C. § 1343 regarding emails between the defendants, specifically emails "that facilitated the solicitation of Allied debtholders to join the involuntary petition[s] and [d]efendants' illegal claims trading" (*id.*, ¶¶ 190-94); (5) mail fraud in violation of 18 U.S.C. § 1341 regarding the "deliver[y of] documents reflecting the illegal claims transfer from Black Diamond to Spectrum to induce Spectrum to support the involuntary bankruptcy petitions against Allied" (*id.*, ¶¶ 196-99); and (6) obstruction of justice in violation of 18 U.S.C. § 1503 regarding the Black Diamond and Spectrum Affidavits and defendants' alleged failure to timely disclose the Cooperation Agreement (*id.*, ¶¶ 184-89).

## III. JURISDICTION AND STANDARD OF REVIEW

The court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c). To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully." *Id.* To determine the sufficiency of a complaint under *Twombly* and *Iqbal*, the court must take the following three steps: (1) the court must "tak[e] note of the elements a plaintiff must plead to state a claim;" (2) the court should identify the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth;" and (3) "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011) (citing *Iqbal*, 556 U.S. at 664).

13

## IV. ANALYSIS

Congress' intent in enacting the RICO statute was to combat "long-term criminal conduct" and the "danger posed by organized crime-type offenses." *Hughes v. Consol-Penn. Coal Co.*, 945 F.2d 594, 611 (3d Cir. 1991) (internal quotations and citations omitted). Careful scrutiny of such claims is appropriate because of the "relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Kolar v. Preferred Real Estate Investments, Inc.*, 361 F. App'x 354, 363 (3d Cir. 2010) (internal citations omitted)). RICO claims should be viewed with scrutiny to ensure that "only those purported RICO claims which truly fit within the intent of the statute will proceed." *O'Malley v. BancAmerica Commercial Corp.*, 1992 WL 81394, *4 (E.D. Pa. Apr. 17, 1992). Moreover, "courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Rotherberg v. Marger*, 2013 U.S. Dist. LEXIS 44473, * 31 (D. N.J. Mar. 28, 2013).

### A.    Count I – Violation of 18 U.S.C. § 1962(c)

Section 1962(c) of the RICO statute provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Similarly, 18 U.S.C. § 1962(d) makes it unlawful to "conspire" to violate § 1962(c). To make out a claim under § 1962(d), plaintiffs must first establish their § 1962(c) claim. *See Annulli v. Panikkar*, 200 F.3d 189, 198 (3d Cir. 1999) (*overruled on other grounds*, *Rotella v. Wood*, 528 U.S. 549 (2000)).

#### 1. Standing

Standing to bring a private action under the RICO statute is extended to "[a]ny person injured in his business or property by reason of a violation of § 1962 . . ." 18 U.S.C.

14

§ 1964(c). The "by reason of" language in § 1964(c) has been interpreted as creating two distinct requirements for standing in RICO claims brought pursuant to § 1962: "(1) that the plaintiff suffered an injury to business or property; and (2) that the plaintiff's injury was proximately caused by the defendant's violation of 18 U.S.C. § 1962." *Maio v. Aetna, Inc.*, 221 F.3d 472, 482-83 (3d Cir. 2000). Such injury must be specific or quantifiable and must have resulted in "tangible financial loss to plaintiff" (*id.* at 483 (internal citations omitted)). As such, a complaint does not adequately plead a RICO violation unless it shows damage to business or property with some certainty; if the claimed injury is speculative, it is not ripe for adjudication. *See id.* at 495 (injury predicated on speculation insufficient to support cause of action under RICO). To meet the proximate cause requirement, a plaintiff must plead sufficient facts to plausibly assert that "the alleged violation led directly to the plaintiff's injuries." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 461 (2006). Plaintiffs argue that the RICO claims are ripe based on several injury theories, each of which fails to meet the above criteria.

Plaintiffs seek damages "in an amount to be proven at trial." (*Id.*, ¶ 200) Here, the injury asserted – equitable subordination of plaintiffs' claims in the Allied bankruptcy – has not yet occurred and is wholly contingent upon the outcome of the bankruptcy court proceedings. Inasmuch as the RICO injury is predicated exclusively on the possibility that future events might occur, rather than on the actual occurrence of those events, the loss requires a significant degree of factual speculation and is insufficient to support a cause of action under RICO. *See Maio*, 221 F.2d at 495. As set forth in the complaint, any injury to plaintiffs' business or property which would result from equitable subordination of their claims remains speculative. (*See id.*, ¶¶ 29, 31 ("**If** [the equitable subordination] claims are ultimately successful . . ., [plaintiffs'] claims **will likely** be wiped out and [d]efendants will reap a substantial windfall . . .") (emphasis added)) In fact, the alleged scheme "is ongoing

15

to this day." (Id., at ¶ 29)  The Third Circuit has made it clear that an injury that is
speculative or contingent on future events does not confer RICO standing.  See Maio, 221
F.3d at 495; see also Walter v. Palisades Collections, LLC, 480 F. Supp. 2d 797, 804 (E.D.
Pa. 2007) ("RICO liability cannot attach to future contingent events").  Plaintiffs have failed
to plead a "concrete financial loss" which is specific or quantifiable.  See Maio, 221 F.3d at
483; Barbieri v. Wells Fargo & Co., 2014 WL 7330461, at *5 (E.D. Pa. Dec. 22, 2014) (to
qualify as a concrete financial loss, plaintiff's injury cannot be speculative).

 Notwithstanding that the equitable subordination of plaintiffs' claims – the ultimate
goal of defendants' alleged scheme – is contingent upon the outcome of the bankruptcy
proceedings, plaintiffs argue that injury to their business or property in the form of an "actual
monetary loss" has been asserted; that is, defendants' scheme "has already injured
[plaintiffs] and cost [them] more than $175 million in damages," including "loss of profit on
the original JCT transaction scuttled by [d]efendants' wrongful involuntary bankruptcy filing,"
and "millions in attorneys' fees and costs."  (Id., ¶ 33; MTD Opp. 16)  Plaintiffs also point to
allegations in the complaint that defendants "stripped [plaintiffs] of [their] property by
arbitrarily reducing [their] ownership interest in certain real estate assets and denied
[plaintiffs the] right to reimbursement of expenses while paying their own."  (D.I. 1, ¶¶ 132-
39; MTD Opp. 17)  However, upon careful consideration, none of the injuries alleged in the
complaint confer RICO jurisdiction.

 Plaintiffs' alleged injury in the form of the "loss of profit on the original JCT
transaction scuttled by [d]efendants' wrongful involuntary bankruptcy filing" cannot be said
to be a "concrete financial loss."  See Maio, 221 F.2d at 483.  Even as pled in the complaint,
the JCT Deal was "uncertain" and "subject to multiple closing conditions including funding
contingencies."  (D.I. 1, ¶ 124)  Plaintiffs' losses arising from a failure to close the JCT Deal,
if any, are not "clear and definite."  See Motorola Credit Corp. v. Uzan, 322 F.3d 130, 135

(2d Cir. 2003) ("a cause of action does not accrue under RICO until the amount of damages becomes clear and definite"). Moreover, plaintiffs cannot satisfy proximate cause in light of the numerous conditions and contingencies attendant to the JCT Deal; that is, there is no plausible basis for asserting that any of the predicate acts set forth in the complaint, including the alleged wrongful filing of the involuntary petitions, "led directly" to the deal's failure and plaintiffs' alleged injuries. *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496-97 (1985) ("plaintiff ... can only recover to the extent that ... he has been injured in his business or property **by the conduct constituting the violation**") (emphasis added)); *Anza,* 547 U.S. 461 (alleged RICO violation must have led directly to plaintiff's injuries); *Lynch v. Capital One Bank,* 2013 WL 2915734, at *3 (E.D. Pa. June 14, 2013) (plaintiff must plead sufficient facts to plausibly assert that the alleged violation act led directly to plaintiff's injuries).

Regarding plaintiffs' argument that the complaint pleads "concrete financial loss" in the form of "millions in attorneys' fees and costs," this alleged injury does not confer RICO standing either. (*See* MTD Opp. at 16-17) The Third Circuit has not formally addressed the question of whether prior legal fees can ever suffice as injuries under RICO, and there is an obvious split among authorities.[15] For instance, in *Weiss v. First Unum Life Ins. Co.,* 482 F.3d 254, 256 (3d Cir. 2007), cited by plaintiffs, a participant in an employee benefits plan

---

[15] *See Walter,* 480 F. Supp. 2d at 804, n.11 (collecting cases). *Compare Handeen v. Lemaire,* 112 F.3d 1339, 1354 (8th Cir. 1997) (attorney fees spent objecting to defendant's allegedly fraudulent claims in another litigation sufficient to confer standing within the meaning of RICO); *Stochastic Decisions, Inc., v. DiDomenico,* 995 F.2d 1158, 1167 (2d Cir. 1993) ("legal fees may constitute RICO damages when they are proximately caused by a RICO violation."); *with Kashelkar v. Rubin & Rothman,* 97 F. Supp. 2d 383, 391 (S.D.N.Y. 2000) (granting defendants' motion to dismiss RICO count where plaintiff's alleged injury in the form of defense costs in state lawsuits was insufficient to establish commercial injury for RICO claim); *Local 355, Hotel, Motel, Restaurant, & Hi-Rise Employees and Bartenders v. Pier 66 Co.,* 599 F. Supp. 761, 765 (S.D. Fla. 1984) ("[Attorneys' fees] are incidental dames and do not rise to the type of proprietary damage for which RICO provides compensation").

alleged that his insurer violated RICO by discounting payment of his benefits as part of a racketeering scheme involving an illegal policy of rejecting expensive payouts to disabled insureds. While the court held that the IRS penalties and fees plaintiff incurred may be actionable damages under RICO, the court did not address whether legal fees were actionable damages. *See id.* at 258 n.2. Plaintiffs also cite cases from the Eastern District of Pennsylvania in which the court noted that attorney fees can establish an injury in a RICO action under certain circumstances. In *Lynch*, for example, the court noted that attorney fees may be actionable under RICO, but only where incurrence of those fees was proximately caused by defendants' misrepresentation or RICO violation. *See Lynch*, 2013 WL 2915734, at *3. In the *Walter* case, the court noted that the "Third Circuit's focus on out-of-pocket expenses . . . leads to the conclusion that the payment of legal fees can be actionable under RICO." *See Walter*, 480 F. Supp. 2d at 804. The court also found, however, that while past attorney fees may be actionable under RICO, future attorney fees are prospective damages that did not confer RICO standing, and fees incurred in initiating or litigating the RICO action could not form the basis for RICO liability. *See id.* ("RICO's injury requirement would be a nullity if paying an attorney to initiate the RICO action itself sufficed as a damage."). While the court does not necessarily disagree that past attorney fees may, in some circumstances, confer RICO standing, this case is distinguishable. Here, plaintiffs' legal fees are the subject of their claims for reimbursement under the Credit Agreement, and those claims remain pending in the bankruptcy proceedings. As plaintiffs' recovery on its reimbursement claims in the bankruptcy proceedings remains unclear, plaintiffs' legal fees do not confer RICO jurisdiction. *See Motorola*, 322 F.3d at 137 (where recovery in the bankruptcy proceedings is unknown, RICO claims are not ripe, even where recovery is a "forlorn hope'); *Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC,* 347 F. App'x 711, 712-13 (2d Cir. 2009) (RICO claims are not ripe

18

where recovery in the bankruptcy proceedings is unknown); *Barnett v. Stern*, 909 F.2d 973, 977 n.4 (7th Cir. 1990) (creditors lacked RICO standing until recovery in bankruptcy proceedings became clear).

Finally, plaintiffs allege that defendants' scheme "stripped [plaintiffs] of [their] property by arbitrarily reducing [their] ownership interest in certain real estate assets" and that this is also a "concrete financial loss" under RICO. (*See* MTD Opp. at 17; D.I. 1 at ¶¶ 132-39)  However, these alleged losses are still being litigated in the Court of Chancery.[16] Thus, any losses remain speculative and do not confer RICO standing.  *See Motorola*, 322 F.2d at 135 (a cause of action does not accrue until the amount of damages becomes clear and definite).

Where a plaintiff fails to allege injury to its business or property in the form of a concrete financial loss proximately caused by an alleged predicate act, or where a plaintiff's injury is speculative or contingent on future events, that plaintiff lacks standing to bring suit under RICO.  *See Maio*, 221 F.3d at 483.  Here, plaintiffs have failed to allege a concrete financial loss, and count I of the complaint will be dismissed for lack of standing.

### 2. Pattern of racketeering activity

Even assuming the injury alleged by plaintiffs were sufficient to make out a claim under RICO, plaintiffs have failed to plead a pattern of racketeering activity.  To prove that defendants violated 18 U.S.C. § 1962(c), plaintiffs must show "a pattern of racketeering activity" which requires commission of "at least two acts of racketeering activity."  18 U.S.C. § 1961(5).  Section 1961's two-act requirement does not so much define a pattern of racketeering activity as set a minimum necessary condition for such a pattern to exist.  *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237 (1989).  Although the statute does not

---

[16] *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, No. 9151-VCP (Del. Ch.).

define such a pattern, the Supreme Court has held that a pattern of racketeering activity requires that the predicate acts (1) are related, and (2) amount to or pose a threat of continued criminal activity. *See id.* at 239.

Regarding whether the predicate acts are related, the Supreme Court has held that that this prong is satisfied when the predicate acts have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240. In the Third Circuit, courts liberally construe this standard. *See, e.g., Banks v. Wolk*, 918 F.2d 418, 425 (3d Cir. 1990) (finding predicate acts were related even where four of five predicate acts did not involve precisely the same parties). Here, plaintiffs allege that the predicate acts set forth in the complaint are all related to each other and to defendants' "purpose of subordinating [plaintiffs'] claims by forcing Allied into involuntary bankruptcy." (D.I. 1, ¶ 163) Plaintiffs' allegations, if accepted as true, satisfy the requirement that the predicate acts are related.

Regarding whether the predicate acts "amount to or pose a threat of continued criminal activity," the Supreme Court has noted that continuity is a "temporal concept." *See HJ Inc.,* 492 U.S. at 241-42. Duration is the *sine qua non* of continuity. *See Hindes v. Castle*, 937 F.2d 868, 873 (3d Cir. 1991). A plaintiff can meet this requirement by showing either "close-ended continuity" or "open-ended continuity." *See H.J. Inc.*, 492 U.S. at 241-42. Close-ended continuity refers "to a closed period of repeated conduct." *Id.* at 241. Open-ended continuity refers to "past conduct that by its nature projects into the future with a threat of repetition." *Id.* The Third Circuit has also noted other factors that are relevant to the "pattern" inquiry, including "the number of unlawful acts, the length of time over which the acts were committed, the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406,1412-13 (3d Cir. 1991) (quoting *Barticheck v. Fidelity Union*

*Bank/First Nat'l State*, 832 F.2d 36, 39 (3d Cir. 1987)). Following *HJ Inc.*, Third Circuit courts "focus on these factors as they bear upon the separate questions of continuity and relatedness." *Marshall-Silver Constr. Co. v. Mendel*, 894 F.2d 593, 596 (3d Cir. 1990). Although the Supreme Court has provided this basic structure for analyzing continuity, the analysis is ultimately fact specific. *See HJ Inc.,* 492 U.S. at 241 (noting "development of these concepts must await future cases").

With respect to continuity, plaintiffs allege that "[d]efendants' pattern of racketeering activity is continuous" as the predicate acts "extend over a substantial period of time, from September of 2011 to the present, and the involuntary bankruptcy proceeding that [d]efendants fraudulently initiated is currently pending." (D.I. 1, ¶ 164) Plaintiffs further allege that "[d]efendants' scheme will continue in the future until they achieve their objective of equitably subordinating [plaintiffs'] debt holdings in Allied, and [d]efendants will continue to make false statement to courts and to engage in other acts of obstruction and fraud in order to bring this scheme to fruition." (*Id.*)

### a. Close-ended continuity

Plaintiffs' allegations, even if accepted as true, do not satisfy close-ended continuity, that is, "a series of related predicates extending over a substantial period of time." *HJ Inc.,* 492 U.S. at 242. The Third Circuit has consistently held that a pattern lasting less than one year does not, as a matter of law, constitute a "substantial period of time" as required by *HJ Inc. See e.g., Hughes,* 945 F.2d at 611 ("We hold that twelve months is not a substantial period of time"); *Tabas v. Tabas,* 47 F.3d 1280, 1293 (3d Cir. 1995) ("Since HJ Inc., this court has faced the question of continued racketeering activity in several cases, each time finding that conduct lasting no more than twelve months did not meet the standard for close-ended continuity"); *Helman v. Murry's Steaks, Inc.*, 742 F. Supp. 860, 882 (D. Del. 1990) (predicate acts spanning twelve months did not satisfy close-ended continuity requirement).

Plaintiffs allege an elaborate scheme dating "potentially as far back as 2009." (D.I. 1, ¶ 159) To determine the duration of the pattern, the court must look to the earliest predicate act. *HJ Inc.*, 492 U.S. at 242 ("party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates"). Although plaintiffs assert that defendants' scheme has run "from at least in 2009 and continues today," the duration of the pattern begins on the date of the earliest alleged predicate act, not on the date that defendants allegedly began contemplating the scheme. Here, the earliest predicate act asserted in the complaint involves the September 2011 emails, which are alleged to constitute acts of wire fraud in violation of 18 U.S.C. §§ 1343, and which "facilitated the solicitation of Allied debtholders to join the involuntary petition[s] and [d]efendants' illegal claims trading." (D.I. 1, ¶¶ 190-94) Defendants argue that these allegations of wire fraud should be rejected because "[plaintiffs] cannot tack on conclusory allegations of mail and wire fraud to add more time to its alleged pattern of racketeering conduct." (*See* MTD at 25-26 (citing *Kehr*, 926 F.2d at 1418)) Even accepting plaintiffs' allegations as true, and including the alleged acts of wire fraud occurring in September 2011, the pattern as alleged still falls short of one year under Third Circuit law. The involuntary petitions, allegedly containing false statements and material omissions in violation of 18 U.S.C. § 1343, and/or resulting from claims trading in violation of 18 U.S.C. § 152(6) in March 2012, were filed in May 2012. Thus, the pattern of racketeering activity alleged in the complaint is at most nine months in duration.

Plaintiffs argue that the predicate acts asserted in the complaint do not end with the May 2012 bankruptcy filings because the complaint references defendants' continued pursuit of the equitable subordination claims against plaintiffs. (MTD Opp. at 18; D.I. 1, ¶ 159) This argument misses the mark for the same reason – the period of continuity is established by the predicate acts in furtherance of the alleged scheme. *See HJ Inc.*, 492

22

U.S. at 242 ("**what** must be continuous [is] RICO's predicate acts or offenses") (emphasis in original). Were an allegation of the continued existence of a scheme sufficient to extend a pattern of racketeering activity, in lieu of predicate acts themselves, the duration consideration would be rendered meaningless.

Plaintiffs further argue that the predicate acts asserted in the complaint do not end with the May 2012 bankruptcy filings because the complaint alleges defendants continue to obstruct justice. (MTD Opp. at 18; D.I. 1, ¶ 157) Obstruction of justice as a predicate act under RICO requires that a defendant

> . . . corruptly, or by threats or force, or by any threatening letter or communication, endeavor to influence, intimidate, or impede any . . . juror, or officer in or of any court of the United States . . . in the discharge of his duty.

18 U.S.C. § 1503(a). The Third Circuit has held that "only acts **directly** affecting parties, witnesses or jurors – and not other acts that may merely influence the proceedings – are cognizable" as predicate acts under RICO. *See CollegeSource, Inc. v. AcademyOne, Inc.*, 597 App'x 116, 126 (3d Cir. 2015) (emphasis in original). "Consequently, we have never recognized obstruction of justice as a viable RICO predicate except in cases involving witness intimidation." *Id.* (citing *Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*, 792 F.2d 341, 355 (3d Cir. 1986)). Here, accepting as true plaintiffs' allegations that defendants filed false affidavits in support of the involuntary bankruptcy petitions, such an act is not cognizable as a predicate act under RICO. *See College Source,* 597 Fed App'x at 126 (finding that allegations of submission of false affidavits and destruction of electronic evidence were facially insufficient to establish obstruction of justice RICO violation).

Plaintiffs claim that the predicate acts asserted in the complaint do not end with the May 2012 bankruptcy filings because defendants withheld relevant documents in the bankruptcy litigation until at least August 2014. (D.I. 1, ¶ 188) Alleged obstruction of justice

23

in a pending proceeding cannot support a RICO claim brought in a different court. *See e.g.,*
*Rafferty v. Halprin*, 1991 WL 148798, at *7 (S.D.N.Y. 1991) (holding that "[o]bstruction [of
justice] claims . . . must be presented in the court in which the civil action giving rise to the
alleged obstruction is pending" and noting that to allow otherwise would be "an improper
use of the civil RICO statute"); *Eli Lilly and Co. v. Roussel Corp.*, 23 F. Supp. 2d 460, 483
n.35 (D. N.J. 1998) (quoting *Rafferty*: "to permit conduct in a pending action to serve as a
basis of a RICO claim would improperly apply the RICO statute, invite forum shopping of a
most pernicious sort and would embroil this Court in the supervision and review of
proceedings" in other courts). Even accepting as true plaintiffs' allegation that defendants
withheld relevant documents in the bankruptcy proceedings, the court agrees that such an
act does not satisfy the predicate act of obstruction of justice for purposes of establishing a
pattern of racketeering activity.

Having alleged a pattern of racketeering activity lasting only nine months, the
complaint does not satisfy close-ended continuity as a matter of law. *See Hughes*, 945
F.2d at 611 (pattern lasting less than one year does not, as a matter of law, constitute a
"substantial period of time").

### b. Open-ended continuity

The allegations in the complaint, accepted as true, do not satisfy open-ended
continuity either. If a plaintiff alleges a RICO violation before continuity is established,
plaintiff must allege "a threat of continued racketeering activity." *HJ Inc.,* 492 U.S. at 242.
This requirement is met where the "racketeering acts themselves include a specific threat of
repetition extending indefinitely into the future." *Id.* at 242-43. A threat of continuity also
exists when the predicate acts are part of an ongoing entity's "regular way of doing
business." *Id.* Additionally, a plaintiff may plead a threat of continued racketeering activity

where the predicate acts can be attributed to "a defendant operating as part of a long-term association that exists for criminal purposes." *Id.*

Plaintiffs do not allege that defendants used fraud as a regular way of doing business or formed an ongoing criminal association. Instead, plaintiffs allege that "[d]efendants' scheme will continue in the future until they achieve their objective of equitably subordinating [plaintiffs'] debt holdings in Allied." (D.I. 1, ¶ 164) Defendants "continue to assert causes of action for equitable subordination against [plaintiffs] in adversary case number 13-50530 filed in the Allied bankruptcy case" and "continue to obstruct justice" (*Id.*, ¶¶ 157, 159). In response, defendants argue that the complaint does not satisfy open-ended continuity because it "amounts to nothing more than a business dispute between creditors that does not constitute criminal activity, let alone pose a threat of continued criminal activity." (*See* MTD at 25)

The Third Circuit has often held that a single scheme involving a single injury to a single victim within a short period of time falls outside of RICO due to lack of continuity, even where all aspects are entirely related. *See e.g., Hughes*, 945 F.2d at 611 (predicate acts against single victim lasting one year did not satisfy continuity); *Kehr*, 926 F.2d at 1413 ("[A]lthough a single fraudulent scheme can give rise to RICO liability, when that scheme is short-lived and directed at a limited number of people, this court has required some further indication that the defendant's fraudulent activities are likely to continue"); *Baldwin v. Township of Union,* 2005 WL 3588473, *6 (D.N.J. Dec. 29, 2005) (no threat of continued racketeering activity where "predicate acts focus on a clearly defined, discrete, and finite goal"); *Kolar*, 361 App'x at 365 (holding that a "single finite transaction cannot by itself underpin a pattern of racketeering activity").

Defendants argue that the complaint's allegations fall outside of RICO because the alleged pattern of racketeering activity has only one objective – equitable subordination of

25

plaintiffs' claims – and targets only plaintiffs. (*See* MTD at 5)  The Supreme Court has

rejected the theory that a RICO pattern requires proof of "multiple schemes." *HJ Inc.*, 492

U.S. at 240; *see also United States v. Starnes,* 644 F.2d 673, 678 (7th Cir. 1981) (no

requirement for separate unrelated schemes); *LSC Assocs. v. Lomas & Nettleton Fin.*

*Corp.*, 629 F. Supp. 979, 981-82 (E.D. Pa. 1986) (schemes involving only one transaction

intended or one objective sufficient when "defendants allegedly committed several

racketeering acts to entice plaintiffs to enter that transaction.").  Nevertheless, when a single

fraudulent scheme "is short-lived and directed at a limited number of people, [the Third

Circuit] has required some further indication that the defendant's fraudulent activities are

likely to continue." *Kehr*, 926 F.2d at 1413.

       As discussed *supra*, accepting plaintiffs' allegations as true, the last predicate act

alleged in the complaint occurred in May 2012.  The final goal of defendants' alleged

scheme is clearly defined: equitable subordination of plaintiffs' claims.  The scheme,

therefore, is of finite duration, and there is no threat of long-term continuous criminal activity

"where predicate acts focus on a clearly defined, discrete, and finite goal." *Baldwin*, 2005

WL 3588473 at \*6.  This single fraudulent scheme, which is short-lived and directed at a

limited number of victims, does not give rise to RICO liability without some "further

indication that the defendant's fraudulent activities are likely to continue." *See Kehr*, 926

F.2d at 1413.  The complaint makes no allegation that the alleged predicate acts

themselves include "a specific threat of repetition extending indefinitely into the future." *HJ*

*Inc.,* 492 U.S. at 242-43.  "[S]chemes which have a clear and terminable goal have a natural

ending point.  Such schemes therefore cannot support a finding of any specific threat of

continuity that would constitute open-ended continuity." *Vicom, Inc. v. Harbridge Merchant*

*Servs.*, 20 F.3d 771, 782 (7th Cir. 1994).

Construing the complaint in a light most favorable to plaintiffs, and assuming all facts in the complaint to be true, for the reasons stated above, plaintiffs have failed to allege continuity under either the open-ended or close-ended standards. Related predicate acts lasting "a few weeks or months and threatening no future criminal conduct do not satisfy [the continuity] requirement." *HJ Inc.,* 492 U.S. at 242. Having failed to allege a pattern of racketeering activity, the complaint fails to state a claim under RICO. Accordingly, count I of the complaint must be dismissed.[17]

### B.     Count II - § 1962(d) Claim

Section 1962(d) of the RICO Act makes it unlawful to "conspire" to violate § 1962(c). To make out a claim under § 1962(d), a plaintiff must first establish its claim under § 1962(a), (b), or (c). *See Annulli,* 200 F.3d at 198. Because plaintiffs have failed to state a claim under § 1962(c), the conspiracy claim must fail as well. *See Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1191 (3d Cir. 1993) ("Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 must necessarily fail if the substantive claims are themselves deficient"). Accordingly, count II of the complaint must be dismissed.

### C.     Counts III and IV – Fraud and Tortious Interference with Business Relations Under State Law

The court's original jurisdiction over this matter is based solely upon plaintiffs' federal RICO claims. Having dismissed those claims, the court no longer has original jurisdiction over the action and must determine whether to exercise supplemental jurisdiction over the state law claims. Pursuant to 28 U.S.C. § 1367, federal courts with original jurisdiction over a federal claim have supplemental jurisdiction over state-law claims that "form part of the

---

[17] Because the court concludes that the complaint fails to state a claim under RICO, the court does not reach defendants' arguments that the RICO claims are barred by the *Noerr-Pennington* doctrine and/or the covenant not to sue in the Credit Agreement.

same case or controversy." 28 U.S.C. § 1367(a).  A district court may, however, decline to exercise supplemental jurisdiction over state law claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1508 (3d Cir. 1996) (dismissal of the jurisdiction-granting claim "triggers a discretionary decision on whether jurisdiction over a state law claim should be declined pursuant to § 1367(c)(3)").

The Third Circuit has instructed that "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Dougherty v. A.O. Smith Corp.*, 2014 WL 3542243, *16 (D. Del. July 16, 2014) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)); *see also Carnegie-Mellon University v. Cohill,* 484 U.S. 343, 351 (1988) (when the federal claims are eliminated early in a case, "the District Court ha[s] a powerful reason to choose not to continue to exercise jurisdiction").

Defendants argue that there are no fairness considerations preventing dismissal of plaintiffs' state law claims because "neither party has invested significant resources in litigating them [in this court]."  (MTD Reply at 18-19)  Plaintiffs previously moved to withdraw the reference of the BD/S Action to the bankruptcy court and argue that, should the court grant their request, it would be more efficient for the same court to adjudicate these state law claims together with the state law claims in the BD/S Action.  (MTD Opp. at 27) However, to avoid the risk of inconsistent rulings between the BD/S Action and Committee Action, the court has since denied plaintiffs' motion to withdraw the reference of the BD/S Action, as "[t]hese proceedings involve at least some overlapping claims and will certainly involve overlapping facts." (*See* Civ. No. 15-256 (SLR), D.I. 19)  Both actions will now proceed in the bankruptcy court, and plaintiffs offer no other considerations in support of

28

their argument that the court should exercise supplemental jurisdiction.  The court finds no affirmative justification for exercising supplemental jurisdiction over the state law claims and accordingly, counts III and IV are dismissed without prejudice.[18]

## V. CONCLUSION

For the foregoing reasons, the complaint fails to state a claim under RICO, and the court declines to exercise supplemental jurisdiction over the state law claims.  Accordingly, the motion to dismiss is granted.  The parties will bear their own costs.  An appropriate order shall issue.

---

[18] Because the court declines to exercise supplemental jurisdiction over the state law claims, the court does not reach defendants' arguments that those claims are barred by the covenant not to sue in the Credit Agreement.