**REDACTED**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ASHINC Corporation, *et al.*, | Case No. 12-11564 (KBO) |
| Debtors. | (Jointly Administered) |
| | |
| CATHERINE E. YOUNGMAN, LITIGATION TRUSTEE FOR ASHINC CORPORATION, ET. AL., AS SUCCESSOR TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ASHINC CORPORATION, AND ITS AFFILIATED DEBTORS | Adv. Proc. No. 13-50530 |
| Plaintiff, | |
| BLACK DIAMOND OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., and SPECTRUM INVESTMENT PARTNERS, L.P., | |
| Intervenors, | |
| v. | |
| YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P., MARK GENDREGSKE, JOS OPDEWEEGH, JAMES FRANK, DEREX WALKER, JEFF PELLETIER, IRA TOCHNER, and JOSEPH TOMCZAK, | |
| Defendants. | |
| CATHERINE E. YOUNGMAN, LITIGATION TRUSTEE FOR ASHINC CORPORATION, ET AL., AS SUCCESSOR TO BLACK DIAMOND OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., SPECTRUM INVESTMENT PARTNERS, L.P., BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., as co- | Adv. Pro. No. 14-50971 (KBO) |

administrative agent, and SPECTRUM
COMMERCIAL FINANCE LLC, as co-
administrative agent,

Plaintiff,

v.

YUCAIPA AMERICAN ALLIANCE FUND I, L.P.,
YUCAIPA AMERICAN ALLIANCE (PARALLEL)
FUND I, L.P., YUCAIPA AMERICAN ALLIANCE
FUND II, L.P., YUCAIPA AMERICAN ALLIANCE
(PARALLEL) FUND II, L.P., RONALD BURKLE,
JOS OPDEWEEGH, DEREX WALKER, JEFF
PELLETIER, IRA TOCHNER, and JOSEPH
TOMCZAK,

Defendants.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS YUCAIPA AMERICAN ALLIANCE FUND I, L.P., AND YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P.

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................. 5

    A.    Parties .......................................................................................................... 5

    B.    Yucaipa Sponsored Allied's Exit from Its Prior Bankruptcy. .......................... 6

        1.    Yucaipa acquired Allied's pre-petition debt and assisted Allied through its prior bankruptcy. .............................................................. 6

        2.    Allied's Joint Plan of Reorganization in the prior bankruptcy. ........... 6

        3.    Allied's First and Second Lien Credit Agreements. .............................. 8

    C.    The Impact of the Great Recession. .................................................................. 8

    D.    Mid-2008:  Yucaipa Steps Up to Deleverage Allied's Balance Sheet Pursuant to a Third Amendment to the Credit Agreements. ........................... 9

    E.    Fall 2008:  Allied's Negotiations with Lenders to Restructure Its Debt. ....... 11

    F.    Early February 2009:  Yucaipa and Allied Launch a Tender Offer.............. 12

    G.    Mid-to-Late February 2009:  ComVest Acquires the Majority of Allied's First Lien Debt. ...................................................................................... 13

    H.    August 2009:  Allied's Non-Payment of Interest to Lenders. ......................... 14

    I.    August/September 2009:  The Fourth Amendment and Yucaipa's Acquisition of ComVest's Debt. ....................................................................... 15

    J.    Late 2009:  Allied and Yucaipa Pursue Litigation Against CIT. ................... 16

    K.    Late 2011 and Early 2012:  Lenders' Negotiations to Sell First Lien Debt to Jack Cooper Transportation. .............................................................. 17

    L.    January 2012: BD/S Sues Yucaipa in New York State Court. ...................... 17

    M.    May 2012:  Black Diamond and Spectrum Force Allied into Bankruptcy. ..................................................................................................... 18

III.  LEGAL STANDARD ....................................................................................... 18

## TABLE OF CONTENTS
*(continued)*

Page

IV.   THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR
      YUCAIPA ON THE LENDER COMPLAINT'S CONTRACT-BASED
      CLAIMS...................................................................................................... 19

    A.   The Lender Complaint's Contract-Based Claims are Time-Barred. ........... 19

        1.   Delaware's Three-Year Statute of Limitations Applies. ..................... 19

        2.   The Lender Complaint's Allegations of Contract Breach. ................. 22

        3.   The Lender Complaint's Contract-Based Claims Accrued in
            August 2009. ..................................................................................... 23

    B.   Yucaipa is Entitled to Partial Summary Judgment on the Lender
        Complaint's Contract-Based Claims Because There is no Genuine
        Dispute on the Element of Damages Resulting from the Vast Majority
        of Yucaipa's Alleged Breaches........................................................................ 27

V.    THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR
      YUCAIPA ON THE ESTATE COMPLAINT'S CAPITAL
      CONTRIBUTION CLAIMS, SPECIFIC PERFORMANCE CLAIMS,
      BREACH OF FIDUCIARY DUTY CLAIM, AND
      RECHARACTERIZATION CLAIM, AND PARTIAL SUMMARY
      JUDGMENT ON THE FRAUDULENT TRANSFER CLAIMS. ............................... 30

    A.   The Third Amendment's Covenant Not to Sue Bars the Capital
        Contribution Claims. ...................................................................................... 31

    B.   The Estate Complaint's Claims for Specific Performance are Moot............ 36

    C.   The Estate Complaint's Breach of Fiduciary Duty Claim Fails on
        Numerous Grounds.......................................................................................... 37

        1.   The Claim is Partially Time-Barred. .................................................. 38

        2.   The MMSA-Related Allegations Constitute an Impermissible
            Collateral Attack on a Prior Court Order........................................... 39

        3.   The Remaining Allegations Supporting the Breach of
            Fiduciary Duty Claim Fail as a Matter of Law and for Lack of
            Evidence. ........................................................................................... 40

    D.   The Recharacterization Claim Fails as a Matter of Law. .............................. 47

    E.   The Trustee has Partially Abandoned the Fraudulent Transfer
        Claims............................................................................................................... 49

## TABLE OF CONTENTS
*(continued)*

Page

**VI.    CONCLUSION** ................................................................................................................ **51**

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re AgFeed USA, LLC*,
    558 B.R. 116 (Bankr. D. Del. 2016) .....................................................................50

*Albert v. Alex. Brown Mgmt. Servs., Inc.*,
    2005 WL 1594085 (Del. Ch. June 29, 2005) ........................................................23

*Am. Energy Techs., Inc. v. Colley & McCoy Co.*,
    1999 WL 301648 (D. Del. Apr. 15, 1999) ............................................................20

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..............................................................................................18

*In re AutoStyle Plastics, Inc.*,
    269 F.3d 726 (6th Cir. 2001) ................................................................................49

*BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*,
    112 A.D.3d 509 (N.Y. App. Div. 2013) ...............................................................18

*BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*,
    2013 WL 1290394 (N.Y. Sup. Ct. Mar. 8, 2013) .................................................18

*In re Bridgeport Holdings, Inc.*,
    388 B.R. 548 (Bankr. D. Del. 2008) .....................................................................39

*Caplin v. Marine Midland Grace Tr. Co.*,
    406 U.S. 416 (1972) ..............................................................................................36

*Casey v. Planned Parenthood*,
    14 F.3d 848 (3d Cir. 1994) ...................................................................................21

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..................................................................................18, 27, 40

*CH Acquisitions 2, LLC v. Aquila Aviation L.P.*,
    2018 WL 2081860 (S.D.N.Y. Mar. 30, 2018) ......................................................34

*Christianson v. Colt Indus. Operating Corp.*,
    486 U.S. 800 (1988) ..............................................................................................21

*In re Coca-Cola Enters., Inc.*,
    2007 WL 3122370 (Del. Ch. Oct. 17, 2007) .................................................25, 38

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

*In re Cold Harbor Assocs.*,
204 B.R. 904 (Bankr. E.D. Va. 1997).....................................................................48

*Collins v. Mary Kay, Inc.*,
874 F.3d 176 (3d Cir. 2017).................................................................................20

*Commonwealth Land Title Ins. Co. v. Funk*,
2014 WL 8623183 (Del. Sup. Dec. 22, 2014) ...........................................................25

*David B. Lilly Co. v. Fisher*,
799 F. Supp. 1562 (D. Del. 1992)..........................................................................20

*Deer Park Enters., LLC v. Ail Sys., Inc.*,
57 A.D.3d 711 (N.Y. App. Div. 2008) ....................................................................27

*In re Delphi Corp.*,
2008 WL 3486615 (Bankr. S.D.N.Y. Aug. 8, 2008) ...................................................36

*Destiny USA Holdings, LLC v. Citigroup Global Mkts. Realty Corp.*,
69 A.D.3d 212 (N.Y. App. Div. 2009) ....................................................................36

*In re DVI, Inc.*,
324 B.R. 548 (D. Del. 2005)................................................................................36

*Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*,
2018 WL 2727542 (Del. Ch. June 6, 2018)..............................................................41

*Ely-Cruikshank Co. v. Bank of Montreal*,
81 N.Y.2d 399 (1993)........................................................................................25

*Equity Corp. v. Milton*,
221 A.2d 494 (Del. 1966) ...................................................................................45

*In re Essar Steel Minn. LLC*,
2019 WL 2246712 (Bankr. D. Del. May 23, 2019)......................................................38

*In re Fedders N. Am., Inc.*,
405 B.R. 527 (Bankr. D. Del. 2009) .......................................................................49

*In re Fruehauf Trailer Corp.*,
250 B.R. 168 (D. Del. 2000)..........................................................................19, 38

*Gianelli v. RE/MAX of N.Y., Inc.*,
144 A.D.3d 861 (N.Y. App. Div. 2016) ..................................................................24

v

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Gluck v. Unisys Corp.*,
    960 F.2d 1168 (3d Cir. 1992)..................................................................................20

*Golovan v. Univ. of Del.*,
    73 F. Supp. 3d 442 (D. Del. 2014) ........................................................................31

*Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    885 F.2d 1149 (3d Cir. 1989)..................................................................................32

*In re HH Liquidation, LLC*,
    590 B.R. 211 (Bankr. D. Del. 2018) ...............................................................48, 49

*IBM Poughkeepsie Emps. Fed Credit Union v. Cumis Ins. Soc., Inc.*,
    590 F. Supp. 769 (S.D.N.Y. 1984) ........................................................................33

*In re: IH1, Inc. Miller v. Kirkland & Ellis LLP*,
    2016 WL 6394296 (Bankr. D. Del. Sept. 28, 2016) ..............................................38

*AM Gen. Holdings LLC ex rel. Ilshar Cap. LLC v. Renco Grp.*,
    2013 WL 5863010 (Del. Ch. Oct. 31, 2013) .........................................................41

*In re Insilico Techs., Inc.*,
    480 F.3d 212 (3d Cir. 2007)...................................................................................48

*Joao v. Cenuco, Inc.*,
    376 F. Supp. 2d 380 (S.D.N.Y. 2005).....................................................................33

*Kamfar v. New World Rest. Grp., Inc.*,
    347 F. Supp. 2d 38 (S.D.N.Y. 2004).......................................................................32

*Kuroda v. SPJS Holdings, LLC*,
    971 A.2d 872 (Del. Ch. 2009).................................................................................28

*In re La Paloma Generating Co.*,
    2020 WL 224569 (Bankr. D. Del. Jan. 13, 2020) ..................................................21

*In re LMI Legacy Holdings, Inc.*,
    553 B.R. 235 (Bankr. D. Del. 2016) .......................................................................32

*Marion v. TDI Inc.*,
    591 F.3d 137 (3d Cir. 2010)....................................................................................35

*In re Marvel Entm't Grp., Inc.*,
    273 B.R. 58 (D. Del. 2002) .........................................................................25, 26, 39

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*McMahon v. Salmond*,
    573 Fed. App'x 128 (3d Cir. 2014)................................................................44

*Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*,
    247 F.3d 44 (3d Cir. 2001)..........................................................................32

*In re Motors Liquidation Co.*,
    590 B.R. 39 (S.D.N.Y. 2018).........................................................................21

*Nemec v. Shrader*,
    991 A.2d 1120 (Del. 2010) ......................................................................41, 46

*Newman v. Resnick*,
    238 N.Y.S.2d 119 (N.Y. App. Div. 1963) ................................................36

*Norman v. Elkin*,
    2007 WL 2822798 (D. Del. Sept. 26, 2007).........................................20

*In re Northfield Labs., Inc.*,
    467 B.R. 582 (Bankr. D. Del. 2010) ........................................................40

*In re Oakwood Homes Corp.*,
    340 B.R. 510 (Bankr. D. Del. 2006) ........................................................35

*Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*,
    267 F.3d 340 (3d Cir. 2001)........................................................................35

*In re Pilgrim's Pride Corp.*,
    442 B.R. 522 (Bankr. N.D. Tex. 2010)....................................................21

*Quadrant Structured Prod. Co. v. Vertin*,
    23 N.Y.3d 549 (N.Y. App. Div. 2014) ............................................33, 34

*In re Radnor Holdings Corp.*,
    564 B.R. 467 (D. Del. 2017).......................................................................21

*Rein v. Providian Fin. Corp.*,
    270 F.3d 895 (9th Cir. 2001) ....................................................................40

*In re Resyn Corp.*,
    945 F.2d 1279 (3d Cir. 1991)....................................................................21

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
    81 F.3d 355 (3d Cir. 1996).........................................................................22

## TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Seaman v. Berman*,
    239 A.D.2d 738 (N.Y. App. Div. 1997) ...............................................................27

*Sony Corp. v. Fujifiml Holdings Corp.*,
    2017 WL 4342126 (S.D.N.Y. Sept. 28, 2017)........................................................33

*Southersby Dev. Corp. v. Borough of Jefferson Hills*,
    852 F. Supp. 2d 616 (W.D. Pa. 2012)...................................................................18

*In re SubMicron Sys. Corp.*,
    432 F.3d 448 (3d Cir. 2006)..................................................................................48

*Suffolk Cty. Water Auth. v. Village of Greenport*,
    21 A.D.3d 947 (N.Y. App. Div. 2005) ..................................................................31

*In re Syntax-Brillian Corp.*,
    573 Fed. App'x 154 (3d Cir. 2014)........................................................................50

*Tucker v. Union of Needlestrades, Indust., & Textile Emps.*,
    407 F.3d 784 (6th Cir. 2005) ................................................................................44

*U.S. for Use of Am. Bank v. C.I.T. Constr. Inc. of Tex.*,
    944 F.2d 253 (5th Cir. 1991) ................................................................................35

*In re Uni-Marts, LLC*,
    404 B.R. 767 (Bankr. D. Del. 2009) .....................................................................40

*United States v. State Street Bank & Tr. Co.*,
    520 B.R. 29 (Bankr. D. Del. 2014) .......................................................................48

*Village of Hamburg v. Am. Ref-Fuel Co. of Niagara, LP*,
    727 N.Y.S.2d 843 (N.Y. App. Div. 2001) .............................................................33

*VLIW Tech., LLC v. Hewlett-Packard Co.*,
    840 A.2d 606 (Del. 2003) .....................................................................................27

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*,
    860 A.2d 312 (Del. 2004) ...............................................................................23, 26

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*,
    901 A.2d 106 (Del. 2006) .....................................................................................24

*Williams v. Chrysler Corp.*,
    991 F. Supp. 383 (D. Del. 1998)......................................................................19, 23

**TABLE OF AUTHORITIES**
*(continued)*

Page(s)

*Wilson v. City of Wilmington*,
    2015 WL 4571554 (D. Del. July 29, 2015) ............................................................44

*In re Winstar Commc'ns, Inc.*,
    435 B.R. 33 (Bankr. D. Del. 2010) .......................................................................20

*Wynyard v. Beiny*,
    214 A.D.2d 344 (N.Y. App. Div. 1995) .........................................................36, 37

*Benjamin ex rel. Yock v. Dep't of Public Welfare of Penn.*,
    701 F.3d 938 (3d Cir. 2012).....................................................................................21

**Statutes**

6 Del. Code § 1309 ...................................................................................................50

10 Del. Code § 8106 ...........................................................................................19, 38

10 Del. Code § 8121 .................................................................................................21

11 U.S.C. § 108...................................................................................................35, 50

11 U.S.C. § 544 .........................................................................................................50

Cal. Civ. Code § 3439.09..........................................................................................50

N.Y. Debt. & Cred. Law § 278 .................................................................................51

**Rules**

Fed. R. Civ. P. 56.......................................................................................................18

## I.      INTRODUCTION

In the wake of the involuntary bankruptcy of Allied Systems Holdings, Inc. and its affiliates (collectively, "Allied"), two minority lenders to Allied—Black Diamond and Spectrum (or "BD/S")—and Allied's Official Committee of Unsecured Creditors ("UCC") each filed lawsuits against Defendants Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. (collectively, "Yucaipa") and certain individuals.  These two adversary proceedings allege a scattershot of overlapping claims, including breach of contract, breach of fiduciary duty, and tortious interference.  Extensive discovery has revealed that many of these claims fail as a matter of law because they are barred by the statute of limitations, binding contract provisions, or the utter absence of evidence on key elements.  This motion addresses only the claims against Yucaipa.

This litigation began with a complaint filed on February 1, 2013 by the UCC in No. 13-50530-KBO (as later amended, the "Estate Complaint"), which asserted claims against Yucaipa and former Allied directors.  On November 14, 2014, BD/S—in their individual capacities and as agents for the First Lien Lenders—filed a second lawsuit in No. 14-50971-KBO (the "Lender Complaint"), which asserted claims against Yucaipa, the same individual defendants,[1] and Ronald Burkle, the founder and managing member of an investment firm affiliated with the Yucaipa Defendants (the "Yucaipa Firm").  The Litigation Trustee has since stepped into the shoes of the UCC and BD/S and is now pursuing both the Lender Complaint and the Estate Complaint.

Although the Estate Complaint pleads thirteen causes of action against Yucaipa and the Lender Complaint pleads four, both lawsuits primarily allege that the Third Amendment to Allied's first lien credit agreement ("FLCA"), executed in 2008, prevented Yucaipa from

---

[1]  Defendant Mark Gendregske, who is represented by separate counsel, was not named in the Lender Complaint.

acquiring the majority of Allied's first lien debt and becoming the "Requisite Lender"—but that Yucaipa did so anyway in August 2009, harming both the Estate and Allied's Lenders.

The Lender Complaint separately alleges that beginning in late 2011, Yucaipa's preliminary negotiations with a third-party potential debt buyer, Jack Cooper Transport ("JCT"), harmed the First Lien Lenders. By contrast, the Estate Complaint makes no mention of JCT or those 2011 and 2012 preliminary negotiations (the "JCT Negotiations").

Claims in both the Lender and Estate Complaints against Yucaipa are flawed as a matter of law—some of the causes of action are subject to summary judgment and some of them are subject to partial summary judgment.

**THE LENDER COMPLAINT**

Yucaipa is entitled to summary judgment on two causes of action in the Lender Complaint: (1) breach of contract (Claim 2); and (2) breach of the covenant of good faith and fair dealing (Claim 3) (collectively, the "Contract-Based Claims"). The Lender Complaint premises these Contract-Based Claims on Yucaipa's alleged breach of certain provisions of the FLCA as amended by the Third Amendment, and on actions that Yucaipa purportedly took in its capacity as Requisite Lender, including in connection with the JCT Negotiations. These claims are subject to complete or partial summary judgment for two independent reasons:

*First*, the claims are time-barred. Under Delaware's three-year statute of limitations, which this Court already has held applies to the FLCA and the Third Amendment, a cause of action accrues at the time that a breach occurs. Here, the undisputed evidence shows that Yucaipa purportedly breached the Third Amendment and became Requisite Lender on *August 21, 2009*—more than five years before BD/S filed the Lender Complaint on November 19, 2014. The only significant alleged conduct that occurred within the three-year window of the statute of limitations—the JCT Negotiations in 2011 and 2012—is not itself a breach of any specific term in the FLCA or Third Amendment. Rather, the Trustee alleges this was merely the purported "effect" of Yucaipa's acquisition of Requisite Lender status in August 2009, so under Delaware law, any Contract-Based Claims premised on such allegations would have accrued at the time of

the purported breach in August 2009.  Consequently, under Delaware law, the Contract-Based Claims are untimely by more than two years, making the claims subject to summary judgment.

*Second*, even though "damages resulting from a breach" is an essential element of a breach of contract claim, the record is devoid of any evidence of damages resulting from Yucaipa's alleged breaches of various provisions of the Third Amendment.  The Trustee's 30(b)(6) witness on damages testified that the Trustee would rely on its expert to identify damages from Yucaipa's purported breaches.  However, the Trustee's damages expert testified that he had no opinion, and was instructed to provide no opinion whatsoever, on damages related to breaches of these provisions.  As a result, the Trustee has failed to proffer any evidence of damages for the majority of the claimed breaches of the Third Amendment.  The only allegations that could arguably survive—because the Trustee's damages expert has at least formed an opinion on them—are those concerning an alleged breach of the Third Amendment's "Capital Contribution Provision" (allegedly requiring Yucaipa to contribute capital to Allied in the form of the acquired debt within 10 days of acquiring first lien debt in August 2009), and those concerning the JCT Negotiations.  Thus, at least partial summary judgment is warranted.

**THE ESTATE COMPLAINT**

This motion addresses seven causes of action in the Estate Complaint: (1) recharacterization (Claim 3); (2) specific performance of the Third Amendment (Capital Contribution Provision) (Claim 4); (3) breach of the Third Amendment (Capital Contribution Provision) (Claim 5) (collectively with Claim 4, the "Capital Contribution Claims"); (4) specific performance of the Third Amendment (divestiture of debt) (Claim 6); (5) breach of fiduciary duty (Claim 7); (6) avoidance and recovery of intentional and constructive fraudulent transfers pursuant to 11 U.S.C. §§ 548(a) and 550 (Claim 10); and (7) avoidance and recovery of intentional and constructive fraudulent transfers pursuant to 11 U.S.C. §§ 544(b) and 550 (Claim 11).  Multiple independent grounds exist for granting complete or partial summary judgment on these claims:

*First*, the Capital Contribution Claims fail because the Trustee cannot pursue them on behalf of Allied's Estate.  The Third Amendment contains a covenant-not-to-sue that expressly bars Allied from suing Yucaipa for breach of the Third Amendment's Capital Contribution Provision.  Further, the Capital Contribution Provision itself excludes Allied from the list of parties that would sustain damages and thus could seek specific performance based on Yucaipa's failure to make a capital contribution.  These provisions demonstrate as a matter of law that the Third Amendment was intended to and *did* prevent Allied from bringing any claims premised on the capital contribution requirement, so the Estate Claims based on that provision fail in their entirety.

*Second*, the specific performance claims fail on the independent ground that Allied's Joint Plan of Reorganization (the "2016 Joint Plan") has rendered Yucaipa's performance impossible, thereby mooting these claims.

*Third*, Yucaipa is entitled to summary judgment on the breach of fiduciary duty claims (Claim 7) for several reasons.  Some of the alleged acts supporting that claim are time-barred, and one allegation constitutes an impermissible collateral attack on a prior court order.  In addition, other alleged acts supporting the breach of fiduciary duty claim overlap completely with the Capital Contribution Claims or were contractual obligations, and the remaining allegations lack any evidentiary support in the record.

*Fourth*, the Estate Complaint's claim for recharacterization of Yucaipa's debt fails as a matter of law.  The viability of a cause of action seeking recharacterization of debt depends on whether that debt was actually equity at the inception of the funding.  Here, the debt held by Yucaipa qualifies as *debt*—not equity—under binding case law.  Among other factors, (a) the funding occurred in May 2007, long before Yucaipa bought any debt in August 2009, (b) it took the form of a secured credit agreement approved by a bankruptcy court as exit financing in Allied's first bankruptcy case; (c) the debt had a fixed interest rate; and (d) Allied and other lenders consistently treated that funding as debt.

*Fifth*, the Trustee has conceded that the tenth and eleventh claims in the Estate Complaint, alleging fraudulent transfers, partially fail as a matter of law.  Further, some of the allegations supporting these claims also are time-barred.

Therefore, as explained more detail below, Yucaipa respectfully requests that the Court grant summary judgment on these grounds.

## II.    FACTUAL BACKGROUND

### A.    Parties

Allied was an automobile and truck hauler—it provided transportation services to automobile manufacturers such as GM and Toyota, transporting vehicles from one location to another, typically from manufacturing plants to dealerships.  (Declaration of Kahn A. Scolnick ("Scolnick Decl."), Ex. 21 at 19–22.)

The Yucaipa Firm is an investment firm founded by Ron Burkle.  (Scolnick Decl., Ex. 12 at 14.)  The specific Yucaipa defendants in these cases—Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP—are two of the funds through which the Yucaipa Firm makes investments.  (*Id*. at 16–17.)

Yucaipa is not a "corporate raider"—it typically invests in companies with the goal of working with management to improve operations and financial performance and grow the business over time. ██████████████████████████████████████████████ ████████████ (Tochner Decl. ¶ 2; Scolnick Decl., Ex. 22 at 12; Ex. 8 at 132.)  Yucaipa has historically accomplished this by working closely with unions, investing in unionized companies, and bringing jobs and investments into economically depressed regions of the United States. (Tochner Decl. ¶ 3.)  Yucaipa historically had not invested in distressed assets.  (*Id.*; Scolnick Decl., Ex. 12 at 34.)

Black Diamond and Spectrum (collectively, "BD/S") are debt investors that invest in distressed assets.  (Scolnick Decl., Ex. 8 at 25–26, 29; Ex. 24.)  As part of their investment strategy, ██████████████████████████████████████████████ ██████████████████████████████████████████████

████████████████████████ (*Id.* Ex. 4 at 84, 107; Exs. 25–27; Ex. 2 at 50–52.)  BD/S filed the involuntary bankruptcy petition against Allied on May 17, 2012.  (*Id.* Ex. 124.)  That involuntary bankruptcy precipitated their filing of the Lender Complaint against Yucaipa and other defendants on November 19, 2014.

**B.    Yucaipa Sponsored Allied's Exit from Its Prior Bankruptcy.**

In 2005, before Yucaipa's involvement, Allied experienced financial difficulties as well as significant friction between management and the Teamsters, the labor union that represented Allied's drivers and mechanics.  (Scolnick Decl., Ex. 28 at 1, 3.)  Accordingly, in July 2005, Allied filed for Chapter 11 bankruptcy protection for the first time in the Northern District of Georgia.  (*Id.* Ex. 28 at 3; Ex. 125.)

**1.    Yucaipa acquired Allied's pre-petition debt and assisted Allied through its prior bankruptcy.**

In a series of transactions during Allied's first bankruptcy, Yucaipa acquired ████████ of Allied's ██████████ in pre-petition senior unsecured notes and became Allied's largest creditor.  (Walker Decl. ¶ 3.)  The Teamsters had been concerned about the current management's ability to achieve a turnaround for Allied, but after acquiring the debt,

████████████████████████████████████████████████ ████████████████████████ (Scolnick Decl., Ex. 28 at 5; Ex. 29 at 3–4, 6.)  ██████████████████████████████████ Yucaipa also played a key role in obtaining more than $300 million in exit financing for Allied and ensuring Allied's successful exit from bankruptcy.  (*Id.* Ex. 126 at 6; Ex. 127 at 93–94.)

**2.    Allied's Joint Plan of Reorganization in the prior bankruptcy.**

In March 2007, Allied, Yucaipa, and the Teamsters co-sponsored a Joint Plan of Reorganization that allowed Allied to preserve thousands of jobs.  (Scolnick Decl., Ex. 6 at 235–236; Ex. 126 at 6; Ex. 30 at 1 (¶ 3).)  The Georgia bankruptcy court approved the Joint Plan, and Allied exited bankruptcy in May 2007 with a de-leveraged capital structure.  (*Id.* Ex. 6 at 235–236; Ex. 128; Ex. 30 at 1–2 (¶ 4).)

Under the Joint Plan, the shares of Allied's old stock were cancelled, and Allied's debt, including the portion held by Yucaipa, was converted into the reorganized Allied's common stock.  (Scolnick Decl., Ex. 21 at 2, 51 (§ 7.12).)  Thus, upon exiting the prior bankruptcy, Yucaipa held a majority— ████████████ —of Allied's equity.  (*Id.* Ex. 6 at 153–54.)

The approved Joint Plan also provided that the reorganized Allied would enter into a Management and Monitoring Services Agreement ("MMSA") with Yucaipa.  (Scolnick Decl., Ex. 21 at 48 (§ 7.2).)  On May 29, 2007, Yucaipa and Allied entered into the MMSA, which provided, among other things, ████████████████████████

████████████████████████████████

███████████████████████████

████████████████████████████████

████████████████████████

███ (*Id.* Ex. 32 at 7–8 (§ 7(b)(iii)).) ████████

██████████████████████████████

██████████████████████████

██████████████████████ (*Id.* at 8 (§ 7(c)).) ████████

████████████████████████████████

(*Id.* at 5 (§ 6(a), (b)).)  The Georgia bankruptcy court expressly approved the MMSA in connection with the Joint Plan.  (*Id.* Ex. 128 at 32–33; *see id.* Ex. 129 at 75 (Proposed MMSA).)

The Joint Plan also provided that the reorganized Allied would have a five-member board of directors.  (Scolnick Decl., Ex. 21 at 48–49 (§ 7.2).)  Under the Joint Plan, the then-existing Creditor's Committee was to select one board member that was "reasonably acceptable" to Yucaipa and Yucaipa could select three board members.  (*Id.* at 48 (§ 7.2).)  The new CEO of Allied, whom Yucaipa could select but who had to be "reasonably acceptable" to the Creditor's Committee and the Teamsters, would serve as the fifth board member, in accordance with the Joint Plan.  (*Id.* at 48 (§ 7.2).)

### 3.    Allied's First and Second Lien Credit Agreements.

To finance its exit from the prior bankruptcy, Allied entered into a two-tiered financing structure with various lenders ("Lenders") comprising $265 million in first lien debt, governed by a First Lien Credit Agreement ("FLCA"), and $50 million in second lien debt, governed by a Second Lien Credit Agreement ("SLCA"). (Scolnick Decl., Ex. 6 at 157; Ex. 33 at 1; Ex. 34 at 1.) Both credit agreements were approved by the Georgia bankruptcy court in connection with the Joint Plan. (*Id.* Ex. 128 at 37–38.)

The first lien facility consisted of three types of debt: $180 million in term loans, a $35 million revolving credit facility from the CIT Group/Business Credit, Inc. ("CIT"), and $50 million in letter of credit commitments ("LC Commitments"). (*Id.* Ex. 33 at 29 (§ 1.1), 42 (same), 45 (same), Appendix A-3.) The FLCA and SLCA were secured by a pledge of substantially all of Allied's assets, and both contained fixed interest rates. (*Id.* at 2, 62–63 (§ 2.8); Ex. 34 at 1–2, 43–44 (§ 2.8).) The Georgia bankruptcy court approved Allied's entry into both the FLCA and SLCA. (*Id.* Ex. 128 at 37–39.)

As initially executed, the FLCA excluded Yucaipa from being an "eligible assignee" (Scolnick Decl., Ex. 33 at 17 (§ 1.1)), meaning that a holder of first lien debt could not sell, assign, or transfer any portion of its debt, rights, or obligations to Yucaipa. (*Id.* at 163–64 (§ 10.6(c)).) The SLCA contained a similar provision. (*Id.* Ex. 34 at 16 (§ 1.1), 136 (§ 10.6(c)).)

Further, the FLCA provided for a "Requisite Lender" that was entitled to take certain actions and exercise particular remedies (or refrain from doing so) on behalf of all Lenders. (Scolnick Decl., Ex. 33 at 135 (§ 6.13), 143 (§ 7.11(a)), 154 (§ 9.7), 160 (§ 10.5(a)).) Under the FLCA, the Requisite Lender was one or more Lenders holding more than 50% of the term loans, LC Commitments, and revolving credit. (*Id.* at 41 (§ 1.1).)

### C.    The Impact of the Great Recession.

At the time of Allied's May 2007 exit from the prior bankruptcy, the court found that Allied demonstrated that it had adequate capitalization, a strong relationship between management and labor, and a solid game plan for the future. (Scolnick Decl., Ex. 128 at 14.)

What happened next was a shock to the global economy.

By December 2007, the Great Recession had begun, and the automotive market imploded along with much of the rest of the global economy. (Scolnick Decl., Ex. 13 at 104.) For example, in 2007, automotive production in North America was around 11 million units, but by 2009 it dropped to around 5.8 million units. (*Id.* Ex. 35 at 6; *see id.* Ex. 13 at 105.) ████████

███████████████████████████████████████████████████████████████████

(*Id.* Ex. 13 at 105.) ██████████████████████████████████████████████

████████ (*Id.* at 108.) Because of the steep decline in auto manufacturers' production output, manufacturers were transporting far fewer cars to dealers, so ██████████████████

███████████████████████████████████████████████████████████████████

(*Id.* Ex. 36 at 8; Ex. 37 at 8.) ████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████ (*Id.* Ex. 7 at 715–16; Ex. 15 at 240.)

**D.      Mid-2008:  Yucaipa Steps Up to Deleverage Allied's Balance Sheet Pursuant to a Third Amendment to the Credit Agreements.**

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████ (Scolnick Decl., Ex. 38 at 2; Ex. 6 at 347–48.) Under those circumstances, Yucaipa considered making an investment in Allied's debt—which it believed could benefit Allied and all its stakeholders. (*Id.* Ex. 38 at 2–3; Ex. 6 at 347–48, 367; Ex. 30 at 5 (¶ 11); Ex. 39.) Specifically, Yucaipa intended to contribute a portion of the acquired debt to Allied's equity, which would deleverage Allied's balance sheet and positively affect Allied by increasing customer confidence and avoiding the triggering of any defaults under the credit agreements. (*Id.* Ex. 6 at 339; Ex. 38 at 3; Ex. 30 at 3 (¶ 7); Ex. 40.)

However, both the FLCA and SLCA precluded Allied's Lenders from assigning their debt to Yucaipa because it was not an "Eligible Assignee." Accordingly, for the deleveraging transaction to occur, Yucaipa, Allied, and its Lenders negotiated amendments to the FLCA and

SLCA that would allow Yucaipa to become an "Eligible Assignee." (Scolnick Decl., Ex. 41 at 2 (§ 2.1); Ex. 42 at 2 (§ 2.1)].)

██████████████████████████████████████████████████

████████████████████████ (the "Special Committee") ███████████████

████████████████████████████████████████ (Scolnick Decl., Ex. 43 at 1–2, 5–7.) On April 28, 2008, the Special Committee approved and recommended to the Allied board that Allied enter into a Third Amendment to the FLCA ("Third Amendment")[2] and a similar amendment to the SLCA. (*Id.* Ex. 44 at 2; Ex. 45 at 2–5; *see id.* Ex. 41; Ex. 42.) The amendments passed with the approval of the majority of Allied's Lenders. (*Id.* Exs. 41–42.)

The Third Amendment to the FLCA expressly allowed Yucaipa to become a "Lender" and "Eligible Assignee." (Scolnick Decl., Ex. 41 at 2 (§ 2.1), 6 (§ 2.7(e) adding § 10.6(j)).) But it also restricted Yucaipa's rights as a Lender with respect to any first lien debt it acquired. In particular, the Third Amendment purported to:

- Limit the amount of Term Loans that Lenders could sell or assign to Yucaipa to the lesser of 25% of the total Term Loan Exposure or $50 million. (*Id.* Ex. 41 at 6–7 (§ 2.7(c), (e) adding § 10.6(j)(i)).)

- Restrict the voting rights Yucaipa would otherwise have as a Lender "for all purposes." (*Id.* at 4–5 (§ 2.7(a)); *see also id.* at 7 (§ 2.7(e) adding § 10.6(j)(iv)).)

- Require Yucaipa to contribute no less than 50% of the aggregate principal amount of any Term Loans it acquired to Allied's capital (the "Capital Contribution Provision"), with those Term Loans then deemed to be cancelled. (*Id.* at 7–8 (§ 2.7(e) adding § 10.6(j)(iii), and § 2.7(f) adding section § 10.6(k)(iii)).)

- Restrict Yucaipa's legal rights through a covenant not to sue specific to Yucaipa. (*Id.* at 7–8 (§ 2.7(e) adding § 10.6(j)(iv)).)

As discussed further below, the Third Amendment also contained several other important provisions relevant to this motion—including a covenant not to sue Yucaipa and key limitations

---

[2]  The first two amendments to the FLCA and SCLA are irrelevant to these cases.

on the remedies that could be sought against Yucaipa.  (*See* Scolnick Decl., Ex. 41 at 8 (§ 2.6(e) adding § 10.6(j)'s limitation on who can sue for breach of § 10.6(j)), 9 (§ 2.7(f) adding § 10.6(k)(v)'s covenant not to sue provision); *see also* Section V.A, *infra*.)

Unlike the Third Amendment to the FLCA, the Third Amendment to the SLCA did not contain a Capital Contribution Provision or limit the amount of debt that Yucaipa could acquire. (*See* Scolnick Decl., Ex. 42.)  Yucaipa opted not to acquire any first lien debt at that time, and instead it acquired ███████ of the outstanding ███████ in Allied's second lien debt.  (*Id.* Ex. 30 at 5 (¶ 12); Ex. 46.)  As anticipated, Yucaipa then voluntarily converted ███████ of its newly acquired second lien debt to Allied's equity, in a "debt-to-equity swap" that deleveraged Allied's balance sheet.  (*Id.* Ex. 30 at 5 (¶ 12).)  This transaction allowed Allied to avoid a covenant default and a going-concern opinion from its auditors.  (*Id.*)

### E.    Fall 2008:  Allied's Negotiations with Lenders to Restructure Its Debt.

Despite Yucaipa's debt-to-equity swap, Allied's financial situation continued to deteriorate due to the impact of the Great Recession.  On August 15, 2008, Allied notified its Lenders that it was in default under the FLCA.  (Scolnick Decl., Ex. 47 at 3; Ex. 30 at 5 (¶ 13).) Allied also informed the Lenders that it wished to discuss another amendment to the FLCA that would reset certain covenants.  (*Id.* Ex. 48 at 27–31; Ex. 2 at 146; Ex. 30 at 5 (¶ 13).)

In late September of 2008, Allied and several First Lien Lenders, ███████, entered a Forbearance Agreement to afford Allied and its Lenders time to negotiate a resolution of the defaults.  (Scolnick Decl., Ex. 49.)  This was done in lieu of exercising the remedies that the Lenders could have enforced at that time.  (*Id.* at 2.)



(*Id.* Ex. 49 at 3–5, 10, 11 (§§ 2(a)–(c), 6(c), 8(a)).)  The Forbearance Agreement was renewed in late October of 2008, ███████ ███████ (*Id.* Ex. 50.)

The forbearance period expired in mid-November 2008, but the Lenders did not require another Forbearance Agreement, and no deal was reached to restructure Allied's debt or cure its defaults.  (Scolnick Decl., Ex. 50 at 3 (§ 2(a)); Ex. 51 at 1.)  With the absence of a forbearance agreement, the Lenders were free to exercise remedies under the FLCA against Allied, but chose not to—even though Allied remained in default under the FLCA through the May 2012 involuntary bankruptcy filing.

**F.    Early February 2009:  Yucaipa and Allied Launch a Tender Offer.**

As the automotive industry continued to decline, Lenders holding the majority of first lien debt, including Spectrum, actively explored selling their debt—and with it, the Requisite Lender position—to Yucaipa.  (Scolnick Decl., Ex. 51 at 2; Ex. 52 at 1–2; Ex. 53 at 1.)  During a December 10, 2008 board meeting, Defendant Derex Walker, chairman of the Allied board,

██████████████████████████████████████████████████████████

██████████████████████.  (*Id.* Ex. 51 at 2.)

To effectuate this transaction, Allied and its Lenders would again need to amend the FLCA to remove the Third Amendment's restrictions on assigning first lien debt to Yucaipa, amend the financial covenants, and provide Allied with the ability to repurchase its own debt.  (Scolnick Decl., Ex. 51 at 2.) ███████████████████████████████████

████████████████████████████████████████████ (*Id.* Ex. 51 at 4; Ex. 54 at 2–3; Ex. 55 at 1–2.) ███████████████████████████████████████████

████████ (*Id.* Ex. 51 at 4.)

However, by February 2009, Yucaipa was unable to complete the individual debt purchases with the lender group with which it had been negotiating.  (Scolnick Decl., Ex. 7 at 521–24; Ex. 56; Ex. 30 at 8–9 (¶¶ 20–21).)  Thus, instead, Yucaipa decided to make a tender offer to all First Lien Lenders, including BD/S.  (*Id.* Ex. 57; Ex. 30 at 9 (¶ 21).)  On February 4, 2009, Allied and Yucaipa launched a tender offer ████████████████████████████

████████████████ (*Id.* Ex. 57.)  However, unbeknownst to Yucaipa, another entity—ComVest Investment Partners ("ComVest")—also had been separately negotiating with Lenders to

purchase the majority of the first lien debt.  (*Id.* Ex. 31; Ex. 60.)  The day before Yucaipa

circulated its tender offer, ███████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████    (*Id.* Ex. 61 at 2, Ex. A.)

**G.**    **Mid-to-Late February 2009:  ComVest Acquires the Majority of Allied's First Lien Debt.**

By February 19, 2009, without any forewarning to Yucaipa or Allied, ComVest acquired

approximately 54% of Allied's first lien debt and became the Requisite Lender under the FLCA.

(Scolnick Decl., Exs. 58–59; Ex. 30 at 11 (¶ 26).)  Thus, Yucaipa's tender offer failed.

Allied, Yucaipa, and several of the Lenders—including Black Diamond—believed that

ComVest wanted to take Allied into a second bankruptcy, which would likely lead to a

liquidation.  (Burkle Decl. ¶ 4; Walker Decl. ¶ 5; Scolnick Decl., Ex. 62; Ex. 63 at 1–2; *see id.*

Ex. 31.)  A potential bankruptcy was deeply concerning to these stakeholders, as Allied had just

emerged from bankruptcy less than two years beforehand and Allied's management believed that

the company would lose critical customer support.  (Opdeweegh Decl. ¶ 4; Walker Decl. ¶ 5;

Scolnick Decl., Ex. 51 at 3–4; Ex. 12 at 167; Ex. 64 at 97–98; Ex. 65; Ex. 15 at 300 ██████

██████████████████████████████████████████████████████████████

██████████████).)  Moreover, another car hauler, PTS, had just gone into bankruptcy in

2008, ████████████████████████████████████████—when it was

forced to liquidate.  (Scolnick Decl., Ex. 8 at 289–90; Ex. 30 at 5–6 (¶ 13); Ex. 51 at 3.)  ████████

████████████████████    (*Id.* Ex. 6 at 136; Ex. 11 at 65.)  ComVest's acquisition also caused

Allied's customers to lose confidence in Allied because they were concerned about the

company's ongoing viability and perceived lack of stability.  (*Id.* Ex. 65 at 2; Ex. 66 at 2; *see id.*

Ex. 16 at 40–41; Burkle Decl. ¶ 3; Walker Decl. ¶ 5.)

Thus, in March 2009, Yucaipa began negotiating with ComVest to purchase ComVest's

majority stake in Allied's first lien debt.  (Scolnick Decl., Exs. 67–73.)  As with the tender offer,

the transaction with ComVest was going to require an amendment to the FLCA to permit

Lenders holding a majority stake in the first lien debt to assign that debt to Yucaipa, without the Third Amendment's voting- or capital-contribution restrictions.  (*Id.* Ex. 67 at Ex. A (Proposed Fourth Amendment); *see id.* at 3 ███████████████████████████████████████.)

On March 6, 2009, ████████████████████████████████ ████████████████████████████████████████ (Scolnick Decl., Ex. 63 at 3–4; Ex. 74.)  However, the March 2009 transaction did not close—so Yucaipa and ComVest continued to negotiate over the following months.  (*Id.* Exs. 71–73; Ex. 17 at 119–20.)

**H.  August 2009:  Allied's Non-Payment of Interest to Lenders.**

While negotiations between Yucaipa and ComVest were ongoing, Allied's financial situation remained dire. ████████████████████████████████ ██████████████████████████████████████ ████████████████████████████ (Walker Decl. ¶ 5; Scolnick Decl., Ex. 75 at 1–2; Ex. 16 at 47; Ex. 65 at Ex. 66 at 2; *see* Scolnick Decl., Ex. 65.) ████████████████████████████ ██████████████████████████████████████ (Scolnick Decl., Ex. 75 at 1.)

████████████████████████████████████ ████████████████████████████ (Scolnick Decl., Ex. 75 at 1–2.) ██████████ ███████████████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████████████████ ████████████████ (*Id.* at 1–2 (emphasis added).) ████████████ ██████████████████████████████████████ ████████████████ (*Id.* at 2.)  This constituted yet another default for Allied, which had continued to operate without a forbearance agreement since November 2008.  (*Id.* Ex. 14 at 303–05; Ex. 30 at 20 (n.5); Ex. 75 at 2.)

I.    **August/September 2009:  The Fourth Amendment and Yucaipa's Acquisition of ComVest's Debt.**

By mid-August 2009, Yucaipa and ComVest were ready to move forward with their deal.



(Scolnick Decl., Ex. 76 at 9.)

(Scolnick Decl., Ex. 10 at 328–30; Ex. 77 at 1–2; Ex. 78.)

. (*Id.* Ex. 79 at 1, 11–13; Ex. 77 at 1–2.)

That same day, Yucaipa and ComVest entered into an assignment and assumption agreement and loan purchase agreement under which Yucaipa acquired ComVest's majority position in Allied's first lien debt—which made Yucaipa the Requisite Lender under the FLCA. (Scolnick Decl., Exs. 80–81.)

From the time the Fourth Amendment was executed and Yucaipa purchased ComVest's debt, BD/S believed the Fourth Amendment and the assignment of debt were invalid—because the Fourth Amendment was enacted with *majority* Lender support, not *unanimous* support—and breached the Third Amendment; they discussed this with their counsel, each other, and other Lenders.  (Scolnick Decl., Ex. 87 at 1 (



); Ex. 82 at 2; *id.* ¶ 85, Ex. 83 at 1

); Ex. 4 at 278–80; Ex. 86 at 195 (

).)  Even before an agreement between Yucaipa and ComVest was reached, BD/S

discussed how to prevent or challenge the assignment with CIT and each other.  (*Id.* Ex. 88

███████████████████████████████████████████████); Ex. 89 at 2

█████████████████████████████████████████████████████████████

████████████); Ex. 84 at 2 ████████████████████████████████████████

█████████████████████).)

Nevertheless, when Yucaipa—in its capacity as Requisite Lender—directed CIT to

terminate certain LC Commitments under the FLCA, resulting in a release of ████████████,

BD/S accepted its *pro rata* portion of the funds.  (Scolnick Decl., Ex. 30 at 16–17 (¶ 45).)

**J.      Late 2009:  Allied and Yucaipa Pursue Litigation Against CIT.**

Shortly after acquiring ComVest's debt, Yucaipa requested that CIT, as the

Administrative Agent, recognize Yucaipa as the Requisite Lender on its register of Lenders.

(Scolnick Decl., Ex. 90 at 1–2.)  But CIT refused to do so, and, at the urging of BD/S, it

challenged the validity of the Fourth Amendment.  (*Id.* Ex. 7 at 616; Ex. 91 at 1–2; Ex. 92.)  In

fact, ██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████  (*Id.* Ex. 85 at 1–2; Ex. 4 at 292–93.)  In light of the uncertainty

that CIT's refusal to recognize it as Requisite Lender created, on November 13, 2009, Allied and

Yucaipa sought declaratory relief to determine its status as Requisite Lender and a determination

of the validity of the Fourth Amendment.  (*Id.* Ex. 93 at 20 (¶¶ 65–66).)  Approximately two

years later, Allied, Yucaipa, and CIT settled all claims related to the Georgia Action.  (*Id.* Ex.

94.)  Under that settlement, CIT agreed not to challenge the validity of the Fourth Amendment or

Yucaipa's status as Requisite Lender.  (*Id.* at 11–12.)  CIT also recognized Yucaipa's status as a

"Lender" under the FLCA.  (*Id.* Ex. 18 at 627.)

**K.    Late 2011 and Early 2012:  Lenders' Negotiations to Sell First Lien Debt to Jack Cooper Transportation.**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

(Scolnick Decl., Exs. 95–98.)[3]  JCT was negotiating separately with Yucaipa, BD/S, and CIT during this time.  (*See, e.g.*, *id.* Exs. 96–100.)  Between December 2011 and May 2012, ████████

████████████████████████████████████████████████████████

████████████████████  (*See, e.g.*, *id.* Exs. 96–97, 99, 101–104.)  The proposals were always subject to numerous contingencies, ████████████████████████████████████

████████████████████████, and the parties never got close to a final deal.  (*Id.* Ex. 101 at 4

(████████████████████████████████████████████████████████

████████████████████████████████████████████████);  Ex. 96 at 5

████████████████████████████████████████████████████

████████████);  Ex. 97 at 4 (██████████████████████████████████████

████████);  Ex. 100 at 1;  Ex. 105 (██████████████████);  Ex. 19 at 102, 110.)

**L.    January 2012: BD/S Sues Yucaipa in New York State Court.**

While JCT Negotiations were ongoing, BD/S filed a lawsuit against Yucaipa in New York state court, seeking a declaration that the Fourth Amendment was invalid and that Yucaipa was not the Requisite Lender.  (Scolnick Decl., Ex. 130.)  The New York state court eventually issued a written decision in March 2013, finding that the Fourth Amendment was invalid because it was not passed with unanimous consent from all Lenders, and therefore Yucaipa was not

---

[3]  JCT and its principal, Mike Riggs, had been negotiating with Allied and its stakeholders for several years at that point in an effort to acquire a controlling stake in Allied.  However, the Lender Complaint alleges that Defendants acted wrongfully regarding the negotiations with JCT only "[i]n late 2011 and early 2012" (Lender Compl. ¶ 135(b)); therefore, the negotiations during this time period are the only ones relevant to the Lender's Complaint.  The Estate Complaint alleges no wrongdoing by Defendants regarding negotiations and discussions with JCT at any other time.

Requisite Lender.  *BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, 2013 WL 1290394, at *4, *6 (N.Y. Sup. Ct. Mar. 8, 2013).  Yucaipa appealed, and the New York appellate court reversed summary judgment as to Black Diamond, finding that there were triable issues of material fact as to whether Black Diamond had waived its ability to challenge the Fourth Amendment and Yucaipa's Requisite Lender status through Black Diamond's "active involvement" in Yucaipa's efforts to become Requisite Lender.  *See BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, 112 A.D.3d 509, 511–12 (N.Y. App. Div. 2013).

**M.     May 2012:  Black Diamond and Spectrum Force Allied into Bankruptcy.**

On May 17, 2012, the same day that BD/S informed JCT that it decided not to continue with negotiations, BD/S filed a petition for an involuntary bankruptcy against Allied in this Court.  (Scolnick Decl., Ex. 102; Ex. 124.)  A few weeks later, Allied consented to the bankruptcy, and its affiliates filed voluntary Chapter 11 petitions for relief.  (*Id.* Ex. 131.)

### III.     LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a "party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Rule 56 requires a court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Moreover, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Under Rule 56(a), partial motions for summary judgment are appropriate as to portions of claims that are legally defective—including those portions based on acts falling outside of the statute of limitations.  *See*, *e.g.*, *Southersby Dev. Corp. v. Borough of Jefferson Hills*, 852 F.

Supp. 2d 616, 623 (W.D. Pa. 2012) (granting partial summary judgment "to the extent" plaintiff's claims were "premised on conduct that occurred" outside the limitations period).

## IV.    THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR YUCAIPA ON THE LENDER COMPLAINT'S CONTRACT-BASED CLAIMS

The Lender Complaint's Contract-Based Claims (breach of contract and breach of the duty of good faith and fair dealing) fail for two independent reasons.

First, these Contract-Based Claims are completely time-barred under the applicable three-year statute of limitations, which this Court has already held is the applicable limitations period.

Second, the Trustee has no evidence on the element of damages resulting from the majority of allegations supporting the Contract-Based Claims, and thus these claims fail as a matter of law.  The only Contract-Based allegations in the Lender Complaint that could arguably survive are those asserting a breach of the Capital Contribution Provision and those concerning the JCT Negotiations, because the Trustee has at least identified some evidence—which is disputed—related to those allegations.

### A.    The Lender Complaint's Contract-Based Claims are Time-Barred.

The Lender Complaint was filed on November 14, 2014.  Under the applicable Delaware three-year statute of limitations, the Lenders' Contract-Based Claims are time-barred unless they accrued on or after November 19, 2011.  They did not, so Yucaipa is entitled to judgment in its favor as a matter of law on these claims.

#### 1.    Delaware's Three-Year Statute of Limitations Applies.

Delaware Code Title 10, Section 8106 specifies a three-year limitations period for the Contract-Based Claims at issue here.  *See In re Fruehauf Trailer Corp.*, 250 B.R. 168, 184 (D. Del. 2000) (breach of contract); *Williams v. Chrysler Corp.*, 991 F. Supp. 383, 390 (D. Del. 1998) (breach of covenant of good faith and fair dealing).[4]

---

[4]  Under Delaware Code Title 10, section 8106, "no action based on a statute, and no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action."  10 Del. Code § 8106.

This is true notwithstanding the generic choice-of-New-York-law clauses in the FLCA and Third Amendment.  (Scolnick Decl., Ex. 33 at 168 (§ 10.14); Ex. 41 at 15 (§ 7.6).)  Because this action is pending in a federal court in Delaware, this Court must first look to Delaware's choice-of-law rules to determine whether "the Delaware or New York statute of limitations applies."  *In re Winstar Commc'ns, Inc.*, 435 B.R. 33, 44 (Bankr. D. Del. 2010); *see Collins v. Mary Kay, Inc.*, 874 F.3d 176, 183 (3d Cir. 2017) (holding district courts apply the choice-of-law rules of the forum state).

Under Delaware law, "[c]hoice of law provisions in contracts are generally understood to incorporate only substantive law, not procedural law."  *Am. Energy Techs., Inc. v. Colley & McCoy Co.*, 1999 WL 301648, at *2 (D. Del. Apr. 15, 1999).  And it is well-settled in Delaware that "[t]he issue of statute of limitations is a procedural issue, not a substantive issue for conflict of law purposes."  *Norman v. Elkin*, 2007 WL 2822798, at *3 (D. Del. Sept. 26, 2007); *see David B. Lilly Co. v. Fisher*, 799 F. Supp. 1562, 1568 (D. Del. 1992).  Consequently, choice of law provisions "do not apply to statutes of limitations, unless the reference [to statute of limitations] is express" (*Gluck v. Unisys Corp.*, 960 F.2d 1168, 1179 (3d Cir. 1992)), which of course is not the case here.  Therefore "the law of the forum [here, Delaware] generally determines whether an action is barred by the statute of limitations."  *In re Winstar*, 435 B.R. at 44.

Indeed, if there were any doubt about whether Delaware's or New York's statute of limitations applied to the claims here, this Court resolved it more than seven years ago.  Specifically, this Court applied Delaware's three-year statute of limitations—adopting the exact reasoning set forth above and argued by BD/S (*see* Scolnick Decl., Ex. 132 at 108; Ex. 133 at 22–23)—and dismissed Yucaipa's cross-claim against BD/S.

In rejecting Yucaipa's argument, the Court explained:  "The Delaware statute of limitations is applicable here based on the fact that this case was brought in Delaware, [a] breach of contract claim brought in a federal court setting in Delaware, so the Delaware statute applies."  (Scolnick Decl., Ex. 132 at 108; Ex. 134 at 3.)  Even though the FLCA contained "a bald choice of law provision," the Court found that "there's nothing in [the FLCA] or deal that is so involved

20

in New York to provide that the New York statute of limitations would have to apply[.]"  (*Id.* Ex. 132 at 108.)  The Court also determined in the alternative that Delaware's "borrowing statute applies which would use the shorter three year statute of limitations."  (*Id.*)[5]

The ruling that Delaware's statute of limitations applies is now the law of the case,[6] as this Court has interpreted that doctrine.  (Scolnick Decl., Ex. 135.)  The doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.  The rule of practice promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (internal citation omitted).

In the "absence of extraordinary circumstances, [the court] should generally adhere to its own prior rulings" (*Benjamin ex rel. Yock v. Dep't of Public Welfare of Penn.*, 701 F.3d 938, 949 (3d Cir. 2012)), including "when a court decides upon a rule of law." *In re Resyn Corp.*, 945 F.2d 1279, 1281 (3d Cir. 1991).  This doctrine applies to "subsequent rulings by the same judge in the same case or a closely related one [and] to rulings by different judges at the same level." *In re Radnor Holdings Corp.*, 564 B.R. 467, 482 (D. Del. 2017) (quoting *Casey v. Planned Parenthood*, 14 F.3d 848, 856 n.11 (3d Cir. 1994)); *see In re Motors Liquidation Co.*, 590 B.R. 39, 62 (S.D.N.Y. 2018) (finding law of the case still applies where "certain parties did not participate in the earlier ruling").  The doctrine also applies to "separate adversary proceedings in the same bankruptcy case." *In re Pilgrim's Pride Corp.*, 442 B.R. 522, 530 (Bankr. N.D. Tex. 2010); *see also in re La Paloma Generating Co.*, 2020 WL 224569, at *3 (Bankr. D. Del. Jan.

---

[5]  Delaware's borrowing statute provides that "[w]here a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state . . . where the cause of action arose, for bringing an action upon such cause of action."  10 Del. Code § 8121.

[6]  Yucaipa has appealed other aspects of this ruling, and the appellate case is pending. *See* Notice of Appeal, *Yucaipa Am. Alliance Fund II L.P. v. ASHINC Corp.*, No. 18-1467 (D. Del. Sept. 24, 2018), ECF No. 1.

13, 2020) (concluding the doctrine applies to decisions "made in a main bankruptcy proceeding and is binding on parties to a subsequent adversary proceeding").

Further, the Trustee is judicially estopped from attempting to argue that New York's longer limitations period should apply here. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996) ("The basic principle of [judicial estoppel] . . . is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.") (citation omitted). As noted above, BD/S, the Trustee's predecessors-in-interest, successfully argued for the application of Delaware's three-year statute in defeating Yucaipa's cross-claim in the Allied Adversary Proceeding.

### 2.    The Lender Complaint's Allegations of Contract Breach.

All the allegations that support the Lender Complaint's Contract-Based Claims arise from the ComVest transaction in August 2009, when Yucaipa acquired the majority of Allied's first lien debt and became the Requisite Lender under the FLCA—purportedly in breach of the Third Amendment. This occurred more than five years before the filing of the Lender Complaint, rendering the claims untimely by more than two years.

Specifically, the Lender Complaint's second cause of action asserts that Yucaipa breached the FLCA, as amended by the Third Amendment, in the following ways:

- Acquiring more first lien debt from ComVest in August 2009 than permitted under the Third Amendment (Lender Compl. ¶¶ 117–120; 123(a));

- Declaring itself to be the Requisite Lender as a result of an impermissible acquisition of First Lien Debt (*id.* ¶ 121; *see also id.* ¶ 123(b));

- Breaching the Third Amendment's provisions related to voting rights "by improperly acting as Requisite Lender" (*id.* ¶ 122);

- Using its status as Requisite Lender "to neutralize the First Lien Lenders, giving the debtors a 'free pass' to ignore" the FLCA's provisions, and to protect its equity investment by precluding a restructuring of Allied (*id.* ¶ 123(c)–(d));

22

- Violating the Third Amendment's Capital Contribution Provision by not making a capital contribution of at least 50% of the aggregate principal of the Term Loans that Yucaipa acquired from ComVest on August 21, 2009, within 10 days of acquiring that debt (*id*. ¶¶ 54 (second bullet), 101);

- Causing the First Lien Lenders to incur unnecessary legal costs regarding the impropriety of Yucaipa's status as Requisite Lender and the invalidity of the purported Fourth Amendment.  (*Id*. ¶ 123(e).)  This refers to Allied and Yucaipa's declaratory relief action against CIT and BD/S's New York lawsuit against Yucaipa filed in January 2012 (*id*. ¶¶ 80–90);

- Hijacking negotiations with JCT, while acting as Requisite Lender, starting in November or December of 2011, by demanding beneficial and favorable terms, which supposedly prevented Allied from consummating a sale with JCT and caused the Lenders to incur unnecessary legal costs.  (*Id*. ¶ 124.)

The Lender Complaint's third cause of action against Yucaipa asserts an alleged breach of the covenant of good faith and fair dealing and alleges that, "[t]o the extent that Yucaipa's wrongful usurpation of Requisite Lender status and its subsequent actions as purported Requisite Lender were not explicitly prohibited by the [FLCA], as amended by the Third Amendment, they are a violation of the covenant of good faith and fair dealing."  (*Id*. ¶ 129.)

### 3.    The Lender Complaint's Contract-Based Claims Accrued in August 2009.

The Lender Complaint's Contract-Based Claims accrued in August 2009, when Yucaipa supposedly breached the FLCA/Third Amendment by acquiring ComVest's majority position in Allied's first lien debt and becoming the Requisite Lender.

In Delaware, "a contract claim accrues at the time of the breach."  *Williams*, 991 F. Supp. at 390.  The three-year limitations period begins running "at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action."  *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 1594085, at *18

(Del. Ch. June 29, 2005) ("The law in Delaware is crystal clear that a claim accrues as soon as the wrongful act occurs.").

The Lender Complaint's allegations that relate to breaches of the FLCA and the Third Amendment are all time-barred.  Specifically, these allegations include:  (a) Yucaipa acquired more first lien debt from ComVest in August 2009 than it was contractually permitted to acquire (Lender Compl. ¶¶ 117–120, 123(a)); (b) Yucaipa "declared itself to be the Requisite Lender" in August 2009 as a result of acquiring ComVest's position (*id.* ¶ 121; *see also id. ¶* 123(b)); (c) Yucaipa breached the Third Amendment's Capital Contribution Provision by not making the required capital contribution within 10 days of acquiring ComVest's position in August 2009 (*id.* ¶¶ 54 (second bullet), 101); (d) Yucaipa breached the Third Amendment's provisions related to voting rights "by improperly acting as Requisite Lender" (*id.* ¶ 122); and (e) Yucaipa engaged in an "improper usurpation of Requisite Lender status" (*id.* ¶¶ 117–125, 129).

Although the Lender Complaint also asserts specific examples of what Yucaipa allegedly (wrongfully) did once it breached the FLCA by acquiring the Requisite Lender status in August 2009, these allegations do not change the accrual date for the Contract-Based Claims.  The reason is simple:  None of these post-August 2009 allegations are themselves breaches of any term of the FLCA or Third Amendment.  There is no provision in the FLCA or the Third Amendment that precludes the Requisite Lender from doing such things as (a) allowing Allied not to make interest or principal payments (Lender Compl. ¶ 123(c)–(d)); (b) precluding a restructuring (*id.*); (c) bringing or defending litigation regarding the validity of Requisite Lender status (*id.* ¶ 123(e)); negotiating with a third party to sell debt and demanding "beneficial and favorable terms" for itself, compared with other Lenders (*id.* ¶ 124).[7]

---

[7]  Under both New York and Delaware law, "a breach of contract cause of actions fails as a matter of law in the absence of any showing that a specific provision of the contract was breached."  *Gianelli v. RE/MAX of N.Y., Inc.*, 144 A.D.3d 861, 862 (N.Y. App. Div. 2016) (affirming summary judgment where plaintiff failed to identify specific contract provision); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 901 A.2d 106, 116 (Del. 2006) (dismissing breach

Instead, under the Lender Complaint, the post-August 2009 allegations are simply the purported "effects" of Yucaipa becoming Requisite Lender through its alleged breach of the Third Amendment in August 2009. What a defendant arguably does to take advantage of a breach of contract does not "toll" the statute of limitations or create new, later accrual dates. To the contrary, under Delaware's accrual rules, these post-August-2009 allegations do not alter the August 2009 accrual date because "the determinative issue is when the specific acts of alleged wrongdoing occurred, and not when their effect is felt." *In re Marvel Entm't Grp., Inc.*, 273 B.R. 58, 74 (D. Del. 2002); *see also Commonwealth Land Title Ins. Co. v. Funk*, 2014 WL 8623183, at *7 (Del. Sup. Dec. 22, 2014) ("Under Delaware law, a cause of action for breach of contract accrues at the time of the breach, not when the actual harm occurs.").[8]

For example, in *In re Coca-Cola Enters., Inc.*, 2007 WL 3122370 at *6 (Del. Ch. Oct. 17, 2007), the Chancery Court dismissed a claim as time-barred under the three-year statute because the claims at issue hinged on the terms and conditions of a contract entered in 1986. The court explained that the plaintiffs had "attempted to avoid dismissal by claiming that they are challenging the actions taken in the last three years, but concede that the contract 'may have provided the means by which the Defendants effectuated'" the alleged breach. *Id.*

This District's decision in *In re Marvel* is also instructive. There, the defendants argued that a claim was time-barred because the three-year statute of limitations began to run in 1993, when the parties entered an allegedly unfair tax-sharing agreement. 273 B.R. at 72. But the

---

of contract claim because plaintiff "ha[d] not identified any express contract provision that was breached").

[8] Indeed, BD/S themselves argued when seeking dismissal of Yucaipa's cross-claim in the Allied Adversary Action that "a cause of action for breach of contract accrues, and the statute of limitations commences, when the contract is breached. *See In re Marvel Entm't Grp., Inc.*, 273 B.R. 58, 80 (Bankr. D. Del. 2002) ('Under Delaware law, the statute of limitations for breach of contract claims begins to run when the contract is breached.'); *Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 402 (1993) (breach of contract action accrues, and statute begins to run, at the time of the breach, even if no damage occurs until later)." (Scolnick Decl., Ex. 136 at 23.)

plaintiffs responded that the statute did not begin to run until 1997, when defendants first engaged in the alleged wrongful conduct that caused plaintiffs' injury. *Id.* The court agreed with the defendants, explaining that when a cause of action arises out of an allegedly unfair contract, "the limitations period begins to run when the contract is formed." *Id.* at 73. Thus, "the cause of action accrued when the contract fixed the parties' rights (in 1993)" and not when the harmful legal obligations arose, which reiterates the principle that in identifying "when a cause of action accrues, 'the determinative issue is when the specific acts of alleged wrongdoing occurred, and not when their effect is felt.'" *Id.* at 74 (citation omitted).

Accordingly, the Lender Complaint makes clear that the post-August-2009 allegations are only the *effects* of what the Trustee asserts is the actual breach of contract—Yucaipa becoming Requisite Lender. Indeed, the Lender Complaint states explicitly that only by "usurping Requisite Lender status" in August 2009 was Yucaipa able to take these various later actions. (Lender Compl. ¶¶ 123–125.) As in *Coca-Cola* and *Marvel*, then, the Contract-Based Claims all arise out Yucaipa's allegedly wrongful acquisition of Requisite Lender status—in breach of the FLCA and Third Amendment—in August 2009. These claims necessarily accrued in August 2009 under Delaware's accrual rules, regardless of whether some of the alleged "effects" were felt later as a result of Yucaipa purportedly exercising its Requisite Lender status.

Lastly, under Delaware's accrual rules as set forth above, this Court can and should grant summary judgment to Yucaipa on the Contract-Based Claims regardless of when BD/S learned of these claims. *See Wal-Mart Stores*, 860 A.2d at 319 (limitations period begins to run "at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action"). In any event, although not a required factor with respect to the accrual rules, the evidence indisputably demonstrates that from the moment that Yucaipa acquired the ComVest debt in August 2009, BD/S believed that Yucaipa had breached the Third Amendment, BD/S believed that the Fourth Amendment was invalid, and that BD/S and other Lenders simply did not elect to pursue the remedies that they had at their disposal. (Scolnick Decl., Ex. 89 at 2; Ex. 4 at 278–80, 292–93; Ex. 84 at 2; Ex. 85 at 1–2; Ex. 87 at 1.)

26

**B.**     **Yucaipa is Entitled to Partial Summary Judgment on the Lender Complaint's Contract-Based Claims Because There is no Genuine Dispute on the Element of Damages Resulting from the Vast Majority of Yucaipa's Alleged Breaches.**

The Lender Complaint's Contract-Based Claims suffer from an additional, and independent, fatal defect:  the complete absence of evidence on the essential element of damages resulting from Yucaipa's alleged breaches.

The Trustee has put forth evidence of damages resulting from *only* two discrete allegations supporting the Lender Complaint's Contract-Based Claims—namely, the Trustee's sole damages expert has rendered an opinion that damage resulted when Yucaipa allegedly breached the Third Amendment's Capital Contribution Provision in August 2009, and when Yucaipa purportedly used its Requisite Lender status in late 2011 and 2012 to "hijack" negotiations with JCT.  But with respect to every other allegation supporting these claims, there is no evidence whatsoever of any resulting damage.  Because injury is an essential element of the Contract-Based Claims, partial summary judgment is warranted.  *See, e.g.*, *Celotex*, 477 U.S. at 322 (summary judgment is required "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

Under both New York and Delaware law,[9] proof of damages is necessary to proceed to trial.  *See, e.g.*, *Seaman v. Berman*, 239 A.D.2d 738, 739 (N.Y. App. Div. 1997) (affirming summary judgment and dismissing a breach of contract counterclaim where the party failed to create a factual issue "with respect to damages" because "[m]erely alleging that damages exist and failing to tender proof to that effect" is insufficient); *see also Deer Park Enters., LLC v. Ail Sys., Inc.*, 57 A.D.3d 711, 712 (N.Y. App. Div. 2008) (cause of action for breach of implied covenant requires resulting "damages"); *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d

---

[9]  As a preliminary matter, and as this Court determined in the Allied Adversary Proceeding, New York law governs the substantive law provisions of the contract-based claims in this case, although Delaware law governs the procedural aspects of this case, such as the applicable statute of limitations.  (Scolnick Decl., Ex. 132 at 108; *see id.* Ex. 136 at 16.)

606, 612 (Del. 2003) (elements of breach of contract claim include "resultant damage to the plaintiff"); *Kuroda v. SPJS Holdings, LLC*, 971 A.2d 872, 888 (Del. Ch. 2009) (elements of breach of implied covenant claim include "resulting damage to the plaintiff").

Here, the Trustee has no evidence of damages resulting from any of the following allegations supporting to the Lender Complaint's Contract-Based Claims:

- Yucaipa breached the FLCA/Third Amendment by acquiring more Term Loan Exposure than permitted under Section 10.6(c) (2.7(c)) of the Third Amendment (Lender Compl. ¶¶ 117–119, 123(a));

- Yucaipa breached the FLCA/Third Amendment by purchasing, and purporting to hold, LC Commitments (*id.* ¶ 120);

- Yucaipa breached the FLCA/Third Amendment by declaring itself to be Requisite Lender (*id.* ¶¶ 121, 123(b));

- Yucaipa breached various voting rights provisions of the Third Amendment by improperly acting as Requisite Lender (*id.* ¶ 122); and

- Yucaipa breached the FLCA/Third Amendment by using its Requisite Lender status to protect its equity investment and preclude a restructuring of Allied (*id.* ¶ 123(d).)

There is no evidence, and thus no genuine factual dispute, regarding damages resulting from these allegations. The Trustee produced Stephen Deckoff as the 30(b)(6) witness on the subject of damages on behalf of all the Allied Estate, the First Lien Lenders, the second lien Lenders, and the unsecured creditors. (Scolnick Decl., Ex. 9 at 17–18; Ex. 106 at 2–3.) Yet when asked about any evidence of damages resulting from Yucaipa's alleged breaches of the FLCA/Third Amendment, Mr. Deckoff consistently was unable to, or refused to, point to anything beyond the opinion of the Trustee's damages expert, Jeffrey Risius.

For instance, Mr. Deckoff was asked what damages the First Lien Lenders suffered from Yucaipa's purported violation of the Third Amendment's voting rights provisions; he testified

███████████████████████████████████████████ (Scolnick

Decl., Ex. 9 at 67–68.) Similarly, as to the amount of damages that the First Lien Lenders

suffered in connection with Yucaipa's acquisition of more term loans than permitted under the FLCA/Third Amendment, Mr. Deckoff testified, ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ (*Id.* at 5 (emphasis added).)

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████ (*See* Scolnick Decl., Ex. 107 at 6 (¶ 8(a), (b)).) ██████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████ (*Id.* Ex. 13 at 77.)

There is no dispute on this point: ██████████████████████

████████████████████████████████████████

████████████████████████████████████ (Scolnick Decl.,

Ex. 13 at 152 ██████████████████████████████████████

████████████████████████████████████████

████████████████████████████████, 151 (██████████████

████████████████████████████████████████████

████████████████████.) ██████████████████████████

████████████████████████████████████████

████████████████████████████. (*Id.* at 155.)

Therefore, there is no triable issue of fact with respect to the essential element of damages resulting from any of the allegations of Yucaipa's purported breaches arising from purchasing excess term loans and LC Commitments (Lender Compl. ¶¶ 117–120, 123(a)), declaring itself to be Requisite Lender (*id*. ¶¶ 121, 123(b)), violating the voting rights provisions (*id*. ¶ 122), "usurp[ing]" Requisite Lender status (*id*. ¶ 129), or using the Requisite Lender status

to protect its equity investment and preclude a restructuring (*id.* ¶ 123(d).)  Yucaipa is entitled to

partial summary judgment on these aspects of the Lender Complaint's Contract-Based Claims.

## V.    THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR YUCAIPA ON THE ESTATE COMPLAINT'S CAPITAL CONTRIBUTION CLAIMS, SPECIFIC PERFORMANCE CLAIMS, BREACH OF FIDUCIARY DUTY CLAIM, AND RECHARACTERIZATION CLAIM, AND PARTIAL SUMMARY JUDGMENT ON THE FRAUDULENT TRANSFER CLAIMS.

Yucaipa is entitled to summary judgment on the Estate Complaint's causes of action for

breach of the Capital Contribution Provision of the Third Amendment (Claims 4 and 5).  The

Third Amendment contains an express covenant-not-to-sue barring these very claims.  In

addition, Claims 4 and 6—seeking "specific performance" of the Capital Contribution Provision

and "specific performance" of the Third Amendment through divestiture of Yucaipa's first lien

debt—have been rendered moot by Allied's 2016 Joint Plan.

The Court should also grant complete or partial summary judgment to Yucaipa on the

Estate Complaint's cause of action for breach of fiduciary duty (Claim 7), because:  (a) this

claim rests partially on time-barred allegations and constitutes a collateral attack on a prior

bankruptcy court order; (b) the claim arises at least in part from the same alleged conduct

underlying the Estate Complaint's Contract-Based Claims (Claims 4, 5, and 6), so as a matter of

Delaware law, the Trustee cannot pursue the breach of fiduciary duty claim based on allegations

that overlap completely with the Contract-Based Claims; and (c) other allegations underlying this

claim fail as a matter of law or lack any evidentiary support.

The Court should also grant summary judgment on the Estate Complaint's claim for

recharacterization (Claim 3).  In determining whether to recharacterize debt as equity, the Third

Circuit focuses on the intent of the parties at the inception of the funding.  Here, Allied's debt

was issued in May 2007—yet the recharacterization claim focuses only on *Yucaipa's* debt

holdings, which were acquired long *after* that initial debt issuance.  No factual dispute exists as

to this timing, and therefore Claim 3 fails as a matter of law.

Lastly, the Trustee has conceded that the fraudulent transfer claims (Claims 10 and 11) fail as a matter of law.  Thus, Yucaipa is entitled to partial summary judgment on these claims.

## A.    The Third Amendment's Covenant Not to Sue Bars the Capital Contribution Claims.

Claims 4 and 5 against Yucaipa, brought on behalf of Allied's Estate, assert that Yucaipa breached the Third Amendment's Capital Contribution Provision by "failing to make a capital contribution not less than [$57 million]" within ten days of acquiring first lien debt in August 2009.  (Estate Compl. ¶¶ 156, 164.)  But these claims fail as a matter of law because they are expressly barred by the Third Amendment's covenant not to sue Yucaipa.

In adjudicating summary judgment motions, New York courts enforce contract terms according to their plain meaning.  *See, e.g.*, *Suffolk Cty. Water Auth. v. Village of Greenport*, 21 A.D.3d 947, 948 (N.Y. App. Div. 2005) (summary judgment proper based on the "plain meaning of the written agreement and basic principles of contract construction that an interpretation which renders language in the contract superfluous is unsupportable"); *see also Golovan v. Univ. of Del.*, 73 F. Supp. 3d 442, 453 (D. Del. 2014) (granting summary judgment based on contract's plain meaning).[10]

Here, the FLCA defines a "Credit Party" as "each Borrower and each Guarantor" under that agreement.  (Scolnick Decl., Ex. 33 at 16 (§ 1.1).)  In turn, the "Borrower" under the FLCA is Allied.  (*Id.* at 6 (§ 1.1), Preamble.)  And under plain language of the Third Amendment, Yucaipa became a "Lender" to Allied as soon as it acquired its first lien debt.  (*See id.* Ex. 41 at 1 ("WHEREAS Administrative Agent and Requisite Lenders have agreed to amend the Credit Agreement to permit [Yucaipa] . . . to become Lenders under the Credit Agreement . . . ."), 6 (§ 2.7(e), adding § 10.6(j): "Each Agent and Lender hereby acknowledges that [Yucaipa] (i) may be a Lender[.]").)

---

[10]  Because the Third Amendment's choice-of-law provision provides that it shall be "governed by, and shall be construed and enforced in accordance with, the laws of the State of New York" (Scolnick Decl., Ex. 41 at 15 (§ 7.6)), New York's substantive law, including the canons of contractual construction, apply.

Specifically, Section 2.7(f) of the Third Amendment provides:

> [N]o Credit Party shall assert, and each Credit Party hereby *irrevocably waives any claim or cause of action against any Lender* … (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement or otherwise) arising out of, in connection with, as a result of, or *in any way related to, any capital contribution of Term Loans made by a Restricted Sponsor Affiliate* to such Borrower or any act *or omission* or event occurring *in connection therewith* and each Credit Party hereby irrevocably waives, releases and agrees not to sue upon any such claim or any such cause of action, whether or not accrued and whether or not known or suspected to exist in its favor[.]

(Scolnick Decl., Ex. 41 at 9 (§ 2.7(f), adding § 10.6(k)(v)) (emphases added).)

The plain language of Section 2.7 prohibits the Trustee from bringing this claim.  Under the Litigation Trust Agreement, Allied assigned all of its rights in (and to) the claims brought by the Estate Complaint to the Litigation Trust.  (Scolnick Decl., Ex. 108 at 2–3 (§ 1.2(a)).)  This makes the Litigation Trust the successor-in-interest to Allied—and the Trustee's right to pursue claims on behalf of Allied's Estate is necessarily no greater than the rights inherited from Allied. *See In re LMI Legacy Holdings, Inc.,* 553 B.R. 235 (Bankr. D. Del. 2016) ("[T]he Trustee is asserting . . . claims inherited from the Debtors; as a result, 'the [T]rustee stands in the shoes of the debtor.'") (quoting *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1154 (3d Cir. 1989)); *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F. 3d 44 (3d Cir. 2001) (recognizing that "[w]hen [the assignee] stepped into [assignor's] shoes, it had to adhere to the covenant not to sue on [assigned] claims.").  As such, the Trustee cannot sue Yucaipa on behalf of Allied's Estate for "any act or omission or event occurring in connection with" the Capital Contribution Provision.  (Scolnick Decl., Ex. 41 at 9 (§ 2.7(f) adding § 10.6(k)(v)).)

Discovery has revealed no triable factual dispute that would prevent the enforcement of the plain language of Section 2.7(f) against the Trustee and the Estate.  New York law expressly authorizes contractual covenants not to sue.  *Kamfar v. New World Rest. Grp., Inc.*, 347 F. Supp. 2d 38, 50–51 (S.D.N.Y. 2004) (citation omitted).  Indeed, where, as here, "two parties sign a

covenant not to sue each other, then a dispute arising out of the conduct covered by that agreement cannot provide the basis for a justiciable controversy, and the case must be dismissed." *Joao v. Cenuco, Inc.*, 376 F. Supp. 2d 380, 382 (S.D.N.Y. 2005).

Further, other provisions of the Third Amendment reinforce the conclusion that the Trustee is not now permitted to bring claims against Yucaipa premised on the Capital Contribution Provision. A contract should be construed in such a way as to "harmonize all of its terms." *Village of Hamburg v. Am. Ref-Fuel Co. of Niagara, LP*, 727 N.Y.S.2d 843, 846 (N.Y. App. Div. 2001) (citation omitted).

Specifically, Section 2.7(e) of the Third Amendment—which added the Capital Contribution Provision—omits Allied from the list of parties entitled to damages or specific performance for breach. It provides that "a breach by [Yucaipa] of . . . this Section 10.6(j) will cause the *other Lenders and Agents* to sustain damages . . . and . . . in the event of any such breach, *each of the other Lenders and Agents* shall be entitled to specific performance of such covenants and agreements." (Scolnick Decl., Ex. 41 at 8 (§ 2.7(e) adding § 10.6(j)) (emphases added).) Allied is neither a Lender nor an Agent under the FLCA. (*See id.* Ex. 33 at 3 (§ 1.1), 30 (§ 1.1), 182–183.)

Under the canon of construction known as *expressio unius est exclusion alterius*, "when certain persons or categories are specified in a contract, an intention to exclude all others may be inferred." *IBM Poughkeepsie Emps. Fed Credit Union v. Cumis Ins. Soc., Inc.*, 590 F. Supp. 769, 773 n.19 (S.D.N.Y. 1984). "Even where there is ambiguity, if the parties to a contract omit terms," then "the inescapable conclusion is that the parties intended the omission." *Quadrant Structured Prod. Co. v. Vertin*, 23 N.Y.3d 549, 560 (N.Y. App. Div. 2014). "For example, where certain parties are explicitly listed [in] a particular contractual clause, an inference may arise that the parties did not intend to extend" that contractual provision to others. *Sony Corp. v. Fujifilm Holdings Corp.*, 2017 WL 4342126, at *7 (S.D.N.Y. Sept. 28, 2017).

As a result, because the Third Amendment states that "other Lenders and Agents" would be harmed and may seek to enforce the Capital Contribution Provision, and makes no mention of

Allied also doing so, "the inescapable conclusion is that the parties intended the omission." *Quadrant Structured Prod.*, 23 N.Y.3d at 560; *accord CH Acquisitions 2, LLC v. Aquila Aviation L.P.*, 2018 WL 2081860, at *10 (S.D.N.Y. Mar. 30, 2018). And taken together, Third Amendment Sections 2.7(e) and 2.7(f)—containing the covenant not to sue—demonstrate that Allied was intentionally excluded from the ability to bring claims against Yucaipa arising out of the Capital Contribution Provision.

In addition, this Court should enforce the covenant not to sue here as a matter of symmetry and fairness, because the Court repeatedly has applied a similar contractual covenant not to sue *against* Yucaipa. Section 2.7(e) of the Third Amendment, states, in part, that upon becoming a Lender, Yucaipa:

> *[W]aives*, any claim or cause of action against any Lender, any Agent and their respective Affiliates . . . *arising out of, in connection with, as a result of, or in any way related to,* this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, [and] *waives, releases and agrees not to sue* upon any such claim or any such cause of action, whether or not accrued and whether or not known or suspected to exist in its favor[.]

(Scolnick Decl., Ex. 41 at 7–8 (§ 2.7(e) adding § 10.6(j)), emphases added.)

This language is substantively identical to that in Section 2.7(f). In 2013, the Court relied on the covenant not to sue in Section 2.7(e) in order to dismiss Yucaipa's cross-claims in this very case. (Scolnick Decl., Ex. 132 at 105, 108–09 ("I don't think there's any question as to the plain meaning of the covenant and I think it's very clear.").) Then, in August 2015, the Court dismissed Yucaipa's counterclaim in the BD/S Action, finding that it was "barred by the Covenant Not to Sue [in Section 2.7(e)]." (*Id.* Ex. 138 at 3, 37.) Consequently, the Trustee should not be able to escape the effect of the covenant not to sue merely because it is being applied in Yucaipa's favor. In sum, the Capital Contribution Claims on behalf of the *Estate* are barred as matter of law under the plain language of the Third Amendment.

Moreover, even assuming for argument's sake that the Trustee were to attempt to circumvent the covenant not to sue by arguing that these claims were being pursued by the Estate *on behalf of the Lenders*—not the Estate itself—that effort would likewise fail as a matter of law for two fundamental reasons:

- Such claims—based on breaches that allegedly occurred in August 2009—would be time-barred for the same rationale that applies to the Lender Complaint. (*See* Section IV.A, *supra*.) As explained in Section V.C.1.a, *infra*, filing a bankruptcy petition can extend the statute of limitations by two years under 11 U.S.C. § 108. But this extension does not apply to claims brought by Lenders, and therefore, any claim brought on behalf of the Lenders would be untimely. *See, e.g.*, *U.S. for Use of Am. Bank v. C.I.T. Constr. Inc. of Tex.*, 944 F.2d 253, 259 (5th Cir. 1991) ("Neither the language nor the purpose of section 108(a) support the proposition that a creditor independently pursuing a claim can avail itself of the elongated statute of limitation provided by section 108(a).").

- Under *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972), the Trustee would lack standing to pursue these claims on behalf of Lenders or other creditors. A trustee does not have the "right to prosecute a claim on behalf of an individual creditor," for the harm "alleged must be a harm to the corporation." *In re Oakwood Homes Corp.*, 340 B.R. 510, 534 (Bankr. D. Del. 2006) (citing *Caplin*, 406 U.S. at 434); *see Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 349 (3d Cir. 2001) (committee may not "attempt[] to recover for injuries to the creditors").[11]

---

[11] The principle set forth in *Caplin*, which involved a Chapter 10 bankruptcy, has been applied routinely to bankruptcy trustees generally: "A bankruptcy trustee lacks authority to bring a claim directly on behalf of the debtor's creditors." *Marion v. TDI Inc.*, 591 F.3d 137, 148 n.15 (3d Cir. 2010) (citing *Caplin*, 406 U.S. at 421–34); *see Lafferty*, 267 F.3d at 348 ("[T]he standing analysis then consists of . . . whether the Committee is merely asserting claims belonging to the creditor[].").

**B.**     **The Estate Complaint's Claims for Specific Performance are Moot.**

Yucaipa is also entitled to summary judgment on the Estate Complaint's fourth cause of action for specific performance of the Capital Contribution Provision, and sixth cause of action for specific performance through divestiture of $32 million of first lien debt.  These claims have been moot since this Court confirmed the 2016 Joint Plan and the existing equity was cancelled. From that point forward, it has been impossible for Yucaipa to perform in accordance with the Capital Contribution Provision because there is no corporation to which Yucaipa can contribute capital, and there is no Allied equity that Yucaipa can receive in return.  Likewise, since confirmation of the 2016 Joint Plan, Yucaipa can no longer "divest" $32 million of first lien debt.

Under New York law, courts ask "whether performance [of a contract] has been rendered moot . . . because of the impossibility" of the parties' contractual performance.  *In re Delphi Corp.*, 2008 WL 3486615, at *15 (Bankr. S.D.N.Y. Aug. 8, 2008).[12]  "Specific performance may be decreed only where it is possible for a defendant to perform, for the court will not grant a vain judgment . . . .   The rule applies even where defendant's inability to perform is caused by his own wrongful act."  *Newman v. Resnick*, 238 N.Y.S.2d 119, 122 (N.Y. App. Div. 1963) (citations omitted).  In other words, where it is impossible for a defendant to specifically perform under a contract, the claim for specific performance is moot.  *See Wynyard v. Beiny*, 214 A.D.2d 344, 344–45 (N.Y. App. Div. 1995).

---

[12]  New York law applies to the mootness analysis for the same reasons set forth in Section IV.A.1, *supra*.  Even if Delaware law applies, which it does not, Delaware courts follow the same principles on the enforcement of specific performance as those in New York.  *See, e.g.*, *In re DVI, Inc.*, 324 B.R. 548, 552 (D. Del. 2005) (finding specific performance moot because property at issued had already been conveyed).  In any event, specific performance cannot be awarded as a matter of law because the Trustee admittedly can seek, and *is seeking*, monetary damages.  *See, e.g.*, *Destiny USA Holdings, LLC v. Citigroup Global Mkts. Realty Corp.*, 69 A.D.3d 212, 217 (N.Y. App. Div. 2009) ("In general, specific performance will not be ordered where money damages would be adequate to protect the expectation interest of the injured party.").

Here, the basis for the Estate Complaint's fourth cause of action for specific performance is Section 2.7(e)(iv) of the Third Amendment, which states that within 10 days after acquiring Term Loans, Yucaipa "shall make a capital contribution to Borrowers of no less than 50% of the aggregate principal amount of such Term Loans *in accordance with Section 10.6(k)*." (Scolnick Decl., Ex. 41 at 7 (§ 2.7(e) adding § 10.6(j)(ii)) (emphasis added).) Section 10.6(k), in turn, and added to the FLCA by Section 2.7(f) of the Third Amendment, states that Yucaipa "may at any time make a capital contribution of its Term Loans to Borrowers *in exchange for Equity Interests of Holdings.*" (*Id.* at 8 (§ 2.7(f) adding § 10.6(k)(ii)) (emphasis added).)

On December 9, 2015, the Court confirmed the 2016 Joint Plan, which cancelled the existing stock and equity interests. (Scolnick Decl., Ex. 139 at 36 (¶ 23).) The effective date of the 2016 Joint Plan was December 20, 2016. (*Id.* Ex. 140 at 1.) Upon the effective date of the 2016 Joint Plan, Yucaipa could no longer make capital contributions to the now-defunct "Borrowers" (Allied); nor could it receive equity interests of Allied in exchange, as mandated by the Third Amendment. Thus, the Estate Complaint's claim for specific performance of the Capital Contribution Provision is moot. *See Wynyard*, 214 A.D.2d at 344–45 (affirming denial of petitioner's motion for summary judgment because performance was impossible).

Likewise, the Estate Complaint's sixth cause of action seeks specific performance of other provisions of the Third Amendment. It asserts that as of August 2009, even if Yucaipa divested itself of 50% of its first lien debt, Yucaipa still held $32 million more in first lien debt than it was permitted to hold, so the Trustee is seeking an order that Yucaipa "divest itself of not less than $32,356,044.33 of Term Loans under the First Lien Credit Agreement." (Estate Compl. ¶¶ 167–173.) This claim is also moot because Yucaipa's performance has been rendered impossible in light of the 2016 Joint Plan—there is no longer a way for Yucaipa to "divest" itself of first lien debt.

**C.    The Estate Complaint's Breach of Fiduciary Duty Claim Fails on Numerous Grounds.**

Yucaipa is entitled to complete or at least partial summary judgment on the Estate

Complaint's claim for breach of fiduciary duty (Claim 7).  This claim is partially time-barred, constitutes an impermissible collateral attack on a prior order, is duplicative of the contract-based claims, and otherwise lacks evidentiary support.

### 1.    The Claim is Partially Time-Barred.

The Estate Complaint partially bases its breach of fiduciary duty claim on an allegedly unfair contract between Allied and Yucaipa, the MMSA, and on Yucaipa's acquisition of second lien debt.  (Estate Compl. ¶¶ 176–177.)  However, the statute of limitations for these alleged breaches expired long before Allied's bankruptcy petition was filed in May 2012.  Thus, Yucaipa is entitled to partial summary judgment on the Trustee's breach of fiduciary duty claim.

### a.    The Only Timely Claims are Those Accruing After May 17, 2009.

Delaware law specifies a three-year limitations period for breach of fiduciary duty claims.  *See* 10 Del. Code § 8106; *In re Fruehauf Trailer Corp.*, 250 B.R. at 184 (applying the three-year statute to claims for breach of fiduciary duty).

But where a bankruptcy petition is filed, Section 108(a) of the Bankruptcy Code extends the statute of limitations an additional two years from the petition date for claims and allegations that are timely as of the petition date.  *See In re Essar Steel Minn. LLC*, 2019 WL 2246712, at *5 (Bankr. D. Del. May 23, 2019); *In re: IH1, Inc. Miller v. Kirkland & Ellis LLP*, 2016 WL 6394296, at *11 (Bankr. D. Del. Sept. 28, 2016).  Significantly, then, to benefit from Section 108(a), the Estate Complaint's breach of fiduciary duty claim must have been timely as of the date of the petition on May 17, 2012.  (Scolnick Decl., Ex. 124.)  This means that, absent any other tolling, the allegations underlying the breach of fiduciary duty claim must have accrued *after* May 17, 2009—three years from the petition date—to be considered timely.

### b.    The Breach of Fiduciary Duty Claim is Based in Part on Allegations that Accrued in May 2007 and April 2008.

In Delaware, a breach of fiduciary duty claim "accrues at the moment of the wrongful act—not when the harmful effects of the act are felt."  *In re Coca-Cola Enters., Inc.*, 2007 WL 3122370, at *5.  When a plaintiff alleges a claim based on multiple wrongful acts, a court will

examine each act individually to determine whether it is timely and can serve as a basis for the claim. *See In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 562 (Bankr. D. Del. 2008). And "where the claimed breach of fiduciary duty is an allegedly unfair contract, the limitations period begins to run when the contract is formed." *In re Marvel Entm't Grp., Inc.*, 273 B.R. at 73.

In pleading that Yucaipa breached its fiduciary duty, the Trustee alleges that "Yucaipa exercised further improper influence over Allied by entering into a consulting agreement with Allied as of May 29, 2007," and that "[t]hrough this [MMSA], Allied was induced to and did repose confidence in Yucaipa," but that "Yucaipa . . . extracted unnecessary and unreasonable fees from Allied" and put its interests before Allied's. (Estate Compl. ¶ 176.) Thus, one of the alleged "acts" giving rise to the Trustee's breach of fiduciary duty claim against Yucaipa is *entering into* the MMSA with Allied on May 29, 2007. As such, the "claimed breach of fiduciary duty" is an "allegedly unfair contract," (the MMSA), so the statute of limitations began to run "when the contract [was] formed" on May 29, 2007, nearly two years before the May 19, 2009 accrual date cut-off for timely claims. *In re Marvel Entm't Grp., Inc.*, 273 B.R. at 73. No facts were developed in discovery to suggest that the MMSA-related allegations could have accrued any later than May 2007. Thus, there is no genuine dispute that the statute of limitations for this purported breach of fiduciary duty already had expired by the petition date.

Likewise, the Trustee alleges that Yucaipa breached its fiduciary duty by "entering into the transactions . . . whereby Yucaipa purported to seize control over the . . . Second Lien Facilit[y]." (Estate Compl. ¶ 177.) It is undisputed that Yucaipa acquired ███████ of the second lien debt in April 2008 (Scolnick Decl., Ex. 46), more than a year before the accrual date for timely claims. Accordingly, this also cannot serve as a basis for liability.

### 2.    The MMSA-Related Allegations Constitute an Impermissible Collateral Attack on a Prior Court Order.

Additionally, allowing the breach of fiduciary duty claim to proceed on the basis of the MMSA would constitute an impermissible collateral attack on the Georgia bankruptcy court's order confirming the Joint Plan. "The collateral attack doctrine precludes litigants from

collaterally attacking the judgments of other courts." *Rein v. Providian Fin. Corp.*, 270 F.3d 895, 902 (9th Cir. 2001) (citing *Celotex*, 514 U.S. at 313). A "final judgment in a civil action may be challenged on direct review but cannot be collaterally attacked in a subsequent proceeding." *In re Uni-Marts, LLC*, 404 B.R. 767, 788 (Bankr. D. Del. 2009). Confirmation orders are considered final judgments on the merits for these purposes. *In re Northfield Labs., Inc.*, 467 B.R. 582, 589 (Bankr. D. Del. 2010).

Here, as explained above, the Georgia bankruptcy court explicitly authorized Allied and Yucaipa to enter into the MMSA in its confirmation order and no one objected. (Scolnick Decl., Ex. 128 at 33.) But now the Estate Complaint alleges that doing what the bankruptcy court authorized—entering into the MMSA—constituted a breach of fiduciary duty. No facts were developed in discovery to suggest that the Georgia bankruptcy court's ruling was incorrect or should be revisited. As a result, allowing the breach of fiduciary duty claim to proceed on this basis would permit the Trustee to challenge the Georgia bankruptcy court's final judgment. The claim arising out of the MMSA must fail as a matter of law for this independent reason.

### 3. The Remaining Allegations Supporting the Breach of Fiduciary Duty Claim Fail as a Matter of Law and for Lack of Evidence.

Beyond the MMSA-related allegations, the balance of allegations supporting the breach of fiduciary duty claim fail either as a matter of law or for lack of evidence. Yucaipa is therefore entitled to summary judgment on this claim, or at least partial summary judgment as to the defective allegations.

### a. Allegations Related to Yucaipa's Acquisition of First Lien Debt.

The Estate Complaint alleges that Yucaipa "engaged in inequitable conduct" and breached its fiduciary duties "by entering into the transactions described above, whereby Yucaipa purported to seize control over the First . . . Lien Facilit[y]." (Estate Compl. ¶ 177.) The referenced "transaction" by which Yucaipa purportedly seized control of the First Lien Facility is Yucaipa's purchase of the ComVest debt in August 2009—the very same transaction that, according to the Estate Complaint, gave rise to the breach of contract claims. (*Id.* ¶¶ 160–

165, 177.)

Delaware "[c]ourts will dismiss [a] breach of fiduciary duty claim where [it] overlap[s] completely [with a breach of contract claim] and arise[s] from the same underlying conduct or nucleus of operative facts as the breach of contract claim." *Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542 at *15 (Del. Ch. June 6, 2018) (internal quotation marks omitted). That is exactly the case here.

Fiduciary duty claims that share "a common nucleus of operative facts" with contract claims can survive only if they "depend on additional facts as well, are broader in scope, and involve different considerations in terms of a potential remedy." *AM Gen. Holdings LLC ex rel. Ilshar Cap. LLC v. Renco Grp.*, 2013 WL 5863010, at *10 (Del. Ch. Oct. 31, 2013) (internal quotation marks omitted). Here, the Committee's breach of fiduciary duty claim against Yucaipa premised on Yucaipa's "entering the transaction" to allegedly "seize control of the First . . . Lien Facilit[y]" is not broader in scope than the breach of contract claim, and does not allege any additional facts. Indeed, when asked what conduct Yucaipa engaged in to seize control of the debt facilities, the Trust's 30(b)(6) witness on damages, Stephen Deckoff, testified only that

███████████████████████████████████████████████████████████████

███████████████  (Scolnick Decl., Ex. 9 at 149–51.) But where, as here, "a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim. In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous." *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010).

Nor does this breach of fiduciary duty allegation involve different considerations in terms of a potential remedy. To the contrary, the Trustee seeks monetary damages for both the breach of contract and breach of fiduciary duty claims. (*See* Estate Compl. ¶¶ 165, 178.) Thus, because this allegation overlaps completely with the breach of contract claim and arises out of the same operative facts, it necessarily fails.

41

b.     **Allegations Related to Yucaipa's Acquisition of Second Lien Debt.**

The Estate Complaint alleges that Yucaipa also breached its fiduciary duties by "seiz[ing] control of the Second Lien Facilit[y]."  (Estate Compl. ¶ 177.)  In addition to being time-barred, as discussed above, this allegation fails for lack of proof.

It is undisputed that the Third Amendment to the SLCA was valid.  And there is no dispute that Yucaipa procured its second lien debt pursuant to that Third Amendment.  It is also undisputed that Yucaipa converted ████ that second lien debt to equity in 2008, despite having no obligation to do so.  (Scolnick Decl., Ex. 30 at 5 (¶ 12).)  And there is no genuine dispute that Yucaipa's purchase of second lien debt, and subsequent conversion of ████ that debt to equity, helped to de-leverage Allied's balance sheet and avoid a going-concern opinion from its auditors. (*Id.* Ex. 15 at 143; Ex. 30 at 5 (¶ 12).)  As such, Yucaipa's purchase of second lien debt was indisputably *good* for Allied and all of its stakeholders.  Thus, absent any evidence to the contrary, Yucaipa cannot be liable for breach of fiduciary duty for merely "entering into [this] transaction."  (Estate Compl. ¶ 177.)

c.     **Allegations Related to Yucaipa's or the Board's Alleged Failure to Consider Potential Transactions.**

The Estate Complaint also alleges that Yucaipa breached its fiduciary duty "by causing the directors to fail to even consider potential transactions that could have benefitted Allied if such transactions held even the potential of harming Yucaipa's equity interests."  (Estate Compl. ¶ 177.)  This allegation fails because there is no evidence of any "potential transactions" that could have benefitted Allied, but which the board failed to consider at Yucaipa's urging.

In discovery, the Trustee failed to identify any "potential transactions" that the board failed to pursue to Allied's detriment. ███████████████████████████ ██████████████████████████████████ ██████████████████████████████████ ██████████████████████████████ ██████████████████████████████ ██████████████████████████████████████ (Scolnick

42

Decl., Ex. 110 at 12 (█████████████████); Ex. 111 at 15 (██████████████████
█).)

████████████████████████ the allegations in the Estate Complaint that

Yucaipa had "rebuffed" ComVest's efforts in 2009 to "effectuate a voluntary, out-of-court

restructuring of Allied's debt structure."  (Estate Compl. ¶¶ 96–101; *see* Scolnick Decl., Ex. 110

at 13 (████████████████); Ex. 111 at 15–16 (██████████████████).)  But these

allegations were not borne out in discovery—there is no evidence that ComVest wanted to

pursue an "out-of-court restructuring" that would have benefitted Allied, but that Yucaipa

prevented the board from considering it.



(Scolnick Decl., Exs. 110 at 12

(████████████████); Ex. 111 at 16 (██████████████████).)  ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████  (*Id.* Exs. 112–113.)  In any event, there is no evidence that what Riggs was

proposing in 2009 would have benefitted Allied.

In fact, contrary to the allegations in the Estate Complaint, there is no genuine dispute

that the Allied board *did* consider various potential transactions and strategic combinations for

Allied.  (*See* Scolnick Decl., Exs. 114–119.)  And there is no evidence or colorable argument that

the board acted improperly with respect to any of these potential deals.

The Trustee also cannot defeat summary judgment on the "potential transactions" issue

by pointing to the JCT Negotiations in late 2011 and early 2012.  Those negotiations are not

described anywhere in the Estate Complaint.  Indeed, the Estate Complaint does not include any

reference to JCT at all.  ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

(Scolnick Decl., Ex. 111 at 15 (███████████████████).) ████████████████

███████████████████████████████████████████ (*Id.* Exs. 110–111.)[13]

Thus, because the 2011-2012 JCT Negotiations are not alleged in the Estate Complaint, the Trustee cannot attempt to rely on those allegations now in an effort to defeat partial summary judgment on the "potential transactions" issue. *See McMahon v. Salmond*, 573 Fed. App'x 128, 135 (3d Cir. 2014) (affirming decision not to consider a claim raised at summary judgment where the plaintiff had not pleaded that claim in the operative complaint); *Wilson v. City of Wilmington*, 2015 WL 4571554, at *8 (D. Del. July 29, 2015) ("The foregoing claims are not alleged in the complaint . . . and cannot be raised for the first time in an opposition to a motion for summary judgment."); *see also Tucker v. Union of Needlestrades, Indust., & Textile Emps.*, 407 F.3d 784, 787–88 (6th Cir. 2005) ("Once a case has progressed to the summary judgment stage . . . the liberal pleading standards under [the Federal Rules] are inapplicable" and therefore liberal construction of complaint could not include new theory raised for first time at summary judgment).

Moreover, even assuming for argument's sake that the Estate Complaint's vague reference to "potential transactions" could refer to an *un-pleaded* hypothetical transaction with JCT in 2011-2012, the undisputed evidence reveals that there was no such transaction in 2011-2012 that the Allied board failed to consider.  Rather, it is undisputed that during that period, JCT was negotiating only with First Lien Lenders, such as Yucaipa and BD/S, with an eye toward acquiring their debt and then negotiating a 363 Sale.  (Scolnick Decl., Ex. 20 at 37–40.)

████████████████████████████████████████████████████

---

[13]  By contrast, the Lender Complaint does contain allegations about the JCT Negotiations, but *only* in connection with the breach of contract claim against Yucaipa.  (Lender Compl. ¶¶ 124–125.) ████████████████████████████████████████

████████████████████████████████████████████████████████

(*See, e.g.*, Scolnick Decl., Ex. 109 at 5 (████████████████████

███████████████████████████████).)

██████████████████████████████████████████████

(Scolnick Decl., Ex. 107 at 30 (¶ 91).) ████████████████████████████

██████████████████████████████████████████████

████████████████████████ (*Id.* Ex. 122 at 18 (¶ 50).)  Thus, there is no evidence

that Yucaipa acted improperly or breached any fiduciary duty by negotiating directly with JCT—

instead of somehow forcing the Yucaipa nominees on the board to insert Allied into the JCT

Negotiations.  *See Equity Corp. v. Milton*, 221 A.2d 494, 498–99 (Del. 1966) (affirming grant of

summary judgment in favor of defendant on breach of fiduciary duty claim because "there was

no corporate opportunity").  In any event, even if the JCT Negotiations *were* a corporate

opportunity of Allied, ████████████████████████████████████

██████████████████████████████████████████████

(Scolnick Decl., Ex. 32 at 7–8 (§ 7(b)).)

Lastly, any breach of fiduciary duty claim premised on the JCT Negotiations would fail

under Delaware law because it would be entirely duplicative of the Lender Complaint's

Contract-Based Claims that arise from the same purported conduct.[14]  *See* Section V.C.3.a,

*supra*.  The Trustee cannot do an end-run around the "well-settled principle" that "fiduciary

claims arising out of the same facts that underlie contract obligations" are "superfluous," *Nemec*,

991 A.2d at 1129, by designating different plaintiffs to pursue overlapping claims arising out of

the same operative facts.

---

[14]  The overlapping nature of these claims is sharply on display in the Trustee's damages
     expert's report.  There, with respect to the Estate Complaint, the Trustee's expert states:
     ████████████████████████████████████
     ████████████████████████████████ (Scolnick
     Decl., Ex. 107 at 30 (¶ 91).)  With respect to the Lender Complaint, he makes an almost
     identical statement, but instead frames it in terms of a contractual breach: ████████████
     ████████████████████████████████████
     ████████████████████████████████
     ████████████████████████ (*Id.* at 38 (¶ 134) (emphasis added).)

### d.    Allegations Related to Structuring of Transactions Nominally in Allied's Name.

The Estate Complaint also alleges that Yucaipa breached its fiduciary duty by "structuring transactions that were nominally in the name of [Allied] but were, in reality, actually structured in a manner to ensure and protect Yucaipa's existing equity investments in Allied." (Estate Compl. ¶ 177.)  This allegation fails to raise a triable issue because the Trustee has presented no evidence of any such "transactions."

To the extent that this allegation refers to Allied's entry into the Third Amendment in 2008, there is no evidence or logical argument that Yucaipa breached any fiduciary duty in connection with the passage of the Third Amendment.  Indeed, the Trustee is now seeking to *enforce* the Third Amendment through these adversary proceedings.  And if this allegation is premised instead on the passage of the Fourth Amendment and Yucaipa's subsequent acquisition of Allied's first lien debt, the allegation still would fail because it would be entirely duplicative of the Estate Complaint's breach of contract claims, as discussed in Section V.C.3.a, *supra*.  *See Nemec*, 991 A.2d at 1129.

### e.    Allegations Related to Extraction of Unnecessary and Unreasonable Fees.

Lastly, the Estate Complaint alleges that Yucaipa "engaged in a self-serving campaign that extracted unnecessary and unreasonable fees from Allied."  (Estate Compl. ¶ 176.)  This generic allegation appears to have been premised on Allied's contractual requirement to transfer $1.5 million per year to Yucaipa under the MMSA, as a management fee.  (*See id.* ¶ 199.) However, it is undisputed that Yucaipa never received its annual management fee.  (Scolnick Decl., Ex. 7 at 624–25.)

Alternatively, if the Trustee asserts that the "unnecessary and unreasonable fees" refer to Allied's payment of fees in connection with the Fourth Amendment and the debt acquisition in August 2009, the Trustee overlooks that if Allied was in default, it was contractually obligated to reimburse its Lenders' costs and expenses, including legal fees, incurred "in connection with any refinancing or restructuring of the credit agreements."  (Scolnick Decl., Ex. 33 at 158 (§ 10.2).)

There is no dispute that Allied was in default in August 2009 when it paid the legal fees relating to the Fourth Amendment, or that ComVest and Yucaipa were, at the relevant times, "Lenders" under the FLCA.

Another possibility is that the reference to "unnecessary and unreasonable fees" may describe fees that Allied incurred in connection with the CIT Litigation.  But Allied was contractually obligated to pay those fees as well.  ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████  (Scolnick Decl., Ex. 32 at 5 (§ 6(a), (b)).)  And, as explained in Section V.C.2, the Georgia bankruptcy court expressly approved the MMSA when Allied exited its prior bankruptcy.  Thus, any payment Allied made on behalf of Yucaipa for the CIT Litigation was consistent with its court-approved contractual obligations.[15]

*   *   *

For all these reasons, the Court should grant summary judgment on the Estate Complaint's breach of fiduciary duty claim against Yucaipa.

**D.    The Recharacterization Claim Fails as a Matter of Law.**

The Trustee also seeks to recharacterize "Yucaipa's purported debt holdings under the First Lien Facility and Second Lien Facility."  (Estate Compl. ¶ 148.)  This claim fails as a matter of law under binding Third Circuit precedent.

"In a recharacterization action, someone challenges the assertion of a debt against the bankruptcy estate on the ground that the 'loaned' capital was actually an equity investment."  *In re Insilico Techs., Inc.*, 480 F.3d 212, 217 (3d Cir. 2007).  The Third Circuit has made clear that

---

[15]   Indeed, even the Trustee's liability expert opined ████████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████  (Scolnick Decl., Ex. 122 at 3.)

"the determinative inquiry in classifying advances as debt or equity is the intent of the parties *as it existed at the time of the transaction*." *In re SubMicron Sys. Corp.*, 432 F.3d 448, 457 (3d Cir. 2006) (emphasis added); *accord United States v. State Street Bank & Tr. Co.*, 520 B.R. 29, 74–75 (Bankr. D. Del. 2014) (placing "particular emphasis on the parties' intent at the initial funding"). "If recharacterization of an investment from debt to equity is warranted, the characterization occurs '*ab initio*,' from the beginning of the investment." *In re HH Liquidation, LLC*, 590 B.R. 211, 290 (Bankr. D. Del. 2018) (quoting *State Street*, 520 B.R. at 74).

It is undisputed that when Allied issued secured debt under the FLCA and SLCA, it intended for the debt to be issued as debt, not equity. Allied issued debt under both the FLCA and the SLCA in connection with its Joint Plan, pursuant to which Allied exited its prior bankruptcy in May 2007.[16] Under the Georgia bankruptcy court's order confirming that Joint Plan, the debt issued under the FLCA and the SLCA was not to be "stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff, or counterclaim." (Scolnick Decl., Ex. 6; Ex. 128 at 37–38 (¶ M(1)–(2)).) Indeed, the issuing instruments "evidence[d] debt," there are "fixed rate[s] of interest," and the parties all "intended the [first lien and second lien debt] to be debt." *See In re HH Liquidation*, 590 B.R. at 292–94. Because the parties' intent at issuance is undisputed, the recharacterization claim necessarily fails.

Ignoring all of this, the Estate Complaint seeks to both (a) recharacterize (as equity) Yucaipa's holdings of first and second lien debt, while (b) preserving the debt issued to other third parties, such as BD/S. But the operative question is whether debt should be recharacterized because the "debt transaction was 'actually an equity contribution *ab initio*.'" *In re AutoStyle Plastics, Inc.*, 269 F.3d 726, 747–48 (6th Cir. 2001) (quoting *In re Cold Harbor Assocs.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997) (alteration omitted). There is no legal basis to

---

[16]  The debt was initially issued as DIP financing and then converted into exit financing. The DIP Financing document expressly called it debt. (*See* Scolnick Decl., Ex. 123.)

recharacterize only a *portion* of the first or second lien debt, several years after the debt was first issued.

The Trustee's theory is that Yucaipa's purported actions after "spring of 2008" warrant the recharacterization of debt that Yucaipa acquired in 2008 and 2009, because Yucaipa "has never sought to obtain" first or second lien debt "as debt" and "was only interested in acquiring First Lien Debt to the extent that it could achieve Requisite Lender status in furtherance of its equity interests." (Estate Compl. ¶ 149). But Yucaipa's intent in acquiring the already-issued debt is irrelevant—the focus is on Allied's and the Lenders' intent at issuance. The only relevant question in deciding whether to recharacterize the first and second lien debt is the intent in May 2007 when Allied and its Lenders (which, at that time did not even include Yucaipa) entered into the FLCA and SLCA.[17] This is fatal to the Trustee's recharacterization claim as a matter of law.

And, in any event, "unlike equitable subordination, '[r]echaracterization has nothing to do with inequitable conduct.'" *In re HH Liquidation*, 590 B.R. at 289 (quoting *In re Fedders N. Am., Inc.*, 405 B.R. 527, 554 (Bankr. D. Del. 2009)). Thus, the Trustee's allegations about Yucaipa's "scheme to take control of Allied's *outstanding* debt" are wholly irrelevant. (Estate Compl. ¶ 149 (emphasis added)).

**E.    The Trustee has Partially Abandoned the Fraudulent Transfer Claims.**

The Estate Complaint's tenth cause of action alleges that Yucaipa caused Allied to fraudulently pay various fees in violation of 11 U.S.C. § 548, and the eleventh cause of action alleges that Yucaipa caused Allied to fraudulently pay various fees in violation of 11 U.S.C. § 544 and the applicable state's fraudulent transfer law. (Estate Compl. ¶¶ 210, 215.)

Although the Estate Complaint alleges that these purported fraudulent transfers took place between November 2007 and December 2011 (*see id.* ¶¶ 196, 198), ▮▮▮▮▮▮▮▮▮▮

---

[17] Even if the Trustee prevailed on its recharacterization claim, *all* of the first lien and second lien debt must be recharacterized as equity because the "characterization occurs '*ab initio*,' from the beginning of the investment." *In re HH Liquidation*, 590 B.R. at 290. As a result, BD/S's debt holdings would also need to be recharacterized as a matter of law.

████████████████████████████████████████████████████

██████████████████████████████████████████████ (Scolnick

Decl., Ex. 107 at 32 n.136 (emphasis added); *see id.* at Ex. 107 at 59 (████████████████████

████████████████████████████████████).)  As a result, the Trustee has effectively

conceded that fees Allied paid before August 2009 cannot constitute intentional or fraudulent

transfers under the relevant statutes.  Yucaipa is therefore entitled to summary judgment on the

Tenth and Eleventh causes of action as to all the alleged fraudulent transfers that occurred before

August 2009.  (*See* Estate Compl. ¶¶ 198(a)–(g), 199.)

In addition, even if the Trustee had not abandoned any ability to recover damages for

transfers made before August 2009, Yucaipa is at a minimum entitled to partial summary

judgment for all alleged transfers made before May 17, 2008.  An avoidance claim under 11

U.S.C. §§ 544 and 548 must have been timely, as applicable here, as of the date of the

bankruptcy petitions because the Estate Complaint was filed within two years of the petitions.

*See* 11 U.S.C. §§ 108, 544(a).  The first petitions were filed on May 17, 2012.  (Scolnick Decl.,

Ex. 124.)  Therefore, any fraudulent transfer claim must have been timely as of that date.

Here, under applicable state law,[18] a fraudulent transfer claim must be brought within

four years of the issuance of the transfer.  *See* Cal. Civ. Code § 3439.09; 6 Del. Code § 1309;

N.Y. Debt. & Cred. Law § 278.[19]  As such, any fees paid before May 17, 2008—four years

before the petition dates—are time-barred and cannot provide the basis for a fraudulent transfer

cause of action under 11 U.S.C. § 544.

---

[18]  Because the limitations periods are the same, "there is no need for the Court to engage in a choice of law analysis."  *In re AgFeed USA, LLC*, 558 B.R. 116, 132 n.7 (Bankr. D. Del. 2016); *see In re Syntax-Brillian Corp.*, 573 Fed. App'x 154, 163 (3d Cir. 2014) ("[B]ecause the laws are sufficiently similar [in] that they result in the same outcome here, a choice of law analysis is unnecessary.").

[19]  A claim under 11 U.S.C. § 548 has a shorter two-year look back period from the date the bankruptcy petition was filed.

## VI.    CONCLUSION

For these reasons, Yucaipa respectfully requests that the Court grant summary judgment as follows:

Lender Complaint

1.  Grant summary judgment in favor of Yucaipa as to the breach of contract claim (Claim 2) and breach of the covenant of good faith and fair dealing claim (Claim 3).

Estate Complaint

1.  Grant summary judgment in favor of Yucaipa as to the recharacterization claim (Claim 3), breach of the Capital Contribution Claims (Claims 4 and 5), specific performance claim (Claim 6), and breach of fiduciary duty claim (Claim 7).

2.  Grant partial summary judgment in favor of Yucaipa as to the fraudulent transfer claims (Claims 10, 11).

Dated: May 1, 2020

YOUNG CONAWAY
STARGATT & TAYLOR, LLP

  _/s/ Michael S. Neiburg_
Michael R. Nestor (No. 3526)
Michael S. Neiburg (No. 5275)
Rodney Square
1000 North King Street
Wilmington, DE  19801
Telephone: (302) 571-6600
mnestor@ycst.com

- and-

GIBSON, DUNN & CRUTCHER LLP
Maurice M. Suh (*Pro Hac Vice*)
Robert A. Klyman (*Pro Hac Vice*)
Kahn Scolnick (*Pro Hac Vice*)
333 South Grand Avenue
Los Angeles, CA  90071
Telephone: (213) 229-7000
msuh@gibsondunn.com

*Attorneys for Defendants Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P., Ronald Burkle, Jos Opdeweegh, Derex Walker, Jeff Pelletier, and Ira Tochner*