# Exhibit 132

# D.I. 1068, Case No. 12-11564

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3   Case No. 12-11564 (CSS)

4   - - - - - - - - - - - - - - - - - - -x

5   In the Matter of:

6

7   ALLIED SYSTEMS HOLDINGS, INC., et al.,

8

9            Debtors.

10

11  - - - - - - - - - - - - - - - - - - -x

12  ALLIED SYSTEMS HOLDINGS, INC.

13

14           Plaintiff,

15

16  v.

17  AMERICAN MONEY MANAGEMENT CORP., AVENUE CAPITAL

18  GROUP, BDCM OPPORTUNITY FUND II, LP, BENNETT MANAGEMENT,

19  BLACK DIAMOND CLO 2005-1 LTD., DEL MAR DISTRESSED

20  OPPORTUNITIES MASTER FUND, MJX ASSET MANAGEMENT, LLC,

21  PAR-FOUR INVESTMENT MANAGEMENT, SPECTRUM INVESTMENT

22  PARTNERS LP, TEAK HILL - CREDIT CAPITAL INVESTMENTS,

23  LLC, THE CIT GROUP/BUSINESS CREDIT, INC., THE OFFICIAL

24  COMMITTEE OF UNSECURED CREDITORS, YUCAIPA AMERICAN

25  ALLIANCE FUND II, L.P. and YUCAIPA AMERICAN ALLIANCE

1   (PARALLEL) FUND II, L.P.

2

3           Defendants.

4

5   YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA

6   AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA

7   AMERICAN ALLIANCE FUND II, L.P., and YUCAIPA AMERICAN

8   ALLIANCE (PARALLEL) FUND II, L.P.

9

10         Counterclaim and Cross-Claim Plaintiffs,

11

12         v.

13

14   ALLIED SYSTEMS HOLDINGS, INC.

15

16         Counterclaim Defendant,

17   and

18   AMERICAN MONEY MANAGEMENT CORP., AVENUE CAPITAL

19   GROUP, BDCM OPPORTUNITY FUND II, LP, BENNETT MANAGEMENT,

20   BLACK DIAMOND CLO 2005-1 LTD., DEL MAR DISTRESSED

21   OPPORTUNITIES MASTER FUND, MJX ASSET MANAGEMENT, LLC, PAR-

22   FOUR INVESTMENT MANAGEMENT, SPECTRUM INVESTMENT PARTNERS

23   LP, TEAK HILL - CREDIT CAPITAL INVESTMENTS, LLC, THE CIT

24   GROUP/BUSINESS CREDIT, INC., THE OFFICIAL COMMITTEE OF

25   UNSECURED CREDITORS.

1        Cross-Claim Defendants.

2   ----------------------------------------------------------X

3   BDCM OPPORTUNITY FUND II, LP, BLACK DIAMOND

4   CLO 2005-1 LTD, and SPECTRUM PARTNERS, L.P.

5

6        Plaintiff(s),

7

8        v.

9

10  YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA

11  AMERICAN ALLIANCE (PARALLEL) FUND I, L.P.,

12  YUCAIPA AMERICAN ALLIANCE FUND II, L.P.,

13  YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II,

14  L.P., RONALD BURKLE, DEREX WALKER, IRA TOCHNER,

15  JEFF PELLETIER, JOS OPDEWEEGH, OSEPH TOMCZAK,

16  And MARK GENDREGSKE

17

18        Defendants.

19  ----------------------------------------------------------X

20  THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF

21  ALLIED SYSTEMS HOLDINGS, INC. and its affiliated debtors,

22

23        Plaintiff,

24  v.

25

Page 4

1   YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA

2   AMERICAN ALLIANCE (PARALLEL) FUND I, L.P.,

3   YUCAIPA AMERICAN ALLIANCE FUND II, L.P.,

4   YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II,

5   L.P., MARK J. GENDREGSKE, JOS OPDEWEEGH, JAMES

6   FRANK, DEREX WALKER, JEFF PELLETIER, IRA TOCHNER,

7   And JOSEPH TOMCZAK.

8

9         Defendants.

10  ----------------------------------------------------------X

11                      United States Bankruptcy Court

12                      824 Market Street

13                      Wilmington, Delaware 19801

14                      February 27, 2013

15                      09:30 AM

16

17  B E F O R E:

18  HONORABLE CHRISTOPHER S. SONTCHI

19  U.S. BANKRUPTCY JUDGE

20

21

22

23

24

25

1    HEARING re: Notice of Agenda of Matters Scheduled for Hearing on

2    February 27, 2013.

3

4    HEARING re: Cross-Claim Defendants BDCM Opportunity Fund II,

5    LP's Black Diamond CLO 2005-1 Ltd's and Spectrum  Investment

6    Partners LP's Motion to Dismiss the Amended Cross Claim in its

7    Entirety [Adv. Docket No. 73; filed January 25, 2013].

8

9    HEARING re: Motion of the Official Committee of Unsecured

10   Creditors for an Order Authorizing the Committee to Pursue

11   Certain Claims and Causes of Action of the Debtors' Estates

12   [Docket No. 858; filed February 1, 2013].

13

14   HEARING re: Motion and Memorandum of Law of Petitioning

15   Creditors for Entry of an Order (I) Pursuant to 11 U.S.C.

16   §105(a) Granting Standing to Petitioning Creditors to

17   Prosecute Certain Claims of the Debtors Estates for, Inter

18   Alia, Equitable Subordination, Breach of Fiduciary, Aiding and

19   Abetting Breach of Fiduciary Duty and Breach of Contract, or

20   Alternatively (II) Granting Petitioning Creditors Leave to

21   Intervene as Plaintiffs in Adversary Proceedings No. 13-50530

22   Pursuant to Federal Rule of Civil Procedure 24 [Docket No. 876;

23   filed February 8, 2013].

24

25   Transcribed by:  Mary Zajaczkowski

Page 6

1   A P P E A R A N C E S :

2

3   SIDLEY AUSTIN

4        Attorneys for the Committee

5        787 7th Avenue

6        New York, New York 10019

7

8   BY:  MICHAEL BURKE, ESQUIRE

9        NICHOLAS LAGEMANN, ESQUIRE

10

11  RICHARDS LAYTON & FINGER

12       Attorney for the Debtors

13       One Rodney Square

14       Wilmington, Delaware 19801

15

16  BY:  ROBERT STEARN, ESQUIRE

17

18  BROWN RUDNICK LLP

19       Attorney for Special Committee of the Board

20       Seven Times Square

21       New York, New York 10036

22

23  BY:  ROBERT STARK, ESQUIRE

24

25

1   ARNOLD & PORTER LLP

2          Attorney for Mark Gendregske

3          555 Twelfth Street, NW

4          Washington, DC 20004

5

6   BY:  JUSTIN ANTONIPILLAI, ESQUIRE

7

8   LATHAM & WATKINS LLP

9          Attorney for Yucaipa

10          355 South Grand Avenue

11          Los Angeles, California 90071

12

13   BY:  ROBERT KLYMAN, ESQUIRE

14

15

16

17

18

19

20

21

22

23

24

25

1               P R O C E E D I N G S

2    [missing audio from 9:49-9:50]

3         MR. KELLY:  -- the Official Committee of Unsecured

4    Creditors and by Black Diamond and Spectrum.  And the other is

5    argument on motions to dismiss in an adversary proceeding.

6    There had been discussions concerning the standing motions, and

7    there is a partial deal involving most of the participants, and

8    I'll let them speak for themselves.  And I'll yield to whoever

9    wishes to address the Court on the suggestion as to handle the

10   standing motions.

11        THE COURT:  Okay.  Mr. Harris.

12        MR. HARRIS:  Good morning, Your Honor.  I believe

13   procedurally that a certificate of no objection was actually

14   entered, was submitted yesterday with respect to the

15   Committee's motion for standing.  There had been no opposition

16   filed by any party to that, so if I understand the docket

17   correctly, Mr. Hazeltine actually filed the certificate of no

18   objection with respect to that.

19        THE COURT:  When?  When?  Did you send it over?

20        MR. HAZELTINE:  Your Honor, William Hazeltine on

21   behalf of the Committee.  We filed a certificate of no

22   objection on the motion to seal.

23        MR. HARRIS:  Motion to seal, I'm sorry, then my

24   mistake.  So there's no --

25        THE COURT:  All right.

```
1          MR. HARRIS:  Sorry.

2          THE COURT:  Okay.

3          MR. HARRIS:  There's no opposition filed --

4          THE COURT:  Because I just lost an evening when I

5    could have signed something.  Okay.  All right.  We're okay

6    now.

7          MR. HARRIS:  There's no --

8          THE COURT:  Yes, I signed that order.

9          MR. HARRIS:  Okay.  There's no opposition filed to the

10   Committee's motion for standing.  There had been responses

11   filed by the Debtors, by the Committee and by Mr. Gendregske to

12   the petitioning creditors' request for standing, or on the

13   alternative a grant of an order for intervention of the

14   Committee's adversary proceeding as an additional plaintiff.

15          There had been discussions between parties, Your

16   Honor, which I believe has resulted in an agreement in

17   principal with the exception of one issue as between the

18   Debtors, the Committee and the petitioning creditors that would

19   resolve the responses and issues raised by the Debtors and the

20   Committee in opposition.  Mr. Gendregske has not signed on to

21   that agreement in principal, Your Honor.  I would be happy to

22   lay out for the Court the terms that had been agreed to by the

23   three parties and identify the one open issue, and I can then

24   turn the podium over to Mr. Gendregske's counsel to address any

25   continuing objections he may have, if that is okay with Your
```

1    Honor.

2            THE COURT:  All right.  So this, this proposed

3    resolution which I guess I'll hear about in a minute, is,

4    resolves both your client's motion for standing and the

5    Committee's motion for standing?

6            MR. HARRIS:  I believe so, Your Honor.

7            THE COURT:  Okay.

8            MR. HARRIS:  If I may.

9            THE COURT:  Yes, please do.  Hang on just -- go ahead.

10           MR. HARRIS:  As a preliminary, I believe all parties

11   are in agreement on the following terms -- that the Committee

12   would be granted standing to prosecute the causes of action set

13   forth in the complaint that the Committee filed in the

14   adversary proceeding.  The petitioning creditors, assuming Your

15   Honor approves this, would withdraw our request for standing as

16   set forth in our motion.

17           THE COURT:  Okay.

18           MR. HARRIS:  The petitioning creditors would be

19   authorized to intervene in the Committee's adversary proceeding

20   as an intervening plaintiff but not acting as an estate

21   representative or be deemed to be acting on behalf of the

22   estate.  The petitioning creditors and the Committee will work

23   to incorporate into an amended complaint if appropriate so that

24   a single complaint will exist and will incorporate all the

25   claims and defendants that are to be prosecuted.  Right now as

1   Your Honor knows there's two adversaries, two complaints, they

2   are substantially overlapping, there are some minor nuance

3   differences in terms of defendants and cases of action.  We're

4   going to talk to the Committee about whether their complaint

5   should be amended in some respect to incorporate some of those

6   things, but we may or may not do an amended complaint.

7           THE COURT: All right.  And when you say you, that's a

8   global you.

9           MR. HARRIS:  Yeah, right.

10          THE COURT:  Right.  And we'll just -- just for

11  parameters, I suppose will withdraw your complaint.

12          MR. HARRIS:  Yes, it's in the list.

13          THE COURT:  Okay, sorry.

14          MR. HARRIS:  That's okay.

15          THE COURT:  When you said that you would intervene not

16  as an estate representative, would, I assume you would not be

17  adding any individual causes of action.

18          MR. HARRIS:  There are two aspects to the causes of

19  action which arguably had individual components for the benefit

20  of petitioning creditors, but I think they're actually subsumed

21  within the causes of action the Committee has already stated.

22  One is the claim for enforcement of the obligations under the

23  third amendment to the credit agreement.  Obviously, the

24  Debtors are a party to that and we are a party to that.  Each

25  one of us could bring that but that cause of action is already

1    stated so we're not going to be adding any additional causes of

2    action there.

3         THE COURT:  All right.

4         MR. HARRIS:  With respect to the equitable

5    subordination causes of action, in connection with the trial on

6    that issue, to the extent Your Honor finds any kind of improper

7    conduct or inequitable conduct that would give rise to

8    subordination, there will also have to be a determination as to

9    which creditor parties were adversely affected.  It could be

10   some it could be all.  So I don't think it adds any additional

11   causes of action there either, although obviously there are

12   individual nuances for different creditor groups that come up

13   in the context of that.

14        THE COURT:  Okay.

15        MR. HARRIS:  My very next point, Your Honor, is that

16   the petitioning creditors will withdraw our adversary

17   proceeding obviously in favor of the Committee's action.

18        The next point is the intervening plaintiffs will be

19   entitled to fully participate in all aspects of discovery and

20   trial.  But to avoid duplication and burden, the petitioning

21   creditors will not require the parties on whom we've served

22   discovery to independently respond to them.  And effectively

23   they're going to be withdrawn.  We're going to rely on the

24   Committee's discovery requests right now with the right to

25   supplement.  And I believe, Your Honor, that to the extent

1   there's any differences in the discovery requests, that'll get

2   flushed out in the context of what are inevitably going to be

3   meet and confer conferences between the various parties so

4   that, you know, the parties on whom we've served discovery and

5   who they served discovery on won't have to duplicate the

6   responses in effect.

7          THE COURT:  And your, I mean is that going to matter,

8   your complaint is being dismissed anyway, so there would be no

9   discovery in connection with your action.

10         MR. HARRIS:   Right.  It'll kind of go away by

11  operation of law.

12         THE COURT:  All right.  What about has there been any

13  discussion about how depositions would occur, or is that an

14  issue for another day?

15         MR. HARRIS:  I think that's an issue for coordination

16  which is kind of my next point, Your Honor, which is that we're

17  going to use, we and the Committee have agreed to use

18  reasonable best efforts to coordinate all of our efforts on

19  discovery, depositions, strategy, prosecution, who is going to

20  take the lead on what issues, things like that to avoid, you

21  know, duplication and incremental costs as best as we possibly

22  can.

23         THE COURT:  Okay.

24         MR. HARRIS:  The UCC has asked and we have agreed that

25  they have the right to seek guidance from the Court to modify

1   the scope of the intervention in the event they believe that we

2   are not acting in the best interest of the estates generally

3   and prosecution of the causes of action.

4          THE COURT:  But your client will remain your client.

5          MR. HARRIS:  My client is going to remain my client,

6   yes.

7          THE COURT:  Right.  And their client will be, well

8   they'll be acting on behalf of the Debtors' estate as a whole.

9          MR. HARRIS:  Correct.  But I think the idea here is if

10  for any reason they think we're being obstructionists in any

11  way or --

12         THE COURT:  Right.

13         MR. HARRIS:  -- overstepping our bounds, if you will,

14  that they have the right to come to Your Honor and ask to put

15  us back in our cage.

16         THE COURT:  Okay.

17         MR. HARRIS:  The next point, Your Honor, is that the

18  petitioning creditors and the Committee have agreed that

19  neither party is going to have either a veto or a consent right

20  over any proposed settlement.  If any party reaches a

21  settlement with one or more defendants they can propose it and

22  seek approval from Your Honor subject, of course, to the whole

23  9019 process and everybody's rights and connection with that

24  process.

25         THE COURT:  All right.  So if they reach a settlement

1    in connection with the Debtors' estate, you'll have the right

2    to object to it.

3         MR. HARRIS:  Correct, and conversely --

4         THE COURT:  And if you reach a settlement on your

5    individual claims, they'll have a right to settle it or

6    objection to it.

7         MR. HARRIS:  Right.  Or if there's, if there are

8    individual claims or if there is a potential for a more global

9    settlement that parties agree to then we have the right to

10   propose it, obviously, they have the right to oppose it and

11   take whatever positions they think are appropriate.

12        THE COURT:  All right.

13        MR. HARRIS:  The nest point, Your Honor, is simply a

14   reservation of rights.  As we noted in our papers, the

15   petitioning creditors simply want to reserve the right to seek

16   an award of substantial contribution under 503(b) in the event

17   such an award would be, in our view, justified.  Obviously,

18   that's subject to the rights of any and all parties in the case

19   to take whatever positions they think are appropriate.  And

20   those are the terms on which all the parties have agreed other

21   than Mr. Gendregske's counsel as I indicated before.

22        The only open issue, Your Honor, is the following one,

23   which is that the Committee and the petitioning creditors

24   believe that the sole and exclusive authority to propose a

25   settlement with the defendants in the case or any of them

1   should be vested in the plaintiffs in the adversary proceeding,

2   and no longer reside with the Debtors.  The --

3          THE COURT:  I'm sorry, start that over again.

4          MR. HARRIS:  The open issue we have which the

5   Committee and we agree on, but which the Debtors are concerned

6   about, and I'll let them speak for themselves on this, is that

7   the plaintiffs both the Committee and the Petitioning Creditors

8   as the intervening plaintiffs either individually or together

9   would have the sole and exclusive authority to propose a

10  settlement and prosecute a settlement with the defendants in

11  the adversary as opposed to having the company continue to have

12  the authority to discuss potential settlements with the

13  defendants.  We believe that if the Committee and the

14  Petitioning Creditors are going to be prosecuting these actions

15  and the defendants, and there's a possibility of settlement,

16  the defendants should be talking to us not having the

17  opportunity to discuss potential settlements with various

18  parties who, you know, may or may not believe in the causes of

19  action who may or not be involved in the causes of action in

20  terms of their assessment, etc.

21          I understand, obviously, any settlement would be subject

22  to everybody's rights to take positions under 9019 when

23  ultimately proposed.  But really, Your Honor, as a matter of

24  efficiency and focus, it would make the most sense to have the

25  defendants talking to the plaintiffs in the action rather than

1  any other parties who have agreed that they would and chosen

2  not to take up the cause here and prosecute them.

3       THE COURT:  You touched on a matter that was certainly

4  on my mind coming in and I'm not sure exactly how or if it's

5  been resolved by what you've gone through, which is who's in

6  charge of running the show.  The Committee is going to be in

7  charge of running the adversary proceeding, correct?

8       MR. HARRIS:  The Committee is going to be in charge of

9  running the adversary proceeding working with us, but they have

10  --

11      THE COURT:  They have the decision making authority

12  and you'll tag along; or, if you feel, at some point like you

13  need to stand up more for yourself you'll come back and they'll

14  either agree or you'll come back and ask for me right?

15      MR. HARRIS:  At this point, Your Honor, we don't

16  actually think that there is a big difference of view certainly

17  as it relates to the prosecution of these causes of action or

18  our collective belief in their viability.  There may

19  differences in opinion on strategy.  There may be differences

20  of opinion on settlement and their parties have the ability to

21  go their own ways, obviously.  But as it relates to the causes

22  of action which are purely estate causes of action, clearly the

23  Committee is the one vested with prosecution of those.  We're

24  in the case.  We get to understand all the discovery.  We,

25  hopefully, will be coordinating with them pretty closely in

1    terms of how the prosecution of the claim gets put together.

2         On those causes of action where we have independent

3    rights, we reserve the right, obviously, to stand up and say

4    hey we think this needs to be prosecuted or dealt with in a

5    slightly different way, particularly, as it relates to the

6    contractual claims and equitable subordination as it relates to

7    the harm we believe was suffered upon my clients directly.  But

8    as a bottom-line matter it's the Committee's adversary

9    proceeding.  We're intervening plaintiff, and they are vested

10   with the causes of action and to act on behalf of the estates.

11        THE COURT:  Okay.  So, I guess there are different

12   ways you could look at it which is there is the idea of

13   settling simply the adversary proceeding.  There is the idea,

14   perhaps, of settling the Debtors' case perhaps separately from

15   the adversary proceeding, although I struggle to see how that

16   would be possible.  Or there could be a global settlement that

17   would deal with the adversary proceeding and the Debtors' case.

18   And what I'm hearing you say is that notwithstanding that the

19   Debtors could be or would be affected by any settlement like

20   that, you do not want them to have the power to actually enter

21   into it.

22        MR. HARRIS:  Well let me be clear, Your Honor.  If the

23   Debtors were to propose a case resolution that didn't require a

24   resolution of the causes of action in the adversary proceeding

25   then what I'm saying here wouldn't matter.  If they were to

1    propose a sale that basically preserved the litigation for

2    later and escrowed a bunch of proceeds, that's fine, and that

3    would not be impacted by what we're saying here.  But I think

4    what we're saying today is that to the extent the case

5    resolution will if the Debtors propose would include or require

6    some resolution or releases that would affect the causes of

7    action, that would require -- that would not be something they

8    could do without having at least the Committee or us supportive

9    of it.

10           THE COURT:  Okay.  Okay I understand.

11           MR. HARRIS:  I'll turn the podium over to the Debtors

12   to speak to that issue.  And then I believe Mr. Gendregske's

13   counsel wants to be heard with respect to the intervention --

14           THE COURT:  Well let me -- I think my plaintiff might

15   want to be heard.

16           MR. KELLEY:  As a preliminary matter, I neglected --

17   this is Jeff Kelley for the Debtors.  I neglected to introduce

18   to the case on the record Mr. Robert Stark who is, I believe,

19   Your Honor knows who Your Honor has approved as counsel to our

20   Special Committee in this case.  And the Special Committee in

21   this particular instance consisting of one person because we

22   have two members: one of whom is defendant and one who is not.

23   So the one person member of our Special Committee has been,

24   through Mr. Stark's involvement, involved in all aspects of our

25   positions on this standing and intervention motion.  I did want

1   to make the Court aware that Mr. Stark was here today.

2          THE COURT:  I did see him on the list, but thank you.

3   Welcome.

4          MR. BURKE:  Good morning, Your Honor, Michael Burke

5   for the Committee and, again, thank you for allowing us to be

6   heard.  Mr. Harris did outline the proposed settlement and

7   quite literally it's done on loose leaf paper 20 minutes before

8   this hearing and which would be subject to a stipulation and

9   order that we would enter.  But I think Your Honor asked the

10  correct questions.

11         The Committee would retain control of their adversary

12  proceeding.  The Petitioning Creditors would be intervening in

13  our adversary proceeding.  Their adversary proceeding would be

14  dismissed.  And as we went through, we are trying to coordinate

15  so there's not duplication of services and unneeded costs to

16  the estate, so we will coordinate with matters with respect to

17  discovery.  And, moreover, and, importantly, in addition to

18  control that if the Committee comes up with a settlement we,

19  obviously, retain and have because we believe standing is

20  unequivocally ours, the right to propose that settlement

21  subject to a 9019 and the Petitioning Creditors could object.

22         Your Honor also hit upon what I think is a very

23  important point of, you know, if there's a settlement of this

24  case that what's the likelihood of a settlement of the

25  Bankruptcy case without addressing this adversary proceeding.

1    I think that's very moot, but, of course, if there is a sale we

2    can always reserve the rights, put the money in escrow or what

3    have you.  But we actually think there probably can be no

4    resolution to the Bankruptcy case without a resolution of the

5    adversary proceeding.

6          So on authority to settle, I guess, I guess isn't the

7    correct word.  We're not trying to prevent the Debtor from

8    proposing a, you know, a plan or a sale process.  But one in

9    which it affects our rights in connection with the adversary

10   proceeding.  We don't think that's likely, but we would not

11   want the Debtors to essentially get around the ability or have

12   them settle the adversary proceeding or grant releases or what

13   have you.

14         So we will try to flush out this protocol again which

15   was just come up with this morning in a form of stipulation and

16   order, but Mr. Harris did appropriately relay the main key

17   points subject to the, you know, the devil being in the details

18   in this stipulation and order.  If Your Honor has any

19   questions.

20         THE COURT:  So what you're asking -- maybe I should

21   ask Mr. Stark.  But what you're asking, the open issue you're

22   asking is whether or not the Debtor, even though it's not a

23   party to the adversary proceeding, would, nonetheless, be able

24   to participate in settlement negotiations presumably with

25   Yucaipa that would include the adversary proceeding without

1  your participation?

2      MR. BURKE:  Right trying to settle the adversary

3  proceeding whether through a plan or without -- well we think

4  we should have the sole exclusive authority to resolve the

5  adversary proceeding.  I'm not trying to infringe upon their

6  plan or 363 sale rights; however, if they affect my complaint

7  they shouldn't be permitted to do that.

8      THE COURT:  Right, okay I got you.

9      MR. BURKE:  Thank you.

10     THE COURT:  You're welcome.  Mr. Stearn, good morning.

11     MR. STEARN:  Good morning, Your Honor, may it please

12  the Court Bob Stearn from Richards Layton & Finger on behalf of

13  the Debtors.  Largely in agreement with what we heard today

14  with the exception of that last point and I'll explain why in a

15  moment.  From the Debtors' perspective what we were trying to

16  guard against was really the burden and expense to the estate

17  of having to participate in really two separate adversary

18  proceedings which were in many ways overlapping.  And one of

19  the reasons we're substantially in agreement with the

20  stipulation as has been presented is because it protects us

21  from that.  For instance, we're now looking at one complaint

22  instead of two.  We're now looking at one discovery request

23  instead of two; although recognizing that there may be some

24  supplementation.

25     I'm encouraged by the suggestion that the Petitioning

1    Creditors and the Committee will coordinate on discovery.  For

2    instance, if we're defending the depositions of, you know, one

3    of our officers our view is going to be look you get seven

4    hours.  If you get relief from the Court for more, you can

5    convince us as to why you're entitled to more fine.  But this

6    is one case, you know, one complaint and we're going to proceed

7    through discovery efficiently and you guys coordinate and you

8    figure out how you're going to divide the seven hours up

9    amongst yourselves.  But when seven hours is up, absent our

10   agreement or Court order, we're leaving.

11          So we were encouraged to hear about the coordination.

12   And, of course, the last thing that I was happy to hear about

13   was, for instance, essentially that everyone is reserving their

14   503(b) rights.  Obviously, you know, the Petitioning Creditors

15   are going to reserve whatever right they think they have to

16   seek substantial contribution.  We're going to reserve our

17   rights with respect to trying to, you know, protect against

18   that.  We don't want the estate to keep paying for really two

19   plaintiffs.

20          But the issue on which we've not yet reached agreement

21   and I think I don't know that we will, but there's been very

22   little discussion about it so far was this notion of sole

23   settlement authority.  It was first raised to us this morning;

24   20, 25 minutes whatever it was before the hearing was the first

25   that we heard about it.  It's not the subject of any of the

1   motions that are presented to Your Honor today.  Neither

2   standing motions sought this relief.  It was first floated to

3   us literally at 10 after 9:00 or something like that this

4   morning.

5            We're certainly not in a position right now to give up

6   what we view to be potentially important rights especially in

7   connection with a plan.  And we've essentially also been asking

8   the Special Committee to address issues relating to standing.

9   And, obviously, there's been no consultation with the Special

10  Committee on an important issue like this.  So as I stand here

11  today with respect to this question about whether the Debtors

12  would or could be forced to give up what we view as potentially

13  important rights, at least, hypothetically; don't know how this

14  case is going to play out.

15           But as we've said many times before, our goal is to

16  get out as quickly as we can, given the damage that's being

17  done to the business while we're in Bankruptcy.  We're

18  certainly not prepared as we stand here today to give up rights

19  that potentially could be valuable with respect to moving

20  forward with a plan process and getting us out of the case.  I

21  think that's something that's going to have to be a subject of

22  further discussion as between the parties.  And if the parties

23  are unable to agree, I suspect we'll be back before Your Honor

24  on that issue.  Thank you, Your Honor.

25           THE COURT:  Thank you, Mr. Stearn.

1      MR. STEARN:  I don't know if Mr. Stark wants to be

2   heard on that issue or not.

3      THE COURT:  Good morning.

4      MR. STARK:  Good morning, Your Honor, thank you for

5   allowing me to appear in the case.  Robert Stark from Brown

6   Rudnick on behalf of the Special Committee.  I'll be very

7   brief, because the points have already been made.  But I do

8   think for three reasons and, again, we're writing pretty

9   quickly on a piece of paper as we're learning about the

10  settlement terms.

11      I cannot state to the Court that the Special

12  Committee is supportive of this particular attribute of the

13  settlement and we do want a settlement.  We want all

14  settlements.  This case seems to be in certain respects

15  contracting as opposed to easing.  And I'm not sure that this

16  company, its business is, otherwise, enabled and strong enough

17  to stand forever in a Bankruptcy case like Tribune or Lyondell

18  or some of these other cases where litigation amok where we

19  kept the case going for years and years and years.  This is not

20  that strong of a company.

21      From our perspective the idea that settlement

22  authority would be vested exclusively with the plaintiffs here

23  and not and removed from the company certainly hasn't been

24  briefed and so, therefore, I haven't had any opportunity to

25  talk to the Special Committee about it.  I think that's really

1    important because this doesn't seem, at least, in my experience

2    to be customary.

3        And some of you were involved in Tribune and Lyondell

4    and cases like that, it doesn't seem to be a customary

5    proposition that a plaintiff, a committee, even an official

6    committee that is leading plaintiff would have the ability to

7    sort of touch upon, if not, eviscerate certain rights of

8    exclusivity, certain rights under 1107, for a debtor in

9    possession to lead his way out.  And on top of that, I'm not

10   entirely sure it's very wise.

11       In this case, again, we have a lot of inter-creditor

12   litigation, here and elsewhere.  We have a lot of issues that

13   are being raised as far as value allocation is concerned.

14   Obviously, there's been governance issues and causes of action

15   have been asserted.  And the Debtor is not objecting to the

16   prosecution of that.  But the beginning of a litigation is far

17   different than the ending of the litigation.  And the

18   foreseeability of how and when we're going to end that

19   litigation at this moment, you have to evaluate the strength of

20   the business and determine whether or not the business is

21   strong enough to withstand the possibility that this could

22   evolve and devolve into further litigation for extended periods

23   of time.  I'm not entirely sure this business is like that.

24       And so the opportunities that the Bankruptcy Code

25   presents a debtor to propose to the Court as all parties in

1    interest a solution.  They don't have to like it.  They can

2    argue against it.  They can vote it down.  But having, at

3    least, the opportunity to lead through and try to come up with

4    ideas that solve problems that's, I think, what debtors are

5    supposed to do and that's what's being proposed we cannot do

6    preordained before even gotten to the idea of sitting down and

7    talking about it.  Thank you, Your Honor.

8         THE COURT:  Thank you, Mr. Starck.  Mr. Gendregske.

9         MR. ANTONIPILLAI:  Good morning, Your Honor, Justin

10   Antonipillai from Arnold & Porter on behalf of Mr. Gendregske.

11   I understand this is a little bit, it has the sort of sense of

12   a train that's already left the station.  If the Court would

13   permit me, I'd like to talk for a minute, just focus on the

14   intervention point because the standing point we made was just

15   simply in a derivative claim, there shouldn't be two separate

16   parties, and I believe that's no longer at issue.

17        There's some very pragmatic concerns we have about the

18   arrangement that is on paper.  And I think largely Your Honor

19   has started unpacking them.  But I'm going to start, if the

20   Court would permit me, with a brief discussion of the law, and

21   I'll try and be brief.  I know Your Honor certainly knows many

22   of these cases.

23        For us, we are facing straightforward breach of

24   fiduciary duty and aiding and abetting of breach of fiduciary

25   duty claims.  There's standard straight, you know,

1  straightforward State law claims, non-core.  They could have

2  been brought in State Court and, you know, then we'd be having

3  an argument about whether they're related too.  Right, you can

4  imagine that kind of a discussion going on.

5       The question really is, you know, I know this is not

6  overly relevant, but if we were outside of Bankruptcy and we

7  were just in the District Court, this would be very clear that

8  the Petitioning Creditors should not be allowed to intervene in

9  this case.  So that's the sort of paradigm I'm starting from.

10  One could disagree and one could say maybe permissive

11  intervention, but it's certainly not mandatory intervention

12  outside the Bankruptcy circumstance.

13       Then we go to the Bankruptcy contacts and how does it

14  change its analysis.  And I'm going to start by citing three

15  cases.  I don't normally do this, but citing three cases that

16  are arguably adverse to my position.  I just want to explain

17  and cite them for the Court up front.  We start with Marin Oil.

18  Marin Oil was the Third Circuit case.  Obviously, it held that

19  a creditor's committee has the mandatory right to intervene in

20  almost any proceeding including adversary proceedings.  And

21  they're not limited in that case to amicus status.  They have

22  to have more.

23       It was, obviously, limited on space to creditors

24  committee.  There's a fair amount of discussion in that case

25  about the special roles of creditors' committees.  But I have

1   to tell Your Honor and Your Honor certainly read the case,

2   there's a fair amount of dicta in that case that arguably

3   relates beyond creditors' committees in interpreting the

4   relationship between 1109(b) and 24.  Okay so that's the first

5   one, but it's limited to creditors' committee.

6       In State Street Bank, Judge Walsh in this Court

7   applied essentially Marin to require intervention by a Debtor

8   in a case essentially applying Marin Oil.  And then third Phar-

9   Mor extended Marin, although it even cited internal criticism

10  and there's a dissent in that case, extended Marin Oil to

11  adversary proceedings that are non-core and arguably unrelated

12  to jurisdiction.  But, again, it's creditors committee case, so

13  that's the sort of lay of the land.

14      You have Marin Oil, State Street Bank and Phar-Mor.

15  They're all in the creditor's committee context or with the

16  debtors' committee context, but they're arguably adverse and

17  they all have sort of general language that interprets the

18  relationship between 1109(b) and 24(a) in a way that's broader.

19  It's dicta, but it's adverse to us.

20      Marin has been harshly criticized in many ways and

21  it's limited on its facts to the creditors' committees' cases.

22  Obviously, the Fifth Circuit and the Tenth Circuit, the Fifth

23  Circuit in Fuel Oil.  The Tenth Circuit has also joined in

24  saying that 1109(b) does not create a mandatory right to

25  intervene in any adversary proceeding related to a bankruptcy.

1    That is the better reading of the relationship between 1109(b)

2    and 24(a).  And in this context, it also plays off the plain

3    language of 7024 and the advisory committee notes.

4         So our simple point is under the plain language of

5    7024 and Rule 24 and the advisory committee notes, a creditor

6    as opposed to a creditor committee does not have the right to

7    mandatorily intervene in a case like this.  And we've looked

8    since Marin Oil, it's been, you know, 20, 24 years since that

9    case came out.  We couldn't find a single case holding that a

10   creditor, an individual creditor as opposed to a creditors

11   committee gets to intervene as a mandatory matter in an

12   adversary proceeding like this under the rationale of Marin

13   Oil.  I think that's for good reasons.

14        One, it would, you know, there are a lot of adverse

15   consequences that one can imagine from that; some of which are

16   playing out in the, you know, proposed order that we have

17   before you.  So, notwithstanding, the language of the cases

18   we've cited, Rule 24(a) does not require the Petitioning

19   Creditors to mandatorily intervene in this case.  And then it

20   becomes a matter of permissive intervention.

21        And I think of what you've heard today which is that

22   essentially the Petitioning Creditors are saying that the

23   creditors committee can proceed with the case.  That

24   essentially that's a concession that their interest are

25   adequately protected in terms of the estates interest here.

1    Again, you have a derivative claim, and we believe that the

2    estate -- essentially what they're saying is that the creditors

3    committee can bring this case as it does in many other cases

4    and that should be the end of the matter in terms of the

5    permissive intervention analysis, because, again, if you have a

6    party that's adequately representing the interest of the

7    estate, there is no permissive intervention.  Obviously, the

8    Judge, Your Honor can reach a different

9    conclusion in its discretion.

10         So that brings us to pragmatic concerns we have in

11   that context.  And we're looking at this from a permission

12   intervention perspective.  We have real concerns about what

13   this means.  I mean the last issue about the various ways in

14   which the settlements can go forward strikes us as very

15   complicated and you can imagine that being fought over at every

16   step in the proceedings.  In many ways, this agreement looks a

17   lot like standing without calling it standing.  They are called

18   the plaintiff in the case.  They're allowed to do every version

19   of discovery.  And even provisions about withdrawing discovery,

20   basically reserve the right to serve it again.  You know,

21   withdraw the complaint means that they have to coordinate, but

22   there's a lot of reservation of rights.

23         It doesn't look like this is a material difference

24   from, you know, affording a separate party standing on a

25   derivative claim.  And, again, you know, in a derivative case,

1    you know, there's hundreds of cases talking about why.  And

2    once you've granted one party standing to bring a derivative

3    claim, you don't want every shareholder, for example, also

4    intervening in the same case.  You know, we cited some of that

5    language because it complicates the case.  You're going to have

6    issues all the way through about what does it mean in

7    discovery, what does it mean in terms of settlement, who has

8    authority, and it's not really necessary in this case.

9            Our point is there seem to be two issues that are

10   really underlying this effort by the Petitioning Creditors to

11   intervene.  I don't think they need to intervene in order to

12   solve those issues.  One, they're already a plaintiff in a case

13   that's essentially been consolidated with my client's case.

14   And we've all agreed that discovery can take place in a

15   coordinative way.  So a simple order that requires coordination

16   of discovery between this case and the case in which the

17   Petitioning Creditors are already bringing their direct claims

18   effectively solves the issue with respect to discovery.  You

19   know, we're going to have to take the discovery once,

20   coordinate the discovery, you know, not repeat it, but that

21   solves most of the issues with respect to discovery.

22           The reason I'm resisting intervention as a plaintiff

23   is that, you know, could very well carry with it other rights

24   that I don't think are necessary and are certainly not

25   justified under either 24(a) or 24(b).  So a coordinated

1    discovery order we don't object to and that would certainly

2    solve the issues with respect to most of the issues.  They're

3    already withdrawing their complaint.  And certainly there's

4    nothing wrong, you know, the Committee and the Petitioning

5    Creditors, they're always allowed to just coordinate in terms

6    of what plan should be brought.  There's no bar on that.  But

7    the notion that they be permitted to intervene as a plaintiff

8    that carries with it, you know, certain, you know, certain

9    other rights potentially and we don't know what that means.

10   But for discovery purposes, I think it's solved by the order of

11   just coordinating discovery.

12        Second, for settlement purposes, this provision is

13   troublesome to us.  We can imagine a lot of issues coming a

14   long down the way as to who's in charge of the case, who gets

15   to weigh in on what.  And Rule 9019 already gives the

16   Petitioning Creditors the right to weigh in once they sort of

17   seen the settlement discussions weigh in and disagree with it

18   or work out, you know, in terms of a settlement authority.

19        And so we think both a coordinated discovery order and

20   an order, you know, the normal 9019 process basically covers

21   most of the watershed, the waterfront.  And I don't know

22   honestly standing here what the consequences, all of the

23   consequences of permitting the Petitioning Creditors to

24   intervene under these circumstances.  We sort of explained why

25   it's not legally permitted or required, certainly.  But, you

1    know, once you have a party in the case as a plaintiff, you

2    know, I'm sure that will be thrown back at us regularly as to

3    what their rights are, what their permitted to participate in,

4    what their rights are for settlement.

5         And in a case that's trying to move towards trial in

6    August, I think that unduly complicates this case.  And,

7    obviously, Your Honor, we've made this clear and Your Honor

8    will be ruling on all of this stuff, but, you know, we haven't

9    worked through our issues with respect to a right to a jury

10   trial.  We could have a severance of this case of our claims

11   against my client.  You could have, you know, withdrawal of the

12   reference or, at least, the discussion about that.  You know,

13   you can imagine what the arguments would be there.  But it's

14   not appropriate at this point on this law to have us burdened

15   in some ways with the Petitioning Creditors as a named

16   intervener when I think most of the relief they seek can be

17   achieved through a coordinated discovery order and through the

18   normal 9019 process.  Thank you, Your Honor.

19        THE COURT:  Thank you.  Mr. Klyman.

20        MR. KLYMAN:  Thank you, Your Honor, for the record

21   Robert Klyman of Latham & Watkins on behalf of Yucaipa.

22   Yucaipa has not taken a position on who has standing.  We've

23   been agnostic on that.  The only point that I'd like to make is

24   that to the extent Your Honor does allow this resolution to

25   move forward, Yucaipa may amend its answer depending on how the

1   complaints shake out.  And we will work -- if you grant this,

2   notwithstanding, Mr. Gendregske's counsel's points that we will

3   work with the Committee to work out an appropriate timeline

4   that doesn't slow down the track that

5   we've already set out to get to a trial in August.

6          THE COURT:  Thank you.

7          MR. HARRIS:  Your Honor, would you like to hear a

8   response?

9          THE COURT:  Sure.

10          MR. HARRIS:  Your Honor, just a couple issues to

11   address the concerns raised by Mr. Gendregske's counsel.  I'm

12   not entirely clear, frankly, what coordinated discovery order

13   Mr. Gendregske's counsel thinks can be entered here.  On the

14   one hand, he complains in his response that there shouldn't be

15   two adversary proceedings that are prosecuted simultaneously.

16   There should be one, etc.  That's exactly the resolution we've

17   come to here.

18          If I understand his position correctly the two

19   adversary proceedings would stay outstanding.  They could be a

20   coordinated discovery order between the two.  To my mind that

21   creates enormous inefficiencies.  The first thing that is going

22   to happen is somebody is going to file motions to dismiss our

23   adversary proceedings or certain portions of it in any event

24   for lack of standing.  So we actually think what we've done

25   here is create a much more efficient means to move these cases

1    forward such that --

2         THE COURT:  Well I think his argument is that your

3    case should be dismissed.  The Committee's case should go

4    forward.  And basically you'd have the right to see whatever

5    happens; attend the deposition, get a copy of the document.

6    But not actually actively participate, and I think that's what

7    he's saying.

8         MR. HARRIS:  I mean maybe that's one interpretation,

9    Your Honor.  I'm not sure that's what I heard.  But that also

10   kind of skirts the few, you know, important issues here that

11   would remain outstanding such as the fact that we do have the

12   right to bring a contract enforcement action against Yucaipa

13   under the terms of the third amendment.  That is a claim that

14   my clients possess independent of the Debtors.

15        THE COURT:  But he wouldn't care about that.  His

16   client wouldn't care about that because he wouldn't be a

17   defendant.

18        MR. HARRIS:  True.  And we also have, we believe, an

19   independent basis for equitable subordination for harm suffered

20   on my clients in particular.  And that claim would subsume

21   virtually all of the discovery and information relating to

22   actions and conduct of the board of directors during the

23   relevant periods here, which while not necessarily in

24   connection with prosecution of a claim for a breach of

25   fiduciary duty or aiding and abetting breach of fiduciary duty.

1  Clearly, the conduct of the board here and the actions of the

2  board here are relevant to the overall claims for equitable

3  subordination.

4         It's not just Yucaipa acting with one hat on.  It's

5  the whole panoply of conduct that they undertook in the context

6  of both trying to become the requisite lender, as well as the

7  conduct in the context of the board.  So I actually think that

8  the way that we set this out is actually a much more efficient

9  process and not as confusing as Mr. Gendregske's counsel would

10  have it.

11         Circling back, Your Honor, I mean in our papers and in

12  Mr. Gendregske's papers there are standards that we both

13  actually agree on for the Court to review in terms of

14  intervention come down to basically two: do we have a

15  sufficient interest in the case in order to justify

16  intervention and is there adequate representation.

17         With respect to the first factor, Your Honor, we've

18  laid it out in our papers, but there seems to be several basis

19  to conclude that we do have a sufficient interest here to

20  justify intervention.  It's not just a mere economic interest

21  in terms of recovery in the case --

22         THE COURT:  You really don't need to get into the

23  intervention issue.

24         MR. HARRIS:  All right, Your Honor.  So with the

25  pragmatic standpoint, we think that the agreement that's been

1  reached between the company, the Committee here creates an

2  enormously efficient way to move forward with what our -- it's

3  not one adversary proceeding.  It's actually several adversary

4  proceedings and potentially cross claims, all of which are

5  being prosecuted simultaneously, all of which we're going to be

6  in the middle of simply by virtue of the way the parties have

7  agreed to proceed with these subject to Mr. Gendregske's issues

8  with potential severance of certain claims, etc.

9          So with that, Your Honor, we think the Court should

10  approve the agreement that's been reached here.  And to the

11  extent Your Honor does so, we will work to prepare an agreed

12  form of order to submit to Your Honor. Thank you.

13          THE COURT:  Mr. Burke.

14          MR. BURKE:  Thank you again, Your Honor, and I'll be

15  brief.  As Your Honor is probably sick of hearing me say, you

16  know, from the outset the Committee's view has always been that

17  they're sitting in the middle of these two titans: Black

18  Diamond and Yucaipa and there can't be a resolution to this

19  case unless these two parties settle or are forced to settle.

20          We proposed as Your Honor knows several months ago to

21  try to streamline the process by teeing up a 363 sale with the

22  Yucaipa bid.  That did not proceed, but it was a way to

23  streamline the case because, quite literally, the Debtor can't

24  stay in bankruptcy for the rest of its life.

25          THE COURT:  Well it just might stay in bankruptcy for

1    the rest of its life.

2         MR. BURKE:  So, you know, to that point again this is

3    another attempt at the Committee trying to streamline this.

4    Quite honestly, I have no desire to go to trial in August.  May

5    is when we're supposed to mediate.  It would be my hope that

6    there can be a resolution through mediation, and we will work

7    our hardest to try to get that.  But I don't want to be left in

8    another situation where under this stipulation if we have, it

9    is our adversary proceeding.  We control the adversary

10   proceeding.  They have rights to intervene.  I'm not conceding

11   for a moment that they have any direct causes of action.  But

12   let's hypothetically if they do, then we may have separate

13   issues that we have to deal with.  By having them intervene in

14   our adversary proceeding, it will tee up everything for

15   mediation or, at least, a trial if we ever get there.  And I do

16   think that this is more streamlined and a quicker approach then

17   battling over estate causes of actions and private causes of

18   action that Black Diamond may have.  Again, our sole intent

19   here is to streamline this, come up with a resolution,

20   hopefully consensually to get the Debtors out of Bankruptcy.

21   Thank you.

22         THE COURT:  You're welcome.  Any last comments?  Okay

23   well a couple of things.  In preparing for today's hearing on

24   the standing issues, it was one of my primary thoughts,

25   concerns issues I thought was just the pragmatic ability to

1    figure out how to run a case like this where the Committee

2    sought standing and in its papers the Petitioning Creditors

3    didn't object provided they would be allowed to intervene.  And

4    the issue becomes who controls the litigation if you have two

5    different plaintiffs with two different ideas going two

6    different directions and one lawsuit, you've got all sorts of

7    problems.

8         So in the context of the proposed agreement, I think,

9    flushes out, at least, most of those issues, although I could

10   see some, perhaps, arising in the future.  And what I really

11   probably will be doing is just kicking the can down the road.

12   Hopefully, we never have to deal with it, but if we do we'll do

13   with it in the context of agreements about discovery,

14   agreements about settlement, etc. etc.

15        So I'm certainly willing to grant the Committee's

16   standing to pursue the Committee's cause of action.  I don't

17   think Mr. Gendregske would object to that.  It is picking one

18   or the other.  However on the picking one or the other issue, I

19   will allow Black Diamond to, excuse me the Petitioning

20   Creditors to intervene/participate in the litigation provided

21   that the issue about coordinating discovery and having one set

22   of document requests and one deposition.  I'm not going to give

23   you -- I can tell you as I'm sitting here right now I'm not

24   giving the Committee a deposition and then turning around and

25   letting the Petitioning Creditors take it a week later.  If you

1    both want to participate and you both want to ask questions at

2    one deposition, I'll deal with that at a future date if

3    necessary.  But, you know, it's going to be one set of document

4    requests, one set of interrogatories, one set of request for

5    admissions, one set of depositions unless you can come back and

6    tell me there's a problem.

7         That solves a big issue I had about coming in and

8    saying okay I'm going to grant the Committee's motion.  I'm

9    going to allow the Petitioning Creditors to intervene.  We

10   don't have one captain.  We got two.  And, you know, gosh knows

11   what's going to happen.  And I think I understand how a

12   settlement might work in the event one is reached.  Certainly,

13   it sounds to me like all parties' rights are being reserved in

14   connection with the substance of any 9019 motion that's put in

15   front of the Court.

16        It's a little unclear -- well and it's also, I think -

17   - well it's confusing when you get to the point of okay let's

18   say Petitioning Creditors and Yucaipa reach some sort of

19   settlement.  The Committee is not a party to it, doesn't

20   necessarily agree with it.  Debtor is not a party to it,

21   doesn't necessarily agree with it.  And you come in and you try

22   to get a 9019 motion approved that settles their causes of

23   action or settles the Debtors' plan, etc. etc., I don't know

24   how that's going to work.  And I can't contemplate it.  All the

25   different ways it might work.  I mean I think the reality is

1    that unless all four parties, Committee, Yucaipa, Petitioning

2    Creditors, the Debtor are all on board with the settlement,

3    it's likely not to be a settlement, but I don't

4    know.

5         So notwithstanding that I'm unsure about how that

6    might play out, at least for purposes of moving the standing

7    motion forward and getting the litigation going and there's not

8    going to be a settlement until the litigation gets going and we

9    know what's happening, I'm okay with the structure that's been

10   set forward.  Now I just want to make sure I understand before

11   I make a decision if I have to on exclusive right to propose a

12   settlement of the adversary proceeding.

13        I guess my question is because I heard Mr. Stark say

14   he hadn't even had a chance to talk to his client about it.  I

15   heard Mr. Stearn say I haven't even had a chance to talk to my

16   client about this piece, do you want me to make a decision on

17   that issue or do you want to wait and?

18        MR. HARRIS:  Your Honor, I think the comments by both

19   Mr. Stearn and Mr. Stark are fair because the issue was not as

20   they said raised in the motion papers and it did come up in a

21   discussion this morning as we were trying to work through the

22   details of this.  I think it would be appropriate to give them

23   an opportunity to speak to their clients about positions and to

24   talk to us as to why we think the structure we proposed makes

25   sense.  And, hopefully, we can come to a resolution in the form

1    of an agreed order to submit to Your Honor.  And if we can't,

2    we may need to come back to you on just that particular issue,

3    but I don't think you need to

4    rule on it this morning.

5         MR. STARK:  Robert Stark again.  Your Honor, I'm

6    certainly fine with that and I'm certainly happy to pick up the

7    phone and call my client as soon as we leave the Courthouse.

8    The only problem that I have if and it is foreseeable

9    especially if the Special Committee decides that it is not

10   supportive of this particular attribute of the settlement, do

11   we then have an opportunity to brief the issue for Your Honor

12   and then come back and argue it again.  And I don't want to

13   necessarily hold up the other attributes of the settlement

14   because as Your Honor just said getting it started we can't

15   have an ending until we've gotten it started.

16        THE COURT:  I don't think I would need, I think have,

17   in effect, heard -- well I don't want to say that.  The idea of

18   briefing the issue really sort of takes me back a bit because

19   this thing needs to get moving and we have a schedule in place.

20   So I'm not sure I'd allow additional briefing, but I certainly

21   would allow I expect more discussion on the record before I

22   rule if you want me to.  I'm a little sort of at a loss how to

23   proceed.  I have an idea in my head, but those are bad places

24   for ideas sometimes.

25        And let me, well let me say that other than that open

1    issue, I am generally on board with what the parties have

2    agreed to do and would approve it subject to seeing the

3    details, etc. etc.  I don't know if that piece would blow up

4    all the other pieces.  I don't know if that piece is

5    sufficiently narrow that I can deal with it on its own and it

6    will not affect the overall settlement.  I'm not asking anybody

7    to make that decision as I sit here today.

8            MR. STEARN:  May I please the Court.

9            THE COURT:  I can't force the parties to settle no

10   matter how much I would like to do that.

11           MR. STEARN:  May I please --

12           THE COURT:  Except that there's 9019 or something like

13   that.

14           MR. STEARN:  May I please the Court, once again, Bob

15   Stearn from Richard Layton & Finger on behalf of the Debtors.

16   Just an observation or two, Your Honor, my view is this last

17   point is not driving the bus.  That the parties, otherwise,

18   have an agreement irrespective of it and then we just have a

19   dispute as to this separate point which can be cleaved off.

20   And, respectfully, I would say that if it something that Your

21   Honor is going to entertain if after I speak with my client,

22   Mr. Stark speaks with his client, if we have sort of a unified

23   voice that we're just not willing to give up this right without

24   kicking and screaming, we likely would, at least, request the

25   ability to submit something in writing to the Court since the

1    issue, again, has not even been presented.  It's not even been

2    requested in any form of motion or pleading.  It's just come up

3    today in conversation

4    so.  Thank you, Your Honor.

5          THE COURT:  All right.  So I'll reserve decision on

6    that aspect of the agreement in principle that's been reached,

7    at least, between the Committee, Mr. Harris's client and

8    Yucaipa's indifferent.  So other than the open issue, I will

9    approve the proposed procedure.  I'll overrule the objection

10   subject, of course, to actually seeing the stipulation and

11   seeing what it says.  And if it's consistent with what I've

12   been told in Court, I won't have a problem with it.  I will

13   hold aside an issue on who gets to take the lead in settlement

14   at this time without prejudice to the concept that that might

15   blow what I've already agreed to up; in which case, I'll deal

16   with that if necessary.  If it's a discreet issue, I'll deal

17   with that in its context.

18         But I think it would be wise for everyone to actually

19   be able to have a more less frantic discussion and be able to

20   talk to their clients, etc., etc. on this issue.  So I think,

21   hopefully, everyone understands that.  Are there any questions

22   in connection with going forward in that way?

23         MR. HARRIS:  No, Your Honor, we'll work to put

24   together an agreed order between the parties consistent with

25   what Your Honor's rulings are.

1        MR. STEARN:  Bob Stearn for the Debtors, no questions,

2    Your Honor; thank you very much.

3        THE COURT:  You're welcome.  Okay that for present

4    purposes hopefully and forever deals with the two standing

5    motions.  That leaves us with the motion to dismiss the cross

6    claims, I believe, correct?  Okay we have to switch personnel,

7    bring in new Court Reporter.  And now seems like a good time

8    since it's a natural break so we'll take a short recess while

9    we get a new Court Reporter.

10        (Recess 10:44:28 to 10:48:47)

11        THE CLERK:  All rise.

12        THE COURT:  Please be seated.  From the Petitioning

13   Creditors.

14        MR. WARD:  Good morning, Your Honor.  Your Honor, my

15   name is Robert Ward from Schulte Roth & Zabel on behalf of

16   Petitioning Creditors and their motion to dismiss.

17        Your Honor, in their cross claims Yucaipa is seeking a

18   declaratory judgment that certain provisions of the third

19   amendment are null and void.  These happen to be the provisions

20   that prevent Yucaipa from acquiring a majority of the debt from

21   controlling the debt, that is, and from becoming the requisite

22   lender.  They also happen to be the same provisions that were

23   nullified by the fourth amendment which allowed them to become

24   the requisite lender and to acquire the debt.

25        With the nullification, if you will, of the fourth

1   amendment, this presents a problem for Yucaipa.  So what

2   they're asking this Court to do is, in effect, through a ruling

3   on this cross claim ultimately to reinstate those provisions

4   that allow them to control the debt and to become the requisite

5   lender, provisions that were in the fourth amendment which have

6   now been knocked out and nullified by the ruling by Justice

7   Ramos.  So it's a clear end run around the decision in New

8   York.  They could have brought this action in New York.  They

9   didn't, clearly, because of the negative result they've gotten

10  in New York, so they're asking Your Honor to provide them with

11  the relief here which is to knock out the various provisions in

12  the third amendment that prevent them from controlling the debt

13  and from becoming the requisite lender.

14         These provisions very briefly, Your Honor, are a

15  provision in the third amendment that prohibited Yucaipa from

16  voting any of the debt it acquired, that prohibited Yucaipa

17  from counting the debt toward for the purposes of becoming the

18  requisite lender for the percentage to get to the 50%.  They

19  couldn't count their debt.  In addition, one of the provisions

20  they seek to have nullified here by Your Honor is the

21  prohibition of Yucaipa acquiring more than 25% of the term

22  loans or $50 million dollars of the term loans.

23         So basically, Your Honor, as we say it's an end run

24  around the decision in New York.  We think it's improper.  And

25  among the reasons we do and these are all legal reasons as

1   opposed to factual.  That's why we're doing this on a motion to

2   dismiss is that New York law, Your Honor, which governs the

3   substance of the credit agreement provides that you look at the

4   four corners of an agreement.  And if the language is

5   unambiguous, you give those unambiguous provisions their

6   effect.

7           And there are two contractual provisions.  We think

8   they're unambiguous, very clear, and then there's the statute

9   of limitations.  The two unambiguous provisions are 2.7(e) of

10  the third amendment which amended the first lien credit

11  agreement and created 10.6(j) which is a covenant not to sue

12  specifically addressed to Yucaipa.  In addition, there's

13  10.6(b) which says that any subsequent holders take subsequent

14  to the consent and authorizations of the predecessors.  And,

15  clearly, the predecessors here consented to the third

16  amendment.  Yucaipa doesn't contest that.

17          The third is the statute of limitations which we

18  believe is the three year statute of limitations.  The third

19  amendment which Yucaipa is claiming violates the provisions of

20  the first lien credit agreement, but the third amendment was

21  created, signed, executed on April 21st of 2008.  The suit to

22  invalidate these provisions of the third amendment was not

23  brought until four and a half years later in December of last

24  year.  It's a three year statute of limitations as I'll get

25  into in a moment, Your Honor.

1          But before I do, I do want to get into some of the

2     facts that were raised by Yucaipa in its cross claim.  First

3     off, this is primarily a detrimental and reasonable reliance

4     case.  I say primarily.  It's actually entirely a detrimental

5     and reasonable reliance case by Yucaipa.  Their principle theme

6     is that Black Diamond, Spectrum, and the other lenders did not

7     say anything in connection with the purported fourth amendment

8     or with Yucaipa's acquisition of the debt and since they didn't

9     say anything, they relied on it.  As I'll get into in a moment,

10    Your Honor, there's a big problem with that claim.  10.9 of the

11    first lien agreement has a no waiver clause, and I'll get into

12    that in more detail, but it says as no waiver clauses say that

13    a delay or failure to act does not result in the loss of that

14    right.

15         Now in addition to the primary focus of the cross

16    claim which is you didn't tell me I couldn't do this which

17    clearly would fall by the no waiver claim, there is a

18    smattering of and Black Diamond encouraged us to do it.  I say

19    a smattering because it's a very small part of the complaint as

20    opposed to the constant and consistent allegations that Black

21    Diamond, Spectrum, the lenders, CIT you didn't tell me I

22    couldn't do this.  You didn't stop me.

23         With respect though to the alleged incursion by Black

24    Diamond, first off, it's got some significant issues.  What

25    Yucaipa is saying is that in a meeting in Los Angeles and in a

1    couple of phone calls in August of 2009, we encouraged them to

2    do something, to buy the debt, to enter into this purported

3    fourth amendment.  The problem is unless, you know, we had a

4    crystal ball in August of 2009 they had a crystal ball in

5    February of 2009.  In February of 2009, they already had done

6    so.  They already sought to acquire the debt.  They had sent

7    tender offer materials to all of the lenders in February of

8    2009 which contained what they called the proposed fourth

9    amendment which they admit in their cross claims is materially

10   the same as the actual fourth amendment that was entered into

11   and has now been nullified.

12          So in February of 2009, they had already committed to

13   do this, already sent out the tender offer materials so they've

14   got their causation backwards to say that in August of 2009 we

15   encouraged them to do something that they had already sought to

16   do in February of 2009.  So although on a motion to dismiss a

17   Court generally has to accept what's well pled.  Something is

18   not well pled, Your Honor, when it's patently absurd and we've

19   cited those cases.  You can't go back in time.  February of '09

20   they made the decision.  August of '09 they had discussions

21   with us.  One can't cause the other.  Something after the fact

22   can't cause something before the effect.

23          In addition to that, Your Honor, Yucaipa is saying

24   that because the lenders failed to object to the draft fourth

25   amendment which they submitted with the tender offer of

1    materials in February of 2009, you know, they moved ahead with

2    the project, you know, to acquire the debt.  And they also say

3    that since there was no objection to that draft fourth

4    amendment that was submitted with the tender offer materials in

5    February of 2009 that they thought they were okay.  They

6    detrimentally relied upon it.  That's hard to believe, Your

7    Honor, because the lenders rejected the tender offer.  So

8    Yucaipa in its papers is saying well no one said there was a

9    problem with our acquisition of the debt.  Well they did.  They

10   voted with their feet.  They didn't go ahead with the tender

11   offer.  The lenders refused to accept it.  So how that's not a

12   rejection is difficult to understand; again, an incredible

13   allegation.

14        The third thing and we raised this in our reply papers

15   is Yucaipa is asserting that in August of 2009 they were

16   encouraged by a meeting with Mr. de Koff [phonetic] of Black

17   Diamond and several, you know, quick phone calls.  However, a

18   year prior in a hotly contested matter called Performance

19   Transportation Services in the western district of New York,

20   Black Diamond and Yucaipa were warring with each other.  We

21   provided the documents that show there clearly was no love

22   lost.  They were fighting with each tooth and nail.

23        So it strains creditability and it patently absurd to

24   say that less than a year later Mr. Burkel from Yucaipa would

25   have relied upon his sworn enemy Mr. de Koff who they were

1    warring with each other in the Performance Transportation

2    Services case.  So it's just not credible as we say, Your

3    Honor.  There's no need to give any credit to what are patently

4    absurd allegations.  In addition, they're a small part of the

5    complaint.  The main complaint is no one told me I couldn't do

6    this and, therefore, I reasonably relied.  But in addition to

7    all that, Your Honor, it's irrelevant because we have legal

8    defenses which get around these facts even if Your Honor was to

9    give them any creditability or any credence and those are the

10   three that I mentioned that I'll get into in a second.

11          But before I do, Your Honor, the no waiver clause

12   which is 10.9 of the first lien agreement says it both ways.

13   It says no failure or delay by the lenders in the exercise of

14   power, right or privilege shall be construed to be a waiver or

15   acquiescence therein.  And then it says in the same paragraph

16   the other way around: any failure to exercise or delay in

17   exercising any right, power, or remedy shall not be construed

18   to be a waiver thereof or preclude the exercise of such rights.

19          So even if it were the case that the lenders sat on

20   their hands this no waiver clause you know ends it for Yucaipa,

21   precludes their claim.  And, Your Honor, I said that the

22   primary theme of the complaint is that the lenders sat on their

23   hands.  I'll give you some examples.  At paragraph 18: the

24   allegation in the cross claim is that Black Diamond did not

25   express any intention to challenge Yucaipa's buying the debt.

1    Paragraph 19: the lenders never raised a timely objection to

2    the purported fourth amendment.  Paragraph 25: the lenders were

3    made aware and made no efforts to oppose the purported fourth

4    amendment or Yucaipa's acquisition to the debt.  It goes on and

5    on.  Then at paragraph 71: Black Diamond never objected to

6    Yucaipa's proposed acquisition.  Paragraph 73: Spectrum never

7    objected to the acquisition.  And then at some other paragraphs

8    CIT and the lenders.

9         These claims of the fact that we sat on our hands and,

10   therefore, they reasonably relied on us not doing anything

11   first off, they're not true.  As I mentioned, Your Honor, on

12   the tender offer our clients voted with our feet and refused to

13   go ahead with it.  But, more importantly, they fall by virtue

14   of Section 10.9.

15        We're getting into the actual legal claims, Your

16   Honor.  Section 2.7(e) is a covenant not to sue.  And it says

17   that Yucaipa, it's specifically tailored to Yucaipa which in

18   the third amendment is called the restricted sponsor affiliate.

19   It says Yucaipa cannot assert, and Yucaipa irrevocably waives

20   any claims, causes of actions against any lenders arising out

21   of contract of tort, in any way related to the third amendment

22   or any of the credit documents, and it releases all claims

23   whether accrued or not, known or not, or suspected.  And it

24   even waives special and direct consequential and punitive

25   damages.  It's a broad covenant not to sue.

1          And by virtue of Section 10.5(b) which I'll get into

2    in a second and that's the provision that says a subsequent

3    holder takes pursuant to the consents and authorizations of the

4    predecessor.  It clearly binds Yucaipa.  In fact, Section

5    2.7(e) specifically says the restricted sponsor affiliate can't

6    bring these claims and that is Yucaipa.  With respect to claims

7    like this, Your Honor, they're enforceable in New York.  A

8    covenant not to sue is expressly permitted under New York law.

9    And as a result, it should be given effect.

10         Yucaipa alleges, Your Honor, that the covenant not to

11   sue is procured by misconduct.  Actually what they say is that

12   Section 2.7(e) is invalidated because of the misconduct of the

13   Petitioning Creditors.  However, in order to nullify a covenant

14   not to sue, there has to be an allegation that the covenant

15   itself was procured by misconduct or fraud.  There's no

16   allegation in the pleadings that that's the case.  The

17   allegation in the pleading is that their purchase of the debt

18   was pursuant to fraud and was produced by fraud.  There's no

19   allegation that the covenant itself was procured by misconduct.

20   And as a result under the law of New York the covenant not to

21   sue is given effect.

22         And, you know, this is not surprising, Your Honor,

23   because if it was simple enough simply to say that the covenant

24   was pursued or my actions were procured by fraud, then every

25   covenant not to sue would be rendered null and void.  You could

1    never have one, because the simple allegation in a fraud claim

2    or a misconduct claim or an estoppel claim that your actions

3    procured, that your actions were, my actions were procured by

4    your action would render a covenant not to sue unenforceable.

5    It can't be the case.  That's why it's restricted.  There has

6    to be an allegation that the covenant itself was procured by

7    misconduct or fraud.  No such allegation in the pleading, Your

8    Honor.  As a result it's in effect.

9         Yucaipa does argue that there's an exception to 2.7(e)

10   an exception to the covenant not to sue.  That the claims are

11   not waived "to the extent their caused by such lenders gross

12   negligence or willful misconduct."  However, what Yucaipa fails

13   to do is continue with that exclusion, with that exception.  It

14   says gross negligence or willful misconduct on or after the

15   date that Yucaipa became a lender.  Yucaipa didn't become a

16   lender until the fourth amendment.  The allegations here are

17   not challenging the fourth amendment.

18        They're challenging the third amendment.  The third

19   amendment was entered into well before Yucaipa acquired the

20   debt.  Yucaipa acquired the debt in August of 2009.  The third

21   amendment was entered into in April of 2008.  So this temporal

22   limitation on this exclusion means that it doesn't apply.

23        In addition to that, Your Honor, another part of the

24   exclusion is that it has to be a finding of gross negligence or

25   willful misconduct on or after the date Yucaipa became the

1    lender "as determined by a Court of competent jurisdiction by a

2    final and non-appealable judgment.  There's been no Court of

3    competent jurisdiction making a finding that there was gross

4    negligence or misconduct on the part of my clients.

5            And as a result, that's the second reason that this

6    exclusion --

7            THE COURT:  I'm sorry where is the exclusion

8    specifically?

9            MR. WARD:  It's in the covenant not to sue 2.7(e) of

10   the third amendment, Your Honor.

11           THE COURT:  Okay.

12           MR. WARD:  And with respect to the fact that there has

13   to be a finding by a Court of competent jurisdiction, Yucaipa

14   seeks to get around that by saying hey, you know we're pleading

15   misconduct and we're pleading willful misconduct and gross

16   negligence here, but that's too easy.  You can't just get

17   around a covenant not to sue like this by claiming that

18   especially when there's language in the exclusion that says

19   there has to be a finding by a Court of competent jurisdiction

20   to that effect.  Because if it was easy enough simply to plead

21   a fraud or an estoppel cause of action, a misconduct cause of

22   action as their pleading here and say well, therefore, the

23   covenant not to sue doesn't apply everybody could do it.  You

24   can imagine, Your Honor, someone comes in and pleads willful

25   misconduct or gross negligence and then is not able to prove it

1   and as a result, they render null and void a covenant like

2   this, which makes no sense because, of course, there's a

3   cardinal rule of contract instruction that you have to give

4   effect to every provision in an agreement.

5        So if Yucaipa can simply come and in and say oh it's

6   okay I'm pleading that and at some point I think I can prove

7   willful misconduct and that gets around your covenant not to

8   sue, it means the covenant not to sue has no effect because

9   what if they don't prove it, then how do you put the covenant

10  into effect, you know, in expo facto, so to speak.  So that

11  exclusion doesn't apply.

12       Yucaipa also makes a number of other arguments to do

13  an end run around the covenant not to sue.  First, they say

14  that -- sorry, Your Honor, just got ahead of myself.  First,

15  they say, Your Honor that the fourth amendment itself nullified

16  this covenant not to sue.  Well except the fourth amendment now

17  has also been nullified in the decision in New York.  But,

18  again, Yucaipa can't have it both ways.  They allege in the

19  cross claim, and the whole basis for the cross claim I saw, I

20  looked at it last night, there's five specific places where

21  Yucaipa says that their cross claim assumes the fact that

22  Justice Ramos in New York is invalidating the whole fourth

23  amendment.  That's how they get a justiciable controversy here.

24  Now if the fourth amendment has been nullified in its entirety

25  and, therefore, they can present this issue in front of the

1    Court.

2         With respect to this covenant not to sue, they're not

3    saying well wait a minute, I know that I'm trying to get a

4    justiciable controversy before the Court for a declaratory

5    judgment by saying the whole fourth amendment is invalidated,

6    but that's except for the part that invalidates the covenant

7    not to sue.  Well they can't have it both ways.  If the fourth

8    amendment is not nullified in its entirety which is the basis

9    for their claim, then they're not here.  If, on the other hand,

10   I'm sorry, then the covenant not to sue can't be invalidated.

11   If, on the other hand, the, you know the Fourth -- sorry I'll

12   have to do it again.

13        If the fourth amendment is invalidated in its

14   entirety, then the covenant not to sue is in effect.  It's in

15   the third amendment.  If, on the other hand, there are pieces

16   of the fourth amendment that are still alive, well their whole

17   cross claim is based on an assumption that Justice Ramos has

18   invalidated the whole fourth amendment, so they

19   can't have it both ways.  They're either or they're not here.

20        If they're here based on the invalidity of the whole

21   fourth amendment, the covenant not to sue applies because it's

22   in the third amendment.  If, on the other hand, they're now

23   saying well, you know, the fourth amendment is still alive well

24   then they're whole cross claim falls because -- at paragraph

25   25, paragraph 93, paragraphs 96 and paragraph 108 they're whole

1    claim is based on the entire invalidity of the fourth

2    amendment.

3          The other thing they're saying which is a little bit

4    in conflict with their allegation that the whole fourth

5    amendment has been rendered null and void in their complaint as

6    I've just cited to Your Honor is that the fourth amendment

7    might be severable.  However, the relief that we sought in our

8    motion for summary judgment which was granted by the Judge from

9    the bench was that that purported fourth amendment to the

10   credit agreement is not and never was effective, and that's

11   what he said to me you've won, move on, and that he'll render a

12   decision in writing.

13         But contrary to what Yucaipa is saying, a ruling from

14   the bench is still an effective ruling.  The relief that we

15   sought in our summary judgment motion was clear.  It was

16   focused.  It was that the fourth amendment was null and void

17   and the Judge granted that ruling.  So with respect to

18   severability, we don't think that there is an issue, but we do

19   take instance with Yucaipa saying that we didn't raise the

20   issue in front of Justice Ramos.  In fact, the issue of

21   severability was raised in front of Justice Ramos.  They raised

22   it in their briefs and they didn't raise it in the oral

23   argument, but, you know, that was their choice in the oral

24   argument.  And then they submitted several letters subsequent

25   to the oral argument to Justice Ramos about severability, so

1    the issue has been raised.  It's not been hidden.

2         But, more importantly than that since Yucaipa does

3    argue the severability issue in their motion before Your Honor

4    and their objection to our motion, Your Honor, the law on

5    severability when it comes to New York is that if the sole

6    purpose and effect of an agreement is an integrated whole and

7    one part is interdependent on the other then it's not

8    severable.  It's an integrated document.  And, Your Honor, the

9    sole purpose and effect of the purported fourth amendment was

10   to remove each of the restrictions that prevented Yucaipa from

11   exerting influence on the lenders and becoming the requisite

12   lender.

13        So the purported fourth amendment, Your Honor, was

14   clearly intended to be a wholly integrated document that had

15   one goal which was handing the requisite lender status to

16   Yucaipa.  And there was no argument otherwise before Justice

17   Ramos.  This is not a typical situation of severability, Your

18   Honor, where you have a mistake and some language that would,

19   otherwise, doom some benign agreement.  Here, the entire

20   purpose of the fourth amendment, every substantive provision,

21   is part of a forbidden objective to give Yucaipa dictatorial

22   power over the first lien debt.  And the reason I can say that

23   so clearly, Your Honor, is if you look through the fourth

24   amendment what it simply does is pick and choose provisions of

25   the third amendment which it needs to overturn in order for

Page 61

1    Yucaipa to vote its debt, to become the requisite lender, to

2    buy enough that it can become the requisite lender.  It's all

3    part and parcel of the same whole.  It's not severable.

4           And with respect to the next argument, Your Honor,

5    which is based on 10.6(b), that's the language that says a

6    subsequent holder is bound by the consent and authorizations of

7    the predecessor lenders.  The fact is the predecessor lenders

8    here consented to the third amendment.  Yucaipa doesn't contest

9    it otherwise.  There's nowhere in their pleadings where you

10   will see that Yucaipa contests that the predecessors from whom

11   they bought consented to the third amendment.

12          And the fact that a subsequent holder takes subject to

13   the predecessor lender's consents and authorizations is not

14   surprising.  It's the law.  Even if there weren't a provision

15   like this, the case law provides that an assignee assumes the

16   assignors obligations.  When they bought this debt, they knew

17   what was contained in the third amendment.  The third amendment

18   had these prohibitions on things it could do.  It couldn't vote

19   its debt.  It couldn't acquire enough debt to become the

20   requisite lender.  And it couldn't count the debt that it

21   bought for the calculation to become the requisite lender.  It

22   knew that.  How do we know that, because it was actively

23   involved in the negotiation and the drafting of the third

24   amendment.

25          The Committee in its complaint at paragraph 66 says

1   that.  So there's no hiding.  The fact is they knew what was in

2   the third amendment and when they bought the debt they knew

3   what was in the third amendment.  And they knew that Section

4   10.6(b) which is in actually the underlying first lien

5   agreement, not even the Third or the fourth amendment, says

6   that the subsequent holders take pursuant to the consents and

7   authorizations of the successors.  So there can't be any doubt

8   that they took subject to the provisions of the third

9   amendment.

10      Now one argument they make is a specific general

11  argument, you know, the rule of contract instruction that the

12  specific governs over the general.  And they say that there's

13  another provision of the first lien agreement 10.5 or 10.5(b)

14  which says when an amendment can and cannot be made.  That's

15  not specific to this case or what's before you, Your Honor.

16  What's specific to us before you is 10.6(b) the provision that

17  I'm talking about which says specifically that a successor take

18  subject to the consents and authorizations of the predecessor.

19  It can't be any more specific than that.

20      Next, Your Honor, with respect to the statute of

21  limitations.  The argument that Yucaipa makes it's throughout

22  its cross claim, but in particular paragraph 108 is that the

23  restrictions in the third amendment are inconsistent with the

24  terms of the first lien credit agreement which was being

25  amended by the third amendment.  And, therefore, if the

1  restrictions in third amendment are inconsistent with the terms

2  of the first lien credit agreement, they were inconsistent at

3  the time the third amendment was passed.  So, in effect, the

4  third amendment was void ab initio.

5         And, in fact, the claim here is a declaratory judgment

6  claim that we believe accrued as of the time of the third

7  amendment.  If the allegation by Yucaipa, Your Honor, is that

8  the third amendment was inconsistent with provisions of the

9  first lien agreement and, therefore, is null and void then it

10  clearly was null and void the moment it was passed.  That was

11  in April of 2008 and the action was not brought within three

12  years which we believe is the statute of limitations.  And

13  that's the Delaware statute of limitations, Your Honor, which

14  is a three year contract statute of limitations.  And as we

15  argued in our papers a Bankruptcy Court as a general matter

16  applies the choice of law rules of the State in which it sits;

17  Delaware clearly here.

18         In addition where there's a choice of law provision as

19  there is in this case, Your Honor, and it is New York, but when

20  there's a choice of law provision the case law that's Gluck vs.

21  Unisys in the Third Circuit and also American Energy which is a

22  case in Delaware, a choice of law provision does not apply with

23  the statute of limitations unless there is an explicit

24  reference in the agreement that it does.  And there is no

25  explicit reference here.  It's Section 11.14, Your Honor, of

1    the first lien credit agreement and that makes no specific

2    reference to the statute of limitation.  So as a result, Your

3    Honor, the choice of law is where Your Honor is sitting which

4    is in Delaware.

5         Now if that weren't enough, the Delaware Borrowing

6    Statute provides that if a cause of action arises outside of

7    the State an action cannot be brought in Delaware after the

8    expiration of whichever is shorter: the time limited by the law

9    of Delaware or time limited by the place where the cause of

10   action arose.  That's 10 Del. C. §121.  The shorter statute

11   here, Your Honor is three years.  The statute in New York is

12   six years, but we don't even see that the cause of action here

13   arises in New York.  It may have arisen in Atlanta.  It may

14   have arisen somewhere else, but we don't think it arose in New

15   York.  But in any case, under the Borrowing Statute this action

16   cannot continue because the statute of limitations applies and

17   it's three years.

18        With respect to the argument that, you know the New

19   York statute should apply, the only thing that happened in New

20   York, Your Honor, is that Justice Ramos ruled to invalidate the

21   purported fourth amendment, but that's no basis for finding

22   that the New York statute applies.  Otherwise, there's no

23   assertion, there's no allegation in the cross claim that

24   anything happened in New York, so New York certainly can't

25   apply.

1        With respect to the argument relating to the statute

2   of limitations, Yucaipa argues that the Borrowing Statute

3   should not apply because Borrowing Statutes typically apply

4   when one party is doing forum shopping.  The case law isn't

5   that strong.  It doesn't really call it forum shopping,

6   however, Yucaipa chose the forum here, Your Honor.  This is the

7   cross claim challenges the third amendment just like we had

8   challenged the fourth amendment in New York.  Yucaipa could

9   have brought this action in New York before Justice Ramos where

10  he was dealing with similar issues; the fourth amendment as

11  opposed to the third amendment.

12       They chose to come to this Court because they didn't

13  like the result that they were getting in New York.  In

14  addition, Your Honor, a cross claim is not like a counterclaim.

15  It's not compulsory.  It's permissive.  It can be brought

16  anytime.  Yucaipa clearly made a choice.  They decided to come

17  into this Court.  And since they decided to come into this

18  Court, they have to be bound by the statute of limitations of

19  this Court pursuant to the Borrowing Statute.  Just a few other

20  points on the statute of limitations, Your Honor; I'm about to

21  wrap up.

22       One of the arguments that they make is, Yucaipa makes

23  is the statute began to run when Justice Ramos ruled.  Well

24  that makes no sense.  The assertion here is that the third

25  amendment was void at the time it was passed, because the

1    assertion at paragraph 108 of the complaint is that the third

2    amendment violated the provisions in the first lien credit

3    agreement which the third amendment was amending.  If that's

4    true, it violated them the moment it was passed.  It doesn't

5    all of a sudden start violating the first lien credit agreement

6    when a Judge decides that the subsequent agreement the fourth

7    amendment should be invalidated.

8         THE COURT:  Don't I not have a controversy until the

9    fourth amendment is invalidated?

10        MR. WARD:  Your Honor, did you not or I couldn't hear

11   you.

12        THE COURT:  I'm sorry I was leaning back.  Wasn't it

13   the case there was no controversy until Justice Ramos made his

14   ruling?

15        MR. WARD:  Well, Your Honor, I think the issue of

16   whether there's a case of controversy which is a justiciability

17   issue isn't relevant for the purpose of the statute of

18   limitations and I was just about to get there, because there

19   are several cases.  One is Marvel and I think the other is

20   Madison Fund vs. Midland that says in connection with a breach

21   of contract cause of action, it runs from the date of the

22   breach.  So it doesn't run from the date of anything else.

23   It's fairly clear contract law that a breach of contract claims

24   runs from the date of the breach.  And it applies to an

25   assignee.  It applies to the third party beneficiary.

1          So if taking Yucaipa at its word as you have to do for

2     purposes of a motion to dismiss, that the third amendment

3     violated the first lien credit agreement.  That was the breach.

4     Now this is a declaratory judgment action, but the way statutes

5     of limitations work with declaratory judgment actions is you

6     take the corresponding damages claim and we've cited, you know,

7     case law for that.  And the corresponding claim here is breach

8     of contract.  And with every breach of contract claim, there's

9     no tolling.  It's not like a fraud claim.  It's not tolled.  A

10    breach of contract starts for the statute of limitations

11    purposes when the breach took place.

12          And the only breach here based on the theory that

13    Yucaipa is espousing is that the third amendment violated

14    provisions and was inconsistent with provisions in the first

15    lien credit agreement.  That had to happen on April 21st of

16    2008 when the third amendment passed.  It's a breach of

17    contract, the statute of limitations.  Those are the rules.

18    They could have brought these claims early on.  And they never

19    tried to bring them early on, because, Your Honor, it didn't

20    hurt them early on.  They had the fourth amendment in effect

21    and so everything was on cruise control.  However, just because

22    they didn't feel that they had a problem by virtue of the

23    fourth amendment knocking out the provisions in the third

24    amendment which they're now asking this Court to knock out

25    doesn't mean there wasn't a breach.  I'm sorry, Your Honor.

1          THE COURT:  No, no, I'm just having trouble getting my

2     head around it.  I mean they didn't have any issue with the

3     third amendment until the fourth amendment was put in place.

4          MR. WARD:  I understand, Your Honor, and I think with

5     all due respect, I think we're confusing two concepts.  I think

6     whether or not you have an issue that's not what causes a

7     statute of limitations to begin to run, at least in connection

8     with a breach of contract claim.  Now we all know that there

9     are tolling --

10          THE COURT:  I was going to say unless there's some

11     tolling.

12          MR. WARD:  Unless there's some tolling, but there's

13     tolling when it comes to a fraud claim.  I mean we all know

14     that.  I don't really know what it is in Delaware.  I know what

15     it is in New York.  It's two years after discovery or six years

16     after the event, so there are tolling provisions like that.

17     But there is not a tolling provision when it comes to a breach

18     of contract that I'm aware of in any Court or in any state, and

19     there certainly isn't one in Delaware.  And maybe it's a hard

20     and fast rule and maybe it's unfortunate that for Yucaipa it's

21     a hard and fast rule, but justiciability is one thing.  Whether

22     I have an issue is another thing.

23          The statute of limitations for a breach of contract

24     claims runs at the time of the breach.  And with all due

25     respect, Your Honor, if Yucaipa thought there was a problem

1   with the third amendment, that is, that some of the terms of

2   the third amendment were inconsistent with the first lien

3   credit agreement, they knew it.  They helped draft it.  The

4   complaint of the Committee points out from documents it has

5   that we didn't have that they were actively involved, and

6   that's paragraph 66 of the creditors committee's complaint.

7        So they really have no standing.  There should be no

8   equitable tolling here and I'll get to that in a second,

9   because they knew about the issue all along.  They didn't have

10  a problem with it.  But that doesn't allow them to get around

11  the statute of limitations.  If their assertion is to be

12  believed in the cross claim, they say clearly the third

13  amendment was inconsistent with provisions of the first lien

14  agreement.  There's nothing about the passing of the fourth

15  amendment that made the third amendment more consistent with

16  the first lien credit agreement.

17       Now we think the fourth amendment was inconsistent and

18  Justice Ramos ruled that way.  But the third amendment if it

19  was inconsistent, they knew it was inconsistent.  They had

20  helped draft it.  They can't bold-facedly come in and say the

21  third amendment was inconsistent with the terms of the first

22  lien credit agreement.  Nothing that Justice Ramos did, nothing

23  that's in the fourth amendment made the third amendment more or

24  less inconsistent with the first lien credit agreement.  It

25  either was or it wasn't.  It's very binary.

1          I'm trying to read a note from my partner, Your Honor.

2     And as I was getting into a moment ago, Your Honor, Yucaipa is

3     an assignee.  They're a subsequent holder.  And the case law

4     which we cite in our papers is that an assignee takes subject

5     to the rights of the assignor including specifically for

6     statute of limitation purposes.  So just like 10.6(b) said if

7     you're a subsequent holder, you take subject to the rights of

8     the predecessor holder.  The case law is very clear that the

9     statute of limitations applies.

10         Now Yucaipa does try to get around this issue, Your

11    Honor, and gets into another one of these logical conundrums

12    that I had a problem with a moment here, but here's how it

13    goes.  What Yucaipa is saying is well we had no right to

14    contest that, because Convest had the interest at the time.

15    Now the answer to that is well yeah, but you took from Convest

16    or you bought from Convest or Convest's predecessors and the

17    statute of limitations for a breach of contract arose at the

18    time Convest or its predecessors entered into the third

19    amendment if we had believed your claim that the third

20    amendment is inconsistent with the first lien.  So it starts

21    running from the date Convest or its predecessors had it.  You

22    as the assignee take subject to that statute of limitations.

23    That the way a statute of limitations law works and the way

24    assignments work.

25         What they say is well except we had no right to

1    contest that.  Well except you're taking subject to the rights

2    of your predecessor.  But then they say well and Convest had no

3    right to contest that because some of the provisions that we're

4    challenging here specifically relate to us that we can't vote

5    any stock that we buy.  You know, that we can't buy so much

6    stock and that we can't count it toward the requisite lender

7    provision.  Here's their problem.  Convest or its predecessors

8    have no standing to challenge the third amendment.  I would

9    say, Your Honor, that the assignee Yucaipa because the only way

10   they get standing is through buying this debt.  Yucaipa, the

11   assignee, has to take subject to the fact that Convest and its

12   predecessors have no standing.

13        So, again, their arguments tend to be very circular.

14   They take with one hand and try to give back with the other.

15   So what they're saying is Convest couldn't contest this and,

16   therefore, the statute of limitations didn't begin to run; well

17   until we got it.  Yeah, but you took it from Convest.  And if

18   Convest had no standing to contest the third amendment, then

19   you don't have standing either.  They need to have some sort of

20   standing to contest this because the only way they get their

21   rights is by buying this debt.  And they bought the debt

22   subject to the rights that the predecessors had.  It does get a

23   little bit convoluted, but since they take their rights as an

24   assignee they're stuck with the way the statute of limitations

25   runs.

1          And just a couple of other quick points, Your Honor,

2     in addition to everything else, third party beneficiary law, to

3     be a third party beneficiary you have to have a valid contract.

4     You have to have the contract being attended for the

5     beneficiary's benefit and the benefit is direct rather than

6     incidental.  And for this, I would just cite, Your Honor, to

7     the whereas clause in the third amendment.  I mean there's no

8     doubt what the third amendment is for.  It's for Yucaipa.  It

9     says Yucaipa you couldn't buy debt before.  Now you can buy

10    debt, but you can only buy debt subject to the following

11    restrictions.  You can't vote it; the things that I went

12    through before.

13         The whereas clause of the third amendment says, the

14    borrowers have requested, the borrower is Allied which is

15    controlled by Yucaipa.  They had all the equity or most of the

16    equity and controlled the board and the management.  The

17    whereas clause says, the borrowers requested --

18         MR. KLYMAN:  Excuse me, Your Honor, if I may this is

19    maybe the 18th time that Mr. Ward is citing the facts outside

20    of the complaint.  He's not allowed to do that as part of a

21    motion to dismiss.  He's going on about the PTS litigation

22    which was -- he cites to the creditor committee's complaint,

23    not our complaint.  He cites to control over management which

24    his nowhere in our complaint.

25         MR. WARD:  Right, Your Honor, I'll take back control

1    over management because I don't --

2          MR. KLYMAN:  Your Honor, there are other issues, Your

3    Honor, that go partly to the heart of his argument where we've

4    tried to give him some leeway.  We were going to address it in

5    our argument, but he's way outside the scope of our complaint,

6    Your Honor.

7          MR. WARD:  I don't think so, Your Honor.  I mean maybe

8    on that point and I'll withdraw on that point on Allied being

9    controlled by Yucaipa, although I do think, Your Honor, this is

10   not the first time you've heard about that, Your Honor.

11         THE COURT:  Well, but look there's a standard to be

12   applied.

13         MR. WARD:  There is --

14         THE COURT:  And a lot of things I know that don't

15   necessarily get taken into account here.

16         MR. WARD:  And I agree, Your Honor --

17         THE COURT:  Including in whatever's in the Committee's

18   complaint.

19         MR. WARD:  I understand, Your Honor, but let me go to

20   the whereas clause of the third amendment which is before Your

21   Honor.  The whereas clause says the borrowers requested the

22   requisite lenders agree to amend the credit agreement to permit

23   the sponsor.  That's Yucaipa, Your Honor, to become a lender

24   under the credit agreement.  Since the whereas clause

25   specifically says that the purpose of the third amendment is to

1    allow Yucaipa to become a lender, clearly they're a third party

2    beneficiary.  And if they're a third party beneficiary, Your

3    Honor, the law is clear that the statute of limitations on a

4    third party beneficiary runs from the date of the contract.

5    The date of the contract April of 2008 Yucaipa is a clear party

6    beneficiary from the whereas clause that is in the third

7    amendment.  I'm not going to astringent evidence, so clearly by

8    virtue of the third party beneficiary argument Yucaipa has to

9    deal with the three year statute of limitations.

10          And with respect to Mr. Klyman's assertion about PTS

11   as we cited in a footnote in our reply brief, Your Honor,

12   matters which are of public record which and thereby which this

13   Court can take judicial notice can be made a part of a motion

14   to dismiss --

15          THE COURT:  Well it's one thing to take notice of the

16   fact there's a lawsuit.  It's another thing to take notice of

17   the fact how parties were behaving in the lawsuit where, you

18   know, whether they were each other's throats or how contentious

19   the litigation is, that's not something I can take judicial

20   notice of.

21          MR. WARD:  I understand, Your Honor.  We did attach

22   several of the pleadings from the PTS case which were filed.

23   They're a matter of public record from which we believe that

24   Your Honor can easily construe and understand that the parties

25   were at each other's throats.  But I take your point, Your

1    Honor.

2         With respect to my final point, Your Honor, maybe

3    second to last point, equitable tolling.  For equitable tolling

4    the main thesis is that a party was actively mislead by the

5    other party concerning their cause of action.  You can't have

6    that here, Your Honor, because Yucaipa was actively involved in

7    connection with the third amendment.

8         MR. KLYMAN:  Again, Your Honor --

9         MR. WARD:  I promise when Mr. Klyman is up I'm not

10   going to interfere with --

11        THE COURT:  Yeah, Mr. Klyman, I understand.  I'll hear

12   from you when it's your turn.  Proceed.

13        MR. WARD:  Thank you, Your Honor.  I just lost my

14   place, Your Honor, I apologize.  In any case, Your Honor, we

15   believe that Yucaipa had notice of its causes of action long

16   ago.  Even if it's not April 21st of 2008 which is the date of

17   the third amendment, they didn't bring this action, this cause

18   claim until December 5th, I believe it was, of 2012, so

19   applying a three year statute of limitations from Delaware that

20   gets them to December of 2009.  That is well after they bought

21   the debt, well after they alleged in their pleadings that the

22   Petitioning Creditors had already turned on them.  I think it's

23   after the Georgia litigation had been started.  It's after the

24   Georgia litigation had been initiated by Yucaipa -- sorry, Your

25   Honor.

1          Your Honor, three years prior to the date they filed

2     their cross claim which should be December 5th of 2009 was

3     after they had already bought the debt in August of 2009.  And

4     according to the allegations in their own pleadings, they had

5     learned that the Petitioning Creditors had done things that

6     were adverse to them.  And they had to start, they being

7     Yucaipa, had to start an action against CIT to try to enforce

8     the fourth amendment.  So, clearly, they had notice that there

9     were issues with the fourth amendment and the third amendment

10    when they started the Georgia action.  And so even if it's not

11    April 21st of 2008, they still had plenty of notice during the

12    times they allege in their complaint August of 2009, for

13    example, which predates the, you know, the three years for the

14    running of the statute of limitations.

15         But the final point, Your Honor, and that is there is

16    an allegation in their opposition that statute of limitations

17    don't apply to an affirmative defense.  And even if Your Honor

18    dismisses their complaint, their declaratory judgment

19    complaint, estoppel and unjust enrichment complaint, they can

20    still bring the same assertions as an affirmative defense.  It

21    is true that typically a statute of limitations doesn't apply

22    to an affirmative defense to another claim.  However, our

23    equitable subordination claim relates to the fourth amendment

24    and the purchase of debt from Comcast.  That took place in

25    August of 2009.

1        Their cross claim relates to the third amendment.

2   It's different issues.  The third amendment was a year and a

3   half before and separate assertions and allegations in their

4   cross claims about the third amendment.  The only relief they

5   seek in their declaratory judgment action, Your Honor, is a

6   declaration that certain provisions of the third amendment are

7   not enforceable and that they're null and void.  In our

8   equitable subordination claim, Your Honor, we don't deal with

9   that issue.  We deal with the fourth amendment and the purchase

10  of the debt from Convest.  Thank you very much, Your Honor.

11        THE COURT:  You're welcome.

12        MR. LAGEMANN:  Good morning, Nick Lagemann from Sidley

13  Austin on behalf of the Committee.  I just would like to speak

14  very briefly in terms of our support for the motion to dismiss

15  the cross claim.  Consistent with what Your Honor was

16  discussing before about what the Court may or may not be able

17  to rely upon in reviewing the motion to dismiss and the cross

18  claim itself, I will confine myself simply to what is in the

19  cross claim itself.  As I'm sure the Court is aware under the

20  Supreme Court's decisions in Twombly and Iqbal the Court is

21  required to take a look at the allegations to determine whether

22  they state a plausible set of facts that could support a claim.

23        Here, we respectfully submit that the cross claim

24  utterly fails that standard for the following reasons.  And Mr.

25  Ward touched upon this, but I do just want to go through a

1   couple of the specific allegations within the cross claim.  In

2   particular, Yucaipa alleges that they somehow relied upon an

3   agreement reached with the Petitioning Creditors in August 2009

4   that the Petitioning Creditors would somehow support or not

5   object or do something in connection with what Yucaipa terms

6   its "plan" to take control of the first lien debt structure.

7   And that's specifically at paragraph 3 of the cross claim.

8        The problem with this allegation is that Yucaipa's own

9   cross claim admits that its intent, its plan, its design was

10  formed months before the Petitioning Creditors are even alleged

11  to have done any affirmative agreement, acquiescence or

12  anything of the sort with relation to what Yucaipa terms its

13  plan.  In particular as of December 2008, Yucaipa admits it

14  would not purchase any first lien debt unless "certain third

15  amendment terms related to Yucaipa's potential acquisition were

16  amended and Yucaipa could serve as the requisite lender on its

17  own."  That's paragraph 60 of the cross claim.

18       Then they admit at paragraph 4 as of February 2009

19  Yucaipa "intended to spend tens of millions of dollars to

20  acquire a majority of the first lien debt pursuant to an

21  amendment that reversed the restrictions on ownership in the

22  third amendment."  That's, again, at paragraph 4 of the cross

23  claim.

24       They admit at paragraph 61 they launched a tender

25  offer which included a version of the fourth amendment that if

Page 79

1    valid would have enacted the intended reversals that Yucaipa

2    was seeking.  Now, we all know the tender offer fails, but

3    Yucaipa doesn't claim that the failure of the tender offer

4    changed its plan, altered its intent, or did anything of the

5    sort, nor does it say the Petitioning Creditors were somehow in

6    some agreement that caused that.

7         No, instead what Yucaipa says is right after the

8    failure of the tender offer "Yucaipa entered into direct

9    negotiations with Convest to acquire its requisite lender

10   position."  That's at paragraph 64 of the cross claim.  And

11   Yucaipa also admits in the same paragraph that it had its

12   negotiations with Convest, but the negotiations "played out

13   over several months and involved different proposals, but every

14   one of them contemplated Convest enacting certain amendments to

15   the third amendments terms.  Yucaipa's acquiring Convest

16   majority position and Allied Holdings first lien debt and

17   becoming the requisite lender."

18        Now what's important about those allegations is they

19   establish that whatever Yucaipa's intent that it's planned, to

20   use its word, was formed and was pursued months before the

21   Petitioning Creditors came into the picture.  Now one very

22   other brief point on plausibility or implausibility, Your

23   Honor, what you're being asked to believe in the cross claim is

24   that a multibillion dollar private equity firm armed with

25   armies of lawyers and advisors was somehow mislead because they

1    had a commercial discussion with another party.  We submit and

2    we certainly did not see anything in the opposition that there

3    was no support in the law and certainly none in the facts of

4    their play that could insulate Yucaipa from liability to the

5    Debtors' estates for the actions that it has done based upon

6    the allegations we see in the cross claim.  Unless Your Honor

7    has any questions, thank you.

8         MR. KLYMAN:  Thank you, Your Honor.  For the record

9    Robert Klyman of Latham & Watkins on behalf of Yucaipa.  Your

10   Honor, we've already touched on the legal standard on our

11   motion to dismiss.  The Court must accept Yucaipa's allegations

12   as true and draw all reasonable conclusions in its favor.  The

13   facts offered up by the Petitioning Creditors or the Committee

14   that are not contained in the amended complaints are irrelevant

15   for purposes of a motion to dismiss.

16        So as I mentioned while Mr. Ward was making his

17   presentation, the inferences that he's drawing from litigation

18   in PPS not applicable here.  The rejection by Black Diamond of

19   a tender offer not present here.  The allegations state that

20   the tender offer was unsuccessful because Convest came in and

21   bought up a majority of the debt.  The allegations that, you

22   know, we should cite to the Committee complaints and rely on

23   that also as you indicated have no place here.

24        Mr. Ward in his argument he narrowly construed the

25   Yucaipa complaint as simply a declaratory relief action seeking

1   to invalidate limited portions of the third amendment.  That's

2   not a fair reading of the complaint.  In count two, for

3   example, Yucaipa seeks to invalidate the applicability of the

4   entire third amendment because of the unjust and inappropriate

5   actions of Black Diamond and Spectrum.  Same thing in count

6   three and count four.  He's looking at one paragraph of count

7   one which is at paragraph 108, but ignoring the rest of the

8   prayer for relief.

9          Now Black Diamond and Spectrum's first argument says

10  that, you know, we should be, that the complaints should be

11  dismissed because of the plain terms of the third amendment.

12  But right now as we sit here today in this Court, there's no

13  legal basis on which to conclude that the third amendment

14  applies to Yucaipa.  I mean we're at (c).  Although Judge Ramos

15  orally ruled in November 2012 that he was going to grant Black

16  Diamond and Spectrum's motion for summary judgment invalidating

17  the fourth amendment, he hasn't written any order and no order

18  has been entered on the docket.

19         We can only speculate as to why this delay has

20  occurred, but based on filings in this Court that were

21  submitted by Black Diamond and Spectrum you know that Yucaipa

22  has argued to Judge Ramos that he can severe certain portions

23  of the fourth amendment while retaining the rest of the fourth

24  amendment.  It is possible that based on severability, Judge

25  Ramos will strike the various amendments that modified Section

1      2.7(e) and 10.6(b) that are identified by Petitioning Creditors

2      and other provisions in the third amendment upon which Black

3      Diamond relies.  As a matter of New York law until there's a

4      written Court order the fourth amendment remains in full force

5      and effect.  For that reason alone, the motion which depends

6      upon the operation of the third amendment should be denied.

7            Now Black Diamond says well if the fourth amendment

8      doesn't apply or the fourth amendment is still in force because

9      we're still waiting for Judge Ramos then we don't have a right

10     controversy for the cross complaint.  And, Your Honor, that's

11     just not true.  First of all, as you've said as the parties

12     just said in this case we need to move the issues along related

13     to who holds what debt, whether or not Yucaipa can be

14     subordinated, what the shape of a purchase agreement would look

15     like quickly, because this is not the type of case that is

16     getting better with age.

17            And there is a right of controversy.  As described in

18     the cross claim at paragraph 15 on December 3rd, 2012 Black

19     Diamond sent a notice to the Debtors demanding that Black

20     Diamond and Spectrum and one other lender be recognized as the

21     requisite lender.  Yucaipa has a firm position that Yucaipa

22     should be recognized as requisite lender and that's one of the

23     issues that is being tested in the cross complaint.  Because if

24     Yucaipa loses the ability to act as requisite lender and loses

25     its debt claim, Yucaipa's overall position and argument is that

1   that would result in an unjust enrichment and a windfall for

2   other lenders and an inappropriate prejudice to Yucaipa in

3   large measure because of the actions by Black Diamond and

4   Spectrum that are laid out in great detail in the complaint.

5          In addition, Black Diamond and the Committee have

6   filed their own complaints, their own litigation where they

7   seek to enforce the third amendment and the Debtor teed this

8   off by filing its own declaratory relief action to which a

9   number of our claims counterclaims against the Debtor were

10  compulsory.  And we ended up having to file cross claims

11  against other parties because they all arose from the same

12  operative facts and implicated core issues that would be tested

13  before this Court such as equitable subordination and credit

14  bidding and the like.

15         Second, the counterclaim seeks a declaration that

16  certain of the third amendment provisions don't apply.  And

17  Black Diamond and Spectrum's attempt to apply those provisions

18  at the motion to dismiss stage seeks to determine the ultimate

19  issue in this case without a trial.  We seek the declaration

20  that not only certain provisions don't apply, but that they're

21  stopped from applying the entire, all of the provisions of the

22  third amendment.

23         You know it's described in the complaints and the

24  cross complaint in 2008 the then existing lenders sought to

25  amend the first lien credit agreement to allow them to sell

1    that to Yucaipa.  This took the form of a third amendment.

2    That's at paragraphs 11 and 54 among others.  CIT, as agent,

3    coordinated the passages of the third amendment and which was

4    approved by the Special Committee of the Debtors' board and

5    approved by the majority of the lenders.  That's at cross

6    complaint at paragraph 12.

7         It's undisputed based on the cross complaint that

8    Yucaipa was not a signatory of the third amendment and never

9    bought any debt under the third amendment.  And, in fact, given

10   the restricted terms of the third amendment, Yucaipa made it

11   clear and would never have purchased debt under the third

12   amendment.  That's, among other places, cross complaint of

13   paragraph 13; therefore, no one expected that Yucaipa was going

14   to be bound by the third amendment in April 2008.

15        And, in fact, as pled in the cross complaint the

16   genesis of the third amendment was that certain lenders who

17   were seeing the decline of the automobile industry and by

18   extension the car haul industry wanted to sell their debt.

19   This document, this third amendment was not for the benefit of

20   Yucaipa unless Yucaipa decided to buy debt.  This document was

21   for the benefit of lenders to enable them to sell debt to

22   Yucaipa without any promise or representation that Yucaipa was

23   going to buy debt on the back end.  It's absurd based on the

24   allegations in the complaint to say that Yucaipa was somehow a

25   third party beneficiary of the third amendment when they

1   disclaimed that they were not going to buy any debt what so

2   ever in the third amendment.

3           Approximately eight months later in December 2008, the

4   auto industry continued to decline and lenders holding a

5   majority of the first lien debt approached Yucaipa about buying

6   the debt.  As set forth in paragraph 60 of the cross complaint,

7   Yucaipa made it clear to those lenders that it would only

8   acquire debt if the restrictions in the third amendment were

9   eliminated and Yucaipa could serve as requisite lender.

10          In February 2009 as described in the cross complaint,

11  Yucaipa launched a tender offer for debt under the fourth

12  amendment, not under the existing third amendment.  And when I

13  say under the fourth amendment it was a precursor to the fourth

14  amendment.  The material terms as set forth in the cross

15  complaint were essentially the same.  The tender offer included

16  an amendment to eliminate provisions of the third amendment

17  concerning, among other things, the amount of debt Yucaipa

18  could acquire and to eliminate restrictions on Yucaipa serving

19  as requisite lender.  That's identified in counterclaim at

20  paragraph 61.

21          Unlike Mr. Ward's allegations that outside the four

22  corners of our complaints there was no rejection by Black

23  Diamond or Spectrum of the fourth amendment.  But instead as

24  alleged in the complaint, Convest came in and for whatever

25  reason better price or whatever, they acquired the majority of

1    the first lien debt, thereby obviating the tender offer.

2    Thereafter, Yucaipa entered into negotiations with Convest and

3    ultimately acquired Convest's majority position pursuant to the

4    fourth amendment as described, in among other places,

5    paragraphs 15 and 16 of the cross complaint.  That was in

6    August of 2009.

7            But it's abundantly clear from the allegations in the

8    complaint that Yucaipa never acquired and never intended to

9    acquire any claims under the third amendment.  And also as I'll

10   describe in a few minutes and as laid out in great detail in

11   the cross complaint, Black Diamond and Spectrum were actively

12   encouraging this debt purchased under the fourth amendment with

13   respect to Convest when in discussions with Yucaipa.  In

14   addition to Yucaipa's clear intent never to be bound by the

15   third amendment, the cross complaint lays out facts which are

16   as I mentioned presumed to be true that Yucaipa relied on Black

17   Diamond and Spectrum's support in acquiring the requisite

18   lender position.  And it also pleads that it would be

19   inequitable and work an unjust enrichment if Black Diamond and

20   Spectrum could now apply the third amendment to Yucaipa.

21           For example, as set forth in paragraph 72 and 73,

22   Black Diamond and Spectrum were consulted in the loop about

23   Yucaipa's purchase of the debt under the fourth amendment and

24   encouraged that purchase.  It wasn't just no noise coming from

25   them and, therefore, Yucaipa made the assumption that there

1  would be no objection. There was active encouragement, and

2  after the execution of the fourth amendment, that support

3  continued.

4        And CIT, for example, recorded all of Yucaipa's loans

5  on the registry which, as a result, means that pursuant to the

6  terms of the credit agreement Black Diamond and Spectrum were

7  obligated to treat Yucaipa's holdings of approximately $145

8  million dollars of debt and requisite lender status. The head

9  of Black Diamond and the head of Yucaipa as described in the

10 cross complaint mentioned about strategies after Yucaipa became

11 requisite lender.

12        For example, after the execution of the fourth

13 amendment as set forth in paragraph 72, they discussed a joint

14 strategy to use their debt to implement a sale of Allied which

15 relied on Yucaipa's status as requisite lender. They further

16 met in February 2010 nearly six months after Yucaipa acquired

17 the requisite lender position under the fourth amendment to

18 discuss Yucaipa's plans as requisite lender to increase

19 Allied's value and Black Diamond expressed support for those

20 plans. That's at paragraph 8.

21        They met in New York on January 31, 2011 nearly 18

22 months after Yucaipa acquired the requisite lender position to,

23 again, discuss Yucaipa's plans as requisite lender. That's at

24 paragraph 8. Then in March through May 2011, Black Diamond

25 made numerous proposals to effectuate a transaction with

1   respect to Allied, each of which relied upon Yucaipa's status

2   as requisite lender.  That's also at cross claim, among other

3   places at paragraph 8.

4           And then in December 2011, more than 25 months after

5   Yucaipa acquired a requisite lender position under the fourth

6   amendment.  Yucaipa directed CIPS agents to terminate certain

7   letters of credit which resulted in the distribution of

8   approximately $17 million dollars in deposit to existing

9   lenders including Black Diamond on a pro rata basis.  This only

10  could have occurred had the lenders and CIT recognized

11  Yucaipa's requisite lender under the fourth amendment.  That's

12  laid out across claim at paragraph 21.

13          It is in the foregoing, Black Diamond's arguments that

14  this covenant to sue should not apply, can't survive.  First of

15  all the whole premise of the cross complaint is that it would

16  be unjust to bind Yucaipa to the third amendment, which it

17  never signed up to, would have never bought debt to and only

18  move forward under the fourth amendment because of the improper

19  encouragement.  It was turned out to be duplicitous by Black

20  Diamond and Spectrum.

21          First as laid out in our papers a party cannot rely on

22  a covenant not to sue, where the covenant was procured by

23  misconduct.  Based on the facts set forth in the cross

24  complaint, the petitioning creditors acted duplicitously in

25  inducing Yucaipa to acquire the first lien debt, supporting

1    Yucaipa as requisite lender, accepting the fruits of the

2    actions of Yucaipa as requisite lender through the release of

3    funds, working with Yucaipa to develop proposals that relied on

4    Yucaipa's requisite lender status and then two years after the

5    fact seeking to apply the terms of the third amendment to

6    Yucaipa.  This bait and switch was intentional

7    misrepresentation.  All as plead in the cross claim and

8    demonstrates that the application of the covenant is the result

9    of their misconduct.

10        Second, covenants not to sue cannot be relied upon to

11   insulate a party from its own willful or intentional misconduct

12   such as the wrongful conduct alleged by Black Diamond and

13   Spectrum throughout the cross complaint.  In essence such

14   covenants are shields, not swords.  And here Black Diamond and

15   Spectrum seek to use the covenant as a sword to grant

16   themselves an unjust financial windfall after falsely assuring

17   Yucaipa that they supported Yucaipa as requisite lender under

18   the fourth amendment.

19        Most interestingly to us was that Black Diamond

20   intentionally, Black Diamond and Spectrum, intentionally

21   omitted from its papers when it was citing to Section 2.7(e) in

22   the covenant not to sue.  The language in 2.7(e) that knocked

23   out the applicability of the covenant not to sue, if any

24   operative act was caused by any lenders gross negligence or

25   willful misconduct after the date that Yucaipa became the

1    lender as determined by a Court.  Well that is essentially what

2    our whole complaint is about that they acted duplicitously

3    before and after execution of the fourth amendment, and as a

4    result we should be able to argue that it would be unjust and

5    inequitable for Black Diamond and Spectrum to be able to apply

6    the third amendment against Yucaipa.

7         We're not yet at point where a Court of competent

8    jurisdiction has made that determination, but we have all

9    agreed pursuant to the schedule that's played out that in

10   August this Court is going to make that determination.  Black

11   Diamond and Spectrum also attempt to bar the cross claim by

12   Section 10.6(b), which according to Black Diamond and Spectrum

13   provide that the consent to the third amendment by Yucaipa's

14   predecessor's in interest bind Yucaipa.

15        Like the other provisions of the third amendment

16   Yucaipa never agreed nor intended to be bound by the third

17   amendment.  Further, as laid out in the papers Yucaipa alleges

18   that that provision was not validly affected because it

19   required the consent to each affected lender.

20        Now Black Diamond and Spectrum next delve into the

21   statute of limitations issue.  Under the legal standard there

22   is no accrual of the statute of limitations unless there is a

23   justiciable controversy which involved some present prejudice

24   to the Plaintiff, which didn't occur until Judge Ramos made his

25   oral ruling.

1          Now, Mr. Ward says no such thing as equitable tolling,

2    but that's just not right.  If a party to a contract alleges a

3    breach and the other party agrees to cure in six months and

4    doesn't, you can't go back to that period of time and say oh,

5    statute of limitations tolled because you had an agreement that

6    they would cure.  The same thing applies here.

7          According to Black Diamond while the fourth amendment

8    was in full force, while Black Diamond was working with Yucaipa

9    to implement transactions that required Yucaipa's requisite

10   lender status, and as late as December 2011 where Black Diamond

11   was accepting the fruits of Yucaipa's requisite lender status

12   under the fourth amendment.  Black Diamond argues that Yucaipa

13   should have brought suit seeking to declaratory relief that the

14   third amendment didn't apply.  Well the fourth amendment was in

15   full force and effect.  We would have been facing other

16   arguments about rightness, and lack of a judiciable controversy

17   if we somehow manufactured an argument at that time that we

18   shouldn't be bound by the third amendment.

19          We were not as I mentioned the third party beneficiary

20   to the third amendment.  In fact Yucaipa expressly disclaimed

21   any interest in being a participant under the third amendment

22   and never bought that under that amendment.  When Yucaipa

23   acquired claims under the fourth amendment CIT as the agent of

24   Black Diamond and Spectrum among others entered Yucaipa on the

25   registry, thereby, recognizing Yucaipa as a valid debt holder.

1    And there has been no allegation that Yucaipa is not properly

2    on the registry today.

3          Following the CIT litigation which involved the fourth

4    amendment that was dismissed with prejudice by CIT, so as late

5    as 2010 there was no controversy that was still brewing that

6    would somehow suggest that Yucaipa should worry itself at all

7    with the third amendment.

8          Further, as we lay down our objection, even if you get

9    into a discussion about which statute of limitation applies,

10   and we think it's irrelevant because the cause of action didn't

11   accrue until Judge Ramos ruled on the bench the six year New

12   York Statute of Limitation applies.  Yucaipa was not forum

13   shopping and ended up in this venue only because the petition

14   and Creditors filed an involuntary petition.  They fought a

15   transfer of this case to another venue.  Then the Debtors filed

16   a declaratory relief action, and Yucaipa had compulsory counter

17   claims to that action.  And as a result also filed cross claims

18   against Black Diamond, and Spectrum and others.

19         Even if this dis-causative action could of somehow

20   been split with some in New York and some here, the overlap of

21   facts and law that would have occurred mandated one forum that

22   combined all Creditors and the Committee.  We spent a lot of

23   time arguing in front of Your Honor months ago about how it was

24   necessary that this Court take jurisdiction of all of the

25   issues because the Debtor needed a binding resolution of all

1    the issues so it could try and exit this case.

2         As I mentioned the issues associated with Yucaipa's

3    claims that Black Diamond and Spectrum acted inequitably are

4    directly implicated by and serve as affirmative defenses to

5    Black Diamond and Spectrum's complaints, and the Committees

6    complaints and their efforts to subordinate Yucaipa's claims as

7    well as other Court proceedings involving credit bidding if we

8    ever get to a sale.  So this was the logical venue, but the

9    underlying policies with respect to the borrowing statute that

10   would shorten the statute of limitations that are not

11   implicated because Yucaipa did not choose this forum.  In any

12   event, as I mentioned under either the New York or Delaware

13   Statutes the claims are barred.

14        Now Black Diamond and Spectrum also contend for the

15   first time in the reply that Section 10.9, the so called no

16   waiver provision, blocks Yucaipa's cross complaint.  This

17   argument was only raised in the reply and should not be

18   considered by the Court.  They had plenty of time to brief

19   their issues and they raised a new argument in the reply.  But

20   if Your Honor is going to consider it, you know, this argument

21   is not applicable.

22        Yucaipa is contending first of all as with all the

23   other provisions of the third amendment that the third

24   amendment doesn't apply and if it did it would result in unjust

25   enrichment windfall to Black Diamond, and Spectrum and the

1    other lenders.  Because Yucaipa never intended to be bound by

2    the third amendment and never would have bought that under the

3    third amendment.

4         The cases cited by Black Diamond and Spectrum as

5    dealing with arguments that the exercise of expressed remedies

6    are not waived by the passage of time or estoppel are just not

7    applicable.  We are not arguing for example, that the

8    acceptance of late payments result in the waiver of compliance

9    with payment terms or that, you know, defendants were prevented

10   from arguing that a one year delay in bringing an action

11   constituted a waiver.

12        Here we are arguing that the entire third amendment

13   should not apply to us on unjust enrichment and inequitable

14   grounds.  And that was purely driven by the decision that was

15   made by Judge Ramos which still, as I mentioned, is not yet

16   reduced to a written order, but we need to get this case

17   moving.  And so as a result we are willing to proceed to get to

18   an August trial date even while Judge Ramos has not issued

19   his written order.

20        THE COURT:  Thank you.  Reply?

21        MR. WARD:  Your Honor, very briefly.  Thank you.

22        THE COURT:  Yes.

23        MR. WARD:  Your Honor, just a couple of points.

24   First, with respect to the equitable tolling argument,

25   throughout the cross-claims Yucaipa alleges that it would never

1    have brought that under the third amendment.  Now, clearly it

2    had made that determination before the passage of the fourth

3    amendment, it sought the fourth amendment to get rid of the

4    restrictions in the third amendment, which were the reasons it

5    wouldn't buy debt.  But considering it wouldn't buy debt under

6    the third amendment and had made that decision well before the

7    fourth amendment adds purchase of the debt, it was aware of the

8    issues with the third amendment at that time, which would be

9    any time between April 21st of 2008 when the third amendment

10   was entered into and August of 2009 when they purchased the

11   debt.  That's still more than the three years prior to the

12   statute of limitations.  Equitable tolling certainly can't toll

13   the claim past the date when they've made the decision that

14   they wouldn't buy under the third amendment or past the date

15   when they actually bought under the fourth amendment.  So I

16   think that that argument is out the window.

17          In addition, what Yucaipa would have us believe is

18   that in connection with the third amendment, the lenders went

19   out on their own without Yucaipa's help and passed an amendment

20   to remit Yucaipa to buy debt but in post terms that were

21   unacceptable to Yucaipa.  I mean what would have been the

22   point?  Again, I think that's relevant to when did Yucaipa get

23   notice of its claim.  Clearly, it had notice of its claim well

24   before the fourth amendment.

25          And with respect to the point that Mr. Klyman just

Page 96

1    raised about the no waiver clause, first off, one of Yucaipa's

2    arguments is that we don't know what parts of the fourth

3    amendment are in effect, but some parts of the fourth amendment

4    may knock out some of the defenses we have.  The primary

5    example is the covenant not to sue which I've dealt with, I

6    raised in the argument.  But there's nothing in the fourth

7    amendment that addresses the no waiver clause, that's 10.9 of

8    the first lien agreement, that's been in effect since the

9    beginning.  So there's nothing in the fourth amendment

10   regardless of what justice Ramos does that's going to knock out

11   the no waiver clause.  Now Mr. Klyman says yeah, but unfair,

12   you didn't raise the no waiver clause until the reply.  The no

13   waiver clause is very much a part of the argument in front of

14   Justice Ramos.  The New York litigation is cited many times in

15   the cross claim, it's clearly before Your Honor, and we've

16   attached the briefs which, the briefs on the motion for summary

17   judgment where we cite to the no waiver clause.  Because not

18   surprisingly, in the New York action, Yucaipa brought up how

19   unfair it would be if the fourth amendment was reversed because

20   they relied upon what Black Diamond did, allegedly did, didn't

21   do, and they relied upon the fact that the lenders didn't

22   oppose the fourth Amendment.  We cited the no waiver clause in

23   front of Justice Ramos in our papers which are an exhibit to

24   our reply.  So clearly this is not a new argument that Yucaipa

25   couldn't anticipate, they are a party, they're with the other

1    party in the New York action.

2         In addition, the assertions relating to the third

3    amendment are before the Court, were before the Court in the

4    Georgia action.  And I looked at my notes which Mr. Klyman was

5    speaking, the Georgia action was commenced by Yucaipa on

6    November 13th of 2009 seeking to enforce the fourth amendment.

7    And in the course of those arguments dealing with the history

8    of the third amendment leading up to the fourth amendment,

9    November 13th, 2009 is still more than three years prior to

10   Yucaipa's bringing this action.  So whether it's equitable

11   estoppels or whatever argument you want to make, they were

12   aware of these claims when they brought the Georgia action in

13   November of 2009.  They were certainly aware of these claims at

14   least in-between the period of the third amendment and the

15   fourth amendment, but it doesn't have to be April 21st, 2008,

16   the date of the third amendment.  It can be any time between

17   the third amendment and the fourth amendment and their purchase

18   of the debt which was August of 2009.  That's still more than

19   three years before.

20        What's happening here is very opportunistically,

21   Yucaipa likes the fourth amendment, they didn't want to do

22   anything vis-à-vis the third amendment, and as I think Mr.

23   Lagemann may have said in his papers, they were caught with

24   their hands in the cookie jar and they're now going back and

25   saying, oh but we have these issues relating to the third

1    amendment.  The fact is statutes of limitations for breaches of

2    contract aren't tolled by any actions except this equitable

3    tolling argument.  And, Your Honor, it doesn't, shouldn't apply

4    here because Yucaipa was aware of these claims well before the

5    three years, and as I say, well before it purchased the debt in

6    August of 2009.

7         So just a couple of other things.  Mr. Klyman points

8    out that I was focusing substantially on the declaratory

9    judgment claim because most of their complaint, or cross claim

10   focuses on that.  But whether it's the declaratory judgment

11   claim which specifically calls for the reversal or voiding of

12   four paragraphs there, or the unjust enrichment claim or the

13   estoppel claim, it all deals simply with the third amendment.

14   The third amendment again was passed a long time ago.

15        Mr. Klyman also says that as a matter of New York

16   law, Justice Ramos's ruling from the bench that the fourth

17   amendment is null and void has no affect.  There's not a single

18   case cited by Yucaipa for that proposition, and in fact it's

19   not true, at least in New York.  I'm not going to get into

20   something that's extraneous to the pleadings, but there's no

21   case cited by Yucaipa that that is true.  Your Honor, I'm

22   pretty much done here.

23        Oh, one of the other issues, and this is the covenant

24   not to sue, is the claimant I think is blending things

25   together.  The law is clear, the cases that he cites, and in

1    fact he even mentioned that a covenant not to sue will not be

2    given affect if that covenant was procured by fraud.  And then

3    half a second later, Mr. Klyman said, as his papers say, as the

4    cross claim says, that their investment was procured by fraud.

5    Their investment is not the covenant not to sue.  Covenant not

6    to sue is separate.  The case law is clear, in order to knock

7    out a covenant not to sue, you have to have a specific

8    allegation that that covenant itself was procured by fraud and

9    misconduct, there is no allegation anywhere in the pleadings to

10   that affect.  So the covenant not to sue applies.

11           THE COURT:  Okay.

12           MR. WARD:  And finally, Your Honor, with respect to

13   the covenant not to sue, Mr. Klyman says, well you know it does

14   say, well it says two things, it's got a temporal limitation

15   which is it's only the actions after they become a lender, and

16   the actions after they become a lender are really not in play

17   in the cross claim as everything before, so the temporal

18   limitation on the exclusion to the covenant not to sue doesn't

19   apply.  But the other aspect of the exclusion is there has to

20   be a finding of willful misconduct or gross negligence by a

21   court.  And he says, oh yeah, it's okay, we're alleging that

22   and we're going to prove that here.  As I said, Your Honor,

23   it's circular.  If that's the way that you can get around a

24   covenant not to sue, then everybody would come in on a covenant

25   like this and say, I can prove willful misconduct.  They'll

1    take the case to discovery, the case will settle, and the

2    covenant will have no effect.  Basically this provision says

3    there has to have been a finding of gross negligence or willful

4    misconduct, and there hasn't been here.  And the reason is that

5    this covenant is more in the nature of a contribution or

6    indemnity claim, and, you know, Your Honor can construe it, but

7    basically this hadn't been an argument raised by Yucaipa

8    before.  But basically what this is is a claim, is a covenant

9    not to sue where Yucaipa gives up the rights, Yucaipa has no

10   right to sue.  But clearly if by virtue of some third party's

11   claim where some court has found that a lender has acted

12   grossly, negligently or with willful misconduct, somehow

13   Yucaipa has to pay for our gross negligence or willful

14   misconduct, then they have the right to sue, but it requires a

15   prior determination by a court.  It's not just an end around a

16   covenant not to sue where you can always simply plead it and

17   say, oh yeah, I'm going to prove that later on, and if I don't,

18   well too bad, the case will be over, and the covenant wouldn't

19   have any affect.

20        With respect to the covenant, and I know I had a

21   point, but now it slipped my mind.  Well I think that's it, it

22   couldn't have been much of a point.  Maybe I'll think of it

23   while Nick is up.

24        THE COURT:  All right.  Thank you.

25        MR. LAGEMANN:  Your Honor, Nick Lagemann from Sidley

1    Austin for the Committee.  Two very quick points.  You did not

2    hear Mr. Klyman, sat and went through the allegations in the

3    cross claim, but you did not hear any refutation of the fact

4    that his own allegations established that Yucaipa formed its

5    intent to pursue its plan well before any action was undertaken

6    by the petitioning creditors.  So in terms of the allegations

7    later on that after August '09 they somehow relied upon whether

8    it be an agreement, affirmative encouragement, acquiesce,

9    whatever, it doesn't fit and it's implausible under the facts

10   as alleged in the complaint.

11       The second point is simply this.  Yucaipa's argument

12   here and is that essential party A, being the petitioning

13   creditors, either agreed or acquiesced to party B, Yucaipa's

14   preexisting plan to purchase the debt of party C, being the

15   debtors, and that that somehow insulates party B from liability

16   to party C if party B's actions were wrongful.  They haven't

17   identified a single case or any authority that supports an

18   allegation or a claim of such a nature, and we frankly think

19   nonexists.  It's implausible, there are allegations are

20   contradicted by their own allegations in the cross claim and we

21   respectfully submit the motion should be granted.  Thank you,

22   Your Honor.

23       THE COURT:  Thank you.

24       MR. KLYMAN:  Very briefly, Your Honor.

25       THE COURT:  Counsel have anything further?

1        MR. WARD:  Actually it was a plausibility point, the

2    fact that, you know, contrary to what Mr. Klyman said, the

3    Court doesn't need to accept everything that's pled in the

4    complaint, the Bell Atlantic Twombley case says it has to be

5    plausible, and we've said in other cases that say it can't be

6    patently absurd.

7        THE COURT:  Okay.  Thank you.  Mr. Klyman, briefly.

8        MR. KLYMAN:  Very briefly, Your Honor.  Going back to

9    the point that Mr. Lagemann just made. Yucaipa developed a plan

10   to buy pursuant to the fourth amendment, and then they made

11   that plan before they pulled the trigger with Convest expressly

12   dependent upon the encouragement and support of Black Diamond

13   and Spectrum.  That's in the pleadings.  That's how it happened

14   and as laid out in the pleadings.  And Mr. Lagemann cannot get

15   up now and say that's not well pled because it's all over the

16   pleadings.

17        Secondly, Mr. Ward would have this Court apply a

18   statute of limitations to when we started litigating with CIT.

19   Well that litigation was settled, while that litigation was

20   going on before there was a resolution, it would have been

21   nonsensical for us to then go into another court or that court

22   and seek to invalidate the third amendment.

23        And last, with respect to the covenant not to sue, Mr.

24   Ward reads into that language which does not exist.  It doesn't

25   say that a covenant not to sue is limited to our action against

1   a lender who has been found in a separate action to have

2   committed willful misconduct or fraud.  It could have been

3   written that way, but that's not how it was written.  A

4   covenant, and this must have been important to them because in

5   their pleadings they put ellipses where the carve out for

6   intentional misconduct and fraud existed in section 2.78.  That

7   provision by its plain terms allows us to get a determination

8   by court of competent jurisdiction that they acted improperly

9   and then argue that the covenant not to sue applies.  And our

10  position is is that we would have never been in this mess and

11  we would not have the third amendment even arguably applied to

12  us had they not acted inequitably as laid out in our cross

13  complaint.  Thank you.

14       THE COURT:  All right.  Thank you.  I'm going to take

15  a break and I'm going to gather my thoughts and then we will,

16  I'll come back out and make a ruling.  That will probably be

17  about, I don't know, 20 minutes or so.  Let's do this.  We'll

18  reconvene at 12:45.

19  (Recess 12:16 to 12:56)

20       THE CLERK:  All rise.

21       THE COURT:  Please be seated.  I'm going to do my best

22  to articulate my reasoning in connection with my ruling.  Given

23  the fast track that this case needs to stay on and really

24  frankly the fact that on the particular close matter, I don't

25  think it requires me to take the matter under advisement and

1    issue a more complete opinion, we'll just go with my ruling,

2    which in short is to grant the motion to dismiss.

3          And in support of that I really for all material

4    aspects adopt the petitioning creditors' arguments virtually in

5    toto.  Let me highlight some of them.

6          Starting off with the standard of review on the motion

7    to dismiss.  Obviously all well pled allegations need to be

8    taken as true, but under the Twombly Iqbal standards as

9    interpreted by the Third Circuit, something more than mere

10   really window dressing or bald allegations need to be made,

11   they have to rise to the level of plausibility.  I think in

12   this case -- let me back up a second.  The motion to dismiss is

13   on two bases, one the covenant not to sue brought us the action

14   and the other is the statute of limitations.  Talking about the

15   first item, that really rests on the factual allegations in the

16   complaint that would be necessary to raise an issue, a

17   plausible issue about whether the covenant not to sue should be

18   applied.  And the allegations in this complaint, and by

19   complaint I mean cross-claim do not meet that standard.  There

20   is some innuendo, there's some vague allegations.  The bottom

21   line is I just don't think the story as pled holds together

22   sufficiently to meet the standard.  Implicit in talking about

23   that is the concept that the actual covenant not to sue

24   applies, and I understand that was also an argument made by

25

1    Yucaipa that it did not.  But hopefully as I go through that

2    here I'll address these things.

3         The argument on the covenant not to sue are several.

4    One is simply under its plain meaning, you can't sue.  I don't

5    think there's any question as to the plain meaning of the

6    covenant and I think it's very clear.  I don't find its sort of

7    carve out to be particularly troubling either.  The -- I agree

8    that the carve out as written deals with the narrow situation

9    of a finding at some time post signing of the covenant by a

10   court that there's been willful misconduct or gross negligence.

11   And I don't think that can, I don't think that is done in the

12   auspices of a lawsuit directly related between the parties, it

13   has to come from somewhere else.  It's a little vague, but I

14   think it's fair to say it has to be a narrow exception.  And I

15   endorse the view that when looking at the covenant not to sue

16   being applicable we have to look at whether that covenant was

17   entered into as a result of some sort of fraud or misconduct by

18   the party that is being forbidden to sue.

19        And I don't find anything in the record that would

20   support plausible claim that the, that in the entry of the

21   third amendment there was any fraud or wrongdoing whatsoever in

22   connection with the actual covenant not to sue.  As a matter of

23   fact, I don't think there's any allegation really that rises to

24   the plausibility that there was any kind of mischief going on

25   that was detrimental or directed at Yucaipa at the time of the

1   third amendment being entered into the purchase, excuse me, and

2   then the fourth amendment being negotiated, and then the debt

3   being brought and then the fourth amendment being passed.

4   Excuse me.  So basically, I don't know it has led to level of

5   fraud necessarily in connection with the covenant not to sue,

6   but it would need to certainly be something with some heft

7   behind it to support some detrimental reliance argument.  And

8   it just isn't there.  It just isn't there.

9          As to the applicability, the first credit agreement

10  does contain the provision that when you buy or assign the debt

11  you are stuck with what your assignor had previously agreed to

12  or waived, etc., and I find that when Yucaipa bought this debt

13  they were subject to the agreements that had previously been

14  entered.  And as such, they are applicable when we're looking

15  at the third amendment.  The fact that it was all part of a

16  grand strategy that somehow Yucaipa was sucked in to allow

17  Convest to make the agreement and then make the sale, I just, I

18  just don't find that plausible.  I think it is true that it was

19  part of the strategy by Yucaipa to eventually purchase the debt

20  under terms roughly equivalent to what ultimately at the time

21  they were contemplating, it ultimately ended up being with the

22  fourth amendment.  And again, the, that's a very normal and

23  understandable provision that when you buy something, when you

24  buy debt, you buy the debt, it is what it is and you are where

25  you are, and you can't undo, you don't have the time machine

1    ability to undo a previous agreement.  Excuse me, I'm sorry.

2         I also find that the waiver argument or the waiver

3    provision bars the case for the reasons that were discussed in

4    the briefs; for instance, statute of limitations.  Again, this

5    is an independent, these are really two rulings.  It's granting

6    the motion to dismiss on the covenant not to sue, granting the

7    motion to dismiss in connection with the statute of

8    limitations.  I look at the statute of limitations.  I think it

9    is not true that the cause of action would arise as of the

10   signing in April of 2008.  Again, while the documents are what

11   they are at that time, I do think you need to look at it in the

12   context of what the underlying facts might be and when a cause

13   of action might arise.  Having said that, Yucaipa was clearly

14   on notice throughout times after April of 2008 as to what was

15   going on, they had their strategy, they were mulled in

16   negotiations that ultimately led to the fourth amendment, and

17   they bought debt into the situation -- this is after April of

18   2008, they bought the debt in August 2009 I believe.

19        I think it is a fair reading and correct that as of

20   August 2009 that the cause of action would be sufficiently ripe

21   to give rise to the beginning of running of the statute of

22   limitations certainly by November of 2009 when litigation had

23   ensued on these very issues, albeit with CIT, there was notice

24   that would give rise to running of the statute of limitations

25   three years, that takes us to November 2012 which is before

1    this lawsuit was brought.  The Delaware statute of limitations

2    is applicable here based on the fact that this case was brought

3    in Delaware, breach of contract claim brought in a federal

4    court setting in Delaware, so the Delaware statute applies.  In

5    the alternative, the borrowing statute applies which would use

6    the shorter three year statute of limitations.  Other than a

7    bald choice of law provision there's nothing in this contract

8    or deal that is so involved in New York to provide that the New

9    York statute of limitations would have to apply.  First of all

10   the contract doesn't say that.  It was mentioned that the case

11   survived the transfer of venue motion but not to New York, to

12   Georgia, I believe.  So maybe not a motion, but certainly, I

13   can't think back that far, but certainly there was movement

14   about changing venue.  So the [indiscernible] year statute

15   applies and that statute run at the latest in November of 2012,

16   so the cause of action, the cross claim is barred by the

17   running of the statute of limitations.

18           Other than to say that I generally endorse the

19   petitioning creditors' legal arguments set forth in their

20   brief, I think this is a sufficient reasoning to support the

21   Court's decision to deny the motion to dismiss.  The Court will

22   enter an order.  Mr. Klyman?

23           MR. WARD:  Your Honor, you said deny.

24           THE COURT:  I'm sorry, to grant the motion to dismiss.

25   And I apologize.

1          MR. KLYMAN:  Your Honor, we obviously respectfully

2     disagree.

3          THE COURT:  Of course.

4          MR. KLYMAN:  We're not going to reargue all the points

5     that we made before.  We do want the opportunity to have leave

6     to amend to see if we can cure whatever you identified as the

7     defects in the pleadings.  We think that there are sufficient

8     facts to justify the inapplicability of these provisions in the

9     third amendment to Yucaipa.  There may be other facts that we

10    can bring out about why there should be additional tolling of

11    the statute of limitations and why we should not be barred, and

12    we want an opportunity to expeditiously amend our complaint to

13    see if we can meet that test.  We won't slow down the process,

14    we're still embarking on discovery, there's still going to be

15    affirmative defenses that are going to be pled, it's not going

16    to prejudice the August trial date, but we think we would be

17    significantly prejudiced if we didn't have an opportunity to

18    amend particularly given, you know, the various standards that

19    apply to a motion to dismiss and that leave to amend is grandly

20    liberally.

21         MR. WARD:  Your Honor, may I?  Your Honor, given the

22    various bases that Your Honor has made your decision on, the

23    waiver clause, the covenant not to sue, the fact that the

24    subsequent holders are bound by their predecessors' consents

25    and the statute of limitations, a number of these of which I

1   don't think are curable at all, it seems to me that you should

2   deny the motion for leave to amend.  And I do think it's going

3   to get in the way of our ability to move this case along.  We

4   start, we've already started document discovery to the extent

5   that we've served document demands on each other, etc.

6        THE COURT:  Okay.  I'm going to deny the motion to

7   amend.  I'm going to dismiss the case with prejudice.  I --

8   sorry.

9        MR. WARD:  We have an order [indiscernible]

10       THE COURT:  Okay.  Just quickly.  I'm not going to

11  allow an amendment of the complaint.  I concur with counsel

12  that these are in effect legal bases, they turn obviously to

13  some extent on the facts, but I simply don't view them as in

14  effect curable based on my understanding of what's in the cross

15  claims today as well as my broader understanding of the case in

16  and of itself.  So, no, I will not allow leave to amend and the

17  case will be, the cross-claim will be dismissed with prejudice.

18       MR. WARD:  Your Honor, we have an order prepared.  I

19  don't know if it's appropriate [indiscernible].

20       THE COURT:  I'll enter an order.

21       MR. WARD:  Thank you, Your Honor.

22       THE COURT:  Anything else for today?  All right.

23  Thank you.  We're adjourned.

24       (Whereupon these proceedings were concluded at 1:11 PM)

25

1                    I N D E X

2

3                    RULINGS

4                                      Page     Line

5    HEARING re:  Notice of Agenda of Matters

6    Scheduled for Hearing on February 6, 2013     6        12

7

8    HEARING re:  Cross-Claim Defendants BDCM

9    Opportunity Fund II, LP's Black Diamond

10   CLO 2005-1 Ltd's and Spectrum Investment

11   Partners LP's Motion to Dismiss the Amended

12   Cross Claim in its Entirety [Adv. Docket

13   No. 73; filed January 25, 2013]            108        7

14

15   HEARING re:  Motion of the Official

16   Committee of Unsecured Creditors for an

17   Order Authorizing the Committee to Pursue

18   Certain Claims and Causes of Action

19   of the Debtors' Estates

20   [Docket No. 858; filed February 1, 2013].   108        7

21

22    HEARING re:  Motion and Memorandum of Law

23   of Petitioning Creditors for Entry of an Order

24   (I) Pursuant to 11 U.S.C. §105(a) Granting

25   Standing to Petitioning Creditors to

1    Prosecute Certain Claims of the Debtors

2    Estates for, Inter Alia, Equitable Subordination,

3    Breach of Fiduciary, Aiding and Abetting

4    Breach of Fiduciary Duty and Breach of

5    Contract, or Alternatively (II) Granting

6    Petitioning Creditors Leave to Intervene

7    as Plaintiffs in Adversary Proceedings

8    No. 13-50530 Pursuant to Federal Rule

9    of Civil Procedure 24

10   [Docket No. 876; filed February 8, 2013]    108      7

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 113

1                        CERTIFICATE

2     I certify that the foregoing is a correct transcript from the

3     electronic sound recording of the proceedings in the above-

4     entitled matter.

5

6     AAERT Certified Electronic Transcriber CET**D-531

7     Mary Zajaczkowski

8

9     AAERT Certified Electronic Transcriber CET**00650

10    Theresa Pullan

11

12

13

14

15

16

17

18

19

20

21    Veritext

22    200 Old Country Road

23    Suite 580

24    Mineola, NY  11501

25    Date:  February 10, 2013

# UNITED STATES BANKRUPTCY COURT
## District of Delaware

**In Re:**
Allied Systems Holdings, Inc.
2711 Centerville Road                    **Chapter:** 11
Suite 400
Wilmington, DE 19808
 **EIN:** 58–0360550

*Case No.*: 12–11564–CSS

### *NOTICE OF FILING OF TRANSCRIPT AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION*

A transcript of the proceeding held on 2/27/2013 was filed on 4/8/2013 . The following deadlines apply:

The parties have  0 days to file with the court a *Notice of Intent to Request Redaction* of this transcript. The deadline for filing a *request for redaction* is 4/8/2013 .

If a request for redaction is filed, the redacted transcript is due 4/15/2013 .

If no such notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is 6/13/2013 unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber (see docket for Transcriber's information) or you may view the document at the clerk's office public terminal.

Clerk of Court

Date: 4/8/13

(ntc)

# Notice Recipients

| | | |
|---|---|---|
| District/Off: 0311−1 | User: Brandon | Date Created: 4/8/2013 |
| Case: 12−11564−CSS | Form ID: ntcBK | Total: 15 |

**Recipients of Notice of Electronic Filing:**

| | | |
|---|---|---|
| ust | United States Trustee | USTPREGION03.WL.ECF@USDOJ.GOV |
| ust | David L. Buchbinder | david.l.buchbinder@usdoj.gov |
| aty | Christopher M. Samis | samis@rlf.com |
| aty | Christopher M. Samis | samis@rlf.com |
| aty | Christopher M. Samis | samis@rlf.com |
| aty | Jeffrey W Kelley | jeffrey.kelley@troutmansanders.com |
| aty | Marisa A. Terranova | terranova@rlf.com |
| aty | Marisa A. Terranova | terranova@rlf.com |
| aty | Mark D. Collins | collins@RLF.com |
| aty | Mark D. Collins | collins@rlf.com |

TOTAL: 10

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

| | | |
|---|---|---|
| db | Allied Systems Holdings, Inc. | 2711 Centerville Road     Suite 400     Wilmington, DE 19808 |
| aty | Carolyn Peterson Richter | Troutman Sanders LLP     Bank of America Plaza     600 Peachtree Street     Suite 5200     Atlanta, GA 30308−2216 |
| aty | Ezra H. Cohen | Troutman Sanders LLP     Bank of America Plaza     600 Peachtree Street     Suite 5200     Atlanta, GA 30308−2216 |
| aty | Jeffery W. Cavender | Troutman Sanders LLP     Bank of America Plaza     600 Peachtree Street, N.E.     Suite 5200     Atlanta, GA 30308−2216 |
| aty | Michael E. Johnson | Troutman Sanders LLP     Bank of America Plaza     600 Peachtree Street     Suite 5200     Atlanta, GA 30308−2216 |

TOTAL: 5

# Exhibit 133

# D.I. 74, Case No. 12-50947

IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re:<br><br>ALLIED SYSTEMS HOLDINGS, INC. *et al.*,[1]<br><br>    Debtors. | ) ) ) ) ) ) ) | |
| ALLIED SYSTEMS HOLDINGS, INC.<br><br>               Plaintiff,<br>v.<br><br>AMERICAN MONEY MANAGEMENT CORP., AVENUE CAPITAL GROUP, BDCM OPPORTUNITY FUND II, LP, BENNETT MANAGEMENT, BLACK DIAMOND CLO 2005-1 LTD., DEL MAR DISTRESSED OPPORTUNITIES MASTER FUND, MJX ASSET MANAGEMENT, LLC, PAR-FOUR INVESTMENT MANAGEMENT, SPECTRUM INVESTMENT PARTNERS LP, TEAK HILL CREDIT CAPITAL INVESTMENTS, LLC, THE CIT GROUP BUSINESS CREDIT, INC., THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, YUCAIPA AMERICAN ALLIANCE FUND II, L.P. and YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P.<br><br>               Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Chapter 11<br>Case No. 12-11564 (CSS)<br>(Jointly Administered)<br><br><br>Adversary Proceeding<br> No.: 12-50947 (CSS)<br><br><br><br>January 25, 2013 |
| YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA ALLIANCE FUND II, L.P. and YUCAIPA | ) ) ) ) ) | |

---

[1] The Debtors in these cases, along with the federal tax identification number (business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta. LLC (45-5215545); Axis Canada Company (875688228); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services. Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems. LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863): RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582).

AMERICAN ALLIANCE (PARALLEL) )
FUND II, L.P. )
 )
  Counterclaim and Cross-Claim Plaintiffs, )
 )
v. )
 )
ALLIED SYSTEMS HOLDINGS, INC. )
Counterclaim Defendant, )
 )
AMERICAN MONEY MANAGEMENT CORP., )
AVENUE CAPITAL GROUP, BDCM )
OPPORTUNITY FUND II, LP, BENNETT )
MANAGEMENT, BLACK DIAMOND CLO 2005- )
1 LTD., DEL MAR DISTRESSED )
OPPORTUNITIES MASTER FUND, MJX ASSET )
MANAGEMENT, LLC, PAR-FOUR )
INVESTMENT MANAGEMENT, SPECTRUM )
INVESTMENT PARTNERS LP, TEAK HILL - )
CREDIT CAPITAL INVESTMENTS, LLC, THE )
CIT GROUP BUSINESS CREDIT, INC., THE )
OFFICIAL COMMITTEE OF UNSECURED )
CREDITORS )
 )
Cross-Claim Defendants. )
 )

---

## MEMORANDUM OF LAW IN SUPPORT OF CROSS-CLAIM DEFENDANTS BDCM OPPORTUNITY FUND II, LP'S, BLACK DIAMOND CLO 2005-1 LTD'S AND SPECTRUM INVESTMENT PARTNERS LP'S MOTION TO DISMISS THE AMENDED CROSS-CLAIM IN ITS ENTIRETY

Adam Harris
Robert Ward
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10012
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

Adam Landis (No. 3407)
Kerri Mumford (No. 4186)
LANDIS RATH & COBB LLP
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450

*Attorneys for Cross-Claim
Defendants BDCM Opportunity
Fund II, LP, Black Diamond CLO
2005-1 LTD and Spectrum
Investment Partners LP*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... ii

NATURE AND STAGE OF PROCEEDING ............................................. 1

SUMMARY OF ARGUMENT .................................................................. 1

CONCISE STATEMENT OF MATERIAL FACTS RELEVANT TO
    PETITIONING CREDITORS' MOTION TO DISMISS ......................... 3

    A.    The Credit Agreement ............................................................. 3

    B.    The Third Amendment ............................................................ 6

    C.    ComVest's Assignment To Yucaipa and The Purported Fourth
        Amendment ............................................................................ 8

    D.    The New York Action and Hearing Before Justice Ramos ...... 9

    E.    Yucaipa's Challenge to The Third Amendment ...................... 10

STANDARD OF REVIEW ....................................................................... 11

ARGUMENT ........................................................................................... 11

I.     THE CROSS-CLAIM MUST BE DISMISSED UNDER THE PLAIN
      TERMS OF THE CREDIT DOCUMENTS. ...................................... 12

    A.    The Third Amendment Precludes Yucaipa from Bringing the Cross-
        Claim. .................................................................................... 12

    B.    Yucaipa is Precluded from Attaining the Relief it Seeks Under
        Section 10.6(b) of the Credit Agreement. ................................ 14

II.    THE THREE-YEAR STATUTE OF LIMITATIONS BARS YUCAIPA'S
      CLAIM FOR DECLARATORY RELIEF ........................................ 15

    B.    Delaware Choice-of-Law Rules Compel this Court to Apply
        Delaware's Statute of Limitations. .......................................... 16

    B.    Delaware's Three-Year Statute of Limitations for the Declaratory
        Judgment Sought in Count I Has Run ...................................... 17

    C.    That Yucaipa Was Not an Original Signatory to the Third
        Amendment is Irrelevant ......................................................... 19

CONCLUSION ........................................................................................ 22

# TABLE OF AUTHORITIES

**CASES**                                                                     **PAGE(S)**

*Algrant v. Evergreen Valley Nurseries Ltd. P'ship,*
   126 F.3d 178 (3d Cir. 1997)..................................................................................18

*Am. Energy Techs., Inc. v. Colley & McCoy Co.,*
   No. CIV. A. 98-398 MMS, 1999 WL 301648 (D. Del. Apr. 15, 1999).............................16-17

*Barnum v. Millbrook Care Ltd. P'ship,*
   850 F. Supp. 1227 (S.D.N.Y. 1994)..................................................................21

*Beal Sav. Bank v. Sommer,*
   8 N.Y.3d 318 (2007) ..................................................................................12

*Buck v. Hampton Twp. Sch. Dist.,*
   452 F.3d 256 (3d Cir. 2006).............................................................................1

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.,*
   394 F.3d 126 (3d Cir. 2004)..........................................................................11

*Certainteed Corp. v. Celotex Corp.,*
   No. Civ. A. 471, 2005 WL 217032 (Del. Ch. January 24, 2005) .............................18

*Contemporary Mission, Inc. v. Famous Music Corp.,*
   557 F.2d 918 (2d Cir. 1977)..........................................................................15

*Edge Mgmt. Consulting, Inc. v. Blank,*
   25 A.D.3d 364 (1st Dep't 2006) ....................................................................21

*Fesnak and Assocs., LLP v. U.S. Bank Nat'l Ass'n,*
   722 F. Supp. 2d 496 (D. Del. 2010) ................................................................12

*In re Garden Ridge Corp.,*
   338 B.R. 627 (Bankr. D. Del. 2006) ................................................................16

*Gaston & Snow v. Erkins (In re Gaston & Snow),*
   243 F.3d 599 (2d Cir. 2001)..........................................................................16

*Gluck v. Unisys Corp.,*
   960 F.2d 1168 (3d Cir. 1992)........................................................................16

*Jadczak v. Assurant, Inc.,*
   No. 08C-05-028, 2009 WL 1277965 (Del. Super. Apr. 30, 2009) .............................20

*Johnson v. Geico Cas. Co.*,
    673 F. Supp. 2d 255 (D. Del. 2009) .......................................................................18

*Kost v. Kozakiewicz*,
    1 F.3d 176 (3d Cir. 1993) ........................................................................................11

*Madison Fund, Inc. v. Midland Glass Co.*,
    No. 394 Civ. A. 1974, 1980 WL 332958 (Del. Super. Aug. 11, 1980) ....................19

*Mendel v. Henry Phipps Plaza West, Inc.*,
    6 N.Y.3d 783 (2006) ................................................................................................20

*Morse v. Lower Merion Sch. Dist.*,
    132 F.3d 902 (3d Cir. 1997) ....................................................................................11

*In re PHP Healthcare Corp.*,
    128 Fed. App'x 839 (3d Cir. 2005) ..........................................................................16

*Polar Int'l Brokerage Corp. v. Richman*,
    32 A.D.3d 717 (1st Dep't 2006) ...............................................................................14

*Reiss v. Fin. Performance Grp.*,
    97 N.Y.2d 195 (2001) ...............................................................................................14

*Resort Point Custom Homes, LLC v. Tait*,
    No. S08C-04-020-ESB, 2010 WL 1443274 (Del. Super. April 7, 2010) ..................19

*Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc.*,
    269 F. Supp. 2d 356 (S.D.N.Y. 2003).......................................................................15

*Simon Wrecking Co. v. AIU Ins. Co.*,
    350 F. Supp. 2d 624 (E.D. Pa. 2004) .......................................................................18

*Southmark Prime Plus, L.P. v. Falzone*,
    776 F. Supp. 888 (D. Del. 1991) ...............................................................................2

*State of Cal. Pub. Emps.' Ret. Sys. v. Shearman & Sterling*,
    95 N.Y.2d 427 (2000) ..............................................................................................20

*Tanbro Fabrics Corp. v. Deering Milliken, Inc.*,
    35 A.D.2d 469 (1st Dep't 1971) ...............................................................................15

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*,
    860 A.2d 312 (Del. 2004) ...........................................................................................2

*Winstar Commc'ns v. Blackstone Grp., L.P. (In re Winstar Commc'ns, Inc.)*,

iii

435 B.R. 33 (Bankr. D. Del. 2010) .................................................................16, 17

*WMC Mortg. LLC v. Baker*,
    No. 10-3118, 2012 WL 628003 (E.D. Pa. Feb. 28, 2012) .......................................18

## STATUTES AND RULES                                             PAGE(S)

10 Del. C. § 8106 ..................................................................................................18

10 Del. C. § 8121 ..................................................................................................17

FED. R. BANKR. P. 7012 .........................................................................................1

FED. R. CIV. P. 12(b)(6) .........................................................................................1

## NATURE AND STAGE OF PROCEEDING

Pursuant to Federal Rules of Civil Procedure 12(b)(6), made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7012, BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 LTD (together, "Black Diamond") and Spectrum Investment Partners LP ("Spectrum") (collectively, with Black Diamond, the "Petitioning Creditors"), by and through their undersigned counsel, respectfully submit this Memorandum of Law in Support of their motion to dismiss Yucaipa's Amended Cross-Claim for Declaratory Judgment and Other Relief (the "Cross-Claim") in its entirety.

## SUMMARY OF ARGUMENT

On November 19, 2012, at the close of oral argument, New York Supreme Court Justice Charles Ramos granted Petitioning Creditors' motion for summary judgment in their declaratory judgment action seeking a determination that Yucaipa is not, and never was, the Requisite Lender under the First Lien Credit Agreement, and that the Purported Fourth Amendment was invalid.[2] During the course of the oral argument Justice Ramos correctly pointed out that Yucaipa had been trying to exercise "dictatorial powers with regard to [the] loan" (Exhibit 1; Tr. 26:18-25)[3] in the face of the prior

---

[2] The "First Lien Credit Agreement" refers to the "Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement," as amended and restated as of May 15, 2007, between Allied Holdings Inc. and Allied Systems Ltd. (L.P.) as Borrowers (collectively, "Allied"), the Lenders from time to time party thereto, and the CIT Group Business Credit, Inc. ("CIT") as Administrative Agent and Collateral Agent, among others. The "Third Amendment" refers to Amendment No. 3 to the Credit Agreement and Consent, dated April 17, 2008. The "Purported Fourth Amendment" refers to "Agreement No. 4 to Credit Agreement" dated August 21, 2009, which is the subject of the litigation before Justice Ramos. All capitalized terms that are not defined herein shall have the meanings attributed to them in the First Lien Credit Agreement.

[3] On a motion to dismiss, the Court may consider "any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (internal quotations omitted). "Tr." refers to the transcript of the November 19, 2012 hearing before Justice Ramos in the New

contractual restrictions prohibiting them from doing so. With this Cross-Claim, Yucaipa once again tries to put itself in the position of having the ability to exercise dictatorial control over Allied's debt, the First Lien Lenders and Allied.

Yucaipa attempts to sidestep Justice Ramos's ruling and reestablish its dictatorial control over Allied and the Obligations under the First Lien Credit Agreement by circumventing the restrictions in the Third Amendment, which were placed there precisely to prevent Yucaipa from gaining such control. That is, during the more than four years since its execution, no one had challenged the Third Amendment (which was entered into at Yucaipa's behest); however, Yucaipa now argues through tangled and self-serving logic that the provisions in the Third Amendment that effectively "neutered" any Obligations purchased by Yucaipa could never have been effective. As demonstrated below, Yucaipa's last gasp to reestablish its dictatorial control over Allied and its debt is of no moment because Yucaipa is prohibited from bringing its Cross-Claim as a matter of law by both the unequivocal terms of the First Lien Credit Agreement and the applicable three-year statute of limitations. That is:

(1) Yucaipa is prohibited by Section 10.6(j) of the Credit Agreement, as amended in Section 2.7(e) of the Third Amendment, from bringing any suit against the Lenders that in any way relates to any Credit Document (of which the Third Amendment is one). This broad waiver precludes Yucaipa from bringing the instant action.

---

York action on Petitioning Creditors' motion for summary judgment, excerpts of which are attached hereto as Exhibit 1. The Court may review the publicly recorded transcript. *See, e.g., Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 860 A.2d 312, 320 n.28 (Del. 2004) (citing *Southmark Prime Plus, L.P. v. Falzone,* 776 F. Supp. 888, 891 (D. Del. 1991), for the proposition that the court can judicially notice contents of court records.

(2) Under the express terms of the Credit Agreement, an assignee of any Obligations, such as Yucaipa, is bound by all consents given by the prior holder of those Obligations. Yucaipa was assigned Obligations that were previously held by Lenders who approved the Third Amendment. Pursuant to the unequivocal terms of the Credit Agreement, Yucaipa cannot now disavow that previous approval of the Third Amendment.

(3) Yucaipa's claim for declaratory relief is barred by the applicable three year statute of limitations. Yucaipa's Cross-Claim alleges that the provisions of the Third Amendment restricting its exercise of control over Allied debt were void *ab initio* because they allegedly violated several provisions of the Credit Agreement. If Yucaipa's argument is correct, the claim that the April 2008 Third Amendment was invalid arose at the moment the Third Amendment was executed. Because Yucaipa brought its claim to invalidate these provisions of the Third Amendment more than four years after the passage of the Third Amendment, the three year statute of limitations bars the Cross-Claim as a matter of law.

For the following reasons, Petitioning Creditors' contractual and statute of limitations defenses dispose of the Cross-Claim in its entirely and should be dismissed as a matter of law.

## CONCISE STATEMENT OF MATERIAL FACTS RELEVANT TO PETITIONING CREDITORS' MOTION TO DISMISS

### A.    The Credit Agreement.

In May 2007, Allied and several related entities emerged from bankruptcy under a plan of reorganization that, among other things, resulted in Yucaipa becoming the majority shareholder of Allied with control over Allied's Board of Directors. (Cross-

3

Claim ¶¶ 9, 10.)  To finance this May 2007 emergence from bankruptcy, Allied obtained

financing through two credit facilities consisting of a senior secured first priority credit

facility evidenced by the First Lien Credit Agreement (the "First Lien Facility"), and a

second lien credit facility ("Second Lien Facility").  (*Id.* ¶ 10.)  As a result of the

conflicts of interest that would arise if Yucaipa, as controlling shareholder of Allied, was

able to control Allied's debt, Yucaipa was entirely foreclosed from becoming a Lender

under the original Credit Agreement, which included express provisions that precluded

Lenders from selling any Obligations to Yucaipa.  (*Id.* ¶ 11.)

Under the Credit Agreement, the Requisite Lender(s) are vested with

broad authority to make key decisions affecting the rights of all Lenders (*Id.* ¶ 49.)  As

defined in the Credit Agreement, the Requisite Lenders are

> one or more Lenders having or holding Term Loan Exposure, LC
> Exposure and/or Revolving Exposure and representing more than
> 50% of the sum of (i) the aggregate Term Loan Exposure of all
> Lenders, (ii) the aggregate LC Exposure of all Lenders and (iii) the
> aggregate Revolving Exposure of all Lenders.

(*Id.*; First Lien Credit Agreement § 1.1.)

Subject to certain exceptions, Requisite Lender consent is all that is

required for any "amendment, modification, termination or waiver of any provision of the

[Credit Agreement], or consent to any departure by any [Borrower or Guarantor]

therefrom." (Cross-Claim ¶ 50; First Lien Credit Agreement§10.5(a).)  In addition, the

Requisite Lenders are vested with authority to direct the Agent to exercise certain rights

and remedies on behalf of *all Lenders*, such as declaring Events of Default, demanding

immediate payment by Allied of any and all amounts due, or commencing foreclosure on

the collateral pledged to secure the Obligations.  (First Lien Credit Agreement §§ 8.1,

9.8.)  Perhaps even more importantly, the Requisite Lender also has the power to direct

4

the Agent to refrain from exercising such remedies. (First Lien Credit Agreement §§ 8.1, 9.8.)

Section 10.5(b) of the First Lien Credit Agreement prohibits certain modifications of the First Lien Credit Agreement without the written consent of each Lender affected by the modification. For example, Section 10.5(b)(ix) provides that "[w]ithout the written consent of each Lender . . . affected thereby, no amendment, modification, termination or consent shall be effective if the effect thereof would: . . . amend the definition of '**Requisite Lenders**' . . . " The other subsections in Section 10.5(b) and 10.5(c) prohibit other modifications to the First Lien Credit Agreement without certain Lender consent. (§§ 10.5(b), 10.5(c).)

Of particular importance to this motion, Section 10.6 of the Credit Agreement, "**Successors and Assigns; Participations,**" governs the rights of assignees and the effect of assignment under the Credit Agreement. (First Lien Credit Agreement § 10.6). Significantly, Section 10.6(b) conclusively binds a subsequent holder, assignee or transferee to all authorities or consents made by its predecessor. The Section provides in relevant part:

> Any request, authority or consent of any Person, who at the time of making such request or giving such authority or consent, is listed in the Register as a Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments, LC Deposits or Loans.

(First Lien Credit Agreement § 10.6(b).) Thus, the authorities or consents made by a Lender listed in the Register binds any subsequent holders of its Commitments, LC Deposits or Loans. (*See id.*) The First Lien Credit Agreement reiterates in Section

5

10.6(f) that assignments of any Commitments, LC Deposits or Loans are "[s]ubject to the terms and conditions of this Section 10.6 . . .". (*Id.*)

## B. The Third Amendment.

Yucaipa, as Allied's majority equity holder and Sponsor under the Credit Agreement, was neither a Lender under the First Lien Credit Agreement nor an Eligible Assignee. (Cross-Claim ¶¶ 11, 53.) Yucaipa contends that in early 2008, however, the Lenders, Yucaipa and Allied discussed potentially amending the First Lien Credit Agreement to allow Yucaipa to become a limited Eligible Assignee and thereby purchase debt but only subject to very strict conditions. (*Id.* ¶¶ 54, 57.) In April 2008, CIT Group/Business Credit, Inc. ("CIT"), as Administrative Agent to all Lenders under the Credit Agreement, coordinated the passage of the Third Amendment by receiving the written consent of a majority of Lenders. (*Id.* ¶¶ 12, 55.)

As set forth in the Cross-Claim, these Lenders authorized Yucaipa to acquire Term Loans under certain conditions and subject to severe restrictions. (Cross-Claim ¶¶ 12, 55.) That is, under the Third Amendment, Yucaipa was designated a Restricted Sponsor Affiliate and was:

- Required to contribute to Allied as capital no less than 50% of the aggregate principal amount of any Term Loans that Yucaipa obtained within ten days after the date of such acquisition (*Id.* § 2.7(e));

- Prohibited from accumulating over (i) 25% of the aggregate principal amount of the Term Loan Exposure held by all Lenders or (ii) $50 million of the principal amount of Term Loans (Third Amendment §§ 2.7(c), 2.7(e));

- Prohibited from exercising any and all voting rights it would otherwise have as a Lender, including the right to consent to an amendment of the First Lien Credit Agreement or the right to vote its debt in any Allied bankruptcy (*Id.* §§ 2.1(e), 2.7(a), 2.7(b), 2.7(e)); and

6

- Prohibited from including its Term Loans in any calculation of Term Loan Exposure when such calculation was required under the First Lien Credit Agreement (*Id.* § 2.1(e).)

To ensure compliance with these restrictions, the Third Amendment further required Allied to deliver to the Administrative Agent monthly reports of the amount of Term Loans acquired and held by Yucaipa, and the price paid for such loans. (Third Amendment § 2.3(a).)

The restrictions on Yucaipa as Restricted Sponsor Affiliates under the Third Amendment were not just limited to the capital contribution requirement or neutered voting rights. Yucaipa was also expressly prohibited from asserting any claims against the other Lenders with respect to any issue under the Credit Documents. Section 10.6(j) of the First Lien Credit Agreement (as amended by Section 2.7(e) of the Third Amendment) provides in pertinent part as follows:

> **To the fullest extent permitted by applicable law, no Restricted Sponsor Affiliate [Yucaipa] shall assert, and each Restricted Sponsor Affiliate immediately and automatically upon becoming a Lender, hereby irrevocably (i) waives, any claim or cause of action against any Lender, any Agent and their respective Affiliates, directors, employees, attorneys, agents or sub-agents (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement or otherwise) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith . . . (ii) waives, releases and agrees not to sue upon any such claim or any such cause of action, whether or not accrued and whether or not known or suspected to exist in its favor and (iii) waives any claim or cause of action against any Agent or any Lender and their respective Affiliates,**

7

> directors, employees, attorneys, agents or sub-agents on
> any theory of liability for special, indirect, consequential or
> punitive damages . . .

(Third Amendment § 2.7(e)) (emphasis added).

### C. ComVest's Assignment To Yucaipa and The Purported Fourth Amendment.

In February 2009, ComVest Investment Partners III, L.P. ("ComVest"), acquired the majority of Allied's Term Loans and LC Commitments from Allied's then-existing Lenders. (Cross-Claim ¶ 64.) Immediately thereafter, Yucaipa entered into negotiations with ComVest to acquire ComVest's position in the debt. (*Id.*)

On August 21, 2009, Yucaipa caused Allied to enter the Purported Fourth Amendment with ComVest, the then-Requisite Lender under the Credit Agreement. (Cross-Claim ¶ 15; Purported Fourth Amendment.) The sole purpose and effect of the Purported Fourth Amendment was to remove the restrictions and conditions that the First Lien Credit Agreement and the Third Amendment had placed on Yucaipa's acquisition, ownership and voting of Obligations. (Cross-Claim ¶ 16.) In particular, the Fourth Amendment purported to:

- Delete language added by the Third Amendment to the definition of Term Loan Exposure, thereby allowing Yucaipa's Term Loans to be counted in the calculation of the aggregate number of Term Loans outstanding for purposes of becoming Requisite Lender (Purported Fourth Amendment § 2.1(b); Third Amendment § 2.1(c));

- Eliminate the provision added by the Third Amendment that prohibited Yucaipa from acquiring more than the lesser of 25% of the aggregate Term Loan Exposure or $50 million of the principal amount of Term Loans (Purported Fourth Amendment § 2.4(c); Third Amendment § 2.7(c));

- Eliminate the restrictions that were added by the Third Amendment on Yucaipa's right to vote as if it were a Lender (Purported Fourth Amendment § 2.4(a); Third Amendment § 2.7(a)); and

- Eliminate the restriction in the definition of Eligible Assignee in the First Lien Credit Agreement as initially drafted that prohibited the Sponsor from becoming an Eligible Assignee. (Purported Fourth Amendment § 2.1(b); Third Amendment § 2.1(c)).

Thus, the Purported Fourth Amendment, for the first time, allowed Yucaipa to acquire enough first lien debt, and to give Yucaipa the power to vote that debt, in order to become Requisite Lender under the Credit Agreement. On the very same day, Yucaipa and ComVest entered into an Assignment and Assumption Agreement whereby Yucaipa acquired all of ComVest's first lien debt. (Cross-Claim ¶ 17.) As a result, Yucaipa claimed (and continues to claim) that it was (and is) the Requisite Lender, with all of the attendant powers to enforce, or refuse to enforce, the Lenders' rights and remedies. (*Id.*)

**D.      The New York Action and Hearing Before Justice Ramos.**

On January 17, 2012, Petitioning Creditors commenced the action entitled, *BDCM Opportunity Fund II, LP et al. v. Yucaipa American Alliance Fund I L.P. et al.*, Index No. 650150/2012 (the "New York Action") in the Supreme Court of the State of New York, County of New York (Cross-Claim ¶ 22) seeking, *inter alia*, a judicial declaration that the Purported Fourth Amendment is null and void and that Yucaipa is not the Requisite Lender under the Credit Agreement. (Cross-Claim ¶ 22.)

Thereafter, on August 27, 2012, Petitioning Creditors filed a motion for summary judgment in the New York Action, arguing that the Purported Fourth Amendment violated the unambiguous terms of the First Lien Credit Agreement by effecting a change to the definition of Requisite Lender without unanimous affected Lender consent. (Exhibit 1; Tr. at 3; *see* First Lien Credit Agreement § 10.5(b)(ix).)

On November 19, 2012, Justice Ramos heard oral argument on Petitioning Creditors' summary judgment motion, as well as on the affirmative defenses raised

thereto by Yucaipa. (Cross-Claim ¶ 23.) Upon hearing Yucaipa's strained interpretation of the Credit Agreement, Justice Ramos remarked, "You've got to be kidding." (Exhibit 1; Tr. 24:4.) Justice Ramos saw the Fourth Amendment for what it was -- nothing more than Yucaipa's attempt to give itself "a free hand" and the ability to exercise "dictatorial powers with regard to [the] loan." (Exhibit 1; Tr. 26:18-25.) At the conclusion of oral argument, Justice Ramos granted Petitioning Creditors' summary judgment motion. (Exhibit 1; Tr. 36:11-13.) Justice Ramos indicated that a written decision to this effect would be forthcoming. (Exhibit 1; Tr. 36: 16-17; Cross-Claim ¶ 23.)

### E.    Yucaipa's Challenge to The Third Amendment.

On December 5, 2012, Yucaipa brought its original cross-claim in the adversary action filed by Allied on October 18, 2012. On January 5, 2013, Yucaipa filed its amended Cross-Claim, containing no additional substantive causes of action, but instead a series of hyperbolic and false allegations meant to disparage the Petitioning Creditors before this Court.

The Cross-Claim presumes that Justice Ramos' order will invalidate the entire Purported Fourth Amendment and seeks the judicial reformation of the Third Amendment. (*Id.* ¶¶ 25, 96, 108). Specifically, Yucaipa asks this Court to strike every provision contained in the Third Amendment that served to prevent it from becoming Requisite Lender under the Credit Agreement, while preserving those provisions that allowed it to acquire Obligations as an Eligible Assignee. (*Id.* ¶¶ 96, 108.) Effectively, Yucaipa would like this Court to allow Yucaipa to be a Lender under the First Lien Credit Agreement without any restrictions -- a structure that no other Lender ever permitted.

10

The Cross-Claim also contains allegations of unjust enrichment and estoppel, as well as a count for a preliminary injunction, all based on Justice Ramos striking of the entire Purported Fourth Amendment and the alleged invalidity of certain provisions of the Third Amendment. (*Id.* ¶¶ 110-140.)

Although Justice Ramos may not strike the entirety of the Purported Fourth Amendment, but rather only those provisions that allow Yucaipa to become Requisite Lender, for the purposes of this motion, the allegations in the Cross-Claim are taken as true. Even doing so, the Cross-Claim should be dismissed for failure to state a claim upon which relief may be granted.

## STANDARD OF REVIEW

A motion pursuant to Federal Rule 12(b)(6), as made applicable to this proceeding through Bankruptcy Rule 7012(b), for failure to state a claim serves to test the sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). While the Court is to accept as true all well pleaded allegations in the complaint, it is "not required to accept legal conclusions either alleged or inferred from the pleaded facts." *Kost*, 1 F.3d at 183. In ruling on a motion to dismiss, the Court "need not credit a complaint's 'bald assertions' or 'legal conclusions.'" *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)).

## ARGUMENT

Yucaipa is seeking an end run around Justice Ramos's ruling by an after the fact challenge to the Third Amendment, which had been authorized by the predecessor holders of Yucaipa's debt and had not been disputed in the more than four years since its execution. Yucaipa's challenge to the Third Amendment, which seeks to

reinstate Yucaipa to the same dictatorial position it had under the Purported Fourth Amendment, fails because (1) Yucaipa is expressly forbidden from bringing this case under the plain terms of the Third Amendment; (2) it is undisputed that a number of Yucaipa's predecessors-in-interest authorized the Third Amendment and the First Lien Credit Agreement precludes Yucaipa from disregarding these prior authorizations, and (3) Yucaipa is barred by the applicable three year statute of limitations from challenging the validity of an agreement executed more than four years ago. As a result, the Cross-Claim fails to state a claim and should be dismissed as a matter of law.

## I. THE CROSS-CLAIM MUST BE DISMISSED UNDER THE PLAIN TERMS OF THE CREDIT DOCUMENTS.

New York law governs the substance of the Credit Agreement. (First Lien Credit Agreement § 10.14.) Construction of an unambiguous contract "is a matter of law, and the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms." *Beal Sav. Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007); *see also Fesnak and Assocs., LLP v. U.S. Bank Nat'l Ass'n*, 722 F. Supp. 2d 496, 501 (D. Del. 2010) ("Where contract language is unambiguous, the court must give the provision's terms their plain meaning.") (internal citation omitted).

### A. The Third Amendment Precludes Yucaipa from Bringing the Cross-Claim.

Section 2.7(e) in the Third Amendment,[4] which amended 10.6(j) of the Credit Agreement, provides by its express terms that, upon becoming a Lender, Yucaipa waives its right to challenge any provision of the Third Amendment.

---

[4] The Cross-Claim is premised on the Purported Fourth Amendment being voided in its entirety. (*See* Cross-Claim ¶ 96 ("Assuming, *arguendo*, that the New York Court disregards the severability clause of the Fourth Amendment and completely invalidates the Fourth Amendment for the reasons urged by Petitioning Creditors ..."); Cross-Claim ¶ 25 ("assuming the broadest possible written order affirming the Petitioning Creditors' motion for summary judgment in the New York Action ..."). Thus, the Cross-Claim, which is to

In fact, the provision is broader, preventing Yucaipa from bringing any suit against the Lenders in connection with any of the Credit Documents, which includes the Third Amendment:

> **To the fullest extent permitted by applicable law, no Restricted Sponsor Affiliate [Yucaipa] shall assert, and each Restricted Sponsor Affiliate immediately and automatically upon becoming a Lender, hereby irrevocably (i) waives, any claim or cause of action against any Lender,** any Agent and their respective Affiliates, directors, employees, attorneys, agents or sub-agents **(whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement or otherwise) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith . . . (ii) waives, releases and agrees not to sue upon any such claim or any such cause of action, whether or not accrued and whether or not known or suspected to exist in its favor** and (iii) **waives any claim or cause of action against** any Agent or **any Lender** and their respective Affiliates, directors, employees, attorneys, agents or sub-agents on any theory of liability for special, indirect, consequential or punitive damages . . . .

(Third Amendment § 2.7(e).)[5]

Under this provision, Yucaipa is expressly prohibited from bringing any action to challenge the Third Amendment. In its Cross-Claim, Yucaipa has assumed the Third Amendment to be the operative document, but despite the express covenant not to sue

---

be taken as true for this motion, assumes that the provision of the Fourth Amendment (§ 2.4(e)), striking § 2.7(e), has itself been stricken.

[5] In case Yucaipa argues that it was not a party to the Third Amendment and thus not bound by this provision, as set forth in the next section of this memorandum, Yucaipa, by virtue of Section 10.6(b) of the Credit Agreement, is bound by the authorizations and consents of its predecessors in interest, which did consent to this provision. Thus, upon acquiring the debt Obligations at issue, Yucaipa became subject to § 2.7(e) and its prohibition on bringing suit.

contained in § 2.7(e) thereof, it has brought four counts against the Lenders which are

clearly foreclosed by this provision.  Section 2.7(e) of the Third Amendment should be

enforced according to its terms, and the Cross-Claim should be dismissed as a matter of

law.  *See e.g., Polar Int'l Brokerage Corp. v. Richman*, 32 A.D.3d 717, 720 (1st Dep't

2006) (granting defendants' motion to dismiss based on an agreement between the parties

containing a covenant not to sue);  *Reiss v. Fin. Performance Grp.*, 97 N.Y.2d 195, 198

(2001) (reversing Appellate Division's denial of motion to dismiss based upon the

principle that "when parties set down their agreement in a clear, complete document, their

writing should as a rule be enforced according to its terms").

### B.   Yucaipa is Precluded from Attaining the Relief it Seeks Under Section 10.6(b) of the Credit Agreement.

In the Cross-Claim, Yucaipa seeks to nullify certain provisions in the

Third Amendment arguing that they are allegedly in violation of the Credit Agreement.

(Cross-Claim ¶ 104).  According to Yucaipa's tangled and self-serving logic, if the

Purported Fourth Amendment, and its rollback of the restrictions and conditions in the

Third Amendment are declared invalid, then the imposition of these very same

restrictions were never valid in the first place.  (*Id.*)

Yucaipa, however, is foreclosed from asserting such a claim under the

plain terms of the Credit Agreement, which categorically binds subsequent holders of

Allied's debt Obligations to the authorities and consents agreed to by their predecessors-

in-interest.  Specifically, Section 10.6(b) of the First Lien Credit Agreement provides

that:

> Any request, authority or consent of any Person, who at the
> time of making such request or giving such authority or
> consent, is listed in the Register as a Lender shall be
> conclusive and binding on any subsequent holder, assignee

or transferee of the corresponding Commitments, LC
Deposits or Loans.

(First Lien Credit Agreement § 10.6(b).) Thus, Yucaipa cannot undo the consents and

authorizations to the Third Amendment given by Lenders that held Commitments, LC

Deposits or Loans now held by Yucaipa.[6] Obligations assigned to Yucaipa by ComVest

were held by Lenders that had authorized CIT to pass the Third Amendment in April

2008. Yucaipa is therefore foreclosed from challenging the prior consents giving rise to

the Third Amendment and is precluded from challenging the Third Amendment or any of

its provisions.

## II.   THE THREE-YEAR STATUTE OF LIMITATIONS BARS YUCAIPA'S CLAIM FOR DECLARATORY RELIEF.

The Cross-Claim should be dismissed for yet another reason: Yucaipa is

precluded from challenging the validity of the April 18, 2008 Third Amendment under

the applicable three-year statute of limitations.

According to Yucaipa, the restrictions and conditions on Yucaipa's ability

to accumulate and vote Obligations are inconsistent with the terms of the First Lien

Credit Agreement and are therefore void on their face. (Cross-Claim ¶ 108.)[7] Because

Yucaipa's claim for declaratory relief thereby accrued at the time of the Third

Amendment's execution, the three-year statute of limitations to challenge the amendment

---

[6] Section 10.6(b) is consistent with the general principal that: "[o]f course, the assignee of a contract acquires the assignor's rights therein and assumes its obligations . . ." *Tanbro Fabrics Corp. v. Deering Milliken, Inc.*, 35 A.D.2d 469, 471 (1st Dep't 1971), see also, *Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc.*, 269 F. Supp. 2d 356, 362 (S.D.N.Y. 2003) ("[T]he assignee of a contract acquires the rights of the assignor therein and assumes its obligations...."); *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 929 n.1 (2d Cir. 1977) ("An assignee of a contract stands in the shoes of his assignor and acquires the assignor's rights thereunder.") By entering the First Lien Credit Facility, Yucaipa, as assignee, was precluded from challenging the propriety of the Third Amendment, which had been approved by its assignors.

[7] *See also* Cross-Claim ¶ 96(a): contribution provisions "violated Section 10.5(b)(vii) because their enforcement would 'reduce the principal amount of any loan; ¶ 96(b): the changed definition of Loan Term Exposure violated Section 10.5(b)(ix); ¶ 96(c): eliminating Yucaipa's voting rights violated Section 10.5(b)(ix); ¶ 96(d) capping Yucaipa's ability to acquire debt violated Section 10.5(b)(ix).

15

ran on April 18, 2011, well prior to Yucaipa's filing of its original Cross-Claim on

December 5, 2012. The claim for declaratory relief is therefore barred by the applicable

statute of limitations.

**B.** **Delaware Choice-of-Law Rules Compel this Court to Apply Delaware's Statute of Limitations.**

As a general matter, a bankruptcy court applies the choice of law rules of

the state in which the court sits. *In re PHP Healthcare Corp.*, 128 Fed. App'x 839, 843

(3d Cir. 2005); *see also Gaston & Snow v. Erkins (In re Gaston & Snow)*, 243 F.3d 599,

606 (2d Cir. 2001) (holding that Bankruptcy Courts should apply the choice of law rules

of its forum state rather than federal choice of law rules in cases where no "significant

federal policy" exists). This Court has consistently applied the Delaware choice of law

rules to determine whether Delaware or another state's law applies. *See, e.g., Winstar

Commc'ns v. Blackstone Grp., L.P., (In re Winstar Commc'ns, Inc.)*, 435 B.R. 33, 44

(Bankr. D. Del. 2010) ("This Court must apply the Delaware choice of law rules to

determine whether the Delaware or New York statute of limitations applies to this

adversary."); *In re Garden Ridge Corp.*, 338 B.R. 627, 632 (Bankr. D. Del. 2006) ("To

determine which state's law to apply, the Court turns to Delaware choice of law rules.")

Although the First Lien Credit Agreement and Third Amendment provide

for the application of New York law (First Lien Credit Agreement §10.14, Third

Amendment § 7.6), the Delaware statute of limitations is applicable here. That is, as the

Third Circuit has held: "[c]hoice of law provisions in contracts do not apply to statutes of

limitations, unless the reference is express." *Gluck v. Unisys Corp.*, 960 F.2d 1168, 1179

(3d Cir. 1992); *see also Am. Energy Techs., Inc. v. Colley & McCoy Co.*, No. CIV. A. 98-

398 MMS, 1999 WL 301648 at *2 (D. Del. Apr. 15, 1999) ("Choice of law provisions in

contracts are generally understood to incorporate only substantive law, not procedural law such as the statutes of limitation"). Consequently, unless otherwise set forth in the agreement, "the law of the forum generally determines whether an action is barred by the statute of limitations." *In re Winstar Comm'cns, Inc.*, 435 B.R. at 44. For conflict of law purposes, statute of limitations is a procedural issue. *Id.*

The choice of law provisions in the Credit Documents do not expressly provide for the application of New York law for statute of limitations purposes. As a result, Delaware's three-year, as opposed to New York's six-year, statute of limitations would apply. *See In re Winstar Comm'cns, Inc.*, 435 B.R. at 44.

Moreover, even if Yucaipa were to argue that their claims arose in New York and called for the application of New York law to the statute of limitations here, the Court would apply Delaware's borrowing statute to determine which state's statute of limitations apply. This statute provides:

> Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action.

10 Del.C. § 8121. Under the borrowing statute, the Court would apply the shorter (Delaware's) statute of limitations period.

### B.   Delaware's Three-Year Statute of Limitations for the Declaratory Judgment Sought in Count I Has Run.

Under Delaware law, Yucaipa's action for declaratory judgment is subject to a three-year statute of limitations. The statute of limitations applicable to actions for declaratory judgment is determined by the corresponding legal claim, which in this case

17

would be breach of contract. *See Algrant v. Evergreen Valley Nurseries Ltd. P'ship*, 126

F.3d 178, 184 (3d Cir. 1997) (holding that "when plaintiffs' claims are barred by a statute

of limitations applicable to a concurrent legal remedy, then a court will withhold

declaratory judgment relief in an independent suit essentially predicated upon the same

cause of action"). Thus, Delaware courts apply the three-year breach of contract statute

of limitations for declaratory judgment actions sounding in contract. *Certainteed Corp.*

*v. Celotex Corp.*, No. Civ. A. 471, 2005 WL 217032, at *7 (Del. Ch. January 24, 2005)

(reasoning that actions for declaratory judgment, contractual indemnification, breach of

contract, and specific performance were all ultimately claims for breach of contract that

were subject to the three-year limitations period); *Johnson v. Geico Cas. Co.*, 673 F.

Supp. 2d 255, 269 n.7 (D. Del. 2009) ("Under 10 Del. C. § 8106, the statute of limitations

for asserting breach of contract, declaratory judgment, and statutory fraud . . . is three

years."). Likewise, other courts sitting in the Third Circuit rely on *Algrant* for the

proposition that the statute of limitations for breach of contract applies to actions for

declaratory judgment on a contract. *See, e.g., WMC Mortg. LLC v. Baker*, No. 10-3118,

2012 WL 628003, at *9 (E.D. Pa. Feb. 28, 2012) (applying the Pennsylvania statute of

limitations for breach of contract where the declaratory judgment claim dealt with a

party's rights and obligations under the contract); *Simon Wrecking Co. v. AIU Ins. Co.*,

350 F. Supp. 2d 624, 639-40 (E.D. Pa. 2004) (applying Pennsylvania statute of

limitations for breach of contract to declaratory judgment action).

In its Cross-Claims Yucaipa alleges that the provisions of the Third

Amendment restricting its ability to buy debt and vote debt were void *ab initio*. (*See* n.7,

*supra*.) The Third Amendment went into effect on April 18, 2008. There is no tolling

provision applicable to this claim.[8]  Since Yucaipa did not bring this claim by April 18,

2011, the Cross-Claim is barred by the applicable three year statute of limitations.

## C.  That Yucaipa Was Not an Original Signatory to the Third Amendment is Irrelevant.

The fact that Yucaipa was not a signatory to the Third Amendment at the

time of its passage is of no consequence.  Once Yucaipa was assigned debt under the

First Lien Facility, it stood in the shoes of its predecessors-in-interest with respect to any

challenges that could have been interposed.  The statute of limitations to challenge the

First Lien Credit Agreement and amendments does not start to run again each time

Obligations are assigned to a new Lender.  Rather, the assignee takes the assigned loans

"subject to all defenses of the obligor against the assignor." *Madison Fund, Inc. v.

Midland Glass Co.*, No. 394 Civ. A. 1974, 1980 WL 332958, at *2 (Del. Super. Aug. 11,

1980) ("That is to say that the assignee stands in the shoes of the assignor; he acquires no

greater right than that which was possessed by his assignor . . . . Defenses such as the

statute of limitations may be interposed against the assignee if it was available against the

assignor."). *See Resort Point Custom Homes, LLC v. Tait*, No. S08C-04-020-ESB, 2010

WL 1443274, at *2 (Del. Super. April 7, 2010) ("It is a rudimentary principle of contract

law that the assignee takes the assigned claim subject to all defenses of the obligor

against the assignor. . . . Moreover, defenses may be interposed against the assignee if

they were available against the assignor, including the right of set-off by the debtor.").

---

[8] In any case, Yucaipa (i) had knowledge in 2008 of the allegedly invalid provisions in the Third Amendment (Cross-Claim ¶¶ 56, 60) and (ii) did not raise any objections relating to the enforceability of these provisions.  (*Id.*)

For these reasons, Yucaipa's action for a declaratory judgment seeking invalidation *ab initio* of portions of the Third Amendment is barred by the statute of limitations and should be dismissed.

In addition, the Third Amendment was passed by Allied, which was controlled by Yucaipa at the time, in order to allow Yucaipa to be an "Eligible Assignee" under the First Lien Credit Agreement under certain conditions. (Cross-Claim ¶ 54.) Yucaipa was a direct beneficiary under the Third Amendment with undisputed knowledge of its contents. (*Id.* ¶¶ 59-60.) As a result of Yucaipa's status as beneficiary under the Third Amendment, the statute of limitations for challenging the terms of the Third Amendment accrued on April 18, 2008, the date of its passage, for Yucaipa. *See e.g.,* 9 Corbin on Contracts § 46.7 (rev. ed. 2006) (reasoning that the rights of a beneficiary arise from the contract between promisor and promisee and therefore "[u]nder that contract he will be subject to the statute of limitations that will run against him from the moment the contract is breached"); *Jadczak v. Assurant, Inc.*, No. 08C-05-028, 2009 WL 1277965 at *4, (Del. Super. Apr. 30, 2009) (holding that a third-party beneficiary insured must bring a breach of contract claim within three years of the actual breach, which could not have occurred later than the date the alleged defective insurance policy began).

Parties are deemed to be third-party beneficiaries when: (1) there is a valid and binding contract between other parties, (2) the contract is intended for the beneficiary's benefit, and (3) the benefit is direct rather than incidental. *Mendel v. Henry Phipps Plaza West, Inc.*, 6 N.Y.3d 783, 811 (2006); *State of Cal. Pub. Emps.' Ret. Sys. v. Shearman & Sterling*, 95 N.Y.2d 427, 434-35 (2000). To be an intended beneficiary,

either the (i) performance of the underlying promise will satisfy an obligation of the

promisee to pay money to the beneficiary or (ii) the circumstances indicate that the

promisee intends to give the beneficiary the benefit of the promised performance. *Edge*

*Mgmt. Consulting, Inc. v. Blank*, 25 A.D.3d 364, 368 (1st Dep't 2006). It is the expressed

intention of the promisee that controls the third-party beneficiary's status. *Barnum v.*

*Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227, 1234 (S.D.N.Y. 1994).

There is no question that Third Amendment was intended for Yucaipa's

direct benefit. Prior to the Third Amendment, Yucaipa was completely foreclosed from

becoming an "Eligible Assignee." (Cross-Claim ¶¶ 11, 54) (First Lien Credit Agreement

§1.1.) The Third Amendment removed this restriction and permitted Yucaipa to become

an Eligible Assignee for the first time, under rigorous restrictions and limitations.

(Cross-Claim ¶¶ 54, 56.) The intent to benefit Yucaipa is set forth in the recitals of the

Third Amendment, which provides:

> "WHEREAS, Borrowers have requested that Requisite
> Lenders agree to amend the Credit Agreement to permit
> Sponsor [Yucaipa] and its Affiliates (other than Borrowers
> and their Subsidiaries) to become Lenders under the Credit
> Agreement by purchasing and assuming the rights and
> obligations of one or more Lenders under the Credit
> Agreement and to contribute such rights and obligations to
> Borrowers in the form of capital contributions; . . .

(Third Amendment, Recitals.) In short, under the Third Amendment, Allied (under

Yucaipa's control) requested the Lenders to allow Yucaipa to become a Lender under the

Credit Agreement. (*Id.*) Yucaipa was clearly an intended third-party beneficiary of this

amendment, and is therefore subject to the same statute of limitations as the signatories of

the contract.

21

# CONCLUSION

For the foregoing reasons, the Petitioning Creditors respectfully request that the Cross-Claim be dismissed in its entirety and with prejudice.

Dated: January 25, 2013
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

_____
Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile:  (302) 467-4450

- and -

**SCHULTE ROTH & ZABEL LLP**
Adam C. Harris
Robert J. Ward
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile:  (212) 593-5955

# Exhibit 134

# D.I. 139, Case No. 12-50947

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ALLIED SYSTEMS HOLDINGS, INC. | : | Case No. 12-11564 (CSS) |
| | : | |
| Debtor. | : | (Jointly Administered) |

---

|  |  |  |
|---|---|---|
| ALLIED SYSTEMS HOLDING, INC. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. Proc. No.: 12-50947 (CSS) |
| | : | |
| AMERICAN MONEY MANAGEMENT | : | |
| CORP., AVENUE CAPITAL GROUP, | : | Adv. Docket No.: 73 |
| BDCM OPPORTUNITY FUND, II, LP, | : | |
| BENNETT MANAGEMENT, BLACK | : | |
| DIAMOND CLO 2005-1 LTD., DEL | : | |
| MAR DISTRESSED OPPORTUNITIES | : | |
| MASTER FUND, MJX ASSET | : | |
| MANAGEMENT, LLC, PAR-FOUR | : | |
| INVESTEMENT MANAGEMENT, | : | |
| SPECTRUM INVESTMENT PARTNERS | : | |
| LP, TEAK HILL – CREDIT CAPITAL | : | |
| INVESTMENTS, LLC, THE CIT | : | |
| GROUP/BUSINESS CREDIT, INC., | : | |
| THE OFFICIAL COMMITTEE OF | : | |
| UNSECURED CREDITORS, YUCAIPA | : | |
| AMERICAN ALLIANCE FUND II, | : | |
| L.P. and YUCAIPA AMERICAN | : | |
| ALLIANCE (PARALLEL)FUND II, L.P. | : | |
| | : | |
| Defendants. | : | |
| | : | |
| YUCAIPA AMERICAN ALLIANCE | : | |
| FUND I, L.P., YUCAIPA AMERICAN | : | |
| ALLIANCE (PARALLEL FUND I, L.P., | : | |
| YUCAIPA AMERICAN ALLIANCE | : | |
| FUND, II, L.P., AND YUCAIPA | : | |
| AMERICAN ALLIANCE (PARALLEL) | : | |

FUND II, L.P.                   :

            :

        Counterclaim and   :

        Cross-Claim Plaintiffs,  :

            :

v.                      :

            :

ALLIED SYSTEMS HOLDING, INC.  :

            :

        Counterclaim Defendant. :

and                   :

            :

AMERICAN MONEY MANAGEMENT :

CORP., AVENUE CAPITAL GROUP,  :

BDCM OPPORTUNITY FUND II, LP,  :

BENNETT MANAGEMENT, BLACK  :

DIAMOND CLO 2005-1TD., DEL MAR :

DISTRESSED OPPORTUNITIES  

MASTER FUND, MJX ASSET      :

MANAGEMENT, LLC, PAR-FOUR   :

INVESTMENTS MANAGEMENT,    :

SPECTRUM INVESTMENT       :

PARTNERS LP, TEAK HILL – CREDIT :

CAPITAL INVESTMENTS, LLC, THE  :

CIT GROUP/BUSINESS CREDIT, INC., :

THE OFFICIAL COMMITTEE OF   :

UNSECURED CREDITORS,      :

            :

        Cross-Claim Defendants.  :

_____:

## ORDER

Upon consideration of the Cross-Claim Defendants BDCM Opportunity

Fund II, LP's Black Diamond CLO 2005-2 Ltd's and Spectrum Investment

Partners LP's Motion to Dismiss the Amended Cross Claim in its Entirety [Adv.

Docket No. 73] filed on January 25, 2013; the Court having reviewed the Motion

and the objections thereto; the Court having heard the statements of counsel and

parties in interest regarding the Motion at a hearing before the Court on February

27, 2013 (the "Hearing"); the Court having found that (i) the Court has

jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, (ii) this is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2), (iii) notice of the Motions and

the Hearing were sufficient notice under the circumstances; and (iv) the Court has

judicial power to enter a final order.

IT IS HEREBY ORDERED THAT, for the reasons set forth on the record at

the hearing, the Motion is granted with prejudice.

Christopher S. Sontchi
United States Bankruptcy Judge

Date: February 27, 2013

3

# Exhibit 135

# D.I. 649, Case No. 13-50530



UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

JUDGE KAREN B. OWENS

824 N. MARKET STREET
WILMINGTON, DELAWARE
(302) 533-3183

January 9, 2020

**VIA CM/ECF**

Seth A. Niederman, Esquire
Fox Rothschild LLP
919 North Market Street, Suite 300
Wilmington, DE 19888-2323

Michael S. Neiburg, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 North King Street
Wilmington, DE 19801

Catherine Youngman, Esquire
Fox Rothschild LLP
49 Market Street
Morristown, NJ 07960

Khan Scolnick, Esquire
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071

Re:     In re ASHINC Corp. *et al.*, Case No. 12-11564 (KBO)

Catherine E. Youngman, Litigation Trustee for ASHINC Corp. *et al.* v. Yucaipa American Alliance Fund I, L.P. *et al.*,
Adv. No. 13-50530 (KBO) & Adv. No. 14-50971 (KBO)

Dear Counsel:[1]

Before the Court are issues raised in a letter dated July 26, 2019 from the Yucaipa Defendants[2] asserting deficiencies in the responses of Black Diamond and Spectrum[3] to discovery

---

[1] Because I write only for the parties, I have not included a detailed history of the above-referenced adversary proceedings.

[2] The letter was written on behalf Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P. (together "Yucaipa") and individual defendants Ron Burkle, Jos Opdeweegh, Derex Walker, Jeff Pelletier, Ira Tochner, and Joseph Tomczak (collectively, the "Yucaipa Defendants").

[3] Black Diamond Opportunity Fund II, L.P. and Black Diamond CLO 2005-1 Ltd. (together, "Black Diamond") and Spectrum Investment Partners, L.P. ("Spectrum" and, collectively with Black Diamond,

January 9, 2020
Page 2

requests issued by the Yucaipa Defendants in the Adversaries.  The Yucaipa Defendants assert that they have "identified notable gaps in BD/S's document production" and argue that "recent depositions have revealed that BD/S likely failed to produce . . . many important documents and communications from the critical period at issue in the litigation."[4]  The Trustee's response argues that there were no discovery deficiencies and, even if there were, the Yucaipa Defendants waited too long to raise issues, especially given that the related document production took place six years earlier by prior counsel.[5]  The Trustee further argues that the Yucaipa Defendants have not articulated any prejudice arising from production issues that would impede the Yucaipa Defendants' ability to prepare for trial.

During briefing on the alleged production deficiencies, it was revealed that BD/S altered the search terms for e-discovery that were set forth in the Yucaipa Defendants' discovery protocol.[6]  The Trustee argues that the changes were reasonable and designed to limit the number of false hits.  The Yucaipa Defendants have requested that the Court require BD/S to un-archive its data and run a new search using the original terms set forth in their discovery protocol.  At the Court's invitation at the conclusion of the August 22, 2019 initial hearing on this matter, the parties submitted supplemental briefing on what the Court perceives as the threshold issue – the relevancy of non-produced documents.  After carefully considering the parties' submissions, the Court concludes that the Yucaipa Defendants have failed to meet their burden of proving such relevancy.  Further, even assuming relevancy, the proposed reopening of discovery is not proportionate to the needs of the Adversaries.  Therefore, the Yucaipa Defendants' request for additional discovery will be denied.

Rule 26 of the Federal Rules of Civil Procedure, made applicable hereto by Rule 7026 of the Federal Rules of Bankruptcy Procedure, provides that the scope of discovery is as follows:

---

"BD/S") are intervenors in adversary proceeding number 13-50530 (the "UCC Adversary").  BD/S, together with co-administrative agents Black Diamond Commercial Finance, L.L.C. and Spectrum Commercial Finance LLC, filed the complaint in adversary proceeding number 14-50971 (the "BD/S Adversary" and together with the UCC Adversary, the "Adversaries").  Both Adversaries were commenced in the 2012 bankruptcy cases of Allied Systems Holding, Inc. and related entities (collectively, "Allied" or the "Debtors").  Pursuant to the Debtors' confirmed plan, Catherine E. Youngman as Litigation Trustee for the ASHINC Litigation Trust (the "Trustee") was substituted as the plaintiff in both Adversaries.  The Adversaries are not formally consolidated.  However, discovery is coordinated, and the Court entered a scheduling order applicable to both proceedings.  *See* Joint Procedural History dated July 25, 2019 (D.I. 365).  Unless otherwise indicated, all docket references are to UCC Adversary docket.

[4] Yucaipa Letter (D.I. 601) at 1.

[5] Trustee Letter (D.I. 603) at 1.

[6] Approximately five years ago, BD/S's previous counsel confirmed in writing that BD/S complied with Yucaipa's discovery protocol.  Now, such counsel has responded with a declaration stating that he recalled discussions about discovery on this matter, generally, and (while he has no specific recollection of conversations six year earlier) his time records and usual practice cause him to believe that the search term modifications would have been discussed with Yucaipa's prior counsel.  Ward Decl. (D.I. 622).  At this time, it is unclear whether the parties conferred about the search term changes and the extent of understanding between the parties' prior counsel.

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within the scope of discovery need not be admissible in evidence to be discoverable.[7]

The Yucaipa Defendants argue that BD/S's "discovery abuse" – specifically, unilaterally changing the search terms – deprived the Yucaipa Defendants of evidence relevant to (1) the Trustee's claims, (2) the Yucaipa Defendants' affirmative defenses of laches, unclean hands, waiver, consent, ratification, and estoppel; and (3) the existence and extent of damages caused by the Yucaipa Defendants.[8] Among other things, the Yucaipa Defendants assert that the missing documents would likely show that BD/S contemporaneously supported the Yucaipa Defendants' actions and strategies challenged by the Trustee, and/or that BD/S knew of no alternative, better strategies that could have been pursued for Allied's benefit.[9] In response, the Trustee argues that the Yucaipa Defendants are merely attempting to revive certain claims, affirmative defenses, and arguments previously considered and rejected by Judge Sontchi.[10]

More specifically, in an opinion dated August 21, 2015, Judge Sontchi dismissed the counterclaim asserted by the Yucaipa Defendants in the BD/S Adversary alleging that BD/S engaged in a multi-step, multi-year scheme to use the bankruptcy process to subordinate Yucaipa's first lien debt. Among other things, Judge Sontchi determined that this counterclaim, based on a sequence of unpredictable events occurring in a manner favorable to BD/S, was not plausible.[11] Following that decision, in 2016, the Yucaipa Defendants filed a motion against BD/S in the BD/S Adversary to compel the production of certain documents,[12] arguing that BD/S wrongfully objected to and refused to comply with their discovery requests. BD/S objected to the relief sought and cross-moved to strike the Yucaipa Defendants' asserted affirmative defenses of, among others, unclean hands, waiver, estoppel, consent, and laches.[13] Directly at issue was the relevance of the Yucaipa Defendants' requested discovery. For various reasons, the Yucaipa Defendants argued that the discovery was relevant to the claims, damages, and affirmative defenses. On January 18, 2017, Judge Sontchi entered an Order denying the Yucaipa Defendants' motion to compel discovery and granting BD/S's motion to strike the affirmative defenses.[14]

---

[7] Fed. R. Bankr. P. 7026(b)(1).

[8] Yucaipa Defendants' Brief (D.I. 614) at 7.

[9] *Id.* at 9.

[10] These proceedings were assigned to me from Judge Sontchi on June 18, 2019.

[11] *BCDM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP (In re ASHINC Corp.)*, Adv. No. 14-50971 (D.I. 82), slip. op. at 64-65 (Bankr. D. Del. Aug. 21, 2015)

[12] BD/S Adversary, D.I. 119.

[13] BD/S Adversary, D.I. 136, 158

[14] BD/S Adversary, D.I. 194. Judge Sontchi's ruling does not specify which affirmative defenses were stricken. In the cross-motion to strike the affirmative defenses, BD/S states in a footnote:

Although the Yucaipa Defendants have invited the Court to reconsider this prior ruling, the Court will not do so based upon the discretion granted by two judicial doctrines – the law of the case and issue preclusion. "The law of the case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. This rule of practice promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues.'"[15] Similarly, issue preclusion (or collateral estoppel) may apply to prior orders and does not require entry of a final judgment that is appealable.[16] "[F]inality for purposes of issue preclusion is a more 'pliant' concept . . . [and] may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again."[17] The four standard requirements for applying collateral estoppel are (1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action.[18]

These doctrines also apply to the current discovery dispute before the Court. A review of the pleadings and hearing transcript related to the 2016 motion to compel and cross-motion to strike affirmative defenses reveals that the recent arguments of the Yucaipa Defendants about the need for further discovery to address claims, damages, and affirmative defenses were already presented to, considered by, and decided upon by Judge Sontchi in the BD/S Adversary. To re-litigate such issues at this time would be a waste of judicial resources.[19] Accordingly, the Court will deny the Yucaipa Defendants' request for additional discovery in the BD/S Adversary as well as in the UCC Adversary to the extent that the requests are related to the causes of action that

---

> Even in the Motion to Compel, the Yucaipa Defendants apparently declined to identify all of the affirmative defenses that rely upon the rejected factual allegations. Instead, they argue that the five affirmative defenses of unclean hands, waiver, estoppel, consent, and laches, along with unidentified 'others,' rely upon those allegations. Although this motion is focused on the five affirmative defenses that the Yucaipa Defendants *have* identified, to the extent that the Yucaipa Defendants attempt to rely upon the rejected factual allegations in support of other affirmative defenses, the Court should preclude them from doing so.

BD/S Adversary, D.I. 158, at 8, n.7 (citation omitted; emphasis in original). The Yucaipa Defendants assert that the Court did not dismiss the affirmative defense of ratification. This affirmative defense is similar to the specifically identified affirmative defenses, and also relies upon the rejected counterclaim alleging wrongful actions taken by BD/S. Accordingly, I understand the intent of Judge Sontchi's order striking the affirmative defenses to apply to all such affirmative defenses, including ratification.

[15] *In re Winstar Commc'ns, Inc.*, 435 B.R. 33, 39 (Bankr. D. Del. 2010) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816, (1988) (internal quotations omitted)). "The law of the case doctrine does not limit a federal court's power; rather it directs its exercise of discretion." *Winstar*, 435 B.R. at 39 (quoting *Public Interest Research Grp. of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997)).

[16] *First Jersey Nat'l Bank v. Brown (In re Brown)*, 951 F.2d 564, 569 (3d Cir. 1991).

[17] *Id.* (quoting *Dyndul v. Dyndul*, 620 F.2d 409, 412 (3d Cir. 1980)).

[18] *Jean Alexander Cosmetics, Inc. v. L'Oreal USA Inc.*, 458 F.3d 244, 249 (3d Cir. 2006).

[19] *Brown,* 951 F.2d at 569.

January 9, 2020
Page 5

mirror those in the BD/S Adversary (*i.e.* equitable subordination and breach of contract) and the stricken affirmative defenses.

Therefore, to prevail on their pending request, the Yucaipa Defendants must demonstrate that the additional discovery is likely to uncover evidence relevant to the remaining claims and defenses in UCC Adversary.[20] To that end, the Yucaipa Defendants assert that the requested discovery is relevant to the claims for breach of fiduciary duties[21] and the Yucaipa Defendants' related business judgment defense. "The business judgment rule presumes that 'in making a business decision the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.'" [22] The business judgment rule rests on the honest belief of the person who owes the fiduciary duty. For example, the duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[23] "To state a legally sufficient claim for breach of the duty of loyalty, plaintiffs must allege facts showing that a self-interested transaction occurred, and that the transaction was unfair to the plaintiffs."[24] Whether the Yucaipa Defendants breached fiduciary duties owing to Allied and its creditors will not rise or fall on BD/S's support for or opinion of the Yucaipa Defendants' actions. "For purposes of discovery, relevancy is broadly construed," but "it is not unlimited."[25] Accordingly, the Court denies the Yucaipa Defendants' request for further discovery in the UCC Adversary.[26]

---

[20] *Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 662 F.Supp.2d 375, 381 (D. Del. 2009) (citing Fed. R. Civ. P. 26(b)(1) ("[T]he party seeking the discovery bears the burden of demonstrating the relevance of the sought information to the claims, defenses, or the subject matter of the litigation.").).

[21] "[T]he Delaware Supreme Court has held that directors and officers of a Delaware corporation owe the corporation and its shareholders a 'triad' of duties. This triad is composed of the duty of care, the duty of loyalty, and the duty to act in good faith." *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners, L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 539 (Bankr. D. Del. 2009) (quoting *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998)).

[22] *Halperin v. Moreno (In re Green Field Energy Services, Inc.*), 594 B.R. 239, 295 (Bankr. D. Del. 2018) (quoting *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011)).

[23] *Fedders*, 405 B.R. at 540 (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)).

[24] *Id.* (quoting *Joyce v. Cuccia*, 1997 WL 257448, *5 (Del. Ch. May 14, 1997)).

[25] *Inventio AG*, 662 F. Supp. 2d at 380-81 (citations omitted).

[26] Similar reasoning leads the Court to conclude that additional discovery would not be relevant to the other remaining claims of the UCC Adversary not addressed by the Yucaipa Defendants in their briefing. For example, an analysis of the recharacterization claim focuses on the intent of the lender/investor and the debtor - not other creditors. "[I]n evaluating a claim to recharacterize a purported debt into equity, the 'determinative inquiry' is the intent of the parties as it existed at the time of the transaction. The Court's role is to determine whether "the party infusing funds [did] so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence they are equity).'" *Official Comm. Of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211, 289 (Bankr. D. Del. 2018) (quoting *Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.)*, 432 F.3d 448, 456-57 (3d Cir. 2006)).

January 9, 2020
Page 6

Finally, even if the requested discovery was relevant, it is not reasonable or appropriate to have BD/S re-run an unaltered set of search terms. The search terms are overly broad, the modifications of BD/S do not appear unreasonable or egregious,[27] and the benefit of the proposed discovery is not likely to outweigh the continued burden and expense.

For the foregoing reasons, the Yucaipa Defendants' discovery request is denied. The parties are requested to confer and promptly submit an order consistent with the foregoing.

Very truly yours,

Karen B. Owens
United States Bankruptcy Judge

KBO/jim

---

[27] BD/S not only added terms and connectors designed to reduce the extent of non-responsive documents but also added several terms to the discovery protocol to expand the scope of discoverable material. Moreover, as highlighted by the Trustee, Yucaipa also made several modifications to the terms prior to conducting its own search.

# Exhibit 136

# D.I. 117, Case No. 12-50947

IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| ALLIED SYSTEMS HOLDINGS, INC. *et al.*,[1] | ) |
| | ) |
| Debtors. | ) |
| | ) |
| ALLIED SYSTEMS HOLDINGS, INC. | ) Chapter 11 |
| | ) Case No. 12 -11564 (CSS) |
| Plaintiff, | ) (Jointly Administered) |
| v. | ) |
| | ) |
| AMERICAN MONEY MANAGEMENT CORP., | ) |
| AVENUE CAPITAL GROUP, BDCM | ) Adversary Proceeding |
| OPPORTUNITY FUND II, LP, BENNETT | ) No.: 12-50947 (CSS) |
| MANAGEMENT, BLACK DIAMOND CLO 2005- | ) |
| 1 LTD., DEL MAR DISTRESSED | ) |
| OPPORTUNITIES MASTER FUND, MJX ASSET | ) |
| MANAGEMENT, LLC, PAR-FOUR | ) February 21, 2013 |
| INVESTMENT MANAGEMENT, SPECTRUM | ) |
| INVESTMENT PARTNERS LP, TEAK HILL | ) |
| CREDIT CAPITAL INVESTMENTS, LLC, THE | ) |
| CIT GROUP BUSINESS CREDIT, INC., THE | ) |
| OFFICIAL COMMITTEE OF UNSECURED | ) |
| CREDITORS, YUCAIPA AMERICAN | ) |
| ALLIANCE FUND II, L.P. and YUCAIPA | ) |
| AMERICAN ALLIANCE (PARALLEL) | ) |
| FUND II, L.P. | ) |
| | ) |
| Defendants. | ) |
| | ) |
| YUCAIPA AMERICAN ALLIANCE FUND I, L.P., | ) |
| YUCAIPA AMERICAN ALLIANCE (PARALLEL) | ) |
| FUND I, L.P., YUCAIPA | ) |
| ALLIANCE FUND II, L.P. and YUCAIPA | ) |

---

[1] The Debtors in these cases, along with the federal tax identification number (business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta. LLC (45-5215545); Axis Canada Company (875688228); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services. Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems. LLC (45-4241751); Logistic Technology, LLC (45-4242057): QAT, Inc. (59-2876863): RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582).

AMERICAN ALLIANCE (PARALLEL)          )
FUND II, L.P.                          )
                                       )
        Counterclaim and Cross-Claim Plaintiffs,  )
                                       )
v.                                     )
                                       )
ALLIED SYSTEMS HOLDINGS, INC.          )
Counterclaim Defendant,                )
                                       )
AMERICAN MONEY MANAGEMENT CORP.,       )
AVENUE CAPITAL GROUP, BDCM             )
OPPORTUNITY FUND II, LP, BENNETT       )
MANAGEMENT, BLACK DIAMOND CLO 2005-    )
1 LTD., DEL MAR DISTRESSED             )
OPPORTUNITIES MASTER FUND, MJX ASSET   )
MANAGEMENT, LLC, PAR-FOUR              )
INVESTMENT MANAGEMENT, SPECTRUM        )
INVESTMENT PARTNERS LP, TEAK HILL -    )
CREDIT CAPITAL INVESTMENTS, LLC, THE   )
CIT GROUP BUSINESS CREDIT, INC., THE   )
OFFICIAL COMMITTEE OF UNSECURED        )
CREDITORS                              )
                                       )
Cross-Claim Defendants.                )
                                       )

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF CROSS-CLAIM DEFENDANTS BDCM OPPORTUNITY FUND II, LP'S, BLACK DIAMOND CLO 2005-1 LTD'S AND SPECTRUM INVESTMENT PARTNERS LP'S MOTION TO DISMISS THE AMENDED CROSS-CLAIM IN ITS ENTIRETY

Adam Harris                          Adam Landis (No. 3407)
Robert Ward                          Kerri Mumford (No. 4186)
SCHULTE ROTH & ZABEL LLP             LANDIS RATH & COBB LLP
919 Third Avenue                     919 Market Street, Suite 1800
New York, New York 10012             Wilmington, Delaware 19801
Telephone: (212) 756-2000            Telephone: (302) 467-4400
Facsimile: (212) 593-5955            Facsimile: (302) 467-4450

                                     *Attorneys for Cross-Claim Defendants*
                                     *BDCM Opportunity Fund II, LP,*
                                     *Black Diamond CLO 2005-1 LTD and*
                                     *Spectrum Investment Partners LP*

# TABLE OF CONTENTS

TABLE OF CONTENTS ..........................................................................................i

TABLE OF AUTHORITIES ..................................................................................ii

ARGUMENT ........................................................................................................6

I.     YUCAIPA'S CLAIMS ARE BARRED BY THE EXPRESS TERMS OF THE FIRST
LIEN CREDIT AGREEMENT AND THE THIRD AMENDMENT ..................................6

    A.  The Third Amendment Governs This Dispute. ............................................6

    B.  There Is No Legal Or Equitable Basis To Ignore The Section 2.7(e) Bar..........................8

        1.      Section 2.7(e) Is Legally Valid. ......................................................9

        2.      The First Lien Credit Agreement's "no waiver" clause disposes of
Yucaipa's equitable claims as a matter of law. ............................................10

    C.  The Exception To Section 2.7(e) Does Not Apply Because No "Court Of Competent
Jurisdiction" Has Found Petitioning Creditors Guilty Of Any Gross Negligence
Or Willful Misconduct. ........................................................................12

    D.  Section 10.6(b) Of The First Lien Credit Agreement Precludes Yucaipa's Challenge
To The Third Amendment. ....................................................................13

II.    THE STATUTE OF LIMITATIONS BARS YUCAIPA'S CROSS-CLAIM. ....................14

    A.  Delaware Choice-Of-Law Rules Mandate The Application Of Delaware's Three-
Year Statute Of Limitations For Breach Of Contract. ..............................................14

    B.  The Statute Of Limitations Began To Run On April 17, 2008. ........................17

    C.  Yucaipa Is Not Entitled To Equitable Tolling Of The Statute Of Limitations. ................19

# TABLE OF AUTHORITIES

**CASES**          **PAGE(S)**

*Aetna Ins. Co. v. Pa. Mfrs. Ass'n Ins. Co.*,
   456 F. Supp. 627 (E.D. Pa. 1978)..................................................................15

*Algrant v. Evergreen Valley Nurseries Ltd. P'Ship*,
   126 F.3d 178 (3d Cir. 1997) ........................................................................17

*Antonini v. Petito*,
   96 A.D.3d 446 (N.Y. App. Div. 2012)...........................................................11

*Augustin v. Mughal*,
   521 F.2d 1215 (8th Cir. 1975) .....................................................................15

*Awards.com v. Kinko's, Inc.*,
   42 A.D.3d 178 (1st Dep't 2007) ...................................................................11

*Buck v. Hampton Twp. Sch. Dist.*,
   452 F.3d 256 (3d Cir. 2006) ..........................................................................2

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) ..........................................................................9

*Children's Seashore House v. Waldman*,
   197 F.3d 654 (3d Cir. 1999) ..........................................................................2

*Christian v. Christian*,
   42 N.Y.2d 63 (1977) ......................................................................................8

*Churchill v. Star Enters.*,
   183 F.3d 184 (3d Cir. 1999) ..........................................................................2

*CrossLand Savs., FSB v. Loguidice-Chatwal Real Estate Inv. Co.*,
   171 A.D.2d 457 (N.Y. App. 1991)................................................................11

*DeWitt v. DeWitt*,
   62 A.D.3d 744 (N.Y. App. Div. 2009)...........................................................14

*Ely-Cruikshank Co. v. Bank of Montreal*,
   81 N.Y.2d 399 (1993) ..................................................................................17

*In re Estate of Robert J. Wilson*,
   50 N.Y.2d 59 (1980) ......................................................................................8

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.,*
　　66 N.Y. 2d 38 (1985) .................................................................................................19

*Gluck v. Unisys Corp.,*
　　960 F.2d 1168 (3d Cir. 1992) ...................................................................................16

*Jadczak v. Assurant, Inc.,*
　　No. 08C-05-028, 2009 WL 1277965 (Del. Super. Ct. Apr. 30, 2009) .........................19

*Joao v. Cenuco, Inc.,*
　　376 F. Supp. 2d 380 (S.D.N.Y. 2005).......................................................................10

*Kamfar v. New World Rest. Grp., Inc.,*
　　347 F. Supp. 2d 38 (S.D.N.Y. 2004) ...........................................................................9

*Laba v. Carey,*
　　29 N.Y.2d 302 (1971) ..............................................................................................13

*In re Liberty Brands, LLC,*
　　476 B.R. 443 (Del. Bankr. 2012) ..............................................................................19

*Litvinov v. Hodson,*
　　74 A.D.3d 1884 (N.Y. App. Div. 2010) .....................................................................10

*Madison Fund, Inc. v. Midland Glass Co.,*
　　No. 394 Civ. A. 1974, 1980 WL 332958 (Del. Super. Ct. Aug. 11, 1980) ...................18

*In re Marvel Entm't Grp., Inc.,*
　　273 B.R. 58 (D. Del. 2002) .......................................................................................17

*McMahon & Co. v. Bass,*
　　250 A.D.2d 460 (N.Y. App. Div. 1998) .......................................................................9

*Morse v. Lower Merion Sch. Dist.,*
　　132 F.3d 902 (3d Cir. 1997) .......................................................................................9

*Muzak Corp. v. Hotel Taft Corp.,*
　　1 N.Y. 2d 42 (1956) ..................................................................................................14

*Peterson v. Watt,*
　　666 F.2d 361 (9th Cir. 1982) ....................................................................................15

*Rotblut v. Conn. Gen. Life Ins. Co.,*
　　226 A.D.2d 617 (N.Y. App. Div. 1996) ........................................................................8

*Ruttenberg v. Davidge Data Sys. Corp.,*

215 A.D.2d 191 (N.Y. App. Div. 1995) ................................................................ 12

*Saudi Basic Indus. Corp. v. Mobile Yanbu Petrochemical Co.*,
866 A.2d 1 (Del. 2005) ........................................................................................ 15

*Seitzinger v. Reading Hosp. & Med. Ctr.*,
165 F.3d 236 (3d Cir. 1999) ................................................................................ 19

*Sheridan v. Sheridan*,
202 A.D.2d 749 (N.Y. App. Div. 1994) ................................................................ 8

*Southmark Prime Plus, L.P. v. Falzone*,
776 F. Supp. 888 (D. Del. 1991) ........................................................................... 2

*Turkish v. Kasenetz*,
27 F.3d 23 (2d Cir. 1994) .................................................................................... 10

*Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*,
860 A.2d 312 (Del. 2004) ..................................................................................... 2

*Weeks Marine, Inc. v. Am. S.S. Owners Mut. Prot. and Indem. Ass'n, Inc.*,
No. 08 Civ. 9878, 2011 WL 3796331 (S.D.N.Y. Aug. 25, 2011) ...................... 11

*Wilder v. Pa. R.R. Co.*,
245 N.Y. 36 (1927) ............................................................................................... 9

*Winstar Commc'ns v. Blackstone Grp., L.P. (In re Winstar Commc'ns, Inc.)*,
435 B.R. 33 (Bankr. D. Del. 2010) ..................................................................... 16

**RULES**

Fed. R. Civ. P. 13(g) ........................................................................................... 16

**MISCELLANEOUS**

6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §
1431 (2012) ......................................................................................................... 15

9 Corbin on Contracts §46.7 (rev. ed. 2006) ..................................................... 19

# PRELIMINARY STATEMENT

Without a hint of irony, Yucaipa claims that Petitioning Creditors induced it to enter into a series of transactions that benefitted only Yucaipa, allowing it (i) to purchase, at an enormous discount, over $145 million of Allied Obligations and (ii) to give itself complete control of the First Lien Debt Facility through the Purported Fourth Amendment. According to its theory, Yucaipa never would have entered into this series of transactions – and thereby enriched itself and further entrenched its control of Allied – without the explicit "encouragement" of Black Diamond and the absence of objection by the other Lenders. This theory strains credulity. Yucaipa has been caught with its hand in the cookie jar, seeking to protect its equity investment in Allied by hijacking control of the First Lien Debt at the direct expense of all the other Lenders, and now is desperately trying to avoid the consequences of its unsuccessful ploy. To be sure, the bases of Yucaipa's challenges are not only facially implausible, they are also barred as a matter of law – and thus must be dismissed – under the plain terms of the First Lien Credit Agreement[2] and the applicable statute of limitations.

The First Lien Lenders enacted the Third Amendment to allow Yucaipa to purchase limited amounts of debt for the first time. These Lenders, however, recognized the danger in allowing Yucaipa to assert unfettered control over the First Lien Debt Facility, so they imposed conditions and severe restrictions on Yucaipa's ability to purchase and vote such debt. Yucaipa played an active role in the negotiation and execution of the Third Amendment but, by its own admission, never intended to purchase any first lien debt under the Third Amendment and its restrictions. (Cross-Claim ¶ 59.) Rather, Yucaipa devised a scheme whereby it would purchase a majority of the first lien debt from a

---

[2] The "First Lien Credit Agreement" refers to the "Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement," as amended and restated as of May 15, 2007, between Allied Holdings Inc. and Allied Systems Ltd. (L.P.) as Borrowers (collectively, "Allied"), the Lenders from time to time party thereto, and the CIT Group Business Credit, Inc. ("CIT") as Administrative Agent and Collateral Agent, among others. The "Third Amendment" refers to Amendment No. 3 to the Credit Agreement and Consent, dated April 17, 2008. The "Purported Fourth Amendment" refers to "Agreement No. 4 to Credit Agreement" dated August 21, 2009, which is the subject of the litigation before Justice Ramos. All capitalized terms that are not defined herein shall have the meanings attributed to them in the First Lien Credit Agreement.

1

single Lender, ComVest, and would simultaneously enter into the Purported Fourth Amendment to remove all of the Third Amendment's restrictions on how much debt Yucaipa could own and what Yucaipa could do with that debt. Justice Ramos, of the New York Supreme Court, Commercial Division, saw this scheme for what it was; an attempt by Yucaipa to "give itself a free hand" and to exercise "dictatorial powers with regard to [the] loan." (Ex. A, Tr.[3] 26:18-25.)

Now, Yucaipa contends that it only became a Lender under the Purported Fourth Amendment because of Petitioning Creditors' alleged encouragement. (Opp. Br. at 1.) Petitioning Creditors allegedly provided this "encouragement" at a meeting between Stephen Deckoff of Black Diamond and Ron Burkle of Yucaipa in August of 2009 (Cross-Claim ¶ 5) and in a series of phone calls between Yucaipa representatives and Rich Ehrlich of Black Diamond in the Summer of 2009. (Cross-Claim ¶65.) Aside from the fact that the only party to benefit from Yucaipa's control and domination over the First Lien Credit Facility would be Yucaipa, any claim that Yucaipa relied upon these limited communications in determining to usurp Requisite Lender status is absurd. Just one year earlier, Yucaipa and Black Diamond were locked in a contentious dispute in another bankruptcy case in the Western District of New York, *In re Performance Transportation Services, Inc.*, No. 07-04746 (MJK). As described in case submissions therein,[4] Yucaipa and Black Diamond battled in 2008 over Black Diamond's proposal for the establishment of a special committee of independent directors to address plan-related matters, and their inability to reach a consensual resolution

---

[3] "Tr." refers to the transcript of the November 19, 2012 hearing before Justice Ramos in the New York Action on Petitioning Creditors' motion for summary judgment, excerpts of which are attached hereto as Exhibit A. The Court may review the publicly recorded transcript. See *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.,* 860 A.2d 312, 320 n.28 (Del. 2004) (citing *Southmark Prime Plus, L.P. v. Falzone,* 776 F. Supp. 888, 891 (D. Del. 1991)), for the proposition that the court can judicially notice contents of court records.

[4] On a motion to dismiss, the Court may consider "any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.,* 452 F.3d 256, 260 (3d Cir. 2006) (internal quotations omitted); *see also Children's Seashore House v. Waldman,* 197 F.3d 654, 661 n.7 (3d Cir. 1999) ("We realize that a court on a motion to dismiss can consider matters of public record . . . ."); *Churchill v. Star Enters.,* 183 F.3d 184, 190 n.5 (3d Cir. 1999).

ultimately resulted in the company's liquidation. (*See* Ex. B, PTS Motion; Ex. C, PTS Opp.[5]) In light of this contentious history, it strains all credulity to imagine that Yucaipa could be persuaded a year later to make a sizeable purchase of Allied debt on the basis of a few purported, vague conversations with Black Diamond in which, as alleged by Yucaipa (Cross-Claim ¶5), the parties *disagreed* on strategy.[6]

It equally offends common sense that Yucaipa now claims that it relied on the "lack of any objection to the Proposed Fourth Amendment" that was attached to an unsuccessful tender offer submitted on February 4, 2009. By Yucaipa's own admission, the tender offer was made irrelevant by ComVest's purchase of Allied debt on or around February 18, 2009. Nevertheless, according to Yucaipa, because no Lender specifically objected to the validity of this "Proposed Fourth Amendment," Yucaipa could presume that no other Lender would object to the August 21, 2009 Purported Fourth Amendment.[7] As is obvious, by rejecting the tender offer, the First Lien Lenders decided not to consent to Yucaipa's attempt to take control of the First Lien Debt Facility and rejected the Proposed Fourth Amendment. For Yucaipa to argue that this rejection was acquiescence to the future Purported Fourth Amendment shows how incredibly far Yucaipa is stretching.

Moreover, the fact that Yucaipa launched a tender offer in February 2009, some six months *before* the purported conversations with Black Diamond upon which Yucaipa allegedly relied (*see*

---

[5] "PTS Motion" refers to the Motion Demanding the Establishment of a Plan Committee of Independent Directors of Performance Logistics Group, Inc, filed April 25, 2008. "PTS Opp" refers to Yucaipa's objection to the PTS Motion, filed May 12, 2008.

[6] Although Yucaipa appears to have no qualms about entirely mischaracterizing and misstating conversations with Black Diamond, Yucaipa does not even attempt to misstate conversations with Spectrum. Rather than attempting to show any potential reliance on an out-of-context statement with Spectrum, Yucaipa merely states that it "attempted to open a line of communication with Mr. Schaffer [of Spectrum]." Instead, Yucaipa simply lumps Black Diamond and Spectrum together and alleges, upon information and belief, "at all relevant times, Spectrum and Black Diamond have acted in concert with one another, and each reference to Black Diamond hereinafter refers to Black Diamond and Spectrum acting in concert." (Cross-Claim ¶ 2 n.4.) How Spectrum and Black Diamond were "acting in concert" during these alleged events is left to the imagination.

[7] Yucaipa was obviously unwilling to test this presumption since Yucaipa failed to solicit consent from any Lender other than ComVest.

3

Cross-Claim ¶ 5), makes clear that Yucaipa had already decided to buy the debt in February and that Yucaipa was not induced to buy the debt by any alleged conversations thereafter in August.

Simply put, Yucaipa could not have "reasonably relied" on any statement (or non-objection) by any Lender with respect to the validity of the Purported Fourth Amendment. Less than 30 days after the passage of the Purported Fourth Amendment, CIT was refusing to recognize Yucaipa as the Requisite Lenders and less than two months thereafter Yucaipa was forced to initiate litigation in Georgia to seek to ratify its scheme. And Yucaipa's continuing mischaracterization of the settlement of that action in Georgia starkly demonstrates Yucaipa's disregard for the truth. That Yucaipa continues to contend that CIT entered into a Settlement Agreement in the Georgia Action "in both its representative capacity as Administrative Agent and in its individual capacity as a Lender" is beyond comprehension. (Opp. Br. at 12.) Indeed, Yucaipa pressed this same argument in the New York Action twice with no success, because this claim directly contradicts the express language of the Settlement Agreement and Mutual Limited Releases ("Settlement Agreement"): "This limited release is made solely by CIT and on its own behalf, *not in a representative capacity*." (Ex. D, Settlement Agreement ¶ 1 (emphasis added).) (*See* Ex. E, N.Y. Opp. Br. at 9-16.)[8]

Aside from being facially implausible, Yucaipa's Cross-Claim should be dismissed as a matter of law. Yucaipa's asserted reliance on Black Diamond's "encouragement" (or the other Lenders' lack of any objection to a prior version of the Purported Fourth Amendment) is foreclosed by the plain terms of the First Lien Credit Agreement. That agreement's express "no waiver clause" (at Section 10.9) bars Yucaipa's equitable claims by conclusively rebutting any assertion of justifiable

---

[8] Additionally, Yucaipa once again contends that Justice Ramos "did not permit any discovery on the Petitioning Lenders' scheme to wrongfully induce Yucaipa to purchase debt under the Fourth Amendment . . . ." (Opp. Br. at 16.) As Petitioning Creditors stressed in the New York Action, no discovery was necessary prior to a ruling on summary judgment because the agreements at issue were unambiguous; therefore, the action presented a pure issue of contract interpretation. (*See* Ex. F, N.Y. Reply Br. at 4.) Justice Ramos agreed, granting Petitioning Creditors' motion for summary judgment at the conclusion of oral argument.

reliance with respect to anything Petitioning Creditors or any other Lender did (or did not do). Therefore, even if "Yucaipa specifically relied – to its detriment – on the Lenders' lack of any objection to the Proposed Fourth Amendment" when floated with its unsuccessful tender offer (*see* Opp. Br. at 7 n.3), such reliance is unreasonable as a matter of law under the First Lien Credit Agreement's "no waiver" clause.

In addition, the Third Amendment, the operative document in this dispute, contains several provisions designed to prevent Yucaipa from bringing this very sort of action, including Section 2.7(e), the covenant not to sue. This provision precludes Yucaipa from bringing any suit relating to the provisions of the First Lien Credit Agreement or the Third Amendment, and is a complete bar to the Cross-Claim. Moreover, as an assignee of ComVest's first lien loans, Yucaipa is also bound by the authorities and consents of its predecessors-in-interest under Section 10.6(b). These consents included the consents given by Yucaipa's predecessors-in-interest to the very Third Amendment Yucaipa now seeks to eviscerate. Finally, Yucaipa's Cross-Claim is time-barred under the applicable Delaware three-year statute of limitations for breach of contract. According to the Cross-Claim, the Third Amendment is invalid on its face, and therefore Yucaipa's cause of action for declaratory judgment accrued on April 17, 2008, the date on which the Third Amendment was executed. Because Yucaipa brought the Cross-Claim more than 4 ½ years after that date, this action is time barred.

Once again, Yucaipa is asking a court (first Georgia, then New York, now this Court) to re-write the Loan Documents in order to give Yucaipa dictatorial control over Allied's First Lien Credit Facility. This Court should reject Yucaipa's request to frustrate the rights of the other Lenders. Yucaipa's arguments have already been rejected in the New York Action and its incredible

allegations of wrongdoing defy common sense. For all of the reasons set forth herein, the Cross-Claim fails to state a cause of action and should be dismissed as a matter of law.

## ARGUMENT

### I. YUCAIPA'S CLAIMS ARE BARRED BY THE EXPRESS TERMS OF THE FIRST LIEN CREDIT AGREEMENT AND THE THIRD AMENDMENT

As demonstrated in Petitioning Creditors' opening brief, Yucaipa's Cross-Claim is contractually barred by Section 2.7(e) of the Third Amendment, pursuant to which Yucaipa has "waive[d] any claim or cause of action against any Lender." Yucaipa raises a number of arguments in its opposition brief in an effort to end-run this clear waiver. None of these arguments, however, has any merit.

#### A. The Third Amendment Governs This Dispute.

At the outset, Yucaipa contends that because Justice Ramos has not issued a written order invalidating the Purported Fourth Amendment, the provision of the Purported Fourth Amendment retracting Section 2.7(e) remains operative. As a result, Yucaipa argues, Section 2.7(e) has no force or effect and cannot bar Yucaipa's Cross-Claim.

However, Yucaipa has explicitly premised its ability to bring the Cross-Claim at this time on the assumption that *no* aspect of the Purported Fourth Amendment is operative. (*See* Cross-Claim ¶ 96 ("Assuming, *arguendo*, that New York Court disregards the severability clause of the Purported Fourth Amendment for the reasons urged by Petitioning Creditors . . ."); Cross-Claim ¶ 25 ("assuming the broadest possible written order affirming the Petitioning Creditors' motion for summary judgment in the New York Action . . .").) Yucaipa cannot assume the invalidity of the Purported Fourth Amendment in order to establish a justiciable controversy when it suits Yucaipa's purposes and then ignore that invalidity when it does not. Either the Purported Fourth Amendment is

6

invalid, and the Third Amendment controls and bars this action; or the Purported Fourth Amendment

remains in force, and this action is premature. Either way, the Cross-Claim should be dismissed.

Moreover, even if Yucaipa had not conceded that the Third Amendment is operative, Justice

Ramos' decision in the New York Action invalidated the Purported Fourth Amendment. (Ex. A, Tr.

36:11-13.) In their motion for summary judgment in the New York Action, Petitioning Creditors

specifically requested that the New York Court declare "that the purported Fourth Amendment to the

Credit Agreement *is not, and never was,* effective." (Ex. G, N.Y. SJ Br. at 1.) When Justice Ramos

granted Petitioning Creditors motion on November 19, 2012, he invalidated the Purported Fourth

Amendment, leaving the Third Amendment as the operative agreement.

Yucaipa's attempt to circumvent the inescapable consequences of Justice Ramos' decision

resorts, once again, to a misstatement of fact. Yucaipa's assertion that Petitioning Creditors "failed to

give Justice Ramos the whole story" regarding the Purported Fourth Amendment's severability

clause is simply inaccurate. (Opp. Br. at 19.) Yucaipa explicitly raised the issue in its motion papers

in the New York Action, and Petitioning Creditors responded in turn. (*See* Ex. E, N.Y. Opp. Br. at

23-24; Ex. F, N.Y. Reply Br. at 11 n.13.) Yucaipa then failed to address its severability argument at

oral argument on the summary judgment motion and instead attempted to raise it by letter submission

after Judge Ramos had already ruled that the Purported Fourth Amendment was invalid.

Nevertheless, Yucaipa's severability argument is unavailing because there is nothing

severable in the Purported Fourth Amendment.[9] The *sole purpose and effect* of the entire Purported

Fourth Amendment was to systematically remove each and every one of the existing restrictions that

prevented Yucaipa from exerting influence on the Lenders and becoming the Requisite Lenders. As

---

[9] Yucaipa's severability argument is also inconsistent with its own position – which is that it never intended to purchase any debt if the terms of the Third Amendment were controlling, and that it required all of the restrictions in the Third Amendment to be eliminated. In making its severability argument, Yucaipa is essentially arguing that it would have purchased debt if some – but not all – of the restrictions from the Third Amendment (such as the limitation on its ability to become the Requisite Lender) remained in place. Yucaipa cannot have it both ways.

7

the New York Court of Appeals has instructed, "whether the provisions of a contract are severable depends largely upon the intent of the parties as reflected in the language they employ and the particular circumstantial milieu in which the agreement came into being." *In re Estate of Robert J. Wilson*, 50 N.Y.2d 59, 65 (1980). There can be no question here that the Purported Fourth Amendment was intended to be a wholly integrated agreement that had but one goal: handing Requisite Lender status to Yucaipa. *See Rotblut v. Conn. Gen. Life Ins. Co.*, 226 A.D.2d 617, 618 (N.Y. App. Div. 1996) ("As a general rule, a contract is entire when by its terms, nature and purpose it contemplates and intends that each and all of its parts and the consideration therefore shall be common each to the other and interdependent.").

Thus, this is not the situation where a severability clause typically applies, where a mistake in some language in one clause may doom an otherwise benign agreement unless the court severs that clause. Here, *every* substantive provision of the Purported Fourth Amendment is part of a single forbidden objective: to give Yucaipa dictatorial power over the First Lien Debt of Allied in contravention of the First Lien Credit Agreement.[10]

As such, there is no basis for invalidating only a portion of the Purported Fourth Amendment. In fact, this severability argument is a red herring because, as set forth above, Yucaipa assumes for purposes of its Cross-Claim that the Purported Fourth Amendment is invalid in its entirety.

### B. There Is No Legal Or Equitable Basis To Ignore The Section 2.7(e) Bar.

Yucaipa also argues that it should not be barred by Section 2.7(e) in any event because the Court must first determine whether Yucaipa is bound by the Third Amendment before it can apply

---

[10] Yucaipa cites two inapposite cases for the proposition that the severability clause should save certain of the provisions of the Purported Fourth Amendment, although they cannot and do not cite to a provision that is not part of the same scheme to "roll back" the restrictions placed on them in the Third Amendment. (Opp. Br. at 19-20 (citing *Christian v. Christian*, 42 N.Y. 2d 63 (1977); *Sheridan v. Sheridan*, 202 A.D.2d 749 (N.Y. App. Div. 1994).) Neither case involves construction of a commercial contract. Instead both are matrimonial cases interpreting separation agreements, where clearly there is a strong public policy interest in not invalidating a whole contract because of one faulty provision. These same policy concerns obviously do not apply in a commercial contract negotiated, or more appropriately here, orchestrated, by a sophisticated financial party.

Section 2.7(e) and, in any case, Section 2.7(e) is invalid because of the Petitioning Creditors' purported conduct. These arguments are baseless.

The central premise of Yucaipa's contention is that it was wrongfully induced to become a Lender under the belief that the Purported Fourth Amendment was valid and Yucaipa would not be subject to the limitations set forth in the Third Amendment (including Section 2.7(e)). Tellingly, Yucaipa never once made the argument that they were wrongfully induced to enter the Purported Fourth Amendment in nearly three years of litigation (in Georgia and New York). It is only now, after the Purported Fourth Amendment has been invalidated and Yucaipa is faced with compliance with the Third Amendment, that Yucaipa has conjured up its allegations as to the "duplicitous conduct" of Black Diamond. Given that the other First Lien Lenders and CIT began challenging the validity of the Purported Fourth Amendment almost immediately after its execution, it cannot be suggested that the Purported Fourth Amendment and Yucaipa's becoming a Lender was induced by anything other than Yucaipa's strong desire to seize complete control over Allied by holding the majority of both Allied's First Lien Debt and equity. Although this Court is bound on a motion to dismiss to accept as true well-pleaded allegations in a complaint, it need not credit allegations that are patently absurd. *See Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 143 (3d Cir. 2004) (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997)). Even putting that aside, however, Yucaipa's arguments fail as a matter of law.

    1.    <u>Section 2.7(e) Is Legally Valid.</u>

Covenants not to sue are expressly permitted under New York law. *Kamfar v. New World Rest. Grp., Inc.*, 347 F. Supp. 2d 38, 51 (S.D.N.Y. 2004) (citing *Wilder v. Pa. R.R. Co.*, 245 N.Y. 36, 39 (1927); *McMahon & Co. v. Bass*, 250 A.D.2d 460, 461 (N.Y. App. Div. 1998).) A dispute arising out of the conduct covered by a covenant not to sue "cannot provide the basis for a justiciable

controversy, and the case must be dismissed." *Joao v. Cenuco, Inc.*, 376 F. Supp. 2d 380, 382 (S.D.N.Y. 2005).

Yucaipa contends that Section 2.7(e) nevertheless is invalid because Yucaipa's becoming a lender purportedly was "procured by misconduct." (Opp. Br. at 24.)  However, Section 2.7(e) can only be invalidated if the section itself was procured by misconduct, and there is not a single allegation – nor could there be – to that effect.  Indeed, it is clear that Yucaipa was substantially involved in the drafting of the Third Amendment. (*See* Committee Compl. ¶ 66.)  Yucaipa's only argument is that, more than a year after the Third Amendment, Yucaipa was wrongfully induced to become a Lender.  That, however, is irrelevant to the validity of Section 2.7(e).

Moreover, the cases Yucaipa cites in support of this argument are clearly inapposite, for several reasons.  As an initial matter, the cases generally deal with releases, not covenants not to sue. (Opp. Br. at 24.).  In addition, far from holding that any "misconduct" is sufficient to invalidate a release (or covenant not to sue), as Yucaipa alleges, these cases require a substantial showing of duress, fraud, illegality, or mutual mistake *in connection with the release itself. See, e.g., Turkish v. Kasenetz,* 27 F.3d 23, 27-28 (2d Cir. 1994) (reasoning that the rationale behind the invalidation of such provisions is to prevent parties from shielding themselves from "liability for their own fraudulent conduct"); *Litvinov v. Hodson*, 74 A.D.3d 1884, 1885 (N.Y. App. Div. 2010) (these provisions should "*not* be set aside *unless* plaintiff demonstrates duress, illegality, fraud, or mutual mistake") (emphasis added).  Yucaipa has not alleged, nor can it demonstrate, any such conduct by Petitioning Creditors with respect to the covenant not to sue.

> 2.     The First Lien Credit Agreement's "no waiver" clause disposes of Yucaipa's <u>equitable claims as a matter of law.</u>

Yucaipa's entire Cross-Claim rests upon the idea that Yucaipa reasonably relied on Petitioning Creditors' "endorsement of Yucaipa's plan to become Requisite Lender and their failure to

assert any objection to Yucaipa's ability to do so." (Cross-Claim ¶ 117; *see id.* ¶¶ 116, 125-26, 128.)

Even assuming, *arguendo*, that these allegations are true, which they are not, the express terms of the

First Lien Credit Agreement prohibit Yucaipa from asserting any such claim. Section 10.9 of the

First Lien Credit Agreement, the "no waiver" provision, provides that:

> No failure or delay on the part of any Agent or any Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege. . . . Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

(Credit Agreement § 10.9.) "No waiver" provisions, such as Section 10.9, are "uniformly enforced"

in New York. *Awards.com v. Kinko's, Inc.*, 42 A.D.3d 178, 188 (1st Dep't 2007). As a result of this

provision, even if Yucaipa purchased first lien debt only because of Petitioning Creditors' failure to

object to the Purported Fourth Amendment or the assignment of ComVest debt as it alleges, it cannot

use this failure to prop up its baseless equitable claims.

As a matter of law, a "no waiver" provision, such as Section 10.9, makes any claimed

reliance not justifiable. *See Antonini v. Petito*, 96 A.D.3d 446, 447 (N.Y. App. Div. 2012) (finding

no merit to waiver and estoppel defenses and granting summary judgment in light of the agreement's

"no waiver" provision); *CrossLand Savs., FSB v. Loguidice-Chatwal Real Estate Inv. Co.*, 171

A.D.2d 457, 457 (N.Y. App. 1991) (affirming grant of summary judgment where the contract at

issue contained a "no waiver" provision because estoppel defense was thereby "negated by the

express terms of the parties' unambiguous written agreements"); *see also Weeks Marine, Inc. v. Am.*

*S.S. Owners Mut. Prot. and Indem. Ass'n, Inc.*, No. 08 Civ. 9878, 2011 WL 3796331, at *13

(S.D.N.Y. Aug. 25, 2011) (finding "no waiver" provision "bars the assertion of an estoppel claim").

11

Thus, even if there were any truth to Yucaipa's tale of Petitioning Creditors' alleged misdeeds, these allegations are ultimately irrelevant to the motion before this Court, because Yucaipa is simply not entitled to rely upon Petitioning Creditors' action (or inaction).

### C. The Exception To Section 2.7(e) Does Not Apply Because No "Court Of Competent Jurisdiction" Has Found Petitioning Creditors Guilty Of Any Gross Negligence Or Willful Misconduct.

Yucaipa's final gambit is to argue that, even if Section 2.7(e) were applicable and valid, Yucaipa's claims fall within the sole exception to Section 2.7(e).  That exception provides that claims are not waived "to the extent caused by such Lender's or Agent's gross negligence or willful misconduct *on or after the date [Yucaipa] becomes a Lender* hereunder *as determined by a court of competent jurisdiction by final and non-appealable judgment*."  (Emphasis added.)  On its face this exception is inapplicable here.

First, by its plain terms, the exception applies only to gross negligence or willful misconduct occurring "*on or after the date*" Yucaipa became a Lender under the First Lien Credit Agreement.  (Third Amendment §2.7(e) (emphasis added).)  Yet, the entirety of Yucaipa's claim is based on alleged conduct that *induced* Yucaipa to become a Lender – *i.e.*, conduct that pre-dated Yucaipa's acquisition of first lien debt.  Yucaipa's claims thus fail the temporal requirement of the exception.

Second, the exception only applies to "gross negligence or willful misconduct . . as determined by a court of competent jurisdiction by final and non-appealable judgment."  Yucaipa reads this language as permitting claims against Lenders for "gross negligence or willful misconduct."  However, that interpretation completely ignores the requirement that there be a pre-existing determination of misconduct, which the rules of contract construction make clear a party may not do.  *See Ruttenberg v. Davidge Data Sys. Corp.*, 215 A.D.2d 191, 196 (N.Y. App. Div. 1995) ("It is a recognized 'rule of construction that a court should not' adopt an interpretation which

will operate to leave a 'provision of a contract . . . without force and effect.'" (quoting *Laba v. Carey*, 29 N.Y.2d 302, 308 (1971)). In fact, if Yucaipa's interpretation of the exception were accepted, it would completely eviscerate the non-suit provision, because Yucaipa could circumvent it entirely by merely alleging willful misconduct regardless of the validity of the allegations.[11]

### D. Section 10.6(b) Of The First Lien Credit Agreement Precludes Yucaipa's Challenge To The Third Amendment.

In addition to being barred by Section 2.7(e) of the Third Amendment from bringing its Cross-Claim, the opening brief established that Yucaipa is barred from bringing its Cross-Claim by Section 10.6(b) of the First Lien Credit Agreement, which binds subsequent holders of First Lien Debt to any consents given by a predecessor-in-interest. Here, Yucaipa's predecessors-in-interest consented to and executed the Third Amendment. As such, Yucaipa cannot now challenge the validity of the Third Amendment in contravention of that consent. Nevertheless, Yucaipa argues that Section 10.6(b) is inapplicable because (1) the Third Amendment was not validly enacted under Section 10.5 and (2) thereby, Yucaipa is not bound to the authorities and consents of its predecessors. (Opp. Br. 28-31.) Neither of these arguments are correct.

First, whether the Third Amendment received unanimous written consent is irrelevant. What is relevant is whether Yucaipa's predecessors-in-interest consented to the Third Amendment – which they did (a fact not disputed by Yucaipa). Under the terms of Section 10.6(b), which applies to "*any* subsequent holder," Yucaipa is thus bound by its predecessors' consent. Accordingly, it makes no difference whether any other Lenders consented to the Third Amendment – Yucaipa is deemed to have consented and cannot now claim the Third Amendment is invalid.

Second, Section 10.5(d) simply does not apply here. Yucaipa correctly states the principle of

---

[11] Thus, the exception relied on by Yucaipa only becomes operative in the context of a suit brought by a third-party against a Lender, where the court concludes by final non-appealable judgment that the Lender engaged in gross negligence or willful misconduct. It does not allow Yucaipa to bring that action.

law that, in the case of an inconsistency between two contract provisions, the specific provision

controls over the general. (Opp. Br. at 29 (citing *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y. 2d 42, 46

(1956); *DeWitt v. DeWitt*, 62 A.D.3d 744, 745 (N.Y. App. Div. 2009)).) But Yucaipa applies this

principle incorrectly. Section 10.6(b), not Section 10.5(d), is the more specific provision because it

directly applies to the circumstances at issue: namely, the effect of a predecessor's consent. (Cross-

Claim ¶ 17.) Section 10.5(d), on the other hand, in no way speaks to this issue, and thus has no

bearing on whether or not Yucaipa is bound by its predecessors' consent. As an assignee, Yucaipa is

bound by the authorities and consents of its predecessors-in interest pursuant to Section 10.6(b), and

therefore is barred from now challenging the validity of the Third Amendment.

## II. THE STATUTE OF LIMITATIONS BARS YUCAIPA'S CROSS-CLAIM.

Beyond the contractual bars to Yucaipa's Cross-Claim, as demonstrated in our opening brief,

the Cross-Claim also is time-barred. Under Delaware law, which provides the applicable limitations

period here, Yucaipa's cause of action challenging the validity of the Third Amendment accrued as of

April 17, 2008 – the date as of which the amendment was executed. As such, this action, brought

well beyond the limitations period, must be dismissed.

Yucaipa attempts to evade this inescapable conclusion by arguing that (1) the Court should

apply New York's six-year statute of limitations rather than Delaware's three-year limitations period;

(2) the statute of limitations did not begin to run until November 2012, when Justice Ramos ruled

that the Purported Fourth Amendment was invalid; and (3) even if that were not the case, the

limitations period was tolled sufficiently to make Yucaipa's action timely irrespective of which

State's law is applied. None of these arguments have support.

### A. Delaware Choice-Of-Law Rules Mandate The Application Of Delaware's Three-Year Statute Of Limitations For Breach Of Contract.

Yucaipa contends that New York's six-year limitations period should be applied in this case

rather than Delaware's three-year limitations period. Yucaipa argues that Delaware's borrowing statute is inapplicable because Yucaipa has not engaged in forum shopping and, absent the borrowing statute, New York law should be applied because New York purportedly has the most significant relationship to the asserted claims. Yucaipa is incorrect on both scores.

First, Yucaipa most certainly chose the forum for its Cross-Claim, and therefore the borrowing statute should be applied. Although Petitioning Creditors filed the involuntary Chapter 11 petition against Allied in this Court, it was Yucaipa (working with the Debtors) that decided to commence the initial declaratory judgment action, and it was Yucaipa that chose this Court to assert its claims with respect to the Third Amendment and the Petitioning Creditors' alleged conduct (as cross-claims in the declaratory judgment action). Contrary to Yucaipa's assertion, it was under no obligation to bring its Cross-Claim against Petitioning Creditors in Delaware[12] (Opp. Br. at 38), as this action arises from a dispute among Lenders concerning the proper interpretation of the First Lien Credit Agreement. Yucaipa was perfectly entitled to bring this action in New York state court had it wanted to do so. Indeed, Yucaipa already was litigating these issues in New York state court when it asserted its Cross-Claims here, and in fact had raised similar arguments there to those that form the basis of its declaratory judgment claim.

Yucaipa elected to bring its Cross-Claim before this Court not because it was compelled to do so, but rather because it lost in New York and was seeking a more favorable forum. As such, *Saudi Basic Indus. Corp. v. Mobile Yanbu Petrochemical Co.*, 866 A.2d 1, 16 (Del. 2005), does not apply. Unlike the situation in *Saudi Basic*, here, Petitioning Creditors did not choose this forum to force Yucaipa to take advantage of a shorter statute of limitations period. *See id.* at 15 (noting that

---

[12] Unlike counterclaims, all cross-claims are permissive in nature. *See* Fed. R. Civ. P. 13(g); *Aetna Ins. Co. v. Pa. Mfrs. Ass'n Ins. Co.*, 456 F. Supp. 627, 635 (E.D. Pa. 1978). Furthermore, contrary to Yucaipa's contention, it is hornbook law that the failure to bring a cross-claim does not bar them from asserting it in later actions through principles of res judicata, waiver, or estoppel. *Peterson v. Watt*, 666 F.2d 361, 363 (9th Cir. 1982); *Augustin v. Mughal*, 521 F.2d 1215, 1216 (8th Cir. 1975); *see also* 6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1431 (2012).

plaintiffs "purposefully chose this forum" in an attempt to "gain a shorter statute of limitations").

Rather, it was Yucaipa that chose this Court to avoid having the issues resolved in New York.

Yucaipa should not be permitted to then hide behind New York law by reading a broad exemption

into the borrowing statute that is neither present on the face of the statute nor supported by precedent.

As a result, this Court should apply the borrowing statute in accordance with its plain meaning.

Second, even if the Court does not apply the borrowing statute, there is no basis to apply

New York's limitation period.  As demonstrated in our opening brief, in the absence of a choice of

law provision explicitly addressing the statute of limitations (as is the case here), "the law of the

forum generally determines whether an action is barred by the statute of limitations." *Winstar*

*Commc'ns v. Blackstone Grp., L.P. (In re Winstar Commc'ns, Inc.)*, 435 B.R. 33, 44 (Bankr. D. Del.

2010).[13]  Yucaipa contends that the Court should ignore that general rule because New York

purportedly "has a more significant relationship to the Amended Counterclaim than does Delaware."

(Opp. Br. at 38.)

Yucaipa does not allege that any conduct at issue took place in New York.  The Third

Amendment was not executed in New York.  Yucaipa does not allege that any of the Petitioning

Creditors' purported misconduct took place in New York.  The only links to New York Yucaipa can

point to are the New York choice-of-law provision in the First Lien Credit Agreement and the fact

that Justice Ramos invalidated the Purported Fourth Amendment from the bench of a New York

Court.  However, the law is clear – and Yucaipa does not dispute – that, absent an express reference,

choice-of-law provisions do not apply to statutes of limitations.  *Gluck v. Unisys Corp.*, 960 F.2d

1168, 1179 (3d Cir. 1992).  And, that Justice Ramos invalidated the Purported Fourth Amendment in

New York is completely irrelevant to whether the Third Amendment is valid, or whether New York

---

[13] Yucaipa attempts to distinguish *Winstar Commc'ns* on the ground that the claims at issue there arose from a prior bankruptcy case. (Opp. Br. at 38 n. 17.)  This distinction, however, is irrelevant for the point of law Petitioning Creditors raise here.

has any interest in the dispute. The simple fact is that Delaware has a greater interest in this dispute than does New York, and its limitations period should be applied with or without the borrowing statute.

### B. The Statute Of Limitations Began To Run On April 17, 2008.

According to Yucaipa, until Justice Ramos stated that he would invalidate the Purported Fourth Amendment, "the validity and applicability of the[] Third Amendment provisions was not relevant to Yucaipa." (Opp. Br. at 33 n.13.) However, Yucaipa's subjective notions of relevance have no bearing on when the statute of limitations began to run.

As set forth in our opening brief, it is clear that the statute of limitations applicable to actions for declaratory judgment is determined by the corresponding legal claim. *See Algrant v. Evergreen Valley Nurseries Ltd. P'Ship*, 126 F.3d 178,184-85 (3d Cir. 1997) (holding that "when plaintiffs' claims are barred by a statute of limitations applicable to a concurrent legal remedy, then a court will withhold declaratory judgment relief in an independent suit essentially predicated upon the same cause of action"). Here, that legal claim is for breach of contract, and both Delaware and New York recognize that a cause of action for breach of contract accrues, and the statute of limitations commences, when the contract is breached. *See In re Marvel Entm't Grp., Inc.*, 273 B.R. 58, 80 (Bankr. D. Del. 2002) ("Under Delaware law, the statute of limitations for breach of contract claims begins to run when the contract is breached."); *Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 402 (1993) (breach of contract action accrues, and statute begins to run, at the time of the breach, even if no damage occurs until later). Yucaipa alleges that the Third Amendment is void *ab initio – i.e.*, it was invalid as of its inception on April 17, 2008. Accordingly, any claim regarding the invalidity of the Third Amendment accrued as of that date, not whenever Yucaipa decided to care about the issue.

17

Also, it is without dispute that Yucaipa took an assignment of ComVest's first lien debt, and therefore stood in ComVest's (and ComVest's predecessors-in-interest's) shoes with respect to any challenges to the First Lien Credit Agreement or the Third Amendment, including the applicability of the statute of limitations. (Opening Br. at 19.) *See Madison Fund, Inc. v. Midland Glass Co.*, No. 394 Civ. A. 1974, 1980 WL 332958, at *2 (Del. Super. Ct. Aug. 11, 1980) (noting that an assignee "acquires no greater right than that which was possessed by his assignor" and therefore "the statute of limitations may be interposed against the assignee if it was available against the assignor").

Yucaipa argues, without citation to any authority whatsoever, that ComVest, however, did not have standing to challenge the Third Amendment because the relevant provisions "apply only to Yucaipa." (Opp. Br. at 32.) Yet, that argument can only be correct if ComVest and the other Lenders were not affected by the Third Amendment provisions because, otherwise, they clearly had rights and standing to protect those rights. And, if ComVest and the other Lenders were not affected by the Third Amendment provisions, under the express terms of Section 10.5(b) of the First Lien Credit Agreement, their consent was not necessary and Yucaipa's declaratory judgment claim must fail. In other words, either ComVest and the other Lenders were affected by the challenged Third Amendment provisions (and therefore had claims arising at the time the Third Amendment was executed) or they were not affected (and Yucaipa as their assignee has no claim.) Either way, the declaratory relief claim should be dismissed.

Equally specious is Yucaipa's contention that the statute of limitations could not run against it prior to August 2009 because Yucaipa did not hold any First Lien Debt prior to that time. Yucaipa does not dispute – nor could it – that it was a third-party beneficiary of the Third Amendment. (Opening Br. at 19-21.) As set forth in the opening brief, a third-party beneficiary, although not a signatory to a contract, is permitted to enforce its rights by bringing an action for breach of contract.

18

*Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y. 2d 38, 43 (1985). Thus, as a third-party beneficiary, Yucaipa could have brought an action for breach as early as April 17, 2008, and the statute of limitations began to run against it on that date. *See* 9 Corbin on Contracts §46.7 (rev. ed. 2006) (reasoning that the rights of a beneficiary arise from the contract between promisor and promisee and therefore "[u]nder that contract he will be subject to the statute of limitations that will run against him from the moment the contract is breached"); *Jadczak v. Assurant, Inc.*, No. 08C-05-028, 2009 WL 1277965 at *4, (Del. Super. Ct. Apr. 30, 2009) (holding that a third-party beneficiary insured must bring a breach of contract claim within three years of the actual breach, which could not have occurred later than the date the alleged defective insurance policy began).

### C. Yucaipa Is Not Entitled To Equitable Tolling Of The Statute Of Limitations.

Finally, Yucaipa argues that, even if the limitations period began to run prior to November 2012, any claim regarding the Third Amendment should be equitably tolled for the period in which the Purported Fourth Amendment was operative. (Opp. Br. at 32-33 n.12.) That is not the law.

As a general rule, a statute of limitations runs continuously, and courts should use the doctrine of equitable tolling sparingly "to guard against possible misuse." *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 240 (3d Cir. 1999). Equitable tolling of a statute of limitations is appropriate only where one of three conditions is met "(1) the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." *In re Liberty Brands, LLC*, 476 B.R. 443, 450 (Del. Bankr. 2012). Yucaipa's failure to file its Cross-Claim in a timely manner clearly does not implicate any of these considerations.

Yucaipa has undoubtedly been aware from the outset of the facts and circumstances of the execution of the Third Amendment, as it played a substantial role in its negotiation (*see* Committee

Compl. ¶ 66) and controlled Allied, a signatory to the amendment. And, any misconceptions Yucaipa may have had as to the validity of the Purported Fourth Amendment were exposed almost immediately upon execution of the Purported Fourth Amendment, as Yucaipa concedes that it was notified less than one month after the amendment was executed of challenges to its validity. (Cross-Claim ¶ 76.) Thus, Yucaipa plainly knew of its potential causes of action long ago, and it has no grounds to claim it was in any way misled by Petitioning Creditors or anyone else.

Nor has Yucaipa been prevented from asserting its rights. To the contrary, in both the Georgia Action and the New York Action, Yucaipa raised the potential invalidity of the Third Amendment, not as an attack on the Third Amendment itself, but as a tool to argue that the Purported Fourth Amendment should be enforced notwithstanding the lack of necessary unanimous Lender consent. (*See* Ex. H, Ga. Opp.[14] at 17 (arguing that if the Purported Fourth Amendment's change to Term Loan Exposure was invalid, then the Third Amendment's change was also invalid); Ex. E, N.Y. Opp. at 25 (same).)

Simply put, Yucaipa made a strategic decision not to challenge the validity of the Third Amendment because to do so would concede the invalidity of the Purported Fourth Amendment. As a sophisticated investor, Yucaipa certainly was entitled to make that choice. However, having made that choice, Yucaipa cannot now plead equity to reverse its consequences – that Yucaipa has now waited too long to assert its claims and they are time-barred.

---

[14] "Ga. Opp" refers to Yucaipa and Allied's Joint Brief in Opposition to CIT's Motion for Summary Judgment in the Georgia Action, filed February 18, 2011.

# CONCLUSION

For the foregoing reasons, the Petitioning Creditors respectfully request that the Cross-Claims be dismissed in their entirety and with prejudice and the Court grant such other and further relief as is just and proper.

Dated:  February 21, 2013        **LANDIS RATH & COBB LLP**
       Wilmington, Delaware

*/s/ Kerri K. Mumford*
Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile:  (302) 467-4450

- and -

**SCHULTE ROTH & ZABEL LLP**
Adam C. Harris
Robert J. Ward
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile:  (212) 593-5955

# Exhibit 137

# D.I. 271, Case No. 12-50947

                                                      Page 1

1    UNITED STATES BANKRUPTCY COURT

2    DISTRICT OF DELAWARE

3    Case No. 12-11564-css

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6    ALLIED SYSTEMS HOLDINGS, INC., ET AL.,

7             Debtors.

8    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9    ADV. PROC. NO. 12-50947-css

10

11   ALLIED SYSTEMS HOLDINGS, INC.,

12            Plaintiff,

13   v.

14   AMMC VIII, LIMITED, AVENUE CAPITAL GROUP,

15   BDCM OPPORTUNITY FUND II, LP, BENNETT

16   MANAGEMENT, BLACK DIAMOND CLO 2005-1 LTD.,

17   DEL MAR DISTRESSED OPPORTUNITIES MASTER FUND,

18   MJX ASSET MANAGEMENT, LLC, PAR-FOUR INVESTMENT

19   MANAGEMENT, SPECTRUM INVESTMENT PARTNERSHIP, LP,

20   TEAK HILL - CREDIT CAPITAL INVESTMENTS, LLC,

21   THE CIT GROUP/BUSINESS CREDIT, INC., THE OFFICIAL

22   COMMITTEE OF UNSECURED CREDITORS, YUCAIPA AMERICAN

23   ALLIANCE (PARALLEL) FUND II, L.P.,

24            Defendants.

25   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
 1   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 2   THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF

 3   ALLIED SYSTEMS HOLDINGS, INC. AND ITS AFFILIATED

 4   DEBTORS, ON BEHALF OF ALLIED SYSTEMS HOLDINGS, INC.,

 5   AND ITS AFFILIATED DEBTORS,

 6            Plaintiffs,

 7

 8   BLACK DIAMOND OPPORTUNITY FUND II, L.P., BLACK

 9   DIAMOND CLO 2005-1 LTD., AND SPECTRUM INVESTMENT

10   PARTNERS, L.P.,

11            Intervenors,

12

13   -against-

14

15   YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA

16   AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA

17   AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN

18   ALLIANC (PARALLEL) FUND II, L.P., MARK J. GENDREGSKE,

19   JOS OPDEWEEGH, JAMES FRANK, DEREX WALKER, JEFF

20   PELLETIER, IRA TOCHNER, and JOSEPH TOMCZAK,

21            Defendants.

22   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

23

24

25
```

1          United States Bankruptcy Court

2          824 North Market Street

3          Wilmington, Delaware

4

5          July 30, 2013

6          10:13 AM

7    B E F O R E :

8    HON CHRISTOPHER S. SONTCHI

9    U.S. BANKRUPTCY JUDGE

10

11   ECR OPERATOR:  LESLIE MURIN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1    First Omnibus Motion for an Order Pursuant to Section 365 of

2    the Bankruptcy Code and Bankruptcy Rule 6006 Authorizing the

3    Debtors to Assume Certain Real Property Leases [Docket No.

4    671; filed November 30, 2012]

5

6    Debtors' Fourth Motion Pursuant to Bankruptcy Rules 9006(b)

7    and 9027 for Order Extending the Time to File Notices of

8    Removal of Civil Actions [Docket No. 1249; filed June 4,

9    2013]

10

11   Debtors' Fourth Motion for Extension of Exclusive Periods

12   During Which Debtors May Propose and File Plans of

13   Reorganization and Solicit Acceptances Thereof [Docket No.

14   1250; filed June 4, 2013]

15

16   Debtors' Motion to Authorize Axis Group, Inc. to Enter

17   License Agreement with City of New York [Docket No. 1284;

18   filed June 17, 2013]

19

20   Motion of the Debtors Pursuant to 11 U.S.C. § 107(b)(1) of

21   the Bankruptcy Code, Bankruptcy Rule 9018, and Local Rule

22   9018-1(b) to File Exhibit to Key Employee Incentive Plan

23   Under Seal [Docket No. 1370; filed July 1, 2013]

24

25

1   Petitioning Creditors' Motion to File a Redacted Version of

2   the Objection of the Petitioning Creditors to the Debtors'

3   Motion for Order Authorizing (I) Implementation of Key

4   Employee Incentive Plan for Certain Insiders and (II)

5   Payment of any Obligations Arising Thereunder as

6   Administrative Expenses [Docket No. 1456; filed July 22,

7   2013]

8

9   Motion for Authorization to Seal the Unredacted Objection of

10  the Official Committee of Unsecured Creditors to Motion for

11  an Order Pursuant to Sections 105(a), 363(b)(1) and

12  503(c)(3) of the Bankruptcy Code Authorizing (I)

13  Implementation of Key Employee Incentive Plan for Certain

14  Insiders and (II) Payment of any Obligations Arising

15  Thereunder as Administrative Expenses [Docket No. 1460;

16  filed July 22, 2013]

17

18  Motion of Norman Fredrick Wessels, Joyce Elaine Wessels,

19  Gladys Ann Walker, Michael Jay Meyer, and Dale Woudstra and

20  Tonia Woudstra for Relief from the Automatic Stay to Pursue

21  Personal Injury Claims [Docket No. 761; filed January 8,

22  2013]

23

24  Motion by James Joseph Pursuant to 11 U.S.C. §362 for Relief

25  from the Automatic Stay [Docket No. 1147; filed May 8, 2013]

1    Motion and Joinder of Travis and Erin Cogdill to Motion of

2    Norman Frederick Wessels, Joyce Elaine Wessels, Gladys Ann

3    Walker, Michael Jay Meyer and Dale Woudstra and Tonia

4    Woudstra for Relief from the Automatic Stay to Pursue

5    Personal Injury Claims (Docket No. 761) [Docket No. 1282;

6    filed June 17, 2013]

7

8    Motion for an Order Pursuant to Sections 105(a), 363(b)(1)

9    and 503(c)(3) of the Bankruptcy Code Authorizing (I)

10   Implementation of Key Employee Incentive Plan for Certain

11   Insiders and (II) Payment of any Obligations Arising

12   Thereunder as Administrative Expenses [Docket No. 1369;

13   filed July 1, 2013]

14

15   Motion of Yucaipa American Alliance Fund I, L.P.'s and

16   Yucaipa American Alliance (Parallel) Fund I, L.P. for

17   Reconsideration and/or Amendment of Final Order Granting

18   Debtors' Motion for Authorization to Obtain Post-petition

19   Secured Replacement DIP Financing and Related Relief [Docket

20   No. 1373; filed July 2, 2013]

21

22   Interim Fee Applications:

23

24   P

25

Page 7

1   Petitioning Creditors' Motion for Summary Judgment Regarding

2   the Determination of Requisite Lenders Under the First Lien

3   Credit Agreement [Adv. (12-50947) Docket No. 246; Adv. (13-

4   50530) Docket No. 253; filed July 9, 2013]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sherri L. Breach & Sheila Orms

```
 1   A P P E A R A N C E S :

 2   RICHARDS, LAYTON & FINGER, P.A.

 3        Attorney for the Debtors

 4        One Rodney Square

 5        920 North King Street

 6        Wilmington, Delaware 19801

 7

 8   BY:  ROBERT STEARN, ESQ.

 9        CHRISTOPHER M. SAMIS, ESQ.

10        MARK D. COLLINS, ESQ.

11

12   TROUTMAN SANDERS, LLP

13        Attorneys for the Debtors

14        Bank of America Plaza

15        600 Peachtree Street, Suite 5200

16        Atlanta, Georgia 30308

17

18   BY:  JEFFREY W. KELLEY, ESQ.

19

20

21

22

23

24

25
```

Page 9

1    YOUNG CONAWAY, STARGATT & TAYLOR, LLP

2         Attorneys for Yucaipa, et al.

3         Rodney Square

4         1000 North King Street

5         Wilmington, Delaware 19801

6

7    BY:  MICHAEL R. NESTOR, ESQ.

8

9    LATHAM & WATKINS, LLP

10        Attorneys for Yucaipa, et al.

11        355 South Grand Avenue

12        Los Angeles, California 90071

13

14   BY:  ROBERT A. KLYMAN, ESQ.

15        RUSSELL F. SAUER, JR., ESQ.

16

17   SCHULTE, ROTH & ZABEL, LLP

18        Attorneys for Black Diamond, CLO 2005-1, LITD. &

19        BDCM Fund II, LP, et al

20        919 Third Avenue

21        New York, New York 10022

22

23   BY:  ADAM C. HARRIS, ESQ.

24        ROBERT J. WARD, ESQ.

25        VICTORIA A. LEPORE, ESQ.

```
 1   LANDIS, RATH & COBB, LLP

 2        Attorneys for Black Diamond, CLO 2005-1, LITD. &

 3        BDCM Fund II, LP, et al

 4        919 North Market Street, Suite 1800

 5        Wilmington, Delaware 19801

 6

 7   BY:  KERRI K. MUMFORD, ESQ.

 8

 9   SIDLEY AUSTIN

10        Attorneys for the Committee of Unsecured Creditors

11        8787 Seventh Avenue

12        New York, New York 10019

13

14   BY:  NICHOLAS K. LAGEMANN, ESQ.

15        BRIAH J. LOHAN, ESQ.

16

17   SULLIVAN, HAZELTINE & ALLINSON, LLC

18        Attorneys for the Committee of Unsecured Creditors

19        901 North Market Street

20        Suite 1300

21        Wilmington, Delaware 19801

22

23   BY:  WILLIAM A. HAZELTINE, ESQ.

24

25
```

Page 11

1   MORRIS, NICHOLS, ARSHT & TUNNELL

2        Attorneys for Mark Gendregske

3        1201 North Market Street, 18th Floor

4        P.O. Box 1347

5        Wilmington, Delaware 1999

6

7   BY:  WILLIAM M. ALLEMAN, JR., ESQ.

8

9   KING & SPALDING, LLP

10       Attorneys for Jack Cooper

11       1180 Peachtree Street

12       Atlanta, Georgia 30309

13

14  BY:  JESSE H. AUSTIN, III, ESQ.

15

16  COUSINS, CHIPMAN & BROWN, LLP

17       Attorneys for Jack Cooper

18       The Nemours Building

19       1007 North Orange Street, Suite 1110

20       Wilmington, Delaware 19801

21

22  BY:  WILLIAM E. CHIPMAN, JR., ESQ.

23

24

25

```
 1    UNITED STATES DEPARTMENT OF JUSTICE

 2         Attorneys for U.S. Trustee

 3         33 Whitehall Street

 4         21st Floor

 5         New York, New York 10004

 6

 7    BY:  DAVID BUCHBINDER, ESQ.

 8

 9    APPEARING TELEPHONICALLY:

10    STEPHEN ANTINELLI

11    PEG BRICKLEY

12    MATTHEW BROOKS

13    JEFF P. BULLER

14    THEO CIUPITU

15    JOSEPH DRYER

16    RICHARD EHRLICH

17    MARK GENDREGSKE

18    MICHAEL E. JOHNSON

19    STEPHEN S. LAPLANTE

20    MEGHAN E. MAREK

21    LES MEIER

22    JUSTIN MENDELSOHN

23    STEPHEN S. ROACH

24    CARL STAPEN

25    ROBERT STARK
```

1   APPEARING TELEPHONICALLY (CONT.):

2   MATT Z. TAYLOR

3   DEREX WALKER

4   RICAHRD M. SELTZER

5   JUSTIN ANTONIPILLAI

6   WAYNE FLICK

7   JULIE GERCHIK

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

     1                    P R O C E E D I N G S

     2              THE CLERK:  All rise.

     3              THE COURT:  Please be seated.

     4              Good morning.

     5              MR. SAMIS:  Good morning, Your Honor.  Chris Samis

     6       from Richards, Layton & Finger here today on behalf of the

     7       debtors.

     8              Your Honor, as for today's agenda, the only items

     9       that require any action by the Court are Items 5, 6, 13, and

    10       14.

    11              Items 5 and 6 are both seal motions that relate to

    12       the Key Employee Incentive Plan which is not being heard

    13       today; Item Number 13 are the third interim fee applications

    14       that were adjourned from a prior hearing; and Item Number 14

    15       is the main event, which is the motion for summary judgment

    16       that was filed by the petitioning creditors on the requisite

    17       lender issue.

    18              Your Honor, we can proceed in any fashion that you

    19       would like.  I -- I leave it up to Your Honor.

    20              THE COURT:  I -- did you mention the fee

    21       applications?

    22              MR. SAMIS:  Yes.  They're -- they're at Agenda

    23       Item 13, Your Honor.  They were adjourned from the hearing

    24       in June.

    25              THE COURT:  Yes.  Yes.

1          First -- give me two minutes to get my papers

2     organized.

3          MR. SAMIS:  Certainly.

4       (Pause)

5          THE COURT:  All right.  I should have done this

6     earlier.

7          Okay.  Well, with Agenda Number 5, that -- that

8     binder had been misplaced and it was found this morning.  So

9     that order has been signed.

10          And 6 indicates -- it's just -- that it's going to

11     go forward.  So what's --

12          MR. SAMIS:  Your Honor, I'm not sure if the

13     petitioning creditors have a form of order here today.

14          THE COURT:  Ms. Mumford.

15          MS. MUMFORD:  Good morning, Your Honor.  I do have

16     a form of order.

17          THE COURT:  All right.

18          MS. MUMFORD:  May I approach?

19          THE COURT:  Yes.

20          And for the record this is the motion to file

21     certain -- a redacted version, I'm sorry, of the petitioning

22     creditors' motion regarding the Key Employee Incentive Plan.

23     Is there any objection?

24          All right.  I've signed the orders presented.

25          Now let's kick over to the fee apps.

Page 16

         1              MR. SAMIS:  Your Honor, on the fee applications,

         2     the fee auditor issued final reports with respect to all the

         3     applications.  All of the professionals have signed off on

         4     the form of order that was previously submitted under

         5     certification of counsel, and I believe there are

         6     representatives from the various forms either in court or on

         7     the phone today.

         8              So I don't know if Your Honor has any independent

         9     questions, but I do have a form of order prepared.

        10              THE COURT:  All right.  Please approach.

        11              MR. SAMIS:  Thank you, Your Honor.

        12              THE COURT:  Does anyone wish to be heard with the

        13     interim fee applications as modified?

        14              All right.  I hear none.  As always, I -- I very

        15     much appreciate the assistance of our fee auditors and this

        16     one in particular, and I'm happy to sign the orders

        17     presented.  And anyone who is here just for that is more

        18     than welcome to jump off the phone or leave the court.

        19              So I've signed the order.

        20              MR. SAMIS:  Thank you, Your Honor.

        21              That would bring us to Item 14, Your Honor, which

        22     is the main event, the petitioning creditors' motion for

        23     summary judgment.

        24              At this time I would cede the podium to counsel

        25     for the petitioning creditors.

 1            THE COURT:  Okay.

 2            Mr. Harris.  No.  All right.

 3            MR. WARD:  Good morning, Your Honor.

 4            THE COURT:  Good morning.

 5            MR. WARD:  Robert Ward on behalf of the

 6     petitioning creditors.

 7            Your Honor, in the -- in petitioning creditors'

 8     motion, we seek a ruling that Yucaipa is not the requisite

 9     lender and that the petitioning creditors are.  And we

10     believe we have numerous bases -- a number of basis -- bases

11     for the relief we seek.

12            First off, Justice Ramos in the State Court in New

13     York resolved two issues.  First, and this is at page 14 of

14     Exhibit 1, that's his opinion:  "That the purported Fourth

15     Amendment is not and never was effective under the plain

16     terms of the credit agreement," and then "Yucaipa is not the

17     requisite lender."

18            Contrary to Yucaipa's argument, Justice Ramos

19     never said that Yucaipa is not the requisite lender as a

20     result of the fact that the Fourth Amendment is null and

21     void.  In fact, in reaching his decision that Yucaipa is not

22     the requisite lender, Justice Ramos reviewed and construed

23     the Third Amendment and the purported Fourth Amendment,

24     both.

25            In particular, as to the Third Amendment, Justice

1    Ramos determined, for example, and this is a quote at page 4

2    to 5 of his opinion:

3              "The Third Amendment prohibited Yucaipa from

4    exercising any and all voting rights" -- that's the Third

5    Amendment -- "prohibited Yucaipa from exercising any and all

6    voting rights it would otherwise have as a lender involving

7    the right to consent to any amendment of the credit

8    agreement or the right to vote in any Allied bankruptcy."

9              He also found that the Third Amendment represented

10   a compromise between Yucaipa, which wanted to acquire a

11   portion of Allied's debt obligations and the lenders who

12   recognized the dangers in allowing Yucaipa to assert

13   unfettered control over the credit lien agreement -- the

14   lien credit agreement.  And he found in that respect, Your

15   Honor, and I quote again, with respect to the Third

16   Amendment:

17             "The quid pro quo for permitting Yucaipa to

18   acquire the term loan was that any such term loans acquired

19   by Yucaipa would be subject to substantial restrictions

20   that, among other things, would preclude Yucaipa from voting

21   on any matter that would affect in any way the rights and

22   remedies of the lenders."

23             That's, again, on the Third Amendment, Your Honor.

24   That's page 9 of Exhibit 1, Justice Ramos's opinion.

25             In fact, Justice Ramos also found, and I quote

1    from page 4 of his opinion:  "The restrictions" -- and he

2    was dealing here with the Third Amendment.  It's the section

3    of his opinion on the Third Amendment:  "The restrictions

4    precluded Yucaipa from becoming the requisite lender or

5    exerting a control over the other lenders."

6              It's clear from the opinion, Your Honor, that

7    Justice Ramos is construing the Third Amendment here.

8              He also found at pages 4 -- 4 and 5 of his opinion

9    that the Third Amendment prohibited Yucaipa from exercising

10   any voting rights they would otherwise have as a lender.

11   With respect to that, pages 4 and 5, the quote by the judge

12   is:

13             "By the terms of the Third Amendment upon

14   acquiring any interest in the term loans, Yucaipa 'knowingly

15   and irrevocably waived any and all right to exercise any

16   voting rights it would otherwise have as lender for all

17   purposes under the credit agreement.'"

18             He was quoting from the Third Amendment.

19             Under the Third Amendment, Your Honor, he also

20   found "That the aggregate outstanding principal amount of

21   the term loan of Yucaipa shall be disregarded for purposes

22   of the definition of term loan exposure and, thus, for the

23   calculation of who can be the requisite lender."  That's

24   page 5 of his opinion.

25             It is clear from Justice Ramos's opinion, Your

1    Honor, that he construed the terms of the Third Amendment

2    and determined the issues which led him to -- to conclude

3    that Yucaipa is not the requisite lender.

4         And, Your Honor, the reason that I'm --

5         THE COURT:  Well, what --

6         MR. WARD:  -- quoting --

7         THE COURT:  -- what about -- what about this

8    argument that, fine, but because of the nature of who was on

9    which side at which time that Justice Ramos's ruling are not

10   binding as collateral estoppel on Yucaipa?

11        MR. WARD:  Well, Your Honor, the only person that

12   -- the only entity I know that's -- that's fighting my

13   clients being the requisite lender is Yucaipa.  The fact is

14   Allied -- and I can find a cite for it, Your Honor.  Allied,

15   I believe, in its opposite -- or its -- its statement on

16   June 19th in connection with the application or the

17   objection, I suppose, of Yucaipa said -- and this is at

18   Exhibit 5 to my -- to my affidavit, Your Honor, which is the

19   reply affidavit.  At paragraph 9, Allied acknowledged that

20   in the New York Court, the New York Court conclusively

21   determined that "Yucaipa is not the requisite lender and

22   that Justice Ramos's ruling is binding and conclusive."

23        Further, at page 2 and in paragraph 16 of that

24   same document, which is the debtors' document -- it's

25   Exhibit 5 to my affidavit -- Allied -- Allied acknowledged

1    in the opening paragraph and at paragraph 16 that Black

2    Diamond, Spectrum and the AMMC Group are the requisite

3    lenders.  The only entity, Your Honor, here that's fighting

4    is -- is the only entity with respect to which we have

5    collateral estoppel, and that is Yucaipa which was a party

6    to the New York case.

7              THE COURT:  Okay.

8              MR. WARD:  And -- and I would like to get into the

9    elements of collateral estoppel, if I can, Your Honor --

10             THE COURT:  Sure.

11             MR. WARD:  -- to -- to seek further to prove that.

12             Your Honor, with respect to collateral estoppel,

13   we believe that the issue of Yucaipa not being the requisite

14   lender was raised in the New York proceeding.  That's the

15   first element of collateral estoppel;

16             Secondly, that the issue was actually litigated

17   and decided in that proceeding;

18             Third, that Yucaipa had a full and fair

19   opportunity to litigate those issues; and

20             Fourth, that the resolution of those issues was

21   necessary to support the final judgment, the valid and final

22   judgment on the merits because the issue of whether or not

23   Yucaipa was a requisite lender was actually raised.

24             And, Your Honor, with respect to that, let me

25   point to Your Honor that in the wherefore clauses in the New

1    York complaint, which is Exhibit 4 to the -- to the

2    Mendelson affidavit, which is our moving affidavit, it

3    doesn't tie the request for a declaration that Yucaipa is

4    not the requisite lender to the Fourth Amendment.  They're

5    separate.  They're separate elements.

6            In addition to that, Your Honor, at paragraph 14

7    of the New York complaint we separately seek "a declaration

8    that the purported Fourth Amendment is invalid and that the

9    Yucaipa defendants are not the requisite lender under the

10   credit agreement."  They weren't tied together.

11           And in fact, Your Honor, at page 5 -- I'm sorry --

12   page 3, paragraph 5 of the New York complaint the

13   petitioning creditors allege:

14           "The Third Amendment also expressly provided that

15   if Yucaipa were to acquire any term loan exposure, Yucaipa

16   would not be entitled to vote and the obligations held by it

17   would essentially be disregarded in connection with any

18   matter required to be submitted to the lenders for consent

19   under the credit agreement."

20           I'm -- I'm just going to point out a few

21   paragraphs, Your Honor, where in our complaint in the New

22   York action we specifically addressed the Third Amendment

23   and -- and Yucaipa engaged us in their answer in connection

24   with those allegations.

25           For example, in paragraph 31 at page 10 of our New

1    York complaint we say, with respect to the Third Amendment:

2    "Specifically, Yucaipa's potential status as a lender was

3    subject to the following restrictions and conditions, among

4    others:  Three, Yucaipa would not have any voting rights

5    with respect to any term loan."  That was specific to the

6    Third Amendment.

7              At paragraph 31 of Yucaipa's answer, Yucaipa

8    engages on that issue and says -- they state that the

9    question of whether or not and to what extent Yucaipa's

10   potential status as a lender is subject to restrictions and

11   conditions is a question of law for which no response is

12   required.

13             By the way, Your Honor, when we sought a

14   determination in our wherefore clause, and I believe I said

15   in paragraph 16 of the complaint, we sought a determination

16   that they were not the requisite lender under the credit

17   agreement.  And in the complaint we defined the credit

18   agreement to include the Third Amendment.  And -- and that

19   is clear throughout the complaint and it's clear in

20   Yucaipa's answer.

21             At paragraph 33, page 11, Your Honor, of our

22   complaint, again speaking about the Third Amendment, we said

23   that the restrictions and conditions were necessary -- the

24   restrictions and conditions in the Third Amendment were

25   necessary to ensure that Yucaipa "did not obtain unfettered

 1     control over Allied by, among other things, becoming the

 2     requisite lender."

 3              We continue at paragraph 34 to cite the Third

 4     Amendment and say, "Pursuant to the Third Amendment, the

 5     prohibitions imposed on Yucaipa's ability to acquire and

 6     write term -- and -- and buy term loans and other

 7     obligations effectively preclude Yucaipa from ever becoming

 8     a requisite lender."

 9              In its answer -- and, again, Yucaipa is engaging

10     us in these allegations.  We're making the allegations about

11     the Third Amendment.  They're engaging us in those

12     allegations.  Yucaipa denies the allegations that I just

13     referred to that we had made, denies the allegations

14     contained in paragraph 34, and respectfully refers the Court

15     to the credit agreement and all of the amendments thereto

16     for a full and accurate statement of its contents.  We had

17     already defined in the complaint what the credit amendment

18     was -- credit agreement was and that is -- it includes the

19     Third Amendment and the Fourth Amendment, and Yucaipa here

20     says, "and all the amendments thereto."

21              I'm not going to burden the record much further,

22     Your Honor, but at page -- paragraph 60, page 18 of our

23     complaint we say, "We seek a declaration under CPLR" --

24     that's Civil Practice Law and Rules -- "3001 that the

25     purported Fourth Amendment is null and void and, separately,

1    that Yucaipa is not requisite lender under the credit

2    agreement."

3              Yucaipa, in its answer, admits that the complaint

4    seeks this declaration, but denies that the plaintiffs are

5    entitled to it.

6              There's no place in the -- in the answer where

7    Yucaipa says, we're only fighting here about the Fourth

8    Amendment.  We were fighting about the Third Amendment and

9    the Fourth Amendment.

10             THE COURT:  Well, my memory of the argument in

11   front of Justice Ramos was that it was focused entirely on

12   the Fourth Amendment.

13             MR. WARD:  Your Honor, there's a couple of things

14   you have to remember.  First off, there was an argument on

15   November 19th and -- and those issues -- and it was a -- it

16   was a longish argument, but those issues, as happens in oral

17   argument, went one or two different directions depending on,

18   you know, how the parties were arguing.

19             But if you actually look at our motion -- if you

20   actually look at two things.  First off, Justice Ramos's

21   decision, which I was reading to you earlier, where there

22   are numerous quotes where he's construing the Third

23   Amendment.  But, also, if you look at the motion for summary

24   judgment that we actually filed -- and let me just quote a

25   couple of things from there.

1          With respect to our motion for summary judgment,

2     in our moving brief at page 25 we seek a ruling from the New

3     York Court that "it declare that Yucaipa is not the

4     requisite lender under the credit agreement."  And we don't

5     say there a requisite lender under the Fourth Amendment.

6          In connection -- in our reply brief on summary

7     judgment -- this is paragraph -- this is Exhibit 68 to Mr.

8     Sauer's affidavit, the petitioning creditors specifically

9     argue that Yucaipa could not have become a requisite lender

10    under the Third Amendment; that under the Third Amendment at

11    Section 2.1(e) Yucaipa "could buy a limited amount of term

12    loans and could never vote them."  That's page 7.  This is

13    all in our motion for summary judgment which was before the

14    Court and, actually, as a result an actually litigated

15    issue.

16         And in addition in our reply brief on summary

17    judgment, "That the prohibitions in the Third Amendment

18    prevent a defendant from becoming requisite lenders."

19    That's at page 8.

20         It's clear, Your Honor, that in our summary

21    judgment motion we were addressing the Third Amendment, the

22    Fourth Amendment, and the issue of requisite lender all at

23    once.  The fact that -- by the way, on the November 19th

24    oral argument that we focused mainly on -- or we focused, I

25    think -- well, actually, we focused on two things, Your

1    Honor.

2            First, language in the Fourth Amendment.  But very

3    quickly, language in one of the defenses that had been

4    raised by Yucaipa based on the Georgia action.  So,

5    basically, those were the two issues that were in that oral

6    argument.

7            However, in the actual written decision from

8    Justice Ramos, I think dated March 19th, he deals

9    extensively with the Third Amendment and then deals with the

10   Fourth Amendment.  And it's on -- on both of those bases,

11   and I think it is very clear from reading his opinion that

12   he decides those issues.

13           But the reason I've been going through, Your

14   Honor, what we actually argued in our complaint and then in

15   response to Your Honor's question of what was actually

16   argued or asserted in our complaint -- alleged in our

17   complaint, and then what we actually argued in summary

18   judgment is that the issue of Yucaipa not being the

19   requisite lender was raised in the New York proceeding.

20   It's in our complaint.  If you look through it, if you look

21   at the cites that I've mentioned it's actually there.

22   Yucaipa engages us in that issue.  The issue was actually

23   litigated and decided in the proceeding.

24           Now Yucaipa says they didn't have a full

25   opportunity -- a full and fair opportunity to litigate.

Page 28

1   However, Justice Ramos said at page 13 of his opinion,

2   Exhibit 1 again, "The credit agreement itself is unambiguous

3   and, accordingly, summary judgment is appropriate."  That's

4   page 11 of his argument -- of his decision actually.

5           For their part, the defendants contend that there

6   are many factual issues.  There are none.  This is a case of

7   contract interpretation.  That's page 13.  And Your Honor

8   knows very well that when you have a case of contract

9   interpretation and when the contract is clear on its face,

10  you don't need extrinsic evidence.  The argument that

11  Yucaipa is making that they didn't have a chance to do

12  discovery and, as a result, they didn't have a full and fair

13  opportunity to litigate is -- is just wrong.

14          In fact, we quote a case at page 7 of our brief

15  called Kronish versus Dehari (ph) saying that a summary

16  judgment constitutes "a full and fair opportunity to

17  litigate."

18          Yucaipa had the full and fair opportunity to

19  litigate, Your Honor.  The issue was raised in our answer.

20  The issue was raised in our summary judgment motion.  And

21  the resolution of the issue, Your Honor, was necessary for a

22  valid and final judgment because we did ask for that relief

23  in our complaint.  In our wherefore clause we do ask

24  separately that the Fourth Amendment is -- is invalid and,

25  secondly, that they were not the requisite lender.

1              In getting there, if you read Justice -- if -- and

2       I'm sure Your Honor has -- if you read Justice Ramos's

3       decision which is Exhibit 1 to our moving affidavit, he

4       clearly goes through the Third Amendment and construes it.

5       And I've --

6              THE COURT:  Okay.

7              MR. WARD:  -- I've cited to some of the

8       constructions.  And, in fact, it's some of the same

9       construction that I'll be going through a minute in talking

10      about the Third Amendment, Your Honor.

11             THE COURT:  Okay.

12             MR. WARD:  But -- so why don't I just move on,

13      Your Honor.  And with respect to the next issue, even if the

14      New York Court had not already ruled that Yucaipa was the

15      requisite lender, that Court clearly ruled that the

16      purported Fourth Amendment is no longer in effect -- is null

17      and void and was never in effect, actually, and that's

18      clearly binding on collateral -- by virtue of collateral

19      estoppel on Yucaipa.  I don't see any fight on that issue.

20             And that holding results, Your Honor, in the

21      application of the Third Amendment since the Fourth

22      Amendment has been dealt -- has been determined to be null

23      and void.  That holding results in the application of the

24      Third Amendment to the issues presented in this motion.

25             And this includes the express provisions in the

1    Third Amendment that any obligations -- and I'll get into

2    these in a second.  Any of the debt obligations acquired by

3    Yucaipa are disregarded and not counted for purposes of

4    determining who is the requisite lender.

5            Now Yucaipa argues that the Third Amendment is

6    ineffective.  But that's directly at odds with, I believe,

7    this Court's prior recognition of the Third Amendment as

8    effective, valid and enforceable.

9            And that is, Your Honor, on October 18, 2012, Your

10   Honor will recall Allied commenced its own adversary

11   proceeding before this Court.  And in Exhibit 4 to my reply

12   affidavit, we attached that complaint and in that complaint

13   Allied seeks a declaration identifying who the requisite

14   lender is and a ruling on the enforceability of both the

15   Third and the Fourth Amendments.

16           Then after Justice Ramos ruled from the bench on

17   November 19th, but before his longer written decision which

18   is the one that deals much more with the Third Amendment, as

19   the Court is aware Yucaipa filed cross-claims against, among

20   other -- among other defendants, my clients, the petitioning

21   creditors.  That's Exhibit 15 to our moving affidavit.

22           Now petitioning creditors moved to dismiss that

23   cross-claim.  That's Exhibit 22 to our moving affidavit,

24   which motion this -- this Court granted on several grounds

25   and including, Your Honor, the ground that the covenant not

1   to -- not to -- that there was a covenant not to sue

2   contained in the Third Amendment at Section 2.7(e), page 7

3   of the Third Amendment, which was binding on Yucaipa once it

4   -- once it purchased the Allied debt.

5           In fact, this Court specifically -- and in fact --

6   I'm sorry -- that Section 2.7(e) at page 7 of the Third

7   Amendment, the covenant not to sue, is binding only on

8   Yucaipa.  It is specifically tailored to Yucaipa.  It just

9   says Yucaipa.  They're called the restricted lender

10  affiliate, something like that, but it's a defined term in

11  there.

12          But with respect to Your Honor's ruling, what Your

13  Honor said on February 27th in your ruling, which is Exhibit

14  3 to our moving affidavit, Your Honor said, "In support of

15  that" -- our motion to dismiss the cross-claims, which Your

16  Honor granted -- "In support of that, I really, for all

17  material aspects, adopt the petitioning creditors' arguments

18  virtually in toto."  And then the Court highlighted the

19  arguments on which it relied.

20          In particular, the Court's decision turned on this

21  covenant not to sue, which is only contained in the Third

22  Amendment and specifically refers only to Yucaipa.  And the

23  Court found that contrary to Yucaipa's arguments, the

24  covenant not to sue in the Third Amendment, which

25  specifically, you know, addressed them, was binding on

1   Yucaipa.  And the Court found that the allegations pled by

2   Yucaipa in arguing in their -- in their cross-claims against

3   the application of the covenant not to sue was not plausible

4   under the Twombly Iqbal standards.  That's page 104 of

5   Exhibit 3, Your Honor.  That's the transcript.

6           The Court found that the plain meaning of this

7   covenant not to sue in the Third Amendment, that the plain

8   meaning is that Yucaipa couldn't sue.  In fact, the quote

9   from Your Honor is, at page 105, "I don't think there's any

10  question as to the plain meaning of the covenant and I think

11  it's very clear."

12          Now since the Court found that Yucaipa was bound

13  by the covenant not to sue, which is contained in the Third

14  Amendment, obviously the Court was finding that Yucaipa was

15  bound by a provision of the Third Amendment and that the

16  Third Amendment was binding and effective on Yucaipa, which

17  we think is the law of the case, but let me just go a little

18  bit further on this, Your Honor.

19          This Court then made several other findings that

20  reinforced the applicability of the Third Amendment as

21  against Yucaipa.  At page 106, lines 9 through 15:

22          "As to the applicability, the first lien credit

23  agreement does contain the provision that when you buy or

24  assign the debt, you are stuck with what you asked nor had

25  previously agreed to and waived, et cetera.  And I find that

1    when Yucaipa bought this debt, they were subject to the

2    agreements that had been previously entered and, as such,

3    they are applicable when they're -- when they're looking at

4    the Third Amendment."  I think it's when we're looking at

5    the Third Amendment, Your Honor, but you certainly

6    referenced the Third Amendment at the end.

7            And then again, Your Honor, at page 106 at -- at

8    -- I'm sorry, Page 106, line 22 to page 107 line 1, "That's

9    the very normal and understandable provision; that when you

10   buy something, when you buy a debt, when you buy the debt,

11   it is what it is and you are where you are, and you can't

12   undo -- you can't have that time machine ability to undo the

13   previous agreement."

14           What Your Honor was talking about there, I

15   believe, was that the Fourth Amendment had been rendered

16   null and void, and you go back to the Third Amendment and

17   you can't act as if the Third Amendment didn't exist.

18           However, once again, the language that I'm quoting

19   to Your Honor from your opinion, I think, of February 27th

20   was -- points out that the Third Amendment was binding on

21   Yucaipa.  And we believe, Your Honor, that this is law of

22   the case.

23           In response, Yucaipa argues that the application

24   of law -- of the law of the case doctrine is discretionary.

25   However, I point out, Your Honor, that one of your bases for

1    your determination was the application of the Twombly Iqbal

2    standards that the claims -- that -- that the claims have to

3    rise to the level of plausibility, which is Exhibit 3, page

4    104, lines 7 through 11.  There's nothing that's happened

5    since this Court's determination of February 27th, five

6    months ago, to make those cross-claims about actions from

7    four -- and four and five years ago more plausible.

8            Further, this Court denied Yucaipa's application

9    to re-plead, and said at Exhibit 3, page 110, lines 6

10   through 7, "I'm going to dismiss the case with prejudice."

11           So, yes, Your Honor, the application of the law of

12   the case doctrine is discretionary, but nothing has changed

13   since then.  We believe it was a firm finding by Your Honor

14   and Your Honor, in fact, dismissed the case with prejudice.

15           Now, Your Honor, moving on to the Third Amendment

16   itself, even if this Court determines not to apply its prior

17   determination that the Third Amendment, we believe, is

18   effective, there can be no doubt that the Third Amendment is

19   effective.

20           Yucaipa's argument as to why the Third Amendment

21   is ineffective is that the Fourth Amendment requires

22   unanimous consent and so must the Third Amendment.  And

23   Yucaipa has several other arguments, but let me get into our

24   -- the main thrust of the argument here, Your Honor.

25           The fact is this -- this argument by Yucaipa rests

1    on the fundamental misconception as to Section 10.5 of the

2    first lien credit agreement, and it ignores critical

3    differences between the Third Amendment and the Fourth

4    Amendment.

5           Generally, amendments to the first lien credit

6    agreement are controlled by Section 10.5(a), and that's

7    Exhibit H, which is the first lien credit agreement, and

8    that requires only requisite lender consent, which was

9    obtained in connection with the Third Amendment.

10          With respect, however, to certain other types of

11   amendments, they are controlled by Section 10.5(b) as

12   opposed to (a), and with respect to Section 10.5(b)(ix), and

13   I quote, this is Exhibit A, the first lien credit agreement:

14   "Without the written consent of each lender, other than a

15   defaulting lender, that would be effected thereby, no

16   amendment, modification, termination or consents shall be

17   effective if the effect thereof would be," and then "(ix)

18   amend the definition of requisite lender."

19          Now Justice Ramos found that the purported Fourth

20   Amendment had the effect of amending the definition of

21   requisite lenders because it allowed Yucaipa, for the first

22   time, to become a requisite lender and thus effected --

23   effected and affected -- thus affected every lender without

24   requiring -- thereby requiring unanimous consent, which

25   wasn't obtained.

1        And I was trying to imagine a more fundamental

2   change than that before the Fourth Amendment Yucaipa could

3   not be the requisite lender and then after the Fourth

4   Amendment they could.

5        But the change to the Third Amendment on the other

6   hand, Your Honor, did not affect any of the lenders because

7   prior to the Third Amendment, Yucaipa could not become the

8   requisite lender and after the Third Amendment Yucaipa could

9   not become the requisite lender because, as I'll get into in

10  a minute, there were significant restrictions placed on the

11  debt that Yucaipa bought.  I've been calling it neutered

12  debt in -- in several of those proceedings.

13       However, as opposed to the Third Amendment, the

14  purported Fourth Amendment is a very different story because

15  after its alleged passage, Yucaipa could become the

16  requisite lender.

17       Your Honor, prior to the Third Amendment Yucaipa

18  was precluded from buying any Allied debt under the first

19  lien credit agreement and that's because the definition of

20  eligible lender excluded Yucaipa specifically.  They were

21  the sponsor and the sponsor was excluded.

22       THE COURT:  Were they -- were they prohibited from

23  buying or were the lenders prohibited from selling?

24       MR. WARD:  Well, Your Honor, I -- I think it's the

25  lenders were prohibited from selling, but I don't see at the

1   end of the day that that really matters as much because,

2   first off, once they bought the debt they were still subject

3   to the prior authorities and conditions, and so they became

4   subject to the terms.  And maybe that's a little bit

5   circular.

6            But. in addition, how do you buy the debt that

7   you're precluded from buying without causing a tortuous

8   interference with the agreement.  So it seems that what

9   Yucaipa is saying is by virtue of their wrongful behavior,

10  they should be rewarded here.  We don't think that that's

11  justifiable or allowable under -- under any of the claims.

12           If what Your Honor is talking about is the Praven

13  (ph) line of decisions that was raised, you know, by

14  Yucaipa, I'm happy to get into that --

15           THE COURT:  Yeah.  Please do.

16           MR. WARD:  -- right now.

17           Well, with respect to Praven, Your Honor, and I

18  think some of this is really a red herring.  But Praven is

19  the governing case.  It's a Second Circuit case and it holds

20  that under New York law only expressed limitations on

21  assignability are enforceable.  And you have to remember the

22  context in which the Praven case was coming out of.

23           In Praven, the underlying agreement "expressly

24  permits assignments to financial institutions," and this is

25  a quote.  "It does not limit assignments only to those

1   entities."  In other words, it's inclusionary.  It's not

2   exclusionary language.  And as I was citing to Your Honor,

3   what -- what Praven -- what the Second Circuit in Praven was

4   looking for is exclusionary language.  You know, it said

5   "Under New York law only expressed limitations on

6   assignability are enforceable."

7           And with respect to Praven, again, the underlying

8   language that's being construed is -- this is -- this is the

9   language from the underlying agreement:  "We may -- we may

10  assign all or any part of our interest in the letter

11  agreement to any financial institution."  In other words,

12  it's all inclusionary.  It says who you can assign to.  It

13  doesn't say who you can't assign to.

14          This agreement is very clear.  It's page -- I

15  believe it's page 17.  It's the definition -- of Exhibit 8.

16  It's the definition of eligible lender, eligible assignee,

17  and it specifically excludes Yucaipa.  In Praven, there's no

18  exclusionary language.  There's only inclusionary language,

19  Your Honor.  That's very, very different.  And -- and we'll

20  get into that in a second, Your Honor.  But, specifically,

21  Yucaipa was excluded from -- from being an eligible assignee

22  under the agreement.  And that's very much missing in

23  Praven.

24          In addition, Your Honor, Yucaipa cites a number of

25  -- of other cases.  And I'm sorry.  And the exclusionary

1   language actually continued in the Third Amendment, Your

2   Honor, because Yucaipa was specifically excluded from being

3   able to buy any letter of credit debt and revolving debt.

4   That's Section 2.1(c) of the Third Amendment.  And under

5   Section 2.7(e) of the Third Amendment, they could only buy

6   20 percent of the aggregate principal amount of term loan

7   exposure or $50 million, subject to significant limitations.

8   I'll get into that in a second.

9           But we believe, Your Honor, that the Praven

10  standard was satisfied because of the expressed limitations

11  on assignability, you know, contained in -- in the credit

12  agreement.

13          Now Yucaipa also cites Sullivan, Alhusen (ph) and

14  a number of other New York cases which it relies on which

15  don't involve credit agreements.  They are factually

16  distinguishable.  They are assignments of simple bilateral

17  contracts which -- where typically there's a provision in

18  each of those contracts requiring the consent of the other

19  side.  That's not this agreement.  This is a very different

20  agreement, our credit agreement.  There's no consent

21  requirement and it's a much more complex agreement.

22          But in connection with Sullivan and Alhusen and

23  the thing to recall -- or the thing to take into account is

24  that these cases state a proposition relative to the general

25  assignability of clauses under New York law.  And in none of

1    these cases is there exclusionary language.  There is no

2    list in Alhusen or Sullivan or any of these cases as to a

3    specific assignee that is excluded.  Again, it's -- it's a

4    simple proposition of New York law that generally, you know,

5    generally you can have assignments.  Generally, as the quote

6    -- as the Court quoted in Alhusen and Sullivan, you know,

7    generally you can have assignments.

8              However, in none of those cases was there any

9    exclusionary language specifying an entity or a person to

10   whom you could not assign.  And I think that's very

11   important, Your Honor.

12             In addition, in Alhusen and Sullivan, Praven and

13   also -- and I'll get to it in a second -- in 785 Partners,

14   you didn't have a case where the assignee, Yucaipa here,

15   negotiated the limitations on their ability to -- on the

16   ability to assign, as Yucaipa did here.  And I can get into

17   that in a second.  We cite it in our brief.  It was Yucaipa

18   itself that negotiated the Third Amendment.

19             And so in none of these cases do you actually have

20   a situation where it's the assignee who is negotiating the

21   limitation and then is seeking relief from the limitation by

22   going to this general principle of New York law.

23             However, Alhusen, Sullivan, they are all general

24   assignability cases, but so is Singer versus Baccus (ph),

25   which is a more recent case.  It's an appellate division

1    case.  As Your Honor knows, that's the intermediate

2    appellate court in New York.  It's a 202 case.

3            And Baccus holds, Your Honor, and we think this is

4    dispositive, "There is no need for the non-assignment clause

5    to also contain talismanic language or magic words

6    describing the effect of any attempt by the assignor to make

7    an assignment."  That's a much more practical way of looking

8    at it.

9            Also, in Alhusen, one of the cases that's relied

10   upon by Yucaipa, the Court said, "When clear language is

11   used and the plainest words have been chosen, parties may

12   limit the freedom of alienation of rights and prohibit an

13   assignment."

14           Your Honor, there's nothing clearer than what's

15   contained in paragraph -- in -- at page 17, Section 1.1 of

16   the first lien credit agreement where it says Yucaipa may

17   not be the eligible -- may not be an eligible assignee.  And

18   then in the Third Amendment where it says Yucaipa may not

19   buy LC debt, may not buy revolving debt, and it can buy a

20   certain amount of term loan debt with significant

21   limitations.

22           Now with respect to 785, once again, as with

23   Praven, there was a provision about the entities to whom an

24   assignment could be made; again, inclusionary language.  You

25   can assign to a financial institution.  There was no

1    language saying you could not assign to X.  There was no

2    exclusionary language.  Again, that's a strong factual

3    distinction between that case, the Praven case, and our

4    case.

5            And with respect to 787 (sic), as I said, it

6    relies very heavily upon Praven, which is to be expected.

7    Praven is the Second Circuit case, and we believe we

8    satisfied the Praven standard with the exclusionary

9    language, the expressed limitation language.  And, remember,

10   what Praven was looking for was expressed limitation

11   language and there's expressed limitation language in the

12   first lien credit agreement and in the -- in the Third

13   Amendment with respect to Yucaipa.

14           But, also, in 785 Partners, the facts are very

15   different from the case here.  The facts in 785 were between

16   -- the dispute was between a borrower and a single assignee

17   of a single creditor.  It was a lender/borrower dispute.

18   Here, the dispute is an inter-creditor dispute where one

19   lender knowingly violated an agreement it itself negotiated

20   in order to obtain an advantage over the other lenders.  We

21   think as a result, Your Honor, 785 is factually

22   distinguishable.

23           And Yucaipa cites no cases involving inter-

24   creditor disputes.  They cite a fair number of New York

25   cases involving simple contract assignability provisions.

1    They are not credit agreements.  They are bilateral

2    contracts.  This is a much more complex situation, as Your

3    Honor knows from all the time we've spent with you.  But

4    there's no case, Your Honor, that they cite where there's an

5    inter-creditor dispute involved.

6              THE COURT:  Okay.

7              MR. WARD:  And once again, 785, Your Honor, is not

8    a case where the assignee negotiated the limitation on the

9    ability to assign as Yucaipa did here.

10             THE COURT:  Right.

11             MR. WARD:  So we think, Your Honor, that there are

12   many reasons that it's distinguishable.

13             But if I -- if I can get back to the Third

14   Amendment, Your Honor.

15             THE COURT:  Yes.  Thank you.

16             MR. WARD:  With respect to the Third Amendment,

17   Your Honor, it -- first off, it -- it provided strict

18   conditions and limitations on the very limited amount of

19   debt that Yucaipa was allowed to buy, the result of which

20   was that Yucaipa could not become a requisite lender.

21             For example, Section 2.1(e) of the Third Amendment

22   -- and that's page 3 of the Third Amendment and that's

23   Exhibit 2 to the Mendelson affidavit, our moving affidavit

24   says, "The aggregate outstanding principal amount of term

25   loans of Yucaipa shall be disregarded for purposes of this

1    definition of term loan exposure."

2            As Justice Ramos explained, Your Honor, at page 12

3    of his opinion, Exhibit 1 -- and by the way, Section 2.1(e)

4    is very important because it specifically says that any term

5    loan debt that Yucaipa buys shall be disregarded for

6    purposes of this definition.  And it's this definition that

7    is applied in connection with requisite lender because, as

8    Justice Ramos explained:

9            "The term loan exposure is utilized both to define

10   which lenders may become the requisite lenders or be part of

11   the group comprising requisite lenders, and to calculate

12   whose obligations may be counted by calculating the amount

13   that a lender or group of lenders must hold in order to be

14   the requisite lender."

15           So the definition, Your Honor, of requisite

16   lender, as Your Honor I think is familiar with very well by

17   now at page 41 of the first lien credit agreement is, "more

18   than 50 percent of the sum of the aggregate of term loan

19   exposure, letter of credit exposure, and revolving debt

20   exposure."

21           And the fact is since, under Section 2.1(e) of the

22   Third Amendment the term loan exposure may not be counted

23   for any purpose whatsoever, they can never become the

24   requisite lender because under Section 2.1(c) of the Third

25   Amendment they are prohibited from buying an LC debt, any

1   letter of credit debt, and they are prohibited from buying

2   revolving debt.

3           And with respect to Section 2.1(e) at page 3 of

4   the Third Amendment that I just read, none of the term loan

5   debt that they buy can be counted for any purpose, including

6   for purposes of determining the requisite lender.  So they

7   can never get there under the Third Amendment.

8           Your Honor, the point I'm trying to make is that

9   the Third Amendment and the Fourth Amendment were very

10  different.  The Fourth Amendment definitely affected all the

11  lenders because it removed all the restrictions in the Third

12  Amendment and thereby allowed Yucaipa for the first time to

13  become the requisite lender.

14          With respect to the Third Amendment, as Justice

15  Ramos found, there was a quid pro quo.  You can buy some

16  debt, but subject to significant restrictions, including

17  some of the ones that I just spoke about, Your Honor.

18          With respect to the Third Amendment -- and I'll

19  continue just a little bit, Your Honor, on that -- the

20  definition of term loan exposure as originally contained in

21  the first lien agreement is at Section 1.1, page 45, and it

22  defines term loan exposure as: "With respect to any lender

23  as of any date of determination, it's the outstanding

24  principle amount of the term loan of such lender."  This is

25  a fairly flat definition of what term loan exposure is.

1         When the Third Amendment was put into effect,

2    there was a proviso added that I eluded to already, Your

3    Honor, and that's at 2.1(e) of the Third Amendment, page 3.

4    And the language continues the language I've cited to you

5    from the first lien agreement which is fairly plain vanilla;

6    that with respect to any lender as of any date of

7    determination, the outstanding principle amount of the term

8    loan of such lender -- that's the underlying language from

9    the Third Amendment.  Then there's a proviso added by the

10   Third Amendment:

11        "Provided further that with respect to any

12   provision of this agreement relating to the voting rights of

13   lenders, including the rights of lenders to consent or take

14   any action with respect to any amendment, modification,

15   termination or waiver of any provision of this agreement or

16   the other credit documents, or consent to any departure by

17   any credit party therefrom, the aggregate outstanding

18   principle amount of the term loans of all restricted sponsor

19   affiliates" -- restrict sponsor affiliates, that's -- that's

20   Yucaipa; that's a defined term.  Their debt "Shall be

21   disregarded for the purposes of the definition of term loan

22   exposure."

23        And that's important, Your Honor, because as I

24   pointed out, the definition of requisite lender includes

25   term loan exposure, LC exposure and revolving debt.  Under

1    Section 2.1(c) of the Third Amendment, Yucaipa could not buy

2    any LC debt.  The definition of eligible assignee, which is

3    amended at that section, says they cannot buy.  They cannot

4    have any LC debt.

5            With respect to the term loan debt that they were

6    allowed to buy, it's -- it doesn't count as -- as the

7    definition of term loan exposure at Section 2.1(e) that I've

8    just read shows.

9            So with respect to those two limitations -- or as

10   a result of those two limitations, Yucaipa could never

11   become the requisite lender because any LC debt -- well,

12   it's not allowed to buy any LC debt under 2.1(c) of the

13   Third Amendment.  And with respect to 2.1(e), any term loan

14   debt it buys, which is of a limited amount, it can't count

15   for the definition of requisite lender.

16           So definitionally it can never become the

17   requisite lender because it can't get to the majority of the

18   aggregate -- of the sum of the aggregate of the term loan

19   debt, the LC debt, and the revolving debt because it can't

20   buy LC debt under 2.1(c) of the Third Amendment, and any

21   debt -- any long-term debt it buys under 2.1(e) just doesn't

22   count for any purpose whatsoever.

23           But in addition to that, Your Honor, there's

24   another reason they can't become the requisite lender, and

25   that's because even if this -- these provisions saying that

1   the term loan debt doesn't count and that they can't buy LC

2   debt, there are other restrictions.

3          For example, Section 2.7(e) of the Third Amendment

4   provides a new section or creates a new section in the first

5   lien credit agreement, 10.6(j)(iv).  It's at page 7 of the

6   Third Amendment and it says: "Each lender that is a

7   restricted sponsor affiliate" -- and that's -- that's

8   Yucaipa.  That's the definition of Yucaipa in the Third

9   Amendment.

10         "Each lender that is a restricted sponsor

11  affiliate, upon succeeding to an interest in the term loans"

12  -- and then -- "(iv) knowingly and irrevocably waives any

13  and all rights to exercise any voting rights it would have

14  otherwise -- it would otherwise have as a lender for all

15  purposes under this agreement and the other credit

16  documents."

17         It just can't get any broader than that.  They

18  completely have given up any voting rights in return for the

19  quid pro quo, as Judge Ramos cites, for obtaining -- or the

20  ability to buy some term loan debt.

21         Now this provision couldn't be any more clearer.

22  Yucaipa just forfeited any right it had to vote.  But this

23  Third Amendment also provides -- and it's very relevant for

24  the proceedings before Your Honor -- at Section 2.7(a) at

25  page 5 of the Third Amendment, which is Exhibit 2:

1    "Restricted sponsor affiliates" -- again, that's Yucaipa.

2    "Restricted sponsor affiliates shall have no voting rights

3    for all purposes under this agreement (whether before,

4    during or after and in any insolvency or liquidation

5    procedure) and the other credit documents with respect to

6    their term loans specific to an insolvency."

7              The same line, Your Honor, continues -- or the

8    same theme continues at Section 2.7(b).  I just read 2.7(a).

9    Section 2.7(b) of the Third Amendment at page 5 says:

10             "Yucaipa, the restricted sponsor affiliate, that

11   becomes a lender hereunder shall not, in their capacity as

12   lenders, hereunder and hereby irrevocably and voluntarily

13   waive in their capacity as lenders hereunder any right to

14   make any election, give any consents, commence any action,

15   or file any motion, claim, obligation, notice or application

16   or take any such action in any insolvency or liquidation

17   proceeding without the prior written consent of all lenders,

18   other than restricted sponsor affiliates."

19             Further, in paragraph 7(a), again, at page 5:

20             "Yucaipa, the restricted sponsor affiliates, that

21   become lenders hereunder shall have no right under the

22   agreements  -- under -- under this agreement or any other

23   credit documents and hereby waive any such right to consent

24   to take any action with respect to any amendment,

25   modification, termination or waiver of any provision of this

Page 50

1    agreement or any other credit document or consent to any

2    departure by any credit party therefrom."

3            They gave up all voting rights.  They specifically

4    gave up all actions with respect to this Court with respect

5    to an insolvency.

6            Now Yucaipa says that the complete lack of voting

7    rights doesn't matter; that they could still count their

8    term loan exposure and partner up with someone else.  Well,

9    they can't count the term loan exposure under 2.1(e).  The

10   Third Amendment specifically says that.  But there are

11   several problems with their argument that -- that they can

12   simply count their exposure even if they can't vote.

13           First, Yucaipa couldn't perform any of the

14   functions that were necessary for a requisite lender if it

15   couldn't vote. If it can't fulfill these functions

16   effectively it can't become the requisite lender.  In fact,

17   the New York Court -- the New York Court found this argument

18   that the determination of requisite lender had nothing to do

19   with term -- with voting rights to be "not logical."  And

20   that's Exhibit 16 to our moving affidavit, the transcript at

21   page 23.  And that the requisite lender's powers to make

22   "amendments, modifications and waivers can be exercised only

23   by voting."

24           So the argument that even though I can't vote I

25   can still become the requisite lender that Yucaipa makes

1   would make this language where they gave up all voting

2   rights, in particular with respect to insolvency

3   proceedings, superfluous.  And as this Court is well aware

4   you can't construe an agreement to render superfluous any of

5   language in the agreement.

6          However, most relevant, Your Honor, are these

7   Sections 2.7(a) and 2.7(b) that I -- that I read to you that

8   specifically provide that Yucaipa has no voting rights

9   "before, during or after any insolvency proceeding."  You

10  know, the obvious intent of all these voting proceedings or

11  all of these voting prohibitions was to prevent Yucaipa from

12  exerting any influence with the very limited amount of term

13  loan debt it was permitted to acquire under the Third

14  Amendment.

15         Plus, Your Honor, whether because of the exclusion

16  of term loan exposure by the definition in 2.1(e) for -- for

17  any purpose, or whether by the voting prohibition that's

18  contained at 2.7(e), Yucaipa simply can't become the

19  requisite lender.  It -- its debt doesn't count for purposes

20  of calculating the requisite lender.  It wasn't allowed

21  under 2.1(c) to buy any LC debt.  So it can never get to the

22  50 percent of the aggregate of term loan debt, LC debt and

23  revolving debt.  And even if it did, it has given up all

24  rights to vote and all rights to participate in proceedings

25  like this.  Therefore, it can't be the requisite lender.

 1            THE COURT:  And what about --

 2            MR. WARD:  But, Your Honor, --

 3            THE COURT:  -- what about the argument on the flip

 4   side that you can't be the requisite lender even if they are

 5   not counted because of the infirmity in the transfer of --

 6            MR. WARD:  Well, Your Honor, I can --

 7            THE COURT:  -- I can't remember the name of the

 8   company, but it's about one-and-a-half-million-dollars.

 9            MR. WARD:  AMMC, Your Honor.  You know, and let me

10   get to there right now.

11            The fact is, Your Honor, Yucaipa concedes that we

12   have $51,938,610 in first lien debt, but -- but they do

13   argue that we are lacking the $4,548,000 in first lien debt

14   from AMMC.  So two things, Your Honor, and we've said this

15   in our reply papers and we've attached the documents.

16            Once Justice Ramos declared that Yucaipa was not

17   the requisite lender, the petitioning creditors and AMMC and

18   certain other first lien lenders constituting the requisite

19   lenders appointed Black Diamond Commercial Finance and

20   Spectrum Commercial Finance as the co-administrator -- co-

21   administrator agents, and Black Diamond Finance -- Black

22   Diamond Commercial Finance as the collateral agent.  And

23   they registered the trades.

24            But even if Your Honor finds that that's a little

25   too circular, the fact is the petitioning creditors,

1   together with AMMC, would still be the requisite lender

2   because if you add our $51 million in debt to their $4.5

3   million in debt, we do get over the 50 percent hurdle, once

4   Yucaipa's, you know, debt is discounted.

5           And, Your Honor, as we point out -- and this is

6   Exhibit 9 to my reply affidavit.  In the AMMC trade

7   confirmation, AMMC agreed to give petitioning creditors full

8   control of the first lien debt it was selling, including the

9   power to vote and/or to exercise rights or remedies under

10  the first lien credit agreement.  So as a result -- as a

11  result, Black Diamond and Spectrum controlled the AMMC debt.

12  And if you -- if you take the 51 million we have plus the

13  four-and-a-half-million they have, we do get over the 50

14  percent, Your Honor.

15          In fact, if -- if you do the math, it comes out

16  something like this:  With Yucaipa's debt, term loan

17  exposure and -- and LC exposure and all the revolving

18  exposure together, there's a total of $244 million in debt.

19  Of this, Yucaipa purports to hold 134 million of term loan

20  exposure and LC exposure.

21          As we point out, their LC exposure, they're not

22  allowed to have it under 2.1(c) of the Third Amendment.

23  That should fall out.  Their term loan exposure doesn't

24  count for purposes of the calculation of requisite lender.

25  When you take that out, it leaves $109 million worth of

1    debt.  We have together 51.9 million and the AMMC debt which

2    is 4.5 million, and that amounts to more than 50 percent.

3          So we believe, Your Honor, that by virtue of

4    Exhibit 9, which is attached to my reply affidavit, that we

5    do meet the standards.  We do have enough debt.

6          Your Honor, just one other -- a few other very

7    brief points, I believe.

8          Even if the Third Amendment is determined to be

9    ineffective and falls out of the picture entirely, still

10   under the first lien credit agreement Yucaipa can't become

11   the requisite lender.  And that's because the definition of

12   eligible assignee in the first lien credit agreement

13   specifically excludes the sponsor.  The sponsor was Yucaipa.

14   They can't be the assignee of any of the debt.  So Yucaipa

15   couldn't buy that debt.

16          And, Your Honor, let me just walk through this

17   very briefly.

18          The definition of requisite lender -- and I think

19   this is pretty obvious.  The definition of requisite lender

20   is one or more lenders having or holding term loan exposure,

21   LC exposure, and a revolving exposure and representing more

22   than 50 percent of the sum of the aggregate of the term loan

23   exposure, the LC exposure, and the revolving exposure of all

24   the lenders.  But it starts out, the requisite lender is one

25   or more lenders.  The fact is Yucaipa can't become a lender

1    and here's why:

2              Lender is defined at page 30 of Exhibit 8, which

3    is the first lien credit agreement, to be either "An

4    original signatory to the first lien credit agreement" --

5    and it wasn't.  It was specifically excluded as -- as a

6    sponsor.  But it's either "An original signatory to the

7    first lien credit agreement or a person that becomes a party

8    hereto" -- that's to the first lien credit agreement --

9    "pursuant to the assignment agreement."

10             Now the assignment agreement is defined at page 5

11   of Exhibit 8 as "the agreement in the form of Exhibit E to

12   the first lien credit agreement," which at Section 1.2 of

13   this -- of the attachment, Exhibit E, it requires that the

14   assignee, which would be Yucaipa, represents that "it meets

15   all requirements of an eligible assignee under the credit

16   agreement."

17             Well, Yucaipa can never meet any -- can never meet

18   all the requirements of an eligible assignee under the

19   credit agreement because specifically under the first lien

20   credit agreement it's excluded from being an eligible

21   assignee.

22             So considering that in order to be a lender -- in

23   order to be the requisite lender you have to be a lender.

24   In order to be a lender, you have to take your interest

25   pursuant to the assignment agreement.  The assignment

1    agreement requires a specific representation that you'll

2    meet all the requirements of the eligible assignee.  They

3    can't because, specifically, under the definition of

4    eligible assignee in Exhibit 8 of the first lien credit

5    agreement, page 17, they're excluded from being an eligible

6    assignee.

7              And the same is -- would be true even -- even

8    under the Third Amendment, Your Honor, because under Section

9    2.1(c) they are not an eligible assignee for any LC or

10   revolving debt.  The same would be true with respect to term

11   loan exposure because none of that exposure counts.  They

12   have no voting rights.

13             I think, Your Honor, the only other point I think

14   I need to touch on or would like to touch on is the

15   procedural basis for this motion, and I can do that fairly

16   quickly.

17             Your Honor, at the hearing before this Court on

18   June 19th, the Court said, "I will make the determination as

19   to who is the requisite lender" -- I'm sorry -- "I will make

20   a determination as to who the requisite lender is either

21   prior to or at -- or in the context of the sale hearing.  I

22   don't see how else we can go forward.  It may or may not be

23   that I can do that as a matter of law.  I'll have to hear

24   the briefing on that."

25             The second basis, Your Honor, for our motion is

1   that in the fully negotiated amended scheduling order, which

2   is Exhibit 2 to my reply affidavit, the parties -- which was

3   so ordered by this Court, the parties, including Yucaipa,

4   acknowledged that this Court may address the issues of "the

5   enforceability and/or the impact of the Third Amendment on

6   any first lien debt purportedly held by Yucaipa and who, if

7   anyone, is the requisite lender."

8           Also, Your Honor, in the Allied adversary

9   proceeding, and I attach it as Exhibit 4 to my reply

10  affidavit, Allied seeks a determination -- a declaration as

11  to which lenders constitute the requisite lender.  They've

12  now made that determination, as I've pointed out, in their

13  June -- in their June 19th papers.

14          However, Your Honor, the Allied proceeding is

15  still under -- is alive and well, and in that proceeding it

16  -- it is a relevant issue, of course, as to who is the

17  requisite lender because that's specifically what Allied is

18  asking for, a declaration as to who is the requisite lender.

19          In addition, and finally, Your Honor, the

20  requisite lender issue is integral and important to the

21  committee adversary proceeding because we argue -- we and

22  the committee argue, but we specifically also argue that

23  Yucaipa manipulated the debtors as an insider and in its

24  capacity as an alleged requisite lender and improperly acted

25  as a requisite lender.  That's Exhibit 6 to my affidavit at

1   paragraph 142.

2            So a finding as to who is the requisite -- as to

3   whether or not Yucaipa is the requisite lender is material

4   to all these claims.

5            So, Your Honor, there was a basis for this motion.

6   The rules are not as strict as -- as Yucaipa would say.

7            And with respect to, I think, just one other point

8   and that is, Your Honor, the statute of limitations.  We are

9   not looking historically as to what happened three years

10  ago.  The issue is who is the requisite lender is something

11  that needs to be currently determined.  Your Honor made that

12  determination, I believe, yourself in the -- in the first

13  language that I cited from your June 19th hearing.

14           It's -- it's not a static situation.  It changes

15  over time.  What we are seeking right now is who is the

16  requisite lender currently and the requisite lender

17  currently is the lender that owns more than 50 percent of

18  the first lien debt which is entitled to be considered in

19  determining the identity of the requisite lender at any

20  given time.

21           And as we point out, pursuant to the Third

22  Amendment, and even without the Third Amendment, pursuant to

23  the first lien credit agreement, Yucaipa can't hold this

24  debt or certainly can't vote this debt and it doesn't count

25  for purposes of -- of who is the requisite lender.

1          And so, Your Honor, very simply, I would finish by

2    saying that it's clear that either under Justice Ramos's

3    decision by the doctrine of collateral estoppel or this

4    Court's rulings on the -- I think the clear and unambiguous

5    language -- I'm sorry -- by this Court's rulings in

6    connection with the effectiveness of the Third Amendment

7    against Yucaipa, or under the clear and unambiguous language

8    of either the Third Amendment, or if that's not effective,

9    the first lien credit agreement that Yucaipa is not the

10   requisite lender and that the petitioning creditors, Your

11   Honor, are the requisite lender.

12          Thank you very much.

13          THE COURT:  You're welcome.

14          Anyone else before I turn to Yucaipa?

15          All right.  Let's take a short recess and then

16   I'll hear from Yucaipa.

17          MR. WARD:  Thank you very much, Your Honor.

18       (Recess taken at 11:06 a.m.; resumed at 11:24 a.m.)

19          THE CLERK:  All rise.

20          THE COURT:  Please be seated.

21          I'll hear from Yucaipa.

22          MR. SAUER:  Good morning, Your Honor.  Russell

23   Sauer of Latham & Watkins for the Yucaipa funds in this

24   matter.

25          And I've been in your courtroom before, Your

1    Honor.  This is the first time I've actually had the

2    opportunity to address you, so I do appreciate that option.

3              THE COURT:  All right.  Welcome.

4              MR. SAUER:  For the first 45, 50 minutes of Mr.

5    Ward's presentation I thought Yucaipa had filed the motion

6    for summary judgment.  But, of course, it has not.  The

7    petitioning creditors' motion for summary judgment in this

8    case that they be deemed requisite lender should be denied.

9    The petitioning creditors have the burden of demonstrating

10   that there are no disputed issues of fact and that they are

11   entitled to judgment as a matter of law.

12             And to prevail, to carry that burden, the

13   petitioning creditors must show two things:  One, that

14   they're entitled to include in the numerator of the

15   requisite lender calculation the $4.56 million of American

16   Money debt, and that all of the Yucaipa first lien debt, all

17   of it must be excluded from the denominator.

18             Here, the petitioning creditors have not and

19   cannot carry that burden.

20             As I proceed through some of my discussion this

21   morning, Your Honor, some of the discussion will be fairly

22   technical and it will be based on the terms of the first

23   lien credit agreement.  But petitioning creditors have made

24   the point of saying the first lien credit agreement is

25   clear.  It should be interpreted according to its terms.

1    It's unambiguous.

2           So as I go through my technical arguments, it is

3    important to understand the petitioning creditors can't have

4    it both ways.  They can't argue that the credit agreement is

5    clear and should be interpreted according to its terms when

6    it suits them, but then -- and we heard Mr. use -- Mr. Ward

7    use the words "the intent of the parties" several times

8    during his arguments.  What they can't do is then turn

9    around and say, but the Court can interpret the first lien

10   credit agreement according to the intent of the parties when

11   it's less conducive for the petitioning creditors or more

12   practical for them to reach a different result.  It doesn't

13   work that way.

14          Finally, there are some very significant

15   procedural issues, some of which Mr. Ward touched upon, some

16   of which he didn't, which we believe provide significant

17   problems for the hearing and granting of this motion.  I'll

18   defer those to the end.

19          The first and most important issue I think that we

20   should address is whether the petitioning creditors are a

21   requisite lender even assuming that no Yucaipa held debt is

22   counted in the denominator.  The American Money debt cannot

23   be counted.  It cannot be counted in the numerator, at least

24   not at this date, not for summary judgment purposes.

25          Requisite lender status is based on debt holdings.

Page 62

1    We heard lots of discussion about voting rights and all

2    kinds of other attributes of the debt, and I will come back

3    to that.  But the first lien credit agreement describes

4    requisite lender as one or more lenders having or holding

5    term loan exposure, letter of credit exposure and/or

6    revolving exposure and representing more than 50 percent of

7    the sum of those three components.

8            So the question is do the petitioning creditors --

9    because that's who is the movant in this case, the

10   petitioning creditors, Black Diamond and Spectrum -- do they

11   have or hold more than 50 percent of the outstanding first

12   lien debt.  If we exclude all of the Yucaipa held debt, all

13   of it, the denominator in the requisite lender formula is

14   $109,211,840, so 1.92 million.  Thus, the petitioning

15   creditors need to hold 54.6 million of first lien debt to be

16   requisite lenders, but they do not.  What they do hold is

17   $51.9 million of Yucaipa first lien debt, which is less than

18   the 50 percent required.

19           Let's talk about the AMMC, the American Money,

20   $4.56 million and why it cannot be counted.  It cannot be

21   counted because under the terms of the first lien credit

22   agreement the petitioning creditors do not hold that debt.

23   Under the first lien credit agreement, Section 10.6(d) at

24   page 164, before an assignment of first lien debt is

25   effective, the following steps are required:

1          First, there needs to be an execution and delivery

2     of an assignment agreement to the administrative agent;

3          Then the administrative agent must record the

4     assignment in the register.

5          Indeed, recordation in the register or lack

6     thereof is "conclusive" on each lender.  And that's Section

7     2.7 of the first lien credit agreement.

8          So who can record the assignment into the

9     register?  Well, only the administrative agent can enter the

10    transfer in the register.  That's also in the first lien

11    credit agreement at Section 2.7(b).  And assignments only

12    become effective on the effective date and the assignment

13    effective date is the date on which the transfer is recorded

14    in the register.

15         So since this is a summary judgment motion, let's

16    talk about the facts that are actually undisputed, not

17    desired, but those that are undisputed.

18         It is undisputed that CIT was the original

19    administrative agent under the first lien credit agreement.

20    It is also undisputed that CIT resigned as administrative

21    agent effective May 19th, 2012.  That is before the

22    purported assignment of the American Money debt to the

23    petitioning creditors.  Only either the administrative agent

24    or requisite lenders may appoint a replacement

25    administrative agent.  Petitioning creditors don't dispute

1    that.

2            The petitioning creditors also don't dispute --

3    it's in Mr. Walker's declaration and there's been no --

4    nothing to dispute it -- that no replacement agent was

5    appointed by CIT when it resigned and no replacement agent

6    was appointed in May of 2012 by the requisite lenders.  And,

7    in fact, the petitioning creditors, in Exhibit 9, in a

8    letter from their counsel specifically warn CIT not to

9    appoint a replacement agent, particularly one suggested by

10   Yucaipa because of this dispute over the requisite lender

11   status.

12           So absent a successor administrative agent, only

13   the requisite lender can then serve as the administrative

14   agent, as a de facto agent.

15           But the issue of requisite lender hasn't been

16   determined.  That's what this motion is about.  That's what

17   the August 22nd hearing is about.  And without a requisite

18   lender and no administrative agent to record the assignment,

19   then the petitioning creditors cannot hold and do not hold

20   this additional debt.

21           So what do the petitioning creditors do?  They

22   recognize this is a fatal problem.  So with their motion,

23   first, the petitioning creditors produced redacted documents

24   purporting to support the amount of Allied first lien debt

25   that they hold.  But not even Mr. Ward stood before this

1    Court and -- and disagreed with the fact that Yucaipa

2    requested all of those documents in the court of discovery.

3              And what did the petitioning creditors do?  They

4    refused to produce them.  That's in my affidavit, Exhibit 78

5    and 79 are the petitioning creditors' responses to the

6    document product requests.  The -- not Request 37, not

7    Request 142.  Request number 1 was all documents

8    demonstrating and/or supporting their claim to the amount of

9    Allied first lien debt that you hold, and each of the

10   petitioning creditors responded and refused to produce any

11   of that material claiming it was not relevant and no likely

12   to lead to the discovery of admissible evidence.  So we

13   didn't get it.

14             When is the first time we see this?  We see this

15   with their motion.  But, of course, as the Court knows,

16   parties are not allowed to rely on evidence in support of a

17   motion for summary judgment which they specifically refuse

18   to produce during the course of discovery.  That is black

19   letter law.

20             Then to compound the problem, the petitioning

21   creditors produce even more evidence with their reply

22   because what we got with their motion was a bunch of

23   redacted stuff.  It doesn't say who they get the debt from,

24   when they got the debt from, where they got it from.

25             So with their reply, they produced the LSTA trade

1    confirmations to support the purchase of the AMMC debt, a

2    purported appointment agreement and some joinders.  But,

3    again, they refused to produce that in discovery.

4              Two, none of this evidence, none of it that was

5    produced with the reply is properly authenticated and, thus,

6    it cannot be considered as a matter of law in support of

7    their motion for summary judgment because it has no

8    evidentiary value.  It is well established in this circuit

9    and every circuit around the country that only admissible

10   evidence may be relied on to support a summary judgment

11   motion.

12             And for the record, Your Honor, I would point the

13   Court to Rule 901 of the Federal Rules of Evidence, the

14   Philbin versus TransUnion Corp case, 101 F.3d 957 (3rd

15   Circuit).  I would point to a United States Supreme Court

16   case in Atticus versus S&H Crest Company, at 398 U.S. 144.

17   And I could go on.  But the Court is familiar with that

18   principle.  None of these new documents that were refused in

19   discovery were produced.  None of these new documents

20   produced in connection with the reply have been properly

21   authenticated and, therefore, they are not properly before

22   the Court and cannot be considered.

23             And more -- just as important is this new evidence

24   should also be rejected because, again, it's black letter

25   law in the Third Circuit and everywhere else in the country

1    that you can't submit new evidence at the reply stage.

2         And for that proposition, I would point the Court

3    to several Third Circuit cases.  One is Guffy (ph) versus AW

4    Chesterton Co., 2012 U.S. District Lexus 150860.  It's the

5    Eastern District of Pennsylvania case in 2012.  I would

6    point the Court to the decision of Judge Stark here in

7    Delaware in Lab -- Laboratory Skin Care, Inc. v Limited

8    Brands, 757 S. Supp. 2d 431, a 2010 case where Judge Stark

9    specifically struck the new evidence that was submitted by

10   the moving party in support of a summary judgment and,

11   therefore, denied summary judgment.

12        But even if the Court is prepared to consider this

13   new evidence, which it shouldn't, it doesn't help the

14   petitioning creditors because it still doesn't justify

15   including that American Money debt in the calculation of the

16   petitioning creditors' holdings.

17        See, petitioning creditors -- and we're going to

18   get to this in a bit -- they recognize the importance of the

19   definitional term "holdings" as opposed to controlling or

20   having support from.  They recognize the importance of that.

21   So what do they do?  They knew they needed to get this

22   American Money debt "recorded in the register."  So to

23   correct the flaw, the petitioning creditors and purportedly

24   American Money entered into an appointment agreement to

25   purportedly appoint affiliates of the two petitioning

1   creditors to serve as a successor administrative agent, and

2   then they purported to record the American Money debt in the

3   register.

4           But they put the cart before the horse because the

5   appointment of themselves as administrative agents could

6   only be effective if, in fact, they are requisite lenders.

7   But at the time they did it they were not.  It cannot be

8   disputed that they were not requisite lenders.  Per Mr.

9   Ward's own affidavit with this new evidence, in Exhibit 10,

10  the appointment agreement was purportedly entered into on

11  December 3, 2012.  But they were not requisite lenders at

12  that time unless both of the following are true:

13          First, the Fourth Amendment was invalidated at

14  that time; and none of the Yucaipa debt holdings were

15  included in the denominator.  Again, I'm going to get to the

16  denominator in a bit because I don't think we even need to

17  get there.

18          But, you see, on December --

19          THE COURT:  Why does the Fourth Amendment have to

20  be invalid at that time?

21          MR. SAUER:  Because if the Fourth Amendment is not

22  invalidated, if the Fourth Amendment remained in effect,

23  then Yucaipa was the requisite lender.  And so the

24  petitioning creditors and American Money couldn't have been

25  requisite lenders.

1          THE COURT:  The Fourth Amendment was never -- the

2     Fourth Amendment was never applicable, was never valid.

3          MR. SAUER:  Your Honor, the Fourth -- the Fourth

4     Amendment was valid until it was deemed invalid.

5          THE COURT:  But how can that be because the whole

6     point that Justice Ramos makes in finding it invalid is that

7     it was a violation of the Third -- Third Amendment as well

8     as the other -- the other issues that arise from the initial

9     -- there's a difference between when the judge says

10    something and when it actually happens.

11         And, for example, with your point about they are

12    not the requisite lender until, I guess, I say they are,

13    that's not the same -- that's not really necessarily true.

14    If I say there's a requisite lender, that really means they

15    always were.  And if I say the Fourth Amendment is invalid,

16    it really means it never was valid.

17         So I -- I don't -- I don't understand your point

18    that -- about why it basically existed or was valid until it

19    was invalid.

20         MR. SAUER:  Well, Your Honor, I guess I would

21    respectfully disagree.  If you have a contractual provision

22    that is enforced, it's enforced until the Court says it can

23    no longer be enforced.  I understand the Court's point.  I

24    think I just respectfully disagree.

25         THE COURT:  Okay.

1            MR. SAUER:  And just to sort of continue this --

2     this line, but it -- not -- not that it necessarily matters

3     because at the end of the day we can't include the American

4     Money debt --

5            THE COURT:  Right.

6            MR. SAUER:  -- in this calculation because new

7     evidence, not permitted, evidence refused to produce in

8     discovery, not permitted.

9            In any event, to finish the line out, Justice

10    Ramos's decision was not entered and final until March of

11    2013, March 29th of 2013, four months after this purported

12    appointment agreement and his oral inclinations indicated on

13    November of 2012, a matter of New York law, which is the law

14    that matters when you are determining the preclusive effect,

15    only a final decision has any collateral estoppel or

16    preclusive effect.  And we've cited those cases to the Court

17    before.

18            The -- for example, Eggbert (ph) Square Realty

19    versus 112 114 Corp at 93 A.D. 3d at 687, a New York

20    Appellate Division case in 2012 reversing the grant of a

21    motion to dismiss counterclaims because the issue preclusion

22    had been based on a decision on which no formal enter had

23    yet been entered.  And several other cases, Church versus

24    New York State Freeway Authority, 16 Atlantic A.D. 3d at

25    808, another 2005 New York Appellate Division case, and a

1    series of others.

2            And, again, since Justice Ramos didn't issue his

3    decision until March 29th, nearly four months after, that

4    appointment agreement was invalid.

5            But, again, I still come back to the fundamental

6    proposition.  We are here arguing the motion for summary

7    judgment wholly founded on documents that the petitioning

8    creditors refused to produce in the course of discovery, and

9    then compounded the problem by producing yet more

10   unauthenticated inadmissible evidence in support of their

11   reply.

12           Now petitioning creditors come here also and say,

13   well, why don't you consider petitioning creditors and

14   American Money to be the movants here.  You can't do that.

15   American Money is not a movant.  This is the petitioning

16   creditors' motion.  American Money isn't even before the

17   Court.  While they were named in the Allied adversary, they

18   haven't even filed an appearance yet.  They're not a proper

19   party to this motion and I don't believe petitioning

20   creditors are permitted, substantively or procedurally, to

21   now add them in an effort to get over some problem that the

22   petitioning creditors created for themselves.

23           So at the end of the day --

24           THE COURT:  Well, they don't necessarily have to

25   be a movant to be considered a requisite lender.  The movant

1    can argue that -- purportedly it could argue that creditor

2    -- Movant A could argue that creditors A, B and C together

3    constitute the requisite lenders.  It doesn't need to be

4    necessarily that Creditor A, B and C move that -- to -- to

5    appoint -- or that A, B and C were requisite lenders.

6              However, I take your point that we don't know

7    about B or C unless --

8              MR. SAUER:  But more -- fair enough.

9              THE COURT:  -- unless you look at the -- what you

10   call the new evidence.

11             MR. SAUER:  Well, and more importantly, the motion

12   isn't that petitioning creditors, along with American Money,

13   are requisite lender.  It's very specifically styled that

14   they are.

15             THE COURT:  Uh-huh.

16             MR. SAUER:  But, again, however one looks at it,

17   it's all based on denied evidence --

18             THE COURT:  Uh-huh.

19             MR. SAUER:  -- and newly produced evidence which

20   is simply improper.

21             Next -- in any event, let's get to the

22   denominator.  You don't exclude all of the Yucaipa held debt

23   from the denominator.  So even if one were to include the

24   4.56 million in American Money debt in the denominator, even

25   if you include it, the petitioning creditors and with the

1   American Money debt are not requisite lender.  Again,

2   petitioning creditors argue that the first lien credit

3   agreement is unambiguous and that unambiguous contractual

4   provisions should be determined as a matter of law by the

5   Court.

6          Again, the first lien credit is crystal clear.

7   Requisite lenders are based on a determination of holdings,

8   not voting rights, not other attributes of the debt.  I will

9   come to that.  I -- it sounds a little counter-intuitive,

10  but not under the terms of these -- of these credit

11  agreements.  It would have been very easy, very easy for

12  these lenders, whether at the outset, in conjunction with

13  the Third Amendment or any other time to make it very clear

14  that requisite lender determinations are based on something

15  other than holdings, or to have specifically said anything

16  they could have said to make it clear, not a practical

17  result, but to make it clear that a restricted sponsor

18  affiliate could not be requisite lender.  They did no such

19  thing.

20          So what does Yucaipa currently hold?  Well, let's

21  -- let's put aside the settlement which, obviously, hasn't

22  been approved yet.  So today Yucaipa currently holds $114

23  million in term loans and $20 million in letter of credit

24  exposure.  For my argument, I'm only going to focus on

25  letter of credit exposure because the balance of the term

1    loans also follows suit.  But let's -- let's focus on the

2    $20 million of letter of credit exposure.

3            Adding $20 million that denominator increases it

4    to $129 million and, thus, not even the 56.4 million that

5    petitioning creditors claim to hold is more than 50 percent.

6    Yes, the petitioning creditors argue that the Third

7    Amendment precluded Yucaipa from acquiring the letter of

8    credit exposure; that it acquired it under the invalid

9    Fourth Amendment.  But, first, I would point out there's a

10   disputed issue of fact even on the application of the Third

11   Amendment in this regard.  And petitioning creditors do not

12   dispute any of these undisputed facts.  Why?  Because they

13   are based on their client's own documents.

14           Exhibits 11, 25, 36 and 37 to my declaration,

15   these are e-mails and handwritten notes of the petition

16   creditors.  And not even the petitioning creditors believe

17   that the time that the third amendment was an impediment to

18   Yucaipa, who was not a party to the agreement.

19           I know we've heard over and over again, the mantra

20   is that Yucaipa negotiated the third amendment, they're

21   bound by the terms of what they negotiated.  But that simply

22   isn't the truth, and it's never been the truth.  Mr.

23   Walker's declaration at paragraph 9 submitted in conjunction

24   with this opposition, which petitioning creditors haven't

25   disputed, makes clear that yes, Yucaipa did participate

1    early on in those discussions over a third amendment.  But

2    there came a time when the demands of the lenders became so

3    onerous that they just walked away, and moved on to a third

4    amendment to the second lien agreement.

5             And I only raise that because we've heard

6    repeatedly about Yucaipa is bound by the terms they

7    negotiated.  At the end of the day, these were lender

8    imposed terms that Yucaipa never agreed to.

9             Putting that aside --

10            THE COURT:  Are you talking about the first lien

11   debt?

12            MR. SAUER:  Yes, Your Honor.

13            THE COURT:  That came out of the bankruptcy?  That

14   came out of the bankruptcy?

15            MR. SAUER:  No, no.  Yucaipa -- we're talking

16   about the first lien debt that Yucaipa currently holds.  The

17   -- we're talking about the third amendment to the first lien

18   credit agreement.

19            THE COURT:  Right.

20            MR. SAUER:  And what we heard Mr. Ward say, we've

21   heard repeatedly said in this court that it was Yucaipa who

22   negotiated the terms of that third amendment.  All I'm

23   telling you is, that for the purpose of summary judgment,

24   there's a very significant factual dispute as to that.

25            So if someone is inclined to say, well, I might

Page 76

1    not otherwise hold a non-party to that amendment to its

2    specific terms, I will hold Yucaipa to those terms, because

3    Yucaipa was a moving force, and negotiated the terms, and

4    I'm telling you they didn't.  And at a minimum, there's a

5    disputed issue of fact as set forth in Mr. Walker's

6    declaration at paragraph 9.  That's exactly what happened.

7              They started the negotiations, the lenders began

8    to impose more and more onerous restrictive terms, in terms

9    of the amount of debt they could buy, the -- whether it had

10   to be contributed, or could be contributed as opposed to

11   mandatory -- the restrictions on the voting rights.  At some

12   point early on in those negotiations, Yucaipa said, you

13   know, finish -- you guys can do what you want --

14             THE COURT:  And then starting negotiating with

15   ComBest.

16             MR. SAUER:  No, no, no.  That -- Your Honor, that

17   doesn't come for a year later.  That's a year and a half

18   later.

19             THE COURT:  When does the third amendment get --

20             MR. SAUER:  Let me walk through the timeline.

21   Allied exits from bankruptcy in May, early June of 2007.

22   The third amendment comes into play in mid-April of 2008.

23   In February of 2009, ComBest acquires the 54.7 percent of

24   the Allied debt.  On August 21 of 2009, a full year and a

25   half after the third amendment, Yucaipa acquires the

1    position from ComBest.  And that's when the fourth amendment

2    is passed in August of '09.

3              THE COURT:  So the third amendment was passed?

4              MR. SAUER:  April of '08.  A year and a half

5    before Yucaipa acquired the debt.

6              THE COURT:  Okay.  Yucaipa stopped talking in

7    connection with that amendment or --

8              MR. SAUER:  The negotiations, as Mr. Walker

9    indicates in his declaration, lenders approached Yucaipa

10   about the possibility of their acquiring some of their debt.

11   Negotiations over the third amendment commenced really in

12   late March of 2008, and Yucaipa walked away from those

13   negotiations effectively in the end of the first week of

14   April or so.

15             THE COURT:  Uh-huh.

16             MR. SAUER:  And then the terms of the third

17   amendment to the first lien credit agreement were then

18   pursued by the lenders and Allied, and on terms that were

19   restrictive for Yucaipa's appetite, so they no longer

20   participated in the discussions.

21             But what Yucaipa did do, was continue to negotiate

22   for a third lien -- third amendment to the second lien

23   credit agreement, which then allowed them to buy second lien

24   debt without restriction.

25             THE COURT:  All right.

1          MR. SAUER:  Which they did, and then contributed

2    most of what their -- or half of what they acquired back to

3    the capital of the company.

4          THE COURT:  Okay.

5          MR. SAUER:  So back to the denominator.  Why do we

6    include at a minimum a letter of credit exposure.  Let me --

7    I'm sorry, let me go back to the third amendment and the

8    petitioning creditors.

9          Their own views at the time, and as we know in

10   interpreting contracts, it's often times the views expressed

11   by the parties at the time, which are the best evidence of

12   their understanding and intent, not what they say later on.

13         Well, we know in December of 2008 that Spectrum

14   Principles wrote to each other in December of '08.  We have

15   gone three or four ideas on how to block or stop the trade

16   to Yucaipa, when the third amendment was in effect, had a

17   block or stop the trade from being 51 percent.  None seemed

18   viable when we talked them through.

19         We also know that Spectrum, one of the petitioning

20   creditors was among a group of creditors who in December of

21   2008 had negotiated to sell their debt to Yucaipa.  It's

22   Spectrum.  One of the petitioning creditors was part of the

23   group.  We've submitted the evidence, it's undisputed.

24         Then in February of 2009, after Black Diamond had

25   determined that they had been excluded from those lenders,

```
 1    then negotiating with ComBest to sell their debt, who did

 2    Black Diamond turn to?  They turned to Yucaipa, and asked to

 3    partner with Yucaipa to buy the debt in a joint bid.

 4             So my only point here --

 5             THE COURT:  And what is it that you would deem

 6    ambiguous in the documents that would make all of that

 7    relevant?

 8             MR. SAUER:  Well, I think it goes to the intent of

 9    the parties --

10             THE COURT:  All right.

11             MR. SAUER:  -- which is ultimately the touchdown.

12    Because we're --

13             THE COURT:  But the intent of the parties is, in

14    the first instance, if possible, gleam from the four corners

15    of the document.

16             MR. SAUER:  That is always the first step, Your

17    Honor.

18             THE COURT:  Right.

19             MR. SAUER:  But here, when the clear understanding

20    of the parties, particularly the parties moving expressed at

21    the time a very different view, I'm not so sure that

22    language which purports to be clear on its face is this

23    clear.  But let's get past that, because I don't want to get

24    bogged down in more of the minutia, because at the end of

25    the day, let's stick with the very expressed terms of the
```

1      third amendment.

2              Let's talk about just the 20 million in letter of

3      credit exposure.  And now we get into the applicability of

4      New York law on this issue.  Well, we heard lots of

5      discussion from Mr. Ward about well, this case is

6      distinguished because it didn't involve a credit agreement.

7      Oh, and this case is distinguishable because it didn't have

8      Allied in the name, or some such thing, if these were

9      personal services contracts.

10             At the end of the day, at the end of the day, New

11     York law is crystal clear, and petitioning creditors have

12     cited not a single case to the contrary.  I will come to the

13     one case they did cite, because they misrepresented to the

14     Court exactly what that Court said.

15             Under New York law, first, the courts look to

16     determine whether or not an assignment is prohibited.  If

17     you don't get past the first prong, you never have to worry

18     about the next, because if the assignment of the contractual

19     right or obligation is not prohibited, there's nothing to

20     debate about.

21             But if, if the language of the contract is clear

22     that a particular form of assignment, type of assignment, or

23     an assignment to a particular person is prohibited, when the

24     Court looks to determine, okay, it's a prohibited

25     assignment, but does that make the assignment invalid or

1   void, and for that, the courts look for very specific

2   language in the contract, whether it says, any prohibited

3   assignment is void, or it is invalid.

4          I'm not making this up.  We've cited eight, nine,

5   ten New York cases, federal cases, state cases, bankruptcy

6   court cases, all of which cite that very same proposition.

7   The petitioning creditors purport to claim that Praven (ph)

8   is the central case.  No Praven is just one of the cases

9   that relies on the fundamental decisions of New York state

10  courts for this proposition.

11         They purport to distinguish Praven on the grounds

12  that -- or sorry, they purport to distinguish Praven on the

13  grounds that the particular contract wasn't fully

14  exclusionary.  It said, you can only assign to financial

15  institutions, and there the assignee in that case was a non-

16  financial institution.

17         So what the Court said in Praven, when one reads

18  it thoroughly, is that gee, the complaining parties to the

19  contract couldn't get over the first hurdle.  The first

20  hurdle being that the assignment was prohibited in the first

21  instance.  But the Praven court did very clearly endorse and

22  cite the New York case law I've identified, that there are

23  two prongs.

24         First, is the assignment prohibited, and if it's

25  clearly prohibited to, is it invalid or void under the

1    specific terms.

2              THE COURT:  Right.  Now, you wouldn't argue with

3    me that the assignment was prohibited?

4              MR. SAUER:  I am not sitting here arguing with you

5    today, Your Honor, that Yucaipa was an eligible assignee.

6    There's no question that under the original first lien

7    credit agreement, or even as it relates to term loan

8    exposure and -- not term loan, but the LC exposure, that

9    they were a not eligible assignee.  So they clearly can

10   overcome the first hurdle.  But they cannot overcome the

11   second hurdle, and they must overcome both.

12             They haven't cited a single case, not a single

13   case, which contravenes New York law, which is applicable to

14   the interpretation of this credit agreement by its own

15   terms.  They just haven't.  The only case they do cite, and

16   you know, we do have the 785 Partners' case which is a

17   federal bankruptcy case from the Southern District of New

18   York, which is quite frankly very close here.  Because first

19   we heard from petitioning creditors, but none of the cases

20   they cite really contain complicated credit agreements.

21   Well, 785 Partners does.

22             And there, what the bankruptcy court determined

23   was I don't have to decide whether the particular assignee

24   in that case was an ineligible assignee because I don't have

25   to worry about the first hurdle, because they couldn't clear

1    the second piece, because there's nothing in that credit

2    agreement which says the prohibited assignment is void.

3    Those are the words, or words to that effect.  It wasn't

4    there, it's not in this credit agreement, it's not in the

5    third amendment, New York law applies.

6           The only case they do cite is the Baucus (ph)

7    case, Single Asset Financial Co. versus Baucus at 294 AD2d

8    818.  But that case doesn't change New York law, it doesn't

9    reverse New York law, it actually cites the law I've been

10   citing to the Court.

11          The full quote that petitioning creditors didn't

12   put in their brief, or again read today is, where they

13   clearly stated intent to render Baucus powerless to assign,

14   their words, no need for the non-assignment clause to also

15   contain talismanic language or magic words describing the

16   effect of any attempt to make such an assignment.

17          They left out where they clearly stated intent to

18   render Baucus powerless to assign.  They left that out.

19   Why?  Because in that particular agreement, the purported

20   assignor didn't have any power to assign, it was very clear

21   from the contract.  Here, all the first lien credit

22   agreement says is, restricted sponsor affiliate isn't an

23   assignee.  The lenders shouldn't sell to a restricted

24   sponsor affiliate.  But that's no different than the other

25   8, 10 or 12 cases we've cited where the contract

1    specifically provided you can't assign without consent, you

2    can't assign to this party, you can't assign to anybody.

3            That language is no different than those other

4    cases, and in every one of those cases, the New York courts

5    have said, absent the voiding language, the assignment is

6    valid and effective, and the assignee takes the rights that

7    go with the contractual obligations assumed.

8            What it leaves them with is a breach of contract

9    claim against the assignor who violated the terms of the

10   agreement, but we're not here to decide that.

11           So at the end of the day, at a minimum --

12           THE COURT:  So explain to me perhaps again okay,

13   the -- Yucaipa is not a party to the amendment.  Yucaipa was

14   not an eligible assignee, but nonetheless was the recipient

15   of the assignment, but having done that, why is it -- if you

16   could just restate it for me, why is it that in that

17   instance, the provisions of the third amendment that would

18   limit Yucaipa from being considered in the numerator or the

19   denominator in figuring out who the requisite lender is.

20   Does that make any sense?  You can't answer a question

21   that doesn't make any sense.

22           MR. SAUER:  Well, Your Honor, let me try to

23   interpret your question.  If I interpret it wrong, I

24   apologize.

25           THE COURT:  My point is, okay fine, everything you

1    said is right, right, they weren't a party, they were not an

2    eligible assignee, they took it anyway, but that's sort of

3    the end of the day, and we don't apply all of the other

4    provisions that arguably they apply, that would make

5    Yucaipa, you know, not in the ballgame.

6             MR. SAUER:  I understand that, and fully prepared

7    to address that question, which I believed I understood the

8    first time.

9             THE COURT:  Okay.

10            MR. SAUER:  Here's the fundamental confusion

11   that's been created by petitioning creditors.  And we heard

12   it again repeatedly today when petitioning creditors tried

13   to define what the third amendment does.

14            Again, if we go back to the first lien credit

15   agreement to the term requisite lender, which has not been

16   modified, it is lenders having or holding.  Having or

17   holding, it has nothing to do with any other attributes of

18   the debt.

19            So what the petitioning creditors then say, but

20   even if they could hold it, it can't be counted towards

21   requisite lender status, because that's what the third

22   amendment says, and they cite the third amendment 2.1(e)

23   which redefines the term, term loan exposure.  And then they

24   go on to paraphrase it and say, that it says, term loan

25   exposure that has been acquired by a restricted sponsor

1   affiliate, Yucaipa, can't be counted for requisite lender

2   status.  That's what they say.

3           That is, however, not, not what that definition

4   reads.  The definition says, "With respect to any provisions

5   of this agreement relating to the voting rights of lenders,"

6   has nothing to do with holdings, nothing to do with

7   requisite lender calculation, paren, "including the right of

8   lenders to consent or take any other action with respect to

9   any amendment, modification, termination, or waiver of any

10  of this provisions, or the provisions of this agreement, or

11  the other credit documents, or consent to any departure."

12          So what it says is, that any term loans acquired

13  by Yucaipa couldn't be counted for voting purposes, to the

14  extent they purported to try to amend the credit documents,

15  that's what it says.  It doesn't say anything, anything at

16  all about how Yucaipa held restricted sponsor affiliate debt

17  to be more precise, how that debt, or whether that debt was

18  to be counted in the definition of requisite lender status,

19  and in fact, again, it's very easy if that really was what

20  they were getting at, and these were all sophisticated

21  parties.  All they had to do is say, any restricted sponsor

22  affiliate, term loan exposure acquired cannot be counted or

23  included for any purpose under the first lien credit

24  agreement or words to that effect.  They didn't.  They were

25  very specific, very specific.  That the exclusion of Yucaipa

1   held debt, term loans, particularly because that's all we're

2   talking about under that provision, are excluded from the

3   voting provisions, not from the holding provisions.

4           And if it's not excluded from the holdings, even

5   the term loans have to be included in the denominator, but I

6   wasn't even going there because the third amendment only

7   speaks to term loan exposure.  It doesn't speak to letter of

8   credit exposure, and that's where we rely in the first

9   instance on the applicable provisions of New York law, which

10  says, even if they weren't supposed to get it, if they got

11  it, they get all the attributes that normally goes with it.

12          And so they get to hold it, they would even get to

13  vote, the letter of credit exposure.  But again, we're not

14  there, we're just talking about the requisite lender

15  definition, and if that 20 million is included in the

16  denominator, even giving petitioning creditors credit for

17  the American money piece, 56 point whatever million divided

18  by 129 doesn't equal 50 percent.

19          Now, that could lead what some might argue is a

20  potentially problematic result, and that is, well, gee, then

21  maybe there's no requisite lender.  But there's no

22  requirement that there be a requisite lender under the

23  credit agreement.  There's no requirement that requisite

24  lenders, holding 50 percent or more of the debt agree on

25  entry.

1           In fact, one of the biggest problems Allied had

2     after emerging from bankruptcy was this functional lender

3     group.  They couldn't get requisite lenders to agree that

4     today was Tuesday.  They just couldn't.

5           So there is no requirement that you have a

6     requisite lender.  I mean, it's no different than if there

7     are only three lenders, two of whom held 49 percent, 1 of

8     them who held 2 percent, and neither one of them could ever

9     get to the 2 percent on their side.  That's just a function

10    or a fact of the credit agreement.

11          So how does that get resolved?  Well, it gets

12    resolved as follows.  If Yucaipa actually gets to hold the

13    debt, all of the debt, even if it can't vote the debt, that

14    doesn't necessarily mean Yucaipa is the requisite lender

15    because of its holdings, and Yucaipa doesn't need to vote or

16    to do anything, because under the terms of this credit

17    agreement, which petitioning creditors say is clear and

18    unambiguous, again, it's going to sound counter intuitive, I

19    struggled with it.  But when you go to the credit agreement,

20    provision-by-provision, this is the conclusion you get to

21    based on the unambiguous terms.

22          The lenders have to vote irrevocably authorize the

23    administrative agent to exercise certain powers delegated to

24    it, including the power to exercise remedies, such as a

25    credit bid.  If no successor agent is appointed, then the

1    requisite lender acts as the de facto administrative agent.

2            But the requisite lender doesn't need to vote to

3    do anything.  Requisite lenders if there were others, they

4    can direct the agent not to do certain things, but the

5    administrative agent, or in this case, a requisite lender

6    standing in the shoes of the administrative agent doesn't

7    need to vote, doesn't need to consent, he has already been

8    delegated the action under the terms of the credit

9    agreement.  That's -- when you read Section 9.29.7 and

10   9.8(b) together, that's exactly where you come out.

11           So Yucaipa actually could be requisite lender, and

12   could for example, credit bid or exercise remedies if it

13   chose to do so.  Not as a lender, but as the administrative

14   agent.  I didn't write the credit agreement, but that's how

15   it reads, and that's what it says.  And that's just --

16   that's the consequence of this unambiguous credit agreement

17   that we're here to argue about.

18           But again, I'm not here asking this Court to

19   determine that Yucaipa is a requisite lender.  We're

20   actually here today to talk about the petitioning creditors,

21   and they are not, for the reasons we've discussed.

22           But let's turn briefly to Justice Ramos' decision

23   because Mr. Ward spent a lot of time on it.  We do not

24   believe, and we said so in our opposition that Justice

25   Ramos' decision should be given collateral estoppel effect

1   because Yucaipa was denied discovery, the opportunity to

2   conduct any discovery in that case.  That's undisputed.

3   Nobody says we had the opportunity to conduct discovery.

4   There's been no dispute about that.

5            And we've cited a number of cases at page 32 of

6   our opposition, where the courts have specifically held that

7   collateral estoppel should not be applied under these very

8   circumstances, where the party who is the target of this

9   preclusive order was denied the opportunity to undertake

10  discovery.  And the petitioning creditors have undertaken no

11  effort whatsoever to distinguish any of the cases.  But they

12  do cite in a footnote, the Cronish (ph) case that Mr. Ward

13  referred to.

14           And I would ask the Court when you have a moment

15  or your clerks, if they haven't, read the Cronish case.  See

16  if it says what the petitioning creditors claim it says in

17  their reply.

18           What the Cronish case says, it's unpublished, but

19  what it does say, it doesn't say that a party who -- against

20  who summary judgment is granted has been deemed to have been

21  given a full opportunity to litigate, even though they were

22  denied discovery.  All it says is, if you lose on summary

23  judgment, that still constitutes an opportunity to litigate,

24  it doesn't address --

25           THE COURT:  Whether or not I give it preclusive

1    effect in connection with this summary judgment motion,

2    assuming there are no material disputed facts, et cetera,

3    that would stand in its way, I could make the very same

4    holdings that Black Diamond is arguing, have already

5    remained and can't be undone.

6              MR. SAUER:  You could, but let me tell you why you

7    wouldn't, because on certain disputed issues of fact, and

8    these are just among the kinds of things that would have

9    been discovered in the New York case, had Yucaipa been given

10   an opportunity to conduct discovery, which they were not.

11             So let me now convince you that there are disputed

12   issues of fact on this very issue.  One, we know, as a

13   matter of undisputed fact, it's in my declaration and a

14   whole series of exhibits, a majority of the first lien

15   lenders including Spectrum were prepared to sell their debt

16   to Yucaipa in December of 2008, and to sign a fourth

17   amendment removing all the restrictions of the third

18   amendment.  They were prepared to do that.

19             The only reason why they didn't do it was because

20   one of the provisions of that new fourth amendment also

21   would've reduced or relaxed their financial covenants, which

22   were hamstringing Allied, and those lenders at the last

23   minute after agreeing on price and other terms, said, gee,

24   we'd like Yucaipa to indemnify us because of the covenant

25   restrictions.  Not because of the elimination of the

1    restrictions of the third debt.  You don't have to believe

2    me and take that as a given at this point, but we've put

3    evidence in front of the Court, the kind of evidence that

4    would've been discovered in New York, but which Yucaipa

5    wasn't allowed to gather or produce.

6              There is a letter from CIT sent to all of the

7    lenders in February of 2009, after -- what had happened was

8    just chronologically in December of 2008, a bunch of lenders

9    come to Yucaipa and asked them to buy their debt.  Because

10   what had happened was, there had been negotiations to amend

11   the credit agreement after Allied went into a covenant

12   default in August of 2008.

13             When no amendment could be reached, lenders come

14   to Yucaipa and say, please get us out of this because the

15   auto industry continues to spiral down, we read every day

16   that Chrysler and GM are on the verge of filing for

17   bankruptcy, and we don't see this credit as a particularly

18   good one, take us out.  This is the ineligible assignee

19   they're talking to.

20             So they go through all this process, at the last

21   minute literally on December 26th, 2008, some of the

22   participating lenders in this group say we need an

23   indemnity.  Well, Yucaipa balks at the indemnity.  Then not

24   having heard from this group, Yucaipa launches a tender

25   offer.  At the same time that now ComBest is out there

1    trying to buy this debt unbeknownst to Yucaipa.

2            So they launch a tender offer, which includes a

3    fourth amendment.  CIT, and that's attached to my

4    declaration, sends a letter to Allied/Yucaipa and the other

5    lenders saying, we don't believe this fourth amendment that

6    you're proposing could be valid as it relates to changes to

7    the administrative agent powers and duties without our

8    consent, but as to the rest, they recognized it only needed

9    requisite lender consent.  I didn't write that.  CIT did,

10   the administrative agent, and the sole holder of the

11   revolving debt.

12           In August of 2009, after Yucaipa acquires the

13   ComBest position, CIT in their own internal memo, they

14   discuss this very same concept and recognize that while some

15   of the provisions of the fourth amendment might be invalid

16   as they affected the role of administrative agent, the

17   balance of the fourth amendment was probably effective and

18   nothing we can do about it because all they needed was

19   requisite lender consent.  These are the lenders who are

20   writing these things.

21           We know, for example, that after -- there's a

22   tremendous volume of information in the Black Diamond

23   documents in particular, where after Yucaipa acquires the

24   ComBest position, where Black Diamond and Yucaipa are

25   working together, and presumptively assumes Yucaipa's

1    requisite lender position.  After the Georgia action was

2    settled in December of 2011, Yucaipa then acting as

3    requisite lender, asks to have released a large amount -- 30

4    or so million dollars or $25 million or so of letter of

5    credit exposure, which they only could have done if they

6    were requisite lender.  That money was disbursed to all the

7    creditors holding letter of credit exposure, including the

8    petitioning creditors.  They were very happy to take that

9    money verifying Yucaipa's requisite lender status, and then,

10   and I know at one point the Court said they didn't think

11   this was particularly relevant, but it would've been

12   relevant to Justice Ramos.  When just a few doors down in

13   his own courtroom, Black Diamond was arguing the exact

14   opposite of what they were arguing in front of Justice

15   Ramos.  They were the borrower in the Commerce Bank case; as

16   the borrower, where they were prohibited under their own

17   credit agreement from buying the debt.  They bought it.

18   They had the seller amend the credit agreement to do a lot

19   of things right before they bought it.

20          I'm not going to bore with you, it's all in my

21   declaration, all in the exhibits.  Again, that kind of

22   discovery I'm not sure how it would affect this Court, but

23   most judges would not be happy to know that one party is

24   standing before it pounding the gavel and arguing about how

25   horrible that Yucaipa was behaving in this massive conflict

1    of interest, when down the hall, in the very same court, at

2    the very same time, they argued just the opposite, just the

3    opposite.

4            Anyway, that's the kind of discovery, some of the

5    kind of discovery that would've been determined in the New

6    York case.

7            There's been some discussion about whether or not

8    this Court has determined that the third amendment was valid

9    in the first instance.  We don't believe it has, because

10   while we spend a lot of time talking about what this Court

11   ruled in connection with the motion to dismiss, I would

12   point out to the Court that for the purpose of that motion,

13   Yucaipa assumed the third amendment was valid.  We were

14   arguing about the covenant not to sue, we were arguing about

15   statues of limitations.  There was no discussion about that

16   the third amendment was invalid during those hearings.  Why,

17   because that would've created all these other issues of

18   fact, that was a motion to dismiss, one.

19           Number two, an interlocutory order isn't entitled

20   to law of the case.  We've cited a plethora of cases in our

21   opposition for that point.

22           And in any event, as the Court is I'm sure aware

23   and we've cited the cases at page 34 in our opposition, even

24   if, even if this Court had ruled on the validity to the

25   third amendment, which it was never asked to do, but even if

1    it had, that was in a motion to dismiss under a much less

2    exacting standard.  And the McKenzie court and others that

3    we've cited makes it clear, that a holding on a motion to

4    dismiss does not -- I'm quoting, does not establish law of

5    the case for the purposes of summary judgment.  It's a very

6    different, more difficult standard.

7              Is the third amendment valid in the first

8    instance, we think that there's a very strong argument that

9    it's not.  Justice Ramos made his ruling based on the

10   changed definition of term loan exposure.  That very

11   definition was changed in the third amendment.  With a

12   minimum, there was a disputed issue of fact, as to the

13   validity of the third amendment, and what these very

14   petitioning creditors believed at the time.

15             They come before you now and say, yes, but you

16   only need unanimous under consent when you have affected

17   lenders under Section 10.6(b) or 5(b), I apologize for not

18   having the specific reference.  But at the time, both

19   petitioning creditors claim they were affected, and in fact,

20   Black Diamond wrote in their own notes, they believed the

21   third amendment was not effective because it didn't have 100

22   percent vote.  I didn't write that.  They did.

23             Spectrum didn't support and didn't sign on the

24   third amendment because they believed in the bankruptcy

25   process that regardless of what the third amendment said,

1  that Yucaipa would get to hold and to vote its debt,

2  Exhibits 14 and 15 to my declaration.  These are Spectrum

3  generated materials.

4        Black Diamond didn't support it because Mr. Urlich

5  (ph) who's on the phone said, "It was too dangerous."  And

6  then Black Diamond wrote, as I mentioned in December of

7  2009, that it believed the third amendment was not effective

8  because it needed 100 percent vote.  These are the words and

9  actions of the petitioning creditors.

10        So these facts alone, none of which were

11  discovered in the New York case, none of which have yet been

12  presented to this Court, these disputed facts alone would

13  suggest there's a triable issue, on the validity of the

14  third amendment.

15        At the end of the day, petitioning creditors do

16  not get to count the American money debt in the numerator,

17  and at least, if some, if not all of the Yucaipa debt should

18  be counted in the numerator.

19        Now, briefly, let me turn to a couple of

20  procedural issues.  We don't believe this motion is

21  appropriate in the first instance.  All that was discussed

22  in the amended scheduling order, and it's a practical matter

23  before this Court on June 19th, was trying this issue, if

24  there was an issue to be tried on August 22.

25        The motion for summary judgment is a possibility

1    was raised by Mr. Harris when he asked the Court, if the

2    Court might have some time at the end of the month to hear a

3    motion for summary judgment if one could be fashioned.  And

4    the Court said maybe the last week of July, I'm not

5    available on the 31st.  I've got a pretty good memory

6    without the transcript.  But no one, even in the amended

7    scheduling order ever unbundled this issue from a claim

8    before the Court.

9           Now, petitioning creditors say yes, but the

10   validity of the third amendment or the applicability or the

11   determination of records at lender status is directly

12   applicable to the Allied adversary.  But Yucaipa no longer

13   has any affirmative claims in the Allied adversary.  The

14   petitioners don't have any cross claims in the Allied

15   adversary.

16          So what they're effectively doing is seeking to

17   bind Allied to the decision of Justice Ramos, except they

18   can't do it.  Because one of the principle foundations of

19   collateral estoppel is that the party must have been before

20   the Court.  They were not.  They weren't in privity with

21   Yucaipa at the time, and privity by definition is a question

22   of fact.

23          Now, we also know that as a matter of bankruptcy

24   law, and I apologize for referencing bankruptcy law, because

25   that's not my primary forum, but my understanding of

Page 99

1    bankruptcy law is that the debtor has scheduled Yucaipa's

2    debt as uncontingent, as due and owing, and that that

3    constitutes an admission of the debtors.  Maybe the debtors

4    at some future point said, oh, we believe petitioning

5    creditors are potentially requisite lender, but we have an

6    admission currently on the records of this Court that

7    Yucaipa's debt has been fully scheduled is non-contingent.

8             Next, petitioning creditors argue that the

9    requisite lender determination is integral to their quote,

10   equitable subordination claim, or an equitable subordination

11   claim that can be filed.  But again, we don't know what's

12   going to happen with the settlement with the committee.  If

13   the committee's settlement is approved, the committee

14   complaint goes away.

15            They rely on the Cencru (ph) decision of Judge

16   Shannon, to suggest that under Rule 56, you don't need to

17   tie an issue on summary judgment to a claim.  They say Judge

18   Shannon said that in the Cencru case.  Again, I would

19   encourage the Court to read that case, that's not what Judge

20   Shannon said.

21            In Cencru, Judge Shannon properly noted that with

22   the amendments to Rule 56, a motion for summary judgment

23   didn't have to dispose of the entire case.  But that a

24   motion for summary judgment could address a single claim or

25   issue directly related to the claim, but nowhere does he

Case 1-12-50947-CSS   Doc 4714   Filed 08/06/20   Page 285 of 462

1    suggest or could he under the terms of the rule, that a

2    motion for summary judgment can be filed on an issue of

3    interest to a party, that's not tethered to a specific

4    claim.

5            Finally, we've talked a lot about discovery here.

6    There is no question, there's no question that we requested

7    depositions for the purposes of this motion.  I know Mr.

8    Ward takes a different view of what was said on the

9    conference call on June 21, and I'm not going to ask the

10   Court -- I'm not going to call the other witness to that

11   phone conversation to the stand, and I'm not going to ask

12   the Court to take on the unpleasant task of trying to decide

13   whose declaration is true, I'm not going to ask you to do

14   that.

15           But Exhibit 78 and 79 of my declaration couldn't

16   be more clear that we wanted depositions; we weren't allowed

17   to have them.  It can't be any more clear that we requested

18   the very documents which form the foundation of the

19   petitioning creditor's claim to account for the American

20   money, $4.56 million, and they refused to produce it in

21   discovery, and then produced most of the important stuff on

22   their reply, which they cannot do.

23           Final word.  I know Mr. Ward says that this is not

24   an effort to get around the three year statute of

25   limitations, but it clearly is.  The only way the

1      petitioning creditors can be requisite lender is if the

2      third amendment is specifically enforced against Yucaipa.

3      That is the only way.  And that effort is barred by the

4      three year statute of limitations.  We know that because

5      that's the law of Delaware.  We know that's the law under

6      Central Mortgage Company versus Morgan Stanley.

7                  THE COURT:  How is it that it's specific

8      performance?

9                  MR. SAUER:  Because right now Yucaipa holds a

10     bunch of debt.  What they want to do is strip the debt of

11     voting rights.  They want to require that Yucaipa

12     contributed a bunch of it, and determine that Yucaipa is not

13     eligible -- is not allowed to hold the letter of credit.

14     They're seeking to --

15                 THE COURT:  No, to say that Yucaipa bought the

16     debt when it was not an eligible assignee, and that nobody

17     raised the issue as to what the limitations might be on that

18     purchased debt within three years doesn't make sense.

19     Because the issue is whether they were subject to those --

20     whether those limitations were or were not applicable to

21     begin with.

22                 So I don't understand how -- to me, that's a

23     dispute that never expires because if they -- the ability or

24     inability to have neutered or non-neutered debt, it's --

25     arguably it's a matter of what the documents say.  And I

1   don't see how -- I really don't see how the statute would

2   apply.  Because it comes to an interpretation of what they

3   are or are not allowed to do, and until they try at least to

4   do something, maybe this is your point, they tried to do

5   something, and it was more than three years ago, and since

6   nobody objected, the statutes expired?

7           MR. SAUER:  Well, I think it's more than that,

8   Your Honor, and look, far be it for me to try to convince

9   you since I'm certain on this point you're made up your

10  mind, but let me just layer this a little bit.

11          When you have a contract and that a party acts

12  under that contract, you have an obligation.  If they breach

13  -- if there's a breach of the third amendment, the breach

14  is, as they argued to this Court, remember they argued this

15  to the Court, and the Court adopted their position, that as

16  it relates to the third amendment, any challenge to the

17  third amendment or any attempt to enforce or not enforce it,

18  accrued back in September of '09.

19          Yucaipa has been acting as requisite lender for

20  three and a half years -- for almost three years, and

21  petitioning creditors went along with it.  They took the

22  money, they did a lot of things.  Yucaipa didn't contribute

23  the debt.  Yucaipa continued to do lots of things that --

24  forget about requisite lender, that a lender holding 54

25  percent of the debt might do.

1          And I think that the petitioning creditors had an

2     obligation, if this was really an issue for them, to have

3     challenged the validity of Yucaipa's actions, or to have

4     specifically enforced the third amendment at the time.  And

5     we know --

6          THE COURT:  All right.  So when Yucaipa acts

7     purportedly in violation of the contract, and the other side

8     is aware they're acting in violation of the contract, that's

9     really when the statute would start to tick.

10         MR. SAUER:  Central Mortgage Company versus Morgan

11    Stanley says, the Delaware statute of limitations for

12    contract claims begins to run on the date of the first

13    breach, the first breach.  Yucaipa was obligated purportedly

14    to contribute 50 percent of $50 million worth of term loan

15    exposure within ten days.  They didn't.

16         And we know -- I mean, this is not like the

17    petitioning creditors weren't thinking about this.

18         THE COURT:  I'm sure there's something in the

19    contract, a no waiver clause, that one breach doesn't

20    necessarily waive other provisions that can be enforced.

21         MR. SAUER:  But I don't believe the no waiver

22    provision applies to the statute of limitations.  I've

23    looked, and have not found a single case for any court

24    anywhere in this country, I thought that might come up, that

25    a no waiver provision somehow trumps a statute of

1    limitations provision.

2              And let me just close with one final exhibit, and

3    that is Exhibit 50, which is to my declaration at paragraph

4    32.  In late September of '09, Mr. Shaffer wrote to Mr.

5    Urlich of Black Diamond an e-mail, so it was Spectrum to

6    Black Diamond, "I like the idea to try and enforce the 50

7    percent covenant and strip their vote."

8              They knew they had the ability to pursue specific

9    enforcement at the time, they contemplated it, they didn't.

10   Any effort to -- I believe to specifically enforce this

11   agreement, which I think really is what this dispute is

12   about is time barred.  But again, we never really have to

13   get there.

14             THE COURT:  Okay.

15             MR. SAUER:  Thank you, Your Honor.

16             THE COURT:  Thank you.

17             MR. WARD:  Your Honor, I have a few things to say

18   in reply, would you like me to go now or should we take a

19   short break?

20             THE COURT:  Yeah, let's take a quick break and

21   hopefully this time it'll be quick.

22        (Recessed at 12:27 p.m.; reconvened at 12:39 p.m.)

23             THE CLERK:  All rise.

24             THE COURT:  You may be seated.

25             Mr. Ward.

1          MR. WARD:  Your Honor, may I?

2          THE COURT:  Yes.

3          MR. WARD:  Your Honor, a couple of points.  First

4    off, we strongly disagree with what Yucaipa, what Mr. Sauer

5    has said about our plan is not having enough debt to

6    constitute the numerator.  And let me see if I understand

7    some of the admissions I believe that Mr. Sauer on behalf of

8    Yucaipa made.

9          I think the principal admission is that we have

10   $51 million in debt, and that AMMC has 4 and a half million

11   dollars in debt, basically it's about 55 million.  The other

12   concession is that if you disregard Yucaipa's debt, and I

13   believe, Your Honor, I'm not going to repeat all of my

14   arguments, I may touch on one of them or two of them, but we

15   believe that under the third amendment, under Justice Ramos'

16   decision, whatever, that there are many, many reasons to

17   disregard Yucaipa's debt.

18         That definition in 2.1(e) of the term loan, that

19   debt doesn't count.  The fact that eligible assignee under

20   2.1(c) of the third amendment says they can't buy LC debt.

21   But if you disregard the debt, then you're down to $109

22   million.  If you add AMMC to our debt, we've got more than

23   half.

24         Now, Your Honor, if what Your Honor rules today is

25   simply that Yucaipa's debt is to be disregarded, we have

1    clearly advanced the ball.  Now, what we had done, Your

2    Honor, is we believed that when Justice Ramos made his

3    decision, and you heard me spend a lot of time arguing that

4    we believed it collateral estoppel not only on the fourth

5    amendment, but also on the issue of requisite lender based

6    on his construction of the third amendment, we believe that

7    he said that the Yucaipa debt, in effect, was disregarded

8    because of his rulings and findings on the third amendment.

9            So when we acted, and Your Honor, it's with

10   respect to Exhibits I think 10 and 11 to my affidavit, after

11   Justice Ramos' decision from the bench on November 19th, and

12   contrary to what Mr. Sauer said, Justice -- I was there.

13   Justice Ramos said, we had won, plaintiff, plaintiff you've

14   won.  We knew we had won.  All that Justice Ramos said, I

15   will follow this up with a decision.

16           As far as we were concerned that was the ruling,

17   and it was a ruling on requisite lender issue, and it was a

18   ruling on the fourth amendment issues.

19           So on December 3rd -- remember that argument is

20   November 19th.  On December 3rd, the entities that believes

21   they were the requisite lender on the basis of Justice

22   Ramos' decision got together and appointed the Black Diamond

23   entity and the Spectrum entity as the co-admin agents, and

24   registered the AMMC trade.

25           If it turns out that Your Honor doesn't believe

1    that Justice Ramos went far enough, and that it is

2    collateral estoppel on the requisite lender issue, then what

3    we would need from Your Honor is simply is a ruling that

4    Yucaipa's debt is to be disregarded.  This afternoon,

5    tomorrow, we will then get together, it doesn't matter how

6    we get together, I mean, if Black Diamond, and Spectrum, and

7    AMMC will then get together and buy the admission that Mr.

8    Sauer and Yucaipa makes, these three entities together,

9    Black Diamond, Spectrum and AMMC have a majority of debt if

10   Yucaipa's debt is disregarded.  And we believe we've given

11   Your Honor many, many bases for the disregarding of the

12   debt.

13          And like I said, what we did on December 3rd, and

14   by the way, Exhibit 12 to my affidavit was the notice we

15   gave to Yucaipa on December 3rd that on that very day,

16   December 3rd, we had -- the parties thought they were the

17   requisite lender by virtue of Justice Ramos' decision of

18   November 19th, had appointed the co-admin agents and they

19   registered the trade.  We can just do that tomorrow.  There

20   doesn't have to be a ruling on that issue today.

21          So -- but there are a number of other things that

22   I just want to address briefly.  First off, much of what Mr.

23   Sauer said on behalf of Yucaipa I think illustrates the

24   reason for the rule, which is very well established that you

25   don't look to extrinsic evidence to create an ambiguity in

1   the document.  You look at the four corners of the document.

2          If the four corners don't show an ambiguity, you

3   don't look at the extrinsic evidence.  Much of what Mr.

4   Sauer said was simply extrinsic evidence, and by the way,

5   the e-mails that he's citing to were by and large after

6   April of 2008, but it's after the third amendment.

7          So basically what Yucaipa is arguing is, well,

8   there was a stayed amendment, and then there was a lot of e-

9   mails back and forth, Black Diamond and Spectrum and other

10  parties who are commenting on what the third amendment does.

11  If there's anything that should be excluded as unnecessary

12  extrinsic evidence in the face of a clear contract, it's

13  that sort of evidence.

14          And where Mr. Sauer said if Judge Ramos only knew

15  what had happened.  Well, Judge Ramos knew what happened,

16  here's his ruling.  He said at page 13 of his decision which

17  is Exhibit 1 to our moving affidavit, "The credit agreement

18  itself is unambiguous, and accordingly summary judgment is

19  appropriate.  For their part, the defendants," that's

20  Yucaipa, "contend there are many factual issues.  There are

21  none.  This is a case for contract interpretation."

22          That is a full and fair opportunity to argue for

23  purposes of collateral estoppel.

24          Now, what Mr. Sauer says is, well, because the

25  discovery wasn't done, it's not a fair and full opportunity.

1    Take that argument to its logical extension.  What that

2    means is that every time a Court rules for summary judgment

3    on the basis of a contract, and excludes the extrinsic

4    evidence, whether before discovery or after discovery, that

5    can't be a full and final ruling.  Because where a Court is

6    determining that a document, a contract, on its face

7    contains no ambiguity, the Court is excluding the extrinsic

8    evidence.

9            And the rule is, you don't -- and Courts do this,

10   Courts know this, you don't look at the contract, and don't

11   look at the extrinsic evidence and say, from this extrinsic

12   evidence I hereby see there's an ambiguity.  You look at the

13   contract, if you're satisfied that the contract

14   unambiguously represents or expresses the intent of the

15   parties, you never look at the extrinsic evidence.

16           Taking Mr. Sauer's argument to its logical

17   exclusion, never can a decision like that on summary

18   judgment be full and final and fair.  There can't be a final

19   judgment.  Well, that's not true.  There are many such

20   decisions that are final judgment.

21           So when Justice Ramos ruled, and we had ruled for

22   summary judgment on the face of what we thought were very

23   clear contracts, the fourth amendment, the third amendment,

24   he ruled that these documents were clear on the face, and he

25   didn't need the extrinsic evidence.

 1          That, pursuant to collateral estoppel indicates a

 2     final judgment, that makes it full and fair in terms of

 3     their ability to have litigated that issue.

 4          But a couple of other things have litigated that

 5     issue, but a couple of other things, Your Honor, one of the

 6     things that Mr. Sauer says is well, you know what, we don't

 7     need to vote the debt, we just need to have the debt.  And

 8     that the fact that the definition of requisite lender speaks

 9     about having a holding.

10          Now, what I think what Mr. Sauer would like to do,

11     what Yucaipa would do, I'm not making this personal, I

12     happen to have a lot of respect for Mr. Sauer, and I hope he

13     has the same for me, the definition of requisite lender is

14     part of an integrated series of documents.  It's the first

15     lien credit agreement, it's the third amendment, and it's

16     not the fourth amendment.

17          In the third amendment, it is very clear when I've

18     cited it to Your Honor, that they can't vote.  And you can't

19     take the definition of requisite lender, where you have to

20     be a lender, and use the having holding language, and

21     exclude the voting language just because it's in another

22     provision.  Now, it may be in the third amendment, but it's

23     still part of an integrated series of documents.

24          So as a result, the having and the holding have to

25     be read together with the voting, you have to be able to

1    vote and -- because otherwise, as I said to Your Honor, it

2    violates the principal of contract instruction that you're

3    giving no effect to a provision in an agreement.

4          So if you're saying, hey, Yucaipa, you can have

5    and hold, and you can be the requisite lender, but you can't

6    vote.  I mean, first off, it doesn't make any sense.  Judge

7    Ramos in his -- Justice Ramos in his decision said that's

8    just not logical, that the requisite lender acts through

9    amendments and waivers, they act, that's what a requisite

10   lender does, they act.

11         But the problem I've got with Yucaipa's argument

12   in this regard is it takes having and holding completely out

13   of the context, and doesn't interrelate with the fact that

14   they can't vote.

15         Now, another thing that's interesting and Mr.

16   Sauer doesn't touch upon this, is the fact that we argue

17   that a critical element of the definition of requisite

18   lenders, you have to be a lender.  Well, I did this before,

19   and I'm going to do it real fast, lender -- requisite lender

20   you have to be a lender.  Lender is defined in paragraph 30

21   of Exhibit 8, which is the first lien credit agreement, and

22   it says, you've got to either be an original signatory, they

23   were not, or you have to be a party to the assignment

24   agreement.  The assignment agreement is contained in the

25   form in Exhibit E.

```
 1              Exhibit E says, you have to be able to represent

 2     in that assignment agreement that it, quote, that's the

 3     assignee, it meets all requirements of an eligible assignee

 4     under the credit agreement.  They can't do that.  Since they

 5     can't do that, they can't be a lender.  If they can't be a

 6     lender, they can't be a requisite lender.

 7              Now, Yucaipa focuses on the having and holding,

 8     and they ignore the voting.  I've addressed that.  But they

 9     also ignore the fact that they have to be a lender.

10              Now, they may think that they can come in and

11     violate the agreement and buy all this LC debt and buy all

12     this term loan debt, and as a result, take advantage of the

13     other creditors.  But they can't do it.  And they can't do

14     it because they can't become a lender, and because the

15     provision that says you can't vote is a problem for them,

16     because you can't be a requisite lender without voting.

17              In particular, as I cited to Your Honor earlier in

18     the day, I think it's 2.7(a) and 2.7(b) specifically says,

19     you, Yucaipa when you buy this debt, term loan debt, any

20     debt, you cannot vote -- and by the way, the conclusion on

21     voting rights applies not only to the term loan debt, but to

22     the LC debt, both of them, and revolving debt if they had

23     bought it.  It's across the board.

24              Now, with respect to 2.7(a) and 2.7(b), as I

25     recited to Your Honor, it says, you in effect can't do
```

Case 14-50947-CSS   Doc 47-14   Filed 08/01/13   Page 113 of 151
Case 1:12-cv-09574-CSS   Doc 47-14   Filed 07/06/20   Page 298 of 462

Page 113

1    anything in a liquidation proceeding.  So I don't even

2    understand what they're doing here.  They want to be the

3    requisite lender, they say they can be the requisite lender

4    having no vote.  They got mooted that, they basically are

5    going to be a transparent requisite lender, and they're

6    specifically not allowed to do anything in this proceeding.

7            That is, as Justice Ramos said, is not logical.

8    That also, I believe, would violate the rule of construction

9    that you're in effect or that you're giving no effect to a

10   particular provision, which is the no vote provision.

11           But let me on to a couple of the other provisions,

12   Your Honor.  Oh, with respect to us being too late I guess

13   under Rule 901 of the Federal Rules of Evidence, I don't

14   think Mr. Sauer is right.  I don't know that that argument

15   was in his papers.  If it was, I missed it.

16           The LSTA trade document we believe is a self-

17   authenticating document, and as a result under the Federal

18   Rules of Evidence, it's not to be excluded pursuant to the

19   argument that Mr. Sauer mentioned.  But I think that's

20   probably overly technical issue because as I said, Your

21   Honor, if Your Honor rules that Yucaipa's debt is

22   disregarded and we're down to $109 million worth of debt,

23   there is a requisite lender out there, I mean, it's Black

24   Diamond, it's Spectrum, and we're going to get together with

25   AMMC.  I mean, we own their debt anyway, and it's just going

```
 1     to be a matter, a purely administrative functional matter of

 2     the three of us then, Black Diamond, Spectrum, and AMMC

 3     appointing the admin agent, who will then register, and

 4     we'll be exactly where we thought we were on December 3rd.

 5              So that, Your Honor, I think gains them absolutely

 6     nothing.

 7              Oh, and with respect to the argument that Justice

 8     Ramos' decision on November 19th was not effective, now as I

 9     said, Your Honor, he ruled from the bench that the agreement

10     was null and void.

11              Let me just quickly go through my notes, Your

12     Honor, because I think I've covered much of this.  Oh, two

13     arguments.  The arguments under -- well, let me do the

14     argument under Praven last, but with respect to Mr. Sauer

15     saying that in fact Yucaipa had nothing to do at least with

16     the execution of the third amendment, we cite -- we attach

17     as Exhibit 14 to our moving affidavit an e-mail from Dericks

18     Walker (ph), who is the Chairman of Allied, appointed by

19     Yucaipa, and he's writing to Ron Burkle (ph), who is for

20     want of a better term, Your Honor, I'll say he's the head

21     guy, he's the head guy at Yucaipa.

22              And what Mr. Walker says on April 17th, 2008,

23     which Your Honor happens to be the exact same date as the

24     third amendment, he says, "We were successful in acquiring

25     $40 million in second lien debt for $26.4 million.  We now
```

1   control 40 of the 50 million of outstanding second lien

2   debt."

3          Who bought that debt that day?  It was Yucaipa.

4          In the very next line of the e-mail he says, "we",

5   the same word he uses to describe the we who bought the

6   debt, "We also successfully obtained an amendment from our

7   first lien lenders, allowing us to buy first lien debt, and

8   convert both the first and second lien debt in equity."

9   That's the third amendment.

10         They drafted it, they negotiated it.  I don't

11  think it's relevant, Your Honor, to be honest, because as

12  Your Honor pointed out, there is a provision that when you

13  take, when you buy the debt, you take subject to the prior

14  authorizations and consents of the parties.

15         So when they took this debt, they took prior --

16  they took subject to the authorization that the third

17  amendment was in effect.

18         With respect to Praven, let me point out a couple

19  of things.  Praven as I said is very clear about this

20  inclusionary/exclusionary point.  Praven makes clear and I

21  apologize, Your Honor, that it was troubled by the fact that

22  there were no express limitations on assignability.  There

23  are expressed limitations on assignability here.  And

24  although Mr. Sauer cites to all the New York cases -- well,

25  basically if you read these cases, Your Honor, like a

1    mantra, he may have said that, they repeat again and again

2    the same language.  They're just recycling some general

3    provision of old New York law about assignability of claims.

4           However, as we point out, in each of those cases,

5    there's no exclusionary language in Praven.  There's no

6    exclusionary language.  In 785, there's no exclusionary

7    language.  There is no language in any of these cases that

8    says, you may be an ineligible assignee or lender, you may

9    be an eligible assignee or lender, but you may not.  That's

10   what distinguishes this case, except for a couple of other

11   points that distinguish this case.

12          First off, as I mentioned, this case here is an

13   intercreditor fight, it's not -- it's a much more simple

14   case of 785 and I know Mr. Sauer said it was very

15   complicated, but surely not that complicated.  If you had a

16   borrower, and you had a lender, and the lender assigned the

17   note to another entity, and it was that entity that was

18   seeking to make the claim.  A much more simple circumstance,

19   it's borrower versus lender, here we have Yucaipa which

20   sought to be lender, and take advantage of the other

21   lenders, through an agreement that itself had negotiated,

22   787 Praven, you don't have a circumstance where the assignee

23   had negotiated an agreement to get their foot in the door,

24   and then once they got their foot in the door, blew it wide

25   open.  It's a very, very different case.  Our case is a

1    very, very different case.

2              The generic state court cases of which Mr. Sauer

3    cites many don't advance the ball, except to simply say, New

4    York law, old New York law is this.  But they don't deal

5    with any exclusionary language.  There's not a single case

6    that Yucaipa has cited, that deals with an intercreditor

7    agreement, where you have two creditors who are fighting

8    with each other under the terms of the agreement.  We think

9    that our case is distinguishable.

10             Another major reason of course is as we say in

11   Praven, the 2nd Circuit was crying out for some exclusionary

12   language, it wasn't there.  787 relies most heavily on

13   Praven, not a surprise, it's a 2nd Circuit case.  And in

14   that case, too, in 785, again, there was no exclusionary

15   language.  Here there is very clear exclusionary language,

16   some of which as I said, Your Honor, in fact, all of which

17   as I said, Your Honor, in the third amendment, was

18   negotiated by Yucaipa itself.

19             I'm almost done, Your Honor, if you can just bear

20   with me one moment.

21        (Pause)

22             MR. WARD:  I mean, what -- the one thing I find I

23   guess probably -- one of the things I find very troubling

24   about Yucaipa's position is what they're saying is under

25   Praven and this line of authority even though under Praven

1   and this line of authority, we can buy the debt, but we

2   don't have to be bound by the provisions in the agreement.

3   And that seems to me to be, Your Honor, a very difficult

4   position for anyone to take.

5           And I think finally, Your Honor, on the procedural

6   issues, Mr. Sauer said that -- I think he admitted, and in

7   fact, it's true that the cases on summary judgment have much

8   more liberal since the amendments in terms of what partial

9   summary judgment means.  And for partial summary judgment

10  you don't have to dispose of a whole claim, in a complaint

11  with three claims, you don't have to dispose of a whole

12  claim for there to be a motion for partial summary judgment

13  allowed.

14          But the fact is, that even if that weren't the

15  case, in the Allied adversary proceeding, one of the

16  specific forms of relief that Allied specifically asks for

17  is who is the requisite lender, and a determination of their

18  rights under the third and fourth amendment.  That's what

19  we're seeking here.  We clearly should be entitled to

20  summary judgment on those issues.  And that I think, Your

21  Honor, is all I have.  Thank you for your patience.

22          MR. SAUER:  Your Honor, may I have just literally

23  one minute?

24          THE COURT:  Yes.

25          MR. SAUER:  Actually I meant what I said one

1    minute.  I think it's important that the Court obviously,

2    I'm sure has and will review the third amendment.  The

3    limitations on voting applicable to how the voting works is

4    very specifically delineated in terms of what it applies to.

5    I raised it on my opening argument, I just refer the Court

6    to that.

7            Two, with respect to New York law, we heard lots

8    of reasons why it's distinguishable and why it's old, it's

9    not distinguishable, and it's not old.  We referenced, for

10   example -- first of all, you've got 785 Partners, which is a

11   2012 case.  We referenced Almado Oil Company (ph) which is a

12   2008 case.  We referenced the Bank Russell's case which is a

13   2000 case, all of these cases come after the Praven

14   decision.

15           We've represented or referred to the Purchased

16   Partners case which is also a 2012 case.  So this is not old

17   outdated New York law, this is old New York which continues

18   in force and in effect, which petitioning creditors don't

19   like because it leads to a result they don't like, but it is

20   the law that needs to be applied.  Thank you.

21           THE COURT:  Okay.  All right.  Thank you.  What

22   I'm going to -- what we're going to do is we're going to

23   take a break.  I am going to make my decision, and then

24   we'll come back and I will announce it.  We'll come back at

25   3 o'clock and I'll announce it.

Page 120

```
 1              I am going to close the courtroom because I'm

 2       going to work here, because I've got everything here, and I

 3       know where everything is.  You may leave your items, I have

 4       no other matters, and we'll reconvene at 3.

 5              All right.  Thank you.

 6         (Recessed at 1:00 p.m.; reconvened at 3:03 p.m.)

 7              THE CLERK:  All rise.

 8              THE COURT:  Please be seated.

 9              All right.  Hopefully this will be as relatively

10       cogent as possible, obviously complicated.  I won't bury the

11       lead.  The Court is going to grant the motion for summary

12       judgment and rule that Black Diamond/Spectrum are the

13       requisite lenders under the first lien credit agreement.

14              So let me tell you how I got there.  I'm going to

15       start with some of the procedural, related two procedural

16       posture issues.  Sorry, first summary judgment can be

17       entered on claims and/or issues properly, and I've granted

18       summary judgment in the past on elements of claims, not even

19       claims in their entirety, and I think finally the identity

20       of the requisite lender here is implicated as an issue

21       (indiscernible) throughout the cases, certainly in

22       connection with many of the things going on in the

23       underlying bankruptcy, but also the adversary proceedings,

24       and otherwise is specifically or it relies in connection

25       with several specific claims.
```

1          Also the motion is not time barred.  The identity

2    of the requisite lender in a situation like this is

3    constantly evolving and liquid issue as people come in or

4    out of the debt.  And while (indiscernible) is the requisite

5    lender in 2007 might be time barred, the question of who is

6    requisite lender now is certainly not time barred.

7          And I guess one could argue that the facts and law

8    governing the determination in 2013 which arose maybe in

9    2008 or 2009 would in effect make those elements time

10   barred, but I don't think that that would be a proper

11   application of a statute of limitations in a case like this.

12         The controversy would've arise on a host of things

13   that have happened since 2007, but the specifics of making

14   the ruling are certainly not time barred.  The other point

15   is that I thought there was an argument, a good argument

16   that this issue or these issues about requisite lender have

17   been a live controversy for five years, really all the way

18   back at least as early as the CIT case being filed, and

19   really perhaps all the way back to the exit of the initial

20   bankruptcy.  So there's never been an instance where this

21   has sort of gone away and people have forgotten about it.

22   It's been something that's been live and in controversy and

23   evolving as we go forward.

24         But again, the issue today who is the requisite

25   lender on July 30, 2013 is clearly not barred in any way by

1    any statute of limitations.

2            So the issue, what is the issue.  The issue as I

3    see it is pretty clear, it's who is the requisite lender.

4    And counsel for Yucaipa I think explained it very well in

5    (indiscernible) issue, that it's really a question of

6    determining the (indiscernible) denominator of the

7    appropriate debt and do the math, and seeing if a group or

8    an individual lender has over 50 percent of the debt.

9            Now, that determination starts with an examination

10   of the four corners of the documents to determine the

11   parties' intent, which is how you -- the parties' intent,

12   first you start with the four corners of the document, if

13   it's ambiguous, you move on, and only if it is ambiguous do

14   you look to extrinsic evidence to determine the intent.

15           And in this case, I found and hold that the

16   contract -- the contracts are not ambiguous in any way, and

17   the Court can determine its -- make its determination based

18   on the four corners of the document.

19           The legal started as summary judgment, the

20   petitioning creditors have the burden to establish they're

21   entitled to judgment as a matter of law, and if there in

22   absence of a genuine issue of material fact, in which point

23   the burden shifts to Yucaipa to identify a genuine issue of

24   material fact.

25           Again, just to read a little law, because I think

1   it's important for figuring out how we proceed, under the

2   summary judgment standard, a Court -- this is -- open quote,

3   a Court faces a conceptually difficult task, end quote, in

4   interpreting a contract, because the Court must, quote,

5   determine whether as a matter of law if the contract is

6   ambiguous or unambiguous on its face.  Typically a Court may

7   (indiscernible) grant summary judgment when the terms are

8   unambiguous; however, where a Court determines as a matter

9   of law that the contract is ambiguous, it may yet examine

10  evidence extrinsic to the contract as including summary

11  judgment materials and what that evidence is as a matter of

12  law dispositive of the interpretive issue grant summary

13  judgment on that basis.

14        And it goes on to say, a contract is unambiguous

15  if it is objectively susceptible to at least two reasonable

16  but conflicting (indiscernible), ambiguity is not determined

17  simply because the parties to the contract have differing

18  interpretations.

19        So it would be possible to enter summary judgment

20  even if we had -- even if the Court had to go outside the

21  four corners of the document.  But in this case, I don't

22  think that you -- that we have to go outside the four

23  corners of the document, and summary judgment is certainly

24  appropriate in that instance.

25        Now, getting into more of the specifics, Yucaipa

1   (indiscernible) collateral estopped from arguing that the

2   fourth amendment is valid.  This arises in the case in front

3   of Judge Ramos.  Again, for (indiscernible) being identical

4   issue was raised, the issue actually litigated and decided,

5   Yucaipa had (indiscernible) opportunity to litigate, and

6   importantly that doesn't mean necessarily discovery, it's

7   really a case-by-case issue on whether there's a fault or

8   opportunity.

9           And further (indiscernible) the issues necessary

10  to support the valid judgment, and I don't think there are

11  going to be any (indiscernible) that the fourth amendment,

12  its validity were clearly the subject of extensive briefing

13  and argument and (indiscernible) Justice Ramos, and I find

14  that Yucaipa is collaterally estopped that the fourth

15  amendment is valid.

16          However, I don't believe they're collaterally

17  estopped from arguing the issues as to who the requisite

18  lender may or may not be under the third amendment.  And

19  (indiscernible) because I think (indiscernible) touches on

20  the third amendment a little bit, there was nothing that I

21  could find in the argument that really touched on it at all.

22  And I don't believe the Court sufficiently focused on it, I

23  don't think it was sufficiently before the Court to really

24  find that that issue was actually litigated and decided.

25          So I find that Yucaipa is not collaterally

1   estopped from arguing the issues related to the third

2   amendment.

3          So that gets us to the next question which is

4   whether the third amendment on the merits precludes Yucaipa

5   from being the requisite lender; i.e., the debt not counted

6   in the denominator which of course leads to a situation

7   where the petitioning creditors might be the -- excuse me,

8   might be the requisite lenders.

9          First, there's this argument that there's law of

10  the case that the Court has already decided, the issue and

11  as a result, we don't need to get to it any further.  And

12  the issue there being is Yucaipa stuck with the provisions

13  of the third amendment no matter what.

14          And I certainly made that statement or statements

15  to that effect twice in the ruling on the motion to dismiss

16  the cross claims, but for purposes of the law of the case, I

17  don't think it was sufficiently really considered or all be

18  different variations were necessarily considered that would

19  make it fairly preclusive.  So I've got to go into the

20  actual amendment itself.

21          The potential issue there is whether the third

22  amendment required all lenders consent, as opposed to a

23  requisite lender consent.  And I'm going to quote or

24  paraphrase from one of the petitioning creditors' briefs,

25  because I think it lays it out.

1          Section 5.5(b)(9) of the first lien credit

2    agreement provides that the written consent of each lender

3    that would be affected thereby is necessary for any

4    amendment that has the effect of modifying the definition of

5    requisite lenders.  Because the purported fourth amendment

6    had the effect of modifying the definition of requisite

7    lenders and affected every lender, by allowing Yucaipa to

8    become requisite lender for the first time, ComBest consent

9    alone, as then requisite lender, was insufficient to validly

10    (indiscernible) fourth amendment.

11          The third amendment, however, affected no lender,

12    but it only allowed Yucaipa to purchase very limited amounts

13    of term loans, and by Yucaipa's own admission, imposed

14    onerous restrictions on such purchases that prohibited

15    Yucaipa from ever becoming requisite lender.

16          The only party affected was Yucaipa, and as a

17    result, the consent of the requisite lender was sufficient,

18    and all the lenders did not have to agree.

19          Now, getting to the meat really of the argument,

20    and it goes to the definitions of term loan exposure, and

21    the definitions and changes in Section 2.1(e), which I think

22    are the critical element or the critical contractual

23    provision.  I think the effect of 2.1(e) is that all of the

24    Yucaipa debt cannot be used in determining who the requisite

25    lender is, which (indiscernible) it down to the $109 million

1    or so of debt over which Black Diamond and Spectrum must

2    have at least 50 percent.

3            The provisions among other things prohibited

4    Yucaipa from acquiring any revolving loans, and letters of

5    credit, which would use those to the extent they exist from

6    the denominator in figuring out the requisite lender.

7            And as a whole, the limitations as to the

8    (indiscernible) the inability to act in insolvency

9    proceedings, the requirement ignored, contributed capital,

10   as a whole, I think I find looking at the document as a

11   whole, remove Yucaipa from being able to act as the

12   requisite lender.

13           Upon acquiring the debt, Yucaipa subjected itself

14   to the first lien agreement and all of the amendments,

15   including the third amendment.  I think importantly though

16   even under the first amendment alone, as pointed out during

17   oral argument, Yucaipa cannot be the requisite lender

18   because it's not a lender as an implied term, as it's not an

19   original lender or not -- I have to put it, not prohibited

20   lender --

21           UNIDENTIFIED:  (indiscernible)

22           THE COURT:  Thank you.  So where are we?  That

23   gives us a numerator arguably of $56 million and a

24   denominator of $109 million, and we move to the issue of

25   whether Black Diamond and Spectrum can include the American

1    debt in their number to come out with over 50 percent.

2              I find that the American debt is certainly -- I

3    find that the American debt, or what I call the American

4    debt is part of the numerator in this case, and it's the

5    acquisition of that debt by Black Diamond's and/or Spectrum

6    is sufficient to include it in the numerator.

7              As a result of Justice Ramos' decision, Black

8    Diamond and Spectrum became requisite lender.  Now, that

9    hasn't been determined by a court of law until today, but

10   the facts that existed, that made them requisite lender that

11   is being identified today existed after Justice Ramos'

12   decision.  And after that point, they acted to appoint an

13   agent, and they did the recommendation that they were

14   supposed to do in appointing that agent.  So there's no

15   argument to be made that the American debt or -- well, I

16   disagree with and overrule the argument that the American

17   debt cannot be included in their number.

18             Back up a little bit here.  So having said all

19   that, I think we come to perhaps the crux of the argument,

20   and the most difficult piece of the argument to deal with.

21   And that's the Plevin (ph) and the 785 case issue about

22   enforceability.

23             In other words, are we limited to a situation

24   where the prohibition was simply that the debt could not be

25   sold to Yucaipa, which it was, but all that does is create a

1    breach of contract claim against the seller, and doesn't --

2    and it follows perhaps that all the limitations are not

3    really enforceable against Yucaipa.

4              And I've looked at those cases, and this case is a

5    very different case I believe from those.  The

6    (indiscernible) to some extent outside of the four corners

7    of the document to deal with the argument about

8    enforceability, but the facts I rely on I really are

9    undisputed and (indiscernible) summary judgment is

10   appropriate.

11             Yucaipa was involved in the negotiation and the

12   establishment of the first lien credit agreement as part of

13   the earlier bankruptcy.  And at all other times, has

14   controlled the equity and the board of directors.  And has

15   been intimately involved in every aspect of the debtor's

16   business, and the credit agreement issues since 2007.

17             To allow Yucaipa to be involved this heavily in

18   negotiating agreements with -- including those with

19   expressed limits on Yucaipa's rights, and wont' allow them

20   to buy the debt, the seller cannot sell to them in the first

21   place, and to (indiscernible) would be inequitable, you

22   know, to the (indiscernible) degree in my mind, and as a

23   result I find that at least under these facts and

24   circumstances, the Plevin and the 785 Holdings are not

25   applicable or inapposite.

```
 1              I think I've covered all the points, I think I
 2      have.  And just to reiterate the ruling, I'm going to grant
 3      summary judgment, holding that the petitioning creditors are
 4      requisite lenders under the first lien credit agreement.
 5      And I think the best thing to do would be to have counsel
 6      submit an order under certification of counsel.
 7              MR. SAUER:  You Honor, may I may one comment or
 8      ask a question?
 9              THE COURT:  Yes.
10              MR. SAUER:  Thank you, Your Honor, Russell Sauer
11      of Latham & Watkins for Yucaipa.
12              One quick comment, there is absolutely no evidence
13      in the record, because it wouldn't be true, that Yucaipa
14      participated in the negotiations in the first lien credit
15      agreement, no evidence.  More importantly just for the
16      record I understand the ruling, I'm assuming the Court is
17      overruling all of our objections to the evidence that was
18      submitted not having been produced and that was produced on
19      reply without any authentication and without being
20      properly --
21              THE COURT:  Well, I think you actually made that
22      argument to (indiscernible) your objection to the entry of
23      that evidence, yes, it's overruled.
24              MR. SAUER:  Thank you.
25              THE COURT:  We obviously disagree on the first
```

Case 1:14-cv-09747-CSS   Doc 4714   Filed 07/06/20   Page 316 of 462
Case 12-50947-CSS   Doc 4714   Filed 08/01/13   Page 131 of 151

Page 131

1    point.  That's for district courts and courts of appeal are

2    for.

3            All right.  Anything else for today?  I guess we

4    do need to deal with this motion to shorten in connection

5    with the settlement motion.

6            MR. SAMIS:  Your Honor, we can certainly deal with

7    that first.  I was going to raise one other matter.  We have

8    a bar date that's looming on August 2.  We did submit a

9    certification of counsel on Friday that would allow Black

10   Diamond and Spectrum to file a consolidated proof of claim

11   as agent under the first lien credit agreement.

12           We received an objection from Mr. Klyman after we

13   had submitted that.  We turned around and withdrew it and

14   submitted a different certification of counsel actually

15   yesterday that basically made it a neutral as to who the

16   agent was, for the purpose of getting around that objection,

17   but still allow -- whoever the agent was determined to be,

18   to file a consolidated proof of claim.

19           We haven't seen an order hit yet on that, I do

20   have a copy of that order here in court.

21           THE COURT:  I haven't seen it, so you can

22   approach.

23           MR. SAMIS:  Thank you, Your Honor.  That was

24   submitted under certification yesterday, Your Honor.

25       (Pause)

```
 1              THE COURT:  To back up on the enforceability

 2     issue, and I understand counsel's comment about what may or

 3     may not be in the record, I -- we can disagree on that and

 4     (indiscernible) overly flip with my comment about appellate

 5     courts, but I think that the -- in my mind at least, that

 6     the summary judgment motion was -- the burden was met by

 7     Black Diamond in establishing that they should be the

 8     requisite lender.  And I didn't see anything that would

 9     rebut that in that I really didn't see any kind of genuine

10     issue of material fact as to whether it should or should not

11     be enforceable.  I believe based on the record, which I

12     think would include really incontrovertible evidence that's

13     been in front of the Court prior, that Black Diamond or

14     excuse me, that Yucaipa was interested, but I stand by my

15     ruling.  I'm just mentioning that sort as a side.  I've

16     signed your order.  I assume there was no objection to the

17     COC?

18              MR. SAMIS:  I think we resolved that, Your Honor,

19     by the withdrawal of the original stipulation, order, and

20     replacement with what Your Honor just signed.

21              THE COURT:  Okay.

22              MR. SAMIS:  Your Honor, with that, I guess I would

23     turn the podium over to Mr. Harris.

24              MR. HARRIS:  No, it's Mr. Klyman's motion.

25              MR. SAMIS:  I'm sorry, I thought there was an
```

Case 1:12-cv-09947-GSS Doc 4714 Filed 05/06/20 Page 318 of 462
Case 12-50947-GSS Doc 4714 Filed 08/01/13 Page 133 of 151

Page 133

1   agreement.  Okay.  Go ahead.

2          MR. KLYMAN:  Good afternoon, Your Honor, for the

3   record, Robert Klyman of Latham & Watkins on behalf of

4   Yucaipa.

5          Your Honor, after many months and a slog through

6   the awful negotiations, Yucaipa and the committee have

7   resolved the estate claims that were brought against

8   Yucaipa.  I won't bore you with all the details, that will

9   come out in the ultimate settlement.

10          THE COURT:  I did read the motion.

11          MR. KLYMAN:  Yeah.  And so it's our view, Your

12   Honor, that Black Diamond and Spectrum who are objecting to

13   shortened time, have known about the economic terms since at

14   least the 17th.  The other terms don't affect their

15   individual rights.  We were very careful and the committee

16   insisted that whatever rights Black Diamond and Spectrum had

17   would be preserved in their individual capacity to sue

18   Yucaipa, Yucaipa would have the benefit of all its defenses.

19          And Black Diamond and Spectrum have been

20   litigating this issue since before this case started, as

21   this Court well knows.  They don't need discovery and a

22   stretch out of the process to test the reasonableness of the

23   settlement.  And a 9019 motion is not a time or place for

24   this Court to conduct a mini trial on all the issues.

25          You're very familiar with the issues with this

1   case, they're very familiar, it's not going to take a lot of

2   evidence to show that this is at the low end of the

3   reasonableness, particularly given this Court's past

4   comments, the debtor's past comments, that we need to -- and

5   even Mr. Harris' comments that we need to clear out the

6   underbrush in order to go forward with the sale as quickly

7   as possible.

8           Pursuant to bid procedures that Black Diamond and

9   Spectrum lobbied for, got the debtor to agree to, and for

10  you to approve, bids are due, there's going to be an auction

11  soon and it's important for us to determine whether or not

12  we have peace with the committee, whether or not there's no

13  guarantee we're going to bid, but whether or not we are

14  going to bid, and what our -- how our claim is going to be

15  treated, at least from the estate perspective.

16          And what's important here, Your Honor, is again,

17  Black Diamond and Spectrum substantive rights are not being

18  prejudiced in terms of whatever rights they have.  They do

19  complain that they did not get a seat at the bargaining

20  table, in terms that they participated in mediation, we

21  tried that one-on-one conversations with them, but the

22  standing order that Your Honor entered did not give them the

23  right to negotiate at the bargaining table.  They had the

24  right to be consulted, which I think the evidence will show,

25  without discovery, that they were.

1            And, in fact, if they did delay the hearing in

2    order to obtain discovery, they don't identify in their

3    papers any discovery that they would actually want to seek.

4    If they take the depositions of committee members, the

5    committee members are likely to say, well, I acted on advice

6    of counsel, in terms of moving forward with the settlement,

7    they were intimately involved, they met, whatever.

8            You know, the issue is, it can be resolved at

9    argument without a delay, and without the benefit of giving

10   them, you know, wasteful depositions and additional document

11   requests.  Thank you, Your Honor.

12           THE COURT:  Thank you.

13           MR. LAGERMANN:  Good afternoon, Your Honor, Nick

14   Lagermann from Sidley Austin on behalf of the committee.

15           I'm not going to repeat what Mr. Klyman said, but

16   the committee obviously does also support having the

17   proposed settlement heard on the expedited schedule that we

18   had requested.

19           I would like to note though, as Mr. Klyman hinted

20   at, and I think is actually admitted in a footnote in the

21   petitioning creditors' objection, we did, in fact, consult

22   with the petitioning creditors with regard to this proposed

23   settlement.  They have known about the economics for a long

24   period of time.  And there is no obligation in the standing

25   order to have them have a quote/unquote seat at the table,

1    if you will.

2            To the contrary, in paragraph 10 of the standing

3    order, this Court ruled that the committee shall have

4    ultimate decision-making authority with regard to the claims

5    and prosecution of the committee adversary proceeding.

6            In addition, paragraph 12 of the standing order

7    gave each individual party, the committee, the petitioning

8    creditors, and actually also the debtors the ability to

9    settle the claim subject to a party's right to object under

10   Rule 9019.

11           The petitioning creditors, if they want to file an

12   objection, they are clearly more than able to do so, and we

13   think we will deal with that at the 9019 hearing.

14           I wanted to make one other point with regard to

15   discovery.  Again, we don't know exactly what they're

16   talking about with respect to discovery, but when this Court

17   appointed a mediator, you specifically included that all

18   mediation and related conversations would be subject to

19   Local Rule 9019-5, which includes 9019-5(d)(1), which we

20   believe would preclude discovery into settlement

21   communications.

22           Obviously we believe this is a fair and equitable

23   rule that prevents people from digging into mediation

24   related conversations.  But to the extent that there is

25   discovery in that regard, and we go past Rule 9019(d)(1),

1    frankly it would need to be a two-way street.  And my guess

2    is, is that's not -- that is exactly the reason why it is

3    inappropriate to have discovery to start going into what

4    people did or did not do in connection with mediation and

5    settlement communications.  Thank you, Your Honor.

6          MR. KELLEY:  Your Honor, Jeff Kelley for the

7    debtor.  I rise in support of the motion to shorten.  The

8    debtor obviously is interested in moving this case along as

9    quickly as possible, as I'm sure the Court is.  The case has

10   been moving quickly, events are transpiring in the near

11   future which are going to be very important to resolution,

12   and we would like to have this very important settlement

13   motion heard as quickly as possible.

14         The prospect of discovery and the estate paying

15   professionals to engage in discovery is not appealing, and

16   we join the committee in not understanding why discovery

17   would be necessary on this issue.  Thank you.

18         THE COURT:  You're welcome.  Mr. Harris.

19         MR. HARRIS:  Thank you, Your Honor.

20         Your Honor, as we laid out in our papers which we

21   filed yesterday morning, we got these papers last Friday

22   night at 11 something p.m.  We're here to talk about timing

23   right now, and when this should be heard.

24         The request that has been made by the settling

25   parties here is to effectively cut in half the period of

1    time for notice of a hearing like this, that is generally

2    required under the local rule, and if granted, would require

3    us to file a substantive objection to this settlement by

4    this Thursday, when everybody here has known that we were

5    preparing for obviously today's hearing, which was supposed

6    to have many more things on the agenda up until yesterday

7    afternoon, when certain of them got adjourned.

8            Physically, Your Honor, there's no way we can

9    actually comply with that timing.  And frankly, in

10   situations such as this, absent exigent circumstances

11   justified under the particular circumstances of the case,

12   frankly a notice period is often times many times longer

13   than what's included in the regular notice provisions, not

14   shortened by 50 percent.

15           Five business days, Your Honor, is simply not

16   sufficient time in the petitioning creditors or any other

17   party in interest, frankly, who might have a say, want to

18   have a say in this, to prepare and be in a position to

19   prosecute a substantive objection should they choose to do

20   that.

21           THE COURT:  What's the timing on the auction?

22           MR. HARRIS:  Bids are due on August 8th.  The

23   auction is scheduled for August 14th.  And the sale hearing

24   is scheduled for August 22nd.

25           THE COURT:  Mr. Klyman, what's the -- I understand

1    the comments about what Black Diamond knew and when they

2    knew it, and you know, all those other now antiquated

3    references, but regardless of sort of what happened with

4    what they knew, and how this shouldn't be a surprise, et

5    cetera, what is the specific reason why say the 5th as

6    opposed to the 19th, other than you want it done sooner

7    rather than later I guess?

8              MR. KLYMAN:  Well, there are a couple of reasons.

9    First, is the obvious, we want it done sooner rather than

10   later, since we've worked hard to get to the settlement.

11   But more substantively, I don't know Yucaipa is going to

12   bid, but if they do, Mr. Collins at the last hearing about

13   bid procedures said, we think it's important that all

14   bidders have an allowed claim.

15             The settlement agreement provides for Yucaipa to

16   have an allowed claim vis a vis the debtor and the

17   committee.  Now, Black Diamond -- but that at least

18   eliminates some of the hurdles, and so we thought it

19   important as part of our calculation to have that resolved

20   prior to the date bids are due.

21             Now, there's no magic to bids being due on the 8th

22   or the 14th.  If you want to extend that date, my suggestion

23   to your court and Mr. Harris, is to extend the bid deadline

24   by a couple of days, or however long is appropriate, to fit

25   us within that window.

1      We're also trying to accommodate what we thought

2   was the availability of this Court after August 5th or 6th

3   or whatever.  So we would --

4      THE COURT:  That's a problem.  You know, it's

5   summer time.  So if I don't take care of you by the 7th, the

6   next available date is the 19th.

7      MR. HARRIS:  Your Honor, if I may?

8      THE COURT:  Yes.  Sorry, I interrupted you, Mr.

9   Harris.

10      MR. HARRIS:  The motion as it was originally filed

11   didn't lay out any exigent circumstances justifying

12   shortening as required by the local rule.  The only argument

13   that's been made about timing here really is the issue Mr.

14   Klyman just raised about how does this affect whatever bid

15   they may submit, if at all, and the requirement of the bid

16   procedures that if you're going to bid, some currency that

17   relates to your claim has to be allowed.

18      Mr. Klyman, first of all, says his client -- is

19   not sure his client is going to bid, so I'm not sure that's

20   a good reason why we should expedite this.  But putting that

21   aside, even if he does bid, it is not subject to argument

22   that even though the settlement agreement purports to give

23   them a quote/unquote allowed claim, that doesn't -- it's not

24   allowed within the bankruptcy, the meaning of that word as

25   used in the Bankruptcy Code, because it also says, but

1    that's subject to arguments brought by other creditors, it's

2    only binding on the committee and the debtors, and everybody

3    knows there's an equitable subordination cause of action

4    that is going to be prosecuted here.

5            So in evaluating the quality of that bid, the

6    debtors are going to have to take into account what value

7    that quote/unquote claim has under any set of circumstances,

8    whether the settlement agreement is approved, not approved,

9    or anything else.

10           So what other factors to be taken into account

11   relative to the knowledge that an equitable subordination

12   claim exists, can also be taken into account the fact that

13   okay, there's a settlement agreement that purports to

14   allowed this at $113 million.  It's just a calculation that

15   -- to get factored in the context of the auction, there's no

16   reason to expedite this.  It can be done the 19th, it can be

17   done in conjunction with the sale hearing on the 22nd.  But

18   trying to put it on for some time around the 5th, a) it's

19   physically impossible for my firm to actually put that case

20   together and get an objection on file by Thursday, and then

21   prosecute this next Monday, which is the timetable that they

22   are suggesting.

23           Your Honor, we think that some amount of discovery

24   is appropriate here, because on factual issues, and I'm not

25   looking to invade the cone of silence that sits around the

1   mediation, I'm not absolutely looking to go there, on the

2   other hand, the standard for approval of these settlement

3   does have a burden that has to be met by the proponent.

4   It's not, we went to mediation, and the mediator blessed

5   this.  That's not the standard and it never has been.

6          There needs to be a case that's put on.  There

7   needs to be a witness, there needs to be something that

8   supports the allegations that are made in favor of the

9   settlement.

10          And just by way of example, Your Honor, the

11   settlement agreement in multiple places talks about how the

12   benefit to the estate of this settlement is $58 million,

13   which is a wonderful headline number, except I don't think

14   that's right, and I'd like to understand -- if that's the

15   number you're using for purposes of your calculation and

16   conclusion that this somewhat falls within the range of

17   reasonableness, then I think we're entitled to inquire as to

18   how someone came to the conclusion this estate has actually

19   benefitted to the tune of $58 million, when 20 million of

20   what is being waived clearly is of zero value, and 21

21   million of what is being contributed, is clearly not worth

22   par, at least based on all the facts and circumstances that

23   are available to the parties as we sit here today.

24          I think that's a fair ground.  I don't think the

25   answer to that is subject to privilege.  And if I do invade

1    the privilege, I'm sure somebody will stop me.

2              THE COURT:  Okay.

3              MR. HARRIS:  So with that, Your Honor, I think a

4    little longer period here would be more appropriate.  Thank

5    you.

6              THE COURT:  Okay.  Thank you.  Mr. Buchbinder,

7    good afternoon.

8              MR. BUCHBINDER:  Good afternoon, Your Honor, Dave

9    Buchbinder on behalf of the United States Trustee.

10             I did not file a written objection to the motion

11   to shorten time for the very simple reason that I did not

12   see it until 8 o'clock this morning.  I had a leave day

13   yesterday.  I had an opportunity to read the underlying

14   motion, and the motion to shorten time, and I would have to

15   concur for different reasons, that the time that's being

16   requested is far too short to properly vet the issues.

17             Without belaboring the point, there appear to be a

18   number of issues within this settlement agreement that may

19   require objection, if not argument, and frankly today's

20   ruling may create additional issues with respect to the

21   settlement agreement.  I won't go there right now.

22             I'll just quote a notice, this motion was filed

23   literally at midnight Friday night, so it was 11:48 p.m. is

24   what my ECF notification says, and I suppose that's so

25   counsel can say they filed it Friday.  But the reality is,

1    this motion was filed Friday night at midnight, and it was

2    -- even though the application says, we're being really

3    nice, and we're serving people by overnight mail, the

4    reality is, they don't receive it till at least Monday

5    anyway.  So it's really only three and a half business days'

6    notice, because the objection deadline as proposed is noon

7    time on Thursday.

8              This is clearly inadequate under the

9    circumstances.

10             THE COURT:  Yeah.

11             MR. BUCHBINDER:  I appreciate the fact that the

12   debtor and Yucaipa and the committee are familiar with the

13   terms, and as the parties seem to have indicated, familiar

14   with them since the 17th of July, that's almost two weeks

15   ago.  The problem is, nobody else was aware of these terms

16   until this motion was filed, and there are other parties in

17   this case.

18             There doesn't appear any reasons for the reasons

19   that have been stated by parties here, why this shouldn't go

20   out on proper notice and be heard on full notice, and an

21   opportunity to object.  Thank you, Your Honor.

22             THE COURT:  Thank you.  All right.  I agree that

23   the time frame is way too short, that the (indiscernible) on

24   such short notice (indiscernible) give you something the

25   week of the 12th but I don't have the ability to do that.

Case 14-50947-CSS   Doc 4714   Filed 08/06/20   Page 330 of 462

Page 145

1    (indiscernible) I don't think it's really necessary to be

2    done that quickly.

3            So I guess technically I'm going to deny the

4    motion to shorten, and I will hear the matter on Monday,

5    August 19th at 2 o'clock, and I'd like objections due by 4

6    o'clock on the 14th.

7            And since we have another hearing later that week,

8    let's leave the 19th for this motion, let's not make it an

9    omnibus date, it'll simply be this motion.  Okay?

10           And the Court will enter an order.

11           Anything else?

12      (No response)

13           THE COURT:  Very good.  Thank you, we're

14    adjourned.

15      (Whereupon, these proceedings were concluded at 2:05

16    p.m.)

17

18

19

20

21

22

23

24

25

Case 1-12-50947-CSS   Doc 4714   Filed 08/01/13   Page 146 of 151

```
 1                    I N D E X

 2

 3                     RULINGS

 4                                    Page      Line

 5   First Omnibus Motion for an Order

 6   Pursuant to Section 365 of the

 7   Bankruptcy Code and Bankruptcy Rule

 8   6006 Authorizing the Debtors to

 9   Assume Certain Real Property Leases     --        --

10

11   Debtors' Fourth Motion Pursuant to

12   Bankruptcy Rules 9006(b) and 9027 for

13   Order Extending the Time to File

14   Notices of Removal of Civil Actions     --        --

15

16   Debtors' Fourth Motion for Extension

17   of Exclusive Periods During Which

18   Debtors May Propose and File Plans

19   of Reorganization and Solicit

20   Acceptances Thereof                     --        --

21

22   Debtors' Motion to Authorize Axis

23   Group, Inc. to Enter License Agreement

24   with City of New York                   --        --

25
```

Page 147

1                          I N D E X

2

3                          RULINGS

4                                        Page        Line

5    Motion of the Debtors Pursuant to 11

6    U.S.C. § 107(b)(1) of the Bankruptcy

7    Code, Bankruptcy Rule 9018, and Local

8    Rule 9018-1(b) to File Exhibit to Key

9    Employee Incentive Plan Under Seal       15          8

10

11   Petitioning Creditors' Motion to File

12   a Redacted Version of the Objection

13   of the Petitioning Creditors to the

14   Debtors' Motion for Order Authorizing

15   (I) Implementation of Key Employee

16   Incentive Plan for Certain Insiders

17   and (II) Payment of any Obligations

18   Arising Thereunder as Administrative

19   Expenses                                 15          24

20

21

22

23

24

25

```
 1                        I N D E X

 2

 3                        RULINGS

 4                                      Page      Line

 5   Motion for Authorization to Seal the

 6   Unredacted Objection of the Official

 7   Committee of Unsecured Creditors to

 8   Motion for an Order Pursuant to

 9   Sections 105(a), 363(b)(1) and

10   503(c)(3) of the Bankruptcy Code

11   Authorizing (I) Implementation of Key

12   Employee Incentive Plan for Certain

13   Insiders and (II) Payment of any

14   Obligations Arising Thereunder as

15   Administrative Expenses                --        --

16

17   Motion of Norman Fredrick Wessels,

18   Joyce Elaine Wessels, Gladys Ann

19   Walker, Michael Jay Meyer, and Dale

20   Woudstra and Tonia Woudstra for

21   Relief from the Automatic Stay to

22   Pursue Personal Injury Claims          --        --

23

24

25
```

```
 1                    I N D E X

 2

 3                    RULINGS

 4                                   Page      Line

 5  Motion by James Joseph Pursuant to 11

 6  U.S.C. §362 for Relief from the

 7  Automatic Stay                    --        --

 8

 9  Motion and Joinder of Travis and

10  Erin Cogdill to Motion of Norman

11  Frederick Wessels, Joyce Elaine

12  Wessels, Gladys Ann Walker, Michael

13  Jay Meyer and Dale Woudstra and

14  Tonia Woudstra for Relief from the

15  Automatic Stay to Pursue Personal

16  Injury Claims                     --        --

17

18  Motion for an Order Pursuant to

19  Sections 105(a), 363(b)(1) and

20  503(c)(3) of the Bankruptcy Code

21  Authorizing (I) Implementation of Key

22  Employee Incentive Plan for Certain

23  Insiders and (II) Payment of any

24  Obligations Arising hereunder as

25  Administrative Expenses           --        --
```

Page 150

I N D E X


RULINGS

                                            Page      Line

Motion of Yucaipa American Alliance

Fund I, L.P.'s and Yucaipa American

Alliance (Parallel) Fund I, L.P. for

Reconsideration and/or Amendment of

Final Order Granting Debtors' Motion

for Authorization to Obtain Post-

petition Secured Replacement DIP

Financing and Related Relief            --         --


Interim Fee Applications                16         19


Petitioning Creditors' Motion for

Summary Judgment Regarding the

Determination of Requisite Lenders

Under the First Lien Credit Agreement   120        11

Page 151

1                    C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6
        Sherri L        Digitally signed by Sherri L Breach
7                       DN: cn=Sherri L Breach, o, ou,
        Breach          email=digital1@veritext.com,
                        c=US
8                       Date: 2013.07.31 17:00:18 -04'00'

     SHERRI L. BREACH

9

     AAERT Certified Electronic Reporter & Transcriber

10

     CERT*D -397

11

12    I, Sheila G. Orms, certify that the foregoing is a correct

13    transcript from the official electronic sound recording of

14    the proceedings in the above-entitled matter.

15

16    Dated:  July 31, 2013

17
        Sheila          Digitally signed by Sheila Orms
18                      DN: cn=Sheila Orms, o, ou,
                        email=digital1@veritext.com,
        Orms            c=US
19                      Date: 2013.07.31 17:00:48
                        -04'00'
20     Signature of Approved Transcriber

21

     Veritext

22

     200 Old Country Road

23

     Suite 580

24

     Mineola, NY  11501

25

# UNITED STATES BANKRUPTCY COURT
## District of Delaware

**In Re:**
ALLIED SYSTEMS HOLDINGS, INC., ET AL.,
    Debtor

Chapter:  11

Bankruptcy No. 12–11564–CSS

_____

Allied Systems Holdings, Inc.

    Plaintiff

    vs.

Bennett Management , et al.

    Defendant

Adversary No. 12–50947–CSS

### *NOTICE OF FILING OF TRANSCRIPT AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION*

A transcript of the proceeding held on 7/30/13 was filed on 8/1/13 . The following deadlines apply:

The parties have  7 days to file with the court a *Notice of Intent to Request Redaction* of this transcript. The deadline for filing a *request for redaction* is 8/22/13 .

If a request for redaction is filed, the redacted transcript is due 9/3/13 .

If no such notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is 10/30/13 unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber (see docket for Transcriber's information) or you may view the document at the clerk's office public terminal.

*David D. Bird*
_____
Clerk of Court

Date: 8/1/13

(ntc)

# Notice Recipients

District/Off: 0311−1                    User: Leslie                         Date Created: 8/1/2013
Case: 12−50947−CSS                     Form ID: ntcAP                     Total: 1

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**
ust          United States Trustee       844 King Street, Room 2207       Lockbox #35        Wilmington, DE 19899−0035

TOTAL: 1

# Exhibit 138

# D.I. 82-1, Case No. 14-50971

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ASHINC Corporation, et al. | : | Case No. 12-11564 (CSS) |
| | : | |
| Debtor. | : | (Jointly Administered) |
| | : | |
| BDCM OPPORTUNITY FUND II, LP | : | |
| BLACK DIAMOND CLO 2005-1 LTD., | : | |
| SPECTRUM INVESTMENT | : | |
| PARTNERS, L.P., BLACK DIAMOND | : | |
| COMMERCIAL FINANCE, L.L.C., | : | |
| AS CO ADMINISTRATIVE AGENT, | : | |
| AND SPECTRUM COMMERCIAL | : | |
| FINANCE LLC, AS CO - | : | |
| ADMINISTRATIVE AGENT | : | |
| | : | |
| Plaintiffs, | : | Adv. Proc. No.: 14-50971 (CSS) |
| | : | |
| v. | : | |
| | : | |
| YUCAIPA AMERICAN ALLIANCE | : | |
| FUND I, L.P., YUCAIPA AMERICAN | : | |
| ALLIANCE (PARALLEL) FUND I, L.P., | : | |
| YUCAIPA AMERICAN ALLIANCE | : | |
| FUND, II, L.P., YUCAIPA AMERICAN | : | |
| ALLIANCE (PARALLEL) FUND II, | : | |
| L.P., RONALD BURKLE, | : | |
| JOS OPDEWEEGH, JAMES FRANK, | : | |
| DEREX WALKER, JEFF PELLETIER, | : | |
| IRA TOCHNER, AND | : | |
| JOSEPH TOMCZAK. | : | |
| | : | |
| Defendants. | : | |

**OPINION**

LANDIS RATH & COBB LLP
Adam G. Landis
Kerri K. Mumford
919 Market Street, Suite 1800
Wilmington, DE 19801

-and-

SCHULTE ROTH & ZABEL LLP
Adam C. Harris
Robert J. Ward
919 Third Avenue
New York, NY 10022

Counsel to the Plaintiffs

SULLIVAN HAZELTINE
ALLINSON LLP
William A. Hazeltine
901 North Market Street, Suite 1300
Wilmington, DE 19801

-and-

SIDLEY AUSTIN LLP
Michael G. Burke
Brian J. Lohan
Dennis Kao
787 Seventh Avenue
New York, NY 10019

Counsel for the Official Committee
of Unsecured Creditors

YOUNG CONAWAY STARGATT
& TAYLOR LLP
John T. Dorsey
Michael R. Nestor
Sharon M. Zieg
1000 North King Street
Wilmington, DE 19801

-and-

GIBSON, DUNN & CRUTCHER LLP
Robert A. Klyman
Maurice M. Suh
Kahn Scolnick
333 South Grand Avenue
Los Angeles, CA 90071

Counsel for Defendants

Date: August 21, 2015

Sontchi, J. _____

2

### INTRODUCTION[1]

Before the Court is a Motion to Dismiss Yucaipa's Counterclaim for Equitable Subordination (the "Motion to Dismiss"). This adversary action was commenced by Black Diamond and Spectrum against Yucaipa for, among other things, equitable subordination of Yucaipa's First Lien Claims. In turn, Yucaipa answered the complaint and asserted its own equitable subordination claim (the "Counterclaim") against both Black Diamond and Spectrum alleging that Black Diamond and Spectrum participated in a sophisticated fraud scheme, specifically targeted at Yucaipa, leading up to the Debtors' bankruptcies. The Counterclaim includes allegations of improper claims trading, an ongoing conspiracy to lure Yucaipa into purchasing First Lien Debt, continuing with stripping Yucaipa's expected rights under the First Lien Debt documents, and then seeking to equitably subordinate Yucaipa's claims. Subsequently, Black Diamond and Spectrum moved to dismiss the Counterclaim.

The Court will grant the Motion to Dismiss for a number of reasons. First, Yucaipa's Counterclaim is barred by the Covenant Not to Sue and the Appearance Prohibition contained in the Third Amendment to the Credit Agreement. Second, several factual predicates asserted by Yucaipa in support of its Counterclaim are barred by collateral estoppel. Third, Yucaipa's story does not hold together under examination and its Counterclaim does not meet the standard of plausibility under Bankruptcy Rule 7012(b)(6). Thus, the Counterclaim will be dismissed with prejudice.

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them *infra*.

## JURISDICTION

This Court has jurisdiction over this matter, pursuant to 28 U.S.C. § 1334. This is a core proceeding, pursuant to 28 U.S.C. § 157(b). Venue is proper in this District, pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL HISTORY

### A. Procedural History

On May 17, 2012, involuntary petitions were filed in this Court by BDCM Opportunity Fund II, LP, Black Diamond CLO 2005- Ltd. (together, "Black Diamond"), and Spectrum Investment Partners LP ("Spectrum," and with Black Diamond, the "Petitioning Creditors") against Allied Systems Holdings, Inc. ("Allied") and its subsidiary Allied Systems, Ltd. (L.P.) ("Systems") under Chapter 11 of the Bankruptcy Code. On June 10, 2012, the remaining debtors (together with Allied and Systems, the "Debtors") filed voluntary petitions in this Court and, in connection therewith, Allied and Systems consented to the involuntary petitions filed against them. The Debtors' cases are being jointly administered.

In November 2014, Black Diamond and Spectrum (and certain of their affiliates) filed a complaint against Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund, II, L.P., and Yucaipa American Alliance (Parallel) Fund II, L.P. (collectively, "Yucaipa") as well as individual defendants who were officers or directors of the Debtors and affiliated with Yucaipa, for (i) equitable subordination, (ii) breach of contract, (iii) breach of implied duty of good

4

faith and fair dealing, and (iv) tortious interference with contract.[2] Yucaipa answered the complaint and asserted an equitable subordination counterclaim against both Black Diamond and Spectrum (the "Counterclaim").[3]

The parties agreed that several of the counts in the complaint were non-core (claims of breach of contract, breach of implied duty of good faith and fair dealing and tortious interference with contract). The Court entered an *Agreed Order* that these three counts constituted non-core claims.[4] In conjunction therewith, Yucaipa and the director defendants filed a motion to withdraw the reference[5] related to the non-core claims, which is under advisement with the District Court for the District of Delaware.[6]

As to the remaining/core count for equitable subordination, Yucaipa filed the Counterclaim also seeking equitable subordination and Black Diamond and Spectrum have moved to dismiss.[7] The motion to dismiss has been fully briefed and is ripe for the Court's consideration.

---

[2] Adv. Pro. No. 14-50971, D.I. 1.

[3] Adv. Pro. No. 14-50971, D.I. 19.

[4] Adv. Pro. 14-50971, D.I. 70.

[5] Adv. Pro. 14-50971, D.I. 7.

[6] *See* Adv. Pro. 14-50971, D.I. 46, 71 and 73.

[7] Adv. Pro. No. 14-50971, D.I. 41.

## B. Facts/Background Applicable to this Matter

### i. Allied's First Lien Debt and Prior Bankruptcy

The Debtors were a leading provider of distribution and transportation services to the automotive industry, specializing in the delivery of new vehicles from manufacturing plants to dealerships.

Certain affiliates of the Debtors entered bankruptcy on July 31, 2005, in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division. When the Debtors emerged from bankruptcy in May 2007, Yucaipa converted its debt into approximately 67% of the issued and outstanding common stock of the reorganized Debtors (which it later increased to approximately 70%). Yucaipa also had the right to appoint three of the five members of the Board, appoint the Chief Executive Officer (the fourth member of the Board), and had approval rights over the fifth and final member of the Board, who was to be appointed by the creditors' committee in the 2005 bankruptcy cases.

The Debtors' exit facility from that bankruptcy case included the First Lien Credit Agreement dated May 15, 2007 (the "First Lien Credit Agreement" for the "First Lien Debt" and held by "First Lien Lenders") and the Second Lien Secured Super Priority Debtor-in-Possession and Exit Credit and Guaranty Agreement dated May 15, 2007 (the "Second Lien Credit Agreement").

The First Lien Credit Agreement provided a $265 million secured facility, consisting of term loans in the aggregate principal amount $180 million, revolving loans

in the amount of $35 million, and letters of credit in the amount of $50 million in favor of Allied Holdings and certain of its affiliates.

The First Lien Credit Agreement was amended four times. Although Yucaipa was not an original lender in the First Lien Credit Agreement, through the third amendment (the "Third Amendment"), Yucaipa became a restricted lender under the First Lien Credit Agreement. The Third Amendment also contained a "Covenant Not to Sue" which limited Yucaipa's right to sue any Lender, as well as an "Appearance Prohibition."[8] At the time of the Third Amendment, Yucaipa did not own any First Lien Debt, nor did Yucaipa purchase any First Lien Debt at this time.

---

[8] Section 2.7(e) of the Third Amendment provides:

> To the fullest extent permitted by applicable law, no Restricted Sponsor Affiliate [Yucaipa] shall assert, and each Restricted Sponsor Affiliate immediately and automatically upon becoming a Lender, hereby irrevocably (i) *waives, any claim or cause of action against any Lender, any Agent and their respective Affiliates* . . . (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement or otherwise) *arising out of, in connection with, as a result of, or un any way related to, this Agreement or any Credit Document* or any agreement of instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, *any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith* except to the extent caused by such Agent's gross negligence or wilful misconduct, , , as determined by a court of competent jurisdiction by final and non-appealable judgment, (ii) *waives, releases and agrees not to sue upon such claim or any such cause of action*, whether or not accrued and whether or not known or suspected to exist in its favor and (iii) waives any claim or cause of action against any Agent or and Lender . . . on any theory or liability for special, indirect, consequential or punitive damages . . .

Third Amendment, § 2.7(e) (emphasis added) ("Covenant Not to Sue"). The Third Amendment also stated that Yucaipa "irrevocably and voluntarily waive[s] in their capacity as Lenders hereunder any right to, make any election, give any consent, commence any action or file any motion, claim, obligation, notice of application or take any other action in any Insolvency or Liquidation Proceeding without the prior written consent of all Lenders other than [Yucaipa]." Third Amendment, § 2.7(b).

By mid-2008, Allied had committed a series of defaults under the First and Second Lien Credit Agreements, and it failed to make the required principal payments due to the lenders. In February 2009, ComVest Investment Partners III, L.P. ("ComVest") acquired a majority of Allied's First Lien Debt. In August 2009, Allied entered into the fourth amendment to the First Lien Credit Agreement ("Fourth Amendment") with ComVest. The Fourth Amendment removed many of the restrictions related to the First Lien Debt placed on Yucaipa that were implemented in the Third Amendment. On October 29, 2009, Yucaipa acquired unrestricted First Lien Debt from ComVest.

### ii.  Black Diamond/Yucaipa Action

In January, 2012, three of Allied Holdings' other first lien lenders, the Petitioning Creditors, filed suit against Yucaipa in the Supreme Court for the State of New York[9] (the "Black Diamond/Yucaipa Action"). The plaintiffs in the Black Diamond/Yucaipa Action sought, *inter alia*, a judicial declaration that the Fourth Amendment was null and void and that, consequently, Yucaipa was not the "Requisite Lender" (as defined therein) under the First Lien Credit Facility. More specifically, Black Diamond and Spectrum sought a declaration that (i) the Fourth Amendment was null and void because such amendment to the First Lien Credit Agreement required unanimous lender consent, which was not obtained, and (ii) a declaration that Yucaipa was not the Requisite Lender.

Thereafter, Black Diamond and Spectrum moved for summary judgment, which the New York court granted, holding that the First Lien Credit Agreement

---

[9] Index No. 650150/2012.

unambiguously required unanimous consent. The New York court held that the Fourth Amendment was "flatly prohibited under the [First Lien] Credit Agreement absent the consent of all the Lenders," as a result the Fourth Amendment was "invalid and of no force and effect."[10] Yucaipa appealed this decision to the New York Appellate Division. The Appellate Division affirmed the New York Supreme Court's decision granting summary judgment in favor of Spectrum that the Fourth Amendment was void *ab initio* and that Yucaipa was not the Requisite Lender.[11] However, the Appellate Division "modified the law" of the lower court's grant of summary judgment in favor of Black Diamond, finding that there was a triable issue of fact as to whether Black Diamond had waived its right to challenge Yucaipa's status as Requisite Lender.[12] The Appellate Division held that there was no such issue of fact as to Spectrum and that Spectrum had not waived its ability to challenge Yucaipa's status as Requisite Lender.[13] As approval of the Fourth Amendment required unanimous consent of *all* Lenders, including Spectrum, and because Spectrum had not waived its right to challenge the validity of the Fourth Amendment, the Appellate Division affirmed the lower court's finding that the Fourth Amendment was void *ab initio*.[14]

---

[10] *BDCM Opportunity Fund II, LP v. Yucaipa American Alliance Fund I, LP*, No. 650150/2012, 2013 WL 1290394, *5 (N.Y. Sup. Ct. Mar 8, 2013).

[11] *BDCM Opportunity Fund II, L.P. v. Yucaipa American Alliance Fund I, LP*, 112 A.D.3d 509 (N.Y. App. Div. 2013).

[12] *Id.* at 511.

[13] *Id.*

[14] *Id.* at 509-10.

Thereafter, Yucaipa filed a motion for leave to appeal to the New York Court of Appeals, which was denied.[15] Due to the Appellate Division's remand on the issue of waiver, the New York Court of Appeals held that insofar as Yucaipa sought leave to appeal as against Black Diamond, there was not a final judgment upon which an appeal could be made.[16] However, the New York Court of Appeals otherwise denied Yucaipa's motion for leave to appeal.[17]

### iii. Sale of the Debtors' Assets

#### a. Pre-Petition Negotiations with Jack Cooper Transport

Yucaipa alleges that the involuntary petitions were filed by Black Diamond and Spectrum in order to disrupt the consummation of the sale of the Debtors' assets to Jack Cooper Transit ("JCT"). Prior to the Debtors' bankruptcy, Black Diamond and Spectrum negotiated directly with JCT to have JCT acquire Allied's assets through voluntary bankruptcy proceedings. Yuciapa alleges that the final term sheet for the sale to JCT provided that all lenders (including Black Diamond and Spectrum) would be entitled to receive payment in full as part of the transaction. Yuciapa claims that Black Diamond and Spectrum sought to force Yucaipa to buy their claims for 90 cents on the dollar to avoid any risk that the sale to JCT would not close. Thereafter, Yucipa alleges that the same day that Black Diamond and Spectrum officially terminated negotiations with JCT, Black Diamond and Spectrum filed these involuntary bankruptcy proceeding. Yucaipa

---

[15] *BDCM Opportunity Fund II, L.P. v. Yucaipa Am. Alliance Fund I, L.P.,* 22 N.Y.3d 1171, 1172, 985 N.Y.S.2d 472 (N.Y. 2014).

[16] *Id.* at 1171-72.

[17] *Id.*

does not believe there is a valid business purpose for termination of negotiations with JCT or the involuntary bankruptcy filing.

### b.  Post-Petition Sale of Assets to JCT

After the bankruptcy, the Debtors sold substantially all of their assets to JCT, pursuant to section 363 of the Bankruptcy Code, in exchange for approximately $135 million (far less than the "par plus interest" discussed prior to the bankruptcy).[18]

### c.  Credit Bid Sale to SBDRE LLC

In August 2013, Black Diamond and Spectrum, acting as Requisite Lender, formed SBDRE LLC[19] ("SBDRE") to credit bid for certain real estate assets and trucks that were not sold to JCT.  On September 17, 2013, this Court approved the credit bid and the sale of the remaining assets to SBDRE.  After SBDRE acquired these assets, Black Diamond and Spectrum circulated a memorandum (the "Memo") to the First Lien Lenders disclosing that certain Black Diamond agents, who were named in the LCC Agreement as the managing members of SBDRE, would hold the First Lien Lenders' pro rata Class A Membership Interests in SBDRE for the benefit of the First Lien Lenders.  The Memo described the contemplated issues of new membership interests in SBDRE (the "New Issuance").  Following the New Issuance, SBDRE would have Class B and Class C Membership Interests.  SBDRE issued $10 million in new Class B Membership Interests that were to receive 66.6% of the voting rights in and rights to distributions from SBDRE.

---

[18]  Del. Bankr. Case No. 12-11564, D.I. 1837.

[19]  SBDRE LLC was formed pursuant to the Amended and Restated Limited Liability Company Agreement of SBDRE LLC (the "LLC Agreement").

The First Lien Lenders were allowed to buy up to their *pro rata* share of Class B Membership Interests. In exchange for backstopping the New Issuance, Black Diamond and Spectrum granted itself all of the new Class C Membership Interests, which represented 3% of the aggregate Membership Interests in SBDRE. Neither Yucaipa nor any of the other First Lien Lenders participated in the New Issuance. Black Diamond and Spectrum now control all of the Class B and Class C Membership Interests in addition to their *pro rata* shares of the Class A Membership Interests.

### iv.   *Related Litigation in these Cases*

#### a. **Allied Adversary Proceeding**

As mentioned *supra*, Black Diamond and Spectrum filed involuntary petitions against Allied on May 17, 2012. Subsequently, Allied filed an adversary proceeding against all of the First Lien Lenders seeking declarations regarding the identity of the Requisite Lender as well as the validity of the Fourth Amendment[20] (the "Allied Adversary Proceeding"). Allied then filed a motion to extend the stay to the Black Diamond/Yucaipa Action pending in New York state court. This Court took the motion to extend the stay under advisement pending the New York court's ruling on the then pending motion to invalidate the Fourth Amendment and determination that Yucaipa was not the Requisite Lender. The New York court ruled and invalidated the Fourth Amendment and determined that Yucaipa was not the Requisite Lender.

---

[20] Adv. Pro. 12-50947.

12

After the New York court's ruling, Yucaipa filed an amended counterclaim and cross-claims ("Cross-Claims") in the Allied Adversary Proceeding seeking, *inter alia*, a declaration that the Third Amendment was invalid.  However, this Court dismissed Yucaipa's Cross-Claims finding that the "Covenant Not to Sue" in the Third Amendment applied to Yucaipa; the Court also found that Yucaipa's Cross-Claims were not plausible under Bankruptcy Rule 7012(b)(6).[21]

### b. The Committee Action

The Court also granted the Official Committee of Unsecured Creditords standing to pursue various claims against Yucaipa and the Debtors' officers and directors and allowed Black Diamond and Spectrum to "intervene/participate in the litigation." Shortly thereafter, the Creditors Committee (as Plaintiff) and Black Diamond and Spectrum (as Intervenors) filed an amended complaint against Yucaipa and numerous officers and directors of Allied (the "Committee Action").[22]  The Complaint in the Committee Action asserts various claims, including an equitable subordination claim on behalf of the estates, brought by the Creditors Committee, and an equitable subordination claim on behalf of the First Lien Lenders (other than Yucaipa) brought by Black Diamond and Spectrum.  The Court entered a scheduling order and discovery ensued.  Thereafter, the Honorable Robert Drain commenced a mediation aimed at finding a global resolution between the Debtors, Black Diamond, Spectrum, the Creditors Committee and Yucaipa.

---

[21] Adv. Pro. 12-50947, Transcript of Hr'g Feb. 27, 2013; 108:12-110:21 (D.I.162).

[22] Adv. Pro. No. 13-50530.

Despite Judge Drain's best efforts over a number of mediation sessions, the mediation was not successful.

Subsequently, in an effort to facilitate the section 363 sale process discussed *supra*, the Court entered a stipulated amended scheduling order pushing out the trial date and related discovery deadlines. This scheduling order also provided that the Court would address the issue of enforceability of the Third Amendment and the identity of the Requisite Lender in conjunction with the proposed sale of Allied's assets.

Thereafter, Black Diamond and Spectrum filed a motion for summary judgment for a determinate that they were the Requisite Lenders under the Credit Agreement, which this Court granted.

### c. Delaware Chancery Court Action

Yucaipa filed an action against SBDRE in the Delaware Chancery Court ("Chancery Court"), which the Chancery Court, upon motion, dismissed. In ruling on the motion to dismiss, the Chancery Court gave collateral estoppel effect to this Court's ruling dismissing the Cross-Claims holding that Yucaipa could not sue Black Diamond and Spectrum "in the absence of a final, non-appealable determination that Black Diamond [and Spectrum] acted with gross negligence or willful misconduct."[23] However, the Chancery Court continued that in any instance where Yucaipa suffers a *distinct harm* not shared by any other person or entity that reasonably could bring suit, it

---

[23] *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, No. CIV.A. 9151-VCP, 2014 WL 5509787, at *14 (Del. Ch. Oct. 31, 2014) (footnote omitted).

would be impossible to satisfy the Prior Determination Requirement."[24] The Chancery

Court held:

> This Court will not revisit the Bankruptcy Court's
> interpretation of the Covenant and the relationship between
> the Carve Out[25] and the Prior Determination Requirement.
> Yucaipa received a full and fair opportunity to litigate that
> issue to the extent it was presented in the Bankruptcy Action
> and cannot re-litigate it here. Yucaipa advances a reasonably
> conceivable argument, however, that in situations where it
> alleges a unique harm—meaning no other Lender could sue
> and the Prior Determination Requirement could not be
> satisfied—construing the Carve Out so broadly that it would
> fail to provide an escape hatch for Yucaipa in those
> circumstances arguably would produce a prohibited result.
> The Bankruptcy Court was not called upon to interpret the
> Covenant in a situation such as Yucaipa alleges here. On the
> whole, I find it reasonably conceivable that Yucaipa could
> show that, even after giving collateral estoppel effect to the
> Bankruptcy Court's holding, Defendants' interpretation of
> the Covenant, in the limited circumstances posited above,
> could produce a result contrary to public policy.[26]

The Chancery Court found that all fourteen counts in Yucaipa's complaint fell within the

Covenant Not to Sue, however, the Chancery Court did not dismiss one of the counts on

this basis because it was "unrealistic to assume anyone other than Yucaipa would seek a

declaratory judgment as to the percentage of the Allied Debt held by Yucaipa," as well as

---

[24] *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, No. CIV.A. 9151-VCP, 2014 WL 5509787, at *14 (Del. Ch. Oct. 31, 2014) (emphasis added).

[25] "Carve Out" was defined by the Chancery Court as the language in the Covenant Not to Sue that states: "except to the extent caused by such Lender's or Agent's gross negligence or willful misconduct . . . ." *See Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, No. CIV.A. 9151-VCP, 2014 WL 5509787, at *10 (Del. Ch. Oct. 31, 2014).

[26] *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, No. CIV.A. 9151-VCP, 2014 WL 5509787, at *15 (Del. Ch. Oct. 31, 2014) (footnote and citations omitted).

two related counts.[27]  However, the counts not dismissed based on the Covenant Not to Sue, were then stayed by the Chancery Court because the bankruptcy action involved substantially similar parties and issues and the Bankruptcy Court could render prompt and complete justice on these counts.[28]

### d.  The Black Diamond/Spectrum vs. Yucaipa Action

As discussed procedurally *supra*, on November 19, 2014, Black Diamond and Spectrum, on behalf of all First Lien Lenders, commenced this adversary action against Yucaipa and Yucaipa directors, among others, seeking (i) equitable subordination, (ii) breach of contract, (iii) breach of the implied duty of good faith and fair dealing, and (iv) tortious interferences with contract (the "Black Diamond/Spectrum Action").[29]  In the Black Diamond/Spectrum Action, the plaintiffs assert that Yucaipa has intentionally schemed to harm the First Lien Lenders.  The plaintiffs continue that Yucaipa held a controlling stake in the Debtors' equity, controlled the Debtors' board of directors, wrongfully acquired majority of the debt under the First Lien Credit Agreement facility, improperly declared itself the "Requisite Lender" under the First Lien Credit Agreement, and used the powers flowing from these positions for Yucaipa's own benefit to the detriment of the First Lien Lenders.[30]

---

[27] *Id.* at *15.

[28] *Id.* at *16-18.

[29] Del. Bankr. Adv. No. 14-50971.

[30] *See* Black Diamond/Spectrum Action, D.I. 1, ¶ 1 (the "Complaint").

Following the commencement of the Black Diamond/Spectrum Action, Yucaipa moved the District Court for the District of Delaware ("District Court") for withdrawal of the reference on all counts in the Complaint except the claim for equitable subordination.[31] Thereafter and pursuant to the parties' agreement, the Court entered an order holding that the following claims were non-core claims: breach of contract, breach of the implied duty of good faith and fair dealing, and tortious interferences with contract. The Court also held that the claim for equitable subordination constituted a core claim.[32] Thereafter, the Bankruptcy Court transmitted the motion for withdrawal of the reference to the District Court for consideration, such motion remains pending.[33] Yucaipa answered the Complaint and asserted the Counterclaim for equitable subordination of Black Diamond's and Spectrum's claims, including those claims held pursuant to the First Lien Credit Agreement. Through the Counterclaim, Yucaipa seeks subordination of Black Diamond's and Spectrum's claims relative to Yucaipa and other holders of claims under the First Lien Credit Agreement. Black Diamond and Spectrum subsequently filed a motion to dismiss this equitable subordination Counterclaim, which is the subject of this opinionn.

    *v.*   *Cooperation Agreement*

In mid-2011, Black Diamond and Spectrum entered into an agreement (the "Cooperation Agreement") under which Black Diamond and Spectrum agreed that if

---

[31] Black Diamond/Spectrum Action, D.I. 7, 8, 28.

[32] Black Diamond/Spectrum Action, D.I. 69 and 70.

[33] *Id.* at D.I. 71.

17

either of them purchased any additional Allied debt, the acquiring party would offer a pro rata share of that debt to the other at the same price.[34] The Cooperation Agreement was memorialized in writing in January 2012. According to the Cooperation Agreement, the Cooperation Agreement was entered into in contemplation of "the pursuit of certain strategies to enforce the rights of the Parties as Lenders under the First Lien Credit Agreement[,]" among other things.[35] The Cooperation Agreement continues that Black Diamond and Spectrum "shall, in good faith, work together to identify and implement courses of action for the purpose of maximizing the recoveries" to the lenders under the First Lien Credit Agreement.[36]

At the time Black Diamond and Spectrum entered into the Cooperation Agreement, Black Diamond held approximately $30 million in principal amount of First Lien Debt and Spectrum held approximately $20 million in principal amount of First Lien Debt. On or around September 28, 2011, Black Diamond purchased approximately $10 million of additional First Lien Debt from an unrelated third party. At the time of this purchase, Spectrum's ratable share of First Lien Debt held by Black Diamond and Spectrum together was approximately 40%. On October 14, 2011, Spectrum purchased approximately $4.2 million of First Lien Debt from Black Diamond, this trade closed on April 4, 2012 pursuant to the Assignment and Assumption Agreement.[37]

---

[34] Ward Declaration at Exh. 2.

[35] Ward Declaration, Exhibit 3 (Cooperation Agreement) at p. 1 (hereinafter referred to only as the "Cooperation Agreement").

[36] Cooperation Agreement at ¶ 1.

[37] *See* Ward Declaration at ¶¶ 5 - 6 and Exhibits 4-5.

18

## C. Yucaipa's New Claims

Yucaipa asserts that in its review of the written discovery propounded by Black Diamond and Spectrum, Yucaipa has uncovered a scheme whereby Black Diamond "paid-off" Spectrum to join Black Diamond in filing the involuntary petitions. Yucaipa asserts that Black Diamond and Spectrum engaged in illegal claims-trading and continued concealment of that misconduct by Black Diamond and Spectrum in connection with the petitions filed in these cases.

Yucaipa alleges that Black Diamond and Spectrum participated in a fraudulent and inequitable scheme as follows:

> 1. Black Diamond and Spectrum encouraged Yucaipa to acquire as much Allied debt as possible by providing false assurances of cooperation and support. Yucaipa continues that Black Diamond and Spectrum could only equitably subordinate the debt if it was owned by Yucaipa, rather than ComVest, so Black Diamond and Spectrum encouraged Yucaipa to buy the debt; further knowing that Yucaipa was relying on the Fourth Amendment when it purchased the debt.

> 2. Once Black Diamond and Spectrum encouraged Yucaipa to purchase a majority of the First Lien Debt, they instructed the Administrative Agent under the First Lien Credit Agreement, who had initially cooperated with Yucaipa as Requisite Lender, to refuse to recognize directions from Yucaipa in its capacity as Requisite Lender and to challenge the validity of Yucaipa's status as Requisite Lender.

> 3. Black Diamond and Spectrum file involuntary bankruptcy petitions and submitted false statements to the Bankruptcy Court to support the involuntary bankruptcy. Black Diamond and Spectrum filed the involuntary petition to scuttle the sale to JCT which was supposed to proceed as a section 363 sale in a voluntary bankruptcy. The Yucaipa-JCT sale would have required transfer of certain of First Lien Claims to JCT, including all of the First Lien Claims held by Yucaipa, before the commencement of any bankruptcy. This

would mean that Black Diamond and Spectrum would have lost their equitable subordination claim against Yucaipa, thus Black Diamond and Spectrum filed the involuntary petition so that the First Lien Claims remained with Yucaipa. Yucaipa continues that Black Diamond paid a $4 million "bribe" to Spectrum, in the form of an illegal claims trade, to induce Spectrum to become a petitioning creditor. Yucaipa continues that Black Diamond and Spectrum did not disclose the claims trade that induced Spectrum to become a petitioning creditor. As a result of the involuntary bankruptcy, substantially all of Allied's assets were sold to JCT for $135 million in December 2013, which was approximately $170 million less in consideration than offered by JCT to all lenders nearly 18 months earlier. Yucaipa alleged that Black Diamond received up to eight times its original investment and Spectrum also recovered more than payment in full of its original investment, even before equitable subordination of Yucaipa's claim.

4. In an attempt to wipe out Yucaipa's First Lien Claims, Black Diamond and Spectrum filed a baseless complaint for equitable subordination. Yucapia continues that Black Diamond and Spectrum were scheming to equitably subordinate Yucaipa's debt even before Yucaipa had acquired any First Lien Claims. Yucaipa alleges that Black Diamond and Spectrum would receive a 20-fold return on their initial investment if Yucaipa's First Lien Claims were equitably subordinated. Yucaipa alleges that Black Diamond and Spectrum excluded assets from the sale to JCT which resulted in an additional multi-million dollar windfall for Black Diamond and Spectrum.

Yucaipa alleges that it is in a singularly unique position to seek relief for the harm that Black Diamond and Spectrum inflicted upon Yucaipa. Yucaipa alleges that Black Diamond and Spectrum's scheme was directed at Yucaipa as a majority holder of Allied's equity, as well as Allied's debt, and was crafted to take advantage of Yucaipa's employees' position on Allied's Board, as well as Yucaipa's majority holdings of Allied's debt.

More specifically, Yucaipa alleges the Black Diamond and Spectrum participated in a "strategy" to ensure that they maximized and shared their First Lien Claim holdings. Yucaipa argues that the Cooperation Agreement was not disclosed and was, in fact, hidden from the Bankruptcy Court and Yucaipa. Yucaipa asserts that the Cooperation Agreement was specifically entered into in contemplation of the involuntary petitions. Yucaipa also argues that Black Diamond gave an "Involuntary Petition Payoff" to Spectrum to secure Spectrum's participation as a petitioning creditor. Yucaipa alleged that Black Diamond agreed to transfer ("as an obvious bride") an additional $4 million in face amount in First Lien Claims to Spectrum on favorable pricing terms in exchange for Spectrum's willingness to filly support the involuntary petition strategy. Yucaipa alleges that evidence of this "bribe" is seen in Jeffrey Shaffer's (managing member of Spectrum) email to Richard Erlick (managing director of Black Diamond), in which Spectrum, which already held at least $20 million in claims against the Debtors expressly conditioned its cooperation in filing these involuntary bankruptcy petitions on a $1.8 million payoff from Black Diamond. Wherein, Mr. Schaffer states, referring to the transfer: "Please get this closed this week. We cannot file an involuntary without it done."[38]

Yucaipa continues that during the time of the "Involuntary Petition Payoff," Black Diamond and Spectrum were pretending to negotiate with JCT. Yucaipa points to an email between Theo Ciupitu (JCT) and Jeffrey Schaffer (Spectrum) requesting the "exact

---

[38] Defendants' Answer and Counterclaims, Exhibit 12.

21

dollar amount" of First Lien Claims held by Spectrum, which Spectrum would not provide.[39]

Yucaipa argues that in March 2012, Yucaipa and JCT had finalized a term sheet pursuant to which JCT would buy the First Lien Claims held by Yucaipa before the commencement of any bankruptcy for approximately $155 million. Yucaipa claims that Black Diamond and Spectrum had no legitimate reason to place Allied in an involuntary bankruptcy which they knew would scuttle the deal with JCT.

Yucaipa claims that Black Diamond and Spectrum violated at least two of the Bankruptcy Rules' material disclosure obligations – Rule 1003 and Rule 2019 – in that Black Diamond and Spectrum failed to disclose "Black Diamond's Involuntary Petition Payoff to . . . Spectrum for the purpose of bribing . . . Spectrum to cooperate in filing the involuntary petition."[40] Yucaipa alleges that Black Diamond and Spectrum are being motivated by greed because if Yucaipa's First Lien Claims are equitably subordinated then Black Diamond's and Spectrum's stake in the claims pool increases from 22% to 50%.

Yucaipa further argues that Black Diamond and Spectrum are attempting to strip Yucaipa's rights in connection with its holdings of the First Lien Claims, including the reimbursement of legal expenses incurred in connection with the bankruptcy and the attendant litigation.

---

[39] Defendants' Answer and Counterclaims, Exhibit 13.

[40] Defendants' Answer and Counterclaims at ¶ 74.

In connection with the credit bid for certain real estate assets and trucks that were not sold to JCT, Yucaipa alleges that its interests were diluted through the actions of Black Diamond and Spectrum, including the equity rights offering in the purchasing entity SBDRE that excluded Yucaipa from participation and reduced Yucaipa's pro rata allocation of the SBDRE membership. Yucaipa also alleges that the SBDRE's LLC agreement purports to waive any fiduciary duties that would be owed by Black Diamond and Spectrum, or their agents, to the fullest extent permitted by Delaware law.

Lastly, Yucaipa claims that the harm caused by Black Diamond and Spectrum is unique to Yucaipa. Yucaipa alleges that the other First Lien Claim holders (a) hold minor stakes in the First Lien debt; (b) have no equity stake in Allied; (c) are not insiders and have no employees who serve on the Allied Board of Directors; (d) have no involvement in the management or control of Allied; (e) would suffer harm too inconsequential to pursue an equitable subordination claim; (f) have not been sued for equitable subordination; and (g) have always acted in concert with Black Diamond and Spectrum. Yucaipa claims that Black Diamond and Spectrum's "scheme" was directed at Yucaipa and is focused on eliminating Yucaipa's rights in favor of their own.

# ANALYSIS

## A.    Legal Standard

A motion under Rule 12(b)(6)[41] serves to test the sufficiency of the factual allegations in the plaintiff's complaint.[42] "Standards of pleading have been in the forefront of jurisprudence in recent years."[43] With the Supreme Court's recent decisions in *Bell Atlantic Corp. v. Twombly*[44] and *Ashcroft v. Iqbal*,[45] "pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss."[46]

In *Iqbal*, the Supreme Court makes clear that the *Twombly* "facial plausibility" pleading requirement applies to all civil suits in the federal courts.[47] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to survive a motion to dismiss.[48] Rather, "all civil complaints must now set

---

[41] Federal Rules of Civil Procedure 8(a) and 12(b)(6) are made applicable to this adversary proceeding pursuant to Federal Rules of Bankruptcy Procedure 7008 and 7012, respectively.

[42] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) ("The pleader is required to set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist." (citations omitted)).

[43] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 209 (3d Cir. 2009).

[44] 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

[45] 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

[46] *Fowler*, 578 F.3d at 210.

[47] *See Fowler*, 578 F.3d at 210.

[48] *Iqbal*, 556 U.S. at 678 (citations omitted). *See also Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) (citations omitted); *Bartow v. Cambridge Springs SCI*, 285 Fed.Appx. 862, 863 (3d Cir. 2008) ("While facts must be accepted as alleged, 'this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions.'"); *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 333 (3d Cir. 2001) ("Liberal construction has its limits, for the pleading must at least set forth sufficient

out sufficient factual matter to show that the claim is facially plausible."[49]  A claim is

facially plausible "when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged."[50]

Determining, whether a complaint is "facially plausible" is "a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense.[51]  "But

where the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged-but not shown-that the pleader is

entitled to relief."[52]

    After *Iqbal*, the Third Circuit has instructed this Court to "conduct a two-part

analysis.  First the factual and legal elements of a claim should be separated.  The [court]

must accept all of the complaint's well-pleaded facts as true, but may disregard any legal

conclusions."[53]  The court "must then determine whether the facts alleged in the

---

information for the court to determine whether some recognized legal theory exists on which relief could
be accorded the pleader.  Conclusory allegations or legal conclusions masquerading as factual conclusions
will not suffice to prevent a motion to dismiss.  While facts must be accepted as alleged, this does not
automatically extend to bald assertions, subjective characterizations, or legal conclusions." (citations
omitted)).

[49] *Fowler*, 578 F.3d at 210 (internal quotations omitted).  *See also Iqbal*, 556 U.S. at 664 ("While legal
conclusions can provide the framework of a complaint, they must be supported by factual allegations.");
*Buckley v. Merrill Lynch & Co. (In re DVI, Inc.)*, 2008 WL 4239120, 2008 Bankr.LEXIS 2338 (Bankr. D. Del.
Sept. 16, 2008) ("Rule 8(a) requires a showing rather than a blanket assertion of an entitlement to relief.  We
caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement
that he or she provide not only fair notice, but also the grounds on which the claim rests." (citations
omitted)).

[50] *Iqbal*, 556 U.S. at 678.

[51] *Id*. at 679.  "It is the conclusory nature of [plaintiff's] allegations, rather than their extravagantly fanciful
nature, that disentitles them to the presumption of truth."  *Id*. at 681.

[52] *Id*. at 679 (citations and internal quotations omitted).

[53] *Fowler*, 578 F.3d at 210-11.  *See also Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (holding that a court *must* take
the complaint's allegations as true, no matter how incredulous the court may be); *Iqbal*, 129 S.Ct. at 678
("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

complaint are sufficient to show that the plaintiff has a plausible claim for relief."[54]  The

Third Circuit has further instructed that "[s]ome claims will demand relatively more

factual detail to satisfy this standard, while others require less."[55]

**B.    Yucaipa is Barred by the Third Amendment from Asserting the Counterclaim**

    *i.    Parties' Arguments*

       Black Diamond and Spectrum assert that the Covenant Not to Sue prevents

Yucaipa from asserting *any* claim against other Lenders with respect to any claim related

to the Credit Agreement.  The Covenant Not to Sue has an exception for claims of "gross

negligence or wilful misconduct . . . as determined by a court of competent jurisdiction

by final and non-appealable judgment (the "Prior Determination Requirement"),[56] Black

Diamond and Spectrum assert that this Court has held that the Prior Determination

Requirement allows Yucaipa to sue only *after* there has been a prior judicial

---

suffice . . . .  When there are well-plead factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."); *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007); *Carino v. Stefan*, 376 F. 3d 156, 159 (3d Cir. 2004).  The Court may also consider documents attached as exhibits to the Complaint and any documents incorporated into the Complaint by reference. *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 183 (Bankr. D. Del. 2000) (citing *PBGC v. White*, 998 F.2d 1192, 1196 (3d Cir. 1993)).  "[I]f the allegations of [the] complaint are contradicted by documents made part thereof, the document controls and the Court need not accept as true allegations of the complaint." *Sierra Invs., LLC v. SHC, Inc. (In re SHC, Inc.)*, 329 B.R. 438, 442 (Bankr. D. Del. 2005).  *See also Sunquest Info Sys., Inc. v. Dean Witter Reynolds, Inc.*, 40 F.Supp.2d 644, 649 (W.D. Pa. 1999) ("In the event of a factual discrepancy between the pleadings and the attached exhibit, the exhibit controls." (citations omitted)).

[54]  *Fowler*, 578 F.3d at 211 (internal quotations omitted) ("[A] complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts." (citations omitted)).  "The plaintiff must put some 'meat on the bones' by presenting sufficient factual allegations to explain the basis for its claim." *Buckley v. Merrill Lynch & Co., Inc. (In re DVI, Inc.)*, 2008 WL 4239120, at *4, 2008 Bankr.LEXIS 2338, at *13 (Bankr. D. Del. Sept. 16, 2008).

[55]  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010).  *See also Arista Records LLC v. Doe*, 604 F.3d 110, 120-21 (2d Cir. 2010) (stating that *Twombly* and *Iqbal* require factual amplification where needed to render a claim plausible, not pleadings of specific evidence or extra facts beyond what is needed to make a claim plausible).

[56]  Third Amendment § 2.7(e).

determination of willful misconduct or gross negligence. Black Diamond and Spectrum further assert that Yucaipa is not alleging a "unique harm" because (i) the Counterclaim related to the First Lien Credit Agreement, (ii) Yucaipa filled the Counterclaim in its capacity as a putative Lender under the First Lien Credit Agreement, (iii) the Counterclaim seeks to increase the distribution payable to Yucaipa on account of its First Lien claims, and (iv) the Counterclaim seeks to equitable subordinate Black Diamond's and Spectrum's claims under the First Lien Credit Agreement. Black Diamond and Spectrum further assert that although Yucaipa states several reasons why it is in a unique position, Yucaipa has not articulated how these points have any bearing on other First Lien Lenders' ability to seek equitable subordination on the basis that Black Diamond and Spectrum were harming all First Lien Lenders by filing an involuntary petition and scuttling the JCT deal.

Black Diamond and Spectrum further assert that Yucaipa is barred from filing the Counterclaim by operation of the section 2.7(b) of the Third Amendment (the "Appearance Prohibition") which prevents Yucaipa from filing claims without the consent of *all* the First Lien Lenders.

Yucaipa responds that the Covenant Not to Sue does not bar Yucaipa's Counterclaim because such claims were caused by Black Diamond's and Spectrum's gross negligence and/or wilful misconduct on or after the date Yucaipa became a Lender under the First Lien Credit Agreement. Yucaipa continues that its claims are unique to Yucaipa and other First Lien Lenders could not bring such claims, thus the Counterclaim

falls into the Chancery Court's public policy exception to the Covenant Not to Sue. Yucaipa argues that the Chancery Court only required that it be "unrealistic" for the other lenders to sue or that it was unlikely that they would sue because Yucaipa had a greater incentive. Furthermore, Yucaipa argues that even if the Chancery Court's holding did apply the Prior Determination Clause, Black Diamond and Spectrum could not be exculpated from willful misconduct or grossly negligent acts. Yucaipa asserts that such a result would violate public policy.

Yucaipa further asserts that the Appearance Prohibition, which bars Yucaipa from asserting claims, among other things, in "Insolvency or Liquidation Proceedings" without consent of all First Lien Lenders, is not valid as to the Counterclaim. More specifically, Yucaipa claims that (i) this adversary action is not an "Insolvency or Liquidation Proceeding" but rather akin to a state law action in district court; (ii) Black Diamond and Spectrum are equitably estopped from asserting the Appearance Prohibition because they have not raised such argument until the Motion to Dismiss; and (iii) the Appearance Prohibition violates public policy because it prevents Yucaipa from asserting claims of willful misconduct and gross negligence against Black Diamond and Spectrum.

Black Diamond and Spectrum reply that Yucaipa misstates the holding of the Chancery Court – Black Diamond and Spectrum assert that the Chancery Court's public policy carve out was narrowly tailored and only applies where *only* Yucaipa has been harmed. Black Diamond and Spectrum reply that even though Yucaipa alleges willful

28

misconduct and gross negligence, the Covenant Not to Sue applies because here the asserted willful or grossly negligent acts allegedly harmed Yucaipa and *other* First Lien Lenders. Thus, the Prior Determination Requirement would mandate that *another* First Lien Lender file such action against Black Diamond and Spectrum. Black Diamond and Spectrum also reply that the Third Amendment was specifically intended to limit Yucaipa's rights, which is why Yucaipa was a "Restricted Sponsor Affiliate" and not a "Lender."

As a portion of Yucaipa's claim is related the JCT sale, where Yucaipa argues that the pre-petition sale would have maximized value for all of Allied's stakeholders with a payment of "up to par plus accrued interest," and as a result of the involuntary petitions, the sale to JCT was $170 million less in consideration than offered by JCT to *all* lenders. Black Diamond and Spectrum point out that the claims related to the JCT sale would have benefited *all* First Lien Lenders, thus, any of the First Lien Lenders could bring this cause of action and it is not unique as to Yucaipa. Black Diamond and Spectrum continue that Yucaipa cannot claim it is "unique" on the basis that there are equitable subordination claims against it. Black Diamond and Spectrum assert that they are protected by the *Noerr-Pennington* doctrine which immunizes litigation from liability, as long as such litigation is not a sham.

Black Diamond and Spectrum continue that they are not equitably estopped from raising the Appearance Prohibition of the Third Amendment because Black Diamond and Spectrum have repeatedly raised such clause, plus Yucaipa, who assisted in drafting the

29

Third Amendment, was aware of this clause. Lastly, Black Diamond and Spectrum assert

that the Appearance Prohibition does not violate public policy because it only limits

Yucaipa's ability to commence litigation, but it does not limit Yucaipa's ability to defend

itself from claims brought by other First Lien Lenders.

### ii. Covenant Not to Sue

The Covenant Not to Sue, embodied in Section 2.7(e) of the Third Amendment,

provides:

> To the fullest extent permitted by applicable law, no
> Restricted Sponsor Affiliate [Yucaipa] shall assert, and each
> Restricted Sponsor Affiliate immediately and automatically
> upon becoming a Lender, hereby irrevocably (i) *waives, any
> claim or cause of action against any Lender, any Agent and their
> respective Affiliates* . . . (whether or not the claim therefor is
> based on contract, tort or duty imposed by any applicable
> legal requirement or otherwise) *arising out of, in connection
> with, as a result of, or un any way related to, this Agreement or any
> Credit Document* or any agreement of instrument
> contemplated hereby or thereby or referred to herein or
> therein, the transactions contemplated hereby or thereby, *any
> Loan or the use of the proceeds thereof or any act or omission or
> event occurring in connection therewith* except to the extent
> caused by such Agent's gross negligence or wilful misconduct
> . . . as determined by a court of competent jurisdiction by final
> and non-appealable judgment, (ii) *waives, releases and agrees
> not to sue upon such claim or any such cause of action*, whether or
> not accrued and whether or not known or suspected to exist
> in its favor and (iii) waives any claim or cause of action
> against any Agent or and Lender . . . on any theory or liability
> for special, indirect, consequential or punitive damages . . . .[57]

In interpreting the Covenant Not to Sue, it is incumbent to discuss both this Court's prior

ruling and the ruling from the Chancery Court, both interpreting this covenant.

---

[57] Third Amendment, § 2.7(e) (emphasis added) (referred to herein as the "Covenant Not to Sue").

On February 27, 2013, this Court heard oral argument regarding Black Diamond and Spectrum's motion to dismiss Cross-Claims filed by Yucaipa. More specifically, Black Diamond and Spectrum moved to dismiss on the grounds that the Third Amendment precluded Yucaipa from bringing Cross-Claims based on the Covenant Not to Sue and because such claims were barred by the applicable statute of limitations. This Court granted the motion to dismiss on both grounds. As to the Covenant Not to Sue, this Court stated:

> The argument on the [Covenent Not to Sue] are several. One is simply under its plain meaning, you can't sue. I don't think there's any question as to the plain meaning of the covenant and I think it's very clear. I don't find its sort of carve out as written deals with the narrow situation of a finding at some time post signing of the covenant by a court that there's been willful misconduct or gross negligence. And . . . I don't think that that is done in the auspices of a lawsuit directly related between the parties, it has to come from somewhere else. It's a little vague, but I think it's fair to say it has to be a narrow exception. And I endorse the view that when looking at the covenant not to sue being applicable we have to look at whether that covenant was entered into as a result of some sort of fraud or misconduct by the party that is being forbidden to sue.[58]

Thus, this Court ruled that there was an absence of any plausible allegations of fraud or wrongdoing in connection with the enactment of the Third Amendment or the Covenant Not to Sue that might provide a basis upon which to invalidate the Covenant Not to Sue. As a result, this Court dismissed Yucaipa's Cross-Claims as barred by the Covenant Not to Sue.

---

[58] Transcript from hearing on Feb. 27, 2013 at 109:14-110:5 (Adv. Pro. No. 12-50947, D.I. 162).

31

As set forth in more detail, *supra*, Yucaipa then sued Black Diamond and Spectrum

in the Chancery Court. The Chancery Court gave collateral estoppel effect to this Court's

holding, expanding and stating:

> Alleging willful misconduct is not enough: Yucaipa must show the existence of a final, non-appealable judgment finding gross negligence or willful misconduct by Black Diamond [and Spectrum] *before* Yucaipa can bring suit. This holding implies that some other party, such as another Lender, must bring suit and obtain a final, non-appealable judgment before Yucaipa could file its own lawsuit.[59]

The Chancery Court then stated:

> At the motion to dismiss state, I find it reasonably conceivable that Yucaipa could show that the outer boundaries of the Covenant [Not to Sue] are ambiguous, even after giving collateral estoppel effect to the Bankruptcy Court's ruling, and that public policy would prevent the wholesale adoption of the board interpretation . . . [Black Diamond and Spectrum] advance.
>
> . . .
>
> [I]n any instance where Yucaipa suffers a *distinct harm not share by any other person or entity that reasonably could bring suit*, it would be impossible to satisfy the Prior Determination Requirement. Covenants not to sue are valid and enforceable under New York law. But agreements prospectively limiting a party's liability resulting from that party's intentional misconduct are void as against public policy.
>
> . . .
>
> [I]n situations where [Yucaipa] alleges a *unique harm – meaning no other Lender could sue and the Prior Determination Requirement could not be satisfied –* construing the Carve Out so broadly that it would fail to provide an escape hatch for Yucaipa in those circumstances arguably would produce a prohibited result.[60]

---

[59] *Yucaipa Am. Alliance Fund I., LP*, C.A. No. 9151-VCP, 2014 WL 5509787 at *12 (emphasis supplied).

[60] *Id.* at *14-15 (emphasis added).

In applying its holding, and after giving collateral estoppel effect to this Court's ruling, as well as the Covenant Not to Sue, the Chancery Court did not dismiss several of the counts[61] based on the following:

> I decline to dismiss Count I. Even assuming some other party might have standing to bring this claim, *it is unrealistic to assume anyone other than Yucaipa* would seek a declaratory judgment as to the percentage of Allied Debt held by Yucaipa. Counts II and III depend on the resolution of Count I and those Counts raise similar standing concerns.[62] Accordingly, they will not be dismissed for related reasons. Additionally, Yucaipa advances a reasonably conceivable argument that it could establish that there claims are outside the scope of the Covenant because *they stem from willful misconduct taken by Defendants that affects only Yucaipa.*[63]

The Chancery Court made several statements that might bring certain claims outside of the prohibition in the Covenant Not to Sue. i.e., claims:

    (i)    where Yucaipa suffers a distinct harm not shared by any other person or entity that reasonably could bring suit;

    (ii)    where Yucaipa suffers a unique harm – meaning no other Lender could sue and the Prior Determination Requirement could not be satisfied;

---

[61] The Counts not dismissed, among others, by the Chancery Court were:

> Count I sought declaratory judgment that Yucaipa validly owns 55.2% of the Allied Debt and that Black Diamond cannot disregard that fact.

> Count II sought declaratory judgment that, under Section 18-110 of the Delaware LLC Act, Yucaipa has elected itself managing member of SBDRE.

> Count III sought declaratory judgment that, under section 187-111 of the Delaware LLC Act, Yucaipa elected itself managing member of SBDRE.

*Id.* at 6. However, these counts, as well as all counts that were not dismissed, were stayed by the Chancery Court. *Id.* at *16-18.

[62] *Id.* at *15.

[63] *Id.*

      (iii)    where it is unrealistic to assume anyone other than Yucaipa will bring suit, even assuming some other party might have standing to bring this claim; and

      (iv)    that stem from willful misconduct taken by Black Diamond and Spectrum that affects only Yucaipa.

Black Diamond and Spectrum advance the argument that the only exception to the Covenant Not to Sue is when *no other lender can sue* and/or that the claims alleged stems from their (alleged) willful misconduct that *only affects Yucaipa;* Yucaipa advances a much broader argument that the only exception to the Covenant Not to Sue is if it is *unreasonable that no other lender would sue.* The Court will review the issue on the "unrealistic that another lender would sue" argument as that would be the "largest" exception to the Covenant Not to Sue.

So the question is whether it is unrealistic that another First Lien Lender would assert a claim for equitable subordination. Yucaipa argues that no other lender (other than Black Diamond, Spectrum, and Yucaipa) holds a large enough piece of the First Lien Debt to realistically seek equitable subordination of Black Diamond's and Spectrum's respective holdings.

That is not the case. As of the Petition Date, Black Diamond and Spectrum collectively owned approximately 20% of First Lien Debt and Yucaipa held approximately 55%; as such, 25% of First Lien Debt is held by various other lenders. The JCT sale resulted in a pay-down of approximately 50% of the First Lien Debt and another portion of the First Lien Debt was credit bid. It is "realistic" that other lenders (who are still holding over $30 million in debt after the JCT sale) would and are able to seek

equitable subordination of Black Diamond's and Spectrum's respective First Lien Debt *if* those Lenders believed Black Diamond and Spectrum committed wrongdoings, because those lenders would then have an opportunity to recover more of their investment if approximately 20% of the First Lien Debt was subordinated.

Under the rubric of wilful misconduct and gross negligence, Yucaipa alleges it is unrealistic another creditor would sue because the allegations are specific to Yucaipa, i.e., Black Diamond and Spectrum (i) encouraged the consolidation of a large amount of First Lien Claims by Yucaipa; (ii) prevented Yucaipa from acting as Requisite Lender, (iii) prevented Yucaipa from selling its First Lien Claims to JCT; (iv) filed an involuntary bankruptcy petition supported by false affidavits in order to pursue equitable subordination of Yucaipa's claims; and (v) attempted to fraudulently subordinate Yucaipa's recoveries on the $170 million in claims against Allied at issue in the bankruptcy proceedings. Except as noted below, however, none of these allegations are unique to Yucaipa – but are shared by all First Lien Lenders (other than Black Diamond and Spectrum).

Furthermore, *if* there was an Involuntary Petition Payoff (discussed in detail *infra*), such "wilful misconduct" would be actionable by *all* First Lien Lenders and not "only Yucaipa." Thus the alleged Involuntary Petition Payoff does not create a distinct harm against Yucaipa.

Yucaipa also alleges "unique" status because it has a pending equitable subordination claim against it. Although this is true, such litigation cannot form the basis

of Yucaipa's equitable subordinate claim against Black Diamond and Spectrum.  The

*Noerr-Pennington* doctrine[64] immunizes litigation from liability "regardless of intent or

purpose," so long as the litigation is not a "sham."[65]  "To invoke the 'sham' exception, a

defendant must prove, by clear and convincing evidence, that a plaintiff's activities were

not really efforts to vindicate its rights in court."[66]  Although Yucaipa disagrees with

Black Diamond's and Spectrum's claims against Yucaipa, the claims against Yucaipa are

clearly intended to vindicate Black Diamond's and Spectrum's claims against Yucaipa,

on behalf of the First Lien Lenders.  Thus, the question becomes whether these non-sham

---

[64] The *Noerr-Pennington* doctrine

> derives from the First Amendment's guarantee of "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I. Under the *Noerr-Pennington* doctrine, those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct.  This right includes litigation: "the right to petition extends to all departments of the Government.  The right of access to the courts is indeed but one aspect of the right of petition."  The Supreme Court has thus emphasized that the First Amendment right to petition extends to all departments of government, including the courts, and has not limited the doctrine to particular types of courts or court cases.  Although the *Noerr-Pennington* doctrine originally applied to antitrust cases, courts have expanded its application to other contexts.

*Giles v. Phelan, Hallinan & Schmieg, L.L.P.*, No. CIV.A. 11-6239 JBS/K, 2013 WL 2444036, at *5 (D.N.J. June 4, 2013) (case citations omitted).  *See also We, Inc. v. City of Philadelphia*, 174 F.3d 322, 330 (3d Cir. 1999) ("[W]e conclude that the *Noerr-Pennington* doctrine does not confer a right not to stand trial, but rather provides only a defense against liability for certain conduct . . . .").

[65] The Supreme Court has adopted a two-part definition of sham litigation: First, "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits"; second, the litigant's subjective motivation must "conceal[ ] an attempt to interfere directly with the business relationships of a competitor ... through the use [of] the governmental process — as opposed to the outcome of that process — as an anticompetitive weapon."  *Prof'l Real Estate Investors, Inc. v. Columbia Pictures*, 508 U.S. 49, 60–61 (citations omitted).  *See also Giles v. Phelan, Hallinan & Schmieg, L.L.P.*, No. CIV.A. 11-6239 JBS/K, 2013 WL 2444036, at *6 (D.N.J. June 4, 2013).  To fall within this exception, a lawsuit "must be a sham *both* objectively and subjectively."  *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 526, 122 S. Ct. 2390, 2396, 153 L. Ed. 2d 499 (2002) (emphasis provided, citations omitted).

[66] *Braintree Labs., Inc. v. Schwarz Pharma, Inc.*, 568 F. Supp. 2d 487, 495 (D. Del. 2008) (citations omitted).

claims against Yucaipa causes Yucaipa a "distinct harm" as to invoke the exception to the Covenant Not to Sue enunciated by the Chancery Court. It would be inequitable for Yucaipa to obtain "unique" status from Black Diamond and Spectrum's claims against Yucaipa. Moreover, such a ruling would chill litigation – for example, if Black Diamond and Spectrum thought that filing claims against Yucaipa would cause a "distinct harm" allowing Yucaipa to fall into the exception to the Covenant Not to Sue, would Black Diamond and Spectrum actually bring their claims and open themselves up to counterclaims? Yucaipa was not uniquely harmed by the filing of this adversary such that application of the Covenant Not to Sue would not apply.

Thus, the Chancery Court exceptions to the Covenant Not to Sue are not applicable to this Counterclaim seeking to equitably subordinate Black Diamond's and Spectrum's First Lien Debt. As such, the claim of equitable subordination is barred by the Covenant Not to Sue.

### iii. *Appearance Prohibition*

Along with the Covenant Not to Sue, the Third Amendment also restricts Yucaipa's ability to participate in "Insolvency or Liquidation Proceedings," which is defined as "any voluntary or involuntary case or proceeding under Bankruptcy Law."[67] The Third Amendment states that Yucaipa "irrevocably and voluntarily waive[s] in their capacity as Lenders hereunder any right to, make any election, give any consent, commence any action or file any motion, claim, obligation, notice of application or take

---

[67] Third Amendment §§ 2.1(a), 2.7(b).

any other action in any *Insolvency or Liquidation Proceeding without the prior written consent of all Lenders* other than [Yucaipa]."[68]

Yucaipa advances three arguments in opposition to the application of Appearance Prohibition: (i) the Appearance Prohibition does not apply to adversary proceedings, (ii) Black Diamond and Spectrum are equitably estopped from raising the Appearance Prohibition, and (iii) application of the Appearance Prohibition would violate public policy.

### a. Appearance Prohibition in "Insolvency or Liquidation Proceedings"

Yucaipa argues that the term "Insolvency or Liquidation Proceeding" does not apply to adversary proceedings. "Insolvency or Liquidation Proceeding" is defined as:

> (a) any voluntary or involuntary case or proceeding under Bankruptcy Law with respect to . . . [Allied];
>
> (b) any other voluntary or involuntary insolvency, reorganization, or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to . . . [Allied] or with respect to a material portion of their respective assets[.][69]

Yucaipa advances the argument that adversary proceedings are analogous to civil actions in district courts and, therefore, do not fall into the category of bankruptcy proceedings described in the "Insolvency or Liquidation Proceeding" definition. Yucaipa states that the Appearance Prohibition is to prevent Yucaipa from commencing a bankruptcy proceeding or controlling Allied's debt. Black Diamond and Spectrum disagree.

---

[68] Third Amendment § 2.7(e) (emphasis added) (the "Appearance Prohibition").

[69] Intercreditor Agreement, § 1.1, May 15, 2007 (found in Case No. 12-11564, D.I. 1757, Exh B) and Third Amendment §2.1(a) ("'**Insolvency or Liquidation Proceeding**' as defined in the Intercreditor Agreement").

All parties agree that the Debtors' bankruptcy cases are unquestionably "Insolvency or Liquidation Proceedings." That being said, the adversary action was filed in this Insolvency or Liquidation Proceeding. Furthermore, Yucaipa is seeking equitable subordination, which is a bankruptcy claim under section 510(c) and 105(a) of the Bankruptcy Code. This Court has stated that "equitable subordination, as set forth in section 510(c), can *only be raised in bankruptcy court*. Like a preference claim—and unlike a fraudulent conveyance claim—it is a unique creature of bankruptcy law."[70]

As equitable subordination is a creature of bankruptcy law, this adversary action is not just "a state-law dispute between non-debtors." Thus, Yucaipa, in its capacity as a Lender on the Credit Agreement, is prohibited from bringing its Counterclaim without written consent of all Lenders, including Black Diamond and Spectrum. Much like the New York Supreme Court stated when voiding the Fourth Amendment: "This was, of course, flatly prohibited under the [First Lien] Credit Agreement absent the consent of all of the Lenders, and thus the Purported Fourth Amendment is invalid and of no force or

---

[70] *Burtch v. Huston (In re USDigital, Inc.)*, 461 B.R. 276, 285 (Bankr. D. Del. 2011) (footnote omitted; emphasis added). This Court also noted that:

> Indeed, the only law in this Circuit concerning "subordination" arises in bankruptcy cases. *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims (In re Papercraft Corp.)*, 323 F.3d 228, 233 (3d Cir.2003); *Burden v. United States*, 917 F.2d 115, 117 (3d Cir.1990); *Citicorp Venture Capital v. Committee of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 n. 7 (3d Cir.1998); *see also Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

*Id.* at n. 45. *See also City of Sioux City, Iowa v. Civic Partners Sioux City, LLC (In re Civic Partners Sioux City)*, LLC, No. ADV 11-9045, 2012 WL 761361, at *11 (Bankr. N.D. Iowa Mar. 8, 2012) ("[T]he Court would have jurisdiction under the portion of *Stern v. Marshall* noting that a counter-claim which arises under the Bankruptcy Code would be a core proceeding.).

effect."[71]  Similarly, here Yucaipa is acting in its capacity to First Lien Lender, the Third Amendment required that Yucaipa seek consent of all of the First Lien Lenders in order to commence its Counterclaim.  As Yucaipa does not have such consent Yucaipa is barred from bringing the Counterclaim.

### b. Equitable Estoppel

Yucaipa next argues that Black Diamond and Spectrum are equitably estopped from asserting the Appearance Prohibition as Yucaipa has appeared in the bankruptcy cases, both through filing motions and advancing claims, approximately 200 times before Black Diamond and Spectrum ever asserted the Appearance Prohibition.  Yucaipa argues that they relied to their detriment on Black Diamond's and Spectrum's failure to assert this argument until August 2014.

As Yucaipa is claiming estoppel, Yucaipa bears the burden of proof.[72]  The elements of estoppel are: "(1) conduct which amounts to a false representation or concealment of material facts; (2) intention that such conduct will be acted upon by the other party; and (3) knowledge of the real facts.  The party asserting estoppel must show with respect to himself: (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in his position."[73]

---

[71]  *BDCM Opportunity Fund II, LP v. Yucaipa American Alliance Fund I, LP*, No. 650150/2012, 2013 WL 1290394, *5 (N.Y. Sup. Ct. Mar 8, 2013).

[72]  *United States v. Asmar*, 827 F.2d 907, 912 (3d Cir. 1987) (citations omitted) ("The burden of proof is on the party claiming estoppel.").

[73]  *Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.*, 76 A.D.2d 68, 81-82, 430 N.Y.S.2d 179, 187 (1980) (citations omitted).  *See also In re Integrated Health Servs., Inc.*, 304 B.R. 101, 110 (Bankr. D. Del. 2004) *subsequently aff'd*, 233 F. App'x 115 (3d Cir. 2007) (citations omitted).

> The essence of the doctrine is to prevent a party from disavowing its previous conduct where the conduct amounts to a concealment or misrepresentation of material fact, unknown to the party claiming estoppel, and where the conduct was motivated by the intention or expectation that it would be acted upon by the adverse party who does in fact rely thereon in good faith in prejudicially changing its position. Application of the doctrine should only be made in very compelling circumstances, where the interests of justice, morality and common fairness clearly dictate that course.[74]

Yucaipa's equitable estoppel argument fails for the following reasons: (i) the Appearance Prohibition is in the Third Amendment, which Yucaipa helped draft;[75] (ii) in July 2013, Black Diamond and Spectrum moved for summary judgment for a determination of Requisite Lenders and argued the Appearance Prohibition;[76] (iii) Black

---

[74] *Great Am. Ins. Cos. v. Subranni (In re Tri-State Armored Servs., Inc.)*, No. 01 1132, 2006 WL 4452993, at *10 (Bankr. D.N.J. Mar. 21, 2006) *aff'd*, 366 B.R. 326 (D.N.J. 2007) (internal modifications, quotation marks and citations omitted).

[75] *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 426 (2d Cir. 1992) ("When the meaning of a contract is litigated, a reviewing court ordinarily looks only at the words used by the drafters, who presumably understood what they intended."); *Brooklyn 13th St. Holding Corp. v. Nextel of New York, Inc.*, No. 11-CV-1048 CBA RLM, 2011 WL 6945862, at *3 (E.D.N.Y. Dec. 30, 2011) *aff'd*, 495 F. App'x 112 (2d Cir. 2012) ("In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use, and thus the court ordinarily looks only at the wording used by the drafters who presumably understood what they intended." (citations and internal quotation marks omitted)). *See also CP III Rincon Towers, Inc. v. Cohen*, 13 F. Supp. 3d 307, 319 (S.D.N.Y. 2014) ("Although contract terms may be interpreted against the drafter, New York applies this rule 'only as a matter of last resort after all aids to construction have been employed without a satisfactory result. Additionally, as is the case in the instant action, where the contract involves bargained-for contracts, negotiated by sophisticated parties, the rationale for this doctrine is inapposite." (citations, internal modifications and quotation marks omitted)).

[76] More specifically, Black Diamond and Spectrum argued:

> Section 2.7(b) provides that Yucaipa "irrevocably and voluntarily waive[s] . . . any right to, make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Insolvency or Liquidation Proceeding without the prior written consent of all Lenders other than [Yucaipa]." Again, Yucaipa makes no attempt to explain how it could possibly act as Requisite Lender in these cases or otherwise if it cannot take any action in "any Insolvency or Liquidation Proceeding."

Diamond and Spectrum raised Appearance Prohibition in the Chancery Court in December 2013;[77] and (iv) Black Diamond and Spectrum raised the Appearance Prohibition in its opposition to Yucaipa's motion for leave to assert a counterclaim in the Committee Action in August 2014 (although, this motion for leave was ultimately withdrawn, it was fully briefed by the parties).[78]

Moreover, Section 10.9 of the First Lien Credit Agreement provides, in relevant part:

> Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.[79]

Therefore, even if Black Diamond and Spectrum failed to raise the Appearance Prohibition, which they did not, such failure would have no effect on their ability to raise it now.

---

Committee Action, Adv. Case No. 13-50530, D.I. 267 at 11 (Reply Memorandum of Law in Further Support of Petitioning Creditors' Motion for Summary Judgment Regarding the Determination of Requisite Lenders Under First Lien Credit Agreement) (emphasis removed).

[77] Chancery Court Action, C.A. No. 9151-VCP (Del. Ch. Dec. 18, 2013) (Brief in Opposition to Yucaipa's Motion for Entry of a Status Quo Order) at 17-18.

[78] More specifically, Black Diamond and Spectrum argued:

> In particular, Section 2.7(b) provides that, upon becoming a Lender, Yucaipa "irrevocably and voluntarily waive[d] . . . any right to, make any election, give any consent, commence any action or file any motion, claim, obligation, notice or application or take any other action in any Insolvency or Liquidation Proceeding without the prior written consent of all Lenders other than [Yucaipa]."

Committee Action, Adv. Case No. 13-50530, D.I. 316 at 9 (Black Diamond's and Spectrum's Objection to Yucaipa's Motion For Leave To File a Counterclaim For Equitable Subordination Under 11 U.S.C. § 510(C) Or, in the Alternative, To Amend the Answer To Assert Additional Affirmative Defenses).

[79] First Lien Credit Agreement, §10.9

Thus, Yucaipa has failed to show that Black Diamond and Spectrum are equitably estopped from asserting the Appearance Prohibition.

### c. Public Policy

Lastly, in regards to the Appearance Prohibition, Yucaipa argues that enforcement of such provision would violate New York's public policy against contractual provisions that exculpate "willful or grossly negligent acts." Yucaipa continues that Black Diamond's and Spectrum's interpretation conceivably prevents Yucaipa from defending itself at all, against any claim. Yucaipa believes that the Appearance Prohibition could prevent Yucaipa from answering a complaint, which is a nonsensical interpretation and contrary to public policy.

Black Diamond and Spectrum respond that the Appearance Prohibition prevents Yucaipa from commencing an action but it does not prevent Yucaipa from defending itself against a claim brought by a Lender.

"A contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties"[80] Furthermore, under New York law:

> an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing. This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith. Or, when, as in gross negligence, it

---

[80] *Lipper Holdings, LLC v. Trident Holdings, LLC (In re Lipper Holdings, LLC)*, 1 A.D.3d 170, 171, 766 N.Y.S.2d 561, 562 (2003) (citations omitted).

> betokens a reckless indifference to the rights of others, it may
> be implicit [81]

As with the Covenant Not to Sue, other than Yucaipa, other First Lien Lenders have the ability to seek redress against Black Diamond and Spectrum for willful misconduct and/or gross negligence. To the extent that any alleged willful misconduct and/or gross negligence was unique to Yucaipa, public policy would prevent application of the Appearance Prohibition which in that circumstance would be an absurd result. However, as Yucaipa's claims could also be made by other First Lien Lenders, Black Diamond and Spectrum do not have general immunity for their (alleged) intentionally wrongdoings. Furthermore, the Appearance Prohibition states as follows:

> Any right to, make any election, give any consent, commence
> any action or file any motion, claim, obligation, notice of
> application, or take any other action . . . [82]

The plain meaning of the Appearance Prohibition prevents affirmative action by Yucaipa from commencing a claim, motion, lawsuit, etc., under certain circumstances. Furthermore, nothing therein restricts Yucaipa's rights from defending itself from claim arising from the First Lien Credit Agreement.[83]

---

[81] *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 385, 448 N.E.2d 413, 416-17 (1983) (footnotes and citations omitted).

[82] Third Amendment, § 2.7(b).

[83] Analogously, when a defendant fails to file a proof of claim and is thus barred from asserting a claim against a debtor, the defendant is not barred from asserting a right of setoff defensively. *See, e.g., Columbia Hosp. for Women Med. Ctr v. NCRIC, Inc. (In re Columbia Hosp. for Women Med. Ctr., Inc.)*, 461 B.R. 648, 672 (Bankr. D.D.C. 2011). Extrapolating this analogous theory, although through the Third Amendment Yucaipa is barred from asserting claims, Yucaipa is allowed to defend itself in any claims brought against it.

*iv.    Conclusion*

Under the plain meaning of the Covenant Not to Sue the Counterclaim is barred and none of the exceptions to application of the bar are present. Furthermore, the Appearance Prohibition is applicable to the Counterclaim. As Yucaipa has not procured the consent of *all* of the First Lien Lenders to bring the Counterclaim it too is barred. Thus, the Counterclaim must be dismissed. Although, these findings are sufficient to resolve the motion to dismiss, the Court will address the parties' additional arguments regarding collateral estoppel and whether the Counterclaim is plausible under Bankruptcy Rule 7012(b)(6).

## C. Certain Factual Assertions Underlying Yucaipa's Counterclaim Are Subject to Collateral Estoppel

In its Counterclaim, Yucaipa alleges that Black Diamond and Spectrum encouraged Yucaipa to purchase as much debt as possible by "providing false assurances of cooperation and support," and allegedly never "once state[d] any opposition to any respect of Yucaipa's plan to become Requisite Lender, including the Fourth Amendment," but then "secretly directed CIT to refuse to recognize Yucaipa as Requisite Lender."[84] Black Diamond and Spectrum argue that these assertions made by Yucaipa are barred by the application of collateral estoppel.

*i.    Parties' Arguments*

Black Diamond and Spectrum assert that Yucaipa's Counterclaim should be dismissed because Yucaipa is collaterally estopped from re-litigating its allegations that

---

[84] Counterclaim ¶¶ 8, 47, and 53.

45

Black Diamond and Spectrum "encouraged" Yucaipa to buy First Lien Debt and proclaim

itself Requisite Lender. Black Diamond and Spectrum assert that this Court has already

found this claim implausible. Black Diamond and Spectrum reference the Cross-Claims

that Yucaipa asserted in the Allied Adversary Proceeding, which were dismissed by this

Court based on the Covenant Not to Sue, as well as a finding that the Cross-Claims were

not plausible. For example, in Yucaipa's Cross-Claims, Yucaipa claimed:

> [Black Diamond] agreed to work together with Yucaipa and support Yucaipa's plan to acquire the Requisite Lender position.[85]
>
> . . . Petitioning Creditors chose to double-cross Yucaipa and thereby enhance their leverage in credit. . . . Petition Creditors . . .[did not] disclose to Yucaipa any concerns regarding the validity of the Fourth Amendment or Yucaipa's requisite Lender status.[86]
>
> Certain Lenders, including Black Diamond, knew in mid-August 2009 that Yucaipa was planning to acquire ComVest's Requisite Lender position, and did not express any objection whatsoever to Yucaipa. . . . During . . . communications, Black Diamond never objected in any way to Yucaipa's proposed acquisition, never expressed that it would not consent to Yucaipa becoming Requisite Lender, and never stated a believe that unanimous Lender consent was required for Yucaipa to acquire ComVest's position. To the contrast, Black Diamond encouraged Yucaipa's proposed plan, a fact on which Yucaipa relied in executing the plan.[87]

Black Diamond and Spectrum argue that the above allegations, among others, were

integral to Yucaipa's Cross-Claims, in which Yucaipa argued that enforcement of the

---

[85] Allied Adv. Pro. 12-50947, D.I. 64 (Yucaipa's Amended Counterclaim and Cross-Claim for Declaratory Judgment and Injunctive and Other Relief and Amended Answer to Debtors' Verified Complaint, ¶ 5.

[86] *Id.* at ¶ 7.

[87] *Id.* at ¶ 71.

Third Amendment would unjustly enrich Black Diamond and Spectrum because Black Diamond and Spectrum "encouraged" Yucaipa to buy a majority of the First Lien Debt and proclaim itself Requisite Lender.[88]  Thus, Black Diamond and Spectrum assert that these allegations have been litigated and ruled upon and, thus, are barred by collateral estoppel from being raised herein.

Yucaipa responds that there is no identity of issues between the Allied Adversary Proceeding and the case *sub judice*.  Yucaipa states: "[t]he Court did nothing more in the February 2013 hearing than dismiss a different complaint, with far different allegations, than what is currently pending."[89]  Yucaipa argues that the Cross-Claims against Black Diamond and Spectrum sought declaratory and injunctive relief, the New York court has already voided the Fourth Amendment, and as a result, Yucaipa asked this Court to determine whether the Third Amended governed Yucaipa's First Lien Claims.  Yucaipa did not seek equitable subordination in the Cross-Claims.  Yucaipa argues that the Cross-Claims relied on two central allegations: (1) between 2009 and 2012, after encouragement from and with full disclosure to Black Diamond and Spectrum regarding the necessity, and content, of the Fourth Amendment, Black Diamond and Spectrum crossed Yucaipa by seeking to invalidate the Fourth Amendment in successive state court actions; and (2) Yucaipa "never would have acquired first lien debt holdings" but for its reasonable and detrimental reliance on the validity of the Fourth Amendment.

---

[88] *Id.* at ¶ 118.

[89] Opposition to Black Diamond and Spectrum's Motion to Dismiss Yucaipa's Counterclaim for Equitable Subordination, D.I. 56, p. 4.

In comparison, Yucaipa asserts that the Counterclaim sets forth Black Diamond and Spectrum's "multi-year, unlawful plan" to: (a) seek the consolidation of a large amount of First Lien Claims into Yucaipa's hands, an insider whose claims would be more vulnerable to equitable subordination; (b) cooperate to prevent Yucaipa from acting as Requisite Lender or from selling its First Lien Claims to JCT; (c) file the 2012 involuntary bankruptcy petition against Allied supported by false affidavits that concealed illegal claims trading in and the payment of a bribe to Spectrum in the form of a claims transfer; and (d) pursue a baseless equitable-subordination strategy in Bankruptcy Court, which had been conceived even before Yucaipa acquired any First Lien Claims from ComVest. Yucaipa argues that the Counterclaim covers a much longer period of time than the Cross-Claims; Black Diamond and Spectrum have used "unlawful means" to reduce and dilute Yucaipa's ownership interest; and have paid the attorneys' fees and expenses of all First Lien Lenders *other than* Yucaipa without explanation or justification. Yucaipa further argues that, unlike the Cross-Claims, here Yucaipa is alleging fraud and unlawful conduct, including false misrepresentation and material omissions in violation of 18 U.S.C. § 152(2), (3) and (6) and Bankruptcy Rules 1003 and 2019. Yucaipa further claims that it only learned of the "bribe" and the Cooperation Agreement *after* the Cross-Claims were dismissed.

Black Diamond and Spectrum reply that collateral estoppel precludes a party from raising the same *issues*, not the same *claim*. Black Diamond and Spectrum are not seeking to bar the entire Counterclaim via collateral estoppel, but believe collateral estoppel bars

Yucaipa from asserting several issues – whether Yucaipa has plausibly alleged that "Black Diamond and Spectrum (i) 'encouraged' Yucaipa to purchase a majority of Allied's First Lien Debt, executed the Purported Fourth Amendment, and purport to act as the Requisite Lender, and (ii) 'surreptitiously' instructed CIT to challenge Yucaipa's purported Requisite Lender status." (These two allegations correspond with Black Diamond and Spectrum's "purported scheme" listed above).

### ii. Analysis

The Third Circuit has identified four standard requirements for the application of collateral estoppel:

> (1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action.[90]

Black Diamond and Spectrum have the burden of demonstrating the propriety of the collateral estoppel application.[91] The Third Circuit has cautioned that collateral estoppel is necessarily "fact intensive."[92] Furthermore, "doubts about its application should usually be resolved against its use."[93]

Yucaipa does not dispute whether it was fully represented in the Allied Adversary Proceeding; thus, the discussion herein is focused on whether the Cross-Claims and the

---

[90] *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006) (citations and internal quotations marks omitted).

[91] *Suppan v. Dadonna*, 203 F.3d 228, 233 (3d Cir. 2000) (citations omitted).

[92] *Witkowski v. Welch*, 173 F.3d 192, 206 (3d Cir. 1999).

[93] *Id.* (citation omitted).

Counterclaims raise identical issues and whether there was a previous determination that was necessary to this Court's dismissal of the Cross-Claims.

### a. Identity of Issues

Yucaipa argues that there is no identity of interests between the Cross-Claims and the Counterclaim. "Identity of the issue is established by showing that the same general legal rules govern both cases and that the facts of both cases are indistinguishable as measured by those rules."[94] Yucaipa claims that the Cross-Claims were based on Yucaipa's detrimental reliance on the validity of the Fourth Amendment – which the Court found implausible. Yucaipa seeks to limit the Court's implausibility findings to (a) Yucaipa would have detrimentally relied on Black Diamond's and Spectrum's encouragement with respect to the 2009 ComVest transaction and the Fourth Amendment and (b) Black Diamond and Spectrum procured the Covenant Not to Sue by fraud.

During the Court's ruling on the Cross-Claims, the Court found:

> As a matter of fact, I don't think there's any allegation really that rises to the plausibility that there was any kind of mischief going on that was detrimental **or directed at** Yucaipa at the time of the third amendment being entered into . . . and then the fourth amendment being entered into [or] negotiated."[95]

> The fact that it was all part of a grand strategy that somehow Yucaipa was sucked in to allow [ComVest] to make the agreement and then make the sale, I just, I just don't find that plausible.[96]

---

[94] *Suppan v. Dadonna*, 203 F.3d 228, 233 (3d Cir. 2000) (citations omitted).

[95] Allied Adv. Pro., D.I. 162, 110:9-16 (emphasis added).

[96] Allied Ad. Proc., D.I. No. 162 at 111:3-6.

These Cross-Claims findings are identical to the issue of whether Black Diamond and Spectrum "encouraged" Yucaipa to purchase a majority of Allied's First Lien Debt, to execute the Fourth Amendment, and purport to act as the Requisite Lender, and whether Black Diamond and Spectrum instructed CIT to challenge Yucaipa's purported Requisite Lender status. Thus, there is an identity of issues between the Cross-Claims and the Counterclaim.

### b. Temporal Requirement

Yucaipa continues that the Counterclaim alleges significant new facts resulting from a continuing course of conduct, which Yucaipa was not aware of when asserting the Cross-Claims. Although it "is axiomatic that collateral estoppel cannot apply to . . . a time period that was not at issue in that trial;"[97] issues are not factually different merely because the damages period extends for a longer period of time.[98]

### c. Cross-Claims Were Dismissed on a "Legal Basis" and Not Upon Implausibility of the Factual Theory.

Yucaipa asserts that this Court relied only of the "legal bases" that Black Diamond and Spectrum has raised, which the Court found were "noncurable" by additional amendment to the Cross-Claims. Yucaipa asserts that this Court's dismissal of the Cross-Claims did not rest on the implausibility of the factual theory of the case but rather legal

---

[97] *Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining & Mfg. Co.)*, No. CIV.A. 02-7676, 2005 WL 736629, at *6 n. 7 (E.D. Pa. Mar. 30, 2005) *amended on reconsideration in part sub nom. Bradburn Parent Teacher Store, Inc. v. 3M*, No. CIV.A. 02-7676, 2005 WL 1388929 (E.D. Pa. June 9, 2005).

[98] *Id.* (citations omitted).

bases, including the application of the Covenant Not to Sue and of the statute of limitations.

Black Diamond and Spectrum respond that in order for the Court to rule on the application of the Covenant Not to Sue contained in the Third Amendment, findings of factual implausibility were necessary to the Court's dismiss without prejudice. Black Diamond and Spectrum continue that this Court dismissed the Cross-Claims on the bases of the Covenant Not to Sue, which is contained in the Third Amendment, the enforcement of which Yucaipa was challenging in the Cross-Claims. Black Diamond and Spectrum argue that for this Court to dismiss the Cross-Claims based on the Covenant Not to Sue, the Court needed to first determine the applicability of the Third Amendment against Yucaipa. Thus, the Court was required to assess the "factual plausibility" of Yucaipa's "encouragement" and Requisite Lender allegations to determine whether the enforcement of the Third Amendment against Yucaipa would be inequitable *before* the Court could determine the "legal basis" as to whether the Covenant Not to Sue barred the Cross-Claims.

Yucaipa's argument is not persuasive. At the hearing on the Cross-Claims, the Court made the following *rulings*:

- While discussing the Covenant Not to Sue, the Court held "that really rests on the *factual allegations* in the complaint that would be necessary to raise an issue, a plausible issue about whether the covenant not to sue should be applied.[99]
- "I don't find anything in the record that would support plausible claim that the, that in the entry of the third amendment there was

---

[99] Allied Adv. Pro., D.I. 162, 109:1-5.

any fraud or wrongdoing whatsoever in connection with the actual covenant not to sue."[100]

- "As a matter of fact, I don't think there's any allegation really that rises to the plausibility that there was any kind of mischief going on that was detrimental or directed at Yucaipa at the time of the third amendment being entered into . . . and then the fourth amendment being entered into negotiated."[101]

- "So basically, I don't know it has led to level of fraud necessarily in connection with the covenant not to sue, but it would need to certainly be something with some heft behind it to support some detrimental reliance argument. And it just isn't there. It just isn't there."[102]

- "As to the applicability, the first credit agreement does contain the provision that when you buy or assign the debt you are stuck with what your assignor had previously agreed to or waived, etc., and I find that when Yucaipa bought this debt they were subject to the agreements that had previously being entered. And as such, they are applicable when we're looking at the third amendment."[103]

- · The fact that it was all part of a grand strategy that somehow Yucaipa was sucked in to allow [ComVest] to make the agreement and then make the sale, I just, I just don't find that plausible.[104]

These are all factual rulings based on the facts plead in Yucaipa's Cross-Claims. The

Court found the *facts* in Yucaipa's Cross-Claims did not meet the plausibility standards.

Using those factual rulings, the Court determined that the Covenant Not to Sue and the

statute of limitations would bar Yucaipa's Cross-Claims.

---

[100] Allied Adv. Pro., D.I. 162, 110:6-9.

[101] Allied Adv. Pro., D.I. 162, 110:9-16.

[102] Allied Adv. Pro., D.I. 162, 110:16-21.

[103] Allied Adv. Pro., D.I. 162, 110:22-111:3.

[104] Allied Adv. Pro., D.I. 162, 111:3-6.

After the Court's ruling, Yucaipa moved for leave to amend their Cross-Claims.[105]

The Court denied Yucaipa's motion for leave to amend and stated:

> I concur with counsel that these are in effect legal bases, they turn obviously to some extent on the facts, but I simply don't view them as in effect curable based on my understanding of what's in the cross claims today as well as my broader understanding of the case in and of itself.[106]

However, the Court's statement about the "legal bases" on a motion to amend can negate the factual findings or convert the Court's ruling to a pure "legal decision." In other words, these factual rulings were necessary to the Court's dismissal of the Cross-Claims.

### iii.   Conclusion

Based upon the discussion above, the Court find that the following factual issues are barred on collateral estoppel grounds:

    (i)    whether Black Diamond and Spectrum "encouraged" Yucaipa to purchase a majority of Allied's First Lien Debt, to execute the Fourth Amendment, and purport to act as the Requisite Lender, and

    (ii)    whether Black Diamond and Spectrum instructed CIT to challenge Yucaipa's purported Requisite Lender status.

## D. Yucaipa's Equitable Subordination Counterclaim is Not Plausible Under Bankruptcy Rule 7012(b)(6)?

### i.   Parties' Arguments

Yucaipa alleges that Black Diamond and Spectrum participated in a pattern of illegal claims-trading and concealment. Yucaipa asserts that the Cooperation Agreement was "hidden" for 16 months and is only now revealed to the Court and the parties.

---

[105] Allied Adv. Pro., D.I. 162, 113:21-114:13.

[106] Allied Adv. Pro., D.I. 162, 114:25-115:1 and 115:5-10.

Yucaipa further argues that the existence of the Cooperation Agreement further expands the scope of Black Diamond and Spectrum's conspiracy as it is written evidence of claims trading in order to file involuntary petitions. Yucaipa further alleges that the Black Diamond and Spectrum's equitable subordination claim against Yucaipa is "objectively baseless" and not plausible.

Black Diamond and Spectrum asserts that Yucaipa's Counterclaim allegations are implausible. Black Diamond and Spectrum assert that the Counterclaim does not contain sufficient facts, if accepted as true, for the Court to draw a reasonable inference that Black Diamond and Spectrum are liable for the alleged misconduct. Black Diamond and Spectrum also assert that their equitable subordination claim against Yucaipa is not "objectively baseless" and argue that the Committee, during their investigation, independently brought a substantially similar equitable subordination claim and Yucaipa.

Yucaipa asserts that the Counterclaim goes far beyond a recitation of the elements of equitable subordination and is supported by specific facts and references. Yucaipa argues that there are emails contemplating an equitable subordination claim even prior to Yucaipa obtaining First Lien Claims; that Black Diamond and Spectrum are both distressed debt traders and repeatedly assume high risk debt for the potential of large investment returns making it plausible that Black Diamond and Spectrum assumed the litigations risks; by subordinating Yucaipa's 56% ownership interest of First Lien Debt, Black Diamond and Spectrum increase their stake in the claims pool from 22% to 49% -

which would be the only way for Black Diamond and Spectrum to obtain a par-plus-accrued-interest recovery; Black Diamond and Spectrum needed sufficient time to "strip" Yucaipa of its Requisite Lender status which accounted for the three year delay between Black Diamond and Spectrum initially discussing equitable subordinate and the filing of the involuntary; Black Diamond and Spectrum's negotiations with JCT were a "sham" to allow more time for Black Diamond and Spectrum to hatch their plan to equitably subordinate Yucaipa's claims; lastly, Black Diamond had to "bribe" Spectrum to participate because Black Diamond had more First Lien Debt, thus Black Diamond increased Spectrum's potential "windfall" from an equitable subordination claim.

Black Diamond and Spectrum respond that it is not plausible for Black Diamond and Spectrum to give up a 100% recovery from JCT for their First Lien Debt to instead pursue a highly unpredictable multi-faceted strategy that was fraught with risk and dependent on outcomes outside of their control. Black Diamond and Spectrum argue that Yucaipa depends on every one of the following unpredictable events occurring in a manner favorable to Black Diamond and Spectrum: (i) invalidating the Fourth Amendment through litigation; (ii) obtaining judicial declaration that Black Diamond and Spectrum are the Requisite Lenders; (iii) acquiring Allied's assets through a credit bid on behalf of all Lenders (including Yucaipa, subject to the equitable subordination claims); (iv) prevailing in their equitable subordination claims against Yucaipa and obtaining a substantial recovery; and (v) hoping that the Allied assets they acquired would increase in value to the point where the asset value plus any recovery realized

56

from the equitable subordination litigation exceeded a par plus accrued interest recovery years after JCT had offered them a 100% recovery. Black Diamond and Spectrum assert that this "scheme" is not plausible.

In response to Yucaipa's claim that Black Diamond and Spectrum's equitable subordination claim against Yucaipa is fraudulent: Black Diamond and Spectrum further respond that the Committee brought a similar claim against Yucaipa. In the Committee's investigation it found that "Yucaipa trampled upon the legitimate rights and expectations of the Debtors' secured and unsecured creditors and cause the Debtors to make exorbitant and unnecessary payments to third parties acting at Yucaipa's direction and for Yucaipa's benefit, not for the benefit of the Company or its stakeholders."[107] Furthermore, Black Diamond and Spectrum had no way of knowing at the time of the involuntary filing that Yucaipa would be stripped of its purported Requisite Lender status. As such, Black Diamond and Spectrum assert that Yucaipa's argument that Black Diamond and Spectrum waited three years to file the petitions because they first needed to strip Yucaipa of its Requisite Lender status is not plausible.

Black Diamond and Spectrum further assert the email exchange Yucaipa alleges is proof of a "payoff" began seven months before the involuntary petitions. Lastly, Black Diamond and Spectrum assert that the email between Michael Riggs of JCT and Jeffrey Schaffer of Spectrum, in which Riggs asks 'I thought you were going to check out the 'equitable subordination' angle," and Schaffer responds, "Why?" – has not been linked

---

[107] Allied Adv. Pro., D.I. 858, ¶¶ 3, 6.

whatsoever to Yucaipa. In fact, Black Diamond and Spectrum point to language in Yucaipa's opposition to the Motion to Dismiss wherein Yucaipa states Riggs "was not a creditor of Allied and thus had no reason to be considering remedies against Yucaipa in its capacity as a creditor."[108]

### ii. Transfers Prior to Filing an Involuntary Petition

Rule 1003(a) of the Federal Rules of Bankruptcy Procedure requires the party filing an involuntary petition – whether it is the "transferor or transferee" – to attach a copy of all documents evidencing transfers of claims and "a signed statement that the claim was not transferred for the purpose of commencing the case . . . "[109] "Any transfer of a claim for the purpose of commencing an involuntary case will fall within the prohibition of the rule."[110]

In *Aigner v. McMillan*, the petitioning creditors entered into an agreement regarding the transfer of claims which stated that the petitioner "agrees to file an involuntary bankruptcy action against [the involuntary debtor] . . . and agrees to cooperate in the prosecution of the same . . . ."[111] The *Aigner* Court found that the petitioner was disqualified from bringing the involuntary petition.[112]

---

[108] Opp'n at 34.

[109] Fed. R. Bankr. P. 1003(a).

[110] *Aigner v. McMillan*, No. 11-47029-DML-7, 2013 WL 2445042, at *5 (Bankr. N.D. Tex. June 4, 2013) (citations, internal quotation marks and modifications omitted).

[111] *Aigner v. McMillan*, No. 11-47029-DML-7, 2013 WL 2445042, at *2 (Bankr. N.D. Tex. June 4, 2013).

[112] *Aigner v. McMillan*, No. 11-47029-DML-7, 2013 WL 2445042, at *6 (Bankr. N.D. Tex. June 4, 2013)

*In re Focus Media, Inc.*[113] is similar to the allegations in the case *sub judice*; therein,

the debtor argued that various claims were traded in order for the creditors to file the

involuntary petitions against the debtor. Without these contested petitioning creditors,

there were not enough petitioning creditors to file the involuntary petitions.[114] The *Focus*

*Media* court was faced with affiliated companies that transferred claims to the parent

company prior to the filing of an involuntary petition. The Ninth Circuit stated:

> Rule 1003 endeavors to curtail "trafficking" in claims.
> Without Rule 1003, such trafficking could enable entities
> without proper claims to acquire them and thus become
> petitioning creditors, or facilitate claim-splitting by
> companies seeking to satisfy the three-entity requirement.[115]

In *Focus Media*, the court determined that the affiliates turned to the parent company to

"facilitate the collection of debts owed to them by" the debtor.[116] The bankruptcy court

in *Focus Media* considered testimony from the parent company stating that the affiliates

did not come to the parent company asking that the parent file a petition for involuntary

bankruptcy, but sought assistance in collecting their claims against the debtor.[117] As

quoted by the Ninth Circuit, the bankruptcy court in *Focus Media* held:

> "Nobody testified to there being an oral or written request for
> transfer. Ms. Menton's feeling that those entities wanted
> ABC, Inc. [the parent company] to collect the debt from Focus

---

[113] *Focus Media, Inc. v. National Broadcasting Company, Inc.* (In re Focus Media, Inc.), 378 F.3d 916 (9th Cir. 2004).

[114] *Id.* at 927.

[115] *Id.* at 927-28 (citations omitted). *See In re Averil, Inc.*, 33 B.R. 562, 563 (Bankr.S.D.Fla.1983) (expressing concern that"[i]f the co-owners of a single obligation qualify as separate claimants ... [the] legislative purpose [of requiring a joint effort to launch an involuntary proceeding] would be frustrated").

[116] *Focus Media, Inc.*, 378 F.3d at 927.

[117] *Id.* at 927.

> falls far short of there being a legally valid transfer or an assignment from the subsidiaries to ABC, Inc. Moreover there was no testimony about any particular subsidiary."[118]

On the opposite side of the spectrum in *In re Guerra*,[119] the bankruptcy court found that the petitioning creditors purchased his claim in order to file the involuntary action. Therein, the petitioning creditor had loaned the selling creditor money over years and owed the petitioning creditor on those loan. The selling creditor received an unrelated arbitration award against the debtor.[120] The petitioning creditor purchased the arbitration award as a way to collect his debt against the debtor.[121] The day after the petitioning creditor purchased the arbitration award, the petitioning creditor, along with another creditor, filed the involuntary petition.[122] The bankruptcy court held:

> The court therefore draws the following, inexorable conclusions: Cancino [the petitioning creditor] retained Hyppa [an attorney] to file this involuntary before the assignment (what attorney would file an involuntary on less than a day's notice), the arbitration award allowed Cancino to act as a petitioning creditor, and Hyppa then filed the involuntary petition. This horse trading is exactly what Rule 1003 was meant to prohibit. As such, Cancino is ineligible to act as a petitioning creditor.[123]

A reading of the entire email chain between individuals at Spectrum and others at Black Diamond establishes that: (i) the discussions regarding the trade began in October

---

[118] *Id.* at 928 (9th Cir. 2004) (no citation to the bankruptcy court's ruling provided).

[119] *In re Guerra*, No. 13-51100 CN, 2014 WL 552963 (Bankr. N.D. Cal. Feb. 11, 2014).

[120] *Id.* at *4.

[121] *Id.*

[122] *Id.*

[123] *Id. See also In re Oberle*, No. 06-41515, 2006 WL 3949174, at *1 (Bankr. N.D. Cal. Dec. 21, 2006) (finding that a petitioning creditor was not a qualified petitioner because she transferred a portion of her claim to another for the purpose of creating another petitioning creditors).

2011, (ii) the trade and allocation are consistent with the Cooperation Agreement, (iii) the trade occurred in October 2011, and (iv) the closing documents were delayed over the drafting of "big boy" language. Although the email states: "Please get this closed this week. We cannot file an involuntary without it done;"[124] that the email is expressing frustration at a trade that happened months before[125] but had not yet been closed due to documentation issues.

Furthermore, as admitted by Yucaipa, Spectrum held sufficient amounts of First Lien Debt without the purported Involuntary Petition Payoff to participate in the involuntary petitions.

Yucaipa alleges that this email chain is "strong circumstantial evidence that just two months before [Black Diamond and Spectrum] filed the involuntary petition, Spectrum made its demand clear" that Black Diamond needed to transfer the additional First Lien Debt to Spectrum in order to secure Spectrum's participation in the involuntary petition.[126] However, Yucaipa's argument belies the Cooperation Agreement, Black Diamond's purchase of additional debt, trading that additional debt pursuant to the terms of the Cooperation Agreement, the price paid by Spectrum for the additional First Lien Debt, and the timing of the trade (although, the trade closed much later). The facts clearly indicate it is more plausible that the trade needed to be completed prior to filing

---

[124] Answer and Counterclaim at Exh 12.

[125] Answer and Counterclaims, Exhibit 12, p. 7

[126] Opposition at p. 39-40.

the involuntary petitions – not for any nefarious reason, but to prevent unnecessary complications with a trade that was made and not yet closed.

Yucaipa argues that the complaint is not a "threadbare" recitation of the elements, and thus, taken as true, should survive the Motion to Dismiss. However, this Court is also charged with using its judicial experience and common sense.[127] "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but not shown-that the pleader is entitled to relief."[128] Here, Yucaipa has not provided more than the mere possibility of misconduct, based on the facts surrounding the prepetition transfer of First Lien Debt from Black Diamond to Spectrum. As Black Diamond and Spectrum did not transfer the "Involuntary Petition Payoff" in order to commence the involuntary proceedings, such transfer did not need to be disclosed pursuant to Bankruptcy Rule 1003.

### iii.   Plausibility of Equitable Subordination Claim

In the Third Circuit, courts generally require the plaintiff to show three elements to establish equitable subordination:

> (1) the claimant must have engaged in some type of inequitable conduct; (2) the claimant's misconduct must have resulted in injury to other creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the Bankruptcy Code. Three principles must be considered in determining whether these three conditions are satisfied. First, the inequitable conduct directed against the bankruptcy or its creditors may

---

[127] *Id.* at 679. "It is the conclusory nature of [plaintiff's] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth." *Id.* at 681.

[128] *Id.* at 679 (citations and internal quotations omitted).

be sufficient to warrant subordination of a claim regardless of whether it was related to the assertion of that claim. Second, a claim or claims should be subordinated only to the extent necessary to offset the harm which the creditors suffered on account of the inequitable conduct. Third, a party seeking equitable subordination has the initial burden of proof.[129]

### a. Alleged Inequitable Conduct

As noted above, Yucaipa's allegation regarding the purported Involuntary Petition Payoff is not plausible. However, Yucaipa also alleges that Black Diamond and Spectrum orchestrated Yucaipa's purchase of First Lien Debt in order to later equitably subordinate Yucaipa's claim. Yucaipa points to an email on August 13, 2009, between Mike Riggs at Innovative Equity Partners and J. Schaffer at Spectrum. The email conversation was:

> Jeffrey Schaffer: "Any new words-thoughts? Quiet here?"
> Mike Riggs: "I thought you were going to check out the 'equitable subordination' angle."
> Jeffrey Schaffer: "Why?"[130]

The email does not mention Yucaipa or against whom the "equitable subordination angle" would be sought. At the time of this email exchange, the (purported) Fourth Amendment had not been entered into.[131] Furthermore, Yucaipa did not acquire First Lien Debt until October 29, 2009. Thus, this email correspondence occurred *prior* to Yucaipa owning any First Lien Debt. As such, it is not plausible that this email indicates

---

[129] *Burtch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 49-50 (Bankr. D. Del. 2011) (citations omitted).

[130] Answer and Counterclaims at Exh. 4.

[131] The Fourth Amendment is dated August 21, 2009. Answer and Counterclaims at Exh. 2.

that Black Diamond and Spectrum schemed to equitably subordinate Yucaipa's First Lien Debt.

Yucaipa further asserts that Black Diamond and Spectrum were "lying in wait" for the optimal time to file their equitable subordination claim, including negotiating for a year with JCT only to scuttle the deal. As stated by Black Diamond and Spectrum in their briefing – Yucaipa's argument depends on every one of the following unpredictable events occurring in a manner favorable to Black Diamond and Spectrum: (i) invalidating the Fourth Amendment through litigation; (ii) obtaining judicial declaration that Black Diamond and Spectrum are the Requisite Lenders; (iii) acquiring Allied's assets through a credit bid on behalf of all Lenders (including Yucaipa, subject to the equitable subordination claims); (iv) prevailing in their equitable subordination claims against Yucaipa and obtaining a substantial recovery; and (v) hoping that the Allied assets they acquired would increase in value to the point where the asset value plus any recovery realized from the equitable subordination litigation exceeded a par plus accrued interest recovery years after JCT had offered them a 100% recovery. Yucaipa's reliance on this sequence of events is not plausible.

### iv. Conclusion re: Plausibility

As set forth above, Yucaipa's allegations are not plausible. Based on the Court's judicial experience and common sense, Yucaipa's allegations cannot create a plausible story. It simply is not plausible that economic actors, such as Black Diamond and

Spectrum, would take that much litigation risk just to aggravate Yucaipa's attempt to own unrestricted First Lien Debt.

## CONCLUSION

At first blush Yucaipa brings a bowl of allegations to the Court for adjudication, but alas, the bowl is really a sieve, and all of Yucaipa's allegations leak out leaving nothing but an empty vessel. In other words, even if Yucaipa's Counterclaim were not barred by the Covenant Not to Sue and the Appearance Prohibition (which they are), they alleged facts do not tell a plausible story. The Counterclaim is an exercise of creative writing which, at closer examination, simply does not hold together. As such, the Court will dismiss Yucaipa's Counterclaim in its entirety, with prejudice, for the reasons set forth above. An order will be entered.

# Exhibit 139

# D.I. 3383, Case No. 12-11564

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **ASHINC CORPORATION, et al.** [1] | ) | **Case No. 12-11564 (CSS)** |
| | ) | |
| | ) | **Jointly Administered** |
| **Debtors.** | ) | |

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE MODIFIED FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE DEBTORS, THE COMMITTEE AND THE FIRST LIEN AGENTS

The above-captioned debtors and debtors in possession (each a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>") having:[2]

    a.    filed, (i) on May 4, 2015, the *Debtors' Joint Chapter 11 Plan of Reorganization Proposed by the Debtors, the Committee and the First Lien Agents* [D.I. 2939]; (ii) on June 17, 2015, a revised *Debtors' Joint Chapter 11 Plan of Reorganization Proposed by the Debtors, the Committee and the First Lien Agents* [D.I. 3013]; (iii) on August 28, 2015, the *Debtors' First Amended Joint Chapter 11 Plan of Reorganization Proposed by the Debtors, the Committee and the First Lien Agents* [D.I. 3164]; and (iv) on September 9, 2015, a revised *Debtors' Fist Amended Joint Chapter 11 Plan of Reorganization Proposed by the Debtors, the Committee and the First Lien Agents* [D.I. 3196]; *and (v) on December 3, 2015, the Debtors' Modified First Amended Joint Chapter 11 Plan of Reorganization Proposed by the Debtors, the Committee and the First Lien Agents* [D.I. 3360] (as further modified, supplemented and amended, the "<u>Plan</u>");

---

[1] The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: ASHINC Corporation (f/k/a Allied Systems Holdings, Inc.) (58-0360550); AAINC Corporation (f/k/a Allied Automotive Group, Inc.) (58-2201081); AFBLLC LLC (f/k/a Allied Freight Broker LLC) (59-2876864); ASCCO (Canada) Company (f/k/a Allied Systems (Canada) Company) (90-0169283); ASLTD L.P. (f/k/a Allied Systems, Ltd. (L.P.) (58-1710028); AXALLC LLC (f/k/a Axis Areta, LLC) (45-5215545); AXCCO Canada Company (f/k/a Axis Canada Company) (875688228); AXGINC Corporation (f/k/a Axis Group, Inc.) (58-2204628); Commercial Carriers, Inc. (38-0436930); CTSINC Corporation (f/k/a CT Services, Inc.) (38-2918187); CTLLC LLC (f/k/a Cordin Transport LLC) (38-1985795); F.J. Boutell Driveway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582). The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Modified First Amended Joint Chapter 11 Plan of Reorganization Proposed by the Debtors, the Committee and the First Lien Agents*, dated December 3, 2015 [D.I. 3360]. The rules of construction set forth in Section 1.1 of the Plan shall apply to this order (the "<u>Confirmation Order</u>").

DOC ID - 23714145.5

b.  filed, on May 4, 2015, the *Motion to (I) Approve Disclosure Statement, (II) Approve Voting and Tabulation Procedures, and (III) Set Confirmation Hearing and Related Deadlines* [D.I. 2941] and the *Disclosure Statement in Support of Debtors' Joint Chapter 11 Plan of Reorganization Proposed by the Debtors, the Committee and the First Lien Agents* [D.I. 2940] (as further modified, supplemented and amended, the "Disclosure Statement");

c.  filed on June 17, 2015, a *Notice of Filing of Revised Plan and Disclosure Statement*, and a revised Disclosure Statement and Plan [D.I. 3014, 3015];

d.  filed, on July 8, 2015, the *Notice of Hearing to Consider Confirmation of Debtors' Joint Chapter 11 Plan of Reorganization Proposed by the Debtors, the Committee and the First Lien Agents and Related Objection Deadline* [D.I. 3052];

e.  distributed solicitations materials, including ballots for voting on the Plan (the "Ballots") on or about July 17, 2015 in the form approved in that certain *Order (I) Approving Disclosure Statement, (II) Approving Voting and Tabulation Procedures, (III) Setting Confirmation Hearing and Related Deadlines, and (IV) Granting Related Relief,* dated July 8, 2015 [D.I. 3049] (the "Initial Solicitation Order"), to holders of Claims and contract and lease counterparties, and parties in interest, in compliance with the procedures contained in the Initial Solicitation Order, title 11 of the United States Code (the "Bankruptcy Code"), and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as set forth in the *Affidavit of Service* of Rust Consulting/Omni Bankruptcy ("Rust/Omni") (and any supplements thereto), dated July 20, 2015 [D.I. 3071] (the "Sahagun Affidavit"), and sworn to by Darleen Sahagun of Rust/Omni;

f.  filed, on July 20, 2015, the *Plan Proponents' Memorandum of Law in Support of Confirmation of Debtors' Joint Chapter 11 Plan of Reorganization Proposed by the Debtors, the Committee and the First Lien Agents* [D.I. 3072];

g.  filed, (i) on August 12, 2015, the *Notice of Filing of Plan Supplement* [D.I. 3126] and (ii) on September 8, 2015, the *Notice of Filing of Additional Exhibit and Revised Exhibits to the Plan Supplement* [D.I. 3189]; and (iii) on September 10, 2015, the *Notice of Filing of Revised Exhibits to the Plan Supplement* [D.I. 3207]; (as subsequently modified, supplemented and amended, together, the "Plan Supplement");

h.  filed, on August 28, 2015, the *Supplement to Disclosure Statement in Support of Debtors' Joint Chapter 11 Plan of Reorganization Proposed by the Debtors, the Committee and the First Lien Agents*, [D.I. 3166] (the "Disclosure Statement Supplement");

i.  distributed the Disclosure Statement Supplement, along with revised solicitation materials (the "Supplemental Ballots"), on or about August 28, 2015 to holders of First Lien Claims, in the form approved in that certain *Order Approving Supplement to Disclosure Statement in Support of Debtors' First Amended Joint*

Chapter 11 Plan of Reorganization Proposed by the Debtors, the Committee and the First Lien Agents [D.I. 3168] (the "Second Solicitation Order" together with the Initial Solicitation Order, the "Solicitation Orders"), as set forth in the Affidavit/Declaration of Mailing re: Class 2 Plan Solicitation, dated September 2, 2015 [D.I. 3178], and sworn to by Scott M. Ewing of Rust/Omni (the "Ewing Affidavit");

j.    filed, on August 28, 2015, the Notice of Continued Objection and Voting Deadlines for the First Lien Lenders with Respect to Debtors' First Amended Joint Chapter 11 Plan of Reorganization Proposed by the Debtors, the Committee and the First Lien Agents [D.I. 3171];

k.    filed, on August 28, 2015, the Notice of Rescheduled Start Date for Confirmation Hearing [D.I. 3170]; and

l.    filed, on September 9, 2015 the Declaration of Catherine Nownes-Whitaker regarding Analysis of Ballots for Accepting or Rejecting Debtors' Joint Chapter 11 Plan of Reorganization Proposed by the Debtors, the Committee and the First Lien Agents [D.I. 3192] (the "Voting Certification"); and

m.    filed on September 8, 2015, the Declaration of John F. Blount in Support of Confirmation of the Debtors' First Amended Joint Chapter 11 Plan of Reorganization Proposed by the Debtors, the Committee and the First Lien Agents [D.I. 3185] (the "Blount Declaration").

The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy

Court") having:

a.    entered the Initial Solicitation Order on July 8, 2015 and the Second Solicitation Order on August 28, 2015;

b.    by the Second Solicitation Order, extended, solely for holders of First Lien Claims, the deadline to object to the Plan through September 8, 2015 at 12:00 p.m. (EDT) and the Plan voting deadline to September 8, 2015 at 4:00 p.m. (EDT)

c.    set September 10, 2015 at 9:30 a.m. prevailing Eastern Time, as the date and time for the commencement of the Confirmation Hearing;

d.    held the initial Confirmation Hearing on September 10, 2015, wherein the Bankruptcy Court (i) sustained the Retiree Committee's objections to confirmation of the Plan, (ii) sustained the United States Trustee's objection to the breadth of the exculpation provisions set forth in the Plan, (iii) overruled all other objections to the Plan not previously withdrawn, and (iv) directed that no further objections be filed absent a material adverse change to the treatment of holders of Allowed Claims pursuant to the Plan;

e.    set December 7, 2015 at 11:00 a.m. for continuance of the Confirmation Hearing;

f.     reviewed the Plan, the Disclosure Statement, the Disclosure Statement Supplement, the Plan Supplement, the Confirmation Brief, the Voting Certification, the Blount Declaration, and all other pleadings, exhibits, statements, affidavits, declarations and comments regarding Confirmation of the Plan, including all objections, statements and reservations of rights made with respect thereto;

g.     heard the statements, arguments and objections made by counsel in respect of Confirmation of the Plan;

h.     considered all oral representations, testimony, documents, filings and other evidence regarding Confirmation of the Plan;

i.     received certain objections to, and reservation of rights with respect to, confirmation of the Plan [D.I. 3132, 3135, 3138, 3139, 3153, 3169, 3184, 3187, 3194, and 3353];

j.     overruled any and all objections to the Plan and Confirmation thereof and all statements and reservations of rights not consensually resolved or withdrawn unless otherwise indicated; and

k.     taken judicial notice of the papers and pleadings filed in these chapter 11 cases (the "Chapter 11 Cases").

NOW, THEREFORE, it appearing to the Bankruptcy Court that notice of the Confirmation Hearing and the opportunity for any party in interest to object to Confirmation have been adequate and appropriate as to all entities affected or to be affected by the Plan and the transactions contemplated thereby, and the legal and factual bases set forth in the documents filed in support of Confirmation and presented at the Confirmation Hearing establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefore, the Bankruptcy Court hereby makes and issues the following findings of fact, conclusions of law, and orders:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.     Findings and Conclusions. The findings and conclusions set forth herein and on the record of the Confirmation Hearing constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made

applicable herein by Rules 7052 and 9014 of the Bankruptcy Rules. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

        **B.**    Jurisdiction, Venue, Core Proceeding (28 U.S.C. §§ 157(b)(2), 1334(a)). The Bankruptcy Court has jurisdiction over the Debtors' Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012. Approval of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Bankruptcy Court has jurisdiction to enter a final order with respect thereto. Venue was proper as of the Petition Date and is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

        **C.**    Eligibility for Relief. The Debtors qualify as "debtors" under section 109 of the Bankruptcy Code. The Debtors, the Committee, and the First Lien Agents (collectively, the "Plan Proponents") are proper proponents of the Plan.

        **D.**    Commencement and Joint Administration of these Chapter 11 Cases. On May 17, 2012, involuntary petitions were filed against ASHINC Corporation (f/k/a Allied Systems Holdings, Inc.) ("Allied Holdings") and its subsidiary ASLTD L.P. (f/k/a/ Allied Systems, Ltd. (L.P.)) ("Allied Systems") under chapter 11 of the Bankruptcy Code. On June 10, 2012, the remaining Debtors filed voluntary petitions in this Court. On June 11, 2012, Allied Holdings and Allied Systems consented to the entry of orders for relief. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. In accordance with the Bankruptcy Court's order, dated June 11, 2012 [D.I. 89], the Debtors' cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).

E.    <u>Statutory Committee of Unsecured Creditors</u>.  On June 19, 2012 the Office of the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "<u>Committee</u>") [D.I. 144].

F.    <u>Judicial Notice</u>.  The Bankruptcy Court takes judicial notice of the docket of the Debtors' Chapter 11 Cases maintained by the Clerk of the Court, including all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the hearings held before the Bankruptcy Court during the pendency of these Chapter 11 Cases.

G.    <u>Claims Bar Date</u>.  On May 29, 2013, the Bankruptcy Court entered the Bar Date Order [D.I. 1208] which among other things, (i) established bar dates for filing proofs of claim (including claims arising under section 503(b)(9) of the Bankruptcy Code), (ii) approved the form and manner for filing proofs of claim, and (iii) approved notice of the applicable bar dates. The Bar Date Order established, as applicable, (a) 12:00 a.m. Eastern Daylight Time on August 2, 2013 as the bar date for all non-governmental persons or entities to file Claims that arose before the relevant Petition Date, including all Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code, all Priority Claims, and all other unsecured non-Priority Claims (other than those owed to governmental units) and (b) 12:00 a.m. Eastern Standard Time on November 30, 2013 as the bar date for all governmental units holding claims that arose prior to the relevant Petition Date.  On July 17, 2015, the Bankruptcy Court entered the *Order Establishing a Deadline for Filing Administrative Expense Requests and Approving the Form and Manner of Notice Thereof* [D.I. 3068], which among other things (x) established procedures for filing requests for the allowance of administrative expenses accruing from the Petition Date

through and including July 31, 2015, and (y) August 31, 2015 at 5:00 p.m. (prevailing Eastern Time) as the deadline for filing such requests.

H.      Burden of Proof. The Plan Proponents have the burden of proving the elements of sections 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence. The Plan Proponents have met their burden with respect to each Debtor and each element of section 1129 of the Bankruptcy Code. Each witness who testified on behalf of the Plan Proponents at or in connection with the Confirmation Hearing was credible, reliable, and qualified to testify as to the topics addressed in his testimony.

**The Solicitation Process**

I.      Solicitation. Each of the Plan, the Disclosure Statement, the Ballots, and the Supplemental Ballots, and notice of the Confirmation Hearing were transmitted and served in compliance with the Bankruptcy Rules, including Bankruptcy Rules 3017 and 3018, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), and the Solicitation Orders. The forms of the Ballots (and Supplemental Ballots, as applicable) adequately address the particular needs of these Chapter 11 Cases and are appropriate for holders of Claims in Class 2 (First Lien Lender Claims), Class 3 (Second Lien Lender Claims), Class 4 (AIG Claims), and Class 5 (General Unsecured Claims) – the Classes of Claims entitled to vote to accept or reject the Plan. The period during which the Debtors solicited acceptances to the Plan was a reasonable period of time for holders to make an informed decision to accept or reject the Plan, and was in accordance with the Solicitation Orders, and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any applicable non-bankruptcy law, rule, or regulation. The Debtors were not required to solicit votes from the holders of Claims or Interests in Class 1 (Priority

Claims) and Class 7 (Subsidiary Equity Interests) as these Classes are unimpaired under the Plan, and thus, the holders of such Claims or Interests are deemed to have accepted the Plan. The Debtors also were not required to solicit votes from the holders of Interests in Class 6 (Parent Equity Interests) as Interests in this Class will not receive any recovery under the Plan and, thus, the holders of such Interests are deemed to have rejected the Plan. As described in and as evidenced by the Voting Certification, the transmittal and service of the Plan, the Disclosure Statement, the Ballots, the Supplemental Ballots, and notice of the Confirmation Hearing (the "Solicitation") were timely, adequate and sufficient under the circumstances.

J.     Notice.  As is evidenced by the Sahagun Affidavit and the Ewing Affidavit, all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to confirmation of the Plan) have been given due, proper, timely, and adequate notice in accordance with the Solicitation Orders and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any applicable non-bankruptcy law, rule, or regulation, and such parties have had an opportunity to appear and be heard with respect thereto. No other or further notice or re-solicitation is required.

K.     Good Faith Solicitation.  Based on the record before the Bankruptcy Court in these Chapter 11 Cases, the Plan Proponents and their respective control persons, members, officers, directors, employees and agents and their respective attorneys, financial advisors, investment bankers, accountants, and other professionals retained by such persons (i) have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Solicitation Orders, the Bankruptcy Code, Bankruptcy Rules, the Local Rules, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with all their respective activities relating to the solicitation

DOC ID - 23714145.5

8

of acceptances to the Plan and their participation in the activities described in section 1125 of the Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan (to the extent deemed applicable), and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of the securities under the Plan, if any, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such parties are listed therein, the exculpation provisions set forth in Section 10.8 of the Plan.

L.    Voting.  As evidenced by the Voting Certification, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Plan, the Solicitation Orders, the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules and any applicable non-bankruptcy law, rule, or regulation.  As set forth in the Voting Certification, the following Classes of Claims entitled to vote on the Plan voted to accept the Plan: Class 2 (First Lien Lender Claims), Class 4 (AIG Claims), and Class 5 (General Unsecured Claims).  Based on the foregoing, and as evidenced by the Voting Certification, at least one Impaired Class of Claims has voted to accept the Plan in accordance with the requirements of sections 1124 and 1126 of the Bankruptcy Code.

M.    Plan Supplement.  The Plan Proponents have filed the Plan Supplement, which included a (i) form of Litigation Trust Agreement; (ii) form of Investment Funding Agreement; (iii) form of "Investment Funding Backstop Agreement;" (iv) form of Certificate of Incorporation for Reorganized ASHINC; (v) form of bylaws for Reorganized ASHINC; (vi) list of executory contracts and unexpired leases to be assumed; and (vii) disclosure concerning

DOC ID - 23714145.5

9

identities of individuals associated with the Litigation Oversight Committee, ASHINC Litigation Trust, and Reorganized ASHINC. All documents contained in the Plan Supplement comply with the terms of the Plan, and the filing, notice, and service of such documents were done in accordance with the Solicitation Orders, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and any applicable non-bankruptcy law, rule, or regulation and no other or further notice is or shall be required.

### Compliance with the Requirements of Section 1129 of the Bankruptcy Code

> N.      Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1)). The Plan complies with the applicable provisions of the Bankruptcy Code and, as required by Bankruptcy Rule 3016, the Plan is dated and identifies the Debtors, the Committee, and First Lien Agents as proponents, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

> (a)      Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)). With the exception of the Administrative Claims and Priority Tax Claims, which need not be classified, Article III of the Plan classifies seven (7) Classes of Claims and Interests in the Debtors. The Claims and Interests placed in each Class are substantially similar to the other Claims and Interests, as the case may be, in each such Class. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, and such Classes do not unfairly discriminate between holders of Claims and Interests. Accordingly, the Plan satisfies sections 1122 and 1123(a)(1) of the Bankruptcy Code.

> (b)      Unimpaired Classes Specified (11 U.S.C. § 1123(a)(2)). Sections 3.2 and 3.5 of the Plan specify that Claims or Interests in Class 1 (Priority Claims) and Class 7 (Subsidiary Equity Interests) (the "Unimpaired Classes") are unimpaired under the Plan within

the meaning of section 1124 of the Bankruptcy Code, thereby satisfying section 1123(a)(2) of the Bankruptcy Code.

(c)     Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)). Sections 3.3 and 3.4 of the Plan designate Claims or Interests in Class 2 (First Lien Lender Claims), Class 3 (Second Lien Lender Claims), Class 4 (AIG Claims), Class 5 (General Unsecured Claims), and Class 6 (Parent Equity Interests) (collectively, the "Impaired Classes") as impaired within the meaning of section 1124 of the Bankruptcy Code and clearly specifies the treatment of the Claims and Interests in those Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code.

(d)     No Discrimination (11 U.S.C. § 1123(a)(4)). The Plan provides for the same treatment for each Claim or Interest in each respective Class except in Class 2 where Yucaipa has agreed to different treatment for its asserted Claims, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

(e)     Adequate Means for Plan Implementation (11 U.S.C. § 1123(a)(5)). The Plan and the Plan Supplement provide adequate and proper means for the implementation of the Plan, including, without limitation, (i) the continued corporate existence of the Debtors as the Reorganized Debtors as set forth in the Plan and Plan Supplement (subject to the right of the Debtors or the Reorganized Debtors, as applicable, to engage in any corporate restructuring prior to, on, or after the Effective Date, which may include the merger, liquidation, or dissolution of one or more of the Debtors or the Reorganized Debtors); (ii) the vesting of assets in the Reorganized Debtors; (iii) the authorization, issuance, and distribution of New Common Stock; (iv) the creation of the ASHINC Litigation Trust and vesting of the Litigation Claims into the ASHINC Litigation Trust; (v) the appointment and designation of the Litigation

DOC ID - 23714145.5

11

Oversight Committee, the Litigation Trustee, and the Plan Administrator; (vi) the approval of (a) the AIG Settlement Agreement, (b) the Central States Settlement, (c) the Northwest Settlement, and (d) the settlement of any and all disputes among the First Lien Agents (on behalf of the First Lien Lenders), the Debtors and the Committee, including (without limitation) with respect to (1) the entitlement to adequate protection pursuant to the 2012 Final DIP Order and the Replacement DIP Order, and (2) the obligation to fund the Wind Down Budget (as defined in the JCT Sale Order), as incorporated into the Plan (items (a) to (d), collectively, the "Plan Settlements"); and (vii) procedures for making distributions to holders of Allowed Claims. Accordingly, the Plan satisfies section 1123(a)(5) of the Bankruptcy Code.

(f)     Prohibition of Issuance of Non-Voting Securities (11 U.S.C. § 1123(a)(6)). The New Debtor Governing Documents contained in the Plan Supplement prohibit the issuance of non-voting securities. The Plan, therefore, satisfies the requirements of section 1123(a)(6) of the Bankruptcy Code.

(g)     Designation of Officers, Directors or Trustees (11 U.S.C. § 1123(a)(7)). The Plan Supplement disclosed the identity and affiliations of the individual proposed to serve as the initial directors of Reorganized ASHINC, the Litigation Trustee (who will serve as the initial Plan Administrator), and the members of the Litigation Oversight Committee. The manner of selection of the directors, the Litigation Trustee, and the members of the Litigation Oversight Committee was consistent with the interests of holders of Claims against, and Interests in, the Debtors and with public policy, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.

(h)     Earnings from Personal Services (11 U.S.C. § 1123(a)(8)).     Section 1123(a)(8) of the Bankruptcy Code applies only to individual debtors and is not applicable to these Chapter 11 Cases.

(i)     Impairment/Unimpairment of Classes of Claims and Equity Interests (11 U.S.C. § 1123(b)(1)).     As permitted by section 1123(b)(1) of the Bankruptcy Code, pursuant to Sections 3.3 and 3.4 of the Plan, Claims or Interests in the Impaired Classes are impaired and, pursuant to Sections 3.2 and 3.5 of the Plan, Claims or Interests in the Unimpaired Classes, are unimpaired.

(j)     Assumption and Rejection (11 U.S.C. § 1123(b)(2)).     As permitted by section 1123(b)(2) of the Bankruptcy Code and Article VI of the Plan, all executory contracts and unexpired leases, other than those identified in the Plan Supplement, shall be deemed rejected as of the Effective Date, unless such executory contract or unexpired lease: (i) was assumed and assigned previously or rejected previously by the Debtors, (ii) previously expired or terminated pursuant to its own terms; or (iii) is the subject to a motion to assume filed before the Effective Date. Assumption and rejection of these executory contracts and unexpired leases pursuant to the Plan satisfies the requirements of Bankruptcy Code section 365, and is expressly authorized by Bankruptcy Code section 1123(b)(2). The Debtors have exercised reasonable business judgment in determining to assume or reject the executory contracts and unexpired leases to be rejected under the Plan. The assumption or rejection of each executory contract or unexpired lease rejected under the Plan shall be binding on the Debtors and each non-debtor party to each such executory contract or unexpired lease. The evidence supporting adequate assurance of future performance includes (a) the Plan, (b) the commitment letter for exit financing to ASHINC Corporation (which shall be subject to Section 5.20 of the Plan in all

respects), filed as part of the Plan Supplement [D.I. 3189], (c) the Reorganized Debtors' Assets, and (d) the evidence proffered or adduced by the Debtors at the Confirmation Hearing which (x) is reasonable, persuasive, credible, and accurate; (y) has not been controverted by other evidence; and (z) satisfies the requirements of the Bankruptcy Code.

(k)     Settlement/Retention of Claim or Interests (11 U.S.C. § 1123(b)(3)). Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The compromise and settlement of such Claims and Interests embodied in the Plan, including the Plan Settlements, are in the best interests of the Debtors, the Estates and all holders of Claims and Interests, and are fair, equitable and reasonable. As permitted by section 1123(b)(3) of the Bankruptcy Code, Sections 5.10, 5.11, and 5.12 of the Plan provide that, from and after the Effective Date, except as otherwise expressly provided in the Plan, the Litigation Trustee may pursue the Litigation Claims.

(l)     Modification of Rights (11 U.S.C. § 1123(b)(5)). As permitted by section 1123(b)(5) of the Bankruptcy Code, the Plan modifies the rights of holders of Claims and Interests in Classes 2, 3, 4, 5, and 6. The Plan leaves unaffected the rights of holders of Claims in Class 1 and 7.

(m)     Additional Plan Provisions (11 U.S.C. § 1123(b)(6)). As permitted by section 1123(b)(6) of the Bankruptcy Code, the Plan includes other appropriate provisions not inconsistent with the applicable provisions of the Bankruptcy Code, including, without

limitation, certain release, exculpation, and injunction provisions in Article X of the Plan. Based upon the facts and circumstances of these Chapter 11 Cases, the release, exculpation, and injunction provisions in the Plan, including the releases by holders of Claims and Interests set forth in Section 10.6(b) of the Plan, are fair, equitable, and reasonable, are supported by sufficient and valuable consideration, are an integral component of compromises and settlements underlying the Plan, are necessary for the realization of value for stakeholders, are the product of extensive arm's length negotiations or based on consent, were necessary to the formation of the consensus embodied in the Plan and the Plan Supplement documents, are in the best interests of the Debtors and their estates, creditors, and equity holders, and are, in light of the foregoing, appropriate. The failure to implement the release, exculpation, and injunction provisions would seriously impair the Debtors' ability to confirm and consummate the Plan, and would likely lead to the conversion of the Debtors' Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. Each of the Released Parties afforded value to the Debtors and aided in the reorganization process. The Released Parties played an integral role in the formulation of the Plan and have expended significant time and resources analyzing and negotiating the issues presented by these Chapter 11 Cases. In addition, the Debtor releases set forth in Section 10.6 of the Plan are fully consensual and the exculpations in Section 10.8 of the Plan do not relieve any party of liability for fraud, criminal conduct, gross negligence, willful misconduct, or willful violation of federal or state securities laws or the Internal Revenue Code. Accordingly, based upon the record of these Chapter 11 Cases, the representations of the parties, and/or the evidence proffered or adduced at the Confirmation Hearing, the Bankruptcy Court finds that the release, exculpation, and injunction provisions set forth in Article X of the Plan are consistent with the Bankruptcy Code and applicable law and are appropriate under the circumstances.

(n)     Sale of Exempt Property (11 U.S.C. § 1123(c)).  The Debtors are not individuals.  Accordingly, section 1123(c) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

O.     The Plan Proponents' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2)).  Except as otherwise provided for or permitted by order of the Bankruptcy Court, the Plan Proponents have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Solicitation Orders in transmitting the Plan, the Plan Supplement, the Disclosure Statement, the Ballots, the Supplemental Ballots, and related documents and notices and in soliciting and tabulating the votes on the Plan.  Accordingly, the requirements of section 1129(a)(2) of the Bankruptcy Code are satisfied.

P.     Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)).  The Plan Proponents have proposed the Plan, including all documents necessary to effectuate the Plan, in good faith and not by any means forbidden by law, thereby satisfying the requirements of section 1129(a)(3) of the Bankruptcy Code.  The Plan Proponents' good faith is evident from the facts and record of these Chapter 11 Cases, the Disclosure Statement, and the record of the Confirmation Hearing and other proceedings held in these Chapter 11 Cases.  The Plan itself and the process leading to its formulation provide independent evidence of the Plan Proponents' good faith, serve the public interest, and assure fair treatment of holders of Claims and Interests.  The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' estates and to maximize distributions to all creditors.  Further, the Plan's classification, indemnification, exculpation, release, discharge, and injunction provisions have been negotiated in good faith and at arm's length, are consistent with sections 105, 1122, 1123(b)(3)(A),

1123(b)(6), 1129, and 1142 of the Bankruptcy Code, and are integral to the Plan and supported by valuable consideration.

        Q.      <u>Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))</u>. Any payment made or to be made by the Plan Proponents, or by any other person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with these Chapter 11 Cases, or in connection with the Plan and incident to these Chapter 11 Cases, has been approved by, or shall be subject to the approval of, the Bankruptcy Court as reasonable. Accordingly, the Plan satisfies the requirements of section 1129(a)(4) of the Bankruptcy Code.

        R.      <u>Directors, Officers, and Successors (11 U.S.C. § 1129(a)(5))</u>. The Plan Proponents have complied with section 1129(a)(5) of the Bankruptcy Code, to the extent applicable. The identity and affiliations of the person(s) proposed to serve as (i) directors and officers of Reorganized ASHINC, (ii) members of the Litigation Oversight Committee, and (iii) the Litigation Trustee and Plan Administrator after the Effective Date of the Plan have been fully disclosed. Each of these persons is qualified and the appointment to such office of such person(s) is consistent with the interests of holders of Claims against and Interests in the Debtors and with public policy. As set forth in the Plan Supplement, on the Effective Date, the Litigation Trustee shall be Catherine E. Youngman who will also serve as the Plan Administrator. As set forth in the Plan Supplement, on the Effective Date, the members of the Litigation Oversight Committee shall oversee the ASHINC Litigation Trust and the Litigation Trustee. The proposed directors and officers of Reorganized ASHINC will serve in accordance with the New Debtor Governing Documents. Thus, the identity and affiliations of the persons proposed to serve as officers and/or directors of the Debtors and the successor to the Debtors under the Plan have

DOC ID - 23714145.5

17

been fully disclosed, and the appointment to such offices of such person(s) is consistent with the interests of holders of Claims against and Interests in the Debtors and with public policy. Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

S.      No Rate Changes (11 U.S.C. § 1129(a)(6)). The Plan does not provide for any rate changes over which a governmental regulatory commission has jurisdiction. Accordingly, section 1129(a)(6) of the Bankruptcy Code is not applicable in these Chapter 11 Cases.

T.      Best Interest of Creditors (11 U.S.C. § 1129(a)(7)). The liquidation analysis (attached as Exhibit DS-5 to the Disclosure Statement) and other evidence proffered or adduced at the Confirmation Hearing (i) is persuasive and credible, (ii) has not been controverted by other evidence, and (iii) establishes that each holder of a Claim or Interest in an Impaired Class either has accepted the Plan or will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date. The liquidation analysis provided in the Disclosure Statement, including the methodology used and estimations and assumptions made therein, and the evidence related thereto that was proffered at the Confirmation Hearing, (a) is persuasive and credible as of the dates such evidence was prepared, presented, or proffered, (b) either has not been controverted by other persuasive evidence or has not been challenged, (c) is based upon reasonable and sound assumptions, and (d) provides a reasonable estimate of the liquidation value of the Debtors' estates upon a conversion to a chapter 7 case. Recoveries pursuant to the Plan are equal to or in excess of those that would be available if the Debtors were liquidated

pursuant to chapter 7 and, therefore, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

U.    Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)).  Claims in Class 1 (Priority Claims) are unimpaired under the Plan and are conclusively presumed to have accepted the Plan without the solicitation of acceptances or rejections pursuant to section 1126(f) of the Bankruptcy Code.  Holders of Claims in Class 2 (First Lien Lender Claims) voted to accept the Plan by at least two-thirds in amount and one-half in number.  *See* Voting Certification.  Holders of Claims in Class 4 (AIG Claims) voted to accept the Plan by at least two-third in amount and one-half in number.  *See* Voting Declaration.  Holders of Claims in Class 5 (General Unsecured Claims) voted to accept the Plan by at least two-third in amount and one-half in number.  *See* Voting Declaration.  With respect to the remaining Impaired Classes (Class 3 – Second Lien Lender Claims and Class 6 – Parent Equity Interests), the Plan is confirmable because it satisfies the provisions of section 1129(b)(2) of the Bankruptcy Code.  Accordingly, the Plan satisfies the requirements of section 1129(a)(8) of the Bankruptcy Code.

V.    Treatment of Administrative Claims, Priority Tax Claims, and Other Priority Claims (11 U.S.C. § 1129(a)(9)).  The treatment of Claims under the Plan of the type specified in sections 507(a)(1) through 507(a)(8) of the Bankruptcy Code, if any, complies with the provisions of section 1129(a)(9)(c) of the Bankruptcy Code.  A condition to the Plan's Effective Date is that (i) the aggregate amount of all Allowed Administrative Claims and Allowed Priority Tax Claims shall not exceed $4.5 million (such cap subject to reduction, per section 8.2(g) of the Plan) and (ii) the aggregate amount of all Allowed Priority Claims shall not exceed $275,000 (collectively, the "Admin/Priority Cap").  The aggregate amount of filed Administrative Claims, Priority Tax Claims, and Priority Claims ("Filed Admin/Priority

Claims") is anticipated to exceed the Admin/Priority Cap (such excess, the "Shortfall Amount").
The Effective Date of the Plan will be deferred until either (a) the Filed Admin/Priority Claims
are below the Admin/Priority Cap as a result of successful claim challenges, or (b) the Plan
Proponents waive the Admin/Priority Cap as a condition to the Plan's effectiveness and the
Shortfall Amount is set aside in a reserve account.   Accordingly, the Plan satisfies the
requirements of section 1129(a)(9) of the Bankruptcy Code.

      W.    Acceptance by at Least One Impaired Class (11 U.S.C. § 1129(a)(10)).  At
least one Impaired Class entitled to vote affirmatively accepted the Plan by the requisite
majorities with respect to each Debtor, determined without including any acceptance of the Plan
by any insider, thereby satisfying the requirements of section 1129(a)(10) of the Bankruptcy
Code with respect to all Debtors.  *See* Voting Certification.  Claims in Class 1 (Priority Claims)
and Class 7 (Subsidiary Equity Interests) are unimpaired under the Plan and are conclusively
presumed to have accepted the Plan without the solicitation of acceptances or rejections pursuant
to section 1126(f) of the Bankruptcy Code.  Accordingly, the Plan satisfies the requirements of
section 1129(a)(10) of the Bankruptcy Code.

      X.    Feasibility (11 U.S.C. § 1129(a)(11)).    The Plan satisfies section
1129(a)(11) of the Bankruptcy Code.  The information in the Disclosure Statement and the
evidence proffered or adduced at the Confirmation Hearing (i) is persuasive and credible, (ii) has
not been controverted by other evidence, and (iii) establishes that the Plan is feasible and that
there is a reasonable prospect of the Debtors being able to meet their financial obligations under
the Plan and that confirmation of the Plan is not likely to be followed by the need for further
financial reorganization of the Debtors, thereby satisfying the requirements of section
1129(a)(11) of the Bankruptcy Code.

Y.      Payment of Fees (11 U.S.C. § 1129(a)(12)).  Pursuant to Section 10.2 of

the Plan, all fees payable pursuant to section 1930 of title 28 of the United States Code prior to

the Effective Date shall be paid by the Debtors on or before the Effective Date.  Accordingly, the

Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

Z.      Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)).  The Retiree

Benefit Plans have been modified and cancelled in accordance with the terms of the 1114 Order.

On the Effective Date, the Debtors shall make the payments to or for the benefit of the

participants or beneficiaries of the Retiree Benefit Plans, as provided in the 1114 Order.

Accordingly, the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

AA.     No Domestic Support Obligations (11 U.S.C. § 1129(a)(14)).  The Debtors

are not required by a judicial or administrative order, or by statute, to pay a domestic support

obligation.  Accordingly, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these

Chapter 11 Cases.

BB.     Debtors Are Not Individuals (11 U.S.C. § 1129(a)(15)).  The Debtors are

not individuals.  Accordingly, section 1129(a)(15) of the Bankruptcy Code is inapplicable in

these Chapter 11 Cases.

CC.     No Applicable Non-Bankruptcy Law Regarding Transfers (11 U.S.C.

§ 1129(a)(16)).   The Debtors are each a moneyed, business or commercial corporation.

Accordingly, section 1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11

Cases.

DD.     No Unfair Discrimination; Fair and Equitable (11 U.S.C. § 1129(b)).

Based upon the evidence proffered, adduced, and presented by the Debtors at the Confirmation

Hearing, the Plan does not discriminate unfairly and is fair and equitable with respect to each

Class that has rejected the Plan or was deemed to reject the Plan, as required by sections 1129(b)(1) and (b)(2) of the Bankruptcy Code, because no holder of any interest that is junior to such Class will receive or retain any property under the Plan on account of such junior interest, and no holder of a Claim in a Class senior to such Class is receiving more than 100% recovery on account of its Claim. Moreover, the Plan's treatment of Class 3 (Second Lien Lender Claims) complies with sections 1129(b)(1) and (b)(2) of the Bankruptcy Code because the treatment of the Claims in such class is fully consistent with the contractual rights of holders of Second Lien Lender Claims, as set forth in the Intercreditor Agreement, which is enforceable under section 510(c) of the Bankruptcy Code. Thus, the Plan may be confirmed notwithstanding its rejection by the rejecting Classes.

EE.     Only One Plan (11 U.S.C. § 1129(c)). The Plan is the only plan solicited and brought to the Court for confirmation in each of these Chapter 11 Cases. Accordingly, section 1129(c) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

FF.     Principal Purpose of the Plan (11 U.S.C. § 1129(d)). The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933 and no governmental entity has objected to the confirmation of the Plan on any such grounds. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

GG.     Small Business Case (11 U.S.C. § 1129(e)). None of these Chapter 11 Cases is a "small business case," as that term is defined in the Bankruptcy Code, and accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.

HH.     Modifications of the Plan (11 U.S.C. § 1127). Any modifications made to the Plan since the Solicitation (other than those disclosed in the Disclosure Statement

Supplement) do not constitute changes that materially and adversely change the treatment of any Claims or Interests and do not require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of acceptances or rejections of the Plan under section 1126 of the Bankruptcy Code, nor do they require that holders of Claims against the Debtors be afforded an opportunity to change previously cast acceptances or rejections of the Plan.. The modifications noticed in the Disclosure Statement Supplement, and the re-solicitation of the holders of Claims in Class 2 (First Lien Lender Claims) and the opportunity afforded them to change previously cast acceptances or rejections of the Plan, as well as the other immaterial modifications of the Plan, comply in all respects with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

II.     Satisfaction of Confirmation Requirements.  Based upon the foregoing, all other pleadings, documents, exhibits, statements, declarations and affidavits filed in connection with Confirmation of the Plan, and all evidence and arguments made, proffered or adduced at the Confirmation Hearing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

JJ.     Implementation.  All documents and agreements necessary to implement the Plan, including, without limitation, each of the documents contained in the Plan Supplement, and all other relevant and necessary documents, have been negotiated in good faith and at arm's length, do not inappropriately conflict with applicable non-bankruptcy law, and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements.

KK.     Good Faith.  Based on the record before this Court in these Chapter 11 Cases, the Plan Proponents and each Plan Proponents' related Persons will be acting in good faith within the meaning of section 1125(e) of the Bankruptcy Code if they proceed to (i) consummate

the Plan and the agreements, settlements, transactions, and transfers contemplated thereby and (ii) take the actions authorized and directed by this Order, and shall not be liable under any applicable law, rule, or regulation governing solicitation of acceptance or rejection of the Plan or the offer, issuance, sale, or purchase of securities.

LL.   Preservation of Causes of Action.  It is in the best interests of the Debtors, their estates, creditors and Interest holders that the Estate Claims (as defined in the Plan) that may be pending on the Effective Date, except as otherwise expressly provided in the Plan or this Order, shall be vested in the ASHINC Litigation Trust which shall have the sole and exclusive right to litigate (or abandon) any claims or causes of action that constitute the Litigation Claims (which includes the Estate Claims).

MM.   Investment Funding Transactions.  The Investment Funding Agreement and the Investment Funding Backstop Agreement, as well as the Litigation Proceeds Waterfall, Investments and the "Backstop Payment" contemplated therein, are fair and reasonable and do not violate any applicable law in that, among other things, (i) the Investors are entering in the Investment Funding Agreement solely for the purpose to profit from their investments, (ii) the Investors will only receive the distributions set forth in the Litigation Proceeds Waterfall in the event that the ASHINC Litigation Trust recovers on the Litigation Claims, and that (ii) the Investors are not acquiring the Debtors' right to sue.

**ORDER**

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

1.   Confirmation of the Plan.  The Plan, as modified pursuant to section 1127 of the Bankruptcy Code, and each of its provisions, including the Plan Supplement, shall be, and

hereby is, CONFIRMED pursuant to section 1129 of the Bankruptcy Code. The documents contained in the Plan Supplement are authorized and approved, including but not limited to the (i) New Debtor Governing Documents, (ii) Litigation Trust Agreement, (iii) Investment Funding Agreement, and (iv) Investment Funding Backstop Agreement. The terms of the Plan, including the Plan Supplement, are incorporated by reference into and are an integral part of this Order. The forms, terms, and provisions of the Plan Supplement may be amended or modified by the Plan Proponents through and including the Effective Date in a manner consistent with, and that does not materially modify, the Plan; *provided, however*, that any amendments or modifications affecting Yucaipa's treatment under the Plan shall require Yucaipa's prior written consent (which consent shall be provided or withheld in Yucaipa's sole discretion), as set forth in Section 10.12 of the Plan.

2.      Objections Overruled. All objections, responses to, and statements and comments, if any, in opposition to or inconsistent with the Plan, other than those withdrawn with prejudice or resolved in their entirety prior to, or on the record at, the Confirmation Hearing, shall be, and hereby are, OVERRULED and DENIED in their entirety. All withdrawn objections are deemed withdrawn with prejudice.

3.      Plan Settlements. Each of the Plan Settlements, and each component of the Plan Settlements, is hereby approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 as fair and reasonable and in the best interests of each of the Debtors, their estates and creditors. Further, the Plan Settlements are deemed an integrated compromise and settlement and, accordingly, are non-severable from each other and from all other terms of the Plan. The compromises and settlements embodied in the Plan Settlements are fair, equitable, and within the range of reasonableness. The Debtors and the Reorganized Debtors, as

DOC ID - 23714145.5

applicable, are duly authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents, and papers, and to take any and all actions reasonably necessary or appropriate to consummate the Plan Settlements.

4.    Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases and exculpation provisions set forth in Article X, constitute a good-faith compromise and settlement of all Claims, disputes, or controversies relating to the rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made pursuant to the Plan on account of any such Allowed Claim.

5.    Implementation of the Plan.  The Debtors, the Reorganized Debtors, the Committee, the First Lien Agents, the Litigation Trustee, the Litigation Oversight Committee and the ASHINC Litigation Trust, each to the extent applicable and in accordance with the terms and conditions of the Plan, are authorized to (i) execute, deliver, file, and/or record such documents, contracts, instruments, releases, and other agreements, including, without limitation, those contained in the Plan Supplement, (ii) make any and all distributions and transfers contemplated pursuant to, and as provided for in, the Plan, and (iii) take such other actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan.  Pursuant to Section 5.1 of the Plan, no portion of the GUC Cash Distribution shall be funded with Cash Collateral allocable to the Disputed First Lien Obligations and held by the Debtors or the First Lien Agents and instead, the GUC Cash Distribution shall be funded solely from Cash Collateral allocable to the First Lien Obligations held by the First Lien Lenders other than Yucaipa.

6.     No Action.  To the extent that, under applicable non-bankruptcy law, any action to effectuate the terms of the Plan would otherwise require the consent or approval of the members, managers, directors or officers of any of the Debtors, this Order shall, pursuant to sections 1123(a)(5) and 1142 of the Bankruptcy Code, constitute the consent or approval, and such actions are deemed to have been taken by unanimous action of the members, managers, directors and officers of the appropriate Debtors.

7.     Binding Effect.  From and after entry of this Order, and subject to the occurrence of the Effective Date, except to the extent otherwise provided in the Plan or this Order, the provisions of the Plan, as applicable, shall be binding on and shall insure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such Person, including, but not limited to, the ASHINC Litigation Trust, the Reorganized Debtors, all holders of Claims and Interests of the Debtors (irrespective of whether such Claims or Interests are impaired under the Plan or whether the holders of such Claims or Interests accepted, rejected or are deemed to have accepted or rejected the Plan), any and all non-Debtor parties to executory contracts and unexpired leases with any of the Debtors, and all other parties in interest in the Chapter 11 Cases.

8.     Corporate Existence.  Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, the Reorganized Debtors shall continue to exist as of and after the Effective Date as private legal entities, in accordance with applicable non-bankruptcy law and pursuant to the New Debtor Governing Documents.  Notwithstanding the foregoing, the Debtors or the Reorganized Debtors, as applicable, may engage in any corporate restructuring prior to, on or after the Effective Date,

DOC ID - 23714145.5

which may include the merger, liquidation or dissolution of one or more of the Debtors or the Reorganized Debtors.

9. New Common Stock. On the Effective Date, Reorganized ASHINC shall authorize and issue or reserve for issuance all of the New Common Stock required to be issued or reserved in connection with the Plan. The New Common Stock authorized or issued in connection with the Plan shall be authorized without the need for further corporate action or without any further action by any Person, and once issued, shall be duly authorized, validly issued, fully paid and non-assessable. The rights of the holders of the New Common Stock shall be as provided for in the New Debtor Governing Documents.

10. Section 1145 Exemption. Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Common Stock shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable law requiring registration, prior to the offering, issuance, distribution or sale of securities. In addition, except as otherwise provided in the Plan, to the maximum extent provided under section 1145 of the Bankruptcy Code, the New Common Stock will be freely tradable by the recipients thereof, subject to: (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of New Common Stock; (ii) the restrictions, if any, on the transferability of New Common Stock; and (iii) applicable regulatory approval.

11. Vesting of Assets in the Reorganized Debtors. As provided for in Section 5.9 of the Plan, all property and assets of each Estate (other than the Litigation Trust Assets)

shall vest in each respective Reorganized Debtor on the Effective Date. Thereafter, subject to Section 5.20 of the Plan, the Reorganized Debtors may operate their business and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, or Bankruptcy Court approval. Except as specifically provided in the Plan or herein, as of the Effective Date, all property of the Reorganized Debtors shall be free and clear of all Claims and Interests, and all Liens with respect thereto.

12.     The provisions of the Plan and this Confirmation Order vesting such assets free and clear of Liens, Claims, Interests, charges, or other encumbrances shall be self-executing, and the Debtors and Reorganized Debtors shall not be required to execute or file releases, termination statements, assignments, consents, or other instruments, agreements, or documents in order to effectuate, consummate and implement such provisions. However, on or before the Effective Date, the Debtors' creditors are authorized and directed to execute such documents and take all other actions as may be necessary or reasonably requested by the Debtors or Reorganized Debtors to release any Liens, Claims, Interests, charges, or other encumbrances (including without limitation any deposit account control agreements) of any kind or nature whatsoever against any portion or all of the assets of the Estates, as such Liens, Claims, Interests, charges, or other encumbrances (including without limitation any deposit account control agreements) may have been recorded or may otherwise exist. If any Person or entity that has filed financing statements or other documents or agreements evidencing any Liens, Claims, Interests, charges, or other encumbrances in or against any assets of the Estates shall not have delivered to the Debtors prior to the Effective Date in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all such Liens, Claims, Interests, charges, or other encumbrances, the Debtors and/or Reorganized Debtors are hereby

authorized to execute and file such statements, instruments, releases, and other documents on behalf of the Person or entity.

13. In the event any of the Reorganized Debtors' Assets (other than the Debtors' interests in Haul Insurance Limited) is sold, transferred, assigned, pledged, hypothecated or otherwise disposed of prior to the occurrence of the Effective Date, for the purposes of the Plan such transaction shall be deemed to have occurred after the Effective Date and the net proceeds from such sale, transfer, assignment or other disposition shall be distributed to the Non-Electing First Lien Lenders entitled thereto in accordance with Sections 3.3(a), 3.7(c) and 5.20 of the Plan.

14. The First Lien Lender Deferred Distribution shall be paid by Reorganized Debtors to the Non-Electing First Lien Lenders. The First Lien Lender Deferred Distribution shall be paid by Reorganized Debtors solely from the net cash proceeds received by the Reorganized Debtors from the sale, transfer, assignment or other disposition of the Reorganized Debtors' Assets (other than the Reorganized Debtors' interest in Haul Insurance Limited), and after the Reorganized Debtors have recovered an amount (in cash and other property) equal to the First Lien Lender Cash Distribution from such Reorganized Debtors' Assets. For the avoidance of doubt, the Reorganized Debtors shall have absolute discretion as to the time, method and terms for the sale, transfer, assignment or disposition of all or any portion of the Reorganized Debtors' Assets (except that the majority of the consideration received by the Reorganized Debtors from such sale, transfer, assignment, or disposition must be Cash). The Reorganized Debtors shall have no fiduciary or other duty to any First Lien Lender that is or may be entitled to receive all or any portion of the First Lien Lender Deferred Distribution. Without limiting the generality of the foregoing, the Reorganized Debtors may incur indebtedness

secured by a Lien on all or a portion of the Reorganized Debtors' Assets *provided* that the incurrence of such indebtedness shall not be for the purpose of (a) making or paying any dividend on account of the New Common Stock, or (b) making any investment in Haul Insurance Limited (except with respect to clauses (a) and (b) to the extent such indebtedness is secured solely by the Reorganized Debtors' equity interests in Haul Insurance Limited), and *provided further* that any such indebtedness incurred shall either be from (i) a third party (i.e., a party that is not a Plan Proponent, an affiliate of a Plan Proponent or any of their respective officers, directors or agents) or (ii) a Plan Proponent, an affiliate of a Plan Proponent or any of their respective officers, directors or agents on terms no less favorable to the Reorganized Debtors than those that could be obtained from a third party.

15. The Reorganized Debtors will make available to each First Lien Lender that is entitled to receive a portion of the First Lien Lender Deferred Distribution an accounting upon the sale, transfer, assignment, or other disposition of any Reorganized Debtor Asset (other than any interest in Haul Insurance Limited) setting forth (to the extent applicable) (a) a description of the Reorganized Debtor Asset sold, transferred, assigned, or otherwise disposed of, (b) the identity of the party (or parties) to whom such Reorganized Debtor Assets was sold, transferred, assigned, or otherwise disposed of, (c) the gross amount received by the Reorganized Debtors, (d) the direct third party (i.e., a party that is not a Plan Proponent, an affiliate of a Plan Proponent or any of their respective officers, directors or agents) reasonable costs and expenses of maintaining, preserving and protecting such Reorganized Debtor Asset and any associated third party costs of sale, transfer, assignment or disposition, (e) the net proceeds recovered by the Reorganized Debtors, (f) the aggregate amount recovered by the Reorganized Debtors through the date thereof on account of the First Lien Lender Cash Distribution, and (g) the amount (if

DOC ID - 23714145.5

31

any) payable on account of the First Lien Lender Deferred Distribution. The obligation of the Reorganized Debtors to provide such accounting shall terminate upon the payment in full of the First Lien Lender Deferred Distribution.

16.　　Treatment of Yucaipa. Pursuant to the Plan, Yucaipa shall receive the treatment afforded to holders of First Lien Claims who are Non-Electing First Lien Lenders in Class 2 and as further set forth in Section 3.7 of the Plan. The First Lien Agents, the Debtors, and the Plan Administrator are authorized and directed to take any action necessary to effectuate the provisions of Section 3.7 of the Plan in accordance with its terms. On the Effective Date, the Plan Administrator shall succeed to the rights and obligations of the Debtors under the Disputed First Lien Obligations Escrow. In addition, nothing in the Plan or this Order shall impair or limit the right of any party with respect to the Disputed First Lien Obligations Escrow or the approximately $16.5 million being held by the First Lien Agents as a reserve for the payment of fees and expenses incurred by Yucaipa, and that Yucaipa has alleged are subject to reimbursement pursuant to the terms of the First Lien Credit Agreement (such reserve the "Yucaipa Fee Reserve"). The Yucaipa Fee Reserve shall be preserved and not disbursed until entry of a Final Order of a court of competent jurisdiction or a written settlement agreement binding the parties resolving the disputes relating to the funds on deposit in the Yucaipa Fee Reserve..

17.　　Accounting With Respect to First Lien Reserves and Winddown Reserve. No later than 10 Business Days following the Effective Date, the Reorganized Debtors and the First Lien Agents shall provide to Yucaipa and each other First Lien Lender who makes a written request therefore an analysis showing, with respect to each of the First Lien Reserve and the Winddown Reserve, (a) the balance in such Reserve as of September 1, 2015, (b) the

distributions of such Cash made pursuant to the Plan, (c) the amount of any reserves established pursuant to the Plan or by the First Lien Agents, as applicable, and (d) the resulting balance of such First Lien Reserve or Winddown Reserve.

18. Approval of the ASHINC Litigation Trust and Appointment of the Litigation Trustee. The establishment of the ASHINC Litigation Trust in accordance with the terms of the Plan and the Litigation Trust Agreement is hereby authorized and approved in accordance with their respective terms. The ASHINC Litigation Trust shall be established on the Effective Date for the purpose of prosecuting the Litigation Claims. Notwithstanding anything in the Plan, the Plan Supplement, or this Confirmation Order to the contrary, nothing in the Plan, Plan Supplement, or this Confirmation Order shall (i) affect the United States District Court's withdrawal of the reference for the Estate Claims asserted against Mark Gendregske or require that trial or discovery of such claims be coordinated with trial or discovery of any other Litigation Claims, or (ii) limit or impair any as yet unnamed defendant's right to contest the coordination of trial or discovery of any Estate Claims that may be asserted against them with trial or discovery of any Litigation Claims. Notwithstanding the foregoing, nothing herein shall limit or impair the right of any party to make any motion, application, or request to the Bankruptcy Court, the United States District Court, or any other court of competent jurisdiction with respect to the Estate Claims asserted against Mr. Gendregske or that may be asserted as against any as yet unnamed defendant, including with respect to the coordination of discovery and/or trial. Except as otherwise ordered, the Litigation Trust Expenses on or after the Effective Date shall be paid in accordance with the Litigation Trust Agreement without further order of the Bankruptcy Court.

19.  <u>Approval of the Investment Transactions</u>.  The Investment Funding Agreement and the Investment Funding Backstop Agreement, as well as the Litigation Proceeds Waterfall, Investments, and the Backstop Payment contemplated therein are hereby authorized and approved in accordance with their respective terms.  Proceeds of any recovery on account of the Litigation Claims shall be distributed in accordance with the Investment Funding Agreement and the Litigation Proceeds Waterfall, as set forth in Section 5.14 of the Plan.

20.  <u>Appointment of the Litigation Trustee and Litigation Oversight Committee</u>.  The appointment of Catherine E. Youngman as the Litigation Trustee is hereby approved.  The appointment of (i) Jeffrey Buller, (ii) Samuel Goldfarb, and (iii) Brad Berliner as the initial three members of the Litigation Oversight Committee is hereby approved.  On the Effective Date, the Litigation Trustee, and not the Reorganized Debtors, shall be the Estates' representative in accordance with Section 1123 of the Bankruptcy Code.  The Litigation Trustee shall have all the rights and powers set forth in the Litigation Trust Agreement and in the Plan.  The Litigation Trustee and Litigation Oversight Committee shall be authorized to retain and employ Professionals to assist it with and advise it with respect to its duties under the Plan.  All fees and expenses of such Professionals shall be satisfied by the ASHINC Litigation Trust.

21.  <u>Vesting of Assets in the ASHINC Litigation Trust</u>.  On the Effective Date, the Litigation Claims shall vest automatically in the ASHINC Litigation Trust.  The ASHINC Litigation Trust shall be deemed to be an assignee of the Committee with respect to the Estate Claims.  Upon the transfer of the Litigation Trust Assets, the ASHINC Litigation Trust shall succeed to all of the Debtors' and the First Lien Agents' rights, title and interest in the Litigation Trust Assets, the ASHINC Litigation Trust shall be substituted in as plaintiff in Adversary Proceedings Numbers No. 13-50530 and 14-50971 for all purposes, and the Debtors and the First

Lien Agents will have no further interest in or with respect to the Litigation Trust Assets (all of which shall be evidenced by the Litigation Trust Interests). The Litigation Trustee shall have the power to make all decisions with respect to the prosecution of the Litigation Claims, subject to oversight from the Litigation Oversight Committee, the terms of the Litigation Trust Agreement, and the limitations set forth in Section 5.10(b) of the Plan.

22.     Appointment of Plan Administrator.  The appointment of Catherine E. Youngman as the Plan Administrator is hereby approved.  On the Effective Date, the Plan Administrator shall have all the rights and powers to implement the provisions of the Plan pertaining to the Plan Administrator, including, without limitation, the right to (i) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan; (ii) make distributions as contemplated in the Plan (other than those distributions to be made by the First Lien Agents), (iii) establish and administer any necessary reserves for Disputed Claims that may be required (so long as such reserves do not impact any treatment of Yucaipa under the Plan); and (iv) object to Disputed Claims and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Bankruptcy Court such Disputed Claims.  For the avoidance of doubt, the Plan Administrator shall have no obligation to object to or dispute (or expend funds to object to or dispute) any Claim where, in the Plan Administrator's sole judgment, the cost of such objection or dispute is not warranted in light of the potential incremental benefit to the remaining holders of Claims.  The reasonable costs and expenses incurred by the Plan Administrator in performing the duties set forth in the Plan shall be paid by the ASHINC Litigation Trust, subject to the approval of the Litigation Oversight Committee.

23.    <u>Cancellation of Existing Securities</u>.  Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated in the Plan, on the Effective Date all Old Securities, including all promissory notes, stock, instruments, warrants, certificates and other documents evidencing the Parent Equity Interests shall be deemed automatically cancelled and surrendered and shall be of no further force in accordance with Sections 5.4 and 7.7 of the Plan, and the obligations of the Debtors thereunder or in any way related thereto, including any obligation of the Debtors to pay any franchise or similar type taxes on account of such Interests, shall be discharged.  Upon entry of this Order and through and until the Effective Date, any trade, transfer, purchase, sale or other disposition of Old Securities by any person or entity that beneficially owns (as determined in accordance with the applicable rules under section 382 of the Internal Revenue Code) at least 4.5% of the issued and outstanding shares of such Old Securities shall be null and void, unless either (i) prior written consent is obtained from the Plan Proponents or (ii) such transaction is approved by an order of this Court upon sixty (60) days' prior written notice to the Plan Proponents.

24.    <u>Corporate Action</u>.  On the Effective Date, the adoption and filing of the New Debtor Governing Documents and all actions contemplated by the Plan shall be authorized and approved in all respects.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders, directors or officers of the Debtors or the Reorganized Debtors.  As of the Effective Date, the appropriate officers and directors of the Reorganized Debtors shall be authorized to execute, deliver, file, or record the documents included in the Plan Supplement and such other contracts, instruments, releases, indentures, and other agreements or documents, and

DOC ID - 23714145.5

take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. All of the foregoing is authorized without the need for any required approvals, authorizations, or consents except for express consents required under the Plan. This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, agreements, any amendments or modifications thereto and any other acts and transactions referred to in or contemplated by the Plan and any related documents, instruments, securities, agreements and any amendments or modifications thereto.

25.   <u>Directors and Officers of the Debtors</u>.   As of the Effective Date, the directors and officers named in the Plan Supplement shall be appointed the directors and officers of Reorganized ASHINC. Other directors and officers of the Reorganized Debtors shall be selected by the parties to whom the New Common Stock will be distributed pursuant to the Plan. All officers and directors of the Debtors not listed in the Plan Supplement shall be deemed to have resigned on the Effective Date.

**Treatment of Executory Contracts and Unexpired Leases**

26.   The provisions of Article VI of the Plan governing executory contracts and unexpired leases are hereby approved in their entirety, provided, however, that the assumption or rejection of any executory contract or unexpired lease provided hereby shall not be effective if the counterparty to such contract or lease files an objection to the proposed assumption or rejection (including as to any Cure Claim) within ten (10) days after filing of notice of this Order. In the event a timely objection is filed, assumption or rejection shall be subject to further order of this Court.

DOC ID - 23714145.5

27.     Rejection of Contracts and Leases.  On the Effective Date, except for the executory contracts and unexpired leases listed on the Plan Supplement, and except to the extent that a Debtor either previously has assumed, assumed and assigned, or rejected an executory contract or unexpired lease by an order of the Bankruptcy Court, including, but not limited to, the JCT Sale Order or the SBDRE Sale Order, or has filed a motion to assume or assume and assign an executory contract or unexpired lease prior to the Effective Date, each executory contract and unexpired lease entered into by the Debtors prior to the Petition Date that has not previously expired or terminated pursuant to its own terms shall be deemed rejected pursuant to section 365 of the Bankruptcy Code.  This Confirmation Order shall constitute approval of any such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

28.     Claims Based on Rejection of Contracts or Leases.  Claims, if any, created by the rejection of executory contracts and unexpired leases or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed with the Bankruptcy Court and served on the Litigation Trustee no later than thirty (30) days after the Effective Date.  Any Claims arising from the rejection of an executory contract or unexpired lease for which proofs of claim are not timely filed within that time period will be forever barred from assertion against the Debtors, the Estates, their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  Any such Claims that are timely filed as provided herein shall be treated, to the extent Allowed, as General Unsecured Claims under the Plan and shall be subject to the provisions of Article III of the Plan.

29.     Assumption of Contracts or Leases.  Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to section 365 of the Bankruptcy Code,

the Debtors shall assume each of the respective executory contracts and unexpired leases listed as Assumed Contracts in the Plan Supplement; *provided, however*, that the Debtors shall have the right, at any time prior to the Effective Date, to amend the Plan Supplement to: (i) delete any executory contract or unexpired lease listed therein, thus providing for its rejection pursuant hereto; or (ii) add any executory contract or unexpired lease to the Plan Supplement.

30.     Payments Related to the Assumption of Contracts or Leases. Any Cure Claims associated with any executory contract or unexpired lease to be assumed shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code: (i) by payment of the Cure Claim in Cash on or after the Effective Date; or (ii) on such other terms as are agreed to by the parties to such executory contract or unexpired lease. Pursuant to section 365(b)(2)(D) of the Bankruptcy Code, no Cure Claim shall be allowed for a penalty rate or other form of default rate of interest. Any objection by a counterparty to a proposed assumption of an executory contract or unexpired lease or amount of any Cure must be filed with the Bankruptcy Court and served on the Litigation Trustee no later than fifteen (15) days after notice of assumption is provided to the counterparty to that contract or lease. Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption and assignment of such executory contract or unexpired lease or such Cure amount shall be deemed to have assented to such matters, and will be forever barred from asserting such objection or any other Cure amount against the Debtors, the Estates, the Reorganized Debtors, the ASHINC Litigation Trust, and their successors and assigns, and their assets and properties. All defaults under any executory contract or unexpired leases assumed under the Plan and this Confirmation Order occurring, arising, or accruing prior to the Effective Date shall be deemed cured or satisfied upon payment on the Cure Claim and, without limiting the foregoing, no effect shall be given to any default of

the type set forth in section 365(b)(2) of the Bankruptcy Code, or the type of default concerning an unexpired lease of real property described in section 365(b)(1) of the Bankruptcy Code whether or not such contract or lease is an executory contract within the meaning of section 365 of the Bankruptcy Code.

31.     Indemnification Obligations Regarding Prepetition Acts or Omissions. Any obligation of the Debtors to indemnify, reimburse or limit the liability of any Person, including, but not limited to, any officer or director of the Debtors, or any agent, professional, financial advisor, or underwriter of any securities issued by the Debtors, relating to any acts or omissions occurring before the Petition Date, whether arising pursuant to charter, bylaws, contracts or applicable state law, shall be deemed to be, and shall be treated as, an executory contract and (i) shall be and hereby is deemed rejected and terminated as of the Effective Date and (ii) any and all Claims resulting from such obligations shall be, and hereby are, disallowed pursuant to Bankruptcy Code section 502(e).   Without limiting the reservation of rights contained in Paragraph 50, for the avoidance of doubt, and notwithstanding anything to the contrary in the Plan, the Plan Supplement, or this Confirmation Order, nothing in the Plan, the Plan Supplement, or this Confirmation Order shall limit or impair the rights, if any, of (a) any current or former officers and/or directors of the Debtors under the Debtors' existing certificates of incorporation, including but not limited to any exculpation of liability for breach of fiduciary duty claims or (b) Yucaipa rights in respect of the Disputed First Lien Obligations Escrow or the Yucaipa Fee Reserve.

32.     Distributions.   The provisions of the Plan governing distributions and procedures for resolving and treating Disputed Claims (including, without limitation, the Disputed First Lien Obligations) are approved and found to be fair and reasonable.   The Plan

Administrator and the Litigation Trustee, as applicable, shall make distributions required under the Plan. The First Lien Agents will make the distributions from the First Lien Reserves to the First Lien Lenders as contemplated by the Plan.

33.     Setoffs and Recoupment.  The Plan Administrator may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim; *provided, however,* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim that the Debtors or the Reorganized Debtors may have against such holder.  Any holder of a Claim (other than Yucaipa) that did not assert any setoff rights against a Claim by a Debtor against such Entity by filing an appropriate motion seeking authority to set off on or before the date hereof shall be deemed to have waived and be forever barred from asserting any right to set off against a Claim by a Debtor or Reorganized Debtor, notwithstanding any statement to the contrary in a proof of claim or any other pleading or document filed with the Bankruptcy Court or delivered to the Debtors.

34.     Subordinated Claims.  Except as expressly provided herein, the allowance, classification and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise.

35.     Administrative Claim Bar Date.  Except as otherwise provided in the Plan, requests for payment of Administrative Claims must have been or be filed on or before the

DOC ID - 23714145.5

Administrative Claims Bar Date, which was (i) August 31, 2015 for Administrative Claims arising from the Petition Date through and including July 31, 2015, and (ii) forty-five (45) days after the Effective Date for Administrative Claims arising from August 31, 2015 through and including the Effective Date. Holders of Administrative Claims that are or were required to, but did not or do not, file and serve a request for payment of such Administrative Claims by such applicable dates are forever barred, estopped and enjoined from asserting such Administrative Claims.

36.     Professional Fee Claims. All final Requests for Payment of Professional Fee Claims must be filed and served on the Reorganized Debtor and the Plan Administrator, their counsel, and other necessary parties in interest no later than forty-five (45) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court; *provided, however,* that any liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto. Objections to Requests for Payment must be filed and served on the Reorganized Debtor and the Plan Administrator, their counsel, and the requesting Professional or other entity no later than twenty (20) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable Request for Payment was served. To the extent necessary, the Plan and this Confirmation Order shall amend and supersede any previously entered order regarding the payment of Professional Fee Claims. Upon entry of a Final Order approving any such Request for Payment, the Debtors shall promptly pay any unpaid portion of such Allowed Professional Fee Claim.

37.     Post-Effective Date Expenses. From and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Reorganized Debtors, the

Plan Administrator, the Litigation Oversight Committee, or the ASHINC Litigation Trust (to the extent different from those of the Plan Administrator) shall not be subject to an application and shall be made in the ordinary course of business and without approval of the Bankruptcy Court.

38.     Reports from Insured Parties.  From and after the Effective Date, Mark Gendregske and Brian Cullen (the "Insured Parties") shall no longer be required to submit a written report of their fees and expenses ("Fee Reports") to the Court, counsel to the Debtors, the U.S. Trustee or the Committee, or any other party in the Chapter 11 Cases, and any costs or expenses sought by the Insured Parties may be made in the ordinary course of business without the need for oversight or approval of the Bankruptcy Court.  Notwithstanding the foregoing, the Insured Parties shall provide Fee Reports to the Litigation Trustee, and nothing herein shall limit or impair the right of any party to submit any motion, application, or request to the Bankruptcy Court, the United States District Court, or any other court of competent jurisdiction with respect to the subject of such Fee Reports.

39.     Release and Exculpation Provisions.   All release, exculpation, and injunction provisions in the Plan, including, without limitation, those contained in Article X of the Plan, are approved and shall be effective and binding on all Persons, to the extent expressly provided herein, provided, however, this Paragraph 39 and the release, exculpation and injunction provisions in the Plan shall be subject in all respects to the terms of Section 3.7(e) of the Plan.

40.     Dissolution of Committees.  Upon the Effective Date, the Committee and Retiree Committee shall dissolve automatically in accordance with Sections 5.18 and 5.19 of the Plan.

41.     Payment of Statutory Fees. All quarterly fees payable pursuant to section 1930 of Title 28 of the United States Code prior to the Effective Date shall be paid by the Debtors on or before the Effective Date. All such fees payable after the Effective Date shall be paid by the Plan Administrator as and when due, until such time as the Chapter 11 Cases are closed, dismissed or converted.

42.     Compliance with Tax Requirements. The Plan Administrator shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all distributions made pursuant to the Plan shall be subject to any such withholding and reporting requirements. The Plan Administrator shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements including, without limitation, requiring that, as a condition to the receipt of a distribution, the holder of an Allowed Claim complete the appropriate IRS Form W-8 or IRS Form W-9, as applicable to each holder. Notwithstanding any other provision of the Plan, (i) each holder of an Allowed Claim that is to receive a distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income and other tax obligations, on account of such distribution, and (ii) no distribution shall be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the applicable Plan Administrator to allow it to comply with its tax withholding and reporting requirements. Any property to be distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable distribution to be held by the Plan Administrator, as the case may be, until such

time as the Plan Administrator is satisfied with the holder's arrangements for any withholding tax obligations.

43.     <u>Exemption from Certain Taxes and Fees</u>.  Pursuant to Bankruptcy Code section 1146(a), any transfers from the Debtors to the ASHINC Litigation Trust or any other Person pursuant to, in contemplation of, or in connection with the Plan, and the issuance, transfer, or exchange of any debt, equity securities or other interest under or in connection with the Plan, shall not be taxed under any law imposing a stamp tax, real estate transfer tax, mortgage recording tax, sales or use tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or government assessment.  This Confirmation Order directs all relevant state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to all documents necessary to evidence and implement distributions under the Plan, including the documents contained in the Plan Supplement and all documents necessary to evidence and implement any of the transactions and actions described in the Plan or the Plan Supplement.

44.     <u>Immaterial Modifications</u>.  Without need for further order or authorization of the Bankruptcy Court, but subject to any limitations set forth in the Plan, the Plan Proponents are authorized and empowered to make any and all modifications to any and all documents included as part of the Plan Supplement, and any other document that is necessary to effectuate the Plan that does not materially modify the terms of such documents and are consistent with the Plan and this Confirmation Order.

45. **Effect of Confirmation on Modifications.** Entry of this Confirmation Order means that all modification or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

46. **Documents and Instruments.** Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan and this Order.

47. **Conditions to Effective Date.** The Plan shall not become effective unless and until the conditions set forth in Section 8.2 of the Plan have been satisfied or waived pursuant to Section 8.3 of the Plan.

48. **Vacatur of Order.** If this Confirmation Order is vacated or deemed vacated, then the Plan shall be deemed null and void in all respects, and nothing contained in the Plan shall (i) constitute a waiver or release of any Claims against or Interests in the Debtors, (ii) prejudice in any manner the rights of the holder of any Claim against, or Interest in, the Debtors, (iii) prejudice in any manner any right, remedy or claim of the Debtors, or (iv) be deemed an admission against interest by the Debtors or any other Person or Entity.

49. **Insurance Preservation.** Nothing in the Plan, the Plan Supplement, or this Confirmation Order (including, without limitation, the provisions governing rejection of executory contracts and/or unexpired leases) shall diminish or impair the enforceability of any insurance policies, or any claims thereunder, covering current or former officers and/or directors of the Debtors.

50.     Reservation of Rights.  The Plan and Confirmation Order shall have no effect on or prejudice in any way Yucaipa's, the Plan Proponents', Brian Cullen's, or Mark Gendregske's (or their successors' or assigns') respective rights, claims or defenses or be used in any way in any litigation, contested matter, adversary proceeding (or any appeal from any order entered in any of the foregoing) involving (i) Yucaipa, (ii) the Plan Proponents (or, with respect to the entities identified in clauses (i) and (ii), their respective affiliates (including BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd., and Spectrum Investment Partners, L.P.), officers or directors, or any of their respective successors or assigns), or (iii) any of the Debtors' current or former officers or directors, provided however, that the Plan and Confirmation Order may be used in any litigation, contested matter or adversary proceeding seeking to enforce the terms of the Plan.

51.     Insurance Programs and Obligations.  Except as otherwise provided as part of the AIG Settlement Agreement, nothing in the Plan, the Plan Supplement, this Confirmation Order, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening or grants an injunction or release) alters or amends the terms and conditions of insurance policies issued to or providing coverage to any of the Debtors and/or any agreements related thereto including, but not limited to, any right of an insurer and/or third party administrator to retain, draw upon, hold and/or apply collateral and/or security to the insureds' obligations thereunder regardless of whether such obligations arise before or after the Effective Date.

52.     Tennessee and Michigan Taxing Authorities.  Notwithstanding any provision to the contrary in this Confirmation Order, the Plan, or the Plan Supplement nothing shall affect the ability of the State of Michigan or the State of Tennessee to pursue and collect tax

liabilities, to the extent allowed by non-bankruptcy law, from any non-debtor entities (other than Haul Insurance Limited, the Reorganized Debtors, the Plan Administrator, the ASHINC Litigation Trust, the Litigation Trustee, the Litigation Oversight Committee (and individual committee members), and any directors or officers of the Reorganized Debtors appointed pursuant to the Plan (collectively, the "Excluded Entities")) for any liabilities that may be related to tax liabilities owed by the Debtors to the State of Michigan or the State of Tennessee.

53.     Internal Revenue Service.  Notwithstanding any provision to the contrary in this Confirmation Order, the Plan, or the Plan Supplement, nothing shall: (i) affect the rights of the United States to assert setoff and recoupment and such rights are expressly preserved; (ii) cause IRS penalties to be automatically disallowed and such penalties shall be treated, assessed and collected in accordance with applicable federal law; or (iii) require the IRS to file an administrative claim in order to receive payment for any liability described in 11 U.S.C. Section 503(b)(1)(B) and (C).  To the extent that Allowed Priority Tax Claims held by the IRS (including any penalties, interest or additions to tax entitled to priority under the Bankruptcy Code), if any, are not paid in full in cash on the Effective Date, such Allowed Priority Tax Claims shall accrue interest commencing on the Effective Date at the rate and method set forth in 26 U.S.C. Sections 6621 and 6622.  IRS Administrative Claims that are Allowed pursuant to section 503 of the Bankruptcy Code shall accrue interest and penalties as provided by non-bankruptcy law until paid in full.

54.     Retention of Jurisdiction.  Subject to the limitations set forth in Sections 3.7(e) and 9.1 of the Plan, the Bankruptcy Court shall retain and have exclusive jurisdiction over any matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to section 105(a) and 1142 of the Bankruptcy Code, including, but not limited to the matters set forth in

Section 9.1 of the Plan. Notwithstanding anything in the Plan, the Plan Supplement, or this Confirmation Order to the contrary, nothing in the Plan, Plan Supplement, or this Confirmation Order shall be deemed to (i) provide the Bankruptcy Court with jurisdiction over any Litigation Claims and any claims involving any of the persons or entities described in Section 3.7(e) of the Plan, (ii) limit or impair any named or unnamed defendant's right to contest the Bankruptcy Court's jurisdiction over any Litigation Claim and any claims involving any of the persons or entities described in Section 3.7(e) of the Plan that may be asserted against them, or (iii) modify the rights of any person or entity as described in Section 3.7(e) of the Plan. Notwithstanding the foregoing, nothing herein shall limit or impair the right of any party to make any motion, application, or request to the Bankruptcy Court, the United States District Court, or any other court of competent jurisdiction with respect to the Estate Claims asserted against Mr. Gendregske or that may be asserted as against any as yet unnamed defendant, including with respect to the coordination of discovery and/or trial.

55. Forum for Actions. Without permission of the Bankruptcy Court, no judicial, administrative, arbitral, or other action or other action or proceeding shall be commenced against the Plan Administrator, the Litigation Trustee, or the Litigation Oversight Committee in their respective capacities as such, with respect to their status, duties, powers, acts or omissions in such capacities in any other forum than the Bankruptcy Court, provided, however, that the foregoing shall not apply to any action or proceeding involving the persons or entities identified in Section 3.7(e) of the Plan.

56. Conflicts. To the extent that any provisions of the Disclosure Statement, the Plan Supplement or any other order (other than this Confirmation Order) entered in the Chapter 11 Cases (or any exhibits, schedules, appendices, supplements or amendments to any of

the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, this Confirmation Order shall govern and control except as expressly set forth herein or in the Plan. Notwithstanding the foregoing or anything else contained in the Plan, nothing in the Plan or Confirmation Order shall modify, alter or affect the (i) New Debtor Governing Documents, (ii) Litigation Trust Agreement, (iii) Investment Funding Agreement, and (iv) Investment Funding Backstop Agreement (items (i)-(iv), collectively, the "Controlling Documents") and in any conflict between the Plan or Confirmation Order on one hand and the Controlling Documents on the other, the Controlling Documents shall govern and control; provided, however, that nothing in this Order shall modify, alter or affect the provisions of the Plan governing the treatment of or reservation of rights with respect to Yucaipa, its affiliates, or any of Yucaipa's or its affiliates' respective officers or directors or successors or assigns.

57.    Severability of Plan Provisions.  Each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (iii) non-severable and mutually dependent. Notwithstanding the foregoing, the provisions of the Plan describing and implementing the treatment of Yucaipa shall not be severed, altered or invalidated in any manner without the prior written consent of Yucaipa (such consent to be provided or withheld in Yucaipa's sole discretion), it being understood that such provisions are non-severable and essential provisions of the Plan.

58.    Waiver or Estoppel.  Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other

DOC ID - 23714145.5

entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, papers filed with this Court, or stated on the record at the Confirmation Hearing, prior to the Confirmation Date.

59.    Governing Law.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided, however*, that corporate governance matters relating to the Debtors not incorporated in Delaware shall be governed by the laws of the state or province of incorporation of the applicable Debtor.

60.    Applicable Non-Bankruptcy Law.  Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of this Order, the Plan, the Plan Supplement, and related documents or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law.

61.    Notice of Order.  In accordance with Bankruptcy Rules 2002 and 3020(c), as soon as reasonably practicable after the Effective Date, the Debtors shall serve notice of the entry of this Order and the occurrence of the Effective Date to all parties who hold a Claim or Interest in these cases, including the U.S. Trustee, the Internal Revenue Service, the United States attorney for the District of Delaware, and any party filing a notice pursuant to Bankruptcy Rule 2002.  Such notice is hereby approved in all respects and shall be deemed good and sufficient notice of entry of this Order.

DOC ID - 23714145.5

51

62.     **Term of Injunctions or Stays.**  Unless otherwise provided in the Plan or this Order, all injunctions or stays pursuant to sections 105 or 362 of the Bankruptcy Code arising under or entered during the Chapter 11 Cases, or otherwise, and in existence on the date hereof, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay and to the extent consistent with the terms and provisions of the Plan or this Order, as applicable.

63.     **Substantial Consummation.**  On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

64.     **No Waiver.**  The failure to specifically include or refer to any particular provision of the Plan in this Order will not diminish the effectiveness of such provision nor constitute a waiver thereof, it being the intent of this Court that the Plan is confirmed in its entirety and incorporated herein by this reference.

65.     **Waiver of Stay.**  The requirement under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of fourteen (14) days after entry of the order is hereby waived.  This Order shall take effect immediately and shall not be stayed pursuant to Bankruptcy Rules 3020(e), 6004(h), 6006(d), or 7062 or other applicable rule.

Dated:  December 9 , 2015
        Wilmington, Delaware

                                        CHRISTOPHER S. SONTCHI
                                        UNITED STATES BANKRUPTCY JUDGE

# Exhibit 140

# D.I. 3744, Case No. 12-11564

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) ) | **Chapter 11** |
| **ASHINC CORPORATION**, *et al.*[1] | ) ) ) | **Case No. 12-11564 (CSS)** |
| Debtors. | ) ) ) ) | **Jointly Administered** |
| | ) | Re: Docket Nos. 3360 & 3383 |

### NOTICE OF EFFECTIVE DATE

PLEASE TAKE NOTICE OF THE FOLLOWING:

1.     On December 9, 2015, the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), entered an order [Docket No. 3383] (the "**Confirmation Order**") confirming the *Debtors' Modified First Amended Joint Chapter 11 Plan of Reorganization Proposed by the Debtors, the Committee and the First Lien Agents* [Docket No. 3360] (the "**Plan**") in the chapter 11 cases of the above-captioned debtors (collectively the "**Debtors**").

2.     On December 20, 2016, all conditions precedent to the Effective Date[2] pursuant to Article VIII of the Plan were satisfied or waived.  Therefore, **December 20, 2016** is the Effective Date of the Plan.

3.     The Plan and its provisions are binding on, among others, the Debtors, all holders of Claims and Interests (irrespective of whether such Claims or Interests are impaired under the Plan or whether the holders of such Claims or Interests voted to accept the Plan), and any and all non-Debtor parties to executory contracts and unexpired leases with the Debtors, as provided in the Plan.

---

[1]     The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: ASHINC Corporation (f/k/a Allied Systems Holdings, Inc.) (58-0360550); AAINC Corporation (f/k/a Allied Automotive Group, Inc.) (58-2201081); AFBLLC LLC (f/k/a Allied Freight Broker LLC) (59-2876864); ASCCO (Canada) Company (f/k/a Allied Systems (Canada) Company) (90-0169283); ASLTD L.P. (f/k/a Allied Systems, Ltd. (L.P.) (58-1710028); AXALLC LLC (f/k/a Axis Areta, LLC) (45-5215545); AXCCO Canada Company (f/k/a Axis Canada Company) (875688228); AXGINC Corporation (f/k/a Axis Group, Inc.) (58-2204628); Commercial Carriers, Inc. (38-0436930); CTSINC Corporation (f/k/a CT Services, Inc.) (38-2918187); CTLLC LLC (f/k/a Cordin Transport LLC) (38-1985795); F.J. Boutell Driveway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (58-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582). The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 150 E. Ponce De Leon Avenue, Suite 375, Decatur, GA 30030.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan and Confirmation Order.

4.      Any holder of a Claim arising from the rejection of an executory contract or unexpired lease pursuant to Article VI.2 of the Plan must complete and file an original Proof of Claim on account of such Claim with the Bankruptcy Court and serve such Proof of Claim on the Litigation Trustee by no later than **January 19, 2017**.  **Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to the Plan for which Proofs of Claim are not timely submitted pursuant to Article VI.2 of the Plan by January 19, 2017 shall be forever barred from assertion against the Debtors, the Estates, their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan.**

5.      The Administrative Expense Claim Bar Date was August 31, 2015. Except as otherwise provided in the Plan or the Confirmation Order, each holder of an Administrative Expense Claim (to the extent such holder had not previously been paid) must have filed with the Bankruptcy Court a request for payment of such Administrative Expense Claim by no later than the Administrative Expense Claim Bar Date.  **Any objections to Administrative Expense Claims must be filed and served according to Article X.1(a) of the Plan no later than January 9, 2017 (or such later date as may be established by the Bankruptcy Court upon motion of the Plan Administrator).**

6.      The Professional Fees Claims bar date is **February 3, 2017**.  **Any Professional Fee Claim not filed by February 3, 2017 (or such later date as may be ordered by the Bankruptcy Court) shall be deemed disallowed under the Plan and shall be forever barred against the Estates, the Reorganized Debtors, or any of the assets or property of the Reorganized Debtors, and the holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset, recoup or recover such Professional Fee Claim.**

7.      The Plan and Confirmation Order contain other provisions that may affect your rights.  Copies of the Confirmation Order, the Plan, and the Plan Supplement are available for inspection (i) at the Office of the Clerk of the Bankruptcy Court, (ii) at, or (iii) the Claims Agent's website for the Debtors, accessible at http://www.omnimgt.com/main/pages/cases.aspx.

RLF1 16271928v.1

Dated:  December 21, 2016
        Wilmington, Delaware

/s/ Marisa A. Terranova Fissel
Mark D. Collins (No. 2981)
Marisa A. Terranova Fissel (No. 5396)
Brendan J. Schlauch (No. 6115)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone No.:  (302) 651-7700
Facsimile No.:  (302) 651-7701
E-mail:  collins@rlf.com
E-mail:  terranova@rlf.com
E-mail:  schlauch@rlf.com

-and-

Jeffrey W. Kelley (GA Bar No. 412296)
Ezra H. Cohen (GA Bar No. 173800)
TROUTMAN SANDERS LLP
Bank of America Plaza
600 Peachtree Street, Suite 5200
Atlanta, Georgia 30308-2216
Telephone No.:  (404) 885-3000
Facsimile No.:  (404) 885-3900
E-Mail:  jeffrey.kelley@troutmansanders.com
E-Mail:  ezra.cohen@troutmansanders.com

*Counsel for Debtors and Debtors-in-Possession*

RLF1 16271928v.1

# Exhibits 141 - 149

# Filed Under Seal