**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| ASHINC Corporation, *et al.*, | Case No. 12-11564 (CSS) |
| Debtors. | (Jointly Administered) |
| CATHERINE E. YOUNGMAN, LITIGATION TRUSTEE FOR ASHINC CORPORATION, ET. AL., AS SUCCESSOR TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ASHINC CORPORATION, AND ITS AFFILIATED DEBTORS, | Adv. Proc. No. 13-50530 (CSS) |
| Plaintiff, | |
| BLACK DIAMOND OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., and SPECTRUM INVESTMENT PARTNERS, L.P., | |
| Intervenors, | |
| v. | |
| YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P., MARK GENDREGSKE, JOS OPDEWEEGH, JAMES FRANK, DEREX WALKER, JEFF PELLETIER, IRA TOCHNER, and JOSEPH TOMCZAK, | |
| Defendants. | |
| CATHERINE E. YOUNGMAN, LITIGATION TRUSTEE FOR ASHINC CORPORATION, ET AL., AS SUCCESSOR TO BLACK DIAMOND OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., SPECTRUM INVESTMENT PARTNERS, L.P., BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., as co-administrative agent, and SPECTRUM COMMERCIAL FINANCE LLC, as co-administrative agent, | Adv. Pro. No. 14-50971 (CSS) |
| Plaintiff, | |

v.

YUCAIPA AMERICAN ALLIANCE FUND I, L.P.,
YUCAIPA AMERICAN ALLIANCE (PARALLEL)
FUND I, L.P., YUCAIPA AMERICAN ALLIANCE
FUND II, L.P., YUCAIPA AMERICAN ALLIANCE
(PARALLEL) FUND II, L.P., RONALD BURKLE,
JOS OPDEWEEGH, DEREX WALKER, JEFF
PELLETIER, IRA TOCHNER, and JOSEPH
TOMCZAK,

Defendants.

**LITIGATION TRUSTEE'S OPPOSITION TO THE
MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS
YUCAIPA AMERICAN ALLIANCE FUND I, L.P., AND
<u>YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P.</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. iii

NATURE AND STAGE OF PROCEEDINGS ............................................................................1

SUMMARY OF ARGUMENT .................................................................................................3

    1.    Yucaipa Cannot Evade Its Capital Contribution Obligations ......................................3

    2.    The Direct Lender Claims of Breach of Contract Are Timely ......................................3

    3.    The First Lien Lenders Were Damaged by Yucaipa's Contractual Breaches ..............4

    4.    The Trustee's Breach of Fiduciary Duty Claims Are Distinct from the Estate Claim for Breach of Contract .................................................................................................4

    5.    The Trustee Has Ample Evidence of Yucaipa Obstructing Potential Transactions to Benefit Itself.................................................................................................................5

    6.    Yucaipa Breached Its Fiduciary Duties By Causing Allied to Pay Millions in Unnecessary and Unreasonable Fees ...........................................................................5

SUPPLEMENTAL STATEMENT OF UNDISPUTED FACTS ....................................................5

ARGUMENT .......................................................................................................................6

    I.    THE CONTRACT CLAIMS ARE LEGALLY AND FACTUALLY SOUND.................................6

        A.    The Estate's Capital Contribution Claim Is Consistent with §2.7 ......................6

            1.    Yucaipa's Interpretation of §2.7(f)(v) Contradicts Its Plain Language .......6

            2.    The Agreement as a Whole Belies Yucaipa's Interpretation......................8

            3.    The Trustee's Interpretation Is Consistent with the Drafting History .........9

            4.    Yucaipa's Interpretation of §2.7(f)(v) Makes No Sense...........................11

            5.    §2.7(e)'s Specific Performance Provision Is Irrelevant............................12

            6.    Yucaipa's "Symmetry and Fairness" Argument Is Meritless ..................14

            7.    Yucaipa Has Forfeited Its Unpled Defense .............................................16

      B.     The Trustee Is Not Pursuing Contract Claims Overtaken By the Joint Plan ......17

      C.     The Direct Lender Contract Claims Are Timely ...............................................18

            1.     The Direct Lender Contract Claims Are Timely Under the "Continuous Contract" and "Continuous Breach" Doctrines .........................................19

            2.     Claims for Yucaipa's Breaches after November 19, 2011, Are Timely ....22

            3.     This Court Should Exercise Its Discretion to Hold All Claims Timely ....25

      D.     Partial Summary Judgment on Lenders' Contract Claims Is Unwarranted ........29

II.     YUCAIPA IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE ESTATE CLAIMS THAT IT BREACHED FIDUCIARY DUTIES ...................................................................................32

      A.     The Estate's Fiduciary Duty Claims Do Not Duplicate Its Contract Claims .....33

            1.     The Claims Are Different .......................................................................33

            2.     Different Remedies Are Sought...............................................................34

      B.     Ample Evidence Shows That Yucaipa Obstructed Board Consideration of Potential Transactions to Benefit Itself...........................................................35

            1.     Evidence of the 2011-2012 JCT Proposals Is Admissible........................40

            2.     Yucaipa's Contention That There Was "No Transaction" with JCT That Could Benefit Allied Is Refuted by The Record.......................................41

            3.     Usurpation of a Corporate Opportunity Is Neither Pled Nor Relevant......42

            4.     It Is Permissible to Support Alternative Claims With Allegations and Damages From the Same Underlying Misconduct ...................................45

      C.     Evidence Proves Yucaipa's Breach of Fiduciary Duty in Causing Allied to Pay Unnecessary and Unreasonable Fees ................................................................46

III.    RECHARACTERIZATION IS WARRANTED IN THE ABSENCE OF EQUITABLE SUBORDINATION ....................................................................................................48

IV.    THE TRUSTEE IS PURSUING VIABLE FRAUDULENT TRANSFER CLAIMS........................48

CONCLUSION....................................................................................................................49

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Auriga Capital Corp. v. Gatz Propers.*,
    40 A.3d 839 (Del. Ch. 2012),
    *aff'd*, 59 A.3d 1206 (Del. 2012)................................................................36

*Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*,
    2018 WL 3326693 (Del. Ch. July 6, 2018),
    *aff'd*, 221 A.3d 100 (Del. 2019)............................................................ 44-45

*BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*,
    2013 WL 1290394 (N.Y. Sup. Ct. Mar. 8, 2013),
    *aff'd*, 112 A.D.3d 509 (N.Y. App. Div. 2013),
    *leave to appeal denied*, 22 N.Y.3d 1171 (2014) ...........................24 n.20, 28 n.29, 47 n.67

*Branin v. Stein Roe Inv. Counsel, LLC*,
    2015 WL 4710321 (Del. Ch. July 31, 2015)............................................21, 22

*Bridgestone/Firestone, Inc. v. Cap Gemini Am., Inc.*,
    2002 WL 1042089 (Del. Super. Ct. May 23, 2002) .........................19 n.15, 20

*Crown, Cork & Seal Co. v. Parket*,
    462 U.S. 345 (1983)..................................................................................28 n.27

*Dieckman v. Regency GP LP*,
    155 A.3d 358 (Del. 2017) ......................................................................24, 25

*Dweck v. Nasser*,
    2012 WL 161590 (Del. Ch. Jan. 18, 2012).......................................................43

*Encite LLC v. Soni*,
    2011 WL 5920896 (Del. Ch. Nov. 28, 2011) ..................................................45

*Fourth Branch Assocs. v. Niagara Mohawk Power Corp.*,
    302 A.D.2d 780 (N.Y. App. Div. 2003) ...................................................11 n.5

*Galvstar Holdings, LLC v. Harvard Steel Sales, LLC*,
    722 F. App'x 12 (2d Cir. 2018) ...............................................................25 n.22

*Greenfield v. Philles Records, Inc.*,
    98 N.Y.2d 562 (2002) .........................................................................7, 11, 16

*GRT, Inc. v. Marathon GTF Tech., Ltd.*,
    2011 WL 2682898 (Del. Ch. July 11, 2011) .........................................................28 n.27

*Guerrieri v. Cajun Cove Condo. Council*,
    2007 WL 1520039 (Del. Super. Ct. Apr. 25, 2007) ..........................................19

*IAC/InterActiveCorp v. O'Brien*,
    26 A.3d 174 (Del. 2011) ....................................................................................26

*IBM Poughkeepsie Emps. Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*,
    590 F. Supp. 769 (S.D.N.Y. 1984) ..............................................................13 n.7

*In re Allied Sys. Holdings Inc.*,
    556 B.R. 581 (D. Del. 2016),
    *aff'd sub nom. In re ASHINC Corp.*, 683 F. App'x 131 (3d Cir. 2017) ...................24 n.20

*In re AMC Invs., LLC*,
    524 B.R. 62 (Bankr. D. Del. 2015) ..............................................................26 n.23

*In re Am. Business Fin. Services, Inc.*,
    384 B.R. 66 (Bankr. Del. 2008) ........................................................................45

*In re ASHINC Corp.*,
    683 F. App'x 131 (3d Cir. 2017) .......................................................................29

*In re Burger*,
    125 B.R. 894 (Bankr. D. Del. 1991) .............................................................19, 22

*In re Coca-Cola Enters., Inc. S'holder Litig.*,
    2007 WL 3122370 (Del. Ch. Oct. 17, 2007) ...............................................23 n.18

*In re Franklin Equip. Co.*,
    416 B.R. 483 (Bankr. E.D. Va. 2009)................................................................48

*In re Green Field Energy Servs., Inc.*,
    2018 WL 619949 (Bankr. D. Del. Nov. 28, 2018) ......................................45 n.62

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    2009 WL 2921313 (D. Del. Sept. 8, 2009)..................................................32 n.33

*In re Lipper Holdings, LLC*,
    1 A.D.3d 170 (N.Y. App. Div. 2003) ................................................................11

*In re Marvel Ent. Grp.*,
    273 B.R. 58 (D. Del. 2002)...........................................................................23 n.18

*In re SubMicron Sys. Corp.*,
    432 F.3d 448 (3d Cir. 2006)........................................................................48

*In re Walt Disney Co. Derivative Litig.*,
    907 A.2d 693 (Del. Ch. 2005),
    *aff'd*, 906 A.2d 27 (Del. 2006)................................................................36

*In re Walt Disney Co. Derivative Litig.*,
    906 A.2d 27 (Del. 2006) ..........................................................................47

*Juran v. Bron*,
    2000 WL 1521478 (Del. Ch. Oct. 6, 2000) ............................................26

*Kahn v. Lynch Commc'n Sys., Inc.*,
    638 A.2d 1110 (Del. 1994) ......................................................................32

*Kaplan v. Jackson*,
    1994 WL 45429 (Del. Super. Ct. Jan. 20, 1994) ....................................19

*Krape v. PDK Labs, Inc.*,
    34 A.D.3d 751 (N.Y. App. Div. 2006) ..............................................11, 12

*Marin v. Constitution Realty, LLC*,
    28 N.Y.3d 666 (2017) ................................................................................8

*McMahon v. Salmond*,
    573 F. App'x 128 (3d Cir. 2014) .....................................................41 n.57

*Odyssey Partners, L.P. v. Fleming Cos.*,
    1996 WL 422377 (Del. Ch. July 24, 1996)......................................36 n.41

*Order of R.R. Telegraphers v. R. Express Agency*,
    321 U.S. 342 (1944)..............................................................................28 n.27

*Parkell v. Senato*,
    2019 WL 1435883 (D. Del. Mar. 31, 2019) ..........................................17

*Philip A. Templeton, M.D., P.A. v. EmCare, Inc.*,
    868 F. Supp. 2d 333 (D. Del. 2012).......................................................45

*Quadrant Structured Prods. Co. v. Vertin*,
    23 N.Y.3d 549 (2014)..........................................................................13 n.7

*Reape v. N.Y. News, Inc.*,
    122 A.D.2d 29 (N.Y. App. Div. 1986) ....................................................11

*Romdhani v. Exxon Mobil Corp.*,
    2010 WL 4682414 (D. Del. Nov. 10, 2010) ...................................................................41

*Schuss v. Penfield Partners, L.P.*,
    2008 WL 2433842 (Del. Ch. June 13, 2008)..........................................................4, 33, 35

*Sheppard v. Atl. States Gas Co. of Pa.*,
    167 F.2d 841 (3d Cir. 1948).........................................................................................16

*Skyline Steel, LLC v. Pilepro, LLC*,
    2016 U.S. Dist. LEXIS 102908 (S.D.N.Y. Aug. 4, 2016) ...............................................17

*Smith v. Mattia*,
    2010 WL 412030 (Del. Ch. Feb. 1, 2010) ........................................................................19

*Snug Harbor Square Venture v. Never Home Laundry, Inc.*,
    252 A.D.2d 520 (N.Y. App. Div. 1998) ...................................................................12 n.6

*Sony Corp. v. Fujifilm Holdings Corp.*,
    2017 WL 4342126 (S.D.N.Y. Sept. 28, 2017)..............................................................13 n.7

*Stardust Monte-Carlo, S.A.R.L. v. Diamond Quasar Jewelry, Inc.*,
    2018 WL 1027754 (S.D.N.Y. Feb. 20, 2018)............................................................25 n.22

*Stewart v. Wilmington Tr. SP Servs., Inc.*,
    112 A.3d 271 (Del. Ch. 2015),
    *aff'd*, 126 A.3d 1115 (Del. 2015).....................................................................................29

*Stone & Paper Invs., LLC v. Blanch*,
    2019 WL 2374005 (Del. Ch. May 31, 2019) ............................................................33, 34

*Sutherland v. Sutherland*,
    2009 WL 857468 (Del. Ch. 2009) ..............................................................................44 n.59

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002)........................................................................................................41

*U.S. ex rel. Landis v. Tailwind Sports Corp.*,
    2015 WL 13711120 (D.D.C. July 2, 2015)................................................................32 n.33

*Wilson v. City of Wilmington*,
    2015 WL 4571554 (D. Del. July 29, 2015) ...............................................................41 n.57

*Young v. United States*,
    535 U.S. 43 (2002)..........................................................................................................26

## Rules & Statutes

8 Del. C. §122(17) ............................................................................... 44 & n.60

10 Del. C. §8106 ......................................................................................... 18

Fed. R. Bankr. P. 7008 ............................................................................. 41

Fed. R. Civ. P. 8 ...................................................................................... 41

Fed. R. Civ. P. 12(b) ........................................................................... 16, 17

Fed. R. Civ. P. 30(b)(6) ..................................................................... 32 & n.33

## Other Authorities

Matthew W. Kavanaugh & Randye B. Soref,
    Business Workouts Manual §§1:1, 1:8 (2019) ................................... 46 n.63

The Trustee respectfully submits this memorandum of law in opposition to the motions

for summary judgment by Yucaipa American Alliance Fund I, LP and Yucaipa American

Alliance (Parallel) Fund I, LP (together, "**Yucaipa**") (13-50530 D.I. 696; 14-50971 D.I. 453).[1]

## NATURE AND STAGE OF PROCEEDINGS

The evidence uncovered by the Trustee conclusively demonstrates that Yucaipa abused

its position as Allied's controlling shareholder and repeatedly breached the First Lien Credit

Agreement, causing hundreds of millions of dollars in damages to the Allied Estate and Allied's

stakeholders.

Yucaipa dominated Allied after it emerged from its first bankruptcy in May 2007,

controlling the Company's equity, its Board, and later its Second Lien Debt.  By August 2009 —

two years after Yucaipa became Allied's controlling shareholder — Allied was insolvent and

began defaulting on its principal and interest obligations under the First Lien Credit Facility.

Instead of acting in the best interests of the Company, Yucaipa embarked on a lawless,

years-long campaign to seize control of all levels of the Company's capital structure in order to

seize value for itself at the expense of Allied and its constituencies.

Among other things:

- Yucaipa's purported Fourth Amendment — which it used as a basis to acquire a

---

[1]    Abbreviations relied on and citation conventions used in the Trustee's memorandum in support of her motion for partial summary judgment — (13-50530, D.I. 706; 14-50971 D.I. 463) (the "**Trustee Brief**") — are used again here.  For the Court's convenience, an appendix of abbreviations is attached as **Appendix A**.  "**Yucaipa Br.**" refers to Yucaipa's memorandum in support of its motion (13-50530, D.I. 697; 14-50971, D.I. 454), and exhibits to the Declaration of Kahn A. Scolnick (13-50530, D.I. 721; 14-50971, D.I. 457) are abbreviated "**Scolnick Ex.**" Exhibits ("**Ex.**") are attached to the first Declaration of Gila S. Singer (13-50530, D.I. 713; 14-50971, D.I. 466) and the accompanying Second Declaration of Gila S. Singer.  References to §2.7 of the Third Amendment — amending §§10.5 and 10.6 of the First Lien Credit Agreement — are used for consistency.  Section 2.7(e)(i), for example, is identical to §10.5(e)(i).

1

majority of Allied's First Lien Debt and arrogate to itself Requisite Lenders status —
has been judicially determined to be invalid, void *ab initio*, and "flatly prohibited" by
the First Lien Credit Agreement (*see* Trustee Br. 19-20), and

- Yucaipa's multiple lawsuits and scorched-earth litigation tactics have consistently been
  rejected by trial and appellate courts in multiple jurisdictions (*see id* 19-20, 28 n.63-64;
  *see also* Joint Procedural History).

It took four years of litigation to secure these rulings.  In the interim, Yucaipa —
parading as Requisite Lender — repeatedly and continuously breached the contractual rights of
Allied and its First Lien Lenders.  Yucaipa failed to make a required capital contribution of $57.4
million; directed, through its employees and agents on Allied's Board, the Company's ongoing
payment defaults under the First Lien Credit Agreement; impeded a badly needed restructuring
of Allied; and caused the Company to incur millions of dollars in unnecessary legal costs to
prosecute and defend the propriety of the Fourth Amendment.

During the period of Yucaipa's domination, Allied's management was reporting that █████
████████████████████████████████████████████████████████████████████████████
████████████████████  Despite Allied's dire predicament, its competitor JCT remained a
*highly* motivated buyer and, by Yucaipa's own account, JCT ████████████████████████
████████████████████  Yucaipa, however, flouted its contractual and fiduciary
duties by demanding for itself a disproportionate share of any JCT purchase price and preventing
any transaction.  Yucaipa principal Ron Burkle could not even defend this as "fair" at his
deposition, admitting now that any deal with JCT should have been allocated *pari passu*.  (Ex.
101 (Burkle Dep.) 173:8-175:20).

Yucaipa's contractual and fiduciary breaches cost the Allied Estate hundreds of millions

of dollars that the Trustee seeks in this action.  After more than a decade of failed litigation,

Yucaipa's motion for partial summary judgment proffers an entirely new set of excuses for its

misconduct.  All are devoid of merit.

## SUMMARY OF ARGUMENT

1.      **Yucaipa Cannot Evade Its Capital Contribution Obligations.**  Yucaipa does

not dispute that it was required to make a $57.4 million capital contribution to Allied under the

governing Third Amendment.  In its summary judgment brief, Yucaipa contends for the first

time that Allied covenanted not to sue for breach of this obligation in the Third Amendment.

The covenant Yucaipa relies on, however, by its terms applies only if a "capital contribution of

Term Loans" is actually "made."  It is undisputed that Yucaipa did not make the required

contribution.  Yucaipa's strained interpretation cannot be reconciled with the plain language of

the Third Amendment; is inconsistent with its drafting history; and is grounded in the bizarre

notion that the Third Amendment — which had to meet the stringent "entire fairness" test —

simultaneously granted Allied a right to a capital contribution and stripped it of any ability to

enforce that right.  Further, Yucaipa waived this supposed defense by raising it for the first time

over 7 years into this case.  (Section I(A)).

2.      **The Direct Lender Claims of Breach of Contract Are Timely.**  Under

Delaware law, the statute of limitations did not accrue until full damages were ascertainable

because the "continuous contract" and "continuous breach" doctrines apply.  It is

incontrovertible that the First Lien Credit Agreement grants the Lenders reoccurring and

continuous rights.  Yucaipa continuously ran roughshod over those rights for 4 years on the

pretext that it was Requisite Lender.  Therefore, the statute of limitations did not accrue until the

Lenders' full damages were ascertainable.  That was not until the JCT 363 Sale was

consummated on December 27, 2013, and the cumulative effect of Yucaipa's breaches could be determined.  Notably, even if these exceptions did not apply (they do), Yucaipa would still not be entitled to summary judgment on contractual breaches occurring on or after November 19, 2011.  (Section I(B)).

      3.     **The First Lien Lenders Were Damaged by Yucaipa's Contractual Breaches.** Yucaipa seeks partial summary judgment with respect to five allegations claiming there is no evidence on damages.  There is substantial evidence of damages from Yucaipa's misconduct in the record, however, and there is no requirement that separate quanta of damages be allocated to each allegation that forms a part of Yucaipa's ongoing breaches of the First Lien Credit Agreement's prohibition against it serving as Requisite Lender.  Yucaipa also mischaracterizes the Trustee's 30(b)(6) witness's testimony in the course of making this argument.  (Section I(C)).

      4.     **The Trustee's Breach of Fiduciary Duty Claims Are Distinct from the Estate Claim for Breach of Contract.**  The Estate Claims for breach of contract (Claim 3) and breach of fiduciary duties (Claim 5) are not duplicative.  The contract claim relates solely to Yucaipa's failure to make the mandatory capital contribution and seeks recovery of $57.4 million for Yucaipa's failure to make this required payment (plus statutory interest).  The fiduciary duty claim relates to Yucaipa's flouting its duties by engaging in self-dealing, culminating in the lost JCT deal in late 2011/early 2012.  The fiduciary duty claim seeks the difference between the value of the lost JCT deal and the value realized from the later JCT 363 Sale.  Because the claims are not "substantially identical" and involve different remedies, they are not duplicative under Delaware law.  *See, e.g.*, *Schuss v. Penfield Partners, L.P.*, 2008 WL 2433842, at *10 (Del. Ch. June 13, 2008).  (Section II(A)).

5.       **The Trustee Has Ample Evidence of Yucaipa Obstructing Potential Transactions to Benefit Itself.**  Yucaipa's insistence that there is no evidence supporting its obstruction of a potential transaction — premised on the notion that Mike Riggs (the CEO of Active and later JCT) was only interested in a deal to acquire Allied's debt and not the Company — is irreconcilable with the evidence. ███████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████ Riggs and JCT's corporate representative were crystal clear that purchasing debt was just one means to the end of combining the two entities.

The record is replete with evidence of potential restructuring possibilities with Riggs over the years that Yucaipa obstructed to further its own interests.  (Section II(B)).

6.       **Yucaipa Breached Its Fiduciary Duties By Causing Allied to Pay Millions in Unnecessary and Unreasonable Fees.**  Yucaipa argues that it could not have breached the fiduciary duties it owed by causing Allied to pay attorney's fees and expenses because the Company was contractually obligated to pay.  This mischaracterizes the agreements.  The First Lien Credit Agreement only requires payment for "reasonable fees" in connection with, *inter alia*, a workout.  Fees paid for the Yucaipa-ComVest transaction were patently unreasonable and were not in connection with a workout.  Nor can Yucaipa justify Allied's bearing the cost of litigating the validity of the void *ab initio* Fourth Amendment.  (Section II(C)).

## SUPPLEMENTAL STATEMENT OF UNDISPUTED FACTS

The Trustee incorporates the Statement of Undisputed Facts set forth in the Trustee's Brief.[2]  Certain supplemental facts are included in the Argument section of this brief when

---

[2]       Trustee Br. at 5-20.

relevant to rebut arguments raised by Yucaipa.

## ARGUMENT

## I.    THE CONTRACT CLAIMS ARE LEGALLY AND FACTUALLY SOUND

Yucaipa breached its contractual obligation to make a $57.4 million capital contribution to Allied when it acquired Allied First Lien Term Loans.  The Third Amendment states: Yucaipa "*shall* make a capital contribution to Borrowers of no less than 50% of the aggregate principal amount" of First Lien Term Loans that Yucaipa acquired "no later than ten days after the date of such assignment or transfer of such Term Loans."  (Ex. 20 at §2.7(e)).  Yucaipa acquired $114.7 million in First Lien Term Loans and contributed nothing to Allied.  The Trustee seeks to recover for this clear contractual breach on behalf of the Estate.

### A.    The Estate's Capital Contribution Claim Is Consistent with §2.7

Yucaipa does not contest that it breached the Third Amendment.  Nor does it assert that the Estate claim for breach of contract is time barred.  Yucaipa simply proffers a new excuse — that the Third Amendment both granted Allied a right to a capital contribution and, simultaneously, barred Allied from enforcing that right.  The argument is illogical; it is belied by the plain language of the Third Amendment; it is inconsistent with the drafting history; and it was waived years ago when Yucaipa failed to raise it in its Answer and Affirmative Defenses.

#### 1.    *Yucaipa's Interpretation of §2.7(f)(v) Contradicts Its Plain Language*

Yucaipa claims that §2.7(f)(v) of the Third Amendment "contains a covenant-not-to-sue that expressly bars Allied from suing Yucaipa for breach of the Third Amendment's Capital Contribution Provision."  (Yucaipa Br. at 4; *see also id.* at 31-35).  It does not.  Section 2.7(f)(v) only restricted Allied's ability to bring claims arising out of or relating to a specific type of capital contribution — "any capital contribution of Term Loans" — and only in the event the contribution was actually "made."  Section 2.7(f)(v) did not render unenforceable Yucaipa's

obligation to make a capital contribution under §2 .7(e) of the Third Amendment.

This is apparent from the plain language of §2.7(f)(v), which provides:



Yucaipa "made" no "capital contribution of Term Loans" to Allied.  The Trustee sued

Yucaipa precisely because it did not make any capital contribution — in cash or in Term Loans

— even though the Third Amendment mandated one.  Under governing New York law, "a

written agreement that is complete, clear and unambiguous on its face must be enforced

according to the plain meaning of its terms."  *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562,

569 (2002).  Because Yucaipa did not actually "make" any "contribution of Term Loans," its

new "covenant-not-to-sue" defense is barred by the plain language of §2.7(f)(v).

This plain-language reading is the only sensible reading.  The Third Amendment had to

meet the stringent "'entire fairness' standard, under which the transaction must be entirely fair to

all involved in order to gain the protection of the business judgment rule."  (Yucaipa Br. at 8; Ex.

19 at 1).  As discussed below, Yucaipa originally proposed that it be allowed to purchase Allied

debt with the option of converting the debt into equity.  (Ex. 19 at 1).  No one considered that

fair. ███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████  Yucaipa promptly relented and agreed to make mandatory

contributions of capital.  It makes no sense in this context to interpret §2.7(f)(v) to convert

Yucaipa's mandatory capital contribution obligation into an option — by rendering the mandate unenforceable — something that neither the other Lenders nor Troutman viewed as acceptable or fair.

### 2. *The Agreement as a Whole Belies Yucaipa's Interpretation*

Yucaipa's argument not only contravenes the language of §2.7(f)(v), it is also inconsistent with the structure of the Third Amendment as a whole. *See, e.g.*, *Marin v. Constitution Realty, LLC*, 28 N.Y.3d 666, 673 (2017) ("A contract should be read as a whole, and if possible it will be so interpreted as to give effect to its general purpose.").

Separate and apart from the mandatory capital contribution requirement of §2.7(e), the Third Amendment allowed Yucaipa to make optional contributions of Term Loans in exchange for equity of Allied in §2.7(f) ("Contribution of Term Loans to [Allied]; Cancellation of Debt"). Subsection 2.7(f)(i) recites Yucaipa's intention to make these capital contributions, and subsection 2.7(f)(ii) gives Yucaipa the right to do so. (Ex. 20 at §2.7(f)(i)-(ii)). The subsections that follow address the mechanics of the extinguishment and cancellation of the debt:



These steps, followed immediately by Allied's waiver of claims "in any way related to,

any capital contribution of Term Loans," reflect the parties' intent that Allied would not assert

any legal claims or rights against the selling Lenders, Lenders in general, or the Agent arising out

of an actual contribution of Yucaipa's Term Loans to Allied, including when the loans were held

by Allied but not formally extinguished.  Section 2.7(f)(v) does nothing to impact the separate,

mandatory obligation in §2.7(e) that Yucaipa "shall" make a capital contribution, either in the

form of cash or Term Loans.

Yucaipa attempts to obfuscate this by selectively quoting §2.7(f)(v), arguing "the Trustee

cannot sue Yucaipa on behalf of Allied's Estate for 'any act or omission or event occurring in

connection with' *the Capital Contribution Provision*."  (Yucaipa Br. at 32).  This is not what

§2.7(f)(v) says.  It says, "any act or omission or event occurring in connection <u>therewith</u>,"

referring back to "any capital contribution <u>of Term Loans</u>" that Yucaipa actually "<u>made</u>."

### 3.    *<u>The Trustee's Interpretation Is Consistent with the Drafting History</u>*

The Trustee's interpretation of §2.7(f)(v) is consistent with the Third Amendment's

drafting history.[3]  The original draft of the Third Amendment, circulated by Goldman Sachs's

counsel to Yucaipa's counsel on March 27, 2008, had no mandatory capital contribution

requirement.  (Ex. 111).  It permitted Yucaipa to acquire First Lien Debt, subject to a cap, and

allowed Yucaipa to make an optional capital contribution similar to §2.7(f)(i) of the actual Third

Amendment.  ███████████████████████████████████████

████████████████████████████████████████

███████.[4]  The draft also included the language under which Allied relinquished all rights

and obligations other Lenders had in the event Yucaipa elected to contribute debt to the

---

[3]    There is no integration clause in the First Lien Credit Agreement or any amendment.

[4]    The only substantive difference between this version and the final version is that it
contemplates Yucaipa having the ability purchase all First Lien Debt, rather than just Term Loans.

Company.  (*See id.* at §2.4(e)(iii)-(iv)).  ███████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

A substantially similar draft with this same language was circulated to the First Lien

Lenders on April 8, 2008, and introduced on a Lender call that day.  (*See* Ex. 112 at

YUCAIPA888500; *see also* Exs. 113, 114 at AM00037).  The response was unfavorable.  ████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

On April 15, 2008, Steve Messina (Goldman's outside counsel) sent Yucaipa's counsel a

revised draft of the Third Amendment ██████████████████████████████

█████████████████████████████████████  This version included the requirement

(substantively identical to that in the final version of §2.7(e)(iii)) that Yucaipa make a capital

contribution upon the acquisition of Term Loans.  (*Compare id.* at Yucaipa_LW00009707 and

Ex. 20 at §2.7(e)(iii)).

This evidence reinforces what the text of the Third Amendment already says:  §2.7(f)(v)

relates to the voluntary capital contributions of Term Loans contemplated by §2.7(f)(i)-(iv).  It

was not drafted to address the mandatory capital contributions that were later insisted on by

Allied and the Lenders and later inserted in a separate section of the document, §2.7(e).

Because the Third Amendment is unambiguous on its face, the Court need not delve into

extrinsic evidence. *See Greenfield*, 98 N.Y.2d at 569 ("Extrinsic evidence of the parties' intent

may be considered only if the agreement is ambiguous…."). Were the Court to detect some

ambiguity, the drafting history repudiates Yucaipa's interpretation.

### 4. *Yucaipa's Interpretation of §2.7(f)(v) Makes No Sense*

It is settled New York law that contracts should be given a practical interpretation, and

terms should not be read to render an agreement nonsensical. *See, e.g.*, *In re Lipper Holdings,

LLC*, 1 A.D.3d 170, 171 (N.Y. App. Div. 2003) ("A contract should not be interpreted to produce

a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of

the parties."); *Reape v. N.Y. News, Inc.*, 122 A.D.2d 29, 30 (N.Y. App. Div. 1986) ("[W]here a

particular interpretation would lead to an absurd result, the courts can reject such a construction

in favor of one which would better accord with the reasonable expectations of the parties.").[5]

Yucaipa's reading of §2.7(f)(v) is that the Third Amendment granted to Allied the right

to a mandatory capital contribution from Yucaipa, then simultaneously stripped Allied of any

ability to enforce that right. Yucaipa's mandatory capital contribution was the bedrock

consideration for Allied in the Third Amendment. Interpreting §2.7(f)(v) to bar enforcement if

Yucaipa failed to pay is an absurd result that no commercial actor would accept.

New York law will not countenance such an interpretation. *Krape v. PDK Labs, Inc.*, 34

A.D.3d 751 (N.Y. App. Div. 2006), is illustrative. In *Krape*, the defendant argued that a

---

[5]     *See also Fourth Branch Assocs. v. Niagara Mohawk Power Corp.*, 302 A.D.2d 780, 782
(N.Y. App. Div. 2003) ("Particular words should be considered … in the light of the obligation as
a whole and the intention of the parties as manifested thereby.").

covenant not to sue was broad enough to preclude plaintiff's enforcement of rights in the same

settlement agreement.  Although that reading could arguably be derived from the literal text of

the covenant, the *Krape* court nevertheless rejected it because it would have left the plaintiff with

no means of enforcing the agreement:

> [C]onstruing a contract, the <u>document must be read as a whole to determine the</u>
> <u>parties' purpose and intent, giving a practical interpretation</u> to the language
> employed so that the parties' reasonable expectations are realized…. Although the
> words might seem to admit of a larger sense … they should be restrained to the
> particular occasion and the particular object which the parties had in view.

*Id.* at 753.[6]  Thus, the *Krape* Court reached the straightforward conclusion that "the covenant not

to sue <u>did not extend to actions to enforce the payments contemplated by the Agreement itself</u>."

*Id.*  The same conclusion applies here.

### 5.    *§2.7(e)'s Specific Performance Provision Is Irrelevant*

Yucaipa maintains that §2.7(e)'s last paragraph — the specific performance provision —

"omits Allied from the list of parties entitled to damages or specific performance for breach,"

and argues that this somehow supports its interpretation of §2.7(f)(v) (Yucaipa Br. at 33-34).

But the specific performance provision is irrelevant.  It merely recognizes that the Lenders and

Agents — unlike Allied itself — would <u>not</u> have an adequate monetary remedy, so it granted

them a right to specific performance.  It does not explicitly or implicitly touch on Allied's rights.

This is clear from the plain language of the provision (Ex. 20 at 8), from which Yucaipa

has consciously excised the critical phrase and disingenuously italicized other language to distort

its import (*see* Yucaipa Br. at 33) (bolded language below omitted by Yucaipa; italics are

---

[6]    *See also, e.g.*, *Snug Harbor Square Venture v. Never Home Laundry, Inc.*, 252 A.D.2d 520,
521 (N.Y. App. Div. 1998) ("In construing a contract, the document must be read as a whole to
determine the parties' purpose and intent, giving a practical interpretation to the language
employed so that the parties' reasonable expectations are realized.  Further, a court should not
adopt an interpretation which would leave any provision without force and effect.").

Yucaipa's):



As this text shows, it does <u>not</u> identify a "list of parties entitled to damages." (*Id.* at 33-34). On the contrary, it recognizes the fact that the Lenders and Agents would be left with no effective remedy in the event of a Yucaipa breach, because Allied would be the only party with a monetary remedy at that time. Because the specific performance provision does not delineate which parties are entitled to damages, Yucaipa's reliance on the doctrine of *expressio unius* is misplaced and its cases are inapposite.[7]

The clear intent of the Third Amendment's mandatory capital contribution requirement was to deleverage Allied through a cash infusion or, alternatively, the contribution and cancellation of debt.[8] The specific performance provision addresses a scenario in which Yucaipa acquires First Lien Term Loans but does not fulfil its obligation to contribute capital to deleverage the Company. In that circumstance, Allied itself would be the only party with an

---

[7]   *See IBM Poughkeepsie Emps. Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 590 F. Supp. 769, 772-773 (S.D.N.Y. 1984) (Yucaipa Br. at 33) (doctrine applied where a contractual definition of "Employee" contained a list that omitted the entity Plaintiff argued was an employee); *Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 560-61 (2014) (Yucaipa Br. at 33) (delineated list of actions or proceedings at law that were waived did not include any reference to an individual securities lawsuit); *Sony Corp. v. Fujifilm Holdings Corp.*, 2017 WL 4342126, at *7 (S.D.N.Y. Sept. 28, 2017) (Yucaipa Br. at 33) (recognizing that "where certain parties are explicitly listed as third party beneficiaries … an inference may arise that the parties did not intend to extend third party beneficiary status others.").

[8]

effective monetary remedy.  Reading the specific performance provision as somehow delineating the list of parties entitled to damages is inconsistent with its plain language and strains credulity.

### 6.    *Yucaipa's "Symmetry and Fairness" Argument Is Meritless*

Yucaipa argues (Yucaipa Br. at 34) that the Court should grant summary judgment "as a matter of symmetry and fairness" because this Court ruled that Yucaipa's claims in a related adversary proceeding were barred by a completely different covenant not to sue — in §2.7(e) of the Third Amendment.[9]  Whatever "symmetry and fairness" mean, they have no application here.

*First*, there is no "symmetry" because the two covenants have different scopes and serve different purposes.

**Scope**.  The covenant not to sue Yucaipa invokes at §2.7(f)(v) is strictly limited to claims "related to … any capital contribution of Term Loans made" by Yucaipa.  The covenant not to sue in §2.7(e), in contrast, is broad and all-encompassing.  It bars Yucaipa from suing the Lenders and the Agent for any claims related to "th[e] [Credit] Agreement, or any other Credit Document or any agreement or instrument contemplated hereby or thereby, any Loan or the use of proceeds thereof or any act or omission or event occurring in connection therewith."  (Ex. 20 at §2.7(e)).  The breadth of claims Yucaipa is barred from asserting is orders of magnitude greater than Allied's limited agreement not to sue for claims relating to "any capital contribution of Term Loans **made** by [Yucaipa]."  (*Id.* at §2.7(f)(v)).  Yucaipa's contention that the two covenants are "substantively identical" (Yucaipa Br. at 34) is mystifying and plainly wrong.

**Purpose**.  The two covenants serve entirely different purposes.  The Third Amendment

---

[9]     Yucaipa's cross-claims against Lenders in the Allied Adversary Proceeding sought a declaration that various aspects of the Third Amendment were invalid (Claim 1), unjust enrichment (Claim 2), estoppel (Claim 3), and injunctive relief against other Lenders (Claim 4).  (*See* Ex. 79 at ¶¶110-40).

broadly strips Yucaipa of legal rights afforded other Lenders if and to the extent Yucaipa acquires Term Loans.  Examples include that Yucaipa, with respect to Term Loans it acquires: (1) relinquishes all voting rights as a Lender (§2.7(e)(iv)); (2) is excluded from Lender calls and Lender meetings with the Agent and/or Allied (§2.7(e)(ii)); and (3) relinquishes all legal rights in any bankruptcy proceeding, absent unanimous consent from other Lenders (§2.7(b)).  Other provisions of the Third Amendment bar Yucaipa from bringing claims against Lenders and the Agent in any bankruptcy proceeding (absent unanimous consent),[10] and immunized Lenders and the Agent from all liability to Yucaipa as a Lender.[11]  The Court simply applied §2.7(e) in accordance with its broad terms, and this was entirely consistent with the Third Amendment's purpose.  Applying the covenant not to sue in §2.7(f)(v) to strip Allied of a remedy for Yucaipa's breach, by contrast, eviscerates the Third Amendment's capital contribution requirement, thus undermining precisely what the Third Amendment was designed to accomplish.

*Second*, Yucaipa's plea to "fairness" is misconceived.  The Trustee, on behalf of the Estate, is prosecuting a straightforward breach of contract claim to enforce the plain language of the mandatory capital contribution requirement in the Third Amendment.  In contrast, the Yucaipa claims dismissed under §2.7(e) were part of a years-long Yucaipa campaign that began with the illegal and void Fourth Amendment — which Yucaipa understood from the outset was

---

10 ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

11 ████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████

of dubious validity[12] — and was followed by a succession of lawsuits and claims that violated the plain language of Yucaipa's contractual obligation not to sue.  The Lenders and Agent endured years of litigation brought by Yucaipa in violation of §2.7(e) and expended millions to defend these claims — all of which were frivolous.  (*See* Trustee Br. at 27-28).  Following more than 10 years of Yucaipa's scorched earth litigation tactics, there would be nothing "fair" about dismissing the Estate's claim based on Yucaipa's disregard of its mandatory capital contribution obligation.  That would only reward further Yucaipa misconduct.  Moreover, under New York law, where, as here, "the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." *Greenfield*, 98 N.Y.2d at 569-570.

### 7.    *Yucaipa Has Forfeited Its Unpled Defense*

Under FED. R. CIV. P. 12(b) — made applicable to adversary proceedings under FED. R. BANKR. P. 7012 — "[e]very defense to a claim for relief in any pleading *must* be asserted in the responsive pleading if one is required."  There is no question that a covenant not to sue is an affirmative defense.  *See, e.g.*, *Sheppard v. Atl. States Gas Co. of Pa.*, 167 F.2d 841, 844 (3d Cir. 1948) (a covenant not to sue "is an affirmative defense which must be proved").

Yucaipa's Answer and Affirmative Defenses, filed seven years ago, does not assert the covenant not to sue as an affirmative defense.  (13-50530, D.I. 95).  In the years that followed,

---

[12]    Yucaipa caused Allied to enter the invalid Fourth Amendment with its eyes wide open. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Allied's financial advisor (Goldman Sachs) then withdrew from its engagement because it was uncomfortable with the approach.  (Ex. 29).  Shortly thereafter, the First Lien Agent told Allied's Board that the contemplated Fourth Amendment could not be consummated without its consent ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Undeterred, Yucaipa pressed it through by indemnifying ComVest and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

the parties have taken massive discovery on a multitude of substantive issues in dispute in this case.  In all that time, Yucaipa did not pose a single question relating to §2.7(f)(v) in either written or oral discovery.  Consequently, issue never having been joined as to the covenant not to sue and discovery into it never having been taken by Yucaipa, the Trustee took no discovery into the parties' intent underlying §2.7(f)(v).  Thus, in addition to violating Rule 12(b), allowing Yucaipa to assert this new affirmative defense at this late stage of the litigation would be highly prejudicial to the Trustee.  Yucaipa has therefore waived this purported affirmative defense.  *Skyline Steel, LLC v. Pilepro, LLC*, 2016 U.S. Dist. LEXIS 102908, at *14 (S.D.N.Y. Aug. 4, 2016) (unpled affirmative defense of covenant not to sue waived where entertaining it "would cause [plaintiff] undue prejudice and result in undue delay, as the Court would have to reopen discovery and entertain further motions with respect to the validity and scope of the [underlying] Agreement"); *see also, e.g.*, *Parkell v. Senato*, 2019 WL 1435883, at *7 (D. Del. Mar. 31, 2019) (defendant waived defense of exhaustion of administrative remedies by waiting to raise it at summary judgment more than 4 years after action was filed and 1 month after close of discovery).[13]

B.    **The Trustee Is Not Pursuing Contract Claims Overtaken By the Joint Plan**

The Estate Claim for Specific Performance (Claim 6) was asserted several years before confirmation of the 2016 Joint Plan and the cancellation of the Company's debt and equity.  The

---

[13]    To the extent Yucaipa tries to bootstrap its Fifth or Eleventh Affirmative Defense — for Waiver and Contractual Prohibition, respectively — neither applies.  The "Waiver" defense asserts that claims are barred not by contract language, but "by the actions and conduct of the Debtors, [BD/S] and other Lenders[,]" and the "Contractual Prohibition" defense asserts that the Third Amendment bars Plaintiff "from seeking Specific Performance…."  (13-50530, D.I. 95 at ¶¶301-02, 313-14).

Trustee, therefore, is no longer pursuing this claim.[14]

### C.    The Direct Lender Contract Claims Are Timely

If the Court finds, as the Trustee urges, that the Estate Claim for Yucaipa's breach of the mandatory capital contribution is not barred, then Yucaipa's arguments regarding the timeliness of the Direct Lender Claim for that breach are academic.  That is because the Direct Lender Claim is encompassed within the Estate Claim, which seeks damages on behalf of *all* the Company's stakeholders — including the First Lien Lenders — to be distributed in accordance with a waterfall set forth in the court-approved Litigation Trust Agreement.  (Scolnick Ex. 108). The Trustee is not seeking a duplicative recovery.

Nor is there any merit to Yucaipa's contention that the Direct Lender Claims for breach of contract are untimely.  The First Lien Credit Agreement was a continuous contract, and Yucaipa all but concedes that it continuously breached the agreement beginning in August 2009 and continuing until at least August 2013.  Under Delaware's "continuous contract" and "continuous breach" doctrines, the 3-year limitations period in 10 Del. C. §8106 did not accrue until 2013.  The operative filing date was November 19, 2014.  (14-50971, D.I. 1).  All of the Direct Lender Claims for breach of contract are, therefore, timely.

Further, regardless of the "continuous contract" and "continuous breach" doctrines, Yucaipa has no argument that its breaches within the 3-year period from November 19, 2011, through November 19, 2014, are untimely.

---

[14]    The Trustee consented to a request from Yucaipa's counsel to dismiss certain claims in advance of summary judgment briefing as a matter of judicial economy.  (*See* 13-50530, D.I. 690, 694).  However, Yucaipa never inquired if the Trustee intended to pursue the specific performance claim overtaken by the 2016 Joint Plan.  Had it done so, the Trustee would have advised that it did not.

1.    ***The Direct Lender Contract Claims Are Timely Under the "Continuous Contract" and "Continuous Breach" Doctrines***

While a cause of action for breach of contract generally accrues at the time of breach, Delaware law recognizes exceptions for a "continuous contract" or a "continuous breach." Under both exceptions, "the statute begins to run only when full damages can be ascertained and recovered." *See In re Burger*, 125 B.R. 894, 901-02 (Bankr. D. Del. 1991); *Guerrieri v. Cajun Cove Condo. Council*, 2007 WL 1520039, at *6 (Del. Super. Ct. Apr. 25, 2007) (statute of limitations did not accrue until damages could be ascertained where contract created an ongoing and continuous duty); *Smith v. Mattia*, 2010 WL 412030, at *4 (Del. Ch. Feb. 1, 2010) (same).[15] Determining the application of these exceptions requires an analysis of "[w]hether the obligations under a contract are continuous or severable" which "turns on the parties' intent, which may be ascertained through the contract's terms and subject matter, taken together with the pertinent facts and circumstances surrounding its formation." *Smith*, 2010 WL 412030, at *4; *Kaplan v. Jackson*, 1994 WL 45429, at *3 (Del. Super. Ct. Jan. 20, 1994) (same).

The First Lien Credit Agreement provided for reoccurring and continual contractual rights to First Lien Lenders for the duration of the 5-year period.[16] In return for providing hundreds of millions of dollars in loans, the non-Yucaipa Lenders were entitled over time to, among other things:

- Reoccurring principal and interest payments. (*See generally* Ex. 9 at §2).

- Reoccurring financial information from the Company and reasonable access to its

---

[15]    *See also Bridgestone/Firestone, Inc. v. Cap Gemini Am., Inc.*, 2002 WL 1042089, at *7 (Del. Super. Ct. May 23, 2002) ("[I]n cases of continuous contract and continuing breach, the statute begins to run only when full damages can be ascertained and recovered.")

[16]    *See* Ex. 9 at 21, 32 (definitions of "Exit Facilities Conversion Date" and "Maturity Date"); *see also* Order Confirming Second Amendment Joint Plan of Reorganization entered May 18, 2007 in the 2005 Bankruptcy. (Case No. 12-11564, D.I. 3127).

management.  (*Id.* at §§5.6, 5.7).

- The right to direct the Agent — through the Requisite Lenders — to exercise certain remedies in the case of an Event of Default.  (*Id.* at §§9.8, 10.5(a)).

- Capital Contributions in the amount of 50% of Term Loans acquired by Yucaipa.  (Ex. 20 at §2.7(e)).

- Yucaipa never serving or acting as Requisite Lender.  (*Id.*).

- Yucaipa never asserting any claims against them, or the Agent, in any way relating to the Credit Agreement or related documents.  (*Id.*).

These contractual rights were designed to ensure the First Lien Lenders were repaid the principal amount of their loans (with the applicable interest) over the duration of the Credit Agreement.  This is a quintessential "continuous contract," and the Delaware courts hold that the statute of limitations for breach of a continuous contract does not accrue until "full damages can be ascertained and recovered."  *Bridgestone/Firestone, Inc.*, 2002 WL 1042089, at *7.

Yucaipa isolates one of its breaches — its purchase of ComVest's debt and declaration that it was Requisite Lender on August 21, 2009 — and claims this is the only relevant date for accrual of the statute of limitations, arguing that all of its subsequent breaches were simply the "effects" of this initial breach.  (*See* Yucaipa Br. at 2, 24-25).  Yucaipa thus essentially admits that its August 21, 2009, breach was the initial trigger enabling it to then *continuously breach* the First Lien Credit Agreement.  It did just that by, among other things: (1) causing Allied to cease making principal or interest payments from that point onward, (2) blocking Lenders from the Company's financial information and access to management, (3) preventing any restructuring dialogue among the Lenders, (4) preventing Lenders from exercising remedies for the Company's ongoing Events of Defaults, (5) routinely asserting claims against the Agent and Lenders in contravention of the express covenant not to sue, and (6) demanding JCT pay Yucaipa, and no other Lender, a premium ███████████████████████.

But none of these later, continuous breaches was committed by Yucaipa when it executed the void Fourth Amendment or proclaimed that it was the Requisite Lender in 2009.  None was an effect caused by execution of the Fourth Amendment or assumption of Requisite Lender status.  As purported Requisite Lender, Yucaipa could still have (1) allowed Allied to make principal and interest payments, (2) granted Lenders access to the Company's financial information and management, (3) permitted restructuring dialogue among the Lenders, (4) allowed Lenders to exercise remedies for Allied's ongoing Events of Defaults, (5) not asserted claims against the Agent and Lenders in contravention of Yucaipa's express covenant not to sue, and (6) not demanded JCT pay Yucaipa, and no other Lender, a premium ████████ ████████████████.

Instead, Yucaipa engaged in a pattern of continuing breaches over the next several years. Yucaipa's execution of the void Fourth Amendment and proclamation that it was the Requisite Lender in 2009 simply afforded Yucaipa the ability to commit its later breaches — it did not cause them to happen.  The continuous nature of Yucaipa's breaches was emphasized by Derex Walker in an internal email discussing whether the Company should withhold financial statements to Lenders in spring 2011. ████████████████████████████████ ████████████████████████████████████████████████████████ ████

Under the "continuous contract" and "continuous breach" exceptions, a plaintiff does not have to bring piecemeal litigation because the statute of limitations does not begin to run until plaintiff's full damages can be ascertained and recovered.  This is illustrated, for example, by *Branin v. Stein Roe Investment Counsel, LLC*, 2015 WL 4710321, at *7 (Del. Ch. July 31, 2015), in which the Court held the defendant-employer was in continuous breach of an operating

agreement by declining (at least 5 times) to indemnify the plaintiff-employee.  The *Branin* Court

ruled that the statute of limitations was "appropriately suspended for the period during which

[plaintiff's] liabilities grew," and it observed that requiring plaintiff "to sue continually to

enforce his indemnification right would have been inefficient." *Id.*  Similarly, in *Burger* this

Court held that the statute of limitations for investors claims against a farm manager's breach of

contract did not accrue when he first allegedly breached the contract (in 1981) given the

continuous nature of the contract and the fact that "full and complete damages … necessarily

relie[d] on the liquidation of [a] herd" occurring seven years later.  125 B.R. at 901-02.

Branin* and *Burger* govern here.  The extent of monetary damages caused by Yucaipa's

continuous breaches of the First Lien Credit Agreement was not ascertainable until December

27, 2013, when JCT purchased substantially all of Allied's assets for $135 million — ███████

████████████████████████████████████████████████████████.[17]

As in *Branin* and *Burger*, it would have been inefficient and was unnecessary for the First Lien

Lenders to sue Yucaipa repeatedly for its continuing breaches until the full extent of the Lenders'

monetary damages were ascertainable.

## 2.    *Claims for Yucaipa's Breaches after November 19, 2011, Are Timely*

There can be no credible dispute that all of the Direct Lender claims for breaches from

November 19, 2011, through November 19, 2014, are timely.  Yucaipa erroneously contends that

all of these contract breaches somehow "relate back" to August 2009.  The breaches identified by

Yucaipa (Yucaipa Br. at 22-23) include:

- Permitting Allied to forgo interest or principal payments (Ex. 2 at ¶123(c));

---

[17]    *See* Ex. 103 (Risius Report) at ¶¶110-144 (assessing damages as a result of Yucaipa's
contractual breaches as of December 27, 2013).

- Precluding a badly-needed restructuring of Allied (*id.* at ¶123(d));

- Causing Allied and its Lenders to incur unnecessary legal costs regarding the impropriety of Yucaipa's status of Requisite Lender (*id.* at ¶123(e)); and

- Hijacking the JCT negotiations in late 2011 through 2012 (*id.* at ¶124).

With respect to each allegation, Yucaipa argues that it did not "breach … any specific term in the [First Lien Credit Agreement] or Third Amendment," but rather that plaintiff's damages are the "'effect' of Yucaipa's acquisition of Requisite Lender status in August 2009" and, therefore, the claims should accrue earlier. (Yucaipa Br. at 2-3; *see also id.* at 24-25). Yucaipa argues this is because there is "no provision … that precludes the Requisite Lender from doing such things." (*Id.* at 24). The argument is meritless.

*First*, Yucaipa offers no support for its argument that any of its breaches were "effects" of its causing Allied to enter an illegal amendment in August 2009. None were caused by the August 2009 breach. They were simply an option afforded Yucaipa by the initial breach.

*Second*, even if Yucaipa could show that its later breaches were in some sense "effects" of the initial breach, it offers no support for its argument that this would render suit on any later breaches untimely.[18] Yucaipa breached the First Lien Credit Agreement on August 21, 2009, and then proceeded to routinely breach it time and again through the purported exercise of non-existent rights.

---

[18]    Yucaipa's reliance on *In re Marvel Entertainment Group*, 273 B.R. 58 (D. Del. 2002) (Yucaipa Br. at 25) and *In re Coca-Cola Enterprises, Inc. Shareholder Litigation*, 2007 WL 3122370 (Del. Ch. Oct. 17, 2007) (Yucaipa Br. at 25) are inapposite. Among other things, neither case relates to accrual of a breach of contract claim. Rather, each case involves defendants alleged to have breached *fiduciary duties* by acting in ways that were anticipated under relevant agreements. *See Coca-Cola*, 2007 WL 3122370, at *5 (alleged breach of fiduciary duty was by acting in manner "clearly permitted and expected" under the parties contract); *Marvel*, 273 B.R. at 66 (conduct alleged to breach fiduciary duty was "pursuant to" parties' Tax Sharing Agreement). Neither case — nor any others cited by Yucaipa — addresses an analogous situation where, as here, Defendant continuously breached an agreement.

*Third*, Yucaipa's "effects" argument remarkably continues to rely on the false notion that Yucaipa actually acquired Requisite Lender status.[19] Every court to consider the issue has definitively ruled that the Fourth Amendment was *void ab initio*. Yucaipa never was the Requisite Lender, and the Third Amendment therefore governed all of Yucaipa's actions.[20] As such, the First Lien Credit Agreement has always expressly prohibited Yucaipa from *being* Requisite Lender.[21] The logical and obvious implication of this prohibition is that Yucaipa was forbidden from *acting* as Requisite Lender. It is unnecessary for the First Lien Credit Agreement to expressly state such an obvious implication. Thus, every instance of Yucaipa *acting* as Requisite Lender — to the detriment of the First Lien Lenders — was another breach of the First Lien Credit Agreement. Such ongoing breaches are precisely what the continuous contract and continuous breach doctrines are meant to address.

*Dieckman v. Regency GP LP*, 155 A.3d 358 (Del. 2017) is instructive. In *Dieckman*, the plaintiff was a Limited Partner/unitholder of a partnership governed by a "Master Limited Partnership Agreement." The plaintiff alleged that the partnership's General Partner breached the Master Agreement by (1) manipulating safe harbor procedures for approving conflicted

---

[19]      *See* Yucaipa Br. at 2 (Yucaipa's alleged hijacking of the JCT deal was the "'effect' of Yucaipa's acquisition of Requisite Lender status in August 2009"); *id.* at 15 ("Yucaipa and ComVest entered into an assignment and assumption agreement … which made Yucaipa the Requisite Lender under the FLCA."); *id.* at 16 ("when Yucaipa — in its capacity as Requisite Lender — directed CIT to terminate certain LC Commitments under the FLCA…"); *id.* at 22 (identifying August 2009 as "when Yucaipa acquired the majority of Allied's first lien debt and became the Requisite Lender under the FLCA"); *id.* at 23 (same).

[20]      *See, e.g.*, *BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*, 2013 WL 1290394, at *5-6 (N.Y. Sup. Ct. Mar. 8, 2013), *aff'd*, 112 A.D.3d 509 (N.Y. App. Div. 2013), *leave to appeal denied*, 22 N.Y.3d 1171 (2014); *In re Allied Sys. Holdings Inc.*, 556 B.R. 581, 608-09 (D. Del. 2016), *aff'd sub nom. In re ASHINC Corp.*, 683 F. App'x 131 (3d Cir. 2017).

[21]      ████████████████████████████████████████████████████████

24

transactions by appointing conflicted members to an "independent committee," and (2) providing misleading information to unitholders ultimately approving the transaction. The General Partner responded that the Master Agreement did not contain any express contractual prohibition against unfairly manipulating the process of appointing an "independent committee" or providing allegedly misleading information to investors. The Supreme Court of Delaware held that "the express terms of the partnership agreement <u>naturally impl[ied]</u> certain corresponding conditions" and the "unitholders [were] entitled to have those terms enforced according to the reasonable expectations of the parties to the agreement." *Id.* at 361. The Court further held that the "implied covenant is well-suited to imply contractual terms that are so obvious … that the drafter would not have needed to include the conditions in the express terms in the agreement." *Id.* New York law follows the principles espoused in *Dieckman*.[22]

Putting aside Yucaipa's failure to even address the Direct Lender Claim for breach of the implied covenant of good faith and fair dealing (Claim 3), the obvious implication of precluding Yucaipa from becoming Requisite Lender, or succeeding to any rights associated with being a Lender at all, "naturally imply" the "corresponding condition[]" that Yucaipa could not take actions as if it were Requisite Lender. *Dieckman*, 155 A.3d at 361. This includes its post-November 2011 breaches for conduct set forth at paragraphs 123-124 of the Lender Compliant.

### 3.    *This Court Should Exercise Its Discretion to Hold All Claims Timely*

Even if Yucaipa were correct that the limitations period for all the Direct Lender breach of contract claims accrued as of August 21, 2009 (it is not), this Court has discretion to

---

[22]    *See, e.g.*, *Galvstar Holdings, LLC v. Harvard Steel Sales, LLC*, 722 F. App'x 12, 16 (2d Cir. 2018) (duties exist where implied terms are "so interwoven in the whole writing of the contract as to be necessary for effectuation of the purposes of the contract"); *Stardust Monte-Carlo, S.A.R.L. v. Diamond Quasar Jewelry, Inc.*, 2018 WL 1027754, at *4 (S.D.N.Y. Feb. 20, 2018) (same).

determine that the 3-year limitations period should not be strictly enforced. The unique circumstances of this case warrant the exercise of that discretion.

Bankruptcy Courts "are courts of equity and apply the principles and rules of equity jurisprudence." *Young v. United States*, 535 U.S. 43, 50 (2002). "[T]he limitations of actions applicable in a court of law are not controlling in equity," and this Court is therefore free to not enforce them if "unusual conditions" exist. *See IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 177-78 (Del. 2011); *see also Juran v. Bron*, 2000 WL 1521478, at *11 (Del. Ch. Oct. 6, 2000) ("[A] statute of limitations is not binding upon a court of equity and will not be applied where there are 'unusual' or special circumstances.").[23]

In *IAC/InterActiveCorp*, the Delaware Supreme Court observed that "[t]here is no precise definition of what constitutes unusual conditions" and recognized that a court of equity "must exercise its discretion, after considering all relevant facts." 26 A.3d at 178. The Supreme Court identified factors "that could bear on the analysis," including: (1) "whether the plaintiff had been pursuing his claim, through litigation or otherwise, before the statute of limitations expired;" (2) "the extent to which the defendant was aware of, or participated in, any prior proceedings;" (3) "whether the delay in filing suit was attributable to a legal determination in another jurisdiction;" and (4) "whether, at the time th[e] litigation was filed, there was a bona fide dispute as to the validity of the claim." *Id.* Each factor weighs in favor of finding that unusual conditions are present here.

**Claims Were Pursued and Defended Before November 19, 2011.** The first two *IAC/InterActiveCorp* factors are satisfied. CIT, acting as the former Administrative Agent on

---

[23]     *See also In re AMC Invs., LLC*, 524 B.R. 62, 80 (Bankr. D. Del. 2015) (Sontchi, J.) ("A court of equity is not bound by the legal statute of limitations.").

behalf of the Lenders, asserted contract claims against Yucaipa as early as December 2009 in the Georgia Action.

As set forth in the Trustee's Statement of Undisputed Facts (Trustee Br. at 15-16), Yucaipa and Allied filed the Georgia Action against CIT on November 13, 2009, seeking declarations that the Fourth Amendment was valid and that Yucaipa was Requisite Lender.[24]  On December 21, 2009, CIT filed its Verified Answer and Counterclaims seeking a declaration that (1) the purported Fourth Amendment was null and void, (2) the Third Amendment was in full force and effect, and (3) that Yucaipa could not be "Requisite Lender" under the First Lien Credit Agreement.  (Ex. 52 at ¶¶36-42).  CIT also sought, among other things: (1) to enjoin Yucaipa and Allied from "causing substantial, continuing damage to CIT and the Lenders by intentionally and materially breaching its obligations under the Credit Agreement" (*id.* at ¶¶47-50), and (2) to specifically enforce §10.6(j) of the First Lien Credit Agreement (as amended by §2.7 of the Third Amendment) against Yucaipa.  (*Id.* at ¶¶60-63).  The specific performance claim called for Yucaipa to make the mandatory capital contribution of no less than 50% of the Term Loans it purchased from ComVest.  (*Id.*).

Yucaipa admits that it understood CIT to be asserting its claims on behalf of all First Lien Lenders,[25] and it vigorously defended itself against those claims for two years before CIT settled — in its individual capacity only — on December 5, 2011.[26]  As such, there can be no credible suggestion of undue surprise or evidence becoming stale, two problems that statutes of

---

[24]    Ex. 50 at ¶¶37-38.

[25]    *See* Ex. 145 at ¶¶27-28 ("I understood that CIT served as [BD/S's] agent in the Georgia litigation, and that CIT was litigating on its own behalf and on behalf of all the Lenders, including [BD/S], throughout the Georgia litigation.").

[26]    Ex. 60 at §1(b).

limitations are designed to prevent.[27]   Moreover, there was no reason for First Lien Lenders to separately assert contract claims against Yucaipa given that the former Agent (CIT) was already seeking specific performance of Yucaipa's required capital contribution in the Georgia Action. As discussed, monetary damages were not ascertainable at that time, so the available remedy was already being pursued.

**Legal Determinations in 2013 Were a Prerequisite to Valid Contract Claims.**   The third factor is also satisfied.   One month after CIT settled the Georgia Action on its own behalf, BD/S filed the NY Action "[t]o protect their interests" by seeking a declaration that the Fourth Amendment was "null and void" and that Yucaipa was not the Requisite Lender under the First Lien Credit Agreement.[28]   In March 2013, summary judgment was granted to BD/S in an opinion holding that: (1) Yucaipa caused Allied to enter into the Fourth Amendment, which was "flatly prohibited under the Credit Agreement;" (2) the Fourth Amendment "is not, and never was, effective," and (3) "Yucaipa [was] not the Requisite Lender."[29]   In the Allied Adversary Proceeding, however, Yucaipa persisted in urging this Court to disregard that ruling.   On July 30, 2013, this Court rejected Yucaipa's argument, ruling from the bench that BD/S, not Yucaipa, were Requisite Lenders (13-50530, D.I. 297 at 130), that the Third Amendment governed (*id.* at 127), and that Yucaipa was collaterally estopped from asserting the Fourth Amendment's

---

[27]     *See, e.g.*, *Crown, Cork & Seal Co. v. Parket*, 462 U.S. 345, 352 (1983) ("Limitations periods are intended to put defendants on notice of adverse claims and to prevent plaintiffs from sleeping on their rights."); *Order of R.R. Telegraphers v. R. Express Agency*, 321 U.S. 342, 348-49 (1944) ("Statutes of limitation … in their conclusive effects are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared."); *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *6 n.32 (Del. Ch. July 11, 2011) (same).

[28]     *See* Ex. 61 at ¶¶14, 59-60.

[29]     *BDCM Opportunity Fund II, LP*, 2013 WL 1290394, at *5-6.

validity (*id.* at 123-24).

Successful adjudication of the validity of the Fourth Amendment was a prerequisite to the Direct Lender breach of contract claims.  Therefore, the limitations period should not be strictly enforced prior to that time.  *See Stewart v. Wilmington Tr. SP Servs., Inc.*, 112 A.3d 271, 294 (Del. Ch. 2015) (statute of limitations disregarded where circumstances "arguably required the [plaintiff] first to achieve certain successes in [prior action] … to plead non-conclusory allegations"), *aff'd*, 126 A.3d 1115 (Del. 2015).

**A Bona Fide Dispute Existed as to the Claim's Validity When Filed.**  The fourth factor — whether a bona fide dispute existed at the time the complaint was filed — is also satisfied.  Yucaipa insisted that the Fourth Amendment was valid and binding until its appeals were exhausted nearly 8 years later, in 2017.  *See In re ASHINC Corp.*, 683 F. App'x 131, 141-42 (3d Cir. 2017).  Notably, Yucaipa is *still* appealing the ruling dismissing its cross-claims. (*See* Ex. 147).  Yucaipa maintains on appeal that:  (1) "[c]ertain provisions of [the Third Amendment] were invalid and should be severed," (2) it "validly holds the term loans and letters of credit … consisting of $145,112,547.06," (3) it "does not have any obligation to contribute any portion of those loans as equity or otherwise," and (4) it "has all voting and other rights associated with those loans under the Credit Agreement."  (*Id.* at 5.).

In light of each of these "unusual conditions," this Court should not strictly enforce a 3-year statute of limitations, were the Court to conclude that it otherwise would apply.

### D.    Partial Summary Judgment on Lenders' Contract Claims Is Unwarranted

Yucaipa argues that partial summary judgment should be granted with respect to five allegations, contending that "[t]here is no evidence, and thus no genuine factual dispute, regarding damages resulting from these allegations."  (Yucaipa Br. at 28).  These allegations are:

29

- Yucaipa's breach of the Third Amendment by acquiring more Term Loan Exposure than permitted under §2.7(c) (Ex. 2 at ¶¶117-119, 123(a));

- Yucaipa's breach by purchasing, and purporting to hold, $30,400,458.40 of LC Commitments (*id.* at ¶120);

- Yucaipa's breach by declaring itself to be Requisite Lender (*id.* at ¶¶121, 123(b));

- Yucaipa's breach of various voting rights provisions in actions it took as Requisite Lender (*id.* at ¶122); and

- Yucaipa's breach by using its purported Requisite Lender status to protect its equity investment at the expense of all other Lenders, thereby precluding a restructuring of Allied (*id.* at ¶123(d)).

Partial summary judgment with respect to these five allegations is unwarranted.

Yucaipa is arguing, without support, that every allegation of a breach of contract cause action needs to be separately supported by distinct and proximate resulting damages.[30]  Each of these five allegations, however, is part and parcel of Yucaipa's four-year campaign of ongoing and continuous breaches of the First Lien Credit Agreement, ultimately resulting in the First Lien Lenders recovering a fraction of their loans upon consummation of the JCT 363 Sale.  The Trustee's damages expert (Jeffrey Risius of Stout) calculates damages "but for" Yucaipa's contractual breaches in reference to their "actual world" recovery.  (Ex. 103 (Risius Report) at ¶¶112-33).

Yucaipa trampled on the First Lien Lenders' rights from August 21, 2009 through, at least, this Court's summary judgment opinion in August 2013 holding that BD/S, not Yucaipa, were Requisite Lenders.  (*See* 13-50530, D.I. 280, 297).  Yucaipa's ongoing breaches during this period included the breaches as to which Yucaipa seeks partial summary judgment.

---

[30]    The cases cited by Yucaipa only stand for the uncontroversial point that resulting injury is a necessary element of a *cause of action* for breach of contract.  None of Yucaipa's cases holds that every allegation of breach must be supported by its own separate and distinct resulting injury.

In addition, Yucaipa grossly mischaracterizes testimony by the Trustee's 30(b)(6) witness, Stephen Deckoff, contending that, when asked about Yucaipa's breaches, he "was unable to, or refused to, point to anything beyond the opinion of the Trustee's damages expert, Jeffrey Risius." (Yucaipa Br. at 28). This is untrue. Mr. Deckoff gave substantive responses with respect to each allegation in question. For example:

**_Damages from Purchasing More Term Loans than Permitted._** On this topic, Mr. Deckoff testified that:



**_Damages from Declaring Itself Requisite Lender and Blocking Lenders from Exercising Their Rights._** On this topic, Mr. Deckoff testified that:



Contrary to Yucaipa's sweeping generalization, Mr. Deckoff only demurred to the

---

31

Trustee's damages expert when asked for a *quantification* of the injury suffered.[32]  Seeking

damages calculations from a 30(b)(6) witness is inappropriate.[33]  As such, the Trustee objected to

such questioning in advance of Mr. Deckoff's deposition.  (*See* 13-50530, D.I. 583 at, *e.g.*, 9).  A

fact witness's inability to quantify damages cannot support the grant of partial summary

judgment sought.

## II.    YUCAIPA IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE ESTATE CLAIMS THAT IT BREACHED FIDUCIARY DUTIES

Yucaipa breached fiduciary duties owed to Allied — by advancing its own pecuniary

interests over the best interests of the Company — and there is no basis to grant Yucaipa

summary judgment with respect to the alleged fiduciary breaches.

Yucaipa does not contest that it owed fiduciary duties.  *See, e.g.*, *Kahn v. Lynch

Commc'n Sys., Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994) ("[A] shareholder owes a fiduciary

duty … if it owns a majority interest in or exercises control over the business affairs of the

corporation.").  Instead, it urges this Court to dismiss various allegations based on arguments that

are devoid of merit, with two exceptions pertaining to claims the Trustee is not pursuing.[34]  The

---

[32] █████████████████████████████████████████████████

[33]     *See e.g.*, *U.S. ex rel. Landis v. Tailwind Sports Corp.*, 2015 WL 13711120, at *3 (D.D.C. July 2, 2015) (permitting testimony from 30(b)(6) witnesses on "factual underpinnings of … alleged damages" but precluding testimony "about the … theory and calculation of damages in [a] litigation"); *In re Intel Corp. Microprocessor Antitrust Litig.*, 2009 WL 2921313, at *2 (D. Del. Sept. 8, 2009) (deposition topics seeking "information concerning … damages allegations, which implicate expert testimony" are "impermissible in the context of a FED. R. CIV. P. 30(b)(6) deposition").

[34]     The first exception relates to allegations relating to the Monitoring and Management Services Agreement ("**MMSA**") Yucaipa entered with Allied on May 29, 2007 (Scolnick Ex. 32). ████████████████████████████████████████████████  Yucaipa's 30(b)(6) witness testified it was never paid pursuant to the MMSA and, therefore, the Trustee is no longer pursing this allegation.  Additionally, the Trustee is also not

Trustee's breach of fiduciary duty claims (1) are not duplicative of the breach of contract claims, and (2) the Trustee has ample evidence supporting its allegations.

### A.    **The Estate's Fiduciary Duty Claims Do Not Duplicate Its Contract Claims**

Under Delaware law, a fiduciary duty claim should be dismissed as duplicative of a breach of contract claim only if the two are "substantially identical, such that the fiduciary duty claim would have been superfluous," or if they "involve[] remedies that were likely to be equivalent." *Schuss*, 2008 WL 2433842, at *10.  Delaware courts allow parallel fiduciary duty and contract claims where, as here, the fiduciary duty claims are "grounded on an additional and distinct fact." *See, e.g.*, *Stone & Paper Invs., LLC v. Blanch*, 2019 WL 2374005, at *6 n.57 (Del. Ch. May 31, 2019).  Yucaipa argues that the Estate's fiduciary duty claims duplicate its Third Amendment contract claims (1) relating to the Yucaipa-ComVest Transaction, and (2) Yucaipa's "structuring transactions that were nominally in the name of [Allied] but were, in reality, actually structured in a manner to ensure and protect Yucaipa's existing equity investments in Allied." (Yucaipa Br. at 40-41, 46).  These claims are not substantially identical and seek distinct remedies.  Hence, they are not duplicative.

### 1.    *The Claims Are Different*

The Estate Claim for breach of contract (Claim 5) relates only to Yucaipa's breach of §2.7(e) of the Third Amendment — its failure to make the mandatory capital contribution.  (*See* Ex. 1 at ¶¶159-65).  The fiduciary duty claim is centered on Yucaipa's breach of its duty of loyalty by causing the Company to enter into the illegal Fourth Amendment, ███████████

---

pursing allegations in connection with the breach of fiduciary claim as it relates to Yucaipa's purchases of Second Lien Debt.

████████████████████████████████████████████ This
self-interested transaction — entered nominally in the name of Allied — allowed Yucaipa to
protect its ████████ investment in Allied's faltering business, at the expense of all other
Lenders. Yucaipa also directed Allied to pay Yucaipa's and ComVest's legal and professional
expenses ██████████████ in connection with the Yucaipa-ComVest Transaction —
at a time when Allied was in dire need of liquidity. Weeks earlier, at Walker's suggestion,
Allied had defaulted on a ████████ principal and interest payment to the First Lien Lenders.[36]
This provided the cash for █████████████ Yucaipa's private deal, which provided no
corresponding benefit to the Estate.

Because of these "additional and distinct" facts, the fiduciary duty claim is not
duplicative of the contract claim. *See, e.g.*, *Stone & Paper Invs., LLC*, 2019 WL 2374005, at *6
n.57 (fiduciary duty claim — relating to allegations that board members engaged in
self-interested transactions — was not duplicative of contract claims for alleged violations
relating to specific provisions of an Operating Agreement implicated by the self-interested deal).

### 2. *Different Remedies Are Sought*

Yucaipa asserts that the remedies for the contract and fiduciary duty claim are the same
because "the Trustee seeks monetary damages for both" (Yucaipa Br. at 41). This
disingenuously ignores that *different* monetary damages are sought for each. ████████

████████████████████████████████████████

---

[35] ████████████████████████████████████████
████████████████████████████████████

[36]    *See* Scolnick Ex. 14 (Macey Dep.) at 137:20-138:19.

█████████████████████████████████████████████████████[37]  Quite

distinctly, Mr. Risius opined that Yucaipa's breach of fiduciary duty damaged the Estate due to

its obstructing a transaction with JCT in late 2011 to 2012.[38]  Mr. Risius determined the loss

from the unconsummated JCT deal by comparing the amount offered to the amount later

received from the December 2013 JCT 363 Sale.  Given that the contract and fiduciary duty

claims "involve different considerations in terms of a potential remedy," they are not duplicative.

See Schuss, 2008 WL 2433842, at *10.[39]

> **B.    Ample Evidence Shows That Yucaipa Obstructed Board Consideration of Potential Transactions to Benefit Itself**

Yucaipa baselessly asserts that "there is no evidence of any 'potential transactions' that

could have benefitted Allied, but which the board failed to consider at Yucaipa's urging."

(Yucaipa Br. at 42).  The evidence in the record is compelling.

Notwithstanding Allied's downturn shortly after Yucaipa sponsored Allied's exit from its

first bankruptcy (Trustee Br. at 7-8), Mike Riggs (CEO of Active and later JCT) remained highly

motivated to acquire the Company.  ██████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████[40]

Yucaipa, however, obstructed meaningful discussions about a combination of Allied and

---

[37]    See Ex. 103 (Risius Report) at ¶¶85-90.

[38]    Id. at ¶¶91-100.

[39]    In the cases cited by Yucaipa, the same conduct underlay both the contract and fiduciary duty claims, and no distinct relief with respect to damages was sought.  All are inapposite.

[40]    See Scolnick Ex. 7 (Walker Dep.) 668:19-669:11.

JCT in a brazen effort to enhance the value of its own investment at the expense of the Estate and all other Lenders. This culminated in late 2011 to 2012 with Yucaipa demanding a $20 million premium for its debt. The hopelessly conflicted Allied Board stood by doing nothing. (*See* Trustee Br. at 18-19). This breached Yucaipa's duty of loyalty to the Company and (derivatively) its creditors at this time. *See, e.g.*, *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 755, 760 n.487 (Del. Ch. 2005) (duty of loyalty requires "true faithfulness and devotion to the interests of the corporation and its shareholders," particularly in cases involving "an imperial … controlling shareholder with a supine or passive board."), *aff'd*, 906 A.2d 27, 67 (Del. 2006); *Auriga Capital Corp. v. Gatz Propers.*, 40 A.3d 839, 844 (Del. Ch. 2012) (fiduciary "not free to create a situation of distress by failing to cause the [company] to explore its market alternatives"), *aff'd*, 59 A.3d 1206 (Del. 2012).[41]

The evidence of Yucaipa's misfeasance in connection with potential transactions with Riggs includes:

**Riggs's September 2008 Overture.** On September 16, 2008 — while Allied was in default under its Credit Agreements and operating without forbearance[42] — Riggs emailed Walker to gauge Yucaipa's interest in selling its equity stake in the Company.[43] The email highlights Riggs's turnaround of Active through margin improvement projects, ████████ ████████████████████████████████████████████████████████ ████████████████████████ There is no evidence of Yucaipa informing the non-Yucaipa

---

[41]     *See also Odyssey Partners, L.P. v. Fleming Cos.*, 1996 WL 422377, at *4 (Del. Ch. July 24, 1996) (allegation that controlling shareholder "ruled out any capitalization plan that would have the effect of diluting its proportionate ownership" supports ███ h of fiduciary claim).

[42]     *See* Exs. 25, 122.

[43]     *See* Ex. 121.

members of Allied's Board about Riggs's overture or taking any steps to explore a potential transaction following receipt of the email.

**Mike Riggs and ComVest's Turnaround Strategy.**  In December 2008, Riggs began pitching various Allied Lenders and outside investors on a strategy to take ownership of the Allied, become CEO, and install as management his successful team at Active.[44]  There was no role for Yucaipa in this strategy (it had earlier rebuffed an approach from Riggs for its equity) and, if carried out, Yucaipa's investments below First Lien would likely have been zeroed out.[45] After ComVest received this proposal from Riggs, it agreed to invest in Allied and work with him.  But Yucaipa prevented any meaningful discussion of a restructuring strategy for Allied involving Riggs.

On February 24, 2009, Mark Hughes of ComVest wrote Walker seeking to arrange a due diligence meeting with Allied's management.  (Ex. 124).  Walker demurred, responding that ComVest's senior principal, Robert Priddy, should call Ron Burkle.  Mark Hughes testified that this impediment raised concern for ComVest, ███████████████████████████████████ ████████████████████████████████.[46]

The following week, on March 5, 2009, ComVest met with Burkle, Tochner and Walker at Burkle's Beverly Hills home.  ████████████████████████████████████ ███████████████████████████████ ███████████████████████████████

---

[44]    *See* Ex. 123.

[45]    ██████████████████████████████████████████████████████████████

[46]    Scolnick Ex. 17 (ComVest 30(b)(6) Dep.) 197:3-198:20.

[47]    *Id.* at 70:24-71:24.



**JCT's June/July 2009 Efforts to Acquire Yucaipa's Stake.**  Convinced that ComVest

had abandoned his turnaround strategy, Riggs again reached out to Yucaipa about buying its

stake in the Company.[52]  Riggs met with Burkle and Walker in late June 2009 on the

understanding that the topic of discussion was to be JCT buying out Yucaipa's stake in Allied.

Instead, Burkle tried to convince Riggs to sell JCT to Yucaipa.[53]  There is no evidence that

---

[48]    *Id.* at 72:23-73:5.

[49]    Scolnick Ex. 12 (Burkle Dep.) 113:5-23.

[50]    Ex. 146 (Priddy Dep.) 97:14-98:7.

[51]    *Id.* at 87:15-24.

[52]    Ex. 125.

[53]    Scolnick Ex. 19 (Riggs Dep.) 171:9-172:18.

Yucaipa ever informed the Board of Riggs's ongoing interest in owning the Company at this time.

**JCT's July 2010 Letter of Intent.**  In July 2010, Riggs sent a Letter of Intent to Gendregske and Walker, again evincing JCT's strong desire to acquire Allied.  (Ex. 135).  ███

███████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████ █ █████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████

**Spring 2011 Negotiations with Riggs.**  Frustrated by Allied's ongoing defaults and failure to provide financial information, Black Diamond — █████████████████████

██████████████████████████████████ — tried to work directly with Riggs to facilitate a restructuring transaction resulting in JCT's ownership of Allied.  (*See* Ex. 139). Yucaipa was brought into these spring 2011 discussions █████████████████████████

█████████████████████████████████

On June 16, 2011, Walker provided Burkle with JCT's proposals to acquire Allied through a 363 sale with Black Diamond financing.  (Ex. 141).  ██████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

---

54      Ex. 135.

55      Ex. 149 (Black Diamond 30(b)(6) Dep.) 403:12-404:4; Scolnick Ex. 9 (Trustee 30(b)(6) Dep.) 44:14-45:22.

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████

       ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

**Late 2011 and 2012 Negotiations.**  The culmination of Yucaipa's disregard for the interests of the Allied Estate — in order to benefit itself — was its demand in late 2011 to 2012 that JCT pay Yucaipa a premium ██████████████████████, based on the false premise that it was Requisite Lender.  (*See* Trustee Br. at 17-18).  █████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

       In response, Yucaipa raises four arguments seeking to suppress evidence of its obstructionist tactics or, alternatively, simply mischaracterizing them.

       1.       ***Evidence of the 2011-2012 JCT Proposals Is Admissible***

       Yucaipa cannot escape liability for its fiduciary breaches — in connection with the JCT

---

[56]       Scolnick Ex. 8 (Deckoff Dep.) 250:23-251:10.

negotiations — on the theory that they were not specifically referenced in the Estate Complaint. (Yucaipa Br. at 43-44).  FED. R. CIV. P. 8 — made applicable to adversary proceedings under FED. R. BANKR. P. 7008 — requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  There is no requirement that plaintiff plead any specific evidence in support of its allegations under this liberal pleading standard.  *See, e.g.*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002); *see also Romdhani v. Exxon Mobil Corp.*, 2010 WL 4682414, at *5 (D. Del. Nov. 10, 2010) (plaintiff is "not required to plead every factual allegation supporting their claims.").  Facts not directly discussed in a complaint are admissible at summary judgment and trial if they "directly relate to and support the initial claims" in the complaint, as opposed to "stat[ing] a new claim or legal theory."  *Id.* (denying motion to strike new allegations raised at summary judgment).  Here, Yucaipa does not contend that the Trustee is raising a new claim or legal theory.  The cases Yucaipa cites, however, each fall into this category.[57]  Yucaipa's argument is meritless.

### 2.    *Yucaipa's Contention That There Was "No Transaction" with JCT That Could Benefit Allied Is Refuted by The Record*

Yucaipa groundlessly contends that "undisputed evidence reveals that there was no … transaction in 2011-2012 that the Allied board failed to consider" because "JCT was negotiating only with First Lien Lenders with an eye toward acquiring their debt and then negotiating a 363 sale."  (Yucaipa Br. at 44).  On the contrary, the evidence reflects that JCT was pursuing a debt transaction because that is how *Yucaipa* insisted on structuring a deal.  Riggs testified that he did

---

[57]    *See McMahon v. Salmond*, 573 F. App'x 128, 135 (3d Cir. 2014) (unpublished) (Yucaipa Br. at 44) (new facts plaintiff raised on summary judgment formed a separate and distinct claim unpled in his complaint); *Wilson v. City of Wilmington*, 2015 WL 4571554, at *7 (D. Del. July 29, 2015) (Yucaipa Br. at 44) (plaintiff "first raised the issue of a hostile work environment in his opposition to Defendants' motion for summary judgment.").

not care what form the transaction took. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████.[58]  Moreover, the Trustee's

30(b)(6) witness, Stephen Deckoff, testified that, after meeting with Riggs on multiple occasions,

his understanding was that:

████████████████████████████████████████

(Scolnick Ex. 9 (Trustee 30(b)(6) Dep.) 44:14-45:22).

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████  The evidence will show that this *was* a tangible

prospective JCT transaction for Allied that Yucaipa squandered by demanding a $20 million

premium for itself, in breach of its fiduciary duties.

### 3.    *Usurpation of a Corporate Opportunity Is Neither Pled Nor Relevant*

Yucaipa baselessly claims that "the Trustee's purported damages resulting from the JCT

Negotiations are rooted in the assumption that Yucaipa 'wrongfully usurp[ed] Allied's corporate

---

[58] ████████████████████████████████████████████
████████████████████████████████████

opportunity,'" and, that such a claim fails because there is no evidence that this was a "corporate opportunity." (Yucaipa Br. at 44-45). This is wrong for four reasons.

First, the Trustee does not allege that the JCT negotiations in late 2011 to 2012 — or any other potential restructuring transaction — constituted a "corporate opportunity." (See Ex. 1). The Trustee's damages expert, who is not a lawyer, used the expression in his opening report but later testified that he could not give any opinion as to whether or not this was a "corporate opportunity" ███████████████████████████████████████████████ He further testified that it makes no difference when calculating damages in any event. (Id. at 158:20-159:3). Conversely, the Trustee's corporate governance expert, Professor Jon Macey (of Yale), opined that a potential JCT transaction was not a "corporate opportunity" ████████████ ████████████████████████████████████████████████████████ ███████████; see also Dweck v. Nasser, 2012 WL 161590, at *12 (Del. Ch. Jan. 18, 2012) (elements of a misappropriation of corporate opportunity include whether "the opportunity is within the corporation's line of business.").

Second, as addressed above, Yucaipa knows, and the record establishes, that the Trustee's allegations are that Yucaipa usurped the negotiations with JCT and scuttled a transaction that would have greatly benefitted Allied and its stakeholders. Yucaipa was not attempting to steal a corporate opportunity form Allied. It was trying to extract disproportionate value for itself at the expense of other Allied stakeholders.

Third, even assuming Yucaipa's hijacking of the JCT negotiations in late 2011 to 2012 could somehow be framed as theft of a "corporate opportunity," the MMSA's waiver provision cannot properly be read — as Yucaipa suggests (Yucaipa Br. at 45) — to override Yucaipa's fiduciary duties of loyalty and good faith. Those duties are, in this context, immutable and

cannot be overridden by contract.[59]  In 2000, a narrow exception was codified permitting the

board to "[r]enounce … any interest or expectancy of the corporation in, or in being offered an

opportunity to participate in, *specified* business opportunities or *specified* classes or categories of

business opportunities."  *See* 8 DEL. C. §122(17).[60]  Section 7(b) of the MMSA does not specify

the supposed corporate opportunity that Yucaipa now claims it was usurping.  It specifies only

other "opportunities."[61]  Neither Yucaipa nor its designated corporate governance expert

contends that any specific language of the MMSA purports to waive Yucaipa's fiduciary duties

in connection with the lost 2011-12 JCT transaction.  (*See* Yucaipa Br. at 45; *see also* Ex. 106

(Macey Rebuttal) at ¶¶51-52).

    *Fourth*, Yucaipa's suggestion that the Trustee cannot establish damages resulting from

the lost JCT deal, because it is somehow "rooted in the assumption" that it "wrongfully usurp[ed]

a corporate opportunity" (Yucaipa Br. at 44-45), ignores that Delaware law takes a broad view of

damages resulting from any breach of fiduciary duties.  As long as there is a connection with the

wrongdoing, "the law does not require certainty in the award of damages where a wrong has

been proven and injury established….  Once a breach of duty is established, uncertainties in

awarding damages are generally resolved against the wrongdoer."  *Basho Techs. Holdco B, LLC*

---

[59]    *See, e.g.*, *Sutherland v. Sutherland*, 2009 WL 857468, at *4 (Del. Ch. 2009) (contracting to eliminate liability for breach of duty of loyalty for self-dealing transaction is "void as contrary to the laws of [Delaware] and against public policy"); *see generally* Lyman Johnson, *Delaware's Non-Waivable Duties*, 91 B.U. L. REV. 701, 705 ("Neither the duty of loyalty, nor the consequences of its breach, may be altered in any way.").

[60]    *See id.* at 705 n.17 ("Although [8 Del. C. §122(17)] empowers a corporation to renounce corporate opportunities … that provision does not relieve directors of their duty of loyalty.").

[61]    

*v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *50 (Del. Ch. July 6, 2018), *aff'd*, 221

A.3d 100 (Del. 2019); *see also Encite LLC v. Soni*, 2011 WL 5920896, at *25 (Del. Ch. Nov. 28,

2011) (once a breach is found, it "loosens the stringent requirements of causation and damages"

and "[a]ny uncertainty in awarding damages is resolved against the wrongdoer.").

### 4. *It Is Permissible to Support Alternative Claims With Allegations and Damages From the Same Underlying Misconduct*

Yucaipa erroneously argues that the Estate Claim for breach of fiduciary duty — to the

extent it is premised on the 2011 to 2012 JCT negotiations — is impermissibly duplicative of the

Direct Lender Claim for breach of contract arising from the same misconduct.  (Yucaipa Br. 45).

There is nothing impermissible, however, with pleading claims in the alternative based on the

same underlying misconduct and damages.  *See, e.g., Philip A. Templeton, M.D., P.A. v.*

*EmCare, Inc.*, 868 F. Supp. 2d 333, 340 (D. Del. 2012) (party "is permitted to pursue claims in

the alternative, even though the alternative theories of liability may share the same damages"); *In*

*re Am. Business Fin. Services, Inc.*, 384 B.R. 66, 72 (Bankr. Del. 2008) ("A party may plead

alternative claims for relief based on the same facts alleged.").  As discussed, the Estate

Complaint seeks broader damages than the Lender Complaint because the Estate Complaint

encompasses harm to the First Lien Lenders.  If there is a recovery for the Estate Claim for

breach of fiduciary duty in connection with Yucaipa torpedoing the JCT deal in 2011-2012, then

the Direct Lender Claim for breach of contract claim for that misconduct is academic because the

Trustee is not seeking duplicative damages.[62]

---

[62]    *See In re Green Field Energy Servs., Inc.*, 2018 WL 619949, at *52 (Bankr. D. Del. Nov. 28, 2018) (awarding plaintiff single measure of damages on its breach of contract and tortious interference claims when damages for the claims were duplicative).

### C.    Evidence Proves Yucaipa's Breach of Fiduciary Duty in Causing Allied to Pay Unnecessary and Unreasonable Fees

Yucaipa's argument that it cannot have breached its fiduciary duties by causing Allied to pay unnecessary and unreasonable fees because the Company was contractually obligated to pay them (Yucaipa Br. at 46-47) is based on a mischaracterization of the contracts it points to.

**Fees for Yucaipa-ComVest Transaction.** Yucaipa selectively quotes §10.2 of the First Lien Credit Agreement to defend the fact that it caused Allied to pay its and ComVest's professional fees and expenses in connection with the Yucaipa-ComVest transaction. (Yucaipa Br. at 46-47) (citing Ex. 9 at §10.2). ███████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████ The Fourth Amendment and Yucaipa's purchase of ComVest's debt were not in the nature of a "work out."

A "workout" is an "adjustment in the reasonable expectations of" stakeholders that results in "a business entity that has realigned its financial structure."[63] It generally "takes the form of negotiations and discussions among creditors, investors, and other interested parties with the debtor."[64] The Fourth Amendment did not "realign" Allied's financial structure. In fact, it had no effect other than purporting to give Yucaipa the unfettered rights to be a Lender.

Further, the Allied default on which Yucaipa premises its right to fees occurred only because Yucaipa (through Walker) requested it. Allied defaulted on its scheduled ███████ principal and interest payment — just weeks before Yucaipa executed the Yucaipa-ComVest transaction — ████████████████████████████████████████████

---

[63]    *See* Matthew W. Kavanaugh & Randye B. Soref, Business Workouts Manual §1:1 (2019).

[64]    *Id.* at §1:8.

██████████████████████████████████████████████    In other words, so that

Allied could pay Yucaipa's and ComVest's fees for a deal that provided no benefit to the Estate

or other Lenders.  Yucaipa then caused Allied pay ████ fees to itself and ComVest as a closing

condition to their deal.[65]  These fees are not "reasonable" and were not incurred in connection

with a workout.

**Fees for CIT Litigation.**  Yucaipa's argument that it was entitled to its fees incurred in

the Georgia Action is similarly flawed.  ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████    That is the case here, as the courts have uniformly held.

The New York Court found that Yucaipa, "as controlling shareholder of Allied, caused

Allied to enter into [the Fourth Amendment]," whose terms were "flatly prohibited under the

[First Lien] Credit Agreement."[67]  It found that Yucaipa did so to "seiz[e] control of the Lenders'

rights and remedies" under the First Lien Credit Agreement.[68]  Under *In re Walt Disney Co.*

*Derivative Litig.*, this violated Yucaipa's fiduciary duty of good faith.  906 A.2d 27, 67 (Del.

2006) (breach of good faith when fiduciary "intentionally acts with a purpose other than that of

advancing the best interests of the corporation.").  (*See also* Ex. 104 (Macey Report) at 17-18).

In addition, the Trustee separately contends that Yucaipa breached its duty of good faith by

causing Allied to enter into the Fourth Amendment.  If that claim is sustained, the MMSA's fees

provision is inapplicable.  The MMSA's fees provision therefore is not a valid basis for granting

---

[65]     Exhibit E1 to Ex. 103 (Risius Report) at 59.

[66]     Scolnick Ex. 32 (MMSA) at §§6(a), (b).

[67]     *BDCM Opportunity Fund II, LP*, 2013 WL 1290394, at *5.

[68]     *Id.*

summary judgment on this issue.

## III.    RECHARACTERIZATION IS WARRANTED IN THE ABSENCE OF EQUITABLE SUBORDINATION

Given the evidence adduced in discovery warranting equitable subordination, the Trustee believes that the treatment of Yucaipa's debt holdings is best addressed through its equitable subordination claim (Estate Claims 1-2). If successful, that renders moot the UCC's recharacterization claim, to which the Trustee succeeded (Estate Claim 3).

Were this Court to decline to equitably subordinate, the Court should recharacterize Yucaipa's First Lien debt holdings in excess of the amount it was permitted to hold under the Third Amendment. The Third Amendment barred Yucaipa from acquiring more than $50 million, or 25%, of the aggregate Term Loans. (Ex. 20 at §2.7(c)). Yucaipa's void attempt to remove this restriction in the lawless Fourth Amendment, its acquisition of Term Loans far in excess of the cap, and its refusal to make the mandatory capital contributions required by the Third Amendment, so altered the nature of the First Lien Debt held by other Lenders as to warrant recharacterization to equity. *See, e.g.*, *In re Franklin Equip. Co.*, 416 B.R. 483, 519 (Bankr. E.D. Va. 2009) (recharacterization may be warranted where "the purchasing insiders effect such radical modification of the terms and conditions of the transaction after acquisition so as to remove its original character"); *see generally In re SubMicron Sys. Corp.*, 432 F.3d 448, 456 (3d Cir. 2006) (courts consider "the economic reality of the surrounding circumstances" to determine whether recharacterization is warranted).

## IV.    THE TRUSTEE IS PURSUING VIABLE FRAUDULENT TRANSFER CLAIMS

Yucaipa contends that "the Trustee has conceded that the fraudulent transfer claims (Claims 10 and 11) fail as a matter of law." (Yucaipa Br. at 31). That is incorrect. It is true that the Trustee's damages expert adopted the conservative assumption that Allied became insolvent

in August 2009, when the Company ceased making payments of principal or interest to its First Lien Lenders.  (Ex. 103 at 32 n.136).  But the Trustee nowhere conceded that the claims failed "as a matter of law."  Yucaipa's damages expert (Daniel Fischel) opined that Allied was insolvent far earlier in 2008 (Ex. 102 (Fischel Report) at ¶¶18-19).  The Trustee has a right to rely on that concession in pursuing its fraudulent transfer claims.

## CONCLUSION

The Trustee respectfully submits that Yucaipa's motion for summary judgment should be denied.

828701

Dated: August 21, 2020

**FOX ROTHSCHILD LLP**

By:     _/s/ Seth A. Niederman_
Seth A. Niederman (DE Bar No. 4588)
Citizens Bank Center
919 N. Market Street, Suite 300
Wilmington, DE 19801
Tel.: (302) 654-7444
Fax: (302) 656-8920
sniederman@foxrothschild.com

-and-

**JOSEPH HAGE AARONSON LLC**
Gregory P. Joseph
Douglas J. Pepe
Gila S. Singer
485 Lexington Avenue, 30th Floor
New York, NY 10017
Telephone: (212) 407-1200
gjoseph@jha.com

-and-

**ZAIGER LLC**
Jeffrey H. Zaiger
432 Park Avenue, Suite 19A
New York, NY 10022
Telephone: (917) 572-7701
jzaiger@zaigerllc.com

*Counsel for the Litigation Trustee and Plan Administrator*

**Appendix A**

**Abbreviations and Defined Terms**

| | |
|---|---|
| **13-50530** | *Catherine E. Youngman, Litig. Tr. for ASHINC Corp. v. Yucaipa Am. All. Fund I, L.P.*, Adv. Proc. No. 13-50530 (Bankr. D. Del.) |
| **14-50971** | *Catherine E. Youngman, Litig. Tr. for ASHINC Corp. v. Yucaipa Am. All. Fund I, L.P.*, Adv. Proc. No. 14-50971 (Bankr. D. Del.) |
| **2005 Bankruptcy** | *In re Allied Holdings, Inc., et al.*, Case Nos. 05-12515 through 05-12526 and 05-12528 through 05-12537 (Bankr. N.D. Ga.) |
| **Active** | Active Carhaul |
| **Allied Adversary Proceeding** | *ASHINC Corp. v. AMMC VIII, Ltd. et al.*, Adv. Proc. No. 12-50947-CSS (Bankr. D. Del) |
| **Allied** or the **Company** | ASHINC Corp.(formerly known as Allied Systems Holdings, Inc.) and related Debtors |
| **Amended Plan** | Debtors' Modified First Amended Joint Chapter 11 Plan of Reorganization dated December 3, 2015 (Case No. 12-11564, D.I. 3360-1) |
| **BD/S** | Black Diamond and Spectrum |
| **Black Diamond** | BDCM Opportunity Fund II, LP and Black Diamond CLO 2005-1 Ltd. |
| **Board** | Allied's Board of Directors |
| **Burkle** | Defendant Ronald Burkle |
| **CIT** | CIT Group/Business Credit, Inc. |
| **ComVest** | ComVest Investment III, L.P. |
| **Credit Agreements** | Allied's First Lien Credit Agreement and Second Lien Credit Agreement |
| **D. Del. Compl.** | *Yucaipa Am. All. Fund I, L.P. et al. v. Richard A. Ehrlich et al.*, No. 15-cv-373 (D. Del. May 8, 2015), ECF No. 1 |
| **Direct Lender Claims** | Claims brought on behalf of the lenders under Allied's first lien credit facility asserted in Adv. Proc. No. 14-50971 |
| **Entities Opposition** or **Entities Opp.** | Litigation Trustee's Opposition to the Motion for Summary Judgment by Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP, dated July 17, 2020 |
| **Estate Claims** | Claims brought on behalf of the Allied Estates asserted in Adv. Proc. No. 13-50530 |
| **Ex.** | Exhibits to the first Declaration of Gila S. Singer, dated May 1, 2020 (13-50530, D.I. 713; 14-50971, D.I. 466) and the accompanying Second Declaration of Gila S. Singer |
| **First Lien Credit Agreement** | Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated as of May 15, 2007 (Ex. 9) |
| **Gendregske Br.** | Defendant Mark Gendregske's Opening Brief in Support of his Motion for Summary Judgment, dated May 1, 2020 (13-50530, D.I. 708) |

1

| **Georgia Action** | *Allied Systems Holdings, Inc., et al. v. The CIT Group/Business Credit, Inc.*, Civil Action No. 2009-CV-177574 (Super. Ct. Fulton Cnty.) |
|---|---|
| **Indiv. Br.** | Memorandum of Points and Authorities in Support of Motion for Summary Judgment by Defendants Ronald Burkle, Jos Opdeweegh, Derex Walker, Jeff Pelletier, and Ira Tochner (13-50530, D.I. 699; 14-50971, D.I. 456) |
| **Individual Defendants** | Defendants Ronald Burkle, Jos Opdeweegh, Derex Walker, Jeff Pelletier, and Ira Tochner |
| **Jack Cooper** or **JCT** | Jack Cooper Transport |
| **JCT 363 Sale** | Purchase by JCT of substantially all of Allied's assets for $135 million following an auction for Debtors' assets under 11 U.S.C. §363, which closed on December 27, 2013 |
| **Joint Procedural History** | Joint Procedural History, dated July 25, 2019 (13-50530, D.I. 599; 14-50971, D.I. 365) |
| **Kasowitz** | Kasowitz Benson Torres LLP |
| **Latham** | Latham & Watkins LLP |
| **LPA** | Loan Purchase Agreement between Yucaipa and ComVest, dated August 21, 2009 (Ex. 43) |
| **MMSA** | Monitoring and Management Services Agreement, dated May 29, 2007 (Scolnick Ex. 32) |
| **NY Action** | *BDCM Opportunity Fund II, LP, et al. v. Yucaipa American Alliance Fund I, L.P., et al.*, Index No. 650150/2012 (N.Y. Sup. Ct. N.Y. Cnty.) |
| **Plan** | Second Amended Joint Plan of Reorganization, *In re Allied Holdings, Inc.*, No. 05-12515 (CRM) (Bankr. N.D. Ga.), D.I. 2802 (Ex. 11) |
| **Requisite Lenders** | As defined in Allied's First Lien Credit Agreement (Ex. 9 at 41) |
| **Scolnick Ex.** | Exhibits to the Declaration of Kahn A. Scolnick, dated May 1, 2020 (13-50530, D.I. 721; 14-50971, D.I. 457) |
| **SDNY Compl.** | *Yucaipa Am. All. Fund I, L.P. et al. v. Richard A. Ehrlich et al.*, No. 15-cv-916 (S.D.N.Y. Feb. 6, 2015), ECF No. 1 |
| **Second Lien Credit Agreement** | Second Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated as of May 15, 2007 |
| **Spectrum** | Spectrum Investment Partners, L.P. |
| **Tender Offer** | February 4, 2009 tender offer by Yucaipa for Allied first lien debt (Ex. 30) |
| **Third Amendment** | Amendment No. 3 to First Lien Credit Agreement and Consent, dated as of April 17, 2008 |
| **Troutman** | Troutman Sanders LLP |
| **Trustee** | Plaintiff Catherine E. Youngman, as Litigation Trustee for ASHINC Corp. (formerly known as Allied Systems Holdings, Inc.) and related Debtors |

| **Trustee Brief** | Litigation Trustee's Memorandum in Support of Motion for Partial Summary Judgment, dated May 1, 2020 (13-50530, D.I. 706; 14-50971 D.I. 463) |
|---|---|
| **UVTA** | Uniform Voidable Transactions Act |
| **Yucaipa** | Defendants Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. |
| **Yucaipa Br.** | Memorandum of Points and Authorities in Support of Motion for Summary Judgment by Defendants Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P., dated May 1, 2020 (13-50530, D.I. 697; 14-50971, D.I. 454) |
| **Yucaipa Directors** | Defendants Jos Opdeweegh, Derex Walker, Jeff Pelletier, and Ira Tochner |
| **Yucaipa-ComVest Transaction** | Yucaipa's August 21, 2009 purchase of ComVest's $145.1 million (principal face amount) of Allied First Lien Debt for approximately $43 million pursuant to the LPA |