**REDACTED**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ASHINC Corporation, *et al.*, | Case No. 12-11564 (CSS) (Jointly Administered) |
| Debtors. | |
| CATHERINE E. YOUNGMAN, LITIGATION TRUSTEE FOR ASHINC CORPORATION, ET. AL., AS SUCCESSOR TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ASHINC CORPORATION, AND ITS AFFILIATED DEBTORS | Adv. Proc. No. 13-50530 |
| Plaintiff, | |
| BLACK DIAMOND OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., and SPECTRUM INVESTMENT PARTNERS, L.P., | |
| Intervenors, | |
| v. | |
| YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P., MARK GENDREGSKE, JOS OPDEWEEGH, JAMES FRANK, DEREX WALKER, JEFF PELLETIER, IRA TOCHNER, and JOSEPH TOMCZAK, | |
| Defendants. | |
| CATHERINE E. YOUNGMAN, LITIGATION TRUSTEE FOR ASHINC CORPORATION, ET AL., AS SUCCESSOR TO BLACK DIAMOND OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., SPECTRUM INVESTMENT PARTNERS, L.P., BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., as co- | Adv. Pro. No. 14-50971 (CSS) |

administrative agent, and SPECTRUM
COMMERCIAL FINANCE LLC, as co-
administrative agent,

Plaintiff,

v.

YUCAIPA AMERICAN ALLIANCE FUND I, L.P.,
YUCAIPA AMERICAN ALLIANCE (PARALLEL)
FUND I, L.P., YUCAIPA AMERICAN ALLIANCE
FUND II, L.P., YUCAIPA AMERICAN ALLIANCE
(PARALLEL) FUND II, L.P., RONALD BURKLE,
JOS OPDEWEEGH, DEREX WALKER, JEFF
PELLETIER, IRA TOCHNER, and JOSEPH
TOMCZAK,

Defendants.

## OPPOSITION TO THE LITIGATION TRUSTEE'S MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., RONALD BURKLE, IRA TOCHNER, DEREX WALKER, JOS OPDEWEEGH, AND JEFF PELLETIER

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................ 1

II.   THE TRUSTEE IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE CAPITAL CONTRIBUTION CLAIMS ............................................................ 3

    A.   The Capital Contribution Provision Did Not Require Yucaipa to Contribute Cash to Allied .......................................................................... 3

    B.   The Lenders Suffered No Damages, or at the Very Least, Genuine Disputes of Fact Preclude Summary Judgment .............................................................. 5

    C.   The Estate Suffered No Damages, or at the Very Least, Genuine Disputes of Fact Preclude Summary Judgment .............................................................. 9

    D.   Genuine Factual Disputes Also Exist Regarding the Amount of Any Damages ................................................................................................... 10

III.  THE TRUSTEE IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE EQUITABLE SUBORDINATION CLAIMS ................................................. 11

    A.   Equitable Subordination Claims Are Inherently Fact-Driven ............................... 11

    B.   Yucaipa Did Not Engage in "Inequitable" Conduct ................................................ 13

        1.   Before 2009, Yucaipa consistently took actions to position Allied for success. ................................................................................................. 14

        2.   February–August 2009:  After ComVest acquired Allied's first lien debt, Yucaipa continues its attempt to save Allied from a second bankruptcy ............................................................................................... 17

        3.   August 2009:  Yucaipa did not act inequitably after acquiring Allied's first lien debt ..................................................................................... 19

        4.   Yucaipa did not act inequitably with respect to the JCT Negotiations. ........ 22

        5.   Yucaipa did not act inequitably post-petition with respect to JCT ............... 25

        6.   Yucaipa did not act inequitably by protecting its rights in court ................... 26

        7.   Any payment of fees by Allied was not inequitable. ..................................... 28

    C.   Yucaipa Did Not Injure Allied's Creditors or Receive an "Unfair Advantage" ................................................................................................ 28

    D.   Equitable Subordination Is Unavailable as a Matter of Law as to Debt That BD/S Purchased for a Substantial Discount After Yucaipa's Purported Misconduct ................................................................................ 31

IV.  THE COURT SHOULD DENY THE TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ON ESTATE COMPLAINT'S FRAUDULENT TRANSFER CLAIMS ................................................................................... 32

**TABLE OF CONTENTS** *(cont'd)*

Page

    A.   **Disputed Issues of Material Fact Preclude Summary Judgment for the Trustee**.................................................................................................. 32

        1.   **Allied received a "reasonably equivalent value" in exchange for the challenged payment of fees.**.............................................. 32

            a.   **Payments to Latham and Kasowitz**............................................ 34

            b.   **Payments for the ComVest Transaction** .................................. 35

            c.   **Allied was contractually obligated to make the contested payments**.......................................................................... 36

        2.   **The Trustee has not put forth undisputed evidence that each challenged transfer was made "for the benefit" of Yucaipa.** .......... 36

    B.   **Summary Judgment Is Improper on the Disallowance Claim and the Trustee's Request for Prejudgment Interest** ............................................ 37

V.    **THE TRUSTEE IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE TORTIOUS INTERFERENCE CLAIM** .......................................................... 37

    A.   **The Individual Defendants are Entitled to Summary Judgment on the Tortious Interference Claim Under Both New York and Delaware Law** ............. 37

    B.   **At a Minimum, Triable Factual Issues Exist Regarding the Trustee's Tortious Interference Claim** ..................................................................... 39

VI.  **CONCLUSION** ............................................................................................. 40

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re 848 Brickell Ltd.*,
   243 B.R. 142 (S.D. Fla. 1998) ............................................................................27

*In re ADI Liquidation, Inc.*,
   555 B.R. 423 (D. Del. Bankr. 2016) .....................................................................6

*Aircraft Guar. Corp. v. Strato-Lift, Inc.*,
   991 F. Supp. 735 (E.D. Pa. 1998) .......................................................................10

*In re Am. Bus. Fin. Servs., Inc.*,
   362 B.R. 149 (Bankr. D. Del. 2007) ...................................................................13

*Andrew Greenberg, Inc. v. Svane, Inc.*,
   36 A.D.3d 1094 (2007) .......................................................................................38

*In re Autobacs Strauss, Inc.*,
   473 B.R. 525 (Bankr. D. Del. 2012) ...................................................................12

*BE & K Constr. Co. v. N.L.R.B.*,
   536 U.S. 516 (2002) ............................................................................................28

*Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*,
   886 N.E.2d 127 (N.Y. 2008) .................................................................................6

*In re Big Wheel Holding Co.*,
   214 B.R. 945 (D. Del. 1997) ...............................................................................22

*Biotronik, AG v. Conor Mediasystems Ireland, Ltd.*,
   11 N.E.3d 676 (N.Y. 2014) ...................................................................................6

*In re BMT-NW Acquisition, LLC*,
   582 B.R. 846 (Bankr. D. Del. 2018) ...................................................................33

*Boyce v. Soundview Tech. Grp., Inc.*,
   464 F.3d 376 (2d Cir. 2006) ..................................................................................6

*Braintree Labs., Inc. v. Schwarz Pharma, Inc.*,
   568 F. Supp. 2d 487 (D. Del. 2008) ....................................................................28

*In re Burbank Generators, Inc.*,
   48 B.R. 204 (Bankr. C.D. Cal. 1985) ..................................................................33

## TABLE OF AUTHORITIES *(cont'd)*

Page(s)

*In re Charys Holding Co.*,
    443 B.R. 628 (Bankr. D. Del. 2010) .......................................................................32

*Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
    323 F.3d 228 (3d Cir. 2006).....................................................................................12

*Comm. Credit Corp. v. C.F. Schwartz Motor Co.*,
    251 A.2d 353 (Del. 1969) ..........................................................................................6

*In re Computer Universe, Inc.*,
    58 B.R. 28 (Bankr. M.D. Fla. 1986) .......................................................................33

*Cruden v. Bank of New York*,
    957 F.2d 961 (2d Cir. 1992).......................................................................................4

*In re CVR Refining LP Unitholder Litig.*,
    2020 WL 506680 (Del. Ch. Jan. 31, 2020).............................................................38

*In re Delta Petroleum Corp.*,
    2015 WL 1577990 (Bankr. D. Del. Apr. 2, 2015)..................................................34

*Dottore v. Nat'l Staffing Servs., LLC*,
    2010 WL 2106223 (N.D. Ohio May 25, 2010)................................................12, 14

*Drummond v. Morgan Stanley & Co.*,
    1996 WL 631723 (S.D.N.Y. Oct. 31, 1996) ...........................................................11

*In re F-Squared Inv. Mgmt., LLC*,
    600 B.R. 294 (Bankr. D. Del. 2019) .......................................................................33

*In re FBI Wind Down, Inc.*,
    581 B.R. 116 (Bankr. D. Del. 2018) ...............................................32, 33, 35, 36

*In re FBI Wind Down, Inc.*,
    581 B.R. 387 (Bankr. D. Del. 2018) .................................................................33, 37

*FCI Grp., Inc. v. County of New York*,
    54 A.D.3d 171 (2008) .................................................................................................4

*First Am. Commercial Bancorp, Inc. v Saatchi & Saatchi Rowland, Inc.*,
    55 A.D.3d 1264 (2008) ............................................................................................38

*In re Fortune Sys. Sec. Litig.*,
    680 F. Supp. 1360 (N.D. Cal. 1987) .......................................................................10

## TABLE OF AUTHORITIES *(cont'd)*

Page(s)

*In re French Quarter Grp., LLC,*
489 B.R. 400 (Bankr. D.S.C. 2013) ................................................................. 12, 14

*In re Green Field Energy Servs., Inc.,*
2018 WL 1116374 (Bankr. D. Del. Feb. 27, 2018) ............................................. 37

*Greenwich Cap. Fin. Prods., Inc. v. Negrin,*
903 N.Y.S.2d 346 (App. Div. 2010) ...................................................................... 5

*In re HH Liquidation, LLC,*
590 B.R. 211 (Bankr. D. Del. 2018) ..................................................................... 12

*Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.,*
2019 WL 1649983 (S.D.N.Y. Mar. 28, 2019) ...................................................... 38

*Int'l Minerals & Res., S.A. v. Pappas,*
96 F.3d 586 (2d Cir. 1996) .................................................................................... 38

*In re J. Silver Clothing, Inc.,*
453 B.R. 518 (Bankr. D. Del. 2011) ......................................................... 12, 19, 26

*Klein v. Tabatchnick,*
610 F.2d 1043 (2d Cir. 1979) .................................................................................. 9

*Lama Holding Co. v. Smith Barney Inc.,*
646 N.Y.S.2d 76 (App. Div. 1996) ................................................................. 38, 39

*In re LandAm. Fin. Grp., Inc.,*
2014 WL 2069651 (Bankr. E.D. Va. May 19, 2014), *aff'd* 525 B.R. 308 (E.D.
Va. 2015) ............................................................................................................... 36

*In re LightSquared Inc.,*
511 B.R. 253 (Bankr. S.D.N.Y. 2014) .................................................................. 13

*In re LTC Holdings, Inc.,*
597 B.R. 554 (Bankr. D. Del. 2019) ..................................................................... 33

*McMahon v. Salmond,*
573 F. App'x 128 (3d Cir. 2014) .......................................................................... 25

*Mellon Bank N.A. v. Metro Commc'ns, Inc.,*
945 F.2d 635 (3d Cir. 1991) .................................................................................. 34

*In re Mid-Am. Waste Sys., Inc.,*
284 B.R. 53 (Bankr. D. Del. 2002) .................................................................. 12, 14

# TABLE OF AUTHORITIES *(cont'd)*

Page(s)

*In re Mobile Steel,*
    563 F.2d 692 (5th Cir. 1977) ................................................................................12

*In re Mushroom Transp. Co.,*
    382 F.3d 325 (3d Cir. 2004)................................................................................14

*In re Opus E., LLC,*
    528 B.R. 30 (Bankr. D. Del. 2015) ...........................................................33, 38, 39

*Prod. Res. Grp., LLC v. Martin Prof'ls, A/S,*
    907 F. Supp. 2d 401 (S.D.N.Y. 2012).....................................................................4

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,*
    508 U.S. 49 (1993)................................................................................................27

*In re QuVis, Inc.,*
    446 B.R. 490 (Bankr. D. Kan. 2011) ....................................................................20

*In re R.M.L., Inc.,*
    92 F.3d 139 (3d Cir. 1996)............................................................................33, 35

*In re Radnor Holdings, Corp.,*
    353 B.R. 820 (Bankr. D. Del. 2006) .....................................................................12

*Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers,*
    894 F. Supp. 2d 288 (S.D.N.Y. 2012)...................................................................38

*In re S&D Foods, Inc.,*
    110 B.R. 34 (Bankr. D. Colo. 1990) .....................................................................31

*Seabury Constr. Corp. v. Jeffrey Chain Corp.,*
    289 F.3d 63 (2d Cir. 2002)......................................................................................4

*SmithKline Beecham Pharm. Co. v. Merck & Co.,*
    766 A.2d 442 (Del. 2000) .....................................................................................38

*In re Steel Wheels Transport, LLC,*
    2011 WL 5900958 (Bankr. D.N.J. Oct. 28, 2011)..........................................12, 13

*Stratton v. Equitable Bank, N.A.,*
    104 B.R. 713 (D. Md. 1989) .................................................................................36

*In re SubMicron Sys. Corp.,*
    432 F.3d 448 (3d Cir. 2006)..............................................................11, 12, 19, 28

## TABLE OF AUTHORITIES *(cont'd)*

Page(s)

*In re Think Retail Sols., LLC*,
 2019 WL 2912717 (Bankr. N.D. Ga. July 5, 2019)..................................................20

*UGI Sunberry LLC v. A Permanent Easement for 1.7575 Acres*,
 949 F.3d 825 (3d Cir. 2020)...........................................................................8

*Van Syckle v. C.L. King & Assocs., Inc.*,
 822 F. Supp. 98 (N.D.N.Y. 1993) ...................................................................10

*VFB LLC v. Campbell Soup Co.*,
 482 F.3d 624 (3d Cir. 2007)..........................................................................32

*In re Vietri Homes, Inc.*,
 58 B.R. 663 (Bankr. D. Del. 1986) ..................................................................12

*In re W.T. Grant Co.*,
 4 B.R. 53 (Bankr. S.D.N.Y. 1980) ...................................................................31

*WaveDivision Holdings, LLC v. Highland Cap. Mgmt., L.P.*,
 49 A.3d 1168 (Del. 2012) .............................................................................38

*Wilson v. City of Wilmington*,
 2015 WL 4571554 (D. Del. July 29, 2015) ......................................................25

### Statutes

11 U.S.C. § 502(d) .......................................................................................37

11 U.S.C. § 510(c) .......................................................................................11

11 U.S.C. § 550(a) ..................................................................................36, 37

10 Del. Code § 8106 ....................................................................................38

N.Y. C.P.L.R. 214........................................................................................38

# I.    INTRODUCTION

The Trustee's motion confuses the standards applicable to summary judgment with those that apply at trial.  The Trustee has simply set forth a narrative of purported "facts"—many of which are flatly untrue—and invites the Court to resolve genuine factual disputes in her favor, as well as draw inferences *against* the non-moving parties.

The Trustee's false narrative asks this Court to find, as a matter of law, that the Individual Defendants and Yucaipa intentionally planned a multi-year scheme to breach contractual obligations, exercise improper control over Allied, and interfere in negotiations with other car haulers.  Not only does the Trustee fail to provide any actual *evidence* to support key elements of this false narrative, but the evidence in the record *contradicts* it.  In particular, the record reveals that Allied, upon emerging from its prior bankruptcy in 2007, was hit particularly hard by the Great Recession, which also crippled the rest of the automotive industry.  Throughout the entire period at issue, the evidence demonstrates that Yucaipa stepped up and continued to invest significant time and capital, with the goal of saving Allied and its stakeholders from being wiped out in a second bankruptcy and potential liquidation.

The Trustee seeks summary judgment on nine claims.  But as set forth in the Yucaipa Defendants' own affirmative motions (which are incorporated here by reference in their entirety), Yucaipa and the Individual Defendants are entitled to summary judgment on many of these claims on purely legal grounds.  And even where Yucaipa or the Individual Defendants are not entitled to judgment in *their* favor as a matter of law, the Trustee's motion still fails.

***First***, the Trustee seeks summary judgment on her claims for breach of the Third Amendment's Capital Contribution Provision (Lender Claim 2 and Estate Claim 5).  Yucaipa, not the Trustee, is entitled to summary judgment on these claims because (1) Lender Claim 2 is barred by Delaware's three-year statute of limitations, and (2) Estate Claim 5 is barred by the Third Amendment's covenant not to sue.  (*See* Entities' Mot. at 19–26, 31–35.)  But even if the Court were to deny Yucaipa's Motion, the Trustee's Motion still fails absent undisputed evidence of damages resulting from the alleged breach, which is a necessary element of any

breach of contract claim.  Here, the Trustee only offers speculation, and no evidence of damages.

*Second*, the Trustee's equitable subordination claims (Estate Claims 1 and 2 and Lender Claim 1) also are not amenable to summary judgment.  Claims for equitable subordination are inherently fact-driven, making them particularly inappropriate for resolution at the summary judgment stage—which explains why it is exceedingly rare for courts to grant summary judgment *to a plaintiff* on these claims.  And here, the Trustee's claims are based entirely on her false narrative.  To prevail on summary judgment, the Trustee would need to demonstrate, among other things, that Yucaipa's conduct was both undisputed and "inequitable" as a matter of law.  The Trustee would also need to show undisputed evidence of injury to other creditors or an unfair advantage to Yucaipa.  But the Trustee does not and cannot demonstrate any of these things.  To the contrary, the evidence shows that between 2008 and 2012, Yucaipa's actions were intended to—and did—stabilize Allied, help it avoid liquidation, and assuage customers' concerns, all to the good of Allied.  At the very least, there are a multitude of facts demonstrating that Yucaipa's actions were not "inequitable" and did not have a negative effect on creditors, both of which preclude summary judgment.

*Third*, the Trustee seeks summary judgment on the Estate Complaint's claims for fraudulent transfer premised on various legal fees and costs paid by Allied (Estate Claims 10, 11, and 13, collectively "Fraudulent Transfer Claims").  Here, too, *Yucaipa* is entitled to partial summary judgment on these claims because several of the challenged transfers—those before May 17, 2008—are indisputably time-barred.

In any event, the Trustee is not entitled to summary judgment on the Fraudulent Transfer Claims because no evidence supports the assertion that Allied failed to receive "reasonably equivalent value" in exchange for the transfers at issue.  The Trustee contends—without evidence—that Allied did not benefit *at all* from the ComVest transaction or from the work of certain law firms.  But the evidence—including much of the evidence cited by the Trustee— shows that Allied did, in fact, benefit materially from the ComVest transaction and other legal work that it paid for.  The Trustee made no attempt to compare the value given to the value

2

received or to show that the two are not "reasonably equivalent." This alone is fatal to her motion. Further, the Trustee has presented no evidence to support other elements of these claims—including whether each of the challenged transfers were made for Yucaipa's benefit.

*Fourth*, the Trustee seeks summary judgment on her tortious interference claim against the Individual Defendants (Lender Claim 4). But as the Individual Defendants explained in their own motion, summary judgment should be granted in their *favor* because: (1) the claim is time-barred; (2) there is no evidence that the Individual Defendants acted beyond the scope of their agency or without justification; (3) the Trustee has failed to present evidence of resulting damages; (4) the Trustee has failed to establish that the JCT Negotiations constituted a breach of the Third Amendment, or that the Individual Defendants purportedly induced that breach; and (5) the Trustee has failed to establish that Messrs. Opdeweegh and Pelletier intentionally interfered with the FLCA when it is undisputed they had zero involvement with Allied at certain times of the alleged interference. Further, triable issues of fact exist as to whether the Individual Defendants *intentionally* interfered with the FLCA and Third Amendment, making summary judgment unavailable to the Trustee for that additional reason.

The Trustee's motion is nothing more than a false narrative unsupported by evidence—let alone undisputed evidence—and ignores the evidence contradicting it. The Court should deny the Trustee's motion in its entirety.

## II.    THE TRUSTEE IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE CAPITAL CONTRIBUTION CLAIMS

### A.    The Capital Contribution Provision Did Not Require Yucaipa to Contribute Cash to Allied

The Trustee asserts that Yucaipa breached the Third Amendment's Capital Contribution Provision. This implicates the threshold legal question of whether the Capital Contribution Provision required Yucaipa to contribute *cash* to Allied in August 2009, as the Trustee contends. (*See* Mot. at 22.) The plain language of the Third Amendment confirms that she is wrong. *See*

*Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 68 (2d Cir. 2002) (where "the contract is unambiguous, courts must effectuate its plain language").

The Capital Contribution Provision explicitly states that within 10 days after acquiring Term Loans, Yucaipa ███████████████████████████████████████████████

████████████████████████████████████████████████ (Scolnick Decl., Ex. 41 at 7 (§ 2.7(e) of the Third Amendment, adding § 10.6(j)(iii)) (emphasis added).) Section 10.6(k), in turn, is titled, "Contribution of Term Loans to Borrowers; Cancellation of Debt."  It states that Yucaipa "█████████████████████████████████████████

████████████████████████████████████ (*Id*. at 8 (§ 2.7(f) adding § 10.6(k)(ii)) (emphasis added).)  Thus, the plain language of the Third Amendment makes clear that a "capital contribution" to Allied would not be made in the form of cash, but rather that Yucaipa would make "a capital contribution of its *Term Loans*" in exchange for equity in Allied.  The Trustee's interpretation of section 2.7(e) would render the words "in accordance with Section 10.6(k)" "mere surplusage, in contravention of the settled rule that a contract is to be construed so as to give effect to each and every part."  *FCI Grp., Inc. v. County of New York*, 54 A.D.3d 171, 176 (2008).

The preamble to the Third Amendment confirms that the parties did not contemplate a *cash* capital contribution.  It states, ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████ (Scolnick Decl., Ex. 41 at 1 (emphasis added).)  So for any "capital contributions" that may become due, Yucaipa would contribute the "rights and obligations" of its newly acquired debt—not cash—to Allied.  *See Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992) ("the entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency").

Further, "[w]hen interpreting contracts, it is accepted that separate agreements executed contemporaneously and that are part of a single transaction are to be read together."  *Prod. Res.*

*Grp., LLC v. Martin Prof'ls, A/S*, 907 F. Supp. 2d 401, 413 (S.D.N.Y. 2012). Here, the Third

Amendment to the *SLCA*—executed contemporaneously with the Third Amendment to the

FLCA—contains an identical clause to Section 10.6(k), which also contemplated a "capital

contribution" to take the form of "Term Loans," not cash. (*See* Scolnick Decl., Ex. 42 at 4

(§ 2.4(c), adding § 10.6(j)(ii)).) It is undisputed that Yucaipa, after acquiring second lien debt in

2008 pursuant to the Third Amendment to the SLCA, contributed ███████ of that debt in

exchange for Allied equity; it did not contribute cash. (*Id.* Ex. 6 at 159–60.) No one at the

time—including BD/S and other Lenders—asserted that any capital contribution was supposed

to be *cash*. (*See* Declaration of Kahn A. Scolnick In Support of Opposition ("Scolnick Supp.

Decl."), Ex. 10 at 3 ████████████████████████████████████

████████████████████████████ Ex. 11 ███████████████████████

██████████████████████████████████████████

Lastly, "a contract should not be interpreted to produce a result that is absurd,

commercially unreasonable or contrary to the reasonable expectations of the parties."

*Greenwich Cap. Fin. Prods., Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (App. Div. 2010). Here, the

Trustee's position is that ten days after Yucaipa paid ComVest over ███████ to acquire its

first lien debt, Yucaipa then would have had to pay another $57 million in cash to Allied. That

would be an absurd and commercially unreasonable result: Yucaipa never would have paid

nearly ████████ for ComVest's position—███████████████████████████

██████████████████████ (*See* Scolnick Decl., Ex. 17 at 45–46; Ex. 58; Ex. 81 at 2.)

**B.     The Lenders Suffered No Damages, or at the Very Least, Genuine Disputes of Fact
        Preclude Summary Judgment**

The Trustee's theory is that if a capital contribution had been due in August 2009,

Yucaipa would have made that contribution directly and entirely to *Allied*, not any of the

Lenders. (*See* Mot. at 22.) But the Trustee also claims that if Yucaipa had made the requisite

capital contribution to Allied in August 2009, the *Lenders* would have enjoyed a greater recovery

from Allied's bankruptcy in 2013, regardless of the form of Yucaipa's contribution (debt or

cash).  (*Id.*)  Any damages that the Lenders may have suffered from events that occurred four years after Yucaipa supposedly breached the Capital Contribution Provision are *not* "direct" or "general" damages, i.e., "the natural and probable consequence of the breach."  *Biotronik, AG v. Conor Mediasystems Ireland, Ltd.*, 11 N.E.3d 676, 680 (N.Y. 2014).  To the contrary, any such damages to the Lenders would be a textbook example of "consequential" damages that "do not 'directly flow from the breach.'"  *Id.*; *see also In re ADI Liquidation, Inc.*, 555 B.R. 423, 432 (D. Del. Bankr. 2016) ("[C]onsequential damages are 'one step removed from the naked performance of the contract by the defendant.'").[1]

It is also well-settled that consequential damages are recoverable only "in limited circumstances," and "proof of consequential damages cannot be speculative or conjectural."  *Bi-Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 130 (N.Y. 2008); *accord Comm. Credit Corp. v. C.F. Schwartz Motor Co.*, 251 A.2d 353, 355 (Del. 1969).  Here, regardless of whether a capital contribution took the form of debt or cash, the Trustee's damages theories as to the *Lenders* are far too speculative to allow for recovery (particularly on summary judgment).

  *i.*    **If the Capital Contribution Provision required Yucaipa to contribute debt**:  "In a breach of contract case, damages are calculated at the time of the breach."  *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 384 (2d Cir. 2006).  Relatedly, "damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract."  *Id.*  Here, if Yucaipa had made the capital contribution to Allied in August 2009 by forgiving $57.4 million in Allied debt, the Lenders indisputably would not

---

[1]  For instance, assume hypothetically that Yucaipa had not made the capital contribution in August 2009, but also that Allied had eventually recovered and was able to repay its outstanding debt without going into bankruptcy.  Had that happened, no Lender would have been able to claim that it suffered damages from Yucaipa's alleged breach in August 2009. This confirms that damage to Lenders was not the "natural and probable consequence" of Yucaipa's purported breach of the Capital Contribution Provision.

have received *anything* at that time—they would have been in precisely the same position in August 2009, regardless of the alleged breach.

Instead, the Trustee's theory is more than four years removed from the alleged breach: She claims that the Lenders would have recovered more following the JCT 363 sale in December 2013 if Yucaipa had made the capital contribution to Allied four years earlier.  (Mot. at 22.)  But this theory—and the expert damages opinion on which it relies—improperly assumes that if Yucaipa had forgiven $57.4 million of debt in August 2009, everything else would have played out in exactly the same way over the next four years.  In particular, Mr. Risius, the Trustee's damages expert, assumed that Allied still would have gone into bankruptcy in 2012, and that the same JCT 363 sale, on the same terms, would have happened in December 2013.  (*Id*.)  These assumptions are unsupported by any evidence.

To take one significant example, BD/S contend that Yucaipa used its Requisite Lender position between 2009 and 2012 to "prevent[] the First Lien Lenders from exercising any of their rights or remedies," and to "usurp[] the negotiations with JCT" in 2011 and 2012.  (Lender Compl., ¶¶ 78, 94.)  Yet if Yucaipa had forgiven $57.4 million of debt in August 2009, Yucaipa would not have been the majority debt holder and as a result would not have been the Requisite Lender.  Thus, accepting BD/S's theories at face value, there is no way to know what would have happened if Yucaipa had *not* been the Requisite Lender starting in August 2009—Allied may have liquidated earlier, later, or not at all; there also may have been a worse (or better) deal with JCT, or no deal at all.  ███████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████. (Mot. at 22.)

   **ii.**  *If the Capital Contribution Provision required a cash infusion*: █████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

(Mot. at 22 & n.48.)  Yucaipa's damages expert, Daniel Fischel, explained that ████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ (Declaration of Gila S. Singer ("Singer Decl."),

Ex. 105 at 3–5 (¶¶ 9, 13).)

████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████ (*Id*. at 239.)

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ (*Id*. at 100–01.)  This is rank speculation and

insufficient for purposes of summary judgment (or trial).  *See UGI Sunberry LLC v. A*

*Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 833–34 (3d Cir. 2020) (expert opinion

may not be based on "subjective belief and unsupported speculation").

**C.      The Estate Suffered No Damages, or at the Very Least, Genuine Disputes of Fact Preclude Summary Judgment**

The Trustee argues that if Yucaipa had made the capital contribution, Allied ████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████ (Scolnick Decl., Ex. 107 at 29 (¶ 88); Mot. at 22, n. 47.)  Yet in either scenario, summary judgment is unavailable because the Estate suffered no damages—an essential element of the claim.

The Trustee's only "evidence" of resulting damages is the opinion of her expert, Mr. Risius, which is in direct contradiction to that of Yucaipa's expert, Mr. Fischel.  This alone prohibits the grant of summary judgment.  "Where, as here, intelligent adjudication requires more than the use of lay knowledge and the resolution of a disputed issue hinges in large measure upon conflicting opinions and judgments of expert witnesses, summary judgment is not appropriate."  *Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979) (citation omitted).

*i.       If the Capital Contribution Provision required Yucaipa to contribute debt*:  Mr. Fischel explained what would have happened if Yucaipa had exchanged half of its newly acquired debt for Allied equity in August 2009: █████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ ███████████████████████████████████████████ (Singer Decl., Ex. 105 at 5 (¶ 14); *see also* Scolnick Supp. Decl., Ex. 12 at 15 (¶¶ 39–40)) ██████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████

*ii.      If the Capital Contribution Provision required a cash infusion*:  Even if Yucaipa had been required to contribute cash in August 2009, Mr. Fischel explained that ████████████ ███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ (Singer Decl., Ex. 105 at 4 (¶¶ 12–13).) ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ (Scolnick Supp. Decl., Ex. 12 at 14–15

(¶ 36) (italics omitted).) ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ (*Id.*)

**D.      Genuine Factual Disputes Also Exist Regarding the Amount of Any Damages**

As an initial matter, the Trustee improperly double-counts by asserting that ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ (Mot. at 22.)  But both cannot simultaneously

be true.  Rather, the total amount available to the Estate and Lenders *in the aggregate* would at

most have been ████████████, or half of the face amount of the newly acquired Term Loans.

In any event, even if there were a definite amount of damages that the Court could find as

a matter of law here, summary judgment would still be unavailable because there is a genuine

dispute as to BD/S's failure to mitigate.  *See Aircraft Guar. Corp. v. Strato-Lift, Inc.*, 991 F.

Supp. 735, 739 (E.D. Pa. 1998) (denying summary judgment:  "The question of how much, if

any, a plaintiff's recovery should be reduced due to a failure to mitigate, like the question of the

reasonableness of a plaintiff's behavior in the face of the breach, is one of fact.").  Plaintiffs are

under an obligation to mitigate and "cannot recover the part of their loss caused by their own

failure to take reasonable steps to avoid further harm once they had reason to know of the

wrongdoing."  *Van Syckle v. C.L. King & Assocs., Inc.*, 822 F. Supp. 98, 102 (N.D.N.Y. 1993);

*see also In re Fortune Sys. Sec. Litig.*, 680 F. Supp. 1360, 1370–71 (N.D. Cal. 1987) (granting

partial summary judgment based on plaintiffs' failure to mitigate).

Here, BD/S did the opposite of mitigating damages— 

███████ (Scolnick Decl., Exs. 26, 27) with full knowledge of Yucaipa's acquisition of

ComVest's loans (Scolnick Supp. Decl., Ex. 13), and with the stated belief that Yucaipa had

failed to make a contractually required capital contribution.  (Scolnick Decl., Ex. 83 at 1; Ex. 85

at 2; Ex. 88.)[2] ████████████████████████████████

████████████.  (*Id.* Exs. 102–103.)  BD/S's failure will be subject to

substantial factual debate at trial.  "A plaintiff who chooses not to mitigate damages but who

instead declines other offers to purchase the securities in effect makes a new investment decision

as to which he or she must suffer the consequences."  *Drummond v. Morgan Stanley & Co.*, 1996

WL 631723, at *2 (S.D.N.Y. Oct. 31, 1996).[3]

### III.    THE TRUSTEE IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE EQUITABLE SUBORDINATION CLAIMS

**A.    Equitable Subordination Claims Are Inherently Fact-Driven**

The Trustee also seeks summary judgment on her equitable subordination claims—Estate

Claims 1 and 2 and Lender Claim 1.  Yucaipa's claim in Allied's bankruptcy may be equitably

subordinated only upon a showing that (1) Yucaipa engaged in inequitable conduct, (2) resulting

in injury to the other creditors or conferring an unfair advantage on Yucaipa, and

(3) subordination is not inconsistent with the Bankruptcy Code.  *In re SubMicron Sys. Corp.*, 432

F.3d 448, 461–62 (3d Cir. 2006); 11 U.S.C. § 510(c).  Even where a claimant is a fiduciary or

insider, "courts generally require a showing of fraud, overreaching, inequitable conduct or the

---

[2]  Ample evidence in the record (including some of the evidence cited here) also supports the
affirmative defenses of waiver, estoppel, consent, laches, unclean hands, and ratification.
Although the Court has stricken those defenses (Scolnick Decl., Ex. 135), Yucaipa maintains
that this was prejudicial error:  Yucaipa could have relied on those defenses now as
additional grounds to defeat the Trustee's motion, and it could have relied on those defenses
at trial as additional grounds to defeat the Trustee's claims.

[3]  The Trustee also claims she is entitled to prejudgment interest accruing as of the date of
alleged breach.  (Mot. at 22–23.)  Because triable issues exist as to whether the Estate or
Lenders suffered damages at all, and if so, how much, summary judgment is not appropriate
on the Trustee's request for prejudgment interest.

violation of the rules of fair play and good conscience." *In re Vietri Homes, Inc.*, 58 B.R. 663, 665 (Bankr. D. Del. 1986).[4]  That is because "equitable subordination is remedial, not penal, and should be applied only to the extent necessary to offset specific harm that creditors have suffered on account of the inequitable conduct." *In re SubMicron*, 432 F.3d at 462 (citation omitted).

"Equitable subordination is an extraordinary remedy which is applied sparingly." *In re HH Liquidation, LLC*, 590 B.R. 211, 298 (Bankr. D. Del. 2018); *see In re Radnor Holdings, Corp.*, 353 B.R. 820, 840 (Bankr. D. Del. 2006) (a "drastic" and "unusual" remedy).  Because the claim requires "a fact-intensive inquiry" (*In re Autobacs Strauss, Inc.*, 473 B.R. 525, 583 (Bankr. D. Del. 2012)), it "is rarely amenable to resolution at summary judgment," particularly on behalf of a plaintiff.  *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. at 126; *In re J. Silver Clothing, Inc.*, 453 B.R. 518, 533 (Bankr. D. Del. 2011) (granting defendants' motion for summary judgment and denying plaintiff's motion); *see also In re French Quarter Grp., LLC*, 489 B.R. 400, 402–03 (Bankr. D.S.C. 2013) (denying cross-motions for summary judgment); *Dottore v. Nat'l Staffing Servs., LLC*, 2010 WL 2106223, at *9–10 (N.D. Ohio May 25, 2010) (same).

Tellingly, almost *none* of the Trustee's cited cases were decided on summary judgment. The Trustee has cited only one equitable subordination case in which a court granted summary judgment to a plaintiff—and the facts of that decision illustrate just how rare such cases should be.  In *In re Steel Wheels Transport, LLC*, the defendants "admit[ted]" to the wrongdoing, which not only lacked any "legal support," but consisted of "a persistent course of inequitable conduct

---

   [4]  The Trustee places substantial weight on the fact that Yucaipa was an insider, citing inapplicable case law addressing equitable subordination at trial.  (*See* Mot. at 23–24.)  But as even those cases explain, insider status "only goes to the standard of review." *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 70 (Bankr. D. Del. 2002).  In other words, "it is axiomatic that insider status alone . . . is insufficient to warrant subordination." *In re HH Liquidation, LLC*, 590 B.R. 211, 298 (Bankr. D. Del. 2018) (denying claim).  Were the rule otherwise, insiders would be subject to "unwarranted burden[s]" that would "requir[e] them to prove the good faith and fairness of *every one* of their actions with respect to their corporation." *In re Mobile Steel*, 563 F.2d 692, 701 (5th Cir. 1977) (emphasis added); *see also Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 234–35 (3d Cir. 2006) (adopting *In re Mobile Steel* analysis).  This would "discourage those most interested in a corporation from attempting to salvage it." *In re Mobile Steel*, 563 F.2d at 701.

[that] includ[ed] willfully breaching" a court's prior dismissal order and a separate settlement agreement. 2011 WL 5900958, at *7 (Bankr. D.N.J. Oct. 28, 2011). The defendants "ha[d] acknowledged all facts" that provided "ample grounds for equitable subordination"—thus, there was no factual dispute for trial. *Id.* at *7–8. That is simply not this case, where the Trustee's false narrative collides with evidence that (1) there was no inequitable conduct and (2) there was no resulting injury to others or unfair advantage to Yucaipa.

**B.      Yucaipa Did Not Engage in "Inequitable" Conduct**

The Trustee relies on the following assertions of "inequitable" conduct:  (1) Yucaipa's acquisition of First Lien Debt and Requisite Lender status; (2) breaches of the Capital Contribution Provision; (3) filing lawsuits; (4) seizing control over negotiations with ComVest and "push[ing] through the invalid Fourth Amendment"; (5) abusing control over Allied by allowing Allied to commit events of default under the FLCA; (6) "commandeer[ing]" the JCT Negotiations; and (7) causing Allied to "make numerous fraudulent transfers for Yucaipa's benefit." (Mot. at 24–27.)  These allegations rest on mischaracterizations of evidence and heavily disputed inferences about Yucaipa's intent.  And even if one were to accept the Trustee's version of the events (which would be error on summary judgment), her allegations do not constitute "inequitable" conduct as a matter of law.

To take just one example, the Trustee argues that Yucaipa's alleged breach of the Third Amendment, "*alone*, suffices to establish inequitable conduct for purposes of equitable subordination."  (*Id.* at 24 (emphasis added).)  But the Trustee's cited authority—*In re Am. Bus. Fin. Servs., Inc.*, 362 B.R. 149 (Bankr. D. Del. 2007)—says no such thing.  The court in *In re Am. Bus. Fin. Servs.* was ruling on a *motion to dismiss*, determining the validity of the claim assuming the plaintiff's allegations were true.  The Trustee's misleading parenthetical of that decision quotes the court's characterization of the complaint's *allegations*, not its ruling.  Her other case, *In re LightSquared Inc.*, explained that equitable subordination may be warranted *post-trial* if the factfinder concludes that there has been "a *substantial* breach of contract *and* advantage-taking by the creditor." 511 B.R. 253, 348 (Bankr. S.D.N.Y. 2014) (emphasis added).

These cases arise in a markedly different context from summary judgment—they certainly do not hold that a breach of contract "alone" establishes inequitable conduct as a matter of law.[5]

The proper inquiry requires the Court to examine the "facts and circumstances of each case," which precludes summary judgment here given the many factual disputes about what Yucaipa supposedly did and whether it was inequitable. *In re Mid-Am.*, 284 B.R. at 126 (denying plaintiff's motion for summary judgment even where the defendant purportedly engaged in illegal conduct); *see also In re French Quarter*, 489 B.R. at 402 (denying cross-motions for summary judgment because neither party had shown there was no genuine dispute of material fact regarding inequitable conduct); *Dottore*, 2010 WL 2106223, at *9–10 (denying cross-motions for summary judgment because "genuine issues of material fact exist regarding" inequitable conduct). The Trustee has not presented undisputed evidence that Yucaipa acted inequitably at any period in time.

**1.    Before 2009, Yucaipa consistently took actions to position Allied for success.**

The Trustee does not—because she cannot—argue that Yucaipa engaged in inequitable conduct before February 2009. The evidence shows that starting in 2007, when Allied was preparing to exit its first bankruptcy, Yucaipa tried to position Allied for success. For example, as the Joint Plan noted, Yucaipa played a "key role in negotiating and drafting the terms of the Plan and a new labor deal with [the Teamsters]" (Scolnick Decl., Ex. 126 at 32 (§ 4.2(a)(iii)(5))), ███████████████████████████████████████████████████ (*Id.* Ex. 29 at 2–3.)

The Trustee concedes that Yucaipa's "control" of Allied's board was part of the court-approved Joint Plan. (*See* Mot. at 6.) Nonetheless, the Trustee mischaracterizes evidence to create the impression that Yucaipa was looking out only for itself, never Allied, when selecting Allied's executive team and board members. But the individuals placed on the board were chosen because of their relevant experience. Mr. Opdeweegh was *not* a Yucaipa employee when

---

[5]  If the Court agrees with Yucaipa that the Lenders' contract claim is time-barred, it would be inequitable for the Trustee to resurrect an untimely claim by making it a basis for equitable subordination. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 336–37 (3d Cir. 2004) (applying laches to equitable claim of turnover under Bankruptcy Code).

he joined the Allied board, and he has specialized experience in logistics, including 11 years in automotive logistics.  (Scolnick Decl., Ex. 3 at 25–26, 32, 41–42; Ex. 142 at 47.)  Mr. Walker's background is in reorganizations, restructurings, and companies "undergoing financial challenges."  (*Id.* Ex. 6 at 37–38, 43.)  Mr. Tochner had years of board experience for a wide range of companies.  (*Id.* Ex. 11 at 34–35.)  An executive search firm, engaged to help Yucaipa *and* "Allied Holdings, Inc. make the best possible recruiting decision" (Singer Decl., Ex. 15 at 2), identified Mr. Gendregske, who had spent the bulk of his career in the automotive logistics industry, as a CEO candidate.  (Gendregske SSUF ¶ 2.)  And Brian Cullen, the Creditor's Committee nominee, is the managing director of distressed M&A transactions at a multinational firm, with over 20 years of experience in distressed and restructuring transactions.  (Scolnick Decl., Ex. 10 at 26–30, 132–33.)  Neither Gendregske nor Cullen had a prior history with Yucaipa.[6]

　　Despite Yucaipa's efforts to secure a successful exit from the prior bankruptcy, Allied encountered massive difficulties due to the brewing Great Recession in early 2008.  ███████

████████████████████████████████████████████████████████████████████

███████████████████████████████.  (Scolnick Decl., Ex. 13 at 105.)

　　As a result of these economic conditions, █████████████████████████████

██████  (*Id.* Ex. 38 at 2.)  Yucaipa, seeking to stabilize Allied, began considering whether to acquire some of its undervalued debt and contribute a portion to equity—which would de-leverage Allied's balance sheet, positively affect its cash flow, and increase customer confidence at a time when companies across the automotive industry were facing an existential crisis.  (*Id.* Ex. 6 at 339; Ex. 38 at 3; Ex. 30 at 3 (¶ 7); Ex. 40.)  After Allied and the Requisite Lenders amended the FLCA to allow Yucaipa to acquire and convert second lien debt (*id.* Ex. 41 at 4

---

[6] ███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████

(§ 2.4(b))), Yucaipa purchased ██████████ in second lien debt and contributed ██████████ to Allied in exchange for equity.  (*Id.* Ex. 2 at 104–05; Ex. 30 at 5 (¶ 12); Ex. 46.)  It is undisputed that Allied benefitted from this transaction—it deleveraged Allied's balance sheet and allowed the company to avoid a covenant default and a going-concern opinion from its auditors.  (*Id.*)

Unfortunately, Yucaipa's ██████████ capital contribution did not save Allied from the most catastrophic financial crisis in generations.  A few months later, Allied was in default.  (Scolnick Decl., Ex. 47 at 3.)  By December 2008, after Yucaipa, Allied, and the first lien Lenders had engaged in various restructuring negotiations, Yucaipa and Lenders holding more than 50% of the first lien debt were negotiating a sale of that debt—and thus Requisite Lender status—to Yucaipa.  (*Id.* Ex. 51 at 2; Ex. 52 at 1–2.) ██████████████████

███████████████████████████████████

████████████████████████  (*Id.* Ex. 51 at 2.) ████████████

███████████████████████████████████

██████████████████████  (*Id.* Ex. 51 at 4; Ex. 54 at 2–3; Ex. 55 at 1–2.)

███████████████████████████████████

███████████████

███████████████████████████

███████████████████████████

██████████████████ ██████████████

███████████████████████████

███████████████████████████

███████████████████████████

██████████████

(Scolnick Supp. Decl., Ex. 14 at 1–2.) ██████████████████████

██████████  (*Id.* Ex. 15.)  The proposed Fourth Amendment that accompanied the December 2008 transaction and the Tender Offer contained the same material terms as the Fourth Amendment ultimately executed in August 2009—removing the Third Amendment's voting restriction and capital contribution requirements, and allowing Yucaipa to own enough debt to

become the Requisite Lender.  (*See* Scolnick Decl., Exs. 57, 79.)  However, unbeknownst to Yucaipa, the day before the Tender Offer launched, ComVest entered into an exclusivity agreement with a group of selling lenders and ultimately acquired the majority of the first lien debt on February 19, 2009.  (*Id.* Exs. 31, 58–61; Scolnick Supp. Decl., Ex. 9 at 105–06.)

In short, there was nothing "inequitable" about Yucaipa's conduct between Allied's exit from the first bankruptcy and February 2009.

### 2.    February–August 2009:  After ComVest acquired Allied's first lien debt, Yucaipa continues its attempt to save Allied from a second bankruptcy.

The Trustee asserts that once ComVest acquired the majority of Allied's first lien debt in February 2009, Yucaipa acted "inequitably" by "seiz[ing] control" of negotiations with ComVest, to the exclusion of the non-Yucaipa board members or Allied's management.  (Mot. at 24–25.)  This is simply untrue.

First, *ComVest* chose to negotiate with Yucaipa because, according to its 30(b)(6) witness, ComVest favored selling its debt to Yucaipa over taking ownership of Allied through a bankruptcy.  (Scolnick Decl., Ex. 17 at 99–100.)  Yucaipa negotiated with ComVest because it was looking to spend its *own* money to purchase ComVest's debt.  Allied had *never* been involved in the debt purchases with any other Lender.

Second, Allied's directors and management were *not* excluded from the negotiations—they were kept apprised throughout.  (Scolnick Supp. Decl., Ex. 16 

; Scolnick Decl., Ex. 63; Ex. 75 at 1.)  Allied's Special Committee met to discuss the proposed Fourth Amendment and related transactions at least five separate times.  (*See* Gendregske SSUF ¶ 19.)  Although the Trustee argues that Mr. Gendregske was excluded from the negotiations,

(Scolnick Decl., Ex. 15 at 275, 280–81.)  In fact, Mr. Gendregske *initiated* an in-person meeting between ComVest, Yucaipa, and ▉▉▉▉ regarding the potential debt purchase, so as to retain ▉▉▉▉ business.  (Scolnick Supp. Decl., Ex. 17; Ex.

17

18; Ex. 8 at 338.) ██████████████████████████████████████████

████████████████████████   (Scolnick Decl., Exs. 63, 75.)[7]

Contrary to the Trustee's false narrative, Allied's directors, management, customers, *and*

employees endorsed Yucaipa's purchase of first lien debt, viewing it as beneficial to Allied and

critical to its survival.  (*E.g.*, Scolnick Supp. Decl., Ex. 1 at 228–29 (███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████)[8]

Further, as established in Yucaipa's own motion for summary judgment:  (1) Yucaipa

believed that the Fourth Amendment and debt acquisition were necessary to prevent a second,

---

[7]  Yucaipa also communicated with Black Diamond about the potential Yucaipa-ComVest deal in the spring and summer of 2009.  (Scolnick Supp. Decl., Ex. 23 (████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████; Ex. 19 (████████████████████████████████████████ ████████████████████████████████████████████████████████████████ In fact, just before closing the deal, Yucaipa had an in-person meeting and follow-up call with Black Diamond.  (*Id.* Exs. 20, 36, 38.)  Black Diamond purported to be supportive. (Scolnick Decl., Ex. 12 at 145–52 (████████████████████████████████████████ ████████  Spectrum, too, was aware of the ComVest-Yucaipa negotiations.  (*Id.* Ex. 17 at 53.) BD/S even discussed selling *their* debt to ComVest or Yucaipa, or making a joint bid on Allied with Yucaipa.  (Scolnick Supp. Decl., Ex. 4 at 118; Ex. 20 at 2; Ex. 21 at 4; Ex. 22; Ex. 24; Ex. 46.)  Yucaipa was unaware that at the same time, BD/S were internally discussing how to prevent the Yucaipa-ComVest transaction from happening.  (*See* Scolnick Decl., Ex. 89 at 2.)

[8]  *See also* Scolnick Decl., Ex. 10 at 321 (████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████; Ex. 68 (████████████████████████████████ ████████████████████████████████████████████████████████████████ Scolnick Supp. Decl., Ex. 26 (████████████████████████████████████████ ████████████████████████████████████████████████████).

and potentially fatal, bankruptcy, and to assuage customer concerns; (2) Allied's board believed the transaction to be permissible and beneficial based in part on the advice of its outside counsel; and (3) Allied in fact *did* benefit from the Fourth Amendment and the ComVest transaction generally.  (*See* Entities' Mot. at 15–16; Individuals' Mot. at 14.)  ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████  (Scolnick Decl., Ex. 4 at 141–42.)  As one of Mr. Gendregske's experts put it, ████████████████████████████████████████ ████████████████████████  (Scolnick Supp. Decl., Ex. 25 at 26 (¶ 80).)  Allied directors and Yucaipa similarly believed that a second bankruptcy could lead to liquidation.  (Walker Decl., ¶ 5; Burkle Decl., ¶ 4; *see* Scolnick Decl., Ex. 51 at 3–4.)  Where, as here, a "company would have been forced to close down and liquidate" absent a defendant's purportedly wrongful conduct, equitable subordination would be improper.  *In re SubMicron*, 432 F.3d at 462–63.

All of this evidence exposes the falsity of the Trustee's contention that Yucaipa "pushed through the invalid Fourth Amendment" or acted inequitably by "purchas[ing] ComVest's debt." (Mot. at 25.)  The Trustee's only "evidence" on this score is to cite the board resolutions approving the Fourth Amendment.  (Singer Decl., Ex. 42.)  Yet those resolutions merely confirm that ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████  (*Id.* at 1–2 (emphasis added).)  Thus, even the Trustee's *own* evidence demonstrates that Yucaipa did not "push[] through" the Fourth Amendment.  Where, as here, the plaintiff fails to present "any facts that the transactions" at issue "were not in the Debtors' best interest," summary judgment in favor of a plaintiff is not warranted (even where the defendant is an insider).  *In re J. Silver Clothing*, 453 B.R. at 533.

**3.**    **August 2009:  Yucaipa did not act inequitably after acquiring Allied's first lien debt.**

Next, the Trustee argues that Yucaipa acted "inequitably" after acquiring ComVest's position by failing to make a capital contribution and by becoming Requisite Lender. (Mot. at 25–26.) Again, not true.

Most fundamentally, the Trustee ignores that Yucaipa acquired its debt only after Allied entered into the *Fourth Amendment* to the FLCA, which Yucaipa (and Allied) reasonably believed to be valid and appropriate from a business and legal perspective ███████████ ████████████ (*See* Walker Decl. ¶ 6; Tochner Decl. ¶ 5; Opdeweegh Decl. ¶ 5; Scolnick Decl., Ex. 10 at 268, 311, 340; Ex. 15 at 65; Ex. 51 at 3; Ex. 64 at 97–98; *see also* Scolnick Supp. Decl., Ex. 3 at 239–40.) The Fourth Amendment expressly removed the Third Amendment's Capital Contribution Provision, so Yucaipa and Allied reasonably believed that no capital contribution was due.

The evidence also demonstrates that Yucaipa did not intend to breach the FLCA when it acquired that debt; it was not until years later that a New York court deemed the Fourth Amendment invalid. Yucaipa's good faith belief *in August 2009* that it was acting in compliance with the FLCA, as amended, negates any remote inference that it was behaving inequitably. *See In re Think Retail Sols., LLC*, 2019 WL 2912717, at *16 (Bankr. N.D. Ga. July 5, 2019) ("Courts will not look with hindsight at a transaction because such an approach could transform fraudulent conveyance law into an insurance policy for creditors."). *Cf. In re QuVis, Inc.*, 446 B.R. 490, 505 (Bankr. D. Kan. 2011) (granting summary judgment in favor of defendant where the defendant "took actions it was entitled to take as a secured creditor").

Yucaipa's actions as Requisite Lender were also not *per se* inequitable. There is no support for the Trustee's suggestion that Yucaipa was required to cure *Allied's* defaults or reset *Allied's* financial covenants (Mot. at 25)—let alone that Yucaipa's failure to do so was inequitable as a matter of law. The evidence shows that Allied had been operating in default since August 2008, *a year before* Yucaipa became Requisite Lender. (*See* Scolnick Decl., Ex. 47 at 3.) During that entire period, the Lenders never exercised any remedies against Allied. To the contrary, a group of Lenders—including BD/S—required the agent (CIT) to *cease* exercising

20

remedies, demanding that it rescind a unilateral cash sweep initiated in December 2008.  (*Id.* Ex. 2 at 235–37; Ex. 4 at 179–80; Scolnick Supp. Decl., Ex. 27 at 1–2.)  Drawing all reasonable inferences in favor of Yucaipa, the Lenders were no worse off with Yucaipa as Requisite Lender than they were with prior Requisite Lenders.

Yucaipa also took other actions as Requisite Lender that were intended to, and did, benefit Allied and its stakeholders.  For instance, Yucaipa directed CIT to terminate certain LC Commitments, resulting in a ████████ release of capital, of which BD/S accepted their share. (Scolnick Decl., Ex. 30 at 16–17 (¶ 45).)  Yucaipa also caused CIT, the agent, to agree to release liens on certain rigs so that they could be transferred from the United States to Canada and scrapped for value (for Allied's benefit).  (*See id.* Ex. 18 at 605–06; Ex. 94 at 12–13 (§ 11(a)); Scolnick Supp. Decl., Ex. 2 at 253; Ex. 28.)  Notably, *after* Yucaipa became Requisite Lender,

████████████████████████████████████████

████████, and Black Diamond's principal told Mr. Burkle that he supported Yucaipa's decisions.  (Scolnick Decl., Ex. 2 at 359, 375–76; Scolnick Supp. Decl., Ex. 29 at 5; Ex. 47 at 1; Ex. 32.)

Similarly, the Trustee fails to point to any evidence that Yucaipa "abused [its] control" or "caus[ed] Allied to commit repeated Events of Default under the [FLCA]."  (Mot. at 25.)  She cites only two notices of default and reservation of rights letters from CIT's counsel (*see* Singer Decl., Exs. 41, 48)—which merely evidence Allied's defaults, but say nothing about who *caused* them—and one self-serving letter from BD/S's counsel.  (*Id.* Ex. 62.)  But Yucaipa, like all the Requisite Lenders before it, simply allowed Allied to continue to operate in default.  And while the Trustee asserts that the Allied board voted to default on an interest payment in August 2009 at Yucaipa's suggestion despite having sufficient funds to make the payment (Mot. at 14), she ignores that Allied's CFO—who was indisputably independent from Yucaipa—advised the board that if Allied made the payment, Allied would fall below ████████████████

████████ (Scolnick Decl., Ex. 75 at 1–2.)  Thus, Allied *did not* have sufficient funds to make payments and continue operating.

21

Lastly, the Trustee does not and cannot link any of Allied's financial troubles to Yucaipa's "control."  The evidence shows that the Great Recession hit the automotive industry—including Allied—particularly hard, with two of the "Big 3" auto manufacturers winding up in bankruptcy themselves.  (*See* Section III.B.1, *supra*; *see also* Scolnick Supp. Decl., Ex. 30 at 23–24 (¶¶ 67–69); Ex. 25 at 6 (¶ 21), 25 (¶ 76); Ex. 12 at 11 (¶ 26); Ex. 31 at 5 (¶¶ 12–14).)  Further, the three-year wage concession that Yucaipa was able to secure on Allied's behalf expired in 2010, causing wages to snap back to their pre-bankruptcy rates.  (Scolnick Supp. Decl., Ex. 31 at 7 (¶ 20).)  All these factors contributed to Allied's financial troubles; none were Yucaipa's fault.

### 4.    Yucaipa did not act inequitably with respect to the JCT Negotiations.

The Trustee's false narrative falls apart most spectacularly with respect to her assertions about the JCT Negotiations.  First, the Trustee asserts that Yucaipa "usurp[ed] [the JCT] opportunity for itself, seeking a premium for its debt and a subpar return for all other debtholders."  (Mot. at 26.)  The Trustee's position is contradicted not only by Yucaipa's witnesses, but by *her own* corporate governance expert, who concluded that the potential deal that Lenders were negotiating with JCT in 2011 and 2012 was ██████████████████████ ████████████████████████████████████████  (Singer Decl., Ex. 106 at 18 (¶ 50) (emphasis added).)  Thus, the Trustee's central premise—that Yucaipa took something that belonged to Allied—is contradicted by her own expert.

But even if the central premise *were* true—it is not—that is not inequitable conduct as a matter of law.  It is well-settled that "a remedy of equitable subordination" is not per se "warrant[ed]" solely because of a "usurpation of a corporate opportunity."  *In re Big Wheel Holding Co.*, 214 B.R. 945, 952 (D. Del. 1997) (granting summary judgment in favor of insider director defendants).  The Trustee points to no other facts to suggest that Yucaipa's supposed usurpation was inherently inequitable.  ██████████████████████████ ████████████████████████████████████████████████████ ████████████████████  (Scolnick Decl., Ex. 32 at 7–8 (§ 7(b)); *see* Entities' Mot. at 7, 44–45.)

Second, the Trustee argues that "[i]t would have been in the best interest of Allied and its stakeholders for the Company to negotiate directly a strategic combination with JCT." (Mot. at 26.) But the Trustee's only support for this assertion comes from her corporate governance expert, ██████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ (*See* Scolnick Decl., Ex. 122 at 40–41 (¶¶ 118–19); Singer Decl., Ex. 106 at 7 (¶ 24).)

By contrast, Yucaipa's expert, former Chancellor Chandler, ██████████████ ███████████████████████████████████████████████████ ████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████ (*Id.*; *see id.* Ex. 33 at 37 (¶ 74); Entities' Mot. at 44.)

According to the Trustee, JCT's CEO—Mike Riggs—testified that he pursued a debt-purchase route to acquire Allied only because "Yucaipa preferred a debt transaction to a typical M&A deal." (Mot. at 18.) But that is not accurate. In fact, Riggs testified that "█████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████ (Scolnick Decl., Ex. 19 at 83–84, 235.)

JCT's 30(b)(6) witness further explained that during this time period, JCT's goal was ██ ████████████████████████████████████████████████████████████ ██████████████████████████ (Scolnick Decl., Ex. 20 at 37–38; *see also* Scolnick Supp. Decl., Ex. 34 at 14 (¶ 27).) JCT ███████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████ (Scolnick Decl., Ex. 20 at 69–70; *see id.* at 112 (███████████

██████████████████████████████████████  Thus, the record demonstrates that

Yucaipa did *not* "commandeer[] the JCT Negotiations" (Mot. at 26); rather, in late 2011–2012,

Allied could not have pursued a deal *directly* with JCT that did not involve JCT's prior

acquisition of debt—at a minimum, this is a disputed fact that precludes summary judgment.[9]

Third, contrary to the Trustee's arguments, Yucaipa did not simply "ignore[]" BD/S's

request to be treated ratably during the JCT negotiations.  (Mot. at 26.)  Yucaipa *agreed* to

ratable treatment, but then BD/S walked away from the deal and filed the involuntary bankruptcy

instead.  On May 16, 2012—the day before BD/S filed the involuntary petition—counsel for

BD/S ██████████████████████████████████████████████████████

████████  (Singer Decl., Exs. 68, 70.)  ██████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████.  (*Id*. Ex. 70 at 3–4 (¶¶ 4,

6).)  ███████████████████████████████████████████  (Mot. at 19.)

BD/S's draft agreement also included other one-sided terms that Yucaipa had not agreed

to on the prior day's call.  (*See* Singer Decl., Ex. 70 at 2–3 (¶¶ 2(c), 3).)  BD/S's counsel

███████████████████████████████████████████████████

Yucaipa did "substantively respond" (Mot. at 19), ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████  (Singer Decl., Ex. 70; Scolnick

Supp. Decl., Ex. 37.)  ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

---

[9] ███████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████  (Scolnick Supp. Decl., Ex. 35.)  ██████████████

███████████████████████████████████████████████████

████████████████████████

████████████. (*Id.* at 1–2; Singer Decl., Ex. 71.) ████████████

████████████████████████████████ (Scolnick Decl., Ex. 124.) ████████████

████████████████████████████████████████████████████████

████████████████████████████████ (*Id.* Ex. 102 at 1.)  Thus, it was BD/S—

*not* Yucaipa—that caused the JCT Negotiations to "disintegrate" by hastily filing the involuntary

bankruptcy after the parties had agreed in principle to ratable treatment.

Mr. Burkle's excerpted testimony (Mot. at 19, 26) confirms that Yucaipa intended to and

*did* agree to ratable treatment, but BD/S jumped the gun by not waiting for the principals to

discuss other terms in the draft.  This was nothing more than a strategic move by BD/S.

### 5.    Yucaipa did not act inequitably post-petition with respect to JCT.

The Trustee also argues that Yucaipa's debt should be subordinated as a matter of law

because Yucaipa "acted inequitably in refusing to support post-petition proposals by JCT in 2012

to serve as a stalking horse bidder," citing Allied board minutes from August 28, 2012.  (Mot. at

28.)  This argument is meritless.

First, the Trustee never proffers any explanation or evidence regarding what Yucaipa

supposedly did (or did not do) to "refuse[] to support" the JCT proposals in 2012.  Perhaps this is

because August 2012 is beyond the scope of either adversary proceeding.  The Lender

Complaint—the only complaint that even references JCT or the JCT Negotiations—refers to

purported wrongdoing by Yucaipa with respect to JCT in "late 2011 or early 2012," before the

involuntary filing.  (Lender Compl. ¶¶ 106, 125, 135(b).)  The Trustee cannot use un-pleaded

facts, outside the time period alleged, to prevail on her equitable subordination claim—

particularly at the summary judgment stage.  *See McMahon v. Salmond*, 573 F. App'x 128, 135

(3d Cir. 2014) (declining to consider an argument or claim at summary judgment where there is

"no citation to his complaint or where this was alleged"); *Wilson v. City of Wilmington*, 2015 WL

4571554, at *8 (D. Del. July 29, 2015) (finding claims "not alleged in the complaint . . . cannot

be raised for the first time" at summary judgment).

Second, the Trustee asserts that JCT's 2012 stalking horse proposals had a face value of

████████, which is ████████ more than what JCT paid in the eventual 363 sale in late

2013.  (Mot. at 28.)  But JCT's 2012 proposal consisted of only ████████

███████████████████████████████████████████████

███████████████████ (Singer Decl., Ex. 72 at 3.) ████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████ (*Id.* at 2–3, Attachment at

11 (Conditions Precedent to Closing); *see also* Scolnick Supp. Decl., Ex. 40 at 1, 3–4.)  As a

result, there is no logical way to conclude as a matter of law that Yucaipa's refusal to "support"

JCT's 2012 stalking horse proposals was inherently inequitable.

Third, Allied and its financial advisor did not believe that what JCT was proposing would

be a viable option.  █████████████████████████████

████████████████████████████████ (Singer Decl.,

Ex. 72 at 3.) ████████████████████ (*Id.* Ex. 73 at 3.)

That Allied's independent directors and financial advisors did not support JCT's post-petition

proposal further illustrates why Yucaipa's position was not "inequitable" as a matter of law.

### 6.    Yucaipa did not act inequitably by protecting its rights in court.

The Trustee next claims that Yucaipa acted inequitably "in filing multiple lawsuits."

(Mot. at 27.)  But litigation does not merit equitable subordination unless it is "protracted and

unjustified," which the Trustee has not demonstrated here as a matter of law and undisputed fact.

*In re J. Silver Clothing*, 453 B.R. at 533–34 (granting insider defendant's motion for summary

judgment notwithstanding claims of protracted litigation).

First, it was *Allied*, not Yucaipa, who initiated the Allied Adversary Proceeding against

*all* first lien Lenders (including Yucaipa) to determine Allied's legal rights and obligations, given

that Allied was not a party to the New York litigation involving BD/S and Yucaipa.  (Singer

Decl., Ex. 74; *see* Scolnick Decl., Ex. 130.) ███████████████

█████████████████████████████████████

██████  (*Id.*)  And while the Trustee argues that Yucaipa "caused Allied" to file it (Mot. at 27), both law firms confirmed that ████████████████████████████████ ████████████████████████████  (Scolnick Supp. Decl., Ex. 41 at 2.)
████████████████████████████████████
████████████████████████████████████
████████████████  (*Id.* at 1–2, 4.)  For this reason, the Trustee's reliance on *In re 848 Brickell Ltd.*, 243 B.R. 142 (S.D. Fla. 1998), is misplaced.  There, the defendant engaged in "protracted and abusive litigation tactics [that] *harmed the estate*," as opposed to litigation in "the pursuit of one's legal rights."  *Id.* at 149 (emphasis added).

Second, the Trustee misleadingly accuses Yucaipa of "disregard[ing] the New York Court's ruling" when it moved in this Court for a declaration of the Third Amendment's enforceability.  (Mot. at 27.)  But as this Court expressly found, the New York court *did not* rule on the validity of the Third Amendment, the identity of the Requisite Lender under the Third Amendment, and other issues related to the Third Amendment.  (Scolnick Supp. Decl., Ex. 42 at 124–25.)

Third, contrary to the Trustee's argument, courts have not "consistently determined that Yucaipa's claims were brought in violation of the covenant not to sue."  (Mot. at 28.)  Each case cited was decided—in full or in part—on the merits.  (Singer Decl., Ex. 85 at 36 (declining to find all claims barred by the covenant not to sue on public policy grounds); Ex. 90 at 27, n.17 (court expressly did not reach BD/S's argument regarding "the covenant not to sue" in the RICO case); Scolnick Decl., Ex. 138 at 64–65 (Yucaipa's counterclaims dismissed on the merits).)

Fourth, litigation is generally deemed to be protected activity under the Constitution (including due process) and other common-law privileges.  For instance, the *Noerr-Pennington* doctrine immunizes litigation from liability so long as the litigation is not a "sham."  *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56–57 (1993).  "To

27

invoke the 'sham' exception, a defendant must prove . . . that a plaintiff's activities were not really efforts to vindicate its rights in court." *Braintree Labs., Inc. v. Schwarz Pharma, Inc.*, 568 F. Supp. 2d 487, 495 (D. Del. 2008). To fall within this exception, a lawsuit "must be a sham *both* objectively and subjectively." *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 526 (2002). Here, even if the Trustee had provided undisputed evidence that Yucaipa's litigation positions were objectively baseless (she has not), she has made no attempt to argue (or support with evidence) that Yucaipa did not bring these challenges to vindicate its own rights.

**7.    Any payment of fees by Allied was not inequitable.**

Finally, the Trustee asserts that Yucaipa acted inequitably by "caus[ing] Allied to make numerous fraudulent transfers for Yucaipa's benefit." (Mot. at 26.) But as explained in Section IV, *infra*, nothing of the sort occurred. The Trustee cannot bootstrap her defective fraudulent transfer claim onto her equitable subordination claim.

**C.    Yucaipa Did Not Injure Allied's Creditors or Receive an "Unfair Advantage"**

The Trustee also fails to show that, as a matter of law and undisputed fact, Yucaipa injured Allied's creditors or received an unfair advantage. *See In re SubMicron*, 432 F.3d at 462–63. As discussed in Section III.B.2, Yucaipa pursued the ComVest transaction and Allied supported it to prevent a forced second bankruptcy. ███████████████████

███████████████████████████████████████████

████████████████ (Scolnick Decl., Ex. 51 at 3.) ███████████████

███████████████████████ (*Id.* Ex. 8 at 288–90; Ex. 30 at 5–6 (¶ 13).)

Nevertheless, the Trustee asserts that Yucaipa "understood" that Allied entering the Fourth Amendment "<u>without</u> unanimous Lender consent[] was risky." (Mot. at 29 (emphasis in original).)[10] This is a red herring. That perceived risk resulted because Allied's Lender group

---

[10]   To support this assertion, the Trustee cites CIT's letter "that it viewed an earlier iteration of the Fourth Amendment as impermissible." (Mot. at 29.) ██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

was—and is—highly litigious.  The risk did not result from any belief that challenges to the Fourth Amendment would be meritorious.  Yucaipa understood, and Troutman advised the board, that other Lenders *might* initiate litigation against Yucaipa regarding the Fourth Amendment and debt acquisition.  (*See* Scolnick Decl., Ex. 51 at 2–3.)  ██████████

██████████████████████████████████████████████████

██████████████████████  That Yucaipa went forward with the ComVest transaction in the face of potential litigation demonstrates, if anything, Yucaipa's strong commitment to Allied, and belief that the Fourth Amendment was proper and valid.  (*Id.*; *see also* Walker Decl., ¶ 6; Burkle Decl., ¶ 6.)

Nor was it inequitable as a matter of law for Yucaipa to ████████████████

████████████████████  (Mot. at 29.)  It is not uncommon for an investor to control a distressed company's debt and equity.  (*See* Scolnick Supp. Decl., Ex. 25 at 27–29 (¶¶ 83–86).)  Indeed, ██████████████████████████████████████████ (*Id.* at 29–30 (¶¶ 87–88); *see also id.* Ex. 4 at 325–27; Ex. 5 at 329–37; Ex. 7 at 595–96; Scolnick Decl., Ex. 8 at 290–300.)[11]  The Trustee also fails to provide any evidence or explanation regarding how Yucaipa received an advantage (unfair or otherwise) by acquiring first lien debt, particularly given that Yucaipa received no interest or principal payments on that debt.  (Scolnick Supp. Decl., Ex. 43; Scolnick Decl., Ex. 30 at 20 (fn. 5).)

The Trustee next asserts that Lenders were harmed by "Allied's violations of the [FLCA] at the behest of Yucaipa," including Allied's "failures to make interest and principal payments or to provide required financial information," and "fraudulent transfers."  (Mot. at 29.)  Yet, as

---

[11]  ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████ (Scolnick Supp. Decl., Ex. 45 at 3 (¶¶ 4–6).)

explained above, ██████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████. (Scolnick Decl.,

Ex. 75 at 1–2.)  The Trustee has presented no evidence that Yucaipa caused any subsequent

missed payments.

As to financial reporting, █████████████████████████████████

██████████████ (*E.g.*, *id.* Ex. 4 at 89–90; Ex. 6 at 355.) ████████████

████████████████████████████████████████████████████████████

████████████████████████████████ (Singer

Decl., Ex. 58.)  Finally, many of the purported "fraudulent transfers" occurred before Yucaipa

bought first lien debt in August 2009.  (*See* Estate Compl. ¶¶ 196, 198.)  And as explained in the

Yucaipa Entities' Motion, Allied was contractually obligated to make these payments.  (Entities'

Mot. at 46–47.)

Further, as described above, Yucaipa did *not* "caus[e] [the JCT] negotiations to crater"

and its purported request for a premium did not harm the Lenders.  (Mot. at 29.)  The JCT term

sheets (with Yucaipa and BD/S) were subject to numerous contingencies, many of which were

exclusively within the control of BD/S or JCT.  (Scolnick Decl., Ex. 101 at 4 ████████

████████████████████████████████████████████████████████████

██████████████████████████████; Ex. 96 at 5 ██████████████

██████████████████████████████████████████████ Ex. 97 at 4

██████████████████████████████████████; Ex. 105 (████████

██████████████; Ex. 19 at 102.)  In fact, a mere two weeks before BD/S filed the involuntary

petition, they still were refusing to provide basic information to JCT—██████████████

██████████████ (Scolnick Supp. Decl., Ex. 44.)  BD/S thus obstructed any potential deal

because JCT could not move forward without that information.  (*Id.* (██████████

████████████████████████████████████

The Trustee's own damages expert ████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████ (Scolnick Decl., Ex. 13 at 165, 177–78.)  Neither the Trustee nor

her expert can point to a single piece of evidence showing that, but-for Yucaipa's alleged

demand for a premium, a deal with JCT would have been consummated.  Indeed, the Trustee's

damages expert ██████████████████████████████████████████████

████ (*Id.* at 185–87.)  And Spectrum's 30(b)(6) witness testified that ██████████████████

████████████████████████████████ (Scolnick Supp. Decl., Ex. 7 at 412–14.)

Lastly, as explained above, litigation does not constitute abusive behavior by Yucaipa,

and there is no evidence that Allied incurred any fees in connection with these lawsuits or

motions, aside from the Allied Adversary Proceeding that it initiated.

**D.**    **Equitable Subordination Is Unavailable as a Matter of Law as to Debt That BD/S Purchased for a Substantial Discount After Yucaipa's Purported Misconduct**

Summary judgment for BD/S is also improper because, as explained *supra*, BD/S

purchased some of their debt "for a substantial discount" after "the alleged misconduct of"

Yucaipa.  *In re S&D Foods, Inc.*, 110 B.R. 34, 37–38 (Bankr. D. Colo. 1990) (denying equitable

subordination claim on this basis).  ███████████████████████████████████████

████████████████████████████████████████████████████████████

(Scolnick Decl., Ex. 27.) ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ (*Id.* Ex. 26.)  In ███████████████████████

████████████████████████████████████████████████████████████

████████ (*Id.* Exs. 25, 26.)  It would be inequitable and illogical to subordinate Yucaipa's debt to

BD/S's discounted debt given their knowledge of—and, in some cases, acquiescence to—the

very actions upon which they have sued now.  *See In re W.T. Grant Co.*, 4 B.R. 53, 78 (Bankr.

S.D.N.Y. 1980); *In re S&D Foods*, 110 B.R. at 37.

## IV.    THE COURT SHOULD DENY THE TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ON ESTATE COMPLAINT'S FRAUDULENT TRANSFER CLAIMS

The Trustee seeks summary judgment on her Fraudulent Transfer Claims, which request avoidance and recovery of fraudulent transfers under 11 U.S.C. §§ 544, 548, and 550, as well as corresponding state law.[12]  (Mot. at 31–36.)  The purported fraudulent transfers refer to fees that Allied paid for legal work and costs associated with the Yucaipa-ComVest transaction and other matters, all of which benefited Allied.  The Trustee's motion fails for several reasons.

### A.    Disputed Issues of Material Fact Preclude Summary Judgment for the Trustee

The Trustee alleges avoidable constructive fraudulent transfers[13] under 11 U.S.C. § 548(a), so she must come forward with undisputed evidence that (1) Allied received less than "a reasonably equivalent value" for the transfer, and (2) Allied was insolvent or became insolvent as a result of the transfer.

In seeking summary judgment, the Trustee offers little more than a boilerplate recitation of the law, arguing that payments to law firms made on or after May 17, 2008 are avoidable "because they were made when Allied was insolvent, for Yucaipa's sole benefit, with no 'reasonably equivalent value' realized by Allied, and are recoverable from Yucaipa."  (Mot. at 32.)  The Trustee also argues that payments for the ComVest transaction are avoidable for the same reasons and because they were made "with the intent of benefitting Yucaipa at the expense of other creditors."  (*Id.* at 35.)  The Trustee points to little or no evidence to support these conclusory statements.  And the record shows that the Trustee's assertions are wrong.

#### 1.    Allied received a "reasonably equivalent value" in exchange for the challenged payment of fees.

"[A] party receives reasonably equivalent value for what it gives up if it gets roughly the value it gave."  *In re FBI Wind Down, Inc.*, 581 B.R. 116, 147 (Bankr. D. Del. 2018) (quoting *In re Charys Holding Co.*, 443 B.R. 628, 636 (Bankr. D. Del. 2010)) (*In re FBI I*); *see VFB LLC v.*

---

[12]    The Trustee concedes that the analysis under state law, as incorporated by 11 U.S.C. § 544, is the same as the analysis under section 548.  (Mot. at 35.)  Yucaipa's analysis under section 548 for Estate Claim 10 therefore applies equally to Estate Claim 11.

[13]    The Trustee does not assert a claim for *actual* fraudulent transfer.

*Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007).  This comparative valuation is "fact-driven and viewed through the 'totality of the circumstances'" (*In re FBI I*, 581 B.R. at 147–49 (denying cross-motions for summary judgment)), making it particularly ill-suited for summary judgment.  *In re LTC Holdings, Inc.*, 597 B.R. 554, 561 (Bankr. D. Del. 2019) (denying plaintiff's motion for summary judgment); *see also In re BMT-NW Acquisition, LLC*, 582 B.R. 846, 858 (Bankr. D. Del. 2018) ("Determining reasonable equivalence 'requires case-by-case adjudication,' which depends on 'all the facts of each case.'").

The Third Circuit has dispelled any assertion that reasonably equivalent value requires a debtor to "receive a direct, tangible economic benefit in order to receive 'value.'"  *In re R.M.L., Inc.*, 92 F.3d 139, 151 (3d Cir. 1996); *see also In re Opus E., LLC*, 528 B.R. 30, 85 (Bankr. D. Del. 2015) ("dollar-for-dollar exchange" not required).  Rather, "any benefit . . . *whether direct or indirect*" and any "'opportunity' to receive an economic benefit in the future" can constitute value.  *In re R.M.L.*, 92 F.3d at 148, 150 (emphasis added); *see also In re F-Squared Inv. Mgmt., LLC*, 600 B.R. 294, 307 (Bankr. D. Del. 2019) (discretionary bonuses paid by debtor may have been "reasonably equivalent value" because they increase employee loyalty and build morale).

As this Court explained in *In re FBI I*—the only summary judgment case that the Trustee cites on this issue—a transfer to satisfy a third party's debt may confer an "indirect benefit[]" on the debtor.  581 B.R. at 148–49.[14]  *In re FBI II* clarifies this point:  "transfers made for the benefit of third parties" may constitute reasonably equivalent value "if the debtor receives an indirect benefit through the transfers."  *In re FBI Wind Down, Inc.*, 581 B.R. 387, 416 (Bankr. D. Del. 2018) (*In re FBI II*).  Thus, in *In re FBI II*, this Court denied a plaintiff's partial summary judgment motion for payments made by a debtor to a creditor to satisfy another entity's obligations, because it was likely that the payments "provided reasonably equivalent value."  *Id.*

Here, the Trustee summarily contends that Allied did not receive reasonably equivalent

---

[14]   The Trustee's out-of-circuit cases—*In re Burbank Generators, Inc.*, 48 B.R. 204 (Bankr. C.D. Cal. 1985) and *In re Computer Universe, Inc.*, 58 B.R. 28 (Bankr. M.D. Fla. 1986)—are distinguishable because they are post-trial decisions, not summary judgment decisions.

value for its payments to Kasowitz and Latham because those firms represented and invoiced Yucaipa and rendered services "solely" to Yucaipa.  (Mot. at 32–33.)  She also argues that the ComVest transaction payments were made "solely to benefit Yucaipa" and that Allied "did not benefit" at all.  (*Id.* at 36.)  But the Trustee cannot rely on the "the blind assumption that [the transfers] had no value" to Allied simply because Yucaipa *also* may have benefitted.  *Mellon Bank N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647–48 (3d Cir. 1991).  Instead, the Trustee must come forward with undisputed evidence that Allied did *not* receive reasonably equivalent value from the challenged transfers—taking all the facts and circumstances into account as the flexible, fact-bound standard demands.  The Trustee has made no such showing.

### a.    Payments to Latham and Kasowitz

The Trustee fails to present *any* evidence that Allied did not receive "reasonably equivalent value" for the payments made to Latham and Kasowitz.  The Trustee's Motion should be denied on this basis alone.  *In re Delta Petroleum Corp.*, 2015 WL 1577990 at *18–19 (Bankr. D. Del. Apr. 2, 2015).

In fact, the evidence demonstrates that Latham and Kasowitz were performing work that benefitted Allied. ███████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████

(Scolnick Decl., Ex. 2 at 104–05; Ex. 30 at 5 (¶ 12).)

The Trustee identifies payments to Kasowitz for work related to the CIT Litigation in support of its motion.  (Singer Decl., Ex. 51.)  But the Trustee makes no attempt to show, based

on undisputed evidence, that Allied did not receive reasonably equivalent value from the CIT Litigation; nor would the record support such a claim.  Rather, the CIT Litigation arose because the Administrative Agent at the time (CIT) refused to recognize Yucaipa as Requisite Lender, even though ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████ (Scolnick Decl., Ex. 90 at 1–2; Ex. 91 at 1–2; *see supra*, pp. 18–19.)  Left with uncertainty about Allied's debt structure, and given the litigious Lender group, Allied and Yucaipa sought declaratory relief regarding Requisite Lender status.  (Scolnick Decl., Ex. 93 at 19–20 (¶¶ 65–66).)  A reasonable factfinder could and likely would conclude that Allied benefitted from the certainty that this litigation sought (and eventually obtained).  *See In re R.M.L.*, 92 F.3d at 151 (debtors are entitled "to take some risks that could generate value").  Similarly, the settlement resulted in Lenders, ███████████████

███████████████████████████████████████████████████████████████

█████████████████ *Supra*, p. 21.  At the very least, given the fact-bound nature of the "reasonably equivalent value" inquiry, the value of this work to Allied cannot be determined at summary judgment.  *See In re FBI I*, 581 B.R. at 149 (denying cross-motions for summary judgment).

### b.    Payments for the ComVest Transaction

The Trustee also argues that "no 'reasonably equivalent value' [was] realized by Allied" for the ComVest transaction because the payments were made pursuant to an agreement "to which Allied was not a party."  (Mot. at 35–36.)  Further, she summarily contends that Jonathan Ornstein's "assistance in negotiating the Yucaipa-ComVest Transaction . . . did not benefit" Allied.  (*Id.* at 36.)  These contentions are not supported by *any* evidence.

In fact, as explained in Section III.B.2, the undisputed evidence demonstrates that Allied *did* benefit from the ComVest transaction.  And at a minimum, there is a genuine dispute as to the value that Mr. Ornstein provided.  He introduced Yucaipa and ComVest to each other shortly after ComVest purchased Allied's debt (Scolnick Decl., Ex. 7 at 712) and ███████████████

███████████████████ (Scolnick Supp. Decl., Ex. 6 at 46.) ███████████████



(*Id.* at 78–79.)

(*Id.* at 94.)

Further, the ComVest transaction included the Fourth Amendment and all associated fees for drafting and negotiating that document.  According to Mr. Gendregske's restructuring expert,

(Scolnick Supp. Decl., Ex. 25 at 31–32 (¶ 93).)

(*Id.* (emphasis added).)

The Trustee's complete failure to address the evidence demonstrating that Allied benefitted from the ComVest transaction and to "compare the value given" for the associated fees to "the value received" are fatal to her motion.  *See In re FBI I*, 581 B.R. at 149.

> **c.    Allied was contractually obligated to make the contested payments**

A triable issue of fact also exists because the "payments in question were made by" Allied pursuant to "valid, contractual obligation[s]."  *Stratton v. Equitable Bank, N.A.*, 104 B.R. 713, 727–28 (D. Md. 1989) (granting defendant's motion for summary judgment on constructive fraudulent transfer claim where payments were contractually mandated); *see, e.g., In re LandAm. Fin. Grp., Inc.*, 2014 WL 2069651, at *4–5 (Bankr. E.D. Va. May 19, 2014) (similar), *aff'd* 525 B.R. 308 (E.D. Va. 2015).  As explained in Yucaipa and the Individual Defendants' Motions, Allied was contractually obligated to make these payments under the MMSA and FLCA. (Entities' Mot. at 46–47; Individuals' Mot. at 19–20, 23–24.)

> **2.    The Trustee has not put forth undisputed evidence that each challenged transfer was made "for the benefit" of Yucaipa.**

Even if a transfer is avoidable under sections 548 or 544, a trustee may recover the value of an avoidable transfer only from "the initial transferee of such transfer or the entity for whose benefit such transfer was made."  11 U.S.C. § 550(a).  Here, the Trustee does not seek to avoid

the transfers from the "initial transferees"—Kasowitz, Latham, ComVest, or Mr. Ornstein. Thus, to avoid the transfers from Yucaipa, she must present undisputed evidence that Yucaipa was "the entity for whose benefit [each] transfer was made." *Id.* The Trustee summarily asserts that all of the transfers are "recoverable from Yucaipa" because "Yucaipa is 'the entity for whose benefit such transfer[s] w[ere] made.'" (Mot. at 33.) The Trustee points to no evidence (let alone undisputed evidence) supporting this assertion. Even if some transfers may have been for the benefit of Yucaipa, she has not presented undisputed evidence that *every* transfer was made for its benefit, as Section 550 mandates. *See In re Green Field Energy Servs., Inc.*, 2018 WL 1116374, at *1–3 (Bankr. D. Del. Feb. 27, 2018) (denying motion for summary judgment).

**B.    Summary Judgment Is Improper on the Disallowance Claim and the Trustee's Request for Prejudgment Interest**

The Trustee also moves for summary judgment on Estate Claim 13 (Disallowance of Claims) (Mot. at 37), which contends that Yucaipa's bankruptcy claims must be disallowed if Yucaipa caused Allied to make fraudulent transfers. *See* 11 U.S.C. § 502(d). But the Trustee is entitled to summary judgment on the disallowance claim and prejudgment interest only if the Court concludes the Trustee is entitled to summary judgment on the claims for avoidance and recovery of purported fraudulent transfers. *See In re FBI II*, 581 B.R. at 414. Because summary judgment is improper on the fraudulent transfer claims (Section IV.A, *supra*), summary judgment is also improper on the disallowance claim and request for prejudgment interest.

**V.    THE TRUSTEE IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE TORTIOUS INTERFERENCE CLAIM**

**A.    The Individual Defendants are Entitled to Summary Judgment on the Tortious Interference Claim Under Both New York and Delaware Law**

The Trustee's Motion fails first because the Individual Defendants are entitled to summary judgment on the tortious interference claim.

Regardless of whether New York or Delaware law applies,[15] the statute of limitations for

---

[15]    The Trustee contends that New York law governs. (Mot. at 38.) The Individual Defendants relied on Delaware law in their Motion. (Individuals' Mot. at 5–17.) As explained below,

tortious interference is three years.  *See* N.Y. C.P.L.R. 214; *Andrew Greenberg, Inc. v. Svane, Inc.*, 36 A.D.3d 1094, 1099 (2007); 10 Del. Code § 8106; *SmithKline Beecham Pharm. Co. v. Merck & Co.*, 766 A.2d 442, 450 (Del. 2000).  Thus, as explained in the Individual Defendants' motion, this claim is time-barred because it hinges on the Individual Defendants' supposed actions that caused Yucaipa to breach the Third Amendment in August 2009—more than five years before BD/S brought this claim.  (Individuals' Mot. at 5–9.)

Both states' laws also mandate that agents and directors of a corporation are not liable for inducing a breach of contract when they act within the scope of their role.  *In re CVR Refining LP Unitholder Litig.*, 2020 WL 506680, at *17 (Del. Ch. Jan. 31, 2020); *Rockland Exposition, Inc. v. Alliance of Auto. Serv. Providers*, 894 F. Supp. 2d 288, 336–37 (S.D.N.Y. 2012).  And agents cannot be liable for inducing a principal to breach a contract unless they did not act in good faith and committed independent torts for personal gain.  *See First Am. Commercial Bancorp, Inc. v Saatchi & Saatchi Rowland, Inc.*, 55 A.D.3d 1264, 1266–67 (2008).  As explained in the Individual Defendants' motion, each Individual Defendant indisputably acted in good faith within the scope of his role, and *not* for personal gain.  (Individuals' Mot. at 10–12.)

Further, under both New York and Delaware law, the Trustee must prove that the Individual Defendants intentionally caused a breach of contract *without justification*.  *See Lama Holding*, 646 N.Y.S.2d at 82; *In re Opus E.*, 528 B.R. at 107.  Both jurisdictions also consider the same factors to determine whether an act was without justification.  *Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, 2019 WL 1649983, at *15 (S.D.N.Y. Mar. 28, 2019); *Int'l Minerals & Res., S.A. v. Pappas*, 96 F.3d 586, 595 (2d Cir. 1996); *WaveDivision Holdings, LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012).  As explained in the Individual Defendants' Motion, the record here shows that the Individual Defendants did not act "without

---

however, under both states' laws, the elements of a tortious interference claim are the same: (1) a valid contract; (2) defendant's knowledge of that contract; (3) defendant's intentional procurement of a breach without justification; (4) actual breach of the contract; and (5) resulting damages.  *See Lama Holding Co. v. Smith Barney Inc.*, 646 N.Y.S.2d 76, 82 (App. Div. 1996); *In re Opus E.*, 528 B.R. at 107.

justification" in negotiating the debt purchase with ComVest, approving the Fourth Amendment, or with respect to the JCT Negotiations.  (Individuals' Mot. at 12–15.)

In addition, in both New York and Delaware, the Trustee must present undisputed evidence of resulting damages.  *See Lama Holding*, 646 N.Y.S.2d at 82; *In re Opus E.*, 528 B.R. at 107.  Yet as demonstrated in the Individual Defendants' motion, they are entitled to at least partial summary judgment because the Trustee did not and cannot establish that damages resulted from the alleged tortious interference.  (Individuals' Mot. at 15–17.)

Finally, under both New York and Delaware law, the Trustee must identify undisputed proof that the Individual Defendants intentionally had a causal role in Yucaipa breaching a contract.  *See Lama Holding*, 646 N.Y.S.2d at 82; *In re Opus E.*, 528 B.R. at 107.  But the Individual Defendants are entitled to at least partial summary judgment with respect to allegations focused on the JCT Negotiations—the Trustee has failed to identify any specific provision of the FLCA/Third Amendment that was breached when Yucaipa purportedly "interfered" with the JCT negotiations.  (*See* Individuals' Mot. at 8–9; *see also* Entities' Mot. at 24–25.)  Nor is there undisputed evidence that any purported contract breach associated with the JCT Negotiations necessarily resulted in damages, given the numerous iterations of term sheets and contingencies involved in the negotiations.  (*See* Scolnick Decl., Exs. 96, 99, 101, 103.)

## B.     At a Minimum, Triable Factual Issues Exist Regarding the Trustee's Tortious Interference Claim

Even if the Court denies the Individual Defendants' motion, the Trustee still cannot prevail on her motion for summary judgment on the Tortious Interference Claim, which asks this Court to impermissibly resolve factual disputes in the Trustee's favor.  For example, the Trustee asserts that a subset of the Individual Defendants "took over negotiations with ComVest" and approved the Fourth Amendment so that Yucaipa could obtain first lien debt in contravention of the Third Amendment.  (Mot. at 38–39.)  But, as explained in Section III.B.3, these defendants did not intend to cause Yucaipa to breach the Third Amendment.  Rather, they reasonably believed that Yucaipa needed to acquire first lien debt to prevent a second Allied bankruptcy and

assuage customer concerns. They negotiated directly with ComVest because Yucaipa was deploying its own cash, but they kept the Allied board apprised throughout. The board also convened the Special Committee, which ████████████████████████████████ ██████████. And most importantly, the Individual Defendants reasonably believed at the time that the Fourth Amendment—which indisputably allowed the debt purchase—was valid, ██████ ████████████████████████████████ Thus, at the very least, there is a triable issue as to whether the Individual Defendants *intentionally* interfered with the Third Amendment.

Triable issues of fact exist also as to whether the Individual Defendants *caused* Allied's non-payment of principal and interest and lack of financial reporting. The Trustee relies here on letters sent by CIT's counsel reserving the Lenders' rights after events of default, and a letter from BD/S's attorneys. (Singer Decl., Exs. 41, 48, 62.) But these do not establish that the Individual Defendants *caused* the non-payments. Rather, as explained in Section III.B.3, ████████████████████████████████████████ (*Id.* Ex. 58; Scolnick Decl., Ex. 75.) Read in the light most favorable to the Individual Defendants (as is required on summary judgment), a reasonable fact finder could conclude that the Individual Defendants *did not* cause these actions.

Lastly, as explained above at Section III.B.4, the Trustee depends on a multitude of plainly erroneous factual assertions regarding the JCT Negotiations—e.g., who is to blame for the negotiations cratering, whether Yucaipa ultimately agreed to ratable treatment with the other Lenders, and whether Yucaipa's purported demand for a premium resulted in a reduced offer to BD/S. (*See, e.g.*, Scolnick Decl., Ex. 103 (███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

## VI.    CONCLUSION

For these reasons, the Court should deny the Trustee's Motion for Summary Judgment in its entirety.

Dated: August 21, 2020

YOUNG CONAWAY
STARGATT & TAYLOR, LLP

 _/s/ Michael S. Neiburg_
Michael R. Nestor (No. 3526)
Michael S. Neiburg (No. 5275)
Rodney Square
1000 North King Street
Wilmington, DE  19801
Telephone: (302) 571-6600
mnestor@ycst.com

- and-

GIBSON, DUNN & CRUTCHER LLP
Maurice M. Suh (*Pro Hac Vice*)
Robert A. Klyman (*Pro Hac Vice*)
Kahn Scolnick (*Pro Hac Vice*)
333 South Grand Avenue
Los Angeles, CA  90071
Telephone: (213) 229-7000
msuh@gibsondunn.com

*Attorneys for Defendants Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P., Ronald Burkle, Jos Opdeweegh, Derex Walker, Jeff Pelletier, and Ira Tochner*