# EXHIBITS 1 – 30

# REDACTED

# EXHIBIT 31

# Declaration of Scott D. Macaulay in Support of Chapter 11 Petitions and First Day Motion – 6.10.2012

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **ALLIED SYSTEMS HOLDINGS, INC.,** *et al.,*[1] | **Case No. 12-11564 (CSS)** |
| **Debtors.** | **(Joint Administration Pending)** |

## DECLARATION OF SCOTT D. MACAULAY IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

Scott D. Macaulay, being duly sworn, deposes and says:

1.     I am Senior Vice President and Chief Financial Officer of Allied Systems Holdings, Inc.  In this capacity, I have substantial knowledge about the business of Allied Systems Holdings, Inc. and its direct and indirect subsidiaries (collectively "**Allied**").

2.     Allied Systems Holdings, Inc. and its direct and indirect U.S. and Canadian subsidiaries (collectively the "**Debtors**") have just become debtors in possession in Chapter 11 cases (collectively the "**Chapter 11 Case**") and are requesting relief by means of motions (the "**First Day Motions**") filed substantially contemporaneously with the orders of relief under Chapter 11. The First Day Motions seek relief necessary to establish joint administration and to continue to operate as a going concern.  I submit this Declaration in support of the First Day Motions.

---

[1]     The Debtors in these cases, along with the federal tax identification number (or Canadian business number where applicable) for each of the Debtors, are: Allied Systems Holdings, Inc. (58-0360550); Allied Automotive Group, Inc. (58-2201081); Allied Freight Broker LLC (59-2876864); Allied Systems (Canada) Company (90-0169283); Allied Systems, Ltd. (L.P.) (58-1710028); Axis Areta, LLC (45-5215545); Axis Canada Company (87568828); Axis Group, Inc. (58-2204628); Commercial Carriers, Inc. (38-0436930); CT Services, Inc. (38-2918187); Cordin Transport LLC (38-1985795); F.J. Boutell Driveaway LLC (38-0365100); GACS Incorporated (58-1944786); Logistic Systems, LLC (45-4241751); Logistic Technology, LLC (45-4242057); QAT, Inc. (59-2876863); RMX LLC (31-0961359); Transport Support LLC (38-2349563); and Terminal Services LLC (91-0847582).  The location of the Debtors' corporate headquarters and the Debtors' address for service of process is 2302 Parklake Drive, Bldg. 15, Ste. 600, Atlanta, Georgia 30345.

3.      Except as otherwise indicated, the statements in this Declaration are based upon my personal knowledge and upon Allied's business records, which are kept in the course of Allied's regularly conducted business activity and which were made at or near the time of the activity, in accordance with the regular practice of that business activity.

4.      Part I of this Declaration provides an overview of Allied's organization, business operations, financial condition, recent history, and the circumstances giving rise to the commencement of the Chapter 11 Case.[2]  Part II of this Declaration sets forth facts more particularly relevant to the various First Day Motions.

## I.

## OVERVIEW

**A.      Allied's Corporate Organization and Business.**

5.      Allied Systems Holdings, Inc., the ultimate parent of the other Debtors, is a privately held Delaware corporation headquartered in Atlanta, Georgia.  The Debtors were reorganized in Chapter 11 cases (collectively the "**Original Chapter 11 Case**") that were filed in the United States Bankruptcy Court for the Northern District of Georgia on July 31, 2005 and that resulted in a plan of reorganization (the "**Allied Plan of Reorganization**"), which was confirmed and became effective on May 29, 2007 (the "**Effective Date**").[3]  As a result of the reorganization, Allied's then unsecured creditors became the shareholders of Allied Systems

---

[2]      The financial data for all of the entities which comprise Allied are reported on a consolidated basis. Accordingly, throughout this Declaration, discussions of financial data and the related implications upon business operations are often presented with reference to "Allied."

[3]      Allied Systems Holdings, Inc. is the successor by merger with Allied Holdings, Inc., which was the ultimate Allied parent when the Original Chapter 11 Case was filed.  When the Allied Plan of Reorganization became effective, Allied Systems Holdings, Inc. was created as a subsidiary of Allied Holdings, Inc., which was merged into Allied Systems Holdings, Inc., the surviving corporation.  Thus, in connection with the Original Chapter 11 Case, the terms "Allied" and "Debtors" exclude Allied Systems Holdings, Inc. and include Allied Holdings, Inc.  Also, in connection with the Original Chapter 11 Case, the term "Debtors" includes certain indirect Allied subsidiaries that no longer exist.  Also, indirect Allied subsidiaries formed under the law of Mexico and Bermuda, as well as Haul Insurance Ltd., a captive insurance company formed under the law of the Cayman Islands, were not then and are not now Debtors.

- 2 -

Holding, Inc. Two investment funds became the largest shareholders. These two funds, Yucaipa American Alliance Fund I, LP and Yucaipa Alliance (Parallel Fund I, L.P. (collectively "**Yucaipa**"), affiliated with The Yucaipa Companies, LLC, together own about 63% of the outstanding shares of Allied Systems Holdings, Inc. After the reorganization, when Yucaipa acquired debt owed by Allied and contributed it to capital, Yucaipa was issued non-voting preferred shares convertible into common shares. If the preferred shares were so converted, Yucaipa would own about 70% of the outstanding common shares.

6.      Allied Systems Holdings, Inc. has three direct subsidiaries. Two of them, Allied Automotive Group, Inc. and Axis Group, Inc., are Debtors. The third, Haul Insurance Limited, which is a captive insurance company incorporated under the laws of the Cayman Islands, is not a Debtor.

7.      Allied's major line of business is carried out by Allied Automotive Group, Inc. and its direct and indirect subsidiaries (collectively the "**Allied Automotive Group**").[4] This major line of business, known in the industry as "car-haul," is the transport of light vehicles, such as automobiles, sport-utility vehicles and light trucks, from manufacturing plants, ports, auctions, and railway distribution points to automobile dealerships in the United States and Canada. The trips are generally what are known in the industry as "short hauls," with each averaging less than two hundred miles. Allied's major customers are automobile manufacturers.

8.      Allied Automotive Group, primarily through its operating subsidiary, Allied Systems Ltd. (L.P.) ("**ASL**") transports light vehicles by means of tractor trailers (the "**Rigs**") specially designed for transporting light vehicles. As of the end of 2011, Allied owned about

---

[4]      The following Debtors are part of the Automotive Group: Allied Automotive Group, Inc., Allied Systems, Ltd. (L.P.), Allied Systems (Canada) Company, QAT, Inc., RMX LLC, Transport Support LLC, F.J. Boutell Driveaway LLC, GACS Incorporated, Commercial Carriers, Inc., and Allied Freight Broker LLC.

- 3 -

2400 Rigs, which operated out of about 44 terminals, most of which were leased, located in the United States and Canada.

9.      ASL's drivers are unionized.  These employees (the "**Teamster Employees**") are members of local unions affiliated with the International Brotherhood of Teamsters (the "**Teamsters**"), which negotiates on behalf of the local unions and their members.  Allied employs about 1,835 people of whom about 1,062 are Teamster Employees.

10.      Allied's much smaller line of business is carried out by Axis Group, Inc. and its direct and indirect subsidiaries (collectively the "**Axis Group**").[5]  This line of business includes arranging for and managing vehicle distribution services, automobile inspections, auction and yard management services, vehicle tracking, vehicle accessorizing, and dealer preparation services for the automotive industry in the United States and Canada, and providing yard management services in Mexico.  The Axis Group operates from 39 terminals located in the United States, Canada, and Mexico

11.      In 2010, Allied had revenue of about $543 million.  In 2011, Allied had substantially less revenue (about $343 million) because, in the first quarter of 2011, Allied ceased providing car-haul services to several customers.  In March 2011, Allied approached substantially all of its car-haul customers for rate increases, because the rate levels then in effect were not sustainable and did not cover current operating costs.  New long-term contracts and rate increases were achieved with Ford and several smaller customers in the United States and with Ford, Mazda, Hyundai, Kia, Honda, Nissan and Mitsubishi in Canada.  However, General

---

[5]      The following Debtors are part of the Axis Group:  Axis Group, Inc., CT Services, Inc., Cordin Transport LLC, Terminal Services LLC, Axis Canada Company. Axis Areta, LLC, Logistic Technology, LLC, Logistic Systems, LLC.  Certain other foreign direct and indirect subsidiaries of Axis Group, Inc. are not Debtors.

- 4 -

Motors, Chrysler, Toyota, and Honda in the United States refused to accept the rate increases and, consequently, Allied discontinued providing car-haul services to these companies.

**B.    Decline in OEM Production**

12.    A major reason for the unsustainable rate levels that caused Allied to cease providing car-haul services to several substantial customers and that caused the Debtors to return to this Court is the drastic decline of production ("**OEM Production**") by original equipment manufacturers of light vehicles since the Allied Plan of Reorganization became effective in May 2007. This decline is a result of the recession which began in December 2007 and which is ongoing. The recession has hit the domestic automobile market particularly hard, with General Motors Corporation and Chrysler LLC commencing bankruptcy cases in 2009 and shutting down most production until their assets could be sold.

13.    As a result of the drastic decline in OEM Production since 2007, there was an industry-wide oversupply of capacity to transport light vehicles. The fierce competition among trucking companies (both union and non-union) and railroads for contracts to transport these vehicles led Allied's customers to reduce substantially the rate of compensation offered to Allied and its competitors. Thus, lower OEM production combined with lower rates of compensation caused Allied to suffer large losses in the years since its reorganization in 2007.

14.    The aggregate industry OEM production of light vehicles in North America in 2007 was approximately 15 million units. OEM Production declined drastically in 2008 and 2009 with a slight improvement in 2010, when production reached 11.9 million units. Reflecting that decline in production, Allied transported 6.9 million light vehicles in 2007 and had revenue of $823 million, while in 2010, Allied transported 4.5 million light vehicles and had revenue of $543 million.

- 5 -

15.     While the rate of compensation to Allied for transporting light vehicles has been declining, Allied's expenses in many areas have increased.   For example, the rate of compensation of its Teamster Employees increased by over 15% in June 2010 and increased again in June 2011.   Also, as the Rigs age, they require more maintenance and capital improvements.

## C.     Allied's First Reorganization.

16.     In connection with the Original Chapter 11 Case, the Debtors commenced ancillary proceedings (the "**CCAA Proceeding**") in the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") under the Companies' Creditors Arrangement Act ("**CCAA**").   In the CCAA Proceeding, the Canadian Court issued orders which, among other things, recognized the Original Chapter 11 Case as a foreign proceeding under the CCAA, stayed creditors from instituting proceedings or taking remedies in Canada against the Debtors or their property, approved the Debtors' financing, and gave full effect to the Allied Plan of Reorganization.

17.     In the Original Chapter 11 Case, Allied's goals were (1) to increase revenue by increasing customer pricing, (2) to deleverage by conversion of debt into equity, and (3) to reduce labor costs through reductions in compensation and changes in work rules with respect to the Teamsters Employees and through shared sacrifice from non-union employees.

18.     These goals were largely achieved, with significant aid from Yucaipa.   During the original Chapter 11 Case, Yucaipa, among other things, (1) acquired about two-thirds of a series of unsecured notes that Allied had issued in the principal amount of $150 million; (2) was the catalyst for obtaining an agreement with the Teamsters for concessions ("Labor Modifications") reducing wages of Allied's Teamster Employees by 15% for a three-year period; (3) financed the

- 6 -

acquisition of Rigs for Allied's use; (4) supported a plan to convert general unsecured debt into equity; and (5) aided Allied in securing the exit financing (the "**Exit Financing**") essential to its reorganization.

19.    Yucaipa and the Teamsters joined the Debtors as proponents of the Allied Plan of Reorganization. As of the Effective Date of the Allied Plan of Reorganization, Allied Holdings, Inc. created Allied Systems Holdings, Inc. as a subsidiary and merged into it. As provided in the Allied Plan of Reorganization, the outstanding stock of Allied Holdings, Inc. was canceled and Allied Systems Holdings, Inc. issued new common stock to Allied's general unsecured creditors, with Yucaipa becoming the owner of about 63% of it. Also as of the Effective Date, Allied's Exit Financing and the Labor Modifications became effective. Allied Systems Holdings, Inc. became a private company and terminated its reporting obligations with the Securities and Exchange Commission.

**D.    Labor Costs**

20.    At the end of May 2010, the Labor Modifications agreed to as part of the Allied Plan of Reorganization expired. The Teamsters insisted on an immediate snap-back of wage rates to what they were under the then current multi-employer collective bargaining agreement, known as the National Master Automobile Transporter Agreement (the "**NMATA**"), which was for a three-year term beginning June 1, 2008 and expiring May 31, 2011. As a result, as of the beginning of June 2010, Allied no longer had the benefit of the wage concessions agreed to in connection with the Allied Plan of Reorganization, and wage rates rose over 15% for Allied's Teamster Employees.

21.    The employers who are parties to the NMATA are members of a multi-employer collective bargaining association, known as the National Automobile Transporters Labor

- 7 -

Division ("**NATLD**"), which is authorized by its employer members to bargain collectively with the Teamsters. When the NMATA for the period June 1, 2008 through May 31, 2011 expired, NATLD agreed to new NMATA for a 51 month term from June 1, 2011 through August 31, 2015 with increases in compensation for all covered employees, including Allied's Teamster Employees. This agreement was entered over Allied's objection but was nevertheless binding on Allied.

E.    **Allied's Major Credit Facilities**

22.    The Exit Financing established on the Effective Date of the Allied Plan of Reorganization is still extant as of the commencement of the Chapter 11 Case. This Exit Financing is comprised of two credit facilities which together provide financing of up to $315 million. The largest facility is the credit facility (the "**First Lien Credit Facility**"), which provides for up to $265 million in financing on terms originally set forth in the *Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement*, dated as of March 30, 2007, amended and restated as of May 15, 2007 (the "**First Lien Credit Agreement**"). The other credit facility (the "**Second Lien Credit Facility**") provides for up to $50 million in loans on terms originally set forth in a *Second Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement*, dated as of May 15, 2007 (the "**Second Lien Credit Agreement**").

23.    The First Lien Credit Facility is secured by a first-priority security interest in substantially all of the Debtors' assets, including accounts, general intangibles, money, inventory, equipment (including Rigs), real estate and the stock of certain subsidiaries (the "**Collateral**") as granted by an *Amended and Restated Pledge and Security Agreement (First Lien)* dated as of May 15, 2007. The Second Lien Credit Facility is secured by a second-priority

- 8 -

security interest in the Collateral, as granted by an *Amended and Restated Pledge and Security Agreement (Second Lien)* dated as of May 15, 2007. Allied and the collateral agents for the two credit facilities entered an *Intercreditor Agreement* dated as of May 15, 2007 to set forth, among other things, the relative rights and priorities as between these two credit facilities.

24.     The First Lien Credit Facility is provided by a group of financial institutions (the "**Lenders**"), one of which, CIT Group/Business Credit Inc. ("**CIT**"), has served, but is no longer serving, as administrative and collateral agent of this facility. The First Lien Credit Facility is comprised of the following three facilities: (i) a facility (the "**Revolving Loan Facility**") for revolving loans and swing line loans (collectively the "**Revolving Loans**") up to the amount of $35 million, (ii) a facility (the "**Letter of Credit Facility**") for the issuance by a bank ("**Issuing Bank**") of letters of credit ("**Letters of Credit**") for the account of Allied in the amount of up to $50 million; and (iii) a Term Loan Facility for loans ("**First Lien Term Loans**") up to the amount of $180 million.

25.     CIT is the sole Lender under the Revolving Loan Facility Agreement and is not a Lender under the other two facilities. The other Lenders ("**First Lien Term Loan Lenders**") have made the First Lien Term Loans and deposited up to $50 million to support the Letter of Credit Facility. CIT asserts that the *Amended and Restated Pledge and Security Agreement (First Lien)* dated as of May 15, 2007 provides for the Revolving Loans to the paid before the Term Loans or the obligations due the First Lien Term Lenders under the Letter of Credit Facility.

26.     The Second Lien Credit Facility, which provides for loans ("**Second Lien Term Loans**") of up to $50 million, is provided by certain lenders ("**Second Lien Lenders**"). Goldman Sachs Credit Partners L.P. ("**Goldman Sachs**") was the original administrative agent

- 9 -

and collateral agent of this facility and was later replaced in these capacities by Bank of New York Mellon.

27.     Both the First Lien Credit Facility and the Second Lien Credit Facility provide that lenders ("**Requisite Lenders**") under each facility with more than 50% of the exposure under the respective facility have certain powers and the right to direct the administrative agent and the collateral agent with respect to certain actions, including whether to waive or exercise remedies if an event of default ("**Event of Default**") should occur under the respective facility.

**F.     Administration of the Credit Facility.**

28.     On May 6, 2008, Yucaipa acquired the face amount of $40 million of the Second Lien Term Loan and exchanged $20 million of it for 21,396 shares of preferred stock ("**Series A Preferred Stock**"), convertible into common stock at a conversion price, whereby each preferred share is valued at $934.74.  In connection with Yucaipa's acquisition of the Second Lien Term Loan, the Second Lien Credit Facility was amended to allow Yucaipa to be an assignee (an "**Eligible Assignee**") with no restrictions on its right to vote.  Yucaipa thereby became the Requisite Lender under the Second Lien Credit Facility.

29.     In August 2008, heavily impacted by the sharp downturn that year in OEM Production, Allied notified CIT, as Administrative Agent of the First Lien Credit Facility, that, as of June 30, 2008, Allied was in default under that facility in that Allied was not in compliance with certain of its financial covenants in the First Lien Credit Agreement.  On September 3, 2008, CIT, as Administrative Agent, sent Allied notice of default and of reservation of rights. Effective September 24, 2008, Allied and CIT entered a Forbearance Agreement, which, as amended, expired on November 15, 2008.  On November 24, 2008, CIT sent Allied another notice of default and reservation of rights.  However, CIT received no instruction from the

- 10 -

Requisite Lenders to terminate the Credit Facility or to declare the indebtedness thereunder to be due.

30.     By April 2009, ComVest Investment Partners III, L.P. ("**ComVest**") had acquired a majority of the outstanding Lender exposure under First Lien Credit Facility and had thereby become the Requisite Lender.  On August 21, 2009, ComVest and Allied entered an amendment ("**Fourth Amendment**") to the First Lien Credit Agreement to allow Yucaipa to be an Eligible Assignee, with no restriction on its right to vote.  In connection with this amendment, Yucaipa purchased from ComVest the majority in face value of the First Lien Exposure.  However, CIT declined to recognize the validity of the Fourth Amendment and consequently declined to recognize Yucaipa's status as the Requisite Lender under the First Lien Credit Facility.

31.     In November 2009, Allied Systems Holdings, Inc and Yucaipa sued CIT to establish (1) that Yucaipa became the Requisite Lender in August 2009 and (2) that CIT was damaging Yucaipa and Allied by failing to take action lawfully demanded by Yucaipa as Requisite Lender.

32.     In 2009, after General Motors Corporation and Chrysler LLC commenced their bankruptcy cases and shut down most production, in order to preserve Allied's liquidity position, Allied did not make quarterly interest payments due under the First Lien Credit Facility for the third and fourth quarters.  Since then, Allied has not made payments due under the First Lien Credit Facility and the Second Lien Credit Facility.

33.     Allied Systems Holdings, Inc., Yucaipa and CIT settled the litigation among them with regard to the First Lien Credit Facility pursuant to a Settlement Agreement dated as of December 5, 2011, with the parties filing Mutual Dismissals with Prejudice on December 7, 2011.  The terms of the Settlement Agreement include, among others, mutual limited releases,

- 11 -

the recognition of the validity of the Fourth Amendment and of Yucaipa as the Requisite Lender, provisions for the resignation and replacement of CIT as administrative and collateral agent, the recognition, by Allied and Yucaipa, of the payment priority of CIT's revolver over the term loans included in the First Lien Credit Facility, and the reduction of the letter of credit facility.

34.     On January 18, 2012, three lenders under the First Lien Credit Facility filed suit against Yucaipa in the Supreme Court of the State of New York, Index No. 650150/2012.  These lenders were Black Diamond CLO 2005-1 Ltd., its affiliate BDCM Opportunity Fund II, LP, and Spectrum Investment Partners, L.P.  In this suit (the "**Black Diamond/Yucaipa Action**"), the plaintiffs seek a judicial declaration that the Fourth Amendment is null and void and that Yucaipa is not the Requisite Lender under the First Lien Credit Facility.  The grounds for the Black Diamond/Yucaipa Action are similar to those asserted by CIT in the prior action between CIT, Yucaipa and Allied Systems Holdings, Inc.  The Black Diamond/Yucaipa Action is still pending.

35.     While the Black Diamond/Yucaipa Action was being litigated, Allied was exploring the possibility of a sale of its business.

36.     On May 17, 2012, the three plaintiffs in the Black Diamond/Yucaipa Action filed involuntary bankruptcy petitions seeking relief under Chapter 11 against Allied Systems Holdings, Inc. and its Allied Systems Ltd. (L.P.) in the U.S. Bankruptcy Court for the District of Delaware.

37.     As of the commencement of the involuntary bankruptcy cases, the outstanding principal amount due under the First Lien Credit Agreement totaled about $244 million, including about $35 million due under the Revolving Loan Facility.  The First Lien Credit Agreement provides for varying interest rates for its facilities, in addition to a default rate of 2%

- 12 -

over the otherwise applicable rates.  Also, as of the commencement of the involuntary cases, the outstanding principal amount due under the Second Lien Term Facility was $30 million.

38.     In light of the involuntary bankruptcy cases and its financial, condition, Allied determined that it would be in the best interests of their estates to proceed under Chapter 11. Therefore, Allied Systems Holdings, Inc, and Allied System Ltd. (L.P.) consented to relief under Chapter 11, and caused seventeen direct and indirect subsidiaries of Allied Systems Holdings, Inc. to join them by filing voluntary Chapter 11 petitions.

## II.

## FIRST DAY MOTIONS

39.     In furtherance of the objective of successfully administering this Chapter 11 Case and maximizing value for all creditors, the Debtors have sought approval of the First Day Motions and related orders (the "**Proposed Orders**"), and respectfully request that the Court consider entering orders granting such First Day Motions.

40.     I have reviewed each of the First Day Motions and Proposed Orders (including the exhibits thereto) listed on **Exhibit A** and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.

41.     Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enable the Debtor to make the transition to, and operate in, chapter 11 with a minimum of interruption or disruption to its business or loss of productivity or value and (b) constitutes a critical element in achieving the maximization of the Debtors' value.

- 13 -

42.　　Accordingly, for the reasons stated herein and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such further relief as the Court deems just and proper.

## CONCLUSION

43.　　I declare under penalty of perjury that I have reviewed the information contained herein and that the information contained herein is true and correct to the best of my information and belief.

Executed on June 10, 2012.

_____
SCOTT D. MACAULAY
Senior Vice President and Chief Financial
Officer, Allied Holdings Systems, Inc..

- 14 -

## EXHIBIT A

**List of First Day Motions**

RLF1 6086970v. 1

## List of First Day Motions

1. Emergency Motion of the Debtors for Bridge Order (I) Authorizing the Use of Cash Collateral, (II) Approving the Continued Use of the Debtors' Cash Management System, (III) Authorizing Debtors to Pay Prepetition Employee Wages and Expenses, and (IV) Granting Related Relief

2. Debtors' Motion for Entry of an Order Directing Joint Administration of Their Related Chapter 11 Cases

3. Application for Order Appointing Rust Consulting/Omni Bankruptcy as Claims and Noticing Agent Pursuant to 28 U.S.C. § 156(c) and Section 105(a) of the Bankruptcy Code *Nunc Pro Tunc* to the Petition Date

4. Motion to Authorize Allied Systems Holdings, Inc. to Act as Foreign Representative of the Debtors

5. Motion for Order (A) Deeming Utilities Adequately Assured of Payment, (B) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services, and (C) Establishing Procedures for Resolving Requests for Additional Assurance

6. Motion for Order Authorizing Debtors to Continue Their Insurance Programs

7. Debtors' Motion for Entry of Interim and Final Orders Authorizing, But Not Directing, the Debtors to Pay Certain Prepetition Claims of Critical Vendors and Granting Certain Related Relief

8. Motion of the Debtors for Order Pursuant to U.S.C. §§ 105(a) and 363(b) Authorizing Payment of Prepetition Customs Duties and Claims of Common Carriers and Warehousemen and Authorizing the Debtors to Honor Certain Prepetition Cargo Claims and Authorizing Financial Institutions to Honor and Process Checks and Transfers Related to Such Claims

9. Motion of the Debtors for Orders Authorizing the Debtors to Pay Prepetition Sales, Use, and Other Taxes and Related Obligations

10. Motion for Authority to (A) Maintain Existing Cash Management System and Bank Accounts, (B) Continue Use of Existing Checks and Business Forms, (C) Obtain Limited Waiver of § 345(b) and (D) Continue to Make Intercompany Advances with § 364(c)(1) Administrative Priority

11. Motion of Debtors for Interim and Final Orders Authorizing Payment of Pre-Petition Wages, Payroll Taxes, Certain Employee Benefits and Related Expenses, and Other Compensation to Employees and Independent Contractors

12. Motion Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503(b) and 507(a), Fed. R. Bankr. P. 2002, 4001 and 9014 and Del. Bankr. L.R. 4001-2: (I) Authorizing Debtors to (A) Obtain Postpetition Secured DIP Financing and (B) Use Cash Collateral; (II) Granting Superpriority Liens and Providing for Superpriority Administrative Expense Status; (III) Granting Adequate Protection to Prepetition Secured Lenders; (IV) Modifying Automatic Stay; and (V) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and (c)

# EXHIBITS 32 – 41

# REDACTED

# EXHIBIT 42

# Hearing Transcript Case No. 12-50947 – 7.30.2013

1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3   Case No. 12-11564-css

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6   ALLIED SYSTEMS HOLDINGS, INC., ET AL.,

7           Debtors.

8   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

9   ADV. PROC. NO. 12-50947-css

10

11  ALLIED SYSTEMS HOLDINGS, INC.,

12          Plaintiff,

13  v.

14  AMMC VIII, LIMITED, AVENUE CAPITAL GROUP,

15  BDCM OPPORTUNITY FUND II, LP, BENNETT

16  MANAGEMENT, BLACK DIAMOND CLO 2005-1 LTD.,

17  DEL MAR DISTRESSED OPPORTUNITIES MASTER FUND,

18  MJX ASSET MANAGEMENT, LLC, PAR-FOUR INVESTMENT

19  MANAGEMENT, SPECTRUM INVESTMENT PARTNERSHIP, LP,

20  TEAK HILL - CREDIT CAPITAL INVESTMENTS, LLC,

21  THE CIT GROUP/BUSINESS CREDIT, INC., THE OFFICIAL

22  COMMITTEE OF UNSECURED CREDITORS, YUCAIPA AMERICAN

23  ALLIANCE (PARALLEL) FUND II, L.P.,

24          Defendants.

25  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

```
 1    - - - - - - - - - - - - - - - - - - - - - - - - - - x

 2    THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF

 3    ALLIED SYSTEMS HOLDINGS, INC. AND ITS AFFILIATED

 4    DEBTORS, ON BEHALF OF ALLIED SYSTEMS HOLDINGS, INC.,

 5    AND ITS AFFILIATED DEBTORS,

 6              Plaintiffs,

 7

 8    BLACK DIAMOND OPPORTUNITY FUND II, L.P., BLACK

 9    DIAMOND CLO 2005-1 LTD., AND SPECTRUM INVESTMENT

10    PARTNERS, L.P.,

11              Intervenors,

12

13    -against-

14

15    YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA

16    AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA

17    AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN

18    ALLIANC (PARALLEL) FUND II, L.P., MARK J. GENDREGSKE,

19    JOS OPDEWEEGH, JAMES FRANK, DEREX WALKER, JEFF

20    PELLETIER, IRA TOCHNER, and JOSEPH TOMCZAK,

21              Defendants.

22    - - - - - - - - - - - - - - - - - - - - - - - - - - x

23

24

25
```

Page 3

1                    United States Bankruptcy Court

2                    824 North Market Street

3                    Wilmington, Delaware

4

5                    July 30, 2013

6                    10:13 AM

7    B E F O R E :

8    HON CHRISTOPHER S. SONTCHI

9    U.S. BANKRUPTCY JUDGE

10

11   ECR OPERATOR:   LESLIE MURIN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    First Omnibus Motion for an Order Pursuant to Section 365 of

2    the Bankruptcy Code and Bankruptcy Rule 6006 Authorizing the

3    Debtors to Assume Certain Real Property Leases [Docket No.

4    671; filed November 30, 2012]

5

6    Debtors' Fourth Motion Pursuant to Bankruptcy Rules 9006(b)

7    and 9027 for Order Extending the Time to File Notices of

8    Removal of Civil Actions [Docket No. 1249; filed June 4,

9    2013]

10

11   Debtors' Fourth Motion for Extension of Exclusive Periods

12   During Which Debtors May Propose and File Plans of

13   Reorganization and Solicit Acceptances Thereof [Docket No.

14   1250; filed June 4, 2013]

15

16   Debtors' Motion to Authorize Axis Group, Inc. to Enter

17   License Agreement with City of New York [Docket No. 1284;

18   filed June 17, 2013]

19

20   Motion of the Debtors Pursuant to 11 U.S.C. § 107(b)(1) of

21   the Bankruptcy Code, Bankruptcy Rule 9018, and Local Rule

22   9018-1(b) to File Exhibit to Key Employee Incentive Plan

23   Under Seal [Docket No. 1370; filed July 1, 2013]

24

25

Page 5

1    Petitioning Creditors' Motion to File a Redacted Version of

2    the Objection of the Petitioning Creditors to the Debtors'

3    Motion for Order Authorizing (I) Implementation of Key

4    Employee Incentive Plan for Certain Insiders and (II)

5    Payment of any Obligations Arising Thereunder as

6    Administrative Expenses [Docket No. 1456; filed July 22,

7    2013]

8

9    Motion for Authorization to Seal the Unredacted Objection of

10   the Official Committee of Unsecured Creditors to Motion for

11   an Order Pursuant to Sections 105(a), 363(b)(1) and

12   503(c)(3) of the Bankruptcy Code Authorizing (I)

13   Implementation of Key Employee Incentive Plan for Certain

14   Insiders and (II) Payment of any Obligations Arising

15   Thereunder as Administrative Expenses [Docket No. 1460;

16   filed July 22, 2013]

17

18   Motion of Norman Fredrick Wessels, Joyce Elaine Wessels,

19   Gladys Ann Walker, Michael Jay Meyer, and Dale Woudstra and

20   Tonia Woudstra for Relief from the Automatic Stay to Pursue

21   Personal Injury Claims [Docket No. 761; filed January 8,

22   2013]

23

24   Motion by James Joseph Pursuant to 11 U.S.C. §362 for Relief

25   from the Automatic Stay [Docket No. 1147; filed May 8, 2013]

1   Motion and Joinder of Travis and Erin Cogdill to Motion of

2   Norman Frederick Wessels, Joyce Elaine Wessels, Gladys Ann

3   Walker, Michael Jay Meyer and Dale Woudstra and Tonia

4   Woudstra for Relief from the Automatic Stay to Pursue

5   Personal Injury Claims (Docket No. 761) [Docket No. 1282;

6   filed June 17, 2013]

7

8   Motion for an Order Pursuant to Sections 105(a), 363(b)(1)

9   and 503(c)(3) of the Bankruptcy Code Authorizing (I)

10  Implementation of Key Employee Incentive Plan for Certain

11  Insiders and (II) Payment of any Obligations Arising

12  Thereunder as Administrative Expenses [Docket No. 1369;

13  filed July 1, 2013]

14

15  Motion of Yucaipa American Alliance Fund I, L.P.'s and

16  Yucaipa American Alliance (Parallel) Fund I, L.P. for

17  Reconsideration and/or Amendment of Final Order Granting

18  Debtors' Motion for Authorization to Obtain Post-petition

19  Secured Replacement DIP Financing and Related Relief [Docket

20  No. 1373; filed July 2, 2013]

21

22  Interim Fee Applications:

23

24  P

25

Page 7

1    Petitioning Creditors' Motion for Summary Judgment Regarding

2    the Determination of Requisite Lenders Under the First Lien

3    Credit Agreement [Adv. (12-50947) Docket No. 246; Adv. (13-

4    50530) Docket No. 253; filed July 9, 2013]

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sherri L. Breach & Sheila Orms

```
 1   A P P E A R A N C E S :

 2   RICHARDS, LAYTON & FINGER, P.A.

 3        Attorney for the Debtors

 4        One Rodney Square

 5        920 North King Street

 6        Wilmington, Delaware 19801

 7

 8   BY:  ROBERT STEARN, ESQ.

 9        CHRISTOPHER M. SAMIS, ESQ.

10        MARK D. COLLINS, ESQ.

11

12   TROUTMAN SANDERS, LLP

13        Attorneys for the Debtors

14        Bank of America Plaza

15        600 Peachtree Street, Suite 5200

16        Atlanta, Georgia 30308

17

18   BY:  JEFFREY W. KELLEY, ESQ.

19

20

21

22

23

24

25
```

Page 9

```
 1   YOUNG CONAWAY, STARGATT & TAYLOR, LLP
 2         Attorneys for Yucaipa, et al.
 3         Rodney Square
 4         1000 North King Street
 5         Wilmington, Delaware 19801
 6
 7   BY:  MICHAEL R. NESTOR, ESQ.
 8
 9   LATHAM & WATKINS, LLP
10         Attorneys for Yucaipa, et al.
11         355 South Grand Avenue
12         Los Angeles, California 90071
13
14   BY:  ROBERT A. KLYMAN, ESQ.
15         RUSSELL F. SAUER, JR., ESQ.
16
17   SCHULTE, ROTH & ZABEL, LLP
18         Attorneys for Black Diamond, CLO 2005-1, LITD. &
19         BDCM Fund II, LP, et al
20         919 Third Avenue
21         New York, New York 10022
22
23   BY:  ADAM C. HARRIS, ESQ.
24         ROBERT J. WARD, ESQ.
25         VICTORIA A. LEPORE, ESQ.
```

1   LANDIS, RATH & COBB, LLP

2        Attorneys for Black Diamond, CLO 2005-1, LITD. &

3        BDCM Fund II, LP, et al

4        919 North Market Street, Suite 1800

5        Wilmington, Delaware 19801

6

7   BY:  KERRI K. MUMFORD, ESQ.

8

9   SIDLEY AUSTIN

10        Attorneys for the Committee of Unsecured Creditors

11        8787 Seventh Avenue

12        New York, New York 10019

13

14   BY:  NICHOLAS K. LAGEMANN, ESQ.

15        BRIAH J. LOHAN, ESQ.

16

17   SULLIVAN, HAZELTINE & ALLINSON, LLC

18        Attorneys for the Committee of Unsecured Creditors

19        901 North Market Street

20        Suite 1300

21        Wilmington, Delaware 19801

22

23   BY:  WILLIAM A. HAZELTINE, ESQ.

24

25

```
 1   MORRIS, NICHOLS, ARSHT & TUNNELL

 2         Attorneys for Mark Gendregske

 3         1201 North Market Street, 18th Floor

 4         P.O. Box 1347

 5         Wilmington, Delaware 1999

 6

 7   BY:  WILLIAM M. ALLEMAN, JR., ESQ.

 8

 9   KING & SPALDING, LLP

10         Attorneys for Jack Cooper

11         1180 Peachtree Street

12         Atlanta, Georgia 30309

13

14   BY:  JESSE H. AUSTIN, III, ESQ.

15

16   COUSINS, CHIPMAN & BROWN, LLP

17         Attorneys for Jack Cooper

18         The Nemours Building

19         1007 North Orange Street, Suite 1110

20         Wilmington, Delaware 19801

21

22   BY:  WILLIAM E. CHIPMAN, JR., ESQ.

23

24

25
```

                                            Page 12

1    UNITED STATES DEPARTMENT OF JUSTICE

2          Attorneys for U.S. Trustee

3          33 Whitehall Street

4          21st Floor

5          New York, New York 10004

6

7    BY:  DAVID BUCHBINDER, ESQ.

8

9    APPEARING TELEPHONICALLY:

10   STEPHEN ANTINELLI

11   PEG BRICKLEY

12   MATTHEW BROOKS

13   JEFF P. BULLER

14   THEO CIUPITU

15   JOSEPH DRYER

16   RICHARD EHRLICH

17   MARK GENDREGSKE

18   MICHAEL E. JOHNSON

19   STEPHEN S. LAPLANTE

20   MEGHAN E. MAREK

21   LES MEIER

22   JUSTIN MENDELSOHN

23   STEPHEN S. ROACH

24   CARL STAPEN

25   ROBERT STARK

Case 12-50947-CSS   Doc 5291   Filed 09/01/13   Page 13 of 131

```
1   APPEARING TELEPHONICALLY (CONT.):

2   MATT Z. TAYLOR

3   DEREX WALKER

4   RICAHRD M. SELTZER

5   JUSTIN ANTONIPILLAI

6   WAYNE FLICK

7   JULIE GERCHIK

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                 P R O C E E D I N G S
 2             THE CLERK:  All rise.
 3             THE COURT:  Please be seated.
 4             Good morning.
 5             MR. SAMIS:  Good morning, Your Honor.  Chris Samis
 6     from Richards, Layton & Finger here today on behalf of the
 7     debtors.
 8             Your Honor, as for today's agenda, the only items
 9     that require any action by the Court are Items 5, 6, 13, and
10     14.
11             Items 5 and 6 are both seal motions that relate to
12     the Key Employee Incentive Plan which is not being heard
13     today; Item Number 13 are the third interim fee applications
14     that were adjourned from a prior hearing; and Item Number 14
15     is the main event, which is the motion for summary judgment
16     that was filed by the petitioning creditors on the requisite
17     lender issue.
18             Your Honor, we can proceed in any fashion that you
19     would like.  I -- I leave it up to Your Honor.
20             THE COURT:  I -- did you mention the fee
21     applications?
22             MR. SAMIS:  Yes.  They're -- they're at Agenda
23     Item 13, Your Honor.  They were adjourned from the hearing
24     in June.
25             THE COURT:  Yes.  Yes.
```

1          First -- give me two minutes to get my papers

2    organized.

3               MR. SAMIS:  Certainly.

4          (Pause)

5               THE COURT:  All right.  I should have done this

6    earlier.

7               Okay.  Well, with Agenda Number 5, that -- that

8    binder had been misplaced and it was found this morning.  So

9    that order has been signed.

10              And 6 indicates -- it's just -- that it's going to

11   go forward.  So what's --

12              MR. SAMIS:  Your Honor, I'm not sure if the

13   petitioning creditors have a form of order here today.

14              THE COURT:  Ms. Mumford.

15              MS. MUMFORD:  Good morning, Your Honor.  I do have

16   a form of order.

17              THE COURT:  All right.

18              MS. MUMFORD:  May I approach?

19              THE COURT:  Yes.

20              And for the record this is the motion to file

21   certain -- a redacted version, I'm sorry, of the petitioning

22   creditors' motion regarding the Key Employee Incentive Plan.

23   Is there any objection?

24              All right.  I've signed the orders presented.

25              Now let's kick over to the fee apps.

1              MR. SAMIS:  Your Honor, on the fee applications,

2    the fee auditor issued final reports with respect to all the

3    applications.  All of the professionals have signed off on

4    the form of order that was previously submitted under

5    certification of counsel, and I believe there are

6    representatives from the various forms either in court or on

7    the phone today.

8              So I don't know if Your Honor has any independent

9    questions, but I do have a form of order prepared.

10             THE COURT:  All right.  Please approach.

11             MR. SAMIS:  Thank you, Your Honor.

12             THE COURT:  Does anyone wish to be heard with the

13   interim fee applications as modified?

14             All right.  I hear none.  As always, I -- I very

15   much appreciate the assistance of our fee auditors and this

16   one in particular, and I'm happy to sign the orders

17   presented.  And anyone who is here just for that is more

18   than welcome to jump off the phone or leave the court.

19             So I've signed the order.

20             MR. SAMIS:  Thank you, Your Honor.

21             That would bring us to Item 14, Your Honor, which

22   is the main event, the petitioning creditors' motion for

23   summary judgment.

24             At this time I would cede the podium to counsel

25   for the petitioning creditors.

```
 1              THE COURT:  Okay.

 2              Mr. Harris.  No.  All right.

 3              MR. WARD:  Good morning, Your Honor.

 4              THE COURT:  Good morning.

 5              MR. WARD:  Robert Ward on behalf of the

 6     petitioning creditors.

 7              Your Honor, in the -- in petitioning creditors'

 8     motion, we seek a ruling that Yucaipa is not the requisite

 9     lender and that the petitioning creditors are.  And we

10     believe we have numerous bases -- a number of basis -- bases

11     for the relief we seek.

12              First off, Justice Ramos in the State Court in New

13     York resolved two issues.  First, and this is at page 14 of

14     Exhibit 1, that's his opinion:  "That the purported Fourth

15     Amendment is not and never was effective under the plain

16     terms of the credit agreement," and then "Yucaipa is not the

17     requisite lender."

18              Contrary to Yucaipa's argument, Justice Ramos

19     never said that Yucaipa is not the requisite lender as a

20     result of the fact that the Fourth Amendment is null and

21     void.  In fact, in reaching his decision that Yucaipa is not

22     the requisite lender, Justice Ramos reviewed and construed

23     the Third Amendment and the purported Fourth Amendment,

24     both.

25              In particular, as to the Third Amendment, Justice
```

1    Ramos determined, for example, and this is a quote at page 4

2    to 5 of his opinion:

3            "The Third Amendment prohibited Yucaipa from

4    exercising any and all voting rights" -- that's the Third

5    Amendment -- "prohibited Yucaipa from exercising any and all

6    voting rights it would otherwise have as a lender involving

7    the right to consent to any amendment of the credit

8    agreement or the right to vote in any Allied bankruptcy."

9            He also found that the Third Amendment represented

10   a compromise between Yucaipa, which wanted to acquire a

11   portion of Allied's debt obligations and the lenders who

12   recognized the dangers in allowing Yucaipa to assert

13   unfettered control over the credit lien agreement -- the

14   lien credit agreement.  And he found in that respect, Your

15   Honor, and I quote again, with respect to the Third

16   Amendment:

17           "The quid pro quo for permitting Yucaipa to

18   acquire the term loan was that any such term loans acquired

19   by Yucaipa would be subject to substantial restrictions

20   that, among other things, would preclude Yucaipa from voting

21   on any matter that would affect in any way the rights and

22   remedies of the lenders."

23           That's, again, on the Third Amendment, Your Honor.

24   That's page 9 of Exhibit 1, Justice Ramos's opinion.

25           In fact, Justice Ramos also found, and I quote

1    from page 4 of his opinion:  "The restrictions" -- and he

2    was dealing here with the Third Amendment.  It's the section

3    of his opinion on the Third Amendment:  "The restrictions

4    precluded Yucaipa from becoming the requisite lender or

5    exerting a control over the other lenders."

6              It's clear from the opinion, Your Honor, that

7    Justice Ramos is construing the Third Amendment here.

8              He also found at pages 4 -- 4 and 5 of his opinion

9    that the Third Amendment prohibited Yucaipa from exercising

10   any voting rights they would otherwise have as a lender.

11   With respect to that, pages 4 and 5, the quote by the judge

12   is:

13             "By the terms of the Third Amendment upon

14   acquiring any interest in the term loans, Yucaipa 'knowingly

15   and irrevocably waived any and all right to exercise any

16   voting rights it would otherwise have as lender for all

17   purposes under the credit agreement.'"

18             He was quoting from the Third Amendment.

19             Under the Third Amendment, Your Honor, he also

20   found "That the aggregate outstanding principal amount of

21   the term loan of Yucaipa shall be disregarded for purposes

22   of the definition of term loan exposure and, thus, for the

23   calculation of who can be the requisite lender."  That's

24   page 5 of his opinion.

25             It is clear from Justice Ramos's opinion, Your

1    Honor, that he construed the terms of the Third Amendment

2    and determined the issues which led him to -- to conclude

3    that Yucaipa is not the requisite lender.

4              And, Your Honor, the reason that I'm --

5              THE COURT:  Well, what --

6              MR. WARD:  -- quoting --

7              THE COURT:  -- what about -- what about this

8    argument that, fine, but because of the nature of who was on

9    which side at which time that Justice Ramos's ruling are not

10   binding as collateral estoppel on Yucaipa?

11             MR. WARD:  Well, Your Honor, the only person that

12   -- the only entity I know that's -- that's fighting my

13   clients being the requisite lender is Yucaipa.  The fact is

14   Allied -- and I can find a cite for it, Your Honor.  Allied,

15   I believe, in its opposite -- or its -- its statement on

16   June 19th in connection with the application or the

17   objection, I suppose, of Yucaipa said -- and this is at

18   Exhibit 5 to my -- to my affidavit, Your Honor, which is the

19   reply affidavit.  At paragraph 9, Allied acknowledged that

20   in the New York Court, the New York Court conclusively

21   determined that "Yucaipa is not the requisite lender and

22   that Justice Ramos's ruling is binding and conclusive."

23             Further, at page 2 and in paragraph 16 of that

24   same document, which is the debtors' document -- it's

25   Exhibit 5 to my affidavit -- Allied -- Allied acknowledged

1    in the opening paragraph and at paragraph 16 that Black

2    Diamond, Spectrum and the AMMC Group are the requisite

3    lenders.  The only entity, Your Honor, here that's fighting

4    is -- is the only entity with respect to which we have

5    collateral estoppel, and that is Yucaipa which was a party

6    to the New York case.

7              THE COURT:  Okay.

8              MR. WARD:  And -- and I would like to get into the

9    elements of collateral estoppel, if I can, Your Honor --

10             THE COURT:  Sure.

11             MR. WARD:  -- to -- to seek further to prove that.

12             Your Honor, with respect to collateral estoppel,

13   we believe that the issue of Yucaipa not being the requisite

14   lender was raised in the New York proceeding.  That's the

15   first element of collateral estoppel;

16             Secondly, that the issue was actually litigated

17   and decided in that proceeding;

18             Third, that Yucaipa had a full and fair

19   opportunity to litigate those issues; and

20             Fourth, that the resolution of those issues was

21   necessary to support the final judgment, the valid and final

22   judgment on the merits because the issue of whether or not

23   Yucaipa was a requisite lender was actually raised.

24             And, Your Honor, with respect to that, let me

25   point to Your Honor that in the wherefore clauses in the New

1    York complaint, which is Exhibit 4 to the -- to the

2    Mendelson affidavit, which is our moving affidavit, it

3    doesn't tie the request for a declaration that Yucaipa is

4    not the requisite lender to the Fourth Amendment.  They're

5    separate.  They're separate elements.

6              In addition to that, Your Honor, at paragraph 14

7    of the New York complaint we separately seek "a declaration

8    that the purported Fourth Amendment is invalid and that the

9    Yucaipa defendants are not the requisite lender under the

10   credit agreement."  They weren't tied together.

11             And in fact, Your Honor, at page 5 -- I'm sorry --

12   page 3, paragraph 5 of the New York complaint the

13   petitioning creditors allege:

14             "The Third Amendment also expressly provided that

15   if Yucaipa were to acquire any term loan exposure, Yucaipa

16   would not be entitled to vote and the obligations held by it

17   would essentially be disregarded in connection with any

18   matter required to be submitted to the lenders for consent

19   under the credit agreement."

20             I'm -- I'm just going to point out a few

21   paragraphs, Your Honor, where in our complaint in the New

22   York action we specifically addressed the Third Amendment

23   and -- and Yucaipa engaged us in their answer in connection

24   with those allegations.

25             For example, in paragraph 31 at page 10 of our New

1   York complaint we say, with respect to the Third Amendment:

2   "Specifically, Yucaipa's potential status as a lender was

3   subject to the following restrictions and conditions, among

4   others:  Three, Yucaipa would not have any voting rights

5   with respect to any term loan."  That was specific to the

6   Third Amendment.

7            At paragraph 31 of Yucaipa's answer, Yucaipa

8   engages on that issue and says -- they state that the

9   question of whether or not and to what extent Yucaipa's

10  potential status as a lender is subject to restrictions and

11  conditions is a question of law for which no response is

12  required.

13           By the way, Your Honor, when we sought a

14  determination in our wherefore clause, and I believe I said

15  in paragraph 16 of the complaint, we sought a determination

16  that they were not the requisite lender under the credit

17  agreement.  And in the complaint we defined the credit

18  agreement to include the Third Amendment.  And -- and that

19  is clear throughout the complaint and it's clear in

20  Yucaipa's answer.

21           At paragraph 33, page 11, Your Honor, of our

22  complaint, again speaking about the Third Amendment, we said

23  that the restrictions and conditions were necessary -- the

24  restrictions and conditions in the Third Amendment were

25  necessary to ensure that Yucaipa "did not obtain unfettered

Case 1:20-cv-09747-GSS   Doc 52-11   Filed 09/01/13   Page 45 of 131
Case 1:13-cv-09747-CSS   Doc 52-11   Filed 09/26/20   Page 245 of 331

Page 24

1    control over Allied by, among other things, becoming the

2    requisite lender."

3              We continue at paragraph 34 to cite the Third

4    Amendment and say, "Pursuant to the Third Amendment, the

5    prohibitions imposed on Yucaipa's ability to acquire and

6    write term -- and -- and buy term loans and other

7    obligations effectively preclude Yucaipa from ever becoming

8    a requisite lender."

9              In its answer -- and, again, Yucaipa is engaging

10   us in these allegations.  We're making the allegations about

11   the Third Amendment.  They're engaging us in those

12   allegations.  Yucaipa denies the allegations that I just

13   referred to that we had made, denies the allegations

14   contained in paragraph 34, and respectfully refers the Court

15   to the credit agreement and all of the amendments thereto

16   for a full and accurate statement of its contents.  We had

17   already defined in the complaint what the credit amendment

18   was -- credit agreement was and that is -- it includes the

19   Third Amendment and the Fourth Amendment, and Yucaipa here

20   says, "and all the amendments thereto."

21             I'm not going to burden the record much further,

22   Your Honor, but at page -- paragraph 60, page 18 of our

23   complaint we say, "We seek a declaration under CPLR" --

24   that's Civil Practice Law and Rules -- "3001 that the

25   purported Fourth Amendment is null and void and, separately,

1    that Yucaipa is not requisite lender under the credit

2    agreement."

3            Yucaipa, in its answer, admits that the complaint

4    seeks this declaration, but denies that the plaintiffs are

5    entitled to it.

6            There's no place in the -- in the answer where

7    Yucaipa says, we're only fighting here about the Fourth

8    Amendment.  We were fighting about the Third Amendment and

9    the Fourth Amendment.

10           THE COURT:  Well, my memory of the argument in

11   front of Justice Ramos was that it was focused entirely on

12   the Fourth Amendment.

13           MR. WARD:  Your Honor, there's a couple of things

14   you have to remember.  First off, there was an argument on

15   November 19th and -- and those issues -- and it was a -- it

16   was a longish argument, but those issues, as happens in oral

17   argument, went one or two different directions depending on,

18   you know, how the parties were arguing.

19           But if you actually look at our motion -- if you

20   actually look at two things.  First off, Justice Ramos's

21   decision, which I was reading to you earlier, where there

22   are numerous quotes where he's construing the Third

23   Amendment.  But, also, if you look at the motion for summary

24   judgment that we actually filed -- and let me just quote a

25   couple of things from there.

1          With respect to our motion for summary judgment,

2     in our moving brief at page 25 we seek a ruling from the New

3     York Court that "it declare that Yucaipa is not the

4     requisite lender under the credit agreement."  And we don't

5     say there a requisite lender under the Fourth Amendment.

6          In connection -- in our reply brief on summary

7     judgment -- this is paragraph -- this is Exhibit 68 to Mr.

8     Sauer's affidavit, the petitioning creditors specifically

9     argue that Yucaipa could not have become a requisite lender

10    under the Third Amendment; that under the Third Amendment at

11    Section 2.1(e) Yucaipa "could buy a limited amount of term

12    loans and could never vote them."  That's page 7.  This is

13    all in our motion for summary judgment which was before the

14    Court and, actually, as a result an actually litigated

15    issue.

16         And in addition in our reply brief on summary

17    judgment, "That the prohibitions in the Third Amendment

18    prevent a defendant from becoming requisite lenders."

19    That's at page 8.

20         It's clear, Your Honor, that in our summary

21    judgment motion we were addressing the Third Amendment, the

22    Fourth Amendment, and the issue of requisite lender all at

23    once.  The fact that -- by the way, on the November 19th

24    oral argument that we focused mainly on -- or we focused, I

25    think -- well, actually, we focused on two things, Your

```
 1    Honor.

 2              First, language in the Fourth Amendment.  But very

 3    quickly, language in one of the defenses that had been

 4    raised by Yucaipa based on the Georgia action.  So,

 5    basically, those were the two issues that were in that oral

 6    argument.

 7              However, in the actual written decision from

 8    Justice Ramos, I think dated March 19th, he deals

 9    extensively with the Third Amendment and then deals with the

10    Fourth Amendment.  And it's on -- on both of those bases,

11    and I think it is very clear from reading his opinion that

12    he decides those issues.

13              But the reason I've been going through, Your

14    Honor, what we actually argued in our complaint and then in

15    response to Your Honor's question of what was actually

16    argued or asserted in our complaint -- alleged in our

17    complaint, and then what we actually argued in summary

18    judgment is that the issue of Yucaipa not being the

19    requisite lender was raised in the New York proceeding.

20    It's in our complaint.  If you look through it, if you look

21    at the cites that I've mentioned it's actually there.

22    Yucaipa engages us in that issue.  The issue was actually

23    litigated and decided in the proceeding.

24              Now Yucaipa says they didn't have a full

25    opportunity -- a full and fair opportunity to litigate.
```

1   However, Justice Ramos said at page 13 of his opinion,

2   Exhibit 1 again, "The credit agreement itself is unambiguous

3   and, accordingly, summary judgment is appropriate."  That's

4   page 11 of his argument -- of his decision actually.

5        For their part, the defendants contend that there

6   are many factual issues.  There are none.  This is a case of

7   contract interpretation.  That's page 13.  And Your Honor

8   knows very well that when you have a case of contract

9   interpretation and when the contract is clear on its face,

10   you don't need extrinsic evidence.  The argument that

11   Yucaipa is making that they didn't have a chance to do

12   discovery and, as a result, they didn't have a full and fair

13   opportunity to litigate is -- is just wrong.

14        In fact, we quote a case at page 7 of our brief

15   called Kronish versus Dehari (ph) saying that a summary

16   judgment constitutes "a full and fair opportunity to

17   litigate."

18        Yucaipa had the full and fair opportunity to

19   litigate, Your Honor.  The issue was raised in our answer.

20   The issue was raised in our summary judgment motion.  And

21   the resolution of the issue, Your Honor, was necessary for a

22   valid and final judgment because we did ask for that relief

23   in our complaint.  In our wherefore clause we do ask

24   separately that the Fourth Amendment is -- is invalid and,

25   secondly, that they were not the requisite lender.

1          In getting there, if you read Justice -- if -- and

2     I'm sure Your Honor has -- if you read Justice Ramos's

3     decision which is Exhibit 1 to our moving affidavit, he

4     clearly goes through the Third Amendment and construes it.

5     And I've --

6          THE COURT:  Okay.

7          MR. WARD:  -- I've cited to some of the

8     constructions.  And, in fact, it's some of the same

9     construction that I'll be going through a minute in talking

10    about the Third Amendment, Your Honor.

11         THE COURT:  Okay.

12         MR. WARD:  But -- so why don't I just move on,

13    Your Honor.  And with respect to the next issue, even if the

14    New York Court had not already ruled that Yucaipa was the

15    requisite lender, that Court clearly ruled that the

16    purported Fourth Amendment is no longer in effect -- is null

17    and void and was never in effect, actually, and that's

18    clearly binding on collateral -- by virtue of collateral

19    estoppel on Yucaipa.  I don't see any fight on that issue.

20         And that holding results, Your Honor, in the

21    application of the Third Amendment since the Fourth

22    Amendment has been dealt -- has been determined to be null

23    and void.  That holding results in the application of the

24    Third Amendment to the issues presented in this motion.

25         And this includes the express provisions in the

1    Third Amendment that any obligations -- and I'll get into

2    these in a second.  Any of the debt obligations acquired by

3    Yucaipa are disregarded and not counted for purposes of

4    determining who is the requisite lender.

5            Now Yucaipa argues that the Third Amendment is

6    ineffective.  But that's directly at odds with, I believe,

7    this Court's prior recognition of the Third Amendment as

8    effective, valid and enforceable.

9            And that is, Your Honor, on October 18, 2012, Your

10   Honor will recall Allied commenced its own adversary

11   proceeding before this Court.  And in Exhibit 4 to my reply

12   affidavit, we attached that complaint and in that complaint

13   Allied seeks a declaration identifying who the requisite

14   lender is and a ruling on the enforceability of both the

15   Third and the Fourth Amendments.

16           Then after Justice Ramos ruled from the bench on

17   November 19th, but before his longer written decision which

18   is the one that deals much more with the Third Amendment, as

19   the Court is aware Yucaipa filed cross-claims against, among

20   other -- among other defendants, my clients, the petitioning

21   creditors.  That's Exhibit 15 to our moving affidavit.

22           Now petitioning creditors moved to dismiss that

23   cross-claim.  That's Exhibit 22 to our moving affidavit,

24   which motion this -- this Court granted on several grounds

25   and including, Your Honor, the ground that the covenant not

```
 1    to -- not to -- that there was a covenant not to sue

 2    contained in the Third Amendment at Section 2.7(e), page 7

 3    of the Third Amendment, which was binding on Yucaipa once it

 4    -- once it purchased the Allied debt.

 5            In fact, this Court specifically -- and in fact --

 6    I'm sorry -- that Section 2.7(e) at page 7 of the Third

 7    Amendment, the covenant not to sue, is binding only on

 8    Yucaipa.  It is specifically tailored to Yucaipa.  It just

 9    says Yucaipa.  They're called the restricted lender

10    affiliate, something like that, but it's a defined term in

11    there.

12            But with respect to Your Honor's ruling, what Your

13    Honor said on February 27th in your ruling, which is Exhibit

14    3 to our moving affidavit, Your Honor said, "In support of

15    that" -- our motion to dismiss the cross-claims, which Your

16    Honor granted -- "In support of that, I really, for all

17    material aspects, adopt the petitioning creditors' arguments

18    virtually in toto."  And then the Court highlighted the

19    arguments on which it relied.

20            In particular, the Court's decision turned on this

21    covenant not to sue, which is only contained in the Third

22    Amendment and specifically refers only to Yucaipa.  And the

23    Court found that contrary to Yucaipa's arguments, the

24    covenant not to sue in the Third Amendment, which

25    specifically, you know, addressed them, was binding on
```

1    Yucaipa.  And the Court found that the allegations pled by

2    Yucaipa in arguing in their -- in their cross-claims against

3    the application of the covenant not to sue was not plausible

4    under the Twombly Iqbal standards.  That's page 104 of

5    Exhibit 3, Your Honor.  That's the transcript.

6            The Court found that the plain meaning of this

7    covenant not to sue in the Third Amendment, that the plain

8    meaning is that Yucaipa couldn't sue.  In fact, the quote

9    from Your Honor is, at page 105, "I don't think there's any

10   question as to the plain meaning of the covenant and I think

11   it's very clear."

12           Now since the Court found that Yucaipa was bound

13   by the covenant not to sue, which is contained in the Third

14   Amendment, obviously the Court was finding that Yucaipa was

15   bound by a provision of the Third Amendment and that the

16   Third Amendment was binding and effective on Yucaipa, which

17   we think is the law of the case, but let me just go a little

18   bit further on this, Your Honor.

19           This Court then made several other findings that

20   reinforced the applicability of the Third Amendment as

21   against Yucaipa.  At page 106, lines 9 through 15:

22           "As to the applicability, the first lien credit

23   agreement does contain the provision that when you buy or

24   assign the debt, you are stuck with what you asked nor had

25   previously agreed to and waived, et cetera.  And I find that

Case 1:12-cv-09947-GSS Doc 52-11 Filed 03/26/20 Page 54 of 131
Case 1:12-cv-09947-GSS Doc 52-11 Filed 03/26/20 Page 54 of 131

Page 33

1    when Yucaipa bought this debt, they were subject to the

2    agreements that had been previously entered and, as such,

3    they are applicable when they're -- when they're looking at

4    the Third Amendment."  I think it's when we're looking at

5    the Third Amendment, Your Honor, but you certainly

6    referenced the Third Amendment at the end.

7            And then again, Your Honor, at page 106 at -- at

8    -- I'm sorry, Page 106, line 22 to page 107 line 1, "That's

9    the very normal and understandable provision; that when you

10   buy something, when you buy a debt, when you buy the debt,

11   it is what it is and you are where you are, and you can't

12   undo -- you can't have that time machine ability to undo the

13   previous agreement."

14           What Your Honor was talking about there, I

15   believe, was that the Fourth Amendment had been rendered

16   null and void, and you go back to the Third Amendment and

17   you can't act as if the Third Amendment didn't exist.

18           However, once again, the language that I'm quoting

19   to Your Honor from your opinion, I think, of February 27th

20   was -- points out that the Third Amendment was binding on

21   Yucaipa.  And we believe, Your Honor, that this is law of

22   the case.

23           In response, Yucaipa argues that the application

24   of law -- of the law of the case doctrine is discretionary.

25   However, I point out, Your Honor, that one of your bases for

Case 14-50947-CSS   Doc 52-11   Filed 09/26/20   Page 35 of 131
Case 1:20-cv-00747-CSS   Doc 52-11   Filed 09/01/13   Page 35 of 131

Page 34

1    your determination was the application of the Twombly Iqbal

2    standards that the claims -- that -- that the claims have to

3    rise to the level of plausibility, which is Exhibit 3, page

4    104, lines 7 through 11.  There's nothing that's happened

5    since this Court's determination of February 27th, five

6    months ago, to make those cross-claims about actions from

7    four -- and four and five years ago more plausible.

8              Further, this Court denied Yucaipa's application

9    to re-plead, and said at Exhibit 3, page 110, lines 6

10   through 7, "I'm going to dismiss the case with prejudice."

11             So, yes, Your Honor, the application of the law of

12   the case doctrine is discretionary, but nothing has changed

13   since then.  We believe it was a firm finding by Your Honor

14   and Your Honor, in fact, dismissed the case with prejudice.

15             Now, Your Honor, moving on to the Third Amendment

16   itself, even if this Court determines not to apply its prior

17   determination that the Third Amendment, we believe, is

18   effective, there can be no doubt that the Third Amendment is

19   effective.

20             Yucaipa's argument as to why the Third Amendment

21   is ineffective is that the Fourth Amendment requires

22   unanimous consent and so must the Third Amendment.  And

23   Yucaipa has several other arguments, but let me get into our

24   -- the main thrust of the argument here, Your Honor.

25             The fact is this -- this argument by Yucaipa rests

1   on the fundamental misconception as to Section 10.5 of the

2   first lien credit agreement, and it ignores critical

3   differences between the Third Amendment and the Fourth

4   Amendment.

5           Generally, amendments to the first lien credit

6   agreement are controlled by Section 10.5(a), and that's

7   Exhibit H, which is the first lien credit agreement, and

8   that requires only requisite lender consent, which was

9   obtained in connection with the Third Amendment.

10          With respect, however, to certain other types of

11  amendments, they are controlled by Section 10.5(b) as

12  opposed to (a), and with respect to Section 10.5(b)(ix), and

13  I quote, this is Exhibit A, the first lien credit agreement:

14  "Without the written consent of each lender, other than a

15  defaulting lender, that would be effected thereby, no

16  amendment, modification, termination or consents shall be

17  effective if the effect thereof would be," and then "(ix)

18  amend the definition of requisite lender."

19          Now Justice Ramos found that the purported Fourth

20  Amendment had the effect of amending the definition of

21  requisite lenders because it allowed Yucaipa, for the first

22  time, to become a requisite lender and thus effected --

23  effected and affected -- thus affected every lender without

24  requiring -- thereby requiring unanimous consent, which

25  wasn't obtained.

1        And I was trying to imagine a more fundamental

2   change than that before the Fourth Amendment Yucaipa could

3   not be the requisite lender and then after the Fourth

4   Amendment they could.

5        But the change to the Third Amendment on the other

6   hand, Your Honor, did not affect any of the lenders because

7   prior to the Third Amendment, Yucaipa could not become the

8   requisite lender and after the Third Amendment Yucaipa could

9   not become the requisite lender because, as I'll get into in

10  a minute, there were significant restrictions placed on the

11  debt that Yucaipa bought.  I've been calling it neutered

12  debt in -- in several of those proceedings.

13       However, as opposed to the Third Amendment, the

14  purported Fourth Amendment is a very different story because

15  after its alleged passage, Yucaipa could become the

16  requisite lender.

17       Your Honor, prior to the Third Amendment Yucaipa

18  was precluded from buying any Allied debt under the first

19  lien credit agreement and that's because the definition of

20  eligible lender excluded Yucaipa specifically.  They were

21  the sponsor and the sponsor was excluded.

22       THE COURT:  Were they -- were they prohibited from

23  buying or were the lenders prohibited from selling?

24       MR. WARD:  Well, Your Honor, I -- I think it's the

25  lenders were prohibited from selling, but I don't see at the

1    end of the day that that really matters as much because,

2    first off, once they bought the debt they were still subject

3    to the prior authorities and conditions, and so they became

4    subject to the terms.  And maybe that's a little bit

5    circular.

6              But. in addition, how do you buy the debt that

7    you're precluded from buying without causing a tortuous

8    interference with the agreement.  So it seems that what

9    Yucaipa is saying is by virtue of their wrongful behavior,

10   they should be rewarded here.  We don't think that that's

11   justifiable or allowable under -- under any of the claims.

12             If what Your Honor is talking about is the Praven

13   (ph) line of decisions that was raised, you know, by

14   Yucaipa, I'm happy to get into that --

15             THE COURT:  Yeah.  Please do.

16             MR. WARD:  -- right now.

17             Well, with respect to Praven, Your Honor, and I

18   think some of this is really a red herring.  But Praven is

19   the governing case.  It's a Second Circuit case and it holds

20   that under New York law only expressed limitations on

21   assignability are enforceable.  And you have to remember the

22   context in which the Praven case was coming out of.

23             In Praven, the underlying agreement "expressly

24   permits assignments to financial institutions," and this is

25   a quote.  "It does not limit assignments only to those

1    entities."  In other words, it's inclusionary.  It's not

2    exclusionary language.  And as I was citing to Your Honor,

3    what -- what Praven -- what the Second Circuit in Praven was

4    looking for is exclusionary language.  You know, it said

5    "Under New York law only expressed limitations on

6    assignability are enforceable."

7           And with respect to Praven, again, the underlying

8    language that's being construed is -- this is -- this is the

9    language from the underlying agreement:  "We may -- we may

10   assign all or any part of our interest in the letter

11   agreement to any financial institution."  In other words,

12   it's all inclusionary.  It says who you can assign to.  It

13   doesn't say who you can't assign to.

14          This agreement is very clear.  It's page -- I

15   believe it's page 17.  It's the definition -- of Exhibit 8.

16   It's the definition of eligible lender, eligible assignee,

17   and it specifically excludes Yucaipa.  In Praven, there's no

18   exclusionary language.  There's only inclusionary language,

19   Your Honor.  That's very, very different.  And -- and we'll

20   get into that in a second, Your Honor.  But, specifically,

21   Yucaipa was excluded from -- from being an eligible assignee

22   under the agreement.  And that's very much missing in

23   Praven.

24          In addition, Your Honor, Yucaipa cites a number of

25   -- of other cases.  And I'm sorry.  And the exclusionary

1    language actually continued in the Third Amendment, Your

2    Honor, because Yucaipa was specifically excluded from being

3    able to buy any letter of credit debt and revolving debt.

4    That's Section 2.1(c) of the Third Amendment.  And under

5    Section 2.7(e) of the Third Amendment, they could only buy

6    20 percent of the aggregate principal amount of term loan

7    exposure or $50 million, subject to significant limitations.

8    I'll get into that in a second.

9            But we believe, Your Honor, that the Praven

10   standard was satisfied because of the expressed limitations

11   on assignability, you know, contained in -- in the credit

12   agreement.

13           Now Yucaipa also cites Sullivan, Alhusen (ph) and

14   a number of other New York cases which it relies on which

15   don't involve credit agreements.  They are factually

16   distinguishable.  They are assignments of simple bilateral

17   contracts which -- where typically there's a provision in

18   each of those contracts requiring the consent of the other

19   side.  That's not this agreement.  This is a very different

20   agreement, our credit agreement.  There's no consent

21   requirement and it's a much more complex agreement.

22           But in connection with Sullivan and Alhusen and

23   the thing to recall -- or the thing to take into account is

24   that these cases state a proposition relative to the general

25   assignability of clauses under New York law.  And in none of

Page 40

1    these cases is there exclusionary language.  There is no

2    list in Alhusen or Sullivan or any of these cases as to a

3    specific assignee that is excluded.  Again, it's -- it's a

4    simple proposition of New York law that generally, you know,

5    generally you can have assignments.  Generally, as the quote

6    -- as the Court quoted in Alhusen and Sullivan, you know,

7    generally you can have assignments.

8           However, in none of those cases was there any

9    exclusionary language specifying an entity or a person to

10   whom you could not assign.  And I think that's very

11   important, Your Honor.

12          In addition, in Alhusen and Sullivan, Praven and

13   also -- and I'll get to it in a second -- in 785 Partners,

14   you didn't have a case where the assignee, Yucaipa here,

15   negotiated the limitations on their ability to -- on the

16   ability to assign, as Yucaipa did here.  And I can get into

17   that in a second.  We cite it in our brief.  It was Yucaipa

18   itself that negotiated the Third Amendment.

19          And so in none of these cases do you actually have

20   a situation where it's the assignee who is negotiating the

21   limitation and then is seeking relief from the limitation by

22   going to this general principle of New York law.

23          However, Alhusen, Sullivan, they are all general

24   assignability cases, but so is Singer versus Baccus (ph),

25   which is a more recent case.  It's an appellate division

1    case.  As Your Honor knows, that's the intermediate

2    appellate court in New York.  It's a 202 case.

3              And Baccus holds, Your Honor, and we think this is

4    dispositive, "There is no need for the non-assignment clause

5    to also contain talismanic language or magic words

6    describing the effect of any attempt by the assignor to make

7    an assignment."  That's a much more practical way of looking

8    at it.

9              Also, in Alhusen, one of the cases that's relied

10   upon by Yucaipa, the Court said, "When clear language is

11   used and the plainest words have been chosen, parties may

12   limit the freedom of alienation of rights and prohibit an

13   assignment."

14             Your Honor, there's nothing clearer than what's

15   contained in paragraph -- in -- at page 17, Section 1.1 of

16   the first lien credit agreement where it says Yucaipa may

17   not be the eligible -- may not be an eligible assignee.  And

18   then in the Third Amendment where it says Yucaipa may not

19   buy LC debt, may not buy revolving debt, and it can buy a

20   certain amount of term loan debt with significant

21   limitations.

22             Now with respect to 785, once again, as with

23   Praven, there was a provision about the entities to whom an

24   assignment could be made; again, inclusionary language.  You

25   can assign to a financial institution.  There was no

1  language saying you could not assign to X.  There was no

2  exclusionary language.  Again, that's a strong factual

3  distinction between that case, the Praven case, and our

4  case.

5         And with respect to 787 (sic), as I said, it

6  relies very heavily upon Praven, which is to be expected.

7  Praven is the Second Circuit case, and we believe we

8  satisfied the Praven standard with the exclusionary

9  language, the expressed limitation language.  And, remember,

10  what Praven was looking for was expressed limitation

11  language and there's expressed limitation language in the

12  first lien credit agreement and in the -- in the Third

13  Amendment with respect to Yucaipa.

14         But, also, in 785 Partners, the facts are very

15  different from the case here.  The facts in 785 were between

16  -- the dispute was between a borrower and a single assignee

17  of a single creditor.  It was a lender/borrower dispute.

18  Here, the dispute is an inter-creditor dispute where one

19  lender knowingly violated an agreement it itself negotiated

20  in order to obtain an advantage over the other lenders.  We

21  think as a result, Your Honor, 785 is factually

22  distinguishable.

23         And Yucaipa cites no cases involving inter-

24  creditor disputes.  They cite a fair number of New York

25  cases involving simple contract assignability provisions.

1    They are not credit agreements.  They are bilateral

2    contracts.  This is a much more complex situation, as Your

3    Honor knows from all the time we've spent with you.  But

4    there's no case, Your Honor, that they cite where there's an

5    inter-creditor dispute involved.

6              THE COURT:  Okay.

7              MR. WARD:  And once again, 785, Your Honor, is not

8    a case where the assignee negotiated the limitation on the

9    ability to assign as Yucaipa did here.

10             THE COURT:  Right.

11             MR. WARD:  So we think, Your Honor, that there are

12   many reasons that it's distinguishable.

13             But if I -- if I can get back to the Third

14   Amendment, Your Honor.

15             THE COURT:  Yes.  Thank you.

16             MR. WARD:  With respect to the Third Amendment,

17   Your Honor, it -- first off, it -- it provided strict

18   conditions and limitations on the very limited amount of

19   debt that Yucaipa was allowed to buy, the result of which

20   was that Yucaipa could not become a requisite lender.

21             For example, Section 2.1(e) of the Third Amendment

22   -- and that's page 3 of the Third Amendment and that's

23   Exhibit 2 to the Mendelson affidavit, our moving affidavit

24   says, "The aggregate outstanding principal amount of term

25   loans of Yucaipa shall be disregarded for purposes of this

1   definition of term loan exposure."

2          As Justice Ramos explained, Your Honor, at page 12

3   of his opinion, Exhibit 1 -- and by the way, Section 2.1(e)

4   is very important because it specifically says that any term

5   loan debt that Yucaipa buys shall be disregarded for

6   purposes of this definition.  And it's this definition that

7   is applied in connection with requisite lender because, as

8   Justice Ramos explained:

9          "The term loan exposure is utilized both to define

10  which lenders may become the requisite lenders or be part of

11  the group comprising requisite lenders, and to calculate

12  whose obligations may be counted by calculating the amount

13  that a lender or group of lenders must hold in order to be

14  the requisite lender."

15         So the definition, Your Honor, of requisite

16  lender, as Your Honor I think is familiar with very well by

17  now at page 41 of the first lien credit agreement is, "more

18  than 50 percent of the sum of the aggregate of term loan

19  exposure, letter of credit exposure, and revolving debt

20  exposure."

21         And the fact is since, under Section 2.1(e) of the

22  Third Amendment the term loan exposure may not be counted

23  for any purpose whatsoever, they can never become the

24  requisite lender because under Section 2.1(c) of the Third

25  Amendment they are prohibited from buying an LC debt, any

1    letter of credit debt, and they are prohibited from buying

2    revolving debt.

3              And with respect to Section 2.1(e) at page 3 of

4    the Third Amendment that I just read, none of the term loan

5    debt that they buy can be counted for any purpose, including

6    for purposes of determining the requisite lender.  So they

7    can never get there under the Third Amendment.

8              Your Honor, the point I'm trying to make is that

9    the Third Amendment and the Fourth Amendment were very

10   different.  The Fourth Amendment definitely affected all the

11   lenders because it removed all the restrictions in the Third

12   Amendment and thereby allowed Yucaipa for the first time to

13   become the requisite lender.

14             With respect to the Third Amendment, as Justice

15   Ramos found, there was a quid pro quo.  You can buy some

16   debt, but subject to significant restrictions, including

17   some of the ones that I just spoke about, Your Honor.

18             With respect to the Third Amendment -- and I'll

19   continue just a little bit, Your Honor, on that -- the

20   definition of term loan exposure as originally contained in

21   the first lien agreement is at Section 1.1, page 45, and it

22   defines term loan exposure as: "With respect to any lender

23   as of any date of determination, it's the outstanding

24   principle amount of the term loan of such lender."  This is

25   a fairly flat definition of what term loan exposure is.

1          When the Third Amendment was put into effect,

2     there was a proviso added that I eluded to already, Your

3     Honor, and that's at 2.1(e) of the Third Amendment, page 3.

4     And the language continues the language I've cited to you

5     from the first lien agreement which is fairly plain vanilla;

6     that with respect to any lender as of any date of

7     determination, the outstanding principle amount of the term

8     loan of such lender -- that's the underlying language from

9     the Third Amendment.  Then there's a proviso added by the

10    Third Amendment:

11         "Provided further that with respect to any

12    provision of this agreement relating to the voting rights of

13    lenders, including the rights of lenders to consent or take

14    any action with respect to any amendment, modification,

15    termination or waiver of any provision of this agreement or

16    the other credit documents, or consent to any departure by

17    any credit party therefrom, the aggregate outstanding

18    principle amount of the term loans of all restricted sponsor

19    affiliates" -- restrict sponsor affiliates, that's -- that's

20    Yucaipa; that's a defined term.  Their debt "Shall be

21    disregarded for the purposes of the definition of term loan

22    exposure."

23         And that's important, Your Honor, because as I

24    pointed out, the definition of requisite lender includes

25    term loan exposure, LC exposure and revolving debt.  Under

1    Section 2.1(c) of the Third Amendment, Yucaipa could not buy

2    any LC debt.  The definition of eligible assignee, which is

3    amended at that section, says they cannot buy.  They cannot

4    have any LC debt.

5           With respect to the term loan debt that they were

6    allowed to buy, it's -- it doesn't count as -- as the

7    definition of term loan exposure at Section 2.1(e) that I've

8    just read shows.

9           So with respect to those two limitations -- or as

10   a result of those two limitations, Yucaipa could never

11   become the requisite lender because any LC debt -- well,

12   it's not allowed to buy any LC debt under 2.1(c) of the

13   Third Amendment.  And with respect to 2.1(e), any term loan

14   debt it buys, which is of a limited amount, it can't count

15   for the definition of requisite lender.

16          So definitionally it can never become the

17   requisite lender because it can't get to the majority of the

18   aggregate -- of the sum of the aggregate of the term loan

19   debt, the LC debt, and the revolving debt because it can't

20   buy LC debt under 2.1(c) of the Third Amendment, and any

21   debt -- any long-term debt it buys under 2.1(e) just doesn't

22   count for any purpose whatsoever.

23          But in addition to that, Your Honor, there's

24   another reason they can't become the requisite lender, and

25   that's because even if this -- these provisions saying that

1    the term loan debt doesn't count and that they can't buy LC

2    debt, there are other restrictions.

3              For example, Section 2.7(e) of the Third Amendment

4    provides a new section or creates a new section in the first

5    lien credit agreement, 10.6(j)(iv).  It's at page 7 of the

6    Third Amendment and it says: "Each lender that is a

7    restricted sponsor affiliate" -- and that's -- that's

8    Yucaipa.  That's the definition of Yucaipa in the Third

9    Amendment.

10             "Each lender that is a restricted sponsor

11   affiliate, upon succeeding to an interest in the term loans"

12   -- and then -- "(iv) knowingly and irrevocably waives any

13   and all rights to exercise any voting rights it would have

14   otherwise -- it would otherwise have as a lender for all

15   purposes under this agreement and the other credit

16   documents."

17             It just can't get any broader than that.  They

18   completely have given up any voting rights in return for the

19   quid pro quo, as Judge Ramos cites, for obtaining -- or the

20   ability to buy some term loan debt.

21             Now this provision couldn't be any more clearer.

22   Yucaipa just forfeited any right it had to vote.  But this

23   Third Amendment also provides -- and it's very relevant for

24   the proceedings before Your Honor -- at Section 2.7(a) at

25   page 5 of the Third Amendment, which is Exhibit 2:

1    "Restricted sponsor affiliates" -- again, that's Yucaipa.

2    "Restricted sponsor affiliates shall have no voting rights

3    for all purposes under this agreement (whether before,

4    during or after and in any insolvency or liquidation

5    procedure) and the other credit documents with respect to

6    their term loans specific to an insolvency."

7              The same line, Your Honor, continues -- or the

8    same theme continues at Section 2.7(b).  I just read 2.7(a).

9    Section 2.7(b) of the Third Amendment at page 5 says:

10             "Yucaipa, the restricted sponsor affiliate, that

11   becomes a lender hereunder shall not, in their capacity as

12   lenders, hereunder and hereby irrevocably and voluntarily

13   waive in their capacity as lenders hereunder any right to

14   make any election, give any consents, commence any action,

15   or file any motion, claim, obligation, notice or application

16   or take any such action in any insolvency or liquidation

17   proceeding without the prior written consent of all lenders,

18   other than restricted sponsor affiliates."

19             Further, in paragraph 7(a), again, at page 5:

20             "Yucaipa, the restricted sponsor affiliates, that

21   become lenders hereunder shall have no right under the

22   agreements  -- under -- under this agreement or any other

23   credit documents and hereby waive any such right to consent

24   to take any action with respect to any amendment,

25   modification, termination or waiver of any provision of this

1    agreement or any other credit document or consent to any

2    departure by any credit party therefrom."

3             They gave up all voting rights.  They specifically

4    gave up all actions with respect to this Court with respect

5    to an insolvency.

6             Now Yucaipa says that the complete lack of voting

7    rights doesn't matter; that they could still count their

8    term loan exposure and partner up with someone else.  Well,

9    they can't count the term loan exposure under 2.1(e).  The

10   Third Amendment specifically says that.  But there are

11   several problems with their argument that -- that they can

12   simply count their exposure even if they can't vote.

13            First, Yucaipa couldn't perform any of the

14   functions that were necessary for a requisite lender if it

15   couldn't vote. If it can't fulfill these functions

16   effectively it can't become the requisite lender.  In fact,

17   the New York Court -- the New York Court found this argument

18   that the determination of requisite lender had nothing to do

19   with term -- with voting rights to be "not logical."  And

20   that's Exhibit 16 to our moving affidavit, the transcript at

21   page 23.  And that the requisite lender's powers to make

22   "amendments, modifications and waivers can be exercised only

23   by voting."

24            So the argument that even though I can't vote I

25   can still become the requisite lender that Yucaipa makes

1    would make this language where they gave up all voting

2    rights, in particular with respect to insolvency

3    proceedings, superfluous.  And as this Court is well aware

4    you can't construe an agreement to render superfluous any of

5    language in the agreement.

6            However, most relevant, Your Honor, are these

7    Sections 2.7(a) and 2.7(b) that I -- that I read to you that

8    specifically provide that Yucaipa has no voting rights

9    "before, during or after any insolvency proceeding."  You

10   know, the obvious intent of all these voting proceedings or

11   all of these voting prohibitions was to prevent Yucaipa from

12   exerting any influence with the very limited amount of term

13   loan debt it was permitted to acquire under the Third

14   Amendment.

15           Plus, Your Honor, whether because of the exclusion

16   of term loan exposure by the definition in 2.1(e) for -- for

17   any purpose, or whether by the voting prohibition that's

18   contained at 2.7(e), Yucaipa simply can't become the

19   requisite lender.  It -- its debt doesn't count for purposes

20   of calculating the requisite lender.  It wasn't allowed

21   under 2.1(c) to buy any LC debt.  So it can never get to the

22   50 percent of the aggregate of term loan debt, LC debt and

23   revolving debt.  And even if it did, it has given up all

24   rights to vote and all rights to participate in proceedings

25   like this.  Therefore, it can't be the requisite lender.

```
 1              THE COURT:  And what about --

 2              MR. WARD:  But, Your Honor, --

 3              THE COURT:  -- what about the argument on the flip

 4   side that you can't be the requisite lender even if they are

 5   not counted because of the infirmity in the transfer of --

 6              MR. WARD:  Well, Your Honor, I can --

 7              THE COURT:  -- I can't remember the name of the

 8   company, but it's about one-and-a-half-million-dollars.

 9              MR. WARD:  AMMC, Your Honor.  You know, and let me

10   get to there right now.

11              The fact is, Your Honor, Yucaipa concedes that we

12   have $51,938,610 in first lien debt, but -- but they do

13   argue that we are lacking the $4,548,000 in first lien debt

14   from AMMC.  So two things, Your Honor, and we've said this

15   in our reply papers and we've attached the documents.

16              Once Justice Ramos declared that Yucaipa was not

17   the requisite lender, the petitioning creditors and AMMC and

18   certain other first lien lenders constituting the requisite

19   lenders appointed Black Diamond Commercial Finance and

20   Spectrum Commercial Finance as the co-administrator -- co-

21   administrator agents, and Black Diamond Finance -- Black

22   Diamond Commercial Finance as the collateral agent.  And

23   they registered the trades.

24              But even if Your Honor finds that that's a little

25   too circular, the fact is the petitioning creditors,
```

1    together with AMMC, would still be the requisite lender

2    because if you add our $51 million in debt to their $4.5

3    million in debt, we do get over the 50 percent hurdle, once

4    Yucaipa's, you know, debt is discounted.

5            And, Your Honor, as we point out -- and this is

6    Exhibit 9 to my reply affidavit.  In the AMMC trade

7    confirmation, AMMC agreed to give petitioning creditors full

8    control of the first lien debt it was selling, including the

9    power to vote and/or to exercise rights or remedies under

10   the first lien credit agreement.  So as a result -- as a

11   result, Black Diamond and Spectrum controlled the AMMC debt.

12   And if you -- if you take the 51 million we have plus the

13   four-and-a-half-million they have, we do get over the 50

14   percent, Your Honor.

15           In fact, if -- if you do the math, it comes out

16   something like this:  With Yucaipa's debt, term loan

17   exposure and -- and LC exposure and all the revolving

18   exposure together, there's a total of $244 million in debt.

19   Of this, Yucaipa purports to hold 134 million of term loan

20   exposure and LC exposure.

21           As we point out, their LC exposure, they're not

22   allowed to have it under 2.1(c) of the Third Amendment.

23   That should fall out.  Their term loan exposure doesn't

24   count for purposes of the calculation of requisite lender.

25   When you take that out, it leaves $109 million worth of

1   debt.  We have together 51.9 million and the AMMC debt which

2   is 4.5 million, and that amounts to more than 50 percent.

3          So we believe, Your Honor, that by virtue of

4   Exhibit 9, which is attached to my reply affidavit, that we

5   do meet the standards.  We do have enough debt.

6          Your Honor, just one other -- a few other very

7   brief points, I believe.

8          Even if the Third Amendment is determined to be

9   ineffective and falls out of the picture entirely, still

10  under the first lien credit agreement Yucaipa can't become

11  the requisite lender.  And that's because the definition of

12  eligible assignee in the first lien credit agreement

13  specifically excludes the sponsor.  The sponsor was Yucaipa.

14  They can't be the assignee of any of the debt.  So Yucaipa

15  couldn't buy that debt.

16         And, Your Honor, let me just walk through this

17  very briefly.

18         The definition of requisite lender -- and I think

19  this is pretty obvious.  The definition of requisite lender

20  is one or more lenders having or holding term loan exposure,

21  LC exposure, and a revolving exposure and representing more

22  than 50 percent of the sum of the aggregate of the term loan

23  exposure, the LC exposure, and the revolving exposure of all

24  the lenders.  But it starts out, the requisite lender is one

25  or more lenders.  The fact is Yucaipa can't become a lender

1    and here's why:

2              Lender is defined at page 30 of Exhibit 8, which

3    is the first lien credit agreement, to be either "An

4    original signatory to the first lien credit agreement" --

5    and it wasn't.  It was specifically excluded as -- as a

6    sponsor.  But it's either "An original signatory to the

7    first lien credit agreement or a person that becomes a party

8    hereto" -- that's to the first lien credit agreement --

9    "pursuant to the assignment agreement."

10             Now the assignment agreement is defined at page 5

11   of Exhibit 8 as "the agreement in the form of Exhibit E to

12   the first lien credit agreement," which at Section 1.2 of

13   this -- of the attachment, Exhibit E, it requires that the

14   assignee, which would be Yucaipa, represents that "it meets

15   all requirements of an eligible assignee under the credit

16   agreement."

17             Well, Yucaipa can never meet any -- can never meet

18   all the requirements of an eligible assignee under the

19   credit agreement because specifically under the first lien

20   credit agreement it's excluded from being an eligible

21   assignee.

22             So considering that in order to be a lender -- in

23   order to be the requisite lender you have to be a lender.

24   In order to be a lender, you have to take your interest

25   pursuant to the assignment agreement.  The assignment

1    agreement requires a specific representation that you'll

2    meet all the requirements of the eligible assignee.  They

3    can't because, specifically, under the definition of

4    eligible assignee in Exhibit 8 of the first lien credit

5    agreement, page 17, they're excluded from being an eligible

6    assignee.

7              And the same is -- would be true even -- even

8    under the Third Amendment, Your Honor, because under Section

9    2.1(c) they are not an eligible assignee for any LC or

10   revolving debt.  The same would be true with respect to term

11   loan exposure because none of that exposure counts.  They

12   have no voting rights.

13             I think, Your Honor, the only other point I think

14   I need to touch on or would like to touch on is the

15   procedural basis for this motion, and I can do that fairly

16   quickly.

17             Your Honor, at the hearing before this Court on

18   June 19th, the Court said, "I will make the determination as

19   to who is the requisite lender" -- I'm sorry -- "I will make

20   a determination as to who the requisite lender is either

21   prior to or at -- or in the context of the sale hearing.  I

22   don't see how else we can go forward.  It may or may not be

23   that I can do that as a matter of law.  I'll have to hear

24   the briefing on that."

25             The second basis, Your Honor, for our motion is

1    that in the fully negotiated amended scheduling order, which

2    is Exhibit 2 to my reply affidavit, the parties -- which was

3    so ordered by this Court, the parties, including Yucaipa,

4    acknowledged that this Court may address the issues of "the

5    enforceability and/or the impact of the Third Amendment on

6    any first lien debt purportedly held by Yucaipa and who, if

7    anyone, is the requisite lender."

8         Also, Your Honor, in the Allied adversary

9    proceeding, and I attach it as Exhibit 4 to my reply

10   affidavit, Allied seeks a determination -- a declaration as

11   to which lenders constitute the requisite lender.  They've

12   now made that determination, as I've pointed out, in their

13   June -- in their June 19th papers.

14        However, Your Honor, the Allied proceeding is

15   still under -- is alive and well, and in that proceeding it

16   -- it is a relevant issue, of course, as to who is the

17   requisite lender because that's specifically what Allied is

18   asking for, a declaration as to who is the requisite lender.

19        In addition, and finally, Your Honor, the

20   requisite lender issue is integral and important to the

21   committee adversary proceeding because we argue -- we and

22   the committee argue, but we specifically also argue that

23   Yucaipa manipulated the debtors as an insider and in its

24   capacity as an alleged requisite lender and improperly acted

25   as a requisite lender.  That's Exhibit 6 to my affidavit at

1   paragraph 142.

2           So a finding as to who is the requisite -- as to

3   whether or not Yucaipa is the requisite lender is material

4   to all these claims.

5           So, Your Honor, there was a basis for this motion.

6   The rules are not as strict as -- as Yucaipa would say.

7           And with respect to, I think, just one other point

8   and that is, Your Honor, the statute of limitations.  We are

9   not looking historically as to what happened three years

10  ago.  The issue is who is the requisite lender is something

11  that needs to be currently determined.  Your Honor made that

12  determination, I believe, yourself in the -- in the first

13  language that I cited from your June 19th hearing.

14          It's -- it's not a static situation.  It changes

15  over time.  What we are seeking right now is who is the

16  requisite lender currently and the requisite lender

17  currently is the lender that owns more than 50 percent of

18  the first lien debt which is entitled to be considered in

19  determining the identity of the requisite lender at any

20  given time.

21          And as we point out, pursuant to the Third

22  Amendment, and even without the Third Amendment, pursuant to

23  the first lien credit agreement, Yucaipa can't hold this

24  debt or certainly can't vote this debt and it doesn't count

25  for purposes of -- of who is the requisite lender.

 1           And so, Your Honor, very simply, I would finish by

 2    saying that it's clear that either under Justice Ramos's

 3    decision by the doctrine of collateral estoppel or this

 4    Court's rulings on the -- I think the clear and unambiguous

 5    language -- I'm sorry -- by this Court's rulings in

 6    connection with the effectiveness of the Third Amendment

 7    against Yucaipa, or under the clear and unambiguous language

 8    of either the Third Amendment, or if that's not effective,

 9    the first lien credit agreement that Yucaipa is not the

10    requisite lender and that the petitioning creditors, Your

11    Honor, are the requisite lender.

12           Thank you very much.

13           THE COURT:  You're welcome.

14           Anyone else before I turn to Yucaipa?

15           All right.  Let's take a short recess and then

16    I'll hear from Yucaipa.

17           MR. WARD:  Thank you very much, Your Honor.

18       (Recess taken at 11:06 a.m.; resumed at 11:24 a.m.)

19           THE CLERK:  All rise.

20           THE COURT:  Please be seated.

21           I'll hear from Yucaipa.

22           MR. SAUER:  Good morning, Your Honor.  Russell

23    Sauer of Latham & Watkins for the Yucaipa funds in this

24    matter.

25           And I've been in your courtroom before, Your

1    Honor.  This is the first time I've actually had the

2    opportunity to address you, so I do appreciate that option.

3              THE COURT:  All right.  Welcome.

4              MR. SAUER:  For the first 45, 50 minutes of Mr.

5    Ward's presentation I thought Yucaipa had filed the motion

6    for summary judgment.  But, of course, it has not.  The

7    petitioning creditors' motion for summary judgment in this

8    case that they be deemed requisite lender should be denied.

9    The petitioning creditors have the burden of demonstrating

10   that there are no disputed issues of fact and that they are

11   entitled to judgment as a matter of law.

12             And to prevail, to carry that burden, the

13   petitioning creditors must show two things:  One, that

14   they're entitled to include in the numerator of the

15   requisite lender calculation the $4.56 million of American

16   Money debt, and that all of the Yucaipa first lien debt, all

17   of it must be excluded from the denominator.

18             Here, the petitioning creditors have not and

19   cannot carry that burden.

20             As I proceed through some of my discussion this

21   morning, Your Honor, some of the discussion will be fairly

22   technical and it will be based on the terms of the first

23   lien credit agreement.  But petitioning creditors have made

24   the point of saying the first lien credit agreement is

25   clear.  It should be interpreted according to its terms.

1      It's unambiguous.

2             So as I go through my technical arguments, it is

3      important to understand the petitioning creditors can't have

4      it both ways.  They can't argue that the credit agreement is

5      clear and should be interpreted according to its terms when

6      it suits them, but then -- and we heard Mr. use -- Mr. Ward

7      use the words "the intent of the parties" several times

8      during his arguments.  What they can't do is then turn

9      around and say, but the Court can interpret the first lien

10     credit agreement according to the intent of the parties when

11     it's less conducive for the petitioning creditors or more

12     practical for them to reach a different result.  It doesn't

13     work that way.

14             Finally, there are some very significant

15     procedural issues, some of which Mr. Ward touched upon, some

16     of which he didn't, which we believe provide significant

17     problems for the hearing and granting of this motion.  I'll

18     defer those to the end.

19             The first and most important issue I think that we

20     should address is whether the petitioning creditors are a

21     requisite lender even assuming that no Yucaipa held debt is

22     counted in the denominator.  The American Money debt cannot

23     be counted.  It cannot be counted in the numerator, at least

24     not at this date, not for summary judgment purposes.

25             Requisite lender status is based on debt holdings.

1   We heard lots of discussion about voting rights and all

2   kinds of other attributes of the debt, and I will come back

3   to that.  But the first lien credit agreement describes

4   requisite lender as one or more lenders having or holding

5   term loan exposure, letter of credit exposure and/or

6   revolving exposure and representing more than 50 percent of

7   the sum of those three components.

8           So the question is do the petitioning creditors --

9   because that's who is the movant in this case, the

10  petitioning creditors, Black Diamond and Spectrum -- do they

11  have or hold more than 50 percent of the outstanding first

12  lien debt.  If we exclude all of the Yucaipa held debt, all

13  of it, the denominator in the requisite lender formula is

14  $109,211,840, so 1.92 million.  Thus, the petitioning

15  creditors need to hold 54.6 million of first lien debt to be

16  requisite lenders, but they do not.  What they do hold is

17  $51.9 million of Yucaipa first lien debt, which is less than

18  the 50 percent required.

19          Let's talk about the AMMC, the American Money,

20  $4.56 million and why it cannot be counted.  It cannot be

21  counted because under the terms of the first lien credit

22  agreement the petitioning creditors do not hold that debt.

23  Under the first lien credit agreement, Section 10.6(d) at

24  page 164, before an assignment of first lien debt is

25  effective, the following steps are required:

1          First, there needs to be an execution and delivery

2     of an assignment agreement to the administrative agent;

3          Then the administrative agent must record the

4     assignment in the register.

5          Indeed, recordation in the register or lack

6     thereof is "conclusive" on each lender.  And that's Section

7     2.7 of the first lien credit agreement.

8          So who can record the assignment into the

9     register?  Well, only the administrative agent can enter the

10    transfer in the register.  That's also in the first lien

11    credit agreement at Section 2.7(b).  And assignments only

12    become effective on the effective date and the assignment

13    effective date is the date on which the transfer is recorded

14    in the register.

15         So since this is a summary judgment motion, let's

16    talk about the facts that are actually undisputed, not

17    desired, but those that are undisputed.

18         It is undisputed that CIT was the original

19    administrative agent under the first lien credit agreement.

20    It is also undisputed that CIT resigned as administrative

21    agent effective May 19th, 2012.  That is before the

22    purported assignment of the American Money debt to the

23    petitioning creditors.  Only either the administrative agent

24    or requisite lenders may appoint a replacement

25    administrative agent.  Petitioning creditors don't dispute

1    that.

2          The petitioning creditors also don't dispute --

3    it's in Mr. Walker's declaration and there's been no --

4    nothing to dispute it -- that no replacement agent was

5    appointed by CIT when it resigned and no replacement agent

6    was appointed in May of 2012 by the requisite lenders.  And,

7    in fact, the petitioning creditors, in Exhibit 9, in a

8    letter from their counsel specifically warn CIT not to

9    appoint a replacement agent, particularly one suggested by

10   Yucaipa because of this dispute over the requisite lender

11   status.

12         So absent a successor administrative agent, only

13   the requisite lender can then serve as the administrative

14   agent, as a de facto agent.

15         But the issue of requisite lender hasn't been

16   determined.  That's what this motion is about.  That's what

17   the August 22nd hearing is about.  And without a requisite

18   lender and no administrative agent to record the assignment,

19   then the petitioning creditors cannot hold and do not hold

20   this additional debt.

21         So what do the petitioning creditors do?  They

22   recognize this is a fatal problem.  So with their motion,

23   first, the petitioning creditors produced redacted documents

24   purporting to support the amount of Allied first lien debt

25   that they hold.  But not even Mr. Ward stood before this

Page 65

1    Court and -- and disagreed with the fact that Yucaipa

2    requested all of those documents in the court of discovery.

3           And what did the petitioning creditors do?  They

4    refused to produce them.  That's in my affidavit, Exhibit 78

5    and 79 are the petitioning creditors' responses to the

6    document product requests.  The -- not Request 37, not

7    Request 142.  Request number 1 was all documents

8    demonstrating and/or supporting their claim to the amount of

9    Allied first lien debt that you hold, and each of the

10   petitioning creditors responded and refused to produce any

11   of that material claiming it was not relevant and no likely

12   to lead to the discovery of admissible evidence.  So we

13   didn't get it.

14          When is the first time we see this?  We see this

15   with their motion.  But, of course, as the Court knows,

16   parties are not allowed to rely on evidence in support of a

17   motion for summary judgment which they specifically refuse

18   to produce during the course of discovery.  That is black

19   letter law.

20          Then to compound the problem, the petitioning

21   creditors produce even more evidence with their reply

22   because what we got with their motion was a bunch of

23   redacted stuff.  It doesn't say who they get the debt from,

24   when they got the debt from, where they got it from.

25          So with their reply, they produced the LSTA trade

1    confirmations to support the purchase of the AMMC debt, a

2    purported appointment agreement and some joinders.  But,

3    again, they refused to produce that in discovery.

4            Two, none of this evidence, none of it that was

5    produced with the reply is properly authenticated and, thus,

6    it cannot be considered as a matter of law in support of

7    their motion for summary judgment because it has no

8    evidentiary value.  It is well established in this circuit

9    and every circuit around the country that only admissible

10   evidence may be relied on to support a summary judgment

11   motion.

12           And for the record, Your Honor, I would point the

13   Court to Rule 901 of the Federal Rules of Evidence, the

14   Philbin versus TransUnion Corp case, 101 F.3d 957 (3rd

15   Circuit).  I would point to a United States Supreme Court

16   case in Atticus versus S&H Crest Company, at 398 U.S. 144.

17   And I could go on.  But the Court is familiar with that

18   principle.  None of these new documents that were refused in

19   discovery were produced.  None of these new documents

20   produced in connection with the reply have been properly

21   authenticated and, therefore, they are not properly before

22   the Court and cannot be considered.

23           And more -- just as important is this new evidence

24   should also be rejected because, again, it's black letter

25   law in the Third Circuit and everywhere else in the country

1    that you can't submit new evidence at the reply stage.

2            And for that proposition, I would point the Court

3    to several Third Circuit cases.  One is Guffy (ph) versus AW

4    Chesterton Co., 2012 U.S. District Lexus 150860.  It's the

5    Eastern District of Pennsylvania case in 2012.  I would

6    point the Court to the decision of Judge Stark here in

7    Delaware in Lab -- Laboratory Skin Care, Inc. v Limited

8    Brands, 757 S. Supp. 2d 431, a 2010 case where Judge Stark

9    specifically struck the new evidence that was submitted by

10   the moving party in support of a summary judgment and,

11   therefore, denied summary judgment.

12           But even if the Court is prepared to consider this

13   new evidence, which it shouldn't, it doesn't help the

14   petitioning creditors because it still doesn't justify

15   including that American Money debt in the calculation of the

16   petitioning creditors' holdings.

17           See, petitioning creditors -- and we're going to

18   get to this in a bit -- they recognize the importance of the

19   definitional term "holdings" as opposed to controlling or

20   having support from.  They recognize the importance of that.

21   So what do they do?  They knew they needed to get this

22   American Money debt "recorded in the register."  So to

23   correct the flaw, the petitioning creditors and purportedly

24   American Money entered into an appointment agreement to

25   purportedly appoint affiliates of the two petitioning

1    creditors to serve as a successor administrative agent, and

2    then they purported to record the American Money debt in the

3    register.

4         But they put the cart before the horse because the

5    appointment of themselves as administrative agents could

6    only be effective if, in fact, they are requisite lenders.

7    But at the time they did it they were not.  It cannot be

8    disputed that they were not requisite lenders.   Per Mr.

9    Ward's own affidavit with this new evidence, in Exhibit 10,

10   the appointment agreement was purportedly entered into on

11   December 3, 2012.  But they were not requisite lenders at

12   that time unless both of the following are true:

13        First, the Fourth Amendment was invalidated at

14   that time; and none of the Yucaipa debt holdings were

15   included in the denominator.  Again, I'm going to get to the

16   denominator in a bit because I don't think we even need to

17   get there.

18        But, you see, on December --

19        THE COURT:  Why does the Fourth Amendment have to

20   be invalid at that time?

21        MR. SAUER:  Because if the Fourth Amendment is not

22   invalidated, if the Fourth Amendment remained in effect,

23   then Yucaipa was the requisite lender.  And so the

24   petitioning creditors and American Money couldn't have been

25   requisite lenders.

Page 69

1          THE COURT:  The Fourth Amendment was never -- the

2    Fourth Amendment was never applicable, was never valid.

3          MR. SAUER:  Your Honor, the Fourth -- the Fourth

4    Amendment was valid until it was deemed invalid.

5          THE COURT:  But how can that be because the whole

6    point that Justice Ramos makes in finding it invalid is that

7    it was a violation of the Third -- Third Amendment as well

8    as the other -- the other issues that arise from the initial

9    -- there's a difference between when the judge says

10   something and when it actually happens.

11         And, for example, with your point about they are

12   not the requisite lender until, I guess, I say they are,

13   that's not the same -- that's not really necessarily true.

14   If I say there's a requisite lender, that really means they

15   always were.  And if I say the Fourth Amendment is invalid,

16   it really means it never was valid.

17         So I -- I don't -- I don't understand your point

18   that -- about why it basically existed or was valid until it

19   was invalid.

20         MR. SAUER:  Well, Your Honor, I guess I would

21   respectfully disagree.  If you have a contractual provision

22   that is enforced, it's enforced until the Court says it can

23   no longer be enforced.  I understand the Court's point.  I

24   think I just respectfully disagree.

25         THE COURT:  Okay.

1            MR. SAUER:  And just to sort of continue this --

2     this line, but it -- not -- not that it necessarily matters

3     because at the end of the day we can't include the American

4     Money debt --

5            THE COURT:  Right.

6            MR. SAUER:  -- in this calculation because new

7     evidence, not permitted, evidence refused to produce in

8     discovery, not permitted.

9            In any event, to finish the line out, Justice

10    Ramos's decision was not entered and final until March of

11    2013, March 29th of 2013, four months after this purported

12    appointment agreement and his oral inclinations indicated on

13    November of 2012, a matter of New York law, which is the law

14    that matters when you are determining the preclusive effect,

15    only a final decision has any collateral estoppel or

16    preclusive effect.  And we've cited those cases to the Court

17    before.

18            The -- for example, Eggbert (ph) Square Realty

19    versus 112 114 Corp at 93 A.D. 3d at 687, a New York

20    Appellate Division case in 2012 reversing the grant of a

21    motion to dismiss counterclaims because the issue preclusion

22    had been based on a decision on which no formal enter had

23    yet been entered.  And several other cases, Church versus

24    New York State Freeway Authority, 16 Atlantic A.D. 3d at

25    808, another 2005 New York Appellate Division case, and a

1    series of others.

2           And, again, since Justice Ramos didn't issue his

3    decision until March 29th, nearly four months after, that

4    appointment agreement was invalid.

5           But, again, I still come back to the fundamental

6    proposition.  We are here arguing the motion for summary

7    judgment wholly founded on documents that the petitioning

8    creditors refused to produce in the course of discovery, and

9    then compounded the problem by producing yet more

10   unauthenticated inadmissible evidence in support of their

11   reply.

12          Now petitioning creditors come here also and say,

13   well, why don't you consider petitioning creditors and

14   American Money to be the movants here.  You can't do that.

15   American Money is not a movant.  This is the petitioning

16   creditors' motion.  American Money isn't even before the

17   Court.  While they were named in the Allied adversary, they

18   haven't even filed an appearance yet.  They're not a proper

19   party to this motion and I don't believe petitioning

20   creditors are permitted, substantively or procedurally, to

21   now add them in an effort to get over some problem that the

22   petitioning creditors created for themselves.

23          So at the end of the day --

24          THE COURT:  Well, they don't necessarily have to

25   be a movant to be considered a requisite lender.  The movant

1    can argue that -- purportedly it could argue that creditor

2    -- Movant A could argue that creditors A, B and C together

3    constitute the requisite lenders.  It doesn't need to be

4    necessarily that Creditor A, B and C move that -- to -- to

5    appoint -- or that A, B and C were requisite lenders.

6             However, I take your point that we don't know

7    about B or C unless --

8             MR. SAUER:  But more -- fair enough.

9             THE COURT:  -- unless you look at the -- what you

10   call the new evidence.

11            MR. SAUER:  Well, and more importantly, the motion

12   isn't that petitioning creditors, along with American Money,

13   are requisite lender.  It's very specifically styled that

14   they are.

15            THE COURT:  Uh-huh.

16            MR. SAUER:  But, again, however one looks at it,

17   it's all based on denied evidence --

18            THE COURT:  Uh-huh.

19            MR. SAUER:  -- and newly produced evidence which

20   is simply improper.

21            Next -- in any event, let's get to the

22   denominator.  You don't exclude all of the Yucaipa held debt

23   from the denominator.  So even if one were to include the

24   4.56 million in American Money debt in the denominator, even

25   if you include it, the petitioning creditors and with the

1    American Money debt are not requisite lender.  Again,

2    petitioning creditors argue that the first lien credit

3    agreement is unambiguous and that unambiguous contractual

4    provisions should be determined as a matter of law by the

5    Court.

6                Again, the first lien credit is crystal clear.

7    Requisite lenders are based on a determination of holdings,

8    not voting rights, not other attributes of the debt.  I will

9    come to that.  I -- it sounds a little counter-intuitive,

10   but not under the terms of these -- of these credit

11   agreements.  It would have been very easy, very easy for

12   these lenders, whether at the outset, in conjunction with

13   the Third Amendment or any other time to make it very clear

14   that requisite lender determinations are based on something

15   other than holdings, or to have specifically said anything

16   they could have said to make it clear, not a practical

17   result, but to make it clear that a restricted sponsor

18   affiliate could not be requisite lender.  They did no such

19   thing.

20               So what does Yucaipa currently hold?  Well, let's

21   -- let's put aside the settlement which, obviously, hasn't

22   been approved yet.  So today Yucaipa currently holds $114

23   million in term loans and $20 million in letter of credit

24   exposure.  For my argument, I'm only going to focus on

25   letter of credit exposure because the balance of the term

1   loans also follows suit.  But let's -- let's focus on the

2   $20 million of letter of credit exposure.

3          Adding $20 million that denominator increases it

4   to $129 million and, thus, not even the 56.4 million that

5   petitioning creditors claim to hold is more than 50 percent.

6   Yes, the petitioning creditors argue that the Third

7   Amendment precluded Yucaipa from acquiring the letter of

8   credit exposure; that it acquired it under the invalid

9   Fourth Amendment.  But, first, I would point out there's a

10  disputed issue of fact even on the application of the Third

11  Amendment in this regard.  And petitioning creditors do not

12  dispute any of these undisputed facts.  Why?  Because they

13  are based on their client's own documents.

14         Exhibits 11, 25, 36 and 37 to my declaration,

15  these are e-mails and handwritten notes of the petition

16  creditors.  And not even the petitioning creditors believe

17  that the time that the third amendment was an impediment to

18  Yucaipa, who was not a party to the agreement.

19         I know we've heard over and over again, the mantra

20  is that Yucaipa negotiated the third amendment, they're

21  bound by the terms of what they negotiated.  But that simply

22  isn't the truth, and it's never been the truth.  Mr.

23  Walker's declaration at paragraph 9 submitted in conjunction

24  with this opposition, which petitioning creditors haven't

25  disputed, makes clear that yes, Yucaipa did participate

1    early on in those discussions over a third amendment.  But

2    there came a time when the demands of the lenders became so

3    onerous that they just walked away, and moved on to a third

4    amendment to the second lien agreement.

5              And I only raise that because we've heard

6    repeatedly about Yucaipa is bound by the terms they

7    negotiated.  At the end of the day, these were lender

8    imposed terms that Yucaipa never agreed to.

9              Putting that aside --

10             THE COURT:  Are you talking about the first lien

11   debt?

12             MR. SAUER:  Yes, Your Honor.

13             THE COURT:  That came out of the bankruptcy?  That

14   came out of the bankruptcy?

15             MR. SAUER:  No, no.  Yucaipa -- we're talking

16   about the first lien debt that Yucaipa currently holds.  The

17   -- we're talking about the third amendment to the first lien

18   credit agreement.

19             THE COURT:  Right.

20             MR. SAUER:  And what we heard Mr. Ward say, we've

21   heard repeatedly said in this court that it was Yucaipa who

22   negotiated the terms of that third amendment.  All I'm

23   telling you is, that for the purpose of summary judgment,

24   there's a very significant factual dispute as to that.

25             So if someone is inclined to say, well, I might

Page 76

1    not otherwise hold a non-party to that amendment to its

2    specific terms, I will hold Yucaipa to those terms, because

3    Yucaipa was a moving force, and negotiated the terms, and

4    I'm telling you they didn't.  And at a minimum, there's a

5    disputed issue of fact as set forth in Mr. Walker's

6    declaration at paragraph 9.  That's exactly what happened.

7             They started the negotiations, the lenders began

8    to impose more and more onerous restrictive terms, in terms

9    of the amount of debt they could buy, the -- whether it had

10   to be contributed, or could be contributed as opposed to

11   mandatory -- the restrictions on the voting rights.  At some

12   point early on in those negotiations, Yucaipa said, you

13   know, finish -- you guys can do what you want --

14             THE COURT:  And then starting negotiating with

15   ComBest.

16             MR. SAUER:  No, no, no.  That -- Your Honor, that

17   doesn't come for a year later.  That's a year and a half

18   later.

19             THE COURT:  When does the third amendment get --

20             MR. SAUER:  Let me walk through the timeline.

21   Allied exits from bankruptcy in May, early June of 2007.

22   The third amendment comes into play in mid-April of 2008.

23   In February of 2009, ComBest acquires the 54.7 percent of

24   the Allied debt.  On August 21 of 2009, a full year and a

25   half after the third amendment, Yucaipa acquires the

1   position from ComBest.  And that's when the fourth amendment

2   is passed in August of '09.

3            THE COURT:  So the third amendment was passed?

4            MR. SAUER:  April of '08.  A year and a half

5   before Yucaipa acquired the debt.

6            THE COURT:  Okay.  Yucaipa stopped talking in

7   connection with that amendment or --

8            MR. SAUER:  The negotiations, as Mr. Walker

9   indicates in his declaration, lenders approached Yucaipa

10  about the possibility of their acquiring some of their debt.

11  Negotiations over the third amendment commenced really in

12  late March of 2008, and Yucaipa walked away from those

13  negotiations effectively in the end of the first week of

14  April or so.

15           THE COURT:  Uh-huh.

16           MR. SAUER:  And then the terms of the third

17  amendment to the first lien credit agreement were then

18  pursued by the lenders and Allied, and on terms that were

19  restrictive for Yucaipa's appetite, so they no longer

20  participated in the discussions.

21           But what Yucaipa did do, was continue to negotiate

22  for a third lien -- third amendment to the second lien

23  credit agreement, which then allowed them to buy second lien

24  debt without restriction.

25           THE COURT:  All right.

Case 1:12-cv-09717-CSS   Doc 52911   Filed 09/26/20   Page 99 of 331
Case 1:12-cv-09717-CSS   Doc 52911   Filed 09/26/20   Page 99 of 131

Page 78

1          MR. SAUER:  Which they did, and then contributed

2     most of what their -- or half of what they acquired back to

3     the capital of the company.

4          THE COURT:  Okay.

5          MR. SAUER:  So back to the denominator.  Why do we

6     include at a minimum a letter of credit exposure.  Let me --

7     I'm sorry, let me go back to the third amendment and the

8     petitioning creditors.

9          Their own views at the time, and as we know in

10    interpreting contracts, it's often times the views expressed

11    by the parties at the time, which are the best evidence of

12    their understanding and intent, not what they say later on.

13         Well, we know in December of 2008 that Spectrum

14    Principles wrote to each other in December of '08.  We have

15    gone three or four ideas on how to block or stop the trade

16    to Yucaipa, when the third amendment was in effect, had a

17    block or stop the trade from being 51 percent.  None seemed

18    viable when we talked them through.

19         We also know that Spectrum, one of the petitioning

20    creditors was among a group of creditors who in December of

21    2008 had negotiated to sell their debt to Yucaipa.  It's

22    Spectrum.  One of the petitioning creditors was part of the

23    group.  We've submitted the evidence, it's undisputed.

24         Then in February of 2009, after Black Diamond had

25    determined that they had been excluded from those lenders,

Case 12-50047-CSS  Doc 271  Filed 08/06/19  Page 190 of 531

1   then negotiating with ComBest to sell their debt, who did

2   Black Diamond turn to?  They turned to Yucaipa, and asked to

3   partner with Yucaipa to buy the debt in a joint bid.

4           So my only point here --

5           THE COURT:  And what is it that you would deem

6   ambiguous in the documents that would make all of that

7   relevant?

8           MR. SAUER:  Well, I think it goes to the intent of

9   the parties --

10          THE COURT:  All right.

11          MR. SAUER:  -- which is ultimately the touchdown.

12  Because we're --

13          THE COURT:  But the intent of the parties is, in

14  the first instance, if possible, gleam from the four corners

15  of the document.

16          MR. SAUER:  That is always the first step, Your

17  Honor.

18          THE COURT:  Right.

19          MR. SAUER:  But here, when the clear understanding

20  of the parties, particularly the parties moving expressed at

21  the time a very different view, I'm not so sure that

22  language which purports to be clear on its face is this

23  clear.  But let's get past that, because I don't want to get

24  bogged down in more of the minutia, because at the end of

25  the day, let's stick with the very expressed terms of the

1    third amendment.

2           Let's talk about just the 20 million in letter of

3    credit exposure.  And now we get into the applicability of

4    New York law on this issue.  Well, we heard lots of

5    discussion from Mr. Ward about well, this case is

6    distinguished because it didn't involve a credit agreement.

7    Oh, and this case is distinguishable because it didn't have

8    Allied in the name, or some such thing, if these were

9    personal services contracts.

10          At the end of the day, at the end of the day, New

11   York law is crystal clear, and petitioning creditors have

12   cited not a single case to the contrary.  I will come to the

13   one case they did cite, because they misrepresented to the

14   Court exactly what that Court said.

15          Under New York law, first, the courts look to

16   determine whether or not an assignment is prohibited.  If

17   you don't get past the first prong, you never have to worry

18   about the next, because if the assignment of the contractual

19   right or obligation is not prohibited, there's nothing to

20   debate about.

21          But if, if the language of the contract is clear

22   that a particular form of assignment, type of assignment, or

23   an assignment to a particular person is prohibited, when the

24   Court looks to determine, okay, it's a prohibited

25   assignment, but does that make the assignment invalid or

1    void, and for that, the courts look for very specific

2    language in the contract, whether it says, any prohibited

3    assignment is void, or it is invalid.

4           I'm not making this up.  We've cited eight, nine,

5    ten New York cases, federal cases, state cases, bankruptcy

6    court cases, all of which cite that very same proposition.

7    The petitioning creditors purport to claim that Praven (ph)

8    is the central case.  No Praven is just one of the cases

9    that relies on the fundamental decisions of New York state

10   courts for this proposition.

11          They purport to distinguish Praven on the grounds

12   that -- or sorry, they purport to distinguish Praven on the

13   grounds that the particular contract wasn't fully

14   exclusionary.  It said, you can only assign to financial

15   institutions, and there the assignee in that case was a non-

16   financial institution.

17          So what the Court said in Praven, when one reads

18   it thoroughly, is that gee, the complaining parties to the

19   contract couldn't get over the first hurdle.  The first

20   hurdle being that the assignment was prohibited in the first

21   instance.  But the Praven court did very clearly endorse and

22   cite the New York case law I've identified, that there are

23   two prongs.

24          First, is the assignment prohibited, and if it's

25   clearly prohibited to, is it invalid or void under the

Case 1-14-50074-CSS  Doc 520-1  Filed 08/26/20  Page 103 of 331
Case 1-14-50074-CSS  Doc 527-1  Filed 08/01/19  Page 82 of 153

Page 82

1    specific terms.

2              THE COURT:  Right.  Now, you wouldn't argue with

3    me that the assignment was prohibited?

4              MR. SAUER:  I am not sitting here arguing with you

5    today, Your Honor, that Yucaipa was an eligible assignee.

6    There's no question that under the original first lien

7    credit agreement, or even as it relates to term loan

8    exposure and -- not term loan, but the LC exposure, that

9    they were a not eligible assignee.  So they clearly can

10   overcome the first hurdle.  But they cannot overcome the

11   second hurdle, and they must overcome both.

12             They haven't cited a single case, not a single

13   case, which contravenes New York law, which is applicable to

14   the interpretation of this credit agreement by its own

15   terms.  They just haven't.  The only case they do cite, and

16   you know, we do have the 785 Partners' case which is a

17   federal bankruptcy case from the Southern District of New

18   York, which is quite frankly very close here.  Because first

19   we heard from petitioning creditors, but none of the cases

20   they cite really contain complicated credit agreements.

21   Well, 785 Partners does.

22             And there, what the bankruptcy court determined

23   was I don't have to decide whether the particular assignee

24   in that case was an ineligible assignee because I don't have

25   to worry about the first hurdle, because they couldn't clear

Page 83

1   the second piece, because there's nothing in that credit

2   agreement which says the prohibited assignment is void.

3   Those are the words, or words to that effect.  It wasn't

4   there, it's not in this credit agreement, it's not in the

5   third amendment, New York law applies.

6          The only case they do cite is the Baucus (ph)

7   case, Single Asset Financial Co. versus Baucus at 294 AD2d

8   818.  But that case doesn't change New York law, it doesn't

9   reverse New York law, it actually cites the law I've been

10  citing to the Court.

11         The full quote that petitioning creditors didn't

12  put in their brief, or again read today is, where they

13  clearly stated intent to render Baucus powerless to assign,

14  their words, no need for the non-assignment clause to also

15  contain talismanic language or magic words describing the

16  effect of any attempt to make such an assignment.

17         They left out where they clearly stated intent to

18  render Baucus powerless to assign.  They left that out.

19  Why?  Because in that particular agreement, the purported

20  assignor didn't have any power to assign, it was very clear

21  from the contract.  Here, all the first lien credit

22  agreement says is, restricted sponsor affiliate isn't an

23  assignee.  The lenders shouldn't sell to a restricted

24  sponsor affiliate.  But that's no different than the other

25  8, 10 or 12 cases we've cited where the contract

Page 84

1   specifically provided you can't assign without consent, you

2   can't assign to this party, you can't assign to anybody.

3          That language is no different than those other

4   cases, and in every one of those cases, the New York courts

5   have said, absent the voiding language, the assignment is

6   valid and effective, and the assignee takes the rights that

7   go with the contractual obligations assumed.

8          What it leaves them with is a breach of contract

9   claim against the assignor who violated the terms of the

10  agreement, but we're not here to decide that.

11         So at the end of the day, at a minimum --

12         THE COURT:  So explain to me perhaps again okay,

13  the -- Yucaipa is not a party to the amendment.  Yucaipa was

14  not an eligible assignee, but nonetheless was the recipient

15  of the assignment, but having done that, why is it -- if you

16  could just restate it for me, why is it that in that

17  instance, the provisions of the third amendment that would

18  limit Yucaipa from being considered in the numerator or the

19  denominator in figuring out who the requisite lender is.

20  Does that make any sense?  You can't answer a question

21  that doesn't make any sense.

22         MR. SAUER:  Well, Your Honor, let me try to

23  interpret your question.  If I interpret it wrong, I

24  apologize.

25         THE COURT:  My point is, okay fine, everything you

1   said is right, right, they weren't a party, they were not an

2   eligible assignee, they took it anyway, but that's sort of

3   the end of the day, and we don't apply all of the other

4   provisions that arguably they apply, that would make

5   Yucaipa, you know, not in the ballgame.

6           MR. SAUER:  I understand that, and fully prepared

7   to address that question, which I believed I understood the

8   first time.

9           THE COURT:  Okay.

10          MR. SAUER:  Here's the fundamental confusion

11  that's been created by petitioning creditors.  And we heard

12  it again repeatedly today when petitioning creditors tried

13  to define what the third amendment does.

14          Again, if we go back to the first lien credit

15  agreement to the term requisite lender, which has not been

16  modified, it is lenders having or holding.  Having or

17  holding, it has nothing to do with any other attributes of

18  the debt.

19          So what the petitioning creditors then say, but

20  even if they could hold it, it can't be counted towards

21  requisite lender status, because that's what the third

22  amendment says, and they cite the third amendment 2.1(e)

23  which redefines the term, term loan exposure.  And then they

24  go on to paraphrase it and say, that it says, term loan

25  exposure that has been acquired by a restricted sponsor

1     affiliate, Yucaipa, can't be counted for requisite lender

2     status.  That's what they say.

3              That is, however, not, not what that definition

4     reads.  The definition says, "With respect to any provisions

5     of this agreement relating to the voting rights of lenders,"

6     has nothing to do with holdings, nothing to do with

7     requisite lender calculation, paren, "including the right of

8     lenders to consent or take any other action with respect to

9     any amendment, modification, termination, or waiver of any

10    of this provisions, or the provisions of this agreement, or

11    the other credit documents, or consent to any departure."

12             So what it says is, that any term loans acquired

13    by Yucaipa couldn't be counted for voting purposes, to the

14    extent they purported to try to amend the credit documents,

15    that's what it says.  It doesn't say anything, anything at

16    all about how Yucaipa held restricted sponsor affiliate debt

17    to be more precise, how that debt, or whether that debt was

18    to be counted in the definition of requisite lender status,

19    and in fact, again, it's very easy if that really was what

20    they were getting at, and these were all sophisticated

21    parties.  All they had to do is say, any restricted sponsor

22    affiliate, term loan exposure acquired cannot be counted or

23    included for any purpose under the first lien credit

24    agreement or words to that effect.  They didn't.  They were

25    very specific, very specific.  That the exclusion of Yucaipa

1   held debt, term loans, particularly because that's all we're

2   talking about under that provision, are excluded from the

3   voting provisions, not from the holding provisions.

4           And if it's not excluded from the holdings, even

5   the term loans have to be included in the denominator, but I

6   wasn't even going there because the third amendment only

7   speaks to term loan exposure.  It doesn't speak to letter of

8   credit exposure, and that's where we rely in the first

9   instance on the applicable provisions of New York law, which

10  says, even if they weren't supposed to get it, if they got

11  it, they get all the attributes that normally goes with it.

12          And so they get to hold it, they would even get to

13  vote, the letter of credit exposure.  But again, we're not

14  there, we're just talking about the requisite lender

15  definition, and if that 20 million is included in the

16  denominator, even giving petitioning creditors credit for

17  the American money piece, 56 point whatever million divided

18  by 129 doesn't equal 50 percent.

19          Now, that could lead what some might argue is a

20  potentially problematic result, and that is, well, gee, then

21  maybe there's no requisite lender.  But there's no

22  requirement that there be a requisite lender under the

23  credit agreement.  There's no requirement that requisite

24  lenders, holding 50 percent or more of the debt agree on

25  entry.

1          In fact, one of the biggest problems Allied had

2     after emerging from bankruptcy was this functional lender

3     group.  They couldn't get requisite lenders to agree that

4     today was Tuesday.  They just couldn't.

5          So there is no requirement that you have a

6     requisite lender.  I mean, it's no different than if there

7     are only three lenders, two of whom held 49 percent, 1 of

8     them who held 2 percent, and neither one of them could ever

9     get to the 2 percent on their side.  That's just a function

10    or a fact of the credit agreement.

11         So how does that get resolved?  Well, it gets

12    resolved as follows.  If Yucaipa actually gets to hold the

13    debt, all of the debt, even if it can't vote the debt, that

14    doesn't necessarily mean Yucaipa is the requisite lender

15    because of its holdings, and Yucaipa doesn't need to vote or

16    to do anything, because under the terms of this credit

17    agreement, which petitioning creditors say is clear and

18    unambiguous, again, it's going to sound counter intuitive, I

19    struggled with it.  But when you go to the credit agreement,

20    provision-by-provision, this is the conclusion you get to

21    based on the unambiguous terms.

22         The lenders have to vote irrevocably authorize the

23    administrative agent to exercise certain powers delegated to

24    it, including the power to exercise remedies, such as a

25    credit bid.  If no successor agent is appointed, then the

1   requisite lender acts as the de facto administrative agent.

2         But the requisite lender doesn't need to vote to

3   do anything.  Requisite lenders if there were others, they

4   can direct the agent not to do certain things, but the

5   administrative agent, or in this case, a requisite lender

6   standing in the shoes of the administrative agent doesn't

7   need to vote, doesn't need to consent, he has already been

8   delegated the action under the terms of the credit

9   agreement.  That's -- when you read Section 9.29.7 and

10  9.8(b) together, that's exactly where you come out.

11        So Yucaipa actually could be requisite lender, and

12  could for example, credit bid or exercise remedies if it

13  chose to do so.  Not as a lender, but as the administrative

14  agent.  I didn't write the credit agreement, but that's how

15  it reads, and that's what it says.  And that's just --

16  that's the consequence of this unambiguous credit agreement

17  that we're here to argue about.

18        But again, I'm not here asking this Court to

19  determine that Yucaipa is a requisite lender.  We're

20  actually here today to talk about the petitioning creditors,

21  and they are not, for the reasons we've discussed.

22        But let's turn briefly to Justice Ramos' decision

23  because Mr. Ward spent a lot of time on it.  We do not

24  believe, and we said so in our opposition that Justice

25  Ramos' decision should be given collateral estoppel effect

1    because Yucaipa was denied discovery, the opportunity to

2    conduct any discovery in that case.  That's undisputed.

3    Nobody says we had the opportunity to conduct discovery.

4    There's been no dispute about that.

5              And we've cited a number of cases at page 32 of

6    our opposition, where the courts have specifically held that

7    collateral estoppel should not be applied under these very

8    circumstances, where the party who is the target of this

9    preclusive order was denied the opportunity to undertake

10   discovery.  And the petitioning creditors have undertaken no

11   effort whatsoever to distinguish any of the cases.  But they

12   do cite in a footnote, the Cronish (ph) case that Mr. Ward

13   referred to.

14             And I would ask the Court when you have a moment

15   or your clerks, if they haven't, read the Cronish case.  See

16   if it says what the petitioning creditors claim it says in

17   their reply.

18             What the Cronish case says, it's unpublished, but

19   what it does say, it doesn't say that a party who -- against

20   who summary judgment is granted has been deemed to have been

21   given a full opportunity to litigate, even though they were

22   denied discovery.  All it says is, if you lose on summary

23   judgment, that still constitutes an opportunity to litigate,

24   it doesn't address --

25             THE COURT:  Whether or not I give it preclusive

1    effect in connection with this summary judgment motion,

2    assuming there are no material disputed facts, et cetera,

3    that would stand in its way, I could make the very same

4    holdings that Black Diamond is arguing, have already

5    remained and can't be undone.

6         MR. SAUER:  You could, but let me tell you why you

7    wouldn't, because on certain disputed issues of fact, and

8    these are just among the kinds of things that would have

9    been discovered in the New York case, had Yucaipa been given

10   an opportunity to conduct discovery, which they were not.

11        So let me now convince you that there are disputed

12   issues of fact on this very issue.  One, we know, as a

13   matter of undisputed fact, it's in my declaration and a

14   whole series of exhibits, a majority of the first lien

15   lenders including Spectrum were prepared to sell their debt

16   to Yucaipa in December of 2008, and to sign a fourth

17   amendment removing all the restrictions of the third

18   amendment.  They were prepared to do that.

19        The only reason why they didn't do it was because

20   one of the provisions of that new fourth amendment also

21   would've reduced or relaxed their financial covenants, which

22   were hamstringing Allied, and those lenders at the last

23   minute after agreeing on price and other terms, said, gee,

24   we'd like Yucaipa to indemnify us because of the covenant

25   restrictions.  Not because of the elimination of the

1   restrictions of the third debt.  You don't have to believe

2   me and take that as a given at this point, but we've put

3   evidence in front of the Court, the kind of evidence that

4   would've been discovered in New York, but which Yucaipa

5   wasn't allowed to gather or produce.

6           There is a letter from CIT sent to all of the

7   lenders in February of 2009, after -- what had happened was

8   just chronologically in December of 2008, a bunch of lenders

9   come to Yucaipa and asked them to buy their debt.  Because

10  what had happened was, there had been negotiations to amend

11  the credit agreement after Allied went into a covenant

12  default in August of 2008.

13          When no amendment could be reached, lenders come

14  to Yucaipa and say, please get us out of this because the

15  auto industry continues to spiral down, we read every day

16  that Chrysler and GM are on the verge of filing for

17  bankruptcy, and we don't see this credit as a particularly

18  good one, take us out.  This is the ineligible assignee

19  they're talking to.

20          So they go through all this process, at the last

21  minute literally on December 26th, 2008, some of the

22  participating lenders in this group say we need an

23  indemnity.  Well, Yucaipa balks at the indemnity.  Then not

24  having heard from this group, Yucaipa launches a tender

25  offer.  At the same time that now ComBest is out there

1    trying to buy this debt unbeknownst to Yucaipa.

2            So they launch a tender offer, which includes a

3    fourth amendment.  CIT, and that's attached to my

4    declaration, sends a letter to Allied/Yucaipa and the other

5    lenders saying, we don't believe this fourth amendment that

6    you're proposing could be valid as it relates to changes to

7    the administrative agent powers and duties without our

8    consent, but as to the rest, they recognized it only needed

9    requisite lender consent.  I didn't write that.  CIT did,

10   the administrative agent, and the sole holder of the

11   revolving debt.

12           In August of 2009, after Yucaipa acquires the

13   ComBest position, CIT in their own internal memo, they

14   discuss this very same concept and recognize that while some

15   of the provisions of the fourth amendment might be invalid

16   as they affected the role of administrative agent, the

17   balance of the fourth amendment was probably effective and

18   nothing we can do about it because all they needed was

19   requisite lender consent.  These are the lenders who are

20   writing these things.

21           We know, for example, that after -- there's a

22   tremendous volume of information in the Black Diamond

23   documents in particular, where after Yucaipa acquires the

24   ComBest position, where Black Diamond and Yucaipa are

25   working together, and presumptively assumes Yucaipa's

1    requisite lender position.  After the Georgia action was

2    settled in December of 2011, Yucaipa then acting as

3    requisite lender, asks to have released a large amount -- 30

4    or so million dollars or $25 million or so of letter of

5    credit exposure, which they only could have done if they

6    were requisite lender.  That money was disbursed to all the

7    creditors holding letter of credit exposure, including the

8    petitioning creditors.  They were very happy to take that

9    money verifying Yucaipa's requisite lender status, and then,

10    and I know at one point the Court said they didn't think

11    this was particularly relevant, but it would've been

12    relevant to Justice Ramos.  When just a few doors down in

13    his own courtroom, Black Diamond was arguing the exact

14    opposite of what they were arguing in front of Justice

15    Ramos.  They were the borrower in the Commerce Bank case; as

16    the borrower, where they were prohibited under their own

17    credit agreement from buying the debt.  They bought it.

18    They had the seller amend the credit agreement to do a lot

19    of things right before they bought it.

20              I'm not going to bore with you, it's all in my

21    declaration, all in the exhibits.  Again, that kind of

22    discovery I'm not sure how it would affect this Court, but

23    most judges would not be happy to know that one party is

24    standing before it pounding the gavel and arguing about how

25    horrible that Yucaipa was behaving in this massive conflict

1    of interest, when down the hall, in the very same court, at

2    the very same time, they argued just the opposite, just the

3    opposite.

4              Anyway, that's the kind of discovery, some of the

5    kind of discovery that would've been determined in the New

6    York case.

7              There's been some discussion about whether or not

8    this Court has determined that the third amendment was valid

9    in the first instance.  We don't believe it has, because

10   while we spend a lot of time talking about what this Court

11   ruled in connection with the motion to dismiss, I would

12   point out to the Court that for the purpose of that motion,

13   Yucaipa assumed the third amendment was valid.  We were

14   arguing about the covenant not to sue, we were arguing about

15   statues of limitations.  There was no discussion about that

16   the third amendment was invalid during those hearings.  Why,

17   because that would've created all these other issues of

18   fact, that was a motion to dismiss, one.

19             Number two, an interlocutory order isn't entitled

20   to law of the case.  We've cited a plethora of cases in our

21   opposition for that point.

22             And in any event, as the Court is I'm sure aware

23   and we've cited the cases at page 34 in our opposition, even

24   if, even if this Court had ruled on the validity to the

25   third amendment, which it was never asked to do, but even if

1    it had, that was in a motion to dismiss under a much less

2    exacting standard.  And the McKenzie court and others that

3    we've cited makes it clear, that a holding on a motion to

4    dismiss does not -- I'm quoting, does not establish law of

5    the case for the purposes of summary judgment.  It's a very

6    different, more difficult standard.

7          Is the third amendment valid in the first

8    instance, we think that there's a very strong argument that

9    it's not.  Justice Ramos made his ruling based on the

10    changed definition of term loan exposure.  That very

11    definition was changed in the third amendment.  With a

12    minimum, there was a disputed issue of fact, as to the

13    validity of the third amendment, and what these very

14    petitioning creditors believed at the time.

15          They come before you now and say, yes, but you

16    only need unanimous under consent when you have affected

17    lenders under Section 10.6(b) or 5(b), I apologize for not

18    having the specific reference.  But at the time, both

19    petitioning creditors claim they were affected, and in fact,

20    Black Diamond wrote in their own notes, they believed the

21    third amendment was not effective because it didn't have 100

22    percent vote.  I didn't write that.  They did.

23          Spectrum didn't support and didn't sign on the

24    third amendment because they believed in the bankruptcy

25    process that regardless of what the third amendment said,

1    that Yucaipa would get to hold and to vote its debt,

2    Exhibits 14 and 15 to my declaration.  These are Spectrum

3    generated materials.

4           Black Diamond didn't support it because Mr. Urlich

5    (ph) who's on the phone said, "It was too dangerous."  And

6    then Black Diamond wrote, as I mentioned in December of

7    2009, that it believed the third amendment was not effective

8    because it needed 100 percent vote.  These are the words and

9    actions of the petitioning creditors.

10          So these facts alone, none of which were

11   discovered in the New York case, none of which have yet been

12   presented to this Court, these disputed facts alone would

13   suggest there's a triable issue, on the validity of the

14   third amendment.

15          At the end of the day, petitioning creditors do

16   not get to count the American money debt in the numerator,

17   and at least, if some, if not all of the Yucaipa debt should

18   be counted in the numerator.

19          Now, briefly, let me turn to a couple of

20   procedural issues.  We don't believe this motion is

21   appropriate in the first instance.  All that was discussed

22   in the amended scheduling order, and it's a practical matter

23   before this Court on June 19th, was trying this issue, if

24   there was an issue to be tried on August 22.

25          The motion for summary judgment is a possibility

1  was raised by Mr. Harris when he asked the Court, if the

2  Court might have some time at the end of the month to hear a

3  motion for summary judgment if one could be fashioned.  And

4  the Court said maybe the last week of July, I'm not

5  available on the 31st.  I've got a pretty good memory

6  without the transcript.  But no one, even in the amended

7  scheduling order ever unbundled this issue from a claim

8  before the Court.

9          Now, petitioning creditors say yes, but the

10  validity of the third amendment or the applicability or the

11  determination of records at lender status is directly

12  applicable to the Allied adversary.  But Yucaipa no longer

13  has any affirmative claims in the Allied adversary.  The

14  petitioners don't have any cross claims in the Allied

15  adversary.

16          So what they're effectively doing is seeking to

17  bind Allied to the decision of Justice Ramos, except they

18  can't do it.  Because one of the principle foundations of

19  collateral estoppel is that the party must have been before

20  the Court.  They were not.  They weren't in privity with

21  Yucaipa at the time, and privity by definition is a question

22  of fact.

23          Now, we also know that as a matter of bankruptcy

24  law, and I apologize for referencing bankruptcy law, because

25  that's not my primary forum, but my understanding of

1    bankruptcy law is that the debtor has scheduled Yucaipa's

2    debt as uncontingent, as due and owing, and that that

3    constitutes an admission of the debtors.  Maybe the debtors

4    at some future point said, oh, we believe petitioning

5    creditors are potentially requisite lender, but we have an

6    admission currently on the records of this Court that

7    Yucaipa's debt has been fully scheduled is non-contingent.

8              Next, petitioning creditors argue that the

9    requisite lender determination is integral to their quote,

10   equitable subordination claim, or an equitable subordination

11   claim that can be filed.  But again, we don't know what's

12   going to happen with the settlement with the committee.  If

13   the committee's settlement is approved, the committee

14   complaint goes away.

15             They rely on the Cencru (ph) decision of Judge

16   Shannon, to suggest that under Rule 56, you don't need to

17   tie an issue on summary judgment to a claim.  They say Judge

18   Shannon said that in the Cencru case.  Again, I would

19   encourage the Court to read that case, that's not what Judge

20   Shannon said.

21             In Cencru, Judge Shannon properly noted that with

22   the amendments to Rule 56, a motion for summary judgment

23   didn't have to dispose of the entire case.  But that a

24   motion for summary judgment could address a single claim or

25   issue directly related to the claim, but nowhere does he

1    suggest or could he under the terms of the rule, that a

2    motion for summary judgment can be filed on an issue of

3    interest to a party, that's not tethered to a specific

4    claim.

5                Finally, we've talked a lot about discovery here.

6    There is no question, there's no question that we requested

7    depositions for the purposes of this motion.  I know Mr.

8    Ward takes a different view of what was said on the

9    conference call on June 21, and I'm not going to ask the

10   Court -- I'm not going to call the other witness to that

11   phone conversation to the stand, and I'm not going to ask

12   the Court to take on the unpleasant task of trying to decide

13   whose declaration is true, I'm not going to ask you to do

14   that.

15               But Exhibit 78 and 79 of my declaration couldn't

16   be more clear that we wanted depositions; we weren't allowed

17   to have them.  It can't be any more clear that we requested

18   the very documents which form the foundation of the

19   petitioning creditor's claim to account for the American

20   money, $4.56 million, and they refused to produce it in

21   discovery, and then produced most of the important stuff on

22   their reply, which they cannot do.

23               Final word.  I know Mr. Ward says that this is not

24   an effort to get around the three year statute of

25   limitations, but it clearly is.  The only way the

1    petitioning creditors can be requisite lender is if the

2    third amendment is specifically enforced against Yucaipa.

3    That is the only way.  And that effort is barred by the

4    three year statute of limitations.  We know that because

5    that's the law of Delaware.  We know that's the law under

6    Central Mortgage Company versus Morgan Stanley.

7              THE COURT:  How is it that it's specific

8    performance?

9              MR. SAUER:  Because right now Yucaipa holds a

10   bunch of debt.  What they want to do is strip the debt of

11   voting rights.  They want to require that Yucaipa

12   contributed a bunch of it, and determine that Yucaipa is not

13   eligible -- is not allowed to hold the letter of credit.

14   They're seeking to --

15             THE COURT:  No, to say that Yucaipa bought the

16   debt when it was not an eligible assignee, and that nobody

17   raised the issue as to what the limitations might be on that

18   purchased debt within three years doesn't make sense.

19   Because the issue is whether they were subject to those --

20   whether those limitations were or were not applicable to

21   begin with.

22             So I don't understand how -- to me, that's a

23   dispute that never expires because if they -- the ability or

24   inability to have neutered or non-neutered debt, it's --

25   arguably it's a matter of what the documents say.  And I

1    don't see how -- I really don't see how the statute would

2    apply.  Because it comes to an interpretation of what they

3    are or are not allowed to do, and until they try at least to

4    do something, maybe this is your point, they tried to do

5    something, and it was more than three years ago, and since

6    nobody objected, the statutes expired?

7              MR. SAUER:  Well, I think it's more than that,

8    Your Honor, and look, far be it for me to try to convince

9    you since I'm certain on this point you're made up your

10   mind, but let me just layer this a little bit.

11             When you have a contract and that a party acts

12   under that contract, you have an obligation.  If they breach

13   -- if there's a breach of the third amendment, the breach

14   is, as they argued to this Court, remember they argued this

15   to the Court, and the Court adopted their position, that as

16   it relates to the third amendment, any challenge to the

17   third amendment or any attempt to enforce or not enforce it,

18   accrued back in September of '09.

19             Yucaipa has been acting as requisite lender for

20   three and a half years -- for almost three years, and

21   petitioning creditors went along with it.  They took the

22   money, they did a lot of things.  Yucaipa didn't contribute

23   the debt.  Yucaipa continued to do lots of things that --

24   forget about requisite lender, that a lender holding 54

25   percent of the debt might do.

```
1              And I think that the petitioning creditors had an
2    obligation, if this was really an issue for them, to have
3    challenged the validity of Yucaipa's actions, or to have
4    specifically enforced the third amendment at the time.  And
5    we know --
6              THE COURT:  All right.  So when Yucaipa acts
7    purportedly in violation of the contract, and the other side
8    is aware they're acting in violation of the contract, that's
9    really when the statute would start to tick.
10             MR. SAUER:  Central Mortgage Company versus Morgan
11   Stanley says, the Delaware statute of limitations for
12   contract claims begins to run on the date of the first
13   breach, the first breach.  Yucaipa was obligated purportedly
14   to contribute 50 percent of $50 million worth of term loan
15   exposure within ten days.  They didn't.
16             And we know -- I mean, this is not like the
17   petitioning creditors weren't thinking about this.
18             THE COURT:  I'm sure there's something in the
19   contract, a no waiver clause, that one breach doesn't
20   necessarily waive other provisions that can be enforced.
21             MR. SAUER:  But I don't believe the no waiver
22   provision applies to the statute of limitations.  I've
23   looked, and have not found a single case for any court
24   anywhere in this country, I thought that might come up, that
25   a no waiver provision somehow trumps a statute of
```

1    limitations provision.

2              And let me just close with one final exhibit, and

3    that is Exhibit 50, which is to my declaration at paragraph

4    32.  In late September of '09, Mr. Shaffer wrote to Mr.

5    Urlich of Black Diamond an e-mail, so it was Spectrum to

6    Black Diamond, "I like the idea to try and enforce the 50

7    percent covenant and strip their vote."

8              They knew they had the ability to pursue specific

9    enforcement at the time, they contemplated it, they didn't.

10   Any effort to -- I believe to specifically enforce this

11   agreement, which I think really is what this dispute is

12   about is time barred.  But again, we never really have to

13   get there.

14             THE COURT:  Okay.

15             MR. SAUER:  Thank you, Your Honor.

16             THE COURT:  Thank you.

17             MR. WARD:  Your Honor, I have a few things to say

18   in reply, would you like me to go now or should we take a

19   short break?

20             THE COURT:  Yeah, let's take a quick break and

21   hopefully this time it'll be quick.

22        (Recessed at 12:27 p.m.; reconvened at 12:39 p.m.)

23             THE CLERK:  All rise.

24             THE COURT:  You may be seated.

25             Mr. Ward.

Page 105

1          MR. WARD:  Your Honor, may I?

2          THE COURT:  Yes.

3          MR. WARD:  Your Honor, a couple of points.  First

4   off, we strongly disagree with what Yucaipa, what Mr. Sauer

5   has said about our plan is not having enough debt to

6   constitute the numerator.  And let me see if I understand

7   some of the admissions I believe that Mr. Sauer on behalf of

8   Yucaipa made.

9          I think the principal admission is that we have

10  $51 million in debt, and that AMMC has 4 and a half million

11  dollars in debt, basically it's about 55 million.  The other

12  concession is that if you disregard Yucaipa's debt, and I

13  believe, Your Honor, I'm not going to repeat all of my

14  arguments, I may touch on one of them or two of them, but we

15  believe that under the third amendment, under Justice Ramos'

16  decision, whatever, that there are many, many reasons to

17  disregard Yucaipa's debt.

18          That definition in 2.1(e) of the term loan, that

19  debt doesn't count.  The fact that eligible assignee under

20  2.1(c) of the third amendment says they can't buy LC debt.

21  But if you disregard the debt, then you're down to $109

22  million.  If you add AMMC to our debt, we've got more than

23  half.

24          Now, Your Honor, if what Your Honor rules today is

25  simply that Yucaipa's debt is to be disregarded, we have

1    clearly advanced the ball.  Now, what we had done, Your

2    Honor, is we believed that when Justice Ramos made his

3    decision, and you heard me spend a lot of time arguing that

4    we believed it collateral estoppel not only on the fourth

5    amendment, but also on the issue of requisite lender based

6    on his construction of the third amendment, we believe that

7    he said that the Yucaipa debt, in effect, was disregarded

8    because of his rulings and findings on the third amendment.

9              So when we acted, and Your Honor, it's with

10   respect to Exhibits I think 10 and 11 to my affidavit, after

11   Justice Ramos' decision from the bench on November 19th, and

12   contrary to what Mr. Sauer said, Justice -- I was there.

13   Justice Ramos said, we had won, plaintiff, plaintiff you've

14   won.  We knew we had won.  All that Justice Ramos said, I

15   will follow this up with a decision.

16             As far as we were concerned that was the ruling,

17   and it was a ruling on requisite lender issue, and it was a

18   ruling on the fourth amendment issues.

19             So on December 3rd -- remember that argument is

20   November 19th.  On December 3rd, the entities that believes

21   they were the requisite lender on the basis of Justice

22   Ramos' decision got together and appointed the Black Diamond

23   entity and the Spectrum entity as the co-admin agents, and

24   registered the AMMC trade.

25             If it turns out that Your Honor doesn't believe

Case 1:12-cv-09047-GSS Doc 52-1 Filed 09/26/20 Page 128 of 331
Case 1:12-cv-09047-GSS Doc 2711 Filed 08/01/13 Page 107 of 131

Page 107

1    that Justice Ramos went far enough, and that it is

2    collateral estoppel on the requisite lender issue, then what

3    we would need from Your Honor is simply is a ruling that

4    Yucaipa's debt is to be disregarded.  This afternoon,

5    tomorrow, we will then get together, it doesn't matter how

6    we get together, I mean, if Black Diamond, and Spectrum, and

7    AMMC will then get together and buy the admission that Mr.

8    Sauer and Yucaipa makes, these three entities together,

9    Black Diamond, Spectrum and AMMC have a majority of debt if

10   Yucaipa's debt is disregarded.  And we believe we've given

11   Your Honor many, many bases for the disregarding of the

12   debt.

13          And like I said, what we did on December 3rd, and

14   by the way, Exhibit 12 to my affidavit was the notice we

15   gave to Yucaipa on December 3rd that on that very day,

16   December 3rd, we had -- the parties thought they were the

17   requisite lender by virtue of Justice Ramos' decision of

18   November 19th, had appointed the co-admin agents and they

19   registered the trade.  We can just do that tomorrow.  There

20   doesn't have to be a ruling on that issue today.

21          So -- but there are a number of other things that

22   I just want to address briefly.  First off, much of what Mr.

23   Sauer said on behalf of Yucaipa I think illustrates the

24   reason for the rule, which is very well established that you

25   don't look to extrinsic evidence to create an ambiguity in

```
 1    the document.  You look at the four corners of the document.

 2              If the four corners don't show an ambiguity, you

 3    don't look at the extrinsic evidence.  Much of what Mr.

 4    Sauer said was simply extrinsic evidence, and by the way,

 5    the e-mails that he's citing to were by and large after

 6    April of 2008, but it's after the third amendment.

 7              So basically what Yucaipa is arguing is, well,

 8    there was a stayed amendment, and then there was a lot of e-

 9    mails back and forth, Black Diamond and Spectrum and other

10    parties who are commenting on what the third amendment does.

11    If there's anything that should be excluded as unnecessary

12    extrinsic evidence in the face of a clear contract, it's

13    that sort of evidence.

14              And where Mr. Sauer said if Judge Ramos only knew

15    what had happened.  Well, Judge Ramos knew what happened,

16    here's his ruling.  He said at page 13 of his decision which

17    is Exhibit 1 to our moving affidavit, "The credit agreement

18    itself is unambiguous, and accordingly summary judgment is

19    appropriate.  For their part, the defendants," that's

20    Yucaipa, "contend there are many factual issues.  There are

21    none.  This is a case for contract interpretation."

22              That is a full and fair opportunity to argue for

23    purposes of collateral estoppel.

24              Now, what Mr. Sauer says is, well, because the

25    discovery wasn't done, it's not a fair and full opportunity.
```

1    Take that argument to its logical extension.  What that

2    means is that every time a Court rules for summary judgment

3    on the basis of a contract, and excludes the extrinsic

4    evidence, whether before discovery or after discovery, that

5    can't be a full and final ruling.  Because where a Court is

6    determining that a document, a contract, on its face

7    contains no ambiguity, the Court is excluding the extrinsic

8    evidence.

9              And the rule is, you don't -- and Courts do this,

10   Courts know this, you don't look at the contract, and don't

11   look at the extrinsic evidence and say, from this extrinsic

12   evidence I hereby see there's an ambiguity.  You look at the

13   contract, if you're satisfied that the contract

14   unambiguously represents or expresses the intent of the

15   parties, you never look at the extrinsic evidence.

16             Taking Mr. Sauer's argument to its logical

17   exclusion, never can a decision like that on summary

18   judgment be full and final and fair.  There can't be a final

19   judgment.  Well, that's not true.  There are many such

20   decisions that are final judgment.

21             So when Justice Ramos ruled, and we had ruled for

22   summary judgment on the face of what we thought were very

23   clear contracts, the fourth amendment, the third amendment,

24   he ruled that these documents were clear on the face, and he

25   didn't need the extrinsic evidence.

1          That, pursuant to collateral estoppel indicates a

2    final judgment, that makes it full and fair in terms of

3    their ability to have litigated that issue.

4          But a couple of other things have litigated that

5    issue, but a couple of other things, Your Honor, one of the

6    things that Mr. Sauer says is well, you know what, we don't

7    need to vote the debt, we just need to have the debt.  And

8    that the fact that the definition of requisite lender speaks

9    about having a holding.

10          Now, what I think what Mr. Sauer would like to do,

11   what Yucaipa would do, I'm not making this personal, I

12   happen to have a lot of respect for Mr. Sauer, and I hope he

13   has the same for me, the definition of requisite lender is

14   part of an integrated series of documents.  It's the first

15   lien credit agreement, it's the third amendment, and it's

16   not the fourth amendment.

17          In the third amendment, it is very clear when I've

18   cited it to Your Honor, that they can't vote.  And you can't

19   take the definition of requisite lender, where you have to

20   be a lender, and use the having holding language, and

21   exclude the voting language just because it's in another

22   provision.  Now, it may be in the third amendment, but it's

23   still part of an integrated series of documents.

24          So as a result, the having and the holding have to

25   be read together with the voting, you have to be able to

1    vote and -- because otherwise, as I said to Your Honor, it

2    violates the principal of contract instruction that you're

3    giving no effect to a provision in an agreement.

4            So if you're saying, hey, Yucaipa, you can have

5    and hold, and you can be the requisite lender, but you can't

6    vote.  I mean, first off, it doesn't make any sense.  Judge

7    Ramos in his -- Justice Ramos in his decision said that's

8    just not logical, that the requisite lender acts through

9    amendments and waivers, they act, that's what a requisite

10   lender does, they act.

11           But the problem I've got with Yucaipa's argument

12   in this regard is it takes having and holding completely out

13   of the context, and doesn't interrelate with the fact that

14   they can't vote.

15           Now, another thing that's interesting and Mr.

16   Sauer doesn't touch upon this, is the fact that we argue

17   that a critical element of the definition of requisite

18   lenders, you have to be a lender.  Well, I did this before,

19   and I'm going to do it real fast, lender -- requisite lender

20   you have to be a lender.  Lender is defined in paragraph 30

21   of Exhibit 8, which is the first lien credit agreement, and

22   it says, you've got to either be an original signatory, they

23   were not, or you have to be a party to the assignment

24   agreement.  The assignment agreement is contained in the

25   form in Exhibit E.

1          Exhibit E says, you have to be able to represent

2     in that assignment agreement that it, quote, that's the

3     assignee, it meets all requirements of an eligible assignee

4     under the credit agreement.  They can't do that.  Since they

5     can't do that, they can't be a lender.  If they can't be a

6     lender, they can't be a requisite lender.

7          Now, Yucaipa focuses on the having and holding,

8     and they ignore the voting.  I've addressed that.  But they

9     also ignore the fact that they have to be a lender.

10          Now, they may think that they can come in and

11     violate the agreement and buy all this LC debt and buy all

12     this term loan debt, and as a result, take advantage of the

13     other creditors.  But they can't do it.  And they can't do

14     it because they can't become a lender, and because the

15     provision that says you can't vote is a problem for them,

16     because you can't be a requisite lender without voting.

17          In particular, as I cited to Your Honor earlier in

18     the day, I think it's 2.7(a) and 2.7(b) specifically says,

19     you, Yucaipa when you buy this debt, term loan debt, any

20     debt, you cannot vote -- and by the way, the conclusion on

21     voting rights applies not only to the term loan debt, but to

22     the LC debt, both of them, and revolving debt if they had

23     bought it.  It's across the board.

24          Now, with respect to 2.7(a) and 2.7(b), as I

25     recited to Your Honor, it says, you in effect can't do

1    anything in a liquidation proceeding.  So I don't even

2    understand what they're doing here.  They want to be the

3    requisite lender, they say they can be the requisite lender

4    having no vote.  They got mooted that, they basically are

5    going to be a transparent requisite lender, and they're

6    specifically not allowed to do anything in this proceeding.

7              That is, as Justice Ramos said, is not logical.

8    That also, I believe, would violate the rule of construction

9    that you're in effect or that you're giving no effect to a

10   particular provision, which is the no vote provision.

11             But let me on to a couple of the other provisions,

12   Your Honor.  Oh, with respect to us being too late I guess

13   under Rule 901 of the Federal Rules of Evidence, I don't

14   think Mr. Sauer is right.  I don't know that that argument

15   was in his papers.  If it was, I missed it.

16             The LSTA trade document we believe is a self-

17   authenticating document, and as a result under the Federal

18   Rules of Evidence, it's not to be excluded pursuant to the

19   argument that Mr. Sauer mentioned.  But I think that's

20   probably overly technical issue because as I said, Your

21   Honor, if Your Honor rules that Yucaipa's debt is

22   disregarded and we're down to $109 million worth of debt,

23   there is a requisite lender out there, I mean, it's Black

24   Diamond, it's Spectrum, and we're going to get together with

25   AMMC.  I mean, we own their debt anyway, and it's just going

Page 114

1    to be a matter, a purely administrative functional matter of

2    the three of us then, Black Diamond, Spectrum, and AMMC

3    appointing the admin agent, who will then register, and

4    we'll be exactly where we thought we were on December 3rd.

5            So that, Your Honor, I think gains them absolutely

6    nothing.

7            Oh, and with respect to the argument that Justice

8    Ramos' decision on November 19th was not effective, now as I

9    said, Your Honor, he ruled from the bench that the agreement

10   was null and void.

11           Let me just quickly go through my notes, Your

12   Honor, because I think I've covered much of this.  Oh, two

13   arguments.  The arguments under -- well, let me do the

14   argument under Praven last, but with respect to Mr. Sauer

15   saying that in fact Yucaipa had nothing to do at least with

16   the execution of the third amendment, we cite -- we attach

17   as Exhibit 14 to our moving affidavit an e-mail from Dericks

18   Walker (ph), who is the Chairman of Allied, appointed by

19   Yucaipa, and he's writing to Ron Burkle (ph), who is for

20   want of a better term, Your Honor, I'll say he's the head

21   guy, he's the head guy at Yucaipa.

22           And what Mr. Walker says on April 17th, 2008,

23   which Your Honor happens to be the exact same date as the

24   third amendment, he says, "We were successful in acquiring

25   $40 million in second lien debt for $26.4 million.  We now

1    control 40 of the 50 million of outstanding second lien

2    debt."

3              Who bought that debt that day?  It was Yucaipa.

4              In the very next line of the e-mail he says, "we",

5    the same word he uses to describe the we who bought the

6    debt, "We also successfully obtained an amendment from our

7    first lien lenders, allowing us to buy first lien debt, and

8    convert both the first and second lien debt in equity."

9    That's the third amendment.

10             They drafted it, they negotiated it.  I don't

11   think it's relevant, Your Honor, to be honest, because as

12   Your Honor pointed out, there is a provision that when you

13   take, when you buy the debt, you take subject to the prior

14   authorizations and consents of the parties.

15             So when they took this debt, they took prior --

16   they took subject to the authorization that the third

17   amendment was in effect.

18             With respect to Praven, let me point out a couple

19   of things.  Praven as I said is very clear about this

20   inclusionary/exclusionary point.  Praven makes clear and I

21   apologize, Your Honor, that it was troubled by the fact that

22   there were no express limitations on assignability.  There

23   are expressed limitations on assignability here.  And

24   although Mr. Sauer cites to all the New York cases -- well,

25   basically if you read these cases, Your Honor, like a

1    mantra, he may have said that, they repeat again and again

2    the same language.  They're just recycling some general

3    provision of old New York law about assignability of claims.

4              However, as we point out, in each of those cases,

5    there's no exclusionary language in Praven.  There's no

6    exclusionary language.  In 785, there's no exclusionary

7    language.  There is no language in any of these cases that

8    says, you may be an ineligible assignee or lender, you may

9    be an eligible assignee or lender, but you may not.  That's

10   what distinguishes this case, except for a couple of other

11   points that distinguish this case.

12             First off, as I mentioned, this case here is an

13   intercreditor fight, it's not -- it's a much more simple

14   case of 785 and I know Mr. Sauer said it was very

15   complicated, but surely not that complicated.  If you had a

16   borrower, and you had a lender, and the lender assigned the

17   note to another entity, and it was that entity that was

18   seeking to make the claim.  A much more simple circumstance,

19   it's borrower versus lender, here we have Yucaipa which

20   sought to be lender, and take advantage of the other

21   lenders, through an agreement that itself had negotiated,

22   787 Praven, you don't have a circumstance where the assignee

23   had negotiated an agreement to get their foot in the door,

24   and then once they got their foot in the door, blew it wide

25   open.  It's a very, very different case.  Our case is a

1    very, very different case.

2            The generic state court cases of which Mr. Sauer

3    cites many don't advance the ball, except to simply say, New

4    York law, old New York law is this.  But they don't deal

5    with any exclusionary language.  There's not a single case

6    that Yucaipa has cited, that deals with an intercreditor

7    agreement, where you have two creditors who are fighting

8    with each other under the terms of the agreement.  We think

9    that our case is distinguishable.

10           Another major reason of course is as we say in

11   Praven, the 2nd Circuit was crying out for some exclusionary

12   language, it wasn't there.  787 relies most heavily on

13   Praven, not a surprise, it's a 2nd Circuit case.  And in

14   that case, too, in 785, again, there was no exclusionary

15   language.  Here there is very clear exclusionary language,

16   some of which as I said, Your Honor, in fact, all of which

17   as I said, Your Honor, in the third amendment, was

18   negotiated by Yucaipa itself.

19           I'm almost done, Your Honor, if you can just bear

20   with me one moment.

21       (Pause)

22           MR. WARD:  I mean, what -- the one thing I find I

23   guess probably -- one of the things I find very troubling

24   about Yucaipa's position is what they're saying is under

25   Praven and this line of authority even though under Praven

1    and this line of authority, we can buy the debt, but we

2    don't have to be bound by the provisions in the agreement.

3    And that seems to me to be, Your Honor, a very difficult

4    position for anyone to take.

5            And I think finally, Your Honor, on the procedural

6    issues, Mr. Sauer said that -- I think he admitted, and in

7    fact, it's true that the cases on summary judgment have much

8    more liberal since the amendments in terms of what partial

9    summary judgment means.  And for partial summary judgment

10   you don't have to dispose of a whole claim, in a complaint

11   with three claims, you don't have to dispose of a whole

12   claim for there to be a motion for partial summary judgment

13   allowed.

14           But the fact is, that even if that weren't the

15   case, in the Allied adversary proceeding, one of the

16   specific forms of relief that Allied specifically asks for

17   is who is the requisite lender, and a determination of their

18   rights under the third and fourth amendment.  That's what

19   we're seeking here.  We clearly should be entitled to

20   summary judgment on those issues.  And that I think, Your

21   Honor, is all I have.  Thank you for your patience.

22           MR. SAUER:  Your Honor, may I have just literally

23   one minute?

24           THE COURT:  Yes.

25           MR. SAUER:  Actually I meant what I said one

1    minute.  I think it's important that the Court obviously,

2    I'm sure has and will review the third amendment.  The

3    limitations on voting applicable to how the voting works is

4    very specifically delineated in terms of what it applies to.

5    I raised it on my opening argument, I just refer the Court

6    to that.

7              Two, with respect to New York law, we heard lots

8    of reasons why it's distinguishable and why it's old, it's

9    not distinguishable, and it's not old.  We referenced, for

10   example -- first of all, you've got 785 Partners, which is a

11   2012 case.  We referenced Almado Oil Company (ph) which is a

12   2008 case.  We referenced the Bank Russell's case which is a

13   2000 case, all of these cases come after the Praven

14   decision.

15             We've represented or referred to the Purchased

16   Partners case which is also a 2012 case.  So this is not old

17   outdated New York law, this is old New York which continues

18   in force and in effect, which petitioning creditors don't

19   like because it leads to a result they don't like, but it is

20   the law that needs to be applied.  Thank you.

21             THE COURT:  Okay.  All right.  Thank you.  What

22   I'm going to -- what we're going to do is we're going to

23   take a break.  I am going to make my decision, and then

24   we'll come back and I will announce it.  We'll come back at

25   3 o'clock and I'll announce it.

```
 1              I am going to close the courtroom because I'm
 2     going to work here, because I've got everything here, and I
 3     know where everything is.  You may leave your items, I have
 4     no other matters, and we'll reconvene at 3.
 5              All right.  Thank you.
 6         (Recessed at 1:00 p.m.; reconvened at 3:03 p.m.)
 7              THE CLERK:  All rise.
 8              THE COURT:  Please be seated.
 9              All right.  Hopefully this will be as relatively
10     cogent as possible, obviously complicated.  I won't bury the
11     lead.  The Court is going to grant the motion for summary
12     judgment and rule that Black Diamond/Spectrum are the
13     requisite lenders under the first lien credit agreement.
14              So let me tell you how I got there.  I'm going to
15     start with some of the procedural, related two procedural
16     posture issues.  Sorry, first summary judgment can be
17     entered on claims and/or issues properly, and I've granted
18     summary judgment in the past on elements of claims, not even
19     claims in their entirety, and I think finally the identity
20     of the requisite lender here is implicated as an issue
21     (indiscernible) throughout the cases, certainly in
22     connection with many of the things going on in the
23     underlying bankruptcy, but also the adversary proceedings,
24     and otherwise is specifically or it relies in connection
25     with several specific claims.
```

Case 1:15-cv-00747-CSS Doc 520-1 Filed 09/26/20 Page 142 of 331
Case 12-50947-CSS Doc 271 Filed 08/01/13 Page 121 of 131

Page 121

1           Also the motion is not time barred.  The identity

2      of the requisite lender in a situation like this is

3      constantly evolving and liquid issue as people come in or

4      out of the debt.  And while (indiscernible) is the requisite

5      lender in 2007 might be time barred, the question of who is

6      requisite lender now is certainly not time barred.

7           And I guess one could argue that the facts and law

8      governing the determination in 2013 which arose maybe in

9      2008 or 2009 would in effect make those elements time

10     barred, but I don't think that that would be a proper

11     application of a statute of limitations in a case like this.

12          The controversy would've arise on a host of things

13     that have happened since 2007, but the specifics of making

14     the ruling are certainly not time barred.  The other point

15     is that I thought there was an argument, a good argument

16     that this issue or these issues about requisite lender have

17     been a live controversy for five years, really all the way

18     back at least as early as the CIT case being filed, and

19     really perhaps all the way back to the exit of the initial

20     bankruptcy.  So there's never been an instance where this

21     has sort of gone away and people have forgotten about it.

22     It's been something that's been live and in controversy and

23     evolving as we go forward.

24          But again, the issue today who is the requisite

25     lender on July 30, 2013 is clearly not barred in any way by

Page 122

```
1    any statute of limitations.

2           So the issue, what is the issue.  The issue as I

3    see it is pretty clear, it's who is the requisite lender.

4    And counsel for Yucaipa I think explained it very well in

5    (indiscernible) issue, that it's really a question of

6    determining the (indiscernible) denominator of the

7    appropriate debt and do the math, and seeing if a group or

8    an individual lender has over 50 percent of the debt.

9           Now, that determination starts with an examination

10   of the four corners of the documents to determine the

11   parties' intent, which is how you -- the parties' intent,

12   first you start with the four corners of the document, if

13   it's ambiguous, you move on, and only if it is ambiguous do

14   you look to extrinsic evidence to determine the intent.

15          And in this case, I found and hold that the

16   contract -- the contracts are not ambiguous in any way, and

17   the Court can determine its -- make its determination based

18   on the four corners of the document.

19          The legal started as summary judgment, the

20   petitioning creditors have the burden to establish they're

21   entitled to judgment as a matter of law, and if there in

22   absence of a genuine issue of material fact, in which point

23   the burden shifts to Yucaipa to identify a genuine issue of

24   material fact.

25          Again, just to read a little law, because I think
```

1    it's important for figuring out how we proceed, under the

2    summary judgment standard, a Court -- this is -- open quote,

3    a Court faces a conceptually difficult task, end quote, in

4    interpreting a contract, because the Court must, quote,

5    determine whether as a matter of law if the contract is

6    ambiguous or unambiguous on its face.  Typically a Court may

7    (indiscernible) grant summary judgment when the terms are

8    unambiguous; however, where a Court determines as a matter

9    of law that the contract is ambiguous, it may yet examine

10   evidence extrinsic to the contract as including summary

11   judgment materials and what that evidence is as a matter of

12   law dispositive of the interpretive issue grant summary

13   judgment on that basis.

14          And it goes on to say, a contract is unambiguous

15   if it is objectively susceptible to at least two reasonable

16   but conflicting (indiscernible), ambiguity is not determined

17   simply because the parties to the contract have differing

18   interpretations.

19          So it would be possible to enter summary judgment

20   even if we had -- even if the Court had to go outside the

21   four corners of the document.  But in this case, I don't

22   think that you -- that we have to go outside the four

23   corners of the document, and summary judgment is certainly

24   appropriate in that instance.

25          Now, getting into more of the specifics, Yucaipa

1   (indiscernible) collateral estopped from arguing that the

2   fourth amendment is valid.  This arises in the case in front

3   of Judge Ramos.  Again, for (indiscernible) being identical

4   issue was raised, the issue actually litigated and decided,

5   Yucaipa had (indiscernible) opportunity to litigate, and

6   importantly that doesn't mean necessarily discovery, it's

7   really a case-by-case issue on whether there's a fault or

8   opportunity.

9           And further (indiscernible) the issues necessary

10  to support the valid judgment, and I don't think there are

11  going to be any (indiscernible) that the fourth amendment,

12  its validity were clearly the subject of extensive briefing

13  and argument and (indiscernible) Justice Ramos, and I find

14  that Yucaipa is collaterally estopped that the fourth

15  amendment is valid.

16          However, I don't believe they're collaterally

17  estopped from arguing the issues as to who the requisite

18  lender may or may not be under the third amendment.  And

19  (indiscernible) because I think (indiscernible) touches on

20  the third amendment a little bit, there was nothing that I

21  could find in the argument that really touched on it at all.

22  And I don't believe the Court sufficiently focused on it, I

23  don't think it was sufficiently before the Court to really

24  find that that issue was actually litigated and decided.

25          So I find that Yucaipa is not collaterally

1    estopped from arguing the issues related to the third

2    amendment.

3           So that gets us to the next question which is

4    whether the third amendment on the merits precludes Yucaipa

5    from being the requisite lender; i.e., the debt not counted

6    in the denominator which of course leads to a situation

7    where the petitioning creditors might be the -- excuse me,

8    might be the requisite lenders.

9           First, there's this argument that there's law of

10   the case that the Court has already decided, the issue and

11   as a result, we don't need to get to it any further.  And

12   the issue there being is Yucaipa stuck with the provisions

13   of the third amendment no matter what.

14          And I certainly made that statement or statements

15   to that effect twice in the ruling on the motion to dismiss

16   the cross claims, but for purposes of the law of the case, I

17   don't think it was sufficiently really considered or all be

18   different variations were necessarily considered that would

19   make it fairly preclusive.  So I've got to go into the

20   actual amendment itself.

21          The potential issue there is whether the third

22   amendment required all lenders consent, as opposed to a

23   requisite lender consent.  And I'm going to quote or

24   paraphrase from one of the petitioning creditors' briefs,

25   because I think it lays it out.

1          Section 5.5(b)(9) of the first lien credit

2   agreement provides that the written consent of each lender

3   that would be affected thereby is necessary for any

4   amendment that has the effect of modifying the definition of

5   requisite lenders.  Because the purported fourth amendment

6   had the effect of modifying the definition of requisite

7   lenders and affected every lender, by allowing Yucaipa to

8   become requisite lender for the first time, ComBest consent

9   alone, as then requisite lender, was insufficient to validly

10  (indiscernible) fourth amendment.

11          The third amendment, however, affected no lender,

12  but it only allowed Yucaipa to purchase very limited amounts

13  of term loans, and by Yucaipa's own admission, imposed

14  onerous restrictions on such purchases that prohibited

15  Yucaipa from ever becoming requisite lender.

16          The only party affected was Yucaipa, and as a

17  result, the consent of the requisite lender was sufficient,

18  and all the lenders did not have to agree.

19          Now, getting to the meat really of the argument,

20  and it goes to the definitions of term loan exposure, and

21  the definitions and changes in Section 2.1(e), which I think

22  are the critical element or the critical contractual

23  provision.  I think the effect of 2.1(e) is that all of the

24  Yucaipa debt cannot be used in determining who the requisite

25  lender is, which (indiscernible) it down to the $109 million

1    or so of debt over which Black Diamond and Spectrum must

2    have at least 50 percent.

3              The provisions among other things prohibited

4    Yucaipa from acquiring any revolving loans, and letters of

5    credit, which would use those to the extent they exist from

6    the denominator in figuring out the requisite lender.

7              And as a whole, the limitations as to the

8    (indiscernible) the inability to act in insolvency

9    proceedings, the requirement ignored, contributed capital,

10   as a whole, I think I find looking at the document as a

11   whole, remove Yucaipa from being able to act as the

12   requisite lender.

13             Upon acquiring the debt, Yucaipa subjected itself

14   to the first lien agreement and all of the amendments,

15   including the third amendment.  I think importantly though

16   even under the first amendment alone, as pointed out during

17   oral argument, Yucaipa cannot be the requisite lender

18   because it's not a lender as an implied term, as it's not an

19   original lender or not -- I have to put it, not prohibited

20   lender --

21             UNIDENTIFIED:  (indiscernible)

22             THE COURT:  Thank you.  So where are we?  That

23   gives us a numerator arguably of $56 million and a

24   denominator of $109 million, and we move to the issue of

25   whether Black Diamond and Spectrum can include the American

1    debt in their number to come out with over 50 percent.

2            I find that the American debt is certainly -- I

3    find that the American debt, or what I call the American

4    debt is part of the numerator in this case, and it's the

5    acquisition of that debt by Black Diamond's and/or Spectrum

6    is sufficient to include it in the numerator.

7            As a result of Justice Ramos' decision, Black

8    Diamond and Spectrum became requisite lender.  Now, that

9    hasn't been determined by a court of law until today, but

10   the facts that existed, that made them requisite lender that

11   is being identified today existed after Justice Ramos'

12   decision.  And after that point, they acted to appoint an

13   agent, and they did the recommendation that they were

14   supposed to do in appointing that agent.  So there's no

15   argument to be made that the American debt or -- well, I

16   disagree with and overrule the argument that the American

17   debt cannot be included in their number.

18           Back up a little bit here.  So having said all

19   that, I think we come to perhaps the crux of the argument,

20   and the most difficult piece of the argument to deal with.

21   And that's the Plevin (ph) and the 785 case issue about

22   enforceability.

23           In other words, are we limited to a situation

24   where the prohibition was simply that the debt could not be

25   sold to Yucaipa, which it was, but all that does is create a

1   breach of contract claim against the seller, and doesn't --

2   and it follows perhaps that all the limitations are not

3   really enforceable against Yucaipa.

4               And I've looked at those cases, and this case is a

5   very different case I believe from those.  The

6   (indiscernible) to some extent outside of the four corners

7   of the document to deal with the argument about

8   enforceability, but the facts I rely on I really are

9   undisputed and (indiscernible) summary judgment is

10  appropriate.

11              Yucaipa was involved in the negotiation and the

12  establishment of the first lien credit agreement as part of

13  the earlier bankruptcy.  And at all other times, has

14  controlled the equity and the board of directors.  And has

15  been intimately involved in every aspect of the debtor's

16  business, and the credit agreement issues since 2007.

17              To allow Yucaipa to be involved this heavily in

18  negotiating agreements with -- including those with

19  expressed limits on Yucaipa's rights, and wont' allow them

20  to buy the debt, the seller cannot sell to them in the first

21  place, and to (indiscernible) would be inequitable, you

22  know, to the (indiscernible) degree in my mind, and as a

23  result I find that at least under these facts and

24  circumstances, the Plevin and the 785 Holdings are not

25  applicable or inapposite.

1          I think I've covered all the points, I think I

2     have.  And just to reiterate the ruling, I'm going to grant

3     summary judgment, holding that the petitioning creditors are

4     requisite lenders under the first lien credit agreement.

5     And I think the best thing to do would be to have counsel

6     submit an order under certification of counsel.

7          MR. SAUER:  You Honor, may I may one comment or

8     ask a question?

9          THE COURT:  Yes.

10          MR. SAUER:  Thank you, Your Honor, Russell Sauer

11     of Latham & Watkins for Yucaipa.

12          One quick comment, there is absolutely no evidence

13     in the record, because it wouldn't be true, that Yucaipa

14     participated in the negotiations in the first lien credit

15     agreement, no evidence.  More importantly just for the

16     record I understand the ruling, I'm assuming the Court is

17     overruling all of our objections to the evidence that was

18     submitted not having been produced and that was produced on

19     reply without any authentication and without being

20     properly --

21          THE COURT:  Well, I think you actually made that

22     argument to (indiscernible) your objection to the entry of

23     that evidence, yes, it's overruled.

24          MR. SAUER:  Thank you.

25          THE COURT:  We obviously disagree on the first

1    point.  That's for district courts and courts of appeal are

2    for.

3              All right.  Anything else for today?  I guess we

4    do need to deal with this motion to shorten in connection

5    with the settlement motion.

6              MR. SAMIS:  Your Honor, we can certainly deal with

7    that first.  I was going to raise one other matter.  We have

8    a bar date that's looming on August 2.  We did submit a

9    certification of counsel on Friday that would allow Black

10   Diamond and Spectrum to file a consolidated proof of claim

11   as agent under the first lien credit agreement.

12             We received an objection from Mr. Klyman after we

13   had submitted that.  We turned around and withdrew it and

14   submitted a different certification of counsel actually

15   yesterday that basically made it a neutral as to who the

16   agent was, for the purpose of getting around that objection,

17   but still allow -- whoever the agent was determined to be,

18   to file a consolidated proof of claim.

19             We haven't seen an order hit yet on that, I do

20   have a copy of that order here in court.

21             THE COURT:  I haven't seen it, so you can

22   approach.

23             MR. SAMIS:  Thank you, Your Honor.  That was

24   submitted under certification yesterday, Your Honor.

25        (Pause)

1          THE COURT:  To back up on the enforceability

2     issue, and I understand counsel's comment about what may or

3     may not be in the record, I -- we can disagree on that and

4     (indiscernible) overly flip with my comment about appellate

5     courts, but I think that the -- in my mind at least, that

6     the summary judgment motion was -- the burden was met by

7     Black Diamond in establishing that they should be the

8     requisite lender.  And I didn't see anything that would

9     rebut that in that I really didn't see any kind of genuine

10    issue of material fact as to whether it should or should not

11    be enforceable.  I believe based on the record, which I

12    think would include really incontrovertible evidence that's

13    been in front of the Court prior, that Black Diamond or

14    excuse me, that Yucaipa was interested, but I stand by my

15    ruling.  I'm just mentioning that sort as a side.  I've

16    signed your order.  I assume there was no objection to the

17    COC?

18          MR. SAMIS:  I think we resolved that, Your Honor,

19    by the withdrawal of the original stipulation, order, and

20    replacement with what Your Honor just signed.

21          THE COURT:  Okay.

22          MR. SAMIS:  Your Honor, with that, I guess I would

23    turn the podium over to Mr. Harris.

24          MR. HARRIS:  No, it's Mr. Klyman's motion.

25          MR. SAMIS:  I'm sorry, I thought there was an

```
 1    agreement.  Okay.  Go ahead.
 2              MR. KLYMAN:  Good afternoon, Your Honor, for the
 3    record, Robert Klyman of Latham & Watkins on behalf of
 4    Yucaipa.
 5              Your Honor, after many months and a slog through
 6    the awful negotiations, Yucaipa and the committee have
 7    resolved the estate claims that were brought against
 8    Yucaipa.  I won't bore you with all the details, that will
 9    come out in the ultimate settlement.
10              THE COURT:  I did read the motion.
11              MR. KLYMAN:  Yeah.  And so it's our view, Your
12    Honor, that Black Diamond and Spectrum who are objecting to
13    shortened time, have known about the economic terms since at
14    least the 17th.  The other terms don't affect their
15    individual rights.  We were very careful and the committee
16    insisted that whatever rights Black Diamond and Spectrum had
17    would be preserved in their individual capacity to sue
18    Yucaipa, Yucaipa would have the benefit of all its defenses.
19              And Black Diamond and Spectrum have been
20    litigating this issue since before this case started, as
21    this Court well knows.  They don't need discovery and a
22    stretch out of the process to test the reasonableness of the
23    settlement.  And a 9019 motion is not a time or place for
24    this Court to conduct a mini trial on all the issues.
25              You're very familiar with the issues with this
```

1    case, they're very familiar, it's not going to take a lot of

2    evidence to show that this is at the low end of the

3    reasonableness, particularly given this Court's past

4    comments, the debtor's past comments, that we need to -- and

5    even Mr. Harris' comments that we need to clear out the

6    underbrush in order to go forward with the sale as quickly

7    as possible.

8              Pursuant to bid procedures that Black Diamond and

9    Spectrum lobbied for, got the debtor to agree to, and for

10   you to approve, bids are due, there's going to be an auction

11   soon and it's important for us to determine whether or not

12   we have peace with the committee, whether or not there's no

13   guarantee we're going to bid, but whether or not we are

14   going to bid, and what our -- how our claim is going to be

15   treated, at least from the estate perspective.

16             And what's important here, Your Honor, is again,

17   Black Diamond and Spectrum substantive rights are not being

18   prejudiced in terms of whatever rights they have.  They do

19   complain that they did not get a seat at the bargaining

20   table, in terms that they participated in mediation, we

21   tried that one-on-one conversations with them, but the

22   standing order that Your Honor entered did not give them the

23   right to negotiate at the bargaining table.  They had the

24   right to be consulted, which I think the evidence will show,

25   without discovery, that they were.

1          And, in fact, if they did delay the hearing in

2     order to obtain discovery, they don't identify in their

3     papers any discovery that they would actually want to seek.

4     If they take the depositions of committee members, the

5     committee members are likely to say, well, I acted on advice

6     of counsel, in terms of moving forward with the settlement,

7     they were intimately involved, they met, whatever.

8          You know, the issue is, it can be resolved at

9     argument without a delay, and without the benefit of giving

10    them, you know, wasteful depositions and additional document

11    requests.  Thank you, Your Honor.

12         THE COURT:  Thank you.

13         MR. LAGERMANN:  Good afternoon, Your Honor, Nick

14    Lagermann from Sidley Austin on behalf of the committee.

15         I'm not going to repeat what Mr. Klyman said, but

16    the committee obviously does also support having the

17    proposed settlement heard on the expedited schedule that we

18    had requested.

19         I would like to note though, as Mr. Klyman hinted

20    at, and I think is actually admitted in a footnote in the

21    petitioning creditors' objection, we did, in fact, consult

22    with the petitioning creditors with regard to this proposed

23    settlement.  They have known about the economics for a long

24    period of time.  And there is no obligation in the standing

25    order to have them have a quote/unquote seat at the table,

1    if you will.

2              To the contrary, in paragraph 10 of the standing

3    order, this Court ruled that the committee shall have

4    ultimate decision-making authority with regard to the claims

5    and prosecution of the committee adversary proceeding.

6              In addition, paragraph 12 of the standing order

7    gave each individual party, the committee, the petitioning

8    creditors, and actually also the debtors the ability to

9    settle the claim subject to a party's right to object under

10   Rule 9019.

11             The petitioning creditors, if they want to file an

12   objection, they are clearly more than able to do so, and we

13   think we will deal with that at the 9019 hearing.

14             I wanted to make one other point with regard to

15   discovery.  Again, we don't know exactly what they're

16   talking about with respect to discovery, but when this Court

17   appointed a mediator, you specifically included that all

18   mediation and related conversations would be subject to

19   Local Rule 9019-5, which includes 9019-5(d)(1), which we

20   believe would preclude discovery into settlement

21   communications.

22             Obviously we believe this is a fair and equitable

23   rule that prevents people from digging into mediation

24   related conversations.  But to the extent that there is

25   discovery in that regard, and we go past Rule 9019(d)(1),

1    frankly it would need to be a two-way street.  And my guess

2    is, is that's not -- that is exactly the reason why it is

3    inappropriate to have discovery to start going into what

4    people did or did not do in connection with mediation and

5    settlement communications.  Thank you, Your Honor.

6                MR. KELLEY:  Your Honor, Jeff Kelley for the

7    debtor.  I rise in support of the motion to shorten.  The

8    debtor obviously is interested in moving this case along as

9    quickly as possible, as I'm sure the Court is.  The case has

10   been moving quickly, events are transpiring in the near

11   future which are going to be very important to resolution,

12   and we would like to have this very important settlement

13   motion heard as quickly as possible.

14               The prospect of discovery and the estate paying

15   professionals to engage in discovery is not appealing, and

16   we join the committee in not understanding why discovery

17   would be necessary on this issue.  Thank you.

18               THE COURT:  You're welcome.  Mr. Harris.

19               MR. HARRIS:  Thank you, Your Honor.

20               Your Honor, as we laid out in our papers which we

21   filed yesterday morning, we got these papers last Friday

22   night at 11 something p.m.  We're here to talk about timing

23   right now, and when this should be heard.

24               The request that has been made by the settling

25   parties here is to effectively cut in half the period of

1    time for notice of a hearing like this, that is generally

2    required under the local rule, and if granted, would require

3    us to file a substantive objection to this settlement by

4    this Thursday, when everybody here has known that we were

5    preparing for obviously today's hearing, which was supposed

6    to have many more things on the agenda up until yesterday

7    afternoon, when certain of them got adjourned.

8              Physically, Your Honor, there's no way we can

9    actually comply with that timing.  And frankly, in

10   situations such as this, absent exigent circumstances

11   justified under the particular circumstances of the case,

12   frankly a notice period is often times many times longer

13   than what's included in the regular notice provisions, not

14   shortened by 50 percent.

15             Five business days, Your Honor, is simply not

16   sufficient time in the petitioning creditors or any other

17   party in interest, frankly, who might have a say, want to

18   have a say in this, to prepare and be in a position to

19   prosecute a substantive objection should they choose to do

20   that.

21             THE COURT:  What's the timing on the auction?

22             MR. HARRIS:  Bids are due on August 8th.  The

23   auction is scheduled for August 14th.  And the sale hearing

24   is scheduled for August 22nd.

25             THE COURT:  Mr. Klyman, what's the -- I understand

1    the comments about what Black Diamond knew and when they

2    knew it, and you know, all those other now antiquated

3    references, but regardless of sort of what happened with

4    what they knew, and how this shouldn't be a surprise, et

5    cetera, what is the specific reason why say the 5th as

6    opposed to the 19th, other than you want it done sooner

7    rather than later I guess?

8              MR. KLYMAN:  Well, there are a couple of reasons.

9    First, is the obvious, we want it done sooner rather than

10   later, since we've worked hard to get to the settlement.

11   But more substantively, I don't know Yucaipa is going to

12   bid, but if they do, Mr. Collins at the last hearing about

13   bid procedures said, we think it's important that all

14   bidders have an allowed claim.

15             The settlement agreement provides for Yucaipa to

16   have an allowed claim vis a vis the debtor and the

17   committee.  Now, Black Diamond -- but that at least

18   eliminates some of the hurdles, and so we thought it

19   important as part of our calculation to have that resolved

20   prior to the date bids are due.

21             Now, there's no magic to bids being due on the 8th

22   or the 14th.  If you want to extend that date, my suggestion

23   to your court and Mr. Harris, is to extend the bid deadline

24   by a couple of days, or however long is appropriate, to fit

25   us within that window.

Page 140

1          We're also trying to accommodate what we thought

2     was the availability of this Court after August 5th or 6th

3     or whatever.  So we would --

4          THE COURT:  That's a problem.  You know, it's

5     summer time.  So if I don't take care of you by the 7th, the

6     next available date is the 19th.

7          MR. HARRIS:  Your Honor, if I may?

8          THE COURT:  Yes.  Sorry, I interrupted you, Mr.

9     Harris.

10          MR. HARRIS:  The motion as it was originally filed

11     didn't lay out any exigent circumstances justifying

12     shortening as required by the local rule.  The only argument

13     that's been made about timing here really is the issue Mr.

14     Klyman just raised about how does this affect whatever bid

15     they may submit, if at all, and the requirement of the bid

16     procedures that if you're going to bid, some currency that

17     relates to your claim has to be allowed.

18          Mr. Klyman, first of all, says his client -- is

19     not sure his client is going to bid, so I'm not sure that's

20     a good reason why we should expedite this.  But putting that

21     aside, even if he does bid, it is not subject to argument

22     that even though the settlement agreement purports to give

23     them a quote/unquote allowed claim, that doesn't -- it's not

24     allowed within the bankruptcy, the meaning of that word as

25     used in the Bankruptcy Code, because it also says, but

1    that's subject to arguments brought by other creditors, it's

2    only binding on the committee and the debtors, and everybody

3    knows there's an equitable subordination cause of action

4    that is going to be prosecuted here.

5          So in evaluating the quality of that bid, the

6    debtors are going to have to take into account what value

7    that quote/unquote claim has under any set of circumstances,

8    whether the settlement agreement is approved, not approved,

9    or anything else.

10         So what other factors to be taken into account

11   relative to the knowledge that an equitable subordination

12   claim exists, can also be taken into account the fact that

13   okay, there's a settlement agreement that purports to

14   allowed this at $113 million.  It's just a calculation that

15   -- to get factored in the context of the auction, there's no

16   reason to expedite this.  It can be done the 19th, it can be

17   done in conjunction with the sale hearing on the 22nd.  But

18   trying to put it on for some time around the 5th, a) it's

19   physically impossible for my firm to actually put that case

20   together and get an objection on file by Thursday, and then

21   prosecute this next Monday, which is the timetable that they

22   are suggesting.

23         Your Honor, we think that some amount of discovery

24   is appropriate here, because on factual issues, and I'm not

25   looking to invade the cone of silence that sits around the

1    mediation, I'm not absolutely looking to go there, on the

2    other hand, the standard for approval of these settlement

3    does have a burden that has to be met by the proponent.

4    It's not, we went to mediation, and the mediator blessed

5    this.  That's not the standard and it never has been.

6              There needs to be a case that's put on.  There

7    needs to be a witness, there needs to be something that

8    supports the allegations that are made in favor of the

9    settlement.

10             And just by way of example, Your Honor, the

11   settlement agreement in multiple places talks about how the

12   benefit to the estate of this settlement is $58 million,

13   which is a wonderful headline number, except I don't think

14   that's right, and I'd like to understand -- if that's the

15   number you're using for purposes of your calculation and

16   conclusion that this somewhat falls within the range of

17   reasonableness, then I think we're entitled to inquire as to

18   how someone came to the conclusion this estate has actually

19   benefitted to the tune of $58 million, when 20 million of

20   what is being waived clearly is of zero value, and 21

21   million of what is being contributed, is clearly not worth

22   par, at least based on all the facts and circumstances that

23   are available to the parties as we sit here today.

24             I think that's a fair ground.  I don't think the

25   answer to that is subject to privilege.  And if I do invade

1    the privilege, I'm sure somebody will stop me.

2            THE COURT:  Okay.

3            MR. HARRIS:  So with that, Your Honor, I think a

4    little longer period here would be more appropriate.  Thank

5    you.

6            THE COURT:  Okay.  Thank you.  Mr. Buchbinder,

7    good afternoon.

8            MR. BUCHBINDER:  Good afternoon, Your Honor, Dave

9    Buchbinder on behalf of the United States Trustee.

10           I did not file a written objection to the motion

11   to shorten time for the very simple reason that I did not

12   see it until 8 o'clock this morning.  I had a leave day

13   yesterday.  I had an opportunity to read the underlying

14   motion, and the motion to shorten time, and I would have to

15   concur for different reasons, that the time that's being

16   requested is far too short to properly vet the issues.

17           Without belaboring the point, there appear to be a

18   number of issues within this settlement agreement that may

19   require objection, if not argument, and frankly today's

20   ruling may create additional issues with respect to the

21   settlement agreement.  I won't go there right now.

22           I'll just quote a notice, this motion was filed

23   literally at midnight Friday night, so it was 11:48 p.m. is

24   what my ECF notification says, and I suppose that's so

25   counsel can say they filed it Friday.  But the reality is,

Page 144

1    this motion was filed Friday night at midnight, and it was

2    -- even though the application says, we're being really

3    nice, and we're serving people by overnight mail, the

4    reality is, they don't receive it till at least Monday

5    anyway.  So it's really only three and a half business days'

6    notice, because the objection deadline as proposed is noon

7    time on Thursday.

8            This is clearly inadequate under the

9    circumstances.

10           THE COURT:  Yeah.

11           MR. BUCHBINDER:  I appreciate the fact that the

12   debtor and Yucaipa and the committee are familiar with the

13   terms, and as the parties seem to have indicated, familiar

14   with them since the 17th of July, that's almost two weeks

15   ago.  The problem is, nobody else was aware of these terms

16   until this motion was filed, and there are other parties in

17   this case.

18           There doesn't appear any reasons for the reasons

19   that have been stated by parties here, why this shouldn't go

20   out on proper notice and be heard on full notice, and an

21   opportunity to object.  Thank you, Your Honor.

22           THE COURT:  Thank you.  All right.  I agree that

23   the time frame is way too short, that the (indiscernible) on

24   such short notice (indiscernible) give you something the

25   week of the 12th but I don't have the ability to do that.

Page 145

1    (indiscernible) I don't think it's really necessary to be

2    done that quickly.

3              So I guess technically I'm going to deny the

4    motion to shorten, and I will hear the matter on Monday,

5    August 19th at 2 o'clock, and I'd like objections due by 4

6    o'clock on the 14th.

7              And since we have another hearing later that week,

8    let's leave the 19th for this motion, let's not make it an

9    omnibus date, it'll simply be this motion.  Okay?

10             And the Court will enter an order.

11             Anything else?

12        (No response)

13             THE COURT:  Very good.  Thank you, we're

14   adjourned.

15        (Whereupon, these proceedings were concluded at 2:05

16   p.m.)

17

18

19

20

21

22

23

24

25

1                        I N D E X

2

3                         RULINGS

4                                      Page      Line

5    First Omnibus Motion for an Order

6    Pursuant to Section 365 of the

7    Bankruptcy Code and Bankruptcy Rule

8    6006 Authorizing the Debtors to

9    Assume Certain Real Property Leases    --        --

10

11   Debtors' Fourth Motion Pursuant to

12   Bankruptcy Rules 9006(b) and 9027 for

13   Order Extending the Time to File

14   Notices of Removal of Civil Actions    --        --

15

16   Debtors' Fourth Motion for Extension

17   of Exclusive Periods During Which

18   Debtors May Propose and File Plans

19   of Reorganization and Solicit

20   Acceptances Thereof                    --        --

21

22   Debtors' Motion to Authorize Axis

23   Group, Inc. to Enter License Agreement

24   with City of New York                  --        --

25

```
 1                    I N D E X

 2

 3                    RULINGS

 4                              Page      Line

 5   Motion of the Debtors Pursuant to 11

 6   U.S.C. § 107(b)(1) of the Bankruptcy

 7   Code, Bankruptcy Rule 9018, and Local

 8   Rule 9018-1(b) to File Exhibit to Key

 9   Employee Incentive Plan Under Seal    15        8

10

11   Petitioning Creditors' Motion to File

12   a Redacted Version of the Objection

13   of the Petitioning Creditors to the

14   Debtors' Motion for Order Authorizing

15   (I) Implementation of Key Employee

16   Incentive Plan for Certain Insiders

17   and (II) Payment of any Obligations

18   Arising Thereunder as Administrative

19   Expenses                             15        24

20

21

22

23

24

25
```

1                     I N D E X

2

3                     RULINGS

4                              Page      Line

5    Motion for Authorization to Seal the

6    Unredacted Objection of the Official

7    Committee of Unsecured Creditors to

8    Motion for an Order Pursuant to

9    Sections 105(a), 363(b)(1) and

10   503(c)(3) of the Bankruptcy Code

11   Authorizing (I) Implementation of Key

12   Employee Incentive Plan for Certain

13   Insiders and (II) Payment of any

14   Obligations Arising Thereunder as

15   Administrative Expenses              --        --

16

17   Motion of Norman Fredrick Wessels,

18   Joyce Elaine Wessels, Gladys Ann

19   Walker, Michael Jay Meyer, and Dale

20   Woudstra and Tonia Woudstra for

21   Relief from the Automatic Stay to

22   Pursue Personal Injury Claims        --        --

23

24

25

1                       I N D E X

2

3                         RULINGS

4                                       Page      Line

5    Motion by James Joseph Pursuant to 11

6    U.S.C. §362 for Relief from the

7    Automatic Stay                      --        --

8

9    Motion and Joinder of Travis and

10   Erin Cogdill to Motion of Norman

11   Frederick Wessels, Joyce Elaine

12   Wessels, Gladys Ann Walker, Michael

13   Jay Meyer and Dale Woudstra and

14   Tonia Woudstra for Relief from the

15   Automatic Stay to Pursue Personal

16   Injury Claims                       --        --

17

18   Motion for an Order Pursuant to

19   Sections 105(a), 363(b)(1) and

20   503(c)(3) of the Bankruptcy Code

21   Authorizing (I) Implementation of Key

22   Employee Incentive Plan for Certain

23   Insiders and (II) Payment of any

24   Obligations Arising hereunder as

25   Administrative Expenses             --        --

Page 150

```
1                    I N D E X

2

3                     RULINGS

4                              Page      Line

5   Motion of Yucaipa American Alliance

6   Fund I, L.P.'s and Yucaipa American

7   Alliance (Parallel) Fund I, L.P. for

8   Reconsideration and/or Amendment of

9   Final Order Granting Debtors' Motion

10  for Authorization to Obtain Post-

11  petition Secured Replacement DIP

12  Financing and Related Relief          --         --

13

14  Interim Fee Applications              16         19

15

16  Petitioning Creditors' Motion for

17  Summary Judgment Regarding the

18  Determination of Requisite Lenders

19  Under the First Lien Credit Agreement 120        11

20

21

22

23

24

25
```

Page 151

1                  C E R T I F I C A T I O N

2

3    I, Sherri L. Breach, CERT*D-397, certified that the

4    foregoing transcript is a true and accurate record of the

5    proceedings.

6       Sherri L          Digitally signed by Sherri L Breach
                           DN: cn=Sherri L Breach, o, ou,
7       Breach            email=digital1@veritext.com,
                           c=US
8                          Date: 2013.07.31 17:00:18 -04'00'

     SHERRI L. BREACH

9

     AAERT Certified Electronic Reporter & Transcriber

10

     CERT*D -397

11

12    I, Sheila G. Orms, certify that the foregoing is a correct

13    transcript from the official electronic sound recording of

14    the proceedings in the above-entitled matter.

15

16    Dated:  July 31, 2013

17

18      Sheila            Digitally signed by Sheila Orms
                           DN: cn=Sheila Orms, o, ou,
                           email=digital1@veritext.com,
19      Orms              c=US
                           Date: 2013.07.31 17:00:48
                           -04'00'
20     Signature of Approved Transcriber

21

     Veritext

22

     200 Old Country Road

23

     Suite 580

24

     Mineola, NY  11501

25

# UNITED STATES BANKRUPTCY COURT
## District of Delaware

| | |
|---|---|
| **In Re:** | Chapter: 11 |
| ALLIED SYSTEMS HOLDINGS, INC., ET AL., | |
|     Debtor | Bankruptcy No. 12–11564–CSS |

_____

Allied Systems Holdings, Inc.

    Plaintiff                           Adversary No. 12–50947–CSS

    vs.

Bennett Management , et al.

    Defendant

### *NOTICE OF FILING OF TRANSCRIPT AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION*

A transcript of the proceeding held on 7/30/13 was filed on 8/1/13 . The following deadlines apply:

The parties have  7 days to file with the court a *Notice of Intent to Request Redaction* of this transcript. The deadline for filing a *request for redaction* is 8/22/13 .

If a request for redaction is filed, the redacted transcript is due 9/3/13 .

If no such notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is 10/30/13 unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber (see docket for Transcriber's information) or you may view the document at the clerk's office public terminal.

_____
Clerk of Court

Date: 8/1/13

(ntc)

# Notice Recipients

District/Off: 0311−1                    User: Leslie                        Date Created: 8/1/2013
Case: 12−50947−CSS                      Form ID: ntcAP                      Total: 1

**Recipients submitted to the BNC (Bankruptcy Noticing Center):**

ust          United States Trustee      844 King Street, Room 2207      Lockbox #35      Wilmington, DE 19899−0035

TOTAL: 1

**<u>EXHIBITS 43 – 44</u>**

**REDACTED**

# EXHIBIT 45

# Summons and Complaint in
# *Commerzbank AG v. Black Diamond*
# *Capital Holdings, LLC*

# (Deposition Exhibit 375)

FILED: NEW YORK COUNTY CLERK 10/05/2011                    INDEX NO. 652733/2011

NYSCEF DOC. NO. 1                                          RECEIVED NYSCEF: 10/05/2011

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

COMMERZBANK AG, NEW YORK AND GRAND
CAYMAN BRANCHES and BMO HARRIS
FINANCING, INC. F/K/A BMO CAPITAL MARKETS
FINANCING, INC.,

                   Plaintiffs,

         -against-

BLACK DIAMOND CAPITAL HOLDINGS, L.L.C.
and BDCM FUND ADVISER, L.L.C.,

                   Defendants.

---

Index No. _____

**SUMMONS**

---

TO THE ABOVE-NAMED DEFENDANTS:

      YOU ARE HEREBY SUMMONED to answer the Complaint in this action, and to serve

a copy of your Answer, or, if the Complaint is not served with this Summons, to serve a Notice

of Appearance on the Plaintiffs' attorneys, within twenty (20) days after service of this

Summons, exclusive of the date of service, where service is made by delivery upon you

personally within the state, or within thirty (30) days after completion of service where service is

made in any other manner, and in case of your failure to appear or answer, judgment will be

ataken against you by default for the relief demanded in the Complaint.

      Pursuant to section 501 of the New York Civil Practice Law and Rules, the basis of the

venue designated is a contractual provision fixing New York City as the agreed-upon place of

trial.

DEPOSITION
EXHIBIT
**375**
4/30/19    *pb*

Dated:  New York, New York
      October  5, 2011

                    CHADBOURNE & PARKE LLP

                    By             *s/Scott S. Balber*
                            Scott S. Balber
                        A Member of the Firm
                    Attorneys for Plaintiffs
                    30 Rockefeller Plaza
                    New York, New York 10112
                    (212) 408-5100
                    sbalber@chadbourne.com

CPAM: 4223662.1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

COMMERZBANK AG, NEW YORK AND GRAND
CAYMAN BRANCHES and BMO HARRIS
FINANCING, INC. F/K/A BMO CAPITAL MARKETS
FINANCING, INC.,

                                Plaintiffs,

              -against-

BLACK DIAMOND CAPITAL HOLDINGS, L.L.C.
and BDCM FUND ADVISER, L.L.C.,

                                Defendants.

Index No. _____

**COMPLAINT**

      Plaintiffs Commerzbank AG, New York and Grand Cayman branches ("Commerzbank")

and BMO Harris Financing, Inc. f/k/a BMO Capital Markets Financing, Inc. ("BMO") (together,

the "Plaintiffs" or "Remaining Lenders"), for their Complaint against Defendants Black

Diamond Capital Holdings, L.L.C. ("BDCH") and BDCM Fund Adviser, L.L.C., formerly

known as Black Diamond Capital Management, L.L.C., ("BDCM" and, together with BDCH,

"Black Diamond" or the "Defendants"), allege as follows upon knowledge as to their own acts

and upon information and belief as to all other matters:

### SUMMARY OF THE ALLEGATIONS

      1.     This action arises out of Black Diamond's duplicitous scheme to selectively repay

certain lenders in a syndicated loan facility without making the *pro rata* payments to Plaintiffs

that were required under the terms of the operative loan agreement.  Black Diamond's scheme

was designed to eviscerate and circumvent certain critical financial covenants and protections

from Black Diamond's loan agreement with Plaintiffs.  To add insult to injury, Black Diamond's

selective repayment was financed using funds borrowed from Plaintiffs under a revolving line of

credit.  Black Diamond's conduct is a blatant breach of the loan agreement, reflects a brazen disregard of its commitment to Plaintiffs and is wholly inconsistent with prevailing industry norms, practice and behavior.

2.     Defendant BDCH, a privately held alternative asset management firm, is the Borrower under a $75 million loan facility established by a Credit Agreement, dated October 12, 2006, between BDCM (as Borrower), certain Lenders, and Credit Suisse, as Administrative Agent (the "Credit Agreement").[1]

3.     Under the terms of the Credit Agreement, all "payments" by Black Diamond must be shared on a *pro rata* basis among all lenders under the Credit Agreement.  This *pro rata* provision of the Credit Agreement is absolute and unconditional, and may only be modified or amended with the unanimous consent of all Lenders.

4.     In or around the beginning of November 2009, Black Diamond secretly agreed to repay three of the six members of the loan syndicate holding a majority of the outstanding Loans (the "Selling Lenders").  In exchange for the immediate payment of substantially all of the amounts due to them, the Selling Lenders individually agreed to a purported amendment to the Credit Agreement to remove a standard prohibition barring any Lender from assigning Loans to Black Diamond, any BDCM Entity, any BDCM Fund, Subsidiaries or Affiliates.

---

[1]   Capitalized terms not otherwise defined herein have the same meaning assigned in the original Credit Agreement.

2

5.    On November 6, 2009, BDCH and the Selling Lenders executed the purported amendment without notifying the Plaintiffs (the "November 6 Amendment").  By November 10, 2009, BDCM had paid $18.8 million to the Selling Lenders with respect to their share of the Loans.  On November 13, 2009, BDCH drew down $20 million from the revolver commitment in the loan facility and transferred $19.4 million to BDCM.  Thus, it appears that the Plaintiffs unwittingly funded BDCM's purchase of the Selling Lenders' Loans.

6.    As a result of the transaction with the Selling Lenders, Black Diamond entities were in the highly unusual and improper position of being both the borrower **and** purportedly the owner of the majority of the outstanding loans (such a majority owner is defined in the Credit Agreement as a "Required Lender").  As such, Black Diamond wrongfully presumed it could act unilaterally as the Required Lender, with the ability to direct the conduct of the Lenders under the Credit Agreement.  Further, BDCM became both a purported Lender and a Guarantor under the Credit Agreement, thus placing BDCM in the precarious position of asking itself for money should its parent, BDCH, commit a payment default.

7.    In its newly presumed capacity as the purported Required Lender, on November 30, 2009, the Black Diamond entities -- both as Borrower and Required Lender -- executed a second purported amendment, Amendment No. 2, to the Credit Agreement (the "November 30 Amendment").  In direct contravention of the Remaining Lenders' bargained-for-rights, this amendment sought to strip from the Credit Agreement all key financial covenants, reporting requirements and mandatory loan prepayment provisions, which were specifically designed to protect Plaintiffs' interests as Remaining Lenders.  Further evidencing the impropriety of the scheme, the same Black Diamond executive signed on behalf of both the Borrower and the Lender in executing the November 30 Amendment.

3

8. Black Diamond continued to enact invalid purported modifications of the Loan Agreement: on December 29, 2010, Black Diamond, again purporting to act as both the Borrower and the Required Lender, executed Amendment No. 3 to the Credit Agreement (the "December 29 Amendment"), which purportedly diluted provisions of the Loan Agreement prohibiting Black Diamond from waiving or deferring receipt of certain management fees.

9. BDCH's actions constitute breaches of the Credit Agreement and the covenant of good faith and fair dealing implied therein.

10. Black Diamond's $18.8 million in payments to the Selling Lenders in satisfaction of their Loans constituted "payments" under the Credit Agreement. Under certain provisions of the Credit Agreement, which may only be amended with the unanimous consent of all Lenders, "payments" must be shared *pro rata* in proportion to each lender's share of the outstanding indebtedness. Because Black Diamond's payments to the Selling Lenders accounted for substantially all of Black Diamond's indebtedness to the Selling Lenders, a *pro rata* payment must now be made to the Remaining Lenders in the full amount outstanding to them.

11. Moreover, the November 6, November 30 and December 29 Amendments are each null and void. Because the November 6 Amendment purportedly altered the *pro rata* share requirements of all Lenders, it required the approval of all Lenders. The Plaintiffs did not consent to the November 6 Amendment.

12. Because the November 6 Amendment is invalid and violated the terms of the Credit Agreement described below in paragraphs 59-60, the November 30 Amendment and the December 29 Amendment, whose validity depends on the validity of the November 6 Amendment, are each also null and void.

4

13.    Because the purported Amendments are void, and Black Diamond has repeatedly undertaken corporate acts that are invalid due to the improper execution of the Amendments, Plaintiffs seek declaratory relief from the Court so that they may vindicate their rights under the Credit Agreement.

14.    Likewise, Plaintiffs seek money damages for the numerous breaches by BDCH of the Credit Agreement and BDCH's breach of the implied covenant of good faith and fair dealing. Specifically, Plaintiffs seek damages for the harm they have suffered, including: (i) payments required by § 2.17 of the Credit Agreement, which requires *pro rata* treatment of all principal payments to Lenders; (ii) any Mandatory Prepayments per § 2.13 of the Credit Agreement and for any costs of Plaintiffs incurred in the enforcement of their rights and remedies under the Credit Agreement, the Guaranty and the related security agreements; and (iii) compensation for any impairment to the value of Plaintiffs' outstanding Loans to BDCH.

## THE PARTIES

15.    Plaintiff BMO is a corporation organized under the laws of Delaware with a principal place of business in Chicago, Illinois.

16.    Plaintiff Commerzbank is a German banking corporation with North American branch offices located in New York City, licensed by the Banking Department of the State of New York, and on Grand Cayman Island, licensed by the Cayman Islands Monetary Authority.

17.    Plaintiffs are Remaining Lenders under the Credit Agreement pursuant to which BDCH borrowed funds.

5

18.    On information and belief, Defendant BDCH is a Delaware limited liability company with its principal places of business in Lake Forest, Illinois and Greenwich, Connecticut.

19.    On information and belief, Defendant BDCM is a Delaware limited liability company with its principal places of business in Lake Forest, Illinois and Greenwich, Connecticut.

20.    On information and belief, BDCH is the parent company of BDCM and other "Prohibited Person[s]" under the Credit Agreement, including BDCM Opportunity Fund, G.P., L.L.C.; BDCM Opportunity Fund II GP, LLC; BDCM Fund Adviser, L.L.C., BDCM Opportunity Fund Adviser, L.L.C.; BDCM Opportunity Fund II Adviser, L.L.C.; Black Diamond CLO 2005-1 Adviser, L.L.C.; Black Diamond CLO 2005-2 Adviser, L.L.C.; Black Diamond CLO 2006-1 Adviser, L.L.C.; and Black Diamond CLO 2007-1 Adviser, L.L.C.

## JURISDICTION AND VENUE

21.    This Court has personal jurisdiction over Defendants pursuant to N.Y. C.P.L.R. 301 and 302(a), because Defendants, *inter alia* (i) contracted to do business within the State of New York, and (ii) regularly transact business in the State of New York.  In particular, pursuant to § 9.15 of the Credit Agreement, Defendant BDCH consented to the personal jurisdiction of this Court.  Pursuant to § 7.09(b) of a Guarantee and Collateral Agreement, dated October 12, 2006, among BDCM, certain subsidiaries and affiliates of BDCM and Credit Suisse, as Collateral Agent, Defendant BDCM also consented to the personal jurisdiction of this Court.

22.    Venue is proper in this County pursuant to N.Y. C.P.L.R. 501, 503(a) and 503(c) because the Credit Agreement fixes the venue in New York City.

6

23.    This Court has authority to issue declaratory relief under N.Y. C.P.L.R. 3001 and Rule 202.70 of the Rules of the Commercial Division of this Court.

## FACTUAL BACKGROUND

I.    **THE CREDIT AGREEMENT**

A.    **Background**

24.    On or about October 12, 2006, the Lenders, including Plaintiffs and non-party Credit Suisse, as Administrative Agent, entered into the Credit Agreement, which created a loan syndicate to fund $75 million of loan facilities to BDCM. A true and correct copy of the Credit Agreement is attached hereto as **Exhibit A**.

25.    Under the terms of the Credit Agreement, the Borrower, prior to a Permitted Restructuring Transaction, was BDCM. After the consummation of the Permitted Restructuring Transaction and execution and delivery of the Joinder Agreement, as defined in the Credit Agreement, BDCH became the Borrower.

26.    The Credit Agreement was guaranteed by BDCM and certain other BDCM entities and subsidiaries.

27.    The loan facilities were divided into term loan commitments and revolving credit commitments. The term loan commitments to the Borrower totaled $40 million, while the revolving credit commitments totaled $35 million.

7

28.    The original Lenders in the loan syndicate were: (a) Credit Suisse, Cayman Islands Branch; (b) Canadian Imperial Bank of Commerce; (c) Dresdner Bank AG, New York and Grand Cayman Branches ("Dresdner")[2]; (d) JPMorgan Chase Bank[3]; (e) Bear Stearns Corporate Lending Inc. ("Bear Stearns"); (f) BMO; and (g) the Bank of Nova Scotia.

29.    Under the Credit Agreement, Commerzbank committed to a term loan to BDCH of $6,666,666.67 and revolving credit of $5,833,333.33; $3,003,813.99 of the term loan and $5,833,333.33 of the revolving credit are currently outstanding.

30.    Under the Credit Agreement, BMO committed to a term loan to BDCH of $5.33 million and revolving credit of $4.6 million; $2.4 million of the term loan and $4.7 million of the revolving loan facility are currently outstanding.

**B.    The Credit Agreement Included Numerous
Provisions To Protect The Interests Of The Lenders**

31.    The Lenders agreed to make the Loans under the condition that their rights and interests would be protected by the numerous and extensive covenants for which they bargained in the Credit Agreement and to which Black Diamond agreed. Without the covenants, and the protection they provided for Lenders holding a minority of the outstanding debt, Plaintiffs would not have entered into the Credit Agreement.

---

[2]    Dresdner Bank merged in May 2009 with Commerzbank.

[3]    JP Morgan Chase Bank assumed Bear Stearns's obligations under the Credit Agreement.

8

32.    To protect each Lender's interest in the Loans, § 2.17 of the Credit Agreement requires, *inter alia*, that any payment or prepayment of any Borrowing by the Borrower under the Loans, any payment of interest on the Loans or each reduction of the Commitments of the Loans is allocated *pro rata* among the Lenders in accordance with their applicable Commitments.[4]

33.    Underscoring its critical importance as an inducement for the Lenders to enter into the Credit Agreement, the *pro rata* requirement for the application of payments could not, under § 9.08(b) of the Credit Agreement, be amended without the unanimous consent of all Lenders.  (Ex. A § 9.08(b).)

34.    It was intended and understood by Black Diamond and each of the Lenders that § 2.17 required any and all funds or value paid by Black Diamond to any Lender in respect of the debt under the Credit Agreement to be shared *pro rata* with all Lenders.  Neither Black Diamond, nor any of the Lenders, understood the Credit Agreement, when it was signed, to permit the *pro rata* provisions of § 2.17 to be rendered meaningless through amendments to other provisions of the Credit Agreement.

35.    Reinforcing § 2.17's *pro rata* requirement, § 2.18 requires that Lenders share with each other any payments received for claims against the Borrower or another Loan Party or any other means of obtaining payment under the Loans.

---

[4]    "§ __" refers to the Credit Agreement.

9

36.    Without the assurances of §§ 2.17 and 2.18 that each of the Plaintiffs would receive the benefit of its bargain under the Credit Agreement, the Plaintiffs would not have participated in the loan syndicate and would not have entered into the Credit Agreement as structured. In fact, these provisions protected Lenders holding minority interests by ensuring these Lenders would receive their *pro rata* share of such payments.

37.    Furthermore, § 2.13 of the Credit Agreement requires the Borrower to make certain Mandatory Prepayments, including an Excess Cash Flow Prepayment Amount, which in 2008 was approximately $21 million.

38.    Likewise, the Credit Agreement requires the Borrower to create and transmit to the Lenders detailed financial reports for the Borrower, including consolidated balance sheets, income statements, budgets and other related information.  (Ex. A § 5.04.)

39.    To support the market value of the debt, the Credit Agreement required the Borrower to use "commercially reasonable efforts to cause the credit facilities" to be rated by rating agencies.  (Ex. A § 5.11.)

40.    Similarly, to protect the Lenders' interests and to insulate them from undue risk, the Credit Agreement included numerous restrictions on the Black Diamond entities.  These negative covenants included:

(a)    preventing the Borrower from incurring certain additional indebtedness beyond the debt incurred by virtue of the Credit Agreement (Ex. A § 6.01);

10

(b)     limiting the Borrower's ability to make or permit to exist additional equity or debt investments including the acquisition by BDCM of Loans from members of the bank syndicate (Ex. A § 6.04);

(c)     restricting the Borrower's ability to make dividend, redemption or other distributions (whether in cash, securities or other property) with respect to equity interests in Black Diamond or any of its affiliates or funds (Ex. A § 6.06);

(d)     restraining the Borrower's ability to conduct transactions with Affiliates (Ex. A § 6.07);

(e)     limiting the business activities of the Borrower and BDCM Entities to those activities conducted by them as of the date of the Credit Agreement and reasonably incidental, ancillary or complementary business ventures (Ex. A § 6.08);

(f)     restricting the Borrower's ability to waive, supplement, modify, amend, terminate or release any indenture, instrument or Agreement that would adversely affect the Borrower, BDCM Entities or any Subsidiary or the interests of the Lenders (Ex. A § 6.09); and

(g)     setting certain ratio limits related to Total Receivables, the Leverage Ratio and Fixed Charge Coverage Ratios. (Ex. A §§ 6.11; 6.12; and 6.13).

41.     These affirmative and negative covenants were essential terms of the Credit Agreement.  Plaintiffs would not have entered into the Credit Agreement but for the inclusion of these and other reporting requirements and covenants.

11

C.    **The Borrower And Its Related Entities, Affiliates And Subsidiaries Were Barred From Purchasing Interests In The Loans**

42.    The Credit Agreement includes provisions specifically barring the Borrower, BDCM, any BDCM Entity, BDCM Fund, Affiliate or Subsidiary from operating on both sides of the transaction.  Specifically, § 9.04(b) provides that "[e]ach Lender may assign to one or more assignees (**other than a Prohibited Person**) all or a portion of its interest, rights and obligations under this Agreement. . . ."  (Ex. A § 9.04(b) (emphasis added).)  The Credit Agreement defined "Prohibited Person" as the Borrower, BDCM, and any BDCM Entity, BDCM Funds, Affiliate or Subsidiary.

43.    Thus, the Credit Agreement specifically barred a Prohibited Person from acquiring interests in the Loans.  (Ex. A §§ 1.01 at 17, 9.04.)

II.    **THE BORROWER UNDERMINES THE VERY RIGHTS AND INTERESTS THAT INDUCED PLAINTIFFS TO PARTICIPATE IN THE CREDIT AGREEMENT**

44.    Black Diamond sought to relieve itself from compliance with certain financial covenants and reporting obligations contained in the Credit Agreement, apparently because Black Diamond was beset by financial problems resulting from the credit crisis that erupted in 2008.

45.    Black Diamond thus devised a scheme to purportedly become the "Lender" holding a majority of the debt under the Credit Agreement, apparently believing that if it could act as both the borrower and the majority lender, it could execute amendments eliminating the financial covenants and reporting requirements it found burdensome and inconvenient (as well as prevent the Remaining Lenders from declaring a default under the Credit Agreement, giving Black Diamond the option to indefinitely delay making payments of interest and principal).

12

A.    **The Purported First Amendment To The Credit Agreement**

46.    Pursuant to the Credit Agreement, with the exception of certain provisions that will be discussed *infra*, to amend the document, a Required Lender majority must approve the amendment and the Borrower must consent.[5]

47.    Black Diamond could not acquire Loans from any Lender unless the Credit Agreement's prohibition against Lenders assigning their Loans to Black Diamond or its affiliates was removed. A Lender with a financial interest in the Credit Agreement would be unlikely to agree to remove the prohibition, let alone remove it to allow an affiliate of the Borrower to become the Required Lender.

48.    Black Diamond thus orchestrated a scheme to eliminate any incentive for certain Lenders to care whether Loans could be assigned to Black Diamond. Black Diamond promised to pay the Selling Lenders for their Loans in exchange for the Selling Lenders consenting to an amendment removing the prohibition against assignments to Black Diamond.

49.    Absent a continuing economic incentive -- *i. e.*, remaining as a Lender -- the Selling Lenders were indifferent as to whether Black Diamond was on both sides of the transaction, as both the Borrower and the Required Lender, with the purported power to change material terms of the Credit Agreement.

---

[5]    "Required Lenders" is defined in the Credit Agreement as Lenders "representing at least a majority of the sum of all Loans outstanding, L/C Exposure and unused Revolving Credit Commitments and Term Loan Commitments at such time; provided that the Revolving Loans, L/C Exposure and unused Revolving Credit Commitments of any Defaulting Lender shall be disregarded in the determination of the Required Lenders at any time."

13

50.    Black Diamond and the Selling Lenders thus entered into a single, integrated transaction consisting of three steps by which (i) Black Diamond and each of the Selling Lenders agreed on the prices for their Loan interests; (ii) the Selling Lenders then executed the purported November 6 Amendment removing the prohibition on Black Diamond ownership of interests in the Loan and, finally, (iii) the Selling Lenders purportedly sold their interests to Black Diamond. A true and correct copy of the ineffective November 6 Amendment is attached hereto as **Exhibit B**.

51.    Black Diamond neither sought nor obtained Plaintiffs' consent to execute the November 6 Amendment and purchase the Selling Lenders' Interests.

52.    Among other things, the purported November 6 Amendment deleted any reference to the Borrower, other BDCM Entities, the Subsidiaries, the BDCM Funds or any Affiliate of any of the foregoing from the definition of "Prohibited Person" and eliminated other protective provisions from the Credit Agreement.

53.    This definitional change significantly altered the rights of the Remaining Lenders because it purported to provide Black Diamond the opportunity and the means to operate on both sides of the transaction as the Required Lender and Borrower.

54.    The November 6 Amendment also purported to alter § 2.18 of the Credit Agreement (which, in essence, requires Lenders to share any payments on Loans constituting setoffs with other Lenders) to exclude "any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, including [Black Diamond] and [its] Affiliates." This purported amendment to § 2.18 seeks to

14

protect the payments made by BDCH to the Selling Lenders from being subject to the *pro rata* provision of § 2.17.

55.    Indeed, by letter dated April 15, 2010, Black Diamond's counsel contended that its payments to the Selling Lenders were not "a form of repayment subject to Section[] 2.17" because "Section 2.18, as amended by the Required Lenders, explicitly states that its provisions 'shall not be construed to apply to any payment obtained by a Lender as consideration for the assignment . . . of any of its Loans'" to Black Diamond.

56.    Black Diamond has therefore conceded that the November 6 Amendment, if given effect, would alter the meaning and effect of the provisions of § 2.17.  It follows that the November 6 Amendment was void: because § 2.17 may only be altered with the unanimous consent of all Lenders, no non-unanimous modification of § 2.18, or any other provision of the Loan Agreement, could change the meaning or application of § 2.17 in any respect.

57.    Moreover, by purportedly purchasing enough interests to constitute the Required Lenders, Black Diamond could presume to control its own destiny and that of the Remaining Lenders since, to declare a default under the Credit Agreement, the Administrative Agent must receive direction from Required Lenders.  (*See* Ex. A. Art. VII.)

58.    Thus, the alteration of § 2.18 by the November 6 Amendment was ineffective to eliminate the obstacle § 2.17 created to Black Diamond's scheme:  Black Diamond's transfers of money to the Selling Lenders with respect to their Loans remained "payments" subject to the *pro rata* requirements of § 2.17, which had not been validly amended.

CPAM: 4223160.4

59.    Further, because Black Diamond is the Borrower under the Credit Agreement, its purported acquisition of the Selling Lenders' Interests was, in reality, a pay-down of the Selling Lenders' Loans.  This agreement to decrease the principal amount of these Loans, therefore, required the Remaining Lenders' consent under § 9.08(b).

60.    In the alternative, if the alteration of § 2.18 by the November 6 Amendment somehow altered the *pro rata* share requirements of § 2.17, then the November 6 Amendment was void and of no effect, because all Lenders needed to consent to such amendment pursuant to § 9.08(b).

**B.    The Plaintiffs Unknowingly Funded**
**The Illicit Buy-Out Of The Selling Lenders' Interests**

61.    One business day after the Selling Lenders consented to the November 6 Amendment, on November 9, 2009, BDCH transferred $19.4 million to BDCM.

62.    Prior to the transfer, upon information and belief, BDCM's account had a negative balance of $312,000.

63.    On the same day as the $19.4 million transfer, BDCM, with BDCH's support, began purchasing the interests of the Selling Lenders for approximately $18.9 million. Specifically, on November 9, 2009, BDCM purportedly purchased JPMorgan Chase Bank's interest at par for a total of $9.9 million and Credit Suisse's interest at 92.5 cents on the dollar for $3.9 million; and on November 10, 2009, BDCM purportedly purchased Canadian Imperial Bank of Commerce's interest at 95 cents on the dollar for total purchase of $5.1 million.

16

64.    Three days after BDCM purportedly purchased all of the Selling Lenders' interests, on November 13, 2009, BDCH drew down $20 million from the Revolving Credit Commitment.

65.    It thus appears that the additional $20 million draw down by BDCH was directly or indirectly used to fund BDCM's purported purchase of the Selling Lenders' Loans.

66.    Pursuant to § 3.13 of the Credit Agreement, and the Preamble to the Credit Agreement, by requesting the $20 million draw on the Revolver on November 13, 2009, Black Diamond represented that the proceeds of the Revolver draw would be used "for general corporate purposes in the ordinary course of the Borrower's business."

67.    This representation was false.  In fact, Black Diamond intended to use the proceeds of the November 13, 2009 Revolver draw to finance its scheme to deprive the Remaining Lenders of their rights under the Credit Agreement.

68.    At the time the Credit Agreement was signed, neither Black Diamond nor any of the Lenders understood the phrase "general corporate purposes in the ordinary course of the Borrower's business" to refer to a restructuring of Black Diamond's obligations under the Loan Agreement in order to selectively pay certain Lenders while depriving the Remaining Lenders of their rights under the Credit Agreement.

69.    Indeed, this November 13, 2009 Revolver draw was in bad faith, violated the letter and spirit of the Credit Agreement, was intended to impair Plaintiffs' rights under the Credit Agreement, and was done when the Credit Agreement was in default, given the agreement by BDCM to selectively pay the Selling Lenders for their interests.

17

70.     This draw down also increased Plaintiffs' exposure to BDCH under purported

terms that were materially different than those contemplated and agreed to at the time the Credit

Agreement was executed and forced Plaintiffs to unknowingly fund an illicit transaction that

destroyed their bargained-for rights.

C.      **The Purported November 30, 2009**
        **And December 29, 2010 Amendments**

71.     On or about November 30, 2009, Black Diamond, presuming to act as **both**

Borrower **and** Required Lender, executed the purported November 30 Amendment.  This

Amendment, if given effect, strips the Credit Agreement of many of the key protections afforded

to the Remaining Lenders, including, without limitation, those from § 2.13 (under enumerated

circumstances), § 5.04 (requiring access to financial reports of Borrower), § 5.11 (requiring the

credit facilities to be rated by rating agencies), § 6.01 (preventing the Borrower from incurring

additional indebtedness), § 6.04 (limiting the Borrower's ability to make additional equity or

debt investments), § 6.06 (restricting dividend, redemption, or other distributions), and § 6.11-13

(ratio limits related to Total Receivables, Leverage, and Fixed Charge Coverage).  The

November 30 Amendment also purported to significantly alter the Defined Terms of the Credit

Agreement.  A true and correct copy of the ineffective November 30 Amendment is attached

hereto as **Exhibit C**.

72.     This Amendment, if valid, severely impairs the Remaining Lenders' ability to

realize repayment of the Loans.

73.     Underscoring the bad faith and sham nature of the November 30 Amendment,

Stephen Deckoff, the Managing Principal for BDCM and BDCH, executed the document on

behalf of both of those entities as the sole counterparties.

18

74.    The November 30 Amendment was invalid because BDCM's purported acquisition of a majority of the debt under the Loan Agreement was invalid, for the reasons stated previously. Further, BDCM's alleged status as Required Lender is suspect because BDCM was also a Guarantor of the Credit Agreement. It is wholly incredible that BDCM, in a surety position, could purportedly act to bind the Remaining Lenders; should the Borrower (BDCH) default on the Loans, the Remaining Lenders would look to BDCM (BDCH's subsidiary) to guaranty payment.

75.    Even assuming BDCM's purported Required Lender vote was valid, consent from all Lenders, including the Remaining Lenders, was needed to approve the November 30 Amendment. Because the November 30 Amendment altered the definition of "BDCM Entities" to exclude BDCM Opportunity Fund III GP, LLC and BDCM Opportunity Fund III Adviser, LLC, the Amendment altered the Guarantors to the Credit Agreement and, thus, pursuant to § 9.08(b), all Lenders should have consented.

76.    On or about December 29, 2010, Black Diamond, as both Borrower and Required Lender, executed the purported December 29 Amendment. This Amendment removed restrictions on Black Diamond's ability to waive or defer management fees payable to them during 2012 and 2013, thereby potentially reducing the revenues available to repay the Remaining Lenders. A true and correct copy of the ineffective December 29 Amendment is attached hereto as **Exhibit D**.

77.    Like the November 30 Amendment, the December 29 Amendment was a sham, executed by Stephen Deckoff on behalf of Black Diamond, which presumed to act as both the Borrower and the purported Required Lender. Like the November 30 Amendment, the

19

December 29 Amendment was invalid because BDCM's purported acquisition of a majority of the debt under the Loan Agreement was invalid, insofar as it was in violation of the terms of the Loan Agreement.

## III.    BDCH CONTINUES TO IMPAIR THE REMAINING LENDERS' RIGHTS

78.    Absent the purported November 6 Amendment and November 30 Amendment, BDCH would have made certain prepayments to the Remaining Lenders no later than 120 days after the end of this past fiscal year. (§ 2.13(e).) Indeed, in 2008 prepayments to the Lenders pursuant to § 2.13(e) totaled over $21 million.

79.    Relying on the purported November 30 Amendment, which deleted § 2.13(e), BDCH has not made any such payments for calendar years 2009 or 2010. Black Diamond has impaired the Remaining Lenders' rights under the Credit Agreement in a number of other ways as well.

80.    Upon discovering the purported amendments to the Credit Agreement and Black Diamond's acquisition of the Selling Lenders' interests, BMO sent a letter to Black Diamond on or about March 19, 2010. In that letter, BMO expressed concern that it and the Remaining Lenders were robbed of the benefits of their bargain and, indeed, were forced to fund a buy-out that implemented a new and undesirable deal on them.

81.    In its April 6, 2010 response to BMO, Black Diamond dismissed BMO's concerns.

20

82.     As a result, BMO felt it had no option but to assert its rights under the Credit Agreement to inspect the financial documents of the Borrower in order to evaluate the situation surrounding the Credit Agreement and its position as a Lender.

83.     Thus, on May 5, 2010, Plaintiff BMO requested pursuant to §§ 5.04(h) and (k) of the Credit Agreement an updated W-9 form for the Borrower, a current organization chart of the BDCM Entities, the December 31, 2009 annual audited financial statements of the Borrower, and the 2008 and 2009 Federal Tax Return, (including all Schedules) of the Borrower.

84.     Much to BMO's dismay and in violation of the Credit Agreement, Black Diamond disregarded BMO's reasonable request and only produced certain W-9 forms, the requested organizational chart, and an unaudited cash balance sheet and income statement for the Borrower, on a non-GAAP basis that was not helpful in understanding the Borrower's financial situation.

85.     On June 8, 2010 Plaintiff BMO notified Black Diamond that its failure to make a *pro rata* distribution of the payments Black Diamond made to the Selling Lenders in November 2009 pursuant to § 2.17 constituted an event of default under Article VII of the Credit Agreement. Plaintiff BMO further informed Black Diamond that it had defaulted under the Credit Agreement by failing to provide the reasonably requested financial information.

86.     Despite providing Black Diamond with more than the requisite thirty (30) days to cure these defaults, Black Diamond has failed to take any action and, thus, continues to deprive the Plaintiffs of their bargained-for rights under the Credit Agreement.

21

87.    Black Diamond's refusal to provide BMO and other Remaining Lenders with access to financial data pursuant to § 5.04 and § 5.07 has continued to hinder Plaintiffs' ability to properly analyze the risks associated with the credit extended to BDCH.

88.    Plaintiffs are, in effect, the sole Lenders and, in that capacity, have the right, as a result of the above events of default, to declare the outstanding principal balance of Plaintiffs' Loans together with accrued interest to be immediately due and payable.

## FIRST CAUSE OF ACTION
### (Breach of Contract as to BDCH)

89.    Plaintiffs repeat and re-allege paragraphs 1 through 88 as if set forth fully herein.

90.    The Credit Agreement is a valid and binding contract to which Plaintiffs and Defendant BDCH are parties.

91.    Section 2.17 of the Credit Agreement requires payments of principal to Lenders to "be allocated *pro rata* among the Lenders in accordance with their respective applicable Commitments . . . ."

92.    The payments of BDCH's affiliate (BDCM) to the Selling Lenders in connection with its acquisition of the Loans are payments of principal subject to § 2.17.

93.    Plaintiffs have not received any *pro rata* distributions of payments from BDCH (through its affiliate BDCM) to the Selling Lenders as required by § 2.17 of the Credit Agreement.

22

94.    Because the Selling Lenders were repaid substantially in full, the *pro rata* requirement of § 2.17 of the Credit Agreement requires BDCH to, likewise, immediately pay in full the outstanding amounts due to the Remaining Lenders.

95.    Plaintiffs therefore seek a judgment from this Court in an amount to be determined at trial for damages from BDCH's breach of § 2.17 of the Credit Agreement.

## SECOND CAUSE OF ACTION
### (Declaratory Relief as to BDCH and BDCM)

96.    Plaintiffs repeat and re-allege paragraphs 1 through 95 as if set forth fully herein.

97.    This is an actual and justiciable controversy between Plaintiffs and Defendants. Defendants have repeatedly asserted that the November 6 and November 30 Amendments and the Assignment were valid and binding acts.  Moreover, Black Diamond has repeatedly undertaken corporate acts, including the November 30 and December 29 Amendments, on the belief that the November 6 Amendment and subsequent assignment were valid and binding corporate acts.  Black Diamond is likely to continue to do so into the future.

98.    As set forth herein, the November 6, November 30, and December 29 Amendments are null and void.

99.    The November 6 Amendment impermissibly altered the *pro rata* distribution provisions of § 2.17 of the Credit Agreement without the required consent of all Lenders, including Plaintiffs.

100.    Because the November 6 Amendment was void, the November 30 Amendment and the December 29 Amendment are also void because they were consented to only by Black

23

Diamond, which, absent the November 6, 2009 Amendment, was not allowed to own Loan interests under the Credit Agreement and thus violated the terms of the Credit Agreement as set forth in paragraph 52.

101.    In addition, as set forth herein, Black Diamond has failed to honor material covenants and reporting obligations set forth in the Credit Agreement.  As a result, Black Diamond has defaulted on the Credit Agreement.

102.    In particular, Black Diamond's purchase of the Selling Lenders' interests after those Selling Lenders consented to the November 6 Amendment and its failure to honor those covenants that it deleted pursuant to the purported November 30 Amendment constitutes a default under the Credit Agreement.

103.    A judicial declaration will resolve the dispute giving rise to this proceeding and is necessary and appropriate at this time under the circumstances so that the Plaintiffs may ascertain and enforce their rights and duties under the Credit Agreement.

104.    Accordingly, Plaintiffs ask that the Court declare the November 6 Amendment, the Assignment of the Selling Lenders' interests to BDCM, and the November 30 and December 29 Amendments invalid, null and void.

105.    Plaintiffs further ask the Court to declare that Events of Default have occurred under the Credit Agreement and, thus, pursuant to Article VII, principal and interest are immediately due and owing by the Borrower.

### THIRD CAUSE OF ACTION
#### (Breach of Contract as to BDCH)

106.    Plaintiffs repeat and re-allege paragraphs 1 through 105 as if set forth fully herein.

107.    The Credit Agreement is a valid and binding contract to which the Plaintiffs and Defendant BDCH are parties.  Plaintiffs have complied in all respects with their obligations under the Credit Agreement.

108.    Pursuant to § 9.08(b) of the Credit Agreement, agreements to amend or modify the Credit Agreement are not permitted if such agreements, *inter alia*, "(i) decrease the principal amount of . . . any Loan . . . [or] (iii) amend or modify the *pro rata* requirements of Section 2.17 . . . without the prior written consent of each Lender."

109.    BDCH breached § 9.08(b) of the Credit Agreement when it executed the November 6 Amendment and arranged for its affiliate, BDCM, to acquire the Selling Lenders' Loans without Plaintiffs' consent.

110.    These actions, if given effect, altered the *pro rata* share requirements of the Credit Agreement and reduced the outstanding principal amount of the Loans of the Selling Lenders in violation of § 9.08(b).

111.    Plaintiffs therefore seek a judgment from this Court in an amount to be determined at trial for damages from BDCH's breach of § 9.08(b) of the Credit Agreement.

### FOURTH CAUSE OF ACTION
#### (Breach of Contract as to BDCH)

112.    Plaintiffs repeat and re-allege paragraphs 1 through 111 as if set forth fully herein.

25

113.    The Credit Agreement is a valid and binding contract to which the Plaintiffs and Defendant BDCH are parties.

114.    Pursuant to § 5.04, **promptly** after the reasonable request of any Lender, BDCH was required to provide all information related to the operations, business affairs and financial condition of the Borrower, any other BDCM Entity, any Subsidiary or any BDCM Fund, or compliance with the terms of any Loan Document, as well as all documentation and other information needed to comply with ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations.

115.    On or about May 5, 2010 and again on or about May 28, 2010 Plaintiff BMO made such a reasonable request.

116.    BDCH failed to fully comply with BMO's requests and, thus, BDCH has breached the Credit Agreement by failing to provide the Plaintiffs with information as required by the Credit Agreement.

117.    Plaintiffs therefore seek a judgment from this Court in an amount to be determined at trial for damages from BDCH's breach of §§ 5.04 and 5.07 of the Credit Agreement.

## FIFTH CAUSE OF ACTION
### (Breach of Contract as to BDCH)

118.    Plaintiffs repeat and re-allege paragraphs 1 through 117 as if set forth fully herein.

119.    The Credit Agreement is a valid and binding contract to which the Plaintiffs and Defendant BDCH are parties.

26

120.    Pursuant to § 9.08(b) of the Credit Agreement, agreements to amend or modify the Credit Agreement are not permitted if such agreements, *inter alia*, "(iii) . . . release any Guarantor, without the prior written consent of each Lender."

121.    The November 30 Amendment effectively released two Guarantors, requiring the prior written consent of each Lender.

122.    The Credit Agreement defines "Guarantors" as "the BDCM Entities (other than the Borrower and the Subsidiary Guarantors)."

123.    The November 30 Amendment removed from the definition of "BDCM Entity" the "Excluded Manager," which was defined as each of BDCM Opportunity Fund III GP, LLC and BDCM Opportunity Fund III Adviser LLC.

124.    By the purported exclusion of the Excluded Manager from the definition of BDCM Entity, BDCH in effect released two Guarantors, and thus, the November 30 Amendment should have received the Remaining Lenders' consent.

125.    Thus, by executing the November 30 Amendment without Plaintiffs' consent, BDCH violated § 9.08(b) of the Credit Agreement.

126.    Plaintiffs therefore seek a judgment from this Court in an amount to be determined at trial for damages from BDCH's breach of § 9.08(b) of the Credit Agreement.

## SIXTH CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing as to BDCH)

127.    Plaintiffs repeat and re-allege paragraphs 1 through 126 as if set forth fully herein.

CPAM: 4223160.4

128.    The Credit Agreement is a valid and binding contract to which Plaintiffs and BDCH are parties and contains under New York law an implied undertaking that the parties will not intentionally do anything to prevent the other parties from enjoying their rights under the Credit Agreement.

129.    By virtue of the Credit Agreement, BDCH impliedly agreed to act in good faith.

130.    BDCH, through its Subsidiary's promise to purchase the Selling Lenders' Loans in exchange for votes in support of the November 6 Amendment, acted in bad faith.  BDCH knew that once the Selling Lenders agreed to accept payment from BDCM in exchange for assigning their Loans, they were, at best, indifferent to the fate of the remaining Lenders.

131.    By covertly paying off the Selling Lenders for purposes of assuming the role of Required Lender and subsequently purporting to eliminate financial covenants and other provisions in the Credit Agreement specifically bargained-for by the Lenders, BDCH breached the duty to act in good faith implied in the Credit Agreement.

132.    Moreover, by purporting to amend the Credit Agreement, without the unanimous consent of all Lenders, so as to render the *pro rata* provision of § 2.17 meaningless, BDCH sought to defeat the unambiguous expectation of the parties to the Loan Agreement that, absent the consent of all Lenders, all payments with respect to Black Diamond's debt under the Loan Agreement would be shared equally among all Lenders.

133.    BDCH's actions directly conflict with § 9.08(b), the *pro rata* provisions contained in § 2.17, and other provisions of the Credit Agreement.

28

134.    Equally egregious, BDCH used the Revolving Loan established under the Credit Agreement to pay for the secret buy-out of the Selling Lenders.  BDCH drew $20 million on the Revolving Loan based upon the false and misleading representation that the draw was to be used for "general corporate purposes in the ordinary course of [BDCH's] business."

135.    It was bad faith to use that draw down, obtained on the basis of misleading representations regarding its purpose, to pay for the Selling Lenders' interests, thus forcing the Remaining Lenders to finance the derogation of their bargained-for rights under the Credit Agreement.

136.    BDCH's actions destroyed Plaintiffs' bargained-for rights under the Credit Agreement and prevented Plaintiffs from receiving the benefit of their bargain.

137.    Plaintiffs therefore seek a judgment from this Court in an amount to be determined at trial for damages from BDCH's breach of the duty of good faith and fair dealing implied in the Credit Agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and demand judgment against Black Diamond Capital Holdings, L.L.C. and BDCM Fund Adviser, L.L.C., formerly known as Black Diamond Capital Management, L.L.C., as follows:

(a)    On the cause of action for declaratory relief, for a declaration that the November 6 Amendment, the Assignment, and the November 30 Amendment, and the December 29 Amendment are invalid, null and void and that all principal and interest are due and owing on the Credit Agreement due to Defendants' defaults thereunder;

29

(b)    On Plaintiff's claims for breach of contract against BDCH, for judgment in favor of the Plaintiffs and against BDCH in an amount to be determined at trial, but not less than $15,937,147.32;

(c)    On Plaintiffs' claim for breach of the covenant of good faith and fair dealing against BDCH, for judgment in favor of Plaintiffs and against BDCH in an amount to be determined at trial, but not less than $15,937,147.32;

(d)    For expenses, costs and attorney's fees;

(e)    For prejudgment and post-judgment interest; and

(f)    For such other and further relief as the Court deems just and equitable.

Dated:  New York, New York
        October 5, 2011

                                CHADBOURNE & PARKE LLP

                                By _____ *s/Scott S. Balber*
                                            Scott S. Balber
                                            A Member of the Firm
                                            Attorneys for Plaintiffs
                                            30 Rockefeller Plaza
                                            New York, New York 10112
                                            (212) 408-5100
                                            sbalber@chadbourne.com

30

# EXHIBIT
# A

EXECUTION COPY

$75,000,000
CREDIT AGREEMENT

dated as of October 12, 2006

among

BLACK DIAMOND CAPITAL MANAGEMENT, L.L.C.,
as Borrower

THE LENDERS PARTY HERETO

and

CREDIT SUISSE,
as Administrative Agent and Collateral Agent

CREDIT SUISSE SECURITIES (USA) LLC,
as Sole Bookrunner and Sole Lead Arranger

CREDIT SUISSE,
as Syndication Agent

TABLE OF CONTENTS

PAGE

## ARTICLE I.

### Definitions

SECTION 1.01. Defined Terms ....................................................................................... 1
SECTION 1.02. Terms Generally .................................................................................... 22
SECTION 1.03. Classification of Loans and Borrowings ............................................... 22
SECTION 1.04. Pro Forma Calculations ........................................................................ 22

## ARTICLE II.

### The Credits

SECTION 2.01. Commitments ......................................................................................... 23
SECTION 2.02. Loans ..................................................................................................... 23
SECTION 2.03. Borrowing Procedure ............................................................................ 24
SECTION 2.04. Repayment of Loans; Evidence of Debt ............................................... 25
SECTION 2.05. Fees ....................................................................................................... 25
SECTION 2.06. Interest on Loans ................................................................................... 26
SECTION 2.07. Default Interest ..................................................................................... 27
SECTION 2.08. Alternate Rate of Interest ..................................................................... 27
SECTION 2.09. Termination and Reduction of Commitments ....................................... 27
SECTION 2.10. Conversion and Continuation of Borrowings ....................................... 27
SECTION 2.11. Repayment of Term Borrowings ........................................................... 29
SECTION 2.12. Prepayment ........................................................................................... 30
SECTION 2.13. Mandatory Prepayments ....................................................................... 30
SECTION 2.14. Reserve Requirements; Change in Circumstances ................................ 31
SECTION 2.15. Change in Legality ................................................................................ 33
SECTION 2.16. Indemnity .............................................................................................. 33
SECTION 2.17. Pro Rata Treatment ............................................................................... 34
SECTION 2.18. Sharing of Setoffs ................................................................................. 34
SECTION 2.19. Payments ............................................................................................... 34
SECTION 2.20. Taxes ..................................................................................................... 35
SECTION 2.21. Assignment of Commitments Under Certain Circumstances; Duty to
              Mitigate ................................................................................................. 36
SECTION 2.22. Letters of Credit .................................................................................... 37

## ARTICLE III.

### Representations and Warranties

SECTION 3.01. Organization; Powers ............................................................................ 40
SECTION 3.02. Authorization; No Conflicts .................................................................. 41
SECTION 3.03. Enforceability ........................................................................................ 41
SECTION 3.04. Governmental Approvals ...................................................................... 41
SECTION 3.05. Financial Statements ............................................................................. 41

030-786-0283

SECTION 3.06.  No Material Adverse Change ..................................................42
SECTION 3.07.  Title to Properties; Possession Under Leases ........................42
SECTION 3.08.  BDCM Entities; BDCM Funds, etc. .......................................42
SECTION 3.09.  Litigation; Compliance with Laws ..........................................43
SECTION 3.10.  Agreements.................................................................................43
SECTION 3.11.  Federal Reserve Regulations ...................................................43
SECTION 3.12.  Investment Company Act .........................................................44
SECTION 3.13.  Use of Proceeds ........................................................................44
SECTION 3.14.  Tax Returns ...............................................................................44
SECTION 3.15.  No Material Misstatements; Acquisition Documentation .......44
SECTION 3.16.  Employee Benefit Plans ...........................................................44
SECTION 3.17.  Environmental Matters .............................................................45
SECTION 3.18.  Insurance ...................................................................................45
SECTION 3.19.  Security Documents .................................................................45
SECTION 3.20.  Location of Real Property ........................................................46
SECTION 3.21.  Labor Matters ...........................................................................46
SECTION 3.22.  Liens ..........................................................................................46
SECTION 3.23.  Intellectual Property .................................................................46
SECTION 3.24.  Solvency ....................................................................................46
SECTION 3.25.  Acquisition Documentation......................................................47
SECTION 3.26.  Permits .......................................................................................47
SECTION 3.27.  Anti-Terrorism Laws.................................................................47

## ARTICLE IV.

### Conditions of Lending

SECTION 4.01.  All Credit Events........................................................................48
SECTION 4.02.  First Credit Event ......................................................................48

## ARTICLE V.

### Affirmative Covenants

SECTION 5.01.  Existence; Compliance with Laws; Businesses and Properties ..........51
SECTION 5.02.  Insurance ....................................................................................51
SECTION 5.03.  Obligations and Taxes ..............................................................52
SECTION 5.04.  Financial Statements, Reports, etc.............................................52
SECTION 5.05.  Litigation and Other Notices ....................................................54
SECTION 5.06.  Information Regarding Collateral..............................................54
SECTION 5.07.  Maintaining Records; Access to Properties and Inspections...........55
SECTION 5.08.  Use of Proceeds ........................................................................55
SECTION 5.09.  Additional Collateral, etc..........................................................55
SECTION 5.10.  Further Assurances ....................................................................56
SECTION 5.11.  Maintenance of Ratings .............................................................57
SECTION 5.12.  Collection of Fees......................................................................57
SECTION 5.13.  Post-Closing Obligations..........................................................57

NYl171256.14

030 l86-0283

# ARTICLE VI.

## Negative Covenants

SECTION 6.01. Indebtedness .................................................................................. 58
SECTION 6.02. Liens ............................................................................................... 59
SECTION 6.03. Sale and Lease-Back Transactions ................................................ 60
SECTION 6.04. Investments, Loans and Advances ................................................. 61
SECTION 6.05. Mergers, Consolidations, Sales of Assets and Acquisitions.......... 62
SECTION 6.06. Restricted Payments; Restrictive Agreements................................ 63
SECTION 6.07. Transactions with Affiliates .......................................................... 65
SECTION 6.08. Business of the BDCM Entities; Limitation on Hedging Agreements.......... 65
SECTION 6.09. Other Indebtedness and Agreements; Amendments to Acquisition
                        Documentation ............................................................................. 65
SECTION 6.10. Fiscal Year ..................................................................................... 66
SECTION 6.11. Total Receivables ........................................................................... 66
SECTION 6.12. Leverage Ratio ............................................................................... 66
SECTION 6.13. Fixed Charge Coverage Ratio ....................................................... 66
SECTION 6.14. Embargoed Person .......................................................................... 66
SECTION 6.15. Anti-Terrorism Law; Anti-Money Laundering .............................. 67
SECTION 6.16. Fees................................................................................................. 67

# ARTICLE VII.

## Events of Default

# ARTICLE VIII.

## The Agents and the Arranger

# ARTICLE IX.

## Miscellaneous

SECTION 9.01. Notices............................................................................................ 71
SECTION 9.02. Survival of Agreement .................................................................... 72
SECTION 9.03. Binding Effect ................................................................................. 72
SECTION 9.04. Successors and Assigns ................................................................... 72
SECTION 9.05. Expenses; Indemnity ...................................................................... 76
SECTION 9.06. Right of Setoff ................................................................................ 77
SECTION 9.07. Applicable Law ............................................................................... 77
SECTION 9.08. Waivers; Amendment ...................................................................... 78
SECTION 9.09. Interest Rate Limitation .................................................................. 79
SECTION 9.10. Entire Agreement............................................................................. 80
SECTION 9.11. WAIVER OF JURY TRIAL ........................................................... 80
SECTION 9.12. Severability...................................................................................... 80
SECTION 9.13. Counterparts .................................................................................... 80
SECTION 9.14. Headings.......................................................................................... 80

NY\1171256.14

031/786-0283

SECTION 9.15. Jurisdiction; Consent to Service of Process...........................................80
SECTION 9.16. Confidentiality...............................................................................81
SECTION 9.17. USA PATRIOT Act Notice...............................................................82

Exhibits and Schedules

| | |
|---|---|
| Exhibit A | Form of Administrative Questionnaire |
| Exhibit B | Form of Assignment and Acceptance |
| Exhibit C | Form of Borrowing Request |
| Exhibit D | Form of Guarantee and Collateral Agreement |
| Exhibit E | Form of Pledge Agreement |
| Exhibit F | Form of Capital Contribution Agreement |
| Exhibit G | Form of Perfection Certificate |
| Exhibit H-1 | Form of Term Loan Note |
| Exhibit H-2 | Form of Revolving Note |
| Exhibit I | Form of Opinion of Sidley Austin LLP |
| Exhibit J | Form of Joinder Agreement |

| | |
|---|---|
| Schedule 1.01(a) | Mortgaged Properties |
| Schedule 1.01(b) | Subsidiary Guarantors |
| Schedule 1.01(c) | Ownership and Advisory Structure after the Acquisition Transactions and before the Permitted Restructuring Transaction |
| Schedule 1.01(d) | Ownership and Advisory Structure after both the Acquisition Transactions and the Permitted Restructuring Transaction |
| Schedule 2.01 | Lenders and Commitments |
| Schedule 3.08(a) | BDCM Entities and Subsidiaries |
| Schedule 3.08(b) | BDCM Funds |
| Schedule 3.08(c) | BDCM Fund Documents |
| Schedule 3.08(d) | Ownership and Advisory Structure before both the Acquisition Transactions and the Permitted Restructuring Transaction |
| Schedule 3.09 | Litigation |
| Schedule 3.17 | Environmental Matters |
| Schedule 3.18 | Insurance |
| Schedule 3.19(a) | UCC Filing Offices |
| Schedule 3.19(c) | Mortgage Filing Offices |
| Schedule 3.20 | Owned and Leased Real Property |
| Schedule 3.25 | Acquisition Documentation |
| Schedule 6.01 | Existing Indebtedness |
| Schedule 6.02 | Existing Liens |
| Schedule 6.04 | Existing Investments |

NY\1171256.14

030786-0283

CREDIT AGREEMENT dated as of October 12, 2006 (this "Agreement"), among BLACK DIAMOND CAPITAL MANAGEMENT, L.L.C., a Delaware limited liability company, the LENDERS from time to time party hereto, and CREDIT SUISSE, as administrative agent (in such capacity and together with its successors, the "Administrative Agent"), collateral agent (in such capacity and together with its successors, the "Collateral Agent") and Issuing Bank.

The Borrower has requested the Lenders (such term and each other capitalized term used but not defined in this preamble and the caption to this Agreement having the meanings assigned to them in Article I) to extend credit in the form of (a) Term Loans on the Closing Date, in an aggregate principal amount not in excess of $40,000,000 and (b) Revolving Loans at any time and from time to time prior to the Revolving Credit Maturity Date, in an aggregate principal amount at any time outstanding not in excess of $35,000,000. The Borrower has requested the Issuing Bank to issue Letters of Credit, in an aggregate face amount at any time outstanding not in excess of $5,000,000, to support payment obligations incurred in the ordinary course of business by the Borrower and its Subsidiaries. The proceeds of the Term Loans, together with the proceeds of approximately $25,000,000 of Revolving Loans to be made on the Closing Date, will be used solely (a) to finance the Acquisition Consideration and (b) to pay related fees, costs and expenses in connection with the Transactions. The proceeds of Revolving Loans to be made after the Closing Date will be used for general corporate purposes in the ordinary course of the Borrower's business.

The Lenders are willing to extend such credit to the Borrower and the Issuing Bank is willing to issue Letters of Credit for the account of the Borrower on the terms and subject to the conditions set forth herein. Accordingly, the parties hereto agree as follows:

ARTICLE I.

Definitions

SECTION 1.01. Defined Terms. As used in this Agreement, the following terms shall have the meanings specified below:

"ABR", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"Acquisition" shall mean the acquisition by the Borrower pursuant to the Purchase Agreement of all of the Seller's Equity Interests in the Borrower, with the Seller receiving an aggregate amount of $63,120,846 in cash (the "Acquisition Consideration").

"Acquisition Consideration" shall have the meaning assigned to such term in the definition of "Acquisition".

"Acquisition Documentation" shall mean, collectively, the Purchase Agreement and all schedules, exhibits, annexes and amendments thereto and all side letters and agreements affecting the terms thereof or entered into in connection therewith.

"Acquisition Transactions" shall mean, collectively, (a) the Acquisition, including the payment of the Acquisition Consideration, (b) the obtaining by the Borrower of the credit facilities provided for by this Agreement and (c) the payment of fees and expenses incurred in connection with the foregoing.

030786-0283

"Adjusted LIBO Rate" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum equal to the product of (a) the LIBO Rate in effect for such Interest Period and (b) Statutory Reserves.

"Administrative Agent" shall have the meaning assigned to such term in the caption hereto.

"Administrative Agent Fees" shall have the meaning assigned to such term in Section 2.05(b).

"Administrative Questionnaire" shall mean an Administrative Questionnaire in the form of Exhibit A, or such other form as may be supplied from time to time by the Administrative Agent.

"Affiliate" shall mean, when used with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided, however, that, for purposes of Section 6.07, the term "Affiliate" shall also include any Person that directly or indirectly owns 10% or more of any class of Equity Interests of the Person specified or that is an officer or director of the Person specified.

"Agents" shall have the meaning assigned to such term in Article VIII.

"Aggregate Revolving Credit Exposure" shall mean the aggregate amount of the Lenders' Revolving Credit Exposures.

"Agreement" shall have the meaning assigned to such term in the caption hereto.

"Alternate Base Rate" shall mean, for any day, a rate per annum equal to the greater of (a) the Prime Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%. If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective on the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, as the case may be.

"Applicable Margin" shall mean, for any day, (a) 1.75% for a Eurodollar Term Loan, (b) 0.75% for an ABR Term Loan, (c) 1.75% for a Eurodollar Revolving Loan and (d) 0.75% for an ABR Revolving Loan.

"Arranger" shall mean Credit Suisse Securities (USA) LLC.

"Asset Sale" shall mean the sale, lease, sub-lease, sale and leaseback, assignment, conveyance, transfer, issuance or other disposition (by way of merger, casualty, condemnation or otherwise) by the Borrower, any of the other BDCM Entities or any of the Subsidiaries to any Person other than the Borrower, any of the other BDCM Entities or any Subsidiary Guarantor of (a) any Equity Interests of any of the Subsidiaries or (b) any other assets of the Borrower, any of the other BDCM Entities or any of the Subsidiaries, including Equity Interests of any Person that is not a Subsidiary (other than inventory, damaged, obsolete or worn out assets, scrap and Permitted Investments, in each case disposed of in the ordinary course of business); provided that any asset sale or series of related asset sales described in clause (b) above having a value not in excess of $250,000 shall be deemed not to be an "Asset Sale" for purposes of this Agreement.

2

"Assets Under Management" shall mean, at any time, with respect to a BDCM Fund, the aggregate amount of assets used to calculate the BDCM Management Fees with respect to such BDCM Fund in accordance with the applicable BDCM Fund Documents.

"Assignment and Acceptance" shall mean an assignment and acceptance entered into by a Lender and an assignee (with the consent of any Person whose consent is required by Section 9.04), and accepted by the Administrative Agent, in the form of Exhibit B or such other form as shall be approved by the Administrative Agent.

"BDCM Entity" shall mean the Borrower, Black Diamond Capital Management, L.L.C. (after the consummation of the Permitted Restructuring Transaction), BDCM Opportunity Fund G.P., I.L.C., BDCM Opportunity Fund II GP, LLC, Black Diamond GB Limited and any other Person formed after the Closing Date that receives BDCM Management Fees or BDCM Incentive Fees pursuant to the BDCM Fund Documents.

"BDCM Fees" shall mean the BDCM Incentive Fees and the BDCM Management Fees.

"BDCM Fund Documents" shall mean all limited partnership agreements, subscription agreements, management agreements, advisory agreements, administration agreements and other similar documents and agreements as in effect from time to time for each BDCM Fund, together with any amendments thereto, including all agreements listed on Schedule 3.08(c).

"BDCM Funds" shall mean BDCM Partners I, L.P., BDCM Offshore Fund Ltd., BDCM Offshore Fund II Ltd., BDC Finance L.L.C., BDCM Opportunity Fund, L.P., BDCM Offshore Opportunity Fund A Ltd., BDCM Opportunity Fund II, L.P., BDCM Offshore Opportunity Fund II Ltd., Black Diamond CLO 2000-1 Ltd., Black Diamond CLO 2005-1 Ltd., Black Diamond CLO 2005-2 Ltd., Black Diamond International Funding, Ltd., Black Diamond USA Funding Corp., Black Diamond CLO 2006-1 S.A., Black Diamond CLO 2006-1 Ltd., BDCM Intermediate Offshore Opportunity Fund, L.P., BDCM Intermediate Offshore Opportunity Fund II, L.P. and all investment funds formed or acquired after the Closing Date that primarily acquire, hold and sell marketable and non-marketable securities, loans and other investments (including operating companies) and/or real property interests and leasehold interests and/or secondary partnership interests, and are managed by any BDCM Entity.

"BDCM Incentive Fees" shall mean for any period, all incentive, carried interest, performance and other similar fees or allocations payable or allocable to the BDCM Entities pursuant to the BDCM Fund Documents or otherwise during such period, whether such fees were in existence on the Closing Date or created or arising thereafter.

"BDCM Management Fees" shall mean for any period, all management, monitoring, transaction, advisory, ancillary, placement and other similar fees payable to the BDCM Entities pursuant to the BDCM Fund Documents or otherwise during such period, whether such fees were in existence on the Closing Date or created or arising thereafter.

"Benefit Plan" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Tax Code or Section 307 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

NY\1171256.14

030786-0283

"Borrower" shall mean (i) prior to the Permitted Restructuring Transaction, Black Diamond Capital Management, L.L.C., a Delaware limited liability company, and (ii) after the consummation of the Permitted Restructuring Transaction and the execution and delivery of the Joinder Agreement by the parties thereto, Black Diamond Capital Holdings, L.L.C., a Delaware limited liability company.

"Borrower's Share of Excess Cash Flow" shall mean, as of the Closing Date, $0, which amount shall be (a) increased, on the date of delivery in any fiscal year of the certificate of a Financial Officer required by Section 5.04(c) setting forth the calculation of Excess Cash Flow for the preceding fiscal year commencing with the fiscal year ended December 31, 2007 (each such date being an "ECF Determination Date"), so long as any prepayment required pursuant to Section 2.13(e) has been made, by an amount equal to the amount of such Excess Cash Flow which is not required to be used to prepay Loans or cash collateralize outstanding Letters of Credit and (b) reduced (i) on each ECF Determination Date where Excess Cash Flow for the immediately preceding fiscal year is a negative number, by such amount, and (ii) by the amount of any Restricted Payment made pursuant to Section 6.06(a)(iii).

"Borrowing" shall mean Loans of the same Class and Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" shall mean a request by the Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit C, or such other form as shall be approved by the Administrative Agent.

"Breakage Event" shall have the meaning assigned to such term in Section 2.16.

"Business Day" shall mean any day other than a Saturday, Sunday or day on which commercial banks in New York City are authorized or required by law to close; provided, however, that when used in connection with a Eurodollar Loan (including with respect to all notices and determinations in connection therewith and any payments of principal, interest or other amounts thereon), the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Contribution Agreement" shall mean the Capital Contribution Agreement substantially in the form of Exhibit F among the parties thereto.

"Capital Expenditures" shall mean, for any period, with respect to any Person, (a) the additions to property, plant and equipment and other capital expenditures of such Person and its consolidated subsidiaries that are (or should be) set forth in a consolidated statement of cash flows of such Person for such period prepared in accordance with GAAP and (b) Capital Lease Obligations or Synthetic Lease Obligations incurred by such Person and its consolidated subsidiaries during such period.

"Capital Lease Obligations" of any Person shall mean the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

A "Change of Control" shall be deemed to have occurred if (a) Stephen H. Deckoff shall fail to own directly or indirectly, beneficially and of record, Equity Interests representing at least 51% of the aggregate ordinary voting power and aggregate equity value represented by the issued and outstanding Equity Interests in the Borrower; (b) Stephen H. Deckoff and two or more of the other holders of the Equity Interests of the Borrower (after giving effect to the Acquisition and the Permitted Restructuring

4

Transaction) shall cease to be actively involved in the management and decision-making of the Borrower; or (c) after the consummation of the Permitted Restructuring Transaction, any change of control (or similar event, however denominated) with respect to the Borrower or any other BDCM Entity shall occur under and as defined in any indenture or agreement in respect of Material Indebtedness to which the Borrower or any BDCM Entity is a party.

"Change in Law" shall mean (a) the adoption of any law, rule or regulation after the date of this Agreement, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender or the Issuing Bank (or, for purposes of Section 2.14, by any lending office of such Lender or by such Lender's or Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"Charges" shall have the meaning assigned to such term in Section 9.09.

"Class", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Revolving Loans or Term Loans and, when used in reference to any Commitment, refers to whether such Commitment is a Revolving Credit Commitment or Term Loan Commitment.

"Closing Date" shall mean the date of the first Credit Event.

"Collateral" shall mean all property and assets of the Loan Parties, now owned or hereafter acquired, upon which a Lien is purported to be created by any Security Document, and shall include the Mortgaged Properties.

"Collateral Agent" shall have the meaning assigned to such term in the caption hereto.

"Commitment" shall mean, with respect to any Lender, such Lender's Revolving Credit Commitment and Term Loan Commitment.

"Commitment Fee" shall have the meaning assigned to such term in Section 2.05(a).

"Commitment Fee Rate" shall mean a rate per annum equal to 0.50%.

"Commitment Letter" shall mean the Commitment Letter dated as of July 24, 2006, among the Black Diamond Capital Management, L.L.C., Credit Suisse and Credit Suisse Securities (USA) LLC.

"Confidential Information Memorandum" shall mean the Confidential Information Memorandum of the Borrower dated September 2006.

"Consolidated EBITDA" shall mean, for any period, Consolidated Net Income for such period plus (a) without duplication and to the extent deducted in determining such Consolidated Net Income, the sum of (i) Consolidated Interest Expense for such period, (ii) consolidated income tax expense for such period, (iii) all amounts attributable to depreciation and amortization for such period, (iv) any non-cash charges (other than the write-down of current assets) for such period and (v) the amount of all fees and expenses incurred during such period in connection with or attributable to the Transactions in an aggregate amount not to exceed $2,500,000 (provided that to the extent that all or any portion of the income of any Person is excluded from Consolidated Net Income pursuant to the definition thereof for all or any portion of such period any amounts set forth in the preceding clauses (i) through (v) that are attributable to such Person shall not be included for purposes of this definition for such period or portion

NY\1171256.14

030786-0283

thereof), and minus (b) without duplication (i) all cash payments made during such period on account of reserves, restructuring charges and other non-cash charges added to Consolidated Net Income pursuant to clause (a)(iv) above in a previous period and (ii) to the extent included in determining such Consolidated Net Income, any extraordinary gains and all non-cash items of income (other than non-cash items of income relating to deferred revenues and income on deferred revenues in connection with deferred compensation arrangements between the BDCM Entities and the BDCM Funds) for such period, all determined on a consolidated basis in accordance with GAAP; provided that for purposes of calculating Consolidated EBITDA for any period (1) the Consolidated EBITDA of any Person or line of business sold or otherwise disposed of by the Borrower, any other BDCM Entity or any Subsidiary (other than the wind-up or dissolution of a BDCM Fund or in connection therewith) during such period shall be excluded for such period (assuming the consummation of such sale or other disposition and the repayment of any Indebtedness in connection therewith occurred as of the first day of such period) and (2) the Consolidated EBITDA of any Person or line of business acquired by the Borrower, any other BDCM Entity or any Subsidiary in compliance with the terms of this Agreement during such period shall be included for such period (assuming the consummation of such acquisition and the incurrence of any Indebtedness in connection therewith occurred as of the first day of such period).

"Consolidated Fixed Charges" shall mean, for any period, without duplication, the sum of (a) Consolidated Interest Expense for such period and (b) the aggregate amount of scheduled principal payments (whether or not made) during such period in respect of long term Indebtedness (including Capital Lease Obligations and Synthetic Lease Obligations, but excluding Revolving Loans) of the Borrower, the BDCM Entities and the Subsidiaries (other than payments made by the Borrower, any other BDCM Entity or any Subsidiary to the Borrower, any other BDCM Entity or a Subsidiary).

"Consolidated Interest Expense" shall mean, for any period, the interest expense (including imputed interest expense in respect of Capital Lease Obligations and Synthetic Lease Obligations) of the Borrower, the BDCM Entities and the Subsidiaries for such period (including all commissions, discounts and other fees and charges owed by the Borrower, the BDCM Entities and the Subsidiaries with respect to letters of credit and bankers' acceptance financing), net of interest income and earnings on direct investments in BDCM Funds that have monthly liquidity during such period, in each case determined on a consolidated basis in accordance with GAAP. For purposes of the foregoing, interest expense shall be determined after giving effect to any net payments made or received by the Borrower, any other BDCM Entity or any Subsidiary with respect to interest rate Hedging Agreements.

"Consolidated Net Income" shall mean, for any period, the net income or loss of the Borrower, the BDCM Entities and the Subsidiaries for such period determined on a consolidated basis in accordance with GAAP; provided that there shall be excluded (a) the income of any BDCM Entity (other than the Borrower) or Subsidiary to the extent that the declaration or payment of dividends or similar distributions by such BDCM Entity or Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, statute, rule or governmental regulation applicable to such BDCM Entity or Subsidiary, provided that the income of such BDCM Entity or Subsidiary so excluded shall be included in the period in which the declaration or payment of dividends or similar distributions by such BDCM Entity or Subsidiary of that income becomes permitted, (b) the income or loss of any Person accrued prior to the date it becomes a BDCM Entity or Subsidiary or is merged into or consolidated with the Borrower, any BDCM Entity or any Subsidiary or the date that such Person's assets are acquired by the Borrower, any BDCM Entity or any Subsidiary, (c) the income of any Person (other than a BDCM Entity or Subsidiary) in which any other Person (other than the Borrower or a Wholly Owned Subsidiary or any director holding qualifying shares in accordance with applicable law) has an interest, except to the extent of the amount of dividends or other distributions actually paid to the Borrower or a Wholly Owned Subsidiary by such Person during such period, and (d) any gains attributable to sales of assets out of the ordinary course of business.

NY\1171256.14

030786-0283

"Control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "Controlling" and "Controlled" shall have meanings correlative thereto.

"Credit Event" shall have the meaning assigned to such term in Section 4.01.

"Default" shall mean any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would constitute an Event of Default.

"Defaulting Lender" shall mean any Revolving Credit Lender that has (a) defaulted in its obligation to make a Revolving Loan or to fund its participation in a Letter of Credit required to be made or funded by it hereunder, (b) notified the Administrative Agent or a Loan Party in writing that it does not intend to satisfy any such obligation or (c) become insolvent or the assets or management of which has been taken over by any Governmental Authority.

"Dollars" or "$" shall mean lawful money of the United States of America.

"Domestic BDCM Entity" shall mean all BDCM Entities incorporated, formed or organized under the laws of the United States of America, any State thereof or the District of Columbia.

"Domestic Subsidiaries" shall mean all Subsidiaries incorporated, formed or organized under the laws of the United States of America, any State thereof or the District of Columbia.

"Environmental Laws" shall mean all former, current and future Federal, state, local and foreign laws (including common law), treaties, regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and agreements in each case, relating to protection of the environment, natural resources, human health and safety or the presence, Release of, threatened Release, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

"Environmental Liability" shall mean all liabilities, obligations, damages, losses, claims, actions, suits, judgments, orders, fines, penalties, fees, expenses and costs (including administrative oversight costs, natural resource damages and remediation costs), whether contingent or otherwise, arising out of or relating to (a) compliance or non-compliance with any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" shall mean shares of capital stock, preferred stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any Person, or any obligations convertible into or exchangeable for, or giving any Person a right, option or warrant to acquire, such equity interests or such convertible or exchangeable obligations.

"Equity Issuance" shall mean any issuance or sale by the Borrower of any Equity Interests of the Borrower, as applicable, or the receipt by the Borrower of any capital contribution, as applicable.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, regulations promulgated thereunder and any successor thereto.

7

030786-0283

"ERISA Affiliate" shall mean any entity (whether or not incorporated) that, together with the Borrower is treated as a single employer under Section 414(b) or (c) of the Tax Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Tax Code, is treated as a single employer under Section 414 of the Tax Code.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Benefit Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Benefit Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Tax Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Tax Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Benefit Plan; (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Benefit Plan or the withdrawal or partial withdrawal of the Borrower or any of its ERISA Affiliates from any Benefit Plan or Multiemployer Plan; (e) the receipt by the Borrower or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Benefit Plan or Plans or to appoint a trustee to administer any Benefit Plan; (f) the adoption of any amendment to a Benefit Plan that would require the provision of security pursuant to Section 401(a)(29) of the Tax Code or Section 307 of ERISA; (g) the receipt by the Borrower or any of its ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from the Borrower or any of its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) the occurrence of a "prohibited transaction" involving a Benefit Plan with respect to which the Borrower or any of the Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Tax Code) or with respect to which the Borrower or any such Subsidiary could otherwise be liable; or (i) any other event or condition with respect to a Benefit Plan or Multiemployer Plan that could result in liability of the Borrower or any Subsidiary.

"Eurodollar", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" shall have the meaning assigned to such term in Article VII.

"Excess Cash Flow" shall mean, for any fiscal year of the Borrower, the sum, without duplication, of (a) Consolidated Net Income for such fiscal year, plus (b) the sum, without duplication, of (i) depreciation, amortization and other non-cash charges or losses deducted in determining Consolidated Net Income and (ii) increases in accounts payable, employee deferred compensation liability, placement fees payable, and other liabilities, but excluding increases in liabilities for investment advisory fees paid in advance and redemptions of Investments in BDCM Funds paid in advance, (iii) investment advisory receivable outstanding at the end of the prior fiscal year, which was either deferred in the current fiscal year or collected after the Excess Cash Flow Prepayment Date for the prior fiscal year and excluded from Excess Cash Flow for the prior fiscal year in accordance with clause (c)(ii) below and (iv) decreases in receivables and other assets, but excluding investment advisory receivables, minus (c) the sum, without duplication, of (i) decreases in accounts payable, employee deferred compensation liability, placement fees payable, and other liabilities, but excluding decreases in liabilities for investment advisory fees paid in advance and redemptions of Investments in BDCM Funds paid in advance, (ii) investment advisory receivable outstanding at the end of the fiscal year, which is either deferred in the following fiscal year or not collected prior to the Excess Cash Flow Prepayment Date for such fiscal year, (iii) increases in receivables and other assets, but excluding investment advisory receivables, (iv) accrued and undistributed income for such fiscal year with respect to Investments in the BDCM Funds (for the avoidance of doubt, excluding any BDCM Fees payable by the BDCM Funds), (v) Tax Restricted

8

Payments made during such fiscal year, (vi) Capital Expenditures made in cash during such fiscal year, (vii) the aggregate amount of scheduled principal payments made by the Borrower, the other BDCM Entities or the Subsidiaries during such fiscal year in respect of long term Indebtedness (including Capital Lease Obligations and Synthetic Lease Obligations, but excluding Revolving Loans) (other than mandatory prepayments of Loans under Section 2.13 and other than payments made by the Borrower, any other BDCM Entity or any Subsidiary to the Borrower, any other BDCM Entity or a Subsidiary) and (viii) Restricted Payments made during such fiscal year pursuant to Section 6.06(a)(v).

"Excess Cash Flow Prepayment Amount" shall mean in the case of any Excess Cash Flow, (x) with respect to the 2006 fiscal year of the Borrower, $0, (y) with respect to each of the 2007, 2008, 2009, 2010 and 2011 fiscal years of the Borrower, if Excess Cash Flow for such fiscal year shall be greater than or equal to $3,600,000, $3,600,000 plus 25% of Excess Cash Flow for such fiscal year in excess of $3,600,000, in each case reduced by the amount of optional prepayments of Term Loans made pursuant to Section 2.12 during such fiscal year (other than such optional prepayments made with the Net Cash Proceeds of Equity Issuances) and optional prepayments of Revolving Loans made pursuant to Section 2.12 during such fiscal year (other than such optional prepayments made with the Net Cash Proceeds of Equity Issuances) accompanied by permanent reductions of Revolving Credit Commitments in like amounts or (z) with respect to each of the 2012 and 2013 fiscal years of the Borrower, 100% of Excess Cash Flow for such fiscal years.

"Excess Cash Flow Prepayment Date" for a fiscal year shall mean the date that the Excess Cash Flow Prepayment Amount with respect to such fiscal year is due pursuant to Section 2.13(e).

"Excluded Foreign Subsidiaries" shall mean, at any time, any Foreign Subsidiary that is (or is treated as) for United States federal income tax purposes either (a) a corporation or (b) a pass-through entity owned directly or indirectly by another Foreign Subsidiary that is (or is treated as) a corporation.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender, the Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) income or franchise taxes imposed on (or measured by) its net income as a result of a present or former connection between such recipient and the jurisdiction imposing such tax (or any political subdivision thereof), other than any such connection arising solely from such recipient having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document and (b) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 2.21(a)), any United States withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party to this Agreement (or designates a new lending office) or is attributable to such Foreign Lender's failure (other than as a result of a Change in Law) to comply with Section 2.20(d), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.20(a).

"Executive Order" shall have the meaning assigned to such term in Section 3.27.

"Facility" shall mean each of (a) the Term Loan Commitments and the Term Loans made thereunder (the "Term Loan Facility") and (b) the Revolving Credit Commitments and the extensions of credit made thereunder (the "Revolving Credit Facility").

"Federal Funds Effective Rate" shall mean, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of

9

New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Fee Letter" shall mean the Fee Letter dated as of July 24, 2006, among the Black Diamond Capital Management, L.L.C., Credit Suisse and Credit Suisse Securities (USA) LLC.

"Fees" shall mean the Commitment Fees, the Administrative Agent Fees, the L/C Participation Fees and the Issuing Bank Fees.

"Financial Officer" of any Person shall mean the chief financial officer, principal accounting officer, treasurer or controller of such Person.

"Fixed Charge Coverage Ratio" shall mean, on any date, the ratio of (a) Consolidated EBITDA for the Test Period most recently ended for which financial statements are required to be delivered pursuant to Sections 5.04(a) and (b), taken as one accounting period, minus the sum of (i) Capital Expenditures of the Borrower, the other BDCM Entities and the Subsidiaries during such period and (ii) direct investments made by the Borrower, the BDCM Entities and the Subsidiaries in the BDCM Funds during such period, to (b) Consolidated Fixed Charges for the Test Period most recently ended for which financial statements are required to be delivered pursuant to Sections 5.04(a) and (b), taken as one accounting period.

"Foreign BDCM Entity" shall mean any BDCM Entity that is not a Domestic BDCM Entity, including Black Diamond GB Limited.

"Foreign Lender" shall mean any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is located. For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" shall mean any Subsidiary that is not a Domestic Subsidiary.

"GAAP" shall mean United States generally accepted accounting principles applied on a consistent basis except with respect to (i) the undervaluation of certain investments held by the Borrower at cost and (ii) the non-consolidation of the BDCM Funds.

"Governmental Authority" shall mean the government of the United States of America or any other nation, any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Granting Lender" shall have the meaning assigned to such term in Section 9.04(i).

"Guarantee" of or by any Person (the "guarantor") shall mean any obligation, contingent or otherwise, of (a) the guarantor or (b) another Person (including any bank under a letter of credit) to induce the creation of which the guarantor has issued a reimbursement, counterindemnity or similar obligation, in either case guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation, contingent or otherwise, of the guarantor, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose

03C786-0283

of assuring the owner of such Indebtedness or other obligation of the payment of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, (iv) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation or (v) to otherwise assure or hold harmless the owner of such Indebtedness or other obligation against loss in respect thereof; provided, however, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"Guarantee and Collateral Agreement" shall mean the Guarantee and Collateral Agreement substantially in the form of Exhibit D, among the Borrower, each Guarantor and the Collateral Agent for the benefit of the Secured Parties.

"Guarantors" shall mean the BDCM Entities (other than the Borrower) and the Subsidiary Guarantors.

"Hazardous Materials" shall mean any petroleum (including crude oil or fraction thereof) or petroleum products or byproducts, or any pollutant, contaminant, chemical, compound, constituent, or hazardous, toxic or other substances, materials or wastes defined, or regulated as such by, or pursuant to, any Environmental Law, or as to which removal, remediation or reporting is required under any Environmental Law, including asbestos, or asbestos containing material, radon or other radioactive material, polychlorinated biphenyls and urea formaldehyde insulation.

"Hedging Agreement" shall mean any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, fuel or other commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided, however, that no phantom stock or similar plan providing for payments and on account of services provided by current or former directors, officers, employees or consultants of the Borrower, any other BDCM Entity or any Subsidiary shall be a Hedging Agreement.

"Indebtedness" of any Person shall mean, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property or assets acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (other than current trade accounts payable incurred in the ordinary course of business), (e) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Equity Interests in such Person, (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, (h) all Capital Lease Obligations or Synthetic Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in, or other relationship with, such other Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. Notwithstanding the foregoing and for the avoidance of doubt, the following shall not be deemed to be Indebtedness for purposes of this Agreement (i) indebtedness and other obligations of any BDCM Fund to the extent that any BDCM Entity is liable therefor as a result of such

11

BDCM Entity being the general partner of such BDCM Fund, (ii) amounts payable to James J. Zenni, Jr. pursuant to the Purchase Agreement, (iii) placement agent fees payable by the Borrower or any other BDCM Entity over time with respect to capital raised for the BDCM Funds from time to time, (iv) guarantees by BDCM Opportunity Fund G.P., L.L.C. and BDCM Opportunity Fund II GP, LLC of subscription lines of credit of BDCM Opportunity Fund, L.P. and BDCM Opportunity Fund II, L.P., respectively, and (v) contractual obligations of the Borrower under its operating agreement to make payments to repurchase Equity Interests issued by it to its members (other than to Stephen H. Deckoff and any of his Affiliates) arising on the death, disability, retirement or termination of employment with the Borrower of such members, pursuant to the terms of the operating agreement of the Borrower.

"Indemnified Taxes" shall mean Taxes other than Excluded Taxes and Other Taxes.

"Indemnitee" shall have the meaning assigned to such term in Section 9.05(b).

"Information" shall have the meaning assigned to such term in Section 9.16.

"Intellectual Property Collateral" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Intellectual Property Security Agreements" shall mean all Intellectual Property Security Agreements to be executed and delivered by the Loan Parties.

"Interest Payment Date" shall mean (a) with respect to any ABR Loan, the last Business Day of each March, June, September and December and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, each day that would have been an Interest Payment Date had successive Interest Periods of three months' duration been applicable to such Borrowing.

"Interest Period" shall mean, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is 1, 2, 3 or 6 months thereafter, as the Borrower may elect; provided, however, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Investments" shall have the meaning assigned to such term in Section 6.04.

"Issuing Bank" shall mean, as the context may require, (a) Credit Suisse, acting through any of its Affiliates or branches, in its capacity as the issuer of Letters of Credit hereunder, and (b) any other Lender that may become an Issuing Bank pursuant to Section 2.22(i) or Section 2.22(k), with respect to Letters of Credit issued by such Lender. The Issuing Bank may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates or branches of the Issuing Bank, in which case the term "Issuing Bank" shall include any such Affiliate or branch with respect to Letters of Credit issued by such Affiliate or branch.

12

030186-0283

"Issuing Bank Fees" shall have the meaning assigned to such term in Section 2.05(c).

"Joinder Agreement" shall mean the Joinder Agreement substantially in the form of Exhibit J, among Black Diamond Capital Management, L.L.C., Black Diamond Capital Holdings, L.L.C., the Administrative Agent and the Collateral Agent, and including supplements to certain schedules hereto and to the Guarantee and Collateral Agreement.

"L/C Commitment" shall mean the commitment of the Issuing Bank to issue Letters of Credit pursuant to Section 2.22.

"L/C Disbursement" shall mean a payment or disbursement made by the Issuing Bank pursuant to a Letter of Credit.

"L/C Exposure" shall mean, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time and (b) the aggregate principal amount of all L/C Disbursements that have not yet been reimbursed at such time. The L/C Exposure of any Revolving Credit Lender at any time shall equal its Pro Rata Percentage of the aggregate L/C Exposure at such time.

"L/C Fee Payment Date" shall have the meaning assigned to such term in Section 2.05(c).

"L/C Participation Fee" shall have the meaning assigned to such term in Section 2.05(c).

"Lenders" shall mean (a) the persons listed on Schedule 2.01 (other than any such Person that has ceased to be a party hereto pursuant to an Assignment and Acceptance) and (b) any Person that has become a party hereto pursuant to an Assignment and Acceptance.

"Letter of Credit" shall mean any letter of credit issued pursuant to Section 2.22.

"Leverage Ratio" shall mean, on any date, the ratio of (a) Total Debt on such date to (b) Consolidated EBITDA for the Test Period most recently ended for which financial statements are required to be delivered pursuant to Section 5.04(a) and (b), taken as one accounting period.

"LIBO Rate" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m., London time, on the date that is two Business Days prior to the commencement of such Interest Period by reference to the British Bankers' Association Interest Settlement Rates for deposits in Dollars (as set forth by the Bloomberg Information Service or any successor thereto or any other service selected by the Administrative Agent that has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; provided that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "LIBO Rate" shall be the interest rate per annum determined by the Administrative Agent to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of such Interest Period.

"Lien" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any

13

of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Loan Documents" shall mean this Agreement, the Letters of Credit and the Security Documents.

"Loan Parties" shall mean the Borrower, the other BDCM Entities and each Subsidiary that is or becomes a party to a Loan Document.

"Loans" shall mean the Revolving Loans and the Term Loans.

"Majority Facility Lenders" shall mean, with respect to any Facility, the holders of a majority of the aggregate unpaid principal amount of the Term Loans or the Aggregate Revolving Credit Exposure, as the case may be, outstanding under such Facility (or, in the case of the Revolving Credit Facility, prior to the termination of the Revolving Credit Commitments, the holders of a majority of the Total Revolving Credit Commitment); provided that the Revolving Loans, L/C Exposure and unused Revolving Credit Commitments of any Defaulting Lender shall be disregarded in the determination of the Majority Facility Lenders with respect to the Revolving Credit Facility at any time.

"Margin Stock" shall have the meaning assigned to such term in Regulation U.

"Material Adverse Effect" shall mean a material adverse condition or material adverse change in (a) the business, assets, liabilities, operations, condition (financial or otherwise), operating results or prospects of the Borrower, the other BDCM Entities and the Subsidiaries, taken as a whole, (excluding any changes resulting from (i) any litigation or other proceedings to which the Borrower is a party and is indemnified by one or more of the BDCM Funds, and (ii) the individual performance by any of the BDCM Funds or other funds or CLOs managed by any BDCM Entity) or (b) the validity or enforceability of any of the Loan Documents or the rights and remedies of the Arranger, the Administrative Agent, the Collateral Agent or the Secured Parties thereunder.

"Material Indebtedness" shall mean Indebtedness (other than the Loans and Letters of Credit), or obligations in respect of one or more Hedging Agreements, of any one or more of the Borrower, the other BDCM Entities and the Subsidiaries in an aggregate principal amount exceeding $1,000,000. For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Borrower, any other BDCM Entity or any Subsidiary in respect of any Hedging Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Borrower, such other BDCM Entity or such Subsidiary would be required to pay if such Hedging Agreement were terminated at such time.

"Maximum Rate" shall have the meaning assigned to such term in Section 9.09.

"Moody's" shall mean Moody's Investors Service, Inc., or any successor thereto.

"Mortgaged Properties" shall mean, initially, each parcel of real property and the improvements thereto owned or leased by a Loan Party and specified on Schedule 1.01(a), and shall include each other parcel of real property and improvements thereto with respect to which a Mortgage is granted pursuant to Section 5.09 or 5.10.

"Mortgages" shall mean the fee or leasehold mortgages or deeds of trust, assignments of leases and rents and other security documents granting a Lien on any Mortgaged Property to secure the Obligations, as the same may be amended, supplemented, replaced or otherwise modified from time to time in accordance with this Agreement.

"<u>Multiemployer Plan</u>" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"<u>Net Cash Proceeds</u>" shall mean (a) with respect to any Asset Sale or Recovery Event, the proceeds thereof in the form of cash and Permitted Investments (including any such proceeds subsequently received (as and when received) in respect of noncash consideration initially received), net of (i) selling expenses (including reasonable and customary broker's fees or commissions, legal fees, transfer and similar taxes incurred by the Borrower or its members, the other BDCM Entities and the Subsidiaries in connection therewith and the Borrower's good faith estimate of income taxes paid or payable in connection with such sale, after taking into account any available tax credits or deductions and any tax sharing arrangements), (ii) amounts provided as a reserve, in accordance with GAAP, against any liabilities under any indemnification obligations or purchase price adjustment associated with such Asset Sale (<u>provided</u> that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds) and (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money which is secured by the asset sold in such Asset Sale and which is required to be repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such asset); <u>provided</u>, <u>however</u>, that, if (x) the Borrower shall deliver a certificate of a Financial Officer of the Borrower to the Administrative Agent at the time of receipt thereof setting forth the Borrower's intent to reinvest such proceeds in productive assets of a kind then used or usable in the business of the Borrower, the other BDCM Entities and the Subsidiaries within 180 days of receipt of such proceeds and (y) no Default or Event of Default shall have occurred and shall be continuing at the time of such certificate or at the proposed time of the application of such proceeds, such proceeds shall not constitute Net Cash Proceeds except to the extent not so used at the end of such 180-day period, at which time such proceeds shall be deemed to be Net Cash Proceeds; and (b) with respect to any issuance or incurrence of Indebtedness or any Equity Issuance, the cash proceeds thereof, net of all taxes and reasonable and customary fees, commissions, costs and other expenses incurred in connection therewith.

"<u>Obligations</u>" shall mean all obligations defined as "Obligations" in the Guarantee and Collateral Agreement and the other Security Documents.

"<u>OFAC</u>" shall have the meaning assigned to such term in Section 3.27(b).

"<u>Other Taxes</u>" shall mean any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies (including interest, fines, penalties and additions to tax) arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"<u>PBGC</u>" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"<u>Perfection Certificate</u>" shall mean the Pre-Closing UCC Diligence Certificate substantially in the form of Exhibit G or any other form approved by the Collateral Agent.

"<u>Permits</u>" shall mean any and all franchises, licenses, leases, permits, approvals, notifications, certifications, registrations, authorizations, exemptions, qualifications, easements, rights of way, Liens and other rights, privileges and approvals required under any Requirement of Law.

15

NY\1171256.14

030786-0283

"<u>Permitted Investments</u>" shall mean:

(a)    direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b)    investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's;

(c)    investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, the Administrative Agent or any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)    fully collateralized repurchase agreements with a term of not more than 30 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria of clause (c) above;

(e)    investments in "money market funds" within the meaning of Rule 2a-7 of the Investment Company Act of 1940, as amended, substantially all of whose assets are invested in investments of the type described in clauses (a) through (d) above;

(f)    investments in so-called "auction-rate" securities rated AAA or higher by S&P or Aaa or higher by Moody's and which have a reset date not more than 90 days from the date of acquisition thereof; and

(g)    other short-term investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in investments of a type analogous to the foregoing.

"<u>Permitted Refinancing Indebtedness</u>" shall mean Indebtedness issued or incurred (including by means of the extension or renewal of existing Indebtedness) to refinance, refund, extend, renew or replace existing Indebtedness ("<u>Refinanced Indebtedness</u>"); <u>provided</u> that (a) the principal amount of such refinancing, refunding, extending, renewing or replacing Indebtedness is not greater than the principal amount of such Refinanced Indebtedness plus the amount of any premiums or penalties and accrued and unpaid interest paid thereon and reasonable fees and expenses, in each case associated with such refinancing, refunding, extension, renewal or replacement, (b) such refinancing, refunding, extending, renewing or replacing Indebtedness has a final maturity that is no sooner than, and a weighted average life to maturity that is no shorter than, such Refinanced Indebtedness, (c) if such Refinanced Indebtedness or any Guarantees thereof are subordinated to the Obligations, such refinancing, refunding, extending, renewing or replacing Indebtedness and any Guarantees thereof remain so subordinated on terms no less favorable to the Lenders, (d) the obligors in respect of such Refinanced Indebtedness immediately prior to such refinancing, refunding, extending, renewing or replacing are the only obligors on such refinancing, refunding extending, renewing or replacing Indebtedness and (e) such refinancing, refunding, extending, renewing or replacing Indebtedness contains covenants and events of default and is benefited by Guarantees, if any, which, taken as a whole, to be no less favorable to the Borrower or the applicable

16

BDCM Entity or Subsidiary and the Lenders in any material respect than the covenants and events of default or Guarantees, if any, in respect of such Refinanced Indebtedness.

"Permitted Restructuring Transaction" shall mean collectively, the transactions by which, immediately after giving effect thereto and to the Acquisition Transactions, the ownership and advisory structure of the BDCM Entities and the BDCM Funds, changes from the ownership and advisory structure set forth on Schedule 1.01(c) to the ownership and advisory structure set forth on Schedule 1.01(d).

"Person" shall mean any natural person, corporation, trust, business trust, joint venture, joint stock company, association, company, limited liability company, partnership, Governmental Authority or other entity.

"Pledge Agreement" shall mean the Pledge Agreement substantially in the form of Exhibit E among the holders of Equity Interests of the Borrower and the Collateral Agent for the benefit of the Secured Parties.

"Pledged Collateral" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement and the Pledge Agreement.

"Prime Rate" shall mean the rate of interest per annum determined from time to time by Credit Suisse as its prime rate in effect at its principal office in New York City and notified to the Borrower.

"Pro Rata Percentage" of any Revolving Credit Lender, at any time, shall mean the percentage of the Total Revolving Credit Commitment represented by such Lender's Revolving Credit Commitment. In the event the Revolving Credit Commitments shall have expired or been terminated, the Pro Rata Percentage of any Revolving Credit Lender shall be determined on the basis of the Revolving Credit Commitments most recently in effect, giving effect to any subsequent assignments.

"Prohibited Person" shall mean (i) the Borrower, the other BDCM Entities, the Subsidiaries, the BDCM Funds or any Affiliate of any of the foregoing and (ii) (A) James J. Zenni, Jr., (B) any Person with respect to which James J. Zenni, Jr. is an employee, officer or director, (C) any member of James J. Zenni, Jr.'s immediate family, (D) any Person Controlled, directly or indirectly, by, or organized for the benefit of, or managed by (1) James J. Zenni, Jr., (2) any Person with respect to which James J. Zenni, Jr. is an employee, officer or director or (3) any member of James J. Zenni, Jr.'s immediate family.

"Purchase Agreement" shall mean the Membership Interest Redemption Agreement dated as of September 5, 2006 among the Seller, James J. Zenni, Jr., SD Investments, LLC, a Connecticut limited liability company, Stephen H. Deckoff, Black Diamond Capital Management, L.L.C., and the additional parties listed on the signature page thereto.

"Real Property" shall mean all Mortgaged Property and all other real property owned or leased from time to time by the Borrower, the BDCM Entities and the Subsidiaries.

"Receiving Party" shall have the meaning assigned to such term in Section 9.16.

"Recovery Event" shall mean any settlement of or payment in respect of any property or casualty insurance claim or any taking under power of eminent domain or by condemnation or similar proceeding of or relating to any property or asset of the Borrower, any other BDCM Entity or any Subsidiary.

"Register" shall have the meaning assigned to such term in Section 9.04(d).

"Regulation T" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation U" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Fund" shall mean, with respect to any Lender that is a fund or commingled investment vehicle that invests in bank loans, any other fund that invests in bank loans and is advised or managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Related Parties" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" shall mean any release, spill, seepage, emission, leaking, pumping, injection, pouring, emptying, deposit, disposal, discharge, dispersal, dumping, escaping, leaching, or migration into, onto or through the environment or within or upon any building, structure, facility or fixture.

"Repayment Date" shall have the meaning given such term in Section 2.11(a).

"Required Lenders" shall mean, at any time, Lenders having Loans, L/C Exposure and unused Revolving Credit Commitments and Term Loan Commitments representing at least a majority of the sum of all Loans outstanding, L/C Exposure and unused Revolving Credit Commitments and Term Loan Commitments at such time; provided that the Revolving Loans, L/C Exposure and unused Revolving Credit Commitments of any Defaulting Lender shall be disregarded in the determination of the Required Lenders at any time.

"Required Prepayment Percentage" shall mean (a) in the case of any Asset Sale or Recovery Event, 100%; (b) in the case of any Equity Issuance, 100%; and (c) in the case of any issuance or other incurrence of Indebtedness, 100%.

"Requirement of Law" shall mean as to any Person, the governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Real Property or personal property or to which such Person or any of its property of any nature is subject.

"Restricted Indebtedness" shall mean Indebtedness of the Borrower, any other BDCM Entity or any Subsidiary, the payment, prepayment, repurchase or defeasance of which is restricted under Section 6.09(c).

"Restricted Payment" shall mean any dividend, redemption or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Borrower, any other BDCM Entity or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, defeasance, retirement, acquisition, cancellation or termination of any Equity Interests in the Borrower, any other BDCM Entity or any Subsidiary or any option, warrant or other right to acquire any such Equity Interests in the Borrower, any other BDCM Entity or any Subsidiary; provided, however, that any such dividend, redemption or other distribution made in connection with or for the purposes of making vested deferred compensation

18

payments or other payments in respect of vested rights to the officers or employees of any BDCM Entity that are not members of the Borrower shall be excluded from this definition if the Borrower would be in pro forma compliance with the covenants set forth in Sections 6.11, 6.12 and 6.13 after giving effect to such dividend or other distribution.

"Revolving Credit Borrowing" shall mean a Borrowing comprised of Revolving Loans.

"Revolving Credit Commitment" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make Revolving Loans (and to acquire participations in Letters of Credit) hereunder as set forth Schedule 2.01, or in the Assignment and Acceptance pursuant to which such Lender assumed its Revolving Credit Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.09 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 9.04.

"Revolving Credit Exposure" shall mean, with respect to any Lender at any time, the aggregate principal amount at such time of all outstanding Revolving Loans of such Lender, plus the aggregate amount at such time of such Lender's L/C Exposure.

"Revolving Credit Lender" shall mean a Lender with a Revolving Credit Commitment or an outstanding Revolving Loan.

"Revolving Credit Maturity Date" shall mean April 12, 2013.

"Revolving Loans" shall mean the revolving loans made by the Lenders to the Borrower pursuant to clause (b) of Section 2.01.

"S&P" shall mean Standard & Poor's Ratings Group, Inc., or any successor thereto.

"Secured Parties" shall have the meaning assigned to such term in the Guarantee and Collateral Agreement.

"Security Documents" shall mean the Guarantee and Collateral Agreement, the Pledge Agreement, the Mortgages, the Intellectual Property Security Agreements and each of the other security agreements, pledges, mortgages, consents and other instruments and documents executed and delivered pursuant to any of the foregoing or pursuant to Section 5.09 or 5.10.

"Seller" shall mean Zenni Holdings, LLC, a Delaware limited liability company.

"SPC" shall have the meaning assigned to such term in Section 9.04(i).

"Statutory Reserves" shall mean a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Board and any other banking authority, domestic or foreign, to which the Administrative Agent or any Lender (including any branch, Affiliate or other fronting office making or holding a Loan) is subject for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board). Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation. Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

19

030786-0283

"subsidiary" shall mean, with respect to any Person (herein referred to as the "parent"), any corporation, partnership, limited liability company, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" shall mean any subsidiary of the Borrower; provided that no BDCM Fund shall be deemed to be a Subsidiary.

"Subsidiary Guarantor" shall mean, initially, each Subsidiary specified on Schedule 1.01(b) and, at any time thereafter, shall include each other Subsidiary that is not an Excluded Foreign Subsidiary.

"Syndication Agent" shall mean Credit Suisse Securities (USA) LLC.

"Synthetic Lease Obligations" shall mean all monetary obligations of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease or (b) an agreement for the use or possession of any property (whether real, personal or mixed) creating obligations which do not appear on the balance sheet of such Person, but which, upon the insolvency or bankruptcy of such Person, would be characterized as Indebtedness of such Person (without regard to accounting treatment).

"Synthetic Purchase Agreement" shall mean any swap, derivative or other agreement or combination of agreements pursuant to which the Borrower, any other BDCM Entity or any Subsidiary is or may become obligated to make (a) any payment in connection with a purchase by any third party from a Person other than the Borrower, any other BDCM Entity or any Subsidiary of any Equity Interest or Restricted Indebtedness or (b) any payment (other than on account of a permitted purchase by it of any Equity Interest or Restricted Indebtedness) the amount of which is determined by reference to the price or value at any time of any Equity Interest or Restricted Indebtedness; provided that no phantom stock or similar plan providing for payments only to current or former directors, officers or employees of the Borrower, the other BDCM Entities or the Subsidiaries (or to their heirs or estates) shall be deemed to be a Synthetic Purchase Agreement.

"Tax Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Tax Restricted Payment" shall have the meaning assigned to such term in Section 6.06(a)(iv).

"Taxes" shall mean any and all present or future taxes, levies, imposts, duties, deductions, charges, liabilities or withholdings imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Borrowing" shall mean a Borrowing comprised of Term Loans.

"Term Lender" shall mean a Lender with a Term Loan Commitment or an outstanding Term Loan.

"Term Loan Commitment" shall mean, with respect to each Lender, the commitment, if any, of such Lender to make Term Loans hereunder as set forth on Schedule 2.01, or in the Assignment and Acceptance pursuant to which such Lender assumed its Term Loan Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.09 and (b) reduced or increased from

time to time pursuant to assignments by or to such Lender pursuant to Section 9.04.  The initial aggregate amount of the Term Loan Commitments is $40,000,000.

"Term Loan Maturity Date" shall mean April 12, 2013.

"Term Loans" shall mean the term loans made by the Lenders to the Borrower pursuant to Section 2.01(a).

"Test Period" shall mean each period of four consecutive fiscal quarters, taken as one accounting period; provided that in the case of the Test Period for the four fiscal quarters ending March 31, 2007, Consolidated EBITDA for such Test Period shall be equal to the sum of (i) Consolidated EBITDA for the fiscal quarter ending March 31, 2007, plus (ii) 75% of Consolidated EBITDA for the four fiscal quarters ending December 31, 2006.

"Total Debt" shall mean, at any time, the aggregate amount of Indebtedness of the Borrower, the other BDCM Entities and the Subsidiaries outstanding at such time other than Indebtedness permitted pursuant to Section 6.01(l).

"Total Receivables" shall mean, at any time, the aggregate amount of receivables of the Borrower, the other BDCM Entities and the Subsidiaries outstanding at such time.

"Total Revolving Credit Commitment" shall mean, at any time, the aggregate amount of the Revolving Credit Commitments, as in effect at such time. The initial Total Revolving Credit Commitment is $35,000,000.

"Transactions" shall mean, collectively, (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party, (b) the borrowings hereunder and the issuance of Letters of Credit and the use of proceeds of each of the foregoing, (c) the granting of Liens pursuant to the Security Documents, (d) the Acquisition and the other Acquisition Transactions and (e) any other transactions related to or entered into in connection with any of the foregoing.

"Type", when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined.  For purposes hereof, the term "Rate" shall include the Adjusted LIBO Rate and the Alternate Base Rate.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the relevant jurisdiction.

"Uniform Customs" shall have the meaning assigned to such term in Section 9.07.

"USA PATRIOT Act" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"wholly owned subsidiary" of any Person shall mean a subsidiary of such Person of which securities (except for directors' qualifying shares) or other ownership interests representing 100% of the Equity Interests are, at the time any determination is being made, owned, Controlled or held by such Person or one or more wholly owned subsidiaries of such Person or by such Person and one or more wholly owned subsidiaries of such Person.

21

"Wholly Owned Subsidiary" shall mean any wholly owned subsidiary of the Borrower other than any BDCM Fund.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

SECTION 1.02.  Terms Generally.  The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including", and words of similar import, shall not be limiting and shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  The words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all rights and interests in tangible and intangible assets and properties of any kind whatsoever, whether real, personal or mixed, including cash, securities, Equity Interests, accounts and contract rights.  The words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision of this Agreement unless the context shall otherwise require.  All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  Except as otherwise expressly provided herein, (a) any definition of, or reference to, any Loan Document or any other agreement, instrument or document in this Agreement shall mean such Loan Document or other agreement, instrument or document as amended, restated, supplemented or otherwise modified from time to time (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein) and (b) all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided, however, that if the Borrower notifies the Administrative Agent that the Borrower wishes to amend any covenant in Article VI or any related definition to eliminate the effect of any change in GAAP occurring after the date of this Agreement on the operation of such covenant (or if the Administrative Agent notifies the Borrower that the Required Lenders wish to amend Article VI or any related definition for such purpose), then the Borrower's compliance with such covenant shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective, until either such notice is withdrawn or such covenant is amended in a manner satisfactory to the Borrower and the Required Lenders.

SECTION 1.03.  Classification of Loans and Borrowings.  For purposes of this Agreement, Loans may be classified and referred to by Class (e.g., a "Revolving Loan") or by Type (e.g., a "Eurodollar Loan") or by Class and Type (e.g., a "Eurodollar Revolving Loan").  Borrowings also may be classified and referred to by Class (e.g., a "Revolving Borrowing") or by Type (e.g., a "Eurodollar Borrowing") or by Class and Type (e.g., a "Eurodollar Revolving Borrowing").

SECTION 1.04.  Pro Forma Calculations.  All pro forma calculations permitted or required to be made by the Borrower, any other BDCM Entity or any Subsidiary pursuant to this Agreement shall include only those adjustments that would be permitted or required by Regulation S-X under the Securities Act of 1933, as amended, together with those adjustments that (a) have been certified by a Financial Officer of the Borrower as having been prepared in good faith based upon reasonable assumptions and (b) are based on reasonably detailed written assumptions reasonably acceptable to the Administrative Agent.

030786-0283

## ARTICLE II.

### The Credits

SECTION 2.01. <u>Commitments</u>. Subject to the terms and conditions hereof and relying upon the representations and warranties set forth herein, (a) each Term Lender agrees, severally and not jointly, to make a Term Loan to the Borrower on the Closing Date in a principal amount not to exceed its Term Loan Commitment and (b) each Revolving Credit Lender agrees, severally and not jointly, to make Revolving Loans to the Borrower, at any time and from time to time on or after the Closing Date and until the earlier of the Revolving Credit Maturity Date and the termination of the Revolving Credit Commitment of such Revolving Credit Lender in accordance with the terms hereof, in an aggregate principal amount at any time outstanding that will not result in such Revolving Credit Lender's Revolving Credit Exposure exceeding such Revolving Credit Lender's Revolving Credit Commitment. Within the limits set forth in clause (b) of the preceding sentence and subject to the terms, conditions and limitations set forth herein, the Borrower may borrow, pay or prepay and reborrow Revolving Loans. Amounts paid or prepaid in respect of Term Loans may not be reborrowed.

SECTION 2.02. <u>Loans</u>. (a) Each Loan shall be made as part of a Borrowing consisting of Loans of the same Class and Type made by the Lenders ratably in accordance with their respective Commitments of the applicable Class; <u>provided</u>, <u>however</u>, that the failure of any Lender to make any Loan required to be made by it shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender). Except for Loans deemed made pursuant to Section 2.02(f), the Loans comprising any Borrowing shall be in an aggregate principal amount that is (i) an integral multiple of $1,000,000 and not less than $1,000,000 or (ii) equal to the remaining available balance of the applicable Commitments.

(b) Subject to Sections 2.08 and 2.15, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrower may request pursuant to Section 2.03; <u>provided</u> that no Borrowings may be made, converted into or continued as a Eurodollar Borrowing having an Interest Period in excess of one month prior to the date which is 60 days after the Closing Date. Each Lender may at its option make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; <u>provided</u> that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement. Borrowings of more than one Type may be outstanding at the same time; <u>provided</u>, <u>however</u>, that the Borrower shall not be entitled to request any Borrowing that, if made, would result in more than ten Eurodollar Borrowings outstanding hereunder at any time. For purposes of the foregoing, Borrowings having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Borrowings.

(c) Except with respect to Loans made pursuant to Section 2.02(f), each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate not later than 12:00 Noon, New York City time, and the Administrative Agent shall promptly credit the amounts so received to an account in the name of the Borrower, maintained with the Administrative Agent and designated by the Borrower in the applicable Borrowing Request or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders.

(d) Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made

030786-0283

such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (c) of this Section and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower to but excluding the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing or (ii) in the case of such Lender, a rate determined by the Administrative Agent to represent its cost of overnight or short-term funds (which determination shall be conclusive absent manifest error). If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement.

(e)    Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request any Revolving Credit Borrowing if the Interest Period requested with respect thereto would end after the Revolving Credit Maturity Date.

(f)    If the Issuing Bank shall not have received from the Borrower the payment required to be made by Section 2.22(e) with respect to a Letter of Credit within the time specified in such Section, the Issuing Bank will promptly notify the Administrative Agent of the L/C Disbursement and the Administrative Agent will promptly notify each Revolving Credit Lender of such L/C Disbursement and its Pro Rata Percentage thereof. Each Revolving Credit Lender shall pay by wire transfer of immediately available funds to the Administrative Agent not later than 2:00 p.m. Noon, New York City time, on such date (or, if such Revolving Credit Lender shall have received such notice later than 12:00 (noon), New York City time, on any day, not later than 10:00 a.m., New York City time, on the immediately following Business Day), an amount equal to such Lender's Pro Rata Percentage of such L/C Disbursement (it being understood that such amount shall be deemed to constitute an ABR Revolving Loan of such Lender and such payment shall be deemed to have reduced the L/C Exposure), and the Administrative Agent will promptly pay to the Issuing Bank amounts so received by it from the Revolving Credit Lenders. The Administrative Agent will promptly pay to the Issuing Bank any amounts received by it from the Borrower pursuant to Section 2.22(e) prior to the time that any Revolving Credit Lender makes any payment pursuant to this paragraph; any such amounts received by the Administrative Agent thereafter will be promptly remitted by the Administrative Agent to the Revolving Credit Lenders that shall have made such payments and to the Issuing Bank, as their interests may appear. If any Revolving Credit Lender shall not have made its Pro Rata Percentage of such L/C Disbursement available to the Administrative Agent as provided above, such Lender agrees to pay interest on such amount, for each day from and including the date such amount is required to be paid in accordance with this paragraph to but excluding the date such amount is paid, to the Administrative Agent for the account of the Issuing Bank at, for the first such day, the Federal Funds Effective Rate, and for each day thereafter, the Alternate Base Rate.

SECTION 2.03.  Borrowing Procedure.  In order to request a Borrowing (other than a deemed Borrowing pursuant to Section 2.02(f), as to which this Section 2.03 shall not apply), the Borrower shall hand deliver or fax to the Administrative Agent a duly completed Borrowing Request or notify the Administrative Agent of such request by telephone (to be confirmed promptly by hand delivery or fax of a duly completed Borrowing Request) (a) in the case of a Eurodollar Borrowing, not later than 2:00 p.m., New York City time, three Business Days before a proposed Borrowing and (b) in the case of an ABR Borrowing, not later than 2:00 p.m. New York City time, one Business Day before a proposed Borrowing. Each such telephonic and written Borrowing Request shall be irrevocable, shall be signed by or on behalf of the Borrower (in the case of written Borrowing Requests) and shall specify the following information:

030786-0283

(i) whether the Borrowing then being requested is to be a Term Borrowing or a Revolving Credit Borrowing, and whether such Borrowing is to be a Eurodollar Borrowing or an ABR Borrowing; (ii) the date of such Borrowing (which shall be a Business Day); (iii) the number and location of the account to which funds are to be disbursed (which shall be an account that complies with the requirements of Section 2.02(c)); (iv) the amount of such Borrowing; and (v) if such Borrowing is to be a Eurodollar Borrowing, the initial Interest Period with respect thereto; provided, however, that, notwithstanding any contrary specification in any Borrowing Request, each requested Borrowing shall comply with the requirements set forth in Section 2.02. If no election as to the Type of Borrowing is specified in any such notice, then the requested Borrowing shall be an ABR Borrowing. If no Interest Period with respect to any Eurodollar Borrowing is specified in any such notice, then the Borrower shall be deemed to have selected an Interest Period of one month's duration. The Administrative Agent shall promptly advise the applicable Lenders of any notice given in accordance with this Section 2.03 (and the contents thereof), and of each Lender's portion of the requested Borrowing.

SECTION 2.04. Repayment of Loans; Evidence of Debt. (a) The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender (i) the principal amount of each Term Loan of such Lender as provided in Section 2.11 and (ii) the then unpaid principal amount of each Revolving Loan of such Lender on the Revolving Credit Maturity Date.

(b) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender to the Borrower from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c) The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of the sum received by the Administrative Agent hereunder from the Borrower or any Guarantor and each Lender's share thereof.

(d) The entries made in the accounts maintained pursuant to paragraphs (b) and (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations therein recorded; provided, however, that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans made to the Borrower in accordance with the terms of this Agreement.

(e) Any Lender may request that Loans made by it hereunder be evidenced by a promissory note. In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to such Lender and its registered assigns and in substantially the form set forth in Exhibits H-1 and H-2, as applicable. Notwithstanding any other provision of this Agreement, in the event any Lender shall request and receive such a promissory note, the interests represented by such note shall at all times (including after any assignment of all or part of such interests pursuant to Section 9.04) be represented by one or more promissory notes payable to the payee named therein or its registered assigns.

SECTION 2.05. Fees. (a) The Borrower agrees to pay to each Lender, through the Administrative Agent, on the last Business Day of March, June, September and December in each year and on each date on which any Commitment of such Lender shall expire or be terminated as provided herein, a commitment fee (a "Commitment Fee") equal to the Commitment Fee Rate on the average daily unused amount of the Commitments of such Lender during the preceding quarter (or other period commencing with the date hereof or ending with the Revolving Credit Maturity Date or the date on which the Commitments of such Lender shall expire or be terminated). All Commitment Fees shall be

25

NY\1171256.14

computed by the Administrative Agent on the basis of the actual number of days elapsed in a year of 360 days. The Commitment Fee due to each Lender shall commence to accrue on the date hereof and shall cease to accrue on the date on which the Commitment of such Lender shall expire or be terminated as provided herein.

(b)    The Borrower agrees to pay to the Administrative Agent, for its own account, the fees in the amounts and at the times from time to time agreed to in writing by the Borrower and the Administrative Agent, including pursuant to the Fee Letter (the "Administrative Agent Fees").

(c)    The Borrower agrees to pay (i) to each Revolving Credit Lender, through the Administrative Agent, on the last Business Day of March, June, September and December of each year and on the date on which the Revolving Credit Commitment of such Lender shall be terminated as provided herein (each, an "L/C Fee Payment Date") a fee (an "L/C Participation Fee") calculated on such Lender's Pro Rata Percentage of the daily aggregate L/C Exposure (excluding the portion thereof attributable to unreimbursed L/C Disbursements which are earning interim interest pursuant to Section 2.22(h)) during the preceding quarter (or shorter period commencing with the date hereof or ending with the Revolving Credit Maturity Date or the date on which all Letters of Credit have been canceled or have expired and the Revolving Credit Commitments of all Lenders shall have been terminated) at a rate per annum equal to the Applicable Margin used to determine the interest rate on Revolving Credit Borrowings comprised of Eurodollar Loans pursuant to Section 2.06, and (ii) to the Issuing Bank with respect to each outstanding Letter of Credit issued for the account of (or at the request of) the Borrower a fronting fee, which shall accrue at the rate of ¼ of 1% per annum or such other rate as shall be separately agreed upon between the Borrower and the Issuing Bank, on the drawable amount of such Letter of Credit, payable quarterly in arrears on each L/C Fee Payment Date after the issuance date of such Letter of Credit, as well as the Issuing Bank's standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit issued for the account of (or at the request of) the Borrower or processing of drawings thereunder (the fees in this clause (ii), collectively, the "Issuing Bank Fees"). All L/C Participation Fees and Issuing Bank Fees shall be computed on the basis of the actual number of days elapsed in a year of 360 days.

(d)    All Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, if and as appropriate, among the Lenders, except that the Issuing Bank Fees shall be paid directly to the Issuing Bank. Once paid, none of the Fees shall be refundable under any circumstances.

SECTION 2.06.  Interest on Loans.  (a) Subject to the provisions of Section 2.07, the Loans comprising each ABR Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be, when the Alternate Base Rate is determined by reference to the Prime Rate and over a year of 360 days at all other times) at a rate per annum equal to the Alternate Base Rate plus the Applicable Margin in effect from time to time.

(b)    Subject to the provisions of Section 2.07, the Loans comprising each Eurodollar Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin in effect from time to time.

(c)    Interest on each Loan shall be payable on the Interest Payment Dates applicable to such Loan except as otherwise provided in this Agreement. The applicable Alternate Base Rate or Adjusted LIBO Rate for each Interest Period or day within an Interest Period, as the case may be, shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

26

NY\1171256.14

SECTION 2.07.  Default Interest.  If the Borrower shall default in the payment of the principal of or interest on any Loan or any other amount becoming due hereunder or under any other Loan Document, by acceleration or otherwise, the Borrower shall on demand from time to time pay interest, to the extent permitted by law, on such defaulted amount to but excluding the date of actual payment (after as well as before judgment) (a) in the case of overdue principal, at the rate otherwise applicable to such Loan pursuant to Section 2.06 plus 2.00% per annum and (b) in all other cases, at a rate per annum (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be, when determined by reference to the Prime Rate and over a year of 360 days at all other times) equal to the rate that would be applicable to an ABR Revolving Loan plus 2.00%.

SECTION 2.08.  Alternate Rate of Interest.  In the event, and on each occasion, that prior to the commencement of any Interest Period for a Eurodollar Borrowing (a) the Administrative Agent shall have determined that adequate and reasonable means do not exist for determining the Adjusted LIBO Rate for such Interest Period or (b) the Administrative Agent is advised by the Majority Facility Lenders in respect of the relevant Facility that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period, the Administrative Agent shall, as soon as practicable thereafter, give written or fax notice of such determination to the Borrower and the Lenders.  In the event of any such determination, until the Administrative Agent shall have advised the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any request by the Borrower for a Eurodollar Borrowing pursuant to Section 2.03 or 2.10 shall be deemed to be a request for an ABR Borrowing and (ii) any Interest Period election that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective.  Each determination by the Administrative Agent under this Section 2.08 shall be conclusive absent manifest error.

SECTION 2.09.  Termination and Reduction of Commitments.  (a)  Unless previously terminated in accordance with the terms hereof, (i) the Term Loan Commitments shall automatically terminate at 5:00 p.m., New York City time, on the Closing Date and (ii) the Revolving Credit Commitments and the L/C Commitment shall automatically terminate on the Revolving Credit Maturity Date.

(b)    Upon at least three Business Days' prior irrevocable written or fax notice to the Administrative Agent, the Borrower may at any time in whole permanently terminate, or from time to time in part permanently reduce, in each case without premium or penalty, the Term Loan Commitments or the Revolving Credit Commitments; provided, however, that (i) each partial reduction of the Term Loan Commitments or the Revolving Credit Commitments shall be in an integral multiple of $1,000,000 and in a minimum amount of $1,000,000 and (ii) the Total Revolving Credit Commitment shall not be reduced to an amount that is less than the Aggregate Revolving Credit Exposure then in effect.

(c)    Each reduction in the Term Loan Commitments or Revolving Credit Commitments hereunder shall be made ratably among the applicable Lenders in accordance with their Pro Rata Percentages.  The Borrower shall pay to the Administrative Agent for the account of the applicable Lenders, on the date of each termination or reduction, the Commitment Fees on the amount of the Commitments so terminated or reduced accrued to but excluding the date of such termination or reduction.

SECTION 2.10.  Conversion and Continuation of Borrowings.  The Borrower shall have the right at any time upon prior irrevocable written or telephonic (to be confirmed in writing promptly by hand delivery or fax) notice to the Administrative Agent (a) not later than 2:00 p.m., New York City time, one Business Day prior to conversion, to convert any Eurodollar Borrowing of the Borrower into an ABR Borrowing, (b) not later than 2:00 p.m., New York City time, three Business Days prior to conversion or

27

030786-0283

continuation, to convert any ABR Borrowing of the Borrower into a Eurodollar Borrowing or to continue any Eurodollar Borrowing of the Borrower as a Eurodollar Borrowing for an additional Interest Period and (c) not later than 2:00 p.m., New York City time, three Business Days prior to conversion, to convert the Interest Period with respect to any Eurodollar Borrowing of the Borrower to another permissible Interest Period, subject in each case to the following:

(i)    each conversion or continuation shall be made pro rata among the Lenders in accordance with the respective principal amounts of the Loans comprising the converted or continued Borrowing;

(ii)    if less than all the outstanding principal amount of any Borrowing shall be converted or continued, then each resulting Borrowing shall satisfy the limitations specified in Sections 2.02(a) and 2.02(b) regarding the principal amount and maximum number of Borrowings of the relevant Type;

(iii)    each conversion shall be effected by each Lender and the Administrative Agent by recording for the account of such Lender the new Loan of such Lender resulting from such conversion and reducing the Loan (or portion thereof) of such Lender being converted by an equivalent principal amount; accrued interest on any Eurodollar Loan (or portion thereof) being converted shall be paid by the Borrower at the time of conversion;

(iv)    if any Eurodollar Borrowing is converted at a time other than the end of the Interest Period applicable thereto, the Borrower shall pay, upon demand, any amounts due to the Lenders pursuant to Section 2.16;

(v)    any portion of a Borrowing maturing or required to be repaid in less than one month may not be converted into or continued as a Eurodollar Borrowing;

(vi)    any portion of a Eurodollar Borrowing that cannot be converted into or continued as a Eurodollar Borrowing by reason of the immediately preceding clause shall be automatically converted at the end of the Interest Period in effect for such Borrowing into an ABR Borrowing;

(vii)    no Interest Period may be selected for any Eurodollar Term Borrowing that would end later than a Repayment Date occurring on or after the first day of such Interest Period if, after giving effect to such selection, the aggregate outstanding amount of (A) the Eurodollar Term Borrowings with Interest Periods ending on or prior to such Repayment Date and (B) the ABR Term Borrowings would not be at least equal to the principal amount of Term Borrowings to be paid on such Repayment Date; and

(viii)    after the occurrence and during the continuance of a Default or Event of Default, no outstanding Loan may be converted into, or continued as, a Eurodollar Loan.

Each notice pursuant to this Section 2.10 shall be irrevocable and shall refer to this Agreement and specify (i) the identity and amount of the Borrowing that the Borrower requests be converted or continued, (ii) whether such Borrowing is to be converted to or continued as a Eurodollar Borrowing or an ABR Borrowing, (iii) if such notice requests a conversion, the date of such conversion (which shall be a Business Day) and (iv) if such Borrowing is to be converted to or continued as a Eurodollar Borrowing, the Interest Period with respect thereto. If no Interest Period is specified in any such notice with respect to any conversion to or continuation as a Eurodollar Borrowing, the Borrower shall be deemed to have selected an Interest Period of one month's duration. The Administrative Agent shall advise the Lenders of any notice given pursuant to this Section 2.10 and of each Lender's portion of any converted or

NY\1171256.14

continued Borrowing. If the Borrower shall not have given notice in accordance with this Section 2.10 to continue any Borrowing into a subsequent Interest Period (and shall not otherwise have given notice in accordance with this Section 2.10 to convert such Borrowing), such Borrowing shall, at the end of the Interest Period applicable thereto (unless repaid pursuant to the terms hereof), automatically be converted or continued into an ABR Borrowing.

SECTION 2.11. <u>Repayment of Term Borrowings</u>. (a) On the dates set forth below, or if any such date is not a Business Day, on the next preceding Business Day (each such date being called a "<u>Repayment Date</u>"), the Borrower shall pay to the Administrative Agent, for the account of the Term Lenders, a principal amount of the Term Loans (as adjusted from time to time pursuant to Sections 2.11(b), 2.12 and 2.13(f)) equal to the amount set forth below for such date, together in each case with accrued and unpaid interest and Fees on the amount to be paid to but excluding the date of such payment:

| Repayment Date | Amount |
| --- | --- |
| December 31, 2006 | $100,000 |
| March 31, 2007 | $100,000 |
| June 30, 2007 | $100,000 |
| September 30, 2007 | $100,000 |
| December 31, 2007 | $100,000 |
| March 31, 2008 | $100,000 |
| June 30, 2008 | $100,000 |
| September 30, 2008 | $100,000 |
| December 31, 2008 | $100,000 |
| March 31, 2009 | $100,000 |
| June 30, 2009 | $100,000 |
| September 30, 2009 | $100,000 |
| December 31, 2009 | $100,000 |
| March 31, 2010 | $100,000 |
| June 30, 2010 | $100,000 |
| September 30, 2010 | $100,000 |
| December 31, 2010 | $100,000 |
| March 31, 2011 | $100,000 |
| June 30, 2011 | $100,000 |
| September 30, 2011 | $100,000 |
| December 31, 2011 | $100,000 |
| March 31, 2012 | $100,000 |
| June 30, 2012 | $100,000 |
| September 30, 2012 | $100,000 |
| December 31, 2012 | $100,000 |
| Term Loan Maturity Date | Remainder |

(b)    In the event and on each occasion that any Term Loan Commitments shall be reduced or shall expire or terminate other than as a result of the making of a Term Loan, the installments payable on each Repayment Date shall be reduced pro rata by an aggregate amount equal to the amount of such reduction, expiration or termination.

(c)    To the extent not previously paid, all Term Loans shall be due and payable on the Term Loan Maturity Date, together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment.

29

030786-0283

(d)    All repayments pursuant to this Section 2.11 shall be subject to Section 2.16, but shall otherwise be without premium or penalty, and shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.12.  Prepayment.  (a)  The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, upon at least three Business Days' prior written or fax notice (or telephone notice promptly confirmed by written or fax notice) in the case of Eurodollar Loans, or written or fax notice (or telephone notice promptly confirmed by written or fax notice) at least one Business Day prior to the date of prepayment in the case of ABR Loans, to the Administrative Agent before 12:00 Noon, New York City time; provided, however, that each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 and not less than $1,000,000.

(b)    Optional prepayments of Term Loans shall be applied, first, pro rata to the scheduled installments of principal due in respect of the Term Loans in accordance with Section 2.11 within twelve months of such prepayment and, second, pro rata against the remaining scheduled installments of principal due in respect of the Term Loans.  In applying prepayments of Term Loans in accordance with the preceding sentence, all such prepayments shall be applied first to ABR Term Loans to the full extent thereof before application to Eurodollar Term Loans, in each case in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 2.16.

(c)    Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable (except if expressly conditioned on a refinancing of such Borrowing) and shall commit the Borrower to prepay such Borrowing by the amount stated therein on the date stated therein.  All prepayments under this Section 2.12 shall be subject to Section 2.16, but otherwise without premium or penalty.  All prepayments under this Section 2.12 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.13.  Mandatory Prepayments.   (a)  In the event of any termination of all the Revolving Credit Commitments, the Borrower shall, on the date of such termination, repay or prepay all its outstanding Revolving Credit Borrowings and replace all its outstanding Letters of Credit and/or deposit an amount in cash in a cash collateral account established with the Collateral Agent for the benefit of the Secured Parties to cash collateralize outstanding Letters of Credit (up to an aggregate amount equal to 105% of the L/C Exposure on such date). If, as a result of any partial reduction of the Revolving Credit Commitments, the Aggregate Revolving Credit Exposure would exceed the Total Revolving Credit Commitment after giving effect thereto, then the Borrower shall, on the date of such reduction, repay or prepay Revolving Credit Borrowings and/or cash collateralize Letters of Credit (up to an aggregate amount equal to 105% of the L/C Exposure on such date) in an amount sufficient to eliminate such excess.

(b)    Not later than the third Business Day following the completion of any Asset Sale or the occurrence of any Recovery Event, the Borrower shall apply the Required Prepayment Percentage of the Net Cash Proceeds received with respect thereto to prepay outstanding Loans in accordance with Section 2.13(f).

(c)    In the event and on each occasion that an Equity Issuance occurs, the Borrower shall, substantially simultaneously with (and in any event not later than the third Business Day next following) the occurrence of such Equity Issuance, apply the Required Prepayment Percentage of the Net Cash Proceeds therefrom to prepay outstanding Loans in accordance with Section 2.13(f); provided, however that no such prepayment shall be required with respect to any such Net Cash Proceeds that, within 6

30

months of the receipt thereof, any BDCM Entity invests or commits to invest within the following 6 months in new or existing business lines or funds.

(d)    In the event that any Loan Party or any subsidiary of a Loan Party shall receive Net Cash Proceeds from the issuance or other incurrence of Indebtedness of any Loan Party or any subsidiary of a Loan Party (other than Indebtedness permitted pursuant to Section 6.01), the Borrower shall, substantially simultaneously with (and in any event not later than the third Business Day next following) the receipt of such Net Cash Proceeds by such Loan Party or such subsidiary, apply an amount equal to the Required Prepayment Percentage of such Net Cash Proceeds to prepay outstanding Loans in accordance with Section 2.13(f).

(e)    No later than the earlier of (i) 120 days after the end of each fiscal year of the Borrower, commencing with the fiscal year ending on December 31, 2007, and (ii) the date on which the financial statements with respect to such period are delivered pursuant to Section 5.04(a), the Borrower shall prepay outstanding Loans in accordance with Section 2.13(f), in an aggregate principal amount equal to the Excess Cash Flow Prepayment Amount for the fiscal year then ended.

(f)    Mandatory prepayments under this Agreement shall be applied (i) first, to Term Loans in accordance with this Section 2.13(f), (ii) second, if no Term Loans are outstanding, to prepay outstanding Revolving Loans to the full extent thereof, without a corresponding permanent reduction of the Revolving Credit Commitments in the amount of such prepayment, (iii) third, if no Term Loans or Revolving Loans are outstanding, to cash collateralize any outstanding Letters of Credit (up to an aggregate amount equal to 105% of the L/C Exposure at such time) and (iv) fourth, any remaining amounts after the application of mandatory prepayments in accordance with clauses (i), (ii) and (iii) of this sentence may be retained by the Borrower to be used for any other purpose not prohibited by this Agreement. Mandatory prepayments of outstanding Term Loans under this Agreement shall be applied in chronological order to the scheduled installments of principal in respect of the Term Loans under Section 2.11. In applying mandatory prepayments of Term Loans in accordance with the preceding sentence, such mandatory prepayments shall be applied first to Term Loans that are ABR Term Loans to the full extent thereof before application to Term Loans that are Eurodollar Term Loans in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 2.16.

(g)    The Borrower shall deliver to the Administrative Agent, at the time of each prepayment required under this Section 2.13, (i) a certificate signed by a Financial Officer of the Borrower setting forth in reasonable detail the calculation of the amount of such prepayment and (ii) to the extent practicable, at least three days prior written notice of such prepayment. Each notice of prepayment shall specify the prepayment date, the Type of each Loan being prepaid and the principal amount of each Loan (or portion thereof) to be prepaid. All prepayments of Borrowings pursuant to this Section 2.13 shall be subject to Section 2.16, but shall otherwise be without premium or penalty, and shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

SECTION 2.14.    Reserve Requirements; Change in Circumstances.    (a) Notwithstanding any other provision of this Agreement, if any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender, the Administrative Agent or the Issuing Bank (except any such reserve requirement which is reflected in the Adjusted LIBO Rate) or

31

030786-0283

(ii)     impose on any Lender, the Administrative Agent or the Issuing Bank or the London interbank market any other condition affecting this Agreement or Eurodollar Loans made by such Lender or any Letter of Credit or participation therein,

and the result of any of the foregoing shall be to increase the cost to such Lender or the Issuing Bank of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to any Lender, the Administrative Agent or the Issuing Bank of issuing or maintaining any Letter of Credit or purchasing or maintaining a participation therein or to reduce the amount of any sum received or receivable by such Lender or the Issuing Bank hereunder (whether of principal, interest or otherwise) by an amount deemed by such Lender, the Administrative Agent or the Issuing Bank to be material, then the Borrower will pay to such Lender, the Administrative Agent or the Issuing Bank, as the case may be, upon demand such additional amount or amounts as will compensate such Lender or the Issuing Bank, as the case may be, for such additional costs incurred or reduction suffered.

(b)     If any Lender, the Administrative Agent or the Issuing Bank shall have determined that any Change in Law regarding capital adequacy has or would have the effect of reducing the rate of return on such Lender's, the Administrative Agent's or the Issuing Bank's capital or on the capital of such Lender's, the Administrative Agent's or the Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit purchased by, such Lender or the Letters of Credit issued by the Issuing Bank to a level below that which such Lender, the Administrative Agent or the Issuing Bank or such Lender's, the Administrative Agent's or the Issuing Bank's holding company could have achieved but for such Change in Law (taking into consideration such Lender's, the Administrative Agent's or the Issuing Bank's policies and the policies of such Lender's, the Administrative Agent's or the Issuing Bank's holding company with respect to capital adequacy) by an amount deemed by such Lender, the Administrative Agent or the Issuing Bank to be material, then from time to time the Borrower shall pay to such Lender, the Administrative Agent or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender, the Administrative Agent or the Issuing Bank or such Lender's, the Administrative Agent's or the Issuing Bank's holding company for any such reduction suffered.

(c)     A certificate of a Lender, the Administrative Agent or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender, the Administrative Agent or the Issuing Bank or its holding company, as applicable, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender, the Administrative Agent or the Issuing Bank, as the case may be, the amount or amounts shown as due on any such certificate delivered by it within 10 days after its receipt of the same.

(d)     Failure or delay on the part of any Lender, the Administrative Agent or the Issuing Bank to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's, the Administrative Agent's or the Issuing Bank's right to demand such compensation; provided that the Borrower shall not be under any obligation to compensate any Lender, the Administrative Agent or the Issuing Bank under paragraph (a) or (b) above for increased costs or reductions with respect to any period prior to the date that is 180 days prior to such request if such Lender, the Administrative Agent or the Issuing Bank knew or could reasonably have been expected to know of the circumstances giving rise to such increased costs or reductions and of the fact that such circumstances would result in a claim for increased compensation by reason of such increased costs or reductions; provided further that the foregoing limitation shall not apply to any increased costs or reductions arising out of the retroactive application of any Change in Law within such 180-day period.  The protection of this Section shall be available to each Lender, the Administrative Agent and the Issuing Bank regardless of any possible contention of the invalidity or inapplicability of the Change in Law that shall have occurred or been imposed.

32

SECTION 2.15. Change in Legality.    (a) Notwithstanding any other provision of this Agreement, if any Change in Law shall make it unlawful for any Lender to make or maintain any Eurodollar Loan or to give effect to its obligations as contemplated hereby with respect to any Eurodollar Loan, then, by written notice to the Borrower and to the Administrative Agent:

(i)    such Lender may declare that Eurodollar Loans will not thereafter (for the duration of such unlawfulness) be made by such Lender hereunder (or be continued for additional Interest Periods and ABR Loans will not thereafter (for such duration) be converted into Eurodollar Loans), whereupon any request for a Eurodollar Borrowing (or to convert an ABR Borrowing to a Eurodollar Borrowing or to continue a Eurodollar Borrowing for an additional Interest Period) shall, as to such Lender only, be deemed a request for an ABR Loan (or a request to continue an ABR Loan as such for an additional Interest Period or to convert a Eurodollar Loan into an ABR Loan, as the case may be), unless such declaration shall be subsequently withdrawn; and

(ii)    such Lender may require that all outstanding Eurodollar Loans made by it be converted to ABR Loans, in which event all such Eurodollar Loans shall be automatically converted to ABR Loans as of the effective date of such notice as provided in paragraph (b) below.

In the event any Lender shall exercise its rights under (i) or (ii) above, all payments and prepayments of principal that would otherwise have been applied to repay the Eurodollar Loans that would have been made by such Lender or the converted Eurodollar Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such Eurodollar Loans. Any such conversion of a Eurodollar Loan under (ii) above shall be subject to Section 2.16.

(b)    For purposes of this Section 2.15, a notice to the Borrower by any Lender shall be effective as to each Eurodollar Loan made by such Lender, if lawful, on the last day of the Interest Period then applicable to such Eurodollar Loan; in all other cases such notice shall be effective on the date of receipt by the Borrower.

SECTION 2.16. Indemnity.    The Borrower shall indemnify each Lender against any loss or expense that such Lender may sustain or incur as a consequence of (a) any event, other than a default by such Lender in the performance of its obligations hereunder, which results in (i) such Lender receiving or being deemed to receive any amount on account of the principal of any Eurodollar Loan prior to the end of the Interest Period in effect therefor, (ii) the conversion of any Eurodollar Loan to an ABR Loan, or the conversion of the Interest Period with respect to any Eurodollar Loan, in each case other than on the last day of the Interest Period in effect therefor or (iii) any Eurodollar Loan to be made by such Lender (including any Eurodollar Loan to be made pursuant to a conversion or continuation under Section 2.10) not being made after notice of such Loan shall have been given by the Borrower hereunder (any of the events referred to in this clause (a) being called a "Breakage Event") or (b) any default in the making of any payment or prepayment required to be made hereunder. In the case of any Breakage Event, such loss shall include an amount equal to the excess, as reasonably determined by such Lender, of (i) its cost of obtaining funds for the Eurodollar Loan that is the subject of such Breakage Event for the period from the date of such Breakage Event to the last day of the Interest Period in effect (or that would have been in effect) for such Loan over (ii) the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such Breakage Event for such period. A certificate of any Lender setting forth any amount or amounts which such Lender is entitled to receive pursuant to this Section 2.16 shall be delivered to the Borrower and shall be conclusive absent manifest error.

33

SECTION 2.17.  Pro Rata Treatment.  Except as required under Section 2.15, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest on the Loans, each payment of the Commitment Fees, each reduction of the Term Loan Commitments or the Revolving Credit Commitments and each conversion of any Borrowing to or continuation of any Borrowing as a Borrowing of any Type shall be allocated pro rata among the Lenders in accordance with their respective applicable Commitments (or, if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans).  Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole dollar amount.

SECTION 2.18.  Sharing of Setoffs.  Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrower or any other Loan Party, or pursuant to a secured claim under Section 506 of Title 11 of the United States Code or under any other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable bankruptcy, insolvency or other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of any Loan or Loans or L/C Disbursement as a result of which the unpaid principal portion of its Loans and participations in L/C Disbursements shall be proportionately less than the unpaid principal portion of the Loans and participations in L/C Disbursements of any other Lender, it shall be deemed simultaneously to have purchased from such other Lender at face value, and shall promptly pay to such other Lender the purchase price for, a participation in the Loans and L/C Exposure of such other Lender, so that the aggregate unpaid principal amount of the Loans and L/C Exposure and participations in Loans and L/C Exposure held by each Lender shall be in the same proportion to the aggregate unpaid principal amount of all Loans and L/C Exposure then outstanding as the principal amount of its Loans and L/C Exposure prior to such exercise of banker's lien, setoff or counterclaim or other event was to the principal amount of all Loans and L/C Exposure outstanding prior to such exercise of banker's lien, setoff or counterclaim or other event; provided, however, that if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.18 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest.  The Borrower expressly consents to the foregoing arrangements and agrees that any Lender holding a participation in a Loan or L/C Disbursement deemed to have been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the Borrower to such Lender by reason thereof as fully as if such Lender had made a Loan directly to the Borrower in the amount of such participation.

SECTION 2.19.  Payments.  (a)  The Borrower shall make each payment (including principal of or interest on any Borrowing or any L/C Disbursement or any Fees or other amounts) hereunder and under any other Loan Document not later than 12:00 (noon), New York City time, on the date when due in immediately available Dollars, without setoff, defense or counterclaim.  Payments received after such time shall be deemed to be received on the next Business Day in the Administrative Agent's sole discretion.  Each payment (other than Issuing Bank Fees, which shall be paid directly to the Issuing Bank) shall be made to the Administrative Agent at its offices at Eleven Madison Avenue, New York, NY 10010.  All payments hereunder and under each other Loan Document shall be made in Dollars.

(b)  Except as otherwise expressly provided herein, whenever any payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or Fees, if applicable.

34

SECTION 2.20.  Taxes.  (a) Any and all payments by or on account of any obligation of the Borrower or any other Loan Party hereunder or under any other Loan Document shall be made free and clear of and without reduction, withholding or deduction for any Indemnified Taxes or Other Taxes; provided that if any Indemnified Taxes or Other Taxes are required by applicable law to be withheld or deducted from such payments, then (i) the sum payable by or on behalf of the Borrower shall be increased as necessary so that after all required deductions (including deductions or withholdings applicable to additional sums payable under this Section) the Administrative Agent or such Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower or such other Loan Party shall make (or cause to be made) such deductions and (iii) the Borrower or such other Loan Party shall pay (or cause to be paid) the full amount deducted to the relevant Governmental Authority in accordance with applicable law.  In addition, the Borrower or any other Loan Party hereunder shall pay (or cause to be paid) any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(b)    The Borrower shall jointly and severally indemnify the Administrative Agent and each Lender, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes paid by the Administrative Agent or such Lender, as the case may be, or any of their respective Affiliates, on or with respect to any payment by or on account of any obligation of the Borrower or any Loan Party hereunder or under any other Loan Document (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) and any penalties, interest and expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender, or by the Administrative Agent on its behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(c)    As soon as practicable after any payment of Indemnified Taxes or Other Taxes pursuant to Section 2.20(a), and in any event within 30 days of any such payment being due, the Borrower shall deliver (or cause to be delivered) to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.  If the Borrower fails to remit to the Administrative Agent the required receipts or other required documentary evidence, the Borrower shall indemnify the Administrative Agent and the Lenders for any incremental taxes, interest or penalties that may become payable by the Administrative Agent or any Lender as a result of such failure.

(d)    Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), at the reasonable written request of the Borrower, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate; provided that such Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's judgment such completion, execution or delivery would not materially prejudice the legal position of such Lender.  In addition, each Foreign Lender shall (i) furnish on or before it becomes a party to the Agreement (a) two accurate and complete originally executed U.S. Internal Revenue Service Form W-8BEN (or successor form), (b) an accurate and complete U.S. Internal Revenue Service Form W-8ECI (or successor form) and/or (c) an accurate and complete U.S. Internal Revenue Service Form W-8IMY (or successor form), certifying, in each case, to such Foreign Lender's legal entitlement to an exemption or reduction from U.S. federal withholding tax with respect to all interest payments hereunder, and (ii) provide a new Form W-8BEN (or successor form), Form W-8ECI (or successor form) and/or Form W-8IMY (or successor form) upon the expiration or

35

030786-0283

obsolescence of any previously delivered form to reconfirm any complete exemption from, or any entitlement to a reduction in, U.S. federal withholding tax with respect to any interest payment hereunder; **provided** that any Foreign Lender that is not a "bank" within the meaning of Section 881(c)(3)(A) of the Tax Code and is relying on the so-called "portfolio interest exemption" shall also furnish a Non-Bank Certificate together with a Form W-8BEN. Notwithstanding any other provision of this paragraph, a Foreign Lender shall not be required to deliver any form pursuant to this paragraph that such Foreign Lender is not legally able to deliver. In addition, each Foreign Lender shall promptly notify the Borrower and the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered form or certificate (or any other form of certification adopted by the United States taxing authorities for such purpose). If any Foreign Lender provides a Form W-8IMY, such Foreign Lender must also attach the additional documentation that must be transmitted with Form W-8IMY, including the appropriate forms described in this Section 2.20(d).

(e)    Any Lender that is a United States Person, as defined in Section 7701(a)(30) of the Tax Code, and is not an exempt recipient within the meaning of Treasury Regulations Section 1.6049-4(c) shall deliver to the Borrower (with a copy to the Administrative Agent) two accurate and complete original signed copies of Internal Revenue Service Form W-9, or any successor form that such Person is entitled to provide at such time in order to comply with United States back-up withholding requirements.

(f)    Without prejudice to the survival of any other agreement of the Borrower hereunder, the agreements and obligations of the Borrower contained in this Section 2.20 shall survive the payment in full of all amounts due hereunder.

SECTION 2.21.    Assignment of Commitments Under Certain Circumstances; Duty to Mitigate. (a) In the event (i) any Lender or the Issuing Bank delivers a certificate requesting compensation pursuant to Section 2.14, (ii) any Lender or the Issuing Bank delivers a notice described in Section 2.15 or (iii) the Borrower is required to pay any additional amount to any Lender or the Issuing Bank or any Governmental Authority on account of any Lender or the Issuing Bank pursuant to Section 2.20, the Borrower may, at its sole expense and effort (including with respect to the processing and recordation fee referred to in Section 9.04(b)), upon notice to such Lender or the Issuing Bank and the Administrative Agent, require such Lender or the Issuing Bank to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all of its interests, rights and obligations under this Agreement to an assignee that shall assume such assigned obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (x) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction, (y) solely with respect to replacements of Lenders pursuant to clauses (i), (ii) or (iii) of this Section, the Borrower shall have received the prior written consent of the Administrative Agent (and, if a Revolving Credit Commitment is being assigned, of the Issuing Bank), which consent shall not unreasonably be withheld, and (z) the Borrower or such assignee shall have paid to the affected Lender or the Issuing Bank in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Loans or L/C Disbursements of such Lender or the Issuing Bank, respectively, plus all Fees and other amounts accrued for the account of such Lender or the Issuing Bank hereunder (including any amounts under Section 2.14 and Section 2.16); provided further that, if prior to any such transfer and assignment the circumstances or event that resulted in such Lender's or the Issuing Bank's claim for compensation under Section 2.14 or notice under Section 2.15 or the amounts paid pursuant to Section 2.20, as the case may be, cease to cause such Lender or the Issuing Bank to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to have the consequences specified in Section 2.15, or cease to result in amounts payable under Section 2.20, as the case may be (including as a result of any action taken by such Lender or the Issuing Bank pursuant to paragraph (b) below), or if such Lender or the Issuing Bank shall waive its right to claim further compensation under Section 2.14 in respect of such

030786-0283

circumstances or event or shall withdraw its notice under Section 2.15 or shall waive its right to further payments under Section 2.20 in respect of such circumstances or event, as the case may be, then such Lender or the Issuing Bank shall not thereafter be required to make any such transfer and assignment hereunder. In connection with any such replacement, if the replaced Lender does not execute and deliver to the Administrative Agent a duly completed Assignment and Acceptance reflecting such replacement within five Business Days of the date on which the replacement Lender executes and delivers such Assignment and Acceptance to the replaced Lender, then such replaced Lender shall be deemed to have executed and delivered such Assignment and Acceptance.

(b)    If (i) any Lender or the Issuing Bank shall request compensation under Section 2.14, (ii) any Lender or the Issuing Bank delivers a notice described in Section 2.15 or (iii) the Borrower is required to pay any additional amount to any Lender or the Issuing Bank or any Governmental Authority on account of any Lender or the Issuing Bank, pursuant to Section 2.20, then such Lender or the Issuing Bank shall use reasonable efforts (which shall not require such Lender or the Issuing Bank to incur an unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden deemed by it to be significant) (x) to file any certificate or document reasonably requested in writing by the Borrower or (y) to assign its rights and delegate and transfer its obligations hereunder to another of its offices, branches or affiliates, if such filing or assignment would reduce its claims for compensation under Section 2.14 or enable it to withdraw its notice pursuant to Section 2.15 or would reduce amounts payable pursuant to Section 2.20, as the case may be, in the future. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender or the Issuing Bank in connection with any such filing or assignment, delegation and transfer.

SECTION 2.22.    Letters of Credit. (a) General. Subject to the terms and conditions hereof, the Borrower may request the issuance of a Letter of Credit at any time and from time to time until the date that is 30 days prior to the Revolving Credit Maturity Date for its own account or for the account of any other BDCM Entity or any of the Subsidiary Guarantors (in which case the Borrower and such BDCM Entity or Subsidiary Guarantor shall be co-applicants with respect to such Letter of Credit), in a form reasonably acceptable to the Administrative Agent and the Issuing Bank. This Section shall not be construed to impose an obligation upon the Issuing Bank to issue any Letter of Credit that is inconsistent with the terms and conditions of this Agreement.

(b)    Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions. In order to request the issuance of a Letter of Credit (or to amend, renew or extend an existing Letter of Credit), the Borrower shall hand deliver or fax to the Issuing Bank and the Administrative Agent (no less than three Business Days (or such shorter period of time acceptable to the Issuing Bank) in advance of the requested date of issuance, amendment, renewal or extension) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, the date of issuance, amendment, renewal or extension, the date on which such Letter of Credit is to expire (which shall comply with paragraph (c) below), the amount of such Letter of Credit, the name and address of the beneficiary thereof and such other information as shall be necessary to prepare such Letter of Credit. A Letter of Credit shall be issued, amended, renewed or extended only if, and upon issuance, amendment, renewal or extension of each Letter of Credit the Borrower shall be deemed to represent and warrant that, after giving effect to such issuance, amendment, renewal or extension (i) the L/C Exposure shall not exceed $5,000,0000 and (ii) the Aggregate Revolving Credit Exposure shall not exceed the Total Revolving Credit Commitment.

(c)    Expiration Date. Each Letter of Credit shall expire at the close of business on the earlier of (i) the date one year after the date of the issuance of such Letter of Credit and (ii) the date that is five Business Days prior to the Revolving Credit Maturity Date, unless such Letter of Credit expires by its terms on an earlier date; provided, however, that a Letter of Credit may, upon the request of the Borrower,

NY\1171256.14                                                                                                                                                   036786-0283

include a provision whereby such Letter of Credit shall be renewed automatically for additional consecutive periods of 12 months or less (but not beyond the date that is five Business Days prior to the Revolving Credit Maturity Date) unless the Issuing Bank notifies the beneficiary thereof at least 30 days prior to the then-applicable expiration date that such Letter of Credit will not be renewed.

(d)    Participations. By the issuance of a Letter of Credit and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank hereby grants to each Revolving Credit Lender, and each such Lender hereby acquires from the Issuing Bank, a participation in such Letter of Credit equal to such Lender's Pro Rata Percentage of the aggregate amount available to be drawn under such Letter of Credit, effective upon the issuance of such Letter of Credit. In consideration and in furtherance of the foregoing, each Revolving Credit Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Pro Rata Percentage of each L/C Disbursement made by the Issuing Bank and not reimbursed by the Borrower (or, if applicable, another party pursuant to its obligations under any other Loan Document) forthwith on the date due as provided in Section 2.02(f). Each Revolving Credit Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or an Event of Default, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)    Reimbursement. If the Issuing Bank shall make any L/C Disbursement in respect of a Letter of Credit, the Borrower shall pay to the Administrative Agent an amount equal to such L/C Disbursement not later than two hours after the Borrower shall have received notice from the Issuing Bank that payment of such draft will be made, or, if the Borrower shall have received such notice later than 10:00 a.m., New York City time, on any Business Day, not later than 10:00 a.m., New York City time, on the immediately following Business Day.

(f)    Obligations Absolute. The Borrower's obligations to reimburse L/C Disbursements as provided in paragraph (e) above shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement, under any and all circumstances whatsoever, and irrespective of:

(i)    any lack of validity or enforceability of any Letter of Credit or any Loan Document, or any term or provision therein;

(ii)    any amendment or waiver of, or any consent to departure from, all or any of the provisions of any Letter of Credit or any Loan Document;

(iii)    the existence of any claim, setoff, defense or other right that the Borrower, any other party guaranteeing, or otherwise obligated with, the Borrower, any subsidiary or other Affiliate thereof or any other Person may at any time have against the beneficiary under any Letter of Credit, the Issuing Bank, the Administrative Agent or any Lender or any other Person, whether in connection with this Agreement, any other Loan Document or any other related or unrelated agreement or transaction;

(iv)    any draft or other document presented under a Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(v)    payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit; and

38

030786-0283

(vi)    any other act or omission to act or delay of any kind of the Issuing Bank, any Lender, the Administrative Agent or any other Person or any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of the Borrower's obligations hereunder.

Without limiting the generality of the foregoing, it is expressly understood and agreed that the absolute and unconditional obligation of the Borrower hereunder to reimburse L/C Disbursements will not be excused by the gross negligence or willful misconduct of the Issuing Bank. However, the foregoing shall not be construed to excuse the Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by the Issuing Bank's gross negligence or willful misconduct in determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof; it is understood that the Issuing Bank may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary and, in making any payment under any Letter of Credit (i) the Issuing Bank's exclusive reliance on the documents presented to it under such Letter of Credit as to any and all matters set forth therein, including reliance on the amount of any draft presented under such Letter of Credit, whether or not the amount due to the beneficiary thereunder equals the amount of such draft and whether or not any document presented pursuant to such Letter of Credit proves to be insufficient in any respect, if such document on its face appears to be in order, and whether or not any other statement or any other document presented pursuant to such Letter of Credit proves to be forged or invalid or any statement therein proves to be inaccurate or untrue in any respect whatsoever and (ii) any noncompliance in any immaterial respect of the documents presented under such Letter of Credit with the terms thereof shall, in each case, be deemed not to constitute willful misconduct or gross negligence of the Issuing Bank.

(g)    <u>Disbursement Procedures</u>. The Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. The Issuing Bank shall as promptly as possible give telephonic notification, confirmed by fax, to the Administrative Agent and the Borrower of such demand for payment and whether the Issuing Bank has made or will make an L/C Disbursement thereunder; <u>provided</u> that any failure to give or delay in giving such notice shall not relieve the Borrower of its obligation to reimburse the Issuing Bank and the applicable Lenders with respect to any such L/C Disbursement. The Administrative Agent shall promptly give each Revolving Credit Lender notice thereof.

(h)    <u>Interim Interest</u>. If the Issuing Bank shall make any L/C Disbursement in respect of a Letter of Credit, then, unless the Borrower shall reimburse such L/C Disbursement in full on such date, the unpaid amount thereof shall bear interest for the account of the Issuing Bank, for each day from and including the date of such L/C Disbursement to but excluding the earlier of the date of payment by the Borrower or the date on which interest shall commence to accrue thereon as provided in Section 2.02(f), at the rate per annum that would apply to such amount if such amount were an ABR Revolving Loan.

(i)    <u>Resignation or Removal of the Issuing Bank</u>. The Issuing Bank may resign at any time by giving 30 days' prior written notice to the Administrative Agent, the Lenders and the Borrower. Subject to the next succeeding paragraph, upon the acceptance of any appointment as the Issuing Bank hereunder by a Lender that shall agree to serve as successor Issuing Bank, such successor shall succeed to and become vested with all the interests, rights and obligations of the retiring Issuing Bank and the retiring Issuing Bank shall be discharged from its obligations to issue additional Letters of Credit hereunder. At the time such removal or resignation shall become effective, the Borrower shall pay all accrued and unpaid fees pursuant to Section 2.05(c)(ii). The acceptance of any appointment as the Issuing Bank hereunder by a successor Lender shall be evidenced by an agreement entered into by such

39

successor, in a form satisfactory to the Borrower and the Administrative Agent, and, from and after the effective date of such agreement, (i) such successor Lender shall have all the rights and obligations of the previous Issuing Bank under this Agreement and the other Loan Documents and (ii) references herein and in the other Loan Documents to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require. After the resignation or removal of the Issuing Bank hereunder, the retiring Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement and the other Loan Documents with respect to Letters of Credit issued by it prior to such resignation or removal, but shall not be required to issue additional Letters of Credit.

(j)    Cash Collateralization. If any Event of Default shall occur and be continuing, the Borrower shall, on the Business Day it receives notice from the Administrative Agent or the Required Lenders (or, if the maturity of the Loans has been accelerated, Revolving Credit Lenders representing greater than 50% of the total L/C Exposure) thereof and of the amount to be deposited, deposit in an account with the Collateral Agent, for the ratable benefit of the Revolving Credit Lenders, an amount in cash equal to the L/C Exposure as of such date. Such deposit shall be held by the Collateral Agent as collateral for the payment and performance of the obligations of the Borrower under this Agreement. The Collateral Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over such account. Other than any interest earned on the investment of such deposits in Permitted Investments, which investments shall be made at the option and sole discretion of the Collateral Agent, such deposits shall not bear interest. Interest or profits, if any, on such investments shall accumulate in such account. Moneys in such account shall (i) automatically be applied by the Administrative Agent to reimburse the Issuing Bank for L/C Disbursements for which it has not been reimbursed, (ii) be held for the satisfaction of the reimbursement obligations of the Borrower for the L/C Exposure at such time and (iii) if the maturity of the Loans has been accelerated (but subject to the consent of Revolving Credit Lenders representing greater than 50% of the total L/C Exposure), be applied to satisfy the Obligations. If the Borrower is required to provide an amount of cash collateral hereunder as a result of the occurrence of an Event of Default, such amount (to the extent not applied as aforesaid) shall be returned to the Borrower within three Business Days after all Events of Default have been cured or waived.

(k)    Additional Issuing Banks. The Borrower may, at any time and from time to time with the consent of the Administrative Agent (which consent shall not be unreasonably withheld) and such Lender, designate one or more additional Lenders to act as an issuing bank under the terms of the Agreement. Any Lender designated as an issuing bank pursuant to this paragraph shall be deemed to be an "Issuing Bank" (in addition to being a Lender) in respect of Letters of Credit issued or to be issued by such Lender, and, with respect to such Letters of Credit, such term shall thereafter apply to the other Issuing Bank and such Lender.

ARTICLE III.

Representations and Warranties

The Borrower represents and warrants to the Arranger, the Administrative Agent, the Collateral Agent, the Issuing Bank and each of the Lenders that:

SECTION 3.01. Organization; Powers. Each BDCM Entity, each BDCM Fund and each Subsidiary (a) is duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its organization or formation, (b) has all requisite power and authority, and the legal right, to own and operate its property and assets, to lease the property it operates as lessee and to carry on its business as now conducted and as proposed to be conducted, and (c) is qualified to do business in. and is in good standing in, every jurisdiction where such qualification is required except for failures to be so

40

qualified which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect. Each Loan Party has the power and authority, and the legal right, to execute, deliver and perform its obligations under this Agreement, each of the other Loan Documents, the Acquisition Documentation and each other agreement or instrument contemplated hereby or thereby to which it is or will be a party, including, in the case of the Borrower, to borrow hereunder, in the case of each Loan Party, to grant the Liens contemplated to be granted by it under the Security Documents and, in the case of each Guarantor, to Guarantee the Obligations as contemplated by the Guarantee and Collateral Agreement.

SECTION 3.02.  Authorization; No Conflicts.  The Transactions (a) have been duly authorized by all requisite corporate, partnership or limited liability company and, if required, stockholder, partner or member action and (b) will not (i) violate (A) any material provision of law, statute, rule or regulation, or of the certificate or articles of incorporation or other constitutive documents or by-laws of the Borrower, any other BDCM Entity or any Subsidiary, (B) any order of any Governmental Authority or arbitrator or (C) any provision of any material indenture, agreement or other instrument to which the Borrower, any other BDCM Entity or a Subsidiary is a party or by which any of them or any of their property is or may be bound, (ii) be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any such indenture, agreement or other instrument or (iii) result in the creation or imposition of any Lien upon or with respect to any material property or assets now owned or hereafter acquired by the Borrower, any other BDCM Entity or any Subsidiary (other than Liens created under the Security Documents).

SECTION 3.03.  Enforceability.  This Agreement has been duly executed and delivered by the Borrower and constitutes, and each other Loan Document when executed and delivered by each Loan Party party thereto will constitute, a legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.04.  Governmental Approvals.  No action, consent or approval of, registration or filing with, Permit from, notice to, or any other action by, any Governmental Authority is or will be required in connection with the Transactions, except for (a) the filing of UCC financing statements and filings with the United States Patent and Trademark Office and the United States Copyright Office, (b) recordation of the Mortgages and (c) such as have been made or obtained and are in full force and effect.

SECTION 3.05.  Financial Statements.  (a)  The Borrower has heretofore furnished to the Lenders its consolidated balance sheets and statements of income, stockholder's equity and cash flows as of and for the fiscal years ended December 31, 2005 and December 31, 2004, in each case audited by and accompanied by the opinion of Deloitte & Touche, independent public accountants. Such financial statements present fairly in all material respects the financial condition and results of operations and cash flows of the Borrower and its consolidated Subsidiaries as of such dates and for such periods. Such balance sheets and the notes thereto disclose all material liabilities, direct or contingent, of the Borrower and its consolidated Subsidiaries as of the dates thereof in accordance with GAAP. Such financial statements were prepared in accordance with GAAP applied on a consistent basis.

(b)     The Borrower has heretofore delivered to the Lenders its unaudited pro forma consolidated balance sheet and statements of income and stockholder's equity as of June 30, 2006, prepared giving effect to the Transactions as if they had occurred, with respect to such balance sheet, on such date and, with respect to such other financial statements, on the first day of the 6-month period ending on such date. Such pro forma financial statements (i) have been prepared in good faith by the

41

Borrower, based on the assumptions used to prepare the pro forma financial information contained in the Confidential Information Memorandum (which assumptions are believed by the Borrower on the date hereof and on the Closing Date to be reasonable), (ii) accurately reflect all adjustments required to be made to give effect to the Transactions and (iii) present fairly in all material respects on a pro forma basis the estimated consolidated financial position of the Borrower and its consolidated Subsidiaries as of such date and for such period, assuming that the Transactions had actually occurred at such date or at the beginning of such period, as the case may be.

SECTION 3.06.  No Material Adverse Change.  No event, change or condition has occurred since December 31, 2005 that has caused, or could reasonably be expected to cause, a Material Adverse Effect.

SECTION 3.07.  Title to Properties; Possession Under Leases.  (a)  Each of the Borrower, the other BDCM Entities and the Subsidiaries has good and marketable title to, or valid leasehold interests in, all its material properties and assets (including all Mortgaged Property), except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes. All such material properties and assets are free and clear of Liens, other than Liens expressly permitted by Section 6.02.

(b)     Each of the Borrower, the other BDCM Entities and the Subsidiaries has complied with all obligations under all material leases to which it is a party and all such leases are in full force and effect.  Each of the Borrower, the other BDCM Entities and the Subsidiaries enjoys peaceful and undisturbed possession under all such material leases.

(c)     As of the Closing Date, the Borrower has not received any notice of, nor has any knowledge of, any pending or contemplated condemnation proceeding affecting the Mortgaged Properties or any sale or disposition thereof in lieu of condemnation.

(d)     As of the Closing Date, none of the Borrower, the other BDCM Entities or any of the Subsidiaries is obligated under any right of first refusal, option or other contractual right to sell, assign or otherwise dispose of any Mortgaged Property or any interest therein.

SECTION 3.08.  BDCM Entities; BDCM Funds, etc.  (a)  Schedule 3.08(a) sets forth as of the Closing Date a list of all BDCM Entities and Subsidiaries, including each such entity's exact legal name (as reflected in such entity's certificate or articles of incorporation or other constitutive documents) and jurisdiction of incorporation or formation and the percentage ownership interest of the Borrower (direct or indirect) therein, and identifies each such entity that is a Loan Party.  The shares of capital stock or other Equity Interests so indicated on Schedule 3.08(a) are fully paid and non-assessable and are owned by the Borrower, directly or indirectly, free and clear of all Liens (other than Liens created under the Security Documents).

(b)     Schedule 3.08(b) sets forth each investment fund in existence as of the Closing Date that acquires, holds and sells marketable and non-marketable securities and/or real property interests and is managed by any BDCM Entity and/or in which any BDCM Entity holds, directly or indirectly, a limited partnership or general partnership interest, together with the identity of each general partner of each such fund, and the capital commitment (indicating funded and unfunded amounts) and ownership interest of each such general partner, limited partner and/or limited liability company member in each such fund, in each case as of the Closing Date.

(c)     Schedule 3.08(c) lists all BDCM Fund Documents in existence as of the Closing Date.

NY\1171256.14                                                                 030786-0283

(d)    Schedule 3.08(d) is a diagram accurately depicting the ownership of each BDCM Entity and Subsidiary as of the Closing Date and the ownership as of the Closing Date of each BDCM Fund by any BDCM Entity or Subsidiary.

(e)    The BDCM Fees payable pursuant to the BDCM Fund Documents are enforceable obligations of the respective obligors with respect thereto, are not subject to any setoff, counterclaim or other defense on the part of such obligors, except for claw-back provisions with respect to the Borrower's carried interest.

SECTION 3.09.  Litigation; Compliance with Laws.    (a) There are no actions, suits or proceedings at law or in equity or by or before any arbitrator or Governmental Authority now pending or, to the knowledge of the Borrower, threatened against or affecting the Borrower, any other BDCM Entity or Subsidiary or any business, property or rights of any such Person (i) that involve any Loan Document or the Transactions or (ii) except as set forth on Schedule 3.09, as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)    Since the date of this Agreement, there has been no change in the status of the matters disclosed on Schedule 3.09 that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

(c)    None of the Borrower, any of the other BDCM Entities, any of the Subsidiaries or any of their respective material properties or assets is in violation of, nor will the continued operation of their material properties and assets as currently conducted violate, any law, rule or regulation (including any zoning, building, Environmental Law, ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting the Mortgaged Property, or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

SECTION 3.10.  Agreements.    (a)  None of the Borrower, any other BDCM Entity or any Subsidiary is a party to any agreement or instrument, or subject to any corporate restriction, that, individually or in the aggregate, has resulted or could reasonably be expected to result in a Material Adverse Effect.

(b)    None of the Borrower, any other BDCM Entity, any Subsidiary or any BDCM Fund is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other material agreement or instrument to which it is a party or by which it or any of its properties or assets are or may be bound where such default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No Default has occurred and is continuing.

SECTION 3.11.  Federal Reserve Regulations.  (a) None of the Borrower, any other BDCM Entity or any Subsidiary is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)    No part of the proceeds of any Loan or any Letter of Credit will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for the purpose of purchasing, carrying or trading in any securities under such circumstances as to involve the Borrower in a violation of Regulation X or to involve any broker or dealer in a violation of Regulation T.  Following the application of the proceeds of the Loans and the Letters of Credit, Margin Stock will not constitute more than 25% of the value of the assets of the Borrower, the other BDCM Entities and the Subsidiaries.  None of the

43

030786-0283

transactions contemplated by this Agreement will violate or result in the violation of any of the provisions of the Regulations of the Board, including Regulation T, U or X. If requested by any Lender or the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1 referred to in Regulation U.

SECTION 3.12.  Investment Company Act.  None of the Borrower, any other BDCM Entity or any Subsidiary is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

SECTION 3.13.  Use of Proceeds.  The Borrower will use the proceeds of the Loans and will request the issuance of Letters of Credit only for the purposes specified in the preamble to this Agreement.

SECTION 3.14.  Tax Returns.  The Borrower, each other BDCM Entity and each Subsidiary has timely filed or timely caused to be filed all Federal and all material state, local and foreign tax returns or materials required to have been filed by it and all such tax returns are correct and complete in all material respects.  The Borrower, each other BDCM Entity and each Subsidiary has timely paid or timely caused to be paid all Taxes due and payable by it and all assessments received by it, except Taxes that are being contested in good faith by appropriate proceedings and for which such entity shall have set aside on its quarterly and annual GAAP financial statements adequate reserves in accordance with GAAP.  The Borrower, each other BDCM Entity and each Subsidiary has made adequate provision in accordance with GAAP for all Taxes not yet due and payable.  No Tax Lien has been filed, and to the knowledge of the Borrower, no claim is being asserted, with respect to any Tax.  None of the Borrower, any other BDCM Entity or any Subsidiary (a) intends to treat the Loans or any of the transactions contemplated by any Loan Document or the Acquisition as being a "reportable transaction" (within the meaning of Treasury Regulation Section 1.6011-4) or (b) is aware of any facts or events that would result in such treatment.

SECTION 3.15.  No Material Misstatements; Acquisition Documentation.  (a) None of (i) the Confidential Information Memorandum or (ii) any other information, report, financial statement, exhibit or schedule furnished by or on behalf of the Borrower, any other BDCM Entity or any Subsidiary to the Arranger, the Administrative Agent or any Lender for use in connection with the transactions contemplated by the Loan Documents or in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto contained, contains or will contain any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading; provided that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, the Borrower represents only that it acted in good faith and utilized reasonable assumptions and due care in the preparation of such information, report, financial statement, exhibit or schedule.

(b)     As of the Closing Date, the representations and warranties of the applicable Loan Parties and their Affiliates set forth in the Acquisition Documentation are true and correct in all material respects.

SECTION 3.16.  Employee Benefit Plans.  Each Benefit Plan has been maintained in compliance in all material respects with the applicable provisions of ERISA and the Tax Code and the regulations and published interpretations thereunder.  No ERISA Event has occurred or is reasonably expected to occur.  The present value of all benefit liabilities under each Benefit Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the last annual valuation date applicable thereto, exceed the fair market value of the assets of such Benefit Plan, and the present value of all benefit liabilities of all underfunded Benefit Plans (based on the assumptions used for

44

030786-0283

purposes of Statement of Financial Accounting Standards No. 87) did not, as of the last annual valuation dates applicable thereto, exceed the fair market value of the assets of all such underfunded Benefit Plans.

SECTION 3.17.  Environmental Matters.  (a) Except as set forth in Schedule 3.17 and except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of the Borrower, the other BDCM Entities or any of the Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

(b)      Since the date of this Agreement, there has been no change in the status of the matters disclosed on Schedule 3.17 that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

SECTION 3.18.  Insurance.  Schedule 3.18 sets forth a true, complete and correct description of all insurance maintained by or on behalf of the Borrower, the other BDCM Entities and the Subsidiaries as of the Closing Date. As of the Closing Date, such insurance is in full force and effect and all premiums have been duly paid. The Borrower, the other BDCM Entities and the Subsidiaries are insured by financially sound and reputable insurers and such insurance is in such amounts and covering such risks and liabilities (and with such deductibles, retentions and exclusions) as are in accordance with normal and prudent industry practice. None of the Borrower, any of the other BDCM Entities or any of the Subsidiaries (a) has received notice from any insurer (or any agent thereof) that substantial capital improvements or other substantial expenditures will have to be made in order to continue such insurance or (b) has any reason to believe that it will not be able to renew its existing coverage as and when such coverage expires or to obtain similar coverage from similar insurers at a substantially similar cost.

SECTION 3.19.  Security Documents.  (a)  The Guarantee and Collateral Agreement is effective to create in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid, binding and enforceable security interest in the Collateral described therein and proceeds thereof and (i) in the case of the Pledged Collateral described in the Guarantee and Collateral Agreement, upon the earlier of (A) when such Pledged Collateral is delivered to the Collateral Agent and (B) when financing statements in appropriate form are filed in the offices specified on Schedule 3.19(a) and (ii) in the case of all other Collateral described therein (other than Intellectual Property Collateral) and Collateral a security interest in which cannot be perfected by the filing of a financing statement under the Uniform Commercial Code, when financing statements in appropriate form are filed in the offices specified on Schedule 3.19(a), the Guarantee and Collateral Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the Secured Parties in such Collateral and proceeds thereof, as security for the Obligations, in each case prior and superior to the rights of any other Person (except, in the case of all Collateral other than such Pledged Collateral, with respect to Liens expressly permitted by Section 6.02 and except that such Pledged Collateral which is certificated must be perfected by possession to obtain priority and superiority).

(b)      Each Intellectual Property Security Agreement is effective to create in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid, binding and enforceable security interest in the Intellectual Property Collateral described therein and proceeds thereof. When each Intellectual Property Security Agreement is filed in the United States Patent and Trademark Office and the United States Copyright Office, respectively, together with financing statements in appropriate form filed in the offices specified in Schedule 3.19(a), such Intellectual Property Security Agreement shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the grantors thereunder in the Intellectual Property Collateral and proceeds thereof, as security for the Obligations, in

45

030786-0283

each case prior and superior in right to any other Person (except with respect to Liens expressly permitted by Section 6.02) (it being understood that subsequent recordings in the United States Patent and Trademark Office and the United States Copyright Office may be necessary to perfect a lien on registered trademarks, trademark applications and copyrights acquired by the grantors after the date hereof).

(c)    Each of the Mortgages is effective to create in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, a legal, valid, binding and enforceable Lien on, and security interest in, all of the Loan Parties' right, title and interest in and to the Mortgaged Property thereunder and proceeds thereof, and when the Mortgages are filed in the offices specified on Schedule 3.19(c), each such Mortgage shall constitute a fully perfected Lien on, and security interest in, all right, title and interest of the grantors thereof in such Mortgaged Property and proceeds thereof, as security for the Obligations, in each case prior and superior in right to any other Person (except with respect to Liens expressly permitted by Section 6.02).

SECTION 3.20.  Location of Real Property.  Schedule 3.20 lists completely and correctly as of the Closing Date all Real Property and the addresses thereof, indicating for each parcel whether it is owned or leased, including in the case of leased Real Property, the landlord name, lease date and lease expiration date. The Borrower, the other BDCM Entities and the Subsidiaries own in fee or have valid leasehold interests in, as the case may be, all the real property set forth on Schedule 3.20.

SECTION 3.21.  Labor Matters.  As of the Closing Date, there are no strikes, lockouts or slowdowns against the Borrower, any other BDCM Entity or any Subsidiary pending or, to the knowledge of the Borrower, threatened.  The hours worked by and payments made to employees of the Borrower, the other BDCM Entities and the Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters.  All payments due from the Borrower, any other BDCM Entity or any Subsidiary, or for which any claim may be made against the Borrower, any other BDCM Entity or any Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the quarterly and annual GAAP financial statements of the Borrower, such BDCM Entity or such Subsidiary.

SECTION 3.22.  Liens.  There are no Liens of any nature whatsoever on any of the properties or assets of the Borrower, any of the other BDCM Entities or any of the Subsidiaries (other than Liens expressly permitted by Section 6.02).

SECTION 3.23.  Intellectual Property.  The Borrower, each of the other BDCM Entities, each of the Subsidiaries and each of the BDCM Funds owns, or is licensed to use, all trademarks, tradenames, copyrights, patents and other intellectual property material to its business, and the use thereof by the Borrower, the other BDCM Entities, the Subsidiaries and the BDCM Funds does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.24.  Solvency.  Immediately after the consummation of the Transactions to occur on the Closing Date and immediately following the making of each Loan (or other extension of credit hereunder) and after giving effect to the application of the proceeds of each Loan (or other extension of credit hereunder), (a) the fair value of the assets of the Loan Parties, taken as a whole, at a fair valuation, will exceed their debts and liabilities, subordinated, contingent or otherwise; (b) the present fair saleable value of the property of the Loan Parties, taken as a whole, will be greater than the amount that will be required to pay the probable liability of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) the Loan Parties, taken as a whole, will be able to pay their debts and liabilities, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) the Loan Parties, taken as a whole, will not have

46

unreasonably small capital with which to conduct the business in which they are engaged as such business is now conducted and is proposed to be conducted following the Closing Date.

SECTION 3.25. <u>Acquisition Documentation</u>.    The Acquisition Documentation listed on Schedule 3.25 constitutes all of the material agreements, instruments and undertakings to which the Borrower, any of the BDCM Entities or any of the Subsidiaries is bound or by which any of their respective property or assets is bound or affected relating to the Acquisition. None of such material agreements, instruments or undertakings has been amended, supplemented or otherwise modified, and all such material agreements, instruments and undertakings are in full force and effect. No party to any of the Acquisition Documentation is in default thereunder as of the Closing Date and no party thereto has the right to terminate any of the Acquisition Documentation.

SECTION 3.26.  <u>Permits</u>. (a) The Borrower, each other BDCM Entity and each Subsidiary has obtained and holds all material Permits required in respect of all Real Property and for any other property otherwise operated by or on behalf of, or for the benefit of, such Person and for the operation of each of its businesses as presently conducted and as proposed to be conducted, (b) all such Permits are in full force and effect, and the Borrower, each other BDCM Entity and each Subsidiary has performed and observed all requirements of such Permits, (c) no event has occurred that allows or results in, or after notice or lapse of time would allow or result in, revocation or termination by the issuer thereof or in any other impairment of the rights of the holder of any such Permit, (d) no such Permits contain any restrictions, either individually or in the aggregate, that are materially burdensome to the Borrower, any other BDCM Entity or any Subsidiary, or to the operation of any of its businesses or any property owned, leased or otherwise operated by such Person, (e) the Borrower, each other BDCM Entity and each Subsidiary reasonably believes that each of its Permits will be timely renewed and complied with, without material expense, and that any additional Permits that may be required of such Person will be timely obtained and complied with, without material expense and (f) the Borrower has no knowledge or reason to believe that any Governmental Authority is considering limiting, suspending, revoking or renewing on materially burdensome terms any such Permit.

SECTION 3.27.  <u>Anti-Terrorism Laws</u>. (a) No BDCM Entity or Subsidiary and, to the knowledge of the Borrower, none of their respective Affiliates is in violation of any Requirement of Law relating to terrorism or money laundering ("<u>Anti-Terrorism Laws</u>"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "<u>Executive Order</u>"), and the USA PATRIOT Act.

(b)     No BDCM Entity or Subsidiary and, to the knowledge of the Borrower, no Affiliate or broker or other agent of any BDCM Entity or Subsidiary acting or benefiting in any capacity in connection with the Loans is any of the following:

(i)     a Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)     a Person owned or controlled by, or acting for or on behalf of, any Person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)     a Person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)     a Person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

47

03C786-0283

(v)     a Person that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control ("OFAC") at its official website or any replacement website or other replacement official publication of such list.

(c)     No BDCM Entity or Subsidiary, directly or indirectly, knowingly (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in paragraph (b) above, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

## ARTICLE IV.

### Conditions of Lending

The obligations of the Lenders to make Loans and the obligations of the Issuing Bank to issue Letters of Credit are subject to the satisfaction of the following conditions:

SECTION 4.01.   All Credit Events.   On the date of each Borrowing, and on the date of each issuance, amendment, extension or renewal of a Letter of Credit (each such event being called a "Credit Event"):

(a)     The Administrative Agent shall have received a notice of such Borrowing as required by Section 2.03 (or such notice shall have been deemed given in accordance with Section 2.03) or, in the case of the issuance, amendment, extension or renewal of a Letter of Credit, the Issuing Bank and the Administrative Agent shall have received a notice requesting the issuance, amendment, extension or renewal of such Letter of Credit as required by Section 2.22(b).

(b)     The representations and warranties set forth in each Loan Document shall be true and correct in all material respects on and as of the date of such Credit Event with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date.

(c)     The Borrower and each other Loan Party shall be in compliance with all the terms and provisions set forth in each Loan Document on its part to be observed or performed, and, at the time of and immediately after such Credit Event, no Event of Default or Default shall have occurred and be continuing.

Each Credit Event shall be deemed to constitute a representation and warranty by the Borrower on the date of such Credit Event as to the matters specified in paragraphs (b) and (c) of this Section 4.01.

SECTION 4.02.   First Credit Event.   On the Closing Date:

(a)     The Administrative Agent shall have received, on behalf of itself, the Collateral Agent, the Issuing Bank, the Arranger and the Lenders, a favorable written opinion of Sidley Austin LLP, counsel for the Borrower, the other BDCM Entities and the Subsidiaries, substantially to the effect set forth in Exhibit I (A) dated the Closing Date, (B) addressed to the Administrative Agent, Collateral Agent, the Issuing Bank, the Arranger and the Lenders and

(C) covering such matters relating to the Loan Documents and the Transactions as the Administrative Agent shall reasonably request and which are customary for transactions of the type contemplated herein, and such Persons hereby request such counsel to deliver such opinions.

(b) The Administrative Agent shall have received (i) a copy of the certificate or articles of incorporation or other formation documents, including all amendments thereto, of each Loan Party, certified as of a recent date by the Secretary of State of the state of its organization, and a certificate as to the good standing of each Loan Party as of a recent date, from such Secretary of State; (ii) a certificate of the Secretary or Assistant Secretary of each Loan Party dated the Closing Date and certifying (A) that attached thereto is a true and complete copy of the by-laws or equivalent documents of such Loan Party as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in clause (B) below, (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors or managers of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such Person is a party, in the case of the Borrower, the borrowings hereunder, in the case of each Loan Party, the granting of the Liens contemplated to be granted by it under the Security Documents and, in the case of each Guarantor, the Guaranteeing of the Obligations as contemplated by the Guarantee and Collateral Agreement, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, (C) that the certificate or articles of incorporation or other formation documents of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate of good standing furnished pursuant to clause (i) above and (D) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party; and (iii) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to clause (ii) above.

(c) The Administrative Agent shall have received a certificate, dated the Closing Date and signed by a Financial Officer of the Borrower, confirming compliance with the conditions precedent set forth in paragraphs (b) and (c) of Section 4.01.

(d) The Administrative Agent shall have received (i) this Agreement, executed and delivered by a duly authorized officer of the Borrower, (ii) the Guarantee and Collateral Agreement, executed and delivered by a duly authorized officer of each of the Borrower and each Guarantor, (iii) the Intellectual Property Security Agreements, executed and delivered by a duly authorized officer of each Loan Party thereto, (iv) if requested by any Lender pursuant to Section 2.04, a promissory note or notes conforming to the requirements of such Section and executed and delivered by a duly authorized officer of the Borrower and (v) a signature page to this Agreement executed and delivered by each Lender and accepted by the Borrower.

(e) The Collateral Agent, for the ratable benefit of the Secured Parties, shall have been granted on the Closing Date first priority perfected Liens on the Collateral (subject, in the case of all Collateral other than Pledged Collateral, only to Liens expressly permitted by Section 6.02) and customary Guarantees from the Guarantors and shall have received such other reports, documents and agreements as the Collateral Agent shall reasonably request and which are customarily delivered in connection with security interests in real property assets. The Pledged Collateral under the Guarantee and Collateral Agreement shall have been duly and validly pledged under the Guarantee and Collateral Agreement to the Collateral Agent, for the ratable benefit of the Secured Parties, and certificates, if any, representing such Pledged Collateral, accompanied by instruments of transfer and stock powers endorsed in blank, shall be in the actual possession of the Collateral Agent.

49

(f)    The Collateral Agent shall have received a duly executed Perfection Certificate dated on or prior to the Closing Date. The Collateral Agent shall have received the results of a recent Lien and judgment search in each relevant jurisdiction with respect to the Borrower and those of the BDCM Entities and Subsidiaries that shall be Guarantors or shall otherwise have assets that are included in the Collateral, and such search shall reveal no Liens on any of the assets of the Borrower or any of such BDCM Entities or Subsidiaries except, in the case of Collateral other than Pledged Collateral, for Liens expressly permitted by Section 6.02 and except for Liens to be discharged on or prior to the Closing Date pursuant to documentation reasonably satisfactory to the Collateral Agent.

(g)    The Acquisition and the Acquisition Transactions shall be consummated simultaneously with the initial funding of the Loans hereunder in accordance with applicable law and the Purchase Agreement; the Purchase Agreement and all other related documentation shall be satisfactory to the Administrative Agent; the Administrative Agent shall be satisfied with the capitalization, structure and equity ownership of the Loan Parties after giving effect to the Transactions.

(h)    After giving effect to the Transactions and the other transactions contemplated hereby, the Loan Parties shall have outstanding no Indebtedness or preferred stock other than (i) the Loans hereunder and (ii) other Indebtedness permitted under Section 6.01.

(i)    The Administrative Agent shall have received (i) the financial statements described in Section 3.05 and (ii) U.S. GAAP unaudited consolidated balance sheets and related statements of income and stockholders' equity of the Borrower for the year-to-date June 30, 2006.

(j)    The Administrative Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 5.02 and the applicable provisions of the Security Documents.

(k)    The Lenders and the Administrative Agent shall have received all Fees and other amounts due and payable on or prior to the Closing Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document.

(l)    The Administrative Agent shall have received a certificate from the chief financial officer of the Borrower certifying that the Borrower, each of the other BDCM Entities and the Subsidiaries, after giving effect to the Transactions and the other transactions contemplated hereby, are solvent.

(m)    All material governmental and third party consents and approvals with respect to the Transactions and the other transactions contemplated hereby to the extent required shall have been obtained, all applicable appeal periods shall have expired and there shall be no litigation, governmental, administrative or judicial action, actual or threatened, that could reasonably be expected to restrain, prevent or impose materially burdensome conditions on the Transactions or the other transactions contemplated hereby.

(n)    The Administrative Agent shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act (provided, that only the employees directly responsible for compliance with such regulations shall receive information identifying the investors in any BDCM Fund).

030786-0283

(o)     No event, series of events or changes have occurred since December 31, 2005 relating to the global and/or domestic financial or securities markets generally, which have or can be reasonably expected to have a material adverse effect on the business or prospects of the Borrower or the BDCM Entities and the BDCM Funds, taken as a whole (excluding any changes resulting from (i) any litigation or other proceedings to which the Borrower is a party and is indemnified by one or more of the BDCM Funds and (ii) the individual performance by any of the BDCM Funds or other funds or CLOs managed by any BDCM Entity).

## ARTICLE V.

### Affirmative Covenants

The Borrower covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document shall have been paid in full and all Letters of Credit have been canceled or have expired and all amounts drawn thereunder have been reimbursed in full, the Borrower will, and will cause each of the BDCM Entities and the Subsidiaries to:

SECTION 5.01.  Existence; Compliance with Laws; Businesses and Properties.  (a) Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05.

(b)     Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, franchises, authorizations, patents, copyrights, trademarks and trade names material to the conduct of its business; maintain and operate such business in substantially the manner in which it is presently conducted and operated or as otherwise permitted by Section 6.08; comply in all material respects with all applicable laws, rules, regulations and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, the failure to comply with which could reasonably be expected to result in a Material Adverse Effect; comply with the terms of, and enforce its rights under, each material lease of real property and each other material agreement so as to not permit any material uncured default on its part to exist thereunder; and at all times maintain and preserve all property material to the conduct of such business and keep such property in good repair, working order and condition and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times.

SECTION 5.02.  Insurance.  (a) Keep its insurable properties adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks (and with such deductibles, retentions and exclusions), including fire and other risks insured against by extended coverage, as is customary with companies in the same or similar businesses operating in the same or similar locations, including public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it; maintain such other insurance as may be required by law; and maintain such other insurance as otherwise required by the Security Documents (and comply with all covenants in the Security Documents with respect thereto).

(b)     In the case of the Borrower, at all times maintain in full force and effect with a financially sound and reputable insurer key-man life insurance on the life of Stephen H. Deckoff in a face amount of not less than, at any time, an amount equal to an amount reasonably acceptable to the Administrative Agent (and such acceptable amount shall be no greater than the amount in effect on the Closing Date).

51

030186-0283

SECTION 5.03. <u>Obligations and Taxes</u>.  Pay its Indebtedness and other obligations promptly and in accordance with their terms and pay and discharge promptly when due all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise that, if unpaid, might give rise to a Lien upon such properties or any part thereof; <u>provided, however</u>, that such payment and discharge shall not be required with respect to any such tax, assessment, charge, levy or claim which is immaterial or so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings and the Borrower or the applicable BDCM Entity shall have set aside on its quarterly and annual GAAP financial statements adequate reserves with respect thereto in accordance with GAAP and such contest operates to suspend collection of the contested obligation, tax, assessment or charge and enforcement of a Lien and, in the case of a Mortgaged Property, there is no risk of forfeiture of such property.

SECTION 5.04. <u>Financial Statements, Reports, etc</u>.  In the case of the Borrower, furnish to the Administrative Agent, who will distribute to each Lender:

(a)    within 120 days after the end of each fiscal year, its consolidated balance sheet and related statements of income, stockholders' or members' equity and cash flows showing the financial condition of the Borrower and its consolidated Subsidiaries as of the close of such fiscal year and the results of its operations and the operations of such Subsidiaries during such year, together with comparative figures for the immediately preceding fiscal year, all audited by Deloitte & Touche or other independent public accountants of recognized national standing and accompanied by an opinion of such accountants (which shall not be qualified in any material respect except with respect to (i) the undervaluation of certain investments held by the Borrower at cost and (ii) the non-consolidation of the BDCM Funds) to the effect that such consolidated financial statements fairly present the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied;

(b)    within 60 days after the end of each of the first three fiscal quarters of each fiscal year, its consolidated balance sheet and related statements of income, stockholders' or members' equity and cash flows showing the financial condition of the Borrower and its consolidated Subsidiaries as of the close of such fiscal quarter and the results of its operations and the operations of such Subsidiaries during such fiscal quarter and the then elapsed portion of the fiscal year, and comparative figures for the same periods in the immediately preceding fiscal year, all certified by one of its Financial Officers as fairly presenting the financial condition and results of operations of the Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes; <u>provided</u> that the Borrower shall not be required to deliver such comparative figures until delivery of financial statements for the fiscal quarter ending September 30, 2007;

(c)    concurrently with any delivery of financial statements under paragraph (a) or (b) above, a certificate of the accounting firm (in the case of paragraph (a)) or Financial Officer (in the case of paragraph (b)) opining on or certifying such statements (which certificate, when furnished by an accounting firm, may be limited to accounting matters and disclaim responsibility for legal interpretations) (i) certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto and (ii) setting forth computations in reasonable detail satisfactory to the Administrative Agent demonstrating compliance with the covenants contained in Sections 6.11, 6.12 and 6.13 and, in the case of a

certificate delivered with the financial statements required by paragraph (a) above, a certificate of a Financial Officer setting forth the Borrower's calculation of Excess Cash Flow;

(d)    within 120 days after the end of each fiscal year of the Borrower, a detailed consolidated budget for the following fiscal year (including a projected consolidated balance sheet and related statements of projected operations and cash flows as of the end of and for such following fiscal year and setting forth the assumptions used for purposes of preparing such budget) and, promptly when available, any significant revisions of such budget;

(e)    promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the Borrower, any other BDCM Entity or any Subsidiary with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed to its shareholders, as the case may be;

(f)    promptly after the receipt thereof by the Borrower, any other BDCM Entity or any of the Subsidiaries, a copy of any "management letter" (whether in final or draft form) received by any such Person from its certified public accountants and the management's response thereto;

(g)    within 60 days after the end of each fiscal quarter of each fiscal year, a summary setting forth the following for each BDCM Fund on an individual basis:

(i) the Assets Under Management of such BDCM Fund as of the last day of such quarterly accounting period;

(ii) the amount of BDCM Management Fees paid by such BDCM Fund during such quarterly accounting period and an explanation of the calculation thereof during such quarterly accounting period; and

(iii) the amount of BDCM Incentive Fees paid by such BDCM Fund during such quarterly accounting period and an explanation of the calculation thereof during such quarterly accounting period;

(h)    promptly after the request by any Lender, all documentation and other information that such Lender reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act (provided, that only the employees directly responsible for compliance with such regulations shall receive information identifying the investors in any BDCM Fund);

(i)    concurrently with any delivery of financial statements under paragraph (a) above, an accurate organization chart of the BDCM Entities, the Subsidiaries and the BDCM Funds if the organization of such entities has changed since the last such organization chart delivered;

(j)    promptly, from time to time, copies of any certificates of incorporation, certificates of formation, by-laws, limited liability company agreements, partnership agreements or equivalent organizational documents of any BDCM Entity or Subsidiary that have been amended or modified in accordance with the terms hereof to the extent such amendment or modification could reasonably be expected to adversely affect the interests of the Lenders; and

NY\1171256.14

030786-0283

(k)     promptly, from time to time, such other information (except information identifying the investors in any BDCM Fund) regarding the operations, business affairs and financial condition of the Borrower, any other BDCM Entity, any Subsidiary or any BDCM Fund, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request.

SECTION 5.05.  Litigation and Other Notices.  Furnish to the Administrative Agent, the Issuing Bank and each Lender prompt written notice of the following:

(a)     any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)     the filing or commencement of, or any threat or notice of intention of any Person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any arbitrator or Governmental Authority, against the Borrower, any other BDCM Entity or any Subsidiary that could reasonably be expected to result in a Material Adverse Effect;

(c)     the occurrence of any ERISA Event;

(d)     any development that has resulted in, or could reasonably be expected to result in, a Material Adverse Effect; and

(e)     any change in the ratings of the credit facilities provided for herein by S&P or Moody's, or any notice from either such agency indicating its intent to effect such a change or to place the Borrower or such credit facilities on a "CreditWatch" or "WatchList" or any similar list, in each case with negative implications, or its cessation of, or its intent to cease, rating such credit facilities.

SECTION 5.06.  Information Regarding Collateral.  (a)  Furnish to each of the Administrative Agent and the Collateral Agent prompt written notice of any change (i) in any Loan Party's corporate name or in any trade name used to identify it in the conduct of its business or in the ownership of its properties, (ii) in the location of any Loan Party's chief executive office, its principal place of business, any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral owned by it is located (including the establishment of any such new office or facility), (iii) in any Loan Party's identity or corporate structure, (iv) in the jurisdiction of organization or formation of any Loan Party or (v) in any Loan Party's Federal Taxpayer Identification Number.  The Borrower agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise and all other actions have been taken that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral.  The Borrower also agrees promptly to notify each of the Administrative Agent and the Collateral Agent if any material portion of the Collateral is damaged or destroyed.

(b)     In the case of the Borrower, each year, at the time of delivery of the annual financial statements with respect to the preceding fiscal year pursuant to Section 5.04(a), deliver to the Administrative Agent a certificate of a Financial Officer setting forth the information required pursuant to Section 4.03(c) of the Guarantee and Collateral Agreement or confirming that there has been no change in such information since the date of the Perfection Certificate delivered on the Closing Date or the date of the most recent certificate delivered pursuant to this Section 5.06.

54

SECTION 5.07.  Maintaining Records; Access to Properties and Inspections.  Keep proper books of record and account in which full, true and correct entries on a cash basis and in conformity with all requirements of law are made of all dealings and transactions in relation to its business and activities. Each BDCM Entity and Subsidiary will, and will cause each of its subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender to visit and inspect during normal business hours the financial records and the properties of such BDCM Entity or Subsidiary or any of its subsidiaries with reasonable prior notice and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent or any Lender to discuss the affairs, finances and condition of any BDCM Entity, any Subsidiary and any BDCM Fund with the officers thereof and independent accountants therefor, in each case except for information identifying the investors in any BDCM Fund.

SECTION 5.08.  Use of Proceeds.  Use the proceeds of the Loans and request the issuance of Letters of Credit only for the purposes set forth in Section 3.13.

SECTION 5.09.  Additional Collateral, etc.  (a)  With respect to any Collateral acquired after the Closing Date or, in the case of inventory or equipment, any material Collateral moved after the Closing Date by the Borrower or any other Loan Party (other than any Collateral described in paragraphs (b), (c) or (d) of this Section) as to which the Collateral Agent, for the benefit of the Secured Parties, does not have a first priority perfected security interest, promptly (and, in any event, within 10 days following the date of such acquisition) (i) execute and deliver to the Administrative Agent and the Collateral Agent such amendments to the Guarantee and Collateral Agreement or such other Security Documents as the Collateral Agent deems necessary or advisable to grant to the Collateral Agent, for the benefit of the Secured Parties, a security interest in such Collateral and (ii) take all actions necessary or advisable to grant to, or continue on behalf of, the Collateral Agent, for the benefit of the Secured Parties, a perfected first priority security interest in such Collateral, including the filing of UCC financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement or by law or as may be requested by the Administrative Agent or the Collateral Agent.

(b)    With respect to any fee interest in any Collateral consisting of Real Property or any lease of Collateral consisting of Real Property acquired or leased after the Closing Date by the Borrower or any other Loan Party, promptly (and, in any event, within 10 days following the date of such acquisition) (i) if requested by the Administrative Agent, execute and deliver a first priority Mortgage in favor of the Collateral Agent, for the benefit of the Secured Parties, covering such real property and complying with the provisions herein and in the Security Documents, (ii) if requested by the Administrative Agent, provide the Secured Parties with title and extended coverage insurance in an amount at least equal to the purchase price of such Real Property (or such other amount as the Administrative Agent shall reasonably specify), surveys, and if applicable, flood insurance, lease estoppel certificates, memoranda or amendments, (iii) if requested by the Administrative Agent, deliver to the Administrative Agent and the Collateral Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent and the Collateral Agent and (iv) deliver to the Administrative Agent a notice identifying, and upon the Administrative Agent's request, provide a copy of, the consultant's reports, environmental site assessments or other documents relied upon by the Borrower or any other Loan Party to determine that any such real property included in such Collateral does not contain Hazardous Materials of a form or type or in a quantity or location that could reasonably be expected to result in a material Environmental Liability.  In furtherance of the foregoing, the Borrower will give prompt notice to the Administrative Agent of the acquisition by it or any of the other BDCM Entities of any real property (or any interest in real property) having a value in excess of $500,000.

55

NY\1171256.14

03-1786-0283

(c)     With respect to any Subsidiary (other than an Excluded Foreign Subsidiary) or Domestic BDCM Entity created or acquired after the Closing Date (which, for the purposes of this paragraph, shall include any existing Subsidiary that ceases to be an Excluded Foreign Subsidiary at any time after the Closing Date) by the Borrower, any of the other BDCM Entities or any of the Subsidiaries, promptly (and, in any event, within 10 days following such creation or the date of such acquisition) (i) execute and deliver to the Administrative Agent and the Collateral Agent such amendments to the Guarantee and Collateral Agreement as the Administrative Agent or the Collateral Agent deems necessary or advisable to grant to the Collateral Agent, for the benefit of the Secured Parties, a valid, perfected first priority security interest in the Equity Interests in such new Subsidiary or Domestic BDCM Entity that are owned by the Borrower, any of the Subsidiaries or any of the BDCM Entities, (ii) deliver to the Collateral Agent the certificates, if any, representing such Equity Interests, together with executed and delivered undated stock powers, in blank, (iii) cause such new Subsidiary or new Domestic BDCM Entity (A) to become a party to the Guarantee and Collateral Agreement (and provide Guarantees of the Obligations) and the Intellectual Property Security Agreements and (B) to take such actions necessary or advisable to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected first priority security interest in the Collateral described in the Guarantee and Collateral Agreement and the Intellectual Property Security Agreement with respect to such new Subsidiary or Domestic BDCM Entity, including the recording of instruments in the United States Patent and Trademark Office and the United States Copyright Office and the filing of UCC financing statements in such jurisdictions as may be required by the Guarantee and Collateral Agreement, the Intellectual Property Security Agreement or by law or as may be requested by the Administrative Agent or the Collateral Agent and (iv) if requested by the Administrative Agent, deliver to the Administrative Agent and the Collateral Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent and the Collateral Agent.

(d)     With respect to any Excluded Foreign Subsidiary or Foreign BDCM Entity created or acquired after the Closing Date by the Borrower, any other Domestic BDCM Entity or any Domestic Subsidiary, promptly (and, in any event, within 10 days following such creation or the date of such acquisition) (i) execute and deliver to the Administrative Agent and the Collateral Agent such amendments to the Guarantee and Collateral Agreement as the Administrative Agent or the Collateral Agent deems necessary or advisable in order to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected first priority security interest in the Equity Interests in such new Excluded Foreign Subsidiary or Foreign BDCM Entity (provided that in no event shall more than 65% of the total outstanding voting Equity Interests in any such new Excluded Foreign Subsidiary or Foreign BDCM Entity be required to be so pledged), (ii) deliver to the Collateral Agent the certificates, if any, representing such Equity Interests, together with executed and delivered undated stock powers, in blank, and take such other action as may be necessary or, in the opinion of the Administrative Agent or the Collateral Agent, desirable to perfect the security interest of the Collateral Agent thereon and (iii) if requested by the Administrative Agent, deliver to the Administrative Agent and the Collateral Agent legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent and the Collateral Agent.

SECTION 5.10.  Further Assurances. From time to time duly authorize, execute and deliver, or cause to be duly authorized, executed and delivered, such additional instruments, certificates, financing statements, agreements or documents, and take all such actions (including filing UCC and other financing statements), as may be required under applicable law, or that the Required Lenders, the Administrative Agent or the Collateral Agent may reasonably request, for the purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, or of more fully perfecting or renewing the rights of the Administrative Agent, the Collateral Agent and the Secured Parties with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds or products thereof or with respect to any other property or assets hereafter acquired by the Borrower, any other BDCM Entity

56

030786-0283

or any Subsidiary which may be deemed to be part of the Collateral) pursuant hereto or thereto. Upon the exercise by the Administrative Agent, the Collateral Agent or any Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, the Borrower will execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Administrative Agent, the Collateral Agent or such Lender may be required to obtain from the Borrower, any other BDCM Entity or any of the Subsidiaries for such governmental consent, approval, recording, qualification or authorization.

SECTION 5.11.  Maintenance of Ratings.  Use commercially reasonable efforts to cause the credit facilities provided for herein to be continuously rated by S&P and Moody's.

SECTION 5.12.  Collection of Fees.  Use commercially reasonable efforts to collect all BDCM Fees payable to it pursuant to the BDCM Fund Documents, subject to the terms and conditions of any deferred compensation arrangements between any BDCM Entity and any BDCM Fund organized under the laws of a jurisdiction outside of the United States, the documentation for which has been provided to the Administrative Agent.

SECTION 5.13.  Post-Closing Obligations.  (i) Use commercially reasonable efforts to consummate the Permitted Restructuring Transaction as promptly as possible on or after the Closing Date and, in any event, within 45 days after the Closing Date except as otherwise specifically described on Schedule 1.01(d), (ii) use commercially reasonable efforts to ensure that all cash and cash equivalents held by the Borrower, any other BDCM Entity or any Subsidiary Guarantor are subject to a valid and perfected first priority security interest in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, pursuant to control agreements satisfactory to the Collateral Agent as promptly as possible after the Closing Date and to deliver such executed control agreements to the Collateral Agent, (iii) use commercially reasonable efforts to obtain landlord personal property collateral access agreements satisfactory to the Collateral Agent executed by the landlords of leased Real Property and by the applicable Loan Party as promptly as possible after the Closing Date and to deliver such executed landlord personal property collateral access agreements to the Collateral Agent, (iv) use commercially reasonable efforts to obtain a collateral assignment satisfactory to and in favor of the Collateral Agent, for the ratable benefit of the Secured Parties, in respect of the key-man life insurance policy described in Section 5.02(b), (v) use commercially reasonable efforts to obtain as promptly as possible after the Closing Date endorsements or amendments to the insurance policies required by Section 5.02 and the applicable provisions of the Security Documents including a customary lender's loss payable endorsement and naming the Collateral Agent as additional insured, in form and substance satisfactory to the Administrative Agent, (vi) cause the subscription lines of credit of BDCM Opportunity Fund, L.P. to expire in accordance with their terms with no renewal thereof and borrowing thereunder prior to such expiration and (vii) on or prior to January 31, 2007, update the offering materials for BDCM Partners I, L.P., BDCM Offshore Fund Ltd. and BDCM Offshore Fund II Ltd. to disclose, among other matters related to the Transactions, the pledge of membership interests in the Borrower to the Collateral Agent and the material potential remedies of the Collateral Agent if an Event of Default occurs.

ARTICLE VI.

Negative Covenants

The Borrower covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document have been paid in full and all Letters of Credit have been cancelled or have expired and all amounts drawn thereunder

NY\1171256.14

039786-0285

have been reimbursed in full, the Borrower will not, nor will it cause or permit any of the Subsidiaries or BDCM Entities to:

SECTION 6.01.  Indebtedness.  Incur, create, assume or permit to exist any Indebtedness, except:

(a)    Indebtedness existing on the date hereof and set forth in Schedule 6.01 and any Permitted Refinancing Indebtedness in respect of any such Indebtedness;

(b)    Indebtedness created hereunder and under the other Loan Documents;

(c)    unsecured intercompany Indebtedness of the Borrower, the other BDCM Entities and the Subsidiaries to the extent permitted by Section 6.04(a) so long as such Indebtedness is subordinated to the Obligations;

(d)    Indebtedness of the Borrower, the other BDCM Entities and the Subsidiaries incurred to finance the acquisition, construction or improvement of any fixed or capital assets, and extensions, renewals and replacements of any such Indebtedness that do not increase the outstanding principal amount thereof; provided that (i) such Indebtedness is incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement and (ii) the aggregate principal amount of Indebtedness permitted by this Section 6.01(d), when combined with the aggregate principal amount of all Capital Lease Obligations and Synthetic Lease Obligations incurred pursuant to Section 6.01(e) shall not exceed $2,000,000 at any time outstanding;

(e)    Capital Lease Obligations and Synthetic Lease Obligations in an aggregate principal amount, when combined with the aggregate principal amount of all Indebtedness incurred pursuant to Section 6.01(d), not exceeding $2,000,000 at any time outstanding;

(f)    Indebtedness of the BDCM Entities under Hedging Agreements permitted under Section 6.08(b);

(g)    Indebtedness of any Person that becomes a Subsidiary after the date hereof; provided that (i) such Indebtedness exists at the time such persons becomes a Subsidiary and is not created in contemplation of or in connection with such Person becoming a Subsidiary, (ii) immediately before and after such Person becomes a Subsidiary, no Default or Event of Default shall have occurred and be continuing and (iii) the aggregate principal amount of Indebtedness permitted by this Section 6.01(g) shall not exceed $1,000,000 at any time outstanding;

(h)    Indebtedness not exceeding $500,000 arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, so long as such Indebtedness is extinguished within three Business Days after its incurrence;

(i)    Indebtedness of the Borrower, the other BDCM Entities and the Subsidiaries with respect to performance bonds, bid bonds, surety bonds, appeal bonds, customs bonds or other obligations of a like nature required in the ordinary course of business or in connection with the enforcement of rights or claims of any such Person or in connection with judgments that do not result in a Default or an Event of Default, provided that the aggregate outstanding amount of all

58

such performance bonds, surety bonds, bid bonds, appeal bonds, customs bonds or other obligations of a like nature permitted by this clause (i) shall not at any time exceed $500,000;

(j)     Indebtedness of the Borrower, the other BDCM Entities and the Subsidiaries which may be deemed to exist in connection with agreements providing for indemnification, purchase price adjustments and similar obligations in connection with the acquisition or disposition of assets permitted by this Agreement, so long as any such obligations are those of the Person making the respective acquisition or sale;

(k)     Guarantees by the Borrower, the other BDCM Entities and the Subsidiaries of Indebtedness permitted to be incurred pursuant to this Section 6.01 of the Borrower, any other BDCM Entity or any Subsidiary; provided that if the Indebtedness that is being guaranteed is unsecured and/or subordinated to the Obligations, the Guarantee thereof shall also be unsecured and/or subordinated to the Obligations;

(l)     non-recourse Indebtedness of the Borrower or the BDCM Entities not exceeding $20,000,000 at any time outstanding, the proceeds of which shall be used for the acquisition of an office building and related real property in or around Greenwich, Connecticut or Chicago, Illinois, provided that only the proceeds of the Borrower's or the applicable BDCM Entity's operation of such office building may be used to pay the principal, interest and other obligations on such non-recourse Indebtedness; and

(m)     other unsecured Indebtedness of the Borrower, the other BDCM Entities and the Subsidiaries in an aggregate principal amount not exceeding $1,000,000 at any time outstanding.

SECTION 6.02.  Liens.  Create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests or other securities of any Person, including any Subsidiary or BDCM Entity) now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except:

(a)     Liens on property or assets of the Borrower, the other BDCM Entities and the Subsidiaries existing on the date hereof and set forth in Schedule 6.02; provided that such Liens shall secure only those obligations which they secure on the date hereof and refinancings, extensions, renewals and replacements thereof permitted hereunder;

(b)     any Lien created under the Loan Documents or in respect of any Hedging Agreements, the obligations of the Loan Parties under which constitute Obligations;

(c)     any Lien existing on any property or asset prior to the acquisition thereof by the Borrower, any other BDCM Entity or any Subsidiary; provided that (i) such Lien is not created in contemplation of or in connection with such acquisition and (ii) such Lien does not apply to any other property or assets of the Borrower, any other BDCM Entity or any Subsidiary;

(d)     carriers', warehousemen's, mechanics', repairmen's or other like Liens arising in the ordinary course of business and securing obligations that are not due and payable or which are being contested in compliance with Section 5.03;

(e)     pledges and deposits made in the ordinary course of business in compliance with workmen's compensation, unemployment insurance and other social security laws or regulations;

NY\1171256.14                                                               030786-0283

(f)  deposits to secure the performance of bids, trade contracts (other than for Indebtedness), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(g)  purchase money security interests in real property, improvements thereto or other fixed or capital assets hereafter acquired (or, in the case of improvements, constructed) by the Borrower, any other BDCM Entity or any Subsidiary; provided that (i) such security interests secure Indebtedness permitted by Section 6.01, (ii) such security interests are incurred, and the Indebtedness secured thereby is created, within 90 days after such acquisition (or construction) and (iii) such security interests do not apply to any other property or assets of the Borrower, any other BDCM Entity or any Subsidiary;

(h)  judgment Liens securing judgments not constituting an Event of Default under Article VII;

(i)  any interest or title of a lessor or sublessor under any lease or with respect to any Capital Lease Obligation or Synthetic Lease Obligation entered into by the Borrower, any of the other BDCM Entities or any Subsidiary in the ordinary course of business and covering only the assets so leased;

(j)  Liens on cash deposits and other funds maintained with a depositary institution, in each case arising in the ordinary course of business by virtue of any statutory or common law provision relating to banker's liens; provided that (i) the applicable deposit account is not a dedicated cash collateral account and is not subject to restrictions against access by the Borrower, the other BDCM Entities or any Subsidiary in excess of those set forth in regulations promulgated by the Board and (ii) the applicable deposit account is not intended by the Borrower, any of the other BDCM Entities or any Subsidiary to provide collateral or security to the applicable depositary institution or any other Person;

(k)  inchoate Liens for taxes, assessments or governmental charges or levies not yet due or Liens for taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established on quarterly and annual GAAP financial statements of the Borrower in accordance with GAAP;

(l)  easements, rights-of-way, restrictions, encroachments and other similar charges or encumbrances, and minor title deficiencies, in each case not securing Indebtedness and not materially interfering with the conduct of the business of the Borrower, any other BDCM Entity or any Subsidiary;

(m)  statutory and common law landlords' liens under leases to which the Borrower, any other BDCM Entity or any Subsidiary is a party; and

(n)  other Liens that do not, individually or in the aggregate, secure obligations in excess of $1,000,000 at any one time.

SECTION 6.03. Sale and Lease-Back Transactions. Enter into any arrangement, directly or indirectly, with any Person whereby it shall sell or transfer any property, real or personal or mixed, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred unless (a) the sale of such property is permitted by Section 6.05 and

60

030786-0283

(b) any Capital Lease Obligations, Synthetic Lease Obligations or Liens arising in connection therewith are permitted by Sections 6.01 and 6.02, respectively.

SECTION 6.04. Investments, Loans and Advances. Purchase, hold or acquire any Equity Interests, evidences of indebtedness or other securities of, make or permit to exist any loans or advances or capital contributions to, or make or permit to exist any investment or any other interest in, any other Person (all of the foregoing, "Investments"), except:

(a)    (i) Investments by the BDCM Entities in or to other BDCM Entities and the Subsidiaries and (ii) Investments by the BDCM Entities in, to or with the BDCM Funds, including as a result of the exercise of any co-investment rights;

(b)    Permitted Investments;

(c)    the BDCM Entities and the Subsidiaries may make loans and advances in the ordinary course of business to their respective members and employees so long as the aggregate principal amount thereof at any time outstanding (determined without regard to any write-downs or write-offs of such loans and advances) shall not exceed $3,000,000;

(d)    the Acquisition;

(e)    Investments existing on the date hereof and set forth on Schedule 6.04;

(f)    Investments consisting of (i) securities or other non-cash Investments received by one or more BDCM Entities or Subsidiaries as payment for transaction fees in lieu of cash and (ii) securities or other non-cash Investments received by one or more BDCM Entities or Subsidiaries as a result of an in-kind distribution by a BDCM Fund;

(g)    Investments consisting of accounts receivable, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(h)    Investments consisting of cash and cash equivalents;

(i)    Investments (including debt obligations) received in connection with the good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(j)    Hedging Agreements permitted pursuant to Section 6.08(b);

(k)    receivables consisting of deferred BDCM Fees;

(l)    Investments consisting of promissory notes and other non-cash consideration received in connection with any asset sale in such amounts and to the extent permitted under Section 6.05;

(m)    Investments consisting of Equity Interests and other securities received in satisfaction of judgments or in settlement of litigations, arbitration or other disputes;

NY\1171256.14

030786-0283

(n)     Investments consisting of acquisitions permitted pursuant to Section 6.05 and in connection with the Permitted Restructuring Transaction to the extent such transaction is permitted pursuant to Section 6.05(c);

(o)     Investments consisting of Equity Interests of the Borrower repurchased from the members thereof (other than Stephen H. Deckoff and any of his Affiliates) in the event of the death, disability, retirement or termination of employment with the Borrower of such members, in each case pursuant to the terms of the operating agreement of the Borrower and only to the extent permitted by Section 6.06(a)(iii);

(p)     in addition to Investments permitted by paragraphs (a) through (o) above, additional Investments by the Borrower so long as the aggregate amount invested, loaned or advanced pursuant to this paragraph (i) (determined without regard to any write-downs or write-offs of such investments, loans and advances) does not exceed $1,000,000 in the aggregate.

SECTION 6.05.  Mergers, Consolidations, Sales of Assets and Acquisitions.  (a) Merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, or sell, transfer, lease, issue or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all the assets (whether now owned or hereafter acquired) of the Borrower, any other BDCM Entity or any Subsidiary or less than all the Equity Interests of any BDCM Entity or Subsidiary, or purchase, lease or otherwise acquire (in one transaction or a series of transactions) all or any substantial part of the assets of any other Person, except for, if at the time thereof and immediately after giving effect thereto no Event of Default or Default shall have occurred and be continuing, (i) the merger or consolidation of any Wholly Owned Subsidiary into or with the Borrower in a transaction in which the Borrower is the surviving corporation, (ii) the merger or consolidation of any Wholly Owned Subsidiary into or with any other Wholly Owned Subsidiary in a transaction in which the surviving entity is a Wholly Owned Subsidiary and no Person other than the Borrower or a Wholly Owned Subsidiary receives any consideration (provided that if any party to any such transaction is (A) a Loan Party, the surviving entity of such transaction shall be a Loan Party and (B) a Domestic Subsidiary, the surviving entity of such transaction shall be a Domestic Subsidiary), (iii) the merger or consolidation of any Subsidiary to effect an Asset Sale permitted under paragraph (b) below, (iv) the liquidation or dissolution of a Subsidiary, the continued existence of which is no longer materially advantageous to the Borrower, the other BDCM Entities or the Subsidiaries so long as any property or assets of such liquidated or dissolved Subsidiary shall be transferred to the Borrower, any other BDCM Entity or a Subsidiary and (v) the acquisition of an office building and related real property in or around Greenwich, Connecticut or Chicago, Illinois for which the total consideration is no more than $25,000,000 in the aggregate, of which no more than $5,000,000 shall be in the form of cash consideration paid by the Borrower or a BDCM Entity (and the remaining portion of the consideration for which shall be in the form of non-recourse Indebtedness permitted by Section 6.01(l)).

(b)     Engage in any Asset Sale unless (i) such Asset Sale is for consideration at least 75% of which is cash (and no portion of the remaining consideration shall be in the form of Indebtedness of the Borrower, any other BDCM Entity or any Subsidiary), (ii) such consideration is at least equal to the fair market value of the assets being sold, transferred, leased or disposed of and (iii) the fair market value of all assets sold, transferred, leased or disposed of pursuant to this paragraph (b) shall not exceed (A) $1,000,000 in any fiscal year or (B) $3,000,000 in the aggregate.

(c)     Notwithstanding anything herein to the contrary, if at the time thereof and immediately after giving effect thereto no Default or Event of Default shall have occurred and be continuing, the Borrower shall be permitted to consummate the Permitted Restructuring Transaction; provided that (i) any successor to the Black Diamond Capital Management, L.L.C. as the borrower under this Agreement

as a result of the Permitted Restructuring Transaction shall expressly assume the Obligations by executing and delivering the Joinder Agreement and grant a perfected first priority security interest in the Collateral described in the Guarantee and Collateral Agreement with respect to such successor borrower, (ii) the holders of Equity Interests of any successor borrower to Black Diamond Capital Management, L.L.C. under this Agreement as a result of the Permitted Restructuring Transaction shall pledge such Equity Interests under the Pledge Agreement to the Collateral Agent, for the ratable benefit of the Secured Parties, and certificates, if any, representing such Equity Interests, accompanied by instruments of transfer and stock powers endorsed in blank, shall be delivered to the Collateral Agent, (iii) all subsidiaries (other than the BDCM Funds) of any successor borrower to Black Diamond Capital Management, L.L.C. under this Agreement as a result of the Permitted Restructuring Transaction shall guarantee the Obligations and grant a perfected first priority security interest in the Collateral described in the Guarantee and Collateral Agreement with respect to such subsidiaries, (iv) the Capital Contribution Agreement shall have been executed by the parties thereto, (v) the Administrative Agent shall have received a favorable written opinion from each counsel to the holders of Equity Interests of the Borrower who will execute and deliver the Capital Contribution Agreement and the Pledge Agreement (x) addressed to the Administrative Agent, Collateral Agent, the Issuing Bank, the Arranger and the Lenders and (y) covering such matters relating to the Permitted Restructuring Transaction as the Administrative Agent shall reasonably request and which are customary for transactions of such type, and such Persons hereby request such counsel to deliver such opinions, (vi) after giving effect to the Permitted Restructuring Transaction, the BDCM Fund Documents shall provide for the indemnification and reimbursement by the BDCM Funds of the Borrower and the other BDCM Entities for any losses, claims, damages, liabilities and related costs and expenses arising under any claim, litigation, investigation, action, suit or proceeding, on terms substantially similar to those in effect prior to the Permitted Restructuring Transaction and (vii) the Administrative Agent shall have received a certificate, dated the date of the consummation of the Permitted Restructuring Transaction and signed by a Financial Officer of the successor borrower to Black Diamond Capital Management, L.L.C. under this Agreement as a result of the Permitted Restructuring Transaction, confirming compliance with the conditions set forth in this Section 6.05(c).

SECTION 6.06.   Restricted Payments; Restrictive Agreements.  (a)  Declare or make, or agree to declare or make, directly or indirectly, any Restricted Payment (including pursuant to any Synthetic Purchase Agreement), or incur any obligation (contingent or otherwise) to do so; provided, however, that:

(i)        any Subsidiary may declare and pay dividends or make other distributions ratably to its equity holders;

(ii)        any BDCM Entity may make Restricted Payments to the Borrower or any other BDCM Entity that is a Guarantor;

(iii)        the Borrower may make Restricted Payments using the Borrower's Share of Excess Cash Flow, provided that with respect to this clause (iii), at the time of the making of such Restricted Payment and after giving effect thereto and to any borrowing in connection therewith, (A) the Leverage Ratio on a pro forma basis does not exceed 1.0 to 1.0, (B) the net worth of the Borrower on a pro forma basis shall be no lower than the net worth of the Borrower set forth on the audited consolidated balance sheet of the Borrower as of December 31, 2006 after giving effect to any distribution to James J. Zenni, Jr. and Stephen H. Deckoff in respect of Consolidated Net Income for the fiscal year ended December 31, 2006, (C) all mandatory prepayments required to be made pursuant to Section 2.13(e) shall have been made by the Borrower and (D) no Default or Event of Default shall have occurred and be continuing or would result therefrom;

(iv)        the BDCM Entities may make Restricted Payments to the members thereof to enable such members to make tax payments (as reasonably estimated by the BDCM Entities)

63

attributable to their interests in the BDCM Entities, in an annual aggregate amount not to exceed the highest applicable combined tax rate of any such member (or to members of such members in the case of any member that itself is a limited liability company) multiplied by the total taxable income of the BDCM Entities (each such Restricted Payment, a "Tax Restricted Payment"), provided that with respect to this clause (iv), (A) all such Tax Restricted Payments shall be made at such times and in a manner consistent with the governing agreements of the BDCM Entities, (B) all Tax Restricted Payments to be made by the BDCM Entities shall relate to taxable income only in calendar years beginning on or after January 1, 2006 and (C) if such Tax Restricted Payments exceed $15,000,000 for a fiscal year, as soon as reasonably practicable after the end of such fiscal year, the Borrower shall calculate the aggregate amount of Tax Restricted Payments for that fiscal year made to the members of the BDCM Entities, along with the amount of payments required to be made by such members (or to members of such members in the case of any member that itself is a limited liability company) (if applicable) to U.S. Federal, state, local and non-U.S. taxing authorities with respect to their tax liabilities related to interests in the BDCM Entities; if it is determined that the amount of Tax Restricted Payments made in respect of any taxable year was less or more than the aggregate amount of payments required to be made to U.S. federal, state, local and non-U.S. taxing authorities by the members of the BDCM Entities (if applicable) with respect to such taxable year, then (as appropriate), (x) the Borrower will cause each member (if applicable) to contribute to the Borrower an amount equal to the excess of such Tax Restricted Payments made to such member over such required payments of such member as soon as practicable following such calculation or (y) the Borrower may make additional Tax Restricted Payments to such members (if applicable), as soon as practicable after such amount is finally determined (but not if a Default or Event of Default exists at such time or would result therefrom) in an amount equal to the additional amount that could have been distributed to such members with respect to such taxable year; and

(v)     the Borrower may make Restricted Payments to James J. Zenni, Jr. pursuant to the terms of the Purchase Agreement and may make Restricted Payments to Stephen H. Deckoff in respect of his proportionate share of Consolidated Net Income of the Borrower (adjusted for the fact that the Borrower's income is computed on a modified cash basis) for the fiscal year ended December 31, 2006 that was not deferred in connection with deferred compensation arrangements between the BDCM Entities and the BDCM Funds.

(b)     Enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (i) the ability of the Borrower, any BDCM Entity or any Subsidiary to create; incur or permit to exist any Lien upon any of its property or assets, or (ii) the ability of any Subsidiary or BDCM Entity to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to the Borrower, any other BDCM Entity or any other Subsidiary or to Guarantee Indebtedness of the Borrower, any other BDCM Entity or any other Subsidiary; provided that (A) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document, (B) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of an entity pending such sale, provided such restrictions and conditions apply only to the entity that is to be sold and such sale is permitted hereunder, (C) the foregoing shall not apply to restrictions and conditions imposed on any Subsidiary that is not a Loan Party by the terms of any Indebtedness of such Subsidiary permitted to be incurred hereunder, (D) clause (i) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, and (E) clause (i) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof.

64

SECTION 6.07. <u>Transactions with Affiliates</u>. Except for transactions by or among Loan Parties, sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except that (a) the Borrower, any other BDCM Entity or any Subsidiary may engage in any of the foregoing transactions (including, without limitation, transactions with Black Diamond Commercial Finance, LLC and AIRTIME II, LLC) in the ordinary course of business at prices and on terms and conditions not less favorable to the Borrower, such other BDCM Entity or Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) Restricted Payments may be made to the extent provided in Section 6.06, (c) any transaction pursuant to or as contemplated by any of the BDCM Fund Documents and the limited partnership agreements and other organization documents of any BDCM Entity or any other similar arrangement or agreement a copy of which has been delivered to the Administrative Agent (i) prior to the Closing Date with respect to any Person created prior to the Closing Date, in each case as in effect on the Closing Date or as the same may be amended as permitted hereunder and (ii) with respect to any Person created after the Closing Date or which becomes a BDCM Entity, BDCM Fund or a Subsidiary after the Closing Date, promptly after such Person is created or becomes a BDCM Entity, BDCM Funds or a Subsidiary, (d) the BDCM Entities may defer the receipt of any BDCM Fees to the extent permitted by this Agreement subject to the terms and conditions of any deferred compensation arrangements between any BDCM Entity and any BDCM Fund organized under the laws of a jurisdiction outside of the United States, the documentation for which has been provided to the Administrative Agent, (e) the BDCM Entities may engage in any of the foregoing transactions with Persons in which the BDCM Funds have made investments in accordance with the BDCM Fund Documents and the limited partnership agreements and other organization documents of the BDCM Entities and (f) the BDCM Entities may make investments in the BDCM Funds on terms and conditions with respect to fees and expenses not less favorable to the BDCM Entities than could be obtained on an arm's-length basis from unrelated third parties.

SECTION 6.08. <u>Business of the BDCM Entities; Limitation on Hedging Agreements</u>. (a) With respect to the Borrower and the other BDCM Entities, engage at any time in any business or business activity other than the business conducted by them as of the date hereof and business activities reasonably incidental, ancillary or complementary thereto (including the establishment of new investment funds and the pursuit of new investment strategies).

(b)     Enter into any Hedging Agreement other than (a) any such agreement or arrangement entered into in the ordinary course of business and consistent with prudent business practice to hedge or mitigate risks to which the Borrower or any BDCM Entity is exposed in the conduct of its business or the management of its liabilities or (b) any such agreement entered into to hedge against fluctuations in interest rates or currency incurred in the ordinary course of business and consistent with prudent business practice; <u>provided</u> that in each case such agreements or arrangements shall not have been entered into for speculation purposes.

SECTION 6.09. <u>Other Indebtedness and Agreements; Amendments to Acquisition Documentation</u>. (a) Permit any waiver, supplement, modification, amendment, termination or release of any indenture, instrument or agreement pursuant to which any Material Indebtedness of the Borrower, any other BDCM Entity or any of the Subsidiaries is outstanding if the effect of such waiver, supplement, modification, amendment, termination or release would materially increase the obligations of the obligor or confer additional material rights on the holder of such Indebtedness in a manner adverse to the Borrower, any other BDCM Entity or any of the Subsidiaries or the Lenders.

(b)     Permit any waiver, supplement, modification, amendment, termination or release of any of the BDCM Fund Documents in a manner materially adverse to the Lenders, <u>provided</u> that the Borrower shall provide prompt notice to the Administrative Agent of any material amendments and modifications to the BDCM Fund Documents.

NY\1171256.14

030786-0283

(c)    (i) Make any distribution, whether in cash, property, securities or a combination thereof, other than regular scheduled payments of principal and interest as and when due (to the extent not prohibited by applicable subordination provisions), in respect of, or pay, or offer or commit to pay, or directly or indirectly (including pursuant to any Synthetic Purchase Agreement) redeem, repurchase, retire or otherwise acquire for consideration, or set apart any sum for the aforesaid purposes, any Indebtedness, except (A) the payment of the Indebtedness created hereunder, (B) refinancings of Indebtedness permitted by Section 6.01 and (C) the payment of secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness, or (ii) pay in cash any amount in respect of any Indebtedness or preferred Equity Interests that may at the obligor's option be paid in kind or in other securities.

(d)    (i) Permit any waiver, supplement, modification, amendment, termination or release of, or fail to enforce strictly the terms and conditions of, any of the indemnities and licenses furnished to the Borrower pursuant to the Acquisition Documentation such that after giving effect thereto such indemnities or licenses shall be materially less favorable to the interests of the Loan Parties or the Secured Parties with respect thereto or (ii) otherwise permit any waiver, supplement, modification, amendment, termination or release of, or fail to enforce strictly the terms and conditions of, any of the Acquisition Documentation except to the extent that such waiver, supplement, modification, amendment, termination or release or failure to enforce could not reasonably be expected to have a Material Adverse Effect.

(e)    Permit any waiver, supplement, modification, amendment, termination or release of the Capital Contribution Agreement in a manner adverse to the Lenders.

SECTION 6.10.  Fiscal Year.  With respect to the Borrower and the other BDCM Entities, change its fiscal year-end to a date other than December 31.

SECTION 6.11.  Total Receivables.  Permit the ratio of Total Receivables to Total Debt to be less than 1.25 to 1.0 at any time.

SECTION 6.12.  Leverage Ratio.  Permit the Leverage Ratio during any Test Period to be greater than 2.5 to 1.0.

SECTION 6.13.  Fixed Charge Coverage Ratio.  Permit the Fixed Charge Coverage Ratio during any Test Period to be less than 2.6 to 1.0

SECTION 6.14.  Embargoed Person.  The BDCM Entities will not knowingly cause or permit (a) any of the funds or properties of the BDCM Entities that are used to repay the Loans to constitute property of, or be beneficially owned directly or indirectly by, any Person subject to sanctions or trade restrictions under United States law ("Embargoed Person" or "Embargoed Persons") that is identified on (1) the "List of Specially Designated Nationals and Blocked Persons" maintained by OFAC and/or on any other similar list maintained by OFAC pursuant to any authorizing statute including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Order or Requirement of Law promulgated thereunder, with the result that the investment in the BDCM Entities (whether directly or indirectly) is prohibited by a Requirement of Law, or the Loans made by the Lenders would be in violation of a Requirement of Law, or (2) the Executive Order, any related enabling legislation or any other similar Executive Orders or (b) any Embargoed Person to have any direct or indirect interest, of any nature whatsoever in the BDCM Entities, with the result that the investment in the BDCM Entities (whether directly or indirectly) is prohibited by a Requirement of Law or the Loans are in violation of a Requirement of Law.

66

SECTION 6.15.  Anti-Terrorism Law; Anti-Money Laundering.  (a) The BDCM Entities will not, directly or indirectly, (i) knowingly conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in Section 3.27, (ii) knowingly deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or any other Anti-Terrorism Law, or (iii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law (and the BDCM Entities shall deliver to the Administrative Agent and the Lenders any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming the BDCM Entities' compliance with this Section 6.15).

(b)    The BDCM Entities will not knowingly cause or permit any of the funds of such BDCM Entity that are used to repay the Loans to be derived from any unlawful activity with the result that the making of the Loans would be in violation of any Requirement of Law.

SECTION 6.16.  Fees.  Each of the BDCM Entities agrees not to waive or defer the payment of (i) any BDCM Management Fees payable to it pursuant to any BDCM Fund Document with respect to the 2012 and 2013 fiscal years (other than those related to deferred compensation arrangements in respect of officers or employees of any BDCM Entity who are not members of the Borrower) and (ii) any BDCM Fees (other than those related to deferred compensation arrangements in respect of officers or employees of any BDCM Entity who are not members of the Borrower) payable to it pursuant to any BDCM Fund Document during the occurrence and continuance of an Event of Default.  The BDCM Entities agree not to assign, transfer (other than pursuant to the Permitted Restructuring Transaction) or voluntarily terminate any agreement pursuant to which it is entitled to BDCM Fees without the prior written consent of the Administrative Agent (not to be unreasonably withheld or delayed).

ARTICLE VII.

Events of Default

In case of the happening of any of the following events ("Events of Default"):

(a)    any representation or warranty made or deemed made in or in connection with any Loan Document or the Borrowings or issuances of Letters of Credit hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(b)    default shall be made in the payment of any principal of any Loan or the reimbursement with respect to any L/C Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)    default shall be made in the payment of any interest on any Loan or L/C Disbursement or any Fee or any other amount (other than an amount referred to in (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of three Business Days;

(d)    default shall be made in the due observance or performance by the Borrower, any other BDCM Entity or any Subsidiary of any covenant, condition or agreement contained in Section 5.01(a), 5.02, 5.05 or 5.08 or in Article VI;

67

(e)    default shall be made in the due observance or performance by the Borrower, any other BDCM Entity or any Subsidiary of any covenant, condition or agreement contained in any Loan Document (other than those specified in clauses (b), (c) or (d) above) and such default shall continue unremedied for a period of 30 days;

(f)    (i) the Borrower, any other BDCM Entity or any Subsidiary shall (i) fail to pay any principal or interest, regardless of amount, due in respect of any Material Indebtedness, when and as the same shall become due and payable beyond the period of grace, if any, provided in an instrument or agreement under which such Material Indebtedness was created, or (ii) any other event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity or that enables or permits (with or without the giving of notice, the lapse of time or both) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any Material Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (ii) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness;

(g)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of the Borrower, any other BDCM Entity or any Subsidiary, or of a substantial part of the property or assets of the Borrower, any other BDCM Entity or a Subsidiary, under Title 11 of the United States Code, as now constituted or hereafter amended, or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower, any other BDCM Entity or a Subsidiary or for a substantial part of the property or assets of the Borrower, any other BDCM Entity or a Subsidiary or (iii) the winding-up or liquidation of the Borrower, any other BDCM Entity or any Subsidiary; and such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(h)    the Borrower, any other BDCM Entity or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other Federal, state or foreign bankruptcy, insolvency, receivership or similar law, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in (g) above, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for the Borrower, any other BDCM Entity or any Subsidiary or for a substantial part of the property or assets of the Borrower, any other BDCM Entity or any Subsidiary, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, (vi) become unable, admit in writing its inability or fail generally to pay its debts as they become due or (vii) take any action for the purpose of effecting any of the foregoing;

(i)    one or more judgments for the payment of money in an aggregate amount in excess of $1,000,000 or other judgments that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect shall be rendered against the Borrower, any other BDCM Entity, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of the Borrower, any other BDCM Entity or any Subsidiary to enforce any such judgment;

(j)    an ERISA Event described in clause (b) of the definition thereof shall have occurred or any other ERISA Event shall have occurred that, when taken together with all other such ERISA Events, could reasonably be expected to result in liability of the Borrower and its ERISA Affiliates in an aggregate amount exceeding $250,000;

030786-0283

(k)    any Guarantee under the Guarantee and Collateral Agreement for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any Guarantor shall deny that it has any further liability under its Guarantee (other than as a result of the discharge of such Guarantor in accordance with the terms of the Loan Documents);

(l)    any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by the Borrower (or holder of Equity Interests of the Borrower in the case of the Pledge Agreement) or any other Loan Party not to be, a valid, perfected and, with respect to the Secured Parties, first priority (except as otherwise expressly provided in this Agreement or such Security Document) Lien on any material Collateral covered thereby, except to the extent that any such loss of perfection or priority results from the failure of the Collateral Agent to maintain possession of certificates representing Equity Interests pledged under the Guarantee and Collateral Agreement or the Pledge Agreement or of cash or cash equivalents in a deposit account or a security account subject to the control of the Collateral Agent; or

(m)    there shall have occurred a Change of Control;

then, and in every such event (other than an event with respect to the Borrower described in paragraph (g) or (h) above), and at any time thereafter during the continuance of such event either or both of the following actions may be taken: (i) the Administrative Agent may, and at the request of the Majority Facility Lenders with respect to the Revolving Credit Facility shall, by notice to the Borrower, terminate forthwith the Revolving Credit Commitments and (ii) the Administrative Agent may, and at the request of the Required Lenders shall, declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding, and the Administrative Agent and the Collateral Agent shall have the right to take all or any actions and exercise any remedies available to a secured party under the Security Documents or applicable law or in equity; and in any event with respect to the Borrower described in paragraph (g) or (h) above, the Revolving Credit Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall automatically become due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding, and the Administrative Agent and the Collateral Agent shall have the right to take all or any actions and exercise any remedies available to a secured party under the Security Documents or applicable law or in equity.

ARTICLE VIII.

The Agents and the Arranger

Each of the Lenders and the Issuing Bank hereby irrevocably appoints each of the Administrative Agent and the Collateral Agent (for purposes of this Article VIII, the Administrative Agent and the Collateral Agent are referred to collectively as the "Agents") its agent and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, the Agents are hereby expressly authorized by the Lenders to execute any and all documents (including releases and the Security Documents) with respect to the

69

Collateral and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents.

Each bank serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower, any other BDCM Entity or any Subsidiary or any of their respective Affiliates as if it were not an Agent hereunder.

No Agent shall have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) no Agent shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) no Agent shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent or the Collateral Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.08), and (c) except as expressly set forth in the Loan Documents, no Agent shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to the Borrower, any other BDCM Entity or any of the Subsidiaries that is communicated to or obtained by the bank serving as any Agent or any of its Affiliates in any capacity. The Administrative Agent and the Collateral Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.08) or in the absence of its own gross negligence or willful misconduct. No Agent shall be deemed to have knowledge of any Default (other than the failure by the Borrower to make a payment hereunder when due of any amount specified hereunder as payable to the Administrative Agent) unless and until written notice thereof is given to such Agent by the Borrower or a Lender, and no Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent.

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. Each Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Each Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

70

030786-0283

Subject to the appointment and acceptance of a successor Agent as provided below, each Agent may resign at any time by notifying the Lenders, the Issuing Bank and the Borrower. Upon any such resignation of the Administrative Agent or the Collateral Agent, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders and the Issuing Bank, appoint a successor Agent which shall be a bank with an office in New York, New York, or an Affiliate of any such bank. Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After an Agent's resignation hereunder, the provisions of this Article and Section 9.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.

Each of the Arranger and the Syndication Agent, in its capacity as such, shall have no duties or responsibilities, and shall incur no liability, under this Agreement or any other Loan Document.

Each Lender acknowledges that it has, independently and without reliance upon the Agents, the Arranger, the Syndication Agent or any Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Agents, the Arranger, the Syndication Agent or any Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

To the extent required by any applicable law, the Administrative Agent may withhold from any interest payment to any Lender an amount equivalent to any applicable withholding tax. If the Internal Revenue Service or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender because the appropriate form was not delivered or was not properly executed or because such Lender failed to notify the Administrative Agent of a change in circumstance which rendered the exemption from, or reduction of, withholding tax ineffective or for any other reason, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including any penalties or interest and together with all expenses (including legal expenses, allocated internal costs and out-of-pocket expenses) incurred.

## ARTICLE IX.

### Miscellaneous

SECTION 9.01. <u>Notices</u>. Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax, as follows:

(a)    if to the Borrower, to it at One Sound Shore Drive, Suite 200, Greenwich, CT 06830, Attention of Mounir Nahas (Fax No. (203) 552-1012);

71

033-786-0283

(b)     if to the Administrative Agent, the Collateral Agent or the Issuing Bank, to Credit Suisse, Eleven Madison Avenue, New York, NY 10010, Attention of Agency Group (Fax No. (212) 325-8304); and

(c)     if to a Lender, to it at its address (or fax number) set forth in its Administrative Questionnaire or the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01. As agreed to among the Borrower, the Administrative Agent and the applicable Lenders from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable Person provided from time to time by such Person.

SECTION 9.02.  Survival of Agreement.   All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and the Issuing Bank and shall survive the making by the Lenders of the Loans and the issuance of Letters of Credit by the Issuing Bank, regardless of any investigation made by the Lenders or the Issuing Bank or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid or any Letter of Credit is outstanding and so long as the Commitments have not been terminated. The provisions of Sections 2.14, 2.16, 2.20 and 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the expiration of any Letter of Credit, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent, the Arranger, any Lender or the Issuing Bank.

SECTION 9.03.  Binding Effect. This Agreement shall become effective when it shall have been executed by each of the parties hereto and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

SECTION 9.04.  Successors and Assigns. (a) Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Borrower, the Administrative Agent, the Collateral Agent, the Issuing Bank or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

(b)     Each Lender may assign to one or more assignees (other than a Prohibited Person) all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided, however, that (i) the Administrative Agent must give its prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed), (ii) the Borrower must give its prior written consent to such assignment (which consent shall not be unreasonably withheld or delayed (it being understood that (x) an assignment to a competitor or potential competitor of the Borrower (or to a product or fund managed by such a competitor or potential competitor) would not constitute an unreasonable basis for the Borrower's withholding of consent and (y)

72

a commercial bank accepting an assignment for its own account would not be considered such a competitor or potential competitor of the Borrower); provided that the consent of the Borrower shall not be required to any such assignment made to another Lender, after the occurrence and during the continuance of any Event of Default or in connection with the initial syndication of the credit facilities provided for herein, (iii) in the case of any assignment of a Revolving Credit Commitment, the Issuing Bank must give its prior written consent to such assignment (not to be unreasonably withheld or delayed), (iv) the amount of the Commitment of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent and determined on an aggregate basis in the event of concurrent assignments to Related Funds) shall not be less than $2,500,000 (or, if less, the entire remaining amount of such Lender's Commitment) and shall be in an amount that is an integral multiple of $500,000 (or the entire remaining amount of such Lender's Commitment), (v) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent) and (vi) the assignee, if it shall not be a Lender immediately prior to the assignment, shall deliver to the Administrative Agent an Administrative Questionnaire and all applicable tax forms. Upon acceptance and recording pursuant to paragraph (e) of this Section 9.04, from and after the effective date specified in each Assignment and Acceptance, (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement and (B) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.14, 2.16, 2.20 and 9.05, as well as to any Fees accrued for its account and not yet paid).

(c)     By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows: (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and that its Term Loan Commitment and Revolving Credit Commitment, and the outstanding balances of its Term Loans and Revolving Loans, in each case without giving effect to assignments thereof which have not become effective, are as set forth in such Assignment and Acceptance, (ii) except as set forth in (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Borrower, any other BDCM Entity or any Subsidiary or the performance or observance by the Borrower, any other BDCM Entity or any Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants that it is legally authorized to enter into such Assignment and Acceptance; (iv) such assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements referred to in Section 3.05(a) or delivered pursuant to Section 5.04 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (v) such assignee will independently and without reliance upon the Administrative Agent, the Collateral Agent, the Arranger, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vi) such assignee appoints and authorizes the Administrative Agent and the Collateral Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the

NY\1171256.14

030186-0283

Administrative Agent and the Collateral Agent, respectively, by the terms hereof, together with such powers as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices in The City of New York a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive and the Borrower, the Administrative Agent, the Issuing Bank, the Collateral Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Issuing Bank, the Collateral Agent and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(e)    Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), applicable tax forms and the written consent of the Issuing Bank and the Administrative Agent to such assignment, the Administrative Agent shall promptly (i) accept such Assignment and Acceptance and (ii) record the information contained therein in the Register. No assignment shall be effective unless it has been recorded in the Register as provided in this paragraph (e).

(f)    Each Lender may without the consent of the Borrower, the Issuing Bank or the Administrative Agent sell participations to one or more banks or other entities not constituting a Prohibited Person in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans); provided, however, that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other entities shall be entitled to the benefit of the cost protection provisions contained in Sections 2.14, 2.16 and 2.20 to the same extent as if they were Lenders (but, with respect to any particular participant, to no greater extent than the Lender that sold the participation to such participant) if they comply with the requirements of Section 2.20 as if they were Lenders and (iv) the Borrower, the Administrative Agent, the Issuing Bank and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and such Lender shall retain the sole right to enforce the obligations of the Borrower relating to the Loans or L/C Disbursements and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers decreasing any fees payable hereunder or the amount of principal of or the rate at which interest is payable on the Loans, extending any scheduled principal payment date or date fixed for the payment of interest on the Loans, increasing or extending the Commitments or releasing any Guarantor or all or any substantial part of the Collateral).

(g)    Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.04, disclose to the assignee or participant or proposed assignee or participant any information relating to the Borrower furnished to such Lender by or on behalf of the Borrower; provided that, prior to any such disclosure of information designated by the Borrower as confidential, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree (subject to customary exceptions) to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Lenders pursuant to Section 9.16.

74

(h)     Any Lender may at any time assign all or any portion of its rights under this Agreement to secure extensions of credit to such Lender or in support of obligations owed by such Lender; provided that no such assignment shall release a Lender from any of its obligations hereunder or substitute any such assignee for such Lender as a party hereto.

(i)     Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (an "SPC"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (provided that the Borrower must give its prior written consent to such grant (which consent shall not be unreasonably withheld or delayed, it being understood that an assignment to a competitor or potential competitor of the Borrower or to a product or fund managed by such a competitor or potential competitor would not constitute an unreasonable basis for the Borrower's withholding of consent); provided that the consent of the Borrower shall not be required to any such grant after the occurrence and during the continuance of any Event of Default or in connection with the initial syndication of the credit facilities provided for herein), the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to make any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this Section 9.04, any SPC may (i) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC.

(j)     The Borrower shall not assign or delegate any of its rights or duties hereunder without the prior written consent of the Administrative Agent, the Issuing Bank and each Lender, and any attempted assignment without such consent shall be null and void.

(k)     In the event that any Revolving Credit Lender shall become a Defaulting Lender or S&P, Moody's and Thompson's BankWatch (or InsuranceWatch Ratings Service, in the case of Lenders that are insurance companies (or Best's Insurance Reports, if such insurance company is not rated by Insurance Watch Ratings Service)) shall, after the date that any Lender becomes a Revolving Credit Lender, downgrade the long-term certificate deposit ratings of such Lender, and the resulting ratings shall be below BBB-, Baa3 and C (or BB, in the case of a Lender that is an insurance company (or B, in the case of an insurance company not rated by InsuranceWatch Ratings Service)) (or, with respect to any Revolving Credit Lender that is not rated by any such ratings service or provider, the Issuing Bank shall have reasonably determined that there has occurred a material adverse change in the financial condition of any such Lender, or a material impairment of the ability of any such Lender to perform its obligations hereunder, as compared to such condition or ability as of the date that any such Lender became a

75

03(786-0283

Revolving Credit Lender) then (i) the Issuing Bank shall have the right, but not the obligation, at its own expense, upon notice to such Lender and the Administrative Agent, to replace such Lender with an assignee (in accordance with and subject to the restrictions contained in paragraph (b) above), and such Lender hereby agrees to transfer and assign without recourse (in accordance with and subject to the restrictions contained in paragraph (b) above) all its interests, rights and obligations in respect of its Revolving Credit Commitment to such assignee; provided, however, that (A) no such assignment shall conflict with any law, rule and regulation or order of any Governmental Authority and (B) the Issuing Bank or such assignee, as the case may be, shall pay to such Lender in immediately available funds on the date of such assignment the principal of and interest accrued to the date of payment on the Loans made by such Lender hereunder and all other amounts accrued for such Lender's account or owed to it hereunder or (ii) the Borrower may elect, upon notice to such Lender and the Administrative Agent, to replace such Lender as a Lender party to this Agreement, provided that, concurrently with such replacement by the Borrower, (A) another bank or entity which is reasonably satisfactory to the Borrower and the Administrative Agent shall agree, as of such date, to purchase for cash the Loans and other Obligations due to such Lender pursuant to an Assignment and Acceptance and to become a Lender for all purposes under this Agreement and to assume all obligations of such Lender to be terminated as of such date and to comply with the requirements of paragraph (b) above and (B) the Borrower shall pay to such Lender in same day funds on the day of such replacement all interest, fees and other amounts then accrued but unpaid to such Lender by the Borrower hereunder to and including the date of termination, including payments due to such Lender under Section 2.15 and 2.20 and an amount, if any, equal to the payment which would have been due to such Lender on the day of such replacement under Section 2.16 had the Loans of such Lender been prepaid on such date rather than sold to the replacement Lender.

SECTION 9.05. Expenses; Indemnity. (a) The Borrower agrees to pay all reasonable out-of-pocket costs and expenses incurred by the Administrative Agent, the Collateral Agent, the Syndication Agent, the Arranger and the Issuing Bank in connection with the syndication of the credit facilities provided for herein and the preparation and administration of this Agreement and the other Loan Documents or in connection with any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions hereby or thereby contemplated shall be consummated), including in each case the reasonable fees, disbursements and other charges of Latham & Watkins LLP, counsel for the Administrative Agent and the Collateral Agent, or incurred by the Administrative Agent, the Collateral Agent, the Syndication Agent, the Arranger, the Issuing Bank and the Lenders in connection with the enforcement or protection of their rights in connection with this Agreement and the other Loan Documents, or in connection with the Loans made or Letters of Credit issued hereunder, and, in connection with any such enforcement or protection, the reasonable fees, disbursements and other charges of any one or more counsel for the Administrative Agent, the Collateral Agent, the Syndication Agent, the Arranger or the Issuing Bank (acting as a group) and any one or more counsel for the Lenders acting as a group.

(b)    The Borrower agrees to indemnify the Administrative Agent, the Collateral Agent, the Syndication Agent, the Arranger, each Lender, the Issuing Bank and each Related Party of any of the foregoing persons (each such Person being called an "Indemnitee") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related costs and expenses, including reasonable counsel fees, disbursements and other charges, incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of this Agreement or any other Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated thereby, (ii) the use of the proceeds of the Loans or issuance of Letters of Credit, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto, or (iv) any actual or alleged presence or Release of Hazardous Materials on any property owned or operated by the Borrower, any other BDCM Entity or any

76

of the Subsidiaries, or any Environmental Liability related in any way to the Borrower, any other HDCM Entity or any of the Subsidiaries; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related costs and expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from primarily the gross negligence or willful misconduct of such Indemnitee (and, upon any such determination, any indemnification payments with respect to such losses, claims, damages, liabilities or related costs and expenses previously received by such Indemnitee shall be subject to reimbursement by such Indemnitee).

(c)    To the extent that the Borrower fails to pay any amount required to be paid by them to the Administrative Agent, the Collateral Agent, the Syndication Agent, the Arranger or the Issuing Bank under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent, the Collateral Agent, the Syndication Agent, the Arranger or the Issuing Bank, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent, the Collateral Agent, the Syndication Agent, the Arranger or the Issuing Bank in its capacity as such. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the Aggregate Revolving Credit Exposure, outstanding Term Loans and unused Commitments at the time.

(d)    To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof.

(e)    The provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the Transactions or the other transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the expiration of any Letter of Credit, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent, the Collateral Agent, the Syndication Agent, the Arranger, any Lender or the Issuing Bank. All amounts due under this Section 9.05 shall be payable on written demand therefor.

SECTION 9.06.  Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, except to the extent prohibited by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement and other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although such obligations may be unmatured. The rights of each Lender under this Section 9.06 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 9.07.  Applicable Law.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN LETTERS OF CREDIT AND AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK. EACH LETTER OF CREDIT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED IN ACCORDANCE WITH, THE LAWS OR RULES DESIGNATED IN SUCH LETTER OF CREDIT, OR IF NO SUCH LAWS OR

NY\1171256.14

030786-0283

RULES ARE DESIGNATED, THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS MOST RECENTLY PUBLISHED AND IN EFFECT, ON THE DATE SUCH LETTER OF CREDIT WAS ISSUED, BY THE INTERNATIONAL CHAMBER OF COMMERCE (THE "UNIFORM CUSTOMS") AND, AS TO MATTERS NOT GOVERNED BY THE UNIFORM CUSTOMS, THE LAWS OF THE STATE OF NEW YORK.

SECTION 9.08.  Waivers; Amendment.  (a)  No failure or delay of the Administrative Agent, the Collateral Agent, any Lender or the Issuing Bank in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent, the Collateral Agent, the Issuing Bank and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

(b)  Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders; provided, however, that no such agreement shall (i) decrease the principal amount of, or extend the maturity of or any scheduled principal payment date or date for the payment of any interest on any Loan or any date for reimbursement of an L/C Disbursement, or waive or excuse any such payment or any part thereof, or decrease the rate of interest on any Loan or L/C Disbursement, without the prior written consent of each Lender affected thereby, (ii) increase or extend the Commitment or decrease or extend the date for payment of any Fees of any Lender without the prior written consent of such Lender, (iii) amend or modify the pro rata requirements of Section 2.17, the provisions of Section 9.04(j), the provisions of this Section or the definition of the term "Required Lenders," or release any Guarantor, without the prior written consent of each Lender, (iv) amend or modify the definition of the term "Majority Facility Lenders" without the prior written consent of each Lender affected thereby, (v) release all or any substantial part of the Collateral without the prior written consent of each Lender, (vi) change the provisions of any Loan Document in a manner that by its terms adversely affects the rights in respect of payments due to Lenders holding Loans of one Class differently from the rights of Lenders holding Loans of any other Class without the prior written consent of Lenders holding a majority in interest of the outstanding Loans and unused Commitments of each adversely affected Class, (vii) have the effect of obligating any Revolving Credit Lender to make any Revolving Loan, or any Issuing Bank to issue any Letter of Credit, if the conditions to such Credit Event in Section 4.01 would not be satisfied absent such agreement, without the prior written consent of the Majority Facility Lenders in the Revolving Credit Facility or (viii) modify the protections afforded to an SPC pursuant to the provisions of Section 9.04(i) without the written consent of such SPC; provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent, the Collateral Agent or the Issuing Bank hereunder or under any other Loan Document without the prior written consent of the Administrative Agent, the Collateral Agent or the Issuing Bank, as applicable.  Notwithstanding the foregoing, if the Borrower shall request the release of any Guarantor and/or any Collateral in connection with any Asset Sale permitted by this Agreement, any merger or consolidation of any Subsidiary to effect any Asset Sale permitted by this Agreement or any liquidation or dissolution of any Subsidiary permitted by this Agreement and shall deliver to the Collateral Agent a certificate to the effect that such transaction and the disposition of the proceeds thereof will comply with the terms of this Agreement, the Collateral Agent, if satisfied that the applicable certificate is correct, shall and is hereby authorized to, without the

78

consent of any Lender, execute and deliver all such instruments as may be required to effect the release of such Guarantor and/or such Collateral.

(c)     If, in connection with any proposed amendment, waiver or consent requiring the consent of "each Lender" or "each Lender affected thereby", the consent of the Required Lenders is obtained, but the consent of other necessary Lenders is not obtained (any such Lender whose consent is necessary but not obtained being referred to herein as a "Non-Consenting Lender"), then (x) the Administrative Agent may elect to purchase all (but not less than all) of (1) any Class of such Lender's Commitments, the corresponding Loans owing to it and other Obligations due to it and all of its rights and obligations hereunder and under the other Loan Documents in respect of such Class or (2) such Lender's Commitments, the Loans owing to it and other Obligations due to it and all of its rights and obligations hereunder and under the other Loan Documents, provided that the Borrower shall pay to such Non-Consenting Lender in same day funds on the day of such purchase all interest, fees and other amounts then accrued but unpaid to such Non-Consenting Lender by the Borrower hereunder to and including the date of termination, including without limitation, payments due to such Non-Consenting Lender under Section 2.15 and 2.20 and an amount, if any, equal to the payment which would have been due to such Lender on the day of such purchase under Section 2.16 had the Loans of such Non-Consenting Lender been prepaid on such date rather than sold to the Administrative Agent or (y) the Borrower may elect to replace a Non-Consenting Lender as a Lender party to this Agreement, provided that, concurrently with such replacement by the Borrower, (i) another bank or other entity which is reasonably satisfactory to the Borrower and the Administrative Agent shall agree, as of such date, to purchase for cash the Loans and other Obligations due to the Non-Consenting Lender pursuant to an Assignment and Acceptance and to become a Lender for all purposes under this Agreement and to assume all obligations of the Non-Consenting Lender to be terminated as of such date and to comply with the requirements of clause (b) of Section 9.04, (ii) the replacement Lender shall grant its consent with respect to the applicable proposed amendment, waiver or consent and (iii) the Borrower shall pay to such Non-Consenting Lender in same day funds on the day of such replacement (1) all interest, fees and other amounts then accrued but unpaid to such Non-Consenting Lender by the Borrower hereunder to and including the date of termination, including without limitation payments due to such Non-Consenting Lender under Sections 2.15 and 2.20, and (2) an amount, if any, equal to the payment which would have been due to such Lender on the day of such replacement under Section 2.16 had the Loans of such Non-Consenting Lender been prepaid on such date rather than sold to the replacement Lender. Each Lender agrees that if the Administrative Agent or the Borrower, as the case may be, exercises its option hereunder, it shall promptly execute and deliver all agreements and documentation necessary to effectuate such assignment as set forth in Section 9.04. The Administrative Agent or the Borrower shall be entitled (but not obligated) to execute and deliver such agreement and documentation on behalf of such Non-Consenting Lender and any such agreement and/or documentation so executed by the Administrative Agent or the Borrower shall be effective for purposes of documenting an assignment pursuant to Section 9.04.

SECTION 9.09.   Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan or participation in any L/C Disbursement, together with all fees, charges and other amounts which are treated as interest on such Loan or participation in such L/C Disbursement under applicable law (collectively, the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan or participation but were not payable as a result of the operation of this Section 9.09 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or participations or periods shall be increased (but not above the Maximum Rate therefor) until

030186-0283

such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.10. <u>Entire Agreement</u>. This Agreement, the Fee Letter and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof. Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents. Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any Person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder (including any Affiliate of the Issuing Bank that issues any Letter of Credit) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent, the Syndication Agent, the Arranger, the Issuing Bank and the Lenders ) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

SECTION 9.11. <u>WAIVER OF JURY TRIAL</u>. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.

SECTION 9.12. <u>Severability</u>. In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 9.13. <u>Counterparts</u>. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 9.03. Delivery of an executed signature page to this Agreement by facsimile transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 9.14. <u>Headings</u>. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 9.15. <u>Jurisdiction; Consent to Service of Process</u>. (a) The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in New York City, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or

80

NY\1171256.14

030786-0283

proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent, the Collateral Agent, the Arranger, the Issuing Bank or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against the Borrower or its properties in the courts of any jurisdiction.

(b)    The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in any New York State or Federal court. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.16.  Confidentiality.  Each of the Administrative Agent, the Collateral Agent, the Syndication Agent, the Arranger, the Issuing Bank and the Lenders (collectively, the "Receiving Parties") agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel and other advisors that have a need to know such information for the purpose of performing their duties (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); provided, however, and for the avoidance of doubt, under no circumstances shall such Information be disclosed to any Receiving Party's officers, directors, employees and agents who are actively engaged in leveraged loan or high yield bond sales and trading activity (other than any such officer, director, employee or agent that is in a management or supervisory role for use by such officer, director, employee or agent solely in connection with any credit, legal or other relevant evaluation related to this Agreement and for no other purpose); provided, further, however, that the foregoing proviso shall not be construed to limit such Person from receiving any Information that is provided to Lenders in connection with the Transactions, (b) to the extent requested by any governmental authority, regulatory authority or quasi-regulatory authority (such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) subject to an agreement containing provisions substantially the same as those of this Section 9.16, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Loan Documents or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower, any other BDCM Entity or any Subsidiary or any of their respective obligations, (f) with the consent of the Borrower or (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 9.16. Each Receiving Party agrees that it shall be responsible for any breach of this Section 9.16 that results from the actions or omissions of its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel and other advisers. Notwithstanding the foregoing, if any Receiving Party, including its and its Affiliates' officers, directors, employees and agents, including accountants, legal counsel and other advisors, is required in accordance with applicable law or by request of a governmental agency or regulatory authority to disclose any Information, such Receiving Party shall, if not expressly prohibited from doing so by applicable law or competent governmental or regulatory authority, promptly notify the Borrower of such requirement (other

81

030186-0283

than as a result of an examination by any regulatory agency) so that the Borrower may seek an appropriate protective order or waive such Receiving Party's compliance with the provision of this Section 9.16. Each Receiving Party agrees that, if not expressly prohibited from doing so by applicable law or competent governmental or regulatory authority, each Receiving Party will fully cooperate with any reasonable request made by the Borrower in seeking any such protective order. If, in the absence of a protective order or the receipt of a waiver hereunder, any Receiving Party is, nonetheless, compelled to disclose any Information, such Receiving Party may disclose only such information or material which is legally required or requested to be disclosed without liability hereunder, and such Receiving Party shall use reasonable efforts to ensure that such information or material shall remain confidential. For the purposes of this Section, "Information" shall mean all information received from the Borrower and related to the Borrower or its business, other than any such information that was available to the Administrative Agent, the Collateral Agent, the Syndication Agent, the Arranger, the Issuing Bank or any Lender on a nonconfidential basis prior to its disclosure by the Borrower; provided that, in the case of Information received from the Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section 9.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information. Notwithstanding any other express or implied agreement, arrangement or understanding to the contrary, each of the parties hereto agrees that each other party hereto (and each of its employees, representatives or agents) are permitted to disclose to any persons, without limitation, the tax treatment and tax structure of the Loans and the other transactions contemplated by the Loan Documents and all materials of any kind (including opinions and tax analyses) that are provided to the Loan Parties, the Lenders, the Arranger or any Agent related to such tax treatment and tax aspects. To the extent not inconsistent with the immediately preceding sentence, this authorization does not extend to disclosure of any other information or any other term or detail not related to the tax treatment or tax aspects of the Loans or the transactions contemplated by the Loan Documents.

SECTION 9.17.  USA PATRIOT Act Notice.  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with the USA PATRIOT Act.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

NY\1171256.14

036780-0283

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

BLACK DIAMOND CAPITAL MANAGEMENT, L.L.C.

By: _____
    Name: Stephen H. Deckoff
    Title:  Managing Principal

CREDIT SUISSE, CAYMAN ISLANDS BRANCH, individually and as Administrative Agent, Collateral Agent and Issuing Bank

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

BLACK DIAMOND CAPITAL
MANAGEMENT, L.L.C.

By: _____
    Name:
    Title:

CREDIT SUISSE, CAYMAN ISLANDS
BRANCH, individually and as Administrative
Agent, Collateral Agent and Issuing Bank

By: _____
    Name:
    Title: VANESSA GOMEZ
          VICE PRESIDENT

By: _____
    Name:
    Title: MOHAN
          ASSOCIATE

[Signature page to Credit Agreement]

SIGNATURE PAGE TO BLACK DIAMOND
CAPITAL MANAGEMENT, L.L.C. CREDIT
AGREEMENT DATED AS OF THE DATE
FIRST WRITTEN ABOVE

NAME OF LENDER:

By
Name: Heather G. Webster
Title: Vice President

SIGNATURE PAGE TO BLACK DIAMOND
CAPITAL MANAGEMENT, L.L.C. CREDIT
AGREEMENT DATED AS OF THE DATE
FIRST WRITTEN ABOVE


THE BANK OF NOVA SCOTIA
NAME OF LENDER

By: _____

Name: Todd Meller
Title: Managing Director

SIGNATURE PAGE TO BLACK DIAMOND
CAPITAL MANAGEMENT, L.L.C. CREDIT
AGREEMENT DATED AS OF THE DATE
FIRST WRITTEN ABOVE


BMO Capital Markets Financing, Inc.


By: _____
Name:  Stephen Maenhout
Title:   Vice President

SIGNATURE PAGE TO BLACK DIAMOND
CAPITAL MANAGEMENT, L.L.C. CREDIT
AGREEMENT DATED AS OF THE DATE
FIRST WRITTEN ABOVE

BEAR STEARNS CORPORATE LENDING
INC.:

By: _____
Name: Victor Bulzacchelli
Title: Vice President

SIGNATURE PAGE TO BLACK DIAMOND
CAPITAL MANAGEMENT, L.L.C. CREDIT
AGREEMENT DATED AS OF THE DATE
FIRST WRITTEN ABOVE

NAME OF LENDER: Dresdner Bank AG, New
York and Grand Cayman Branches

By: _____
     Name: Janet Wolff
     Title: Director

By: _____
     Name: Brian Schneider
     Title: Vice President

SIGNATURE PAGE TO BLACK DIAMOND
CAPITAL MANAGEMENT, L.L.C. CREDIT
AGREEMENT DATED AS OF THE DATE
FIRST WRITTEN ABOVE

CANADIAN IMPERIAL BANK OF
COMMERCE:

By: _____
Name:
Title:
              John Rozario
          Authorized Signatory

**Schedule 2.01**

Lenders and Commitments

| Lender | Term Loan Commitment | Revolving Credit Commitment |
|---|---|---|
| Credit Suisse, Cayman Islands Branch | $5,333,333.33 | $4,666,666.67 |
| Canadian Imperial Bank of Commerce | $6,666,666.67 | $5,833,333.33 |
| Dresdner Bank AG, New York and Grand Cayman Branches | $6,666,666.67 | $5,833,333.33 |
| JPMorgan Chase Bank | $6,666,666.67 | $5,833,333.33 |
| Bear Stearns Corporate Lending Inc. | $5,333,333.33 | $4,666,666.67 |
| BMO Capital Markets Financing, Inc. | $5,333,333.33 | $4,666,666.67 |
| The Bank of Nova Scotia | $4,000,000.00 | $3,500,000.00 |
| **Total** | **$40,000,000.00** | **$35,000,000.00** |

EXHIBIT B

[FORM OF]
ASSIGNMENT AND ACCEPTANCE

This Assignment and Acceptance (the "<u>Assignment and Acceptance</u>") is dated as of the Effective Date set forth below and is entered into by and between *[Insert name of Assignor]* (the "<u>Assignor</u>") and *[Insert name of Assignee]* (the "Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, supplemented or otherwise modified from time to time, the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Acceptance as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including, to the extent included in any such facilities, any guarantees and letters of credit) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "<u>Assigned Interest</u>"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Acceptance, without representation or warranty by the Assignor.

1.   Assignor:

2.   Assignee:

3.   Borrower(s)         [Black Diamond Capital Management, L.L.C./Black Diamond Capital Holdings, L.L.C.]

4.   Agent:              Credit Suisse, as the administrative agent and collateral agent under the Credit Agreement

5.   Credit Agreement:   The Credit Agreement dated as of October 12, 2006, among Black Diamond Capital Management, L.L.C., a Delaware limited liability company, the Lenders and Credit Suisse, as administrative agent and collateral agent for the Lenders (in such capacities, the "<u>Agent</u>") and as Issuing Bank.

B-1

6.    Assigned Interest:

| Facility Assigned | Aggregate Amount of Commitment/Loans of all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitments/Loans[1] | CUSIP |
|---|---|---|---|---|
| Revolving Credit Commitment | $35,000,000 | $ | % | |
| Term Loan Commitment | $40,000,000 | $ | % | |

Effective Date:_____, 20__  [TO BE INSERTED BY AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Acceptance are hereby agreed to:

ASSIGNOR

[NAME OF ASSIGNOR]

By:_____
     Name:
     Title:

ASSIGNEE

[NAME OF ASSIGNEE]

By:_____
     Name:
     Title:

---

[1]    Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

B-2

Consented to and Accepted:

CREDIT SUISSE, CAYMAN ISLANDS BRANCH, as Agent

By:_____
     Name:
     Title:

By:_____
     Name:
     Title:


[Consented to:][2]

[BLACK DIAMOND CAPITAL MANAGEMENT, L.L.C./BLACK DIAMOND CAPITAL HOLDINGS, L.L.C.]

By:_____.
     Name:
     Title:


[Consented to:][3]

[CREDIT SUISSE, CAYMAN ISLANDS BRANCH, as Issuing Bank]

By:_____
     Name:
     Title:

By:_____
     Name:
     Title:

---

[2]    To be added only if the consent of the Borrower is required by the terms of the Credit Agreement.

[3]    To be added only if the consent of the Issuing Bank is required by the terms of the Credit Agreement.

B-3

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ACCEPTANCE

1.    Representations and Warranties.

1.1    Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) its Commitments, and the outstanding balances of its Loans, in each case without giving effect to assignments thereof which have not become effective, are as set forth herein, and (iv) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates, any of the other BDCM Entities or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates, any of the other BDCM Entities or any other Person of any of their respective obligations under any Loan Document.

1.2.    Assignee. The Assignee (a) represents and warrants that (i) it is an eligible assignee and has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements referred to in Section 3.05(a) or delivered pursuant to Section 5.04 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Agent or any other Lender, and (v) if it is a Foreign Lender, attached to the Assignment and Acceptance is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, (ii) it appoints and authorizes the Agent to take such action on its behalf and to exercise such powers under the Credit Agreement as are delegated to the Agent, by the terms thereof, together with such powers as are reasonably incidental thereto, and (iii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2.    Payments. From and after the Effective Date, the Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date.

3.    General Provisions. This Assignment and Acceptance shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Acceptance may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Acceptance

NY\1194408.3

by facsimile shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance. This Assignment and Acceptance shall be construed in accordance with and governed by the laws of the State of New York.

# EXHIBIT

# B

**EXECUTION COPY**

AMENDMENT NO. 1

to

CREDIT AGREEMENT

THIS AMENDMENT NO. 1 TO THE CREDIT AGREEMENT REFERRED TO BELOW, dated as of _November 6_, 2009 (the "Amendment"), is entered into among BLACK DIAMOND CAPITAL HOLDINGS, L.L.C. (the "Borrower") and the LENDERS (as defined in the Credit Agreement referred to below) party hereto. Capitalized terms used herein and not otherwise defined herein shall have the meaning assigned to such terms in the Credit Agreement, dated as of October 12, 2006, by and among BLACK DIAMOND CAPITAL MANAGEMENT, L.L.C. (as predecessor in interest to the Borrower), the Lenders party thereto, and CREDIT SUISSE, as Administrative Agent, Collateral Agent and Issuing Bank (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").

WITNESSETH

WHEREAS, the parties hereto are parties to the Credit Agreement; and

WHEREAS, the parties hereto have agreed to amend the Credit Agreement on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto have agreed to the following amendments to the Credit Agreement:

1.     Amendments to the Credit Agreement. Effective as of the date hereof, the Credit Agreement is hereby amended as follows:

A. The definition of "Prohibited Person" is amended by deleting clause (i) thereof;

B. Section 2.18 is amended by adding the following at the end of the first sentence thereof:

"and that the provisions of this Section 2.18 shall not be construed to apply to any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, including the BDCM Entities and their Affiliates";

C. Section 6.04 is amended by adding "; and" after subsection (p) and adding the following as new subsection (q) thereof:

"(q) Investments consisting of Loans";

*Amendment No. 1 to*
*Credit Agreement*

D. Section 6.07 is amended by deleting "and" before subsection (f) and replacing it with a comma and adding the following as new subsection (g) thereof:

"and (g) the BDCM Entities or their Affiliates may purchase Loans.";

E. Section 6.08(a) is amended by adding the text "the purchase of Loans by BDCM Entities, and" after the words "activity other than" and before the words "the business conducted by them"; and

F. Article VI is amended by adding the following new Section 6.17:

"SECTION 6.17. Loan Purchases. The BDCM Entities agree to, and shall cause their Affiliates to, not repay, prepay, cancel, forgive, terminate or otherwise retire prior to maturity any Loans purchased by any BDCM Entity or any of their respective Affiliates other than pursuant to the provisions of Section 2.11, Section 2.12 or Section 2.13 or pursuant to any cancellation, forgiveness, termination or other retirement of all or any portion of the Obligations by all of the Lenders on a pro rata basis whether pursuant to a consensual arrangement, as a result of a bankruptcy proceeding or otherwise.

2.    Conditions to Effectiveness.  This Amendment shall become effective as of the date hereof only upon the satisfaction of all of the following condition precedent (the date of satisfaction of such conditions being referred to herein as the "Amendment Effective Date"): the Administrative Agent shall have received a counterpart signature page of this Amendment duly executed by the Borrower and the Required Lenders.

3.    Reference to and Effect on the Credit Agreement.

(a)    On and after the Amendment Effective Date, each reference in the Credit Agreement to "this Agreement," "hereunder," "hereof," "herein" or words of like import referring to the Credit Agreement, and each reference in the other Loan Documents to the "Credit Agreement," "thereunder," "thereof," "therein" or words of like import referring to the Credit Agreement shall mean and be a reference to the Credit Agreement as amended hereby.

(b)    Except as specifically amended by this Amendment, the Credit Agreement, the other Loan Documents and all other documents, instruments and agreements executed and/or delivered in connection therewith, shall remain in full force and effect, and are hereby ratified and confirmed. Nothing herein shall be deemed to entitle the Borrower to a further consent to, or a further waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other Loan Document in similar or different circumstances.

(c)    The execution, delivery and performance of this Amendment shall not constitute a waiver of any provision of, or operate as a waiver of any right, power or remedy of the Administrative Agent, the Collateral Agent, the Issuing Bank or any Lender under, the Credit Agreement or any of the other Loan Documents.

4.    GOVERNING LAW.  THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

5.    Headings.  Section headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purpose or be given any substantive effect.

6.    Counterparts.  This Amendment may be executed by one or more of the parties to this Amendment on any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Amendment by facsimile, email or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Amendment.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

*Amendment No. 1 to*
*Credit Agreement*

IN WITNESS WHEREOF, this Amendment has been duly executed as of the day and year first above written.

BLACK DIAMOND CAPITAL HOLDINGS, L.L.C., as the Borrower

By: _____
Name: Stephen H. Deckoff
Title: Managing Principal

*Amendment No. 1 to*
*Credit Agreement*

JPMORGAN CHASE BANK, as a Lender

By: _Patricia Foley_____

Name: PATRICIA FOLEY

Title: VP

CANADIAN IMPERIAL BANK OF
COMMERCE, as a Lender

By: _____
Name: KATHRYN LAGROZY
Title: EXECUTIVE DIRECTOR

CREDIT SUISSE, CAYMAN ISLANDS
BRANCH, as a Lender

By: _____
Name:
Title:          Alain Daoust
                    Director

By: _____
Name:       VIPUL DHADDA
Title:          ASSOCIATE

# EXHIBIT
# C

AMENDMENT NO. 2

to

CREDIT AGREEMENT

THIS AMENDMENT NO. 2 TO THE CREDIT AGREEMENT REFERRED TO BELOW, dated as of _November 30_, 2009 (the "Amendment"), is entered into among BLACK DIAMOND CAPITAL HOLDINGS, L.L.C. (the "Borrower"), and the LENDERS (as defined in the Credit Agreement referred to below) party hereto.  Capitalized terms used herein and not otherwise defined herein shall have the meaning assigned to such terms in the Credit Agreement, dated as of October 12, 2006, by and among BLACK DIAMOND CAPITAL MANAGEMENT, L.L.C. (as predecessor in interest to the Borrower), the Lenders party thereto, and CREDIT SUISSE, as Administrative Agent, Collateral Agent and Issuing Bank  (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").

WITNESSETH

WHEREAS, the parties hereto are parties to the Credit Agreement; and

WHEREAS, the parties hereto have agreed to amend the Credit Agreement on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto have agreed to the following amendments to the Credit Agreement:

1.    Amendments to the Credit Agreement.  Effective as of the date hereof, the Credit Agreement is hereby amended as follows:

(a)    The definition of "BDCM Entity" set forth in Section 1.1 of the Credit Agreement is amended to add the following words at the end thereof:

_"other than the Excluded Manager"._

(b)    The definition of "BDCM Funds" set forth in Section 1.1 of the Credit Agreement is amended to add the following words at the end thereof:

_"other than the Excluded Fund"._

(c)    The definition of "Subsidiary" set forth in Section 1.1 of the Credit Agreement is amended and restated in its entirety to read as follows:

_"Subsidiary" shall mean any subsidiary of the Borrower; provided that neither any BDCM Fund, the Excluded Fund or the Excluded Manager shall be deemed to be a Subsidiary._

(d)    Section 1.1 of the Credit Agreement is amended to delete the definitions of "Borrower's Share of Excess Cash Flow", "Consolidated EBITDA", "Consolidated Fixed Charges", "Consolidated Interest Expense", "Consolidated Net Income", "Fixed Charge Coverage Ratio",  "Equity Issuance", "Excess Cash Flow", "Excess Cash Flow Prepayment Amount", "Excess Cash Flow Prepayment Date", "Investments", "Leverage

Ratio", "Net Cash Proceeds", "Permitted Refinancing Indebtedness", "Recovery Event", "Required Prepayment Percentage", "Tax Restricted Payment", "Total Debt", "Test Period" and "Total Receivables" in their entirety.

(e)     Section 1.1 of the Credit Agreement is amended to add the definitions of "Excluded Fund" and "Excluded Manager", in proper alphabetical order, as follows:

> *"Excluded Fund" means BDCM Opportunity Fund III, L.P., a [Delaware] limited partnership.*

> *"Excluded Manager" means each of BDCM Opportunity Fund III GP, L.L.C., a Delaware limited liability company, and BDCM Opportunity Fund III Adviser, L.L.C., a Delaware limited liability company.*

(f)     Section 2.13 of the Credit Agreement is amended to (x) delete clauses (b) through (f) thereof in their entirety and replace them with the following:

> (b)     *[Reserved]*

> (c)     *[Reserved]*

> (d)     *[Reserved]*

> (e)     *[Reserved]*

> (f)     *Mandatory prepayments pursuant to Section 2.13(a) shall be applied as provided in Section 2.13(a).*

(g)     Section 3.21 of the Credit Agreement is amended to delete the second sentence thereof.

(h)     Article V of the Credit Agreement is amended by deleting Section 5.11 in its entirety.

(i)     Section 5.03 of the Credit Agreement is amended to delete the phrase "on its quarterly and annual GAAP financial statements adequate reserves with respect thereto in accordance with GAAP" set forth in the proviso thereto and replace it with the following:

> *"as reasonably determined by the Borrower"*

(j)     Section 5.04 of the Credit Agreement is amended by deleting clauses (a) through (g) and (i) in their entirety.

(k)     Section 5.05 of the Credit Agreement is amended to (x) insert the word "and" after clause (c) thereof, (y) delete the word "and" after clause (d) thereof and (z) delete clause (e) thereof in its entirety.

(l)     Section 5.06(b) of the Credit Agreement is amended to delete the phrase "at the time of delivery of the annual financial statements with respect to the preceding fiscal year pursuant to Section 5.04(a)" and replace it with the following:

> *"within 120 days after the end of each fiscal year"*

(m)     Article VI of the Credit Agreement is amended by deleting Sections 6.01, 6.04, 6.06, 6.11, 6.12 and 6.13 in their entirety.

(n)    Section 6.02(g) of the Credit Agreement is amended to delete clause (i) set forth in the proviso at the end thereof in its entirety and replace it with the following:

*"(i) such security interests secure Indebtedness,"*

(o)    Section 6.02(k) of the Credit Agreement is amended to delete the phrase " on quarterly and annual GAAP financial statements of the Borrower in accordance with GAAP" and replace it with the following:

*"as reasonably determined by the Borrower"*

(p)    Section 6.03 of the Credit Agreement is amended to delete the phrase "Sections 6.01 and 6.02, respectively" at the end thereof and replace it with the following:

*"Section 6.02 or constitute Indebtedness"*

(q)    Section 6.05 of the Credit Agreement is amended to delete the words "permitted by Section 6.01(l)" appearing at the end of the last parenthetical at the end thereof.

(r)    Section 6.07 of the Credit Agreement is amended to (x) replace the reference to "AIRTIME II, LLC" in clause (a) thereof with a reference to "Black Diamond Aviation Group, L.L.C. (f/k/a Airtime II, LLC)" and (y) delete the words "to the extent provided in Section 6.06" from clause (b) thereof.

(s)    Section 6.09 of the Credit Agreement is amended by deleting clause (a) thereof in its entirety.

(t)    Section 6.09(c)(i) of the Credit Agreement is amended to delete the words "permitted by Section 6.01" from clause (B) thereof.

(u)    Section 9.04(c) of the Credit Agreement is amended to delete the words "or delivered pursuant to Section 5.04" from clause (iv) thereof.

(v)    The Credit Agreement is amended by deleting Schedules 6.01 and 6.04 thereto.

2.    <u>Conditions to Effectiveness</u>. This Amendment shall become effective as of the date hereof only upon the satisfaction of the following condition precedent (the date of satisfaction of such conditions being referred to herein as the "<u>Amendment Effective Date</u>"): the Administrative Agent shall have received a counterpart signature page of this Amendment duly executed by the Borrower and the Required Lenders.

3.    <u>Reference to and Effect on the Credit Agreement</u>.

(a)    On and after the Amendment Effective Date, each reference in the Credit Agreement to "this Agreement," "hereunder," "hereof," "herein" or words of like import referring to the Credit Agreement, and each reference in the other Loan Documents to the "Credit Agreement," "thereunder," "thereof," "therein" or words of like import referring to the Credit Agreement shall mean and be a reference to the Credit Agreement as amended hereby.

(b)    Except as specifically amended by this Amendment, the Credit Agreement, the other Loan Documents and all other documents, instruments and agreements executed and/or delivered in connection therewith, shall remain in full force and effect, and are hereby ratified and

*Amendment No. 2 to*
*Credit Agreement*

confirmed.  Nothing herein shall be deemed to entitle the Borrower to a further consent to, or a further waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other Loan Document in similar or different circumstances.

(c)     The execution, delivery and performance of this Amendment shall not constitute a waiver of any provision of, or operate as a waiver of any right, power or remedy of the Administrative Agent, the Collateral Agent, the Issuing Bank or any Lender under, the Credit Agreement or any of the other Loan Documents.

4.      GOVERNING LAW.  THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

5.      Headings.  Section headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purpose or be given any substantive effect.

6.      Counterparts.  This Amendment may be executed by one or more of the parties to this Amendment on any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Amendment by facsimile, email or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Amendment.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, this Amendment has been duly executed as of the day and year first above written.

BLACK DIAMOND CAPITAL HOLDINGS, L.L.C., as the Borrower

By: _____

Name:

Title:    Stephen H. Deckoff
          Managing Principal

*Amendment No. 2 to*
*Credit Agreement*

BLACK DIAMOND CAPITAL MANAGEMENT,
L.L.C., as a Lender

By: _____
Name:
Title:        Stephen H. Deckoff
              Managing Principal

# EXHIBIT
# D

EXECUTION COPY

AMENDMENT NO. 3

to

CREDIT AGREEMENT

THIS AMENDMENT NO. 3 TO THE CREDIT AGREEMENT REFERRED TO BELOW, dated as of December 29, 2010 (the "Amendment"), is entered into among BLACK DIAMOND CAPITAL HOLDINGS, L.L.C. (the "Borrower"), and the LENDERS (as defined in the Credit Agreement referred to below) party hereto.  Capitalized terms used herein and not otherwise defined herein shall have the meaning assigned to such terms in the Credit Agreement, dated as of October 12, 2006, by and among BLACK DIAMOND CAPITAL MANAGEMENT, L.L.C. (as predecessor in interest to the Borrower), the Lenders party thereto, and Credit Suisse, as Administrative Agent, Collateral Agent and Issuing Bank (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").

WITNESSETH

WHEREAS, the parties hereto are parties to the Credit Agreement; and

WHEREAS, the parties hereto have agreed to amend the Credit Agreement on the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises set forth above, the terms and conditions contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto have agreed to the following amendments to the Credit Agreement:

1.       Amendments to the Credit Agreement.  Effective as of the date hereof, Section 6.16 of the Credit Agreement is amended and restated in its entirety to read as follows:

> SECTION 6.16    Fees.    Each of the BDCM Entities agrees not to waive or defer the payment of any BDCM Fees (other than those related to deferred compensation arrangements in respect of officer or employees of any BDCM Entity who are not members of the Borrower) payable to it pursuant to any BDCM Fund Document during the occurrence and continuance of an Event of Default.  The BDCM Entities agree not to assign, transfer (other than pursuant to the Permitted Restructuring Transaction) or voluntarily terminate any agreement pursuant to which they are entitled to BDCM Fees without the prior written consent of the Administrative Agent (not to be unreasonably withheld or delayed).

2.       Conditions to Effectiveness.  This Amendment shall become effective as of the date hereof only upon the satisfaction of all of the following condition precedent (the date of satisfaction of such conditions being referred to herein as the "Amendment Effective Date"): the Administrative Agent shall have received a counterpart signature page of this Amendment duly executed by the Borrower and the Required Lenders.

*Amendment No. 3 to*
*Credit Agreement*

3.    <u>Reference to and Effect on the Credit Agreement.</u>

(a)    On and after the Amendment Effective Date, each reference in the Credit Agreement to "this Agreement," "hereunder," "hereof," "herein" or words of like import referring to the Credit Agreement, and each reference in the other Loan Documents to the "Credit Agreement," "thereunder," "thereof," "therein" or words of like import referring to the Credit Agreement shall mean and be a reference to the Credit Agreement as amended hereby.

(b)    Except as specifically amended by this Amendment, the Credit Agreement, the other Loan Documents and all other documents, instruments and agreements executed and/or delivered in connection therewith, shall remain in full force and effect, and are hereby ratified and confirmed. Nothing herein shall be deemed to entitle the Borrower to a further consent to, or a further waiver, amendment, modification or other change of, any of the terms, conditions, obligations, covenants or agreements contained in the Credit Agreement or any other Loan Document in similar or different circumstances.

(c)    The execution, delivery and performance of this Amendment shall not constitute a waiver of any provision of, or operate as a waiver of any right, power or remedy of the Administrative Agent, the Collateral Agent, the Issuing Bank or any Lender under, the Credit Agreement or any of the other Loan Documents.

4.    <u>GOVERNING LAW</u>. THIS AMENDMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

5.    <u>Headings</u>. Section headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purpose or be given any substantive effect.

6.    <u>Counterparts</u>. This Amendment may be executed by one or more of the parties to this Amendment on any number of separate counterparts and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Amendment by facsimile, email or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Amendment.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, this Amendment has been duly executed as of the day and year first above written.

BLACK DIAMOND CAPITAL HOLDINGS,
L.L.C., as the Borrower

By: _____
Name: Stephen H. Deckoff
Title: Managing Principal

BLACK DIAMOND CAPITAL MANAGEMENT,
L.L.C., as a Lender

By: _____
Name: Stephen H. Deckoff
Title: Managing Principal

## EXHIBITS 46 – 47

# REDACTED