# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ASHINC Corporation, *et al.*,<br><br>Debtors. | Case No. 12-11564 (CSS)<br>(Jointly Administered) |
| CATHERINE E. YOUNGMAN, LITIGATION TRUSTEE FOR ASHINC CORPORATION, ET. AL., AS SUCCESSOR TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ASHINC CORPORATION, AND ITS AFFILIATED DEBTORS<br><br>Plaintiff,<br><br>BLACK DIAMOND OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., and SPECTRUM INVESTMENT PARTNERS, L.P.,<br><br>Intervenors,<br><br>v.<br><br>YUCAIPA AMERICAN ALLIANCE FUND I, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P., YUCAIPA AMERICAN ALLIANCE FUND II, L.P., YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND II, L.P., MARK GENDREGSKE, JOS OPDEWEEGH, JAMES FRANK, DEREX WALKER, JEFF PELLETIER, IRA TOCHNER, and JOSEPH TOMCZAK,<br><br>Defendants. | Adv. Proc. No. 13-50530 |
| CATHERINE E. YOUNGMAN, LITIGATION TRUSTEE FOR ASHINC CORPORATION, ET AL., AS SUCCESSOR TO BLACK DIAMOND OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., SPECTRUM INVESTMENT PARTNERS, L.P., BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., as co- | Adv. Pro. No. 14-50971 (CSS) |

administrative agent, and SPECTRUM
COMMERCIAL FINANCE LLC, as co-
administrative agent,

                              Plaintiff,

v.

YUCAIPA AMERICAN ALLIANCE FUND I, L.P.,
YUCAIPA AMERICAN ALLIANCE (PARALLEL)
FUND I, L.P., YUCAIPA AMERICAN ALLIANCE
FUND II, L.P., YUCAIPA AMERICAN ALLIANCE
(PARALLEL) FUND II, L.P., RONALD BURKLE,
JOS OPDEWEEGH, DEREX WALKER, JEFF
PELLETIER, IRA TOCHNER, and JOSEPH
TOMCZAK,

                              Defendants.

## REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS YUCAIPA AMERICAN ALLIANCE FUND I, L.P. AND YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P.

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................ 1

II. YUCAIPA IS ENTITLED TO SUMMARY JUDGMENT ON THE LENDER COMPLAINT'S CONTRACT-BASED CLAIMS ................................................ 1

    A. The Lender Complaint's Contract-Based Claims are Time-Barred.............................. 2

        1. The "Continuous Breach" Doctrine is Inapplicable................................................ 2

            a. The Trustee Fails to Identify Any Actionable "Subsequent Breaches" After August 2009. ...................................................................................... 3
            b. Yucaipa's Obligations Were Discrete and Severable, Not Continuous. ................................................................................................. 8
            c. The Trustee Relies on Inapposite Case Law ............................................... 11

        2. The Court Has No Discretion to Disregard the Statute of Limitations................. 14

    B. Partial Summary Judgment Is Warranted Because There No Evidence of Damages. ...................................................................................................................... 17

III. THE THIRD AMENDMENT'S COVENANT NOT TO SUE BARS THE ESTATE COMPLAINT'S CONTRACT CLAIM ................................................................ 18

    A. The Trustee's Interpretation of Section 2.7 Violates its Plain Language. ................... 18
    B. The Trustee's Reliance on Extrinsic Evidence is Unavailing. ..................................... 21
    C. Yucaipa Has Not Waived its Defense Based on the Covenant Not to Sue .................. 23

IV. YUCAIPA IS ENTITLED TO SUMMARY JUDGMENT ON THE ESTATE COMPLAINT'S BREACH OF FIDUCIARY DUTY CLAIM ........................................ 25

    A. The Trustee Concedes that Partial Summary Judgment is Warranted on Allegations Related to the MMSA and Second Lien Debt. ......................................... 25
    B. The Court Should Grant Summary Judgment on the Trustee's Theory That Yucaipa "Caus[ed] the Directors to Fail to Even Consider Potential Transactions." ............................................................................................................. 25

        1. The "Potential Transactions" Allegations Fail as a Matter of Law and Undisputed Fact. ..................................................................................................... 25
        2. The Trustee Also Cannot Rely on Post-2009 Potential Transactions Because Those Facts Were Withheld During Discovery...................................... 30
        3. Any Fiduciary Duty Claim Premised on the JCT Negotiations is Fatally Duplicative of the Contract-Based Claims. .......................................................... 32

**TABLE OF CONTENTS** *(cont'd)*

Page

C. Yucaipa is Entitled to Summary Judgment on the Improper Fees Allegation............. 32

D. The Court Should Grant Summary Judgment on Allegations Related to Yucaipa's Acquisition of First Lien Debt and Structuring Transactions in Allied's Name. ........................................................................................................... 35

   1. These Allegations are Duplicative of the Contract Claims................................... 35

   2. The Allegations Are Not Grounded on Additional or Distinct Facts. ................. 36

   3. The Trustee Seeks Damages For the Same Conduct on Both Claims ................. 37

E. The Court Should Grant Partial Summary Judgment to Yucaipa on the Issue of Damages for the Alleged Breach of Fiduciary Duty.................................................... 37

V. THE RECHARACTERIZATION CLAIM IS FATALLY DEFECTIVE........................... 39

VI. YUCAIPA IS ENTITLED TO SUMMARY JUDGMENT ON THE FRAUDULENT TRANSFER CLAIM FOR ANY TRANSFERS MADE ON OR BEFORE AUGUST 2009................................................................................................ 39

VII. CONCLUSION................................................................................................................ 40

# TABLE OF AUTHORITIES

Page(s)

## Cases

*In re Am. Business Fin. Servs., Inc.*,
  384 B.R. 66 (Bankr. Del. 2008) .................................................................32

*AM Gen. Holdings LLC v. The Renco Grp., Inc.*,
  2016 WL 4440476 (Del. Ch. Aug. 22, 2016) ......................................2, 3, 10, 11, 37

*AM Gen. Holdings LLC ex rel. Ilshar Cap. LLC v. Renco Grp.*,
  2013 WL 5863010 (Del. Ch. Oct. 31, 2013) ..................................................35, 36

*In re AMC Invs., LLC*,
  524 B.R. 62 (Bankr. D. Del. 2015) ...........................................................15

*In re Art Van Furniture, LLC*,
  617 B.R. 509 (Bankr. D. Del. 2020) .........................................................33

*Artvale, Inc. v. Rugby Fabrics Corp.*,
  363 F.2d 1002 (2d Cir. 1966) .................................................................5

*In re ASHINC Corp.*,
  683 F. App'x 131 (3d Cir. 2017) ............................................................16

*Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*,
  2018 WL 3326693 (Del. Ch. July 6, 2018) ...................................................38

*Battelle Energy All., LLC v. Southfork Sec., Inc.*,
  3 F. Supp. 3d 852 (D. Idaho 2014) ..........................................................14

*BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I,*
  LP, 2013 WL 1290394 (N.Y. Mar. 8, 2013) ..................................................34

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
  586 F. Supp. 1286 (S.D.N.Y. 1984) ...........................................................6

*Betts v. New Castle Youth Dev. Ctr.*,
  621 F.3d 249 (3d Cir. 2010) ................................................................30

*Bowling v. Johnson & Johnson*,
  2019 WL 1760162 (S.D.N.Y. Apr. 22, 2019) ..................................................23

*Branin v. Stein Roe Inv. Counsel, LLC*,
  2015 WL 4710321 (Del. Ch. July 31, 2015) ..................................................12

## TABLE OF AUTHORITIES *(cont'd)*

Page(s)

*In re Burger*,
    125 B.R. 894 (Bankr. D. Del. 1991). ...................................................................11

*In re Cellnet Data Sys., Inc.*,
    313 B.R. 604 (Bankr. D. Del. 2004) .................................................................10

*Cetel v. Kirwan Fin. Grp., Inc.*,
    460 F.3d 494 (3d Cir. 2006)...........................................................................23

*Charpentier v. Godsil*,
    937 F.2d 859 (3d Cir. 1991)...........................................................................23

*Colbert v. City of Chicago*,
    851 F.3d 649 (7th Cir. 2017) ...........................................................................1

*Componentone, L.L.C. v. Componentart, Inc.*,
    2008 WL 4790661 (W.D. Pa. Oct. 27, 2008) .........................................................36

*Davis, Bowen & Friedel, Inc. v. Disabatino*,
    2016 WL 7469691 (Del. Super. Ct. Dec. 27, 2016) .................................................3

*Del-One Fed. Credit Union v. Sokolove*,
    2019 WL 6711443 (Del. Super. Ct. Dec. 9, 2019) .................................................2

*Eddy v. V.I. Water & Power Auth.*,
    256 F.3d 204 (3d Cir. 2001)...........................................................................24

*Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*,
    2018 WL 2727542 (Del. Ch. June 6, 2018)....................................................32, 35

*Encite LLC v. Soni*,
    2011 WL 5920896 (Del. Ch. Nov. 28, 2011) .........................................................38

*Evans v. Tex. State Bank*,
    2004 WL 306052 (Tex. App. Feb. 19, 2004)...........................................................33

*FCI Grp., Inc. v. Cty. of New York*,
    54 A.D.3d 171 (2008) ...................................................................................19

*In re Franklin Equip. Co.*,
    416 B.R. 483 (Bankr. E.D. Va. 2009)..................................................................39

*In re Green Field Energy Servs., Inc.*,
    2018 WL 6191949 (D. Del. Nov. 28, 2020) .........................................................32

# TABLE OF AUTHORITIES *(cont'd)*

Page(s)

*In re Hayes Lemmerz Int'l, Inc.*,
 340 B.R. 461 (Bankr. D. Del. 2006) ........................................................................25

*Holland v. Bramble*,
 638 F. Supp. 2d 429 (D. Del. 2009) ........................................................................24

*IAC/InterActiveCorp v. O'Brien*,
 26 A.3d 174 (Del. 2011) ...............................................................................14, 15

*Kamfar v. New World Rest. Grp., Inc.*,
 347 F. Supp. 2d 38 (S.D.N.Y. 2004) .........................................................................6

*Kaplan v. Jackson*,
 1994 WL 45429 (Del. Super. Ct. Jan. 20, 1994) ....................................................3, 9

*Kleinknecht v. Gettysburg Coll.*,
 989 F.2d 1360 (3d Cir. 1993) ................................................................................24

*Kraft v. WisdomTree Invs., Inc.*,
 145 A.3d 969 (Del. Ch. 2016) .........................................................................14, 15

*Krape v. PDK Labs, Inc.*,
 34 A.D.3d 751 (N.Y. App. Div. 2006) ..................................................................20, 21

*In re Marvel Entm't Grp., Inc.*,
 273 B.R. 58 (D. Del. 2002) ...................................................................................8

*Moody v. Atl. City Bd. of Educ.*,
 870 F.3d 206 (3d Cir. 2017) ................................................................................23

*Nemec v. Shrader*,
 991 A.2d 1120 (Del. 2010) ...........................................................................32, 35

*Norman v. Elkin*,
 961 F.3d 275 (3rd Cir. 2020) ......................................................2, 3, 9, 10, 13, 14

*Odyssey Partners, L.P. v. Fleming Cos.*,
 735 A.2d 386 (Del. Ch. 1999) .....................................................................26, 29, 30

*In re Opus E., LLC*,
 528 B.R. 30 (Bankr. D. Del. 2015) ........................................................................40

*Pantzer v. Shields Dev. Co.*,
 660 F. Supp. 56 (D. Del. 1986) .............................................................................24

## TABLE OF AUTHORITIES *(cont'd)*

Page(s)

*Parkell v. Senato*,
　2019 WL 1435883 (D. Del. Mar. 31, 2019) .............................................................24

*Philip A. Templeton, M.D., P.A. v. EmCare, Inc.*,
　868 F. Supp. 2d 333 (D. Del. 2012)........................................................................32

*Phillips v. County of Allegheny*,
　515 F.3d 224 (3d Cir. 2008).....................................................................................31

*Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*,
　2014 WL 12769275 (E.D.N.Y. Sept. 17, 2014) ......................................................18

*Proper v. State Farm Mut. Auto. Ins. Co.*,
　63 A.D.3d 1486 (N.Y. App. Div. 2009) ..................................................................18

*Romdhani v. Exxon Mobil Corp.*,
　2010 WL 4682414 (D. Del. Nov. 10, 2010) ...........................................................31

*Scotto v. Almenas*,
　143 F.3d 105 (2d Cir. 1998).....................................................................................18

*Skyline Steel, LLC v. Pilepro, LLC*,
　2016 U.S. Dist. LEXIS 102908 (S.D.N.Y. Aug. 4, 2016) ......................................24

*Snug Harbor Square Venture v. Never Home Laundry, Inc.*,
　252 A.D.2d 520 (N.Y. App. Div. 1998) ..................................................................19

*Solomon v. Pathe Commc'ns Corp.*,
　1995 WL 250374 (Del. Ch. Apr. 21, 1995), *aff'd*, 672 A.2d 35 (Del. 1996) .........29

*In re Sols. Liquidation LLC*,
　608 B.R. 384 (Bankr. D. Del. 2019) ........................................................................21

*Stone & Paper Invs., LLC v. Blanch*,
　2019 WL 2374005 (Del. Ch. May 31, 2019).........................................................36

*Stored Value Sols., Inc. v. Card Activation Techs., Inc.*,
　796 F. Supp. 2d 520 (D. Del. 2011)........................................................................23

*In re SubMicron Sys. Corp.*,
　432 F.3d 448 (3d Cir. 2006).....................................................................................39

*Swierkiewicz v. Sorema N.A.*,
　534 U.S. 506 (2002).................................................................................................31

## TABLE OF AUTHORITIES *(cont'd)*

Page(s)

*Taupita Inv., Ltd. v. Benny Ping Wing Leung,*
  2017 WL 3600422 (S.D.N.Y. Aug. 17, 2017) ............................................................6

*Tucker v. Union of Needlestrades, Indust., & Textile Emps.,*
  407 F.3d 784 (6th Cir. 2005) ...............................................................................31

*United States v. Prevezon Holdings, Ltd.,*
  289 F. Supp. 3d 446 (S.D.N.Y. 2018).................................................................21

*Versatile Housewares & Gardening Sys., Inc. v. Thill Logistics, Inc.,*
  819 F. Supp. 2d 230 (S.D.N.Y. 2011)....................................................................5

*Weyerhaeuser Co. v. Domtar Corp.,*
  204 F. Supp. 3d 731 (D. Del. 2016).....................................................................24

*Worrel v. Farmers Bank,*
  430 A.2d 469 (Del. 1981) ...........................................................................2, 8, 13

*WWW Assocs. v. Giancontieri,*
  77 N.Y.2d 157 (1990) ..........................................................................................21

*Yucaipa Am. All. Fund I, L.P. v. SBDRE LLC,*
  2014 WL 5509787 (Del. Ch. Oct. 31, 2014) ......................................................5, 6

## **Rules**

Fed. R. Civ. P. 37(c)(1)...........................................................................................31

## **Treatises**

Black's Law Dictionary (11th ed. 2019)............................................................18, 33

23 Williston on Contracts § 63:13 (4th ed.)..............................................................17

# I.    INTRODUCTION

Throughout her opposition brief, the Trustee does little more than parrot her operative *allegations* about Yucaipa, while failing to identify any *evidence* in the record to support them. This conflates the Trustee's burden in opposing a motion to dismiss with her much higher burden in opposing summary judgment, and fails to satisfy the latter.  *See, e.g*., *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (explaining that if the plaintiff had "faced a motion to dismiss, where district courts take all well-pleaded allegations as true, his theory of the case … may have been sufficient.  At summary judgment, however, [plaintiff] must put forth evidence to support that claim.  He did not," making summary judgment proper).

Beyond lacking any evidentiary basis, many of the Trustee's claims and allegations fail as a matter of law, for reasons explained in Yucaipa's motion.  To take one of the most glaring examples, the Trustee complains repeatedly about certain things that Yucaipa supposedly did after acquiring First Lien debt—for instance, negotiating directly with JCT in 2011-12, instead of insisting that JCT make a proposal directly to Allied's board—and she labels those acts as "breaches" of the FLCA/Third Amendment.  But Yucaipa's motion challenged the Trustee to identify any specific provision of any operative contract that was supposedly violated.  Rather than accept Yucaipa's challenge, the Trustee simply doubled down on her formulaic labels and rhetoric, without identifying any actual language in the FLCA or Third Amendment that would even arguably preclude what Yucaipa is accused of doing.

Finally, the Trustee asks this Court to save her claims by adopting unprecedented legal theories that would be clear reversable error.  For example, the Trustee recognizes that the Contract-Based Claims are time barred (by several years), so she openly asks this Court not to "strictly enforce[]" the three-year statute of limitations, relying on a strained analogy to a doctrine under Delaware law that not even Chancery Courts can agree on.  (Opp. at 26.)  This is just a polite way of asking the Court to ignore the law.  It should do no such thing.

# II.    YUCAIPA IS ENTITLED TO SUMMARY JUDGMENT ON THE LENDER COMPLAINT'S CONTRACT-BASED CLAIMS

The Lender Complaint's Contract-Based Claims are time-barred.  Alternatively, Yucaipa

is entitled to partial summary judgment because the Trustee cannot prove damages associated with certain allegations supporting her damages claim due to her expert's express disavowal of the consideration of those damages calculations.

## A.    The Lender Complaint's Contract-Based Claims are Time-Barred

As Yucaipa has explained, the Lender Complaint alleges only two actionable breaches of contract: (1) failing to make a capital contribution in August 2009 and (2) "usurping" the Requisite Lender position by purchasing the majority of Allied's first lien debt in August 2009. (Mot. at 24–25.)  Any claims premised on those alleged breaches accrued in August 2009 because the statute "begins to run *at the time the contract is broken*, not at the time when actual damage results or is ascertained." *Worrel v. Farmers Bank*, 430 A.2d 469, 472 (Del. 1981) (emphasis added); *see also Del-One Fed. Credit Union v. Sokolove*, 2019 WL 6711443, at *2 (Del. Super. Ct. Dec. 9, 2019) (same).  And since the Trustee does not dispute that Delaware's three-year statute of limitations applies, her claims are time-barred, as the Lender Complaint was not filed until nearly *five and a half* years after the contract was allegedly broken.

In response, the Trustee contends that Yucaipa "continuously breached" the FLCA through August 2013, so any breaches between August 2009 and August 2013 are fair game. (Opp. at 18–22.)  As a variation on the same theme, the Trustee also purports to identify breaches that occurred after November 19, 2011—within the three-year limitations period.  (*Id.* at 22–25.) Both arguments ignore the applicable law and facts developed during discovery.  Then, in a tacit concession that her claims are time-barred, the Trustee invites plain error by asking this Court to disregard the statute of limitations entirely.  (*Id.* at 25–29.)

### 1.    The "Continuous Breach" Doctrine is Inapplicable.

The Trustee does not dispute that breaches in August 2009 would fall well outside the three-year limitations period.  Instead, she invokes the "continuous breach" doctrine, which the Third Circuit described as a "narrow" exception to the statute of limitations that "is applied only in unusual situations." *Norman v. Elkin*, 961 F.3d 275, 286 (3rd Cir. 2020) (quoting *AM Gen. Holdings LLC v. The Renco Grp., Inc.*, 2016 WL 4440476, at *11 (Del. Ch. Aug. 22, 2016)).

"The plaintiff bears the burden of proving that the continuing breach doctrine tolls the statute of limitations." *Davis, Bowen & Friedel, Inc. v. Disabatino*, 2016 WL 7469691, at *4 (Del. Super. Ct. Dec. 27, 2016). In attempting to meet that burden, the Trustee's theory is that the FLCA was a "continuous contract" such that Yucaipa's August 2009 breach was just the "initial trigger" that allowed it to "continuously breach" the contract again and again "until at least August 2013," so all breaches committed during that period are timely. (Opp. at 18, 21.) There are two basic flaws in this argument.

First, despite the Trustee's pejorative descriptions of Yucaipa's conduct, she has not identified or supported any "subsequent breaches" of the FLCA (Opp. at 20) occurring after the alleged breach in August 2009. By definition, if there was but a single breach (in August 2009), the "continuous breach" doctrine cannot apply. *See AM Gen. Holdings LLC*, 2016 WL 4440476, at *12 (the doctrine contemplates "a series of breaches" that are "'inexorably intertwined'").

Second, the FLCA is not a "quintessential 'continuous contract'" (Opp. at 20), which explains why none of the Trustee's cited cases involve a credit agreement. The FLCA imposed obligations on Yucaipa that were discrete and severable, and thus not subject to the narrow "continuous breach" doctrine, since Lenders could have sued immediately upon a breach. *See Norman*, 961 F.3d at 286 (where "a 'plaintiff could have alleged a prima facie case for breach of contract … after a single incident,' … the 'continuing breach doctrine does not apply even when confronted with numerous repeated wrongs of similar, if not same, character over an extended period'" (citation omitted)); *Kaplan v. Jackson*, 1994 WL 45429, at *2 (Del. Super. Ct. Jan. 20, 1994) ("[I]f a Court finds [a] contract severable in nature, the statute of limitations generally begins to run on each severable portion when a party breaches that portion of the contract.").

### a.    The Trustee Fails to Identify Any Actionable "Subsequent Breaches" After August 2009.

The Trustee accuses Yucaipa of engaging in a "four-year campaign of ongoing and continuous breaches of the [FLCA]." (Opp. at 30.) These bald accusations are insufficient to defeat summary judgment because all of the post-August-2009 conduct that she identifies as

"breaches" are either (a) contractual obligations of Allied, not Yucaipa; (b) not actionable breaches of contract at all; or (c) unsupported by any evidence.  Under both New York and Delaware law, a breach of contract cause of actions fails as a matter of law absent a showing that a specific provision of the contract was breached.  (*See* Mot. at 24, n.7 (citing cases).)

*First*, the Trustee contends that Yucaipa breached the FLCA by "preventing Lenders from exercising remedies for [Allied's] ongoing Events of Defaults."  (Opp. at 20.)  She points out that Lenders had the "right to direct the Agent—through the Requisite Lenders—to exercise certain remedies in the case of an Event of Default."  (*Id*.)  But this right existed before Yucaipa became Requisite Lender.  There is no dispute that Allied was in default beginning in August 2008, so Lenders could have directed the Agent, through the Requisite Lender, to exercise remedies against Allied *before* Yucaipa acquired debt and assumed Requisite Lender status—but the Lenders never did so.  (Scolnick Decl., Ex. 75 at 2.)  It is likewise undisputed that none of the previous Requisite Lenders moved to cure those defaults.

Even more important, it is undisputed that no Lender—BD/S included—ever invoked its right to direct Yucaipa exercise remedies as Requisite Lender.  (*See*, *e.g.*, Scolnick Decl., Ex. 149 at 6–15; *see also id.* at 10.)  There is simply no evidence or reasonable inference that Yucaipa "prevented" Lenders from exercising a remedy that they never even tried to exercise.

*Second*, the Trustee insists that Yucaipa "caus[ed] Allied to cease making principal or interest payments" and "block[ed] Lenders from the Company's financial information and access to management."  (Opp. at 20.)  Even if true (it is not), this would not be a "breach" of the FLCA.  The FLCA does not give the Requisite Lender the obligation to somehow force Allied to make principal or interest payments, or to ensure that other Lenders have access to Allied's information and management.  Certainly, the Lenders had a contractual right to such things—but that is by virtue of their contracts with *Allied*.  In other words, Allied's failures to pay principal and interest, or provide information to Lenders, are Allied's breaches, not *Yucaipa's*.  That is precisely the point that Mr. Walker made in the spring 2011 email cited by the Trustee, when he noted that ████████████████████████████████████████████████

4

██████. (*Id.* at 21 (citing Singer Decl., Ex. 58).)  Mr. Walker's observation of Allied's breach is immaterial to and separate from the question of whether *Yucaipa* breached the FLCA.

**Third**, the Trustee argues that Yucaipa, as Requisite Lender, "prevent[ed] any restructuring dialogue among the Lenders." (*Id.* at 20.)  Again, she points to no provision of the FLCA (because there is none) that *required* the Requisite Lender to facilitate a restructuring dialogue.  Nor does she cite any evidence in support of this contention.  In fact, the undisputed evidence shows that while Yucaipa was Requisite Lender, the other Lenders *did* discuss strategies for Allied, including whether to "accelerate" the debt.  (Suh Supp. Decl., Ex. 10.)

**Fourth**, the Trustee contends that Yucaipa breached the Third Amendment when it "assert[ed] claims … in contravention of" the covenant not to sue.  (*Id.*)  No such claim is included in the Lender Complaint (it makes no reference whatsoever to a covenant not to sue), so the Trustee cannot rely on this alleged breach to defeat summary judgment.

In any event, a breach of a covenant not to sue does not give rise to a viable contractual claim.  Absent an express right to recover in the covenant, a plaintiff cannot recover damages for breach unless the suit was "brought in obvious breach or otherwise in bad faith" because the "primary function" of the covenant not to sue "is to serve as a shield rather than as a sword." *Artvale, Inc. v. Rugby Fabrics Corp.*, 363 F.2d 1002, 1008 (2d Cir. 1966).  Here, the covenant does not include an express right to recover monetary damages upon breach (*see* Scolnick Decl., Ex. 41 at 7 (§ 2.7(e))), so the Trustee cannot pursue a claim for breach of the covenant unless Yucaipa's suit was "brought in obvious breach or otherwise in bad faith." *Artvale*, 363 F.2d at 1008.  But the Trustee has put forth no *evidence*—as is her burden on summary judgment—that Yucaipa brought any particular suit "in obvious breach" of the covenant or in "bad faith." *Id.*

Courts have explained that "[a] party with a reasonable argument for why the covenant does not cover the suit, or why the covenant should not be enforced, has not committed an 'obvious' breach, and the breach is not 'otherwise in bad faith' if such an argument is made in good faith." *Versatile Housewares & Gardening Sys., Inc. v. Thill Logistics, Inc.*, 819 F. Supp. 2d 230, 245 (S.D.N.Y. 2011).  As to the Georgia Action that Yucaipa filed in November 2009,

there is no legitimate argument that it did so in "obvious breach" or "bad faith" because the suit was premised on the Fourth Amendment, which had removed the covenant. (Scolnick Decl., Ex. 93.) Until the Fourth Amendment was invalidated in March 2013, Yucaipa reasonably believed that it *was* valid and effective and operated under that assumption. (*See* Yucaipa Opp. at 20.) And it is undisputed that the Georgia Action resulted in benefits to Lenders (including the release of nearly $17 million in capital, *see* Yucaipa Opp. at 21), which should preclude any finding of "bad faith" on Yucaipa's part in bringing the suit.

Even for lawsuits that post-dated the New York court's ruling, the covenant expressly carved out ████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ (Scolnick Decl., Ex. 41 at 8 (§ 2.7(e)).) Yucaipa reasonably and in good faith relied on that exception in each of the suits at issue. Notably, the Chancery Court held it was "*reasonably* conceivable that Yucaipa could show that the outer boundaries of the Covenant [not to sue] are ambiguous … and that public policy would prevent the wholesale adoption of the broad interpretation [BD/S] advance[s]," because it would prevent Yucaipa from seeking redress for unique harms. *Yucaipa Am. All. Fund I, L.P. v. SBDRE LLC*, 2014 WL 5509787, at *14–15 (Del. Ch. Oct. 31, 2014) (emphasis added). On that basis, the court denied BD/S's motion to dismiss a number of Yucaipa's claims. *Id*. at *15–17.

Although this Court held that some of Yucaipa's claims and counterclaims were barred by the covenant, "a party who brings an action which is ultimately held to be in breach of a covenant not to sue, but which was based on a reasonable and good faith argument … that the covenant did not bar the suit … is not liable for his opponent's litigation expenses." *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 586 F. Supp. 1286, 1288 (S.D.N.Y. 1984) (suit not in "obvious breach" of covenant where plaintiff has "at least one reasonable good faith argument" for suit).[1]

---

[1] *See Kamfar v. New World Rest. Grp., Inc.*, 347 F. Supp. 2d 38, 51 (S.D.N.Y. 2004) (claims prohibited by a covenant not to sue but no relief was warranted); *Taupita Inv., Ltd. v. Benny Ping Wing Leung*, 2017 WL 3600422, at *9 (S.D.N.Y. Aug. 17, 2017).

That is the case here, where Yucaipa proceeded under a carve-out in the covenant, and relied on the Chancery Court's construction of that carve-out.

*Fifth*, the Trustee posits that Yucaipa "breach[ed]" the FLCA by demanding "a premium of ██████████ of its First Lien Debt" when negotiating with JCT in 2011-12. (Opp. at 20.) Once again, the Trustee cannot identify any provision of the FLCA that Yucaipa supposedly breached, which is the bare minimum she would need to do to assert a breach-of-contract claim on this theory. Instead, even if the Trustee's description of Yucaipa's negotiating position were factually accurate, nothing in FLCA prevented Yucaipa, as a debt-holder, from setting whatever price it wanted for its debt. In fact, the Third Amendment expressly contemplated that Yucaipa ███████████████████████████ ████████████████████████████████████████████ ██████████████████ (Scolnick Decl., Ex. 41 at 6 (§ 2.7(e)).)

Regardless, the Trustee is mistaken on the facts: Yucaipa *did not* "demand … a premium … based on the *false premise* that it was Requisite Lender." (Opp. at 40 (emphasis added).) For one thing, as explained in Yucaipa's opposition, Yucaipa ultimately *agreed* to ratable treatment for *all* Lenders. (Yucaipa Opp. at 24–25.) For another, JCT was well aware throughout the negotiations that BD/S had filed suit challenging the Fourth Amendment and Yucaipa's Requisite Lender status—that is why the JCT Term Sheets address that lawsuit expressly. (*See*, *e.g.*, Scolnick Decl., Ex. 99 at 5; Ex. 101 at 4.) Still, armed with the knowledge that Yucaipa's Requisite Lender status was uncertain, JCT continued to negotiate the deal.

*Finally*, the Trustee assert that "every instance of Yucaipa *acting as* Requisite Lender … was another breach of the [FLCA]." (Opp. at 24.) But why? The FLCA did not expressly preclude Yucaipa from being Requisite Lender. Even if it did so implicitly (by limiting the amount of debt that Lenders could assign), the breach would have occurred in August 2009.

Nor has the Trustee identified evidence of later actions that Yucaipa took "as Requisite Lender" in breach of any contract. Indeed, the only things that Yucaipa *did* do as Requisite Lender—such as ███████████████████████████████████, including

7

BD/S—indisputably benefitted the Lenders and Allied.  (*See* Yucaipa Opp. at 21; *see also* Suh

Supp. Decl., Ex. 8; Ex. 9 ███████████████████████████████████

███████████████████████████████████████████████.)

For the same reasons, the Trustee's claim for breach of the covenant of good faith and

fair dealing—premised on "Yucaipa's wrongful usurpation of Requisite Lender status" (Lender

Compl. ¶ 129)—accrued in August 2009.  The Trustee does not and cannot dispute that

Yucaipa's alleged "wrongful usurpation of Requisite Lender status" occurred in August 2009.

And she has identified no *evidence* of any "subsequent actions" that Yucaipa took as Requisite

Lender in breach of the covenant of good faith and fair dealing.

      **b.**     **Yucaipa's Obligations Were Discrete and Severable, Not Continuous.**

As Yucaipa's motion explains, all of the alleged post-August-2009 conduct about which

the Trustee now complains reflected, at most, the purported "effects" of Yucaipa becoming

Requisite Lender in August 2009, in supposed breach of the FLCA.  (Mot. at 25–26.)  Those

later effects cannot retroactively change the accrual date of a claim that accrued in August 2009.

*See Worrel*, 430 A.2d at 472 (breach of contract claim accrues when "the contract is broken, not

at the time when actual damage results or is ascertained"); *In re Marvel Entm't Grp., Inc.*, 273

B.R. 58, 74 (D. Del. 2002) ("[T]he determinative issue is when the specific acts of alleged

wrongdoing occurred, and not when their effect is felt.").[2]

Even assuming for argument's sake that the Trustee's post-August-2009 allegations

amounted to actionable "breaches" of the FLCA (they do not), that would not transform the

FLCA into a "continuous contract" subject to the "continuous breach" doctrine.  To the contrary,

as the Trustee's predecessors correctly noted, any claim for breach of the FLCA "accrues, and

the statute of limitations commences, when the contract is breached," which necessarily means

---

[2]   The Trustee contends that *Marvel* is "inapposite."  (Opp. at 23, n.18.)  She should be
estopped from taking that position because her predecessors relied on *Marvel* to make the
exact same argument Yucaipa makes now.  (*See* Mot. at 25, n.8.)  And there is plenty of
other authority (such as *Worrel*) for the proposition that the later "effects" of a breach do not
change the accrual date.

that the FLCA is *not* a continuous contract.  (Scolnick Decl., Ex. 136 at 17 ("any claim regarding the invalidity of the Third Amendment accrued as of that date, not whenever Yucaipa decided to care about the issue."); *see also id.* Ex. 132 at 67 ("A breach of contract starts for the statute of limitations purposes when the breach took place.").)  This Court agreed.  (*Id.* Ex. 132 at 107–08.)

As explained above, "[t]he continuing breach doctrine is 'narrow' and 'typically is applied only in unusual situations.'"  *Norman*, 961 F.3d at 286.  The key question is whether the contractual obligations are discrete and severable—such that a plaintiff would be able to sue immediately upon a breach—or whether they amount to one continuous obligation.  "[I]f a Court finds [a] contract severable in nature, the statute of limitations generally begins to run on each severable portion when a party breaches that portion of the contract."  *Kaplan*, 1994 WL 45429, at *2.  Here, the FLCA does not present the "unusual situation" of a non-severable, continuous contract.  Lenders could have sued for breach of the Capital Contribution Provision or "usurpation" of the Requisite Lender status—the only actionable breaches that the Trustee alleges—when they allegedly happened in August 2009.

Even now, the Trustee takes the position that a "breach of the Capital Contribution Provision" occurred on August 31, 2009; she contends that Yucaipa had a contractual "duty to make a capital contribution to Allied on or before" that date.  (Tr. Mot. at 21.)  She thus points to a discrete contractual obligation that Yucaipa supposedly violated by not making a payment on a specific date, giving rise to a claim at that very point in time.  This belies the Trustee's current contention that all of the FLCA's obligations were "continuous" and non-severable.

As to Yucaipa's assumption of Requisite Lender status—resulting from Yucaipa allegedly acquiring more First Lien debt than contractually allowed—the Trustee does not dispute that this breach also happened at a fixed point in time (August 21, 2009) or that Lenders could have brought suit immediately upon the breach.  (*See* Opp. at 20.)  Rather, she argues this was the "initial breach [that] enable[d]" Yucaipa to "*continuously breach*" the FLCA by *acting* as Requisite Lender.  (*Id.*)  This is sophistry.  Where "a 'plaintiff could have alleged a prima facie case for breach of contract … after a single incident,' then the 'continuing breach doctrine

9

does not apply even when confronted with *numerous repeated wrongs of similar, if not same, character* over an extended period.'"  *Norman*, 961 F.3d at 286 (citation omitted, emphasis added).  So even assuming that Yucaipa breached the FLCA *after* August 2009 by "acting as" Requisite Lender (it did not), that later breach of "the same character" would not render the August 2009 breach timely.  Instead, it is at most a "repeated" wrong of the same character.

As Judge Walsh explained in *In re Cellnet Data Sys., Inc.*, 313 B.R. 604, 610 (Bankr. D. Del. 2004), "[c]ourts have uniformly rejected attempts to characterize alleged breaches of contract accruing at fixed points in time as 'continuing' breaches."  The "rationale behind these cases is easy to understand," namely, "[i]f the failure to perform … a defined contractual obligation at some fixed point in time were characterized as a 'continuing' breach, the non-breaching party would be able to avoid the impact of any applicable statute of limitations during the term of the contract."  *Id*. (citations omitted).  That reasoning is squarely applicable here.

The Chancery Court's decision in *AM Gen. Holdings LLC*, 2016 WL 4440476, is also instructive.  There, Renco sued AMG for breaching the operating agreement of their joint venture, Holdco, which contained several provisions designed "to ensure [Renco's] investment was managed fairly." *Id.* at *1, 3.  Renco alleged that AMG had "engaged in an ongoing scheme 'to unfairly enrich [defendants] at the expense of the minority stake-holders,'" leveraging its management position to diminish distributions to Renco through conduct that breached certain provisions of the operating agreement.  *Id.* at *4.  Although the alleged misconduct began more than three years before the filing of the complaint, Renco argued "a single 'continuing breach'" insofar as each breach was "a component of [defendant's] broader scheme."  *Id.* at *6, 11–12.  The Chancery Court rejected this argument out of hand:  "While the alleged breaches were repetitive, they were not 'continuing' in the legal sense" because they were "based on" the defendant's "violations of specific, identifiable provisions of the" operating agreement, and resulted in damages "that were determinable the moment they occurred."  *Id.* at *13.

That is exactly the case with the alleged August 2009 breaches here.  They are based on "specific, identifiable" provisions of the FLCA and Third Amendment, and Lenders could have

sued Yucaipa for the alleged breaches at the moment they occurred.  (*See, e.g.*, Scolnick Decl.,

Ex. 41 at 8 (§ 2.7(e)) (████████████████████████████████████).)

      In sum, to the extent any of the Trustee's post-August-2009 allegations describe

actionable breaches of FLCA (they do not, *see supra* Section II(A)(1)(a)), they would at most be

"repetitive," not continuous breaches.  Courts have rejected attempts to bundle discrete breaches

into continuing breaches that "collectively contribut[e] to some broader end."  *AM Gen.*, 2016

WL 4440476, at *12, n.97.  "Were that convention countenanced, the continuing breach doctrine

might expand far beyond its logical scope since virtually every contract has a 'general purpose'

broader than the various intermediate objectives its individual terms accomplish."  *Id.*

### c.      The Trustee Relies on Inapposite Case Law

      The Trustee relies heavily on this Court's decision in *In re Burger* and the Chancery

Court's decision in *Branin v. Stein Roe Inv. Counsel, LLC*.  (Opp. at 21–22.)  Neither supports

the Trustee's plea to apply the continuous breach doctrine here, which is foreclosed by the Third

Circuit's recent decision in *Norman*.

      *In re Burger* involved a services agreement in which a cow herd manager agreed "to

manage, maintain, and expand the herd as well as to improve its quality" for seven years until

"the total liquidation of the dairy herd."  125 B.R. 894, 898 (Bankr. D. Del. 1991).  The manager

was later sued for breach of contract because he had "failed to expand the herd" as promised.  *Id.*

at 901.  The court rejected the manager's argument that the claim was time-barred, finding that

"there was a continuous contract for a fixed seven-year period where full and complete damages

could not be determined by either party until the end of that time," since "any claim … for

damages *necessarily* relie[d] on the liquidation of" the herd.  *Id.* at 902.  In contrast, the Trustee

asserts that Yucaipa violated specific provisions of the FLCA.  Such claims were actionable

immediately upon the purported breaches in August 2009 because Lenders could have brought

suit "after a single incident," *AM Gen.*, 2016 WL 4440476, at *12, and the claims accrued at that

point in time, even if the "effects" were not felt until later.

In *Branin v. Stein Roe Inv. Counsel, LLC*, an employee sued for indemnification after successfully defending a suit brought by his former employer. While damages were calculable, there was a "continuing injury" because the employer had a "continuing duty to indemnify" until the action was resolved. 2015 WL 4710321, at *7 (Del. Ch. July 31, 2015). Further, indemnity was contingent on a no bad faith finding in the underlying action, meriting the standard rule in indemnification cases that a claim cannot accrue until resolution of the underlying litigation. *Id.* The logic and holding of *Branin* are thus cabined to the indemnification context.

The Trustee contends that *Burger* and *Branin* support the application of the continuing breach doctrine because "[t]he extent of *monetary* damages caused by Yucaipa's continuous breaches of the [FLCA] was not ascertainable until December 27, 2013" and that "it would have been inefficient and was unnecessary" for Lenders to sue Yucaipa until they could ascertain "the full extent" of *monetary* damages. (Opp. at 22 (emphasis added).) That contention is meritless. The Trustee's position is that when Yucaipa failed to make the capital contribution and assumed Requisite Lender status in August 2009—the supposed "initial trigger" that enabled Yucaipa to "continuously breach" the FLCA—Yucaipa violated Section 2.7(e) of the Third Amendment. (*See* Opp. at 20.) In Section 2.7(e), the Lenders expressly agreed that in the event of a breach, they would sustain an injury for which *they would not have* an adequate *monetary* remedy, so that is why they agreed up front to a specific performance remedy. (Scolnick Decl., Ex. 41 at 8 (§ 2.7(e)).) The Trustee seeks to turn Section 2.7(e) on its head—the contract gave Lenders an express remedy but BD/S elected not to avail themselves of it; yet this does not somehow excuse their delay in bringing suit for the very remedy that they agreed up front would be inadequate.

Simply put, there is zero case law, *Burger* and *Branin* included, to support the theory that BD/S were entitled to stand by and wait for damages to mount after the breach in August 2009, with the statute of limitations tolled indefinitely for "efficiency" purposes.[3] Quite the opposite:

---

[3]  If, as Section 2.7(e) contemplated, Lenders had successfully pursued specific performance in August 2009, that would have precluded any monetary damages that the Trustee now claims

The relevant cases say that a breach of contract claim accrues at the moment of breach, even if the "effects" are not felt until later. *See*, *e.g.*, *Worrel*, 430 A.2d at 472 (claim accrues when "the contract is broken, not at the time when actual damage results or is ascertained").

The Third Circuit in *Norman* recently rejected a plaintiff's effort to rely on *Branin* "to dramatically expand the 'narrow' continuous breach doctrine." 961 F.3d at 286. The plaintiff had sued his business partner for improper distributions made more than three years before the filing of the suit. Relying on *Branin*, the plaintiff argued that the continuous breach doctrine applied "because his damages from each individual distribution were 'inherent[ly] contingen[t]' on [an alleged improper agreement] being invalidated and could not be calculated until that time." *Id.* But the Third Circuit found "there was no prior, independent litigation that needed to be resolved before [the plaintiff] could bring a breach of contract claim." *Id.* Rather, "the [improper agreement's] validity and [the defendant's] purported failure to make proper distributions could be, and were, adjudicated simultaneously." *Id.*

Here it is undisputed that BD/S understood in August 2009 that they could sue Yucaipa to invalidate the Fourth Amendment and enforce the Third Amendment. (*See* Mot. at 26.) This means that the validity of the Fourth Amendment and Yucaipa's purported breaches of the Third Amendment "could be" adjudicated simultaneously, as in *Norman*. And indeed, they *were*. In December 2009, CIT countersued Yucaipa in the Georgia Action in its capacity as agent for the Lenders, seeking, among other things: a declaration that the Fourth Amendment was invalid and that Yucaipa was not Requisite Lender, and specific performance of the Capital Contribution Provision. (Singer Decl., Ex. 52 ¶¶ 36–46; 60–63.)[4] Thus, "there was no prior, independent

---

were the result of Yucaipa *acting* as Requisite Lender. So the Trustee's latest theory runs headlong into the text and design of the Third Amendment itself.

[4] In *Norman*, as in the Georgia Action, "the question of [the improper agreement's] validity arose in connection with" the defendant's defense to the claim, "not as a condition precedent to the claim." 961 F.3d at 286. The Third Circuit held that the continuous breach doctrine could not reach "defenses to claims rather than true contingencies." *Id.*

litigation that needed to be resolved" before BD/S could bring its Contract-Based Claims. *Norman*, 961 F.3d at 286.

### 2.    The Court Has No Discretion to Disregard the Statute of Limitations.

Lastly, the Trustee throws a Hail Mary:  She asks the Court to disregard the law and simply "exercise its discretion to hold all claims timely."  (Opp. at 25.)  The Trustee relies on the following syllogism:  (a) this Court is a court of equity; (b) the Chancery Court is also a court of equity; (c) in the Chancery Court, extraordinary circumstances may provide an exception to the strict application of the statute of limitations, *see IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 177–78 (Del. 2011); so (d) this Court should create brand-new law and excuse the Trustee's time-barred claims because of supposedly "unusual conditions."  (Opp. at 25–26.)  Nonsense.

First, the Trustee does not cite a single case in which this Court (or *any* bankruptcy court) recognized a discretionary exception to the statute of limitations that would allow a plaintiff to pursue an otherwise time-barred legal claim for damages.  Tellingly, the lone case upon which the Trustee relies for this remarkable proposition—*IAC*—has not been cited by any state court outside of Delaware, and has been cited precisely once by a federal court since the decision was issued nearly a decade ago, but not for the proposition for which the Trustee now cites it.  *See Battelle Energy All., LLC v. Southfork Sec., Inc.*, 3 F. Supp. 3d 852, 863 (D. Idaho 2014) (laches).  The Trustee is asking this Court to break truly new ground; it should decline to do so.

Second, even in Delaware, the Chancery Courts have had difficulty applying *IAC*, and it remains unclear whether that decision gives Chancery Courts discretion to "avoid[] a strict application of a statute of limitations to a purely legal claim," such as the breach-of-contract claims here.  *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 978 (Del. Ch. 2016); *see also id.* at 977–78 ("a plaintiff pressing a purely legal claim in the Court of Chancery should not be able to avoid the statute of limitations by invoking the doctrine of laches when the limitations period

would have conclusively barred the same claim had it been brought in a court of law").[5]

Third, *IAC* is factually inapposite in any event. There, O'Brien was sued by his former employer (PRC); he prevailed, and sought indemnification for his defense costs in that case, and also for a separate claim that he brought in Florida against PRC for breach of his employment agreement. *IAC*, 26 A.3d at 176. After O'Brien prevailed on his indemnification claim, but before fees could be determined, PRC went bankrupt. *Id.* O'Brien then sued PRC's parent company, IAC, who had controlled PRC's defense and admitted to being the real party in interest in the indemnification suit. *Id.* at 177. Although O'Brien's suit would have been too late under the three-year statute of limitations, the court held that this was "one of those few cases" where "unusual condition or extraordinary circumstances" existed, because: (1) O'Brien "promptly sought advancement and/or indemnification from PRC"; (2) the Florida court initially ruled *against* O'Brien, so he had to wait for the appellate decision before he would be entitled to indemnification; (3) IAC was already litigating on PRC's behalf; (4) PRC "unexpectedly declared bankruptcy after the Florida appellate court determined that O'Brien's claims were valid and enforceable"; and (5) after the appeal, the trial court ruled in his favor. *Id.* at 177–79.

None of these circumstances—or any other "unusual conditions or extraordinary circumstances"—exist here. The Trustee brings straightforward breach-of-contract claims that her predecessors, BD/S, admittedly could have brought in 2009 at the time of the alleged breach, precisely as CIT did, and she therefore fails to carry her burden. For example:

BD/S did not pursue its breach of contract claim before the statute of limitations expired. The Trustee asserts that "claims were pursued and defended before November 19, 2011" because

---

[5]  In a footnote, the Trustee cites this Court's statement in *In re AMC Invs., LLC*, 524 B.R. 62, 80 (Bankr. D. Del. 2015, that "[a] court of equity is not bound by the legal statute of limitations." (Opp. at 26, n.23.) But she omits the key language that appeared immediately after that quote: "However, '[e]quity follows the law and in appropriate circumstances will apply a statute of limitations by analogy.' Because breach of fiduciary duty claims are 'equitable claim[s] bearing a close resemblance to … legal claim[s],' a statute of limitations analysis is appropriate here." *Id.* The breach of contract claim here is *legal*, not equitable, so likewise, the applicable statute of limitations for contract claims applies (not laches).

*CIT* countersued in the Georgia Action.  But she and BD/S do not get credit for that suit. ██



(Scolnick Decl., Ex. 41 at 8

(§ 2.7(e)) (emphasis added).)  It is undisputed that BD/S were aware they could have sued to

enforce the Capital Contribution Provision and to strip Yucaipa of its Requisite Lender status as

early as September 2009.  (*See id.* Ex. 83 (

).)  And in January 2010,

(Suh Supp. Decl., Ex. 3 at BDCM0030712.)  But it affirmatively chose to

do neither, and instead waited *five and a half* years (and nearly three years after the Georgia

Action settled) to file suit.

    <u>Legal determinations in 2013 were not a prerequisite to valid contract claims.</u>  The

Trustee argues that "[s]uccessful adjudication of the validity of the Fourth Amendment was a

prerequisite to the Direct Lender breach of contract claims."  (Opp. at 29.)  Not so.  As explained

above (pp. 13–14), any Lender could have pursued the Contract-Based Claims *and* the validity of

the Fourth Amendment simultaneously—as CIT did in 2009.  Nor does the Trustee dispute that

BD/S could have asserted timely Contract-Based Claims when they filed suit in New York in

2011, seeking a declaration as to the Fourth Amendment's validity.  BD/S's strategic claim-

splitting is not an "extraordinary circumstance" to resuscitate a time-barred claim.

    <u>Any dispute as to the claim's validity did not hamper BD/S's ability to bring it.</u>  Even

though there was litigation concerning the Fourth Amendment's validity as early as 2009, the

Trustee suggests that Lenders were somehow unable to bring Contract-Based Claims until 2017

(even though CIT asserted them in 2009, and BD/S filed them 2013) because "Yucaipa insisted

that the Fourth Amendment was valid and binding until its appeals were exhausted … in 2017."

(Opp. at 29.)  The Trustee is actually referring to Yucaipa's challenge to the validity of the *Third

Amendment*.  *See In re ASHINC Corp.*, 683 F. App'x 131, 137 (3d Cir. 2017); *see also* Singer

Decl., Ex. 147 (appeal of cross-claims dismissal concerning the Third Amendment's validity).

Regardless, as noted above, Lenders could have, and did, bring contract claims simultaneously

with challenges to the Fourth Amendment.  Unlike in *AIC*, where the Florida trial court had ruled

*against* O'Brien—meaning that he did not have a valid indemnity claim until the appellate court

reversed—no adverse rulings would have impeded BD/S from timely filing suit.

  <u>The delay was not attributable to a material and unforeseeable change in the parties'</u>

<u>financial circumstances.</u>  The final *AIC* factor, which the Trustee omitted from her list, also does

not weigh in her favor.  No change in the parties' circumstances occurred that would justify

BD/S's delay in bringing the Contract-Based Claims.

**B.**  **Partial Summary Judgment Is Warranted Because There No Evidence of Damages.**

  Yucaipa also is entitled to partial summary judgment on five allegations supporting the

Contract-Based Claims because there is no evidence of damages.  (Mot. at 27–30.)

  The Trustee does not dispute that resulting damages is an essential element of her claims.

But she asserts that the law does not require proof of damages for each distinct breach of the

same contract.  (Opp. at 30.)  In her view, a plaintiff may bring an action for multiple discrete

breaches of the same contract, and as long as she has evidence of damages resulting from one of

them, she may proceed to trial on all, presenting them to the factfinder as a conglomeration of

breaches.  This is another variation on the Trustee's "continuous breach" theme, but it fails here

as well.  She does not cite a single case in support of her "aggregation of damages" theory, and it

runs counter to the most basic principles of contract law, under which each breach is assessed

separately.  *See*, *e.g.*, 23 Williston on Contracts § 63:13 (4th ed.) ("Contracts sometimes provide

for more than one performance by a promisor.  In such cases, it seems the nonperformance of

each thing promised is a separate breach of contract rendering the promisor liable.").

  The Trustee does not dispute that her damages expert did not identify any damages

associated with five of the Trustee's alleged breaches.  (*See* Mot. at 29; Opp. at 30.)  Indeed, the

expert testified that he had not opined on damages associated with those alleged breaches

because he was not asked to.  (*See* Mot. at 30; Scolnick Decl., Ex. 13 at 151–55.)

  The Trustee accuses Yucaipa of "mischaracteriz[ing]" the testimony of her Rule 30(b)(6)

witness on damages, Mr. Deckoff.  (Opp. at 31.)  She asserts that Mr. Deckoff's testimony is

sufficient to sustain her burden in opposing summary judgment because he gave "substantive responses" about damages for the five alleged breaches at issue, and "only demurred to the Trustee's damages expert when asked for a *quantification* of the injury suffered." (*Id.* at 31–32.) This concession—that there is no evidence to support any "*quantification*" (any actual dollar amount) of damages—is alone grounds for granting Yucaipa's motion.

Moreover, Mr. Deckoff's generic, non-quantified descriptions of the Trustee's damages do not go beyond "pure speculation or bare assertions," which is also insufficient to meet the Trustee's burden in opposing summary judgment. *Proper v. State Farm Mut. Auto. Ins. Co.*, 63 A.D.3d 1486, 1487 (N.Y. App. Div. 2009). Mr. Deckoff merely repeated the Complaint's allegations (*see* Opp. at 31)—but rhetoric does not become proof through dint of repetition. *Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*, 2014 WL 12769275, at *2 (E.D.N.Y. Sept. 17, 2014) (citing *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) ("the non-movant must produce specific facts indicating that a genuine factual issue exists.")).

## III.   THE THIRD AMENDMENT'S COVENANT NOT TO SUE BARS THE ESTATE COMPLAINT'S CONTRACT CLAIM

The Trustee acknowledges the existence and validity of the covenant not to sue in the Third Amendment. (*See* Tr. Mot. at 27–28.) But she argues that it is inapplicable and that Yucaipa has waived this defense. (Opp. at 6–17.) She is wrong on both counts.

### A.   The Trustee's Interpretation of Section 2.7 Violates its Plain Language.

The plain language of the Third Amendment bars the Trustee's claim. Section 2.7(e)



states that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ (Scolnick Decl., Ex. 41 at 7 (§ 2.7(e)(ii)) (emphasis added).) In turn, Section 2.7(f)(v) contains the covenant not to sue, which provides that Allied cannot sue Yucaipa ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* at 9 (§ 2.7(f)(v)) (emphases added).) This precludes Allied from bringing a claim ▮▮▮▮▮▮▮▮▮ to Yucaipa not making a capital contribution. *See, e.g.*, Black's Law Dictionary (11th ed. 2019) (defining "omission" as "[a] failure to do something").

18

The Trustee argues that Section 2.7(f) is "[s]eparate and apart" from Section 2.7(e), such that Section 2.7(f) "does [not] impact the separate, mandatory obligation in §2.7(e)." (Opp. at 8–9.)  In her view, the covenant in Section 2.7(f) applies only "to a specific type of capital contribution—'any capital contribution of Term Loans.'" (*Id.* at 6.)  But the contribution of Term Loans is the *only* capital contribution at issue—i.e., there is no separate requirement for Yucaipa to make a cash capital contribution.  (*See* Yucaipa Opp. at 3–5.)

Further, Section 2.7(e) and Section 2.7(f) are inextricably linked.  Section 2.7(e) *expressly* states that any capital contribution must be ███████████ the provision added by Section 2.7(f).  The Trustee's interpretation would render this clause "mere surplusage, in contravention of the settled rule that a contract is to be construed so as to give effect to each and every part." *FCI Grp., Inc. v. Cty. of New York*, 54 A.D.3d 171, 176 (2008).

The Trustee also suggests that the covenant applies *only* after a capital contribution has actually been made.  (Opp. at 6–7.)  But again, the plain language of Section 2.7(f) defeats this argument: ████████████████████████████████████████████████ ████████████████████████████████████████████ The entire premise of the Trustee's claim is that Yucaipa was supposed to make a capital contribution, but failed to do so in violation of Section 2.7(e).  This, by definition, is a claim ████████ an ████████ occurring ████████████ with Yucaipa's obligation to make a capital contribution. The Trustee's contrary construction of Section 2.7(f) would leave the ████████ provision "without force and effect," violating settled rules of contract interpretation.  *Snug Harbor Square Venture v. Never Home Laundry, Inc.*, 252 A.D.2d 520, 521 (N.Y. App. Div. 1998).

Next, the Trustee wrongly argues that applying the plain language of the FLCA would somehow convert Yucaipa's capital contribution obligation into an "option" or "render" it "unenforceable."  (Opp. at 7–8.)  This does not withstand scrutiny.  It is undisputed that if Yucaipa breached the Capital Contribution Provision, the Third Amendment provides an express remedy to the Agent and any Lenders (specific performance), which CIT pursued in 2009.  (Scolnick Decl., Ex. 41 at 8 (§ 2.7(e)).)  But Section 2.7(e) also *excludes* Allied from the parties

that could sue to enforce the provision (*see* Mot. at 33–34), and Section 2.7(f) explicitly *bars* Allied from suing for any recovery with respect to any capital contribution or failure to make it.

Nor is the Trustee correct that it would be "nonsensical" (Opp. at 11) to grant exclusive enforcement rights to the Agent and Lenders, who, according to the Trustee's allegations, negotiated the terms of the Third Amendment with Yucaipa.  (*See, e.g.*, Lender Compl. ¶¶ 7 ("[T]he First Lien Lenders agreed [in the Third Amendment] to permit Yucaipa to acquire only a strictly limited amount of First Lien Debt" subject to the capital contribution requirement), 47 ("[T]he First Lien Lenders did not want to have [Yucaipa] as a Lender under their First Lien Credit Facility.").)  After all, the Lender Complaint expressly alleges that Allied "took a back seat and allowed Yucaipa to dictate the terms of the [Third Amendment]" (*id.* ¶ 52), so it is not surprising that Allied did not have its own enforcement mechanism in the event of a breach.

The Trustee also argues that Section 2.7(e)'s specific performance remedy is "irrelevant" because Allied, unlike the Lenders, had "a monetary remedy at that time."  (Opp. at 12–13.) This argument is circular and ignores the text of Section 2.7(f), which ███████████████ ██████████████████████████████████████████████████████████████████████ ██████████████████████████████████████ (Scolnick Decl., Ex. 41 at 9 (§ 2.7(f)).)  Thus, Allied had *no* remedy of any kind, at the time of breach or otherwise.

The Trustee relies on *Krape v. PDK Labs, Inc.*, 34 A.D.3d 751 (N.Y. App. Div. 2006), for the proposition that a covenant not to sue cannot bar actions to enforce the underlying agreement itself.  (Opp. at 11–12.)  This badly overstates *Krape*'s holding and reasoning.  *Krape* involved the interpretation of a *settlement* agreement, which required one party to pay the other, and in exchange, "no further litigation of any kind between them would be brought."  34 A.D.3d at 752.  When one party failed to make the settlement payment, the other sued and the court held the covenant did not bar an action for that specific breach because a contrary ruling would leave the non-breaching party "with an illusory remedy."  *Id.* at 753.  In other words, the breaching party should not "retain the benefit for which it bargained"—the release and covenant not to sue—"without making the agreed-upon payment for that benefit."  *Id.*

20

*Krape* is distinguishable.  Allied is not seeking to enforce a promise contained in a settlement agreement, of course.  And more importantly, applying the plain text of the Third Amendment would not render Yucaipa's promises in the Third Amendment "illusory."  It would simply mean that with respect to one specific promise (the capital contribution), the only parties who can sue for breach are those specified in the contract, and the one party expressly *precluded* from suing may not do so.  Allied retains the ability to sue Yucaipa on a variety of other grounds unrelated to a failure to make a capital contribution.  Accordingly, "restrain[ing]" the Third Amendment's words "to the particular occasion and to the particular object which the parties had in view" *Krape*, 34 A.D.3d at 753, *requires* enforcement of Section 2.7(f) as written.

Finally, the Trustee does not dispute that the text of Section 2.7(f) is *identical* in all relevant respects to the covenant not to sue that this Court applied against Yucaipa.  (*See* Opp. at 14–15; *compare* Scolnick Decl., Ex. 41 at 7 (§ 2.7(e)), *with id.* at 9 (§ 2.7(f)).)  The Court interpreted that latter covenant to be "very clear," and "under it's plain meaning, you can't sue." (Scolnick Decl., Ex. 132 at 105.)  The Trustee's only response is to argue that the two provisions have a different "scope" and "purpose" (Opp. at 14), but even if true, that would not change the result, since the contract is unambiguous and its plain meaning controls.  *See In re Sols. Liquidation LLC*, 608 B.R. 384, 405 (Bankr. D. Del. 2019).

**B.      The Trustee's Reliance on Extrinsic Evidence is Unavailing.**

The parties' agreement that the Third Amendment "is unambiguous on its face" (Opp. at 11) precludes the Court from considering extrinsic evidence, such as the drafting history, in interpreting the covenant not to sue.  *See United States v. Prevezon Holdings, Ltd.*, 289 F. Supp. 3d 446, 455 n.3 (S.D.N.Y. 2018) (with an unambiguous contract, court "need not consider the parties' drafting … history"); *WWW Assocs. v. Giancontieri*, 77 N.Y.2d 157, 162–63 (1990). Indeed, this Court has held that the FLCA and its amendments "are not ambiguous in any way, and the Court can … make its determination based on the four corners of the document." (Scolnick Supp. Decl., Ex. 42 at 122.)

In any event, the Trustee argues that Section 2.7(f) (the covenant not to sue) was included in the Third Amendment *before* the capital contribution requirement, which suggests that the covenant must relate only "to the voluntary capital contribution of Term Loans contemplated by §2.7(f)(i)-(iv)," and "not the mandatory capital contributions … later inserted in a separate section of the document, §2.7(e)."  (Opp. at 10–11.)  She continues to ignore the express language of Section 2.7(e)—in *both* the final *and* draft version—that Yucaipa shall make the capital contribution of Term Loans ███████████████████████      (*Compare* Singer Decl., Ex. 119 at Yucaipa_LW00009707, *with* Scolnick Decl., Ex. 41 at 7 (§ 2.7(e)).)  The drafters' conscious choice to reference and incorporate Section 2.7(f) into Section 2.7(e) shows that they *intended* Section 2.7(f) to apply to the Capital Contribution Provision.

Ironically, the evidence of drafting history (if relevant) defeats another of the Trustee's arguments:  that the "capital contribution" was supposed to be in cash.  The drafting history *confirms* that all parties (Yucaipa, Lenders, and Allied) understood and intended the Capital Contribution Provision to mandate that Yucaipa contribute Term Loans—not cash—in exchange for equity.  First, ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████ [6]  Second, the selectively quoted Lender email ██████████████████████████████████████ (*Id.* Ex. 115.)  This extrinsic evidence also demonstrates that when Section 2.7(f) prohibited Allied from bringing a claim ████████████████████████████████████████████████████ ██████ this necessarily included the capital contribution contemplated by Section 2.7(e).

---

[6]  Contrary to the Trustee's characterization, the minutes do not say that any proposal "that did not include a capital contribution" does not help the company.  (Opp. at 7.) ████████████ ████████████████████████████████████████ (Singer Decl., Ex. 116 at 2.) ████████████████████████████████████████████████████ ██████████████████████████   ██ ██   ████████████ *id.*, *not* cash.

**C.      Yucaipa Has Not Waived its Defense Based on the Covenant Not to Sue**

The Trustee also argues that Yucaipa waived its bargained-for contractual defense by not pleading it in the answer to the Estate Complaint.  (Opp. at 16–17.)  This argument is meritless.

*First*, a failure to specifically list "covenant not to sue" in the answer does not waive it. Rather, "[a]n affirmative defense generally 'need not be articulated with any rigorous degree of specificity, and is sufficiently raised for purposes of [Rule] 8 by its bare assertion.'"  *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 218 (3d Cir. 2017) (affirmative defense not waived even though it was not "explicitly identif[ied]" in the answer) (citation omitted).

As the Trustee tacitly admits (Opp. at 17, n.13), the covenant not to sue is encompassed within affirmative defenses that Yucaipa *has* pled, such as waiver and consent.  *See Bowling v. Johnson & Johnson*, 2019 WL 1760162, at *5 (S.D.N.Y. Apr. 22, 2019) (no waiver of covenant because it was covered by "informed consent, release and waiver").  Yucaipa's fifth defense asserts the Trustee "is barred by the doctrine of waiver … by [Allied's] actions and conduct," *including* its "approv[al]" and "execut[ion]" of the Third Amendment, which of course contains the covenant not to sue.  (13-50530, ECF 95 ¶¶ 238, 302.)  The eighth defense asserts that the Trustee "is bound by the actions and conduct of [Allied]" who "expressly and/or impliedly consent[ed] to each and every act" and is "barred by the doctrine of consent."  (*Id.* ¶ 308.)

*Second*, and regardless, "[c]ourts in [the Third] Circuit … have taken a more forgiving approach to parties who fail to raise affirmative defenses in an answer."  *Stored Value Sols., Inc. v. Card Activation Techs., Inc.*, 796 F. Supp. 2d 520, 541 (D. Del. 2011) (citation omitted); *see Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 506 (3d Cir. 2006) (affirmative defenses can be raised "at any time (even after trial), if plaintiffs suffer no prejudice").[7]  Defendants may thus pursue an affirmative defense not pleaded in the answer, so long as it was raised "at a pragmatically sufficient time and [the plaintiff] was not prejudiced in its ability to respond." *Charpentier v. Godsil*, 937 F.2d 859, 863–64 (3d Cir. 1991) (defense first raised in trial brief);

---

[7]   Whether an affirmative defense has been waived is governed by Third Circuit law.  *See Stored Value Sols., Inc.*, 796 F. Supp. 2d at 541.

*see, e.g.*, *Eddy v. V.I. Water & Power Auth.*, 256 F.3d 204, 210 (3d Cir. 2001) (defense first raised at summary judgment); *Kleinknecht v. Gettysburg Coll.*, 989 F.2d 1360, 1373–74 (3d Cir. 1993) (same).[8]

Here, there is no possible prejudice to the Trustee from Yucaipa failing to put the words "covenant not to sue" in its answer.  Again, the parties agree that the Third Amendment is unambiguous and extrinsic evidence is unnecessary.  (Opp. at 11.)  Thus, it is illogical for the Trustee to suggest now that relying on this defense would be "highly prejudicial" because she "took no discovery into the parties' intent."  (*Id.* at 17.)  Likewise, the Trustee's citation to *Parkell v. Senato*, 2019 WL 1435883 (D. Del. Mar. 31, 2019) is unavailing because there— unlike here—a new defense would have required "additional inquiry into" the factual predicate for it.  *Id.* at *7, n.11.

Even if intent were a relevant topic, there is no prejudice because the Trustee has everything she needs.  (*E.g.*, Opp. at 9–11 (raising an intent-based argument premised on the covenant's drafting history).)  The Trustee has not claimed—let alone shown—that she "would have sought any particular discovery different from what [she] already obtained."  *Weyerhaeuser Co. v. Domtar Corp.*, 204 F. Supp. 3d 731, 737 (D. Del. 2016); *see Kleinknecht*, 989 F.2d at 1374 (no waiver because relevant facts were "not in dispute," "the issue presents only a question of law for resolution," and plaintiffs received notice of the defense at summary judgment).

Lastly, Yucaipa raised this defense at a "pragmatically sufficient" time because the Trustee was "able to address [it] in [her] summary judgment brief[]."  *Weyerhaeuser*, 204 F. Supp. 3d at 737.  She devoted nearly eleven pages to it, not counting the "waiver" argument (Opp. at 6–16).  *See, e.g.*, *Holland v. Bramble*, 638 F. Supp. 2d 429, 431–32 (D. Del. 2009) (no waiver of defense first raised at summary judgment); *Pantzer v. Shields Dev. Co.*, 660 F. Supp.

---

[8]  The Third Circuit's liberal approach to unpled affirmative defenses controls over Trustee's citation to *Skyline Steel, LLC v. Pilepro, LLC*, 2016 U.S. Dist. LEXIS 102908 (S.D.N.Y. Aug. 4, 2016).  Moreover, the court in *Skyline Steel* found that the defendant had "act[ed] in bad faith or with a dilatory motive."  *Id.* at *13.  The Trustee makes no similar argument (nor could she).

56, 61 (D. Del. 1986) (no waiver where plaintiff responded to defense in opposition to summary judgment); *In re Hayes Lemmerz Int'l, Inc.*, 340 B.R. 461, 467–68 (Bankr. D. Del. 2006) (no waiver of defense first raised in pretrial statement).

## IV. YUCAIPA IS ENTITLED TO SUMMARY JUDGMENT ON THE ESTATE COMPLAINT'S BREACH OF FIDUCIARY DUTY CLAIM

The Estate Complaint identifies six allegations in support of the fiduciary duty claim against Yucaipa, at paragraphs 176 to 177. All of them are legally and/or factually deficient. And because the Trustee has conceded that the JCT Negotiations were not Allied's corporate opportunity, she has no evidence of damages resulting from any alleged breach.

### A. The Trustee Concedes that Partial Summary Judgment is Warranted on Allegations Related to the MMSA and Second Lien Debt.

The Trustee does not dispute that allegations related to the MMSA and acquisition of second-lien debt are time-barred or otherwise defective. (Mot. at 38–40, 42; Opp. at 32, n.34.) Thus, Yucaipa is entitled to partial summary judgment on those issues.

### B. The Court Should Grant Summary Judgment on the Trustee's Theory That Yucaipa "Caus[ed] the Directors to Fail to Even Consider Potential Transactions."

The Trustee alleges that Yucaipa breached its fiduciary duty by causing the Board to fail to "consider potential transactions that could have benefitted Allied." (Estate Compl. ¶ 177.) But as Yucaipa has demonstrated, the Trustee's allegations are devoid of factual and legal support. (Mot. at 42–45.) The Trustee's response amounts to little more than hand-waving.

#### 1. The "Potential Transactions" Allegations Fail as a Matter of Law and Undisputed Fact.

The Trustee identifies six sets of alleged discussions with Riggs or JCT that occurred from 2008–2012, portraying them as steps along a continuum toward Riggs's "dream" of owning Allied. (Opp. at 35–40.) Her theory is that Riggs (eventually JCT) wanted to acquire Allied at any cost and would have pursued a deal with Allied had Yucaipa not interfered, in supposed breach of fiduciary duties. (*See id.*) But that theory is not supported by law or fact.

a. Riggs's 2008 and 2009 Efforts to Acquire Yucaipa's Equity: The Trustee notes that in September 2008 and June-July 2009, Riggs approached *Yucaipa* about acquiring its *equity*

*stake* in Allied.  (Opp. at 36, 38; *see* Mot. at 43.)  She argues that "there is no evidence of Yucaipa informing the non-Yucaipa [Board] members … about Riggs's overture or taking any steps to explore a potential transaction."  (Opp. at 36–37; 38–39.)  But even if that were accurate, it does not give rise to a viable breach of fiduciary duty claim against Yucaipa.  Delaware law "does not … require … controlling shareholders [to] sacrifice their own financial interest in the enterprise"—such as selling an equity interest it does not want to sell—"for the sake of the corporation."  *Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386, 411 (Del. Ch. 1999) (controlling shareholder had not breached duty to the corporation merely by acting in self-interest and failing to search for capital for the corporation).  The Trustee makes no effort to explain why Yucaipa's fiduciary duties required it to inform the Board of a third-party's interest in acquiring its equity stake.  Nor does the Trustee cite any cases to that effect.

      b.    <u>ComVest in 2009:</u>  The Trustee next argues that "Yucaipa prevented any meaningful discussion [with ComVest] of a restructuring strategy for Allied," pointing to █████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████  (*Id.* at 38.)  None of these facts, individually or collectively, raise a triable issue regarding whether Yucaipa breached its fiduciary duty.

      As for the March 5, 2009, meeting, Mr. Hughes ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████ [9]  There
is no evidence or reasonable inference that Yucaipa *prevented* restructuring discussions between
ComVest and Allied.

As for the email directing Mr. Hughes to Mr. Burkle, Mr. Hughes testified ████████
████████████████████████ (*Id.* at 198.)  The Trustee's implicit theory is that
Yucaipa somehow breached its fiduciary duty by directing a lender (ComVest) to proceed in a
specific manner (i.e., to contact Mr. Burkle) to obtain information about the borrower.  Not
surprisingly, the Trustee cites no case law to support this proposition.

With respect to Mr. Priddy's testimony that Mr. Burkle had "threatened" ComVest with
labor unrest if ComVest "wiped him out" (Opp. at 38), ████████████████████████

████████████████████████████████████████████████████████████

█████████████ (Suh Decl., Ex. 2 at 87, 91.)[10]  Again, the Trustee's opposition is notably
devoid of any legal authority indicating that a controlling shareholder breaches its fiduciary duty
through tough negotiations with a lender to acquire its debt.

There is also zero evidence that ComVest had ever developed a "turnaround strategy"
that Yucaipa somehow thwarted.  (Opp. at 37.)  ComVest did little more than threaten to drive
Allied into bankruptcy.  Even then, ComVest did not intend to follow through unless it could not
reach ████████ deal terms with Yucaipa because a second bankruptcy presented significant
risks to Allied's survival.  (*See* Scolnick Decl., Ex. 17 at 88, 110–114; Suh Decl. Ex. 2 at 106

(███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ ).)

---

9  ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████

10  ██████████████████████████████████████████████████████████
████████████████████████████████████████████████

c.    JCT's July 2010 Letter of Intent:  The Trustee next points to a July 2010 Letter of Intent ("LOI") that Mr. Riggs sent to Messrs. Gendregske and Walker, seeking to acquire Allied. (Opp. at 39.)  But the full Board *did* consider this LOI, and it exercised its business judgment to decline.  The Trustee selectively cites the board meeting minutes to make it appear that Yucaipa alone chose to pass on the offer.  (*Id.*) ██████████████████████████████

██████████████████████████████████████  (Scolnick Supp. Decl., Ex. 35 at 2.) ████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████  (*See id.*) ████████████████████████

██████████████████████████  (*Id.*)  Thus, there is no cognizable claim that Yucaipa breached any fiduciary duty in connection with the LOI.[11]

d.    JCT Debt Purchase Negotiations:  The Trustee further relies on Spring 2011 negotiations among Riggs, Black Diamond, and Yucaipa and the 2011-2012 JCT Negotiations. (Opp. at 39–45.)  But these negotiations involved potential *debt purchases*, not offers to acquire Allied directly. ██████████████████████████████████████████████████

████████  (Scolnick Decl., Ex. 19 at 236.)  That is because there was no potential for a deal to be made directly with Allied or its Board in the 2011-2012 timeframe.

Yucaipa does not dispute that Riggs's and JCT's ultimate "goal was to acquire Allied." (Opp. at 42.)  But by 2011, Allied was indisputably in financial distress and in default so, practically, any acquisition of Allied had to involve a debt purchase and a 363 sale, and no reasonable fact-finder could conclude that JCT would have, or could have, acquired Allied by

---

[11] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

pursuing a direct purchase.  (*See* Yucaipa Opp. at 23–24 (citing testimony of Riggs and JCT's

Rule 30(b)(6) witness).)  That explains why JCT approached BD/S, CIT, and Yucaipa about

acquiring *debt*, rather than approaching the Board.  Thus, although the Trustee proclaims "JCT

was willing to pay approximately $244.2 million to *own* Allied in spring 2012," she ignores that

it would have gone to Allied's *debtholders*, including BD/S, not Allied.  (Opp. at 42.)  As such,

this was *not* "a tangible JCT prospective transaction for *Allied*."  (*Id.*)  In fact, the Trustee admits

that these negotiations were not a "corporate opportunity" of Allied at all.  (*See id.* at 43.)

As a Lender, Yucaipa could set its own price for its debt.  *See Solomon v. Pathe

Commc'ns Corp.*, 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995), *aff'd*, 672 A.2d 35 (Del.

1996) ("A controlling shareholder is not required to give up legal rights that it clearly possesses;

this is certainly so when those legal rights arise in a non-stockholder capacity.").  And the

Trustee points to nothing that shows Yucaipa had a legal obligation to inform the Board of JCT's

interest in buying debt.  Yucaipa had no such duty.  *See Odyssey Partners*, 735 A.2d at 415 ("one

who may be both a creditor and a fiduciary (e.g., … controlling shareholder) does not by reason

of that status alone have special limitations imposed upon the exercise of [its] creditor rights.").

As for the Spring 2011 negotiations, the Trustee concedes this was a potential *debt*

purchase orchestrated by *Black Diamond*.  *(*Singer Decl., Ex. 141 at 2 (████████████

████████████████████████).)  ████████████

████████████████  (*Id.*)  Neither Black Diamond (the orchestrator) or

JCT (the would-be purchaser) presented this potential deal to Allied.  Instead, Black Diamond

approached and communicated with Yucaipa only.[12]  While Mr. Deckoff may have believed that

the proposal would have been "a good outcome for both" Yucaipa and Black Diamond (Opp. at

40), the Trustee cites no evidence that it would have been beneficial to *Allied* or any of its other

stakeholders, which is the only relevant question.

As for the 2011-2012 JCT Negotiations, ████████████████████████

---

[12]  *See* Suh Supp. Decl., Exs. 4–7.

███████████████████████████████████████████████

█████████████ (Singer Decl., Ex. 59)  But the Trustee fails to cite any authority for the proposition that Yucaipa had a fiduciary obligation *not* to demand a premium when selling its own debt, or that it could not negotiate with JCT and instead had to refer JCT to Allied's Board. The Trustee's theory is contrary to Delaware law.  *See Odyssey Partners*, 735 A.2d at 423 (when a "controlling shareholder" is "both a creditor and a fiduciary," the shareholder is not restricted by its fiduciary duties from exercising its rights as a creditor).

The allegations also fail for lack of proof.  (*See supra* p. 7; *see also* Yucaipa Opp. at 24–25.)  The Trustee predicts that "[t]he evidence will show that this was a tangible prospective JCT transaction for Allied that Yucaipa squandered" (Opp. at 42), but she points to no evidence to back up her prediction.  "Unsupported assertions [or] conclusory allegations … are insufficient" to defeat summary judgment.  *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).  In *fact*, the undisputed evidence shows that JCT term sheets exchanged during this period were subject to numerous contingencies, and the Trustee's own witnesses and expert admitted that there was no final term sheet exemplifying an actual deal that would have occurred but-for Yucaipa's purported conduct.  (*See* Yucaipa Opp. at 30–31.)

The Trustee also argues that Riggs "did not care what form the transaction took" and that "*Yucaipa* insisted on structuring" it as debt transaction; she relies on self-serving testimony from Black Diamond's principal, Mr. Deckoff, that this was his understanding, based on conversations with Riggs.  (Opp. at 41–42.)  But Riggs squarely refuted Mr. Deckoff's "understanding."  He testified that ███████████████████████████████████████████

██████████████████████████████ (Yucaipa Opp. at 23.)[13]  Yucaipa's 30(b)(6) witness concurred.  (Scolnick Decl., Ex. 7 at 670–71; 679–81; 695–96.)

    2.    **The Trustee Also Cannot Rely on Post-2009 Potential Transactions Because Those Facts Were Withheld During Discovery.**

---

[13] ███████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

Yucaipa also explained why the Trustee cannot rely on any "potential transactions" after 2009 (specifically, the discussions with JCT) to defeat summary judgment—namely, because her complaint makes no mention of such transactions *and* her predecessor (the UCC) did not identify any facts about them during discovery in response to pointed questions. (*See* Mot. at 42–44.)

The Trustee's invocation of the "liberal pleading standard" (Opp. at 40–41) is beside the point because the rules are clear: "[i]f a party fails to provide information ... as required by Rule 26(a) or (e), the party *is not allowed to use that information ... to supply evidence on a motion*, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1) (emphasis added), made applicable to this proceeding under Fed. R. Bankr. P. 7037.

It is undisputed that the Trustee and her predecessor never told Yucaipa that evidence of post-2009 negotiations with JCT and/or Riggs would form the basis for this claim, despite Yucaipa asking about it in interrogatories. (Mot. at 42–44.) The Trustee makes no effort to explain how she or the UCC could have been justified in withholding this information during discovery. Nor does she argue that failure to disclose it until now is harmless to Yucaipa. In fact, had Yucaipa known that the Trustee would premise her fiduciary duty claim on these allegations, it at the very least would have affected questioning at the JCT and Riggs depositions.

None of the Trustee's cited cases involved a failure to disclose information in response to specific discovery requests. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), merely addresses the pleading standard on a motion to dismiss, but "[s]tandards of pleading are not the same as standards of proof." *Phillips v. County of Allegheny*, 515 F.3d 224, 246 (3d Cir. 2008). "Once a case has progressed to the summary judgment stage … the liberal pleading standards … are inapplicable." *Tucker v. Union of Needlestrades, Indust., & Textile Emps.*, 407 F.3d 784, 787–88 (6th Cir. 2005). And unlike in *Romdhani v. Exxon Mobil Corp.*, 2010 WL 4682414, at *4–5 (D. Del. Nov. 10, 2010), Yucaipa posed specific interrogatories on precisely this issue; there must be consequences for a party's strategic withholding of information during discovery, only to spring it in response to summary judgment.

3.    **Any Fiduciary Duty Claim Premised on the JCT Negotiations is Fatally Duplicative of the Contract-Based Claims.**

Alternatively, the Trustee cannot maintain a fiduciary duty claim premised on the JCT Negotiations because that would be entirely duplicative of the Lenders' Contract-Based Claims. (Mot. at 45.)  The Trustee *concedes* that the claims are duplicative.  (Opp. at 45 ("If there is a recovery for the Estate Claim for breach of fiduciary duty in connection with Yucaipa torpedoing the JCT deal in 2011-2012, then the Direct Lender Claim for breach of contract for that misconduct is academic because the Trustee is not seeking duplicative damages.").)

The Trustee nonetheless argues there is "nothing impermissible … with pleading claims in the alternative based on the same underlying misconduct and damages." (Opp. at 45.)  But this case is well past the pleading stage—her expert report shows the claims' substantial overlap. (*See* Mot. at 45, n.14.)  Under Delaware law, courts dismiss fiduciary duty claims that "arise from the same underlying conduct… as [] breach of contract claim[]," *Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *15 (Del. Ch. June 6, 2018), and treat them as *breach of contract* claims.  *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010).[14]

C.    **Yucaipa is Entitled to Summary Judgment on the Improper Fees Allegation.**

Yucaipa is also entitled to summary judgment on the allegation that it "extracted unnecessary and unreasonable fees from Allied" (Estate Compl., ¶ 176), because Allied was contractually obligated to pay those fees.  (Mot. at 46–47.)  In response, the Trustee misinterprets the contractual provisions at issue and misstates the evidence.  (*See* Opp. at 46–48.)

ComVest Transaction:  The Trustee does not dispute that Section 10.2 of the FLCA required that if Allied was in default, it had to reimburse Lenders' expenses ████████████████
████████████████████████████████████████████████████████████

---

[14]  None of the Trustee's cited cases support her position.  *Philip A. Templeton, M.D., P.A. v. EmCare, Inc.*, 868 F. Supp. 2d 333, 340 (D. Del. 2012), addressed duplicative breach of contract and covenant of good faith and fair dealing claims.  *In re Am. Business Fin. Servs., Inc.*, 384 B.R. 66, 72 (Bankr. Del. 2008), concluded that fiduciary duty and contract claims were "separate claims based on separate factual allegations."  And *In re Green Field Energy Servs., Inc.*, 2018 WL 6191949, at *52 (D. Del. Nov. 28, 2020) awarded a single measure of damages for breach of contract and tortious interference claims, not fiduciary duty claims.

(Scolnick Decl., Ex. 33 at 158.)  She also does not dispute that Allied was in default at the time of the ComVest transaction, that Yucaipa and ComVest were both "Lenders," or that the Fourth Amendment and related transaction constituted a "refinancing or restructuring" of the FLCA. Accordingly, the Trustee is left with three meritless arguments.

First, the Trustee contends that the Fourth Amendment and ComVest transaction "were not in the nature of a 'work out.'"  (Opp. at 46.)  But whatever definition one employs for a "workout," it is clear that the ComVest transaction and Fourth Amendment count:

- Black's Law Dictionary defines a "workout" as "[t]he act of restructuring or refinancing overdue loans."  Black's Law Dictionary (11th ed. 2019); *see also Evans v. Tex. State Bank*, 2004 WL 306052, at *1–2 (Tex. App. Feb. 19, 2004) (relying on Black's Law Dictionary).  Another treatise defines a workout as "an agreement between the parties to solve the problem [of default] other than through an adverse foreclosure by the lender or bankruptcy by the borrower."  1 L. Distressed Real Estate § 3:1.  The very purpose of the Fourth Amendment and the ComVest transaction were to buy time to resolve Allied's financial troubles, as ComVest had been threatening a bankruptcy.  (*See infra*, p. 36, n.18; Mot. at 13; Yucaipa Opp. at 18–19.)[15]

- This Court recently found that the term "loan workout" is "defined as a 'mutual agreement between a lender and borrower to renegotiate the terms on a loan that is in default.'"  *In re Art Van Furniture, LLC*, 617 B.R. 509, 516 (Bankr. D. Del. 2020).  The Fourth Amendment fits this definition too:  It memorialized a renegotiation between Allied and ComVest of the terms of the FLCA, at a time when Allied was in default.

- The Fourth Amendment and ComVest transaction even fit squarely within the *Trustee's* own definition—they indisputably "[took] the form of negotiations and discussions among creditors [ComVest], investors, and other interested parties [Yucaipa] with the debtor [Allied]."  (Opp. at 46 (citing treatise).)

---

[15]  ███████████████████████████████████████████

Second, the Trustee argues that Yucaipa's fees were not "reasonable" because the August 2009 default "on which Yucaipa premises its right to fees occurred only because Yucaipa … requested it." (Opp. at 46.) But the contractual right to recover fees in the event of a default did not turn on the *reason* for the default. And it is also undisputed that Allied had been in default for over *a year before* the August 2009 default. (*See* Scolnick Decl., Ex. 47 at 3; Ex. 49 at 1.)[16] For that reason, Allied had previously paid other Lenders' attorneys' fees and financial advisor fees pursuant to § 10.2 while it was in default. (*See id.* Ex. 49 at 10 (§ 6.3(c)), 11 (§ 8); Mot. at 11–12.) The undisputed evidence also confirms that Allied defaulted on payments in August 2009 because ███████████████████████████████ (Scolnick Decl., Ex. 75 at 1), *not* "so that Allied could pay Yucaipa's and ComVest's fees[.]" (Opp. at 46–47.)

Third, the Trustee falsely claims that the fees were not reasonable because the deal "provided no benefit to the Estate or other Lenders." (*Id.* 47.) But the evidence shows that *both* benefited. (*See supra* pp. 7–8.)

<u>Georgia Action</u>: The MMSA's indemnification provisions contain a carve-out for fees arising solely out of "gross negligence or bad faith." (Opp. at 47.) According to the Trustee, this carve-out applies to fees incurred in connection with the Georgia Action, since the "New York [C]ourt" found that Yucaipa's fees arose out of its bad faith. (*Id.*) But the Trustee is distorting the contractual-carve out, as well as the New York court's decision.

In reality, no court has ever found that Yucaipa acted in bad faith or was grossly negligent with respect to the fees incurred for the Georgia Action against CIT. The New York action sought declaratory relief *only*; there was no claim for negligence or breach of fiduciary duty. *See BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*, 2013 WL 1290394 at *1, *5 (N.Y. Mar. 8, 2013) ("This is a case of contract interpretation."). And when the New York court granted declaratory relief, it *at most* found that Yucaipa had breached the FLCA; it made no "good faith" or negligence determination at all.

---

[16] As the Trustee's admits, "By June 2008, the Company defaulted on covenant provisions of the FLCA." (Tr. Mot. at 9.)

The Trustee also notes that she is asserting *in this action* that Yucaipa breached its duty of good faith.  (Opp. at 47.)  But as she concedes, ███████████████ ████████████████████████████████████████████████████████ (Scolnick Decl., Ex. 32 at 5 (§ 6(a), (b)) (emphasis added); Opp. at 47.)  No such finding has been made (let alone "finally" made) in this action or any other.

## D.    The Court Should Grant Summary Judgment on Allegations Related to Yucaipa's Acquisition of First Lien Debt and Structuring Transactions in Allied's Name.

### 1.    These Allegations are Duplicative of the Contract Claims

Two fiduciary duty allegations—"entering into … transactions" whereby Yucaipa allegedly "seize[d] control" and "structuring transactions" nominally in Allied's name to "protect Yucaipa's existing equity investments in Allied," which the Trustee confirms relate to the Fourth Amendment and debt purchase (Opp. at 33 & n.34)—are duplicative of the Contract-Based Claims.  (Mot. at 40, 46.)  Specifically, the Trustee alleges that Yucaipa breached the Third Amendment by failing to contribute debt, because the Fourth Amendment was void.  (Estate Compl. ¶¶ 161–64.)  Thus, while she contends that the contract claim "relates only" to Yucaipa's "failure to make the mandatory capital contribution" (Opp. at 33), it still "*arises from the same* underlying conduct"—the Fourth Amendment and Yucaipa's debt purchase.  *Edinburgh Holdings, Inc.*, 2018 WL 2727542 at *15.  Thus, the breach of fiduciary duty claim premised on these same allegations is "superfluous."  *Nemec*, 991 A.2d at 1129.

Notably, the Trustee's 30(b)(6) witness on damages confirmed that the "dispute arises from obligations expressly addressed by contract."  (*Id.*) ██████████████████ ████████████████████████████████████████████████████████ ████████████    (Mot. at 45; Scolnick Decl., Ex. 9 at 151.)  The Trustee ignored this evidence entirely, even though it demonstrates that "the factual circumstances underlying these claims arise not from Defendants' fiduciary duties, but from their contractual obligations."  *AM Gen. Holdings LLC ex rel. Ilshar Cap. LLC v. Renco Grp.*, 2013 WL 5863010, at *10 (Del. Ch. Oct. 31, 2013) (dismissing fiduciary duty claims that arose out of underlying contractual breaches).

As a result, Yucaipa had no fiduciary obligation to refrain from purchasing debt or championing an FLCA amendment that it believed would maximize Allied's value.  (Scolnick Supp. Decl., Ex. 33 at 41 (¶¶ 80–81); Yucaipa Opp. at 29.)  Rather, the only purported impediment to such conduct arose from the FLCA, making the claims duplicative.[17]

### 2.    The Allegations Are Not Grounded on Additional or Distinct Facts.

The Trustee argues that her fiduciary duty claim is not duplicative of her contract claim because the former is "grounded on an additional and distinct fact."  (Opp. at 33.)  But she points to no *evidence* of this supposed "additional" fact.  She merely reiterates her false *allegations*, claiming the Fourth Amendment "allowed Yucaipa to protect its $121.4 million investment in Allied's faltering business, at the expense of all other Lenders."  (*Compare* Estate Compl. ¶¶ 71, 137, *with* Opp. at 34.)  She also relies on factually unsupported expert testimony.  (Opp. at 33–34, n.35.)  But "[a]t the summary judgment stage, a party cannot stand on self-serving, largely unsupported conclusions to create a genuine issue of material fact for trial."  *Componentone, L.L.C. v. Componentart, Inc.*, 2008 WL 4790661, at \*14 (W.D. Pa. Oct. 27, 2008).

Contrary to the conclusory assertions of the Trustee's expert, the undisputed evidence shows that Yucaipa's debt acquisition *did* serve a "valid corporate purpose" *and* "provide[d] a corresponding benefit to the Estate."  (Opp. at 18.)  The "transaction" allowed Allied to avoid bankruptcy, to the benefit of all stakeholders, and retain key customers.  (*See* Mot. at 13; Yucaipa Opp. at 18–19, 28.)[18]

---

[17]  In *Stone & Paper Invs., LLC v. Blanch*, 2019 WL 2374005, at \*6 n.57 (Del. Ch. May 31, 2019), the court found on a motion to dismiss that fiduciary duty claims against a company's directors were "grounded in additional distinct facts" because the plaintiffs alleged that the directors "engaged in self-interested transactions" through which they stole millions from the company.  *Id.* at \*2.  These allegations presented an independent fiduciary claim, irrespective of the contract.  Here, the fiduciary claims at issue arise only "out of the obligations contemplated by the contractual agreements."  *AM Gen. Holdings*, 2013 WL 5863010.

[18]  ██████████████████████████████████████████████████████████████

The Trustee also refers to Allied's payment of Yucaipa's fees.  (Opp. at 34.)  But Yucaipa did not argue that the improper fees allegation was *duplicative* of the contract claims.  Instead, that allegation fails for the independent reasons stated above.

### 3.    The Trustee Seeks Damages For the Same Conduct on Both Claims

The Trustee posits that she seeks "*different* monetary damages" for her fiduciary duty and contract claims, relying on her damages expert's opinion that "Yucaipa's *breach of fiduciary duty* damaged the Estate due to its obstructing a transaction with JCT in late 2011 to 2012." (Opp. at 35.)  But her expert *also* opined that the *same* conduct caused the Lenders to suffer *breach of contract* damages.  (*See* Mot. at 45, n.14.)  "[T]o maintain both claims, a plaintiff must properly plead 'distinct harms caused by the defendants that fell outside the scope of their contractual relationship.'"  *AM Gen.*, 2016 WL 5863010, at *10 (citation omitted).  The Trustee has not done that here.  In fact, her expert testified that ▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  (Scolnick Decl., Ex. 13 at 156–57.)

## E.    The Court Should Grant Partial Summary Judgment to Yucaipa on the Issue of Damages for the Alleged Breach of Fiduciary Duty.

The parties agree that the JCT Negotiations were *not* a corporate opportunity of Allied. (Opp. at 43.)  Inexplicably, however, the Trustee seeks fiduciary duty damages based on the assumption that the JCT Negotiations *were* a corporate opportunity.  She acknowledges that her damages expert "used the expression" in his report, but she tries to explain it away by noting he "is not a lawyer."  (*Id.*)  This is not simply a question of verbiage.  The expert testified that ▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  (Scolnick Decl., Ex. 13 at 157–62.)  So it is untrue that whether Yucaipa usurped a corporate opportunity made "no difference" to her

---

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

expert's damages calculation.  (Opp. at 43.)  He actually testified ███████████

████████████████████████████████████████████████████████████████

███████████████████████████ (Scolnick Decl., Ex. 13 at 160; *see id.* at 159.)

        The Trustee's expert's report states: ██████████████████████████

████████████████████████████████████████████████████

██████████████ (Scolnick Decl., Ex. 107 at 30 (¶ 91) (emphasis added).)  ███████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████

(Scolnick Decl., Ex. 13 at 162 (emphasis added).)

        Logically, then, because the Trustee now admits that ███████████████

██████—that Yucaipa usurped a corporate opportunity—is untrue, her expert's damages

calculation on breach of fiduciary duty is ████████████[19]  And because the Trustee's alleged

damages for her *entire* fiduciary duty claim rest on this calculation (Opp. at 34–35 & nn. 37–38),

she cannot demonstrate that the Estate has damages for *any* of Yucaipa's alleged breaches.

        The Trustee's own cited cases explain that "[d]amages must be 'logically and reasonably

related to the harm or injury for which compensation is being awarded.'"  *Basho Techs. Holdco*

*B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *50 (Del. Ch. July 6, 2018)

(citation omitted).  So even if the Trustee could otherwise prove breach of fiduciary duty (she

cannot), courts "refuse to award damages based on mere speculation or conjecture where a

plaintiff fails to adequately prove damages."  *Encite LLC v. Soni*, 2011 WL 5920896, at *25

(Del. Ch. Nov. 28, 2011).

---

[19]  In its motion, Yucaipa argued that the MMSA waived any obligation Yucaipa may have had
to present corporate opportunities to Allied.  (Mot. at 45.)  Because the Trustee concedes that
the JCT Negotiations were not Allied's corporate opportunity, Yucaipa need not respond to
her argument that the MMSA cannot override Yucaipa's fiduciary duties.  (Opp. at 43–44.)

## V.    THE RECHARACTERIZATION CLAIM IS FATALLY DEFECTIVE

Yucaipa is entitled to summary judgment on the recharacterization claim because Allied's first lien debt was intended to be debt, not equity, at issuance.  (Mot. at 47–49.)

The Trustee responds that Yucaipa "altered the nature" of the debt through allegedly inequitable conduct, including removing the Third Amendment's restrictions, acquiring excess Term Loans, and failing to make a capital contribution.  (Opp. at 48.)  But the dispositive question is:  "what is the proper characterization *in the first instance* of an investment[?]"  *In re SubMicron Sys. Corp.*, 432 F.3d 448, 454 (3d Cir. 2006) (emphasis added).  The Trustee does not dispute that Allied's First Lien Debt was properly characterized as debt (not equity) when it was issued in May 2007, upon Allied's exit from the first bankruptcy.  (*See* Mot. at 48–49.)

The Trustee relies on *In re Franklin Equip. Co.*, 416 B.R. 483 (Bankr. E.D. Va. 2009) (Opp. at 48) for the principle that post-issuance conduct could "alter" debt into equity.  This is misleading at best.  The court in *Franklin* actually stated that it was "unable to locate any decision that has considered whether a loan indisputably originated as debt by a non-insider lender that is subsequently purchased and continued by insiders can ever have its certain origin as debt 'transformed' into a capital contribution."  *Id.* at 519.  The court simply assumed "arguendo" that a loan could theoretically be "transformed" into equity after acquisition, and it then rejected the recharacterization claim on the merits.  *Id.* at 519–23.

## VI.    YUCAIPA IS ENTITLED TO SUMMARY JUDGMENT ON THE FRAUDULENT TRANSFER CLAIM FOR ANY TRANSFERS MADE ON OR BEFORE AUGUST 2009

The Trustee does not dispute—and therefore concedes—that all alleged fraudulent transfers made before May 17, 2008 are time-barred.  (*See* Opp. at 50.)

The Court should also grant summary judgment as to any alleged transfers made before August 2009.  (Mot. at 49–50.)  It is undisputed that that the Trustee's expert used August 2009 as the insolvency date at the direction of counsel, based on the evidence in the record.[20]  The

---

20 ████████████████████████████████████████████████████████████████

expert calculated damages for transfers made after that date only.  (Scolnick Decl., Ex. 107 at 32, n.136.)  The Trustee expressly deferred to her damages expert for any monetary recovery due on the fraudulent transfer claims.  (Scolnick Decl., Ex. 141 at 119 █████████████████████

████████████████████████████████████████████████████████████████

██████).)

   For each challenged transfer, the Trustee bears the burden of proving Allied's insolvency.  *See In re Opus E., LLC*, 528 B.R. 30, 51 (Bankr. D. Del. 2015).  Yet in opposing summary judgment on this issue, the Trustee's *only* evidence of insolvency before August 2009 is the opinion of *Yucaipa's* expert, Daniel Fischel.  (Opp. at 49.)  The Trustee argues that Mr. Fischel "opined that Allied was insolvent … in 2008," and that she "has a right to rely on that concession in pursuing" her claim.  (*Id.*)  This mischaracterizes Mr. Fischel's opinions and testimony.  He decidedly did not express an opinion on whether Allied was insolvent as of any specific date.

████████████████████████████████████████████████████████████████

██████████████████████████████ (Scolnick Decl., Ex. 35 at 8)—was completely illogical, given that the operative Complaints acknowledge that Allied was insolvent in early 2008, and Allied's trading prices indicated that Allied was insolvent before August 2009.  The Trustee's reliance on an out-of-context snippet of Mr. Fischel's testimony is insufficient to meet her burden in opposing summary judgment.

### VII.    CONCLUSION

   For these reasons, the Court should grant Yucaipa's Motion for Summary Judgment.

---

████████████████████████████████████████████████████████████

████████████████████████████████████

Dated: December 18, 2020

YOUNG CONAWAY
STARGATT & TAYLOR, LLP

 */s/ Michael S. Neiburg*
Michael R. Nestor (No. 3526)
Michael S. Neiburg (No. 5275)
Rodney Square
1000 North King Street
Wilmington, DE  19801
Telephone: (302) 571-6600
mnestor@ycst.com

- and-

GIBSON, DUNN & CRUTCHER LLP
Maurice M. Suh (Pro Hac Vice)
Robert A. Klyman (Pro Hac Vice)
Kahn Scolnick (Pro Hac Vice)
333 South Grand Avenue
Los Angeles, CA  90071
Telephone: (213) 229-7000
msuh@gibsondunn.com

*Attorneys for Defendants Yucaipa American
Alliance Fund I, L.P., Yucaipa American Alliance
(Parallel) Fund I, L.P., Ronald Burkle, Jos
Opdeweegh, Derex Walker, Jeff Pelletier, and Ira
Tochner*