## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ASHINC CORPORATION, *et al.*, | : | Case No. 12-11564 (CSS) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| _____ | : | |
| CATHERINE E. YOUNGMAN, | : | |
| LITIGATION TRUSTEE FOR ASHINC | : | |
| CORPORATION, ET AL., AS | : | |
| SUCCESSOR TO THE OFFICIAL | : | |
| COMMITTEE OF UNSECURED | : | |
| CREDITORS OF ASHINC | : | |
| CORPORATION, AND ITS | : | |
| AFFILIATED DEBTORS | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| BDCM OPPORTUNITY FUND II, LP, | : | Adv. Proc. No.: 13-50530 (CSS) |
| BLACK DIAMOND CLO 2005-1 LTD., | : | |
| and SPETRUM INVESTMENT | : | |
| PARTNERS, L.P., | : | |
| | : | |
| Intervenors, | : | |
| | : | |
| v. | : | |
| | : | **Related Docket Nos. 696 and 705** |
| YUCAIPA AMERICAN ALLIANCE | : | |
| FUND I, L.P., and YUCAIPA | : | |
| AMERICAN ALLIANCE (PARALLEL) | : | |
| FUND I, L.P., | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |
| CATHERINE E. YOUNGMAN, | : | |
| LITIGATION TRUSTEE FOR ASHINC | : | |
| CORPORATION, ET AL., AS | : | |
| SUCCESSOR TO BDCM | : | |
| OPPORTUNITY FUND II, LP., | : | |
| BLACK DIAMOND CLO 2005-1 | : | |
| LTD., SPECTRUM INVESTMENT | : | |

PARTNTERS L.P., BLACK      :
DIAMOND COMMERICAL      :
FINANCE, L.L.C., as co-administrative  :
agent, and SPECTRUM      :    Adv. Pro. No. 14-50971 (CSS)
COMMERICAL FINANCE LLC,    :
as co-administrative agent,     :
      :
      Plaintiff,     :
v.      :
      :    **Related docket Nos. 453 and 462**
YUCAIPA AMERICAN ALLIANCE  :
FUND I, L.P., and YUCAIPA    :
AMERICAN ALLIANCE (PARALLEL) :
FUND I, L.P.,      :
      :
      Defendants     :

## OPINION[1]

FOX ROTHSCHILD LLP
Seth A. Niederman
919 Market Street, Suite 300
Wilmington, DE  19801
    -and-
JOSEPH HAGE AARONSON LLC
Gregory P. Joseph
Douglas J. Pepe
Gila S. Singer
485 Lexington Avenue, 30th Floor
New York, NY  10017
    -and-
ZAIGER LLC
Jeffrey H. Zaiger
432 Park Avenue, Suite 19A
New York, NY 10022

Counsel for the Litigation Trustee

Date: May 4, 2021
Sontchi, C.J. _____

YOUNG CONAWAY STARGATT
& TAYLOR LLP
Michael R. Nestor
Michael S. Neiberg
1000 North King Street
Wilmington, DE  19801
    -and-
GIBSON, DUNN &
CRUTCHER LLP
Robert A. Klyman
Maurice M. Suh
Kahn Scolnick
333 South Grand Avenue
Los Angeles, CA  90071

Counsel for Defendants

---

[1]  This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## Table of Contents

INTRODUCTION ............................................................................................................ 5

JURISDICTION ............................................................................................................. 6

FACTUAL HISTORY ..................................................................................................... 6

  A. Procedural History ................................................................................................ 6

  B. Facts/Background Applicable to this Matter ....................................................... 8

     i.   2005 Bankruptcy and Yucaipa's Investment in Allied ................................... 8
     ii.  Allied's First and Second Lien Credit Agreements...................................... 10
     iii. Third Amendment to the Credit Agreements ............................................. 11
     iv. Tender Offer by Allied and Yucaipa ........................................................... 14
     v.  ComVest Acquires the Majority of Allied's First Lien Debt ...................... 15
     vi. Fourth Amendment and Yucaipa's Acquisition of ComVest's Debt. ........ 16
     vii. Yucaipa Does Not Make Capital Contribution and CIT Litigation .......... 17
     viii. Potential Sale to Jack Cooper Transportation ......................................... 19
     ix. BD/S Sues Yucaipa in New York State Court ........................................... 19
     x.  BD/S File Involuntary Bankruptcy Against Allied .................................... 20
     xi. Fourth Amendment Voided and BD/S Recognized as Requisite Lender ........... 21
     xii. JCT Buys Substantially All of Allied's Assets ......................................... 21
     xiii. The Trustee Assumes Prosecution of These Adversary Proceedings ................ 21

ANALYSIS ................................................................................................................... 22

  A. Summary Judgment Standard .............................................................................. 22

  B. Summary of Cross-Motions for Summary Judgment ......................................... 25

  C. Estate Claim 5 and Lender Claim 2: Breach of Contact ..................................... 26
     i.   Capital Contribution Provision and the Trustee's Allegations .............................. 26
     ii.  Prejudgment Interest ................................................................................... 33
     iii. Covenant Not to Sue .................................................................................... 34

  D. Lender Claims 2 and 3: Breach of Contract and Breach of Duty of Good Faith and
    Fair Dealing - Statute of Limitations................................................................... 38

  E. Lender Count 3 – Breach of Duty of Good Faith and Fair Dealing Against Yucaipa
    ................................................................................................................................. 46

  F. Estate Claims 4 and 6: Specific Performance .................................................... 47

  G. Estate Claims 10, 11 and 13: Fraudulent Transfer and Disallowance of Claims
    Pursuant to § 502(d) ........................................................................................... 47
     i.   Relief Requested........................................................................................... 47
     ii.  Relevant and Reiterated Facts .................................................................... 48
     iii. Shifting Standard and Law .......................................................................... 55
     iv. Summary ....................................................................................................... 74

  H. Estate Claim 7 – Breach of Fiduciary Duty ....................................................... 75

i.  The Fiduciary Duty Claim is not Duplicative of the Breach of Contract Claim ... 76
ii. There is Enough Evidence to Go to Trial on the Issue of Whether Yucaipa
    Obstructed Board Consideration to Benefit Itself ..................................................... 78
iii. JCT Negotiations ............................................................................................................ 84
iv. Could Any Transaction with JCT Benefit Allied? ................................................... 85
v.  Corporate Opportunity ................................................................................................. 87
vi. Unnecessary and Unreasonable Fees. ....................................................................... 87

I.  Lender Claim 4: Tortious Interference Against the Yucaipa Directors and Ron
    Burkle ................................................................................................................................ 94

J.  Estate Claims 1-2 and Lender Claim 1: Equitable Subordination .............................. 94
i.  Insider Status .................................................................................................................. 100
ii. Inequitable Conduct ..................................................................................................... 101

K. Estate Claim 3 – Recharacterization ................................................................................ 110

CONCLUSION ............................................................................................................................ 114

Appendix ..................................................................................................................................... 115

## INTRODUCTION[2]

Before the Court is the (i) *Motion for Summary Judgment by Defendants Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P.*[3] and (ii) the *Litigation Trustee's Motion for Partial Summary Judgment.*[4]  The dispute before the Court results from two complaints asserted against Defendants Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. (collectively, "Yucaipa") and certain individuals filed by (a) the Official Committee of Unsecured Creditors (the "Committee") and (b) BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd. (collectively, "Black Diamond"), and Spectrum Investment Partners, L.P. ("Spectrum," and together with Black Diamond, "BD/S") (the Committee action and the BD/S action are not being pursued by the Trustee on behalf of the Trust, described more fulsomely below).  The Trustee asserts a bevy of claims against Yucaipa related to the First Lien Credit Agreement[5] ("FLCA," the lenders therein the "First Lien Lenders," and the debt therein, the "First Lien Debt") and its various amendments.  The claims include

---

[2]  Capitalized terms not defined herein shall have the meaning ascribed to them *infra*.

[3]  Adv. Pro. 13-50530, Adv. D.I. 696; Adv. Pro. 14-50971, Adv. D.I. 453 (the "Yucaipa Summary Judgment Motion"). Although the Yucaipa Summary Judgment Motion and associated briefing were filed in both adversary actions, the Court will reference *only* docket numbers in Adv. Pro. 13-50530, unless otherwise indicated.

[4]  Adv. Pro. 13-50530, Adv. D.I. 705; Adv. Pro. 14-50971, Adv. D.I. 462 (pursued by the "Trustee" and referred to herein as "Trustee Summary Judgment Motion" and together with Yucaipa Summary Judgment Motion, the "Cross-Motions for Summary Judgment").  Although the Trustee Summary Judgment Motion and associated briefing were filed in both adversary actions, the Court will reference *only* docket numbers in Adv. Pro. 13-50530, unless otherwise indicated.

[5]  Declaration of Gila S. Singer in Support of Motion for Partial Summary Judgment (D.I. 710) (the "Singer Dec.") Exh. 9 (Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated Mar. 30, 2007).

breach of contract, breach of fiduciary duty, equitable subordination, recharacterization, tortious interference, fraudulent transfers, and disallowance of claims.  The Trustee and Yucaipa each moved for summary judgment on a variety of these claims.  This is the Court's opinion on the Cross-Motions for Summary Judgment.  As detailed below (and summarily in a chart attached as <u>Appendix</u> hereto), the Court will grant, in part, and deny, in part, each motion.  The Court will also enter judgment and award damages in favor of the Trustee on behalf of the Trust against Yucaipa on Estate Claims 5, 10, 11 and 13 and Lender Claim 2.  The Court will also enter judgment, in part, in favor of the Trustee on behalf of the Trust against Yucaipa on Estate Claims 1 and 2 and Lender Claim 1. Finally, the Court will enter judgment in favor of Yucaipa against the Trust on Estate Claims 3, 4, and 6.

## JURISDICTION

This Court has jurisdiction over this matter, pursuant to 28 U.S.C. § 1334. This is a core proceeding, pursuant to 28 U.S.C. § 157(b).  Venue is proper in this District, pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL HISTORY

### A.    Procedural History

The Official Committee of Unsecured Creditors began litigation against Yucaipa on February 1, 2013[6] (Del. Bankr. Adv. 13-50530); thereafter, BD/S filed their own

---

[6] Adv. No. 13-50530, D.I. 1, as amended D.I. 76 (The Official Committee of Unsecured Creditors' Complaint for (i) Equitable Subordination, (ii) Recharacterization, (iii) Breach of Contract, (iv) Specific Performance, (v) Breaches of Fiduciary Duties, (vi) Aiding and Abetting Breaches of Fiduciary Duties, (vii) Avoidance

complaint against Yucaipa on November 19, 2014[7] (Del. Bankr. 14-50971).  Under the

Debtors' Modified First Amended Joint Chapter 11 Plan of Reorganization dated

December 3, 2015[8] and a Litigation Trust Agreement dated December 20, 2016, the Estate

Claims and Lender Claims are now jointly prosecuted by the Trustee.[9]

The litigation history between these parties has been long and arduous.[10]  Before

the Court herein are Cross-Motions for Summary Judgment and their attendant briefs

---

and Recovery of Avoidable Transfers, and (viii) Disallowance of Certain Claims) (the "Estate Complaint").
The Estate Complaint includes the following claims (each an "Estate Claim" and together, the "Estate
Claims): (i) Estate Claim 1: Equitable Subordination, (ii) Estate Claim 2: Equitable Subordination for Harm
to All First Lien and Second Lien Lenders, (iii) Estate Claims 3: Recharacterization, (iv) Estate Claim 4:
Specific Performance of Contribution Provision, (v) Estate Claim 5: Breach of Contract for Breach of
Contribution Provision, (vi) Estate Claim 6: Specific Performance of Divestiture of Debt Provision,
(vii) Estate Claim 7: Breach of Fiduciary Duty against Yucaipa, (viii) Estate Claim 8: Breach of Fiduciary
Duty against Allied Directors, (ix) Estate Claim 9: Aiding and Abetting Breaches of Fiduciary Duties,
(x) Estate Claim 10: Avoidance and Recovery of Fraudulent Transfers (11 U.S.C. §§ 548(a), 550), (xi) Estate
Claim 11: Avoidance and Recovery of Fraudulent Transfers (11 U.S.C. §§ 544(b), 550), (xii) Estate Claim 12:
Preferential Transfers, and (xiii) Estate Claim 13: Disallowance of Claims.

[7]  Del. Bankr. 14-50971 at D.I. 1 (Complaint for (i) Equitable Subordination, (ii) Breach of Contract,
(iii) Breach of the Implied Duty of Good Faith and Fair Dealing, and (iv) Tortious Interference with
Contract) (the "Lender Complaint").  The Lender Complaint includes the following claims (each a "Lender
Claim" and together, the "Lender Claims"): (i) Lender Claim 1: Equitable Subordination, (ii) Lender Claim
2: Breach of Contract, (iii) Lender Claim 3: Breach of the Implied Duty of Good Faith and Fair Dealing, and
(iv) Lender Claim 4: Tortious Interference with Contract.

[8]  12-11564, D.I. 3360-1 (Debtors' Modified First Amended Joint Chapter 11 Plan of Reorganization Proposed
by the Debtors, the Committee, and the First Lien Agents (the "Amended Plan")).  See also 12-11564, D.I.
3383 (Findings of Fact, Conclusions of Law, and Order Confirming the Plan) (the "Confirmation Order").
The Amended Plan became effective on December 20, 2016.  See D.I. 3744 (Notice of Effective Date).
Thereafter, the Trustee was substituted as plaintiff in both above-captioned adversary actions.  Order
Substituting Plaintiffs and Amending Captions in Above-Referenced Adversary Proceedings to Reflect
Litigation Trustee as Plaintiff (Adv. Pro. 13-50530, D.I. 415; Adv. Pro. 14-050971, D.I. 214).

[9]  Amended Plan § 5.13.  The Confirmation Order appointed Ms. Catherine E. Youngman as the Litigation
Trustee (the "Trustee" for the "Trust") and Plan Administrator in these cases.  See Confirmation Order
¶¶ 20, 22.

[10]  See generally Yucaipa Am. All. Fund I, L.P. v. Ehrlich, 204 F. Supp. 3d 765 (D. Del. 2016), aff'd sub nom.
Yucaipa Am. All. Fund I, LP v. Ehrlich, 716 F. App'x 73 (3d Cir. 2017) (RICO Action); Yucaipa American Alliance
Fund II, LP v. BDCM Opportunity Fund II, LP (In re Allied Sys. Holdings Inc.), 556 B.R. 581, 584 (D. Del. 2016),
aff'd sub nom. In re ASHINC Corp., 683 F. App'x 131 (3d Cir. 2017) (requisite lender litigation); Gendregske v.
Black Diamond Commercial Finance LLC (In re Ashing [sic] Corp.), 552 B.R. 80, 82 (D. Del. 2015) Committee v.
Yucaipa (In re Allied Sys. Holdings, Inc.), 524 B.R. 598, 601 (Bankr. D. Del. 2015) (Committee against former
chief executive officer for breach of fiduciary duties), Del. Bankr. Case. No. 12-11564 (D.I. 1068) (Tr. of Hr'g

7

and declarations.[11]  The Court heard argument on these motions on February 4, 2021.

This is the Court's decision thereon.

## B.    Facts/Background Applicable to this Matter

### i.    2005 Bankruptcy and Yucaipa's Investment in Allied

The above-captioned debtor ("Allied" or the "Company") was a unionized car

hauling company engaged in the transport of new vehicles in North America.  On July

31, 2005, Allied filed a petition for relief under Chapter 11 of the Bankruptcy Code in the

---

Feb. 27, 2013); *BDCM Opportunity Fund II, L.P. v. Yucaipa American Alliance Fund L.L.P. (In re ASHInc. Corp.)*, Del. Bankr. 14-50971, D.I. 81; *Yucaipa Am. All. Fund I, LP v. SBDRE LLC*, No. CIV.A. 9151-VCP, 2014 WL 5509787, at *10-15 (Del. Ch. Oct. 31, 2014).

[11] **Yucaipa Summary Judgment Motion:** Motion for Summary Judgment by Defendants Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. (D.I. 696 and brief at D.I. 697, as amended D.I. 762); Declaration of Kahn Scolnick in Support of Motion For Summary Judgment by Defendants Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P., Ronald Burkle, Jos Opdeweegh, Derex Walker, Jeff Pelletier, and Ira Tochner (D.I. 700, the "Scolnick Dec."); Declaration of Derex Walker in Support of Motion for Summary Judgment (D.I. 701); Declaration of Ira Tochner in Support of Motion for Summary Judgment (D.I. 702); Declaration of Jeff Pelletier in Support of Motion for Summary Judgment (D.I. 703); Declaration of Jos Opdeweegh in Support of Motion for Summary Judgment (D.I. 704); Objection/Litigation Trustee's Opposition To The Motion For Summary Judgment By Defendants Yucaipa American Alliance Fund I, L.P., And Yucaipa American Alliance (Parallel) Fund I, L.P. (D.I. 770); Declaration Of Gila S. Singer In Support Of Litigation Trustee's Oppositions To The Motion For Summary Judgment By Defendants Yucaipa American Alliance Fund I, L.P., And Yucaipa American Alliance (Parallel) Fund I, L.P., And The Motion For Summary Judgment By Ronald Burkle, Jos Opdeweegh, Derex Walker, Jeff Pelletier, And Ira Tochner (D.I. 772) (the "Supp. Singer Dec."); Reply in Support of Motion for Summary Judgment by Defendants Yucaipa American Alliance Fund I, L.P., and Yucaipa American Alliance (Parallel) Fund I, L.P. (D.I. 803); and Declaration of Maurice M. Suh in Further Support of Yucaipa Defendants' Motion for Summary Judgment (D.I. 804). **Trustee Summary Judgment Motion**: Litigation Trustee's Motion for Partial Summary Judgment (D.I. 705, brief at D.I. 706); Declaration of Gila S. Singer in Support of Motion for Partial Summary Judgment (D.I. 710) (defined *supra* the "Singer Dec."); Brief - Opposition to the Litigation Trustee's Motion for Summary Judgment by Defendants Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P., Ronald Burkle, Ira Tochner, Derex Walker, Jos Opdeweegh, and Jeff Pelletier (D.I. 766); Declaration of Kahn Scolnick in Support of Defendants' Opposition to the Litigation Trustee's Motion for Summary Judgment (D.I. 767, the "Supp. Scolnick Dec."); Litigation Trustees Reply Memorandum in Further Support of Motion for Summary Judgment (D.I. 794); Declaration of Gila S. Singer in Support of Litigation Trustees Reply Memorandum in Further Support of Motion for Partial Summary Judgment (D.I. 796); Declaration of Richard A. Ehrlich in Support of Litigation Trustees Reply Memorandum in Further Support of Motion for Partial Summary Judgment (D.I. 798); Declaration of Adam C. Harris in Support of Litigation Trustees Reply Memorandum in Further Support of Motion for Partial Summary Judgment (D.I. 800); and Declaration of Jeffrey A. Schaffer in Support of Litigation Trustee's Reply Memorandum in Further Support of Motion for Partial Summary Judgment (D.I. 802).

Bankruptcy Court for the Northern District of Georgia[12] (the "2005 Bankruptcy"). Yucaipa — a private equity firm founded by Ron Burkle — began analyzing investment opportunities in the Company in an effort spearheaded by Derex Walker, a Transaction Partner hired by Yucaipa in January 2006 to provide experience with restructuring and distressed debt investing. Yucaipa purchased approximately 66% of Allied's then outstanding $150 million in pre-petition senior secured notes for $81.6 million in May 2006. Yucaipa also financed Allied's purchase of used rigs for approximately $12.6 million, and later purchased $1.5 million in claims tendered by unsecured creditors for 25¢ on the dollar. Yucaipa's initial investments in Allied totaled approximately $95 million.

Allied emerged from the 2005 Bankruptcy in May 2007 under a Plan of Reorganization sponsored by Yucaipa and the International Brotherhood of Teamsters.[13] Yucaipa converted its $95 million investment in Allied into 67% of reorganized Allied's equity under the Plan. Yucaipa obtained the ability to control Allied's Board of Directors (the "Board"), with the right to appoint three of Allied's five Board members and Allied's Chief Executive Officer (the fourth Board member), and a veto over Allied's fifth Board member, who was to be selected by the Creditors' Committee from the 2005 Bankruptcy.

---

[12] Bankr. N.D. Ga., No. 05-12515 (CRM).

[13] *See* Singer Dec. Exh. 5 (Bankr. N.D. Ga., No. 05-12515 (CRM) Second Amended Joint Plan of Reorganization of Allied Holdings, Inc. and Affiliated Debtors Proposed by the Debtors, Yucaipa and the Teamsters National Automobile Transportation Industry Negotiating Committee) (the "2005 Bankruptcy Joint Plan").

## ii.    Allied's First and Second Lien Credit Agreements.

To finance its exit from the prior bankruptcy, Allied entered into a two-tiered financing structure with various lenders ("Lenders") comprising $265 million in first lien debt, governed by the FLCA, and $50 million in second lien debt, governed by a Second Lien Credit Agreement[14] ("SLCA").   Both credit agreements were approved by the Georgia bankruptcy court in connection with the Joint Plan.

The first lien facility consisted of three types of debt: $180 million in term loans (the "Term Loans"), a $35 million revolving credit facility from the CIT Group/Business Credit, Inc. ("CIT"), and $50 million in letter of credit commitments ("LC Commitments").   The FLCA and SLCA were secured by a pledge of substantially all of Allied's assets, and both contained fixed interest rates.   The Georgia bankruptcy court approved Allied's entry into both the FLCA and SLCA.   As initially executed, the FLCA excluded Yucaipa from being an "Eligible Assignee," meaning that a holder of first lien debt could not sell, assign, or transfer any portion of its debt, rights, or obligations to Yucaipa.   The SLCA contained a similar provision.

Further, the FLCA provided for a "Requisite Lender" that was entitled to take certain actions and exercise particular remedies (or refrain from doing so) on behalf of all Lenders.   Under the FLCA, the Requisite Lender was one or more Lenders holding more than 50% of the term loans, LC Commitments, and revolving credit.

---

[14]   Singer Dec. Exh. 10 (Second Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated May 15, 2007).

Although the 2005 Bankruptcy right-sided Allied's business, the 2007 recession greatly impacted Allied (and the rest of the automotive market), again putting Allied in financial distress.

### iii.    Third Amendment to the Credit Agreements

Allied's distressed financial condition in early 2008 meant that the company's first lien debt was trading well below par and many of its Lenders were trying to sell their debt holdings but lacked buyers.  As a result, Yucaipa intended to contribute a portion of the acquired debt to Allied's equity, which would deleverage Allied's balance sheet and with the hope that it would increase customer confidence and avoid the triggering of any defaults under the credit agreements.

However, both the FLCA and SLCA precluded Allied's Lenders from assigning their debt to Yucaipa because it was not an "Eligible Assignee." Accordingly, for the deleveraging transaction to occur, Yucaipa, Allied, and its Lenders negotiated amendments to the FLCA and SLCA.

Allied's board of directors formed a special committee (the "Special Committee") comprised of two directors whom Allied's counsel deemed to be independent of Yucaipa. On April 28, 2008, the Special Committee approved and recommended to the Allied board that Allied enter into a Third Amendment to the FLCA[15] ("Third Amendment")

---

[15]  Singer Dec. Exh. 20 (Amendment No. 3 to Credit Agreement and Consent (to the FLCA)).

and a similar amendment to the SLCA.[16]  The amendments passed with the approval of the majority of Allied's Lenders.

The Third Amendment to the FLCA expressly allowed Yucaipa to acquire a limited amount of Term Loans and made Yucaipa a "Restricted Sponsor Affiliate."[17]  The Third Amendment also restricted Yucaipa's rights as a Lender with respect to any first lien debt it acquired.  In particular, the Third Amendment purported to:

i. Limit the amount of Term Loans that Lenders could sell or assign to Yucaipa to the lesser of 25% of the total Term Loan Exposure or $50 million.[18]

ii. Restrict the voting rights Yucaipa would otherwise have as a Lender "for all purposes."[19]

iii. Require Yucaipa to contribute no less than 50% of the aggregate principal amount of any Term Loans it acquired to Allied's capital (the "Capital

---

[16] Singer Dec. Exh. 22 (Amendment No. 3 to Credit Agreement and Consent (to the SLCA)).  The FLCA, SLCA, and the Third Amendments are governed by New York law.  FLCA at § 10.14; SLCA at § 10.14; Third Amendment (to the FLCA) at § 7.6, and Third Amendment to the SLCA at § 6.5.

[17] *ASHInc. Corp. v. AMMC VII, Ltd (In re ASHINC Corp.)*, 683 F. App'x at 135 ("In April 2008, a majority of Lenders approved the Third Amendment to the Credit Agreement, which allowed Yucaipa to acquire a limited amount of Term Loans. Specifically, the Third Amendment made Yucaipa a 'Restricted Sponsor Affiliate' and amended the definition of 'Eligible Assignee' to provide that 'no Restricted Sponsor Affiliate may be an Eligible Assignee with respect to a sale, assignment or transfer of Commitments, Revolving Loans or LC Deposits.' Third Amendment § 2.1(c). Thus, Yucaipa was effectively prohibited from acquiring any First Lien Debt other than Term Loans.").

[18] Third Amendment at § 2.7(c), (e), adding language to § 10.6(c)(ii) to the FLCA.

[19] Third Amendment at § 2.7(a), adding language to § 10.5(e)(i) of the FLCA.

Contribution" in the "Capital Contribution Provision"), with those Term Loans then deemed to be cancelled. [20]

iv.   Restrict Yucaipa's legal rights through a covenant not to sue specific to Yucaipa and adding a covenant not to sue and restricting remedies against Yucaipa.[21]

The parties similarly amended the SLCA, however, the Third Amendment to the SLCA did not contain a Capital Contribution Provision or limit the amount of second lien debt that Yucaipa could acquire.  Yucaipa proceeded to acquire $40 million of the outstanding $50 million in Allied's second lien debt.  Yucaipa then converted $20 million of its newly acquired second lien debt to Allied's equity, in a "debt-to-equity swap."

Allied's financial condition continue to deteriorate due to the economy's recission. Allied informed the Lenders that it would like to discuss another amendment to the FLCA that would reset various covenants.

In September 2008, Allied and several First Lien Lenders, including Spectrum, entered a Forbearance Agreement[22] in order for Allied to negotiate with its Lenders regarding the defaults.  In the Forbearance Agreement, the First Lien Lenders agreed to temporarily refrain from exercising remedies in return for various concessions, a 2% increase in the interest rate payable on the debt, a $250,000 fee, and the payment of

---

[20]  Third Amendment at § 2.7(e), adding language to § 10.6(j)(iii) of the FLCA.

[21]  Third Amendment at § 2.7(e), adding language to § 10.6(j)(iv) of the FLCA; and § 2.7(f), adding language to § 10.6(k)(v) of the FLCA.

[22]  *See* Scolnick Dec. at Exh. 49 (Forbearance Agreement dated Sept. 24, 2008).

hundreds of thousands of dollars to the Lenders' lawyers and financial advisors. The Forbearance Agreement was renewed in late October of 2008, signed by both Black Diamond and Spectrum, among other Lenders.

The forbearance period expired in mid-November 2008, but the Lenders did not require another Forbearance Agreement, and no deal was reached to restructure Allied's debt or cure its defaults. With the absence of a forbearance agreement, the Lenders were free to exercise remedies under the FLCA against Allied but chose not to—even though Allied remained in default under the FLCA through the May 2012 involuntary bankruptcy filing.

### iv.    Tender Offer by Allied and Yucaipa

Lenders holding the majority of first lien debt, including Spectrum, actively explored selling their debt—and with it, the Requisite Lender position—to Yucaipa. During a December 10, 2008 board meeting, Derex Walker, chairman of the Allied board, notified the board about a possible transaction between Yucaipa and Lenders holding a majority of the first lien debt.

To effectuate this transaction, Allied and its Lenders would again need to amend the FLCA to remove the Third Amendment's restrictions on assigning first lien debt to Yucaipa, amend the financial covenants, and provide Allied with the ability to repurchase its own debt. The board reconvened the Special Committee, which considered the proposed transaction and recommended that the board approve it. The board then approved the transaction and authorized Allied's officers to pursue it.

14

In February 2009, Allied and Yucaipa launched a tender offer to purchase first lien debt at approximately 26 cents on the dollar to all First Lien Lenders, including Black Diamond and Spectrum.   However, during that same period, ComVest Investment Partners ("ComVest") was also negotiating with the Lenders to purchase a majority of the first lien debt.

> *v.*   ***ComVest Acquires the Majority of Allied's First Lien Debt***

By mid-February 2009, ComVest acquired approximately 54% of Allied's first lien debt and became the Requisite Lender under the FLCA.

Allied, Yucaipa, and several of the Lenders—including Black Diamond—believed that ComVest wanted to take Allied into a second bankruptcy, which could lead to a liquidation.   However, Allied, Yucaipa and certain Lenders were concerned that another bankruptcy, along with the existing climate for car haulers, would be harm Allied's business.

As a result, in March 2009, Yucaipa began negotiating with ComVest to purchase ComVest's majority stake in Allied's first lien debt.   As with the tender offer, the transaction with ComVest was going to require an amendment to the FLCA to permit Lenders holding a majority stake in the first lien debt to assign that debt to Yucaipa, without the Third Amendment's voting- or capital-contribution restrictions.

On March 6, 2009, the Special Committee recommended Yucaipa's transaction with ComVest to the board, which unanimously approved the transaction.   However, the

March 2009 transaction did not close—so Yucaipa and ComVest continued to negotiate over the following months.

At this same meeting, the board discussed whether to make a $4.8 million interest payment to the First Lien Lenders due the next day.  Allied's CFO advised, "if the Company were to make the $4.8 million interest payment due that day, the Company would end the day with approximately $5.5 million available for the Company's operations, which is well below the $8 to $10 threshold the Company believes to be its minimum operating liquidity."[23]    Under those circumstances, and based on the recommendations of Allied's management, the board unanimously voted to forgo the quarterly interest payment due under the FLCA.  This constituted yet another default for Allied, which had continued to operate without a forbearance agreement since November 2008.

### vi.    Fourth Amendment and Yucaipa's Acquisition of ComVest's Debt.

In August 2009, Yucaipa and ComVest were preparing to move forward with Yucaipa's acquisition of Comvest's debt.  The Special Committee recommended that the Allied Board approve the Fourth Amendment to the FLCA[24] (the "Fourth Amendment"), so that ComVest could assign its majority stake of Allied's first lien debt to Yucaipa without the voting and capital contribution restrictions of the Third Amendment.  On August 21, 2009, Yucaipa and ComVest entered a Loan Purchase Agreement ("LPA"),

---

[23] Singer Dec. Exh. 40 (Minutes of Meeting of the Board of Directors of Allied Systems Holdings, Inc., Aug. 3, 2009), at p. 1-2.

[24] Singer Dec. Exh. 44 (Amendment No. 4 to Credit Agreement (to the FLCA)).

pursuant to which Yucaipa purchased ComVest's $145.1 million (principal face amount) of First Lien Debt for approximately $43 million (the "Yucaipa-ComVest Transaction"). Allied was not a party to the LPA, but the LPA's closing conditions required Allied to: (i) reimburse ComVest $1.85 million for its associated legal fees and expenses, (ii) reimburse Yucaipa $831,325.83 for its legal fees and expenses, and (iii) agree to the later-voided Fourth Amendment to the First Lien Credit Agreement. The Fourth Amendment did not purport to cure any of Allied's Events of Default or reset any financial covenants, as contemplated in earlier iterations of the amendment.

From the time the Fourth Amendment was executed and Yucaipa purchased ComVest's debt, BD/S believed the Fourth Amendment and the assignment of debt were invalid—because the Fourth Amendment was enacted with majority Lender support, not unanimous support—and breached the Third Amendment; they discussed this with their counsel, each other, and other Lenders. Nevertheless, when Yucaipa—in its capacity as Requisite Lender—directed CIT to terminate certain LC Commitments under the FLCA, resulting in a release of $16,928,474.40, BD/S accepted its *pro rata* portion of the funds.

### vii.    *Yucaipa Does Not Make Capital Contribution and CIT Litigation*

Yucaipa did not make a capital contribution to Allied following its acquisition of ComVest's First Lien Debt. It did, however, develop a "Contingency Plan" focused on the "Validity of Amendment No. 4" with its litigation counsel. Yucaipa contemporaneously announced to its investors that:

> [The ComVest] transaction makes us "requisite lender" for purposes of any amendments or consents to the Company's first lien credit facility. Our ownership of the first lien debt is

> not subject to any of the customary restrictions or limitations normally associated with a sponsor's acquisition of its bank debt.
>
> Our purchase of the first lien debt is also notable because it puts us in the position of controlling every tranche of the Company's capital structure. In addition to holding 56% of the first lien debt, we also hold 67% of the second lien debt as well as 71% of the fully-diluted equity.[25]

On September 17, 2009, Yucaipa's counsel sent CIT a "direction letter from the Requisite Lenders to the Agent," demanding that CIT immediately terminate account control agreements and enter new ones.  When CIT did not heed this direction, Yucaipa sent another letter demanding that CIT comply on or before October 14, 2009.  When CIT did not do so, Yucaipa and Allied sued CIT in Georgia seeking, among other things, a declaratory judgment holding that the Fourth Amendment was valid, and that Yucaipa was Requisite Lenders under the First Lien Credit Agreement (the "CIT Litigation").

On December 21, 2009, CIT filed a counterclaim in the CIT Litigation seeking, among other things, declaratory judgment that (i) the purported Fourth Amendment was ineffective, (ii) the Third Amendment remains in full force and effect, and (iii) Yucaipa cannot be "Requisite Lenders" under the First Lien Credit Agreement.

The CIT Litigation continued for two years, during which time Allied paid for Yucaipa's litigation counsel in the approximate amount of $2.5 million for legal fees.  In December 2011, CIT settled the CIT Litigation on its own behalf, but expressly not on behalf of any of Allied's other lenders.  Under the CIT Litigation settlement, CIT agreed

---

[25]  Singer Dec. Exh. 47 (Email from D. Walker to S. Bond re: Allied, dated Sept. 11, 2009 (attaching memorandum to Limited Partners from Yucaipa American Alliance Fund I, LP (Main and Parallel), dated Sept. 11, 2009)) at p. 3.

not to challenge the validity of the Fourth Amendment or Yucaipa's status as Requisite

Lender.  CIT also recognized Yucaipa's status as a "Lender" under the FLCA.

### viii.    *Potential Sale to Jack Cooper Transportation*

In the spring of 2011, Jack Cooper Transportation ("JCT"), another car hauling

company, made a series of offers to purchase Allied debt from Yucaipa and BD/S at the

same price, ranging up to about 84 cents on the dollar.  In late 2011, Yucaipa, BD/S, and

CIT were each in negotiations with JCT (the "JCT Negotiations"), regarding JCT's

potential acquisition of their first lien debt in Allied, which JCT would then use to acquire

Allied in a 363 Sale in connection with a bankruptcy proceeding.[26]  However, the parties

were unable to close a transaction with JCT.

### ix.    *BD/S Sues Yucaipa in New York State Court*

On February 15, 2012, lawyers for BD/S wrote to the Allied Board stating that the

Company was insolvent and offering to "engage the Board of Directors immediately in a

discussion regarding an appropriate restructuring and/or recapitalization . . . to preserve

and protect the Company's assets, and to maximize the value available for all interested

parties."[27]

---

[26]  From late 2011 through spring 2012, Yucaipa demanded a premium price of $1.15 for each dollar of its First Lien Debt, based on the premise that it was Requisite Lender.  Yucaipa's demand for a premium left less JCT money available for all other First Lien debtholders, so JCT lowered its offer other debtholders like BD/S to 70¢ on the dollar.  *See* Singer Dec. Exh. 64 (Email from I. Tochner to D. Walker re: call me some time, dated Mar. 5, 2012 (stating that Yucaipa should "stay tight on demanding $155 [million]" on account of its then $135 million of First Lien Debt holdings)) and Singer Dec. Exh. 67 (Email from T. Ciupitu (JCT) to J. Schaffer, re: Revised Term Sheet with Black Diamond and Spectrum (May 10, 2012), dated May 10, 2012).

[27]  Singer Dec. Exh. 66 at p. 2 (Letter from A. Harris, counsel to BD/S, to Board of Directors of Allied, dated Mar. 22, 2012).

BD/S filed a lawsuit against Yucaipa in New York state court, seeking a declaration that the Fourth Amendment was invalid, and that Yucaipa was not the Requisite Lender (the "NY Action"). The New York state court eventually issued a written decision in March 2013, finding that the Fourth Amendment was invalid because it was not passed with unanimous consent from all Lenders, and therefore Yucaipa was not Requisite Lender.[28]  The Court held that: (i) Yucaipa caused Allied to enter into the Fourth Amendment, which was "flatly prohibited under the Credit Agreement;" (ii) the Fourth Amendment "is not, and never was, effective;" and (iii) "Yucaipa [was] not the Requisite Lender."[29]  Yucaipa appealed, and the New York appellate court reversed summary judgment as to Black Diamond, finding that there were triable issues of material fact as to whether Black Diamond had waived its ability to challenge the Fourth Amendment and Yucaipa's Requisite Lender status through Black Diamond's "active involvement" in Yucaipa's efforts to become Requisite Lender.[30]

### x.    BD/S File Involuntary Bankruptcy Against Allied

On May 17, 2012, the same day that BD/S informed JCT that it decided not to continue with negotiations, BD/S filed a petition for an involuntary bankruptcy against Allied in this Court.  A few weeks later, Allied consented to the bankruptcy, and its affiliates filed voluntary Chapter 11 petitions for relief.

---

[28]  *BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, No. 650150/2012, 2013 WL 1290394, at *4, *6 (N.Y. Sup. Ct. Mar. 8, 2013), *aff'd*, 112 A.D.3d 509 (1st Dep't 2013), *leave to appeal denied*, 22 N.Y.3d 1171 (2014).

[29]  *Id.* at *5- 6.

[30]  *BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, 112 A.D.3d 509, 511–12 (N.Y. App. Div. 2013).

### xi.    Fourth Amendment Voided and BD/S Recognized as Requisite Lender

On August 8, 2013, the Court granted summary judgment to BD/S, holding that they, not Yucaipa, were Requisite Lenders,[31] that the Third Amendment governed,[32] and that Yucaipa was collaterally estopped from asserting the Fourth Amendment's validity.[33]  The District Court and Third Circuit both affirmed.[34]

### xii.    JCT Buys Substantially All of Allied's Assets

An auction for the Debtors' assets under 11 U.S.C. § 363 was held in September 2013.  JCT submitted a bid to buy substantially all of Allied's assets for $135 million, which the Court approved.[35]  The sale (the "JCT 363 Sale") closed on December 27, 2013.[36]

### xiii.    The Trustee Assumes Prosecution of These Adversary Proceedings

Under the Debtors' Modified First Amended Joint Chapter 11 Plan of Reorganization dated December 3, 2015[37] and a Litigation Trust Agreement dated December 20, 2016, the Estate Claims and Lender Claims are now jointly prosecuted by the Trustee.[38]  These claims seek recovery on behalf of Allied and, if successful, all

---

[31] *See* 13-50530, D.I. 297 (Tr. of Hr'g July 30, 2013) at 130:1-6.

[32] *Id.* at 127:13-20.

[33] *Id.* at 123:5-124:24.

[34] *In re Allied Sys. Holdings Inc.*, 556 B.R. at 608-09, *aff'd sub nom. In re ASHINC Corp.*, 683 F. App'x at 141-42.

[35] *See* 12-11564, D.I. 1837 (Sale Order).  BD/S as confirmed Requisite Lenders placed a successful credit bid for certain additional assets. (See 12-11564, D.I. 1868 (Order Authorizing and Approving Sale of Assets)).

[36] *See* 12-11564, D.I. 2127 (Report of Sale of Debtors' Assets).

[37] 12-11564, D.I. 3360 (the "Amended Plan").

[38] Amended Plan § 5.13.

stakeholder constituents will recover under a Litigation Proceeds Waterfall approved by the Court.[39]

The Estate Claims and Lender Claims have been coordinated for purposes of discovery and are subject to a joint schedule through dispositive motions. Fact discovery closed on July 26, 2019, and expert discovery closed on January 10, 2020.[40]

## ANALYSIS

### A.    Summary Judgment Standard

Summary judgment is a mechanism used to ascertain the existence of a genuine factual dispute between the parties that would necessitate a trial. Fed. R. Civ. P. 56, made applicable by Fed. R. Bank. P. 7056 is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[41]

When seeking summary judgment, the movant bears the initial burden of "establishing the absence of a genuine issue of material fact."[42]  A genuine issue is not simply based on opposing opinions or unsupported assertions but rather on conflicting factual evidence over which "reasonable minds could disagree on the result."[43]

---

[39] *See id.* §§ 5.11(b), 5.14.  Yucaipa is an exception to this recovery waterfall. (12-11564, D.I. 3383 at ¶¶MM, 1).

[40]  Further procedural history is set forth in the parties' joint submission at 13-50530, D.I. 599 ("Joint Procedural History").

[41] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[42] *J. Aron & Co. v. SemCrude, L.P.* (*In re SemCrude, L.P.*), 504 B.R. 39, 51 (Bankr. D. Del. 2013) (*citing Celotex*, 477 U.S. at 322).

[43] *Liquidation Tr. v. Huffman (In re U.S. Wireless Corp.)*, 386 B.R. 556, 560 (Bankr. D. Del. 2008) (citations omitted).

Furthermore, a fact is material if it could "alter the outcome of a case."[44]   In other words, the movant's goal is "to establish an absence of evidence to support the nonmoving party's case."[45]

If the movant meets this initial burden, the burden shifts to the nonmoving party to defeat summary judgment by producing "evidence in the record creating a genuine issue of material fact."[46]   To demonstrate a genuine issue of material fact, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."[47]   The nonmoving party must demonstrate "sufficient evidence (not mere allegations) upon which a reasonable trier of fact could return a verdict in favor of a nonmoving party."[48]   This evidence "cannot be conjectural or problematic; it must have substance in the sense that it [highlights] differing versions of the truth which a factfinder must resolve at an ensuing trial."[49]

When considering a motion for summary judgment, "the court does not weigh the evidence and determine the truth of the matter; rather, the court determines whether there is a genuine issue for trial."[50]   The Court must "view the facts in the light most

---

[44] *Id.*

[45] *Id.* (*quoting Celotex*, 477 U.S. at 325).

[46] *In re W.R. Grace & Co.*, 403 B.R. 317, 319 (Bankr. D. Del. 2009).

[47] *Matushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[48]  *Giuliano v. World Fuel Servs., Inc.* (*In re Evergreen Int'l. Aviation*), 2018 WL 4042662, at *2 (Bankr. D. Del. Aug. 22, 2018) (citations omitted).

[49] *Huffman*, 386 B.R. at 560 (*quoting Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989)).

[50]  *Argus Mgmt. Grp. v. GAB Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del .2005) (*quoting Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249 (1986) (citations omitted)).

favorable to the nonmoving party and draw all inferences in that party's favor."[51] "If the opposition evidence is merely colorable or not significantly probative, summary judgment may be granted."[52] However, where the record could lead reasonable minds to draw "conflicting inferences, summary judgment is improper, and the action must proceed to trial."[53] Summary judgment is proper only where one reasonable inference or interpretation of the facts can be drawn in favor of the moving party.[54]

A cross-motion filing does not change the standards or analysis by which to grant or deny summary judgment to the moving party. Each moving party still bears the initial burden of demonstrating the absence of a genuine issue of material fact. "[T]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the [summary judgment] standard."[55] Although the filing of a cross motion may imply that the parties agree that no material issue of fact exists, "the court is not bound by this implicit agreement and is not required to enter a judgment for either party."[56]

---

[51] *Saldana v. Kmart*, 260 F.3d 228, 231-32 (3d Cir. 2001).

[52] *Whitlock v. Pepsi Am*s., No. C 08-24742 SI, 2009 WL 3415783, at *7 (N.D. Cal Oct. 21, 2009) (citations omitted).

[53] *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002) (*quoting Munger v. City of Glasgow Police Dep't*, 227 F.3d 1082, 1087 (9th Cir. 2000)).

[54] *Id.*

[55] *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citations omitted).

[56] *Huffman*, 386 B.R. at 560-61 (*quoting WorldCom, Inc. v. HE Global Asset Mgmt. Servs. (In re WorldCom, Inc.)*, 339 B.R. 56, 62 (Bankr. S.D.N.Y. 2006)).

B.    **Summary of Cross-Motions for Summary Judgment**

The Trustee is seeking summary judgment on Estate Claims and Lender Claims. More specifically, and as summarized in a chart attached as an <u>Appendix</u>:

• Estate Claims: (i) Claims 1 and 2 (equitable subordination (against Yucaipa)), (ii) Claim 5 (breach of contract (against Yucaipa)), (iii) Claims 10 and 11 (avoidance and recovery of fraudulent transfers (against Yucaipa)), and (iv) Claim 13 (disallowance of claims (against Yucaipa)); and

• Lender Claims: (i) Claim 1 (equitable subordination (against Yucaipa)), (ii) Claim 2 (breach of contract (against Yucaipa)), and (iii) Claim 4 (tortious interference with contract (against the Yucaipa Directors and Burkle)).

In turn, Yucaipa is seeking summary judgment on:

• Estate Claims: (i) Claim 3 (recharacterization); (ii) Claim 4 (specific performance of the Third Amendment (Capital Contribution Provision)); (iii) Claim 5 (breach of the Third Amendment (Capital Contribution Provision)) (collectively with Claim 4, the "Capital Contribution Claims"); (iv) Claim 6 (specific performance of the Third Amendment (divestiture of debt)); (v) Claim 7 (breach of fiduciary duty); (vi) Claim 10 (avoidance and recovery of intentional and constructive fraudulent transfers pursuant to 11 U.S.C. §§ 548(a) and 550); and (vii) Claim 11 (avoidance and recovery of intentional and constructive fraudulent transfers pursuant to 11 U.S.C. §§ 544(b) and 550); and

• Lender Claims: (i) Claim 2 (breach of contract); and (ii) Claim 3 (breach of the covenant of good faith and fair dealing).

C.     **Estate Claim 5 and Lender Claim 2: Breach of Contact**[57]

i.     *Capital Contribution Provision and the Trustee's Allegations*

The Trustee seeks summary judgment on Yucaipa's failure to make the Capital Contribution required by section 2.7(e) of the Third Amendment.  The Trustee asserts that Fourth Amendment's purpose was to delete the restrictions and obligations of the Third Amendment imposed on Yucaipa, such as the Capital Contribution Provision. Following the implementation of the Fourth Amendment, Yucaipa failed to make the Capital Contribution to Allied on or before the deadline of August 31, 2009, in the amount of 50% of the first lien term loans Yucaipa had purchased (i.e. $57.4 million).

Section 10.6(j) of the FLCA, through language added by the Third Amendment, required Yucaipa to make a capital contribution to Allied of 50% of the face amount of these Term Loans on or before August 31, 2009:

> The Restricted Sponsor Affiliates [i.e. Yucaipa and its affiliates] … agree[] … that no later than ten days after the date of such assignment or transfer of such Term Loans … such Restricted Sponsor Affiliates shall make a capital contribution to [Allied] of no less than 50% of the aggregate principal amount of such Term Loans in accordance with Section 10.6(k) . . .[58]

The Trustee asserted that Yucaipa breached the FLCA and the Third Amendment by not making that Capital Contribution.

---

[57]  As discussed below, Yucaipa also asserts a statute of limitations defense against Lender Claim 2.  The Court will discuss the merits of the breach of contract claims in this section.  The Court will then discuss whether the Lender's breach of contract claim (Lender Claim 2) is barred by the statute of limitations.

[58]  Third Amendment, § 2.7(e), adding language to § 10.6(j)(iii) to the FLCA, among other relevant additions to the FLCA noted *infra*.

### a. Elements of Breach of Contract

Under New York law, a claim for breach of contract is comprised of (i) existence of a contract, (ii) plaintiff's performance under that contract, (iii) defendant's breach thereof, and (iv) resulting damages.[59]

Here, the FLCA and the Third Amendment are valid and binding on Yucaipa. Allied and BD/S, along with other First Lien Lenders, are signatories to the Third Amendment, and Yucaipa became bound by the Third Amendment with it purchased First Lien Debt in August 2009.[60]

There is no doubt that the Trustee has established the first three elements of a breach of contract claim – nor does Yucaipa present any material evidence to the contrary. The only remaining element to be established is whether the Trustee can establish damages.

### b. Damages – Cash versus Contribution

As damages are the remedy for breach of contract, the Trustee must establish damages as part of its motion for summary judgment. However, Yucaipa has cross-

---

[59] *Second Source Funding, LLC v. Yellowstone Cap., LLC*, 144 A.D.3d 445, 445–46, 40 N.Y.S.3d 410 (2016) (*citing Nevco Contracting Inc. v. R.P. Brennan Gen. Contractors & Builders, Inc.*, 139 A.D.3d 515, 33 N.Y.S.3d 166 (2016) (citation omitted) (holding that a claim for breach of contracts includes the following: "existence of the parties' agreement, its performance thereunder, and defendant general contractor's failure to perform, resulting in harm to plaintiff") and *Harris v. Seward Park Hous. Corp.*, 79 A.D.3d 425, 426, 913 N.Y.S.2d 161 (2010) (further citation omitted) (holding that "elements of such a [breach of contract] claim include the existence of a contract, the plaintiff's performance thereunder, the defendant's breach thereof, and resulting damages.")). *See also Morris v. 702 E. Fifth St. HDFC*, 46 A.D.3d 478, 479, 850 N.Y.S.2d 6, 7 (2007) (setting forth "the existence of a valid contract, plaintiff's performance of his obligations thereunder, defendant's breach by its refusal to schedule a sound test, and resulting damages in the form of lost profits").

[60] See 13-50530, D.I. 297 (Tr. of Hr'g July 30, 2013) at 127:13- 15 (holding that "[u]pon acquiring the debt, Yucaipa subjected itself to the first lien credit agreement and all of the amendments, including the third amendment.").

moved for summary judgment (in the alternative) on the issue that damages cannot be determined. Yucaipa makes this damages argument for both Count 2 (breach of contract claim) and Count 3 (breach of duty of good faith and fair dealing claim). Here, the Court will discuss the breach of contract claim (Lender Count 2) *only*. The Court will address Yucaipa's Motion for Summary Judgment (and the alternative motion for partial summary judgment on the issue of damages) on Lender Claim 3 (breach of duty of good faith and fair dealing) *infra*.

Under sections 2.1(c)[61] and 2.7(c)[62] and 2.7(e)[63] of the Third Amendment, Yucaipa was obligated to make a capital contribution equal to 50% of any Term Loans it purchased within 10 days of the purchase. Yucaipa purchased $114,712,088.66 in Term Loans in the Yucaipa-ComVest Transaction, and $30,400,458.40 in LC Commitments.[64]

Yucaipa argues that the Third Amendment's recitals states:

> Whereas, [Allied] ha[s] requested that Requisite Lenders agree to amend the Credit Agreement to permit [Yucaipa] to become Lenders . . . by purchasing and assuming the rights and obligations of one or more Lenders . . . and to contribute such rights and obligations to [Allied] in the form of capital contributions.[65]

Yucaipa asserts that for any "capital contributions" that may become due, Yucaipa would contribute the "rights and obligations" of its newly acquired debt—not cash—to Allied.

---

[61] Adding the definition of "Eligible Assignee" and "Term Loan Exposure" to section 1.2 of the FLCA, as well as other language modifications.

[62] Adding language to section 10.6(c) of the FLCA.

[63] Adding language to section 10.6(j) of the FLCA.

[64] *See* Singer Dec. Exh. 45 (Assignment and Assumption Agreement between ComVest and Yucaipa).

[65] Third Amendment, Recitals, p. 1.

As discussed below, Yucaipa is correct that Yucaipa *could have* made the Capital Contribution in the form of debt or cash.  However, this language in the Third Amendment's preamble is general permission for Yucaipa to purchase Term Loans and to participate and to contribute such rights and obligations under the FLCA.  Reading the entire FLCA and the Third Amendment together, the specific provisions as to the form of the Capital Contribution outweigh the general provisions of the recital.[66]

More specifically, the section 2.7(f) of the Third Amendment modifies section 10.6 of the FLCA by adding subsection (k) which states in relevant part (the "Form of Capital Contribution Provision"):

> A Restricted Sponsor Affiliate **may** at any time make a capital contribution of its Term Loans to [Allied] in exchange for Equity Interests [and upon such contribution the Term Loans will] … be deemed to be irrevocably prepaid, terminated, extinguished, cancelled and of no further force and effect.[67]

---

[66] *Law Debenture Tr. Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) ("Where the parties dispute the meaning of particular contract clauses, the task of the court 'is to determine whether such clauses are ambiguous when 'read in the context of the entire agreement,'" (*quoting Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan*, 7 F.3d 1091, 1095 (2d Cir.1993) (*quoting W.W.W. Associates*, 77 N.Y.2d at 163, 565 N.Y.S.2d at 443, 566 N.E.2d 639))); *ASHInc Corp. v. AMMC VII, Ltd. (In re ASHINC Corp.)*, 683 F. App'x at 140 ("However, 'contractual language must be read in context.') (*citing LightSquared LP v. SP Special Opportunities LLC (In re Lightsquared Inc.)*, 511 B.R. 253, 335 (Bankr. S.D.N.Y. 2014) (applying New York law).

[67] Third Amendment, § 2.7(f), modifying section 10.6 of the FLCA by adding subsection (k).  Furthermore, the Third Amendment address the mechanics of the extinguishment and cancellation of the debt (had Yucaipa contributed Term Loans): (i) Yucaipa was to "promptly provide all information and data reasonably requested by Administrative Agent in connection with such capital contribution" of Term Loans. *Id.* at § 2.7(f)(ii). (ii) Upon Yucaipa's contribution of Term Loans to Allied: (a) "all rights and obligations as a Lender related thereto" were "deemed to be irrevocably prepaid, terminated, extinguished, cancelled," (b) Allied was not to obtain "any rights as a Lender hereunder or under the other Credit Documents," and (c) the Company was to "deliver to Administrative Agent a written acknowledgment and agreement executed by an Authorized Officer" acknowledging its relinquishment of any rights as a Lender. *Id.* at § 2.7(f)(iii)). (iii) "As soon as practicable after [Allied's] acquisition of Term Loans from [Yucaipa]," Allied was to "take all actions necessary to cause such Term Loans to be extinguished or otherwise canceled in its books and record in accordance with GAAP." *Id.* at § 2.7(f)(iv).

As a result, Yucaipa asserts that a Capital Contribution under section 10.6(k) could take the form of "Term Loans" rather than cash.   Reading both the Capital Contribution Provision (section 10.6(j)(iii)) and the Form of Capital Contribution Provision (section 10.6(k)(ii)) together and giving meaning to all the provisions – the Court finds that Yucaipa was obligated (shall - mandatory) to make a Capital Contribution and could (may - permissively) make that Capital Contribution in as an exchange for equity interests. [68]

By August 31, 2009, Allied should have received $57.4 million in cash *or* $57.4 million of debt it owed to Yucaipa should have been extinguished.[69]   Allied received neither.  Under New York law, the Court must measure damages as of August 31, 2009, the date of the breach.[70]

---

[68]  The Capital Contribution Provision explicitly states that within 10 days after acquiring Term Loans, Yucaipa "shall make a capital contribution to [Allied] of no less than 50% of the aggregate principal amount of such Term Loans in accordance with Section 10.6(k)." Third Amendment, § 2.7(e), adding FLCA § 10.6(j)(iii).  Section 10.6(k), in turn, is titled, "Contribution of Term Loans to Borrowers; Cancellation of Debt."  It states that Yucaipa "may at any time make a capital contribution of its Term Loans to Borrowers in exchange for Equity Interests of [Allied.]" Third Amendment, § 2.7(f) adding FLCA § 10.6(k)(ii).  Thus, the plain language of the Third Amendment makes clear that a "capital contribution" to Allied would not have to be made in the form of cash, but rather that Yucaipa could make "a capital contribution of its Term Loans" in exchange for equity in Allied.  However, had Yucaipa forgiven debt in exchange for equity, Allied would have had less debt, resulting in fewer claims, further resulting in a higher payout to the other First Lien Lenders.  There is no dispute, that Yucaipa neither contributed cash nor gave the Capital Contribution by way of its Term Loans.

[69]  *See* Singer Dec. Exh. 103 (Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA, dated Sept. 27, 2019 (the "Risius Report")) at ¶ 88 ("If Yucaipa had made this $57.4 million contribution, the Estate would have been better off by $57.4 million.  This holds true notwithstanding whether the required contribution would have involved the receipt of $57.4 million in cash or the forgiveness of $57.4 million in debt.  Yucaipa never made the required capital contribution, resulting in damages to the Estate of $57.4 million." (footnote excluded)).

[70]  *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145 (1971) ("The proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach."); *Boyce v. Soundview Technology Group, Inc.*, 464 F.3d 376, 384 (2d Cir. 2006) ("[I]n a breach of contract case, damages are calculated at the time of the breach.").

Allied was insolvent at the date of the breach.[71]  It is illogical to think that Yucaipa would exchange its Term Loans in favor of worthless equity in Allied – however, the reduction of debt would have benefitted Allied.  Furthermore, if Allied's enterprise value was greater than Allied's First Lien Debt (as represented by Yucaipa in quarterly auditor memos from 2008 through 2011), then debt reduction would have benefitted Allied in the full amount of $57.4 million.[72]

Under New York law, once breach is established, mathematical precision is unnecessary to recover damages.  To prove damages, "a plaintiff need only show a stable foundation for a reasonable estimate of the damage incurred as a result of the breach."[73]  There must be a certainty as to the "fact of damage, not the amount."[74]  "The burden of uncertainty as to the amount of damage is upon the wrongdoer."[75]

There appears to be a certain amount of speculation as to what would have happened to the $57.4 million had Yucaipa contributed it – Professor Fischel appears to indicate that Allied would have "burned through" all the money and it would add no

---

[71]  Singer Dec. at Exh. 102 (Expert Report of Daniel R. Fischel, dated Sept. 27, 2019 (the "Fischel Report")) at ¶¶ 17-20.

[72]  *See* Singer Dec. Exh. 103 (Risius Report) at ¶ 88 n. 130.

[73]  *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110-11 (2d Cir. 2007).

[74]  *Tractebel Energy Mktg.*, 487 F.3d at 110.

[75]  *Queens Ballpark Co. v. Vysk Commc'ns*, 226 F. Supp. 3d 254, 259 (S.D.N.Y. 2016) (citations omitted). *Tractebel Energy Mktg.*, 487 F.3d at 110 ("For 'when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach.  A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he has caused is uncertain.'" (footnote omitted; *quoting Wakeman v. Wheeler & Wilson Mfg. Co.*, 101 N.Y. 205, 209, 4 N.E. 264, 266 (1886))).  *See also Entis v. Atl. Wire & Cable Corp.*, 335 F.2d 759, 763 (2d Cir. 1964) ("Such an estimate [of damages] necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection." (citations omitted).

value to Allied.  Respectfully, this is speculative.[76]  Indeed, Professor Fischel appears to indicate that $57.4 million would have had no impact on Allied whatsoever.[77]  The Court understands that a cash contribution of $57.4 million might not have changed Allied's ultimate fate[78] – it *could* be that Allied's second bankruptcy was inevitable.  However, Yucaipa's failure to make the Capital Contribution *ensured* such a result.  Here, the reasonable foundation for the amount of damages is the full value of the Capital Contribution that Yucaipa failed to pay.

The Court finds that Allied was damaged in the full amount of the Capital Contribution that Yucaipa failed to make on the date of the breach.  It is now impossible for Yucaipa to contribute its Term Loans at this stage of the bankruptcy case, in other words, Yucaipa's original option of cash *or* contribution of Term Loans is now precluded.

---

[76] Scolnick Dec. Exh. 13 (Risius Dep.) 97:13-15.

[77] *See, e.g.,* Singer Dec. at Exh. 102 (Fischel Report) at ¶¶ 40-42.

[78] As Mr. Risius testified:

> My damages analysis is essentially reliable and kind of middle of the road . . . . I don't assume that the $57.4 million would have been used to benefit the first lien lenders by getting their interest payments over that period, from 2009 to 2010, 2011.  I don't assume that those dollars would have been used to – essentially for capital investment in the company to improve the prospects above and beyond what actually happened in the actual world.
>
> . . .
>
> So I don't assume kind of that rose-colored glass viewpoint that the 5.4 million would have improved the ultimate outcome at the end of the day. I also don't assume, as Mr. Fischel has in his report, that the 57.4 million would essentially be burned through and all lost. . . . I didn't assume rose-colored glass view, and I didn't assume doom-and-gloom view.  I just took, hey, I'm not going to speculate on what would have happened with that cash because there's too many . . . . variables.

Scolnick Dec. Exh. 13 (Risius Dep.) 97:13-99:16.

Thus, the full cash value of the Capital Contribution is the appropriate measure of damages.

### ii.    Prejudgment Interest

The Trustee also requests statutory prejudgment interest on its contractual damages. New York law provides that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract."[79]  Prejudgment interest accrues at the 9% statutory rate under New York law, running from the date of the breach.[80]

---

[79] *Polk Lending 33, LLC v. THL Corporate Finance, Inc. (In re Aerogroup Int'l, Inc.)*, 601 B.R. 571, 598 and n. 191 (Bankr. D. Del. 2019) (citations omitted), *motion to certify appeal denied*, No. BR 17-11962 (CSS), 2020 WL 757892 (D. Del. Feb. 14, 2020), and *aff'd*, 620 B.R. 517 (D. Del. 2020).

[80] *See Roan/Meyers Assocs., L.P. v. CT Holdings, Inc.*, 26 A.D.3d 295, 296, 810 N.Y.S.2d 67 (2006) (prejudgment interest properly awarded on plaintiff's successful summary judgment motion on breach of contract claim); *City of Binghamton v. Serafini*, 8 A.D.3d 835, 838 (3d Dep't 2004) (plaintiff properly recovered prejudgment interest at statutory rate of 9% running from the date of default).  *See also* Singer Dec. Exh. 103 (Risius Report) at ¶¶ 89-90, 121-122, 132-133, exhs. A-1 and B-1.

### iii.    Covenant Not to Sue[81]

Yucaipa argues that the Trustee's Claim 5 is barred by the Third Amendment's covenant not to sue (the "Covenant Not to Sue").[82] Section 2.7(f) of the Third Amendment (adding clause (k)(v) to section 10.6 of the FLCA) states:

> (v) To the extent permitted by applicable law, no Credit Party shall assert, and each Credit Party hereby irrevocably waives, any claim or cause of action against any Lender, any Agent and their respective Affiliates, directors, employees, attorneys, agents or sub-agents (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement or otherwise) **arising out of, in connection with, as a result of, or in any way related to, any capital contribution of Term Loans** <u>made</u> **by a Restricted Sponsor Affiliate to such Borrower** *or* any act or omission or event occurring in connection therewith, and each Credit Party hereby irrevocably waives, releases and agrees not to sue upon any such claim or any such cause of action, whether or not accrued and whether or not suspected to exist in its favor . . .[83]

---

[81] The Court and the Delaware Chancery Court have construed the covenant not to sue in section 2.7(e) of the Third Amendment against Yucaipa. *See, e.g.,* Del. Bankr. Case. No. 12-11564 (D.I. 1068) (Tr. of Hr'g Feb. 27, 2013 at 105:4-6 ("One is simply under its plain meaning, you can't sue. I don't think there's any question as to the plain meaning of the covenant and I think it's very clear.")); *BDCM Opportunity Fund II, L.P. v. Yucaipa American Alliance Fund L.L.P. (In re ASHInc. Corp.),* Del. Bankr. 14-50971, D.I. 81 at pp. 30-37; *Yucaipa Am. All. Fund I, LP v. SBDRE LLC,* 2014 WL 5509787 at *10-15 (allowing for a narrow exception to the Covenant Not to Sue). However, the covenant not to sue in section 2.7(e) differs from the Covenant Not to Sue in section 2.7(f) (that is the subject of this Opinion). Although many of the words or the same – there is a considerable distinction. Section 2.7(e) applies to *any* claims or causes of action arising out of the Third Amendment or any other Credit Document; whereas the Covenant Not to Sue in section 2.7(f) applies to any claims or causes of action arising out of *any capital contribution*. The Covenant Not to Sue in section 2.7(f) is wholly related to the Capital Contributions and not all claims and causes of action related to the Third Amendment or the other Credit Documents. There is a vast difference between a full relationship waiver of causes of action and the specific, nuanced waiver that the Court is examining herein. To compare the breadth of the waiver in section 2.7(e) to the narrowness of the waiver in section 2.7(f) would be a mistake.

[82] There has been argument that Yucaipa's use of this affirmative defense has been waived by Yucaipa's failure to raise the Covenant Not to Sue until the summary judgment phase of this litigation. As set forth in detail herein, the Court finds that the Covenant Not to Sue is not applicable on the merits and, therefore, does not need to address the issue of waiver.

[83] Third Amendment, § 2.7(f); adding new subsection (k)(v) to FLCA § 10.6) (emphasis added).

The Covenant Not to Sue was made by "Credit Party," which is defined as "each Borrower and each Guarantor."[84]  Here, the Trustee stands in the shoes of the Debtor (i.e., the Credit Party) and the Trustee's right to pursue claims on behalf of Allied's Estate is necessarily no greater than the rights inherited from Allied.[85]

A covenant not to sue is governed by principles of contract law.[86]  "Whether a contract is ambiguous is a question for the court.  The interpretation of an unambiguous contract—including a release—is also a question of law reserved for the court.  Where contract language is ambiguous, the differing interpretations of the contract present a triable issue of fact."[87]

In general, covenants not to sue are permitted under New York law.[88]

> If two parties sign a covenant not to sue each other, then a dispute arising out of the conduct covered by that agreement cannot provide the basis for a justiciable controversy, and the case must be dismissed.  Because the law disfavors agreements intended to absolve a party from the consequences of its wrongdoing, however, releases and covenants not to sue are subject to the "**closest of judicial scrutiny**" to determine the intent of the parties.  For a

---

[84] FLCA § 1.1 (p. 16).  *See also id.* at FLCA § 1.1 (p. 6) and Preamble (definition of "Borrower") and FLCA § 1.1 (p. 23) (definition of "Guarantor"). The Third Amendment also includes a covenant not to sue in favor of other Lenders against Yucaipa (Third Amendment, § 2.7(e)).

[85] *See Lipscomb v. Clairvest Equity Partners Ltd. P'ship (In re LMI Legacy Holdings, Inc.)*, 553 B.R. 235, 246 (Bankr. D. Del. 2016) ("[T]he Trustee is asserting . . . claims inherited from the Debtors; as a result, 'the [T]rustee stands in the shoes of the debtor.'") (*quoting Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1154 (3d Cir. 1989)); *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F. 3d 44 (3d Cir. 2001) (recognizing that "[w]hen [the assignee] stepped into [assignor's] shoes, it had to adhere to the covenant not to sue on [assigned] claims.").

[86] *Bank of Am. Nat. Tr. & Sav. Ass'n v. Gillaizeau*, 766 F.2d 709, 715 (2d Cir. 1985) (apply New York law).

[87] *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 514–15 (2d Cir. 2001) (citations and internal quotations marks omitted).

[88] *Joao v. Cenuco, Inc.*, 376 F. Supp. 2d 380, 382 (S.D.N.Y. 2005) (*citing Kamfar v. New World Restaurant Group, Inc.*, 347 F.Supp.2d 38, 50 (S.D.N.Y. 2004) (further citations omitted)).

document to constitute a release from liability, it must contain an **explicit, unmistakable and unequivocal statement** by one party that it intends to abandon its right to prosecute a present or future claim against the other party[89]

Furthermore, the Court must give effect and meaning to every term of the contract and "reasonable effort must be made to harmonize all of its terms."[90]  A "contract *must* be interpreted to give effect to, not nullify, its general or primary purpose."[91]

Yucaipa asserts that section 2.7(e) of the Third Amendment, which added the Capital Contribution Provision, omits Allied from the list of parties entitled to damages or specific performance for breach.   Section 2.7(e) provides that

> **a breach by [Yucaipa] of . . . this Section 10.6(j) will cause the other Lenders and Agents to sustain damages for which it would not have an adequate remedy at law for money damages, and therefore [Yucaipa] agrees that on the event of any such breach, each of the other Lenders and Agents shall be entitled to specific performance of such covenants and agreements and injunctive and other equitable relief in addition to any other remedy to which it may be entitled, at law or in equity.**[92]

Yucaipa continues that Allied is neither a Lender nor an Agent under the FLCA[93] and as the section 2.7(e) Third Amendment set forth specific instructions regarding the enforcements of the provisions of the Third Amendment, the omission of Allied in section 2.7(e) (in Yucaipa's view) is dispositive.

---

[89] *Joao*, 376 F. Supp. 2d at 382–83 (citations omitted; emphasis added).  *See also Golden Pac. Bancorp*, 273 F.3d at 515; *Bank of Am. Nat. Tr. & Sav. Ass'n v. Gillaizeau*, 766 F.2d at 713.

[90] *Vill. of Hamburg v. Am. Ref-Fuel Co. of Niagara, L.P.*, 284 A.D.2d 85, 89, 727 N.Y.S.2d 843, 845 (2001) (*quoting Reda v. Eastman Kodak Co.*, 233 A.D.2d 914, 915, 649 N.Y.S.2d 555, 557 (1996) (emphasis added; further citation omitted).

[91] *Reda v. Eastman Kodak Co.*, 649 N.Y.S.2d at 557 (citations omitted).

[92] Third Amendment, § 2.7(e) (adding § 10.6(j) to the FLCA) (emphasis supplied).

[93] FLCA, § 1.1.

36

The Court disagrees.  Section 2.7(e) specifically speaks to the Lenders and their *equitable* remedies if Yucaipa were to breach *any* of the covenants in the Third Amendment.  It does not limit Allied's remedies at law, which is what the Trustee is seeking in its breach of contract claim.  It is incongruous that the Third Amendment both grants Allied's right to the Capital Contribution and, simultaneously, bars Allied from enforcing that right.

Section 2.7(f)(v) provides a Covenant Not to Sue related to "any capital contribution of Term Loans **made** by [Yucaipa] to [Allied]."[94]  However, it is undisputed that Yucaipa <u>made</u> no capital contribution of Term Loans (or cash) to Allied.  Under New York law, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."[95]  Because Yucaipa did not actually "make" any "contribution of Term Loans," its "covenant-not-to-sue" defense is barred by the plain language of § 2.7(f)(v).

Yucaipa response to this plain meaning is that the Covenant Not to Sue continues to waive claims related to "any act or <u>omission</u> or event occurring in connection therewith."  Yucapia asserts that the *only* possible "omission" is the failure to pay the Capital Contribution entirely.  Again, this cannot be the result.  The Court can conceive of many omissions that could have occurred *if* Yucaipa <u>made</u> a contribution of Term Loans – paperwork could have been omitted, requisite state filings not made, notice to

---

[94]  Third Amendment, § 2.7(f)(v).

[95]  *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002) (further citation omitted).  *Slamow v. Del Col*, 79 N.Y.2d 1016, 1018, 594 N.E.2d 918 (1992) (holding that "the best evidence of what parties to a written agreement intend is what they say in their writing").

various parties not given – *all of these are possible* omissions that could occur in connection with the contribution of Term Loans.[96]

Under New York law, covenants not to sue are disfavored because "agreements intended to absolve a party from the consequences of its wrongdoing.[97]  With the policy in mind and instructions to review the Covenant Not to Sue with strict scrutiny, the Court rejects on the merits Yucaipa's defense of the Estate's breach of contract claim based on the Covenant Not to Sue.  The language is clear and unambiguous that the Covenant Not to Sue *only* applies when Yucaipa *makes* a Capital Contribution of its Term Loans, which Yucaipa did not do.  Furthermore, any "omission" can only follow if Yucaipa actually *made* the Capital Contribution.  The Court will grant summary judgment in favor of the Trustee on Count 5 of the Complaint and will deny Yucaipa's motion for summary judgment regarding Count 5.

**D.    Lender Claims 2 and 3: Breach of Contract and Breach of Duty of Good Faith and Fair Dealing - Statute of Limitations**

Yucaipa asserts that Lender Claims 2 (Breach of Contract) and 3 (Breach of Duty of Good Faith and Fair Dealing) are barred by Delaware's three-year statute of limitations.  The Lender Complaint was filed on November 14, 2014.  Yucaipa asserts that under the applicable Delaware three-year statute of limitations, the Lenders' contract-based claims are time-barred unless they accrued on or after November 19, 2011.  Yucaipa

---

[96]  *See, supra*, n. 67 listing some of the Third Amendment mechanics for contributing Term Loans (instead of cash).  The Court is aware that the contribution of debt is a complicated process wherein many things could be omitted inadvertently.

[97]  *Joao*, 376 F. Supp. 2d at 382 (citations omitted); *Golden Pac. Bancorp*, 273 F.3d at 515 (citations omitted).

argues that despite the FLCA and Third Amendment's choice of law provision, as these actions are pending in federal court in Delaware, that this Court must look to Delaware's choice-of-law rules to determine whether "the Delaware or New York statute of limitations applies."   This Court has previously held that the Delaware statute of limitations applies as it relates to the FLCA and its various amendments.[98]

Yucaipa asserts that the Lender Complaint's contract-based claims arise from the ComVest transaction in August 2009, when Yucaipa acquired the majority of Allied's first lien debt.[99]  Yucaipa asserts that this occurred more than five years before the filing of the Lender Complaint.

---

[98]  Del. Bankr. Case. No. 12-11564 (D.I. 1068) (Tr. of Hr'g Feb. 27, 2013 at 108:1-17 (hearing on the motion to dismiss Yucaipa's cross-claims)).  The Court held:

> The Delaware statute of limitations is applicable here based on the fact that this case was brought in Delaware, breach of contract claims brought in federal court setting [sic] in Delaware, so the Delaware statute applies. In the alternative, the borrowing statute applies which would use the shorter three year statute of limitations. Other than a bald choice of law provision there's nothing in this contract or deal that is so involved in New York to provide that the New York statute of limitations would have to apply.  First of all, the contract doesn't say that.  It was mentioned that the case survived the transfer of venue motion but not to New York, to Georgia, I believe. . . . So the [three] year statute [of limitations] applications that that statute run at the latest in November of 2012, so the cause of action, the cross claim is barred by the running of the statute of limitations.

*Id.* at 108:1-17.

[99]  The Lender Complaint makes the following allegations: Yucaipa breached the FLCA by (i) acquiring more first lien debt from ComVest in August 2009 than permitted under the Third Amendment (Lender Compl. ¶¶ 117–120; 123(a)); (ii) declaring itself to be the Requisite Lender as a result of an impermissible acquisition of First Lien Debt (*id.* ¶ 121; *see also id.* ¶ 123(b)); (iii) breaching the Third Amendment's provisions related to voting rights "by improperly acting as Requisite Lender" (*id.* ¶ 122); (iv) using its status as Requisite Lender "to neutralize the First Lien Lenders, giving the debtors a 'free pass' to ignore" the FLCA's provisions, and to protect its equity investment by precluding a restructuring of Allied (*id.* ¶ 123(c)–(d)); and (v) violating the Third Amendment's Capital Contribution Provision by not making a capital contribution of at least 50% of the aggregate principal of the Term Loans that Yucaipa acquired from ComVest on August 21, 2009, within 10 days of acquiring that debt (*id.* ¶¶ 54 (second bullet), 101).  For the purposes of this Opinion, although many factual allegations overlap various counts in the Lender

In response, the Trustee assert that the statute of limitations did not accrue until full damages were ascertainable because of the "continuous contract" and "continuous breach" doctrines.  The Trustee asserts that the FLCA grants the Lender reoccurring and continuous rights, and that Yucaipa continuously breached the FLCA for 4 years on the pretext that it was Requisite Lender.  The Trustee continues that it was not until the JCT 363 Sale was consummated on December 27, 2013, that the cumulative effect of Yucaipa's breaches could be determined.

Delaware Code Title 10, Section 8106 specifies a three-year limitations period for the Contract-Based Claims:

> no action based on a statute, and no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action.[100]

However, "the statute of limitations does not typically run against a continuing cause of action until the termination of the contract."[101]  In cases of continuous contract and continuing breach, "the statute begins to run only when full damages can be ascertained

---

Complaint, the Trustee's breach of contract claim is distinct from the Trustee's breach of fiduciary duty claim.

[100] 10 Del. Code § 8106.  Delaware's borrowing statute provides that "[w]here a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this State, or the time limited by the law of the state . . . where the cause of action arose, for bringing an action upon such cause of action." 10 Del. Code § 8121.  *See End of the Road Trust v. Terex Corp. (In re Fruehauf Trailer Corp.)*, 250 B.R. 168, 184 (D. Del. 2000) (breach of contract); *Williams v. Chrysler Corp.*, 991 F. Supp. 383, 390 (D. Del. 1998) (state law action for breach of the implied covenant of good faith and fair dealing, the applicable limitations period is also three years).

[101] *Burger v. Level End Dairy Investors (In re Burger)*, 125 B.R. 894, 901–02 (Bankr. D. Del. 1991) (citation omitted).

and recovered."[102]  Determining the application of these exceptions requires an analysis of "[w]hether the obligations under a contract are continuous or severable."  This "turns on the parties' intent, which may be ascertained through the contract's terms and subject matter, 'taken together with the pertinent facts and circumstances' surrounding its formation."[103]

The Trustee asserts that the FLCA and the Third Amendment is a continuing contract.  More specifically, in return for providing hundreds of millions of dollars in loans, the non-Yucaipa Lenders were entitled over time to, among other things: (i) recurring principal and interest payments;[104] (ii) recurring financial information from the Company and reasonable access to its management;[105] (iii) the right to direct the Agent — through the Requisite Lenders — to exercise certain remedies in the case of an Event of Default;[106] (iv) Capital Contributions in the amount of 50% of Term Loans

---

[102] *See Burger*, 125 B.R. at 901-02 (*citing Oliver B. Cannon & Son, Inc. v. Fid. & Cas. Co. of New York*, 484 F. Supp. 1375, 1390 (D. Del. 1980) (recognizing continuing contracts and continuing breach in Delaware)); *Guerrieri v. Cajun Cove Condo. Council*, C.A. No. 04C-08-022, 2007 WL 1520039, at *6 (Del. Super. Ct. Apr. 25, 2007) (holding that whether a contract is continuous is a question of fact); *Smith v. Mattia*, C.A. No. 4498-VCN, 2010 WL 412030, at *4 (Del. Ch. Feb. 1, 2010) (same; citations omitted).

[103] *Mattia*, 2010 WL 412030, at *4 (quoting *Kaplan v. Jackson*, No. C.A. 90-C-JN-6, 1994 WL 45429, at *3 (Del. Super. Ct. Jan. 20, 1994)). *See also Palisades Collection, LLC v. Unifund CCR Partners*, No. C.A. No. N14C-08-036 EMD CCLD, 2015 WL 6693962, at *5 (Del. Super. Ct. Nov. 3, 2015) ("If the Court finds a contract continuous in nature, Delaware's statute of limitations does not typically begin to run until the termination of the entire contract.  If the Court finds the contract severable in nature, the statute of limitations generally begins to run on each severable portion when a party breaches that portion of the contract.  The Court determines the continuous or severable nature of a contract by analyzing the intent of the parties.  The Court must ascertain this intent through the terms and subject matter of the contract, taken together with pertinent facts and circumstances surrounding the contract." (footnotes and citations omitted)).

[104] *See generally* FLCA at § 2.

[105] FLCA at §§ 5.6, 5.7.

[106] FLCA at §§ 9.8, 10.5(a).

acquired by Yucaipa;[107] (v) Yucaipa never serving or acting as Requisite Lender;[108] and (vi) Yucaipa never asserting any claims against them, or the Agent, in any way relating to the Credit Agreement or related documents.[109]   The Trustee claims that Yucaipa continually breached these obligations under the FLCA and the Third Amendment, and that the full damages of Yucaipa's continuous breaches could not be ascertained and recovered until 2013.  The Trustee accuses Yucaipa of isolating just one of its breaches – its purchase of ComVest's debt and declaration that it was Requisite Lender on August 21, 2009 – to bar claims arising from all of its breaches.  The Trustee asserts that this breach was just an initial trigger, which then enabled Yucaipa to continuously breach the FLCA by (i) causing Allied to cease making principal or interest payments from that point onward; (ii) blocking Lenders from the Company's financial information and access to management; (iii) preventing any restructuring dialogue among the Lenders; (iv) preventing Lenders from exercising remedies for the Company's ongoing Events of Defaults; (v) routinely asserting claims against the Agent and Lenders in contravention of the express covenant not to sue; and (vi) demanding JCT pay Yucaipa, and no other Lender, a premium of $1.15 for each dollar of its First Lien Debt.  The Trustee claims that these were all independent and did not have to occur but that Yucaipa's proclamation that it was Requisite Lender in 2009 afforded Yucaipa the ability to commit its later breaches of the FLCA and the Third Amendment.

---

[107]  Third Amendment at § 2.7(e).

[108]  Third Amendment at § 2.7(e).

[109]  Third Amendment at § 2.7(e).

The Trustee further asserts that the continuous nature of Yucaipa's breaches was acknowledged by Derex Walker in an internal Yucaipa email discussing whether Allied should withhold financial statements to Lenders in spring 2011.  In it, Walker admitted that withholding the financials would "simply [be] another breach (one of many) under the credit agreement."[110]  The Trustee contends that the extent of monetary damages caused by Yucaipa's continuous breaches of the First Lien Credit Agreement was not ascertainable until December 27, 2013, when JCT purchased substantially all of Allied's assets for $135 million — generating only $53.8 million to the Company's First Lien Lenders, who held about $244 million of loans.[111]

The case law supports the Trustee's argument.  In *Branin v. Stein Roe Investment Counsel, LLC*,[112] the Chancery Court held the defendant-employer was in continuous breach of an operating agreement by declining (at least 5 times) to indemnify the plaintiff-employee.[113] The *Branin* Court ruled that the statute of limitations was "appropriately suspended for the period during which [plaintiff's] liabilities grew," and it observed that requiring plaintiff "to sue continually to enforce his indemnification right would have been inefficient."[114]

---

[110] Singer Dec. at Exh. 58 (Email from D. Walker to I. Tochner, May 29, 2011 re: Meeting with Gores).

[111] *See* Singer Dec. Exh. 103 (Risius Report) at ¶¶ 110-144 (discussion of damages as a result of Yucaipa's contractual breaches as of December 27, 2013).

[112] C.A. No. 8481-VCN, 2015 WL 4710321, at *7 (Del. Ch. July 31, 2015).

[113] *Id.* at *2.

[114] *Id.* at *7.

43

In *Matter of Burger*,[115] the parties entered into a service contract where Burger would purchase a herd of cattle with the investor's money, manage, maintain and expand the herd as well as improve the quality of the herd.[116] The investor agreed to pay all feed and upkeep expenses while Burger would pay over all milk revenues and any sale proceeds from bulls or cull cows.[117] The investor and Burger also executed a seven-year lease agreement, wherein the investor would pay monthly rent for keeping the herd at Burger's ranch. At the end of the seven-year period, the investor and Burger would liquidate the herd.[118] In *Burger*, the Court held that the statute of limitations for investors claims against a farm manager's breach of contract did not accrue when he first allegedly breached the contract (in 1981).[119] The Court continues that there was a continuous contract for a "fixed seven-year period where full and complete damages could not be determined by either party until the end of that time."[120] The *Burger* Court stated:

> Moreover, any claim by the Investors for damages necessarily relies on the liquidation of the herd which, under the terms of the contract, was scheduled to take place on or about September 1, 1988. Furthermore, this contract was continuously acknowledged by both parties throughout the seven-year period by the various payments made between the parties. These payments toll the statute because a new promise to pay is implied therefrom.[121]

---

[115] *Burger*, 125 B.R. at 898.

[116] *Id.* at 898.

[117] *Id.*

[118] *Id.*

[119] *Id.* at 901.

[120] *Id.* at 902.

[121] *Id.*

The similarity to the case here is remarkable.  Here, the Lenders invested in Allied, pursuant to the FLCA, just as the cattle-investor paid for the initial herd of cattle.  As part of that transaction, the Lenders expected to receive financial information, interest and principal payments, among other things.  If BD/S had to run into court at each and every breach – it would have been impossible to adjudicate let alone assess damages.  Here, the Court agrees that the failure to pay the Capital Contribution is just one of the breaches of the FLCA and the Third Amendment made by Yucaipa and that the parties had a continuous contract that Yucaipa continuously breached.  Furthermore, the Court finds that it would have been impossible to determine the extent of the breach until such time as the JCT 363 Sale, which determined the bulk of the damages.  In other words, like in *Burger*, the full and complete damages could not be determined until the JCT 363 Sale.

Thus, the FLCA and the Third Amendments are continuous contracts and the statute of limitations did not begin to run until the JCT 363 Sale.  As a result, Yucaipa's Summary Judgment Motion as to Lender Claim 2 (breach of contract) based on the statute of limitations is denied.  Similarly, Yucaipa's Summary Judgment Motion as to Lender Claim 3 (breach of good faith and fair dealing) based on the statute of limitations is denied.

In the alternative, Yucaipa also moved for partial summary judgment on the issue of damages as it relates to both of these counts (Lender Count 2 and Lender Count 3).  As discussed *supra*, damages have been established as it relates to Lender Count 2 (breach of

contract). [122]  As such, Yucaipa's motion for partial summary judgment on the ground of failure to establish damages as to the Lender Claim of breach of damages is denied. Yucaipa has similarly moved for summary judgment on the basis that the Trustee could not establish damages as it relates to breach of good faith and fair dealing (Lender Count 3).  This portion of Yucaipa's motion will be discussed below.

## E.    Lender Count 3 – Breach of Duty of Good Faith and Fair Dealing Against Yucaipa

As stated above, Yucaipa's Summary Judgment Motion on Lender Count 3 on the basis of the statute of limitations has been denied.  In the alternative, Yucaipa moves for partial summary judgment on whether the Trustee has met its burden of proving damages.  Here the Trustee did not similarly move for summary judgment based on Lender Count 3 the (alleged) breach of the duty of good faith and fair dealing against Yucaipa.  As a result, none of the elements and arguments of Lender Count 3 have been fleshed out by the Trustee to prove the affirmative claim; the Court would be in the impossible and illogical position of deciding that the Trustee, who has no pending motion on Lender Count 3, did not meet their burden of damages in relation to that count.  Thus,

---

[122] As the Trustee has prevailed on the breach of contract claim such victory subsumes the Lender Claims. The Trustee's expert Mr. Risius, directly addressed this point in his report, explaining that these claims "are mutually exclusive and cannot be added together."[122]  Singer Dec. Exh. 103 (Risius Report) at ¶109 ("The Lender Damages Claims and the Estate Damages Claims are generally factually consistent.  However, because the Lender Damage Claims are only available to the First Lien Debt lenders, as opposed to the Estate, the method of calculating damages would be different.  As such, the factual basis and framework described below does not include the same commentary that was provided in the Estate Damage Claims section of this report as it would be duplicative.  It should also be noted that the Estate Damage Claims and Lender Damages Claims are *mutually exclusive* and *cannot* be added together." (emphasis added)). As a result, the Trustee could have only prevailed once on its damages as it relates to the breach of contract claim against Yucaipa.

the Court finds that there are genuine issues of material facts with respect to the damages portion of Lender Count 3 and will deny Yucaipa's Summary Judgment Motion as to this point.

### F.    Estate Claims 4 and 6: Specific Performance

The Trustee has abandoned Estate Claim 6 (specific performance related to the divestiture of $32 million of first lien debt).   As such, Yucaipa's Summary Judgment Motion as to Estate Claim 6 will be granted.

The Trustee's briefs appear to be silent on Estate Claim 4 (specific performance related to the Capital Contribution Provision).   As specific performance is not the Trustee's only remedy, the Court will address Yucaipa's Motion for Summary Judgment as to Estate Claim 4.   As argued by Yucaipa, this claim for specific performance has been moot since the Court confirmed the 2016 Joint Plan.   It would be impossible for Yucaipa to perform in accordance with the Capital Contribution Provisions because there is no corporation to which Yucaipa can contribute capital.   The Court agrees.   As such, Yucaipa's Summary Judgment as to Estate Claim 4 will be granted.

### G.    Estate Claims 10, 11 and 13: Fraudulent Transfer and Disallowance of Claims Pursuant to § 502(d)

#### i.    *Relief Requested*

The Trustee seeks summary judgement on Claims 10–11 to avoid certain transactions as constructive fraudulent transfers under 11 U.S.C. section 548(a)(1)(B) and under the state law fraudulent transfer statutes of either Arizona, California, Delaware,

Florida, Georgia, or New York pursuant to section 544(b).[123]  If successful, the Trustee seeks summary judgment on Claim 13 to recover the transferred property or the value of the transferred property pursuant to section 550 and disallow the avoidable or recoverable claim under 11 U.S.C. § 502(d).

### ii.    Relevant and Reiterated Facts

May 17, 2010 is two years prior to the Petition Date (the "548 Lookback Period"). May 17, 2008 is four-years prior to the Petition Date (the "544 Lookback Period").

The Trustee asserts that the transfers contained in the table below (the "Contested Payments") are constructive fraudulent transfers under 548(a)(1)(B) and 544(b):[124]

*(reminder of page intentionally left blank)*

---

[123]  *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 648 (3d Cir. 1991).

[124]  The Contested Payments include the "Kasowitz Legal Payments," the "Latham Legal Payments," the "Ornstein Payment," the "Yucaipa Payment," and the "ComVest Payment," each as summarized on the below chart by date of the transfer and amount.

| Transfer Period | Date | Amount |
|---|---|---|
| **544 Kasowitz** | October 15, 2008 | $36,461.28 |
| | December 31, 2008 | $1,280,000.00 |
| | December 23, 2009 | $15,276.86 |
| | December 31, 2009 | $26,961.67 |
| | February 4,2010 | $4,495.50 |
| **544 Latham** | December 23, 2009 | $19,155.09 |
| | March 8, 2010 | $100,379.58 |
| | April 13, 2010 | $38,128.38 |
| | April 16, 2010 | $13,359.04 |
| | May 13, 2010 | $98,894.79 |
| **Kasowitz 544/548** | July 26, 2010 | $101,538.66 |
| | September 15, 2010 | $191,526.39 |
| | September 20, 2010 | $304,033.11 |
| | October 6, 2010 | $209,165.47 |
| | November 2, 2010 | $360,447.42 |
| | December 16, 2010 | $111,808.98 |
| | December 21, 2010 | $4,897.50 |
| | March 7, 2011 | $237,893.64 |
| | June 30, 2011 | $100,000.00 |
| | September 7, 2011 | $117,321.71 |
| | October 12,2011 | $200,000.00 |
| | November 23, 2011 | $100,000.00 |
| | December 9, 2011 | $75,000.00 |
| | December 15, 2011 | $75,000.00 |
| **Latham 544/548** | September 23, 2010 | $33,220.53 |
| | October 6, 2010 | $46,285.93 |
| | December 9, 2010 | $1,235.00 |
| | December 31,2010 | $39,106.45 |
| | March 11, 2011 | $26,536.16 |
| | December 27, 2011 | $139,256.33 |
| **Yucaipa Payment (544)** | August 21, 2009 | $831,325.83 |
| **ComVest Payment (544)** | August 21, 2009 | $1,850,000 |
| **Ornstein Payment (544)** | January 2009 | $250,000 |
| **Total** | | **$7,038,711.30** |
| **Latham Total** | | **$1,648,835.71** |
| **Kasowitz Total** | | **$2,458,549.76** |
| **ComVest, Yucaipa Total** | | **$2,681,325.83** |
| **Ornstein** | | **$250,000** |

### a. ComVest and Yucaipa Payment Facts

Prior to the Yucaipa-Comvest Transaction, the facts suggest that there was a possibility that Allied was facing a second bankruptcy. For example, the record reveals that as of December 2008, certain members of Allied's Board believed that actions of CIT and other lenders "had the clear intent of driving [Allied] into bankruptcy."[125] As of October 2, 2008, the record indicates that at least Mr. Tomczak of Allied believed that a second bankruptcy could lead to the possibility of a liquidation which might benefit CIT, but not Allied or its other lenders.[126]

Nevertheless, the record, as cited by the parties, reveals that by 2009, Allied, Allied's Lenders, and interested parties mention the possibility of bankruptcy, but only in the context of a sale or restructuring. For instance, on January 28, 2009, JCT's CEO, Mike Riggs, sent to Mark Hughes of Comvest, an email stating: "[CIT] clearly wants to push Allied Holdings into bankruptcy, so they would be supportive of our go forward strategy."[127] A July 29, 2009 email from Richard Ehlrich of Black Diamond sent to Jeffrey Shaffer and Jeffrey Buller of Spectrum after Mr. Ehlrich spoke with ComVest, reveals Mr. Ehlirch's belief that ComVest's primary objective is to place Allied in bankruptcy and credit bid for the company.[128] In corroboration, Mr. Walker, of Yucaipa and Allied,

---

[125]  Scolnick Dec. Exh. 51 (Minutes of Meeting of the Board of Directors of Allied Systems Holdings, Inc. Dec. 10, 2008) at p. 3.

[126]  Scolnick Dec. Exh. 1 (Tomczak Deposition p. 100–102, 191–93).

[127]  Scolnick Dec. Exh. 31 (Email from M. Riggs to M. Hughes, re: Allied Holdings Deal Updates from Riggs 1-28-09; dated Jan. 28, 2009) p. 1-2.

[128]  Scolnick Decl. Exh. 62 (Email from R. Ehrlich to J. Schaffer, re: ComVest, dated July 29, 2009).

reported at a March 6, 2009 Board meeting, "that Com-Vest's stated intention was to push [Allied] into bankruptcy and force a 363 sale."[129]

Allied was insolvent when the Board determined to forego a quarterly interest payment due August 4, 2009.[130]  The Board chose to forego the payment despite Scott Macaulay's, Allied's then Chief Financial Officer, advice that Allied would have $5.5 million in cash after making the $4.8 million quarterly interest payment from their $10.3 million in available funds.[131]

Only 18 days after Allied's failure to make the payments due on its debt, Yucaipa finalized the LPA—a bilateral contract between Yucaipa and ComVest, where Yucaipa purchased from ComVest a majority of Allied's First Lien Debt—in which Allied was neither a signatory nor a beneficiary.[132]  Yucaipa and ComVest structured the LPA such that the closing conditions required Allied to pay, in total, $2.7 million for fees and expenses related to the Fourth Amendment and the LPA.[133]  This totals over 50% of the entire required debt payment to lenders that Allied refused to make eighteen days prior.

---

[129] Scolnick Dec. Exh. 63 (Minutes of Meeting of the Board of Directors of Allied Systems Holdings, Inc., Mar. 6, 2009) p. 1-2. Scolnick Dec. Exh. 17 (ComVest 30(b)(6) Dep.) 70:24-71:24; 72:23-73:5) ("ComVest's strategy was "to move forward and work on a restructuring to get the business properly capitalized.").

[130] Yucaipa's expert concedes that Allied was insolvent by early 2008.  *Infra* n. 156.

[131] Singer Dec. Exh. 40 (Minutes of Meeting of the Board of Directors of Allied Systems Holdings, Inc., Aug. 3, 2009), at p. 1.

[132]  *See* Singer Dec. Exh. 43 (Loan Purchase Agreement (the "LPA"), dated Aug. 21, 2009), at §§ 1.5(a)(ii), (b)(ii), 1, S-1; *Compare* LPA *with* Singer Dec. Exh. 40 (Minutes of Meeting of the Board of Directors of Allied Systems Holdings, Inc., Aug. 3, 2009).  Singer Dec. Exh. 40 (Minutes of Meeting of the Board of Directors of Allied Systems Holdings, Inc., Aug. 3, 2009), at p. 1.

[133]  LPA at § 1.5.

ComVest did not care if it received its payment from Yucaipa or Allied.[134]  Yet Allied, a non-party to the transaction, was required to pay and, in exchange, received only an invalid amendment to the FLCA.[135]  The record is clear that these payments covered legal fees and expenses that were not incurred by Allied, for services that were not rendered for Allied.[136]

The record also shows that the Fourth Amendment eliminated provisions of the Third Amendment that:[137]

(i)    prohibited Yucaipa from acquiring more than $50 million of the principal amount of Term Loans (or 25% of the aggregate Term Loan Exposure, whichever was less);

(ii)   restricted Yucaipa's right to vote (a) on modification to the Credit Agreement and (b) as a debtholder in a bankruptcy proceeding;

(iii)  required that Yucaipa make a capital contribution to Allied of 50% of the aggregate principal amount of Term Loans it acquired; and

(iv)   restricted the existing definition of "Eligible Assignee" in the Credit Agreement, which prohibited the Sponsor from becoming an Eligible Assignee.

---

[134]  Scolnick Dec. Exh. 17 (ComVest 30(b)(6) 135:20–136:3) ("I just know that part of the deal with Yucaipa is that they . . . would reimburse us for our expenses . . . we didn't care if it came from Allied or Yucaipa.").

[135]  *See* LPA at § 1.5.

[136]  Scolnick Dec. Exh.17 (ComVest 30(b)(6) 135:20–136:3) ("I just know that part of the deal with Yucaipa is that they . . . would reimburse us for our expenses . . . we didn't care if it came from Allied or Yucaipa.").

[137]  Fourth Amendment §§ 1.1, 2.1(b), 2.4. 2.7(e), 10.5, and 10.6(c).

The record provides evidence that after the Fourth Amendment, at least some of Allied's creditors believed that Yucaipa was operating Allied in good faith to add value to the company. For instance, Spectrum, after forming a steering committee to protect its "rights in the event that the Sponsor does not operate in good faith to restructure the company and improve operations and add value" believed, as of December 31, 2009, that Yucaipa was "operating in good faith to add value to the company."[138] Also, on May 31, 2010 a Spectrum internal memorandum stated: "It is our belief that Yucaipa will be able to extract value from the first lien in order to protect this investment and we will benefit from that."[139] Finally, BDCM's Steve Deckhoff emailed Ron Burkle on February 2, 2011 stating: "[o]n Allied, the strategy you outlined seemed right and you have our support."[140]

### b. The Ornstein Payment

It is uncontroverted that the Ornstein Payment was made by Allied, at Mr. Burkle's request,[141] for services that were rendered to Yucaipa rather than Allied.[142] Instead, Ornstein performed the following services for Yucaipa:[143] (i) introduced Yucaipa and

---

[138] Supp. Scolnick Dec. Exh. 47 (Email from J. Bulter to J. Schaffer, re: DRAFT Allied_Audit_Memo_12-31-2009, dated Jan 13, 2010). The deposition witness clarified that Spectrum distinguished between Yucaipa's efforts to add value to Allied and Yucaipa's efforts to restructure Allied and improve operations. Scolnick Dec. Exh. 2 (Shaffer Dep. 361:12-16).

[139] Supp. Scolnick Dec. Exh. 29 (Email from J. Butler to J. Schaffer, re: AHI Valuation Memo, dated May 28, 2010) at p. 5.

[140] Supp. Scolnick Dec. Exh. 32 (Email from S. Deckoff to R. Burkle, dated Feb. 2, 2011).

[141] *See* Burkle emailed a ComVest principal that "we gave [Ornstein] 250k a few months ago." Singer Dec. Exh. 55 (Email from R. Burkle to R. Priddy re: Jonathan [Ornstein], dated Mar. 26, 2010) ("I know you guys have been talking . . .just an fyi . . . we gave him 250k a few months ago").

[142] *See id.*

[143] *Id.*

ComVest shortly after ComVest became a Requisite Lender,[144] (ii) acted as a go-between in the negotiations between Yucaipa and ComVest,[145] and (iii) provided to Burkle advice on the transaction.[146]

### c.  The Legal Payments

Regarding the Legal Payments, it is uncontroverted that (i) Yucaipa did not share its legal counsel with Allied — Allied retained its own legal advisors; (ii) the legal invoices Allied made payments on were billed to Yucaipa; and (iii) the legal work was done for Yucaipa.[147]

Yucaipa points to two Latham transactions revealed by the record.  The first concerns Allied payment of Yucaipa's legal fees related to the $17 million financing Yucaipa provided to Allied so that Allied could purchase rigs from a competitor.  The second concerns Allied's payment of Yucaipa's legal fees related to the Third Amendment.

On December 21, 2009, Yucaipa sued CIT in Georgia seeking, *inter alia*, declaratory judgment on the validity of the Fourth Amendment in Georgia.[148]   CIT countersued

---

[144]  Scolnick Dec. Exh. 7 (Walker/Yucaipa 30(b)(6) Dep.) at 712.

[145]  Supp. Scolnick Dec. Exh. 6 (Ornstein Dep.) at 46.

[146]  *Id.* at p. 78-79.

[147]  *See, e.g.*, Singer Dec. Exh. 26 (Email from D. Walker to M. Gendregske attaching an invoice from Latham to Yucaipa and asking "Could you guys review and handle payment?"); Singer Dec. Exh. 51 (Email from D. Walker to S. Macaulay and J. Blount of Allied attaching an invoice from Kasowitz to Yucaipa and asking "Could you please pay directly to Kasowitz?"). *See also, e.g.*, Singer Dec. Exh. 97 (Gendregske Dep.) 148:14-16 (Latham was Yucaipa's counsel), 278: 21-23 (same); Singer Dec. Exh. 98 (Walker Dep.) 350:20-22 (Latham represented Yucaipa), 619:4-13 (Yucaipa was represented by Kasowitz).

[148]  Singer Dec. Exh. 49 at ¶¶56–57.

seeking declaratory judgment that the Fourth Amendment is invalid.[149]  CIT and Yucaipa

settled.[150]   It is uncontroverted that the Kasowitz Legal Payments were made in

connection with the CIT Litigation.   After settling with CIT, Yucaipa directed CIT to

release (i) $17 million of letter of credit deposits, pro rata, to first lien lenders, and

(ii) certain liens on rigs.[151]

### iii.    Shifting Standard and Law

The Trustee must introduce "evidence to support its burden of showing that"[152]

Allied transferred the Contested Payments (i) while Allied was insolvent, or resulting in

its insolvency; (ii) within two years (548) or four years (544(b)) prior to the petition date;

(iii) with funds that constituted an interest of Allied in property; and (iv) received less

than reasonably equivalent value in exchange.[153]   The state law elements under section

544(b) are substantially similar to section 548(a)(1)(B) except that the transfers must be

---

[149]  Singer Dec. Exh. 52 at p. 35 of 39.

[150]  Scolnick Dec. Exh. 94 (Settlement Agreement and Mutual Limited Releases between Allied, Yucaipa and CIT, dated Dec. 5, 2011).

[151]  Scolnick Dec. Exh. 30 (Dec. of Derex Walker in Support of Yucaipa's Opposition to the Petition Creditors' Motion for Summary Judgment Regarding the Determination of Requisite Lenders Under the First Lien Credit Agreement) at 16–17 (¶ 45); *See* Scolnick Dec. Exh. 18 (Aliberto/CIT 30(b)(6) Dep.) at 605–06; Scolnick Dec. Exh. 94 (Settlement Agreement and Mutual Limited Releases between Allied, Yucaipa and CIT, dated Dec. 5, 2011) at 12–13 (§ 11(a); Supp. Scolnick Dec. Exh. 2 (CIT 30(b)(6) Dep.) at 253; Supp. Scolnick Dec. Exh. 28 (Email from M. Aliberto to A. O'Shea, re: Allied request to release US titles for transfer to Canada, dated Feb. 1, 2012).

[152]  *Pension Transfer Corp. v. Beneficiaries Under the Third Amendment of Fruehauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 213 (3d Cir. 2006).  *Contra Riley v. Countrywide Home Loans, Inc. (In re Duplication Mgmt., Inc.)*, 501 B.R. 461, 483 (Bankr. D. Mass. 2013) ("To make out the elements of a fraudulent conveyance claim, a plaintiff must prove that a debtor did not receive direct benefits reasonably equivalent to the value which it gave up. If the plaintiff meets that burden, the burden is then on defendants to produce (if they can) evidence that the debtors indirectly received sufficient, concrete value.") (citations omitted).

[153]  11 U.S.C § 548(a)(1) (2020).

made within four years, not two.[154]  The Trustee, bears the burden of proving that it has

established all the elements of its case entitling it to judgment in its favor and that there

is no genuine issue of material fact in dispute."[155]

The Trustee established her prima facie case as to the first three elements.  Allied

was insolvent in early 2008.[156]  The Contested Payments occurred within the 548 or 544

Lookback Periods.[157]  Allied had an interest in the money used to make the Contested

---

[154]  The UFCA, UFTA, and UVTA generally track the legal elements of 11 U.S.C. § 548(a)(1)(B) but allow the avoidance of transactions occurring within a four (UVTA and UFTA) or six-year (NY-UFCA) lookback period rather than section 548's two-year lookback period.  *See, e.g., Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1062, n.5 (3d Cir. 1992) (agreeing that district court correctly disposed of UFCA claims and section 548 claims together); *Charys Holding Co., Inc. v. Growth Mgmt., LLC (In re Charys Holding Co., Inc.)*, Adv. No. 10-50204, 2010 WL 2774852, at *6 (Bankr. D. Del. July 14, 2010) ("Plaintiffs here have alternatively pled claims under the fraudulent conveyance laws of Georgia, New York, and Delaware. These laws do not meaningfully vary from the requirements of Bankruptcy Code section 548(a)(1)(B) for present purposes.").  The four or six-year distinction is irrelevant as the Trustee only alleges fraudulent transfers within a four-year lookback period.  *See* D.I. 307 p. 33–36.

At the time of the transfers, Arizona, California, Delaware, Florida, and Georgia all operated under the UFTA and New York operated under the Uniform Fraudulent Conveyance Act (the "UVCA").  ARIZ.REV. STAT. ANN. §§ 44-1001 to –1010 (1990); CAL. CIV. CODE §§ 3439 to 3439.14 (West 2016) (replaced UFTA with UVTA effective January 1, 2016); DEL. CODE. ANN. tit. 6 § 1301 – 1312 (1996); FLA. STAT. ANN. § 726.101 – .112 (West 1987); GA. CODE ANN. §§ 18-2-70 to -85 (UFTA – 2002; UVTA 2015); and N.Y. DEBT. & CRED. LAW §§ 273 – 278 (McKinney 2021) (UVTA – April 4, 2020 and UFCA – 1925).  California, Georgia, and New York have, since adopted the Uniform Voidable Transactions Act (the "UVTA").  *See, e.g.*, 2015 Cal. Legis. Serv. Ch. 44 (S.B. 161) (West); GA. CODE ANN. § 18-2-70; 2019 N.Y. Laws 580.

[155]  *Argus Mgmt. Group v. Chanin Capital Partners, LLC (In re CVEO Corp.)*, 320 B.R. 258, 260 (Bankr. D. Del. 2005).

[156]  *Compare* Singer Dec. at Exh. 102 (Fischel Report) at ¶ 18 ("[O]ne direct piece of evidence of whether a firm is solvent or insolvent—especially in this context where Allied's common shares were not publicly traded—is the price at which a company's debt is traded in arm's—length transaction.  Deeply discounted debt implies the company is insolvent.") *with id.* at Exh. 81 (Dec. of Derex Walker in Support of Yucaipa's Opposition to the Petitioning Creditors' Motion for Summary Judgment Regarding the Determination of Requisite Lenders Under the First Lien Credit Agreement) at ¶7 ("Thus, shortly after Allied exited bankruptcy, its financial condition began to deteriorate.  As a consequence, in early 2008 the Allied first and second lien debt was trading at a significant discount to par, and a number of lenders expressed interest in potentially selling their debt positions to Yucaipa.") *and* Singer Dec. at Exh. 102 (Fischel Report) at ¶19 ("At the outset, I note that Plaintiffs themselves acknowledge that Allied was insolvent in early 2008.").

[157]  D.I. 706 at p. 31-36.  Singer Dec. Exh. 88 (The Yucaipa Defendants' First Supplemental Responses and Objections to the Official Committee of Unsecured Creditors' First Set of Requests for Admission).

Payments. made from Allied's corporate assets, constitute an "interest of the debtor in property."[158]

Yucaipa argues that the Trustee has failed to meet her burden, on summary judgment, as she has not established her prima facie case as to the fourth element—that Allied did not receive reasonably equivalent value in exchange for the transfers. The Trustee counters, arguing that, at trial, she bears the burden of proving that Allied received no direct value in exchange for the Contested Payments—a burden she asserts she met; and that Yucaipa then bears the burden of persuasion that Allied (i) received indirect value in exchange for the Contested Payments and (ii) that the indirect value Allied received was the roughly equivalent to what Allied paid for it.

### a. Law: Reasonably Equivalent Value

In determining whether the transfer was made for "less than reasonably equivalent value," courts must first make the "factual determination of whether the debtor received any value at all."[159]    "[T]he question whether the debtor *received*

---

[158] *Compare* 11 U.S.C. § 541(a)(1) (defining debtor's property interests broadly as ""all legal or equitable interests of the debtor in property as of the commencement of the case.") *with* 11 U.S.C. § 548(a) ("The trustee may avoid any transfer . . . of an interest of the debtor in property . . . ."); *and Begier v. I.R.S.*, 496 U.S. 53, 54 (1990) (defining same term in 547(b) as "property that would have been part of the estate had it not been transferred."). Allied's payments were made from corporate assets, the transfer of which diminished the fund from which creditors could be paid. *Compare, e.g., Sierra Steel, Inc. v. S&S Steel Fabrication (In re Sierra Steel, Inc.)*, 96 B.R. 271, 273 (B.A.P. 9th Cir. 1989) (finding 547(b) transfer "must involve property of the debtor such that the transfer diminishes the fund from which similarly situated creditors may be paid.") *with* Singer Dec. Exh. 104 (Expert Report of Jonathan R. Macey ("Macey Report")) at ¶¶105—106 *and* Singer Dec. Exh. 103 (Risius Report) at ¶ 82.

[159] *Mellon Bank, N.A. v. Off. Committee of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 149 (3d Cir. 1996) ("The bankruptcy court, therefore, conflated two inquiries that should remain separate and distinct: before determining whether the value was "reasonably equivalent" to what the debtor gave up, the court must make an express factual determination as to whether the debtor received any value at all.").

reasonable value must be determined from the standpoint of the creditors."[160]   Only if

the debtor receives value in exchange for the transfer do courts consider "whether the

value was 'reasonably equivalent' to what the debtor gave up."[161]   Value is determined

based on the benefit, direct or indirect, the debtor received.[162]   When a debtor makes a

transfer solely for the benefit of a third party, the debtor does not receive reasonably

equivalent value.[163]   However, if the transfer is for the benefit of a third party and the

benefit "ultimately flows to the debtor," the debtor likely indirectly received value for the

transfer.[164]

Even losing investments—or, "money spent on investments that fail to stabilize or

improve the debtor's condition"—can confer value.[165]   Nevertheless, where a debtor

makes a losing investment to improve its condition, value can only be conferred where

there is an expectation of perceived value that is *legitimate and reasonable*."[166]

Accordingly, "so long as there is some chance that a contemplated investment will

---

[160] *In re R.M.L., Inc.*, 92 F.3d at 150 (citations and internal quotation marks omitted) (emphasis in original).

[161] *Id.*

[162] *Id.*

[163] *Leonard v. Noram Vinitsky Residuary Trust (In re Jolly's Inc.)*, 188 B.R. 832, 842 (Bankr. D. Minn. 1995) ("Transfers made *solely* for the benefit of a third party do not furnish reasonably equivalent value." (quotations marks and citations omitted)).   *See e.g., Klein v. Tabatchnick*, 610 F.2d 1043, 1047 (2d Cir. 1979) ("[T]ransfers solely for the benefit of third parties do not furnish fair consideration under section 67(d)(2)(a).").

[164] *Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.)*, 267 B.R. 602, 613-14 (B.A.P. 8th Cir. 2001).   *Klein v. Tabatchnick*, 610 F.2d at 1047 ("Benefit to a debtor need not be direct; it may come indirectly through benefit to a third person.") (citations omitted).

[165] *In re R.M.L., Inc.*, 92 F.3d at 152.

[166] *Id.* (emphasis in original) (citations omitted).

generate a positive return at the time of the disputed transfer, we will find that value has been conferred."[167]

Upon determining that a debtor received indirect value from a transfer, courts must focus on whether that indirect value is reasonably equivalent to what the debtor transferred for it.  In the event where a debtor indirectly benefits from paying the debt of a third party, the economic benefit of the value the debtor received must be quantified, by "[t]he party claiming to have delivered" it.[168]  If the indirect value is reasonably equivalent, the transfer cannot be avoided as fraudulent but if not, it can be avoided.[169]  Courts consider whether the value received was the reasonable, or rough, equivalent, to what the debtor gave for it by examining the totality of the circumstances.[170]

### b.  Standard: Reasonably Equivalent Value

At trial, the Trustee bears the burden of persuasion to prove that there was no direct value received.[171]  If proven, Yucaipa then carries the burden of proving that Allied

---

[167] *Id.*

[168] *In re Richards & Conover Steel, Co.*, 267 B.R. at 613-14 (citation omitted).

[169] *In re Richards & Conover Steel, Co.*, 267 B.R. at 613-14 (citation omitted).

[170] *FBI Wind Down Inc. Liquidating Trust v. All American Policy Corp. (In re FBI Wind Down, Inc.)*, 581 B.R. 116, 147-48 (Bankr. D. Del. 2018).

[171] *Wallace v. McFarland (In re McFarland)*, Nos. 11-10218, 11-01021, 2013 WL 5442406, *14 (Bankr. S.D. Ga. Sep. 30, 2013) ("If the Trustee makes a *prima facie* showing that the alleged "value" given to the Debtor provided no direct value to the Debtor, the burden shifts to the defendants to show that tangible and concrete indirect value was provided and to quantify that value." (citations omitted); *see also Cooper v. Centar Invest. (Asia) Ltd. (In re TriGem America Corp.)*, 431 B.R. 855, 868 (Bankr. C.D. Cal. 2010) ("Once the plaintiff makes a *prima facie* showing that no sufficient direct benefit was received in the transaction, it is the defendants' burden to prove sufficient indirect benefit that is tangible and concrete.").

received an indirect economically quantifiable value in exchange for the Contested Payments.[172]

On summary judgment, the Trustee must show evidence establishing that there is an absence of material fact that would allow this Court to find that direct value was given to Allied in exchange for the Contested Payments.  As for the indirect value defense, the Trustee must produce evidence that negates Yucaipa's argument that indirect value was provided or establish an absence of evidence supporting Yucaipa's argument.[173]

### c.  Discussion: Reasonably Equivalent Value

Other than the question of whether the Contested Payments were contractually obligated, the record reveals no facts supporting the argument that Allied received direct benefits from any of the Contested Payments.  Yucaipa argues that certain of the Contested Payments were made as Allied's contractual obligations under § 2(b) of the Monitoring and Management Services Agreement ("MMSA"), or under § 10.2 of the FLCA.  Yucaipa also argues that under § 6 of the MMSA, Allied is barred from seeking recovery for the Kasowitz Legal Payments in connection with the CIT Litigation.

---

[172] *FBI Wind Down Inc. Liquidating Trust*, 581 B.R. at 149 ("Regardless, the Defendant's argument falters as it makes no attempt to actually compare the value given, the Transfers, to the value received, the alleged increase in the borrowing base."); *Metro Communications, Inc.*, 945 F.2d at 646–47 ("These indirect economic benefits must be measured and then compared to the obligations that the bankrupt incurred."); *In re Richards & Conover Steel, Co.*, 267 B.R. at 614.

[173] *See supra* n. 171-172.

### i.    Allied Received No Direct Benefits

#### A.  § 2(b) of the MMSA

Yucaipa asserts, for the first time at the hearing, that each of the Contested Payments were made as contractual obligations under § 2(b) of the Monitoring and Management Services Agreement ("MMSA").[174]  Under Local Rule 7007–2(b)(ii), a "party filing the opening brief shall not reserve material for the reply brief that should have been included in a full and fair opening brief."[175]  Yucaipa failed to make this argument in its motion for summary judgment.  It likewise did not reserve it for its reply brief.  Instead, it brought it forward at the hearing.  "Plaintiff has not had a fair chance to contend with this new argument, . . . and should not be harmed for not having done so."[176]  At this stage in this lengthy litigation it would be unconscionable to allow Yucaipa to spring arguments on the Trustee in violation of the local rules.

#### B.  § 10.2 of the FLCA

Yucaipa also asserts that Allied received direct value for making the ComVest and Yucaipa Payments because it was contractually obligated to make those payments under § 10.2 of the FLCA as Allied was in default and was required to reimburse its Lenders' costs and expenses incurred "in connection with any refinancing or restructuring of the

---

[174] Scolnick Dec. Exh. 32 (Monitoring and Management Services Agreement).

[175] Bankr. L.R. 7007–2(b)(ii).

[176] *FBI Wind Down Inc. Liquidating Trust*, 581 B.R. at 149 (Bankr. D. Del. 2018).

credit arrangements provided."[177]   Yucaipa states:   "[t]here is no dispute . . . that ComVest and Yucaipa were, at the relevant times, 'Lenders' under the FLCA."[178]

> [A]fter the occurrence of a Default or an Event of Default, **all reasonable costs** and expenses, including **reasonable attorneys' fees** . . . incurred by any **Agent and Lenders** in enforcing any Obligations . . . or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work-out . . . ."[179]

Although Yucaipa is correct that there is no dispute as to whether ComVest was a Lender, Yucaipa is barred by the doctrine of collateral estoppel from asserting that it was a Lender under the FLCA.  Both the Third Circuit and New York Supreme Court have clearly determined that "[t]here is no credible dispute that under the terms of the Credit Agreement as initially drafted and executed, Yucaipa, as the 'Sponsors' and controlling shareholders of Allied, **were absolutely prohibited from being a Lender to Allied**, or an Eligible Assignee of a Lender."[180]

Yucaipa asserts that the ComVest and Yucaipa Payments were reasonable because, it is "common practice for the borrower to pay all fees incurred relating to any and all

---

[177] FLCA § 10.2.

[178] D.I. 762 at p. 47.

[179] FLCA § 10.2.

[180] *ASHInc Corp. v. AMMC VII, Ltd.*, 683 Fed. Appx. at 139 ("The Credit Agreement defined "Lender "as each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement.  Based on this definition, Yucaipa could not be a Lender because it was not an original signatory.  Further, Yucaipa could not become a party to the Credit Agreement pursuant to an Assignment Agreement because it was not an Eligible Assignee.  For an Assignment Agreement to become effective, the assignee was required to represent and warrant as of the Closing Date or as of the Assignment Effective Date that (i) it is an Eligible Assignee.  The Credit Agreement further stated that an assignee becomes a Lender 'subject to the terms and conditions of this Section 10.6.' *Id.* § 10.6(f). Yucaipa could not represent and warrant that it was an Eligible Assignee.") (*quoting BDCM Opportunity Fund II v. Yucaipa American Alliance Fund I, LP,* 2013 WL 1290394, at *3-4).

loan amendments . . . [i]n fact, I can't recall any of the over 200 transactions that I have worked on where the borrower did not pay all the fees for a loan amendment."[181]

The Trustee counters, arguing that the ComVest Payment is unreasonable because (i) the $1,850,000 that Allied paid to ComVest under the terms of the LPA were for the costs of negotiating and drafting an **invalid** amendment to the credit arrangements, (ii) Allied, a non-party to the LPA, did not directly receive anything other than burdens under the LPA or Fourth Amendment in exchange for the $1,850,000, (iii) the Fourth Amendment remove benefits Allied was to have received,[182] and (iv) Yucaipa's debt purchase allowed it to gain favorable treatment of its equity claims in Allied at the expense of Allied's legitimate contract creditors because it allowed Yucaipa to (a) cut to the front of the line of Allied's creditors, (b) gain administrative control over insolvency proceedings, and (c) gain the power to prevent other creditors from exercising their contractual rights against Allied.[183]

Indeed, it is unreasonable for an insolvent company to default in order to "provide runway for negotiations" between Yucaipa and ComVest for an amendment to a credit

---

[181] Supp. Scolnick Dec. Exh. 25 (Expert Report of J. Scott Victor) at 31–32 ¶93.

[182] *Compare* Singer Dec. Exh. 43 (Loan Purchase Agreement, dated Aug. 21, 2009) *with* Singer Dec. Exh. 40 (Minutes of Meeting of the Board of Directors of Allied Systems Holdings, Inc., Aug. 3, 2009), p. 2; Scolnick Dec. Exh. 57 (Email from J. Tomczak to P. Bartles, re: Allied Systems Holdings Amendment 4 and Purchase Offer, dated Feb. 4, 2009) *and* Singer Dec. Exh. 37 (Letter from M. Kasowitz to R. Priddy re: Allied Systems Holdings, Inc. and Allied Systems, Ltd., dated Mar. 13, 2009). There is evidence that the Allied Board considered earlier versions of the Fourth Amendment. The only evidence that the final version of the Fourth Amendment was considered by the Allied Board derives from an email describing a 10-minute phone call that took place *after* the Fourth Amendment was executed. *See* Supp. Singer Dec. Exh. 150 (Email from M. Gendregske to B. Cullen re: Emergency Call, dated Aug. 19, 1009), Supp. Singer Dec. Exh. 151 (Email from J. Blount to R. O'Shea re Signature Pages Needed, dated Aug. 19, 2009); Supp. Scolnick Dec. Exh. 3 (Troutman 30(b)(6) Dep.) 346:5-350:19; Scolnick Dec. Exh. 10 (Cullen Dep.) at 229:3-8.

[183] Singer Dec. Exh. 104 (Macey Report) at ¶56.

agreement that was invalid and that Yucaipa knew was contrary to the intent of the parties.[184]  The Yucaipa and ComVest Payments were not contractually obligated under § 10.2 of the FLCA.[185]  Other than the contractual obligation argument, Yucaipa makes no other serious contentions that Allied would directly benefit from the Yucaipa and ComVest Payments.

## C.  § 6 of the MMSA

Yucaipa asserts, as an affirmative defense to the Kasowitz Legal Payments made in connection with the CIT Litigation, that Allied indemnified Yucaipa from any losses arising under § 6 of the MMSA.  Section 6 of the MMSA provide that Allied will indemnify Yucaipa from losses (costs, fees, and expenses) related to or arising out of acts or failure to act (i) at Allied's request or with Allied's consent or (ii) otherwise related to or arising out of services provided by Yucaipa under this Agreement but § 6 will not apply if it is finally judicially determined that the losses arose out of the sole gross negligence or bad faith of Yucaipa.[186]

The Trustee argues that it was finally judicially determined that Yucaipa acted in bad faith as the New York Court found that: "Yucaipa caused Allied to enter into that certain Amendment No. 4 . . . , which purported to eliminate any restrictions on Yucaipa's

---

[184] Singer Dec. Exh. 40 (Minutes of Meeting of the Board of Directors of Allied Systems Holdings, Inc., Aug. 3, 2009), at 1.  *ASHInc Corp. v. AMMC VII, Ltd.*, 683 Fed. Appx. at 140 ("It would be inequitable to allow Yucaipa to achieve an 'end run' around the substance of the Eligible Assignee restrictions in the Credit Agreement and undercut what Yucaipa certainly knew the restrictions were designed to prevent.") (citations and quotations marks omitted).

[185] *See also infra* section H(vi)(b) (in addition to the fees being unreasonable, there was no "work out").

[186] Scolnick Dec. Exh. 32 (MMSA) § 6.

ownership of Allied debt . . . . [Yucaipa] seiz[ed] control of the Lenders' rights and remedies under the Credit Facility."[187]  "This was, of course, flatly prohibited under the Credit Agreement, and thus the Purported Fourth Amendment is invalid and of no force or effect."[188]  The Third Circuit has found, "[a]s discussed above, those provisions made clear that the parties' intent was to prohibit Yucaipa from ever becoming the Requisite Lender."[189]  Citing to *LightSquared Inc.*, the Third Circuit determined that "**[i]t would be inequitable to allow Yucaipa to achieve an 'end run' around** the substance of the Eligible Assignee restrictions in the Credit Agreement and undercut **what Yucaipa certainly knew the restrictions were designed to prevent**."[190]

Yucaipa argues that the courts failed to determine that its losses were incurred from its acts of bad faith.  The Court disagrees.  *LightSquared, Inc.*, determined that a "[party's conduct] was an end-run around the Eligible Assignee provisions of the Credit Agreement that breached the implied covenant of good faith and fair dealing arising under the Credit Agreement."[191]  Implicit in the Third Circuit's findings is the determination that Yucaipa did not act in good faith by amending the FLCA.  It is uncontroverted that the Kasowitz Legal Payments made towards the CIT Litigation arose from the Yucaipa's execution of the Fourth Amendment to the FLCA.  And that Yucaipa

---

[187] *BDCM Opportunity Fund II v. Yucaipa American Alliance Fund I, LP*, 2013 WL 1290394, at *5.  *See Murray v. Nat'l Broad. Co., Inc.*, 576 N.Y.S.2d 578, 580 (App. Div. 1991) (ruling on summary judgment constitutes final determination).

[188] *BDCM Opportunity Fund II v. Yucaipa American Alliance Fund I, LP*, 2013 WL 1290394, at *5.

[189] *ASHInc Corp. v. AMMC VII, Ltd.*, 683 Fed. Appx. at 142.

[190] *Id.* at 140 (emphasis added; citations and internal quotation marks omitted).

[191] *LightSquared LP*, 511 B.R. at 333 (applying New York law and ruling on summary judgment).

executed the Fourth Amendment adding provisions it knew to be against the intent of the contracting parties.[192]  Indeed, all of Yucaipa's expenses arising out of or related to the Fourth Amendment to the FLCA arose from the bad faith of Yucaipa.  Accordingly, the record undisputedly reveals that Yucaipa acted in bad faith where it intentionally worked around the bargained-for-rights of the contractual parties to the Third Amendment.[193] The Trustee is not prohibited from pursuing recovery related to the CIT Litigation under § 6 of the MMSA.

### ii.    Indirect Benefits and Rough Equivalent

#### A.  ComVest and Yucaipa Payments

The Trustee has met her burden in showing that there is no genuine issue of material fact that Allied did not receive direct value in exchange for the Contested Payments.  The Court now considers whether the Trustee has proven an absence of evidence that the Contested Payments indirectly benefited Allied in an amount roughly equivalent to what Allied exchanged for them.  Evidence proving that Allied indirectly

---

[192] *See, e.g.*, *ASHInc Corp. v. AMMC VII, Ltd.*, 683 Fed. Appx. at 140 ("It would be inequitable to allow Yucaipa to achieve an 'end run' around the substance of the Eligible Assignee restrictions in the Credit Agreement and undercut what Yucaipa certainly knew the restrictions were designed to prevent.").

[193] *LightSquared LP*, 511 B.R. at 333 (applying New York law and finding that the "[Defendant] violated, at a minimum, the covenant of good faith and fair dealing automatically implied by law in the credit agreement" and that '[s]uch an end-run, if not a downright sham' was not permissible as it did away with the 'fruits' of the contract.") (*quoting Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.*, 680 F. Supp. 2d 625, 632 (S.D.N.Y.), *aff'd and remanded*, 381 F. App'x 117 (2d Cir. 2010)). *See also Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) ("We will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." (applying Delaware law; footnotes and citations omitted); *Lightsway Litigation Services, LLC v. Yung (In re Tropicana Ent., LLC)*, 520 B.R. 455, 474 (Bankr. D. Del. 2014) (reviewing allegations that "entities unreasonably failed to manage the Debtors in accordance with the Debtors' best interests, thus denying them the fruits of the contract and resulting in damages." (applying Delaware law, citations omitted)).

benefited from a Contested Payment, alone, is insufficient.  The evidence must also show a comparison establishing that the indirect value Allied received was roughly equivalent to the Contested Payment exchanged for it.

The bar for finding indirect value is very low.  There need only be, at the time of the transfer, facts showing that Allied had "at least *some* chance of receiving a future economic benefit"[194] in exchange for the Contested Payment from the standpoint of Allied's creditors.[195]

Yucaipa argues that Allied benefited from the ComVest Transaction because the ComVest Transaction (i) was necessary to prevent Allied's liquidation and (ii) after the CIT Litigation and settlement, Yucaipa's actions as Requisite Lender benefited Allied.

There was a remote chance in 2008 that Allied believed CIT and other creditors may push it into liquidation.  However, by 2009, the record clearly shows that Allied's creditors were interested in selling Allied through bankruptcy, not liquidating Allied. There is no evidence that, from the viewpoint of the creditors, Allied benefited by paying Yucaipa and ComVest's legal fees in connection with the LPA and Fourth Amendment to the FLCA.  In fact, pushing Allied into a bankruptcy restructuring or 363 sale would

---

[194] *In re R.M.L., Inc.*, 92 F.3d at 153 ("Since we review the transaction at the time the transfer was made . . .") (citing to *In re Chomakos*, 69 F.3d 769, 770–71 (6th Cir. 1995) ("The point in time as of which we must determine whether [Debtor] received property of reasonably equivalent value in exchange for the money they wagered at the casino is the point at which their bets were placed.")); *id.* at 152 ("The best solution, therefore, is to determine, based on the circumstances that existed at the time the investment was contemplated, whether there was any chance that the investment would generate a positive return.").

[195] *In re R.M.L., Inc.*, 92 F.3d at 150.

have likely benefited Allied's creditors more than watching an insolvent debtor pay the legal fees and expenses necessary to subvert their contractually obligated rights.

There is a sliver of factual evidence supporting the idea that Yucaipa added value to Allied as seen in the internal emails or memoranda of BD/S. The record also establishes that as Requisite Lender, Yucaipa took acts that benefited Allied from the standpoint of its creditors—such as releasing letter of credit deposits and liens. The record also supports the idea that Allied thought Yucaipa would benefit it as Requisite Lender. As the bar for finding indirect value is low, the Court finds that the record supports the argument that Allied received indirect value in exchange for the ComVest and Yucaipa Payments.

Notwithstanding the finding that Allied indirectly benefited from the ComVest and Yucaipa Payments, the Trustee has met her burden by establishing the absence of fact supporting the argument that any indirect value Allied received from the ComVest and Yucaipa Payments was roughly equivalent to what Allied paid for it. The release of liens and letter of credit deposits is never compared to the $2.7 million that Allied paid in exchange for them. Likewise, the value Yucaipa added to Allied as the "Requisite Lender" has not been calculated or compared to the $2.7 million Allied exchanged for it.

## B.  *Ornstein Payment*

There is no real dispute that Allied did not directly receive anything, including consulting services, from Ornstein in exchange for the $250,000 payment he received from Allied. Yucaipa argues that Ornstein added value to the ComVest Transaction by:

(i) introducing Yucaipa and ComVest shortly after ComVest became a Requisite Lender,[196] (ii) acting as a go-between in the negotiations between Yucaipa and ComVest,[197] and (iii) providing to Burkle advice on the transaction.[198]  As any indirect value must be tied to the benefits Allied received from the completion of the Yucaipa-Comvest transaction, as explained above, the Trustee need only establish an absence of evidence in the record that such indirect benefit is comparable to the $250,000 Allied paid Ornstein for the services he provided Yucaipa and ComVest.  The Trustee has met her burden.

## C.  Kasowitz Legal Payments

Yucaipa argues that Allied and Allied's lenders, in exchange for the Kasowitz Legal Payments, received benefits from the litigation because: (i) the litigation sought for certainty that the Fourth Amendment was valid and Yucaipa was legitimately the Requisite Lender; (ii) as a result of the negotiated settlement with CIT, CIT recognized Yucaipa as the Requisite Lender and took direction from Yucaipa to release (a) $17 million of letter of credit deposits, *pro rata*, to first lien lenders, and (b) certain liens on rigs; and (iii) Allied's lenders acknowledged the value that Yucaipa was adding.[199]

---

[196]  Scolnick Dec. Exh. 7 (Walker/Yucaipa 30(b)(6) Dep.) at 712.

[197]  Supp. Scolnick Dec. Exh. 6 (Ornstein Dep.) at 46.

[198]  *Id.* at p. 78-79.

[199]  Supp. Scolnick Dec. Exh. 47 (Email from J. Bulter to J. Schaffer, re: DRAFT Allied_Audit_Memo_12-31-2009, dated Jan 13, 2010) (Spectrum, after forming a steering committee to protect its "rights in the event that the Sponsor does not operate in good faith to restructure the company and improve operations and add value" believed, as of 12/31/2009, that Yucaipa was "operating in good faith to add value to the company."). *See also* Supp. Scolnick Dec. Exh. 29 (Email from J. Butler to J. Schaffer, re: AHI Valuation Memo, dated May 28, 2010) at p. 5 (A May 31, 2010 Spectrum internal memorandum stated: "It is our belief that Yucaipa will be able to extract value from the first lien in order to protect this investment and we will

There is likely some benefit associated with the certainty of the CIT Litigation and the actions Yucaipa took as Requisite Lender.  However, as explained above, even if Yucaipa's assertion that litigation to enforce amendment it made in bad faith indirectly benefited Allied were true, it must also establish that the record provides evidence comparing the indirect benefit and showing that it is roughly equivalent to the millions Allied paid in exchange.  Additionally, Yucaipa must differentiate the indirect benefits Allied received from paying for Yucaipa's legal counsel when it was receiving direct benefits from the same litigation by paying for its own counsel.[200]  The Trustee has met her burden in establishing an absence of evidence on the record comparing the indirect value, Allied received with the price Allied paid for it and showing that it was roughly equivalent.

### D.  Latham Legal Payments

#### 1.  Blue Thunder Financing

Yucaipa argues that the Latham Legal Payments relating to the "Blue Thunder Financing" provided value to Allied as Allied was paying the legal fees Yucaipa owed to Latham in relation to Allied's receipt of $17 million in financing to purchase rigs from a competitor.[201]  The Court finds that there is at least some economic benefit to paying a

---

benefit from that.").  Supp. Scolnick Dec. Exh. 32 (Email from S. Deckoff to R. Burkle, dated Feb. 2, 2011) (BDCM's Steve Deckhoff emailed Ron Burkle on February 02, 2011 stating: "On Allied, the strategy you outlined seemed right and you have our support.").

Scolnick Dec. Exh. 93 (Verified Complaint in Allied Systems Holdings, Inc. v. The CIT Group/Business Credit, Inc.) at 19–20 ¶¶65–66.

[200] Scolnick Dec. Exh. 93 (Verified Complaint in Allied Systems Holdings, Inc. v. The CIT Group/Business Credit, Inc.) at 28.

[201] *See* Scolnick Dec. Exh. 7 (Walker Dep.) at 707–11 *and* Singer Dec. Exh. 26 at 91990–91, 91994–003.

creditor's legal fees to obtain financing — the debtor can receive the financing.  Yet, the Trustee points to an absence of evidence in the record comparing the indirect economic benefit Allied received with the amount Allied paid for it.  The Trustee has met her burden.

### 2. *Third Amendment*

There is no dispute that Yucaipa owed Latham money for services Latham provided on Yucaipa's behalf and that Allied paid to Latham the fees Yucaipa incurred.  As such, there is no dispute that Allied did not directly benefit from the legal services Latham provided to Yucaipa.   Instead, Yucaipa argues that the fees incurred in connection with the Third Amendment and the subsequent debt-to-equity swap by Yucaipa in 2008 benefited Allied by allowing it to deleverage its balance sheet, increase its cash flow, and avoid a going-concern opinion.

In support, Yucaipa provides (i) an email with the Latham invoices attached, (ii) a citation to the deposition of Mr. Jeffrey Shaffer who testified, "I do recall, that the entire negotiation was regarding the first amendment, and at the end, it turned out to be something that was more geared towards the second lien, because that's the only acquisition that Yucaipa did immediately following the process,"[202] and (iii) the declaration of Mr. Walker who states, "Yucaipa elected not to purchase first lien debt because of the restrictions and conditions limiting Yucaipa's potential ownership rights.

---

[202] Scolnick Dec. Exh. 2 (JCT 30(b)(6) Dep.) at 104.

But Yucaipa did invest an additional $26 million in Allied, purchasing $40 million of the $50 million in outstanding second lien debt."[203]

The Trustee asserts that while the Third Amendment to the SLCA resulted in Yucaipa's debt-to-equity swap, the majority of the Latham legal fees relate to negotiating and finalizing the Third Amendment to the FLCA— which "only allowed Yucaipa to purchase very limited amounts of term loans, and by Yucaipa's own admission, imposed onerous restrictions on such purchases" such that no purchases under the Third Amendment to the FLCA were ever made.[204]  As such, Yucaipa would need to show that an Amendment it was not interested in purchasing debt under, indirectly benefited Allied in an amount "roughly equivalent" to what Allied paid for it.

While a portion of the legal bill may have been in relation to the Third Amendment to the SLCA, the Trustee has met her burden in showing that the record contains an absence of evidence supporting Yucaipa's burden at trial to compare the economic benefit Allied indirectly received from the debt-to-equity swap with the amount Allied paid for it and establishing that it was roughly equivalent.  The Trustee has met her burden.

---

[203] Scolnick Dec. Exh. 30 (Dec. of Derex Walker in Support of Yucaipa's Opposition to the Petition Creditors' Motion for Summary Judgment Regarding the Determination of Requisite Lenders Under the First Lien Credit Agreement) at p. 5 ¶12.

[204] 13-50530 D.I. 297 (Tr. of Hr'g. 126:11-15); Scolnick Dec. Exh. 6 (Ornstein Dep.) at 381:21-383:23 (Third Amendment to the FLCA was never used and was too onerous to be used).

### iii.    Yucaipa Benefited

The Trustee may only recover the value of the Contested Payments from Yucaipa if the Court finds that Yucaipa is "the entity for whose benefit such transfer was made" or is "the initial transferee of such transfer."[205]

It is undisputed that Yucaipa is the initial transferee of the Yucaipa ComVest Payment.  Yucaipa argues that the Trustee has failed to show that the record established undisputed evidence that the remaining Contested Payments were made for Yucaipa's benefit.  There is no genuine issue of material fact as to whether the Legal Payments were made for the benefit of Yucaipa.   Indeed, Yucaipa was the beneficiary as Yucaipa (i) received the direct benefit of the work performed, (ii) did not share its legal counsel with Allied—they retained their own legal advisors, and (iii) the invoices Allied paid were addressed to Yucaipa.  No evidence exists in contravention of these facts.

The uncontroverted facts show that Yucaipa benefited from Allied's payment to Ornstein as the payment was made at Mr. Burkle's request for services that were rendered to Yucaipa rather than Allied.

The uncontroverted facts show that the ComVest Payment was a necessary component of the ComVest Transaction and that ComVest did not care whether the payment came from Allied or Yucaipa.[206]  The uncontroverted facts also show that Allied was not a party to the transaction and did not received direct benefits from the

---

[205]  11 U.S.C. § 550(a)(1).

[206]  Scolnick Dec. Exh. 17 (ComVest 30(b)(6) Dep. 135:20–136:3) ("I just know that part of the deal with Yucaipa is that they . . . would reimburse us for our expenses . . . we didn't care if it came from Allied or Yucaipa.").

transaction.  To close the deal, Yucaipa had Allied pay $1,850,000, that it would have otherwise had to pay.  Yucaipa benefited from the payment because (i) it did not have to make the payment itself and (ii) the transaction closed as a result.

The Trustee seeks to disallow Yucaipa's bankruptcy claim under 11 U.S.C. § 502(d) until Yucaipa "has paid the amount . . . for which [it] . . . is liable." It is undisputed that Yucaipa has not returned the Contested Payments to Allied.

### iv.    Summary

In sum, the Trustee established her prima facie case that Allied transferred the Contested Payments (i) while Allied was insolvent or resulting in its insolvency; (ii) within two years (548) or four years (544(b)) prior to the petition date; (iii) with funds that constituted an interest of Allied in property.

The Trustee established her prima facie case that Allied did not receive the reasonably equivalent value of the Contested Payments as she: (i) established that Allied received no direct value in exchange for the Contested Payments; and (ii) established an absence of fact that the indirect benefit Allied received, if any, was compared to what Allied paid for it such that what Allied received and what Allied paid were roughly equivalent to each other.

The Trustee has met her burden and may recover the value of the fraudulent transfers under 11 U.S.C. §§ 548(a)(1)(B), 544, and 550.  For the reasons discussed above, the Court grants the Trustee's motion for summary judgment on Estate Claim 13 and

disallows Yucaipa's bankruptcy claims in the amount of the Contested Payments under 11 U.S.C. § 502(d).

## H.    Estate Claim 7 – Breach of Fiduciary Duty[207]

In part, the Trustee claims that Yucaipa breached its fiduciary duty by engaging in self-dealing, culminating in the lost JCT deal in late 2011/early 2012.  The Trustee asserts that damages as a result of this breach of fiduciary duty is the difference between the value of the lost JCT deal and the value realized from the later JCT 363 Sale.[208]

The Trustee further asserts that Yucaipa obstructed the potential transaction with JCT to benefit itself and that Yucaipa caused Allied to pay millions in attorney's fees and expenses that were patently unreasonable and not in connection with the workout.

It is undisputed that Yucaipa owed a fiduciary duty to Allied.[209]  As the Court is only considering Yucaipa's motion for summary judgment on this claim.  The Court will only considering the defenses Yucaipa has enumerated to the Trustee's claims.

---

[207] The Trustee is no longer pursuing this claim based on two allegations.  (i) The first relates to the MMSA that Yucaipa entered with Allied on May 29, 2009 (*see* Scolnick Dec. Exh. 32 (MMSA)).  The understanding at the time the Committee filed the Estate Complaint was that Yucaipa had the Company pay it $1.5 million annually pursuant to the MMSA notwithstanding its various acts of misconduct.  Yucaipa's 30(b)(6) witness testified it was never paid pursuant to the MMSA and, therefore, the Trustee is no longer pursing this allegation.  (ii) Additionally, the Trustee is also not pursing allegations in connection with the breach of fiduciary claim as it relates to Yucaipa's purchases of Second Lien Debt.  *See Litigation Trustee's Opposition to the Motion for Summary Judgment by Defendants Yucaipa American Alliance Fund I, L.P., and Yucaipa American Alliance (Parallel) Fund I, L.P.* (Adv D.I. 770) at p. 32-33, n. 34.

[208] *See* Singer Dec. Exh. 103 (Risius Report) at ¶¶68-71 ("Relying on the March 8, 2012 'final' term sheet with JCT, Yucaipa pled in a counterclaim against BD/S in these proceedings – as well as RICO actions filed in New York and Delaware – that JCT was offering a deal of $305 million for all of Allied's debt.  Yucaipa claimed that, but for the filing of the 2012 bankruptcy, a JCT sale would have been consummated at $170 million more than the ultimate figure of approximately $135 million." *Id.* at ¶ 71 (footnote excluded).).

[209] *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113 (Del. 1994) (*quoting Ivanhoe Partners v. Newmont Min. Corp.*, 535 A.2d 1334, 1344 (Del. 1987) (further citation omitted) ("'a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation.'").

### i. The Fiduciary Duty Claim is not Duplicative of the Breach of Contract Claim

Yucaipa argues that the Trustee's breach of fiduciary duty claim is duplicative of the Trustee's breach of contract claims.

Under Delaware law, a "breach of fiduciary duty claims is duplicative of breach of contract claims that either were substantially identical, such that the fiduciary duty claim would have been 'superfluous,' or involved remedies that were likely to be equivalent . . . ."[210] In *Gale v. Bershad*,[211] the plaintiff alleged that the defendants breached both contractual and fiduciary duties owed to stockholders. The *Gale* plaintiff sued the company and its directors for breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty for allegedly redeeming the preferred stock at an unreasonably low and unfair price in violation of the certificate of incorporation. The court determined that (i) the same facts that underlie the plaintiff's implied contract claim also form the basis of his fiduciary duty claim,[212] and that (ii) the duty sought to be enforced arose out of the parties' contractual, as opposed to their fiduciary, relationship.[213] The *Gale* court held: "[t]o allow a fiduciary duty claim to coexist in parallel with an implied contractual claim, would undermine the primacy of contract law over fiduciary law in matters involving the essentially contractual rights and

---

[210] *Schuss v. Penfield Partners, L.P.*, No. CIV.A. 3132-VCP, 2008 WL 2433842, at *10 (Del. Ch. June 13, 2008) (footnotes and citations omitted).

[211] *Gale v. Bershad*, No. CIV. A. 15714, 1998 WL 118022 (Del. Ch. Mar. 4, 1998).

[212] *Id.* at *5.

[213] *Id.*

obligations of preferred stockholders."[214]   Therefore, it held that "because the contract claim addresses the alleged wrongdoing by the board, any fiduciary duty claim arising out of the same conduct is superfluous."[215]

However, Delaware courts allow parallel fiduciary duty and contract claims where, as here, the fiduciary duty claims are "grounded on an additional and distinct fact."[216]   Although breach of fiduciary duty claims may share a "common nucleus of operative facts" with breach of contract claims, they must depend on "additional facts as well, are broader in scope, and involve different considerations in terms of a potential remedy."[217]

Here, the Estate Claim for breach of contract (Estate Claim 5) relates to Yucaipa's breach of the Capital Contribution Provision in section 2.7(e) of the Third Amendment. The fiduciary duty claim is centered on Yucaipa's breach of duty of loyalty by causing Allied to enter into the Fourth Amendment, which "serve no valid corporate purpose for Allied" but carried "significant benefits to Yucaipa."[218]   Furthermore, the damages for the Capital Contribution Claim ($57.4 million, as discussed *supra*) are distinct and separate from the fiduciary duty damages being sought (the difference between the

---

[214]   *Id.*

[215]   *Id.*

[216]   *Nemec*, 991 A.2d at 1129 (Del. 2010) (*citing Schuss v. Penfield Partners, L.P.*, 2008 WL 2433842, at *10).

[217]   *Schuss v. Penfield Partners, L.P.*, 2008 WL 2433842, at *10.

[218]   *See* Singer Dec. Exh. 104 (Macey Report) at ¶¶114, 116-17 (Yucaipa's decision to purchase ComVest debt and cause Allied to enter into the Fourth Amendment "represent[ed] an egregious attempt by Yucaipa to use its position of control over Allied's corporate governance to benefit itself at the expense of non-Yucaipa shareholders.").

unconsummated JCT deal versus the JCT 363 Sale price).  As a result, although the claims share a common nucleus of facts, the breach of fiduciary duty claim is broader in scope and involves a different remedy.  Thus, the Court finds that the breach of fiduciary duty claim is not duplicative of the breach of contract claim.[219]

### ii.    There is Enough Evidence to Go to Trial on the Issue of Whether Yucaipa Obstructed Board Consideration to Benefit Itself

Yucaipa asserts that "there is no evidence of any 'potential transactions' that could have benefitted Allied, but which the Board failed to consider at Yucaipa's urging."[220] Here, the Trustee alleges that Yucaipa exploited Allied for its own benefit by not presenting alternative offers to the Board and by seeking a greater recovery than the other Lenders.

Delaware law:

> requires that corporate fiduciaries observe high standards of fidelity and, when self-dealing is involved, places upon them the burden of demonstrating the intrinsic fairness of transactions they authorize, the law does not require more than fairness. Specifically, it does not, absent a showing of culpability, require that directors or controlling shareholders

---

[219] *See Schuss v. Penfield Partners, L.P.*, 2008 WL 2433842, at *10.  *See, e.g., Kulick v. Gamma Real Est. LLC*, No. 1:20-CV-03582-MKV, 2021 WL 918555, at *8 (S.D.N.Y. Mar. 10, 2021) (finding that the breach of contract claim was distinct from the breach of fiduciary duty claim because the breach of contract claim is "that Defendants underpaid him for his outstanding shares in the company. Meanwhile, [plaintiff's] fiduciary duty claim concerns different conduct (purported self-dealing transactions and interference with [plaintiff's] role as Administrative Member of SLP), different harm (breach of the duty of loyalty rather than only underpayment), and a different time period (the harms occurred largely before [plaintiff] departed SLP, whereas the contract breach occurred contemporaneous with and after his departure) . . . ").

[220] Yucaipa Summary Judgment Motion at p. 42.

> sacrifice their own financial interest in the enterprise for the
> sake of the corporation or its minority shareholders.[221]

Thus, it may not be a breach of a fiduciary duty for groups of shareholders to be apportioned different proceeds as long as it is fairly divided.[222]  As the Chancery Court observed in *Thorpe v. CERBCO*, "controlling shareholders, while not allowed to use their control over corporate property or processes to exploit the minority, are not required to act altruistically towards them."[223]  Here, the allegations, supported by, albeit contested material facts, are that Yucaipa used their control over Allied's processes to exploit Allied and the other Lender's holdings.  This is not Yucaipa acting in its own self-interest, the allegations rise to the level of exploitation of Allied.

For brevity – the Court will highlight some of that record:

    i.    Mike Riggs (CEO of Active and later JCT) remained highly motivated to acquire the Company.  Mr. Riggs testified that it was a "dream" of his to combine the entities, and that in the course of a five year "quest" he made several overtures and proposals.[224]

    ii.    Yucaipa's 30(b)(6) witness admitted that "Riggs was certainly interested in trying to put together a transaction at various points in time."[225]

---

[221] *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986); *Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386, 411 (Del. Ch. 1999) (controlling shareholder had not breached duty to the corporation merely by acting in self-interest and failing to search for capital for the corporation).

[222] *Jedwab*, 509 A.2d at 598-99.

[223] Del. Ch., C.A. No., Allen, C., 1993 WL 443406, *7, mem. op. at 14 (Oct. 29, 1993).  *See also Odyssey Partners, L.P. v. Fleming Companies, Inc.*, 735 A.2d at 411.

[224] Singer Dec. Exh. 93 (Riggs Dep.) at 97:17-98:15, 271:5-13.

[225] Scolnick Dec. Exh. 7 (Walker Dep.) at 668:19-669:11.

iii.   Mr. Riggs e-mailed Mr. Walker in September 2008, to gauge Yucaipa's interest in selling its equity stake in Allied.  There is no evidence that Yucaipa informed the non-Yucaipa Allied's Board members of Mr. Riggs' interest.[226]

iv.   In December 2009, Mr. Riggs began pitching various Allied Lenders and outside investors on a strategy to take ownership of Allied, becomes CEO, and install a new management team.[227]

v.   In February 2009, Mark Hughes of ComVest wrote to Mr. Walker to arrange a due diligence meeting with Allied's management.[228]  Mr. Hughes testified that ComVest was concerned it was not "getting access to information" about Allied that it was entitled to receive as a Lender.[229]

---

[226] Supp. Singer Dec. Exh. 121 (Email from M. Riggs to D. Walker, re: confidential – from Mike Riggs, dated Sept. 6, 2008) (stating "given the recent financial trends at Allied, and also given Zuckerman's recent 'grievance' regarding the 15% pay cut, I can envision a way to bring those investors into play if Y [Yucaipa] would consider divesting its stock in Allied Holdings. . . . To be clear, if Yucaipa would have any interest in selling off its stake in Allied Holdings, then I am confident I could get funding at an appropriate price to purchase your shares.  I would intend to implement a similar margin turnaround strategy at Allied, and I am fully aware of all of the risks.").

[227] Supp. Singer Dec. Exh. 123 (General Concept Presentation for Jason New IEP Innovative Equity Partners, LLC, dated Dec. 20, 2008).  There was no role for Yucaipa in this strategy (it had earlier rebuffed an approach from Riggs for its equity).  *See also* Scolnick Dec. at Exh. 17 (ComVest 30(b)(6) Dep.) 182:22-24 ("Based on [ComVest's] valuation … our expectation was that everything below the first lien would be flushed.").

[228] Supp. Singer Dec. Exh. 24 (Email from M. Hughes to D. Walker, dated Feb. 24, 2009).

[229] Scolnick Dec. Exh. 17 (ComVest 30(b)(6) Dep) 197:3-198:20.

> Q: And you testified earlier that ComVest wasn't being given access to information, is this right?
>
> . . .
>
> A: Yes.

*Id.* at 198:17-20.  Yucaipa points out that Mr. Hughes testified that he was not "concerned about Ron's involvement[.]" *Id.* at 198:6-15.  However, in full, Mr. Hughes testified:

vi.    In March 2009, ComVest met with Messrs. Burkle, Tocher and Walker at Burkle's home.  At the meeting, ComVest explained its "intent to work with [Riggs] … on a solution to recapitalize Allied."[230]  Mr. Hughes testified that ComVest was "prepared to move forward and work on a restructuring to get the business properly capitalized."[231]  At this time, Mr. Burkle proposed that Yucaipa and ComVest agreed to a waterfall for recoveries in the event of liquidation, and that ComVest get a warrant for 25% of the outstanding shares of Allied.[232]  However, ComVest did not agree.

vii.   In the spring of 2009, ComVest was locked out of talking with Allied and Mr. Burkle assured that ComVest would never run Allied.[233]

---

A.  My recollection is we were concerned that we weren't getting access to information, and that it got escalated to Ron [Burkle], but I don't think I was concerned about Ron's involvement, per se, I was just – I think we were more concerned about getting the information.

*Id.*  Yucaipa argues that the Trustee implies that Yucaipa breached its fiduciary duty by directing ComVest to proceed in a specific manner (i.e. contacting Mr. Burkle) to obtain information about the borrower. *See* Yucaipa Reply (Adv. D.I. 803) p. 27.  However, the Court believes that the Trustee is pointing to the lack of information and process and not ComVest speaking to Mr. Burkle.  Again, this is again why the Court is finding a dispute of material fact – Why was this escalating to Mr. Burkle? Why was Yucaipa directing information traffic? Why was ComVest not receiving the information?  Questions that may need to be answered before the Court can make a determination.

[230]  Scolnick Dec. Exh. 17 (ComVest 30(b)(6) Dep) 70:24-71:24.

[231]  Scolnick Dec. Exh. 17 (ComVest 30(b)(6) Dep.) 72:23-73:5. Mr. Hughes also testified that if Yucaipa had offered ComVest the right price for its debt at that meeting, ComVest would have sold to Yucaipa. (Scolnick Dec. Exh. 17 (ComVest 30(b)(6) Dep.) at 103:3-14). Mr. Hughes also testified that from the time Riggs approached ComVest about buying Allied's debt, ComVest "thought there was a chance that Yucaipa … could come in, because [they] thought it still had potential if they could weather the storm. So we thought there was an opportunity that—that [Yucaipa] would potentially buy out our position." (*Id.* at 31:7–32:4.) Mr. Hughes confirmed that ComVest favored selling its debt to Yucaipa over a bankruptcy, the only "restructuring strategy" ComVest ever considered. (*Id.* at 99:8–100:25.).

[232]  Singer Dec. Exh. 35 (Minutes of Meeting of the Board of Directors of Allied Systems Holdings, Inc. Mar. 6, 2009).

[233]  Supp. Singer Dec. at Exh. 146 (Priddy Dep) 87:15-24 and 97:14-98:7.

viii.    In the summer of 2009, Mr. Riggs again reached out to Yucaipa about

buying its stake in Allied.[234]  Mr. Riggs met with Messrs. Burkle and Walker

in late June 2009 regarding a JCT transaction to buy-out Yucaipa's stake in

Allied.[235]   Instead, Mr. Burkle tried to convince Mr. Riggs to sell JCT to

Yucaipa.[236]  However, there is no evidence that Yucaipa informed Allied's

Board of Mr. Rigg's ongoing interest in owning Allied at this time.[237]

ix.    In July 2010, Mr. Riggs sent a Letter of Intent ("LOI") to Messrs. Gendregske

and Walker, again seeking to acquire Allied.[238]  The offer included (a) $100

million in cash, (b) $50 million in JCT preferred equity with a redemption

---

[234] Supp. Singer Dec. Exh. 125 (Email from M. Riggs to D. Walker, dated June 27, 2009, re: Equity Offer for Jack Cooper-Active Transportation – confidential) ("My relationships with various financing partners could help affect a buyout of Yucaipa's position in Allied Holdings if you are ever interested in pursuing that alternative."). Yucaipa claims that all of JCT's terms sheets were subject to numerous contingencies and as such the Trustee has not proved that a deal with JCT could be reached. Yucaipa Reply, Adv. D.I. 802 at 30. However, the Trustee did not move for summary judgment and has not had the time to establish its affirmative case on the breach of fiduciary duty claim. Here, the Court is determining whether there are any disputes of material facts as to preclude Yucaipa's motion for summary judgment, and the Court finds that there are.

[235] Scolnick Dec. Exh. 19 (Riggs Dep.) 171:9-172:18.

[236] Scolnick Dec. Exh. 19 (Riggs Dep.) 171:9-172:18.

[237] Yucaipa asserts that there is "no evidence or reasonable inference" that Yucaipa prevented restructuring discussions between ComVest and Allied. *See* Yucaipa Reply (Adv. D.I. 803 at p. 27). This is where a trial would be helpful in flushing out some of these issues of material fact – and again, the Court is not considering the Trustee's affirmative case in this Opinion, rather, assuming *arguendo* that the Trustee makes its affirmative case would any of Yucaipa's defenses prevent a ruling in the Trustee's favor?  Be that as it may, Yucaipa does not dispute that it owed fiduciary duties to Allied – so while Yucaipa did not prevent, it is clear from the present record before the Court that Yucaipa did nothing to facilitate discussions between ComVest and Allied nor is there evidence before the Court that Yucaipa even brought the ComVest discussions to Allied's attention.  So, while Yucaipa is correct that there is no evidence that Yucaipa prevented discussions, that argument also cuts the other way to show that Yucaipa's inaction also caused harm to Allied.  As a result, the Court finds that there are disputes of material fact regarding these issues.

[238] Supp. Singer Dec. Exh. 135 (Email from M. Riggs to D. Walker and M. Gendregske, dated July 20, 2010, re: CONFIDENTIAL – Letter of Intent from Jack Cooper for the Acquisition of Allied Systems Holdings, Inc. 7-21-10, attaching Allied LOI from Jack Cooper 7.20.10).

right (accruing a return of 7% annually and exercisable on the 5th anniversary of closing), and (c) the assumption of designated liabilities of the Company.[239]    The Allied Board discussed the JCT letter of intent, however, Mr. Walker stated  that Yucaipa would  "never accept such an offer and rather believes that the Company [Allied] is worth very significantly more than liquidation."[240]    The Board, upon Mr. Walker's motion, approved to allow the Letter of Intent to lapse would any response from Allied.[241]

x.    In late 2011 to 2012, Yucaipa demanded a 15% premium ($20 million) premium for its debt.  As set forth in the Expert Report of Jeffrey Risius, JCT's term sheets during this period reflected its willingness to pay approximately $244.2 million to acquire substantially all of Allied's

---

[239] *Id.*

[240] Scolnick Dec. Exh. 119 (Minutes of Meeting of the Board of Directors of Allied Systems Holdings, Inc. July 29, 2010).

[241] *Id.* Yucaipa notes that "(1) a copy of the LOI was provided to all Board members; (2) Allied's CFO (who was indisputably independent from Yucaipa) conducted a financial analysis of the LOI and concluded that it was 43% short of a conservative liquidation value for Allied; (3) the entire Board received that financial analysis, and the CFO walked the Board through it; and (4) Allied's CEO weighed in on the value of the offer and found it unfavorable. (*See id.*)  Only after this discussion and evaluation did Mr. Walker comment on the offer."  Yucaipa Reply, Adv. D.I. 803, at p. 27.  Again, the Court finds there to be a dispute of material fact because the minutes continue:

> Mr. Walker stated that he found the offer flawed on several levels: first, a release of all claims as a condition to negotiations is clearly unacceptable. Second, *as the Company's largest lender, Mr. Walker stated that Yucaipa would* ***never*** *accept such as offer* and rather believes that the Company is worth very significantly more on [sic] liquidation.

*Id.* (emphasis added).  It was only **after** Mr. Walker's statement that a "thorough discussion of the Letter of Intent was undertaken after which Mr. Walker made a motion to allow the Letter of Intent to lapse without any response from the Company."  *Id.* (emphasis added).

assets.[242]   This shrank to $135 million by the time of the JCT 363 sale in

December 2013.[243]

As stated, the Court is not ruling on the breach of fiduciary duty claim at this time

– the Court is only ruling on Yucaipa's motion for summary judgment, which is premised

on the grounds that such allegations fail for lack of proof.   As related to alternative

transactions, the Trustee has presented ample evidence that in 2008-2009 there was a

potential alternative transaction that Yucaipa did not present to Allied's Board for

consideration and such failure went beyond Yucaipa's self-interest and had significant

negative impact on Allied and its stakeholders.

### iii.    JCT Negotiations

Yucaipa asserts that the JCT 2011-2012 proposals were not specifically referenced

in the Estate Complaint.[244]   This is a summary judgment motion (and not a motion to

dismiss) and this argument is a sufficiency of pleadings argument.   Needless to say,

Federal Rule of Civil Procedure Rule 8, made applicable to these proceeds by Federal

Rule of Bankruptcy Procedure 7008, requires only "a short and plain statement of the

claim showing that the pleader is entitled to relief."[245]   It would be unrealistic for the

Estate (and now the Trustee) to make specific allegations in the Estate Complaint before

---

[242] Singer Dec. Exh. 103 (Risius Report) at ¶ 68.  Yucaipa asserts that "although the Trustee proclaims 'JCT was willing to pay approximately $244.2 million to own Allied in spring 2012, she ignores that it would have gone to Allied's debtholders, including BD/S, not Allied."  Yucaipa Reply, Adv. D.I. 803 at p. 29. Yucaipa does not address that ultimately Allied only received $135 million of its assets – a decline in value to Allied and its Lenders of approximately $109 million – a significant sum.

[243] Del. Bankr. Case No. 12-11564, D.I. 1837.

[244] *See* Yucaipa's Summary Judgment Motion at pp. 43-44.

[245] Fed.R.Civ.P. 8(a)(2).

discovery had begun.[246]  "Plaintiffs are held only to the notice pleading standard and are

not required to plead every factual allegation supporting their claims."[247] Furthermore,

here, the factual allegations do not state a new claim or legal theory,[248] instead, these facts

"directly relate to and support the initial claims made by"[249] the Estate (and now the

Trustee).  As a result, these allegations are admissible, and Yucaipa's argument is without

merit.

### iv.    Could Any Transaction with JCT Benefit Allied?

Yucaipa further contends that there was "no transaction" with JCT that could

benefit Allied.  Again, only Yucaipa moved for summary judgment on the basis that "no

facts" exist – as set forth herein, there are material facts asserted by the Trustee (and

supporting evidence) to allow the Court to determine that there are material facts in

dispute for this issue to go forward at trial.  In addition to the evidence outlined in bullet

points above, the Trustee sets forth the following:

---

[246]  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) ("Before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case in a particular case. Given that the prima facie case operates as a flexible evidentiary standard . . . ").; *see also Romdhani v. Exxon Mobil Corp.*, Civ. Action No. 07-715-LPS, 2010 WL 4682414, at *5 (D. Del. Nov. 10, 2010) (plaintiff is "not required to plead every factual allegation supporting their claims.").

[247]  *Romdhani v. Exxon Mobil Corp.*, 2010 WL 4682414, at *5.

[248]  In its brief Yucaipa cites to the following cases, which are distinguishable as the "new facts" raise new and distinct claims: *McMahon v. Salmond*, 573 F. App'x 128, 135 (3d Cir. 2014) (unpublished) (new facts plaintiff raised on summary judgment formed a separate and distinct claim unpled in his complaint); *Wilson v. City of Wilmington*, Civ. No. 13-1390-LPS, 2015 WL 4571554, at *7 (D. Del. July 29, 2015) (plaintiff "first raised the issue of a hostile work environment in his opposition to Defendants' motion for summary judgment."). *See also Krouse v. American Sterilizer Co.*, 984 F. Supp. 891, 914 (W.D.Pa.1996) (citing numerous reasons for striking affidavit, including that it "inappropriately raises new allegations"), *aff'd*, 126 F.3d 494 (3d Cir. 1997).

[249]  *Romdhani v. Exxon Mobil Corp.*, 2010 WL 4682414, at *5.

i.    Riggs testified that he did not care what form the transaction took.[250]

ii.   The Trustee's 30(b)(6) witness, Stephen Deckoff (Black Diamond principal), testified that, after meeting with Riggs on multiple occasions, his understanding was that:

> Yucaipa … through [its] position as requisite lender tried to structure a transaction where instead of the company being sold to Jack Cooper in a normal M&A transaction, Jack Cooper would buy from Yucaipa their controlling interest in the debt and the requisite lender status that went along with that controlling position in the debt … they tried to negotiate a transaction where they would get better treatment than the other lenders.[251]

iii.  JCT's corporate representative testified that in 2011 and 2012:

> The goal was not to acquire any debt, the goal was to acquire Allied.  In order to acquire Allied, one, you needed a requisite lender; and two, you wanted as much debt as possible so you could end up with as much of the equity as possible or the assets . . . [252]

The Trustee has shown that there is dispute of material fact for this allegation to go forward at trial.

---

[250] Scolnick Dec. Exh. 19 (Riggs Dep.) 233:17-236:15) ("whether … a purchase of the debt or a[n] M&A deal," the "end game" was "own[ing] the company and combin[ing] the entities, same as it has always been.").  *See also* Supp. Singer Dec. Exh. 144 (Email from M. Riggs to BD/S on December 18, 2011 stating that Yucaipa is "simply not interested in exploring a typical M&A type transaction…").

[251] Scolnick Dec. Exh. 9 (Trustee 30(b)(6) Dep.) 44:14-45:22.

[252] Scolnick Dec. Exh. 20 (JCT 30(b)(6) Dep.) 37:10-21.  *See also* Singer Dec. Exh. 93 (Riggs Dep.) 234:8-236:9 ("I was not in the debt investing business, I was in the business of running companies, so this whole thing was to try to get a package together.").

### v.    Corporate Opportunity

Yucaipa continues that the Trustee's (purported) damages resulting from the JCT negotiations are rooted in the assumption that Yucaipa wrongfully usurped Allied's "corporate opportunity."[253]    However, the Trustee alleges that Yucaipa usurped the *negotiations* with JCT and torpedoed a transaction that could have brought value to Allied and its stakeholders.  In other words, Yucaipa asserts that the Trustee cannot make a case for breach of the "doctrine of corporate opportunity" – and the Trustee agrees.  As the parties agree that the "doctrine of corporate opportunity" is not an issue in this litigation, the Court will not discuss it further.

### vi.    Unnecessary and Unreasonable Fees.

As the fees are recovered by the Trustee as fraudulent transfers in Estates Claims 10 and 11, the Court rules here in the alternative.  In any event, the Court is only ruling on Yucaipa's defenses and not on the Trustee's *prima facie* case.

Yucaipa asserts that it could not have breached its fiduciary duties by causing Allied to pay unnecessary and unreasonable fees because Allied was contractually obligated to pay these fees. Yucaipa continues that if Allied was in default, Allied was

---

[253] *Dweck v. Nasser*, No. CIV.A. 1353-VCL, 2012 WL 161590, at *12 (Del. Ch. Jan. 18, 2012) ("The doctrine of corporate opportunity represents ... one species of the broad fiduciary duties assumed by a corporate director or officer.  The doctrine holds that a corporate officer or director may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation." (citations and internal citations omitted)). *See* Scolnick Dec. Exh. 13 (Risius Dep.) 158:8-160:11 (Q. Do you have any separate opinion about whether or not a deal with JCT was, in fact, a corporate opportunity that belonged to Allied? A. I think it requires a legal conclusion. Q. So I'm just asking you if you have an opinion, yes or no. A. I'm not here to give legal opinions.  "corporate opportunity" is a legal term."); Singer Dec. Exh. 106 (Responsive Expert Report of Jonathan R. Macey) at ¶ 50 ("There is no dispute that Allied was in the car hauling business.  It was not in the business of acquiring control of other firms, or of itself.").

contractually obligated to reimburse its Lenders' costs and expenses, including legal fees

incurred in connection with any refinancing or restructuring of the credit agreements.

Yucaipa also asserts that Allied was contractually obligated to pay Yucaipa's fees in

connection with the CIT Litigation.  The Court will take these two groups of fees in turn

to determine if there is a dispute as to material fact.

### a.  Fees for Yucaipa-ComVest Transaction

Section 10.2 of the FLCA states:

> Each Borrower agrees to pay promptly . . . (h) after the
> occurrence of a Default of an Event of Default, all *reasonable*
> costs and expenses, including reasonable attorneys' fees
> (including reasonable allocated costs of internal counsel) and
> reasonable costs of settlement, incurred by any Agent and
> Lenders in enforcing any Obligations of or in collecting any
> payments due from aby Credit Party hereunder or under the
> other Credit Documents by reason of such Default or Event of
> Default (including in connection with the sale, lease or license
> of, collection from, or other realization upon any of the
> Collateral or the enforcement of the Guaranty) or in
> connection with any refinancing or restructuring of the credit
> agreements hereunder in the nature of a "work-out"
> or pursuant to any insolvency or bankruptcy cases of
> proceedings.[254]

Thus, fees must be (i) reasonable, (ii) after default, and (iii) in connection with any

refinancing or restructuring of the credit arrangements provided under the FLCA in the

nature of a work-out.  The Fourth Amendment and Yucaipa's purchase of ComVest's

debt were not in the nature of a "work out."  As stated by the Trustee, a "workout" is an

"adjustment in the reasonable expectations of" stakeholders that results in "a business

---

[254] FLCA § 10.2(h) (emphasis added).

entity that has realigned its financial structure."[255]    Although Yucaipa attempted to characterize the Fourth Amendment as a "workout,"[256] as argued by the Trustee, the Fourth Amendment did not "realign" Allied's financial structure (it only realigned the lenders' claims and rights).

Furthermore, the Trustee alleges that the Allied default on which Yucaipa premises its right to fees occurred *only* because Yucaipa (through Mr. Walker) requested it.  Allied defaulted on its scheduled $4.8 million principal and interest payment, weeks before Yucaipa executed the Yucaipa-ComVest transaction, because Mr. Walker advised the Board to do so.  More specifically, the minutes of the Board of Directors meeting on August 3, 2009 reflect:

> Mr. Blount called the meeting to order, and announced that the purpose of the meeting was to discuss the Company's liquidity, especially with respect to the approximately $4.8 million interest payment due to the first lien lenders the next

---

[255] Matthew W. Kavanaugh, Randye B. Soref, *What is a workout?*, Business Workouts Manual § 1:1 (2020):

> The term "workout" describes a process rather than an event or a technique. The successful result of this process is a business entity that has realigned its financial structure. Essential to that realignment is an adjustment in the reasonable expectations of creditors, shareholders, labor, management, suppliers, and other parties that have an economic interest in the continued viability of the financially troubled business.

> A workout is needed when the condition of the debtor's business has changed radically. The original expectations of parties in interest at the time of their first involvement with the business no longer are attainable. The workout requires reevaluation by everyone. It is traumatic and, of necessity, involves conflict.

*See also In re Art Van Furniture, LLC*, 617 B.R. 509, 516 (Bankr. D. Del. 2020) ("the term 'loan workout,' it is ordinarily defined as 'a mutual agreement between a lender and borrower to renegotiate the terms on a loan that is in default.'" (citations omitted)); Black's Law Dictionary defines a "workout" as "[t]he act of restructuring or refinancing overdue loans." Black's Law Dictionary (11th ed. 2019).

[256] Yucaipa Reply (Adv. D.I. 803) at p. 33 (The Fourth Amendment "memorialized a renegotiation between Allied and ComVest of the terms of the FLCA, at a time when Allied was in default.").

day.  Mr. Blount advised the Board that Mr. Walker had suggested that the Company might be well-advised *not* to make the payment. . . .

Mr. Walker then updated the Board on the status of negotiations with ComVest, stating that ComVest and Yucaipa were back in discussions and that Yucaipa was feeling optimistic that a consensual deal that would be beneficial to the Company could be accomplished in the near future.  Mr. Walker warned, however, that it was critical that the Company have adequate liquidity to provide a sufficient runway for negotiations. . . . [257]

After advising the Board to "default" on the payment, Yucaipa then caused Allied to pay $2.7 million in fees to Yucaipa and ComVest as a closing condition to their deal.[258]

Yucaipa responds that Allied had been in default for over a year before the August 2009 default.[259]  However, at least some of the earlier defaults had been negotiated though a forbearance agreement.  What is notable to the Court is that weeks prior to the transaction, a Yucaipa principal is recommending that Allied default.  At the very least, this creates a dispute of material fact as to whether these fees were "reasonable" or even warranted under section 10.2 of the FLCA.  Thus, the Court will deny Yucaipa's Summary Judgment motion on the basis of the fees for Yucaipa-ComVest Transaction.

---

[257]  Singer Dec. Exh. 40 (Minutes of Meeting of the Board of Directors of Allied Systems Holdings, Inc., Aug. 3, 2009), at p. 1.

[258]  Singer Dec. Exh. 103 (Risius Report) at ¶ 57 ("Yucaipa and ComVest also agreed that, as a closing condition to the transaction, Allied would reimburse ComVest in the amount of $1,850,000 for its legal fees and expenses in connection with the sale of its debt to Yucaipa, and that Allied would reimburse Yucaipa for its fees and expenses in the amount of $831,325.83.  Allied was not a party to the Loan Purchase Agreement." (footnotes omitted)) and Exh. E1.

[259]  However, the parties had entered into a forbearance agreement regarding (some of the) prior existing defaults. *See* Scolnick Dec. at Exh. 49 (Forbearance Agreement dated Sept. 24, 2008).

### b. Fees for CIT Litigation

Yucaipa asserts that Allied was contractually obligated to pay the fees incurred in connection with the CIT Litigation.  Under the MMSA, Allied agreed to indemnify Yucaipa for any losses, fees, and expenses arising out of any "action or failure to act" by Allied or by Yucaipa "at the Company's request or with the Company's consent," including fees incurred in "investigating, preparing or pursuing" any action or proceeding in connection with litigation.[260]  Yucaipa asserts that the Georgia bankruptcy court expressly approved the MMSA when Allied exited its prior bankruptcy.  Thus, Yucaipa argues that any payment Allied made on behalf of Yucaipa for the CIT Litigation was consistent with its court-approved contractual obligations.

In response, the Trustee asserts that provisions of the MMSA requiring Allied to pay Yucaipa's legal fees are inapplicable "if it is finally judicially determined by a court of competent jurisdiction" that the fees incurred "arose solely out of [Yucaipa's] gross negligence or bad faith."[261]

The New York Supreme Court held:

> Thus, on August 21, 2009, Yucaipa, as controlling shareholder of Allied, caused Allied to enter into that certain Amendment No. 4 to Credit Agreement with ComVest (the "Purported Fourth Amendment"), which purported to eliminate any restrictions on Yucaipa's ownership of Allied debt (including those that existed in the Credit Agreement as initially drafted

---

[260] Scolnick Dec. Exh. 32 (MMSA) at § 6 (a) and (b).

[261] Scolnick Dec. Exh. 32 (MMSA) at § 6 (a) (". . . provided, that this clause (ii) shall not apply if it is finally judicially determined by a court of competent jurisdiction that such Losses arose solely out of the gross negligence or bad faith of such Indemnified Party.") and (b) (" . . . provided, however, that in the event it is finally judicially determined by a court of competent jurisdiction that the Losses of such Indemnified Party arose solely out of the gross negligence or bad faith of such Indemnified Party, such Indemnified Party will promptly remit tot the Company any amounts reimbursed or advanced under this paragraph.").

> and executed), including the provision disregarding Yucaipa-held debt in calculating "Term Loan Exposure," which would otherwise have prevented Yucaipa from becoming the Requisite Lender. After the Purported Fourth Amendment was signed, Yucaipa consummated its transaction with ComVest and acquired a majority of the Obligations - thereby **seizing control** of the Lenders' rights and remedies under the Credit Facility.
>
> This was, of course, **flatly prohibited** under the Credit Agreement absent the consent of all of the Lenders, and thus the Purported Fourth Amendment is invalid and of no force or effect.[262]

Yucaipa also litigated with it was an "Eligible Assignee" under the FLCA, where the

Third Circuit held:

> It would be **inequitable** to allow Yucaipa "to achieve an 'end run' around the substance of the Eligible Assignee restrictions in the Credit Agreement and **undercut** what Yucaipa certainly knew the restrictions were designed to prevent.
>
> It is clear Yucaipa knew that it was prohibited from acquiring LC Commitments and that the Third Amendment restricted Yucaipa's rights as a Lender. Yucaipa's argument that the express language in the Third Amendment does not exclude LC Commitments is an attempted "end run" around the intent to limit Yucaipa's holdings and prevent Yucaipa from becoming the Requisite Lender.[263]

Yucaipa asserts that the New York court granted declaratory relief, it *at most* found that

Yucaipa had breached the FLCA, it made no "good faith" or negligence determination.

However, "'[a] failure to act in good faith may be shown, for instance, where the

fiduciary intentionally acts with a purpose **other than that of advancing the best**

**interests of the corporation**, where the fiduciary acts with the intent to violate applicable

---

[262] *BDCM Opportunity Fund II, LP v. Yucaipa American Alliance Fund I, LP*, 2013 WL 1290394, at *5 (emphasis added).

[263] *ASHInc Corp. v. AMMC VII, Ltd.*, 683 F. App'x at 140 (emphasis added; citations and internal quotation marks omitted).

positive law, or where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.'"[264]  The New York Supreme Court and the Third Circuit have already made these determinations regarding Yucaipa making an "inequitable end run"[265] around the substance of the restrictions in the FLCA. As a result, the MMSA's fee provisions relied upon Yucaipa in its motion, would be inapplicable.

Thus, the Court will deny Yucaipa's Motion for Summary Judgment with regard to the payment of the fees related to the CIT Litigation.

---

[264] *Brehm v. Eisner (In re Walt Disney Co. Derivative Litig.)*, 906 A.2d 27, 67 (Del. 2006) (emphasis added, *quoting In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 755 (Del. Ch. 2005) (footnotes and further citations omitted), *aff'd*, 906 A.2d 27 (Del. 2006)).  *See also* Singer Dec. Exh. 104 (Macey Report) at ¶¶50-54. The duty to act in good faith is described as:

> The duty to act in good faith, meanwhile, is a subsidiary element of the duty of loyalty. The behavior that must be shown to prove a violation of the duty to act in good faith requires conduct that is qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence). The Delaware Supreme Court has identified three examples of conduct that may establish a failure to act in good faith. First, it has held that such a failure may be shown where a director intentionally acts with a purpose other than that of advancing the best interests of the corporation. Second, it has held that a failure may be proven where a director acts with the intent to violate applicable positive law. Third, it has held that a failure may be shown where the director intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties. The court noted, however, that this list of examples is not necessarily exclusive. More specifically, it said there may be other examples of bad faith yet to be proven or alleged, but these three are the most salient.

*Official Comm. of Unsecured Creditors v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 540 (Bankr. D. Del. 2009) (internal quotation marks omitted; *citing Stone v. Ritter*, 911 A.3d 362, 370 (Del. 2006) and *In re Walt Disney Co. Derivative Litig.*, 907 A.2d at 755.

[265] *ASHInc Corp. v. AMMC VII, Ltd.*, 683 F. App'x at 140.

## I.    Lender Claim 4: Tortious Interference Against the Yucaipa Directors and Ron Burkle

The Trustee asserts that a claim of tortious interference against Yucaipa and Rob Burkle alleging that they intentionally interfered with the First Lien Lenders' rights under the FLCA.  However, the Trustee has abandoned this claim.[266]  As a result, the Court will deny the Trustee Summary Judgment Motion on Lender Claim 4 (Tortious Interference).

## J.    Estate Claims 1-2 and Lender Claim 1: Equitable Subordination

The Trustee seeks summary judgment on Estate Claims 1-2 and Lender Claim 1 to subordinate Yucaipa's claim arising from its First and Second Lien Facilities, in its entirety, to all other debt claims under 11 U.S.C. section 510(c) as Yucaipa acted in a way that harmed Allied, Allied's creditors, or advantaged Yucaipa by: (i) acquiring first lien debt in and Requisite Lender status (and causing Allied to foot the transaction costs) in willful breach of the Third Amendment; and (ii) using the illegitimate Requisite Lender Status to (a) litigate the validity of an invalid Fourth Amendment, (b) allow Allied to default on its obligations under the FLCA, (c) act unreasonably during the JCT Negotiations, and (d) cause Allied to make fraudulent transfer.[267]

---

[266] *See Litigation Trustee's Reply Memorandum in Further Support of Motion for Partial Summary Judgment*, Adv. D.I. 794 at p. 1 n. 1 ("The Trustee's claims against Defendants Ron Burkle and the Yucaipa Directors have been voluntarily dismissed (13-50530, D.I. 793; 14-50971, D.I. 533 and 534). The Trustee's motion seeking summary judgment on Lender Claim 4 (Tortious Interference) is, therefore, no longer in the case.").

[267] The Trustee and Lenders have standing to bring the claims.  *See Picard v. J. Ezra Merkin (In re Bernard L. Madoff Inv. Sec. LLC)*, 515 B.R. 117, 159 (Bankr. S.D.N.Y. 2014) ("[W]here the inequitable conduct injures the estate as a whole, the trustee is the person with the standing to assert it."); *id.* (A creditor may bring an equitable subordination claim only if he can allege a particularized injury resulting from the defendant's inequitable conduct . . . [or] that [Yucaipa's] inequitable conduct . . . allowed [Yucaipa] to achieve an unfair advantage.").  *See also supra* p. 7 (allowed under the Litigation Trust Agreement).

Yucaipa argues that claims for inequitable subordination are inherently fact driven—unsuitable for disposition on summary judgment.[268]  Yucaipa also asserts that the factual narrative demonstrates the good faith or inherent fairness of its actions. Yucaipa argues that because BD/S acquired its debt in 2011-2012, after most of the allegedly inequitable actions were conducted, BD/S is not entitled to equitable subordination.[269]

Section 510(c) permits the subordination of claims under principles of equitable subordination for:

> purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or order that

---

[268] Yucaipa's citation to this proposition is misleading at best.  Yucaipa's brief states (with all but the relevant internal citations and quotations omitted):

> Equitable subordination is an extraordinary remedy which is applied sparingly.  Because the claim requires a fact-intensive inquiry, it "is rarely amenable to resolution at summary judgment," particularly on behalf of a plaintiff. *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. at 126; *In re J. Silver Clothing, Inc.*, 453 B.R. 518, 533 (Bankr. D. Del. 2011) . . . .

*Miller v. U.S. (In re Miller)*, 284 B.R. 121, 126 (N.D. Ca. 2002) reveals no such quote.  *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53 (Bankr. D. Del. 2002) also contains no such quote.  *Burtch v. Connecticut Comm. Bank (In re J. Silver Clothing, Inc.),* 453 B.R. 518, 533 also does not contain this quote.

Instead, the quote is found in *YA Global Invest., L.P. v. Global Outreach, S.A. (In re Glob. Outreach, S.A.)*, Civ. Act N. 11-620, 2011 WL 2294168, at *8 (D.N.J. June 6, 2011) and does not stand for the proposition cited. Instead, *Glob. Outreach* states: "[T]his language . . . does not conclusively establish an *actual intent* to hinder, delay, or defraud the Debtor's creditors when divorced from the context and circumstances surrounding the transaction. The issue of intent **with respect to a fraudulent transfer** is rarely amenable to resolution at summary judgment." (emphasis added).  The issue of intent as to a fraudulent transfer is not at issue here.

[269] Yucaipa's argument is irrelevant as to the Estate Claims 1 and 2 because any injury to the Estate occurred independent of when certain lenders held claims.  This argument fails as to Lender Claim 1 because equitable subordination claims have only been barred where they are purchased **after the intervention of bankruptcy**.  Indeed, § 510(c) subordinates claims to other claims—not claims to specific claimants.  *See, also, Consol. Pet Foods v. Millard Refrigeration Services, Inc. (In re S & D Foods, Inc.)*, 110 B.R. 34, 37 (Bankr. D. Colo. 1990) (no subordination for claims purchased "after the alleged misconduct of other creditors *and after the intervention of bankruptcy* and at distressed prices"); *In re W. T. Grant Co.*, 4 B.R. 53, 78 (Bankr. S.D.N.Y. 1980) (debt acquired "after the alleged misconduct of the [defendants], *the intervention of bankruptcy* and at distressed prices"), *appeal aff'd*, 699 F.2d 599 (2d Cir. 1983).

any lien securing such a subordinated claim be transferred to the estate.[270]

The Supreme Court has interpreted § 510(c)'s reference to "principles of equitable subordination" as a clear indication of "congressional intent at least to start with existing doctrine."[271] The pre-1978 doctrine mentioned largely refers to the general application of equitable subordination where (i) the claimant engaged in inequitable conduct, (ii) the inequitable conduct resulted in: (a) injury to the debtor or creditors or (b) created an unfair advantage for the claimant, and (iii) granting equitable subordination must be consistent with the provisions of the Bankruptcy Code.[272] The consistency requirement reminds bankruptcy courts that they are "not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives that the result is inequitable."[273] In keeping with pre-1978 doctrine, many Courts of Appeals have continued to require inequitable conduct before allowing the equitable subordination of most claims . . . ."[274]

While the *Noland* court did not resolve the issue of "whether a bankruptcy court must always find creditor misconduct before a claim may be equitably subordinated,"[275]

---

[270] 11 U.S.C. § 510(c).

[271] *United States v. Noland*, 517 U.S. 535, 539 (1996) (citations and quotations omitted).

[272] *Id. See also Schubert v. Lucent Tech. Inc. (In re Winstar Commc'ns, Inc.)*, 554 F.3d 382, 411 (3d Cir. 2009) (*quoting Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977)); *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. at 71 ("Under the second prong of the traditional equitable subordination analysis, the Court must determine whether the claimant's inequitable conduct either (i) created some unfair advantage for the claimant or (ii) harmed the debtor or its creditors.").

[273] *Noland*, 517 U.S. at 539.

[274] *Id.*

[275] *Id.* at 543.

it clarified that courts have "leeway to develop the doctrine" of equitable subordination "rather than to freeze the pre-1978 law in place."[276]   Indeed, "despite its earlier endorsement of *Mobile Steel* as the benchmark of equitable subordination, the Court expressly declined to rule that equitable subordination was unavailable merely because the IRS was not guilty of misconduct."[277]   As such, under § 510(c), courts are permitted "to make exceptions to a general rule when justified by particular facts."  "Such case-by-case adjudication is at the core of judicial competence."[278]

Although courts have the power to tweak pre-1978 law, they do not have the power to subordinate categorically claims based on the type of claim.[279]   Some types of claims may, generally, be more suspect to subordination than others, but "a court sitting in equity must nonetheless consider whether subordinating a *particular* claim would be fair based on the totality of the circumstances in the individual case.[280]

In the Third Circuit, claims of insiders are generally more suspect to subordination than claims of non-insiders.  This is expressed in differing standards of inequitable conduct for the two types of claims.[281]

---

[276] *Id.* at 540.

[277] *See, e.g., Merrimac Paper Co. v. Harrison (In re Merrimac Paper Co.)*, 420 F.3d 53, 61 (1st Cir. 2005).

[278] *Id.* at 61 (emphasis in original).

[279] *See generally, id.*

[280] *Id.* at 63.

[281] *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. at 73.

For non-insiders, inequitable conduct must be "egregious conduct" such as "fraud, overreaching, or spoliation."[282]  Conversely, for insiders, inequitable conduct requires only "material evidence of unfair conduct" or, "any unfair act by the creditor as long as the conduct affects the bankruptcy results of the other creditors."[283]  If sufficiently challenged, the claimant then bears the burden of proving the good faith of the conduct and "its inherent fairness from the viewpoint of the corporation and those interested therein."[284]

There is no standardized test for what constitutes "unfair conduct."  And courts look to the particularized facts before them to determine whether the conduct and injury demand equitable subordination.[285]  In cases of fiduciary or insider claimants, courts have found, based on the facts of the case before them, unfair conduct where the insider or fiduciary: (i) dominated and exploited the debtor; (ii) violated the "rules of fair play and good conscience;" (iii) engaged in illegal or fraudulent conduct; (iv) breached fiduciary duties owed to the debtor, stockholders, or creditors; (v) used "the debtor as a mere

---

[282]  *In re Winstar Commc'ns, Inc.*, 554 F.3d at 412 (citations and internal quotation marks omitted).

[283]  *Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 323 F.3d 228, 234 (3d Cir. 2003); *In re Winstar Commc'ns, Inc.*, 554 F.3d at 412.

[284]  *Pepper v. Litton*, 308 U.S. 295, 306 (1939); *See, e.g. In re Winstar Commc'ns, Inc.*, 554 F.3d at 412.

[285]  *See, e.g.*, *Noland*, 517 U.S. at 540 (stating that the "principles of equitable subordination permits a court to make exceptions to a general rule when justified by particular facts . . . ."). (citations and quotations omitted).

instrumentality or alter ego;"[286] (vi) breached a contract;[287] or (vii) if a controlling stockholder, undercapitalized the debtor or capitalized the debtor with debt.[288]

Where a parent entity dominates a subordinate and occupies the position of fiduciary, mere domination is insufficient to show inequitable conduct—instead, the parent's conduct must advantage the parent entity at the disadvantage of the subsidiary.[289]

In *Comstock v. Group of Int'l Investors*, a parent entity dominated its subsidiary because it owned 58-83% of the subsidiary's equity during the relevant time period. Importantly, while the parent entity made loans to the subsidiary, the parent's conduct benefited the subsidiary's creditors. As such, the court did not subordinate the claim.[290]

Conversely, in *Gannet Co. v. Larry*, the court found a parent entity's actions inequitable where it caused the subsidiary to engage in a business experiment that benefited the parent entity regardless of the experiment's financial profitability but only benefited the subsidiary's creditors if the experiment proved financially profitable.[291] In other words, the action benefited the parent entity at the disadvantage of the subsidiary and creditors.

---

[286] *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. at 70.

[287] *Miller v. Greenwich Capital Fin. Products, Inc. (In re Am. Bus. Fin. Servs., Inc.)*, 362 B.R. 149, 164-65 (Bankr. D. Del. 2007) (finding that the Trustee made a claim for equitable subordination by alleging inequitable conduct such as breach of contract, but also finding that the relief sought could not be granted under a claim for equitable subordination.).

[288] *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. at 70; *Pepper v. Litton*, 308 U.S. at 310.

[289] *See Comstock v. Grp. of Institutional Inv'rs*, 335 U.S. 211, 229 (1948).

[290] *See generally id.*

[291] *Gannett Co. v. Larry*, 221 F.2d 269, 275 (2d Cir. 1955).

While examining whether a claim should be equitably subordinated, courts should also remember that inequitable conduct can warrant subordination of a claim even if the conduct is unrelated to the "assertion of that claim," and that claims should only be subordinated to the extent necessary to offset the harm suffered as a result of the conduct.[292]

### i.    Insider Status

Under 11 U.S.C. section 101(31)(B)(iii), business entities in control of a debtor are insiders.  And control is the "legal right or ability to exercise control over a corporate entity."[293]  The record shows that Yucaipa had the legal right to control every tranche of Allied's capital structure as of August 21, 2009.[294]  The record contains no evidence suggesting that Yucaipa was not an insider of Allied, nor does Yucaipa dispute that it was an insider.  Controlling every tranche of Allied's capital structure grants Yucaipa the legal right to exercise authority over Allied.  The Court finds that the Trustee has produced undisputed evidence showing Yucaipa's status as an insider of Allied as Yucaipa was a person in control of Allied, under 11 U.S.C. § 101(31)(B)(iii) as of August

---

[292] *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. at 69.

[293] *Anstine v. Carl Zeiss Meditec AG (In re U.S. Med., Inc.)*, 531 F.3d 1272, 1279 (10th Cir. 2008).

[294] Singer Dec. Exh. 47 (Email from D. Walker to R. Burkle, re: Allied, dated Sept. 11, 2009) at p. 2 ("Our purchase of the first lien debt is also notable because it puts us in the position of controlling every tranche of the Company's capital structure. In addition to holding 56% of the first lien debt, we also hold 67% of the second lien debt as well as 71% of the fully-diluted equity.").

100

21, 2009, if not earlier.[295]  It is further undisputed that Yucaipa owed a fiduciary duty to

Allied.[296]

### ii.    Inequitable Conduct

At trial, the Trustee will bear the burden of persuasion in showing that (i) there

was inequitable conduct; (ii) the inequitable conduct resulted in: (a) injury to the debtor

or creditors or (b) created an unfair advantage for the claimant; and (iii) equitable

subordination is consistent with the Bankruptcy Code.[297]  Thus, on summary judgment,

the Trustee must produce admissible, undisputed evidence proving each of the above

elements.[298]

### c.  Undisputed Conduct

As to amending the FLCA in breach of the Third Amendment and invalidly

assuming the title of Requisite Lender, the Trustee has shown that there is no genuine

dispute of material fact that (i) Yucaipa knew that it was prohibited from becoming

Requisite Lender under the FLCA or acquiring LC Commitments under the FLCA; (ii) the

Third Amendment burdened Yucaipa with onerous restrictions placed on its purchases

---

[295]  13-50530 D.I. 297 at p. 129 (Tr. of Hr'g. 129:11-22) ("Yucaipa was involved in the negotiation and the establishment of the first lien credit agreement as part of the earlier bankruptcy. And at all other times, has controlled the equity and the board of directors.  And has been intimately involved in every aspect of the debtor's business, and the credit agreement issues since 2007.  To allow Yucaipa to be involved this heavily in negotiating agreements with -- including those with expressed limits on Yucaipa's rights, and wont' allow them to buy the debt, the seller cannot sell to them in the first place, and to (indiscernible) **would be inequitable**, you know, to the (indiscernible) degree in my mind . . . ." (emphasis added)).

[296]  *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113 (Del. 1994) (*quoting Ivanhoe Partners v. Newmont Min. Corp.*, 535 A.2d 1334, 1344 (Del. 1987) (further citation omitted) ("'a shareholder owes a fiduciary duty only if it owns a majority interest in or exercises control over the business affairs of the corporation.'").

[297]  11 Moore's Federal Practice – Civil § 56.40 (2021).

[298]  11 Moore's Federal Practice – Civil § 56.40 (2021).

of first lien debt; and (iii) by proclaiming an (invalid) amendment to the FLCA, Yucaipa advantaged itself by: (a) acquiring more than $50 million in principal amount of Term Loans, (b) obtaining voting powers on future modifications to the Credit Agreements and bankruptcy proceedings, (c) avoiding the requirement that it make the Capital Contribution, and (d) enabling itself to become an Eligible Assignee; (iv) Yucaipa's actions heavily injured Allied's Lenders by subverting their contracted rights; (v) Yucaipa's actions injured Allied and creditors, as it withheld the Capital Contribution.

By subverting the bargained-for rights of the Lenders,[299] Yucaipa advantaged itself while simultaneously causing the Lenders to suffer particularized harm. Yucaipa argues that but for the Fourth Amendment and the ComVest Transaction, Allied would have been forced into bankruptcy liquidation. There is no evidence in support of this argument.[300] There is no credible dispute that these amendments were not made in good faith.[301]

The Trustee argues that, under the terms of the Third Amendment, Yucaipa was required to make a capital contribution of $57.4 million to Allied in cash or debt cancellation in connection with the ComVest Transaction. As explained, *supra*, the

---

[299] *BDCM Opportunity Fund II v. Yucaipa American Alliance Fund I, LP*, 2013 WL 1290394, at *5. *See Murray v. Nat'l Broad. Co., Inc.*, 576 N.Y.S.2d 578, 580 (App. Div. 1991) ("[Yucaipa] seiz[ed] control of the Lenders' rights and remedies under the Credit Facility.") (ruling on summary judgment constitutes final determination). *See supra* Sections D and E (granting Trustee's Lender Claims 2 and 3 for breach of contract and breach of duty of good faith and fair dealing); *id*. p. 41–42 (listing the contractual injuries Lenders assert they sustained).

[300] *See e.g.*, *supra* p. 50-51 and accompanying notes.

[301] Allied was under no contractual obligation to make the payments related to the ComVest transaction. *See* Singer Dec. Exh. 43 (Loan Purchase Agreement, dated Aug. 21, 2009), at p. 2 (§ 1.4).

undisputed facts show that Yucaipa's failure to contribute constitute a breach of the Third Amendment and resulted in injury to Allied in the amount of $57.4 million plus pre-judgment interest.  As to the lenders, the Trustee provides an expert report demonstrating that in bankruptcy, the lenders would have received: (i) if cash contribution, an additional $25.7 million without interest or $39 million with interest[302] or (ii) if debt cancellation, an additional $10.7 million without interest and $16.3 million with interest.[303]  Yucaipa provides an expert report disputing the Trustee's experts report as to the degree of injury as to the Lenders.

Yucaipa caused an insolvent Allied to (i) pay nearly $2.7 million in ComVest transaction fees (ii) pay Yucaipa's counsel approximately $2.5 million in connection with the CIT Litigation and (iii) pay to Latham around $1.6 million for Yucaipa's benefit.[304] Because Yucaipa knowingly caused Allied, through the ComVest Transaction to enter the invalid Fourth Amendment, it was aware that litigation was likely to follow, and in fact, filed the first suit against CIT in Georgia.[305]  As a result of the lawsuits and fees, Allied

---

[302] Singer Dec. Exh. 103 (Risius Report) at ¶¶ 120-122.

[303] *Id.* at Exhs. B.2 through B.6.  *See also supra* p. 44 (asserting damages related to the JCT Negotiations).

[304] Singer Dec. Exh. 43 (Loan Purchase Agreement, dated Aug. 21, 2009), at p. 2 (§ 1.4).

[305]  Yucaipa knew it was imposing an end-run around creditors' contractual rights.  *See supra* n. 34.  In response to Yucaipa's February 2009 tender that included an Amendment to the FLCA that allowed Yucaipa to become Requisite Lender, CIT's counsel stated:

> [C]ertain provisions of the Proposed Fourth Amendment cannot be entered into without the consent of Administrative Agent or Collateral Agent [also CIT], or both . . . [T]he Proposed Fourth Amendment may not be consummated on its present terms without the consent of each Agent. On behalf of CIT, we can confirm that CIT will not grant its consent, whether in its capacity as a Lender or as an Agent, to the Proposed Fourth Amendment.

was injured to the extent of approximately $6.8 million.  Allied's Lenders were harmed because they could have benefited by receiving payments the insolvent Allied spent on fees and litigation, the fees and litigation expenses were all to Yucaipa's advantage as they would have otherwise been Yucaipa's responsibility.[306]  Furthermore, Yucaipa gained an advantage over Allied's Lenders by causing an insolvent Allied to pay the legal fees associated with drafting and negotiating the Fourth Amendment, which subverted Lenders' rights.  The Lenders further incurred legal fees and invested time in validating their valid contractual rights after the ComVest Transaction and further suffered where Yucaipa caused Allied to fund its litigation against them.

As for the consulting services, Burkle emailed a ComVest principal that "we gave [Ornstein] 250k a few months ago."[307]  The money was paid through Allied, while it was insolvent, for services rendered to Yucaipa, not Allied.[308]  This payment was to the advantage of Yucaipa, as it received the benefits from Ornstein while causing an insolvent Allied to pay for them.[309]  While the degree of injury to the creditors will be reserved for trial, the Trustee has met her burden as to one instance of inequitable conduct.

---

Singer Dec. Exh. 32 (Letter from E. Kimball to H. Dempster re: Amended and Restates First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement . . . , dated Feb. 12, 2009) at p. 2 (emphasis in original).

[306]  *See supra* p. 61 (finding § 2(b) of the MMSA to have been improperly raised); p. 61-64 (determining § 10.2 of the FLCA to not obligate Allied to make the payments); p. 64-66 (finding § 6 of the MMSA did not preclude Allied from suing).

[307]  Singer Dec. Exh. 55 (Email from R. Burkle to R. Priddy re: Jonathan [Ornstein], dated Mar. 26, 2010) ("I know you guys have been talking . . .just an fyi . . . we gave him 250k a few months ago").

[308]  *See supra* p. 53-54 (containing relevant facts).

[309]  *See supra* p. 53-54 (containing facts as to Ornstein Payment).

The Trustee has failed to prove, as undisputed, that: (i) Yucaipa's conduct in the JCT Negotiations was unreasonable as there still exist genuine issues of fact as to whether (a) the JCT Negotiations were a missed opportunity for Allied, (b) whether Yucaipa agreed to *pari passu* treatment, or (c) whether it was Yucaipa's or BDS's actions which terminated the JCT Negotiations; and (ii) Yucaipa caused Allied to commit events of default under the FLCA as there still exist genuine issues of fact as to whether Yucaipa was able to prevent the defaults.  Left for trial are the above facts as well as whether acts (i) and (ii) above resulted in injury to Allied, creditors, or the advantage of Yucaipa.

### d.  Good Faith and Inherent Fairness

At trial, Yucaipa bears the burden of persuasion of proving not only "the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.[310]  The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain.  If it does not, equity will set it aside."[311]  Thus, Yucaipa must establish that its dealings with Allied were arms-length transactions from the viewpoint of Allied and its creditors.  The Trustee, on summary judgment, must produce evidence that negates this or provide an absence of evidence as the arms-length nature of Yucaipa's dealings.  The Trustee provides the following facts as evidence that Yucaipa did not deal at arms-length with Yucaipa from the viewpoint of Allied and its creditors:

---

[310] *Pepper v. Litton*, 308 U.S. at 306–08.

[311] *Id.*

i. Yucaipa caused Allied agree to the Fourth Amendment in connection with the Yucaipa-ComVest while (a) understanding that the validity of the Fourth Amendment was likely to be litigated, (b) usurping the position of Requisite Lender from BD/S, (c) causing Allied to pay legal fees relating to the transaction that it was not a party to while Allied was insolvent.[312] Entering into a MMSA with Allied but never receiving payment. Advocating to buy first lien debt but not receiving payment for interest or principal.

    a. On August 19, 2009, Allied's Board resolved to authorized Allied to enter into the Fourth Amendment prior to receiving a legal opinion from its counsel, dated the day after, that the Fourth Amendment "constitutes the legal, valid and binding obligation of [Yucaipa, ComVest, and Allied] enforceable in accordance with its terms."[313] Notably, the legal opinion does not claim the Fourth Amendment binding on any other lender party.[314]

---

[312] Singer Dec. Exh. 32 (Letter from E. Kimball to H. Dempster re: Amended and Restates First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement . . . , dated Feb. 12, 2009) at p. 2 ("may not be consummated on its present terms without the consent of each Agent . . . we can confirm that [we] will not grant [our] consent . . . .") (emphasis in original)).  Singer Dec. Exh. 42 (Resolutions for Meeting of the Board of Directors of Allied Systems Holdings, Inc., Aug. 19, 2009) (Yucaipa employee and Allied Board Member Walker moved to approve Fourth Amendment and Allied's Board passed it).

[313] Scolnick Dec. Exh. 76 (Letter from Troutman Sanders to The CIT Group/Business Credit, Inc., dated Aug. 20, 2009) at p. 10 of 70.

[314] *See generally,* Scolnick Dec. Exh. 76 (Letter from Troutman Sanders to The CIT Group/Business Credit, Inc., dated Aug. 20, 2009).

b.  On August 21, 2009, Yucaipa and ComVest entered the LPA.  In the LPA, Yucaipa specifically refused to represent or warrant that the LPA or Fourth Amendment breached the Third Amendment to the FLCA.[315]

c.  Within two days of entering the Fourth Agreement, Yucaipa hired its counsel to develop a contingency plan on the validity of the Fourth Amendment.[316]

ii.  On December 21, 2009, Yucaipa sued CIT in Georgia seeking, *inter alia*, declaratory judgment on the validity of the Fourth Amendment.[317]  CIT countersued seeking declaratory judgment that the Fourth Amendment is invalid.[318]  CIT and Yucaipa settled.[319]  Despite arguing that the ComVest Transaction was not a "corporate opportunity," (Allied was not a party to it) Yucaipa caused Allied to pay its legal fees in relation to the CIT Litigation at a time when Allied was insolvent.

---

[315]  *See* LPA § 2.6.

[316]  Singer Dec. Exh. 46 (E-mail from S. Bond to D. Walker, re: Restructuring Plan.pdf, dated Aug. 23, 2009) at p. 2.

[317]  *See supra* p. 18.

[318]  Singer Dec. Exh. 52 (Verified Answer and Counterclaims of Defendant The CIT Group Business Credit, Inc. in Allied Systems Holdings, Inc. v. The CIT Group/Business Credit, Inc.) at p. 35 of 39.

[319]  Singer Dec. Exh. 88 (The Yucaipa Defendants' First Supplemental Responses and Objections to the Official Committee of Unsecured Creditors' First Set of Requests for Admissions).

  iii. Causing Allied to pay, while insolvent, Ornstein $250,000 for Consulting Services that were not provided under the terms of the Consulting Agreement, but rather were provided to Yucaipa.

  iv. As to the JCT Negotiations, see *supra* pages: 79–85.

Additionally, this Court, on summary judgment, finds that Yucaipa amended the FLCA despite knowing the proposed amendment was opposed to the original intent of the FLCA.[320]  This Court has already determined that Yucaipa's attempt to amend the FLCA was bad faith conduct.[321]  The above allegations are sufficient to negate Yucaipa's claims that it dealt in good faith and inherent fairness.  The Trustee has met her burden.

### e.  Summary

The Trustee has met her burden and produced admissible, undisputed evidence proving that (i) Yucaipa acted in bad faith in purchasing first lien debt under an invalid Fourth Amendment and assuming Requisite Lender status thereunder; (ii) Yucaipa breached the Third Amendment to the FLCA by failing to provide a substantial capital contribution to Allied at a time that Allied was insolvent, in default of its loans, and needed the capital contribution, (iii) Yucaipa's inequitable conduct resulted in lawsuits and fees that Allied was required to pay at a time when Allied was insolvent, (iv) the conduct described in (i), (ii), and (iii) resulted in injury to Allied or creditors or resulted

---

[320]  *ASHInc. v. AMMC VII, Ltd*, 683 Fed. Appx. at 140 (finding the amendment to the FLCA to be invalid and finding that Yucaipa knew the amendments were prohibited).

[321]  *See supra* p. 65-66.

in the advantage of Yucaipa, and (v) Yucaipa did not conduct itself in good faith and inherent fairness in the above course of actions.

The Court grants, in part, the Trustee's motion for summary judgment on the following elements of Estate Claims 1–2 and Lender Claim 1: (i) Yucaipa is an insider and fiduciary; (ii) Yucaipa's conduct described in acts (i)–(iii), above, (a) constitute inequitable conduct and (b) injured Allied or Allied's lenders or advantaged Yucaipa; (iii) Yucaipa did not act in good faith in the instances of inequitable conduct described above; and (iv) the Court finds that the type of equitable subordination the Trustee is requesting (debt subordinated to debt) is consistent with the provisions of the Bankruptcy Code.[322]

The Court denies, in part, the Trustee's motion for summary judgment on the following triable issues of fact: (i) Yucaipa's conduct in the JCT Negotiations was unreasonable; (ii) Yucaipa caused Allied to commit events of default under the FLCA as there exists genuine issues of fact as to whether Yucaipa was able to prevent the defaults; (iii) if (i) and (ii) are inequitable acts, a triable issue of fact exists as to the degree of injury that Allied or Lenders suffered, or the advantage Yucaipa gained as a result; and (iv) the Court reserves for trial the exact extent to which Yucaipa's claims should be subordinated.

---

[322] *United States v. State St. Bank & Tr. Co.*, 520 B.R. 29, 85 (Bankr. D. Del. 2014) (determining that where a court subordinates a claim based on the facts before it without attempting to categorically reorder statutory priorities, the subordination is likely to be consistent with the Bankruptcy Code).

K.    **Estate Claim 3 – Recharacterization**

The Trustee also seeks to recharacterize "Yucaipa's purported debt holdings under the First Lien Facility and Second Lien Facility."[323]    Since the filing of the Estate Complaint, the Trustee now believes that the treatment of Yucaipa's debt holdings is best addressed through its equitable subordination claim (Estate Claims 1-2).[324]    However, as the Court is not granting the Trustee's Summary Judgment Motion on Estate Claims 1-2, the Court must turn to whether, as a matter of law, the Trustee may assert a claim for recharacterization.

Yucaipa asserts that Allied issued secured debt under the FLCA and SLCA as debt, not equity.  Allied issued both the FLCA and the SLCA in connection with its Joint Plan,[325] pursuant to which Allied exited its 2005 Bankruptcy.  In response, the Trustee argues that the Court should recharacterize Yucaipa's First Lien debt holdings in excess of the amount it was permitted to hold under the Third Amendment.  The Third Amendment barred Yucaipa from acquiring more than $50 million or 25% of the aggregate Term Loans.[326]  The Trustee claims that Yucaipa's void attempt to remove this restriction in the "lawless" Fourth Amendment, its acquisition of Term Loans far in excess of the cap, and its refusal to make the mandatory capital contributions required by the Third

---

[323] Estate Compl. § 148.

[324] If the Court were to grant the claims for equitable subordination, the claim for recharacterization would be moot.  *See Litigation Trustee's Opposition to the Motion for Summary Judgment by Defendants Yucaipa American Alliance Fund I, L.P., and Yucaipa American Alliance (Parallel) Fund I, L.P.* (Adv D.I. 770) at p. 48.

[325] The debt was initially issued as DIP financing in the 2005 Bankruptcy and then converted into exit financing. The DIP Financing document expressly called it debt. (*See* Scolnick Dec. Exh. 123 (Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated Mar. 30, 2007)).

[326] Third Amendment § 2.7(e) (amending and inserting § 10.6(j) into the FLCA).

Amendment, so altered the nature of the First Lien Debt held by other Lenders as to warrant recharacterization to equity.[327]

"In a recharacterization action, someone challenges the assertion of a debt against the bankruptcy estate on the ground that the 'loaned' capital was actually an equity investment."[328]   The Third Circuit has made clear that "the determinative inquiry in classifying advances as debt or equity is the intent of the parties as it existed at the time of the transaction."[329]   The Third Circuit decided that:

> [The factors] devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else. ***That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances.*** Answers lie in facts that confer context case-by-case.
>
> ....
>
> Which course a court discerns is typically a commonsense conclusion that the party infusing funds does so as a banker (the party expects to be repaid with interest no matter the borrower's fortunes; therefore the funds are debt) or as an investor (the funds infused are repaid based on the borrower's fortunes; hence, they are equity). Form is no doubt

---

[327] *See, e.g., In re Franklin Equip. Co.,* 416 B.R. 483, 519 (Bankr. E.D. Va. 2009) (recharacterization may be warranted where "the purchasing insiders effect such radical modification of the terms and conditions of the transaction after acquisition so as to remove its original character"); *Cohen v. KB Mezzanine Fund II, LP (In re Submicron Systems Corp.),* 432 F.3d 448, 456 (3d Cir. 2006) (courts consider "the economic reality of the surrounding circumstances" to determine whether recharacterization is warranted).

[328] *In re Insilico Techs., Inc.,* 480 F.3d 212, 217 (3d Cir. 2007) (*citing Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.),* 269 F.3d 726, 749 (6th Cir. 2001) (further citation omitted)).

[329] *In re SubMicron Sys. Corp.,* 432 F.3d at 457; *accord United States v. State Street Bank & Tr. Co.,* 520 B.R. at 74–75 (placing "particular emphasis on the parties' intent at the initial funding").

a factor, but in the end it is no more than an indicator of what the parties actually intended and acted on.[330]

"If recharacterization of an investment from debt to equity is warranted, the characterization occurs '*ab initio*,' from the beginning of the investment."[331]

Although "[n]o mechanistic scorecard suffices,"[332] courts have considered the following factors in considering recharacterization:

> (1) the name given to the instrument; (2) the intent of the parties; (3) the presence or absence of a fixed maturity date; (4) the right to enforce payment of principal and interest; (5) the presence or absence of voting rights; (6) the status of the contribution in relation to regular corporate contributors; and (7) certainty of payment in the event of the corporation's insolvency or liquidation.[333]

The Trustee cites to *In re Franklin* wherein the defendant argued that a loan may experience a "transformation" after acquisition – which the *Franklin* court acknowledged that the existing law was to review the "loan" as of the date it originated; however, the

---

[330] *United States v. State St. Bank & Tr. Co.*, 520 B.R. at 74 (emphasis supplied by *State St. Bank & Tr. Co.* court; *quoting In re SubMicron Sys. Corp.*, 432 F.3d at 456).  *See also Drake v. Franklin Equip. Co., (In re Franklin Equip. Co.)*, 416 B.R. 483, 509 (Bankr. E.D. Va. 2009) (citations and internal quotation marks omitted) (holding "reclassification is substantially different from subordination in that subordination focuses on the creditor's behavior; whereas, reclassification rests on the substance of the transaction giving rise to the claim.").

[331] *Official Comm. Of Unsec. Creditors of HH Liquidation, LLC v. ComVest Group Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211, 290 (Bankr. D. Del. 2018) (*quoting United States v. State St. Bank & Tr. Co.*, 520 B.R. at 74).

[332] *In re SubMicron Sys. Corp.*, 432 F.3d at 456.

[333] *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 291 B.R. 314, 323 (D. Del. 2003), *aff'd*, 432 F.3d 448 (3d Cir. 2006) (citations omitted).  *See also Friedman's Liquidating Trust v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.)*, 452 B.R. 512, 525 (Bankr. D. Del. 2011).

*Franklin* court acknowledged that the "transformation" argument was a strong, albeit ultimately unsuccessful, argument.[334]

Here, the Trustee is urging the Court to consider that the Fourth Amendment so altered the nature of the First Lien Debtor held by other Lenders as to warrant recharacterization to equity.  As intriguing as this argument is, it would be counter to Third Circuit binding precedent.  The Court *must* look to the beginning of the investment to determine if such "loan" should be recharacterized, regardless of the now-voided steps that Yucaipa took in the Fourth Amendment.  As a result, the Court will grant Yucaipa's Summary Judgment Motion as to Estate Claim 3 (recharacterization).

---

[334] *In re Franklin Equip. Co.*, 416 B.R. at 519.  The Court stated in full (as it is important to help distinguish the Trustee's argument here):

> Remembering decisions teach that a court considering recharacterization must center its focus on the time at the time of origination of a challenged transaction, . . .  a strong argument may be waged that a transaction originated as a loan may not change its fundamental character, unless perhaps the **purchasing insiders effect such radical modification of the terms and conditions of the transaction after acquisition so as to remove its original character**. The Trustee has presented nothing to suggest that existing law or the existence of a good faith argument for the reversal or a modification of existing law support of this component of her argument. Nevertheless, and assuming *arguendo* that for recharacterization purposes a loan may experience "transformation" after acquisition, the Court will analyze the loan represented by the Replacement Note at the time of its purchase by the Drakes.

*Id.* (emphasis added, citations omitted). Although the *Franklin Equipment* court assumed *arguendo* that a loan could be "transformed," the Court held that the note in question never became a capital contribution after reviewing all the recharacterization factors. *Id.* at 521.

**CONCLUSION**

The Court will grant, in part, and deny, in part, the Trustee Summary Judgment Motion.  In addition, the Court will grant, in part, and deny, in part, Yucaipa Summary Judgment Motion, consistent with the statements above and the chart attached hereto as Appendix.  An order will be entered.

**Appendix**

Summary Chart of Claims and Rulings

ASHInc. Opinion Appendix

| Complaint Claim #/Description | Trustee Summary Judgment Motion (Adv. 13-50530, D.I. 703) | Yucaipa Summary Judgment Motion (Adv. 13-50530, D.I. 696) | Ruling |
|---|---|---|---|
| **Estate Claims** | | | |
| Estate Claim 1 – Equitable Subordination Pursuant to 11 U.S.C. § 510(c) against Yucaipa | Trustee moves for summary judgment | | Grant, in part, deny, in part, Trustee Summary Judgment Motion as to Estate Claim 1. |
| Estate Claim 2 - Equitable Subordination Pursuant to 11 U.S.C. § 510(c) against Yucaipa for Harm to All First Lien and Second Lien Lenders | Trustee moves for summary judgment | | Grant, in part, deny, in part, Trustee Summary Judgment Motion as to Estate Claim 2. |
| Estate Claim 3 - Recharacterization Pursuant to 11 U.S.C. § 105(a) of Yucaipa's Purported Debt Holdings Under the First and Second Lien Facilities against Yucaipa | | Yucaipa moves for summary judgment | As a matter of law, the Trustee cannot establish a claim for recharacterization. Grant Yucaipa Summary Judgment Motion as there are no set as facts which would entitle the Trustee to judgment. |
| Estate Claim 4 - Specific Performance of Third Amendment to the First Lien Credit Agreement against Yucaipa (Contribution Provision) | | Yucaipa moves for summary judgment | Trustee did not address in its briefs; however, since the confirmation of the 2016 Joint Plan, specific performance is moot. Grant Yucaipa Summary Judgment Motion as to Estate Claim 4. |
| Estate Claim 5 - Breach of Third Amendment to the First Lien Credit Agreement against Yucaipa (Contribution Provision) | Trustee moves for summary judgment | Yucaipa moves for summary judgment | Grant Trustee Summary Judgment Motion as to Estate Claim 5; Deny Yucaipa Summary Judgment Motion as to Estate Claim 5. |
| Estate Claim 6 - Specific Performance of Third Amendment to the First Lien Credit Agreement against Yucaipa (Divestiture of Debt) | | Yucaipa moves for summary judgment | Grant Yucaipa Summary Judgment Motion as to Estate Claim 6 (*See also* Adv. D.I. 770 p. 17 Trustee specifically abandons Estate Claim 6) |
| Estate Claim 7 - Breach of Fiduciary Duty against Yucaipa | | Yucaipa moves for summary judgment | Deny Yucaipa Summary Judgment Motion. Triable issues remain. |
| Estate Claim 8 - Breach of Fiduciary Duty against the Allied Directors | | | |
| Estate Claim 9 -Aiding and Abetting Breach of Fiduciary Duty against the Allied Directors and Yucaipa | | | |
| Estate Claim 10 – Avoidance and Recovery of Constructive Fraudulent Transfers against Yucaipa Pursuant to 11 U.S.C. §§ 548(a) and 550 | Trustee moves for summary judgment | Yucaipa moves for partial summary judgment | Grant Trustee Summary Judgment Motion as to Estate Claim 10; Deny Yucaipa Summary Judgment Motion (partial) as to Estate Claim 10. |

| Complaint Claim #/Description | Trustee Summary Judgment Motion (Adv. 13-50530, D.I. 703) | Yucaipa Summary Judgment Motion (Adv. 13-50530, D.I. 696) | Ruling |
|---|---|---|---|
| Estate Claim 11 – Avoidance and Recovery of Constructive Fraudulent Transfers and Conveyances against Yucaipa Pursuant to 11 U.S.C. §§ 544(b) and 550 | Trustee moves for summary judgment | Yucaipa moves for partial summary judgment | Grant Trustee. Summary Judgment Motion as to Estate Claim 11; Deny Yucaipa Summary Judgment Motion (partial) as to Estate Claim 11. |
| Estate Claim 12 – Preferential Transfers against Yucaipa Pursuant to 11 U.S.C. §§ 547 and 550 | | | |
| Estate Claim 13 – Disallowance of Claim against Yucaipa | Trustee moves for summary judgment | | Grant Trustee Summary Judgment Motion as to Estate Claim 13. |
| **Lender Claims** | | | |
| Lender Claim 1 – Equitable Subordination Pursuant to 11 U.S.C. § 510(c) against Yucaipa for Harm to All First Lien and Second Lien Lenders | Trustee moves for summary judgment | | Grant, in part, deny, in part, Trustee Summary Judgment Motion as to Lender Claim 1. |
| Lender Claim 2 – Breach of Contract Against Yucaipa | Trustee moves for summary judgment | Yucaipa moves for summary judgment, and in the alternative for partial summary judgment on issue of damages | Grant Trustee Summary Judgment Motion as to Lender Claim 2; Deny Yucaipa Motion for Summary Judgment as to Lender Claim 2. |
| Lender Claim 3 – Breach of the Duty of Good Faith and Fair Dealing Against Yucaipa | | Yucaipa moves for summary judgment, or, alternatively, for partial summary judgment on damages | Claim is not time barred by the statute of limitation; however, the Trustee has not established its prima facie case; triable issues remain. Claim should go forward at trial. As to the issue of damages, Deny Yucaipa (partial) Summary Judgment Motion, without prejudice, as to Lender Claim 3. |
| Lender Claim 4 – Tortious Interferences with Contract Against the Yucaipa Directors and Burkle | Trustee moves for summary judgment | | Deny Trustee Summary Judgment Motion as to Lender Claim 4. *See* Trustee's reply (Adv. D.I. 794 at n. 1) ("The Trustee's claims against Defendants Ron Burkle and the Yucaipa Directors have been voluntarily dismissed (13-50530, D.I. 793; 14-50971, D.I. 533 and 534). The Trustee's motion seeking summary judgment on Direct Lender Claim 4 (Tortious Interference) is, therefore, no longer in the case"). |