# **EXHIBIT A**

# EXPERT WITNESS REPORT OF
## Jeffrey M. Risius, CPA/ABV, CFA, ASA

**September 27, 2019**

**Presented in:**

### _Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al., Adv. Pro. Nos. 13-50530 and 14-50971_

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**





EXHIBIT 832
WIT: RISIUS
DATE: 12-19-19
E. Mulvenna, CSR/RMR/CRR



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al.,* Adv. Pro. Nos. 13-50530 and 14-50971

Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA

September 27, 2019

**Table of Contents**

I. SCOPE OF OPINION AND DISCLOSURES REQUIRED UNDER RULE 26(A)(2)(B) 4

II. QUALIFICATIONS ................................................................................................8

III. BACKGROUND OF RELEVANT EVENTS ...............................................................10

III.A. ALLIED'S EMERGENCE FROM ITS 2005 BANKRUPTCY .......................................10
III.B. ALLIED'S 2007 REORGANIZATION PLAN ........................................................11
III.C. THE 2008 THIRD AMENDMENT TO ALLIED'S FIRST LIEN CREDIT AGREEMENT.................12
III.D. ALLIED'S 2008 EVENTS OF DEFAULT UNDER ITS CREDIT AGREEMENTS AND YUCAIPA'S TENDER OFFER TO PURCHASE ALLIED FIRST LIEN DEBT......................14
III.E. THE 2009 FOURTH AMENDMENT TO ALLIED'S FIRST LIEN CREDIT AGREEMENT .................16
III.F. YUCAIPA'S 2009 ACQUISITION OF FIRST LIEN DEBT .......................................19
III.G. JCT EFFORTS TO ACQUIRE ALLIED ..............................................................20
III.H. YUCAIPA'S DEMAND FOR A PREMIUM – AS OPPOSED TO PARI PASSU TREATMENT WITH THE OTHER FIRST LIEN DEBT LENDERS – IN NEGOTIATIONS WITH JCT, LEADING TO ALLIED'S 2012 BANKRUPTCY.................24
III.I. TRANSFERS OF FUNDS MADE BY ALLIED FOR YUCAIPA'S BENEFIT, FROM 2007 THROUGH 2011.................26

IV. ESTATE DAMAGE CLAIMS ..............................................................................29

IV.A. ESTATE DAMAGE CLAIM #1 ........................................................................29
IV.B. ESTATE DAMAGE CLAIM #2 ........................................................................30
IV.C. ESTATE DAMAGE CLAIM #3 ........................................................................32

V. LENDER DAMAGE CLAIMS ...............................................................................34

V.A. LENDER DAMAGE CLAIM #1 .......................................................................34
*V.A.1. Lender Damage Claim #1A* ......................................................................34
*V.A.2. Lender Damage Claim #1B* ......................................................................36
V.B. LENDER DAMAGE CLAIM #2 .......................................................................38
V.C. LENDER DAMAGE CLAIMS #1A AND #2 (COMBINED)......................................39
V.D. LENDER DAMAGE CLAIMS #1B AND #2 (COMBINED)......................................41

VI. CONCLUSION ...............................................................................................43

VII. ASSUMPTIONS AND LIMITING CONDITIONS .....................................................44



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al.,* Adv. Pro. Nos. 13-50530 and 14-50971

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

September 27, 2019

## Exhibits and Appendices

Exhibit A................................................................... Estate Damage Claims
Exhibit B................................................................... Lender Damage Claims
Exhibit C.......................................................................JCT 2011 Offer
Exhibit D................................................................... JCT 363 Sale Proceeds
Exhibit E.......................................................................Fraudulent Transfers


Appendix 1........................................List of Documents Considered
Appendix 2........................................................... Curriculum Vitae



Catherine E.
Youngman,
Litigation Trustee
for ASHINC
Corporation, et al.
v. Yucaipa
American Alliance
Fund I, L.P., et al.,
Adv. Pro. Nos. 13-
50530 and 14-
50971

Expert Witness
Report of
Jeffrey M. Risius,
CPA/ABV, CFA,
ASA

September 27,
2019

### I.   Scope Of Opinion and Disclosures Required Under Rule 26(a)(2)(B)

1.    I have been retained by Catherine E. Youngman, Litigation Trustee of the ASHINC Litigation Trust (the "Trustee"), through her counsel Joseph Hage Aaronson LLC and Zaiger LLC ("Counsel").

2.    This report concerns claims being prosecuted by the Trustee against Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P. (together, "Yucaipa"), Mark Gendregske ("Mr. Gendregske"), Ronald Burkle ("Mr. Burkle"), Jos Opdeweegh ("Mr. Opdeweegh"), James Frank ("Mr. Frank"), Derex Walker ("Mr. Walker"), Jeff Pelletier ("Mr. Pelletier"), Ira Tochner ("Mr. Tochner"), and Joseph Tomczak ("Mr. Tomczak") in the following cases pending in the United States Bankruptcy Court for the District of Delaware:

(a)  *Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I L.P., et al., Adv. Pro. No. 13-50530*; and

(b)  *Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al., Adv. Proc. No. 14-50971*.

3.    Yucaipa, Mr. Gendregske, Mr. Burkle, Mr. Opdeweegh, Mr. Frank, Mr. Walker, Mr. Pelletier, Mr. Tochner, and Mr. Tomczak are collectively referred to as the "Defendants" in this report.

4.    This report presents my expert opinions regarding certain allegations as described in the following two complaints:

(a)  The Amended Complaint filed on March 14, 2013 by the Official Committee of Unsecured Creditors in the Chapter 11 case of Allied System Holdings, Inc., Allied Systems, Ltd. (L.P.), and their U.S. and Canadian subsidiaries (collectively, "Allied," the "Debtors," or the "Company"), against Yucaipa, Mr. Gendregske, Mr. Opdeweegh, Mr. Frank, Mr. Walker, Mr. Pelletier, Mr. Tochner, and Mr. Tomczak for (i) Equitable Subordination, (ii) Recharacterization, (iii) Breach of Contract, (iv) Specific Performance, (v) Breaches of Fiduciary Duties, (vi) Aiding and Abetting Breaches of Fiduciary Duties, (vii) Avoidance and Recovery of Avoidable Transfers, and (viii) Disallowance of Certain Claims (the "Estate Complaint").

(b)  The Complaint filed on November 19, 2014 by BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 Ltd. (together, "Black Diamond"), and Spectrum Investment Partners, L.P. ("Spectrum" and, together with Black Diamond, "BD/S") and Black Diamond Commercial Finance, L.L.C. and Spectrum Commercial Finance, LLC, each in its capacity as co-administrative agent under the first lien facility and on behalf of first lien lenders against Yucaipa, Mr. Burkle, Mr. Opdeweegh, Mr. Walker, Mr. Pelletier, Mr. Tochner, and Mr. Tomczak for (i) Equitable Subordination, (ii) Breach of Contract, (iii) Breach of Implied Duty of Good Faith and Fair Dealing, and (iv) Tortious Interference with Contract (the "Lender Complaint").

4



**Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al., Adv. Pro. Nos. 13-50530 and 14-50971**

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

**September 27, 2019**

5.  Pursuant to the Debtors' Modified First Am. Joint Chapter 11 Plan of Reorganization, dated December 3, 2015 (Case No. 12-11564, D.I. 3360-1) (the "2015 Plan"), and the Litigation Trust Agreement, dated as of December 20, 2016, the litigation claims at issue are jointly prosecuted by the Trustee and discovery is coordinated.[1] The litigation claims are divided into two categories, as follows:

(a)  "Estate Damage Claims" suffered by and attributable to the Debtors' estate (the "Estate"), pursuant to the Estate Complaint; and

(b)  "Lender Damage Claims" suffered by and attributable to the non-Yucaipa first lien lenders of Allied, pursuant to the Lender Complaint.

6.  The allowed creditors of the Debtors' Estate, including first lien lenders, second lien lenders, and general unsecured creditors, were issued Litigation Trust Interests under the 2015 Plan, giving them the right to receive a distribution therefrom in accordance with a Litigation Proceeds Waterfall if the Trustee recovers on the Litigation Claims.[2]

7.  Pursuant to the Estate Complaint, Counsel has asked me to:

(a)  Determine the economic damages suffered by the Estate as a result of Yucaipa's alleged breach of Section 2.7(e) of Amendment No. 3 to Credit Agreement and Consent (the "Third Amendment")[3] related to Yucaipa's failure to make a capital contribution within 10 days of no less than 50% of the aggregate principal amount of the first lien term loans acquired by Yucaipa on August 21, 2009 ("Estate Damage Claim #1"). Counsel has asked me to determine the economic damages under Estate Damage Claim #1 in two ways: (1) that Yucaipa should have contributed half of its first lien term loan debt to capital by contributing $57.4 million of cash or (2) that Yucaipa should have forgiven $57.4 million of first lien term loan debt in exchange for equity.

(b)  Determine the economic damages suffered by the Estate as a result of Yucaipa allegedly wrongfully usurping Allied's corporate opportunity and failing to effectively pursue the sale of Allied to Jack Cooper Transport Company, Inc. ("JCT") in late 2011 through spring 2012, and the Allied Board of Directors' failure to take any steps to prevent such usurpation ("Estate Damage Claim #2").

---

[1] *See also* Order Substituting Plaintiffs and Amending Captions, Adv. Proc. No. 13-50530, D.I. 415.

[2] Case No. 12-11564, D.I. 3360-2, Section 5.14, page 30 of 51; *see also id.*, Section 1.2(102), (104), (109), page 15 of 51.

[3] Amendment No.3 to Credit Agreement and Consent, dated as of April 17, 2008, to the Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated as of May 15, 2007, Exhibit 418 (YUCAIPA980901-937).



Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al., Adv. Pro. Nos. 13-50530 and 14-50971

Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA

September 27, 2019

(c) Calculate the economic damages suffered by the Estate as a result of claimed fraudulent transfers between 2009 and 2011 ("Estate Damage Claim #3").

8.  Pursuant to the Lender Complaint, Counsel has asked me to:

(a) Determine the economic damages suffered by the non-Yucaipa first lien lenders (the "Damaged Lenders") as a result of Yucaipa's alleged breach of Section 2.7(e) of the Third Amendment related to Yucaipa's failure to make a capital contribution within 10 days of no less than 50% of the aggregate principal amount of the first lien term loans acquired by Yucaipa on August 21, 2009 ("Lender Damage Claim #1"). Counsel has asked me to determine the economic damages under Lender Damage Claim #1 considering two scenarios:

i.   Yucaipa should have contributed half of its first lien term loan debt to capital in August 2009 by contributing $57.4 million of cash ("Lender Damage Claim #1A"); or, alternatively

ii.  Yucaipa should have contributed half of its first lien term loan debt to capital in August 2009 by forgiving $57.4 million of first lien term loan debt in exchange for equity ("Lender Damage Claim #1B").

(b) Determine the economic damages suffered by the Damaged Lenders as a result of Yucaipa's alleged contractual breach in acting as purported Requisite Lender[4] to usurp Allied's corporate opportunity and failing to effectively pursue the sale of Allied to JCT in late 2011 through spring 2012 ("Lender Damage Claim #2").

9.  This report contains the facts and data I relied upon in developing my opinions and a statement of qualifications. My opinions, detailed herein, are based on the data available to me as summarized in this report.

10. A detailed list of the sources of information considered is presented in *Appendix 1*.

11. My curriculum vitae and lists of recent testimony, publications, and presentations are presented in *Appendix 2*.

12. While the terms "we" and "our" may be used throughout this report, any other Stout Risius Ross, LLC ("Stout") representatives involved in this matter worked under my direction and control with respect to assisting in the research, analysis development, and report preparation for this engagement.

13. Stout is compensated at a rate of $700 per hour for time incurred by me. Other individuals from Stout also provided assistance in this matter; their hourly rates range from $150 per hour to $500 per hour.

---

[4] As defined later in this report.



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al.,* Adv. Pro. Nos. 13-50530 and 14-50971

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

September 27, 2019

14.  I reserve the right to supplement and/or revise this report if additional information becomes available. I also may be asked to testify at trial, as well as to prepare demonstratives in this matter.



Catherine E.
Youngman,
Litigation Trustee
for ASHINC
Corporation, et al.
v. Yucaipa
American Alliance
Fund I, L.P., et al.,
Adv. Pro. Nos. 13-
50530 and 14-
50971

Expert Witness
Report of
Jeffrey M. Risius,
CPA/ABV, CFA,
ASA

September 27,
2019

## II.  Qualifications

15.   I have extensive experience in the field of valuation, litigation advisory services, and mergers and acquisitions. My advisory experience encompasses a broad range of industries and has been performed for numerous purposes including fairness and solvency opinions, estate and gift taxation, employee stock ownership plans, marital dissolution, shareholder disputes, fraudulent conveyance matters, breach of contract matters, intellectual property disputes, tortious interference cases, disputes related to business transactions, bankruptcy and reorganization, purchase price allocation, purchase and sale advisement, and other tax, corporate, and litigation related matters.

16.   I am a Managing Director at Stout, the Head of Client Service, and the co-leader of its Valuation Advisory group. Stout is a financial advisory firm serving a range of clients from Fortune 500 corporations to privately held companies in numerous industries around the world. Stout focuses in the areas of (1) Valuation Advisory; (2) Investment Banking; (3) Dispute Consulting; and (4) Management Consulting. Stout has over 350 professionals located in multiple offices throughout the United States and internationally. Stout has consistently ranked as one of the top U.S. fairness opinion advisors for the past seven years, based on the total number of deals reported in Thomson Reuters' Mergers & Acquisitions Review (2012-2018). I sit on Stout's Transaction Opinion Committee, which sets internal policy for Stout and also reviews the draft fairness and solvency opinions that are reached by members of Stout's Transaction Opinion and ESOP Advisory practices before they are issued to clients.

17.   I received a Bachelor of Science Degree in Accounting with Honors at Indiana University's School of Business. I also received a Master of Business Administration with an emphasis in Finance at Indiana University's Graduate School of Business.

18.   I am a senior member of the American Society of Appraisers (ASA) and a member of the American Institute of Certified Public Accountants (AICPA), the Michigan Association of CPAs (MICPA), the CFA Institute, and the CFA Society of Chicago.

19.   Among other publications, I have authored a book titled <u>Business Valuation: A Primer for the Legal Professional</u>, published by the Business Law Section of the American Bar Association. I have lectured and presented numerous continuing education seminars on the subjects of valuation, litigation advisory services, succession planning, and transaction advisory services. In addition, I have testified as an expert witness at trial in state and federal courts, public service hearings, arbitration, and in deposition.

20.   With the aforementioned education, training, and experience I am well established to offer opinions regarding the disputes identified in this matter.



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al.,* Adv. Pro. Nos. 13-50530 and 14-50971

Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA

September 27, 2019

21.     My curriculum vitae and lists of recent testimony, publications, and presentations are presented in Appendix 2.



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al.,* Adv. Pro. Nos. 13-50530 and 14-50971

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

**September 27, 2019**

### III.  Background of Relevant Events

22.    In this section, I will discuss relevant events related to the Estate Damage Claims and the Lender Damage Claims, in chronological order, divided into the following categories: (i) Allied's emergence from its 2005 bankruptcy; (ii) Allied's 2007 reorganization plan; (iii) the 2008 Third Amendment to Allied's first lien credit agreement; (iv) Allied's 2008 events of default under its credit agreements and Yucaipa's tender offer to purchase Allied first lien debt; (v) the 2009 Fourth Amendment[5] to Allied's first lien credit agreement; (vi) Yucaipa's 2009 acquisition of first lien debt; (vii) JCT's efforts to acquire Allied; (viii) Yucaipa's demand for a premium — as opposed to *pari passu* treatment with the other first lien lenders — in negotiations with JCT, leading to Allied's 2012 bankruptcy; and (ix) transfers of funds made by Allied for Yucaipa's benefit, from 2007 through 2011.

### III.A.  *Allied's Emergence from its 2005 Bankruptcy*

23.    Allied was a unionized car hauling company headquartered in Georgia, primarily focused on the delivery of new automobiles from manufacturing facilities to dealerships.[6]

24.    On July 31, 2005, Allied filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division (the "2005 Bankruptcy").[7]

25.    On May 15, 2007, Allied emerged from the 2005 Bankruptcy with two credit facilities, comprised of: $265 million of first lien debt (the "First Lien Debt") from numerous lenders pursuant to the First Lien Credit Agreement (the "First Lien Credit Agreement")[8] and $50 million of second lien debt (the "Second Lien Debt") pursuant to the Second Lien Credit Agreement (the "Second Lien Debt Agreement,"[9] and together with the First Lien Credit Agreement, the "Credit Agreements"). Allied's restructuring was co-sponsored by Yucaipa and the International Brotherhood of Teamsters (the "IBT").

(a) The First Lien Debt was comprised of: (i) $180 million in term loans (the "First Lien Term Loans"); (ii) a $35 million revolving credit facility (the "Revolving Loans"); and (iii) a $50 million synthetic letter of credit facility (the "LC Commitments"); and

---

5 As defined later in this report.
6 Exhibit 586 (YUCAIPA740972-981).
7 *In re Allied Automotive Group, Inc.,* No. 05-12515 (CRM) (Bankr. N.D. Ga.).
8 Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement, entered into by and among Allied and Systems as borrowers, and certain subsidiaries of Allied, as guarantors, various lenders, Goldman Sachs Credit Partners L.P., as lead arranger and syndication agent, and CIT, as administrative agent and collateral agent, dated May 15, 2007, Exhibit 133 (Yucaipa071689-926).
9 Second Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, entered into by Allied and Systems as borrowers, and certain subsidiaries of Allied, as guarantors, dated May 15, 2007, Yucaipa0052174-382.



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al.,* Adv. Pro. Nos. 13-50530 and 14-50971

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

September 27, 2019

(b) The Second Lien Debt was comprised of term loans of $50 million (the "Second Lien Term Loans").

26. Pursuant to the First Lien Credit Agreement, one or more lenders having or holding Term Loan Exposure, [10] LC Exposure, and/or Revolving Exposure and representing more than 50% of the sum of (i) the aggregate Term Loan Exposure of all lenders, (ii) the aggregate LC Exposure of all lenders and (iii) the aggregate Revolving Exposure of all lenders, can act as the "Requisite Lenders."[11]

27. The Requisite Lenders are vested with authority to exercise – or refrain from exercising – certain rights and remedies on behalf of all lenders, such as instructing the Agent to declare events of default and demanding immediate payment by Allied of any and all amounts due.[12]

28. Based on the First Lien Credit Agreement, the only parties eligible to act as Requisite Lenders were Lenders, which consisted only of the original lender signatories to the First Lien Credit Agreement and "Eligible Assignees" that subsequently become lenders pursuant to an Assignment Agreement. Yucaipa was not an original lender signatory to the First Lien Credit Agreement, and the definition of Eligible Assignee provides that "no…Sponsor shall be an Eligible Assignee." "Sponsor" is a defined term applicable only to Yucaipa.[13]

### III.B. *Allied's 2007 Reorganization Plan*

29. On May 29, 2007, Allied completed its restructuring pursuant to a Plan of Reorganization (the "2007 Reorganization Plan") co-sponsored by Yucaipa and the IBT, under which Allied converted approximately $200 million in unsecured claims (including approximately $99 million in unsecured claims held by Yucaipa) into equity.[14] Yucaipa converted its total investment of $94.4 million into 67% of the Company's reorganized equity.[15]

30. The 2007 Reorganization Plan gave Yucaipa the right to appoint three of the five members of the Allied Board of Directors (the "Board of Directors" or the "Board"), the right to appoint Allied's Chief Executive Officer (the "CEO") as the fourth member of the Board of Directors, and approval rights over the fifth member of the Board of Directors, who would be nominated by the committee of unsecured creditors.[16] Yucaipa appointed Mr. Tochner, Mr. Walker, and Mr. Opdeweegh — all Yucaipa employees — as its initial designated Board members. [17] Additionally, Yucaipa selected Mr.

---

[10] As defined later in this report.
[11] First Lien Credit Agreement, Section 1.1, definition of "Requisite Lenders," page 41.
[12] *Id.*, Section 8.1, page 149.
[13] *Id.*, Section 1.1, definition of "Eligible Assignee," page 17, definition of "Requisite Lenders," page 41, definition of "Sponsor," page 44.
[14] YUCAIPA774597-598.
[15] Exhibit 587 (YUCAIPA752658-660), page 2.
[16] *In re Allied Automotive Group, Inc.*, No. 05-12515 (CRM) (Bankr. N.D. Ga.), ECF No. 2802 at Art. IV.D.3(d), page 64.
[17] Exhibit 500 (Yucaipa_LW00010525-531), Section 2(c), page 2.



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al.,* Adv. Pro. Nos. 13-50530 and 14-50971

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

September 27, 2019

Gendregske as CEO, and Brian Cullen ("Mr. Cullen") was elected as the unsecured creditors' nominee, with Yucaipa's approval.[18]

31.    In summary, upon Allied's 2007 exit from the 2005 Bankruptcy, Yucaipa was Allied's Sponsor and majority shareholder, with a super-majority position of Allied's outstanding common equity, and control over the Board pursuant to the 2007 Reorganization Plan.

### III.C. *The 2008 Third Amendment to Allied's First Lien Credit Agreement*

32.    In early 2008, Yucaipa began to consider purchasing Allied's debt, which would require an amendment to the First Lien Credit Agreement. On January 30, 2008, Mr. Walker (of Yucaipa) emailed Mr. Burkle (founder and managing partner of Yucaipa) stating: "we would like to discuss an idea involving buying Allied's bank debt, which is now trading in the 70s given the dislocation in the marketplace."[19]

33.    On March 31, 2008, Allied's Board formed a Special Committee (the "Special Committee") authorized to negotiate with Yucaipa in connection with Yucaipa's proposed purchase of Allied's debt. The Special Committee consisted of Mr. Gendregske and Mr. Cullen, with Mr. Cullen serving as Chairman.[20]

34.    On or about April 17, 2008, Yucaipa and Allied requested and obtained consent from a majority of the lenders to amend the First Lien Credit Agreement and enter into the Third Amendment to permit Yucaipa to become a "Restricted Sponsor Affiliate" and purchase First Lien Term Loans under limited circumstances and conditions with certain restrictions.[21]

35.    The Third Amendment precluded Yucaipa from becoming Requisite Lender and, to the extent Yucaipa decided to acquire any of the First Lien Debt, Yucaipa was subject to the following restrictions, among others:

(a) Yucaipa was permitted to acquire First Lien Term Loans only, and was prohibited from acquiring any Revolving Loans or LC Deposits.[22]

(b) Yucaipa was prohibited from acquiring an amount of First Lien Term Loans exceeding the lesser of: (i) 25% of the aggregate principal amount of the Term Loan Exposure[23] held or beneficially owned by all lenders (including Restricted Sponsor Affiliates); or (ii) $50 million of the aggregate amount of the First Lien Term Loans outstanding.[24]

(c) Yucaipa was required to make a capital contribution to Allied of no less than 50% of the aggregate principal amount of the First Lien Term

---

[18] Walker Dep. 155:12-156:13, 236:24-237:8; Exhibit 395 (Yucaipa_LW0010556-565).
[19] Exhibit 604 (YUCAIPA701764).
[20] Exhibit 284 (AHS00137527-533).
[21] Third Amendment.
[22] *Id.*, Section 2.1(c), page 2.
[23] As defined later in this report.
[24] Third Amendment; Section 2.7(c), page 6.

12



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al.,* Adv. Pro. Nos. 13-50530 and 14-50971

Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA

September 27, 2019

Loans acquired, no later than 10 days after the date of such assignment or transfer of such First Lien Term Loans.[25]

(d) Yucaipa was prohibited from exercising any and all voting rights it would otherwise have as a lender for all purposes, and from serving as Requisite Lender.[26]

36.    Restricted Sponsor Affiliate is defined as the "Sponsor and its Affiliates (other than Borrowers or any of their Subsidiaries)."[27] "Sponsor," as defined in the First Lien Credit Agreement, is applicable only to Yucaipa.[28]

37.    Term Loan Exposure is defined as follows: "with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender plus during the Term Loan Commitment Period, the unfunded Term Loan Commitment of such Lender; provided, at any time prior to the making of the initial Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Term Loan Commitment; provided further that with respect to any provisions of this Agreement relating to the voting rights of Lenders (including the right of Lenders to consent or take any other action with respect to any amendment, modification, termination or waiver of any provision of this Agreement or the other Credit Documents, or consent to any departure by any Credit Party therefrom), the aggregate outstanding principal amount of the Term Loans of all Restricted Sponsor Affiliates shall be disregarded for purposes of the definition of 'Term Loan Exposure.'"[29]

38.    Pursuant to the Third Amendment, it was agreed that:

(a) no later than ten days after the date of assignment or transfer of First Lien Term Loans, Yucaipa would make a capital contribution to Allied of no less than 50% of the aggregate principal amount of such First Lien Term Loans;[30] and

(b) Yucaipa would have no right under the First Lien Credit Agreement, or the other credit documents, to consent or take any other action with respect to any amendment, modification, termination or waiver of any provision of the First Lien Credit Agreement.[31]

39.    A similar amendment to the Second Lien Credit Agreement was entered on April 30, 2008, which allowed Yucaipa to purchase and hold Second Lien Debt and to make a capital contribution of that debt to Allied.[32] Pursuant to that amendment, Yucaipa purchased Second Lien Debt with a

[25] *Id.,* Section 10.6(i)(iii), page 7.
[26] *Id.,* Section 2.7(a), pages 5 and 7.
[27] *Id.,* Section 2.1(a), page 2.
[28] First Lien Credit Agreement Section 1.1, definition of "Sponsor," page 44.
[29] Third Amendment, Section 2.1(e), page 3.
[30] *Id.,* Section 2.7(e), page 7.
[31] *Id.,* Section 2.7(a), page 5.
[32] Exhibit 343 (AHS00064051-063).



**Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al.,** Adv. Pro. Nos. 13-50530 and 14-50971

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

**September 27, 2019**

face value of $40 million for $26.4 million.[33] However, Yucaipa did not purchase any First Lien Term Loans following the execution of the Third Amendment to the First Lien Credit Agreement until entry of a supposed Fourth Amendment, discussed below.

40. In May 2008, Yucaipa converted $20 million of its acquired $40 million in Second Lien Debt into convertible preferred stock (at 100% par value), increasing its ownership to 71.5% on a fully-diluted basis.[34]

### III.D. *Allied's 2008 Events of Default Under its Credit Agreements and Yucaipa's Tender Offer to Purchase Allied First Lien Debt*

41. On September 3, 2008, Allied received a notice of default from CIT Group/Business Credit, Inc. ("CIT"), the administrative agent and collateral agent under the First Lien Credit Agreement, notifying Allied that it was in violation of Section 6.7(a) and 6.7(b) of the First Lien Credit Agreement as of June 30, 2008, by failing to comply with the financial covenants set forth in the First Lien Credit Agreement.[35]

42. In light of the default, CIT and a steering committee of First Lien Debt lenders, including BD/S, negotiated a forbearance agreement with Allied, and a side agreement with Yucaipa. Under the agreement, the lenders would forbear taking action with respect to Allied's defaults for a period of time during which Allied could negotiate a restructuring plan. CIT and the lenders proposed that, as a precondition to forbearance, Yucaipa would suspend its ability to buy any First Lien Debt[36] during the forbearance period, and would inject equity into Allied.[37] Yucaipa agreed not to buy any First Lien Debt during the forbearance period, but refused to inject needed capital into Allied.[38]

43. After a series of negotiations among CIT, the First Lien Debt lenders, Yucaipa, and Allied, a Forbearance Agreement and Sponsor Side Agreement were executed on or about September 24, 2008.[39] With these agreements in place, restructuring negotiations were undertaken to address Allied's defaults.

44. CIT and the First Lien Debt lenders, again, requested a $30 million equity infusion from Yucaipa as part of their restructuring proposal.[40] Yucaipa not only rejected the proposed term, but submitted a counteroffer in which it proposed to purchase $45 million (face value) of Allied's First Lien Debt

---

[33] Exhibit 612 (Yucaipa044510).
[34] YUCAIPA593221-224.
[35] Exhibit 150 (AHS00037891-892), page 1.
[36] Yucaipa049153; Yucaipa049154-173, Section 2(b)(vi) page 4.
[37] Exhibit 156 (AHS00092035).
[38] *Id.*, page 2.
[39] Exhibits 152 (AHS00031619-683) and 153 (AHS00012846-852). The Forbearance Agreement was later amended in October 2008, see Exhibit 158 (AHS00031399-480).
[40] Exhibit 324 (Yucaipa_LW00001429-432), page 2.



Catherine E.
Youngman,
Litigation Trustee
for ASHINC
Corporation, et al.
v. Yucaipa
American Alliance
Fund I, L.P., et al.,
Adv. Pro. Nos. 13-
50530 and 14-
50971

Expert Witness
Report of
Jeffrey M. Risius,
CPA/ABV, CFA,
ASA

September 27,
2019

without any direct capital contribution to the company. The lenders did not accept this counteroffer.[41]

45.   In early December 2008, Yucaipa contemplated acquiring 50% of the First Lien Debt in order to take control over the credit facility and make unilateral decisions on covenants as the Requisite Lender.[42] Yucaipa intended to buy First Lien Debt with a face value of $130 million for $40 million to $50 million.[43] Because the limitations and restrictions in the Third Amendment prohibited Yucaipa from buying First Lien Debt in excess of $50 million or becoming the Requisite Lender, the purchase would require further amendment of the First Lien Credit Agreement. During a December 10, 2008 Board Meeting, Mr. Walker of Yucaipa (who also served as Chairman of Allied's Board of Directors) "advised that there would be an amendment to the Company's first lien credit facility" with Yucaipa's proposed purchase, "which amendment would remove the existing restrictions on Yucaipa ownership of Allied [] first lien debt."[44]

46.   On February 4, 2009, Yucaipa, with the approval of Allied's Yucaipa-controlled Board, launched a tender offer to the existing First Lien Debt holders to acquire First Lien Debt for approximately 16% of face value, if, among others things, (i) Allied prepaid $25 million of First Lien Debt at face value, (ii) CIT was removed as agent, (iii) more than 50% (calculated by dollar amount) of First Lien Debt lenders accepted the offer, and, (iv) an amendment was entered removing the restrictions on Yucaipa's ownership of First Lien Debt and permitting Yucaipa to hold and vote the First Lien Debt.[45]

47.   The Special Committee held the following meetings related to Yucaipa's tender offer:

(a)   On January 24, 2009, the Board of Directors of Allied held a meeting to consider and authorize or reject a proposed debt transaction involving Yucaipa.[46]

(b)   On January 26, 2009, the Board of Directors reported that the Special Committee was prepared to recommend the proposed transaction under two conditions: (i) that the opportunity to purchase First Lien Debt be extended – on the same terms and conditions as Yucaipa – to Allied's shareholders holding at least 5% of Allied stock; and (ii) Yucaipa agreed to commit to its general offer to accept payment-in-kind ("PIK") first lien interest should Allied encounter liquidity problems. Consequently, the Special Committee unanimously recommended that the Board approve the proposed transaction but requested that the Board seek to obtain modifications to the proposed transaction to allow as many Allied shareholders as practicable to participate in the First

[41] Exhibit 161 (YUCAIPA889456-459), page 2; Exhibit 327 (AHS00137568-571), page 1.
[42] Exhibit 514 (YUCAIPA718282-284), page 3.
[43] Id.
[44] Exhibit 327 (AHS00137568-571), page 2.
[45] Exhibit 170 (SPEC 0014088-148), page 54.
[46] Exhibit 331 (AHS00137574-578), page 1.

15



**Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al.,** Adv. Pro. Nos. 13-50530 and 14-50971

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

**September 27, 2019**

Lien Debt purchase and to allow Allied's Second Lien Debt holders also to participate in the First Lien Debt purchase.[47] Yucaipa rejected these proposals by the Special Committee.[48] However, the Special Committee ultimately approved the tender offer without these conditions.

48.   The lenders did not accept Yucaipa's tender offer.[49]

49.   While the tender offer was pending, in February 2009, ComVest Investment Partners III, L.P. ("ComVest") acquired approximately 55% of the First Lien Debt and became the Requisite Lender.[50] Over the following months, Yucaipa began to meet with ComVest to discuss, among other things, Allied's ongoing default status.[51] Yucaipa also began negotiating directly with ComVest for a transaction in which Yucaipa would purchase, or otherwise obtain control over, ComVest's First Lien Debt holdings.[52]

50.   In August 2009, Allied's Board of Directors agreed to forego a $4.8 million quarterly interest payment due to Lenders.[53] The motion to forego the interest payment was first suggested by Mr. Walker of Yucaipa, and was proposed as a way to ensure that there would be "adequate liquidity to provide a sufficient runway" for Yucaipa's negotiations with ComVest.[54]

### III.E.   *The 2009 Fourth Amendment to Allied's First Lien Credit Agreement*

51.   Following a series of negotiations between Yucaipa and ComVest, on August 21, 2009, Yucaipa and ComVest reached an agreement in which Yucaipa would purchase all of ComVest's First Lien Debt. As a condition to the sale of its debt, ComVest, as Requisite Lender, and Allied agreed to execute an Amendment No. 4 to the First Lien Credit Agreement (the "Fourth Amendment"). The Fourth Amendment lifted all restrictions on Yucaipa's ability to purchase First Lien Debt and allowed Yucaipa, for the first time, to acquire any type of First Lien Debt in any amount. The definitions of "Eligible Assignee" and "Term Loan Exposure" were removed in their entirety and replaced with the following:

"Eligible Assignee" means (i) *any Lender, any Affiliate of any Lender and any Related Fund (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), and (ii) any commercial bank, insurance company, investment or mutual fund or other entity that is an 'accredited investor' (as defined in Regulation D under the Securities Act) and which extends credit or*

---

[47] Exhibit 291 (ALLIED000206-207), page 1; Exhibit 332 (AHS00137579-580), page 1.
[48] Exhibit 291 (ALLIED000206-207), page 1; Exhibit 332 (AHS00137579-580), page 1; *see also* Exhibit 170 (SPEC 00140880-148).
[49] Walker Dep. 528:9-11; Exhibit 176 (AHS00032551-552), page 2.
[50] Exhibit 10 (AHS00134425-427); Exhibit 177 (AHS00095862-870).
[51] Hughes Dep. 69:14-73:5.
[52] Walker Dep. 528:19-530:3; Hughes Dep. 65:24-77:5; Exhibit 51 (YUCAIPA889564-601).
[53] Exhibit 299 (AHS00137591-593), pages 1-2.
[54] *Id.*, page 1.



Catherine E.
Youngman,
Litigation Trustee
for ASHINC
Corporation, et al.
v. Yucaipa
American Alliance
Fund I, L.P., et al.,
Adv. Pro. Nos. 13-
50530 and 14-
50971

Expert Witness
Report of
Jeffrey M. Risius,
CPA/ABV, CFA,
ASA

September 27,
2019

*buys loans; provided, neither Borrowers nor any of their Subsidiaries shall be an Eligible Assignee.[55]*

"Term Loan Exposure" means*, with respect to any Lender, as of any date of determination, the outstanding principal amount of the Term Loans of such Lender plus during the Term Loan Commitment Period, the unfunded Term Loan Commitment of such Lender; provided, at any time prior to the making of the initial Term Loans, the Term Loan Exposure of any Lender shall be equal to such Lender's Term Loan Commitment.[56]*

52.    The amendment of the definitions of Eligible Assignee and Term Loan Exposure removed the restrictions imposed on Yucaipa under The Third Amendment, ostensibly permitting Yucaipa to become the Requisite Lender.

53.    The validity of the Fourth Amendment was contested first by CIT, in its capacity as the Agent, and later by certain First Lien Debt lenders, because it was executed without unanimous lender consent. ComVest was the only lender that consented to the Fourth Amendment.[57] Pursuant to the First Lien Credit Agreement, enacting the Fourth Amendment required the unanimous consent of all lenders.[58]

(a) In November 2009, Yucaipa and Allied brought suit against CIT in the Superior Court of Fulton County, Georgia (the "Georgia Action"), seeking, among other things, a declaratory judgment that the Fourth Amendment was valid and that Yucaipa was the Requisite Lender. In response, CIT filed counterclaims seeking, among other things, a declaration that the Fourth Amendment was invalid. After two years of litigating the Georgia Action, the parties settled on or about December 5, 2011. CIT entered into a settlement agreement, in which CIT, solely in its individual capacity and not on behalf of any other lenders, agreed to recognize Yucaipa as the Requisite Lender.[59]

(b) On October 18, 2012, Allied filed an adversary proceeding seeking a determination as to, among other things, the identity of the Requisite Lenders under the First Lien Credit Agreement.[60]

(c) In 2012, the Fourth Amendment was found to be null and void by multiple courts, as described below:

    i.    On January 17, 2012, BD/S commenced an action in the Supreme Court of the State of New York against Yucaipa seeking a declaration that the Fourth Amendment was void and

---

[55] Fourth Amendment, Exhibit 26 (YUCAIPA_DEPO00017891-905), Section 2.1(b), definition of "Eligible Assignee," page 2.
[56] *Id.,* definition of "Term Loan Exposure," page 2.
[57] *Id.,* page 13.
[58] First Lien Credit Agreement, Section 10.5(b), pages 160-61.
[59] Exhibit 198 (MJX 0005136-161), page 12.
[60] Adv. Proc. No. 12-50947, D.I. 1.



Catherine E.
Youngman,
Litigation Trustee
for ASHINC
Corporation, et al.
v. Yucaipa
American Alliance
Fund I, L.P., et al.,
Adv. Pro. Nos. 13-
50530 and 14-
50971

Expert Witness
Report of
Jeffrey M. Risius,
CPA/ABV, CFA,
ASA

September 27,
2019

that Yucaipa was not the Requisite Lender (the "New York Action").[61]

    ii.    On August 27, 2012, BD/S filed a motion for summary judgment in the New York Action.[62]

    iii.    On November 19, 2012, the New York Court ruled from the bench in favor of BD/S, finding that the Fourth Amendment was void *ab initio* and that Yucaipa was not the Requisite Lender. The decision was affirmed by the First Department of the New York Appellate Division, and the New York Court of Appeals denied leave to appeal further.[63]

    iv.    Following the rulings of the New York courts, on August 8, 2013, the Bankruptcy Court in these proceedings granted summary judgment to BD/S holding that they, not Yucaipa, were the Requisite Lenders, and that the Third Amendment governed.[64] Yucaipa unsuccessfully appealed the decision to the Delaware District Court and the Third Circuit.[65]

54.    Because the Fourth Amendment is null and void, the Third Amendment is the latest enforceable amendment and its terms govern any holders of First Lien Debt, including Yucaipa. Pursuant to the Third Amendment:

    (a)    Yucaipa was permitted to acquire First Lien Term Loans only and was prohibited from acquiring any LC Deposits.[66] Accordingly, Yucaipa breached the First Lien Credit Agreement, as amended, by purchasing $30,400,458.40 of LC Deposits.[67]

    (b)    Yucaipa was prohibited from acquiring an amount of First Lien Term Loans exceeding the lesser of: (i) 25% of the aggregate principal amount of the Term Loan Exposure held or beneficially owned by all lenders (including Restricted Sponsor Affiliate); or (ii) $50 million in

---

[61] *BDCM Opp. Fund II, L.P., et al. v. Yucaipa Am. Alliance Fund I, LP, et al.*, No. 650150/2012 (N.Y. Sup. Ct. N.Y. Cnty.), Doc. No. 1.

[62] *Id.*, Doc. No. 41.

[63] Nov. 19, 2012 Transcript of Hearing on Motion for Summary Judgment; Mar. 29, 2013 Order on Motion for Summary Judgment, Doc. No. 84. A written decision was subsequently entered on March 8, 2013. *See BDCM Opp. Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, No. 650150/2012, 2013 WL 1290394, at *5-6 (N.Y. Sup. Ct. N.Y. Cnty. Mar. 8, 2013), *aff'd*, 112 A.D.3d 509 (1st Dep't 2013), *leave to appeal denied*, 22 N.Y.3d 1171 (2014).

[64] 13-50530, D.I. 297, page 127-28.

[65] *In re Allied Sys. Holdings Inc.*, 556 B.R. 581, 608-09 (D. Del. 2016), *aff'd sub nom.*, *In re ASHINC Corp.*, 683 F. App'x 131, 141-42 (3d Cir. 2017).

[66] Third Amendment; Section 2.1(c), page 2.

[67] Assignment and Assumption Agreement entered into by and between ComVest Investment Partners III, L.P. and CVY Holdings, LLC, dated August 21, 2009, Exhibit 25 (Yucaipa052924-931), Paragraph 6, page 2.



Catherine E.
Youngman,
Litigation Trustee
for ASHINC
Corporation, et al.
v. Yucaipa
American Alliance
Fund I, L.P., et al.,
Adv. Pro. Nos. 13-
50530 and 14-
50971

Expert Witness
Report of
Jeffrey M. Risius,
CPA/ABV, CFA,
ASA

September 27,
2019

principal amount.[68] Accordingly, Yucaipa's acquisition of $114,712,088 of First Lien Term Loans was in violation of the Third Amendment.[69]

(c) Yucaipa was required to make a capital contribution to Allied of no less than 50% of the aggregate principal amount of the First Lien Term Loans acquired, no later than 10 days after the date of such assignment or transfer of such First Lien Term Loans.[70] I understand that there is no dispute that Yucaipa never made such a capital contribution to Allied. Thus, this is another violation of the Third Amendment.

### III.F. *Yucaipa's 2009 Acquisition of First Lien Debt*

55. Concurrently with the execution of the Fourth Amendment, Yucaipa and ComVest entered into a Loan Purchase Agreement[71] and Assignment and Assumption Agreement,[72] whereby Yucaipa acquired $114,712,088.66 of First Lien Term Loans and $30,400,458.40 of LC Deposits, as presented in the table below.[73]

| Yucaipa's Acquisition of First Lien Debt | | | | | |
|---|---|---|---|---|---|
| *In U.S. Dollars* | | | | | |
| | Effective Date: August 21, 2009 | | | Yucaipa Ownership | |
| Facility Assigned | Maximum Amount Allowed [a] | Aggregate Amount for all Lenders [b][c] | Assigned Amount (Yucaipa) [d] | (%) of Maximum | (%) of Aggregate |
| First Lien Term Loans | $ 180,000,000.00 | $ 175,950,000.00 | $ 114,712,088.66 | 63.73% | 65.20% |
| Revolving Loans | 35,000,000.00 | 34,896,492.00 | 0 | 0.00% | 0.00% |
| LC Commitment | 50,000,000.00 | 50,000,000.00 | 30,400,458.40 | 60.80% | 60.80% |
| Total | $ 265,000,000.00 | $ 260,846,492.00 | $ 145,112,547.06 | 54.76% | 55.63% |

Source: The First Lien Credit Agreement, Loan Purchase Agreement and Assignment and Assumption Agreement.
[a] Reflects the maximum amount allowed under the First Lien Credit Agreement.
[b] Reflects the aggregate amount of Commitment/Loans/LC Deposits for all lenders as of August 21, 2009.
[c] Breakdown of the aggregate amount for all First Lien Debt lenders is taken from YUCAIPA0769793.
[d] Reflects the amount assigned to Yucaipa under the Assignment and Assumption Agreement.

56. In connection with the assignment of ComVest's First Lien Debt to Yucaipa, Yucaipa (i) paid ComVest an aggregate amount in cash of $43,013,927.04[74] and (ii) agreed that "in connection with each Liquidity Event that occurs at any time on or following the date [of the Loan Purchase Agreement (i.e., August 21, 2009)], Yucaipa shall pay, or cause to be paid, to ComVest … a subsequent cash payment (…"Subsequent Payment")."[75]

---

[68] Third Amendment, Section 2.7(c), page 6.
[69] Loan Purchase Agreement among Yucaipa American Alliance Fund I, LP, Yucaipa American Alliance (Parallel) Fund I, LP, and ComVest Investment Partners III, LP, dated August 21, 2009, Exhibit 408 (YUCAIPA895012-050), Section 1.2, pages 1-2.
[70] Third Amendment, Section 2.7(e), page 7.
[71] Loan Purchase Agreement, Exhibit 408 (YUCAIPA895012-050).
[72] Assignment and Assumption Agreement, Exhibit 25 (Yucaipa052924-931).
[73] *Id.*, page 2.
[74] Loan Purchase Agreement, Exhibit 408 (YUCAIPA895012-050), Section 1.3, page 2.
[75] *Id.*, Section 1.6(a), page 3.



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al.,* Adv. Pro. Nos. 13-50530 and 14-50971

Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA

September 27, 2019

57.    Yucaipa and ComVest also agreed that, as a closing condition to the transaction, Allied would reimburse ComVest in the amount of $1,850,000 for its legal fees and expenses in connection with the sale of its debt to Yucaipa,[76] and that Allied would reimburse Yucaipa for its fees and expenses in the amount of $831,325.83.[77] Allied was not a party to the Loan Purchase Agreement.[78]

58.    Allied also made a payment of $250,000 to Jonathan Ornstein ("Mr. Ornstein"), a mutual acquaintance of Mr. Burkle and a ComVest principal. Mr. Ornstein assisted in brokering the ComVest transaction after being contacted by Yucaipa.[79] The payment was pursuant to a "consulting agreement" with a term of January 1, 2010 to January 1, 2011.[80] Mr. Ornstein testified that he did not recall having provided any consulting services to Allied in that period of time.[81] He also testified that he was paid a broker's fee of approximately $100,000 or $200,000.[82]

### III.G.    *JCT Efforts to Acquire Allied*

59.    Allied was in continuous breach of the financial covenants under its credit facility from August 2008 through the spring of 2012, and did not make any required payments of principal or interest after July 2009.[83]

60.    From as early as the fall of 2008, T. Michael Riggs ("Mr. Riggs") had expressed interest in pursuing a strategic combination with Allied.[84] In 2009, Mr. Riggs became Chairman of JCT's parent company, and eventually CEO.[85] JCT is a unionized car hauling company and a competitor of Allied. Mr. Gendregske, Allied's CEO, testified that a combination of Allied with JCT would offer the best synergies as compared to a combination with any other unionized carrier.[86]

61.    Prior to Allied's 2012 bankruptcy, JCT proffered a series of offers that were effectively for the acquisition of substantially all of the assets of Allied.[87] To this end, JCT proposed to purchase Allied's First Lien Debt from Yucaipa, BD/S, and other lenders, and then exercise its right as Requisite Lender to take Allied into bankruptcy and credit bid its debt at an auction for the purchase of Allied's assets under Section 363 of Title 11 of the United States Code.[88]

---

[76] *Id.*, Section 1.5(a)(ii), page 2.
[77] *Id.*, Section 1.5(b)(ii), page 3.
[78] *Id.*, page 1.
[79] AHS00075414, page 2 of 86; Ornstein Dep. 38:15-21.
[80] Ornstein Exhibit 20 (YUCAIPA708714-720), Paragraph 5, page 3 of 7.
[81] Ornstein Dep. 130:15-22.
[82] *Id.* 129:1-14.
[83] YUCAIPA0705042-045, page 3.
[84] Riggs Dep. 160:23-161:1, 162:6-13; Exhibit 101 (YUCAIPA700026-027).
[85] Riggs Dep. 20:20-21:4.
[86] Gendregske Dep. 210:24-211:8, 213:13-20; *see also* Riggs Dep. 178:21-179:11.
[87] Riggs Dep. 189:21-190:16.
[88] Exhibit 105 (YUCAIPA709758-773); Exhibit 107 (YUCAIPA1010155-165); Exhibit 116 (YUCAIPA1024532-542); Exhibit 117 (YUCAIPA831008-019);



Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al., Adv. Pro. Nos. 13-50530 and 14-50971

Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA

September 27, 2019

62.    Throughout the negotiation process for the potential sale of its First Lien Debt to JCT, Yucaipa sought a premium over its principal amount of First Lien Debt, as compared to other First Lien Debt lenders, who would not receive similar treatment.[89]

63.    On February 15, 2012, the Board of Directors of Allied received a letter from Adam C. Harris ("Mr. Harris") of Schulte Roth & Zabel, LLP ("Schulte"), as counsel for BD/S, stating that "the Borrowers and Subsidiary Guarantors are insolvent. … As a result, the Board of Directors and officers owe a fiduciary duty to the creditors of the Borrowers and Subsidiary Guarantors to maximize value for their benefit. … [W]e believe that the Board of Directors and management of the Borrowers are in breach of their fiduciary duties by virtue of the fact that they have and continue to operate the Borrowers and Subsidiary Guarantors principally for the benefit of their largest shareholders," Yucaipa.[90] I understand that BD/S did not receive a response.

64.    On March 22, 2012, the Board of Directors of Allied received a second letter from Mr. Harris of Schulte addressing "the continuing breaches of fiduciary duties by Allied's Board of Directors to Allied's creditors, including Black Diamond and Spectrum."[91] The letter stated that "the Borrowers and Subsidiary Guarantors are hopelessly insolvent and, as a result, the Board of Directors and officers owe fiduciary duties to the creditors, including our clients [BD/S], to maximize value for their benefit. These fiduciary duties have been breached because the Board of Directors has engaged – and continues to engage – in conduct designed to benefit Yucaipa American Alliance Fund I, LP and Yucaipa American Alliance (Parallel) Fund I, LP… , the controlling shareholders, at the expense of the Lenders such as [Black Diamond and Spectrum.]"[92] Additionally, the letter stated that "[a] restructuring or sale is inevitable. We [BD/S] want immediate assurances from the Board of Directors that they will only pursue a transaction or restructuring that provides equal treatment to all creditors."[93]

65.    On March 30, 2012, Allied's General Counsel responded with a letter stating that the Board "has not breached any fiduciary duties and has acted, and continues to act, in the best interests of Allied's stakeholders."[94] Allied's Board did not reach out to BD/S for further discussion of their concerns.[95]

66.    As shown in the table below, the debt purchase offers from JCT to Yucaipa ranged from $150 million to $160 million between December 2011 and

---

Exhibit 118 (YUCAIPA831026-044); Exhibit 90 (BDCM0000031-039); YUCAIPA870652-659; Exhibit 119 (YUCAIPA831120-140); and Exhibit 122 (YUCAIPA831192-219). *See also* Riggs Dep. 190:10-16.

[89] Riggs Dep. 256:17-257:3; Ciupitu Dep 68:9-70:16; Exhibit 638 (YUCAIPA713075).

[90] Exhibit 349 (YUCAIPA976484-487), page 2.

[91] Exhibit 350 (YUCAIPA976488 -490), page 1.

[92] *Id.*, pages 1-2.

[93] *Id.*, page 2.

[94] Exhibit 639 (YUCAIPA927707).

[95] Cullen Dep. 240:20-241:9.



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al., Adv. Pro. Nos. 13-50530 and 14-50971*

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

**September 27, 2019**

March 2012. All but one of the debt purchase offers consisted of a combination of cash and the issuance of notes by JCT.



**Summary of Debt Purchase Offers Received by Yucaipa**

*In Millions of U.S. Dollars*

| Date | Amount |
|---|---|
| 12/9/2011 | $150 |
| 12/12/2011 | $160 |
| 12/15/2011 | $150 |
| 12/19/2011 | $150 |
| 2/20/2012 | $155 |
| 2/28/2012 | $150 |
| 3/8/2012 | $155 |
| 5/17/2012 | Filed for Bankruptcy |

Source: Exhibit 116, Exhibit 117, Exhibit 118, Exhibit 90, YUCAIPA870652, Exhibit 119, and Exhibit 122.

67.  JCT also offered $1.00 of cash consideration for the purchase of all Second Lien Term Loans in the offers provided to Yucaipa.[96]

68.  On December 19, 2011, JCT circulated a term sheet for the purchase of all Allied debt held by Yucaipa, BD/S, and CIT (the "JCT 2011 Offer"). The JCT 2011 Offer implies a total value of Allied of $244.2 million. The purchase price terms were as follows:[97]

(a)  Yucaipa would receive $150 million, with $100 million paid in cash at closing and $50 million paid in the form of JCT notes issued and delivered upon Allied's filing for bankruptcy in connection with a 363 sale;

(b)  BD/S would receive "100% of principal claims transferred" with the entire price paid in the form of JCT notes issued and delivered upon Allied's filing for bankruptcy in connection with a 363 sale; and

(c)  CIT would receive $20 million in exchange for its debt holdings (the $35 million Revolving Loans), with the entire purchase price paid in cash at closing.

69.  Yucaipa pushed back on the $150 million that JCT was offering for its debt, which already reflected a premium to the face amount of its First Lien Debt of $134.8 million, and demanded an additional $5 million. On March 5, 2012, Mr. Tochner of Yucaipa sent an email stating that Mr. Riggs' "purchase price is $150 vs our $155," and advising, "I'd stay tight on

---

[96] Exhibit 116 (YUCAIPA1024532-542); Exhibit 117 (YUCAIPA831008-019); Exhibit 118 (YUCAIPA831026-044); Exhibit 90 (BDCM0000031-039); YUCAIPA870652-659; Exhibit 119 (YUCAIPA831120-140); and Exhibit 122 (YUCAIPA831192-219).
[97] Exhibit 90 (BDCM0000031-39).

22



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al.,* Adv. Pro. Nos. 13-50530 and 14-50971

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

September 27, 2019

demanding $155."[98] Mr. Riggs responded asking for an explanation of "the $155 million figure (versus the $150)," noting that "[i]t will make it so much harder to get your lenders AND my lenders to go along with this transaction."[99]

70.    Despite these concerns, JCT capitulated to Yucaipa's demand. On March 8, 2012, JCT sent Yucaipa a "final" term sheet with a purchase price of $155 million for Yucaipa's First Lien Debt.[100] Yucaipa has admitted that it believed this to be a real, viable offer from JCT, and Yucaipa used the $155 million offer as the basis for the valuation of its investment in Allied which it reported to its investors.[101] Similarly, Mr. Riggs testified that it was his dream to combine JCT and Allied,[102] that he wouldn't waste time making proposals he didn't think he could consummate,[103] and that he was confident in his ability to obtain proper financing to do so.[104] JCT's corporate representative, Theo Ciuputu, also testified that JCT's offers, including the March 8, 2012 offer, "were not intended to waste anyone's time," that JCT "never submitted an offer that we didn't try to pursue," and that "Jack Cooper was very interested in acquiring Allied."[105]

71.    Relying on the March 8, 2012 "final" term sheet with JCT, Yucaipa pled in a counterclaim against BD/S in these proceedings — as well as RICO actions filed in New York and Delaware — that JCT was offering a deal of $305 million for all of Allied's debt. Yucaipa claimed that, but for the filing of the 2012 bankruptcy, a JCT sale would have been consummated at $170 million more than the ultimate figure of approximately $135 million.[106]

72.    In contrast to the premium over par that JCT was offering Yucaipa in the March 8, 2012 term sheet, JCT's last offer to BD/S, on May 10, 2012, included a purchase price of only 70% of par, with the possibility of increasing to 75% if BD/S would agree to certain conditions. As discussed,

---

[98] Exhibit 638 (YUCAIPA713085).

[99] *Id.*; *see also* Riggs Dep. 266:18-24 (JCT's final term sheet to Yucaipa in March 2012 offered "a higher percentage of the face value" than JCT was offering BD/S); Ciuputu (JCT 30(b)(6)) Dep. 173:15-175:21 ("Q: Would Jack Cooper have agreed to pay a premium if Yucaipa, in fact, was not a requisite lender? . . . A: I – I don't believe so.").

[100] Exhibit 122 (YUCAIPA831192-219).

[101] Tochner Dep. 306:10-309:16.

[102] Riggs Dep. 97:17-98:5, 161:18-162:13, 178:21-179:11, 271:5-13.

[103] Riggs Dep. 121:12-19, 166:14-18.

[104] Riggs Dep. 267:9-268:16.

[105] Ciuputu (JCT 30(b)(6)) Dep. 164:17-167:11; *see also id.* 37:10-21 ("The goal was to acquire Allied."); Riggs Dep. 267:9-268:16. Even in the spring of 2011, JCT had made a series of offers to purchase Allied debt from BD/S and Yucaipa, ranging up to about 84 cents on the dollar. *See* Exhibit 663 (BDCM0006125-126). That proposal was not consummated because Yucaipa, in Riggs' words, "demanded a much higher price. A crazy high price."

[106] Adv. Proc. No. 14-50971, D.I. 19, Paragraph 9(e), page 36; Yucaipa Responses to BD/S Interrogatories, dated March 30, 2016, Response to Interrogatory No. 2 ("A purchase price of 'par plus accrued and unpaid interest' for all Lenders would have amounted to approximately $305 million" as set forth in the March 8, 2012 term sheet.).



Catherine E.
Youngman,
Litigation Trustee
for ASHINC
Corporation, et al.
v. Yucaipa
American Alliance
Fund I, L.P., et al.,
Adv. Pro. Nos. 13-
50530 and 14-
50971

Expert Witness
Report of
Jeffrey M. Risius,
CPA/ABV, CFA,
ASA

September 27,
2019

BD/S insisted to Allied's Board and Yucaipa that such unequal treatment was improper.[107]

### III.H. *Yucaipa's Demand for a Premium – As Opposed to Pari Passu Treatment With the Other First Lien Debt Lenders – in Negotiations with JCT, Leading to Allied's 2012 Bankruptcy*

73.    Throughout the negotiation process between JCT and Yucaipa, BD/S repeatedly requested that all lenders be treated ratably:

(a)    As discussed, on February 15, 2012 and March 22, 2012, Mr. Harris of Schulte wrote letters to the Board of Directors, stating that the Board had been breaching its fiduciary duties by engaging in conduct designed to benefit Yucaipa at the expense of other lenders, and requesting equal and ratable treatment for all lenders in any restructuring deal with JCT.[108]

(b)    On May 15, 2012, Mr. Harris of Schulte, on behalf of BD/S, sent an email to Yucaipa and its counsel stating: "As a follow-up to last night's discussion, please be prepared to advise whether Yucaipa is prepared to (a) compromise on the purchase price it had previously required from JCT in order to facilitate a transaction in which Yucaipa, Black Diamond and Spectrum would each receive equal and ratable treatment on account of their First Lien debt, and (b) confirm that Yucaipa will contractually commit to assure that Black Diamond and Spectrum will receive equal and ratable treatment with Yucaipa in any transaction affecting the First Lien debt (with JCT or anyone else)."[109]

(c)    On May 16, 2012, Mr. Harris of Schulte circulated a draft of a lock up agreement requiring, among other things, that Yucaipa "not...engage in discussions...with respect to...any transaction...if such Transaction does not provide that each Party that owns...First Lien Obligations...will receive...Identical Consideration..."[110]

(d)    On May 17, 2012, after hearing no response from Yucaipa, BD/S sent an email stating: "We have not received any comments from you on the draft agreement we distributed last night. Nor have we received any written indication that Yucaipa and Allied have agreed to extend the [Voluntary Filing Standstill Period]. Further, despite representations that principals [of] Yucaipa would be reaching out to principals of Black Diamond, no such communications have been made. As a result, unless we receive extension agreements from each of Yucaipa and Allied by 12 noon today, the clients have authorized us to file the involuntary petitions. This information has already been conveyed to

---

[107] Exhibit 123 (BDCM0002625-641), page 1; Exhibit 88 (BDCM0002462-469), page 2.
[108] Exhibit 349 (YUCAIPA976484-487), page 2; Exhibit 350 (YUCAIPA976488-490), page 2.
[109] Exhibit 713 (BDCM0003525-528), page 1.
[110] Exhibit 265 (BDCM0004354-368), page 5.



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al., Adv. Pro. Nos. 13-50530 and 14-50971*

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

September 27, 2019

Kasowitz and Black Diamond has tried to reach Derex Walker by telephone as well."[111]

74.    On May 17, 2012, having received no substantive responses from Yucaipa, BD/S filed an involuntary petition for bankruptcy against Allied in the Bankruptcy Court.[112] The Debtors subsequently consented to the entry of an order for relief and filed voluntary petitions on behalf of their subsidiaries and affiliates.[113]

75.    JCT continued to pursue a purchase of Allied's assets, and submitted the following stalking-horse bids:

(a) On August 23, 2012, JCT submitted a stalking-horse bid for Allied's assets, valued at $40 million in cash plus $80 million in Second Lien Term Loans, plus 14% of non-voting common stock (valued at $80 million), plus "Assumed Liability Amount."[114]

(b) On October 26, 2012, JCT provided a revised transaction proposal with $120 million of cash, plus 14% of the non-voting common stock in pro forma JCT with a value estimated to equal $80 million, plus the assumption of Allied's liabilities for past due amounts to the Central States Pension Fund in an amount not to exceed $4 million.[115]

76.    A 363 auction for Allied's assets was eventually held in August 2013, and reopened in September 2013. At the September auction, JCT submitted a revised bid for substantially all of Allied's assets of $135 million, consisting of $125 million in cash and $10 million in issued JCT notes.[116]

77.    Ultimately, JCT's bid was determined to be the highest and best. On December 27, 2013, JCT acquired substantially all of Allied's assets for $135 million (the "JCT 363 Sale").[117] The net proceeds from the JCT 363 Sale, after taking into account certain expenses, were $123.4 million.[118]

78.    Additionally, the Estate incurred prepetition expenses and other wind down expenses, as well as the requirement to pay off the debtor in possession ("DIP") financing, as detailed below. Accordingly, the net proceeds from the JCT sale available to all lenders was ultimately $53.8 million.

---

[111] Exhibit 476 (BDCM0034431-432).
[112] Case No. 12-11564, D.I.1.
[113] Case No. 12-11564, D.I. 86.
[114] SPEC0019765-778, page 3.
[115] YUCAIPA944591-597, page 3.
[116] In the United States Bankruptcy Court for the District of Delaware, Transcript of Auction Proceedings, Auction Date September 12, 2013, Case No. 12-11564, pages 14-17; Exhibit 129 (Notice of Filing of Asset Purchase Agreement) at D.I. 1812-1, Section 2.1, page 20 of 145.
[117] Case No. 12-11564, D.I. 2127 (Report of Sale of Debtors' Assets).
[118] LIT-TRUSTEE_000007.



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al.,* Adv. Pro. Nos. 13-50530 and 14-50971

Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA

September 27, 2019

| Actual JCT 363 Sale Proceeds | | | |
|---|---|---|---|
| *In Millions of U.S. Dollars* | | | |
| Actual JCT 363 Sale Proceeds | | Notes | |
| | | | Amount |
| Net Proceeds from Sale - 12/27/13 | | [a] | $ 123.383 |
| Sale Escrow - 5/16/14 | | [a] | 9.500 |
| DIP Payoff | | [a] | (29.590) |
| Expense Reserve | | [a] | (8.856) |
| Net | | | 94.437 |
| | | | |
| Wind Down Reserve - 12/27/13 | | [a] | (6.000) |
| Wind Down Reserve - 5/16/14 | | [a][b] | (6.500) |
| Prepetition Expenses | | [a] | (28.101) |
| | | | |
| **Net Proceeds from JCT 363 Sale Available for All Lenders** | | | $ 53.836 |

[a] Based on the file "LIT- TRUSTEE_000007_CONFIDENTIAL.pdf"
[b] Based on the file "LIT- TRUSTEE_000008_CONFIDENTIAL.pdf"

79. At the 2013 auction, BD/S, acting as Requisite Lenders, successfully credit bid for certain real estate assets that were not sold to JCT, and formed SBDRE LLC ("SBDRE")[119] as an acquisition vehicle for those assets. On September 30, 2013, the bankruptcy court approved the credit bid and sale of the remaining assets to SBDRE.[120]

80. The First Lien Debt lenders acquired certain real estate assets of Allied for a $5.0 million credit bid at the auction, subject to adjustment based on subsequent appraisals.[121] The real estate assets were determined to have an "Appraised Value"[122] of approximately $21.1 million six months following the credit bid.[123]

### III.I. *Transfers of Funds Made by Allied for Yucaipa's Benefit, From 2007 Through 2011*

81. Beginning shortly after Allied's emergence from the 2005 Bankruptcy in 2007, Allied made a series of payments for Yucaipa's benefit.

---

[119] Amended and Restated Limited Liability Company Agreement of SBDRE LLC.
[120] Case No. 12-11564, D.I. 1868 (Order Authorizing and Approving Sale of Assets), 1868-1 (Asset Purchase Agreement), Sections 2.1(a), 10.1, definition of "Initial Claim Contribution Amount," page 30, definition of "Post-Closing Claim Contribution Amount," page 33.
[121] In the United States Bankruptcy Court for the District of Delaware, Transcript of Auction Proceedings, Auction Date September 12, 2013, Case No. 12-11564, pages 20-24; Case No. 12-11564, D.I. 1868-1 (Asset Purchase Agreement), Sections 2.1(a), 2.2, 10.1, definition of "Initial Claim Contribution Amount," page 30, definition of "Post-Closing Claim Contribution Amount," page 33.
[122] Case No. 12-11564, D.I. 1868-1 (Asset Purchase Agreement), Section 10.1, definition of "Appraised Value," page 27.
[123] Based on the file "Appraised Valuation Determination.pdf."



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al.,* Adv. Pro. Nos. 13-50530 and 14-50971

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

**September 27, 2019**

82.    Allied made the following payments to Yucaipa's legal counsel—Kasowitz Benson Torres LLP ("Kasowitz") in New York and Latham & Watkins LLP ("Latham") in California—of legal fees incurred by Yucaipa.[124]

| Transfer Date | Transferred Amount | Recipient |
|---|---|---|
| 11/19/2007 | $13,701.44 | Latham |
| 12/11/2007 | $26,064.71 | Latham |
| 12/13/2007 | $196,295.99 | Latham |
| 1/2/2008 | $8,408.82 | Latham |
| 5/2/2008 | $18,642.50 | Latham |
| 10/15/2008 | $36,461.28 | Latham |
| 12/31/2008 | $1,280,000.00 | Latham |
| 12/23/2009 | $15,276.86 | Latham |
| 12/23/2009 | $19,155.09 | Kasowitz |
| 12/31/2009 | $26,961.67 | Latham |
| 2/4/2010 | $4,495.50 | Latham |
| 3/8/2010 | $100,379.58 | Kasowitz |
| 4/13/2010 | $38,128.38 | Kasowitz |
| 4/16/2010 | $13,359.04 | Kasowitz |
| 5/13/2010 | $98,894.79 | Kasowitz |
| 7/26/2010 | $101,538.66 | Kasowitz |
| 9/15/2010 | $191,526.39 | Kasowitz |
| 9/20/2010 | $304,033.11 | Kasowitz |
| 9/23/2010 | $33,220.53 | Latham |
| 10/6/2010 | $209,165.47 | Kasowitz |
| 10/6/2010 | $46,285.93 | Latham |
| 11/2/2010 | $360,447.42 | Kasowitz |
| 12/9/2010 | $1,235.00 | Latham |
| 12/16/2010 | $111,808.98 | Kasowitz |
| 12/21/2010 | $4,897.50 | Kasowitz |
| 12/31/2010 | $39,106.45 | Latham |
| 3/7/2011 | $237,893.64 | Kasowitz |
| 3/11/2011 | $26,536.16 | Latham |
| 6/30/2011 | $100,000.00 | Kasowitz |
| 9/7/2011 | $117,321.71 | Kasowitz |
| 10/12/2011 | $200,000.00 | Kasowitz |
| 11/23/2011 | $100,000.00 | Kasowitz |
| 12/9/2011 | $75,000.00 | Kasowitz |
| 12/15/2011 | $75,000.00 | Kasowitz |
| 12/27/2011 | $139,256.33 | Latham |

---

[124] The Yucaipa Defendants' First Supplemental Responses and Objections to the Official Committee of Unsecured Creditors' First Set of Requests for Admission, dated May 29, 2015.



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al., Adv. Pro. Nos. 13-50530 and 14-50971*

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

**September 27, 2019**

83.  In August 2009, Allied paid ComVest $1,850,000 as reimbursement for its legal fees and expenses in connection with the sale of its debt to Yucaipa,[125] and paid Yucaipa $831,325.83 as reimbursement for its fees and expenses.[126]

84.  In January 2010, Allied made a payment of $250,000 to Mr. Ornstein for his role in brokering the ComVest transaction.[127]

---

[125] Loan Purchase Agreement, Exhibit 408 (YUCAIPA895012-050), Section 1.5(a)(ii), page 2.
[126] *Id.*, Section 1.5(b)(ii), page 3.
[127] Ornstein Exhibit 20 (YUCAIPA708714-720), page 2; AHS00075414; Ornstein Dep. 38:15-21.

28



Catherine E.
Youngman,
Litigation Trustee
for ASHINC
Corporation, et al.
v. Yucaipa
American Alliance
Fund I, L.P., et al.,
Adv. Pro. Nos. 13-
50530 and 14-
50971

Expert Witness
Report of
Jeffrey M. Risius,
CPA/ABV, CFA,
ASA

September 27,
2019

## IV.   Estate Damage Claims

### IV.A. *Estate Damage Claim #1*

85.  Counsel has asked me to determine the economic damages suffered by the Estate as a result of Yucaipa's alleged breach of Section 2.7(e) of the Third Amendment related to its failure to make a capital contribution within 10 days of no less than 50% of the aggregate principal amount of the First Lien Term Loans acquired by Yucaipa on August 21, 2009. Counsel has asked me to determine the economic damages under Estate Damage Claim #1 in two ways: (1) that Yucaipa should have contributed half of its First Lien Term Loan debt to capital by contributing $57.4 million of cash or (2) that Yucaipa should have forgiven $57.4 million of First Lien Term Loan debt.

86.  On August 21, 2009, Yucaipa purchased $114.7 million of First Lien Term Loans from ComVest through the execution of the Loan Purchase Agreement[128] and the Assignment and Assumption Agreement.[129]

87.  Pursuant to Section 2.7(e) of the Third Amendment, a capital contribution in the amount of half of the First Lien Term Loans that were acquired was to be made by August 31, 2009, accounting for the 10-day period within which Yucaipa was required to make a capital contribution.

88.  If Yucaipa had made this $57.4 million contribution, the Estate would have been better off by $57.4 million. This holds true notwithstanding whether the required contribution would have involved the receipt of $57.4 million in cash or the forgiveness of $57.4 million in debt.[130] Yucaipa never made the required capital contribution, resulting in damages to the Estate of $57.4 million.

89.  In addition to the damage of $57.4 million, I have calculated the pre-judgment interest associated with this damage. Counsel has instructed me to calculate pre-judgment interest using simple interest at the statutory rate of 9.0%. The damage period for Estate Damage Claim #1 spans from the date Yucaipa failed to contribute the capital associated with the acquired First Lien Term Loans (i.e., August 31, 2009) through September 27, 2019, or 10.1 years.

90.  I applied simple interest at the 9% statutory interest rate to the concluded damage for the indicated damage period for Estate Damage Claim #1. As

---

[128] Loan Purchase Agreement, Exhibit 408 (YUCAIPA895012-050).

[129] Assignment and Assumption Agreement, Exhibit 25 (Yucaipa052924-931).

[130] Yucaipa represented to its auditors and investors that the enterprise value of Allied was greater than the First Lien Debt in quarterly auditor memos from 2008 through 2011 (YUCAIPA0593196, YUCAIPA593221, YUCAIPA0593239, YUCAIPA0593255, YUCAIPA0593204, YUCAIPA0593225, YUCAIPA0593243, YUCAIPA0955102, YUCAIPA0593208, YUCAIPA0593228, and YUCAIPA0593246). While I do not endorse or accept these valuations, Yucaipa's admission belies the notion that a contribution in the form of debt reduction would have benefitted the Estate by any amount less than $57.4 million.



Catherine E.
Youngman,
Litigation Trustee
for ASHINC
Corporation, et al.
v. Yucaipa
American Alliance
Fund I, L.P., et al.,
Adv. Pro. Nos. 13-
50530 and 14-
50971

Expert Witness
Report of
Jeffrey M. Risius,
CPA/ABV, CFA,
ASA

September 27,
2019

presented in Exhibit A.1, the concluded damage, inclusive of statutory interest, for Estate Damage Claim #1 is $109.4 million.

### IV.B. *Estate Damage Claim #2*

91.    Counsel has asked me to determine the economic damages suffered by the Estate as a result of Yucaipa allegedly wrongfully usurping Allied's corporate opportunity and failing to effectively pursue the sale of Allied to JCT in late 2011 through spring 2012, and the Allied Board of Directors' failure to take any steps to prevent such usurpation.

92.    As described above, JCT was highly motivated to acquire Allied, and, to that end, made numerous offers to purchase Allied First Lien Debt in 2011-2012 with the objective of acquiring Allied in a 363 sale.[131] Defendants have admitted in multiple court filings that JCT was offering a deal of $305 million for all of Allied's debt — claiming that, but for the filing of the 2012 bankruptcy, a JCT sale would have been consummated at $170 million more than the ultimate figure of approximately $135 million.[132] In light of this, my reliance on the JCT 2011 Offer as a measure of damages is conservative.

93.    In the December 19, 2011 term sheet, Yucaipa was offering to purchase the Company for a total implied value of approximately $244.2 million, as detailed in Exhibit C.1. Had Yucaipa pursued JCT's offer of $244.2 million and sold the Company to JCT through a pre-packaged bankruptcy and 363 sale, we are estimating expenses required to go through that process in the contemplated 90-day timeframe to be approximately $5.0 million. This would have left the Estate with net proceeds of approximately $239.2 million.

94.    As detailed previously, while JCT was making its offers to allow it to effectively purchase all of the assets of the Company, Yucaipa continued to demand that its debt be purchased at a premium as the Requisite Lender, and that it not be treated equally to all of the other First Lien Debt lenders, while refusing to compromise on purchase price and facilitate a transaction in which all lenders would receive equal and ratable treatment. Given Yucaipa's demands, a sale of the Company to JCT in the 2011/2012 timeframe was never consummated. On May 17, 2012, Black Diamond filed an involuntary petition for bankruptcy against Allied.[133]

95.    After Allied entered bankruptcy, the value of the Company declined materially. In the bankruptcy process, JCT ultimately purchased the majority of Allied's assets for $135.0 million through a 363 sale.[134] As presented in Exhibit D.1, the net proceeds from the JCT 363 Sale available

---

[131] See footnotes 102-105 above.
[132] Adv. Proc. No. 14-50971, D.I. 19, Paragraph 9(e); Yucaipa Responses to BD/S Interrogatories, dated March 30, 2016, Response to Interrogatory No. 2 ("A purchase price of 'par plus accrued and unpaid interest' for all Lenders would have amounted to approximately $305 million" as set forth in the March 8, 2012 term sheet.).
[133] Case No. 12-11564, D.I.1.
[134] Case No. 12-11564, D.I. 2127 (Report of Sale of Debtors' Assets).



Catherine E.
Youngman,
Litigation Trustee
for ASHINC
Corporation, et al.
v. Yucaipa
American Alliance
Fund I, L.P., et al.,
Adv. Pro. Nos. 13-
50530 and 14-
50971

Expert Witness
Report of
Jeffrey M. Risius,
CPA/ABV, CFA,
ASA

September 27,
2019

to all lenders, after taking expenses and other adjustments into account, were $53.8 million.

96.    In addition to the net proceeds from the JCT 363 Sale, the Company's First Lien Debt lenders received additional recoveries related to equity in the reorganized Debtor ($2.6 million), an earnout in the reorganized Debtor ($500,000), wind down reserve proceeds ($2.6 million), and real estate not purchased by JCT ($21.1 million)[135] totaling approximately $26.8 million in aggregate, as presented in Exhibit D.1.

97.    Had the JCT 2011 Offer been consummated, the Estate would have received net proceeds in the amount of $239.2 million (see Exhibit C.1). However, because Yucaipa, with support of the Allied Board, focused on negotiating a premium purchase price for its own position in Allied as opposed to pursuing a maximum purchase price for the Company as a whole, the actual proceeds to the Estate were only $80.6 million (see Exhibit D.1).

98.    Based thereon, I calculate the damage suffered by the Estate as the difference between $239.2 million and $80.6 million, which results in $158.6 million of damages, before applying any pre-judgment interest.

99.    In addition to the damage of $158.6 million, I have calculated the pre-judgment interest associated with this damage. Counsel has instructed me to calculate pre-judgment interest using quarterly compounded interest at the average Federal Reserve discount rate between December 19, 2011 and September 19, 2019 plus 5.0%. The damage period for Estate Damage Claim #2 spans from the December 19, 2011 offer date through September 27, 2019, or 7.8 years.

100.    I applied quarterly compound interest at a calculated interest rate of 6.3% to the concluded damages for the indicated damage period for Estate Damage Claim #2. As presented in Exhibit A.1, the concluded damages, inclusive of interest, for Estate Damage Claim #2 is $258.0 million.

---

[135] As discussed previously, these real estate assets were acquired for a credit bid of $5 million at the JCT 363 Sale. Six months later, the real estate was appraised for $21.1 million. While as a general principle the sale price of an asset at auction provides the best indication of the market value of the asset, I conservatively relied on the higher Appraised Value of the real estate for purposes of my analysis. This has the effect of reducing damages.



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al.,* Adv. Pro. Nos. 13-50530 and 14-50971

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

**September 27, 2019**

## IV.C. *Estate Damage Claim #3*

101.   Counsel has asked me to calculate the economic damages suffered by the Estate as a result of claimed fraudulent transfers between 2009 and 2011 that are listed in Exhibit E.1.[136]

102.   As presented in Exhibit E.1, Allied transferred money to Latham and Kasowitz related to legal fees incurred by Yucaipa between December 2009 and December 2011.[137]

103.   Additionally, Allied transferred money to ComVest and Yucaipa related to the Loan Purchase Agreement between ComVest and Yucaipa executed on August 21, 2009.[138]

104.   Further, Allied transferred money to Mr. Ornstein related to consulting/broker fees in January 2010 for his role in the ComVest-Yucaipa transaction.[139]

105.   The time period for the fraudulent transfers spans from August 21, 2009 to December 27, 2011.

106.   As presented in Exhibit E.1, I calculate the economic damage suffered by the Estate to be $5.7 million, calculated as the sum of all transfers to Latham, Kasowitz, ComVest, Yucaipa, and Mr. Ornstein.

107.   In addition to the damages of $5.7 million, I have calculated the pre-judgment interest associated with these damages. Counsel has instructed me to calculate pre-judgment interest using quarterly compounded interest at the average Federal Reserve discount rate between each transfer date and September 19, 2019 plus 5.0%, calculated from the date of each fraudulent transfer through September 27, 2019. The damage period for Estate Damage Claim #3 spans from the date of the alleged fraudulent transfers (i.e., between August 21, 2009 and December 27, 2011) through September 27, 2019, or 7.8 to 10.1 years.

108.   I applied quarterly compound interest at calculated interest rates ranging from 6.2% to 6.3% to the concluded damages for the indicated damage periods for Estate Damage Claim #3. As presented in Exhibit E.1, the

---

[136] I understand that, under the relevant statutes governing fraudulent transfers, there is a presumption that a debtor is insolvent when it is unable to pay its debts as they come due. Beginning in August 2009, Allied ceased making any payments of principal or interest under the First Lien Credit Agreement. Accordingly, I have been instructed by Counsel to calculate damages as a result of claimed fraudulent transfers that took place between August 2009 and the initiation of the 2012 Bankruptcy.

[137] The Yucaipa Defendants' First Supplemental Responses and Objections to the Official Committee of Unsecured Creditors' First Set of Requests for Admission, dated May 29, 2015.

[138] Loan Purchase Agreement, Exhibit 408 (YUCAIPA895012-050), Section 1.5(a)(ii), page 2, and Section 1.5(b)(ii), page 3.

[139] Ornstein Exhibit 20 (YUCAIPA708714-720), page 2; AHS00075414; Ornstein Dep. 38:15-21.



*Catherine E.
Youngman,
Litigation Trustee
for ASHINC
Corporation, et al.
v. Yucaipa
American Alliance
Fund I, L.P., et al.,*
Adv. Pro. Nos. 13-
50530 and 14-
50971

Expert Witness
Report of
Jeffrey M. Risius,
CPA/ABV, CFA,
ASA

September 27,
2019

concluded damages, inclusive of interest, for Estate Damage Claim #3 is $10.2 million.



Catherine E.
Youngman,
Litigation Trustee
for ASHINC
Corporation, et al.
v. Yucaipa
American Alliance
Fund I, L.P., et al.,
Adv. Pro. Nos. 13-
50530 and 14-
50971

Expert Witness
Report of
Jeffrey M. Risius,
CPA/ABV, CFA,
ASA

September 27,
2019

## V.   Lender Damage Claims

109.    The Lender Damage Claims and the Estate Damage Claims are generally factually consistent. However, because the Lender Damage Claims are only available to the First Lien Debt lenders, as opposed to the Estate, the method of calculating damages is different. As such, the factual basis and framework described below does not include the same commentary that was provided in the Estate Damage Claims section of this report as it would be duplicative. It should also be noted that the Estate Damage Claims and Lender Damage Claims are mutually exclusive and cannot be added together.

### V.A.   *Lender Damage Claim #1*

110.    Counsel has asked me to determine the economic damages suffered by the Damaged Lenders as a result of Yucaipa's alleged breach of Section 2.7(e) of the Third Amendment related to its failure to make a capital contribution within 10 days of no less than 50% of the aggregate principal amount of the First Lien Term Loans acquired by Yucaipa on August 21, 2009. Counsel has asked me to determine the economic damages under Lender Damage Claim #1 considering two scenarios:

(a) Yucaipa should have contributed half of its First Lien Term Loan debt to capital in August 2009 by contributing $57.4 million of cash; or, alternatively

(b) Yucaipa should have contributed half of its First Lien Term Loan debt to capital in August 2009 by forgiving $57.4 million of First Lien Term Loan debt.

111.    Unlike Estate Damage Claim #1 whereby I was measuring damages to the entire Estate associated with Yucaipa's failure to contribute capital, the form of the capital contribution being either cash or debt forgiveness has an impact on my damage calculation for Lender Damage Claim #1. As such, I have presented separate conclusions for Lender Damage Claim #1 based on whether the capital contribution is cash or debt forgiveness.

### V.A.1.  Lender Damage Claim #1A

112.    Lender Damage Claim #1A assumes that Yucaipa should have contributed $57.4 million of cash by August 31, 2009.

113.    As presented in Exhibit B.2 under the actual allocation of proceeds, the net proceeds from the JCT 363 Sale of $53.8 million (line 1) was allocated to the Company's lenders based on level of priority and the amount of debt outstanding on December 27, 2013. This same waterfall of proceeds that was utilized in the actual world [140] is consistent throughout all of my calculations of damages under the Lender Damage Claims.

---

[140] LIT-TRUSTEE_000008.



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al.,* Adv. Pro. Nos. 13-50530 and 14-50971

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

September 27, 2019

114.    As presented in Exhibit B.2 in the but for scenario, the cash contribution of $57.4 million (line 5) is added to the net proceeds from the JCT 363 Sale of $53.8 million (line 1) and allocated to the Company's lenders based on the actual debt outstanding as of December 27, 2013, utilizing the same waterfall as in the actual world.

(a) As presented in Exhibit B.2, the amount of First Lien Debt of $244.1 million is greater than the sum of the net proceeds from the JCT 363 Sale and Yucaipa's cash contribution of $111.2 million, and, thus, net proceeds are allocated only to First Lien Debt holders given the priority over Second Lien Debt and unsecured claims.

115.    Had Yucaipa made a cash contribution of $57.4 million, there would have been at least an incremental $57.4 million available to distribute to the First Lien Debt lenders at the time of the JCT 363 Sale. This conservatively assumes that the $57.4 million of cash in the Company's bank account would not have earned any return between the August 31, 2009 contribution and the date of the JCT 363 Sale.

116.    Had Yucaipa made the cash contribution, the Damaged Lenders would have received proceeds from the JCT 363 Sale in the amount of $49.8 million (Exhibit B.2, lines 19-21 under the but for scenario) instead of $24.1 million (Exhibit B.2, lines 19-21, under the actual allocation of proceeds) through the actual net proceeds from the JCT 363 Sale.

117.    In addition to the net proceeds from the JCT 363 Sale, Allied's First Lien Debt lenders received additional recoveries as part of the Company's bankruptcy, as presented in Exhibits B.2 and D.1. These recoveries consisted of the following:

(a) the value of equity and an earnout in the reorganized Debtor in the aggregate amount of $3.1 million (Exhibit B.2, lines 2-3); and

(b) real estate that was later given an appraised value of $21.1 million that was not purchased by JCT and was acquired at a bankruptcy auction through a credit bid (Exhibit B.2, line 4).

118.    Accordingly, the Damaged Lenders received the following additional recoveries:

(a) the value of equity and an earnout in the reorganized Debtor in the amount of $1.4 million, which is attributed to the Damaged Lenders using the same waterfall as was used in the actual allocation of proceeds; and

(b) the value of real estate in the amount of $9.4 million, which is attributed to the Damaged Lenders using the same waterfall as was used in the actual allocation of proceeds.

119.    Based thereon, I calculate the total recoveries for the Damaged Lenders to be (i) $60.6 million (sum of lines 19-21 and 24-25) under the but for



Catherine E.
Youngman,
Litigation Trustee
for ASHINC
Corporation, et al.
v. Yucaipa
American Alliance
Fund I, L.P., et al.,
Adv. Pro. Nos. 13-
50530 and 14-
50971

Expert Witness
Report of
Jeffrey M. Risius,
CPA/ABV, CFA,
ASA

September 27,
2019

scenario and (ii) $34.9 million (sum of lines 19-21 and 24-25) under the actual allocation of proceeds.

120. Based on the difference between the but for proceeds and the actual world proceeds, I calculate the total damage suffered by the Damaged Lenders under Lender Damage Claim #1A to be $25.7 million.

121. In addition to the damage of $25.7 million, I have calculated the pre-judgment interest associated with this damage. Counsel has instructed me to calculate pre-judgment interest using simple interest at the statutory rate of 9.0%. The damage period for Lender Damage Claim #1A spans from the date of the actual JCT 363 Sale (i.e., December 27, 2013) through September 27, 2019, or 5.8 years.

122. I applied simple interest at the 9% statutory interest rate to the concluded damage for the indicated damage period for Lender Damage Claim #1A. As presented in Exhibit B.1, the concluded damage, inclusive of statutory interest, for Lender Damage Claim #1A is $39.0 million.

## V.A.2. Lender Damage Claim #1B

123. Lender Damage Claim #1B assumes that Yucaipa should have forgiven $57.4 million of First Lien Term Loan debt by August 31, 2009.

124. As presented in Exhibit B.3 under the actual allocation of proceeds, the net proceeds from the JCT 363 Sale of $53.8 million (line 1) was allocated to the Company's lenders based on level of priority and the amount of debt outstanding on December 27, 2013, consistent with Exhibit B.2.

125. As presented in Exhibit B.3 in the but for scenario, the debt forgiveness of $57.4 million (line 5) is removed from Yucaipa's actual debt outstanding in order to calculate the but for debt outstanding for Yucaipa. The net proceeds from the JCT 363 Sale of $53.8 million (line 1) is then allocated to the Company's lenders based on the but for debt outstanding as of December 27, 2013, utilizing the same waterfall methodology as in the actual world.

(a) As presented in Exhibit B.3, the amount of but for First Lien Debt of $186.8 million is still greater than the sum of the net proceeds from the JCT 363 Sale of $53.8 million, and, thus, net proceeds are allocated only to First Lien Debt holders given the priority over Second Lien Debt and unsecured claims.

126. Had Yucaipa forgiven $57.4 million of debt, there would have been $57.4 million less debt attributable to Yucaipa when calculating the amount of net proceeds to distribute to the First Lien Debt lenders at the time of the JCT 363 Sale.

127. Had Yucaipa forgiven the debt, the Damaged Lenders would have received proceeds from the JCT 363 Sale in the amount of $31.5 million (Exhibit B.3, lines 19-21 under the but for scenario) instead of $24.1 million (Exhibit B.3, lines 19-21, under the actual allocation of proceeds) through the actual net proceeds from the JCT 363 Sale.

36



Catherine E.
Youngman,
Litigation Trustee
for ASHINC
Corporation, et al.
v. Yucaipa
American Alliance
Fund I, L.P., et al.,
Adv. Pro. Nos. 13-
50530 and 14-
50971

Expert Witness
Report of
Jeffrey M. Risius,
CPA/ABV, CFA,
ASA

September 27,
2019

128.    In addition to the net proceeds from the JCT 363 Sale, Allied's First Lien Debt lenders received additional recoveries as part of the Company's bankruptcy, as presented in Exhibits B.3 and D.1. These recoveries consisted of the following:

    (a) the value of equity and an earnout in the reorganized Debtor in the aggregate amount of $3.1 million (Exhibit B.3, lines 2-3); and

    (b) real estate that was later given an appraised value of $21.1 million that was not purchased by JCT that was acquired at a bankruptcy auction through a credit bid (Exhibit B.3, line 4).

129.    Accordingly, the Damaged Lenders received the following additional recoveries:

    (a) the value of equity and an earnout in the reorganized Debtor in the amount of $1.8 million under the but for scenario and $1.4 million in the actual world, which is attributed to the Damaged Lenders using the same waterfall as was used in the actual allocation of proceeds. These amounts are different because the Damaged Lenders would have received a larger portion of these recoveries if Yucaipa had forgiven $57.4 million of debt in 2009; and

    (b) the value of real estate in the amount of $12.3 million under the but for scenario and $9.4 million in the actual world, which is attributed to the Damaged Lenders using the same waterfall as was used in the actual allocation of proceeds. These amounts are different because the Damaged Lenders would have received a larger portion of these recoveries if Yucaipa had forgiven $57.4 million of debt in 2009

130.    Based thereon, I calculate the total recoveries for the Damaged Lenders to be (i) $45.6 million (sum of lines 19-21 and 24-25) under the but for scenario and (ii) $34.9 million (sum of lines 19-21 and 24-25) under the actual allocation of proceeds.

131.    Based on the difference between the but for proceeds and the actual world proceeds, I calculate the total damage suffered by the Damaged Lenders under Lender Damage Claim #1B to be $10.7 million.

132.    In addition to the damage of $10.7 million, I have calculated the pre-judgment interest associated with this damage. Counsel has instructed me to calculate pre-judgment interest using simple interest at the statutory rate of 9.0%. The damage period for Lender Damage Claim #1B spans from the date of the actual JCT 363 Sale (i.e., December 27, 2013) through September 27, 2019, or 5.8 years.

133.    I applied simple interest at the 9% statutory interest rate to the concluded damage for the indicated damage period for Lender Damage Claim #1B. As presented in Exhibit B.1, the concluded damage, inclusive of statutory interest, for Lender Damage Claim #1B is $16.3 million.



Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al., Adv. Pro. Nos. 13-50530 and 14-50971

Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA

September 27, 2019

**V.B.** *Lender Damage Claim #2*

134.  Counsel has asked me to determine the economic damages suffered by the Damaged Lenders as a result of Yucaipa's alleged contractual breach in acting as purported Requisite Lender to usurp Allied's corporate opportunity and failing to effectively pursue the sale of Allied to JCT in late 2011 through spring 2012.

135.  As presented in Exhibit B.4 under the actual allocation of proceeds, the net proceeds from the JCT 363 Sale of $53.8 million (line 1) was allocated to the Company's lenders based on level of priority and the amount of debt outstanding on December 27, 2013, consistent with Exhibit B.2.

136.  As presented in Exhibit B.4 in the but for scenario, the net proceeds from the JCT 2011 Offer of $239.2 million (line 5) is allocated to the Company's lenders based on the actual debt outstanding as of December 27, 2013, utilizing the same waterfall as in the actual world.

  (a)  As presented in Exhibit B.4, the amount of First Lien Debt of $244.1 million is still greater than the net proceeds from the JCT 2011 Offer of $239.2 million, and, thus, net proceeds are allocated only to First Lien Debt holders given the priority over Second Lien Debt and unsecured claims.

137.  Had Yucaipa and Allied pursued the JCT 2011 Offer and sold the Company for $244.2 million, the Damaged Lenders would have received proceeds from the JCT 2011 Offer in the amount of $107.1 million (Exhibit B.4, lines 19-21 under the but for scenario) instead of $24.1 million (Exhibit B.4, lines 19-21, under the actual allocation of proceeds) through the actual net proceeds from the JCT 363 Sale.

138.  In addition to the net proceeds from the JCT 363 Sale, Allied's First Lien Debt lenders received additional recoveries as part of the Company's bankruptcy, as presented in Exhibits B.4 and D.1. These recoveries consisted of the following:

  (a)  the value of equity and an earnout in the reorganized Debtor in the aggregate amount of $3.1 million (Exhibit B.4, lines 2-3); and

  (b)  real estate that was later given an appraised value of $21.1 million that was not purchased by JCT that was acquired at a bankruptcy auction through a credit bid (Exhibit B.4, line 4).

139.  Accordingly, the Damaged Lenders received the following additional recoveries:

  (a)  the value of equity and an earnout in the reorganized Debtor in the amount of $1.4 million under the actual allocation of proceeds, which is attributed to the Damaged Lenders using the same waterfall as was used in the actual allocation of proceeds; and

38



Catherine E.
Youngman,
Litigation Trustee
for ASHINC
Corporation, et al.
v. Yucaipa
American Alliance
Fund I, L.P., et al.,
Adv. Pro. Nos. 13-
50530 and 14-
50971

Expert Witness
Report of
Jeffrey M. Risius,
CPA/ABV, CFA,
ASA

September 27,
2019

(b) the value of real estate in the amount of $9.4 million under the actual allocation of proceeds, which is attributed to the Damaged Lenders using the same waterfall as was used in the actual allocation of proceeds.

140.    This analysis assumes that the JCT 2011 Offer was for all of the equity and all of the assets of the Company. Therefore, I assume no additional recoveries for the Damaged Lenders in the but for scenario based on equity in the reorganized Debtor or real estate not purchased by JCT.

141.    Based thereon, I calculate the total recoveries for the Damaged Lenders to be (i) $107.1 million (sum of lines 19-21 and 24-25) under the but for scenario and (ii) $34.9 million (sum of lines 19-21 and 24-25) under the actual allocation of proceeds.

142.    Based on the difference between the but for proceeds and the actual world proceeds, I calculate the total damage suffered by the Damaged Lenders under Lender Damage Claim #2 to be $72.2 million.

143.    In addition to the damage of $72.2 million, I have calculated the pre-judgment interest associated with this damage. Counsel has instructed me to calculate pre-judgment interest using simple interest at the statutory rate of 9.0%. The damage period for Lender Damage Claim #2 spans from the December 19, 2011 offer date through September 27, 2019, or 7.8 years.

144.    I applied simple interest at the 9% statutory interest rate to the concluded damage for the indicated damage period for Lender Damage Claim #2. As presented in Exhibit B.1, the concluded damage, inclusive of statutory interest, for Lender Damage Claim #2 is $122.7 million.

**V.C. *Lender Damage Claims #1A and #2 (Combined)***

145.    Lender Damage Claim #1A is interdependent with Lender Damage Claim #2 and, therefore, the two damages cannot be simply added together. As such, in Exhibit B.5 and this section of the report, I present the combined damages for Lender Damage Claim #1A and Lender Damage Claim #2.

146.    As presented in Exhibit B.5 under the actual allocation of proceeds, the net proceeds from the JCT 363 Sale of $53.8 million (line 1) was allocated to the Company's lenders based on level of priority and the amount of debt outstanding on December 27, 2013, consistent with Exhibit B.2.

147.    As presented in Exhibit B.5 in the but for scenario, the net proceeds from the JCT 2011 Offer of $239.2 million (line 5) and the cash contribution of $57.4 million (line 6) are allocated to the Company's lenders based on the actual debt outstanding as of December 27, 2013, utilizing the same waterfall as in the actual world.

(a) As presented in Exhibit B.5, the amount of First Lien Debt of $244.1 million is less than the sum of the net proceeds from the JCT 2011 Offer and Yucaipa's cash contribution of $296.6 million, and, thus, net



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al.,* Adv. Pro. Nos. 13-50530 and 14-50971

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

September 27, 2019

proceeds are allocated to First Lien Debt holders, Second Lien Debt holders, and unsecured claims based on the order of priority.

148. Had Yucaipa made a cash contribution of $57.4 million, there would have been at least an incremental $57.4 million available to distribute to the lenders at the time of the JCT 2011 Offer. This conservatively assumes that the $57.4 million of cash in the Company's bank account would not have earned any return between the August 31, 2009 contribution and the date of the JCT 2011 Offer.

149. Had Yucaipa pursued the JCT 2011 Offer and sold the Company for $244.2 million as well as made the cash contribution, the Damaged Lenders would have received proceeds from the JCT 2011 Offer and Yucaipa cash contribution in the amount of $109.3 million (Exhibit B.5, lines 20-22 under the but for scenario) instead of $24.1 million (Exhibit B.5, lines 20-22, under the actual allocation of proceeds) through the actual net proceeds from the JCT 363 Sale.

150. In addition to the net proceeds from the JCT 363 Sale, Allied's First Lien Debt lenders received additional recoveries as part of the Company's bankruptcy, as presented in Exhibits B.5 and D.1. These recoveries consisted of the following:

(a) the value of equity and an earnout in the reorganized Debtor in the aggregate amount of $3.1 million (Exhibit B.5, lines 2-3); and

(b) real estate that was later given an appraised value of $21.1 million that was not purchased by JCT that was acquired at a bankruptcy auction through a credit bid (Exhibit B.5, line 4).

151. Accordingly, the Damaged Lenders received the following additional recoveries:

(a) the value of equity and an earnout in the reorganized Debtor in the amount of $1.4 million under the actual allocation of proceeds, which is attributed to the Damaged Lenders using the same waterfall as was used in the actual allocation of proceeds; and

(b) the value of real estate in the amount of $9.4 million under the actual allocation of proceeds, which is attributed to the Damaged Lenders using the same waterfall as was used in the actual allocation of proceeds.

152. This analysis assumes that the JCT 2011 Offer was for all of the equity and all of the assets of the Company. Therefore, I assume no additional recoveries for the Damaged Lenders in the but for scenario based on equity in the reorganized Debtor or real estate not purchased by JCT.

153. Based thereon, I calculate the total recoveries for the Damaged Lenders to be (i) $109.3 million (sum of lines 20-22 and 25-26) under the but for scenario and (ii) $34.9 million (sum of lines 20-22 and 25-26) under the actual allocation of proceeds.

40



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al., Adv. Pro. Nos. 13-50530 and 14-50971*

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

**September 27, 2019**

154. Based on the difference between the but for proceeds and the actual world proceeds, I calculate the total combined damage suffered by the Damaged Lenders under Lender Damage Claims #1A and #2 to be $74.4 million.

155. In addition to the damage of $74.4 million, I have calculated the pre-judgment interest associated with this damage. Counsel has instructed me to calculate pre-judgment interest using simple interest at the statutory rate of 9.0%. The damage period spans from the December 19, 2011 offer date through September 27, 2019, or 7.8 years.

156. I applied simple interest at the 9% statutory interest rate to the concluded damage for the indicated damage period. As presented in Exhibit B.1, the concluded combined damage, inclusive of statutory interest, for Lender Damage Claims #1A and #2 is $126.4 million.

### V.D. *Lender Damage Claims #1B and #2 (Combined)*

157. Lender Damage Claim #1B is interdependent with Lender Damage Claim #2 and, therefore, the two damages cannot be simply added together. As such, in Exhibit B.6 and this section of the report, I present the combined damages for Lender Damage Claim #1B and Lender Damage Claim #2.

158. As presented in Exhibit B.6 under the actual allocation of proceeds, the net proceeds from the JCT 363 Sale of $53.8 million (line 1) was allocated to the Company's lenders based on level of priority and the amount of debt outstanding on December 27, 2013, consistent with Exhibit B.2.

159. As presented in Exhibit B.6 in the but for scenario, the debt forgiveness of $57.4 million (line 6) is removed from Yucaipa's actual debt outstanding in order to calculate the but for level of debt for Yucaipa. The net proceeds from the JCT 2011 Offer of $239.2 million (line 5) is then allocated to the Company's lenders based on but for debt outstanding as of December 27, 2013, utilizing the same waterfall as in the actual world.

   (a) As presented in Exhibit B.6, the amount of but for First Lien Debt of $186.8 million is less than the sum of the net proceeds from the JCT 2011 Offer of $239.2 million, and, thus, net proceeds are allocated to First Lien Debt holders, Second Lien Debt holders, and unsecured claims based on the order of priority.

160. Had Yucaipa pursued the JCT 2011 Offer and sold the Company for $244.2 million as well as forgiven the debt, the Damaged Lenders would have received proceeds from the JCT 2011 Offer in the amount of $109.3 million (Exhibit B.6, lines 20-22 under the but for scenario) instead of $24.1 million (Exhibit B.6, lines 20-22, under the actual allocation of proceeds) through the actual net proceeds from the JCT 363 Sale.

161. In addition to the net proceeds from the JCT 363 Sale, Allied's First Lien Debt lenders received additional recoveries as part of the Company's bankruptcy, as presented in Exhibits B.6 and D.1. These recoveries consisted of the following:



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al., Adv. Pro. Nos. 13-50530 and 14-50971*

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

**September 27, 2019**

(a) the value of equity and an earnout in the reorganized Debtor in the aggregate amount of $3.1 million (Exhibit B.6, lines 2-3); and

(b) real estate that was later given an appraised value of $21.1 million that was not purchased by JCT that was acquired at a bankruptcy auction through a credit bid (Exhibit B.6, line 4).

162.    Accordingly, the Damaged Lenders received the following additional recoveries:

(a) the value of equity and an earnout in the reorganized Debtor in the amount of $1.4 million under the actual allocation of proceeds, which is attributed to the Damaged Lenders using the same waterfall as was used in the actual allocation of proceeds; and

(b) the value of real estate in the amount of $9.4 million under the actual allocation of proceeds, which is attributed to the Damaged Lenders using the same waterfall as was used in the actual allocation of proceeds.

163.    This analysis assumes that the JCT 2011 Offer was for all of the equity and all of the assets of the Company. Therefore, I assume no additional recoveries for the Damaged Lenders in the but for scenario based on equity in the reorganized Debtor or real estate not purchased by JCT.

164.    Based thereon, I calculate the total recoveries for the Damaged Lenders to be (i) $109.3 million (sum of lines 20-22 and 25-26) under the but for scenario and (ii) $34.9 million (sum of lines 20-22 and 25-26) under the actual allocation of proceeds.

165.    Based on the difference between the but for proceeds and the actual world proceeds, I calculate the total combined damage suffered by the Damaged Lenders under Lender Damage Claims #1B and #2 to be $74.4 million.

166.    In addition to the damage of $74.4 million, I have calculated the pre-judgment interest associated with this damage. Counsel has instructed me to calculate pre-judgment interest using simple interest at the statutory rate of 9.0%. The damage period spans from the December 19, 2011 offer date through September 27, 2019, or 7.8 years.

167.    I applied simple interest at the 9% statutory interest rate to the concluded damage for the indicated damage period. As presented in Exhibit B.1, the concluded combined damage, inclusive of statutory interest, for Lender Damage Claims #1B and #2 is $126.4 million.



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al.,* Adv. Pro. Nos. 13-50530 and 14-50971

Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA

September 27, 2019

## VI.  Conclusion

168.   Based on the details presented in this report, I have reached the opinions regarding the Estate Damage Claims as presented in Exhibit A.1.

169.   Based on the details presented in this report, I have reached the opinions regarding the Lender Damage Claims as presented in Exhibit B.1.



*Catherine E. Youngman, Litigation Trustee for ASHINC Corporation, et al. v. Yucaipa American Alliance Fund I, L.P., et al., Adv. Pro. Nos. 13-50530 and 14-50971*

**Expert Witness Report of Jeffrey M. Risius, CPA/ABV, CFA, ASA**

**September 27, 2019**

### VII.   Assumptions and Limiting Conditions

170.   My conclusions are based on the information received to date. I reserve the right to change those conclusions should additional information be provided.

171.   No one that worked on this engagement has any known financial interest in the Company, its shareholders, any of its related entities, or the outcome of the analysis. Further, Stout Risius Ross, LLC's compensation is neither based nor contingent on the results of the analysis.

172.   This expert witness report is solely for use in the cited dispute, for the purpose stated herein, and is not to be referred to or distributed, in whole or in part, without prior written consent.

Jeffrey M. Risius, CPA/ABV, CFA, ASA
Managing Director
Stout Risius Ross, LLC

44

**Exhibit A**
**Estate Damage Claims**

## Summary of Damages – Estate Damage Claims                    Exhibit A.1
*In Millions of U.S. Dollars*

### Estate Damage Claims

Estate Damage Claim #1 – Yucaipa should have contributed half of its First Lien Term Loan debt to capital in August 2009 by contributing $57.356 million of cash or forgiving $57.356 million of First Lien Term Loan debt in exchange for equity.
Estate Damage Claim #2 – Yucaipa should have sold Allied to JCT in December 2011 for $244.212 million.
Estate Damage Claim #3 – Allied made certain fraudulent transfers between 2009 and 2011.

| Calculation of Damages | Estate Damage Claim #1 Indicated Amount | Notes | Estate Damage Claim #2 Indicated Amount | Notes | Estate Damage Claim #3 Indicated Amount | Notes |
|---|---|---|---|---|---|---|
| 1 But For Scenario | $ 57.356 | | $ 239.212 | [a] | n/a | |
| 2 Actual Proceeds | 0.000 | | 80.616 | [b] | n/a | |
| 3 Concluded Damages | $ 57.356 | [d] | $ 158.596 | | $ 5.722 | [c] |
| | 8/31/2009 | | 12/19/2011 | [e] | Various | |
| 4 Concluded Damages | $ 57.356 | | $ 158.596 | | $ 5.722 | |
| 5 Years of Interest | 10.075 | | 7.772 | | Various | |
| 6 Add: Interest | 9.0% $ 52.008 | [f] | 6.3% $ 99.430 | [g] | $ 4.494 | [c] |
| 7 Concluded Damages With Interest | $ 109.364 | | $ 258.026 | | $ 10.216 | |

[a] See Exhibit C.1.
[b] See Exhibit D.1.
[c] See Exhibit E.1.
[d] Reflects the date of damage based on the date Yucaipa acquired the first lien term loans through the Amendment No. 4 to Credit Agreement dated August 21, 2009, accounting for the 10 day period within which Yucaipa was required to make a capital contribution of no less than 50% of the aggregate principal amount of the acquired term loans (based on Amendment No. 3 to Credit Agreement and Consent dated April 17, 2008).
[e] Reflects the date of damage based on the date of the December 19, 2011 Term Sheet For Acquiring First And Second Lien Secured Debt Claims With Respect To Allied Systems Holdings, Inc. And Providing Bridge Financing.
[f] Based on simple interest at the 9% statutory interest rate from the date of the damages through September 27, 2019.
[g] Based on quarterly compounded interest at the average Federal Reserve discount rate between December 19, 2011 and September 19, 2019 (1.3%) plus 5.0%, calculated from the date of the damages through September 27, 2019.

47

**Exhibit B**
**Lender Damage Claims**

Exhibit B.1

## Summary of Damages – Lender Damage Claims
*In Millions of U.S. Dollars*

**Lender Damage Claims**

Lender Damage Claim #1A – Yucaipa should have contributed half of its First Lien Term Loan debt to capital in August 2009 by contributing $57.356 million of cash.

Lender Damage Claim #1B – Yucaipa should have contributed half of its First Lien Term Loan debt to capital in August 2009 by forgiving $57.356 million of first lien term loan debt in exchange for equity.

Lender Damage Claim #2 – Yucaipa should have sold Allied to JCT in December 2011 for $244.212 million.

Note: Lender Damage Claim #1A and Lender Damage Claim #1B are mutually exclusive and cannot be combined. However, Lender Damage Claim #2 is interdependent with Lender Damage Claims #1A and #1B and, therefore, can be combined but cannot be simply added together. As such, we present the combined damages for Lender Damage Claim #2 in combination with both Lender Damage Claim #1A and Lender Damage Claim #1B below.

| Calculation of Damages | Lender Damage Claim #1A Only Indicated Amount | Notes | Lender Damage Claim #1B Only Indicated Amount | Notes | Lender Damage Claim #2 Only Indicated Amount | Notes | Lender Damage Claims #1A and #2 Indicated Amount | Notes | Lender Damage Claims #1B and #2 Indicated Amount | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 But For Scenario | $ 60.601 | [a] | $ 45.645 | [b] | $ 107.098 | [c] | $ 109.305 | [d] | $ 109.305 | [e] |
| 2 Actual Allocation of Proceeds | 34.922 | [a] | 34.922 | [b] | 34.922 | [c] | 34.922 | [d] | 34.922 | [e] |
| 3 Concluded Damages | $ 25.679 | | $ 10.723 | | $ 72.176 | | $ 74.383 | | $ 74.383 | |
| | 12/27/2013 | [f] | 12/27/2013 | [f] | 12/19/2011 | [g] | 12/19/2011 | [g] | 12/19/2011 | [g] |
| 4 Concluded Damages | $ 25.679 | | $ 10.723 | | $ 72.176 | | $ 74.383 | | $ 74.383 | |
| 5 Years of Interest | 5.750 | | 5.750 | | 7.772 | | 7.772 | | 7.772 | |
| 6 Add: Interest (9.0%) | $ 13.289 | [h] | $ 5.549 | [h] | $ 50.487 | [h] | $ 52.031 | [h] | $ 52.031 | [h] |
| 7 Concluded Damages With Interest | $ 38.968 | | $ 16.273 | | $ 122.664 | | $ 126.414 | | $ 126.414 | |

[a] See Exhibit B.2.
[b] See Exhibit B.3.
[c] See Exhibit B.4.
[d] See Exhibit B.5.
[e] See Exhibit B.6.
[f] Reflects the date of damage based on the actual JCT 363 sale.
[g] Reflects the date of damage based on the date of the December 19, 2011 Term Sheet For Acquiring First And Second Lien Secured Debt Claims With Respect To Allied Systems Holdings, Inc. And Providing Bridge Financing.
[h] Based on simple interest at the 9% statutory interest rate from the date of the damages through September 27, 2019.

48

## Lender Damage Claim #1A
*In Millions of U.S. Dollars*

Exhibit B.2

| | | |
|---|---|---|
| 1 Net Proceeds from JCT 363 Sale Available for All Lenders | [a] | $ 53.836 |
| 2 Value of Equity in Reorganized Debtor - All Lenders | [a] | 2.600 |
| 3 Value of Earnout in Reorganized Debtor - All Lenders | [a] | 0.500 |
| 4 Real Estate - All Lenders | [a] | 21.064 |
| 5 Yucaipa Cash Contribution | [b] | 57.356 |

| Debt Lenders | | But For Scenario | | | | Actual Allocation of Proceeds | |
|---|---|---|---|---|---|---|---|
| | | Actual Debt Outstanding | Adjustment | But For Debt Outstanding | Allocation of Proceeds | Actual Debt Outstanding | Allocation of Proceeds |
| 6 Yucaipa | [c] | $ 134.836 | $ 0.000 | $ 134.836 | $ 61.410 | $ 134.836 | $ 29.733 |
| 7 Black Diamond / Spectrum | [c] | 56.487 | 0.000 | 56.487 | 25.727 | 56.487 | 12.456 |
| 8 CIT | [c] | 35.093 | 0.000 | 35.093 | 15.983 | 35.093 | 7.738 |
| 9 Other | [c] | 17.725 | 0.000 | 17.725 | 8.073 | 17.725 | 3.909 |
| 10 Total First Lien | | 244.140 | 0.000 | 244.140 | 111.192 | 244.140 | 53.836 |
| 11 Yucaipa | [d] | 20.000 | 0.000 | 20.000 | 0.000 | 20.000 | (0.000) |
| 12 Black Diamond / Spectrum | [d] | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| 13 Other | [d] | 10.000 | 0.000 | 10.000 | 0.000 | 10.000 | (0.000) |
| 14 Total Second Lien | | 30.000 | 0.000 | 30.000 | 0.000 | 30.000 | (0.000) |
| 15 Total Secured Debt | | $ 274.140 | $ 0.000 | $ 274.140 | $ 111.192 | $ 274.140 | $ 53.836 |
| 16 Unsecured Claims | [e] | 1,705.134 | | 1,705.134 | 0.000 | 1,705.134 | 0.000 |
| 17 Total Liabilities | | $ 1,979.274 | $ 0.000 | $ 1,979.274 | $ 111.192 | $ 1,979.274 | $ 53.836 |

**Allocation of Proceeds of JCT 363 Sale**

| | | Allocation of Proceeds | | Allocation of Proceeds |
|---|---|---|---|---|
| 18 First Lien Lenders - Yucaipa | | $ 61.410 | | $ 29.733 |
| 19 First Lien Lenders - Black Diamond / Spectrum | | 25.727 | | 12.456 |
| 20 First Lien Lenders - CIT | | 15.983 | | 7.738 |
| 21 First Lien Lenders - Other | | 8.073 | | 3.909 |
| 22 Second Lien Lenders | | 0.000 | | (0.000) |
| 23 Unsecured Claims | | 0.000 | | 0.000 |

**Additional Recoveries to Non-Yucaipa First Lien Lenders**

| | | | | |
|---|---|---|---|---|
| 24 Value of Equity and Earnout in Reorganized Debtor | [f] | $ 1.388 | | $ 1.388 |
| 25 Value of Real Estate | [g] | 9.431 | | 9.431 |
| 26 Total Recoveries of Non-Yucaipa First Lien Lenders (Rows 19-21 and 24-25) | | 60.601 | | 34.922 |
| 27 Total Damages | | | | $ 25.679 |

[a] See Exhibit D.1
[b] Based on the assumption that Yucaipa should have contributed $57.356 million of cash in August 2009 (half of its First Lien Term Loan debt).
[c] Based on the file "LIT-TRUSTEE_000008_CONFIDENTIAL.pdf"
[d] Based on the Excel file titled "Restructuring Analysis_Dec 2012 (native YUCAIPA876500).xlsx"
[e] Based on the Excel file titled "102370259_1_Allied - UNSECURED - Updated Claimed Chart from Rust Omni (5_23_17) - Unsecured Claims Only-C2.xlsx"
[f] Based on the proportion of total First Lien Debt held by the non-Yucaipa First Lien Debt lenders to the total First Lien Debt multiplied by the $3.100 million of equity/earnout value received in the reorganized Debtor.
[g] Based on the proportion of total First Lien Debt held by the non-Yucaipa First Lien Debt lenders to the total First Lien Debt multiplied by the $21.064 million of real estate.

49

50

Exhibit B.3

## Lender Damage Claim #1B
*In Millions of U.S. Dollars*

| | | |
|---|---|---|
| 1 Net Proceeds from JCT 363 Sale Available for All Lenders | [a] | $  53.836 |
| 2 Value of Equity in Reorganized Debtor - All Lenders | [a] | 2.600 |
| 3 Value of Earnout in Reorganized Debtor - All Lenders | [a] | 0.500 |
| 4 Real Estate - All Lenders | [a] | 21.064 |
| 5 Yucaipa Debt Forgiveness | [b] | 57.356 |

| | | | But For Scenario | | | Actual Allocation of Proceeds | |
|---|---|---|---|---|---|---|---|
| Debt Lenders | | Actual Debt Outstanding | Adjustment | But For Debt Outstanding | Allocation of Proceeds | Actual Debt Outstanding | Allocation of Proceeds |
| 6 Yucaipa | [c] | $  134.836 | $  (57.356) | $  77.480 | $  22.332 | $  134.836 | $  29.733 |
| 7 Black Diamond / Spectrum | [c] | 56.487 | 0.000 | 56.487 | 16.281 | 56.487 | 12.456 |
| 8 CIT | [c] | 35.093 | 0.000 | 35.093 | 10.115 | 35.093 | 7.738 |
| 9 Other | [c] | 17.725 | 0.000 | 17.725 | 5.109 | 17.725 | 3.909 |
| 10 Total First Lien | | 244.140 | (57.356) | 186.784 | 53.836 | 244.140 | 53.836 |
| 11 Yucaipa | [d] | 20.000 | 0.000 | 20.000 | 0.000 | 20.000 | (0.000) |
| 12 Black Diamond / Spectrum | [d] | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| 13 Other | [d] | 10.000 | 0.000 | 10.000 | 0.000 | 10.000 | (0.000) |
| 14 Total Second Lien | | 30.000 | 0.000 | 30.000 | 0.000 | 30.000 | (0.000) |
| 15 Total Secured Debt | | $  274.140 | $  (57.356) | $  216.784 | $  53.836 | $  274.140 | $  53.836 |
| 16 Unsecured Claims | [e] | 1,705.134 | 0.000 | 1,705.134 | 0.000 | 1,705.134 | 0.000 |
| 17 Total Liabilities | | $  1,979.274 | $  (57.356) | $  1,921.918 | $  53.836 | $  1,979.274 | $  53.836 |
| **Allocation of Proceeds of JCT 363 Sale** | | | | | | | |
| 18 First Lien Lenders - Yucaipa | | | | | $  22.332 | | $  29.733 |
| 19 First Lien Lenders - Black Diamond / Spectrum | | | | | 16.281 | | 12.456 |
| 20 First Lien Lenders - CIT | | | | | 10.115 | | 7.738 |
| 21 First Lien Lenders - Other | | | | | 5.109 | | 3.909 |
| 22 Second Lien Lenders | | | | | 0.000 | | (0.000) |
| 23 Unsecured Claims | | | | | 0.000 | | 0.000 |
| **Additional Recoveries to Non-Yucaipa First Lien Lenders** | | | | | | | |
| 24 Value of Equity and Earnout in Reorganized Debtor | [f] | | | | $  1.814 | | $  1.388 |
| 25 Value of Real Estate | [g] | | | | 12.327 | | 9.431 |
| 26 Total Recoveries of Non-Yucaipa First Lien Lenders (Rows 19-21 and 24-25) | | | | | 45.645 | | 34.922 |
| 27 Total Damages | | | | | | | $  10.723 |

[a] See Exhibit D.1
[b] Based on the assumption that Yucaipa should have forgiven $57.356 million of debt in August 2009 (half of its First Lien Term Loan debt).
[c] Based on the file "LIT- TRUSTEE_000008_CONFIDENTIAL.pdf"
[d] Based on the Excel file titled "Restructuring Analysis_Dec 2012 (native YUCAIPA875500).xlsx"
[e] Based on the Excel file titled "102378259_1_Allied - UNSECURED - Updated Claimed Chart from Rust Omni (5_23_17) - Unsecured Claims Only-C2.xlsx"
[f] Based on the proportion of total First Lien Debt held by the non-Yucaipa First Lien Debt lenders to the total First Lien Debt multiplied by the $3.100 million of equity/earnout value received in the reorganized Debtor.
[g] Based on the proportion of total First Lien Debt held by the non-Yucaipa First Lien Debt multiplied by the $21.064 million of real estate.

## Lender Damage Claim #2
*In Millions of U.S. Dollars*

Exhibit B.4

| | | |
|---|---|---|
| 1 Net Proceeds from JCT 363 Sale Available for All Lenders | [a] | $ 53.836 |
| 2 Value of Equity in Reorganized Debtor - All Lenders | [a] | 2.600 |
| 3 Value of Earnout in Reorganized Debtor - All Lenders | [a] | 0.500 |
| 4 Real Estate - All Lenders | [a] | 21.064 |
| 5 Net Proceeds Available from JCT 2011 Offer | [b] | 239.212 |

| Debt Lenders | | Actual Debt Outstanding | But For Scenario Adjustment | But For Debt Outstanding | Allocation of Proceeds | Actual Allocation of Proceeds Actual Debt Outstanding | Allocation of Proceeds |
|---|---|---|---|---|---|---|---|
| 6 Yucaipa | [c] | $ 134.836 | $ 0.000 | $ 134.836 | $ 132.114 | $ 134.836 | $ 29.733 |
| 7 Black Diamond / Spectrum | [c] | 56.487 | 0.000 | 56.487 | 55.347 | 56.487 | 12.456 |
| 8 CIT | [c] | 35.093 | 0.000 | 35.093 | 34.384 | 35.093 | 7.738 |
| 9 Other | [c] | 17.725 | 0.000 | 17.725 | 17.367 | 17.725 | 3.909 |
| 10 Total First Lien | | 244.140 | 0.000 | 244.140 | 239.212 | 244.140 | 53.836 |
| 11 Yucaipa | [d] | 20.000 | 0.000 | 20.000 | 0.000 | 20.000 | (0.000) |
| 12 Black Diamond / Spectrum | [d] | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| 13 Other | [d] | 10.000 | 0.000 | 10.000 | 0.000 | 10.000 | (0.000) |
| 14 Total Second Lien | | 30.000 | 0.000 | 30.000 | 0.000 | 30.000 | (0.000) |
| 15 Total Secured Debt | | $ 274.140 | $ 0.000 | $ 274.140 | $ 239.212 | $ 274.140 | $ 53.836 |
| 16 Unsecured Claims | [e] | 1,705.134 | 0.000 | 1,705.134 | 0.000 | 1,705.134 | 0.000 |
| 17 Total Liabilities | | $ 1,979.274 | $ 0.000 | $ 1,979.274 | $ 239.212 | $ 1,979.274 | $ 53.836 |

Allocation of Proceeds of JCT 2011 Offer and JCT 363 Sale

| | | | | | | |
|---|---|---|---|---|---|---|
| 18 First Lien Lenders - Yucaipa | | | | | $ 132.114 | $ 29.733 |
| 19 First Lien Lenders - Black Diamond / Spectrum | | | | | 55.347 | 12.456 |
| 20 First Lien Lenders - CIT | | | | | 34.384 | 7.738 |
| 21 First Lien Lenders - Other | | | | | 17.367 | 3.909 |
| 22 Second Lien Lenders | | | | | 0.000 | (0.000) |
| 23 Unsecured Claims | | | | | 0.000 | 0.000 |

Additional Recoveries to Non-Yucaipa First Lien Lenders

| | | | | | | |
|---|---|---|---|---|---|---|
| 24 Value of Equity and Earnout in Reorganized Debtor | [f] | | | | $ 0.000 | $ 1.388 |
| 25 Value of Real Estate | [g] | | | | 0.000 | 9.431 |
| 26 Total Recoveries of Non-Yucaipa First Lien Lenders (Rows 19-21 and 24-25) | | | | | 107.098 | 34.922 |
| 27 Total Damages | | | | | | $ 72.176 |

[a] See Exhibit D.1
[b] See Exhibit C.1
[c] Based on the file "LIT- TRUSTEE_000008_CONFIDENTIAL.pdf"
[d] Based on the Excel file titled "Restructuring Analysis_Dec 2012 (native 'YUCAIPA876500).xlsx"
[e] Based on the Excel file titled "102378259_1_Allied - UNSECURED - Updated Claimed Chart from Rust Omni (5_23_17) - Unsecured Claims Only-C2.xlsx"
[f] Based on the proportion of total First Lien Debt held by the non-Yucaipa First Lien Debt lenders to the total First Lien Debt multiplied by the $3.100 million of equity/earnout value removed in the reorganized Debtor. The but for scenario assumes that the JCT 2011 Offer was for all of the equity and no additional recovery is included.
[g] Based on the proportion of total First Lien Debt held by the non-Yucaipa First Lien Debt lenders to the total First Lien Debt multiplied by the $21.064 million of real estate for the actual allocation of proceeds. The but for scenario assumes that the JCT 2011 Offer was for all of the assets and no additional recovery is included.

52

**Lender Damage Claims #1A and #2 (Combined)**
*In Millions of U.S. Dollars*

Exhibit B.5

| | | |
|---|---|---|
| 1 Net Proceeds from JCT 363 Sale Available for All Lenders | [a] | $ 53.836 |
| 2 Value of Equity in Reorganized Debtor - All Lenders | [a] | 2.600 |
| 3 Value of Earnout in Reorganized Debtor - All Lenders | [a] | 0.500 |
| 4 Real Estate - All Lenders | [a] | 21.064 |
| 5 Net Proceeds Available from JCT 2011 Offer | [b] | 239.212 |
| 6 Yucaipa Cash Contribution | [c] | 57.356 |

| Debt Lenders | | But For Scenario | | | | Actual Allocation of Proceeds | |
|---|---|---|---|---|---|---|---|
| | | Actual Debt Outstanding | Adjustment | But For Debt Outstanding | Allocation of Proceeds | Actual Debt Outstanding | Allocation of Proceeds |
| 7 Yucaipa | [d] | $ 134.836 | $ 0.000 | $ 134.836 | 134.836 | $ 134.836 | $ 29.733 |
| 8 Black Diamond / Spectrum | [d] | 56.487 | 0.000 | 56.487 | 56.487 | 56.487 | 12.456 |
| 9 CIT | [d] | 35.093 | 0.000 | 35.093 | 35.093 | 35.093 | 7.738 |
| 10 Other | [d] | 17.725 | 0.000 | 17.725 | 17.725 | 17.725 | 3.909 |
| 11 Total First Lien | | 244.140 | 0.000 | 244.140 | 244.140 | 244.140 | 53.836 |
| 12 Yucaipa | [e] | 20.000 | 0.000 | 20.000 | 20.000 | 20.000 | (0.000) |
| 13 Black Diamond / Spectrum | [e] | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| 14 Other | [e] | 10.000 | 0.000 | 10.000 | 10.000 | 10.000 | (0.000) |
| 15 Total Second Lien | | 30.000 | 0.000 | 30.000 | 30.000 | 30.000 | (0.000) |
| 16 Total Secured Debt | | $ 274.140 | $ 0.000 | $ 274.140 | $ 274.140 | $ 274.140 | $ 53.836 |
| 17 Unsecured Claims | [f] | 1,705.134 | 0.000 | 1,705.134 | 22.428 | 1,705.134 | (0.000) |
| 18 Total Liabilities | | $ 1,979.274 | $ 0.000 | $ 1,979.274 | $ 296.568 | $ 1,979.274 | $ 53.836 |

Allocation of Proceeds of JCT 2011 Offer and JCT 363 Sale

| | | | | | Allocation of Proceeds | | Allocation of Proceeds |
|---|---|---|---|---|---|---|---|
| 19 First Lien Lenders - Yucaipa | | | | | 134.836 | | $ 29.733 |
| 20 First Lien Lenders - Black Diamond / Spectrum | | | | | 56.487 | | 12.456 |
| 21 First Lien Lenders - CIT | | | | | 35.093 | | 7.738 |
| 22 First Lien Lenders - Other | | | | | 17.725 | | 3.909 |
| 23 Second Lien Lenders | | | | | 30.000 | | (0.000) |
| 24 Unsecured Claims | | | | | 22.428 | | (0.000) |

Additional Recoveries to Non-Yucaipa First Lien Lenders

| | | | | | Allocation of Proceeds | | Allocation of Proceeds |
|---|---|---|---|---|---|---|---|
| 25 Value of Equity and Earnout in Reorganized Debtor | [g] | | | | $ 0.000 | | $ 1.388 |
| 26 Value of Real Estate | [h] | | | | 0.000 | | 9.431 |
| 27 Total Recoveries of Non-Yucaipa First Lien Lenders (Rows 20-22 and 25-26) | | | | | 109.305 | | 34.922 |
| 28 Total Damages | | | | | | | $ 74.383 |

[a] See Exhibit D.1
[b] See Exhibit C.1
[c] Based on the assumption that Yucaipa should have contributed $57.356 million of cash in August 2009 (half of its First Lien Term Loan debt).
[d] Based on the file "LIT- TRUSTEE_000008_CONFIDENTIAL.pdf"
[e] Based on the Excel file titled "Restructuring Analysis_Dec 2012 (native YUCAIPA876500).xlsx"
[f] Based on the Excel file titled "102378259_1 Allied - UNSECURED - Updated Claimed Chart from Rust Omni (5_23_17) - Unsecured Claims Only-C2.xlsx"
[g] Based on the proportion of total First Lien Debt held by the non-Yucaipa First Lien Debt lenders to the total First Lien Debt multiplied by the $3.100 million of equity/earnout value received in the reorganized Debtor. The but for scenario assumes that the JCT 2011 Offer was for all of the equity and no additional recovery is included.
[h] Based on the proportion of total First Lien Debt held by the non-Yucaipa First Lien Debt lenders to the total First Lien Debt multiplied by the $21.064 million of real estate for the actual allocation of proceeds. The but for scenario assumes that the JCT 2011 Offer was for all of the assets and no additional recovery is included.

## Lender Damage Claims #1B and #2 (Combined)
*In Millions of U.S. Dollars*

Exhibit B.6

| | | | |
|---|---|---|---|
| 1 | Net Proceeds from JCT 363 Sale Available for All Lenders | [a] | $ 53.836 |
| 2 | Value of Equity in Reorganized Debtor - All Lenders | [a] | 2.600 |
| 3 | Value of Earnout in Reorganized Debtor - All Lenders | [a] | 0.500 |
| 4 | Real Estate - All Lenders | [a] | 21.064 |
| 5 | Net Proceeds Available from JCT 2011 Offer | [b] | 239.212 |
| 6 | Yucaipa Debt Forgiveness | [c] | 57.356 |

| | Debt Lenders | | Actual Debt Outstanding | But For Scenario | | | Actual Allocation of Proceeds | |
|---|---|---|---|---|---|---|---|---|
| | | | | Adjustment | But For Debt Outstanding | Allocation of Proceeds | Actual Debt Outstanding | Allocation of Proceeds |
| 7 | Yucaipa | [c] | $ 134.836 | $ (57.356) | $ 77.480 | $ 77.480 | $ 134.836 | $ 29.733 |
| 8 | Black Diamond / Spectrum | [d] | 56.487 | 0.000 | 56.487 | 56.487 | 56.487 | 12.456 |
| 9 | CIT | [d] | 35.093 | 0.000 | 35.093 | 35.093 | 35.093 | 7.738 |
| 10 | Other | [d] | 17.725 | 0.000 | 17.725 | 17.725 | 17.725 | 3.909 |
| 11 | Total First Lien | | 244.140 | (57.356) | 186.784 | 186.784 | 244.140 | 53.836 |
| 12 | Yucaipa | [e] | 20.000 | 0.000 | 20.000 | 20.000 | 20.000 | (0.000) |
| 13 | Black Diamond / Spectrum | [e] | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| 14 | Other | [e] | 10.000 | 0.000 | 10.000 | 10.000 | 10.000 | (0.000) |
| 15 | Total Second Lien | | 30.000 | 0.000 | 30.000 | 30.000 | 30.000 | (0.000) |
| 16 | Total Secured Debt | | $ 274.140 | $ (57.356) | $ 216.784 | $ 216.784 | $ 274.140 | $ 53.836 |
| 17 | Unsecured Claims | [f] | 1,705.134 | 0.000 | 1,705.134 | 22.428 | 1,705.134 | (0.000) |
| 18 | Total Liabilities | | $ 1,979.274 | $ (57.356) | $ 1,921.918 | $ 239.212 | $ 1,979.274 | $ 53.836 |

Allocation of Proceeds of JCT 2011 Offer and JCT 363 Sale

| | | | | | | Allocation of Proceeds | | Allocation of Proceeds |
|---|---|---|---|---|---|---|---|---|
| 19 | First Lien Lenders - Yucaipa | | | | | $ 77.480 | | $ 29.733 |
| 20 | First Lien Lenders - Black Diamond / Spectrum | | | | | 56.487 | | 12.456 |
| 21 | First Lien Lenders - CIT | | | | | 35.093 | | 7.738 |
| 22 | First Lien Lenders - Other | | | | | 17.725 | | 3.909 |
| 23 | Second Lien Lenders | | | | | 30.000 | | (0.000) |
| 24 | Unsecured Claims | | | | | 22.428 | | (0.000) |

Additional Recoveries to Non-Yucaipa First Lien Lenders

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 25 | Value of Equity and Earnout in Reorganized Debtor | [g] | | | | $ 0.000 | | $ 1.388 |
| 26 | Value of Real Estate | [h] | | | | 0.000 | | 9.431 |
| 27 | Total Recoveries of Non-Yucaipa First Lien Lenders (Rows 20-22 and 25-26) | | | | | 109.305 | | 34.922 |
| 28 | Total Damages | | | | | | | $ 74.383 |

[a] See Exhibit D.1
[b] See Exhibit C.1
[c] Based on the assumption that Yucaipa should have have forgiven $57.356 million of debt in August 2009 (half of its First Term Loan debt).
[d] Based on the file "LIT- TRUSTEE_000008_CONFIDENTIAL.pdf"
[e] Based on the Excel file titled "Restructuring Analysis_Dec 2012 (native YUCAIPA876500).xlsx"
[f] Based on the Excel file titled "102378259_1_Allied - UNSECURED - Updated Claimed Chart from Rust Omni (5_23_17) - Unsecured Claims Only-C2.xlsx"
[g] Based on the proportion of total First Lien Debt held by the non-Yucaipa First Lien Debt lenders to the total First Lien Debt multiplied by the $3.100 million of equity/earnout value received in the reorganized Debtor. The but for scenario assumes that the JCT 2011 Offer was for all of the equity and no additional recovery is included.
[h] Based on the proportion of total First Lien Debt held by the non-Yucaipa First Lien Debt held by the non-Yucaipa First Lien Debt lenders to the total First Lien Debt multiplied by the $21.064 million of real estate for the actual allocation of proceeds. The but for scenario assumes that the JCT 2011 Offer was for all of the assets and no additional recovery is included.

54

**Exhibit C**
**JCT 2011 Offer**

**JCT 2011 Offer**                                                                                 **Exhibit C.1**

*In Millions of U.S. Dollars*

| JCT 12/19/11 Offer | | Amount Offered | |
|---|---|---|---|
| 1  Yucaipa - First Lien | [a] | $ | 150.000 |
| 2  CIT - First Lien | [a] | | 20.000 |
| 3  Other Lenders - First Lien | [a][b] | | 74.212 |
| 4  Total First Lien Debt Offer | | | 244.212 |
| 5  Second Lien Debt Offer | [a] | | 0.000 |
| 6  **Indicated Total Purchase Price** | | $ | **244.212** |
| 7  Less: Expenses | [c] | | (5.000) |
| 8  **Net Proceeds Available** | | $ | **239.212** |

[a] Based on December 19, 2011 Term Sheet For Acquiring First And
   Second Lien Secured Debt Claims With Respect To Allied Systems
   Holdings, Inc. And Providing Bridge Financing.
[b] Based on the file "LIT-TRUSTEE_000008_CONFIDENTIAL.pdf"
[c] Estimated expenses that would have been incurred to consummate
   the transaction associated with the JCT 2011 Offer in an estimated 90-
   day timeframe.

56

Exhibit D
JCT 363 Sale Proceeds

## JCT 363 Sale Proceeds                                    Exhibit D.1
*In Millions of U.S. Dollars*

### Actual JCT 363 Sale Proceeds

| | | | Amount |
|---|---|---|---|
| 1 | Net Proceeds from Sale - 12/27/13 | [a] | $ 123.383 |
| 2 | Sale Escrow - 5/16/14 | [a] | 9.500 |
| 3 | DIP Payoff | [a] | (29.590) |
| 4 | Expense Reserve | [a] | (8.856) |
| 5 | Net | | 94.437 |
| | | | |
| 6 | Wind Down Reserve - 12/27/13 | [a] | (6.000) |
| 7 | Wind Down Reserve - 5/16/14 | [a][b] | (6.500) |
| 8 | Prepetition Expenses | [a] | (28.101) |
| | | | |
| 9 | Net Proceeds from JCT 363 Sale Available for All Lenders | | $ 53.836 |

### Additional Recoveries

| | | | |
|---|---|---|---|
| 10 | Value of Equity in Reorganized Debtor - All Lenders | [b] | $ 2.600 |
| 11 | Value of Earnout in Reorganized Debtor - All Lenders | [c] | 0.500 |
| 12 | Wind Down Reserve Proceeds – Yucaipa Only | [d] | 2.615 |
| 13 | Real Estate - All Lenders | [e] | 21.064 |
| | | | |
| 14 | Total Additional Recoveries | | $ 26.780 |
| | | | |
| 15 | **Total Recovery for All Lenders** | | **$ 80.616** |

[a] Based on the file "LIT- TRUSTEE_000007_CONFIDENTIAL.pdf"
[b] Based on the file "LIT- TRUSTEE_000008_CONFIDENTIAL.pdf"
[c] Based on the December 3, 2015 Amended Joint Chapter 11 Plan of Reorganization (Doc. 3360).
[d] Based on the file "LIT- TRUSTEE_000009_CONFIDENTIAL.pdf"
[e] Based on the file "Appraised Valuation Determination.pdf"

58

**Exhibit E**
**Fraudulent Transfers**

59

**Fraudulent Transfers**

Exhibit E.1

*In U.S. Dollars*

| | Transfer Description | Recipient | Transfer Date | Transferred Amount | | Interest Rate [f] | Years of Interest [e] | Interest [f] | Total Damages With Interest [g] |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Loan Purchase Expenses | ComVest | 8/21/2009 | $ 1,850,000 | [a] | 6.2% | 10.1 | $ 1,583,341 | $ 3,433,341 |
| 2 | Loan Purchase Expenses | Yucaipa | 8/21/2009 | 831,326 | [b] | 6.2% | 10.1 | 711,498 | 1,542,824 |
| 3 | Legal Fees | Latham | 12/23/2009 | 15,277 | [c] | 6.2% | 9.8 | 12,555 | 27,832 |
| 4 | Legal Fees | Kasowitz | 12/23/2009 | 19,155 | [c] | 6.2% | 9.8 | 15,742 | 34,897 |
| 5 | Legal Fees | Latham | 12/31/2009 | 26,962 | [c] | 6.2% | 9.7 | 22,107 | 49,068 |
| 6 | Consulting/Broker Fees | Jonathan Ornstein | 1/31/2010 | 250,000 | [c] | 6.2% | 9.7 | 202,921 | 452,921 |
| 7 | Legal Fees | Latham | 2/4/2010 | 4,496 | [c] | 6.2% | 9.6 | 3,644 | 8,139 |
| 8 | Legal Fees | Kasowitz | 3/8/2010 | 100,380 | [c] | 6.2% | 9.6 | 80,402 | 180,781 |
| 9 | Legal Fees | Kasowitz | 4/13/2010 | 38,128 | [c] | 6.2% | 9.6 | 30,160 | 68,289 |
| 10 | Legal Fees | Kasowitz | 4/16/2010 | 13,359 | [c] | 6.2% | 9.5 | 10,556 | 23,915 |
| 11 | Legal Fees | Kasowitz | 5/13/2010 | 98,895 | [c] | 6.2% | 9.4 | 77,386 | 176,281 |
| 12 | Legal Fees | Kasowitz | 7/26/2010 | 101,539 | [c] | 6.2% | 9.2 | 77,372 | 178,911 |
| 13 | Legal Fees | Kasowitz | 9/15/2010 | 191,526 | [c] | 6.2% | 9.0 | 143,336 | 334,862 |
| 14 | Legal Fees | Kasowitz | 9/20/2010 | 304,033 | [c] | 6.2% | 9.0 | 227,113 | 531,146 |
| 15 | Legal Fees | Latham | 9/23/2010 | 33,221 | [c] | 6.2% | 9.0 | 24,788 | 58,009 |
| 16 | Legal Fees | Kasowitz | 10/6/2010 | 209,165 | [c] | 6.2% | 9.0 | 155,320 | 364,485 |
| 17 | Legal Fees | Latham | 10/6/2010 | 46,286 | [c] | 6.2% | 9.0 | 34,371 | 80,656 |
| 18 | Legal Fees | Kasowitz | 11/2/2010 | 360,447 | [c] | 6.2% | 8.9 | 265,078 | 625,526 |
| 19 | Legal Fees | Latham | 12/9/2010 | 1,235 | [c] | 6.2% | 8.8 | 896 | 2,131 |
| 20 | Legal Fees | Kasowitz | 12/16/2010 | 111,809 | [c] | 6.2% | 8.8 | 80,875 | 192,684 |
| 21 | Legal Fees | Kasowitz | 12/21/2010 | 4,898 | [c] | 6.2% | 8.8 | 3,536 | 8,433 |
| 22 | Legal Fees | Latham | 12/31/2010 | 39,106 | [c] | 6.2% | 8.7 | 28,138 | 67,245 |
| 23 | Legal Fees | Kasowitz | 3/7/2011 | 237,894 | [c] | 6.3% | 8.6 | 166,838 | 404,732 |
| 24 | Legal Fees | Latham | 3/11/2011 | 26,536 | [c] | 6.3% | 8.5 | 18,582 | 45,118 |
| 25 | Legal Fees | Kasowitz | 6/30/2011 | 100,000 | [c] | 6.3% | 8.2 | 67,111 | 167,111 |
| 26 | Legal Fees | Kasowitz | 9/7/2011 | 117,322 | [c] | 6.3% | 8.1 | 76,667 | 193,989 |
| 27 | Legal Fees | Kasowitz | 10/12/2011 | 200,000 | [c] | 6.3% | 8.0 | 128,863 | 328,863 |
| 28 | Legal Fees | Kasowitz | 11/23/2011 | 100,000 | [c] | 6.3% | 7.8 | 63,367 | 163,367 |
| 29 | Legal Fees | Kasowitz | 12/9/2011 | 75,000 | [c] | 6.3% | 7.8 | 47,214 | 122,214 |
| 30 | Legal Fees | Kasowitz | 12/15/2011 | 75,000 | [c] | 6.3% | 7.8 | 47,098 | 122,098 |
| 31 | Legal Fees | Latham | 12/27/2011 | 139,256 | [c] | 6.3% | 7.8 | 87,018 | 226,274 |
| | | | | | | | | | |
| 32 | **Total Damages** | | | $ 5,722,250 | | | | $ 4,493,894 | $ 10,216,144 |

[a] The Loan Purchase Agreement as of August 21, 2009; Section 1.5(a)(ii).

[b] The Loan Purchase Agreement as of August 21, 2009; Section 1.5(b)(ii).

[c] The Yucaipa Defendants' First Supplemental Responses and Objections to the Official Committee of Unsecured Creditors' First Set of Requests for Admission, dated May 29, 2015.

[d] YUCAIPA708716; AHS00075414; Ornstein Deposition 38:15-21.

[e] Reflects the number of years since the transfer through September 27, 2019.

[f] Based on quarterly compounded interest at the average Federal Reserve discount rate between the transfer date and September 19, 2019 plus 5.0%, calculated from the date of the damages through September 27, 2019.

[g] Reflects the sum of the transferred amount and the accrued interest.

# APPENDIX 1

## List of Documents Considered

1) The Estate Complaint
2) The Lender Complaint
3) Order Substituting Plaintiffs and Amending Captions, Adv. Proc. No. 13-50530, D.I. 415
4) Case No. 12-11564, D.I. 3360-2
5) Amendment No.3 to Credit Agreement and Consent, dated as of April 17, 2008, to the Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, dated as of May 15, 2007, Exhibit 418 (YUCAIPA980901-937)
6) Exhibit 586 (YUCAIPA740972-981)
7) In re Allied Automotive Group, Inc., No. 05-12515 (CRM) (Bankr. N.D. Ga.)
8) Amended and Restated First Lien Secured Super-Priority Debtor In Possession and Exit Credit and Guaranty Agreement, entered into by and among Allied and Systems as borrowers, and certain subsidiaries of Allied, as guarantors, various lenders, Goldman Sachs Credit Partners L.P., as lead arranger and syndication agent, and CIT, as administrative agent and collateral agent, dated May 15, 2007, Exhibit 133 (Yucaipa071689-926)
9) Second Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, entered into by Allied and Systems as borrowers, and certain subsidiaries of Allied, as guarantors, dated May 15, 2007, Yucaipa0052174-382
10) YUCAIPA774597-598
11) Exhibit 587 (YUCAIPA752658-660)
12) In re Allied Automotive Group, Inc., No. 05-12515 (CRM) (Bankr. N.D. Ga.), ECF No. 2802 at Art. IV.D.3(d)
13) Exhibit 500 (Yucaipa_LW00010525-531)
14) Derex Walker Deposition
15) Exhibit 395 (Yucaipa_LW0010556-565)
16) Exhibit 604 (YUCAIPA701764)
17) Exhibit 284 (AHS00137527-533)
18) Exhibit 343 (AHS00064051-063)
19) Exhibit 612 (Yucaipa044510)
20) YUCAIPA593221-224
21) Exhibit 150 (AHS00037891-892)
22) Yucaipa049153
23) Yucaipa049154-173
24) Exhibit 156 (AHS00092035)
25) Exhibit 152 (AHS00031619-683)
26) Exhibit 153 (AHS00012846-852)
27) Exhibit 158 (AHS00031399-480)
28) Exhibit 324 (Yucaipa_LW00001429-432)
29) Exhibit 161 (YUCAIPA889456-459)
30) Exhibit 327 (AHS00137568-571)
31) Exhibit 514 (YUCAIPA718282-284)
32) Exhibit 327 (AHS00137568-571)
33) Exhibit 170 (SPEC 0014088-148)
34) Exhibit 331 (AHS00137574-578)
35) Exhibit 291 (ALLIED000206-207)
36) Exhibit 332 (AHS00137579-580)
37) Exhibit 176 (AHS00032551-552)
38) Exhibit 10 (AHS00134425-427)
39) Exhibit 177 (AHS00095862-870)
40) Mark Hughes Deposition

41) Exhibit 51 (YUCAIPA889564-601)
42) Exhibit 299 (AHS00137591-593)
43) Exhibit 26 (YUCAIPA_DEPO00017891-905)
44) Exhibit 198 (MJX 0005136-161)
45) Adv. Proc. No. 12-50947, D.I. 1
46) BDCM Opp. Fund II, L.P., et al. v. Yucaipa Am. Alliance Fund I, LP, et al., No. 650150/2012 (N.Y. Sup. Ct. N.Y. Cnty.), Doc. No. 1
47) BDCM Opp. Fund II, L.P., et al. v. Yucaipa Am. Alliance Fund I, LP, et al., No. 650150/2012 (N.Y. Sup. Ct. N.Y. Cnty.), Doc. No. 41
48) Nov. 19, 2012 Transcript of Hearing on Motion for Summary Judgment; Mar. 29, 2013 Order on Motion for Summary Judgment, Doc. No. 84. A written decision was subsequently entered on March 8, 2013
49) BDCM Opp. Fund II, LP v. Yucaipa Am. Alliance Fund I, LP, No. 650150/2012, 2013 WL 1290394, at *5-6 (N.Y. Sup. Ct. N.Y. Cnty. Mar. 8, 2013), aff'd, 112 A.D.3d 509 (1st Dep't 2013), leave to appeal denied, 22 N.Y.3d 1171 (2014)
50) 13-50530, D.I. 297
51) In re Allied Sys. Holdings Inc., 556 B.R. 581, 608-09 (D. Del. 2016), aff'd sub nom., In re ASHINC Corp., 683 F. App'x 131, 141-42 (3d Cir. 2017)
52) Assignment and Assumption Agreement entered into by and between ComVest Investment Partners III, L.P. and CVY Holdings, LLC, dated August 21, 2009, Exhibit 25 (Yucaipa052924-931)
53) YUCAIPA0769793
54) Loan Purchase Agreement among Yucaipa American Alliance Fund I, LP, Yucaipa American Alliance (Parallel) Fund I, LP, and ComVest Investment Partners III, LP, dated August 21, 2009 Exhibit 408 (YUCAIPA895012-050)
55) YUCAIPA708716
56) AHS00075414
57) Jonathan Ornstein Dep
58) Exhibit 20 (YUCAIPA708714-720)
59) YUCAIPA0705042-045
60) Michael Riggs Dep
61) Exhibit 101 (YUCAIPA700026-027)
62) Mark Gendregske Deposition
63) Exhibit 105 (YUCAIPA709758-773)
64) Exhibit 107 (YUCAIPA1010155-165)
65) Exhibit 116 (YUCAIPA1024532-542)
66) Exhibit 117 (YUCAIPA831008-019)
67) Theo Ciuputu Deposition
68) Exhibit 638 (YUCAIPA713075)
69) Exhibit 349 (YUCAIPA976484-487)
70) Exhibit 350 (YUCAIPA976488 -490)
71) Exhibit 639 (YUCAIPA927707)
72) Brian Cullen Deposition
73) Exhibit 116 (YUCAIPA1024532-542)
74) Exhibit 117 (YUCAIPA831008-019)
75) Exhibit 118 (YUCAIPA831026-044)
76) Exhibit 90 (BDCM0000031-039)
77) YUCAIPA870652-659
78) Exhibit 119 (YUCAIPA831120-140)
79) Exhibit 122 (YUCAIPA831192-219)
80) Exhibit 638 (YUCAIPA713085)

81) Ira Tochner Deposition
82) Adv. Proc. No. 14-50971, D.I. 19
83) Yucaipa Responses to BD/S Interrogatories, dated March 30, 2016, Response to
     Interrogatory No. 2
84) Exhibit 123 (BDCM0002625-641)
85) Exhibit 88 (BDCM0002462-469)
86) Exhibit 349 (YUCAIPA976484-487)
87) Exhibit 350 (YUCAIPA976488-490)
88) Exhibit 713 (BDCM0003525-528)
89) Exhibit 265 (BDCM0004354-368)
90) Exhibit 476 (BDCM0034431-432)
91) Case No. 12-11564, D.I.1
92) Case No. 12-11564, D.I. 86
93) SPEC0019765-778
94) YUCAIPA944591-597
95) In the United States Bankruptcy Court for the District of Delaware, Transcript of Auction
     Proceedings, Auction Date September 12, 2013, Case No. 12-11564
96) Exhibit 129 (Notice of Filing of Asset Purchase Agreement) at D.I. 1812-1
97) Case No. 12-11564, D.I. 2127 (Report of Sale of Debtors' Assets)
98) LIT-TRUSTEE_000007
99) Amended and Restated Limited Liability Company Agreement of SBDRE LLC
100)     Case No. 12-11564, D.I. 1868 (Order Authorizing and Approving Sale of Assets)
101)     Case No. 12-11564, D.I. 1868-1 (Asset Purchase Agreement)
102)     Appraised Valuation Determination.pdf.
103)     The Yucaipa Defendants' First Supplemental Responses and Objections to the Official
     Committee of Unsecured Creditors' First Set of Requests for Admission, dated May 29,
     2015
104)     YUCAIPA0593196
105)     YUCAIPA593221
106)     YUCAIPA0593239
107)     YUCAIPA0593255
108)     YUCAIPA0593204
109)     YUCAIPA0593225
110)     YUCAIPA0593243
111)     YUCAIPA0955102
112)     YUCAIPA0593208
113)     YUCAIPA0593228
114)     YUCAIPA0593246
115)     LIT-TRUSTEE_000008
116)     Excel file titled "Restructuring Analysis_Dec 2012 (native YUCAIPA876500).xlsx
117)     Excel file titled "102378259_1_Allied - UNSECURED - Updated Claimed Chart from
     Rust Omni (5_23_17) - Unsecured Claims Only-C2.xlsx
118)     Case No. 12-11564, D.I. 3360-2
119)     Joseph Tomczak Deposition
120)     Michael Aliberto Deposition
121)     Jeff Schaffer Deposition
122)     Jos Opdeweegh Deposition
123)     Hazen Dempster Deposition
124)     Leslie Meier Deposition
125)     Catherine Youngman Deposition
126)     Richard Ehrlich Deposition

127)    Jeffrey Buller Deposition
128)    Stephanie Bond Deposition
129)    Jeff Pelletier Deposition
130)    LIT-TRUSTEE_000001_CONFIDENTIAL.pdf
131)    LIT-TRUSTEE_000009_CONFIDENTIAL.pdf
132)    LIT-TRUSTEE_000610_CONFIDENTIAL.pdf
133)    Opinion re Counterclaims, Case No. 12-11564, filed 08/21/2015, Doc 82-1, Adv. Proc.
        No.: 14-50971
134)    Exhibit 327 (AHS00137568)
135)    YUCAIPA870652-59
136)    YUCAIPA0769793
137)    YUCAIPA593252
138)    YUCAIPA0593196
139)    YUCAIPA0593239
140)    YUCAIPA0593255
141)    YUCAIPA0593204
142)    YUCAIPA0593225
143)    YUCAIPA0593243
144)    YUCAIPA0955102
145)    YUCAIPA0593208
146)    YUCAIPA0593228
147)    YUCAIPA0593246
148)    YUCAIPA0593262
149)    YUCAIPA0593125
150)    YUCAIPA0593128
151)    YUCAIPA0593131
152)    YUCAIPA0593134
153)    YUCAIPA0593168
154)    YUCAIPA0593171
155)    YUCAIPA0593175
156)    YUCAIPA0593178
157)    BDC0007691
158)    Yucaipa027832
159)    YUCAIPA0712709
160)    Affidavit of Jeffrey Schaffer in Support of Petitioning Creditors' Motion for Summary
        Judgment Regarding the Determination of Requisite Lenders Under the First Lien Credit
        Agreement, Case 12-50947, Doc 250
161)    Affidavit of Richard Ehrlich in Support of Petitioning Creditors' Motion for Summary
        Judgment Regarding the Determination of Requisite Lenders Under the First Lien Credit
        Agreement, Case 12-50947, Doc 249
162)    Restructuring Analysis_January 2013 (native YUCAIPA876501)
163)    Restructuring Analysis_January 2013_v2 (native YUCAIPA876502)
164)    Allied_Fin Summ_120227 (native YUCAIPA876899)
165)    YUCAIPA0771058
166)    YUCAIPA0745743
167)    BDCM0007658
168)    YUCAIPA839190
169)    YUCAIPA731654
170)    YUCAIPA701177-180
171)    YUCAIPA7098676
172)    YUCAIPA774425

173) YUCAIPA0701266
174) YUCAIPA701267
175) YUCAIPA701268
176) YUCAIPA779200
177) YUCAIPA734306
178) YUCAIPA785120
179) BDCM0010606
180) YUCAIPA944591-97
181) YUCAIPA664777
182) YUCAIPA746723
183) AHS00137594
184) YUCAIPA0712701
185) YUCAIPA072961
186) AHS00064992
187) YUCAIPA0712811
188) YUCAIPA0735135
189) BDCM0006296
190) BDCM0006302
191) YUCAIPA0744117
192) CIT0000019985
193) CIT0000020698
194) BDCM0000425
195) BDCM0019104
196) BDCM0005979
197) CIT0000023527
198) CIT0000022995
199) CIT0000022654
200) YUCAIPA0745766
201) YUCAIPA0728919
202) YUCAIPA0735312
203) YUCAIPA0746703
204) YUCAIPA0746694
205) YUCAIPA702447
206) ASH00092667
207) YUCAIPA731624
208) YUCAIPA732853
209) YUCAIPA0712703
210) YUCAIPA685226
211) Exhibit 417
212) Exhibit 481
213) Exhibit 137
214) Exhibit 514
215) Exhibit 327
216) In the United States Bankruptcy Court for the District of Delaware, Transcript of Auction Proceedings, Auction Date August 14, 2013, Case No. 12-11564
217) In the United States Bankruptcy Court for the District of Delaware, Transcript of Auction Proceedings, Auction Date August 15, 2013, Case No. 12-11564
218) AHS00114132
219) AHS00114133
220) CIT0000020735
221) CIT0000020711

222) CIT0000020777
223) CIT0000020742
224) CIT0000020768
225) CIT0000020761
226) CIT0000020749
227) CIT0000020756
228) CIT0000020784
229) CIT0000020726
230) CIT0000020712
231) CIT0000020719
232) BDCM0018942
233) YUCAIPA0735268
234) CIT0000027562
235) CIT0000027596
236) CIT0000027582
237) CIT0000027589
238) CIT0000027603
239) CIT0000027577
240) CIT0000027570
241) CIT0000027563
242) YUCAIPA1022899
243) AHS00096585
244) AHS00084345
245) YUCAIPA0307458
246) AHS00105329
247) AHS00105166
248) YUCAIPA0695486
249) YUCAIPA0581819
250) BDCM0020133
251) BDCM0020013
252) YUCAIPA0702326
253) BDCM0019968
254) SPEC 0009320
255) AHS00121720
256) AHS00082872
257) AHS00082999
258) YUCAIPA0446433
259) BDCM0014807
260) YUCAIPA0501614
261) YUCAIPA0751567
262) AHS00106613
263) AHS00112008
264) AHS00119989
265) AHS00121929
266) YUCAIPA0448609
267) YUCAIPA0448623
268) YUCAIPA0893396
269) AHS00110696
270) AHS00108834
271) AHS00125592
272) AHS00125480

273)  AHS00125512
274)  AHS00125469
275)  YUCAIPA0080673
276)  YUCAIPA0751840
277)  AHS00094945
278)  BDCM0018465
279)  YUCAIPA0707538
280)  YUCAIPA0707537
281)  YUCAIPA0707536
282)  YUCAIPA0732485
283)  YUCAIPA0894465
284)  YUCAIPA0733383
285)  YUCAIPA0075595
286)  YUCAIPA0075550
287)  YUCAIPA0076800
288)  YUCAIPA0075715
289)  YUCAIPA0075361
290)  YUCAIPA0080693
291)  YUCAIPA0080688
292)  YUCAIPA0080178
293)  YUCAIPA0081257
294)  YUCAIPA0080596
295)  BDCM0014515
296)  YUCAIPA0735328
297)  YUCAIPA0735326
298)  AHS00051828
299)  AHS00052734
300)  AHS00053127
301)  AHS00049145
302)  AHS00049212
303)  AHS00049270
304)  AHS00049095
305)  AHS00048921
306)  Venor-Yucaipa0006994
307)  AHS00056196
308)  AHS00048855
309)  AHS00051932
310)  AHS00051734
311)  AHS00049468
312)  AHS00054133
313)  AHS00054169
314)  AHS00052970
315)  AHS00048979
316)  G094993
317)  AHS00054184
318)  YUCAIPA0082947
319)  YUCAIPA0085292
320)  YUCAIPA0082831
321)  YUCAIPA0025819
322)  YUCAIPA0084237
323)  YUCAIPA0774807

324) YUCAIPA0774804
325) YUCAIPA0083874
326) YUCAIPA0035920
327) YUCAIPA0084257
328) YUCAIPA0082931
329) YUCAIPA0082424
330) YUCAIPA0083821
331) YUCAIPA0746712
332) YUCAIPA0026446
333) YUCAIPA0082909
334) YUCAIPA0026429
335) YUCAIPA0577854
336) YUCAIPA0085228
337) YUCAIPA0028325
338) YUCAIPA0045927
339) YUCAIPA0083538
340) YUCAIPA0026443
341) YUCAIPA0025806
342) YUCAIPA0082928
343) YUCAIPA0083583
344) YUCAIPA0752786
345) YUCAIPA0577499
346) YUCAIPA0578564
347) YUCAIPA0752877
348) YUCAIPA0752953
349) YUCAIPA0045941
350) YUCAIPA0577788
351) YUCAIPA0577809
352) YUCAIPA0082412
353) YUCAIPA0082418
354) YUCAIPA605106
355) YUCAIPA730862
356) BDCM0007666
357) YUCAIPA712701
358) AHS00092667
359) YUCAIPA730981
360) AHS00036443
361) AHS00095930
362) YUCAIPA701266
363) YUCAIPA701519
364) YUCAIPA734208
365) BDCM0006125
366) YUCAIPA712703
367) YUCAIPA712811
368) YUCAIPA775312
369) YUCAIPA877025
370) YUCAIPA902795
371) YUCAIPA902811
372) YUCAIPA664776

## APPENDIX 2

**Curriculum Vitae**

## Jeff Risius
Managing Director
**Head of Client Service**





Detroit, MI USA
**Office:** +1 248.432.1240
**Mobile:** +1 248.318.1099
jrisius@stout.com

### Education

M.B.A., Indiana University
B.S., Indiana University

### Designations

Chartered Financial Analyst (CFA)
Accredited Senior Appraiser (ASA)
Certified Public Accountant Accredited
in Business Valuation (CPA/ABV)

### Practice Areas

Bankruptcy
Business Valuation Disputes
Shareholder Disputes
Transaction Disputes
Trust & Estate
Shareholder & Succession Planning
Fairness Opinions
Solvency Opinions

Jeff Risius is a Managing Director, co-leads the firm's Valuation Advisory group, and is the Head of Client Service. He has over thirty years of experience in providing valuation consulting services and is one of the country's leading experts in the field.

Mr. Risius has extensive experience in providing transaction advisory services to companies in a wide range of industries and valuation consulting to shareholders, including for estate planning purposes. Mr. Risius also sits on Stout's Fairness Opinion Committee, which sets internal policy for Stout and also reviews the draft opinions that are reached by members of Stout's Transaction and ESOP Advisory practices. Mr. Risius is frequently engaged as an expert, consultant, or third party neutral on high-stakes litigation involving complex valuation issues including shareholder disputes, fraudulent conveyance matters, transaction disputes, and bankruptcy related valuation litigation.

Mr. Risius has lectured and presented numerous continuing education seminars on the subjects of valuation, litigation advisory services, succession planning, and transaction advisory services.

### Professional Memberships

- Financial and Estate Planning Council of Metropolitan Detroit, Past President
- CFA Institute
- American Institute of Certified Public Accountants (AICPA)
- Michigan Association of CPAs (MICPA

**Jeff Risius**
Managing Director
**Head of Client Service**



### Testimony Experience

*Estate of Rita M. McGinley v. Pittsburgh Steelers Sports, Inc.,* Private Arbitration, Pennsylvania, 2019

*Deborah Innis (on behalf of the Telligen, Inc. Employee Stock Ownership Plan) v. Bankers Trust Company of South Dakota,* U.S. District Court, Southern District of Iowa, Central Division, 2018

*The Wayne L. Ryan Revocable Trust, et al. v. Constance "Connie" Ryan and Streck, Inc.,* District Court of Sarpy County, Nebraska, 2018

*Marie Joseph v. Ronald Joseph, et al.,* U.S. District Court, Southern District of Ohio, Western Division, 2018

*Violet Shuker Shasha Living Trust, et al. v. Peter L. Malkin, et al.,* American Arbitration Association, New York, 2017

*Guardian Protection Services, Inc. f/k/a Armstrong-Guardian, Inc. and Armstrong Mastertech, Inc. v. Russell L. Cersosimo, et al.,* Court of Common Pleas of Allegheny, Pennsylvania Civil Division, 2017

*Joseph Joseph, Famous Horse, Inc. et al. v. Elazar Joseph, et al.,* Supreme Court of the State of New York, County of Nassau, 2017

*John Wildern v. NorthCoast Asset Management LLC,* Private Arbitration, Connecticut, 2017

*Bonnie Fish, Christopher Mino, Monica Lee Woosley, Lynda D. Hardman, Evolve Bank & Trust v. GreatBanc Trust Company, Lee Morgan, Asha Moran, Chandra Attiken, and the Morgan Family Foundation,* U.S. District Court, Northern District of Illinois, 2016

*John P. Jagger v. Charles P. Huebner, Paul J. Huebner, and Jeffrey C. Huebner,* American Arbitration Association, Michigan, 2015

*Robert L. Cohen, as Receiver for PEI Liquidation, Inc. v. Lawrence J. Dulay, et al.,* Court of Common Pleas, Summit County, Ohio, 2015

*SII Liquidation Company, John B. Pidcock, not individually but as the creditor trustee of the Schwab Industries, Inc. Creditor Trust v. Jerry A. Schwab, Donna L. Schwab, and David A Schwab,* United States Bankruptcy Court, Northern District of Ohio, Eastern Division, 2015

*Thomas W. Charron, Jr., Individually and as Trustee of the Thomas W. Charron Jr. Grantor Retained Annuity Trust Dated July 8, 2010 v. Sallyport Global Holdings, Inc., Gian Paul DeBlasio (a/k/a John P. DeBlasio), et al.,* U.S. District Court, Southern District of New York, 2014

*Chris A. Davis v. 24 Hour Fitness Worldwide, Inc.,* U.S. District Court, District of Delaware, 2014

*Bob Smith Automotive Group, Inc., Giant GMC, Inc. and William Lee Denny v. Ally Financial Inc.,* Circuit Court for Talbot County, Maryland, 2014

*Adrian Steel Company v. Shelby M. Balik and William Philpott, et al.,* State of Michigan, Lenawee County Circuit Court, 2014

**Jeff Risius**
Managing Director
**Head of Client Service**



*The Antioch Company Litigation Trust, W. Timothy Miller, Trustee v. Lee Morgan, et al.,* U.S. District Court, Southern District of Ohio, Western Division, 2013

*The Brown Publishing Company Liquidating Trust v. Roy E. Brown, et al.,* U.S. Bankruptcy Court, Eastern District of New York, 2013

*Micheal J. Demil, Henri James Demil, Sarah Mae Demil, Hannah Rene Demil, and Savannah Lynn Demil v. RMD Holdings, Ltd. and Robert E. Demil, State of Michigan,* Circuit Court for the County of Macomb, 2013

*Estate of Franklin Z. Adell, Deceased, Kevin R. Adell, Temporary Co-Personal Representative v. Commissioner of Internal Revenue,* United States Tax Court, 2012

*Police and Fire Retirement System and General Retirement System of the City of Detroit v. Donald V. Watkins, Watkins Aviation, LLC, Northpoint Advisors, LLC, Adrian Anderson, and Jeffrey Conry,* U.S. District Court, Eastern District of Michigan, Southern Division, 2011

*John F. Korachis v. Basil T. Simon, Stephen P. Stella, Peter N. Zingas, and Simon, Stella & Zingas, P.C. and Simon, Stella & Zingas, P.C. v. Law Offices of John F. Korachis and Associates, PLLC, State of Michigan,* 3rd Circuit Court for the County of Wayne, 2011

*Liccardi Motors, Inc. v. Chrysler Group LLC, American Arbitration Association,* New Jersey, 2010

*Midtown Motors, Inc., dba John Howard Motors v. Chrysler Group LLC,* American Arbitration Association, West Virginia, 2010

*Richard D. Nelson, as Trustee of Petro Acquisitions, Inc. v. Walnut Investment Partners, L.P.,* U.S. District Court, Southern District of Ohio, 2010

*U.S. Securities and Exchange Commission v. Delphi Corporation, et al.,* U.S. District Court, Eastern District of Michigan, 2009

*ILSBio, LLC v. Asterand, Inc., et al.,* U.S. District Court, Eastern District of Michigan, 2009

*Idearc, Inc., et al., The Official Committee of Unsecured Creditors, on behalf of Idearc, Inc. v. JPMorgan Chase Bank, N.A. as Administrative Agent for Lenders,* U.S. Bankruptcy Court, Northern District of Texas, Dallas Division, 2009

*Craig London, James Hunt, and MA Federal, Inc. v. Michael Tyrrell, Patrick Neven, and Walter Hupalo,* State of Delaware, Court of Chancery for the County of New Castle, 2009

*Jay E. Link v. L.S.I, Inc., et. al.,* State of South Dakota, Circuit Court for the County of Jerauld, 2009

*Global Link Logistics, Inc., et al. v. Olympus Growth Fund III, L.P., et al.,* American Arbitration Association, Illinois, 2008

*Anthony Carmen, Jr. v. Tecnoma, LLC, et al.,* State of Michigan, Circuit Court for the County of Oakland, 2008

**Jeff Risius**
Managing Director
**Head of Client Service**



*Aaron H. Gershenson Trust v. Ramco-Gershenson, Inc., and Ramco Gershenson Properties Trust,* Private Arbitration, Michigan, 2007

*Gary J. Grosicki v. Trident Systems, Inc., et al.,* State of Virginia, Circuit Court for the County of Fairfax, 2007

*Mark A. Hiner v. Ashland Broadcasting Corporation, et al.,* U.S. District Court, Southern District of Ohio, Columbus Division, 2006

*Global Technovations, Inc., et al., v. Onkyo U.S.A. Corporation, et al.,* U.S. Bankruptcy Court, Eastern District of Michigan, Southern Division, 2006

*David Brent Leininger, Jennifer Lynne Hauser, and Stephen Andrew Leininger v. Jon Channing Utter, Dean P. Baker, and Joseph S. Northrop, Individually and as the Trustees of the Revocable Agreement of Kay Joan Brown,* State of Indiana, Circuit Court for the County of Huntington, 2006

*Kenneth Meade v. Deborah Meade,* State of Michigan, Circuit Court for the County of Ogemaw, 2006

*Martin F. Fiascone and Edmund J. Sweeney v. John S. Stafford, Jr., individually, John S. Stafford, III, individually, and John S. Stafford, Jr., and John S. Stafford, III doing business as Stafford Trading Group, and Ronin Capital, LLC, successor in interest to Stafford Trading Group,* State of Illinois, Circuit Court for the County of Lake, 2006

*G. Jeff Mennen, et al. v. Onkyo Corporation, et al.,* U.S. District Court, Southern District of Florida, 2005

*Global Technovations, Inc., et al., v. Onkyo America, Inc.,* U.S. Bankruptcy Court, Eastern District of Michigan, Southern Division, 2005

*Hirsh Industries, Inc. et al., U.S. Bankruptcy Court,* Southern District of Indiana, Indianapolis Division, 2005

*Horiba Instruments, Inc., v. AVL North America, Inc.,* U.S. District Court, Central District of California, 2005

*Q Sales & Leasing, L.L.C. v. Quilt Protection, Inc. and Robert Grady,* U.S. District Court, Northern District of Illinois, Eastern Division, 2004

*Joseph Henry & Michael Malinky v. Champlain Enterprises, Inc. dba CommutAir, et al.,* U.S. District Court, Northern District of New York, Albany Division, 2004

*Magnex Corporation, et al. v. Joseph Pinkerton, et al.,* State of Michigan, Circuit Court for the County of Wayne, 2003

*Torretta v. Torretta, State of Michigan,* Circuit Court for the County of Oakland, 2002

*Branford Townhouses Cooperative v. City of Taylor,* Michigan Tax Tribunal, 2002

**Jeff Risius**
Managing Director
**Head of Client Service**



*Raymond J. Martin, et al., v. Martin Bros. Container & Timber Products Corp., an Ohio Corp., et al.,* U.S. District Court, Northern District Of Ohio, Western Division, 2002

*Xcel Manufacturing v. Homedics, Inc.,* U.S. District Court, Eastern District of Michigan, Southern Division, 2002

*Ameritech Corporation, et al. v. George F. Riley, et al.,* U.S. District Court, Eastern District of Michigan, Southern Division, 2002

*Bruce A. Miller and Norton J. Cohen v. Martens, Ice, Geary, Klass, Legghio & Gorchow P.C.,* State of Michigan, Circuit Court for the County of Oakland, 2002

*Federal-Mogul Global Inc., et al., Debtors,* U.S. Bankruptcy Court, District of Delaware, 2001

*Noble v. National Auto Glass & Mirror, Inc., et al.,* State of Michigan, Circuit Court for the County of Oakland, 2001

*Joseph Marasco v. Dales & Graphic Systems, L.L.C.,* State of Michigan, Circuit Court for the County of Wayne, 2001

*Plastech Exterior Systems, Inc. v. Grupo Antolin Kentucky, Inc.,* State of Michigan, Circuit Court for the County of Oakland, 2001

*Amway C Corporation v. Procter & Gamble, et al.,* U.S. District Court, Western District of Michigan, 2001

*Robert B. McQueen, et al. v. Thomas Horn, et al.,* U.S. District Court, Western District of Kentucky, 2001

*Paul Murray v. Susan Murray, State of Michigan,* Circuit Court for the County of Isabella, 2000

*Russell P. Dippel, Jr. v. Orsco, Inc., State of Michigan,* Circuit Court for the County of Macomb, 1998

*Brody v. Brody, State of Michigan,* Circuit Court for the County of Oakland, 1998
*Estate of George Riff v. St. John Hospital and Medical Center,* State of Michigan, Circuit Court for the County of Wayne, 1998

*Kotsonis v. Kotsonis, State of Michigan,* Circuit Court for the County of Macomb, 1998

*CMS Gas Transmission and Storage v. Abate, et al.,* Michigan Public Service Commission, 1997

*Mackin v. Mackin, State of Michigan,* Circuit Court for the County of Oakland, 1997

**Publications**

"10 Common Pitfalls When Reviewing Business Valuation Expert Opinions," www.stout.com, 2019

"Business Valuation Issues," *Buying and Selling a Business in Michigan,* 2018

**Jeff Risius**
Managing Director
**Head of Client Service**



"Valuation: The Cornerstone of the Bankruptcy Process," *Association of Insolvency & Restructuring Advisors Journal*, Vol. 31 No. 3 – 2017

"Valuation – The Cornerstone of the Bankruptcy Process," *The Stout Journal*, Spring/Summer 2017

"Business Valuation Issues," *Buying and Selling a Business in Michigan*, 2016

"Adelphia Fraudulent Transfer Litigation: A 'Poster Child" Situation for Exclusion of the Discounted Cash Flow Method," *The SRR Journal*, Fall 2014

"Another Tax Court Case Addresses the Question of Whether Identified Intangible Value is Business Goodwill or Personal Goodwill," *The SRR Journal*, Fall 2014

"The Orchard Enterprises, Inc.: The Delaware Court Analyzes Valuation and Whether or Not Only a Bum Would Utilize the BUM," *The SRR Journal*, Spring 2013

"Just Care, Inc.: Shareholders Lose Argument Regarding Inadequate Offering Price," *The SRR Journal*, Fall 2012

"Valuation's Crucial Role in the Bankruptcy Process," *Valuation Strategies*, March/April 2012

"Mirant Corporation Bankruptcy: A Thorough Review of Valuation by the Bankruptcy Court," *The SRR Journal*, Spring 2012

"The Use of Personal Goodwill as a Tax Savings Opportunity in a Transaction: Recent Case Law Highlights the Importance of Good Facts and Economic Support," *The SRR Journal*, Fall 2011

"Significant Valuation and Expert Witness Credibility Issues in Chemtura Corp. Bankruptcy," *The SRR Journal*, Spring 2011

"Valuation in Bankruptcy," *Business Valuation*, 2010

"Impact of Recent Market Trends on Section 1111(b)(2) Elections Involving Real Property," *The SRR Journal*, Fall 2010

"Business Valuation Issues," *Buying and Selling a Business in Michigan*, 2010

"Business Valuation: Why "Cookie Cutter" Approaches Are Ineffective," *Expert Witness*, 2009 Annual Review

"What Price Phelps' Gold," *Trusts & Estates*, October 2008

*Business Valuation: A Primer for the Legal Professional*, 2007

"The Definitions of Value in Bankruptcy," *AIRA Journal*, June/July 2006

"Ignoring the Value of Personal Goodwill Can Result in Unnecessary Tax Burdens to Sellers in Certain C-Corporation Sales," *The SRR Journal*, Fall 2005

**Jeff Risius**
Managing Director
**Head of Client Service**



"Intangible Asset Valuation is a Critical Issue in Supporting a Worthless Stock Deduction," *The SRR Journal*, Fall 2005

"Blind Application of Valuation Multiples Can Blur the Result," *AIRA Journal*, August/September 2005

"Obsolescence ID: How to Identify and Measure Economic Obsolescence in Underperforming Assets," Illinois CPA Society's *'Insights,'* May/June 2005

"Trends in Purchase Price Allocations under SFAS 141: Goodwill Remains the Most Significant Portion of the 'Intangible Gap,' *The SRR Journal*, Spring 2005

"International Cost of Equity," Bringing the Pie out of the Sky," *The SRR Journal*, Fall 2004

"Voila! Identifying and Measuring Economic Obsolescence with Underperforming Global Assets," *The SRR Journal*, Fall 2004

"Level of Value Implications in Light of Eckelkamp," *ESOP Report*, May 2003

"Double-dipping Is Not Just A Problem With Ice Cream: Evaluating Duplicative Claims For Economic Damages," *Michigan Defense Quarterly*, October 2002

"Primer for the Attorney to Understand Financial Statements in the Context of Commercial Litigation," State Bar of Michigan's *'The Litigation Newsletter,'* Spring 2001

"Stock Premiums and Estate Planning," *Michigan Lawyers Weekly*, November 1999

"Family Limited Partnerships Can Offer Savings on Estate, Gift Taxes," *Business First*, November 1999

"Valuation Issues Associated With Family Limited Partnerships," *Michigan Tax Lawyer*, First Quarter 1997

"How Family Limited Partnerships Can Be Used to Reduce Gift/Estate Taxes," *The Tax Advisor*, July 1995

"IRS Intangible Asset Settlement Guidelines Impact on Broadcasters," *Broadcast Cable Financial Management Journal*, May 1994

**Speeches and Seminars**

"Business Valuation 101 for Legal Professionals," Business Boot Camp program sponsored by the Business Law Section of the State Bar of Michigan, January 31, 2017

"Business Valuation 101 for Legal Professionals," Business Boot Camp program sponsored by the Business Law Section of the State Bar of Michigan, November 4, 2016

"Personal Goodwill Valuation Implications Based on Recent Tax Court Decisions," Estate and Trust Committee of the Taxation Section of the Michigan Bar Association, October 30, 2014

"Business Valuations and Appraisals," ICLE Business Boot Camp, January 14, 2014

**Jeff Risius**
Managing Director
**Head of Client Service**



"Business Valuations and Appraisals," ICLE Business Boot Camp, November 5, 2013

"To Merge or Not to Merge," World Services Group (WSG) Annual Meeting, September 20, 2013

"Use of Market Evidence in Distressed Business Valuation," Association of Insolvency & Restructuring Advisors (AIRA) 29th Annual Bankruptcy & Restructuring Conference, June 7, 2013

"Business Valuation Issues in Bankruptcy," Business Valuation Resources Webinar, March 1, 2012

"Business Valuation Issues in Bankruptcy Context," American Society of Appraisers (ASA) 30th Annual Advanced Business Valuation Conference, October 12, 2011

"Business Valuations and Appraisals," ICLE Business Boot Camp, November 9, 2010

"Estate and Gift Tax Valuation: Pressing Issues, Financial Explanations, and Typical IRS Inquiries," United States Law Firm Group, September 30, 2010

"Business Valuation Issues Relevant for Estate Planners," Annual Conference of The Estate Planning Council of Central New York, May 19, 2010

"Valuation of Family Limited Partnerships and Family Limited Liability Companies," ICLE After Hours Tax Law Series: Hot Topics in Estate & Gift Tax, February 23, 2010

"Estate and Gift Tax Valuation: How the 'Black Box' Actually Works!," Notre Dame Tax and Estate Planning Institute, October 1, 2009

"Business Valuation Issues in Bankruptcy," Business Valuations Seminar hosted by the CPA Associates International (CPAAI), July 20-21, 2009

"Estate of Litchfield v. Commissioner: The Latest Development in the Evolution of Case Law Recognizing Built-in Gains Tax Liabilities," SRR Webinar, April 22, 2009

"Business Valuation Issues in Bankruptcy," Columbus Bar Association – Bankruptcy Committee, March 12, 2009

"Business Valuation Issues for Attorneys to Understand," ICLE Business Boot Camp Program, February 26, 2009

"Business Valuation Issues for Attorneys to Understand," ICLE Business Boot Camp Program, February 12, 2009

"Business Valuations Issues with Pass-Through Entities," Michigan Bar's 2008 LLC and Business Entity Update, February 26, 2008

"Business Valuations Issues with Pass-Through Entities," Michigan Bar's 2008 LLC and Business Entity, February 8, 2008

"Business Valuation Issues in Bankruptcy Context," American Institute of Certified Public Accountants (AICPA) National Business Valuation Conference, December 2, 2007

**Jeff Risius**
Managing Director
**Head of Client Service**



"Advanced Business Valuation Issues," MACPA Litigation & Business Valuation Conference, June 12, 2007

"Increasing the Value of Manufacturing Companies – Business Experts Discuss How to Increase Value Before a Manufacturer's Merger or Acquisition," Small Business Forum of the Business Law Section of the State Bar of Michigan, May 23, 2007

"Valuation Issues in Litigation," ICLE After Hours Tax Series, February 27, 2007

"Reconciling Income Approach Methodologies," AICPA National Business Valuation Conference, December 4, 2006

"Valuation Principles," ICLE Fundamentals of Closely Held Business Practice Seminar, November 1, 2006

"Valuation Discounts in Estate/Gift Tax Contexts," MACPA Advanced Tax Forum, October 26, 2006

"Succession Planning Options for Closely-held Companies," 46th Annual Probate and Estate Planning Institute Conference, June 9, 2006

"A Basic ESOP Primer - Just about everything you absolutely need to know, or else!," 18th Annual Business Law Institute Conference, June 2, 2006

"Succession Planning Options for Closely-held Companies - Advantages and Disadvantages," 46th Annual Probate and Estate Planning Institute Conference, May 18, 2006

"Current Business Valuation Issues Including Latest on AICPA Proposed Statement on Standards for Valuation Services," Michigan Association of CPA's Current Accounting Issues Conference, May 11, 2006

"Business Valuations and Appraisals," ICLE Business Boot Camp I, February 27, 2006

"Business Valuations and Appraisals," ICLE Business Boot Camp I, February 8, 2006

"Valuation Issues in Tax Reporting Contexts," Tax Executives Institute Detroit Chapter, October 19, 2005

"Valuation Issues in Tax Reporting Contexts," Tax Executives Institute Western Michigan Chapter, September 8, 2005

"Business Valuation 101," MACPA's Summer Management Information Show, June 29, 2005

"Valuation Issues Surrounding Buy/Sell Agreements," ICLE's 17th Annual Business Law Institute Conference, June 3, 2005

"Business Valuation in Bankruptcy Situations," TMA/RMA Spring Symposium, May 25, 2005

"Valuation Issues Surrounding Family LLC's and FLP's," Estates and Trusts Committee – Tax Section of Michigan State Bar, April 20, 2005

"Recent Court Decisions Involving Valuation Issues," Business Entities Committee – Taxation Section of Michigan State Bar, April 7, 2005

**Jeff Risius**
Managing Director
**Head of Client Service**



"Business Succession Planning Options in the Current Economic Environment," The Financial and Estate Planning Council of Macomb, March 10, 2005

"Fiduciary Review of Valuation Reports," The ESOP Association – The 2004 Two Day Conference, November 4, 2004

"Roundtable Presentation: Hot Topics in Business Valuation," ICLE – After Hours Tax Conference, October 19, 2004

"Understanding Your Role as An ESOP Trustee," MI ESOP Association, October 12, 2004

"Business Succession Options in the Current Economic Environment," 17th Annual Summer Tax Conference, June 25, 2004

"Drop in ESOP Share Value Post-Transaction," 27th Annual Conference of the ESOP Association, May 13, 2004

"Current Issues Surrounding FLPs/FLLCs," Estate and Probate Section of the Oakland County Bar, January 26, 2004

"Appraising ESOP Shares and Communicating the Value to Employees," The ESOP Association – The 2003 Two Day Conference, November 20, 2003

"Valuing ESOP Shares and Communicating That Value to Employee Owners," The ESOP Association Annual Fall Conference, October 22, 2003

"Business Valuation Issues: Experience Exchange Workshop," MACPA: Litigation & Business Valuation Conference, June 17, 2003

"SFAS 141 and 142 Valuation Issues," MACPA: Litigation & Business Valuation Conference, June 17, 2003

"Fiduciary Issues for Internal Trustees," 26th Annual Conference of the ESOP Association, May 1, 2003

"Cash Flow: The Driver of Intangible Asset Value and Economic Obsolescence," Michigan Department of Treasury/IPT: Michigan One-Day Tax Seminar, April 24, 2003

"Valuation of Intellectual Property," Intellectual Property Section of the Washtenaw County Bar, April 15, 2003

"Business Valuation Primer for Attorneys," ICLE – Business Boot Camp, February 18, 2003

"Business Valuation Primer for Attorneys," ICLE – Business Boot Camp, February 14, 2003

"Appraising ESOP Shares and Communicating Value," The ESOP Association – The 2002 Two Day Conference, November 14, 2002

"The Repurchase Obligation and Stock Value," MACPA: Fall Accounting Conference, October 23, 2002

**Jeff Risius**
Managing Director
**Head of Client Service**



"Latest Developments in FLP and FLLC Arena," Workshop for Managing Closely-Held Business Interests in Estates and Trusts, September 26, 2002

"Succession Strategies for Closely-Held Companies," Ohio Society of CPAs, June 18, 2002

"How to Use Financial Statements in the Financial Decision-Making Process," MACPA: Current Accounting Issues Conference, June 13, 2002

"Valuation of Fractional Interests in Real Estate," National Real Estate Conference, May 17, 2002

"Expert Testimony and Preparing an Expert Witness," MACPA: Fraud Issues Conference, May 17, 2002

"Business Valuation Issues for the Accountant," MACPA: Current Accounting Issues Conference, May 13, 2002

"Latest Developments in FLP and FLLC Arena," Estate Planning, Probate and Trust Law Section of the Cleveland Bar Association, January 15, 2002

"How to Communicate Business Valuations to Clients," MACPA: Management Information Shows, June 28 and 29, 2001

"How to Use Financial Statements," MACPA: Current Accounting Issues Conference, June 21, 2001

"Business Valuation Issues for the Accountant," MACPA: Current Accounting Issues Conference, June 21, 2001

"Measurement of Economic Damages," MACPA: Valuation/Litigation Conference, June 12, 2001

"Buy-Sell Agreements and Other Business Valuation Issues," ICLE – Choice of Entity Conference, May 4, 2001

"Solving the Business Valuation Problem," ICLE – Succession Planning for Family Businesses, December 12, 2000

"How to Work with a Business Valuation Professional to Obtain Optimum Results," 2000 Notre Dame Tax and Estate Institute, September 14, 2000

"Business Valuation Issues with ESOPs," Huntington Bank ESOP Conference, March 13, 2000

"Hot Topics Involving Family Limited Partnerships," Columbus Estate Planning Council II, March 8, 2000

"Resolution of Real Estate Partnership and Membership Disputes," State Bar of Michigan – Real Property Law Section, February 10, 2000

"Valuation Issues Associated with Pass-Through Entities," 'Back to Basics' Partnership, LLC & S-corporation Seminar Presented by CCH, September 27, 1999 and October 25, 1999

**Jeff Risius**
Managing Director
**Head of Client Service**



"Business Valuation Issues in Estate Planning," American Bar Association – 1999 Annual Meeting, August 6, 1999

"Valuation of Privately Held Companies," CLFER&L Seminar for Independent Accountants Association of Michigan, June 22, 1999

"How to Review a Business Valuation Report and Other Hot Topics in Business Valuation," Cleveland Estate Planning Council, June 8, 1999

"Business Valuation Issues," Washtenaw Estate Planning Council, May 6, 1999

"Estate Planning and Related Valuation Issues," MACPA – Income & Estate Taxation Conference, May 4, 1999

"Estate Planning and Valuations," Estate Planning Council of Columbus # 1, March 17, 1999

"Valuation of Closely Held Businesses, Limited Liability Companies, Family Limited Partnerships, and Related Entities," presented to the Colorado Bar Association CLE – Estate Planning for Family Owned Businesses, March 5, 1999

"Estate Planning and Valuations," The Northeastern Michigan Estate Planning Council, January 28, 1999

"Estate Planning and Valuations," Ohio CLE Institute – Workshop Series, December 1, 1998

"Valuation of Closely Held Businesses," MACPA – CPA/Attorney Conference, November 6, 1998

"Valuation of Closely Held Businesses, Limited Liability Companies, Family Limited Partnerships, and Related Entities," 24th Annual Notre Dame Tax & Estate Planning Institute, October 29, 1998

"Estate Planning and Valuations," Taxation Section of the State Bar of Michigan – Summer Tax Conference, June 19, 1998

"Estate Planning and Business Valuation," The Institute of Continuing Legal Education – Annual Probate and Estate Planning Seminar, May 1, 1998

"Business Valuation Issues," Oakland County Bar Probate and Estate Planning Section, April 27, 1998

"Valuation Discount Issues Involving FLPs and FLLCs," Partnership, Corporation and Real Estate Tax Sections of Michigan State Bar, March 26, 1998

"Estate Planning and Valuation," Washtenaw County Estate Planning and Probate Section, February 23, 1998

"Estate Planning and Business Valuation," MACPA Education Monthly Meeting Group, November 20, 1997

"Business Valuation Issues," Livonia Bar Association, May 20, 1997

"Asset Valuation Issues," Indiana Continuing Legal Education Forum, January 28, 1997