# **<u>EXHIBIT D</u>**

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

------------------------------------------------------------x

YUCAIPA AMERICAN ALLIANCE FUND I,  :
L.P., and YUCAIPA AMERICAN ALLIANCE  :
(PARALLEL) FUND I, L.P.,  :
        :
        Plaintiffs,  :    Case No.: 15-cv-373 (SLR)
        :
        - against -  :    ECF Case
        :
RICHARD A. EHRLICH, STEPHEN H.  :
DECKOFF, LESLIE A. MEIER, JEFFREY A.  :
SCHAFFER, BDCM OPPORTUNITY FUND II,  :
L.P., BLACK DIAMOND CLO 2005-1 LTD., and :
SPECTRUM INVESTMENT PARTNERS, L.P.,  :
        :
        Defendants.  :
        :

------------------------------------------------------------x

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS OR STAY THE ACTION

**LANDIS RATH & COBB LLP**
919 Market Street, Suite 1800
Wilmington, Delaware 19801
(302) 467-4400

-and-

**SCHULTE ROTH & ZABEL LLP**
919 Third Avenue
New York, New York 10022
(212) 756-2000

*Attorneys for Defendants Richard A. Ehrlich,*
*Stephen H. Deckoff, Leslie A. Meier, Jeffrey A.*
*Schaffer, BDCM Opportunity Fund II, L.P.,*
*Black Diamond CLO 2005-1 Ltd., and Spectrum*
*Investment Partners, L.P.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................................1

STATEMENT OF FACTS ......................................................................................................7

    A.    The Credit Agreement.......................................................................................7

    B.    The Third Amendment ......................................................................................7

    C.    The Purported Fourth Amendment ...................................................................8

    D.    Spectrum Buys Additional First Lien Debt......................................................9

    E.    JCT's Negotiations to Buy Allied's Assets and First Lien Debt ....................10

    F.    Proceedings Before the Bankruptcy Court ....................................................11

    G.    Proceedings Before the Delaware Chancery Court ........................................14

    H.    Proceedings in the Southern District of New York ........................................14

ARGUMENT ........................................................................................................................15

I.    Yucaipa's Claims Are Barred by *Noerr-Pennington*...........................................15

    A.    Yucaipa Fails to Satisfy the Objective Prong of the "Mere Sham" Exception ......16

    B.    Yucaipa Fails to Satisfy the Subjective Prong of the "Mere Sham" Exception.....17

II.    Yucaipa's Complaint Is Barred by the Covenant Not to Sue ...........................18

III.    Yucaipa Fails to State a Claim Under RICO.......................................................20

    A.    Yucaipa Lacks Standing to Assert Its RICO Claims.................................21

    B.    Yucaipa Fails to Allege a Pattern of Racketeering Activity ................................23

    C.    Yucaipa Is Collaterally Estopped From Alleging that Black Diamond and Spectrum "Encouraged" Yucaipa to Buy First Lien Debt....................................26

    D.    Yucaipa's Allegations Regarding Black Diamond and Spectrum's Purported Racketeering "Scheme" Are Implausible...............................................29

    E.    Yucaipa Fails to State a Claim for RICO Conspiracy...........................................32

    F.    The Court Should Decline to Exercise Supplemental Jurisdiction Over Yucaipa's State Law Claims.....................................................................................33

i

IV.    Yucaipa Fails to State Claims for Tortious Interference With Business Relations or Fraud ....................................................................................................................... 33

V.     This Action Should Be Stayed Pending Resolution of Related Actions in the Bankruptcy Court ....................................................................................................... 34

CONCLUSION ................................................................................................................... 35

## TABLE OF AUTHORITIES

**Cases**                                                  **Page(s)**

*A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*,
263 F.3d 239 (3d Cir. 2001) .................................................................... 15

*APV N. Am., Inc v. Sig Simonazzi N. Am., Inc.*,
295 F. Supp. 2d 393 (D. Del. 2002) ......................................................... 34

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................. 29

*Baldwin v. Township of Union*,
No. 02 Civ. 1822 (WGB), 2005 WL 3588473 (D.N.J. Dec. 29, 2005) .................................. 24

*Barbieri v. Wells Fargo & Co.*,
No. 09 Civ. 3196 (RBS), 2014 WL 7330461 (E.D. Pa. Dec. 22, 2014) ................................ 22

*Barnett v. Stern*,
909 F.2d 973 (7th Cir. 1990) .................................................................... 23

*Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*,
No. 00-7302, 2000 WL 1508873 (2d Cir. Oct. 11, 2000) .................................. 15-16

*Bd. of Trustees of Trucking Employees of N. Jersey Welfare Fund, Inc. - Pension Fund v. Centra*,
983 F.2d 495 (3d Cir. 1992) .................................................................... 27

*BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*,
No. 650150/2012, 2013 WL 1290394 (N.Y. Sup. Ct. Mar. 8, 2013) ...................................... 9

*BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*,
112 A.D.3d 509 (1st Dep't 2013) ............................................................... 3

*BDCM Opportunity Fund II, L.P. v. Yucaipa Am. Alliance Fund I, LP*,
22 N.Y.3d 1171 (2014) .............................................................................. 3

*Beck v. Prupis*,
529 U.S. 494 (2000) ................................................................................. 32

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................. 29

*Braintree Labs., Inc. v. Schwartz Pharma, Inc.*,
568 F. Supp. 2d 487 (D. Del. 2008) ......................................................... 16

*Cheminor Drugs, Ltd. v. Ethyl Corp.*,
168 F.3d 119 (3d Cir. 1999)...............................................................15, 16

*E.E.O.C. v. Univ. of Pennsylvania*,
850 F.2d 969 (3d Cir. 1988)....................................................................35

*E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961)................................................................................15

*First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*,
219 F. Supp. 2d 576 (S.D.N.Y. 2002).....................................................23

*FL Receivables Trust 2002-A v. Bagga*,
No. 03 Civ. 5108 (BWK), 2005 WL 563535 (E.D. Pa. Mar. 8, 2005)....................22

*Giles v. Phelan, Hallinan & Schmeig, L.L.P.*,
No. 11-6239, 2013 WL 2444036 (D.N.J. June 4, 2013)........................15

*Goldfine v. Sichenzia*,
118 F. Supp. 2d 392 (S.D.N.Y. 2000)........................................... 1, 20-21

*Gross v. Waywell*,
628 F. Supp. 2d 475 (S.D.N.Y. 2009).....................................................26

*H.J. Inc. v. Nw. Bell Telephone Co.*,
492 U.S. 229 (1989)..........................................................................23, 24

*Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC*,
347 F. App'x 711 (2d Cir. 2009).............................................................22

*Helman v. Murry's Steaks, Inc.*,
742 F. Supp. 860 (D. Del. 1990).............................................................25

*Hindes v. Castle*,
937 F.2d 868 (3d Cir. 1991).....................................................................25

*Hughes v. Consol-Penn. Coal Co.*,
945 F.2d 594 (3d Cir. 1991)...............................................................21, 24

*Irwin & Leighton, Inc. v. W.M. Anderson Co.*,
532 A.2d 983 (Del. Ch. 1987).................................................................33

*Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*,
458 F.3d 244 (3d Cir. 2006).....................................................................27

*Johnson v. Goldstein*,
864 F. Supp. 490 (E.D. Pa. 1994), *aff'd* 66 F.3d 311 (3d Cir. 1995)......................31

*Johnson v. Heimbach,*
    No. 03 Civ.A. 2483 (BMS), 2003 WL 22838476 (E.D. Pa. Nov. 25, 2003).........................22

*Kehr Packages, Inc. v. Fidelcor, Inc,*
    926 F.2d 1406 (3d Cir. 1991).........................................................................................25, 26

*Klatch-Maynard v. Sugarloaf Twp.,*
    No. 3:06cv845, 2011 WL 532168 (M.D. Pa. Feb. 8, 2011) ..........................................15

*Kolar v. Preferred Real Estate Investments, Inc.,*
    361 F. App'x 354 (3d Cir. 2010) ..................................................................................24

*Lightning Lube, Inc. v. Witco Corp.,*
    4 F.3d 1153 (3d Cir. 1993).............................................................................................33

*Lord v. Souder,*
    748 A.2d 393 (Del. 1999) ..............................................................................................34

*Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc.,*
    No. 07-127-LPS, 2011 WL 678707 (D. Del. Feb. 18, 2011) ......................................15

*Maio v. Aetna, Inc.,*
    221 F.3d 472 (3d Cir. 2000)...........................................................................................22

*Mcdonald v. Smith,*
    472 U.S. 479 (1985).......................................................................................................15

*Meade v. Meade,*
    No. 91 Civ. 5515, 1991 WL 243539 (E.D. Pa. Nov. 18, 1991).....................................25

*Meyers v. Heffernan,*
    740 F. Supp. 2d 637 (D. Del. 2010)..................................................................................7

*Mierzwa v. Safe & Secure Self Storage, LLC,*
    493 F. App'x 273 (3d Cir. 2012) ...................................................................................32

*Motorola Credit Corp. v. Uzan,*
    322 F.3d 130 (2d Cir. 2003)...........................................................................................22

*O'Malley v. BancAmerica Commercial Corp.,*
    No. 89 Civ. A. 89-2405, 1992 WL 81394 (E.D. Pa. Apr. 17, 1992) ..............................21

*Pac. Elec. Wire & Cable Co., Ltd. v. Set Top Intern., Inc.,*
    No. 03 Civ. 9623 (JFK), 2005 WL 578916 (S.D.N.Y. Mar. 11, 2005) ..........................21

*Prof'l Real Estate Investors v. Columbia Pictures Indus.,*
    508 U.S. 49 (1993)....................................................................................................16, 17

*Rotherberg v. Marger*,
    11 Civ. 5497 (RBK), 2013 U.S. Dist. LEXIS 44473 (D.N.J. Mar. 28, 2013) ........................21

*Sedima S.P.R.L. v. Imrex Co., Inc.*,
    473 U.S. 479 (1985).......................................................................................................23

*Sunlight Elec. Contracting Co., Inc. v. Turchi*,
    918 F. Supp. 2d 392 (E.D. Pa. 2013) ...........................................................................21

*Tabas v. Tabas*,
    47 F.3d 1280 (3d Cir. 1995)..........................................................................................25

*United Mine Workers of Am. v. Gibbs*,
    383 U.S. 715 (1966).......................................................................................................33

*United Mine Workers of Am. v. Pennington*,
    381 U.S. 657 (1965).......................................................................................................15

*Walter v. Palisades Collection, LLC*,
    480 F. Supp. 2d 797 (E.D. Pa. 2007) ...........................................................................22

*Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*,
    No. 9151-VCP, 2014 WL 5509787 (Del. Ch. Oct. 31, 2014) ..............................14, 18, 19, 20

*Zahl v. N.J. Dep't of Law & Public Safety Division of Consumer Affairs*,
    428 F. App'x 205 (3d Cir. 2011) ...............................................................................28-29

Defendants BDCM Opportunity Fund II L.P., Black Diamond CLO 2005-1 Ltd. (collectively, "Black Diamond"), Spectrum Investment Partners, L.P. ("Spectrum"), Richard A. Ehrlich, Stephen H. Deckoff, Leslie A. Meier and Jeffrey A. Schaffer (collectively, "Defendants"), by and through their undersigned counsel, respectfully submit this Memorandum of Law in support of their motion, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the Complaint filed by Plaintiffs Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. ("Yucaipa"), or alternatively to stay this action pending resolution of earlier-filed related actions.

## PRELIMINARY STATEMENT

This action is nothing more than a garden variety business dispute dressed up as a federal RICO case.[1]  Further, claims based on the same allegations as those asserted here have been filed in four other court[2] systems at various times over the last three and a half years, and have been the subject of numerous decisions.  Several of these cases are still being actively litigated.  The claims brought before this Court are simply Yucaipa's attempt to get one more bite at the apple because of its failure in all the other courts to date.

The instant Complaint is the most transparent example of Yucaipa's opportunistic forum shopping.  Only 7 days before filing the Complaint in this Court, Yucaipa withdrew a nearly *identical* RICO complaint against the same Defendants in the Southern District of New York before Judge Denise L. Cote (the "SDNY Complaint") after: (i) Defendants filed a motion to dismiss (on the same substantive grounds underlying this motion); and (ii) Judge Cote issued

---

[1] "[E]very member of the federal bench has before him or her at least one – and possibly more – garden variety fraud or breach of contract case that some Plaintiff has attempted to transform into a [RICO case]."  *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 394-95 (S.D.N.Y. 2000).

[2] Chronologically, New York state court, the United States Bankruptcy Court for the District of Delaware, Delaware Chancery Court, and United States District Court for the Southern District of New York.

an Order directing that if Yucaipa filed opposition papers to Defendants' motion rather than amending the SDNY Complaint, Yucaipa would be given "no further opportunity to amend."[3] Yucaipa, rather than amending the SDNY Complaint or defending the sufficiency of its allegations, withdrew the SDNY Complaint and filed a virtually identical Complaint in this Court in an incredibly transparent attempt at forum shopping. For the reasons discussed below, the Complaint should be dismissed.

To begin, Yucaipa's RICO claims are completely without merit because this action does *not* involve a criminal enterprise or a pattern of racketeering activity. This is simply a contractual dispute between creditors of Allied Systems Holdings, Inc.[4] and its related entities (collectively, "Allied"), which are debtors in a three-year-old bankruptcy case, *In re ASHINC Corp.*, Case No. 12-11564 (CSS) (Bankr. D. Del.). The contract at issue is a Credit Agreement[5] pursuant to which Allied borrowed $265 million of first lien debt (the "First Lien Debt") from the lenders party to the Credit Agreement (the "Lenders").

Allied was an automotive hauling company. When Allied emerged from a prior bankruptcy in 2007, Yucaipa became Allied's majority shareholder; in addition, at that time, Allied entered into the Credit Agreement. Shortly thereafter, in 2008, under the direction of the Yucaipa-controlled board, Events of Default occurred under the terms of the Credit Agreement, and in August 2009 Yucaipa caused Allied to stop making interest payments on the First Lien

---

[3] A copy of the SDNY Complaint is attached as Exhibit 1 to the Affirmation of Kerri K. Mumford in Support of Defendants' Motion to Dismiss ("Mumford Aff."), dated June 4, 2015 and filed concurrently herewith.

[4] Allied Systems Holdings, Inc. is now known as ASHINC Corporation.

[5] "Credit Agreement" refers to the Amended and Restated First Lien Secured Super-Priority Debtor in Possession and Exit Credit and Guaranty Agreement, as amended and restated as of May 15, 2007, between Allied Holdings Inc. and Allied Systems Ltd. (L.P.) as Borrowers, and the Lenders from time to time party thereto (as amended). (Compl. Ex. 1.)

Debt. Then, in violation of the express terms of the Credit Agreement, Yucaipa attempted in

August 2009 to purchase a majority of Allied's First Lien Debt in order to seize control of that

debt by declaring itself the "Requisite Lender" (*i.e.*, the majority Lender under the Credit

Agreement vested with the power to exercise, or refrain from exercising, the remedies under the

Credit Agreement) and prevent the other Lenders (including Black Diamond and Spectrum) from

exercising the remedies available to them under the Credit Agreement, including accelerating the

First Lien Debt and foreclosing on the collateral.[6]

When the administrative agent for the Lenders ("CIT") opposed Yucaipa's

attempt to seize control of the debt, Yucaipa sued CIT in 2009. That case settled in December

2011 which did not resolve the issues between Yucaipa and the other Lenders.

Black Diamond and Spectrum thereupon commenced suit in January 2012 in the

Supreme Court for the State of New York (the "New York Court") and successfully obtained a

judicial declaration that Yucaipa was not the Requisite Lender because the Purported Fourth

Amendment to the Credit Agreement was not validly enacted and was void *ab initio*.[7]

In May 2012, shortly before the maturity date of the First Lien Debt, Black

Diamond and Spectrum filed involuntary bankruptcy petitions against Allied in the Bankruptcy

Court for the District of Delaware (the "Bankruptcy Court"). Allied shortly thereafter consented

---

[6] As set forth in greater detail below, Yucaipa engineered an amendment (the "Third Amendment") to the Credit Agreement in order to allow itself to buy First Lien Debt, which had been previously prohibited by the Credit Agreement, and then attempted to force another amendment (the "Purported Fourth Amendment") on the Lenders to allow itself to become the Requisite Lender. If Yucaipa could prevent the Lenders from exercising rights and remedies against Allied resulting from Events of Default, it could preserve its equity investment in Allied in the face of Allied's defaults. (The Third Amendment is attached to the Complaint as Exhibit 14; and the Purported Fourth Amendment is attached to the Complaint as Exhibit 2.)

[7] The New York Appellate Division affirmed that decision. *BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, 112 A.D.3d 509 (1st Dep't 2013). Yucaipa then sought leave to appeal from the New York Court of Appeals, which application was denied. *BDCM Opportunity Fund II, L.P. v. Yucaipa Am. Alliance Fund I, LP*, 22 N.Y.3d 1171, 1171 (2014).

to the entry of orders for relief under the Bankruptcy Code.  In Allied's bankruptcy cases, Black Diamond and Spectrum, as well as the Official Committee of Unsecured Creditors of Allied Systems Holdings, Inc. (the "Committee"), commenced actions, which are still pending, seeking (among other things) to equitably subordinate Yucaipa's First Lien Debt because of Yucaipa's inequitable conduct.[8]  Black Diamond and Spectrum also successfully obtained a judicial declaration from the Bankruptcy Court that they, and not Yucaipa, are the Requisite Lenders.[9]

Faced with these litigation losses and the prospect that the First Lien Debt it purchased will be equitably subordinated, Yucaipa has filed a series of claims in different courts against Black Diamond and Spectrum: (i) in the Court of Chancery of the State of Delaware (the "Delaware Chancery Court"),[10] where Yucaipa seeks to seize control of certain assets of Allied that were purchased by the Lenders in a Bankruptcy Court-supervised auction; (ii) in the Bankruptcy Court, where Yucaipa made a motion in the Committee Action to file an otherwise untimely counterclaim which seeks to equitably subordinate Black Diamond and Spectrum's First Lien Debt and where Yucaipa filed an identical counterclaim in the BD/S Action; (iii) in the Southern District of New York, asserting the SDNY Complaint that was virtually the mirror image of Yucaipa's aforesaid counterclaims in the Bankruptcy Court, but simply re-characterizes the same allegations as an alleged "criminal enterprise" of racketeering activity; and (iv) in this

---

[8] The Committee, asserting derivative claims on behalf of Allied, commenced its action against Yucaipa in January 2013 (the "Committee Action") in which Black Diamond and Spectrum are Intervenor Plaintiffs; Black Diamond and Spectrum commenced their own action (the "BD/S Action") in November 2014, asserting direct claims against Yucaipa.

[9] Yucaipa appealed this decision to this Court, although the prosecution of that appeal was stayed pending mediation by the parties by order of the Bankruptcy Court.  That mediation was unsuccessful and the appeal is now proceeding.

[10] Most of the claims raised by Yucaipa in the Delaware Chancery Court have been dismissed, with some claims being stayed pending the resolution of the adversary proceedings before the Bankruptcy Court.

Court, asserting yet another RICO complaint that is virtually the mirror image of the SDNY Complaint and the aforesaid equitable subordination claims.

Yucaipa's Complaint in this action should be dismissed for the following reasons:

*First*, Yucaipa's Complaint is premised entirely on the assertion that, as part of a racketeering scheme to equitably subordinate Yucaipa's claims, Black Diamond and Spectrum filed the involuntary petitions against Allied and filed equitable subordination claims against Yucaipa. However, Black Diamond and Spectrum's litigation filings are protected under the *Noerr-Pennington* Doctrine, which immunizes litigation-related activity from liability.

*Second*, Yucaipa's claims are barred by a covenant in the operative Third Amendment to the Credit Agreement (the "Covenant Not to Sue") pursuant to which Yucaipa is barred from suing any Lenders for claims related to the Credit Agreement.

*Third*, Yucaipa lacks standing to assert its RICO claims because those claims would not be ripe until Black Diamond and Spectrum have actually succeeded in equitably subordinating Yucaipa's claims.

*Fourth*, Yucaipa has failed to allege a pattern of racketeering activity given that the alleged predicate acts spanned only nine months, and because the alleged scheme has only one objective (the equitable subordination of Yucaipa's debt), only one intended victim (Yucaipa), and an inherently finite duration (the conclusion of Allied's bankruptcy cases).

*Fifth*, Yucaipa's allegations of a RICO scheme are simply not plausible. Yucaipa alleges that as part of their scheme to equitably subordinate Yucaipa's First Lien Debt, Black Diamond and Spectrum "encouraged" Yucaipa to buy First Lien Debt and declare itself the Requisite Lender – allegations which, as set forth below, the Bankruptcy Court has already dismissed as implausible, a finding entitled to collateral estoppel before this Court. Yucaipa also

alleges that Black Diamond and Spectrum "scuttled" a deal with a third party, Jack Cooper Transport ("JCT") in which JCT would have paid Lenders, including Black Diamond and Spectrum, 100% of their First Lien Debt plus accrued interest (which, according to Yucaipa, would have resulted in a substantial gain based on the discounted price paid for the debt), to instead pursue a highly unpredictable litigation strategy, with no assured outcome, to recover the same amount in damages based on the subordination of Yucaipa's debt.[11]  It is simply not plausible that any rational business person would forgo a *guaranteed* full recovery to instead pursue a highly unpredictable and costly litigation for a substantially similar recovery.

> *Sixth*, given that Yucaipa has failed to state a federal RICO claims, Yucaipa's state law claims should be dismissed for lack of subject matter jurisdiction.

> *Seventh*, even if this Court exercises supplemental jurisdiction over Yucaipa's state law claims, those claims should nevertheless be dismissed.  Yucaipa's tortious interference claim fails because, by Yucaipa's own admission, Black Diamond and Spectrum pursued their own economic self-interests when they filed the involuntary bankruptcy petitions and the equitable subordination claims against Yucaipa.  Yucaipa's fraud claim fails because Yucaipa has failed to adequately allege reliance or injury, and, moreover, the allegations of fraud are best adjudicated by the Bankruptcy Court where the alleged fraud took place.

> *Finally*, if any of Yucaipa's claims are not dismissed, this action should be stayed pending the resolution of the earlier-filed actions that are pending in the Bankruptcy Court in the

---

[11] In the SDNY Complaint, Yucaipa admitted that JCT would have paid par plus accrued interest. (SDNY Compl. ¶¶ 24, 103.)  Tellingly, because that fact demonstrates the implausibility of Yucaipa's alleged RICO scheme, Yucaipa now alleges that the JCT would *not* have paid par plus accrued interest (Compl. ¶¶ 19, 99, 124) in a transparent attempt to conceal the implausibility of their allegations.  Yucaipa, however, cannot escape its prior admission in the SDNY Complaint that JCT would have paid par plus accrued interest because the term sheet showing that price offer is attached to the current Complaint.  (Compl. Ex. 4.)

interests of judicial economy and to avoid the risk of inconsistent rulings and because those actions are likely to resolve all claims between the parties, including those asserted here.

### STATEMENT OF FACTS[12]

#### A.    The Credit Agreement

As noted above, in May 2007, Allied emerged from bankruptcy under a plan of reorganization financed by $265 million of First Lien Debt pursuant to the Credit Agreement. Compl. ¶ 68.)  Central to the Credit Agreement is the "Requisite Lender," which is the Lender(s) holding a majority of the First Lien Debt vested with the authority to exercise, or refrain from exercising, numerous remedies on behalf of all Lenders.  (Compl. ¶ 78, Ex. 1 § 1.1.)  The Credit Agreement, as originally drafted, expressly prohibited Yucaipa (Allied's majority shareholder which controlled Allied's board) from acquiring any First Lien Debt, thereby preventing Yucaipa from ever becoming the Requisite Lender.  (*Id.* ¶ 68.)

#### B.    The Third Amendment

In 2008, Yucaipa orchestrated the passage of a Third Amendment to the Credit Agreement that would, for the first time, allow Yucaipa to acquire First Lien Debt.  (Compl. ¶ 73.)  However, under the Third Amendment, Yucaipa has extremely limited rights to become a "Lender":  the amount of debt Yucaipa could acquire was capped and any debt it purchased would be stripped of any voting power.  (Compl. Ex. 14 (Third Amendment § 2.1(a)).)  Because of those restrictions, and others, Yucaipa could never become the Requisite Lender under the Third Amendment.

---

[12] Although, for purposes of a motion to dismiss, the Court must accept the well-pled factual allegations in the Complaint as true, because Yucaipa's Complaint is replete with mischaracterizations and material omissions, this Statement of Facts supplements the allegations in the Complaint with facts from various public filings of which this Court can take judicial notice (especially given the extensive history of the numerous cases between the parties). *Meyers v. Heffernan*, 740 F. Supp. 2d 637, 640 n.4 (D. Del. 2010).

Additionally, the Third Amendment has a Covenant Not to Sue, which severely

limits Yucaipa's right to sue any Lender. The Covenant Not to Sue provides:

> To the fullest extent permitted by applicable law, no Restricted
> Sponsor Affiliate [Yucaipa] shall assert, and each Restricted
> Sponsor Affiliate immediately and automatically upon becoming a
> Lender, hereby irrevocably (i) *waives, any claim or cause of action*
> *against any Lender, any Agent and their respective Affiliates* . . .
> (whether or not the claim therefor is based on contract, tort or duty
> imposed by any applicable legal requirement or otherwise) *arising*
> *out of, in connection with, as a result of, or in any way related to,*
> *this Agreement or any Credit Document or* any agreement or
> instrument contemplated hereby or thereby or referred to herein or
> therein, the transactions contemplated hereby or thereby, *any Loan*
> *or the use of the proceeds thereof or any act or omission or event*
> *occurring in connection therewith* except to the extent caused by
> such Lender's or Agent's gross negligence or willful misconduct
> . . . as determined by a court of competent jurisdiction by final and
> non-appealable judgment, (ii) *waives, releases and agrees not to*
> *sue upon any such claim or any such cause of action*, whether or
> not accrued and whether or not known or suspected to exist in its
> favor and (iii) waives any claim or cause of action against any
> Agent or any Lender . . . on any theory of liability for special,
> indirect, consequential or punitive damages . . . .

(*Id.* § 2.7(e) (emphasis added).)

## C.    The Purported Fourth Amendment

In February 2009, ComVest Investment Partners III, L.P. ("ComVest") became the

Requisite Lender. (Compl. ¶ 78.) Between March 2009 and August 2009, Yucaipa directly

negotiated with ComVest to acquire ComVest's First Lien Debt in an effort to become the

Requisite Lender. (*Id.*) Yucaipa alleges that during this period, Black Diamond and Spectrum

hatched a scheme to equitably subordinate Yucaipa's First Lien Debt, which it had not even

bought yet. (*Id.* ¶ 79.) As part of that alleged scheme, Yucaipa alleges that Black Diamond and

Spectrum "encouraged" Yucaipa to buy as much First Lien Debt as possible. (*Id.* ¶ 85.)

As discussed above, the Third Amendment restricted, among other things, the

amount of First Lien Debt that Yucaipa could acquire, which prevented Yucaipa from becoming

the Requisite Lender. Thus, in an effort to become the Requisite Lender, on August 21, 2009, Yucaipa caused Allied, which was under Yucaipa's direction and control, to enter into the Purported Fourth Amendment that, if effective, would have eliminated the Third Amendment's restrictions on Yucaipa's acquisition of First Lien Debt, and would have allowed Yucaipa to become the Requisite Lender.[13] (*Id.* ¶ 88.) That same day, Yucaipa purported to purchase the First Lien Debt owned by ComVest, and declared itself the Requisite Lender. (*Id.* ¶ 89.)

The Purported Fourth Amendment, however, was never approved by the unanimous consent of the Lenders as was required for it to become effective. Thus, on March 8, 2013, Black Diamond and Spectrum successfully obtained a declaratory judgment from the New York Court that the Purported Fourth Amendment was void *ab initio* and that Yucaipa was not the Requisite Lender. *BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP*, No. 650150/2012, 2013 WL 1290394, at *5 (N.Y. Sup. Ct. Mar. 8, 2013).

### D. Spectrum Buys Additional First Lien Debt

In mid-2011, Black Diamond and Spectrum entered into a Cooperation Agreement pursuant to which they agreed to work together to maximize their recoveries as Lenders. (Compl. ¶ 101; *id.* Ex. 13.) The Cooperation Agreement provides that if one party acquired additional First Lien Debt, the acquiring party would offer the other party the opportunity to buy its ratable share of that debt at the same price. (*Id.* Ex. 13 ¶ 3.)

Pursuant to the Cooperation Agreement, Black Diamond and Spectrum agreed to communicate regularly. (*Id.* ¶ 4.) Yucaipa alleges that five such email communications, from September 16, 2011 through March 21, 2012, constitute RICO predicate acts of wire fraud in violation of 18 U.S.C. § 1343. (*Id.* ¶ 193.)

---

[13] In fact, the only Lender who executed the Purported Fourth Amendment was ComVest; no other Lender was even asked to sign.

Yucaipa also alleges that in or around May 2012, Black Diamond transferred $4 million (in face amount) of First Lien Debt to Spectrum – the so-called "Involuntary Petition Payoff" – to obtain "Spectrum's support of the involuntary petition strategy." (*Id.* ¶ 107.) Yucaipa admits, however, that this transfer was made "in accordance with the Cooperation Agreement" and that the amount of First Lien Debt that Spectrum purchased was its ratable share of First Lien Debt that Black Diamond had purchased earlier and at the same price. (*Id.*) Yucaipa further alleges that the Involuntary Petition Payoff was a "bribe" because Spectrum allegedly received "favorable pricing terms in exchange for Spectrum's support of the involuntary petition strategy." (*Id.*) Yucaipa alleges that the Involuntary Petition Payoff was "a bribe and inducement" for Spectrum's agreement to join the involuntary petitions in violation of 18 U.S.C. § 152(6), which Yucaipa alleges was a RICO predicate act. (Compl. ¶¶ 167-72.) Yucaipa alleges additional RICO predicate acts of mail fraud for the transfer of "documents reflecting the illegal claims transfer from Black Diamond to Spectrum." (*Id.* ¶ 198.)

**E.    JCT's Negotiations to Buy Allied's Assets and First Lien Debt**

Yucaipa alleges that from December 2011 to May 2012, Yucaipa was in negotiations with JCT for a deal in which JCT would acquire Allied's assets using First Lien Debt, and that from March 2011 to May 2012, Black Diamond and Spectrum also were in negotiations with JCT regarding JCT's efforts to acquire Allied's assets. (Compl. ¶¶ 96, 98.) In the virtually identical SDNY Complaint that Yucaipa filed (and later withdrew), Yucaipa admitted that JCT would have purchased all outstanding First Lien Debt "for a purchase price of up to par plus accrued interest," which "would have benefitted *all* First Lien Lenders (including Yucaipa and Defendants) on *equal* terms" and "would have maximized value for *all* Allied stakeholders." (SDNY Compl. ¶ 103 (emphasis added).) Realizing, as set forth below, that such admissions are fatal to its claims, Yucaipa omitted those admissions from its present Complaint

10

and now alleges that Black Diamond and Spectrum "were not interested in any deal with JCT because they would have been *unable* to recover par plus accrued interest" and that "it was *doubtful* any First Lien Claims would be paid in full." (Compl. ¶¶ 124-25 (emphasis added).) Yucaipa alleges that Black Diamond and Spectrum "scuttled" the deal with JCT when it filed involuntary bankruptcy petitions against Allied. (*Id.* ¶¶ 33, 157.)[14]

### F. Proceedings Before the Bankruptcy Court

On May 17, 2012, Black Diamond and Spectrum filed involuntary petitions against Allied in the Bankruptcy Court. Allied consented to the bankruptcy shortly thereafter. (Compl. ¶ 110; Mumford Aff. Ex. 2 (Allied Bankr., D.I. No. 68).)[15] Yucaipa alleges that, as part of the alleged "pattern of racketeering activity," the affidavits submitted by Richard Ehrlich of Black Diamond (the "Ehrlich Affidavit") and Jeffrey Schaffer of Spectrum (the "Schaffer Affidavit") in support of the involuntary petitions failed to disclose that the alleged Involuntary Petition Payoff was "for the purpose of commencing an involuntary bankruptcy case," in violation of 18 U.S.C. §§ 152(2), 152(3), 1503. (Compl. ¶¶ 175, 178, 182, 186.)

On February 1, 2013, the Committee commenced the Committee Action on behalf of Allied and its unsecured creditors,[16] asserting derivative claims against Yucaipa for, *inter alia*, equitable subordination based on the Committee's "comprehensive investigation of potential claims belonging to the Debtors' estates, including the review of thousands of pages of

---

[14] Interestingly, Yucaipa fails to explain why, given their control of the Allied board, Yucaipa did not simply have Allied enter into an asset purchase agreement directly with JCT.

[15] "Allied Bankr." refers to *In re ASHINC Corporation, et al.*, Case No. 12-11564 (CSS) (Bankr. D. Del.).

[16] The Committee represents the interests of Allied and its *unsecured* creditors. Black Diamond and Spectrum are *secured* creditors and are thus not members of, or represented by, the Committee. The Committee was granted standing by the Bankruptcy Court to bring claims on behalf of Allied. (Mumford Aff. Ex. 3 (Allied Bankr., D.I. No. 1015) ¶ 1.)

documents obtained from the relevant parties." (Mumford Aff. Ex. 4 (Committee Adv. Proc., D.I. No. 1)[17]; *id.* Ex. 5 (Allied Bankr., D.I. No. 858) ¶ 6.) In the course of that independent investigation, the Committee uncovered Yucaipa's "efforts to take control over all facets of the Debtors' capital structure in an effort to protect its equity investment and frustrate the legitimate rights of creditors of Allied" and found that "Yucaipa trampled upon the legitimate rights and expectations of the Debtors' secured and unsecured creditors and caused the Debtors to make exorbitant and unnecessary payments to third parties acting at Yucaipa's direction and for Yucaipa's benefit, not for the benefit of the Company or its stakeholders." (*Id.* Ex. 5 ¶ 3.) The Committee concluded that Yucaipa's claims "are subject to equitable subordination." (*Id.* ¶ 6.)

On February 27, 2013, the Bankruptcy Court granted Black Diamond and Spectrum intervenor status in the Committee Action to assert a direct equitable subordination claim against Yucaipa. (Mumford Aff. Ex. 6 (Allied Adv. Proc., D.I. No. 162) at 40:15-22.)[18] As a result, on March 14, 2013, the Committee (as Plaintiff) and Black Diamond and Spectrum (as Intervenors) filed an amended complaint against Yucaipa and numerous directors of Allied (the "Committee Amended Complaint"), asserting various claims, including the Committee's derivative equitable subordination claim against Yucaipa, and Black Diamond and Spectrum's direct equitable subordination claim against Yucaipa. (Mumford Aff. Ex. 7 (Committee Adv. Proc., D.I. No. 76).) The Committee Action is pending.

On July 30, 2013, the Bankruptcy Court granted motions for summary judgment filed by Black Diamond and Spectrum, holding that Black Diamond and Spectrum are the

---

[17] "Committee Adv. Proc." refers to *The Official Committee of Unsecured Creditors of Allied Systems Holdings, Inc. v. Yucaipa Am. Alliance Fund I, L.P., et al.*, Adv. Proc. No. 13-50530 (CSS) (Bankr. D. Del.).

[18] "Allied Adv. Proc." refers to *Allied Systems Holdings, Inc. v. Am. Money Mgmt., et al.*, Adv. Proc. 12-50947 (CSS) (Bankr. D. Del.).

Requisite Lenders under the operative Third Amendment. (Mumford Aff. Ex. 8 (Committee Adv. Proc., D.I. No. 297) at 120:11-13.) Yucaipa has appealed that decision, and its appeal will be fully briefed and submitted on June 22, 2015 to this Court.

In the summer of 2013, the Bankruptcy Court supervised an auction of Allied's assets in which (i) JCT purchased substantially all of Allied assets for approximately $135 million; and (ii) the remainder of Allied's assets (the "SBDRE Assets") were acquired on behalf of all Lenders (including Yucaipa). (Compl. ¶¶ 28, 32.) The full amount of what Yucaipa asserts is its purported pro rata share (55.2%) is being held in escrow pending the equitably subordination claims against Yucaipa. (Mumford Aff. Ex. 9 (Allied Bankr., D.I. No. 1837) ¶ 13.)

On November 19, 2014, Black Diamond and Spectrum (and related entities) commenced the BD/S Action in the Bankruptcy Court against Yucaipa, numerous directors of Allied, and Ronald Burkle (Yucaipa's principal). (Mumford Aff. Ex. 10 (BD/S Adv. Proc., D.I. No. 1).)[19] The BD/S Action asserts, *inter alia*, a claim for equitable subordination against Yucaipa based, in part, on Yucaipa's use of its status as purported Requisite Lender to derail negotiations with JCT by insisting upon a disproportionate share of the consideration. (*Id*.)

On February 19, 2015, Yucaipa filed an answer and counterclaim for equitable subordination against Black Diamond and Spectrum in the BD/S Action ("Yucaipa's Counterclaim"). (Mumford Aff. Ex. 11(BD/S Adv. Proc., D.I. No. 19).) Yucaipa's Counterclaim is virtually identical to Yucaipa's Complaint in this action, except that, based on the same facts alleged in this case, it seeks to equitably subordinate Black Diamond and Spectrum's First Lien Debt. Black Diamond and Spectrum have moved to dismiss Yucaipa's Counterclaim based on

---

[19] "BD/S Adv. Proc." refers to *BDCM Opportunity Fund II, LP, et al. v. Yucaipa Am. Alliance Fund I, L.P., et al.*, Adv. Proc. No. 14-50971 (CSS) (Bankr. D. Del.).

many of the same arguments raised here, in particular the Covenant not to Sue and collateral estoppel based on prior decisions by the Bankruptcy Court. The BD/S Action is pending.[20]

### G.    Proceedings Before the Delaware Chancery Court

On December 11, 2013, Yucaipa filed an action in the Delaware Chancery Court against Black Diamond, Spectrum, and related entities, seeking to increase Yucaipa's recovery from the SBDRE Assets (the "Chancery Action"). (Compl. ¶ 143.) On October 31, 2014, the Delaware Chancery Court dismissed most of the claims in the Chancery Action pursuant to the Covenant Not to Sue and stayed the remainder of the action pending the resolution of the Committee Action and other proceedings in the Bankruptcy Court because "[r]esolution of the claims pending before the Bankruptcy Court could moot every non-dismissed aspect of this case and terminate the litigation." *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, No. 9151-VCP, 2014 WL 5509787, at *14, *16 (Del. Ch. Oct. 31, 2014).

### H.    Proceedings in the Southern District of New York

On February 6, 2015, Yucaipa filed the SDNY Complaint which was virtually identical to the instant Complaint. After Defendants moved to dismiss the SDNY Complaint on substantially the same grounds raised herein, on April 7, 2015, Judge Cote ordered that if Yucaipa opposed the motion to dismiss instead of amending the SDNY Complaint, Yucaipa "will have no further opportunity to amend." (Mumford Aff. Ex. 12.) In a transparent attempt at forum shopping, Yucaipa, rather than responding to the motion or amending its SDNY Complaint, instead withdrew its SDNY Complaint and re-filed it in this Court.

---

[20] Yucaipa moved in the Committee Action for leave to assert the same equitably subordination counterclaim against Black Diamond and Spectrum; that motion has been opposed by Black Diamond and Spectrum and is still pending. Yucaipa was required to make the motion because of the untimeliness of the proposed counterclaim, which, as with Yucaipa's Counterclaim asserted in the BD/S Action, is virtually identical to the RICO claim asserted in the SDNY Complaint and in this action.

## ARGUMENT

### I.     YUCAIPA'S CLAIMS ARE BARRED BY *NOERR-PENNINGTON*

All of Yucaipa's claims are premised upon Black Diamond and Spectrum's litigation-related conduct in connection with filing the involuntary petitions and equitable subordination claims against Yucaipa in the Allied bankruptcy cases.  (*See*, *e.g.*, Compl. ¶¶ 164, 210-12, 215-17.)  Fatal to those claims, however, is the *Noerr-Pennington* doctrine, which protects a litigant's right to "petition the Government for redress of grievances," a fundamental principle that cannot be abridged under the First Amendment of the U.S. Constitution.  *See E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137 (1961); *Mcdonald v. Smith*, 472 U.S. 479, 482 (1985).  Under the *Noerr-Pennington* doctrine, every step of litigation is immunized from liability.  *See Noerr Motor Freight*, 365 U.S. at 136, 144; *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965).  The *Noerr-Pennington* doctrine even extends to protect conduct that is "incident to litigation," such as pre-litigation activity, threat letters, and settlement negotiations, *Magnetar Techs. Corp. v. Six Flags Theme Parks, Inc.*, No. 07-127-LPS, 2011 WL 678707, at *2 (D. Del. Feb. 18, 2011), "even if there is an improper purpose or motive" behind that conduct, so long as that conduct does not constitute sham activity, *A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239, 250 (3d Cir. 2001).

Courts in the Third Circuit have applied the *Noerr-Pennington* doctrine to dismiss RICO, fraud and tortious interference claims – the very claims Yucaipa asserts in this action.  *See*, *e.g.*, *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 128 (3d Cir. 1999) (dismissing state law tort claims); *Giles v. Phelan, Hallinan & Schmeig, L.L.P.*, No. 11-6239, 2013 WL 2444036, at *6 (D.N.J. June 4, 2013) (dismissing RICO claims); *Klatch-Maynard v. Sugarloaf Twp.*, No. 3:06cv845, 2011 WL 532168, at *5 (M.D. Pa. Feb. 8, 2011) (dismissing RICO claims); *see also Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.*, No. 00-7302, 2000 WL 1508873, at *1

(2d Cir. Oct. 11, 2000) ("Noerr-Pennington immunity is applicable to RICO actions and to state-law claims such as fraud and tortious interference.").

To overcome *Noerr-Pennington*'s immunization of litigation-related activity, a plaintiff must show that such activity is a "mere sham." *See Prof'l Real Estate Investors v. Columbia Pictures Indus.*, 508 U.S. 49, 51 (1993). The "mere sham" exception has "objective" and "subjective" components, both of which are Yucaipa's burden to establish. *Id.* at 60-61.

### A.  Yucaipa Fails to Satisfy the Objective Prong of the "Mere Sham" Exception

Under the objective prong of the "mere sham" exception, litigation-related conduct is "objectively baseless" where "no reasonable litigant could realistically expect success on the merits." *Prof'l Real Estate Investors*, 508 U.S. at 60. If "the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*." *Id.* If the Court initially determines that the litigation conduct was not "objectively baseless," the Court need not even reach the subjective prong of the "mere sham" exception. *See Cheminor*, 168 F.3d at 123 & n.10; *Braintree Labs., Inc. v. Schwartz Pharma, Inc.*, 568 F. Supp. 2d 487, 495 (D. Del. 2008).

Here, Yucaipa cannot satisfy its burden of showing that the involuntary bankruptcy petitions filed by Black Diamond and Spectrum are "objectively baseless." Indeed, Yucaipa admits that before the involuntary petitions were filed, Allied could not pay its debts as they became due and that Yucaipa itself was contemplating putting Allied into bankruptcy. (Compl. ¶¶ 74, 95, 97.) Moreover, shortly after the involuntary petitions were filed, Allied itself *consented* to the bankruptcy. Black Diamond and Spectrum were protecting their rights as creditors of Allied, and therefore were engaging in constitutionally-protected petitioning activity when they filed the involuntary petitions. Accordingly, Yucaipa cannot seriously contend that the filing of the involuntary petitions was "objectively baseless."

16

Likewise, Yucaipa cannot seriously contend that the equitable subordination claims against it are "objectively baseless." Conspicuously absent from Yucaipa's Complaint is the fact that the Committee, acting on behalf of Allied and the unsecured creditors (not Black Diamond and Spectrum), *independently* brought a substantially similar equitable subordination claim against Yucaipa that arises from the same nucleus of operative facts. Under its statutory authority to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor," 11 U.S.C. § 1103(c)(2), the Committee undertook an independent investigation and discovered Yucaipa's "efforts to take control over all facets of the Debtors' capital structure in an effort to protect its equity investment and frustrate the legitimate rights of creditors of Allied" and found that "Yucaipa trampled upon the legitimate rights and expectations of the Debtors' secured and unsecured creditors and caused the Debtors to make exorbitant and unnecessary payments to third parties acting at Yucaipa's direction and for Yucaipa's benefit, not for the benefit of the Company or its stakeholders." (Mumford Aff. Ex. 5 ¶¶ 3, 6.) The Committee concluded that Yucaipa's claims "are subject to equitable subordination." (*Id.* ¶ 6.) Given that Black Diamond and Spectrum's equitable subordination claims are substantially the same as the Committee's claim, Yucaipa plainly cannot show that the equitable subordination claims brought by Black Diamond and Spectrum are "objectively baseless."

### B. Yucaipa Fails to Satisfy the Subjective Prong of the "Mere Sham" Exception

The Supreme Court has held that "[o]nly if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation." *Prof'l Real Estate Investors*, 508 U.S. at 60. In determining the subjective prong of the "mere sham" exception, the Court "should focus on whether the baseless lawsuit conceals 'an attempt to interfere directly with the business relationships of a competitor,' through the 'use of the governmental *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon.'" *Id.* at 60-61 (citations

17

omitted). Thus, to satisfy the subjective prong, Yucaipa must show that Black Diamond and Spectrum filed the involuntary petitions and equitable subordination claims not in the hopes that they would be successful, but rather because they knew that their *mere filing* would harm Yucaipa.

Yucaipa cannot satisfy this burden. Even assuming, for the sake of argument, that the involuntary petitions and equitable subordination claims are objectively baseless, and that this Court is to examine the subjective prong, Yucaipa cannot show that Black Diamond and Spectrum used the governmental *process* solely to harm Yucaipa. Rather, the entire purported scheme alleged by Yucaipa hangs on the ultimate *outcome* of the equitable subordination litigation in order to secure a greater recovery for themselves through litigation. (*See, e.g.*, Compl. ¶¶ 1-3, 7, 29, 31, 79-80, 123.) As such, Yucaipa cannot show that Black Diamond and Spectrum's litigation filings subjectively were a "mere sham."

## II. YUCAIPA'S COMPLAINT IS BARRED BY THE COVENANT NOT TO SUE

Yucaipa's Complaint is also barred by the Covenant Not to Sue, which prohibits Yucaipa from suing Lenders for claims "arising out of, in connection with, as a result of, or in any way related to, [the Credit Agreement] or . . . any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith."[21] (Compl. Ex. 14 § 2.7(e)).)

Here, all of Yucaipa's claims are "arising out of, in connection with, as a result of, or in any way related to" the Credit Agreement or "any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith." In particular, Yucaipa's claims are all based upon a purported "scheme" by Black Diamond and Spectrum to make more money

---

[21] Based on the Covenant Not to Sue, both the Bankruptcy Court and the Delaware Chancery Court dismissed claims asserted by Yucaipa. (Mumford Aff. Ex. 6 (Allied Adv. Proc., D.I. No. 162) at 105:3-107:1); *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, C.A. No. 9151-VCP, 2014 WL 5509787, at *14-16 (Del. Ch. Oct. 31, 2014).

off their *First Lien Debt* issued under the Credit Agreement by "knowingly making false accusations of misconduct on the part of Yucaipa in order to 'equitably subordinate' Yucaipa's $170 million in *First Lien Claims*." (Compl. ¶ 2 (emphasis added).) Yucaipa's "First Lien Claims" plainly arise from the Credit Agreement and the Loans and proceeds thereunder. Similarly, Yucaipa's allegations that Black Diamond and Spectrum "scuttled" the proposed sale to JCT are likewise barred by the Covenant Not to Sue because that transaction contemplated the sale of First Lien Debt to JCT. (*See* Compl. ¶ 98.)

The Covenant Not to Sue has an exception for claims of "gross negligence or willful misconduct . . . as determined by a court of competent jurisdiction by final and non-appealable judgment" (the "Prior Determination Requirement"). (Compl. Ex. 14 § 2.7(e).) As the Bankruptcy Court and Delaware Chancery Court have already found, the Prior Determination Requirement, by its express terms, is not satisfied by Yucaipa merely *alleging* gross negligence or willful misconduct. Rather, Yucaipa can sue other Lenders only *after* there has been a final and non-appealable judgment that the Lender committed gross negligence or willful misconduct. (Mumford Aff. Ex. 6 (Allied Adv. Proc., D.I. No. 162) at 105:6-13); *Yucaipa Am. Alliance Fund I, LP v. SBDRE LLC*, C.A. No. 9151-VCP, 2014 WL 5509787, at *14 (Del. Ch. Oct. 31, 2014) ("Yucaipa cannot sue Black Diamond [or Spectrum] in the absence of a final, non-appealable determination that Black Diamond [or Spectrum] acted with gross negligence or willful misconduct.").

Yucaipa indisputably cannot satisfy the Prior Determination Requirement because there has been no prior judicial determination that Black Diamond or Spectrum engaged in gross negligence or willful misconduct in connection with the Credit Agreement or the Loan or any

proceeds thereof. Accordingly, the Complaint should be dismissed in its entirety because all of

Yucaipa's claims in this action are barred by the Covenant Not to Sue.[22]

## III. YUCAIPA FAILS TO STATE A CLAIM UNDER RICO

Another reason that Yucaipa's Complaint should be dismissed in its entirety is

that Yucaipa has failed to state a claim under RICO, which is Yucaipa's *sole* basis for federal

subject matter jurisdiction. The RICO statute, 18 U.S.C. § 1961, *et seq*., is one of "the most

misused statutes in the federal corpus of law." *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 394

---

[22] The Delaware Chancery Court found that, on a motion to dismiss, it is "reasonably conceivable" that where Yucaipa "alleges a unique harm – meaning no other Lender could sue and the Prior Determination Requirement could not be satisfied – construing the Carve Out so broadly that it would fail to provide an escape hatch for Yucaipa in those circumstances arguably would produce a prohibited result" that would be "contrary to public policy." *Yucaipa Am. Alliance Fund I, LP*, 2014 WL 5509787, at *15. However, because the Chancery Action has not reached a final judgment on the merits, this "public policy" interpretation of the Covenant Not to Sue is not subject to collateral estoppel. But even if it were, Yucaipa nevertheless cannot show that the application of the Covenant Not to Sue to this action would violate public policy because the harms alleged in the Complaint are not unique to Yucaipa.

In a brazen attempt to sidestep this inevitable conclusion, in the instant Complaint, Yucaipa has excised all of its prior admissions from its SDNY Complaint as to harm suffered by Lenders other than Yucaipa. In the SDNY Complaint, Yucaipa alleged that "if the sale [to JCT] had proceeded as then contemplated it would have maximized value for *all stakeholders*. Under that March 2012 term sheet, *each of the First Lien Lenders* (including Yucaipa and Defendants) would have benefitted on equal terms." (SDNY Compl. ¶ 24 (emphasis added).) Yucaipa further alleged in the SDNY Complaint that it suffered damages from the "loss of profit on the original JCT transaction scuttled by Defendants' wrongful involuntary bankruptcy filing." (SDNY Compl. ¶ 30.) Those alleged harms were not unique to Yucaipa. Because *all* the First Lien Lenders stood to benefit from the proposed JCT deal, the filing of the involuntary petitions – which allegedly "scuttled" the JCT deal – harmed *all* the Lenders.

In the instant action, Yucaipa cannot invoke the "public policy" interpretation of the Covenant Not to Sue simply by omitting its prior admissions that the alleged scheme harmed *all* the Lenders. Indeed, notwithstanding Yucaipa's attempt to whitewash its new Complaint, this Court should find that the Complaint still alleges harm that was not unique to Yucaipa because Yucaipa has attached as an exhibit to its new Complaint the March 2012 term sheet, which provided that JCT would purchase the debt held by the First Lien Lenders "for a purchase price of up to par plus accrued and unpaid interest." (Compl. Ex. 4.) Because *all* the Lenders stood to get a full recovery on their First Lien Debt from JCT, Black Diamond and Spectrum's alleged "scuttling" of that deal harmed *all* the Lenders, not just Yucaipa. Accordingly, application of the Covenant Not to Sue to bar Yucaipa's new Complaint would not violate public policy.

(S.D.N.Y. 2000) (internal quotation marks omitted).  Indeed, "courts should strive to flush out frivolous RICO allegations at an early stage of the litigation."  *Rotherberg v. Marger*, 11 Civ. 5497 (RBK), 2013 U.S. Dist. LEXIS 44473, at *31 (D.N.J. Mar. 28, 2013).

Courts must "carefully scrutinize" RICO claims "because of the 'relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it.'"  *Sunlight Elec. Contracting Co., Inc. v. Turchi*, 918 F. Supp. 2d 392, 402 (E.D. Pa. 2013) (*quoting Kolar v. Preferred Real Estate Investments, Inc.*, 361 F. App'x 354, 363 (3d Cir. 2010)).  Congress's intent in enacting RICO was to combat "long-term criminal conduct" and the "danger posed by organized crime-type offenses."  *Hughes v. Consol-Penn. Coal Co.*, 945 F.2d 594, 611 (3d Cir. 1991) (internal quotations and citations omitted).  Accordingly, RICO claims should be viewed with scrutiny to ensure that "only those purported RICO claims which truly fit within the intent of the statute will proceed."  *O'Malley v. BancAmerica Commercial Corp.*, No. 89 Civ. A. 89-2405, 1992 WL 81394, at *4 (E.D. Pa. Apr. 17, 1992).

Garden variety business disputes that are *disguised* as RICO claims should be dismissed.  *See, e.g.*, *Sunlight*, 918 F. Supp. 2d at 405-06 (dismissing RICO claim that "present[ed] a garden variety breach of contract claim"); *Pac. Elec. Wire & Cable Co., Ltd. v. Set Top Intern., Inc.*, No. 03 Civ. 9623 (JFK), 2005 WL 578916, at *13 (S.D.N.Y. Mar. 11, 2005) ("[C]ourts must always be on the lookout for the putative RICO case that is really nothing more than a fraud case clothed in the Emperor's trendy garb.") (internal quotation marks omitted).

A. **Yucaipa Lacks Standing to Assert Its RICO Claims**

As a threshold matter, Yucaipa does not have standing to assert RICO claims because its damages are contingent upon outcomes of the proceedings in Bankruptcy Court.  As Yucaipa itself admits, the ultimate objective of the alleged RICO conspiracy – equitable subordination of Yucaipa's claims in Bankruptcy Court – has not yet occurred and "is ongoing to

this day."  (Compl. ¶ 29.)  Where, as here, a "concrete financial loss" cannot be alleged, plaintiffs lack standing under RICO because their claims are not ripe.  *Maio v. Aetna, Inc.*, 221 F.3d 472, 486-87 (3d Cir. 2000); *see also*, *e.g.*, *Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir. 2003) (unless damages are "clear and definite," plaintiffs "lack statutory standing under RICO because their claims are unripe"); *Johnson v. Heimbach*, No. 03 Civ.A. 2483 (BMS), 2003 WL 22838476, at *4 (E.D. Pa. Nov. 25, 2003) ("a complaint does not adequately plead a RICO violation unless it shows damage to business or property with some certainty; if the claimed injury is speculative, it is not ripe for adjudication").

Critically, under Third Circuit law, damages that, as here, are prospective or contingent on future events are not sufficient to satisfy RICO's standing requirements.  *Maio*, 221 F.3d at 494-95; *see also Barbieri v. Wells Fargo & Co.*, No. 09 Civ 3196 (RBS), 2014 WL 7330461, at *5 (E.D. Pa. Dec. 22, 2014)  ("to qualify as a 'concrete financial loss,' the plaintiff's injury cannot be speculative or contingent on future events"); *FL Receivables Trust 2002-A v. Bagga*, No. 03 Civ. 5108 (BWK), 2005 WL 563535, at *4 (E.D. Pa. Mar. 8, 2005) ("the [Third Circuit in *Maio*] left no doubt that an injury that is speculative or contingent on future events does not confer RICO standing"); *Walter v. Palisades Collection, LLC*, 480 F. Supp. 2d 797, 804 (E.D. Pa. 2007) ("RICO liability cannot attach to future contingent damages").

For these very reasons, where damages are contingent upon the outcomes of collection efforts or pending claims in bankruptcy proceedings, RICO standing is lacking because the claims are unripe.  *See, e.g.*, *FL Receivables Trust*, 2005 WL 563535, at *3-4 (dismissing RICO claims on the basis that the amount of alleged damages "depends directly on the results of [plaintiff's] currently pending collection action"); *Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC*, 347 F. App'x 711, 712-13 (2d Cir. 2009)

("[B]ecause bankruptcy proceedings are still pending, and because it cannot now be determined whether those proceedings will mitigate or remedy [plaintiffs'] damages, we conclude their claims are not yet ripe"); *Barnett v. Stern*, 909 F.2d 973, 977, n.4 (7th Cir. 1990) (creditors lacked standing under RICO until recovery from bankruptcy proceeding became clear); *First Capital Asset Mgmt., Inc. v. Brickellbush, Inc.*, 219 F. Supp. 2d 576, 578 (S.D.N.Y. 2002) (a creditor "claiming that its ability to collect its debt has been impaired or frustrated by a RICO violation lacks standing to sue under RICO for the amount of the debt as long as the extent of the loss remains uncertain, as for example where collection efforts continue").

Here, Yucaipa's RICO claims are premised entirely on the notion that "the culmination of Defendants' scheme" is the *equitable subordination* of Yucaipa's debt. (Compl. ¶ 29.) Yucaipa's RICO claims cannot satisfy the "concrete financial loss" standing requirement because, as Yucaipa itself admits, "[t]his final step . . . is ongoing to this day" and "*if* the [equitable subordination] claims are ultimately successful . . . , Yucaipa's claims will *likely* be wiped out." (*Id.* ¶¶ 29, 31 (emphasis added).) Indeed, Yucaipa's damages – if any – will not be "concrete" until final resolution of the pending equitable subordination claims. Accordingly, Yucaipa's RICO claims are not ripe and must be dismissed.

**B.      Yucaipa Fails to Allege a Pattern of Racketeering Activity**

Yucaipa's RICO claims also must be dismissed because Yucaipa fails to plead the essential element of a "pattern" of racketeering activity. *See Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). To establish a pattern, Yucaipa must show that the alleged predicate acts of racketeering are related and "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Telephone Co.*, 492 U.S. 229, 239 (1989). There are two types of "continuity" that satisfy RICO's pattern requirement: (i) closed-ended continuity, which is "a closed period of repeated conduct"; and (ii) open-ended continuity, which is "past conduct that

23

by its nature projects into the future with a threat of repetition." *Id.* at 241; *Hughes v. Consol-Pennsylvania Coal Co.*, 945 F.2d 594, 609-10 (3d Cir. 1991).

### 1. Yucaipa Has Failed to Adequately Allege Open-Ended Continuity

Yucaipa cannot satisfy open-ended continuity because Yucaipa alleges that the "scheme is ongoing and will continue *until* the members of the Enterprise achieve their goal of equitably subordinating Yucaipa's claims in the Allied bankruptcy case." (Compl. ¶ 159 (emphasis added).) Given the inherently finite duration of the alleged scheme, Yucaipa has not adequately alleged open-ended continuity. *See*, *e.g.*, *Kolar v. Preferred Real Estate Invs., Inc.*, 361 F. App'x 354, 365 (3d Cir. 2009) (a "single, finite transaction cannot by itself underpin a pattern of racketeering activity"); *Baldwin v. Township of Union*, No. 02 Civ. 1822 (WGB), 2005 WL 3588473, at *6 (D.N.J. Dec. 29, 2005) (no open-ended continuity where "predicate acts focus on a clearly defined, discrete and finite goal").

### 2. Yucaipa Has Failed to Adequately Allege Closed-Ended Continuity

Yucaipa has also failed to sufficiently plead closed-ended continuity. To do so, Yucaipa must allege "a series of related predicates extending over a '*substantial* period of time.'" *Hughes v. Consol-Penn. Coal Co.*, 945 F.2d 594, 609 (3d Cir. 1991)) (emphasis added) (*quoting H.J. Inc.*, 492 U.S. at 242). "Congress was concerned in RICO with *long-term* criminal conduct." *H.J. Inc.*, 492 U.S. at 242 (emphasis added); *see also Kolar,* 361 F. App'x at 365 (recognizing that the pattern requirement is designed to prevent "ordinary commercial fraud from being transformed into a federal RICO claim" (internal citations and quotations omitted)).

The predicate acts at issue here took place over a nine-month period. The Third Circuit has held that conduct lasting less than twelve months does not meet the continuity standard, and even twelve months still may be insufficient. *See*, *e.g.*, *Hughes*, 945 F.2d at 611 (3d Cir. 1991) ("twelve months is not a substantial period of time" and "cases finding substantial

24

period . . . dealt with fraudulent conduct lasting *years*, sometimes over a decade"); *Hindes v. Castle*, 937 F.2d 868, 875 (3d Cir. 1991) (eight months not sufficient to establish closed-ended continuity); *Helman v. Murry's Steaks, Inc.*, 742 F. Supp. 860, 882 (D. Del. 1990) (predicate acts spanning twelve months did not satisfy closed-ended continuity requirement); *see also*, *e.g.*, *Tabas v. Tabas*, 47 F.3d 1280, 1293 (3d Cir. 1995) ("Since *H.J. Inc.*, this court has faced the question of continued racketeering activity in several cases, each time finding that conduct lasting no more than twelve months did not meet the standard for closed-ended continuity.").

Courts in the Third Circuit consider additional factors other than duration, such as "the similarity of the acts, the number of victims, the number of perpetrators, and the character of the unlawful activity." *Kehr Packages, Inc. v. Fidelcor, Inc*, 926 F.2d 1406, 1412-13 (3d Cir. 1991); *Meade v. Meade*, No. 91 Civ. 5515, 1991 WL 243539, at *4-5 (E.D. Pa. Nov. 18, 1991) (no continuity based on "the small number of victims, small number of perpetrators, and the isolated character of the unlawful activity").

Here, Yucaipa's Complaint amounts to nothing more than a business dispute between creditors that does not constitute criminal activity, let alone pose a threat of continued criminal activity. The alleged pattern of racketeering activity has only one objective (the equitable subordination of Yucaipa's First Lien Debt) and only one intended victim (Yucaipa). Further, the predicate acts of racketeering alleged in the Complaint all took place over only a *nine-month* period, between September 2011 and May 2012. (*See* Compl. ¶¶ 163-99.)

In addition, Yucaipa's allegations of mail and wire fraud from September 2011 (emails between Black Diamond and Spectrum concerning the potential of filing involuntary petitions (Compl. ¶ 193)) should be rejected in determining whether Yucaipa has satisfied the continuity requirement because Yucaipa cannot tack on conclusory allegations of mail and wire

fraud to add more time to its alleged pattern of racketeering conduct.  *See*, *e.g.*, *Kehr Packages*, 926 F.2d at 1418 ("in determining the duration of a scheme involving mail fraud, the relevant criminal conduct is the defendant's deceptive or fraudulent activity, rather than otherwise innocent mailings that may continue for a long period of time").  In *Kehr*, the Third Circuit held that "the continuity test requires us to look beyond the mailings and examine the underlying scheme or artifice" and that "the instances of deceit constituting the underlying fraudulent scheme are more relevant to the continuity analysis." *Id.* at 1413-14.[23]  If the Complaint's conclusory allegations of mail and wire fraud in September 2011 are disregarded, the remaining alleged predicate acts of racketeering took place over only a *three month* period, between March 2012 (the alleged "Involuntary Petition Payoff") and May 2012 (the filing of the involuntary petitions).  (Compl. ¶¶ 169-89.)

But in any event, even if the emails from September 2011 are counted, the nine-month time period of alleged predicate acts is too short to satisfy the continuity requirement. Accordingly, Yucaipa has failed to adequately allege closed-ended continuity.

### C.  Yucaipa Is Collaterally Estopped From Alleging that Black Diamond and Spectrum "Encouraged" Yucaipa to Buy First Lien Debt

This is not the first time that Yucaipa has alleged that Black Diamond and Spectrum "encouraged" Yucaipa to buy First Lien Debt.  Yucaipa previously made that *same* allegation in the cross-claims that Yucaipa filed against Black Diamond and Spectrum in the Bankruptcy Court (the "Cross-Claims"), which the Bankruptcy Court rejected as implausible.

---

[23] *See also Gross v. Waywell*, 628 F. Supp. 2d 475, 494 (S.D.N.Y. 2009) ("allegations of RICO violations involving solely mail and wire fraud or little other variety in the predicate acts, a limited number of participants or victims, a discrete scheme with a narrow purpose or a single property – as opposed to complex, multi-faceted schemes – are generally insufficient to demonstrate closed-ended continuity, and thus to satisfy the 'pattern' element of a plausible RICO claim.").

(Mumford Aff. Ex. 13 (Allied Adv. Proc., D.I. No. 65) ¶¶ 5, 7, 71, 118.)  Accordingly, Yucaipa is
collaterally estopped from recycling those same allegations in support of its RICO claims.

Collateral estoppel prevents parties from re-litigating an issue that was fully and
fairly litigated in a previous action.  *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458
F.3d 244, 248-49 (3d Cir. 2006).[24]  Collateral estoppel applies where (1) the identical issue was
raised in a previous action; (2) the issue was actually litigated and decided; (3) the party had a
full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to
support a final judgment on the merits.  *Id*.

Here, Yucaipa alleges that as part of the alleged RICO scheme, Black Diamond
and Spectrum "encouraged" Yucaipa to purchase as much First Lien Debt as possible and
allegedly never "once voice[d] any opposition to any aspect of Yucaipa's plan to become
Requisite Lender, including the Fourth Amendment," but then "secretly" directed CIT "to refuse
to recognize Yucaipa as Requisite Lender."  (Compl. ¶¶ 8, 83-91, 93.)

Yucaipa made these *same* allegations in its Cross-Claims.  The Cross-Claims
alleged that Black Diamond and Spectrum "supported Yucaipa's acquisition of the Requisite
Lender position" and "encouraged Yucaipa's proposed plan, a fact on which Yucaipa relied in
executing the plan."  (Mumford Aff. Ex. 13 (Allied Adv. Proc., D.I. No. 65) ¶¶ 4, 71.)  Black
Diamond and Spectrum then allegedly "chose to double-cross Yucaipa" by "surreptitiously
sen[ding] a letter to [CIT] questioning the validity of Yucaipa's Requisite Lender status."  (*Id.* ¶
7.)  These allegations were integral to Yucaipa's Cross-Claims, in which it argued that
enforcement of the Third Amendment would unjustly enrich Black Diamond and Spectrum

---

[24] District Courts are required to give preclusive effect to final orders by Bankruptcy Courts that
satisfy the requirements for collateral estoppel.  *See Bd. of Trustees of Trucking Employees of N.
Jersey Welfare Fund, Inc. - Pension Fund v. Centra*, 983 F.2d 495, 505-06 (3d Cir. 1992).

because of their alleged "encouragement" to Yucaipa to improperly proclaim itself Requisite Lender. (*Id.* ¶ 118.) Yucaipa had a full and fair opportunity to litigate the plausibility of those allegations in opposing Black Diamond and Spectrum's motion to dismiss the Cross-Claims. The Bankruptcy Court dismissed the Cross-Claims, finding that Yucaipa's allegations that Black Diamond and Spectrum "encouraged" Yucaipa to buy First Lien Debt were implausible:

- "[T]he allegations in [the Cross-Claims] do not meet [the plausibility] standard. There is some innuendo, there's some vague allegations. The bottom line is I just don't think the story as pled holds together sufficiently to meet the standard." (Mumford Aff., Ex. 6 (Allied Adv. Proc, D.I. No. 162) at 104:18-22.)

- "I don't think there's any allegation really that rises to the plausibility that there was any kind of mischief going on that was detrimental or directed at Yucaipa at the time of the third amendment being entered into the purchase, excuse me, and then the fourth amendment being negotiated, and then the debt being b[]ought and then the fourth amendment being passed." (*Id.* at 105:23-106:3.)

The Bankruptcy Court's implausibility findings were necessary to support the final judgment on the merits dismissing Yucaipa's Cross-Claims, and Yucaipa never pursued an appeal of that dismissal order. Accordingly, Yucaipa is now collaterally estopped from alleging that (i) Black Diamond and Spectrum "encouraged" Yucaipa to purchase a majority of Allied's First Lien Debt, execute the Purported Fourth Amendment, and purport to act as the Requisite Lender, and (ii) Black Diamond and Spectrum "surreptitiously" instructed CIT to challenge Yucaipa's purported Requisite Lender status.[25] Without those allegations, the house of cards Yucaipa attempts to build in alleging a RICO scheme lacks a foundation and collapses under its own weight. *See*, *e.g.*, *Zahl v. N.J. Dep't of Law & Public Safety Division of Consumer Affairs*,

---

[25] Even if Yucaipa were not collaterally estopped from making these allegations (which it is), Yucaipa's "encouragement" allegations are not plausible. In particular, if Black Diamond and Spectrum "encouraged" Yucaipa to purchase First Lien Debt, as Yucaipa alleges, it makes no sense that Yucaipa *never asked* Black Diamond and Spectrum to execute the Purported Fourth Amendment which was necessary to permit that acquisition.

428 F. App'x 205, 211-12 (3d Cir. 2011) (providing preclusive effect to findings in prior state court action which "inject[ed]" federal RICO allegations with "crippling implausibility").

###### D.    Yucaipa's Allegations Regarding Black Diamond and Spectrum's Purported Racketeering "Scheme" Are Implausible

Aside from Yucaipa's implausible "encouragement" allegations, the remainder of Yucaipa's allegations of a RICO scheme are also implausible.  In order to survive a motion to dismiss, Yucaipa's Complaint must contain "sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  The Complaint must set forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  If the Plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Yucaipa's Complaint, which is replete with inconsistencies and logical holes, cannot meet the plausibility standard.  For instance, Yucaipa alleges that Black Diamond and Spectrum hatched a scheme to equitably subordinate Yucaipa's First Lien Debt in 2009, but then inexplicably waited nearly three years from the time Yucaipa acquired its First Lien Debt to file involuntary petitions and then seek equitable subordination.  (Compl. ¶¶ 78-79, 110.)  Black Diamond and Spectrum had nothing to gain by waiting around for *years* to execute their plan.

Similarly, Yucaipa alleges that Black Diamond and Spectrum "negotiated directly with JCT" for more than a year for a deal in which JCT would purchase all the First Lien Debt, including the debt held by Black Diamond, Spectrum and Yucaipa.  (Compl. ¶ 96.)  If, as Yucaipa alleges, Black Diamond and Spectrum's plan all along was to equitably subordinate Yucaipa's debt, it is not plausible that they would have wasted more than a year negotiating with JCT for a deal in which (i) Yucaipa would no longer hold any First Lien Debt to equitably subordinate and

29

(ii) Black Diamond and Spectrum would no longer hold claims against Allied, which would have prevented them from filing the involuntary petitions needed to seek equitable subordination.

Further, Yucaipa's allegation that Black Diamond and Spectrum had been conspiring since 2009 to equitably subordinate Yucaipa's debt renders implausible the allegation that three years later, in 2012, Black Diamond had to "buy Spectrum's support for filing the involuntary bankruptcy" with the so-called Involuntary Petition Payoff.  (Compl. ¶ 107.)  As Yucaipa admits, Spectrum already held sufficient claims to qualify as a petitioning creditor without the debt that was the subject of the alleged payoff (*id.* ¶ 23), and in any case, it was Spectrum that had to *pay* Black Diamond (not Black Diamond pay Spectrum) for the additional debt pursuant to the Cooperation Agreement (*id.* ¶¶ 101-05).[26]  Accordingly, Yucaipa's allegations of an "Involuntary Petition Payoff" are not plausible.

Additionally, Yucaipa alleges that shortly before filing the involuntary petitions, Black Diamond and Spectrum "scuttled" a deal with JCT in which JCT would have purchased the debt held by all Lenders (including Black Diamond and Spectrum), "in order to equitably subordinate Yucaipa's $170 million in First Lien Claims."  (*Id.* ¶ 2).  But in order for Black Diamond and Spectrum to prevail in their equitable subordination claims, *Yucaipa must have*

---

[26] In alleging that Black Diamond "bribed" Spectrum into filing the involuntary petitions, Yucaipa focuses on a single line in a many-months-long email chain, taken completely out of context, in which Spectrum stated to Black Diamond:  "Please get this closed this week.  We cannot file an involuntary without it done."  (Compl. ¶ 108; *id* Ex. 7.)  Read in its entirety, the email chain shows that, after months of trying to close the trade, Spectrum was expressing its frustration that the trade still had not closed and that it should be closed before the involuntary petitions were filed to avoid any delays or other administrative issues that could arise if the trade were not closed until after the bankruptcy filing.  (Compl. Ex. 7.)  Throughout the months long email chain, there is nothing about a payoff.  Simply put, Spectrum's purchase of its ratable share of the debt under the Cooperation Agreement was *not* – as Yucaipa falsely alleges – a "payoff" by Black Diamond to induce Spectrum to join in filing the involuntary petitions.

*committed inequitable conduct*.  It is simply not plausible that Yucaipa is the innocent victim of a purported RICO scheme to equitably subordinate Yucaipa's debt if Yucaipa did nothing wrong.

Moreover, Yucaipa's implausible RICO scheme is built entirely on the premise that Black Diamond and Spectrum gave up a guaranteed recovery from a transaction with JCT to instead pursue a highly speculative scheme that (at most) would have resulted in the *same* recovery.  In this regard, a noticeable difference between the SDNY Complaint and the instant Complaint is that Yucaipa has now *omitted* the fact that the JCT deal would have resulted in a purchase price of "up to par plus accrued interest" for all of the First Lien Lenders.  (SDNY Compl. ¶ 24.)  Yucaipa seeks to plead around that fact in the instant Complaint by alleging that "at no time . . . did [Black Diamond and Spectrum] agree on terms that would have given Black Diamond and Spectrum par plus accrued interest for their First Lien Debt" and that "Black Diamond and Spectrum were not interested in any deal with JCT because they would have been unable to recover par plus accrued interest."  (Compl. ¶¶ 19, 124.)  Yucaipa's impetus for reversing course is obvious – Yucaipa seeks (but fails) to render its allegations more plausible.  However, Yucaipa cannot escape its prior admission in the SDNY Complaint that "JCT was obligated to purchase all outstanding debt claims held by non-consenting Lenders 'for a purchase price of up to par plus accrued interest.'"  (SDNY Compl. ¶ 24.)  *See Johnson v. Goldstein*, 864 F. Supp. 490, 493 (E.D. Pa. 1994) (abandoned pleadings admissible as admission of party opponent), *aff'd* 66 F.3d 311 (3d Cir. 1995).  In fact, Yucaipa attaches to the instant Complaint the term sheet for the JCT deal showing that JCT offered to pay the Lenders a "par plus accrued interest" recovery.  (Compl. Ex. 4.)  It is simply not plausible that Black Diamond and Spectrum would give up a guaranteed recovery of par plus accrued interest to pursue a highly unpredictable and costly litigation strategy that would have yielded, at most, the same recovery.

Indeed, the ultimate success of this implausible "scheme" was dependent on *all* of the following highly contingent events going Black Diamond and Spectrum's way:  *First*, Black Diamond and Spectrum would have to convince Yucaipa to spend $43 million to buy a majority of the First Lien Debt, even though the Third Amendment expressly prohibited Yucaipa from doing so.  *Second*, Black Diamond and Spectrum then would have to prevail in litigation on the issue of whether Yucaipa could be the Requisite Lender (and prevail in any appeal of that ruling).  *Third*, Black Diamond and Spectrum would have to prevail in litigation for a declaration that they are the Requisite Lenders (and prevail in any appeal of that ruling).  *Fourth*, Black Diamond and Spectrum would have to acquire Allied's assets at a court-supervised auction through a credit bid of the First Lien Debt, or cause the assets to be sold at a price that left the First Lien Debt unsatisfied.  *Fifth*, Black Diamond and Spectrum would have to prevail in litigation to equitably subordinate Yucaipa's debt (where recoverable damages would be capped at par plus accrued interest (*i.e.*, the same amount that JCT was willing to pay)).  If any one of those five highly unpredictable events did not occur, Black Diamond and Spectrum's purported RICO scheme would leave them with no better recovery than that which they would have obtained from JCT through a risk-free transaction.  Simply put, this "scheme" alleged by Yucaipa is not plausible.

Because Yucaipa's allegations concerning the purported scheme are not plausible, Yucaipa's RICO claims must be dismissed.  *See Mierzwa v. Safe & Secure Self Storage, LLC*, 493 F. App'x 273, 275-76 (3d Cir. 2012) (dismissing RICO claims on the basis that the allegations supporting them were not plausible).

### E.     Yucaipa Fails to State a Claim for RICO Conspiracy

Because Yucaipa has failed to adequately allege a pattern of racketeering activity under Section 1962(c), Yucaipa's RICO conspiracy claim under Section 1962(d) also must be dismissed.  *See Beck v. Prupis*, 529 U.S. 494, 504-05 (2000) (holding that a claim for RICO

conspiracy under Section 1962(d) must fail if the plaintiff cannot establish a RICO violation

under Section 1962(c)); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1191 (3d Cir. 1993)

("Any claim under section 1962(d) based on a conspiracy to violate the other subsections of

section 1962 necessarily must fail if the substantive claims are themselves deficient.").

### F. The Court Should Decline to Exercise Supplemental Jurisdiction Over Yucaipa's State Law Claims

As set forth above, Yucaipa fails to state a claim under RICO, mandating

dismissal of Yucaipa's federal claims. With no independent basis for federal jurisdiction, the

Court should decline to exercise supplemental jurisdiction over Yucaipa's remaining state law

claims. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

## IV. YUCAIPA FAILS TO STATE CLAIMS FOR TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS OR FRAUD

Even if the Court were to exercise supplemental jurisdiction over Yucaipa's state

law claims, those claims should be dismissed for independent reasons.

The Complaint fails to state a valid claim for tortious interference with business

relations. The Restatement (Second) of Torts provides that if a defendant's conduct is directed,

at least in part, to advancing the defendant's own competitive interest, "the fact that he is also

motivated by other impulses, as, for example, hatred or a desire for revenge is not alone

sufficient to make his interference improper." Restatement (Second) of Torts § 768 cmt. g

(1979).[27] Here, Yucaipa admits that Black Diamond and Spectrum advanced their own

economically competitive interests by allegedly backing out of the JCT deal to pursue a larger

recovery on their debt holdings through involuntary bankruptcy. (*See*, *e.g.*, Compl. ¶ 124.)

Accordingly, Yucaipa has failed to state a claim for tortious interference with business relations.

---

[27] Delaware follows the Restatement (Second) of Torts with respect to tortious interference claims. *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987).

Yucaipa's fraud claim should likewise be dismissed because the Complaint fails to adequately allege the essential elements of reasonable reliance or damages.  *See, e.g.*, *Lord v. Souder*, 748 A.2d 393, 402 (Del. 1999).  However, more importantly, Yucaipa's fraud allegations principally consist of allegedly false statements made to the Bankruptcy Court in connection with Black Diamond and Spectrum's involuntary bankruptcy petitions.  (*See* Compl. ¶ 211.) These alleged misrepresentations are squarely before the Bankruptcy Court in the Committee Action and the BD/S Action and are properly adjudicated there (where the false statements were allegedly made).  Defendants respectfully submit that this Court should dismiss Yucaipa's fraud claim and permit the Bankruptcy Court to adjudicate those allegations.

## V.  THIS ACTION SHOULD BE STAYED PENDING RESOLUTION OF RELATED ACTIONS IN THE BANKRUPTCY COURT

In the event that the Complaint is not dismissed in its entirety, this action should be stayed pending the resolution of earlier-filed actions involving the same legal and factual issues.[28]  Courts in the Third Circuit follow the first-filed rule, which aims at "conserving judicial resources and safeguarding litigants by preventing concurrent duplicative litigation of the same issues between the same parties in more than one federal court.  *APV N. Am., Inc v. Sig Simonazzi N. Am., Inc.*, 295 F. Supp. 2d 393, 396 (D. Del. 2002).  Under this rule, "priority is given to an earlier filed action, such that any subsequently filed action involving the same parties and the same issues should be stayed and/or transferred to the court in which the earlier filed

---

[28] If Yucaipa's Complaint is dismissed in its entirety, Yucaipa should not be granted leave to amend its Complaint.  Any amendment would be futile because (i) the filing of the involuntary petitions and equitable subordination claims are protected activity under the *Noerr-Pennington* doctrine; (ii) Yucaipa's claims are barred by the Covenant Not to Sue; and (iii) Yucaipa cannot meet the continuing scheme requirement given that the alleged predicate acts span only a few months.  Further, Yucaipa's Complaint is, in itself, nothing more than an amendment of its SDNY Complaint.  Yucaipa should not be given a third bite at the apple to assert another meritless RICO complaint.

action is pending." *Id.* Although a court may depart from the first-filed rule in "exceptional circumstances," invocation of the rule "will usually be the norm, not the exception." *E.E.O.C. v. Univ. of Pennsylvania*, 850 F.2d 969, 979 (3d Cir. 1988).

Here, Yucaipa's claims arise from Black Diamond and Spectrum's alleged scheme to equitably subordinate Yucaipa's claims. Whether, and the extent to which, Yucaipa's claims are equitably subordinated will be determined in the pending Committee Action and BD/S Action. To allow Yucaipa to simultaneously litigate the same issues in different courts plainly would constitute a waste of judicial resources and would create a possibility of inconsistent rulings. Accordingly, if this action is not dismissed in its entirety, it should be stayed pending resolution of the Committee Action and the BD/S Action.

## CONCLUSION

For the foregoing reasons, Yucaipa's Complaint should be dismissed in its entirety with prejudice, or alternatively should be stayed pending resolution of the related actions.

Dated:  June 4, 2015
        Wilmington, Delaware

**LANDIS RATH & COBB LLP**

/s/ Kerri K. Mumford
Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile:  (302) 467-4450

- and -

**SCHULTE ROTH & ZABEL LLP**
Adam C. Harris
Robert J. Ward
919 Third Avenue
New York, New York 10022
Telephone: (212) 756-2000
Facsimile:  (212) 593-5955