# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ASHINC Corporation, *et al.*,<br><br>                Debtors. | Chapter 11<br><br>Case No. 12-11564 (CSS)<br>(Jointly Administered) |
| CATHERINE E. YOUNGMAN, LITIGATION TRUSTEE FOR ASHINC CORPORATION, ET AL., AS SUCCESSOR TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF ASHINC CORPORATION, AND ITS AFFILIATED DEBTORS,<br><br>                Plaintiff,<br><br>BDCM OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., and SPECTRUM INVESTMENT PARTNERS, L.P.,<br><br>                Intervenors,<br><br>              v.<br><br>YUCAIPA AMERICAN ALLIANCE FUND I, L.P., and YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P.,<br><br>                Defendants. | Adv. Proc. No. 13-50530 |
| CATHERINE E. YOUNGMAN, LITIGATION TRUSTEE FOR ASHINC CORPORATION, ET AL., AS SUCCESSOR TO BDCM OPPORTUNITY FUND II, LP, BLACK DIAMOND CLO 2005-1 LTD., SPECTRUM INVESTMENT PARTNERS, L.P., BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., as co-administrative agent, and SPECTRUM COMMERCIAL FINANCE LLC, as co-administrative agent,<br><br>                Plaintiff,<br><br>                v.<br><br>YUCAIPA AMERICAN ALLIANCE FUND I, L.P., and YUCAIPA AMERICAN ALLIANCE (PARALLEL) FUND I, L.P.,<br><br>                Defendants. | Adv. Pro. No. 14-50971 (CSS) |

## LITIGATION TRUSTEE'S [PROPOSED]
## POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ............................................................................................ 2

FINDINGS OF FACT AND CONCLUSIONS OF LAW ............................................ 5

PROCEDURAL BACKGROUND ......................................................................... 5

    A.    Proceedings Early 2013 through Late 2015 ........................................ 5

    B.    Bankruptcy Plan Confirmation, Appointment of the Trustee,
        and Grant of BD/S' Motion to Strike Yucaipa's Affirmative Defenses .............. 9

    C.    Cross-Motions for Partial Summary Judgment, Resolution of Claims
        Against the Individual Defendants, and the Judgment Against Yucaipa ........... 11

    D.    Pre-Trial Motion Practice and Rulings ............................................. 14

        i.    Yucaipa's Motions to Stay Enforcement of the Judgment,
            and Constitutional Arguments Therein, Were Rejected ............................ 14

        ii.    Yucaipa's Motion to Withdraw the Reference
            and Motion Seeking a Stay Pending Appeals ....................................... 15

        iii.    The Parties' Motions in Limine and Pre-Trial Submissions ..................... 15

FINDINGS OF FACT ..................................................................................... 18

    A.    Allied's 2005 Bankruptcy, Yucaipa's Sponsorship of Allied's Exit Plan, and
        Yucaipa's Selection of the Company's CEO and the Appointment of Board .... 18

    B.    Allied's Credit Agreements and the Third Amendments Thereto ................ 20

    C.    Allied Defaults Under FLCA and ComVest Becomes Requisite Lender .......... 21

    D.    Yucaipa Assumes Requisite Lender Status In Bad Faith, Sues
        CIT, and Permits Ongoing Defaults Under the Credit Agreements ............. 23

    E.    JCT's Long Running Desire to Acquire Allied ................................... 26

    F.    Yucaipa's Self-Interested Dealings With JCT in Spring 2011 ................... 31

    G.    The Initial Stages of the JCT Negotiations ...................................... 36

i

H.    The Disparity of Offers During the JCT Negotiations and BD/S'
      Attempts to Have Fiduciary Duties Honored and Achieve a
      Fair Price and Fair Process ...................................................................40

I.    CIT's Agreement in Principle With JCT .........................................................43

J.    Schulte's Letters to Board and Yucaipa's Continued
      Demand for a Premium.......................................................................43

K.    Yucaipa Thwarts BD/S' Efforts to Get a Fair Process and Equal Treatment.....48

L.    Yucaipa Never Agreed to Equal and Ratable Treatment...................................51

M.    Yucaipa's Response to Allied's Bankruptcy, Increased Costs, and JCT's
      Eventual Purchase of Substantially All of Allied's Assets in Late 2013............57

CONCLUSIONS OF LAW......................................................................................58

A.    Jurisdiction and Venue.....................................................................58

B.    Yucaipa Breached its Fiduciary Duty ...............................................59

      i.    Yucaipa Indisputably Owed Fiduciary Duties to Allied
            for the Benefit of All Residual Claimants, Including Creditors ...............59

      ii.   Yucaipa's Self-Dealing Torpedoed a Potential JCT Transaction .............60

C.    Yucaipa's Defenses To The Breach of Fiduciary Duty Claim
      Are Unavailing...............................................................................64

      i.    The JCT Term Sheets Were Not Plain Vanilla Debt Transactions............65

      ii.   *Odyssey Partners* Is Inapposite................................................65

      iii.  The Entire Fairness Standard — Not Business Judgment Rule —
            Applies .......................................................................67

      iv.   Causation Was Sufficiently Established .....................................70

D.    Damages: Allied Could have Sold for
      Significantly More But For Yucaipa's Breach .................................71

      i.    The Trustee's Damages Calculation .........................................72

      ii.   Yucaipa's Arguments Are Unavailing.......................................74

iii.    Professor Fischel's Opinions Do Not Alter the Court's Conclusion .........81

iv.    The Estate Was Damaged by the Failure to Transact
With JCT in the Full Amount of the Anticipated Credit Bid....................86

E.    Yucaipa's Full Claims Are Subject to Equitable Subordination ........................89

F.    Yucaipa Breached the Implied Covenant of Good Faith and Fair Dealing ........94

CONCLUSION.......................................................................................................................101

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,
  773 N.E.2d 496 (N.Y. 2002) ...................................................................95, 97

*Adams v. Clearance Corp.*,
  121 A.2d 302 (Del. 1956) .........................................................................71 n.279

*Agilent Techs., Inc. v. Kirkland*,
  C.A. No. 3512-VCS, 2010 WL 610725 (Del. Ch. Feb. 18, 2010).........................81 n.315

*Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*,
  120 A. 486 (Del Ch. 1923) .........................................................................71 n.279

*Ams. Mining Corp. v. Theriault*,
  51 A.3d 1213 (Del. 2012) ........................................................64 n.255, 68 n.268

*Auriga Cap. Corp. v. Gatz Props.*,
  40 A.3d 839 (Del. Ch.),
  *judgment entered*, No. 4390-CS, 2012 WL 598121 (Del. Ch.),
  *aff'd*, 59 A.3d 1206 (Del. 2012) ...............................71 n.281, 72 n.283, 75 n.296, 88 n.343

*Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*,
  C.A. No. 11802-VCL, 2018 WL 3326693 (Del. Ch. July 6, 2018),
  *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*,
  No. 14 2019, 2019 WL 5399453 (Del. Oct. 22, 2019) .....................................4 n.7

*BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*,
  No. 650150/2012, 2013 WL 1290394 (N.Y. Sup. Ct. Mar. 8, 2013),
  *aff'd*, 978 N.Y.S.2d 10 (App. Div. 2013),
  *leave to appeal denied*, 8 N.E.3d 849 (N.Y. 2014).....................6 n.12, 26 n.94, 91 n.351

*BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*,
  978 N.Y.S.2d 10 (App. Div. 2013) ..............................................................26 n.95

*BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*,
  8 N.E.3d 849 (N.Y. 2014).........................................................................26 n.96

*Berteau v. Glazek*,
  C.A. No. 2020-0873-PAF, 2021 WL 2711678 (Del. Ch. June 30, 2021) ...............68 n.267

*Bomarko, Inc. v. Int'l Telecharge, Inc.*,
    794 A.2d 1161 (Del. Ch. 1999),
    *as revised* (Nov. 16, 1999), *aff'd*, 766 A.2d 437 (Del. 2000) ................................... *passim*

*Cinerama, Inc. v. Technicolor, Inc.*,
    No. Civ. A. No. 8358, 1991 WL 111134 (Del. Ch. June 24, 1991),
    *aff'd in part, rev'd in part on other grounds sub nom.*
    *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993),
    *decision modified on reargument*, 636 A.2d 956 (Del. 1994),
    *abrogated by Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110 (Del. 1994) .......60 n.244

*Cinerama, Inc. v. Technicolor, Inc.*,
    663 A.2d 1156 (Del. 1995) .................................................................................67 n.264

*Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*,
    160 F.3d 982 (3d Cir. 1998)..................................................90 n.349, 91 n.354

*Cox v. Crawford-Emery*,
    No. C.A. 3202-VCN, 2007 WL 4327775 (Del. Ch. Nov. 30, 2007) .....................67 n.261

*Demetre v. HMS Holdings Corp.*,
    7 N.Y.S.3d 110 (App. Div. 2015) ....................................................................95

*Entis v. Atl. Wire & Cable Corp.*,
    335 F.2d 759 (2d Cir. 1964)............................................................................100 n.387

*ForteCEO Servs., Inc. v. Terra Contracting, LLC*,
    No. 11 CV 5179, 2014 WL 4376299 (N.D. Ill. Sept. 4, 2014)..........................80-81 n.313

*Gantler v. Stephens*,
    965 A.2d 695 (Del. 2009) .................................................................................68 n.266

*Gentile v. Rossette*,
    C.A. No. 20213-VCN, 2010 WL 2171613 (Del. Ch. May 28, 2010).....................81 n.316

*Gesoff v. IIC Indus., Inc.*,
    902 A.2d 1130 (Del. Ch. 2006)..........................................................................68 n.269

*Gottwald v. Sebert*,
    148 N.Y.S.3d 37 (App. Div. 2021) ....................................................................96

*Hackettstown Nat'l Bank v. D.G. Yuengling Brewing Co.*,
    74 F. 110 (2d Cir. 1896)..........................................................................95, 96 n.371

*Halperin v. Moreno (In re Green Field Energy Servs., Inc.)*,
    No. 13-12783 (KG), 2017 WL 2729065 (Bankr. D. Del. June 23, 2017) ................15 n.57

*Hampshire Grp., Ltd. v. Kuttner*,
   C.A. No. 3607-VCS, 2010 WL 2739995 (Del. Ch. July 12, 2010) .......................65 n.256

*Hollinger Inc. v. Hollinger Int'l, Inc.*,
   858 A.2d 342 (Del. Ch. 2004).................................................................................61 n.245

*Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1062 (Del. Ch.),
   *judgment entered*, No. 183-N, 2004 WL 5322715 (Del. Ch. Mar. 4, 2004),
   *aff'd*, 872 A.2d 559 (Del. 2005) ............................................................61 n.245, 62 n.247

*In re Allied Sys. Holdings Inc*,
   556 B.R. 581 (D. Del. 2016),
   *aff'd sub nom. In re ASHINC Corp.*, 683 F. App'x 131 (3d Cir. 2017) .....................6 n.15

*In re ASHINC Corp.*,
   683 F. App'x 131 (3d Cir. 2017) .................................................................6 n.15, 97 n.373

*In re BMT-NW Acquisition, LLC*,
   582 B.R. 846 (Bankr. D. Del. 2018) ........................................................................60 n.242

*In re Cellular Tel. P'ship Litig.*,
   C.A. No. 6885-VCL, 2022 WL 698112 (Del. Ch. Mar. 9, 2022)............................69 n.271

*In re Chrysler LLC*,
   576 F.3d 108 (2d Cir. 2009),
   *vacated on other grounds sub nom.*
   *Ind. State Police Pension Tr. v. Chrysler LLC*, 558 U.S. 1087 (2009)...................87 n.339

*In re CNX Gas Corp. S'holders Litig.*,
   C.A. No. 5377-VCL, 2010 WL 2291842 (Del.Ch. May 25, 2010) ........................60 n.243

*In re Cont'l Airlines, Inc.*,
   279 F.3d 226 (3d Cir. 2002)......................................................................................70 n.278

*In re EZCORP Inc. Consulting Agmt. Derivative Litig.*,
   C.A. No, 9962-VCL, 2016 WL 301245 (Del. Ch. Jan. 25, 2016) ..........................68 n.267

*In re Hokulani Square, Inc.*,
   776 F.3d 1083 (9th Cir. 2015) ................................................................................87 n.339

*In re Mid-Am. Waste Sys., Inc.*,
   284 B.R. 53 (Bankr. D. Del. 2002) ...........................................90 n.349, 92 n.355, 93 n.358

*In re NSC Wholesale Holdings LLC*,
   637 B.R. 71 (Bankr. D. Del. 2022) .........................................................................59 n.239

*In re SemCrude, L.P.*,
    428 B.R. 590 (D. Del. 2010) ..............................................................71 n.280

*In re Vaso Active Pharms.*, *Inc.*,
    500 B.R. 384 (Bankr. D. Del. 2013),
    *aff'd*, 537 B.R. 182 (D. Del. 2015) ...................................................70 n.278

*In re Walt Disney Co. Derivative Litig.*,
    907 A.2d 693 (Del. Ch. 2005),
    *aff'd*, 906 A.2d 27 (Del. 2006).................................................. 62-63 n.250

*In re Winstar Commc'ns, Inc.*,
    348 B.R. 234 (Bankr. D. Del. 2005),
    *aff'd*, Adv. No. 01-01430-KJC, 2007 WL 1232185 (D. Del. Apr. 26, 2007),
    *aff'd in part, modified in part*, 554 F.3d 382 (3d Cir. 2009) .................90 n.350, 94 n.365

*In re Winstar Commc'ns, Inc.*,
    Adv. No. 01-01063-KJC, 2007 WL 1232185, at *4 (D. Del. Apr. 26, 2007) .........93 n.358

*Jedwab v. MGM Grand Hotels, Inc.*,
    509 A.2d 584 (Del. Ch. 1986)..............................................................67 n.263

*Just-Irv Sales Inc. v. Air-Tite Bus. Ctr., LLC.*,
    655 N.Y.S.2d 131 (App. Div. 1997)..............................................................97

*Kahn v. Lynch Commc'n Sys., Inc.*,
    638 A.2d 1110 (Del. 1994) ...................................................59 n.240, 60 n.244

*Merritt v. Colonial Foods, Inc.*,
    505 A.2d 757 (Del. Ch. 1986)..............................................................69 n.273

*Nixon v. Blackwell*,
    626 A.2d 1366 (Del. 1993) ..............................................................68 n.266

*Odyssey Partners, L.P. v. Fleming Cos.*,
    735 A.2d 386 (Del. Ch. 1999)................................................. *passim*

*PharmAthene, Inc. v. SIGA Techs., Inc.*,
    No. Civ. A. 2627-VCP, 2014 WL 3974167 (Del. Ch. Aug. 8, 2014)....................81 n.315

*Pineda v. Ford Motor Co.*,
    520 F.3d 237 (3d Cir. 2008)..............................................................17 n.65

*Polk Lending 33, LLC v. THL Corp. Fin., Inc. (In re Aerogroup Int'l, Inc.)*,
    601 B.R. 571 (Bankr. D. Del. 2019),
    *motion to certify appeal denied*,
    Bankr. No. 17-11962 (CSS), 2020 WL 757892 (D. Del. Feb. 14, 2020),
    *aff'd*, 620 B.R. 517 (D. Del. 2020) ......................................................................101 n.393

*Queens Ballpark Co. v. Vysk Commc'ns*,
    226 F. Supp. 3d 254 (S.D.N.Y. 2016)................................................................100 n.387

*Sage v. Cent. R.R. Co.*,
    99 U.S. 334 (1878).........................................................................................................95

*Salladay v. Lev*,
    C.A. No. 2019-0048-SG, 2020 WL 954032 (Del. Ch. Feb. 27, 2020)...................68 n.267

*Shandler v. DLJ Merch. Banking, Inc.*,
    No. C.A. 4797-VCS, 2010 WL 2929654 (Del. Ch. July 26, 2010)........................60 n.243

*Siga Techs., Inc. v. PharmAthene, Inc.*,
    132 A.3d 1108 (Del. 2015), *as corrected* (Dec. 28, 2015) ......................................72 n.284

*Steiner v. Meyerson*,
    Civ. A. No. 13139, 1995 WL 441999 (Del. Ch. July 19, 1995)............................62 n.250

*Thorpe ex rel. Castleman v. CERBCO, Inc.*,
    676 A.2d 436 (Del. 1996) ........................................................ 71 n.281, 72 nn.284 & 285

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
    487 F.3d 89 (2d Cir. 2007)............................................................ 100 nn.386, 387, & 388

*Wakeman v. Wheeler & Wilson Mfg. Co.*,
    4 N.E. 264 (1886)................................................................................................100 n.387

*Wellness Int'l Network, Ltd. v. Sharif*,
    575 U.S. 665 (2015).............................................................................................59 n.238

*William Penn P'ship v. Saliba*,
    13 A.3d 749 (Del. 2011) ......................................................................................72 n.284

*Yucaipa Am. All. Fund I, L.P. v. Ehrlich*,
    204 F. Supp. 3d 765 (D. Del. 2016),
    *aff'd* 716 F. App'x 73 (3d Cir. 2017)..............................................................9 n.25, 17 n.68

## Rules & Statutes

FED. R. BANKR. P. 5011(a) ..........................................................................15

FED. R. BANKR. P. 7032 .........................................................................19 n.72

FED. R. BANKR. P. 7052 ...........................................................................5 n.9

FED. R. BANKR. P. 8007 ...............................................................................15

FED. R. CIV. P. 30(b)(6) ..........................................................................*passim*

FED. R. CIV. P. 32(a)(3) .........................................................................19 n.72

FED. R. CIV. P. 52 ....................................................................................5 n.9

FED. R. EVID. 702 .......................................................................................16

11 U.S.C. § 363 ......................................................................................*passim*

11 U.S.C. § 510(c) ......................................................................................90

11 U.S.C. § 544(b) ...................................................................................5 n.10

11 U.S.C. § 548(a) ...................................................................................5 n.10

11 U.S.C. § 550 .......................................................................................5 n.10

28 U.S.C. § 157 ......................................................................................15, 59

28 U.S.C. § 1334 ........................................................................................58

## Other Authorities

11 DANIEL R. COQUILLETTE ET AL.,
    MOORE'S FEDERAL PRACTICE § 56.40 (3d ed. 2021) ...............................89 n.346

22A N.Y. JUR.2D *Contracts* § 423 (2022) ....................................................99

1 R. FRANKLIN BALOTTI ET AL., DELAWARE LAW OF CORPORATIONS
    AND BUSINESS ORGANIZATIONS § 4.16 (4th ed. Supp. 2022)..................60 n.242

1 RODMAN WARD, JR. ET AL.,
    FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 151.6 (4th ed.1999) .....68 n.265

On May 4, 2021, the Court issued a detailed 117-page Opinion on the parties' cross-motions for summary judgment[1] in the above-captioned Adversary Proceedings[2] against Defendants Yucaipa American Alliance Fund I, L.P. and Yucaipa American Alliance (Parallel) Fund I, L.P. (together, "**Yucaipa**").  The Court subsequently entered Judgment in favor of the Trustee on several claims on June 23, 2021,[3] leaving three remaining claims for trial.  The remaining claims are: (1) Equitable Subordination (Estate Claim 1/Lender Claim 1), (2) Breach of Fiduciary Duty (Estate Claim 7), and, in the alternative to Breach of Fiduciary Duty, (3) Breach of the Implied Covenant of Good Faith and Fair Dealing (Lender Claim 3) (collectively, the "**Remaining Claims**").

The Court conducted a trial on the Remaining Claims over seven days from March 1 through 8, and March 17, 2022 (the "**Trial**").  During the course of the Trial, the Court received into evidence testimony from seven witnesses appearing live in Court, four witnesses by deposition designations submitted with video also played in Court, deposition designations from nine additional witnesses submitted by Yucaipa for consideration, and stipulations, filed in lieu of live testimony, for two witnesses.  The Court also received 426 documents designated as exhibits by the Parties as well as the Parties' stipulations and objections with respect to those exhibits, and objections to deposition designations offered.

---

[1]    *See* Adv. Pro. 13-50530, D.I. 825 (the "**Summary Judgment Opinion**").  Given the nearly decade-long history of this litigation, the Court assumes the parties and counsel are familiar with the relevant facts and procedural history.  For brevity and completeness, the Court incorporates the Summary Judgment Opinion, and will summarize the relevant facts and procedural history herein.  Any terms not otherwise defined shall have the meaning ascribed to them in the Summary Judgment Opinion.

[2]    The "**Adversary Proceedings**" are Adv. Pro. 13-50530 (the "**Estate Action**") and Adv. Pro. 14-50971 (the "**Lender Action**").  To the extent necessary, the findings will reference *only* docket numbers in Adv. Pro. 13-50530, unless otherwise indicated.

[3]    13-50530, D.I. 841 (the "**Judgment**").

## **INTRODUCTION**

Yucaipa was the controlling shareholder of Allied Systems Holding, Inc. and related debtors ("**Allied**" or the "**Company**").  At all times relevant to the Adversary Proceedings, Yucaipa indisputably controlled Allied's Board, it had hand-picked the Company's CEO, and it held a majority of the Company's $315 million of First and Second Lien secured debt.[4]  With Yucaipa's complete control came corporate responsibility and the duty to act in good faith, loyalty, and the utmost fidelity to the Company.[5]  Yucaipa, however, abandoned these responsibilities after Allied became insolvent in early 2008.

It is the law of this case that, in August 2009, "Yucaipa acted in bad faith in purchasing first lien debt under an invalid Fourth Amendment and assuming Requisite Lender status."[6] Yucaipa proceeded thereafter to engage in a years-long pattern of inequitable conduct, including (i) breaching the First Lien Credit Agreement ("**FLCA**") by failing to provide a substantial capital contribution to the Company, (ii) causing the Company to pay for a series of lawsuits and other significant costs in an ill-fated attempt to justify its wrongdoing, and (iii) permitting ongoing defaults under the FLCA to persist with impunity for years by purporting to be Requisite Lender.

This pattern reached a crescendo in late 2011/early 2012, when Yucaipa was presented

---

[4]     *See* Summary Judgment Opinion at 100 ("The Court finds that the Trustee has produced undisputed evidence showing Yucaipa's status as an insider of Allied as Yucaipa was a person in control of Allied. . . as of August 21, 2009, if not earlier.").

[5]     Summary Judgment Opinion at 101 (It is "undisputed that Yucaipa owed a fiduciary duty.")

[6]     Summary Judgment Opinion at 108; *see also* 13-50530, D.I. 929 at 14:25-15:15:5 ("[T]he undisputed facts prove as a matter of law that [Yucaipa] acted in bad faith. Period."); 3/1/22 p.m. Trial Tr. 74:7-11 (The Court to Yucaipa's counsel: "You're trying to re-argue what the Court has already decided that the Fourth Amendment was entered into in bad faith.  You can argue all you want now about whether that was the right or wrong decision, but it's irrelevant because it's law of the case that it was entered into in bad faith.").

with an opportunity to use its control position to lock in a lucrative transaction for the sale of substantially all of Allied's assets with a strategic buyer, Jack Cooper Transport ("**JCT**"), on terms that would have benefitted all of Allied's Lenders equally.

JCT's owner, Mike Riggs, had been pursuing an acquisition of Allied for years and in late 2011/early 2012 offered to purchase Allied assets in a sale under Section 363 of Title 11 of the United States Code (a "**Section 363 Sale**").  Allied was insolvent at the time, and Yucaipa, as Allied's controlling shareholder and the entity that dominated Allied's Board, owed fiduciary duties to maximize the value of Allied for all stakeholders.  Instead of deploying its controlling position to establish a process that would benefit all Lenders from the sale of Allied's assets on an equal and ratable basis, Yucaipa — principally through its lead Partner on the investment, Derex Walker, who served as Chairman of Allied's board — proceeded to negotiate the best deal for Yucaipa, in breach of those fiduciary obligations.

Yucaipa' Founder and Managing Principal, Ron Burkle, testified that he knew that any transaction with JCT should be *pari passu* with other Lenders.  But when Mr. Walker marked up a proposal from JCT in early December 2011, *at a time he was Allied's Chairman*, he demanded an outsize premium *for Yucaipa* on account of its illegitimate First Lien debt holdings.  Further, despite Mr. Walker admitting that a bankruptcy and Section 363 Sale were *Allied's decisions* to make, he did nothing to ensure that the Allied Board was substantively engaged or to establish any sort of fair process — free from Yucaipa's domination and control — to maximize value for the Estate.  Subsequent pleas from non-Yucaipa Lenders to institute such a process were ignored, and Yucaipa continued to negotiate for a premium on its debt by leveraging its control over Allied.

Yucaipa's post-hoc justification — that its fiduciary duties to Allied were never implicated because it was only negotiating as a Lender for a plain vanilla debt transaction — is unavailing.

At all relevant times from December 2011 through and including Allied's bankruptcy filing in May 2012, JCT was seeking to engage in a two-step transaction involving the acquisition of Allied's debt *so that it could acquire Allied's assets.*

Equally unavailing are Yucaipa's unsupported arguments that it ultimately agreed to equal and ratable treatment to facilitate a JCT transaction immediately prior to the May 2012 bankruptcy filing. As discussed more fully below, the evidence at Trial reveals that Yucaipa wrongfully held out for a $20 million premium for itself.

Yucaipa's argument that a JCT transaction contemplated in late 2011/early 2012 was too uncertain to support damages is also rejected. Under settled Delaware law, any uncertainties in awarding damages are resolved against the wrongdoer. The Trustee needed to demonstrate that there was a likelihood that a JCT transaction could have closed and provide a responsible estimate of damages.[7] The Court finds both, here, and holds that Yucaipa's abdication of its fiduciary duties to Allied resulted in approximately $158 million in damages to the Estate.

In light of Yucaipa's inequitable conduct over the course of many years, the Court also finds that Yucaipa's claims on its debt holdings — the majority of which it acquired illegitimately and in bad faith — should be subordinated to the claims of over $19 billion of Allied's creditors.

The Trustee also carried her burden on Lender Claim 3 at Trial and the Court finds that Yucaipa breached the implied covenant of good faith and fair dealing. However, damages in connection therewith are subsumed by the Estate's Breach of Fiduciary Duty claim.

---

[7] *See, e.g.*, *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1181 (Del. Ch. 1999), *as revised* (Nov. 16, 1999), *aff'd*, 766 A.2d 437 (Del. 2000) (some likelihood of a deal is sufficient basis for damages once a breach is found); *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, C.A. No. 11802-VCL, 2018 WL 3326693, at *50 (Del. July 6, 2018) (uncertainties in damages resolved against wrongdoer), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC*, No. 14 2019, 2019 WL 5399453 (Del. Oct. 22, 2019).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[8]

The Court, having reviewed the record, and after due deliberations, enters the following findings of fact and conclusions of law with respect to the Trustee's Remaining Claims and Yucaipa's Answers and surviving affirmative defenses in connection therewith.[9]

## PROCEDURAL BACKGROUND

### A.    Proceedings Early 2013 through Late 2015

1.      On February 1, 2013, the Official Committee of Unsecured Creditors commenced the Estate Action against Yucaipa, and it subsequently filed an Amended Complaint on March 14, 2013.  (Stip. Fact ¶ 63).[10]

2.      On April 1, 2013, Yucaipa filed its Answer in the Estate Action.[11]

---

[8]      The parties  have agreed on the following citation styles to be used: (1) references to the docket ("**13-50530, D.I__**") or, to the extent necessary, ("**14-50971, D.I.__**); (2) trial transcripts ("**[date/a.m. or p.m.] Trial Tr. xx:yy-xx:yy [name of the witness] [direct/cross/re-direct]**"); (3) deposition transcripts ("**Dep. Tr. [name of witness] xx:yy-xx:yy**"; (4) Exhibits ("**Ex.**); (5) Trustee's Exhibits ("**PX**");   (6) Yucaipa's Exhibits ("**DX**"); (7) the Joint Pre-Trial Memorandum (13-50530, D.I. 960) ("**Joint PTM**"), and (8) the Parties' Statement of Uncontested Facts in the Joint PTM at 2-11 ("**Stip. Fact ¶__**").  Page references to exhibits refer to those in the footer. Findings of Fact are abbreviated "**FF**" and Conclusions of Law are abbreviated "**CL**."

[9]      The findings of fact and conclusions of law set forth herein constitute the findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.  To the extent that findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law.  To the extent that any conclusions of law are determined to be findings of fact, they are adopted, and shall be deemed, findings of fact.

[10]      13-50530, D.I. 1, 76 (the "**Estate Complaint**").  The Estate Complaint asserted the following "Estate Claims:" (1) Equitable Subordination, (2) Equitable Subordination for Harm to All First Lien and Second Lien Lenders, (3) Recharacterization, (4) Specific Performance of Contribution Provision, (5) Breach of Contract for Breach of Contribution Provision, (6) Specific Performance of Divestiture of Debt Provision, (7) Breach of Fiduciary Duty against Yucaipa, (8) Breach of Fiduciary Duty against Allied Directors, (9) Aiding and Abetting Breaches of Fiduciary Duties, (10) Avoidance and Recovery of Fraudulent Transfers (11 U.S.C. §§ 548(a), 550), (11) Avoidance and Recovery of Fraudulent Transfers (11 U.S.C. §§ 544(b), 550), (12) Preferential Transfers, and (13) Disallowance of Claims.

[11]      13-50530, D.I. 95.

3.      On July 9, 2013, BDCM Opportunity Fund II, LP, Black Diamond CLO 2005-1 LTD., Spectrum Investment Partners, L.P (collectively, "**BD/S**"), intervenors at this time, moved for summary judgment in the Estate Action seeking summary judgment determining that they, not Yucaipa, were Requisite Lenders under the FLCA.[12]  This Summary Judgment Motion was also filed by BD/S in a related adversary proceeding commenced by Allied.[13]

4.      On August 8, 2013, this Court granted BD/S' motion for summary judgment in the Estate Action and the Allied Adversary Proceeding, holding that (i) BD/S were Requisite Lenders, (ii) the Third Amendment to the FLCA governed, and (iii) Yucaipa was collaterally estopped from asserting the Fourth Amendment's validity.[14]  The District Court and Third Circuit both affirmed.[15]

5.      On November 19, 2014, BD/S, together with the Co-Administrative Agents under

---

[12]     This followed a ruling by Justice Ramos in the NY Action that: (i) Yucaipa caused Allied to enter into the Fourth Amendment, which was "flatly prohibited under the Credit Agreement," (ii) the Fourth Amendment "is not and never was, effective," and (iii) "Yucaipa [was] not the Requisite Lender."  *See BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*, No. 650150/2012, 2013 WL 1290394, at \*5-6 (N.Y. Sup. Ct. Mar. 8, 2013) (Ex. 843), *aff'd*, 978 N.Y.S.2d 10 (App. Div. 2013), *leave to appeal denied*, 8 N.E.3d 849 (N.Y. 2014).

[13]     On October 8, 2012, Allied filed a Verified Complaint seeking a judicial declaration regarding the validity and enforceability of the Third and Fourth Amendments to the FLCA, and to determine which of Allied's First Lien Lenders constitute(s) the Requisite Lender.  (*See* Adv. Pro. 12-50947, D.I. 1 (the "**Allied Adversary Proceeding**"); Ex. 689 (Verified Complaint)).  On December 5, 2012, Yucaipa filed counterclaims and crossclaims in the Allied Adversary Proceeding which were amended on January 5, 2013.  (12-50947, D.I. 55, 65; PX UU).  Yucaipa's amended counterclaims and crossclaims sought relief prohibiting enforcement of certain provisions of the Third Amendment and declaring that enforcement thereof would "result in the unjust and inequitable enrichment of the Debtor and the other Lenders at Yucaipa's expense." (*See* PX UU at ¶ 121).  On January 25, 2013, BD/S moved to dismiss Yucaipa's Amended crossclaims in the Allied Adversary Proceedings.  (*See* 12-50947, D.I. 73, 74).  This Court granted BD/S' dismissal motion in its entirety finding, among other things, that Yucaipa's crossclaims did not rise to the level of plausibility under the pleading standards of *Iqbal* and *Twombly*.  (*See* PX VV at 108:7-113:7; 12-50947, D.I. 139 (Order)).

[14]     13-50530, D.I. 297 (Tr. of Hr'g July 30, 2013) at 123:5-124:24, 127:13-20, and 130:1-6; 13-50530, D.I. 280 (Order dated August 8, 2013).

[15]     *In re Allied Sys. Holdings Inc*, 556 B.R. 581, 608-09 (D. Del. 2016), *aff'd sub nom. In re ASHINC Corp.*, 683 F. App'x 131, 141-42 (3d Cir. 2017).

the FLCA (the "**First Lien Agents**"), filed a Lender Complaint against Yucaipa and certain individual defendants asserting four claims for relief on behalf of all First Lien Lenders. (Stip. Fact ¶ 63).[16]

6.    On February 10, 2015, Yucaipa filed a motion to withdraw the reference in the Lender Action, and a motion to determine the core/non-core status of the Lender Claims.[17]

7.    On February 19, 2015, Yucaipa filed an Answer and Counterclaim to the Lender Complaint, asserting affirmative defenses and a counterclaim against BD/S.  Yucaipa's counterclaim sought to equitably subordinate all of BD/S' claims in the Allied bankruptcy, alleging that they conducted a multi-step fraudulent scheme targeting Yucaipa leading up to BD/S' involuntary bankruptcy petition (the "**Counterclaim**").[18]

8.    Contemporaneous with Yucaipa's filing of the Counterclaim, it also filed complaints in the United States District Court for the Southern District of New York, and subsequently in the United States District Court for the District of Delaware, asserting civil RICO violations and claims for common law fraud and tortious interference with business relationships against BD/S, Stephen Deckoff, Richard Ehrlich and Leslie Meier (each of Black Diamond at the time), and Jeffrey Schaffer of Spectrum.[19]  The RICO Complaints included allegations similar to those set forth in the Counterclaim with respect to a supposed multi-step fraudulent scheme by BD/S, and its employees, targeting Yucaipa.

---

[16]    14-50971, D.I. 1; Ex. 207 (the "**Lender Complaint**").  The Lender Complaint asserted the following "Lender Claims:" (i) Equitable Subordination, (ii) Breach of Contract, (iii) Breach of Implied Duty of Good Faith and Fair Dealing, and (iv) Tortious Interference with Contract.

[17]    14-50971, D.I. 9.  On May 18, 2015, the Court entered an Agreed Order that Lender Claim 1 was a core claim and Lender Claims 2 to 4 were non-core claims.  (14-50971, D.I. 70).

[18]    *See* 14-50971, D.I. 19.

[19]    *See* PX BBB (the "**SDNY RICO Compl.**" filed February 6, 2015); PX DDD (the "**D. Del. RICO Compl.**" filed May 8, 2015) (together, the "**RICO Complaints**").

9.      On March 18, 2015, BD/S moved to dismiss Yucaipa's Counterclaim.[20]

10.     On August 21, 2015, this Court granted BD/S' motion to dismiss Yucaipa's Counterclaim with prejudice (the "**8/21/15 Opinion**").[21]

11.     This Court's 8/21/15 Opinion held, among other things, that: (i) Yucaipa's Counterclaim was "barred by the Covenant Not to Sue and the Appearance Prohibition contained in the Third Amendment to the Credit Agreement[,]" (ii) "several factual predicates asserted by Yucaipa in support of its Counterclaim are barred by collateral estoppel[,]" and (iii) "Yucaipa's story does not hold together under examination and its Counterclaim does not meet the standard of plausibility under Bankruptcy Rule 7012(b)(6)."[22]

12.     Among the factual issues this Court held were barred on collateral estoppel grounds — when dismissing Yucaipa's Counterclaim — were:

   i.    "whether [BD/S] 'encouraged' Yucaipa to purchase a majority of Allied's First Lien Debt, to execute the Fourth Amendment, and purport to act as the Requisite Lender," and

   ii.   "whether [BD/S] instructed CIT [the former First Lien Agent] to challenge Yucaipa's purported Requisite Lender status."[23]

13.     The 8/21/15 Opinion concluded that Yucaipa's allegations "d[id] not tell a plausible story" and that the "Counterclaim [was] an exercise of creative writing which at closer examination, simply does not hold together."[24]

---

[20]     14-50971, D.I. 41

[21]     14-50971, D.I. 82-1; PX EEE (copy of 8/21/15 Opinion).

[22]     PX EEE (8/21/15 Opinion) at 3.

[23]     PX EEE (8/21/15 Opinion) at 54.

[24]     PX EEE (8/21/15 Opinion) at 65.

14.     Yucaipa's RICO Complaints were later dismissed with prejudice as well.[25]

**B.     Bankruptcy Plan Confirmation, Appointment of the Trustee,
and Grant of BD/S' Motion to Strike Yucaipa's Affirmative Defenses**

15.     Under the Debtors' Modified First Amended Joint Chapter 11 Plan of Reorganization dated December 3, 2015,[26] the Confirmation Order, and a Litigation Trust Agreement (the "**Trust Agreement**"),[27] the Estate Claims and Lender Claims were coordinated and have been jointly prosecuted by the Trustee.[28]

16.     On July 22, 2016, Yucaipa moved to compel BD/S' production of additional documents and responses to discovery requests (the "**7/22/16 Motion to Compel**").[29]

17.     On August 12, 2016, BD/S opposed the 7/22/16 Motion to Compel arguing, among other things, that Yucaipa's voluminous requests were predicated on the same implausible allegations previously dismissed in the Allied Adversary Proceeding (*see* n.13, above) and in the 8/21/15 Opinion. BD/S simultaneously cross-moved to strike Yucaipa's affirmative defenses of

---

[25]     *Yucaipa Am. All. Fund I, L.P. v. Ehrlich*, 204 F. Supp. 3d 765, 778 (D. Del. 2016), *aff'd* 716 F. App'x 73 (3d Cir. 2017).

[26]     12-11564, D.I. 3360-1 (Debtors' Modified First Amended Joint Chapter 11 Plan of Reorganization proposed by the Debtors, the Committee, and the First Lien Agents (the "**Amended Plan**")).  *See also* 12-11564, D.I. 3383 (Findings of Fact, Conclusions of Law, and Order Confirming the Plan) (the "**Confirmation Order**").

[27]     The Trust Agreement and the Plan's Effective Date were both entered on December 20, 2016.  (*See* 12-11564, D.I. 3744 (Notice of Plan Effective Date)).  Thereafter, the Trustee was substituted as plaintiff in the Adversary Proceedings.  (*See* 13-50530, D.I. 415; 14-50971, D.I. 214 (Order Substituting Plaintiffs and Amending Captions in Above-Referenced Adversary Proceedings to Reflect Litigation Trustee as Plaintiff)).

[28]     *See* Amended Plan § 5.13.  The Confirmation Order appointed Ms. Catherine Youngman as the Trustee for the Trust and Plan Administrator in these cases.  (*See* Confirmation Order ¶¶ 20, 22).  The Trustee is prosecuting "Litigation Claims" and seeking recovery for claims in excess of $19 billion to be apportioned through a Court-Approved Litigation Proceeds Waterfall.  (*See* 13-50530, D.I 990 (Order Approving Stipulation in Lieu of Testimony of Catherine E. Youngman dated March 17, 2022), 13-50530, D.I 990-1 (Ex. A) at ¶¶ 5, 13).

[29]     14-50971, D.I. 119.

unclean hands, waiver, consent, estoppel, and laches as being grounded on the same implausible allegations (the "**Motion to Strike**").[30]

18.    On January 9, 2017, this Court heard argument in connection Yucaipa's 7/22/16 Motion to Compel and BD/S' Motion to Strike.[31]

19.    On January 18, 2017, this Court entered an order denying the 7/22/16 Motion to Compel and granting the Trustee's Motion to Strike Yucaipa's affirmative defenses of unclean hands, waiver, consent, estoppel, and laches, which were each predicated on the same implausible allegations this Court had twice dismissed (the "**1/8/17 Order**").[32]

20.    On July 26, 2019, Yucaipa filed another motion seeking to compel additional discovery from BD/S due to supposed deficiencies in productions (the "**7/26/19 Motion**").[33]  Judge Owens heard argument on August 22, 2019, where she requested additional briefing on discrete issues from Yucaipa and the Trustee.[34]  Supplemental briefing was completed on September 13, 2019.[35]

21.    On January 16, 2020, Judge Owens issued an Order denying Yucaipa's 7/26/19 Motion and held that Yucaipa's affirmative defense of ratification was also stricken in light of the Court's prior orders (the "**1/16/20 Order**").[36]

22.    On January 30, 2020, Yucaipa moved for clarification and/or reconsideration of the

---

[30]    14-50971, D.I. 136; *see also* additional briefing at D.I. 142, 150, 158.

[31]    14-50971, D.I. 192.

[32]    14-50971, D.I. 194.

[33]    13-50530, D.I. 601-05.

[34]    *See* 13-50530, D.I. 613.  Judge Owens was temporarily assigned the Adversary Proceedings from June 18, 2019, through August 5, 2020.

[35]    13-50530, D.I. 614-17, 620-22, 625.

[36]    13-50530, D.I. 654-1 at 3 n.14.

1/16/20 Order.[37]

23.     On April 27, 2020, Judge Owens denied Yucaipa's motion for clarification and/or reconsideration holding, among other things, that Yucaipa's affirmative defense of ratification was premised on the same implausible "multi-step, multi-year scheme to use the bankruptcy process to subordinate Yucaipa's first lien debt" that the Court had previously rejected.[38]

### C.     Cross-Motions for Partial Summary Judgment, Resolution of Claims Against the Individual Defendants, and the Judgment Against Yucaipa

24.     Extensive discovery was undertaken by the Parties in the coordinated Adversary Proceedings.

25.     Fact discovery closed on July 26, 2019, following a total of 38 depositions (several over the course of multiple days).[39]  Expert discovery closed on January 10, 2020, following the exchange of affirmative and rebuttal reports — on September 27, 2019 and November 12, 2019, respectively — and 7 expert depositions.[40]

26.     On May 1, 2020, the Trustee and Yucaipa filed cross motions each seeking partial summary judgment.[41]  Briefing on the parties' cross motions was adjourned several times to, in part, facilitate settlement discussions that eventually resulted in the resolution of claims asserted against the individual defendants named in the Adversary Proceedings.[42]

---

[37]     13-50530, D.I. 658-662.

[38]     13-50530, D.I. 692 at 3.

[39]     *See* 13-50530, D.I. 657 (1/27/20 Status Report by Trustee).

[40]     13-50530, D.I. 657 (1/27/20 Status Report by Trustee).

[41]     *See* Summary Judgment Opinion at 8 n.11 (summarizing voluminous submissions in connection therewith).

[42]     A confidential Settlement Agreement was entered on November 18, 2020, resulting in the dismissal of claims against the individual defendants asserted in the Adversary Proceedings.  A copy of the agreement was submitted *in camera* by Yucaipa. (*See* DX M).  The Court notes that

11

27.    The Court heard argument on the Trustee and Yucaipa's cross-motions for summary judgment on February 4, 2021.

28.    On May 4, 2021, the Court issued the Summary Judgment Opinion and an Order[43] in connection therewith.  The Summary Judgment Opinion granted in part, and denied, in part each parties' motion.[44]

29.    The Trustee moved for summary judgment on, *inter alia*, the equitable subordination claims against Yucaipa.  This Court granted the motion, in part, on the claims holding that the Trustee had met her burden and produced admissible, undisputed evidence proving that:

    i.    "Yucaipa acted in bad faith in purchasing first lien debt under an invalid Fourth Amendment and assuming Requisite Lender status [];

    ii.    Yucaipa breached the Third Amendment to the FLCA by failing to provide a substantial capital contribution to Allied at a time that Allied was insolvent, in default of its loans, and needed the capital contribution;

    iii.    Yucaipa's inequitable conduct resulted in lawsuits and fees that Allied was required to pay at a time when Allied was insolvent;

    iv.    The conduct described in (i), (ii), and (iii) resulted in injury to Allied or [its] creditors or resulted in the advantage of Yucaipa; and

    v.    Yucaipa did not conduct itself in good faith and inherent fairness in the above

---

█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████.

[43]    13-50530, D.I. 826.

[44]    *See* Summary Judgment Opinion at 116-17 (Appendix summarizing holdings).

course of action."[45]

30.    This Court further held that: "(i) Yucaipa is an insider and fiduciary; (ii) Yucaipa's conduct described in acts (i)-(iii), above, (a) constitute inequitable conduct and (b) injured Allied or Allied's lenders or advantaged Yucaipa; (iii) Yucaipa did not act in good faith in the instances of inequitable conduct described above; and (iv) the Court finds that the type of equitable subordination the Trustee is requesting (debt subordinated to debt) is consistent with the provisions of the Bankruptcy Code."[46]

31.    The Court reserved for trial the "exact extent to which Yucaipa's claims should be subordinated" and ruled that the following triable issues existed with respect to the claim:

    i.    Whether "Yucaipa's conduct in the JCT Negotiations was unreasonable;"

    ii.    Whether "Yucaipa caused Allied to commit events of default under the FLCA as there exists genuine issues of fact as to whether Yucaipa was able to prevent the defaults;" and

    iii.    "[I]f (i) and (ii) are inequitable acts, a triable issue of fact exists as to the degree of injury that Allied or Lenders suffered, or the advantage Yucaipa gained as a result."[47]

32.    On June 23, 2021, this Court issued the Judgment awarding the Trustee damages in the amount of $132,431,957 (inclusive of pre-judgment interest), plus post-judgment interest on Estate Claim 5 (Breach of Contract), and Estate Claims 10, 11, and 13 (Fraudulent Transfers and Disallowance of Claims). (Stip. Fact ¶ 69).

---

[45]    Summary Judgment Opinion at 108-09.

[46]    Summary Judgment Opinion at 109.

[47]    Summary Judgment Opinion at 109.

33.     Yucaipa has not satisfied the Judgment nor posted a supersedeas bond.

**D.      Pre-Trial Motion Practice and Rulings**

    *i.      Yucaipa's Motions to Stay Enforcement of the Judgment,*
    *and Constitutional Arguments Therein, Were Rejected*

34.     On June 25, 2021, Yucaipa moved to stay the effectiveness and enforcement of the Judgment pending appeal arguing, among other things, that Yucaipa had a strong likelihood of prevailing on an appeal because this Court lacked constitutional authority to issue the Judgment on Estate Claim 5 (Breach of Contract).[48]   The Trustee opposed[49] and argument was held on July 6, 2021.[50]

35.     At the argument on July 6, 2021, the Court denied Yucaipa's motion seeking to stay enforcement of the Judgment and rejected its argument that the Court somehow violated its powers by entering final orders and judgments in the Estate Action, finding that:

> There is no question in my mind that the history of this case indicates that the defendants' numerous times have taken actions that would be implied consent to this Court's … entry of final order[s], not the least of which was seeking affirmative relief from this Court numerous times clearly seeking not some, you know, proposed findings of fact and conclusions of law but actually seeking final entry of the decision.[51]

36.     On July 13, 2021, Yucaipa filed an "emergency motion" seeking to stay the effectiveness and enforcement of the Judgment pending appeal with the District Court.[52]   That motion was denied in a memorandum opinion entered by Chief Judge Connolly on August 2,

---

[48]      *See* 13-50530, D.I. 845 at 7-11.

[49]      13-50530, D.I. 855.

[50]      13-50530, D.I. 864.

[51]      13-50530, D.I. 864 at 30:2-9.

[52]      *See Youngman v. Yucaipa Am. All. Fund I, L.P.*, Civ. A. Nos. 1:21-cv-00994-CFC and 1:21-cv-00995-CFC (D. Del.), D.I. 4 (Motion), D.I. 10 (Opposition), and D.I. 23 (Reply).

2021.[53]

<blockquote>

**ii.    *Yucaipa's Motion to Withdraw the Reference and Motion Seeking a Stay Pending Appeals***

</blockquote>

37.    On October 4, 2021, Yucaipa filed: (1) a motion to withdraw the reference of the Adversary Proceedings pursuant to 28 U.S.C. § 157(d) and Bankruptcy Rule 5011(a) which was transmitted to the District Court following briefing,[54] and (2) a motion to stay proceedings pursuant to Bankruptcy Rule 8007.  (Stip. Fact ¶ 71).[55]

38.    On December 6, 2021, this Court denied Yucaipa's Motion to Stay Proceedings.[56] In so holding, the Court found, among other things,  that a stay pending appeal would "serve to carry on the delays that [Yucaipa] has been so successful in achieving to date, to the immediate an irreparable detriment of [Allied's] creditors and [] estate."[57]  The Court further held that the Trial should proceed as the "parties and the Court are highly familiar with the facts, operative documents, and issues of this case as a result of the recent cross-motions for summary judgment" and, therefore, the "Trial should be held now so that the parties and the Court are not forced to relearn these topics after a long period of time."

<blockquote>

**iii.    *The Parties' Motions in Limine and Pre-Trial Submissions***

</blockquote>

39.    On January 11, 2022, the Trustee filed a motion *in limine* to exclude Yucaipa's

---

[53]    *See Youngman v. Yucaipa Am. All. Fund I, L.P.*, Civ. Nos. 21-994-CFC and 21-995-CFC, 2021 WL 3288078 (D. Del. Aug. 2, 2021).

[54]    13-50530, D.I. 890 (the "**Withdrawal Motion**"), D.I. 895 (Trustee Opposition), D.I. 898 (Yucaipa Reply), D.I. 904-05 (Transmittal and Docking of the Withdrawal Motion).

[55]    13-50530, D.I. 891 (the "**Motion to Stay Proceedings**"), D.I. 896 (Trustee Opposition), D.I. 899 (Yucaipa Reply).

[56]    13-50530, D.I. 907.

[57]    13-50530, D.I. 907 at ¶ 30 (quoting *Halperin v. Moreno (In re Green Field Energy Servs., Inc.*), No. 13-12783 (KG), 2017 WL 2729065, at *3 (Bankr. D. Del. June 23, 2017) and collecting cases).

entry of evidence that the Fourth Amendment was entered into in good faith and to clarify the scope of the Trial.[58]  The Court heard argument on February 8, 2022 and granted the Trustee's Motion *in Limine*, finding that "th[e] issue of [Yucaipa's] bad faith has been determined by the Court as a matter of law … there is … no genuine material issue of fact that prevented the Court from ruling as a matter of law that there is bad faith in connection with the fourth amendment" and "the undisputed facts prove as a matter of law that [Yucaipa] acted in bad faith.  Period."[59]

40.    Yucaipa subsequently filed two pre-trial motions *in limine*:  (1) to exclude the Reports and testimony of Professor Jonathan R. Macey filed on February 9, 2022 (the "**Macey Motion**"),[60] and (2) to exclude argument, evidence, and testimony that the transaction being negotiated with JCT in late 2011/early 2012 was sufficiently certain to support an award of damages and request for judicial notice filed on February 15, 2022 (the "**JCT Motion**").[61]

41.    On February 25, 2022, this Court denied the Macey Motion and the JCT Motion.[62]

42.    The Macey Motion was denied without prejudice to renewal following consideration of Professor Macey's testimony during Trial.[63]  Yucaipa renewed its Macey Motion at Trial following Professor Macey's testimony.[64]  As discussed below, the Court finds Professor Macey's testimony helpful in the context of this case and permissible under Rule 702's "liberal

---

[58]    13-50530, D.I. 912 (the "**Trustee's Motion *in Limine***), D.I. 918 (Yucaipa Opposition), D.I. 922 (Trustee Reply).

[59]    13-50530, D.I. 929 at 14:25-15:5, 15:21-23; *see also* D.I. 935.

[60]    *See* 13-50530, D.I. 931 (Macey Motion), D.I. 948 (Trustee Opposition to Macey Motion).

[61]    *See* 13-50530, D.I. 940 (JCT Motion), D.I. 953 (the "**Plaintiff's Opposition**").

[62]    13-50530, D.I. 962.

[63]    13-50530, D.I. 962.

[64]    *See* 3/4/22 p.m. Trial Tr. 65:24-71:13 (Argument on Renewed Macey Motion).

policy of admissibility."[65]  Yucaipa's renewed Macey Motion is therefore denied.

43.    Yucaipa's JCT Motion was denied "for reasons set forth in the Plaintiff's Opposition."[66]  This included that:

    i.    The JCT Motion was procedurally improper because it involved a legal question that should have been raised on summary judgment and not a motion *in limine*;

    ii.    The Trustee was not collaterally estopped by dismissal of the D. Del. RICO Complaint from asserting that the lost JCT transaction in late 2011 through spring 2012 cannot serve as a basis for damages on Estate Claim 7 (breach of fiduciary duty) or Lender Claim 2 (Breach of the Implied Covenant of Good Faith and Fair Dealing) because the burden is different in these cases.  At Trial on the Trustee's claims, Yucaipa bore the burden of establishing that there was no likelihood of the JCT transaction being consummated, and not the stringent standards for RICO standing.  As discussed below, Yucaipa did not carry the relevant burden at Trial in this action.[67]

    iii.    Both the District Court and the Third Circuit previously held in adjudicating defendants' motion to dismiss the D. Del. RICO Complaint that any damages suffered by the First Lien Lenders were contingent on these Adversary Proceedings and, as such, there was not a sufficient concreteness to impart RICO standing.[68]

---

[65]    *See, e.g.*, *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008).

[66]    13-50530, D.I. 962 at 3.

[67]    *See, e.g.*, CL ¶¶ 224-63, below.

[68]    *See Yucaipa Am. All. Fund I, L.P. v. Ehrlich*, 204 F. Supp. 3d 765, 776 (D. Del. 2016) ("Here, the injury asserted—equitable subordination of plaintiffs' claims in the Allied bankruptcy—has not yet occurred and is wholly contingent upon the outcome of the bankruptcy

44.     Pursuant to the Court's General Order regarding pre-trial procedures, the Parties submitted a Joint-Pre-Trial Memorandum and Pre-Trial Briefs on February 23, 2022.[69]  The Court carefully reviewed and considered these submissions.

## FINDINGS OF FACT

**A.      Allied's 2005 Bankruptcy, Yucaipa's Sponsorship of Allied's Exit Plan, and Yucaipa's Selection of the Company's CEO and the Appointment of Board**

45.     Allied was a unionized automobile and truck hauler engaged in the transport of vehicles in North America.  (Stip. Fact ¶ 1).

46.     On July 31, 2005, Allied filed a petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia (the "**2005 Bankruptcy**"). (Stip. Fact ¶ 2).

47.     On or about May 3, 2006, Yucaipa purchased the majority of Allied's debt for $81.6 million and later financed Allied's purchase of used rigs and contributed to the payment of claims tendered by unsecured creditors who opted for cash in lieu of equity.  (Stip. Fact ¶¶ 3-4).

48.     On March 5, 2007, in anticipation of sponsoring Allied's emergence from the 2005 Bankruptcy, Yucaipa retained the executive search firm Heidrick & Struggles to assist in identifying a new CEO for the Company.[70]  Derex Walker and Ira Tochner — both Partners of Yucaipa at the time and later two initial members of Allied's new Board of Directors (the "**Board**")

---

court proceedings."), *aff'd*, 716 F. App'x 73, 77 (3d Cir. 2017) (the loss alleged is "plainly contingent on the outcome of the pending bankruptcy proceeding" and "[a]n injury that 'necessarily is contingent upon the impact of events in the future which have not yet occurred' will not suffice" to confer RICO standing).

[69]     13-50530, D.I. 960 (Joint PTM), 958 (Yucaipa's Trial Brief), 961 (Trustee's Trial Brief).

[70]     Ex. 393 at 2-6 (Heidrick & Struggles engagement letter to Derex Walker dated February 2, 2007 and countersigned on March 5, 2007).

— met and interviewed candidates to be Allied's CEO in advance of the Company's emergence.[71]

49.    The position of Allied's CEO was initially offered to Mike Riggs, who at the time was the CEO of an automotive logistics company called JHT Holdings, Inc ("**JHT**").[72]  Mr. Riggs declined, and the position went to Mark Gendregske.  Mr. Gendregske served as Allied's CEO and as a director on Allied's Board from June 2007 through the Company's sale in December 2013 (the "**JCT 363 Sale**").  (Stip. Fact ¶ 9).[73]

50.    Allied emerged from the 2005 Bankruptcy in late May 2007 under a Joint Plan of Reorganization sponsored by Allied, Yucaipa, and the International Brotherhood of Teamsters (the "**Joint Plan**").  (Stip. Fact ¶ 5).

51.    Under the Joint Plan, Yucaipa's old debt was converted into approximately 67% of Allied's new equity, and Yucaipa was granted governance rights in the reorganized Company. (Stip. Fact ¶ 6).

52.    Among Yucaipa's governance rights was its ability to appoint three members of Allied's five-member Board.  Yucaipa also had the right to select the Company's CEO, who would serve as the fourth member of the Board, which selection had to be "reasonably acceptable to the [Teamsters] and the Creditors' Committee."  The fifth member, selected by the Creditors'

---

[71]    Dep. Tr. (Riggs) 148:15-149:2, 153:18-154-7 (Riggs testified that he interviewed with Messrs. Walker and Tochner in spring 2007 for the CEO position at Allied, and he understood at the time that Yucaipa was the controlling shareholder and that he would ultimately be answering to Yucaipa, in that capacity, if he became Allied's CEO).

[72]    *See* Dep. Tr. (Walker Vol. I) 156:4-22.  Derex Walker is no longer a Partner with Yucaipa primarily due to the circumstances surrounding Yucaipa's investment in Allied. (3/3/22 a.m. Trial Tr. 53:21-54:5 (Burkle/Adverse Direct)).  However, Mr. Walker was a Yucaipa Partner when deposed in May 2019, and was also produced as Yucaipa's Rule 30(b)(6) representative.  His deposition testimony is therefore admissible for any purpose pursuant to Fed. R. Civ. P. 32(a)(3), made applicable by Bankruptcy Rule 7032.

[73]    *See also* Dep. Tr. (Walker Vol. I) at 156:4-22.

Committee, had to be "reasonably acceptable" to Yucaipa.[74]

53.    From June 2007 through the JCT 363 Sale in late 2013, the Board at all times included three Yucaipa-affiliated directors, Mark Gendregske (the Company's CEO), and Brian Cullen (an outside director).  (Stip. Fact ¶¶ 8-9; *see also* Dep. Tr. (Cullen) at 30:14-17).[75]

## B.    **Allied's Credit Agreements and the Third Amendments Thereto**

54.    To finance its exit from the 2005 Bankruptcy, Allied entered into a two-tiered financing structure with various lenders (the "**Lenders**") comprising $265 million in first lien debt, governed by the FLCA, and $50 million in second lien debt, governed by a Second Lien Credit Agreement ("**SLCA**").  (Stip. Fact ¶ 10).

55.    The first lien facility included three types of debt: (1) $180 million in term loans ("**Term Loans**"), (2) a $35 million revolving credit facility from the CIT Group/Business Credit, Inc. ("**CIT**"), and (3) $50 million in letter of credit commitments ("**LC Commitments**").  The FLCA and SLCA were secured by a pledge of substantially all of Allied's assets, and both contained fixed interest rates.  The Georgia bankruptcy court approved Allied's entry into both the FLCA and SLCA.  (Stip. Fact ¶ 11).

56.    As initially executed, the FLCA barred Yucaipa from being an "Eligible Assignee," meaning that a holder of First Lien debt could not sell, assign, or transfer any portion of its debt, rights or obligations to Yucaipa.  The SLCA contained a similar provision.  (Stip. Fact ¶ 12).

---

[74]    Ex. 398 (Joint Plan) at § 7.2.  *See also* Ex. 587 (Yucaipa memorandum providing that Yucaipa "appointed four of the five directors on the board, consisting of three [Yucaipa] representatives and the CEO."); Dep. Tr. (Walker Vol. I) 148:18-25, 148:17-23) (authenticating same).

[75]    During the relevant period for Trial, the Yucaipa-affiliated directors of Allied were: (1) Derex Walker (Chairman of the Board), (2) Ira Tochner, and (3) Jeff Pelletier.  (*See* PX Q at 1 (Minutes of Meeting of Board dated July 29, 2010); Ex. 573 at 1 (Minutes of Meeting of the Board dated March 8, 2011); Ex. 688 at 1 (Minutes of Special Meeting of the Board dated October 5, 2012)).

57.    The FLCA also provided for a "**Requisite Lender**" entitled to direct the First Lien Agent to take certain actions and exercise particular remedies (or refrain from doing so) on behalf of all Lenders.  Under the FLCA, the Requisite Lender was one or more Lenders holding more than 50% of the Term Loans and LC Commitments.  (Stip. Fact ¶ 13).[76]

58.    In April 2008, a Third Amendment to the FLCA was entered.  (Stip. Fact ¶ 14).

59.    The Third Amendment to the FLCA permitted Yucaipa to acquire a limited amount of Term Loans as a "Restricted Sponsor Affiliate," but placed restrictions on any Term Loans Yucaipa purchased.[77]

60.    The parties similarly amended the SLCA.  However, the Third Amendment to the SLCA did not restrict the amount of Second Lien debt Yucaipa could acquire or require Yucaipa to make a capital contribution to Allied in connection with any acquisition of Second Lien debt.[78]

61.    In the second quarter of 2008, Yucaipa purchased $40 million of the $50 million of Second Lien debt at a discount to par — $0.66 cents on the dollar — and exercised its option to convert $20 million of those holdings into preferred stock in Allied while holding onto the remainder, increasing Yucaipa's equity stake in Allied to slightly over 71%.  (Stip. Fact ¶15).[79]

### C.    Allied Defaults Under FLCA and ComVest Becomes Requisite Lender

62.    On August 15, 2008, Allied notified its First Lien Lenders that it was in default.

---

[76]    Ex. 133 (FLCA) at § 1.1, p. 47.  A consortium of Lenders were the Requisite Lenders immediately following entry of the FLCA.

[77]    *See* Ex. 27 (Third Amendment) at § 2.7(c); *see also* Summary Judgment Opinion at 12-13 (summarizing restrictions); Summary Judgment Opinion at 25-46 (holding that Yucaipa breached the Third Amendment to the FLCA by disregarding restrictions on, among other things, its requirement to make a substantial capital contribution to Allied).

[78]    *See* Ex. 343 (Third Amendment to SLCA).

[79]    *See also* Dep. Tr. (Walker Vol. I) 159:11-160:4; Ex. 615 (Yucaipa trade blotter); Ex. 587 (March 2010 Yucaipa Memorandum) at 2.

Allied remained in default under the FLCA through consummation of the JCT 363 Sale in late 2013.  (Stip. Fact ¶ 16).[80]

63.     On or about February 19, 2009, ComVest Investment Partners ("**ComVest**") — acquired approximately 54% of the Allied's First Lien debt and became the Requisite Lender. (Stip. Fact ¶ 17).

64.     On or about August 4, 2009, Allied missed its first quarterly interest payment due to Lenders under the FLCA.[81]

65.     On August 21, 2009, Yucaipa and ComVest entered a Loan Purchase Agreement pursuant to which Yucaipa purchased ComVest's $145.1 million (principal face amount) of First Lien debt for approximately $43 million.  (Stip. Fact ¶ 18; Ex 24 (the "**LPA**")).

66.     Allied was not a party to the LPA, but the agreement required the Company to: (i) reimburse ComVest $1.85 million for its associated legal fees and expenses, (ii) reimburse Yucaipa $831,325.83 for its legal fees and expenses, and (iii) agree to the later-voided Fourth Amendment to the FLCA (Ex. 26, the "**Fourth Amendment**").  The Fourth Amendment did not purport to cure any of Allied's Events of Default or reset any financial covenants, as contemplated in earlier iterations of the amendment.[82]

67.     In connection with the LPA, ComVest was ultimately paid all accrued interest on

---

[80]     *See* Ex. 537 (Email from Stephanie Bond to Derex Walker Re: pres dated September 11, 2011) at 4 ("Allied has been in default of the Obligations since August 2008 and is currently operating without a forbearance agreement from the bank group."); Ex. 532 (Email from Derex Walker to Patti Kelley attaching Allied-BD_Update_Internal100222_Final.ppt dated February 22, 2010) at 3 ("Allied has been in default of its credit agreement since August 2008 and has not made interest payments since May 2009.").

[81]     *See* Ex. 299 (Minutes of Meeting of Board dated August 3, 2009) at 2 ("Mr. Walker made a motion that the Company forego the quarterly interest payment due August 4, 2009.  Mr. Tochner seconded the motion, and it carried unanimously.").

[82]     *See* Summary Judgment Opinion at 17.

account of its prior First Lien debt holdings by Yucaipa.  No other First Lien Lender was paid

interest owed on account of their holdings after May 2009.[83]

### D.    Yucaipa Assumes Requisite Lender Status In Bad Faith, Sues CIT, and Permits Ongoing Defaults Under the Credit Agreements

68.    In September 2009 — contemporaneous with developing a "Contingency Plan"

focused on the "Validity of Amendment No. 4"[84] — Yucaipa announced to its investors that:

> [The ComVest] transaction makes us 'requisite lender' for purposes of any amendments or consents to the Company's first lien credit facility.  Our ownership of the first lien debt is not subject to any of the customary restrictions or limitations normally associated with a sponsor's acquisition of its bank debt.
>
> Our purchase of the first lien debt is also notable because it puts us in the position of controlling every tranche of the Company's capital structure.  In addition to holding 56% of the first lien debt, we also hold 67% of the second lien debt as well as 71% of the fully-diluted equity.[85]

69.    On September 17, 2009, Yucaipa's counsel at Latham & Watkins sent CIT (then

the First Lien Agent) a "Direction Letter" from Yucaipa as purported Requisite Lender, directing

and instructing CIT to immediately terminate certain control agreements and enter into a new

account control agreement with JPMorgan Chase Bank, N.A.[86]

70.    On October 10, 2009, Yucaipa's counsel sent another letter to CIT's counsel

---

[83]    Dep. Tr. (Walker Vol. II) 571:12-15, 20-25 (Q: "[I]s it your recollection that ComVest was paid its interest payments for the period of time that it held Allied's first lien debt?" A: "Yes, that was the case." Q: "Do you know if any other lenders were paid their interest payments on or after August 2009, setting aside ComVest?" A: "I – Allied didn't make any interest payments after August 4th – or starting on August 4th, Allied stopped making interest payments.").

[84]    Ex. 525 (Email from Stephanie Bond (of Yucaipa) to Derex Walker Re: Restructuring Plan dated August 23, 2009) at 2.

[85]    Ex. 529 (Memorandum to Limited Partners from Yucaipa dated September 11, 2009) at 3.

[86]    Ex. 530 (Email from May Chan (Latham & Watkins) Re: Allied Letter of Direction dated September 17, 2009).

demanding CIT comply with the "Requisite Lenders'" directions on or before October 14, 2009.[87]

71.    On October 26, 2009, Aaron Marks of Kasowitz Benson — litigation counsel to Yucaipa — sent a letter to CIT's counsel, Eric Kimball of Patton Boggs LLP.  Mr. Marks' letter set forth alleged breaches of the FLCA by CIT, claimed that CIT was "hinder[ing] and tortiously interfer[ing] with Yucaipa's business and contractual relationships," and demanded that "CIT immediately comply with its duties as Administrative Agent and Collateral Agent under the [FLCA] by, among other things, taking immediate steps to cure the breaches described herein." Mr. Marks' letter concluded that "[a]bsent such compliance, Yucaipa will not hesitate to enforce its rights against CIT, pursuant to the Credit Agreement and otherwise."[88]

72.    On October 29, 2009, Mr. Kimball responded to Mr. Marks' letter that CIT disagreed with Yucaipa's statements and allegations.  Among other things, Mr. Kimball's letter demanded that Yucaipa comply with the Third Amendment's required capital contribution.[89]

73.    On November 13, 2009, Yucaipa and Allied sued CIT in Georgia state court seeking, among other things, a declaratory judgment holding that the Fourth Amendment was

---

[87]    PX III (Email from May Chan Re: Allied Demand Letter dated October 10, 2009).

[88]    *See* PX G (Letter from Aaron Marks to Eric Kimball dated October 26, 2009) at 2.  Mr. Mark's correspondence is reflective of a pattern of behavior taken by Yucaipa relating to its Allied investment over the past 13 years, including (1) threatening litigation against ComVest, (2) commencing a lawsuit against CIT, (3) causing Allied to sue Mike Riggs and his related entities, (4) filing cross-claims against Lenders in the Allied Adversary Proceeding, (5) filing the Counterclaim against BD/S, (6) bringing claims against BD/S and others in the Delaware Chancery Court, and (7) prosecuting the RICO Complaints through appeal to the Third Circuit. (*See generally* Summary Judgment Opinion at 7-8 n.10).  While Yucaipa witnesses testified at Trial about endeavoring to be "great partners" to fellow investors in good times and bad, it admits that the lead partner on the Allied investment (Derex Walker) was "more aggressive" than others. (3/3/22 a.m. Trial Tr. 27:22 (Burkle/Adverse Direct)).  Mr. Burkle also testified that although Yucaipa tries to put a person with corporate governance experience on the boards of its portfolio companies, it failed to do so for Allied.  (*See* 13-50530, D.I. 700-11 (Dep. Tr. (Burkle) 202:4-11).

[89]    Ex. 446 (Letter from Eric Kimball to Aaron Marks dated October 29, 2009) at 3-4.

valid, and that Yucaipa was Requisite Lender under the FLCA (the "**CIT Litigation**"). (Stip. Fact ¶ 19; Ex. 630 (Verified Complaint)).

74.    On December 21, 2009, CIT filed counterclaims in the CIT Litigation on behalf of itself and First Lien Lenders seeking, among other things, declaratory judgment that: (i) the Fourth Amendment was ineffective, (ii) the Third Amendment to the FLCA remains in full force and effect, and (iii) Yucaipa cannot be "Requisite Lenders" under the FLCA. CIT also sought specific performance of Yucaipa's capital contribution requirement in the Third Amendment. (Stip. Fact ¶ 20).[90]

75.    Two years later, on December 5, 2011, CIT settled the CIT Litigation solely on its own behalf, but expressly not on behalf of any of Allied's other Lenders. This settlement did not resolve the validity of the Fourth Amendment. (Stip. Fact ¶ 21).[91]

76.    No longer having their interests represented by CIT in a representative capacity, BD/S — both Lenders who collectively were owed approximately $61 million under the FLCA and SLCA[92] — filed a lawsuit in New York State Court on January 17, 2012 against Yucaipa (the "**NY Action**"). (Stip. Fact ¶ 37).

77.    The NY Action sought a declaration that the Fourth Amendment was invalid, and that Yucaipa was not the Requisite Lender.[93]

78.    On March 9, 2013, the New York State Supreme Court ruled in favor of BD/S, issuing a written opinion to "amplif[y]" an earlier oral ruling issued on November 19, 2012. In

---

[90]    Ex. 193 (CIT Verified Answer and counterclaims at 18-38).

[91]    Ex. 198 (Settlement Agreement and Mutual Limited Releases dated December 5, 2011).

[92]    *See* DX QQ at 1 (total First Lien debt outstanding pre-distributions); *see also* Ex. 481 ($5 million second lien debt held by Spectrum).

[93]    *See generally* PX AA (Summons and Complaint in NY Action).

this published opinion, Justice Charles E. Ramos concluded, among other things, that: (i) Yucaipa caused Allied to enter into the Fourth Amendment, which was "flatly prohibited under the Credit Agreement;" (ii) the Fourth Amendment "is not, and never was, effective;" and (iii) "Yucaipa [was] not the Requisite Lender." (Stip. Fact ¶56).[94]

79.     Yucaipa appealed Justice Ramos' decision, and the New York appellate court issued an opinion on December 17, 2013, affirming the trial court's dispositive holdings.[95]   The New York Court of Appeals thereafter denied Yucaipa's petition for further review on April 3, 2014. (Stip. Fact ¶ 57).[96]

**E.    JCT's Long Running Desire to Acquire Allied**

80.     The evidence adduced at Trial was clear that Mike Riggs — both before and after acquiring JCT in spring 2009 — held a strong desire to acquire Allied.

81.     Among other things, Mr. Riggs testified that it was a "dream" of his to combine the entities, and that in the course of a five year "quest" he made several overtures and proposals.[97]

82.     Mr. Deckoff, the founder and a principal of Black Diamond, testified that he had met with Mr. Riggs on multiple occasions and observed that "[h]e was highly motivated" and

---

[94]    *See BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*, No. 650150/2012, 2013 WL 1290394, at *5-6 (N.Y. Sup. Ct. Mar. 8, 2013) (Ex. 843), *aff'd*, 978 N.Y.S.2d 10 (App. Div. 2013), *leave to appeal denied*, 8 N.E.3d 849 (N.Y. 2014).

[95]    *BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*, 978 N.Y.S.2d 10 (App. Div. 2013) (affirming in all material respects).

[96]    *BDCM Opportunity Fund II, LP v. Yucaipa Am. All. Fund I, LP*, 8 N.E.3d 849 (N.Y. 2014).

[97]    Dep. Tr. (Riggs) 97:17-98:5 (Combining Allied and JCT "was really kind of the dream" and "I really wanted it to work whatever it took."), 79:8-11 ("[F]or me it was always about acquiring Allied, however we did that."), 161:18-162:13 (describing five-year quest), 178:21-179:11 (testifying that he wanted to combine JCT and Allied notwithstanding rumors of a bankruptcy because he was confident in his turnaround capabilities and thought there were a lot of synergies between JCT and Allied).

"there was no doubt he wanted to buy [Allied]."[98]

83.    Jeffrey Schaffer, a founder and principal of Spectrum, similarly testified about Mr. Riggs' "desire to buy Allied" and interactions he had with Mr. Riggs as a "debt holder [of Allied] and as a friend."[99]   Mr. Schaffer testified that he told Mr. Riggs to "[m]ake a bid for the [C]ompany" and "Mike being the type of person that he is, won't ever stop and won't ever stop finding different angles, different ways to try to buy something[.]"[100]  Mr. Schaffer further testified that "there never was a[n] inkling in my mind that [Riggs'] goal was not to buy the company."[101]

84.    Yucaipa's 30(b)(6) witness (Derex Walker) also admitted that "Riggs was certainly interested in trying to put together a transaction at various points in time" to acquire Allied, which was supported by testimony by Ira Tochner, a Senior Partner at Yucaipa, and Ron Burkle, the Founder and Managing Principal of Yucaipa.[102]

85.    There can be no serious dispute that JCT's desire to acquire Allied was sincere. Among the evidence of Mr. Riggs' ongoing efforts were:

    i.    In September 2008, Mr. Riggs sent an e-mail to Mr. Walker to gauge Yucaipa's interest in selling its equity stake in Allied.[103]   There was no evidence that

---

[98]    3/1/22 a.m. Trial Tr. 83:1-7 (Deckoff/Direct).

[99]    Dep. Tr. (Schaffer Vol. II) 402:4-11.

[100]    Dep. Tr. (Schaffer Vol. II) 402:11-19.

[101]    Dep. Tr. (Schaffer Vol. II) 426:24-427:4.

[102]    Dep. Tr. (Walker Vol. II) 668:19-669:11; *see also* 3/2/22 a.m. Trial Tr. 88:5-8 (Tochner/Adverse Direct) ("Mike Riggs had been interested in doing a deal since I think maybe 2008."); 3/3/22 a.m. Trial Tr. 25:25-26:1 (Burkle/Adverse Direct) ("There were so many things with Riggs, I don't remember when the first one was.  But it was quite early."); 3/3/22 a.m. Trial Tr. 76:19-25 (Burkle/Friendly Cross) (Q: "Did Jack Cooper ever offer to buy assets in Allied instead of debt?" A: "I believe he did. . . . There were – he threw everything he could against the wall along the way so I think there were asset deals as well.").

[103]    Ex. 526 (Email from M. Riggs to D. Walker re: confidential – from Mike Riggs, dated Sept. 16, 2008) ("given the recent financial trends at Allied, and also given Zuckerman's recent

Yucaipa ever informed any other Board members about Mr. Riggs' initial interest around this time notwithstanding that the Company was admittedly insolvent.

ii.   In December 2008, Mr. Riggs began pitching various Allied Lenders and outside investors on a strategy to take ownership of Allied, become CEO, and install a new management team and Board.[104]  Mike Riggs began working with ComVest to this end.  Yucaipa, however, stymied any efforts at restructuring at this time.  Instead, Yucaipa pushed through the LPA and caused Allied to enter the void Fourth Amendment in bad faith.[105]

iii.   On June 27, 2009, before the Fourth Amendment was entered, Mr. Riggs reached out to Yucaipa about buying its stake in Allied.[106]  This was followed by a meeting with Messrs. Burkle and Walker in Los Angeles regarding a transaction for JCT to buy Yucaipa's stake in Allied, which turned into Mr.

---

'grievance' regarding the 15% pay cut, I can envision a way to bring those investors into play if Yucaipa would consider divesting its stock in Allied Holdings. . . . To be clear, if Yucaipa would have any interest in selling off its stake in Allied Holdings, then I am confident I could get funding at an appropriate price to purchase your shares.  I would intend to implement a similar margin turnaround strategy at Allied, and I am fully aware of all of the risks.") (emphasis added); *see also* Dep. Tr. (Riggs) 160:14-161:1 (confirming he was interested in acquiring Allied as early as fall 2008).

[104]    GSO Ex. 41 (General Concept Presentation from Mike Riggs dated December 20, 2008).

[105]    *See* Summary Judgment Opinion at 101-108 (summarizing undisputed conduct of Yucaipa's bad faith conduct leading up to passage of the void Fourth Amendment).

[106]    PX C (Email from M. Riggs to D. Walker forwarded internally dated June 27, 2009) ("My relationships with various financing partners could help affect a buyout of Yucaipa's position in Allied Holdings if you are ever interested in pursuing that alternative.  I have attached several other examples of some of prior financing term sheets, to hopefully add more credibility to the idea.  I am comfortable in the fund raising space.  See you in the morning.").

Burkle trying to convince Mr. Riggs to sell JCT to Yucaipa.[107]  Yucaipa, in its efforts to entice Mr. Riggs to sell JCT to Yucaipa, proposed, among other things, that upon any new investment by Yucaipa in Allied that Mr. Riggs would get a 10% profit share and be named the Chairman of Allied's Board.[108] Mr. Riggs testified that after he turned down Yucaipa's offer, Yucaipa "immediately filed a lawsuit against me and/or Jack Cooper."[109]  There was no evidence presented that Yucaipa ever informed other Board members of Mr. Riggs' interest in acquiring Allied around this time.

iv.    On July 20, 2010, Mr. Riggs sent a Letter of Intent to Messrs. Walker and Gendregske seeking to acquire Allied.  The offer included (a) $100 million in cash, (b) $50 million in JCT preferred equity with a redemption right (accruing a return of 7% annually and exercisable on the 5th anniversary of closing), and (c) the assumption of designated liabilities of the Company.[110]

v.    On November 29, 2010, Mr. Riggs emailed a "new proposal" to Derex Walker proposing to purchase all of Allied's trucks and trailers from its United States

---

[107]    *See* Dep. Tr. (Riggs) 169:11-170:2, 170:11-171:14, 172:3-18.

[108]    *See* Ex 103 (Email from Derex Walker to Mike Riggs re: IEP/Yucaipa LOI) at 3-4; Dep. Tr. (Riggs) 174:6–175:6 (testifying about same).

[109]    *See* Dep. Tr. (Riggs) 182:4-22, 206:22-207:25 (testifying about a lawsuit filed against him after declining Yucaipa's offer); *see also* PX H (Email from Derex Walker to John Blount Re: Riggs, dated October 26, 2009) ("I need an update and we need the complaint filed asap today."); PX J (Email from John Blount to Derex Walker Re: Allied Lawsuit dated October 26, 2009) (forwarding email to Mike Riggs attaching "a courtesy copy of a suit Allied filed today against you and Active-Cooper."); PX K (Email from Derex Walker to Ron Burkle and others at Yucaipa attaching a copy of lawsuit against Mike Riggs on October 26, 2009).

[110]    Ex. 105 (Email from Mike Riggs to Derex Walker and Mark Gendregske Re: Letter of Intent from Jack Cooper for the Acquisition of Allied Systems Holdings, Inc. 7-21-10) (the "**7/20/10 LOI**").

based operations for $100 million while leaving behind the Canadian car haul operations and Allied's Canadian-based subsidiary, Axis.[111]

86.    JCT's various proposals to acquire Allied (or Yucaipa's stake in Allied) — over his 5-year "quest" — were never met with fair process for the *Company's* consideration.

87.    As discussed more fully below — in connection with JCT's additional efforts to acquire Allied in 2011-2012 — there was never an independent process free from Yucaipa's domination and control of the Company.  Rather, the evidence adduced at Trial reveals that Mr. Riggs was dealing exclusively with Yucaipa — never an independent committee (or "restructuring committee") or Company advisors — and his perception was that Yucaipa controlled Allied's entire capital structure.  In Mr. Riggs' words, "[if] you think [Yucaipa] own[s] control of the common stock, you think they own control of the senior debt, who else would you work it with?"[112]

88.    The only substantive evidence of Board-level consideration of any of Riggs/JCT offers and overtures over the years — including the critical offers during late 2011/early 2012 "**JCT Negotiations**" addressed below — was minutes of a Board meeting on July 29, 2010, where the 7/20/10 LOI was addressed.  Notably, at this meeting "Mr. Walker stated that he found the offer flawed on several levels:  first, a release of all claims [against Riggs] as a condition to negotiations is clearly unacceptable. Second, *as the Company's largest lender, Mr. Walker stated*

---

[111]    PX S (Email from Mike Riggs to Derex Walker Re: confidential – new proposal from Mike Riggs dated November 29, 2010).

[112]    *See, e.g.*, Dep. Tr. (Riggs) 237:25-238:8; Dep. Tr. (Riggs) at 175:9-176:21 (testifying that he had no knowledge of or meetings with a Special Committee: "I'm sorry, I may be confused. Unless that special committee is Derex and Ron, and I didn't know they were a special committee, then I'd say the same answer, no, I don't think I ever met with that special committee."). Only *after* BD/S filed the involuntary bankruptcy on May 17, 2012 (the "**Bankruptcy**") did Allied hire outside advisors in connection with a restructuring.  Even then, the evidence reflects that Mike Riggs continued to negotiate directly with Yucaipa despite Yucaipa being aware that BD/S was alleging it suffered from debilitating conflicts of interest.

*that Yucaipa would **never** accept such an offer* and rather believes that the Company is worth very significantly more on [sic] liquidation."[113]    It was only **after** Mr. Walker's statements that a supposed "thorough discussion of the Letter of Intent was undertaken, after which Mr. Walker made a motion to allow the Letter of Intent to lapse without any response from the Company[,]" which unanimously carried.[114]

### F.    Yucaipa's Self-Interested Dealings With JCT in Spring 2011

89.    In a March 6, 2011 email, Mark Gendregske (Allied's CEO ) told Messrs. Walker and Tochner that "[b]ankruptcy is inevitable," while seeking approval of an incentive compensation structure for management that was "bankruptcy proof."[115]

90.    On March 8, 2011, Mr. Gendregske apprised the full Board that Allied "no longer had a future absent new customer terms," and the CFO added that "the Company was forecast to run out of cash in 2012."[116]

91.    Mr. Deckoff testified that around this time Allied "had been in payment default … for a few years," and Lenders "weren't getting any financial statements on the company."[117] Mr. Deckoff's testimony was undisputed and is supported by a May 29, 2011, internal Yucaipa email — from Derex Walker to Ira Tochner — discussing whether Allied should issue financial reporting for March and April 2011 to Lenders.  Mr. Walker writes that these reports "show a dramatic decline in cash, down $8MM in April" and notes management's concern "that issuing the reports

---

[113]    PX Q (7/29/10 Board Minutes) at 2.

[114]    PX Q (7/29/10 Board Minutes) at 2.

[115]    Ex. 632 (email from Mark Gendregske to Derex Walker and Ira Tochner dated March 6, 2011) ("Bankruptcy is inevitable, so incentive comp structure [for management] must be bankruptcy proof.").

[116]    Ex. 573 (Minutes of Meeting of the Board dated March 8, 2011).

[117]    3/1/22 a.m. Trial Tr. 70:25-71:4 (Deckoff/Direct).

will lead certain lenders like Black Diamond to think the end is near and make it harder to cut a

deal.  <u>Not issuing the report is simply another breach (one of many) under the credit agreement</u>."[118]

92.    At this time, JCT still remained a *highly* motivated strategic buyer.[119]

93.    On May 9, 2011, following some preliminary discussions with Black Diamond

about a potential transaction to acquire Allied, Mike Riggs sent another Letter of Intent to purchase

substantially all the assets of Allied to Derex Walker and Black Diamond (the "**May 2011 LOI**").

(Stip. Fact ¶ 26; Ex. 107).

94.    The May 2011 LOI was addressed to Derex Walker as Chairman of Allied's Board

(at the Company's address), as well as to Mr. Walker in his capacity as a Yucaipa Partner (at

Yucaipa's address).[120]  Messrs. Deckoff and Ehrlich (of Black Diamond) were also recipients of

the May 2011 LOI.[121]

95.    The May 2011 LOI provided that JCT was "was interested in acquiring

---

[118]    Ex. 636 (Email from Derex Walker to Ira Tochner dated May 29, 2011) (emphasis added).

[119]    It was undisputed at Trial that JCT was a strategic buyer for Allied.  (*See, e.g.*, 3/1/22 a.m. Trial Tr. 72:16-74:2 (Deckoff/Direct) ("For Jack Cooper, if he did this deal, he'd go from being the number 3 player to the number 1 player by a lot. . . . I think this would give him the leverage that he would probably need to negotiate a deal with the OEMs [so] that he could get pricing where the economics weren't meeting.  You could cover your expenses, your fuel, the labor costs under the union contract and get a return on capital.")).

[120]    As a director of a Delaware company, lawyer, and experienced restructuring professional, the potential conflicts inherent in Mr. Walker's dual role should have been obvious.  (*See* 3/3/22 a.m. Trial Tr. 70:23-24 (Burkle/Friendly Cross) ("[W]e hired Derex Walker because he was a lawyer who had experience in debt acquisition[.]")).  This is particularly so given that the claimed legitimacy of both the Fourth Amendment and Yucaipa's debt holdings were being actively litigated in the CIT Litigation, and Mr. Walker was also aware that BD/S did not believe the Fourth Amendment was valid.  (*See* Ex. 532 at 3 (Email from Derex Walker to Patti Kelley attaching Allied-BD_Update_Internal100222_Final.ppt dated February 22, 2010) ("Black Diamond has also sought to undermine Yucaipa's position as requisite lender and bolster CIT's countersuit, by directing CIT in September 2009 not to follow any directions given by us and questioning the validity of the ComVest purchase.")).

[121]    Ex. 107 (Email from Mike Riggs to Rich Ehrlich and Derex Walker attaching Allied 363 Letter of Intent from TM Riggs 5-9-11.doc dated May 9, 2011).

substantially all the assets of [Allied] . . . through a [Section 363 Sale]," which would require Allied, Yucaipa and Black Diamond (collectively defined as the "Seller Parties" therein) to execute "a mutually acceptable definitive asset purchase agreement" and submission of bid procedures.[122]

96.     Initially, the "Total Consideration" contemplated in the May 2011 LOI was (a) $175 million "payable in cash at closing," (b) an additional amount to be "mutually agreed upon between [JCT] and CIT," and (c) the "assumption of certain designated liabilities deemed critical to the operations of Allied as determined by [JCT] in its sole and absolute discretion."[123]

97.     The May 2011 LOI further contemplated the Seller Parties would enter "Definitive Documents as soon as practicable" and for the Parties' "respective Board of Directors . . . or other similar governance bodies necessary to approve Definitive Documents" and take "all corporate actions necessary" to consummate the transaction.[124]

98.     The May 2011 LOI anticipated that it would take JCT "no longer than forty-five (45) days from the date of execution of th[e] LOI to obtain a financing commitment," and further that "the Bankruptcy Process would commence shortly thereafter and be expected to take no longer than ninety (90) days."[125]

99.     On May 17, 2011, Ira Tochner (a Yucaipa Partner and Board member at the time) wrote Messrs. Walker and Gendregske that "Bilbao [a banker for JCT] called and said Riggs desperately wants to do a deal.  Doesn't want Axis.  I didn't respond, except to say Riggs knows

---

[122]    Ex. 107 at p 3.

[123]    Ex. 107 at p. 3 § 2.

[124]    Ex. 107 at p. 3 §§ 3, 4.

[125]    Ex. 107 at p. 4 § 3.

the deal (which I assume he knows that it's par or nothing)."  (Stip. Fact ¶ 27).[126]

100.    The undisputed evidence reflects that JCT's initial offer in the May 2011 LOI increased to approximately $0.84 on the dollar — approximately a $225 million implied valuation of Allied — by June 21, 2011.[127]  This presumptively final offer — made before JCT declared the deal dead after Yucaipa demanded a "crazy high price" — is reflected in Yucaipa's contemporaneous internal correspondence and was not refuted at Trial.[128]

101.    Mr. Deckoff sent Mr. Burkle an email on June 21, 2011, after receiving word that this potential JCT transaction might be dead, because he "thought this was a good resolution" given that "[t]he company had been [insolvent] for quite a few years.  The company wasn't performing well . . . [a]nd [he] thought 84 cents for all the lenders was a good recovery."  Despite asking Mr. Burkle to call him and explain if he was "missing something," however, Mr. Deckoff received no response.[129]

---

[126]    Ex. 410 (Email from Ira Tochner to Derex Walker and Mark Gendregske dated May 17, 2011).

[127]    *See* Stip. Fact. ¶ 32; Ex. 663 at 1 (Email from Steve Deckoff to Ron Burkle dated June 21, 2011) ("The deal we had with Riggs worked out to 84 cents on the dollar.  About a 225mm enterprise valuation. . . . It may not be what you wished for when you made the investment, but it's a surprisingly high value given the situation."); *see also* 3/1/22 a.m. Trial Tr. 74:19-76:1 (Deckoff/Direct) (testifying regarding same); 3/1/22 p.m. Trial Tr. 113:2-4 (Deckoff/Cross) ("We ultimately got [JCT] to 84 cents on the dollar and then Yucaipa scuttled it by wanting I think 110 cents on the dollar."); 3/1/22 p.m. Trial Tr. 114:15-115:12 (Deckoff/Cross) (testifying that Yucaipa was insisting on 110 cents on the dollar); 3/1/22 p.m. Trial Tr. 122:21-22 (Deckoff/Cross) ("I believe the deal was there to do at 84 and it fell apart because Yucaipa insisted on 110.").

[128]    Ex. 536 (Email from Derex Walker attaching "Allied Proposal" dated June 16, 2011) at 2 (presenting an option 2 to "[a]ssign $135MM in Allied first lien loans held by Yucaipa to Jack Cooper for cash and a note at a rate of $0.837 on the dollar or $113MM" and "be entitled to receive $10MM in excess LC deposits outside of the loan assignment to Jack Cooper, bringing the total distribution to Yucaipa to $123MM.").  Mr. Walker's email is consistent with Mr. Deckoff's statement that this deal with JCT was "[a]bout a 225mm enterprise valuation" (*see* n.127, above).

[129]    3/1/22 a.m. Trial Tr. 76:2-14 (Deckoff/Direct); 3/1/22 a.m. Trial Tr. 93:18-24 (Deckoff/Direct) ("[H]e never responded to my email" and "I don't believe I spoke to him again after that until, maybe when we were – the company had the 363 Sale in Bankruptcy.").

102.    No evidence was introduced reflecting that Yucaipa took any steps to ensure a fair process (or any process at all) for the *Company* to consider JCT's interest expressed in the May 2011 LOI, and subsequent discussions through June 2011, free from Yucaipa's domination and control of Allied.[130]  Relatedly, there was no evidence presented that JCT's interest in acquiring substantially all of Allied's assets was ever discussed at the Board level.  Brian Cullen, Allied's only outside Board member, testified he had no recollection of entertaining any proposals at the time.[131]  Further, JCT had no familiarity with the name Brian Cullen at *any* point in time.[132]

103.    Critically, Yucaipa's 30(b)(6) deponent (Derex Walker) ***admitted*** that any Section 363 Sale — as contemplated in the May 2011 LOI and subsequent offers during the JCT Negotiations — is "not something Yucaipa could do on its own" because "filing a bankruptcy and commencing a 363 sale is a company decision.  ***It's not a Lender decision.***" Accordingly, Mr. Walker testified that a Section 363 Sale "***has nothing to do with Yucaipa***" and was a Board decision.[133]

104.    As discussed below, Yucaipa's arguments that it was entitled to negotiate the best deal for itself — wearing just its Lender hat in the JCT Negotiations — is inconsistent with Mr. Walker's admission.[134]  That argument also ignores the reality that Yucaipa was an illegitimate Lender who purchased its First Lien debt in bad faith under a void Fourth Amendment.[135]

---

[130]    At Trial, Mr. Tochner had no recollection what he "did or what [he] didn't do" with respect to being told by JCT's banker that "Riggs desperately wants to do a deal" in May 2011.  (3/2/22 a.m. Trial Tr. 89:23-90:7 (Tochner/Direct) (testifying about Ex. 410)).

[131]    Dep. Tr. (Cullen) 230:15-23.

[132]    *See* Dep. Tr. (Ciupitu) 159:3-11.

[133]    *See* Dep. Tr. (Walker Vol. II) 609:3-610:5 (emphasis added).

[134]    *See e.g.*, CL ¶ 206-08.

[135]    *See* Summary Judgment Opinion at 108.

105.    At Trial, Yucaipa offered no explanation or defense for why a transaction with JCT was abandoned in June 2011, or why Allied's Board did not actively engage in the process despite Yucaipa being on notice that Riggs "desperately wants to do a deal."[136]  Presumably, with the recovery of the automotive industry during that period, which Mr. Burkle testified at length about,[137] Yucaipa believed a recovery for itself exceeding $123 million, less Comvest's profit sharing under the LPA (*see* n.128, above), was achievable.  In all events, Yucaipa's self-interest was placed ahead of the Company during this period.

106.    The evidence adduced at Trial reflects that a higher recovery from JCT did, in fact, subsequently materialize during the JCT Negotiations.  However, Yucaipa's pursuit of a disproportionate recovery for itself again scuttled a deal resulting in significant damages to the Estate and its residual stakeholders.[138]

**G.**    **The Initial Stages of the JCT Negotiations**

107.    In late 2011, Yucaipa and JCT began discussing a prospective deal for JCT to simultaneously acquire First Lien debt holdings from Yucaipa and other Lenders to facilitate a pre-negotiated Section 363 Sale.[139]

108.    On December 9, 2011, Mike Riggs sent Ira Tochner a "Term Sheet for Acquiring First and Second Lien Secured Debt Claims With Respect to Allied System Holdings, Inc. And Consummating 363 Sale Under Chapter 11 of the Bankruptcy Code" (the **"December 9 Term Sheet"**).  (Stip. Fact ¶ 33; Ex. 116).

---

[136]    Ex. 410 (Email from Ira Tochner to Derex Walker and Mark Gendregske dated May 17, 2011).

[137]    *See* CL ¶ 229.

[138]    *See, e.g.*, CL ¶¶214-21.

[139]    *See* Ex. 115 (Emails between Mike Riggs and Ira Tochner from December 6-7, 2011) (referring to a potential "package deal" for the First Lien debt holdings).

109.    The December 9 Term Sheet contemplated a purchase of Yucaipa's First Lien debt holdings for face value ("100% principal claims transferred") and Second Lien Debt holdings for $1.00,[140] as a first step to JCT "purchasing substantially all of the assets of Allied, free and clear of all liens, claims and other encumbrances" pursuant to a Section 363 Sale by "[c]redit bid[ing] all claims against Allied under the First Lien Credit Agreement."[141]

110.    At this time, Allied had been in default under the FLCA for over three years and no Lenders — other than ComVest — had been paid any principal or interest for over two years.[142] The Obligations under the FLCA were also set to mature in May 2012.[143]

111.    On December 13, 2011, Derex Walker sent Mr. Riggs a mark-up of the December 9 Term Sheet (the "**December 13 Counterproposal**").  (Stip. Fact ¶ 34).[144]  Mr. Walker's mark-up reflected Yucaipa's First Lien holdings totaled $134.8 million, consisting of $114.7 million of Term Loans and $20.1 million of LC Commitments.  The December 13 Counterproposal sought "100% of principal claims transferred plus all accrued interest (approx. $25.4 million as of the end of November)" and any additional interest accrued through closing.[145]

112.    Thus, as of December 13, 2011, Yucaipa was seeking at least $160.2 million on account of its $134.8 million face amount of First Lien debt held — *i.e.*, approximately $1.19 for

---

[140]    Ex. 116 at 4 ("Purchase Debt Purchase Price").

[141]    Ex. 116 at 8 ("Structure of 363 Sale" and "363 Sale Purchase Price").

[142]    *See* n.80, above.

[143]    Ex. 537 (Email from Stephanie Bond to Derex Walker Re: pres dated September 11, 2011) at 4 ("The First Lien Obligations mature in May 2012, whereas the Second Lien Obligations mature in November 2012").

[144]    Ex. 117 (Email from Derex Walker to Mike Riggs, copying Ira Tochner, Re: Allied dated December 13, 2011).

[145]    *See* Ex. 117 at 2-3 ("Amount of Purchased Debt," "Purchased Debt Purchase Price," and "Payment of Purchased Debt Purchase Price") (emphasis in original).

37

each dollar of its First Lien debt, a 19¢ premium to face value.[146]

113.    There was no evidence adduced at Trial that following receipt of the December 9

Term Sheet, and prior to Yucaipa making a counterproposal four days later, Mr. Walker (or others

at Yucaipa) took ***any steps*** to apprise the other Board members of JCT's interest in acquiring

Allied's assets through a pre-negotiated Section 363 Sale.  Nor was there any evidence of Yucaipa

taking any measures to ensure the fairness of the process from the perspective of the Estate by, for

example, setting up an independent committee or hiring outside advisors to engage with JCT to

maximize the value for all stakeholders.[147]

114.    Among Yucaipa's principal defenses to the Trustee's breach of fiduciary duty claim

is that during the JCT Negotiations, "JCT was interested in buying Allied's debt, not its assets."[148]

Thus, Yucaipa claims it was free to negotiate with JCT solely as a Lender without regard to

fiduciary duties owed to Allied.  The contention that JCT was not interested in buying Allied's

assets, however, is belied by the terms of the December 9 Term Sheet and those that followed.

---

[146]    Yucaipa argues that it was not seeking a premium given that it was offering its equity stake for no consideration and its Second Lien debt for $1.00.  (*See, e.g.*, 13-50530, D.I. 958 (Yucaipa's Trial Brief) at 15).  This is neither persuasive nor relevant.  JCT was negotiating for Allied's assets through a credit bid of the First Lien debt.  It was never contemplated or suggested that Yucaipa should receive consideration for its equity position or junior debt.  Additionally, with respect to Second Lien debt holdings, there is no evidence that anything more than nominal consideration was ever contemplated, and JCT was also offering Spectrum $1.00 consideration for its $5 million Second Lien debt during the JCT Negotiations.

[147]    Professor Jonathan Macey — the Trustee's corporate governance expert — convincingly and credibly opined based on his decade of study of corporate governance and control change transactions that one would anticipate Allied and its Board "to vigorously engage with JCT and try to get a deal done" by, among other things "hiring advisors and the like." (3/4/22 p.m. Trial Tr. 12:22-13:9 (Macey/Direct)).  Tellingly, Professor Macey testified that in his decades of study and practical experience that he has never seen a scenario, such as this case, where the board of a distressed company takes no action in response to a potential proposal to explore the sale of substantially all of its assets.  (3/4/22 p.m. Trial Tr. 13:10-15 (Macey/Direct)).  The Court attributes this lack of any action to Yucaipa given its domination and control of the Company.

[148]    *See* 3/1/22 a.m. Trial Tr. 35:14-15 (Yucaipa Opening Statement) (emphasis added).

The evidence adduced at Trial reflecting that JCT's objective was to own Allied, not debt, included:

    i.    Theo Ciupitu — JCT's General Counsel responsible for managing JCT's legal dealings[149] — testified that "in 2011 and 2012," JCT's "goal was **not to acquire any debt**.  **The goal was to acquire Allied**."[150]

    ii.    Mr. Riggs testified that "the whole idea for [JCT] was the acquisition of [Allied] . . . whether we call it a purchase of the debt or an M&A deal or a transaction, the end game was to buy the debt and own the company and combine the entities, same as it has always been."[151]

    iii.    Mr. Riggs further testified: "*I was not in the debt investing business, I was in the business of running companies, so this whole thing was to try to get a package together*."[152]

115.    The Court finds that, for all practical purposes, JCT's efforts to purchase Yucaipa's and other's debt during the JCT Negotiations were a means to acquire Allied's assets and rejects Yucaipa's contention that this was a plain vanilla debt trade enabling Yucaipa to somehow evade fiduciary responsibility to the Company.  (*See* CL ¶¶ 198-201, below).

116.    Relatedly, the Court rejects Yucaipa's contention that the JCT Negotiations had no role for the Company.  This contention was unsupported by the evidence adduced at Trial.  Allied's cooperation was integral to every iteration of the various proposals during the JCT Negotiations. Every Term Sheet required Allied's cooperation in a Section 363 Sale which, as discussed above,

---

[149]    Dep. Tr. (Ciupitu) 21:21-22:11.

[150]    Dep. Tr. (Ciupitu) 37:15-16 (emphasis added).

[151]    *See* Dep. Tr. (Riggs) 234:8-235:6.

[152]    Dep. Tr. (Riggs) 236:3-6 (emphasis added).

Yucaipa admits required approval from the Company and its Board.[153]  The evidence reflects that Yucaipa — under the false pretext that was "in the position of controlling every tranche of the Company's capital structure" — never meaningfully sought Allied's input with respect Section 363 Sale aspect of JCT's proposals, notwithstanding this admission.[154]

117.    Critically, Yucaipa **admitted** at Trial that it was simply wearing its Yucaipa/Lender hat throughout the course of the JCT Negotiations.[155]  As discussed herein, Yucaipa used its control of Allied as an opportunity to negotiate in a manner that was most advantageous *to itself* in, among other things, transmitting the December 13 Counterproposal to achieve the best price for Yucaipa.[156]  As discussed below, this was one in a series of Yucaipa's breaches of its duty of good faith and loyalty owed to the Company.

118.    The evidence adduced at Trial reflects that Yucaipa relied on its domination and control of Allied to broker a transaction with JCT beneficial to its own self-interests by no later than December 13, 2011.

H.    **The Disparity of Offers During the JCT Negotiations and BD/S' Attempts to Have Fiduciary Duties Honored and Achieve a Fair Price and Fair Process**

119.    On December 15, 2011, JCT sent Ira Tochner and Derex Walker a revised Term

---

[153]    *See* Dep. Tr. (Walker Vol. II) 609:3-610:5 (a Section 363 Sale is "not a Lender decision.").

[154]    *See e.g.*, Ex. 804 (Email from JCT's counsel to Yuciapa's counsel negotiating Cooperation Agreement for Allied dated May 11, 2012).

[155]    *See* 3/2/22 a.m. Trial Tr. 105:5-10 (Tochner/Direct) (Q: "So you had your duties to Allied in mind when you were negotiating for the highest price . . . for Yucaipa's debt?" A: "No, no.  I would say that the highest price for the debt would be Yucaipa when I was doing this particular deal.").

[156]    *See* 3/2/22 a.m. Trial Tr. 93:18-19 (Tochner/Direct) ("my testimony is that at the time, we were negotiating for the best price for our debt."), 3/2/22 a.m. Trial Tr. 102:3-6 (Tochner/Direct) ("we're selling our debt for the best price that we can get and [Riggs] was going to structure it in a way that enabled him to somehow take control of Allied."); 3/3/22 a.m. Trial Tr. 85:15-16 (Burkle/Friendly Cross) ("[W]e tried to get the best price we could.").

Sheet countering Yucaipa's December 13 Counterproposal (the "**12/15/11 Revised Term Sheet**"). (Stip. Fact ¶ 35; Ex. 118).  JCT's 12/15/11 Revised Term Sheet reduced the "Purchased Debt Purchase Price" for First Lien holdings from the approximately $160.2 million, set forth in Yucaipa's December 13 Counterproposal, to $150 million consisting of: (1) $100 million cash, and (2) $50 million paid in "notes issued as part of a 'tack-on' financing under Jack Cooper' 12 ¾% Senior Secured Notes Due 2015" ("**JCT Notes**").[157]

120.    On December 18, 2011, JCT's 12/15/11 Revised Term Sheet was forwarded to representatives of BD/S.  (Stip. Fact ¶ 35; Ex. 99).

121.    On December 19, 2011, in anticipation of a meeting scheduled the next day at Black Diamond's offices in Greenwich, Connecticut, Mike Riggs sent Rich Ehrlich of Black Diamond and Jeffrey Schaffer attachments entitled "Allied Acquisition – Summary of Financial Impact Dec 19, 2011.pptx" and "JCT and Allied Combined.xlsx." (Stip. Fact ¶ 36).[158]  Mr. Rigg's attachments reflect, among other things, that JCT envisioned:

      i.     Giving Yucaipa a premium for its First Lien debt while discounting other Lenders, and a "total acquisition costs with fees" of $253 million.[159]

      ii.    Projected pro forma EBITDA results of a combined JCT and Allied "after Synergies" of: (1) $115 million "expected case," (2) $174 million "best case," and (3) $58 million "Worst Case Armageddon Scenario."[160]

---

[157]    Ex. 118 (Email from Theo Ciupitu to Ira Tochner and Derex Walker Re: Yucaipa/JC – revised Term Sheet dated December 15, 2011) at 3-4.

[158]    *See* PX Y (Email from Rich Ehrlich to Les Meier and Steve Deckoff forwarding Email from Mike Riggs FW: Jack Cooper Information – CONFIDENTIAL EMAIL #1 dated December 19, 2011).

[159]    PX Y at 13 (reflecting $5 million "premium" for Yucaipa and discounts for others, and a "total acquisition costs with fees" of $253 million).

[160]    PX Y at 14 (Pro forma results).

122.    On December 19, 2011, Theo Ciupitu of JCT also sent Rich Ehrlich and Jeffrey Schaffer a Term Sheet for a prospective purchase of Yucaipa, BD/S and CIT's debt holdings which contemplated bridge financing from Black Diamond.  (Stip. Fact ¶ 36; Ex. 90) (the "**12/19/11 Term Sheet**").

123.    On December 20, 2011, JCT met at Black Diamond's offices in Connecticut to discuss JCT's proposals and its goal of acquiring Allied.[161]  Participants at this meeting included Steve Deckoff and Rich Ehrlich, from Black Diamond, Jeffrey Schaffer, from Spectrum, and Mike Riggs, Theo Ciupitu and Kirk Ferguson from JCT.[162]

124.    Mr. Deckoff testified that JCT's proposal, presented on December 20, 2011, was not acceptable to BD/S because the terms were not equal and ratable and contemplated Yucaipa receiving a premium. This disparate treatment was unacceptable to Mr. Deckoff.[163]

125.    Mr. Deckoff further testified that if JCT's proposals over the course of the JCT Negotiations been equal and ratable with Yucaipa, he was prepared to support a transaction including by accepting certain conditions precedent within Black Diamond's control.[164]

126.    Mr. Burkle admitted during the course of the proceedings that any JCT transaction *should* have been equal and ratable.[165]  Notwithstanding Mr. Burkle's admission of what fairness

---

[161]    *See* 3/1/22 a.m. Trial Tr. 81:4-82:12 (Deckoff/Direct) ("[M]y recollection is, [JCT] walked through, you know, the terms of it with us.  And then, you know, in doing that deal, they wanted us to take back debt.  And then, they also wanted us to provide them financing.  So they were walking through with us, you know, some numbers in terms of financial performance and what they projected that the combined companies would do. I – my recollection is the purpose of it was to try to get us comfortable with making them the bridge loan.").

[162]    Dep. Tr. (Ciupitu) 61:10-62:6, 62:16-24.

[163]    3/1/22 a.m. Trial Tr. 80:25-81:5 (Deckoff/Direct).

[164]    *See generally* 3/1/22 a.m. Trial Tr. 86-87 (Deckoff/Direct).

[165]    *See* 3/3/22 a.m. Trial Tr. 24:11-15 (Burkle/Adverse Direct) (testifying that after Mr. Deckoff complained about not being treated *pari passu* he told him "he should be"); *see also* 3/3/22 a.m. Trial Tr. 22:11-23:24 (Burkle/Adverse Direct) (testifying that the conversation with Mr.

dictated (*pari passu*), there was no evidence that Yucaipa ever agreed to commit to equal and ratable treatment or deviate from the premium price it had negotiated with JCT.

### I.    CIT's Agreement in Principle With JCT

127.    On February 10, 2012, CIT agreed in principle to JCT purchasing its $35 million First Lien debt holdings and to facilitate JCT's credit bidding for substantially all of Allied's assets in a Section 363 Sale (the "**JCT/CIT Agreement**").[166]  The JCT/CIT Agreement contemplated CIT's First Lien debt to be purchased for "the greater of (x) US $20 million, or (y) an amount that would yield a recovery to CIT that is not less than the highest recovery obtained by any other lender under the Credit Agreement . . . Such consideration [to] be paid in cash upon execution and delivery of the Documentation."[167]  CIT's corporate representative testified that the deal was "a floor of $20 million, and if any other lender could negotiate a better price, CIT was essentially going to get a most-favored nations provision."[168]

### J.    Schulte's Letters to Board and Yucaipa's Continued Demand for a Premium

128.    On February 10, 2012, the same day CIT was reaching an agreement in principle with JCT, it was reported to Mr. Deckoff that JCT was nearing a deal with both Yucaipa and CIT, and that JCT no longer needed any bridge financing from Black Diamond.[169]  Mr. Deckoff testified

---

Deckoff regarding him being unhappy with Derex Walker and not being treated *pari passu* occurred during a lunch at a restaurant called Gemma in January 2011: "I told him, you're going to get treated just like I do.  And I didn't mean just on the debt.  I mean on information, on everything.").

[166]    Ex. 62 (Aliberto) (Email from Michael Aliberto to Michael Riggs Re: Term Sheet dated February 10, 2012).

[167]    *See* Ex. 62 (Aliberto) at 1-3 ("Purchased Debt," "Amount of Purchased Debt," and "Purchased Debt Purchase Price").

[168]    Dep. Tr. (Aliberto) 504:18-24.

[169]    Ex. 469 (Email from Richard Ehrlich to Steve Deckoff Re: Riggs dated February 10, 2012); *see also* 3/1/22 a.m. Trial Tr. 84:3-23 (Deckoff/Direct).

that this was concerning because he knew the contemplated transaction with Yucaipa included a premium on its First Lien debt: "[s]o I was concerned that they were going to . . . go ahead and do this, buy Yucaipa's debt, then they would have . . . control of the debt.  And then, ultimately, we wouldn't be treated fairly."[170]  In light of these concerns, Mr. Deckoff directed Adam Harris — BD/S' lawyer at Schulte Roth & Zabel at this time — to write Allied's Board and remind it of its fiduciary duties and the need to maximize value for all stakeholders.[171]

129.    On February 15, 2012, Adam Harris wrote to Allied's Board (the "**2/15/12 Letter**").[172]  Mr. Harris testified that the purpose of the 2/15/12 Letter was to "put the Board on notice that the manner in which they were conducting themselves at the time, in our view, was in violation of their fiduciary obligations given the financial circumstances of the company and the company's existing events of default, including payment defaults that had been extended for several years."[173]

130.    Mr. Harris' 2/15/12 Letter stated his understanding that Yucaipa: (1) "own[ed] more than 70% of the common equity of Allied," (2) "control[led] the Board of Directors and management" and (3) had "caused the Board of Directors and management to intentionally cause Defaults and Events of Default to occur and continue under the Credit Agreements, including the failure to pay interest and principal on the Obligations to the Lenders when due."[174]  Mr. Harris testified that no representative of Allied or Yucaipa ever denied these statements.[175]

---

[170]    3/1/22 a.m. Trial Tr. 84:16-23 (Deckoff/Direct).

[171]    3/1/22 a.m. Trial Tr. 84:17-85:11 (Deckoff/Direct).

[172]    Ex. 349 (Letter to Allied's Board of Directors from Adam Harris dated February 15, 2012).

[173]    3/2/22 a.m. Trial Tr. 9:9-15 (Harris/Direct).

[174]    Ex. 349 at 2 (Letter to Allied's Board of Directors from Adam Harris dated February 15, 2012).

[175]    3/2/22 a.m. Trial Tr. 11:16-2:17 (Harris/Direct).

131.    Mr. Harris concluded his 2/15/11 Letter stating:

<u>We are prepared to engage the Board of Directors immediately in a discussion regarding an appropriate restructuring and/or recapitalization of the Borrowers and Subsidiary Guarantors to preserve and protect the Company's assets, and to maximize the value available for all interested parties.</u>  As you are well aware, the Maturity Date of the Obligations under the First Lien Credit Agreement is May, 2012, and based upon the information available to us (including the recently revised 2012 projections) we do not believe the Borrowers or Subsidiary Guarantors will be in a position to pay the Obligations that become due on that date (resulting in a cross default under the Second Lien Credit Agreement).  Thus, <u>we believe a restructuring and/or recapitalization is inevitable.  If the Borrowers choose not to engage in this constructive and value preserving dialogue, our clients will take such actions as they deem necessary or appropriate to end the status quo and move forward towards a prompt resolution</u>. . . . <u>We look forward to hearing from you promptly.</u>[176]

132.    It is undisputed that the 2/15/12 Letter was received,[177] yet Mr. Harris testified that he received no response to BD/S' request to discuss a restructuring and/or recapitalization to "maximize the value available for all interested parties."[178]

133.    Despite the fact that the JCT Term Sheets being discussed contemplated the sale of substantially all of Allied's assets in a Section 363 Sale, and each required Allied's participation and support, there was no process set up for Allied to consider the proposed transaction in a manner that would be free of Yucaipa's domination and control.  The 2/15/12 letter, and the concerns raised by BD/S therein, were ignored.  And Yucaipa persisted in its efforts to finalize a Term Sheet with JCT whereby it would receive a premium on account of its First Lien debt.

134.    On February 21, 2012, Derex Walker sent a marked-up term sheet back to JCT (the

---

[176]    Ex. 349 at 3-4.

[177]    Dep. Tr. (Walker Vol. II) 692:4-11; *see also* 13-50530, D.I. 700-10 (Dep. Tr. (Tochner) 285:18-286:25 (testifying that he received the 2/15/11 Letter but had no recollection of the Board or any special committee of the Board meeting and discussing the letter).

[178]    3/2/22 a.m. Trial Tr. 14:19-15:7 (Harris/Direct) ("No.  The Board never took us up on this invitation for negotiations.").

"**February 21 Term Sheet**") which, among other things, modified the "Purchased Debt Purchase Price" for Yucaipa's First Lien debt from $145 million to $155 million.  (Stip. Fact ¶ 39).[179]

135.    On February 28, 2012, JCT provided comments to Yucaipa's February 21, 2012, Term Sheet.  JCT amended the "Purchased Debt Purchase Price" for Yucaipa's First Lien debt from $155 million to $150 million.  (Stip. Fact ¶ 40).[180]

136.    On March 5, 2012, Ira Tochner inadvertently sent an email to Mike Riggs making certain observations on JCT's most recent markup of the Term Sheet to Yucaipa.  In the email, Mr. Tochner states that Yucaipa should "stay tight on demanding $155 [million] and a cash breakup fee." (Stip. Fact ¶Dep. Ex. 638).[181]   Mike Riggs agreed to "to give in on the $155 [million]" following a discussion with Mr. Tochner later that day.[182]

137.    On March 7, 2012, Ira Tochner and Derex Walker met with Mike Riggs in Atlanta, Georgia, in an effort to negotiate final deal points with JCT.  (Stip. Fact ¶ 42).[183]

138.    On March 8, 2012, JCT sent Derex Walker and Ira Tochner a Term Sheet captioned

---

[179]    PX LLL at 5 (Email from Derex Walker to Mike Riggs and others Re: Yucaipa/Jack Cooper – Revised Term Sheet dated February 21, 2012) ("Purchased Debt Purchase Price").

[180]    Ex. 119 at 4 (Email from Theo Ciupitu to Derex Walker and Ira Tochner Re: Yucaipa/Jack Cooper – revised Term Sheet (February 28, 2012) dated February 28,2012) ("Purchased Debt Purchase Price").

[181]    13-50530, D.I. 700-10 (Dep. Tr. (Tochner) 279:4-281:3) (testifying that he inadvertently sent Ex. 638 to Mike Riggs stating that Yucaipa should "stay tight on demanding 155 [million].").

[182]    *See* PX CC at 3 (Email from Mike Riggs to Theo Ciupitu Re: $155 dated March 5, 2012).

[183]    *See* PX CC at 1 (Email from Ira Tochner to Mike Riggs dated March 6, 2012) ("We reviewed the term sheet and some issues still require some discussion.  Ron would like us to get in a room tomorrow and either sign a deal or move on. . . . So if its ok with you, we'll hop on a plane with the intention of meeting tomorrow."), *see also* Ex 121 (Email between Derex Walker, Ira Tochner and Mike Riggs including a list of deal points to discuss dated March 6, 2012); *see also* PX DD (Email from Ira Tochner to Mike Riggs Re: Meeting Time dated March 6, 2012).

"Confidential Term Sheet-Final Version 03/08/2012" (the "**JCT/Yucaipa Final Term Sheet**").[184]
The price for Yucaipa's First Lien debt in the JCT/Yucaipa Final Term Sheet was $155 million,
with $80 million paid in cash and $75 million in JCT Notes.  (Stip. Fact ¶ 43).[185]

139.    Later in the day on March 8, 2012, JCT separately sent BD/S a new Term Sheet
presenting two alternate payment options (the "**3/8/12 BD/S Term Sheet**").   Under the 3/8/12
BD/S Term Sheet, BD/S would receive either: (a) 70% of the principal amount of all FLCA claims
if they accepted 50% of consideration paid on a "First Closing Date" in JCT Notes, and the balance
in JCT Notes on a later date, or (b) 60% of the principal amount of all FLCA claims if they accepted
25% of consideration paid on a "First Closing Date" in JCT Notes, and the balance in cash on a
later date.[186]

140.    Mr. Deckoff testified that the 3/8/12 BD/S Term Sheet was unacceptable because
JCT "lowered the price to us and I believe they simultaneously increased the price to Yucaipa.  So
value [wa]s getting transferred from us to Yucaipa."[187]  Mr. Deckoff, however, testfied that he was
prepared to agree to a JCT transaction if it had been on equal and ratable terms.[188]

141.    Mr. Ciupitu's testimony confirms Mr. Deckoff's understanding that value was, in
fact, getting transferred from other Lenders to Yucaipa as the JCT Negotiations progressed: "[JCT]
looked at this as an M&A deal.  We equated requisite lender position similar to a control[]

---

[184]    Ex. 122 at 1 (Email from Theo Ciupitu to Derex Walker and Ira Tochner dated March 8,
2012) ("Thank you, Derex.  This Term Sheet is final.").

[185]    Ex. 122 at 6-7 ("Purchased Debt Purchase Price" and "Payment of Purchase Debt Purchase
Price").

[186]    Ex. 86 at 3-4 ("Purchased Debt Purchase Price," "Closing Dates," "Payment of Purchased
Debt Purchase Price – Payment Option 1," and "Payment of Purchased Debt Purchase Price –
Payment Option 2").

[187]    3/1/22 a.m. Trial Tr. 86:20-87:2 (Deckoff/Direct).

[188]    3/1/22 a.m. Trial Tr. 87:3-23 (Deckoff/Direct).

premium.  So . . . it made sense for us to placate [Yucaipa] and give them a premium."[189]

142.    Mr. Ciupitu further testified that any transaction to acquire the Company hinged on Yucaipa's participation given its purported status as Requisite Lender: "[t]he underlying transaction from Jack Cooper's perspective was to acquire Allied. . . . [N]ot having Yucaipa who held either the requisite lender position at the time and/or a large portion of the debt didn't make sense to proceed with the Black Diamond transaction without Yucaipa."[190]

143.    Responding to whether JCT would be willing to pay a premium if Yucaipa "in fact, was not a requisite lender," Mr. Ciupitu testified that he did not believe it would have.[191]

**K.    Yucaipa Thwarts BD/S' Efforts to Get a Fair Process and Equal Treatment**

144.    After receiving the 3/8/12 BD/S Term Sheet, BD/S instructed Adam Harris of Schulte to send another letter to Allied's Board "encouraging them to negotiate with Jack Cooper to get the best deal for everybody on an equal and ratable basis."[192]

145.    On March 22, 2012, Adam Harris sent a second letter to the Board (the "**3/22/12 Letter**").[193]

146.    The 3/22/12 Letter reminded the Board members that — whether in connection with a JCT transaction or any other restructuring — they were "required by the fiduciary duties they owe to Allied's creditors to establish a process to maximize the value of the sale of [Allied's]

---

[189]    Dep. Tr. (Ciupitu) 69:14-21; Dep. Tr. (Ciupitu) 70:1-7 ("Substantively for [JCT], it was an M&A deal.  It was a means to an end.  Structurally and technically . . . a two-step transaction with a debt trade, but from our perspective in 2011, 2012, the substance was an M&A deal.").

[190]    Dep. Tr. (Ciupitu) 75:16-22.

[191]    Dep. Tr. (Ciupitu) 175:12-21.

[192]    3/1/22 p.m. Trial Tr. 119:23-120:12 (Deckoff/Cross).

[193]    Ex. 350 (Letter from Adam Harris to The Board of Directors dated March 22, 2012).

assets for all creditors."[194]

147.    The 3/22/12 Letter continued that BD/S was "prepared to engage the Board of Directors immediately in a discussion to facilitate a transaction with JCT, or any other appropriate buyer, or on the terms of an appropriate restructuring[,]" and sought "immediate assurances from the Board of Directors that they will only pursue a transaction or restructuring that provides equal treatment to all creditors" and concluded that BD/S "look[ed] forward to hearing [back] promptly."[195]

148.    On March 30, 2012, Allied's General Counsel, John Blount, wrote a terse response stating that the Board "has not breached any fiduciary duties and has acted, and continues to act, in the best interests of Allied's stakeholders."[196]

149.    Mr. Tochner testified that he had no recollection of any Board or Special Committee meeting to address the 3/22/12 Letter.[197]

150.    On May 10, 2012, JCT sent BD/S a revised Term Sheet to acquire their Allied debt holdings and consummate a Section 363 Sale (the "**5/10/12 Term Sheet**").  The 5/10/12 Term Sheet offered a "Purchased Debt Purchase Price" for FLCA claims of 70% of the principal amount of claims held, with 50% paid in JCT Notes at a "First Closing," and the balance paid in JCT Notes at a "Second Closing."[198]  The 5/10/12 Term Sheet again contemplated JCT's purchase of

---

[194]    Ex. 350 at 2 (Letter from Adam Harris to The Board of Directors dated March 22, 2012).

[195]    Ex. 350 at 2-3 (Letter from Adam Harris to The Board of Directors dated Mach 22, 2012).

[196]    Ex. 639 (Letter from John Blount to Adam Harris dated March 30, 2012).

[197]    13-50530, D.I. 700-11 (Dep. Tr. (Tochner) 287:3-23) (testifying that he received the 3/22/12 Letter but had no recollection of any Board or Special Committee meeting held to address it).

[198]    Ex. 123 at 9-10 (Email from Theo Ciupitu to Jeffrey Schaffer Re: Revised Term Sheet with Black Diamond and Spectrum dated May 10, 2012) ("Purchased Debt Purchase Price" and "Payment of Purchased Debt Purchase Price.").

"substantially all of the assets of Allied, free and clear of all liens, claims, and other encumbrances, pursuant to a [Section 363 Sale]," and Allied's support and cooperation in connection therewith. The 5/10/12 Term Sheet further provided that the "363 Sale Purchase Price" was to be a "Credit bid of all lender claims against Allied under the First Lien Credit Agreement."[199]

151.    Yucaipa — having received the 2/15/22 Letter and the 3/22/12 Letter — was on notice at this time of BD/S' concerns that, among other things, (i) there was not a fair process put in place "to protect the interests of [Allied's] creditors and other stakeholders," and (ii) BD/S had not received any assurances that a transaction involving Allied would provide "equal treatment to all creditors."[200]    No evidence was adduced at Trial that BD/S' concerns were substantively addressed as of May 10, 2012.[201]

152.    At Trial, Mr. Tochner emphasized a provision in the JCT/Yucaipa Final Term Sheet contemplating that JCT, Yucaipa and Allied would sign "Definitive Agreements" simultaneously with definitive agreements also being entered among JCT, CIT, and BD/S.[202] According to Mr. Tochner, this provision protected BD/S by requiring that "everybody holds hands and agrees" to

---

[199]    Ex. 123 at 14 ("Structure of 363 Sale" and "Signing and Closing 363 Sale") (emphasis added).

[200]    *See generally* Exs. 349 (2/15/12 Letter) and 350 (3/22/12 Letter).  Because it is undisputed that Yucaipa received the Schulte letters dated February 15 and March 22, 2012, Mr. Tochner's testimony that Yucaipa "had no idea what was going on [BD/S'] side" of the JCT discussions is not credible.  (*See* 3/2/22 a.m. Trial Tr. 117:13-18 (Tochner/Adverse Direct) ("[JCT] had a negotiation going on here with Black Diamond and Spectrum and a separate one going on with us. We had no idea what was going on their side.  On []our side, we were simply negotiating for the best price.  That's all we were doing.")).

[201]    There are no Board Minutes in the record memorializing any meetings during the JCT Negotiations.

[202]    *See* Ex. 122 at 5 (definition of "Definitive Agreements"), 9 (definition of "Other Seller Definitive Agreements").

any deal with JCT at the end of the day.[203]  The provision, however, does not address establishing a fair process for Allied to maximize value to all stakeholders or ensure ratable treatment for Lenders.[204]    Additionally, there was no evidence presented by Yucaipa reflecting that the JCT/Yucaipa Final Term Sheet, or the contents of this provision, were ever sent to BD/S.

153.    Rather, the evidence reflects that Yucaipa simply proceeded towards finalizing definitive documentation with JCT by, among other things, having its lawyers negotiate a Cooperation Agreement between Allied, Yucaipa, and JCT supporting a Section 363 Sale.[205] Yucaipa did this without implementing any protections to address BD/S' concerns articulated in Mr. Harris' letters, such as using an independent restructuring committee or third-party advisors for Allied.  Mr. Riggs testified that his understanding was that he only ever needed to work with Yucaipa: "[I] was under the presumption that [Yucaipa] owned control of the debt and they owned control of the common stock . . . So there's no reason to work with anybody but [Yucaipa]."[206]

L.    **Yucaipa Never Agreed to Equal and Ratable Treatment**

154.    After receiving no substantive response to either the February 15 or March 22, 2012, letters to the Board, BD/S sought assurances directly from Yucaipa that it would agree to equal and ratable treatment to facilitate a transaction with JCT (or any other restructuring).  These

---

[203]    *See* 3/2/22 a.m. Trial Tr. 94:8-11 (Tochner/Adverse Direct).

[204]    Mr. Harris also correctly observed that BD/S "weren't third-party beneficiaries" to this provision, so "it wasn't a binding agreement" and "[Yucaipa] could have chosen to enforce or not enforce it . . . in their own discretion."  (3/2/22 a.m. Trial Tr. 61:16-62:4 (Harris/Cross)).

[205]    *See* Ex. 804 (Email from Lee Craig of Paul Hastings (JCT's counsel) to Derex Walker, Ira Tochner and Yucaipa's counsel at Latham & Watkins dated May 11, 2012) ("Attached please find revised drafts of the Debt Purchase Agreement, Cooperation Agreement and Note Purchase Agreement (each with redlines to the prior drafts distributed).").

[206]    Dep. Tr. (Riggs) 237:7-15; Dep. Tr. (Riggs) 254:12-17 (testifying that he had no recollection of ever meeting with any representatives of Yucaipa or Allied other than Ron Burkle, Derex Walker, and Ira Tochner during the JCT Negotiations).

discussions occurred between May 14 through May 17, 2012.

155.    Yucaipa contends that it agreed to equal and ratable treatment during these discussions.[207]  The evidence adduced at Trial does not support this contention.

156.    On May 14, 2012, Adam Harris of Schulte circulated a dial-in for a 9:45 p.m. EST call between representatives of BD/S and Yucaipa.[208]  On that call for Yucaipa were Derex Walker and Doug Teitelbaum (also of Yucaipa), Yucaipa's outside counsel, Rich Ehrlich of Black Diamond, and Adam Harris and his colleague Victoria Lepore.[209]

157.    Mr. Harris testified that the May 14 call "was to facilitate a discussion about getting equal and ratable treatment and allocation of [JCT] consideration as between Yucaipa, Black Diamond, and Spectrum[.]"[210]  During the call, Yucaipa acknowledged that it had, in fact, negotiated for a greater percentage return on its First Lien debt than what was being offered to BD/S, but it would not commit to equal and ratable treatment going forward in principle or otherwise.[211]

158.    On May 15, 2012, Mr. Harris sent dial-in details to Yucaipa and its representatives

---

[207]    13-50530, D.I. 958 (Yucaipa's Trial Brief) at 10 ("Yucaipa agreed to ratable treatment in an effort to reach a global deal with JCT") (citing Exs. 351, 472); *see also* 3/1/22 a.m. Trial Tr. 40:6-7 (Yucaipa Opening) ("Yucaipa had agreed to share in the debt purchase price ratably"); 3/1/22 a.m. Trial Tr. 45:2-5 (Yucaipa Opening) ("May 15, 2012, Yucaipa reiterates its agreement to contractually commit that BD/S receives equal and ratable treatment with Yucaipa and any transaction affecting the first lien debt."); "); 3/1/22 a.m. Trial Tr. 50:13-14 (Yucaipa Opening) ("Yucaipa did agree and the evidence will establish that."); 13-50530, D.I. 958 at 3 (Yucaipa's Trial Brief) ("Yucaipa agreed to re-negotiate its deal with JCT to satisfy BD/S' demand for 'ratable treatment' among the lenders.").

[208]    Ex. 713 at 2 (Email from Adam Harris to Rich Ehrlich, Derex Walker, and Doug Teitelbaum Re: Dial in for 9:45 pm call) ("Derex—Please arrange to have counsel on the phone. Thanks.").

[209]    3/2/22 a.m. Trial Tr. 18:18-23 (Harris/Direct).

[210]    3/2/22 a.m. Trial Tr. 19:3-12 (Harris/Direct).

[211]    3/2/22 a.m. Trial Tr. 19:14-23 (Harris/Direct).

for a call "at noon, with a tentative follow up for 2." Mr. Harris' email states:

> As a follow up to last night's discussion, please be prepared to advise whether Yucaipa is prepared to (a) compromise on the purchase price it had previously required from JCT in order to facilitate a transaction in which Yucaipa, Black Diamond and Spectrum would each receive equal and ratable treatment on account of their First Lien debt, and (b) confirm that Yucaipa will contractually commit to assure that Black Diamond and Spectrum will receive equal and ratable treatment with Yucaipa in any transaction affecting the First Lien debt (with JCT or anyone else).[212]

159.    Another call between the parties occurred mid-day EST on May 15, 2012. Mr. Harris testified that during the course of these discussions Yucaipa did not agree to commit to equal and ratable treatment, in principle or otherwise.[213] Yucaipa did not present any evidence to the contrary.[214]

160.    Following the call on May 15, 2012, Mr. Harris was asked by his clients to prepare an agreement for Yucaipa's consideration which memorialized BD/S' request for equal and ratable treatment of any transaction affecting Lenders. Mr. Harris drafted and circulated such an agreement on May 16, 2012 (the "**May 16 Draft Letter Agreement**").[215]

161.    Mr. Harris' cover email attaching the May 16 Draft Letter Agreement asked for comments from Yucaipa "by no later than 11 am NY time" on May 17, 2012, given a "12 noon expiration of the Yucaipa and Allied agreements regarding the commencement of any voluntary

---

[212]    Ex. 713 at 1 (Email from Adam Harris to Douglas Teitelbaum and others Re: My schedule dated May 15, 2012).

[213]    3/2/22 a.m. Trial Tr. 21:21-22:3 (Harris/Direct).

[214]    Mr. Tochner testified that he was not a participant on these calls, and could not say affirmatively that Yucaipa agreed to commit to equal and ratable treatment. (*See* 3/2/22 p.m. Trial Tr. 94:3-95:5 (Tochner/Adverse Redirect); *see also* 3/2/22 p.m. Trial Tr. 68:21-23 (Tochner/Friendly Cross) ("I can't recall being on these calls. I can't – I can't picture it. I just don't remember being on those calls.")). Mr. Burkle also testified that he was not a participant on these calls. (*See* 3/3/22 a.m. Trial Tr. 28:8-17 (Burkle/Adverse Direct)).

[215]    Ex. 265 at 3-15 (May 16 Draft Letter Agreement); *see also* 3/2/22 a.m. Trial Tr. 22:4-17 (Harris/Direct).

chapter 11 cases."[216]  This "standstill" agreement was reached at the outset of the May 14 to 17,

2012, discussions to address BD/S' concern that Yucaipa would not cause Allied to preemptively

commence a bankruptcy in Atlanta while discussions between the parties were underway.[217]

162.    On May 17, 2012, at 12:50 a.m. EST, Derex Walker wrote Rich Ehrlich that "Ron

[Burkle] is reaching out to Steve Deckoff" and that they would "be in touch re: the lock-up after

they've connected."[218]  However, by 11:00 a.m. EST time on May 17, 2012, Mr. Deckoff had not

heard from Mr. Burkle, nor had Yucaipa provided any comments to the May 16 Draft Letter

Agreement.    At 11:50 a.m. EST, Mr. Harris' colleague (Victoria Lepore) wrote Yucaipa

representatives and their counsel:

> We have not received any comments from you on the draft agreement we
> distributed last night.  Nor have we received any written indication that
> Yucaipa and Allied have agreed to extend the representations previously
> given regarding the commencement of voluntary chapter 11 cases.  Further,
> despite representations that principals to Yucaipa would be reaching out to
> principals of Black Diamond, no such communication has been made.  As
> a result, unless we receive extension agreements from each of Yucaipa and
> Allied by 12 noon today, the clients have authorized us to file the
> involuntary petitions.
>
> This information has already been conveyed to Kasowitz and Black
> Diamond has tried to reach Derex Walker by telephone as well.
>
> We look forward to your response.[219]

163.    Around 12 p.m. EST on May 17, 2012, Yucaipa and Allied each agreed to extend

the standstill agreement — that they would not cause the Company to file for bankruptcy — until

---

[216]    Ex. 265 at 1 (Email from Adam Harris to Ira Tochner and others Re: Allied dated May 16, 2012).

[217]    3/2/22 a.m. Trial Tr. 22:18-23:23-9 (Harris/Direct) (the deadline "was agreed to by the parties as part of an overall conversation.").

[218]    Ex. 475 (Email from Derex Walker to Rich Ehrlich Re: Allieed [sic] dated May 17, 2012).

[219]    DX L at 3 (Email from Victoria Lepore to Ira Tochner and others Re: Allied dated May 17, 2012).

5:00 p.m. EST that day.[220]  Derex Walker also provided further assurances that Mr. Burkle would be reaching out to Mr. Deckoff.[221]

164.    Mr. Deckoff testified that he was aware that Mr. Burkle was supposed to call before 5:00 p.m. on May 17, 2012, and that he was in the office "waiting for this phone call and the phone call shockingly never came."[222]

165.    Yucaipa did not provide any comments on the May 16 Draft Letter Agreement either before the 5:00 p.m. deadline or thereafter.[223]  Per Ms. Lepore's email earlier that day, BD/S therefore filed an involuntary bankruptcy petition for Allied at 5:45 p.m. on May 17, 2012.[224]  This was in order to "create[] a court supervised process."[225]

166.    Mr. Harris testified that, from BD/S' perspective, a bankruptcy "was necessary to have the Board of Directors and Yucaipa as the majority equity holder [] become more responsive to their fiduciary responsibilities to all creditors, generally" and, separately, "it creates a process to facilitate a reorganization and recapitalization of the company, whether through a standalone or

---

[220]    PX NNN at 1 (Email from Adam Grant to Adam Harris dated May 17, 2012 at 12:04 p.m.) ("This will confirm our agreement to extend the agreement below to 5 PM today, NY Time."); PX OOO (Email from John Blount to Derex Walker and others dated May 17, 2012 at 12:05 p.m. EST) ("Agreed on behalf of Allied").

[221]    *See* DX L at 2 (Email from Rich Ehrlich to Jeffrey Schaffer Re: Allied dated May 17, 2012 at 1:09 PM) ("Derex said that Ron knows to call Steve…"); Ex. 477 (Email from Rich Ehrlich to Steve Deckoff Re: Burkle at 3:49 p.m.) ("Spoke to Derex.  He said that Ron should have called in the last few minutes or will be calling shortly.").

[222]    3/1/22 p.m. Trial Tr. 181:5-10 (Deckoff/Cross); *see also* /1/22 p.m. Trial Tr. 181:13-15 (Deckoff/Cross) (explaining that "Mr. Burkle knows my cell phone number, and Mr. Burkle also knows my office number, and Mr. Burkle has left messages with my secretary before.").

[223]    3/2/22 a.m. Trial Tr. 24:10-14 (Harris/Direct) ("Not prior to 5:00 p.m.  Not ever.").

[224]    DX B (Notice of Bankruptcy Case Filing).

[225]    3/2/22 a.m. Trial Tr. 28:14-18 (Harris/Direct).

a sale, that could benefit the company in the long term as well as the parties in interest."[226]

167.    At the time BD/S filed the involuntary bankruptcy petition, they also filed an expedited motion for the appointment of a Trustee.  Consistent with Mr. Harris' testimony, BD/S argued at that time, among other things, that "Yucaipa's position as majority shareholder and purported controlling First Lien Lender, and its control of the Allied board of directors . . . and senior management, create conflicts of interest that prevent [Allied] from discharging their fiduciary duties" and that Allied was "undeniably under the control of Yucaipa, whose many roles relative to [Allied] will inevitably lead to the untenable situation of Yucaipa negotiating the terms of any restructuring with itself."[227]

168.    Following commencement of the Bankruptcy, none of Yucaipa's representatives who had participated in the calls between May 14 to 17, 2012, communicated to BD/S or its representatives that there had been any misunderstanding and that Yucaipa had, in fact, agreed in principle to equal and ratable treatment for any JCT transaction.[228]

169.    Allied subsequently consented to the Bankruptcy and Allied and certain affiliates filed voluntary Chapter 11 Petitions.

---

[226]    3/2/22 Trial Tr. 28:14-29:2 (Harris/Direct).

[227]    12-11564, D.I. 13 at 2, 3.

[228]    Mr. Burkle does not deny having never called Mr. Deckoff on May 17, 2012 before the agreed-upon deadline at 5:00 p.m. EST.  At Trial, Yucaipa attempted to impeach with an email from Mr. Burkle to Mr. Deckoff two days later stating that he "called a couple of times and missed you." (See 3/1/22 p.m. Trial Tr. 179:10-180:4 (Deckoff/Cross); DX TTT (Email from Ron Burkle to Steve Deckoff dated May 19, 2012)).  At this point in time, it is not disputed that BD/S had attempted to get Yucaipa and the Allied Board to agree to a fair process for at least months, and there was an agreed-upon deadline for a response to the May 16 Draft Letter Agreement that came and passed.

**M.      Yucaipa's Response to Allied's Bankruptcy, Increased Costs, and JCT's Eventual Purchase of Substantially All of Allied's Assets in Late 2013**

170.    Following commencement of the Bankruptcy, JCT remained interested in acquiring Allied.[229]  If Yucaipa agreed to equal and ratable treatment for any JCT transaction — as it claims it had — it was not prevented from proceeding along these lines following the filing of the Bankruptcy.[230]

171.    However, as Mr. Harris testified — and the Court observed over the history of this litigation — "the reaction of Yucaipa and the company to the involuntary was not to work cooperatively with [BD/S], but rather to retreat to a corner and effectively start what became almost 18 months of litigation[.]"[231]

172.    Yucaipa's proliferation of litigation post-Bankruptcy resulted in increased: (i) professional expenses, (ii) reimbursable Lender expenses (pursuant to § 10.2 of the FLCA), and (iii) DIP financing.  This decreased the value of the Estate and recovery for its stakeholders.

173.    During the Bankruptcy, Yucaipa continued to claim it was the Requisite Lender and no evidence was adduced at Trial that it took any measures to address conflicts of interest.

174.    The evidence shows that post-Bankruptcy:

   i.    The Board never considered whether Yucaipa-affiliated directors should recuse themselves from any matters.[232]

   ii.    Yucaipa continued to negotiate for benefits for itself (such as millions of dollars

---

[229]    3/2/22 a.m. Trial Tr. 27:9-28:12 (Harris/Direct); Ex. 128 at 10 (Email from Jesse Austin (JCT's counsel) to Adam Harris Re: Allied dated May 17, 2012) ("My client still wants to buy the company.").

[230]    *See* 3/22/22 a.m. Trial Tr. at 26:4-27:2 (Harris/Direct).

[231]    *See* 3/22/22 a.m. Trial Tr. at 29:9-13 (Harris/Direct).

[232]    Dep. Tr. (Cullen) 246:22-247:4.

in consulting arrangements in a potential JCT transaction).[233]

iii.   Yucaipa maintained it had the right to direct a credit bid whereby the Company

would emerge with Yucaipa remaining its controlling shareholder.[234]

175.    In September 2013 — after it was judicially determined that Yucaipa caused Allied

to enter into the Fourth Amendment, which was "flatly prohibited" under the Credit Agreement

and therefore was not the Requisite Lender (*see* FF ¶ 78, above) — an auction for Allied's assets

was held under 11 U.S.C. § 363.  (Stip. Fact ¶60).[235]

176.    At this action, JCT submitted a bid to buy substantially all of Allied's assets for

$135 million which the Court approved. (Stip. Fact. ¶ 61).[236]

177.    The JCT 363 Sale closed on December 27, 2013. (Stip. Fact. ¶ 62).[237]

## CONCLUSIONS OF LAW

### A.    Jurisdiction and Venue

178.    The Court has jurisdiction over this matter, pursuant to 28 U.S.C. § 1334.

179.    The Court has statutory and constitutional authority to enter final orders and

judgments in this adversary proceeding with respect to Estate Claims 1-2 and Lender Claim 1

---

[233]    Dep. Tr. (Ciuputi) 183:19-185:6.

[234]    Ex. 642 at 2 (Minutes of Yucaipa Advisory Boards held on October 23, 2012); *see also* Ex. 715 at 2 (Ira Tochner LP Meeting notes to himself re: same dated October 23, 2012) (emphasis added).

[235]    PX XX (Transcript of Auction dated September 11, 2013); PX YY (Transcript of Auction dated September 12, 2013).

[236]    *See* 12-11564, D.I. 1837 (Sale Order dated September 17, 2013); DX Z (copy of same). BD/S as confirmed Requisite Lenders placed a successful credit bid for $5 million for certain real estate assets on behalf of the First Lien Lenders.  (*See* 12-11564, D.I. 1868) (Order Authorizing and Approving Sale of Assets dated September 30, 2013).

[237]    *See* 12-11564, D.I. 2127 (Report of Sale of Debtors' Assets dated December 31, 2013); DX BB (copy of same).

(Equitable Subordination) and Estate Claim 7 (Breach of Fiduciary Duty).

180.    Estate Claims 1-2 and Lender Claim 1 are core claims pursuant to 28 U.S.C. § 157(b).

181.    With respect to Estate Claim 7, Yucaipa's actions over the history of the Estate Action demonstrate its clear consent for this Court to issue final orders and judgments in the Estate Action.[238]

182.    These findings and conclusions reflect the Court's recommendations with respect to Lender Claim 3 (Breach of the Implied Duty of Good Faith and Fair Dealing).

## B.    Yucaipa Breached its Fiduciary Duty

183.    "A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty."[239]   The Trustee established that Yucaipa controlled Allied and its Board, purported to fully control Allied's equity and debt, and that it abused its position of control by failing to act with the utmost loyalty and fairness required, and this culminated in a lost JCT deal during the JCT Negotiations.

184.    This resulted in significant harm to the Estate for which Yucaipa is liable.

### i.    *Yucaipa Indisputably Owed Fiduciary Duties to Allied for the Benefit of All Residual Claimants, Including Creditors*

185.    It is undisputed that Yucaipa owed a fiduciary duty to Allied.[240]   It is also

---

[238]    *See* 13-50530, D.I. 864 at 30:2-10; *see also Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 684-86 (2015) (litigants can consent to bankruptcy court orders by express or implied consent).

[239]    *In re NSC Wholesale Holdings LLC*, 637 B.R. 71, 85 (Bankr. D. Del. 2022) (Sontchi, J.).

[240]    Summary Judgment Opinion at 75 n.209 (citing *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994) ("[A] shareholder owes a fiduciary duty … if it owns a majority interest in or exercises control over the business affairs of the corporation.")).

undisputed that Allied was insolvent from early 2008 forward.[241]

186.    Under longstanding principles of Delaware law, when a corporation becomes insolvent, its fiduciaries owe duties "to the corporation for the benefit of all of its residual claimants, a category which now includes creditors."[242]  Thus, Yucaipa owed fiduciary duties to Allied for the benefit of all its residual claimants, including Allied's secured and unsecured creditors, at all relevant times.

### ii.    *Yucaipa's Self-Dealing Torpedoed a Potential JCT Transaction*

187.    "[T]he premise of controlling stockholder fiduciary responsibility is to hold the controller liable for actions it[] causes using its control of the company's board … ."[243]  In a scenario where "a controlling shareholder does not set the terms of a transaction unilaterally, use confidential corporate information in the negotiation process, or otherwise use his power to impede or impair the effectiveness of a negotiation, he has not used his power to impair the normal and primary protection that the law affords the corporation and its shareholders: the judgment of its independent board of directors."[244]  On the other hand, a controller that "intentionally subvert[s]"

---

[241]    *See* Summary Judgment Opinion at 51 n.130 ("Yucaipa's expert concedes that Allied was insolvent by early 2008.") (citing, *inter alia*, Ex. 805 (Fischel Report) ¶19)).

[242]    1 R. FRANKLIN BALOTTI ET AL., DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS § 4.16[E][4] (4th ed. Supp. 2022).  *See also, e.g.*, *In re BMT-NW Acquisition, LLC*, 582 B.R. 846, 863 (Bankr. D. Del. 2018) ("[W]hen the Debtor reached insolvency, Broad Street [the Debtor's sole member and fiduciary] would then be obligated to exercise its control and influence over the Debtor for the benefit of the Debtor's creditors.").

[243]    *Shandler v. DLJ Merch. Banking, Inc.*, No. C.A. 4797-VCS, 2010 WL 2929654, at *16 (Del. Ch. July 26, 2010); *see also In re CNX Gas Corp. S'holders Litig.*, C.A. No. 5377-VCL, 2010 WL 2291842, at *15 (Del.Ch. May 25, 2010) ("[D]irector primacy remains the centerpiece of Delaware law, even when a controlling stockholder is present.").

[244]    *Cinerama, Inc. v. Technicolor, Inc.*, No. Civ. A. No. 8358, 1991 WL 111134, at *20 (Del. Ch. June 24, 1991), *aff'd in part, rev'd in part on other grounds sub nom. Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993), *decision modified on reargument*, 636 A.2d 956 (Del. 1994), and *abrogated by Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110 (Del. 1994).

a board of directors from exercising its independent business judgment breaches its fiduciary duty.[245] This case falls into the latter category.

188.    The evidence adduced at Trial demonstrates that Yucaipa exploited its control over Allied to demand a premium price for First Lien debt throughout the JCT Negotiations.    At all relevant times, Allied was hopelessly insolvent and under the direct control of Yucaipa.  Yucaipa dominated every aspect of Allied's capital structure and business.  (*See, e.g.*, FF ¶¶ 52-53, 68).  It was Allied's controlling shareholder, held a majority of its First and Second Lien debt, illegitimately claimed the status of Requisite Lender through its bad faith acquisition of First Lien debt, and it hand-picked Allied's CEO. (*See, e.g.*, FF ¶¶ 48-49, 51-53, 68).  When JCT — a committed suitor that had been pursuing Allied for years — offered to purchase Allied's assets in a Section 363 Sale in late 2011, Yucaipa should have used its control to initiate a process to lock in a lucrative transaction on equal terms for Allied's Lenders.[246]

189.    Rather than exploiting JCT's interest to benefit Allied and its stakeholders, Yucaipa exploited Allied in an effort to extract a premium for itself.

190.    Allied's cooperation was integral to every iteration proposed during the JCT

---

[245]    *See Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1062 (Del. Ch.) (ultimate controlling stockholder and chairman of the board who "intentionally subverted" an independent process created to sell company assets breached his fiduciary duty to the company), *judgment entered*, No. 183-N, 2004 WL 5322715 (Del. Ch. Mar. 4, 2004), and *aff'd*, 872 A.2d 559 (Del. 2005); *Hollinger Inc. v. Hollinger Int'l, Inc.*, 858 A.2d 342, 387 (Del. Ch. 2004) ("The reality is that controlling stockholders have no inalienable right to usurp the authority of boards of directors that they elect. … Like other stockholders, a controlling stockholder must live with the informed (i.e., sufficiently careful) and good faith (i.e., loyal) business decisions of the directors unless the DGCL requires a vote. That is a central premise of our law, which vests most managerial power over the corporation in the board, and not in the stockholders.").

[246]    This is not to say that late 2011 was the *first* time that JCT's interest in acquiring Allied implicated Yucaipa's fiduciary duty to Allied.  In fact, only months before, JCT had written Mr. Walker in his capacity as Allied's Chairman with an offer to acquire Allied's assets.  *See* Ex. 107 (Email from Mike Riggs to Rich Ehrlich and Derex Walker Re : Allied 363 Letter of Intent from TM Riggs 5-9-11.doc dated May 9, 2011)).

Negotiations.  Every Term Sheet required Allied's cooperation in a Section 363 Sale which, as discussed above, Yucaipa's 30(b)(6) witness admitted required Company approval.  (FF ¶¶ 103, 116).

191.    Nevertheless, the evidence demonstrates that Yucaipa — under the false pretext that it was "in the position of controlling every tranche of the Company's capital structure" — never meaningfully sought Allied's input with respect Section 363 Sale.[247] (*See e.g.*, FF ¶¶ 68, 86-87, 102, 113).  Confronted with the unfairness of this process, the Yucaipa representatives in control of Allied's Board did nothing.  By removing Allied from this process, Yucaipa ensured that there would be no deal for Allied's assets unless JCT agreed to Yucaipa's terms, which included its demand for a premium price for its First Lien debt.[248]

192.    In this respect, the Court agrees with Professor Macey's opinion that Yucaipa wielded its control over Allied as bargaining power that reflected "inappropriate favoritism" to Yucaipa as the controlling shareholder.[249]  Under Delaware law, this is the "essence" of a breach of the duty of loyalty.[250]

---

[247]    The evidence adduced at Trial reflects that Mr. Walker was primarily responsible for Yucaipa's strategy with respect to its Allied investment, including the JCT Negotiations.  Mr. Walker's conduct is imputed to Yucaipa.  *See, e.g.*, *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1062 (Del. Ch.) (controlling shareholder "is, regrettably, not an innocent bystander to [its principal]'s breaches of fiduciary duty" as the principal "felt free to and did act for [controlling shareholder]—as in function both its principal and agent—in a manner that was obviously inconsistent with the duties [that principal] owed [to the subsidiary].")*, judgment entered*, No. 183-N, 2004 WL 5322715 (Del. Ch. Mar. 4, 2004), and *aff'd*, 872 A.2d 559 (Del. 2005).

[248]    Riggs' testimony on this point is revealing: "If you think they own control of the common stock, you think they own control of the senior debt, ***who else would you work it with***." (*See* Dep. Tr. (Riggs) 237:25-238:8) (emphasis added).

[249]    3/4/22 p.m. Trial Tr. 14:13-15:10 (Macey/Direct).

[250]    *Steiner v. Meyerson*, Civ. A. No. 13139, 1995 WL 441999, at *2 (Del. Ch. July 19, 1995) ("The essence of a duty of loyalty claim is the assertion that a corporate officer or director has misused power over corporate property or processes in order to benefit himself rather than advance corporate purposes."); *see also In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 755, 760

193.    Yucaipa's breach deprived Allied and its stakeholders of the benefits that would have flowed from a transaction with JCT in late 2011/early 2012.  Fair and ratable treatment for creditors in the JCT Negotiations was the cardinal principle urged in multiple communications from BD/S to Yucaipa — in numerous letters, emails, and phone calls throughout the JCT Negotiations.  (*See, e.g.*, FF ¶¶ 129-31, 156-63).  Mr. Burkle also admitted that Allied's creditors were "entitled to *pari passu*" treatment in the JCT Negotiations, that *pari passu* treatment for all creditors is "what [he] would have done," and what he instructed his team to do.[251]  Nevertheless, the evidence adduced at Trial demonstrates that Yucaipa never agreed to equal and ratable treatment.[252]

194.    This effectively ended the negotiations, causing damage to Allied and its stakeholders.[253]

---

n.487 (Del. Ch. 2005) (The duty of loyalty requires "true faithfulness and devotion" to the interests of the corporation, particularly in cases involving "an imperial … controlling shareholder with a supine or passive board."), *aff'd*, 906 A.2d 27 (Del. 2006).

[251]    13-50530, D.I. 700-11 (Burkle (Dep. Tr.) 173:8-175:20).

[252]    Yucaipa's sole evidence in support of its assertion that it offered fair, equal, and ratable treatment to BD/S prior to the Bankruptcy is a May 16, 2012 email from BD/S' counsel to Yucaipa and its counsel circulating the May 16 Draft Letter Agreement.  However, the Court agrees with Mr. Harris, who testified that "[t]here's nothing in this document that suggests [Yucaipa] agreed" to equal and ratable treatment.  The Court also finds Mr. Harris's testimony that Yucaipa never agreed to equal ratable treatment to be credible. (*See* 3/2/22 a.m. Trial Tr. 25:24-26:3 (Harris/Direct)).

[253]    In support of its argument that BD/S was responsible for ending the JCT Negotiations, Yucaipa points to an email from May 17, 2012, from Mr. Ehrlich to Mr. Ciuputu informing him that "[a]t this time, [BD/S] have decided not to continue with negotiations." (*See* Ex. 88).  The email is after the 5:00 p.m. EST agreed upon deadline for a response, and after Mr. Deckoff had still not heard from Mr. Burkle.  (FF ¶ 164).  The email therefore only reflects that by this time, BD/S had concluded that Yucaipa was not going to agree to *pari passu* treatment and were finalizing the Bankruptcy it told Yucaipa it would file earlier that day if it did not receive a response.

C.      **Yucaipa's Defenses To The Breach of Fiduciary Duty Claim Are Unavailing**

195.    Yucaipa does not dispute that it failed to facilitate an independent,
value-maximizing process for the sale of Allied's assets in the course of the JCT Negotiations.
Rather, Yucaipa's principal defense to the Trustee's breach of fiduciary duty claim at Trial was
that its fiduciary duty was not implicated in the context of the JCT Negotiations because "JCT was
interested in buying Allied debt, not its assets."[254]  Thus, Yucaipa claims, it was free to negotiate
with JCT wearing its Lender hat without regard to fiduciary duties owed as a controlling
shareholder.  To this end, Yucaipa relies heavily on *Odyssey Partners, L.P. v. Fleming Cos.*, 735
A.2d 386 (Del. Ch. 1999), and similar holdings.  As discussed below, Yucaipa was not entitled to
disregard its fiduciary duties.  Even putting aside that Yucaipa acquired its debt illegitimately and
in bad faith, JCT was never proposing a plain vanilla debt deal.  It wanted to acquire Allied.  For
this reason, and others addressed below, *Odyssey Partners* is readily distinguishable.

196.    Yucaipa's also suggests that its actions should be subject to a deferential business
judgment standard.  Not so.  Its self-dealing implicates the entire fairness standard whereby
Yucaipa must demonstrate its actions were entirely fair to the Company and its residual
claimants.[255]  Yucaipa did not carry this heavy burden at Trial.

197.    Finally, Yucaipa's arguments that the Trustee has failed to establish causation in
this case are unavailing.  Under Delaware law Yucaipa, as the wrongdoer, bore the burden of
establishing there was no likelihood of a JCT transaction and the causation requirements are

---

[254]    *See* 3/1/22 a.m. Trial Tr. 35:14-15 (Yucaipa Opening).

[255]    *See, e.g.*, *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1242 (Del. 2012) ("Delaware has
long adhered to the principle that the controlling shareholders have the burden of proving an
interested transaction was entirely fair.").

loosened.[256]  Again, Yucaipa did not carry this burden at Trial.

        *i.*       ***The JCT Term Sheets Were Not Plain Vanilla Debt Transactions***

198.    Yucaipa's assertion that JCT was not interested in buying Allied's assets is belied by the terms of the December 9 Term Sheet and those that followed.  As discussed, each of JCT Term Sheets makes clear that the objective of the transaction was for JCT to "purchas[e] substantially all of the assets of Allied, free and clear of all liens, claims and other encumbrances" pursuant to a Section 363 Sale by "[c]redit bid[d]ing all claims against Allied under the First Lien Credit Agreement."  (*See, e.g.*, FF ¶¶ 109, 150).

199.    Further, every Term Sheet considered during the JCT Negotiations required Allied's cooperation in a Section 363 Sale which, Yucaipa admits required Company approval. (*See, e.g.*, FF ¶ 116).

200.    Messrs. Ciupitu, and Riggs each testified that, contrary to Yucaipa's contentions, they did not view the proposed transaction as a plain vanilla debt acquisition.  On the contrary, JCT's "goal was not to acquire any debt.  The goal was to acquire Allied." (*See, e.g.*, FF ¶ 114).

201.    Accordingly, the Court rejects Yucaipa's contention that JCT was simply interested in acquiring Allied's debt, and not its assets.  Its fiduciary duties to Allied and its stakeholders were undoubtedly implicated in the JCT Negotiations.

        *ii.*       ***Odyssey Partners* Is Inapposite**

202.    Yucaipa relies heavily on *Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386 (Del. Ch. 1999) to argue that it was not restricted from protecting its rights as a creditor by virtue

---

[256]    *See, e.g.*, *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1181 (Del. Ch. 1999), *as revised* (Nov. 16, 1999) (some likelihood of a deal is sufficient basis of damages once a breach of fiduciary duty is established), *aff'd*, 766 A.2d 437 (Del. 2000); *Hampshire Grp., Ltd. v. Kuttner*, C.A. No. 3607-VCS, 2010 WL 2739995, at *50 (Del. Ch. July 12, 2010) (a duty of loyalty breach "loosen[s] the stringent requirements of causation and damages.").

of being Allied's controlling shareholder. However, *Odyssey Partners* illustrates why Yucaipa indisputably owed a fiduciary duty to Allied and its stakeholders in the course of the JCT Negotiations.

203.    The plaintiffs in *Odyssey Partners* alleged that a majority shareholder breached its fiduciary duty by (i) hindering the company's search for capital; (ii) acquiring the company's first lien credit facility; and (iii) initiating foreclosure proceedings on the first lien credit facility and acquiring the remainder of the company's equity in a credit bid.[257] The Chancery Court held that there was no breach, as (i) the majority shareholder did not "control" the board, and therefore was not responsible for the board's inability to secure capital; (ii) there was no evidence "that [the majority shareholder] used its position as [the company]' largest stockholder" to acquire the company's first lien facility; and (iii) in initiating foreclosure proceedings, the majority shareholder exercised its statutory rights as a creditor, which did not invoke its fiduciary duty.[258]

204.    In this case, unlike *Odyssey Partners*, Yucaipa was not simply Allied's majority shareholder: it dominated and controlled Allied.  Further, as this Court previously held, Yucaipa, acting in bad faith, used its control over Allied to acquire its First Lien debt and purported Requisite Lender status.[259]  Thus, unlike the majority shareholder in *Odyssey Partners*, Yucaipa's rights as a creditor "derive[d] from the circumstances or conditions giving rise to [its] fiduciary obligation in the first instance."[260]  Having acquired its Requisite Lender status in bad faith, Yucaipa was prohibited from using that status to subsequently leverage a premium price on that same, unlawfully acquired, debt to the detriment of Allied's legitimate creditors.

---

[257]    *Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386, 415-16 (Del. Ch. 1999).

[258]    *Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386, 411-12, 415 (Del. Ch. 1999).

[259]    Summary Judgment Opinion at 102.

[260]    *Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386, 415 (Del. Ch. 1999).

205.   Even assuming Yucaipa legitimately acquired its Requisite Lender status (it did not) "Delaware law does not countenance a director's misuse of his fiduciary position for his benefit as a creditor."[261]   In *Odyssey Partners*, there was no misuse by the majority shareholder because the foreclosure sale that it initiated was a "statutory process" that "did not require [the company] directors' approval."[262]  Here, in stark contrast, every iteration of the Term Sheets in the JCT Negotiations required the Allied Board's cooperation and approval.  For the reasons discussed above, Yucaipa misused its control over the Board by preventing it from initiating a value-maximizing transaction for the benefit of all of Allied's stakeholders.[263]

### iii.      *The Entire Fairness Standard — Not Business Judgment Rule — Applies*

206.   Yucaipa also contends that if the Court determines a fiduciary duty was owed to Allied in the context of the JCT Negotiations, its conduct is entitled to review under the deferential business judgment standard.  However, "if the Court finds facts evidencing disloyalty by the defendant, the business judgment rule is rebutted, and the Court reviews the transaction to determine whether, despite the disloyal act, the transaction is nevertheless entirely fair to the Company's shareholders."[264]  "[A]n entire fairness standard of review is appropriate where the controlling stockholder has actually used its power over the corporation 'to impair the normal and

---

[261]   *Cox v. Crawford-Emery*, No. C.A. 3202-VCN, 2007 WL 4327775, at *4 n.26 (Del. Ch. Nov. 30, 2007).

[262]   *Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386, 414 (Del. Ch. 1999).

[263]   Yucaipa's misconduct distinguishes this case from *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584 (Del. Ch. 1986) on the same grounds.  *See Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986) (The law "does not, **absent a showing of culpability**, require that directors or controlling shareholders sacrifice their own financial interest in the enterprise for the sake of the corporation or its minority shareholders") (emphasis added).

[264]   *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1178 (Del. Ch. 1999), *as revised* (Nov. 16, 1999), *aff'd*, 766 A.2d 437 (Del. 2000); *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1162 (Del. 1995). ("Where … the presumption of the business judgment rule has been rebutted, the [fiduciary's] action is examined under the entire fairness standard.").

primary protection the law affords the corporation and its stockholders; the judgment of its independent board of directors.'"[265]  This applies regardless of whether a transaction is ultimately consummated.[266]  Because the Court has determined that Yucaipa engaged in self-dealing by exploiting its control over Allied during the JCT Negotiations, the entire fairness standard of review applies to this transaction.[267]

207.    The record demonstrates that Yucaipa's conduct during the JCT Negotiations was not entirely fair to the Company and its residual claimants.[268]  This demanding standard requires objective fairness, independent of Yucaipa's subjective belief.[269]  Here, Yucaipa understood what

---

[265]    *Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386, 412 (Del. Ch. 1999) (quoting 1 RODMAN WARD, JR. ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW § 151.6, at GCL-V-38 (4th ed.1999)).  In *Odyssey Partners, L.P. v. Fleming Cos.*, 735 A.2d 386, 412 (Del. Ch. 1999), the Chancery Court held that the majority shareholder's acquisition of the company's first lien credit facility was entitled to the presumption of the business judgment rule because there was "no evidence or suggestion in the record that the [company's] board of directors had any occasion to become involved in" negotiating the terms of the acquisition.  In contrast, the Board had every reason to be involved in the JCT Negotiations given that it required its assistance and contemplated the sale of Allied's Assets in a Section 363 Sale which Yucaipa's 30(b)(6) witness admits was "a company decision . . not a Lender decision." (*See* FF ¶ 103).

[266]    *See, e.g.*, *Gantler v. Stephens*, 965 A.2d 695, 708 n.33 (Del. 2009) ("[O]ur decisions have applied the entire fairness standard in a non-transaction context.") (citing *Nixon v. Blackwell*, 626 A.2d 1366, 1376 (Del. 1993) (applying the fair dealing prong of entire fairness)).

[267]    Yucaipa's demand for a premium at the expense of Allied's legitimate Lenders places this transaction squarely within the purview of the entire fairness standard.  *See, e.g.*, *Berteau v. Glazek*, C.A. No. 2020-0873-PAF, 2021 WL 2711678, at *12 (Del. Ch. June 30, 2021) ("[T]he entire fairness framework governs any transaction between a controller and the controlled corporation in which the controller receives a <u>non-ratable benefit</u>" relative to other stakeholders, or where the controller "<u>compete[s] with the minority stockholders for the transaction consideration</u>.") (Citing *In re EZCORP Inc. Consulting Agreement Derivative Litig.*, C.A. No, 9962-VCL, 2016 WL 301245, at *11 (Del. Ch. Jan. 25, 2016) and *Salladay v. Lev*, C.A. No. 2019-0048-SG, 2020 WL 954032, at *8 (Del. Ch. Feb. 27, 2020)).  Opposing summary judgment, Yucaipa submitted an Expert Opinion of William B. Chandler III.  (13-50530, D.I. 767-1, Ex. 33).  Notably, Chancellor Chandler (Ret.) assumed that the entire fairness standard applied to the allegations at issue.  Yucaipa ultimately did not call Mr. Chandler at Trial.

[268]    *See, e.g.*, *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1242 (Del. 2012).

[269]    *See, e.g.*, *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1144-45 (Del. Ch. 2006).

was required.   Yucaipa's principal Ron Burkle admitted that Allied's creditors were "<u>entitled to</u> <u>*pari passu*</u>" treatment in the JCT Negotiations, that *pari passu* treatment for all creditors is "what [he] would have done," and what he instructed his team to do.[270]    However, as the evidence adduced at Trial demonstrates, Yucaipa never agreed to this price.

208.    There was also no fair dealing.  "The fair dealing inquiry looks for steps designed to ensure fairness to the minority."[271]   The evidence presented at Trial demonstrates that Yucaipa and the Yucaipa-controlled Board failed to take any steps to ensure that the non-Yucaipa Lenders were treated fairly during the JCT Negotiations.   This remained true even after they were confronted with the unfairness of the manner in which the JCT Negotiations were proceeding. There were numerous mechanisms that Yucaipa and the Board could have employed to create a fair process, including  (i) creating a special committee (or "restructuring committee") composed of independents to evaluate the potential transaction and the possibility of alternative transactions, (ii) retaining an investment bank to pursue the potential transaction, or (iii) requiring minority Lender approval for any transaction with JCT.[272]  Yucaipa breached its fiduciary duties by failing to take any of these measures during the JCT Negotiations.[273]

---

[270]    *See* FF ¶¶ 126.

[271]    *In re Cellular Tel. P'ship Litig.*, C.A. No. 6885-VCL, 2022 WL 698112, at *22 (Del. Ch. Mar. 9, 2022).

[272]    For the reasons discussed above, the Court rejects Yucaipa's contention that there was a provision in the JCT/Yucaipa Final Term Sheet that protected BD/S by requiring that "everybody holds hands and agrees" to any deal with JCT at the end of the day —as well as its assertion that the existence of such a provision was sufficient to satisfy Yucaipa's fiduciary duty to Allied.  (*See* FF ¶¶152-53).

[273]    *See, e.g.*, *Merritt v. Colonial Foods, Inc*., 505 A.2d 757, 758 (Del. Ch. 1986) (controlling shareholder breached its fiduciary duty because, *inter alia*, "no independent agency, either board committee, special counsel or investment banker, provided an independent basis to conclude" that transaction involving controlling shareholder was fair to the company).

iv.    *Causation Was Sufficiently Established*

209.    Yucaipa's contention that BD/S cannot establish causation for its damages is unavailing.  Yucaipa argued that it had agreed to equal and ratable treatment prior to the Bankruptcy, but that BD/S decided "that it could make more money by forcing Allied into bankruptcy."[274]  However, it was Yucaipa's intransigence, not the Bankruptcy, that ended the JCT Negotiations.[275]  This argument fails for two additional reasons:

210.    *First*, in arguing that BD/S filed the Bankruptcy "understanding that it could make more money by forcing Allied into bankruptcy,"[276] Yucaipa is advancing a theory that this Court has rejected several times as "not plausible."[277]  This holding is the law of the case.[278]  None of

---

[274]    13-50530, D.I. 958 (Yucaipa's Trial Brief) at 16.

[275]    If BD/S were somehow mistaken in their belief that Yucaipa had not agreed to equal and ratable treatment before the Bankruptcy (and there is no evidence that it was), it stands to reason that Yucaipa would have endeavored to correct BD/S' misunderstanding after they filed the Bankruptcy.  There is no evidence that Yucaipa or its counsel reached out to inform BD/S that it was prepared to re-negotiate its deal with JCT to accommodate equal and ratable treatment.

[276]    13-50530, D.I. 958 (Yucaipa's Trial Brief) at 16.

[277]    *See* 14-50971, D.I. 82-1 at 64 (PX EEE) ("Yucaipa's argument depends on every one of the following unpredictable events occurring in a manner favorable to Black Diamond and Spectrum: (i) invalidating the Fourth Amendment through litigation; (ii) obtaining judicial declaration that Black Diamond and Spectrum are the Requisite Lenders; (iii) acquiring Allied's assets through a credit bid on behalf of all Lenders (including Yucaipa, subject to the equitable subordination claims); (iv) prevailing in their equitable subordination claims against Yucaipa and obtaining a substantial recovery; and (v) hoping that the Allied assets they acquired would increase in value to the point where the asset value plus any recovery realized from the equitable subordination litigation exceeded a par plus accrued interest recovery years after JCT had offered them a 100% recovery. *Yucaipa's reliance on this sequence of events is not plausible*.") (emphasis added).

[278]    *See In re Vaso Active Pharms.*, *Inc.*, 500 B.R. 384, 399 (Bankr. D. Del. 2013) ("In the interests of finality and judicial economy, the law of the case doctrine precludes relitigation of issues in which parties have already had a full and fair opportunity to litigate" in the absence of "extraordinary circumstances, such as situations in which new evidence is available, a supervening law has been announced, or an earlier decision was clearly erroneous and would create manifest injustice.") (citing *In re Cont'l Airlines, Inc.*, 279 F.3d 226, 232 (3d Cir. 2002)), *aff'd*, 537 B.R. 182 (D. Del. 2015).

the "exceptional circumstances" warranting reconsideration are present here.

211.    *Second*, BD/S was entitled to invoke this Court's jurisdiction in response to Yucaipa's breach.  "When the directors, or the majority stockholders, exercise a power that the general corporation law confers upon them, 'it is competent for any one who conceives himself aggrieved thereby to invoke the processes of a court of equity for protection against its oppressive exercise.'"[279]   Yucaipa failed to act in response to BD/S imploring for a fair process to be established.  Thus, it was appropriate for BD/S to ask this Court to oversee a process that they could not obtain from Allied's fiduciaries.[280]

### D.    Damages: Allied Could have Sold for Significantly More But For Yucaipa's Breach

212.    The Trustee asserts that the Estate suffered damages of $158,596,000, plus pre-judgment interest, reflecting the delta between the value of a lost JCT transaction in late 2011/spring 2012 and the actual proceeds of the JCT 363 Sale in late 2013.

213.    "Damages resulting from a breach of the fiduciary duty of loyalty are liberally calculated."[281]   Delaware law does not generally require certainty in the award of damages where a wrong has been proven and injury established, but "where, as is true here, issues of loyalty are involved, potentially harsher rules come into play."[282]   Where a breach of fiduciary duty has been

---

[279]    *Adams v. Clearance Corp.*, 121 A.2d 302, 306 (Del. 1956) (quoting *Allied Chem. & Dye Corp. v. Steel & Tube Co. of Am.*, 120 A. 486, 491 (Del Ch. 1923).

[280]    *See In re SemCrude, L.P.*, 428 B.R. 590, 594 (D. Del. 2010) ("[T]he primary goal of the Bankruptcy Code [is] to ensure equal and fair treatment among similarly situated creditors.").

[281]    *Auriga Cap. Corp. v. Gatz Properties*, 40 A.3d 839, 880 (Del. Ch.), *judgment entered sub nom. Auriga Cap. Corp. v. Gatz Properties*, LLC (Del. Ch. 2012), *aff'd*, 59 A.3d 1206 (Del. 2012) (citing *Thorpe by Castleman v. CERBCO, Inc.*, 676 A.2d 436, 444-445 (Del. 1996)).

[282]    *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999), *as revised* (Nov. 16, 1999), *aff'd*, 766 A.2d 437 (Del. 2000).

established, "a responsible basis for an estimate of damages" will suffice.[283]  Further, evidentiary

uncertainties as to the amount of damages caused by a breach are resolved against the

wrongdoer.[284]  "The strict imposition of penalties under Delaware law are designed to discourage

disloyalty."[285]

### i.    *The Trustee's Damages Calculation*

214.    The Trustee's valuation expert, Jeffrey Risius of Stout, Risius, Ross, has over 30

years' experience valuing a broad array of businesses.  His career began at Price Waterhouse in

1989 before he moved to Stout, in or around 1996, where he is currently a Managing Director and

head of client services.[286]

215.    Mr. Risius was tasked with opining on, among other things, economic damages

suffered by the Allied Estate if the Court concludes Yucaipa wrongfully prevented a JCT deal in

the course of the JCT Negotiations.  In doing so, Mr. Risius testified that he followed four steps:

(1) calculating the implied value for JCT to acquire the Assets of Allied during the JCT

Negotiations; (2) subtracting anticipated expenses of that prospective deal; (3) comparing that

---

[283]    *Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 879 n.167 (Del. Ch.) (citing *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999), *as revised* (Nov. 16, 1999), *aff'd*, 766 A.2d 437 (Del. 2000)), *judgment entered*, No. 4390-CS, 2012 WL 598121 (Del. Ch.), *aff'd*, 59 A.3d 1206 (Del. 2012).

[284]    *See Thorpe ex rel. Castleman v. CERBCO, Inc.*, 676 A.2d 436, 441 (Del. 1996) ("[O]nce a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer."); *William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del. 2011) (construing evidentiary uncertainty on the issue of fairness against the defendants where their breaches of their fiduciary duty of loyalty "prevented a fair and open process" and thus their "self interest in the transaction and their domination of the sales process tainted the entire transaction."); *see also Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1131 n.132 (Del. 2015), *as corrected* (Dec. 28, 2015) (explaining that "[c]ourts in Delaware and other jurisdictions have frequently applied the 'wrongdoer rule' where the wrongdoer's breach contributed to uncertainty over the amount of damages") (collecting cases).

[285]    *Thorpe ex rel. Castleman v. CERBCO, Inc.*, 676 A.2d 436, 445 (Del. 1996).

[286]    *See generally* 3/4/22 a.m. Trial Tr. 7:14-9:15 (Risius/Direct).

figure to the actual recovery by the Estate following the JCT 363 Sale nearly two years later; and, (4) calculating pre-judgment interest.[287]  Following these steps, Mr. Risius opined that Allied's Estate suffered economic damages as a result of Yucaipa's conduct of approximately $158.6 million prior to consideration of prejudgment interest.[288]

216.    Mr. Risius testified that he arrived that this implied value of approximately $244 million in his first step by (1) "rely[ing] on a population of term sheets that JCT put forth in late 2011 through early 2012," (2) "consider[ing] . . . contemporaneous valuations that Yucaipa prepared marking its investment in Allied to fair value," and (3) reviewing "deposition testimony" of the relevant market participants including Messrs. Riggs and Ciupitu.[289]

217.    In reviewing the population of term sheets during the JCT Negotiations, Mr. Risius testified that he focused on the 12/19/11 Term Sheet because it was "the only term sheet out of that population that actually had JCT offering specific amounts to Yucaipa, to Black Diamond/Spectrum, and to CIT.  So that represented about 93 percent of the total debt outstanding. And so from my perspective, that was the most reliable because it was all in the same document."[290]  He further testified, however, that the balance of the Term Sheets he reviewed were consistent with his $244 million valuation.[291]

218.    Although JCT never provided a Term Sheet to residual holders of approximately

---

[287]    3/4/22 a.m. Trial Tr. 17:2-14 (Risius/Direct).

[288]    3/4/22 a.m. Trial Tr. 14:9-16 (Risius/Direct).  As of March 1, 2022, Mr. Risius calculated pre-judgment interest on this amount of approximately $137 million, for a total damages figure as of that date of $295.6 million.  (*See* 3/4/22 a.m. Trial Tr. 15:24-16-25 (Risius/Direct); *see also* PX VVV (updated prejudgment interest calculation as of March 1, 2022)).

[289]    *See* 3/4/22 a.m. Trial Tr. 17:2-14 (Risius/Direct).

[290]    3/4/22 a.m. Trial Tr. 21:11-23 (Risius/Direct).

[291]    3/4/22 a.m. Trial Tr. 22:8-15 (Risius/Direct).

$17 million of Allied First Lien debt (*i.e.*, 7% of the First Lien Lenders), the JCT/Yucaipa Final Term Sheet provides that "[p]rior to the closing or in connection with the 363 Sale, Jack Cooper would purchase all outstanding debt claims against Allied under the First Lien Credit Agreement held by any non-consenting lender(s) for a purchase price up to par plus accrued and unpaid interest."[292]  Mr. Risius testified that he assumed a purchase price of par for these residual lenders — rather than par *plus accrued interest* —to be "conservative."[293]

219.    **12/19/11 Term Sheet Implied Value.**  The chart below summarizes the pricing JCT was offering in the 12/19/11 Term Sheet for Allied's First Lien debt held by Yucaipa, CIT, BD/S, and residual holders (assuming a payment of par):

| YUCAIPA | CIT | BD/S + 7% RESIDUAL HOLDERS |
|---|---|---|
| $150 Million/$1.11 on the dollar | $20 million/0.57¢ on the dollar | $74.2 million/$1.00 on the dollar |

220.    As Mr. Risius opined, the total implied value of Allied's Assets reflected in the 12/19/11 Term Sheet is approximately $244.2 million.[294]

221.    As discussed further below, the Court determines that Mr. Risius reasonably estimated the Estate's damages resulting from Yucaipa's breach of its fiduciary duty.

ii.    *Yucaipa's Arguments Are Unavailing*

222.    At Trial, Yucaipa did not offer any alternative calculation of damages to the Trustee's.  Instead, it attacked Mr. Risius's valuation along three lines:

i.    it took the position that any JCT deal in late 2011/early 2012 "was neither

---

[292]    *See* Ex. 122 at 14 ("Purchase of Debt Held by Non-Consenting Lenders").

[293]    *See* 3/4/22 a.m. Trial Tr. 23:18-25:14 (Risius/Direct).

[294]    *See* Ex. 832 at Ex. C.1; *see also* 3/4/22 a.m. Trial Tr. 18:20-23 (Risius/Direct).

possible nor sufficiently certain to form the basis for damages claim;"[295]

    ii.    it offered opinions by Professor Daniel Fischel who claimed, among other things, that Mr. Risius' valuation was inflated; and,

    iii.    it argued that the *Estate* was not damaged by the failure to transact with JCT in late 2011/spring 2012.

223.    The Court addresses each of these arguments in turn.

### *A JCT Deal in Late 2011/Spring 2012 Was Sufficiently Certain*

224.    Yucaipa's argument that that any JCT deal in late 2011/spring 2012 "was neither possible nor sufficiently certain to form the basis for damages claim" confuses the Trustee's burden of proof on this issue.  Once a breach of fiduciary duty is established, the defendant "is responsible for the evidentiary uncertainty caused by his own disloyalty."[296]  Accordingly, when a plaintiff asserts that a beneficial transaction could have closed but for a defendant's breach of fiduciary duty, the defendant bears the burden of proving that there was <u>no likelihood</u> of the transaction closing in order to avoid liability from the failed transaction.[297]

225.    *Bomarko, Inc. v. International Telecharge, Inc.*, 794 A.2d 1161, 1181 (Del. Ch. 1999), a*s revised* (Nov. 16, 1999), *aff'd*, 766 A.2d 437 (Del. 2000) is instructive.  There, the Chancery Court held that the CEO, Chairman, and large shareholder of a company (ITI) breached his duty of loyalty by subverting negotiations between the company and a potential lender (Bell Atlantic) regarding the terms of critical financing.  At trial, the defendant took the position that

---

[295]    13-50530, D.I. 958 at 3, 18-19 (Yucaipa's Trial Brief).

[296]    *Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 877 (Del. Ch.), *judgment entered*, No. 4390-CS, 2012 WL 598121 (Del. Ch.), *aff'd*, 59 A.3d 1206 (Del. 2012).

[297]    *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1179 (Del. Ch. 1999), *as revised* (Nov. 16, 1999), *aff'd*, 766 A.2d 437 (Del. 2000).

"whether or not he breached his fiduciary duties ma[de] no difference because Bell Atlantic would not have lent to ITI in any case."[298]   The Chancery Court addressed this argument as follows:

> How am I to analyze this contention?  Whether Bell Atlantic would have financed ITI was a matter of uncertainty until [defendant] interfered with the dealings between ITI and Bell Atlantic. … It was [defendant]'s faithless behavior thereafter that makes it difficult to know with any degree of certainty whether or not ITI could have worked out a deal with Bell Atlantic.[299]

While the Court could not conclude that it was even "probable" that the company would have obtained financing from Bell Atlantic, it held that the defendant was liable for squandering this opportunity since "there was some likelihood of such a deal before [defendant]'s interference."[300]

226.    This case presents the same issue.  Whether a transaction with JCT could have closed in late 2011/spring 2012 is, ultimately, unknowable.  However, the Court determines that it was Yucaipa's disloyalty to Allied that makes this fact unknowable.  Thus, unless Yucaipa demonstrated at Trial that there was no likelihood that the JCT deal would have closed in late 2011/spring 2012 but for its inequitable conduct, the Trustee was entitled to a presumption that such a deal *could* have been reached — and that Yucaipa caused injury by ensuring that it wasn't.

227.    The evidence adduced at trial demonstrates that Yucaipa failed to carry its burden.  On the contrary, as discussed below, Yucaipa witnesses **admitted** at Trial numerous times that there was a *strong* likelihood of a deal with JCT in late 2011/spring 2012.  Additional evidence adduced at Trial further establishes that there was a likelihood of a lost JCT deal in late 2011/spring

---

[298]    *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1181 (Del. Ch. 1999), *as revised* (Nov. 16, 1999), *aff'd*, 766 A.2d 437 (Del. 2000).

[299]    *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1181 (Del. Ch. 1999), *as revised* (Nov. 16, 1999), *aff'd*, 766 A.2d 437 (Del. 2000).

[300]    *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1181 (Del. Ch. 1999), *as revised* (Nov. 16, 1999), *aff'd*, 766 A.2d 437 (Del. 2000).

2012 worth significantly more than the eventual recovery following the JCT 363 Sale.

### ***Yucaipa Admits to a Likelihood of a Lost JCT Deal During the JCT Negotiations***

228.     As addressed above, Yucaipa first became familiar with Mike Riggs when he was offered the position as Allied's CEO in spring 2007.  (*See* FF ¶¶ 48-49).  Thereafter, Mr. Riggs had multiple interactions with Messrs. Walker, Tochner and Burkle regarding a combination with Allied over the years.  (*See, e.g.*, FF ¶¶ 85, 93-98).  Thus, by the time of the JCT Negotiations, Mr. Riggs was well known to Yucaipa and viewed as a legitimate and highly motivated potential acquiror.

229.     Testifying regarding the JCT Negotiations in late 2011/early 2012, Mr. Burkle admitted — numerous times — that a JCT deal was effectively complete by spring 2012:

> By 2012 the [auto] industry was up to delivering I think 14 million cars a year . . . **So it was the first time I believed you could get a deal financed** . . . the markets have turned around, we're in a good shape, **we have everything we need, we have an agreement [with JCT] that's done and [Mr. Deckoff] blew the deal up** . . . Now, why would [he] sit around all day hoping I would call and not call me? . . . I was shocked that [Mr. Deckoff] asked the company for me to call instead of him just picking up the phone.  I couldn't believe it.  And, again, in my opinion, and I've done about $50 billion worth of deals personally, **in my opinion this was the first time we had a deal that could have gotten done and [he] blew it up**."[301]

---

[301]     3/3/22 a.m. Trial Tr. 62:25-64:7 (Burkle/Friendly Cross) (emphasis added); *see also* 3/3/22 a.m. Trial Tr. 73:14-20 (Burkle/Friendly Cross) ("[T]he economy had turned and the car industry had turned and there were 14 million cars and we were on the verge of which means that **if Riggs was the buyer, [it was] the first time I think he could have gotten financed and the first time I think it would have worked**…"); 3/3/22 a.m. Trial Tr. 86:6-87:6 (Burkle/Friendly Cross) ("[My testimony and my belief and all commonsense says the reason **we finally got to a deal that worked** was because the market had turned and there were 14 million cars being sold instead of ten . . . **So you finally get to a deal, and again, the market I think would have loved the transaction at that point in time because the market had turned**.  And it had turned from 10 million to 14 million, but two years later it was at 17 million.  I mean, it was really – you could really see this coming.  And for whatever reasons that only Black Diamond knows they bankrupted the company") (emphasis added); 3/2/22 a.m. Trial Tr. 89:19-25 (Burkle/Friendly Cross) ("**We got to an agreement and everything about the agreement worked for everybody.  And as I said over and over the industry was back and so the deal would have worked.**  Probably for

230.    The record does not support Mr. Burkle's speculation that Mr. Deckoff "blew the deal up" by asking the Company to have Mr. Burkle call rather than reaching out directly. As discussed above, Mr. Walker provided BD/S assurances that Mr. Burkle would call Mr. Deckoff by 5:00 p.m. on May 17, 2012, and this was *after* months of BD/S putting the Yucaipa-controlled Board on notice of its concerns regarding the process underway and disparity of offers being presented. (*See e.g.* FF ¶162, 165, Exs. 349 (2/15/12 Letter) and 350 (3/22/12 Letter)).[302]

231.    Mr. Tochner also testified that the Final JCT/Yucaipa Final Term Sheet reflected a "real" offer from bona fide purchaser and, as such, the $155 million consideration in that Term Sheet served as the basis for Yucaipa's valuation reported to its investors thereafter.[303] Further, Yucaipa's argument is inconsistent with the undisputed fact that it was valuing the JCT/Yucaipa Final Term Sheet at face and presenting it to its investors as a bona fide offer.

### *Conditions Do Not Establish That There Was No Likelihood of a Deal*

232.    Its admissions at Trial notwithstanding, Yucaipa contends that the JCT deal was subject to numerous unsatisfied conditions and contingencies, which could have prevented it from

---

the first time the deal would have worked.  I can't comprehend why they did that.  Nor can I comprehend why Steve [Deckoff] said he waited around for me all day to call him and he was shocked that I didn't.").  (Emphasis added).

[302]    The only percipient witness to the discussions between Yucaipa and BD/S from May 14 to 17, 2012 to testify at Trial (Mr. Harris) was credible in testifying, among other things, that Yucaipa's contention that BD/S was responsible for losing the JCT deal was "false." (*See* 3/2/22 a.m. Trial Tr. 29:14-18 (Harris/Direct)).

[303]    *See* 3/2/22 p.m. Trial Tr. 10:9-11:16 (Tochner/Adverse Direct) ("Well, when we had entered into the [Final JCT/Yucaipa Term Sheet], [we] definitely believed it was real.  No reason to believe otherwise."); *see also* 13-50530, D.I. 990-1 (Stipulation in Lieu of Stephanie Bond Testimony) at ¶ 2 ("Yucaipa's 'Valuation Rationale' of where it was holding its Allied investment set forth in Exhibit PX EE [and PX FF] are based upon JCT's March 8, 2012 term sheet offer of $155 million, as contained in Exhibit 122."); *see also* Ex. 642 at 2, 13 (Minutes of Meeting of the Advisory Boards of Yucaipa dated October 23, 2012) ("Our valuation is based on the expected net proceeds from a contemplated strategic transaction.").

closing.  As a threshold matter, because Yucaipa does not take the position that a deal with JCT had <u>no likelihood</u> of closing in late 2011/spring 2012, this argument fails to satisfy its burden. Nevertheless, as discussed below, the evidence adduced at Trial demonstrates the conditions that the parties considered material in late 2011/spring 2012 would have been satisfied as long as there was agreement on equal and ratable treatment of any transaction.

233.   **Conditions Within BD/S' Control.**  The majority of the conditions Yucaipa raises were within BD/S control, and Mr. Deckoff testified that BD/S was prepared to waive them provided Lenders receive equal and ratable treatment.[304]  Mr. Schaffer of Spectrum similarly testified that negotiations with respect to supposed "conditions" were immaterial provided the parties were being treated fairly.[305]

234.   **Financing.**  Beyond Mr. Burkle's testimony that a deal in late 2011/spring 2012 "could have gotten financed," testimony from JCT representatives further supports that it could have obtained consent of its lenders and investors to raise financing to acquire Allied in late 2011/spring 2012.  Among other things, Mr. Ciupitu testified that he had witnessed Jack Cooper raise "hundreds of millions of dollars for various deals over time" and that raising funds was an "area that [Mr. Riggs] excels at."[306]

235.   **JCT Lender Consent.**  Mr. Riggs testified that he believed he could get approval

---

[304]   *See* 3/1/22 Trial Tr. 87:3-23 (Deckoff/Direct) (if a JCT deal was equal and ratable BD/S was prepared to (i) drop the NY action, (ii) affirm the validity of the Fourth Amendment, and (iii) amend the loan documents to allow JCT to be an "Eligible Assignee").

[305]   *See, e.g.*, Dep. Tr. (Schaffer Vol. II) 430:15-21 (testifying that negotiations over a confidentiality agreement with JCT were "just noise" and ultimately had a "[n]onmaterial impact."); Dep. Tr. (Schaffer Vol. II) at 422:10-19, 438:1-3, 458:11-20 (testifying that sensitivity over a non-compete related to Spectrum's partial ownership in a competitor (JHT), but ultimately the lawyers would have resolved this point).

[306]   Dep. Tr. (Ciupitu) 171:2-10; Dep. Tr. (Ciupitu) 181:7-16 (JCT raised $375 million in 2013).

and he "wouldn't have wasted his time if [he] didn't think [he] could get approval[.]"[307]  Further, it is undisputed that JCT did secure lender consent for its December 2013 acquisition of Allied's assets.[308]  Thus, the Court disagrees with Professor Fischel's opinion that there is "no basis" to assume that JCT would have been able to obtain the consent of its Lenders for the acquisition of Allied's assets in late 2011/spring 2012.[309]  Notably, Professor Fischel failed to consider Mr. Ciuputu's or Mr. Rigg's testimony when he offered this opinion.[310]

236.    **Sustainable Annual EBITDA in Excess of $40 Million.**  Yucaipa argues that a condition in the December 19, 2011 term sheet requiring confirmation that Allied's "sustainable annual EBITDA" is in excess of $40 million had no possibility of being satisfied as Allied's actual EBITDA was actually negative $29 million at the time.[311]  However, the evidence reflects that this term was ultimately immaterial to JCT because, in subsequent versions of the Term Sheets (including the JCT/Yucaipa Final Term Sheet), the condition was dropped.[312]  In any event, evidence adduced at trial reflects that the December 19, 2011 term sheet's choice of the term "sustainable" EBITDA was likely referring to the pro forma EBITDA of a combined Allied-JCT.[313]  JCT was projecting a post-synergy EBITDA to be $58 million in a "Worst Case

---

[307]    Dep. Tr. (Riggs) 121:12-19.

[308]    Dep. Tr. (Ciuputu)179:15-20 ("[JCT] obtained consent to consummate the acquisition in December of 2013"); *see also* Ex. 129 ¶8.6(a)(i), DX BB).

[309]    *See* 3/4/22 p.m. Trial Tr. 81:12-82:16 (Fischel/Direct).

[310]    *See* 3/4/22 p.m. Trial Tr. 128:2-7 (Fischel/Cross).

[311]    13-50530, D.I. 958 at 19 (Yucaipa's Trial Brief).

[312]    *See, e.g.*, Ex. 122 (JCT/Yucaipa Final Term Sheet dated March 8, 2012); Ex. 471 (Email from Rich Ehrlich forwarding "Allied – Term Sheet for Black Diamond and Spectrum" dated March 8, 2012).

[313]    *See* 3/4/22 a.m. Trial Tr. 129:3-9 (Risius/Cross) (explaining that the term "sustainable annual EBITDA" refers to "normalized pro forma EBITDA that you can get on a normalized basis once you take out one time restructuring costs and you put in synergies and how this thing's going to operate in the future."). *See also ForteCEO Servs., Inc. v. Terra Contracting, LLC*, No. 11 CV

Armageddon Scenario," supporting the conclusion that this condition would have been satisfied.[314]

### iii.    Professor Fischel's Opinions Do Not Alter the Court's Conclusion

237.    At Trial, Yucaipa offered opinions by Professor Daniel.  As a general matter, by confining his opinions to discrediting Mr. Risius' analysis, rather than submitting his own calculation of the Trustee's damages, Professor Fischel limits the usefulness of his testimony.[315] None of Professor Fischel's opinions disturb the Court's conclusion that Mr. Risius' valuation is a responsible estimate of the Trustee's damages.[316]

### Mr. Risius' Estimate Based on the 12/19/11 Term Sheet is Reasonable

238.    Professor Fischel testified that Mr. Risius' reliance on the 12/19/11 Term Sheet to imply a value of "244 million minus [$5 million expenses]" reflects "the highest possible price that [Mr. Risius] could have chosen."[317]  This is demonstrably false.  Contemporaneous valuations — depicted and discussed below — were almost all higher than Mr. Risius' valuation.

---

[314] 5179, 2014 WL 4376299, at *4 (N.D. Ill. Sept. 4, 2014) (distinguishing "plain-vanilla EBITDA" from "sustainable annual EBITDA" and holding the parties to their use of the former in services agreement).

[314] PX Y (JCT Presentation) at 14 (Pro forma results).

[315] *See, e.g.*, *PharmAthene, Inc. v. SIGA Techs., Inc.*, No. CIV.A. 2627-VCP, 2014 WL 3974167, at *16 n.78 (Del. Ch. Aug. 8, 2014) (Noting that, "in a general sense, [defendant's expert]'s credibility was undermined by the fact that at trial he merely attempted to discredit [plaintiff's expert]'s analysis without providing an alternative calculation of his own … At a minimum, the fact that [defendant's expert] failed to offer any damages model of his own and confined his opinions to criticisms of [plaintiff]'s damages case, limits the usefulness of his testimony."); *Agilent Techs., Inc. v. Kirkland*, No. CIV.A. 3512-VCS, 2010 WL 610725, at *29 (Del. Ch. Feb. 18, 2010) (criticizing defendant's expert who "failed to present a compensatory damages calculation of his own, and did not even attempt to reconstruct [company]'s market share. Instead, the defendants do little more than point out potential flaws in [plaintiff's expert]'s analysis.").

[316] Here, again, Yucaipa's burden on this issue underlies the Court's analysis. *See, e.g.*, *Gentile v. Rossette*, C.A. No. 20213-CVN, 2010 WL 2171613, at *11 (Del.Ch. May 28, 2010) (resolving uncertainties in determining the fair value of a company "against the fiduciary who has not faithfully discharged his duties.").

[317] 3/4/22 p.m. Trial Tr. 76:21-77:3 (Fischel/Direct).



239.   **The 3/8/12 Term Sheet Implied Value.**  The chart below summarizes the pricing JCT was offering Yucaipa, CIT, BD/S, and residual holders (assuming residual holders received the same 0.60¢ or 0.70¢ on the dollar offered to BD/S) based on the then outstanding term sheets:

| 240.YUCAIPA | CIT | BD/S +7% RESIDUAL HOLDERS |
|---|---|---|
| $155 Million/ $1.15 on the dollar[318] | $40.25 Million /$1.15 on the dollar[319] | $44.5 million/0.60¢ on the dollar[320] |
| | | $51.9 million/0.70¢ on the dollar[321] |

241.   The total implied value of Allied's assets reflected in the 3/8/12 Term Sheets —

---

[318]   Ex. 122 (JCT/Yucaipa Final Term Sheet dated March 8, 2012).

[319]   Ex. 62 (Aliberto) (JCT/CIT Agreement dated February 10, 2012).

[320]   Ex. 258 (3/8/12 Term Sheet).

[321]   Ex. 258 (3/8/12 Term Sheet).

conservatively assuming residual holders received the same 0.60¢ or .70¢ on the dollar as BD/S was being offered — is $239.8 million (0.60¢/dollar to BD/S and residual holders) or $247.2 million (0.70¢/dollar to BD/S and residual holders). These figures are "consistent" with Mr. Risius' calculation.[322]

242.    **Yucaipa's Valuation of Allied as of May 1, 2012.** As of May 1, 2012, Yucaipa was internally reporting an "Implied Enterprise Value" for the Company ranging from a low of $261 million to a high of $379.6 million.[323]

243.    Yucaipa had unfettered access to Allied's financials at this time, unlike other Lenders and JCT.[324] As such, Mr. Risius could have elected to rely on Yucaipa's own valuations in an attempt to increase the Trustee's damages calculation. He did not. Instead, Mr. Risius testified that Yucaipa's valuations informed his opinion that a $244 million implied valuation was reasonable.[325]

---

[322]    *See* 3/4/22 a.m. Trial Tr. 22:11-15 (Risius/Direct).

[323]    *See* PX FF at 6 (Email from Stephanie Bond to Craig Beatty Re: Allied auditor memo dated May 1, 2012); *see also* PX EE at 4 (Email from S. Bond to Craig Beatty Re: Allied auditor memo dated April 27, 2012 ("We are holding the investment in Allied at $132.6 million based on the proceeds of a potential transaction that we are currently contemplating. This is supported by a sum-of-the-parts analysis, which includes a discounted cash flow analysis for ongoing operations"); 13-50530, D.I. 990-1 at ¶ 3 (Stipulation in Lieu of Stephanie Bond Testimony) ("The parties further stipulate and agree that (A) Yucaipa supported [its] holding valuation with 'sum-of-the-parts analysis, which includes a discounted cash flow analysis of ongoing operations' as stated in Exhibit PX EE at page 4 of 5; and (B) Yucaipa's calculation of the sum-of-the parts analysis is set forth in the 'Detailed Sum-of-the-Parts Schedule' of Exhibit FF on page 6 of 11 and summarized in the 'Summary Valuation Schedule' on page 5 of 11 of Exhibit PX FF.").

[324]    *See* Dep. Tr. (Walker Vol. I) 258:10-265:8 (describing how Yucaipa generally held "bimonthly calls for business updates" with Allied's management and received "monthly board reporting packages" from Allied's management, which included, among other things, income statements, balance sheets, cash flow information (actual, budgeted, and prior year) and covenant calculations and bank reporting packages). Mr. Walker testified further that he could not recall "an instance where we [Yucaipa] requested something and Allied had it but Allied's management refused to provide it.").

[325]    *See* 3/4/22 a.m. Trial Tr. 43:8-15 (Risius/Cross).

244.    Neither Professor Fischel's testimony nor any of Yucaipa's fact witnesses suggested at Trial that Yucaipa's own valuations are somehow not probative of the value of Allied's assets during the course of the JCT Negotiations.

245.    **The 5/10/12 Term Sheet Implied Value.**  The chart below summarizes the pricing JCT was offering Yucaipa, CIT, BD/S, and residual holders (assuming residual holders received the same 0.70¢ on the dollar offered to BD/S) based on the then outstanding term sheets:

| YUCAIPA | CIT | BD/S +7% RESIDUAL HOLDERS |
|---|---|---|
| $155 Million/ $1.15 on the dollar[326] | $40.25 Million /$1.15 on the dollar[327] | $51.9 million/0.70¢ on the dollar[328] |

246.    The total implied value of Allied's assets reflected in the 5/10/12 Term Sheets — conservatively assuming residual holders received 0.70¢ on the dollar as BD/S was being offered — is $247.2 million.[329]

247.    Here, again, Professor Fischel's testimony that Mr. Risius simply chose the highest price is incorrect.  As Mr. Risius testified, this was "consistent" with his calculation.[330]

248.    **Yucaipa's Valuation of Allied as of October 15, 2012.** As of October 15, 2012, Yucaipa was internally reporting an "Implied Enterprise Value" for Allied ranging from a low of

---

[326]    Ex. 122 (JCT/Yucaipa Final Term Sheet dated March 8, 2012).

[327]    Ex. 62 (Aliberto) (JCT/CIT Agreement dated February 10, 2012).

[328]    Ex. 123 (Term Sheet dated May 10, 2012).

[329]    Mr. Ciupitu's cover email attaching the 5/10/12 Term Sheet provided that if BD/S agreed to affirm the Fourth Amendment and settle the NY Action at a "First closing, then we could agree to a 75% purchase price."  (See Ex. 123 (Email from Theo Ciuputu to Jeffrey Schaffer and Rich Ehrlich Re: Revised Term Sheet with Black Diamond and Spectrum dated May 10, 2012)). Assuming a $0.75¢ on the dollar recovery to BD/S and the residual holders, it results in an increase of $3.8 million — or an implied valuation of $251 million.

[330]    See 3/4/22 a.m. Trial Tr. 22:11-15 (Risius/Direct).

$274.1 million to a high of $394.1 million.[331]  Again, no Yucaipa witness testified regarding this valuation by Yucaipa or suggested that it was in any way unreasonable.  Rather, it is supported by Mr. Burkle's testimony regarding the automotive market rebounding at this point in time.  (*See* CL ¶ 229 & n.301, above).

249.    **Yucaipa's Judicial Admissions of Allied's Value as of May 17, 2012.**  Yucaipa alleged in the RICO Complaints that (i) JCT was offering a pre-bankruptcy deal of $305 million to acquire all First Lien debt and (ii) a JCT sale would have been consummated at $170 million more than the ultimate $135 million if not for the 2012 Bankruptcy filing.[332]

250.    **Spectrum's Valuation as of June 30, 2012 Assuming Company Sale.**  During his testimony, Professor Fischel alluded to some of Black Diamond and Spectrum's estimates of Allied's value.[333]  The demonstrative addressed in his testimony cherry picks from two exhibits found in Professor Fischel's report without context and ignores the only moderately relevant valuation by Spectrum post-Bankruptcy on June 30, 2012, which valued Allied based on a "Company Sale" methodology at 83% of par — *i.e.*, a valuation in excess of $205 million.[334]  Even

---

[331]    PX OO at 4 (Email form Stephanie Bond to Craig Beatty and Derex Walker Re: Q3 Valuation Support dated October 15, 2012).

[332]    PX BBB at ¶¶ 25, 172, 204 (S.D.N.Y. RICO Compl.); PX CCC at ¶¶ 185, 217 (D. Del. RICO Compl.); Allied Adversary Proceeding, D.I. 19 (Answer and Counterclaim), Counterclaim ¶ 10(e).  *See also* PX FFF at 10-13 (Yucaipa Interrogatory Response No. 2).

[333]    3/4/22 p.m. Trial Tr. 104:3-23 (Fischel/Direct) (referencing a demonstrative purporting to depict certain estimates of Allied's valuation from 12/31/08 through 12/31/10 and the same for Black Diamond from 12/31/10 through 3/31/12).

[334]    *See* Ex. 805 at 23 (Exhibit 4B to the Report of D. Fischel dated September 27, 2019).  Professor Fischel's testimony regarding Black Diamond valuations fail to note that they are based on "Asset Liquidation" methodology, not a sale to a strategic buyer like JCT.  (Ex. 805 at 22 (Exhibit 4A to the Report of D. Fischel dated September 27, 2019)).  As such, the valuations effectively write off Black Diamond's investment.  Further, the analysis is not nearly as probative of Allied's value as Yucaipa's own valuations in light of its full access to Allied's information in contrast to Black Diamond and other Lenders.  (*See* 3/1/22 a.m. Trial Tr. 70:25-71:4

this valuation, based on limited information, reflects a recovery in excess to the JCT 363 Sale.

### *Mr. Risius' Estimate of $5 Million in Expenses is Reasonable*

251.    Professor Fischel also suggested that Mr. Risius's estimate of $5 million in expenses for a Section 363 Sale in late 2011/spring 2012 was "aggressive" because the actual costs of Allied's 2012-2013 bankruptcy were close to $79.5 million.[335]   However, there is no basis for this comparison:  Mr. Risius assumes a 90-day, pre-negotiated bankruptcy, while Allied's actual Bankruptcy was a heavily litigated, 18-month process.

252.    Allied's actual bankruptcy included tens of millions in expenses that would not exist under Mr. Risius' but-for scenario.  For example, while the actual expenses included approximately $28.1 million in pre-petition expense reimbursement claimed by First Lien Lenders, none of this amount would have existed if JCT had purchased the debt before the Bankruptcy.[336] Similarly, it is inconceivable that Allied would require approximately $29.5 million of DIP financing — the actual amount it required — as part of a 90-day pre-negotiated bankruptcy.[337]

253.    In light of Professor Fischel's failure to offer an alternative measure of Allied's expenses under Mr. Risius' assumptions, the Court accepts Mr. Risius's estimate as reasonable.

### iv.    *The Estate Was Damaged by the Failure to Transact With JCT in the Full Amount of the Anticipated Credit Bid*

254.    Yucaipa also argues that even under Mr. Risius' but-for scenario, the Estate would

---

(Deckoff/Direct) (testifying that from spring 2011 on, Black Diamond was not receiving financial statements on Allied)).

[335]    *See* 3/4/22 p.m. Trial Tr. 105:12-20 (Fischel/Direct).

[336]    *See* Ex. 382 (Prepetition Expenses – Non-Yucaipa Lenders and Expense Reserve - Yucaipa).  The First Lien Lenders rights to such expenses would have extinguished upon transfer to JCT.  (*See* Ex. 133 (FLCA) at § 10.6(f) (following assignment of debt, the assigning lender shall "relinquish its rights . . . and be released from its obligations hereunder…")).

[337]    *See* Ex. 382 (showing $29,589,837.33 in "DIP Payoff").

not have received a benefit valued at $244.2 million because the $244.2 million in consideration would have been paid to the *Lenders*, not the Estate.

255.    Separately, the Court raised the question during Trial whether JCT would have credit bid the full amount of the First Lien debt after acquiring it.

256.    Neither point ultimately undermines the reasonableness of the Trustee's estimate and the Court will address these points in turn.

### *A Credit Bid in Late 2011/Spring 2012 Would Have Benefitted Allied*

257.    Yucaipa's argument — that Allied was not injured by the failure to transact because "JCT did not propose to pay $244.2 million (or any other amount) to *Allied* between December 2011 and May 2012[338] — overlooks the fundamental nature of a credit bid. As consequence of a successful credit bid, *Allied* would enjoy debt forgiveness in the full amount of face value of the bid.[339]

258.    As Mr. Risius testified, and the Court agrees, Allied's "balance sheet is going to look much different at the end of this process. Their debt is going to be a lot lower. That's their consideration."[340]

259.    Relatedly, while Professor Fischel opined that the JCT Notes that formed part of

---

[338]    13-50530, D.I. 958 (Yucaipa's Trial Brief) at 19.

[339]    *See, e.g.*, *In re Hokulani Square, Inc.*, 776 F.3d 1083, 1085 (9th Cir. 2015) ("[T]he secured creditors exercised their right to credit bid under 11 U.S.C. § 363(k). This means that they used the money the estate owed them, rather than cash, in making their bid. In such a transaction, the creditors get the property, and the estate's debt is reduced by the amount of the bid."); *In re Chrysler LLC*, 576 F.3d 108, 116 (2d Cir. 2009) ("A § 363 sale can often yield the highest price for the assets because the buyer can select the liabilities it will assume and purchase a business with cash flow (or the near prospect of it). Often, a secured creditor can "credit bid," or take an ownership interest in the company by bidding a reduction in the debt the company owes."), *vacated on other grounds sub nom. Ind. State Police Pension Tr. v. Chrysler LLC*, 558 U.S. 1087 (2009).

[340]    3/4/22 a.m. Trial Tr. 49:19-24 (Risius/Cross).

the consideration in the late 2011/spring 2012 Term Sheets would have been worth less than par,[341] this has no impact on the *Estate's* consideration from a successful credit bid: the Estate would have benefited equally from a credit bid of its First Lien debt regardless of the value of the JCT Notes that JCT was offering as part of the consideration to acquire debt in the first step of the transaction. In any event, the Court determines that Mr. Risius' valuation of the JCT Notes is reasonable in light of the fact that they were trading at or above par in widely traded markets.

### *JCT Was Envisioning a Full Credit Bid in Late 2011/Spring 2012*

260.    The Court raised whether, assuming JCT purchased of all the First Lien debt in late 2011/spring 2012, it would have credit bid the full amount of the debt at a subsequent Section 363 Sale.[342]  While it is an academically interesting question, it does not alter the result reached here for at least three reasons.

261.    *First*, it was Yucaipa's burden to establish at Trial that JCT would <u>not</u> have credit bid the full amount of Allied's First Lien Debt.[343]  Yucaipa presented no evidence on this point.

262.    *Second*, the Term Sheets support the conclusion that if JCT *had* acquired First Lien debt during the JCT Negotiations, it was also agreeing to credit bid the full amount at a subsequent Section 363 Sale that required the Company's support.  The relevant term sheets provide that JCT's "363 Sale Purchase Price," would be a "[c]redit bid of <u>all lender claims</u> against Allied under the Credit Agreements."[344]

---

[341]    3/4/22 p.m. Trial Tr. 91:24-92:1 (Fischel/Direct).

[342]    3/4/22 a.m. Trial Tr. 83:10-13 (The Court to Mr. Risius: "Are you assuming that JCT bids a hundred percent of its debt?").

[343]    *See Auriga Cap. Corp. v. Gatz Props.*, 40 A.3d 839, 877 (Del. Ch.), *judgment entered*, No. 4390-CS, 2012 WL 598121 (Del. Ch.), *aff'd*, 59 A.3d 1206 (Del. 2012) ("[Defendant] himself is responsible for the evidentiary uncertainty caused by his own disloyalty").

[344]    *See* Ex. 122 (JCT/Yucaipa Final Term Sheet) at 13 (emphasis added); Ex. 123 (5/10/12 Term Sheet) at 14.

263.    *Third*, there was no evidence presented at trial demonstrating that JCT planned to hold any First Lien debt after it acquired Allied in a Section 363 Sale. Mr. Riggs' testimony suggests the contrary: "***I was not in the debt investing business, I was in the business of running companies …***"[345]

### E.    Yucaipa's Full Claims Are Subject to Equitable Subordination

264.    To support its claim for equitable subordination of Yucaipa's (Estate Claims 1-2 and Lender Claim 1), the Trustee was required to establish: "(i) that there was inequitable conduct; (ii) the inequitable conduct resulted in: (a) injury to the debtor or creditors or (b) created an unfair advantage for the claimant; and (iii) equitable subordination is consistent with the Bankruptcy Code."[346]    The Court has already ruled that the Trustee has "met her burden and produced admissible, undisputed evidence proving that:"

> (i) Yucaipa acted in bad faith in purchasing first lien debt under an invalid Fourth Amendment and assuming Requisite Lender status thereunder; (ii) Yucaipa breached the Third Amendment to the FLCA by failing to provide a substantial capital contribution to Allied at a time that Allied was insolvent, in default of its loans, and needed the capital contribution, (iii) Yucaipa's inequitable conduct resulted in lawsuits and fees that Allied was required to pay at a time when Allied was insolvent, (iv) the conduct described in (i), (ii), and (iii) resulted in injury to Allied or creditors or resulted in the advantage of Yucaipa, and (v) Yucaipa did not conduct itself in good faith and inherent fairness in the above course of actions.[347]

The Court has further ruled that:

> (i) Yucaipa is an insider and fiduciary; (ii) Yucaipa's conduct described in acts (i)–(iii), above, (a) constitute inequitable conduct and (b) injured Allied or Allied's lenders or advantaged Yucaipa; (iii) Yucaipa did not act in good faith in the instances of inequitable conduct described above; and (iv) the Court finds that the type of equitable subordination the Trustee is requesting (debt subordinated to debt)

---

[345]    Dep. Tr. (Riggs) 236:3-6.

[346]    Summary Judgment Opinion at 101 (citing 11 DANIEL R. COQUILLETTE ET AL., MOORE'S FEDERAL PRACTICE § 56.40 (3d ed. 2021)).

[347]    Summary Judgment Opinion at 108-09.

is consistent with the provisions of the Bankruptcy Code.[348]

265.    Given these rulings, what remains to be decided is (i) the determination whether Yucaipa's conduct in the JCT Negotiations or causing Allied to commit events of default under the FLCA are "inequitable acts" within the meaning of 11 U.S.C. § 510(c); (ii) the "degree of injury that Allied or Lenders suffered, or the advantage Yucaipa gained as a result;" and (iii) the "exact extent to which Yucaipa's claims should be subordinated."  (Summary Judgment Opinion at 109).

266.    **Yucaipa's Conduct Was Inequitable.**  In light of the Court's holding that Yucaipa breached its fiduciary duty during the JCT Negotiations, it is axiomatic that Yucaipa's conduct in this context was inequitable.[349]  The voluminous evidence of Yucaipa's misconduct in the course of the JCT Negotiations far exceeds the Trustee's required showing of "'material evidence' of unfair conduct" to establish equitable subordination of an insider like Yucaipa.[350]

267.    The Court further finds that Allied's ongoing default to Lenders under the FLCA are fairly attributed to Yucaipa given its insider status and domination and control of the Company.  Once Yucaipa purported to acquire Requisite Lender status, Yucaipa could cause Allied to breach the FLCA with  impunity.  As the New York Court recognized, in passing the Fourth Amendment, Yucaipa "seiz[ed] control of the Lenders' rights and remedies" under the FLCA so that they had

---

[348]    Summary Judgment Opinion at 109.

[349]    *See, e.g.*, *Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 988-89 (3d Cir. 1998) (affirming holding that breaches of insider's fiduciary duties in failing to act in the best interest of debtor and its creditors demonstrated inequitable conduct warranting equitable subordination); *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 70 (Bankr. D. Del. 2002) (breach of fiduciary duties "generally recognized" as "misconduct which may constitute inequitable conduct for insiders").

[350]    *See In re Winstar Commc'ns, Inc.*, 348 B.R. 234, 284 (Bankr. D. Del. 2005), *aff'd*, Adv. No. 01-01430-KJC, 2007 WL 1232185 (D. Del. Apr. 26, 2007), *aff'd in part, modified in part*, 554 F.3d 382 (3d Cir. 2009).

no recourse to Allied's breaches.[351]  Yucaipa's control over Allied's FLCA compliance — as well

as its indifference to breaches of the FLCA — is evidenced by an internal email from Derex Walker

discussing whether the Company should withhold financial statements to Lenders in spring 2011.

In it, Walker brazenly admitted that withholding the financials would "simply [be] another breach

(one of many) under the credit agreement."[352]  The Court finds Yucaipa's conduct in this regard

was inequitable.

268.   **Injury to Creditors and Advantage Gained by Yucaipa**.  The Court has already

discussed the advantage that Yucaipa gained in late 2011/spring 2012 by falsely claiming Requisite

Lender status in negotiations with JCT, as well as the disadvantageous position that the non-

Yucaipa Lenders were put in as a result.[353]  The JCT Negotiations followed years in which the

non-Yucaipa Lenders had been stripped of protections they had bargained for under the Third

Amendment, including their ability to respond to Allied's years of payment defaults. This was

clearly to their disadvantage and to Yucaipa's benefit.  This condition is satisfied.[354]

269.   **Extent to Which Yucaipa's Claims Should be Subordinated**.  "[F]ull

quantification of harm is not required in every case.  Nor does the burden of providing the evidence

of the amount of harm always fall fully on the proponent of subordination. Rather, once the

---

[351]   *BDCM Opportunity Fund II v. Yucaipa Am. All. Fund I, LP*, No. 650150/2012, 2013 WL
1290394, at *5 (N.Y. Sup. Ct. Mar. 8, 2013) (Ex. 843), *aff'd*, 978 N.Y.S.2d 10 (App. Div. 2013),
*leave to appeal denied*, 8 N.E.3d 849 (N.Y. 2014).

[352]   Ex. 636 (Email from Derex Walker to Ira Tochner dated May 29, 2011).

[353]   *See, e.g.*, Dep. Tr. (Riggs) 237:8-15 ("[I] was under the presumption that [Yucaipa] owned
control of the debt and they owned control of the common stock . . . So there's no reason to work
with anybody but [Yucaipa].").

[354]   *See Citicorp Venture Cap., Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160
F.3d 982, 989 (3d Cir. 1998) (insider with significant equity in the debtor realized an unfair
advantage by surreptitiously purchasing debt post-petition and thus "secur[ing] a position of
influence over the [debtor's] reorganization negotiations").

proponent establishes that the inequitable conduct caused substantial harm to the debtor or its creditors, the burden shifts to the claimant who engaged in the inequitable conduct to demonstrate that the (i) harm caused was discrete in nature and (ii) the court can determine the amount of harm done without undue complication."[355]

270.    Here, Yucaipa fails to meet its burden of proving that its claims should not be fully subordinated to the over $19 billion in claims of Allied's stakeholder constituents represented by the Trustee.[356]  Yucaipa makes no attempt to satisfy its showing that the harm it caused was "discrete" in nature, or that the Court can calculate the amount of harm without "undue complication."  Rather, it advances two legal arguments as to why the Trustee cannot recover on her equitable subordination claims.  Each is unavailing.

271.    *First*, Yucaipa argues that damages for the Trustee's equitable subordination claim would be entirely duplicative of the damages that the Trustee recovered on account of her breach of contract claim and her breach of fiduciary duty claim.  The Court disagrees.  In the years that Yucaipa masqueraded as Requisite Lender, it injured Allied and its creditors in ways that are distinct from its failure to make its required capital contribution in August of 2009 and its squandering of the JCT Negotiations in late 2011/spring 2012.  For example, the non-Yucaipa First Lien Lenders were undoubtedly injured by Yucaipa's seizure of their rights and remedies.  In arguing that these injuries are duplicative, Yucaipa confuses the distinct nature of these damages with the Court's ability to quantify them.[357]  Equitable subordination is designed to address injuries

---

[355]    *In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 72 (Bankr. D. Del. 2002).

[356]    *See* 12-11564, D.I. 3360-1, Amended Plan §§ 5.11(b), 5.14 (Yucaipa is an exception to this recovery waterfall).

[357]     Yucaipa points to Mr. Risius's expert report, in which he calculates damages for Yucaipa's failure to make the required capital contribution and the squandered JCT transaction.  (13-50530, D.I. 958 (Yucaipa's Trial Brief) at 25).  Nowhere in Mr. Risius's report does he purport to calculate damages for *all* of the harm that Allied and the non-Yucaipa First Lien Lenders suffered on account

that are not easily quantified.[358]

272.    *Second*, Yucaipa claims that equitable subordination would allow BD/S to recover many times over the amount of their debt, despite the fact that they had "knowledge of, and after participating in or encouraging, all of the actions that underlie the Trustee's claims."[359]  The Court rejects this argument for several reasons: (i) while the Court awarded the Judgment against Yucaipa on her breach of contract and fraudulent transfer claims over six months ago, she (and, by extension, BD/S) has not recovered on that Judgment which remains unstayed and unsatisfied;[360] (ii) Yucaipa's argument relies on its stricken defenses of unclean hands, waiver, estoppel, consent, and laches, and ratification;[361] (iii) Yucaipa's argument is little more than a resurrection of its previously-rejected "implausible" arguments that BD/S spent years "'lying in wait' for the optimal time to file their equitable subordination claim;"[362] (iv) the Court has already rejected the notion that the timing of *BD/S*' acquisition of First Lien debt has anything to do with the Estate's ability to recover for equitable subordination;[363] (v) BD/S is hardly the only

---

of Yucaipa's inequitable conduct.

[358]    *See In re Mid-Am. Waste Sys., Inc.*, 284 B.R. 53, 72 (Bankr. D. Del. 2002) ("When making a finding as to whether a claimant's inequitable conduct caused harm to the debtor or its creditors, a court need not overlook an injury to those parties merely because such injury is not easily quantified … ."); *In re Winstar Commc'ns, Inc.*, Adv. No. 01-01063-KJC, 2007 WL 1232185, at *4 (D. Del. Apr. 26, 2007) ("[A]lthough a bankruptcy court should identify the nature and extent of the injury to determine the proportionality of the remedy, quantification of harm is not always feasible nor is it required in every case."), *aff'd in part, modified in part*, 554 F.3d 382 (3d Cir. 2009).

[359]    13-50530, D.I. 958 (Yucaipa Trial Brief) at 25.

[360]    The Trustee's earlier settlement of claims against the individual Yucaipa defendants in 2020 has no bearing on her claim for equitable subordination.  That settlement resulted in a recovery from Allied's D&O insurers — not from Yucaipa — on claims that are no longer part of this case.  (*See* FF ¶ 26 n.42).

[361]    *See* PX HHH (13-50530, D.I. 649) at 3 n.14.

[362]    14-50971, D.I. 82-1 (8/21/15 Opinion) at 64-65

[363]    *See* Summary Judgment Opinion at 95 n.269 (holding that Yucaipa's argument as to the

beneficiary that stands to recover under the Litigation Proceeds Waterfall approved by this Court through which even unsecured creditors will recover millions;[364] and (vi) there is nothing inequitable about allowing BD/S to benefit from funding years of litigation which includes years of defending itself from Yucaipa's scorched-earth litigation tactics.

273.    Equity dictates that Yucaipa's actions to "reap[] a substantial benefit" for itself "at the expense of the Debtors' other creditors" not be countenanced.[365]    Full subordination of Yucaipa's holdings is warranted.

### F.    Yucaipa Breached the Implied Covenant of Good Faith and Fair Dealing

274.    Because the Court has concluded above that Yucaipa breached its fiduciary duty, there is no need to reach the Trustee's alternative claim for breach of the implied covenant of good faith and fair dealing (Lender Claim 3).    Nevertheless, for completeness, the Court concludes that Yucaipa also breached the implied covenant, and finds in favor of the Trustee on Lender Claim 3.[366]

275.    As this Court previously held, the FLCA and its amendments are governed by New York law,[367] under which the covenant of good faith and fair dealing is implied in every contract. The covenant "embraces a pledge that 'neither party shall do anything which will have the effect

---

timing of BD/S' acquisition of First Lien debt is irrelevant as to the Estate Claims 1 and 2 because any injury to the Estate occurred independent of when certain lenders held claims.).

[364]    *See* 12-11564, D.I. 3360-1, Amended Plan §§ 5.11(b), 5.14 (Yucaipa is an exception to this recovery waterfall).

[365]    *In re Winstar Commc'ns, Inc.*, 348 B.R. 234, 285 (Bankr. D. Del. 2005), *aff'd*, Adv. No. 01-01063-KJC, 2007 WL 1232185 (D. Del. Apr. 26, 2007), *aff'd in part, modified in part*, 554 F.3d 382 (3d Cir. 2009).

[366]    The Trustee has represented that Estate Claim 7 (Breach of Fiduciary Duty) subsumes Lender Claim 3 (Breach of the Implied Covenant) and that she is not seeking double recovery (*see, e.g.*, 13-50530, D.I. 961 (Trustee's Trial Brief) at 2 n.3).

[367]    Summary Judgment Opinion at 12 n.16.

of destroying or injuring the right of the other party to receive the fruits of the contract.'" *511 W.*

*232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. 2002).  *See also, e.g.*,

*Demetre v. HMS Holdings Corp.*, 7 N.Y.S.3d 110, 111-12 (App. Div. 2015) (reversing dismissal

of implied covenant claim where the complaint alleged that the defendant "in bad faith, engaged

in acts that had the effect of destroying or injuring the plaintiffs' right to 'receive the fruits of the

contract'").

276.    In the context of the rights of lenders in a syndicate, New York courts have long

held that majority lenders owe an implied duty of good faith and fair dealing not to abuse their

contractual rights to achieve an unfair or disproportional recovery compared to minority lenders.

*See Sage v. Cent. R.R. Co.*, 99 U.S. 334, 341 (1878) (majority could not "crush out the rights of

the minority, or subject them to any disadvantage" but rather the agreements between the two

"authorized only such arrangements as would inure equally to the benefit alike of the majority and

the minority").  Here, Yucaipa (albeit in bad faith) held itself out as the majority lender at the

relevant time and thus bears the burden of proving that it acted "in the utmost good faith" toward

the minority lenders (here, BD/S and the other First Lien Lenders).  *Hackettstown Nat'l Bank v.*

*D.G. Yuengling Brewing Co.*, 74 F. 110, 112 (2d Cir. 1896) (a "[c]ommunity of interest, whether

in the case of partners or security holders, creates mutual obligation, and imposes upon all persons

occupying that position the duty of acting in <u>the utmost good faith</u> towards the interests of their

associates") (emphasis added).

277.    Each element of a claim for breach of the implied covenant of good faith and fair

dealing is satisfied here:

278.    **Parties to a binding contract.**  As previously held, the FLCA and the Third

Amendment are valid and binding on Yucaipa and BD/S, along with the other First Lien

95

Lenders.[368]

279.   **Implied promise not contrary to express provision.**   The implied covenant cannot "imply obligations inconsistent with contractual provisions" or "impose … an obligation … that is not found in the contract[]."   *Gottwald v. Sebert*, 148 N.Y.S.3d 37, 47 (App. Div. 2021). This requirement is satisfied here.   There is no inconsistency here with any express provision of the FLCA, because it contains no provision that permits a Lender to masquerade as the Requisite Lender when they are not.   Nor does the FLCA expressly permit Yucaipa, purporting to be Requisite Lender, to act to benefit itself at the expense of BD/S and the other First Lien Lenders.

280.   Yucaipa contends that Lender Claim 3 must fail "because the FLCA does not expressly or impliedly limit any lender's right to retain or assign its debt at any price."[369]   But as discussed above (*see, e.g.*, FF ¶ 114; CL ¶¶198-201), the JCT Negotiations were not for plain vanilla debt trades.   Rather, they were for an acquisition of the Company by a strategic buyer, implicating the rights of the Lenders to recover on their investments under the FLCA.[370]

281.   **No "utmost good faith."**   Yucaipa cannot meet its burden of proving that it acted "in the utmost good faith" with respect to the other First Lien Lenders in the JCT Negotiations.[371] This Court and others have determined as a matter of law that: (i) "Yucaipa acted in bad faith in purchasing first lien debt under an invalid Fourth Amendment and assuming Requisite Lender Status;"[372] (ii) Yucaipa "could never be the Requisite Lender" and (iii) Yucaipa "knew the

---

[368]   Summary Judgment Opinion at 27.
[369]   13-50530, D.I. 958 (Yucaipa's Trial Brief) at 21.

[370]   *See, e.g.*, Dep. Tr. (Ciupitu) 70:1-7 ("Substantively for [JCT], it was an M&A deal.  It was a means to an end.  Structurally and technically … a two-step transaction with a debt trade, but from our perspective in 2011, 2012, the substance was an M&A deal.").

[371]   *Hackettstown Nat'l Bank v. D.G. Yuengling Brewing Co.*, 74 F. 110, 112 (2d Cir. 1896).

[372]   Summary Judgment Opinion at 108; *see also* 2/8/22 Trustee's Motion *in Limine* Tr. at 15:21-23 ("The undisputed facts prove as a matter of law that [Yucaipa] acted in bad faith.

restrictions [in the FLCA] were designed to prevent [this]."[373]  Yucaipa purported to take on

Requisite Lender status in bad faith, and thus acted in bad faith in holding itself out as Requisite

Lender during the JCT Negotiations.  The evidence presented at trial reflects that Yucaipa's

insistence on its Requisite Lender status was a key factor in JCT's decision to offer a premium

price to Yucaipa for its debt, while offering BD/S below par.[374]

282.    **Yucaipa deprived the First Lien Lenders of the benefit of the bargain.**  The

Court finds that Yucaipa acted "in a manner that, although not expressly forbidden by any

contractual provision, would deprive the other party of the right to receive the benefits under their

agreement."  *Just-Irv Sales Inc. v. Air-Tite Bus. Ctr., LLC.*, 655 N.Y.S.2d 131, 132 (App. Div.

1997).

283.    The implied covenant of good faith and fair dealing encompasses "any promises

which a reasonable person in the position of the promise would be justified in understanding were

included."  *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500-01 (N.Y.

2002).  Here, the parties agree that the First Lien Lenders reasonably expected ratable treatment

with respect to their recoveries under the FLCA.  Mr. Deckoff, the principal of Black Diamond,

testified to his belief that the First Lien Lenders should be treated ratably in negotiations with JCT

---

Period.").

[373]    *In re ASHINC Corp.*, 683 F. App'x 131, 139-40 (3d Cir. 2017).

[374]    *See* Dep. Tr. (Riggs) 237:16-238:22 (Riggs' understanding during the JCT Negotiations was that Yucaipa was the Requisite Lender and any package deal for Allied's debt would need Yucaipa to be successful), Dep. Tr. (Riggs) 266:18-24 (JCT's final term sheet to Yucaipa in March 2012 offered "a higher percentage of the face value" than JCT was offering BD/S); Dep. Tr. (Ciuputu) 69:14-21 ("[M]y recollection was we [JCT] looked at this as an M&A deal.  We equated requisite lender position similar to a control[] premium.  So the requisite lender, it made sense to us to placate [Yucaipa] and give them a premium."), Dep. Tr. (Ciuputu) 173:15-175:21 ("[I]t would make sense to work with a requisite lender and offer a requisite lender more than a minority lender. … Q: …Would Jack Cooper have agreed to pay a premium if Yucaipa, in fact, was not a requisite lender? … A: I — I don't believe so.").

for the sale of their Allied debt and JCT's ultimate acquisition of Allied.[375]  Yucaipa's principal Mr. Burkle confirmed that a deal with JCT that was "*pari passu*" among all Lenders is what he considered "fair" and "what I would have done."[376]  As discussed above, the record is clear that Yucaipa never agreed to ratable treatment, despite BD/S's repeated requests.[377]

284.    By falsely — and in bad faith — holding itself out as Requisite Lender throughout the JCT Negotiations and refusing to work with the other First Lien Lenders to achieve an equal and ratable recovery, Yucaipa deprived the First Lien Lenders of the benefits of the FLCA, including the ability to exercise remedies,[378] and, ultimately, of a ratable recovery on their investments from an acquisition of the Company by JCT in late 2011 to 2012, in an amount greater than their actual recovery from the JCT 363 Sale.

285.    Yucaipa also argues that Lender Claim 3 must fail because BD/S obtained certain benefits under the FLCA, and points to statements by BD/S which it contends "show that [they] believed that Yucaipa's conduct as Requisite Lender was benefiting them."[379]  As a threshold matter, this argument implicates reliance on Yucaipa's stricken affirmative defenses of unclean hands, waiver, estoppel, consent, laches, and ratification.[380]  Even putting that aside, however, the

---

[375]    *See* FF ¶¶ 124-25.  *See also* 3/1/22 a.m. Trial Tr. 80:25-81:5 (Deckoff/Direct) ("We [BD/S] thought it should be equal and ratable."), 3/1/22 a.m. Trial Tr. 87:9-13 (Deckoff/Direct) ("[H]ad they made it equal and ratable, … that would have been acceptable."); *see also* Ex. 350 at 2 (3/22/12 letter from BD/S counsel to Allied Board: "We want immediate assurances from the Board of Directors that they will only pursue a transaction or restructuring that provides equal treatment to all creditors").

[376]    3/3/22 a.m. Trial Tr. 10:11-11:22 (Burkle/Adverse Direct) (playing Dep. Tr. (Burkle) 173:8-174:6).  *See also* 3/3/22 a.m. Trial Tr. 24:3-5 (Burkle/Adverse Direct) (testifying that he told Mr. Deckoff that they should "make sure that we both feel that [the JCT deal is] fair").

[377]    *See* FF ¶¶ 154-68.

[378]    *See, e.g.*, FF ¶¶ 62 n.80, 68; Stip. Fact ¶¶ 13, 16.

[379]    *See* 13-50530, D.I. 958 (Yucaipa's Trial Brief) at 23.

[380]    *See* PX HHH (13-50530, D.I. 649) at 3 n.14.

argument is unavailing.  That Yucaipa may have honored some of the obligations of the Requisite Lender under the FLCA does not negate the fact that it breached the FLCA in numerous other ways,[381] or that it breached the implied covenant through its bad faith conduct during the JCT Negotiations.  "The implied covenant emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party … ."  22A N.Y. JUR.2D *Contracts* § 423 (2022).  The Lenders' common purpose in entering into the FLCA was to receive a return on their investments,[382] and, as explained above, their "justified expectation" was that this return would be apportioned ratably.  This fundamental expectation was thwarted, and the First Lien Lenders deprived of the benefit of their agreement, by Yucaipa improperly and in bad faith holding itself out as Requisite Lender during the JCT Negotiations.

286.    Moreover, Yucaipa misrepresents the BD/S statements it relies on as supposedly reflecting BD/S's support of Yucaipa as Requisite Lender.[383]  Mr. Deckoff testified that the Yucaipa "strategy" he was voicing support of in Ex. 656 was Yucaipa's "strategy regarding the OEMs and the union," not Yucaipa's improper assumption of the title of Requisite Lender and use of that title to extract disproportionate value for itself in the JCT Negotiations at the expense of the other First Lien Lenders.[384]  Similarly, Exs. 249 and 251 are internal Spectrum memos

---

[381]    *See, e.g.*, Summary Judgment Opinion at 26-33 (Yucaipa liable for breach of FLCA for failing to make required capital contribution); Ex. 636 (Email from Derex Walker dated May 29, 2011) (acknowledging that having Allied not issue a required monthly report to the Lenders would "simply [be] another breach (one of many) under the credit agreement.").

[382]    *See, e.g.*, 3/1/22 p.m. Trial Tr. 22:20-25 (Deckoff/Cross) (Q: "[W]hen we [Black Diamond] make an investment, whether it's debt or equity, we want to make a return that's positive."); 3/2/22 p.m. Trial Tr. 27:11-28:14 (Tochner/Friendly Cross) (describing Yucaipa's investment strategy for Allied as making Allied profitable so opportunities to sell Yucaipa's interest "would be available").

[383]    *See* 13-50530, D.I. 958 (Yucaipa's Trial Brief) at 23 (citing Exs. 656, 249, and 251).

[384]    3/1/22 p.m. Trial Tr. 63:25-64:18 (Deckoff/Cross), *see also* /1/22 p.m. Trial Tr. 92:13-18 Deckoff/Cross) ("I was supportive of what he [Ron Burkle] was trying to do with the unions and

regarding Allied dated well before the relevant JCT Negotiations (December 31, 2009, and May 31, 2010, respectively).  None of this evidence precludes Yucaipa's liability on Lender Claim 3, or the Trustee's ability to recover.

287.    **Damages.**    Finally, the First Lien Lenders suffered damages resulting from Yucaipa's breach.  As this Court has previously held, under New York law, once breach of a contract is established, mathematical precision is unnecessary to recover damages.[385]  To prove damages, a "plaintiff need only show a stable foundation for a reasonable estimate' of the damage incurred as a result of the breach," and there must be certainty only as to the "fact of damage, not the amount."[386]  Once again, "[t]he burden of uncertainty as to the amount of damage is upon the wrongdoer."[387]

288.    The Court finds that the Trustee has shown a "'stable foundation for a reasonable estimate' of the damage" BD/S and the other First Lien Lenders suffered in connection with Lender Claim 3.[388]  As discussed above, the Trustee's expert Mr. Risius has reasonably estimated the value of a JCT transaction that could have been had in late 2011 to early 2012, but for Yucaipa's bad

---

the OEMs.").

[385]    Summary Judgment Opinion at 31.

[386]    *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110-11 (2d Cir. 2007).

[387]    *Queens Ballpark Co. v. Vysk Commc'ns*, 226 F. Supp. 3d 254, 259 (S.D.N.Y. 2016) (citations omitted).  *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) ("For 'when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach. A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he has caused is uncertain.'") (footnote omitted) (quoting *Wakeman v. Wheeler & Wilson Mfg. Co.*, 4 N.E. 264, 266 (1886)).  *See also Entis v. Atl. Wire & Cable Corp.*, 335 F.2d 759, 763 (2d Cir. 1964) ("Such an estimate [of damages] necessarily requires some improvisation, and the party who has caused the loss may not insist on theoretical perfection." (citations omitted).

[388]    *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110-11 (2d Cir. 2007).

faith conduct.  Mr. Risius has calculated the difference between that lost, 'but for' transaction and the actual proceeds of the JCT 363 Sale to the non-Yucaipa First Lien Lenders as $72,176,000.00.[389]

289.    The Court also accepts Mr. Risius' assumption that the JCT Notes that formed part of the consideration in the late 2011/spring 2012 term sheets should be valued at par.  Mr. Risius' opinion is based on contemporaneous market data regarding the trading price of JCT's existing notes.[390]  In response, Yucaipa fails to offer an alternative for what the JCT Notes would have been worth, which was its burden to do.  Instead, Professor Fischel simply opined that they would have been worth less than par in light of JCT's existing debt load.[391]  However, Professor Fischel's opinion is incomplete and the Court declines to accept it.[392]

290.    In addition to her damages, the Trustee is entitled to prejudgment interest accruing at the 9% statutory rate under New York law, running from the date of the breach.[393]

## CONCLUSION

For the reasons set forth above, the Court hereby finds in favor of the Trustee on the Remaining Claims.  In connection with Estate Claim 7 (Breach of Fiduciary Duty Against

---

[389]    *See* Ex. 832 (Risius Report) at ¶¶ 134-44.

[390]    *See* 3/4/22 a.m. Trial Tr. 102:12-16 (Risius/Cross).

[391]    *See* 3/4/22 p.m. Trial Tr. 93:3-94:5 (Fischel/Direct).

[392]    Among other things, Professor Fischel failed to consider what the price of newly issued JCT Notes would be in late 2011/spring 2012 given that the notes would be supported by a combined JCT-Allied entity.  As the Court noted at Trial, such an analysis would require multiple assumptions, none of which Professor Fischel considered as part of his analysis.  (*See* 3/4/22 p.m. Trial Tr. 100:3-25 (Fischel/Direct)).

[393]    *See, e.g.*, *Polk Lending 33, LLC v. THL Corp. Fin., Inc. (In re Aerogroup Int'l, Inc.)*, 601 B.R. 571, 598 & n.191 (Bankr. D. Del. 2019) (Under New York law, "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of a contract."), *motion to certify appeal denied*, Bankr. No. 17-11962 (CSS), 2020 WL 757892 (D. Del. Feb. 14, 2020), and *aff'd*, 620 B.R. 517 (D. Del. 2020).

Yucaipa) the Court will enter a judgment for damages of $158,596,00.00 plus pre-judgment interest which reflects the lost JCT transaction less the JCT 363 Sale proceeds.[394]  In connection with Estate Claim 1 / Lender Claim 1 for Equitable Subordination, the Court will enter a judgment equitably subordinating 100% of Yucaipa's Allied debt holdings.  With respect to Lender Claim 3 (Breach of the Implied Covenant of Good Faith and Fair Dealing), this Court finds Yucaipa liable but does not award damages which are subsumed in the Trustee's recovery for Estate Claim 7.

_____
Christopher S. Sontchi
United States Bankruptcy Judge

Dated: _____, 2022

---

[394]    The Trustee shall provide the Court with an updated calculation of pre-judgment interest within 3 business days of entry of this decision together with a proposed Judgment consistent with this decision.

RESPECTFULLY PROPOSED AND SUBMITTED

Dated April 21, 2022

**FOX ROTHSCHILD LLP**

By:      */s/ Seth A. Niederman*
Seth A. Niederman (DE Bar No. 4588)
Citizens Bank Center
919 N. Market Street, Suite 300
Wilmington, DE 19801
Telephone: (302) 654-7444
Fax: (302) 656-8920
sniederman@foxrothschild.com

            -and-

**JOSEPH HAGE AARONSON LLC**

Gregory P. Joseph
Gila S. Singer
485 Lexington Avenue, 30th Floor
New York, NY 10017
Telephone: (212) 407-1200
gjoseph@jhany.com

            -and-

**ZAIGER LLC**

Jeffrey H. Zaiger
Judd A. Lindenfeld
2187 Atlantic Street, 9th Floor
Stamford, CT 06902
Telephone: (917) 572-7701
jzaiger@zaigerllc.com

            -and-

**COHEN AND GRESSER LLP**

Douglas J. Pepe
800 Third Avenue
New York, NY 10022
Telephone: (212) 957-7605
dpepe@cohengresser.com

*Counsel for the Litigation Trustee and Plan Administrator*

103